UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 11-20427-JORDAN

DISNEY ENTERPRISES, INC., TWENTIETH
CENTURY FOX FILM CORPORATION,
UNIVERSAL CITY STUDIOS PRODUCTIONS
LLLP, COLUMBIA PICTURES INDUSTRIES, INC.,
and WARNER BROS. ENTERTAINMENT INC.,

     *Plaintiffs*,

v.

HOTFILE CORP., ANTON TITOV, and
DOES 1-10.

     *Defendants*.                                /

## MOTION AND MEMORANDUM OF LAW OF DEFENDANTS HOTFILE CORPORATION AND ANTON TITOV TO DISMISS PLAINTIFFS' COMPLAINT

### MOTION

     Pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, Defendants Hotfile Corporation ("Hotfile") and Anton Titov seek an order dismissing the Complaint on the grounds that Plaintiffs fail to assert facts constituting any claim upon which relief can be granted.

### MEMORANDUM OF LAW

## I.    INTRODUCTION

     Plaintiffs' ("the Studios'") Complaint alleges that Hotfile, a web-hosting service, and Mr. Titov, in his capacity as the "guiding spirit" of Hotfile, are liable for direct and indirect copyright infringement. Though long on hyperbole, the Studios' factual allegations fall far short of the legal mark. They fail to state any claims for copyright infringement upon which relief can be granted and should accordingly be dismissed.

     The Studios fail to state a claim for "direct infringement" (Count I) because they do not – as copyright law requires – allege that Hotfile itself engaged in volitional copying or any other volitional act of infringement of the copyright owners' exclusive rights under the Copyright Act.

Instead, they allege that Hotfile's "entire business model" is to facilitate infringement by *others* (e.g., its users), which could only support a claim – if any exists – for secondary infringement.

Count II – which alleges "secondary infringement" under theories of "active inducement," "contributory infringement," and "vicarious infringement" – is also facially deficient. The Studios do not allege the requisite "clear expression" or "affirmative steps" showing that Hotfile has the specific intent to promote infringement.

The Studios' "contributory infringement" count – that Hotfile had general knowledge of "massive infringement" on its systems makes it a contributory infringer – effectively rehashes the argument that they lost in the Supreme Court in *Sony* in an attempt to stop technological advances in copying equipment (i.e., consumers' use of Betamax or VCRs). The Court recently in *Grokster* reaffirmed that under its *Sony* decision, the interests of "vigorous commerce" weigh in favor of not imputing intent to induce infringement where a product is "capable of substantial non-infringing uses," which is not the case here. (*See* Part V.B, *infra*.) While courts will find contributory infringement if a web host has actual knowledge of *specific infringing content* and fails to take simple measures to remove it, the Studios make no such allegation here.

The Studios' vicarious liability theory fails because they do not allege facts to show that Hotfile has the "practical ability" to itself supervise or police infringement among the millions of files that it hosts. Without concrete factual allegations supporting this element, this Count is a bare recitation of elements of vicarious liability and fails to state a claim under *Twombly*.

Finally, the Studios' claim against Mr. Titov is premised on the identical alleged acts underlying Hotfile's purported liability and fails to state a claim for the same reasons. Further, as to Mr. Titov, the complaint is even more attenuated, because the Studios merely make boilerplate recitations of legal elements for individual liability and fail to allege Mr. Titov's personal involvement in any acts of infringement. Accordingly, Mr. Titov should be dismissed on independent grounds. As explained below, the Complaint should be dismissed in its entirety.

## II.    ALLEGATIONS OF THE COMPLAINT

### A.    The Studios Allege That Hotfile Hosts "Popular" Files Posted By Users.

The Studios' Complaint for copyright infringement alleges that Hotfile is engaged in infringement on a "massive scale." (¶ 2.)[1] The recurring theme is that Hotfile encourages its

---

[1] References to paragraphs of the Complaint are in the form "¶ __."

users to upload and download popular files to and from its servers, and these user files include some of the Studios' copyrighted content.  The Studios allege that Hotfile "profits handsomely" for its hosting services by charging users a monthly fee for high speed access to its servers.  This, the Studios allege, is Hotfile's "entire business model."  (¶ 3.)  The Studios allege that Hotfile especially encourages uploading of "popular" files by paying users who upload files that end up being downloaded the most. (¶ 4.)  But being popular does not equate with being copyrighted, and the Studios concede that Hotfile can be used by consumers "only to store files."  *Id*.

The Complaint asserts that there are "millions" of files uploaded to the Hotfile servers. (¶ 20.)  But the Studios admit that Hotfile offers no "search box," and that instead "third-party pirate link sites" (i.e. sites other than Hotfile) host and organize links to Hotfile's content.  (¶ 22.) The Studios do not allege that they have attempted to sue these "pirate link sites" or that any such sites are controlled by Hotfile.  The Studios allege that Hotfile also provides "hotlinks" that can be embedded on third-party websites.  When clicked, these allow a user to obtain the underlying file without having to visit the Hotfile website.  (¶ 26.) The Studios further allege that Hotfile offers a "referral" program that rewards website operators when their users purchase Hotfile subscriptions.  (¶ 35.)  That is the sum and substance of the infringement allegations.

### B.   The Complaint Concedes that Hotfile Takes Measures To Combat Infringement.

Conspicuously absent from the Complaint is any allegation that Hotfile has failed to take down promptly offending files when Hotfile has received notices identifying them or otherwise fails to comply with the safe harbor provisions of the Digital Millennium Copyright Act ("DMCA") (17 U.S.C. § 512).  To the contrary, the Studios' admit they are able to send (and, indeed, allege that they have sent) takedown notices for infringing files.  (¶ 37.)  And the Complaint admits that Hotfile blocks access to specifically-identified copyrighted works.  (¶ 38.) The Studios acknowledge that Hotfile "legally reserves the right" to block such access and to terminate infringer users under its posted Terms of Service.  (¶ 23.)  They attach, however, selected excerpts from the hotfile.com website, not the cited Terms of Service itself.  But they do include a "frequently asked questions" page that confirms Hotfile's strict takedown policy:

> Q: My files disappear?
> A: Most probably we received complain[t] from the copyright owner or other authority and thus remove[d] your files.

(Complaint, Ex. B.)

The Studios do not deny that Hotfile scrupulously complies with the DMCA safe harbor provisions. They nonetheless complain that they are "left to play catch-up" because of the "scale" and "speed" of users' alleged infringement. (*Id.*) They further allege that Hotfile permits users to make multiple copies of uploaded works on its servers and that Hotfile could mitigate infringement by password protection, keyword filtering, or fingerprinting. (¶ 32, 40-41.) But in attempting to omit the complete facts that establish Hotfile's safe harbor affirmative defense, the Studios have failed to sufficiently allege copyright infringement liability.

The Complaint contains two counts, one for direct and the other for secondary infringement. (¶¶ 46-69.) The Studios have set forth three theories of secondary liability: active inducement, contributory infringement and vicarious infringement. For the reasons set forth below, none of these allegations state a claim for relief against either Hotfile or Mr. Titov.

### C.     The Studios' Allegations Against Mr. Titov.

In addition to Hotfile, Plaintiffs sued Anton Titov, whom they identify as Hotfile's manager and/or operator and the President and sole officer and shareholder of non-party Lemuria Communications, Inc. ("Lemuria"), which provides hosting services for Hotfile.com. (¶¶ 10-11, 45.) The sum of the Studios' specific and independent factual allegations against Mr. Titov, repeated throughout the Complaint, are that:

- Mr. Titov acts as Hotfile's manager. (¶ 10.)
- Mr. Titov operates and is the President and sole officer and director of Lemuria, Hotfile's hosting provider. Compl. (¶¶ 12, 45.)

Plaintiffs also allege in conclusory fashion that Mr. Titov "personally directed and participated in, exercised control over, and benefited from" certain alleged activities of Hotfile.[2] The lone allegation of conduct specific to Mr. Titov is that he allegedly "paid at least some of Hotfile's uploading users." (¶ 45.) Otherwise, Plaintiffs merely recite boilerplate elements of so-called "guiding spirit" liability—that Mr. Titov is jointly and severally liable for Hotfile Corp.'s alleged

---

[2] Those alleged activities of Hotfile are:
- "[A]doption of a business plan dependent upon massive copyright infringement,"
- "[D]esign and implementation of technical features to frustrate copyright owner enforcement efforts,"
- "[I]mplementation of technical features to frustrate copyright owner enforcement efforts," and
- "Hotfile's refusal to implement any of the readily available technologies to mitigate the infringement." (¶ 45.)

infringement "because he personally directed and participated in, and benefited from, Hotfile Corp.'s infringing conduct as alleged herein, and has been the guiding spirit behind and central figure in Hotfile Corp.'s infringing activities." (¶¶ 51, 63.)

## III.   LEGAL STANDARD

A motion to dismiss under Rule 12(b)(6) tests the legal sufficiency of the claims asserted. Fed. R. Civ. P. 12(b)(6).  Dismissal is proper if the facts, as pleaded, do not support a claim for relief.  *Sinaltrainal v. Coca-Cola Co.,* 578 F.3d 1252, 1260 (11th Cir. 2009).  In order to survive a dismissal motion, a plaintiff must allege facts that are enough to raise his/her right to relief "above the speculative level.… it is a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief [which] requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do.'"  *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 554-55, 127 S. Ct. 1955, 1964-65 (2007); *Ashcroft v. Iqbal,* 556 U.S. __,129 S. Ct. 1937, 1920 1950, 173 L. Ed. 2d 868, 884 (2009) ("[T]he tenet that a court must accept a complaint's allegations as true is inapplicable to threadbare recitals of a cause of action's elements, supported by mere conclusory statements."); *Oxford Asset Mgmt., Ltd. v. Jaharis,* 297 F.3d 1182, 1188 (11th Cir. 2002); *Sinaltrainal*, 578 F.3d at 1260.

The pleadings must contain "enough factual matter … to raise a reasonable expectation that discovery will reveal evidence of" the alleged wrongdoing.  *Bell Atlantic Corp.*, 550 U.S. at 556 (2007).  The Studios cannot avoid dismissal by claiming a mere possibility of an "entitlement to relief."  *Id.*  Instead, a plaintiff must plead specific facts sufficient to demonstrate a claim's "plausibility."  *Id.* at 558.

## IV.   THE COMPLAINT DOES NOT STATE A CLAIM FOR "DIRECT INFRINGEMENT" BECAUSE IT ALLEGES "VOLITIONAL ACTS" OF INFRINGEMENT BY USERS, NOT HOTFILE.

The Studios' direct copyright infringement claim (Count I) fails because it alleges that Hotfile provides a hosting service used by *others* – i.e. "users" – to infringe, rather than alleging Hotfile itself is selecting and instigating unauthorized copying of particular files.  Alleging infringement by others, and that a defendant is an "enabler," is quintessentially not direct infringement under well-settled copyright authority.

To state a claim for direct, as opposed to contributory infringement, the plaintiff must allege an affirmative, ***volitional*** act of copying by the defendant.  In the seminal case of *Religious Tech. Ctr. v. Netcom On-Line Comm. Svcs., Inc.*, 907 F. Supp. 1361, 1369-70 (N.D.

Cal. 1995), the defendant ISP, Netcom, merely provided servers that provided the means to copy, distribute, or display plaintiff's works, in the same manner that the owner of a public copying machine would provide the means for a third party to copy protected material. *Id*. at 1369. Netcom did not initiate the copying or instigate the distribution of the work. *Id*. at 1370-72. The automatic nature of Netcom's servers precluded plaintiff's claim for direct infringement. *Id*. The court held that "[a]lthough some of the people using the machine may directly infringe copyrights, courts analyze the machine owner's liability under the rubric of contributory infringement, ***not direct infringement***." *Id*. at 1369 (emphasis added).

The volitional action requirement established in *Netcom* —and its application in the internet context – has been widely followed across the nation and is now established law. *See e.g.*, *CoStar, Inc. v. LoopNet, Inc.*, 373 F.3d 544, 555 (4th Cir. 2004) ("Agreeing with the analysis in *Netcom*, we hold that the automatic copying, storage, and transmission of copyrighted materials, when instigated by others, does not render an ISP strictly liable for copyright infringement under §§ 501 and 106 of the Copyright Act."); *Marobie-FL, Inc. v. National Ass'n of Fire Equip. Distrib.*, 983 F. Supp. 1167, 1178 (N.D. Ill. 1997) ("Northwest only provided the means to copy, distribute or display plaintiff's works…[and] did not actually engage in any of these activities itself. Accordingly, Northwest may not be held liable for direct infringement."); *Parker v. Google, Inc.*, 422 F. Supp. 2d 492, 497 (E.D. Pa. 2006) ("It is clear that Google's automatic archiving of USENET postings and excerpting of websites in its results to users' search queries do not include the necessary volitional element to constitute direct copyright infringement."); *Metal Morphosis, Inc. v. Acorn Media Publ'g., Inc.,* 639 F. Supp. 2d 1367, 1372 (N.D. Ga. 2009) ("internet service providers or search engines are absolved from liability when illegally copied works pass through their sites").

In *Cartoon Network LP, LLLP v. CSC Holdings, Inc.*, 536 F.3d 121 (2nd Cir. 2008) the Second Circuit applied *Netcom's* holding to the realm of "Remote Storage Digital Video Recorder" systems that Cablevision sought to distribute.[3]  The court wrote, "[w]hen there is a dispute as to the author of an allegedly infringing instance of reproduction, *Netcom* and its progeny direct our attention to the volitional conduct that causes the copy to be made." *Id*. at

---

[3] A "Remote Storage Digital Video Recorder" is a system similar to a Digital Video Recorder ("DVR")," but it resides at the cable company rather than at the consumer's home.

131.  The court held that there were only two potential volitional elements in the Cablevision system – Cablevision's "designing, housing, and maintaining a system that exists only to produce a copy" and "a customer's conduct in ordering that system to produce a copy of a specific program." *Id*.  The court, analogizing to the realm of VCRs, held that like the user who by pressing the record button on the VCR supplies the volitional element of copying, the Cablevision customer who actually operates and uses Cablevision's remote video recording system supplies the volitional element necessary for direct infringement, not Cablevision.  There was no basis "to impose liability as a direct infringer on a different party for copies that are made automatically upon that customer's command." *Id.*

Under this controlling authority requiring a volitional act of copying for "direct infringement" – not just providing a system that enables it – the Studios fail to state a viable claim against Hotfile for direct infringement.  The Studios merely allege that Hotfile, like Netcom and Cablevision, provides systems, i.e., computer servers, that facilitate copying by users, not that Hotfile itself is volitionally copying.

The Studios aver that Hotfile "encourages its **users** to upload content to Hotfile's on commercial grade servers and that it "host[s] millions of copies of files."  ( ¶ 20.) (emphasis added).  "Hosting" is a staple web service that by definition permits Internet *users* to post and download content.  *See e.g., CoStar Group, Inc. v. LoopNet, Inc.*, 373 F. 3d at 547 (4th Cir. 2004) ("web *hosting* service that enables *users* who wish to display real estate over the Internet to *post* listings for those properties on LoopNet's web site.") (emphasis added); *Doe v. GTE Corp.*, 347 F. 3d 655  (7th Cir. 2003) ("usual package of services that ***enables someone to publish a web site"*** includes network connection and "storage space on a server"); *Perfect 10, Inc. v. CCBill LLC*, 488 F.3d 1102, 1108 (9th Cir. 2007) ("webhosting and related Internet connectivity services [provided] to the owners of various websites" included power to server and connection to the Internet); *see also, Marobie-FL, Inc.* 983 F. Supp. at 1171.  Web hosting of files is an integral part of the Internet infrastructure – that is why the DMCA provides "safe harbors" to internet service providers from any monetary liability arising from "information residing on systems or networks at direction of users."  17 U.S.C. § 512(c).

Pervasive allegations of the Complaint confirm that the Studios' claims is that Hotfile enables ***users*** to post and download infringing content but nothing plausibly suggesting that Hotfile itself is doing the posting: "Any **user** who has the URL link can access and download the

associated content from Hotfile's servers." (¶ 21.) (emph. added). The words "user" or "users" appear in the complaint *108* times. Indeed, the Studios allege that this provision of hosting services to "users" is Hotfile's "*entire business model*." *Id.* (*See also*, e.g., ¶¶ 1, (online hub), 2 ("encourage their users," "anyone clicking the 'link' can download").) This sole focus on the acts of the user in the Studios' complaint precludes the claim "direct" infringement by Hotfile.

Even if Hotfile did encourage the uploading of "popular" content, as alleged, that does not equate to encouraging copyright infringement. There is plenty of "popular" content being distributed on the Internet that is not infringing at all. This includes music and videos. *See UMG Recordings, Inc. v. Veoh Networks, Inc.,* 665 F. Supp. 2d 1099, 1101, 1109 (C.D. Cal. 2009) (authorized content included videos from SonyBMG, ABC, CBS, ESPN, Viacom, and Warner Television); *id*. at n. 13 (popular band signed by Universal uploading content to Veoh); *IO Group, Inc. v. Veoh Networks, Inc.*, 586 F. Supp. 2d 1132, (N.D. Cal. 2008) ("Since its website launch in February 2006, users have uploaded and shared hundreds of thousands of videos on Veoh. Veoh says that it has received notices of alleged copyright infringement with respect to less than seven percent of those videos."); *Lenz v. Universal Music Corp.*, 572 F. Supp. 2d 1150 (N.D. Cal. 2008) (video of child dancing to famous song by Prince, a likely fair use, viewed over half a million times). Such "popular" authorized content also includes public domain movies and open source software. *See also, Online Policy Group v. Diebold, Inc.*, 337 F. Supp. 2d 1195 (N.D. Cal. 2004) (portions of email archive posted on the Internet were fair use). Indeed, the purpose of the DMCA – which is not the subject of the instant motion but which Hotfile believes will provide a complete defense should this matter progress beyond the pleading stage – was to "facilitate making available quickly and conveniently via the Internet the movies, music, software, and literary works that are the fruit of American creative genius." *Viacom v. YouTube*, 718 F. Supp. 2d 514, 519 (S.D.N.Y. 2010).

The conclusory allegation that "[t]hese unauthorized copies are not made by or at the request of Hotfile users, but rather through the decisions and actions of Hotfile Corp., for its own business purposes" (¶ 50) is directly contradicted by the specific factual allegations summarized above that users in fact decide what to upload and download from Hotfile. It is a transparent attempt to get around a motion to dismiss by pleading bare legal elements. Such a conclusory recitation, bereft of supporting facts, fails the *Twombly* standard. *Bell Atlantic Corp.*, 127 S. Ct. at 1974 (requiring "enough facts to state a claim to relief that is plausible on its face," such that

Plaintiff "nudge[s] their claims across the line from conceivable to plausible."). The Complaint alleges that Hotfile provides hosting services for users, and its users are the ones who decide what to upload and download.  This fundamentally and repeatedly undermines the direct infringement claim.  The Studios' inescapable averments are that Hotfile hosts, while users upload and download.  The direct infringement claim is doomed by the allegation that this is Hotfile's "***entire business model***."  (¶ 3.)  Count I should accordingly be dismissed. [4]

## V.    THE STUDIOS' "SECONDARY INFRINGEMENT" COUNT ALSO FAILS TO STATE A CLAIM AGAINST HOTFILE FOR INFRINGEMENT

The Studios' claim for secondary infringement is based on three theories: active inducement (¶ 60), contributory infringement (¶ 61), and vicarious infringement (¶ 62).  The Studios fail to state a claim for relief under any of these theories.

### A.    The Studios Fail To State A Claim For Active Inducement Liability Because They Have Not Alleged Facts That Satisfy *Grokster's* Specific Intent Standard.

In *Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.,* 545 U.S. 913 (2005) ("*Grokster*"), the defining case for the active inducement branch of contributory copyright infringement liability, the Supreme Court held that "[o]ne who distributes a device with the object of promoting its use to infringe copyright, as shown by *clear expression* or other *affirmative steps*,… is liable for the resulting acts of infringement by third parties." *Id.* at 936-37 (emphasis added).  This is a specific intent standard.  *See id.* at 962-963 (Breyer, J., concurring) ("As today's opinion makes clear, a copyright holder may proceed against a technology provider where a provable specific intent to infringe (of the kind the Court describes) is present.").  The salient facts in *Grokster* were that:

- Grokster and its co-defendants, through their peer-to-peer file sharing architecture permitted "staggering" infringement by allowing a user to search all of the millions of other users' computers for infringing content files.  *Id.* at 921-923.  Their system thus permitted free infringement on demand.

---

[4] *Arista Records LLC v. Usenet. com, Inc.*, 633 F. Supp. 2d 124, 149 (S.D.N.Y. 2009) is distinguishable because there the Defendants engaged in a process of "human review." Relying on *Playboy Enters., Inc. v. Russ Hardenburgh, Inc.*, 982 F. Supp. 503 (N.D. Ohio 1997), where the court emphasized that "employees viewed all files in the upload file and moved them into the generally available files for subscribers," the Court found direct infringement.  Here the Studios do not (and could not) allege there is a process of human review by Hotfile.  No such review is or could be made.

- Through their advertising and solicitation of the system, they had "clearly voiced the objective that recipients use it to download copyrighted works" including expressing the intent to satisfy the known market for copyright infringement comprising former Napster customers.  They in fact distributed the software over the Napster network. *Id.* at 924, 927, 939-40.
- Grokster "never blocked anyone from continuing to use its software to share copyrighted files."  *Id.* at 926.  The "evidence of unlawful objective [wa]s given added significance by MGM's showing that neither company attempted to develop filtering tools or other mechanisms to diminish the infringing activity using their software."  *Id.* at 939.
- "[T]he business models employed by Grokster and StreamCast confirm that their principal object was use of their software to download copyrighted works. Grokster and StreamCast receive no revenue from users…."  *Id.* at 926.  The business model of these companies relied on advertising that was directly tied to the use of their software, meaning that they were commercially driven to exploit high volume use in order to make money.  *Grokster*, 545 U.S. at 939-940.

The allegations in the Complaint lack ***all*** of these characteristics. In stark contrast to *Grokster*, the Studios have not alleged facts constituting "clear expression" or "other affirmative steps" to establish specific intent.  Indeed, when stripped of their rhetoric, the allegations are entirely consistent with Hotfile being a *bona fide* web hosting service.  Like in *Twombly*, "plaintiffs here have not nudged their claims across the line from conceivable to plausible."  *Bell Atl. Corp.*, 550 U.S. at 569.  They have not even come close.

       1.      The Studios Allege No Clear Expression by Hotfile to Induce Infringement by its Users.

Since it was decided, *Grokster* has been consistently applied only where there was an egregiously "clear expression" of an intent to induce infringement.  For example, the oft-cited (by the Studios) but unpublished *Fung* case involved a "file-sharing" network that was "an evolutionary modification of traditional 'peer-to-peer' sharing sites such as Napster and Grokster." *Columbia Pictures Indus., Inc. v. Fung*, No. CV 06-5578 SVW (JCX), 2009 WL 6355911, at *2 (C.D. Cal. Dec. 21, 2009) ("*Fung*").  Fung had made numerous blatant expressions of an intent to infringe including publicly stating: "they accuse us for [sic] thieves, and they r [sic] right."  *Id*. at *5.  *Arista Records LLC v. Usenet.com, Inc.*, 633 F. Supp. 2d 124, 152-53 (S.D.N.Y. 2009) ("*Usenet.com*"). involved a company whose employee had stated "Usenet is full of Music and Movies so get your pirate on!"  *Arista Records LLC v. Lime Group LLC*, 715 F. Supp. 2d 481, 495-96, 510-12 (S.D.N.Y. 2010) ("*Limewire*") (advertising "Napster Independence Day" promotion).  And in *Grokster* itself, the Court identified numerous

expressions by the defendants of their intent to go after the Napster market, even going so far as to affirmatively respond to requests for help from customers in locating and playing copyrighted material.  *Grokster*, 545 U.S. at 938.

By contrast, here, the Complaint contains *no* allegation of *any* actual expression – much less a *clear* expression – of intent by Hotfile to induce infringement. The allegation that Hotfile states it rewards "good promoters" as opposed to those "that mainly use the free Hotfile resources for storage," (¶ 4), does not suggest an intent to induce infringement.  At most it shows an intent to reward users who publicize the materials they upload instead of merely using the service for personal storage (such as backups).  This statement applies to appealing content irrespective of whether it is infringing or not.  So it requires a substantial inferential leap for the Studios to suggest this offer of a "reward" is intended to promote infringement.  And it is a leap too far.  Furthermore, it requires overlooking the admitted and alleged fact that Hotfile promptly blocks access to specifically identified copyrighted works in compliance with the DMCA safe harbor provisions. (¶ 38; *see also*, Complaint Ex. B (missing files were likely taken down in response to notice from "copyright owner").)  This statement is in stark contrast to Grokster's marketing campaign to former Napster users, Fung's admission that he was a thief, or Usenet.com's invitation to "get your pirate on!"

> 2.      The Studios Do Not Allege "Other Affirmative Steps" That Support An Intent To Induce Infringement Under Grokster.

In the absence of allegations that Hotfile clearly expressed an intent to induce infringement, the Studios rely on strained inferences and innuendo based on Hotfile's business model to try to cobble together an active inducement claim.  The Studios' allegations, however, simply do not constitute "other affirmative acts" showing an intent to induce infringement as described in the *Grokster* opinion.  If anything, the Studios' factual allegations, when stripped of their rhetorical flourishes, show the opposite.  They are certainly at least **consistent** with actions of a legitimate hosting service.  *See Bell Atlantic Corp.*, 127 S. Ct. at 1964 (not enough to allege facts "consistent with conspiracy" which are "just as much in line with a wide swath of rational and competitive business strategy…").

*The Studios Concede That Hotfile Responds to Takedown Notices.*  As a DMCA safe harbored service provider, Hotfile takedowns specifically identified infringing links, a fact the Studios concede.  (¶¶ 37-38.)  They also admit that Hotfile "legally reserves the right" to block access to works identified in takedown notices and to terminate infringing users under its posted

Terms of Service. (¶ 23.) There can be no plausible inference of an intent to infringe when a company takes pains to comply with the DMCA and content owner takedown requests. In contrast, Grokster and its co-defendants never blocked infringement through filtering or takedown notices. *Grokster* at 927, 939; *see also id*. at 922 (designed without central way to block files). Here, there is no allegation that Hotfile fails to respond expeditiously to takedown notices or that it does not filter content. This is incompatible with the Studios' active inducement theory.

*Contrary to Grokster, the Studios allege the absence of a search box, and then draw the puzzling inference that this shows inducement.* A key fact in much of the relevant case law is that the defendants have a search box allowing users to search for copyrighted material. Indeed, Grokster allowed free infringement on demand through its search box, and so did Fung, Usenet.com and LimeWire. *Grokster* at 921-22; *Fung* at *2 ("provide[d] users the ability to search for and download BitTorrent files..."); *Usenet.com* at 155 ("To use their service to download content, subscribers must connect to one of those servers; once connected, subscribers may search through newsgroups by header or they may run searches for particular desired works they wish to download."); *LimeWire* at 494 ("When a LimeWire user wishes to locate digital files available through the network, she enters search criteria into the search function on LimeWire's user interface. LimeWire then scans the computers of other LimeWire users, to locate files that match the search criteria.")

The Studios, however, expressly aver that Hotfile **lacks** a search box. (¶ 22 (Hotfile has no search box).) This absence of a search box obviously means that users cannot – in contrast to sites such as Grokster and Napster – find and download whatever content they want, including alleged infringing content, by simply visiting the Hotfile website and searching for it. As the Frequently Asked Questions attached to the Complaint explain "Q. Can I search the Hotfile server for certain files? A. No . . . Only the person storing a file on Hotfile gets the download link. That person decides who should have access to the link. A file can only be downloaded if the download link details are known." (Complaint, Ex. B, p. 1.) Hotfile does not index, organize, categorize or otherwise participate in user selection of files to host. Hotfile provides the same basic service as the hundreds, if not thousands, of other *bona fide* web hosting services that are critical and necessary to enable the full potential of the Internet.

Realizing that the uninterrupted line of active inducement cases all involved sites with built in search capability, the Studios try to twist the absence of a search box into "concealment." Thus, according to the Studios, web hosts are damned if they allow search (as "active inducers") and are damned (as "concealers") if they don't. As a web hosting service, Hotfile is not in the business of providing a search function. Hotfile provides server space and bandwidth for rapid downloading. Not having a search box permits Hotfile to be used for private storage of files or limited sharing by those authorized by the uploader (e.g., as among family). (¶¶ 2, 40 (conceding that Hotfile may be "used only to store files" and that "individually authorized" sharing is fine.)) The lack of search box thus fails to provide "plausible grounds to infer" intent to induce infringement. *Bell Atlantic Corp.*, 127 S. Ct. at 1965.

*Rewarding "popular" content does not denote an intent to encourage infringement.* The Studios try to impugn Hotfile's business model by claiming that its Affiliate Program is actually a plot to encourage "pirate sites" – including alleged but unidentified "criminal copyright infringers" – to post links to copyrighted material. (¶ 35.) Hotfile's Affiliate Program is designed to steer more traffic to its website in order to increase its revenue and drive sales of premium subscriptions. There is nothing unusual about this – every business seeks to attract more customers, whether it is an Internet business or a brick-and-mortar business. That does not in any manner suggest that Hotfile has the specific intent to induce copyright infringement.

Rather, Hotfile's Affiliate Program is completely consistent with a legitimate web hosting business seeking to increase its number of premium users. Veoh, a website that withstood Plaintiff Universal's music affiliate's copyright infringement claims, employed a similar system of rewarding uploaders. *Io Group, Inc. v. Veoh Networks, Inc.*, 586 F. Supp. 2d at 1136 ("Veoh has implemented a 'premium content' program in which users who upload content may choose to charge for viewing the content, and Veoh receives a portion of the proceeds.").

The idea that financially rewarding uploaders of "popular" content shows bad intent—the word "popular" shows up *23 times* in the Complaint—is logically flawed. The Studios assume without any legal precedent that an internet business model encouraging access to "popular" content inherently trenches on their rights. Yet, case after case has proved just the opposite. Some of the most "popular" content on the Internet is uploaded with authorization and does not infringe the Studios' rights. *See* Section IV, *supra* (collecting examples like user generated content, and open source software).

*Contrary to Grokster, the Studios allege that Hotfile does receive revenue from users.* Whereas in *Grokster* a key factor was that Grokster received ***no revenue*** from users, here the Studios allege the opposite—that Hotfile receives substantial revenue from users.  *Grokster* at 926; ¶ 24.  Thus, Hotfile makes "commercial sense" even with relatively low volume use, unlike Grokster.  *Grokster* at 940.  In sum, viewed side-by-side with the *Grokster*, and stripped of its frequent yet unsupported refrain of "massive" infringement, the Complaint fails to allege facts that show "a patently illegal objective from statements and actions showing what that objective was." *Grokster* at 941.  This theory of relief should accordingly be dismissed.

> **B.**     **The Studios' "Contributory Infringement" Theory Fails Because Intent To Infringe May Be Presumed From Generalized Knowledge Only Where A Technology Is "Good For Nothing Else" But Infringement.**

The Studios' contributory copyright infringement theory fails to state a claim as well. "One infringes contributorily by *intentionally* inducing or encouraging direct infringement…" *Grokster* at 930 (emph. added).  Under this theory, the Studios allege no actual *intent*, but instead allege that Hotfile "had actual and constructive ***knowledge*** of massive copyright infringement" and "had full ***knowledge*** that Hotfile was being used predominantly and overwhelmingly to infringe the rights of copyright owners."  (¶ 61).  In effect, they seek to rely on a theory derived from the *Sony* case, which permits intent to be imputed in the limited circumstance where a product is "good for nothing else" but infringement.  *See Sony Corp. of America v. Universal City Studios, Inc.,* 464 U. S. 417 (1984)*; Grokster*, 545 U.S. at 932.  Where a product is capable of noninfringing uses, however, *Sony* expressly bars secondary liability against the distributor of the product, even if the distributor knows that the product is actually being used for infringement:  "*Sony* barred secondary liability based on presuming or imputing intent to cause infringement solely from the design or distribution of a product capable of substantial lawful use, which the distributor knows is in fact used for infringement." *Grokster* 545 U.S. at 933-34.  Indeed, "high volume use" for purposes of infringement "alone would not justify an inference of unlawful intent." *Id.* at 940.

Good policy supports the Supreme Court's refusal to allow contributory infringement liability based solely on generalized knowledge of user infringement.  Under such a regime, copyright owners could destroy innovative technologies capable of substantial non-infringing uses simply because certain users of those systems may abuse those systems.  The *Sony* rule, as revisited in *Grokster*, "leaves breathing room for innovation and a vigorous commerce."

*Grokster* at 932-33.  *See also, Tiffany (NJ) Inc. v. eBay Inc.*, 600 F.3d 93 (2d Cir. 2010) (affirming dismissal, holding "generalized knowledge [of 75% trademark infringement] was insufficient to impose upon eBay an affirmative duty to remedy the problem).

The allegations of the Complaint make clear that this is not a case where the Hotfile service as a whole is "good for nothing else" but infringement.  Although the Studios are careful not to come out and say it expressly, it can readily be inferred from the Complaint that users can just as easily upload noninfringing and infringing content. (¶ 20 ("… Hotfile encourages its users to upload content files to Hotfile's own commercial-grade servers … Uploading a content file to Hotfile is straightforward and can be done even by unregistered users.")) The Studios also acknowledge that Hotfile can be used for file storage.  (¶ 4.)  Not surprisingly, the Studios do not – and cannot – allege that Hotfile is not capable of substantial lawful use.

Under *Sony* and *Grokster*, courts have drawn an inference of intent to infringe for a web host only where they have *actual* knowledge of *specific* infringing content and allow that content to continue to reside there anyway.  Such known infringing content is by definition not capable of non-infringing use, so the web host is expected to remove it.  *Dawes-Ordonez v. Realtor Ass'n of Greater Fort Lauderdale, Inc.,* No. 90-345, 2010 WL 1791754 (S.D. Fla. May 5, 2010) (defendant not liable for contributory infringement where it removed photos from its website after notification of copyright infringement); *Napster*, 239 F.3d at 1021 (finding knowledge where "a computer system operator learns of specific infringing material and fails to purge such materials from the system"); *Religious Tech. Ctr. v. Netcom On-Line Commc'n Servs., Inc.*, 907 F. Supp. 1361, 1366-67 (N.D. Cal. 1995) (host of an online bulletin board would be liable for infringement if it retained posts containing infringing material after it knew of their infringing content); *Perfect 10, Inc. v. Amazon. com, Inc.,* 508 F. 3d 1146, 1172 (9th Cir. 2007) (possibility of contributory infringement if Google "ha[d] *actual* knowledge that *specific* infringing material is available using its [search engine] system" (and other conditions are satisfied)) (emphasis in original). The Studios make no such averment against Hotfile; rather, they concede Hotfile responds to takedown notices. "[A]bsent any specific information which identifies infringing activity, a computer system operator cannot be liable for contributory infringement merely because the structure of the system allows for the exchange of copyrighted material." *Napster Inc.,* 239 F.3d at 1021.  Under *Sony*, *Grokster*, and the weight of well-reasoned lower court authority, Plaintiffs fail to state a claim for contributory infringement.

**C.**     **The Studios Fail to State a Claim For Vicarious Infringement**

The Studios fail to state a claim for vicarious infringement because they fail to allege that Hotfile has the *practical ability* to curtail infringing activity on its website.

To state a claim for vicarious infringement, the Studios must allege that Hotfile:  (1) has the right and ability to stop copyright infringement but failed to do so; and (2) directly profits from third party copyright infringement.  *Grokster*, 545 U.S. at 930; *BUC Int'l Corp. v. Int'l Yacht Council Ltd*., 489 F.3d 1129, 1139 n.19 (11th Cir. 2007) (*quoting Grokster*); *see also Perfect 10*, 508 F.3d at 1173; *Shapiro, Bernstein & Co. v. H. L. Green Co*., 316 F.2d 304, 307 (2d Cir. 1963).  The "right and ability to control" element requires  "both a legal right to stop or limit the directly infringing conduct, as well as the *practical ability* to do so."  *Perfect 10*, 508 F.3d at 1173.  Where a web host cannot practicably determine what on their systems is infringing, the "practical ability" element is lacking.  *See Perfect 10 v. Amazon, et al.*, 508 F.3d 1146 (9th Cir. 2007).

In *Perfect 10,* in concluding that Google was not liable for vicarious infringement for its image search feature, the court found that Google's "supervisory power [was] limited" because it could not "analyze every image on the [I]nternet, compare each image to all the other copyrighted images that exist in the world … and determine whether a certain image on the web infringes someone's copyright." *Id.* at 1174.  Similarly, Hotfile—which the Studios alleges hosts "millions" of files (¶ 20)—cannot analyze every file on its systems, compare them to all files in the world, and make a determination of infringement.  Even if digital fingerprinting were technically effective, the Studios do not allege how it could discriminate between licensed or fair use and infringing use.  Keyword filtering has similar limitations.  *UMG Recordings, Inc.*, 665 F.Supp.2d at 1110 ("simply searching for a name would not necessarily unearth only unauthorized material").

The Studios' conclusory assertions that Hotfile could "terminat[e] infringing users," "block[] their access," "polic[e] its computer service" or "implement[] any number of industry standard technologies or policies" fundamentally fail to allege how Hotfile is any different from Google in terms of its practical inability to make determinations about whether the files it hosts infringe any of the millions of copyrights that exist in the world.  As the Studios concede, Hotfile *does* block access to copyrighted works when they are specifically identified by copyright owners.  (¶ 38.)  Accordingly, the Studios' vicarious infringement claim fails.

## VI.   PLAINTIFFS FAIL TO STATE A CLAIM AGAINST MR. TITOV FOR DIRECT OR SECONDARY INFRINGEMENT.

Because the Studios' allegations against Mr. Titov are premised upon their allegations against Hotfile, Mr. Titov should be dismissed for all of the reasons already described in this motion.  Furthermore, the Studios' claims against Mr. Titov are even more attenuated, as they are based solely on conclusory statements about his role with Hotfile and rote recitations of the legal grounds for holding an individual corporate officer liable for infringement by a company.

In order to impose personal liability on an individual corporate officer for alleged copyright infringement by the entity, a plaintiff must establish either that the individual (a) has the ability to supervise infringing activity and has a financial interest in that activity, or (b) personally participates in the infringement.  *See Playboy Enters. v. Starware Publ'g Corp.*, 900 F. Supp. 438, 441 (S.D. Fla. 1995) (citing *Southern Bell Tel. & Tel. Co. v. Associates. Tel. Directory Publishers*, 756 F.2d 801, 811 (11th Cir. 1985)).  A plaintiff can establish that an individual has supervisory power where the individual is the "moving active conscious force behind the corporation's infringement."[5]  *Netbula, LLC v. Chordiant Software, Inc.*, No. 08-00019, 2009 WL 750201, at *3 (N.D. Cal. Mar. 20, 2009).

"At the pleading stage, however, bare allegations that an individual was a corporate officer or member of the company's board of directors are insufficient."  *Id.* at *2.  Indeed, "[w]ithout allegations of acts of infringement, supervision or control over the direct infringers, or contribution to the infringement," a court should dismiss copyright infringement claims against individual managers or directors of companies that have allegedly infringed.  *CNN, L.P. v. GoSMS.com, Inc.*, No. 00-4812, 2000 WL 1678039, at *6 (S.D.N.Y. Nov. 6, 2000).

The Complaint should be dismissed as to Mr. Titov because it merely recites the bare elements of the legal standard for holding an individual officer liable for an entity's acts.  (¶¶ 45, 51 ("Defendant Titov personally directed and participated in, exercised control over, and benefited from the specific infringement-inducing conduct of Hotfile that has resulted in the massive infringement of plaintiff's copyrights."); (Mr. Titov "has been the guiding spirit behind

---

[5] This is sometimes articulated as being the "guiding spirit" or "central figure" behind the alleged wrongful conduct.  *See Escude Cruz v. Ortho Pharm. Corp.*, 619 F.2d 902, 907 (1st Cir. 1980).  The Studios state no facts to suggest that Mr. Titov's connection to Hotfile rises to the level of an alter ego relationship.  Indeed, Plaintiffs do not even allege that Hotfile is Mr. Titov's alter ego, nor do they allege that Mr. Titov is an officer, director, or principal of Hotfile.

and central figure in Hotfile Corp.'s infringing activities.").)  These conclusory allegations are inadequate to maintain a claim for copyright infringement – either direct or secondary – against Mr. Titov personally, because they fail to show Mr. Titov's personal involvement in any infringing activity.  *See Netbula,* 2009 WL 750201, at *4 (dismissing claims against corporate officers because plaintiffs did not adequately allege facts supporting conclusory assertions that officers had the ability to supervise or control alleged infringing activity); *GoSMS.com, Inc*., 2000 WL 1678039, at *6 (bare allegation that individual defendant "controls the affairs" of other defendants and was "personally involved" cannot prevent dismissal); *J&J Sports Prods., Inc. v. Walia*, No. 10-5136, 2011 WL 902245, at *4-5 (N.D. Cal. Mar. 14, 2011) (dismissing claims against shareholders of entity where complaint contained solely conclusory statements of supervisory authority).  In order to survive a motion to dismiss, Plaintiffs must provide more than "labels and conclusions, and a formulaic recitation of the elements of a cause of action." *Twombly*, 127 S. Ct. at 1964-65.

The other allegations specific to Mr. Titov consist of little more than generalized statements that he manages Hotfile and that he runs and is the sole officer and director of a non-party, Lemuria.  (¶ 10, 12, 45.)  This is insufficient.  *See Netbula,* 2009 WL 750201, at *4 ("Although Plaintiffs allege the means by which [the individual defendant] can supervise the general activity of [the company] employees, they fail to allege more than general supervisory power within the corporation.").  None of Plaintiffs' sparse factual allegations identify personal and substantial involvement by Mr. Titov with any *specific incidents of infringement*.  *Marvullo v. Gruner & Jahr*, 105 F. Supp. 2d 225, 230 (E.D.N.Y. 2000) ("Participation in the infringement must be substantial" and "authorization or assistance must bear a direct relationship to the infringing acts").  At best, Plaintiffs' allegations only show that Mr. Titov engages in ordinary acts relating to Hotfile's general business operations and are insufficient to subject Mr. Titov to personal liability.[6]  *See GoSMS.com,* 2000 WL 1678039, at *6 ("Without allegations of acts of

---

[6] Indeed, cases holding corporate directors, officers or shareholders personally liable for infringement have only done so where the individual was personally involved in procuring, creating, and/or selling infringing materials and/or where the individual did not contest personal liability.  *See, e.g., Babbit Elecs., Inc. v. Dynascan Corp*., 828 F. Supp. 944, 960 (S.D. Fla. 1993) (individuals admitted they were personally involved in the specific infringing sale and purchase of accused products by their company and did not contest that they authorized, directed and participated in the infringement); *Novell, Inc. v. Unicom Sales, Inc*., 2004 U.S. Dist. LEXIS (footnote continued)

infringement, supervision or control over the direct infringers, or contribution to the infringement, the Court finds that plaintiffs' allegations are insufficient to plead either direct copyright or trademark infringement or either contributory infringement or vicarious liability.").

Similarly, the conclusory assertion that Mr. Titov "benefited" from alleged infringement-inducing conduct of Hotfile is inadequate to withstand a motion to dismiss. *See Netbula,* 2009 WL 750201, at *3 (granting motions to dismiss by corporate officers where facts alleged did not show a direct financial interest in alleged acts of infringement); *Goes Litho. Co. v. Banta Corp.*, 26 F. Supp. 2d 1042, 1045 (N.D. Ill. 1998) (granting motion to dismiss claim for vicarious infringement because complaint failed to allege facts about defendant's direct financial interest in infringement or ability to control it).

The only specific alleged conduct attributed to Mr. Titov is that he "paid at least some of Hotfile's uploading users." (¶ 45.)  This vague assertion fails to salvage the Studio's claims against Mr. Titov as it does nothing to tie Mr. Titov to any alleged infringing activity but, instead, refers generically to "uploading users."[7]  This is inadequate as a matter of law.  *See GoSMS.com*, 2000 WL 1678039, at *6 (dismissing copyright infringement claims against the manager and the director of a co-defendant corporation because plaintiffs failed to present allegations of acts of infringement); *Marvullo*, 105 F. Supp. 2d at 230 (dismissing complaint without leave to amend for failure to indicate "by what acts during what time the defendant infringed the copyright").

Accordingly, the Studios' claims against Mr. Titov should be dismissed.

---

16861 (N.D. Cal. 2004) (company president was the sole shareholder and only officer of infringing company, continued to directly participate in infringing distribution of plaintiff's products after personally receiving notice of infringing activity, and did not oppose his liability); *Playboy Enters.,* 900 F. Supp. 438, 441 (president of admitted directly authorizing sale, advertisement and production of specific infringing products).  Such is not the case here, and holding Mr. Titov personally liable is improper.

[7] Even if the allegation stated that Mr. Titov paid infringing users, it would not salvage the claim against Mr. Titov for the reasons stated in the prior sections of this motion concerning Hotfile's business model.

## VII.  __CONCLUSION__

The Studios' claims should be dismissed because they fail to assert sufficient facts supporting any of their claims against Hotfile or Mr. Titov.  The Studios' direct infringement claim lacks factual support of volitional conduct, a necessary element of the claim.  And each of the Studios' three theories of secondary liability fail as well.  The Studios' theory of active inducement fails because the facts alleged, even if accepted as true, do not demonstrate a specific intent to infringe under the high bar set in *Grokster*.  The Studios' contributory infringement theory fails because the facts alleged confirm that Hotfile's product has substantial noninfringing uses, and there is no allegation that Hotfile has allowed specifically identified infringing content to reside on its servers – thus, there is no legal basis to impute to Hotfile an intent to infringe.  And the Studios' contributory infringement claim fails because pursuant to the reasoning of *Perfect 10*, the facts alleged make clear that Hotfile has no practical ability stop infringement.  As to Mr. Titov, the Complaint's bare recitation of the legal elements of personal liability are inadequate to state a claim against him.  Accordingly, the Complaint should be dismissed in its entirety as to Hotfile and Mr. Titov.

Dated:  March 31, 2011                   Respectfully submitted,

                                         s/ Janet T. Munn
                                         Janet T. Munn, Fla. Bar No. 501281
                                         Rasco Klock
                                         283 Catalonia Avenue, Suite 200
                                         Coral Gables, Fl 33134
                                         Telephone:  305.476.7101
                                         Telecopy: 305.476.7102
                                         Email: jmunn@rascoklock.com

                                         And

CASE NO. 11-20427-JORDAN

s/ Anthony P. Schoenberg
Roderick M. Thompson (*Admitted pro hac vice*)
rthompson@fbm.com
N. Andrew Leibnitz (*Admitted pro hac vice*)
aleibnitz@fbm.com
Anthony P. Schoenberg (*Admitted pro hac vice*)
tschoenberg@fbm.com
Deepak Gupta (*Admitted pro hac vice*)
dgupta@fbm.com
Janel Thamkul (*Admitted pro hac vice*)
jthamkul@fbm.com
FARELLA BRAUN + MARTEL LLP
235 Montgomery St.
San Francisco, CA  94104
Telephone:  415.954.4400
Telecopy: 415.954.4480

*Counsel for Defendants*

CASE NO. 11-20427-JORDAN

## CERTIFICATE OF SERVICE

I hereby certify that on March 31, 2011, the foregoing document was served on all counsel of record or pro se parties identified below either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

By: s/Janet T. Munn
    Janet T. Munn

## SERVICE LIST: CASE NO. 11-CIV-20427-JORDAN

Karen L. Stetson, Fla. Bar No.: 742937
GRAY-ROBINSON, P.A.
Email: Karen.Stetson@gray-robinson.com
1211 Brickell Avenue
Suite 1600
Miami, FL 33131
Phone:  305.416.6880
Fax:    305.416.6887

Steven B. Fabrizio (*Pro Hac Vice*)
Email: sfabrizio@jenner.com
Duane C. Pozza (*Pro Hac Vice*)
Email: dpozza@jenner.com
Luke C. Platzer (*Pro Hac Vice*)
Email: lplatzer@jenner.com
JENNER AND BLOCK, LLP
1099 New York Ave, N.W.
Suite 900
Washington, DC 20001
Phone: 202.639.6000
Fax:    202.639.6066

Daniel M. Mandil, Esq.
Motion Picture Association of America, Inc.
15301 Ventura Boulevard
Building E
Sherman Oaks, CA
818-935-5812
Email: Daniel_Mandil@mpaa.org

Karen R. Thorland, Esq.
Senior Content Protection Counsel
Motion Picture Association of America, Inc.
15301 Ventura Boulevard
Building E
Sherman Oaks, CA
818-935-5812
Email: Karen_Thorland@mpaa.org