# EXHIBIT F



2006 WL 5400906 (C.D.Cal.)                                                                                                   Page 1

For Opinion See 518 F.Supp.2d 1197 , 454 F.Supp.2d 966 , 269 F.Supp.2d 1213 , 259 F.Supp.2d 1029 , 243 F.Supp.2d 1073

United States District Court, C.D. California.
METRO-GOLDWYN-MAYER STUDIOS INC., et al., Plaintiffs,
v.
GROKSTER, LTD., et al., Defendants;
Jerry Leiber, et al., Plaintiffs,
v.
Consumer Empowerment BV a/k/a Fasttrack, et al., Defendants,
And Related Counterclaims.
No. CV 01-08541 SVW (FMOx).
February 14, 2006.

Consolidated with: CV 01-09923 SVW (FMOx)

Declaration of Charles J. Hausman in Support of Plaintiffs' Motions for Summary Judgment

Donald B. Verrilli, Jr. (pro hac vice), Steven B. Fabrizio (pro hac vice), Jenner & Block LLP, 601 Thirteenth Street, NW, Washington, D.C. 20005-3823, Telephone: (202) 639-6000, Facsimile: (202) 639-6066, dverrilli @jenner.com, sfabrizio@jenner.com, Attorneys for Record Company Plaintiffs.

George M. Borkowski (SBN 133416), Mitchell Silberberg & Knupp LLP, 11377 West Olympic Boulevard, Los Angeles, CA 90064-1683, Telephone: (310) 312-2000, Facsimile: (310) 312-3100, GMB@msk.com, Attorneys for Record Company Plaintiffs.

David E. Kendall (pro hac vice), Williams & Connolly LLP, 725 Twelfth Street, N.W., Washington, D.C. 20005, Telephone: (202) 434-5000, Facsimile: (202) 434-5029, dkendall@wc.com, Attorneys for the Motion Picture Studio Plaintiffs.

Carey R. Ramos (pro hac vice), Paul Weiss Rifkind, Wharton & Garrison LLP, 1285 Avenue of the Americas, New York, NY 10019-6064, Telephone: (212) 373-3000, Facsimile: (212) 757-3990, cramos@paulweiss.com, Attorneys for Music Publisher Plaintiffs.

Date: May 1, 2006

Time: 1:30 p.m.

Ctrm: The Hon. Stephen V. Wilson

I, Charles J. Hausman, the undersigned, declare:

1. I am the Deputy Director of Anti-Piracy for the Motion Picture Association of America ("MPAA"). I make this declaration in support of plaintiffs' motions for summary judgment. I have personal knowledge of the following

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

facts and, if called and sworn as a witness, could competently testify thereto.

2. My regular duties at MPAA include formulating and implementing strategies regarding movie theft in the United States, including investigations into the online infringement and theft of movies and trademark infringement of all kinds.

3. I have over a decade of experience assessing works for copyright infringement and identification of copyright ownership. Having also worked for many years at the Recording Industry Association of America ("RIAA"), I am familiar with the organization and operation of both the MPAA and the RIAA, their member companies, their policies regarding copyright ownership, and both criminal and civil piracy. Between 1995 and 2004, I served in various capacities relating to anti-piracy for the RIAA, including several years as the RIAA's Anti-Piracy Counsel.

4. I am familiar with all aspects of the prosecution of sound recording and motion picture copyright infringement, including Internet violations. I regularly gather forensic evidence relating to such prosecution, and have organized, led and managed teams engaged in infringement analyses. In addition, as part of the normal course of my job responsibilities, I often am called upon to review the corporate records of member companies to ascertain copyright ownership. I also regularly research and prepare affidavits in criminal matters affirming that the defendants' acts violate an MPAA member company's copyrights and are not licensed.

5. I use a variety of source material to determine copyright ownership in the ordinary course of performing my duties. This includes both print publications and reliable Internet databases that report corporate affiliations, exclusive distribution rights, and copyright ownership. I also consult additional commonly used Internet sources to gain supplemental information relating to new releases and ownership thereof.

*General Overview*

6. I conducted and supervised an investigation and analysis, on behalf of the plaintiffs in this case, regarding the amount of infringing material being traded through the services offered by StreamCast (through the Morpheus system) and Sharman (through the Kazaa system). That investigation and analysis took the form of four separate statistical studies.

7. The purpose of the first study was to determine the proportion of files made available through Kazaa and Morpheus that infringe the copyrights of copyright owners (the "Making Available" Study). This study was undertaken separately with each client application (*i.e.,* separately through Morpheus and through Kazaa) in order to provide a system-specific percentage of infringing-to-noninfringing works.

8. The second statistical study determined the proportion of infringing audio files that Kazaa users are actually requesting for download, using a sample set of data provided by iMesh (the "iMesh Data" Study).

9. The final two projects determined what users are actually requesting for download on each of the Kazaa and Morpheus systems by monitoring the files requested from controlled file-sharing folders created on Morpheus and Kazaa clients (the "Actual Download" Studies). The Actual Download Studies were divided into two versions. Version I used as its sample set of files the same random files that resulted from the Making Available Study for each client application. Thus, it used approximately 1,800 representative files from each system as determined by the sampling protocol designed by Dr. Ingram Olkin, Professor of Statistics and Education at Stanford University. Actual Download Version II used as its sample set of files 100 copyrighted works owned by plaintiffs that were not authorized for distribution and 100 works that were either authorized for distribution by the owners or otherwise public domain works, including many of the so-called "noninfringing" works that had been cited by the defendants in this case in earlier court filings.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

10. The results of these studies reveal that at least 89.28% of the files made available on Kazaa are copyrighted and not authorized for distribution, while only 3.11% of the files available on Kazaa are not infringing. Similarly, 87.33% of the files made available on Morpheus are not authorized for distribution, while only 2.17% of the files are noninfringing.

11. In the iMesh Data study, moreover, over 95.05% of audio files actually requested by Kazaa users for downloading are copyrighted works not authorized for distribution.

12. The Actual Download studies yielded similar results. Looking at the Kazaa data from the Making Available study, the works determined to be infringing were requested for downloading with great frequency; the works determined to be noninfringing or otherwise unknowable were hardly requested at all. Specifically, 95.94% of the requests by Kazaa users were for infringing works, while only 1.36% of the requests were for noninfringing works. The results were the same when looking at the Morpheus Making Available data. 96.61% of the requests by Morpheus users were for infringing works, while only 1.72% were for noninfringing works. Thus, while the Making Available studies reveal that some Kazaa and Morpheus users may have some trivial amount of noninfringing works in their Kazaa and Morpheus "share" folders, almost no one is actually requesting to download those works.

13. These results were confirmed in Version II of the Actual Download study. The 100 popular copyrighted works were requested for downloading persistently and with great frequency. The 100 noninfringing works -- even the works that have been touted by defendants -- were hardly requested at all. Specifically, 96.67% of the requests from Kazaa users were for infringing works, while only 3.33% were for noninfringing works. On Morpheus, 96.70% of the requests were for infringing works, while only 3.30% were for noninfringing works.

*The Making Available and iMesh Data Studies*

14. The Making Available and iMesh Data Studies are the results of data collection protocols designed by Professor Olkin, which are described in Professor Olkin's declaration, also submitted in support of plaintiffs' motions for summary judgment.

15. The Making Available studies are comprised of 1,800 random files downloaded from Morpheus and 1,800 random files downloaded from Kazaa per Professor Olkin's protocol. That protocol employed random word searches and was implemented in five cities distributed throughout the major geographic regions in the United States. The first 1,800 files from each application to fit within the categories of confirmed or highly likely infringing, confirmed or highly likely noninfringing, or "unknowable" (discussed in detail below), populated the Making Available sample for each client application. The list of 1,800 files contained in the Morpheus Making Available sample are attached hereto as Exhibit 1. The list of 1,800 files contained in the Kazaa Making Available sample are attached hereto as Exhibit 2.

16. The iMesh Data Study consists of a sample set of 2,645 randomly selected audio files actually requested by Kazaa users for download from iMesh between September 12, 2005 and October 9, 2005. As noted above, these files were also chosen by implementing a protocol designed by Professor Olkin and described in his declaration. The list of files contained in the iMesh Data study are attached hereto as Exhibit 3.

17. I oversaw the data collection for both studies, and have assured myself that each was conducted in accordance with the relevant protocols.

18. In connection with determining copyright ownership and authorization, I led a team of investigators, lawyers, and technologists experienced in entertainment and anti-piracy matters. Bringing to the project my prior experience conducting piracy analyses on both RIAA and MPAA matters, I selected individuals who had proven themselves reliable and with whom I had previously worked. Under my close supervision, these investigators reviewed the

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

works and/or data, and checked, and rechecked, the copyright and authorization status for each work.

19. As an initial matter, each file was run, under my supervision, through an Audible Magic tool that checked the file against a database of audio fingerprints for copyrighted sound recordings not authorized for distribution. I, together with my team, spot-checked the results of the Audible Magic identification tool manually on an ongoing basis to confirm accuracy. Works that were not identified by the Audible Magic tool were further analyzed manually to determine the identity of the work, its copyright status, and the copyright owner, using a variety of online and print sources.

20. Once copyright holders were identified, I supervised my team in verifying that works identified as being owned or exclusively controlled by plaintiffs or their affiliates were so owned or controlled. To verify such ownership or control, we used sources generally accepted in the anti-piracy community that I have also personally found to be accurate and effective in determining issues of copyright ownership. I, together with my team, determined that the record company plaintiffs the music publisher plaintiffs, and/or the motion picture studio plaintiffs (or their respective affiliates) own or control the rights to the files attributed to them in the confirmed infringing category.

21. In addition, my team and I sought, in the time available, to contact as many third-party copyright owners -- *i.e.,* owners who are not plaintiffs -- as possible to ascertain whether they had authorized the distribution of their particular work(s) through the peer-to-peer system on which they were found. In many instances, third party rightsholders who confirmed to us that they did not authorize the particular works to be distributed on Morpheus or Kazaa provided sworn statements to that effect. This effort continues.

22. After thorough investigation and analysis involving multiple levels of review, each of the files downloaded as a result of the Making Available and iMesh Data studies was assigned to a "copyright status" category. These categories consisted of:
• "Confirmed infringing," meaning that the work was confirmed to be owned by a plaintiff or third party and not authorized for distribution on the relevant peer-to-peer system;
• "Highly likely infringing," meaning that based on the nature of the work and/or its owner, it was highly likely that the work was copyrighted and not authorized for distribution on the relevant peer-to-peer system;
• "Highly likely noninfringing," meaning that based on the nature of the work and/or its owner, it was highly likely that the work was either not copyrighted, in the public domain, or copyrighted but authorized for peer-to-peer distribution;
• "Confirmed noninfringing," meaning that the work was either confirmed to be copyrighted but authorized for peer-to-peer distribution or based on the nature of the work and/or its owner, it was almost certain to be not copyrighted, in the public domain, or authorized;
• "Unknowable," meaning that the copyright status of the file could not fairly be determined, generally because the file could not be identified;
• "Spoofs," meaning that the file was deliberately labeled so as to mislead the user to believe it contained particular content, when it did not in fact contain that content but served another commercial purpose, for example, a file labeled as a popular copyrighted work that did not in fact contain that work and turned out to be unusable (often distributed by record companies to protect their copyrighted works);
• "Porn," meaning that the file was plainly pornographic, including files that, from their metadata, appeared clearly to constitute illegal pornography (e.g., child porn, etc.);
• "Junk/damaged/unintelligible," meaning that the file could not be analyzed in any way for infringement purposes because it was so badly distorted, damaged or junk that it was essentially unintelligible;
• "Virus/malicious," meaning that the file was a virus or otherwise malicious;
• "KPL," meaning that the file was not a content file at all but a list of files organized as a playlist which could be separately downloaded; and
• "Illegal," meaning that the file constitutes or reflects illegal activity, for example, a file containing acknowledged stolen personal financial data.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

23. Once works were assigned to a particular category, spoofs, porn, junk/damaged/unintelligible, virus/malicious, KPL, and illegal files were removed from the sample per the protocol established by Professor Olkin, and the first 1,800 files obtained through Kazaa and through Morpheus (3,600 total) that fit one of the confirmed infringing/noninfringing; highly likely infringing/noninfringing; or unknowable categories were analyzed for copyright infringement. The data regarding actual Kazaa user requests for downloading from iMesh was categorized in the same way.

24. As a result of the above analysis, we were able to determine that, for the Making Available sample of files obtained through Kazaa, at least 1,607 (or 89.28%) of the files were infringing. Within that group, 1,077 files were confirmed infringing by either plaintiffs or third party owners. An additional 530 files were highly likely infringing, but could not be confirmed and/or documented, in the allotted time, as conclusively infringing.

25. Only 56 (3.11%) of the 1,800 files obtained through Kazaa appear to consist of public domain material or material being made available without objection from a rightsholder. This makes up the confirmed noninfringing and highly likely noninfringing files.

26. As for the remaining 137 files available through Kazaa, there simply was no way to determine the copyright status of the particular works. These unknowable files constitute 7.61% of the Kazaa Making Available database.

27. The Morpheus Making Available sample revealed similar findings. We were able to conclude that at least 1,572 (or 87.33%) of the files obtained through Morpheus were infringing. This group includes 1,095 files that are confirmed infringing by either plaintiffs or third party owners. An additional 477 files are highly likely infringing, but could not be confirmed and/or documented, in the available time, as conclusively infringing.

28. Only 39 (2.17%) appear to consist of public domain material or material being made available without objection from a rightsholder. This makes up the confirmed noninfringing and highly likely noninfringing files.

29. The remaining 189 files available through Morpheus are unknowable; these constitute 10.50% of the Morpheus Making Available sample.

30. Upon their completion, both the Morpheus and Kazaa Making Available results were transmitted to Professor Olkin.

31. With respect to the iMesh Data Study, we were able to conclude that at least 2,514 (or 95.05%) of the files were infringing. Within that group, 1,970 files (or 74.48% of the total files) were confirmed infringing. An additional 544 files (or 20.57% of the total files) were highly likely infringing.

32. Only 10 (or 0.38%) of the files populating the iMesh Data database consist of confirmed noninfringing or highly likely noninfringing files. The unknowable files requested for download by Kazaa users constitute 4.57% of the database. The results of the iMesh Data Study were also transmitted to Professor Olkin.

*Actual Download Studies*

33. As explained above, the Actual Download studies took two forms. In Actual Download Version I, approximately 1,800 files that were randomly obtained for the Making Available study from each of the Kazaa and Morpheus systems were uploaded and offered for distribution using the same client application (*i.e.,* Morpheus or Kazaa) from which they were obtained. The files were offered for distribution through Kazaa and Morpheus clients in each of the same five cities used for the Making Available studies. The purpose of this study was to determine which of these randomly selected files would actually be requested for download by Kazaa and Morpheus users. The computers were configured to log every request for downloading, but to prevent the actual downloading of the files. Duplicate

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

or repeated requests for a file from the same IP address were eliminated such that the results avoid overcounting and reflect requests for downloading by unique users.

34. Data was collected for the Actual Download study over a two-week period, 24 hours a day, seven days a week.

35. Using the same category demarcations determined in the Making Available Study, the Actual Download Version I database reveals that 95.94% of the download requests by Kazaa users were for infringing works (i.e., works that were determined to be confirmed or highly likely infringing). Only 1.36% of the download requests by Kazaa users were for noninfringing works (i.e., works found to be confirmed or highly likely noninfringing), and only 2.70% were for works in the unknowable category. Similarly, 96.61% of Morpheus users' requests were for works categorized as confirmed or highly likely infringing, whereas only 1.72% of the requests were for confirmed or highly likely noninfringing files, and only 1.67% were for works in the unknowable category.

36. In the second version of the Actual Download study, I supervised the selection of 100 copyrighted works that were not authorized for distribution ("Copyrighted Works") and 100 public domain or authorized-for-distribution works ("Noninfringing Works"). Included in the 100 Noninfringing Works were materials and sources previously referenced by defendants. For example, the Noninfringing Works include a number of e-books (including the Bible, Romeo and Juliet, and the Communist Manifesto) available from the Gutenberg Project; the "top ten" movie picks from the Prelinger Archives; presidential speeches; NASA images of 9/11; and authorized for distribution audio works. Each of these works and/or types of works have been previously identified by defendants. On the infringing side, the Copyrighted Works included popular songs, movies, and TV shows. A list of the 100 Noninfringing and 100 Copyrighted Works used in Actual Download Version II are attached hereto as Exhibit 4. As in Actual Download Version I, each of these files was shared through Morpheus and Kazaa clients in each of the five cities selected for the Making Available study. Data was collected for the same two-week period, and the download requests were processed in the same way as in Version I of the Actual Download study.

37. Actual Download Version II reveals that 96.67% of the download requests by Kazaa users were for the Copyrighted Works, whereas only 3.33% of the download requests were for Noninfringing Works. Similarly, 96.70% of Morpheus users' requests were for Copyrighted Works, whereas only 3.30% of the requests were for Noninfringing Works.

I declare under penalty of perjury that the foregoing is true and correct and that this Declaration was executed on Feb 7, 2006, at Los Angeles California.

<<signature>>

Charles J. Hausman

END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.