UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

CASE NO. 11-20427-CIV-JORDAN

| | |
|---|---|
| DISNEY ENTERPRISES, INC. et al., | ) |
| Plaintiffs | ) ) ) |
| vs. | ) ) |
| HOTFILE CORP. et al., | ) ) |
| Defendants | ) ) |

### ORDER ON MOTION TO DISMISS

As explained below, Hotfile Corp.'s and Anton Titov's motion to dismiss [D.E. 50] is GRANTED IN PART AND DENIED IN PART, and the motion for a hearing [D.E. 51] is DENIED AS MOOT. Count I of the complaint is DISMISSED WITHOUT PREJUDICE. Hotfile and Mr. Titov shall answer Count II by July 22, 2011.

### I. LEGAL STANDARD

To survive a motion to dismiss under Rule 12(b)(6), the plaintiff must plead "either direct or inferential allegations respecting all the material elements necessary to sustain a recovery under some viable legal theory." *Roe v. Aware Woman Ctr. for Choice, Inc.*, 253 F.3d 678, 683 (11th Cir. 2001). The court must limit its consideration to the complaint. *See GSW, Inc. v. Long County*, 999 F.2d 1508, 1510 (11th Cir. 1993). The factual allegations are accepted as true and all reasonable inferences from these allegations are drawn in the plaintiff's favor. *See Roberts v. Fla. Power & Light Co.*, 146 F.3d 1305, 1307 (11th Cir. 1998). The plaintiff, however, must allege more than "labels and conclusions." *Fin. Sec. Assurance, Inc. v. Stephens, Inc.*, 500 F.3d 1276, 1282 (11th Cir. 2007) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 554–55 (2007)). The factual allegations in the complaint must "possess enough heft" to set forth "a plausible entitlement to relief." *Id.*

### II. FACTUAL ALLEGATIONS

The plaintiffs, Disney Enterprises, Inc., Twentieth Century Fox Film Corp., Universal Studios Productions LLLP, Columbia Pictures Industries, Inc., and Warner Bros. Entertainment Inc., are motion-picture studios [D.E. 1 ¶ 15]. As motion-picture studios, they create and distribute films, for which they own the copyrights [*Id.* ¶¶ 15–16].

Hotfile Corp. is a Panamanian corporation that operates the website www.hotfile.com [*Id.* ¶¶ 1, 17]. Anton Titov runs Hotfile [*Id.* ¶ 18].

A visitor to hotfile.com can upload electronic files to the website. That information is then stored on Hotfile's servers, on which Hotfile can save and host millions of files. The visitor, in turn, receives a unique link that begins with hotfile.com—say, hotfile.com/123 [*Id.* ¶ 20]. The Hotfile servers then make five more copies of the uploaded files, and each copy receives a unique link [*Id.* ¶ 38]. This link acts as a locator, allowing anyone with the link to click it or to plug it into a web browser and then to download the file originally uploaded. Anyone downloading the file has two options: she can download it for free at regular speed or, if she is a paying member of Hotfile, download it at high speeds [*Id.* ¶ 21].

Hotfile controls its physical premises, its servers, its databases, and the software that manages the website. As a result, it can remove any uploaded files or prevent the files from being uploaded in the first place. Similarly, Hotfile can block anyone's access to hotfile.com and even reserves the right to do so [*Id.* ¶ 23]. Still, third-party sites, not Hotfile, spread the links that allow persons to download the files [*Id.* ¶22].

Hotfile makes a profit in two ways. First, although anyone can use a link to download a file, Hotfile makes a profit by charging members, who can download files much faster than those who are not members. Members, moreover, can download many files simultaneously; non-members may only download one file every 30 minutes [*Id.* ¶ 24]. Second, Hotfile sells what it calls "hotlinks." Hotlinks allow third-party sites to post a link that, when clicked, automatically begins to download the file, without ever directing the person who clicked the link to hotfile.com [*Id.* ¶ 26].

Of course, Hotfile earns more money as its rank of members grow. To increase its number of members, Hotfile pays users to upload the most popular content to its servers and asks that the users promote their links [*Id.* ¶ 28]. Hotfile's affiliate program, for example, pays those uploading files cash when the file is downloaded 1000 times [*Id.* ¶ 29]. And the payment scheme awards those who upload highly popular and large files more than those who upload highly popular but not-so-large files [*Id.* ¶ 31]. Finally, if a non-member clicks a link and decides to join Hotfile as a member, Hotfile gives the person who uploaded the file a "credit" [*Id.* ¶ 30]. Mr. Titov designed this business model and, indeed, has personally paid some of Hotfile's uploading users [*Id.* ¶ 45].

Hotfile's business model deals similarly with third-party sites that post links directing users to Hotfile-hosted content [*Id.* ¶ 35]. Specifically, Hotfile pays third-party sites when a user who clicked on a link on the third-party site then becomes a Hotfile member [*Id.*]. Mr. Titov created this business plan too [*Id.* ¶ 45].

Popularity may very well be "glory's small change," VICTOR HUGO, RUY BLAS act 3, sc. 5 (1838), but popular links generated big profits for Hotfile. And the most popular links, according to the complaint, are those that contain material with copyrights. As a result of their popularity, copyright-infringing files constitute the bulk of files downloaded through Hotfile [*Id.* ¶ 25]. Consequently, Hotfile's business encourages persons to upload material with copyright protection, including the plaintiffs' films [*Id.* ¶ 34]. Hotfile understands the consequence of its business model [*Id.*]. It is not difficult for Hotfile to correct the rampant infringement, for it has easy means to control the infringement, such as keyword filtering and audio fingerprinting [*Id.* ¶ 40].

Incapable of preventing the massive infringement allegedly occurring on hotfile.com, the plaintiffs sued Hotfile and Mr. Titov for direct and secondary copyright infringement.

### III. LEGAL ANALYSIS

Hotfile and Mr. Titov argue that the plaintiffs have failed to state a cause of action for either direct or secondary copyright infringement. I agree that the complaint does not state a cause of action for direct infringement, but disagree with the contention that it fails to properly plead secondary infringement.

#### A. DIRECT INFRINGEMENT

When it comes to copyrighted film, a copyright owner "has the exclusive rights to" reproduce it, make derivative material based on it, distribute it, and display it. *See* 17 U.S.C. § 106 (2006). "Anyone who violates any of [these] exclusive rights of the copyright owner . . . is an infringer of the copyright . . . ." 17 U.S.C. § 501. Where a plaintiff shows that he owns a valid copyright and that the other party copied some of the protected elements of that work, he has shown direct infringement of his copyright. *See Saregama India Ltd. v. Mosley*, 635 F.3d 1284, 1290 (11th Cir. 2011). In *Religious Technology Center v. Netcom On-Line Communication Services*, 907 F. Supp. 1361, 1370 (N.D. Cal. 1995), the court noted that, "[a]lthough copyright is a strict liability statute, there should still be some element of volition or causation which is lacking where a defendant's system is merely

used to create a copy by a third party." As the *Netcom* court saw it, making an internet company liable for direct copyright infringement simply because it gave users access to copyrighted material posted by others "would create unreasonable liability." *Id.* at 1372.

Since then, *Netcom* has become the standard in cases alleging that an internet company is infringing a plaintiff's copyright. For example, in *CoStar Group v. Loopnet Inc.*, 373 F.3d 544, 550 (4th Cir. 2004), the Fourth Circuit Court of Appeals agreed with *Netcom*'s reasoning:

> [T]o establish *direct* liability [for copyright infringement] . . . something more must be shown than mere ownership of a machine used by others to make illegal copies. There must be actual infringing conduct with a nexus sufficiently close and causal to the illegal copying that one could conclude that the machine owner himself trespassed on the exclusive domain of the copyright owner. The *Netcom* court descirbed this nexus as requiring some aspect of volition.

The Fourth Circuit is not alone in approving *Netcom*. *See, e.g.*, *Cartoon Network LP v. CSC Holdings, Inc.*, 536 F.3d 121, 130–33 (2d Cir. 2008); *Parker v. Google, Inc.*, 422 F. Supp. 2d 492, 497–98 (E.D. Pa. 2006); *Marobie-Fl, Inc. v. Nat'l Ass'n of Equip. Distribs. & Nw. Nexus, Inc.*, 983 F. Supp. 1167, 1178 (N.D. Ill. 1997). *See also MGM Studios Inc. v. Grokster, Ltd.*, 545 U.S. 912, 929–30 (2005) ("When a widely shared service or product is used to commit infringement, it may be impossible to enforce rights in the protected work effectively against all direct infringers, the only practical alternative being to go against the distributor of the copying device for *secondary liability* on a theory of *contributory or vicarious infringement*." (emphasis added)). Thus, the law is clear that Hotfile and Mr. Titov are not liable for direct copyright infringement because they own and manage internet facilities that allow others to upload and download copyrighted material. *See CoStar*, 373 F.3d at 550; *Parker*, 422 F. Supp. 2d at 497.

Here, as the complaint alleges, the website hotfile.com merely allows users to upload and download copyrighted material without volitional conduct from Hotfile or Mr. Titov. To be sure, Mr. Titov and Hotfile allegedly encourage the massive infringement. Yet nothing in the complaint alleges that Hotfile or Mr. Titov took direct, volitional steps to violate the plaintiffs' infringement. There are no allegations, say, that Hotfile uploaded copyrighted material. Therefore, under the great weight of authority, the plaintiffs have failed to allege direct copyright infringement.

Citing numerous cases, the plaintiffs argue that, *Netcom* notwithstanding, they have alleged a direct–copyright-infringement claim by alleging that Hotfile created a business plan that induced infringement. These cases, however, are either inapposite or unpersuasive.

For instance, in some of the cases cited by the plaintiffs, rather than having users upload the copyrighted material, the defendant took a volitional act, i.e., uploading the copyrighted work itself or using software to search for material to upload. *See N.Y. Times Co. v. Tasini*, 533 U.S. 483, 489 (2001) ("The Print Publisher codes each article to facilitate computerized retrieval, then transmits it in a separate file. After further coding, LEXIS/NEXIS places the article in the central discs of its database."); *Playboy Enters. v. Webbworld, Inc.*, 991 F. Supp. 543, 549 (N.D. Tex. 1997) ("Defendant Ellis selected the particular adult-oriented newsgroups to be downloaded. . . . The heart of the Webbworld operation was 'ScanNews,' software that . . . took the news feed, discarded most of the text, and retained the sexually oriented images."), *aff'd*, 168 F.3d 486 (5th Cir. 1999) (per curiam); *Playboy Enters. v. Russ Hardenburgh, Inc.*, 982 F. Supp. 503, 510 (N.D. Ohio 1997) ("RNE employees viewed each and every photograph that was uploaded onto the system, and then *moved* those photographs that were not discarded from the upload file to the central files where they became available to RNE customers."). And in others, the courts explicitly recognized that their opinions did not apply to the situation where, as here, a website or internet facility uploads material automatically at the direction of a user. *See Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146, 1160 n.6 (9th Cir. 2007) ("Because Google initiates and controls the storage and communication of these thumbnail images, we do not address whether an entity that merely passively owns and manages an Internet bulletin board or similar system violates a copyright owner's display and distribution rights when the users of the bulletin board or similar system post infringing works."). Thus, none of these cases are applicable here, where, as in *Netcom*, the internet system allows users to automatically upload or download copyright material.

The plaintiffs cite two cases that support their argument that Hotfile and Mr. Titov, by creating a plan that induced infringement, are liable for direct copyright infringement. I find neither case, however, persuasive.

In *Capitol Records, Inc. v. Mp3Tunes, LLC*, No. 07-cv-9931, 2009 WL 3364036, at *3 (S.D.N.Y. Oct. 16, 2009), one court, without much analysis, held that a company's knowledge of

5

massive infringement plausibly alleged volitional conduct. Similarly, in *Arista Records LLC v. Usenet.com, Inc.*, 633 F. Supp. 2d 124, 148 (S.D.N.Y. 2009), another court held that a company, with a policy encouraging infringement plus the ability to stop that infringement, was liable for direct copyright infringement. These two cases, then, support the plaintiffs argument. I nonetheless believe that these cases were not correctly decided. First, *Arista Records* held that a policy encouraging infringement coupled with an ability—but refusal—to stop the massive infringement gave rise to a volitional act. But this conclusion ignores the language of *Netcom* and other cases following *Netcom*. As the Fourth Circuit put it, "knowledge coupled with inducement" or "supervision coupled with a financial interest in the illegal copying" gives rise to secondary liability, not direct-infringement liability. *See CoStar*, 373 F.3d at 549. Second, *Capitol Records*, for its part, had no analysis and simply cited *Arista Records* and *Russ Hardenburgh* as authority for its holding. *See* 2009 WL 3364036, at *3. But, as already explained, the defendant in *Russ Hardenburgh* committed a direct, volitional act by having its employees upload the copyrighted material to its server, *see* 982 F. Supp. at 510, and *Arista Records* was (in my view) wrongly decided. Accordingly, *Arista Records* and *Capitol Records* are unconvincing.

The plaintiffs next argue that *Netcom*, *Cartoon Network*, and the other cases extending *Netcom* do not apply here because those cases concerned the right to reproduce copyrighted material, not the right to distribute copyrighted material, and the plaintiffs are suing for violation of their right to distribute their copyrighted material. *Netcom* therefore does not apply, the plaintiffs say. This argument too is unconvincing.

*Netcom* is not as limited as the plaintiffs believe. The *Netcom* court, for instance, stated that it considered the copyright holder's right to distribution in its analysis. *See* 907 F. Supp. at 1372. And other courts have similarly applied *Netcom* where a defendant allegedly violated a copyright holder's right to distribute the material. *See, e.g.*, *Marobie-Fl*, 983 F. Supp. at 1178. Hence, to the extent that the plaintiffs assert that *Netcom* applies only where a defendant violates a copyright holder's right to reproduce—but not to distribute—that assertion is incorrect.

Finally, the plaintiffs contend that they have alleged a volitional act because they allege that hotfile.com makes additional copies once the copyrighted material is uploaded to the server. This argument too fails, for courts have repeatedly held that the automatic conduct of software, unaided

by human intervention, is not "volitional." *See CoStar*, 373 F.3d at 550 ("[A]n ISP who owns an electronic facility that responds automatically to users' input is not a direct infringer."); *Cartoon Network*, 536 F.3d at 131 ("[A] significant difference exists between making a request to a human employee, who then volitionally operates the copying system to make the copy, and issuing a command directly to a system, which automatically obeys commands and engages in no volitional conduct."); *Parker*, 422 F. Supp. 2d at 497 ("When an ISP automatically and temporarily stores data without human intervention so that the system can operate and transmit data to its users, the necessary element of volition is missing. The automatic activity of Google's search engine is analogous. It is clear that Google's automatic archiving of USENET postings and excerpting of websites in its results to users' search queries do not include the necessary volitional element . . . .").

Consequently, the plaintiffs' claim for direct copyright infringement in Count I is dismissed without prejudice.

### B. SECONDARY INFRINGEMENT

In Count II, the plaintiffs allege that Hotfile has induced infringement of, has committed contributory infringement of, and has vicariously infringed the plaintiffs' copyrighted works. Hotfile and Mr. Titov seek to dismiss this claim, arguing that the plaintiffs have failed to properly plead claims for infringement by inducement, contributory infringement, and vicarious infringement. Hotfile's and Mr. Titov's arguments are unconvincing.

Under Supreme Court precedent, a defendant may be liable for inducing copyright infringement if he "distributes a device with the object of promoting its use to infringe copyright, as shown by clear expression or other affirmative steps taken to foster infringement." *MGM Studios*, 545 U.S. at 936–37. The complaint alleges that hotfile.com is a website that Hotfile uses to promote copyright infringement and alleges that Hotfile took affirmative steps to foster this infringement by creating a structured business model that encourages users to commit copyright infringement. The complaint, moreover, outlines this business model in detail. At this stage, that suffices to plead a claim for inducing copyright infringement.

Someone commits contributory infringement when he, with knowledge of the infringing acts, nonetheless "induces, causes, or materially contributes to the infringing conduct of another." *Cable/Home Commc'n Corp. v. Network Prods., Inc.*, 902 F.2d 829, 845 (11th Cir. 1990). Again,

the complaint alleges that, through its business model, Hotfile induced its users to infringe the plaintiffs' copyright, that hotfile.com causes and contributes to users' copyright infringement, and that Hotfile knows of this massive infringement. And, again, the complaint explains Hotfile's business model and the operations of hotfile.com with enough detail to survive at the pleading stage. *See Fin. Sec.*, 500 F.3d at 1282.

And, finally, to allege a claim for vicarious infringement, a plaintiff must allege that the defendant "infringes vicariously by profiting from direct infringement while declining to exercise a right to stop or limit it." *MGM Studios*, 545 U.S. at 930. The complaint here alleges that Hotfile (1) has complete control over the servers that users employ to infringe, (2) has the technology necessary to stop this type of infringement, (3) refuses to stop the massive infringement, and (4) actually encourages the infringement because the infringement increases its profits. The complaint, moreover, alleges specific technological gizmos and software that Hotfile can use to prevent the infringement [D.E. 1 ¶¶ 40–41]. As with the claims for inducing infringement and for contributory infringement, nothing else is needed at this stage.

### C. Mr. Titov's Liability

Finally, the plaintiffs allege that Mr. Titov, as the guiding spirit of Hotfile, is also liable for the infringement. Mr. Titov and Hotfile believe that the complaint alleges bare allegations insufficient to overcome the pleading standard pronounced in *Twombly*, 550 U.S. at 554–55. Even after *Twombly*, however, a plaintiff need not allege all facts in novelistic detail. Here, the plaintiffs allege that Mr. Titov manages Hotfile, that he adopted the business model leading to the massive infringement, that he personally refuses to implement technologies that could reduce the infringement, and that he has paid users to upload files. At the pleading stage, this suffices to show that Mr. Titov "has the ability to supervise infringing activity and has a financial interest in that activity." *S. Bell Tel. & Tel. v. Associated Tel. Directory Publishers*, 756 F.2d 801, 811 (11th Cir. 1985).

### IV. Conclusion

For these reasons, Hotfile's and Mr. Titov's motion to dismiss [D.E. 50] is GRANTED IN PART AND DENIED IN PART, and the motion for a hearing [D.E. 51] is DENIED AS MOOT. Count I of the complaint is DISMISSED WITHOUT PREJUDICE.

DONE and ORDERED in chambers in Miami, Florida, this 8th day of July, 2011.

_____
Adalberto Jordan
United States District Judge

Copies to: All counsel of record