# EXHIBIT 13

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 11-20427-JORDAN

DISNEY ENTERPRISES, INC.,
TWENTIETH CENTURY FOX FILM CORPORATION,
UNIVERSAL CITY STUDIOS PRODUCTIONS LLLP,
COLUMBIA PICTURES INDUSTRIES, INC., and
WARNER BROS. ENTERTAINMENT INC.,

*Plaintiffs*,

v.

HOTFILE CORP., ANTON TITOV, and
DOES 1-10.

*Defendants*.
_____/

## DECLARATION OF DAVID KAPLAN

I, DAVID KAPLAN, declare as follows:

1. I hold the position of Senior Vice President, Intellectual Property Counsel, Worldwide Antipiracy Operations at Warner Bros. Entertainment Inc. ("Warner"). In that capacity, I oversee Warner's antipiracy efforts worldwide, including with respect to so-called "locker" sites, also known as "download hubs," and "linking" sites, including Hotfile. I make this declaration in support of Plaintiffs' Motion for a Protective Order. Unless otherwise indicated, I have personal knowledge of all of the procedures and events described herein.

2. One of the many tasks performed by Warner's Worldwide Antipiracy Operations Group to protect Warner's content online is to identify and respond to infringement on locker sites/download hubs (which host infringing content) and linking sites (which organize information and links regarding infringing files hosted on locker sites). Warner primarily

investigates the infringement of its works on locker sites using internal personnel and technology that Warner developed at considerable expense, and is continuously updating and refining. This technology is used to locate unauthorized Warner content on linking sites, to collect information concerning the infringement for use by Warner's attorneys and antipiracy personnel, and to generate notifications of infringement to the sites hosting the unauthorized content.

3. The parameters and instructions used by Warner's internal antipiracy personnel who manage this process have been developed by me and other attorneys in Warner's Worldwide Antipiracy Operations Group. For instance, decisions about when and how to send takedown notices, which types of online locations to search for infringing content, and which types of data to collect about infringing websites all reflect legal advice and strategic decisions made by me and other Warner counsel.

4. Warner also augments its investigation of the infringement of its works on locker sites by retaining vendors to assist Warner's investigation. Warner requires these vendors to enter into nondisclosure agreements regarding the work they perform at Warner's direction, including the specific Warner content they are tasked with searching for, the particular online locations they search for infringing content, and Warner's directions regarding the circumstances under which Warner issues notifications of infringement. These vendors all report to, and receive instructions from, either Warner attorneys or antipiracy personnel working at their direction.

5. Information gathered by Warner's antipiracy personnel and vendors, including in the course of issuing notifications of infringement, is used by Warner's attorneys, including myself, to guide our legal advice to the company regarding its response to infringement by particular websites. For instance, information about a given website's pattern of infringement

learned through Warner's takedown process is used to decide whether to escalate enforcement efforts, including to bring civil litigation or recommend criminal prosecution, as well as to assemble evidence for use in potential litigation or to provide as part of a criminal referral.

6.      If pirates were to obtain information about the antipiracy work that Warner performs on locker and linking sites, Warner would be significantly prejudiced. Such information would give pirates access to multiple routes for evading detection and enforcement. First, because Warner's technology looks for Warner content on particular online locations, pirates could readily relocate their infringement to other online locations. Second, pirate sites could implement technical countermeasures to frustrate the ability of Warner's personnel to obtain information about piracy from their websites using Warner's technology. In that case, Warner's current technology, developed over the course of several years and at significant expense, would lose much of its effectiveness. Second, because Warner and its vendors must inevitably prioritize the use of scarce resources in searching for infringement of Warner titles online, pirates could identify titles subject to a lower enforcement priority, and then infringe those titles freely. More broadly, disclosing how Warner searches for infringing content on linking and locker sites could eliminate much of the deterrent effect of Warner's antipiracy efforts with respect to piracy on those sites – persons familiar with Warner's methods and strategies for identifying unauthorized Warner content online could infringe without fear of detection if they knew how the detection worked.

7.      This concern is not theoretical, but reflects Warner's actual experience in antipiracy work. Pirates are always finding new ways to avoid detection and circumvent the technologies and strategies copyright holders' use to find them. For example, as pirates have learned of various software programs that copyright owners use to "crawl" websites and identify

3

infringing content, they have implemented various features and code changes on their sites that disable content owners' software, forcing a constant "cat and mouse" game in which copyright owners must make repeated changes to their software to keep up. Disclosure of Warner's technologies for locating infringing content on linking sites, which files are in turn hosted on locker sites/download hubs, such as Hotfile, would provide a road map for precisely such circumvention, potentially rendering ineffective the technological solutions Warner has developed for investigating piracy, as well as decreasing the usefulness of other strategies and approaches Warner has developed for responding to piracy once identified.

8. Because of these sensitivities, Warner closely guards its antipiracy strategy and enforcement priorities. Warner requires both its own employees and its outside vendors to sign confidentiality agreements. Furthermore, Warner's antipiracy strategies are not discussed with employees outside the Worldwide Antipiracy Operations Group; such matters are shared with business people within the company only on a need-to-know basis.

I declare under penalty of perjury that the foregoing is true and correct.

Executed in the State of California this 21st day of July, 2011.

_____
David Kaplan