UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 11-20427-WILLIAMS

DISNEY ENTERPRISES, INC.,
TWENTIETH CENTURY FOX FILM
CORPORATION, UNIVERSAL CITY
STUDIOS PRODUCTIONS LLLP,
COLUMBIA PICTURES INDUSTRIES,
INC., and WARNER BROS.
ENTERTAINMENT INC.,

      Plaintiffs,

v.

HOTFILE CORP., ANTON TITOV, and
DOES 1-10,

      Defendants.                /

HOTFILE CORP.,

      Counterclaimant,

v.

WARNER BROS. ENTERTAINMENT INC.,

      Counter-Defendant.          /

## FIRST AMENDED ANSWER, AFFIRMATIVE DEFENSES AND COUNTERCLAIM OF DEFENDANT HOTFILE CORPORATION TO PLAINTIFFS' COMPLAINT

      Defendant Hotfile Corporation ("Hotfile"), hereby answers, pleads defenses and

affirmative defenses to Plaintiffs'[1] Complaint, dated and filed on February 8, 2011 (the

"Complaint") and provides its first amended counterclaims against Counterdefendant Warner

Bros. Entertainment Inc.

---

[1] Plaintiffs are: Disney Enterprises, Inc., Twentieth Century Fox Film Corp., Universal City Studios Productions LLLP, Columbia Pictures Industries, Inc., and Warner Bros. Entertainment Inc., and are hereinafter referred to collectively as "Plaintiffs."

CASE NO. 11-20427-WILLIAMS

## <u>ANSWER</u>

1.      Hotfile denies each and every allegation contained in paragraph 1.

2.      Hotfile admits that when a user uploads content to hotfile.com, a uniform resource locator ("URL") relating to the uploaded file is generated.  Hotfile admits that the URL can then be shared with others who can download the uploaded file from any internet-enabled location by clicking on the URL.  Hotfile admits that Hotfile remunerates users and websites that direct traffic to hotfile.com through "affiliate" advertising, a commonly used practice among internet businesses.  Except as so expressly admitted, Hotfile denies each and every allegation contained in paragraph 2.

3.      Hotfile denies each and every allegation contained in paragraph 3.

4.      Hotfile admits that at one time, the FAQ page of the hotfile.com website contained the phrase "[u]pload files only if you intend [sic] to promote them" and the Affiliate page of the hotfile.com website contained the phrase "to encourage the good promoters by increasing their earnings and to reduce the earnings for uploaders that mainly use the free Hotfile resources for storage."  Except as so expressly admitted, Hotfile denies each and every allegation contained in paragraph 4.

5.      Hotfile admits that some estimates have ranked hotfile.com as one of the top 100 visited websites on the Internet.  Except as so expressly admitted, Hotfile denies each and every allegation contained in paragraph 5.

6.      Hotfile denies each and every allegation contained in paragraph 6.

7.      Hotfile denies each and every allegation contained in paragraph 7.

8.      Hotfile admits that the Complaint is a civil action purporting to seek damages and injunctive relief for alleged copyright infringement under the copyright laws of the United States, 17 U.S.C. § 101 *et seq.*, but denies that Plaintiffs are entitled to any relief.

9.      Paragraph 9 states a legal conclusion to which no response is required.  To the extent a response is required, Hotfile is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 9 and therefore denies each and every allegation in paragraph 9.

10.      Hotfile admits that it operates the hotfile.com website.  Hotfile admits that hotfile.com can be accessed by users in Florida.  The remaining allegations in paragraph 10 state a legal conclusion to which no response is required.  To the extent a response is required, Hotfile denies each and every allegation contained in paragraph 10.

11.      Hotfile admits that Florida corporation Lemuria Communications, Inc., provides hosting services for hotfile.com.  The remaining allegations in paragraph 11 state a legal conclusion to which no response is required.  To the extent a response is required, Hotfile denies each and every allegation contained in paragraph 11.

12.      The allegations in paragraph 12 state a legal conclusion to which no response is required.  To the extent a response is required, Hotfile denies each and every allegation contained in paragraph 12.

13.      Paragraph 13 states a legal conclusion to which no response is required.  To the extent a response is required, Hotfile denies each and every allegation contained in paragraph 13.

14.      Paragraph 14 states a legal conclusion to which no response is required.  To the extent a response is required, Hotfile denies each and every allegation contained in paragraph 14.

15.      Hotfile is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 15 and therefore denies each and every allegation therein.

16.     Hotfile is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 16 and therefore denies each and every allegation therein.

17.     Hotfile admits that Hotfile is a Panamanian corporation that operates hotfile.com. Except as so expressly admitted, Hotfile denies each and every allegation contained in paragraph 17.

18.     Hotfile denies each and every allegation contained in paragraph 18.

19.     Hotfile is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 19 and therefore denies each and every allegation therein.

20.     Hotfile admits that registered and non-registered users can upload content to hotfile.com.  Hotfile admits that when a user uploads content to hotfile.com, a URL relating to the uploaded file is generated.  Except as so expressly admitted, Hotfile denies each and every allegation contained in paragraph 20.

21.     Hotfile admits that users can access and download a file associated with a URL generated by Hotfile by clicking on the URL link or copying the URL into a web browser. Hotfile admits that a user can download the linked file for free as a regular user.  Hotfile admits that users can purchase premium memberships, which gives users access to faster download speeds and other benefits.  Except as so expressly admitted, Hotfile is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in paragraph 21 and therefore denies each and every allegation therein.

22.     Hotfile denies each and every allegation in paragraph 22.

23.     Hotfile admits that it stores content files on its servers.  Hotfile admits that Hotfile's Terms of Service reserve the right to terminate users or users' access to the Hotfile site. Except as so expressly admitted, Hotfile denies each and every allegation contained in paragraph 23.

24.     Hotfile admits users can sign up for Premium memberships, which cost up to $9 per month.  Hotfile admits that with Premium memberships, users have access to simultaneous downloads, unlimited high speed downloads, and no initial delays or download time restrictions. Hotfile admits that non-Premium users are allowed to download one file at a time and that the downloads are at slower speeds than Premium users' downloads with a delay before a file begins to download.  Hotfile admits that non-Premium users may download one file in a 30-minute period.  Except as so expressly admitted, Hotfile denies each and every allegation contained in paragraph 24.

25.     Hotfile denies each and every allegation contained in paragraph 25.

26.     Hotfile admits that "hotlinks" are URL links by which a recipient can directly access the content file corresponding to the link without visiting hotfile.com.  Hotfile admits that Premium users can purchase hotlinks.  Except as so expressly admitted, Hotfile denies each and every allegation contained in paragraph 26.

27.     Hotfile is without knowledge or information sufficient to form a belief as to the truth of Plaintiffs' characterization of the business models of Netflix or iTunes.  Hotfile denies each and every allegation contained in paragraph 27.

28.     Hotfile denies each and every allegation contained in paragraph 28.

29.     Hotfile admits that it has implemented an "Affiliate" program in which uploaders are remunerated in part based on the number of times a file they uploaded has been downloaded.

Hotfile admits that the amount affiliates are paid when their files are downloaded takes into account the rank of the affiliate and the size of the uploaded file.  Hotfile admits that an affiliate's rank is determined by (1) the ratio of the users who downloaded that affiliates files and the users who become Premium members based on that affiliate's uploaded files, and (2) the ratio of uploaded files to the number of downloaded files.  Except as expressly so admitted, Hotfile denies each and every allegation in paragraph 29.

30.     Hotfile admits that affiliates can earn a higher rank if the users who downloaded their uploaded content become premium members.  Hotfile admits that when a downloading user signs up for a premium membership, the affiliate (if any) who uploaded that content file gets credit for the sale of a premium subscription.  Hotfile admits that when a downloading user clicks a Hotfile URL link, that user is taken to a download page.  Hotfile admits that the download page allows a user to sign up for a Premium membership.  Except as expressly so admitted, Hotfile denies each and every allegation contained in paragraph 30.

31.     Hotfile admits that its affiliate compensation formula provides earnings for downloads of 100MB to 2000MB sized files that are at rates twice as high as earnings for downloads of 5 to 50MB sized files.  Except as so expressly admitted, Hotfile denies each and every allegation contained in paragraph 31.

32.     Hotfile admits that the affiliate program is intended to encourage traffic to hotfile.com.  Hotfile admits that at one time, the FAQ page of the hotfile.com website contained the phrase "[u]pload files only if you intend [sic] to promote them."  Except as so expressly admitted, Hotfile denies each and every allegation contained in paragraph 32.

33.     Hotfile admits that at one time, the Affiliate page of the hotfile.com website contained the phrase:  "We are trying to encourage the good promoters by increasing their

earnings and to reduce the earnings for uploaders that mainly use the free Hotfile resources for storage." Except as so expressly admitted, Hotfile denies each and every allegation contained in paragraph 33.

      34.    Hotfile denies each and every allegation contained in paragraph 34.

      35.    Hotfile admits that it has two additional affiliate programs listed on the Affiliate page of the hotfile.com website under "Referral programs." Hotfile further admits that at one point in time, the phrase "earn money spreading links in your site" appeared on the Affiliate page of the hotfile.com website. Except as so expressly admitted, Hotfile denies each and every allegation contained in paragraph 35.

      36.    Hotfile denies each and every allegation contained in paragraph 36.

      37.    Hotfile denies each and every allegation contained in paragraph 37.

      38.    Hotfile denies each and every allegation contained in paragraph 38.

      39.    Hotfile denies each and every allegation contained in paragraph 39.

      40.    Hotfile denies each and every allegation contained in paragraph 40.

      41.    Hotfile denies each and every allegation contained in paragraph 41.

      42.    Hotfile denies each and every allegation contained in paragraph 42.

      43.    Hotfile denies each and every allegation contained in paragraph 43.

      44.    Hotfile admits that some estimates have ranked hotfile.com as one of the top 100 visited websites on the Internet. Except as so expressly admitted, Hotfile denies each and every allegation contained in paragraph 44.

      45.    Hotfile admits that Anton Titov is the sole officer and director of Lemuria Communications. Except as so expressly admitted, Hotfile denies each and every allegation contained in paragraph 45.

## ANSWERS TO CLAIMS FOR RELIEF

### Count I – Direct Infringement of Copyright

#### (Against All Defendants)

46-57.  Count I of Plaintiffs' Complaint has been dismissed and therefore does not require a response.

### Count II – Secondary Infringement of Copyright

#### (Against All Defendants)

58.  Hotfile incorporates by reference its responses to paragraphs 1 through 57 as if fully set forth herein.

59.  Hotfile denies each and every allegation contained in paragraph 59.

60.  Hotfile denies each and every allegation contained in paragraph 60.

61.  Hotfile denies each and every allegation contained in paragraph 61.

62.  Hotfile denies each and every allegation contained in paragraph 62.

63.  Hotfile denies each and every allegation contained in paragraph 63.

64.  Hotfile denies each and every allegation contained in paragraph 64.

65.  Hotfile denies each and every allegation contained in paragraph 65.

66.  Hotfile denies each and every allegation contained in paragraph 66.

67.  Hotfile denies each and every allegation contained in paragraph 67.

68.  Hotfile denies each and every allegation contained in paragraph 68.

69.  Hotfile denies each and every allegation contained in paragraph 69.

70.  Any allegation of the Complaint not specifically admitted is hereby denied.

## DEFENSES AND AFFIRMATIVE DEFENSES

Hotfile asserts the following defenses and affirmative defenses in response to Plaintiffs' Complaint and counts purportedly stated therein, undertaking the burden of proof only as to

those defenses deemed affirmative defenses by law, regardless of how such defenses are denominated below.

71.     Plaintiffs' Complaint, and each count purportedly stated therein, is barred under the safe harbor provisions of the Digital Millennium Copyright Act as codified at 17 U.S.C. section 512 *et seq.*, because Hotfile is an Internet Service Provider that meets all the requirements of the Act.

72.     Plaintiffs' Complaint, and each count purportedly stated therein, is barred in whole or in part because Hotfile's allegedly infringing conduct constitutes fair use.  On information and belief, Hotfile users store and transmit user-generated content files, some of which may incorporate copyrighted material.  However such use can be of a small amount, and its purposes include parody and commentary.  As such use has little or no detrimental effect on the market for the copyrighted work, it constitutes fair use under the Copyright Act, 17 U.S.C. § 107.  Others uses of Hotfile, including "personal cloud storage," also constitute fair use under 17 U.S.C. § 107.

73.     Plaintiffs' Complaint, and each count purportedly stated therein, is barred in whole or in part by an express and/or implied license or due to authorization from Plaintiffs.  On information and belief, some Hotfile users store and transmit content files of which they are the authors or to which they have the authorization or license of the copyright owner.  Plaintiffs or their content-protection agents have on some occasions misidentified such works and alleged them to be infringing.  Hotfile has a license and authorization to such alleged infringements.  Furthermore, Plaintiffs have been aware of Hotfile's Special Rightsholder Accounts and Hotfile's notice and takedown policy under the DMCA and have used these mechanisms for content protection on Hotfile as to some allegedly infringing files.  These means were available

for Plaintiffs to takedown and prevent the very uses they now claim are acts of infringement. Yet, on information and belief, Plaintiffs consciously and deliberately abstained from taking down or deleting such files, which constitutes conduct reasonably interpreted as the grant of an implied license or authorization for the continued storage and sharing of these files.

74.     Plaintiffs' Complaint, and each count purportedly stated therein, fails to state a claim upon which relief can be granted for any allegedly copyrighted work that Plaintiffs did not list in Exhibit A of the Complaint and any file that Plaintiffs did not list in Schedule A to Plaintiffs' response to Hotfile Interrogatory No. 1, because Hotfile has no notice of what works Plaintiffs contend are being alleged and no ability to defend against such un-alleged claims.

75.     Plaintiffs' Complaint, and each count purportedly stated therein, is barred in whole or in part by the doctrine of laches because Plaintiffs, with full notice of Hotfile's operations and of particular hosted files that they believed to be infringing, unreasonably delayed in filing suit, which delay has prejudiced Hotfile.  On information and belief, Plaintiffs have been investigating Hotfile for over a year in which time they were aware of particular URLs of files that they believed to be infringing and had decided to contend that Hotfile's content protection policies were inadequate.  Rather than diligently and promptly bringing suit, however, Plaintiffs and their content protection agents delayed in seeking any remedy.  Not only did Plaintiffs inexplicably fail to bring suit or otherwise give Hotfile notice of their allegations during this period, to the contrary, they repeatedly complimented Hotfile's content protection efforts, offered for Hotfile to become a business affiliate, and refrained from using their Special Rightsholder Accounts to takedown the files they believed were infringing.  Plaintiffs thereby perpetuated the very infringement they now allege in this case.  Plaintiffs' unreasonable delay resulted in prejudice by causing Hotfile to leave up the files that are now alleged to infringe,

inducing Hotfile to maintain the very content protection policies Plaintiffs now impugn, and causing potentially helpful evidence to be lost.

76.     Plaintiffs' Complaint, and each count purportedly stated therein, is barred in whole or in part by the doctrine of estoppel.  Plaintiffs have been aware of Hotfile for over two years, since the earliest days of its existence.  In that time period Hotfile has consistently expeditiously responded to takedown notices from Plaintiffs and engineered a Special Rightsholder Account system to enable Plaintiffs and other content owners to immediately takedown links from Hotfile that they believed were infringing.  In that period the Studios repeatedly complimented Hotfile's content protection efforts and cooperation, and one Plaintiff offered to discuss with Hotfile a possible business affiliate partnership.  Hotfile relied on these representations believing that the Studios found Hotfile's content protection policies to be more than adequate, enforced those policies and continued to invest in the growth and expansion of its business.  Despite their repeated compliments and request for a business partnership, on information and belief, Plaintiffs had, during the period when they were complimenting Hotfile, already decided on a strategy to contend in this lawsuit that Hotfile's policies were inadequate, including that they would demand a strengthened repeat infringer policy, and stronger fingerprinting.  Furthermore, on information and belief, Plaintiffs were aware of URLs for particular files on Hotfile they believed to be infringing but deliberately left on the site.  Before bringing suit, Plaintiffs never requested or even suggested that Hotfile modify its policies, did not identify the allegedly infringing links of which they were aware and did not delete the files using their Special Rightsholder Accounts, which the Studios themselves had requested and which they represented was an "ideal" way to protect content.  In view of Plaintiffs' compliments and their silence regarding Hotfile's policies and particular files which they could

have readily sought to have revised or rectified, Plaintiffs should be estopped from seeking infringement damages or any other remedy for the pre-Complaint period.

77.     Plaintiffs' Complaint, and each count purportedly stated therein, is barred in whole or in part by the doctrine of waiver.  Plaintiffs' voluntarily relinquished their right to any remedy for the alleged infringements at issue.  On information and belief, Plaintiffs were aware of the particular infringements they have alleged against Hotfile, but deliberately abstained from promptly bringing these alleged infringements to Hotfile's attention by way of a takedown notice or by utilizing their Special Rightsholder Accounts.  Hotfile to its detriment and prejudice relied on the Studios' inaction with respect to these works, and believing that the Studios found Hotfile's content protection policies to be more than adequate, enforced those policies and continued to invest in the growth and expansion of its business.  Thus, the Studios by their own actions and inaction have perpetuated the very acts of which they now complain and have voluntarily relinquished any right to a remedy for the particular copyright infringements that they have identified in this lawsuit.

78.     Plaintiffs' Complaint, and each count purportedly stated therein, is barred in whole or in part by the doctrine of unclean hands.  Plaintiffs have engaged in a pattern of deceptive and harmful actions toward Hotfile, including complimenting Hotfile's policy to perpetuate alleged infringement, while secretly harboring a strategy to contend that Hotfile's policies were inadequate and should be strengthened, and deliberately and knowingly requesting that Hotfile takedown content that Plaintiffs did not own in order to curtail and undermine Hotfile's substantial non-infringing uses.  Because of their unclean hands, the Plaintiffs' claims are barred.

79.     Plaintiffs' Complaint, and each count purportedly stated therein, is barred in whole or in part by Plaintiffs' failure to mitigate damages.  Plaintiffs have identified approximately one thousand files or URLs on Hotfile.com that they allege are infringing.  On information and belief, Plaintiffs were aware of these files for a substantial period of time before they filed their Complaint.  Plaintiffs had at their disposal tools, including Special Rightsholder Accounts, which they themselves requested and which Hotfile engineered specifically for their benefit, to take down these links.  Yet Plaintiffs inexplicably failed to either provide notice to Hotfile under the DMCA or use their Special Rights Holder Accounts to delete the files they allege were infringing.  Moreover, after this lawsuit was filed, the Studios refused to provide Hotfile with a list of the suspected links.  They waited until they were forced to do so in discovery, finally providing a list in May 2011 some three months after filing this action.  Hotfile promptly removed or disabled any remaining files that were on the list.  The Studios' unexplained failure to take the simple measure of using notice-and-takedown or their Special Rights Holder accounts to stop the alleged infringement constitutes a failure to mitigate damages.

80.     Plaintiffs' Complaint, and each count purportedly stated therein, is barred in whole or in part because Plaintiffs do not hold the right, title or exclusive license to the copyrights they alleged are being infringed.  Plaintiffs have sent takedown notices alleging infringement of works that they do not appear to own or otherwise possess rights with respect to which they may seek redress under the Copyright Laws.  On information and belief, Plaintiffs do not own all relevant rights for all the works that they seek to have included in this case and as to which they intend to allege infringement.

81.     Plaintiffs' Complaint, to the extent it seeks redress for contributory infringement, is barred in whole or in part based on the doctrine of substantial non-infringing uses.  Hotfile is

capable of substantial non-infringing uses, including limited sharing, distribution of authorized and licensed content, sharing of public domain content and "personal cloud storage."  In light of these and other substantial non-infringing uses, the Hotfile system does not contributorily infringe Plaintiffs' copyrights.

82.     Plaintiffs' Complaint is barred by the doctrine of copyright misuse.  Warner and its agents, and on information and belief, other Plaintiffs and their agents, sent takedown requests using Hotfile Special Rightsholder Accounts for files they did not themselves own or have authority to takedown from Hotfile.  As Plaintiffs' exclusive rights under the Copyright Act did not extend to these files, such takedown requests worked an unjustified expansion of the scope of Plaintiffs' rights.  These improper and unlawful requests were violative of the policies underlying copyright law because, *inter alia*, they undermined the rights of the true copyright owners, and interfered with the public's access to those works of authorship.   These acts constitute copyright misuse and render Plaintiffs' copyrights unenforceable.

## DEMAND FOR JURY TRIAL

Hotfile demands trial by jury on all claims of Plaintiffs' Complaint so triable.

## PRAYER FOR RELIEF

WHEREFORE, Hotfile prays for the following relief:

a.     That Plaintiffs take nothing by way of their Complaint, that the Complaint be dismissed with prejudice and that judgment be rendered in favor of Hotfile;

b.     That Hotfile be awarded its costs including reasonable attorneys' fees incurred herein pursuant to 17 U.S.C. § 505, and costs pursuant to 28 U.S.C. § 1920; and

c.     For such other and further relief the Court deems just and proper.

**FIRST AMENDED COUNTERCLAIM OF COUNTERCLAIMANT HOTFILE CORP.
AGAINST COUNTER-DEFENDANT WARNER BROS. ENTERTAINMENT INC.**

Defendant/Counterclaimant Hotfile Corporation ("Hotfile"), hereby counterclaims

against Plaintiff/Counter-Defendant Warner Bros. Entertainment Inc. ("Warner") as follows:

## NATURE OF THE COUNTERCLAIM

1.      Warner is a famous and respected Hollywood Studio.  It holds copyrights to

thousands of movies and television shows.  In this case, however, Warner has acted

unscrupulously and dishonestly.  Not only has Warner (along with four other major motion

picture studios) filed this unfounded and contrived litigation against Hotfile employing overly

aggressive tactics, Warner has made repeated, reckless and irresponsible misrepresentations to

Hotfile falsely claiming to own copyrights in (or to have the owners' authorization to delete)

material from Hotfile.com.  Worse, Warner continued to make these misrepresentations even

after Hotfile explicitly brought this rampant abuse to Warner's attention, ruling out any

possibility that its wrongful actions were accidental or unknowing.  Thus, Warner has knowingly

made misrepresentations and it has engaged in DMCA abuse on an unprecedented scale by

grossly misusing the powerful anti-piracy software tool that Hotfile specially created at Warner's

request.

2.      Hotfile designed that tool, called a Special Rightsholder Account ("SRA"), to

enable Warner immediately to delete or disable an unlimited number of files that Hotfile users

have uploaded to Hotfile.com that Warner believes in good faith infringe its copyrights.  In

providing Warner with this special privilege, Hotfile relied on Warner's sophistication and

experience in DMCA take down procedures as well as its representations of its honesty and

integrity in business dealings.  Regrettably, Warner has betrayed that trust.  It has knowingly and

recklessly abused the power of the SRA tool.  It has falsely stated to Hotfile – literally thousands

of times – under penalty of perjury that Warner is the owner, or authorized legal representative of the owner, of copyrights to materials that Warner caused to be deleted from Hotfile.com when in fact Warner had no right to do so.  Warner's conduct has harmed Hotfile, Hotfile's reputation, and Hotfile's relationship with the many Hotfile users whose files have been wrongfully deleted by use of the SRA tool by Bentkover and other Warner representatives.  By this counterclaim, Hotfile seeks to recover compensation for Warner's fraudulent and irresponsible actions.

## JURISDICTION AND VENUE

3.      This Court has exclusive jurisdiction over the First Count of this counterclaim under 28 U.S.C. §§ 1331 and 1338(a) because it arises under the Copyright Act, 17 U.S.C., §§ 101 *et seq*.  This Court has jurisdiction over the state law Counts under 28 U.S.C. §§ 1332 (diversity) and 1367 (supplemental).

4.      This Court has personal jurisdiction over the Plaintiff/Counter-defendant Warner by virtue of its doing business in this District and because Warner filed this action against Hotfile as one of the Plaintiffs.

5.      Venue for this counterclaim is appropriate within this judicial district pursuant to 28 U.S.C. § 1391(b) and § 1400(a), as Warner and its agents may be found in this district.

## THE PARTIES

6.      Counterclaimant Hotfile Corporation ("Hotfile") is a corporation organized and existing under the laws of Panama, with its principal place of business located outside the United States.  Hotfile operates Hotfile.com, an internet file hosting service that offers premium network storage and access that enable its global userbase to reliably store and share digital files.

7.      Counter-defendant Warner is a Delaware corporation, with its principal place of business in Burbank, California.  Warner is intimately familiar with the requirements of the

Digital Millennium Copyright Act, 17 U.S.C. Section 512, including the rights and responsibilities of content owners such as Warner.

## **GENERAL ALLEGATIONS**

8.      Hotfile is a successful file hosting or "cloud storage" service.  It offers premium network storage and access that enable its global userbase to reliably store and share digital files. Hotfile's technology works with literally any type of computer file.  It has made significant investments in the expansion of its server facilities and is particularly well-suited to host large files including video, audio, photos and open source software packages, file types that are the future of the Internet.

9.      Upon learning that there is a claim that potentially copyright infringing material is included in files loaded on to its servers, Hotfile acts expeditiously to remove, or disable access to the material.  Hotfile has proactively worked with content owners such as Warner to devise an effective notice and take down procedure to ensure that genuinely copyrighted material is taken down and stays down.

10.      In April 2009 Hotfile's posted policy stated that "Hotfile (www.hotfile.com) is an Online Service Provider under Title II of the Digital Millennium Copyright Act, 17 U.S.C. Section 512 …"  Hotfile informed content owners, including Warner:  "To exercise your DMCA rights, your Proper DMCA Notice must be sent to Designated Agent of hotfile.com to email: abuse@hotfile.com. . .  When a Proper DMCA notification is received by Designated Agent, or when hotfile.com becomes otherwise aware that copyright rights are infringed, it will remove or disable access to infringing materials as soon as possible."

11.      Since its founding, Hotfile has consistently complied with the letter and spirit of the DMCA, which contains a number of measures designed to enlist the cooperation of Internet service providers such as Hotfile to combat ongoing copyright infringement.  Congress passed

the DMCA, so that "service providers and copyright owners to cooperate to detect and deal with copyright infringements that take place in the digital networked environment." H.R. Rep. 105-551, pt. 2, at 49 (1998).  At all times Hotfile has attempted to cooperate in good faith with Warner and the other Studios; unfortunately Warner has not reciprocated.  Instead Warner has feigned cooperation while actually working to undermine Hotfile and its user relationships.

12.     Michael Bentkover is an individual employed by Warner, as Manager, Anti-Piracy, Internet Operations, on information and belief, operating out of Warner's Burbank, California offices.  On information and belief, Bentkover is a member of Warner's Worldwide Antipiracy Operations and reports to a Warner Senior Vice President and Intellectual Property Counsel.  Shortly after Hotfile's launch, Bentkover began sending DMCA take down notices on behalf of Warner to Hotfile at the Designated Agent address, abuse@hotfile.com.  In late April 2009, Bentkover wrote to Hotfile and requested a special "takedown tool" to allow Warner to delete files "immediately and hence more efficiently [to] curb the spread of piracy of Warner Bros. content."  Warner and Bentkover represented that other sites already allowed Warner to more quickly remove infringing content "rather than sending an official takedown abuse notice every time URL's are identified."  Consistent with Hotfile's desire to cooperate Warner under the DMCA, and in reliance on Warner's representations to Hotfile that the SRA tool would be used responsibly only to delete Warner's copyrighted material and in full compliance with Warner's obligations under the DMCA, Hotfile specially engineered the SRA tool the way that Warner requested.

13.     Hotfile provided Warner with the SRA tool, which was activated in August 2009.  The account is listed under the email address michael.Bentkover@warnerbros.com.  This password protected account permits Bentkover (or someone using his email address) to log in

with the password to directly command Hotfile's servers to block any file.  Warner can enter one

or a list of URLs for files on Hotfile's systems, and they are immediately blocked.  Alternatively,

users such as Bentkover and Warner can upload a batch file with links in it, and all files

corresponding to those links will be blocked and eventually deleted.  The process is completely

automated; there is no action taken by anyone at Hotfile.

14.     If misused, the SRA tool provides Warner with the ability to cause significant,

unchecked harm to Hotfile and its users.  Once a file is deleted via the SRA tool, the Hotfile

system automatically blocks uploading of the same file or any other copy of the file with the

same hash value.  Thus if the SRA tool is misused to delete a file that is not infringing any

Warner copyright, all copies of the same file are blocked from being uploaded regardless of the

fact that the file was deleted by abusive conduct.  With the power inherent in the SRA tool came

significant responsibility for Warner.

15.     Every time Warner used the SRA tool it expressly certified "under penalty of

perjury that [it is] the owner or an authorized legal representative of the owner of copyrights"

and it "has a good faith belief that use of this material is not authorized by the copyright owner,

the copyright owner's agent, or the law" to each and every URL or file they deleted from

Hotfile.com.  This representation is required in substance to be included in DMCA notifications.

See 17 U.S.C. § 512(c)(3)(A)(vi).  Hotfile relied on Bentkover and Warner's sophistication and

familiarity with the DMCA procedures, their shared obligation with Hotfile to cooperate under

the DMCA, and in the accuracy of their representations in allowing Warner to use and maintain

its SRA tool.  As set forth below, in thousands of instances these testifications were untrue.

16.     On information and belief, Warner also utilized the services of PeerMedia,

DtectNet and Opsec to assist Warner in its so-called "anti-piracy" campaign.  On information

and belief, Bentkover, and/or other Warner representatives encouraged PeerMedia, DtectNet and Opsec to obtain SRA tools from Hotfile.  Similarly, Hotfile relied on the sophistication and expertise of these Warner agents, their familiarity with the DMCA procedures, their shared obligation with Hotfile to cooperate under the DMCA,  and in the accuracy of their representations in allowing them to use and maintain SRA tools.

17.      Hotfile also provided Warner with complimentary premium accounts by which Bentkover and Warner could view and download an unlimited number of Hotfile files at the highest available speed.  By September 2010, Warner had at least five such complimentary accounts.  Hotfile made these accounts available to Warner to allow it to verify that its copyrighted material was in fact displayed in suspected files before using the SRA tool to delete the file.  Bentkover gave Hotfile the impression that he was in fact using the premium accounts in coordination with use of the SRA tool, once complaining when the premium accounts were temporarily disabled.  On information and belief, however, Warner deleted thousands of files without ever viewing them.  Many of these files were deleted without being downloaded by anyone, meaning that although Warner had the capability to view and download the content before deleting the file, it failed to do so.  There is no excuse for Warner's failure to verify its representations, especially as they were made under penalty of perjury.

## WARNER'S ABUSE AND MISREPRESENTATIONS

18.      In September 2009, Michael Bentkover requested several increases in the daily limits of files that could be deleted via the SRA established in his name.  He requested and Hotfile provided increases to one thousand, then two thousand files, per day.  Warner requested and received additional increases in October 2009, finally requesting and receiving authority from Hotfile for the ability to delete an unlimited number of files each day.  For all of the reasons explained above, Hotfile placed its complete trust and confidence in Warner and believed that

Warner would exercise its ability to delete large numbers of files in good faith and in strict compliance with its DMCA obligations.  Hotfile would never have given Warner the ability to delete an unlimited number of files from Hotfile.com if it had known Warner would delete files without ever checking their content.

19.     In the spring of 2010, Warner provided every indication to Hotfile that it was very pleased with the effectiveness of the SRA and in Hotfile's copyright compliance efforts.  Indeed Warner's Director of Technology and Business Strategy, Worldwide Corporate Antipiracy approached Hotfile with a business proposal for the further cooperative use of the SRA, this time to generate more business for Warner and potential commissions for Hotfile.  The idea was for Hotfile to send a message to any user seeking to download content already deleted by the Warner SRA, explaining to the user the file had been deleted for copyright infringement and providing ecommerce links where the user might purchase the file.  Although Hotfile expressed interest and described adjustments to the SRA that were "exactly" what Warner had in mind, the proposed ecommerce venture did not materialize.  Nevertheless, Warner's emphasis on its use of the SRA to delete only Warner's copyrighted material, reinforced Hotfile's belief that Warner was acting responsibly and sincerely desired to cooperate with Hotfile.

20.     By September 2010, Hotfile began noticing suspicious conduct associated with the Warner DMCA takedown notices.  Hotfile alerted Warner employee Bentkover that two individuals purporting to be employees of Warner in Europe were requesting takedowns in Warner's name, explaining that Hotfile suspected that false DMCA notices were being sent under Warner's name.  Bentkover assured Hotfile that the individuals were in fact authorized by Warner to send DMCA notices on its behalf, but that henceforth they would use the SRA tool in

Bentkover's name.  Hotfile continued to rely on Warner's good faith and the accuracy of its representations made to Hotfile under penalty of perjury.

21.     Throughout 2010, and unbeknownst to Hotfile, Warner and the other Plaintiffs (other major motion picture studios), their trade association (the MPAA) along with their agent DtectNet were secretly investigating Hotfile and preparing to file this lawsuit.  The MPAA and the Plaintiffs had decided to make an example of Hotfile.com to send a message to the many similar (but generally less responsible) so-called cyberlocker sites.  On information and belief, Warner was supportive of the planned litigation and its intended very aggressive message to be sent to Hotfile and its competitors. Warner assumed (incorrectly) that it would not have same unlimited access to use its SRA tool after the lawsuit was filed.  As a result, Warner became even more overly aggressive and irresponsible in using—and abusing—the SRA in the period before and after this action was filed in February 2011.

22.     Warner's use of the SRA continued to increase in late 2010 and early 2011.  By February 2011, the Warner/Bentkover SRA was deleting literally tens of thousands of files from Hotfile.com, sometimes in a single day.  The sheer volume and rapidity of these deletions meant that Warner could never view and verify the content it was deleting.  On information and belief, it examined the text of the URLs, which contain titles selected by the user who uploaded the files on to Hotfile.com, and in some cases seemingly random sequences of letters, numbers and symbols.  Although these file names are not necessarily indicative of file content, the URLs corresponding to the some of these files deleted by Warner contained names/titles indicating that thousands of software games, freeware software and videos with pornographic content had been wrongfully deleted by use of the Warner SRA.

23.     The single file deleted by Warner that had been most frequently downloaded by Hotfile users—five times more frequently than any other file—was a freeware software title wrongfully deleted by Warner.  The software publisher that uploaded the file used Hotfile.com as a means for distribution of its open source software.  Warner was not authorized by the software publisher to delete the file.  On information and belief, Warner had never downloaded a large proportion of files that it deleted using its SRA.  As noted, if a file has never been downloaded, Warner could not have viewed its contents before deleting the file.

24.     In the days shortly before and immediately after this lawsuit was filed on February 8, 2011 the Warner SRA appears to have been used extensively to delete a huge volume of various gaming software along with many other files that do not appear to have any connection to Warner.  As many as twenty of the deleted software games include the word "demo" in the URL, strongly suggesting that the owner intended the files to be freely distributed as a marketing tool.  On information and belief, Warner did not own the copyright, and was not authorized by the copyright owner to make these deletions.

25.     In early April 2011, Hotfile provided Warner with a listing of some of these suspicious deletions made on February 7 and 8, and requested a Rule 30(b)(6) deposition witness to provide Warner's explanation.  A copy of that list, Attachment A to a Deposition Notice dated April 5, 2011, is attached as Exhibit A.  To date, however, despite repeatedly postponing the deposition (now scheduled for October 5) to allow it to complete its "investigation," Warner has offered no explanation or justification for these or other wrongful deletions.  While it has reduced the frequency of  use of the SRA somewhat since February 2011, Warner has continued to use and misuse the SRA just as before.

26.     The records of SRA deletions produced in this litigation by Warner and Hotfile indicate that a large number of files with titles indicative of content other than Warner content were being taken down wholesale by Warner without regard to whether the posting had been authorized by its owner or was fair use for other reasons.  These wrongful deletions fall into several categories.

27.     First, as noted, many software games were deleted on February 7 and February 8 approximately around the same time this lawsuit was filed.  On information and belief, Warner did not have authority from the copyright owners of these files to make these deletions. Examples of these improper software deletions as shown by Warner's own records, illustrative of hundreds if not thousands of similar deletions, are listed in Exhibit B attached hereto.  This listing shows (1) the URL or link identified by Warner as supposedly infringing, (2) the title of the Warner copyrighted work allegedly infringed, and (3) the time Warner sent the command to delete the file via its SRA.

28.     Second, on information and belief, the Warner SRA uses an automated search function looking for the title of Warner movies and television shows included in the URL or link to files posted on the Internet.  This technique has resulted in many wrongful deletions. Illustrative is the otherwise forgettable Warner movie made several years ago called *The Box*. Warner records list 3,481 files as deletions from Hotfile.com made via its SRA that it claims were copies of *The Box*.  However, Warner's own records strongly suggest that many if not a majority of those deleted files were not actually copies of—indeed had nothing to do with—the movie *The Box*.  Rather, most are just Hotfile links that had the two common words "The Box" somewhere in the file name.  For example, dozens of files whose name suggests that the content was an audio book entitled "Cancer: Out Of The Box," by Ty M. Bollinger—an alternative

cancer treatment book were deleted.  Another title suggests that the BBC production of "The Box that Saved Britain" were deleted by Warner's SRA.

29.     Recent deletions of files containing the term "The Box" were made on April 16, 2011—*after* Hotfile had notified Warner of the pattern of suspicious deletions.  Some of these appear to be a generic image file with clip art meant to be inserted as the front and back cover for "the box" of a wedding DVD.  On information and belief, the Warner/Bentkover SRA was used by Warner to delete files indiscriminately and without justification, likely with the assistance of an automated "crawler" computer program, which identified each file on Hotfile.com containing the words "the box" consecutively in its title.  Warner apparently took the results from the crawler and fed them wholesale into its Hotfile SRA without engaging in any human review or other quality check of the underlying files to verify they were actually Warner content.

30.     Warner appears to have adopted the same willful blindness strategy for file name searching with respect to other generically titled entertainment products and works (e.g. "The Closer," "Seven," "O.C.," "The Mask," "The Town," and "Exodus"), with similar overly broad and unjustifiable results.  Examples of these improper deletions as shown by Warner's own records, illustrative of hundreds if not thousands of similar deletions, are listed in Exhibit C attached hereto.  This listing shows (1) the URL or link identified by Warner as supposedly infringing, (2) the title of the Warner copyrighted work allegedly infringed, and (3) the time Warner sent the command to delete the file via its SRA.

31.     Third, is the misuse of websites listing many links to files.  For example the Warner movie entitled *The Rite*, was uploaded to *another* file hosting site, called filesonic.com, not Hotfile.  Nevertheless, because Warner apparently went to a third party search site looking for links to *The Rite,* it returned a page containing not only the filesonic link to *The Rite* but also

dozens of seemingly unrelated links to other files at filesonic.com, Hotfile.com and other sites. On information and belief, Warner used the SRA to delete each of the twenty or so Hotfile links listed on that page, even though from their titles (e.g., "Julia-Mavroi") none appear to have any relationship to *The Rite* or to Warner.  Warner's representations under penalty of perjury that it was the owner or authorized legal representative of the owner of the copyrights for the content of these files were false.  Examples of such improper deletions associated with the *Rite* as shown by Warner's own records, illustrative of hundreds if not thousands of similar deletions, are listed in Exhibit D attached hereto.  This listing shows (1) the URL or link identified by Warner as supposedly infringing, (2) the title of the Warner copyrighted work allegedly infringed, and (3) the time Warner sent the command to delete the file via its SRA.

32.     An extreme example of  Warner's wrongful conduct involves the television show "Fringe."  Warner's records show it tried to delete a file associated with the "URL" "http://hotfile.com/contacts.html and give them the details of where the link was posted and the link and they will deal to the @sshole who posted the fake."  Obviously, the "URL" Warner identified was not a Hotfile download URL at all.  Rather, the "URL" that Warner tried to delete was taken from a comment to a blog post discussing the television show "Fringe," and there was no file or content of any kind associated with the identified text.  (Since the "URL" was not a Hotfile.com file, the attempted deletion via the SRA was not successful.)  The mere presence of the word "Hotfile" in a blog entry discussing one of Warner's television shows prompted Warner to try to delete a non-file.

33.     Warner asserts that in the past it and other copyright owners have used software to "crawl" websites looking for infringing content and Warner admits that it has "technologies for locating infringing content on linking sites." See Dkt. # 106-14, pp. 3-4 [Kaplan Declaration].

On information and belief, Warner, Bentkover and Warner's other agents are well aware that its technology and techniques produce an unacceptably large number of "false positives" yet Warner used and continues to use these flawed procedures to identify and delete thousands of files from Hotfile.com in which Warner had no copyright interest and no permission from the true content owner to delete them.  As recently as July of this year one of Warner's agents for content protection on the Internet took down a Brazilian language version of a fan game relating to a Warner movie from a file hosting site.  Although it was just a software game – not the movie – Warner's agent apparently deleted the file.

34.     Warner asserts that it tracks suspected copyright infringement on hosting sites such as Hotfile primarily using its internal personnel (such as Bentkover) and its sophisticated and proprietary technology, which it is continuously updating and refining.  See Dkt. # 106-14, p.3 [Kaplan Declaration].  Yet some six months after it was provided with a list of wrongful deletions made by the Warner SRA tool, Warner continues to make the same types of erroneous deletions on Hotfile.com and apparently other sites.  Whatever updates and refinements Warner may have made, it did not correct the wrongful DMCA abuse.

35.     Even after Warner knew its methods for using the SRA were resulting in a large number of wrongful take-downs, Warner knowingly and deliberately continued to use the same flawed methods for selecting files to delete.  Thus, on information and belief, Warner knowingly and materially misrepresented to Hotfile that files on Hotfile.com contained infringing content when Warner knew they in fact did not.   Despite being given at least five complimentary premium accounts (warnerbros1-warnerbros5), that enabled Warner and Bentkover ready access to the content of each file to allow for a cursory check of the content before deleting, Warner and

Bentkover recklessly and repeatedly deleted files which they never downloaded or otherwise even attempted to verify the contents as containing Warner material.

36.     In sum, thousands of files were improperly deleted by the Warner SRA, even though contrary to its representations under penalty of perjury in each case Warner had no legitimate interest in the content and certainly no copyright ownership.  Worse, Warner's conduct was volitional.  Warner has continued to use the SRA in the same improper manner even after being notified by Hotfile of its massive abuse.

## HOTFILE HAS BEEN INJURED BY WARNER'S ACTIONS

37.     Warner and its agents, while using Hotfile's SRAs not only to expeditiously takedown content they did not own, complimented Hotfile for its DMCA policy and copyright compliance.  They emailed Hotfile on several occasions making statements such as, "I just wanted to thank you again for the removal tool…"; "Thanks – we appreciate your fast response and help"; and "Thank you *as always* for your fast cooperation and removal of Warner Bros. property."  Another anti-piracy vendor stated "Thank you very much," and made the unsolicited endorsement that "we will inform our clients of **hotfile.com's commitment to copyright compliance** at first opportunity."  While giving this reassurance to Hotfile, Warner was in fact harming Hotfile and Hotfile users and secretly preparing this lawsuit.

38.     Hotfile's DMCA notice-and-takedown regime and its SRAs represent a significant investment by Hotfile.  The success of Hotfile's copyright compliance necessarily rests in large part on the good faith and cooperation of the content owners, such as Warner. Hotfile entrusted Warner and its employee Bentkover with the SRA tool enabling them at their sole discretion to takedown links on Hotfile without any oversight or approval by Hotfile.  In placing its trust and confidence in Warner and Bentkover, Hotfile was attempting in good faith to work with Warner to "cooperate to detect and deal with copyright infringements," in accordance

with the DMCA.  S. Rep. 105-190, at 20 (1998); H.R. Rep. 105-551(11), at 49 (1998).  Warner

and Bentkover, however, abused that trust.  They repeatedly and glaringly misused the SRA

thereby harming Hotfile and its users.

39.     Hotfile users, including users whose software files were distributed on

Hotfile.com, have complained to Hotfile about their files being wrongfully deleted.  Hotfile has

been injured by Warner's wrongful conduct in at least the following ways: (1) interference with

valuable relationships with customer whose files were wrongfully deleted by Warner, (2) lost

income from customers who terminated premium accounts, (3) damage to its reputation and

good will, and (4) costs incurred in investigations and attorneys fees to uncover the full

magnitude of Warner's DMCA abuse.

## **FIRST COUNT**

### **(Violation of the DMCA, 17 U.S.C. § 512(f))**

40.     Hotfile re-alleges and incorporates Paragraphs 1-39 of this Counterclaim as

though fully set forth herein.

41.     In utilizing the SRA tool, Warner made knowing and material misrepresentations

that files on Hotfile's servers infringed Warner's intellectual property rights under the DMCA,

17 U.S.C. section 512(f).  In particular, Warner and Bentkover provided notice of claimed

infringement through their SRAs in which they falsely represented under penalty of perjury that

Warner was the owner or authorized legal representative of the owner of copyrights in hundreds

if not thousands of files as to which they had absolutely no reason or basis to make such a claim.

Warner and Bentkover further stated they had a good faith belief that the use of such material

was not authorized by the copyright owner, the copyright owner's agent, or the law, when in fact

they could have had no such belief and had no basis for such a belief.

42.     On information and belief, Warner and Bentkover actually knew of the material falsity of their misrepresentations, which arose *inter alia*, from the flawed nature of Warner's crawler algorithms and their failure to conduct a human review of the files they were submitting for takedown through their SRAs.  Warner certainly learned of the falsity of its pattern of misrepresentations at the latest when Hotfile provided notice to Warner in April 2011. Nevertheless, as shown in Exhibit C, Warner continued to engage in these misrepresentations and must have known of their falsity.

43.     In the alternative, Warner should have known, if it had acted with reasonable care or diligence, or would have no substantial doubt had it been acting in good faith and not been reckless, that Warner was not the owner or authorized legal representative of the owner of any copyrights in thousands of files it deleted from Hotfile.

44.     Hotfile relied upon the misrepresentations made by Warner in having its system delete or disable access to the files listed by Warner as allegedly infringing its copyrights in using the Warner SRA, as detailed above.

45.     Warner's and Bentkover's misrepresentations were material because hundreds, if not thousands, of the files that Warner took down based on these misrepresentations were not Warner property nor was Warner authorized to take them down.  Indeed, Warner could not have known whether these works were copyrighted or authorized at all.  Many of the files that Warner took down included open source software and other similar material which is intended by its creators to be freely shared.  As there was no basis to deprive Hotfile users of access to these works, the deprivation occasioned by Warner's misrepresentations was material.

46.     Warner had an economic motive to make these misrepresentations.  As noted above, in early 2010, Warner proposed a business arrangement with Hotfile whereby Warner

sought to present ecommerce links to Hotfile users who might purchase a Warner file for Warner's profit in place of links that Warner had deleted using its SRA. By increasing the number of links it was taking down with Hotfile's SRA, and indeed falsely inflating these numbers, Warner was increasing the number of times it could present ecommerce links to Hotfile's users for its own enrichment. On information and belief, Warner also was motivated by a desire to put Hotfile out of business.

47.     As a proximate result of Warner's conduct, Hotfile has suffered injury and has been damaged in an amount subject to proof at trial to include actual damages, including costs and attorneys' fees, incurred by Hotfile as permitted under 17 U.S.C. § 512(f).

## SECOND COUNT

### (Intentional Interference With a Contractual or Business Relationship)

48.     Hotfile re-alleges and incorporates Paragraphs 1-39 of this Counterclaim as though fully set forth herein.

49.     Warner knew that Hotfile had contracts and business relationships with its customers for the provision of file hosting services. Warner was further aware that takedown demands through its Hotfile SRAs were likely to result in Hotfile initiating steps for the removal of particular users' content and possibly the termination of users' accounts, regardless of whether such content actually infringed Warner's intellectual property rights. Warner also knew that other Hotfile users unable to download files they rightfully should have had access to would terminate their Hotfile accounts and go to other competing hosting services.

50.     Warner knew, for example, that its submission of SRA requests for files hosted on Hotfile's infrastructure, including those listed in Exhibits A-D hereto, were incorrect. Indeed, Warner continued to issue such incorrect requests without human review or adequate verification even after it was provided notice by Hotfile of the suspicious behavior of its crawler.

51.     On information and belief, Warner's use of its defectively designed crawler, its failure to engage in human review of files, and its false statements under penalty of perjury testifying to its authorization and a good faith belief of infringement, were for the purpose of interfering with Hotfile's contracts and business relationships with its users.  This has disrupted and interfered with Hotfile's business relationships and contracts and Hotfile's performance of its corresponding obligations.

52.     As a direct and proximate result of the actions of Warner as alleged herein, Hotfile has suffered and continues to suffer damages in an amount to be proven at trial.

53.     Furthermore, Hotfile seeks a permanent injunction requiring Warner to individually review Hotfile hosted files before requesting takedown or, in the alternative, to re-engineer its crawler system so as not to employ these over-inclusive algorithms.

## THIRD COUNT

### (Negligence)

54.     Hotfile re-alleges and incorporates Paragraphs 1-39 of this Counterclaim as though fully set forth herein.

55.     By virtue of Hotfile creating for Warner a special SRA with the ability directly to cause file deletions, Warner and Hotfile stood in a special relationship such that Warner owed a duty to Hotfile to exercise reasonable care and diligence in its use of its SRA.   It was highly foreseeable to Warner that its misuse of its SRA, for example by using flawed crawler algorithms for content identification, would result in taking down content from Hotfile to which Warner had no rights, and that this would directly cause losses of accounts and damage to Hotfile's goodwill. Warner and Hotfile shared an incentive to cooperate for the effective implementation of the DMCA.  Thus, in requesting a special takedown tool and entering into this collaborative

arrangement to detect and curb infringement of Warner's works on Hotfile, Warner assumed a duty of reasonable diligence and ordinary care in its use of its Hotfile SRA.

56.     Warner was negligent and breached this duty by (a) falsely representing to Hotfile under penalty of perjury that it was the owner or the authorized legal representative of the owner of copyrighted materials in thousands of files deleted by its SRA, while (b) failing to review the actual files it was taking down before requesting they be taken down, despite attesting to a good faith belief of infringement, (c) secretly operating its SRA by using a web crawler having a defective algorithm that failed to perform according to industry standards, and (d) failing to implement digital fingerprinting or other equivalent and available technology for verification of its representations.  Thus, Warner failed to exercise reasonable care under all the circumstances.

57.     Warner's conduct was deceptive and harmful, and contrary to public policy. While outwardly maintaining that Warner and Hotfile were mutually cooperating to curb piracy, Warner was simultaneously using its Hotfile SRAs in this negligent and reckless manner.  Such negligence should not be tolerated as policy matter, as Congress has contemplated that service providers and content owners should work together to curb piracy on the Internet.  Such duplicitous behavior erodes the trust necessary for such cooperation.  Furthermore, such negligent use of SRAs reduces the reliability of open hosting services like Hotfile for users, and undermines the policy aim of growing the Internet's infrastructure.

58.     As a direct and proximate result of Warner's negligent engineering of its crawler system and its secret use of this defective crawler in conjunction with Hotfile's SRAs, Hotfile has suffered damages  including loss of accounts and goodwill in an amount to be proven at trial. Indeed, Warner's practices have resulted in hundreds if not thousands of takedowns that directly resulted in injury to Hotfile.

59.     Furthermore, Hotfile seeks a permanent injunction requiring Warner to individually review or otherwise verify the content of Hotfile hosted files before requesting their takedown or, in the alternative, to certify that it has re-engineered its crawler system so as not to employ these over-inclusive algorithms.

## DEMAND FOR JURY TRIAL

Hotfile demands trial by jury on its Counterclaim.

## PRAYER FOR RELIEF

WHEREFORE, as to its Counterclaim against Warner, Hotfile prays for the following relief:

a.     Award Hotfile actual damages in an amount to be determined at trial, attorneys fees and costs pursuant to 17 U.S.C. § 512(f);

b.     Award Hotfile money damages to compensate it for the injury caused by Warner's wrongful and tortious conduct;

c.     For a permanent injunction;

d.     That Hotfile be awarded its costs pursuant to 28 U.S.C. § 1920; and

e.     For such other and further relief the Court deems just and proper.

DATED:   September 12, 2011

s/ Roderick M. Thompson
Roderick M. Thompson (admitted *pro hac vice*)
Andrew Leibnitz (admitted *pro hac vice*)
Anthony P. Schoenberg (admitted *pro hac vice*)
Deepak Gupta (admitted *pro hac vice*)
Janel Thamkul (admitted *pro hac vice*)
FARELLA BRAUN + MARTEL LLP
235 Montgomery Street
San Francisco, CA  94104
Telephone:  415.954.4400
Telecopy:  415.954.4480

s/ Janet T. Munn
Janet T. Munn
Florida Bar Number:  501281
Rasco Klock, et al.
283 Catalonia Avenue, Suite 200
Coral Gables, FL  33134
Telephone:  305.476.7101
Telecopy:  305.476.7102
Email:  jmunn@rascoklock.com

And

s/ Valentin Gurvits
Valentin Gurvits (admitted *pro hac vice*)
BOSTON LAW GROUP
825 Beacon Street, Suite 20
Newton Center, MA  02459
Telephone:  617.928.1800
Telecopy:  617.928.1802

*Counsel for Defendants Hotfile Corp. and
 Anton Titov*

CASE NO. 11-20427-WILLIAMS

## CERTIFICATE OF SERVICE

I hereby certify that on September 12, 2011, the foregoing document was served on all counsel of record or prose parties identified below either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

By: s/ Janet T. Munn
Janet T. Munn

Karen L. Stetson, Esq.
Florida Bar No. 742937
Email:  Karen.Stetson@gray-robinson.com
**GRAY-ROBINSON, P.A.**
1211 Brickell Avenue
Suite 1600
Miami, FL  33131
Telephone:  305.416.6880
Telecopy:  305.416.6887

Steven B. Fabrizio, Esq. (*pro hac vice*)
Email:  sfabrizio@jenner.com
Duane C. Pozza, Esq. (*pro hac vice*)
Email:  dpozza@jenner.com
Luke C. Platzer, Esq. (*pro hac vice*)
Email:  lplatzer@jenner.com
**JENNER AND BLOCK, LLP**
1099 New York Avenue, N.W.
Suite 900
Washington, D.C.  20001
Telephone:  202.639.6000
Telecopy:  202.639.6066