# EXHIBIT A

Highly Confidential

Page 1

1                UNITED STATES DISTRICT COURT
                 SOUTHERN DISTRICT OF FLORIDA
2             CASE NO. 11-20427-WILLIAMS/TURNOFF
3      - - - - - - - - - - - - - - - - - - - - - - - -
       DISNEY ENTERPRISES,
4      INC., TWENTIETH CENTURY
       FOX FILM CORPORATION,
5      UNIVERSAL CITY STUDIOS
       PRODUCTIONS LLLP,
6      COLUMBIA PICTURES
       INDUSTRIES, INC., and
7      WARNER BROS.
       ENTERTAINMENT, INC.,
8
9              Plaintiff,
10     v.
11     HOTFILE CORP., ANTON
       TITOV, and DOES 1-10,
12
13             Defendants.
14
15     HOTFILE CORP.,
16             Counterclaimant,
17     v.
18     WARNER BROS ENTERTAINMENT
       INC.,
19             Counterdefendant.
20     - - - - - - - - - - - - - - - - - - - - - - - -
                          VOLUME I
21           H I G H L Y   C O N F I D E N T I A L
           (Pursuant to protective order, the following
22     transcript has been designated highly confidential)
23            30(b)(6) DEPOSITION OF ANTON TITOV
                       Radisson Blu Hotel
24                      Sofia, Bulgaria
                 Monday, December 5, 2011
25                 Job Number: 44174

Highly Confidential

Page 163

1   A.   I don't know.  It might be, for a certain period of

2        time.

3   MR. FABRIZIO:  I'm going to ask the court reporter to mark

4        as Titov exhibit 26 a one-page document bearing Bates

5        number HF00032714.  And this is a document that consists

6        of three pages:  A Bulgarian original, an English

7        translation, and the certification of the translator.

8            (Titov exhibit 26 marked for identification.)

9   MR. FABRIZIO:  This is off the record.

10                   (Discussion off the record.)

11  MR. THOMPSON:  Mr. Fabrizio, just from looking at this, it

12        doesn't appear to me to match.

13  MR. FABRIZIO:  May I see?  That may explain something else

14        I'm looking at.

15            It's not.  But that does explain the other thing

16        I was looking at.  I'll take this exhibit back, so we're

17        going to adjust this exhibit; my apologies.

18            And now I will impress you all with my mastery of

19        Bulgarian.  All right.  So we have withdrawn exhibit --

20        the exhibit 26 that had been previously marked, and I'm

21        going to re-mark as exhibit 26 -- is that acceptable?

22  MR. THOMPSON:  Sure.

23  MR. FABRIZIO:  A one-page document -- darn, hold on

24        a second.

25            A one-page document bearing Bates number HF02303232.

Highly Confidential

Page 164

1          (Exhibit Titov 26 re-marked for identification.)

2     BY MR. FABRIZIO:

3     Q.   Mr. Titov, I take it that you have no issues reading

4          this document in Bulgarian?

5     A.   No, I don't.

6     MR. THOMPSON:  His counsel does.

7               Mr. Fabrizio, let me also just state while he's

8          reading that, we have become aware in the last week or

9          two or some inadvertent produced documents that were

10         written in Bulgarian that contained work product

11         information.  And I'd ask -- have asked for their

12         return.  I don't know if this is among them or not, not

13         being able to read the Bulgarian.

14    MR. FABRIZIO:  Well, then, we can deal with that afterwards.

15    MR. THOMPSON:  And I'd just like to -- I'll allow this to

16         continue, but I want to reserve a potential objection to

17         the extent this has any work product.

18    MR. FABRIZIO:  Okay.  Fair enough.  You preserve the

19         objection.  Obviously, until we see what it is, I can't

20         say whether we agree or not.

21    MR. THOMPSON:  But you agree there's no waiver by

22         letting me --

23    MR. FABRIZIO:  No, not by letting him answer the following

24         question.

25    BY MR. FABRIZIO:

Highly Confidential

Page 165

 1   Q.   Mr. Titov, is exhibit 26 a true and correct copy of an
 2        email from March 7, 2011?
 3   A.   I don't have any reasons to believe that it's not.
 4   Q.   Okay.  And is the substance of the email Hotfile's
 5        investigation of files submitted for takedown by Warner?
 6   MR. THOMPSON:  Objection, vague.
 7   A.   Yes, it is.
 8   BY MR. FABRIZIO:
 9   Q.   And in the second-to-last line, the one that ends in an
10        exclamation point, is the English translation of that
11        "This is a priority"?
12   A.   Yes, it says so.
13   Q.   Okay.  So at least at this point in time, Hotfile's
14        investigation of files taken down by Warner was
15        a priority?
16   MR. THOMPSON:  Objection, vague.
17   A.   It seems to be priority for at least part of the Hotfile
18        personnel, yes.
19   BY MR. FABRIZIO:
20   Q.   It says "andrew@Hotfile."  Who is that?
21   A.   That is Andre -- Andre Ianakov.
22   Q.   And Hotfile Corp., is that a group email?
23   A.   Without the email address, I can't say.  But probably
24        it's something that Stanislav reads, since it turns to
25        Stanislav.

Highly Confidential

Page 166

1   Q.  All right.  Fair enough.

2   MR. FABRIZIO:  We're going to change the tape.

3   VIDEOGRAPHER:  Off the record at 5:28.  This is the end of

4       tape 3, volume I I, of Anton Titov's deposition.

5                    (A break was taken.)

6   VIDEOGRAPHER:  This is the beginning of tape 4, volume I I,

7       and a continuation in the deposition of Mr. Anton Titov.

8       On the record, 5:29.

9   BY MR. FABRIZIO:

10  Q.  Over the course of your investigation of takedowns by

11      Warner, you came across DMCA notices submitted by other

12      companies and entities that contained errors as well,

13      correct?

14  A.  I believe so, yes.

15  Q.  Including a company called Porn Guardian?

16  A.  I am not aware of this occasion.

17  Q.  Did you find errors by a company called Web Sheriff?

18  A.  I don't know.

19  Q.  Did you find errors by a company called IFPI?

20  A.  I don't know.

21  Q.  But you do recall that you found errors by companies

22      that were not Warner, correct?

23  A.  Yes, I do.

24  Q.  Did Hotfile bring claims against any of those other

25      companies that had made mistakes?

Highly Confidential

Page 167

1    A.   No, they did not.

2    Q.   Hotfile had identified what it believed to have been

3         mistakes in the notices by Warner throughout

4         February, March, April and even May of 2001; is that not

5         correct?

6    MR. THOMPSON:   I'm going to object to the extent that it

7         calls for work product information which commenced after

8         the date of early March 2011.

9             To the extent you can answer without revealing work

10        product information, you can do so.

11   A.   I don't think I can answer.

12   BY MR. FABRIZIO:

13   Q.   Okay.  Well, you identified what you believed to have

14        been mistakes made by Warner prior to early March 2001;

15        is that not correct?

16   A.   Yeah, I believe so.

17   Q.   Okay.  Did you ever bring those mistakes to the

18        attention of Warner prior to filing your counterclaim?

19   A.   Not directly, no.

20   Q.   Indirectly?

21   A.   It is my belief that at some point our counsel

22        communicated with Warner, who knew.

23   MR. FABRIZIO:   Let me ask the court reporter to mark as

24        Titov exhibit 27 a document bearing the Bates number

25        HF02866338 through 369.

Highly Confidential

Page 168

```
 1          (Titov exhibit 27 marked for identification.)

 2    BY MR. FABRIZIO:

 3    Q.  I'm not going to ask you about each individual entry.

 4        Could I just ask you if this is a true and correct copy

 5        of an email and attachment that you received on or

 6        about March 10, 2011?

 7    A.  I don't reason to believe -- I don't have reasons to

 8        believe that it's not.

 9    Q.  And this is part of your early investigation of what you

10        perceived to be mistakes made by Warner in sending

11        takedown notices?

12    A.  This is some list that might contain errors, yes.

13    Q.  Okay.  Just turn to the first page, which is the first

14        page of the exhibit.  This was -- just look at -- look

15        at entry number 36, just to take one, and if you look

16        under the column F, under the heading "Copyright:" it

17        says:

18            "Copyright not Warner."

19            Do you see that?

20    A.  Yes, I do.

21    Q.  Okay.  And does that reflect that the author of this

22        exhibit concluded that that file, while not containing

23        a property likely owned by Warner, nonetheless contained

24        copyrighted content?

25    MR. THOMPSON:  Objection.  Calls for speculation, misstates
```

Highly Confidential

Page 169

1       the document.

2    A.  I'm not aware of the exact method of research the author

3        of the document used, and from what I see, my

4        interpretation would be that that is the list -- very

5        early draft of list, just to get examples.

6    BY MR. FABRIZIO:

7    Q.  But your understanding when you received this document

8        was that the notation "Copyright not Warner" meant that

9        the file was copyrighted, but not owned by Warner?

10   MR. THOMPSON:  Objection.  Calls for a legal conclusion, and

11       speculation.

12   A.  Yeah, the way I read it is that the author of the

13       document by -- I don't know, by performing some kinds of

14       analysis, concluded that probably it's copyright, but

15       not by Warner.

16   BY MR. FABRIZIO:

17   Q.  And you were one of the people that supervised this

18       investigation, were you not?

19   MR. THOMPSON:  Objection, vague.

20   A.  Say that I participated in the investigation.

21   BY MR. FABRIZIO:

22   Q.  Okay.  The "From:" says "hotfile.mailbox@gmail.com."  Do

23       you see that?

24   A.  Yes.

25   Q.  Who uses that email address?

Highly Confidential

Page 170

1   MR. THOMPSON:  You're referring to the first page now?

2   MR. FABRIZIO:  Yes, I am.

3   A.  My belief is both Andre Ianakov and Stanislav Manov had

4       access to this mailbox.

5   BY MR. FABRIZIO:

6   Q.  Mr. Ianakov and Mr. Manov?

7   A.  Yes.

8   Q.  Was Mr. Manov still employed by Blue Ant in March of

9       2011, in this timeframe?

10  A.  I'm not sure if Mr. Manov were ever employed by Blue

11      Ant.

12  Q.  What was your understanding of his relationship with

13      Blue Ant?

14  A.  I'm not aware of any relationship he had with Blue Ant.

15  Q.  Okay.  What was Mr. Manov's relationship with Hotfile?

16  A.  I think it's fair to say that Mr. Manov was independent

17      contractor.

18  Q.  Retained by what entity?

19  A.  I think Hotfile Corp.

20  Q.  Okay.  Directly?

21  A.  Yes, he was working for Hotfile Corp.

22  Q.  Do you know who the author of the exhibit to Titov

23      exhibit 27 was?

24  A.  I don't know for a fact.

25  Q.  Who do you believe it was?

Highly Confidential

Page 171

1    MR. THOMPSON:  Objection.  Calls for speculation.

2    A.  I don't know.

3    BY MR. FABRIZIO:

4    Q.  Okay.  When you received exhibit 27, did the -- did you

5        have discussions with -- strike that.

6            When you received what's been marked as exhibit 27,

7        did you discuss the attachment with anyone at Hotfile?

8    A.  I don't know.

9    Q.  Did you discuss it with Mr. Ianakov?

10   A.  I don't remember.

11   Q.  With Mr. Manov?

12   A.  I don't think so.

13   Q.  With Mr. Stoyanov?

14   A.  I don't have any memory of discussing this particular

15       document.

16   Q.  With Mr. Kolev?

17   A.  I don't remember.

18   Q.  Mr. Vangelov?

19   A.  I don't know.

20   Q.  There's an email in the CC list that says

21       "no1knows.me@gmail.com."

22           Who is "no1knowsme"?

23   MR. THOMPSON:  I think you misspoke.  It's an email address,

24       right?

25   MR. FABRIZIO:  I'm sorry?

Highly Confidential

Page 172

1    MR. THOMPSON:  You said "email"; I think you meant "email

2        address," at the beginning of your question.  Go ahead.

3    MR. FABRIZIO:  Okay.  I'll clarify.

4    Q.  Who uses the email address "no1knowsme@gmail.com"?

5    A.  That would be Diyan Chubarov.

6    Q.  Who?

7    A.  Diyan Chubarov.

8    Q.  Can you spell that?

9    MR. THOMPSON:  He spelled it earlier this morning.

10   A.  D-I-Y-A-N, C-H-U-B-U-R-O-V.

11   BY MR. FABRIZIO:

12   Q.  Okay.  I vaguely remember something like that.

13       What role does Diyan play at Hotfile, if any?

14   MR. THOMPSON:  Objection, asked and answered.

15   A.  Most generally speaking, he's a programmer.

16   BY MR. FABRIZIO:

17   Q.  Okay.  And did you have discussions with him about what

18       we've marked as exhibit 27?

19   A.  I don't remember.

20   Q.  Okay.  So you have no recollection of talking to anybody

21       about this exhibit?

22   A.  No, I don't.

23   Q.  Okay.  So you never told anyone that you thought any of

24       the results contained in the exhibit were inaccurate; is

25       that correct?

Highly Confidential

Page 173

1    MR. THOMPSON:  Objection, overbroad and vague.

2    A.  I don't recall saying anything about this exhibit .

3    BY MR. FABRIZIO:

4    Q.  Okay.  After the filing of the complaint in this action,

5        did Hotfile have a falloff in user traffic?

6    MR. THOMPSON:  Objection, vague.

7    A.  I don't know.

8    BY MR. FABRIZIO:

9    Q.  Let me rephrase the question:  In the month between the

10       filing of this action and the end of the summer of this

11       year, has Hotfile suffered a significant decrease in

12       user traffic?

13   MR. THOMPSON:  Objection, vague.

14   A.  I think it's fair to say that.

15   BY MR. FABRIZIO:

16   Q.  And in that same period, from the filing of the

17       complaint until the end of the summer, did Hotfile

18       suffer a significant decrease in monthly revenues?

19   MR. THOMPSON:  Objection, overbroad and vague.

20   A.  Yeah, I think it's fair to say so.

21   BY MR. FABRIZIO:

22   Q.  To what does Hotfile attribute the fall in traffic and

23       user revenues?

24   MR. THOMPSON:  Objection, calls for speculation.  And

25       opinion.