# EXHIBIT "D"

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 11-20427-WILLIAMS/TURNOFF

DISNEY ENTERPRISES, INC.,
TWENTIETH CENTURY FOX FILM CORPORATION,
UNIVERSAL CITY STUDIOS PRODUCTIONS LLLP,
COLUMBIA PICTURES INDUSTRIES, INC., and
WARNER BROS. ENTERTAINMENT INC.,

*Plaintiffs*,

v.

HOTFILE CORP., ANTON TITOV, and
DOES 1-10.

*Defendants.*
_____/

HOTFILE CORP.,

*Counterclaimant*,

v.

WARNER BROS. ENTERTAINMENT INC.,

*Counterdefendant.*
_____/

## RULE 26(a)(2)(B) REBUTTAL REPORT OF DR. RICHARD WATERMAN

1.  My name is Richard Waterman and I am an Adjunct Professor of Statistics at The Wharton School at the University of Pennsylvania, and the President and Co-Founder of Analytic Business Services, Inc., a consultancy focused on providing expert advice and opinions in the field of statistical analysis. Further details of my educational background, professional experience, qualifications, publications, previous testimony, and compensation are included in

my November 18, 2011 Rule 26(a)(2)(B) report in this case, and are incorporated herein by reference.

2. I have reviewed the report submitted by Prof. James Boyle in this litigation, in which Prof. Boyle identified downloads of files from Hotfile that he believes to be non-infringing. However, as Prof. Boyle acknowledges, he did not attempt to analyze a "representative statistical sample of the uses of Hotfile as a whole." Boyle Report at p. 2. He therefore provides no basis to draw conclusions from his study about the level of infringing activity on Hotfile generally, which a statistical analysis involving sampling would allow. Further, although he identifies a total number of downloads of files that he considers to be non-infringing, he does not compare that number to the number of all downloads on Hotfile. According to data provided to me that I understand has been produced by Hotfile, there have been over 2 billion downloads over the lifetime of Hotfile. Thus, from a quantitative perspective, there is no basis for concluding that the downloads that Prof. Boyle identified are "substantial" in terms of the predominant uses of the site.

3. In the statistical analysis I described in my November 18 report, I analyzed a representative sample of daily downloads of files on Hotfile drawn from Hotfile's "dailydownload" data from January 2011. That analysis enabled me to draw conclusions about the level of infringing downloads from Hotfile during the month from which the sample was drawn, and provides information about periods of time on Hotfile with substantially similar circumstances. The methodology of looking at infringement levels based on data reflecting a certain period of time is consistent with the approach taken in other studies of online infringement levels, including in the *LimeWire*, *Usenet*, and *Fung* cases. Each of those cases

CASE NO. 11-20427-WILLIAMS/TURNOFF

analyzed the availability or download activity of files at certain points or periods of time in order to determine what percentage of the file availability or activity was infringing.

4. In this case, there were strong reasons for choosing January 2011 as the period of time from which to draw the sample. My reasonable expectation is that Hotfile, in general, would be more likely to be in possession of actual content files available on Hotfile in more recent periods of time. Thus, if we drew a sample of downloads from January 2011, we would be more likely to obtain the associated files from Hotfile for those downloads than if we drew a sample of downloads from previous months. Subsequent to my initial report I have been provided with data that confirms that expectation. In the attached Exhibit 1, I have provided a graphic illustration of data showing that cohorts[1] of files uploaded in earlier months generally were less likely to be available from Hotfile after this litigation than cohorts of files uploaded in months closer to January 2011. (I understand that the presence of "file size" data is an indication of whether Hotfile is still in possession of the content file.) For example, only 15-20% (at most) of files uploaded shortly after the launch of Hotfile were still available as of the initiation of litigation, whereas up to 80% of the more recent files were available.

5. I have reviewed data regarding the development of the Hotfile site over time. Based on my review of the data, it appears that Hotfile grew at a relatively stable rate from its launch in February 2009 through January 2011. In Exhibits 2, 3, 4, and 5, I have provided a graphic depiction of a number of trends in the Hotfile data, including the steady growth in revenue, number of uploads, number of downloads, and available files.[2] All of these graphs

---

[1] A cohort of files is defined as a sequential set of one million file uploads. My understanding is that Hotfile generally numbers its uploads sequentially.
[2] Available files is defines as the cumulative sum of the difference between uploaded and deleted files.

3

show a distinct "break point" occurring in February 2011, the month in which this litigation began

6. Likewise, I have received information regarding the changes that Hotfile claims to have made to address infringing activity at various points in time. While I have no information about the effectiveness of any of these steps in reducing infringement, by intention, none of these would be expected to increase the amount of infringement on Hotfile. As reflected in Exhibits 2-5, each of the steps taken prior to February 2011 appears to have had little effect on Hotfile's consistent pattern of growth.

7. Based on the stability in Hotfile's growth from the beginning of its operation, and the fact that changes in Hotfile's operation purportedly addressing infringing activity during that time were unlikely to result in increased infringement, I would not anticipate that the level of infringing daily downloads on Hotfile for periods prior to January 2011 would be materially lower than the level of infringing daily downloads in January 2011.

8. In contrast, the change that Hotfile claims to have made to its repeat infringer policy in February 2011 appears to have been the kind of major change, a watershed event in the site, that could potentially affect the level of infringement on Hotfile. As noted in Exhibit 6, Hotfile's deletions of files spiked dramatically in February 2011. At the same time, as noted in Exhibits 2-5, Hotfile's revenues, uploads, and downloads fell sharply after February 2011. Thus, drawing a sample from January 2011 was likely a relatively conservative choice for estimating the level of infringement prior to that month, whereas I am not able to draw similar conclusions about the level of infringement on Hotfile after February 2011.

9. I understand that Hotfile has provided testimony that the "daily download" counts of downloads by "free" (non-Premium) users includes downloads from users in 54 specific

4

CASE NO. 11-20427-WILLIAMS/TURNOFF

countries, and thus there are some downloads of files by non-Premium users in January 2011 that were not included in the population from which the statistical sample was drawn. Based on the review of the data I have been provided, the volume of downloads by non-Premium users in January 2011 not included in the sampled population appears to be only approximately 16% of the total downloads. I have calculated this by comparing the non-Premium download counts of the sample files recorded in the "dailydownload" data with the non-Premium download counts in the "uploadsdownloads" data for all time periods. Assuming that the "uploadsdownloads" table counts all non-Premium downloads, approximately 84% of the total non-Premium downloads are included in the "dailydownload" data. Based on Hotfile's testimony, the other approximately 16% of daily non-Premium downloads appear to come from countries other than the 54 Affiliate countries. However, I understand that Mr. Titov has testified that he does not have any reason to believe that the downloading patterns of users from those other countries are any different from those of the users from the 54 Affiliate countries. Further, based on the sample of 1,750 downloaded files, the proportion of infringing files from non-Premium users in non-Affiliate countries was on average 16% of all downloads. For all the remaining files in the sample, it was 17%. Hence, the download rates from non-Premium users in non-Affiliate countries of sampled infringing files, and those of the remaining sample files, are almost identical. Based on Mr. Titov's testimony and my analysis described above, I have no reason to believe that the level of infringing daily downloads for non-Premium users outside the 54 countries would be materially different than to the level of infringing downloads for Premium users within the 54 countries.

10. Overall, my review of data and other information as described above leads me to believe that my conclusions about infringement levels from the sample data are likely indicative of the level of infringement prior to January 2011.

5

CASE NO. 11-20427-WILLIAMS/TURNOFF

11. I reserve the right to conduct additional analyses based on additional information and to supplement this report based on such further analyses. I further reserve the right to provide additional graphical exhibits reflecting my analysis. Additional materials that I have considered in the course of this report and exhibits I may present are being produced concurrently with this report.

CASE NO. 11-20427-WILLIAMS/TURNOFF

Dated: January 6, 2012

_____
Richard Waterman, Ph.D.