# EXHIBIT 2

Page 1

```
 1                UNITED STATES DISTRICT COURT

 2                SOUTHERN DISTRICT OF FLORIDA

 3                CASE NO. 11-20427-WILLIAMS

 4

 5   DISNEY ENTERPRISES, INC.,      )
     TWENTIETH CENTURY FOX FILM     )
 6   CORPORATION, UNIVERSAL CITY    )
     STUDIOS PRODUCTIONS LLLP,      )
 7   COLUMBIA PICTURES              )
     INDUSTRIES, INC., and          )
 8   WARNER BROS. ENTERTAINMENT     )
     INC.,                          )
 9                                  )
                                    )
10   Plaintiffs,                    )
                                    )
11                                  )
     v.                             )
12                                  )
     HOTFILE CORP., ANTON TITOV     )
13   and DOES 1-10,                 )
                                    )
14   Defendants.                    )

15

16

17              Deposition of JAMES BOYLE

18                (Taken by the Plaintiffs)

19                Raleigh, North Carolina

20                   December 21, 2011

21

22

23   Reported by:    Marisa Munoz-Vourakis -
                     RMR, CRR and Notary Public
24   TSg Job # 44315

25
```

TSG Reporting - Worldwide         877-702-9580

1    A.    This is my expert report in this case.

2    Q.    It describes a study you performed on

3 behalf of the defendants in this case?

4          MR. GUPTA:  Objection, leading.

5    A.    Yes, it does.

6    Q.    What was the methodology of your study?

7          MR. GUPTA:  Objection, that's vague

8    and ambiguous.

9    A.    Can you be a little more precise?  Would

10 you like me -- I'm happy to talk about the methodology

11 of the study.  I just -- which I lay out in some detail

12 in the report, and we can go through it, which would be

13 my preference, carefully, but I want to know which

14 aspect of the methodology you want me to answer?

15   Q.    We'll go through it carefully.

16         What was the hypothesis, if any, that you

17 were testing in your study?

18         MR. GUPTA:  Objection, that's vague

19    and ambiguous.

20   A.    There were at least two hypotheses that I

21 was testing; the first was that Hotfile was being used

22 for the distribution of content that was either clearly

23 noninfringing or highly likely noninfringing.

24         The second related hypothesis was that some

25 of those who were distributing content on Hotfile that

1  way were, that is to say, content that was
2  noninfringing were being indirectly compensated through
3  the affiliate program.
4      Q.   So your hypothesis, just taking the first
5  hypothesis, was it that Hotfile was being used to
6  distribute noninfringing or highly likely noninfringing
7  content at all?
8          MR. GUPTA:  Objection, that's
9       compound, it's vague and ambiguous.
10     A.   I understood my instructions to be to
11 examine the use of the Hotfile system in order to offer
12 to the court material that might be useful in the
13 court's determination of whether or not Hotfile had
14 substantial, noninfringing uses as a service, as laid
15 down in the case of the Sony case, and also to find out
16 the kind of uses in terms of its distribution of
17 noninfringing content that might be relevant to a
18 court's determination over several inducement viability
19 set forth in the Grokster case.
20          That was the general framework in which I
21 was looking at it, and thus I wanted to look at uses of
22 the Hotfile system that might illuminate both of those
23 questions.
24          In order to do that, I looked at the three
25 specific kinds of content identified here; namely, open

1  source software, material licensed under creative

2  commons licenses and public domain material, to see

3  whether or not there were uses in each of these cases.

4              I would stress, however, that I was simply

5  looking for exemplary uses, that is to say, examples.

6  This was not a study which purported to exhaust either

7  all of the types of noninfringing use of the Hotfile

8  service or even all of the specific types of use

9  identified in the study, that is to say, open source

10  software, creative commons license material and public

11  domain material.

12      Q.    Did you attempt to analyze the extent to

13  which Hotfile was being used to distribute

14  noninfringing content?

15              MR. GUPTA:  Objection, that's vague

16      and ambiguous, calls for speculation.

17      A.    The word extent is a vague one.  I prefer

18  to be a little more precise.  I did look at the number

19  of downloads of the material that I looked at here, and

20  in several cases in addition, I looked at whether or

21  not that material was -- whether that material fell

22  into the most downloaded categories, the list of most

23  downloaded material on Hotfile.  Those were the two

24  ways in which I was examining it.  Those obviously go

25  to the question of extent, but there are obviously

```
 1              MR. GUPTA:  Objection, that's vague
 2        and ambiguous, calls for speculation, it's
 3        outside the scope of his report.
 4     A.     I have the same work product concern that
 5  was mentioned earlier.
 6              MR. GUPTA:  Okay.  I will say that
 7        please don't answer, to the extent it would
 8        divulge any work product.
 9     A.     Could you repeat the question?
10     Q.     Do you have a conclusion as to how common
11  uploading of a file without any downloads of the file
12  is on Hotfile?
13              MR. GUPTA:  There's a work product
14        objection, and I'll instruct him not to
15        answer.
16              MR. POZZA:  Okay.
17     Q.     You did identify specific instances of
18  files being uploaded and never downloaded in your
19  report, correct?
20     A.     Yes.
21     Q.     And you were asked to study the use of the
22  Hotfile service to store certain types of material,
23  correct?
24     A.     Yes.
25     Q.     And --
```

1           hypothetical.
2      A.       It would depend very much on the facts and
3   why one was asking the question.
4      Q.       Does it depend on the total number of
5   downloads from Hotfile overall?
6           MR. GUPTA:  Objection, that's vague
7        and it lacks foundation.
8      A.       I was attempting to give the court
9   information which would be useful in a determination of
10  whether or not there was substantial noninfringing uses
11  of the Hotfile service, and whether or not there were
12  uses of Hotfile which tended to militate against
13  inducement liability under the theory of Grokster.
14  Since that was the question I was attempting to answer,
15  I looked at the kinds of things that seem relevant in
16  answering that question.
17           Since the court in Sony stressed a number
18  of different factors in talking about noninfringing
19  uses, and the courts since Sony have stressed a number
20  of different factors in talking about the capabilities
21  of system for noninfringing uses, I tried to look,
22  where possible, at the types of usages of the Hotfile
23  system which seemed to fall within those categories.
24           So high volume here for me is --
25  1.7 million seems to me to be a large number, and

1  that's a large number of downloads of a particular
2  piece of software. In this case, a great many people
3  are acquiring this piece of software. I think a court
4  looking at that, looking at the distribution of
5  copyrighted material, looking at the incentivization of
6  creativity would say that the provision of copyrighted
7  content to 1.7 million people is a very substantial
8  use.
9         That would be a substantial use, regardless
10 of the total number of downloads from the Hotfile
11 service, but that was not what I was looking at.
12     Q.    So the total number of downloads does not
13 matter in determining whether or not there is what you
14 characterize a high volume of usage?
15         MR. GUPTA:  Objection, that
16           mischaracterizes the testimony. It's vague.
17           It lacks foundation. It calls for
18           speculation and it's asked and answered.
19     A.    I think I did answer that question
20 previously, but I shall try and answer it again
21 slightly more tersely.
22         I think there are a number of factors that
23 one would look at in terms of volume. In this case, I
24 think one key feature is looking at substantial
25 noninfringing uses is to look at whether or not a

1  system allows for a particular kind of creativity or
2  cultural sharing and whether or not it allows a
3  relatively large number of people to profit from that.
4  That is one and only one of many factors that one might
5  consider in considering substantial noninfringing uses.
6           If one thinks, for example, of a book or a
7  movie, and I were able to tell you that this book or
8  movie was distributed to 1.7 million people, I think I
9  would say that is a high volume.  I, as an author,
10 would be delighted were my books to be read by
11 1.7 million people.  I imagine that the creators of
12 this software felt that that was a high volume.
13          So relative to that question, I think, yes,
14 that is indeed a high volume.
15     Q.   Going down a bit, you say, and I'll just
16 read this to be precise:  Using the Hotfile system to
17 share noninfringing software files was also a popular
18 usage of the system in relative and absolute terms.
19          Do you see that?
20     A.   Yes, I do.
21     Q.   How was it a popular usage in absolute
22 terms?
23     A.   Because there were 1.7 million downloads of
24 those files.
25     Q.   And how was it a popular usage in relative

Page 58

1  terms?

2      A.     Because the two most commonly downloaded

3  files were files of that type, that is to say,

4  noninfringing files.

5      Q.     When you say commonly downloaded, what do

6  you mean?

7             MR. GUPTA:  Objection, calls for

8         speculation.

9      A.     The two files that were listed at the top

10 of the most downloaded files on the database as --

11 which I believe the plaintiffs also have, and that was

12 determined by Elysium Digital.

13            MR. GUPTA:  I would just like to lodge

14        and objection.  It may be helpful for

15        counsel, if you want more specifics on these

16        numbers, to actually direct the witness to

17        the different tables and other numbers in

18        the report.

19     A.     The details are provided in the attached

20 documents.

21     Q.     So you say the top two most downloaded

22 files on Hotfile were open source programs, correct?

23     A.     Yes.

24     Q.     You're looking at specific files, right?

25     A.     Yes, I am, but let me qualify that

Page 61

1    Q.    But given my hypothetical, would you
2 conclude that file A, that's being downloaded 10,000
3 times, reflects a more popular usage of the system than
4 the downloading of file B, that's downloaded a thousand
5 times in a day?
6          MR. GUPTA: Same objections.
7    A.    I am happy to answer. I would rather focus
8 on what I actually said than what I might say to a
9 hypothetical that isn't what I actually said.
10         So what I actually said was that I thought
11 it was a popular usage in that first, there were a high
12 number, 1.7 million is a high number that indicates
13 some level of popularity; and B, in terms of most
14 downloaded files, some of these examples were very high
15 on the list. That's what I meant by popularity. Your
16 hypothetical is too vague for me to do the same thing
17 as I did in the study, which is to answer precisely as
18 I did here.
19   Q.    I'm trying to get a sense of what you mean
20 by popularity.
21         So in looking at the download counts, you
22 essentially looked at download counts over the entire
23 life span of Hotfile, right?
24         MR. GUPTA: Objection, once again,
25      that's vague and ambiguous. It's outside

1         the scope of his report, lacks foundation,
2         and to the extent it might divulge work
3         product, I will ask the witness not to
4         answer that part of it.
5     A.    I looked at a database, which I believe
6  included downloads from the inception of Hotfile up
7  until some relatively recent point, and it was from
8  that that I obtained the numbers you see here.
9     Q.    So did you look at the rate at which a file
10 was downloaded during the period of time it was
11 actually uploaded?
12         MR. GUPTA:  Objection, vague and
13     ambiguous.
14         MR. POZZA:  I will ask that again.
15    Q.    Did you look at the rate a file was
16 downloaded during the period of time it was available
17 on Hotfile?
18         MR. GUPTA:  Objection, vague again.
19    A.    Could you clarify rate?  What do you mean
20 by rate?
21    Q.    I'll define rate as number of downloads
22 over a day.
23    A.    No, I did not.
24    Q.    Do you think that would be an appropriate
25 measure of popularity of a file?

Page 104

1                AFTERNOON SESSION
2            (On the record at 2:44 p.m.)
3            BY MR. POZZA:
4       Q.   So turning to page two of your report.
5  Paragraph nine, sub-ii, the first sentence there reads:
6  Second Hotfile's architecture is compatible with and is
7  actually being used for a wide range of activities
8  beyond the open source software context.
9            Do you see that?
10      A.   I do.
11      Q.   What is the range of activities that
12 Hotfile's architecture is being used for?
13      A.   The specific range of activities that I
14 identified here was sharing licit content, and the
15 particular examples I picked were public domain works
16 and creative commons material, and there more broadly
17 the compatible with portion of that sentence means that
18 Hotfile's architecture allows it to be used for licit
19 purposes beyond those listed here, which as I note,
20 this is not an exhaustive list.  There are other types
21 of licit uses, which Hotfile is compatible with, which
22 I did not investigate in this report.
23      Q.   So for this report, the licit uses are the
24 distribution of public domain materials and creative
25 commons materials?

Page 126

1  In one case, for example, and I use this
2  only for illustrative purposes, they found a
3  distribution, a hash verified distribution of
4  OpenOffice, which had a file name that made it appear
5  to be a film.
6  Q.    Right.
7  A.    They told me of examples like that, but it
8  was -- that was the extent of it, because I was focused
9  on I want something which is licit, and I'm focused
10 only on that.
11 Q.    Did you investigate how many downloads of
12 the misnamed file there were?
13       MR. GUPTA:  Objection, lacks
14  foundation and is vague.
15 A.    No, as I'll say again, my goal was to study
16 illustrative, noninfringing uses.  I was specifically
17 looking for noninfringing uses, and I wanted to find
18 out if those noninfringing uses were ones which were
19 significant, either numerically or in terms of the
20 types of creativity they enabled.  That's what I was
21 trying to do.  That's what my study did.  I did not use
22 other kinds of methodologies aimed at other different
23 goals.
24 Q.    So if a copy of OpenOffice is misnamed to
25 be a pornographic film, such that would you infer that

Page 165

1  common uses of the Hotfile system.

2          Do you see that?

3      A.     I do.

4      Q.     I think we talked about the raw numbers.
5  In terms of the most common uses of the Hotfile system,
6  what do you mean there?

7      A.     I mean the information about the fact that
8  files such as iREB and sn0wbreeze and to a less extent
9  JDownloader, were among the most commonly shared files
10 on Hotfile, that their number of downloads was high in
11 proportion to, excuse me, was high in rank if you
12 looked at the most downloaded.

13     Q.     So are you making a statement about
14 different kinds of uses of the Hotfile system in
15 general?

16             MR. GUPTA:  Objection, it's vague.

17     A.     So I'm trying to give the court information
18 relevant to whether or not there are substantial,
19 noninfringing uses of Hotfile and also relevant to
20 whether or not Hotfile would be guilty of a Grokster
21 style inducement liability.  To me, as a legal scholar,
22 it appears that if you find that the one and two most
23 downloaded files on the system are actually licitly
24 shared, that seems important, that seems significant.

25             The fact that those files are examples of

1  open source development, a kind of creativity, and the
2  fact that the developers of that open source software
3  are actively choosing to use Hotfile licitly to spread
4  it and appear to be gaining some compensation, I
5  believe that a court would see that as significant in
6  the determination of substantial noninfringing uses.
7     Q.   And in the sentence when you talk about the
8  most common uses, are you referring to those particular
9  downloaded files that iREB and sn0wbreeze?
10    A.   IREB, sn0wbreeze, JDownloader, but also I
11 was talking about other open source programs which
12 weren't downloaded as many times but which were also
13 being downloaded.
14         In the next sentence, I very carefully add
15 the qualification, which is part of this:  This report
16 does not attempt to present a statistically
17 representative sample of the usage of Hotfile, and I
18 have no personal knowledge of what Hotfile's uploaded
19 content or of user downloads is noninfringing.
20 Nevertheless, within the limits suggested by the
21 sentence, my investigation provided some striking
22 facts, and then I list the factual information, which
23 we have discussed.
24    Q.   Are there any other potential noninfringing
25 uses of Hotfile, other than distributing those three

1                MR. GUPTA:  No, the covering e-mails
2        are just covering e-mails.
3        A.      Most of my communication with Elysium was
4   by teleconference, by phone call, and then I would get
5   e-mails, which were basically the only purpose of the
6   e-mail was to include the attachment.
7                So to the best of my knowledge, you have
8   all of the information that I received from Elysium,
9   which were facts and data on which I rely for my
10  opinion, and I tried to be as scrupulous about that as
11  I was about the conservatism of the method here.
12       Q.      This may provoke an objection.  What do you
13  know about the use of Hotfile storage?
14               MR. GUPTA:  I'll ask the witness not
15        to answer as to work product, and also
16        object that it's vague, ambiguous, calls for
17        speculation and lacks foundation.
18               MR. POZZA:  Are you instructing the
19        witness not to answer?
20               MR. GUPTA:  I'll give him limited room
21        to answer it.  To the extent relevant to his
22        opening report, I think he can answer.
23       A.      Based on the material in my opening report,
24  information there, I saw a design, which is consistent
25  with the use of Hotfile for storage.

Page 198

1  can be used for this. But what I didn't do, because I
2  was being very careful only to focus on those, is then
3  go out specifically to investigate it in more depth in
4  terms of numbers or what have you.
5      Q.   Did you receive any data bearing on the use
6  of Hotfile for storage of content solely for personal
7  retrieval or backup in the course of preparing this
8  report?
9      A.   To my recollection, no, because I
10 specifically was directing Elysium Digital to give me
11 information about these three categories, and so the
12 information they gave me was entirely related to that,
13 and so that was the information that I saw.
14          MR. GUPTA:  Objection, vague as to
15      solely for personal retrieval or backup.
16          MR. POZZA:  Counsel, is it your
17      position that to the extent I ask these
18      questions generally and not limited to the
19      preparation of this report, that you have a
20      work product objection?
21          MR. GUPTA:  We have a work product
22      objection to the extent counsel seeks
23      information reflecting the thought process
24      Mr. Boyle is going through in connection
25      with rebuttal report that he's preparing,

Page 199

1        and so we would ask that all questioning be

2        limited to the current expert report.

3            BY MR. POZZA:

4    Q.   Professor Boyle, do you know what a link

5  site is?

6    A.   A link site?

7            MR. GUPTA:  Objection, vague, assumes

8      facts not in evidence.

9    A.   I'm not familiar with that term.

10   Q.   Have you ever been to a site that indexes

11 Hotfile content?

12           MR. GUPTA:  Objection, vague and

13     ambiguous.

14   A.   I've been to Google, and I've looked on the

15 Hotfile site, but that doesn't list it.  So I've been

16 to Google, and that's the only one.

17   Q.   That's it, just Google?

18   A.   Google.

19   Q.   In the course of Googling content on

20 Hotfile, did you ever -- were you ever pointed to

21 another site on which a Hotfile link was listed?

22           MR. GUPTA:  Objection, vague.

23   A.   Yes, I was directed to the IHateSnow

24 developer page on which a link to Hotfile was created,

25 but my search, since I was interested in Hotfile, I

TSG Reporting - Worldwide     877-702-9580