1

```
 1                    UNITED STATES DISTRICT COURT
                      SOUTHERN DISTRICT OF FLORIDA
 2                         MIAMI DIVISION
 3
                   Case No. 11-CV-20427-WILLIAMS/TURNOFF
 4
 5   DISNEY ENTERPRISES, INC.,
     TWENTHIETH CENTURY FOX FILM
 6   CORPORATION, UNIVERSAL CITY
     STUDIOS PRODUCTIONS, LLLP,
 7   COLUMBIA PICTURES INDUSTRIES,
     INC. AND WARNER BROTHERS
 8   ENTERTAINMENT, INC.,
 9
                   Plaintiffs,
10
     vs.                                  MIAMI, FLORIDA
11                                        JANUARY 13, 2012
                                          (SEALED HEARING)
12
     HOTFILE CORPORATION,
13   ANTON TITOV AND
     DOES 1-10,
14
                   Defendants.
15
16        UNSEALED HEARING TRANSCRIPT FOR ATTORNEYS ONLY
                      OF STATUS CONFERENCE
17       BEFORE THE HONORABLE WILLIAM C. TURNOFF,
                UNITED STATES MAGISTRATE JUDGE
18
     APPEARANCES:
19
     FOR THE PLAINTIFF:
20                                 JENNER & BLOCK
                                   1099 New York Avenue, N.W.
21                                 Suite 900
                                   Washington, D.C.
22                                 BY: STEVEN B. FABRIZIO, ESQ.
                                   BY: DUANE C. POZZA, ESQ.
23
24   REPORTED BY:          JERALD M. MEYERS, RPR
     TELEPHONE:            954-431-4757
25   E-MAIL ADDRESS:       CRJM@AOL.COM
```

FILED by_____ D.C.

JAN 3 0 2012

STEVEN M. LARIMORE
CLERK U.S. DIST. CT.
S. D. of FLA. – MIAMI

```
 1

 2                                   GRAY ROBINSON, P.A.
                                     1221 Brickell Avenue
 3                                   Suite 1650
                                     Miami, Florida 33131
 4                                   BY: KAREN L. STETSON, ESQ.

 5

 6
     FOR THE DEFENDANTS:
 7

 8

 9

10                                   FARELLA BRAUN & MARTEL, LLP
                                     235 Montgomery Street
11                                   17th Floor
                                     San Francisco, California 94104
12                                   BY: RODERICK M. THOMPSON, ESQ.

13

14

15

16                                   RASCO KLOCK REININGER PEREZ ESQUENAZI
                                     VIGIL & NIETO
17                                   283 Catalonia Avenue
                                     Suite 200
18                                   Coral Gables, Florida 33134
                                     BY: JANET T. MUNN, ESQ.
19

20

21

22
     REPORTED BY:                    JERALD M. MEYERS, RPR.
23                                   J.M. COURT REPORTING, INC.
                                     1601 N.W. 109TH TERRACE
24                                   Pembroke Pines, FL 33026-2717
                                     Telephone: 954-431-4757
25                                   E-Mail Address: CRJM@AOL.COM
```

1    (Call to order of the Court)

2              THE CLERK:  All rise.

3              THE COURT:  All right.  I see this is coming from

4    Judge Williams.  We noticed this matter for a status conference

5    with respect to pending matters.

6              This is Disney Enterprises, Inc. versus Hotfile Corp.,

7    case number 11-20427-Judge Williams.

8              Can we have is appearances, please, starting with

9    plaintiffs.

10             MR. FABRIZIO:  Good afternoon, Your Honor.  Steven

11   Fabrizio, Jenner & Block for the plaintiffs.

12             MR. POZZA:  Duane Pozza, Jenner & Block for the

13   plaintiffs.

14             MS. STETSON:  Karen Stetson, Gray Robinson for the

15   plaintiffs.

16             MR. THOMPSON:  Good afternoon, Your Honor.  Robert

17   Thompson, Farella Braun & Martel for the defendants.

18             MS. MUNN:  Good afternoon, Your Honor.  Janet Munn

19   from Rasco Klock for the defendants.

20             THE COURT:  Okay.  Nice to see you all, and I know I

21   spoke to some of you on the phone before.  Where are you coming

22   from?

23             MR. FABRIZIO:  Washington, D.C., Your Honor.

24             THE COURT:  All of you?

25             MR. POZZA:  Washington, D.C. as well.

4

```
 1              MS. STETSON:  Miami Beach.

 2              THE COURT:  Oh.

 3              MS. MUNN:  Miami.

 4              MR. THOMPSON:  San Francisco for me.

 5              THE COURT:  Very good.  I am sure I told you before,

 6   you look honest, I guess.  My daughter is at San Francisco's

 7   Bloomingdale's.

 8              MR. THOMPSON:  All right.

 9              THE COURT:  My other daughter is in D.C. at Latham &

10   Watkins.

11              MR. THOMPSON:  Oh.  My daughter is also at Latham &

12   Watkins.

13              THE COURT:  What?

14              MR. THOMPSON:  I have a daughter at Latham & Watkins.

15              THE COURT:  Oh.  Is that right?

16              MR. THOMPSON:  Yes.

17              THE COURT:  Oh.  What is your last name again?

18              MR. THOMPSON:  Thompson, although she is married.  Her

19   married name is Potts.  P-o-t-t-s.

20              THE COURT:  Okay.  My daughter is married, just to

21   lose her last name, and her married name is Atricoff.

22              MR. THOMPSON:  Is it hyphenated?

23              THE COURT:  No.  Wendy Atricoff.  She doesn't do it

24   like the Russian style where they make it Atricova.  It is

25   Atricoff, and she runs their or she was in their Moscow office
```

1   for 10 years, and now she runs their world-wide pro bono

2   program out of D.C.

3            MS. MUNN:  Wow.

4            MR. THOMPSON:  Excellent.

5            MS. MUNN:  My husband taught her in high school in AP

6   classes.  Doctor Michael Fass

7            THE COURT:  Oh, sure.  Yes.  Sure.

8            MS. MUNN:  Yes.  So I will pass it on.

9            THE COURT:  And who is this?

10           MS. MUNN:  Michael Fass.

11           THE COURT:  And what is this relationship?

12           MS. MUNN:  He taught her.

13           THE COURT:  What is his relationship to you?

14           MS. MUNN:  He is my husband.

15           THE COURT:  Okay.  You are so young.  How could that

16   be?

17           MS. MUNN:  So he will be happy to hear that because he

18   asked me the other day.

19           THE COURT:  Yes.  He will remember Wendy.  Wendy is a

20   good kid.  So is my other one.  Dana.

21           MS. MUNN:  Yes.  He had both of them.

22           THE COURT:  And I remember the name.  Now, was this in

23   high school?

24           MS. MUNN:  Yes.  It was I guess North Miami Beach.

25           THE COURT:  North Miami Beach, yes.  It was right as

```
 1    they were starting to dumb down the whole program and eliminate
 2    the AP stuff.  Am I right?
 3              MS. MUNN:  Yes.
 4              THE COURT:  And, sure, I remember it very well.  The
 5    kids are very lucky.  They grew up with Mrs. Boone.
 6              MS. MUNN:  Yes.
 7              THE COURT:  And then we had Hablet who was the
 8    principal at the middle school at the time.
 9              He was the chief counselor of my summer camp, Hablet,
10    but they did very well there, and I remember the name very
11    well.  It was so many years ago.
12              MS. MUNN:  It was.
13              THE COURT:  But I sure do.  How about that?
14              Well, I ask you guys, because, you know, if you follow
15    through and remember all of this, I just mentioned it to my
16    wife, but I remember the name Fass very well.
17              It is very interesting, but, yes.  So we are
18    represented by San Francisco and D.C., and they all have
19    daughters.
20              MS. MUNN:  Yes.
21              THE COURT:  It is scary, and it got scarier about 10
22    years ago.  Their friends started to appear before me.
23              MS. MUNN:  Yes.
24              THE COURT:  Very scary.
25              MS. MUNN:  Yes.  Some of my husband's former students
```

1    were my associates at Steel Hector & Davis.  Also scary.

2        THE COURT:  Well, it is very embarrassing when you

3    have a full courtroom and you are talking to somebody, and I am

4    saying the young lady looks very familiar to me.

5        "Don't you remember?  I am little Jenny.  I used to

6    play at your house."

7        You are dealing with this multi-million dollar

8    transnational case.  My God, am I that old?  Am I that old?

9        In fact, we are interviewing somebody for a temporary

10   law clerk position.  One of my law clerks is going on maternity

11   leave, and I reached out to some of my former law clerks to let

12   them know if they know anybody, and one of my law clerks, I

13   performed the marriage ceremony for her brother more than 25

14   years ago, and so it is her nephew that is here now, and she

15   reminds me, she brought him to take pictures in the court when

16   she was a kid, and now he is graduating law school.

17       He has got a job offer in a firm.  You know, he is

18   really smart.  He went to Penn; the whole thing, and so he

19   referred him for an interview, and this is like I married his

20   father, you know, 25 years ago.  It is absolutely scary.

21       Well, folks, I can assure you that we have looked over

22   everything very carefully, so you won't be short-changed.

23   Okay.

24       You don't have to repeat everything that is set forth,

25   you know, in the pleadings, and you have already burnt 40 pages

1    of docket sheets already so early in the case.

2            So let's go down the list of the things that I have.

3    I know you did things before Judge Williams, and the first

4    thing is there are a bunch of things I can clean up easily

5    because they are duplicates of sealed matters, but what we want

6    to do is we want to clean up the record so that the computer

7    doesn't keep churning out notices of things that are not

8    pending, or duplicates.  So, before you leave, we will attempt

9    to do that.

10            The first thing I am looking at is Warner's motion to

11    compel the production of the Titov deposition, exhibit 27.

12            That is docket entry 180, and this pertains to

13    document that were produced during the depositions in Bulgaria.

14            Bearing in mind that I have reviewed everything, okay,

15    including the confidentiality agreements, okay, let me hear

16    from Hotfile.

17            MR. THOMPSON:   Thank you, Your Honor.

18            Obviously, we didn't have a chance to respond to the

19    rather extensive reply memorandum, and I would like to take a

20    few minutes to do that, if I may.

21            THE COURT:   Okay.  Now, bear in mind it is the art of

22    persuasion here.  Okay.  So use that time accordingly.

23            MR. THOMPSON:   Yes, Your Honor, and I am going to try

24    to say this very politely, but we are dealing here with several

25    violations of the protective order, and to illustrate that, if

```
 1   Your Honor --
 2            THE COURT:  They didn't complain within 5 days.  Okay?
 3            MR. THOMPSON:  That's the second one.  First, may I
 4   pass up a copy of paragraph 20?
 5            THE COURT:  That's okay.  Pass over his pass.  You can
 6   keep it.
 7            MR. THOMPSON:  Okay.  Paragraph 20 of the court's
 8   protective order required that once a document has been
 9   requested to be returned, which happened here, no dispute, on
10   November 28th, within 5 days the plaintiffs were obligated,
11   shall destroy or return all copies.  That didn't happen.
12            THE COURT:  Say this again.
13            MR. THOMPSON:  Within 5 days of a document being
14   requested back that was inadvertently produced, the protective
15   order is mandatory.  It says, "The possessing" --
16            THE COURT:  Well, first of all, did they request it
17   within 5 days that it be returned or it was retained?
18            MR. THOMPSON:  It was requested on November 28th.
19            THE COURT:  That it be returned?
20            MR. THOMPSON:  Yes.
21            THE COURT:  Okay.  So at the deposition you had
22   retained it.  I am sorry.  The plaintiff had it.  You are
23   Hotfile.
24            MR. THOMPSON:  Yes.
25            THE COURT:  You had never given up custody of the
```

1  document past the deposition, right?

2          MR. THOMPSON:  It had been produced inadvertently in

3  October.

4          THE COURT:  At the deposition?

5          MR. THOMPSON:  Before the deposition.

6          THE COURT:  Before the deposition?

7          MR. THOMPSON:  Right.

8          THE COURT:  Okay.  And then they later used it at the

9  deposition?

10          MR. THOMPSON:  Right.

11          THE COURT:  And then they kept it after the

12  deposition?

13          MR. THOMPSON:  That's correct.

14          THE COURT:  Go ahead.

15          MR. THOMPSON:  But my point is, just to go through

16  these very quickly, November 28th is the date that the document

17  was asked to be returned.  By the court's order, it was

18  supposed to be returned.

19          "Shall return within 5 days."  It was not returned.

20  That's violation number 1.

21          The Federal Rules of Civil Procedure, Rule 26(b)(3) is

22  also very explicit on this point.

23          Once a document has been asked for the return, the

24  party in the plaintiff's position shall return, sequester and

25  destroy and must not use or disclose the information until the

 1    claim of privilege is resolved.

 2              THE COURT:  Okay.

 3              MR. THOMPSON:  They used the document.  They marked it

 4    at the deposition.  They proceeded to ask questions.  They used

 5    it.  That's a violation of Rule 26.

 6              THE COURT:  I am sorry.  Did you request its return

 7    before the deposition?

 8              MR. THOMPSON:  Yes.

 9              THE COURT:  Okay.

10              MR. THOMPSON:  On November 28th, more than 5 court

11    days before.

12              THE COURT:  How much time had elapsed from the time

13    that you say you inadvertently disclosed it and the time that

14    you requested it back?

15              MR. THOMPSON:  Approximately 6 weeks.  October 14th is

16    the  --

17              THE COURT:  A month and a half?

18              MR. THOMPSON:  Yes.

19              THE COURT:  But prior to the deposition, more than 5

20    days prior to the deposition you requested it back.  Is that

21    what you are saying?

22              MR. THOMPSON:  Yes.

23              THE COURT:  And they didn't return it, and they, in

24    fact, used it at the deposition, right?

25              MR. THOMPSON:  Yes.

```
 1          THE COURT:  Now, at the deposition did you make any
 2   objections for the record, or anything like that.
 3          MR. THOMPSON:  I objected to the line of questioning
 4   which called for --
 5          THE COURT:  Did you object to the use of the document?
 6          MR. THOMPSON:  I did not make an objection to that
 7   specific document, assuming that the plaintiffs would not
 8   attempt to use a document that had been recalled.
 9          THE COURT:  Well, they were using it at the
10   deposition?
11          MR. THOMPSON:  Yes, Your Honor, and I was not aware.
12   I was in Sofia.  I was not aware of the fact that that
13   particular document had been requested to be returned.
14          After the deposition closed that day, this happened
15   about 6:00 o'clock in the evening then, right before the end of
16   the day.
17          I went on my computer and determined that that, in
18   fact, was a protected document, and the next morning, actually
19   that evening I sent an e-mail requesting its return again, and
20   the next morning I went on the record requesting its return.
21          The argument that the plaintiffs make here essentially
22   is --
23          THE COURT:  And it has never been returned?
24          MR. THOMPSON:  It has never been returned.  They did
25   follow a procedure and now bring it to Your Honor, and they say
```

1   they destroyed the other copies, but their argument comes down
2   to this, Your Honor:

3       Even though they are required under the protective
4   order to return all copies and not make no use of it, after we
5   have requested it back, that they can try and still slip it in
6   and use it at a deposition, and if we don't object, then call
7   it a waiver.  That is what their argument is.

8       I didn't object in Sofia because I didn't know that
9   particular document had been requested until later that
10  evening.

11      THE COURT:  You better say Sofia, Bulgaria.

12      MR. THOMPSON:  Sofia, Bulgaria, yes.  So, Your Honor,
13  the other violation is they used it when they shouldn't have,
14  and the third is what you alluded to earlier, they were
15  required to bring this motion within 5 days of the request to
16  return the document.  5 court days.

17      Again, that was November 28th.  This motion was filed
18  on December 12th.  It wasn't even close.

19      Now, the reason I wanted to show you --

20      THE COURT:  What were the two dates?

21      MR. THOMPSON:  Pardon me?

22      THE COURT:  What were the two dates?

23      MR. THOMPSON:  On November 28th the document was
24  requested to be returned.

25      THE COURT:  Yes.

1      MR. THOMPSON:  The motion was filed on December 12th.

2  That's not 5 court days, and I don't think there is any real

3  dispute about that.

4      They say that that was an arguable, is their word in

5  their reply, a violation, but they say essentially, well, we

6  read the court's order as saying all they had to do was submit

7  the document in-camera within 5 court days, and that they could

8  file a motion at any time thereafter.

9      That's why I wanted to show Your Honor the sentence,

10  which is all one sentence and it is, in my view, very clear.

11  Perhaps if Your Honor does not mind, I can -- well, I can read

12  it.

13      THE COURT:  You could have read it about 5 minutes

14  ago.

15      MR. THOMPSON:  I could have.  It says, "A party may

16  move the COURT for an order compelling production of the

17  document and may present the document to the court under seal

18  within 5 court days of receiving a request to return the

19  document."

20      THE COURT:  What are you reading from?

21      MR. THOMPSON:  This is paragraph 20 of the protective

22  order entered by the court, which is docket entry 68.

23      THE COURT:  You have got to say all of this for the

24  record.  Everything is being recorded here.

25      MR. THOMPSON:  Yes.  Thank you for reminding me, Your

1    Honor.

2          So that language the plaintiffs construe as saying the

3    5 court days only applies to submitting the document under seal

4    to the court, and that the tagalong about filing a motion is

5    not constrained to 5 days.

6          First of all, that's a nonsensical reading of that

7    sentence that I just read, but, secondly, Your Honor, they

8    didn't file the document under seal within 5 court days.

9          Again, the request was November 28th.  The motion

10   filing the document under seal was December 12th.  That's a

11   violation.

12         Now, when we found all of this out, before we filed

13   our opposition, we alerted the plaintiffs, "You really have

14   filed a motion here that is out of time.  It is improper."

15         We asked them to withdraw it.  It should have been

16   withdrawn, Your Honor.  It wasn't, and we are here today.

17         So, Your Honor --

18         THE COURT:  That's it?

19         MR. THOMPSON:  That's it.  Thank you.

20         MR. FABRIZIO:  Thank you, Your Honor.  Steven

21   Fabrizio.

22         Three points, Your Honor.  First, the document was

23   waived when it was used at the deposition and the witnesses

24   were questioned without any objection, but before that, Your

25   Honor, it was waived independently because the production of

1    the document was not inadvertent by all of the legal standards

2    that are considered for when a document is inadvertently

3    produced and, third, to address the point that counsel spent

4    most of his time on --

5         THE COURT:  Well, how can you say that?  I mean they

6    are saying it was inadvertent.

7         MR. FABRIZIO:  Well, Your Honor, they say subjectively

8    we didn't intend to produce it, and we credit them.

9         THE COURT:  Which is always the case.

10        MR. FABRIZIO:  Of course.  No one ever intends to

11   produce an unintendedly produced document.

12        THE COURT:  But sometimes something is inadvertent.  I

13   am just making the point that they can make that claim, and

14   they are making the claim.

15        MR. FABRIZIO:  Yes, Your Honor.  It is not the fact

16   that they produced it that makes it not inadvertent.  It is the

17   fact that of all of the circumstances surrounding the

18   production that make it legally inadvertent.

19        THE COURT:  Okay.

20        MR. FABRIZIO:  And, third, as to the claims of

21   protective order violations, what counsel does not quite make

22   clear is that they didn't produce this document once.  They

23   produced it twice.  Two identical copies of it simply with

24   different Bates numbers on it.  One of them they requested back

25   on November 28th.

1          THE COURT:  When did they produce the two?

2          MR. FABRIZIO:  Well, one of them was produced in June

3     and one of them was produced --

4          THE COURT:  That was the response to the discovery

5     request?

6          MR. FABRIZIO:  Both of them were in response to the

7     discovery requests.

8          THE COURT:  Were they produced on two separate

9     occasions?

10          MR. FABRIZIO:  On two separate occasions.

11          THE COURT:  In two separate requests?

12          MR. FABRIZIO:  No.  The same request.  It was an

13     extended production.

14          THE COURT:  Okay.

15          MR. FABRIZIO:  One was in June.  One was in October.

16     So it is not the case that we had this document for 6 weeks.

17          We had this document and we were working with it and

18     integrated it into our work product for 5 months without anyone

19     saying anything about it.

20          They served.  They didn't just request this document

21     back on November 28th or on December 3rd when they sent a

22     second e-mail.

23          The two e-mails that were sent on November 28th and

24     December 3rd asked for 64 separate documents back, and the only

25     way they identified them was with an endless stream of Bates

1   numbers.

2          Now, context, Your Honor, is important.  We were in

3   the busiest part of the case.  All of us were getting ready to

4   conduct 23 depositions in 15 days, including a series of them

5   in Bulgaria.

6          No one could have reasonably expected anyone to track

7   down Bates numbers because it is not a matter of just going to

8   a file and saying, "What is this document?  Let me pull it from

9   the file."

10          We had these documents for months.  They were part of

11   our preparation.

12          So when we marked and used the document at the

13   deposition, no one could have reasonably, with all diligence,

14   have understood that we were marking a document that they had

15   already clawed back.

16          So that is the answer in our respect to use at the

17   deposition.  Our motion is timely.  As we explained in our

18   papers, the protective order is very clear, and they want to

19   leave other provisions of the protective order out, but as we

20   briefed, the motion is timely, and Your Honor properly has the

21   document to review.

22          So what I would like to address is simply that this is

23   a document that was 297 pages long.  This is not a one page

24   document that snuck by.

25          It was produced, not among millions of documents, but

1   in a production that consisted of 83 documents.  So it is a

2   297 --

3           THE COURT:  83 documents containing more than 83 total

4   pages?

5           MR. FABRIZIO:  Yes, but this was, Your Honor, a 300

6   page document.

7           THE COURT:  It is one of the 83 documents.  When you

8   say "document," this was one of the 83 consisting of 270 pages?

9           MR. FABRIZIO:  Yes.  Exactly, and they have clawed

10  back 10 of those 83 documents.  So one out of every 8 documents

11  they produced in that production they have attempted to claw

12  back.

13          Obviously, we have honored the protective order and

14  given them all back, but this one has become so part of our

15  trial preparation and has been in use for so long and was used

16  at the deposition, it is just impossible to unring that bell,

17  Your Honor.

18          If Your Honor doesn't have any questions, I am will

19  leave it there.

20          THE COURT:  What I am going to do is the following:  I

21  am prepared to rule, counsel, on this.

22          Go ahead.  I will give you a minute.  Go ahead.

23          MR. THOMPSON:  Thank you, Your Honor.  I will be very

24  quick.

25          This was an e-mail, and it was addressed to 6

20

1    recipients.  Four of the 6 copies were withheld as privileged.

2    Only two slipped through, the two we are talking about.

3            THE COURT:  What are you talking about?  What e-mail?

4    You have to explain it.

5            MR. THOMPSON:  Okay.  An e-mail was sent to

6    addressees.  So this particular document is an e-mail.  It is

7    278 pages.  It is an attachment to an e-mail.

8            THE COURT:  Right.

9            MR. THOMPSON:  So it was sent to 6 different people --

10           THE COURT:  Yes.

11           MR. THOMPSON:  -- at Hotfile.  We reviewed those

12   documents for production.  Four of the 6 copies we found, saw

13   it was work product and did not produce them.  Withheld them.

14           THE COURT:  Right.

15           MR. THOMPSON:  You can see from the front of the

16   e-mail it went to 6 people.

17           THE COURT:  Yes.

18           MR. THOMPSON:  So only 2 of the 6 were produced.

19   That's clear evidence that it was inadvertent.

20           64 documents were withheld; were recalled Mr. Fabrizio

21   mentions.  We produced more than 1,000,000 documents in total,

22   Your Honor, and I won't bother you further.  I just wanted to

23   make those two quick points.

24           THE COURT:  It is not a question of bothering me.  It

25   is a question of having all of the information that is

1    pertinent to make a ruling on the motion.

2              MR. THOMPSON:  I didn't want to interrupt you again.

3    Sorry.

4              THE COURT:  In this matter, I understand your

5    respective positions.

6              Quite frankly, I think the better argument, and I am

7    just explaining this for the record, the better argument is

8    with the plaintiff here.

9              The technical arguments are not.  We follow the rules,

10   but the better argument here is with the plaintiff.  I am just

11   observing that because of the time lag, the use of the

12   documents, the fact it was part and parcel of the deposition,

13   and I don't know enough to know how this could impinge upon the

14   deposition as a whole, the use of this particular exhibit, and

15   the motion is not, as I understand it, to quash the deposition,

16   or has the deposition been sealed?

17             MR. FABRIZIO:  No, Your Honor.  I actually found out

18   this morning, I was very curious to find this out, Hotfile

19   allowed the -- the deposition has been final, and the

20   transcript along with I understand the exhibits has been

21   distributed for a month, and Hotfile has not sought to seal it.

22             THE COURT:  So one of the exhibits is this document in

23   question, correct?

24             MR. FABRIZIO:  Yes.

25             MR. THOMPSON:  Yes, Your Honor.  At the deposition in

1    Bulgaria, I demanded return of the document.  I asked for the

2    reporter to give it to me.  Mr. Fabrizio, who hired the

3    reporter, would not allow that to happen.

4         I didn't have any choice.  Unless he tells his

5    reporter to give it back, she is not going to do that.

6         THE COURT:  Okay.  I am not criticizing.  Whatever,

7    but if you wanted, you could have filed a motion with the court

8    to get a court order before it was even transcribed, but that's

9    okay.

10        I am not criticizing.  What I will do is the following

11   though:  I think the best I could do under the circumstances is

12   the following:

13        I will grant the motion to compel in part and defer it

14   in part, and what we will do is you will take the document.

15   You have one document remaining, the 270 pages, right?

16        MR. FABRIZIO:  No, Your Honor.  Pursuant to the

17   protective order, we gave it back to defendants and destroyed

18   all copies.

19        THE COURT:  What do you have?

20        MR. FABRIZIO:  At this point we have nothing.  We need

21   them to produce it back to us.  The protective order requires

22   us to destroy them.

23        THE COURT:  Let me ask you a question, though:  The

24   deposition you said has the attachments?

25        MR. FABRIZIO:  Oh.  That is an excerpt of this

 1  document, Your Honor.  It is a 32 page excerpt of this

 2  document.

 3      THE COURT:  Okay.  All right.  That will simply change

 4  the mechanics of what I am going to do.

 5      The motion is going to be granted in part and deferred

 6  in part, and I am going to order counsel for Hotfile to file

 7  under seal with the court, do I have to say the original or

 8  could I say a copy of the, an accurate copy, the original

 9  and/or an accurate copy of the documents in question at issue

10  here?  How can we further describe that document?

11      MR. FABRIZIO:  I think we know it, Your Honor.  Do you

12  have the Bates number?

13      THE COURT:  Well, I want a higher and wiser authority

14  to know if it reaches like the Supreme Court.  So what are we

15  referring to?

16      MR. FABRIZIO:  We can refer to it as the full 297 page

17  version of a Titov exhibit 27.

18      THE COURT:  Okay.  At issue before the court in

19  connection with docket entry 180, Warner's motion to compel

20  production of Titov's deposition, exhibit 27.

21      MR. THOMPSON:  I have the Bates numbers, Your Honor,

22  if you would like them.

23      THE COURT:  Okay.  Well, for you guys, just

24  sufficiently identify it, you know, what needs to be done.

25      MR. FABRIZIO:  Yes, Your Honor.

1          THE COURT:  And you will file it under seal with the

2     court and with the appropriate pleading, you know, a cover

3     sheet explaining it is a court order.

4          Pursuant to my court order, you are filing this

5     exhibit under seal.

6          Now, what does that accomplish?  One, I am not

7     addressing the deposition or the use thereof.  That's not

8     before me now.

9          I am not addressing whether or not the document at

10    issue can be further used in connection with this litigation

11    one way or the other.

12         If you want to use it in connection with a pleading or

13    a hearing, then that will have to be addressed beforehand by

14    pleading or something by Judge Williams or upon referral to me.

15         If you want to use it at trial, then it becomes an in

16    limine matter.  Do you follow me?

17         So what I am doing is I am maintaining the status quo.

18    You know what the document is.  You have used it in the

19    deposition.

20         You say an excerpt was filed, you know, but that is

21    there and the deposition has not been addressed and any

22    exhibits thereon have not been addressed, and so I am limiting

23    myself to your request here with request to the document at

24    issue.

25         I am requiring them to file it with the court.  And so

| | |
|---|---|
| 1 | if you don't go back to it until the trial comes up, it is |
| 2 | there and it is for Judge Williams to make an in limine ruling |
| 3 | unless you file a motion in advance.  Yes? |
| 4 | MR. FABRIZIO:  May I clarify it, Your Honor? |
| 5 | THE COURT:  Yes. |
| 6 | MR. FABRIZIO:  The document is multiple lines, |
| 7 | hundreds of lines of data, and we would have been already using |
| 8 | that data for analysis. |
| 9 | So does your order does not permit or does not |
| 10 | prohibit Warner from using that data for its analyses, does it? |
| 11 | THE COURT:  No.  I am limiting myself to the request |
| 12 | for the return of the document, am I not?  That is what you are |
| 13 | raising here. |
| 14 | MR. FABRIZIO:  The procedural confusion, Your Honor, |
| 15 | is that -- |
| 16 | THE COURT:  Let me ask you that.  Is that what you are |
| 17 | asking for?  You are asking for the return of the document? |
| 18 | MR. THOMPSON:  Exactly.  We are asking for the return |
| 19 | of the 297 page document. |
| 20 | THE COURT:  that is the request for relief, right? |
| 21 | MR. THOMPSON:  Yes. |
| 22 | THE COURT:  Okay.  I have addressed that. |
| 23 | MR. THOMPSON:  That has been granted. |
| 24 | MR. POZZA:  No. |
| 25 | MR. FABRIZIO:  No, Your Honor -- |

26

 1              THE COURT:  Counsel, you guys are like, you know, the

 2    big time lawyers here, and you filed a motion.  You crafted a

 3    motion.

 4              MR. THOMPSON:  Yes.

 5              THE COURT:  And you asked for relief.

 6              MR. THOMPSON:  Yes, sir.

 7              THE COURT:  The relief that you requested is the

 8    return of this what turns out to be a 270 page document,

 9    correct?

10              MR. THOMPSON:  Yes, sir.

11              THE COURT:  I have addressed that.  I said that it is

12    granted in part and deferred in part.  It is granted to the

13    extent that they will file that document with the court under

14    seal.  That's all I am addressing.

15              I am not addressing its use in connection with the

16    deposition, or anything else.  I am not addressing that, and

17    their opposition is to your motion which was to return the

18    document.

19              I don't see anything, maybe I missed it, a motion on

20    their part to forbid any use for you of that document where

21    nothing has been made ripe for me for consideration.

22              They are just opposing your getting the documents

23    back.  Am I missing something?  I will hear from counsel.  Am I

24    missing something from your point of view?

25              MR. FABRIZIO:  Not in terms of procedural posture.

1          THE COURT:  I am not going to tell you how to prepare

2     your case.  I am just addressing whether you get the documents

3     back from them.  What you already have, you have.

4          MR. FABRIZIO:  And, Your Honor, I appreciate that and

5     I think I understand exactly what Your Honor is saying.

6          I just want to make sure that counsel is not going to

7     accuse of us of violating orders or the Federal Rules of CIVIL

8     Procedure for using that.

9          THE COURT:  Unless you do something that is patently

10     in bad faith.  If you do something that, or you know, obviously

11     common sense suggests something that is inconsistent with what

12     I have done is, I am sealing this document.

13          MR. FABRIZIO:  But you have said we can use it

14     internally for our analysis so that we know whether we want to

15     use it.

16          THE COURT:  Well, you just used it for the deposition.

17     You had it in front of you, didn't you?

18          MR. FABRIZIO:  We had it in front of us, and I asked

19     foundational questions about it, Your Honor.

20          THE COURT:  Okay.  But you returned every copy that

21     you have, right?

22          MR. FABRIZIO:  Other than what I believe now the court

23     reporter has recirculated.

24          THE COURT:  But you said the court reporter only did

25     an excerpt?

1          MR. FABRIZIO:  Yes, Your Honor.

2          THE COURT:  Well, was there a complete copy that the

3     court reporter had?

4          MR. FABRIZIO:  I don't believe so.  I believe the

5     court reporter had a 32 page excerpt, and I believe that is the

6     only copy of the document that we have left in our possession

7     because I just found out this morning that it was returned.

8          THE COURT:  Well, you go check, you know, and the

9     excerpt, I am not addressing it.  That's part of the deposition

10    that was made a part of the record in this case.

11         MR. FABRIZIO:  Okay.

12         THE COURT:  If there is anything more than the excerpt

13    that the court reporter has, then you seal it in your own

14    safe --

15         MR. FABRIZIO:  I understand.

16         THE COURT:  -- as an officer of the Court.

17         MR. FABRIZIO:  I understand, Your Honor.

18         THE COURT:  Okay.

19         MR. FABRIZIO:  Thank you.

20         THE COURT:  Now, have I addressed your concerns?

21         MR. FABRIZIO:  You have, Your Honor.  I think it is

22    very clear now what we need to do.

23         THE COURT:  It is not a license here, though, to, you

24    know, use trickeration here and get around this order.

25         MR. FABRIZIO:  Absolutely not, Your Honor.  There was

1    never any intention to get around that order.

2         THE COURT:  I understand that.  I am just making that

3    clear for the record.

4         MR. FABRIZIO:  Thank you, Your Honor.

5         MR. THOMPSON:  Your Honor.  So the record is clear,

6    and I took good notes, I hope.  So Your Honor has directed us

7    to file it under seal.  We will do that, and then, secondly,

8    Your Honor is deferring, not making any ruling on the use of

9    the document at the deposition or the use of the document more

10   generally, and if we want to, that is if Hotfile cares to make

11   a motion in limine, to exclude this document based on work

12   grounds, we are free to do that with Judge Williams.

13        THE COURT:  That sounds about right, consistent with

14   what I have just said to counsel for the plaintiff.

15        The fact is this is a huge complicated case.  Do you

16   follow me?  And I accept in good faith his representation.

17   That has been out there for his paralegals and his associates

18   and everybody else, the investigators to deal with.

19        It would probably be difficult, if not impossible to

20   find out exactly what use it has been put to, but that's not an

21   unreasonable request.

22        I am just making it clear that if there is obviously

23   any circumvention of the letter and spirit of my ruling, it

24   will be dealt with, but I want to make it clear what you are

25   saying is that you raise a good question, though, at trial.  If

1    somebody wants to use it at trial, do you follow me?

2              MR. THOMPSON:  Yes.

3              THE COURT:  It seems to me that that would have to be

4    the subject of a specific motion before Judge Williams.

5              I don't know what her procedure is.  She may want a

6    written motion in limine in advance, or whether you do it

7    during -- I just cannot speak for her.  Do you follow me, or

8    you may not know until you are preparing for trial, but, for

9    example, if you want to use that for something, I guess

10   directly or indirectly, you would have to get a ruling from

11   Judge Williams because the document remains sealed.

12             MR. THOMPSON:  Right.

13             THE COURT:  Okay.  That is what I am trying to do.  So

14   I am trying to do the right thing here and be fair to

15   everybody.

16             MR. FABRIZIO:  Right.

17             THE COURT:  The cat is already out of the bag, to a

18   large extent.

19             MR. THOMPSON:  Yes.  I understand that, Your Honor.  I

20   just wanted to make sure we all understand your ruling.

21             So what will come up next are summary judgment

22   motions, and I anticipate that plaintiffs will want to use that

23   document in connection with their summary judgment motions.

24             I want to make clear that Your Honor has deferred any

25   ruling on whether they can or cannot do that, and it would be

1    free to object to their use of the document in connection with
2    summary judgment motions by filing an appropriate objection
3    with Judge Williams.

4              THE COURT:  Sadly, I think that is the case, and sadly
5    I see a motion coming before me on that, and that's why I have
6    said, although I have an open mind on this, believe me, but my
7    sense of it is, quite frankly, is the cat is out of the bag,
8    and without criticizing anybody, you know, and under all of the
9    circumstances, I would be justified and I think a higher and
10   wiser authority would probably agree that their motion should
11   be granted in toto, but I am not considering that now, and I am
12   sure you would have additional argument and I would have
13   additional questions.

14             MR. THOMPSON:  Thank you, Your Honor.

15             MR. FABRIZIO:  Your Honor?

16             THE COURT:  I am just giving you a sense of things
17   because the bottom line is the cat is already out of the bag
18   already, without criticizing anybody.

19             MR. THOMPSON:  I understand, Your Honor.

20             THE COURT:  That's why you guys have ulcers and I
21   don't.  Go ahead.

22             MR. FABRIZIO:  Again, Mr. Thompson threw two concepts
23   together.  I just want to make sure we are clear.

24             THE COURT:  The things that lawyers say sometimes --
25             MR. FABRIZIO:  I know.

1          THE COURT:  -- are like oxymorons.

2          MR. FABRIZIO:  I am sorry, Your Honor.

3          THE COURT:  Let's make this clear.

4          MR. FABRIZIO:  I want to make sure that I am not going

5   to get accused of violating another order.

6          There is a 297 page document that is going to be filed

7   under seal.  There is the deposition testimony and the excerpt

8   of that that is the deposition exhibit.

9          THE COURT:  Yes.

10         MR. FABRIZIO:  Now, am I correct that we may use the

11  deposition exhibit and the deposition testimony, because that

12  cat is out of the bag, but that if we want to use the full

13  document, that document is going to be under seal?

14         THE COURT:  As the record stands now, as I understand

15  it, that is absolutely correct.

16         MR. FABRIZIO:  Okay.

17         THE COURT:  And I am addressing the relief that was

18  requested in this motion to compel, and I have limited it to

19  that document as is now in the possession of Hotfile.  Do you

20  follow me?

21         MR. FABRIZIO:  I do.

22         THE COURT:  On the depositions, I have got nothing

23  before me on the deposition or the exhibits.  I am the one that

24  raised that.  Okay?

25         Does that answer your question?

1              MR. FABRIZIO:  It does exactly, Your Honor.  Is Warner

2    Brothers going to get a copy of the 297 page document as they

3    filed it under seal so that we have a copy that we keep under

4    seal as well?

5              THE COURT:  No.

6              MR. FABRIZIO:  Okay.

7              THE COURT:  They are going to file that with the

8    court.

9              MR. FABRIZIO:  Very well, Your Honor.

10             THE COURT:  What I am telling you to do is, so we

11   don't clog up the Clerk's Office even more is the full

12   transcript if your court reporter has it, which you don't know.

13   You are not in a position to answer that now.

14             MR. FABRIZIO:  She does not have the full document.

15   She does not.  I know that.  We never marked the full document.

16             THE COURT:  Well, whatever she has that is beyond the

17   37 page excerpt, which is an official part of the transcript

18   from the deposition --

19             MR. FABRIZIO:  Yes.

20             THE COURT:  -- If there is one word beyond that --

21             MR. FABRIZIO:  We put it under seal ourselves.

22             THE COURT:  -- you it under seal yourself.  You put it

23   in the safe.

24             MR. FABRIZIO:  I understand.

25             THE COURT:  Okay.

1    MR. FABRIZIO:  Thank you, Your Honor.

2    THE COURT:  Okay.

3    MR. THOMPSON:  Thank you, Your Honor.

4    THE COURT:  No more?  Nothing more?  This is only the

5    first one.

6    Okay.  That is my order.  All of my orders are in

7    effect as we speak.  We will reduce it to writing, but the full

8    record here is incorporated by reference into the orders.

9    Now, I have Warner's sealed motion to compel

10   production of Titov deposition.  Did I just do that?

11   MR. THOMPSON:  Yes, Your Honor.

12   THE COURT:  Hold on a second.  I have document entry

13   180, Warner's motion to compel production of Titov's

14   deposition, exhibit 27.  Document entry 28.

15   Okay.  Is that the sealed motion?  Is that the sealed

16   version of the motion?

17   MS. MUNN:  183 is the sealed version.

18   THE COURT:  It is the same thing, right?

19   MS. MUNN:  Yes.

20   THE COURT:  Okay.  That is deemed moot.  Does

21   everybody agree?

22   MR. FABRIZIO:  Yes, Your Honor.

23   MR. THOMPSON:  Yes, Your Honor.

24   THE COURT:  187 is Disney's sealed motion to compel

25   the deposition of Andrei Ianakov and request for expedited

 1   briefing.  Yes, sir?

 2            MR. FABRIZIO:  That motion has been withdrawn, Your

 3   Honor, pursuant to stipulation between the parties.

 4            THE COURT:  Great.  Oh, great.  Let me be clear and

 5   say "great."

 6            MR. FABRIZIO:  Thank you, Your Honor.  199.  So that

 7   is withdrawn.

 8            199.  Plaintiff's renewed motion to compel production

 9   of documents from Lemuria Communications.  This is a redacted

10   docket entry 203 which contains the motion in a sealed form.

11            Okay.  So remind me when we get to 203.  Now, this

12   involves -- give me one second, please.  Okay.

13            Counsel for plaintiff, this involves, and I will hear

14   from you, involves documents from Lemuria.

15            MR. POZZA:  Duane Pozza for the plaintiffs, Your

16   Honor.  That's right.  This involves a renewed motion to compel

17   documents from Lemuria Communications which is a third-party

18   pursuant to a subpoena.

19            THE COURT:  How do you get around Judge Jordan's prior

20   order?

21            MR. POZZA:  Judge Jordan's prior order was based on

22   the representations that Lemuria made based on discovery that

23   had been done until that time that Lemuria was an arm's length

24   third-party providing hosting services to Hotfile.

25            We knew at the time that it was owned and operated by

1    the defendant, Anton Titov, but there was no hard evidence at

2    that Lemuria --

3           THE COURT:  Judge Jordan knew it was owned by Titov,

4    correct?

5           MR. POZZA:  That's right.

6           THE COURT:  Go ahead.

7           MR. POZZA:  And what Judge Jordan held was the fact

8    that there is like these overlapping ownership and the fact

9    that Lemuria provides hosting services meant that, you know, we

10   were entitled to discovery about documents that Lemuria had

11   about hosting services provided to Hotfile.

12          THE COURT:  No  He said that just because there is

13   that relationship, you haven't met your legal test to pierce

14   the corporate veil and the reasons why there are laws regarding

15   corporations.

16          MR. POZZA:  Right.  What we have subsequently learned

17   in discovery is that Lemuria has a much closer relationship,

18   not just in the sense of needing to sort of pierce the

19   corporate veil, but also in the operational aspects of Hotfile,

20   such that Lemuria would have a large number of documents that

21   go beyond merely hosting services that would be relevant and

22   discoverable as from any third-party, and that, in our view, no

23   longer give burdens for them to produce, and these were

24   documents that, you know, are based on relationships we did not

25   know at the time.

1         So, for example, Lemuria is contracting to provide the

2   software for Hotfile.  Lemuria has the contract with this

3   company, Blue Ant that is providing the contractor/employees

4   who run Hotfile.

5         Lemuria has the contract with this other party Vogel

6   that developed this digital fingerprinting technology that

7   Hotfile has implemented.

8         So these are all situations where Hotfile is

9   essentially using Lemuria as the repository of potentially

10  relevant documents.  And so the reason why we renewed the

11  motion was because we were unable to get a straight answer that

12  Lemuria did, in fact, produce, which they did because they

13  opposed our previous motion, a full range of documents that

14  they had about these other topics as to which we only recently

15  learned Lemuria would definitely have responsive information.

16        THE COURT:  Has Lemuria represented, under penalities

17  of perjury, that they have no further documents to produce?

18        MR. POZZA:  I don't believe they have, Your Honor.

19  There is an e-mail that they had sent prior to, when we brought

20  the motion.  It addresses only two categories, and I believe

21  they have sort of, it is not under penalty of perjury, and it

22  is carefully worded to say that they produced "responsive

23  documents," but that only begs the question because Judge

24  Jordan's previous order limited what was responsive, and this

25  would expand the scope of documents that would be responsive.

1          So there has been no representation that they no

2    longer have any documents to produce.  And, indeed, it wouldn't

3    make much sense because we spent a lot of energy fighting about

4    this the first time.

5          If there were no other documents that Lemuria had, I

6    don't see why we would have even needed to fight about the

7    motion in the first place.

8          They would have said Lemuria has nothing else.

9          THE COURT:  In your renewed motion, remember, we are

10   making a record here.  We have Judge Jordan's well-reasoned and

11   sound opinion.

12         In the motion before me that is here now, have you

13   cited the additional facts and law that would support your

14   request, notwithstanding Judge Jordan's prior order?

15         MR. POZZA:  Yes, Your Honor.  We have cited to

16   additional facts and law that would entitle us to that.

17         THE COURT:  Okay.  Why don't you summarize that.

18         MR. POZZA:  We attached excerpts of the deposition of

19   Anton Titov.

20         THE COURT:  Did that take place after Judge Jordan's

21   ruling?

22         MR. POZZA:  Which took place after Judge Jordan's

23   ruling, establishing that Lemuria is a corporate entity and has

24   been used to further a number of Hotfile's operations,

25   including by entering into contracts with Vogel as I mentioned,

39

1   this company Blue Ant as I mentioned and has paid for Hotfile's

2   contractors who are essentially its employees and has paid for

3   its software development, and also that it essentially has, you

4   know, served as a funnel for Hotfile's money to go to other

5   third-parties as well.

6           THE COURT:  And, again, the situation is the same.

7   Titov owns this company as well, correct?

8           MR. POZZA:  Titov owns and operates this company.

9   That is correct.

10          THE COURT:  Okay.  And summarize the category of

11   documents that you are requesting?

12          MR. POZZA:  The category of documents in response to

13   the subpoena is all documents --

14          THE COURT:  This is a third-party subpoena?

15          MR. POZZA:  A third-party subpoena are documents that

16   relate to any Hotfile entity to the extent they relate to

17   Hotfile's operations, and on page 2 of our reply brief, we have

18   summarized some specific examples of the kind of documents that

19   we know about that we anticipate they have.

20          Those include communications between Lemuria and the

21   principals of this company, Blue Ant; documents about how this

22   Vogel technology was implemented and documents about the

23   software development that Lemuria contracted with another

24   company and with various other companies in order to develop.

25          THE COURT:  Well, implicit or explicit in your

1   pleadings and in your argument is that it is all related and

2   the end user or beneficiary was Hotfile?

3            MR. POZZA:  That is correct, Your Honor.

4            THE COURT:  Okay.  Let me hear from counsel.  You left

5   your argument in San Francisco, right?

6            MR. THOMPSON:  I think I can keep it very brief.

7            THE COURT:  Well, go ahead.  That would be the 8th

8   wonder of the world.

9            MR. THOMPSON:  No.

10           THE COURT:  I am being facetious.  You are a very fine

11   young man and a fine lawyer.  Go ahead.

12           MR. THOMPSON:  Thank you for the young man.  I

13   appreciate that.

14           THE COURT:  Well, you are a fine lawyer.

15           MR. THOMPSON:  I am getting up in age.  I really do

16   appreciate that.

17           Now, Mr. Pozza just said that there was no

18   representation by Hotfile that these documents have been

19   produced.

20           I would like to read the first two sentences from the

21   opposition.

22           "Non-party Lemuria Communications, Inc. has already

23   produced all of the documents demanded by plaintiffs on this

24   motion."

25           THE COURT:  Stop right there.  Respond.

1        MR. POZZA:  Well, Your Honor, I think that has to be

2   read in the context of the remainder of the opposition, which

3   is very carefully worded as to what documents we are talking

4   about.

5        It is clear that Lemuria would potentially be in

6   possession of all of the documents that I talked about, and

7   Lemuria spent great resources fighting not to produce them in

8   response to our first motion.

9        THE COURT:  You just read something.  You said they

10  have produced all of the documents that were requested.

11       MR. POZZA:  Well, I think we need to be completely

12  clear on what documents are being requested.  The opposition

13  goes on.

14       THE COURT:  So you are now requesting more than you

15  did before Judge Jordan?

16       MR. POZZA:  No.  It is actually a narrower set than

17  before Judge Jordan.

18       THE COURT:  All right.  Let me hear from you, counsel.

19       MR. THOMPSON:  The second sentence goes on to say,

20  "Lemuria informed plaintiffs of this fact in writing on

21  December 21st.

22       Instead of meeting, conferring, calling us up, talking

23  about it, this motion was filed."

24       Unfortunately, we should have discussed this.

25  Obviously there has been a misunderstanding, and in particular

1   Mr. Pozza does not realize -- he could have looked at this --

2   Judge Jordan's ruling, which I have here is dated September 14,

3   2011.

4          Lemuria produced additional documents after that.  Not

5   because Judge Jordan ordered us to.  He didn't, but because of

6   the relationship between Hotfile, Titov and Lemuria, we

7   believed that it was best for Lemuria to produce all documents

8   it had because of that close relationship, and they have all of

9   the documents.

10          What Mr. Pozza says about what he suspects if this

11   communication exists, or that must have been, that could have

12   been is simply wrong.

13          He is guessing there are just more documents.  It is

14   not the fact.  As we told him on December 21st, the motion is

15   really pointless and should not have been brought.

16          Your Honor, if I may, also, anticipating this last

17   motion we have, the source code motion, is the same answer.

18          THE COURT:  Don't get into that, you know.

19          MR. THOMPSON:  Well, I think I can cut through it all

20   that they have everything there, too.

21          THE COURT:  Okay.

22          MR. THOMPSON:  And they didn't meet and confer.  Thank

23   you, Your Honor.

24          THE COURT:  Okay.

25          MR. POZZA:  If I may, Your Honor, just two points.

1          The first is the e-mail to which Mr. Thompson refers

2    is talking about two specific categories of documents.

3          It is communications with the Blue Ant contractors

4    themselves and communications with the Vogel representatives.

5          There are other categories of documents that we are

6    seeking in this motion.  So it was not or it is hardly an

7    unequivocal statement they do not have documents, and the

8    second is, you know, the issue with Lemuria from the outset has

9    been that Lemuria has very carefully worded its explanation of

10   how it is, in fact, related to Hotfile, and it was only after

11   we dug through discovery that we discovered that it was more

12   closely involved.

13         And so given the fact that, for example, you know, the

14   e-mail he just read only talks about responsive documents.

15         I actually sent an e-mail in response saying, "That's

16   evasive.  We don't know what you mean when you say a responsive

17   document."

18         Now, if Mr. Thompson is willing to say that all of the

19   documents that are set forth in our proposed order that we

20   submitted to the court have been produced, that would be one

21   thing.

22         MR. THOMPSON:  Yes, Your Honor, I will say that, and

23   that's what the first sentence said.

24         Lemuria has already produced all of the documents

25   demanded by plaintiffs in their motion.  That's the fact, and I

1  will represent it to the court and we have represented it in
2  writing already.
3       THE COURT:  Does that include to the present motion?
4       MR. THOMPSON:  To the present motion, yes.
5       THE COURT:  You have made that statement on the record
6  as an officer of the court that you have produced all of the
7  records that are requested in the document, and that you have
8  possession constructively or actual possession of your client?
9       MR. THOMPSON:  Yes, Your Honor.
10       THE COURT:  How is that?
11       MR. POZZA:  As I understand that representation, that
12  would be a representation on the record that if he is
13  representing that all documents that are encompassed by the
14  scope of our proposed order have been produced, then that's the
15  first I have heard of that representation, but it is what it
16  is.
17       THE COURT:  Is that satisfactory?
18       MR. POZZA:  That is satisfactory.
19       THE COURT:  Okay.  So I will enter an order.  Excuse
20  me for one second, please.
21       We are talking about docket entry 199, plaintiffs
22  renewed motion to compel production of documents from Lemuria
23  Communications, correct?
24       MR. THOMPSON:  Yes, Your Honor.
25       MR. POZZA:  Yes, Your Honor.

 1          THE COURT:  Okay.  Counsel for defendant has

 2   represented on the record that the defendant has produced all

 3   of the documents in question.  Therefore, the motion is deemed

 4   moot.

 5          All of this is on the record, and I guess when we get

 6   to 203, I will repeat myself.  This mirrors 203, okay, which is

 7   the same motion in a sealed form.  So we will deem that moot.

 8          Counsel, what is your name again?  Fabrizio?

 9          MR. FABRIZIO:  Yes, Your Honor.  It is Fabrizio.

10          THE COURT:  I am the only person in the court that

11   will note this, but you bear a resemblance to the young Victor

12   Mature.

13          Have a seat.  Am I correct?  Am I far off here, a

14   young Victor Mature?

15          MR. FABRIZIO:  I could see it.

16          THE COURT:  You can see it.  You don't know who Victor

17   mature was, do you?

18          MR. FABRIZIO:  I am embarrassed to say I don't, Your

19   Honor.

20          THE COURT:  Well, do a Wikipedia.

21          MR. FABRIZIO:  I will, Your Honor.

22          THE COURT:  It is a complement.

23          MS. MUNN:  It is a compliment

24          MR. FABRIZIO:  Thank you, Your Honor.

25          THE COURT:  Not to imply that I was a big Victor

1  Mature fan, or anything like that, but it is a compliment.

2  Okay?

3         MR. FABRIZIO:   Thank you.

4         THE COURT:   He was known more for his looks than his

5  acting ability, and his Hollywood name, it was probably a name

6  like Fabrizio who went to Hollywood or Turnoff, or something

7  like that.

8         Okay.   Now we have plaintiffs renewed motion to compel

9  particular source code, docket entry 200.

10        Now, the key here is, if my and my recollection is,

11  and I am going to say this in terms of like I am really not Web

12  savvy, but the argument is that when Hotfile got a notice, to

13  simplify things, to remove a certain copyrighted item, they

14  would remove the item, and they say that meant any links that

15  connected to that removed item would be vitiated, if I find

16  what the defendant is saying.

17        You are saying that is not the case; that it only

18  eliminates that particular Website, but they could still, any

19  downloaders could have access to the same copyrighted material

20  through other links and, therefore, you need the operating code

21  because you believe that will show when they implemented any

22  notices that there have been infringements.   Counsel?

23        MR. POZZA:   That is essentially right.   Mr. Titov's

24  testimony in Bulgaria established that for some period of time

25  when Hotfile received a notice, they would leave the file up on

1    their system, only to take down a specific link; meaning that

2    other users with different links could download the same

3    infringing file.

4                 THE COURT:  Right.

5                 MR. POZZA:  And the question is when did that occur?

6    When did Hotfile change its system to take down the file

7    itself?

8                 THE COURT:  So you are in agreement that there did

9    come a point where, and I guess its current practice would be,

10   if Hotfile is still in business, that when they get a notice of

11   copyright violation, they removed the cite which eliminates any

12   connections with any links to that cite.  Would that be

13   correct?

14                MR. POZZA:  We believe their current practice is that

15   when they receive a notice, they essentially disable access to,

16   through various technical means that specific file, in general.

17                THE COURT:  Which means that when it is eliminated, it

18   is eliminated and nobody can get to it through any other Web

19   connections related to Hotfile, correct?

20                MR. POZZA:  Right.  There is a slight variation on

21   this, which is that it is only as to a specific file.

22                You could have a different copy of the movie with one

23   second shaved off of the end.

24                THE COURT:  Yes.

25                MR. POZZA:  And they haven't done anything to stop

1    that from being uploaded or downloaded.

2              THE COURT:  Okay.

3              MR. POZZA:  It would have to be the exact same file

4    which is why --

5              THE COURT:  But so what this motion, though, is

6    limited to is not the permutations and the complications, but

7    the first notice that you are downloading Casablanca --

8              MR. POZZA:  Right.

9              THE COURT:  -- to eliminate that file.  And when did

10   that notice and elimination of that -- I don't understand.  The

11   term of file is a term of art.  I am saying that link, at what

12   point does the elimination of the link eliminate any

13   connections to that link or the ability to connect to that

14   link?

15             MR. POZZA:  To the file, that's right.

16             THE COURT:  To the right, file?

17             MR. POZZA:  Right.  Yes of the specific copy of

18   Casablanca.

19             THE COURT:  Right.  And so that's the information that

20   you are looking for?

21             MR. POZZA:  Yes.

22             THE COURT:  Right?

23             MR. POZZA:  Yes.

24             THE COURT:  And so you are saying that the only way

25   that you can get that information is to get the operating

1    system in question; is that correct?

2          MR. POZZA:   To get a specific portion of the source

3    code that would deal with the specifics, and the source code is

4    just, you know, the program that tells Hotfile the operating

5    system what to do when something happens.

6          THE COURT:   The source code for the operating system?

7          MR. POZZA:   Right.  But just as it pertains to what

8    Hotfile does when it receives one of these notices in terms of

9    blocking this file, removing this file, stopping the reupload

10   of this file, but just that particular functionality of

11   Hotfile.

12         It is basically, if you think of source code as being

13   like the book that explains everything about Hotfile, this is

14   like a chapter in the book.

15         THE COURT:   The chapter pertaining to how you

16   eliminate a file and eliminate any connections to that file?

17         MR. POZZA:   Right, and we have complained it in more

18   technical terms in our proposed order, but it is essentially,

19   you know, how you block access to a file.  A specific file.

20         THE COURT:   And did Mr. Titov, you are saying in this

21   deposition you say that did not occur?

22         MR. POZZA:   No.  Mr. Titov testified that a change had

23   happened at a  certain point in time.

24         He was not able to recall exactly when.  His best

25   guess was August of 2009.  August of 2009 is obviously very

1     early.

2          Well, Hotfile started in early 2009.  This litigation

3     was brought in 2011.  So it is possible that this change, which

4     is very critical for liability reasons, occurred any time

5     between August of 2009 and February of 2011.

6          THE COURT:  I understand all of that.  What I want to

7     know is do you have any other means of getting that

8     information?

9          MR. POZZA:  We have no other means of getting that

10    information.

11         THE COURT:  Now, they say, if I understand their

12    position is, among other things, they say that that will not

13    show that.

14         MR. POZZA:  Their unsworn representation in their

15    brief is that they have conducted a search, and they do not

16    believe that the specific portion of the source code that we

17    are seeking, which does exist, this is not like the Lemuria

18    situation.  It does exist, will not tell us what time the

19    change was made.

20         THE COURT:  Now, what potential damage is there by

21    allowing you access to that source code?

22         MR. POZZA:  Our view is that there is no or there is

23    no potential damage to allowing us to obtain it.

24         It is subject to heightened trade secret protection.

25    You know, that is what Judge Jordan has already said.

```
 1                THE COURT:  Yes.
 2                MR. POZZA:  But that's not a categorical bar.  You
 3   have to look at whether or not we meet the requirement of
 4   necessity to obtain it, which we believe we have.
 5                THE COURT:  Now, is that done?  Is there a printout?
 6   What is it?  How do you look at it?
 7                MR. POZZA:  Actually, it would be produced in native
 8   form like computer language.
 9                THE COURT:  Yes.
10                MR. POZZA:  And there are extensive provisions in the
11   protective order, actually.
12                THE COURT:  Now, just bear with me.
13                MR. POZZA:  Sure.
14                THE COURT:  Let's say you get it.  What do you get?
15                MR. POZZA:  We would get a computer file like a
16   program.
17                THE COURT:  And what kind of a program are we talking
18   about?  Are we talking about, for the record, you have to
19   explain this for the record.
20                MR. POZZA:  Sure.
21                THE COURT:  What do you mean?  Is it a CD that
22   contains an operating system?
23                MR. POZZA:  It would be lines of code that would be
24   produced on a hard drive.
25                THE COURT:  Lines of code?
```

1     MR. POZZA:  Yes.

2     THE COURT:  So it would take somebody who was computer

3  savvy to make sense of it, correct?

4     MR. POZZA:  Yes.  Our experts.

5     THE COURT:  And would they be able to be discreet and

6  just produce that aspect of the operating system, that chapter

7  containing that code?

8     MR. POZZA:  Yes.  Our view is they could produce

9  essentially that chapter that contains that code.

10     THE COURT:  And what else does that chapter do other

11  than allegedly eliminate the possibility of any connections

12  with the file?

13     MR. POZZA:  It depends on how they designed it.  It is

14  not clear to us how they coded it.  It could be very simple, if

15  they essentially had it.

16     THE COURT:  In other words, it could be do more than

17  just eliminate any connections with the file?

18     MR. POZZA:  If they had designed it, potentially, yes,

19  it could be slightly larger, although it is not -- you know, it

20  is not a huge portion of the source code, but it could be

21  larger and encompass other functionalities depending on how

22  they coded it themselves.

23     THE COURT:  Okay.  And how physically would that be

24  done?  They would turn it over to one lawyer in your firm?

25     MR. POZZA:  That's right.

| 1 | THE COURT:  And you would consult with one expert? |
| 2 | MR. POZZA:  Right. |
| 3 | THE COURT:  And we could fashion an order to that |
| 4 | effect, correct? |
| 5 | MR. POZZA:  That's correct, and actually there is a |
| 6 | source code provision in the protective order that has even |
| 7 | heightened protections of that source code, yes. |
| 8 | THE COURT:  Okay.  Let me hear from counsel for |
| 9 | Hotfile. |
| 10 | MR. THOMPSON:  Your Honor, I think there is a little |
| 11 | confusion in what happened here. |
| 12 | There is no dispute that in August of 2009 Hotfile |
| 13 | made a change that Mr. Pozza described. |
| 14 | They took Mr. Titov's deposition for 4 full days in |
| 15 | Sofia, Bulgaria.  You are very familiar with that.  They asked |
| 16 | him all of the questions they wanted to. |
| 17 | THE COURT:  Yes.  As I remember, you were not here, |
| 18 | and it was telephonic, right? |
| 19 | MR. THOMPSON:  It was telephonic and it was awkward. |
| 20 | THE COURT:  In the middle of your argument, my |
| 21 | forehead started to spontaneously bleed. |
| 22 | MR. THOMPSON:  I wasn't aware of that. |
| 23 | THE COURT:  That is a true story. |
| 24 | MR. THOMPSON:  I didn't realize that at the time.  I |
| 25 | am sorry, Your Honor. |

1        THE COURT:  I didn't realize it at the time, either,

2   until my law clerk described to me as I was leaving the bench

3   with blood dripping down in my eyes.

4        It will be in my memoirs.  I was concentrating in

5   listening to the arguments, and we reviewed it, and I had this

6   spontaneous head bleed from my forehead from the argument over

7   depositions in Bulgaria, but I digress.

8        MR. THOMPSON:  I hope I wasn't speaking at the time.

9        THE COURT:  You were all very good, as a matter of

10  fact, and I don't like telephonic depositions, but go ahead.

11       MR. THOMPSON:  So, Your Honor, a change was made in

12  the source code sometime around August of 2009.

13       THE COURT:  Yes.

14       MR. THOMPSON:  They have the sworn deposition

15  testimony from Hotfile as to its best information on that

16  topic.

17       When you make changes in the source code, you

18  essentially write over what was there before.

19       THE COURT:  Okay.

20       MR. THOMPSON:  It is likes in your word processing,

21  you make a spelling correction.  You save the document.  What

22  used to be there is not necessary saved.

23       There is something in the software world known as

24  version control.  So if you wanted to save that change you

25  made, you would use version control software, and admittedly

1   most sophisticated companies use that.  Software is a small

2   company -- I am sorry.  Hotfile is a small company.

3           They have three principals and a couple of

4   contractors.  They never used version control until this

5   lawsuit was filed.

6           When the lawsuit was filed, the plaintiffs' lawyers

7   were concerned about preserving evidence.  Please use version

8   control.  Hotfile adopted it at that time.

9           So their software from the filing of this lawsuit in

10  February of 2011 has version control, and if it becomes

11  relevant for some reason, you can see when something was

12  changed after February of 2011.  There is no dispute that it

13  didn't exist before that.

14          So plaintiffs are trying to ascertain when a change

15  was made a year and a half ago before February of 2011 to

16  software.

17          At the Titov deposition, Mr. Fabrizio asked a lot of

18  questions about this and made a request on the record for us to

19  investigate, to see if there was any trace of when the change

20  was made around August of 2009.

21          That is what Mr. Titov, who wrote most of this

22  software, that is what he did.  He investigated.  There is no

23  software that would show the date of that change.

24          So what they are asking for now is the current

25  functionality which is being used right now, even though it is

 1   not going to prove anything, because you cannot tell when the

 2   change was made.  All they can say is, well, this is what they

 3   have now.

 4        This is very significant because, of course, what you

 5   have now is what is sensitive.

 6        Judge Jordan already made the finding, which is the

 7   law of this case now, that Hotfile software is a trade secret.

 8   We put thousands of man hours into developing that software.

 9        THE COURT:  Let me stop you right there.  Factually,

10   is that consistent with your understanding of the facts?  Not

11   the argument.

12        I just want to know.  You can stay there and speak

13   into the microphone.

14        MR. POZZA:  The facts of the source code, we disagree

15   with the characterization that it is undisputed that the change

16   was made in August of 2009.  That is the fact which we are

17   trying to ascertain by obtaining the source code.

18        THE COURT:  Here is what I suggest that we do:  Let me

19   think out loud to try to cut through this.

20        Now, as I understood the request, I thought it was you

21   were asking for what I will call the chapter that was in

22   existence at the time that they made the change eliminating the

23   possibility of linking to the file.

24        Is that wrong?  You are requesting their current

25   chapter.  Is that it?

1    counsel, that, you know, the bottom line here is we are looking

2    to have this matter resolved on the merits with all available

3    properly discoverable evidence, and it just seems to me that

4    there is a way to protect the interests of your client and

5    secure the proprietary and other rights that he has to it and

6    allowing them an opportunity to take a look at it and see if

7    they could trace back and make that determination, because I

8    think that theoretically the determination is certainly

9    discoverable material, but it would have to be done in a way

10   that does not in any way, shape or form jeopardize the

11   proprietary rights of your client.  So it seems to me --

12           MR. FABRIZIO:  May I interrupt for one second, Your

13   Honor?

14           THE COURT:  Yes.  Let me think out loud because I will

15   forget simply what I started with.

16           MR. THOMPSON:  I am sorry.  Forgive me.

17           THE COURT:  I have already forgotten what I started

18   with, but it seems to me that that is the way to proceed with

19   adequate protections and, additionally, one thing I was

20   thinking of earlier is an affidavit under oath prepared by the

21   plaintiffs with respect, and this is before we got to what you

22   are talking about, of the nonexistence of any revision files or

23   other files, and so forth and so on.  Do you follow me?  That

24   would protect the plaintiff from any surprises or anything

25   else.

1    MR. POZZA:  If they still had a copy that was from

2  August of 2009, that is what we request.

3    THE COURT:  But they don't have that.

4    MR. POZZA:  What we are requesting is the current

5  version of this chapter in order to look at it because we think

6  there are at least two other ways in which we might determine

7  when they made the change.

8    One, they might have overriden what was still there

9  from August of 2009.  There might be some legacy portions of

10  it, and, second, in computer programming, often programers put

11  comments in.

12    They are called in-line comments into the code as they

13  make changes, and unless we can look at that, which is in the

14  current version of this chapter, we cannot satisfy ourselves

15  that, in fact, what Mr. Thompson is just representing, which is

16  that he or his clients have looked at it.

17    THE COURT:  Which I am sure is made in good faith and

18  is, you know, accurate.

19    MR. POZZA:  Right.

20    THE COURT:  But I have got to say the common sense of

21  the matter is I cannot believe and take judicial notice of it

22  is if it were the C.I.A. or the F.B.I. or the National Security

23  Agency looking at it, that they may be able to do more than you

24  say could be done with it.

25    Of course, I may be wrong, but it seems to me,

1          You know, you cannot get blood from a stone, but if

2   something does not exist or it cannot be found, you know, you

3   have that under oath from the people who would know and would

4   be liable under penalties of perjury, but it seems to me the

5   only way you are going to know for sure is if you have a chance

6   to look at it with an expert with under the penalties of

7   contempt of court and anything else, you know.

8          We certainly know the plaintiffs are not judgment

9   proof if there is any violation of any court order, or

10  anything.  Do you follow what I am saying?  So that is what my

11  thinking is, counsel, and now I will hear from you.

12          MR. THOMPSON:  Okay.  With respect to the last point,

13  Your Honor, the harm is not monetary.  This is a trade secret.

14          This is the crown jewel of an Internet company.  And

15  as Judge Jordan found, software is a trade secret.

16          THE COURT:  But they are being sued for being the

17  napster of the movie industry.

18          MR. THOMPSON:  Which has not been proven, Your Honor.

19          THE COURT:  Of course not.

20          MR. THOMPSON:  And there are summary judgment motions.

21          THE COURT:  Of course, but I am saying you have been

22  sued because you are allegedly violating their crown jewels, if

23  you consider some of Disney's earlier cartoons.  Go ahead.

24          MR. THOMPSON:  The second point is --

25          THE COURT:  They are, actually, as a matter of fact.

1          MR. THOMPSON:  Your Honor, Mr. Titov was deposed under

2     oath on this subject.  If Your Honor would like a sworn

3     declaration from him about what he has done to investigate, we

4     can provide that.

5          And, Your Honor, just think about it.  This comes down

6     to they don't believe Mr. Titov.  He testified under oath as to

7     when this change happened.

8          THE COURT:  Well, why don't they just drop this

9     lawsuit then?

10          MR. THOMPSON:  Your Honor --

11          THE COURT:  You said Mr. Titov said he didn't do

12     anything wrong.  I mean, your argument is, well, okay.

13          MR. THOMPSON:  Your Honor, he was under oath.  He is

14     bound by the oath just as you and I are.  He spoke honestly,

15     and we will show you, Your Honor, when we have a chance to get

16     into his testimony, but bear with me one moment.

17          THE COURT:  Sure.

18          MR. THOMPSON:  Their allegation is, "Don't trust

19     Titov.  He is a liar.  Therefore, give us trade secrets."  That

20     is what this comes down to.  Your Honor, their theory is --

21          THE COURT:  No.  They are saying is and reasonably it

22     is that he made -- I don't mean to put words in his mouth -- he

23     may well be telling the truth, and you are representing what

24     your understanding is, and what they are saying is there may be

25     a way that you can take what you presently have and find out

61

1    when changes were made and what changes were made.  That's all

2    they are saying.

3         MR. THOMPSON:  Mr. Pozza said look at for Legacy --

4         THE COURT:  Let me stop you.  Am I putting words in

5    your mouth?

6         MR. POZZA:  No, Your Honor, that's right.  The only

7    thing is a slight clarification to that is when I say, "current

8    version," they started this version control at some point,

9    right, so they have essentially tracked the changes to the

10   chapter for the last year.

11        So when I say that, I mean you know, the current

12   version and any changes that they have tracked.

13        THE COURT:  That they have available that they haven't

14   waived a claim, right?

15        MR. POZZA:  Right.

16        THE COURT:  Yes.

17        MR. POZZA:  So our experts can look at it and see what

18   they can find.

19        MR. THOMPSON:  Your Honor, Hotfile started in early

20   2009.  If Mr. Titov was going to lie, he would have said the

21   change was made from the beginning.

22        He testified there was a change made in August of 2009

23   which the plaintiffs believe is very incriminating.

24        They believe anything that happened before that helps

25   their case.  If Mr. Titov was going to be less than honest, he

1    had no incentive to admit that the change was made in August of

2    2009.

3            They may not like that date, but that's the date.  So,

4    Your Honor, please consider it.

5            THE COURT:  What do you have to be worried about then

6    if he is telling the truth?

7            MR. THOMPSON:  Because of trade secrets.  This is

8    their crown jewels that is going to go to a party that is going

9    to be investigating.

10           THE COURT:  You are going to be limited to an expert

11   and one lawyer under penalty of disbarment and contempt of

12   court and an independent lawsuit by you.

13           MR. THOMPSON:  Your Honor, one final request.  I see

14   which way you are going.

15           THE COURT:  It is not which way I am going.  It is not

16   like this is the first such case that has been before this

17   court.

18           This is not an uncommon way to proceed.  As a matter

19   of fact, this is probably one of the most strictest remedies

20   that I have ever been involved with.

21           MR. THOMPSON:  Well, Your Honor, let me suggest that

22   if Your Honor is inclined to let them have any source code --

23           THE COURT:  Just don't ask me to do it in-camera

24   because I can't even e-mail.

25           MR. THOMPSON:  No.  I am not going to do that.

63

1    Version control was instituted in February of 2011.  So we can

2    tell of any changes it made that took place after that.

3         What took place after version control is not of

4    interest to them.  They want to know what happened before

5    February of 2011.

6         So, Your Honor, if you are inclined to order the

7    production of any source code, I would suggest there is no

8    basis to go with respect to anything that happened after

9    February of 2011.  We should just ask for whatever the --

10        THE COURT:  No.  I can't with that.

11        MR. THOMPSON:  Your Honor, what possible relevance is

12   there?  They want to know what happened in August of 2009.

13        THE COURT:  I can't agree with that.  I think they are

14   entitled to see it.

15        MR. THOMPSON:  Your Honor, maybe --

16        THE COURT:  Be specific what you are requesting,

17   counsel, so the record is clear.

18        MR. POZZA:  I will, if you will allow me to brief it

19   in the proposed order because it is worded in a way that our

20   experts agree with to understand exactly what we are requesting

21   because it is technical.

22        THE COURT:  While we are waiting, I can tell you that

23   we are the repository of all of Wendy's and Dana's awards.

24        They could not care less about them.  We live in a

25   small condo, and I kept everything, and the overflow is in my

1   lawyer's conference area.

2   They didn't care about anything, and I have maintained

3   all of the stuff that they don't want, and I don't have the

4   space for it, but, you know, tell your husband I am proud of

5   everything.  I went to everything that was done.  It was such a

6   good school.

7   MS. MUNN:  It was.

8   THE COURT:  And I look now at what people have to pay

9   for their kids to be educated, to be interviewed for preschool

10  and the money involved in the case, and my kids got such a

11  great education up there through high school and even in the

12  advanced placement program.

13  MS. MUNN:  They did.  And, in fact, in that age group,

14  there was a Rhodes Scholar, a couple of Fulbrites in that whole

15  cohort.  So it was very a very interesting group of students.

16  THE COURT:  And everybody else, the people, they all

17  just did very well.  They were good kids.  They got a great

18  education.

19  It was in a public school which I think is the

20  healthiest, you know, but we just lucked out because now I mean

21  it has been years.

22  I look at, you know, my law clerks and the expenses

23  that are involved in my nephews and nieces and their kids and

24  my daughters now have kids, and the expense is absurd.  It is

25  absurd.

1        MS. MUNN:  It is enormous, and sadly, you know, the

2   public school system has just declined.

3        THE COURT:  Right.  They were starting to dumb it down

4   just as my kids were graduating.  We are off the record.

5        (At this point the courtroom deputy turned off the

6   recording machine and did not turn it back on to conclude the

7   hearing)

8        (Whereupon the proceedings were concluded)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25                    C E R T I F I C A T E

1        I hereby certify that the foregoing is an accurate

2   transcription of proceedings in the above-entitled matter.

3

4   JANUARY 24, 2012          S/JERALD M. MEYERS
    _____         _____
        DATE                  JERALD M. MEYERS, RPR-CM
5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Quality Assurance by Proximity Linguibase Technologies