# EXHIBIT A

Highly Confidential

1              UNITED STATES DISTRICT COURT
2              SOUTHERN DISTRICT OF FLORIDA
3          CASE NO. 11-20427-WILLIAMS/TURNOFF
4   DISNEY ENTERPRISES, INC., )
    TWENTIETH CENTURY          )
5   FOX FILM CORPORATION,      )
    UNIVERSAL CITY STUDIOS     )
6   PRODUCTIONS LLLP,          )
    COLUMBIA PICTURES          )
7   INDUSTRIES, INC., and      )
    WARNER BROS.               )
8   ENTERTAINMENT, INC.,       )
                               )
9              Plaintiffs,     )
                               )
10       v.                    )
                               )
11  HOTFILE CORP., ANTON       )
    TITOV, and DOES 1-10       )
12                             )
    Defendants.                )
13  _____)
14

           H I G H L Y   C O N F I D E N T I A L
15

16    (Pursuant to protective order, the following
         transcript has been designated highly
17                  confidential)
18      DEPOSITION OF MATTHEW LYNDE, Ph.D.
19            SAN FRANCISCO, CALIFORNIA
20           FRIDAY, DECEMBER 16, 2011
21
22
23
24  REPORTED BY:  Linda Vaccarezza, CSR No. 10201
25  JOB NO.:  44313

Highly Confidential

Page 2

1

2

3

4

                    DECEMBER 16, 2011

5

                    10:07 A.M.

6

7

        Deposition of MATTHEW LYNDE, Ph.D.,

8

     held at the offices of Farella,

9

     Braun & Martel, 235 Montgomery

10

     Street, San Francisco, California, before

11

     Linda Vaccarezza, a Registered

12

     Professional Reporter and Certified

13

     Shorthand Reporter of the State of

14

     California.

15

16

17

18

19

20

21

22

23

24

25

Highly Confidential

```
 1        A P P E A R A N C E S:
 2     ATTORNEY FOR THE PLAINTIFFS:
            JENNER & BLOCK
 3          BY:  STEVEN B. FABRIZIO, ESQ.
            1099 New York Avenue, NW
 4          Washington, DC 20001
 5
 6
 7     ATTORNEY FOR THE DEFENDANTS
        HOTFILE CORP., AND ANTON TITOV:
 8          FARELLA, BRAUN & MARTEL
            BY:  RODERICK M. THOMPSON, ESQ.
 9          235 Montgomery Street
            San Francisco, California 94104
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Highly Confidential

Page 21

1    Brothers only one takedown notice that was

2    erroneous, do you believe that that would cause

3    injury to Hotfile's business reputation?

4              MR. THOMPSON:  Objection.

5         Incomplete hypothetical.

6              THE WITNESS:  Well, if I

7         understand your question correctly --

8         Q.    If you don't, I'm happy to

9    clarify.

10        A.    Once again, as I said earlier, it

11   depends on some more context to the wrongful

12   takedown.  If, for example, there was a great

13   deal of publicity, and impact and awareness

14   around the Internet amongst Hotfile's actual or

15   potential customers, there might be a measurable

16   impact.

17        Q.    Any other considerations that

18   might lead to a measurable impact from a single

19   erroneous takedown notice?

20        A.    Well, if that single notice was

21   related to a popular file, that might result in

22   some loss of actual or potential premium

23   subscriptions, and that could be quantifiable as

24   an impact.

25        Q.    Anything else?

Highly Confidential

Page 22

1          A.    If a wrongful takedown notice

2    resulted in, for example, erroneous termination

3    of a premium account, that could also have

4    quantifiable impact.

5          Q.    What if it resulted in an

6    erroneous termination of a non-premium account?

7          A.    My understanding of Hotfile's

8    business is only premium accounts generate

9    revenue for Hotfile, at least direct revenue.

10         So if I understand your question

11   correctly, the wrongful takedown of a non-premium

12   account would only potentially have an indirect

13   impact on revenue.

14         Q.    Just to get us back to the list,

15   you referred to a great deal of publicity whether

16   the takedown might be related to a popular file,

17   or whether it resulted in an erroneous

18   termination.

19         Is there anything else?

20         A.    Those are the principle

21   potentially channels of, I believe, impact, in

22   response to your hypothetical question, that I

23   can think of right now.

24         Q.    And my question was purposefully

25   targeted to a single notice, just to make the

Highly Confidential

Page 24

1    incidents of say, wrongful takedown, the

2    larger potential impact for reputation

3    could be in the marketplace, and it would

4    expand in actually a non-linear fashion,

5    generally.

6        Q.    Dr. Lynde, in your damages

7    analysis, are all takedown notices considered

8    equal in terms of the economic impact they cause?

9              MR. THOMPSON:  Objection.  Vague.

10             THE WITNESS:  For the impact of

11   the wrongful takedown notices as a whole,

12   yes.  I have not distinguished between

13   different individual wrongful takedown

14   notices.

15       Q.    Well, broadening the question to

16   go beyond what you term the "wrongful takedown

17   notices," just in the way you do your

18   calculations, are any takedown notices treated

19   differently from any others in terms of the

20   economic impact they cause?

21       A.    No.  In the analysis I've done, I

22   have not distinguished between the impacts of

23   what are mostly, as I understand it, lawful and

24   correct takedown notices from wrongful takedown

25   notices, in terms of individual impact.

Highly Confidential

Page 25

1          Q.    And within the category that you

2     term "wrongful takedown notices," is it correct

3     that you also don't distinguish from one notice

4     to the other in terms of its estimated economic

5     impact?

6          A.    That is correct.  I was not able

7     to distinguish between individual types of

8     wrongful takedown notices.  I've considered them

9     as a collectivity.

10         Q.    Just to confirm, you did not

11    consider as to any individual takedown notices,

12    the publicity or public impact that that

13    particular notice had, correct?

14              MR. THOMPSON:  Objection.

15         Overbroad and vague.

16              THE WITNESS:  I did not do that

17         kind of analysis, apart from gaining an

18         awareness of -- of types of files, for

19         example, that might have been wrongfully

20         taken down.

21         Q.    And is it also correct that in

22    your analysis you did not consider whether any

23    individual notice referred to a file that was

24    particularly popular or not?

25              MR. THOMPSON:  Objection.  Vague.

Page 26

```
 1              THE WITNESS:  That is correct.  I
 2         did not have the means to potentially
 3         calibrate individual wrongful takedowns
 4         with the popularity rating of particular
 5         files.
 6         Q.    And did you look to see whether
 7    individual takedown notices resulted in, I think
 8    you termed it "the erroneous termination of a
 9    premium account"?
10         A.    I did not look to see if there was
11    a particular link from a particular wrongful
12    takedown to a particular termination of a premium
13    account.
14         Q.    So it's fair to say, considering
15    the category of takedown notices that you
16    considered wrongful, you considered them as a
17    group and not individually at all; is that
18    correct?
19              MR. THOMPSON:  Objection.
20         Overbroad and vague.
21              THE WITNESS:  Well, to be
22         specific, I have no opinion as to whether
23         the wrongful -- I've been asked to assume
24         that there's a finding of liability, that
25         there was a set of wrongful takedowns
```

Highly Confidential

Page 27

1        during this period of time.

2                And under that assumption, I

3        have performed my analysis looking at the

4        collection of alleged wrongful takedown

5        notices.

6        Q.    And not looking at any of them

7    individually?

8        A.    And I was not able to look at any

9    particular takedown notice individually, that's

10   correct.

11       Q.    And I appreciate your

12   clarification about "wrongfully," you may have

13   just saved my spa.

14               In my earlier question about

15   whether there was a de minimis number of takedown

16   notices that wouldn't cause measurable injury I

17   was focusing on takedown notices.

18               I want to consider the same

19   question from the perspective of what you termed

20   "erroneous terminations."

21               Is there, in your professional

22   judgment, a de minimis number of erroneous user

23   terminations that you would agree as a practical

24   matter doesn't result in any measurable injury to

25   Hotfile?

Highly Confidential

Page 28

1          MR. THOMPSON:  Objection.  Vague.

2     And incomplete hypothetical.

3          THE WITNESS:  Well, I'm not sure I

4     completely understand the context of the

5     question.  But if it could be established

6     that there was a wrong termination that

7     would not have occurred but for a

8     wrongful takedown, the loss of that

9     subscription would indeed be a

10    quantifiable harm to Hotfile.

11         Q.    Even if it was just a single

12 wrongful termination of a premium account?

13         A.    Yes.

14         Q.    And what if it was a single

15 erroneous termination of a non-subscription,

16 non-premium account?

17         A.    If I understand your question

18 correctly -- we discussed this a little bit

19 before -- that possibly could indirectly lead to

20 the loss of a paying account, and therefore

21 revenue, but the connection would be, as I

22 understand, a little more difficult to

23 establish.

24         But if it could be established,

25 then indeed the loss of a subscription account

Highly Confidential

Page 29

1    would be an economic harm to Hotfile.

2          Q.    In your analysis, did you attempt

3    to make that connection between terminations of

4    non-premium users and economic harm to Hotfile?

5          A.    I did not.

6          Q.    I want to talk through the

7    protocol you used for your damages calculations,

8    and so let's turn to Lynde Exhibit 1, which is

9    the revised schedule.

10             If you need to refer to your

11   report at any time, that's one of the reasons I

12   put it in front of you.  I'm not going to need

13   to, but feel free if you do.

14         A.    Thank you.

15         Q.    Let's first start with the damages

16   model that's reflected on Schedules 1 and 1.1.

17             First, can you describe for us the

18   differences in how you -- in the calculations

19   that are reflected on Schedule 1 and 1.1?

20         A.    Yes, there's fundamentally only

21   one difference between Schedule 1 and Schedule

22   1.1, and that is the assumed beginning date of

23   the damages period.

24             In Schedule 1 the assumed

25   beginning is February, and in Schedule 2 it is

Highly Confidential

Page 75

1  turns out to be about, on average over this

2  period, about 1.3 percent to the lost profits

3  column, I result in a damages estimate.

4       Q.    In that model -- strike that.

5            Does that model assume that each

6  takedown notice sent by Warner, whether properly

7  or erroneously, is responsible equally for each

8  dollar of lost profits due to Warner that you've

9  calculated?

10           MR. THOMPSON:  Objection.  Vague.

11           THE WITNESS:  If I understand your

12           question correctly, with other things

13           equal it does presume an equal impact of

14           takedown notices ultimately, whether they

15           be correct takedown notices or wrongful

16           takedown notices, on their average

17           impact, that is correct.

18      Q.    Well, this question actually --

19  this is -- the "all things being equal" doesn't

20  really apply, does it?  Because there's a

21  calculation here and there's a model.

22           So what I'm really trying to

23  figure out is in the model that you've actually

24  calculated, is there the assumption that each

25  takedown notice, whether wrongful or proper, is

Highly Confidential

Page 83

1          be.

2                      And according to the structure

3          of this model if there are takedown

4          notices and those are involved with the

5          reduction in premium accounts given in

6          that interaction, that would be part of

7          the model.

8          Q.    And that is one of the assumptions

9    of your model, is it not, that takedown notices

10   result in lost revenues and lost profits

11   regardless of whether they are wrongful or not

12   wrongful?

13                  MR. THOMPSON:  Objection.  Assumes

14         facts.

15                  THE WITNESS:  Well, in a general

16         sense, that is correct.

17         Q.    So then is it fair to say that the

18   model that you've used assumes that -- well,

19   maybe I should put it a different way.

20                  In the model that you have used,

21   takedown notices that have not been considered

22   wrongful are responsible for the bulk of the lost

23   profits that Hotfile suffered from February 2011

24   through September 7, 2011; is that correct?

25         A.    In the model that I've considered

Highly Confidential

Page 84

1    here in terms of estimating damages to Hotfile

2    from wrongful notices, it is correct.

3                    As I consider that -- as I

4    indicated earlier this morning, the interaction

5    between the takedown notice process, which I

6    understand provides notice of copyrighted subject

7    matter which shouldn't be on the website and

8    ultimately that might be related with notice to

9    up loaders, that if they upload copyrighted

10   material they will be terminated, that the

11   termination process occurs.  And if that's

12   associated with premium accounts, that can result

13   in a loss in revenue.

14        Q.    And I'm not actually looking to

15   get sort of behind the relationship between

16   notices and terminations just yet, I'm just

17   talking about the model that you've actually

18   applied.

19                    It calculates a lost profits that

20   Hotfile has suffered from February 2011 through

21   September 7, 2011, correct?

22        A.      That is correct, it does.

23        Q.      And it calculates a -- it

24   calculates lost profits that Hotfile has lost in

25   that period that are attributed to notices sent

Highly Confidential

Page 87

1    be a part of the model, yes.

2          Q.    And the causal links that you

3    remember talking about was that it's possible

4    that not all of those correct takedown notices

5    would have resulted in terminations?

6                MR. THOMPSON:  Objection.  Assumes

7          facts.  Calls for a legal conclusion.

8                THE WITNESS:  If I understand your

9          question correctly, as a matter of

10         economics, yes.  There would be a

11         necessity to assess the causal links from

12         the correct takedown notices.

13         Q.    And by the same token, you would

14   want to assess the causal connection between the

15   correct takedown notices and any impact on

16   Hotfile's business reputation?

17               MR. THOMPSON:  Same objection.

18               THE WITNESS:  If I understand the

19         question correctly, similar causal

20         mechanism would occur.

21         Q.    And again by the same token, you

22   would want to assess the impact on all of those

23   correct takedown notices on whether there were

24   terminations of premium users?

25               MR. THOMPSON:  Same objections.

Highly Confidential

Page 88

```
 1            THE WITNESS:  In parallel to the
 2       discussion I put forward this morning
 3       about the structure of the model, yes.
 4       That would be a similar and parallel
 5       assessment.
 6            Q.   And you would want to assess
 7   whether those correct takedown notices resulted
 8   in the taking down of particularly popular files,
 9   correct?
10            MR. THOMPSON:  Objection.  Vague
11       and assumes facts.
12            THE WITNESS:  As I think I
13       mentioned, that might be a factor that
14       might be considered in such a necessity.
15            Q.   So in considering whether the
16   correct takedown notices were responsible for all
17   of the lost profits that aren't attributable to
18   the wrongful takedown notices, is there anything
19   else you would want to consider?
20            MR. THOMPSON:  Objection.
21       Overbroad and vague.
22            MR. FABRIZIO:  Let me clarify that
23       a little bit.  Sorry.
24            Q.   Just to separate our pots here.
25            We have got total lost profits
```

Highly Confidential

Page 91

1          in February, in terms of termination

2          notices that I would have taken into

3          account.

4          Q.    Well, in your model if that

5     portion of total profits that Hotfile lost, the

6     portion that's not attributable to the wrongful

7     takedowns, what else could that pool of lost

8     profits be attributable to if not the correct

9     takedown notices?

10         MR. THOMPSON:  Objection.

11         Incomplete hypothetical and calls for

12         legal conclusion.

13         THE WITNESS:  Well, there are

14         several parts in the links of logic in

15         the model, so I want to make sure I

16         understand your question.

17              But the purpose of the model

18         being to estimate the lost profit impact

19         due to wrongful takedowns.  But included

20         in that chain in terms of an assessment

21         of an impact of rightful takedowns, as I

22         said, would need to be an assessment of

23         these other factors that would be related

24         to potential impact on revenue, which we

25         discussed, and including the change in

Highly Confidential

Page 92

1          Hotfile policy in terms of the

2          termination three strike rule in

3          February.

4          Q.    So in order to make a final

5    determination as to whether the rest of the lost

6    profits are attributable to the correct notices

7    you would need to look at things like the

8    publicity associated with them, whether they are

9    related to popular files, whether they resulted

10   in erroneous termination or terminations of

11   premium account users, and the rest of those

12   factors that we talked about earlier?

13              MR. THOMPSON:  Objection.

14          Overbroad and asked and answered.

15              THE WITNESS:  If I understand your

16          question correctly, I believe indeed

17          those need to be assessed.

18          Q.    And in your damages model, looking

19   at lost profits due to wrongful notices, did you

20   look at any of those considerations on an

21   individual basis?

22              MR. THOMPSON:  Objection.

23          Overbroad and vague.

24              THE WITNESS:  Given my review of

25          the evidence I was not aware, with

Highly Confidential

Page 93

1          respect to the wrongful notices of

2          information, which would specifically

3          apply to the wrongful notice situation,

4          which is what I was focusing on.

5          Q.    I'm just trying to understand why

6     you were prepared to opine without looking at

7     those considerations in particular, why the

8     wrongful notices resulted in certain lost

9     profits, but you're not prepared to sit here and

10    opine as to why the rightful notices resulted in

11    the rest of the lost profits.  They seem to be

12    parallel considerations to me.

13              MR. THOMPSON:  Objection.  That's

14          really not a question.

15              THE WITNESS:  Sorry, could you

16          repeat the question?

17          Q.    Sure.  Is there some reason that

18    you're prepared to opine that the wrongful

19    takedown notices have resulted in certain

20    specific lost profits, but that you're not

21    prepared to opine that the rest of the notices,

22    which I'll refer to as the rightful notices,

23    resulted in the rest of the lost profits?

24              MR. THOMPSON:  Objection.

25          Incomplete.  Calls for a legal

Highly Confidential

Page 97

1    Bulgaria I saw.

2              But in any event, Mr. Titov

3    testified that if a file is actually infringing,

4    and it's removed from Hotfile due to a notice,

5    that Hotfile doesn't consider itself injured as a

6    result of the loss of that infringing file.

7              Do you agree that Hotfile is not

8    injured by taking down a file that is, in fact,

9    copyright infringing?

10             MR. THOMPSON:  Objection.  Vague.

11         Calls for a legal conclusion, and to the

12         extent it states Mr. Titov's testimony.

13             MR. FABRIZIO:  I'll take my

14         chances on that one.

15             THE WITNESS:  Well, I'm not sure I

16         understand the full context of the

17         question, because it's my understanding

18         that Hotfile has a policy of not allowing

19         infringing material and taking down

20         material for which it receives notice

21         that it's infringing, so that would not

22         be a part of its expectation of revenue.

23         Q.    So infringing files are not part

24   of Hotfile's expectation of revenue, to your

25   understanding?

Highly Confidential

Page 98

1          A.     That is my understanding, yes.

2          Q.     And do you have that understanding

3    through people at Hotfile?

4          A.      Not specifically, but from my

5    review of the materials and my understanding of

6    Hotfile's policy of taking down material for

7    which it receives notice that the copyright owner

8    does not concur that that is appropriately on the

9    Hotfile site.  And that's what Hotfile does, it

10   takes those files down.

11         Q.     So from an economic perspective,

12   if Hotfile removes from its site a file that is,

13   in fact, copyright infringing, that does not

14   affect Hotfile's expected revenues?

15              MR. THOMPSON:  Objection.  Vague

16         and overbroad.

17              THE WITNESS:  Well, for -- with

18         respect to its policy of not having

19         infringing files and taking them down

20         timely when they have received notice,

21         which I understand is their policy and

22         obligation, yes.  It's my understanding

23         that business models is based on users

24         using the site to store and share files

25         for which they have rights.

Highly Confidential

Page 99

1          Q.    So if Warner Brothers had

2     mistakenly sent a takedown notice to Hotfile for

3     a file that in fact contained a Disney movie, an

4     infringing copy of a Walt Disney movie, is

5     Hotfile injured by removing the infringing copy

6     of the Disney movie?

7               MR. THOMPSON:  Objection.  Calls

8          for a legal conclusion.

9               THE WITNESS:  Well, if I

10         understand the context of your question,

11         perhaps not specifically with respect to

12         that file, but there are other potential

13         impacts on the business in terms of its

14         operations and its goodwill and

15         reputation.

16         Q.    There are other potential impacts

17    on the business and its goodwill as a result of

18    Hotfile removing an infringing copy of a Disney

19    movie?

20         A.    Not from a -- as I said in my

21    answer, not from a specific removal, which is

22    appropriate, and according to its policy, no.

23         Q.    Well, let me just put it this

24    way.

25               Does it matter in terms of

Highly Confidential

Page 100

1    Hotfile's lost profits or -- strike that.

2              In terms of injury to Hotfile,

3    does it make a difference whether Warner Brothers

4    sends a notice for an infringing copy of a Disney

5    movie, or Disney sends a notice for infringing

6    copy of a Disney movie?

7              MR. THOMPSON:  Objection.

8         Incomplete hypothetical.  Vague.

9              THE WITNESS:  If I understand your

10        question correctly, no.  Because in

11        either case it is material that the

12        copyrighted owner does not agree belongs

13        on the website.

14        Q.    Mr. Titov also testified that if a

15   copyrighted owner ratified Warner Brother's

16   authority to have sent a notice to Hotfile, then

17   Hotfile would not consider that notice to be

18   wrongful.

19              Given our prior discussion, do you

20   agree that if Warner sends a takedown notice to

21   Hotfile for a work that is in fact infringing,

22   and that the copyright owner later ratifies

23   Warners having sent the notice, do you agree that

24   that notice doesn't cause Hotfile injury?

25              MR. THOMPSON:  Objection.  Calls

Highly Confidential

Page 102

1            not be considered legally as a wrongful

2            takedown notice, then that would have a

3            straightforward impact on my model for

4            Exhibit 1.

5            Q.   Yes, but you've reduced my

6    question to math.

7            A.   That's my favorite area.

8            Q.   I know, one of mine, too.  I'm a

9    frustrated economist and technologist.

10           So let me try and put a little bit

11   of it back on your judgment.

12           You have previously testified that

13   if a file is actually infringing, the impact to

14   Hotfile is the same regardless of who sends

15   Hotfile the notice, correct?

16           MR. THOMPSON:  Objection.  Vague

17           and misstates testimony.

18           THE WITNESS:  If I'm recalling the

19           earlier question within the context of

20           the -- within the context that I

21           understand, if it's a copyrighted

22           material that shouldn't be on the

23           website, yes.  It doesn't matter who

24           sends the notice in terms of economic

25           impact.

Highly Confidential

Page 106

1    terminated, had been assigned three or more

2    strikes without counting any strikes assigned

3    from a Warner notice for any of the A through D

4    files, it's your understanding is it not, that

5    that user would have been terminated by Hotfile

6    under its policy, whether or not Warner had ever

7    sent its notices?

8                MR. THOMPSON:  Objection.  Vague

9           and incomplete.

10               THE WITNESS:  If I'm understanding

11          your hypothetical question, putting aside

12          the difficulty of assigning causality, if

13          there's equally at-cause agents then it

14          wouldn't necessarily be the case that

15          Warner was associated necessarily with

16          the termination of that user.

17          Q.    Well, Mr. Titov testified that in

18   that case where a user was assigned three strikes

19   without counting any of the Warner strikes, that

20   Hotfile did not consider -- did not consider that

21   a wrongful termination.

22               In your understanding of the

23   Hotfile system, do you have reason to disagree

24   with him?

25               MR. THOMPSON:  Excuse me.

Highly Confidential

Page 107

1          Objection.  Incomplete hypothetical.

2          Overbroad.

3                    You can answer.

4                    THE WITNESS:  I do not have any

5          reason to agree with him --

6          Q.    Agree or disagree?

7          A.    I do not have any reason to

8     disagree with him, so...

9          Q.    Take it out of the negatives.

10                    Given your understanding of the

11    Hotfile system and its policy, if a user has

12    three strikes without counting any strikes from

13    Warner notices, that file -- that user is

14    properly terminated, correct?

15                    MR. THOMPSON:  Again, objection.

16         Assumes facts.  Incomplete hypothetical.

17                    THE WITNESS:  Given my

18         understanding of Hotfile's policy and

19         their implementation of the policies

20         since February, that user would be

21         terminated.

22         Q.    And that user would be terminated

23    properly, correct?

24                    MR. THOMPSON:  Objection.  Calls

25         for a legal conclusion.

Highly Confidential

Page 108

1          Q.     Let me sort of put it

2     differently.

3               We have previously talked about a

4     situation where a user was terminated based on a

5     wrongful notice, and I believe you referred to

6     that as a wrongful termination.

7               If a user was terminated because

8     of three strikes having nothing to do with Warner

9     notices, you would not consider that a wrongful

10    termination, would you?

11               MR. THOMPSON:  Objection.  Calls

12          for a legal conclusion.

13               THE WITNESS:  If I'm understanding

14          the context of the question, that would

15          be correct.

16          Q.     Have you analyzed whether that

17    ever happened, whether any of the users that were

18    terminated -- strike that.

19               Have you ever analyzed whether any

20    of the users that received strikes based on the A

21    through D notices already had three strikes

22    without counting the strikes assigned by the

23    Warner notices?

24          A.     I have not done that analysis.

25          Q.     Did you personally review any of

Highly Confidential

Page 130

                    2:00 p.m.)

2  BY MR. FABRIZIO:

3          Q.    Good afternoon, Dr. Lynde.  How
4  was lunch?

5          A.    Good afternoon.  It was okay.

6          Q.    Well, he's not that good a host,
7  huh?

8          A.    We outsourced it, so it's not
9  Farella's call.

10         Q.    You would agree with me, would you
11  not, that if Hotfile only began assigning strikes
12  based on notices on February 18, 2011, that any
13  of the files on Exhibit A through D that were the
14  subject of notices sent before February 18, 2011
15  could not have resulted in users being terminated
16  as a result of the Warner notices?

17             MR. THOMPSON:  Objection.
18         Incomplete hypothetical.

19             THE WITNESS:  If I understand your
20         question correctly, and the date of the
21         initiation of the policy, for involuntary
22         terminations due to that policy, I
23         believe that would be correct.

24         Q.    Did you look at the Exhibit A
25  through D files to determine whether any of them

Highly Confidential

Page 170

1                    Just kidding.

2          A.    It's complex.

3          Q.    That was a joke.  I was just

4     having some fun.

5                    Do you have any evidence, and did

6     you consider any evidence that any Hotfile user

7     failed to purchase a premium account as a result

8     of the takedown notices reflected on Exhibits A

9     through D of the counterclaim?

10         A.    Failed to purchase an account?

11    Well, that -- I don't believe that data set would

12    exist since those are all the people for which

13    there would be no records.

14         Q.    So then the answer would be, no,

15    you don't?  You're not aware of any evidence?

16         A.    Nor would any exist logically.

17         Q.    Do you have any evidence that any

18    user failed to purchase a premium Hotfile account

19    because of any Warner Brothers takedown notices?

20         A.    Once again, if I understand the

21    question correctly, there wouldn't be any such

22    evidence since those are all the subscribers that

23    are -- potential subscribers that are invisible

24    to us.  They are the ones that did not choose a

25    subscription by definition.

Highly Confidential

Page 171

1           Q.    Okay.  Are you aware of any

2    evidence that any Hotfile premium user

3    voluntarily cancelled their subscription as a

4    result of any of the takedowns reflected on

5    Exhibits A through D of the counterclaim?

6           A.    I am not aware of specific

7    evidence with regard to specific premium

8    subscribers making that choice.

9           Q.    Too many "specifics" in there for

10   me, let me try this one more time.

11               Can you identify a single Hotfile

12   premium user who cancelled his or her

13   subscription from Hotfile as a result of the

14   takedown notices reflected on Exhibits A through

15   D of the counterclaim?

16           A.    I'm not aware of evidence with

17   regard to a single user.

18           Q.    Let me broaden that.

19               Are you aware of any Hotfile

20   premium users who cancelled their premium

21   subscription as a result of any takedown notices

22   sent to Hotfile by Warner Brothers?

23           A.    I am not aware of specific

24   evidence with regard to any group of premium

25   users with respect to those takedown notices.

Highly Confidential

Page 172

1      Q.    You're killing me with the

2  "specifics" here.

3            Are you aware of a single Hotfile

4  premium user who cancelled his or her premium

5  subscription as a result of any takedown notices

6  sent by Warner Brothers?

7      A.    I am not aware of such specific

8  evidence.

9      Q.    Are you aware of a single Hotfile

10  premium user that was involuntarily terminated as

11  a result of a strike assigned from a notice for

12  one of the Exhibit A through D works?

13            MR. THOMPSON:  Objection.  Asked

14            and answered.

15            THE WITNESS:  I am not aware of a

16            specific instance of such.

17      Q.    Are you aware of any Hotfile user,

18  premium or otherwise, that was involuntarily

19  terminated as a result of the takedown notices

20  for the files on Exhibits A through D of the

21  counterclaim?

22      A.    I'm not aware of any such specific

23  evidence.

24      Q.    You understand that Hotfile has

25  users that can register as affiliates, correct?

Highly Confidential

Page 175

1    being interested in subscribing or current

2    subscribers terminating their subscription.  And

3    that this information, in fact, could expand over

4    time.

5        Q.    I realize that's an assumption of

6    your damages model.  My question, though, is to

7    try to -- to try to figure out whether there was

8    any evidence of any adverse effect on Hotfile's

9    business reputation or goodwill coming from the

10   Exhibit A through D takedowns?

11       A.    I do not have specific evidence

12   from the Exhibit A through D takedowns to

13   reputation or goodwill.

14       Q.    Are you aware that any takedown

15   notice sent by Warner Brothers has had an adverse

16   impact on Hotfile's business reputation or

17   goodwill?

18       A.    I am not sure I understand the

19   distinction --

20       Q.    My first question --

21       A.    -- between the questions.

22       Q.    My first question was related to

23   the A through D works; my second question was

24   related to any Warner takedown notice.

25             So with that clarification, let me

Highly Confidential

Page 176

1    just ask the question in a whole.

2              Are you aware of any Warner

3    Brothers takedown notice that has resulted in an

4    adverse impact on Hotfile's business reputation

5    or goodwill?

6         A.    I'm not aware of any such specific

7    evidence.

8         Q.    Are you aware of any evidence of

9    negative feedback from users -- strike that.

10             Are you aware of any evidence of

11   negative feedback from users based on the

12   takedown notices reflected on Exhibits A through

13   D of the counterclaim?

14             MR. THOMPSON:  Objection.

15        Overbroad and vague.

16             THE WITNESS:  I'm not aware of

17        specific evidence with respect to user.

18        Q.    I'm broadening it to all of

19   Warners' takedown notices.

20             Are you aware of any negative

21   feedback from any Hotfile user related to any

22   takedown notice sent by Warner Brothers?

23        A.    I'm not aware of specific evidence

24   on that.

25        Q.    Are you aware of any negative

Highly Confidential

Page 282

1          Q.     Have you incurred additional --

2     have you billed additional time to this matter in

3     December?

4          A.     I have.

5          Q.     And has your team billed

6     additional time on this matter in December?

7          A.     I believe most of the time has

8     been mine, in preparation for this deposition.

9          Q.     Do you believe it is a fair

10    statement that as of today if you count your

11    hours approved for your deposition, that

12    Cornerstone Research has accrued more than

13    $20,000 worth of fees in this matter?

14         A.     That's likely to be the case.

15         Q.     So if you look at Schedule 1 of

16    Lynde Exhibit 1, Cornerstone Research has

17    probably incurred more fees twice -- strike

18    that.

19                Cornerstone Research has incurred

20    more fees in this case than the total damage you

21    estimate in Schedule 1?

22         A.     I believe that's correct.

23         Q.     And the total you estimate in

24    Schedule 1.1 as well?

25         A.     Correct.

Highly Confidential

Page 291

```
 1          MR. FABRIZIO:  Okay.  I'm good.

 2     Thank you, Dr. Lynde.

 3               (Time noted: 5:59 p.m.)

 4

 5

 6

 7               MATTHEW LYNDE

 8

 9                              See Below

10     Subscribed and sworn to before me

11     This  30th day of January     , 2012.

12     _____

13

14

15

16

17

18     State of California
       County of   San Francisco
19     Subscribed and sworn to (or affirmed) before me
       on this 30th day of January , 20 12
       by  Matthew Lynde
20     proved to me on the basis of satisfactory evidence
       to be the person(s) who appeared before me.
       Signature _____ (Seal)

21

22

23

24

25
```

MARK MCQUILLEN
COMM. #1793325
NOTARY PUBLIC-CALIFORNIA
SAN FRANCISCO COUNTY
My Comm. Expires Mar. 10, 2012

Errata to the Deposition of Matthew R. Lynde
December 16, 2011
*Disney Enterprises, Inc. et al. v. Hotfile Corp., et al.*
*Hotfile Corp., et al. v. Disney Enterprises, Inc. et al.*

| Page | Line | Now reads | Should read | Reason |
|------|------|-----------|-------------|--------|
| 9 | 13 | "didn't" | "don't" | Misspoke |
| 42 | 14 | "affect" | "effect" | Transcribing error |
| 52 | 9-10 | "up loader" | "uploader" | Transcribing error |
| 75 | 3 | "I result" | "results" | Misspoke |
| 84 | 9 | "up loaders" | "uploaders" | Transcribing error |
| 118 | 14 | "prescription" | "subscription" | Misspoke |
| 126 | 10 | "focused in" | "focused on" | Transcribing error |
| 150 | 4 | "I was" | "I" | Misspoke |
| 157 | 25 | "basis is" | "basis" | Transcribing error |
| 162 | 17 | "have" | "have;" | Transcribing error |
| 178 | 23 | "an" | "a" | Transcribing error |
| 179 | 18 | "or" | "where" | Transcribing error |
| 185 | 15 | "MegaDownload" | "Megaupload" | Misspoke |
| 212 | 22 | "over" | "of" | Transcribing error |
| 212 | 22 | "and" | "that" | Transcribing error |
| 213 | 10 | "it's bought and" | "its robot" | Transcribing error |
| 218 | 1 | "variants" | "variance" | Transcribing error |
| 218 | 22 | "is you" | "is that you" | Transcribing error |
| 245 | 3 | "ELLS" | "Yale" | Transcribing error |
| 262 | 18 | "provided" | "have been provided" | Transcribing error |
| 276 | 19 | "Tolav" | "Kolev" | Transcribing error |

1/30/12
_____
Date

_____
Matthew R. Lynde

_____
Notary Public

State of California
County of San Francisco
Subscribed and sworn to (or affirmed) before me
on this 30 day of January, 20 12,
by Matthew R. Lynde
proved to me on the basis of satisfactory evidence
to be the person who appeared before me.
Signature _____ (Seal)

MARK MCQUILLEN
COMM. #1793325
NOTARY PUBLIC-CALIFORNIA
SAN FRANCISCO COUNTY
My Comm. Expires Mar. 10, 2012

*Highly Confidential*                    Page 1 of 1

Highly Confidential

Page 292

C E R T I F I C A T E

STATE OF CALIFORNIA        )

                          )

COUNTY OF SAN FRANCISCO )

   I, LINDA VACCAREZZA, a Certified

Shorthand Reporter for the State of

California, do hereby certify:

   That MATTHEW LYNDE, the witness

whose deposition is hereinbefore set

forth, was duly sworn by me and that such

deposition is a true record of the

testimony given by such witness.

   I further certify that I am not

related to any of the parties to this

action by blood or marriage; and that I

am in no way interested in the outcome of

this matter.

   IN WITNESS WHEREOF, I have hereunto

set my hand this 29th day of December

2011.


_____

LINDA VACCAREZZA, CSR. NO. 10201