# EXHIBIT B

Highly Confidential

Page 1

1                  UNITED STATES DISTRICT COURT
                   SOUTHERN DISTRICT OF FLORIDA
2               CASE NO. 11-20427-WILLIAMS/TURNOFF
3    - - - - - - - - - - - - - - - - - - - - - - - - -
     DISNEY ENTERPRISES,
4    INC., TWENTIETH CENTURY
     FOX FILM CORPORATION,
5    UNIVERSAL CITY STUDIOS
     PRODUCTIONS LLLP,
6    COLUMBIA PICTURES
     INDUSTRIES, INC., and
7    WARNER BROS.
     ENTERTAINMENT, INC.,
8
9               Plaintiff,
10   v.
11   HOTFILE CORP., ANTON
     TITOV, and DOES 1-10,
12
13              Defendants.
14
15   HOTFILE CORP.,
16              Counterclaimant,
17   v.
18   WARNER BROS ENTERTAINMENT
     INC.,
19              Counterdefendant.
20   - - - - - - - - - - - - - - - - - - - - - - - - -
                        VOLUME I
21        H I G H L Y   C O N F I D E N T I A L
          (Pursuant to protective order, the following
22      transcript has been designated highly confidential)
23           30(b)(6) DEPOSITION OF ANTON TITOV
                  Radisson Blu Hotel
24                  Sofia, Bulgaria
                Monday, December 5, 2011
25               Job Number: 44174

Highly Confidential

1                        A P P E A R A N C E S
2     ATTORNEY FOR THE PLAINTIFFS:
3                 JENNER & BLOCK
                  BY:  STEVEN B. FABRIZIO, ESQ.
4                 1099 New York Avenue, NW
                  Washington, DC  20001
5

6

7

8

      ATTORNEY FOR THE DEFENDANTS HOTFILE CORP.,
9     AND ANTON TITOV:
                  FARELLA, BRAUN & MARTEL
10                BY:  RODERICK M. THOMPSON, ESQ.
                  235 Montgomery Street
11                San Francisco, California  94104
12

13

                  BOSTON LAW GROUP
14                VALENTIN GURVITS
                  825 Beacon Street
15                Newton Center, MA 02459
16

17

18

19

20

21

22

23

24

25

Highly Confidential

1    Also present:

2    Court reporter:

3          Fiona Farson

           TSG Reporting

4

5    Videographer:

6          Simon Rutson

           TSG Reporting

7

8    Interpreter:

9          Assist. Prof. Boris Naimushin, Ph.D.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Highly Confidential

Page 156

1       Hotfile's counterclaim against Warner is?

2   MR. THOMPSON:  Object, that it calls for a legal conclusion.

3          You can answer.

4   A.  The counterclaim against Warner reflects the fact that

5       we've given Warner a powerful tool to be able to take

6       down and block content on the Hotfile website, and that

7       this tool, in our opinion, was misused to take down

8       files for which Warner doesn't hold the copyright.

9       That's the substance, without the legal part.

10  BY MR. FABRIZIO:

11  Q.  And do you believe Warner took down material that it

12      didn't own on purpose?

13  MR. THOMPSON:  Objection, vague.

14  A.  I don't know about the motives of Warner doing so.

15  BY MR. FABRIZIO:

16  Q.  Would you believe Warner saw a file, recognized that it

17      wasn't one of their properties, but sent a notice

18      through the special rights holder's account, knowing

19      that it wasn't their property?

20  MR. THOMPSON:  Objection.  Hypothetical, calls for

21      speculation.

22  A.  I don't know what was Warner's goal or policy, so

23      I don't know.

24  BY MR. FABRIZIO:

25  Q.  Do you understand that in part, Warner uses an automated

Highly Confidential

Page 157

1      process to send DMCA notices?

2   A.  I am not ruling out this possibility, but I don't have

3       any proof of this, I guess.

4   Q.  Okay.  So do you have any knowledge of the process

5       Warner uses to identify content it believes to be

6       infringing and to send notices about that content to

7       Hotfile?

8   A.  I know -- I don't know the actual process, and my

9       lawyers may know more, because some of the information

10      is classified in a way that I don't have access to.

11  Q.  Fair enough.  Hotfile, in its operations, uses processes

12      that are fully automated, do they not?

13  MR. THOMPSON:  Objection.  Vague and overbroad.

14  A.  Yes, it does.

15  BY MR. FABRIZIO:

16  Q.  Okay.  Is it Hotfile's position that -- that an

17      automated system of sending notices is never acceptable?

18  MR. THOMPSON:  Objection.  Overbroad and vague.  And calls

19      for a legal conclusion, I believe, as well.

20  A.  I don't know.

21  BY MR. FABRIZIO:

22  Q.  Okay.  As someone who helps operate a very large-scale

23      system, do you agree that any system will yield some

24      errors?

25  MR. THOMPSON:  Objection.  Overbroad and vague.

Highly Confidential

Page 158

1    A.   I don't want to say that, and probably somebody

2         operating an online banking account won't agree to you,

3         but mistakes happen.

4    BY MR. FABRIZIO:

5    Q.   But mistakes do happen?

6    A.   Yes, they do.

7    Q.   And on large-scale systems, even if human beings looked

8         at everything, do you agree that mistakes would still

9         happen?

10   MR. THOMPSON:   Objection.   Overbroad, unintelligible.

11   A.   Normally a computer algorithm is doing what it's

12        designed to do, and part of the design might be

13        a mistake, but my understanding is that it will operate

14        the way it operates, and -- and that's it.

15   BY MR. FABRIZIO:

16   Q.   Well, I'm moving away from computer algorithms; I'm

17        talking about having human beings review everything.   So

18        if Warner had a system where human beings reviewed every

19        single notice that it was sending, would you agree that

20        there would still be likely to be errors?

21   MR. THOMPSON:   Objection, vague.

22   A.   Yeah, that is vague.

23   BY MR. FABRIZIO:

24   Q.   And what sort of error rate would Hotfile find

25        acceptable in a company sending notices to Hotfile on

Page 159

1      a large scale?

2   MR. THOMPSON:  Objection, calls for a legal conclusion.

3   A.  I don't know.  Hotfile never -- never -- were never

4      thinking about that.

5   BY MR. FABRIZIO:

6   Q.  Is it true, is it not, that Hotfile began looking for

7      a basis for a counterclaim almost immediately upon being

8      sued by plaintiffs?

9   MR. THOMPSON:  Objection, assumes facts.

10  A.  Yes, I think so.

11  BY MR. FABRIZIO:

12  Q.  And prior to the filing of the complaint in this action,

13     Hotfile never investigated any Warner takedown notices

14     before that?

15  MR. THOMPSON:  Objection, overbroad and vague.

16  A.  I'm not aware of such an investigation.

17  MR. FABRIZIO:  I don't believe this needs to be marked,

18     since it's a pleading in the case, but I just want to

19     make sure the witness has in front of him the second

20     amended answer and counterclaim.

21         Do you believe it needs to be marked?  I'm happy to

22     do whatever you like.

23  MR. THOMPSON:  If you're representing that it's filed,

24     that's fine.

25  MR. FABRIZIO:  Great.

Highly Confidential

Page 162

1   BY MR. FABRIZIO:

2   Q.   I realize --

3   MR. THOMPSON:   Excuse me for interrupting.   Go ahead.

4   MR. FABRIZIO:   That's okay.

5   Q.   Mr. Titov, you personally participated in the process of

6        Hotfile looking for mistakes among the takedown notices

7        Warner sent, correct?

8   A.   That is correct.

9   Q.   Okay.   And do you understand the files listed on

10       exhibits A through D of the counterclaim to reflect

11       files that Hotfile located that they believed to have

12       been sent in error?

13  A.   Hotfile itself identified a small number of files, and

14       further research was performed by counsels and experts.

15       I -- I don't really know.

16  Q.   Okay.   And all of the files that are identified on

17       exhibits A through D, is it fair to say that the first

18       time Hotfile formed the belief that these files were

19       sent in error was after the complaint in this case had

20       been filed?

21  A.   Yes, I believe so.

22  Q.   And is it also fair to say that within Hotfile, the

23       process of identifying potential mistaken takedowns sent

24       by Warner was a high priority?

25  MR. THOMPSON:   Objection, vague.

Highly Confidential

Page 163

1   A.   I don't know.  It might be, for a certain period of

2        time.

3   MR. FABRIZIO:  I'm going to ask the court reporter to mark

4        as Titov exhibit 26 a one-page document bearing Bates

5        number HF00032714.  And this is a document that consists

6        of three pages:  A Bulgarian original, an English

7        translation, and the certification of the translator.

8            (Titov exhibit 26 marked for identification.)

9   MR. FABRIZIO:  This is off the record.

10               (Discussion off the record.)

11  MR. THOMPSON:  Mr. Fabrizio, just from looking at this, it

12       doesn't appear to me to match.

13  MR. FABRIZIO:  May I see?  That may explain something else

14       I'm looking at.

15           It's not.  But that does explain the other thing

16       I was looking at.  I'll take this exhibit back, so we're

17       going to adjust this exhibit; my apologies.

18           And now I will impress you all with my mastery of

19       Bulgarian.  All right.  So we have withdrawn exhibit --

20       the exhibit 26 that had been previously marked, and I'm

21       going to re-mark as exhibit 26 -- is that acceptable?

22  MR. THOMPSON:  Sure.

23  MR. FABRIZIO:  A one-page document -- darn, hold on

24       a second.

25           A one-page document bearing Bates number HF02303232.

Highly Confidential

Page 164

1          (Exhibit Titov 26 re-marked for identification.)

2     BY MR. FABRIZIO:

3     Q.  Mr. Titov, I take it that you have no issues reading

4          this document in Bulgarian?

5     A.  No, I don't.

6     MR. THOMPSON:  His counsel does.

7          Mr. Fabrizio, let me also just state while he's

8          reading that, we have become aware in the last week or

9          two or some inadvertent produced documents that were

10         written in Bulgarian that contained work product

11         information.  And I'd ask -- have asked for their

12         return.  I don't know if this is among them or not, not

13         being able to read the Bulgarian.

14    MR. FABRIZIO:  Well, then, we can deal with that afterwards.

15    MR. THOMPSON:  And I'd just like to -- I'll allow this to

16         continue, but I want to reserve a potential objection to

17         the extent this has any work product.

18    MR. FABRIZIO:  Okay.  Fair enough.  You preserve the

19         objection.  Obviously, until we see what it is, I can't

20         say whether we agree or not.

21    MR. THOMPSON:  But you agree there's no waiver by

22         letting me --

23    MR. FABRIZIO:  No, not by letting him answer the following

24         question.

25    BY MR. FABRIZIO:

Highly Confidential

Page 165

1    Q.  Mr. Titov, is exhibit 26 a true and correct copy of an
2        email from March 7, 2011?
3    A.  I don't have any reasons to believe that it's not.
4    Q.  Okay.  And is the substance of the email Hotfile's
5        investigation of files submitted for takedown by Warner?
6    MR. THOMPSON:  Objection, vague.
7    A.  Yes, it is.
8    BY MR. FABRIZIO:
9    Q.  And in the second-to-last line, the one that ends in an
10       exclamation point, is the English translation of that
11       "This is a priority"?
12   A.  Yes, it says so.
13   Q.  Okay.  So at least at this point in time, Hotfile's
14       investigation of files taken down by Warner was
15       a priority?
16   MR. THOMPSON:  Objection, vague.
17   A.  It seems to be priority for at least part of the Hotfile
18       personnel, yes.
19   BY MR. FABRIZIO:
20   Q.  It says "andrew@Hotfile."  Who is that?
21   A.  That is Andre -- Andre Ianakov.
22   Q.  And Hotfile Corp., is that a group email?
23   A.  Without the email address, I can't say.  But probably
24       it's something that Stanislav reads, since it turns to
25       Stanislav.

Highly Confidential

Page 167

1   A.   No, they did not.

2   Q.   Hotfile had identified what it believed to have been

3        mistakes in the notices by Warner throughout

4        February, March, April and even May of 2001; is that not

5        correct?

6   MR. THOMPSON:   I'm going to object to the extent that it

7        calls for work product information which commenced after

8        the date of early March 2011.

9            To the extent you can answer without revealing work

10       product information, you can do so.

11  A.   I don't think I can answer.

12  BY MR. FABRIZIO:

13  Q.   Okay.  Well, you identified what you believed to have

14       been mistakes made by Warner prior to early March 2001;

15       is that not correct?

16  A.   Yeah, I believe so.

17  Q.   Okay.  Did you ever bring those mistakes to the

18       attention of Warner prior to filing your counterclaim?

19  A.   Not directly, no.

20  Q.   Indirectly?

21  A.   It is my belief that at some point our counsel

22       communicated with Warner, who knew.

23  MR. FABRIZIO:   Let me ask the court reporter to mark as

24       Titov exhibit 27 a document bearing the Bates number

25       HF02866338 through 369.

Page 168

1        (Titov exhibit 27 marked for identification.)

2    BY MR. FABRIZIO:

3    Q.  I'm not going to ask you about each individual entry.

4        Could I just ask you if this is a true and correct copy

5        of an email and attachment that you received on or

6        about March 10, 2011?

7    A.  I don't reason to believe -- I don't have reasons to

8        believe that it's not.

9    Q.  And this is part of your early investigation of what you

10       perceived to be mistakes made by Warner in sending

11       takedown notices?

12   A.  This is some list that might contain errors, yes.

13   Q.  Okay.  Just turn to the first page, which is the first

14       page of the exhibit.  This was -- just look at -- look

15       at entry number 36, just to take one, and if you look

16       under the column F, under the heading "Copyright:" it

17       says:

18            "Copyright not Warner."

19            Do you see that?

20   A.  Yes, I do.

21   Q.  Okay.  And does that reflect that the author of this

22       exhibit concluded that that file, while not containing

23       a property likely owned by Warner, nonetheless contained

24       copyrighted content?

25   MR. THOMPSON:  Objection.  Calls for speculation, misstates

Highly Confidential

Page 169

1        the document.

2    A.   I'm not aware of the exact method of research the author

3         of the document used, and from what I see, my

4         interpretation would be that that is the list -- very

5         early draft of list, just to get examples.

6    BY MR. FABRIZIO:

7    Q.   But your understanding when you received this document

8         was that the notation "Copyright not Warner" meant that

9         the file was copyrighted, but not owned by Warner?

10   MR. THOMPSON:  Objection.  Calls for a legal conclusion, and

11        speculation.

12   A.   Yeah, the way I read it is that the author of the

13        document by -- I don't know, by performing some kinds of

14        analysis, concluded that probably it's copyright, but

15        not by Warner.

16   BY MR. FABRIZIO:

17   Q.   And you were one of the people that supervised this

18        investigation, were you not?

19   MR. THOMPSON:  Objection, vague.

20   A.   Say that I participated in the investigation.

21   BY MR. FABRIZIO:

22   Q.   Okay.  The "From:" says "hotfile.mailbox@gmail.com."  Do

23        you see that?

24   A.   Yes.

25   Q.   Who uses that email address?

Highly Confidential

Page 179

1    MR. FABRIZIO:  I was hoping we'd go a little longer, since

2        we started a little later.

3    MR. THOMPSON:  Through no fault of ours.

4    MR. FABRIZIO:  Granted.  We haven't established that it's

5        the fault of ours, but I don't think there's any reason

6        to fight about that.  I was hoping just to go a little

7        longer.

8    MR. THOMPSON:  Mr. Titov, let us know if you're tiring, but

9        we can -- we can go a little longer.

10   BY MR. FABRIZIO:

11   Q.  Earlier you said that explaining the reasons for the

12       falloff in traffic was complicated.  Do you recall that?

13   A.  Yes, I do.

14   Q.  Okay.  Why do you believe it's complicated?

15   A.  Because we have to consider many factors.

16   Q.  Such as?

17   A.  I'd say general awareness of users about this lawsuit.

18   Q.  Anything else?

19   A.  And general awareness of users about the fact that their

20       data is going to be produced to somebody.

21   Q.  Anything else?

22   A.  Of course, to a certain degree, the wrongful takedowns

23       by Warner and other companies and its impact when we

24       implemented the tightened repeat infringement policy

25       with the strikes.

Highly Confidential

Page 180

1   Q.   You said "implemented the" -- what was the word you

2        used?  "Tightened"?

3   A.   Yes.

4   Q.   "Tightened [routine] infringement policy."

5            Anything else?

6   A.   There might be others, but I'm not able to think of

7        anything more.

8   Q.   Do you think the fact that you -- that Hotfile began

9        terminating users in large quantities played

10       a significant role?

11  MR. THOMPSON:  Objection, vague.

12  A.   Yeah, I think it did play a role.

13  BY MR. FABRIZIO:

14  Q.   Would you agree that the Hotfile terminations, post

15       complaint, played a very significant role?

16  MR. THOMPSON:  Objection.  Vague, asked and answered.

17  A.   Depends on the definition of "significant," but

18       definitely, to a certain extent, fair to say that.

19  BY MR. FABRIZIO:

20  Q.   Is it fair to say that prior to Hotfile's beginning to

21       terminate users in large quantities, Hotfile's user

22       traffic and revenues were going up, generally speaking?

23  MR. THOMPSON:  Objection.  Overbroad, vague as to time.

24  A.   Are you talking about some specific period of time, like

25       between filing the complaint and terminations, or in

Highly Confidential

Page 181

1          general?

2     BY MR. FABRIZIO:

3     Q.   No, I mean -- let me try it a different way.  And it

4          almost doesn't make a difference when it began; why

5          don't we just pick a point in time.

6               Is it not the case that throughout 2010 and up -- up

7          through the filing of the complaint, as a general

8          matter, Hotfile's revenues and its user traffic were

9          increasing?

10    MR. THOMPSON:  Objection, vague as to "general matter."

11    A.   I think it's fair to say so.

12    BY MR. FABRIZIO:

13    Q.   And is it not also fair to say that upon Hotfile

14         beginning to terminate users en masse, Hotfile's user

15         traffic and revenues began to fall dramatically?

16    MR. THOMPSON:  Objection.  Assumes facts and misstates prior

17         testimony.

18    A.   To a certain extent it began -- there was such a result.

19    BY MR. FABRIZIO:

20    Q.   Okay.  So do you believe that the falloff in user

21         traffic and revenues was caused almost exclusively by

22         Hotfile deciding to terminate users en masse?

23    MR. THOMPSON:  Objection.  Assumes facts, misstates

24         testimony, and also calls for speculation.

25    A.   I don't know.

Highly Confidential

Page 182

1    BY MR. FABRIZIO:

2    Q.   You identified awareness of -- of users of this lawsuit.

3         Do you believe the mere filing of this lawsuit caused

4         Hotfile to lose users?

5    A.   It's not impossible.

6    Q.   But I'm asking what you believe.

7    MR. THOMPSON:  Objection.  Asked and answered, calls for

8         speculation.

9    A.   I don't want to talk about quantities, but at least to

10        some degree, it can happen.

11   BY MR. FABRIZIO:

12   Q.   What is it about the filing of this lawsuit that in your

13        mind would cause users to leave Hotfile?

14   A.   Some invasion in their privacy that they can expect.

15   Q.   What invasion of their privacy?

16   A.   As a result of the discovery process that is ongoing.

17   Q.   Anything else?

18   A.   Nothing that I can think of now.

19   Q.   Okay.  Prior to the filing of this complaint, did

20        Hotfile respond to each and every DMCA notice it

21        received by blocking access to the files identified?

22   MR. THOMPSON:  Objection, overbroad.

23   A.   It was general policy of Hotfile to do its best to be

24        able to respond to each DMCA takedown notice and to

25        block access to it.

Page 184

1          to "mistakenly" as vague and ambiguous.

2              You can answer.

3   A.   To my belief, Hotfile doesn't have information about

4          each and every file and part of information about each

5          and every file is classified to a level of

6          confidentiality that won't allow Hotfile access to it.

7                    (Reporter clarification.)

8              Confidentiality that won't allow Hotfile access to

9          it.

10  BY MR. FABRIZIO:

11  Q.   Well, I'm asking about your contention, not information

12         that's confidential.  And I don't know how this would

13         qualify anyway, but is it Hotfile's belief that the

14         files on which it is suing Warner were mistakenly taken

15         down by Warner?

16  MR. THOMPSON:  Objection, vague and ambiguous.

17  A.   To the extent we believe everybody who worked on

18         produced -- producing this list, it is, yes, Hotfile's

19         belief.

20  BY MR. FABRIZIO:

21  Q.   Did you assign the users that uploaded those files on

22         exhibits A through D a strike pursuant to your post

23         complaint repeat infringer policy?

24  MR. THOMPSON:  Objection.  Vague and overbroad.

25  A.   I don't know about every and each file, but it is my

Highly Confidential

Page 185

1    belief that there were strikes assigned with --

2    connected to these deletions.

3    BY MR. FABRIZIO:

4    Q.   So my question is, why did you assign a strike to the

5         users who uploaded those files if you believed that

6         Warner's notices were in error?

7    MR. THOMPSON:   Objection, overbroad.

8    A.   The strike was probably assigned quite earlier in time

9         quite earlier in time than Hotfile became -- Hotfile

10        started to believe that these files are mistakenly

11        removed.

12   BY MR. FABRIZIO:

13   Q.   When did you start assigning strikes?   It was only after

14        the complaint was filed, correct?

15   A.   Correct.

16   Q.   Okay.   And shortly after the complaint was filed, you

17        began investigating filing a claim against Warner,

18        correct?

19   MR. THOMPSON:   Objection.   Vague, asked and answered.

20   A.   Correct.

21   BY MR. FABRIZIO:

22   Q.   So I believe it's the case that every single one of the

23        files on exhibits A through D are -- were taken down

24        after the filing of this, or -- I shouldn't say that;

25        either within a week of or -- the filing or after the

Highly Confidential

Page 186

1    filing of this complaint, but you didn't start assigning

2    it strikes until afterwards -- let me do this

3    a different way.  I'm going to stop.  Strike that.

4        At some point before you were assigning strikes, you

5    believe that Warner -- some of the Warner notices were

6    mistaken, correct?

7    MR. THOMPSON:  Objection, misstates prior testimony.

8    A.  I don't know about the exact timeline.

9    BY MR. FABRIZIO:

10   Q.  All right.  Let me just ask it this way:  Why didn't you

11       just go back and remove the strikes you had given the

12       users that uploaded the files on exhibits A through D of

13       the counterclaim, if you believed that those files were

14       taken down in error?

15   MR. THOMPSON:  Objection.  Overbroad, and vague as to time.

16   A.  I don't know.

17   BY MR. FABRIZIO:

18   Q.  There's no technical reason why you couldn't have

19       removed a strike, is there?

20   MR. THOMPSON:  Same objections.

21   A.  Yeah, there is no technical reason not to remove

22       a strike, but it might be too late after months or --

23       generally, this investigation, it takes time.

24   BY MR. FABRIZIO:

25   Q.  Did you go back and remove any strikes?

Highly Confidential

Page 187

1   A.  I did not.

2   Q.  Did anyone in Hotfile, to your knowledge?

3   A.  To my knowledge, no.

4   Q.  Why not?

5   A.  I don't know.

6   MR. THOMPSON:  Are we ready for -- to stop?

7   MR. FABRIZIO:  Unless you're prepared to indulge me starting

8       on a new line of questions, which I imagine not.

9   MR. THOMPSON:  I think we should start in the morning.

10  MR. FABRIZIO:  Okay.

11  MR. THOMPSON:  At the right location.

12  MR. FABRIZIO:  I was going to say:  Here, in this very room.

13      It will be easier for you guys.

14  MR. THOMPSON:  Next time please give us notice; that's all.

15  MR. FABRIZIO:  Off the record.

16  VIDEOGRAPHER:  Off the record.  6:08.  This is the end of

17      tape 4, volume I , and concludes today's deposition of      1

18      Anton Titov.

19   (Whereupon the deposition adjourned until 9:00 a.m. on

20              Tuesday, December 6, 2011.)

21

22

23

24

25

Page 189

HIGHLY CONFIDENTIAL
CERTIFICATE OF COURT REPORTER

I, Fiona Farson, with TSG Reporting, hereby certify that the testimony of the witness Anton Titov in the foregoing transcript, taken on Monday, December 5, 2011 was reported by me in machine shorthand and was thereafter transcribed by me; and that the foregoing transcript is a true and accurate verbatim record of the said testimony.

I further certify that I am not a relative, employee, counsel or financially involved with any of the parties to the within cause, nor am I an employee or relative of any counsel for the parties, nor am I in any way interested in the outcome of the within cause.

Signed:  ......................

Fiona Farson

Dated:   December 15th, 2011

Highly Confidential

```
                                                      Page 188

 1                    HIGHLY CONFIDENTIAL
                    CERTIFICATE OF DEPONENT
 2

 3
         I, ANTON TITOV, hereby certify that I have read the
 4    foregoing pages of my deposition of testimony taken in these
      proceedings on Monday, December 5, 2011, and, with the
 5    exception of the changes listed on the next page and/or
      corrections, if any, find them to be a true and accurate
 6    transcription thereof.

 7

 8

 9

10

      Signed:  ......../................
11

      Name:    ANTON TITOV
12
      Date:    1/20/2012
13

14

15

16

17

18

19

20

21

22

23

24

25
```

Highly Confidential

```
                                                    Page 190
 1                    HIGHLY CONFIDENTIAL

 2
                         E R R A T A
 3
                  Deposition of ANTON TITOV
 4
       Page/Line No.        Description        Reason for change
 5      14:18         Eitinerum --> Itinerum     Correct transcription

 6      14:20         EITINERUM --> ITINERUM     Correct transcription

 7      14:21          internet --> intranet     Correct transcription

 8      14:24      all in shelves --> online shops  Correct transcription

 9      15:7       webcasting --> webhosting       Correct transcription

10      15:10       webcasting --> webhosting      Correct transcription

11      18:6            Ilan --> Elan              Correct transcription

12      20:9  Manix: M-A-N-I-X -> Maniax: M-A-N-I-A-X  Correct trans.

13      35:16      unimportant --> important       Correct transcription

14      35:17    he show choice --> he may choose  Clarify record

15      37:6     Stillings --> Stallings          Correct transcription

16      37:8   S-T-I-L-L-I-N-G-S --> S-T-A-L-L-I-N-G-S Correct trans.

17      38:3   qualification --> collocation      Correct transcription

18      39:2   Equinix bandwith --> Equinix, bandwith  Clarify record

19

20   Signed:   ....................

21   Name:   ANTON TITOV

22   Date:   ....................

23

24

25
```

TSG Reporting - Worldwide      800-702-9580

Highly Confidential

```
                                                    Page 190
1                    HIGHLY CONFIDENTIAL

2                        E R R A T A

3                 Deposition of ANTON TITOV

4      Page/Line No.        Description        Reason for change

5      _____

6      44:1            IT --> IP              Correct transcription

7      46:16    with the grade, --> would degrade  Correct trans.

8      46:17  the traffic flows into there from --> when the traffic

9            flows into their network from      Correct transcription

10     47:3 We can say any old --> We cannot say we want  Correct trans.

11     57:23    costing --> hosting            Correct transcription

12     61:15    Vlad --> Blue Ant              Correct transcription

13     65:24  Konstantin Lucyan --> Constantin Luchian  Correct trans.

14     77:11    lemur --> Lima                 Correct transcription

15     89:6     SA --> Yes                     Correct transcription

16     89:21    I know what --> I don't know what   Correct trans.

17     99:11    Panek --> Penev                Correct transcription

18     109:23   Chubarov --> Chuburov          Correct transcription

19

20     Signed:    ....................

21     Name:   ANTON TITOV

22     Date:   ....................

23

24

25
```

TSG Reporting – Worldwide      800-702-9580

Highly Confidential

```
                                                      Page 190
 1                    HIGHLY CONFIDENTIAL

 2                         E R R A T A

 3               Deposition of ANTON TITOV

 4     Page/Line No.      Description         Reason for change
 5     110:1 Mr. Ianakov manages --> Mr. Stoyanov and Mr. Vangelov manage
 6                                            Conform to facts

 7     111:15    SecPay --> SegPay           Correct transcription

 8     119:5     Limewire --> Limelight      Correct transcription

 9     119:13    Limewire --> Limelight      Correct transcription

10     126:10    I was there --> I checked   Correct transcription

11     128:17    And that is tradition the Blue Ant contract is to -->

12         And the Blue Ant contract is still    Correct transcription

13     128:18    enforce --> in force        Correct transcription

14     138:8     Ignitov --> Ignatov         Correct transcription

15     138:10    I-G-N-I-T-O-V --> I-G-N-A-T-O-V   Correct transcription

16     65:24, 66:3, 66:8, 67:4, 68:3, Lucyan --> Luchian    Correct trans.
       68:16, 70:13, 70:19, 70:21,
17     71:13, 71:18, 72:3, 72:7, 72:9,               "
       74:3, 75:10, 75:18, 76:4, 76:5, 76:8
18                                                   "

19     72:17    Lucyan's --> Luchian's       Correct transcription

20     Signed:  ................................

21     Name:   ANTON TITOV

22     Date:   1/20/2012 .............

23

24

25
```

TSG Reporting - Worldwide      800-702-9580

Highly Confidential

Page 191

1                 UNITED STATES DISTRICT COURT
                  SOUTHERN DISTRICT OF FLORIDA
2                CASE NO. 11-20427-WILLIAMS/TURNOFF
3      - - - - - - - - - - - - - - - - - - - - - - - - -
       DISNEY ENTERPRISES,
4      INC., TWENTIETH CENTURY
       FOX FILM CORPORATION,
5      UNIVERSAL CITY STUDIOS
       PRODUCTIONS LLLP,
6      COLUMBIA PICTURES
       INDUSTRIES, INC., and
7      WARNER BROS.
       ENTERTAINMENT, INC.,
8
9               Plaintiff,
10     v.
11     HOTFILE CORP., ANTON
       TITOV, and DOES 1-10,
12
13              Defendants.
14
       HOTFILE CORP.,
15
                Counterclaimant,
16
       v.
17
       WARNER BROS ENTERTAINMENT
18     INC.,
                Counterdefendant.
19
       - - - - - - - - - - - - - - - - - - - - - - - -
20                      VOLUME II
          H I G H L Y   C O N F I D E N T I A L
21        (Pursuant to protective order, the following
       transcript has been designated highly confidential)
22
                 30(b)(6) DEPOSITION OF ANTON TITOV
23                    Radisson Blu Hotel
                       Sofia, Bulgaria
24               Tuesday, December 6, 2011
                    AT:  9:10 a.m.
25                  Job No: 44175

Highly Confidential

Page 192

1            A P P E A R A N C E S

2    ATTORNEY FOR THE PLAINTIFFS:

3            JENNER & BLOCK
             BY:  STEVEN B. FABRIZIO, ESQ.
4            1099 New York Avenue, NW
5            Washington, DC  20001
6

7

8

     ATTORNEY FOR THE DEFENDANTS HOTFILE CORP.,
9    AND ANTON TITOV:

             FARELLA, BRAUN & MARTEL
10           BY:  RODERICK M. THOMPSON, ESQ.
             235 Montgomery Street
11           San Francisco, California  94104
12

13           BOSTON LAW GROUP
             VALENTIN GURVITS
14           825 Beacon Street
             Newton Center, MA 02459
15

16

17

18

19

20

21

22

23

24

25

Highly Confidential

Page 193

1    Also present:

2    Court reporter:

3           Fiona Farson

            TSG Reporting

4

5    Videographer:

6           Simon Rutson

            TSG Reporting

7

8    Interpreter:

9           Assist. Prof. Boris Naimushin, Ph.D.

10

11   Technical expert:

12          Kelly Truelove

13

14

15

16

17

18

19

20

21

22

23

24

25

Highly Confidential

Page 210

1     notices; is that correct?

2     MR. THOMPSON:  Objection, vague.  Just so -- are you asking

3          him if that's what he said, or if that's the policy?

4     BY MR. FABRIZIO:

5     Q.   Is it the case that currently Hotfile terminates users

6          who have received three strikes based on Hotfile's

7          receipt of DMCA notices?

8     A.   That is correct, to my knowledge, yes.

9     Q.   Okay.  If a user is rightly terminated because that user

10         had received three or more strikes for uploading

11         infringing content, does the termination of that user

12         still negatively effect Hotfile's revenues?

13    MR. THOMPSON:  Objection.  Incomplete, hypothetical, calls

14         for speculation.

15    A.   I don't know.

16    BY MR. FABRIZIO:

17    Q.   You don't know?

18    A.   It's a very broad topic.  I don't have any factual

19         information.

20    Q.   Okay.  Let me ask it this way:  Does Hotfile consider

21         itself entitled to revenue from users who are repeat

22         copyright infringers by Hotfile's own standard?

23    MR. THOMPSON:  Objection.  Vague and ambiguous, calls for

24         a legal conclusion, and argumentative.

25    A.   I don't think so.

Highly Confidential

Page 211

1   BY MR. FABRIZIO:

2   Q.  Okay, let me make sure I understand your answer.

3       Is it correct that Hotfile does not consider itself

4       entitled to revenue from users who are repeat copyright

5       infringers by Hotfile's own standard?

6   MR. THOMPSON:  Same objections, and also it's overbroad.

7   A.  Well, I've said that our standards expect, of course,

8       copyright owners to co-operate; it means to issue right

9       and correct taking-down notices.  So I don't think

10      Hotfile considers income from confirmed copyright

11      infringers -- Hotfile doesn't consider to be entitled

12      for income from repeated copyright infringers.

13  Q.  In Hotfile's counterclaim against Warner, does Hotfile

14      claim damages based on users who were properly

15      terminated by Hotfile's repeat infringer policy pursuant

16      to Hotfile's own three-strikes policy?

17  MR. THOMPSON:  Objection.  Calls for a legal conclusion,

18      vague and ambiguous as to "properly."

19  A.  My belief is that we called for damages that are

20      for users that terminated based on wrongful takedown.

21  BY MR. FABRIZIO:

22  Q.  Okay, let me put it a different way.

23  MR. THOMPSON:  Excuse me, the last word, I think the

24      reporter didn't hear him correctly.

25  MR. FABRIZIO:  It's a rough, but I'm sure she'll correct it.

Highly Confidential

Page 212

1    It says "wrongful data"; it should say "wrongful

2    takedowns."

3  MR. THOMPSON:  Thank you.

4  BY MR. FABRIZIO:

5  Q.  Hotfile's current policy is that users who are the

6      subject of three DMCA notices from copyright owners

7      should be terminated, correct?

8  A.  Yes.  To my belief, it's the current policy.

9  Q.  Okay.  If a user had received more than three notices

10     before a Warner notice that was in error, should that

11     user have been terminated irrespective of the Warner

12     notice?

13 MR. THOMPSON:  Objection.  Vague and ambiguous, incomplete

14     hypothetical.

15 A.  If you assume that other notices were correct, then

16     I believe so.

17 BY MR. FABRIZIO:

18 Q.  Okay.  So in that case, if Warner was -- if the Warner

19     notice that was in error was the fourth, fifth, sixth or

20     tenth strike, Hotfile would not consider that Warner

21     notice to be the cause of that user termination because

22     the user already should have been terminated based on

23     having three previous strikes.  Is that correct?

24 MR. THOMPSON:  Objection.  Hypothetical, calls for

25     speculation.

Highly Confidential

Page 213

1   A.  Yeah, you may say so.

2   BY MR. FABRIZIO:

3   Q.  And so we are clear, Hotfile does not know whether any

4       users were terminated as a result of an erroneous Warner

5       takedown; is that correct?

6   MR. THOMPSON:  Objection, to the extent it calls for

7       revealing attorney work product information.

8        I instruct you not to reveal any attorney work

9       product information in answering.

10  A.  Again, I will repeat that Hotfile didn't perform --

11      I believe that Hotfile didn't ever perform such an

12      investigation for its own use.

13  BY MR. FABRIZIO:

14  Q.  All right, I want to draw a distinction between

15      a takedown of a file and a termination of a user.  You

16      understand that those are two distinct concepts,

17      correct?

18  MR. THOMPSON:  Objection, vague.

19  A.  They are two different actions, I would say.

20  BY MR. FABRIZIO:

21  Q.  Okay.  I just want to make sure we understand the

22      distinction.

23       Has Hotfile ever received a complaint from a user

24      about a mistaken takedown of a file?

25  MR. THOMPSON:  Objection, overbroad and vague.

Highly Confidential

Page 214

1    A.   My understanding is that you are asking for any file,

2         and with that in mind, I'm aware of such situations.

3    BY MR. FABRIZIO:

4    Q.   Do such complaints by users typically get forwarded to

5         you?

6    MR. THOMPSON:   Objection, vague.

7    A.   I remember seeing some of those, but I can't say whether

8         it's typically or occasionally.

9    BY MR. FABRIZIO:

10   Q.   Okay.  So has Hotfile ever received a complaint from

11        a user based on the takedowns of the files listed on

12        exhibits A through D of your counterclaim?

13   MR. THOMPSON:   Objection, vague.  Again I instruct the

14        witness not to reveal any work product information.

15   MR. FABRIZIO:   I don't think that's possible.

16   MR. THOMPSON:   I don't really care what you think is

17        possible.  That's the instruction.

18   MR. FABRIZIO:   But your instructions are -- can confuse

19        a witness, so you should confine privilege instructions

20        to where they're proper.  I'm asking whether -- listen

21        to the question, Rod.

22   BY MR. FABRIZIO:

23   Q.   Has Hotfile ever received a complaint from a Hotfile

24        user regarding one of the files in exhibits A through D

25        of the counterclaim that Hotfile contends were wrongly

Highly Confidential

Page 215

1      taken down?

2   MR. THOMPSON:  I'm instructing Mr. Titov not to reveal the

3      results of any work product investigation.  To the

4      extent he can answer without doing so, he's free to do

5      so.

6   A.  I don't know.

7   BY MR. FABRIZIO:

8   Q.  You don't know whether Hotfile has ever received such

9      a complaint?

10  A.  No, I -- I don't know if Hotfile ever received such

11     a complaint.

12  Q.  So as you sit here today, you are unaware of any

13     complaint Hotfile received from a user based on the

14     Warner takedowns in exhibits A through D of the

15     counterclaim, correct?

16  A.  Yes, that is correct.

17  Q.  Have you had any communications with anyone outside of

18     Hotfile, excluding your counsel, regarding any of the

19     Warner Brothers takedowns that you consider to be

20     mistaken?

21  MR. THOMPSON:  Mr. Fabrizio would include by that any

22     working for counsel.

23  MR. FABRIZIO:  Yes, of course.

24  A.  Nothing that I can remember particularly.

25  BY MR. FABRIZIO:

Highly Confidential

Page 216

1    Q.   Okay, let me be more specific:  Have you had discussions

2         or communications with any Hotfile affiliates about

3         Warner takedowns that Hotfile believes to be erroneous?

4    A.   I'm not aware of any.

5    Q.   Have you had discussions or communications with any site

6         operator regarding Warner takedowns that Hotfile

7         believes to be erroneous?

8    A.   As I sit here today, I can't think of any.

9    Q.   Are you aware that anyone else at Hotfile having had

10        such conversations or discussions?

11   A.   No, I'm not.  I don't think so.

12   Q.   Have you had communications with any user who was

13        terminated by Hotfile about any Warner takedowns that

14        Hotfile believes to have been erroneously made?

15   A.   I don't know.

16   Q.   Have you identified a single Hotfile user who was

17        terminated where a Warner takedown was that user's third

18        strike?

19   MR. THOMPSON:  Again, Mr. Titov I instruct you to exclude

20        the results from any attorney work product

21        investigation.  If you can answer and do that, you're

22        free to answer.

23   A.   And again, Hotfile never performed such an analysis for

24        its own use.

25   BY MR. FABRIZIO:

Highly Confidential

Page 223

1   A.   I don't know if it's possible.

2   BY MR. FABRIZIO:

3   Q.   I didn't ask you whether it was possible to do.  I asked

4        you whether, as you sit here today, you can identify

5        a single user who terminated a premium account as

6        a result of a Warner notice that Hotfile beliefs was

7        mistakenly sent.

8   MR. THOMPSON:  Objection, asked and answered.

9   A.   No, I believe I cannot.

10  BY MR. FABRIZIO:

11  Q.   Can you identify a single user who failed to sign up for

12       a premium account because of a Warner notice that

13       Hotfile believes was mistakenly sent?

14  A.   No, I don't think I can, but I'm not an expert in lost

15       revenues.

16                    (Reporter clarification.)

17  BY MR. FABRIZIO:

18  Q.   Well, I appreciate that, but I didn't ask you about lost

19       revenues.  I'm asking you, as a factual matter, whether

20       you can identify any user who failed to sign up for a

21       premium account because of a Warner Brothers takedown

22       notice that you believe was mistakenly sent.

23  MR. THOMPSON:  Objection.  Asked and answered,

24       argumentative.

25  A.   I don't believe I can.

Highly Confidential

Page 224

1    BY MR. FABRIZIO:

2    Q.   If you look back at paragraph 38, Mr. Titov, under

3         subparagraph 3, it refers to "damage to its reputation

4         and goodwill."  Do you see that?

5    A.   Yes, I do.

6    Q.   Can you explain to us what damage to Hotfile's

7         reputation and goodwill you believe resulted from

8         Warner's sending the takedown notices on exhibits A

9         through D of the counterclaim?

10   A.   Users had their files suspended, or even received

11        strikes, and been terminated without a reason for that.

12        That -- normally that will -- it's my opinion that that

13        will damage the reputation.

14   Q.   That's your opinion?

15   A.   It is.

16   Q.   But you previously testified that you can't identify any

17        user who complained about having one of their files

18        taken down as a result of one of the exhibit A through D

19        takedowns, correct?

20   MR. THOMPSON:  Objection.  The testimony speaks for itself.

21        Asked and answered.

22   A.   I'm currently not aware of any.

23   BY MR. FABRIZIO:

24   Q.   Okay.  And you also testified that you're not aware of a

25        single user who was terminated as a result of one of the

Highly Confidential

Page 225

1      takedown notices sent by Warner that are on exhibits A

2      through D of your counterclaim, correct?

3   MR. THOMPSON:  Same objections.

4   A.  I think my testimony was that Hotfile never performed

5      such analysis for its own use and enjoyment.

6   BY MR. FABRIZIO:

7   Q.  Is there any other basis for the contention that

8      Hotfile's reputation and goodwill was injured, other

9      than what you perceived to be wrongly taken down files

10      and wrongly terminated users?

11   MR. THOMPSON:  Objection.  Misstates prior testimony.

12   A.  As of now, I can't think of any, but there might be

13      others.

14   BY MR. FABRIZIO:

15   Q.  In what way does having a user's file removed impact

16      Hotfile's reputation and goodwill?

17   MR. THOMPSON:  Objection, vague.  Do you mean wrongfully

18      removed?  Overbroad.

19   A.  I think that when user receives -- a user -- user's file

20      are being wrongfully take down, he will lose trust and

21      respect for the company who he expected to host him --

22      his file.

23   BY MR. FABRIZIO:

24   Q.  Anything else?

25   A.  Nothing that I think of -- can think of now.  Remind me.

Highly Confidential

Page 226

1   Q.   Does Hotfile, in your view, lose the trust and respect

2        of its users when it takes down a file that is in fact

3        copyright infringing?

4   A.   I don't believe so.

5   Q.   Why not?

6   A.   Because the user is infringing.

7   Q.   Does it make a difference what type of content the user

8        is infringing?

9   MR. THOMPSON:  Objection.  Vague, overbroad.

10  A.   I don't understand the question.

11  BY MR. FABRIZIO:

12  Q.   Okay, let me try it this way:  In what way does Hotfile

13       lose the trust and respect of its users when it

14       wrongly -- well, strike that.

15       In your view, how does Hotfile lose the trust and

16       respect of its users when it terminates a user?

17  MR. THOMPSON:  Objection.  Overbroad, and vague and

18       ambiguous.

19  A.   Because the user will believe that it's Hotfile's

20       mistake for this mistaken user suspension.

21  BY MR. FABRIZIO:

22  Q.   In your view, does Hotfile lose the trust and respect of

23       its users when it terminates a user that had received

24       three strikes under Hotfile's repeat infringer policy?

25  MR. THOMPSON:  Objection.  Overbroad, incomplete

Highly Confidential

Page 227

1    hypothetical.

2  A.  If the strikes are based on wrongful takedowns, I think

3       so, can lose trust.

4  BY MR. FABRIZIO:

5  Q.  And what if at least three of the strikes are based on

6       absolutely correct notices?

7  MR. THOMPSON:  Objection.  Vague and overbroad.

8  A.  Then under Hotfile's policy, users infringe, he will be

9       suspended.

10 BY MR. FABRIZIO:

11 Q.  And does Hotfile, in your view, lose the trust and

12      respect of its users when it terminates a user who is

13      a repeat infringer under Hotfile's post complaint

14      policies?

15 MR. THOMPSON:  Objection, overbroad.

16 A.  I don't know if Hotfile is concerned about this.

17 BY MR. FABRIZIO:

18 Q.  What do you mean by that?

19 MR. THOMPSON:  Objection, vague.

20 A.  I mean that if the user is confirmed as copyright

21      infringer, it's not Hotfile's concern what the user

22      thinks about Hotfile.

23 BY MR. FABRIZIO:

24 Q.  Now, yesterday we talked about the fact that Hotfile

25      began investigating Warner's takedowns almost

Highly Confidential

Page 233

1      question, when excluding what we know from our counsel.

2  MR. FABRIZIO:  Okay.  Rod, if -- I'm trying to figure out

3      how you're conveying to your client a fact that I

4      conveyed to you or Warner conveyed to you, but you're

5      telling him to exclude that knowledge from his answer.

6  MR. THOMPSON:  Because our selection of what facts to -- or

7      information we know to share with our client is

8      obviously attorney/client communication.

9  MR. FABRIZIO:  Well, you're just conveying what I told you.

10 MR. THOMPSON:  Whether or not I choose to convey that to the

11     client is my subjective work product and attorney/client

12     communications.

13 MR. FABRIZIO:  All right.  You have a very different view of

14     these issues when you're on the other side.

15 MR. THOMPSON:  And so do you.

16 MR. FABRIZIO:  Nah, nah.

17 Q.  Mr. Titov, I will tell you that all or substantially all

18     of the files listed in exhibit A consist of works for

19     which the games maker EA owns the copyright, and EA has

20     authorized Warner to issue the takedown notices that

21     resulted in their takedown upon learning after the fact,

22     after Warner -- after Warner learned of this instance.

23     Does Hotfile still contend that the exhibit A works

24     are wrongful takedowns?

25 MR. THOMPSON:  Objection, to the extent the preamble is

Highly Confidential

Page 234

1          confusing and incomplete.  Also incomplete hypothetical.

2     A.   Since you are presenting me the facts and I don't have

3          the opportunity to confer with anybody else at Hotfile

4          now, I can only ask -- answer for myself, but I won't --

5          I don't think I would consider takedowns of the games

6          you mentioned wrongful.

7     BY MR. FABRIZIO:

8     Q.   Is there -- you and I may refer to this differently, so

9          let me just say how I refer to it:  Is there something

10         that -- on Hotfile that you refer to as "list pages"?

11    A.   Yeah, I believe so.

12    Q.   Can you describe what they are?

13    A.   It is a page that consists of a number of links, to cut

14         Hotfile down on pages.

15    Q.   And is a list page a page that is hosted on the

16         hotfile.com servers?

17    A.   Yes, it's fair to say that.

18    Q.   For what purpose does Hotfile offer users list pages, or

19         I guess it's the ability to create list pages?

20    A.   List pages are another presentation of the cost of the

21         folder that Hotfile has, which is generally a typical

22         feature of any system that would deal with files.

23    Q.   Okay.  Are list pages and folders synonymous?  Do they

24         mean the same thing?  Or does it refer to two different

25         functionalities?

Highly Confidential

Page 325

1    MR. THOMPSON:  Objection, argumentative.

2    A.  I don't know.

3    BY MR. FABRIZIO:

4    Q.  Do you want to take a quick break now, or do you want to

5        go on for a little bit?

6    A.  A quick break would be nice.

7    MR. FABRIZIO:  Let's take a quick break.

8    VIDEOGRAPHER:  Off the record at 3:53.

9                    (A break was taken.)

10   VIDEOGRAPHER:  Back on the record, 4:04.

11   BY MR. FABRIZIO:

12   Q.  Mr. Titov, I now want to talk about the strike system

13       for repeat infringers that Hotfile put in place after

14       the filing of this action, okay?

15   A.  After.

16   Q.  What constitutes a strike under Hotfile's current

17       policy?

18   A.  Email DMCA notice or takedown by SRA account.

19   Q.  Anything else?

20   A.  And -- yeah, the -- the internal tool I mentioned in the

21       previous deposition.

22   Q.  Anything else?

23   A.  I can't think of anything else.

24   Q.  Okay.  Will the receipt of a notice through any means

25       for a single file result in the user who uploaded that

Highly Confidential

Page 326

1      file getting a strike?

2    MR. THOMPSON:  Objection, vague.

3    A.  I believe so, yes.

4    BY MR. FABRIZIO:

5    Q.  Okay.  If there are multiple files uploaded by the same

6        user in a single notice, does the user receive as many

7        strikes as there are files in the notice, or does that

8        user just receive one strike for that notice?

9    MR. THOMPSON:  Objection.  Vague and overbroad.

10   A.  My belief is the user will receive one strike for it,

11       the DMCA notice.

12   BY MR. FABRIZIO:

13   Q.  Let me just put it into an illustration to make sure we

14       got it:  If Hotfile receives a single notice that

15       contains two files identified as infringing and both

16       were uploaded by the same user, under Hotfile's current

17       policy, that user would get one strike, because there

18       was one notice.  Correct?

19   A.  I believe so, yes.

20   Q.  You understand -- I think we actually talked about it

21       earlier -- that some works or entire pieces of content

22       may be uploaded in multiple different files, correct?

23   MR. THOMPSON:  Objection, vague.

24   BY MR. FABRIZIO:

25   Q.  Do you understand what I mean?

Highly Confidential

Page 335

1    address to prevent that user from continuing to download

2    files from hotfile.com?

3    MR. THOMPSON:  Same objection.

4    A.  No, it does not.

5    BY MR. FABRIZIO:

6    Q.  All right.  At what specific point in the processing of

7        a notice, whether it's an email notice or an SRA notice,

8        is a strike recorded?

9    A.  When the notice is processed.

10   Q.  Is the strike recorded when the processing begins, or

11       only when the processing has completed?

12   A.  I would say completed.

13   Q.  Completed?

14   A.  Yes.

15   Q.  And forgive me, we may have covered this last time,

16       but -- I know it was following the filing of this

17       action, but when after the filing of this action did

18       Hotfile adopt the strike system?

19   A.  I think it was towards the end of February.

20   Q.  If a user uploads an item that is -- that has already

21       been blocked -- well, strike that.

22           Currently, if Hotfile gets a notice about a file, in

23       addition to deleting the file, Hotfile take the MB5 hash

24       and prevents -- prevents other users from uploading

25       files containing the identical MB5 hash?  Is that

Highly Confidential

Page 372

1           HIGHLY CONFIDENTIAL
          CERTIFICATE OF COURT REPORTER
2
3
     I, Fiona Farson, with TSG Reporting, hereby certify that the
4    testimony of the witness Anton Titov in the foregoing
     transcript, taken on Tuesday, December 6, 2011 was reported
5    by me in machine shorthand and was thereafter transcribed by
     me; and that the foregoing transcript is a true and accurate
6    verbatim record of the said testimony.
7
     I further certify that I am not a relative, employee,
8    counsel or financially involved with any of the parties to
     the within cause, nor am I an employee or relative of any
9    counsel for the parties, nor am I in any way interested in
     the outcome of the within cause.
10
11
12
13
14
     Signed:  ......................
15
     Fiona Farson
16
     Dated: 12/17/2011
17
18
19
20
21
22
23
24
25

Highly Confidential

Page 371

1                          HIGHLY CONFIDENTIAL
                          CERTIFICATE OF DEPONENT
2

3
        I, ANTON TITOV, hereby certify that I have read the
4   foregoing pages of my deposition of testimony taken in these
    proceedings on Tuesday, December 6, 2011, and, with the
5   exception of the changes listed on the next page and/or
    corrections, if any, find them to be a true and accurate
6   transcription thereof.

7

8

9

10
    Signed:  ...................................
11
    Name:    ANTON TITOV
12
    Date:    1/ 20/ 20 12 ...............
13

14

15

16

17

18

19

20

21

22

23

24

25

                TSG Reporting - Worldwide    (877) 702-9580

Highly Confidential

Page 373

```
 1                    HIGHLY CONFIDENTIAL

 2                         E R R A T A

 3                 Deposition of ANTON TITOV

 4     Page/Line No.        Description            Reason for change

 5

 6      225:25    Remind me. --> There might be.   Correct transcription

 7      234:20    Presentation --> representation  Correct transcription

 8      234:20    cost of the --> concept of       Correct transcription

 9      261:2     As --> That's                     Correct transcription

10      273:20    Limewire --> Limelight            Correct transcription

11      279:3     is --> would                      Correct transcription

12      293:11    following --> logging             Correct transcription

13      306:5     calls --> holds                   Correct transcription

14      306:6   service at hotfile.com --> to abuse@hotfile.com Correct trans.

15      321:6     would decide it --> with this ID  Correct transcription

16      333:20    brought --> blocked              Correct transcription

17      337:7     file --> file ID                  Correct transcription

18     Signed:   ...................

19     Name:   ANTON TITOV

20     Date:   ...................

21

22

23

24

25
```

TSG Reporting - Worldwide    (877) 702-9580

Highly Confidential

```
                                                        Page 373

 1                    HIGHLY CONFIDENTIAL

 2                       E R R A T A

 3            Deposition of ANTON TITOV

 4    Page/Line No.        Description          Reason for change

 5

 6    361:25         state --> table            Correct transcription

 7    368:7  users stay on our uploads --> users_cowner_upload  Correct trans

 8

 9

10

11

12

13

14

15

16

17

18    Signed:   ........../...........

19    Name:   ANTON TITOV

20    Date:   1/20/20 12

21

22

23

24

25
```

TSG Reporting - Worldwide    (877) 702-9580