# EXHIBIT A

# FILED UNDER SEAL

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.: 11-CIV-20427-WILLIAMS/TURNOFF

DISNEY ENTERPRISES, INC.,
TWENTIETH CENTURY FOX FILM
CORPORATION, UNIVERSAL CITY
STUDIOS PRODUCTIONS LLLP,
COLUMBIA PICTURES INDUSTRIES,
INC., and WARNER BROS.
ENTERTAINMENT INC.,

     *Plaintiffs,*

v.

HOTFILE CORP., ANTON TITOV, and
DOES 1-10,

     *Defendants.*

_____/

HOTFILE CORP.,

     *Counterclaimant,*

v.

WARNER BROS. ENTERTAINMENT INC.,

     *Counter-Defendant.*

_____/

## DECLARATION OF DEEPAK GUPTA
## IN SUPPORT OF DEFENDANT HOTFILE CORPORATION'S
## MOTION FOR PARTIAL SUMMARY JUDGMENT
## BASED ON THE
## THE DIGITAL MILLENNIUM COPYRIGHT ACT SAFE HARBOR

**FILED UNDER SEAL**          CASE NO.: 11-CIV-20427-WILLIAMS/TURNOFF

I, Deepak Gupta, declare as follows:

1.       I am an attorney at Farella Braun + Martel LLP and counsel for defendant Hotfile Corporation and Anton Titov. I have personal knowledge of the matters stated herein and, if called and sworn as a witness, I could and would competently testify to the fact set forth herein.

2.       Attached hereto as Exhibit 1 is a true and correct copy of United States Senate Report No. 105-190, *The Digital Millennium Copyright Act of 1998*, dated May 11, 1998.

3.       Attached hereto as Exhibit 2 is a true and correct copy of the Expert Report of Professor James Boyle. This document is Exhibit 3 to the deposition of James Boyle, taken on December 21, 2011 in the above-captioned case.

4.       Attached hereto as Exhibit 3 is a true and correct copy of the Rebuttal Expert Report of Professor James Boyle, dated January 12, 2012. This document is Exhibit 2 to the deposition of James Boyle, taken on January 19, 2012 in the above-captioned case.

5.       Attached hereto as Exhibit 4 is a true and correct copy of excerpts of the deposition of James Boyle, taken on December 21, 2011 and January 19, 2012 in the above-captioned case.

6.       Attached hereto as Exhibit 5 is a true and correct copy of excerpts of the deposition of Scott Zebrak, taken on December 20, 2011 and January 20, 2012 in the above-captioned case.

7.       Attached hereto as Exhibit 6 is a true and correct copy of Plaintiffs' Supplemental Responses and Objections to Defendant Hotfile Corp.'s Interrogatory No. 8, dated November 29, 2011.

8.       Attached hereto as Exhibit 7 is a true and correct copy of excerpts of the deposition of Vicki Solmon, taken on December 9, 2011 in the above-captioned case.

**FILED UNDER SEAL**                CASE NO.: 11-CIV-20427-WILLIAMS/TURNOFF

9.      Attached hereto as Exhibit 8 is a true and correct copy of excerpts of the deposition of Michael Bentkover, taken on December 13, 2011 in the above-captioned case.

10.      Attached hereto as Exhibit 9 is a true and correct copy of Defendants' Supplemental Response to Plaintiffs' Interrogatory No. 10, dated February 10, 2012.

11.      Attached hereto as Exhibit 10 is a true and correct copy of excerpts from the deposition of David Kaplan, taken on December 13, 2011 and December 14, 2011 in the above-captioned case.

12.      Attached hereto as Exhibit 11 is a true and correct copy of an emails between Rod Thompson and Duane Pozza.

13.      Attached hereto as Exhibit 12 is a true and correct copy of *Perfect 10, Inc. v. Google, Inc.*, No. CV 04-9484 (AHM), Dkt. No. 937 (C.D. Cal. July 26, 2010).

14.      Attached hereto as Exhibit 13 is a true and correct copy of an excerpt from Plaintiffs' Responses and Objections to Hotfile's First Set of Requests for Admission, dated January 3, 2012.

15.      Attached hereto as Exhibit 14 is a true and correct copy of Defendants' Amended Supplemental Response to Plaintiffs' Interrogatory No. 2, dated June 2, 2011.

16.      Attached hereto as Exhibit 15 is a true and correct copy of excerpts from the Deposition of Braxton Perkins, taken on December 16, 2011 in the above-captioned case.

17.      Attached hereto as Exhibit 16 is a true and correct copy of an email between chris@fileserve.com and Michael Bentkover, from June to July, 2010.  This document is Exhibit 4 to the deposition of Michael Bentkover, taken on December 13, 2011 in the above-captioned case.

3

**FILED UNDER SEAL**                    CASE NO.: 11-CIV-20427-WILLIAMS/TURNOFF

18.     Attached hereto as Exhibit 17 is a true and correct copy of an excerpt from

Plaintiffs' Responses and Objections to Defendant Hotfile Corp.'s Third Set of Interrogatories,

dated December 1, 2011.

19.     Attached hereto as Exhibit 18 is a true and correct copy of excerpts of the

deposition of Yangbin Wang, taken on December 22, 2011 in the above-captioned case.

20.     Attached hereto as Exhibit 19 is a true and correct copy of a press release from

Vobile, dated September 26, 2011.  This document is Exhibit 2 to the deposition of Yangbin

Wang, taken on December 22, 2011 in the above-captioned case.

21.     Attached hereto as Exhibit 20 is a true and correct copy of excerpts from the

deposition of Kevin Suh, taken December 20, 2011 in the above-captioned case.

22.     Attached to the Declaration of Anton Titov as Exhibits 8, 9, 15, and 17 are all

printouts reflecting various pages of the Hotfile website from different points in time that were

obtained and printed from the website archive.org by staff at Farella Braun + Martel at my

direction.

23.     Attached hereto as Exhibit 21 is a true and correct copy of an Affidavit of

Christopher Butler, the Office Manager at the Internet Archive, located in San Francisco,

California, dated July 20, 2011.

24.     I declare under penalty of perjury under the laws of the United States of America

that the foregoing is true and correct.

Executed on this 7th day of February 2012, at San Francisco, California.


_____
Deepak Gupta


4

26501\2960216.1

# EXHIBIT 1

# Calendar No. 358

| 105TH CONGRESS | | REPORT |
|---|---|---|
| 2d Session | SENATE | 105–190 |

## THE DIGITAL MILLENNIUM COPYRIGHT ACT OF 1998

———————

MAY 11, 1998.—Ordered to be printed

———————

Mr. HATCH, from the Committee on the Judiciary,
submitted the following

## REPORT

together with

## ADDITIONAL VIEWS

[To accompany S. 2037]

The Committee on the Judiciary reported an original bill (S. 2037), to amend title 17, United States Code, to implement the WIPO Copyright Treaty and the WIPO Performances and Phonograms Treaty, to provide limitations on copyright liability relating to material online, and for other purposes, having considered the same, reports favorably thereon and recommends that the bill do pass.

### CONTENTS

| | | Page |
|---|---|---|
| I. | Purpose | 1 |
| II. | Legislative history | 2 |
| III. | Discussion | 8 |
| IV. | Vote of the committee | 24 |
| V. | Section-by-section analysis | 25 |
| VI. | Cost estimate | 62 |
| VII. | Regulatory impact statement | 64 |
| VIII. | Additional views of Mr. Leahy | 65 |
| IX. | Changes in existing law | 70 |

## I. PURPOSE

The "Digital Millennium Copyright Act of 1998" is designed to facilitate the robust development and world-wide expansion of electronic commerce, communications, research, development, and edu-

59–010

2

cation in the digital age. Title I will implement the new World Intellectual Property Organization (WIPO) Copyright Treaty and the WIPO Performances and Phonograms Treaty, thereby bringing U.S. copyright law squarely into the digital age and setting a marker for other nations who must also implement these treaties. Title II will provide certainty for copyright owners and Internet service providers with respect to copyright infringement liability online. Title III will provide a clarifying exemption in the Copyright Act to ensure that the lawful owner or lessee of a computer machine May authorize an independent service technician to activate the computer in order to service its hardware components. Finally, Title IV will begin to update our nation's copyright laws with respect to library, archive, and educational uses of copyrighted works in the digital age.

## II. LEGISLATIVE HISTORY

Copyright laws have struggled through the years to keep pace with emerging technology from the struggle over music played on a player piano roll in the 1900's[1] to the introduction of the VCR in the 1980's.[2] With this constant evolution in technology, the law must adapt in order to make digital networks safe places to disseminate and exploit copyrighted materials. The legislation implementing the treaties, Title I of this bill, provides this protection and creates the legal platform for launching the global digital online marketplace for copyrighted works. It will also make available via the Internet the movies, music, software, and literary works that are the fruit of American creative genius. Title II clarifies the liability faced by service providers who transmit potentially infringing material over their networks. In short, Title II ensures that the efficiency of the Internet will continue to improve and that the variety and quality of services on the Internet will expand.

The process to update U.S. copyright law with respect to digital transmissions began in February, 1993, with the formation of the Information Infrastructure Task Force (IITF) to implement the Administration's vision for the National Information Infrastructure (NII).[3] The IITF then established the Working Group on Intellectual Property Rights to investigate the effects of emerging digital technology on intellectual property rights and make recommendations on any appropriate changes to U.S. intellectual property law and policy. This task force issued a report in 1995 known as the White Paper, which discussed the application of existing copyright law to the NII and recommended changes to keep copyright law current with new technology.[4]

To prepare the report, the Working Group held a public hearing in November 1993, at which 30 witnesses testified reflecting the views of copyright industries, libraries, educators, and beneficiaries of the public domain. The Working Group also solicited written comments and received some 70 statements during a public com-

---

[1] *White-Smith Music Publishing Co.* v. *Apollo Co.,* 209 U.S. 1 (1908).
[2] *Sony Corporation of America* v. *Universal City Studios, Inc.,* 464 U.S. 417 (1984).
[3] Information Infrastructure Task Force, Intellectual Property and the National Information Infrastructure: The Report of the Working Group on Intellectual Property Rights 1 (1995). The "National Information Infrastructure" encompasses digital, interactive services now available, such as the Internet, as well as those contemplated for the future.
[4] Id. at 2.

3

ment period.[5] Following the Working Group's review of the public comments and analysis of the issues, it released a "Green Paper" on July 7, 1994.[6] Following the release of the Green Paper, the Working Group again heard testimony from the public in four days of hearings in Chicago, Los Angeles, and Washington, D.C., in September 1994. More than 1,500 pages of written comments were filed during the four-month comment period by more than 150 individuals and organizations.[7]

The Working Group also convened a Conference on Fair Use (CONFU) to explore the particularly complex issue of fair use in a digital environment and to develop guidelines for uses of copyrighted works by librarians and educators.[8] CONFU issued an Interim Report in December, 1996, and a report in September, 1997, that concluded the first phase of CONFU.[9] The 1997 report addressed the issues of digital images, distance learning, educational multimedia, electronic reserve systems, and use of computer software in libraries.

Interested parties had numerous opportunities to submit their views on the intellectual property implications of the development and use of the NII and on the Working Group's Green Paper. This open process resulted in a voluminous record indicating the views of a wide variety of interested parties including service providers, libraries, copyright owners, and the entertainment industries.[10]

On September 28, 1995, Chairman Hatch, with Senator Leahy, introduced the National Information Infrastructure (NII) Copyright Protection Act of 1995 (S. 1284), which embodied the legislative recommendations of the White Paper. Congressman Moorhead introduced identical legislation (H.R. 2441) in the House on September 29, 1995, with Congresswoman Schroeder as an original cosponsor.[11] The Senate Judiciary Committee and the Subcommittee on Courts and Intellectual Property of the House Judiciary Committee held a joint hearing on November 15, 1995, to consider the NII legislation. Dr. Mihaly Ficsor, Assistant Director General, World Intellectual Property Organization; Bruce A. Lehman, Assistant Secretary of Commerce and Commissioner of Patents and Trademarks; and Marybeth Peters, Register of Copyrights and Associate Librarian for Copyright Services testified at the hearing.

The House Subcommittee on Courts and Intellectual Property held a second set of hearings to consider H.R. 2441 on February 7 and 8, 1996. On February 7, the Subcommittee heard testimony from Jack Valenti, Chairman and CEO, Motion Picture Association of America; Frances W. Preston, President and CEO, Broadcast

---

[5] See Request for Comments on Intellectual Property Issues Involved in the National Information Infrastructure Initiative, 58 Fed. Reg. 53,917 (Oct. 19, 1993).

[6] See Information Infrastructure Task Force, Working Group on Intellectual Property Rights, Intellectual Property and the National Information Infrastructure: A Preliminary Draft of the Report of the Working Group on Intellectual Property Rights (July 1994).

[7] See Notice of Hearings and Request for Comments on Preliminary Draft of the Report of the Working Group on Intellectual Property Rights, 59 Fed. Reg. 42,819 (Aug. 19, 1994); Extension of Deadline for Comments on Preliminary Draft of the Report of the Working Group on Intellectual Property Rights, 59 Fed. Reg. 50,222 (Oct. 3, 1994).

[8] See, supra note 3, at 4 (1995).

[9] See The Conference on Fair Use; An Interim Report to the Commissioner (December 1996); Report to the Commissioner on the Conclusion of the First Phase of the Conference on Fair Use (September 1997).

[10] See, supra note 3, at 5 (1995).

[11] Representatives Coble, Bono, Burr, Minge, Luther, and Jacobs cosponsored H.R. 2441.

4

Music, Inc. (BMI); Edward P. Murphy, President and CEO, National Music Publishers Association; Robert Holleyman, II, President, Business Software Alliance; Edward J. Black, Computer & Communications Industry Association; Barbara A. Munder, Senior Vice President, Corporate Affairs, McGraw Hill Co. and on behalf of the Information Industry Association; Gary L. Shapiro, Chairman, Home Recording Rights Coalition and President, Consumer Electronics Manufacturers Association; Garry L. McDaniels, President, Skills Bank Corporation; and David M. Ostfeld, Vice Chairman, U.S. Activities Board Institute for Electrical and Electronics Engineers, and Vice Chairman, United States Intellectual Property Committee.

On February 8, the Subcommittee heard testimony from Jeanne Hurley Simon, Chair, U.S. National Commission on Libraries and Information Science; Dr. Tuck Tinsley III, President, American Printing House for the Blind, Inc.; Richard Robinson, Chair, President & CEO, Scholastic Corp., for the Association of American Publishers; Cornelius Pings, President, Association of American Universities; Stephen M. Heaton, Secretary and General Counsel, CompuServe, Inc.; Scott Purcell, President, HLC-Internet, Inc.; William J. Cook, Partner, William, Brinks, Hofer, Gilson & Lione; Catherine Simmons-Gill, President, International Trademark Association.

On May 7, 1996, the Senate Judiciary Committee also an additional hearing to consider S. 1284. The Committee heard testimony from John Bettis of the American Society of Composers, Authors, and Publishers (ASCAP); William W. Burrington, Assistant General Counsel and Director of Public Policy, America Online, Inc.; Robert L. Oakley, Professor of Law and Director of the Law Library, Georgetown University Law Center, on behalf of the Digital Future Coalition; and Daniel Burton, Vice President of Government Relations, Novell, Inc.

These hearings were supplemented by a series of negotiations overseen by Congressman Goodlatte of the House Subcommittee on Courts and Intellectual Property in which representatives of copyright owners and Internet and online service providers sought to resolve the contentious issue of the scope of liability of service providers for the infringing acts of their users. Agreement was reached on some issues, but many of the core issues remained unresolved. Negotiations resumed under the auspices of the Patent and Trademark Office in the summer of 1996, but produced no resolution of those issues. Ultimately, the NII Copyright Protection Act stalled in the 104th Congress due largely to the unsettled nature of these and other issues.

Meanwhile, parallel efforts to ensure protection of copyrighted works in the digital age proceeded on the international front. These efforts originated shortly after the United States ratified the Berne Convention in 1989, when the governing body of the Berne Union called upon WIPO to form a Committee of Experts concerning a possible supplementary agreement to the Berne Convention to clarify the existing provisions and explore the scope of the treaty.[12] The

---

[12] Basic Proposal for the Substantive Provisions of the Treaty on Certain Questions Concerning the Protection of Literary and Artistic Works to Be Considered by the Diplomatic Conference

5

result was the introduction of formal proposals to update the Berne Convention to reflect the challenges of the digital age ("Protocol") and to supplement that instrument with enhanced protections for performers and producers of phonograms ("New Instrument"). In December, 1996, the World Intellectual Property Organization held a diplomatic conference in Geneva, Switzerland, which culminated with the adoption of two treaties, the "WIPO Copyright Treaty" and the "WIPO Performances and Phonograms Treaty," which were agreed to by consensus of 160 countries.

The WIPO Copyright Treaty originally contained a provision, article 7, which would have defined the term "reproduction" of a copyrighted work to include any direct or indirect reproduction whether permanent or temporary, in any manner or form.[13] This article proved to be too controversial and was deleted from the treaty prior to its adoption. Instead, the treaty was accompanied by an agreed upon statement that simply confirmed that the reproduction right in Article 9 of the Berne Convention applies fully in the digital environment. The treaty also originally contained language that banned circumvention devices. Again, controversy resulted in a milder declaration that member countries "shall provide adequate legal protection and effective legal remedies against the circumvention of effective technological measures that are used by authors in connection with the exercise of their rights under this Treaty."[14] The end result is that the treaty shifted the debate over technological circumvention measures and on-line service provider liability back to the national level, where each nation will determine how to best conform with the treaty.

The President submitted the WIPO treaties to the U.S. Senate on July 29, 1997, where they were referred to the Foreign Relations Committee. The Administration also submitted draft implementing legislation, which Chairman Hatch introduced by request as S. 1121 on July 31, 1997. Senators Leahy, Thompson, and Kohl joined as original cosponsors. Congressman Coble introduced identical legislation in the House as H.R. 2281 on July 29, 1997.[15] S. 1121 later became the basis for Title I of the Digital Millennium Copyright Act in the Senate Judiciary Committee.

With respect to the issue of service provider liability, two bills were introduced in the first session of the 105th Congress. Congressman Coble introduced H.R. 2180 on July 17, 1997, with Congressman Hyde as a cosponsor. Senator Ashcroft introduced S. 1146 on September 3, 1997, which proposed limitations on copyright liability relating to material on-line for service providers as well as amendments to the Copyright Act to implement the WIPO Treaties and make certain changes to accommodate libraries and educators in the digital environment.

The Senate Judiciary Committee conducted hearings on September 4, 1997, to consider the issues surrounding service provider li-

on Certain Copyright and Neighboring Rights Questions, WIPO Document AB/XX/2, Annex A, item PRG.02/2), paragraph 1 (Aug. 30, 1996).
[13] World Intellectual Property Organization, Basic Proposal for the Substantive Provisions of the Treaty on Certain Questions Concerning the Protection of Literary and Artistic Works to Be Considered by the Diplomatic Conference, art. 7(1) (Aug. 30, 1996).
[14] Diplomatic Conference on Certain Copyright and Neighboring Rights Questions, WIPO Copyright Treaty, art. 11, WIPO Document CRNR/DC/94 (December 20, 1996).
[15] Representatives Hyde, Conyers, Frank, Bono, McCullum, and Berman cosponsored the bill.

6

ability. Testimony was heard from Fritz Attaway, Senior Vice President, Government Relations and Washington General Counsel, Motion Picture Association of America; Cary Sherman, General Counsel, Recording Industry Association of America; Daniel F. Burton, Vice President, Government Relations, Novell; George Vradenburg, Senior Vice President and General Counsel, America Online, Inc.; Roy Neel, President and C.E.O., U.S. Telephone Association; and Professor Robert L. Oakley, Director of Law Library and Professor Law, Georgetown University Law Center. At this hearing, parties on all sides were urged by Chairman Hatch and the Ranking Member, Senator Leahy, to resolve the remaining issues prior to the end of the year.

Shortly thereafter, a series of hearings were held in the House on these issues as well as on the issue of WIPO implementation. The Subcommittee on Courts and Intellectual Property of the House Judiciary Committee held two days of hearings on H.R. 2281, the WIPO Copyright Treaties Implementation Act, and H.R. 2180, the Online Copyright Liability Limitation Act, on September 16 and 17, 1997. Bruce Lehman, Assistant Secretary of Commerce and Commissioner of Patents and Trademarks, Patent and Trademark Office, and Marybeth Peters, Register of Copyrights, Copyright Office of the United States, Library of Congress testified on behalf of the Administration. The Subcommittee also heard testimony from Roy Neel, President and Chief Executive Officer, United States Telephone Association; Jack Valenti, President and Chief Executive Officer, Motion Picture Association of America; Robert Holleyman, II, President, Business Software Alliance; M.R.C. Greenwood, Chancellor, University of California, Santa Cruz, on behalf of the Association of American Universities and the National Association of State Universities and Land Grant Colleges; Tushar Patel, Vice President and Managing Director, USWeb, Lawrence Kenswil, Executive Vice President, Business and Legal Affairs, Universal Music Group; Marc Jacobson, General Counsel, Prodigy Services, Inc.; Ken Wasch, President, Software Publishers Association; Ronald G. Dunn, President, Information Industry Association; John Bettis, Songwriter, on behalf of the American Society of Composers, Authors, and Publishers; Allee Willis, Songwriter, on behalf of Broadcast Music, Inc. (BMI); Robert L. Oakley, Professor of Law, Georgetown University Law Center and Director, Georgetown Law Library, on behalf of a Coalition of Library and Educational Organizations; Johnny Cash, Vocal Artist, with Hilary Rosen, President and Chief Executive Officer, Recording Industry Association of America; Allan Adler, Vice President, Legal and Governmental Affairs, Association of American Publishers; Gail Markels, General Counsel and Senior Vice President, Interactive Digital Software Association; Mike Kirk, Executive Director, American Intellectual Property Law Association; Thomas Ryan, President, SciTech Software, Inc.; Mark Belinsky, Vice President Copy Protection Group, Macrovision, Inc.; Douglas Bennett, President, Earlham College, Vice President, American Council of Learned Societies, on behalf of the Digital Futures Coalition; Edward J. Black, President, Computer and Communications Industry Association; Christopher Byrne, Director of Intellectual Property, Silicon Graphics, Inc., on behalf of the Information Technology Industry Council; and Gary

7

Shapiro, President, Consumer Electronics Manufacturer's Association, and Chairman, Home Recording Rights Coalition.

In January, 1998, Chairman Hatch initiated comprehensive negotiations within the Judiciary Committee among copyright owners and Internet and online service providers to resolve the issue of service provider liability. These negotiations centered around a draft proposal put forth by Chairman Hatch, which built upon the efforts over the previous two years. These negotiations continued under the supervision of the Chairman for three months, from January to April, 1998.

On February 26, 1998, the House Subcommittee on Courts and Intellectual Property conducted a markup of H.R. 2281, the WIPO Copyright Treaties Implementation Act, and of H.R. 3209, the On-Line Copyright Infringement Liability Limitation Act. H.R. 2281 and H.R. 3209 were reported favorably by voice vote to the House Judiciary Committee. On April 1, 1998, the full Committee adopted a substitute amendment to H.R. 2281, offered by Congressmen Coble, Hyde, Conyers, and Goodlatte, which incorporated both the provisions of H.R. 2281 and provisions regarding service provider liability in anticipation of a resolution of this issue that appeared to be close in the Senate Judiciary Committee. H.R. 2281 was then favorably reported to the House of Representatives.

On April 2, 1998, Chairman Hatch offered the "Digital Millennium Copyright Act of 1998" at an executive business meeting of the Committee. This bill incorporated the text of S. 1121, a proposal for resolving the issue of service provider liability for copyright infringement, and a provision that had been agreed to by the House Judiciary Committee with respect to computer maintenance and repair.

On April 23, 1998, the Committee met again in executive session to consider the bill. At that meeting, the Committee considered and accepted two amendments offered by Chairman Hatch, with Senators Leahy and Ashcroft, and one amendment offered by Senator Ashcroft, with Senators Leahy and Hatch, en bloc, by unanimous consent. These amendments dealt with reverse engineering of computer programs for interoperability purposes, ephemeral recordings, and an exemption for libraries and archives from copyright infringement liability.

On April 30, 1998, the Judiciary Committee resumed consideration of the bill and accepted the following ten amendments en bloc, by unanimous consent: an amendment by the Chairman (for himself, Mr. Leahy and Mr. Ashcroft), with respect to ephemeral recordings; an amendment by the Chairman (for himself, Mr. Leahy and Mr. Ashcroft), with respect to the use of copyright management information in the course of certain analog and digital transmissions; an amendment by the Chairman (for himself and Mr. Leahy), to make certain clarifying amendments; an amendment by Mr. Ashcroft (for himself, Mr. Leahy and Mr. Hatch), with respect to protection of subscribers of online and Internet service providers; an amendment by Mr. Ashcroft (for himself, Mr. Hatch and Mr. Leahy), with respect to the accommodation of particular technological protection measures; an amendment by Mr. Ashcroft (for himself, Mr. Hatch and Mr. Leahy), with respect to protection of personal privacy interests; an amendment by Mr. Ashcroft (for

8

himself, Mr. Hatch and Mr. Leahy), with respect to the preservation of the ability to control minors' access to material on the Internet; an amendment by Mr. Ashcroft (for himself, Mr. Leahy and Mr. Hatch), with respect to distance education through digital technologies; an amendment by Mr. Grassley (for himself and Mr. Kyl), with respect to law enforcement and intelligence activities; and an amendment by Mrs. Feinstein, with respect to the liability of nonprofit educational institutions for copyright infringement online. The Committee then unanimously ordered the Digital Millennium Copyright Act of 1998 reported favorably, as amended.

## III. DISCUSSION

The Digital Millennium Copyright Act (DMCA) in Title I implements the World Intellectual Property (WIPO) treaties on copyright and on performers and phonograms, and in Title II limits the copyright infringement liability of on-line and Internet service providers (OSPs and ISPs) under certain circumstances. The DMCA also provides in Title III a minor but important clarification of copyright law that the lawful owner or lessee of a computer may authorize someone to turn on their computer for the purposes of maintenance or repair. Title IV addresses the issues of ephemeral recordings, distance education, and digital preservation for libraries and archives.

Due to the ease with which digital works can be copied and distributed worldwide virtually instantaneously, copyright owners will hesitate to make their works readily available on the Internet without reasonable assurance that they will be protected against massive piracy. Legislation implementing the treaties provides this protection and creates the legal platform for launching the global digital on-line marketplace for copyrighted works. It will facilitate making available quickly and conveniently via the Internet the movies, music, software, and literary works that are the fruit of American creative genius. It will also encourage the continued growth of the existing off-line global marketplace for copyrighted works in digital format by setting strong international copyright standards.

At the same time, without clarification of their liability, service providers may hesitate to make the necessary investment in the expansion of the speed and capacity of the Internet. In the ordinary course of their operations service providers must engage in all kinds of acts that expose them to potential copyright infringement liability. For example, service providers must make innumerable electronic copies by simply transmitting information over the Internet. Certain electronic copies are made to speed up the delivery of information to users. Other electronic copies are made in order to host World Wide Web sites. Many service providers engage in directing users to sites in response to inquiries by users or they volunteer sites that users may find attractive. Some of these sites might contain infringing material. In short, by limiting the liability of service providers, the DMCA ensures that the efficiency of the Internet will continue to improve and that the variety and quality of services on the Internet will continue to expand.

Besides the major copyright owners and the major OSP's and ISP's (e.g., the local telephone companies, the long distance car-

9

riers, America OnLine, etc.), the Committee heard from representatives of individual copyright owners and small ISP's, from representatives of libraries, archives and educational institutions, from representatives of broadcasters, computer hardware manufacturers, and consumers. Title II, for example, reflects 3 months of negotiations supervised by Chairman Hatch and assisted by Senator Ashcroft among the major copyright owners and the major OSP's and ISP's. Intense discussions took place on distance education too, with the participation of representatives of libraries, teachers, and educational institutions, under the supervision of Chairman Hatch, Senator Leahy, Senator Ashcroft, and the Copyright Office.

As a result, the Committee took substantial steps to refine the discussion draft that Chairman Hatch laid down before the Committee through a series of amendments, each of which was adopted unanimously. For example, the current legislation contains: (1) a provision to ensure that parents will be able to protect their children from pornography and other inappropriate material on the Internet; (2) provisions to provide for the updating of the copyright laws so that educators, libraries, and archives will be able to take advantage of the promise of digital technology; (3) important procedural protections for individual Internet users to ensure that they will not be mistakenly denied access to the World Wide Web; (4) provisions to ensure that the current practice of legitimate reverse engineering for software interoperability may continue; and (5) provisions to accommodate the needs of broadcasters for ephemeral recordings and regarding copyright management information. These provisions are in addition to provisions Chairman Hatch had already incorporated into the discussion draft, such as provisions on library browsing, provisions addressing the special needs of individual creators regarding copyright management information, and provisions exempting nonprofit archives, nonprofit educational institutions, and nonprofit libraries from criminal penalties and, in the case of civil penalties, remitting damages entirely when such an institution was not aware and had no reason to believe that its acts constituted a violation.

Consequently, the DMCA enjoys widespread support from the motion picture, recording, software, and publishing industries, as well as the telephone companies, long distance carriers, and other OSP's and ISP's. It is also supported by the Information Technology Industry Council, which includes the leading computer hardware manufacturers, and by representatives of individual creators, such as the Writers Guild, the Directors Guild, the Screen Actors Guild, and the American Federation of Television and Radio Artists. The breadth of support for this bill is reflected in the unanimous roll call vote (18–0) by which the DMCA was reported out of Committee.

### TITLE I

Title I implements the WIPO Copyright Treaty and the WIPO Performances and Phonograms Treaty. These treaties were concluded by the Clinton administration in December 1996. The treaties are best understood as supplements to the Berne Convention for the Protection of Literary and Artistic Works. The Berne Convention is the leading multilateral treaty on copyright and related

10

rights, with 130 countries adhering to it. The United States ratified the Berne Convention in 1989. The two new WIPO treaties were adopted at a diplomatic conference by a consensus of over 150 countries. In general, the Copyright Treaty updates the Berne Convention for digital works and the growth of the Internet and other digital communications networks, and the Performances and Phonograms Treaty supplements the Berne Convention with comprehensive copyright protection for performances and sound recordings (called "phonograms" in international parlance).

The importance of the treaties to the protection of American copyrighted works abroad cannot be overestimated. The treaties, as well as the Berne Convention, are based on the principle of national treatment; that is, that adhering countries are obliged to grant the same protection to foreign works that they grant to domestic works. Even more importantly, the Berne Convention and the treaties set minimum standards of protection. Thus, the promise of the treaties is that, in an increasing global digital marketplace, U.S. copyright owners will be able to rely upon strong, nondiscriminatory copyright protection in most of the countries of the world.

The copyright industries are one of America's largest and fastest growing economic assets. According to International Intellectual Property Alliance statistics, in 1996 (when the last full set of figures was available), the U.S. creative industries accounted for 3.65 percent of the U.S. gross domestic product (GDP)—$278.4 billion. In the last 20 years (1977–1996), the U.S. copyright industries' share of GDP grew more than twice as fast as the remainder of the economy—5.5 percent vs. 2.6 percent. Between 1977 and 1996, employment in the U.S. copyright industries more than doubled to 3.5 million workers—2.8 percent of total U.S. employment. Between 1977 and 1996 U.S. copyright industry employment grew nearly three times as fast as the annual rate of the economy as a whole—4.6 percent vs. 1.6 percent. In fact, the copyright industries contribute more to the U.S. economy and employ more workers than any single manufacturing sector, including chemicals, industrial equipment, electronics, food processing, textiles and apparel, and aircraft. More significantly for the WIPO treaties, in 1996 U.S. copyright industries achieved foreign sales and exports of $60.18 billion, for the first time leading all major industry sectors, including agriculture, automobiles and auto parts, and the aircraft industry.

The WIPO treaties contain many important provisions. For example, the Copyright Treaty contains significant provisions such as: (1) explicit recognition that computer programs are covered by the Berne Convention; (2) recognition of a broad right of public distribution; (3) recognition of a broad right of communication to the public that includes the Internet; (4) an official statement that interprets the existing reproduction right of the Berne Convention to "fully apply in the digital environment"; [16] (5) an obligation to provide "legal protection and effective legal remedies" against circumventing technological measures, e.g. encryption and password protection, that are used by copyright owners to protect their works

[16] Concerning Art. 1(4).

11

from piracy; [17] and (6) an obligation to provide "adequate and effective legal remedies" to preserve the integrity of "rights management information." [18] The Performances and Phonograms Treaty recognizes certain rights of performers over their performances and basically gives the copyright owners of sound recordings the same protection for their works as exist in the Berne Convention for other works.

The Committee believes that in order to adhere to the WIPO treaties, legislation is necessary in two primary areas—anticircumvention of technological protection measures and protection of the integrity of rights management information, or "copyright management information" (CMI), as it is referred to in the bill. This view is shared by the Clinton administration. In drafting implementing legislation for the WIPO treaties, the Committee has sought to address those two areas, as well as avoid government regulation of the Internet and encourage technological solutions. The Committee is keenly aware that other countries will use U.S. legislation as a model.

A. ANTICIRCUMVENTION

Title I encourages technological solutions, in general, by enforcing private parties' use of technological protection measures with legal sanctions for circumvention and for producing and distributing products or providing services that are aimed at circumventing technological protection measures that effectively protect copyrighted works. For example, if unauthorized access to a copyrighted work is effectively prevented through use of a password, it would be a violation of this section to defeat or bypass the password and to make the means to do so, as long as the primary purpose of the means was to perform this kind of act. [19] This is roughly analogous to making it illegal to break into a house using a tool, the primary purpose of which is to break into houses.

Legislation prohibiting circumvention devices is not unprecedented. The Copyright Act in section 1002(c) already protects sound recordings and musical works by prohibiting devices which circumvent any program or circuit that implements a serial copy management system or similar system included in digital audio recording devices and digital audio interface devices. The Communications Act in section 605(e)(4) prohibits devices that are "primarily of assistance in the unauthorized decryption of satellite cable programming." In addition to the WIPO Copyright Treaty, the NAFTA in article 1707(b) requires each party to make it a criminal offense to make available a device or system that is "primarily of assistance in decoding an encrypted program-carrying

---

[17] Art. 11.

[18] Rights management information is "information which identifies the work, the author of the work, the owner of any right in the work, or information about the terms and conditions of use of the work . . . which is attached to a copy of a work or appears in connection with communication of the work to the public." Art. 12. Rights management information is more commonly referred to in the U.S. as copyright management information (CMI). The purpose of CMI is to facilitate licensing of copyright for use on the Internet and to discourage piracy.

[19] Note that even if a device does not have circumvention as its primary purpose or design, that is, that it does not fall within the prohibition of section 1201(a)(2)(A), the device would still be illegal if it fell within the prohibitions of either 1201 (a)(2)(B) and (C).

12

satellite signal without the authorization of the lawful distributor of such signal.'

Although sections 1201(a)(2) and 1201(b) of the bill are worded similarly and employ similar tests, they are designed to protect two distinct rights and to target two distinct classes of devices. Subsection 1201(a)(2) is designed to protect access to a copyrighted work. Section 1201(b) is designed to protect the traditional copyright rights of the copyright owner. As a consequence, subsection 1201(a)(2) prohibits devices primarily designed to circumvent effective technological measures that limit access to a work. Subsection 1201(b), on the other hand, prohibits devices primarily designed to circumvent effective technological protection measures that limit the ability of the copyrighted work to be copied, or otherwise protect the copyright rights of the owner of the copyrighted work. The two sections are not interchangeable, and many devices will be subject to challenge only under one of the subsections. For example, if an effective technological protection measure does nothing to prevent access to the plain text of the work, but is designed to prevent that work from being copied, then a potential cause of action against the manufacturer of a device designed to circumvent the measure lies under subsection 1201(b), but not under subsection 1201(a)(2). Conversely, if an effective technological protection measure limits access to the plain text of a work only to those with authorized access, but provides no additional protection against copying, displaying, performing or distributing the work, then a potential cause of action against the manufacturer of a device designed to circumvent the measure lies under subsection 1201(a)(2), but not under subsection 1201(b).

This, in turn, is the reason there is no prohibition on conduct in 1201(b) akin to the prohibition on circumvention conduct in 1201(a)(1). The prohibition in 1201(a)(1) is necessary because prior to this Act, the conduct of circumvention was never before made unlawful. The device limitation in 1201(a)(2) enforces this new prohibition on conduct. The copyright law has long forbidden copyright infringements, so no new prohibition was necessary. The device limitation in 1201(b) enforces the longstanding prohibitions on infringements.

*Accommodation of particular technological protection measures*

The Committee was concerned that the provisions of subsections 1201(a)(2) and (b) might be read to mandate that manufacturers of consumer electronics, telecommunications, and computing products design their products and components to respond to particular technological protection measures employed to protect copyrighted works. Subsection 1201(d)(3) addresses this concern and clarifies that section 1201 does not impose any affirmative design mandates on manufacturers of consumer electronics, telecommunications, and computing products. The fact that a product or component does not respond to any particular technological protection measure, standing alone, neither creates liability under section 1201 nor immunizes those trafficking in the product, part or component from liability. This provision recognizes that there may be legitimate reasons for a product or component's failure to respond to a particular technological measure—such as design efficiency or ensuring high

13

quality output from the product—as well as illegitimate reasons—such as an unlawful intent to circumvent the protection measure.

That a component or part's failure to respond to a technological measure does not immunize the product or component from further review under section 1201 is made clear by the following example. Suppose a device expressly intended to circumvent an effective technological protection measure commonly employed to protect copyrighted works contained a component that was critical to the effectiveness of the device in achieving its stated purpose. Suppose further that the product was marketed as a circumvention device and had no commercially significant purposes or use other than to circumvent. That component would not provide the desired response to the effective technological protection measure, but the product would still clearly run afoul of section 1201 in light of the device manufacturer's unlawful intent, the marketing strategy and the lack of other commercially significant uses for the product.

On the other hand, suppose a manufacturer of a state-of-the-art consumer electronics device, which did not circumvent any technological protection measure when it was introduced into the market and which was designed and marketed for a purpose other than circumventing any technological protection measures, was sued for violating section 1201 because the device did not accommodate a particular technological protection measure developed after the device was designed and sold. In such a case, section 1201(d)(3) would make it clear that the device's failure to accommodate this new protection measure does not render the device unlawful, and in light of the nature of the product, the manner in which it functions, the way it had been marketed and its obvious legitimate uses (assuming the device continues to be marketed and produced for the same legitimate uses), there would clearly be no basis for arguing that the device was unlawful under section 1201.

*Library browsing*

Section 1201(e) allows nonprofit libraries, archives, and educational institutions to gain access to a commercially exploited copyrighted work solely to make the determination of whether to acquire a copy of the work.

*Reverse engineering*

Sections 1201(g)–(j) are intended to allow legitimate software developers to continue engaging in certain activities for the purpose of achieving interoperability to the extent permitted by law prior to the enactment of this chapter. The objective is to ensure that the effect of current case law interpreting the Copyright Act is not changed by enactment of this legislation for certain acts of identification and analysis done in respect of computer programs. *See, Sega Enterprises Ltd.* v *Accolade, Inc.,* 977 F.2d 1510, 24 U.S.P.Q.2d 1561 (9th Cir. 1992.). The purpose of this section is to foster competition and innovation in the computer and software industry.

*Controlling the access of minors to material on the Internet*

The Committee supports the voluntary efforts underway by a broad group of Internet users, library groups, publishers and other

14

copyright industry groups, family-focused organizations, on-line service providers, and civil liberties groups to empower parents to supervise and control the material their children access from the Internet. Nothing in this bill is intended to undercut these efforts.

To emphasize this point, an amendment (section 1201(k)) sponsored by Senator Ashcroft, Chairman Hatch and Senator Leahy was adopted unanimously by the Committee to ensure that the prohibitions in section 1201(a) did not inadvertently make it unlawful for parents to protect their children from pornography and other inappropriate material available on the Internet, or have unintended legal consequences for manufacturers of products designed solely to enable parents to protect their children in this fashion. Section 1201(k) makes clear that in a suit brought under section 1201(a), a court may consider the necessity for a challenged component or part's intended and actual incorporation into a technology, product, service or device, which does not itself violate the provisions of new chapter 12 on Copyright Protection and Management Systems, and which has the sole purpose of preventing the access of minors to pornography or other inappropriate material on the Internet. This provision applies to subsection 1201(a) in its entirety (as opposed to subsection 1201(a)(2) alone) in order to clarify that the bill protects the actions of parents in ensuring that their children do not have access to inappropriate material on-line.

A variety of tools available now allow parents to exercise control in a manner consistent with their own family values, of their children's access to online materials. In the event that, in the future, any of these tools incorporates a part or component which circumvents a technological protection measure effectively controlling access to a copyrighted work solely in order to provide a parent with the information necessary to ascertain whether that material is appropriate for his or her child, this provision authorizes a court to take into consideration the necessity for incorporating such part or component in a suit alleging a violation of section 1201(a).

This provision is limited to the application of subsection (a) because the Committee does not anticipate that it would be necessary for parental empowerment tools to make copies of questionable material, or to distribute or perform it, in order to carry out their important function of assisting parents in guiding their children on the Internet. Accordingly, circumvention of copy controls, or of similar measures, should never be a necessary capability of a parental empowerment tool. By the same token, if a technology, product, service or device which (1) has the sole purpose of preventing the access of minors to certain materials on the Internet, and (2) that technology, product, service or device circumvents a technological protection measure that effectively controls access to a work as defined in subsection 1201(a)(3) only for the purpose of gaining access to the work to ascertain whether it is suitable for a minor, but does not otherwise defeat any copy protection for that work, then that technology, product, service or device is only subject to challenge under subsection 1201(a)(2) and not subsection 1201(b). In such circumstances, no cause of action would lie under section 1201(b) and therefore limiting language would be unnecessary.

This provision is not to be interpreted to allow the wholesale access to copyrighted works in their entirety, but merely to allow par-

15

ents to have an ability to determine whether a work is inappropriate for that parent's child.

*Encryption research*

The purpose of the Committee in proposing enactment of section 1201 is to improve the ability of copyright owners to prevent the theft of their works, including by applying technological protection measures. The effectiveness of such measures depends in large part on the rapid and dynamic development of better technologies, including encryption-based technological protection measures. The development of encryption sciences requires, in part, ongoing research and testing activities by scientists of existing encryption methods, in order to build on those advances, thus promoting and advancing encryption technology generally.

The goals of section 1201 would be poorly served if these provisions had the undesirable and unintended consequence of chilling legitimate research activities in the area of encryption. It is the view of the Committee, after having conducted extensive consultations, and having examined a number of hypothetical situations, that Section 1201 should not have such an unintended negative effect.

It is the view of the Committee that generally available encryption testing tools would not be made illegal by this Act. Each of those tools has a legitimate and substantial commercial purpose—testing security and effectiveness—and are not prohibited by Section 1201. In addition, the testing of specific encryption algorithms would not fall within the scope of 1201, since mathematical formulas as such are not protected by copyright. Thus, testing of an encryption algorithm or program that has multiple uses, including a use as a technical protection measure for copyrighted works, would not fall within the prohibition of section 1201(a) when that testing is performed on the encryption when it is in a form not implemented as a technical protection measure. Similarly, the testing of encryption technologies developed by or on behalf of the government of the United States, would not violate section 1201 since copyright does not subsist in such subject matter. Finally, there are many situations in which encryption research will be undertaken with the consent or at the direction of the copyright owner and therefore will not give rise to any action under section 1201.

For these reasons, it is the view of the Committee that the following types of encryption testing are not generally prohibited by section 1201.

If a cryptographer uses various cryptanalytic research techniques to discover a flaw in, for example, the U.S. government's Escrowed Encryption Standard (EES) used in the Clipper Chip and Fortezza cards. The flaw allows users to circumvent essential features of the algorithm. Since these encryption products are not covered by copyright, because they are merely mathematical algorithms in addition to being owned by the U.S. government, these acts do not violate 1201, and the results may be made available to the public.

If a company, in the course of developing a new cryptographic product, sponsors a crypto-cracking contest with cash prizes, contestants would not violate section 1201 since the research acts are specifically authorized.

16

Significantly, section 1201 does not make illegal cryptographic devices that have substantial legitimate purposes other than to circumvent technological protection measures as applied to a work. For example, many popular word processing and other computer programs include a security feature allowing users to password-protect documents (employing a low-grade form of encryption.) It is not uncommon for users of such products to forget or lose their passwords for such documents, making their own protected works unrecoverable. As a result, many independent programmers have created utilities designed to assist in the recovery of passwords or password-protected works. Several of these utilities are distributed over the Internet as freeware or shareware. Because these utilities have a substantial legitimate use, and because they would be used by persons to gain access to their own works, these devices do not violate section 1201.

The law would also not prohibit certain kinds of commercial "key-cracker" products, e.g., a computer program optimized to crack certain 40-bit encryption keys. Such machines are often rented to commercial customers for the purpose of quick data recovery of encrypted data. So long as these devices would have a substantial legitimate use, and they do not become principally used to facilitate infringement, they would not be prohibited by section 1201.

Today, network and web site management and security tools increasingly contain components that automatically test systems security and identify common vulnerabilities. These programs are valuable tools for systems administrators and web site operators, to use in the course of their regular testing of their systems' security. Again, because these devices do not meet the test of section 1201, because they are good products put to a good use, the devices do not fall within the scope of this statute.

### B. COPYRIGHT MANAGEMENT INFORMATION

Copyright Management Information (CMI) is an important element in establishing an efficient Internet marketplace in copyrighted works free from governmental regulation. Such information will assist in tracking and monitoring uses of copyrighted works, as well as licensing of rights and indicating attribution, creation and ownership.

Under the bill, CMI includes such items as the title of the work, the author, the copyright owner, and in some instances, the writer, performer, and director. CMI need not be in digital form, but CMI in digital form is expressly included. It is important to note that the DMCA does not *require* CMI, but if CMI is provided, the bill protects it from falsification, removal or alteration. Information that is not defined as CMI under the bill would not be protected by these provisions, although its removal or falsification might be protected under other laws, such as unfair trade. The definition of CMI may be expanded by regulation prescribed by the Register of Copyrights.

Section 1202(a) prohibits knowingly providing CMI that is false or knowingly distributing CMI that is false with the intent to induce, enable, facilitate or conceal infringement. Section 1202(b) prohibits (1) the intentional removal or alteration of CMI, (2) the distribution of CMI knowing that the information has been re-

17

moved or altered, and (3) the distribution or public performance of works knowing or having reason to know that CMI has been removed or altered, so long as, regarding the prohibited acts described in section 1202(b), there is knowledge or reasonable grounds to know that these acts will induce, enable, facilitate or conceal an infringement.

Section 1202(e) recognizes special problems that certain broadcasting entities may have with the transmission of copyright management information. Under this subsection, radio and television broadcasters, cable systems, and persons who provide programming to such broadcasters or systems, who do not intend to induce, enable, facilitate or conceal infringement (eligible persons) may be eligible for a limitation on liability for violation of the copyright management information provisions of section 1202(b) in certain, limited circumstances.

## C. Civil Remedies and Criminal Penalties

Section 1203 gives civil remedies and section 1204 imposes criminal penalties for violations of sections 1201 and 1202.

In addition to an award of damages, section 1203(b) provides for various kinds of affirmative relief in civil actions such as temporary and permanent injunctions, impoundment, and, as part of a final judgment or decree finding a violation, the court may order remedial modification or destruction of the offending device or product. Such affirmative relief is currently found in the Copyright Act for copyright infringements.

Regarding monetary relief, section 1203 provides for actual damages, profits derived from the unlawful activity, statutory damages, and treble damages for repeat offenders. Such monetary relief is available under the current Copyright Act.

An important feature of section 1203 is the remittitur for innocent violators and for nonprofit libraries, archives, and educational institutions. In the case of a violator who was not aware and had no reason to believe that the acts at issue constituted a violation, the court may reduce or remit the total award of damages. In the cases of nonprofit libraries, archives, and educational institutions the court must remit damages if the institution was not aware and had no reason to believe that its acts constituted a violation.

The current Copyright Act provides for criminal penalties for copyright infringement. Section 1204 of the bill also provides criminal penalties for violations of section 1201(a) and (b). Specifically, willful violations of sections 1201 or 1202 for purposes of commercial advantage or private financial gain are punished by up to $500,000 in fines or imprisonment for up to 5 years. Repeat offenses are punishable by up to $1,000,000 in fines or imprisonment for up to 10 years. The bill requires that criminal proceedings be commenced within 5 years after the cause of action arose. Criminal penalties do not apply to nonprofit libraries, archives, and educational institutions.

## D. Protecting Personal Privacy Interests

Section 1205 responds to concerns expressed by some that certain technologies used to gather personally identifiable information

18

from Internet users could be characterized as technological protection measures for copyrighted materials, and that therefore efforts by Internet users to protect their privacy by disabling or bypassing such technologies could be prohibited by section 1201. The Committee does not believe that enactment of this legislation will have this effect. No specific example of such a privacy-invasive technology in use today that would be affected in this way has been called to the Committee's attention. For example, even if "cookie" files—which are automatically deposited on the hard drives of computers of users who visit World Wide Web sites—are considered to be invasive of personal privacy (and are deemed to be copyrighted works), all commercially significant browser programs can be readily configured to reject "cookies," and such a configuration raises no issue of any violation of section 1201.

In fact, enactment of section 1201 should have a positive impact on the protection of personal privacy on the Internet. The same technologies that copyright owners use to control access to and use of their works can and will be used to protect the personal privacy of Internet users by, for example, encrypting e-mail communications, or requiring a password for access to personal copyrighted information on an individual's web site. By outlawing the activities of those who make it their business to provide the tools for circumventing these protective technologies, this legislation will substantially enhance the degree to which individuals may protect their privacy as they work, play and communicate on the Internet.

However, because of the privacy concerns expressed that existing or future technologies may evolve in such a way that an individual would have to circumvent a technological protection measure to protect his or her privacy, the committee concluded that it was prudent to rule out any scenario in which section 1201 might be relied upon to make it harder, rather than easier, to protect personal privacy on the Internet. Accordingly, Senator Ashcroft, Chairman Hatch and Senator Leahy proposed a savings clause to clarify that nothing in the new chapter 12 will abrogate, diminish or weaken the provisions of any Federal or State law that prevents the violation of an individual's privacy in connection with the individual's use of the Internet. The savings clause also specifies that section 1201 cannot be used to provide a defense, or an element of mitigation, in any civil or criminal action to enforce such a law. For example, if a valid Federal or State law regulates, on personal privacy grounds, the use of "cookie" files, which are automatically placed on the computer hard drives of users as they visit Internet web sites, and a party with standing sues to enforce the limitations contained in that law, the defendant may not excuse his actions in violation of those limitations by pointing to anything in chapter 12 of title 17.

*Law enforcement*

Sections 1201(f) and 1202(d) create exceptions for the lawfully authorized investigative, protective, or intelligence activities of an officer, agent, or employee of, the United States, a State, or a political subdivision of a State, or of persons acting pursuant to a contract with such an entity. These exceptions will protect officers, agents, employees, or contractors of, or other persons acting at the

19

direction of, a law enforcement or intelligence agency of the United States, a State, or a political subdivision of a State, who are performing lawfully authorized investigative, protective, or intelligence activities. These exceptions will also protect officers, agents, employees, or contractors of, or other persons acting at the direction of, elements or divisions of an agency or department of the United States, a State, or a political subdivision of a State, which does not have law enforcement or intelligence as its primary function, but who may nevertheless, in the course of lawfully authorized protective, intelligence, or criminal investigative activities, engage in actions otherwise prohibited by this bill. These exceptions only apply to individuals covered under this section when they are performing investigative, protective, or intelligence activities, within the scope of their duties and in furtherance of lawfully authorized activities.

The Committee is concerned that these sections should not be misinterpreted as an opportunity to circumvent the WIPO Copyright Treaty. It should be clear that this is a routine law enforcement and intelligence exception. As such, the exceptions under sections 1201(f) and 1202(d) are to be narrowly construed. In addition, these exceptions are to be construed in a manner consistent with similar law enforcement and intelligence exceptions found elsewhere in U.S. law, such as 18 U.S.C. 1029(f), 1030(f), or 2512(2)(b).

TITLE II

Although the copyright infringement liability of on-line and Internet service providers (OSPs and ISPs) is not expressly addressed in the actual provisions of the WIPO treaties, the Committee is sympathetic to the desire of such service providers to see the law clarified in this area. There have been several cases relevant to service provider liability for copyright infringement.[20] Most have approached the issue from the standpoint of contributory and vicarious liability. Rather than embarking upon a wholesale clarification of these doctrines, the Committee decided to leave current law in its evolving state and, instead, to create a series of "safe harbors," for certain common activities of service providers. A service provider which qualifies for a safe harbor, receives the benefit of limited liability.

In the beginning, the Committee identified the following activities: (1) digital network communications, (2) system caching, (3) information stored on service providers, and (4) information location tools. In the end, Title II contains five general categories of activities, which are addressed in a newly created section 512 in Chapter 5 of the Copyright Act. This new section contains limitations on service providers' liability for five general categories of activity set forth in subsections (a) through (d) and subsection (f). As provided in subsection (k), Section 512 is not intended to imply that a service provider is or is not liable as an infringer either for conduct that qualifies for a limitation of liability or for conduct that fails to so qualify. Rather, the limitations of liability apply if the provider is found to be liable under existing principles of law.

---

[20] For example, *Religious Technology Center* v. *Netcom On-line Communications Services*, 907 F. Supp. 1361 (N.D. Cal. 1995); *Playboy Enterprises* v. *Frena*, 839 F. Supp. 1552 (M.D. Fla. 1993); and *Marobie-FL* v. *Nat. Assn. Of Fire Equipment Distributors*, 983 F. Supp. 1167 (N.D. Ill. 1997).

20

The limitations in subsections (a) through (d) protect qualifying service providers from liability for all monetary relief for direct, vicarious and contributory infringement. Monetary relief is defined in subsection (j)(2) as encompassing damages, costs, attorneys' fees, and any other form of monetary payment. These subsections also limit injunctive relief against qualifying service providers to the extent specified in subsection (I). To qualify for these protections, service providers must meet the conditions set forth in subsection (h), and service providers' activities at issue must involve a function described in subsection (a), (b), (c), (d) or (f), respectively. The liability limitations apply to networks "operated by or for the service provider," thereby protecting both service providers who offer a service and subcontractors who may operate parts of, or an entire, system or network for another service provider.

Title II preserves strong incentives for service providers and copyright owners to cooperate to detect and deal with copyright infringements that take place in the digital networked environment. At the same time, it provides greater certainty to service providers concerning their legal exposure for infringements that may occur in the course of their activities.

*Particular concerns of educational institutions*

At least two concerns have been raised concerning the applicability of section 512 to educational institutions, such as universities and libraries, when they act as on-line service providers. The first concerns the extent to which the knowledge of faculty members using the Internet will be imputed to a college or university as a whole or the specific department within the college or university responsible for providing Internet service. To the extent such knowledge is imputed, the on-line service provider might fail to qualify for certain of the exceptions to liability included in this section. This is one of the specific questions upon which the Copyright Office study authorized in section 204 of this Act will focus. Without prejudging any issues to be considered in that study, it seems that the extent to which knowledge is imputed to the service provider in the case of colleges and universities, and in other settings in which the service provider and end-user share an employee-employer or other relationship, is a matter of the relevant State law of respondeat superior, rather than a matter of Federal copyright law. As a consequence, there may be much that a non-profit educational institution can do to structure the internal relationships between its faculty and its online service provider functions. What is more, nothing in this Act should be read to preclude a Federal court from taking into account the special circumstances of a non-profit educational institution in applying agency law to determine whether knowledge should be imputed to such an institution in its capacity as an online service provider.

The second concern raised about the applicability of section 512 to public universities and libraries, and indeed other public entities which operate as online service providers, is that by complying with the notice and take-down provisions of section 512, the public entities might violate the due process rights of their users. Any such due process objection suffers at least two flaws. In the first place, a prerequisite to any due process claim is a state law prop-

21

erty interest. In the case of the relatively new concept of Internet access, the service provider contract, rather than any common law property interest, would appear to be the yardstick of the Internet user's property interest in continued access. The contract for Internet service, therefore, can limit any property interest that would form the basis for a procedural due process claim. Second, and even more important, the procedural protections afforded by the notification requirements of subsection 512(c)(3) and the provisions for the replacement of removed or disabled materials in subsection 512(f) provide all the process that is due. The Committee was acutely concerned that it provide all end-users—whether contracting with private or public sector online service providers—with appropriate procedural protections to ensure that material is not disabled without proper justification. The provisions in the bill balance the need for rapid response to potential infringement with the end-users legitimate interests in not having material removed without recourse.

In order to explore these and other issues more fully, the Committee provides in section 204 for a study to be conducted by the Register of Copyrights.

### TITLE III

*Computer maintenance or repair*

Title III of the bill amends section 117 of the Copyright Act (17 U.S.C. 117) to ensure that independent service organizations do not inadvertently become liable for copyright infringement merely because they have turned on a machine in order to service its hardware components.

When a computer is activated, that is when it is turned on, certain software or parts thereof (generally the machine's operating system software) is automatically copied into the machine's random access memory, or "RAM". During the course of activating the computer, different parts of the operating system may reside in the RAM at different times because the operating system is sometimes larger than the capacity of the RAM. Because such copying has been held to constitute a "reproduction" under section 106 of the Copyright Act (17 U.S.C. 106),[21] a person who activated the machine without the authorization of the copyright owner of that software could be liable for copyright infringement. This legislation has the narrow and specific intent of relieving independent service providers, persons unaffiliated with either the owner or lessee of the machine, from liability under the Copyright Act when, solely by virtue of activating the machine in which a computer program resides, they inadvertently cause an unauthorized copy of that program to be made.

This title is narrowly crafted to achieve the foregoing objective without prejudicing the rights of copyright owners of computer software. Thus, for example, 1201(k) does not relieve from liability persons who make unauthorized adaptations, modifications, or other changes to the software. This title also does not relieve from liabil-

---

[21] *See MAI Sys. Corp.* v. *Peak Computer,* 991 F.2d 511 (9th Cir. 1993), *cert. denied,* 114 S.Ct. 671 (1994).

22

ity persons who make any unauthorized copies of software other than those caused solely by activation of the machine.

TITLE IV

A. EPHEMERAL RECORDINGS

Section 401 of the bill amends section 112 of the Copyright Act to address two issues concerning the application of the ephemeral recording exemption in the digital age.

The first of these issues is the relationship between the ephemeral recording exemption and the Digital Performance Right in Sound Recordings Act of 1995 ("DPRA"). The DPRA granted sound recording copyright owners the exclusive right to perform their works publicly by means of digital audio transmission, subject to certain limitations, particularly those set forth in section 114(d). Among those limitations is an exemption for nonsubscription broadcast transmissions, which are defined as those made by terrestrial broadcast stations licensed as such by the FCC. 17 U.S.C. 114(d)(1)(A)(iii) and (j)(2). The ephemeral recording exemption presently privileges certain activities of a transmitting organization when it is entitled to transmit a performance or display under a license or transfer of copyright ownership or under the limitations on exclusive rights in sound recordings specified by section 114(a). The Committee believes that the ephemeral recording exemption should apply to broadcast radio and television stations when they make nonsubscription digital broadcasts permitted by the DPRA. The Committee has therefore changed the existing language of the ephemeral recording exemption (redesignated as 112(a)(1)) to extend explicitly to broadcasters the same privilege they already enjoy with respect to analog broadcasts.

The second of these issues is the relationship between the ephemeral recording exemption and the anticircumvention provisions that the bill adds as section 1201 of the Copyright Act. Concerns were expressed that if use of copy protection technologies became widespread, a transmitting organization might be prevented from engaging in its traditional activities of assembling transmission programs and making ephemeral recordings permitted by section 112 for purposes of its own transmissions within its local service area and of archival preservation and security. To address this concern, the Committee has added to section 112 a new paragraph that permits transmitting organizations to engage in activities that otherwise would violate section 1201(a)(1) in certain limited circumstances when necessary for the exercise of the transmitting organization's privilege to make ephemeral recordings under redesignated section 112(a)(1). By way of example, if a radio station could not make a permitted ephemeral recording from a commercially available phonorecord without violating section 1201(a)(1), then the radio station could request from the copyright owner the necessary means of making a permitted ephemeral recording. If the copyright owner did not then either provide a phonorecord that could be reproduced or otherwise provide the necessary means of making a permitted ephemeral recording from the phonorecord already in the possession of the radio station, the radio station would not be liable for violating section 1201(a)(1) for taking the steps

23

necessary for engaging in activities permitted under section 112(a)(1). The radio station would, of course, be liable for violating section 1201(a)(1) if it engaged in activities prohibited by that section in other than the limited circumstances permitted by section 112(a)(1).

## B. Distance Education

New technology, especially digital technology, is increasingly being used by educational institutions in their distance learning programs. In the past, distance learning programs were developed primarily for students who, because of their special circumstances, could not be taught in a traditional classroom. Section 110(2) of the copyright law contains an exemption that accommodates this type of activity. The current exemption is designed to cover instructional broadcasting, and allows the use of only certain categories of works. Future distance education, however, may involve a wider range of activities, including the use of interactive digital transmissions, and be designed for a broader audience of students working from personal computers in their own homes.

The Committee believes that the scope of the distance education exemption should be re-examined in light of the range of educational activities made possible by digital technologies. The Committee therefore initiated discussions on distance learning with representatives of libraries, educational institutions and copyright owners, and asked the Register of Copyrights to recommend any appropriate legislative language for an updated distance education exemption. In response to this request by Chairman Hatch, Senator Leahy and Senator Ashcroft, the Register reported the conclusion that digital distance education is an evolving field, and the range of activities contemplated is diverse and potentially far-reaching in impact and scope.

In light of the complexity, importance and potential scope of the issues implicated by distance education, the Committee has determined that further study of the issues would be useful. The Committee therefore has directed the Copyright Office to provide Congress with a report recommending ways to promote distance learning through digital technologies no later than six months after enactment of this legislation. In conducting this study, the Copyright Office is required to consult with representatives of copyright owners, nonprofit educational institutions, libraries and archives. The Committee anticipates that the Copyright Office will also consult with others with relevant expertise, where appropriate, such as the Department of Education.

The Committee underscores the importance to the public of a speedy resolution of any copyright issues associated with distance learning and commits itself to developing a fair and effective distance learning regime promptly after receipt of the Register's Report.

*Fair use*

The bill does not amend section 107 of the Copyright Act, the fair use provision. The Committee determined that no change to section 107 was required because section 107, as written, is technologically

24

neutral, and therefore, the fair use doctrine is fully applicable in the digital world as in the analog world.

### C. Exemption for Libraries and Archives

Section 108 of title 17 permits libraries and archives of the type described in that section to make and, in some cases, distribute a limited number of copies of certain types of copyrighted works, without the permission of the copyright holder, for specified purposes relating to these entities' functions as repositories of such works for public reference. Section 403 of the bill updates section 108 to allow these entities to take advantage of digital technologies when engaging in specified preservation activities.

### IV. VOTE OF THE COMMITTEE

Pursuant to paragraph 7 of rule XXVI of the Standing Rules of the Senate, each Committee is to announce the results of rollcall votes taken in any meeting of the Committee on any measure or amendment. The Senate Committee on the Judiciary, with a quorum present, met on Thursday, April 23, 1998, at 10 a.m., to consider the Digital Millennium Copyright Act of 1998. The Committee considered and accepted the following three amendments en bloc, by unanimous consent: an amendment by the Chairman (for himself, Mr. Leahy, and Mr. Ashcroft), with respect to reverse engineering of computer programs for interoperability purposes; an amendment by the Chairman (for himself, Mr. Leahy and Mr. Ashcroft), with respect to ephemeral recordings; and, an amendment by Mr. Ashcroft (for himself, Mr. Leahy, and Mr. Hatch), with respect to the exemption from copyright infringement liability for libraries and archives.

The Committee, with a quorum present, met to resume consideration of the Digital Millennium Copyright Act on Thursday, April 30, 1998, at 10 a.m. The Committee considered and accepted the following amendments en bloc, by unanimous consent: an amendment by the Chairman (for himself, Mr. Leahy, and Mr. Ashcroft), with respect to ephemeral recordings; an amendment by the Chairman (for himself, Mr. Leahy, and Mr. Ashcroft), with respect to the use of copyright management information in the course of certain analog and digital transmissions; an amendment by the Chairman (for himself and Mr. Leahy), to make certain clarifying amendments; an amendment by Mr. Ashcroft (for himself, Mr. Leahy, and Mr. Hatch), with respect to protection of subscribers of online and Internet service providers; an amendment by Mr. Ashcroft (for himself, Mr. Hatch, and Mr. Leahy), with respect to the accommodation of particular technological protection measures; an amendment by Mr. Ashcroft (for himself, Mr. Hatch, and Mr. Leahy), with respect to protection of personal privacy interests; an amendment by Mr. Ashcroft (for himself, Mr. Hatch, and Mr. Leahy), with respect to the preservation of the ability to control minors" access to material on the Internet; an amendment by Mr. Ashcroft (for himself, Mr. Leahy, and Mr. Hatch), with respect to distance education through digital technologies; an amendment by Mr. Grassley (for himself and Mr. Kyl), with respect to law enforcement and intelligence activities; and an amendment by Mrs. Feinstein, with re-

25

spect to the liability of nonprofit educational institutions for copyright infringement online. The Committee then ordered the Digital Millennium Copyright Act of 1998 reported favorably, as amended, with a recommendation that the bill do pass, by a rollcall vote of 18 yeas to 0 nays.

| YEAS | NAYS |
|---|---|
| Thurmond (by proxy) | |
| Grassley (by proxy) | |
| Specter (by proxy) | |
| Thompson | |
| Kyl | |
| DeWine | |
| Ashcroft | |
| Abraham (by proxy) | |
| Sessions | |
| Leahy | |
| Kennedy | |
| Biden (by proxy) | |
| Kohl (by proxy) | |
| Feinstein | |
| Feingold | |
| Durbin (by proxy) | |
| Torricelli (by proxy) | |
| Hatch | |

## V. SECTION-BY-SECTION ANALYSIS

*Section 1. Short title*

This Act may be cited as the "Digital Millennium Copyright Act of 1998.'

*Section 2. Table of contents*

### TITLE I—WIPO TREATIES IMPLEMENTATION

*Section 101. Short title*

This Title may be cited as the "WIPO Copyright and Performances and Phonograms Treaties Implementation Act of 1998."

*Section 102. Technical amendments*

To comply with the obligations of the WIPO Treaties, several technical amendments to the U.S. Copyright Act are necessary. These amendments are needed to ensure that works from countries that join the two new WIPO Treaties, including works in existence on the date each treaty becomes effective for the United States, will be protected in the United States on a formality-free basis, as required by the provisions of each treaty. Three sections of the Copyright Act require amendment: (1) section 104, which specifies the conditions on which works from other countries are protected in the United States; (2) section 104A, which restores protection to certain preexisting works from other countries that have fallen into the public domain in the United States; and (3) section 411(a), which makes copyright registration a precondition to bringing suit for infringement for some works. In addition, the amendments made to

26

these sections require some additions to, and changes in, the definition section of the Copyright Act, section 101.

*Subsection (a)—Amendments to Section 101: Definitions.*—The bill amends section 101 of the Copyright Act (17 U.S.C. 101) to define "treaty party" as "any country or intergovernmental organization that is a party to an international agreement" and to define "international agreement" to include, *inter alia,* the two new WIPO Treaties. Definitions of the two new WIPO Treaties are also provided. In addition, a definition of "United States work" was added for purposes of section 411 of the Copyright Act (17 U.S.C. 411), as amended by the bill.

*Subsection (b)—Amendments to Section 104: Subject Matter of Copyright: National Origin.*—Section 104 of the Copyright Act (17 U.S.C. 104) identifies the criteria that must be met for a work to qualify for protection under the U.S. copyright law (i.e., "points of attachment"). Among those protected under section 104 are nationals or domiciliaries of those countries with which we have an appropriate treaty relationship. Section 104, as it is presently written, explicitly identifies those treaty relationships, but does not refer to the two new WIPO Treaties. Therefore, section 104 needs to be amended to provide for points of attachment for the two new WIPO Treaties.

Subsection (b) amends section 104 so that all countries that have copyright relations with the United States would be referred to collectively by the term "treaty parties." This change, in conjunction with the amendments to section 101, which define "treaty party" and "international agreement," serves to ensure that the two new WIPO Treaties are covered by section 104. This subsection also amends section 104 to extend protection to foreign works from any treaty party based on four points of attachment: nationality of the author, place of first publication of the work, place of fixation of the sounds embodied in a sound recording, and the situs of a constructed architectural work.

The way section 104 is presently written requires that it be amended each time U.S. treaty membership changes. By defining "treaty party" in section 101 and amending section 104 to refer to "treaty party," future changes in the treaties to which the U.S. is a party would not require changes to section 104. It is much clearer and less unwieldy to have a single set of criteria for eligibility in section 104 as proposed by this bill, rather than multiple, overlapping criteria in a long list of complex definitions in section 101. If the U.S. joins any future treaties, those treaties can simply be added to the list of "international agreements" without any detailed amendments repeating the criteria for eligibility. The amendment to section 104 also makes clear that membership in the Geneva Phonograms Convention and the WIPO Performances and Phonograms Treaty provides national eligibility for sound recordings only, not other types of works.

*Subsection (c)—Amendments to Section 104A: Copyright in Restored Works.*—Subsection (c) amends section 104A(h) of the Copyright Act (17 U.S.C. 104A(h)) by adding the two new WIPO Treaties to the definitions of "date of adherence or proclamation" and "eligible country." It would also add a paragraph to the definition of "restored work" to ensure that copyrighted works other than

27

sound recordings do not qualify as restored works where the sole basis for protection in the United States is adherence to the WIPO Performances and Phonograms Treaty.

*Subsection (d)—Amendments to Section 411(a): Registration and Infringement Actions.*—In its current form, section 411(a) of the Copyright Act (17 U.S.C. 411(a)) requires works to be registered with the Copyright Office before suit can be brought for their infringement, but exempts Berne Convention works whose country of origin is not the United States. Subsection (d) amends section 411(a) of the Copyright Act to include works from members of the two new WIPO Treaties within the exemption.

The amendments made by subsection (d) reframe the registration requirement in the affirmative—essentially the converse of the current section 411(a). In other words, the provision would state affirmatively that "United States works" must be registered before suit. Rather than frame an exemption from that requirement for certain works whose origin *is not* the United States, section 411(a) would, as amended by this subsection, merely limit the requirement of registration as a precondition to suit to those works whose country of origin *is* the United States. "United States works" are defined in section 101 of the Copyright Act (17 U.S.C. 101), as amended by this Title. As discussed with respect to the amendments in subsection (b) to section 104 of the Copyright Act, section 411(a), as amended by this subsection, may be easily updated each time the United States joins another treaty, without the need to change several interrelated provisions of the Act.

*Subsection (e)—Amendment to section 507(a).*—Section 507(a) of the Copyright Act (17 U.S.C. 507(a)) provides for a 3-year statute of limitations period for all criminal copyright actions. Subsection (e) amends section 507(a) to recognize exceptions to the 3-year limitations period if expressly provided elsewhere in title 17. This amendment is necessary in light of the 5-year criminal limitation period contained in the new chapter 12 of title 17, which is created by this title.

*Section 103. Copyright protection systems and copyright management information*

The two new WIPO Treaties include substantively identical provisions on technological measures of protection (also commonly referred to as the "black box" or "anticircumvention" provisions). These provisions require contracting parties to provide "adequate legal protection and effective legal remedies against the circumvention of effective technological measures that are used by authors in connection with the exercise of their rights under this Treaty or the Berne Convention and that restrict acts, in respect of their works, which are not authorized by the authors concerned or permitted by law."

Both of the new WIPO treaties also include substantively identical provisions requiring contracting parties to protect the integrity of copyright management information. The treaties define copyright management information as "information which identifies the work, the author of the work, the owner of any right in the work, or information about the terms and conditions of use of the work, and any numbers or codes that represent such information,

28

when any of these items of information is attached to a copy of a work or appears in connection with the communication of a work to the public.'

Legislation is required to comply with both of these provisions. To accomplish this, the bill adds a new chapter (chapter twelve) to title 17 of the United States Code. This new chapter twelve includes five sections—(1) section 1201, which prohibits the circumvention of technological copyright protection measures; (2) section 1202, which protects the integrity of copyright management information; (3) section 1203, which provides for civil remedies for violations of sections 1201 and 1202; (4) section 1204, which provides for criminal penalties for violations of sections 1201 and 1202; and (5) section 1205, which provides a savings clause to preserve the effectiveness of federal and state laws in protecting individual privacy on the Internet.

*Section 1201. Circumvention of copyright protection systems*

*Subsection (a)—Violations regarding circumvention of technological protection measures.*—Subsection (a) applies when a person has not obtained authorized access to a copy or a phonorecord of a work that is protected under the Copyright Act and for which the copyright owner has put in place a technological measure that effectively controls access to his or her work. The relevant terminology is defined in paragraph (a)(3), as described below.

Paragraph (a)(1) establishes a general prohibition against gaining unauthorized access to a work by circumventing a technological protection measure put in place by the copyright owner where such protection measure otherwise effectively controls access to a work protected under title 17 of the U.S. Code. This paragraph does not apply to the subsequent actions of a person once he or she has obtained authorized access to a copy of a work protected under title 17, even if such actions involve circumvention of other types of technological protection measures.

In order to provide meaningful protection and enforcement of the copyright owner's right to control access to his or her copyrighted work, paragraph (a)(2) supplements the prohibition against the act of circumvention in paragraph (a)(1) with prohibitions on creating and making available certain technologies, products and services used, developed or advertised to defeat technological protections against unauthorized access to a work. Similar laws have been enacted in related contexts. See, *e.g.*, 17 U.S.C. 1002(a) (prohibiting the import, manufacture, or distribution of digital audio recording equipment lacking specified characteristics and prohibiting the import, manufacture, or distribution of any device, or the offer to perform any service, the primary purpose or effect of which is to circumvent the serial copy management system required for digital audio equipment); 47 U.S.C. 553(a)(2) (prohibiting the manufacture or distribution of equipment intended for the unauthorized reception of cable television service); 47 U.S.C. 605(e)(4) (prohibiting the manufacture, assembly, import, and sale of equipment used in the unauthorized decryption of satellite cable programming.)

Specifically, paragraph (a)(2) prohibits manufacturing, importing, offering to the public, providing, or otherwise trafficking in certain technologies, products, services, devices, components, or parts that

29

can be used to circumvent a technological protection measure that otherwise effectively controls access to a work protected under title 17. It is drafted carefully to target "black boxes," and to ensure that legitimate multipurpose devices can continue to be made and sold. For a technology, product, service, device, component, or part thereof to be prohibited under this subsection, one of three conditions must be met. It must: (1) be primarily designed or produced for the purpose of circumventing; (2) have only a limited commercially significant purpose or use other than to circumvent; or (3) be marketed by the person who manufactures it, imports it, offers it to the public, provides it or otherwise traffics in it, or by another person acting in concert with that person with that person's knowledge, for use in circumventing a technological protection measure that effectively controls access to a work protected under title 17. This provision is designed to protect copyright owners, and simultaneously allow the development of technology.

Paragraph (a)(3) defines certain terms used throughout paragraph (a). Subparagraph (1) defines the term "circumvent a technological protection measure" as meaning "to descramble a scrambled work, to decrypt an encrypted work, or otherwise to avoid, bypass, remove, deactivate, or impair a technological protection measure, without the authority of the copyright owner." This definition applies to paragraph (a) only, which covers protections against unauthorized initial access to a copyrighted work. Subparagraph (2) states that a technological protection measure "effectively controls access to a work" if the measure, in the ordinary course of its operation, requires the application of information, or a process or a treatment, with the authority of the copyright owner, to gain access to the work.

*Subsection (b)—Additional violations.*—Subsection (b) applies to those technological measures employed by a copyright owner that effectively protect his or her copyright rights in a work, as opposed to those technological protection measures covered by subsection (a), which prevent unauthorized access to a copyrighted work. Unlike subsection (a), which prohibits the circumvention of access control technologies, subsection (b) does not, by itself, prohibit the circumvention of effective technological copyright protection measures. It is anticipated that most acts of circumventing a technological copyright protection measure will occur in the course of conduct which itself implicates the copyright owners rights under title 17. This subsection is not intended in any way to enlarge or diminish those rights. Thus, for example, where a copy control technology is employed to prevent the unauthorized reproduction of a work, the circumvention of that technology would not itself be actionable under section 1201, but any reproduction of the work that is thereby facilitated would remain subject to the protections embodied in title 17.

Paralleling paragraph (a)(2), above, paragraph (b)(1) seeks to provide meaningful protection and enforcement of copyright owners' use of technological protection measures to protect their rights under title 17 by prohibiting the act of making or selling the technological means to overcome these protections and thereby facilitate copyright infringement. Paragraph (b)(1) prohibits manufacturing, importing, offering to the public, providing, or otherwise

30

trafficking in certain technologies, products, services, devices, components, or parts thereof that can be used to circumvent a technological protection measure that effectively protects a right of a copyright owner under title 17 in a work or portion thereof. Again, for a technology, product, service, device, component, or part thereof to be prohibited under this subsection, one of three conditions must be met. It must: (1) be primarily designed or produced for the purpose of circumventing; (2) have only limited commercially significant purpose or use other than to circumvent; or (3) be marketed by the person who manufactures it, imports it, offers it to the public, provides it, or otherwise traffics in it, or by another person acting in concert with that person with that person's knowledge, for use in circumventing a technological protection measure that effectively protects the right of a copyright owner under title 17 in a work or a portion thereof. Like paragraph (a)(2), this provision is designed to protect copyright owners, and simultaneously allow the development of technology.

Paragraph (b)(2) defines certain terms used in subsection (b). Subparagraph (b)(2)(A) defines the term "circumvent protection afforded by a technological protection measure" as "avoiding, bypassing, removing, deactivating, or otherwise impairing a technological protection measure." Subparagraph (b)(2)(B) provides that a technological protection measure "effectively protects a right of a copyright owner under title 17" if the measure, in the ordinary course of its operation, prevents, restricts, or otherwise limits the exercise of a right under Title 17 of a copyright owner.

*Subsection (c)—Importation.*—Subsection (c) prohibits the importation, sale for importation, or sale within the United States after importation by the owner, importer or consignee of any technology, product, service, device, component, or part thereof covered by subsections (a) or (b). This paragraph further provides that violations of this provision are actionable under section 337 of the Tariff Act (19 U.S.C. 1337), which authorizes actions by the International Trade Commission against unfair import practices.

*Subsection (d)—Other rights, etc., not affected.*—Subsection (d) sets forth several provisions clarifying the scope of section 1201. Paragraph (d)(1) provides that section 1201 shall not have any effect on rights, remedies, limitations, or defenses to copyright infringement, including fair use, under title 17. Paragraph (d)(2) provides that section 1201 shall not alter the existing doctrines of contributory or vicarious liability for copyright infringement in connection with any technology, product, service, device, component or part thereof. Together, these provisions are intended to ensure that none of the provisions in section 1201 affect the existing legal regime established in the Copyright Act and case law interpreting that statute.

Paragraph (d)(3) clarifies that nothing in section 1201 creates a mandate requiring manufacturers of consumer electronics, telecommunications, and computing products to design their products or their parts and components to respond to any particular technological measure employed to protect a copyrighted work. The provision also makes clear, however, that while the failure of a product to respond to a particular technological measure does not in and of itself create liability, neither does the failure of the product to re-

31

spond to a particular technological protection measure immunize those trafficking in the product from liability under section 1201(a)(2) or (b), if the tests of liability in those provisions are met.

*Subsection (e)—Exemption for nonprofit libraries, archives, and educational institutions.*—Subsection (e) provides a limited exemption from the prohibition on circumvention of technological protection measures contained in section 1201(a)(1) for qualified nonprofit libraries, archives, and educational institutions.

Paragraph (1) of this subsection allows a nonprofit library, nonprofit archives or nonprofit educational institution to obtain access to a copyrighted work for the sole purpose of making a good faith determination as to whether it wishes to acquire a copy, or portion of a copy, of that work in order to engage in conduct permitted under the Copyright Act, such as a fair use under section 107. A qualifying institution may not gain access for a period of time longer than necessary to determine whether it wishes to obtain a copy, or portion of a copy, for such purposes, and the right to gain access shall not apply for any other purpose.

Paragraph (2) provides that the right to obtain access under this paragraph only applies when the nonprofit library, nonprofit archives, or nonprofit educational institution cannot obtain a copy of an identical work by other means, and such an entity may not use the exemption in this paragraph for commercial advantage or financial gain without penalty.

Paragraph (3) seeks to protect the legitimate interests of copyright owners by providing a civil remedy against a library, archive, or educational institution that violates section 1201(a) by gaining access to a commercially exploited copyrighted work and willfully and for the purpose of commercial advantage or financial gain failing to comply with the provisions of paragraph (1)(A) (requiring that a qualifying library, archive, or educational institution not retain the work for longer than necessary to make a good faith determination as to whether to acquire a copy or portion of the work) or paragraph (1)(B) (requiring that a qualifying library, archive, or educational institution not use the work to which it has gained access for any purpose other than to make a good faith determination as to whether to acquire a copy or portion of the work). Under this paragraph, a violator shall be subject to civil remedies under section 1203 for the first time it gains access in violation of section 1201(a) without complying with the requirements of paragraph (1). For subsequent offenses, the violator shall not only be subject to civil remedies under section 1203, but also lose the benefit of the exemption provided by this subsection.

Paragraph (4) provides that this subsection may not be used as a defense to the prohibitions on manufacturing or selling devices contained in sections 1201(a)(2) or 1202(b).

Finally, paragraph (5) provides that a library or archive, to be eligible for the exemption in paragraph (1), must maintain its collections open to the public and available, not only to researchers affiliated with the library or archives or with the institution of which it is a part, but also to other persons doing research in a specialized field.

*Subsection (f)—Law enforcement and intelligence activities.*—Subsection (f) creates an exception for the lawfully authorized inves-

32

tigative, protective, or intelligence activities of an officer, agent, or employee of, the United States, a State, or a political subdivision of a State, or of persons acting pursuant to a contract with such an entity. This exception will protect officers, agents, employees, or contractors of, or other persons acting at the direction of, a law enforcement or intelligence agency of the United States, a State, or a political subdivision of a State, who are performing lawfully authorized investigative, protective, or intelligence activities. This exception will also protect officers, agents, employees, or contractors of, or other persons acting at the direction of, elements or divisions of an agency or department of the United States, a State, or a political subdivision of a State, which does not have law enforcement or intelligence as its primary function, but who may nevertheless, in the course of lawfully authorized protective, intelligence, or criminal investigative activities, engage in actions otherwise prohibited by this bill. This exception only applies to individuals covered under this section when they are performing investigative, protective, or intelligence activities, within the scope of their duties and in furtherance of lawfully authorized activities.

*Subsections (g)–(j)—Interoperability of computer programs.*—Subsections (g) through (j) are intended to allow legitimate software developers to continue engaging in certain activities for the purpose of achieving interoperability to the extent permitted by law prior to the enactment of this chapter. The objective is to ensure that the effect of current case law interpreting the Copyright Act is not changed by enactment of this legislation for certain acts of identification and analysis done in respect of computer programs. See, *Sega Enterprises Ltd.* v. *Accolade, Inc.*, 977 F.2d 1510, 24 U.S.P.Q.2d 1561 (9th Cir. 1992.). The purpose of this section is to foster competition and innovation in the computer and software industry.

Subsection (g) permits the circumvention of access control technologies for the sole purpose of achieving software interoperability. For example, this subsection permits a software developer to circumvent an access control technology applied to a portion or portions of a program in order to perform the necessary steps to identify and analyze the information necessary to achieve interoperability. Subsection (g) permits the act of circumvention in only certain instances. First, the copy of the computer program which is the subject of the analysis must be lawfully acquired. That is the computer program must be acquired from a legitimate source, along with any necessary serial codes, passwords, or other such means as may be necessary to be able to use the program as it was designed to be used by a consumer of the product. The permitted acts must be limited to those elements of the program which must be analyzed to achieve the sole permitted purpose, which is interoperability of an independently created program with other programs. Interoperability is defined in subsection (j) as the ability of computer programs to exchange information, and for such programs mutually to use the information which has been exchanged. The resulting product must be a new and original work, in that it may not infringe the original computer program. In addition, the objective of the analysis must be to identify and extract such elements as are necessary to achieve interoperability which are not

33

otherwise available to the person. Finally, the goal of this section is to ensure that current law is not changed, and not to encourage or permit infringement. Thus, each of the acts undertaken must avoid infringing the copyright of the author of the underlying computer program.

Subsection (h) recognizes that to accomplish the acts permitted under subsection (g) a person may, in some instances, have to make and use certain tools. In most instances these will be generally available tools that programmers use in developing computer programs, such as compilers, trace analyzers and disassemblers, which are not prohibited by this section. In certain instances, it is possible that a person may have to develop special tools to achieve the permitted purpose of interoperability. Thus, this provision creates an exception to the prohibition on making circumvention tools contained in subsections 1201(a)(2) and (b). These tools can be either software or hardware. Again, this provision is limited by a general admonition not to act in a way that constitutes infringing activity.

Subsection (i) recognizes that developing complex computer programs often involves the efforts of many persons. For example, some of these persons may be hired to develop a specific portion of the final product. For that person to perform these tasks, some of the information acquired through the permitted analysis, and the tools to accomplish it, may have to be made available to that person. This subsection allows developers of independently created software to rely on third parties either to develop the necessary circumvention tools or to identify the necessary information to achieve interoperability. The ability to rely on third parties is particularly important for small software developers who do not have the capability of performing these functions in-house. This provision permits such sharing of information and tools. Recognizing, however, that making such circumvention information or tools generally available would undermine the objectives of this Act, this section imposes strict limitations. Such acts of sharing information and tools is permitted solely for the purpose of achieving interoperability of an independently created computer program with other programs. If a person makes this information available for a purpose other than to achieve interoperability of an independently created computer program with other programs, that action is a violation of this Act. In addition, these acts are permitted only to the extent that doing so does not constitute infringement under this title, or violate applicable law other than this title.

Subsection (j) defines "interoperability" as the ability of computer programs to exchange information, and for such programs mutually to use the information which has been exchanged. The seamless exchange of information is an key element of creating such an interoperable independently created program. This provision applies to computer programs as such, regardless of their medium of fixation and not to works generally, such as music or audiovisual works, which may be fixed and distributed in digital form. Accordingly, since the goal of interoperability is the touchstone of the exceptions contained in subsections 1201(g) through (j), nothing in those subsections can be read to authorize the circumvention of any technological protection measure that controls access to any work other

34

than a computer program, or the trafficking in products or services for that purpose.

*Subsection (k).*—The Committee was concerned that section 1201(a) might inadvertently make it unlawful for parents to protect their children from pornography and other harmful material available on the Internet, or have unintended legal consequences for manufacturers of products designed solely to enable parents to protect their children in this fashion. Subsection (k) addresses these concerns.

*Section 1202: Integrity of copyright management information*

Section 1202 implements the obligation contained in Article 12 of the WIPO Copyright Treaty and Article 19 of the WIPO Performances and Phonograms Treaty that Contracting Parties "provide adequate and effective legal remedies" against any person who knowingly and without authority removes or alters copyright management information (CMI), or who distributes, imports, broadcasts, or communicates to the public, works or copies of works knowing that such information has been removed or altered without authority.[22] This section does not mandate the use of CMI, nor does it prescribe the choice of any particular type of CMI for those who do use it. It merely protects the integrity of CMI if a party chooses to use it in connection with a copyrighted work by prohibiting its deliberate deletion or alteration. Furthermore, this section imposes liability for specified acts. It does not address the question of liability for persons who manufacture devices or provide services.

*Subsection (a)—False copyright management information.*—Subsection (a) establishes a general prohibition against intentionally providing false copyright management information, as defined in subsection (c), and against distributing or importing for distribution false copyright management information. There are two prerequisites that must be met for these prohibitions to be violated:

---

[22] Article 12 of the WIPO Copyright Treaty provides:

(1) Contracting Parties shall provide adequate and effective legal remedies against any person knowingly performing any of the following acts knowing, or with respect to civil remedies having reasonable grounds to know, that it will induce, enable, facilitate or conceal an infringement of any right covered by this Treaty or the Berne Convention:

(i) to remove or alter any electronic rights management information without authority;

(ii) to distribute, import for distribution, broadcast or communicate to the public, without authority, works or copies of works knowing that electronic rights management information has been removed or altered without authority.

(2) As used in this Article, "rights management information" means information which identifies the work, the author of the work, the owner of any right in the work, or information about the terms and conditions of use of the work, and any numbers or codes that represent such information, when any of these items of information is attached to a copy of a work or appears in connection with the communication of the work to the public.

Article 19 of the WIPO Performances and Phonograms Treaty provides:

(1) Contracting Parties shall provide adequate and effective legal remedies against any person knowingly performing any of the following acts knowing, or with respect to civil remedies having reasonable grounds to know, that it will induce, enable, facilitate or conceal an infringement of any right covered by this Treaty:

(i) to remove or alter any electronic rights management information without authority;

(ii) to distribute, import for distribution, broadcast, communicate or make available to the public, without authority, performances, copies of fixed performances or phonograms knowing that electronic rights management information has been removed or altered without authority.

(2) As used in this Article, "rights management information" means information which identifies the performer, the performance of the performer, the producer of the phonogram, the phonogram, the owner of any right in the performance or phonogram, or information about the terms and conditions of use of the performance or phonogram, and any numbers or codes that represent such information, when any of these items of information is attached to a copy of a fixed performance or a phonogram or appears in connection with the communication or making available of a fixed performance or a phonogram to the public.

35

(1) the person providing, distributing or importing the false CMI must know the CMI is false, and (2) the person providing, distributing, or importing the false CMI must do so with the intent to induce, enable, facilitate or conceal an infringement of any right under title 17.

*Subsection (b)—Removal or alteration of copyright management information.*—Subsection (b) establishes general prohibitions against removing or altering CMI, against distributing or importing for distribution altered CMI, and against distributing, importing for distribution or publicly performing works in which CMI has been removed. There are three specific acts prohibited if they are committed without the authority of the copyright owner or the law, and if they are done knowing, or with respect to civil remedies under section 1203, having reasonable grounds to know, that they will induce, enable, facilitate or conceal a copyright infringement: (1) intentionally removing or altering CMI; (2) distributing or importing for distribution CMI knowing that it has been altered without the authority of the copyright owner or the law; or (3) distributing, importing for distribution, or publicly performing works, copies of works, or phonorecords knowing that CMI has been removed or altered without the authority of the copyright owner or the law.

*Subsection (c)—Definition.*—Subsection (c) defines "copyright management information." To fall within the definition, there is a threshold requirement that the information be conveyed in connection with copies or phonorecords, performances or displays of the copyrighted work. The term "conveyed" is used in its broadest sense and is not meant to require any type of transfer, physical or otherwise, of the information. It merely requires that the information be accessible in conjunction with, or appear with, the work being accessed. Such information is "copyright management information" as defined in this subsection if it falls within the categories enumerated in paragraphs (1) through (6).

Paragraph (1) describes information that identifies the copyrighted work, including the title of a work. This paragraph makes clear that the information set forth on a notice of copyright is included within the definition of copyright management information.

Paragraph (2) describes information that identifies the author of the work.

Paragraph (3) describes information that identifies the copyright owner.

Paragraph (4) describes information that identifies a performer whose performance is fixed in a work, other than an audiovisual work. Information that identifies such a performer is excluded from the definition of CMI, however, when such information is conveyed by a radio or television broadcast station in connection with the public performance of a work.

Paragraph (5) describes, in the case of an audiovisual work, information that identifies the writer, performer, or director who is credited in the work. Paralleling paragraph (4), information that identifies such a writer, performer, or director is excluded from the definition of CMI when such information is conveyed by a radio or television broadcast station in connection with the public performance of a work.

36

Paragraph (6) describes numbers and symbols which refer to or represent the above information. As noted above, both the WIPO Copyright Treaty and the WIPO Performances and Phonograms Treaty require that numbers and symbols be included within the definition of CMI. Links, such as embedded pointers and hypertext links, to the above information are also included. The phrase "links to such information" was included because removing or altering a link to the information will have the same adverse effect as removing or altering the information itself.

Finally, paragraph (7) permits the Register of Copyrights to prescribe by regulation other information that, if conveyed in connection with a work, is to be protected as copyright management information. To protect the privacy of users of copyrighted works, however, the Register of Copyrights may not include within the definition of CMI any information concerning users of copyrighted works.

Consistent with the proviso contained in paragraph (7), it should be noted that the definition of "copyright management information" does not encompass, nor is it intended to encompass, tracking or usage information relating to the identity of users of the works. The definition of CMI is limited by this subsection to the types of information listed, and it would be inconsistent with the purpose and construction of this bill, and contrary to the protection of privacy to include, tracking and usage information within the definition of CMI.

*Subsection (d)—Law enforcement and intelligence activities.*—Section 1202(d) creates an exception for the lawfully authorized investigative, protective, or intelligence activities of an officer, agent, or employee of, the United States, a State, or a political subdivision of a State, or of persons acting pursuant to a contract with such an entity. This exception will protect officers, agents, employees, or contractors of, or other persons acting at the direction of, a law enforcement or intelligence agency of the United States, a State, or a political subdivision of a State, who are performing lawfully authorized investigative, protective, or intelligence activities. This exception will also protect officers, agents, employees, or contractors of, or other persons acting at the direction of, elements or divisions of an agency or department of the United States, a State, or a political subdivision of a State, which does not have law enforcement or intelligence as its primary function, but who may nevertheless, in the course of lawfully authorized protective, intelligence, or criminal investigative activities, engage in actions otherwise prohibited by this section. This exception only applies to individuals covered under this subsection when they are performing investigative, protective, or intelligence activities, within the scope of their duties and in furtherance of lawfully authorized activities.

*Subsection (e)—Limitations on Liability.*—Subsection (e) recognizes special problems that certain broadcasting entities may have with the transmission of copyright management information. Under this subsection, radio and television broadcasters, cable systems, and persons who provide programming to such broadcasters or systems, who do not intend to induce, enable, facilitate or conceal infringement (eligible persons) may be eligible for a limitation on liability for violation of the copyright management information provisions of subsection (b) in certain, limited circumstances.

37

In the case of an analog transmission, paragraph (1) provides that an eligible person will not be held liable for violating provisions of subsection (b) if it is not "technically feasible" for that person to avoid the violation or if avoiding the violation would "create an undue financial hardship." Avoiding a violation of subsection (b) with respect to the transmission of credits that are of an excessive duration in relation to standard practice in the relevant industries (for instance, the motion picture and television broadcast industries) is one example of an activity that may "create an undue financial hardship" under paragraph (1). As indicated above, this limitation on liability applies only if such person did not intend, by engaging in such activity, to induce, enable, facilitate or conceal infringement.

Paragraph (2) provides a limitation on liability in the case of a digital transmission, and contemplates voluntary digital transmission standards for the placement of copyright management information. Separate standards are likely to be set for the location of copyright management information in different categories of works. For instance, the standard(s) for the location of the name of the copyright owner in a sound recording or musical work to be broadcast by radio stations may differ—and be set in a separate standard-setting process(es)—from the standard for the location of such information in a motion picture to be broadcast by television stations.

Paragraph (2)(A) provides that if a digital transmission standard for the placement of copyright management information for a category of works is set in a voluntary, consensus standard-setting process involving a representative cross-section of the relevant copyright owners and relevant transmitting industry, including but not limited to representatives of radio or television broadcast stations, cable systems, and copyright owners of a category of works that are intended for public performance by such stations or systems, an eligible person will not be liable for a violation of subsection (b) if the copyright management information involved in the violation was not placed in a location specified by the standard for that information. The eligible person, however, cannot qualify for this limitation on liability if that person was responsible for the nonconforming placement.

Paragraph (2)(B)(i) provides that until such a standard is set for a category of works, an eligible person will not be liable for a violation of subsection (b) if the transmission of the copyright management information would cause a perceptible visual or aural degradation of the digital signal. Paragraph (2)(B)(ii) provides that during this time period before a standard is set, an eligible person also will not be liable if the digital transmission of the information would conflict with an applicable government regulation or industry standard relating to transmission of information in a digital signal, such as the regulation requiring the placement of closed captioning in line 21 of the vertical blanking interval (47 C.F.R. 79.1, implementing 47 U.S.C. 613). For purposes of this paragraph, however, the applicable industry-wide standard must be of a type specified in paragraphs (2)(B)(ii)(II) or (III). The first type, defined in paragraph (2)(B)(ii)(II), includes only those standards that were adopted by a voluntary, consensus standards body, such as the Ad-

38

vanced Television Systems Committee, before the effective date of section 1202. The other type, defined in paragraph (2)(B)(ii)(III), includes only those standards adopted in a voluntary, consensus standards-setting process open to participation by groups, including but not limited to a representative cross-section of radio or television broadcast stations, cable systems, and copyright owners of a category of works that are intended for public performance by such stations or systems.

*Section 1203—Civil remedies*

*Subsection (a)—Civil actions.*—Subsection (a) sets forth the general proposition that civil remedies are available for violations of sections 1201 and 1202. This paragraph establishes the jurisdiction for such civil actions as the "appropriate U.S. district court" and limits standing to bring a civil action to those persons injured by a violation of section 1201 or 1202.

*Subsection (b)—Powers of the court.*—Subsection (b) sets out the powers of the court that hears the case. Paragraph (1) authorizes the court to grant temporary and permanent injunctions on such terms as it deems reasonable to prevent or restrain a violation of section 1201 or 1202. Paragraph (2) authorizes the court to order the impounding of any device or product that is in the custody or control of the alleged violator and that the court has reasonable cause to believe was involved in a violation. Under paragraph (3), the court may award damages as provided in subsection (c). Paragraph (4) authorizes the court to allow the recovery of costs by or against any party other than the United States or an officer thereof. Under paragraph (5), the court may award reasonable attorneys' fees to the prevailing party. Finally, paragraph (6) authorizes the court to order the remedial modification or the destruction of any device or product involved in a violation of section 1201 or 1202 that is in the custody or control of the violator or has been impounded under paragraph (2).

*Subsection (c)—Award of damages.*—Subsection (c) is divided into five paragraphs, each of which addresses the awarding of damages to the prevailing party.

Paragraph (1) establishes the general proposition that a person who violates section 1201 or 1202 is liable for either actual damages and any additional profits of the violator, or statutory damages.

Paragraphs (2) and (3) specify that the complaining party may finalize a choice between the two types of damage awards at any time until the final judgment is entered.

Paragraph (2) provides that, when the prevailing party opts for actual damages, the court shall award to that party the actual damages suffered by the party as a result of the violations, as well as any profits of the violator that are attributable to the violation and are not taken into account in computing the actual damages.

Paragraph (3) provides different statutory award amounts depending upon whether the civil action involves a section 1201 or 1202 violation. When the violation is a section 1201 violation and the prevailing party opts to recover an award of statutory damages, the prevailing party will be awarded statutory damages of not less than $200 or more than $2,500 per act of circumvention, device,

39

product, component, offer, or performance of service. When the violation is a section 1202 violation and the prevailing party opts to recover an award of statutory damages, the prevailing party will be awarded statutory damages of not less than $2,500 or more than $25,000 for each violation.

Paragraphs (4) and (5) set forth circumstances in which it would be appropriate to increase or decrease a damage award.

Paragraph (4) provides for an increased damage award when the violator is a repeat offender. Specifically, when the prevailing party establishes that a person violated section 1201 or 1202 within three years after a final judgment was entered against that person for another such violation, the award of damages may be increased to a sum of up to triple the amount that would otherwise be awarded.

Paragraph (5)(A) provides that, when a violator of section 1201 or 1202 was not aware and had no reason to believe that its acts constituted a violation, the damage award *may* be reduced or remitted. Paragraph (5)(B) requires the reduction or remission of damages in certain circumstances by providing that, when a nonprofit library, nonprofit archives, or nonprofit educational institution violator of section 1201 or 1202 was not aware and had no reason to believe that its acts constituted a violation, the damage award *shall* be remitted entirely.

*Section 1204—Criminal offenses and penalties*

*Subsection (a)—In general.*—Subsection (a) provides for the availability of criminal penalties for violations of sections 1201 and 1202. The standard applicable under this subsection is identical to the standard used in section 506 of the Copyright Act to establish criminal violations. Subsection (a)(1) sets forth the penalties available for a criminal violation of sections 1201 and 1202 as "not more than $500,000 or imprisonment for not more than five years, or both" for the first offense. If the person who is found guilty of criminal violation of sections 1201 or 1202 is a repeat offender, subsection (a)(2) provides that penalties may be increased to "not more than $1,000,000 or imprisonment for not more than ten years, or both."

*Subsection (b)—Limitation for nonprofit library, archives, or educational institution.*—Subsection (b) exempts completely any nonprofit library, nonprofit archives or nonprofit educational institution from the criminal penalties contained in subsection (a).

*Subsection (c)—Statute of limitations.*—Subsection (c) provides for a 5-year statute of limitations for criminal offenses under chapter 12.

*Section 104. Conforming amendment*

This section amends the table of chapters for title 17 to reflect the addition of new chapter 12.

*Section 105. Effective date*

*Subsection (a)—In general.*—Subsection (a) establishes the effective date of the proposed amendments in this bill as the date the bill is enacted into law, subject to the exceptions enumerated in subsection (b).

40

*Subsection (b)—Amendments relating to certain international agreements.*—Subsection (b) sets forth several exceptions to the effective date established by subsection (a). These exceptions only apply to the technical amendments that are proposed in section 102 of the bill. Section 105 of the bill changes the effective date of any provision in section 102 of the bill that specifically refers to the WIPO Copyright Treaty or the WIPO Performances and Phonograms Treaty from the date the bill is enacted into law to the date the Treaty enters into force.

These exceptions are necessary because, as of the drafting of this bill, the two treaties have not entered into force and will not do so until three months after 30 States deposit their instruments of ratification or accession with the Director General of WIPO. The exceptions ensure that the amendments that refer specifically to the two treaties do not become effective until the treaties themselves become effective. In addition, it was necessary to refer to each treaty separately in this section, because it is possible that the two treaties may enter into force at different times and the amendments particular to each treaty had to be grouped together to ensure that the provisions relating specifically to one treaty do not become effective once the other treaty enters into force. Finally, it was necessary to add the phrase "with respect to the United States" in paragraphs (1) and (2) to ensure that, if the Treaties enter into force before the United States deposits its instrument of accession, the United States does not extend benefits to Member States of these Treaties until the United States becomes party to the Treaties.

### TITLE II—INTERNET COPYRIGHT INFRINGEMENT LIABILITY

The liability of online service providers and Internet access providers for copyright infringements that take place in the online environment has been a controversial issue. Title II of the Digital Millennium Copyright Act, the Internet Copyright Infringement Liability Clarification Act, addresses this complex issue. Title II preserves strong incentives for service providers and copyright owners to cooperate to detect and deal with copyright infringements that take place in the digital networked environment. At the same time, it provides greater certainty to service providers concerning their legal exposure for infringements that may occur in the course of their activities.

New section 512 contains limitations on service providers' liability for five general categories of activity set forth in subsections (a) through (d) and subsection (f). As provided in subsection (k), section 512 is not intended to imply that a service provider is or is not liable as an infringer either for conduct that qualifies for a limitation of liability or for conduct that fails to so qualify. Rather, the limitations of liability apply if the provider is found to be liable under existing principles of law.

The limitations in subsections (a) through (d) protect qualifying service providers from liability for all monetary relief for direct, vicarious and contributory infringement. Monetary relief is defined in subsection (j)(2) as encompassing damages, costs, attorneys' fees, and any other form of monetary payment. These subsections also limit injunctive relief against qualifying service providers to the ex-

41

tent specified in subsection (i). To qualify for these protections, service providers must meet the conditions set forth in subsection (h), and service providers' activities at issue must involve a function described in subsection (a), (b), (c), (d) or (f), respectively. The liability limitations apply to networks "operated by or for the service provider," thereby protecting both service providers who offer a service and subcontractors who may operate parts of, or an entire, system or network for another service provider.

*Section 201. Short title*

This title may be cited as the "Internet Copyright Infringement Liability Clarification Act of 1998."

*Section 202. Limitations on liability for Internet copyright infringement*

This section amends chapter 5 of the Copyright Act (17 U.S.C. 501, *et. seq.*) to create a new section 512, titled "Liability of service providers for online infringement of copyright."

*Subsection (a)—Digital network communications.*—Subsection (a) applies to communications functions associated with sending digital communications of others across digital networks, such as the Internet and other online networks. It establishes a limitation on liability for infringements that may occur in the provision of services falling within the definition of subsection (j)(1)(A). The limitations on injunctive relief set forth in subsection (i)(1)(B) are applicable when the functions at issue fall within the provisions of subsection (a), and the service provider meets the threshold criteria of subsection (h).[23]

Subsection (a) applies to service providers transmitting, routing, or providing connections for material, and some forms of intermediate and transient storage of material in the course of performing these functions. For example, in the course of moving packets of information across digital online networks, many intermediate and transient copies of the information may be made in routers and servers along the way. Such copies are created as an automatic consequence of the transmission process. In this context, "intermediate and transient" refers to such a copy made and/or stored in the course of a transmission, not a copy made or stored at the points where the transmission is initiated or received.

The use of the term "transmitting" throughout section 512 is not intended to be limited to transmissions of "a performance or display" of "images or sounds" within the meaning of section 101 of the Copyright Act.

Subsections (a)(1) through (5) limit the range of activities that qualify under this subsection to ones in which a service provider plays the role of a "conduit" for the communications of others. This limitation on liability applies if: (1) the communication was initiated by or at the direction of a person other than the service provider; (2) it is carried out through an automatic technical process without selection of the material by the service provider; (3) the service provider does not select the recipients of the material except as an automatic response to the request of another; (4) no copy

---

[23] These threshold criteria apply to all of the liability limitations contained in section 512.

42

of the material made in the course of intermediate or transient storage is maintained on the system or network so that it is ordinarily accessible to other than the anticipated recipients, and no copy is maintained on the system or network in a manner ordinarily accessible to the anticipated recipients for a longer period than is reasonably necessary for the communication; and (5) the content (but not necessarily the form) of the material is not modified in the course of transmission. Thus, for example, an e-mail transmission may appear to the recipient without bolding or italics resulting from format codes contained in the sender's message.

The Committee intends the term "selection of the material" in subsection (a)(2) to reflect an editorial function of determining what material to send, or the specific sources of material to place online (*e.g.*, a radio station), rather than "an automatic technical process" of responding to a command or request, such as one from a user, an Internet location tool, or another network. The term "automatic response to the request of another" is intended to encompass a service provider's actions in responding to requests by a user or other networks, such as requests to forward e-mail traffic or to route messages to a mailing list agent (such as a Listserv) or other discussion group. The Committee intends subsection (a)(4) to cover copies made of material while it is *en route* to its destination, such as copies made on a router or mail server, storage of a web page in the course of transmission to a specific user, store and forward functions, and other transient copies that occur en route. The term "ordinarily accessible" is intended to encompass stored material that is routinely accessible to third parties. For example, the fact that an illegal intruder might be able to obtain access to the material would not make it ordinarily accessible to third parties. Neither, for example, would occasional access in the course of maintenance by service provider personnel, nor access by law enforcement officials pursuant to subpoena make the material "ordinarily accessible." However, the term does not include copies made by a service provider for the purpose of making the material available to other users. Such copying is addressed in subsection (b).

*Subsection (b)—System caching.*—Subsection (b) applies to a different form of intermediate and temporary storage than is addressed in subsection (a). In terminology describing current technology, this storage is a form of "caching," which is used on some networks to increase network performance and to reduce network congestion generally, as well as to reduce congestion and delays to popular sites. This storage is intermediate in the sense that the service provider serves as an intermediary between the originating site and ultimate user. The material in question is stored on the service provider's system or network for some period of time to facilitate access by users subsequent to the one who previously sought access to it.

For subsection (b) to apply, the material must be made available on an originating site, transmitted at the direction of another person through the system or network operated by or for the service provider to a different person, and stored through an automatic technical process so that users of the system or network who subsequently request access to the material from the originating site may obtain access to the material from the system or network.

43

Subsections (b)(1) through (b)(5) further refine the circumstances under which subsection (b) applies. Subsection (b)(1) provides that the material must be transmitted to subsequent users without modification to its content in comparison to the way it was originally transmitted from the originating site. The Committee intends that this restriction apply, for example, so that a service provider who caches material from another site does not change the advertising associated with the cached material on the originating site without authorization from the originating site.

Subsection (b)(2) limits the applicability of the subsection to circumstances where the service provider complies with certain updating commands.

Subsection (b)(3) provides that the service provider shall not interfere with the ability of certain technology that is associated with the work by the operator of the originating site to return to the originating site information, such as user "hit" counts, that would have been available to the site had it not been cached. The technology must: (i) not significantly interfere with the performance of the storing provider's system or network or with intermediate storage of the material; (ii) be consistent with generally accepted industry standard communications protocols applicable to Internet and online communications, such as those approved by the Internet Engineering Task Force and the World Wide Web Consortium; and (iii) not extract information beyond that which would have been obtained had the subsequent users obtained access to the material directly on the originating site.

Subsection (b)(4) applies to circumstances in which the originating site imposes a prior condition on access.

Subsection (b)(5) establishes a notification and take down procedure for cached material modeled on the procedure under subsection (c). However, this take down obligation does not apply unless the material has previously been removed from the originating site, or the party submitting the notification has obtained a court order for it to be removed from the originating site and notifies the service provider's designated agent of that order. This proviso has been added to subsection (b)(5) because storage under subsection (b) occurs automatically and unless infringing material has been removed from the originating site, the infringing material would ordinarily simply be re-cached.

*Subsection (c)—Information stored on service providers.*—Subsection (c) limits the liability of qualifying service providers for claims of direct, vicarious and contributory infringement for storage at the direction of a user of material that resides on a system or network controlled or operated by or for the service provider. Examples of such storage include providing server space for a user's web site, for a chatroom, or other forum in which material may be posted at the direction of users. Subsection (c) defines the scope of this limitation on liability. It also sets forth procedural requirements that copyright owners or their agents and service providers must follow with respect to notifications of claimed infringement under subsection (c)(3). Information that resides on the system or network operated by or for the service provider through its own acts or decisions and not at the direction of a user does not fall within the liability limitation of subsection (c).

44

*Subsection (c)(1)—In general.*—Subsection (c)(1)(A) sets forth the applicable knowledge standard. This standard is met either by actual knowledge of infringement or in the absence of such knowledge by awareness of facts or circumstances from which infringing activity is apparent. The term "activity" is intended to mean activity using the material on the system or network. The Committee intends such activity to refer to wrongful activity that is occurring at the site on the provider's system or network at which the material resides, regardless of whether copyright infringement is technically deemed to occur at that site or at the location where the material is received. For example, the activity at an online site offering audio or video may be unauthorized public performance of a musical composition, a sound recording, or an audio-visual work, rather than (or in addition to) the creation of an unauthorized copy of any of these works.

Subsection (c)(1)(A)(ii) can best be described as a "red flag" test. As stated in subsection (l), a service provider need not monitor its service or affirmatively seek facts indicating infringing activity (except to the extent consistent with a standard technical measure complying with subsection (h)), in order to claim this limitation on liability (or, indeed any other limitation provided by the legislation). However, if the service provider becomes aware of a "red flag" from which infringing activity is apparent, it will lose the limitation of liability if it takes no action. The "red flag" test has both a subjective and an objective element. In determining whether the service provider was aware of a "red flag," the subjective awareness of the service provider of the facts or circumstances in question must be determined. However, in deciding whether those facts or circumstances constitute a "red flag"—in other words, whether infringing activity would have been apparent to a reasonable person operating under the same or similar circumstances—an objective standard should be used.

Subsection (c)(1)(A)(iii) provides that once a service provider obtains actual knowledge or awareness of facts or circumstances from which infringing material or activity on the service provider's system or network is apparent, the service provider does not lose the limitation of liability set forth in subsection (c) if it acts expeditiously to remove or disable access to the infringing material. Because the factual circumstances and technical parameters may vary from case to case, it is not possible to identify a uniform time limit for expeditious action.

Subsection (c)(1)(B) sets forth the circumstances under which a service provider would lose the protection of subsection (c) by virtue of its benefit from and control over infringing activity. In determining whether the financial benefit criterion is satisfied, courts should take a common-sense, fact-based approach, not a formalistic one. In general, a service provider conducting a legitimate business would not be considered to receive a "financial benefit directly attributable to the infringing activity" where the infringer makes the same kind of payment as non-infringing users of the provider's service. Thus, receiving a one-time set-up fee and flat periodic payments for service from a person engaging in infringing activities would not constitute receiving a "financial benefit directly attributable to the infringing activity." Nor is subparagraph (B) intended