45

to cover fees based on the length of the message (per number of bytes, for example) or by connect time. It would however, include any such fees where the value of the service lies in providing access to infringing material.

Subsection (c)(1)(C) establishes that in cases where a service provider is notified of infringing activity by a copyright owner or its authorized agent, in accordance with the notification procedures of subsection (c)(3), the limitation on the service provider's liability shall be maintained only if the service provider acts expeditiously either to remove the infringing material from its system or to prevent further access to the infringing material on the system or network. This "notice and takedown" procedure is a formalization and refinement of a cooperative process that has been employed to deal efficiently with network-based copyright infringement.

Section 512 does not require use of the notice and take-down procedure. A service provider wishing to benefit from the limitation on liability under subsection (c) must "take down" or disable access to infringing material residing on its system or network of which it has actual knowledge or that meets the "red flag" test, even if the copyright owner or its agent does not notify it of a claimed infringement. On the other hand, the service provider is free to refuse to "take down" the material or site, even after receiving a notification of claimed infringement from the copyright owner; in such a situation, the service provider's liability, if any, will be decided without reference to section 512(c). For their part, copyright owners are not obligated to give notification of claimed infringement in order to enforce their rights. However, neither actual knowledge nor awareness of a red flag may be imputed to a service provider based on information from a copyright owner or its agent that does not comply with the notification provisions of subsection (c)(3), and the limitation of liability set forth in subsection (c) may apply.

*Subsection (c)(2)—Designated agent.*—Subsection (c)(2) provides that to qualify for the liability limitation of subsection (c), the service provider must designate an agent to receive notifications under subsection (c)(1)(C). The designation, provided to the Register of Copyrights, and made available on the service provider's web site is to contain certain information necessary to communicate with the service provider concerning allegedly infringing material or activity. The Register of Copyrights is directed to maintain a directory of designated agents available for inspection by the public, both on the web site of the Library of Congress, and in hard copy format on file at the Copyright Office. The Committee does not intend or anticipate that the Register will publish hard copies of the directory. The directory shall have entries for the name, address, telephone number and electronic mail address of an agent designated by service providers. The service provider's designation shall substantially comply with these elements.

*Subsection (c)(3)—Elements of notification.*—Subsection (c)(3) sets forth the procedures under which copyright owners and their agents may provide effective notification to a service provider of allegations of infringement on the provider's system or network. Subsection (c)(3)(A) requires that to count as an effective notification, the notification must be in writing and submitted to the service provider's designated agent.

46

Subsections (c)(3)(A)(i)–(vi) then set forth the information to be included in an effective notification. The standard against which a notification is to be judged is one of substantial compliance. Subsection (c)(3)(A)(i) provides that the notification must be signed by the copyright owner or its authorized agent to be effective. The requirement for signature, either physical or electronic, relates to the verification requirements of subsections (c)(3)(A)(v) and (vi). Subsection (c)(3)(A)(ii) requires that the copyright owner identify the copyrighted work alleged to be infringed. Where multiple works at a single online site are covered by a single notification, a representative list of such works at that site is sufficient. Thus, where a party is operating an unauthorized Internet jukebox from a particular site, it is not necessary for a compliant notification to list every musical composition or sound recording that has been or could be infringed at that site, so long as a representative list of those compositions or recordings is provided so that the service provider can understand the nature and scope of the infringement being claimed.

Subsection (c)(3)(A)(iii) requires that the copyright owner or its authorized agent provide the service provider with information reasonably sufficient to permit the service provider to identify and locate the allegedly infringing material. An example of such sufficient information would be a copy or description of the allegedly infringing material and the URL address of the location (web page) which is alleged to contain the infringing material. The goal of this provision is to provide the service provider with adequate information to find and address the allegedly infringing material expeditiously.

Subsection (c)(3)(A)(iv) requires that the copyright owner or its authorized agent provide reasonably sufficient identifying information concerning the owner or its agent who submits the notification, such as an address, telephone number, and if available an electronic mail address so that the service provider may contact the complaining party.

Subsection (c)(3)(A)(v) makes clear that the notification from complaining parties must contain a statement that the complaining party has a good faith belief that the use of the material in the manner complained of is not authorized by the copyright owner, or its agent, or the law.

Subsection (c)(3)(A)(vi) specifies that the notification must contain a statement that the information contained therein is accurate. The complaining party—whether the copyright owner, or an authorized representative—also must confirm under penalty of perjury, that it has authority to act on behalf of the owner of the exclusive right that is alleged to be infringed. The term "perjury" is used in the sense found elsewhere in the United States Code. See 28 U.S.C. 1746; 18 U.S.C. 1621.

Subsection (c)(3)(B) addresses the effect of notifications that do not substantially comply with the requirements of subsection (c)(3). Under this subsection, the court shall not consider such notifications as evidence of whether the service provider has actual knowledge, is aware of facts or circumstances, or has received a notification for purposes of subsection (c)(1)(A). However, a defective notice provided to the designated agent may be considered in evaluating

47

the service provider's knowledge or awareness of facts and circumstances, if (i) the complaining party has provided the requisite information concerning the identification of the copyrighted work, identification of the allegedly infringing material, and information sufficient for the service provider to contact the complaining party, and (ii) the service provider does not promptly attempt to contact the person making the notification or take other reasonable steps to assist in the receipt of notification that substantially complies with paragraph (3)(A). If the service provider subsequently receives a substantially compliant notice, the provisions of paragraph (1)(C) would then apply upon receipt of the notice.

The Committee intends that the substantial compliance standard in subsections (c)(2) and (c)(3) be applied so that technical errors (such as misspelling a name, supplying an outdated area code if the phone number is accompanied by an accurate address, or supplying an outdated name if accompanied by an e-mail address that remains valid for the successor of the prior designated agent or agent of a copyright owner) do not disqualify service providers and copyright owners from the protections afforded under subsection (c). The Committee expects that the parties will comply with the functional requirements of the notification provisions—such as providing sufficient information so that a designated agent or the complaining party submitting a notification may be contacted efficiently—in order to ensure that the notification and take down procedures set forth in this subsection operate smoothly.

*Subsection (d)—Information location tools.*—Subsection (d) applies to referring or linking users to an online location containing infringing material or infringing activity using information location tools. The reference to "infringing activity" is intended to refer to wrongful activity that is occurring at the location to which the link or reference refers, without regard to whether copyright infringement is technically deemed to occur at that location or at the location where the material is received. The term information location tools includes, for example: a directory or index of online sites or material such as a search engine that identifies pages by specified criteria, a reference to other online material such as a list of recommended sites, a pointer that stands for an Internet location or address, or a hypertext link which allows users to access material without entering its address.

Subsection (d) incorporates the notification and take down structure of subsection (c) and applies it to the provision of references and links to infringing sites. A service provider is entitled to the liability limitations of subsection (d) if it: (1) lacks actual knowledge of infringement on the other site, and is not aware of facts or circumstances from which infringing activity in that location is apparent; (2) does not receive a financial benefit directly attributable to the infringing activity on the site, where the service provider has the right and ability to control the infringing activity; and (3) responds expeditiously to remove or disable the reference or link upon receiving a notification of claimed infringement as described in subsection (c)(3). The notification procedures under subsection (d) follow those set forth in subsection (c). However, the information submitted by the complaining party under subsection (c)(3)(A)(iii) is identification of the reference or link to infringing

48

material or activity, and information reasonably sufficient to permit the service provider to locate that reference or link.

Section 512(d) provides a safe harbor that would limit the liability of a service provider that refers or links users to an online location containing infringing material or activity by using "information location tools," such as hyperlink directories and indexes. A question has been raised as to whether a service provider would be disqualified from the safe harbor based solely on evidence that it had viewed the infringing Internet site. If so, there is concern that online directories prepared by human editors and reviewers, who view and classify various Internet sites, would be denied eligibility to the information location tools safe harbor, in an unintended number of cases and circumstances. This is an important concern because such online directories play a valuable role in assisting Internet users to identify and locate the information they seek on the decentralized and dynamic networks of the Internet.

Like the information storage safe harbor in section 512(c), a service provider would qualify for this safe harbor if, among other requirements, it "does not have actual knowledge that the material or activity is infringing" or, in the absence of such actual knowledge, it is "not aware of facts or circumstances from which infringing activity is apparent." Under this standard, a service provider would have no obligation to seek out copyright infringement, but it would not qualify for the safe harbor if it had turned a blind eye to "red flags" of obvious infringement.

For instance, the copyright owner could show that the provider was aware of facts from which infringing activity was apparent if the copyright owner could prove that the location was clearly, at the time the directory provider viewed it, a "pirate" site of the type described below, where sound recordings, software, movies or books were available for unauthorized downloading, public performance or public display. Absent such "red flags" or actual knowledge, a directory provider would not be similarly aware merely because it saw one or more well known photographs of a celebrity at a site devoted to that person. The provider could not be expected, during the course of its brief cataloguing visit, to determine whether the photograph was still protected by copyright or was in the public domain; if the photograph was still protected by copyright, whether the use was licensed; and if the use was not licensed, whether it was permitted under the fair use doctrine.

The important intended objective of this standard is to exclude sophisticated "pirate" directories—which refer Internet users to other selected Internet sites where pirate software, books, movies, and music can be downloaded or transmitted—from the safe harbor. Such pirate directories refer Internet users to sites that are obviously infringing because they typically use words such as "pirate," "bootleg," or slang terms in their uniform resource locator (URL) and header information to make their illegal purpose obvious to the pirate directories and other Internet users. Because the infringing nature of such sites would be apparent from even a brief and casual viewing, safe harbor status for a provider that views such a site and then establishes a link to it would not be appropriate. Pirate directories do not follow the routine business practices of legitimate service providers preparing directories, and thus

49

evidence that they have viewed the infringing site may be all that is available for copyright owners to rebut their claim to a safe harbor.

In this way, the "red flag" test in section 512(d) strikes the right balance. The common-sense result of this "red flag" test is that online editors and catalogers would not be required to make discriminating judgments about potential copyright infringement. If, however, an Internet site is obviously pirate, then seeing it may be all that is needed for the service provider to encounter a "red flag." A provider proceeding in the face of such a red flag must do so without the benefit of a safe harbor.

Information location tools are essential to the operation of the Internet; without them, users would not be able to find the information they need. Directories are particularly helpful in conducting effective searches by filtering out irrelevant and offensive material. The Yahoo! directory, for example, currently categorizes over 800,000 online locations and serves as a "card catalogue" to the World Wide Web, which over 35,000,000 different users visit each month. Directories such as Yahoo!'s usually are created by people visiting sites to categorize them. It is precisely the human judgment and editorial discretion exercised by these cataloguers which makes directories valuable.

This provision is intended to promote the development of information location tools generally, and Internet directories such as Yahoo!'s in particular, by establishing a safe-harbor from copyright infringement liability for information location tool providers if they comply with the notice and takedown procedures and other requirements of subsection (d). The knowledge or awareness standard should not be applied in a manner which would create a disincentive to the development of directories which involve human intervention. Absent actual knowledge, awareness of infringement as provided in subsection (d) should typically be imputed to a directory provider only with respect to pirate sites or in similarly obvious and conspicuous circumstances, and not simply because the provider viewed an infringing site during the course of assembling the directory.

*Subsection (e)—Misrepresentations.*—Subsection (e) establishes a right of action against any person who knowingly misrepresents that material or activity online is infringing, or that material or activity was removed or disabled by mistake or misidentification under the "put back" procedure set forth in subsection (f). Actions may be brought under subsection (e) by any copyright owner, copyright owner's licensee, or by a service provider, who is injured by such misrepresentation, as a result of the service provider relying upon the misrepresentation in either taking down material or putting material back online. Defendants who make such a knowing misrepresentation are liable for any damages, including costs and attorneys" fees, incurred by any of these parties as a result of the service provider's reliance upon the misrepresentation. This subsection is intended to deter knowingly false allegations to service providers in recognition that such misrepresentations are detrimental to rights holders, service providers, and Internet users.

*Subsection (f)—Immunity for take downs and user put back procedure.*—Subsection (f) provides immunity to service providers for

50

taking down infringing material, and establishes a "put back" pro-
cedure under which subscribers may contest a complaining party's
notification of infringement provided under subsection (c)(3). The
put back procedures were added as an amendment to this title in
order to address the concerns of several members of the Committee
that other provisions of this title established strong incentives for
service providers to take down material, but insufficient protections
for third parties whose material would be taken down.

Subsection (f)(1) immunizes service providers from any claim
based on the service provider's good faith disabling of access to, or
removal of, material or activity claimed to be infringing. The immu-
nity also applies to material or activity that a service provider dis-
ables access to or removes based on facts or circumstances from
which infringing activity is apparent. This immunity applies even
if the material or activity is ultimately determined not to be in-
fringing. The purpose of this subsection is to protect service provid-
ers from liability to third parties whose material service providers
take down in a good faith effort to comply with the requirements
of subsection (c)(1).

Subsection (f)(2) establishes a "put back" procedure through an
exception to the immunity set forth in subsection (f)(1). The excep-
tion applies in a case in which the service provider, pursuant to a
notification provided under subsection (c)(1)(C) in accordance with
subsection (c)(3), takes down material that a subscriber has posted
to the system or network. In such instances, to retain the immu-
nity set forth in subsection (f)(1) with respect to the subscriber
whose content is taken down, the service provider is to follow up
to three steps.

Under subsection (f)(2)(A), the service provider is to take reason-
able steps to notify the subscriber promptly of the removal or dis-
abling of access to the subscriber's material. The Committee in-
tends that "reasonable steps" include, for example, sending an e-
mail notice to an e-mail address associated with a posting, or if
only the subscriber's name is identified in the posting, sending an
e-mail to an e-mail address that the subscriber submitted with its
subscription. The Committee does not intend that this subsection
impose any obligation on service providers to search beyond the
four corners of a subscriber's posting or their own records for that
subscriber in order to obtain contact information. Nor does the
Committee intend to create any right on the part of subscribers
who submit falsified information in their postings or subscriptions
to complain if a service provider relies upon the information sub-
mitted by the subscriber.

The subscriber may then file a counter notification, in accordance
with the requirements of subsection (f)(3), contesting the original
take down on grounds of mistake or misidentification of the mate-
rial and requesting "put back" of the material that the service pro-
vider has taken down. If a subscriber files a counter notification
with the service provider's designated agent, subparagraph (f)(2)
calls for the service provider to promptly forward a copy to the
complaining party who submitted the take down request. Finally,
under subsection (f)(2)(C), the service provider is to place the sub-
scriber's material back online or cease disabling access to it be-
tween 10 and 14 business days after receiving the counter notifica-

51

tion unless the designated agent receives a further notice from the
complaining party that the complaining party has filed an action
seeking a court order to restrain the subscriber from engaging in
infringing activity on the service provider's system or network with
regard to the material in question.

Subscriber counter notifications must substantially comply with
defined requirements set forth in subsection (f)(3). Notifications
shall be signed by the subscriber physically or by electronic signa-
ture; identify the material taken down and the location from which
it was taken down; include a statement under penalty of perjury
that the subscriber has a good faith belief that the material was
taken down as a result of mistake or misidentification of the mate-
rial; and include the subscriber's contact information, as well as a
statement consenting to the jurisdiction of a Federal district court
and to accept service of process from the complaining party or the
complaining party's agent. The substantial compliance standard is
the same as that set forth in subsections (c)(2) and (3).

Subsection (f)(4) is included to make clear the obvious proposition
that a service provider's compliance with the put back procedure
does not subject it to liability for copyright infringement or cause
it to lose its liability limitation with respect to the replaced mate-
rial.

*Subsection (g)—Identification of direct infringer.*—Subsection (g)
creates a procedure by which copyright owners or their authorized
agents who have submitted or will submit a request for notification
satisfying the requirements of subsection (c)(3)(A) may obtain an
order for identification of alleged infringers who are users of a serv-
ice provider's system or network. Under this procedure, the copy-
right owner or agent files three documents with the clerk of any
U.S. District Court: a copy of the notification, a proposed order, and
a sworn declaration that the purpose of the order is to obtain the
identity of an alleged infringer and that the information obtained
will only be used to protect the owner's rights under this Title.

Orders issued under subsection (g) shall authorize and order the
service provider expeditiously to disclose to the person seeking the
order information sufficient to identify the alleged infringer to the
extent such information is available to the service provider. The
Committee intends that an order for disclosure be interpreted as
requiring disclosure of information in the possession of the service
provider, rather than obliging the service provider to conduct
searches for information that is available from other systems or
networks. The Committee intends that such orders be expeditiously
issued if the notification meets the provisions of subsection (c)(3)(A)
and the declaration is properly executed. The issuing of the order
should be a ministerial function performed quickly for this provi-
sion to have its intended effect. After receiving the order, the serv-
ice provider shall expeditiously disclose to the copyright owner or
its agent the information required by the order to the extent that
the information is available to the service provider, regardless of
whether the service provider responds to the notification of claimed
infringement.

*Subsection (h)—Conditions for eligibility.*—Subsection (h) sets
forth two conditions that a service provider must satisfy to be eligi-

52

ble for the limitations of liability provided in subsections (a) through (d).

First, the service provider is expected to adopt and reasonably implement a policy for the termination in appropriate circumstances of the accounts of subscribers [24] of the provider's service who are repeat online infringers of copyright. The Committee recognizes that there are different degrees of online copyright infringement, from the inadvertent to the noncommercial, to the willful and commercial. In addition, the Committee does not intend this provision to undermine the principles of subsection (l) or the knowledge standard of subsection (c) by suggesting that a provider must investigate possible infringements, monitor its service, or make difficult judgments as to whether conduct is or is not infringing. However, those who repeatedly or flagrantly abuse their access to the Internet through disrespect for the intellectual property rights of others should know that there is a realistic threat of losing that access.

Second, a provider's system must accommodate, and not interfere with, standard technical measures used to identify or protect copyrighted works. The Committee believes that technology is likely to be the solution to many of the issues facing copyright owners and service providers in this digital age. For that reason, we have included subsection (h)(1)(B), which is intended to encourage appropriate technological solutions to protect copyrighted works. The Committee strongly urges all of the affected parties expeditiously to commence voluntary, interindustry discussions to agree upon and implement the best technological solutions available to achieve these goals.

Subsection (h)(1)(B) is explicitly limited to "standard technical measures" that have been developed pursuant to a broad consensus of both copyright owners and service providers in an open, fair, voluntary, multi-industry standards process. The Committee anticipates that these provisions could be developed both in recognized open standards bodies or in ad hoc groups, as long as the process used is open, fair, voluntary, and multi-industry and the measures developed otherwise conform to the requirements of the definition of standard technical measures set forth in paragraph (h)(2). A number of recognized open standards bodies have substantial experience with Internet issues. The Committee also notes that an ad-hoc approach has been successful in developing standards in other contexts, such as the process that has developed copy protection technology for use in connection with DVD.

*Subsection (i)—Injunctions.*—Subsection (i) defines the terms and conditions under which an injunction may be issued against a service provider that qualifies for the limitations of liability set forth in subsections (a) through (d), but is otherwise subject to an injunction under existing principles of law. Subsection (i)(1) limits the scope of injunctive relief that may be ordered against a qualifying

---

[24] By "subscribers," the Committee intends to include account holders who are parties with a business relationship to the service provider that justifies treating them as subscribers, for the purpose of section 512, even if no formal subscription agreement exists. Examples include students who are granted access to a university's system or network for digital online communications; employees who have access to their employer's system or network; or household members with access to a consumer online service by virtue of a subscription agreement between the service provider and another member of that household.

53

provider. Subsection (i)(2) identifies factors a court must consider in deciding whether to grant injunctive relief and in determining the appropriate scope of injunctive relief.

*Subsection (i)(1)—Scope of relief.*—Subsection (i)(1) is divided into two subparagraphs. Subparagraph (A) defines the scope of injunctive relief available against service providers who qualify for the limitations of liability set forth in subsections (b), (c) or (d). Only three forms of injunctive relief may be granted. First, the court may provide for the removal or blocking of infringing material or activity that is residing at a specific location on the provider's system or network. This is essentially an order to take the actions identified in subsection (c)(1)(C) to "remove, or disable access" to the material that is claimed to be infringing or to be the subject of infringing activity.

Second, the court may order the provider to terminate the accounts of a subscriber [25] of the provider's service who is engaging in infringing activity.

Subsection (i)(1)(A) permits the court, under appropriate circumstances, to enter a different form of injunction if the court considers it necessary to prevent or restrain infringement of specific copyrighted material that resides at an identified online location. If a court enters an injunction other than that contemplated in the first two clauses of subparagraph (A), the court must determine that the injunctive relief is the least burdensome to the service provider among those forms of relief that are comparably effective.

Subsection (i)(1)(B) sets forth a different set of remedies available for injunctions against service providers qualifying for the limitation on remedies set forth in subsection (a). In such cases, if a court determines that injunctive relief is appropriate, it may only grant injunctive relief in one or both of two specified forms. The first is an order to the service provider to terminate subscriber accounts that are specified in the order. The second form of relief, available in cases in which a provider is engaging in infringing activity relating to a foreign online location, is an order to take reasonable steps to block access to a specific, identified foreign online location. Such blocking orders are not available against a service provider qualifying under subsection (a) in the case of infringing activity on a site within the United States or its territories.

*Subsection (i)(2)—Considerations.*—Subsection (i)(2) sets forth mandatory considerations for the court beyond those that exist under current law. These additional considerations require the court to consider factors of particular significance in the digital online environment.

*Subsection (i)(3)—Notice and ex parte orders.*—Subsection (i)(3) prohibits most forms of ex parte injunctive relief (including temporary and preliminary relief) against a service provider qualifying for a liability limitation under section 512. A court may issue an order to ensure the preservation of evidence or where the order will have no material adverse effect on the operation of the provider's network.

*Subsection (j)—Definitions.*—Subsection (j) sets forth two definitions of the term "service provider" as used in this title, as well as

---

[25] See footnote 24.

54

a definition of the term "monetary relief." Only an entity that is performing the functions of a "service provider" is eligible for the limitations on liability set forth in section 512 with respect to those functions.

The first definition of a service provider, set forth in subsection (j)(1)(A), defines a narrower range of functions and applies to use of the term in subsection (a). As used in that subsection the term "service provider" means any entity offering the transmission, routing or providing of connections for digital online communications, between or among points specified by a user, of material of a user's choosing without modification to the content of the material as sent or received. This freestanding definition is derived from the definition of "telecommunications" found in 47 U.S.C. 153(48) in recognition of the fact that the functions covered by this definition are conduit activities, but the Committee has reworked the definition and written subsection (j)(1)(A) to make it appropriate for the Internet and online media. Thus, the subsection (j)(1)(A) definition includes the offering of transmission, routing or providing of connections. Although the transmission, routing or providing of connections may occur over digital or analog networks, the service provider must be providing such services for communications that are both digital and online. By online communications, the Committee intends to refer to communications over an interactive computer network, such as the Internet. Thus, over-the-air broadcasting, whether in analog or digital form, or a cable television system, or a satellite television service would not qualify, except to the extent it provides users with online access to a digital network such as the Internet, or it provides transmission, routing or connections to connect material to such a network, and then only with respect to those functions. An entity is not disqualified from being a "service provider" because it alters the form of the material, so long as it does not alter the content of the material. As a threshold matter, a service provider's performance of a particular function with respect to allegedly infringing activity falls within the (j)(1)(A) definition of service provider if and only if such function is within the range of functions set forth in subsection (j)(1)(A). For example, hosting a World Wide Web site does not fall within the subsection (j)(1)(A) definition; providing connectivity for a world wide web site does fall within that definition. The subparagraph (A) definition of service provider is not intended to exclude providers that perform other functions in addition to those set forth in subparagraph (A), including the functions identified in subsection (j)(1)(B). Conversely, the fact that a provider performs some functions that fall within the definition of subparagraph (A) does not imply that its other functions that do not fall within the definition of subparagraph (A) qualify for the limitation of liability under subsection (a).

The second definition of "service provider," set forth in subsection (j)(1)(B), applies to the term as used in any other subsection of section 512. This definition is broader than the first, covering providers of online services or network access, or the operator of facilities therefor. This definition includes, for example, services such as providing Internet access, e-mail, chat room and web page hosting services. The (j)(1)(B) definition of service provider, for example, includes universities and schools to the extent they perform the func-

55

tions identified in subsection (j)(1)(B). The definition also specifically includes any entity that falls within the first definition of service provider. A broadcaster or cable television system or satellite television service would not qualify, except to the extent it performs functions covered by (j)(1)(B).

Finally, subsection (j)(2) defines the term "monetary relief" broadly for purposes of this section as encompassing damages, costs, attorneys' fees and any other form of monetary payment.

*Subsection (k)—Other defenses not affected.*—Subsection (k) clarifies that other defenses under copyright law are not affected and codifies several important principles.

New section 512 does not define what is actionable copyright infringement in the online environment, and does not create any new exceptions to the exclusive rights under copyright law. The rest of the Copyright Act sets those rules. Similarly, new section 512 does not create any new liabilities for service providers or affect any defense available to a service provider. Enactment of section 512 does not bear upon whether a service provider is or is not an infringer when its conduct falls within the scope of section 512. Even if a service provider's activities fall outside the limitations on liability specified in the bill, the service provider is not necessarily an infringer; liability in these circumstances would be adjudicated based on the doctrines of direct, vicarious or contributory liability for infringement as they are articulated in the Copyright Act and in the court decisions interpreting and applying that statute, which are unchanged by section 512. In the event that a service provider does not qualify for the limitation on liability, it still may claim all of the defenses available to it under current law. New section 512 simply defines the circumstances under which a service provider, as defined in this Section, may enjoy a limitation on liability for copyright infringement.

*Subsection (l)—Protection of privacy.*—Subsection (l) is designed to protect the privacy of Internet users. This subsection makes clear that the applicability of subsections (a) through (d) is no way conditioned on a service provider: (1) monitoring its service or affirmatively seeking facts indicating infringing activity except to the extent consistent with implementing a standard technical measure under subsection (h); or (2) accessing, removing or disabling access to material if such conduct is prohibited by law, such as the Electronic Communications Privacy Act.

*Subsection (m)—Rule of construction.*—Subsection (m) establishes a rule of construction applicable to subsections (a) through (d). Section 512's limitations on liability are based on functions, and each limitation is intended to describe a separate and distinct function. Consider, for example, a service provider that provides a hyperlink to a site containing infringing material which it then caches on its system in order to facilitate access to it by its users. This service provider is engaging in at least three functions that may be subject to the limitation on liability: transitory digital network communications under subsection (a), system caching under subsection (b), and information location tools under subsection (d). If this service provider (as defined in subsection (j)(1)(A) in the case of transitory digital communications, or as defined in subsection (j)(1)(B) in the case of system caching or information location tools) meets the

56

threshold criteria spelled out in subsection (h)(1), then for its acts of system caching defined in subsection (b), it may avail itself of the liability limitations stated in subsection (b), which incorporate the limitations on injunctive relief described in subsection (i)(1)(B) and (i)(3). If it is claimed that the same company is committing an infringement by using information location tools to link its users to infringing material, as defined in subsection (d), then its fulfillment of the requirements to claim the system caching liability limitation does not affect whether it qualifies for the liability limitation for information location tools; the criteria in subsection (d), rather than those in subsection (b), are applicable. Section 512(m) codifies this principle by providing that the determination of whether a service provider qualifies for one liability limitation has no effect on the determination of whether it qualifies for a separate and distinct liability limitation under another subsection of section 512.

*Section 203. Conforming amendment*

This section amends the table of sections for chapter 5 of the Copyright Act (17 U.S.C. 501 et. seq.) to reflect the new section 512, as created by this title.

*Section 204. Liability of educational institutions for online infringement of copyright*

Subsection 204(a) directs the Register of Copyrights to consult with representatives of copyright owners and nonprofit educational institutions and to submit to the Congress within 6 months after enactment of the bill recommendations regarding the liability of nonprofit educational institutions for copyright infringements that take place through the use of the institution's computer system or network, where the institution qualifies as a "service provider" under the provisions of this Title. Included in the Register's report are to be any recommendations for legislation that the Register considers appropriate.

Subsection 204(b) sets forth specific considerations that the Register shall take into account, where relevant, in formulating her recommendations to the Congress.

TITLE III—COMPUTER MAINTENANCE OR REPAIR

*Section 301. Limitation on exclusive rights; computer programs*

This section effects a minor, yet important clarification in section 117 of the Copyright Act (17 U.S.C. 117) to ensure that the lawful owner or lessee of a computer machine may authorize an independent service provider—a person unaffiliated with either the owner or lessee of the machine—to activate the machine for the sole purpose of servicing its hardware components. When a computer is activated, certain software or parts thereof is automatically copied into the machine's random access memory, or "RAM". A clarification in the Copyright Act is necessary in light of judicial decisions holding that such copying is a "reproduction" under section 106 of the Copyright Act (17 U.S.C. 106),[26] thereby calling into question the right of an independent service provider who is not the licensee of

---

[26] *See MAI Sys. Corp. v. Peak Computer*, 991 F.2d 511 (9th Cir. 1993), cert. denied, 114 S.Ct. 671 (1994).

57

the computer program resident on the client's machine to even acti-
vate that machine for the purpose of servicing the hardware compo-
nents. This section does not in any way alter the law with respect
to the scope of the term "reproduction" as it is used in the Copy-
right Act. Rather, this section it is narrowly crafted to achieve the
objectives just described—namely, ensuring that an independent
service provider may turn on a client's computer machine in order
to service its hardware components, provided that such service pro-
vider complies with the provisions of this section designed to pro-
tect the rights of copyright owners of computer software.

Paragraphs (1) and (2) make technical changes to the structure
of section 117, dividing the existing provisions between two sub-
sections, the first entitled "(a) Making of Additional Copy or Adap-
tation by Owner of Copy" and the second entitled "(b) Lease, Sale,
or Other Transfer of Additional Copy or Adaptation." The operative
provisions, and limitations, are in paragraph (3), which creates two
new subsections in section 117, subsections (c) and (d).

*Subsection (c)—Machine maintenance or repair.*—The bill creates
a new subsection (c) in section 117 of the Copyright Act (17 U.S.C.
117), which delineates the specific circumstances under which a re-
production of a computer program would not constitute infringe-
ment of copyright. The goal is to maintain undiminished copyright
protection afforded under the Copyright Act to authors of computer
programs, while making it possible for third parties to perform
servicing of the hardware. This new subsection states that it is not
an infringement of copyright for the owner or lessee of a machine
to make or authorize the making of a copy of a computer program
provided that the following conditions are met:

First, subsection (c) itself makes clear that the copy of
the computer program must have been made solely and
automatically by virtue of turning on the machine in order
to perform repairs or maintenance on the hardware compo-
nents of the machine. Moreover, the copy of the computer
program which is reproduced as a direct and sole con-
sequence of activation must be an authorized copy that has
lawfully been installed in the machine. Authorized copies
of computer programs are only those copies that have been
made available with the consent of the copyright owner.
Also, the acts performed by the service provider must be
authorized by the owner or lessee of the machine.

Second, in accordance with paragraph (c)(1), the result-
ing copy may not be used by the person performing repairs
or maintenance of the hardware components of the ma-
chine in any manner other than to effectuate the repair or
maintenance of the machine. Once these tasks are com-
pleted, the copy of the program must be destroyed, which
generally will happen automatically once the machine is
turned off.

Third, as is made clear in paragraph (c)(2), the amend-
ment is not intended to diminish the rights of copyright
owners of those computer programs, or parts thereof, that
also may be loaded into RAM when the computer is turned
on, but which did not need to be so loaded in order for the
machine to be turned on. A hardware manufacturer or

58

software developer might, for example, provide diagnostic and utility programs that load into RAM along with or as part of the operating system, even though they market those programs as separate products—either as freestanding programs, or pursuant to separate licensing agreements. Indeed, a password or other technical access device is sometimes required for the owner of the machine to be able to gain access to such programs. In other cases, it is not the hardware or software developer that has arranged for certain programs automatically to be reproduced when the machine is turned on; rather, the owner of the machine may have configured its computer to load certain applications programs into RAM as part of the boot-up process (such as a word processing program on a personal computer). This subsection is not intended to derogate from the rights of the copyright owners of such programs. In order to avoid inadvertent copyright infringement, these programs need to be covered by subsection (c), but only to the extent that they are automatically reproduced when the machine is turned on. This subsection is not intended to legitimize unauthorized access to and use of such programs just because they happen to be resident in the machine itself and are reproduced with or as a part of the operating system when the machine is turned on. According to paragraph (c)(2), if such a program is accessed or used without the authorization of the copyright owner, the initial reproduction of the program shall not be deemed exempt from infringement by this subsection.

*Subsection (d)—Definitions.*—Subsection (d) defines two terms not previously defined by the Copyright Act. Paragraph (1) defines the term "maintenance" as the servicing of the machine in order to make it work in accordance with its original specifications and any changes to those specifications authorized for that machine. These acts can include, but are not limited to, cleaning the machine, tightening connections, installing new components such as memory chips, circuit boards and hard disks, checking the proper functioning of these components, and other similar acts.

Paragraph (2) defines the term "repair" as the restoring of the machine to the state of working in accordance with its original specifications and any changes to those specifications authorized for that machine. These acts of repairing the hardware include, but are not limited to, replacing worn or defective components such as memory chips, circuit boards and hard disks, correcting the improper installation of new components, and other similar acts.

Both paragraphs (1) and (2) of this subsection are subject to the same limitations, which are intended to clarify that activating a machine in order to perform maintenance or repair does not constitute infringement as provided in subsection (c) if the maintenance or repair is undertaken to make the machine work in accordance with the parameters specified for such a machine and its component parts. Because technological improvements may lead customers to upgrade their machines, the language of both definitions authorizes service providers to maintain those components of the hardware that have been installed since the time the machine was

59

originally acquired, or to install new components. But their acts shall be noninfringing under subsection (c) only if the components being serviced have been lawfully acquired and installed. Finally, the terms "maintenance" and "repair" do not include unauthorized adaptations, modifications, error corrections or any other changes to any software which may be in the machine being serviced.

TITLE IV—EPHEMERAL RECORDINGS; DISTANCE EDUCATION; EXEMPTION FOR LIBRARIES AND ARCHIVES

*Section 401. Ephemeral recordings*

Section 401 amends section 112 of the Copyright Act (17 U.S.C. 112) to address two issues concerning the application of the ephemeral recording exemption in the digital age.

The first of these issues is the relationship between the ephemeral recording exemption and the Digital Performance Right in Sound Recordings Act of 1995 ("DPRA"). The DPRA granted sound recording copyright owners the exclusive right to perform their works publicly by means of digital audio transmission, subject to certain limitations, particularly those set forth in section 114(d). Among those limitations is an exemption for nonsubscription broadcast transmissions, which are defined as those made by terrestrial broadcast stations licensed as such by the FCC. 17 U.S.C. 114(d)(1)(A)(iii) and (j)(2). The ephemeral recording exemption presently privileges certain activities of a transmitting organization when it is entitled to transmit a performance or display under a license or transfer of copyright ownership or under the limitations on exclusive rights in sound recordings specified by section 114(a). The Committee believes that the ephemeral recording exemption should apply to broadcast radio and television stations when they make nonsubscription digital broadcasts permitted by the DPRA. The Committee has therefore changed the existing language of the ephemeral recording exemption (redesignated as 112(a)(1)) to extend explicitly to broadcasters the same privilege they already enjoy with respect to analog broadcasts.

The second of these issues is the relationship between the ephemeral recording exemption and the anticircumvention provisions that the bill adds as section 1201 of the Copyright Act. Concerns were expressed that if use of copy protection technologies became widespread, a transmitting organization might be prevented from engaging in its traditional activities of assembling transmission programs and making ephemeral recordings permitted by section 112 for purposes of its own transmissions within its local service area and of archival preservation and security. To address this concern, the Committee has added to section 112 a new paragraph that permits transmitting organizations to engage in activities that otherwise would violate section 1201(a)(1) in certain limited circumstances when necessary for the exercise of the transmitting organization's privilege to make ephemeral recordings under redesignated section 112(a)(1). By way of example, if a radio station could not make a permitted ephemeral recording from a commercially available phonorecord without violating section 1201(a)(1), then the radio station could request from the copyright owner the necessary means of making a permitted ephemeral recording. If the

# EXHIBIT 4

Page 1

1                       UNITED STATES DISTRICT COURT

2                       SOUTHERN DISTRICT OF FLORIDA

3                       CASE NO. 11-20427-WILLIAMS

4

5     DISNEY ENTERPRISES, INC.,     )
      TWENTIETH CENTURY FOX FILM     )
6     CORPORATION, UNIVERSAL CITY    )
      STUDIOS PRODUCTIONS LLLP,      )
7     COLUMBIA PICTURES              )
      INDUSTRIES, INC., and          )
8     WARNER BROS. ENTERTAINMENT     )
      INC.,                          )
9                                    )
                                     )
10    Plaintiffs,                    )
                                     )
11                                   )
      v.                             )
12                                   )
      HOTFILE CORP., ANTON TITOV     )
13    and DOES 1-10,                 )
                                     )
14    Defendants.                    )

15

16

17                       Deposition of JAMES BOYLE

18                       (Taken by the Plaintiffs)

19                       Raleigh, North Carolina

20                         December 21, 2011

21

22

23    Reported by:     Marisa Munoz-Vourakis -
                        RMR, CRR and Notary Public
24    TSg Job # 44315

25

Page 2

1     APPEARANCE OF COUNSEL:

2     For the Plaintiffs:

3              DUANE POZZA, ESQ.

4              Jenner & Block

5              1099 New York Avenue, NW, Suite 900

6              Washington, DC 20001

7

8

9

10    For the Defendants:

11             DEEPAK GUPTA, ESQ.

12             Farella Braun & Martel

13             Russ Building

14             235 Montgomery Street

15             San Francisco, CA 94104

16

17

18

19             Deposition of JAMES BOYLE, taken by the

20    Plaintiffs, at Office Suites Plus, 3737 Glenwood

21    Avenue, Suite 100, Raleigh, North Carolina, on the 21st

22    day of December, 2011 at 11:04 a.m., before Marisa

23    Munoz-Vourakis, Registered Merit Reporter, Certified

24    Realtime Reporter and Notary Public.

25

Page 38

1              BY MR. POZZA:

2       Q.     Are you aware of whether all documents in

3    response to topic number eight have been produced?

4              MR. GUPTA:  Objection, that's vague

5         and ambiguous and it lacks foundation.

6       A.     Yes, I believe they have.

7       Q.     Are you aware of whether all documents in

8    response to topic number nine have been produced?

9              MR. GUPTA:  Objection.  Same

10        objection, once again it lacks foundation

11        and it's vague and ambiguous, to the extent

12        it's being formulated specifically in the

13        passive voice.

14      A.     Yes, I believe those documents have been

15   disclosed.

16             MR. POZZA:  I'd like to mark Exhibit

17        3.

18                  (The document referred to was marked

19        Plaintiff's Boyle Exhibit Number 3  for

20        identification.)

21      Q.     Are you familiar with this document?

22      A.     Assuming that this is an unmodified version

23   of my expert report, yes, I am.

24      Q.     I'll represent that it is.

25             What is this document?

1      A.      This is my expert report in this case.

2      Q.      It describes a study you performed on

3  behalf of the defendants in this case?

4             MR. GUPTA:  Objection, leading.

5      A.      Yes, it does.

6      Q.      What was the methodology of your study?

7             MR. GUPTA:  Objection, that's vague

8       and ambiguous.

9      A.      Can you be a little more precise?  Would

10  you like me -- I'm happy to talk about the methodology

11  of the study.  I just -- which I lay out in some detail

12  in the report, and we can go through it, which would be

13  my preference, carefully, but I want to know which

14  aspect of the methodology you want me to answer?

15     Q.      We'll go through it carefully.

16             What was the hypothesis, if any, that you

17  were testing in your study?

18             MR. GUPTA:  Objection, that's vague

19       and ambiguous.

20     A.      There were at least two hypotheses that I

21  was testing; the first was that Hotfile was being used

22  for the distribution of content that was either clearly

23  noninfringing or highly likely noninfringing.

24             The second related hypothesis was that some

25  of those who were distributing content on Hotfile that

Page 44

1          not in evidence and it's vague and

2          ambiguous.

3      A.    The list of noninfringing uses that I

4   considered in this report were free and open source

5   software, cultural material made available under

6   licenses, such as creative commons licenses and public

7   domain material.

8      Q.    And did you explore the distribution of

9   those three different kinds of materials?

10          MR. GUPTA:   Objection, that's vague

11      and ambiguous.

12      A.    Could you clarify the question, please?

13      Q.    The original question was to list examples

14   of the uses of the Hotfile system you studied.  So my

15   question is, did you explore the distribution of those

16   three different kinds of materials as opposed to say

17   the storage?

18          MR. GUPTA:   Objection, once again,

19      that assumes facts not in evidence, calls

20      for speculation and it's vague.

21      A.    I would say that with some of the examples

22   that I was looking at, particularly open source

23   software, it appeared that competitors were uploading

24   the material or people were uploading the material,

25   which were open source licenses, and then it was being

Page 45

1   downloaded by many, many others.  That would seem to be

2   an example of distribution.

3          Some of the other kinds of uses, for

4   example, some of the public domain material consistent

5   either with distribution or with storage, and it's

6   conceivable, of course, that while the person who

7   uploaded the material to Hotfile did not mind other

8   people downloading it, that they also used it as their

9   own source of storage.

10          So, for example, were I an open source

11   developer who wished to make my software available to

12   the world, I could use Hotfile for that purpose, and I

13   had evidence that people did use it for that purpose,

14   but I might also use Hotfile as a way of storing the

15   material myself.

16      Q.    So the next sentence in the report says,

17   defendant's counsel asked me to study the use of the

18   Hotfile service to store or distribute or download the

19   types of material described above, and it goes on.

20          Do you see that?

21      A.    I do.

22      Q.    So you did study the use of the Hotfile

23   service to both store and to distribute these three

24   different types of material?

25          MR. GUPTA:  Objection,

Page 52

1    Q.     Turning to paragraph six, the last sentence

2    there, how did you determine whether Hotfile's

3    affiliate program compensated the open source software

4    developers for the software they write and freely

5    distribute?

6              MR. GUPTA:  Objection, assumes facts

7         not in evidence.

8    A.     I looked at two of the specific authors of

9    open source software identified in the study, that is

10   to say, JDownloader on one case and iREB and sn0wbreeze

11   on the other.  I identified those who were uploading

12   that material from a variety of pieces of evidence,

13   including statements on the web site from which the

14   material originated, links directly to Hotfile and so

15   on.

16             I then asked Elysium Digital to find out

17   whether someone who appeared to be this person or to be

18   affiliated with this person was actually a member of

19   the affiliate program.  I discovered in both of those

20   cases that they did appear to be.

21             In addition, I determined that the

22   affiliate program compensates people for files that are

23   downloaded.  From those pieces of evidence, I concluded

24   that A, some open source developers were using Hotfile

25   to distribute their material.  B, it appears that they

Page 53

1   were members of the affiliate program.  C, it appeared

2   that members of the affiliate program who were using

3   Hotfile to distribute their service would be

4   compensated.

5        Q.    Did you examine other ways in which those

6   developers were being compensated?

7              MR. GUPTA:  Objection, that's vague

8         and ambiguous and would call for

9         speculation.

10       A.    When you say those, do you mean the

11  specific ones to which I just referred?  Do you mean

12  all open source software distributors?

13       Q.    I mean, the specific ones to which you

14  referred, specifically the developer of sn0wbreeze and

15  iREB.

16             MR. GUPTA:  I'd like to lodge the same

17        objection and also add foundation.

18       A.    I am not aware of other methods through

19  which the developer of iREB and sn0wbreeze is

20  compensated, but I simply don't know.  I was looking at

21  the affiliate program.

22       Q.    Did you consider doing a representative

23  statistical sample of the uses of Hotfile as a whole?

24             MR. GUPTA:  Objection, it's vague and

25        ambiguous.

1      Q.     Are you aware of -- do you believe that

2   there is data that would show the uses of the site by

3   those premium users?

4             MR. GUPTA:  Objection, it's vague and

5        calls for speculation.

6      A.     I am not aware of that data.

7      Q.     So sub-iii, 9 sub-iii, let's start in the

8   middle of the sentence, I'm going to ask about this

9   language:  Services, such as Hotfile, fill a gap in

10  internet's architecture by providing a convenient and

11  generic method of distributing or storing files that

12  are too large for e-mail.

13             Do you see that?

14     A.     I do.

15     Q.     What is the gap in the internet's

16  architecture to which you are referring?

17     A.     The internet, the general internet, meaning

18  the whole packet switched system, allows, obviously,

19  certain forms of communication very easily.

20             For example, e-mail communication can

21  travel over the internet, as it used to over

22  proprietary systems, as a set of packets.

23             However, while e-mail is very easy to use

24  and people can easily log on to it and use it, and many

25  other things, such as web browsing are very easy to do,

Page 110

1    one thing which is relatively hard to do over the

2    internet, without using a service such as Hotfile, is

3    to transfer a large file, and in fact, this has been

4    the subject of, you know, much commentary, much

5    internet humor, to the extent that that isn't an

6    oxymoron.  This is a difficult thing to do.

7              In my personal experience, it is hard to

8    collaborate with colleagues around the world if one

9    needs to transfer large files, files that are too large

10   for e-mail, which is something that I sometimes need to

11   do, and so I personally have used services like

12   YouSendIt to transfer such files.

13             When I spoke of the gap in the internet's

14   architecture, I meant that without a service of the

15   kind that Hotfile appears to provide, it would be

16   difficult, if not impossible, for those that did not

17   own their own domain name or did not have the

18   capability to upload to a web page to share those large

19   files across the internet.

20        Q.    What about using an FTP?

21             MR. GUPTA:  Objection, lacks

22        foundation, calls for speculation.

23        A.    FTP is certainly a method which experienced

24   users can use.  First of all, I think many people

25   nowadays won't even know what FTP stands for.  It

Page 111

1   stands for file transfer protocol.  Many browsers no

2   longer have it as a standard feature.  There's actually

3   evidence along that fact.  I think people find it a

4   difficult method to do it.

5           In order to transfer it, ideally, it's

6   actually much easier if you have your own server onto

7   which the files were loaded, in which case people can

8   download it using the conventional HTTP, the

9   conventional method over the web.

10          So FTP is certainly a method, but I don't

11  think it's a method that is either convenient or offers

12  all the features of services such as YouSendIt or

13  Hotfile.

14      Q.    You testified earlier, correct me if I'm

15  wrong, that you're not familiar with how Bittorrent

16  technology works?

17      A.    That is correct.  I know in the abstract.

18  I believe Bittorrent to be appear to be a file sharing

19  system, but beyond that, I know very little.

20      Q.    So do you know whether or not Bittorrent is

21  useful for distributing large files?

22          MR. GUPTA:  Objection, calls for

23          speculation.

24      A.    I do not.  I do not believe that Bittorrent

25  provides a stable URL from which authorized versions of

Page 149

1       A.      I'm not sure I understand your question.

2   Are you asking about what motivation JDownloader might

3   have to put the material on Hotfile?  I'm afraid I

4   don't understand.

5               MR. POZZA:  Strike that.

6       Q.      I'm trying to get a sense of what are the

7   obstacles to distribution that would lead small

8   developers, in particular, to benefit more from

9   distribution platforms like Hotfile?

10      A.      Excellent.

11              MR. GUPTA:  Objection, asked and

12       answered.

13      A.      So I think there are two principal ones and

14   then others.

15              The two principal ones are that it is

16   frequently expensive to have high download volume from

17   your web site.  People may not be aware of this.  They

18   may think that it's free.  You just upload it, but many

19   web providers actually charge you once you go over

20   certain limit or they may charge you per download or

21   they may charge you per megabyte.  So that it may

22   actually be costing a developer who is providing to

23   you, which obviously that's a disincentive to spreading

24   it.

25      Q.      The bandwidth cost?

1      A.      The bandwidth cost, again, I'm talking in

2    the abstract, this is not the claim that says I know

3    that this is what's motivating JDownloader, but that in

4    general is clearly an issue, and that obviously affects

5    small downloaders more than large for whom the

6    economies of scale are such that bandwidth costs are

7    less important.

8            The second, of course, is that if you are,

9    for example, having the material downloaded from your

10   own site, you aren't receiving the kind of compensation

11   that the affiliate program provides, and while that

12   compensation might be relatively unimportant on the

13   scale of a very large company or a very large

14   distribution project, such as Chrome or Android, for a

15   small developer it might be a significant source of

16   income.

17           Those are two highly plausible reasons that

18   small developers would want to use a service, such as

19   Hotfile.  And I want to be very clear, I'm not saying

20   specifically Hotfile, a service such as Hotfile, and

21   there are also, I think, others, but I think those are

22   enough to plausibly suggest to me that they would have

23   a motivation to do so.

24      Q.      And that's, in the abstract, that's not as

25   to JDownloader specifically?

Page 151

1        A.       Exactly.

2        Q.       Or to iREB and sn0wbreeze?

3        A.       Again, with iREB and sn0wbreeze, I would

4    say that the fact that on IHateSnow, the developer's

5    page, the fact that the links that he gives where you

6    can download the material are direct links to Hotfile,

7    that more strongly suggests that he is interested in

8    those two benefits.

9        Q.       Is that a large program, iREB?

10                MR. GUPTA:   Objection, it's vague.

11       A.       I do not know, because I did not ask

12   Elysium Digital to give me information on file size, so

13   I do not know.

14                I will note that bandwidth costs can be

15   substantial if you have very high volume of even a

16   medium-sized file.

17       Q.       OpenOffice, is that available in a variety

18   of places besides Hotfile?

19       A.       Absolutely, yes, it is.

20       Q.       Is it similar to Firefox in that respect?

21       A.       Yes, it is.

22       Q.       What about Ubuntu?

23       A.       And I would -- yes, I think Ubuntu is also

24   available, as widely available, both on line and a

25   variety of other distributions.

Page 157

1   on Hotfile was one of the searches?

2        A.     Yes.

3        Q.     For public domain materials, would you

4   describe this as a large number of downloads of public

5   domain content from Hotfile?

6               MR. GUPTA:   Objection, it's vague.

7        A.     Certainly not as high as the 1.7 million

8   download figure for the open source programs.  I

9   included this because, as I understand the test in

10  Sony, the court in Sony and subsequent courts are

11  interested both in magnitude, that is to say, the

12  number of uses, but also in types of uses, and this is

13  illustrative of a type of use.

14              When we think about the uses of a system in

15  order to spread cultural material, we, at least I, in

16  interpreting the Sony and Napster test, are not looking

17  only at the number, although that is clearly something

18  that we do look at, but also at what this represents.

19  In some cases, it may represent intensity of

20  preference.  People who really like Hamlet or Othello

21  rather than many people who like JDownloader.

22              And so, again, I was offering this to the

23  court for the court's assessment of this use of the

24  service to provide this kind of material.

25              I note that the Huck Finn, we had 45 hash

Page 158

1    verified downloads of that particular book, and I think

2    one could come to different opinions as to whether or

3    not that is an important and substantial noninfringing

4    use.  For myself, that seems like a viable and benign,

5    licit use of the service.

6         Q.    Would you describe it as substantial?

7         A.    I think that's a complex inquiry.  In --

8    the Sony court refers to many different types of

9    material.  It refers to a single film, My Man Godfrey,

10   which was in the public domain; refers to a single

11   television program, Mr. Rogers' Neighborhood, which he

12   allowed to be there; refers to a single national public

13   radio station which allowed, and it lists those in its

14   discussion of substantial noninfringing uses.  To me,

15   that suggests strongly that the court in Sony cared

16   about what we might think of as a diversity of uses, as

17   well as about -- and did not believe that the important

18   thing to focus on was what the court of appeals in Sony

19   had focused on, which was predominant use.

20              So to me, that suggests that this kind of

21   information would be relevant to the court, but the

22   court, of course, will make the final determination on

23   whether that's true or not.

24        Q.    So this is -- of these four works, there

25   are 49 verified downloads, correct?

1  open source development, a kind of creativity, and the

2  fact that the developers of that open source software

3  are actively choosing to use Hotfile licitly to spread

4  it and appear to be gaining some compensation, I

5  believe that a court would see that as significant in

6  the determination of substantial noninfringing uses.

7       Q.    And in the sentence when you talk about the

8  most common uses, are you referring to those particular

9  downloaded files that iREB and sn0wbreeze?

10      A.    IREB, sn0wbreeze, JDownloader, but also I

11 was talking about other open source programs which

12 weren't downloaded as many times but which were also

13 being downloaded.

14          In the next sentence, I very carefully add

15 the qualification, which is part of this:  This report

16 does not attempt to present a statistically

17 representative sample of the usage of Hotfile, and I

18 have no personal knowledge of what Hotfile's uploaded

19 content or of user downloads is noninfringing.

20 Nevertheless, within the limits suggested by the

21 sentence, my investigation provided some striking

22 facts, and then I list the factual information, which

23 we have discussed.

24      Q.    Are there any other potential noninfringing

25 uses of Hotfile, other than distributing those three

Page 167

1   kinds of files that we've been discussing throughout

2   this deposition?

3              MR. GUPTA:  Objection, calls for

4          speculation, asked and answered, goes beyond

5          the scope of his report.

6      A.     Absolutely there are.  I mention at the

7   beginning of the report that I don't attempt to do an

8   exhaustive study.

9              So, for example, one could use Hotfile to

10  store or to share material one had generated one self;

11  large briefs, large documents.  One could use it to

12  share photographs.  One could use it to store or get

13  access to federal government works which are in the

14  public domain for that reason.  One could also use it

15  for uses that would be fair use.

16             So material which was copyright but which

17  because of the particular manner of its use, could be

18  considered fair use.  So I think it is debatable.

19             I would argue that there are cases where

20  people can use storage in order to have archival or

21  backup copies in order to space shift content that they

22  had licitly purchased, and I think a service such as

23  Hotfile could be used for that, and Hotfile clearly

24  could, as a matter of technical potential, be used for

25  that.

Page 178

1          MR. GUPTA:  No, the covering e-mails

2      are just covering e-mails.

3      A.     Most of my communication with Elysium was

4  by teleconference, by phone call, and then I would get

5  e-mails, which were basically the only purpose of the

6  e-mail was to include the attachment.

7          So to the best of my knowledge, you have

8  all of the information that I received from Elysium,

9  which were facts and data on which I rely for my

10  opinion, and I tried to be as scrupulous about that as

11  I was about the conservatism of the method here.

12     Q.     This may provoke an objection.  What do you

13  know about the use of Hotfile storage?

14          MR. GUPTA:  I'll ask the witness not

15      to answer as to work product, and also

16      object that it's vague, ambiguous, calls for

17      speculation and lacks foundation.

18          MR. POZZA:  Are you instructing the

19      witness not to answer?

20          MR. GUPTA:  I'll give him limited room

21      to answer it.  To the extent relevant to his

22      opening report, I think he can answer.

23     A.     Based on the material in my opening report,

24  information there, I saw a design, which is consistent

25  with the use of Hotfile for storage.

Page 179

1          I saw a few examples in my attempts to

2     think about and search to find examples of this.   I

3     would come upon other material, such as PowerPoints,

4     for example, which suggested the possibility of

5     storage.

6          I saw in the course of my inquiry a fair

7     amount of zero download material that seemed to meet

8     written fact, which would be consistent with basically

9     personal backup, the file would be stored and you would

10    only download it if you lost it or garbled it so that

11    it's consistent with that, it certainly doesn't prove

12    it.  And those are all the pieces of information that

13    are relevant to this report which, as I note, focuses

14    mainly on the three subjects we have been discussing;

15    namely, open source materials, public domain and

16    creative commons license material.

17       Q.    Does Hotfile encourage the storage of

18    materials?

19          MR. GUPTA:  Objection, vague and

20       ambiguous, calls for speculation as to

21       Hotfile's intent and goes beyond the expert

22       report.

23       A.    In my opinion, that is something about

24    which a court would have to look at a number of

25    factors.

Page 196

1    Hepatitis C?

2        A.     It was found because I was trying to look

3    for different types of material on line.   It

4    occurred -- on Hotfile.   It occurred to me that there

5    might be creative commons licensed content stored that

6    was scientific in nature.   I can't remember the exact

7    search that I did, but it included PowerPoint and some

8    science terms, and it turned up this file.   As I noted,

9    that didn't have enough information on the file to say

10   it was infringing.   I thought it was very unlikely that

11   it was infringing.   It's not the kind of content that I

12   would imagine would be, but since I couldn't determine

13   that and since it didn't fall into the category, which

14   I was considering here, I excluded it from my

15   consideration.

16       Q.     Do you know whether or not that link is

17   publicly available?

18       A.     I believe it is.

19       Q.     I guess did you find it by searching on

20   Google as opposed to searching by Hotfile's own data?

21       A.     Yes, I found it by searching on Google.

22       Q.     So that's an example of personal storage

23   but with a publicly available link that would allow

24   other people to download that?

25              MR. GUPTA:   Objection,

Page 197

1          mischaracterizes his testimony and seeks

2          speculation.

3      A.    As I said, I ended up excluding this,

4   because it wasn't the type of material in there, and,

5   again, because I applied this extremely conservative

6   squeaky clean analysis, I couldn't tell that that was

7   personal -- the facts were consistent with that, and

8   yes, the link was publicly available.

9      Q.    Now, in the scope of this report, have you

10  considered any data about the number of files that are

11  never -- that are uploaded but not ever downloaded from

12  Hotfile?

13     A.    In the scope of this report, I have not

14  considered that.

15     Q.    In the scope of this report, have you

16  considered the extent to which Hotfile is used to

17  upload files only for personal retrieval by the

18  uploader?

19     A.    No, in the scope of this report, I did not

20  specifically consider it as an example of files which I

21  would identify those numbers.  I did list it in the

22  report as a potential, noninfringing use.  The report

23  is offering the court facts about potential,

24  noninfringing uses.  I say the system is consistent

25  with that.  That is in my report, that is to say, it

Page 201

1                          SIGNATURE PAGE

2

3

4

5                                        Digitally signed by James Boyle
                                         DN: cn=James Boyle, o, ou,
6                                        email=boyle@law.duke.edu, c=US
                                         Date: 2012.01.23 13:24:53 -05'00'
7        _____

8            JAMES BOYLE

9

10

11    SUBSCRIBED AND SWORN to before me this _____

12    day of _____, 20__.

13

14

15

16       _____

17                     NOTARY PUBLIC

18

19    My Commission expires:_____

20

21

22

23

24

25

Page 202

1                          TRANSCRIPTION

2                                                    MMV

3   CASE NAME:  Disney vs. Hotfile

4

5

6   WITNESS NAME:  JAMES BOYLE

7   DATE:  December 21, 2011

8

| PAGE | LINE | READS | SHOULD READ |
|------|------|-------|-------------|
| 18 | 17 | No, I have not. | I have downloaded one file. |
| 59 | 6 | signal | signature |
| 64 | 8 | illicitly | licitly |
| 65 | 17 | that in fact file | in fact that file |
| 67 | 21 | is | has |
| 76 | 13 | infringing | noninfringing |
| 83 | 10 | indecent | inducement |
| 102 | 12 | mutual | neutral |
| 111 | 4 | do it | use |
| 120 | 14-15 | and telling | and in addition told |
| 141 | 15 | hope file | Hotfile |
| 155 | 10 | license material | licensed |
| 165 | 8 | less | lesser |
| 167 | 16 | copyright | copyrighted |

Page 203

1                    C E R T I F I C A T E

2        I, Marisa Munoz-Vourakis, RMR, CRR and Notary Public,

3   the officer before whom the foregoing proceeding was

4   conducted, do hereby certify that the witness(es) whose

5   testimony appears in the foregoing proceeding were duly

6   sworn by me; that the testimony of said witness(es) were

7   taken by me to the best of my ability and thereafter

8   transcribed under my supervision; and that the foregoing

9   pages, inclusive, constitute a true and accurate

10  transcription of the testimony of the witness(es).

11       I do further certify that I am neither counsel for,

12  related to, nor employed by any of the parties to this

13  action in which this proceeding was conducted, and

14  further, that I am not a relative or employee of any

15  attorney or counsel employed by the parties thereof, nor

16  financially or otherwise interested in the outcome of the

17  action.

18  IN WITNESS WHEREOF, I have hereunto subscribed my name

19  this 27th of December, 2011.
                                _____
20                              MARISA MUNOZ-VOURAKIS

21  Notary #20032900127

22

23

24

25

Page 204

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF FLORIDA

CASE NO. 11-20427-WILLIAMS


DISNEY ENTERPRISES, INC.,  )
TWENTIETH CENTURY FOX FILM  )
CORPORATION, UNIVERSAL CITY  )
STUDIOS PRODUCTIONS LLLP,  )
COLUMBIA PICTURES  )
INDUSTRIES, INC., and  )
WARNER BROS. ENTERTAINMENT  )
INC.,  )
  )
  )
Plaintiffs,  )
  )
  )
v.  )
  )
HOTFILE CORP., ANTON TITOV  )
and DOES 1-10,  )
  )
Defendants.  )


Continued Deposition of JAMES BOYLE

Volume II

(Taken by the Plaintiffs)

Raleigh, North Carolina

January 19, 2012



Reported by:   Marisa Munoz-Vourakis -
                RMR, CRR and Notary Public
TSG Job # 45588

Page 205

1    APPEARANCE OF COUNSEL:

2    For the Plaintiffs:

3             DUANE POZZA, ESQ.

4             Jenner & Block

5             1099 New York Avenue, NW, Suite 900

6             Washington, DC 20001

7

8

9

10   For the Defendants:

11            DEEPAK GUPTA, ESQ.

12            Farella Braun & Martel

13            Russ Building

14            235 Montgomery Street, 17th Floor

15            San Francisco, CA 94104

16

17

18                         o0o

19

20            Continued Deposition of JAMES BOYLE,

21   taken by the Plaintiffs, at Office Suites Plus, 3737

22   Glenwood Avenue, Suite 100, Raleigh, North Carolina, on

23   the 19th day of January, 2012 at 9:38 a.m., before

24   Marisa Munoz-Vourakis, Registered Merit Reporter,

25   Certified Realtime Reporter and Notary Public.

1       Q.      What is Exhibit 2?

2       A.      **Exhibit 2 appears to be my rebuttal report.**

3       Q.      This is your rebuttal report submitted in

4  this Hotfile litigation, correct?

5       A.      **That appears to be the case.  I haven't**

6  **read all of it, but assuming it's as I submitted it,**

7  **then that would be true.**

8               MR. POZZA:  And just for the record,

9          I'll note the text of the report itself,

10         there were some attached exhibits that were

11         also sent, but those are not included in

12         this exhibit, although some of them we'll

13         look at later.

14      Q.      We went over this a bit last time, but what

15  is your educational background?

16      A.      **I have an LLB law degree from Glasgow**

17  **University and an LLM and an SJD from Harvard Law**

18  **School.**

19      Q.      And what are you formally trained in?

20              MR. GUPTA:  Objection, vague and

21          ambiguous.

22      A.      **I am trained as a lawyer and legal scholar.**

23      Q.      What bar are you a member?

24      A.      **I'm not a member of the bar.**

25      Q.      Have you ever been a member of the bar?

Page 444

1          (Off the record at 5:15 p.m.)

2          (On the record at 5:18 p.m.)

3          BY MR. POZZA:

4      Q.    If you look at paragraph 53, is this a

5  statistical analysis you present here?

6      A.    This is an analysis of the data in -- that

7  Hotfile keeps under the log heading paid for connected

8  to the Zebrak study, the Zebrak/Waterman study, and in

9  particular using Mr. Zebrak's categories in order to

10  indicate of the paid for files, that is to say, the

11  files that were the files that caused users to convert

12  to the premium service that caused them to actually --

13  the files on which they chose to select premium, what

14  percentage of the daily download total of those files

15  were the ones which caused the user to convert to

16  premium.

17      Q.    Do you know what queries were used to

18  generate this table?

19          MR. GUPTA:   Objection, vague as to

20      queries.

21          BY MR. POZZA:

22      Q.    Database queries?

23      A.    So I'm not sure what you mean by database

24  queries.  Basically what I was trying to describe there

25  was the arithmetic process that went through there.  So

1   material, yes.

2        Q.    Are you purporting to claim that this

3   allowed you to draw any opinions or conclusions about

4   Hotfile?

5        A.    I would say that these numbers indicate

6   that the category that Mr. Zebrak identified as

7   noninfringing had a much higher conversion rate, that

8   is to say, a rate of converting people to premium than

9   the confirmed infringing.

10             I'd say in addition, that Mr. Zebrak's

11  confirmed infringing category was the lowest of all of

12  the types of content, lower even than unknowable, and

13  so I think I can from that draw the conclusion that

14  Hotfile was gaining economic success from noninfringing

15  material, number one, I can conclude that; and number

16  two, that they were actually gaining more economic

17  success proportionately from noninfringing material

18  than from confirmed infringing or highly likely

19  infringing material.

20        Q.    Can you extrapolate these results from the

21  1750 files to the broader population of files on

22  Hotfile?

23        A.    I believe it is the assertion of

24  Dr. Waterman and Mr. Zebrak that the study can be

25  extrapolated.  I, for the reasons in this report, I

Page 462

1                    SIGNATURE PAGE

2         you.

3              (Whereupon the deposition was

4         concluded at 5:43 p.m.)

5              (Signature reserved.)

6

7    _____

8         JAMES BOYLE

9

10

11   SUBSCRIBED AND SWORN to before me this _____

12   day of_____, 2012

13

14

15        _____

16                    NOTARY PUBLIC

17

18   My Commission expires:_____

19

20

21

22

23

24

25

```
 1              C E R T I F I C A T E

 2        I, Marisa Munoz-Vourakis, RMR, CRR and Notary Public,

 3   the officer before whom the foregoing proceeding was

 4   conducted, do hereby certify that the witness(es) whose

 5   testimony appears in the foregoing proceeding were duly

 6   sworn by me; that the testimony of said witness(es) were

 7   taken by me to the best of my ability and thereafter

 8   transcribed under my supervision; and that the foregoing

 9   pages, inclusive, constitute a true and accurate

10   transcription of the testimony of the witness(es).

11        I do further certify that I am neither counsel for,

12   related to, nor employed by any of the parties to this

13   action in which this proceeding was conducted, and

14   further, that I am not a relative or employee of any

15   attorney or counsel employed by the parties thereof, nor

16   financially or otherwise interested in the outcome of the

17   action.

18   IN WITNESS WHEREOF, I have hereunto subscribed my name

19   this 23rd of January, 2012.

20

21

22                    _____
                       MARISA MUNOZ-VOURAKIS
23                     Notary #20032900127

24

25
```

# EXHIBIT 5

Page 1

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF FLORIDA

------------------------------------x

DISNEY ENTERPRISES, INC., et al.,   )

       Plaintiffs,    ) Case No.

    v.                  ) 11-20427-

HOTFILE CORP., et al.,          ) WILLIAMS/

      Defendants.   ) TURNOFF

------------------------------------x

HOTFILE CORP.,                  )

     Counterclaimant,    )

    v.                  )

WARNER BROS. ENTERTAINMENT, INC.,   )

     Counterdefendant.    )

------------------------------------x

VIDEOTAPED DEPOSITION OF SCOTT A. ZEBRAK, ESQUIRE

Washington, D.C.

Tuesday, December 20, 2011

9:43 a.m.

Job No.:  439702

Pages 1 - 370

Reported By:  Joan V. Cain

1        Videotaped Deposition of SCOTT A. ZEBRAK,

2    ESQUIRE, held at the law offices of:

3

4           STRADLEY RONON STEVENS & YOUNG, LLP

5           Suite 500

6           1250 Connecticut Avenue, Northwest

7           Washington, D.C. 20036

8           (202) 822-9611

9

10        Pursuant to Notice, before Joan V. Cain, Court

11    Reporter and Notary Public in and for the District of

12    Columbia.

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 3

1          A P P E A R A N C E S

2

3    ON BEHALF OF PLAINTIFFS:

4      STEVEN B. FABRIZIO, ESQUIRE

5      JENNER & BLOCK, LLP

6      Suite 900

7      1099 New York Avenue, Northwest

8      Washington, D.C. 20001

9      Telephone:  (202) 639-6000

10     E-mail:  sfabrizio@jenner.com

11

12     ON BEHALF OF DEFENDANTS AND COUNTERCLAIMANT:

13     ANDREW LEIBNITZ, ESQUIRE

14     FARELLA BRAUN & MARTEL, LLP

15     Russ Building

16     235 Montgomery Street

17     San Francisco, California 94104

18     Telephone:  (415) 954-4400

19     E-mail:  aleibnitz@fbm.com

20

21     ALSO PRESENT:

22       Terry Michael King, Videographer

23

24

25

1   pronouncing her first name.  It's Nastachia, and --

2   how many names is that?

3      Q   That's six.

4      A   That's six.  There's another woman whose

5   name is escaping me right now and another man by the

6   name, I believe it's Greg.  This was some time ago,

7   including for some of them.

8      Q   Have you now listed everyone you remembered

9   to the fullest detail you can?

10     A   I think that's right.

11     Q   You said some time ago.  What do you mean by

12  that?

13     A   It was some time ago.  I mean, the project

14  began in mid November -- or I'm sorry -- mid October

15  and, you know, my -- my work with them stopped I guess

16  roughly at the time I did my report.  So I mean I

17  worked with these folks from mid October through mid

18  November, roughly, and not all of them on a continuous

19  basis.

20     Q   Okay.  So you worked with them for about a

21  month, spending between 225 -- did you spend between

22  225 and 275 hours in that month period between mid

23  October and mid November?

24     A   Give or take, maybe a little more than mid

25  November.  Maybe, you know, some supplemental, you

1   know, thought and analysis and, you know, confirming

2   of my opinions after -- after mid November, but, you

3   know, give or take.  If it's not 4 or 5 weeks, maybe

4   it's in a 6-week period.

5       Q    What did you do after November 18th, when

6   your report was due?

7       MR. FABRIZIO:  Objection, vague.  Overbroad.

8       THE WITNESS:  What did I do related to the

9   report?

10  BY MR. LEIBNITZ:

11      Q    Yes, please.

12      A    In the immediate days -- I don't recall the

13  exact timing, but, you know, some -- you know, some --

14  some further work to sort of further -- further

15  confirm what my conclusions were and, you know, just

16  some additional look at it.  Probably not a

17  significant amount of time.  Certainly not in the

18  overall scheme of that hour block I gave you.

19      Q    Do you recall anything else about what you

20  did after your report was due on November 18th, 2011?

21      MR. FABRIZIO:  Objection to form.

22  Overbroad.

23      THE WITNESS:  Well, there may have been

24  other things.  One -- one item I remember doing, I

25  know there -- there were some Hotfile records that I

1   fact that Hotfile or Anton Titov have taken active

2   steps to encourage infringement?

3       MR. FABRIZIO:  Objection.  Outside the scope

4   of the witness's testimony.  Calls for speculation.

5   And, Counsel, the answer to your question is, no, he

6   will not.

7       THE WITNESS:  Yeah, I mean, I don't know

8   what questions you're going to ask me at a trial, if

9   I'm testifying at a trial.  I do know that I was

10  retained for -- or what Jenner & Block might ask.  But

11  I was retained for the purpose of the project that

12  I've described for you.  That -- that's the work that

13  I've done and have considered and I believe is the

14  scope of my testimony being -- you know, reviewing

15  this sample of files and, if I could, make an

16  infringement determination or not.

17  BY MR. LEIBNITZ:

18      Q   You studied approximately 1,750 files,

19  right?

20      A   Approximately, that's right.

21      Q   You charged $45,000 for that review, right?

22      A   Well, sort of right.  My retainer letter has

23  a flat fee of that amount based on an estimate of the

24  number of hours the project would take, and so that

25  flat fee of $45,000 relates to an estimate of the

1   amount of time I would have to incur on the project.

2   So that's how my compensation was structured.  It's

3   laid out in a little more detail in the engagement

4   letter.

5       Q   Are you entitled to the $45,000 whether or

6   not you spend more or less than 128 hours at $350,

7   your billing rate?

8       MR. FABRIZIO:  Objection.

9       THE WITNESS:  I'm sorry.

10      MR. FABRIZIO:  Vague and ambiguous.

11      THE WITNESS:  Well, let me clarify that as I

12  answer the question.  First of all, I've -- I've spent

13  well more than 180 to 200 hours on the project.  I

14  think there was no question I would spend that amount

15  of time on it.  So I never considered whether I would

16  receive that money in the event that my hours didn't

17  exceed the 180 to 200 range.  So that's not something

18  I considered.

19      And, actually, if you break my hourly rate

20  out, it comes to a discount off my hourly rate.  It's

21  not $350 an hour times 180 to 200 hours to get you to

22  $45,000.  It's, I believe, a number at least $100

23  below that.  $350 an hour reference is with respect to

24  other components of my time that may be taken up in

25  connection with my retention, such as today's

1    CERTIFICATE OF SHORTHAND REPORTER-NOTARY PUBLIC

2       I, Joan V. Cain, Court Reporter, the officer

3    before whom the foregoing deposition was taken, do

4    hereby certify that the foregoing transcript is a true

5    and correct record of the testimony given; that said

6    testimony was taken by me stenographically and

7    thereafter reduced to typewriting under my direction

8    and that I am neither counsel for, related to, nor

9    employed by any of the parties to this case and have

10   no interest, financial or otherwise, in its outcome.

11      IN WITNESS WHEREOF, I have hereunto set my

12   hand and affixed my notarial seal this 29th day of

13   December 2011.

14

15   My commission expires:

16   June 14, 2014

17   _____

18   NOTARY PUBLIC IN AND FOR THE

19   DISTRICT OF COLUMBIA

20

21

22

23

24

25