1   lacks foundation, is overbroad.

2          You haven't -- you haven't established that

3   this witness had any role in producing the documents.

4          THE WITNESS:  Again, this is the only document

5   I've seen.  So far this is one that I believe we

6   produced.

7   BY MR. ENGSTROM:

8      Q   Do you recognize this document?

9      A   Yes.

10     Q   Do you recall sending -- we'll start with the

11  bottom level email, which starts on the bottom of the

12  first page WARNER025866.

13         It appears to be sent Thursday, April 30th,

14  2009.

15         Could you read the first part of the email,

16  please.

17     A   Okay.  "I was wondering if you have

18         any type of takedown tool that could

19         assist us in removing content from

20         HOTFILE that infringes Warner Bros.

21         Entertainment Inc. rights, rather than

22         sending an official takedown abuse

23         notice every time URL's are

24         identified.  As you know, we recently

25         requested over 1000 URLs which were

```
1          MR. FABRIZIO:  Consider it a standing

2     objection.

3          MR. ENGSTROM:  Fair enough.

4          I'd like to introduce as Exhibit I believe 4 --

5          MR. FABRIZIO:  Yes.

6          MR. ENGSTROM:  -- the attached document to you.

7          (Bentkover Exhibit 4 was marked for

8          identification by the court reporter.)

9          THE WITNESS:  Okay.

10    BY MR. ENGSTROM:

11       Q    Are you familiar with this --

12       A    Yes, I am.

13       Q    -- document, Mr. Bentkover?

14       A    Uh-huh.

15       Q    Okay.  Off the bat, do you know who Fileserve

16    is or what Fileserve is?

17       A    Yes.

18       Q    What is Fileserve?

19       A    It's an online cyberlocker site.

20       Q    Is it similar to Hotfile in terms of --

21       A    Yes.

22       Q    -- the way it operates?

23          MR. FABRIZIO:  Objection to form.  Calls for

24    speculation.

25    BY MR. ENGSTROM:
```

1  BY MR. ENGSTROM:

2      Q   So the -- the extent of working with Fileserve

3  to remove infringing materials was sending takedown

4  notices?

5          MR. FABRIZIO:  Same objections.

6          THE WITNESS:  Yes.

7  BY MR. ENGSTROM:

8      Q   Okay.  Is the automated way to remove files --

9  the preferred way, the automated way to refer -- remove

10  files from the system, are you referring to an SRA?

11     A   Yes, I am.

12     Q   Okay.  Did you communicate with Fileserve about

13  any other mechanisms for limiting infringement on

14  Fileserve?

15         MR. FABRIZIO:  Objection.  Lacks foundation,

16  vague as to "you."

17  BY MR. ENGSTROM:

18     Q   When I say "you," I'm referring to you, Michael

19  Bentkover.

20     A   No.

21     Q   And if I'm referring to Warner Bros., I'll

22  refer to Warner Bros.

23         MR. FABRIZIO:  Throughout the deposition?

24         MR. ENGSTROM:  Yes.  Unless it's clear from the

25  context.  And if there is a question, please ask me to

Page 112

1

2          I, the undersigned, a Certified Shorthand

3     Reporter of the State of California, do hereby certify:

4          That the foregoing proceedings were taken

5     before me at the time and place herein set forth; that

6     any witnesses in the foregoing proceedings, prior to

7     testifying, were duly sworn; that a record of the

8     proceedings was made by me using machine shorthand

9     which was thereafter transcribed under my direction;

10    that the foregoing transcript is a true record of the

11    testimony given.

12         Further, that if the foregoing pertains to

13    the original transcript of a deposition in a Federal

14    Case, before completion of the proceedings, review of

15    the transcript [ x ] was [ ] was not requested.

16         I further certify I am neither financially

17    interested in the action nor a relative or employee

18    of any attorney or party to this action.

19         IN WITNESS WHEREOF, I have this date

20    subscribed my name.

21

22    Dated: 12-15-11

23

24    _____

LORI SCINTA, RPR

25                            CSR No. 4811

# EXHIBIT 9

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 11-20427-WILLIAMS-TURNOFF

DISNEY ENTERPRISES, INC.,
TWENTIETH CENTURY FOX FILM
CORPORATION, UNIVERSAL CITY
STUDIOS PRODUCTIONS LLLP,
COLUMBIA PICTURES INDUSTRIES,
INC., and WARNER BROS.
ENTERTAINMENT INC.,

      Plaintiffs,

v.

HOTFILE CORP., ANTON TITOV, and
DOES 1-10,

      Defendants.
_____/

HOTFILE CORP.,

      Counterclaimant,

v.

WARNER BROS. ENTERTAINMENT INC.,

      Counter-Defendant.
_____/

## DEFENDANTS' SUPPLEMENTAL RESPONSE TO PLAINTIFFS' INTERROGATORY NO. 10

PROPOUNDING PARTY:      Plaintiffs Disney Enterprises, Inc., Twentieth Century Fox Film Corporation, Universal City Studios Productions LLLP, Columbia Pictures Industries, Inc., and Warner Bros. Entertainment

**HIGHLY CONFIDENTIAL**

CASE NO. 11-20427-WILLIAMS-TURNOFF

RESPONDING PARTIES:     Defendants Hotfile Corporation and Anton Titov
                        (collectively "Hotfile")[1]

SET NO.:                One (1)

## GENERAL OBJECTIONS

1.      Hotfile has not completed its investigation of facts, witnesses or documents relating to this case, has not completed discovery, has not completed analysis of available information, and has not completed preparation for trial. Hotfile reserves the right to supplement its response to each and every interrogatory (or part thereof) without obligating itself to do so, and reserves the right to introduce and rely upon such information in the course of this litigation.

2.      All of the responses set forth below are based solely on such information and documents that are available to and specifically known to Hotfile at this time. It is anticipated that further discovery, independent investigation, and analysis may lead to substantial additions or changes in, and variations from the responses set forth herein.

3.      Hotfile objects to each interrogatory to the extent that it is vague, ambiguous, overbroad, and requires an unduly burdensome search for and production of, documents or information neither relevant to the subject matter involved in the pending action nor reasonably calculated to lead to the discovery of admissible evidence, and which will result in unnecessary burden and undue expense to Hotfile.

4.      Hotfile objects each interrogatory to the extent that it seeks disclosure of information or documents protected from disclosure or production by the attorney-client privilege, the attorney work-product doctrine, or any other privilege available under statutory, constitutional or common law. Inadvertent production of any such information or documents shall not constitute waiver of any privilege or any other ground for objecting to discovery with

---

[1] The Defendants reserve their respective rights to assert all appropriate separate defenses. Mr. Titov is included in the shorthand term "Hotfile" along with Hotfile Corp. solely as a convenience and in light of the Parties agreement "that discovery requests served by one side on the opposing side will be equally applicable to all parties on the other side." Joint Scheduling Conference Report, filed 4/15/11, Dkt. 54 at 16. Nothing in these responses is an admission by Anton Titov or Hotfile Corp. of any particular relationship between them or any other fact.

2                          **HIGHLY CONFIDENTIAL**

CASE NO. 11-20427-WILLIAMS-TURNOFF

respect to such information or documents, nor shall inadvertent production waive Hotfile's right to object to the use of any such information or documents in any proceedings.

5.     Hotfile objects to each interrogatory to the extent that it seeks electronically stored information that is not reasonably accessible to Hotfile because of undue burden or cost.

6.     Hotfile objects to each interrogatory to the extent that it calls for disclosure of private, proprietary, and confidential information. Hotfile will not produce private, proprietary, and/or confidential information or documents unless and until a Protective Order is issued in this litigation. Hotfile reserves its right to object to disclosure of any private, proprietary, and confidential information in light of the terms of the Protective Order in this litigation or based on any state, federal, or international standards or laws governing privacy.

7.     Hotfile objects to each interrogatory to the extent it seeks proprietary information of third parties which Hotfile is not authorized to disclose. Hotfile will not produce private, proprietary, and/or confidential information or documents unless and until a Protective Order is issued in this litigation. Hotfile further reserves the right to object to the disclosure of any information protected by any state, federal, or international standards or laws governing privacy.

8.     Hotfile objects to the Definition of "Hotfile users" as vague, ambiguous, and overbroad. As currently defined, that term purportedly refers to every internet user who has ever accessed the Hotfile.com website for any purpose, irrespective of whether a given individual has actually downloaded files from or uploaded files to Hotfile.com. To the extent that Plaintiffs' interrogatories seek information regarding or related to all such internet users, such interrogatories are unduly burdensome and not reasonably calculated to lead to the discovery of admissible evidence.

9.     Hotfile objects to the Definition of "You" as overbroad. As currently defined, that term would include any entity, business venture, or organization subject to any Defendant's control (assuming any such entity, business venture or organization exists), irrespective of whether such entity has any relation or relevance to the present dispute. To the extent that Plaintiffs' interrogatories seek information regarding or related to irrelevant entities, such

3

**HIGHLY CONFIDENTIAL**

CASE NO. 11-20427-WILLIAMS-TURNOFF

interrogatories are unduly burdensome and not reasonably calculated to lead to the discovery of admissible evidence.

10.     Hotfile objects to the Definition of "Hotfile entity" as overbroad. As currently defined, that term would include any entity, business venture, or organization subject to any Defendant's control (assuming any such entity, business venture or organization exists), irrespective of whether such entity has any relation or relevance to the present dispute. To the extent that Plaintiffs' interrogatories seek information regarding or related to all such entities, such requests are unduly burdensome and not reasonably calculated to lead to the discovery of admissible evidence.

11.     Hotfile objects to the providing of information about activities outside the United States as overbroad and unduly burdensome. "Federal copyright law has no extraterritorial effect, and cannot be invoked to secure relief for acts of infringement occurring outside the United States." *Palmer v. Braun*, 376 F.3d 1254, 1258 (11th Cir. 2004). Hotfile objects to all interrogatories that seek information related to conduct occurring outside the United States.

12.     Hotfile objects to each interrogatory to the extent it imposes on Hotfile obligations that exceed or are inconsistent with the obligations imposed by the Federal Rules of Civil Procedure.

13.     Hotfile objects to each interrogatory to the extent it imposes on Hotfile obligations that are inconsistent with United States or foreign privacy laws.

14.     All responses to these interrogatories are made without in any way waiving or intending to waive, but on the contrary preserving and intending to preserve:

      a.     all objections as to the competence, relevance, and admissibility of any documents or information produced in response to these interrogatories as evidence for any purpose in subsequent proceedings or at the trial of this or any other action, arbitration, proceeding or investigation;

      b.     the right to object on any ground at any time to the use of any of the documents or information provided in response to these interrogatories, or the subject

**HIGHLY CONFIDENTIAL**

CASE NO. 11-20427-WILLIAMS-TURNOFF

matter thereof, in any subsequent proceedings or at any trial(s) of this action, or any other action, arbitration, proceeding or investigation; and

c.      the right to object on any ground at any time to a demand for further responses to these interrogatories or any other requests, or to other discovery proceedings involving or relating to the subject matter of these interrogatories.

15.      The general objections stated herein are incorporated by reference into each response herein, as if fully set forth below. While Hotfile has responded to this interrogatory for production, it does so without waiving any right to object to any further inquiry or any effort to compel responses beyond those provided herein. Any response provided herein is subject to, and limited by, all general and specific objections stated herein.

## RESPONSES TO INTERROGATORIES

### INTERROGATORY NO. 10:

Identify each user whose access to the Hotfile website any Defendant or Hotfile Entity has ever terminated, limited, suspended, or otherwise penalized, and for each state:

a) The specific reason(s) therefore;

b) The date on which such action was taken; and

c) Whether the user was believed or alleged to be a copyright infringer or a repeat infringer. For purposes of responding to this Interrogatory, Plaintiffs do not believe that Defendants may lawfully withhold information on the basis that it contains identifying information regarding specific Hotfile users. Without prejudice to Plaintiffs' right to seek the identity and additional information pertaining to such users, Defendants may, in the first instance, limit their identification of users in response to this Interrogatory by identifying the users' usernames, Hotfile user identification number, and geographic location (such as by providing country, city and state information and/or sufficient unredacted IP address information).

### SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 10:

Hotfile has conducted further investigation in response to this interrogatory and discovered additional responsive information.

**HIGHLY CONFIDENTIAL**

26501\2957105.1

CASE NO. 11-20427-WILLIAMS-TURNOFF

Hotfile hereby supplements and amends its previous response. This response supersedes and replaces Hotfile's previous response to this Interrogatory No. 10.

Hotfile incorporates by reference it general objections to this interrogatory. Hotfile further objects to this interrogatory as overbroad and unduly burdensome to the extent that it seeks information pertaining to any "Hotfile Entity" as that term is defined in the Definitions and Instructions. As currently defined, that term would include any entity, business venture, or organization subject to any Defendant's control (assuming any such entity, business venture or organization exists), irrespective of whether such entity has any relation or relevance to the present dispute. Hotfile further objects to this interrogatory as overbroad and unduly burdensome to the extent that it seeks information pertaining to "Hotfile users" as that term is defined in the Definitions and Instructions. Plaintiffs' definition includes every internet user who has ever accessed the Hotfile website, regardless of whether such user has uploaded or downloaded files from Hotfile. It is impossible for Hotfile to know the identity of every person who has ever accessed the Hotfile website. Hotfile further objects to this interrogatory as overbroad, unduly burdensome, and not reasonably calculated to lead to the discovery of admissible evidence insofar as it seeks information regarding users that have been terminated for reasons unrelated to the alleged copyright infringement upon which this dispute is based.

Subject to those general and specific objections, Hotfile responds as follows:

Pursuant to Federal Rule of Civil Procedure 33(d), Hotfile has produced, to the extent information is available, documents sufficient for Plaintiffs to ascertain the Hotfile identification number of terminated users recorded in Hotfile's database, and the date of the terminations and the reason(s) for the terminations. *See* HF00000048. In addition to the repeat copyright infringer terminations expressly noted in HF00000048, Hotfile recorded the termination of over 700 users prior to the institution of this lawsuit for which it did not retain an exact date or reason for termination. *Id.* (see rows with N/A for date and reason for termination). Based on Hotfile's internal investigation, a portion of these users were terminated under Hotfile's repeat copyright

HIGHLY CONFIDENTIAL

CASE NO. 11-20427-WILLIAMS-TURNOFF

infringer policy.  Furthermore, as Mr. Titov testified at his deposition, in or around 2009, before Hotfile had the functionality to "suspend" users (which would preserve certain data about the users in a database), Hotfile "deleted" many users for copyright infringement.  Data regarding such user deletions was not maintained in Hotfile's databases and, thus, are not reflected on HF00000048.  *See* Deposition of Anton Titov as 30(b)(6) Representative of Hotfile Corp. at 290:7-12, 294:4-295:10.

DATED: February 10, 2012

By:   /s/ Deepak Gupta
    Roderick M. Thompson (admitted *pro hac vice*)
    Andrew Leibnitz (admitted *pro hac vice*)
    Anthony P. Schoenberg (*admitted pro hac vice*)
    Deepak Gupta (admitted *pro hac vice*)
    Janel Thamkul (admitted *pro hac vice*)
    FARELLA BRAUN + MARTEL LLP
    235 Montgomery St.
    San Francisco, CA  94104
    Telephone:  415.954.4400
    Telecopy: 415.954.4480

    *Counsel for Defendants Hotfile Corp. and Anton Titov*

7

**HIGHLY CONFIDENTIAL**

CASE NO. 11-20427-WILLIAMS-TURNOFF

## CERTIFICATE OF SERVICE

I hereby certify that on February 10, 2012, I caused to be served the foregoing DEFENDANTS' SUPPLEMENTAL RESPONSE TO PLAINTIFFS' INTERROGATORY NO. 10 on all counsel of record or pro se parties identified below via their email address(es) as set forth on the attached Service List, pursuant to the parties' service agreement.

I further certify that I am admitted pro hac vice to the United States Court for the Southern District of Florida and certify that this Certificate of Service was executed on this date at San Francisco, California

_____/s/_____
Deepak Gupta

**HIGHLY CONFIDENTIAL**

CASE NO. 11-20427-WILLIAMS-TURNOFF

## SERVICE LIST: CASE NO. 11-CIV-20427-WILLIAMS-TURNOFF

Duane C. Pozza, Esq.
Luke C. Platzer, Esq.
Steven B. Fabrizio, Esq.
Jenner & Block
1099 New York Avenue, N.W., Ste. 900
Washington, DC 20001-4412
Telephone:     (202) 639-6094
Fax:               (202) 639-6068
Email: dpozza@jenner.com;
lplatzer@jenner.com; sfabrizio@jenner.com

*Attorneys for Plaintiffs*
*Party Name:   Disney Enterprises, Inc.,*
*Twentieth Century Fox Film Corporation,*
*Universal City Studios Productions LLP,*
*Columbia Pictures Industries, Inc., Warner*
*Bros. Entertainment Inc.*

**Served via electronic mail by agreement**

Karen Linda Stetson, Esq.
Gray-Robinson P.A.
1221 Brickell Avenue, Suite 1650
Miami, FL 33131
Telephone:     (305) 416-6880
Fax:               (305) 416-6887
Email: kstetson@gray-robinson.com

*Attorneys for Plaintiffs*
*Party Name:   Disney Enterprises, Inc.,*
*Twentieth Century Fox Film Corporation,*
*Universal City Studios Productions LLP,*
*Columbia Pictures Industries, Inc., Warner*
*Bros. Entertainment Inc.*

**Served via electronic mail by agreement**

Karen R. Thorland, Esq.
Motion Picture Association of America, Inc.
15301 Ventura Blvd., Building E
Sherman Oaks, CA 91403
Telephone:     (818) 935-5812
Fax:               (818) 285-4407
Email: Karen_Thorland@mpaa.org

*Attorneys for Plaintiffs*
*Party Name:   Disney Enterprises, Inc.,*
*Twentieth Century Fox Film Corporation,*
*Universal City Studios Productions LLP,*
*Columbia Pictures Industries, Inc., Warner*
*Bros. Entertainment Inc.*

**Served via electronic mail by agreement**

9

**HIGHLY CONFIDENTIAL**

## VERIFICATION

I, Anton Titov, am a Manager of Hotfile Corporation, a defendant in this lawsuit. I make this verification on behalf of said party and on behalf of myself as an individual. I have read the foregoing Hotfile's Supplemental Response to Plaintiffs' Interrogatory No. 10 and know the contents thereof. To the best of my knowledge, information and belief, the responses set forth therein are true and correct.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this ____ day of February, 2012, in ___Sofia, Bulgaria___

By: _____

Anton Titov

8

# EXHIBIT 10

Page 1

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF FLORIDA


DISNEY ENTERPRISES, INC.,
TWENTIETH CENTURY FOX FILM
CORPORATION, UNIVERSAL CITY
STUDIOS PRODUCTIONS LLLP,
COLUMBIA PICTURES INDUSTRIES,
INC., and WARNER BROS.
ENTERTAINMENT INC.,

       Plaintiffs,

                      CASE NO.
                      11-20427-WILLIAMS-TURNOFF
     vs.

HOTFILE CORP., ANTON TITOV,
and DOES 1-10,

       Defendants.

AND RELATED CROSS-ACTION.


CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

VIDEOTAPED DEPOSITION OF DAVID P. KAPLAN, ESQUIRE

PURSUANT TO FEDERAL RULE 30(b)(6)

Los Angeles, California

Tuesday, December 13, 2011

Volume 1


Reported by:
LORI SCINTA, RPR
CSR No. 4811

Job No. 177476B

Page 2

1                    UNITED STATES DISTRICT COURT

2                    SOUTHERN DISTRICT OF FLORIDA

3

4    DISNEY ENTERPRISES, INC.,
     TWENTIETH CENTURY FOX FILM
5    CORPORATION, UNIVERSAL CITY
     STUDIOS PRODUCTIONS LLLP,
6    COLUMBIA PICTURES INDUSTRIES,
     INC., and WARNER BROS.
7    ENTERTAINMENT INC.,

8            Plaintiffs,
                            CASE NO.
9        vs.                11-20427-WILLIAMS-TURNOFF

10   HOTFILE CORP., ANTON TITOV,
     and DOES 1-10,
11
             Defendants.
12   _____
     AND RELATED CROSS-ACTION.
13   _____

14

15       CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

16           Videotaped deposition of DAVID P. KAPLAN,

17   ESQUIRE, Volume 1, pursuant to Federal Rule 30(b)(6),

18   taken on behalf of Defendants and Counterclaimant,

19   at 633 West Fifth Street, Los Angeles, California,

20   beginning at 2:18 P.M. and ending at 4:58 P.M. on

21   Tuesday, December 13, 2011, before LORI SCINTA, RPR,

22   Certified Shorthand Reporter No. 4811.

23

24

25

Page 3

```
 1    APPEARANCES:

 2

 3    For Plaintiffs:

 4
           JENNER & BLOCK LLP
 5         BY:  STEVEN B. FABRIZIO
           Attorney at Law
 6         1099 New York Avenue, NW, Suite 900
           Washington, D.C. 20001-4412
 7         202.639.6000
           Email:  sfabrizio@jenner.com
 8

 9
      For Defendants and Counterclaimant:
10
11         FARELLA BRAUN + MARTEL LLP
           BY:  EVAN M. ENGSTROM
12         Attorney at Law
           235 Montgomery Street
13         San Francisco, California 94104
           415.954.4400
14         Email:  eengstrom@fbm.com

15

16
      Videographer:
17
18         VONYARN MASON
           SARNOFF COURT REPORTERS
19         20 Corporate Park, Suite 350
           Irvine, California 92606
20         877.955.3855

21

22

23

24

25
```

1          THE WITNESS:  Yes.

2          MR. FABRIZIO:  We didn't just run searches and

3    hand the results over to you and say, "This is a list of

4    what we contend is infringing."

5          We spent hundreds of man-hours, maybe

6    thousands, but certainly hundreds of man-hours having

7    human beings look through the metadata and all

8    information with regard to those files.

9          With regard to some of them, "they" may have in

10   fact been content files to look at but, in the main, we

11   did not yet have the content files.

12         So we advised defendants that we would get the

13   content files from defendants and do further analysis.

14         MR. ENGSTROM:  What metadata was looked at?

15         MR. FABRIZIO:  I believe all the metadata that

16   Hotfile made available to us was looked at.

17   BY MR. ENGSTROM:

18      Q   Okay.  And we'll talk about files that are

19   produced -- files that are -- content files that have

20   already been produced.

21         But is that your understanding as to what was

22   done and that is the basis for Warner's allegation -- or

23   identification of files in Schedule A that it alleges

24   are infringing?

25      A   It is.

DAVID P. KAPLAN, ESQ.                    12/13/2011
CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

1

2

3

4

5

6

7

8

9          I, DAVID P. KAPLAN, ESQUIRE, do hereby declare

10   under penalty of perjury that I have read the foregoing

11   transcript; that I have made any corrections as appear

12   noted, in ink, initialed by me, or attached hereto; that

13   my testimony as contained herein, as corrected, is true

14   and correct.

15

16

17          EXECUTED this 13th day of _January_,

18   20 12, at _Burbank_, _California_.
                    (City)              (State)

19

20

21

22   _____
     DAVID P. KAPLAN, ESQUIRE
23   Volume 1

24

25



DAVID P. KAPLAN, ESQ.                          12/13/2011
CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

ERRATA SHEET

Pg/Ln                    Corrections

1

2

3    13/ 2   Change from: delete 'No'_____

4            Change to:_____

5    15/ 7   Change from: "I don't"_____

6            Change to:   'I'd'_____

7    72/18   Change from: add "or" before "a"_____

8            Change to:_____

9    ___/___  Change from:_____

10           Change to:_____

11   ___/___  Change from:_____

12           Change to:_____

13   ___/___  Change from:_____

14           Change to:_____

15   ___/___  Change from:_____

16           Change to:_____

17   ___/___  Change from:_____

18           Change to:_____

19   ___/___  Change from:_____

20           Change to:_____

21   ___/___  Change from:_____

22           Change to:_____

23   ___/___  Change from:_____

24           Change to:_____

25   Signature:_____     Date: 12/13/2012



Page 106

1
2          I, the undersigned, a Certified Shorthand

3   Reporter of the State of California, do hereby certify:

4          That the foregoing proceedings were taken

5   before me at the time and place herein set forth; that

6   any witnesses in the foregoing proceedings, prior to

7   testifying, were duly sworn; that a record of the

8   proceedings was made by me using machine shorthand

9   which was thereafter transcribed under my direction;

10   that the foregoing transcript is a true record of the

11   testimony given.

12          Further, that if the foregoing pertains to

13   the original transcript of a deposition in a Federal

14   Case, before completion of the proceedings, review of

15   the transcript [ x ] was [ ] was not requested.

16          I further certify I am neither financially

17   interested in the action nor a relative or employee

18   of any attorney or party to this action.

19          IN WITNESS WHEREOF, I have this date

20   subscribed my name.

21

22   Dated: 12-15-11

23

24                          _____
                            LORI SCINTA, RPR
25                          CSR No. 4811

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 11-20427-WILLIAMS-TURNOFF

DISNEY ENTERPRISES, INC.,
TWENTIETH CENTURY FOX FILM
CORPORATION, UNIVERSAL CITY
STUDIOS PRODUCTIONS LLLP,
COLUMBIA PICTURES INDUSTRIES,
INC., and WARNER BROS.
ENTERTAINMENT INC.,

           Plaintiffs,

      vs.

HOTFILE CORP., ANTON TITOV,
and DOES 1-10,

           Defendants.

AND RELATED CROSS-ACTION.

_____

HIGHLY CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

VIDEOTAPED DEPOSITION OF DAVID R. KAPLAN, ESQUIRE

PURSUANT TO FEDERAL RULE 30(b)(6)

Los Angeles, California

Wednesday, December 14, 2011

Volume 2

Reported by:
CHERYL R. KAMALSKI
CSR No. 7113

Job No. 179415



877.955.3855

1       UNITED STATES DISTRICT COURT
        SOUTHERN DISTRICT OF FLORIDA

2

        CASE NO. 11-20427-WILLIAMS-TURNOFF

3

4  DISNEY ENTERPRISES, INC.,
   TWENTIETH CENTURY FOX FILM

5  CORPORATION, UNIVERSAL CITY
   STUDIOS PRODUCTIONS LLLP,

6  COLUMBIA PICTURES INDUSTRIES,
   INC., and WARNER BROS.

7  ENTERTAINMENT INC.,

8          Plaintiffs,

9       vs.

10 HOTFILE CORP., ANTON TITOV,
   and DOES 1-10,

11

12         Defendants.
   _____

13 AND RELATED CROSS-ACTION.
   _____

14    HIGHLY CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

15

16       Videotaped Deposition of DAVID R. KAPLAN,

17 ESQUIRE, Volume 2, pursuant to Federal Rule 30(b)(6),

18 taken on behalf of Defendants and Counterclaimant,

19 at 633 West Fifth Street, 37th Floor, Los Angeles,

20 California, beginning at 9:16 a.m. and ending at

21 12:33 p.m. on Wednesday, December 14, 2011, before

22 CHERYL R. KAMALSKI, Certified Shorthand Reporter

23 No. 7113.

24

25

DAVID R. KAPLAN, ESQUIRE, V. 2                12/14/2011
HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

```
 1    APPEARANCES:

 2

 3    For Plaintiffs:

 4         JENNER & BLOCK LLP
           BY:  DUANE POZZA
 5         Attorney at Law
           1099 New York Avenue, NW, Suite 900
 6         Washington, D.C. 20001-4412
           202.639.6000
 7
      For Defendants and Counterclaimant:
 8
           FARELLA BRAUN + MARTEL LLP
 9         BY:  EVAN M. ENGSTROM
           Attorney at Law
10         235 Montgomery Street
           San Francisco, California 94104
11         415.954.4400

12    Videographer:

13         VONYARN MASON
           SARNOFF, a Veritext Company
14

15

16

17

18

19

20

21

22

23

24

25
```



Sarnoff.
A VERITEXT COMPANY        877.955.3855

1          THE WITNESS:  Again, for theatrical features

2     alone there's probably like 8,000 titles.  So the answer

3     is some of them were and some of them were not.

4     BY MR. ENGSTROM:

11:09  5      Q    Okay.  Were titles, movies, that Warner was

6     searching for infringing copies of on the Internet, were

7     all of those movies fingerprinted?

8          MR. POZZA:  Objection; ambiguous and also

9     outside the scope of the notice.

11:10 10          THE WITNESS:  I don't think all were.

11    BY MR. ENGSTROM:

12     Q    How about now, today?

13          MR. POZZA:  Objection; the question's

14    ambiguous, it's also outside the scope of the notice.

11:10 15          THE WITNESS:  No, I don't think all are.

16    BY MR. ENGSTROM:

17     Q    Okay.  We can put this document away for now.

18    Well, I don't think I'll be coming back to it, so we can

19    just put it away.

11:10 20          Okay.  You'll forgive me.  I have to staple

21    these quickly.

22          Why don't I give you a copy so you can look at

23    it while I'm doing this.  I'd like to mark this as

24    Exhibit 31.

11:11 25          (WB Exhibit 31 marked.)



1          MR. POZZA:  Counsel, do you know if this has

2    previously been marked as an exhibit in the previous

3    Warner Bros. deposition?

4          MR. ENGSTROM:  Off the top of my head, I don't.

11:12   5          THE WITNESS:  It was, but --

6          MR. ENGSTROM:  There may have been other

7    iterations of the document.  I'm not sure if this

8    particular one was, because there were several e-mails

9    on that string of e-mails, I believe.

11:12  10          MR. POZZA:  Okay.  Well, I will object to any

11    questioning on this document to the extent that it is

12    duplicative of questioning that has already been asked

13    of the witness in the previous deposition, or the same

14    topic, for that matter.

11:12  15    BY MR. ENGSTROM:

16          Q   So if you believe this was already marked as an

17    exhibit, do you recognize this document?

18          A   I do.

19          Q   Okay.  Do you recall what -- do you recall

11:12  20    the -- strike that.

21              What business proposal -- and I'm quoting

22    here -- I should say Business Idea, which is the subject

23    line of the top level e-mail, "Business Idea for Hotfile

24    and Warner Bros.," do you -- can you explain what the

11:13  25    business idea is?

1          MR. POZZA:  I'm going to object that this --

2      this was already covered at the last deposition, it's

3      repetitive.  And we have objected to reopening any of

4      the testimony there.

11:13  5          MR. ENGSTROM:  If you'd like to stipulate that

6      the foundation for this document has been laid, I'm more

7      than happy to ask different questions on it.

8          MR. POZZA:  Not a speaking objection, but to

9      understand where this is going, are you just -- are you

11:13 10   asking about other things, but using this as a

11     foundation?

12         MR. ENGSTROM:  I'm -- I'm asking questions

13     about this document that weren't asked in the previous

14     deposition that relate to the topic noticed here,

11:13 15   communications with Hotfile that relate to the studios'

16     main claim, not the counterclaim.

17         MR. POZZA:  Okay.  Well, you can ask questions.

18     But, you know, he testified as to what the, quote,

19     business idea was at length.

11:13 20       MR. ENGSTROM:  And if we want to -- if you

21     can -- if you stipulate that the previous testimony

22     remains the same --

23         MR. POZZA:  Well, we're not -- I'm not

24     withdrawing his previous testimony.  We don't need to

11:14 25   question him again.

1        MR. ENGSTROM:  Okay.  Fair enough.

2        MR. POZZA:  It's just not the time to ask him

3    questions you already asked.  I mean, if you want to ask

4    him different questions about the affirmative claims,

11:14  5    that's fine.

6    BY MR. ENGSTROM:

7        Q    Let me ask this.  Why did Warner Bros. propose

8    this to Hotfile?

9        A    I think we covered that, too, in the previous

11:14 10    deposition.  So --

11        MR. POZZA:  Yeah.  I'm --

12        THE WITNESS:  -- I would be inclined to just --

13    just to say what I said before was the reason.

14    BY MR. ENGSTROM:

11:14 15        Q    Which was what?

16        A    I may not say it this time with the exact same

17    words.  That's my only --

18        Q    Okay.  Sure.

19        MR. POZZA:  Yeah.  No.  I'm going to -- I'm

11:14 20    going to object to this as asked and answered.

21        MR. ENGSTROM:  Fine.

22        MR. POZZA:  There was extensive questioning and

23    explanation of -- of this -- this e-mail chain.  I don't

24    think it's necessary to get back into it again.

11:14 25        MR. ENGSTROM:  Are you instructing him not to

1    answer?

2          MR. POZZA:  I'm going to object to it as asked

3    and answered.

4          MR. ENGSTROM:  Okay.

11:14  5          MR. POZZA:  And he can state that he's already

6    answered it and he sticks by his previous answer.

7    BY MR. ENGSTROM:

8      Q   You can answer.

9      A   Yeah, I -- we testified about that -- I

11:14 10   testified to that in the previous deposition.  And I --

11   I stick by whatever I said in the previous deposition.

12     Q   Did -- did Warner Bros. offer the same business

13   idea or similar business idea to other hosting sites?

14         MR. POZZA:  Object to this in that it's

11:15 15   ambiguous and outside the scope of the deposition

16   notice.

17         THE WITNESS:  This idea never really got off

18   the ground at all.  So I don't know exactly what --

19   exactly what it would have been had Hotfile said yes, we

11:15 20   were interested in talking to you more about this so --

21   I can't say we offered this to somebody else because

22   there was never anything offered here, is what I'm

23   trying to say.

24   BY MR. ENGSTROM:

11:15 25     Q   Proposed.  The proposal.  Was this proposed to

DAVID R. KAPLAN, ESQUIRE, V. 2                    12/14/2011
HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

1    other hosting sites?

2              MR. POZZA:  I have the same objections as to

3    ambiguity and outside the scope of the notice.

4              THE WITNESS:  So I'm referring to now --

11:16  5    because this is the only basis for what the proposal

6    would have been, is the e-mail that Ethan sent in

7    February of 2010, which is, I guess, the first e-mail in

8    this chain, that talks about including links on Hotfile

9    to e-commerce sites where Warner Bros. content is

11:16 10   hosted.  And I don't believe we contacted other one-

11   click downloading sites with that proposal.

12   BY MR. ENGSTROM:

13        Q   Why was Hotfile the only one-click downloading

14   site that Warner Bros. contacted with that proposal?

11:17 15             MR. POZZA:  I'm going to object to the extent

16   that this covers testimony that he's already had about

17   this proposal, as you've characterized it.

18             THE WITNESS:  Yeah, I did testify as to why we

19   contacted Hotfile at the time, which was that it was a

11:17 20   site that had a lot of traffic on it, and it looked like

21   maybe they would be amenable to some anti- -- you know,

22   taking steps to minimize the piracy on the site, and

23   that if there was a commercial incentive for them to do

24   that, maybe they'd be more inclined to, you know,

11:17 25   eliminate the piracy of Warner Bros. content.

DAVID R. KAPLAN, ESQUIRE, V. 2                    12/14/2011
**HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER**

ERRATA SHEET

1

2    Pg/Ln                    Corrections

3    132 / 16   Change from: " to have up -- prescreened "

4               Change to: " to have -- prescreened "

5    199 / 4    Change from: _____

6               Change to: _____

7    199 / 6    Change from: " They were "

8               Change to: " they were not "

9    ___/___    Change from: _____

10              Change to: _____

11   ___/___    Change from: _____

12              Change to: _____

13   ___/___    Change from: _____

14              Change to: _____

15   ___/___    Change from: _____

16              Change to: _____

17   ___/___    Change from: _____

18              Change to: _____

19   ___/___    Change from: _____

20              Change to: _____

21   ___/___    Change from: _____

22              Change to: _____

23   ___/___    Change from: _____

24              Change to: _____

25   Signature: _____ Date: _____

1

2

3

4

5

6

7

8        I, DAVID R. KAPLAN, ESQUIRE, do hereby declare

9    under penalty of perjury that I have read the foregoing

10   transcript; that I have made any corrections as appear

11   noted, in ink, initialed by me, or attached hereto; that

12   my testimony as contained herein, as corrected, is true

13   and correct.

14       EXECUTED this _16__ day of _January_,

15   20_12_ at _Burbank_____, _California____.
                      (City)              (State)

16

17

18

19   
     DAVID R. KAPLAN, ESQUIRE
20   Volume 2

21

22

23

24

25

1        I, the undersigned, a Certified Shorthand

2    Reporter of the State of California, do hereby certify:

3        That the foregoing proceedings were taken

4    before me at the time and place herein set forth; that

5    any witnesses in the foregoing proceedings, prior to

6    testifying, were duly sworn; that a record of the

7    proceedings was made by me using machine shorthand

8    which was thereafter transcribed under my direction;

9    that the foregoing transcript is a true record of the

10   testimony given.

11       Further, that if the foregoing pertains to

12   the original transcript of a deposition in a Federal

13   Case, before completion of the proceedings, review of

14   the transcript [ ] was [x] was not requested

15       I further certify I am neither financially

16   interested in the action nor a relative or employee

17   of any attorney or any party to this action.

18       IN WITNESS WHEREOF, I have this date subscribed

19   my name.

20

21   Dated: 12/27/2011

22

23                          _____
                            CHERYL R. KAMALSKI
24                          CSR No. 7113

25

# EXHIBIT 11

**From:**   RThompson@fbm.com
**Sent:**   Thursday, May 05, 2011 4:57 PM
**To:**   DPozza@jenner.com
**Subject:** RE: Disney v. Hotfile

Duane, unless I'm missing something, it appears that you have provided this information in Schedule A to your interrogatory responses. I know you and Tony have been discussing confidentiality, so I want to be sure that I can forward Schedule A to Hotfile. Please confirm.

> -----Original Message-----
> **From:** Pozza, Duane [mailto:DPozza@jenner.com]
> **Sent:** Thursday, May 05, 2011 3:55 PM
> **To:** Thompson, Rod (27) x4445
> **Subject:** RE: Disney v. Hotfile
>
> Rod, on point #2, I understand that you are taking some position that the list of files is relevant to defendants' discovery responses. However, you've still not identified what the basis of that position is, much less identified the request for which you think it matters. As I noted below, that information is not relevant to defendants' responses. Defendants have no basis for delaying their production based on an alleged need for this information, nor must they "necessarily" do so.
>
> -Duane
>
> **From:** RThompson@fbm.com [mailto:RThompson@fbm.com]
> **Sent:** Friday, April 29, 2011 7:49 AM
> **To:** Pozza, Duane
> **Subject:** RE: Disney v. Hotfile

Duane, I suspected that there was a typo.

1.   We see no reason to agree to a start date for discovery as that will necessarily depend on the category of information sought.

2.   We disagree with your statement (as amended) that a list of the each of the specific files (or links to those files) accused of infringing the 150 works identified in the complaint is not needed to respond to discovery. If Plaintiffs choose to withhold that list (which they obviously prepared before filing suit) until they produce it in discovery, it will necessarily delay defendants collection and review of documents. Yes, it is your call whether to provide it early and informally, but it will have an affect on our response to your discovery requests.

Rod

-----Original Message-----

**From:** Pozza, Duane [mailto:DPozza@jenner.com]
**Sent:** Wednesday, April 27, 2011 8:02 PM
**To:** Thompson, Rod (27) x4445
**Subject:** RE: Disney v. Hotfile

Rod, there's a typo in one sentence in my email below. I've fixed it here:

However, even if it was appropriate to provide that information outside the context of discovery, defendants do <u>not</u> need that information to provide a complete response to our documents requests, and your email does not explain how it would even be used in the review process.

-Duane

**From:** Pozza, Duane
**Sent:** Wednesday, April 27, 2011 12:41 AM
**To:** RThompson@fbm.com; Fabrizio, Steven B
**Cc:** jmunn@rascoklock.com; ALeibnitz@fbm.com
**Subject:** RE: Disney v. Hotfile

Rod,

I am following up on our discussion Friday about proposed date limitations for the parties to use in responding to document requests, which is addressed in your third point below. I do not mean to re-hash this discussion, but I do want to be clear on our position given the brief statement in the email below suggesting that the plaintiffs would not agree to a 1/1/08 start date for document responses. I noted on the call that the plaintiffs cannot agree to a global 1/1/2009 start date for all requests, but I did suggest 1/1/2008 as a start date for both parties. Defendants would not agree to that. And given that the parties have not been able to agree on a start date for responding to all requests (whether or not that this is the same for both parties), we are left discussing this category by category, but I don't necessarily agree that that approach makes "more sense" in the abstract.

On a related note, in your email to me last night you requested that plaintiffs provide information about certain Hotfile links they have identified, outside the discovery process, in order to "facilitate" your client's review of responsive documents. However, even if it was appropriate to provide that information outside the context of discovery, defendants do need that information to provide a complete response to our documents requests, and your email does not explain how it would even be used in the review process. Your request in fact suggests that defendants intend to unreasonably limit the scope of their responses to at least some of our document requests. To the extent you are seeking to narrow defendants' response to our requests, we should separately discuss your basis for doing so.

-Duane

**Duane Pozza**
Jenner & Block LLP
1099 New York Avenue, N.W.
Suite 900
Washington, DC 20001-4412

Tel (202) 639-6027
Fax (202) 661-4962
DPozza@jenner.com
www.jenner.com

CONFIDENTIALITY WARNING: This email may contain privileged or confidential information and is for the sole use of the intended recipient(s). Any unauthorized use or disclosure of this communication is prohibited. If you believe that you have received this email in error, please notify the sender immediately and delete it from your system.

**From:** RThompson@fbm.com [mailto:RThompson@fbm.com]
**Sent:** Friday, April 22, 2011 8:05 PM
**To:** Pozza, Duane; Fabrizio, Steven B
**Cc:** jmunn@rascoklock.com; ALeibnitz@fbm.com
**Subject:** Disney v. Hotfile

Duane,

This follows up our conversation earlier today on several topics.

First, you asked on behalf of the Plaintiffs for another extension of time to exchange the initial Rule 26 disclosures. Defendants have previously agreed to a 10-day extension up until next Monday, April 25, 2011 on condition that the 10-day delay would not be used as a ground for Plaintiffs to oppose a possible motion to transfer to California. Frankly, we were strongly inclined to refuse this courtesy as the Plaintiffs refused a similar request last week to extend the time for Lemuria to respond to the subpoena served on it. Nevertheless, in view of your representation of inconvenience caused by need to coordinate with your clients over the holiday weekend, and hoping to establish a climate for future reciprocal courtesy, Defendants agree to a further one-week extension until Monday, May 2, 2011 for the exchange of initial Rule 26 disclosures with the same caveat that the additional seven-day delay will not be used as a ground to oppose a transfer motion. Enjoy the weekend.

Second, with respect to the Rule 30(b)(6) of Warner Bros., you indicated that Steve Fabrizio would be in the position to discuss scheduling a date certain with me upon his return to the office next week. My last email to Steve of subject (of April 13) is attached for reference. As requested therein, we would like to proceed with a deposition on topics 1 through 5, 10 and 13 of the deposition notice. With respect to our related request that Warner Bros. give priority to the document production related to those same categories--1 through 5, 10 and 13 of the deposition notice--you suggested that it was possible but the agreement should be reciprocal. That is, Warner Bros. would agree to give priority to producing documents responsive to those subject on condition that Hotfile would do the same. In this way we would have documents from both parties in time for use at the deposition. Subject to confirmation with my clients, I believe your

proposal should be acceptable and I look forward to working out a schedule with Steve for both the production of documents and the deposition of Warner Bros.

<<RE: Disney, et al., v. Hotfile, et al.>>     Third, Plaintiffs cannot agree to 1/1/08 as the presumptive start date for document discovery.  We agreed that it made more sense to look at the requests, category by category, to evaluate a reasonable starting date.


**Roderick M. Thompson**
Attorney at Law

---

**Farella Braun + Martel LLP**
RUSS BUILDING
235 MONTGOMERY STREET
SAN FRANCISCO / CA 94104

---

T 415.954.4400
D 415.954.4445
F 415.954.4480
www.fbm.com

# EXHIBIT 12

O

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

Case No.   CV 04-9484 AHM (SHx)                    Date   July 26, 2010

Title      PERFECT 10, INC. v. GOOGLE, INC.

---

Present: The Honorable        A. HOWARD MATZ, U.S. DISTRICT JUDGE

| Stephen Montes | Not Reported | |
|---|---|---|
| Deputy Clerk | Court Reporter / Recorder | Tape No. |

Attorneys **NOT** Present for Plaintiffs:        Attorneys **NOT** Present for Defendants:

**Proceedings:**        IN CHAMBERS (No Proceedings Held)

## I.    INTRODUCTION

On November 19, 2004, Perfect 10, Inc. ("P10") filed suit against Google, Inc. ("Google"), alleging a variety of claims, including direct, contributory, and vicarious copyright infringement. P10 creates and sells pictures of nude models through a now-defunct print magazine and through a password-protected subscription website. It alleges that Google—a search engine and provider of other internet services—infringes on its copyright by, among other things, linking to third-party websites that host images that infringe P10's copyrights, caching portions of websites that host infringing images, and hosting infringing images on its own servers that have been uploaded by users of its "Blogger" service.[1]

In three separate motions, Google has moved for partial summary judgment that it is entitled to immunity under three different provisions of the Digital Millennium

---

[1] The Court notes that the Ninth Circuit has already examined whether P10 has met its prima facie infringement case in an opinion granting P10 a preliminary injunction against Google on certain of its claims. *Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146 (9th Cir. 2007), *superseding* 487 F.3d 701. The Ninth Circuit examined the underlying copyright liability without considering the merits of Google's affirmative defense under the DMCA. 508 F.3d at 1158 n.4 ("Therefore, we must consider Google's potential liability under the Copyright Act without reference to title II of the DMCA.").

O

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

| | | | |
|---|---|---|---|
| Case No. | CV 04-9484 AHM (SHx) | Date | July 26, 2010 |
| Title | PERFECT 10, INC. v. GOOGLE, INC. | | |

Copyright Act ("DMCA"). Specifically, Google asserts that it deserves safe harbor under 17 U.S.C. § 512(d) for its web and image searches, under 17 U.S.C. § 512(b) for its caching feature, and under 17 U.S.C. § 512(c) for its Blogger service.

For the following reasons, the Court GRANTS IN PART AND DENIES IN PART Google's motion for partial summary judgment of entitlement to safe harbor under 17 U.S.C. § 512(d) for its Web and Image Search.[2] The Court GRANTS Google's motion for partial summary judgment for its caching feature based on 17 U.S.C. § 512(d), without having to assess whether it would be separately entitled to safe harbor under 17 U.S.C. § 512(b).[3] The Court GRANTS Google's motion for partial summary judgment of entitlement to safe harbor under 17 U.S.C. § 512(c) for its Blogger feature.[4]

## II.   FACTUAL BACKGROUND[5]

---

[2]Docket No. 456.

[3]Docket No. 458.

[4]Docket No. 457.

[5]Unless otherwise stated, the facts below are undisputed. Although the parties have claimed confidentiality in many filed documents, they have not provided the Court with specifications necessary to redact any of the specific recitals. Throughout P10's Statements of Genuine Issues for all three of the motions, it purports to "dispute" a fact, but then states allegations that are consistent with the asserted fact. *See, e.g.,* Perfect 10's Statement of Genuine Issues In Opposition to Google's Motion for Summary Judgment Re: Safe Harbor Under 17 U.S.C. § 512(d) For Web And Image Search ("SGI(d)") ¶ 25 (responding to the assertion that "[w]ebsites are included in Google's organic search results if they were crawled by the Googlebot and if they are relevant to users' queries," P10 states, "Disputed. Perfect10.com is presumably 'relevant' to a search for Jamike Hansen, as P10 is the sole owner of copyrights of her published images. However, a Google search on Jamike Hansen yields only infringing websites, most of which are Google advertising affiliates. Such search results do not contain a single link to perfect10.com." This purported dispute does not account for whether perfect10.com is crawled by the Googlebot, and, indeed, the Googlebot does not crawl websites that are

O

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| | | | |
|---|---|---|---|
| Case No. | CV 04-9484 AHM (SHx) | Date | July 26, 2010 |
| Title | PERFECT 10, INC. v. GOOGLE, INC. | | |

Google operates an Internet search engine by using an automated software program, known as a web crawler or the "Googlebot," to obtain copies of publicly-available webpages for use in its search index. Google's Consolidated Statement of Undisputed Facts in Support of Google's Motion for Summary Judgment Re: Safe Harbor Under 17 U.S.C. § 512(d) for Web and Image Search ("CSUF(d)") ¶¶ 1-2. For Image Search, Google's search engine compiles an index of the text associated with each image crawled, which is associated with a particular "thumbnail" image. *Id.* at ¶ 2. The Googlebot does not crawl literally every website. Haahr Decl. ¶ 14.

Google also provides Web Search users with the option of selecting a link to a "cached copy" of the webpages that appear in its search results. Google's Consolidated Statement of Undisputed Facts in Support of Google's Motion for Summary Judgment Re: Google's Entitlement to Safe Harbor Under 17 U.S.C. § 512(b) for its Caching Feature ("CSUF(b)") ¶ 5. The cached copy is an archival copy that Google stores on its servers until the next time its Googlebot visits that particular webpage. CSUF(b) ¶ 9. In most cases, the cached copy is stored only for a few weeks, and all of the copies are replaced within 18 months. Rebuttal Brougher Decl. ¶¶ 3-5. No images are stored in Google's cache, only the text; however, any images displayed on a cached page are delivered from their original source, if they still exist at that source. CSUF(b) ¶¶ 7-8.

In addition, Google provides a service, known as Blogger, that allows Blogger account holders to create their own blogs hosted on Google's servers. Google's Corrected Consolidated Separate Statement of Undisputed Facts in Support of Google's Motion for Summary Judgment Re: Safe Harbor Under 17 U.S.C. § 512(c) for its Blogger Service ("CSUF(c)") ¶ 1. *See* www.blogspot.com. Blogger account holders may display images on their blogs—in some cases the images are uploaded onto Google's servers and in other cases a user hyperlinks to content hosted on other servers. Poovala Decl. ¶ 26.

Google has a DMCA notification policy for each of these services. Poovala Decl., Ex. B (web search and cache), Ex. D (image search), Ex. G (Blogger). Google requires a

password protected, like perfect10.com is. *See* Haahr Decl. ¶ 14.). The Court will not address these immaterial "disputes," which do nothing more than strain the Court's resources and distract from the real issues in this litigation.

O

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

Case No.   CV 04-9484 AHM (SHx)          Date   July 26, 2010

Title   PERFECT 10, INC. v. GOOGLE, INC.

complainant to send a DMCA notice to Google's designated agent, specifying the copyrighted work infringed (including how to locate it), the complete URL at which the infringing material is located, and the Web Search query that links to the web page. Poovala Decl. ¶¶ 6-8. Google maintains the same DMCA policy for its Web Search and its cache. Poovala Decl. ¶ 5. Its policies differ slightly for its Image Search (requiring copyright holders to include the "image URL" for each image) and for the Blogger service (requiring copyright holders to include the "post URL" for each post and to target their notifications to the DMCA agent for its blogger site). Poovala Decl. ¶¶ 22-23; 27-31.

Google then verifies that the copyrighted work is, in fact, infringed, and, if so, it blocks the infringing URL from appearing in Google search results. Google allows the operator of the infringing website to file a counter-notification, which would then unblock the URL, unless the complainant files a lawsuit within 10 days. Poovala Decl. ¶¶ 11-20. Google will terminate account holders on its Blogger service if it determines that three DMCA notices of infringement were valid. Poovala Decl. ¶ 37.

Between 2001 and the time the summary judgment motion papers were filed, P10 sent Google 83 DMCA notices. Kassabian Decl., Exhs. L1-L17; Poovala Decl. Exhs. L1-L48, N1-N18. The parties sort these notices into three groups—the 17 Group A notices sent in 2001, Kassabian Decl. ¶ 13, Exhs. L1-L17; the 48 Group B "spreadsheet" notices sent between May 31, 2004 and April 24, 2007, Poovala Decl. ¶ 41, Exhs. L1-L48; and the 18 Group C "DVD and hard drive notices" sent in or after December 2005, Poovala Decl. ¶ 48, Exhs. N1-N18. Google has not processed any of the Group A notices. CSUF(d) ¶¶ 33, Poovala Decl. ¶ 79-80, Exh. FF-GG. The parties dispute whether Google has processed all of the Group B notices. CSUF(d) ¶¶ 33, Poovala Decl. ¶ 79-80, Exh. FF-GG; Zada Decl. ¶ 26, Ex. 14. Google has processed a fraction of the Group C notices beginning in 2007, but it has not processed the majority of the notices. Poovala Decl. ¶¶ 87-88, Exs. HH & II.

## III.   LEGAL STANDARD FOR SUMMARY JUDGMENT

Federal Rule of Civil Procedure 56(c) provides for summary judgment when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that

O

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

Case No.   CV 04-9484 AHM (SHx)                    Date   July 26, 2010

Title   PERFECT 10, INC. v. GOOGLE, INC.

there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." The moving party bears the initial burden of demonstrating the absence of a "genuine issue of material fact for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986). A fact is material if it could affect the outcome of the suit under the governing substantive law. *Id.* at 248. The burden then shifts to the nonmoving party to establish, beyond the pleadings, that there is a genuine issue for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).

"When the party moving for summary judgment would bear the burden of proof at trial, it must come forward with evidence which would entitle it to a directed verdict if the evidence went uncontroverted at trial. In such a case, the moving party has the initial burden of establishing the absence of a genuine issue of fact on each issue material to its case." *C.A.R. Transp. Brokerage Co., Inc. v. Darden Rests., Inc.*, 213 F.3d 474, 480 (9th Cir. 2000) (citations omitted). In contrast, when the non-moving party bears the burden of proving the claim or defense, the moving party can meet its burden by pointing out the absence of evidence from the non-moving party. The moving party need not disprove the other party's case. *See Celotex*, 477 U.S. at 325. Thus, "[s]ummary judgment for a defendant is appropriate when the plaintiff 'fails to make a showing sufficient to establish the existence of an element essential to [his] case, and on which [he] will bear the burden of proof at trial.'" *Cleveland v. Policy Mgmt. Sys. Corp.*, 526 U.S. 795, 805-06 (1999) (citing *Celotex*, 477 U.S. at 322).

When the moving party meets its burden, the "opposing party may not rely merely on allegations or denials in its own pleading; rather, its response must—by affidavits or as otherwise provided in this rule—set out specific facts showing a genuine issue for trial." Fed. R. Civ. P. 56(e). Summary judgment will be entered against the opposing party if that party does not present such specific facts. *Id.* Only admissible evidence may be considered in deciding a motion for summary judgment. *Id.*; *Beyene v. Coleman Sec. Servs., Inc.*, 854 F.2d 1179, 1181 (9th Cir. 1988).

"[I]n ruling on a motion for summary judgment, the nonmoving party's evidence 'is to be believed, and all justifiable inferences are to be drawn in [that party's] favor.'" *Hunt v. Cromartie*, 526 U.S. 541, 552 (1999) (quoting *Anderson*, 477 U.S. at 255). But the non-moving party must come forward with more than "the mere existence of a

O

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| | | | |
|---|---|---|---|
| Case No. | CV 04-9484 AHM (SHx) | Date | July 26, 2010 |
| Title | PERFECT 10, INC. v. GOOGLE, INC. | | |

scintilla of evidence." *Anderson*, 477 U.S. at 252. Thus, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citation omitted).

## IV. ANALYSIS

### A. Threshold Requirements for Safe Harbor Under All Three Sections

In order to be eligible for any of these three safe harbors under the DMCA, a party must satisfy three threshold conditions. First, the party must be a service provider as defined under 17 U.S.C. § 512(k)(1)(B). Second, the party must have "adopted and reasonably implemented, and inform[] subscribers and account holders of the service provider's system or network of a policy that provides for the termination in appropriate circumstances of subscribers and account holders of the service provider's system or network who are repeat infringers." 17 U.S.C. § 512(i)(1). Third, the party must "accommodate[] and . . . not interfere with standard technical measures" used by copyright owners to identify or protect copyrighted works. 17 U.S.C. §§ 512(i)(1)-(2).

P10 does not dispute that Google meets the first and third threshold requirements—service provider status and non-interference with standard technical measures. CSUF(d) ¶¶ 1-3. P10 does argue, however, that there are genuine issues of material fact as to whether Google has implemented a suitable repeat infringer policy.

The key case analyzing the "repeat infringer" requirement under 512(i) is *Perfect 10, Inc. v. CCBill LLC*, 488 F.3d 1102, 1110-11 (9th Cir. 2007). As this Court noted in *UMG Recordings, Inc. v. Veoh Networks, Inc.*, 665 F. Supp. 2d 1099, 1117 (C.D. Cal. 2009),

In *CCBill*, the Ninth Circuit set forth the standard for evaluating termination policies under the DMCA:

[A] service provider "implements" a policy if it has a working notification system, a procedure for dealing with

O

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

Case No.   CV 04-9484 AHM (SHx)                    Date   July 26, 2010

Title      PERFECT 10, INC. v. GOOGLE, INC.

> DMCA-compliant notifications, and if it does not actively prevent copyright owners from collecting information needed to issue such notifications.... The statute permits service providers to implement a variety of procedures, but an implementation is reasonable if, under "appropriate circumstances," the service provider terminates users who repeatedly or blatantly infringe copyright.

*CCBill*, 488 F.3d at 1109 (citations omitted). *See also Corbis Corp. [v. Amazon.com, Inc.*, 351 F. Supp. 2d 1090, 1104 (W.D. Wash. 2004)] ("Because it does not have an affirmative duty to police its users, failure to properly implement an infringement policy requires a showing of instances where a service provider fails to terminate a user even though it has sufficient evidence to create actual knowledge of that user's blatant, repeat infringement of a willful and commercial nature."); H.R. Rep. 105-551(II), at 61 ("[T]he Committee does not intend this provision to undermine the principles of new subsection (1) or the knowledge standard of new subsection (c) by suggesting that a provider must investigate possible infringements, monitor its service, or make difficult judgments as to whether conduct is or is not infringing.").

Here, Google has provided evidence that it has a system for receiving and processing notifications. *See* CSUF(d) ¶¶ 4-8. Moreover, Google points out—and P10 does not dispute—that Web Search, Image Search, and the caching feature do not have account holders or subscribers, CSUF(d) ¶ 23. P10 does not contend that Google must, or even can, have a repeat infringer policy for those services. *See* 17 U.S.C. § 512(i)(1)(A) (requiring a repeat infringer policy for those services with "subscribers and account holders").

As for the Blogger service, Google provides clear evidence that it terminates Blogger users who repeatedly or blatantly infringe copyright. CSUF(c) ¶¶ 13, 15, 34. P10 nevertheless makes several unavailing arguments that Google's repeat infringer policy is deficient. It argues that Google has not removed many of the links that P10 complained about or placed on its DMCA log. In response, Google counters that it is

O

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

Case No.    CV 04-9484 AHM (SHx)                      Date    July 26, 2010

Title    PERFECT 10, INC. v. GOOGLE, INC.

required to record into its log only notices that are DMCA compliant, *CCBill*, 488 F.3d at 1113-14, and that all of the notices that were not recorded were within Group C, in the form of DVDs or hard drives. *See* CSUF(c) ¶ 35. Google has offered evidence that all the notices that did comply with the DMCA were recorded in its logs. CSUF(c) ¶ 15. P10 next argues that the DMCA logs contain too few entries to be truly comprehensive. However, this argument suffers from the same deficiency—that Google was required to record only DMCA compliant notices. P10 also argues that Google could not have had an effective repeat offender policy because it tracks only email addresses, not the actual names of users. However, the DMCA does not impose an obligation on service providers to track their users in any particular way. In *Io Group, Inc. v. Veoh Networks, Inc.*, 586 F. Supp. 2d 1132, 1144 (N.D. Cal. 2008), the court did not require the service provider to verify or track actual identities because "the hypothetical possibility that a rogue user might reappear under a different user name and identity does not raise a genuine fact issue as to the implementation of" the service provider's repeat infringer policy. This Court agrees.

P10 also offers declarations from four copyright holders—Dean Hoffman, C.J. Newton, Les Schwartz, and Margaret Jane Eden—complaining about Google's processing of their DMCA notices. The Ninth Circuit has held that evidence of notices provided by a party other than the plaintiff may be relevant in determining whether a service provider has "implemented its repeat infringer policy in an unreasonable manner." *CCBill*, 488 F.3d at 1113. However, as Google notes, P10 did not identify any of these individuals in its Rule 26 disclosures. Rebuttal Kassabian Decl. ¶ 6. "If a party fails to provide information or identify a witness as required by Rule 26(a) or 26(e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1). Here, Google was deprived of the opportunity to depose or otherwise directly rebut these witnesses' declarations. P10 has provided no argument as to why its failure was substantially justified or harmless. Thus, the Court will not consider these declarations on this motion for partial summary judgment. *See Guang Dong Light Headgear Factory Co. v. ACI Intern., Inc.*, 2008 WL 53665 at *1 (D. Kan. Jan. 2, 2008) (striking an affidavit in a motion for summary judgment because the witness's identity and testimony were not properly disclosed under Rule 26).

O

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

Case No.   CV 04-9484 AHM (SHx)                    Date   July 26, 2010

Title   PERFECT 10, INC. v. GOOGLE, INC.

For the foregoing reasons, then, the Court concludes that Google employs an adequate repeat infringer policy and practice.

**B.    Safe Harbor For Web and Image Searches Under Section 512(d) ("Information Location Tools")**

The Court will now analyze whether Google has proven it has met all the requirements for a safe harbor for its web and image searches under 17 U.S.C. § 512(d). To the extent that Google's Blogger service and web search caching feature function as information location tools by linking users to content hosted on third-party websites, rather than any content hosted by Google, this analysis will apply to those tools as well.[6]

Section 512(d) entitled "Information location tools," provides a safe harbor from liability for a "service provider" that infringes a copyright by "referring or linking users to an online location containing infringing material or infringing activity, by using information location tools, including a directory, index, reference, pointer, or hypertext link"—provided that the provider:

(1)(A) does not have actual knowledge that the material or activity is infringing;

(B) in the absence of such actual knowledge, is not aware of facts or circumstances from which infringing activity is apparent; or

(C) upon obtaining such knowledge or awareness, acts expeditiously to remove, or disable access to the material;

(2) does not receive a financial benefit directly attributable to the

---

[6]In particular, Google offers evidence, which is undisputed by P10, that no images found in Google's cache are stored on Google's servers. CSUF(b) ¶ 7. Thus, any claims for copyright infringement based on images "found in" Google's cache are actually claims for infringement based on linking users to content hosted on third-party websites, and therefore the § 512(d) safe harbor will apply to these claims.

O

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

Case No.   CV 04-9484 AHM (SHx)                    Date   July 26, 2010

Title    PERFECT 10, INC. v. GOOGLE, INC.

infringing activity, in a case in which the service provider has the right and ability to control such activity; and

(3) upon notification of claimed infringement as described in subsection (c)(3), responds expeditiously to remove, or disable access to, the material that is claimed to be infringing or to be the subject of infringing activity, except that, for purposes of this paragraph, the information described in subsection (c)(3)(A)(iii) shall be identification of the reference or link, to material or activity claimed to be infringing, that is to be removed or access to which is to be disabled, and information reasonably sufficient to permit the service provider to locate that reference or link.

17 U.S.C. § 512(d).

The preceding cited portion of the DMCA thus effectively requires that for P10 to have provided adequate notice purporting to disclose infringements on Google's web and image searches, P10 had to satisfy 17 U.S.C. § 512(c)(3)(A), which applies to "Information residing on systems or networks at direction of users." It specifies that in order for a notification of claimed infringement to be effective, it must include:

(i) A physical or electronic signature of a person authorized to act on behalf of the owner of an exclusive right that is allegedly infringed.

(ii) Identification of the copyrighted work claimed to have been infringed, or, if multiple copyrighted works at a single online site are covered by a single notification, a representative list of such works at that site.

(iii) Identification of the material that is claimed to be infringing or to be the subject of infringing activity and that is to be removed or access to which is to be disabled, and information reasonably sufficient to permit the service provider to locate the material.

O

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| | | |
|---|---|---|
| Case No. | CV 04-9484 AHM (SHx) | Date   July 26, 2010 |
| Title | PERFECT 10, INC. v. GOOGLE, INC. | |

(iv) Information reasonably sufficient to permit the service provider to contact the complaining party, such as an address, telephone number, and, if available, an electronic mail address at which the complaining party may be contacted.

(v) A statement that the complaining party has a good faith belief that use of the material in the manner complained of is not authorized by the copyright owner, its agent, or the law.

(vi) A statement that the information in the notification is accurate, and under penalty of perjury, that the complaining party is authorized to act on behalf of the owner of an exclusive right that is allegedly infringed.

17 U.S.C. § 512(c)(3).

P10 argues that Google acquired knowledge of infringement upon its receiving notices of infringement from P10 and that once Google had this knowledge, it did not act expeditiously to suppress the infringing links. (P10 does not, however, argue that Google receives a direct financial benefit from the infringing activity, has the right and ability to control such activity, and thus cannot enjoy safe harbor for its web and image search results.)

For its part, Google asserts that it has met all of the requirements necessary to qualify for the section 512(d) safe harbor for its web and image search results. It counters P10's arguments that Google had knowledge of infringement by asserting that P10's notices of infringement were defective for a multitude of reasons and that Google nonetheless expeditiously processed numerous notices in circumstances where it was feasible to do so. The Court must examine the specific characteristics of the notices to determine which party is correct.

The parties divide the DMCA notices into three groups based on when they were sent to Google. (See Section II of this Order.) The Group A notices consist of email communications that P10 sent between May 11, 2001 and July 6, 2001. CSUF(d) ¶¶ 28-31 n.1. The Group B notices comprise notices sent primarily in Excel spreadsheet form

O

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

Case No.   CV 04-9484 AHM (SHx)                    Date   July 26, 2010

Title   PERFECT 10, INC. v. GOOGLE, INC.

---

between May 31, 2004 and April 24, 2007.  CSUF(d) ¶¶ 32-48 n.2.  The Group C notices were provided on DVDs and external hard drives between December 9, 2005 and June 13, 2009.  CSUF(d) ¶¶ 49-68 n.3.

1.  The Group A notices

Google first argues that the Group A notices are irrelevant because they are time-barred.  Google is incorrect, as the Ninth Circuit has held that "[i]n a case of continuing copyright infringements, an action may be brought for all acts that accrued within the three years preceding the filing of the suit."  *Roley v. New World Pictures*, 19 F.3d 479, 481 (9th Cir. 1994).  P10 has presented facts that indicate that Google was still linking to URLs identified as infringing in the Group A notices within three years of when the lawsuit commenced.  Zada Decl. ¶¶ 15-17, Ex. 8-10.  Thus, the claims are not time-barred.

Google also argues that because P10 has not answered Google's requests for admission pertaining to the Group A notices, P10 cannot rely on these notices as evidence of Google's knowledge.  Google bases this argument on Fed. R. Civ. P. 26 and 37, but these rules merely allow the court *discretion* to prohibit a party who disobeys a discovery order or a request for discovery from introducing the related evidence.  The Court does not find that P10's conduct with respect to the Group A notices rises to a level that would justify their exclusion from consideration.

However, the Court does find that Google has shown that there is no genuine dispute of material fact that the Group A notices were inadequate to provide notice under the DMCA.  Google has offered undisputed evidence that all of the Group A notices were sent by email to "webmaster@google.com" instead of to the address of Google's designated agent listed at the Copyright Office.  Kassabian Decl. Exhs. L1-L17; Rebuttal Kassabian Decl. Ex. B.  In addition, the notices are substantively deficient.  They uniformly do not identify specifically which copyrighted works were infringed as required by 17 U.S.C. § 512(c)(3)(A)(ii).  Kassabian Decl. ¶ 13, Exhs. L1-L17.  Thus, the Court finds that Google has shown that there is no genuine dispute of material fact that the Group A notices did not provide notice under the DMCA.

---

O

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 04-9484 AHM (SHx) | Date | July 26, 2010 |
|---|---|---|---|
| Title | PERFECT 10, INC. v. GOOGLE, INC. | | |

2. The Group B notices

As for the Group B notices, Google has *not* met its burden of showing that there is no dispute of material fact as to whether these notifications were valid under the DMCA. Each notice contains references to dozens or even hundreds of alleged infringing links. Google argues that these notices are invalid in their entirety because the majority of the references are invalid. Google is correct that many of the references do contain incomplete URLs, lack image-specific URLs, or do not reference the copyrighted work with specificity. Poovala Decl. Exhs. L1-L48. References having these deficiencies do not confer adequate notice under the DMCA. The DMCA requires a notification to include "[i]dentification of the copyrighted work claimed to be infringed," 17 U.S.C. § 512(c)(3)(A)(ii), and "identification of the reference or link, to material claimed to be infringing, that is to be removed or access to which is to be disabled, and information reasonably sufficient to permit the service provider to locate that reference or link," 17 U.S.C. § 512(d)(3). Of course, Google was not required to act to remove any entry that did not meet the DMCA requirements.

However, P10 does point to some notices that *do* meet all of the requirements of the DMCA. For example, in its May 31, 2004 notice, P10 provided Google with the complete URL "http://pix.alronix.net/Photo_Scans/Tits/Monika_Zsibrita/pic00076.htm" along with the volume, issue, and page number of *Perfect 10 Magazine* in which the image originally appeared. Zada Decl. ¶ 21; Exh. 13. These individual references sufficed to confer notice of infringement for those particular URLs, despite the fact that other URL references within the notices were insufficient.

In *CCBill*, the Ninth Circuit expressed concern that "[p]ermitting a copyright holder to cobble together adequate notice from separately defective notices . . . unduly burdens service providers." 488 F.3d at 1113. In that case, P10 provided CCBill with three sets of documents that would have required the defendant service provider to "find the relevant line in the spreadsheet indicating ownership information, then comb the 22,185 pages provided by Perfect 10 in order to find the appropriate image, and finally copy into a browser the location printed at the top of the page—a location which was, in some instances, truncated." *Id.* Here, by-and-large the Group B notices also are organized in spreadsheet format, including a cover letter or email and a three-column

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

Case No.   CV 04-9484 AHM (SHx)                                  Date   July 26, 2010

Title      PERFECT 10, INC. v. GOOGLE, INC.

spreadsheet. Poovala Decl. ¶ 42, Ex. L1-L48. The first column lists infringing URLs,
the second lists the search terms used to find the URL, and the third lists the location of
the copyrighted work at issue within P10's website or magazine. *Id.* Unlike in *CCBill*,
where the service provider would have to refer back and forth between different files,
here the Group B notices enabled Google to scan the entries to determine their
compliance with the DMCA. This is not an undue burden. Therefore, P10 has
demonstrated that at least some of those notices were valid under the DMCA.

The parties dispute whether Google has processed all of the adequate Group B
notices. SGI(d) ¶ 33; Zada Decl. ¶ 26, Ex. 14. In addition, P10 argues that even as to
those notices that Google did process, Google failed to do so quickly enough to satisfy
the DMCA requirement that "upon notification of claimed infringement" the alleged
infringer act "expeditiously to remove, or disable access to, the material that is claimed to
be infringing or to be the subject of infringing activity." *See* 17 U.S.C. § 512(d)(3).

Google has the burden as the moving party on this summary judgment motion, to
show that there is no genuine issue of material fact as to whether it is entitled to DMCA
safe harbor for the Group B notices and thus is entitled to judgment as a matter of law on
this issue. It has not met that burden. Google offers evidence that it began processing
P10's Group B notices immediately upon receipt and completed processing the majority
of the notices within one-to-two weeks of receipt. Poovala Decl. ¶¶ 56-91. However,
P10 offers other evidence that sometimes Google waited between four and seventeen
months to process a number of the Group B notices, as well as evidence that some notices
were not processed at all. Zada Decl. ¶ 26. This factual dispute as to how long the
processing took precludes summary judgment for Google for the Group B notices.

In addition, the legislative history suggests that Congress contemplated that
whether a service provider's removal or disabling of access to infringing material was
expeditious ordinarily would be a factual rather than a legal inquiry, unless the delay is
unusually lengthy and not justifiable. Thus, the Senate Judiciary Committee Report on
the DMCA notes

Subsection (c)(1)(A)(iii) provides that once a service provider obtains
actual knowledge or awareness of facts or circumstances from which

O

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| | | | |
|---|---|---|---|
| Case No. | CV 04-9484 AHM (SHx) | Date | July 26, 2010 |
| Title | PERFECT 10, INC. v. GOOGLE, INC. | | |

infringing material or activity on the service provider's system or network is apparent, the service provider does not lose the limitation of liability set forth in subsection (c) if it acts expeditiously to remove or disable access to the infringing material. *Because the factual circumstances and technical parameters may vary from case to case, it is not possible to identify a uniform time limit for expeditious action.*

S. Rep. No. 105-190, at 44 (1998) (emphasis added).  Thus, the Court DENIES Google's motion for summary judgment as to safe harbor for at least some of the Group B notices.

    3.  <u>The Group C notices</u>

      The Group C notices are, however, a different story.  As Google has demonstrated, the Group C notices, much like the notices described in *CCBill*, require the service provider to move back and forth between several different files in order to determine that a given URL was infringing (in the instances where the URLs were provided, which was not always the case).  The Group C notices generally consist of a cover letter, a spreadsheet, and a hard drive or DVDs containing electronic files. Poovala Decl. ¶ 48, ex. N1-N18.  Where P10 provided spreadsheets, the spreadsheets do not identify the infringing URL, but merely the top-level URL for the entire website.  Poovala Decl. ¶ 51. P10 evidently expected Google to comb through hundreds of nested electronic folders containing over 70,000 distinct files, including raw image files such as JPEG files and screen shots of Google search results, in order to find which link was allegedly infringing.  Poovala Decl. ¶¶ 52-53, Ex. O; Khan Decl. ¶ 6.  In many cases, the file containing the allegedly infringing image does not even include a URL, or the URL was truncated.  Poovala Decl. ¶¶ 54-55.  The spreadsheets also do not identify the copyrighted work that was allegedly infringed.  *Id.* at ¶ 50.  Instead, the cover letters contain a statement similar or identical to the following:

    If you wish to examine the copyrighted images of Perfect 10 which correspond to these infringing images, I have previously sent to you all of the images on our website, as of June, 2007. [*sic*] Also, as I have previously advised you, if you would like a free subscription to Perfect 10's website, please let me know and I will provide a user name and

O

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

Case No.   CV 04-9484 AHM (SHx)                              Date   July 26, 2010

Title   PERFECT 10, INC. v. GOOGLE, INC.

password for you.

Poovala Decl., Ex. N4 at 846.  P10 then expected Google to search through a separate electronic folder—attached only to the June 28, 2007 DMCA notice—containing all of the more than 15,000 images that appeared on P10's website as of June 2007, in order to identify the copyrighted work that was infringed.  Poovala Decl. ¶ 50, Ex. N3.

As the Ninth Circuit explained in *CCBill*, "The DMCA notification procedures place the burden of policing copyright infringement—identifying the potentially infringing material and adequately documenting infringement—squarely on the owners of the copyright." *CCBill*, 488 F.3d at 1113.  P10's Group C notices do not "identif[y] . . . the copyrighted work claimed to have been infringed . . . ." 17 U.S.C. § 512(c)(3).  To refer Google to more than 15,000 images appearing on the entirety of P10's website falls far short of identifying what may have been infringed.  Nor is a reference to the totality of the P10 image collection "a representative list" of "multiple copyrighted works" appearing without authorization at a single infringing site.  *See* 17 U.S.C. § 512(c)(3).  Thus, all of P10's Group C notices lack the identification of the copyrighted work required by section 512(c)(3)(A)(ii).[7]

P10's Group C notices are additionally defective because they do not contain all of

_____

[7]P10 argued at the hearing that if an allegedly infringing photo included in the thousands of website screenshot files sent to Google contains a P10 copyright notice—*see, e.g.*, Zada Decl., Ex. 33 at 2—that copyright notice should satisfy the requirement that P10 "identif[y] . . . the copyrighted work claimed to have been infringed." 17 U.S.C. § 512(c)(3)(A)(ii). However, such a copyright notice on a screenshot taken from an infringing website does not identify the copyrighted *work*. At best, the notice merely serves to identify someone claiming to own the image, whereas it would contain the necessary identification if it also showed the URL on the P10 website or the volume and page number of *Perfect10* magazine at which the original copyrighted image appears. In any event, Google is not obligated to comb through tens of thousands of images to determine which ones contain copyright notices. This would impermissibly "shift a substantial burden from the copyright owner to the provider," *CCBill*, 488 F.3d at 1113, as described more fully in the next paragraph.

O

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

Case No.   CV 04-9484 AHM (SHx)                          Date   July 26, 2010

Title      PERFECT 10, INC. v. GOOGLE, INC.

the required information in a single written communication. In *CCBill*, the Ninth Circuit held that Perfect 10's "separate communications" in that case were inadequate because "[p]ermitting a copyright holder to cobble together adequate notice from separately defective notices . . . unduly burdens service providers." *CCBill*, 488 F.3d at 1113. As the *CCBill* court noted, "the text of § 512(c)(3) requires that the notice be '*a* written communication.' (Emphasis added)." *Id.* Though the notices at issue in that case were actually sent at different times, the thousands of separate electronic files on each disk that P10 sent to Google are the functional equivalent of separate notices. Unlike certain of the Group B notices that contain all of the statutorily required information in a single spreadsheet, no single document in any of the Group C notices contains all of the information required in a valid DMCA notification. Instead, in order to process a Group C notice, Google would be required to examine thousands of separate files in order to determine which URLs might be infringing and which copyrighted images are alleged to be infringed. This would impermissibly "shift a substantial burden from the copyright owner to the provider." *Id.*

     For example, in order to process one entry in the spreadsheet for the July 2, 2007 notice—Ex. N4 to the Poovala Declaration (the cover letter of which is attached hereto as Exhibit 1)—Google would have to go through the following steps, among others.

     **Step One.**   First, it would have to look to the cover letter for the required statements by the copyright owner of ownership, nonlicensed use, and veracity of the notice, as well as for instructions about how to process the two enclosed DVDs. Ex. N4 at 845-47.

     **Step Two.**   Then Google would have to refer to the attached Excel spreadsheet, which specifies the top-level (not image-specific) URL for the allegedly infringing website, the DVD on which the images at that site appear, and the folder or subfolder in which the images appear. *See* Ex. N4 at 848-56. This, for example, is the first page of the spreadsheet accompanying the July 2, 2007 notice, reproduced as Page 848 of Exhibit N4:

///
///

O

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

Case No.   CV 04-9484 AHM (SHx)                    Date   July 26, 2010

Title      PERFECT 10, INC. v. GOOGLE, INC.

| INFRINGING WEBSITE | LOCATION OF IMAGES | FOLDER OR SUBFOLDER |
|---|---|---|
| 4eyes.free.fr | DISK I | ALL LARGE ARE P10 |
| 62.208.64.5 | DISK I | ALL LARGE ARE P10 |
| 99modells.com | DISK I | ALL LARGE ARE P10 |
| abshell.net | DISK I | ALL ARE P10 |
| adamast.ru | DISK I | ALL LARGE ARE P10 |
| adamscelebs.net | DISK I | ALL ARE P10 |
| aeonsuper.250x.com | DISK I | ALL LARGE ARE P10 |
| aeonsuper.250x.com | DISK I | ALL LARGE ARE P10 |
| agrreviews.com | DISK I | ALL LARGE ARE P10 |
| akty.cz | DISK I | ALL LARGE ARE P10 |
| alacarga.com | DISK I | ALL LARGE ARE P10 |
| alibi.com.mk | DISK I | ALL LARGE ARE P10 |
| ali-saschofk.infostore.org | DISK I | ALL ARE P10 |
| allwallpapers.net | DISK I | ALL LARGE ARE P10 |
| amp2000.com.ar | DISK I | ALL LARGE ARE P10 |
| anarkasis.com | DISK I | ALL ARE P10 |
| angelicscans.com | DISK I | ALL LARGE ARE P10 |
| angelodellasega.com | DISK I | ALL LARGE ARE P10 |
| art.picturetrades.com | DISK I | ALL ARE P10 |
| averio.com | DISK I | ALL LARGE ARE P10 |
| babefocus.com | DISK I | ALL LARGE ARE P10 |
| babeportal.dk | DISK I | ALL LARGE ARE P10 |
| babereactor.com.ar | DISK I | ALL LARGE ARE P10 |
| bevarilideling.dk | DISK I | ALL LARGE ARE P10 |
| big.dads.net | DISK I | ALL ARE P10 |
| big.supereva.com | DISK I | ALL LARGE ARE P10 |
| bimmer.roadfly.com | DISK I | ALL LARGE ARE P10 |
| blastyourbrain.com | DISK I | ALL ARE P10 |
| blinkyou.com | DISK I | ALL LARGE ARE P10 |
| boobieblog.com | DISK I | ALL LARGE ARE P10 |

Page 1 of 10

Figure 1.  (Sample spreadsheet.)

**Step Three**.  Then, for Google to figure out which images P10 alleged to be infringing on the website referred to as "big.supereva.com" on the above shown Ex. N4 at 848, it would have to load Disk I on a computer and open the "ALL LARGE ARE P10" folder.  This is the top-level menu window that loads when that is done:

///

///

///

O

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| | | | |
|---|---|---|---|
| Case No. | CV 04-9484 AHM (SHx) | Date | July 26, 2010 |
| Title | PERFECT 10, INC. v. GOOGLE, INC. | | |

Figure 2. (Top-Level Menu)

The contents of the "ALL LARGE ARE P10" folder are shown next.

///
///
///

O

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

Case No.   CV 04-9484 AHM (SHx)                    Date   July 26, 2010

Title      PERFECT 10, INC. v. GOOGLE, INC.



Figure 3.  (Files shown when Top-Level Window is opened.)

**Step Four.**
    Google would next have to open the "big.supereva.com" folder, which contains 129 files.  Figure 4, below, shows some of the contents of a very small portion of the "big.supereva.com" folder.

///
///

O

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

Case No.   CV 04-9484 AHM (SHx)                    Date   July 26, 2010

Title     PERFECT 10, INC. v. GOOGLE, INC.



Figure 4.  (Contents of the big.supereva.com folder.)

///
///
///
///
///
///
///

---

O

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| | | | |
|---|---|---|---|
| Case No. | CV 04-9484 AHM (SHx) | Date | July 26, 2010 |
| Title | PERFECT 10, INC. v. GOOGLE, INC. | | |

The cover letter (discussed above in Step One) instructs Google that within the "ALL LARGE ARE P10" folder, "all full-sized images are copyrighted by Perfect 10," presumably distinguishing full-sized images from thumbnails. *See* Ex. N4 at 845. On the immediately preceding Figure 4 there are at least four entries described as "thumbs" and at least nine entries described as "large." Although there are no entries described as "full-sized," the Court assumes that Google would equate "large" with "full-sized." In any event, what P10's cover letter fails to explain is whether it also claimed an ownership interest in the entries described merely with the model's name (*e.g.,* "amy 7"), which would have required Google to open up those files as well.[8]

**Step Five**.
Figure 5, shown next, is the file that opens when a user clicks on the file in Figure 4 labeled "amy large 2.png."

///
///
///
///
///
///
///
///
///
///
///
///
///
///
///

---

[8]In some of the Group C notices, P10 uses green check marks or red Xs to indicate that particular photos are or are not P10-owned images. *See, e.g.,* Zada Decl., Exs. 8 at 4 and 41 at 9. However, P10 did not do this for the images in the "big.supereva.com" folder.

O

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

Case No.   CV 04-9484 AHM (SHx)                                    Date   July 26, 2010

Title      PERFECT 10, INC. v. GOOGLE, INC.



Figure 5.

Figure 5 does not contain a complete URL specifying where the image or images in question appear. The URL is truncated by ellipses in the middle, thereby requiring Google to search within the big.supereva.com website to find the allegedly infringing

O

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 04-9484 AHM (SHx) | Date | July 26, 2010 |

| Title | PERFECT 10, INC. v. GOOGLE, INC. |

image.[9]  As discussed above, in order to find the copyrighted work to which Figure 5 corresponds, Google would have to search through either the perfect10.com website or through a folder containing over 15,000 P10 images that P10 had submitted with its June 28, 2007 DMCA notice.  Poovala Decl. ¶ 50, Ex. N3.

Thus, in order to process a single allegedly infringing URL, Google would have to go through at least eight steps—(1) review the cover letter; (2) review the spreadsheet; (3) insert Disk I; (4) open the "ALL LARGE ARE P10" folder; (5) open the "big.supereva.com" folder; (6) open the "amy large 2.png" file; (7) determine the image URL for the image in that file notwithstanding that the URL was truncated; and (8) refer to the folder sent with a separate DMCA notice containing the 15,000 P10 images in order to find the copyrighted image that corresponds to the "amy large 2.png" file. Google might have to complete this process for many, if not all, of the 70,000 distinct files contained in the DVDs (including some files that each contain hundreds of pages of images), as well as for the external hard drive submitted with Ex. N3, which contained at least 46,187 pages of material.  *See* Khan Decl. ¶¶ 6, 13, 19.  This would be even more onerous than the situation in *CCBill*, where the Ninth Circuit found it was improper to require the defendant to "first find the relevant line in the spreadsheet indicating ownership information, then comb the 22,185 pages provided by Perfect 10 in order to find the appropriate image, and finally copy into a browser the location printed at the top of the page—a location which was, in some instances, truncated." *CCBill*, 488 F.3d at 1113.

At the hearing, P10 voiced its concern that this Court's ruling would prevent it from including collections of infringing images as supporting evidence for otherwise valid DMCA notices.  Not so; P10 remains free to include additional supporting evidence, such as screenshots, with the material it submits to a service provider. However, at a minimum, the essential elements of notification—the copyright owner's attestations of ownership, nonlicensed use, and veracity of the notice; contact information

---

[9]Some of the files submitted to Google did include complete URLs, such as page 2 of Exhibit 33 to the Zada Declaration.  However, the numerous steps Google would nonetheless have to take to process a Group C notice for those files would render that notice invalid.

O

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| | | | |
|---|---|---|---|
| Case No. | CV 04-9484 AHM (SHx) | Date | July 26, 2010 |
| Title | PERFECT 10, INC. v. GOOGLE, INC. | | |

for the complainant; identification of the copyrighted work; and identification of the infringing material (including the location of that material and if necessary, a specific link under section 512(d))—must be included in a single written communication. Because the Group C notices fail to provide all of this information in one place, they do not impute knowledge to Google. Perfect 10 has therefore not raised a genuine issue of material fact as to whether Google is eligible for safe harbor under § 512(d).

C.   **Safe Harbor for Caching Feature Under Section 512(b)**

Google has moved for summary judgment that it is entitled to safe harbor under 17 U.S.C. § 512(b) for its caching feature. As discussed in footnote six, *supra*, it is undisputed that Google's servers do not store images found in its cache. The images displayed on a cached page are made available to a viewer from their original source, if they still exist at that source. CSUF(b) ¶ 7-8. Thus, P10's claims for infringement based on images "located in" Google's cache are really claims based on Google's linking to outside infringing content, and the preceding § 512(d) analysis applies. That analysis concluded that Google is entitled to the § 512(d) safe harbor with respect to linking to outside infringement for all of the Group A, all of the Group C, and some of the Group B notices. For those Group B notices for which Google would not be entitled to safe harbor under § 512(d), a question could remain whether Google might nevertheless be entitled to safe harbor under § 512(b) because P10 had failed to indicate in its notices that the infringing material had been removed from the originating site, as required by § 512(b)(2)(E)(ii). But it is unnecessary to go through that analysis. On July 21, 2010, the Court ordered the parties to file statements identifying "where in the existing briefs on Google's motion for safe harbor under 17 U.S.C. § 512(b) there is any reference in any of the"Group B" "spreadsheet" notices sent between May 31, 2004 and April 24, 2007 (Poovala Decl. ¶ 41, Exhs. L1-L48) identifying any specific material on Google's cache as infringing." The Court has reviewed the parties' responses to this Order. In its response, Google demonstrated that nowhere in any of the Group B notices did P10 identify any specific material in Google's cache as infringing. P10 merely cited to one Group B notice that mentioned in passing that "Jerkengine.com has thousands of Perfect 10 infringements available by clicking on the Google cache link and dainews.nu has

O

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| | | | | |
|---|---|---|---|---|
| Case No. | CV 04-9484 AHM (SHx) | | Date | July 26, 2010 |
| Title | PERFECT 10, INC. v. GOOGLE, INC. | | | |

many as well."[10]  Poovala Decl., Ex. L22 at 431.  However, the spreadsheet attached to that notice does not cite to any Google cache pages as infringing, and the mere reference to "thousands of Perfect 10 infringements" could not reasonably be deemed to confer notice of infringement as to these cache pages on Google.  Thus, the Court has been presented with no evidence that any portion of the Group B notices for which the availability of safe harbor is still at issue contains a valid notification of infringement for a Google cache page.  As a result, the Court GRANTS Google's motion for partial summary judgment for its caching feature.

**D.     Safe Harbor for Google's Blogger Service Under Section 512(c)**

Because Google's Blogger service allows account holders to create their own blogs, which in some cases include allegedly infringing images that are uploaded onto Google's own servers, it is necessary to analyze the availability of a safe harbor under 17 U.S.C. § 512(c), which addresses service providers that store material on their systems at the direction of users.  *See* CSUF(c) ¶ 1; Poovala Decl. ¶ 26.  A service provider that stores allegedly infringing material on its system or network at the direction of users is entitled to safe harbor under 17 U.S.C. § 512(c)(1) if it

> (A)(i) does not have actual knowledge that the material or an activity using the material on the system or network is infringing;

> (ii) in the absence of such actual knowledge, is not aware of facts or

---

[10]In its response, P10 argued—without any statutory or case law support—that a notice identifying a web page necessarily identifies the cached page as well.  In support, P10 cites to the Poovala Declaration, which discloses that it is Google's practice to automatically remove a cached link when it suppresses the corresponding live web page URL.  Poovala Decl. ¶ 10.  Google's policy in responding to a notice is irrelevant to the question of whether that notice identified a cached web page in the first place.  P10 also ignored the Court's instructions and cited to references to Group C notices.  *See* Response (Docket No. 932) at 3 (citing Zada Decl. ¶ 39 for the proposition that "The Google cache link matches the full URL of the infringing web page . . . ." but not acknowledging that this paragraph of Zada's declaration is referring to Group C notices).