HIGHLY CONFIDENTIAL ATTORNEYS EYES ONLY

```
 1      APPEARANCE OF COUNSEL:
 2
 3      For Plaintiffs:
 4           JENNER & BLOCK LLP
             BY: LUKE C. PLATZER
 5           Attorney at Law
             1099 New York Avenue, NW, Suite 900
 6           Washington, DC 20001
             202.639.6000
 7           lplatzer@jenner.com
 8
 9      For Defendants Hotfile and Anton Titov:
10           FARELLA BRAUN & MARTEL LLP
             BY: ANDREW LEIBNITZ
11           Attorney at Law
             Russ Building, 235 Montgomery Street
12           San Francisco, California 94104
             415.954.4400
13           aleibnitz@fbm.com
14
15      For Witness:
16           PILLSBURY WINTHROP SHAW PITTMAN LLP
             BY: JOSEPH R. TIFFANY II
17           Attorney at Law
             2475 Hanover Street
18           Palo Alto, California 94304-1114
             650.233.4500
19           joseph.tiffany@pillsburylaw.com
20
21      VIDEOGRAPHER:
22           SARNOFF COURT REPORTERS AND LEGAL TECHNOLOGIES
             BY:  MARTY MAJDOUB
23
24
25
```

Page 3

HIGHLY CONFIDENTIAL ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | they allow them to exist. | 09:53:07 |
| 2 | Q  So the copyright owner dictates the business | 09:53:10 |
| 3 | rule? | 09:53:13 |
| 4 | A  Yes. | 09:53:13 |
| 5 | Q  Is it understanding that in this case the | 09:53:16 |
| 6 | plaintiffs are the copyright owners? | 09:53:18 |
| 7 | A  Yes. | 09:53:20 |
| 8 | Q  Does the results that are returned from | 09:53:38 |
| 9 | MediaWise depend in any way on content provided by | 09:53:43 |
| 10 | rights holders? | 09:53:49 |
| 11 | MR. PLATZER:  Objection to the form. | 09:53:51 |
| 12 | BY MR. LEIBNITZ: | 09:53:55 |
| 13 | Q  Let me rephrase. | 09:53:56 |
| 14 | A  Yes. | 09:53:57 |
| 15 | Q  Does Vobile have any relationship with movie | 09:53:59 |
| 16 | studios? | 09:54:02 |
| 17 | MR. PLATZER:  Objection, form. | 09:54:04 |
| 18 | THE WITNESS:  What do you mean relationship? | 09:54:07 |
| 19 | BY MR. LEIBNITZ: | 09:54:08 |
| 20 | Q  Does Vobile get anything from movie studios? | 09:54:08 |
| 21 | A  Yes, they provide the fingerprint. | 09:54:12 |
| 22 | Q  Can you describe that for me, please? | 09:54:13 |
| 23 | A  We provide tools to the studios, and basically | 09:54:15 |
| 24 | business rules and fingerprints are provided by the | 09:54:20 |
| 25 | studios. | 09:54:24 |

Page 13

HIGHLY CONFIDENTIAL ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | Q    And what do you mean by fingerprint? | 09:54:25 |
| 2 | A    Fingerprint is a technology term to describe, | 09:54:30 |
| 3 | you know, ways to -- the features to identify the | 09:54:36 |
| 4 | content.  So very much like the fingerprint of a person. | 09:54:42 |
| 5 | It's a signature, basically, extracted from the content | 09:54:46 |
| 6 | and use that to identify the content. | 09:54:48 |
| 7 | Q    Is it fair to say that Vobile provides to the | 09:54:53 |
| 8 | plaintiff studios the protocol for determining a | 09:54:58 |
| 9 | fingerprint? | 09:55:05 |
| 10 | A    It's not the protocol. | 09:55:07 |
| 11 | MR. PLATZER:  Objection to the form. | 09:55:08 |
| 12 | THE WITNESS:  It's not a protocol. | 09:55:09 |
| 13 | BY MR. LEIBNITZ: | 09:55:11 |
| 14 | Q    How do the plaintiff studios, if you know, pull | 09:55:11 |
| 15 | together the fingerprint that is supplied to Vobile? | 09:55:19 |
| 16 | MR. PLATZER:  Objection to the form. | 09:55:22 |
| 17 | MR. TIFFANY:  You can answer. | 09:55:26 |
| 18 | THE WITNESS:  Okay.  So I was confused a little | 09:55:28 |
| 19 | bit.  That's okay. | 09:55:30 |
| 20 | Basically, it's a piece of software.  You know, | 09:55:32 |
| 21 | generating the fingerprint, it requires using our | 09:55:33 |
| 22 | technology and software.  So we provide that software to | 09:55:38 |
| 23 | the studios and other content owners to allow them to | 09:55:41 |
| 24 | generate fingerprints. | 09:55:45 |
| 25 | BY MR. LEIBNITZ: | 09:55:45 |

Page 14

HIGHLY CONFIDENTIAL ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | A    Definitely.  Definitely true.  Everything, the | 10:33:55 |
| 2 | full file, every file possible.  Just like a virus scan, | 10:33:58 |
| 3 | you want to scan every possible files. | 10:34:02 |
| 4 | Q    Do you know on behalf of Vobile the range of | 10:34:09 |
| 5 | latency periods in obtaining results? | 10:34:13 |
| 6 | MR. PLATZER:  Objection to the form. | 10:34:17 |
| 7 | THE WITNESS:  We have our SLA sign up with | 10:34:18 |
| 8 | customer in general.  You know, we return -- depends on | 10:34:21 |
| 9 | each different cases -- you know, seconds, minutes, you | 10:34:26 |
| 10 | know, I mean, that's basically within the specific | 10:34:30 |
| 11 | application's acceptable range. | 10:34:33 |
| 12 | BY MR. LEIBNITZ: | 10:34:35 |
| 13 | Q    What is an SLA? | 10:34:36 |
| 14 | A    Service level agreement. | 10:34:38 |
| 15 | Q    So as you sit here today, you don't know, for | 10:34:46 |
| 16 | example, the shortest latency period that Hotfile | 10:34:48 |
| 17 | experienced? | 10:34:52 |
| 18 | A    I don't know specific case with Hotfile at all, | 10:34:53 |
| 19 | you know. | 10:34:55 |
| 20 | Q    And you wouldn't know the longest latency | 10:34:56 |
| 21 | period that Hotfile experienced? | 10:34:58 |
| 22 | A    I don't know.  Just we have too many customers. | 10:34:59 |
| 23 | Q    What is vCloud9? | 10:35:10 |
| 24 | A    VCloud9 is a content identification products we | 10:35:13 |
| 25 | design and provided for storage-based service providers. | 10:35:17 |

Page 42

HIGHLY CONFIDENTIAL ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | Q    What is a storage-based service provider? | 10:35:26 |
| 2 | A    It's -- you know, if you're looking at the file | 10:35:29 |
| 3 | distribution on Internet today, they are UGC, like | 10:35:35 |
| 4 | YouTube, for example, streaming sites.  There's P2P | 10:35:41 |
| 5 | streaming sites like Ustream, Justin.TV. | 10:35:45 |
| 6 | There's a storage based companies, you know, | 10:35:53 |
| 7 | like Hotfile, Drop Box, you know, all those kinds of | 10:35:58 |
| 8 | place -- online storage service provider. | 10:36:02 |
| 9 | Q    You said UGC, as in user-generated content; | 10:36:08 |
| 10 | right? | 10:36:12 |
| 11 | A    Yes, user-generated content sites, like YouTube | 10:36:13 |
| 12 | as an example. | 10:36:15 |
| 13 | Q    How long did vCloud9 take to develop? | 10:36:19 |
| 14 | A    Again, the product shared the same foundation, | 10:36:25 |
| 15 | VDDB and VDNA technology.  It's a different branch of | 10:36:29 |
| 16 | the product.  And, you know, so it's -- when you say how | 10:36:36 |
| 17 | long it takes, you know, if you include everything, it | 10:36:40 |
| 18 | takes very long.  If you including the vCloud9 specific, | 10:36:46 |
| 19 | you know, it takes shorter period of time. | 10:36:49 |
| 20 | Q    Well, let's start with everything. | 10:36:51 |
| 21 | A    Yes. | 10:36:53 |
| 22 | Q    Can you tell me in your estimation how many | 10:36:53 |
| 23 | engineering man years or man hours it took to develop | 10:36:55 |
| 24 | vCloud9? | 10:37:01 |
| 25 | MR. PLATZER:  Objection to the form. | 10:37:03 |

Page 43

HIGHLY CONFIDENTIAL ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | MR. LEIBNITZ: Let's mark this as Wang 2. | 10:38:34 |
| 2 | (Whereupon, Wang Exhibit 2 was marked | 10:38:38 |
| 3 | for identification by the court | 10:38:38 |
| 4 | reporter.) | 10:38:38 |
| 5 | BY MR. LEIBNITZ: | 10:38:48 |
| 6 | Q   Mr. Wang, do you recognize this document? | 10:38:49 |
| 7 | A   Yes. | 10:38:52 |
| 8 | Q   What is it? | 10:38:53 |
| 9 | A   It's a press release. | 10:38:54 |
| 10 | Q   Regarding vCloud9? | 10:38:56 |
| 11 | A   Yes. | 10:38:58 |
| 12 | Q   How do you know this to be a press release | 10:38:58 |
| 13 | regarding the release of vCloud9? | 10:39:01 |
| 14 | A   Just by reading it, and I do read every single | 10:39:04 |
| 15 | press release we -- go out. | 10:39:08 |
| 16 | Q   It's part of your job responsibility? | 10:39:11 |
| 17 | A   Yes. | 10:39:13 |
| 18 | Q   Does Vobile keep in the ordinary course of its | 10:39:15 |
| 19 | business all of its press releases? | 10:39:18 |
| 20 | A   Yes, it's on our website. | 10:39:20 |
| 21 | Q   Do you have any reason to believe that this is | 10:39:21 |
| 22 | not an authentic copy of a Vobile press release? | 10:39:23 |
| 23 | A   I certainly have not checked every word by | 10:39:26 |
| 24 | word, but the version on our website is the authentic | 10:39:28 |
| 25 | version. | 10:39:31 |

Page 45

HIGHLY CONFIDENTIAL ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | Q   You have no reason to doubt that -- you can | 10:39:32 |
| 2 | take more time if you'd like.  But you have no reason to | 10:39:34 |
| 3 | doubt that this is that release? | 10:39:37 |
| 4 | A   No, I don't doubt it, unless someone altered | 10:39:40 |
| 5 | it, a word, you know, but I don't think so. | 10:39:42 |
| 6 | Q   I will represent to you I did not alter the | 10:39:46 |
| 7 | document. | 10:39:48 |
| 8 | A   Yes.  If you took it from our website, that's | 10:39:49 |
| 9 | authentic. | 10:39:53 |
| 10 | Q   Okay.  Thank you, sir. | 10:39:54 |
| 11 | Why did Vobile issue a press release on or | 10:40:01 |
| 12 | about September 26th, 2011? | 10:40:04 |
| 13 | A   Well, we issue press release all the time. | 10:40:09 |
| 14 | From time to time when we have new product, we always do | 10:40:12 |
| 15 | that.  So that specific timeline, I don't have control. | 10:40:15 |
| 16 | It's -- as you see here, Spiral Group is our marketing, | 10:40:20 |
| 17 | consulting group and, you know, they handle the details. | 10:40:23 |
| 18 | Q   Prior to September 26th, 2011 -- well, strike | 10:40:29 |
| 19 | that. | 10:40:33 |
| 20 | Do you know when Vobile first told Hotfile | 10:40:34 |
| 21 | about vCloud9, if it did? | 10:40:40 |
| 22 | A   I don't know, because, again, that -- I am not | 10:40:43 |
| 23 | a contact person, you know, dealing with Hotfile. | 10:40:47 |
| 24 | Q   So you don't know even if prior to September | 10:40:49 |
| 25 | 26th -- well, I guess it's fair to say that you could | 10:40:53 |

Page 46

HIGHLY CONFIDENTIAL ATTORNEYS EYES ONLY

| | | |
|---|---|---|
| 1 | not testify under oath the time at which Hotfile became | 10:40:59 |
| 2 | aware of vCloud9, whether before or after September | 10:41:09 |
| 3 | 26th? | 10:41:13 |
| 4 | A   I cannot know for sure, but my -- you know, I | 10:41:16 |
| 5 | cannot know for sure, but that's really to Mike, but... | 10:41:20 |
| 6 | Q   Why did -- so you say that you review every | 10:41:26 |
| 7 | press release issued by Vobile.  Is that true? | 10:41:31 |
| 8 | A   Yes. | 10:41:34 |
| 9 | Q   Do you review them for accuracy, to make sure | 10:41:34 |
| 10 | that the content they deliver is true? | 10:41:37 |
| 11 | A   Generally, they -- the process they need to | 10:41:40 |
| 12 | submit to -- because they put quote there, you know, and | 10:41:44 |
| 13 | they need to submit for my approval. | 10:41:46 |
| 14 | And most time, you know, I give them approval, | 10:41:49 |
| 15 | unless there is a timing pressure that this goes out | 10:41:53 |
| 16 | before my review.  That happens sometime. | 10:41:57 |
| 17 | Q   Did that happen here, to your knowledge? | 10:42:00 |
| 18 | A   I think this is a normal process.  I probably | 10:42:02 |
| 19 | reviewed, yes. | 10:42:05 |
| 20 | Q   Do you see the second paragraph beginning with | 10:42:13 |
| 21 | the words "copyrighted content contained"? | 10:42:15 |
| 22 | A   Yes. | 10:42:19 |
| 23 | Q   Why did Vobile state, Copyrighted content | 10:42:22 |
| 24 | contained within Cloud-based cyberlockers is very | 10:42:27 |
| 25 | difficult to find? | 10:42:31 |

Page 47

HIGHLY CONFIDENTIAL ATTORNEYS EYES ONLY

```
1        A   I do review every press release, but I don't        10:42:36

2    challenge every word the marketing person put in there.     10:42:41

3        Q   You don't think that's inaccurate though --          10:42:45

4        A   I don't think it's inaccurate.  I mean, it's         10:42:47

5    difficult in general.  It's all difficult.                  10:42:50

6        Q   Why is that?                                         10:42:51

7        MR. PLATZER:  Objection, lacks foundation.               10:42:57

8        THE WITNESS:  It's -- you know, if it's an easy          10:42:59

9    problem, then there is no need for Vobile's service.         10:43:02

10   BY MR. LEIBNITZ:                                             10:43:08

11       Q   And how is it that you know that -- counsel          10:43:13

12   just made an objection.  I want to make sure that you        10:43:19

13   have a basis to give me your answer.                         10:43:21

14       So how is it that you know that copyrighted              10:43:24

15   content in Cloud-based cyberlockers is difficult to          10:43:29

16   find?                                                        10:43:32

17       A   It's because, as I said, our theory is this is       10:43:33

18   difficult, so people need our service, they pay us.  If      10:43:37

19   it's such a simple job, the customers won't come to us       10:43:40

20   for help and won't pay us for services.                      10:43:44

21       Q   Is -- the word "cyberlocker" is used here.           10:43:49

22       Is it fair to say that Hotfile is a                      10:43:53

23   cyberlocker?                                                 10:43:55

24       A   Yes.                                                 10:43:56

25       Q   The next sentence says, On cyberlockers, the         10:43:58

                                                                 Page 48
```

HIGHLY CONFIDENTIAL ATTORNEYS EYES ONLY

1    I, the undersigned, a Certified Shorthand

2  Reporter of the State of California, do hereby certify:

3    That the foregoing proceedings were taken

4  before me at the time and place herein set forth; that

5  any witnesses in the foregoing proceedings, prior to

6  testifying, were duly sworn; that a record of the

7  proceedings was made by me using machine shorthand which

8  was thereafter transcribed under my direction; that the

9  foregoing transcript is a true record of the testimony

10  given.

11    Further, that if the foregoing pertains to the

12  original transcript of a deposition in a Federal Case,

13  before completion of the proceedings, review of the

14  transcript [ ] was [ ] was not requested.

15    I further certify I am neither financially

16  interested in the action nor a relative or employee of

17  any attorney or party to this action.

18    IN WITNESS WHEREOF, I have this date subscribed

19  my name.

20

21  Dated: January 12, 2012

22

23                    _____

                      LYNNE MARIE LEDANOIS

24                    CSR No. 6811

25

Page 115

# EXHIBIT 19

CONTACT
Jean Sexton
Spiralgroup for Vobile
(530) 432-1820
jeans@spiralgroup.com



**Vobile vCloud9 Helps File-Hosting Services Easily Comply with International Copyright Law; Opens New Opportunities for Monetization for Content Owners and Publishers**

Santa Clara, CA -- September 26, 2011 – Vobile®, creator of the world's most trusted multimedia content monitoring and protection technology, today introduced vCloud9™, a new Software-As-A-Service solution that helps cloud-based file hosting services identify and manage unauthorized content that has been uploaded to their sites.

Copyrighted content contained within cloud-based cyberlockers is very difficult to find. On cyberlockers, the vast majority of unauthorized content– such as copyrighted movies or TV shows – is saved as compressed files to allow easier file downloading; however, file compression "hides" the true content, which – until now – has made it impossible to identify.

Vobile's VDNA® technology, the *de facto* content identification technology for the world's leading content owners, including major movie studios, television networks, record labels, and sports leagues, forms the foundation of vCloud9. When vCloud9 finds new content, it matches the content to Vobile's VDNA Database (VDDB®), the world's largest registry of copyrighted audiovisual content. If a match is found, business rules set by the content owner are automatically triggered; the rules range from serving ads against the uploaded content to removing the material.

Because vCloud9 can specifically identify content contained within compressed files, vCould9 helps file-hosting services comply with international copyright law and provides content owners with a tool to manage the distribution and monetization of their content over the Web.

"Vobile vCloud9 offers an important new tool for website operators offering legitimate cloud-based storage services to be able to discover unauthorized content online and ensure copyright compliance, thereby protecting the rights of content owners and the creative community," said Kevin Suh, Senior Vice President, Content Protection, Internet for Motion Picture Association of America (MPAA).

"Vobile vCloud9 is a revolutionary tool that could mark a turning point in the fight against online piracy. Movies, and other creative content, can be uploaded, stored anonymously and distributed via cyber-locker websites anywhere in the world and rights holders like us are powerless to stop them. Vobile vCloud9 will not only allow us



to find illegal copies of our content online, but it will offer us the option of monetizing that content. It's a huge technological breakthrough and finally gives us an effective way to leverage interest in our film in a positive way.  Both the audience and content creators will be the beneficiaries in this," said independent film producer and anti-piracy advocate Ellen Seidler.

"As traditional content distribution channels continue to face new challenges, industry support for our new vCloud9 service underscores our success in ensuring fair use and proper monetization of copyrighted material as it is distributed and stored throughout the Web," said Yangbin Wang, Vobile CEO.

File-hosting services, content publishers and content owners interested in vCloud9 are invited to visit the Vobile site at www.vobileinc.com, email info@vobileinc.com or call 408-217-5000.

**About Vobile**

Vobile is the leading provider of video content identification and management services. Its core VDNA technology enables fully automated identification, tracking and management of any video and audio content with high performance, accuracy and scalability. Vobile operates the VDNA Database (VDDB), which is the most comprehensive database of authorized video fingerprints, metadata and business rules from major movie studios, television networks and record labels. Founded in 2005, the company is headquartered in Santa Clara, California, with additional offices in China, Japan and Singapore. For more information, please visit http://www.vobileinc.com.

Vobile, vCloud9, VDNA, VDDB, the Vobile and VDNA logos are registered trademarks or trademarks of Vobile, Inc.

# EXHIBIT 20

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF FLORIDA


DISNEY ENTERPRISES, INC.,
TWENTIETH CENTURY FOX FILM
CORPORATION, UNIVERSAL CITY
STUDIOS PRODUCTIONS LLLP,
COLUMBIA PICTURES INDUSTRIES,
INC., and WARNER BROS.
ENTERTAINMENT INC.,

       Plaintiffs,

    vs.          CASE NO. 11-20427-WILLIAMS-TURNOFF

HOTFILE CORP., ANTON TITOV,
and DOES 1-10,

       Defendants.
_____

AND RELATED CROSS-ACTION.
_____


HIGHLY CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

VIDEOTAPED DEPOSITION OF KEVIN M. SUH, ESQUIRE,

INDIVIDUALLY AND

PURSUANT TO FEDERAL RULE 30(b)(6)

Los Angeles, California

Tuesday, December 20, 2011

Reported by:
LORI SCINTA, RPR
CSR No. 4811

Job No. 178796



KEVIN M. SUH, ESQUIRE                    12/20/2011
HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

1                    UNITED STATES DISTRICT COURT

2                   SOUTHERN DISTRICT OF FLORIDA

3

4    DISNEY ENTERPRISES, INC.,
     TWENTIETH CENTURY FOX FILM
5    CORPORATION, UNIVERSAL CITY
     STUDIOS PRODUCTIONS LLLP,
6    COLUMBIA PICTURES INDUSTRIES,
     INC., and WARNER BROS.
7    ENTERTAINMENT INC.,

8              Plaintiffs,

9         vs.              CASE NO. 11-20427-WILLIAMS-TURNOFF

10   HOTFILE CORP., ANTON TITOV,
     and DOES 1-10,
11
               Defendants.
12
     AND RELATED CROSS-ACTION.
13

14

15     HIGHLY CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

16          Videotaped deposition of KEVIN M. SUH, ESQUIRE,

17   individually, and pursuant to Federal Rule 30(b)(6),

18   taken on behalf of Defendants and Counterclaimant

19   Hotfile Corp., at 633 West Fifth Street, Los Angeles,

20   California, beginning at 9:17 A.M. and ending at

21   6:03 P.M. on Tuesday, December 20, 2011, before

22   LORI SCINTA, RPR, Certified Shorthand Reporter No. 4811.

23

24

25



1    APPEARANCES:

2

3    For Plaintiffs:

4

5          JENNER & BLOCK LLP
           BY:  DUANE C. POZZA
           Attorney at Law

6          1099 New York Avenue, NW, Suite 900
           Washington, D.C. 20001-4412

7          202.639.6000
           Email:  dpozza@jenner.com

8
                  -- and --
9

           MOTION PICTURE ASSOCIATION OF AMERICA, INC.

10         BY:  KAREN R. THORLAND
           Attorney at Law

11         15301 Ventura Boulevard, Building E
           Sherman Oaks, California 91403

12         310.244.6946
           Email:  karen_thorland@mpaa.org

13

14
     For Defendants and Counterclaimant Hotfile, Corp.:

15

16         FARELLA BRAUN + MARTEL LLP
           BY:  ANTHONY SCHOENBERG

17         Attorney at Law
           235 Montgomery Street

18         San Francisco, California 94104
           415.954.4400

19         Email:  tschoenberg@fbm.com

20

21   Videographer:

22

           VONYARN MASON

23         SARNOFF COURT REPORTERS
           20 Corporate Park, Suite 350

24         Irvine, California 92606
           877.955.3855

25



877.955.3855

3

KEVIN M. SUH, ESQUIRE                    12/20/2011
HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

```
05:15   1            (MPAA Exhibit 13 was marked for

05:16   2            identification by the court reporter.)

05:16   3   BY MR. SCHOENBERG:

05:16   4        Q    And I will represent to you that page -- it

05:16   5   says there were three pages to this exhibit.

05:16   6            Well, I can't say what -- what the third page

05:16   7   was, but the only part that I'm interested in is Page 2.

05:16   8            And so I'll just ask you if you recognize

05:16   9   Page 2 of this document.

05:16  10        A    This is MPA Exhibit No. 13.

05:16  11            Page 2 appears to be a printout of the Vobile

05:16  12   website describing -- or exhibiting a press release in

05:16  13   connection with vCloud9.

05:16  14        Q    And I'd like to direct your attention to the

05:17  15   middle of the press release.  There's a quote attributed

05:17  16   to you.

05:17  17            Do you see that?

05:17  18        A    Yes.  Actually, if I would make one

05:17  19   clarification.

05:17  20            The footer of Exhibit 13 at the bottom notes

05:17  21   that this was printed out from prnewswire.com, spelled

05:17  22   p-r-n-e-w-s-w-i-r-e.com.

05:17  23            So just a point of correction.  This isn't from

05:17  24   the Vobile website.

05:17  25        Q    Okay.  Thanks for that clarification.
```



HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

```
05:17  1            Do you see the quote that's attributed to you
05:17  2     in the middle of the press release?
05:17  3         A   Yes.
05:17  4         Q   It says, "Vobile" -- "Vobile vCloud9
05:17  5             offers an important new tool for
05:17  6             website operators offering legitimate
05:17  7             cloud-based storage services to be
05:17  8             able to discover unauthorized content
05:17  9             online and ensure copyright
05:17 10             compliance, thereby protecting the
05:17 11             rights of content owners and the
05:17 12             creative community," unquote.
05:18 13            Did you either say or authorize that statement
05:18 14     to be attributed to you?
05:18 15         A   I did authorize that statement to be attributed
05:18 16     to me.
05:18 17         Q   And you agree that that's an accurate
05:18 18     statement?
05:18 19         A   Yes.
05:18 20         Q   Is there anything in this press release with
05:18 21     which you do not agree?
05:18 22             MR. POZZA:  Objection.  Ambiguous.
05:18 23             THE WITNESS:  If I could just -- I'm sorry.  Go
05:18 24     ahead.
05:18 25             MR. POZZA:  No.  That's all I have.
```



KEVIN M. SUH, ESQUIRE                12/20/2011
HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

1

2

3

4

5

6

7

8

9          I, KEVIN M. SUH, ESQUIRE, do hereby declare

10    under penalty of perjury that I have read the foregoing

11    transcript; that I have made any corrections as appear

12    noted, in ink, initialed by me, or attached hereto; that

13    my testimony as contained herein, as corrected, is true

14    and correct.

15

16

17         EXECUTED this _27th_ day of _January_,

18    20_12_, at _Sherman Oaks_, _California_.
                      (City)                    (State)

19

20

21

22    KEVIN M. SUH, ESQUIRE

23

24

25



877.955.3855

261

1

2          I, the undersigned, a Certified Shorthand

3   Reporter of the State of California, do hereby certify:

4          That the foregoing proceedings were taken

5   before me at the time and place herein set forth; that

6   any witnesses in the foregoing proceedings, prior to

7   testifying, were duly sworn; that a record of the

8   proceedings was made by me using machine shorthand

9   which was thereafter transcribed under my direction;

10  that the foregoing transcript is a true record of the

11  testimony given.

12          Further, that if the foregoing pertains to

13  the original transcript of a deposition in a Federal

14  Case, before completion of the proceedings, review of

15  the transcript [x] was [ ] was not requested.

16          I further certify I am neither financially

17  interested in the action nor a relative or employee

18  of any attorney or party to this action.

19          IN WITNESS WHEREOF, I have this date

20  subscribed my name.

21

22  Dated: 12/27/2011

23

24  _____
    LORI SCINTA, RPR

25  CSR No. 4811



# EXHIBIT 21



www.archive.org
415.561.6767
415.840-0391 e-fax

Internet Archive
300 Funston Avenue
San Francisco, CA 94118

# AFFIDAVIT OF CHRISTOPHER BUTLER

1. I am the Office Manager at the Internet Archive, located in San Francisco, California. I make this declaration of my own personal knowledge.

2. The Internet Archive is a website that provides access to a digital library of Internet sites and other cultural artifacts in digital form. Like a paper library, we provide free access to researchers, historians, scholars, and the general public. The Internet Archive has partnered with and receives support from various institutions, including the Library of Congress.

3. The Internet Archive has created a service known as the Wayback Machine. The Wayback Machine makes it possible to surf more than 150 billion pages stored in the Internet Archive's web archive. Visitors to the Wayback Machine can search archives by URL (i.e., a website address). If archived records for a URL are available, the visitor will be presented with a list of available dates. The visitor may select one of those dates, and then begin surfing on an archived version of the Web. The links on the archived files, when served by the Wayback Machine, point to other archived files (whether HTML pages or images). If a visitor clicks on a link on an archived page, the Wayback Machine will serve the archived file with the closest available date to the archived page upon which the link appeared and was clicked.

4. The archived data made viewable and browseable by the Wayback Machine is compiled using software programs known as crawlers, which surf the Web and automatically store copies of web files, preserving these files as they exist at the point of time of capture.

5. The Internet Archive assigns a URL on its site to the archived files in the format http://web.archive.org/web/[Year in yyyy][Month in mm][Day in dd][Time code in hh:mm:ss]/[Archived URL]. Thus, the Internet Archive URL http://web.archive.org/web/19970126045828/http://www.archive.org/ would be the URL for the record of the Internet Archive home page HTML file (http://www.archive.org/) archived on January 26, 1997 at 4:58 a.m. and 28 seconds (1997/01/26 at 04:58:28). A web browser may be set such that a printout from it will display the URL of a web page in the printout's footer. The date assigned by the Internet Archive applies to the HTML file but not to image files linked therein. Thus images that appear on a page may not have been archived on the same date as the HTML file. Likewise, if a website is designed with "frames," the date assigned by the Internet Archive applies to the frameset as a whole, and not the individual pages within each frame.

6. Attached hereto as Exhibit A are true and accurate copies of printouts of the Internet Archive's records of the HTML files for the URLs and the dates specified in the footer of the printout.

7. I declare under penalty of perjury that the foregoing is true and correct.

DATE: 7/20/11

Christopher Butler

# Exhibit A

Hotfile.com: One click file hosting



Buy gift voucher for a friend

News   Envoyez   Premium   Affiliate   FAQ   Nous contacter   Inscrivez - vous

French □ ▾

Identifiant:
Mot de passe:
Mot de passe oublié? Identifiez-vous

# Terms of Service

## Services of Hotfile.

Hotfile offers the Client services provided the Client completely and unconditionally undertakes to comply with the present Agreement. In this Agreement, it is agreed that: - The client (if you, or the user, or the subscriber) means a private person or an organization, including its employees that uses or intends to use the Services of Hotfile; - Services of Hotfile mean the electronic or interactive services rendered by Hotfile.

Hotfile reserves the right to change or stop all of the rendered Services at any time.

## The rights to use the Services of Hotfile.

Our Services are rendered to private persons or organizations that have the corresponding legal status that enables the conclusion of legally binding arrangements in accordance with legislation. Accepting this agreement, the User confirms the fact that he or she has the license of economic activity (to be the consumer of services) in accordance with the law (during a period of validity in the present Agreement), he or she is not a business rival of Hotfile, and also declares that in accepting the present Agreement, the Client is at least 18 years of age and has the right to conclude the contracts, which have a binding force, as the Client.

## Account of the Client. Rights of the client. Responsibilities of the client.

The client undertakes to give to Hotfile the true, exact, and full information about him or herself for all of the questions that are requested on the registration form. The client agrees the update and support information to be true, exact, and in a full state. Otherwise, Hotfile has the right to suspend or cancel your account and present Agreement.

The client is the unique legal owner for the data of the account (the login, password and all attendant data). The client has full responsibility for all and any (successful or unsuccessful) attempts to access the Services or use of Services (including all actions and transactions) with the use of the account of Client, except for cases when access or the utilization of Services is a direct result of negligence of Hotfile.

The client agrees that the voluntary transfer of login and password of its privileged account (GOLD-account) to third parties leads to the automatic lifting of the privileged status of the account, and notes that a violation of the user's agreement used.

The client is completely responsible for the preservation of the confidentiality of the information of access to his or her account, as well as has full responsibility for the actions that occur by way of his or her account.

The client undertakes to notify Hotfile immediately in case of nascence of the circumstances indicating that his or her account or information was used unauthorized. These cases are (but not limited): reception by the Client of confirmation his or her orders of services, made on his or her account that the Client didn't order; occurrence in client's account of data regarding actions (downloading or uploading files) that the client didn't do or other similar inconsistent actions.

## Client's data. Ordering information. Changing the information about the client.

The client has exclusive obligations and full responsibility for the information, which he or she saved on the servers of Hotfile. The client supervises his or her own files through the unique reference generated for him or her. The client has full responsibility for the data and exclusive obligation for any lost and unreduced information. The client agrees to contain the information according to legal responsibilities. The client agrees to reception on the e-mail address of news of service, the information on new services and actions of service Hotfile. Hotfile undertakes to delete the client's information after completing a period of validity in the present Agreement. Hotfile reserves the right to keep the client's information in the archives after his or her deletion, and has not any obligation to the Client for such information.

In using our service IP address your browser will be identified and brought into the databases of our servers. This IP address is saved by the servers of Hotfile only for our internal utilization (calculation of visiting, optimum usage of downloading files, etc.). Hotfile uses cookies to save the options of the users' browsers, in the case that users provide their consent. Utilization of cookies doesn't permit one to find out confidential information about a client - e-mail address, postal address, numbers on a credit card, etc.

Our service calculates the e-mail addresses of users of Hotfile with the purpose of registration and the enumeration of users. Hotfile does not sell and does not share your personal information with any companies.

## Ownership of information and copyrights.

You recognize that all materials (except the users' uploading), submitted on the present Web page, switching the information, documentation, goods, trademarks, drawings, sounds, GUI, software, and services (further called Materials), rendered by Hotfile or third parties - authors, developers, suppliers (in generally called Intermediaries), belong to Hotfile and/or to Intermediaries. Elements of Web pages are protected by legislation on a set of various nonfunctional elements of the goods or services and other legislation and cannot be copied or reproduced in part or whole. Hotfile, trademark of Hotfile and other goods mentioned in the present agreement, are trademark of Hotfile. Other names of goods, names of companies, marks, trademarks, and symbols are trademarks of corresponding organizations.

Services of Hotfile can be used in legitimate objectives. Transmission, distribution, or storage of any materials that violate laws are forbidden. This includes without restriction patented materials, copyright laws, trademarks,commercial secrets and other intellectual property rights. The client is obliged to receive the author's preliminary agreement in the case of the use of his or her materials. In using the Services, you declare and guarantee that you are the author and owner of the copyrights and/or have due

licenses for the represented information, you also declare and guarantee that your information does not offend trademarks and other rights of third parties. Hotfile reserves the right to immediately suspend or delete the account of a client, which, in the opinion of Hotfile, offends the present agreement or laws or decisions.

Attention! In case of using Hotfile Service for distribution of the files containing materials which appear to involve child exploitation, the account of the user who placed such files will be immediately deleted and all neccessary information will be passed on to the National Center for Missing & Exploited Children as well as to the administrative tribunals and/or members of the ISP.

## You agree to not use the services of Hotfile

for the purpose of: Loading, accommodation, sending by way of e-mail, transmission or publication by other means of information distributing for terrorist propagation, propagandizing of kindling interethnic, racial or religious break a set, representing violence or death;

Causing of harm to minors, including any form of child pornography; in the case that we shall regard this as sufficiently serious, it will be transferred to the corresponding administrative tribunals and/or members of the ISP;

Loading, accommodation, sending by way of e-mail, transmission or publication by other means of information, which offends the rights of some party on all patents, trademarks, commercial secrets, copyrights, or other property rights.

You undertake to not place information containing illegal materials, as well as other forms of the transmission of illegal or obscene contents and information prompting illegal actions inducing gaming, illegal sales of the weapons, advertising, pornography and racism. You also undertake to not place discrediting information concerning some person, without the consent or intentionally rendering such to someone as mental cruelty.

In the case of the non-observance of the present requirements, **Hotfile reserves the right to immediately suspend or delete, without preliminary prevention, your account or the transaction** violating the present agreement.

Illegal actions also include intrusions or attempts of intrusion into the information system of Hotfile, or attempts to affect the ability of Hotfile to render Services.

These are (but not limited to the following actions):

Unauthorized access to the Services of Hotfile, which includes attempts to probe, test systems for availability, to try to break down the system of information protection of the website without permission from Hotfile;

Intervention in the process of rendering Services to any client or users' network for example avalanche routing or intentional attempts to overload system;

We don't allow multiple accounts for one user. If we found such an accounts they will be deleted.

There are many other actions that can destroy the infrastructure of Hotfile, which are strictly prohibited and are the subject of criminal and civil liability.

Lawfully or not, Hotfile reserves the right to decide for the fate of the activity of Hotfile and its Clients.

Attentions please, in such a case if it will be detected that an account or transmitted information violates any of those rules, Hotfile reserves the right to delete the account or stop the transfer of information. If it is necessary, Hotfile will send claims to the corresponding legal structures. In this case, Hotfile will actively cooperate with administrative tribunals in the investigation and criminal prosecution of similar actions, which means the disclosure of the data of the Client's account.

**Attention! In case of using Hotfile Service for distribution of the files containing materials which appear to involve child exploitation, the account of the user who placed such files will be immediately deleted and all neccessary information will be passed on to the National Center for Missing & Exploited Children as well as to the administrative tribunals and/or members of the ISP.**

Complaints of the persons, breaking our Rules, are accepted here. Each complaint will be considered, and depending on the results, can lead to the deletion of the Client's account without preliminary prevention.

## Absence of guarantees. Responsibility.

You express understanding and agreement with the following:

You use these services at your own risk.

Services of Hotfile are rendered "as is" and "as far as possible". Hotfile and its representatives, within the limits allowed by legislation, haven't the responsibility for the any guarantees, for example, the guarantee of conformity of the user's purpose, guarantee of commercial suitability, and guarantee of absence of violation of third parties rights. Hotfile and its representatives do not guarantee accuracy, reliability, completeness, timeliness of Services, software or other information content;

We don't guarantee that Services will correspond to your requirements, Services will be rendered continuously, quickly, reliably, and without mistakes, Results which can be received through the utilization of services, will be exact and reliable, Quality of some product, service, information, or other materials, which you received through the utilization of Services, will correspond to your expectations. Some materials, which you loaded or otherwise received through the utilization of Services, are used by you at your own discretion and at your own risk, and only you have exclusive responsibility for any data that is lost or damaged, which can also damage your computer system or as the result of loading these materials;

Any consultation or information, written or oral, received by you through the utilization of Services, doesn't represent a guarantee, except for direct guarantees in the present Agreement.

You agree to recover damages, including reasonably the necessary payment of legal services, and to release Hotfile, its affiliated organizations, and branches, management, employees, agents from responsibility for any claims and requirements based on your utilization of Services; or violation of the present Agreement or other rules and conditions of Hotfile.

Hotfile.com: One click file hosting

You use the services of Hotfile at your own risk. If you are not satisfied with our Services or present user agreement, or any other rules, you have the right to stop the utilization of Services. You agree that Hotfile is not responsible for any sheer, indirect, collateral, or penal losses as such as lucrum cessans, lost of reputation, data that is lost or other non-material losses, taken place for reasons of utilization or impossibility of utilization of services; necessities to pay anew the unremunerative goods or services purchased through the utilization of Services; unauthorized access or modification in transmitted information or data; statements or actions of any third party within the framework of services; any other event concerning the Services.

**Modification of the Agreements and Rules for extension of Services.**

We reserve the right at any time to modify the present agreement for the extension of Services. We also reserve the right at any time to modify or stop all Services, with the prior notification or without, for a specified time or without a time limit.

You agree that Hotfile does not have any obligations to you, nor to any third party for any modification, suspension, or termination of Services. You recognize that we can establish the general rules and restrictions of using Services, including the maximal disk space allotted to you on the servers of Hotfile, the maximal number of look-up, (and their time of duration) to Services for the specified time.

In addition, you recognize that Hotfile has the right, without preliminary prevention, to change tariffs for the utilization of Services. Modification of tariffs for the utilization of Services inures after the termination of the validity of an existing subscription of the Client.

Hotfile has the immediate right to prevent, suspend, (without a time limit or temporarily) to close access and to stop the extension of Services to the client, or to delete the account of the Client, and also to refuse to render service to the client further in the case of: Hotfile is justified to believe that the Client has broken or has not executed any aspect of the present Agreement or other contracts or instructions of Hotfile, Client hasn't paid for services or any others indebtednesses to Hotfile, Hotfile cannot establish authenticity of the information given by the Client, Hotfile is justified to believe that actions of the Client can entail the legal responsibility of the Client, other Clients of Hotfile or Hotfile. Hotfile reserves the right at their own discretion at any time to stop Services or their part, with the prior notification or without such. You agree that the termination of access to Services on any item of present user's agreement can inure without prior notification, and also agree that Hotfile has the immediate right to deactivate, archive, or delete your account and their parts: information, data and-or refuse to access in the further to those data or Services. Furthermore, you agree that Hotfile is not responsible to you or any third party for the termination of your access to Services.

After the cancellation of the present Agreement by the Client or Hotfile, all privileges of the Client stipulated in the Agreement, and obligations of Hotfile extension of Services, are immediately cancelled.

Incapacity of Hotfile to undertake actions concerning violations performed by theClient or other persons, does not deprive the right of Hotfile to take measures concerning subsequent or similar violations.

Any requirement or claim raised by the Client for any items of the present Agreement should be given within twelve months from the moment of occurrence of the requirement or the claim's basis.

The client and Hotfile are independent contractors. The present Agreement does not provide and does not create such forms of legal relationship with the Client as an establishment, company, joint venture, labor relations, trading relations.

For the conditions of the present Agreement, the Client has not the right to transfer any rights or to assign other persons duties. Any attempts of transfer those rights have not validity.

Our activity for the extension of Services can be broken by various factors, which we can't control. We have not the responsibility for any delays, or the incapacity to render Service as a result of reasons, which do not depend on us.

If any clause of the present Agreement is declared invalid, that clause should be bypassed, with the least damage of interests of the parties, and other clauses of the Agreement continue to be in effect. Headings of items of the Agreement serve only for convenience, and in any degree do not determine, limit, interpret, or describe a spectrum or a measure of an item of agreement.

Accepting this agreement, you declare and guarantee to Hotfile company, that you are not a competitor of Hotfile and you undertake to not use the information received through the utilization of the website of Hotfile and Services of Hotfile for being in a competition to the last.

**Excepting agreements and conditions that are published on the website, the present Agreement regulates full understanding and agreement between the parties concerning the discussed subject.**

Department of the fight against abuse: Click here

Counterfeit files will be immediately deleted after the reception of your proven confirmation. In the case of the detection of such files, we will take advantage of this form and send a full reference on such a file.

**HotFile.com does not support or allow uploading files containing illegal content as well as other forms of transferring illegal or obscene materials and information that induce individuals to committing illegal action**

**Important Notice**

All users who post links in sites / forums without following respective rules (spamming, flooding and etc) will be suspended and their accounts will be closed!

Copyright © 2008, 2009 hotfile.com, Tous droits réservés.

Hotfile.com: One click file hosting

Accueil | Premium | Charte de confiance | Conditions de services | Signaler abus | Imprint | File Checker | Reseller | ICRA labelled | Nous contacter

Hotfile.com: One click file hosting



Username: _____

Password: _____

Forgot Password        [Login]

HotFile (www.hotfile.com) is an Online Service Provider under Title II of the Digital Millennium Copyright Act, 17 U.S.C. Section 512 ("DMCA"). This document outlines the policy that hotfile.com have introduced in order to implement notice and takedown policy as required by DMCA. This document guides copyright owners interested in utilizing this procedure, as well as service users interested in restoring access to material mistakenly taken down.

**Writing and sending Proper Notification**

The DMCA provides a legal procedure by which you can request any Online Service Provider to disable access to a website where your copyrighted work(s) are appearing without your permission. The legal procedure consists of two parts: (1) Writing a Proper DMCA Notice, and (2) Sending the Proper DMCA Notice to hotfile.com Designated Agent.

**To write a Proper DMCA Notice, state the following information:**

* Identify yourself as an owner of copyrighted work or exclusive rights that you believe are infringed, or a person acting on behalf of such owner.

* State your contact information, including your name, street address, phone number, and email address.

* Identify the copyrighted work that you believe is being infringed, or if a large number of works are being infringed, a representative list of the works.

* Identify the location of materials that allegedly are infringing your copyrighted work, by providing Web URLs on hotfile.com site that contain these materials.

* State that you have "a good faith belief that use of the aforementioned material is not authorized by the copyright owner, its agents, or the law".

* State that the information in the notice is accurate, under penalty of perjury.

Your notice **must be signed with a physical signature** (when it is in paper form) or **electronic signature** (when it is in electronic form).

To exercise your DMCA rights, your Proper DMCA Notice must be sent to Designated Agent of hotfile.com to email: **abuse@hotfile.com**

**Notice and takedown procedure**

HotFile.com will follow the procedures provided in the DCMA to properly enforce rights of copyright holders. When a Proper DMCA notification is received by Designated Agent, or when hotfile.com becomes otherwise aware that copyright rights are infringed, it will remove or disable access to infringing materials as soon as possible. You don't need to wait confirmation from us about this action.

If users submitting or downloading materials believe that their use of materials was lawful, they have the right of sending a Proper Counter-notification in order to restore access to these materials. Hotfile.com will comply with the appropriate provisions of the DMCA in the event a counter notification is received by its Designated Agent.
Thank you for your understanding!

Copyright © 2008, 2009 hotfile.com, All Rights Reserved.
Home | Premium | Privacy Policy | Terms of Service | Report Abuse | Imprint | Contacts

Hotfile.com: One click file hosting

**hotfile**

English | Russian | Polish

Upload   Premium   Affiliate   FAQ   Contacts   Sign up

Username:

Password:

Forgot Password                    Login

# Terms of Service

### Services of Hotfile.

Hotfile offers the Client services provided the Client completely and unconditionally undertakes to comply with the present Agreement. In this Agreement, it is agreed that: - The client (if you, or the user, or the subscriber) means a private person or an organization, including its employees that uses or intends to use the Services of Hotfile; - Services of Hotfile mean the electronic or interactive services rendered by Hotfile.

Hotfile reserves the right to change or stop all of the rendered Services at any time.

### The rights to use the Services of Hotfile.

Our Services are rendered to private persons or organizations that have the corresponding legal status that enables the conclusion of legally binding arrangements in accordance with legislation. Accepting this agreement, the User confirms the fact that he or she has the license of economic activity (to be the consumer of services) in accordance with the law (during a period of validity in the present Agreement), he or she is not a business rival of Hotfile, and also declares that in accepting the present Agreement, the Client is at least 18 years of age and has the right to conclude the contracts, which have a binding force, as the Client.

### Account of the Client. Rights of the client. Responsibilities of the client.

The client undertakes to give to Hotfile the true, exact, and full information about him or herself for all of the questions that are requested on the registration form. The client agrees the update and support information to be true, exact, and in a full state. Otherwise, Hotfile has the right to suspend or cancel your account and present Agreement.

The client is the unique legal owner for the data of the account (the login, password and all attendant data). The client has full responsibility for all and any (successful or unsuccessful) attempts to access the Services or use of Services (including all actions and transactions) with the use of the account of Client, except for cases when access or the utilization of Services is a direct result of negligence of Hotfile.

The client agrees that the voluntary transfer of login and password of its privileged account (GOLD-account) to third parties leads to the automatic lifting of the privileged status of the account, and notes that a violation of the user's agreement used.

The client is completely responsible for the preservation of the confidentiality of the information of access to his or her account, as well as has full responsibility for the actions that occur by way of his or her account.

The client undertakes to notify Hotfile immediately in case of nascence of the circumstances indicating that his or her account or information was used unauthorized. These cases are (but not limited): reception by the Client of confirmation his or her orders of services, made on his or her account that the Client didn't order; occurrence in client's account of data regarding actions (downloading or uploading files) that the client didn't do or other similar inconsistent actions.

### Client's data. Ordering information. Changing the information about the client.

The client has exclusive obligations and full responsibility for the information, which he or she saved on the servers of Hotfile. The client supervises his or her own files through the unique reference generated for him or her. The client has full responsibility for the data and exclusive obligation for any lost and unreduced information. The client agrees to contain the information according to legal responsibilities. The client agrees to reception on the e-mail address of news of service, the information on new services and actions of service Hotfile. Hotfile undertakes to delete the client's information after completing a period of validity in the present Agreement. Hotfile reserves the right to keep the client's information in the archives after his or her deletion, and has not any obligation to the Client for such information.

In using our service IP address your browser will be identified and brought into the databases of our servers. This IP address is saved by the servers of Hotfile only for our internal utilization (calculation of visiting, optimum usage of downloading files, etc.). Hotfile uses cookies to save the options of the users' browsers, in the case that users provide their consent. Utilization of cookies doesn't permit one to find out confidential information about a client - e-mail address, postal address, numbers on a credit card, etc.

Our service calculates the e-mail addresses of users of Hotfile with the purpose of registration and the enumeration of users. Hotfile does not sell and does not share your personal information with any companies.

### Ownership of information and copyrights.

You recognize that all materials (except the users' uploading), submitted on the present Web page, switching the information, documentation, goods, trademarks, drawings, sounds, GUI, software, and services (further called Materials), rendered by Hotfile or third parties - authors, developers, suppliers (in generally called intermediaries), belong to Hotfile and/or to intermediaries. Elements of Web pages are protected by legislation on a set of various nonfunctional elements of the goods or services and other legislation and cannot be copied or reproduced in part or whole. Hotfile, trademark of Hotfile and other goods mentioned in the present agreement, are trademark of Hotfile. Other names of goods, names of companies, marks, trademarks, and symbols are trademarks of corresponding organizations.

Services of Hotfile can be used in legitimate objectives. Transmission, distribution, or storage of any materials that violate laws are forbidden. This includes without restriction patented materials, copyright laws, commercial secrets and other intellectual property rights. The client is obliged to receive the author's preliminary agreement in the case of the use of his or her

Hotfile.com: One click file hosting

materials. In using the Services, you declare and guarantee that you are the author and owner of the copyrights and/or have due licenses for the represented information, you also declare and guarantee that your information does not offend trademarks and other rights of third parties. Hotfile reserves the right to immediately suspend or delete the account of a client, which, in the opinion of Hotfile, offends the present agreement or laws or decisions.

Attention! In case of using Hotfile Service for distribution of the files containing materials which appear to involve child exploitation, the account of the user who placed such files will be immediately deleted and all neccessary information will be passed on to the National Center for Missing & Exploited Children as well as to the administrative tribunals and/or members of the ISP.

## You agree to not use the services of Hotfile

for the purpose of: Loading, accommodation, sending by way of e-mail, transmission or publication by other means of information distributing for terrorist propagation, propagandizing of kindling interethnic, racial or religious break a set, representing violence or death;

Causing of harm to minors, including any form of child pornography; in the case that we shall regard this as sufficiently serious, it will be transferred to the corresponding administrative tribunals and/or members of the ISP;

Loading, accommodation, sending by way of e-mail, transmission or publication by other means of information, which offends the rights of some party on all patents, trademarks, commercial secrets, copyrights, or other property rights.

You undertake to not place information containing illegal materials, as well as other forms of the transmission of illegal or obscene contents and information prompting illegal actions inducing gaming, illegal sales of the weapons, advertising, or the publication of materials that violate legislation regarding the distribution of pornography and racism. You also undertake to not place discrediting information concerning some person, without the consent or intentionally rendering such to someone as mental cruelty.

In the case of the non-observance of the present requirements, Hotfile **reserves the right to immediately suspend or delete, without preliminary prevention, your account or the transaction** violating the present agreement.

Illegal actions also include intrusions or attempts of intrusion into the information system of Hotfile, or attempts to affect the ability of Hotfile to render Services.

These are (but not limited to the following actions):

Unauthorized access to the Services of Hotfile, which includes attempts to probe, test systems for availability, to try to break down the system of information protection of the website without permission from Hotfile;

Intervention in the process of rendering Services to any client or users' network for example avalanche routing or intentional attempts to overload system;

There are many other actions that can destroy the infrastructure of Hotfile, which are strictly prohibited and are the subject of criminal and civil liability.

Lawfully or not, Hotfile reserves the right to decide for the fate of the activity of Hotfile and its Clients.

Attentions please, in such a case if it will be detected that an account or transmitted information violates any of those rules, Hotfile reserves the right to delete the account or stop the transfer of information. If it is necessary, Hotfile will send claims to the corresponding legal structures. In this case, Hotfile will actively cooperate with administrative tribunals in the investigation and criminal prosecution of similar actions, which means the disclosure of the data of the Client's account.

**Attention! In case of using Hotfile Service for distribution of the files containing materials which appear to involve child exploitation, the account of the user who placed such files will be immediately deleted and all neccessary information will be passed on to the National Center for Missing & Exploited Children as well as to the administrative tribunals and/or members of the ISP.**

Complaints of the persons, breaking our Rules, are accepted here. Each complaint will be considered, and depending on the results, can lead to the deletion of the Client's account without preliminary prevention.

## Absence of guarantees. Responsibility.

You express understanding and agreement with the following:

You use these services at your own risk.

Services of Hotfile are rendered "as is" and "as far as possible". Hotfile and its representatives, within the limits allowed by legislation, haven't the responsibility for the any guarantees, for example, the guarantee of conformity of the user's purpose, guarantee of commercial suitability, and guarantee of absence of violation of third parties rights. Hotfile and its representatives do not guarantee accuracy, reliability, completeness, timeliness of Services, software or other information content;

We don't guarantee that Services will correspond to your requirements, Services will be rendered continuously, quickly, reliably, and without mistakes. Results which can be received through the utilization of services, will be exact and reliable, Quality of some product, service, information, or other materials, which you received through the utilization of Services, will correspond to your expectations. Some materials, which you loaded or otherwise received through the utilization of Services, are used by you at your own discretion and at your own risk, and only you have exclusive responsibility for any data that is lost or damaged, which can also damage your computer system or as the result of loading these materials;

Any consultation or information, written or oral, received by you through the utilization of Services, doesn't represent a guarantee, except for direct guarantees in the present Agreement.

You agree to recover damages, including reasonably the necessary payment of legal services, and to release Hotfile, its affiliated organizations, and branches, management, employees, agents from responsibility for any claims and requirements based on your utilization of Services; or violation of the present Agreement or other rules and conditions of Hotfile.

Hotfile.com: One click file hosting

You use the services of Hotfile at your own risk. If you are not satisfied with our Services or present user agreement, or any other rules, you have the right to stop the utilization of Services. You agree that Hotfile is not responsible for any sheer, indirect, collateral, or penal losses as such as lucrum cessans, lost of reputation, data that is lost or other non-material losses, taken place for reasons of utilization or impossibility of utilization of services; necessities to pay anew the unremunerative goods or services purchased through the utilization of Services; unauthorized access or modification in transmitted information or data; statements or actions of any third party within the framework of services; any other event concerning the Services.

**Modification of the Agreements and Rules for extension of Services.**

We reserve the right at any time to modify the present agreement for the extension of Services. We also reserve the right at any time to modify or stop all Services, with the prior notification or without, for a specified time or without a time limit.

You agree that Hotfile does not have any obligations to you, nor to any third party for any modification, suspension, or termination of Services. You recognize that we can establish the general rules and restrictions of using Services, including the maximal disk space allotted to you on the servers of Hotfile, the maximal number of look-up, (and their time of duration) to Services for the specified time.

In addition, you recognize that Hotfile has the right, without preliminary prevention, to change tariffs for the utilization of Services. Modification of tariffs for the utilization of Services inures after the termination of the validity of an existing subscription of the Client.

Hotfile has the immediate right to prevent, suspend, (without a time limit or temporarily) to close access and to stop the extension of Services to the client, or to delete the account of the Client, and also to refuse to render service to the client further in the case of: Hotfile is justified to believe that the Client has broken or has not executed any aspect of the present Agreement or other contracts or instructions of Hotfile, Client hasn't paid for services or any others indebtedness to Hotfile, Hotfile cannot establish authenticity of the information given by the Client, Hotfile is justified to believe that actions of the Client can entail the legal responsibility of the Client, other Clients of Hotfile or Hotfile. Hotfile reserves the right at their own discretion at any time to stop Services on their part, with the prior notification or without such. You agree that the termination of access to Services on any item of present user's agreement can inure without prior notification, and also agree that Hotfile has the immediate right to deactivate, archive, or delete your account and their parts: information, data and-or refuse to access in the further to those data or Services. Furthermore, you agree that Hotfile is not responsible to you or any third party for the termination of your access to Services.

After the cancellation of the present Agreement by the Client or Hotfile, all privileges of the Client stipulated in the Agreement, and obligations of Hotfile extension of Services, are immediately canceled.

Incapacity of Hotfile to undertake actions concerning violations performed by theClient or other persons, does not deprive the right of Hotfile to take measures concerning subsequent or similar violations.

Any requirement or claim raised by the Client for any items of the present Agreement should be given within twelve months from the moment of occurrence of the requirement or the claim's basis.

The client and Hotfile are independent contractors. The present Agreement does not provide and does not create such forms of legal relationship with the Client as an establishment, company, joint venture, labor relations, trading relations.

For the conditions of the present Agreement, the Client has not the right to transfer any rights or to assign other persons duties. Any attempts of transfer those rights have not validity.

Our activity for the extension of Services can be broken by various factors, which we can't control. We have not the responsibility for any delays, or the incapacity to render Service as a result of reasons, which do not depend on us.

If any clause of the present Agreement is declared invalid, that clause should be bypassed, with the least damage of interests of the parties, and other clauses of the Agreement continue to be in effect. Headings of items of the Agreement serve only for convenience, and in any degree do not determine, limit, interpret, or describe a spectrum or a measure of an item of agreement.

Accepting this agreement, you declare and guarantee to Hotfile company, that you are not a competitor of Hotfile and you undertake to not use the information received through the utilization of the website of Hotfile and Services of Hotfile for being in a competition to the last.

**Excepting agreements and conditions that are published on the website, the present Agreement regulates full understanding and agreement between the parties concerning the discussed subject.**

Department of the fight against abuse: Click here

Counterfeit files will be immediately deleted after the reception of your proven confirmation. In the case of the detection of such files, we will take advantage of this form and send a full reference on such a file.

**HotFile.com does not support or allow uploading files containing illegal content as well as other forms of transfering illegal or obscene materials and information that induce individuals to committing illegal action**

Copyright © 2008, 2009 hotfile.com, All Rights Reserved.
Home | Premium | Privacy Policy | Terms of Service | Report Abuse | Contacts

Hotfile.com: One click filehosting

Upload   Premium   FAQ   Contacts   Sign up

Username:
Password:
Forgot Password          Login

Your E-Mail Address:
Subject:              Hotfile:Abuse
Url:
Message:

Contact Us

Copyright: © 2008, 2009 hotfile.com, All Rights Reserved.
Home | Premium | Privacy Policy | Terms of Service | Report Abuse | Contacts



Upload   Premium   FAQ   Contacts   Sign up

Username:
Password:
Forgot Password                        Login

# Terms of Service

### Services of Hotfile.

Hotfile offers the Client services provided the Client completely and unconditionally undertakes to comply with the present Agreement. In this Agreement, it is agreed that: - The client (if you, or the user, or the subscriber) means a private person or an organization, including its employees that uses or intends to use the Services of Hotfile; - Services of Hotfile mean the electronic or interactive services rendered by Hotfile.

Hotfile reserves the right to change or stop all of the rendered Services at any time.

### The rights to use the Services of Hotfile.

Our Services are rendered to private persons or organizations that have the corresponding legal status that enables the conclusion of legally binding arrangements in accordance with legislation. Accepting this agreement, the User confirms the fact that he or she has the license of economic activity (to be the consumer of services) in accordance with the law (during a period of validity in the present Agreement), he or she is not a business rival of Hotfile, and also declares that in accepting the present Agreement, the Client is at least 18 years of age and has the right to conclude the contracts, which have a binding force, as the Client.

### Account of the client. Rights of the client. Responsibilities of the client.

The client undertakes to give to Hotfile the true, exact, and full information about him or herself for all of the questions that are requested on the registration form. The client agrees the update and support information to be true, exact, and in a full state. Otherwise, Hotfile has the right to suspend or cancel your account and present Agreement.

The client is the unique legal owner for the data of the account (the login, password and all attendant data). The client has full responsibility for all and any (successful or unsuccessful) attempts to access the Services or use of Services (including all actions and transactions) with the use of the account of Client, except for cases when access or the utilization of Services is a direct result of negligence of Hotfile.

The client agrees that the voluntary transfer of login and password of its privileged account (GOLD-account) to third parties leads to the automatic lifting of the privileged status of the account, and notes that a violation of the user's agreement used.

The client is completely responsible for the preservation of the confidentiality of the information of access to his or her account, as well as has full responsibility for the actions that occur by way of his or her account.

The client undertakes to notify Hotfile immediately in case of nascence of the circumstances indicating that his or her account or information was used unauthorized. These cases are (but not limited): reception by the Client of confirmation his or her orders of services, made on his or her account that the Client didn't order; occurrence in client's account of data regarding actions (downloading or uploading files) that the client didn't do or other similar inconsistent actions.

### Client's data. Ordering information. Changing the information about the client.

The client has exclusive obligations and full responsibility for the information, which he or she saved on the servers of Hotfile. The client supervises his or her own files through the unique reference generated for him or her. The client has full responsibility for the data and exclusive obligation for any lost and unreduced information. The client agrees to contain the information according to legal responsibilities. The client agrees to reception on the e-mail address of news of service, the information on new services and actions of service Hotfile. Hotfile undertakes to delete the client's information after completing a period of validity in the present Agreement. Hotfile reserves the right to keep the client's information in the archives after his or her deletion, and has not any obligation to the Client for such information.

In using our service IP address your browser will be identified and brought into the databases of our servers. This IP address is saved by the servers of Hotfile only for our internal utilization (calculation of visiting, optimum usage of downloading files, etc.). Hotfile uses cookies to save the options of the users' browsers, in the case that users provide their custom. Utilization of cookies doesn't permit one to find out confidential information about a client - e-mail address, postal address, numbers on a credit card, etc.

Our service calculates the e-mail addresses of users of Hotfile with the purpose of registration and the enumeration of users. Hotfile does not sell and does not share your personal information with any companies.

### Ownership of information and copyrights.

You recognize that all materials (except the users' uploading), submitted on the present Web page, switching the information, documentation, goods, trademarks, drawings, sounds, GUI, software, and services (further called Materials), rendered by Hotfile or third parties - authors, developers, suppliers (in generally called intermediaries), belong to Hotfile and/or to intermediaries. Elements of Web pages are protected by legislation on a set of various nonfunctional elements of the goods or services and other legislation and cannot be copied or reproduced in part or whole. Hotfile, trademark of Hotfile and other goods mentioned in the present agreement, are trademark of Hotfile. Other names of goods, names of companies, marks, trademarks, and symbols are trademarks of corresponding organizations.

Services of Hotfile can be used in legitimate objectives. Transmission, distribution, or storage of any materials that violate laws are forbidden. This includes without restriction patented materials, copyright laws, trademarks,commercial secrets and other intellectual property rights. The client is obliged to receive the author's preliminary agreement in the case of the use of his or her materials. In using the Services, you declare and guarantee that you are the author and owner of the copyrights and/or have due licenses for the represented information, you also declare and guarantee that your information does not offend trademarks and

other rights of third parties. Hotfile reserves the right to immediately suspend or delete the account of a client, which, in the opinion of Hotfile, offends the present agreement or laws or decisions.

Attention! In case of using Hotfile Service for distribution of the files containing materials which appear to involve child exploitation, the account of the user who placed such files will be immediately deleted and all neccessary information will be passed on to the National Center for Missing & Exploited Children as well as to the administrative tribunals and/or members of the ISP.

## You agree to not use the services of Hotfile

for the purpose of: Loading, accommodation, sending by way of e-mail, transmission or publication by other means of information distributing for terrorist propagation, propagandizing of kindling interethnic, racial or religious break a set, representing violence or death;

Causing of harm to minors, including any form of child pornography; in the case that we shall regard this as sufficiently serious, it will be transferred to the corresponding administrative tribunals and/or members of the ISP;

Loading, accommodation, sending by way of e-mail, transmission or publication by other means of information, which offends the rights of some party on all patents, trademarks, commercial secrets, copyrights, or other property rights.

You undertake to not place information containing illegal materials, as well as other forms of the transmission of illegal or obscene contents and information prompting illegal actions inducing gaming, illegal sales of the weapons, advertising, or the publication of materials that violate legislation regarding the distribution of pornography and racism. You also undertake to not place discrediting information concerning some person, without the consent or intentionally rendering such to someone as mental cruelty.

In the case of the non-observance of the present requirements, Hotfile **reserves the right to immediately suspend or delete, without preliminary prevention, your account or the transaction** violating the present agreement.

Illegal actions also include intrusions or attempts of intrusion into the information system of Hotfile, or attempts to affect the ability of Hotfile to render Services.

These are (but not limited to the following actions):

Unauthorized access to the Services of Hotfile, which includes attempts to probe, test systems for availability, to try to break down the system of information protection of the website without permission from Hotfile;

Intervention in the process of rendering Services to any client or users' network for example avalanche routing or intentional attempts to overload system;

There are many other actions that can destroy the infrastructure of Hotfile, which are strictly prohibited and are the subject of criminal and civil liability.

Lawfully or not, Hotfile reserves the right to decide for the fate of the activity of Hotfile and its Clients.

Attentions please, in such a case if it will be detected that an account or transmitted information violates any of those rules, Hotfile reserves the right to delete the account or stop the transfer of information. If it is necessary, Hotfile will send claims to the corresponding legal structures. In this case, Hotfile will actively cooperate with administrative tribunals in the investigation and criminal prosecution of similar actions, which means the disclosure of the data of the Client's account.

**Attention! In case of using Hotfile Service for distribution of the files containing materials which appear to involve child exploitation, the account of the user who placed such files will be immediately deleted and all neccessary information will be passed on to the National Center for Missing & Exploited Children as well as to the administrative tribunals and/or members of the ISP.**

Complaints of the persons, breaking our Rules, are accepted here. Each complaint will be considered, and depending on the results, can lead to the deletion of the Client's account without preliminary prevention.

## Absence of guarantees. Responsibility.

You express understanding and agreement with the following:

You use these services at your own risk.

Services of Hotfile are rendered "as is" and "as far as possible". Hotfile and its representatives, within the limits allowed by legislation, haven't the responsibility for the any guarantees, for example, the guarantee of conformity of the user's purpose, guarantee of commercial suitability, and guarantee of absence of violation of third parties rights. Hotfile and its representatives do not guarantee accuracy, reliability, completeness, timeliness of Services, software or other information content;

We don't guarantee that Services will correspond to your requirements, Services will be rendered continuously, quickly, reliably, and without mistakes, Results which can be received through the utilization of services, will be exact and reliable, Quality of some product, service, information, or other materials, which you received through the utilization of Services, will correspond to your expectations. Some materials, which you loaded or otherwise received through the utilization of Services, are used by you at your own discretion and at your own risk, and only you have exclusive responsibility for any data that is lost or damaged, which can also damage your computer system or as the result of loading these materials;

Any consultation or information, written or oral, received by you through the utilization of Services, doesn't represent a guarantee, except for direct guarantees in the present Agreement.

You agree to recover damages, including reasonably the necessary payment of legal services, and to release Hotfile, its affiliated organizations, and branches, management, employees, agents from responsibility for any claims and requirements based on your utilization of Services; or violation of the present Agreement or other rules and conditions of Hotfile.

You use the services of Hotfile at your own risk. If you are not satisfied with our Services or present user agreement, or any other rules, you have the right to stop the utilization of Services. You agree that Hotfile is not responsible for any sheer, indirect,

collateral, or penal losses as such as lucrum cessans, lost of reputation, data that is lost or other non-material losses, taken place for reasons of utilization or impossibility of utilization of services; necessities to pay anew the unremunerative goods or services purchased through the utilization of Services; unauthorized access or modification in transmitted information or data; statements or actions of any third party within the framework of services; any other event concerning the Services.

**Modification of the Agreements and Rules for extension of Services.**

We reserve the right at any time to modify the present agreement for the extension of Services. We also reserve the right at any time to modify or stop all Services, with the prior notification or without, for a specified time or without a time limit.

You agree that Hotfile does not have any obligations to you, nor to any third party for any modification, suspension, or termination of Services. You recognize that we can establish the general rules and restrictions of using Services, including the maximal disk space allotted to you on the servers of Hotfile, the maximal number of look-up, (and their time of duration) to Services for the specified time.

In addition, you recognize that Hotfile has the right, without preliminary prevention, to change tariffs for the utilization of Services. Modification of tariffs for the utilization of Services inures after the termination of the validity of an existing subscription of the Client.

Hotfile has the immediate right to prevent, suspend, (without a time limit or temporarily) to close access and to stop the extension of Services to the client, or to delete the account of the Client, and also to refuse to render service to the client further in the case of: Hotfile is justified to believe that the Client has broken or has not executed any aspect of the present Agreement or other contracts or instructions of Hotfile, Client hasn't paid for services or any others indebtednesses to Hotfile, Hotfile cannot establish authenticity of the information given by the Client, Hotfile is justified to believe that actions of the Client can entail the legal responsibility of the Client, other Clients of Hotfile or Hotfile. Hotfile reserves the right at their own discretion at any time to stop Services or their part, with the prior notification or without such. You agree that the termination of access to Services on any item of present user's agreement can inure without prior notification, and also agree that Hotfile has the immediate right to deactivate, archive, or delete your account and their parts: information, data and-or refuse to access in the further to those data or Services. Furthermore, you agree that Hotfile is not responsible to you or any third party for the termination of your access to Services.

After the cancellation of the present Agreement by the Client or Hotfile, all privileges of the Client stipulated in the Agreement, and obligations of Hotfile extension of Services, are immediately cancelled.

Incapacity of Hotfile to undertake actions concerning violations performed by theClient or other persons, does not deprive the right of Hotfile to take measures concerning subsequent or similar violations.

Any requirement or claim raised by the Client for any items of the present Agreement should be given within twelve months from the moment of occurrence of the requirement or the claim's basis.

The client and Hotfile are independent contractors. The present Agreement does not provide and does not create such forms of legal relationship with the Client as an establishment, company, joint venture, labor relations, trading relations.

For the conditions of the present Agreement, the Client has not the right to transfer any rights or to assign other persons duties. Any attempts of transfer those rights have not validity.

Our activity for the extension of Services can be broken by various factors, which we can't control. We have not the responsibility for any delays, or the incapacity to render Service as a result of reasons, which do not depend on us.

If any clause of the present Agreement is declared invalid, that clause should be bypassed, with the least damage of interests of the parties, and other clauses of the Agreement continue to be in effect. Headings of items of the Agreement serve only for convenience, and in any degree do not determine, limit, interpret, or describe a spectrum or a measure of an item of agreement.

Accepting this agreement, you declare and guarantee to Hotfile company, that you are not a competitor of Hotfile and you undertake to not use the information received through the utilization of the website of Hotfile and Services of Hotfile for being in a competition to the last.

**Excepting agreements and conditions that are published on the website, the present Agreement regulates full understanding and agreement between the parties concerning the discussed subject.**

Department of the fight against abuse: Click here

Counterfeit files will be immediately deleted after the reception of your proven confirmation. In the case of the detection of such files, we will take advantage of this form and send a full reference on such a file.

Copyright © 2008, 2009 hotfile.com, All Rights Reserved.

Home | Premium | Privacy Policy | Terms of Service | Report Abuse | Contacts

60

copyright owner did not then either provide a phonorecord that could be reproduced or otherwise provide the necessary means of making a permitted ephemeral recording from the phonorecord already in the possession of the radio station, the radio station would not be liable for violating section 1201(a)(1) for taking the steps necessary for engaging in activities permitted under section 112(a)(1). The radio station would, of course, be liable for violating section 1201(a)(1) if it engaged in activities prohibited by that section in other than the limited circumstances permitted by section 112(a)(1).

*Section 402. Limitation on exclusive rights; distance education*

Section 402(a) directs the Register of Copyrights to consult with representatives of copyright owners, nonprofit educational institutions, and nonprofit libraries and archives and to submit recommendations to the Congress no later than 6 months after the date of enactment of the bill on how to promote distance education through digital technologies, including interactive digital networks, while maintaining an appropriate balance between the rights of copyright owners and the needs of users. Where appropriate, the Register shall include legislative recommendations to achieve those objectives.

Section 402(b) specifies considerations which the Register shall take into account in formulating such recommendations.

*Section 403. Exemption for libraries and archives*

Section 108 of the Copyright Act (17 U.S.C. 108) permits libraries and archives of the type described in that section to make and, in some cases, distribute a limited number of copies of certain types of copyrighted works, without the permission of the copyright holder, for specified purposes relating to these entities' functions as repositories of such works for public reference. Section 403 of the bill updates section 108 to allow these entities to take advantage of digital technologies when engaging in specified preservation activities.

Except for the amendment to paragraph (a)(3), which deals with the inclusion of copyright notice on all copies or phonorecords of works made or distributed pursuant to section 108, the amendments revise either subsection (b), which addresses the reproduction and distribution of a copy or phonorecord of an unpublished work for purposes of preservation and security or for deposit for research use in another library or archive of the type described; or subsection (c), which addresses the reproduction of a copy or phonorecord of a published work for the purpose of replacement of a copy of that work that is damaged, deteriorating, lost, or stolen, if an unused replacement copy cannot be obtained at a fair price.

The amendment to paragraph (a)(3) of section 108 is intended to ease the burden on libraries and archives of the current law's requirement that a notice of copyright be included on copies that are reproduced under section 108. Under this amendment, such notice would be required only where the particular copy that is reproduced by the library or archives itself bears a notice. In other words, a notice appearing on the material copied would still need to be maintained, and could not be deleted. On the other hand, if

61

the copy being reproduced does not bear a copyright notice, the library or archives would fully satisfy its obligation under this section by simply placing on the reproduction a legend that states "This work may be protected by copyright," or words to that effect. This minimal obligation is similar to those found in subsections (e) and (f) of existing section 108, which condition the exemption in those subsections on the display of a general notice or warning of potential copyright protection.

Subsection (b) currently permits a library or archive under this section to make and distribute one copy or phonorecord of an unpublished work solely for purposes of preservation and security or for deposit for research use in another library or archives, provided that the duplication of the work occurs "in facsimile form." The legislative history to that section makes clear that, when this language was enacted more than twenty years ago, Congress intended to permit the copy to be made by microfilm or electrostatic photocopying process, but not in a computerized form i.e., "in machine readable language for storage in an information system." [27]

The amendment to subsection (b) permits a library or archive to make (for itself or another library or archive of the type described by clause (2) of subsection (a)) up to 3 copies or phonorecords for these purposes, rather than just one, and permits such copies or phonorecords to be made in digital as well as analog formats. In recognition of the risk that uncontrolled public access to the copies or phonorecords in digital formats could substantially harm the interests of the copyright owner by facilitating immediate, flawless and widespread reproduction and distribution of additional copies or phonorecords of the work, the amendment provides that any copy of a work that the library or archive makes in a digital format must not be otherwise distributed in that format and must not be made available in that format to the public outside the premises of the library or archives. In this way, the amendment permits the utilization of digital technologies solely for the purposes of this subsection.

Similarly, subsection (c) currently permits a library or archives under this section to make one copy or phonorecord of any published work solely for purposes of replacement of a copy or phonorecord that is damaged, deteriorating, lost or stolen, provided that the library or archive has determined after a reasonable effort that an unused replacement cannot be obtained at a fair price, and provided that the duplication of the work occurs "in facsimile form."

As in subsection (b), the amendment to subsection (c) permits a library or archive to make and use three copies or phonorecords for these purposes, rather than just one, and permits such copies or phonorecords to be made in digital as well as analog formats, with the proviso that any copy of a work that the library or archive makes in a digital format must not be made available to the public in that format except for use on the premises of a library or archives in lawful possession of such copy. In the view of the Committee, this proviso is necessary to ensure that the amendment strikes the appropriate balance, permitting the use of digital technology by libraries and archives while guarding against the poten-

[27] See H.R. Rep. No. 1476, 94th Cong., 2d Sess. (1976).

62

tial harm to the copyright owner's market from patrons obtaining unlimited access to digital copies from any location.

The amendment to subsection (c) also broadens its coverage to allow the updating of obsolete formats. It permits the making of such copies or phonorecords of a work "if the existing format in which the work is stored has become obsolete." This provision is intended to permit libraries and archives to ensure that copies of works in their collections continue to be accessible and useful to their patrons. In order to ensure that the provision does not inadvertently result in the suppression of ongoing commercial offerings of works in still-usable formats, the amendment explicitly provides that, for purposes of this subsection, a format will be considered obsolete only if the machine or device necessary to render perceptible a work stored in that format is no longer manufactured or reasonably available in a commercial marketplace. Under this language, if the needed machine or device can only be purchased in secondhand stores, it should not be considered "reasonably available."

Finally, the Committee wants to make clear that, just as when section 108 of the Copyright Act was first enacted, the term "libraries" and "archives" as used and described in this provision still refer to such institutions only in the conventional sense of entities that are established as, and conduct their operations through, physical premises in which collections of information may be used by researchers and other members of the public. Although online interactive digital networks have since given birth to online digital "libraries" and "archives" that exist only in the virtual (rather than physical) sense on websites, bulletin boards and homepages across the Internet, it is not the Committee's intent that section 108 as revised apply to such collections of information. The ease with which such sites are established online literally allows anyone to create his or her own digital "library" or "archives." The extension of the application of section 108 to all such sites would be tantamount to creating an exception to the exclusive rights of copyright holders that would permit any person who has an online website, bulletin board or a homepage to freely reproduce and distribute copyrighted works. Such an exemption would swallow the general rule and severely impair the copyright owners' right and ability to commercially exploit their copyrighted works. Consequently, the Committee intends that references to "the premises of the library or archives" in amended sections 108 (b)(2) and (c)(2) mean only physical premises.

## VI. COST ESTIMATE

U.S. CONGRESS,
CONGRESSIONAL BUDGET OFFICE,
*Washington, DC, May 11, 1998.*

Hon. ORRIN G. HATCH,
*Chairman, Committee on the Judiciary, U.S. Senate, Washington, DC.*

DEAR MR. CHAIRMAN: The Congressional Budget Office has prepared the enclosed cost estimate for S. 2037, the Digital Millennium Copyright Act of 1998.

63

If you wish further details on this estimate, we will be pleased to provide them. The CBO staff contacts are Kim Cawley (for federal costs), Pepper Santalucia (for the state and local impact), and Matthew Eyles (for the private-sector impact).

Sincerely,

JAMES L. BLUM
(For June E. O'Neill, Director).

Enclosure.

CONGRESSIONAL BUDGET OFFICE COST ESTIMATE

S. 2037—DIGITAL MILLENNIUM COPYRIGHT ACT OF 1998

CBO estimates that enacting S. 2037 would have no significant impact on the federal budget. Enacting the bill would establish new criminal penalties and thus could affect both receipts and direct spending. hence, pay-as-you-go procedures would apply, but we expect that any changes in receipts and direct spending would be insignificant. S. 2037 contains an intergovernmental and a private-sector mandate as defined in the Unfunded Mandates Reform Act of 1995 (UMRA), but the costs of the mandates would not exceed the thresholds in the law.

Title I of S. 2037 would amend U.S. copyright law to comply with two treaties produced by the December 1996 conference of the World Intellectual Property Organization—one regarding the use of copyrighted material in digital environments, and the other dealing with international copyright protection of performers and producers of phonograms. Section 103 would establish criminal fines of up to $1 million for anyone attempting to circumvent copyright protection systems or falsifying or altering copyright management information. Enacting this provision could increase governmental receipts from the collection of fines, but we estimate that any such increase would be less than $500,000 annually. Criminal fines are deposited in the Crime Victims Fund and are spent in the following year. Thus any change in direct spending from the fund would also amount to less than $500,000 annually.

Title II would limit the liability for copyright infringement of persons who are providers of on-line services or network access. Title III would amend copyright law to allow copies of computer programs to be made for the purpose of repairing or maintaining a computer. Title IV would require copyright owners that protect their audio recordings with technical measures to prevent the reproduction of such work, to make available to transmitting organizations entitled to make a copy of such work the necessary means of making a copy, provided that it is technologically and economically feasible for the copyright owner to do so. The bill would direct the Copyright Office to make recommendations to the Congress concerning the liability for copyright infringement of nonprofit educational institutions when they are providers of Internet services. The bill also would seek recommendations from the Copyright Office in using digital technologies to promote distance learning while protecting the rights of copyright owners. Based on information from the Copyright Office, CBO estimates that preparing these provisions would cost less than $300,000.

64

Section 4 of UMRA excludes from the application of that act any legislative provisions that are necessary for the ratification or implementation of international treaty obligations. CBO has determined that Title I of the bill fits within that exclusion, because it is necessary for the implementation of the WIPO Copyright Treaty and the WIPO Performances and Phonograms Treaty.

Title IV of S. 2037 would impose a mandate on certain owners of copyrights who apply technical protections to works that prevent their reproduction. Title IV would require copyright owners who employ mechanisms that prevent the reproduction of copyrighted works to make available to federally licensed broadcasters the necessary means to copy such works. Under current law, federally licensed broadcasters are authorized to reproduce copyright-protected material under specific conditions. Since this mandate would apply to both public and private entities that own copyrights, it would be considered both a private-sector and an intergovernmental mandate.

The use of reproduction protections envisioned in the bill is not yet widespread. Furthermore, copyright owners may claim economic hardship or technical infeasibility to avoid the new requirement and the costs of providing federally licensed broadcasters with the means to copy technically protected works would likely be modest. Therefore, CBO estimates that the direct cost of the new mandates would be well below the statutory thresholds in UMRA.

The CBO staff contacts for this estimate are Kim Cawley (for Federal costs); Pepper Santalucia (for the State and local impact); and Matthew Eyles (for the private-sector impact). This estimate was approved by Paul N. Van de Water, Assistant Director for Budget Analysis.

## VII. REGULATORY IMPACT STATEMENT

In compliance with paragraph 11(b)(1), rule XXVI of the Standing Rules of the Senate, the Committee, after due consideration, concludes that S. 2037 will not have significant regulatory impact.

## VIII. ADDITIONAL VIEWS OF MR. LEAHY

The successful adoption by the World Intellectual Property Organization (WIPO) in December 1996 of two new copyright treaties—one on written material and one on sound recordings—was appropriately lauded in the United States. The WIPO Copyright Treaty and the WIPO Performances and Phonograms Treaty will give a significant boost to the protection of intellectual property rights around the world, and stand to benefit important American creative industries—from movies, recordings, computer software and many other copyrighted materials that are subject to piracy online.

According to Secretary Daley of the Department of Commerce, for the most part, "the treaties largely incorporate intellectual property norms that are already part of U.S. law." What the treaties will do is give American owners of copyrighted material an important tool to protect their intellectual property in those countries that become a party to the treaties. With an ever-expanding global marketplace, such international protection is critical to protect American companies and, ultimately, American jobs and the U.S. economy.

The President submitted the two WIPO treaties to the U.S. Senate on July 29, 1997, as well as draft legislation to implement the two treaties. I was proud to introduce this draft implementing legislation, S. 1121, with Senators Hatch, Thompson, and Kohl on July 29, 1997.

This legislation is the culmination of an effort to ensure that the appropriate copyright protections are in place around the world to foster the enormous growth of the Internet and other digital computer networks. Our dependence on interconnected computers only grows as a means to communicate, manage our personal and business affairs and obtain the goods and services we want. Indeed, computer networks will increasingly become the means of transmitting copyrighted works in the years ahead. This presents great opportunities but also poses significant risks to authors and our copyright industries.

We must make sure that our copyright laws protect the intellectual property rights of creative works available online in ways that promote the use of the Internet, both by content providers and users. The future growth of computer networks like the Internet and of digital, electronic communications requires it. Otherwise, owners of intellectual property will be unwilling to put their material online. If there is no content worth reading online, the growth of this medium will be stifled, and public accessibility will be retarded.

The Clinton administration showed great foresight when it formed, in 1993, the Information Infrastructure Task Force (IITF), which in turn established the Working Group on Intellectual Property Rights to examine and recommend changes to keep copyright

66

law current with new technology. In 1995, the Administration's Working Group on Intellectual Property Rights released its report, "Intellectual Property and the National Information Infrastructure," in which it explained the importance of adequate copyright protection for the future of the Internet:

> The full potential of the NII will not be realized if the education, information and entertainment products protected by intellectual property laws are not protected effectively when disseminated via the NII. Creators and other owners of intellectual property will not be willing to put their interests at risk if appropriate systems—both in the U.S. and internationally—are not in place to permit them to set and enforce the terms and conditions under which their works are made available in the NII environment. Likewise, the public will not use the services available on the NII and generate the market necessary for its success unless a wide variety of works are available under equitable and reasonable terms and conditions, and the integrity of those works is assured. All the computers, telephones, fax machines, scanners, cameras, keyboards, televisions, monitors, printers, switches, routers, wires, cables, networks, and satellites in the world will not create a successful NII, if there is no content. What will drive the NII is the content moving through it.

The same year that report was issued, Senator Hatch and I joined together to introduce "The NII Copyright Protection Act of 1995", S. 1284, which incorporated the recommendations of the Administration. That legislative proposal confronted fundamental questions about the role of copyright in the next century—many of which are echoed by the Digital Millennium Copyright Act (DMCA), which was reported by the Senate Judiciary Committee.

I note that the Report of the Administration's Working Group on Intellectual Property also generally supported "the amendments to the copyright law and the criminal law (which sets out sanctions for criminal copyright violations) set forth in S. 1122, introduced in the 104th Congress by Senators Leahy and Feingold following consultations with the Justice Department." While the 104th Congress did not act on this legislation, I revised and reintroduced this bill as S. 1044 in 1997. This important legislation, the No Electronic Theft Act, to adapt to the emerging digital environment was finally enacted in this Congress.

Title I of the DMCA is based on the administration's recommendations for legislation to implement the two WIPO treaties, as reflected in S. 1121. In sum, Title I makes certain technical changes to conform our copyright laws to the treaties and substantive amendments to comply with two new treaty obligations. Specifically, the treaties oblige the signatories to provide legal protections against circumvention of technological measures used by copyright owners to protect their works, and against violations of the integrity of copyright management information (CMI), which identifies a work, its author, the copyright owner and any information about the terms and conditions of use of the work. The bill adds a new chapter to U.S. copyright law to implement the

67

anticircumvention and CMI provisions, along with corresponding
civil and criminal penalties. Title II of the DMCA provides limita-
tions, under certain conditions, on copyright infringement liability
for Internet service providers (ISP's) and online service providers
(OSP's). Title III provides a statutory exemption in the Copyright
Act to ensure that the lawful owner or lessee of a computer ma-
chine may authorize an independent service technician to activate
the computer in order to service its hardware components. Title IV
begins the process of updating our Nation's copyright laws with re-
spect to library, archives, and educational uses of copyrighted
works in the digital age.

Following intensive discussions with a number of interested par-
ties, including libraries, universities, small businesses, ISP's and
OSP's, telephone companies, computer users, broadcasters, content
providers and device manufacturers, the Senate Judiciary Commit-
tee was able to reach unanimous agreement on certain modifica-
tions and additions incorporated into the DMCA.

For example, significant provisions were added to the bill in Title
II to clarify the liability for copyright infringement of online and
Internet service providers. These provisions set forth "safe harbors"
from liability for ISP's and OSP's under clearly defined cir-
cumstances, which both encourage responsible behavior and protect
important intellectual property rights. In addition, during the Com-
mittee's consideration of this bill, an Ashcroft-Leahy-Hatch amend-
ment was adopted to ensure that computer users are given reason-
able notice of when their Web sites are the subject of infringement
complaints, and to provide procedures for computer users to have
material that is mistakenly taken down put back online.

This bill contains a number of provisions designed to help librar-
ies and archives. First, libraries expressed concerns about the pos-
sibility of criminal sanctions or potentially ruinous monetary liabil-
ity for actions taken in good faith. This bill makes sure that librar-
ies acting in good faith can never be subject to fines or civil dam-
ages. Specifically, a library is exempt from monetary liability in a
civil suit if it was not aware and had no reason to believe that its
acts constituted a violation. In addition, libraries are completely ex-
empt from the criminal provisions.

Second, the bill contains a "browsing" exception for libraries. Li-
braries have indicated that in an online environment dominated by
encrypted works it may be impossible for them to gain access to
works to decide whether or not to acquire them. The current ver-
sion of the bill permits libraries to disregard access prevention
technologies in order to make a good faith determination of wheth-
er or not it would like to buy a copy of a work. If the library de-
cides that it wishes to acquire the work it must negotiate with the
copyright owner just as libraries do today.

Third, Senator Hatch, Senator Ashcroft, and I crafted an amend-
ment to provide for the preservation of digital works by qualified
libraries and archives. The ability of libraries to preserve legible
copies of works in digital form is one I consider critical. Under
present law, libraries are permitted to make a single facsimile copy
of works in their collections for preservation purposes, or to replace
lost, damaged or stolen copies of works that have become commer-
cially unavailable. This law, however, has become outmoded by

68

changing technology and preservation practices. The bill ensures that libraries' collections will continue to be available to future generations by permitting libraries to make up to three copies in any format—including in digital form. This was one of the proposals in The National Information Infrastructure (NII) Copyright Protection Act of 1995, which I sponsored in the last Congress. The Register of Copyrights, among others, has supported that proposal.

In addition, the bill would permit a library to transfer a work from one digital format to another if the equipment needed to read the earlier format becomes unavailable commercially. This change addresses a problem that should be familiar to anyone whose office has boxes of eight-inch floppy disks tucked away somewhere.

These provisions go a long way toward meeting the concerns that libraries have expressed about the original bill, S. 1121.

Another issue that the bill addresses is distance learning. When Congress enacted the present copyright law it recognized the potential of broadcast and cable technology to supplement classroom teaching, and to bring the classroom to those who, because of their disabilities or other special circumstances, are unable to attend classes. At the same time, Congress also recognized the potential for unauthorized transmissions of works to harm the markets for educational uses of copyrighted materials. In the present Copyright Act, we struck a careful balance and crafted a narrow exemption. But as with so many areas of copyright law, the advent of digital technology requires us to take another look at the issue.

I recognize that the issue of distance learning has been under consideration for the past several years by the Conference on Fair Use (CONFU) that was established by the administration to consider issues relating to fair use in the digital environment. In spite of the hard work of the participants, CONFU has so far been unable to forge a comprehensive agreement on guidelines for the application of fair use to digital distance learning.

We made tremendous strides in the Committee to chart the appropriate course for updating the Copyright Act to permit the use of copyrighted works in valid distance learning activities. Senator Hatch, Senator Ashcroft, and I joined together to ask the Copyright Office to facilitate discussions among interested library and educational groups and content providers with a view toward making recommendations that could be incorporated into the DMCA at the April 30 markup.

Based on the Copyright Office's recommendations, we incorporated into the DMCA a new section 122 requiring the Copyright Office to make broader recommendations to Congress on digital distance education within six months. Upon receiving the Copyright Office's recommendations, it is my hope that the Senate Judiciary Committee will promptly commence hearings on the issue and move expeditiously to enact further legislation on the matter. I know that all members on this Committee are as anxious as I am to complete the process that we started in Committee of updating the Copyright Act to permit the appropriate use of copyrighted works in valid distance learning activities. This step should be viewed as a beginning—not an end, and we are committed to reaching that end point as quickly as possible.

69

Senator Feinstein had sought to clarify when a university would be held responsible for the actions of its employees in connection with its eligibility for the safe harbors spelled out in title II of the bill. I and others on the Committee agreed with Senator Feinstein that, because of the importance, complexity, and implications for other online service providers, including libraries and archives of this issue, we should have the Copyright Office examine the issue in a comprehensive fashion as well.

Amendments sponsored by Senator Ashcroft, Senator Hatch, and I were also crafted to address the issues of reverse engineering, ephemeral recordings and to clarify the use of copyright management information in the course of certain analog and digital transmissions in broadcasting. Additional legislative language was incorporated into the bill to clarify that the law enforcement exemptions apply to all government agencies which conduct law enforcement and intelligence work, as well as to government contractors engaging in intelligence, investigative, or protective work.

Finally, to assuage the concerns of the consumer electronics manufacturers and others that the bill might require them to design their products to respond to any particular technological protection measure, Senator Hatch, Senator Ashcroft, and I crafted an amendment that clarified the bill on this issue. We also agreed to incorporate provisions into the bill clarifying that nothing in the bill will prevent parents form controlling their children's access to the Internet or individuals from protecting personal identifying information.

The DMCA is a product of the Senate Judiciary Committee's recognition that ours is a time of unprecedented challenge to copyright protection. Copyright has been the engine that has traditionally converted the energy of artistic creativity into publicly available arts and entertainment. Historically, the Government's role has been to encourage creativity and innovation by protecting copyrights that create incentives for the dissemination to the public of new works and forms of expression. That is the tradition which I have sought to honor and which I intend to continue to promote.

Now, with the DMCA, the Senate Judiciary Committee takes another important step toward protecting American ingenuity and creative expression. This bill is a well-balanced package of proposals that address the needs of creators, consumers and commerce in the digital age and well into the next century.

PATRICK LEAHY.

IX. CHANGES IN EXISTING LAW

In compliance with paragraph 12 of rule XXVI of the Standing Rules of the Senate, changes in existing law made by S. 2037, as reported, are shown as follows (existing law proposed to be omitted is enclosed in black brackets, new matter is printed in italic, and existing law in which no change is proposed is shown in roman):

# UNITED STATES CODE

\*        \*        \*        \*        \*        \*        \*

# TITLE 17—COPYRIGHTS

| Chap. | Sec. |
|---|---|
| 1. Subject Matter and Scope of Copyright ........................................................ | 101 |
| \*        \*        \*        \*        \*        \*        \* | |
| 11. Sound Recordings and Music Videos ........................................................ | 1101 |
| *12. Copyright Protection and Management Systems* ........................................... | *1201* |

## CHAPTER 1—SUBJECT MATTER AND SCOPE OF COPYRIGHT

\*        \*        \*        \*        \*        \*        \*

### § 101. Definitions

Except as otherwise provided in this title, as used in this title, the following terms and their variant forms mean the following:

\*        \*        \*        \*        \*        \*        \*

[A work is a "Berne Convention work" if—
    [(1) in the case of an unpublished work, one or more of the authors is a national of a nation adhering to the Berne Convention, or in the case of a published work, one or more of the authors is a national of a nation adhering to the Berne Convention on the date of first publication;
    [(2) the work was first published in a nation adhering to the Berne Convention, or was simultaneously first published in a nation adhering to the Berne Convention and in a foreign nation that does not adhere to the Berne Convention;
    [(3) in the case of an audiovisual work—
        [(A) if one or more of the authors is a legal entity, that author has its headquarters in a nation adhering to the Berne Convention; or
        [(B) if one or more of the authors is an individual, that author is domiciled, or has his or her habitual residence in a nation adhering to the Berne Convention;

(70)

71

〔(4) in the case of a pictorial, graphic, or sculptural work that is incorporated in a building or other structure, the building or structure is located in a nation adhering to the Berne Convention; or

〔(5) in the case of an architectural work embodied in a building, such building is erected in a country adhering to the Berne Convention.

〔For purposes of paragraph (1), an author who is domiciled in or has his or her habitual residence in, a nation adhering to the Berne Convention is considered to be a national of that nation. For purposes of paragraph (2), a work is considered to have been simultaneously published in two or more nations if its dates of publication are within 30 days of one another.〕

\*      \*      \*      \*      \*      \*      \*

〔The "country of origin" of a Berne Convention work, for〕 *For* purposes of section 411, 〔is the United States〕 *a work is a "United States work" only* if—

(1) in the case of a published work, the work is first published—

(A) in the United States;

(B) simultaneously in the United States and another 〔nation or nations adhering to the Berne Convention〕 *treaty party or parties*, whose law grants a term of copyright protection that is the same as or longer than the term provided in the United States;

(C) simultaneously in the United States and a foreign nation that 〔does not adhere to the Berne Convention〕 *is not a treaty party*; or

(D) in a foreign nation that 〔does not adhere to the Berne Convention〕 *is not a treaty party*, and all of the authors of the work are nationals, domiciliaries, or habitual residents of, or in the case of an audiovisual work legal entities with headquarters in, the United States;

(2) in the case of an unpublished work, all the authors of the work are nationals, domiciliaries, or habitual residents of the United States, or, in the case of an unpublished audiovisual work, all the authors are legal entities with headquarters in the United States; or

(3) in the case of a pictorial, graphic, or sculptural work incorporated in a building or structure, the building or structure is located in the United States.

〔For the purposes of section 411, the "country of origin" of any other Berne Convention work is not the United States.〕

\*      \*      \*      \*      \*      \*      \*

A work is "fixed" in a tangible medium of expression when its embodiment in a copy or phonorecord, by or under the authority of the author, is sufficiently permanent or stable to permit it to be perceived, reproduced, or otherwise communicated for a period of more than transitory duration. A work consisting of sounds, images, or both, that are being transmitted, is "fixed" for purposes of this title if a fixation of the work is being made simultaneously with its transmission.

72

*The "Geneva Phonograms Convention" is the Convention for the Protection of Producers of Phonograms Against Unauthorized Duplication of Their Phonograms, concluded at Geneva, Switzerland on October 29, 1971.*

The terms "including" and "such as" are illustrative and not limitative.

*An "international agreement" is—*
*(1) the Universal Copyright Convention;*
*(2) the Geneva Phonograms Convention;*
*(3) the Berne Convention;*
*(4) the WTO Agreement;*
*(5) the WIPO Copyright Treaty;*
*(6) the WIPO Performances and Phonograms Treaty; and*
*(7) any other copyright treaty to which the United States is a party.*

\* \* \* \* \* \* \*

To "transmit" a performance or display is to communicate it by any device or process whereby images or sounds are received beyond the place from which they are sent.

*A "treaty party" is a country or intergovernmental organization other than the United States that is a party to an international agreement.*

\* \* \* \* \* \* \*

The author's "widow" or "widower" is the author's surviving spouse under the law of the author's domicile at the time of his or her death, whether or not the spouse has later re-married.

*The "WIPO Copyright Treaty" is the WIPO Copyright Treaty concluded at Geneva, Switzerland, on December 20, 1996.*

*The "WIPO Performances and Phonograms Treaty" is the WIPO Performances and Phonograms Treaty concluded at Geneva, Switzerland on December 20, 1996.*

\* \* \* \* \* \* \*

A "work made for hire" is—
(1) a work prepared by an employee within the scope of his or her employment; or

\* \* \* \* \* \* \*

*The "WTO Agreement" is the Agreement Establishing the World Trade Organization entered into on April 15, 1994. The terms "WTO Agreement" and "WTO member country" have the meanings given those terms in paragraphs (9) and (10) respectively of section 2 of the Uruguay Round Agreements Act.*

\* \* \* \* \* \* \*

## § 104. Subject matter of copyright: National origin

(a) UNPUBLISHED WORKS.—The works specified by sections 102 and 103, while unpublished, are subject to protection under this title without regard to the nationality or domicile of the author.

(b) PUBLISHED WORKS.—The works specified by sections 102 and 103, when published, are subject to protection under this title if—
(1) on the date of first publication, one or more of the authors is a national or domiciliary of the United States, or is a

73

national domiciliary, or sovereign authority of a [foreign nation that is a party to a copyright treaty to which the United States is also a party] *treaty party*, or is a stateless person, wherever that person may be domiciled; or

(2) the work is first published in the United States or in a foreign nation that, on the date of first publication, is a [party to the Universal Copyright Convention] *treaty party*; or

*(3) the work is a sound recording that was first fixed in a treaty party; or*

(4) the work is a [Berne Convention work] *pictorial, graphic or sculptural work that is incorporated in a building or other structure, or an architectural work that is embodied in a building and the building or structure is located in the United States or a treaty party*; or

[(3)] *(5)* the work is first published by the United Nations or any of its specialized agencies, or by the Organization of American States; or

[(5)] *(6)* the work comes within the scope of a Presidential proclamation. Whenever the President finds that a particular foreign nation extends, to works by authors who are nationals or domiciliaries of the United States or to works that are first published in the United States, copyright protection on substantially the same basis as that on which the foreign nation extends protection to works of its own nationals and domiciliaries and works first published in that nation, the President may by proclamation extend protection under this title to works of which one or more of the authors is, on the date of first publication, a national, domiciliary, or sovereign authority of that nation, or which was first published in that nation. The President may revise, suspend, or revoke any such proclamation or impose any conditions or limitations on protection under a proclamation.

*(7) For purposes of paragraph (2), a work that is published in the United States or a treaty party within thirty days of publication in a foreign nation that is not a treaty party shall be considered first published in the United States or such treaty party as the case may be.*

\*      \*      \*      \*      \*      \*      \*

*(d) Effect of Phonograms Treaties.—Notwithstanding the provisions of subsection (b), no works other than sound recordings shall be eligible for protection under this title solely by virtue of the adherence of the United States to the Geneva Phonograms Convention or the WIPO Performances and Phonograms Treaty.*

## § 104A. Copyright in restored works

(a) Automatic Protection and Term.—

(1) Term.—

(A) Copyright subsists, in accordance with this section, in restored works, and vests automatically on the date of restoration. ...

\*      \*      \*      \*      \*      \*      \*

(h) Definitions.—For purposes of this section and section 109(a):