74

(1) The term "date of adherence or proclamation" means the earlier of the date on which a foreign nation which, as of the date the WTO Agreement enters into force with respect to the United States, is not a nation adhering to the Berne Convention or a WTO member country, becomes—

[(A) a nation adhering to the Berne Convention or a WTO member country; or]

[(B) subject to a Presidential proclamation under subsection (g).]

*(A) a nation adhering to the Berne Convention;*

*(B) a WTO member country;*

*(C) a nation adhering to the WIPO Copyright Treaty;*

*(D) a nation adhering to the WIPO Performances and Phonograms Treaty; or*

*(E) subject to a Presidential proclamation under subsection (g).*

\* \* \* \* \* \* \*

[(3) The term "eligible country" means a nation, other than the United States, that is a WTO member country, adheres to the Berne Convention, or is subject to a proclamation under section 104A(g).]

*(3) the term "eligible country" means a nation, other than the United States that—*

*(A) becomes a WTO member country after the date of enactment of the Uruguay Round Agreements Act;*

*(B) on the date of enactment is, or after the date of enactment becomes, a nation adhering to the Berne Convention;*

*(C) adheres to the WIPO Copyright Treaty;*

*(D) adheres to the WIPO Performances and Phonograms Treaty; or*

*(E) after such date of enactment becomes subject to a proclamation under subsection (g).*

\* \* \* \* \* \* \*

(6) The term "restored work" means an original work of authorship that—

(A) is protected under subsection (a);

(B) is not in the public domain in its source country through expiration of term of protection;

(C) is in the public domain in the United States due to—

\* \* \* \* \* \* \*

(iii) lack of national eligibility; [and]

(D) has at least one author or rightholder who was, at the time the work was created, a national or domiciliary of an eligible country, and if published, was first published in an eligible country and not published in the United States during the 30-day period following publication in such eligible country[.]; and

*(E) if the source country for the work is an eligible country solely by virtue of its adherence to the WIPO Performances and Phonograms Treaty, is a sound recording.*

\* \* \* \* \* \* \*

(8) The "source country" of a restored work is—

75

(A) a nation other than the United States;
(B) in the case of an unpublished work—
(i) the eligible country in which the author or rightholder is a national or domiciliary, or, if a restored work has more than 1 author or rightholder, *of which* the majority of foreign authors or rightholders are nationals or domiciliaries [of eligible countries]; or

\*      \*      \*      \*      \*      \*      \*

[(9) The terms "WTO Agreement" and "WTO member country" have the meanings given those terms in paragraphs (9) and (10), respectively, of section 2 of the Uruguay Round Agreements Act.]

\*      \*      \*      \*      \*      \*      \*

## § 108. Limitations on exclusive rights: Reproduction by libraries and archives

(a) [Notwithstanding] *Except as otherwise provided and notwithstanding* the provisions of section 106, it is not an infringement of copyright for a library or archives, or any of its employees acting within the scope of their employment, to reproduce no more than one copy or phonorecord of a work *except as provided in subsections (b) and (c),* or to distribute such copy or phonorecord, under the conditions specified by this section, if—

\*      \*      \*      \*      \*      \*      \*

(3) the reproduction or distribution of the work includes a notice of copyright *if such notice appears on the copy of phonorecord that is reproduced under the provisions of this section, or a legend stating that the work may be protected by copyright if no such notice can be found on the copy or phonorecord that is reproduced under the provisions of this section.*
(b) The rights of reproduction and distribution under this section apply to [a copy or phonorecord] *three copies or phonorecords* of an unpublished work duplicated [in facsimile form] solely for purposes of preservation and security or for deposit for research use in another library or archives of the type described by clause (2) of subsection (a), [if the copy or phonorecord reproduced is currently in the collections of the library or archives.] *if—*
(1) *the copy or phonorecord reproduced is currently in the collections of the library or archives; and*
(2) *any such copy or phonorecord that is reproduced in digital format is not otherwise distributed in that format and is not made available to the public outside the premises of the library or archives in that format.*
(c) The right of reproduction under this section applies to [a copy or phonorecord] *three copies or phonorecords* of a published work duplicated [in facsimile form] solely for the purpose of replacement of a copy or phonorecord that is damaged, deteriorating, lost, or stolen, *or if the existing format in which the work is stored has become obsolete,* [if the library or archives has, after a reasonable effort, determined that an unused replacement cannot be obtained at a fair price.] *if—*

76

> (1) the library or archives has, after a reasonable effort, determined that an unused replacement cannot be obtained at a fair price; and
>
> (2) any such copy or phonorecord that is reproduced in digital format is not made available to the public in that format except for use on the premises of the library or archives in lawful possession of such copy.
>
> For purposes of this subsection, a format shall be considered obsolete if the machine or device necessary to render perceptible a work stored in that format is no longer manufactured or is no longer reasonably available in the commercial marketplace.

<div align="center">*        *        *        *        *        *        *</div>

## § 112. Limitations on exclusive rights: Ephemeral recordings

〖(a)〗 *(a)(1)* Notwithstanding the provisions of section 106, and except in the case of a motion picture or other audiovisual work, it is not an infringement of copyright for a transmitting organization entitled to transmit to the public a performance or display of a work, under a license or transfer of the copyright or under the limitations on exclusive rights in sound recordings specified by section 114(a), *or for a transmitting organization that is broadcast radio or television station licensed as such by the Federal Communications Commission that broadcasts a performance of a sound recording in a digital format on a nonsubscription basis.* to make no more than one copy or phonorecord of a particular transmission program embodying the performance or display, if—

〖(1)〗 *(A)* the copy of phonorecord is retained and used solely by the transmitting organization that made it, and no further copies or phonorecords are reproduced from it; and

〖(2)〗 *(B)* the copy or phonorecord is used solely for the transmitting organization's own transmissions within its local service area, or for purposes of archival preservation or security; and

〖(3)〗 *(C)* unless preserved exclusively for archival purposes, the copy or phonorecord is destroyed within six months from the date the transmission program was first transmitted to the public.

*(2) Where a transmitting organization entitled to make a copy or phonorecord under section 112(a)(1) in connection with the transmission to the public of a performance or display or a work pursuant to that section is prevented from making such copy or phonorecord by reason of the application by the copyright owner or technical measures that prevent the reproduction of the work, such copyright owner shall make available to the transmitting organization the necessary means for permitting the making of such copy of phonorecord within the meaning of that section, provided that it is technologically feasible and economically reasonable for the copyright owner to do so, and provided further that, if such copyright owner fails to do so in a timely manner in light of the transmitting organizations' reasonable business requirements, the transmitting organization shall not be liable for a violation of section 1201(a)(1) of this*

77

*title for engaging in such activities as are necessary to make such copies or phonorecords as permitted under section 112(a)(1).*

\*     \*     \*     \*     \*     \*     \*

### §117. Limitations on exclusive rights: Computer programs

[Notwithstanding] *(a) MAKING OF ADDITIONAL COPY OR ADAPTATION BY OWNER OF COPY.—Notwithstanding* the provisions of section 106, it is not an infringement for the owner of a copy of a computer program to make or authorize the making of another copy or adaption of that computer program provided:

\*     \*     \*     \*     \*     \*     \*

[Any exact] *(b) LEASE, SALE, OR OTHER TRANSFER OF ADDITIONAL COPY OR ADAPTATION.—Any exact* copies prepared in accordance with the provisions of this section may be leased, sold, or otherwise transferred, along with the copy from which such copies were prepared, only as part of the lease, sale, or other transfer of all rights in the program. Adaptations so prepared may be transferred only with the authorization of the copyright owner.

*(c) MACHINE MAINTENANCE OR REPAIR.—Notwithstanding the provisions of section 106, it is not an infringement for an owner or lessee of a machine to make or authorize the making of a copy of a computer program if such copy is made solely by virtue of the activation of a machine that lawfully contains an authorized copy of the computer program, for purposes only of maintenance or repair of that machine, if—*

    *(1) such new copy is used in no other manner and is destroyed immediately after the maintenance or repair is completed; and*

    *(2) with respect to any computer program or part thereof that is not necessary for that machine to be activated, such program or part thereof is not accessed or used other than to make such new copy by virtue of the activation of the machine.*

*(d) DEFINITIONS.—For purposes of this section—*

    *(1) the "maintenance" of a machine is the servicing of the machine in order to make it work in accordance with its original specifications and any changes to those specifications authorized for that machine; and*

    *(2) the "repair" of a machine is the restoring of the machine to the state of working in accordance with its original specifications and any changes to those specifications authorized for that machine.*

\*     \*     \*     \*     \*     \*     \*

### CHAPTER 4—COPYRIGHT NOTICE, DEPOSIT, AND REGISTRATION

\*     \*     \*     \*     \*     \*     \*

### §411. Registration and infringement actions

(a) Except for [actions for infringement of copyright in Berne Convention works whose country of origin is not the United States and] an action brought for a violation of the rights of the author under section 106A(a), and subject to the provisions of subsection

78

(b), no action for infringement of the copyright in any *United States* work shall be instituted until registration of the copyright claim has been made in accordance with this title. In any case, however, where the deposit, application, and fee required for registration have been delivered to the Copyright Office in proper form and registration has been refused, the applicant is entitled to institute an action for infringement if notice thereof, with a copy of the complaint, is served on the Register of Copyrights. The Register may, at his or her option, become a party to the action with respect to the issue of registrability of the copyright claim by entering an appearance within sixty days after such service, but the Register's failure to become a party shall not deprive the court of jurisdiction to determine that issue.

\*       \*       \*       \*       \*       \*       \*

## CHAPTER 5—COPYRIGHT INFRINGEMENT AND REMEDIES

Sec.
501. Infringement of copyright.

\*       \*       \*       \*       \*       \*       \*

511. Liability of States, instrumentalities of States, and State officials for infringement of copyright.
*512. Liability of service providers for online infringement of copyright.*

\*       \*       \*       \*       \*       \*       \*

### § 507. Limitations on actions

(a) CRIMINAL PROCEEDINGS.—*Except as expressly provided elsewhere in this title,* [No] *no* criminal proceeding shall be maintained under the provisions of this title unless it is commenced within three years after the cause of action arose.

\*       \*       \*       \*       \*       \*       \*

### § 512. Liability of service providers for online infringement of copyright

*(a) DIGITAL NETWORK COMMUNICATIONS.—A service provider shall not be liable for monetary relief, or except as provided in subsection (i) for injunctive or other equitable relief, for infringement for the provider's transmitting, routing, or providing connections for, material through a system or network controlled or operated by or for the service provider, or the intermediate and transient storage of such material in the course of such transmitting, routing or providing connections, if—*

*(1) it was initiated by or at the direction of a person other than the service provider;*

*(2) it is carried out through an automatic technical process without selection of such material by the service provider;*

*(3) the service provider does not select the recipients of such material except as an automatic response to the request of another;*

*(4) no such copy of such material made by the service provider is maintained on the system or network in a manner ordinarily accessible to anyone other than anticipated recipients, and no such copy is maintained on the system or network in a*

79

manner ordinarily accessible to the anticipated recipients for a longer period than is reasonably necessary for the communication; and

(5) the material is transmitted without modification to its content.

(b) SYSTEM CACHING.—A service provider shall not be liable for monetary relief, or except as provided in subsection (i) for injunctive or other equitable relief, for infringement for the intermediate and temporary storage of material on the system or network controlled or operated by or for the service provider, where (i) such material is made available online by a person other than such service provider, (ii) such material is transmitted from the person described in clause (i) through such system or network to someone other than that person at the direction of such other person, and (iii) the storage is carried out through an automatic technical process for the purpose of making such material available to users of such system or network who subsequently request access to that material from the person described in clause (i), provided that:

(1) such material is transmitted to such subsequent users without modification to its content from the manner in which the material otherwise was transmitted from the person described in clause (i);

(2) such service provider complies with rules concerning the refreshing, reloading or other updating of such material when specified by the person making that material available online in accordance with an accepted industry standard data communications protocol for the system or network through which that person makes the material available; provided that the rules are not used by the person described in clause (i) to prevent or unreasonably impair such intermediate storage;

(3) such service provider does not interfere with the ability of technology associated with such material that returns to the person described in clause (i) the information that would have been available to such person if such material had been obtained by such subsequent users directly from such person, provided that such technology—

(A) does not significantly interfere with the performance of the provider's system or network or with the intermediate storage of the material;

(B) is consistent with accepted industry standard communications protocols; and

(C) does not extract information from the provider's system or network other than the information that would have been available to such person if such material had been accessed by such users directly from such person;

(4) either—

(A) the person described in clause (i) does not currently condition access to such material; or

(B) if access to such material is so conditioned by such person, by a current individual pre-condition, such as a pre-condition based on payment of a fee, or provision of a password or other information, the service provider permits access to the stored material in significant part only to

80

users of its system or network that have been so authorized and only in accordance with those conditions; and

(5) if the person described in clause (i) makes that material available online without the authorization of the copyright owner, then the service provider responds expeditiously to remove, or disable access to, the material that is claimed to be infringing upon notification of claimed infringements described in subsection (c)(3); provided that the material has previously been removed from the originating site, and the party giving the notification includes in the notification a statement confirming that such material has been removed or access to it has been disabled or ordered to be removed or have access disabled.

(c) INFORMATION STORED ON SERVICE PROVIDERS.—

(1) IN GENERAL.—A service provider shall not be liable for monetary relief, or except as provided in subsection (i) for injunctive or other equitable relief, for infringement for the storage at the direction of a user of material that resides on a system or network controlled or operated by or for the service provider, if the service provider—

(A)(i) does not have actual knowledge that the material or activity is infringing,

(ii) in the absence of such actual knowledge, is not aware of facts or circumstances from which infringing activity is apparent, or

(iii) if upon obtaining such knowledge or awareness, the service provider acts expeditiously to remove or disable access to, the material;

(B) does not receive a financial benefit directly attributable to the infringing activity, where the service provider has the right and ability to control such activity; and

(C) in the instance of a notification of claimed infringement as described in paragraph (3), responds expeditiously to remove, or disable access to, the material that is claimed to be infringing or to be the subject of infringing activity.

(2) DESIGNATED AGENT.—The limitations on liability established in this subsection apply only if the service provider has designated an agent to receive notifications of claimed infringement described in paragraph (3), by substantially making the name, address, phone number, electronic mail address of such agent, and other contact information deemed appropriate by the Register of Copyrights, available through its service, including on its website, and by providing such information to the Copyright Office. The Register of Copyrights shall maintain a current directory of agents available to the public for inspection, including through the Internet, in both electronic and hard copy formats.

(3) ELEMENTS OF NOTIFICATION.—

(A) To be effective under this subsection, a notification of claimed infringement means any written communication provided to the service provider's designated agent that includes substantially the following:

(i) a physical or electronic signature of a person authorized to act on behalf of the owner of an exclusive right that is allegedly infringed;

81

*(ii) identification of the copyrighted work claimed to have been infringed, or, if multiple such works at a single online site are covered by a single notification, a representative list of such works at that site;*

*(iii) identification of the material that is claimed to be infringing or to be the subject of infringing activity that is to be removed or access to which is to be disabled, and information reasonably sufficient to permit the service provider to locate the material;*

*(iv) information reasonably sufficient to permit the service provider to contact the complaining party, such as an address, telephone number, and, if available an electronic mail address at which the complaining party may be contacted;*

*(v) a statement that the complaining party has a good faith belief that use of the material in the manner complained of is not authorized by the copyright owner, or its agent, or the law; and*

*(vi) a statement that the information in the notification is accurate, and under penalty of perjury, that the complaining party has the authority to enforce the owner's rights that are claimed to be infringed.*

*(B) A notification from the copyright owner or from a person authorized to act on behalf of the copyright owner that fails substantially to conform to the provisions of paragraph (3)(A) shall not be considered under paragraph (1)(A) in determining whether a service provider has actual knowledge or is aware of facts or circumstances from which infringing activity is apparent, provided that the provider promptly attempts to contact the complaining party or takes other reasonable steps to assist in the receipt of notice under paragraph (3)(A) when the notice is provided to the service provider's designated agent and substantially satisfies the provisions of subparagraphs (3)(A)(ii), (iii), and (iv).*

*(d) INFORMATION LOCATION TOOLS.—A service provider shall not be liable for monetary relief, or except as provided in subsection (i) for injunctive or other equitable relief, for infringement for the provider referring or linking users to an online location containing infringing material or activity by using information location tools, including a directory, index, reference, pointer or hypertext link, if the provider—*

*(1) does not have actual knowledge that the material or activity is infringing or, in the absence of such actual knowledge, is not aware of facts or circumstances from which infringing activity is apparent;*

*(2) does not receive a financial benefit directly attributable to the infringing activity, where the service provider has the right and ability to control such activity; and*

*(3) responds expeditiously to remove or disable the reference or link upon notification of claimed infringement as described in subsection (c)(3); provided that for the purposes of this paragraph, the element in subsection (c)(3)(A)(iii) shall be identification of the reference or link, to material or activity claimed to*

82

*be infringing, that is to be removed or access to which is to be disabled, and information reasonably sufficient to permit the service provider to locate such reference or link.*

*(e) MISREPRESENTATIONS.—Any person who knowingly materially misrepresents under this section (1) that material or activity is infringing, or (2) that material or activity was removed or disabled by mistake or misidentification, shall be liable for any damages, including costs and attorneys' fees, incurred by the alleged infringer, by any copyright owner or copyright owner's authorized licensee, or by the service provider, who is injured by such misrepresentation, as the result of the service provider relying upon such misrepresentation in removing or disabling access to the material or activity claimed to be infringing, or in replacing the removed material or ceasing to disable access to it.*

*(f) REPLACEMENT OF REMOVED OR DISABLED MATERIAL AND LIMITATION ON OTHER LIABILITY.—*

*(1) Subject to paragraph (2) of this subsection, a service provider shall not be liable to any person for any claim based on the service provider's good faith disabling of access to, or removal of, material or activity claimed to be infringing or based on facts or circumstances from which infringing activity is apparent, regardless or whether the material or activity is ultimately determined to be infringing.*

*(2) Paragraph (1) of this subsection shall not apply with respect to material residing at the direction of a subscriber of the service provider on a system or network controlled or operated by or for the service provider that is removed, or provided under subsection (c)(1)(C), unless the service provider:—*

*(A) takes reasonable steps promptly to notify the subscriber that it has removed or disabled access to the material;*

*(B) upon receipt of a counter notice as described in paragraph (3), promptly provides the person who provided the notice under subsection (c)(1)(C) with a copy of the counter notice, and informs such person that it will replace the removed material or cease disabling access to it in ten business days; and*

*(C) replaces the removed material and ceases disabling access to it not less than ten, nor more than fourteen, business days following receipt of the counter notice, unless its designated agent first receives notice from the person who submitted the notification under subsection (c)(1)(C) that such person has filed an action seeking a court order to restrain the subscriber from engaging in infringing activity relating to the material on the service provider's system or network.*

*(3) To be effective under this subsection, a counter notification means any written communication provided to the service provider's designated agent that includes substantially the following:*

*(A) a physical or electronic signature of the subscriber;*

*(B) identification of the material that has been removed or to which access has been disabled and the location at*

83

which such material appeared before it was removed or access was disabled;

(C) a statement under penalty of perjury that the subscriber has a good faith belief that the material was removed or disabled as a result of mistake or misidentification of the material to be removed or disabled;

(D) the subscriber's name, address and telephone number, and a statement that the subscriber consents to the jurisdiction of Federal Court for the judicial district in which the address is located, or if the subscriber's address is outside of the United States, for any judicial district in which the service provider may be found, and that the subscriber will accept service of process from the person who provided notice under subsection (c)(1)(C) or agent of such person.

(4) A service provider's compliance with paragraph (2) shall not subject the service provider to liability for copyright infringement with respect to the material identified in the notice provided under subsection (c)(1)(C).

(g) IDENTIFICATION OF DIRECT INFRINGER.—The copyright owner or a person authorized to act on the owner's behalf may request an order for release of identification of an alleged infringer by filing (i) a copy of a notification described in subsection (c)(3)(A), including a proposed order, and (ii) a sworn declaration that the purpose of the order is to obtain the identity of an alleged infringer and that such information will only be used for the purpose of this title, with the clerk of any United States district court. The order shall authorize and order the service provider receiving the notification to disclose expeditiously to the copyright owner or person authorized by the copyright owner information sufficient to identify the alleged direct infringer of the material described in the notification to the extent such information is available to the service provider. The order shall be expeditiously issued if the accompanying notification satisfies the provisions of subsection (c)(3)(A) and the accompanying declaration is properly executed. Upon receipt of the order, either accompanying or subsequent to the receipt of a notification described in subsection (c)(3)(A), a service provider shall expeditiously give to the copyright owner or person authorized by the copyright owner the information required by the order, notwithstanding any other provision of law and regardless of whether the service provider responds to the notification.

(h) CONDITIONS FOR ELIGIBILITY.—

(1) ACCOMMODATION OF TECHNOLOGY.—The limitations on liability established by this section shall apply only if the service provider—

(A) has adopted and reasonably implemented, and informs subscribers of the service of, a policy for the termination of subscribers of the service who are repeat infringers; and

(B) accommodates and does not interfere with standard technical measures as defined in this subsection.

(2) DEFINITION.—As used in this section, "standard technical measures" are technical measures, used by copyright owners to identify or protect copyrighted works, that—

84

(A) *have been developed pursuant to a broad consensus of copyright owners and service providers in an open, fair, voluntary, multi-industry standards process;*

(B) *are available to any person on reasonable and non-discriminatory terms; and*

(C) *do not impose substantial costs on service providers or substantial burdens on their systems or networks.*

(i) INJUNCTIONS.—*The following rules shall apply in the case of any application for an injunction under section 502 against a service provider that is not subject to monetary remedies by operation of this section:*

(1) SCOPE OF RELIEF.—

(A) *With respect to conduct other than that which qualifies for the limitation on remedies as set forth in subsection (a), the court may only grant injunctive relief with respect to a service provider in one or more of the following forms:*

(i) *an order restraining it from providing access to infringing material or activity residing at a particular online site on the provider's system or network;*

(ii) *an order restraining it from providing access to an identified subscriber of the service provider's system or network who is engaging in infringing activity by terminating the specified accounts of such subscriber; or*

(iii) *such other injunctive remedies as the court may consider necessary to prevent or restrain infringement of specified copyrighted material at a particular online location, provided that such remedies are the least burdensome to the service provider that are comparably effective for that purpose.*

(B) *If the service provider qualifies for the limitation on remedies described in subsection (a), the court may only grant injunctive relief in one or both of the following forms:*

(i) *an order restraining it from providing access to an identified subscriber of the service provider's system or network who is using the provider's service to engage in infringing activity by terminating the specified accounts of such subscriber; or*

(ii) *an order restraining it from providing access, by taking specified reasonable steps to block access, to a specific, identified, foreign online location.*

(2) CONSIDERATIONS.—*The court, in considering the relevant criteria for injunctive relief under applicable law, shall consider:*

(A) *whether such an injunction, either alone or in combination with other such injunctions issued against the same service provider under this subsection, would significantly burden either the provider or the operation of the provider's system or network;*

(B) *the magnitude of the harm likely to be suffered by the copyright owner in the digital network environment if steps are not taken to prevent or restrain the infringement;*

(C) *whether implementation of such an injunction would be technically feasible and effective, and would not interfere*

85

with access to noninfringing material at other online loca-
tions; and

(D) whether other less burdensome and comparably effec-
tive means of preventing or restraining access to the in-
fringing material are available.

(3) NOTICE AND EX PARTE ORDERS.—Injunctive relief under
this subsection shall not be available without notice to the serv-
ice provider and an opportunity for such provider to appear, ex-
cept for orders ensuring the preservation of evidence or other or-
ders having no material adverse effect on the operation of the
service provider's communications network.

(j) DEFINITIONS.—

(1)(A) As used in subsection (a), the term "service provider"
means an entity offering the transmission, routing or providing
of connections for digital online communications, between or
among points specified by a user, of material of the user's choos-
ing, without modification to the content of the material as sent
or received.

(B) As used in any other subsection of this section, the term
"service provider" means a provider of online services or net-
work access, or the operator of facilities therefor, and includes
an entity described in the preceding paragraph of this sub-
section.

(2) As used in this section, the term "monetary relief" means
damages, costs, attorneys' fees, and any other form of monetary
payment.

(k) OTHER DEFENSES NOT AFFECTED.—The failure of a service
provider's conduct to qualify for limitation of liability under this
section shall not bear adversely upon the consideration of a defense
by the service provider that the service provider's conduct is not in-
fringing under this title or any other defense.

(l) PROTECTION OF PRIVACY.—Nothing in this section shall be con-
strued to condition the applicability of subsections (a) through (d)
on—

(1) a service provider monitoring its service or affirmatively
seeking facts indicating infringing activity except to the extent
consistent with a standard technical measure complying with
the provisions of subsection (h); or

(2) a service provider accessing, removing, or disabling access
to material where such conduct is prohibited by law.

(m) RULE OF CONSTRUCTION.—Subsections (a), (b), (c), and (d)
are intended to describe separate and distinct functions for purposes
of analysis under this section. Whether a service provider qualifies
for the limitation on liability in any one such subsection and shall
be based solely on the criteria in each such subsection and shall not
affect a determination of whether such service provider qualifies for
the limitations on liability under any other such subsection.

\*   \*   \*   \*   \*   \*   \*

# CHAPTER 12—COPYRIGHT PROTECTION AND MANAGEMENT SYSTEMS

Sec.
1201. Circumvention of copyright protection systems.

86

1202. Integrity of copyright management information.
1203. Civil remedies.
1204. Criminal offenses and penalties.
1205. Savings Clause. ...............................................................................

## §1201. Circumvention of copyright protection systems

(a) VIOLATIONS REGARDING CIRCUMVENTION OF TECHNOLOGICAL PROTECTION MEASURES.—(1) No person shall circumvent a technological protection measure that effectively controls access to a work protected under this title.

(2) No person shall manufacture, import, offer to the public, provide or otherwise traffic in any technology, product, service, device, component, or part thereof that—

(A) is primarily designed or produced for the purpose of circumventing a technological protection measure that effectively controls access to a work protected under this title;

(B) has only limited commercially significant purpose or use other than to circumvent a technological protection measure that effectively controls access to a work protected under this title; or

(C) is marketed by that person or another acting in concert with that person with that person's knowledge for use in circumventing a technological protection measure that effectively controls access to a work protected under this title.

(3) As used in this subsection—

(A) to "circumvent a technological protection measure" means to descramble a work, to decrypt an encrypted work, or otherwise to avoid, bypass, remove, deactivate, or impair a technological protection measure, without the authority of the copyright owner; and

(B) a technological protection measure "effectively controls access to a work" if the measure, in the ordinary course of its operation, requires the application of information, or a process or a treatment, with the authority of the copyright owner, to gain access to the work.

(b) ADDITIONAL VIOLATIONS.—(1) No person shall manufacture, import, offer to the public, provide, or otherwise traffic in any technology, product, service, device, component, or part thereof that—

(A) is primarily designed or produced for the purpose of circumventing protection afforded by a technological protection measure that effectively protects a right of a copyright owner under this title in a work or a portion thereof;

(B) has only limited commercially significant purpose or use other than to circumvent protection afforded by a technological protection measure that effectively protects a right of a copyright owner under this title in a work or a portion thereof; or

(C) is marketed by that person or another acting in concert with that person with that person's knowledge for use in circumventing protection afforded by a technological protection measure that effectively protects a right of a copyright owner under this title in a work or a portion thereof.

(2) As used in this subsection—

(A) to "circumvent protection afforded by a technological protection measure" means avoiding, bypassing, removing, deacti-

87

vating, or otherwise impairing a technological protection measure; and

(B) a technological protection measure "effectively protects a right of a copyright owner under this title" if the measure, in the ordinary course of its operation, prevents, restricts, or otherwise limits the exercise of a right of a copyright owner under this title.

(c) IMPORTATION.—The importation into the United States, the sale for importation, or the sale within the United States after importation by the owner, importer, or consignee of any technology, product, service, device, component, or part thereof as described in subsection (a) or (b) shall be actionable under section 337 of the Tariff Act of 1930 (19 U.S.C. 1337).

(d) OTHER RIGHTS, ETC., NOT AFFECTED.—(1) Nothing in this section shall affect rights, remedies, limitations, or defenses to copyright infringement, including fair use, under this title.

(2) Nothing in this section shall enlarge or diminish vicarious or contributory liability for copyright infringement in connection with any technology, product, service, device, component or part thereof.

(3) Nothing in this section shall require that the design of, or design and selection of parts and components for, a consumer electronics, telecommunications, or computing product provide for a response to any particular technological protection measure, so long as such part or component or the product, in which such part or component is integrated, does not otherwise fall within the prohibitions of subsections (a)(2) or (b)(1).

(e) EXEMPTION FOR NONPROFIT LIBRARIES, ARCHIVES, AND EDU-CATIONAL INSTITUTIONS.—(1) A nonprofit library, archives, or educational institution which gains access to a commercially exploited copyrighted work solely in order to make a good faith determination of whether to acquire a copy of that work for the sole purpose of engaging in conduct permitted under this title shall not be in violation of subsection (a)(1). A copy of a work to which access has been gained under this paragraph—

(A) may not be retained longer than necessary to make such good faith determination; and

(B) may not be used for any other purpose.

(2) The exemption made available under paragraph (1) shall only apply with respect to a work when an identical copy of that work is not reasonably available in another form.

(3) A nonprofit library, archives, or educational institution that willfully for the purpose of commercial advantage or financial gain violates paragraph (1)—

(A) shall, for the first offense, be subject to the civil remedies under section 1203; and

(B) shall, for repeated or subsequent offenses, in addition to the civil remedies under section 1203, forfeit the exemption provided under paragraph (1).

(4) This subsection may not be used as a defense to a claim under subsection (a)(2) or (b), nor may this subsection permit a nonprofit library, archives, or educational institution to manufacture, import, offer to the public, provide or otherwise traffic in any technology which circumvents a technological protection measure.

88

(5) In order for a library or archives to qualify for the exemption under this subsection, the collections of that library or archives shall be—

(A) open to the public;

(B) available not only to researchers affiliated with the library or archives or with the institution of which it is a part, but also to other persons doing research in a specialized field.

(f) LAW ENFORCEMENT AND INTELLIGENCE ACTIVITIES.—This section does not prohibit any lawfully authorized investigative, protective, or intelligence activity of an officer, agent or employee of the United States, a State, or a political subdivision of a State, or a person acting pursuant to a contract with such entities.

(g) Notwithstanding the provisions of subsection 1201(a)(1), a person who has lawfully obtained the right to use a copy of a computer program may circumvent a technological protection measure that effectively controls access to a particular portion of that program for the sole purpose of identifying and analyzing those elements of the program that are necessary to achieve interoperability of an independently created computer program with other programs, and that have not previously been readily available to the person engaging in the circumvention, to the extent any such acts of identification and analysis do not constitute infringement under this title.

(h) Notwithstanding the provisions of subsections 1201(a)(2) and (b), a person may develop and employ technological means to circumvent for the identification and analysis described in subsection (g), or for the limited purpose of achieving interoperability of an independently created computer program with other programs, where such means are necessary to achieve such interoperability, to the extent that doing so does not constitute infringement under this title.

(i) The information acquired through the acts permitted under subsection (g), and the means permitted under subsection (h), may be made available to others if the person referred to in subsections (g) or (h) provides such information or means solely for the purpose of achieving interoperability of an independently created computer program with other programs, and to the extent that doing so does not constitute infringement under this title, or violate applicable law other than this title.

(j) For purposes of subsections (g), (h) and (i), the term "interoperability" means the ability of computer programs to exchange information, and for such programs mutually to use the information which has been exchanged.

(k) In applying subsection (a) to a component or part, the court may consider the necessity for its intended and actual incorporation in a technology, product, service or device, which (i) does not itself violate the provisions of this chapter and (ii) has the sole purpose to prevent the access of minors to material on the Internet.

### § 1202. Integrity of copyright management information

(a) FALSE COPYRIGHT MANAGEMENT INFORMATION.—No person shall knowingly—

(1) provide copyright management information that is false, or

89

(2) distribute or import for distribution copyright management information that is false, with the intent to induce, enable, facilitate or conceal infringement.

(b) REMOVAL OR ALTERATION OF COPYRIGHT MANAGEMENT INFORMATION.—No person shall, without the authority of the copyright owner or the law—

(1) intentionally remove or alter any copyright management information,

(2) distribute or import for distribution copyright management information knowing that the copyright management information has been removed or altered without authority of the copyright owner or the law, or

(3) distribute, import for distribution, or publicly perform works, copies of works, or phonorecords, knowing that copyright management information has been removed or altered without authority of the copyright owner or the law, knowing, or, with respect to civil remedies under section 1203, having reasonable grounds to know, that it will induce, enable, facilitate or conceal an infringement of any right under this title.

(c) DEFINITION.—As used in this chapter, copyright management information means the following information conveyed in connection with copies or phonorecords of a work or performances or displays of a work, including in digital form—

(1) the title and other information identifying the work, including the information set forth on a notice of copyright;

(2) the name of, and other identifying information about, the author of a work;

(3) the name of, and other identifying information about, the copyright owner of the work, including the information set forth in a notice of copyright;

(4) with the exception of public performances of works by radio and television broadcast stations the name of, and other identifying information about, a performer whose performance is fixed in a work other than an audiovisual work;

(5) with the exception of public performances of works by radio and television broadcast stations, in the case of an audiovisual work, the name of, and other identifying information about, a writer, performer, or director who is credited in the audiovisual work;

(6) identifying numbers of symbols referring to such information or links to such information; or

(7) such other information as the Register of Copyrights may prescribe by regulation, except that the Register of Copyrights may not require the provision of any information concerning the user of a copyrighted work.

(d) LAW ENFORCEMENT AND INTELLIGENCE ACTIVITIES.—This section does not prohibit any lawfully authorized investigative, protective, or intelligence activity of an officer, agent, or employee of the United States, a State, or a political subdivision of a State, or a person acting pursuant to a contract with such entities.

(e) LIMITATIONS ON LIABILITY.—

(1) ANALOG TRANSMISSIONS.—In the case of an analog transmission, a person who is making transmissions in its capacity as a radio or television broadcast station, or as a cable system,

90

or someone who provides programming to such station or system, shall not be liable for a violation of subsection (b) if—

(A) avoiding the activity that constitutes such violation is not technically feasible or would create an undue financial hardship on such person; and

(B) such person did not intend, by engaging in such activity, to induce, enable, facilitate or conceal infringement.

(2) DIGITAL TRANSMISSIONS.—

(A) If a digital transmission standard for the placement of copyright management information for a category of works is set in a voluntary, consensus standard-setting process involving a representative cross-section or radio or television broadcast stations or cable systems and copyright owners of a category of works that are intended for public performance by such stations or systems, a person identified in subsection (e)(1) shall not be liable for a violation of subsection (b) with respect to the particular copyright management information addressed by such standard if—

(i) the placement of such information by someone other than such person is not in accordance with such standard; and

(ii) the activity that constitutes such violation is not intended to induce, enable, facilitate or conceal infringement.

(B) Until a digital transmission standard has been set pursuant to subparagraph (A) with respect to the placement of copyright management information for a category or works, a person identified in subsection (e)(1) shall not be liable for a violation of subsection (b) with respect to such copyright management information, where the activity that constitutes such violation is not intended to induce, enable, facilitate or conceal infringement, if—

(i) the transmission of such information by such person would result in a perceptible visual or aural degradation of the digital signal; or

(ii) the transmission of such information by such person would conflict with

(I) an applicable government regulation relating to transmission of information in a digital signal;

(II) an applicable industry-wide standard relating to the transmission of information in a digital signal that was adopted by a voluntary consensus standards body prior to the effective date of this section; or

(III) an applicable industry-wide standard relating to the transmission of information in a digital signal that was adopted in a voluntary, consensus standards-setting process open to participation by a representative cross-section of radio or television broadcast stations or cable systems and copyright owners of a category of works that are intended for public performance by such stations or systems.

91

### § 1203. Civil remedies

(a) CIVIL ACTIONS.—Any person injured by a violation of section 1201 or 1202 may bring a civil action in an appropriate United States district court for such violation.

(b) POWERS OF THE COURT.—In an action brought under subsection (a), the court—

(1) may grant temporary and permanent injunctions on such terms as it deems reasonable to prevent or restrain a violation;

(2) at any time while an action is pending, may order the impounding, on such terms as it deems reasonable, or any device or product that is in the custody or control of the alleged violator and that the court has reasonable cause to believe was involved in a violation;

(3) may award damages under subsection (c);

(4) in its discretion may allow the recovery of costs by or against any party other than the United States or an officer thereof;

(5) in its discretion may award reasonable attorney's fees to the prevailing party; and

(6) may, as part of a final judgment or decree finding a violation, order the remedial modification or the destruction of any device or product involved in the violation that is in the custody or control of the violator or has been impounded under paragraph (2).

(c) AWARD OF DAMAGES.—

(1) IN GENERAL.—Except as otherwise provided in this chapter, a person committing a violation of section 1201 or 1202 is liable for either—

(A) the actual damages and any additional profits of the violator, as provided in paragraph (2), or

(B) statutory damages, as provided in paragraph (3).

(2) ACTUAL DAMAGES.—The court shall award to the complaining party the actual damages suffered by the party as a result of the violation, and any profits of the violator that are attributable to the violation and are not taken into account in computing the actual damages, if the complaining party elects such damages at any time before final judgment is entered.

(3) STATUTORY DAMAGES.—

(A) At any time before final judgment is entered, a complaining party may elect to recover an award of statutory damages for each violation of section 1201 in the sum of not less than $200 or more than $2,500 per act of circumvention, device, product, component, offer, or performance of service, as the court considers just.

(B) At any time before final judgment is entered, a complaining party may elect to recover an award of statutory damages for each violation of section 1202 in the sum of not less than $2,500 or more than $25,000.

(4) REPEATED VIOLATIONS.—In any case in which the injured party sustains the burden of proving, and the court finds, that a person has violated section 1201 or 1202 within three years after a final judgment was entered against the person for another such violation, the court may increase the award of dam-

92

*ages up to triple the amount that would otherwise be awarded, as the court considers just.*

(5) INNOCENT VIOLATIONS.—

(A) IN GENERAL.—*The court in its discretion may reduce or remit the total award of damages in any case in which the violator sustains the burden of proving, and the court finds, that the violator was not aware and had no reason to believe that its acts constituted a violation.*

(B) NONPROFIT LIBRARY, ARCHIVES, OR EDUCATIONAL IN-STITUTIONS.—*In the case of a nonprofit library, archives, or educational institution, the court shall remit damages in any case in which the library archives, or educational institution sustains the burden of proving, and the court finds, that the library, archives, or educational institution was not aware and had no reason to believe that its acts constituted a violation.*

## § 1204. Criminal offenses and penalties

(a) IN GENERAL.—*Any person who violates section 1201 or 1202 willfully and for purposes of commercial advantage or private financial gain—*

(1) *shall be fined not more than $500,000 or imprisoned for not more than 5 years, or both, for the first offense; and*

(2) *shall be fined not more than $1,000,000 or imprisoned for not more than 10 years, or both, for any or subsequent offense.*

(b) LIMITATION FOR NONPROFIT LIBRARY, ARCHIVES, OR EDU-CATIONAL INSTITUTION.—*Subsection (a) shall not apply to a nonprofit library, archives, or educational institution.*

(c) STATUTE OF LIMITATIONS.—*Notwithstanding section 507(a) of this title, no criminal proceeding shall be brought under this section unless such proceeding is commenced within five years after the cause of action arose.*

## § 1205. Savings Clause

*Nothing in this chapter abrogates, diminishes or weakens the provisions of, nor provides any defense or element or mitigation in a criminal prosecution or civil action under, any federal or state law that prevents the violation of the privacy of an individual in connection with the individual's use of the Internet.*

○

# EXHIBIT 2

<u>HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY</u>

### Expert Report of Professor James Boyle

1. I am currently the William Neal Reynolds Professor of Law at Duke University, and have been retained by Farella, Braun + Martel LLP on behalf of the Defendants in this action as an expert witness. I have personal knowledge of the following facts and, if called and sworn as a witness, could competently testify thereto.

**Background and Qualifications**

2. I received an LL.B. (Hons) from Glasgow University (1980), and an LL.M. (1981) and S.J.D. (1986) from Harvard Law School. I have been a law professor since 1982, teaching at American University, and at the Universities of Pennsylvania, Harvard and Yale as a Visiting Professor. In 2000 I joined the law faculty at Duke.

3. My academic research is mainly in the areas of intellectual property and communication policy, with a particular focus on the Internet. I have written and edited numerous articles and books on these subjects; a full list is available in the attached *curriculum vitae*. In 2003 I received the World Technology Network Award for law. My most recent book, *The Public Domain* (Yale University Press 2009), was the American Society for Information Science and Technology Book of the Year and the winner of the Donald McGannon Award for communications policy.

4. My scholarly work has dealt with three areas relevant to this testimony: a) "open source" software, such as Linux or Firefox, which is distributed under licenses that allow users freely to copy and make derivative works of the copyrighted code. I have extensively researched the structure of incentives and innovation in open source software and written about its features and its various licenses in my articles and books. b) cultural material that is made available under open licenses such as the Creative Commons set of licenses. There are millions of digital files covered by such licenses, ranging from photographs to scientific articles. The license is a way for the copyright owner to give permission in advance for various kinds of uses. I was one of the founding Board Members of Creative Commons and served on its board from 2002 until 2009, the last year as Chairman. c) Public Domain material. I am one of the founders of the Center for the Study of the Public Domain at Duke Law School and the subject of my most recent book was the role of the public domain in innovation and culture.

**Scope of Expert Assignment**

5. My primary task was to explore some examples of the non-infringing uses of the Hotfile system. Defendants' counsel asked me to study the use of the Hotfile service to store and to distribute or download the types of material described above, that is to say, material which can be licitly copied and distributed. I did not research the many other types of content that could be licitly stored or transferred on Hotfile, including US government works, uncopyrightable material such as databases made up entirely of unoriginal compilations of facts, users' privately created content and so on.

PLAINTIFF'S
EXHIBIT
Boyle
NO-5-1

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

6. Defendant's counsel also asked me to examine Hotfile's Affiliate program, and specifically to look at how it can be used to compensate creators of content for distribution of their work on the Internet. I was asked to determine whether, for example, Hotfile's Affiliate program compensates open source software developers for the software they write and freely distribute.

7. My examination of Hotfile was not an exhaustive review of the files on Hotfile, nor does it purport to be a representative statistical sample of the uses of Hotfile as a whole.

8. I am being compensated for my testimony at the rate of $750 an hour.

**Summary of Opinions**

9. After examining the Hotfile system, I came to four conclusions that I believe may be helpful to the court's analysis of both "substantial non-infringing uses" and of *Grokster*-style inducement liability.

i. First, there was a high volume of usage of the Hotfile system for activities that were either clearly non-infringing or highly likely to be non-infringing. Most notably, I determined that there is a high volume of usage of the Hotfile system for distribution of free and open source software. My non-comprehensive study found more than 1.7 million downloads of the six open source programs examined. Using the Hotfile system to share non-infringing software files was also a *popular* usage of the system in relative and absolute terms: the top two most downloaded files on Hotfile were open source programs. Open source and free software programs are a substantial (and growing) component of the software market today, so Hotfile's proven suitability and compatibility with such licensing models is of significance.

ii. Second, Hotfile's architecture is compatible with and is actually being used for a wide *range* of activities, beyond the open source software context. Examples of non-infringing uses that I identified ranged from distributing a public domain version of *Huckleberry Finn* to sharing Creative Commons-licensed "open source" animated movies. My methodology did not attempt to exhaustively identify such uses.

iii. Third, for reasons explained in the report, services such as Hotfile fill a gap in the Internet's architecture by providing a convenient and generic method of distributing or storing files that are too large for e-mail. This is particularly important for small developers of open source software or non-profit distributors and collaborators in cultural projects under open licenses, like the "Blender Project" of open animation discussed in the report. This functionality is useful to anyone who wishes to store and transfer large files of their own creation for use in their daily professional and personal activities.

iv. Fourth, at least two of the open source developers featured in this study were

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

active participants in Hotfile's "Affiliate" program, thus being indirectly compensated for the programs they were freely providing to the public. This suggests that the Hotfile Affiliate program is capable of fulfilling the valuable function of compensating authors and distributors in proportion to the frequency with which their works are downloaded.

## Study Methodology

10. In order to conduct my examination of the material stored on the Hotfile system, I worked with Elysium Digital, LL.C., a computer science consulting company retained by defendant's counsel.  Under my direction, Elysium searched the Hotfile database for examples of the three types of files I mentioned earlier:

I.  Open source software
II. Creative Commons licensed content
III. Public Domain material

Each of these types of material is more specifically described below.

11. The search method was a multi-step process that proceeded as follows.

First, Elysium searched by keywords likely to be associated with each type of content. For example, in searching for open source software, Elysium would use the official filenames of open source programs – such as Firefox or Ubuntu -- and would search for these terms both in Hotfile's database and on Google.

Second, they engaged in a human review of the contents of a small sample of the files retrieved by that search in order to discover what material was actually in the files since those terms alone could not identify the content precisely.   For example, Ubuntu might refer to an African humanist philosophy of the same name, and there is a copyrighted film called "Firefox" which cannot be licitly shared.  They verified, for example, that example files labeled "JDownloader" were actually the JDownloader software and that the movies that turned up from these searches were actually the Creative Commons licensed movies as indicated on Google.  Based on the attached spreadsheet, this analysis should be reproducible.  I assessed the copyright status of the human-verified materials they discovered. and instructed them to discard material that was not clearly in the relevant licitly sharable category.

Third, when they identified an example of a particular file type – for example a file that contained a verified distribution of Firefox – they produced a "hash" or digital signature that uniquely identified the file.  I asked Elysium to use two different mathematical methods of producing hashes – MD5 and SHA1 – on each file in order to preclude false positives.  Additionally, developers of open source software often list the hashes of the files on their web site so that users can verify that there were no errors during the download of the software. When possible,

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

Elysium compared the hashes of a file from Hotfile with the hashes listed on the developer's web site to further confirm that the file is identical to what can be downloaded from the developer's web site.

Fourth, Elysium searched the Hotfile database for those unique hashes – thus identifying other examples of exactly the same file which might or might not have been stored under the same name. This allowed me to have confidence that if we identified one copy of a file and confirmed that it was indeed within the specific category (open source, public domain, etc.) I could establish that all of the other "hits" with the identical hash in the Hotfile database were perfect duplicates, and thus were also within the specific licitly shared category. This method was deliberately conservative. For example, an open source program that had become garbled in uploading, or an earlier release of a freeware program – version 1.0 rather than 1.1– would produce a different hash and thus would not be counted in the analysis, though it would still be legal to up- and download. In addition, different compression software, or simply a decision to "break" the various portion of a Creative Commons film at a different point in a .rar file, would also result in a different hash signature.

12. This process was extremely labor-intensive and, in the time allowed, we could not classify, verify and conclusively assess a majority of the files identified by the preliminary keyword search. Thus, for example, there were 36 sets of files that used the name of an open source program which may be legally copied that we did not have time to assess at all: Apache, Chrome, ChromeOS, Debian, Django, Drupal, Emacs, FreeBSD, FreeSpire, Gimp, GNU programs, KDE, Knoppix, LibreOffice, Linspire, Mediawiki, MongoDB, Moodle, Mozilla, MySQL, Mythbuntu, OpenSolaris, PHP, Python, RenovatioCMS, Solaris, Squiz, StarOffice, SugarCRM, Suse, Symbian, Thunderbird, Wiki, Wordpress, Xandros, and Xebian. Due to the constraints, none of these were included in the final assessment. Thus, the listing in this report is best viewed as exemplary of particular non-infringing uses, not exhaustive. In addition, any material that we could not identify with a high degree of certainty as non-infringing—for example due to insufficient licensing information--was omitted from this report. For example, we omitted pre-1923 movie files that might or might not have had new copyrighted material added to them, and Creative Commons licensed material that might or might not have been distributed in accordance with the terms of the license.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

I

## Free and Open Source software

13.  "Free and open source software" is the term used to describe software that is produced under a number of public licenses that grant to users the rights freely to copy the software and to make derivative works – new versions of the program, customized for some particular purpose.   Commonly known examples of such software include the Firefox and Chrome web browsers, the Linux operating system, the Apache web server software and the Android operating system for mobile devices.

14.  The most common free and open source licenses include the General Public License (GPL) produced by the Free Software Foundation and the BSD, or Berkeley Software Distribution license.  These licenses differ in their particular terms.  For example the GPL requires that, if a user receives software governed by the GPL, modifies it and then publicly redistributes the resulting derivative work, he must place the modified code under the same license that granted him the freedom to modify it in the first place.   The BSD license, by contrast, imposes no such requirement on makers of derivative works.  All of the licenses classified as free or open source, however, allow users freely to copy and distribute the software placed under the license. They also place no limits on commercial exploitation of the code by users and developers. Thus, uploading this type of software to or downloading it from a site such as Hotfile is entirely legal, as is receiving compensation from the "Affiliates" program for the volume of such downloads.

15.  Unlike proprietary software developed by a single company, open source software relies on a decentralized network of developers, commercial and non-commercial, large and small.  Both developers and users of open source software must use a variety of file storage and transfer methods to distribute or get access to the code produced under the license.   Open source software is now a significant piece of the global software market.

16. The networks that produce open source are diverse.  A single software project such as Mozilla/Firefox or a particular distribution of Linux might include paid programmers working for a large company such as IBM, Google or Red Hat and individuals who are donating their time to the project and who work in loosely organized collaborative arrays.[1] They are also heterogeneous in size, ranging from huge projects such as the two just mentioned, to small groups or individuals working on a single program. These features of open source projects have been of considerable interest to scholars studying the structure of innovation in this apparently anomalous economic system.[2] Two salient characteristics emerge from

---

[1]        Yochai Benkler, Coase's Penguin, or, Linux and the Nature of the Firm, 112 Yale Law Journal 369 (2002.);

[2]        Steven Weber, THE SUCCESS OF OPEN SOURCE (2004); PERSPECTIVES ON FREE AND OPEN SOURCE SOFTWARE (Feller, Fitzgerald et al. eds 2005); Josh Lerner and Jean

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

that scholarship:  a.) these networks rely on the ease of communication and file transfer and storage facilitated by the Internet; the reduction of the transaction costs of collaboration is the single most important precipitating factor for forms of creativity such as open source.    b.) participants who are not working for commercial entities are nevertheless able to profit from their contributions to open source projects, whether by demonstrating their skills to future employers or by being paid indirectly, for example through "tip jars" or per download fees from file storage systems such as Hotfile.  These methods of indirect compensation are thus important to the future of distributed creativity.

17. Elysium Digital's search focused on six open source programs: Firefox, iREB and sn0wbreeze, JDownloader, OpenOffice.org and Ubuntu.  As mentioned in paragraph 12, 36 other possible open source programs were identified by keyword searches, but it was impossible in the time available to explore and verify them all, and they are not included in this count.  Under my direction, Elysium human-verified a source file and then used two different methods of generating "hashes" or digital fingerprints of the file so that they could identify perfect copies of that file elsewhere on the system, even if they were named differently.   A complete table of all the results, with download counts of the individual source file and comprehensive download counts that include both the source file and hash-verified identical instances of the file is provided at the end of the open source software section of this report.  The "Verified ID" column provides the ID or locator of the source file on the Hotfile system.  The "Hash Match ID" column gives the ID's of all of the files that were an exact hash match with that original source file.

18. Focusing only on the six programs in the current study, we found a significant level of downloading.  There were more than 1.7 million downloads of these files from Hotfile.  Elysium Digital reported to me that two of the programs, iREB and sn0wbreeze, were the top 2 most downloaded files from Hotfile.  That is to say, out of all the content on Hotfile, these files were the most often downloaded.   The examples of open source software were as follows:

19. **Firefox:**  Firefox is an open source web browser distributed by Mozilla, a non-profit organization[3]  It is distributed under the Mozilla Public License[4] which

---

Tirole, *The Simple Economics of Open Source* NBER Research Paper 7600 (2000).

[3]     http://www.mozilla.org/about/ (last visited Nov 12, 2011.)

[4]     *Firefox: About* tab, "Mozilla Firefox is free and open source software, built by a community of thousands from all over the world.  There are a few things you should know:

          Firefox is made available to you under the terms of the Mozilla Public License.  This means you may use, copy and distribute Firefox to others.  You are also welcome to modify the source code of Firefox as you want to meet your needs.  The Mozilla Public License also gives you the right to distribute your modified versions."  The Mozilla Public License can be found here http://www.mozilla.org/MPL/  (Last visited Nov 12, 2011.)

<u>**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**</u>

specifically gives users the freedom to copy, distribute and modify its code.[5]

Legal Status: Clearly Non-infringing

Downloads: There were 460 verified downloads of the human-verified instance of Firefox that we identified.

20. **JDownloader:** JDownloader is an open source download assistant that simplifies the process of downloading. JDownloader's developers describe it as completely open source,[6] and licensed[7] under the General Public License.[8] The developers allow free copying and redistribution. JDownloader advertises itself as useful on one-click hosting sites, and can also be used on sites such as Google Books or social networking sites such as Taringa.[9] Like a web browser, JDownloader makes no distinction between infringing or non-infringing content and thus could be used for both licit and illicit downloading. The potential for illicit use, however, is not sufficient to enjoin a product. JDownloader would seem easily to pass the standard laid down in *Sony v Universal*[10]: a product's distribution may not be enjoined on the grounds that it could be used to violate copyright if the product has or is capable of substantial non-infringing uses.

Legal Status: Very likely non-infringing.

Downloads: There were 203,389 downloads of the identified JDownloader files and 228,814 total downloads, including hash-match copies of the human-verified instances of JDownloader. Under my direction, Elysium Digital determined that JDownloader's developers appear to be members of the Hotfile Affiliates program

---

5        "2.1. The Initial Developer Grant. The Initial Developer hereby grants You a world-wide, royalty-free, non-exclusive license, subject to third party intellectual property claims: under intellectual property rights (other than patent or trademark) Licensable by Initial Developer to use, reproduce, modify, display, perform, sublicense and distribute the Original Code (or portions thereof) with or without Modifications, and/or as part of a Larger Work." Mozilla Public License 1.1 http://www.mozilla.org/MPL/MPL-1.1.html (last visited Nov 12, 2011.)

6        "JDownloader is open source, platform independent, and written completely in Java." http://jdownloader.org/ (last visited Nov 12, 2011.)

7        http://jdownloader.org/home/features (last visited Nov 12, 2011.)

8        My preliminary investigations indicate the source code for some portions of the program may not be publicly available (a requirement of the license.) While this may be legally significant for those who wish to *modify* the code, and are unable to find all of it, it has no effect on whether it is legal simply to copy or redistribute the program as is, and thus has no apparent bearing on this case.

9        "JDownloader Review" Software Explorer http://www.softwareexplorer.com/jdownloader-96540.html (last visited Nov 12, 2011.)

10        *Sony Corp. v. Universal City Studios, Inc.*, 464 U.S. 417 (1984).

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

and thus are being indirectly compensated for their popular free software in proportion to the number of downloads.[11] The number of downloads was substantial and, in all probability, considerably higher than the figures given here. Elysium Digital examined the Hotfile database and discovered that authors of JDownloader had 17 of the top 100 most downloaded files. Since the software distributed by the authors of JDownloader is open source, these files would presumably be entirely licit to copy and share. However, most of those files were no longer available on Hotfile, so this count is limited to a subset of those versions of the JDownloader software that we able to conclusively verify.

21.   **iREB & sn0wbreeze**:  iREB and sn0wbreeze are open source programs developed (predominantly) by a programmer whose screen name is iH8sn0w.[12] They are used to "jailbreak" iPhones.  In the words of the Librarian of Congress, "jailbreaking" is the colloquial term for "circumvention of the technological measures contained on certain wireless phone handsets (known as 'smartphones') that prevent third–party software applications from being installed and run on such phones."[13] To put it differently, to "jailbreak" a phone is to allow the phone's operating system to run applications of the user's choice. On July 27th, 2010, in a Digital Millennium Copyright Act (DMCA) triennial rulemaking, the Librarian of Congress determined that jailbreaking a smartphone such as an iPhone was legal under the DMCA. That is, it does not constitute a violation of DMCA section 1201's prohibition against circumventing a technological protection measure that controls access to a copyrighted work (the software in the smartphone).  More specifically, one of the six exempt classes of works that the rulemaking announced was:

> Computer programs that enable wireless communication handsets to execute software applications, where circumvention is accomplished for the sole purpose of enabling interoperability of such applications, when they have been lawfully obtained, with computer programs on the telephone handset.[14]

iREB and sn0wbreeze are used to do exactly this. Without access to such programs consumers (at least those consumers who are not software engineers) would be unable to make the use identified in the Librarian's rulemaking. Both programs are licensed under the General Public License[15] and are thus legal to copy and to

---

11     The Affiliate account has an associated e-mail address which uses the JDownloader domain and has the user-name JDownloader. The software uploaded by that account is software produced by the JDownloader developers.

12     *See* http://ih8sn0w.com/ (last visited Nov 12, 2011.)

13     http://www.copyright.gov/fedreg/2010/75fr43825.pdf

14     Exemption to Prohibition on Circumvention of Copyright Protection Systems for Access Control Technologies, Final Rule, 75 Fed. Reg. 43,825 (July 27, 2010) (codified at 37 C.F.R. §201.40).

15     *See* https://github.com/iH8sn0w/iREB-2.0/blob/master/LICENSE and https://github.com/iH8sn0w/sn0wbreeze/blob/master/LICENSE (last visited Nov 12, 2011.)

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

redistribute, commercially and non-commercially.    The developer of these programs, iH8sn0w, uses Hotfile to distribute them to the public.  If one goes to his homepage, one will find download links directly to Hotfile.[16]  For example, the most recent version of iREB can be found at http://hotfile.com/dl/125818297/0d55168/iREB-r4.zip.html  and of sn0wbreeze can  be  found   at   http://hotfile.com/dl/134691967/4171147/sn0wbreeze-v2.8b11.zip.html

Under my direction, Elysium Digital determined that iH8sn0w is a member of the Hotfile Affiliates program and is thus being indirectly compensated for his popular free software in proportion to the number of downloads.

Legal Status:  Very likely non-infringing

Downloads:  For iREB, there were 691,625 downloads of the source file identified by Elysium and a total of 885,583 downloads including hash-match verified copies of that file.    For sn0wbreeze, there  were  108,985  downloads  of  the  source  file identified by Elysium and 629,783 total downloads including hash-match verified of copies of that file.  As mentioned before, Elysium Digital reported to me that iREB and sn0wbreeze were the two most frequently downloaded files on Hotfile.

22. **OpenOffice.org:**  OpenOffice.org is an open source suite of office productivity tools similar to Microsoft Office in its functions.  The software is distributed under the Lesser General Public License.[17]  Copying is expressly permitted.

Legal Status:  Clearly non-infringing.

Downloads:  There were 9581 downloads of the identified OpenOffice.org source files and 30,265 total downloads including identical hash-verified instances of those OpenOffice.org files.

23. **Ubuntu:** Ubuntu is an open source desktop software system built on the Linux platform. The Ubuntu distribution is designed to supply open source versions of all the software a user will require – from operating system to browser to word processing – either included in the bundle or downloadable from within the operating system.  While various add on components of Ubuntu may have differing licenses, the standard distribution of the "Main" and "Restricted" sections of Ubuntu is licensed under open source terms and all parts of the standard distribution are

---

16      *See* http://ih8sn0w.com/ (last visited Nov 12, 2011.)

17      "OpenOffice.org uses a single open-source license for the source code and a separate documentation license for most documents published on the website without the intention of being included in the product.  The source-code license is the GNU Lesser General Public License. Effective OpenOffice.org 3.0 Beta, OpenOffice.org uses the LGPL v3. The document license is the Public Document License (PDL)." http://www.openoffice.org/license.html (last visited Nov 11, 2011.)

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

under licenses that guarantee the right freely to copy the software.[18]

Legal Status: Clearly non-infringing.

Downloads: There were 113 downloads of Ubuntu, source and hash-verified.

### TABLE ONE – EXAMPLES OF FREE AND OPEN SOURCE SOFTWARE ON HOTFILE

| Name | Keywords/Query | Verified IDs | Hash Match IDs | Verified Downloads | Verified & Hash Downloads |
|---|---|---|---|---|---|
| Firefox | Searched on "firefox" from file_names on hotfile database. | 111035126 | | 460 | 460 |
| JDownloader | JDownloader | 4051026, 14052520, 81315168, 23418241, 27342313 | 45471394, 14090647, 29015390, 13934079, 106024395, 124158886, 106346182, 98911239, 124395721, 85729258, 105581035, 106344622, 92329459, 105548820, 102599094, 114067993, 106462457, 97900827, 81607389, 94567934, 24440741, 127148368, 99280977, 125775956, 93040444, 18894080, 25576195, 106438662, 73552519, 117806124, 113552377, 126354675, 109171920, 116443534, 22398479, 18270992, 82381329, 103151762, 94548371, 91699126, 110450072, 23823513, 113545910, 101418523, 117047836, 27326109, 29522078, 106593311, 121139744, 119304336, 112377525, 102973863, 20506410, 110701227, 21782444, 109229943, 99494703, 95191217, 109932082, 35106867, | 203389 | 228814 |

---

[18]     "All application software in both main and restricted must meet the following requirements:
        Must allow redistribution. Your right to sell or give away the software alone, or as part of an aggregate software distribution, is important because:
        You, the user, must be able to pass on any software you have received from Ubuntu in either source code or compiled form.
        While Ubuntu will not charge licence fees for this distribution, you might want to charge to print Ubuntu CDs, or create your own customised versions of Ubuntu which you sell, and should have the freedom to do so."
        http://www.ubuntu.com/project/about-ubuntu/licensing

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

| Name | Keywords/Query | Verified IDs | Hash Match IDs | Verified Downloads | Verified & Hash Downloads |
|------|---------------|-------------|----------------|-------------------|---------------------------|
| | | | 106450996, 78606238, 19013686, 63918903, 18709817, 116444730, 65760059, 51676988, 129274557, 19771966, 19142975, 120815723, 61837635, 31650884, 69522757, 96581338, 104790647, 106458189, 100567888, 86529234, 106450005, 128863574, 22128215, 102844760, 61812186, 119437199, 60841308, 109804729, 96118201, 80631266, 106448483, 73963108, 119445733, 105134182, 109748074, 116444651, 64639357, 123847152, 119434994, 109813103, 106451700, 20000631, 57853816, 21419769, 97386618, 19608315, 63227946, 18574719 | | |
| OpenOffice | OpenOffice%; OOo% | 61682386, 63993443, 106906538 | 101748046, 98264344, 97312315, 106374379, 100448967, 108379358, 85581586, 103002761, 107602983, 93365244, 53570616, 128924696, 95551033, 116362996, 100190542, 114295685, 112135971, 106128722, 101747896, 108983774, 112144612 | 9581 | 30265 |
| Ubuntu | Google: "Ubuntu on hotfile" | 81087050, 81087051 | | 113 | 113 |
| iREB | iREB | 108923557 | 118055012, 108969652, 125969054, 124080917, 116963265, 111015314, 108944058, 113950902, 127338293, 111134233, 111102945, 109432291, 117509749, 118236145, 113493651, 111044524, 113300326, 111225402, 129285191, 123426938, 121844508, 129137393, 123549421, 117009434, 128306751, 113216075, 108928623, 128926633, 117509141, 115224338, 128513796, 113062967, 120433044, 121484483, 127268020, 125818297, 122450789, 124740681, 110330855, 110910580, 122605094, 118434968, 123529015, 122692366, 117258783, 109050411, 126842839, 124958429, 121793717, 120075176, 128188567, 118654221, 119874964, 116596749, 119193810, 124958467, 119380105, 129237270, 126667967, 118062795, | 691625 | 885583 |

<u>HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY</u>

| Name | Keywords/Query | Verified IDs | Hash Match IDs | Verified Downloads | Verified & Hash Downloads |
|------|----------------|--------------|----------------|--------------------|---------------------------|
| | | | 110387124, 111657566, 116941345, 124958585, 128653559, 127267996, 116829785, 118624030, 128111985, 125027246, 115932793, 111866952, 112285263, 114633459, 124661491, 116309824, 113299943, 116047221, 122776323, 126562919, 109043298, 123686433 | | |
| sn0wbreeze | sn0wbreeze% | 125818066 | 128419283, 117674441, 118702210, 122423360, 121460959, 121201922, 118222269, 128814851, 127449487, 118533619, 128733652, 128421432, 128652641, 119299826, 118937654, 121473429, 124771672, 118043851, 117674872, 124476756, 120737623, 124138569, 124476894, 118263379, 117726226, 124561020, 128457680, 125123833, 128202577, 126383120, 123897164, 118576938, 125214726, 119067724, 125396398, 118942400, 117722117, 126110757, 117635913, 122806897, 124329140, 125454952, 119483092, 120027357, 125145002, 117662024, 118048976, 125088395 | 108985 | 629783 |

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

II
## Creative Commons Licensed Content

24.   Creative Commons licenses are standardized licenses that allow copyright holders to share their content under a variety of possible terms they choose.[19] Users select from a list of options, for example to allow commercial uses or not, to allow derivative works or not.  The resulting license has three layers; a simplified 'human readable' page that summarizes the terms of the license,[20] the actual license itself,[21] known as the 'lawyer-readable' portion, and a machine-readable set of metatags that identify the terms of the license to search engines, so that those seeking open material can search by the license terms as well as the content.  (For example, physics textbooks that are available for non-commercial reproduction and distribution.)   Creative Commons licenses have been used by a wide array of copyright holders, ranging from successful commercial artists such as Trent Reznor and David Bowie, to scholarly publications such as the Public Library of Science journals, to universities such as MIT that wish to make their course materials available on the web for reproduction and distribution.

25.  Searching for Creative Commons materials on Hotfile was challenging because the compression of files necessary to save space means the license information, too, is compressed and hidden. This means that one cannot simply search for the license terms as one can when the files are not compressed.  Instead, I directed Elysium Digital to search for the names of three popular animated films, Big Buck Bunny, Elephants Dream, and Sintel on Google and in Hotfile's data.   These films were chosen because they were all produced by the Blender Project and released under the least restrictive Creative Commons license, CC BY, which requires only attribution.   Other Creative Commons content that we discovered, including MIT Open Courseware, or author Cory Doctorow's novels and stories, were not included in this count because that material is released under a Creative Commons license that precludes commercial use and we could not be certain the uploader was receiving no revenue as a result of sharing the material.  This survey also does not

---

19    *About Creative Commons*, "Our tools give everyone from individual creators to large companies and institutions a simple, standardized way to keep their copyright while allowing certain uses of their work – a "some rights reserved" approach to copyright – which makes their creative, educational, and scientific content instantly more compatible with the full potential of the Internet. The combination of our tools and our users is a vast and growing digital commons, a pool of content that can be copied, distributed, edited, remixed, and built upon, all within the boundaries of copyright law." http://creativecommons.org/about (last visited Nov 12, 2011.)

20    Here, for example, is the human readable summary of the CC 3.0 Attribution license. http://creativecommons.org/licenses/by/3.0/us/

21    Here for example is the full text of the CC 3.0 Attribution License http://creativecommons.org/licenses/by/3.0/us/legalcode

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

include counts of the material discovered during the search that appears to be freely shared by the author and copyright holder but which is not under a formal Creative Commons license. For example, this Chinese PowerPoint on "Hepatitis C Treatment: Current and Future Trends"[22] seems unlikely to be infringing, but it is not formally licensed under a Creative Commons license.

26. **Big Buck Bunny:**  Despite its rather alarming name, Big Buck Bunny is an animated film[23] about the eponymous rabbit of the title, created by the Blender Project. The Blender Project is an organization that was formed to explore the use of the open source program Blender to produce films which are also freely licensed.[24]  The film is licensed[25] under the Creative Commons Attribution 3.0 license[26] which permits commercial and non-commercial reproduction and distribution and the creation of derivative works.  Because it is a movie, the file is very large (885 megabytes in its .avi format) and cannot be easily shared without some kind of file-transfer service.  It is stored on Hotfile in the highly compressed, multi-part, .rar format.   A trailer for the movie can be found here. http://www.youtube.com/watch?v=YE7VzlLtp-4

Legal Status:  Clearly non-infringing

Downloads:  The instances of Big Buck Bunny that we found and human verified had 103 downloads.

27. **Elephants Dream:**  Elephants Dream was the first movie produced by the Blender Project.  It was part of a demonstration of the possibilities of open source film-making in which source files and graphics files are made available to the audience as well as the film itself.  "Elephants Dream is the world's first open movie, made entirely with open source graphics software such as Blender, and with all production files freely available to use however you please, under a Creative Commons license."[27]  It, too, is produced under the Creative Commons Attribution 3.0 License and as such may be copied and redistributed freely.

Legal Status:  Clearly non-infringing

---

22   "Hepatitis C Treatment: Current and Future Trends"
http://hotfile.com/dl/126573095/0852787/1000616.ppt.html
23   http://www.bigbuckbunny.org/index.php/about/ (last visited Nov 13, 2011.)
24   http://www.blender.org/features-gallery/blender-open-projects/ (last visited Nov 13, 2011.)
25   "The results of the Peach open movie project has been licensed under the Creative Commons Attribution 3.0 license."
http://www.bigbuckbunny.org/index.php/about/ (last visited Nov 13, 2011.)
26   http://creativecommons.org/licenses/by/3.0/ (last visited Nov 13, 2011.)
27   http://orange.blender.org/ (last visited Nov 13, 2011.)

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

Downloads:  The instance of Elephants Dream we identified had 18 hash-verified downloads.

28.  **Sintel:**  Sintel is the third film in the Blender Project Series.  "Sintel is an independently produced short film, initiated by the Blender Foundation as a means to further improve and validate the free/open source 3D creation suite Blender. With initial funding provided by 1000s of donations via the Internet community, it has again proven to be a viable development model for both open 3D technology as for independent animation film."[28]  It, too, is released under the Creative Commons Attribution 3.0 license.

Legal Status: Clearly non-infringing

Downloads:  Though this file was stored on Hotfile, we did not find any downloads of Sintel.

### TABLE TWO – EXAMPLES OF CREATIVE COMMONS CONTENT ON HOTFILE

| Name | Keywords/Query | Verified IDs | Hash Match IDs | Verified Downloads | Verified & Hash Downloads |
|---|---|---|---|---|---|
| Big_Buck_Bunny | Google:"Big Buck Bunny on hotfile"; searched bunny and buck on hotfile database | 108538977, 108549505, 108557338 | | 103 | 103 |
| Elephants_Dream | google "Elephants Dream on hotfile" | 25133372 | | 18 | 18 |
| Sintel | Google: "Sintel on hotfile"; searched "Sintel" on hotfile database | 97697238, 97697035, 97697403 | | 0 | 0 |

---

[28]    http://www.sintel.org/about/  (last visited November 13, 2011.)

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

### III
### Public Domain Material

29.  Material may be in the public domain in the United States for many reasons.  For example, its public domain status may be because it is uncopyrightable, such as an unoriginal compilation of fact, or that it is a work of the Federal Government and thus is put into the public domain by section 105 of the Copyright Act.  In my assessment of Hotfile, I asked Elysium to search for examples of works that are in the public domain either because the work had never been under copyright to begin with, such as Shakespeare's plays, or because the copyright had expired, such as *Huckleberry Finn*. (Works published before 1923 can be presumed to be in the public domain in the United States.[29])

I applied very conservative standards even to works such as these, however.  A Google Books scan of Hamlet, while clearly in the public domain, was omitted from this analysis because the Google books cover page, listing the terms of use, was included in the download. We also found a number of pre-1923 films, including *Birth of A Nation*, and the Charlie Chaplin films *The Adventurer, On Easy Street* and *The Fireman*.  However, in the time available I could not examine the films fully enough to be sure that copyrighted material had not been added to the version stored on Hotfile.  They are not included in these counts.

30.  **Huckleberry Finn:**  Mark Twain's classic tale is available on Hotfile in the form of an attractive illustrated 1885 edition, which appears to be the very first book ever published by the Charles L. Webster publishing company.[30]

Legal Status:  Clearly non-infringing.  Works published before 1923 are in the public domain in the United States.  This book was published 38 years before that cut-off. The book has an imprint on the title page declaring "Prepared and Published by E-Books Directory" but neither mechanically scanning a book, nor adding the name of your firm to it, suffices to confer a new copyright in it.  For that to happen there would need to be additional original expressive material.  I examined the book and it is otherwise unchanged.

Downloads:  There were 17 instances of the human-verified file of Huckleberry Finn and 45 hash-verified downloads.

---

[29]      17 U.S.C. § 304
[30]      I am grateful to the Cornell University Library's exhibition "The Business of Being Mark Twain" for this fact. Both the cover and the dates match exactly. http://rmc.library.cornell.edu/twain/exhibition/webster/index.html (last visited Nov 16, 2011.)

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

31. **Othello:** Dating from approximately 1603, a time that preceded the coming into effect of the first true copyright act by 107 years, Shakespeare's Othello is clearly in the public domain.

Legal Status: Clearly non-infringing

Downloads: Othello was uploaded to the Hotfile system but, as yet, the Moor of Venice has found no admirers among Hotfile users. We found zero downloads.

32. **Macbeth:** Shakespeare's Macbeth was written in the early 1600's and is therefore in the public domain in the United States. The particular version on Hotfile is an unchanged pdf of the text of the play.

Legal Status: Clearly non-infringing

Downloads: Macbeth was uploaded to the Hotfile system but we found no downloads.

33. **A Tale of Two Cities:** Charles Dickens' A Tale of Two Cities was published in 1859 and is in the public domain in the United States. The version uploaded to Hotfile bore markings of an organization called "Planet PDF" but no original expression had been added to the book and thus its copyright status is unchanged.

Legal Status: Clearly non-infringing

Downloads: A Tale of Two Cities had been downloaded 4 times.

### TABLE THREE – EXAMPLES OF PUBLIC DOMAIN CONTENT ON HOTFILE

| Name | Keywords/Query | Verified IDs | Hash Match IDs | Verified Downloads | Verified & Hash Downloads |
|------|----------------|--------------|----------------|--------------------|---------------------------|
| A_Tale_of_Two_Cities | google: "A Tale of Two Cities on hotfile" | 94112268 | | 4 | 4 |
| Huckleberry_Finn | google: "Huckleberry Finn on hotfile"; search Huckleberry and Finn on hotfile database | 65463776 | 76947371, 59344815, 120866286, 95907818 | 17 | 45 |
| Macbeth | Searched on Macbeth.pdf from Hotfile database, Googled "Macbeth.pdf on hotfile" | 99000556, 118496987 | | 0 | 0 |
| Othello | Googled: "Othello.pdf on hotfile" | 118398280 | | 0 | 0 |

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

IV
Conclusion

33. The court will make its own assessment of whether Hotfile has substantial non-infringing uses and whether Hotfile "induces" infringement. This expert report focused only on specific instances of three types of non-infringing content, and did not survey all, or even a majority of the examples of that content. Nevertheless, in my opinion, it reveals four facts that are relevant to the court's decision.

34. First, non-infringing content is frequently uploaded and downloaded on Hotfile and those uses are substantial both in terms of raw numbers, and in terms of the most common uses of the Hotfile system. This report does not attempt to present a statistically representative sample of the usage of Hotfile and I have no personal knowledge about what percentage of Hotfile's uploaded content, or of user downloads, is non-infringing. Nevertheless, even within the limits suggested by the previous sentence, my investigation of the system provided some striking facts about the usage of Hotfile. There were more than 1.7 million downloads of the six open source programs described here. OpenOffice.org alone was downloaded more than 30,000 times. From the records we have, it appears likely, though not certain, that JDownloader supplied 17 of the top 100 most shared files on Hotfile. Elysium Digital informs me that sn0wbreeze and iREB are the two most downloaded programs on Hotfile, iREB being the #1 most downloaded and sn0wbreeze being the #2. The fact that it is highly likely that the two most commonly downloaded files on Hotfile are open source programs that seem to be licitly shared appears relevant to any assessment the court might make about the *current* usage of the system. In terms of the *potential* uses of the system, it is worth noting that open source software is an important, and growing, component of the software market today. Hotfile appears suited for, compatible with, and widely used for independent open source distribution. In my opinion, therefore, this shows both current, and potential future, substantial non-infringing uses.

35. Second, Hotfile is also being used for a wide *range* of non-infringing activity, even when the number of downloads in the category is relatively lower than for open source software. In this study, other uses ranged from sharing Shakespearean plays to open source movies. The courts have made clear that it is not merely current non-infringing use, but capability for future non-infringing use, that is relevant to any legal assessment of a service such as Hotfile.[31]

---

[31] "Accordingly, the sale of copying equipment, like the sale of other articles of commerce, does not constitute contributory infringement if the product is widely used for legitimate, unobjectionable purposes. Indeed, it need merely be *capable* of substantial noninfringing uses." *Sony Corp. v. Universal City Studios, Inc.*, 464 U.S. 417, at 442 (emphasis added); "We depart from the reasoning of the district court that Napster failed to demonstrate that its system is capable of commercially significant noninfringing uses. *The district court improperly confined the use analysis*

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

36.    Third, Hotfile provides a type of service that is very important in the architecture of the Internet.  Transferring large files over the Internet is difficult. Gmail's maximum file attachment size is 25MB, for example, and most e-mail systems set lower limits.[32]  For an 885 MB movie such as *Elephants Dream,* or an entire distribution of Ubuntu or OpenOffice.org, some kind of file hosting or transfer service is required.   Independent open source developers or filmmakers collaborating on an open source film do not necessarily have their own servers from which material can be shared.  The growth of distributed creative activity on the Internet suggests that the already important role for services such as Hotfile is likely to grow in the future.

37. Fourth, some of those producing and sharing content licitly and freely on Hotfile are using the Affiliate Program as a way of being indirectly compensated for their efforts.  This is true of the open source developers of iREB, sn0wbreeze, and JDownloader, for example. Since we know that iREB and sn0wbreeze are the two most commonly downloaded files on the system and since Elysium Digital found that the developers of JDownloader appear to have provided 17 of the top 100 most downloaded files,[33] the Affiliate Program may offer each of them a source of revenue. Methods of indirect compensation such as this are important to the future of the types of distributed creativity described in the open source and Creative Commons sections of this report. Any assessment of the Affiliate Program, particularly one that indirectly casts doubt on the legal acceptability of such programs elsewhere on the Internet, should take this into account.

---

*to current uses, ignoring the system's capabilities.* Consequently, the district court placed undue weight on the proportion of current infringing use as compared to current and future noninfringing use." *A&M Records, Inc. v. Napster, Inc.,* 239 F.3d 1004,1021 (9th Cir. 2001) (emphasis added.); "Importantly, Sony also used the word "capable," asking whether the product is "capable of " substantial noninfringing uses... its language also indicates the appropriateness of looking to potential future uses of the product to determine its "capability." *Metro-Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd.,* 545 U.S. 913, 953-954 (2005) (Breyer, J., concurring).

[32]      http://mail.google.com/support/bin/answer.py?answer=8770 (last visited Nov 13, 2011.)

[33]      *See infra* at paragraph 20.

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

**SUPPLEMENTATION OF OPINIONS**

38.  I expect to testify regarding the matters set forth in this expert report, if asked about these matters by the court or the parties' attorneys. I understand that discovery is ongoing in this case.  I therefore reserve the right to adjust or supplement my opinions after I have had the opportunity to review deposition testimony or in light of additional documents or arguments that may be brought to my attention, including any additional orders from the court.

Signed,

James Boyle

Curriculum Vitae of
# JAMES D.A. BOYLE

**Office:**
Duke Law School
Box 90360 / 210 Science Drive
Durham, North Carolina 27708-0360
919 613-7287
e-mail: boyle@law.duke.edu

---

## EMPLOYMENT

| | |
|---|---|
| 2002–present | **William Neal Reynolds Professor of Law**, Duke Law School. Founder and Faculty Co-Director, Duke Center for the Study of the Public Domain. |
| 2000–2002 | **Professor**, Duke Law School |
| 1998–99 | **Visiting Professor**, Yale Law School |
| 1993–94 | **Visiting Professor**, Duke Law School |
| Spring 1992 | **Visiting Professor**, Harvard Law School |
| Fall 1991 | **Visiting Professor**, Boston University Law School |
| Spring 1986 | **Visiting Associate Professor**, University of Pennsylvania Law School |
| 1986–2000 | **Professor**, Washington College of Law, American University |
| 1985–1986 | **Associate Professor**, Washington College of Law, American University |
| 1982–1984 | **Assistant Professor**, Washington College of Law, American University |
| 1981–1982 & 1980–1981 | **Teaching Fellow**, Harvard University Harvard-Danforth Certificate for Excellence in Teaching |
| 1981–1982 | **Research Assistant**, Harvard Law School |

## EDUCATION

| | |
|---|---|
| 1986 | Harvard Law School **S.J.D.** |

1981–82    Harvard Law School
           Coursework for S.J.D.: Frank Knox Fellow

1980–1981  Harvard Law School
           **LL.M.:** Frank Knox Fellow

1975-1980  Glasgow University
           **LL.B. (Hons.):** Double First in International Law and Politics. Viscount Stair
           Prize for best graduate in international law.


## PUBLICATIONS

**Books &
Collections**    THE PUBLIC DOMAIN: ENCLOSING THE COMMONS OF THE MIND (Yale University
                 Press 2009)

                 CULTURAL ENVIRONMENTALISM @ 10, 70 LAW & CONTEMPORARY PROBLEMS
                 1–210 (2007) (Larry Lessig and James Boyle eds.)

                 PAPERS ON THE PUBLIC DOMAIN (edited with an introduction by James Boyle,
                 Law & Contemporary Problems 2003)

                 SHAMANS, SOFTWARE, AND SPLEENS: LAW AND THE CONSTRUCTION OF THE
                 INFORMATION SOCIETY (Harvard University Press 1996)

                 CRITICAL LEGAL STUDIES: SELECTED READINGS (edited with an introduction by
                 James Boyle, Dartmouth/N.Y.U. Press 1994), part of the INTERNATIONAL
                 LIBRARY ON LAW & LEGAL THEORY SERIES

**Educational
Comic Book**     TALES FROM THE PUBLIC DOMAIN: BOUND BY LAW? (with Keith Aoki and
                 Jennifer Jenkins 2006) (expanded edition, Duke University Press 2008) (also
                 translated into French, Portuguese, and Italian)

**Articles &
Chapters**       *Endowed by Their Creator?: The Future of Constitutional Personhood*, in
                 BROOKINGS INSTITUTION, THE FUTURE OF THE CONSTITUTION SERIES, No. 10
                 (2011)

                 *What Intellectual Property Law Should Learn from Software*, COMMUNICATIONS
                 OF THE ACM, Vol. 52 no. 9, p. 71 (2009)

                 *Intellectual Property: The Key Challenges*, in G8 SUMMIT 2008: CHALLENGES
                 OF GLOBALIZATION, at 162 (Maurice Fraser ed., Agora Press 2008)

                 *Cultural Environmentalism and Beyond*, 70 LAW & CONTEMPORARY PROBLEMS
                 5 (2007)

2

*Synthetic Biology: Caught Between Property Rights, the Public Domain and the Commons*, 6 PLoS BIOLOGY 389 (2007) (with Arti Rai)

*Mertonianism Unbound?: Imagining Free, Decentralized Access to Most Cultural and Scientific Material*, in UNDERSTANDING KNOWLEDGE AS A COMMONS: FROM THEORY TO PRACTICE, at 123 (Elinor Ostrom & Charlotte Hess eds., MIT Press 2007)

*Towards a Global Learning Commons*, EDUCATIONAL TECHNOLOGY, Nov/Dec 2007, at 5 (with Ahrash Bissel)

*Promoting Innovation, Protecting Intellectual Property: Towards Evidence-based Policy*, in G8 SUMMIT 2007: GROWTH AND RESPONSIBILITY, at 34 (Maurice Fraser ed., Agora Press 2007)

*A Manifesto on WIPO and the Future of Intellectual Property*, 2004 DUKE LAW & TECHNOLOGY REVIEW 0009

*What the Squabbles over Genetic Patents Could Teach Us*, ADVANCES IN GENETICS 2003

*The Opposite of Property*, 66 LAW & CONTEMPORARY PROBLEMS 1 (2003)

*The Second Enclosure Movement & the Construction of the Public Domain*, 66 LAW & CONTEMPORARY PROBLEMS 33 (2003)

*Fencing Off Ideas*, DAEDALUS (Intellectual Property Issue) (Spring 2002), at 13

*Cruel, Mean or Lavish?: Economic Analysis, Price Discrimination and Digital Intellectual Property*, 536 VANDERBILT LAW REVIEW 2007 (2000)

*The First Amendment and Cyberspace: The Clinton Years*, 63 LAW & CONTEMPORARY PROBLEMS 337 (2000)

*A Non-Delegation Doctrine for the Digital Age*, 50 DUKE LAW JOURNAL 5 (2000)

*Conservatives and Intellectual Property: Address to the Federalist Society*, 1 ENGAGE 83 (2000)

*Anachronism of the Moral Sentiments? Integrity, Post-Modernism and Justice*, 51 STANFORD LAW REVIEW 493 (1999)

*A Politics of Intellectual Property: Environmentalism for the Net?* 47 DUKE LAW JOURNAL 87 (1997)

*Foucault in Cyberspace: Surveillance, Sovereignty and Hard-Wired Censors*, 66 UNIVERSITY OF CINCINNATI LAW REVIEW 177 (1997)

*Intellectual Property Policy On-Line: A Young Person's Guide*, 10 HARVARD JOURNAL OF LAW AND TECHNOLOGY 47 (1996)

3

*The P.C. Harangue*, 45 STANFORD LAW REVIEW 1493 (1993)

*Legal Realism and the Social Contract: Fuller's Public Jurisprudence of Form, Private Jurisprudence of Substance*, 78 CORNELL LAW REVIEW 371 (1993)

*A Theory of Law and Information: Copyright, Spleens, Blackmail and Insider Trading*, 80 CALIFORNIA LAW REVIEW 1413 (1992)

*A Process of Denial: Bork and Post-Modern Conservatism*, 3 YALE JOURNAL OF LAW AND THE HUMANITIES 263 (1991)

*Is Subjectivity Possible? The Post-Modern Subject in Legal Theory*, 62 UNIVERSITY OF COLORADO LAW REVIEW 489 (1991)

*A Progressive View of Tort Law*, THE WORLD AND I 541 (Feb. 1989)

*In Re 'William Shakespeare,'* 37 AMERICAN UNIVERSITY LAW REVIEW 725–797, 809–817 (1988)

*Search for the Author: Shakespeare and the Framers*, 37 American University Law Review 625 (1988)

*Thomas Hobbes and the Invented Tradition of Positivism*, 135 UNIVERSITY OF PENNSYLVANIA LAW REVIEW 383 (1987)

*The Politics of Reason*, 133 UNIVERSITY OF PENNSYLVANIA LAW REVIEW 685 (1985)

*Ideals and Things: International Legal Scholarship and the Prison House of Language*, 26 HARVARD INTERNATIONAL LAW JOURNAL 327 (1985)

*Anatomy of a Torts Class*, 34 AMERICAN UNIVERSITY LAW REVIEW 1003 (1985)

*Symposium on Critical Legal Studies: Introduction*, 34 AMERICAN UNIVERSITY LAW REVIEW 929-938 (1985)

**Review Essays**

*Legal Fiction: Law's Empire by Ronald Dworkin*, 38 HASTINGS LAW JOURNAL 401 (1987)

*Imagining Free, Decentralized Access to Most Cultural and Scientific and Scientific Material*, 98 HARVARD LAW REVIEW 1066 (1985)

**Reprinted & Translated Essays**

*O Segundo Movimento de Emparcelamento e a Construcao do Dominio Publico* (Portuguese translation of *The Second Enclosure Movement and the Construction of the Public Domain*), in A ECONOMIA DA PROPRIEDADE INTELECTUAL E OS NOVOS MEDIA: ENTRE A INOVACAO E A PROTECCAO, at 20 (Guerra & Paz Press 2007)

4

*Las Ideas Cercadas: El Confinamiento Y La Desaparición Del Dominio Público* (Spanish translation of *Fencing off Ideas*), *in* ¿UN MUNDO PATENTADO? LA PRIVATIZACIÓN DE LA VIDA Y DEL CONOCIMIENTO, at 39 (Jorge Villarreal, Silke Helfrich & Alejandro Calvillo eds., Heinrich Boell Press 2007)

*Fencing Off Ideas: Enclosure and the Disappearance of the Public Domain*, *reprinted in* A PATENTED WORLD?: PRIVATISATION OF LIFE AND KNOWLEDGE, at 19 (Ana Agostino & Glenn Ashton eds., Jacana Press 2007)

*Foucault in Cyberspace: Surveillance, Sovereignty, and Hardwired Censors*, *reprinted in* LAW AND SOCIETY APPROACHES TO CYBERSPACE (International Library of Essays in Law and Society), at 235 (Paul Berman ed., Ashgate Press 2007)

*A Manifesto on WIPO and the Future of Intellectual Property*, *reprinted in* COPYRIGHT LAW AND POLICY IN A NETWORKED WORLD, at 135 (Georgia Harper ed., NACUA Press 2007)

*Intellectual Property: The Analogy to Environmentalism*, *in* LAND ART: A CULTURAL ECOLOGY HANDBOOK, at 127 (RSA Press: Royal Society for the Encouragement of Arts, Manufacture and Commerce 2007)

*Fencing off Ideas: Enclosure and the Disappearance of the Public Domain*, *reprinted in* CODE: COLLABORATION AND OWNERSHIP IN THE DIGITAL ECONOMY, at 235 (Rishab Aiyer Ghosh ed., MIT Press 2005)

*A Politics of Intellectual Property: Environmentalism for the Net*, *reprinted in* READINGS IN CYBERETHICS, at 231 (Richard Spinello & Herman Tavani eds., Jones & Bartlett Press 2001)

*Copyright and the Invention of Authorship* (chapter from SHAMANS, SOFTWARE AND SPLEENS), *in* GROWING PAINS: ADAPTING COPYRIGHT FOR LIBRARIES, EDUCATION AND SOCIETY (Laura N. Gasaway ed., F.B. Rothman Press 1997)

*Modernist Social Thought: Roberto Unger's Passion*, *reprinted in* CLS: ESSAYS ON CRITICAL LEGAL STUDIES FROM THE PAGES OF THE HARVARD LAW REVIEW (Harvard Law Review 1986)

*Ideals and Things: International Legal Scholarship and the Prison House of Language*, *reprinted in* THE INTERNATIONAL LIBRARY OF ESSAYS IN LAW AND LEGAL THEORY: INTERNATIONAL LAW (Martti Koskenniemi ed., Aldershot/ Dartmouth Press 1992)

**POSITIONS & HONORS:**

Expert Advisor to the Hargreaves Review of Intellectual Property Law for the Government of the United Kingdom (2010/2011)

Melville B. Nimmer Memorial Lecturer, UCLA School of Law (2011)

Arcadia Lecturer, University of Cambridge (2009)

Duke Law School Distinguished Teaching Award (2006)

Columnist, *Financial Times* "New Economy Policy Forum"

Winner, World Technology Award for Law, 2003

Co-Founder, Science Commons, ccLearn

Founder and Faculty Co-Director, Duke Center for the Study of the Public Domain (www.law.duke.edu/cspd)

Board Member, Creative Commons (www.creativecommons.org)

Academic Advisory Board, EPIC (Electronic Privacy and Information Center www.epic.org)

Academic Advisory Board, Public Knowledge (www.publicknowledge.org)

Advisory Board, Connexions Open Source Learning Tools

American University Faculty Award for Outstanding Scholarship 1996

# EXHIBIT 3

**Disney Enterprises, Inc. et al v. Hotfile Corp. et al,**
**1:11-cv-20427-KMW (S.D. Fl.)**
**Rebuttal Report of Professor James Boyle**

1.  I am currently the William Neal Reynolds Professor of Law at Duke University, and have been retained by Farella, Braun + Martel LLP on behalf of the Defendants in this action as an expert witness.

**Background and Qualifications**

2.  I received an LL.B. (Hons) from Glasgow University (1980), and an LL.M. (1981) and S.J.D. (1986) from Harvard Law School.  I have been a law professor since 1982, teaching at American University, and at the Universities of Pennsylvania, Harvard and Yale as a Visiting Professor.  In 2000 I joined the law faculty at Duke.  My other qualifications, awards and publications were listed in my initial expert report.

3.  I have not previously testified as an expert.  I am being remunerated for my work as an expert in these proceedings at the rate of $750 per hour.

4.  The Documents that were used in support of my opinions are listed below under the heading "Documents reviewed".

**Scope of Expert Assignment**

5.  I have been asked by Farella, Braun + Martel LLP on behalf of the Defendants to provide an expert rebuttal report to a statistical report prepared by Dr. Richard Waterman, [1] (The Waterman Report) on the uses of Hotfile.com.  The Waterman report also includes a section (Exhibit C) by Mr. Scott Zebrak.  In that section Mr. Zebrak details the methods by which he assessed the copyright status of the 1750 files in Dr. Waterman's sample.  He also lists those files, together with his assessment of their legal status.  I have studied both Dr. Waterman's and Mr. Zebrak's methods and am prepared to testify on my conclusions about them.

**Documents reviewed**

6. In forming my opinions, I reviewed:

a)      The Rule 26(a)(2)(B) Report of Dr. Richard Waterman and all Exhibits

b)      The Rule 26(a)(2)(B) Report of Scott Zebrak (Exhibit C to the Waterman Report), all Exhibits and database materials produced by Mr. Zebrak in a timely manner

c)      The November 29, 2011 Transcript of the Deposition of Richard Waterman

---

[1] RULE 26(a)(2)(B) REPORT OF DR. RICHARD WATERMAN.



PLAINTIFF'S EXHIBIT 2

1

d)      The December 20th, 2011 Transcript of the Deposition of Scott Zebrak

e)      Prior testimony and reports of Dr. Waterman in other copyright matters attached as Exhibit A

f)      Elysium Digital's technical analyses of aspects of the Hotfile database, software questions, Internet issues, and the hard drive and databases provided by Mr. Zebrak.  See Elysium's analysis summaries attached as Exhibit B, hereto.

g)      Sample counter-notices received by Hotfile attached as Exhibit C, hereto.

h)      Declaration of Charles J. Hausmann in Support of Plaintiff's Motion for Summary Judgment (*Grokster*), attached as Exhibit D, hereto.

i)      Case law, offline and online articles and websites, as identified below.

j)      Affidavit of Scott Wittenburg and Elysium Analysis of a Photography Podcast, attached as Exhibit E, hereto

k)      Email from Legal Counsel of Opera Software, attached as Exhibit F, hereto.

l)      Email and affidavit from Marc Schwegler from Farm Simulator / Giants Software and End User License Agreement, attached as Exhibit G, hereto.

m)      DirectX End User Licenses and printouts re: DirectX attached as Exhibit H

n)      Russian Book regarding weaving and embroidery from 1871 attached as Exhibit I

7.   For the remainder of this report, I will focus on the quantitative picture that Dr. Waterman's report paints of Hotfile.  I by no means agree, however, that the quantitative picture is the only relevant one, and I reserve my right, if called to testify, to comment on *qualitatively* important non-infringing uses of the Hotfile system.  As an example, of what I mean by a qualitatively important non-infringing use I would point to the following incident. MIT's *Technology Review* recently published an article dealing with the role of digital services in the democratic uprisings collectively referred to as the Arab Spring.[2]  The article recounts that one of the very important catalysts for the democratic demonstrations was a gory video of a hospital emergency room in Kasserine, Tunisia, dealing with individuals who had been beaten by the police.  Denied access to other online services, one of the protest movements (Takriz) "smuggled a CD of the video over the Algerian border and streamed it via MegaUpload."[3] Al Jazeera picked up the video because of its exposure on MegaUpload and the excerpts showed on television catalyzed a wave of pro-democracy protests. Upon investigating this, I found that MegaUpload – like Hotfile – is a cyberlocker

---

[2] John Pollock, *Streetbook: How Egyptian and Tunisian Youth Hacked the Arab Spring*
TECHNOLOGY REVIEW (Sept-Oct 2011) http://www.technologyreview.com/web/38379/
[3] *Id.*

2

site. (Interestingly, two hash-identical versions of the same video can be found on Hotfile, uploaded on Jan 11th 2011. Those versions were downloaded 21 times in January of 2011.)[4]

8.   The importance of the site design here is that there was no approval required for posting, nor any editorial screening for what – in this case – was extremely disturbing, but nevertheless important material. In any quantitative study of a service like Hotfile, the video would count as a single non-infringing file.  In terms of the *qualitatively* important non-infringing uses, a story like the Arab Spring one reveals the importance of open communication networks to free speech and First Amendment values in a way that transcends a single entry in an Excel spreadsheet quantifying infringement. In a final assessment, I presume that a court would want also to look at those qualitatively important non-infringing uses. In my remaining comments, however, I shall focus only on Dr. Waterman's quantitative study and the flaws I found within it.

9. Dr. Waterman's statistical review of Hotfile paints the following picture:

> Based upon my review of the most recent data provided by Mr. Zebrak, approximately 90.3% of all daily downloads of files on Hotfile were downloads of infringing or highly likely infringing content; approximately 5.4% of the downloads of files per day on Hotfile were downloads of non-infringing or highly likely non-infringing files; and the remaining approximately 4.3% of the downloads of files per day on Hotfile were downloads of files whose copyright status could not be reliably determined in the time allowed.[5]

10.  Dr. Waterman obtained this statistical snapshot by a procedure that includes several steps that deserve the court's critical attention.  I am not a statistician and cannot opine as to whether Dr. Waterman's random number generator was properly calibrated.  However, a key part of Dr. Waterman's method is the choice of what files to exclude from the study, and how to weight those that remain. That choice – at least if the study is to be legally relevant to this trial – is one that is profoundly shaped by the law.  With Dr. Waterman's and Mr. Zebrak's testimony, the plaintiffs are presumably attempting to provide the court with factual information relevant to the legal determination of

a.)      whether Hotfile is a service with "substantial non-infringing uses" under *Sony*

and

b.)      whether Hotfile is guilty of *Grokster*-style inducement liability.

11.  In my opinion as a legal scholar, the method they have chosen to use has several fundamental flaws that cause it to present a misleading answer to both of those questions. In particular, by focusing purely on downloads, Dr. Waterman's method entirely excludes one important use of the Hotfile system, a use that appears to be clearly non-infringing

---

[4] *See* Exhibit B, Massacre at Kasserine.
[5] RULE 26(a)(2)(B) REPORT OF DR. RICHARD WATERMAN, paragraph 5.

under *Sony* and which is obviously relevant to any analysis of inducement: namely, temporary personal storage and archival backup. A statistical analysis of the use of VCR's in the *Sony* case that, because of its design, implicitly excluded the time-shifting of TV programs from its analysis of VCR uses would paint a legally misleading picture. A court could not rely on such a study in making an assessment of contributory or vicarious liability, or in assessing whether there were substantial non-infringing uses. The same would appear to be true here. In reviewing District Court findings on substantial non-infringing uses, Courts of Appeal have made the rigorous requirements of such an inquiry very clear.[6] This study does not appear to satisfy those requirements.

12. My objections are grouped into three parts. The first is to Dr. Waterman's method as a general matter. The second is to the specific application of that method or protocol to the material found on Hotfile. The third goes to decisions that Mr. Zebrak made in assessing the copyright status of the files on Hotfile. I will deal with each of them in turn.

I

**GENERAL FLAWS IN DR. WATERMAN'S METHODOLOGY AS APPLIED TO ANY FILE-STORAGE AND TRANSFER OR "CYBERLOCKER" SITE**

13. To make clear the problems with Dr. Waterman's methodology it may be instructive first to imagine it being applied to an entirely hypothetical cyberlocker and file transfer site called Example.com. Example.com has 10,000 users. 9,900 of them use the site for storage and back up. Such users upload documents on which they are working, such as the PowerPoint files they use for work purposes. Since the users do not choose to share the URL's with others, and since Example.com does not provide a file listing search feature or allow other search engines to index content that is not linked to on the open web, those files are relatively inaccessible to anyone but the uploader. An average of 10 files is uploaded by each user. So long as no disaster occurs – the document does not get corrupted, or the folder does not get mistakenly deleted – they will never need to download those files and thus, the file will register zero downloads. Example.com's business model is to encourage these users to purchase the premium subscription by removing any content that has not been downloaded for 3 months. The premium subscription to Example.com

---

[6] As I pointed out in my initial Report, the Courts of Appeal have disapproved of District Court assessments of substantial non-infringing use on the basis of far more subtle mistakes, such as a focus only on current use rather than potential uses. "We depart from the reasoning of the district court that Napster failed to demonstrate that its system is capable of commercially significant noninfringing uses. *The district court improperly confined the use analysis to current uses, ignoring the system's capabilities.* Consequently, the district court placed undue weight on the proportion of current infringing use as compared to current and future noninfringing use." *A&M Records, Inc. v. Napster, Inc.*, 239 F.3d 1004,1021 (9th Cir. 2001) (emphasis added.) To omit from one's statistical sample the method of usage most characteristic of a cyberlocker site – namely zero download storage – which is a direct analog to the substantial non-infringing uses that carried the day in *Sony v. Universal* - is an error of an altogether more obvious and fundamental type.

removes this limitation and allows storage for an unlimited period of time.

14. The remaining 100 users of Example.com use the system for file transfer. 10 use it for "space shifting" commercial content they have purchased so that they can watch it at another location when they are away from their home computers. (So long as they are space shifting their own content to themselves, this is a practice that is very probably a fair use.) Less salubriously, 70 use it for "sharing" their favorite pornography. Of those 70, 35 create edited excerpts featuring their favorite performers or scenes (raising a complex issue of legal analysis about whether there is a fair use, one that would depend on the substantiality of the portion used, the degree of transformation and the market for short form edited versions of pornography.) 35 simply copy the entire pornographic video file. (This would be infringing *unless* the pornographer gives express or implied license to distribute the pornographic video files to the web, perhaps to drive content towards a particular site whose watermark appears on the film.) 10 users utilize Example.com to share full length, commercial, (non-pornographic) copyrighted major studio films with the world. This use is infringing and provides 10% of the total downloads on the site. The total number of downloads combining the space shifters, the remixing and sharing pornography fans and the users illicitly copying commercial feature films is 90,000.

15. Finally, the last 10 users use the system to share open source software that they themselves have written and in which they hold the copyright. This is a popular use of Example.com and in fact includes the two most downloaded files on the system. (This is clearly a non-infringing use and many scholars, including me, would claim that this, by itself and without regard to any of the other clearly licit uses of the site, satisfies the *Sony* standard of a substantial non-infringing use.) There are a total of 10,000 downloads of the open source software.

16. As I understand Dr. Waterman and Mr. Zebrak's methodology, they would classify the uses of Example.com as "90% infringing." First Dr. Waterman's methodology by focusing only on *downloads*, implicitly excludes the 9,900 users who utilize the site for storage and back up. Their 99,000 uploads have no downloads. This leaves him with a universe of 100,000 downloads. Based upon my review of Mr. Zebrak's report and deposition transcript, it appears likely that he would classify all but the open source software downloads as infringing. If true, their conclusion would be that 90% of the uses of Example.com are infringing though the reality is very different. In fact, more than 99% of the *users* of Example.com are *not* infringing. More than half of the *uses* of the system – both uploads and downloads – are clearly non-infringing. And a significant percentage of the *downloads* on the system are either debatably a fair use, authorized by implied license or clearly non-infringing.

17. i.) Percentage of users, ii.) of uses and iii.) of uploads *and* downloads; these are all pieces of evidence that courts would presumably need in the process of determining whether services have a substantial non-infringing use – and given that *Sony* instructs courts not to look at *predominant* use, but rather current and potential substantial non-infringing uses, that evidence presumably needs to be comprehensive. Those same factors are also relevant to the multi-factor assessment of inducement liability that the Supreme

Court laid out in *Grokster*.

18.   In short, there are crucial omissions in the universe of uses and users that Dr. Waterman's method captures.   As a result in my opinion, his method – if used as *the* statistical snapshot on which a contributory, vicarious, or inducement liability assessment were to be carried out – would yield a legally misleading conclusion when applied to a cyberlocker and file transfer site.

19. I wish to stress that my claim is not that Example.com is Hotfile, though there are some obvious similarities. My claim is that the Example.com hypothetical shows why Dr. Waterman's method – as a general matter, not just in the case of Hotfile – will present a legally misleading picture of the facts about *any* cyberlocker/file-transfer site.  I will now turn to his analysis of Hotfile in order to show in more detail the problems caused by the methodological choices he has made.

## II
### SPECIFIC FLAWS IN DR. WATERMAN'S METHODOLOGY AS APPLIED TO HOTFILE

### i.) Files – And Types of Use –Excluded from Study

20.  First, and vitally, by focusing only on downloads, Dr. Waterman excludes all files that have zero downloads from Mr. Zebrak's analysis of infringement.   Working under my direction, the computer consulting company Elysium Digital examined the Hotfile database in order to discover how many files had zero downloads.  They reported that, out of a total of 107,271,438 total files stored on the Hotfile system 57,923,301, or 54%, had no registered downloads.   Thus in the case of Hotfile, Dr. Waterman's study actually excludes a *majority* of the files on the system.

21.   Were many of those 57,923,301 files in fact being uploaded to Hotfile.com for file storage?   That is something that neither Dr. Waterman, nor Mr. Zebrak nor I actually know because – by design – those files have been excluded from their statistical assessment of the uses of the system.   Hotfile clearly can be and surely is used for file storage. Both Hotfile's architecture and its business model are consistent with it, particularly Hotfile's policy of capping (free) zero download storage at 3 months (14 days for anonymous users), while allowing unlimited storage time for Premium users.   Offering a free "teaser" service that attracts users to a more feature-rich fee-paying premium service is such a standard business method on the Internet that it has attracted its own neologism: "freemium."[7] Further, given that Hotfile itself has no index to the files and the choice whether to share

---

[7] Nicolas Pujol, *Freemium: Attributes of an Emerging Business Model*
http://papers.ssrn.com/sol3/papers.cfm?abstract_id=1718663
"Freemium is a business model that works by offering a product or service free of charge (typically digital offerings such as software, content, games, web services or other) while charging a premium for advanced features, functionality, or related products and services. The word 'freemium' is a portmanteau combining the two aspects of the business model: 'free' and 'premium'." http://en.wikipedia.org/wiki/Freemium [Last visited Dec 18, 2011]

the direct URL is the user's, the system appears well-suited to storage of a wide range of material[8] – such as a large PowerPoint file, for example.[9]

22.   A user could store such a file on Hotfile, intending only to retrieve it personally if necessary, but would have the option of giving out the URL if subsequently she decided to share it with colleagues, who would then be able to access it without being given a personal password.  As no one but the user has the URL to the file, and it is not indexed by search engines, the file is effectively private – yet the user can at any time share the file with colleagues or co-workers simply by giving them the URL. The Google search referred to in note 9 found more than 45,000 *publicly* listed PowerPoint files on Hotfile – that is, PowerPoint files that users have chosen to link to on the open web.   Those files are presumably being shared – after a conference say.  But a user can also use the system for storage or space shifting.  Acting at my direction Elysium Digital found that there were more than 40,000 PowerPoint files on Hotfile, that have been downloaded either zero or one times. And of course, PowerPoint files are only one example of this kind of storage.  A counter notice issued in response to an apparently faulty 'notice and takedown' request, for example, reveals that an architecture company was apparently using Hotfile to store drawings of the designs it created for clients.[10]   One can imagine many other such examples.

23.   One reason the plaintiffs have suggested that Hotfile is not used for storage is the absence of password protection on the files.  The implication is that no one would store on a cyberlocker unless the file was protected by a password.  However, once one understands the architecture of Hotfile, this particular objection is completely unconvincing, in my opinion.  Files stored on Hotfile, if the user does not reveal or post the URL, are actually considerably *more* secure than files stored on common types of password-protected online storage.  Consider files that are stored on a user's email or iTunes account.  An outsider who wished to get access to that account and see the material would need to provide a username and password to do so.  In both these cases, however, the username is the person's email address.  Anyone who has had an e-mail from me or who has seen my e-mail posted on my website already has the username.  Now the password alone protects the

---

[8] Hotfile URLs include the ID of the content and a randomly generated number. And the result is sufficiently long and complex as to be highly, highly unlikely for any other person to stumble upon by accident – actually more unlikely, as I will explain in a moment, than guessing a password on many typical forms of email or online storage. Hotfile does not index files. The large search engines such as Google only index a file on Hotfile if a user has chosen to publicly post the URL somewhere on the open web. If the user chooses not to do that, the file effectively cannot be accessed without the user's consent – the filename could not be discovered in any way.

[9] A search on Google on December 29th 2011 for ".ppt OR .pptx site:hotfile.com" (i.e. files with the PowerPoint file extensions .ppt or .pptx on the Hotfile site) returned  45,800 hits. These are the PowerPoint files on Hotfile that *have* had their URL's posted publicly. There are presumably more that have not had their URL's posted publicly and which could not be found without the storing user's consent.

[10]  *See* Exhibit C.

content. Password rules vary.  Assume here that the password can be composed of any number and any lowercase letter. If the password is a 7 character alphanumeric, longer than most passwords, the chances of "brute forcing" that password – that is of obtaining the password by random computerized guessing is 1 in 78 billion.  Assuming 10 efforts a second, it would take a "brute force" attack (i.e. one that simply tries every different combination of letters and numbers) 248 years to gain the password and get access to the stored material.  That certainly provides security.  But how does it compare to a file posted to Hotfile where the user keeps the URL and never shares it with anyone?  (Search engines do not index Hotfile files unless the user posts the link elsewhere on the open web.)  An outsider who knows I have stored a file on Hotfile, but does not know the URL will need to guess the URL in order to get access to the content.  He knows that the URL begins http://www.hotfile.com of course, but nothing else.  A Hotfile URL is composed of two parts, a numerical upload ID and a second 7 character identifier. Together, they make up the URL.  For example, http://hotfile.com/dl/97361133/4bc1eqz/. In order to guess the 7 character identifier, which is also composed of any number and any lowercase letter, the outsider would face the same odds as the person guessing my password – 1 in 78 billion.  But *in addition* he would also need to guess the upload ID.  In other words it is actually harder to get access to the URL of a particular Hotfile file than to get access to a typical kind of online password protected storage.

24.  The fact that 57,923,301, or 54%, of the files on Hotfile have no downloads suggests that users are employing the system for something other than file transfer. Users who rely on Hotfile for temporary storage will most likely have zero downloads. Certainly many of them will. By excluding this central, and very probably legal, use, Dr. Waterman's method, in my opinion, presents a legally misleading picture of Hotfile. I would note that Dr. Waterman's testimony[11] in prior cases of alleged contributory and vicarious copyright infringement included a different statistical method as well as a download study – a study of files that were "made available," that is, that were uploaded to the system. That was in the context of a peer-to-peer system where the possibility of storage effectively did not exist.  Yet there, Dr. Waterman's study effectively had two parts; one focused on the act of uploading and the other that of downloading. Had some variant of that technique been included here, in addition to the study of downloads, Dr. Waterman's statistical picture could have included the storage function of Hotfile and Mr. Zebrak would have had to assess the legality of such storage.  Dr. Waterman's statistical analysis would thus not have neglected the possibility that Hotfile.com, the cyberlocker and file transfer site, was indeed being used as a cyberlocker. The method he uses here does neglect that possibility. In fact, he states in his deposition that, in this case, he was instructed by plaintiffs' counsel to look only at downloads.[12] In my opinion, this is clearly an error.

25.   At my direction, Elysium Digital examined the Hotfile database and found that an additional 6,182,360, or 5.76%, of the files on Hotfile have only one registered download, a number of downloads consistent with both storage and space-shifting – potentially licit uses. The 'one download' files do appear in Dr. Waterman's sample, but they are given a

---

[11] *See for example* Exhibit A; Usenet Declaration paragraph 5.
[12] Waterman Depo. p. 212.

8

reduced weight relative to those that are downloaded more frequently.

> Within each selected day, the sample frame was obtained by taking the dailydownload data and expanding the record of each file to capture the total number of recorded downloads of that file on that day. For example, if a file was downloaded 5 times in a day, the record would be expanded to reflect five separate downloads of that file.[13]

26.  This method has a striking result.  Imagine that there were to be only 10 files on the Hotfile system – eight an example of legal (no download) storage, one an example of legal (one download) space shifting of licitly purchased commercial content and one a commercial film that was illicitly uploaded and was then downloaded nine times. The eight files that were not downloaded would be ignored by the study, the file that was downloaded once would appear a single time, and the file that was illicitly downloaded would appear nine times. As a result, Dr. Waterman would classify the system as having at least 90% illicit uses.  In addition, if Mr. Zebrak assessed the legal status of the file without considering the number of times that it was downloaded, as I believe he did, he would classify the single download space-shifting file as also being illicit, despite the fact there is a very strong argument this is a fair use under section 107.[14]  In that case, the Waterman protocol would describe the system as 100% infringing.

27.  A file downloaded nine times appears nine times in the total listing, in order to identify the relative percentage of illicit *downloads*.  But if this is extrapolated into an assessment that 90% of the *uses* of the system are illicit, the conclusion becomes unsupportable. *Sony* directs courts to look at *types of uses* in assessing a system or product. It also rejects the conclusion that a system be classified as legal or illegal based on its predominant use. Thus, any study that merely includes statistical assessment of downloads, if not accompanied by other statistical surveys that include the zero download files, will fail to provide an assessment on which a court applying *Sony*'s standard can rely. In this case, the focus on downloads alone actually excludes a majority of the files on the system from Mr.

---

[13] RULE 26(a)(2)(B) REPORT OF DR. RICHARD WATERMAN, paragraph 12

[14] *See* for example the explicit endorsement of such a position in the *Diamond* case. "The Rio merely makes copies *in order to render portable, or "space-shift," those files that already reside on a user's hard drive. Cf. Sony Corp. of America v. Universal City Studios*, 464 U.S. 417, 455 (1984) (holding that "time-shifting" of copyrighted television shows with VCR's constitutes fair use under the Copyright Act, and thus is not an infringement). Such copying is paradigmatic noncommercial personal use entirely consistent with the purposes of the Act." *Recording Indus. Ass'n of Am. v. Diamond Multimedia Sys., Inc.*, 180 F.3d 1072, 1079 (9th Cir. 1999). [Emphasis added.]  Subsequent cases in the peer-to-peer context have cast doubt on whether this finding would hold true in a situation where a user sought to i.) claim fair use privileged access  on a peer-to-peer network to *someone else's* copy of a copyrighted work that the user himself had purchased, ii.)  if that copy was being shared with the entire world.  But in the context of a zero or one download storage or space shifting on a cyberlocker neither of those other factors obtains and *Diamond's* premise would therefore strongly suggest fair use.

9

Zebrak's review and ignores a type of use that would clearly qualify as an actual current, and potential future, substantial non-infringing use.

**ii.) Questionable Decision to Include  Pornographic Files**

28. Dr. Waterman made the decision to include pornographic files though, as specified in his protocol, content that the Jenner and Block team classified as illegal or child pornography was removed from the database.  Not all prior empirical studies in cases of alleged contributory, vicarious or inducement liability included pornographic files in the empirical assessments of copyright infringement.  In the *Grokster* case, for example, all pornographic content appears to have been deliberately omitted.[15] But both Mr. Zebrak's description of his protocol,[16] and the plethora of content with tasteful titles such as "Wreck My Asian Virgin A\*\*" or "Big Wet T\*\*s # 10" in the Waterman study show that the opposite decision was made in this case. No explanation was given for that different methodology. Mr. Zebrak then proceeded to find the vast majority of that pornographic content "highly likely infringing." It is remarkable how many of the files listed in Dr. Waterman's study have salacious or disgusting file names, particularly in contrast to the relatively smaller percentage of the sample that actually contains verified studio content, that is to say, content in which the plaintiffs might actually have any copyright interest.

29. The impact of the decision to include pornographic works is significant.  For example,

---

[15] The excluded "pornography" category in the *Grokster* study covered all pornography, not merely illegal (and particularly) child pornography, meaning that a much wider category of files was excluded from the infringement study. Dr. Hausman's report describes the classification as "'Porn,' *meaning that the file was plainly pornographic, including files that, from their metadata, appeared clearly to constitute illegal pornography* (e.g., child porn, etc.)" Declaration of Charles J. Hausman in Support of Plaintiffs' Motions for Summary Judgment at paragraph 22[Emphasis added.] Dr. Hausman's report is also clear that these files were then excluded from the study.  "Once works were assigned to a particular category, spoofs, porn, junk/damaged/unintelligible, virus/malicious, KPL, and illegal files were removed from the sample per the protocol established by Professor Olkin, and the first 1,800 files obtained through Kazaa and through Morpheus (3,600 total) that fit one of the confirmed infringing/noninfringing; highly likely infringing/ noninfringing; or unknowable categories were analyzed for copyright infringement." *Id.* at paragraph 23. Thus Dr. Hausman excluded *all* pornography, illegal or not.
[16] Mr. Zebrak and Dr. Waterman, by contrast to Dr. Hausman, only excluded illegal pornography. "I understand that Dr. Waterman's protocol calls for exclusion of any file that, by its metadata, appears to contain child pornography or other illegal pornography, before the files are requested from Hotfile. Consistent with that approach, and in consultation with Dr. Waterman, I excluded any sample file from the study that, upon further review, I believed might likely contain child or other illegal pornography. All of these files were replaced in the sample set of 1750 files that I reviewed with another randomly selected file per Dr. Waterman's pre-established protocol." RULE 26(a)(2)(B) REPORT OF MR SCOTT ZEBRAK, paragraph 7. I could find no explanation for the variance in method from the Hausman study.

of the first 100 files in the Zebrak study, 25 seemed by their titles[17] likely to have pornographic content. Of those, Mr. Zebrak counted 22 as "Highly Likely Infringing" 2 as "Non-infringing" and one as "Child Pornography." (The latter one being the only file which would be removed from the study.) In other words, 22 of the files tagged by Mr. Zebrak as "Highly Likely Infringing" in that 100 file stretch appear likely to be pornography – approximately 25% of the files identified as infringing in that set of files. Under the protocol used by Dr. Hausman in the *Grokster* case, all of those files would have been removed from the study. By contrast, in that same 100 file sample, only nine files are listed as "Confirmed Infringing (Studio)," that is, as being content in which the plaintiffs might actually have a copyright interest. The relatively small percentage of studio content is striking.

30. Pornographers certainly can have enforceable intellectual property rights and it is doubtless commendable to see the plaintiffs looking out for their interests so assiduously here. Nevertheless, there are reasons other than tastefulness why prior studies may have chosen to omit pornographic content, and why the court here might choose to put less weight on this fraction of Dr. Waterman's statistics and Mr. Zebrak's determinations.

31. One reason that pornographic content may sometimes be omitted from surveys of potentially infringing works is that it is very difficult, as compared to mainstream commercial content, to assess its copyright status. Consider the task that Mr. Zebrak and his team faced, forced to spend the holiday season going through what sounds like gigabytes of porn. Thankfully, I was spared this chore, but, as a legal scholar I am at a loss to think of how I could reliably determine the copyright status of so much pornographic content in such a short time-frame. Some producers of adult films clearly do *not* intend them to be spread freely and indeed litigate their claims of copyright infringement assiduously. This is an important point, one which presumably Mr. Zebrak and Dr. Waterman considered, and it should not be overlooked. On the other hand, the scholarly literature on the economics of pornography stresses that some of it is distributed free,[18] using indirect methods such as advertising, or the lure of longer versions or higher quality versions on a pay site to generate revenue. Indeed articles stress that some pornographers energetically push content at viewers, even when those viewers are unwilling,[19] and newspaper coverage has stressed the multiple business methods that the adult film industry has been using to generate revenue.

> Michael Herman, director of business development at Adult Entertainment Broadcast Network — owner of PornoTube.com, a YouTube-like site with user-generated content — says exposure on the Internet is ideal for a company's branding. PornoTube, started nearly a year ago, generates 10 million to 15 million hits a day — making it one of the 200 most-popular sites on the Web, according to

---

[17] I note for clarity's sake that neither filename nor file title is a sure indicator of the contents of a file.
[18] Simon Bowmaker, *Economics of Pornography* in ECONOMICS UNCUT 174-175 (2000).
[19] Jerry Ropelato, *Tricks Pornographers Play* Internet Filter Software Review http://internet-filter-review.toptenreviews.com/tricks-pornographers-play.html

Alexa, which tracks Internet traffic. Most of PornoTube's user-generated videos are free, but clips are limited to a few minutes. Consumers who want more must pay. PornoTube partners with others to sell subscriptions to paid websites, dating services and video-on-demand. "It's become an invaluable tool for us to promote business partnerships" with adult studios, Herman says. And it's a valuable outlet for adult performers. "I can do short clips just for the Internet," says Sunny Lane, an actress in Southern California who owns Sunnylanelive.com. "It's a way to make more money and gain more exposure."[20]

32. Distribution of many of the types of pornographic content I have just mentioned on Hotfile would not be illicit, at least if it were expressly or impliedly licensed as it apparently sometimes is. Then, what of non-commercially produced videos by amateur exhibitionists – who now have access to high quality digital photographic equipment? Mr. Zebrak apparently did classify as non-infringing or unknowable some works tagged as amateur content, but how can one tell where the line is? And what of the user-generated remix containing excerpts from multiple films featuring favorite performers or positions? That would present a challenging fair use analysis though not one I would choose to put in a final exam. Finally, what of adult films where the copyright owner is not known or cannot be found? The term of art "orphan works" seems particularly inappropriate when dealing with such content, but it does not seem unreasonable to believe that many pornographic production companies are – literally – fly-by-night operations, where after several years the copyright owner may not exist as a corporate entity, or may have no interest in policing the rights to its work.

33. Given the difficulties in making any, let alone all, of these assessments in an objectively reliable manner, were I designing the legal protocols for the Waterman/Zebrak study, I would have omitted pornographic content from the analysis. I wish to stress however, that Dr. Waterman's choice to include pornography, unlike the decision implicitly to exclude zero download files from review, is not necessarily by itself an error. Reasonable minds could differ about whether it should be done or not – given the nature of the content. But once that decision has been made in the affirmative, a question is raised for the court about the reliability of that particular portion of the evidence if no *confirmation* of the copyright holder's objection to the sharing of the file is obtained. My own opinion is that little weight can be put on that portion of the files in the survey, at least without certification from the pornographers in question, similar to that that Mr. Zebrak received from the studios for their commercial content, that the file is indeed "confirmed infringing." Thus, I believe that the Waterman/Zebrak study should either have omitted pornography altogether, or included it but only classified it as infringing if there was confirmation from the copyright holder. This is both because of the difficulty of identifying with certainty the copyright status of this particular content, and because of the reality that some purveyors of pornography may not object to having their work shared, particularly if it drives traffic to a

---

[20] Jon Swartz, *Purveyors of Porn Scramble to Keep Up With Internet* USA Today (Updated 6/12/2007) available at http://www.usatoday.com/tech/techinvestor/industry/2007-06-05-internet-porn_N.htm (last visited Dec 30, 2011)

particular site, or increases demand for a longer commercial version.   That possible diversity of viewpoint about the desirability of sites that allow for viral distribution of copyrighted content raises an additional issue in this litigation given the disparity between the high levels of pornography found on Hotfile and the relatively low levels of confirmed studio content. In the words of the *Sony* Court,

> In an action for contributory infringement against the seller of copying equipment, the copyright holder may not prevail *unless the relief that he seeks affects only his programs, or unless he speaks for virtually all copyright holders with an interest in the outcome.*[21]

Because of the choice made by Dr. Waterman to include pornography and a number of other types of content when some copyright holders in those types of content have a different business model of digital distribution than that of the major studios, I question whether that last requirement has been satisfied.

### III
### FLAWS IN MR. ZEBRAK'S ASSESSMENT OF COPYRIGHT STATUS

34.   Beyond the general methodological problems with the Waterman study, I have questions about specific decisions that Mr. Zebrak made in his review of the content to determine its copyright status. In my opinion, there are flaws in his methods.

35. First, because he is applying Dr. Waterman's protocol, he does not examine any zero download files in order to assess their copyright status. This excludes 54% of the files on the system – and one of the most important potential uses of the system – from consideration. I have pointed out the flaws this introduces to the study in Parts I and II of this Rebuttal Report and will not repeat those points here.

36. Second, it appears that, in those files that he *did* examine, Mr. Zebrak makes a clear methodological error.   Effectively, his method seems to have focused intensively on the copyright status of the file itself, omitting full consideration of two key factors that one would need to examine in order to be able to classify a file as "highly likely infringing."

- The type of use involved, including whether the conduct would constitute a fair use under section 107.
- The full range of possible forms of implied or express license by the copyright owner that would make the distribution legal.

i.)  Failure to Assess *Type* of Use: Fair Use

37. I pointed out earlier that 5.76% of the files on Hotfile have only a single registered download. As with zero-download storage and backup, there is a very strong argument that

---

[21] *Sony Corp. v. Universal City Studios, Inc.*, 464 U.S. 417, 447 (1984). [emphasis added]

a user who purchases commercial, copyrighted content and "space shifts" a single copy of that content to a different computer, using Hotfile as the storage and download method, is making a fair use and is thus not violating the exclusive rights of the copyright holder. It was precisely a version of this argument that won the day in *Sony*. The content was copyrighted, commercially produced and was copied without permission – nevertheless the court, having considered all the aspects of the use, declared that it was a fair use. Space shifting was explicitly endorsed as a fair use in *RIAA. v. Diamond Multimedia Sys., Inc.*[22] As I pointed out earlier, cases in the peer-to-peer context have cast doubt on whether this finding would hold true in a situation where a user sought to i.) claim fair use privileged access  on a peer-to-peer network to *someone else's* copy of a copyrighted work that the user himself had purchased, ii.) if that copy was being shared with the entire world. But in the context of zero or one download storage or space shifting on a cyberlocker neither of those other factors obtains. *Sony* and *Diamond* would therefore strongly suggest fair use. Mr. Zebrak's deposition suggests that he took it to be black letter law that any file that is even theoretically available to others cannot thereby constitute space shifting or storage fair use.[23] In the context of a peer-to-peer network where numbers on downloads are unavailable this position might be credible. In a situation where we know the number of downloads to be zero or one, or in a situation where the link is not available on the open web, *Diamond's* reasoning returns full force. At the very least, we cannot assume by the design of the study itself that such uses are not fair. The one download files return us squarely to the central category of uses in *Sony* and *Diamond*.

38.  So far as I can tell, Mr. Zebrak's analysis of downloads on Hotfile does not attempt to assess whether the use is of this type. Rather, from his description of his method, it would appear that his approach is one-dimensional. He looks at the legal status of the file in question and, if it is commercially produced and under copyright, with no evidence of formal open licensing, assumes that all copying is infringement.  An analyst applying a similar method in the *Sony* case would have looked at the nature of the content in question – the movie *Shane*, say.  The analyst would have discovered that *Shane* was commercially produced, was under copyright and was shared without permission. He then would have concluded, without looking at any other circumstances, including the number of copies made or by whom, that this was "highly likely infringing."  But an analysis with these assumptions would have found that all the uses of the VCR were "highly likely infringing."  In other words, it would have omitted the key variable on which *Sony* turned.

---

22 *Recording Indus. Ass'n of Am. v. Diamond Multimedia Sys., Inc.*, 180 F.3d 1072, 1079 (9th Cir. 1999).

23 "[W]e're dealing with viral distribution  of full-length commercial works, you know, without the authority of the copyright owner.  That's -- that's what I concluded, and, you know, fair use is not applicable in that scenario.  That's well established." DEPOSITION OF SCOTT ZEBRAK at 296.  But in a situation where the file is only downloaded once, or the link to the file is not made available on the open web we cannot assume "viral distribution" of copyrighted works.  We may well be dealing with exactly the kind of single copy, private storage dealt with in *Sony* and *Diamond*. Those uses – uses where there are zero or one copies made – do not somehow become unfair because the storage is "in the cloud" rather than in an iPod or on a dusty shelf behind the television.

39. There are a number of ways in which Mr. Zebrak's analysis could have been more accurate. The simplest would be to acknowledge that, in the case of 'one download' files, the fair use calculation made it impossible to say that the file was "highly likely infringing" and thus meant it must be included in the "unknowable" category. Other more complex methods that capture more of the factors relevant to fair use are also possible, such as classifying all single download files *that are not linked to on the open web* as "noninfringing" and those that are linked as "possibly infringing." A simple Google search would have enabled such a procedure, one that clearly distinguished between those files that were available publicly, and those that were effectively inaccessible to all but the uploader – itself further evidence of fair use. A failure even to consider the possibility of these forms of fair use renders the legal conclusions of the analysis particularly problematic in any study that purports to give the court relevant facts about the application of the test in *Sony*, a case that explicitly required attention to exactly such contextual issues. This appears to be a clear flaw in Mr. Zebrak's study. A study of a peer-to-peer network such as in the cases of *Napster* or *Grokster* would not need to pay as much attention to these factors, precisely because on a peer-to-peer network archival storage and backup is effectively impossible and space shifting less likely. A study of a cyberlocker site, however, has to pay attention to such issues. It is important to remember that Dr. Waterman's protocol excludes 54% of the files – the files with zero registered downloads – which could represent legal usage. When one adds to this the fact that Mr. Zebrak fails to consider fair use in looking at the 5.76% of files that were downloaded once, it seems that a total of nearly 60% of the files on Hotfile most likely to represent legal uses were either excluded from the study or classified using an incorrect procedure.

**ii.) Errors in Classifying Content that Is Shared With Permission or Otherwise Legal to Distribute**

40. First, let me be clear that I am respectful of the daunting task that Mr. Zebrak faced in attempting to survey the copyright status of such a large number of files in a short period of time. Yet I have concerns about whether his method was accurate when applied to copyrighted content that was shared under an express or implied license. To his credit, Mr. Zebrak correctly identifies as non-infringing (and not illegal) those open source programs mentioned in my initial report that are found within his sample. That includes iReb and sn0breeze, the two most distributed files on the Hotfile system, and JDownloader, which is also very highly ranked. Yet beyond the world of software that is formally under an open source license, his method appears to have been tilted in the direction of finding content infringing even if there is strong evidence that it is shared with permission. Here are some examples:

41. **Orbit Downloader**[24]  Orbit Downloader is a download assistant that is available for free download from http://orbitdownloader.com. The opening line in the site's "metatags" – the description of the site's content by the webdevelopers – is <meta name="description" content="Orbit Downloader is a free social music, video and file downloader.."> Elsewhere

---

[24] Orbit Downloader is listed as file number 1510 in Mr. Zebrak's spreadsheet.

on the Orbitdownloader site, one can find the XML or Extensible Markup Language, data for the Portable Application Description.

> <MASTER_PAD_INFO>Portable Application Description, or PAD for short, is a data set that is used by shareware authors to disseminate information to anyone interested in their software products. To find out more go to **Error! Hyperlink reference not valid.**>[25]

The XML data provided by the developers of OrbitDownloader formally defines its qualities as follows. On each line a formal characteristic of the program is given between brackets that look like this <>....</>.

> <Program_Name>Orbit Downloader</Program_Name>
> <Program_Version>4.1.0.2</Program_Version>
> <Program_Release_Month>06</Program_Release_Month>
> <Program_Release_Day>28</Program_Release_Day>
> <Program_Release_Year>2011</Program_Release_Year>
> <Program_Cost_Dollars>0</Program_Cost_Dollars>....
> <Program_Type>Freeware</Program_Type>[26]

That is, the developers of the software are explicitly identifying it as not merely zero cost but as "freeware." If one goes to other popular and relatively authoritative download sites, such as CNet,[27] one will see the program listed as "freeware," and available for free download. Finally, if one simply Google searches for "Orbit Downloader License," Google, which has a "license search feature" will return the following:

Google   Orbit Downloader License

Search   About 1,070,000 results (0.12 seconds)

Everything   **Best guess for Orbit Downloader License is Freeware**
Images   Mentioned on at least 6 websites including orbitdownloader.com, qarchive.org and orbitdownloader.com - Show sources - Feedback

Faced with this evidence, Mr. Zebrak classified Orbit Downloader as "Highly Likely Infringing." The sources he gave to back up that conclusion included the Orbitdownloader .com site from which I have quoted, a site that clearly lists the program as both free and

---

[25] http://dl.orbitdownloader.com/dl/pad_file.xml (visited Dec 30, 2011)
[26] http://dl.orbitdownloader.com/dl/pad_file.xml (visited Dec 30, 2011) [emphasis added]
[27] http://download.cnet.com/Orbit-Downloader/3000-2071_4-10600926.html [last visited January 2nd 2012]

16

freeware. When asked about Orbit Downloader in his deposition, his reasoning appeared to be that – absent evidence that a company *specifically* authorized a particular distribution channel such as Hotfile – content is to be classified as "highly likely infringing," even where the copyright owners themselves classify it as freeware.[28]  Of course, a company might distribute at zero cost through certain sites and prefer not to distribute through others. Copyright gives them the legal right to make that choice. Yet if they formally classify their product as "freeware" and fail to include any End User License Agreement to the contrary, I think the argument for either express or implied license to reproduce is a solid one.  At the very least, from this evidence one could not responsibly classify such a program as *"Highly Likely* Infringing."

42. **Photography 101: Professional Photography Tips Tutorial**[29]   Mr. Zebrak lists Photography 101 as Highly Likely Infringing.  Photography 101 is in fact a popular set of podcasts by Scott Wittenburg, a photography teacher who distributes his podcasts freely online.[30]  Mr. Wittenburg's own site includes links to free versions of these podcasts (though, like many purveyors of free content, he also has a paid "app" that allows you to view the content more easily on your smartphone. This viral distribution of free content as an advertisement for other services is a common business method online and one that Mr. Zebrak's working assumptions might lead him to misclassify.)  Defendant's counsel gave me an affidavit from Mr. Wittenburg.  In that affidavit, which is attached, Mr. Wittenburg states "I know that by making my podcasts available for free on the internet, that people are able to download them and also repost them.  So long as a person is not charging money for my podcast, I do not have any problems with this."[31] Individuals clearly could download Mr. Wittenburg's podcast from Hotfile without being charged money.   This appears to be a legal reposting of Mr. Wittenburg's podcast. It certainly cannot be classified, as Mr. Zebrak does, as "highly likely infringing."

43. **DirectX**[32]  DirectX is Microsoft's collection of multimedia and gaming API's (Application Programming Interfaces) that allow games and multimedia programs to play on, and thoroughly use, the capabilities of Windows platforms.   Thus, developers of games frequently need to distribute the DirectX libraries together with their games. Microsoft freely distributes the DirectX libraries under an End User License Agreement (EULA)[33] that explicitly permits game developers to distribute the DirectX libraries with their games.

---

[28] "So, you know, the fact that it was doing that on its own web site doesn't -- doesn't make it less likely to me -- I'm saying that awkwardly.  The fact that it's doing that on its own web site, if it's doing that, doesn't -- doesn't change my opinion that the distribution of it through Hotfile was unauthorized." Deposition of Scott Zebrak  at 307.

[29] Photography 101 is listed as file number 132 in Mr. Zebrak's spreadsheet.  It contains 7 of Mr. Wittenburg's podcasts.

[30] http://scottwittenburg.com/ [last visited Jan 3rd 2012]

[31] Affidavit of Scott Wittenburg 19th December, 2011.  EXHIBIT E.

[32] DirectX is part of a set of files listed as file number 30 in Mr. Zebrak's spreadsheet.  *See* EXHIBIT H (Direct X Exhibits).

[33] END-USER LICENSE AGREEMENT FOR MICROSOFT SOFTWARE DirectX 9.0 Software Development Kit Update (October 2004)  (Attached.)

That is, Microsoft not only makes the program available freely, it does so under a license that allows a game developer to *redistribute* the Direct X library in or with their game.   Mr. Zebrak classifies what is apparently a ski jumping game – Skoki 2006 – as highly likely infringing and states that this is because the game folder includes DirectX.  At my direction, the computer consulting company Elysium Digital examined the files that Mr. Zebrak classified as infringing.  So far as I can tell, they are the files covered by Microsoft's EULA. One of the files has a slightly different hash, but I think that it may simply be an earlier version of the program. In fact, if one installs DirectX from the game distribution, Elysium Digital confirmed that, during the installation, one is required to assent to a EULA binding the user to the terms of the DirectX EULA, thus complying with the requirements that Microsoft had set up for the "redistributable" portion of DirectX.  Based on these facts, I do not think Mr. Zebrak can classify the software as "highly likely infringing" for its inclusion of the DirectX files.  In fact it appears to be distributed in exactly the way Microsoft envisioned in writing the "redistributable" portion of the EULA.  I would also note that in practice the software is widely available around the World Wide Web on reputable and highly visible sites where drivers or API libraries can be found – such as "Major Geeks." Elysium Digital identified multiple examples of the DirectX software being made freely available by itself, suggesting, but not proving, that Microsoft tolerates distribution even more widely than the license suggests.  That implication is not necessary for my analysis, however.  Based on all of these facts, I would say the copyright status of the DirectX library, the software Mr. Zebrak focused on, is either "likely non-infringing" or, at the most conservative, "unknown."  It cannot in my view be classified as "highly likely infringing."

44.  **Farming Simulator "Mods"**    This litigation has been an enlightening experience in many ways, but none perhaps more delightful than the discovery that there is a great interest in a game called "Farming Simulator."[34]   Farming Simulator, published by Giants Software is a simulator game akin to "Sim City."  The player makes certain choices and based on that, her farm thrives or fails to thrive.  Farming Simulator, like many games, allows users to create new aspects to the game.  Indeed it provides an editor program that assists the user to do so. In some other games, these new aspects consist of new levels or landscapes in which the game is played.  In the case of Farming Simulator, users can create new features called "Mods" that generally consist of new types of farm equipment that the game will feature.  Interestingly, and contrary to the assumption that commercial providers of copyrighted works would never relinquish any aspect of control over their works, makers of copyrighted games frequently allow and even encourage this practice.  This practice has sufficiently fascinated scholars, that it has attracted its own academic literature, including articles such as *The Labour of User Co-Creators: Emergent Social Network Markets?*[35] The practice, and the academic literature, are directly relevant to this litigation in that they demonstrate another reason that one cannot assume that high quality, commercially produced online content is only shared illicitly.  Sharing that content

---

[34] http://www.farming-simulator.com/  [last visited January 6th 2012]
[35] John Banks & Sal Humphries, The Labour of User Co-Creators : Emergent Social Network Markets? 14 *Convergence: The International Journal of Research into New Media Technologies* vol. 401-418 (November 2008).  The canonical book on the more general practice is Eric von Hippel, DEMOCRATIZING INNOVATION (MIT Press 2005).

licitly is in fact a central part of many business models.

45.   Giants Software is one of the companies that encourages this practice, that is, it encourages its users to produce and to share "Mods."   As mentioned before, Giants Software actually includes an editor program in the game to make it easier for users to create Mods.  They have even held competitions as an incentive to the practice, a fact noted on the website Mr. Zebrak cites in his reasons for claiming the Mods are infringing.[36] In the sample of 1750 files examined by Mr. Zebrak there are multiple examples of Farming Simulator Mods – that is, multiple file directories containing Mod files, each one of which Mr. Zebrak assessed and classified separately. Co-counsel in this case sent eight of those files to Giants Software, the copyright holders in and developers of Farming Simulator, to confirm that the company had no objection to the sharing of these Mods. Of the eight, Mr. Zebrak had found seven "highly likely infringing" and one non-infringing. Mr. Schwegler of Giant Software provided an Affidavit confirming that all of the files were not infringing. He also provided an email stating "I got the files. and checked them all. They are all free mods created by fans of our game and are legal to share anywhere on the web including Hotfile. The items do not infringe on our copyrights and do not contain cracks, serial keys or similar illegal software which would compromise our products." It is hard to think of a more definitive answer.[37] In my opinion Mr. Zebrak's classification of "Highly Likely Infringing" for seven of the Mods is clearly incorrect.   Elysium Digital discovered two additional Mods, AA01 and BiginParadies, both listed as "highly likely infringing." (All Mods are listed in the attached analysis.)[38] Given these facts, I would classify these files, too, as highly likely non-infringing, but I was not able to confirm this with Mr. Schwegler before this report was to be filed.

46.   **Opera Portable Browser**  Opera Portable Browser is a version of the Opera web browser that can be run from a USB stick. Mr. Zebrak classified it as highly likely infringing. There are both free and paid versions of the browser. An e-mail inquiry to Opera elicited a response[39] that seems to indicate they do not object to cloud storage of the free version. At the time this report was filed, I was still attempting to discover whether the version of software shared on Hotfile was the free version.

47.   These examples are indicative of a larger point.  Many, many copyright holders allow

---

[36] http://www.farming-simulator.com/modContest2011.php [last visited January 6th 2012]

[37] One could postulate the Mod creators objecting to the copying of their Mods but I think this far fetched since the only way for them to get online is for the user to post them himself. Further, the fact that users *like* sharing their Mods and showing their competence at creating them is well established in the scholarly literature cited earlier. Users do sometimes ask for attribution – one such request was included in the Mods mentioned here. The file posted on Hotfile included the requested attribution. Another Mod contained a claim for rights to an "Excerpt" of code. This too seems consistent with permission from the author of the Mod.

[38]  *See* Elysium Farming Simulator analysis, EXHIBIT G.

[39] *See* EXHIBIT F.

redistribution of their work online, some of them as part of a profit making strategy, others because they have simply chosen to share the work. Mr. Zebrak stated several times in his deposition that his assumption is that if content was being generated as part of a profit making enterprise, then the copyright holder would object to it being shared and therefore he could classify it as "highly likely infringing."[40]  But on the world of the Internet, that assumption is a problematic one.  Microsoft is a profit-making company but they want developers of games to embed Microsoft's software platform, DirectX, inside their games and thus they give permission to distribute versions of games that include those files.  Mr. Wittenburg makes high quality podcasts giving lessons in photography, but distributes those podcasts freely. Farming Simulator players create and freely share Mods – a practice encouraged by the copyright holder in the game. Mr. Zebrak's assumption causes him to incorrectly classify all of these examples.  To use an example that does not occur in Mr. Zebrak's study, Nine Inch Nails distribute their album Ghosts I-IV under a Creative Commons license.  It is legal to copy and redistribute non-commercially online.  Yet at the same time, they sell CD's and digital copies of their music and in fact that album was the best selling MP3 download album on Amazon.com in 2008.[41] Note the way in which this situation does not fit Mr. Zebrak's background assumptions. Similarly, I note that there is music from little-known artists from Bulgaria and Turkey in Mr. Zebrak's study.[42]  Do the musicians, particularly those in countries with less well-developed music distribution systems than the United States, object to viral distribution of their songs or do they welcome it as a way of building recognition and increasing demand for concert performances? I would want more facts before I assumed that all this content was "highly likely infringing."  Finding this pattern of errors in the files I did examine makes me question whether the pattern continues in the ones I did not.

48.  In the case of Hotfile, these concerns are not academic ones.  I have attached to this study a collection of Counter Notices to Takedown requests received by Hotfile.[43]  Those protesting include a musician who shares the musician's own work online using Hotfile, a company that writes and freely distributes firmware updates for Samsung products and an architecture company that uses Hotfile for storage of drawings made for clients.  All are complaining that their work has been wrongly removed when they intended to share it with permission, wanted to use the Hotfile service as one of their distribution channels, and had every right to do so.  Classification of the copyright status of works shared online is extremely difficult and time-consuming – for content owners and online services alike.  It is highly factually specific and easily distorted if one assumes that all of those distributing content online have the same business model or motivation.  The Counter Notices, as well as the points made in my initial report, raise an additional point – one that was of particular interest to the *Sony* Court.  There are clearly individuals and companies who

---

[40] Zebrak at p. 218-219; p. 257-258 ("professional artist" wouldn't allow distribution through Hotfile); p. 276-278 ("antithesis").

[41] Nate Anderson, *Free Nine Inch Nails Albums Top 2008 Amazon MP3 Sales Charts* http://arstechnica.com/media/news/2009/01/free-nine-inch-nails-albums-top-2008-amazon-mp3-sales-charts.ars

[42] See Zebrak Depo. pp. 209 and 280-84 (Turkish Rap) and 266-70 (Bulgarian Pop).

[43] *See* EXHIBIT C.

wish to use the Hotfile service to pursue entirely legitimate goals ranging from personal back up and storage to creating and distributing open source software and being compensated for it through the Affiliate Program to storing architectural drawings. These users wish to use this service to do things that are entirely in accord not only with the Copyright Act, but with the larger goals in Article 1 section 8 clause 8 of the Constitution. This lawsuit, and the plaintiffs' curiously narrow design of Dr. Waterman's study, implicate – and in the case of storage and space shifting, improperly ignore – those unquestionably legitimate uses. Discussing the analogy between contributory copyright infringement and contributory patent infringement, the Supreme Court had this to say;

> When a charge of contributory infringement is predicated entirely on the sale of an article of commerce that is used by the purchaser to infringe a patent, the public interest in access to that article of commerce is necessarily implicated. A finding of contributory infringement does not, of course, remove the article from the market altogether; it does, however, give the patentee effective control over the sale of that item. Indeed, a finding of contributory infringement is normally the functional equivalent of holding that the disputed article is within the monopoly granted to the patentee.[44]

Because it believed that intellectual property holders should not be able to veto technological developments or services merely because those developments *could* be used to violate their intellectual property rights, the Court found that possibility unacceptable in the copyright as well as the patent context so long as the article had "substantial non-infringing uses." I mention this legal background only to make the point that it is unfortunate that so few of those uses are reflected in Dr. Waterman and Mr. Zebrak's study.

49. Finally, I have more general concern about the accuracy of Mr. Zebrak's classification. It seems at times that his default assumption is that content is "highly likely infringing" and that considerable evidence is required to shift the needle on that point. He includes, for example, an 1871 Russian book[45] on the subject of weaving and embroidery techniques as "highly likely infringing." The illustrations in the book are quite beautiful, but the idea that a book which carries the date "1871" on its cover is "highly likely infringing" in the United States is truly a strange one. (Published works from before 1923 are in the public domain in the United States.[46]) Mr. Zebrak links to a 1976 Dover Books edition on Amazon.com,[47] but this is not the version found on Hotfile. Dover Books is a publishing company that predominantly reissues works that have fallen into the public domain. The cover of the 1976 Dover Books edition is significantly different and the title is in English, making it easy to distinguish between the two at first sight. Dover's copyright would, in any event, only extend to any original material that they added, such as a new cover, not to the underlying

---

[44] *Sony Corp. v. Universal City Studios, Inc.,* 464 U.S. 417 440-441 (1984).

[45] A literal translation of the Russian title would be RUSSIAN ORNAMENT: SEWING, FABRIC, LACE (St. Petersburg: 1871)

[46] 17 U.S.C. § 304

[47] http://www.amazon.com/Russian-Peasant-Needleworkers-Craftsmen-Pictorial/dp/0486232352/ref=sr_1_1?ie=UTF8&qid=1320680095&sr=8-1

21

book or images, which remain in the public domain. Mr. Zebrak also links to another site that does contain the same file found on Hotfile and that correctly identifies the book's date of publication as 1871 and its place of publication as St. Petersburg,[48] so he must have been aware of its publication date. Given these facts, this book is clearly in the public domain and I am surprised to see Mr. Zebrak assert otherwise. Errors such as these in that fraction of his sample I did examine make me wary of the accuracy of Mr. Zebrak's assessments in the remainder of his sample.

<div align="center">

IV

**RELEVANCE OF THE FLAWS IN THE STUDY TO ANY INDUCEMENT LIABILITY CLAIM**

</div>

50. Many of my comments have been directed to the way that the flaws in the Waterman/Zebrak study are problematic for any court investigating "substantial non-infringing uses" under *Sony*. Before concluding, I would like to highlight several key connections of those flaws to the factual analysis a court would perform in assessing any claim of *Grokster* style inducement liability.

51. First, and most obviously, the *Grokster* test is a multi-part one, with no single portion being sufficient. In applying such a test, a finder of fact will be guided by a sense of the overall *bona fides* of the service in question. By omitting key legal uses of Hotfile from the study, the Waterman report, in my opinion, provides a misleading starting place for such an assessment.

52. Second, the specific omissions from the Waterman study are relevant to particular components of the *Grokster* test. *Grokster* asks a court to engage in a complex study of whether a service is aiming to profit principally from infringement. If one omits storage or space shifting from one's picture of Hotfile, as the Waterman report does, then features of Hotfile's system – such as its removal of files that have not been downloaded after three months, for example, can be cast in a negative light. If one includes storage and space shifting, however, and the fact that Premium users are allowed to store their material permanently regardless of whether it is downloaded, then the business model looks rather different and altogether more benign.

---

[48]http://translate.google.com/translate?hl=en&sl=ru&u=http://valhalla.ulver.com/f49/t1 1428.html&ei=_y20TqTMM5KRgQefm9iwBA&sa=X&oi=translate&ct=result&resnum=1&s qi=2&ved=0CCQQ7gEwAA&prev=/search%3Fq%3D%25D0%25A0%25D1%2583%25D1 %2581%25D1%2581%25D0%25BA%25D0%25B8%25D0%25B9%2B%25D0%25BE%2 5D1%2580%25D0%25BD%25D0%25B0%25D0%25BC%25D0%25B5%25D0%25BD%25 D1%2582.%2B%25D0%25A8%25D0%25B8%25D1%2582%25D1%258C%25D1%2591, %2B%25D1%2582%25D0%25BA%25D0%25B0%25D0%25BD%25D0%25B8,%2B%25D 0%25BA%25D1%2580%25D1%2583%25D0%25B6%25D0%25B5%25D0%25B2%25D0 %25B0.rar.html%26hl%3Den%26biw%3D685%26bih%3D300%26prmd%3Dimvns Collection patterns of Russian folk ornamentation (embroidery, fabrics, laces). Title: Russian ornament. Sewing, fabric, lace Year: 1871 Publisher: St. Petersburg Series / Issue: A series or Issue: Pages: 42 Quality: good Size: 9.81 MB Format: DjVu Language: Russian