# FILED UNDER SEAL

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.: 11-CIV-20427-WILLIAMS/TURNOFF

DISNEY ENTERPRISES, INC.,
TWENTIETH CENTURY FOX FILM
CORPORATION, UNIVERSAL CITY
STUDIOS PRODUCTIONS LLLP,
COLUMBIA PICTURES INDUSTRIES,
INC., and WARNER BROS.
ENTERTAINMENT INC.,



     *Plaintiffs,*

v.

HOTFILE CORP., ANTON TITOV, and
DOES 1-10,

     *Defendants.*

_____/

HOTFILE CORP.,

     *Counterclaimant,*

v.

WARNER BROS. ENTERTAINMENT INC.,

     *Counter-Defendant.*

_____/

## MOTION AND MEMORANDUM OF LAW IN SUPPORT OF
## DEFENDANT ANTON TITOV'S MOTION FOR SUMMARY JUDGMENT

FILED UNDER SEAL                    CASE NO.: 11-CIV-20427-WILLIAMS/TURNOFF

## TABLE OF CONTENTS

Page

MOTION ...................................................................................................................... 1

MEMORANDUM OF LAW .......................................................................................... 1

I.     INTRODUCTION ................................................................................................ 1

II.    STATEMENT OF FACTS ................................................................................... 2

       A.    Mr. Titov Is A Technology Specialist - Not The "Guiding Spirit" Of Hotfile – And The Studios' Allegations To The Contrary Are Demonstrably False ........................................................................................ 2

           1.    Mr. Titov Did Not Originate The Idea For Hotfile ...................................... 3

           2.    As Hotfile's Smallest and Minority Shareholder, Mr. Titov Does Not Control Hotfile .................................................................................... 4

           3.    Mr. Titov Was Not Responsible For The Adoption Of Hotfile's Business Plan Or The Design Of Its Affiliate Program .............................. 4

           4.    Neither Mr. Titov Nor Hotfile Have Implemented Technical Features To Frustrate Copyright Enforcement Efforts Nor Have They Refused To Implement Reasonable Technologies To Mitigate Infringement – And Mr. Titov Does Not Have Authority To Take Such Steps In Any Event ............................................................. 5

           5.    Mr. Titov's Responsibilities Are And Have Always Been Limited .......... 6

           6.    Mr. Titov Did Not Pay Uploading Users ..................................................... 7

           7.    The Founding Of Lemuria Had Nothing To Do With Webazilla's Receipt of A Subpoena ............................................................................... 8

III.   LEGAL STANDARD ......................................................................................... 9

IV.  SUMMARY JUDGMENT SHOULD BE GRANTED IN FAVOR OF MR. TITOV ............................................................................................................... 10

       A.    The Evidence Fails To Create A Triable Issue Of Fact To Hold Mr. Titov Liable Under A "Guiding Spirit" Theory .......................................... 10

       B.    The Evidence Fails To Create A Triable Issue of Fact To Hold Mr. Titov Liable Under A Vicarious Liability Theory ......................................... 13

       C.    The Studios Have Not And Cannot Prove That Mr. Titov Is Subject To Personal Jurisdiction in Florida. .......................................................... 17

           1.    The Studios Cannot Prove That Mr. Titov Is Subject To General Jurisdiction ................................................................................................ 17

           2.    The Studios Cannot Prove That Mr. Titov Is Subject To Specific Jurisdiction ................................................................................................ 19

FILED UNDER SEAL                           CASE NO.: 11-CIV-20427-WILLIAMS/TURNOFF

**TABLE OF CONTENTS**
(continued)

**Page**

V.      CONCLUSION.............................................................................................................. 20

FILED UNDER SEAL                                    CASE NO.: 11-CIV-20427-WILLIAMS/TURNOFF

## MOTION

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, Defendant Anton Titov hereby moves for summary judgment on the Studios'[1] copyright infringement claim. The Studios cannot establish a genuine issue of material fact that Mr. Titov could be held personally liable for the infringement alleged in this case. Moreover, he is not subject to personal jurisdiction in this Court. He is accordingly entitled to judgment as a matter of law. This motion is based on the attached Declaration of Anthony Schoenberg, the Declaration of Anton Titov attached to the motion for summary judgment filed concurrently by Hotfile, the accompanying Memorandum of Law, the Statement of Material Facts and such other matter as may be presented.

## MEMORANDUM OF LAW

### I.      INTRODUCTION

After a year of discovery stretched across two continents, production of millions of pages of documents, over four days of examination of Mr. Titov by deposition, the expenditure of untold sums in legal fees, and the consumption of countless hours of this Court's time, the Plaintiffs have no evidence sufficient to maintain a claim against individual defendant Anton Titov.

This lawsuit began with unsubstantiated factual allegations regarding Mr. Titov's purported activities at Hotfile – allegations that the Court was required to accept as true for the purposes of Rule 12(b)(6). In response to Mr. Titov's challenge to these allegations at the outset of the case, the Court held that the Studios had plead sufficient facts to survive his Motion to Dismiss. In particular, the Court relied on the Studios' allegations that:

> Mr. Titov manages Hotfile, that he adopted the business model leading to the massive infringement, that he personally refuses to implement technologies that could reduce the infringement, and that he has paid users to upload files. At the pleading stage, this suffices …

[Dkt. 94 at 8.]

One year later, the Studios have come up entirely empty in their effort to find any proof for their allegations. Contrary to their allegations, Mr. Titov does not manage Hotfile. He is a

---

[1] The Plaintiffs are five major motion picture studios: Disney Enterprises, Inc., Twentieth Century Fox Film Corporation, Universal City Studios Productions LLLP, Columbia Pictures Industries, Inc. and Warner Bros. Entertainment Inc. (collectively the "Studios").

minority shareholder who has neither operational control nor decision-making authority over the company.  He did not conceive of, nor did he adopt, the Hotfile business plan.  Neither he, nor Hotfile, have refused to implement reasonable technical measures that would reduce infringement—to the contrary, Hotfile has consistently implemented ever-improving measures to reduce infringement.  Finally, Mr. Titov did not pay users to upload files.  Discovery has exposed a vacuum of support for Plaintiffs' allegations against Mr. Titov.

In any event, the Studios cannot prove that Mr. Titov has the necessary contacts with the state of Florida to establish personal jurisdiction over him.  Mr. Titov's sporadic and infrequent contacts with Florida do not approach the kind of "continuous and systematic" contacts needed to assert general jurisdiction, and there is no evidence of any activity by Mr. Titov directed to Florida that would support an assertion of specific jurisdiction.

The Studios have failed to meet their burden of proving the existence of a genuine issue of material fact that would entitle them to proceed to trial.  Summary judgment should be granted in Mr. Titov's favor.

## II.   STATEMENT OF FACTS

### A.   Mr. Titov Is A Technology Specialist - Not The "Guiding Spirit" Of Hotfile – And The Studios' Allegations To The Contrary Are Demonstrably False

Hotfile is an Internet file-hosting company that was founded in the Fall of 2008 by three individuals residing in Sofia, Bulgaria:  Rumen Stoyanov, Atanas Vangelov and defendant Anton Titov.  (Dec. of Anthony Schoenberg (attached hereto as Exhibit A), Ex. 2 at 18:23-19:3.)  Hotfile offers premium network storage and access that enables its global user base to reliably store, use, and share digital files.[2]  The Studios have sued Hotfile for secondary copyright infringement alleging that Hotfile is liable for the conduct of Internet users who upload copyrighted material to Hotfile's servers.  In an attempt to punish Mr. Titov personally for Hotfile's corporate activities, Plaintiffs have sued Mr. Titov under a misguided "guiding spirit" theory of liability.  Specifically, the Studios alleged that Mr. Titov "personally directed and participated in, exercised control over, and benefited from" the alleged infringement-inducing conduct of Hotfile by:

- "[A]doption of a business plan dependent upon massive copyright infringement,"

---

[2] The Hotfile business model and the services that Hotfile provides are described in more detail in Hotfile's summary judgment motion, filed concurrently with this motion.

- "[D]esign and implementation of Hotfile's 'Affiliate' and 'Referral' programs, which actively encourage copyright infringement,"
- "[I]mplementation of technical features to frustrate copyright owner enforcement efforts,"
- "Hotfile's refusal to implement any of the readily available technologies to mitigate the infringement,"
- Paying "at least some of Hotfile's uploading users,"
- Managing "the operations of Hotfile," and
- Founding Lemuria "after Hotfile's previous online service provider received a subpoena concerning Hotfile's infringements."

Compl. ¶ 45.  The Studios cited to these same allegations in opposing Mr. Titov's 12(b)(6)

Motion to Dismiss.  *See* Dkt. 52 (Plaintiffs' Opposition To Defendants' Motion To Dismiss

Plaintiffs' Complaint) at 18.

Discovery is now closed.  The Studios cannot prove their allegations against Mr. Titov,

as demonstrated by the undisputed facts discussed below.

      1.    <u>Mr. Titov Did Not Originate The Idea For Hotfile</u>

Hotfile evolved out of a business partnership between Messrs. Stoyanov and Vangelov

that dates back to 2003.  (AT Fact[3] 1.)  That year, the two of them founded Blue Ant, a company

that develops websites and that they continue to own as equal partners.  (AT Fact 1.)  Between its

founding in 2003 and the founding of Hotfile in 2008, Blue Ant developed various websites.

(AT Fact 1.)  For a short time in mid-2000s, Mr. Titov was a Blue Ant employee performing

programming, search engine optimization, and server administration.  (AT Fact 2.)  Mr. Titov

has never had any ownership interest in Blue Ant.  (AT Fact 2.)

In 2008, Mr. Stoyanov conceived of the idea for the Hotfile business.  (AT Fact 4.)  At

the time, there were already a number of successful file hosting companies in the market,

including then-market-leader Rapidshare.  (AT Fact 4.)  Mr. Stoyanov initially became

interested in the idea for the file-hosting business after speaking with friends who expressed

frustration regarding the difficulty of coordinating tasks among team-members working on

projects.  (AT Fact 4.)  Mr. Stoyanov's friends expressed an interest in finding a web-based

solution that would allow them to upload materials, check the progress of others and download

what the others had uploaded.  (Ex. 2 at 19:6-18 to Exhibit A.)  Thus, Mr. Stoyanov came to Mr.

---

[3] "AT Fact" refers to an undisputed fact set forth in the Statement Of Undisputed Material Facts In Support Of Defendant Anton Titov's Motion For Summary Judgment, filed herewith.

FILED UNDER SEAL                          CASE NO. 11-CIV-20427-WILLIAMS/TURNOFF

Vangelov with the idea of founding a venture to fill this need, and Mr. Vangelov agreed that this
was a good idea for a new business venture.  (AT Fact 3.)

At this time in 2008, Mr. Titov was working for a leading Bulgarian web-hosting
company called host.bg.  (Dec. of Anthony Schoenberg (attached hereto as Exhibit A), Ex. 1 at
14:14-15:12.)  Messrs. Stoyanov and Vangelov decided to approach Mr. Titov about getting
involved with this new venture because of Mr. Titov's web-hosting experience at host.bg and
because they were familiar with Mr. Titov's technical skills based on his prior work at Blue Ant.
(Ex. 1 at 99:17-20 to Exhibit A.)  Thus, in the Fall of 2008, Messrs. Stoyanov, Vangelov and
Titov together founded Hotfile.  (Dec. of Anthony Schoenberg (attached hereto as Exhibit A),
Ex. 3 at 28:6-14; Ex. 2 at 18:23-19:3 to Exhibit A.)

2.      As Hotfile's Smallest and Minority Shareholder, Mr. Titov Does Not
        Control Hotfile

Mr. Titov holds the fewest number of shares in Hotfile of any shareholder .  (AT Fact 5.)
He currently holds a 26% beneficial interest in Hotfile, while Messrs. Stoyanov and Vangelov
each own a 37% beneficial interest.[4]  (AT Fact 5.)  Start-up capital for the business was provided
by Messrs. Stoyanov and Vangelov.  (AT Fact 3.)  Other than the three founders, the personnel
who work on the operations of Hotfile are and have always been Blue Ant employees.  (AT Fact
6.)  These Blue Ant employees all report to Messrs. Stoyanov and Vangelov (*i.e.,* the owners of
Blue Ant), *not* to Mr. Titov.[5]  (AT Fact 6.)  Mr. Titov's primary role vis-à-vis these Blue Ant
employees is to provide guidance, as needed, on technical matters.  (AT Fact 6.)

3.      Mr. Titov Was Not Responsible For The Adoption Of Hotfile's Business
        Plan Or The Design Of Its Affiliate Program

As the Hotfile business was being formulated, Mr. Stoyanov, assisted by Messrs.
Vangelov and Titov and a Blue Ant employee, researched the competition in this space to learn
about the functionalities of other services.  (AT Fact 8.)  They ultimately decided upon a
"freemium" business model, similar to the one used by Rapidshare.   (Exhibit A ¶ 7.)  Under that
model, users can store files for a limited time and get downloads at limited speeds for free.

---

[4] Initially, Mr. Titov's share was only 20%, while the other two shareholders each had 40%
shares.  (AT Fact 5.)
[5] For a time, there was one individual performing work for Hotfile as an independent contractor.
(AT Fact 7.)  He also reported to Messrs. Stoyanov and Vangelov.  (AT Fact 7.)

4

Hotfile derives revenues when users upgrade to "premium" subscriptions.  Premium users pay up to $9 per month for faster downloads, permanent file storage, and other benefits.  This fixed fee does not vary based on what or how much use is made of Hotfile.com— users can use Hotfile for personal cloud storage, downloading open source software, or streaming video.  The fee compensates Hotfile for its substantial investments in building out its state-of-the-art server and networking infrastructure.  (HF Fact[6] 19.)

The founders also learned that affiliate programs are a common and established way for Internet-based businesses – including file hosting companies – to increase traffic to their websites.[7]  (AT Fact 7.)  Ultimately, Mr. Stoyanov – who generally had responsibility for matters of business and finance at Hotfile – made the decision to implement the Hotfile Affiliate program, modeled on longstanding affiliate programs of other established companies in the marketplace such as Rapidshare.  (AT Fact 7.)  Consistent with these pre-existing models at companies like Rapidshare, the Affiliate program was conceived as a way to attract more users to Hotfile and incentivize people to use Hotfile rather than other services or methods to share files.  (Ex. 2 at 25:5-26:2 at Exhibit A.)  After making the decision to adopt the Affiliate program, Mr. Stoyanov designed the payment criteria that constitutes the Affiliate program.  (AT Fact 8.)  Mr. Titov's input into the Affiliate program was limited to how to store information in Hotfile's database rather than the business terms of the program.  (AT Fact 8.)  Hotfile's affiliate program – like many others on the market – distributes a portion of its revenue to users whose actions generate more premium subscribers.  Hotfile's affiliate program applies equally to all forms of digital files, regardless of whether they are video, software or anything else.  (Dec. of Anton Titov (attached as Exhibit B to Hotfile's Motion for Summary Judgment, filed herewith ("HF")) at ¶ 8.)

> 4.      Neither Mr. Titov Nor Hotfile Have Implemented Technical Features To Frustrate Copyright Enforcement Efforts Nor Have They Refused To Implement Reasonable Technologies To Mitigate Infringement – And Mr. Titov Does Not Have Authority To Take Such Steps In Any Event

No evidence supports the assertion that Mr. Titov has "implemented technical features to

---

[6] "HF Fact" refers to an undisputed fact set forth in the Statement Of Undisputed Material Facts In Support Of Defendant Hotfile's Motion For Summary Judgment, filed herewith.

[7] Affiliate programs are ubiquitous among web-based business and are utilized by such well-known companies as Amazon, eBay and many others.

frustrate copyright owner enforcement efforts" or that it has "refused to implement technologies" to mitigate infringement.  To the contrary, Hotfile has implemented a variety of technologies to minimize infringement by users of the Hotfile website.[8]  Those steps include the following:

- Hotfile developed a tool called a "Special Rightsholder Account" that allows copyright owners to instantaneously take down files that they believe infringe their copyrights without any oversight from Hotfile (AT Fact 9.)

- Hotfile implemented hash technology to prevent any future downloads of a file that is subject to a takedown notice and block any future uploads of the same file (AT Fact 9.)

- At a substantial cost, Hotfile implemented state-of-the art digital fingerprinting technology from Vobile to prevent users from uploading files containing copyrighted works and recently upgraded to Vobile's newest such technology, vCloud9. (AT Fact 9.)

In any event, even if the Studios could prove that Hotfile had adopted (or refused to adopt) technologies for improper purposes – which it cannot – the Studios cannot muster any evidence to hold Mr. Titov *personally* responsible for such decision-making.  Mr. Titov does not have the authority to make unilateral decisions effecting important aspects of Hotfile or its business or operations.  (AT Fact 10.)  He is not authorized to establish general policy or to make decisions regarding substantial aspects of the operations of Hotfile without the approval and vote of the other shareholders.  (AT Fact 10.)

### 5.   Mr. Titov's Responsibilities Are And Have Always Been Limited

The three founders of Hotfile have differing responsibilities.  Mr. Titov is not responsible for the day-to-day operations of Hotfile.  (AT Fact 11.)  Rather, day-to-day operations are handled by Mr. Stoyanov, who is also responsible for matters of business and finance.  (AT Fact 11.)  Mr. Vangelov is responsible for DMCA-related issues and other legal matters, dealing with potential investors, advertising opportunities and communications with external contractors.  (AT Fact 11.)  Mr. Titov is responsible for technical matters relating to the company's software and hardware, which sometimes requires his attention as little as once a month.  (AT Fact 11.)  In that, capacity, Mr. Titov was the lead developer of the Hotfile storage and delivery technology (supported by two Blue Ant employees), which involved writing the program code and designing the database.  (AT Fact 22.)  The functionality of the Hotfile website, however, was largely

---

[8] These steps are discussed at length in Hotfile's motion for summary judgment, filed concurrently with this motion.

derived from existing competitors, with the implementation input coming from all three founders, with some assistance from a Blue Ant employee. (Ex. 1 at 23:12-25:15, 28:19-30:8 to Exhibit A.) The website itself was designed by a Blue Ant employee and an outside contractor. (Ex. 1 at 23:12-25:15, 28:19-30:8 to Exhibit A.)

6.    <u>Mr. Titov Did Not Pay Uploading Users</u>

Despite the Studios' assertions, Mr. Titov has never paid Hotfile's uploading users; all such payments were made by Hotfile. (AT Fact 12.) At the inception of Hotfile's operations, it learned that PayPal imposed substantial limitations on transactions involving Panamanian accounts. (HF Exhibit B ¶ 40.) Because Hotfile Corp. is a Panamanian corporation, this meant that Hotfile required a different method for conducting PayPal transactions with its customers. (HF Exhibit B ¶ 40.) Hotfile's solution was to form Hotfile Ltd., a Bulgarian corporation wholly owned by Hotfile, to operate a PayPal account on behalf of Hotfile. (HF Exhibit B ¶ 40.) This took some time to implement, and Hotfile Ltd could not make payments until it was legally established. (HF Exhibit B ¶ 40.) As a result, while they were waiting for the formation of Hotfile Ltd. to be completed, Mr. Titov contributed his own PayPal account to Hotfile, and for a brief period of time in 2009 Hotfile made payments to Affiliates via this PayPal account issued to Mr. Titov. (HF Exhibit B ¶ 40.) These payments were made on behalf of Hotfile Corp., using exclusively Hotfile Corp. funds. Before using this account to conduct any transactions on Behalf of Hotfile Corp., Mr. Titov first removed all of his own funds from the PayPal account and opened a second, separate account for his personal use. (HF Exhibit B ¶ 40.)

As soon as Hotfile Ltd. was formed (in approximately May 2009), title to the PayPal account was transferred from the name of Mr. Titov to Hotfile Ltd., and Hotfile Ltd. has continued to use this account to make all payments to Affiliates ever since. (HF Exhibit B ¶ 40.) PayPal expressly permits such person-to-business account transfers in order to allow start-up companies to get their operations off the ground. (HF Exhibit B ¶ 40.) This PayPal account was never used simultaneously for both Hotfile business and for Mr. Titov's personal use; Mr. Titov's money was never used to pay a Hotfile user; and at no time did Mr. Titov receive any money from any Hotfile user. (HF Exhibit B ¶ 40.) If this were enough to hold Mr. Titov personally liable, then no officer of a start-up company would ever be safe from personal liability, because this is exactly the kind of unexpected circumstance that start-ups and small business owners encounter all the time.

7

7.   The Founding Of Lemuria Had Nothing To Do With Webazilla's Receipt
     of A Subpoena

The Hotfile website commenced operations in February 2009. (Titov Decl. 13.) In approximately May of 2009, Hotfile began to experience dissatisfaction with its Internet connectivity service provider, Webazilla, and the following month communicated to Webazilla that it was going to terminate Webazilla's services. (HF Exhibit B ¶ 41; AT Fact 13.) Shortly thereafter, Hotfile began deploying all new servers to be used with a new Internet connectivity provider, Limelight. (HF Exhibit B ¶ 41; AT Fact 13.)

The termination of the relationship with Webazilla took several months, as it required many hardware changes and reconnections, including the relocation of 30-40 servers between two different data centers several miles apart. (HF Exhibit B ¶ 41; AT Fact 13.) In order to avoid these problems in the future, Mr. Titov offered to incorporate a new entity, Lemuria Communications, Inc. ("Lemuria"), to deliver Internet connectivity (and other related services) to Hotfile going forward. (HF Exhibit B ¶ 41; AT Fact 13.) Thus, in October 2009, Mr. Titov, incorporated Lemuria, a Florida corporation of which he is the sole owner, manager and director, and which pays him a monthly salary.[9] (Fact 32.) Lemuria thereafter commenced providing Hotfile with its Internet connectivity utilizing a variety of bandwidth sources (including Limelight).[10]

Throughout this litigation, the Studios have sought to impugn Mr. Titov by claiming that the decision to form Lemuria and sever the relationship with Webazilla was a response to Webazilla receiving a subpoena related to Hotfile. Besides being completely irrelevant to the allegations of their Complaint, this, too, is false. Hotfile was dissatisfied with the service it was receiving from Webazilla due to issues with the quality of the bandwidth providers Webazilla worked with and resulting problems with connectivity. (AT Fact 13.) Indeed, Hotfile communicated to Webazilla that it would terminate its services in June 2009, some two months before Webazilla received a subpoena. (AT Fact 13; Dec. of Anthony Schoenberg (attached

---

[9] Mr. Titov incorporated Lemuria in the United States because Hotfile learned that a Panamanian corporation – which Hotfile is – could not obtain Internet Protocol addresses from the Latin American and Caribbean Internet Addresses Registry (LACNIC) for servers located outside of Latin America. *See* Dkt. 30-1, ¶ 3.

[10] Lemuria's operations have begun to expand beyond providing services to Hotfile, as it now provides colocation and connectivity services to an unrelated company called Neterra, which is in the streaming television business. (HF Exhibit B ¶ 41.)

hereto as Exhibit A), Ex. 4.)  Forming Lemuria and terminating Webazilla was a way to ensure that Hotfile would have a reliable connectivity provider and avoid future connectivity problems, obviously a very important issue for a company operating a web-based business.  (AT Fact 13; HF Exhibit B ¶ 42.)

This is the sum and substance of the Studios' factual claims against Mr. Titov.  The true facts have turned out to be dramatically and significantly different than alleged in the Complaint. Because the true facts do not support any theory of liability against Mr. Titov, summary judgment should be granted in his favor.

## III.   **LEGAL STANDARD**

Summary judgment is appropriate where the moving party establishes that "there is no genuine issue as to any material fact and that [it] is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  A factual dispute between the parties will not defeat a motion for summary judgment unless it is both genuine and material.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).  "According to the plain language of Fed. R. Civ. P. 56(e), the non-moving party 'may not rely merely on allegations or denials in its own pleadings,' but instead must come forward with 'specific facts showing a genuine issue for trial.'"  *Birster v. Am. Home Mortg. Servicing, Inc.,* 796 F. Supp. 2d 1376, 1378 (S.D. Fla. 2011).  Once the moving party has carried its burden under Rule 56, "its opponent must do more than simply show that there is some metaphysical doubt as to the material facts" in question. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  Conclusory statements, general denials, and factual allegations not based on personal knowledge [are] insufficient to avoid summary judgment.  Fed. R. Civ. P. 56(e).  Nor may the non-moving party merely attack or discredit the moving party's evidence. *Nat'l Union Fire Ins. Co. v. Argonaut Ins. Co.*, 701 F.2d 95, 97 (9th Cir. 1983).  To defeat a summary judgment, the non-moving party must affirmatively present specific admissible evidence sufficient to create a genuine issue of material fact for trial.  *See Fed R. Civ. P. 56(e); Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).  "A mere 'scintilla' of evidence supporting the opposing party's position will not suffice; there must be a sufficient showing that the jury could reasonably find for that party." *Walker v. Darby*, 911 F. 2d 1573, 1577 (11th Cir. 1990).

**IV.      SUMMARY JUDGMENT SHOULD BE GRANTED IN FAVOR OF MR. TITOV.**[11]

In order to impose personal liability on an individual corporate officer for alleged copyright infringement by the entity, a plaintiff must satisfy one of two tests:  a plaintiff must prove either that the officer (a) personally participated in the infringement or (b) that he had the ability to supervise infringing activity and a direct financial interest in that activity.  *See Playboy Enters. v. Starware Publ'g Corp.,* 900 F. Supp. 438, 441 (S.D. Fla. 1995) (citing *Southern Bell Tel. & Tel. Co. v. Assoc. Tel. Directory Publishers*, 756 F.2d 801, 811 (11th Cir. 1985)).  As is described in more detail below, the Studios have failed to create a triable issue of fact as to Mr. Titov's personal liability under either of these two tests.

**A.      The Evidence Fails To Create A Triable Issue Of Fact To Hold Mr. Titov Liable Under A "Guiding Spirit" Theory**

To hold an individual liable for alleged copyright infringement under the first test requires proof that the individual was the "moving, active, conscious force who caused the infringement*." Chanel, Inc. v. Italian Activewear of Florida, Inc.*, 931 F.2d 1472, 1478 n. 8 (11th Cir. 1991) (applying principle in trademark infringement context).  This is sometimes referred to as "guiding spirit" liability.  *Mozingo v. Correct Mfg. Corp.,* 752 F.2d 168, 174 (5th Cir. 1985) (quoting *Escude Cruz v. Ortho Pharm. Corp.,* 619 F.2d 902, 907 (1st Cir. 1980).  The Eleventh Circuit has explained what this means:

> Merely selling the items cannot turn [a defendant] into a moving, active, conscious force who caused the infringement; if it did, the entire sales force of infringing companies would be personally liable.  The individual liability standard does not ask whether the individual participated or engaged in some infringing act; instead, it asks whether he actively participated as a moving force in the *decision* to engage in the infringing acts, or otherwise caused the infringement as a whole to occur.

*Chanel, Inc.*, 931 F.2d at 1478 n. 8.

The factual record in this case is plainly not sufficient to create a triable issue of fact as to Mr. Titov's personal liability.  Indeed, as already shown, the allegations upon which the Studios based their "guiding spirit" theory against Mr. Titov have proven false.  *See supra*, Part II.  The

---

[11] In addition to the arguments specifically articulated below, Mr. Titov also incorporates by reference those arguments made by Defendant Hotfile.

undisputed facts belie any suggestion that Mr. Titov is the "active, moving force" behind the conduct of which the Studios complain, including the following facts:

- Mr. Titov is a minority (and the smallest) shareholder of Hotfile. (AT Fact 5.)

- The idea for the company and its business model – including the Affiliate program (and the specific payment criteria of the Affiliate program) – were not Mr. Titov's but, rather, were his co-founder's ideas based on pre-existing business models that were apparent in the marketplace. (AT Facts 4, 7, 8.)

- Mr. Titov is not responsible for the day-to-day operations of Hotfile. (AT Fact 11.)

- Mr. Titov does not have authority to establish general policy or make decisions about substantial aspects of the operations of Hotfile without the approval of the other shareholders. (AT Fact 10.)

- Mr. Titov is not responsible for matters of business, finance, or DMCA and legal compliance at Hotfile. His responsibilities are limited to technological issues. (AT Fact 11.)

- The personnel who perform work for Hotfile are employees of Blue Ant and do not report to Mr. Titov. (AT Fact 6.)

It is apparent based on this factual record that the Studios cannot muster evidence sufficient to create a triable issue of fact as to whether Mr. Titov is the "active, moving force" behind Hotfile's allegedly infringing conduct. The *Mozingo* case is on point. There, the plaintiff in a products liability action sued the president, general manager and controlling shareholder of the company that designed the product that caused his injury. *Mozingo*, 752 F.2d at 173. The defendant had personally authorized the production of a prototype of the accused product, and he had expressed reservations about the safety of the product. *Id.* Notwithstanding these facts, the Fifth Circuit affirmed a directed verdict in favor of the defendant because of the absence of evidence that he was the "guiding spirit" or "central figure" behind the wrongful conduct. *Id.* at 173-174. The court was persuaded that a finding of personal liability could not be justified because to find otherwise would mean that "any corporate officer who fails to maintain an almost total ignorance of the products the corporation produces may be personally liable in the event a defective product is produced." *Id.* at 174.

The case for holding Mr. Titov personally liable is far weaker than the case against the individual defendant in *Mozingo*. Unlike the defendant in *Mozingo*, Mr. Titov is not a chief

officer or controlling shareholder of Hotfile.  Unlike the defendant in *Mozingo*, Mr. Titov does not have the authority to direct Hotfile's operations or business, nor does he have authority over Hotfile's personnel.  Furthermore, Mr. Titov was not personally responsible for, nor did he personally authorize, the Hotfile business model or Affiliate program that the Studios claim are responsible for the infringement of their copyrights.  If the Court were to find that Mr. Titov could be liable under these facts, any corporate officer "who fails to maintain an almost total ignorance" of the company's activities could be held personally liable.  *See Mozingo,* 752 F.2d at 174.

In stark contrast to Mr. Titov, courts typically reserve "guiding spirit" liability for individuals who exert singular and dominant control over a corporation and its accused conduct.  *See Morley Music Co v. Continental, Inc.*, 777 F. Supp. 1579, 1580, 1582 (S.D. Fla. 1991) (individual defendant personally liable for copyright infringement where he was the "president and sole shareholder" of corporation and the "manager and operator of day to day affairs"); *j2 Global Communications, Inc. v. Blue Jay, Inc.*, No. C 08-4254 PJH, 2009 WL 29905, at *9 (N.D. Cal. Jan. 5, 2009) (refusing to dismiss individual claim against defendant who was "president and sole officer" of corporation, "set company policies and oversaw day-to-day operations" of the corporation, and was "personally and solely responsible" for the accused conduct); *Playboy Enters.,* 900 F. Supp. at 441-442 (defendant held personally liable for  copyright infringement where he was President and shareholder of corporation and had personally authorized the sale, advertisement and production of the infringing material).  Mere knowledge of alleged infringement is wholly insufficient to hold an individual liable under the "guiding spirit" theory of liability.  *GamerModz, LLC v. Golubev,* No. 8:10-CIV-1466-T-27TGW, 2011 WL 4755026, at *9 (M.D. Fla. Aug. 3, 2011) ("the plaintiff presents no legal authority that an individual can be held personally liable for infringing conduct that he did not bring about, merely because he should have been aware of it.").

Because the evidence here confirms that Mr. Titov had a far more limited role at Hotfile than what the law requires before it will impose personal liability, summary judgment should be granted in his favor.  *See id.* (granting summary judgment to individual defendant where discovery failed to demonstrate that the individual was the "'moving, active and conscious force' in the alleged wrongful conduct"); *Chanel, Inc.*, 931 F.2d at 1478 (reversing summary judgment against individual defendant because "the individual liability standard does not ask whether the

individual participated or engaged in some infringing act instead, it asks whether he actively participated as a moving force in the *decision to engage in the infringing acts, or otherwise caused the infringement as a whole to occur"*) (emphasis added); *Omega, .S.A. v. Giftland Co.,* No. 03-CIV-5808 WJM, 2005 WL 192571, at *4 (D. N.J. Aug. 11, 2005) (refusing on summary judgment to find individual personally liable for infringement due to absence of evidence that he was a "central figure" or "moving force" in the alleged infringements); *Innospan Corp. v. Intuit, Inc.,* No. C 10-04422 WHA, 2011 WL 856265, at *8 (N.D. Cal. Mar. 9, 2011) (denying motion to amend complaint to add claims for trademark infringement against individual officers where facts did not support that they had "complete control," "principal decision-making authority" or were "clearly the central figure" in the challenged activity). *See also Escude Cruz,* 619 F.2d at 907 ("But merely being an officer or agent of a corporation does not render one personally liable for a tortious act of the corporation. Specific direction or sanction of, or active participation or cooperation in, a positively wrongful act of commission or omission which operates to the injury or prejudice of the complaining party is necessary to generate individual liability in damages of an officer or agent of a corporation for the tort of the corporation.") *quoting, Lobato v. Pay Less Drug Stores,* 261 F.2d 406, 408-09 (10th Cir. 1958).

**B.      The Evidence Fails To Create A Triable Issue of Fact To Hold Mr. Titov Liable Under A Vicarious Liability Theory**

The second test for personal liability requires proof that the individual "has the ability to supervise infringing activity and has a financial interest in that activity." *Southern Bell Tel. & Tel. Co.,* 756 F.2d at 811. This is a vicarious liability standard (*see Playboy Enters.,* 900 F. Supp. at 441), and it is reserved for claims of infringement against individuals "who have a dominant influence in a corporation and who have the capacity to control the acts of that corporation...." *Morley Music Co.,* 777 F. Supp. at 1582. "[A]n individual who is the dominant influence in a corporation and has the capacity to control the acts of that corporation may be held jointly liable with the corporation for any proven infringements...." *Nick-O-Val Music. Co., Inc. v. P.O.S. Radio, Inc.,* 656 F. Supp. 826, 828 (M.D. Fla. 1987) (holding individual liable for copyright infringement because evidence showed that he "occupied such a position of dominant influence and control over both corporate Defendants").

As described above, the evidence adduced here does not come close to proving that Mr. Titov exerts a "dominant influence" or otherwise controls Hotfile. *See* AT Fact 5 (minority

FILED UNDER SEAL                                    CASE NO. 11-CIV-20427-WILLIAMS/TURNOFF

shareholder), AT Fact 10 (does not have unilateral or controlling decision-making authority), AT

Fact 6 (does not have authority over Hotfile personnel), AT Fact 11(responsibilities limited to

technological matters), AT Facts 7-8 (did not conceive of Hotfile or Affiliate program or design

Affiliate program). This factual record cannot support the Studios' claim under the vicarious

liability test.

      The case for vicarious liability is even more attenuated in this case because the "primary

infringers" are Hotfile users. As noted in the case law, "The imposition of vicarious liability on

a controlling individual, even in the absence of any knowledge of infringement, is premised on

the belief that the defendant '*is in a position to police the conduct of the 'primary' infringer*'."

*Boz Scaggs Music v. KND Corp.*, 491 F. Supp. 908, 914 (D. Conn. 1980 ) (emphasis added)

(imposing personal liability on radio station general manager who had "responsibility to oversee

the day-to-day activities of the station" and had "pretty much complete control over the

operations of the station," *id.*).

      As explained in Hotfile's summary judgment motion filed concurrently with this motion,

Hotfile does not have the ability to control or "police" the conduct of its users. Indeed, the

DMCA expressly holds that service providers are *not* obligated to police the conduct of

uploading users. *See Perfect 10, Inc. v. CCBill LLC*, 488 F.3d 1102, 1113 (9th Cir. 2007) ("The

DMCA notification procedures place the burden of policing copyright infringement –identifying

the potentially infringing material and adequately documenting infringement – squarely on the

owners of the copyright ...."). Under the DMCA, a service provider does not have the "right and

ability to control" infringing conduct of uploading users unless the service provider has

knowledge and awareness of *the specific infringing files* at issue. *UMG Recordings v. Shelter

Cap. Partners et al.*, __ F.3d __, 2011 WL 6357788, at *15 (9th Cir. 2011); *Viacom Int'l Inc. v.

YouTube, Inc.*, 718 F. Supp. 2d 514, 527 (S.D.N.Y. 2010) ("The 'right and ability to control' the

activity requires knowledge of it, which must be item-specific...the provider must know of the

particular case before he can control it. "); *Capitol Records, Inc. v. MP3Tunes, LLC*, No. 07 Civ.

9931 (WHP), 2011 WL 5104616, at *14 (S.D.N.Y. Oct. 25, 2011) (online storage locker does

not have control over infringing activity where "users alone choose ... the songs ... they store in

their lockers); *Hendrickson v. eBay, Inc.*, 165 F. Supp. 2d 1082, 1093 (C.D. Cal. 2009) ("[T]he

'right and ability to control' the infringing activity, as the concept is used in the DMCA, cannot

simply mean the ability of a service provider to remove or block access to materials posted on its

website or stored on its system."); *CoStar Grp. Inc. v. LoopNet*, 164 F. Supp. 2d 688, 704 (D. Md. 2001) (service provider's ability to remove or block access to material does not establish "control"); *cf. Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146, 1174 (9th Cir. 2007) ("Google's supervisory power is limited because Google's software lacks the ability to analyze every image on the [I]nternet, compare each image to all the other copyrighted images that exist in the world ... and determine whether a certain image on the web infringes someone's copyright." (alterations in original) (internal quotation marks omitted)).

Hotfile does not have knowledge of what its users upload and does not control this. (HF Fact 15.) Knowledge and control are with the users and Hotfile "does not participate in those decisions." *Capitol Records*, 2011 WL 5104616, at *14. Accordingly, Hotfile does not have the ability to "control" or "police' the conduct of its users, who are the "primary" alleged infringers. It goes without saying, then, that Mr. Titov – a minority shareholder who does not control Hotfile or its operations – is not "in a position to police" the conduct of Hotfile's users. *Boz Scaggs Music*, 491 F. Supp. at 914. Accordingly, he cannot be held personally liable. *Id.*

Additionally, the evidence fails entirely to create a triable issue of fact as to whether Mr. Titov has a direct financial interest in the alleged infringing activity. The "direct financial interest" factor requires that the plaintiff prove an "obvious and direct financial interest in the exploitation of copyrighted materials." *Parker v. Google*, 422 F. Supp. 2d 492, 500 (E.D. Pa. 2006) (holding insufficient the plaintiff's unsupported allegation that "Google's advertising revenue is directly related to the number of Google users and that the number of Google users is 'dependent directly on Google's facilitation of and participation in the alleged infringement.'") It is similarly inadequate as a matter of law for the plaintiff to merely prove that the individual earns a salary or distribution of profits from the entity responsible for the allegedly infringing conduct. *Netbula, LLC v. Chordiant Software, Inc.*, No. C 08-00019 JW, 2009 WL 750201, at *2-3 (N.D. Cal. March 20, 2009). As explained by that court:

> The essential aspect of the direct financial benefit inquiry is whether there is a causal relationship between the infringing activity and any financial benefit a defendant reaps, irrespective of the magnitude of the benefit. There must be an *obvious and direct* financial interest in the exploitation of copyrighted materials. The mere fact that a defendant is an officer and shareholder of an infringing corporation is too attenuated to show a direct financial interest in the exploitation of copyrighted materials. Similarly, a shareholder who receives compensation from an infringing corporation that is unrelated to infringing activity has a financial interest that is too far

> removed from the alleged infringement to be considered a direct financial
> interest.   However, where a defendant is a high ranking executive with a
> majority ownership, or receives payments directly related to the infringing
> activity, he can be held vicariously liable.

*Id.* (internal citations and quotations omitted) (italics in original).

The evidence against Mr. Titov does not come close to meeting the above standard.  First, Hotfile's revenues come entirely from Premium memberships.  (HF Fact 19.)  Premium memberships are content neutral – that is, Premium members pay the same amount for Premium service regardless of the content or nature of the files that the Premium member is uploading, downloading or storing.  (HF Fact 20.)  Thus, Mr. Titov's 26% ownership interest in Hotfile does not constitute an "obvious and direct financial interest in the exploitation of copyrighted materials."  *Netbula, LLC,* 2009 WL 750201, at *2-3

Mr. Titov's other sources of income are even more attenuated.  He earns a modest salary from non-party Hotfile Ltd., which is the entity that processes PayPal transactions with Hotfile customers.  (Ex. 1 at 54:24-55:9 to Exhibit A.)  In addition, he receives a salary from Lemuria, the non-party entity that provides web hosting services to Hotfile.  (Ex. 1 at 54:24-55:9 to Exhibit A.)  Earning salaries from non-parties that provide ancillary services to Hotfile is plainly "too attenuated" to give rise to personal liability.  *See Netbula, LLC,* 2009 WL 750201, at *2-3.

The DMCA and case law interpreting it further refute any suggestion that the Studios can establish the "financial benefit" element.  Under the DMCA, a service provider is not considered to receive a 'financial benefit directly attributable to the infringing activity' where the infringer "makes the same kind of payment as non-infringing users of the provider's service."  (S. Rep. No. 105-190, p.44).  *See also Capital Records,* 2011 WL 5104616, at *14 (refusing to find direct financial benefit because infringing and non-infringing users "paid precisely the same or nothing at all"); *CoStar,* 164 F. Supp. 2d at 705 (no direct financial benefit where infringing and non-infringing users make the "same kind of payment").  As explained above, Hotfile earns money through Premium memberships, in which infringers and non-infringers pay the same rates for their Premium accounts.  (HF Fact 20.)  Accordingly, Hotfile does not obtain a "direct financial benefit" from infringing activity.  *See Capitol Records,* 2011 WL 5104616, at *14.  Moreover, the Studios have failed entirely to adduce any evidence that either Hotfile or Mr. Titov directly profited because of the existence of infringing materials on the website.  This is fatal to the Plaintiffs' claims against Mr. Titov.  *Ellison v. Robertson,* 357 F.3d 1072, 1079 (9th Cir. 2004)

FILED UNDER SEAL                                          CASE NO. 11-CIV-20427-WILLIAMS/TURNOFF

("We note that there is no evidence that indicates that AOL customers either subscribed because of the available infringing material or canceled subscriptions because it was no longer available. While a causal relationship might exist between AOL's profits from subscriptions and the infringing activity taking place on its USENET servers, Ellison has not offered enough evidence for a reasonable juror to so conclude"); *Klein & Heuchan, Inc. v. Costar Realty Info.*, 707 F. Supp. 2d 1287, 1297-1299 (M.D. Fla. 2010) (rejecting individual liability where plaintiff could not specifically prove that the defendant had made additional profit as the direct result of the existence of infringing material). Accordingly, it is beyond doubt that Mr. Titov does not have a "direct financial interest" in infringing activity.

### C.   The Studios Have Not And Cannot Prove That Mr. Titov Is Subject To Personal Jurisdiction in Florida.

Although the Complaint contains an unsubstantiated allegation (which the Court had to consider true at earlier stages of the litigation) that Mr. Titov was a resident of Florida (Cmpt, ¶¶10-12), the undisputed facts demonstrate this, too, is simply not true. As Mr. Titov has stated from the outset of this case, he is a Russian citizen who has resided in Bulgaria for the last two decades. *See* AT Fact 14. His wife, son, mother, and brother all reside in Bulgaria, where Mr. Titov owns a home and a car and pays taxes. (AT Fact 14.)

Similarly, the Plaintiffs' unsubstantiated allegation that Mr. Titov ran Hotfile from Florida was never accurate. Not only does the undisputed evidence conclusively demonstrate that Mr. Titov did not "run Hotfile," there is no evidence that Mr. Titov has had anything but an infrequent and passing contacts with Florida in connection with his work for non-party Lemuria. To the extent that Mr. Titov has, on occasion, performed work while in Florida, such work has neither been continuous nor systemic (AT Fact 16 (stating that Mr. Titov visited non-party Lemuria's office in Florida perhaps ten times)). In any event, Florida's corporate shield doctrine exempts such activities undertaken by Mr. Titov as a corporate officer from consideration as part of the Court's jurisdictional analysis.

### 1.   The Studios Cannot Prove That Mr. Titov Is Subject To General Jurisdiction

In order to prove general jurisdiction, the Studios were required to have proven that Mr. Titov maintained "'continuous and systematic general business contacts' with the forum, so that [he] can properly be considered to be 'present' in the forum." *Am. Overseas Marine Corp. v.*

*Patterson*, 632 So. 2d 1124, 1127 (Fla. 1st DCA 1994); *Baker v. Carnival Corp.*, No. 06-21527-CIV-HUCK, 2006 WL3360418, at *2 (S.D. Fla. Nov. 20, 2006) ("General jurisdiction does not require a connection between a defendant's activities and the cause of action. ...Accordingly, the due process requirements are more stringent, and 'substantial, persistent, continuous, and systematic' contacts with the forum state must be present. ... The defendant's contacts with the forum 'must be so extensive to be tantamount to [a defendant] being constructively present in the state to such a degree that it would be fundamentally fair to require it to answer in [the forum state's courts] in any litigation arising out of any transaction or occurrence taking place anywhere in the world'") (internal citations omitted).

The Studios have failed entirely to adduce any facts which would support general jurisdiction over Mr. Titov in Florida.  To the extent that the Studios have adduced any facts concerning Mr. Titov's presence in Florida, they have shown nothing more than sporadic visits to Florida to perform services in his capacity as a corporate officer or director of Lemuria, which is not a party to this lawsuit.  Such contacts are an insufficient basis upon which to base general jurisdiction, both because they are not "substantial, persistent, continuous and systematic" and also because Florida recognizes a strong corporate shield doctrine in connection with its jurisdictional analysis.[12]  *Radcliffe*, 902 So. 2d at 972 n.4 ("Any activity in one's capacity as a corporate officer or director is exempted"); *Doe v. Thompson*, 620 So. 2d 1004, 1006 (Fla. 1993) (noting that the corporate shield doctrine means that "acts of corporate employee performed in corporate capacity do not form the basis for jurisdiction over corporate employee in individual capacity," and explaining that "the rationale of the doctrine is the notion that it is unfair to force

---

[12] To the extent that during his visits to Florida Mr. Titov spent any of his time engaged in recreation rather than just doing work for Lemuria, those activities would also be wholly insufficient to confer general jurisdiction. *See, e.g. Vax-D Med. Techs., LLC v. Allied Health Mgmt.,* No. 8:04-CV-1617-T-26, 2006 WL 680659, at *4 (M.D. Fla. Mar. 14, 2006) ("Florida courts, however, do not consider sporadic or occasional vacations sufficient to bestow personal jurisdiction"); *Radcliffe v. Gyves*, 902 So. 2d 968, 972 n.4 (Fla. 4th DCA 2005) ("Therefore, the only basis for general jurisdiction against the individual board members is their sporadic or occasional family vacations, which we find to be insufficient"); *Latta v. Latta*, 654 So. 2d 1043 (Fla. 1st DCA 1995) (holding that the trial court did not have in personal jurisdiction over a non-resident husband under Florida's long-arm statute where the husband's activity within Florida was limited to infrequent trips to visit with his wife); *Two Worlds United v. Zylstra*, 46 So. 3d 1175, 1178 (Fla. 2nd DCA 2010) ("Zylstra testified that he has not lived in Florida since 1994 and that he comes to Florida only a few times a year to visit friends and family. His contacts in Florida are insufficient to satisfy section 48.193(2).").

an individual to defend a suit brought against him personally in a forum with which his only relevant contacts are acts performed not for his own benefit but for the benefit of his employer. We approve this distinction.") (internal quotation marks omitted).  Accordingly, there is no basis on which to assert general jurisdiction over Mr. Titov.

2.   The Studios Cannot Prove That Mr. Titov Is Subject To Specific Jurisdiction

"Where a forum seeks to assert specific personal jurisdiction over a nonresident defendant, due process requires that the defendant have fair warning that a particular activity may subject him to the jurisdiction of a foreign sovereign.  This fair warning requirement is satisfied if the defendant has purposefully directed his activities at residents of the forum, and the litigation results from alleged injuries that arise out of or relate to those activities." *Healthcare Appraisers, Inc. v. Healthcare FMV Advisors, LLC*, 10-80293-CIV, 2011 WL 4591960 (S.D. Fla. Sept. 30, 2011) (internal citations and quotation marks omitted).

The Studios have not identified (nor has discovery revealed) any action taken by Mr. Titov in Florida which forms the basis of the complaint against him.  Instead, the Studios have alleged, generally, that Mr. Titov is the "guiding spirit" behind Hotfile.  As is discussed elsewhere in this brief, these unsubstantiated allegations were conclusively disproved during discovery.  Even if this were not the case, discovery has simply failed to adduce any evidence that Mr. Titov took actions in Florida or directed at Florida which would subject him to personal jurisdiction here.

At most, the Studios might argue that Hotfile operates a website which is accessible in Florida, that some of the effects of the alleged infringements took place in Florida, and that (somehow) this is sufficient to assert personal jurisdiction over Mr. Titov.  This very Court, however, has recently rejected a similar argument.  *Liberty Media Holdings, LLC v. Letyagin*, 11-62107-CV-WILLIAMS (Dkt. 47) (2011) ("Precedent, however, establishes that maintaining a website accessible to users in a jurisdiction does not subject a defendant to be sued there; those users must be directly targeted, such that the defendant can foresee having to defend a lawsuit.*"*). *See also Roblor Mktg. Group, Inc. v. GPS Indus., Inc.*, 645 F. Supp. 2d 1130, 1143 (S.D. Fla. 2009) (rejecting personal jurisdiction over the defendant, despite the defendant's operation of an interactive website accessible in Florida, because "traditional notions of due process" precluded an exercise of jurisdiction where the defendant "could not have foreseen being haled in Florida.

19

FILED UNDER SEAL                                    CASE NO. 11-CIV-20427-WILLIAMS/TURNOFF

[The defendant] is not licensed to do business in Florida and has no income from direct Florida sales. [The defendant] has no agents, resellers, and distributors, nor any presence whatsoever in Florida. [The defendant] has never targeted Florida residents through an advertising campaign."); *Zamora Radio, LLC v. Last.FM, Ltd.,* No. 09-20940-CIV 2011, WL 2580401, at *6 69101 (S.D. Fla. Jun. 28, 2011) (rejecting jurisdiction over foreign defendants who operate a website because none of the activities were specifically aimed at Florida, as opposed to users of the internet world-wide); *Instabook Corp. v. Instantpublisher.com,* 469 F. Supp. 2d 1120, 1127 (M.D. Fla. 2006).

　　　Because it is undisputed that Mr. Titov does not have sufficient contacts with Florida to subject him to jurisdiction here in a manner consistent with the Due Process Clause of the United States Constitution, the claims against him individually must be dismissed.

**V.      CONCLUSION**

　　　The evidence is conclusive. Mr. Titov is neither the "active, moving force" behind the allegedly infringing conduct in this case nor is he the "dominant" or "controlling" influence at Hotfile. Rather, he is a minority shareholder and has never had the authority and ability to control the company. The Studios avoided dismissal by relying on inaccurate allegations against Mr. Titov. The extensive discovery they have elicited has now disproved each of the claims relied upon by the court to deny the Rule 12(b)(6) dismissal. Furthermore, Mr. Titov is not subject to general or specific personal jurisdiction in this Court. Accordingly, Mr. Titov is entitled to summary judgment in his favor as a matter of law. A proposed Order is attached hereto as Exhibit B.

DATED: February 17, 2012              Respectfully submitted,

　　　　　　　　　　　　　　　　　　Janet T. Munn, Esq. Fla. Bar No. 501281
　　　　　　　　　　　　　　　　　　Email: jmunn@rascoklock.com
　　　　　　　　　　　　　　　　　　RASCO KLOCK
　　　　　　　　　　　　　　　　　　283 Catalonia Avenue, Suite 200
　　　　　　　　　　　　　　　　　　Coral Gables, Fl 33134
　　　　　　　　　　　　　　　　　　Telephone: 305.476.7101
　　　　　　　　　　　　　　　　　　Telecopy: 305.476.7102

　　　　　　　　　　　　　　　　　　And

                                          20

FILED UNDER SEAL                    CASE NO. 11-CIV-20427-WILLIAMS/TURNOFF

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on February 17, 2012, a true and correct copy of the foregoing

document, was filed conventionally under seal and served on all counsel of record identified

below via e-mail and via FedEx.

Karen L. Stetson, Esq., Fla. Bar No.: 742937
GRAY-ROBINSON, P.A.
Email: Karen.Stetson@gray-robinson.com
1221 Brickell Avenue
Suite 1600
Miami, FL  33131
Telephone: 305.416.6880
Telecopy: 305.416.6887

Karen R. Thorland, Esq. (admitted *pro hac vice*)
Senior Content Protection Counsel
Email: Karen_Thorland@mpaa.org
Motion Picture Association of America, Inc.
15301 Ventura Boulevard, Building E
Sherman Oaks, CA  91403-5885
Telephone: 818.935.5812

Steven B. Fabrizio, Esq. (admitted *pro hac vice*)
Email: sfabrizio@jenner.com
Duane C. Pozza, Esq. (admitted *pro hac vice*)
Email: dpozza@jenner.com
Luke C. Platzer, Esq. (admitted *pro hac vice*)
Email: lplatzer@jenner.com
JENNER AND BLOCK, LLP
1099 New York Avenue, N.W.
Suite 900
Washington, DC  20001
Telephone: 202.639.6000
Telecopy: 202.639.6066

By: _Janet B. Munn_____
Janet T. Munn

4833-6036-6350, v.  1

22

FILED UNDER SEAL                          CASE NO. 11-CIV-20427-WILLIAMS/TURNOFF

*Roderick M. Thompson by Janel S. Munn*

Roderick M. Thompson, Esq. (admitted *pro hac vice*)
Email:  rthompson@fbm.com
Andrew Leibnitz, Esq. (admitted *pro hac vice*)
Email:  aleibnitz@fbm.com
Anthony P. Schoenberg, Esq. (admitted *pro hac vice*)
Email:  tschoenberg@fbm.com
Deepak Gupta, Esq. (admitted *pro hac vice*)
Email:  dgupta@fbm.com
Janel Thamkul, Esq. (admitted *pro hac vice*)
Email:  jthamkul@fbm.com
FARELLA BRAUN + MARTEL LLP
235 Montgomery St.
San Francisco, CA  94104
Telephone:  415.954.4400
Telecopy: 415.954.4480

And

*Valentin Gurvits by Janel S. Munn*

Valentin Gurvits, Esq. (admitted *pro hac vice*)
Email: vgurvits@bostonlawgroup.com
BOSTON LAW GROUP
825 Beacon Street, Suite 20
Newton Center, MA 02459
Telephone:  617.928.1800
Telecopy:  617.928.1802

*Counsel for Defendants Hotfile Corporation
 and Anton Titov*

21