FILED by _____ D.C.

FEB 17 2012

STEVEN M. LARIMORE
CLERK U.S. DIST. CT.
S.D. of FLA – MIAMI

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 11-20427-WILLIAMS/TURNOFF

DISNEY ENTERPRISES, INC.,
TWENTIETH CENTURY FOX FILM CORPORATION,
UNIVERSAL CITY STUDIOS PRODUCTIONS LLLP,
COLUMBIA PICTURES INDUSTRIES, INC., and
WARNER BROS. ENTERTAINMENT INC.,

*Plaintiffs*,

v.

HOTFILE CORP., ANTON TITOV, and
DOES 1-10.

  *Defendants*.
_____/

HOTFILE CORP.,

*Counterclaimant*,

v.

WARNER BROS. ENTERTAINMENT INC.,

*Counterdefendant*.
_____/

## DECLARATION OF STEVE THOMAS KANG IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

### [FILED UNDER SEAL PURSUANT TO PROTECTIVE ORDER]

1.  I am Vice President and Senior Counsel, Anti-Piracy Legal Affairs, at NBCUniversal ("NBCUniversal"). I make this declaration in support of Plaintiffs' Motion for Summary Judgment. Unless otherwise indicated, I have personal knowledge of all of the facts described herein. If called as a witness at trial, I would testify as to the statements in this declaration.

**Confidential**

2. I have been involved in anti-piracy legal work for the past several years, both in private practice and in my work for Universal Music Group prior to joining NBCU. For the past six years, I have served in an anti-piracy legal capacity at NBCUniversal, and also serve as NBCU's representative to the Motion Picture Association of America's ("MPAA") Anti-Piracy Operations Working Group, a collaboration among in-house attorneys, along with technical experts and executives working with those attorneys, from each of the MPAA's member studios (which include, but are not limited to, the five Plaintiffs in the present case). In both capacities, I have been involved during this period in working directly with executives, experts and/or in-house counsel at each of the member studios to analyze the threat to the industry posed by online theft of digital content, understanding the impact that such theft has on the business models of both NBCUniversal and the other MPAA member studios, and setting both NBCUniversal's and the MPAA's strategies in responding to online theft of motion pictures and television programming. I believe I am considered one of the industry's foremost experts in the field of anti-piracy. A copy of my CV is attached hereto as Exhibit A.

3. I understand that the evidence in this case shows that over 945,000 copies of Plaintiffs' works, representing over 10,000 distinct works, have been uploaded to Hotfile, with substantial representation of each of the five studios that has brought this case, and that those copies were downloaded more than 32 million times. I understand that those works include many that would be considered the top theatrical and television hits of each of the Plaintiffs. I submit this declaration to explain how such widespread, unauthorized distribution and reproduction of the Plaintiffs' works by Hotfile causes harm to the Plaintiffs in this case.

4. The massive and easy availability of stolen copies of Plaintiff's intellectual property on Hotfile harms the Plaintiffs in at least the following ways:

    a. It directly displaces or undermines legitimate business channels that are authorized by Plaintiffs.

    b. It more fundamentally devalues intellectual property, as users come to understand and expect that content can be readily available for free (or almost free) on illegitimate platforms such as Hotfile.

    c. It feeds ongoing redistribution of our content in ways that fundamentally undermine the exclusive rights granted to our companies under copyright, and therefore, our companies' business models.

**Confidential**

These are not the sole ways in which Hotfile causes harm to Plaintiffs.

**Displaced Sales and Disruption of Release Windows**

5. The most obvious, and direct, harm caused by the online theft of studio content through Hotfile and sites like it is by displacing legitimate transactions that generate economic value.

6. By way of background, the major motion picture studios (encompassing all five Plaintiffs in this case) all monetize their content by selling access to it to different audiences, through different means, at different times. In the industry, these are known as the "windows" for a given copyrighted asset. For instance, a motion picture is initially monetized during a theatrical window in which the studios sell rights to perform the film to exhibitors, who in turn sell theater tickets. The theatrical window is often staggered across different geographic markets (e.g., a motion picture may open in North America before Europe or other markets). Then the studios monetize the film through other distributors and licensees in later defined time periods and geographical areas, such as pay-per-view, digital online downloads through authorized distributors (such as iTunes or Amazon.com), physical DVD and BluRay sales, pay television, and free or basic cable television. (This list is not intended to be exhaustive.) With respect to television programming, the windows and distribution channels are somewhat different, but the basic business concept of selling access to the content to different audiences at different times is the same. Content is initially monetized by being licensed to broadcasters and multiple system operators ("MSOs," or, in lay parlance, cable companies), who in turn monetize it through paid advertising, as well as licensed Internet streaming and download distributors, then later through other third parties, such as syndication rights and DVD sales.

7. Extensive planning goes into selecting the different release windows and audiences for each work in order to maximize the economic value of the asset and prevent cannibalization of earnings from one window by another (which is why, for instance, DVDs of motion pictures are typically not sold through retailers while a motion picture is still being shown in theaters). Although the particular selection of windows and distributors may vary from studio to studio and from work to work, this business model is a constant across all major American film and television studios, including the Plaintiffs in this case.

8. The different windows all share in common that they are undermined and harmed by the easy, massive, unauthorized availability of the content. Only paying customers can enter

Confidential

a movie theater or carry a DVD out of a store; only customers on legitimate websites should be able to download or stream a movie (typically for a fee); only a customer who watches placed advertisements can watch a broadcast or ad-supported online stream (such as Hulu), and so forth. Again, while the specifics of any one studio's business model or windows may vary, the need for effective protection of content from easy, unauthorized uses is a constant. It is precisely for this reason that the plaintiff studios do not, as a matter of course, allow the online distribution of full-length digital copies of their works without restrictions on further distribution.

9. The online theft of movies and television programs allows users to obtain access to the content without engaging in any of the wide ranges of economic transactions used to monetize it (whether that transaction takes place in the form of purchasing a movie theater ticket, paying to download a file from iTunes, watching a series of paid advertisements in order to watch an online stream or broadcast, paying a cable subscription, etc.). Therefore, making stolen, unauthorized copies of motion pictures and television programming available both disrupts the carefully-planned windows described above and displaces the legitimate economic transactions through which the content could have otherwise been distributed or performed.

10. One need not (and I do not) assume that every stolen copy of a motion picture or television program represents a lost economic transaction for the harm to Plaintiffs from such theft to be apparent. Given the vast scales at which content from the major motion picture and television studios is stolen on the Internet generally and through Hotfile specifically, a dramatic number of legitimate transactions are clearly disrupted and displaced even if only a modest percentage of persons who consume stolen content would have otherwise engaged in a legitimate economic transaction. This is a common-sense observation: if a product is being offered for free (or at very low cost, such as the cost to subscribe to a "premium" membership with Hotfile or a similar download hub specializing in unauthorized content), it becomes more difficult to sell it, or sell access to it, for a cost, and some portion of users will use the unauthorized version instead of paying the higher cost for the authorized version. The fact that users engaging in unauthorized downloads from Hotfile were willing to undertake the effort, and in many cases the cost (through a premium Hotfile membership) of obtaining unauthorized copies of the works, for instance, demonstrates that those users place some economic value on the content being copied. This in turn further supports the conclusion that at least some nontrivial number of those users would have engaged in some legitimate transaction in the absence of the stolen copy.

Confidential

11.     The observation that offering free, stolen copies of an asset causes harm to those trying to sell that asset by displacing legitimate transactions is supported by common sense and basic economics. However, I note that professional consumer surveys have provided further confirmation that online digital theft of copyrighted entertainment content has the effect of displacing legitimate economic transactions. To take one example, an Oxford Economics study released in early 2011 and performed in combination with Ipsos MediaCT (a professional market research company) found, based on consumer surveys conducted in Canada, that nearly half of persons who had obtained unauthorized copies of movies online would have engaged in a legitimate economic transaction in the absence of the unauthorized copy. *See* "Economic consequences of movie piracy: Canada," *available at* http://www.mpa-canada.org/press/IPSOS-OXFORD-ECONOMICS-Report_February-17-2011.pdf, at 3 & 10. Ultimately, the precise percentage is not critical. What is significant, however, is the confirmation that a significant number of users who obtain stolen digital copies of copyrighted entertainment works would represent potential customers in the absence of such theft.[1]

**Devaluation of the Underlying Intellectual Property**

12.     In addition to displacing legitimate transactions, digital content theft also harms studios in another, and related way: by devaluing the content and hence the value of legitimate transactions. The widespread and easy availability of movies and television programming online through illegal channels for free (or for the comparatively modest cost of a subscription to Hotfile or a similar website) creates the expectation that movies and television programming can always be obtained at no or minor cost – which in turn inhibits customer acceptance of the paying, legitimate transactions described above. Thus, even legitimate transactions that are not displaced by piracy may lose some of their economic value (i.e., be feasible only at lower price points) due to the widespread expectation that the content is freely available elsewhere without restrictions.

---

[1] I witnessed a similar confirming phenomenon after YouTube began implementing "fingerprinting" software to prevent the upload of unauthorized NBCUniversal videos to their website in 2008. When it became much more difficult to watch unauthorized NBCUniversal content on YouTube, viewers turned to NBCUniversal's own websites to stream that content legally.

5

Confidential

**Unauthorized "Viral" Redistribution**

13. When a Hotfile user downloads a movie or television program, the user receives a digital copy that, in almost every case, does not contain any technological impediments to further distribution of the work. The user can take that file and forward it to others or upload it to other pirate sites. We refer to this as "viral" distribution because the work can literally spread like a virus from one user to another, even outside the Hotfile system. That sort of viral distribution is antithetic to the "exclusive right" to reproduce and distribute the work that is granted to the copyright owner under the Copyright Act – and can then further contribute to the displacement of legitimate transactions, and devaluing of the content, as described above. One does not need to look further than the economic devastation that befell the recorded music industry, as it was one of the first industries in line to experience the negative impact of unauthorized viral distribution of its intellectual property. It resulted in a dramatic contraction in the industry, the closure of record labels, layoffs of employees, and a fundamental disruption of their businesses.

\* \* \* \* \*

14. The problem of Internet theft is of course not unique to Hotfile. Internet theft of copyrighted movies and television programming is, unfortunately, a widespread phenomenon, encompassing not only Hotfile and other "download hub" sites like it, but also other forms, such as torrent sites and peer-to-peer networks. However, the fact that Hotfile's contribution to the phenomenon is not unique does not mean that it has not been substantial. First, as I noted at the beginning of my declaration, I understand that the evidence here shows that the theft taking place through Hotfile has been very substantial as a purely quantitative matter (and that, before the Plaintiffs brought this lawsuit, that Hotfile had become one of the most-trafficked websites on the Internet according to publicly-released metrics). Thus, Hotfile was one of the major drivers of Internet theft as of the time of the filing of this lawsuit. Second, Hotfile has made the theft of content extremely easy as well as profitable, compared to some other means for stealing copies of movies and television programs online that have been prevalent in recent years. Whereas the use of peer-to-peer applications or torrent sites requires a specialized software "client," one can download stolen copies of movies and television programming from Hotfile using only a common Internet browser – a fact that makes this form of theft more accessible to a wider class

**Confidential**

of Internet users for whom previous means of online content theft would have been more complex. Moreover, Hotfile makes content theft profitable not just for its principals but also for end users, by paying end users to upload and distribute stolen content through Hotfile.

15. Precise quantification of the harms to the Plaintiffs caused by Internet piracy from download hubs generally, and from Hotfile specifically, is beyond the intended scope of this declaration. Nonetheless, it is undeniable that both the qualitative and quantitative harm to Plaintiffs from the theft of their intellectual property by Hotfile has been real and substantial.

I declare under penalty of perjury that the foregoing is true and correct.

Executed in Los Angeles, California this 15th day of February 2012.

_____
Steve Thomas Kang

Confidential