# EXHIBIT A

Highly Confidential

Page 1

1                UNITED STATES DISTRICT COURT
2                SOUTHERN DISTRICT OF FLORIDA
3              CASE NO. 11-20427-WILLIAMS/TURNOFF
4     DISNEY ENTERPRISES, INC., )
      TWENTIETH CENTURY         )
5     FOX FILM CORPORATION,     )
      UNIVERSAL CITY STUDIOS    )
6     PRODUCTIONS LLLP,         )
      COLUMBIA PICTURES         )
7     INDUSTRIES, INC., and     )
      WARNER BROS.              )
8     ENTERTAINMENT, INC.,      )
                                )
9              Plaintiffs,      )
                                )
10        v.                    )
                                )
11    HOTFILE CORP., ANTON      )
      TITOV, and DOES 1-10      )
12                              )
      Defendants.               )
13    _____)
14

            H I G H L Y   C O N F I D E N T I A L

15
16      (Pursuant to protective order, the following
          transcript has been designated highly
17                    confidential)
18       DEPOSITION OF MATTHEW LYNDE, Ph.D.
19            SAN FRANCISCO, CALIFORNIA
20            FRIDAY, DECEMBER 16, 2011
21
22
23
24    REPORTED BY:  Linda Vaccarezza, CSR No. 10201
25    JOB NO.:  44313

Highly Confidential

Page 2

1

2

3

4

DECEMBER 16, 2011

5

10:07 A.M.

6

7

Deposition of MATTHEW LYNDE, Ph.D.,

8

held at the offices of Farella,

9

Braun & Martel, 235 Montgomery

10

Street, San Francisco, California, before

11

Linda Vaccarezza, a Registered

12

Professional Reporter and Certified

13

Shorthand Reporter of the State of

14

California.

15

16

17

18

19

20

21

22

23

24

25

Highly Confidential

Page 3

1        A P P E A R A N C E S:

2    ATTORNEY FOR THE PLAINTIFFS:

         JENNER & BLOCK

3        BY:  STEVEN B. FABRIZIO, ESQ.

         1099 New York Avenue, NW

4        Washington, DC 20001

5

6

7    ATTORNEY FOR THE DEFENDANTS

     HOTFILE CORP., AND ANTON TITOV:

8        FARELLA, BRAUN & MARTEL

         BY:  RODERICK M. THOMPSON, ESQ.

9        235 Montgomery Street

         San Francisco, California 94104

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Highly Confidential



Page 21

Q.    Anything else?

Highly Confidential

Page 22

1          A.    If a wrongful takedown notice

2     resulted in, for example, erroneous termination

3     of a premium account, that could also have

4     quantifiable impact.

5          Q.    What if it resulted in an

6     erroneous termination of a non-premium account?

7          A.    My understanding of Hotfile's

8     business is only premium accounts generate

9     revenue for Hotfile, at least direct revenue.

10               So if I understand your question

11    correctly, the wrongful takedown of a non-premium

12    account would only potentially have an indirect

13    impact on revenue.

Highly Confidential

Page 24



15    Q.   Well, broadening the question to

16  go beyond what you term the "wrongful takedown

17  notices," just in the way you do your

18  calculations, are any takedown notices treated

19  differently from any others in terms of the

20  economic impact they cause?

21    A.   No.   In the analysis I've done, I

22  have not distinguished between the impacts of

23  what are mostly, as I understand it, lawful and

24  correct takedown notices from wrongful takedown

25  notices, in terms of individual impact.

Highly Confidential

Page 25

1        Q.    And within the category that you

2    term "wrongful takedown notices," is it correct

3    that you also don't distinguish from one notice

4    to the other in terms of its estimated economic

5    impact?

6        A.    That is correct.  I was not able

7    to distinguish between individual types of

8    wrongful takedown notices.  I've considered them

9    as a collectivity.

10       Q.    Just to confirm, you did not

11   consider as to any individual takedown notices,

12   the publicity or public impact that that

13   particular notice had, correct?

14            MR. THOMPSON:  Objection.

15            Overbroad and vague.

16            THE WITNESS:  I did not do that

17            kind of analysis, apart from gaining an

18            awareness of -- of types of files, for

19            example, that might have been wrongfully

20            taken down.

21       Q.    And is it also correct that in

22   your analysis you did not consider whether any

23   individual notice referred to a file that was

24   particularly popular or not?

25            MR. THOMPSON:  Objection.  Vague.

Highly Confidential

Page 26

1            THE WITNESS:  That is correct.  I

2       did not have the means to potentially

3       calibrate individual wrongful takedowns

4       with the popularity rating of particular

5       files.

6       Q.    And did you look to see whether

7  individual takedown notices resulted in, I think

8  you termed it "the erroneous termination of a

9  premium account"?

10       A.    I did not look to see if there was

11  a particular link from a particular wrongful

12  takedown to a particular termination of a premium

13  account.

Highly Confidential



Page 27

21    Is there, in your professional

22  judgment, a de minimis number of erroneous user

23  terminations that you would agree as a practical

24  matter doesn't result in any measurable injury to

25  Hotfile?

Highly Confidential

Page 28

1          MR. THOMPSON:  Objection.  Vague.

2     And incomplete hypothetical.

3          THE WITNESS:  Well, I'm not sure I

4     completely understand the context of the

5     question.  But if it could be established

6     that there was a wrong termination that

7     would not have occurred but for a

8     wrongful takedown, the loss of that

9     subscription would indeed be a

10    quantifiable harm to Hotfile.

11    Q.    Even if it was just a single

12 wrongful termination of a premium account?

13    A.    Yes.

14    Q.    And what if it was a single

15 erroneous termination of a non-subscription,

16 non-premium account?

17    A.    If I understand your question

18 correctly -- we discussed this a little bit

19 before -- that possibly could indirectly lead to

20 the loss of a paying account, and therefore

21 revenue, but the connection would be, as I

22 understand, a little more difficult to

23 establish.

24          But if it could be established,

25 then indeed the loss of a subscription account

Highly Confidential

Page 29

1   would be an economic harm to Hotfile.

2           Q.     In your analysis, did you attempt

3   to make that connection between terminations of

4   non-premium users and economic harm to Hotfile?

5           A.     I did not.



Highly Confidential

Page 75



5          Does that model assume that each

6    takedown notice sent by Warner, whether properly

7    or erroneously, is responsible equally for each

8    dollar of lost profits due to Warner that you've

9    calculated?

10             MR. THOMPSON:  Objection.  Vague.

11             THE WITNESS:  If I understand your

12        question correctly, with other things

13        equal it does presume an equal impact of

14        takedown notices ultimately, whether they

15        be correct takedown notices or wrongful

16        takedown notices, on their average

17        impact, that is correct.

Highly Confidential

Page 83

8      Q.   And that is one of the assumptions

9   of your model, is it not, that takedown notices

10  result in lost revenues and lost profits

11  regardless of whether they are wrongful or not

12  wrongful?

13          MR. THOMPSON:  Objection.  Assumes

14       facts.

15          THE WITNESS:  Well, in a general

16       sense, that is correct.

17      Q.   So then is it fair to say that the

18  model that you've used assumes that -- well,

19  maybe I should put it a different way.

20          In the model that you have used,

21  takedown notices that have not been considered

22  wrongful are responsible for the bulk of the lost

23  profits that Hotfile suffered from February 2011

24  through September 7, 2011; is that correct?

25      A.   In the model that I've considered

Highly Confidential

Page 84

1    here in terms of estimating damages to Hotfile

2    from wrongful notices, it is correct.

3              As I consider that -- as I

4    indicated earlier this morning, the interaction

5    between the takedown notice process, which I

6    understand provides notice of copyrighted subject

7    matter which shouldn't be on the website and

8    ultimately that might be related with notice to

9    up loaders, that if they upload copyrighted

10   material they will be terminated, that the

11   termination process occurs.  And if that's

12   associated with premium accounts, that can result

13   in a loss in revenue.



Page 87

21   Q.   And again by the same token, you

22   would want to assess the impact on all of those

23   correct takedown notices on whether there were

24   terminations of premium users?

25          MR. THOMPSON:   Same objections.

Highly Confidential

Page 88

1          THE WITNESS:  In parallel to the

2      discussion I put forward this morning

3      about the structure of the model, yes.

4      That would be a similar and parallel

5      assessment.

Highly Confidential

Page 91

18    being to estimate the lost profit impact

19    due to wrongful takedowns.  But included

20    in that chain in terms of an assessment

21    of an impact of rightful takedowns, as I

22    said, would need to be an assessment of

23    these other factors that would be related

24    to potential impact on revenue, which we

25    discussed, and including the change in

Highly Confidential

Page 92

1          Hotfile policy in terms of the

2          termination three strike rule in

3          February.

4          Q.    So in order to make a final

5     determination as to whether the rest of the lost

6     profits are attributable to the correct notices

7     you would need to look at things like the

8     publicity associated with them, whether they are

9     related to popular files, whether they resulted

10    in erroneous termination or terminations of

11    premium account users, and the rest of those

12    factors that we talked about earlier?

13          MR. THOMPSON:  Objection.

14          Overbroad and asked and answered.

15          THE WITNESS:  If I understand your

16          question correctly, I believe indeed

17          those need to be assessed.

18          Q.    And in your damages model, looking

19    at lost profits due to wrongful notices, did you

20    look at any of those considerations on an

21    individual basis?

22          MR. THOMPSON:  Objection.

23          Overbroad and vague.

24          THE WITNESS:  Given my review of

25          the evidence I was not aware, with

Highly Confidential

Page 93

1          respect to the wrongful notices of

2          information, which would specifically

3          apply to the wrongful notice situation,

4          which is what I was focusing on.



Highly Confidential

Page 97

7          Do you agree that Hotfile is not

8    injured by taking down a file that is, in fact,

9    copyright infringing?

10          MR. THOMPSON:  Objection.  Vague.

11          Calls for a legal conclusion, and to the

12          extent it states Mr. Titov's testimony.

13          MR. FABRIZIO:  I'll take my

14          chances on that one.

15          THE WITNESS:  Well, I'm not sure I

16          understand the full context of the

17          question, because it's my understanding

18          that Hotfile has a policy of not allowing

19          infringing material and taking down

20          material for which it receives notice

21          that it's infringing, so that would not

22          be a part of its expectation of revenue.

23          Q.   So infringing files are not part

24    of Hotfile's expectation of revenue, to your

25    understanding?

Highly Confidential

Page 98

1          A.     That is my understanding, yes.

2          Q.     And do you have that understanding

3     through people at Hotfile?

4          A.     Not specifically, but from my

5     review of the materials and my understanding of

6     Hotfile's policy of taking down material for

7     which it receives notice that the copyright owner

8     does not concur that that is appropriately on the

9     Hotfile site.  And that's what Hotfile does, it

10    takes those files down.

11         Q.     So from an economic perspective,

12    if Hotfile removes from its site a file that is,

13    in fact, copyright infringing, that does not

14    affect Hotfile's expected revenues?

15              MR. THOMPSON:  Objection.  Vague

16         and overbroad.

17              THE WITNESS:  Well, for -- with

18         respect to its policy of not having

19         infringing files and taking them down

20         timely when they have received notice,

21         which I understand is their policy and

22         obligation, yes.  It's my understanding

23         that business models is based on users

24         using the site to store and share files

25         for which they have rights.

Highly Confidential

Page 99

1          Q.    So if Warner Brothers had

2     mistakenly sent a takedown notice to Hotfile for

3     a file that in fact contained a Disney movie, an

4     infringing copy of a Walt Disney movie, is

5     Hotfile injured by removing the infringing copy

6     of the Disney movie?

7                    MR. THOMPSON:  Objection.  Calls

8          for a legal conclusion.

9                    THE WITNESS:  Well, if I

10         understand the context of your question,

11         perhaps not specifically with respect to

12         that file, but there are other potential

13         impacts on the business in terms of its

14         operations and its goodwill and

15         reputation.

16         Q.    There are other potential impacts

17     on the business and its goodwill as a result of

18     Hotfile removing an infringing copy of a Disney

19     movie?

20         A.    Not from a -- as I said in my

21     answer, not from a specific removal, which is

22     appropriate, and according to its policy, no.

23         Q.    Well, let me just put it this

24     way.

25                    Does it matter in terms of

Highly Confidential

Page 100

1    Hotfile's lost profits or -- strike that.

2              In terms of injury to Hotfile,

3    does it make a difference whether Warner Brothers

4    sends a notice for an infringing copy of a Disney

5    movie, or Disney sends a notice for infringing

6    copy of a Disney movie?

7              MR. THOMPSON:  Objection.

8         Incomplete hypothetical.  Vague.

9              THE WITNESS:  If I understand your

10        question correctly, no.  Because in

11        either case it is material that the

12        copyrighted owner does not agree belongs

Highly Confidential

Page 102

12          You have previously testified that

13   if a file is actually infringing, the impact to

14   Hotfile is the same regardless of who sends

15   Hotfile the notice, correct?

16          MR. THOMPSON:  Objection.  Vague

17          and misstates testimony.

18          THE WITNESS:  If I'm recalling the

19          earlier question within the context of

20          the -- within the context that I

21          understand, if it's a copyrighted

22          material that shouldn't be on the

23          website, yes.  It doesn't matter who

24          sends the notice in terms of economic

25          impact.

Highly Confidential

Page 106



17        Q.    Well, Mr. Titov testified that in

18    that case where a user was assigned three strikes

19    without counting any of the Warner strikes, that

20    Hotfile did not consider -- did not consider that

21    a wrongful termination.

22             In your understanding of the

23    Hotfile system, do you have reason to disagree

24    with him?

25             MR. THOMPSON:  Excuse me.

Highly Confidential

Page 107

1       Objection.   Incomplete hypothetical.

2       Overbroad.

3                   You can answer.

4              THE WITNESS:   I do not have any

5       reason to agree with him --

6       Q.    Agree or disagree?

7       A.    I do not have any reason to

8       disagree with him, so...



Highly Confidential

■        ■        ████████████████

■    ██████████████

3              We have previously talked about a

4    situation where a user was terminated based on a

5    wrongful notice, and I believe you referred to

6    that as a wrongful termination.

7              If a user was terminated because

8    of three strikes having nothing to do with Warner

9    notices, you would not consider that a wrongful

10   termination, would you?

11              MR. THOMPSON:  Objection.  Calls

12          for a legal conclusion.

13              THE WITNESS:  If I'm understanding

14          the context of the question, that would

15          be correct.

16          Q.    Have you analyzed whether that

17   ever happened, whether any of the users that were

18   terminated -- strike that.

19              Have you ever analyzed whether any

20   of the users that received strikes based on the A

21   through D notices already had three strikes

22   without counting the strikes assigned by the

23   Warner notices?

24          A.    I have not done that analysis.

■        ■        ████████████████

Highly Confidential

Page 130



10          Q.    You would agree with me, would you

11    not, that if Hotfile only began assigning strikes

12    based on notices on February 18, 2011, that any

13    of the files on Exhibit A through D that were the

14    subject of notices sent before February 18, 2011

15    could not have resulted in users being terminated

16    as a result of the Warner notices?

17              MR. THOMPSON:  Objection.

18         Incomplete hypothetical.

19              THE WITNESS:  If I understand your

20         question correctly, and the date of the

21         initiation of the policy, for involuntary

22         terminations due to that policy, I

23         believe that would be correct.

Highly Confidential

Page 170

5      Do you have any evidence, and did

6  you consider any evidence that any Hotfile user

7  failed to purchase a premium account as a result

8  of the takedown notices reflected on Exhibits A

9  through D of the counterclaim?

10      A.    Failed to purchase an account?

11  Well, that -- I don't believe that data set would

12  exist since those are all the people for which

13  there would be no records.

14      Q.    So then the answer would be, no,

15  you don't?  You're not aware of any evidence?

16      A.    Nor would any exist logically.

Highly Confidential

Page 171

11          Can you identify a single Hotfile

12   premium user who cancelled his or her

13   subscription from Hotfile as a result of the

14   takedown notices reflected on Exhibits A through

15   D of the counterclaim?

16          A.   I'm not aware of evidence with

17   regard to a single user.

18          Q.   Let me broaden that.

19          Are you aware of any Hotfile

20   premium users who cancelled their premium

21   subscription as a result of any takedown notices

22   sent to Hotfile by Warner Brothers?

23          A.   I am not aware of specific

24   evidence with regard to any group of premium

25   users with respect to those takedown notices.

Highly Confidential

Page 172

1        Q.    You're killing me with the
2    "specifics" here.

3             Are you aware of a single Hotfile
4    premium user who cancelled his or her premium
5    subscription as a result of any takedown notices
6    sent by Warner Brothers?

7        A.    I am not aware of such specific
8    evidence.

Highly Confidential

■ ████████████████████████████████

■ ██████████████████████████  ████

■ █████████████████████████████████

■  ██████

5          Q.    I realize that's an assumption of

6    your damages model.  My question, though, is to

7    try to -- to try to figure out whether there was

8    any evidence of any adverse effect on Hotfile's

9    business reputation or goodwill coming from the

10   Exhibit A through D takedowns?

11         A.    I do not have specific evidence

12   from the Exhibit A through D takedowns to

13   reputation or goodwill.

14         Q.    Are you aware that any takedown

15   notice sent by Warner Brothers has had an adverse

16   impact on Hotfile's business reputation or

17   goodwill?

18         A.    I am not sure I understand the

19   distinction --

20         Q.    My first question --

21         A.    -- between the questions.

22         Q.    My first question was related to

23   the A through D works; my second question was

24   related to any Warner takedown notice.

25               So with that clarification, let me

Highly Confidential

Page 176

1   just ask the question in a whole.

2             Are you aware of any Warner

3   Brothers takedown notice that has resulted in an

4   adverse impact on Hotfile's business reputation

5   or goodwill?

6             A.   I'm not aware of any such specific

▮   ▮▮▮▮▮▮▮▮

8             Q.   Are you aware of any evidence of

9   negative feedback from users -- strike that.

10            Are you aware of any evidence of

11  negative feedback from users based on the

12  takedown notices reflected on Exhibits A through

13  D of the counterclaim?

14            MR. THOMPSON:   Objection.

15            Overbroad and vague.

16            THE WITNESS:   I'm not aware of

17            specific evidence with respect to user.

18            Q.   I'm broadening it to all of

19  Warners' takedown notices.

20            Are you aware of any negative

21  feedback from any Hotfile user related to any

22  takedown notice sent by Warner Brothers?

23            A.   I'm not aware of specific evidence

24  on that.

▮   ▮   ▮▮▮▮▮▮▮▮▮▮

Highly Confidential

Page 282

9        Q.     Do you believe it is a fair

10   statement that as of today if you count your

11   hours approved for your deposition, that

12   Cornerstone Research has accrued more than

13   $20,000 worth of fees in this matter?

14        A.     That's likely to be the case.

15        Q.     So if you look at Schedule 1 of

16   Lynde Exhibit 1, Cornerstone Research has

17   probably incurred more fees twice -- strike

18   that.

19             Cornerstone Research has incurred

20   more fees in this case than the total damage you

21   estimate in Schedule 1?

22        A.     I believe that's correct.

23        Q.     And the total you estimate in

24   Schedule 1.1 as well?

25        A.     Correct.

Highly Confidential

Page 291

1       MR. FABRIZIO:  Okay.  I'm good.

2  Thank you, Dr. Lynde.

3       (Time noted: 5:59 p.m.)

4

5

6

7          MATTHEW LYNDE

8

9

                    *See Below*

10  Subscribed and sworn to before me

11  This  30th day of  January  , 2012.

12

13

14

15

16

17

18  State of California
     County of San Francisco
     Subscribed and sworn to (or affirmed) before me
19  on this 30th day of January , 2012
     by Matthew Lynde ,
     proved to me on the basis of satisfactory evidence
20  to be the person(s) who appeared before me.
     Signature _____ (Seal)

                      MARK MCQUILLEN
                    COMM. #1793325
              NOTARY PUBLIC-CALIFORNIA
               SAN FRANCISCO COUNTY
              My Comm. Expires Mar. 10, 2012

21

22

23

24

25

## Errata to the Deposition of Matthew R. Lynde
### December 16, 2011
*Disney Enterprises, Inc. et al. v. Hotfile Corp., et al.*
*Hotfile Corp., et al. v. Disney Enterprises, Inc. et al.*

| Page | Line | Now reads | Should read | Reason |
|------|------|-----------|-------------|--------|
| 9 | 13 | "didn't" | "don't" | Misspoke |
| 42 | 14 | "affect" | "effect" | Transcribing error |
| 52 | 9-10 | "up loader" | "uploader" | Transcribing error |
| 75 | 3 | "I result" | "results" | Misspoke |
| 84 | 9 | "up loaders" | "uploaders" | Transcribing error |
| 118 | 14 | "prescription" | "subscription" | Misspoke |
| 126 | 10 | "focused in" | "focused on" | Transcribing error |
| 150 | 4 | "I was" | "I" | Misspoke |
| 157 | 25 | "basis is" | "basis" | Transcribing error |
| 162 | 17 | "have" | "have;" | Transcribing error |
| 178 | 23 | "an" | "a" | Transcribing error |
| 179 | 18 | "or" | "where" | Transcribing error |
| 185 | 15 | "MegaDownload" | "Megaupload" | Misspoke |
| 212 | 22 | "over" | "of" | Transcribing error |
| 212 | 22 | "and" | "that" | Transcribing error |
| 213 | 10 | "it's bought and" | "its robot" | Transcribing error |
| 218 | 1 | "variants" | "variance" | Transcribing error |
| 218 | 22 | "is you" | "is that you" | Transcribing error |
| 245 | 3 | "ELLS" | "Yale" | Transcribing error |
| 262 | 18 | "provided" | "have been provided" | Transcribing error |
| 276 | 19 | "Tolav" | "Kolev" | Transcribing error |

1/30/12

Date

_Matthew R. Lynde_

Matthew R. Lynde

Notary Public

State of California
County of San Francisco
Subscribed and sworn to (or affirmed) before me
on this 30 day of January, 2012
by Matthew R. Lynde,
proved to me on the basis of satisfactory evidence
to be the person(s) who appeared before me.
Signature _____ (Seal)

MARK MCQUILLEN
COMM. #1793325
NOTARY PUBLIC-CALIFORNIA
SAN FRANCISCO COUNTY
My Comm. Expires Mar. 10, 2012

Highly Confidential

Page 292

1          C E R T I F I C A T E

2     STATE OF CALIFORNIA      )

3                              )

4     COUNTY OF SAN FRANCISCO )

5          I, LINDA VACCAREZZA, a Certified

6     Shorthand Reporter for the State of

7     California, do hereby certify:

8          That MATTHEW LYNDE, the witness

9     whose deposition is hereinbefore set

10    forth, was duly sworn by me and that such

11    deposition is a true record of the

12    testimony given by such witness.

13         I further certify that I am not

14    related to any of the parties to this

15    action by blood or marriage; and that I

16    am in no way interested in the outcome of

17    this matter.

18         IN WITNESS WHEREOF, I have hereunto

19    set my hand this 29th day of December

20    2011.

21

22    _____

23     LINDA VACCAREZZA, CSR. NO. 10201

24

25