UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 11-20427-WILLIAMS/TURNOFF

DISNEY ENTERPRISES, INC.,
TWENTIETH CENTURY FOX FILM CORPORATION,
UNIVERSAL CITY STUDIOS PRODUCTIONS LLLP,
COLUMBIA PICTURES INDUSTRIES, INC., and
WARNER BROS. ENTERTAINMENT INC.,

*Plaintiffs*,

v.

HOTFILE CORP., ANTON TITOV, and
DOES 1-10.

 *Defendants*.

_____/

HOTFILE CORP.,

*Counterclaimant*,

v.

WARNER BROS. ENTERTAINMENT INC.,

*Counterdefendant*.

_____/

**PLAINTIFFS' MOTION AND MEMORANDUM OF LAW IN SUPPORT OF
SUMMARY JUDGMENT AGAINST DEFENDANTS HOTFILE CORP.
AND ANTON TITOV**

**PUBLIC REDACTED VERSION**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................................... iv

CITATION LEGEND.......................................................................................... vii

INTRODUCTION ................................................................................................1

FACTUAL BACKGROUND ..................................................................................3

    A.    How Hotfile Works...........................................................................3

    B.    Hotfile's Business Model...................................................................5

    C.    Hotfile's Affiliate Program Openly Induces Copyright Infringement....................5

    D.    Hotfile's Business is Unlawful File Distribution, Not File Storage. ......................8

    E.    Hotfile Is Used Overwhelmingly For Copyright Infringement. ...........................9

    F.    Defendants Actively and Knowingly Foster Copyright Infringement...................10

        1.    Defendants Turned a Blind Eye to Repeat Copyright Infringers..............10

        2.    Defendants Sought Out Users Who Would Upload Infringing
              Files. ..................................................................................12

        3.    Defendants Helped Users Engage in Specific Acts of Infringement.........13

        4.    Defendants Had Actual Knowledge of Specific Infringing Files. .............13

        5.    Defendants Used Copyrighted Content to Illustrate How to Use
              Hotfile. ................................................................................15

        6.    Defendants Had Knowledge from Multiple Additional Sources..............15

    G.    Defendants Failed to Consider Standard "Filtering" Technology. ......................16

    H.    Plaintiffs Suffer Substantial Harm from Defendants' Piracy. .............................17

LEGAL STANDARD..........................................................................................17

ARGUMENT ...................................................................................................17

I.    DEFENDANTS CANNOT PROVE ENTITLEMENT TO DMCA SAFE HARBOR.....18

    A.    Defendants Failed to Reasonably Implement a Repeat Infringer Policy...............19

B.     Defendants Failed to Comply With DMCA Agent Designation
Requirements. ......................................................................................22

C.     At All Times, Defendants Had Disqualifying Knowledge of Infringement. ..........24

1.     Defendants Had Actual Knowledge, including of Specific
Infringing Files. ...................................................................24

2.     Defendants Have "Red Flag" Knowledge. ................................25

3.     Defendants' Willfully Blindness Establishes Actual Knowledge. ............26

D.     Defendants' Inducement of Infringement Disqualifies Them from Safe
Harbor. .................................................................................................27

II.     DEFENDANTS ARE LIABLE AS SECONDARY COPYRIGHT INFRINGERS. ........29

A.     Hotfile Users Are Direct Infringers. .......................................................29

B.     Defendants Are Liable for Inducement of Copyright Infringement. ....................29

1.     Defendants' Unlawful Objective Is Unmistakable from Hotfile's
Affiliate Program Alone. ......................................................30

2.     Defendants Directly Targeted a User Base of Infringers. ..........................30

3.     Defendants Refused to Terminate Blatant Repeat Infringers. ...................30

4.     Hotfile Is Overwhelmingly Used For Infringement and Little Else. ........31

5.     Hotfile's Business Model Depends on Infringement. ...............................31

6.     Defendants Helped Hotfile Users to Infringe and Infringed
Themselves. ........................................................................32

7.     Defendants Have Impeded Copyright Owner Enforcement Efforts. .........32

8.     Defendants Refused to Consider Technology to Prevent
Infringement. ......................................................................32

C.     Defendants Are Liable for Contributory Infringement. .........................................33

D.     Defendants Are Liable for Vicarious Infringement. .............................................34

III.     TITOV IS PERSONALLY LIABLE FOR HOTFILE'S INFRINGEMENT. ..................35

A.     Titov Is at the Center of the Web of Companies that Run Hotfile. ......................35

B.    Titov "Personally Participates" in Virtually all of Hotfile's Infringing
       Conduct. ............................................................................................................38

CONCLUSION ...............................................................................................................40

## TABLE OF AUTHORITIES

CASES

*A&M Records, Inc. v. Napster, Inc.*, 239 F.3d 1004 (9th Cir. 2001)................................29, 33, 34

*ALS Scan, Inc. v. RemarQ Communities, Inc.*, 239 F.3d 619 (4th Cir. 2001) .................18, 19, 28

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ..................................................................17

*Arista Records LLC v. Usenet.com, Inc.*, 633 F. Supp. 2d 124 (S.D.N.Y. 2009),
    *superseded by*, 784 F. Supp. 2d 398 (S.D.N.Y. 2011).........................27, 30, 31, 32, 34, 35, 40

*Arista Records, Inc. v. Flea World, Inc.*, No. Civ. A. 03-2670(JBS), 2006 WL 842883
    (D.N.J. Mar 31, 2006)..............................................................................................33, 34

*Arista Records LLC v. Lime Group LLC*, 784 F. Supp. 2d 398
    (S.D.N.Y. 2011).............................................17, 29, 31, 32, 33, 34, 38, 40

*Babbit Electronics, Inc. v. Dynascan Corp.*, 38 F. 3d 1161 (11th Cir. 1994) .................35, 38, 39

*Blendingwell Music, Inc. v. Moor-Law, Inc.*, 612 F. Supp. 474 (D. Del. 1985)...........................39

*BMG Music v. Gonzalez*, 430 F.3d 888 (7th Cir. 2005) ...............................................................29

*Cable/Home Communication Corp. v. Network Productions, Inc.*, 902 F.2d 829 (11th Cir.
    1990) ..............................................................................................................17, 33

*Cartoon Network LP, LLLP v. CSC Holdings, Inc.*, 536 F.3d 121 (2d Cir. 2008)......................34

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) .............................................................................17

*Columbia Pictures Industries, Inc. v. Fung*, No. CV 06-5578 SVW, 2009 WL 6355911
    (C.D. Cal. Dec. 21, 2009) ................................................................19, 26, 27, 29, 30, 31, 32

*Corbis Corp. v. Amazon.com, Inc.*, 351 F.Supp.2d 1090 (W.D. Wash. 2004).................21, 24, 25

*Costar Group Inc. v. Loopnet, Inc.*, 164 F. Supp. 2d 688 (D. Md. 2001), *aff'd*, 373 F.3d
    544 (4th Cir. 2004)........................................................................................................23

*Ellison v. Robertson,* 357 F.3d 1072 (9th Cir. 2004).............................................................20, 22

*Fame Publishing Co. v. Alabama Custom Tape, Inc.*, 507 F.2d 667 (5th Cir. 1975)...................18

*Faulkner v. National Geographic Society*, 211 F. Supp. 2d 450 (S.D.N.Y. 2002),
    *modified by*, 220 F. Supp. 2d 237 (S.D.N.Y. 2002), *aff'd*, 409 F.3d 26 (2d Cir. 2005) .........33

*Flava Works, Inc. v. Gunter*, No. 10 Civ. 6517, 2011 WL 3205399 (N.D. Ill. July 27,
    2011) ..............................................................................................................................20

*Floyd v. McNeil*, Case No. 4:10cv289-RH/WCS, 2011 U.S. Dist. LEXIS 150619 (N.D. Fla. Dec. 5, 2011)...........................................................................................................17

*Gershwin Publishing Corp. v. Columbia Artists Management, Inc.*, 443 F.2d 1159 (2d Cir. 1971) ..................................................................................................................34

*Global-Tech Appliances, Inc. v. SEB S.A.*, 131 S. Ct. 2060 (2011)........................................26, 27

*Home Design Services, Inc. v. Park Square Enterprises, Inc.*, No. 6:02-CV-637-ORL28JGG, 2005 WL 1027370 (M.D. Fla. May 2, 2005) ...................................................39

*In re Aimster Copyright Litigation*, 252 F. Supp. 2d 634 (N.D. Ill. 2002), *aff'd*, 334 F.3d 643 (7th Cir. 2003)........................................................................................................22

*In re Aimster Copyright Litigation*, 334 F.3d 643 (7th Cir. 2003) ............................19, 26, 28, 33

*Io Group, Inc. v. Veoh Networks, Inc.*, 586 F. Supp. 2d 1132 (N.D. Cal. 2008).........................21

*Louis Vuitton Malletier, S.A. v. Akanoc Solutions, Inc.*, No. C 07-03952 JW, 2010 WL 5598337 (N.D. Cal. Mar. 19, 2010), *aff'd in part, vacated in part*, 658 F.3d 936 (9th Cir. 2011) .....................................................................................................................23

*Mattel, Inc. v. Robarb's, Inc.*, No. 00 Civ. 4866 (RWS), 2001 WL 913894 (S.D.N.Y. Aug. 14, 2001) ...................................................................................................................38

*Metro-Goldwyn Mayer Studios, Inc. v. Grokster, Ltd.*, 545 U.S. 913 (2005)....................................................................17, 18, 28, 29, 30, 33, 34

*Metro-Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd.*, 454 F. Supp. 2d 966 (C.D. Cal. 2006) ....................................................................................................25, 29, 31, 32

*Mini Maid Services Co. v. Maid Brigade Systems, Inc.*, 967 F.2d 1516 (11th Cir. 1992)............31

*Mozingo v. Correct Mfg. Corp.*, 752 F.2d 168 (5th Cir. 1985)....................................................35

*Perfect 10, Inc. v. CCBill LLC*, 488 F.3d 1102 (9th Cir. 2007)............................................20, 21

*Perfect 10, Inc. v. Cybernet Ventures, Inc.*, 213 F. Supp. 2d 1146 (C.D. Cal. 2002).............19, 22

*Playboy Enterprises, Inc., Inc. v. Starware Publishing Corp.*, 900 F. Supp. 438 (S.D. Fla. 1995) .........................................................................................................................40

*Southern Bell Telephone & Telegraph Co. v. Associated Telephone Directory Publishers*, 756 F.2d 801 (11th Cir. 1985) ....................................................................................35, 38

*Songmaker v. Forward of Kansas, Inc.*, No. 90-4156-SAC, 1993 WL 106833 (D. Kan. Mar. 5, 1993)...................................................................................................................39

*Sony Corp. of America v. Universal City Studios, Inc.*, 464 U.S. 417 (1984)..............................34

*United States Media Corp. v. Edde Entertainment, Inc.*, No. 94 Civ.
4849(MBM)(MHMD), 1996 WL 520901 (S.D.N.Y. Sept. 12, 1996)....................................39

*United States v. Texas*, 507 U.S. 529 (1993) ...............................................................................18

*UMG Recordings, Inc. v. Shelter Capital Partners LLC*, No. 09-55902, --- F.3d ---,  2011
WL 6357788 (9th Cir. Dec. 20, 2011) ("*Veoh*") .....................................................................26

*UMG Recordings, Inc. v. Sinnott*, 300 F. Supp. 2d 993 (E.D. Cal. 2004) ....................................27

*UMG Recordings, Inc. v. Veoh Networks, Inc.*, 665 F. Supp. 2d 1099 (C.D. Cal. 2009),
*aff'd sub nom. UMG Recordings, Inc. v. Shelter Capital Partners LLC*, No. 09-55902,
--- F.3d ---, 2011 WL 6357788 (9th Cir. Dec 20, 2011)............................................................21

*Viacom International Inc. v. YouTube, Inc.*, 718 F. Supp. 2d 514 (S.D.N.Y. 2010) ....................21

**STATUTES AND REGULATIONS**

17 U.S.C. § 512.................................................................................................................................2

17 U.S.C. § 512(c) ..............................................................................................................18, 24, 28

17 U.S.C. § 512(c)(1)(A)(i) ......................................................................................................18, 24

17 U.S.C. § 512(c)(1)(A)(ii) .....................................................................................................18, 24

17 U.S.C. § 512(c)(1)(B) ..............................................................................................................19

17 U.S.C. § 512(c)(2)...........................................................................................................18, 22, 23

17 U.S.C. § 512(i) ..........................................................................................................................18

17 U.S.C. § 512(i)(1)(A) ...............................................................................................................19

37 C.F.R. § 201.38(c).....................................................................................................................23

**LEGISLATIVE MATERIALS**

H.R. Rep. No. 105-551(I) (1998)..................................................................................................18

H.R. Rep. No. 105-551(II) (1998) .................................................................................................24

S. Rep. No. 105-190 (1998)......................................................................................................18, 19

**OTHER AUTHORITIES**

Fed. R. Civ. P. 56(a) ......................................................................................................................17

**CITATION LEGEND**

1.      "Foster Decl." shall refer to the declaration of Dr. Ian Foster, Director of the Computation Institute at Argonne National Laboratory and the University of Chicago, dated February 17, 2012, filed herewith.

2.      "Kang Decl." shall refer to the declaration of Thomas Kang, Vice President and Senior Counsel, Anti-Piracy Legal Affairs of NBCUniversal, dated February 15, 2012.

3.      "Kaplan Decl." shall refer to the declaration of David Kaplan, Senior Vice President, Intellectual Property Counsel, Worldwide Antipiracy Operations of Warner Bros. Entertainment Inc., dated February 14, 2012, filed herewith.

4.      "Reed Decl." shall refer to the declaration of Marsha Reed, Vice President and Assistant Secretary of Disney Enterprises, Inc., dated February 16, 2012, filed herewith.

5.      "Seabrook Decl." shall refer to the declaration of Carly Seabrook, Director, Copyright Administration at NBCUniversal, dated February 16, 2012, filed herewith.

6.      "Sehested Decl." shall refer to the declaration of Thomas Sehested, founder and Senior Vice President of DtecNet Software, dated February 15, 2012, filed herewith.

7.      "Solmon Decl." shall refer to the declaration of Vicki R. Solmon, Senior Vice President of Anti Digital Theft & Theatrical Distribution at Sony Pictures Entertainment Inc., dated February 14, 2012, filed herewith.

8.      "SUF" shall refer to specific paragraph numbers of uncontroverted facts in Plaintiffs' Statement of Uncontroverted Facts.

9.      "Titov Decl., Feb. 27, 2011" shall refer to the Declaration of Anton Titov in Support of Defendants' Opposition to Plaintiffs' Emergency Motion for Order Preserving Evidence, dated February 27, 2011 (Dkt. # 30-1).

10.      "Titov Decl., June 17, 2011" shall refer to the Declaration of Anton Titov in Support of Defendants' Opposition to Plaintiffs' Motion to Compel Responses to Request for Production of Documents and Interrogatories, dated June 17, 2011 (Dkt. # 81-17).

11.      "Waterman Decl." shall refer to the declaration of Dr. Richard Waterman, Adjunct Professor of Statistics at The Wharton School at the University of Pennsylvania and Co-Founder of Analytic Business Services, Inc., dated February 16, 2012, filed herewith.

12.      "Wold Decl." shall refer to the declaration of Dr. Erling Wold, Chief Scientist at Audible Magic, Inc., dated February 15, 2012, filed herewith.

13.     "Yeh Decl." shall refer to the Declaration of Jennifer V. Yeh in Support of Warner Bros. Entertainment's Motion for Summary Judgment, dated February 16, 2012, filed herewith.

14.     "Yeh Ex. __," shall refer to exhibits attached to the Yeh Declaration, and, if appropriate, pinpoint citations to the page number(s), and paragraph or line numbers, internal to the cited document.  In some instances where individual Yeh Declaration exhibits were not paginated, page numbers have been added manually for ease of the Court's reference.  The parentheticals indicate the nature of the item cited – e.g., deposition transcripts ("Dep.") – or documents produced in discovery by various parties.  Thus, by way of illustration, "Yeh Ex. 1 (Titov Dep.) at 200:1-10" would refer to the deposition of defendant Anton Titov, which could be found in Exhibit 1 to the Yeh Declaration, at page 200 of the transcript pages, at lines 1 through 10.  And, "Yeh Ex. 110 at 2" would refer to Exhibit 110 to the Yeh Declaration, and specifically the page of that Exhibit found at page 2 of the numbered Exhibit pages.

15.     "Zebrak Decl." shall refer to the declaration of Scott Zebrak, dated February 17, 2012, filed herewith.

## INTRODUCTION

Defendants Hotfile Corp. and Anton Titov operate www.hotfile.com ("Hotfile" or the "Hotfile website"), a system that enables copyright infringement on a mindboggling scale. Hotfile is responsible for *billions* of infringing downloads of copyrighted works, including plaintiffs' valuable motion picture and television properties.  As with other adjudicated pirate services that came before it, from Napster and Grokster to Isohunt and Limewire, Hotfile exists to profit from copyright infringement.  As with those other adjudicated infringers, the evidence is unmistakable that Hotfile actively fosters the massive copyright infringement that fuels its business.  As with those other infringers, more than 90% of the files downloaded from Hotfile are copyright infringing, and nearly every Hotfile user is engaged in copyright infringement.  In short, as defendants acknowledged internally, Hotfile is a ███████████████████████

Defendants protest that Hotfile is not like Napster, Grokster, Limewire, and other notorious infringers.  But the differences make Hotfile's infringement more egregious, not less. No earlier pirate services had the temerity actually to *pay* its users to upload infringing content. Hotfile does.  Hotfile's own economist acknowledges that Hotfile's practice of paying uploaders (Hotfile's so-called "Affiliates") based on how many times their files are downloaded induces the uploading of "popular" (*i.e.*, infringing) content.  Additionally, unlike previous adjudicated infringers, which facilitated access to content stored on users' computers, Hotfile itself physically stores all the infringing content on its *own* servers, giving it an unprecedented ability to stop the infringement – an ability Hotfile chooses not to exercise.  Finally, Hotfile's business model is indistinguishable from that of the website Megaupload, which recently was indicted *criminally* for engaging in the very same conduct as Hotfile.  Defendants even admit that they formed Hotfile "to compete with" Megaupload.

The uncontroverted evidence proves Hotfile is liable as a secondary copyright infringer, for the same reasons as the adjudicated infringers that preceded Hotfile:

o   Hotfile is overwhelmingly used for infringement and little else.

o   Hotfile's business model depends on copyright infringement to attract users.

o   Hotfile actively encourages and promotes its users' copyright infringement.

o   Hotfile has full knowledge of the rampant infringement on its system.

o   And, Hotfile has the ability to mitigate the copyright infringement on its system but does not, choosing instead to monetize and profit from it.

Likewise, incontrovertible evidence establishes that defendant Titov is personally liable for the infringing acts of Hotfile. Titov admittedly "personally participated" in substantially all of the conduct that gives rise to Hotfile's liability. As discussed below, as Hotfile is liable, so is Titov.

The core issue in this case is whether Hotfile is eligible for "safe harbor" under the Digital Millennium Copyright Act ("DMCA"), 17 U.S.C. § 512. If it is, then defendants are immunized from damages and subject to only limited injunctive relief. If it is not, then defendants bear full responsibility for the infringement they facilitated through the Hotfile website. Here, on facts not reasonably in dispute, Hotfile cannot meet *any* of the DMCA's requirements for safe harbor.

*First*, Hotfile did not reasonably implement a policy of terminating "repeat infringers," as the DMCA requires. This was not inadvertent. Prior to this litigation, defendants claimed ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████ before this litigation, Hotfile did *not* identify or keep track of infringers, did *not* assign "strikes" to infringing users, and did *not* terminate those repeat infringing Hotfile users who received multiple strikes. Defendants took no action against repeat infringers because Hotfile's business model depended on repeat copyright infringers. Defendants *need* Hotfile "Affiliates" to upload popular copyrighted content en masse. Instead of terminating these repeat infringers, Hotfile paid them ████████████. Nearly all of Hotfile's top Affiliates were egregious repeat infringers.

After getting access to Hotfile's data through discovery in this litigation, plaintiffs did what Hotfile should have done, but refused to do. Plaintiffs examined the infringement notices sent to Hotfile by copyright owners and identified the repeat infringers. The number of repeat infringers was staggering. By the time this complaint was filed, *more than* ████ *Hotfile users* had been the subject of three or more copyright infringement notices – that is, they had accumulated three or more "strikes" for copyright infringement and should have been terminated, but were not. ████ of Hotfile users had been the subject of 300 or more infringement notices, yet Hotfile still permitted them to continue infringing. Long after defendants should have terminated them (but did not), these repeat infringers uploaded more than ████ files containing infringing copies of plaintiffs' copyrighted motion pictures and

television programs, and these infringing files were then downloaded from Hotfile ███████
███████

 *Second*, the DMCA has strict requirements for registration and disclosure of a DMCA "agent" and provides that a service provider is not eligible for any DMCA safe harbor unless and until those requirements are met.  By their own admissions, defendants failed to comply with the DMCA's registration and disclosure provisions until at least May 2010, more than 15 months after Hotfile's launch.  In fact, Hotfile remains in violation of those provisions even today.

 *Third*, service providers with actual or "red flag" knowledge of copyright infringement on their systems are ineligible for DMCA safe harbor.  Based on facts that cannot genuinely be disputed, defendants plainly had disqualifying knowledge.

 *Finally*, service providers who induce copyright infringement (who act with the object of fostering infringement) are not eligible for DMCA safe harbor at all.  As discussed below, defendants did just that.

 It is not a coincidence that Hotfile cannot satisfy any of the DMCA prerequisites.  These DMCA tests are designed to limit DMCA safe harbor to only *innocent* service providers – those who have no meaningful knowledge of infringement on their systems and who act reasonably to prevent infringement.  Hotfile is anything but innocent.  As with earlier adjudicated infringers, defendants conceived, built and operate Hotfile to promote and profit from massive copyright infringement.  Defendants are liable for that copyright infringement, and cannot seek refuge under the DMCA.  Plaintiffs request that the Court grant summary judgment in their favor.

## FACTUAL BACKGROUND

 At the time of the complaint, Hotfile was one of the most popular websites on the Internet.  Yeh Ex. 85.  Its business was and still is selling access to the more than one hundred million files – movies, television programs, software, and other content – that Hotfile users upload to Hotfile.

 **A.** **How Hotfile Works.**

 Hotfile is a web-based file distribution service (a "download hub") supported by more than 700 high-powered computer servers located in Dallas, Texas.  Foster Decl. ¶ 5.  Users are encouraged to upload files to Hotfile; uploaded files are stored physically on one or more of Hotfile's servers in Dallas.  *Id.* ¶¶ 5, 7.  Uploading to Hotfile is easy.  The upload feature is on Hotfile's homepage; a user simply uses the "Choose File" feature to select a file on the user's

computer.  Clicking the "Upload" button initiates the upload.  *Id.* ¶¶ 5-6.  Once the file is uploaded, the user receives a unique Hotfile "download link" corresponding to the uploaded file. A typical Hotfile download link is in the following form: "http://hotfile.com/dl/80275915/b1255e7/Modern.Family.S02E07.HDTV.XviD-LOL.rar.html." *Id.* ¶ 6.  That download link identifies the file on Hotfile; anyone with the download link can access and download the file.  *Id.* ¶¶ 6-7.

Hotfile does not have a search feature on its website to allow users to locate Hotfile-stored content directly from the site.  *Id.* ¶ 9.  Instead, Hotfile actively encourages its users to post Hotfile download links on other websites and "promote" them so that other people can find them and download the content: "Earn money while uploading and sharing your files with your friends."  SUF 16(a)(v).  As a result, a pirate network of websites (known as "link sites") has emerged to host, organize and promote download links to content stored on Hotfile and similar download hubs.  Foster Decl. ¶¶ 7-9; Yeh Ex. 98 ¶¶ 10-11.  These link sites function as storefronts for Hotfile-stored content, enabling Hotfile users to find content.  In the case of a movie, for example, a link site may contain detailed information including the title, release year, official movie posters, and cast information, as well as the various download links needed to download the movie.  Yeh Ex. 43.  Hotfile pays these websites for referring users to Hotfile.[1]

When a user finds a file to download on a link site, the user simply clicks the Hotfile download link and is brought to a "Download" webpage on the Hotfile website.  The "Download" page gives the user two download options:  a "Regular Download," which is free, or a "High Speed Download," which requires the user to pay for a "premium" subscription.  For "free" users, Hotfile deliberately slows the download speed, allowing users to download only one file every 30 minutes, and generally provides less attractive download features.  A premium subscription requires payment, but offers the user faster downloads and other advanced downloading features.  Foster Decl. ¶ 7.  In this way, Hotfile seeks to encourage users to purchase premium accounts.  SUF 16(e).

---

[1] There is no technological or business reason why Hotfile does not have a search function on its own website; even defendant Titov could not think of one.  SUF 11(b)(i); *see also* Foster Decl. ¶ 9.  Rather, some years ago pirates were advised, as a way to avoid copyright liability, to "disaggregate" the functions of their sites so they were not performing all infringement-related functions on a single site.  SUF 11(b)(ii).  Thus, Hotfile's subcontracting of the Hotfile search function to various link sites, which Hotfile then compensates, reflects Hotfile's attempt to conceal, or blind itself to, the rampant copyright infringement it fosters.

Whether the user has a free or premium account, with the push of the download button Hotfile transmits a copy of the content from its servers in Dallas to the user's personal computer. Foster Decl. ¶ 7. Once the download is complete, the user can play the file (*e.g.*, watch the movie), transfer the file to another device, or further distribute it without limitation. *Id.* ¶ 7.

### B. Hotfile's Business Model.

Hotfile's sole source of revenue is selling premium subscriptions. SUF 16(e)(i). Every time a non-premium user clicks a Hotfile download link to obtain a file the user is brought to a Hotfile "Download" page where Hotfile attempts to sell the user a premium account. Currently, Hotfile sells premium accounts for $9 a month, $35 for six months, or $55 for a year. Foster Decl., Ex. C. ███████████████████████████████████████████████████████
███████████████████████████████████

Hotfile's entire business model hinges on being able to offer its users access to the content they want most. In order to make a business selling premium subscriptions, Hotfile needs users by the millions to click Hotfile download links, so that Hotfile can sell them premium subscriptions. SUF 16(a)(i) & (e). In order to attract that volume of users, Hotfile needs to offer content that users want to download. SUF 16(e). As Hotfile's economist explained, there are other download hubs that compete with Hotfile. SUF 16(e)(ii). If users cannot find the content they want on Hotfile, they will go elsewhere.

### C. Hotfile's Affiliate Program Openly Induces Copyright Infringement.

Hotfile offers a variety of monetary rewards to users and link site operators to encourage them to upload, and promote the downloading of, popular content. Hotfile refers to this as its "Affiliate" Program and refers to the participating users and link site operators as Affiliates.

Hotfile's Affiliate Program for Uploaders. Any registered Hotfile user can become an Affiliate, upload files, and receive payments from Hotfile. Yeh Ex. 1 (Titov dep.) at 648:5-7; Yeh Ex. 57. Hotfile pays its Affiliates to upload content "popular" with Hotfile downloaders. SUF 16(a)(i)-(iii). Hotfile is not subtle about this. SUF 16(a)(i); Yeh Ex. 58 ("we want to benefit all uploaders which works good, got many downloads of their files . . . "). Hotfile pays Affiliates based on how many times their uploaded files are downloaded by other users. The more times a file is downloaded, the more Hotfile pays the uploader. SUF 16(a)(ii)-(iii). As shown below, content "popular" with downloaders is overwhelmingly copyright infringing. *See infra* 9-10; SUF 16(a)(vii).

Hotfile's Affiliate program affirmatively discourages users from uploading files that are not downloaded frequently, because those files consume Hotfile resources without generating premium subscriptions.  SUF 16(a)(iv)-(vi); *e.g.*, Yeh Ex. 61 at 13 ("some webmaster just . . . upload LOTS of gigabytes, but don't promote their files.  So these kind of webmasters use our server resources, upload resources, bandwidth, diskspace and at final they make our service to work slow").  Hotfile discourages unpopular files through a "ranking" system (Platinum, Gold, Silver, Bronze, and Copper), which governs how much Affiliates are paid.  SUF 16(a)(iv).  Hotfile assigns "rank" based in part on an Affiliate's ratio of uploaded files to downloaded files.  SUF 16(a)(i)-(iv).[2]

Hotfile also uses its Affiliate program to encourage Affiliates to upload large files – because "free" users frustrated with downloading large files at slow download speeds are more likely to upgrade to premium accounts to get faster download speeds.  SUF 16(a)(ix).  To accomplish this, Hotfile defines three categories of file size (5-50MB, 50-100MB, and 100-2000MB), and pays more for downloads of the larger files.  SUF 16(a)(ix).  Movies and television programs are very large files, usually well over 100MB.  SUF 16(a)(x).  Larger files generally are more likely to be copyright infringing.  Br. Appendix A; SUF 16(a)(xi).

The following "Earnings Table" from Hotfile's website illustrates how the different elements of Hotfile's rewards system work together to encourage infringement:

| Earnings Table | | | |
|---|---|---|---|
| Rank | 5 - 50MB | 50 - 100MB | 100 - 2000MB |
| Copper | $2 | $3 | $4 |
| Bronze | $3 | $5 | $7 |
| Silver | $5 | $7 | $10 |
| Gold | $6 | $9 | $12 |
| Platinum | $7 | $10 | $15 |
| Note: All prices are for 1000 downloads. | | | |

Yeh Ex. 57.

---

[2] For example, Hotfile gives an Affiliate a higher rank for uploading one file that is downloaded 10,000 times, than for uploading 10,000 files that are each downloaded once.  In each case, there are 10,000 downloads, yet Hotfile rewards the former and punishes the latter.  SUF 16(a)(iii)-(iv); Yeh Ex. 59 at 3 (Hotfile FAQ: "Used server space is also accounted when your rank is considered").

6

Both the design and effect of Hotfile's Affiliate compensation scheme are clear:  Hotfile encourages Affiliates to upload and promote very popular large files, to attract downloading users to whom Hotfile can sell premium subscriptions.  SUF 16(a)(i)-(ii) & (vii).  Defendants' economist agrees.  SUF 16(a)(viii) (the "economically logical conclusion" of Hotfile's "incentive structure" is to "encourage users to upload files that will be popular with downloaders").

<u>Hotfile's Affiliate Program for Link Site Operators.</u>  Because Hotfile avoids having a search function, Hotfile depends on link sites to host, organize and promote download links to content stored on Hotfile.  Hotfile's Affiliate program encourages the development of pirate link sites that do nothing other than promote download links.  SUF 16(a)(xii).  Link site owners can register their sites with Hotfile, and Hotfile compensates the owners whenever users coming from their sites purchase Hotfile premium subscriptions.  SUF 16(a)(xiii).

Hotfile actively solicits these link sites:  "Post ***interesting*** download links in your site, blog or forum and ***earn big money***."  SUF 16(a)(xii) (emphasis added).  Titov encouraged link sites to become Hotfile Affiliates so that "people will make search/catalogue sites like rapidlibrary.com and more people will download our links."  SUF 16(a)(xii).  Hotfile so needs link sites to promote Hotfile-stored content that, ██████████████████████████████ ██████████████████████████████████████████████████████████ ██████████████████████████ SUF 10(d)(i).  That operator's link site blatantly promotes movie and television piracy – right on its homepage – ████████████████████████ ████████████████████████████████████ SUF 10(d)(i).

Most of link sites of this sort are not legitimate websites by any stretch.  Several of them have been shut down by federal law enforcement; others have been found liable for copyright infringement in civil actions.  *E.g.*, SUF 10(d)(iii).  From their names alone, it is clear that a great many of ████████████████ link sites are devoted to copyright infringement:

- Currentmoviesnowplaying.com
- online-television.tv
- free-albums.net
- ebook-free-download.net
- copymovie.net
- topdvdmovie.net
- amazingtv.info
- tvrip.info
- hotfilemovie.net
- tvseries.me
- seriesfree.biz
- best-movies.info

SUF 10(d)(iii) ████████████████████████████████████████).

Hotfile has paid its Affiliates handsomely for providing and promoting content files on Hotfile. ████████████████████████████████████████████████████████

████████████████████████████ Yeh Ex. 13 at 13. ████████████████████████████

████████████████████████████ Yeh Ex. 3 (Stoyanov dep.) at 52:7-54:9; Yeh Exs. 87-88.

### D. Hotfile's Business is Unlawful File Distribution, Not File Storage.

In this litigation, defendants have suggested that they created Hotfile as a place where users can store their personal files.  But that claim is belied by defendants' pre-litigation statements, by the structure of Hotfile's Affiliate program, and by the business rules defendants impose on Hotfile.  SUF 16(a)(iv)-(vi).  While some users may incidentally use Hotfile for personal storage, Hotfile's true business is the mass *distribution* of files.  Hotfile earns revenue *only* from premium subscriptions, which users buy for a better downloading experience. ███████

████████████████████████████████████████████████████████████

██████████████████████████ Yeh Ex. 7 (Lynde dep.) at 184:12-23.  Indeed, Hotfile's marketing of its premium service focuses exclusively on the benefits of enhanced downloading. SUF 16(e).  Hotfile's Affiliate program only pays uploaders when their files are downloaded. *See supra* 5-6.  And, as it tells users, Hotfile actually deletes files if they are not frequently downloaded.  SUF 16(a)(vi). ██████████████████████████████████ Foster Decl. ¶ 47 n.9.  That is the antithesis of personal storage.[3]

Before this litigation, defendants were blunt that they wanted files only for distribution, not for storage: "Upload files only if you intent [sic] to promote them."  SUF 16(a)(v).  Hotfile's Affiliate compensation scheme, moreover, admittedly sought "to encourage good *promoters* by increasing their earnings and to *reduce* the earnings for uploaders that mainly use the free hotfile resources for personal storage."  SUF 16(a)(v).  As noted above, defendants *reduce* payments to Affiliates who upload files that do not generate many downloads.  SUF 16(a)(iv); *supra* 6.

Hotfile's chiding of users on public forums puts to rest any suggestion that Hotfile based its business on personal storage:  "To pay you just to upload?  Why should we pay you then?  … Why should we upload files that nobody wants to download?  You may think your files are interest[ing] and most probably they are, but we must convince downloaders and convert them to premium users."  Yeh Ex. 58 at 5.

---

[3] The files of premium users are not deleted for inactivity. ████████████████████████
████████████████████████████████ Foster Decl. ¶ 39.

### E.      Hotfile Is Used Overwhelmingly For Copyright Infringement.

Hotfile is used overwhelmingly for copyright infringement. SUF 10(a). Using established statistical methodologies accepted in federal courts in every comparable online infringement case, Dr. Richard Waterman measured the proportion of downloads from Hotfile that are copyright infringing using data from the month before this litigation. That analysis demonstrates that *over 90%* of the download activity from the Hotfile website is copyright infringing. *See* Br. Appendix B; SUF 10(a)(i). In this respect, Hotfile is no different from previous adjudicated infringers. *See* Br. Appendix C; SUF 10(a)(i); *see also infra* 30-31.

That Hotfile is effectively a hub for infringement and little else is confirmed from Hotfile's own data, examined from any number of different perspectives. For instance:

o   Looking at Hotfile uploaders in plaintiffs' statistical analysis, over ███ were found to be engaged in copyright infringement – that is, they had uploaded infringing content for public distribution. *See* Br. Appendix D; SUF 10(a)(ii).

o   As a result of copyright owner infringement notices, Hotfile has been forced to delete – just for reasons related to infringement – almost ███ of all files *ever uploaded* to Hotfile; furthermore, Hotfile has been forced to delete almost ███ of all files *ever downloaded* from Hotfile – even just once – for reasons directly related to infringement. *See* Br. Appendix E; SUF 10(a)(iii).

o   This litigation forced Hotfile finally to adopt a "three strikes" termination policy. ███ ████████████████████████████████████████████████████████ ████████████████████████████ Yeh Ex. 2 (Titov ESI dep.) at 67:20-68:17. Nevertheless, within months, Hotfile was forced to terminate ███ of its "Top 500" highest paid Affiliates – its most important uploaders. *See* Br. Appendix I; SUF 10(a)(vi). Moreover, about ███ of the rest escaped termination only because they had stopped uploading by the time Hotfile adopted its "three strikes" policy. SUF 10(a)(vi).

o   Hotfile uploaders overwhelmingly have been identified as copyright infringers – *i.e.*, they have been the subject of copyright owner infringement notices or, after the filing of this action, terminated as repeat copyright infringers. SUF 10(a)(iv)-(v). For instance, the average Hotfile uploader has uploaded ███ files; of all Hotfile users having uploaded ███ files or more, more than ███ have been the subject of infringement notices and more than ███ have been terminated (post-litigation) as repeat copyright infringers. SUF

10(a)(iv).  And those infringement numbers increase dramatically for Hotfile users with greater numbers of uploads.  *See* Br. Appendix F; SUF 10(a)(iv).[4]

o   In what is plainly just the tip of the iceberg, plaintiffs identified ▮▮▮ unique Hotfile download links comprising ▮▮▮ distinct motion pictures and television programs for which the copyrights are held by plaintiffs.  Yeh Decl. ¶ 120 & Ex. 119.  Hotfile users downloaded these infringing files over ▮▮▮▮ Foster Decl. ¶ 66.

These are indisputable facts from Hotfile's own data.  Collectively, they show that Hotfile is a business with no credible claim to legitimacy.

### F.   Defendants Actively and Knowingly Foster Copyright Infringement.

#### 1.   Defendants Turned a Blind Eye to Repeat Copyright Infringers.

To support Hotfile's business model, defendants depend upon a core of uploaders to supply content, whose blatantly infringing activities they ignored.

Defendants received notifications from copyright owners identifying more than ▮▮▮



unique infringing files on Hotfile.  SUF 1.  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

SUF 2.  Indeed, Hotfile had to identify the uploaders in order to pay them as Affiliates.  Foster Decl. ¶ 20.  Yet, until this litigation forced the issue, defendants made no effort to identify or give warnings to uploaders of files identified as infringing; they did not assign "strikes" or otherwise keep track which users' files were removed for copyright infringement, and therefore obviously could not implement a repeat infringer policy.  SUF 3-4.[5]

Defendants knew that they could not justify ignoring repeat infringers.  Other online companies have well-publicized repeat infringer policies that warn users on the first infringement notice and terminate users after the second or third notice.  *See infra* 21.  So, defendants simply fabricated a policy that did not exist.  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

---

[4] These figures do not measure the true number of Hotfile users who are infringers – just those who "got caught" in that a copyright owner sent an infringement notice on one or more of their files.  Of course, not all copyright owners have the resources to continually monitor Hotfile for infringing works, and many Hotfile users may have uploaded infringing files that copyright owners simply have not yet been able to locate or notice.

[5] As defendants acknowledge, they are the only ones in a position to identify repeat copyright infringers; copyright owners themselves have no means of identifying the user associated with a particular infringing upload.  SUF 3.

██████████████████████████████ SUF 4(b)(i). ████████████████████████

████████████████████ SUF 4(b)(ii). █████████████████████████████████

████████████████████████████████████████████████████████████████████

███████████████████ SUF 4(b)(iii)-(iv).  Hotfile had no such policy.

Defendants' approach to repeat infringers before this litigation was filed can only be described as disingenuous.  In the two years of operation prior to the filing of this litigation, despite having received ███████ infringement notices, Hotfile terminated only ██ users for reasons related to copyright infringement.  SUF 4(c).  ████████ of those came as a direct result of a lawsuit against Hotfile brought by a copyright owner named Liberty Media, *after* Liberty Media secured a temporary restraining order enjoining Hotfile from further infringement of Liberty Media copyrights.  SUF 4(c)(i).  The few other terminations similarly were ████ ██████████████████████████████████████████████████████████████ ████████████████████ SUF 4(c)(ii).  As reflected in the appended timeline, prior to this litigation, Hotfile did not terminate any infringers on its own initiative.  *See* Br. Appendix G.

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████████ SUF 4(d).

Hotfile's "no termination" policy was well understood by its users.  In one online forum discussion, in which Hotfile personnel actively participated, a Hotfile user openly touted Hotfile's policy as a reason to become a Hotfile Affiliate:  "If any of your files are reported by a real representative . . . then the file will be deleted, but your account credit will not be removed, and you will not be suspended from hotfile.com."  SUF 4(e).

Defendants' failure to terminate even the most blatant repeat infringers caused enormous harm to copyright owners.  Prior to this litigation, █████ Hotfile users should have been terminated as repeat copyright infringers under any "three strikes" policy.  SUF 5(a).  ████████ of Hotfile users were subject to 10, 25 and even 100 infringement notices; indeed, ████ users were the subject of 300 or more notices.  SUF 5(a); *see* Br. Appendix H.  These repeat copyright infringers were responsible for uploading nearly ██████ files after their third "strike," *i.e.*, after Hotfile should have terminated them.  SUF 5(a)(i).  Those files, which Hotfile never should have allowed to be uploaded, were downloaded almost ████████████ SUF 5(a)(iii); *see* Br.

Appendix H.  Hotfile paid these repeat infringers – Hotfile's Affiliates – more than ███
████ SUF 5(a)(iv).  Out of a total of ████████ paid to *all* Affiliates, Hotfile paid over
$10.8 million to these blatant repeat infringers.  *Id.*

Defendants' implementation of a "three strikes" termination policy *only after* this
litigation was filed reflects how important repeat infringers were to Hotfile.  Yeh Ex. 9 (Titov
Decl., Feb. 27, 2011) ¶ 14.  Within months of adopting a "three strikes" policy, Hotfile was
forced to terminate ██████ of its top Affiliates and ████████████ of its uploaders.  *See* Br.
Appendix I; SUF 5(b).  ***Those repeat infringers collectively accounted for over*** ████ ***all files
ever uploaded to Hotfile, and more than*** ████ ***of all downloads Hotfile ever recorded.***  SUF
10(a)(vi)-(vii).  When Hotfile finally terminated those repeat infringers and removed their files,
Hotfile's premium subscribers complained loudly that copyrighted works were no longer
available, and made clear in email after email that they had purchased premium accounts
specifically to download copyrighted works, including plaintiffs' movies and television shows.
SUF 16(e)(iii) (*e.g.*, complaining that they could no longer download *Two and a Half Men,
Grey's Anatomy, Glee*).  User traffic to the Hotfile website, and ███████████████ .
Yeh Exs. 69 & 70 at 7.

**2.      Defendants Sought Out Users Who Would Upload Infringing Files.**

During the formative early months of Hotfile's operation, defendants made concentrated
efforts to solicit users to upload popular – infringing – content to Hotfile.  SUF 16(b).  To do
this, defendants charged contractor-employee Andrei Ianakov with responsibility for promoting
Hotfile in online forums.  Yeh Ex. 1 (Titov dep.) at 493:19-494:14, 76:19-77:3.  Using the screen
name "Butcher Boy," Ianakov overtly solicited what he termed "good uploaders," those who
would upload files for widespread distribution, and emphasized that Hotfile's "goal" was to have
users upload "some stuff-mp3, videos, applications, games on our file host and spread these links
over forums like pornbb.org (for videos) and like http://www.zona-musical.com/forum1.html
(for mp3) and other forums where download links are posted (to games, applications and so on)."
SUF 16(b)(ii).  Ianakov specifically solicited users to upload movies.  SUF 16(b)(ii).  When one
forum user posted that "I want to upload 200-400mb videos for a tv show site," Ianakov
encouraged the user to upload the infringing files to Hotfile.  SUF 16(b)(iii).[6]

---

[6] Defendants claim Ianakov quit as soon as plaintiffs filed a motion to compel his deposition,
leaving no means to compel defendants to produce him for deposition.  Yeh Ex. 89 at 4.


SUF 16(b)(v).

SUF 16(b)(v).

SUF 10(h).  That private acknowledgement among Hotfile principals speaks volumes about defendants' knowledge.

### 3. Defendants Helped Users Engage in Specific Acts of Infringement.

Defendants provided assistance to users seeking to download copyrighted works – specific works clearly identified in their communications with defendants.  SUF 9(c).  For example, in response to a request for technical assistance in downloading the popular movie *Despicable Me*, Hotfile personnel advised that the user "must be logged as premium and then . . . copy/paste links in browser window."  SUF 9(c).  In responding to another Hotfile user asking for help with downloading an episode of the popular television show *Chuck*, Hotfile recommended using "download managers" such as Jdownloader.  SUF 9(c).  Hotfile helped another user download an episode of *The Howard Stern Show*, and when a user had problems downloading the design software *SolidWorks*, Hotfile personnel responded that they downloaded "the same file and there is no problem."  SUF 9(c).  The list goes on.  *E.g.,* SUF 9(c).

Moreover, in requesting technical assistance, Hotfile users repeatedly told defendants explicitly that they were trying to download copyrighted content that was obviously infringing, including numerous works owned by the plaintiff studios.  Users, for example, asked Hotfile for help downloading *Desperate Housewives, Avatar, The Social Network*, *How I Met Your Mother*, *The Karate Kid, Wall-E, NCIS, The Italian Job, Iron Man, Spiderman 3, Alien, 30 Rock, Sex and the City 2, Little Fockers, Cinderella*, and countless others.  SUF 10(c).

### 4. Defendants Had Actual Knowledge of Specific Infringing Files.

Defendants had actual knowledge of copyright infringement on Hotfile at the most granular level – they knew of countless Hotfile download links to infringing content, and did nothing about them.  One source of Hotfile's actual knowledge was notices of infringement sent by copyright owners – notices with which defendants did *not* comply.  By way of background,



SUF 9(a)(v).  This allowed Hotfile users to defeat DMCA notices, by simply posting one of the remaining download links.

Defendants additionally gained actual knowledge of infringement from Hotfile user communications.  Defendants designed Hotfile's web-based user messaging system so that every user communication includes data showing the actual download link the user accessed immediately before sending the message.  SUF 9(b).  Those links – displayed to Hotfile personnel in thousands of user communications as "lastdl" for "last download" – repeatedly identified blatantly infringing content on Hotfile.  SUF 9(b).  Thus defendants had actual knowledge of specific download links for such obviously infringing copyrighted works as

---

[7] A "hash" is a long alphanumeric value that identifies a unique file, such as a specific digital copy of a movie or television show.  Foster Decl. ¶ 28(b) & n.4.

*House*, *Two and Half Men*, *Inception*, *Wall-E*, *Glee*, *Heroes*, *Million Dollar Baby*, *Black Swan*, *Date Night*, *The Simpsons*, and countless more.  SUF 9(b).

### 5.   Defendants Used Copyrighted Content to Illustrate How to Use Hotfile.

Infringement on Hotfile was so prevalent and well understood that defendants did not think twice about using copyrighted works as examples when describing the functioning of Hotfile tools.  SUF 10(e).   Defendants tweeted instructions for using its remote upload tool illustrated with an infringing adult content title.  SUF 10(e)(iii).  And, defendants illustrated the "file checker" feature on the Hotfile website using a download link for the Pussycat Dolls' popular album "Doll Domination."  SUF 10(e)(i).

### 6.   Defendants Had Knowledge from Multiple Additional Sources.

Defendants' knowledge of rampant copyright infringement was repeatedly revealed in defendants' routine Hotfile activities and communications:

- o  Defendants' concern was not about blocking infringing content, but about making sure infringing content was properly labeled.

- o  In email after email, Hotfile's users told defendants of specific, named copyrighted works being downloaded through Hotfile.  SUF 10(c) (*e.g.*, movies *Unfaithful, Salt, Get Him to the Greek*; television shows *Criminal Minds, Dexter, The Office*).

- o  In numerous communications, Hotfile users admitted buying premium accounts for the purpose of downloading specifically identified copyrighted content.  SUF 16(e)(iii).

- o

- o



o ████████████████████████████████████████████
████████████████████████████████████

o ██████████████████████████████████████████
██████████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████  Defendants expressed no concern
that these infringing files would remain available through Hotfile.

o ██████████████████████████████████████████████
████████████████████████████████████████████

From the sheer volume of DMCA infringement notices Hotfile received, defendants
cannot credibly claim they were not aware of the widespread infringement on the site.  In the two
years from Hotfile's formation to the filing of this litigation, Hotfile received copyright notices
identifying over ████████ unique infringing files.  SUF 1.  Those notices forced Hotfile to
delete almost ██████ of all files ever downloaded from Hotfile.  SUF 10(a)(iii).

G.      **Defendants Failed to Consider Standard "Filtering" Technology.**

Against this backdrop, it is hardly surprising that defendants failed to use standard
"filtering" technologies to automatically identify and block copyright infringing files.  These
video content identification technologies have been routinely deployed on websites and in
numerous other commercial applications for years, well before Hotfile launched.  SUF 16(j)(i).
The most common technology, known as "digital fingerprinting," identifies content based on its
actual video and audio properties, and is widely accepted as extremely accurate.  SUF 16(j)(ii).
Defendants knew that major sites such as YouTube were using digital fingerprinting.  However,
prior to the filing of this litigation, defendants ████████████████████████████████
████████ ████████████████ as a means to prevent infringement on Hotfile.  SUF
16(j)(iii).  That is because defendants did not want to eliminate infringement on Hotfile.  They
deliberately built Hotfile to exploit and profit from copyright infringement.[9]

---

[9] Well after this litigation was filed, trying to improve its litigation position, Hotfile licensed
digital fingerprinting technology from Vobile, a well respected vendor in the field.  Yeh Ex. 1
(Titov dep.) at 506:17-508:7. ████████████████████████████████████████████
████████████████████████████████████████████████████████████████████

### H.      Plaintiffs Suffer Substantial Harm from Defendants' Piracy.

The massive infringement of plaintiffs' works on Hotfile has caused and continues to cause substantial damage to the plaintiffs.  *See* Kang Decl. ¶ 4.  By making free copies of plaintiffs' works – among them some of plaintiffs' most valuable titles – available for unrestricted distribution over the Internet, Hotfile harms plaintiffs' ability to monetize those works through legitimate transactions.  *Id.* ¶¶ 9-11.  It also devalues the works by creating an environment in which Hotfile users can obtain them, at any time, free of cost.  *Id.* ¶ 12.  Every infringing Hotfile download, moreover, potentially results in limitless further "viral" distribution, because users can distribute a file to other users, who in turn can distribute it to countless other users.  *Id.* ¶ 13.

### LEGAL STANDARD

Summary judgment is proper if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  A party opposing a motion for summary judgment must "come forward with evidentiary material demonstrating a genuine issue of material fact for trial." *Floyd v. McNeil*, Case No. 4:10 cv 289-RH/WCS, 2011 U.S. Dist. LEXIS 150619, at *4 (N.D. Fla. Dec. 5, 2011).  The non-moving party "must show more than the existence of a metaphysical doubt regarding the material facts."  *Id.*  "If the [non-moving party's] evidence is merely colorable, or is not significantly probative, summary judgment may be granted."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50 (1986) (internal citations omitted).

### ARGUMENT

Defendants are liable under each of the three theories of secondary copyright liability: (1) Defendants are liable for inducement of infringement under *Metro-Goldwyn Mayer Studios, Inc. v. Grokster, Ltd.*, 545 U.S. 913, 936-37 (2005) ("*Grokster*"), which holds that a defendant who operates a service with the "object" that it be used to infringe is liable for the resulting acts of infringement by third parties.  *Id.*  (2) Defendants are liable under traditional contributory liability, which imposes liability on one who "with knowledge of the infringing activity, . . . materially contributes to the infringing conduct of another."  *Arista Records LLC v. Lime Group LLC*, 784 F. Supp. 2d 398, 432 (S.D.N.Y. 2011) (quotation marks omitted) ("*Limewire*")*; see also, e.g., Cable/Home Commc'n Corp. v. Network Prods., Inc.*, 902 F.2d 829, 845 (11th Cir. 1990) (same).  (3) Defendants are vicariously liable for infringement by "profiting from direct

infringement while declining to exercise a right to stop or limit it." *Grokster*, 545 U.S. at 930. Under well established principles of secondary copyright liability, absent safe harbor under the DMCA, defendants are plainly liable.

Thus, the key issue in this case is defendants' claim that they are entitled to the "safe harbor" protections of the Digital Millennium Copyright Act, 17 USC § 512(c). Accordingly, plaintiffs address defendants' DMCA defense first, in Section I below.

## I.  DEFENDANTS CANNOT PROVE ENTITLEMENT TO DMCA SAFE HARBOR.

In enacting the DMCA, Congress understood that "copyright industries are one of America's largest and fastest growing economic assets," S. Rep. No. 105-190, at 10 (1998), but that the ease with which digital files can be disseminated across networks "will unfortunately . . . facilitate pirates who aim to destroy the value of American intellectual property." H.R. Rep. No. 105-551(I), at 9 (1998).[10]  Accordingly, the strict eligibility rules for DMCA "safe harbor" ensure that "[t]his immunity … is not presumptive, but granted only to 'innocent' service providers…." *ALS Scan, Inc. v. RemarQ Communities, Inc.*, 239 F.3d 619, 625 (4th Cir. 2001). Moreover, the DMCA's safe harbors, as with all immunities from liability, are to be narrowly construed. *United States. v. Texas*, 507 U.S. 529, 53435(1993); *see also Fame Publ'g Co. v. Ala. Custom Tape, Inc.*, 507 F.2d 667, 670 (5th Cir. 1975) (statutes that provide exceptions to liability under the Copyright Act should be strictly and narrowly construed).

Here, defendants assert the "Section 512(c)" safe harbor, which addresses content stored on the service provider's system at the direction of a user. 17 U.S.C. § 512(c).  In order to qualify for the § 512(c) safe harbor, defendants need to establish *each* of the following:

o  That defendants have "reasonably implemented" a policy for terminating Hotfile subscribers who are "repeat infringers," 17 U.S.C. § 512(i);

o  That defendants properly complied with the DMCA provisions for registration and disclosure of a DMCA "agent," 17 U.S.C. § 512(c)(2); and

o  That defendants did not have actual knowledge of the infringement on Hotfile, and otherwise were not aware of facts or circumstances – "red flags" – from which infringing activity was apparent, 17 U.S.C. § 512(c)(1)(A)(i) & (ii).

---

[10] The White House recently emphasized: "Piracy and counterfeiting in the online environment are significant concerns for the Administration.  They cause economic harm and threaten the health and safety of American consumers.  Foreign-based and foreign-controlled websites and web services raise particular concerns for U.S. enforcement efforts."  Yeh Ex. 90 at 1.

Further, defendants are not eligible for DMCA safe harbor if they are found to have induced copyright infringement under *Grokster*, as "inducement liability and the [DMCA] safe harbors are inherently contradictory." *Columbia Pictures Industries, Inc. v. Fung*, No. CV 06-5578 SVW (JCx), 2009 WL 6355911, at *18 (C.D. Cal. Dec. 21, 2009).[11]

Because the DMCA is a defense to copyright infringement, it is defendants' burden to prove that they satisfy each statutory requirement. *ALS Scan*, 239 F.3d at 623. Defendants cannot do so.

### A.    Defendants Failed to Reasonably Implement a Repeat Infringer Policy.

As a fundamental threshold requirement applicable to all DMCA safe harbors, a service provider is ineligible for safe harbor unless it:

> has adopted and reasonably implemented . . .  a policy that provides for the termination in appropriate circumstances of subscribers and account holders of the service provider's system or network who are repeat infringers.

17 U.S.C. § 512(i)(1)(A); *see also* S. Rep. 105-190, at 52 ("those who repeatedly and flagrantly … disrespect … the intellectual property rights of others should know that there is a realistic threat of losing that access"). As described by Judge Posner, "[t]he common element of [the DMCA's] safe harbors is that the service provider must do what it can reasonably be asked to do to prevent use of its service by 'repeat infringers.'" *In re Aimster Copyright Litig.*, 334 F.3d 643, 655 (7th Cir. 2003); *see also Fung*, 2009 WL 6355911, at *18. Enforcement of this provision is essential to "maintain the 'strong incentives' for service providers to prevent their services from becoming safe havens or conduits for known repeat copyright infringers." *Perfect 10, Inc. v. Cybernet Ventures*, 213 F. Supp. 2d 1146, 1178 (C.D. Cal. 2002) ("*Cybernet*").

Here, it is incontrovertible that, prior to this lawsuit, defendants failed to implement a meaningful policy to terminate repeat infringers. As described above, time and again, defendants received notice that specific files uploaded by Hotfile Affiliates and other users were infringing, and defendants did nothing to terminate those users. *See supra* 13-15; SUF 1. Defendants admit they did not attempt to associate infringement notices with the uploaders of the files, though it would have been ████████ to do so. SUF 2. ██████████████ hey had no systematic

---

[11] Defendants also are disqualified from safe harbor because they "receive a financial benefit directly attributable to the infringing activity, in a case in which [they also have] the right and ability to control such activity." 17 U.S.C. § 512(c)(1)(B). Plaintiffs reserve this issue for trial, if necessary.

practice of investigating uploaders of infringing files, and no process to flag or keep track of those users.  SUF 3.  ████████████████ they had no practice of terminating users who were the subject of multiple infringement notices, or any meaningful policy at all.  SUF 4.

Where a service provider has the ability to keep track of infringements by particular users but does not do so, it has not reasonably implemented a policy.  *Flava Works, Inc. v. Gunter*, No. 10 Civ. 6517, 2011 WL 3205399, at *10 (N.D. Ill. July 27, 2011) (finding no safe harbor for failure to comply with §512(i): "[i]t would be very easy for [defendant] to determine whether a particular [service] user had posted, on two or more occasions, a video that infringes one of plaintiff's copyrights" but defendant "refuse[d] to do so"); *Perfect 10, Inc. v. CCBill LLC*, 488 F.3d 1102, 1110 (9th Cir. 2007) ("*CCBill*") (failure to keep records of identified infringers, without more, calls into question service provider's implementation of a repeat infringer policy); *Ellison v. Robertson,* 357 F.3d 1072, 1080 (9th Cir. 2004) (failure to review infringement notices suggests that service provider did not reasonably implement policy).  In *CCBill*, the Ninth Circuit made clear that a service provider must account for takedown notices in determining which users are repeat infringers in order to implement a "reasonable" policy.  488 F.3d at 1113.

Defendants' failure to comply with the DMCA's repeat infringer provision was not based on inadvertence or ignorance.  ██████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ██████████████████████████████.

The effects of defendants' failure to comply with the DMCA's repeat infringer rules were staggering in scale and devastating for plaintiffs.  Using Hotfile's own data, plaintiffs have identified ████████████ Hotfile users who had at least "three strikes" as of the filing of the complaint – *i.e.*, they had uploaded files explicitly identified as infringing in copyright owner infringement notices on three or more separate occasions.  SUF 5(a).  The number of (ignored) strikes that some of Hotfile's users accumulated is even more astonishing:

   o   at least ████ Hotfile users had 5 or more strikes;
   o   at least ████ had 10 or more strikes;
   o   at least ████ had 25 or more strikes;
   o   at least ████ had ***100 or more*** strikes; and
   o   at least ██ Hotfile users accumulated ***300 or more*** strikes, while Hotfile allowed

their infringement to continue.  SUF 5(a).

These repeat infringers were the mainstay of Hotfile's Affiliate program, core uploaders responsible for a grossly disproportionate share of all files ever uploaded to Hotfile.  After their third strikes – that is, long after Hotfile should have terminated them – these repeat infringers uploaded a total of ███████████ files to Hotfile.  SUF 5(a)(i).  That is more than ████ of all files ever uploaded to Hotfile.  SUF 5(a)(ii).  Other Hotfile users downloaded those ███████████ files almost ████████ times.  SUF 5(a)(iii).  That is more than half of all downloads from Hotfile, ever.  *Id.*  Focusing on plaintiffs' content, those un-terminated repeat infringers uploaded at least ██████ files containing plaintiffs' copyrighted works, and those files were downloaded approximately ████ million times.  SUF 5(a)(v); *see also* Br. Appendix H.[12]  Rather than terminate these repeat infringers, defendants paid them as Affiliates, collectively more than ███████████ dollars.  SUF 5(a)(iv).

The egregiousness of defendants' failure to implement a repeat infringer policy – and the magnitude that the resulting harm – is unprecedented.

Defendants' conduct stands in stark contrast to that of any defendant that has been found by any court to have reasonably implemented a DMCA repeat infringer policy.  Indeed, in the cases upholding implementation of a repeat infringer policy as reasonable, the courts specifically found that the service providers identified the infringing users from DMCA notices, warned the user on the first notice, and terminated the user on the second or third notice.  *E.g.*, *IO Group, Inc. v. Veoh Networks, Inc.*, 586 F. Supp. 2d 1132, 1143 (N.D. Cal. 2008) ("two-strike" policy); *Corbis Corp v. Amazon.com, Inc.*, 351 F. Supp. 2d 1090, 1102-03 (W.D. Wash. 2004) (warning on first notice); *Viacom Int'l Inc. v. YouTube, Inc.*, 718 F. Supp. 2d 514, 527-28 (S.D.N.Y. 2010) (warning on first notice; "three strikes" policy); *see also CCBill*, 488 F.3d at 1110-11 (defendant kept detailed logs of subscribers identified as infringers in copyright owner DMCA notices).

In *Aimster*, the court found that defendants had not reasonably implemented a repeat infringer policy because Aimster encrypted user communications to make it impossible to identify infringers.  The court ruled that "[a]dopting a repeat infringer policy and then purposely eviscerating any hope that such a policy could ever be carried out is not an 'implementation' as

---

[12] These numbers just scratch the surface.  Defendants have denied plaintiffs access to Hotfile's full content database, which undoubtedly would have allowed plaintiffs to identify hundreds of thousands of additional infringing files.

required by § 512(i)." *In re Aimster Copyright Litig.*, 252 F. Supp. 2d 634, 659 (N.D. Ill. 2002), *aff'd*, 334 F.3d 643 (7th Cir. 2003). Willfully blinding oneself to the identities of repeat infringing users, as defendants did here, is no different. *Cf. Ellison*, 357 F.3d at 1080.

The DMCA's "repeat infringer" provision provides a critical protection for copyright owners. Defendants cannot qualify for a DMCA safe harbor merely by removing specific individual links identified in copyright owner infringement notices, without ever addressing the *sources* of repeated infringement: "Making the entrance into the safe harbor too wide would allow service providers acting in complicity with infringers to approach copyright infringement on [a file] by [file] basis without ever targeting the source of these [files]." *Cybernet*, 213 F. Supp. 2d at 1177; *see also id.* (DMCA does not "endorse business practices that would encourage content providers to turn a blind eye to the *source* of massive copyright infringement while continuing to knowingly profit"). Defendants here did more than "act[] in complicity with infringers"; they paid them as Hotfile Affiliates. Defendants' failure to reasonably implement a repeat infringer policy disqualifies them from DMCA safe harbor.

### B. Defendants Failed to Comply With DMCA Agent Designation Requirements.

As a second threshold prerequisite to any safe harbor, the DMCA requires service providers to designate and disclose a DMCA "agent":

> The limitations on liability established in this subsection apply to a service provider *only if* the service provider has designated an agent to receive notifications of claimed infringement …, by making available through its service, including *on its website* in a location accessible to the public, *and* by providing to *the Copyright Office*, substantially the following information:
> (A) the name, address, phone number, and electronic mail address of the agent…

17 U.S.C. § 512(c)(2) (emphasis added). Under Section 512(c)(2), Hotfile is not even potentially eligible for any safe harbor unless and until it had designated a DMCA agent *both* by listing the agent on the Hotfile website *and* by registering that agent with the Copyright Office.

The facts establishing defendants failure to comply with this DMCA mandate are admitted: (1) Hotfile launched in February 2009, but defendants did not register an agent with the Copyright Office until December 24, 2009; and (2) defendants did not identify a DMCA agent, or post the agent's name or contact information, on the Hotfile website until sometime in May 2010, 15 months after Hotfile's launch. SUF 6-7. Even today – although plaintiffs have pointed out the continuing violation – Hotfile still is not in compliance with Section 512(c)(2).

The Registrar of Copyrights has provided by regulation that a service provider cannot list a post office box for its DMCA agent unless it is the only possible address that can be used in the geographic location.  37 C.F.R. § 201.38(c).  Yet, in their DMCA agent disclosure filed with the Copyright Office, directly beneath a statement of the regulation prohibiting P.O. boxes, defendants identify only a P.O. box for their Florida-based DMCA agent.  SUF 8.

Defendants' failure to comply with the explicit statutory requirements is not a mere technicality.  Congress was unequivocal – a service provider is eligible for safe harbor "only if" it complies with Section 512(c)(2).  In addition to ensuring a readily identifiable contact for sending DMCA notices, S. Rep. 105-190, at 45, Section 512(c)(2) prevents illicit websites that operate in the back alleys of the Internet from seeking the protection of the DMCA.  In other words, service providers cannot hide behind anonymous email addresses and post office boxes while simultaneously seeking the DMCA's statutory protections.  That, however, is exactly what defendants did, and still do today.  Defendant Hotfile Corp. is a Panamanian-registered company purporting to operate out of Bulgaria, but it does not have physical offices anywhere ███████████
███████████████████████████████████████████████████████████
█████████████████████████████████████████████████████
████████████████████████████████████████████████
███████████████████████████████████████████████
██████████████████████████████

The statutory language is clear and its mandate is express.  Every court to decide the issue has held that failure to fully comply with Section 512(c)(2) operates as a complete bar to any DMCA safe harbor.  *See Louis Vuitton Malletier, S.A. v. Akanoc Solutions, Inc.*, No. C 07-03952 JW, 2010 WL 5598337, at *6 -7 (N.D. Cal. Mar. 19, 2010) (failure to register an agent with Copyright Office precludes defendants from claiming the protection of the safe harbor provision for the period prior to registering an agent), *aff'd in part, vacated in part* 658 F.3d 936 (9th Cir. 2011); *Perfect 10, Inc. v. Rapidshare A.G.*, No. 09-CV- 2596 H (WMC), at 12-13 (S.D. Cal. May 18, 2010) (Dkt. #71) (Yeh Ex. 91) (same); *CoStar Group Inc. v. Loopnet, Inc.*, 164 F. Supp. 2d 688, 698 n.4 (D. Md. 2001), *aff'd*, 373 F.3d 544 (4th Cir. 2004) (same).

Thus, for this independent reason, Hotfile cannot claim a DMCA safe harbor.

**C.      At All Times, Defendants Had Disqualifying Knowledge of Infringement.**

To be eligible for the Section 512(c) safe harbor, defendants must demonstrate that they does not have knowledge that Hotfile was being used to infringe.  Simply put:

> The DMCA's protection of an innocent service provider disappears at the moment the service provider loses its innocence, *i.e.*, at the moment it becomes aware that a third party is using its system to infringe.

*ALS Scan,* 239 F.3d at 625.  This common sense proposition is embodied in Section 512(c)(1)(A), which requires that a service provider demonstrate that it:

> (i) does not have actual knowledge that the material or an activity using the material on the system or network is infringing; [and]
>
> (ii) in the absence of such actual knowledge, is not aware of facts or circumstances from which the infringing activity is apparent.

17 U.S.C. § 512(c)(1)(A)(i) & (ii).  The latter is commonly referred to as "red flag" knowledge.  H.R. Rep. 105-551(II), at 53 (1998).

Defendants cannot come close to making this required showing.  Defendants in fact have both actual knowledge and "red flag" knowledge of the rampant infringement on Hotfile.

**1.      Defendants Had Actual Knowledge, including of Specific Infringing Files.**

For thousands and likely tens of thousands of infringing files, defendants had actual knowledge of infringement of specific copyrighted works identified by their download links.

*First*, ██████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ██████████████████████████████████████████  Thus, defendants repeatedly gained actual knowledge of specific infringing ████████ files on Hotfile, and permitted continued infringement of those files.  *See Corbis Corp.*, 351 F. Supp. 2d at 1107 ("the most powerful evidence of a service provider's knowledge [is an] actual notice of infringement from the copyright holder").

*Second*, almost every communication from a Hotfile user through Hotfile's website message form identified the specific download link of the most recent file the user came to Hotfile to download.  SUF 9(b); *see also supra* 14.  ████████████████████████████ ████████████████████████████████████████████████████

████████████████████████ 404:21-405:12.  The download link displayed in these user communications identifies a specific file on Hotfile's servers – and, in most instances, includes the title of the copyrighted work.  SUF 9(b).  These user communications thus gave defendants actual knowledge of countless specific infringing files.  SUF 9(b).

*Third*, repeatedly, defendants affirmatively helped Hotfile users to infringe copyrighted works.  These users usually identified the infringing works by name and often by specific download link, including such unmistakably infringing titles as *Despicable Me* and *Chuck*.  SUF 9(c); *see also supra* 13.

Defendants' actual knowledge disqualifies them from DMCA safe harbor.

**2.     Defendants Have "Red Flag" Knowledge.**

Once a service provider has "subjective awareness of . . . the facts or circumstances" in question, "in deciding whether those facts or circumstances constitute a 'red flag' – in other words, whether infringing activity would have been apparent to a reasonable person operating under the same or similar circumstances – an objective standard should be used."  S. Rep. 105-190, at 44.  The ultimate guiding principle is that there can be no safe harbor for a service provider that "turned a blind eye" to "blatant factors" that would have led a reasonable observer to suspect infringement was taking place.  *Corbis Corp.,* 351 F. Supp. 2d at 1108.

There is no dispute that defendants continually turned a blind eye to blatant red flags:

a.  First, the sheer magnitude of infringement could not be missed – more than 90% of downloads were infringing; Hotfile has been forced to delete almost ████ of all files ever downloaded for reasons related to copyright infringement; a shocking number of Hotfile users had to be terminated as repeat infringers the moment defendants were forced to adopt a "three strikes" policy; and those belatedly terminated repeat infringers alone were responsible for uploading ██████████ the files ever uploaded to Hotfile.  SUF 10(a); *see also supra* 9.  *Metro-Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd.*, 454 F. Supp. 2d 966, 985 (C.D. Cal. 2006) ("*Grokster II*") ("the staggering scale of infringement makes it more likely that [defendants] condoned illegal use").

b.  ████████████████████████████████████████████ *See, e.g., Fung*, 2009 WL 6355911, at *16-18 ("red flag" knowledge found where, among other facts, defendants downloaded copyrighted works from own service).

c.  Defendants received a constant stream of communications from users indicating that

they were downloading or had just downloaded specifically named copyrighted works.  SUF 10(c); *see also supra* 13-14.  *UMG Recordings, Inc. v. Shelter Capital Partners LLC*, No. 09-55902, -- F.3d --, 2011 WL 6357788, at *13 (9th Cir. Dec. 20, 2011) ("*Veoh*") (observing that "evidence of emails sent to Veoh executives and investors by … users identifying infringing content" could constitute "red flag" knowledge); *Fung*, 2009 WL 6355911, at *17 (relying on user activity).

> d.  Defendants' ███████████ link sites whose names alone would alert anyone to their infringing nature.  SUF 10(d); *see also supra* 7.  Congress called out such "pirate" sites as "obviously infringing because they typically use words such as 'pirate,' 'bootleg,' or slang terms in their uniform resource locator (URL) and header information."  S. Rep. No. 105-190, at 48.  Thousands of Hotfile's ███████████ link sites contained the terms "pirate" or "warez" (slang for illegal content) or similar terms universally associated with online infringement.  SUF 10(d).

> e.  Defendants illustrated Hotfile tutorials using infringing works.  SUF 10(e).

> f.  █████████████████████████████████████████████████
> █████████████████████████████████████████

> g.  Defendants understood that ██████████████████████████████████
> ██████████████████████████████

> h.  Defendants recognized internally that ████████████████████████████
> ███████████████████

Indeed, what should not get lost in cataloging particular red flags is that, more broadly, copyright infringement literally permeates every aspect of Hotfile's operations, as "would have been apparent to a reasonable person operating under the same or similar circumstances."  S. Rep. 105-190, at 44 (emphasis added).  Thus, their "red flag" knowledge independently disqualifies defendants from DMCA safe harbor.

### 3.    Defendants' Willfully Blindness Establishes Actual Knowledge.

In light of the overwhelming evidence of infringement, "to avoid actual knowledge of infringement, Defendants would have had to engage in willful blindness."  *Fung*, 2009 WL 6355911, at *18.  But "persons who know enough to blind themselves to direct proof of critical facts in effect have actual knowledge of those facts."  *Global-Tech Appliances, Inc. v. SEB S.A.*, 131 S. Ct. 2060, 2069-70 (2011).  In the copyright context too, courts have made clear that willful blindness constitutes actual knowledge.  *See Aimster*, 334 F.3d at 650 ("Willful blindness

is knowledge, in copyright law . . . as it is in the law generally"); *Fung*, 2009 WL 6355911, at

*18 (willful blindness constitutes knowledge under the DMCA); *Veoh*, 2011 WL 6357788, at

*16 (willful blindness "[o]f course" demonstrates actual knowledge). A defendant is willfully

blind to infringing activity where "(1) the defendant subjectively believe[s] that there is a high

probability that a fact exists and (2) the defendant take[s] deliberate actions to avoid learning of

that fact." *Global-Tech Appliances*, 131 S. Ct. at 2070.

Defendants effectively admit that they sought to blind themselves to the infringement all

around them as much as possible: ███████████████████████████████

███████████████████████████████████████████████

Defendant Titov acknowledged that Hotfile readily could review what its users were

downloading but, outside of working with litigation counsel in this case, has never done so. SUF

11(c). Until this suit was filed, defendants studiously avoided learning from infringement

notices whether the Affiliates they were paying were repeat infringers. SUF 11(d); *see also*

*supra* 10-12; *cf. UMG Recordings, Inc. v. Sinnott*, 300 F. Supp. 2d 993, 1000 (E.D. Cal. 2004)

(defendant "is held to actual knowledge of the information contained in [infringement

notification] letters" even if he deliberately avoided reading them). And, defendants designed

their "link site" Affiliate program to avoid the knowledge that inevitably would come from

having search functionality on the Hotfile website itself. SUF 11(b); *see also supra* 4, n.1. To

the extent defendants did not have actual knowledge, it is only because they willfully blinded

themselves to the rampant infringement on Hotfile.

> ### D.     Defendants' Inducement of Infringement Disqualifies Them from Safe Harbor.

Lastly, if this Court rules that defendants are responsible for inducing copyright

infringement under the standard set forth in *Grokster*, *see infra* 30-32, then, as a matter of law,

defendants are not entitled to safe harbor under the DMCA. As one court explained:

> [I]nducement liability and the [DMCA] safe harbors are inherently
> contradictory. Inducement liability is based on active bad faith
> conduct aimed at promoting infringement; the statutory safe harbors
> are based on passive good faith conduct aimed at operating a
> legitimate internet business…. Defendants are liable for inducement.
> There is no safe harbor for such conduct.

*Fung*, 2009 WL 6355911, at *18; *accord Arista Records LLC v. Usenet.com, Inc.*, 633 F. Supp.

2d 124, 142 (S.D.N.Y. 2009) ("if Defendants ... encouraged or fostered such infringement, they

would be ineligible for the DMCA's safe harbor provisions").  This is consistent with the Courts of Appeal that have emphasized that the DMCA's safe harbor protections are strictly limited to "innocent" service providers who have done all they reasonable can to prevent copyright infringement on their systems.  *ALS Scan,* 239 F.3d at 625 ("The DMCA's protection of an innocent service provider disappears at the moment the service provider loses its innocence"); *Aimster,* 334 F.3d at 655 ("The common element of [the DMCA's] safe harbors is that the service provider must do what it can reasonably be asked to do to prevent use of its service by 'repeat infringers'").

This conclusion is rooted in the text and structure of the statute.  Foundationally, the DMCA safe harbors, if they apply, provide protection from liability for provision of specified Internet technical functions.  Section 512(c) addresses one such function:  "storage at the direction of a user."  17 U.S.C. 512(c).  The safe harbor limits liability "for infringement of copyright **by reason of** … storage."  *Id.* (emphasis added).  But, in *Grokster*, the Supreme Court made clear that inducement liability does not arise by reason of the provision of a device (*e.g.,* software) or service (*e.g.*, storage).  Inducement liability arises by reason of providing the device or service *with culpable intent*: "with the object of promoting its use to infringe copyright." *Grokster*, 545 U.S. at 919.

That was the seminal distinction made in *Grokster*.  Grokster distributed a device (software).  It did not have any ongoing relationship with the users of the software after the moment of distribution; nor did it have any meaningful ability to supervise how the software was used.  *Id.* at 919-22.  The Court explained that, without more, a court could not rest liability solely on the provision of the software.  However, distribution of that same device could (and did) give rise to liability "where evidence shows that the distributor intended and encouraged the product to be used to infringe," *i.e.*, where the defendant was liable for inducement of infringement.  *Id.* at 941 n.13.  The difference, the Court explained, is that inducement liability is not by reason of the provision of the device (or here "storage at the direction of a user"); inducement liability occurs by reason of "a patently illegal objective."  *Id.* at 941.

Therefore, when defendants are held liable for *Grokster* inducement of copyright infringement, as plaintiffs believe they should be, defendants cannot seek refuge in a safe harbor that limits liability "for infringement of copyright **by reason of** … storage."  17 U.S.C. § 512(c) (emphasis added).  Defendants' inducement liability will be "by reason of" their "patently illegal

objective," not the provision of storage.  Any other interpretation not only conflicts with the statutory text, but also the clear Congressional intent that the safe harbor requirements "preserve[] strong incentives for service providers and copyright owners to cooperate to detect and deal with copyright infringements that take place in the digital networked environment."  S. Rep. 105-190, at 20.  "Inducement liability is based on active bad faith conduct aimed at promoting infringement." *Fung*, 2009 WL 6355911, at *18.  That is hardly the "cooperat[ion] to detect and deal with copyright infringements" that Congress intended to preserve.

## II.    DEFENDANTS ARE LIABLE AS SECONDARY COPYRIGHT INFRINGERS.

### A.    Hotfile Users Are Direct Infringers.

Hotfile's users have uploaded and/or downloaded content files corresponding to over 3,800 of plaintiffs' copyrighted works, each of which is identified in Yeh Ex. 56.  SUF 15. Plaintiffs own the exclusive online distribution rights in each of those works, and have not authorized the distribution of those works through Hotfile or at all for unrestricted Internet distribution.  SUF 13-14.  Hotfile users are therefore directly liable for infringing reproductions and distributions of those works.  *A&M Records, Inc. v. Napster, Inc.*, 239 F.3d 1004, 1013-14 (9th Cir. 2001); *BMG Music v. Gonzalez*, 430 F.3d 888, 890-91 (7th Cir. 2005).  Defendants are secondarily liable for those direct infringements.

### B.    Defendants Are Liable for Inducement of Copyright Infringement.

"[O]ne who distributes a device with the object of promoting its use to infringe copyright, as shown by clear expression or other affirmative steps taken to foster infringement, is liable for the resulting acts of infringement by third parties."  *Grokster*, 545 U.S. at 919; *see also Fung*, 2009 WL 6355911, at *14 n.24 ("improper purpose can be shown in a variety of ways; the factors considered by the Supreme Court in *Grokster* were not exhaustive or exclusive"). Summary judgment is warranted where, as here, the evidence of defendants' "unlawful objective is unmistakable."  *Grokster*, 545 U.S. at 940; *see also Limewire*, 784 F. Supp. 2d at 431 (granting summary judgment to copyright holders on inducement claim); *Fung*, 2009 WL 6355911, at *15 (same); *Usenet.com*, 633 F. Supp. 2d at 153 (same); *Grokster II*, 454 F. Supp. 2d at 992 (same). Defendants' conduct here parallels the pattern of prior adjudicated infringers.

1. **Defendants' Unlawful Objective Is Unmistakable from Hotfile's Affiliate Program Alone.**

In *Grokster*, the Supreme Court explained that "[t]he classic instance of inducement is by advertisement or solicitation that broadcasts a message designed to stimulate others to commit violations." *Grokster*, 545 U.S. at 937. Defendants do not just "broadcast a message"; they offer to pay Hotfile users to upload and promote "popular" and "interesting" content, and penalize their earnings if they fail to sufficiently promote their uploaded content. *See supra* 5-6; SUF 16(a). That content is predictably infringing. Even defendants' economist agrees that Hotfile's "incentive structure" is "designed to encourage users to upload files that will be popular with downloaders." SUF 16(a)(viii). That level of direct stimulation of infringing activities is simply unprecedented and, standing alone, establishes that defendants are promoting infringement.

2. **Defendants Directly Targeted a User Base of Infringers.**

Since Hotfile's inception, defendants have overtly solicited "good uploaders" who will upload popular content, including movies, for widespread distribution. SUF 16(b); *see also supra* 6; *Fung*, 2009 WL 6355911, at *11 (inducement liability found where defendants solicited users to upload infringing files of high-grossing movies). Defendants explicitly used the lure of high payouts from their Affiliate program to attract uploaders from other known infringing services. SUF 16(b)(v). ████████████████████████████████████████████ ███████████████████████████████████████████████████████ ██████████████████████████████████ *See Grokster*, 545 U.S. at 938 (fact that defendant "showed itself to be aiming to satisfy a known source of demand for copyright infringement" was indication of inducement liability); *Usenet.com*, 633 F. Supp. 2d at 152 (defendants affirmatively solicited former users of notorious file-sharing services).

3. **Defendants Refused to Terminate Blatant Repeat Infringers.**

Defendants received notices identifying millions of infringing files. It would have been "trivial" for defendants to identify and keep track of the Hotfile users who uploaded those files. Yet, until this litigation was filed, defendants made no effort to identify repeat infringers because they needed the popular content supplied by those infringers. SUF 1-5; *see also supra* 12. Defendants also knew that uploaders were attracted to Hotfile because of its reputation that, despite infringement notices, "your account credit will not be removed, and you will not be

suspended from hotfile.com." SUF 4(e). Defendants' attitude towards repeat infringers is further evidence of their intent to foster copyright infringement.

### 4.    Hotfile Is Overwhelmingly Used For Infringement and Little Else.

Hotfile is used overwhelmingly for copyright infringement, with over 90% of downloads infringing. SUF 10, 16(d). That is a direct result of Hotfile's Affiliate program and business model, and puts defendants squarely in the company of other adjudicated *Grokster* inducers. *See* Br. Appendix C; *Limewire*, 784 F. Supp. 2d at 424 (over 90% infringement); *Fung*, 2009 WL 6355911, at *4 (same); *Usenet.com*, 633 F. Supp. 2d at 131-32 (same); *Grokster II*, 454 F. Supp. 2d at 985 (87% infringement). To state the obvious, "the staggering scale of infringement makes it more likely that [defendants] condoned illegal use, and provides the backdrop against which all of [defendants'] actions must be assessed." *Grokster II*, 454 F. Supp. 2d at 985; *see also Mini Maid Servs. Co. v. Maid Brigade Sys., Inc.*, 967 F.2d 1516, 1522 (11th Cir. 1992) ("If the infringement is serious and widespread, it is more likely that the [defendant] knows about and condones the acts").

### 5.    Hotfile's Business Model Depends on Infringement.

"[T]he Supreme Court identified . . . reliance on revenue from infringing use as evidence of unlawful intent." *Grokster II*, 454 F. Supp. 2d at 988. Here, defendants' only source of revenue is selling premium subscriptions. Users admittedly pay for "premium" accounts in order to download copyrighted content and in fact sought to cancel their subscriptions when that content was removed. SUF 16(e). Defendants' own economist agrees that "providing access to content attract[s] users to Hotfile's site." SUF 16(e)(ii). *See Usenet.com*, 633 F. Supp. 2d at 153 (finding that infringing music was "backbone of their business model" based on evidence that users purchased subscriptions to access infringing content, and complained and cancelled subscriptions when access to music was disabled); *Fung*, 2009 WL 6455911, at *14-15 (defendants derive revenue by attracting users to the sites with "popular works"); *Limewire*, 784 F. Supp. 2d at 429 (same). As in *Grokster*, with 90% of downloads being infringing, the "commercial sense" of Hotfile turns on copyright infringement. *Grokster*, 545 U.S. at 940.

Tellingly, defendants modeled Hotfile's business after Megaupload, whose operators have been indicted for criminal copyright infringement. SUF 16(f). Defendants have admitted that Hotfile "was founded to compete with the services provided by . . . RapidShare [and] MegaUpload," SUF 16(f)(i), and that ██████████████████████████

31

███████████████████████████████ SUF 16(f).  Indeed, the business described in the Megaupload indictment describes Hotfile's business to a tee.  *See* Yeh Ex. 98.

### 6.    Defendants Helped Hotfile Users to Infringe and Infringed Themselves.

Defendants repeatedly provided technical assistance to users they knew were seeking to download copyrighted content.  *See supra* 13; SUF 16(g).  By "providing technical assistance to help users enjoy copyrighted content they illegally downloaded, [defendants have] demonstrated an intent to encourage . . . infringement."  *Grokster II*, 454 F. Supp. 2d at 987; *see also Limewire*, 784 F. Supp. 2d at 428 (same); *Usenet.com*, 633 F. Supp. 2d at 153 (same); *Fung*, 2009 WL 6355911, at *12 (same).

Further, ████████████████████████████████████████████ ██████ *Usenet.com*, 633 F. Supp. 2d at 155 (evidence that defendants' own employees downloaded copyrighted content contributed to finding of inducement of infringement).

### 7.    Defendants Have Impeded Copyright Owner Enforcement Efforts.

██████████████████████████████████████████████████
██████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████
███████████████  *See Grokster II*, 454 F. Supp. 2d at 988 (taking "active steps to [protect] illegal file trading from the enforcement efforts of copyright holders" shows an intent to foster infringement).

### 8.    Defendants Refused to Consider Technology to Prevent Infringement.

Finally, defendants refused even to investigate digital fingerprinting technology as a means to prevent copyright infringement, notwithstanding that, by the time of Hotfile's launch, such technology was commercially available and in use on major websites across the Internet.  SUF 16(j).  In *Grokster*, the Supreme Court emphasized that defendants did not "attempt[] to develop filtering tools or other mechanisms to diminish the infringing activity," finding that "this evidence underscore[d defendants'] intentional facilitation of their users' infringement."  *Grokster*, 545 U.S. at 939; *see also Limewire*, 784 F. Supp. 2d at 429-30; *Grokster II*, 454 F. Supp. 2d at 988.

*        *        *        *

32

Taken as a whole, no reasonable finder of fact could deny defendants' objective to foster and profit from infringement.  Just as it was in *Grokster*, *Limewire*, *Fung*, and *Usenet*, defendants' "unlawful objective is unmistakable."  *Grokster*, 545 U.S. at 940.

### C.     Defendants Are Liable for Contributory Infringement.

Defendants are liable under the traditional test for contributory infringement because "with knowledge of the infringing activity, . . . [they] materially contribute[] to the infringing conduct of another."  *Limewire*, 784 F. Supp. 2d at 432 (quotation marks omitted)*; see generally Cable/Home*, 902 F.2d at 845 (same test in this Circuit).

For the knowledge prong, "actual knowledge is not required.  All that must be shown is that [defendant] had reason to know" of the infringing activity.  *Cable/Home*, 902 F.2d at 846 (citing *Casella v. Morris*, 820 F. 2d 362, 365 (11th Cir. 1987)); *see also Faulkner v. Nat'l Geographic Society*, 211 F. Supp. 2d 450, 474 (S.D.N.Y. 2002) ("Knowledge of the infringing activity may be actual or constructive") (quotation marks omitted), *modified by*, 220 F. Supp. 2d 237 (S.D.N.Y. 2002), *aff'd*, 409 F.3d 26 (2d Cir. 2005); *Napster*, 239 F.3d at 1020 ("Contributory liability requires that the secondary infringer 'know or have reason to know' of direct infringement") (citation omitted); *Arista Records, Inc. v. Flea World, Inc.*, No. Civ. A. 03-2670 (TBS), 2006 WL 842883, at *14 (D.N.J. Oct. 10, 2005) (plaintiffs are not "required to prove that Defendants had knowledge of 'specific infringement(s)'" to support a finding of contributory infringement).  The same evidence of knowledge and willful blindness that disqualifies defendants from DMCA safe harbor *a fortiori* establishes knowledge for contributory infringement.  *See supra* 24-27; SUF 9-11.

Defendants, as a matter of law, also materially contribute to infringement by providing the "site and facilities" for infringement.  *See, e.g.*, *Napster*, 239 F.3d at 1022 (Napster "materially contribute[d] to the infringing activity" of its users by providing them with "the site and facilities for direct infringement") (internal quotation marks omitted); *Aimster*, 252 F. Supp. 2d at 652 (Aimster materially contributed by providing "the software and the support services necessary for individual Aimster users to connect with each other"); *Flea World,* 2006 WL 842883, at *15 (flea market "need only provide a central 'hub' for infringing activity to materially contribute to infringement").  Defendants operate over 700 servers that physically store the infringing content uploaded by Hotfile users and transmit that infringing content to other Hotfile downloaders.  SUF 18.  They thereby provide the site and facilities for

33

infringement; that is quintessential material contribution. *E.g.*, *Usenet*, 633 F. Supp. 2d at 155 (finding material contribution where defendant operated central servers hosting content).

Without a DMCA defense, defendants' liability as a contributory infringer is clear.[13]

### D.     Defendants Are Liable for Vicarious Infringement.

Defendants are liable as vicarious infringers because they "profit[] from direct infringement while declining to exercise a right to stop or limit it." *Grokster*, 545 U.S. at 930; *see also Gershwin Pub'lg Corp. v. Columbia Artists Mgmt. Inc.,* 443 F.2d 1159, 1162 (2d Cir. 1971) ("one may be vicariously liable if he has the right and ability to supervise the infringing activity and also has a direct financial interest in such activities").

"The ability to block infringers' access to a particular environment for any reason whatsoever is evidence of the right and ability to supervise." *Napster*, 239 F.3d at 1023. Likewise, the requisite control is shown where defendants "have the right and ability to block access to [files] stored on their own servers that contain infringing content." *Usenet.com*, 633 F. Supp. 2d at 157; *see also id.* (requisite control is also shown where "Defendants expressly reserve the right, in their sole discretion, to terminate, suspend or restrict users' subscriptions, thereby limiting their access to uploading or downloading content to or from Defendants' servers"). Defendants cannot dispute that they can block users' access to the Hotfile servers and block access to files on the Hotfile system. SUF 19; *see Limewire*, 784 F. Supp. 2d at 435 ("LW had the right and ability to limit the use of its product for infringing purposes, including by (1) implementing filtering; (2) denying access; and (3) supervising and regulating users").

The "financial benefit" element of a vicarious infringement claim is satisfied where there is any "causal relationship between the infringing activity and any financial benefit a defendant reaps." *Ellison*, 357 F.3d at 1079; *see also Napster*, 239 F.3d at 1023. That relationship is established where the availability of infringing content acts as a draw for users. "[T]he law is

---

[13] Defendants' argument that Hotfile has "substantial noninfringing uses," even if true, is misplaced. *Sony Corp. of America v. Universal City Studios, Inc.*, 464 U.S. 417 (1984), is simply inapplicable where, as here, the contributory infringer maintains an ongoing relationship with the direct infringer during the course of the infringement. *See Cartoon Network LP, LLLP v. CSC Holdings, Inc.*, 536 F.3d 121, 133 (2d Cir. 2008) (recognizing that lack of "ongoing relationship" between product distributor and product user was critical factor in *Sony*); *Usenet.com*, 633 F. Supp. 2d at 156 ("Defendants maintain an ongoing relationship with their users. . . . *Sony*'s insulation from contributory liability is inapplicable"); *Flea World*, 2006 WL 842883, at *15 (rejecting *Sony* defense because "Defendants are not distributors of a device or product that has non-infringing uses like in *Grokster* and *Sony*" but "an ongoing business").

34

clear that to constitute a direct financial benefit, the 'draw' of infringement need not be the primary, or even a significant draw – rather, it need only be 'a' draw." *Usenet.com*, 633 F. Supp. 2d at 156-57; *Flea World,* 2006 WL 842883 at *12.

Here, again, it cannot be disputed that the copyrighted content on Hotfile was "a" draw for users.  The overwhelming use of Hotfile is infringement, SUF 10(a); defendants have acknowledged that the goal of Hotfile's Affiliate program is to draw potential subscribers to Hotfile in order to sell them "premium" subscriptions, and users have confirmed that they have bought premium subscriptions in order to download copyrighted content, SUF 20.  *See supra* 15. Defendants' own economist agrees.  SUF 16(e)(ii).

## III.   TITOV IS PERSONALLY LIABLE FOR HOTFILE'S INFRINGEMENT.

Personal liability for a corporation's copyright infringement is found when an individual "has the ability to supervise infringing activity and has a financial interest in that activity," ***or*** "personally participates in that activity." *S. Bell Tel. & Tel. Co. v. Associated Tel. Directory Publishers*, 756 F.2d 801, 811 (11th Cir. 1985).  This test is also expressed in terms of the individual serving as a "guiding spirit" or "moving force" behind the corporation's infringement by directing, ratifying or participating in it.  *Babbit Elecs., Inc. v. Dynascan Corp.*, 38 F.3d 1161, 1183-84 (11th Cir. 1994); *Mozingo v. Correct Mfg. Corp.*, 752 F.2d 168, 174 (5th Cir. 1985). Titov's extensive involvement in Hotfile's operations makes his personal liability clear.  He conducts, participates in, directs, or is otherwise deeply involved in all of the key aspects of Hotfile's business that facilitate infringement.  He is also at the center of the various companies related to Hotfile that operate and control Hotfile.

### A.   Titov Is at the Center of the Web of Companies that Run Hotfile.

The absence of any distinction between the actions of Titov and Hotfile is revealed, without more, through the web of companies that Titov has created to operate Hotfile.

Defendant Hotfile Corp. is a Panamanian company that claims to own or control the domain name, ███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████████████████████████████
████████████████████████████████████████

        The operations of the Hotfile website are directed by two other entities ███████
████████████████████ One is a Bulgarian company, Hotfile Ltd., █████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████.
        The second company that operates the Hotfile website is a Florida company called
Lemuria Communications, Inc. ("Lemuria").  Titov is the sole owner, operator and officer of
Lemuria.  SUF 21(c).  Publicly, Lemuria admits that it provides web-hosting services to Hotfile,
which it purportedly does through █████████████"arrangement" with Hotfile Ltd.  SUF
21(c)(ii).  Titov formed Lemuria to provide web-hosting services to Hotfile ████████████
████████████████████████████████████████████████████████
████████████████████  SUF 21(c)(iii).  A Titov-controlled Lemuria protects Hotfile from being
terminated for infringement by a legitimate Internet service provider.
        Lemuria's – and correspondingly Titov's – role in Hotfile is even more extensive than
defendants disclose publicly.  Discovery has revealed that, privately, Titov uses Lemuria to carry
out or coordinate ██████████████████████ acting as a "front" for Hotfile██
████████████████████  SUF 21(c)(iv).  For example, █████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
███████████  As a result, each of these essential Hotfile functions is directed by Titov.

None of these companies interacts with each other or their principals at arms-length, or with any meaningful regard for corporate formalities. ███████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████

██████████████████████████████████████████████

███████████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████

The relationship between Lemuria and Hotfile Corp. and Hotfile Ltd. is no different. ████████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████    SUF 21(c)(ii).   ████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████████████

█████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████

Whether as the exclusive owner and operator of Lemuria, ███████████████████ ████████ of Hotfile Ltd. or a principal and manager of Hotfile Corp., Titov directs the relevant components of Hotfile's activities, from Affiliate payments, to software development, to employment of Hotfile's personnel.

B.      **Titov "Personally Participates" in Virtually all of Hotfile's Infringing Conduct.**

Given the central role that Titov plays in all aspects of Hotfile's operations, he shares fully in any liability for Hotfile's actions. *First*, Titov "personally participate[d]" in crucial infringement-promoting activities himself. *S. Bell Tel. & Tel.*, 756 F.2d at 811; *Babbit Elecs.*, 38 F.3d at 1183-84. ███████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████ Those Affiliates are the linchpin of Hotfile's infringing activities.

*Second*, Titov was the "lead developer" of the Hotfile website, which he designed to facilitate infringement. By his own estimate, Titov personally wrote ████████ of the source code – the computer operating instructions – that controls Hotfile and its operations. SUF 22(a)(i). ██████████████████████████████████████████████

████████████████████ He was also involved in the user-facing design and functionality of the website, and had technical input into the design and functioning of the Affiliate program. SUF 22(a)(iii). Personal liability for infringement has routinely been imposed on individuals who similarly participated in the creation of a corporation's infringing products or services. *See Limewire*, 784 F. Supp. 2d at 438 (corporate officer/shareholder who "directed and approved many aspects of [copyright-infringing service's] design and development" personally liable for infringement); *Mattel, Inc. v. Robarb's, Inc.*, No. 00 Civ. 4866 (RWS), 2001 WL 913894, at *8-9 (S.D.N.Y. Aug. 14, 2001) (imposing liability on corporate officer involved in conception, design and preparation of infringing product).

*Third*, through Lemuria, Titov is personally involved in most of Hotfile's technical operations. ████████████████████████████████████████

█████████████████████████████████████

*Fourth*, Titov is actively manages Hotfile's key affairs. ██████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

██████████████████████████████████████████ Titov retained, and continues to manage, Hotfile's appointed DMCA agent. SUF 22(d)(ii). █████████████████

███████████████████████████████████████   SUF 22(d)(ii).  Titov therefore

supervises Hotfile's response to infringement.  *See Babbit Electronics*, 38 F. 3d at 1184.

   *Fifth*, as a principal of Hotfile Corp., Titov is involved in all decisions concerning

Hotfile's policies and operations, and has broad decision-making authority over Hotfile's

business.  SUF 22(e).  In particular, he personally participated in key decisions about Hotfile that

facilitated infringement, including the site's design, the creation and structure of its Affiliate

program, and its failure to implement a repeat copyright infringer policy.  SUF 22(e).

   Titov undeniably also had direct knowledge of Hotfile's infringing activities.  ███████

████████████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████████

█████████████████████████████████████████

██████████████████████████████████████

████████████████████████████████████   SUF

22(f)(iii); *see also supra* 15-16.  Titov was well aware of Hotfile's many other infringing

activities but took no steps to stop them.  *See supra* 13-16.  *Blendingwell Music, Inc. v. Moor-*

*Law, Inc.*, 612 F. Supp. 474, 482 (D. Del. 1985) (corporate officer and shareholder personally

liable for infringement where aware of it "[t]hrough repeated complaints").

   Under circumstances in which a defendant has been much less involved, courts have

found personal liability for infringement.  *See, e.g., U.S. Media Corp. v. Edde Entertainment,*

*Inc.*, No. 94 Civ. 4849(MBM)(MHMD), 1996 WL 520901, at *5-6 (S.D.N.Y. Sept. 12, 1996)

(finding executive vice president liable for corporate copyright infringement where he personally

oversaw infringing activities even without "ultimate policy-making authority").

   *Finally*, Titov has a powerful direct financial interest in Hotfile's infringement.  The

financial interest element is satisfied by showing that an individual has an ownership interest in

the corporation and thus benefits from infringement that increases corporate revenue.  *Home*

*Design Servs., Inc. v. Park Square Enters., Inc.*, No. 6:02-CV-637-ORL28JGG, 2005 WL

1027370, at *4 (M.D. Fla. May 2, 2005) ("As a 3% owner of Park Square, it is clear that

[defendant] had a financial interest in the alleged infringing activities") (internal quotation marks

omitted); *Songmaker v. Forward of Kansas, Inc.*, No. 90-4156-SAC, 1993 WL 106833, at *6 (D.

Kan. Mar. 5, 1993) (sufficient financial interest in infringing activity where officer was

shareholder).  ███████████████████████████████████████████████████

██████████████████████████████████████████████████ *Playboy Enters., Inc. v.*

*Starware Publ'g Corp.*, 900 F. Supp. 438,  441 (S.D. Fla. 1995) (receipt of payments from

corporation in form of "distributions to shareholders" shows financial interest in infringing

activity).  Titov is also the sole owner of Lemuria, which receives income for providing services

to the Hotfile website.  SUF 23(b)(ii).  ████████████████████████████████████████████

██████████████████████████████████████████  Thus, Titov has a direct financial

stake in Hotfile's extensive infringing activities, which he took active steps to enable.

Titov has been as or more personally involved in the infringing activities of Hotfile, than

the principals in comparable online enterprises where summary judgment was granted

establishing the principal's personal liability for the infringement.  *E.g.*, *Limewire*, 784 F. Supp.

2d at 438-39; *Fung*, 2009 WL 6355911 at *18; *Usenet.com*, 633 F. Supp. 2d at 158-59.  On this

record, the outcome here cannot be any different.

## CONCLUSION

For the foregoing reasons, plaintiffs' motion for summary judgment should be granted.

Dated: February 17, 2012                    Respectfully submitted,

By: /s/ Karen L. Stetson

Karen L. Stetson
GRAY-ROBINSON, P.A.
1221 Brickell Avenue
16th Floor
Miami, Fl 33131
Telephone: (305) 416-6880
Facsimile:  (305) 416-6887

MOTION PICTURE ASSOCIATION          JENNER & BLOCK LLP
   OF AMERICA, INC.                       Steven B. Fabrizio (*Pro Hac Vice*)
Karen R. Thorland (*Pro Hac Vice*)        Duane C. Pozza (*Pro Hac Vice*)
15301 Ventura Blvd.                        Luke C. Platzer (*Pro Hac Vice*)
Building E                                 1099 New York Ave., N.W.
Sherman Oaks, CA 91403                     Suite 900
Phone:  (818) 995-6600                     Washington, DC 20001
Fax:  (818) 285-4403                       Facsimile:  (202) 639-6066

                                          *Attorneys for Plaintiffs*

40

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 17th Day of February, 2012, I served the following

documents on all counsel of record on the attached service list via their email address(es) and/or

FTP pursuant to the parties' service agreement:

**Plaintiffs' Motion and Memorandum of Law in Support of Summary Judgment Against Defendants Hotfile Corp. and Anton Titov**

**Declaration of Jennifer V. Yeh in Support of Plaintiffs' Motion for Summary Judgment Against Defendants Hotfile Corp. and Anton Titov, and accompanying exhibits**

**Declaration of Scott Zebrak in Support of Plaintiffs' Motion for Summary Judgment Against Defendants Hotfile Corp. and Anton Titov, and accompanying exhibits**

**Declaration of Dr. Richard Waterman in Support of Plaintiffs' Motion for Summary Judgment Against Defendants Hotfile Corp. and Anton Titov, and accompanying exhibits**

**Declaration of Thomas Sehested in Support of Plaintiffs' Motion for Summary Judgment Against Defendants Hotfile Corp. and Anton Titov, and accompanying exhibits**

**Declaration of Steve Thomas Kang in Support of Plaintiffs' Motion for Summary Judgment Against Defendants Hotfile Corp. and Anton Titov, and accompanying exhibit**

**Declaration of Dr. Ian Foster in Support of Plaintiffs' Motion for Summary Judgment Against Defendants Hotfile Corp. and Anton Titov, and accompanying exhibits**

By: /s/ _____
           Karen L. Stetson

**SERVICE LIST**

**Disney Enterprises, Inc., et al. v. Hotfile Corp. et al.**
**CASE NO. 11-CIV-20427-JORDAN**

FARELLA BRAUN + MARTEL LLP
Anthony P. Schoenberg
tschoenberg@fbm.com
Roderick M. Thompson
rthompson@fbm.com
N. Andrew Leibnitz
aleibnitz@fbm.com
Deepak Gupta
dgupta@fbm.com
Janel Thamkul
jthamkul@fbm.com
235 Montgomery Street
San Francisco, CA  94104
Phone:  415-954-4400

*Attorneys for Defendants Hotfile Corp. and
Anton Titov*

RASCO KLOCK
Janet T. Munn
jmunn@rascoklock.com
283 Catalonia Ave., Suite 200
Coral Gables, FL  33134
Phone:  305-476-7101
Fax:  305-476-7102

*Attorney for Defendants Hotfile Corp. and
Anton Titov*

BOSTON LAW GROUP, PC
Valentin Gurvits
vgurvits@bostonlawgroup.com
825 Beacon Street, Suite 20
Newton Centre, MA  02459
Phone:  617-928-1804

*Attorneys for Defendants Hotfile Corp. and
Anton Titov*