# Yeh Exhibit 86



### HotFile - new rules - who like it?

Printable View

▼ Page 6 of 6 | ◀◀First | ◀ | ... | 4 | 5 | 6        Show 40 post(s) from this thread on one page

---

**nomankhan111**                                                                         Jul 16th 2009, 7:18 pm

hello

no one wanna join hotfile because of new rule can any one help me to get auto poster i tried a lot but still cant get auto poster i haev installe .netframe work but still not work on my system any one can remote help to me

---

**animedbsellersz**                                                                      Jul 16th 2009, 8:13 pm

they still not paying me...but the new rules are not band also

im now a gold with 100% platinum?

why im still a gold

but the bar are 100%

---

**shanewang**                                                                            Jul 16th 2009, 8:24 pm

My opinion:
I think it's not 100% which get you promoted, it's actually 150%. I stayed at bronze only for 3 days, then got back at copper yesterday. After the launch of the new rules, I kept checking my hotfile account almost every hour to see what's happening, the first day when I got promoted I remember the figure was 67%, then it started to fall, every one or two hours, one percent or two, it was OK at bronze I guess, at least way much better than at copper. I was happy seeing I still got almost 60% to lose, but when I was dropped to copper yesterday still at 47% to silver several minutes before updating, I was like WTF? I still got 47%, why it drops so fast?? Then I suddenly realized it must be 150% you have to beat, that means at least you have to be above 50% to stay at each rank. So I guess that's why we are 100% and still stuck at copper.

And by the way, what did you do to stay at gold? Some advice?

> Quote:
> ---
> Originally Posted by **animedbsellersz** *View Post*
>
> *they still not paying me...but the new rules are not band also*
>
> *im now a gold with 100% platinum?*
>
> *why im still a gold*
>
> *but the bar are 100%*
> ---

---

**Convert RSS to PHP**                                                                   Jul 17th 2009, 4:00 am

Yes, they explained its a conversion/downloads formula automated by their software!

---

**Bionicman**                                                        Jul 17th 2009, 9:28 am

I enjoyed 2 days of gold. Dropped to 100% silver today, hope I'll be gold again tomorrow

**george101**                                                       Jul 17th 2009, 9:37 am

lol... i was at gold for over week and suddenly dropped to bronze in one night. left HF for now

**dduck**                                                           Jul 20th 2009, 9:59 am

Today I see in my hotfile profile that I had been paid. But in my ePassporte I still have **US$0.00**. Does anyone had this kind of situation? Is there a delay when you been paid thru ePassporte?
I just register for the first time on ePassporte 4-5 days ago. This money that I waited to receive from hotfile, I needed for my account verification. And my ePassporte wallet balance still show **US$0.00**. Anyone with same problem?
Last monday first hotfile had problems with there paypal account, and then they couldn't pay me thru paypal so they took back the money on my hotfile profile. Today, I again see on my hotfile profile that I had been paid, but (as in the case with paypal) I can't see on my ePassporte any money. Only zeros.
I really don't know what should I do.

**george101**                                                      Jul 20th 2009, 10:07 am

just wait for a day and if its still not there contact HF

most probably it will be in ur account soon

**dduck**                                                           Jul 20th 2009, 10:15 am

Well I am new to ePassporte so I don't know how does that work. Why is there a delay (if it is a delay)?

My country is on some kind of 'black list', so I can only receive money on my ePassporte from business account holders. I told hotfile support about this, asking them to tell me what kind of account they use for payout. And they told me that they use business account. So...there shoudn't be a problem. But I still see zeros in my account.
If it is a delay, it's ok, I can wait. But what if tomorrow is the same thing? Can hotfile take back that money (that maybe I will not receive) and put it back on my hotfile account ( just like in paypal case last monday) or they can't?
I can't believe that it is this hard to receive money. :(

**dduck**                                                           Jul 20th 2009, 11:36 am

I just received hotfile payment on my ePassporte. Finally. :)

**HyPn0sE**                                                         Jul 24th 2009, 6:17 am

New rules are becoming even more strange. I do not upload for several days, i post at forums and earn money but... the darn percentage bar is falling some points every day. Last night I've earned around $1 and loss 6 percentage points... very strange. Probably a new (not announced rule)... every time someone download my files i earn money but loose percentage points.
This way not even at the doomsday i will reach Platinum level

### nexuslivez

Jul 24th 2009, 9:54 am

I used to earn to 14$ a day..now around 4-5$ a day..I'm doing nothing on hotfile now..Using storage/depositfiles/uploading for the time being.

### george101

Jul 24th 2009, 2:16 pm

Quote:

Originally Posted by **dduck** View Post

I just received hotfile payment on my ePassporte. Finally. :)

glad to know that :)

### lansiko

Jul 24th 2009, 3:21 pm

Quote:

Originally Posted by **HyPn0sE** View Post

New rules are becoming even more strange. I do not upload for several days, i post at forums and earn money but... the darn percentage bar is falling some points every day. Last night I've earned around $1 and loss 6 percentage points... very strange. Probably a new (not announced rule)... every time someone download my files i earn money but loose percentage points.
This way not even at the doomsday i will reach Platinum level

That's not strange, it's their formula. The more downloads you get, you are suppose to generate more sales (premium account) for them. Otherwise, you are just leeching from them and that's why they drop your ranking % over the time. It's that simple :)

I stop using hotfile totally now.

### maxxs

Jul 25th 2009, 7:50 am

my ip was banned from using remote upload.101 - 105 :mad:

### singaporeboyracer.com

Jul 30th 2009, 2:30 am

i still using hotfile, been gold for 2 weeks now, i wonder when will it go up,

### Vikrant

Jul 30th 2009, 2:48 am

no payout from hotfile :(

### dduck

Aug 1st 2009, 12:17 am

haha
The biggest pr0n board (the 'pink one') has a banner on the top of their main page for a poll, asking you if they should ban hotfile? Go there and vote!

They didn't wanted to pay fairly uploaders, they don't deserve to advertize themselves for free. And it seams the admin of that board got enough of them, so he decided to make a poll. :D

## hatem20      Aug 2nd 2009, 10:00 pm

anyone have tried **UploadCell** ? **EnterUpload** ? and got **paid** !!

## dduck      Aug 2nd 2009, 10:16 pm

You can find this info on **UploadCell** page:

Quote:

> *Whenever someone downloads your files, you earn ePoints!!*
>
> *You'll make up to 2 ePoints per download. We give out:*
> ***2 ePoints** when a premium or a registered user downloads your files*
> *and*
> ***1 ePoint** for the downloads of anonymous visitors.*

Quote:

> *Collect your 10.000 ePoints to earn $24*

So...

If we imagine that all your downloads are made by anonymous visitors, that means that to collect 10.000 ePoints, you need 10.000 downloads. That further mean: $24 / 10K (downloads) = **$2.4 / 1000 (downloads)**
And that sucks. It's worst then hotfile copper level. :D

Also, if we imagine that you got all 10.000 ePoints from your Premium users, that means 10.000 / 2 = 5.000 (downloads). So, to earn $24 you need 5000 premium downloads, which further mean $24/ 5K = **$4.8 / 1000 (premium downloads)**. And that sucks too.

The count downloads from every coutnry.

(It's hard for me to decide should I use them or hotfile. But at least hotfile pays) :D

## lansiko      Aug 3rd 2009, 1:11 am

Guys, question here. Will I get a better ranking if I upgrade my account from free to premium?

## hatem20      Aug 3rd 2009, 7:26 am

Quote:

> *(It's hard for me to decide should I use them or hotfile. But at least hotfile pays)*

collect 15$ with copper level not easy :(
i've got $2.61 (983 downloads) :confused:

## dduck      Aug 3rd 2009, 7:36 am

Quote:

> *Originally Posted by **hatem20** View Post*
>
> *collect 15$ with copper level not easy :(*
> *i've got $2.61 (983 downloads) :confused:*

hatem20, that was a joke that I made. I don't like both of them.

---

**Hipto**                                                         Aug 3rd 2009, 9:35 am

Ya man, they're smart by using that stupid ranking system but I'll not be using them anymore

---

**steve87**                                                       Aug 3rd 2009, 1:55 pm

I am using them & its great for me till now, I am always on Gold or sometime Platinum.

If I will down, I can think to leave them.

---

**dduck**                                                         Aug 7th 2009, 11:03 am

**NEW RULES FROM HOTFILE !**

Guys...you better sit down until you read it. ...at least those of you on gold and premium levels. :D

Quote:

> *Originally Posted by **ButcherBoy** View Post*
> *Earn money spreading links in your site!*
> *Get 5% commission of all premium accounts sold through your site.*
>
> *For every referrer that comes from your site and buys premium you will get 5% of the account's price.*
> *No matter if download link is yours or you find it in other place! Post interesting download links in your site, blog or forum and earn big money.*
>
> *Please check our Affiliate page for more info.*
>
> *Regards,*

So, from now on, all the 'bonus' from selling premiums will go to site's owner. It's is clear that hotfile did this because they know now that they made a mistake with new rules, and that only small group of ppl keep uploading files.
By making new rules that are even worst for uploaders then the ones they made before, hotfile triend to profitt from the old links, because I am sure new links do not show up so much these days.

To conclude: If you share on many places, trying hard to make more ppl see your links, in this situation, that would be exellent job from you for hotfile. ..An exellent job for which you will not be paid, because site will profit from that, and not you. Amount of premiums that you were selling this way will drop, and you will soon end up on copper level. When all uploaders drop down on copper level, hotfile will silently just close this part of affiliate program, and it will keep paying only site's owners.
But once all old links get used too much, I am wondering who will upload more links. The only answer is: site owners by themselfs (or by paying a team of uploaders). And then, we are back on the start. Hotfile will continue to shave the earnings, bu this time earnings of sites itself.

Only sites that force users to post links in code tags, so that links are not 'clickable', will not earn from that.

And yes, now everyone will try to steal as much links as he can for his blog. :D

The only chance for survival in this kind of situation would be IF hotfile is willing to pay you (uploader) and site

owner for making a premium for the same link. Well...who knows, maybe even that is possible. At least, they have now enough money that they saved, by shaving your earnings with previous rules, that they can afford it. :)

| virco | Aug 7th 2009, 11:56 am |
|---|---|

Quote:

> Originally Posted by **dduck** *View Post*
>
> *To conclude: If you share on many places, trying hard to make more ppl see your links, in this situation, that would be exellent job from you for hotfile. ..An exellent job for which you will not be paid, because site will profit from that, and not you. Amount of premiums that you were selling this way will drop, and you will soon end up on copper level.*

I don't see how giving money to site owner will get negative impact premium sales. There are more chance for the opposite to happen if site owners somehow encourage uploaders to post hotfile. Another positive consequence can less/lifting bans for hotfile on forums.

| dduck | Aug 7th 2009, 12:02 pm |
|---|---|

Yes that may happen. But still, when you as an uploader share your link, you are doing all you can to share somethign that ppl will like to download. And if they do, you are sure that you will get paid for that. But you will never be sure if that person would buy a premium.
So that still mean, that your sure money is in downloads, and not in premiums. Premiums are just a nice bonus but you can't affect that. And hotfile still hide the information about how mny premiums you sold, how you gonna know if your hard work is going to be paid by hotfile.

As I said, the only positive thing in all this, would be if hotfile want to pay you both for the same link. You (the uploader) and the site owner (for 'hosting' your link). So if anyone buy a premium, you both profit. That would be nice, but since hotfile already show us that he only cares for himself, it would be a surprise.
This was created to make a huge mess. So, soon you will see your links everywhere. The same links would be posted over and over on 100's of places. And it may happen that your downloads count will rise, but you know what that mean if you are not selling premiums. ;)
Also, it may produce selling of premiums in first month(s) (I agree with that), but after some time, most ppl that wanted to have a premium would already have it. So...who will buy premiums then? It's a nice plan to mess with rapidshare, but the answer from rapidshare will sure be more then clear. Anyway, competition is a good thing (for end users), so rapidshare may offer some even better things for premiums.

The main purpose of this is too make hotfile links more spreaded across the net, and I must admit that this is a nice business idea from hotfile ...for hotfile.
Until they reveal in statistics how many premiums you sold, this only means that the one who sure will profit from new rules is hotfile himself.

| virco | Aug 7th 2009, 12:54 pm |
|---|---|

Still, I continue to see this as positive move so far. And another good thing may be that people will make search/catalogue sites like rapidlibrary.com and more people will download our links.

| dduck | Aug 7th 2009, 1:03 pm |
|---|---|

I agree that it will produce more downloads, but that doesn't mean it will produce as much premiums. So...I fear that platinum users may soon loose their rank.

Offcorse I would like to be wrong, 'cause I have old hotfile links too. But in last 6 weeks hotfile wasn't playing a fair game with uploaders.

## HyPn0sE                                                                    Aug 8th 2009, 4:46 am

Quote:

> Originally Posted by **dduck** View Post
>
> **NEW RULES FROM HOTFILE !**
>
> *So, from now on, all the 'bonus' from selling premiums will go to site's owner. It's is clear that hotfile did this because they know now that they made a mistake with new rules, and that only small group of ppl keep uploading files.*
> *By making new rules that are even worst for uploaders then the ones they made before, hotfile triend to profit from the old links, because I am sure new links do not show up so much these days.*
>
> *To conclude: If you share on many places, trying hard to make more ppl see your links, in this situation, that would be exellent job from you for hotfile. ..An exellent job for which you will not be paid, because site will profit from that, and not you.*

I think you're not getting it correctly. You get the commission only if the site's owner is you... IF you have a forum or blog and if the link is your's and not from other poster. They have a code that the site's owner have to include in his forum HTML to check if you're the real owner of the forum or blog.

**How to verify?**
**In order to verify your site you need to create a file named 7xxxxxxxxxxxxxx.html that include the text XXXXXXX-XXXXXXXXXXXXXXX in it.**
**Ready that and then click "Verify" bellow to complete the procces.**

## dduck                                                                      Aug 8th 2009, 4:53 am

Well, I think you didn't even had time to read few posts above from this page. :)

Let me quote again, for you:

Quote:

> Originally Posted by **ButcherBoy** View Post
>
> *Earn money spreading links in your site!*
> *Get 5% commission of all premium accounts sold through your site.*
>
> **For every referrer that comes from your site** *and buys premium you will get 5% of the account's price.*
> **No matter if download link is yours or you find it in other place!** *Post interesting download links in your site, blog or forum and earn big money.*
>
> *Please check our Affiliate page for more info.*
>
> *Regards,*

So...what did you said? :)

btw. that is the official quote, and you can find the same information on the bottom of affiliate page on hotfile site.

## xcoolrajx                                                                  Aug 11th 2009, 5:15 am

Quote:

> Originally Posted by **dduck** View Post
>
> **NEW RULES FROM HOTFILE !**

> *So, from now on, all the 'bonus' from selling premiums will go to site's owner. It's is clear that hotfile did this because they know now that they made a mistake with new rules, and that only small group of ppl keep uploading files.*
> *By making new rules that are even worst for uploaders then the ones they made before, hotfile triend to profitt from the old links, because I am sure new links do not show up so much these days.*
>
> ─────────────────────────────────
>
> I also think this will benefit the uploader. To start with, there is NO bonus for uploaders who sell premium to start with - your status increases but there is no money/ commission. The new rule is basically encouraging website owners to allow hotfile links to be posted so that many sites will lift and even encourage people into downloading hotfile links. As far as my understanding goes, if someone buys premium from your site from another uploaders link, you get 5% of the premium link money - but the fact that the uploader get promoted to higher status does not change. So its a win-win situation. I don't get where you get the idea that that its even worse for the uploaders from.

### dduck
Aug 11th 2009, 5:32 am

Just a simple question:
You upload file
I share your link
if someone buy premium form that link,

I get 5%

But, is that also counted onto your account? (are you granted better level for selling account from your link, or the only one who get bonus is me for posting your link on my site that someone used to buy a premium?)

Also, even if it wasn't me who uploaded that file, but I received a 5% bonus....does that also raise my level, or not?

---

Page 6 of 6   ◀◀First   ◀   ...   4   5   6

Show 40 post(s) from this thread on one page

All times are GMT -5. The time now is **11:16 pm**.

Digital Point modules: Sphinx-based search, CSS

# Yeh Exhibit 87

**REDACTED**

# Yeh Exhibit 88

**REDACTED**

# Yeh Exhibit 89

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 11-20427-WILLIAMS/TURNOFF

DISNEY ENTERPRISES, INC., TWENTIETH
CENTURY FOX FILM CORPORATION,
UNIVERSAL CITY STUDIOS
PRODUCTIONS LLLP, COLUMBIA
PICTURES INDUSTRIES, INC., and
WARNER BROS. ENTERTAINMENT INC.,

*Plaintiffs,*

v.

HOTFILE CORP., ANTON TITOV,
and DOES 1-10.

*Defendants.*

_____/

HOTFILE CORP.,

*Counterclaimant,*

v.

WARNER BROS. ENTERTAINMENT INC.,

*Counterdefendant.*

_____/

**DEFENDANTS' MEMORANDUM OF LAW IN
OPPOSITION TO PLAINTIFFS' MOTION TO COMPEL
THE DEPOSITION OF ANDREI IANAKOV**

Case 1:11-cv-20427-KMW Document 329-15 Entered on FLSD Docket 03/05/2012 Page 16 of
Case 1:11-cv-20427-KMW Document 290-15 Entered on FLSD Docket 12/19/2011 Page 2 of 10
79

CASE NO. 11-20427-WILLIAMS/TURNOFF

I.    **INTRODUCTION**

Plaintiffs requested and received from the Court leave to take four days of deposition of

Mr. Titov, in both his individual capacity and as Rule 30b6 designee of Defendant Hotfile Corp.

("Hotfile"), along with the depositions of the two other owners of Hotfile in Sofia Bulgaria.

Plaintiffs justified this extraordinary request for four days of testimony by one individual in large

part by asserting that they were unable to take the depositions of the non-managing agent

independent contractors who work on Hotfile in Bulgaria, including Mr. Ianakov.  Plaintiffs

represented to the Court—correctly—that those depositions could proceed if at all only under the

provisions of the Hague convention.  Having deposed Mr. Titov for four full days, Plaintiffs now

take the opposite position and ask the Court to order Mr. Ianakov's deposition under the Federal

Rules.[1]  There is no legal or factual basis for this request; it must be denied.

II.    **FACTUAL BACKGROUND**

Third Party Andrei Ianakov was an entry-level employee of Blue Ant, Ltd. ("Blue Ant"),

a company which provides contract website support services to Hotfile.  *See* Exhibit 1, attached

hereto, which is the Declaration of Roderick Thompson in Support of Opposition to Motion to

Compel the Deposition of Andrei Ianakov ("Thompson Decl."), at Ex. A [Titov Dep., Vol. 1] at

27:8-10[2].  Mr. Ianakov shared responsibility with Stanislov Manov for answering user inquiries

and responding to DMCA takedown notices for Hotfile.  *Id.* at 27:22-28:10.  He reported to Blue

Ant's owners.  *Id.* at 121:11-15.  He was not a manager, and he oversaw the work of no other

---

[1]  Plaintiffs filed their motion on December 13, 2011 [I.E. # 184] and requested expedited
briefing in light of the December 23, 2011 discovery cut off.  Defendants are filing this
opposition more than a week early as an accommodation to that request, and with the expectation
that any Reply will also be filed promptly to allow a decision by the Court before December 23.

[2]  All transcript citations are to the "rough" deposition transcripts provided by the court reporters
to both parties at the conclusion of each day's testimony.

Case 1:11-cv-20427-KMW   Document 329-15   Entered on FLSD Docket 03/05/2012   Page 17 of
79
Case 1:11-cv-20427-KMW   Document 390-15   Entered on FLSD Docket 03/05/2012   Page 2 of 10

CASE NO. 11-20427-WILLIAMS/TURNOFF

person.  *Id.* at 100:14-17.  He had limited discretion to answer straightforward user requests, but

otherwise sought oversight from Blue Ant's owners or, for technical issues, Anton Titov.  *See*

*Id.*, Ex. B [Titov Dep., Vol. 3] at 5:5-19.  He had no ownership interest in Hotfile and received

no portion of Hotfile's profits.  *Id.* at 61:20-25, 62:18-21.  His salary ranged between $16,150 -

$24,225 per year.  *Id.* at 62:5-10.  He had no authority to set policy for Hotfile.  *Id.* at 151:18-21.

He had no authority to hire or enlist any other individual to assist him with any tasks.  *Id.*, Ex. C

[Titov Dep., Vol. 4] at 16:2-7.  He had no authority to set prices for Hotfile's services or change

the benefits that users received without obtaining approval from superiors.  Id. at 55:9-23.

On May 2, 2011, Hotfile first disclosed to Plaintiffs that Mr. Ianakov provided e-mail

support services to Hotfile as an employee of Blue Ant, and that he resided in Sofia, Bulgaria.

[*See* Dkt. No. 174-1 ¶ 5 (discussing Hotfile's initial disclosures).]  For the following five months,

Plaintiffs made no effort to seek his deposition.  Eventually, on September 29, 2011 – ignoring

the Hague Convention On Taking Evidence Abroad – Plaintiffs noticed Mr. Ianakov's deposition

in Miami.  [*See* Dkt. No. 174-10 at 2.][3]  Plaintiffs at first asserted that every Bulgarian individual

who had ever done work for Hotfile was Hotfile's "managing agent" and thus subject to

deposition under American procedural rules regardless of their citizenship, residence, or any

international convention.  [*See* Dkt. No. 174-11 at 1 (e-mail exchange between counsel).]  When

Hotfile requested factual support for Plaintiffs' characterization of Mr. Ianakov as a "managing

agent" subject to deposition in the absence of the protections of the Hague Convention – a

proposition on which Plaintiffs admitted bearing the burden of proof – Plaintiffs responded with

---

[3]  Plaintiffs noticed the deposition in Miami without any evidence that Mr. Ianakov had ever
been to Miami, or Florida, or the United States in his life.

insults and threats, not facts.[4]  The next day, Plaintiffs abandoned their deposition notices
without identifying a single document supporting their position.  *Id.*

On November 16, 2011, Plaintiffs instead filed a motion seeking four days to depose
Defendant Anton Titov both individually and as Hotfile's corporate designee on grounds that
Plaintiffs were "unable to elicit testimony from other witnesses."  [Dkt. No. 165 at 4.]  They
argued that they could not obtain testimony of Blue Ant employees such as Mr. Ianakov under
the procedural rules of the Hague Convention in the time remaining for discovery.  [*Id.* ("While
plaintiffs may attempt to compel depositions of certain of Hotfile's "employees" **through
international process**, the timeline of that process is uncertain and, in any event, under
Bulgarian law, it would afford a relatively limited examination.") (Emphasis added)].  To justify
their request for four days of Mr. Titov's deposition, Plaintiffs represented to the Court that
Bulgaria does not ordinarily permit depositions of its citizens.  [Dkt. No. 176 at 6 n.6 ("under
Bulgarian rules . . . questioning is limited and is done . . . by the court, not counsel") (citing
Response Bulgaria to Convention of 18 March 1970 on Taking of Evidence Abroad in Civil or
Commercial Matters ¶¶ 42, 44, 63 (2008).]  Plaintiffs told the Court that "Including the Hotfile
and Titov depositions at issue in this motion, plaintiffs have noticed a total of four (4)
depositions for their entire affirmative copyright case," the three owners of Hotfile and a Rule30
(b)(6) deposition.  *Id.*

The Court granted Plaintiffs motion on December 1, 2011.  As planned, Plaintiffs took
the deposition of Hotfile and Mr. Titov for four full days from December 5-8, 2011 as well as the
depositions of Hotfile's  two other principals in Sofia Bulgaria.  Plaintiffs now have changed

---

[4]  Plaintiffs commanded Hotfile to "stop playing games," halt the "abuse of the meet-and-confer
process," stop "obviously seeking to stonewall and delay," make only "whatever arguments you
*ethically* can," and abandon this "sham of a meet-and-confer."  [*See* Dkt. No. 174-12 (e-mail
exchange between counsel).]

Case 1:11-cv-20427-KMW Document 329-15 Entered on FLSD Docket 03/05/2012 Page 19 of 79
Case 1:11-cv-20427-KMW Document 390-5 Entered on FLSD Docket 02/13/2012 Page 5 of 10

CASE NO. 11-20427-WILLIAMS/TURNOFF

course and noticed the deposition of Mr. Ianakov on December 8, 2011 and seek to proceed outside of the Hague Convention. [Dkt. No. 179.] Hotfile forwarded the deposition notice to Mr. Ianakov on December 13, requesting, that while he is not a Hotfile managing agent and should not be subject to a deposition, that he confirm that he would appear if ordered by the Court. In response, and no doubt reflecting Bulgaria's history of iron curtain repression resulting in deep-seeded mistrust of governmental authorities, Mr. Ianakov expressed great concern about being questioned "by foreign lawyers," which was causing him severe psychological and emotional distress, and tendered his resignation of employment with Blue Ant, effective December 15, 2011. *Id.*, Ex. D. Two business days after noticing Mr. Ianakov's deposition, and without first speaking with Hotfile's counsel, Plaintiffs served this Motion on Hotfile.

## III.    <u>LEGAL STANDARD</u>

A party may depose a "managing agent" of a party pursuant to notice. Fed. R. Civ. P. 30(b)(6). If the proposed deponent is *not* an officer, director, or managing agent, then the examining party must resort to a subpoena pursuant to Rule 45 or international service of process pursuant to the Hague Convention. Fed. R. Civ. P. 45; *E.I. DuPont de Nemours & Co. v. Kolon Indus., Inc.*, 268 F.R.D. 45, 48 (E.D. Va. 2010).

In determining whether a deponent qualifies as a "managing agent," Courts consider: (1) whether the individual is invested with general powers allowing him to exercise judgment and discretion in corporate matters; (2) whether the individual can be relied upon to give testimony, at his employer's request, in response to the demands of the examining party; (3) whether any person or persons are employed by the corporate employer in positions of higher authority than the individual designated in the area regarding which the information is sought by the examination; (4) the general responsibilities of the individual respecting the matters involved

CASE NO. 11-20427-WILLIAMS/TURNOFF

in the litigation; and (5) whether the individual can be expected to identify with the interests of the corporation. *JSC Foreign Economic Ass'n Technostroyexport v. International Development & Trade Services, Inc.*, 220 F.R.D. 235, 237 (S.D.N.Y. 2004). "Care must be taken not to confuse the analysis by suggesting that parties who are intimately involved in matters concerning the litigation, but do not manage, have attributes of managing agents." *DuPont*, 268 F.R.D. at 49 n.3. Furthermore, "[t]he general rule is that former employees cannot be managing agents of a corporation." *Id.* at 49

## IV. ARGUMENT

### A. As A Former Entry-Level Employee Of A Consultant To Hotfile, Mr. Ianakov Remains So Distant From "Managing Agent" Status That He Does Not Possess Even One Of The Five Relevant Indicia Of Managing Agents

Case law sets forth at least five factors to consider regarding an individual's alleged status as a managing agent. *JSC*, 220 F.R.D. at 237. Mr. Ianakov does not even meet one of these criteria.

#### 1. Mr. Ianakov Never Possessed "General Powers Allowing Him To Exercise Judgment And Discretion In Corporate Matters"

In every one of the cases cited by Plaintiffs, the identified "managing agents" were founders, chief executives, 50% stakeholders, or individuals with "supervisory authority" over the CEO of a party. *See Felman Prod., Inc. v. Industrial Risk Insurers*, No. 3:09-cv-00481, 2010 WL 5110076, at *5 (S.D.W.Va. Dec. 9, 2010) (witness "had supervisory authority over [Plaintiff's] CEO); *id.* at *7 (witness was "50% owner of [Plaintiff]"); *Calixto v. Watson Bowman Acme Corp.*, No. 07-60077-CIV, 2008 WL 4487679, at *3 (S.D. Fla. Sept. 29, 2008) (witness was CEO of relevant entity); *Founding Church of Scientology v. Webster*, 802 F.2d 1448, 1453-54 (D.C. Cir. 1986) (witness was founder of plaintiff organization whose unquestioned word was scripture "venerated by the flock of the faithful"). Indeed, Plaintiffs'

case law analogized "managing agent" status under Rule 30 to the "alter ego" of a corporation, where "an individual so dominates an organization as in reality to negate its separate personality." *Id.* at 1452-3.

Here, as to Hotfile, Mr. Ianakov was neither the chief executive, the 50% stakeholder, the alter ego, or the founder venerated by his followers as a holy man and prophet. In fact, he is the former entry-level employee of a third party consulting firm who: responded to user e-mails alongside another consultant; supervised no one; answered to Hotfile's owners; possessed no ownership interest in Hotfile; collected an annual salary as low as $16,150; had no authority to set policy for Hotfile; had no authority to hire or enlist any individual to assist him; and had no authority to set prices or change user benefits. The areas in which he exercised "discretion" related to: (1) implementation of policies dictated to him by Hotfile's owners regarding repeat infringers; and (2) responding to the most straightforward user inquiries. This is not the profile of a managing agent. As Mr. Ianakov put it in his resignation email, "the fact [is] that I am only an employee of BlueAnt, and my involvement with Hotfile.com was only to the extent of web support and answering emails/ customer service." Thompson Decl., Exh. D.

**2.      Upon Learning of the Request For His Deposition, Mr. Ianakov Resigned His Employment With Blue Ant; He Cannot Be Relied Upon To Give Testimony At Hotfile's Request**

The second factor considered by courts in determining "managing agent" status is "whether the individual can be relied upon to give testimony, at his employer's request, in response to the demands of the examining party." *JSC*, 220 F.R.D. at 237. Here, Mr. Ianakov cannot be expected to testify, even when directed by Blue Ant. Shortly after Plaintiffs' service upon Hotfile of the notice of deposition of Mr. Ianakov, Blue Ant's owners transmitted the notice to Mr. Ianakov and directed him to confirm that he would appear if ordered by the Court. In response, on December 13, 2011, Mr. Ianakov wrote "I am so worried that I have to be

CASE NO. 11-20427-WILLIAMS/TURNOFF

deposed by foreign attorneys, taking into consideration the fact that I am only an employee of

BlueAnt, and my involvement with Hotfile.com was only to the extent of web support and

answering emails/ customer service."  Thompson Decl., Ex. D.  He terminated his employment

with Blue Ant, citing stress, effective December 15, 2011.  *Id.*

        As a result, there is no reason to believe that Mr., Ianakov will appear for deposition.

Given that Mr. Ianakov is no longer an employee of Blue Ant, and holds no stake in Blue Ant or

Hotfile, he has no motivation to voluntarily appear for deposition – even assuming that he were a

managing agent for Hotfile, which is not the case.  Indeed it was the prospect of the deposition

and the stress it was causing him that apparently led Mr. Ianakov to resign.  Id, ("Rationalizing

on all the above, I decided to leave the company BlueAnt.")

        Plaintiffs' own case law demonstrates the impropriety of any deposition of Mr. Ianakov

where he refuses to voluntarily appear at Blue Ant's request.  In *JSC*, plaintiff sought to avoid

the requirements of the Hague Convention and depose two former officers and directors of

defendants as "managing agents" under Rule 30 even though both individuals resided in Europe.

220 F.R.D. at 237-38.  The individuals declined to appear for deposition.  *Id.* at 237.

Overturning the Magistrate Judge's order compelling the depositions as "clearly erroneous or

contrary to law," the Court found that "allowing deposition by notice would result in not merely

the waiver of formal subpoena procedures, but also [possibly result in] sanctions on the opponent

for failing to produce witnesses who are in fact beyond its control."  *Id.*  Holding that "[a]

managing agent is a person who has the interests of the corporation so close to his heart that he

could be depended upon to carry out his employer's direction to give testimony," the Court

vacated the notices of deposition despite the fact that the witnesses continued to maintain

attenuated connections to the defendants.  *Id.* at 238.

Here, the case against Mr. Ianakov's qualification as a "managing agent" remains even stronger than the arguments possessed by the deponents in *JSC*. Mr. Ianakov *never* held a position as an officer or director of a party. Moreover, he maintains no remaining connection to Blue Ant or Hotfile. Given that he resides in a European nation subject to the Hague Convention and has refused to appear voluntarily for deposition – just like the proposed deponents in *JSC* – Plaintiffs' own case law demonstrates the impropriety of deposing Mr. Ianakov under the Federal Rules of Civil Procedure.

### 3. As A Former Entry-Level Employee At Third-Party Blue Ant, Mr. Ianakov Has No Authority Over The Management Of Hotfile As To Any Subject

The third factor considered by courts in determining "managing agent" status is "whether any person or persons are employed by the corporate employer in positions of higher authority than the individual designated in the area regarding which the information is sought by the examination." *JSC*, 220 F.R.D. at 237. Here, Mr. Ianakov reported to Blue Ant's owners. *See Id.*, Ex. A (Titov Dep., Vol. 1) at 121:11-15. He was permitted to handle routine user inquiries on his own, but if novel issues arose he was required to obtain direction from Blue Ant's owners or, for technical issues, Mr. Titov – whom Plaintiffs have already been deposed in this case. *See Id.*, Ex. B (Titov Dep., Vol. 3) at 5:5-19.

Nor can Plaintiffs establish any need to depose Mr. Ianakov. As Plaintiffs acknowledge in their motion, Mr. Titov testified as the Rule 30b6 witness of Hotfile on all fifty subjects listed in Plaintiffs notice, including the subject of terminations of accounts for repeat infringement. See Opp. at 5 (citing Mr. Titov's deposition testimony, and noting that Mr. Titov had prepared and testified as to "what Mr. Ianakov had told him on the subject.") Plaintiffs do not argue—nor could they—that Mr. Titov was unprepared to testify on behalf of Hotfile on this or any other Rule 30b6 topic.

-8-

CASE NO. 11-20427-WILLIAMS/TURNOFF

In short, Mr. Ianakov was not a manager, and indeed oversaw the work of no other

person. *Id.*, Ex. A (Titov Dep., Vol. 1) at 100:14-17.  Mr. Ianakov was far distant from being the

ultimate decision-maker on any subject; he had no authority over Hotfile's management.  "[T]he

fact [is] that I am only an employee of BlueAnt, and my involvement with Hotfile.com was only

to the extent of web support and answering emails/ customer service."  Thompson Decl., Exh. D.

### 4. By Plaintiffs' Own Admission, Mr. Ianakov Did Not Have "General Responsibilities" Regarding The Matters Involved In The Litigation

The fourth factor considered by courts in determining "managing agent" status is

"the general responsibilities of the individual respecting the matters involved in the litigation."

*JSC*, 220 F.R.D. at 237.  "Care must be taken not to confuse the analysis by suggesting that

parties who are intimately involved in matters concerning the litigation, but do not manage, have

attributes of managing agents."  *DuPont*, 268 F.R.D. at 49 n.3.

Here, Mr. Ianakov responded to user inquiries and requests that Hotfile "take down" files.

He had no managerial responsibilities – and indeed no responsibilities at all – regarding Hotfile's

policies, functionality, technical direction, hiring, services, or price.  With respect to the topics

for discovery identified by Plaintiffs at the outset of the case, Mr. Ianakov had no involvement

whatsoever with many (if not most) of the topics, including:

- "technological measures defendants took, did not take, considered taking, or could have taken to limit infringement on Hotfile";

- "defendants' revenues and profit from their infringing activities";

- "the extent to which …defendants …receive a financial benefit attributable to infringement";

- "defendants' right and ability to control infringement, including by blocking files . . . "; and

-9-

CASE NO. 11-20427-WILLIAMS/TURNOFF

- "the identities and involvement of other individuals, investors, or entities involved in the creation or operation of Hotfile, or working in concert with defendants to facilitate infringement."

Joint Scheduling Report at 5 [Dkt. No. 54].

While Mr. Ianakov shared some role with Stanislav Manov for carrying out Hotfile's policies regarding repeat infringers and DMCA takedown requests – topics involved in this litigation – he exerted no *managerial control* as required to qualify as a "managing agent" under the Rules because he *managed* nothing at Hotfile. *See DuPont*, 268 F.R.D. at 53 (rejecting characterization of witness as "managing agent" where witness: "has no authority to approve technology, hire or fire staff, or approve travel"; "does not appear to have had any supervisory authority"; and "has not . . . *manag[ed]* anything.") As stated in *DuPont*, "[t]he law of managing agency cannot, by its plain language, be said to extend to one who was not a manager in some capacity." *Id.*

### 5. Having Never Possessed Any Stake In Hotfile, And Having Severed Any Relationship With Hotfile's Consultant, Mr. Ianakov Cannot Be Expected To Identify With The Interests Of Hotfile

The fifth factor considered by courts in determining "managing agent" status is "whether the individual can be expected to identify with the interests of the corporation." *JSC*, 220 F.R.D. at 237. This is important for two reasons: (1) the testimony of a managing agent binds the corporation, Fed. R. Civ. P. 32(a)(3); and (2) a managing agent's failure to obey a discovery order may subjects the corporate defendant to sanctions, Fed. R. Civ. P. 37(b)(2)(A). A third party with no interest in the corporate defendant should not bind the corporate defendant or subject it to sanctions.

Here, Mr. Ianakov never had any stake in Hotfile. He never possessed any ownership interest, and never received any share of its profits. Indeed, he did not even work directly for

Hotfile. Currently, he has no relationship with Hotfile – not even an employment relationship with Blue Ant, Hotfile's outside consulting firm – and Hotfile could exert no greater influence over Mr. Ianakov to compel compliance with Plaintiffs' subpoena. To the contrary, Mr. Ianakov may hold ill will against Hotfile for subjecting him to a notice of deposition in foreign proceedings and the accompanying stress. Hotfile should not be bound to Mr. Ianakov's behavior or testimony. This factor – which at least one court has viewed as "paramount" – militates against any characterization of Mr. Ianakov as Hotfile's "managing agent," just like all the other factors discussed herein. *In re Honda American Motor Co., Inc. Dealership Relations Litigation*, 168 F.R.D. 535, 541 (D. Md. 1996).

    **B.**     **Having Prevailed On Their Motion To Extend The Deposition Of Hotfile Based On The "Unavailability" Of Mr. Ianakov, Plaintiffs Cannot Now Justifiably Demand His Deposition**

Judicial estoppel bars a party from obtaining judicial relief based on serially inconsistent positions. *See Robinson v. Tyson Foods, Inc.*, 595 F.3d 1269, 1273 (11th Cir. 2010) ("The purpose of judicial estoppel is to protect the integrity of the judicial process by prohibiting parties from changing positions according to the exigencies of the moment."). Judicial estoppel applies: (1) when the present position is clearly inconsistent with the earlier position; (2) when the party succeeded in persuading the court to accept the earlier position; and (3) where the party advancing the inconsistent position would derive an unfair advantage. *Id.*

Here, Plaintiffs sought to extend the deposition of Hotfile and Anton Titov to four days based on grounds that Plaintiffs were "unable to elicit testimony from other witnesses." [Dkt. No. 165 at 4.] They represented to the Court that they could not obtain testimony of Blue Ant employees such as Mr. Ianakov under the procedural rules of the Hague Convention in the time remaining for discovery. *Id.* The Court, apparently relying on Plaintiffs' argument, granted the motion on December 1, 2011. Despite Defendants agreement to "commingle" Mr. Titov's

-11-

individual and Rule 30b(6) depositions, as the Court had suggested to shorten the overall time, Plaintiffs insisted on examining Mr. Titov for four full days of deposition in Sofia, Bulgaria between December 5-8, 2011.  *See* Thompson Decl., ¶ 3.  Now, Plaintiffs demand the deposition of Mr. Ianakov, in conflict with their prior representations, outside of the Hague Convention procedure.  The positions are clearly inconsistent; this Court granted Plaintiffs' motion after reviewing Plaintiffs' argument; and Plaintiffs have now consumed the benefit of that ruling to Hotfile's detriment.  *Robinson*, 595 F.3d at 1273.  Plaintiffs should not be permitted to advance directly contrary positions to this Court.  Based on judicial estoppel principles alone, Plaintiffs' Motion should be denied.

### C. Plaintiffs Cannot Properly Seek The Deposition Of Mr. Ianakov Nearly Six Weeks After Concluding The Parties' Meet-And-Confer Discussions

Under this Court's Local Rules, "[a]ll motions related to discovery, including but not limited to motions to compel discovery and motions for protective order, shall be filed within thirty (30) days of the occurrence of grounds for the motion."  Local Rule 26.1(h)(1).  Apart from the fact that Plaintiffs have known of Mr. Ianakov's role in this litigation for eight months, Plaintiffs first noticed the deposition of Mr. Ianakov over ten weeks ago.  [Dkt. No. 174-10 at 2.]  Plaintiffs concluded the meet-and-confer negotiations on October 6, 2011, when Plaintiffs dismissed Hotfile's attempt to discuss the issue as abusive game-playing, improper stonewalling, and a sham.  [Dkt. No. 174-12 (identifying further discussion as a "dead issue").]  Nonetheless – even though Hotfile did not produce any further documents from Mr. Ianakov since September – Plaintiffs refused to bring any motion to compel for over two months.  Instead, Plaintiffs waited until the last ten days of discovery – when the parties had eighteen remaining depositions to complete – and demanded that Hotfile file its opposition to Plaintiffs' motion within *three business hours* of the filing.  Mot. at 5.  Even though no additional meet-and-confer discussion

occurred between October 6, 2011 and the filing on December 13, 2011 – indeed, Plaintiffs filed

this Motion without even talking to Hotfile's counsel, despite Hotfile's stated willingness to talk

– Plaintiffs filed their Motion nearly six weeks after the deadline set by the Local Rules.  On its

own, this reason justifies denial of Plaintiffs' Motion.  *See* Local Rule 26.1(h)(1) ("Failure to file

a discovery motion within thirty (30) days, absent a showing of reasonable cause for a later

filing, may constitute a waiver of the relief sought.").

## V.    **CONCLUSION**

There is no legal or factual basis to consider Mr. Ianakov as a managing agent; Plaintiffs'

motion to compel the deposition of Andrei Ianakov should be denied.  A proposed Order is

attached as Exhibit 2.


Dated:  December 19, 2011                              Respectfully submitted,

s/ Andrew Leibnitz
Roderick M. Thompson *(Admitted pro hac vice)*
rthompson@fbm.com
Andrew Leibnitz *(Admitted pro hac vice)*
aleibnitz@fbm.com
Anthony P. Schoenberg *(Admitted pro hac vice)*
tschoenberg@fbm.com
Deepak Gupta *(Admitted pro hac vice)*
dgupta@fbm.com
Janel Thamkul *(Admitted pro hac vice)*
jthamkul@fbm.com
FARELLA BRAUN & MARTEL LLP
235 Montgomery St.
San Francisco, CA 94104
Telephone:  415.954.4400
Telecopy:  415.954.4480


s/ Janet T. Munn
Janet T. Munn, Fla. Bar No. 501281
RASCO KLOCK, et al.
283 Catalonia Avenue, Suite 200
Coral Gables, FL 33134
Telephone:  305.476.7101
Telecopy:  305.476.7102
Email: jmunn@rascoklock.com


AND


s/Valentin Gurvits
Valentin Gurvits *(Admitted pro hac vice)*
BOSTON LAW GROUP
825 Beacon Street, Suite 20
Newton Center, MA 02459
Telephone:  617.928.1800
Telecopy:  617.928.1802
Email: vgurvits@bostonlawgroup.com


*Counsel for Defendants Hotfile Corporation*
*and Anton Titov*


*Counsel for Defendants*

**CERTIFICATE OF SERVICE**

I hereby certify that on December 19, 2011, the foregoing document was served on all counsel of record or pro se parties identified below either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

By: s/Janet T. Munn
Janet T. Munn

Karen L. Stetson, Fla. Bar No.: 742937
GRAY-ROBINSON, P.A.
Email: Karen.Stetson@gray-robinson.com
1211 Brickell Avenue
Suite 1600
Miami, FL 33131
Telephone: 305.416.6880
Telecopy: 305.416.6887

Steven B. Fabrizio (*Pro Hac Vice* )
Email: sfabrizio@jenner.com
Duane C. Pozza (*Pro Hac Vice* )
Email: dpozza@jenner.com
Luke C. Platzer (*Pro Hac Vice* )
Email: lplatzer@jenner.com
JENNER AND BLOCK, LLP
1099 New York Ave, N.W.
Suite 900
Washington, DC 20001
Telephone: 202.639.6000
Telecopy: 202.639.6066

Karen R. Thorland, Esq. *(Pro Hac Vice)*
Senior Content Protection Counsel
Motion Picture Association of America, Inc.
15301 Ventura Boulevard Building E
Sherman Oaks, CA
Telephone: 818.935.5812
Email: Karen_Thorland@mpaa.org

# Yeh Exhibit 90



# ADMINISTRATION'S WHITE PAPER ON INTELLECTUAL PROPERTY ENFORCEMENT LEGISLATIVE RECOMMENDATIONS

      

MARCH 2011



# INTRODUCTION

On June 22, 2010, the U.S. Intellectual Property Enforcement Coordinator (IPEC) issued the Administration's first Joint Strategic Plan on Intellectual Property Enforcement (Strategy), which was developed in coordination with many Federal agencies, including the Departments of Commerce, Health and Human Services, Homeland Security (DHS), Justice (DOJ), and State, and the U.S. Trade Representative. As part of the Strategy, the Administration undertook to review existing laws to ensure that they were effective and to identify deficiencies that could hinder enforcement. Based on that review, this White Paper identifies specific recommended legislative changes, designed to increase the effectiveness of U.S. enforcement efforts. We will, of course, continue to assess existing legislation and recommend any further changes to the law as the need arises.

Piracy and counterfeiting in the online environment are significant concerns for the Administration. They cause economic harm and threaten the health and safety of American consumers. Foreign-based and foreign-controlled websites and web services raise particular concerns for U.S. enforcement efforts. We are aware that members of Congress share our goal of reducing online infringement and are considering measures to increase law enforcement authority to combat websites that are used to distribute or provide access to infringing products. We look forward to working with Congress on those efforts and the recommendations contained in this paper in the coming year.

Turning to the specific recommendations, the Administration recommends increasing the statutory maxima for the following offenses:

1. Increase the statutory maximum for economic espionage (18 U.S.C. § 1831) from 15 years in prison to at least 20 years in prison; and

2. Increase the statutory maxima for drug offenses under the Federal Food, Drug and Cosmetic Act (FFDCA), particularly for counterfeit drug offenses.

The Administration recommends that Congress: (1) direct the U.S. Sentencing Commission to increase the U.S. Sentencing Guideline range for intellectual property offenses; (2) require the U.S. Sentencing Commission to consider five specific categories of changes to the Guidelines; and (3) require the U.S. Sentencing Commission to act within 180 days of such legislation being adopted (including issuing a report explaining why it has not adopted any of the specific recommendations). The five categories of specific recommendations for the U.S. Sentencing Commission are:

1. Increase the U.S. Sentencing Guideline range for the theft of trade secrets and economic espionage, including trade secrets transferred or attempted to be transferred outside of the U.S.;

2. Increase the U.S. Sentencing Guideline range for trademark and copyright offenses when infringing products are knowingly sold for use in national defense, national security, critical infrastructure, or by law enforcement.

3. Increase the U.S. Sentencing Guideline range for intellectual property offenses committed by organized criminal enterprises/gangs;

**4.** Increase the U.S. Sentencing Guideline range for intellectual property offenses that risk death or serious bodily injury and for those offenses involving counterfeit drugs (even when those offenses do not present that risk); and

**5.** Increase the U.S. Sentencing Guideline range for repeat intellectual property offenders.

The Administration recommends three legislative changes to give enforcement agencies the tools they need to combat infringement:

**1.** Clarify that, in appropriate circumstances, infringement by streaming, or by means of other similar new technology, is a felony;

**2.** Authorize DHS, and its component U.S. Customs and Border Protection (CBP), to share pre-seizure information about, and samples of, products and devices with rightholders to help DHS to determine whether the products are infringing or the devices are circumvention devices; and

**3.** Give law enforcement authority to seek a wiretap for criminal copyright and trademark offenses.

The Administration recommends two legislative changes to allow DHS to share information about enforcement activities with rightholders:

**1.** Give DHS authority to notify rightholders that infringing goods have been excluded or seized pursuant to a U.S. International Trade Commission (ITC) order; and

**2.** Give DHS authority to share information about, and samples of, circumvention devices with rightholders post-seizure.

The Administration recommends six legislative changes to improve U.S. enforcement efforts involving pharmaceuticals, including counterfeit drugs:

**1.** Require importers and manufacturers to notify the Food and Drug Administration (FDA) and other relevant agencies when they discover counterfeit drugs or medical devices, including the known potential health risks associated with those products;

**2.** Extend the Ryan Haight Act's definition of "valid prescription" (and its telemedicine exemption) to the FFDCA to drugs that do not contain controlled substances;

**3.** Adopt a track-and-trace system for pharmaceuticals and related products;

**4.** Provide for civil and criminal forfeiture under the FFDCA, particularly for counterfeit drug offenses;

**5.** As noted above, increase the statutory maxima for drug offenses under the FFDCA, particularly for counterfeit drug offenses; and

**6.** As noted above, recommend that the U.S. Sentencing Commission increase the U.S. Sentencing Guideline range for intellectual property offenses that risk death and serious bodily injury, and for those offenses involving counterfeit drugs (even when those offenses do not present that risk).

INTRODUCTION

The Administration recommends three legislative changes as to CBP's administrative penalties:

1. Permit relief when someone who unknowingly and unintentionally acquires infringing products voluntarily discloses them to CBP before becoming aware of any CBP enforcement action (or a law enforcement investigation);

2. Give CBP authority to issue penalties for infringing exports; and

3. Strengthen CBP's authority to issue penalties for infringing imports discovered during audits of company records.

Finally, the Administration recommends a legislative change to provide a right of public performance that will improve international enforcement efforts:

1. Create a right of public performance for copyright owners for sound recordings transmitted by over-the-air broadcast stations which, in part, will allow copyright owners to obtain overseas royalties that are now denied to them.

# Increase Existing Criminal Penalties

## *Increase Intellectual Property Statutory Maxima*

**Increase the Statutory Maximum for Economic Espionage:** Economic espionage is one of the most serious intellectual property crimes. A defendant committing that offense, however, faces a statutory maximum sentence of only 15 years in prison. 18 U.S.C. § 1831(a). We recommend that Congress raise that statutory maximum given the severity of the conduct inherent in the offense. Other non-intellectual property offenses that have higher statutory maxima include mail fraud (20 years; 18 U.S.C. § 1341), bank fraud (30 years; 18 U.S.C. § 1344), smuggling goods into the U.S. (20 years; 18 U.S.C. § 545), and counterfeit U.S. currency offenses (20 years; 18 U.S.C. §§ 471, 472, 473). Moreover, under the U.S. Sentencing Guideline that applies to economic espionage, U.S. Sentencing Guideline (USSG) § 2B1.1, an offense with a statutory maximum sentence of 20 years or more in prison triggers a base offense level of seven, as opposed to the base offense level of six triggered by an offense with a statutory maximum sentence of less than 20 years in prison. USSG §§ 2B1.1(a)(1),(a)(2). Increasing the statutory maximum to at least 20 years in prison, thereby triggering the higher base offense level, is appropriate for this serious offense.

> **Recommendation:** The Administration recommends that Congress increase the statutory maximum sentence for economic espionage to at least 20 years in prison.

**Increase the Statutory Maxima under the FFDCA:** The FFDCA prohibits, among other offenses, adulterated, misbranded, and counterfeit pharmaceuticals. Most criminal violations of the FFDCA, however, are subject to statutory maxima of no more than three years in prison. For example, counterfeit pharmaceutical cases prosecuted under 21 U.S.C. § 331(i) are generally misdemeanors, 21 U.S.C. § 333(a)(1), unless the government proves that the defendant committed the offense with the intent to defraud or mislead, 21 U.S.C. § 333(a)(2). In such circumstances, the offense becomes a felony, but one subject only to a statutory maximum sentence of three years in prison. Id. This contrasts with the 10-year statutory maximum for the sale of products with counterfeit trademarks (including for drugs) under 18 U.S.C. § 2320. The Administration recommends that Congress increase the statutory maxima for drug offenses under the FFDCA, particularly for counterfeit drug offenses.

> **Recommendation:** The Administration recommends that Congress increase the statutory maxima under the FFDCA, particularly for counterfeit drugs.

## *Legislation Requiring the U.S. Sentencing Commission to Consider Increases to the Guideline Range Based on Aggravated Offense Conduct in Intellectual Property Cases*

According to DOJ's 2009 and 2010 PRO-IP Act reports to Congress, from Fiscal Year 2004 through 2010 — a period of seven years — less than half (762) of the defendants sentenced for intellectual property

INCREASE EXISTING CRIMINAL PENALTIES

crimes (1,469) received prison time as part of their sentence. To help ensure that the penalties for intellectual property crimes match the harm caused by those offenses, the Administration considered a number of increases to intellectual property crime statutory maxima based on aggravated offense conduct. The Administration believes that Congress can effectively address the harm caused by this conduct by directing the U.S. Sentencing Commission to amend the theft of trade secret and economic espionage U.S. Sentencing Guideline (USSG § 2B1.1) and the copyright and trademark infringement Guideline (USSG § 2B5.3).

> **Recommendation:** The Administration recommends that Congress direct the U.S. Sentencing Commission that it shall: (1) amend the theft of trade secret and economic espionage U.S. Sentencing Guideline (USSG § 2B1.1) and the copyright and trademark infringement Guideline (USSG § 2B5.3) to increase the Guideline ranges applicable to those offenses, so as to more effectively address the substantial harm caused by intellectual property crimes; (2) consider, among other possible increases, the following five categories of recommended increases to the Guidelines (described below); and (3) complete its consideration/review within 180 days of the date of enactment of the legislation and, if it chooses not to adopt any of the specific recommendations, within that 180 days, the U.S. Sentencing Commission shall issue a report explaining why it has not adopted the recommendation(s).

**Increase in the Offense Level for Theft of Trade Secrets and Economic Espionage:** There is currently a two-level enhancement for economic espionage: "If the offense involved misappropriation of a trade secret and the defendant knew or intended that the offense would benefit a foreign government, foreign instrumentality, or foreign agent, increase by 2 levels." USSG § 2B1.1(b)(5). The Administration recommends that Congress adopt legislation requiring the U.S. Sentencing Commission to consider three changes to this Guideline. First, the two-level enhancement should apply to the simple misappropriation of a trade secret (the Guideline at issue is a general fraud Guideline and does not otherwise account for the theft of trade secrets). Second, an additional two-level enhancement should apply if the defendant transmits or attempts to transmit the stolen trade secret outside of the U.S., or an additional three-level enhancement should apply if the defendant instead commits economic espionage, i.e., he/she knew or intended that the offense would benefit a foreign government, foreign instrumentality, or foreign agent. Third, when a defendant transmits trade secrets outside of the U.S. or commits economic espionage, that defendant should face a minimum offense level.

These three changes will help make the sentences for the theft of trade secrets — particularly those involving economic espionage — more appropriately reflect the harm caused by the criminal conduct. Moreover, adopting a two-level enhancement for the theft of trade secrets would make the offense level (absent other aggravated conduct) the same for trade secret, copyright, and trademark offenses. That is so, because trade secret offenses start with a two-level lower base offense level under USSG § 2B1.1(a)(2) (six) than do copyright and trademark offenses under USSG § 2B5.3(a) (eight).

We note that we have only recommended an additional one-level enhancement when a defendant steals trade secrets to commit economic espionage, as opposed to transfers of trade secrets outside of the U.S. We recommend only an additional one-level enhancement, rather than a two-level increase because,

if Congress adopts our recommendation to increase the statutory maximum for economic espionage to at least 20 years in prison, the base offense level for economic espionage will be one level higher (seven) than for the theft of trade secrets (six). Accordingly, with an additional one-level enhancement for economic espionage, someone committing that offense would actually have an offense level two levels higher than someone who stole trade secrets and transferred or attempted to transfer them outside of the U.S. We, thus, believe that the additional, one-level enhancement addresses the aggravated harm from economic espionage (over and above the theft and transfer or attempt to transfer trade secrets outside the U.S.).

Finally, we have recommended that, when a defendant transmits or attempts to transmit trade secrets outside of the U.S. or commits economic espionage, that defendant should face a minimum offense level. The Guideline at issue (USSG § 2B1.1) is largely based on loss, with a significant prison sentence resulting when the loss or intended loss from the theft of the trade secret is significant. But, even where there is little loss or the government is unable to prove a significant loss, there is inherent aggravated harm in transferring or attempting to transfer trade secrets outside of the U.S. or in committing economic espionage. Without a minimum offense level, even with the changes above, a first time offender, with no other aggravated conduct and taking into account acceptance of responsibility, will face a Guideline range of only: (1) 0-6 months in prison for transferring or attempting to transfer trade secrets outside the U.S.; and (2) 6-12 months in prison for economic espionage. These Guideline ranges do not properly account for the aggravated harm inherent in such offense conduct. The Administration, thus, recommends that the U.S. Sentencing Commission study and adopt an appropriate minimum offense level for this conduct.

> **Recommendation:** The Administration recommends that Congress direct the U.S. Sentencing Commission to consider providing: (1) a two-level enhancement for theft of trade secrets; (2) an additional two-level enhancement if the defendant transmits or attempts to transmit trade secrets outside of the U.S. or an additional three-level enhancement if the defendant instead commits economic espionage; and (3) a minimum offense level when the defendant transmits or attempts to transmit trade secrets outside of the U.S. or commits economic espionage.

**Increase in the Offense Level for Infringing Products Knowingly Sold for Defense, Military, Law Enforcement, or Other Critical Uses:** There is currently no Guideline enhancement if a defendant sells infringing products to, or for use by, the military or law enforcement or for use in critical infrastructure. This criminal conduct, however, jeopardizes the safety of those serving in the U.S. military, those serving in law enforcement, and the public as a whole. This significantly aggravated criminal conduct deserves a significantly increased criminal sentence. The Administration recommends that Congress direct the U.S. Sentencing Commission to consider adopting the following enhancement: "If the defendant knew the offense involved a critical infrastructure or product sold for use in national defense or national security or by law enforcement, increase by four levels. If the resulting offense level is less than level 14, increase to level 14." With a minimum offense level of 14, a first-time offender with no criminal history will face

INCREASE EXISTING CRIMINAL PENALTIES

at least a 10-16 month Guideline range without any other aggravated conduct (taking into account a reduction for acceptance of responsibility).

The Administration also recommends adding an application note to the provision to ensure that sales that only indirectly impact national defense or security, law enforcement functions, or critical infrastructure are not swept into the provision. Thus, a sale of counterfeit semiconductors for use in a military system qualifies for the enhancement; the sale of a counterfeit toner cartridge for a computer printer used at military headquarters would ordinarily not.

> **Recommendation:** The Administration recommends that Congress direct the U.S. Sentencing Commission to consider providing a four-level enhancement (and a minimum offense level of 14) for copyright and trademark offenses involving products knowingly sold for use in critical infrastructure, national defense, national security, or by law enforcement.

**Increase in the Offense Level for Intellectual Property Crimes Involving Gangs/Organized Criminal Enterprises:** Intellectual property infringement is a strong lure to organized criminal enterprises, which could use infringement as a revenue source to fund their other unlawful activities. That is so, because intellectual property infringement can involve a potentially high profit margin while risking a shorter prison sentence than other criminal offenses, such as trafficking drugs. U.S. Sentencing Guideline Section 2B5.3 does not currently provide an enhancement if the offense was committed by, or for the benefit of, organized criminal enterprises, although it does suggest that an upward departure may be appropriate if "[t]he offense was committed in connection with, or in furtherance of, the criminal activities of a national, or international, organized criminal enterprise." USSG § 2B5.3 comment. (n.4(B)). Similarly, the Guidelines suggest that an upward departure may be appropriate if the offense involved violent criminal street gangs. USSG § 5K2.18. Rather than provide optional departures, the Administration recommends that Congress direct the U.S. Sentencing Commission to consider up to a four-level enhancement "[i]f the offense was committed in connection with, or in furtherance of, the criminal activities of a local, national, or international organized criminal enterprise." We believe that this recommendation more appropriately reflects the significant aggravated harm in such circumstances.

> **Recommendation:** The Administration recommends that Congress direct the U.S. Sentencing Commission to consider providing up to a four-level enhancement for intellectual property offenses involving gangs/organized criminal enterprises.

**Increase in the Offense Level for Counterfeit Drug Cases and Cases Presenting a Serious Risk to Health:** The sale of counterfeit pharmaceuticals is a significant problem, including the sale of counterfeit drugs containing potentially dangerous chemicals or lacking the ingredients needed to treat serious medical conditions. U.S. Sentencing Guideline Section 2B5.3(b)(5) provides: "If the offense involved

(A) the conscious or reckless risk of death or serious bodily injury; or (B) possession of a dangerous weapon (including a firearm) in connection with the offense, increase by 2 levels. If the resulting offense level is less than level 14, increase to level 14." The Administration recommends two changes to this existing Guideline.

First, where there is a "conscious or reckless risk of death or serious bodily injury," that significantly aggravated conduct should warrant a significantly increased sentence. The Administration, thus, recommends increasing the current enhancement by two levels when there is "conscious or reckless risk of death or serious bodily injury," such that there would be a four-level enhancement. The Administration recommends retaining the current minimum offense level of 14.

Second, there are inherent risks associated with counterfeit drugs that are not accounted for under this Guideline and that warrant an enhanced sentence even where a defendant does not recklessly risk serious bodily injury. Accordingly, a defendant selling counterfeit pharmaceuticals should automatically receive a two-level enhancement (even where there is no conscious or reckless risk of death or serious bodily injury). Where a defendant has no other aggravated conduct (taking into account a reduction for acceptance of responsibility), this two-level increase does not actually raise the Guideline range: It is 0-6 months in prison with a base offense level of 8 (minus two points for acceptance of responsibility) and after the two-level enhancement (10 minus those same two points). Accordingly, the Administration recommends that the U.S. Sentencing Commission consider a minimum offense level of 12 for offenses involving counterfeit drugs. With that minimum offense level, a first-time offender with no criminal history will face a 6-12 month Guideline range without any other aggravated conduct (taking into account a reduction for acceptance of responsibility).

> **Recommendation:** The Administration recommends that Congress direct the U.S. Sentencing Commission to consider providing: (1) a four-level enhancement for offenses involving the conscious or reckless risk of death or serious bodily injury; and (2) a two-level enhancement, and a minimum offense level of 12, for offenses involving counterfeit pharmaceuticals (where there is no conscious or reckless risk of death or serious bodily injury).

***Increase in the Offense Level for Recidivist Intellectual Property Offenders:*** U.S. Sentencing Guideline Section 2B5.3 does not currently provide an enhancement to a defendant who committed a second or subsequent intellectual property offense, even though Congress has doubled the statutory maximum for recidivist intellectual property offenders. See, e.g., 18 U.S.C. §§ 2319(b)(2),(c)(2),(d)(3),(d)(4) (doubling the statutory maxima for recidivist copyright offenses); 18 U.S.C. § 2320(a)(1) (doubling the statutory maximum for recidivist trademark offenses). Some other Guideline provisions take recidivist conduct into account when calculating the offense level. See USSG § 2N2.1(b)(1) (four-level enhancement for a conviction under 21 U.S.C. § 331 if the defendant had a previous conviction under that section); see also USSG §§ 2D1.1(a)(1),(a)(3) (increased base offense level where, among other factors, the defendant committed the offense "after one or more prior convictions for a similar offense"); § 2L1.1(b)(3) (enhancements for smuggling, transporting, or harboring aliens when the defendant had previous immigration

INCREASE EXISTING CRIMINAL PENALTIES

convictions); § 2L2.1(b)(4) (similar); § 2L2.2(b)(2) (similar), § 4B1.5 (increased offense level for repeat sex offenders).[1] To appropriately increase the punishment for recidivist intellectual property offenders, we recommend that Congress direct the U.S. Sentencing Commission to consider imposing a two-level enhancement when a defendant has a previous intellectual property conviction (either under Federal or state law, whether the conviction was a misdemeanor or a felony, and regardless of the type of the previous intellectual property offense).

> **Recommendation:** The Administration recommends that Congress direct the U.S. Sentencing Commission to consider providing a two-level enhancement for defendants with a previous conviction for an intellectual property offense.

---

1. See USSG § 2B1.5(b)(5) (enhancement for pattern of misconduct involving cultural heritage resources); § 2G2.2(b)(5) (enhancement for pattern of sexual abuse or exploitation of minors); § 2Q2.1(b)(1)(B) (enhancement for pattern of wildlife offenses); see, e.g., USSG §§ 2K1.3(a)(1),(a)(2) (increased base offense level for explosive material offenses if the defendant had prior convictions for crimes of violence or controlled substances); §§ 2K2.1(a)(1)-(a)(4) (increased base offense level for firearm offenses if the defendant had prior convictions for crimes of violence or controlled substances), § 2L1.2(b) (enhancements for aliens illegal returning to the U.S. after being deported and sustaining various convictions), § 4B1.1 (increased offense level for career offenders), § 4B1.4 (similar).



# Providing Enforcement Agencies the Tools They Need to Discover and Combat Infringement

***Ensure Felony Penalties for Infringement By Streaming and by Means of Other New Technology:*** It is imperative that our laws account for changes in technology used by infringers. One recent technological change is the illegal streaming of content. Existing law provides felony penalties for willful copyright infringement, but felony penalties are predicated on the defendant either illegally reproducing or distributing the copyrighted work.[2] Questions have arisen about whether streaming constitutes the distribution of copyrighted works (and thereby is a felony) and/or performance of those works (and thereby is a not a felony). These questions have impaired the criminal enforcement of copyright laws. To ensure that Federal copyright law keeps pace with infringers, and to ensure that DOJ and U.S. law enforcement agencies are able to effectively combat infringement involving new technology, the Administration recommends that Congress clarify that infringement by streaming, or by means of other similar new technology, is a felony in appropriate circumstances.

> ***Recommendation:*** The Administration recommends that Congress clarify that infringement by streaming, or by means of other similar new technology, is a felony in appropriate circumstances.

***Give DHS Authority to Share Information with Rightholders Pre-Seizure to Help Determine Whether Products Are Infringing or Devices Are Circumvention Devices:*** Obtaining the assistance of rightholders pre-seizure to help determine whether goods are infringing is important. Rightholders know their products better than anyone else and, thus, obtaining their assistance allows DHS, particularly its component CBP, to more effectively identify and combat infringing products. There are concerns, however, that sharing unredacted samples of products and its packing with a rightholder pre-seizure would violate the Trade Secrets Act, 18 U.S.C. § 1905. In the Joint Strategic Plan, the Administration committed to providing DHS with express authority to share such information pre-seizure. The Administration recommends legislation giving DHS that authority, with any appropriate safeguards for importers importing legitimate products.

Similarly, it is illegal to import or traffic in devices that can be used to circumvent technological measures that control access to copyrighted works. When DHS discovers the importation of a potential circumvention device, current law does not authorize DHS to share a sample with a rightholder to aid CBP in determining whether it is, in fact, a circumvention device. Allowing DHS to provide a sample would aid enforcement efforts. In the Joint Strategic Plan, the Administration committed to providing DHS with that authority and the Administration recommends legislation giving DHS that authority.

---

2. See 17 U.S.C. § 506(a)(1)(A) (offense), 18 U.S.C. § 2319(b)(1) (felony for specified "reproduction or distribution"); 17 U.S.C. § 506(a)(1)(B) ("reproduction or distribution" offense), 18 U.S.C. § 2319(c)(1) (felony for specified "reproduction or distribution"); 17 U.S.C. § 506(a)(1)(C) (pre-release "distribution" offense), 18 U.S.C. § 2319(d)(1) (felony penalty).

> **Recommendation:** The Administration recommends that Congress authorize DHS to: (1) share information about, or unredacted samples of, products and/or their packaging with rightholders pre-seizure to aid in determining whether goods are infringing (subject to any bonding requirement and any appropriate safeguards for importers of legitimate products); and (2) share samples of potential circumvention devices pre-seizure to aid in determining whether they are, in fact, circumvention devices (subject to any bonding requirement).

***Give Wiretap Authority for Criminal Copyright and Trademark Offenses:*** The Joint Strategic Plan committed Federal agencies to identify gaps in current intellectual property laws and ways that the U.S. Government could enhance enforcement. One such gap involves wiretapping authority (that is, authority to intercept wire, electronic, and/or oral communications). Title 18, United States Code, Section 2516 contains an extensive list of offenses for which the U.S. Government is authorized to seek wiretap authority from a court to obtain evidence of those offenses, including for economic espionage (18 U.S.C. § 1831) and theft of trade secrets (18 U.S.C. § 1832). <u>See</u> 18 U.S.C. § 2516(1)(a) (listing offenses under chapter 90). Omitted from this list are criminal copyright (17 U.S.C. § 506(a)(1), 18 U.S.C. § 2319) and criminal trademark offenses (18 U.S.C. § 2320). Wiretap authority for these intellectual property crimes, subject to the existing legal protections that apply to wiretaps for other types of crimes, would assist U.S. law enforcement agencies to effectively investigate those offenses, including targeting organized crime and the leaders and organizers of criminal enterprises.

> **Recommendation:** The Administration recommends that Congress amend 18 U.S.C. § 2516 to give law enforcement authority to seek a wiretap for criminal copyright and trademark offenses.



# Enhance Information Sharing About Enforcement Activity

Ordinarily, DHS is able to inform rightholders after infringing goods have been seized, which can help rightholders to enforce their own rights, including bringing a civil suit, if appropriate. The Administration has identified two areas in which DHS is not expressly authorized to share information post-seizure.

***Give DHS Authority to Share Information with Rightholders About Seizures and Exclusions Pursuant to an ITC Order:*** Under 19 U.S.C. § 1337, the ITC investigates allegations regarding unfair importation practices, including those involving intellectual property infringement. Once the ITC finds a violation and issues an order barring the importation of infringing goods, DHS, through its component CBP, is responsible for enforcing that order at the border. DHS currently lacks express authority to notify rightholders that goods have been excluded or seized under an ITC order. Giving rightholders that information will aid them in combating infringement. In the Joint Strategic Plan, the Administration committed to providing DHS with authority to share this information.

> ***Recommendation:*** The Administration recommends that Congress give DHS authority to notify rightholders that infringing goods have been excluded or seized pursuant to an ITC order.

***Give DHS Express Authority to Share Information with Rightholders About Circumvention Devices:*** After DHS has seized a circumvention device, current law does not expressly give DHS authority to share that information with rightholders or to provide a sample of the device. Allowing DHS to provide both, however, would assist rightholders in protecting their copyrighted work by, among other possibilities: (1) allowing them to alter the technological control to render the circumvention devices ineffective; (2) assisting them in investigating infringement of their intellectual property rights; and (3) assisting them in bringing civil actions to enforce their intellectual property rights. In the Joint Strategic Plan, the Administration committed to providing DHS and its components with authority to share such information and samples, which is what DHS already does for trademark and copyright seizures.

> ***Recommendation:*** The Administration recommends that Congress authorize DHS to inform rightholders when circumvention devices are seized and to provide samples of such devices (subject to any DHS bonding requirement).



# Combat Counterfeit Drugs

***Notification When Importers and Manufacturers Discover Counterfeit Drugs and Medical Products:***
Counterfeit drugs threaten public health and, when they are discovered by importers or manufacturers, the importers or manufacturers should notify the FDA and other relevant agencies, including any known potential health risks, thereby allowing the FDA or other agencies to take action. Members of the Pharmaceutical Research and Manufacturers of America (PhRMA) have already voluntarily agreed to provide notification to the FDA. That disclosure, however, does not include all manufacturers, nor does it necessarily include importers. In the Joint Strategic Plan, the Administration recognized the need for such notification and the Administration recommends adopting legislation providing for such notification.

> ***Recommendation:*** The Administration recommends that Congress require importers and manufacturers to notify the FDA and other relevant agencies when they discover counterfeit drugs or medical products, including the known health risks associated with them.

***Extend the Ryan Haight Act's Definition of "Valid Prescription" (and Telemedicine Exemption) to the FFDCA to Apply to Drugs that Do Not Contain Controlled Substances:*** Online pharmacies that are least likely to enforce prescription requirements are also generally most likely to sell counterfeit drugs.

The Controlled Substances Act prohibits the distribution of controlled substances without a valid prescription and, significantly, the Ryan Haight Online Pharmacy Consumer Protection Act of 2008 (the Ryan Haight Act) provides, for the first time, a Federal definition of "valid prescription." Public Law 110-425, 122 Stat. 4820, § 2 (2008). Under that definition, a prescription is only valid if it has been issued by a practitioner who has conducted an "in-person medical evaluation" or by a covering practitioner (although an exemption is included in the Ryan Haight Act for prescriptions issued by a practitioner engaged in the legitimate practice of telemedicine). The Ryan Haight Act also codified regulatory language (21 C.F.R. § 1306.04(a)) that requires the prescription to be issued for a "legitimate medical purpose in the usual course of professional practice." The definition was designed to address the practice of online pharmacies that dispensed controlled substances without a prior prescription or on the basis of a purported review by a physician who reviewed a questionnaire.

Many online pharmacies sell prescription drugs that do not contain controlled substances. The FFDCA regulates such sales, requiring a "practitioner licensed by law to administer such drug." 21 U.S.C. § 353(b)(1). There is, however, no definition of what constitutes a valid prescription under this Act and, thus, no definition that applies to prescription drugs that do not contain controlled substances. The Administration recommends amending the FFDCA (21 U.S.C. § 353(b)(1)) to use the definition of valid prescription in the Ryan Haight Act (and also to use its exemption for prescriptions issued through the legitimate practice of telemedicine). By making that amendment, Congress can help reduce the number of online pharmacies evading prescription requirements and, in turn, selling counterfeit drugs.

> *Recommendation:* The Administration recommends that Congress apply the Ryan Haight Act's definition of "valid prescription" to the FFDCA to drugs that do not contain controlled substances (and incorporate an exemption for prescriptions issued through the legitimate practice of telemedicine).

***Adoption of a Track-and-Trace System:*** Effective track-and-trace systems can make it more difficult to introduce counterfeit drugs into the U.S. market, make it easier to identify those responsible for making a product unsafe, and facilitate the recall of unsafe products by more quickly identifying where a product is located. In the Joint Strategic Plan, the Administration recommended the adoption of a track-and-trace system. We note the importance of addressing privacy concerns, such as deciding where the information resulting from this system will be housed and who will have access to it.

> *Recommendation:* The Administration recommends that Congress adopt a track-and-trace system for pharmaceuticals and related products.

***Provide for Forfeiture under FFDCA:*** Title 18, United States Code, Section 2320(b) provides for civil and criminal forfeiture for counterfeit trademark offenses, as provided in 18 U.S.C. § 2323. The FFDCA also prohibits, among other offenses, counterfeit trademark offenses involving pharmaceuticals, 21 U.S.C. § 331(i), but no such forfeiture authority exists under the FFDCA. To make the FFDCA consistent with other criminal statutes, particularly counterfeit trademark offenses under 18 U.S.C. § 2320, the Administration recommends providing forfeiture authority.

> *Recommendation:* The Administration recommends that Congress give civil and criminal forfeiture authority under the FFDCA, particularly for counterfeit drug offenses.

***Increase the Statutory Maxima under the FFDCA:*** As noted above, the Administration recommends that Congress increase the statutory maxima sentences under the FFDCA, particularly for counterfeit drug offenses.

> *Recommendation:* The Administration recommends that Congress increase the statutory maxima sentences under the FFDCA, particularly for counterfeit drug offenses.

***Increase the U.S. Sentencing Guideline Range in Counterfeit Drug Cases:*** As noted above, the Administration recommends that Congress direct the U.S. Sentencing Commission to consider increasing the Guideline range for counterfeit drug offenses, including a further enhanced penalty for such offenses involving the conscious or reckless risk of death or serious bodily injury.

*Recommendation:* The Administration recommends that Congress direct the U.S. Sentencing Commission to consider increasing the U.S. Sentencing Guideline range for counterfeit drug offenses, including a further enhanced penalty for such offenses involving the conscious or reckless risk of death or serious bodily injury.



# Increase the Effectiveness of CBP Administrative Penalties

***Provide Relief from Penalties for Voluntary Disclosure to CBP:*** In the Joint Strategic Plan, the Administration noted that there is no existing procedure for an importer or other party who unknowingly and unintentionally imported or acquired infringing products to voluntarily disclose them to CBP without being subject to seizure, penalties, and/or other enforcement actions. Allowing such voluntary disclosure is beneficial: It increases the destruction of infringing products and will potentially aid investigations into the source of those products.

> ***Recommendation:*** The Administration recommends that Congress permit relief when someone who unknowingly and unintentionally acquires infringing products voluntarily discloses them to CBP before becoming aware of any CBP enforcement action (or becoming aware of a law enforcement agency investigation).

***Authorize CBP to Issue Penalties for Infringing Exports:*** CBP can seize and forfeit infringing exports, but is not authorized to issue administrative penalties for infringing exports. Such administrative penalties would help serve as an effective deterrent to those exporting infringing products. Moreover, providing the ability to impose penalties for exporting infringing products would improve the U.S. Government's ability to advocate for other countries to impose penalties on those exporting infringing products into the U.S. In the Joint Strategic Plan, the Administration committed to seek legislation to give CBP such authority and the Administration, thus, recommends that Congress adopt such legislation.

> ***Recommendation:*** The Administration recommends that Congress give CBP authority to issue penalties for the export of infringing products.

***Give CBP Express Authority to Impose Penalties When an Examination of Records Demonstrates Previous Infringing Shipments:*** CBP has express authority to issue penalties only for infringing shipments that it seizes at the border. During post-entry audits of company records, however, CBP sometimes discovers evidence of infringing products previously imported into the U.S. Providing CBP express authority to establish violations, and thereby assess penalties, based on an examination of company records would help deter the importation of infringing products.

> ***Recommendation:*** The Administration recommends that Congress give CBP authority to issue penalties for infringing imports discovered during audits of company records.



# Public Performance Right
# for Sound Recordings

***Ensure Copyright Owners Are Entitled to Compensation When Radio Stations Play Their Works:***
Historically, in the U.S., there has been no right of public performance for sound recordings transmitted by over-the-air broadcast stations. The absence of such a right puts U.S. copyright owners at a disadvantage internationally. They are not permitted to collect overseas royalties because they are not granted rights in the U.S. The U.S. stands alone among industrialized nations in not recognizing a public performance right in sound recordings. The Administration recommends legislation giving sound recording owners that right.

> ***Recommendation:*** The Administration recommends that Congress create a right of public performance for sound recordings transmitted by over-the-air broadcast stations.

# Yeh Exhibit 91

# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| PERFECT 10, INC., a California corporation,<br><br>                                    Plaintiff,<br><br>    vs.<br><br>RAPIDSHARE A.G., a corporation;<br>CHRISTIAN SCHMID; BOBBY<br>CHANG; and DOES 1 through 100,<br>inclusive,<br><br>                                    Defendants. | **CASE NO. 09-CV-2596 H (WMC)**<br><br>**ORDER DENYING<br>PLAINTIFF'S MOTION FOR<br>PRELIMINARY INJUNCTION** |

On November 18, 2009, Perfect 10, Inc. ("Plaintiff") filed a complaint against Rapidshare A.G., Christian Schmid, and Bobby Chang ("Defendants"). (Doc. No. 1.) On March 23, 2010, Defendants filed a motion to dismiss for lack of personal jurisdiction and a motion to dismiss for forum non conveniens. (Doc. Nos. 6 & 7.) On April 11, 2010, Plaintiff filed a motion for preliminary injunction against Defendants. (Doc. No. 9.) Plaintiff seeks an injunction to prohibit Defendants from "(1) [c]ontinuing to infringe thousands of Perfect 10 copyrighted images; and (2) [c]ontinuing to engage in unfair competition with Perfect 10." (Doc. No. 9-1 at 5.) On April 29, 2010, Defendants filed a response in opposition to Plaintiff's motion for preliminary injunction. (Doc. No. 26.) On May 5, 2010, Plaintiff filed a reply in

support of its motion for preliminary injunction.  (Doc. No. 43.)  On May 6, 2010, the Court issued an order requesting additional briefing on Plaintiff's motion for preliminary injunction. (Doc. No. 44.)  On May 9, 2010, Plaintiff submitted a supplemental brief.  (Doc. No. 49.)  On May 10, 2010, Defendants also submitted a supplemental brief.  (Doc. No. 50.)  On May 11, 2010 Plaintiff and Defendants each filed a response in opposition to the other side's supplemental brief.  (Doc. Nos. 53 & 54.)

On May 12, 2010, the Court held a hearing on Plaintiff's motion for preliminary injunction.  Eric Benink and Jeffrey Mausner appeared on behalf of Plaintiff and Ian Ballon and Lori Chang appeared on behalf of Defendants.  On May 12, 2010, the Court issued an order granting Defendants' motion to dismiss for lack of personal jurisdiction as to Bobby Chang and Christian Schmid, denying Defendants' motion to dismiss for lack of personal jurisdiction as to RapidShare, and denying Defendants' motion to dismiss for forum non conveniens.  (Doc. No. 60.)  The Court also issued an order submitting Plaintiff's motion for preliminary injunction and requesting that the parties meet and confer on certain issues.  (Doc. No. 61.)

## **BACKGROUND**

Plaintiff's business consists of the design, creation, production, promotion, and sale of adult entertainment products, including photographs, videos, magazines, cell phone downloads, and other media.  (Doc. No. 1 ¶ 9.)  Plaintiff's website, perfect10.com, provides users access to content owned by Plaintiff for a membership fee of $25.50 per month.  (Id. ¶ 12.)  Plaintiff alleges that it owns thousands of copyrighted photographs and video productions.  (Id. ¶ 14-15.)

Defendants characterize RapidShare as an internet file-hosting service that stores electronic files of various types and sizes belonging to companies and individuals who sign up for its service.  (Doc. No. 6-2 ("Pfaff Decl.") ¶ 4.)  To use RapidShare, individuals must either register for a free account or pay a fee to obtain a premium account.  (Doc. No. 26-5 ("4/29 Schmid Decl.") ¶ 22.)  Once registered, a user can upload files from her hard drives or other remote locations onto RapidShare's servers.  (Pfaff Decl. ¶ 7.)  The servers automatically

1  generate a unique download link (a URL) for each uploaded file and send that link to the user

2  who uploaded the file.  (Id.)  The user's file, which resides on RapidShare's servers, may only

3  be accessed by the user or a third party through the unique link assigned to the file.  (Id.)  Once

4  the user obtains a download link for her file, she can email the link to friends, post it on her

5  website for others to access, or keep it confidential, among other potential uses.  (See id. ¶ 8.)

6  RapidShare's website does not have a search function and does not index the files stored on

7  RapidShare's servers.  (Id. ¶ 9.)  Rather, users manage access to information stored on

8  RapidShare's servers by making available and distributing download links.  (Id. ¶ 8.)

9  Although RapidShare does not offer a search engine, several third-party websites such as

10  filestube.com allow users to search for files found on RapidShare's servers.  (See Doc. No. 9-2

11  ("Zada Decl.") ¶ 7.)

12  <center>**DISCUSSION**</center>

13  **I.      Preliminary Injunction - Legal Standard**

14      "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed

15  on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief,

16  that the balance of equities tips in his favor, and that an injunction is in the public interest."

17  Winter v. Natural Res. Def. Council, 129 S. Ct. 365, 374 (2008); Marlyn Nutraceuticals, Inc.

18  v. Mucos Pharma GmbH & Co., 571 F.3d 873, 877 (9th Cir. 2009).  Injunctive relief is

19  available under both the Copyright Act and California's Unfair Competition Law ("UCL").

20  Section 502(a) of the Copyright Act authorizes a court to grant injunctive relief "on such terms

21  as it may deem reasonable to prevent or restrain infringement of a copyright." 17 U.S.C. §

22  502(a).  The UCL provides that "[a]ny person who engages, has engaged, or proposes to

23  engage in unfair competition may be enjoined in any court of competent jurisdiction."  Cal.

24  Bus. & Prof. Code § 17203.

25  ///

26  ///

27  ///

28  ///

<center>- 3 -</center>

## A. Likelihood of Success on the Merits - Copyright

Plaintiff argues that it is likely to succeed on the merits of its copyright claim based on both direct and contributory infringement. (Doc. No. 9-1 at 12-16.) Defendants contend Plaintiff has not met its burden of showing a likelihood of success on the merits and additionally that RapidShare is entitled to protection under the Digital Millennium Copyright Act ("DMCA"), 17 U.S.C. § 512. The Ninth Circuit has made clear that Plaintiff bears the burden of establishing RapidShare's liability under the Copyright Act without reference to the DMCA, and that Defendants then have the burden of showing a likelihood that their DMCA defense will succeed. Perfect 10, Inc. v. Amazon.com, Inc., 508 F.3d 1146, 1158 & n.4 (9th Cir. 2007).

## 1. Direct Copyright Infringement

"Plaintiffs must satisfy two requirements to present a prima facie case of direct infringement: (1) they must show ownership of the allegedly infringed material and (2) they must demonstrate that the alleged infringers violate at least one exclusive right granted to copyright holders under 17 U.S.C. § 106." Amazon.com, 508 F.3d at 1159 (citing A & M Records, Inc. v. Napster Inc., 239 F.3d 1004, 1013 (9th Cir. 2001); 17 U.S.C. § 501(a)). Defendants do not dispute Plaintiff's ownership of at least some of the copyrighted works at issue in Plaintiff's motion. (Doc. No. 26 at 19.) Rather, Defendants argue that RapidShare is not liable for direct infringement because any of Plaintiff's images found on its servers were copied onto the servers by RapidShare users. (Doc. No. 26 at 26.) Plaintiff, however, argues that RapidShare is itself violating Plaintiff's exclusive distribution rights.[1] (Doc. No. 9-1 at 13.) Section 106(3) provides that a copyright owner has the exclusive right "to distribute copies or phonorecords of the copyrighted work to the public by sale or other transfer of ownership, or by rental, lease, or lending." 17 U.S.C. § 106(3). Copies may be distributed electronically. Amazon.com, 508 F.3d at 1162 (citing N.Y. Times Co. v. Tasini, 533 U.S. 483, 498 (2001)).

---

[1] Plaintiff also contends, in a footnote, that RapidShare is violating Plaintiff's reproduction rights, rights to create derivative works, and performance rights. (Doc. No. 49 at 3 n.1.) However, Plaintiff analyzes only RapidShare's alleged violation of Plaintiff's exclusive distribution rights. (Id.)

Plaintiff first argues that "because Defendants are offering unauthorized P10 Images to RapidShare users who pay the monthly fee, they are violating Perfect 10's distribution rights and are liable for direct copyright infringement." (Doc. No. 49 at 3.) Defendants contend that RapidShare does not sell content, but rather, that it is a file-hosting site that provides users with online storage space for their private files. (Doc. No. 26 at 11.) The characterization of RapidShare's service is hotly disputed. After considering the parties' arguments, the Court concludes that, at this phase, Plaintiff has not shown that it is likely to succeed on the merits of its claim for direct infringement based on a theory of distribution by sale.

Plaintiff also argues that RapidShare violates Plaintiff's exclusive "distribution rights merely by making P10 Images available on RapidShare servers." (Id.) In Amazon.com, the Ninth Circuit noted that "Perfect 10 incorrectly relies on Hotaling v. Church of Jesus Christ of Latter-Day Saints and Napster for the proposition that merely making images 'available' violates the copyright owner's distribution right." 508 F.3d at 1162 (citing Hotaling v. Church of Jesus Christ of Latter-Day Saints, 118 F.3d 199 (4th Cir.1997); Napster, 239 F.3d 1004). However, the Amazon.com court suggested that Hotaling and Napster may outline a "deemed distribution" rule. (Id.) Applying this rule to the facts before it, the Amazon.com court distinguished Google's activities from those at issue in Hotaling and Napster:

> Unlike the participants in the Napster system or the library in Hotaling, Google does not own a collection of Perfect 10's full-size images and does not communicate these images to the computers of people using Google's search engine. Though Google indexes these images, it does not have a collection of stored full-size images it makes available to the public. Google therefore cannot be deemed to distribute copies of these images under the reasoning of Napster or Hotaling.

Id. at 1162-63. The Amazon.com decision implies that where an entity has a collection of infringing materials and makes those materials available to the public, it is deemed to have distributed those materials for purposes of 17 U.S.C. § 106(3). See id. Defendants distinguish the dicta in Amazon.com by contending that it is RapidShare users and third-party websites

who make Plaintiff's images available. (Doc. No. 54 at 4.) The Court agrees that RapidShare does not make files available in the same way as the library in <u>Hotaling</u> or the users in <u>Napster</u>. The public cannot enter rapidshare.com and browse through a catalog for desired materials as the library visitors could in <u>Hotaling</u>. <u>See</u> 118 F.3d at 203 (concluding that "[w]hen a public library adds a work to its collection, lists the work in its index or catalog system, and makes the work available to the borrowing or browsing public, it has completed all the steps necessary for distribution to the public"). Additionally, a RapidShare user cannot find files located on RapidShare's servers in the same way as a Napster user could find a specific song from a peer's library because RapidShare does not index its files. <u>See</u> <u>Napster</u>, 239 F.3d at 1012 (stating that "the user can access an index of all MP3 file names in a particular hotlisted user's library and request a file in the library by selecting the file name"). Because the Court concludes that RapidShare does not make infringing material available in the same way or to the same extent as the library in <u>Hotaling</u> or the users in <u>Napster</u>, the Court declines to hold RapidShare liable for direct infringement on a theory of deemed distribution. Accordingly, the Court concludes that Plaintiff has failed to present a prima facie case of direct infringement against RapidShare based on the present record before the Court.

**2.      Contributory Copyright Infringement**

Contributory infringement exists when a defendant intentionally induces or encourages direct infringement. <u>See</u> <u>Metro-Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd.</u>, 545 U.S. 913, 930 (2005). The basic test is "that one contributorily infringes when he (1) has knowledge of another's infringement and (2) either (a) materially contributes to or (b) induces that infringement." <u>Perfect 10, Inc. v. Visa Int'l Service, Ass'n</u>, 494 F.3d 788, 795 (9th Cir. 2007). To show contributory infringement, a plaintiff must show direct infringement by third parties. <u>See</u> <u>Amazon.com</u>, 508 F.3d at 1169.

///

///

///

///

*a.*     *Direct infringement by third parties*

Direct infringement by third parties is occurring. Defendants do not dispute Plaintiff's ownership of at least some of the copyrighted works at issue in Plaintiff's motion. (Doc. No. 26 at 19.) Additionally, Plaintiff has demonstrated that its copyrighted images were uploaded onto RapidShare's servers and are available for download. (Zada Decl. ¶¶ 6-7.) RapidShare users who uploaded Plaintiff's copyrighted images to the server violated Plaintiff's distribution rights and any RapidShare users who may have download files containing Plaintiff's copyrighted images violated Plaintiff's reproduction rights. See Napster, 239 F.3d at 1014.

*b.*     *Knowledge of infringing activity*

"Contributory liability requires that the secondary infringer know or have reason to know of direct infringement." Napster, 239 F.3d at 1020. The knowledge required for a finding of contributory infringement may not be imputed merely because a technology may be used to infringe a plaintiff's copyrights. Id. at 1020-21 (discussing Sony Corp. v. Universal City Studios, Inc., 464 U.S. 417 (1984)). Rather, the defendant must have actual, specific knowledge of direct infringement. Id. at 1020-22.

Defendants argue that RapidShare cannot be liable for contributory infringement because it did not have knowledge of specific infringing material. (Doc. No. 26 at 26.) Defendants acknowledge that they received a disc from Plaintiff that contained hundreds of Plaintiff's copyrighted works. (See Doc. No. 26 at 15.) The disc does not provide information about where the files are located, but organizes the files by model name and provides the full-sized image. (See Doc. No. 26-5 ("Schmid Decl.") Ex. B.) Many of the images provided contain Perfect 10 copyright notices. (See id.) Defendants, however, contend that Plaintiff provided inadequate notice because RapidShare cannot locate and delete files where the only information provided is an image. (Doc. No. 26 at 17.)

In Napster, the Ninth Circuit concluded that the service provider had sufficient knowledge of infringement for a finding of contributory infringement even though Napster contended "that because the company cannot distinguish infringing from noninfringing files, it does not 'know' of the direct infringement." See Napster, 239 F.3d at 1020-22. Thus, it

1    appears that specific knowledge of direct infringement may exist even where an operator does

2    not have information that would allow it to search its contents and distinguish infringing from

3    non-infringing materials.  Here, RapidShare received notice of hundreds of copyrighted Perfect

4    10 images that were found on its servers.  The Court therefore concludes that RapidShare had

5    actual, specific knowledge of direct infringement.

6    *c.*      *Material contribution*

7          "To state a claim of contributory infringement, Perfect 10 must allege facts showing that

8    Defendants induce, cause, or materially contribute to the infringing conduct."  Visa, 494 F.3d

9    at 796.  In Napster, the Ninth Circuit affirmed the district court's determination that the service

10   provider materially contributed to direct infringement.  239 F.3d at 1022.  While RapidShare

11   and Napster's services both allow for file sharing, the services provided are materially

12   different.  Importantly, Napster utilized software that allowed it to maintain a search index of

13   its collective directory of files.  Id. at 1012.  This enabled Napster users to search for and locate

14   specific MP3 file names listed on the server's index.  See id.  In affirming the district court's

15   conclusion that Napster materially contributed to direct infringement, the Ninth Circuit focused

16   on district court's determinations that "[w]ithout the support services defendant provides,

17   Napster users could not find and download the music they want with the ease of which

18   defendant boasts," and that "Napster is an integrated service designed to enable users to locate

19   and download MP3 music files."  Id. at 1022 (citing  Napster, 114 F. Supp. 2d at 919-20).  In

20   contrast, RapidShare does not index user materials and does not have a function that allows

21   users to search for specific files.  (Pfaff Decl. ¶ 9.)  All communication regarding the location

22   of files is user driven.  (Id. ¶ 8.)  Accordingly, the Court concludes that the rationale for finding

23   that Napster materially contributed to direct infringement does not apply with equal force to

24   RapidShare.  RapidShare does not provide an integrated service that allows users to locate and

25   download infringing files.  It does not provide "the site and facilities" for direct infringement

26   in the same way as Napster did.  See Napster, 239 F.3d at 1022 (citing Fonovisa, Inc. v. Cherry

27   Auction, Inc., 76 F.3d 259, 264 (9th Cir. 1996)).  Thus, Plaintiff must show something more

28   than the mere existence of RapidShare's file-hosting service to show that RapidShare

1    materially contributes to direct infringement.

2         In Amazon.com, the Ninth Circuit stated "that a computer system operator can be held

3    contributorily liable if it has actual knowledge that specific infringing material is available

4    using its system and can take simple measures to prevent further damage to copyrighted works,

5    yet continues to provide access to infringing works." 508 F.3d at 1172 (quotation marks and

6    citations omitted). Here, RapidShare did have actual knowledge of specific infringing

7    material. RapidShare argues that it is taking all simple measures available to remove the

8    infringing material. According to Defendants,

9         RapidShare cannot locate and delete files where the only information provided

10        is [an] image. See Hartojo Dec., ¶ 14. However, the Abuse Department was

11        able to find and take down certain files whose download links were identified

12        on the screen shots that Zada attached to his declaration . . . and also proactively

13        searched the third-party websites identified in his declaration, such as

14        filestube.com, and took down any files listed on those sites that appeared to be

15        suspect. See [id.] ¶ 12. In addition, the download links identified in the

16        complaint have also been disabled and the files deleted. Id. ¶ 13. The Abuse

17        Department has also begun probatively searching Google and Bing.com for files

18        that may contain the words "RapidShare" and either "Perfect 10" or the names

19        of specific models identified by Zada. Id. ¶ 15.

20   (Doc. No. 26 at 17.) Considering the evidence submitted by the parties thus far, the Court

21   concludes that Plaintiff has not shown that RapidShare is failing to take simple measures to

22   prevent further damage to Plaintiff's copyrighted works. Rather, the evidence suggests that

23   RapidShare is using information provided by Plaintiff to locate and remove infringing

24   materials, and is also taking independent steps to identify, locate, and remove infringing files.

25   Accordingly, the Court concludes that Plaintiff has not shown that RapidShare is contributorily

26   liable for copyright infringement under the standard announced in Amazon.com, 508 F.3d at

27   1172.

28   ///

Plaintiff also argues that RapidShare materially contributes to direct infringement through its affiliate program. Plaintiff explains that, under this program, RapidShare pays its members when they refer traffic to rapidshare.com and when other RapidShare members download infringing content that these members have uploaded onto RapidShare's servers. (Doc. No. 9-1 at 14.) RapidShare concedes that it had a program that it referred to as an affiliate program. (Doc. No. 26 at 12 n.7.) However, RapidShare contends that "it terminated its cash rewards program well before it filed its Jurisdictional Motions because it became concerned that program was being used by some users to promote infringement." (Id.) In March 2010, RapidShare also terminated a rewards program that provided users with merchandise like t-shirts and computer gadgets. (Id.) RapidShare still has a program that allows users to generate points and use them to make charitable donations. (Id.) The goal of RapidShare's program was, and still is, to reward users for distributing and reproducing (through uploading and downloading) material, even if that material is infringing. Whether the program rewards users with money, merchandise, or charitable donations, it encourages users to upload and download potentially infringing material. Since the Court has insufficient information about the scope of the charitable donations rewards program, the Court denies the motion for an injunction without prejudice.

*d.*     *Inducement*

In Grokster, the Supreme Court found that "one who distributes a device with the object of promoting its use to infringe copyright, as shown by clear expression or other affirmative steps taken to foster infringement, is liable for the resulting acts of infringement by third parties." 545 U.S. at 936-37. The Court summarized the rule for contributory liability based on "inducement" as follows:

> In sum, where an article is good for nothing else but infringement, there is no
> legitimate public interest in its unlicensed availability, and there is no injustice
> in presuming or imputing an intent to infringe. Conversely, the doctrine
> absolves the equivocal conduct of selling an item with substantial lawful as well
> as unlawful uses, and limits liability to instances of more acute fault than the

mere understanding that some of one's products will be misused. It leaves breathing room for innovation and a vigorous commerce.

Id. at 932-33 (quotation marks and citations omitted); see Visa, 494 F.3d at 801. Here, RapidShare argues that there are substantial lawful uses for RapidShare's service. For example, RapidShare provides users with a secure location to store and access files from anywhere that there is Internet access. (Pfaff Decl. ¶ 4.) Additionally, RapidShare provides data storage capacity which may present businesses with an economical alternative to buying and maintaining their own storage-related computer hardware. (Id.) RapidShare has presented evidence that the German edition of PC World magazine has twice used RapidShare to host files of anti-virus software for its readers to download. (Id. ¶ 5.) Moreover, Plaintiff has not presented evidence to show that RapidShare's software system was "engineered, disseminated, and promoted explicitly for the purpose of facilitating piracy of copyrighted [material] and reducing legitimate sales of such [materials] to that extent." Visa, 494 F.3d at 801. Rather, RapidShare argues that it strives to eliminate infringing uses. RapidShare's Conditions of Use prohibit uploading of files that violate third-party copyrights. (Pfaff Decl. ¶ 12.) Additionally, RapidShare's Abuse Department responds to takedown notices submitted by copyright owners by removing infringing files, terminates the accounts of users who upload unauthorized files, and independently searches for and removes infringing files using third-party websites. (Id. ¶ 13.) Accordingly, the Court concludes Plaintiff has not met its burden of showing that RapidShare is liable for contributory infringement based on an inducement theory.

**3.      Digital Millennium Copyright Act**

"Because the burdens at the preliminary injunction stage track the burdens at trial, once the moving party has carried its burden of showing a likelihood of success on the merits, the burden shifts to the non-moving party to show a likelihood that its affirmative defense will succeed." Amazon.com, 508 F.3d at 1158 (quotation marks and citations omitted). Defendants claim that RapidShare qualifies for the limitations on liability set forth in title II of the DMCA, 17 U.S.C. § 512. (See Doc. No. 26 at 22.)

Congress enacted title II of the DMCA to provide greater certainty to service

providers concerning their legal exposure for infringements that may occur in the course of their activities. Sections 512(a) through (d) limit liability for (respectively): (1) transitory digital network communications; (2) system caching; (3) information residing on systems or networks at the direction of users; and (4) information location tools. A service provider that qualifies for such protection is not liable for monetary relief and may be subject only to the narrow injunctive relief set forth in section 512(j).

Amazon.com, 508 F.3d at 1158 (quotation marks and citations omitted).

Plaintiff argues that RapidShare is ineligible for the DMCA's safe harbor because RapidShare has not designated a DMCA agent with the United States Copyright Office. (Doc. No. 9-1 at 16.) Section 512(c)(2) provides that

[t]he limitations on liability established in this subsection apply to a service provider only if the service provider has designated an agent to receive notifications of claimed infringement . . . by making available through its service, including on its website in a location accessible to the public, and by providing to the Copyright Office, substantially the following information: (A) the name, address, phone number, and electronic mail address of the agent. (B) other contact information which the Register of Copyrights may deem appropriate.

17 U.S.C. § 512(c)(2). Defendants contend that this provision is merely a notice requirement, and that Plaintiff had adequate notice regarding where to send infringement notifications. (Doc. No. 26 at 22 n.24.) The Court disagrees with Defendants' interpretation of the statute. The language of the DMCA clearly states that a service provider can take advantage of the safe harbor only if the service provider has given the Copyright Office specific information regarding its designated agent. RapidShare has failed to follow this procedure and Defendants have cited no case that has allowed a service provider to take advantage of the safe harbor without following the prescribed procedures. Accordingly, the Court concludes that, until RapidShare provides the required information to the Copyright Office, RapidShare may not

1  take advantage of the protections afforded by this section of the DMCA.

2      Considering all of the law and facts presented by the parties, the Court concludes that,

3  at this point in the case, Plaintiff has not met its burden of showing that it is likely to succeed

4  on the merits of its claims for direct and contributory copyright infringement.  Moreover, the

5  Court concludes that RapidShare is not likely to succeed on its DMCA affirmative defense

6  because RapidShare has not yet designated an agent with the U.S. Copyright Office.

7  **B.     Likelihood of Success on the Merits - Unfair Competition**

8      Plaintiff's unfair competition claim rests on its cause of action for copyright

9  infringement.  Plaintiff argues that RapidShare is providing access to "stolen intellectual

10  property" in a manner which significantly harms competition.  (Doc. No. 9-1 at 19.)  Because

11  the Court declines, at this time, to find that Plaintiff is likely to succeed on the merits of its

12  copyright infringement claim, the Court concludes that Plaintiff is also unlikely to succeed on

13  the merits of its unfair competition claim.

14  **C.     Likelihood of Irreparable Harm**

15      "[A] plaintiff that demonstrates a likelihood of success on the merits of a copyright

16  infringement claim is entitled to a presumption of irreparable harm."  Sun Microsystems, Inc.

17  v. Microsoft Corp., 188 F.3d 1115, 1119 (9th Cir. 1999); LGS Architects, Inc. v. Concordia

18  Homes of Nevada, 434 F.3d 1150, 1155 (9th Cir. 2006).  Defendants argue that this standard

19  no longer applies after Winter v. Natural Res. Def. Council, 129 S. Ct. 365, 374 (2008) and

20  eBay, Inc. v. MercExchange, LLC, 547 U.S. 388 (2006).  (Doc. No. 26 at 19-20.)  The Ninth

21  Circuit has continued to apply a presumption of irreparable injury in a trademark case after

22  Winter.  See Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co., 571 F.3d 873, 877

23  (9th Cir. 2009) (citing Winter, 129 S. Ct. at 374 for preliminary injunction standard in a

24  trademark infringement case and stating that "[b]ecause the court found a likelihood of success

25  on the merits, it reasonably presumed irreparable injury").  Moreover, the Ninth Circuit has

26  not interpreted eBay to mean that it is inappropriate for a district court to apply a presumption

27  of irreparable harm upon a finding that a plaintiff is likely to succeed on the merits of its

28  copyright infringement claim.  In any event, the Court has concluded that Plaintiff has not

1   shown a likelihood of success on the merits of its copyright infringement and unfair

2   competition claims.  Accordingly, the Court need not determine whether Plaintiff is likely to

3   suffer irreparable harm in the absence of an injunction.

4   **D.      Balance of Equities**

5          At this point, the Court is not convinced that the balance of equities tip in Plaintiff's

6   favor.  See Winter, 129 S. Ct. at 374.  Plaintiff contends that, without injunctive relief, Plaintiff

7   will be forced into bankruptcy.  (Doc. No. 9-1 at 22.)  However, Plaintiff has not availed itself

8   of simple, available measures to protect its property.  For example, while Plaintiff alleges that

9   it has been able to download at least 43,000 infringing copies of Perfect 10 images from

10  RapidShare's servers, it has not provided RapidShare with sufficient information to allow

11  RapidShare to locate and remove the images.  (See Doc. Nos. 49 at 2-3 & 26 at 17.)  Moreover,

12  Defendants contend that Plaintiff declined RapidShare's offer to provide Plaintiff with a

13  "takedown tool" that would allow Plaintiff to immediately delete infringing files from

14  RapidShare's servers.  (Doc. No. 26 at 7.)  Defendants have also offered evidence that Plaintiff

15  was aware that its copyrighted images were available on RapidShare's servers in 2005, but

16  nonetheless waited until November 2009 to file this lawsuit.  (Doc. No. 26-2 ("Bridges

17  Decl.").)  Considering Plaintiff's apparent lack of interest in self-help measures and its delay

18  in bringing this action, the Court concludes that, at present, the equities do not weigh in favor

19  of granting injunctive relief.

20  **E.      Public Interest**

21         "In exercising their sound discretion, courts of equity should pay particular regard for

22  the public consequences in employing the extraordinary remedy of injunction."  Winter, 129

23  S. Ct. at 376-77 (quotation marks and citations omitted).  The Supreme Court has recognized

24  the need for a "balance between the respective values of supporting creative pursuits through

25  copyright protection and promoting innovation in new communication technologies by limiting

26  the incidence of liability for copyright infringement."  Grokster, 545 U.S. at 928.  Considering

27  both of these values, the Court concludes that the public interest will not be served by an

28  injunction at this point.

**CONCLUSION**

For the reasons set forth above, the Court denies Plaintiff's motion for preliminary injunction without prejudice.

**IT IS SO ORDERED**.

DATED: May 18, 2010

_____
MARILYN L. HUFF, District Judge
UNITED STATES DISTRICT COURT

COPIES TO:

All parties of record

- 15 -

09cv2596

# Yeh Exhibit 92

**REDACTED**

# Yeh Exhibit 93

**REDACTED**

# Yeh Exhibit 94

OPERATION IN OUR SITES targets Internet movie pirates                 http://www.ice.gov/news/releases/1006/100630losangeles.htm



TO REPORT CRIME: EMAIL OR CALL 1-866-DHS-2-ICE

U.S. Immigration and Customs Enforcement

Search

Home    About ICE    Investigations    National Security    Enforcement & Removal    Newsroom    Español

Newsroom ›  Recent Releases

## News Releases

SHARE

JUNE 30, 2010 LOS ANGELES, CA

**"Operation In Our Sites" targets Internet movie pirates**
ICE, Manhattan U.S. Attorney seize multiple Web sites for criminal copyright violations

LOS ANGELES - U.S. Immigration and Customs Enforcement (ICE) and the U.S. Attorney for the Southern District of New York (SDNY) announced the launch Wednesday of "Operation In Our Sites," a new initiative aimed at Internet counterfeiting and piracy.

In the first action carried out as part of the initiative, authorities executed seizure warrants against 10 domain names of Web sites that were offering first-run movies, often within hours of their theatrical release. Eight of those sites were targeted for seizure by the SDNY. Agents from ICE's Homeland Security Investigations (HSI) also seized assets from 15 bank, Paypal, investment and advertising accounts, and executed four residential search warrants in several states.

ICE Assistant Secretary John Morton, joined on a Los Angeles soundstage by senior representatives from major movie studios, entertainment unions and the Motion Picture Association of America (MPAA), made clear that the theft of such intellectual property is a serious crime and one the U.S. government has made a priority combating.

Copyrighted material is known as intellectual property (IP) under the law.

"ICE and our partners at the National Intellectual Property Rights Coordination Center are targeting pirate Web sites run by people who have no respect for creativity and innovation," said ICE Assistant Secretary Morton, who was in Southern California to meet with the leaders of the movie industry. "We are dedicated to protecting the jobs, the income and the tax revenue that disappear when organized criminals traffic in stolen movies for their own profit."

"Criminal copyright infringement occurs on a massive scale over the Internet, reportedly resulting in billions of dollars in losses to the U.S. economy," said Preet Bharara, the U.S. Attorney for the Southern District of New York, whose office handled the seizure warrants of seven domain names Wednesday. "That translates into lost jobs and real hardships for ordinary working people. That's why we took the actions we did. If your business model is movie piracy, your story will not have a happy ending."

"Content theft online has become increasingly ubiquitous as technology and software improve and access to the Internet increases," said Mike Robinson, chief of operations, content protection for the MPAA. "We are committed to working with law enforcement to get the illegal choices out of the marketplace and instead focus on continuing to offer more innovative and flexible legal options to consumers to enjoy the movies and TV shows that we all love. The American motion picture and television industry is one of our nation's most valuable cultural and economic resources. We are grateful to ICE, the Obama Administration, and the federal agencies that have made the protection of intellectual property a priority for the United States."

"We are facing a dramatic rise in the number of foreign and domestic Web sites that are in the business of making films and television shows - created by our members - available for illegal download or streaming," said Kathy Garmezy, associate executive director of government and international affairs for the Directors Guild of America. "If left unchecked, this illegal activity threatens the very ability of filmmakers to both earn a living and create the content that is enjoyed by billions around the world."

"We commend the action of ICE and IPR Center in striking a significant blow against those who seek to profit from the copyrighted intellectual property of others," said Matthew D. Loeb, president of the International Alliance of Theatrical Stage Employees (IATSE). "Intellectual property is the basis of our modern economy. The stealing of digital content is not a victimless crime; it's also the theft of tens of thousands of American jobs."

The National Intellectual Property Rights Coordination Center (IPR Center), based in Virginia and managed by ICE, is directing the government's response to a crime that is estimated to cost American industry billions of dollars and hundreds of thousands of jobs every year. Its "Operation In Our Sites" is targeting not only films and music, but other items distributed over the Internet, such as counterfeit pharmaceuticals, software, electronics, games and other products that threaten public health and safety.

The investigation involving SDNY together with the ICE New York Special Agent in Charge and the IPR Center resulted in the seizure warrants for eight domain names: TVSHACK.NET, TVSHACK.CC, MOVIES-LINKS.TV, FILESPUMP.COM, NOW-MOVIES.COM, PLANETMOVIEZ.COM, THEPIRATECITY.ORG, and ZML.COM. In an undercover capacity, investigators downloaded various newly released movies from the Web sites and their affiliates, to identify those Web sites that were involved in the distribution of stolen content.

Also on Wednesday, as a result of a months-long operation, the IPR Center seized the domain names and Web site content of NinjaVideo.net and NinjaThis.net, both of which generated revenue from donations and advertising. These sites allowed visitors to stream or download popular television shows and movies. Over the course of the investigation, agents observed links to more than 200 movies and more than 300 television programs on the NinjaVideo site. This investigation resulted in the execution of federal search warrants for their content and domain name at servers in the United States and the Netherlands. HSI agents also executed four residential search warrants in North Carolina, New Jersey, New York and Washington. The case is ongoing.

The IPR Center has united the U.S. government agencies that combat intellectual property theft. In addition to ICE, the partners include: U.S. Customs and Border Protection; the FBI; the Department of Commerce; the Food and Drug Administration; the Postal Inspection Service; the General Services Administration, Office of the Inspector General; the Naval Criminal Investigative Service; the Defense Criminal Investigative Service; the Army Criminal Investigative Division's Major Procurement Fraud Unit; and the Government of Mexico Tax Administrative Service.

The IPR Center is one of the U.S. government's key weapons in the fight against counterfeiting and piracy. The IPR Center offers assistance for both law enforcement and the private sector to address the growing transnational threat of counterfeit merchandise. The IPR Center coordinates outreach to U.S. rights holders and conducts domestic and international law enforcement training to stem the growing counterfeiting threat as well as coordinating and directing anti-counterfeiting investigations.

To learn more about the IPR Center go to www.ice.gov.

Report information on counterfeiting and trademark violations at (866) IPR-2060.

For more images from Operation In Our Sites, visit the ICE media gallery.

You may also visit us on Facebook, Twitter and YouTube.

### Recent Releases
### Library
### Images and Videos
### Fact vs. Fiction
### Legal Notices
### Media Kit
### Widgets

**Find releases based on**
Location (State)...
Month...
Topic...

**Search all news releases**

**Tags**

267g Immigration and Nationality Act; Contraband; Counter Proliferation Investigations; Cultural Property, Art and Antiquities Investigations; Document & Benefit Fraud; Enforcement & Removal: Federal Protective Service; Financial Crimes/Cornerstone; Gangs; Human Rights Violators; Hitman Trafficking/Smuggling; Intellectual Property Rights: Predator; Secure Communities; Student and Exchange Visitor Information System; Worksite: Other

U.S. Immigration and Customs Enforcement (ICE) is the largest investigative arm of the Department of Homeland Security.

ICE is a 21st century law enforcement agency with broad responsibilities for a number of key homeland security priorities. For more information, visit WWW.ICE.gov. To report suspicious activity, call 1-866-347-2423 or complete our tip form.

OPERATION IN OUR SITES targets Internet movie pirates                    http://www.ice.gov/news/releases/1006/100630losangeles.htm

# Yeh Exhibit 95

**REDACTED**

# Yeh Exhibit 96

02-Dec-2011
http://hotfile.com/premium.html

**hotfile**

News   Upload   Premium   Hotlink   Affiliate   FAQ

Login / Sign up   Language:   English

### As a PREMIUM member you will have the following benefits:

- ✓ Unlimited high speed downloads
- ✓ Unlimited parallel downloads
- ✓ Hot/Direct linking for you files

- ✓ Download directly without waiting time and advertising
- ✓ Support for download accelerators
- ✓ Up to 1200Gb Hot/Direct link traffic included

| $9 | $35 | $55 |
|---|---|---|
| **1 Month Unlimited Downloading** | **6 Months Unlimited Downloading** | **1 Year Unlimited Downloading** |
| **100Gb Hot/Direct Linking** | **600Gb Hot/Direct Linking** | **1200Gb Hot/Direct Linking** |
| Paypal Subscription | Pay by Paypal | Pay by Paypal |

#### Resellers

If you're looking for payment provider different than the above or you need a local billing solution, check out our **Resellers**

**Q. What unlimited downloading means? Is it really unlimited?**
**A.** Yes! Unlike other websites, we allow you to download as much as you want 24/7 with no restrictions. Your daily download is limited only by your connection speed.

**Q. What is hotlink/direct link download?**
**A.** Hotlink/direct download link enables you to allow other users to download your files with premium privileges fast and easy. Users given with hotlink/direct download link can instantly save the file, without being a HotFile premium member.

**Q. May I embed or hotlink my direct download links?**
**A.** Yes! You can use your hotlink/direct download links in every site. Hotfile will directly stream your files if hotlink/direct download is enabled for that file.

**Q. How does monthly subscription work?**
**A.** When you subscribe to a Hotfile plan, your payment method will automatically be set up for monthly recurring billing for your convenience - without having to always manually send money. Your account will remains premium and you don't need to worry about account expiration. Your payment method will automatically be charged one month after your initial transaction and each month thereafter.

Home   |   Premium   |   Report Abuse   |   Imprint   |   File Checker   |   Reseller   |   Contacts

Copyright © 2008-2011 hotfile.com, All Rights Reserved.        Privacy Policy   |   Intellectual Property Policy   |   Terms of Service