UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 11-20427-WILLIAMS/TURNOFF

DISNEY ENTERPRISES, INC.,
TWENTIETH CENTURY FOX FILM CORPORATION,
UNIVERSAL CITY STUDIOS PRODUCTIONS LLLP,
COLUMBIA PICTURES INDUSTRIES, INC., and
WARNER BROS. ENTERTAINMENT INC.,

*Plaintiffs*,

v.

HOTFILE CORP., ANTON TITOV, and
DOES 1-10.

 *Defendants*.
_____/

HOTFILE CORP.,

*Counterclaimant*,

v.

WARNER BROS. ENTERTAINMENT INC.,

*Counterdefendant*.
_____/

**DECLARATION OF SCOTT A. ZEBRAK IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AGAINST DEFENDANTS HOTFILE CORP. AND ANTON TITOV**

**PUBLIC REDACTED VERSION**

I, Scott A. Zebrak, hereby declare as follows:

1.  I am a partner at the law firm of Oppenheim + Zebrak, LLP, and have been retained by the plaintiffs Disney Enterprises, Inc., Twentieth Century Fox Film Corporation, Universal City Studios Productions LLLP, Columbia Pictures Industries, Inc., and Warner Bros. Entertainment Inc. ("plaintiffs") to investigate, analyze, and provide my conclusions regarding the infringement status of certain content files available on www.hotfile.com ("Hotfile"). The statements made in this declaration are based on my personal knowledge, including as to information provided to me by personnel working under my supervision on this case, along with my specialized experience as applied to the facts of this matter. If called to testify, I would testify based on the best of my knowledge, information, and belief, as follows:

2.  I am a practicing attorney with extensive experience and familiarity analyzing copyrighted works and online infringement. For the past 15 years, I have represented and advised clients on a range of matters involving copyright, trademark, and other intellectual property issues, including those that arise in an online or digital environment. Among other things, my experience includes serving for roughly four years as Vice-President, Litigation & Legal Affairs, at the Recording Industry Association of America, a trade group that represents the U.S. recording industry, and serving as Deputy General Counsel & Director of Intellectual Property at CoStar Group, Inc., a publicly-traded provider of online commercial real estate information services, where I worked for approximately six years. Based on my experience, I am extensively familiar with practices for analyzing works and determining their ownership and copyright status. Further details of my professional history can be found on the résumé attached hereto as Exhibit A. I have not provided testimony in any case in the last four years. Other than

the first phase of my work for my initial report, which was billed based on a flat fee of $45,000 (with work above 200 hours billed pro rata), I am being compensated at $350 an hour.

3. I was asked by plaintiffs' counsel to investigate, analyze, and provide my conclusions regarding the copyright infringement status of a set of files selected pursuant to the protocol of a statistical study designed by Dr. Richard Waterman to estimate the extent of infringement on Hotfile. My role was to conduct an investigation to identify those files and their copyright owner, and determine whether distribution of the files through Hotfile was infringing. For each file, I attempted to make a determination as to whether I believed it to be "highly likely infringing" or "non-infringing," which are terms that I describe in more detail below. I understand that this kind of analysis has been performed in numerous other online infringement cases in which a statistical analysis of the defendants' website or service has been performed, for example: *Metro-Goldwyn Mayer Studios, Inc. v. Grokster, Ltd.*, 545 U.S. 913, 936-37 (2005) ("*Grokster*"); *Arista Records LLC, et al. v. Lime Group LLC, et al.* No. 06-Civ. 05936 (S.D.N.Y) ("*Limewire*"); *Columbia Pictures Industries, Inc. et al. v. Gary Fung*, No. 06-CV-5578 (C.D. Cal.) ("*Fung*"); and *Arista Records LLC v. Usenet.com, Inc.*, No. 07 Civ. 8822 (S.D.N.Y.) ("*Usenet.com*")

4. Following the process described below, I was able to make an infringement determination on almost all of the 1,750 files contained in Dr. Waterman's sample. The overwhelming majority of those sample files – 1,578 of them – I found to be infringing. A very significant portion of the classifications were in fact quite straightforward. Indeed, a very substantial portion of the sample files consisted of popular motion pictures, television programs, games, software and music. Free and unrestricted distribution of those files through Hotfile is

2

incompatible with how their copyright owners commercialize those works. The remainder of the sample files – 172 of them – I found either to be non-infringing, illegal, or unknowable.

**Background of Statistical Study and Analysis.**

5.      I performed my analysis as part of a statistical study conducted by Prof. Richard Waterman. For each sample file, I received information about the file (such as the unique Hotfile URL link used to download the file) as well as a copy of the actual content file where available. For purposes of clarity, I refer to all the files that I analyzed in the sample as "sample files," and the actual copy of the file (*e.g.*, the digital copy of the movie) as a "content file."

6.      As noted above, my role was to conduct an investigation to identify the sample files and their copyright owners, and determine whether distribution of the sample files through Hotfile was infringing. In terms of my review and analysis, I investigated and analyzed each of the sample files using a rigorous, evenhanded, and conservative process described below, in order to determine whether the files were highly likely infringing or were non-infringing. If I had concerns whether distribution of a particular file through Hotfile was infringing, I did not classify that file as "highly likely infringing." Instead, if I was unable to make an infringement determination, I would classify that file as "unknowable." In conducting my investigation, I was assisted in certain operational matters by a team of assistants I supervised, who were helpful, for example, in opening files or conducting Internet searches for webpages on which Hotfile URL links were posted. I ultimately conducted my own review and analysis of each sample file and formed my own conclusions regarding each file's infringement status. Defendants have received my work product, and each of the sample files, thus enabling them to verify my conclusions.

7.      For each of the sample files, I began by attempting to identify the content of the file. In most of the cases, I had the content file (which I understand to have been obtained from

3

Hotfile) available for review, and I made reasonable efforts to open and play or view the content file. I also examined the "metadata" for each of the files – the information about the file obtained from Hotfile. For example, I reviewed the name of the file and other abbreviations in the file name (such as "DVDRip" which indicates that the file was a copy of a movie ripped from a DVD). I also searched for webpages where the Hotfile URL link for the file was made available, and identified many instances where Hotfile URL links to the content were still available online. Those webpages containing the Hotfile URL link often contained descriptions of the content file, as well as cover art, screenshots, and other pertinent information about the file.

8. After identifying the sample file, I researched and investigated the copyright ownership of the file and whether the owner had authorized the work for free and unrestricted distribution through Hotfile. In making the determination of the file's authorization status, I considered a number of factors, including but not limited to: whether the content was subject to Terms of Use that restricted or authorized its distribution; whether the content included a copyright notice; whether the content owner monetized distribution of the content in a manner inconsistent with the free and unrestricted distribution of the content through Hotfile; whether distribution of the content would constitute a fair use under United States copyright law; and whether the copyright owner gave any indication that the file was authorized for free and unrestricted distribution. Where available, I also considered notices of copyright infringement. In reviewing the sample files, I also examined whether the file appeared to be less than a full length copy of the original. In fact, the video content files I classified as "highly likely infringing" were overwhelmingly full-length or consisted of a very substantial portion of the content.

4

9. Overall, in reaching my opinions and conclusions, I relied upon my knowledge and experience, as well as publicly available resources and other research that I have outlined in my disclosures and deposition testimony in this case. In investigating and identifying the sample files and their infringement status, I consulted a variety of sources, including reliable Internet databases that contain information on copyright ownership and distribution. Some key sources of information for my analysis in this case include, but are not limited to: the Internet Movies Database at www.imdb.com, the All Music Guide at www.allmusic.com, the Internet Adult Film Database at www.iafd.com, and online retailers such iTunes and Amazon.com that provide information about the ownership and distribution of certain works as well as whether a particular work is being commercially exploited. I also reviewed various corporate websites that provided information about the identified content. I even conducted interviews with qualified representatives from trade groups for several relevant industries.

10. As a result of my analysis and the multiple levels of review performed, I assigned each of the sample files to a category, as follows:

- "Confirmed infringing (Studio)" – the file was determined to contain a copyrighted work that was confirmed to be owned or controlled by a plaintiff or its affiliate and not authorized for free and unrestricted distribution on Hotfile.

- "Highly likely infringing" – the file was determined to contain copyrighted content and it is highly likely that the content was not authorized for free and unrestricted distribution on Hotfile by its copyright owner, based on the evidence I reviewed, including publicly available evidence of commercial exploitation of the content by the owner and the lack of any indication of authorization for free and unrestricted distribution on Hotfile.

- "Non-infringing" – the file was confirmed or determined to be highly likely in the public domain, authorized for free and unrestricted distribution by its owner, or not a copyrighted work, based on my review.

- "Unknowable" – the file could not be identified, or its authorization status could not be determined in the time permitted to complete this project.

11. As noted above, in making my determination that a file was "highly likely infringing," I employed a similar categorization system to those used in statistical studies in other cases, including *Grokster*, *Fung*, *Usenet.com*, and *Limewire*. Based on the evidence I reviewed and analyzed, I classified a file as "highly likely infringing" only if I determined that the file contained copyrighted content and it is highly likely that the content was not authorized for free and unrestricted distribution on Hotfile (either by the copyright owner or operation of law (*e.g.*, fair use)).

12. As part of my review process I occasionally came across files that could not be placed in the above categories, which I treated in a manner consistent with Dr. Waterman's protocol. An explanation of those categories, and how they were treated in the study, is described below:

- Corrupt files – Files we received that were corrupt, inoperable, or unplayable/undisplayable, for a reason other than being password-protected or encrypted. As a result, these files had no apparent infringement status. In accordance with Dr. Waterman's protocol, these files were replaced in the sample set of 1,750 files I reviewed with another randomly selected file per Dr. Waterman's pre-established protocol.

6

- Child or illegal pornography – I understand that Dr. Waterman's protocol calls for exclusion of any file that, by its metadata, appears to contain child pornography or other illegal pornography, before the files are requested from Hotfile. Consistent with that approach, and in consultation with Dr. Waterman, I excluded any sample file from the study that, upon further review, I believed might likely contain child or other illegal pornography. All of these files were replaced in the sample set of 1,750 files that I reviewed with another randomly selected file per Dr. Waterman's pre-established protocol.

- Illegal content – We identified a number of files that contained tools for circumventing limitations on access to protected hardware, copyrighted works, or websites (*e.g.*, "crack" files). In each case, I determined that distribution of the file would likely be unlawful (*e.g.*, a violation of the anti-circumvention provisions of the Digital Millennium Copyright Act). In consultation with Dr. Waterman, we classified such files as "Illegal," and they were not replaced in the sample. My understanding of Dr. Waterman's protocol is that, for purposes of calculating the percentage of infringing files in the sample, these "illegal" files were effectively treated as "non-infringing."

13.     In the course of my review, I preserved all of the content files I analyzed (other than the files I identified as potential child or illegal pornography which were originally on Hotfile's servers in the first place). Thus, for all sample files, even for the sample files excluded from consideration, defendants were able to review the same set of content files to confirm for themselves my classifications of each file.

7

14. After making my assessment of the infringement status of each of the sample files, I did additional work to test and ultimately corroborate my infringement determinations. First, utilizing information provided by Dr. Ian Foster using Hotfile's records of takedown notices, I checked further to see whether a takedown notice had been sent by a copyright owner on the same sample file. Second, I considered information provided by Dr. Foster using Hotfile's records that shows whether there was a "hash match" between the sample files and a file that had been removed for reasons associated with copyright infringement. A "hash match" file is a digitally identical copy of the sample file – in other words, it has the same unique "hash" value. Third, I checked information provided by Dr. Foster using Hotfile's records that shows whether there were takedown notices that had the same title as the sample file, which indicates that other copies of the same work had been identified as infringing. Fourth, in certain circumstances, again using information provided by Dr. Foster using Hotfile's records, I also included in my consideration whether the identified copyright owner had sent takedown notices to Hotfile on other works. Where applicable, I found it relevant to know that the copyright owner sent takedown notices to Hotfile on a similar work that it commercialized in a similar manner. This information on takedown notices provided by Dr. Foster was organized and summarized by plaintiffs' counsel for presentation on Exhibit B, which I describe in more detail below.

**Conclusions.**

15. I have provided my classification results to Dr. Waterman to complete his analysis. Attached as Exhibit B is a chart listing each sample file and its classification to one of the categories noted above. In Exhibit B, I provide the Hotfile URL link for each file, the date in January 2011 from which the sample file was selected pursuant to Dr. Waterman's protocol, the

identified title and copyright owner, and my conclusion as to the infringement status of that file. In Exhibit B, I also include other data about each of those files that I was provided and understand to have been derived from defendants' data by Dr. Ian Foster. That additional data includes the following fields:

- URL Noticed - whether takedown notices were sent to Hotfile on that specific sample file (the same Hotfile URL link), as explained in paragraph 14.

- Hash Noticed - whether takedown notices were sent on files with the same "hash," as explained in paragraph 14.

- Title Noticed - whether takedown notices were sent on files that had the same title as the work in the sample file, as explained in paragraph 14.

- Company Notice - whether other takedown notices were sent by the copyright owner of the sample file I identified, as explained in paragraph 14.

- User ID - the numerical user ID assigned by Hotfile to the user who uploaded the file.

- Strikes - the number of "strikes" Hotfile assigned to the uploading user after receiving an infringement notice on that uploading user's file" ████████████████████████████████████████████████████████████████

- Notice Days - the true copyright infringement "strikes" the user had based on all infringement notices received by Hotfile on that uploading user's files (that is, including those notices received before February 18, 2011).

- Copyright Suspension - whether the uploading user was suspended for copyright infringement.

9

Finally, I indicate whether I determined that the user had uploaded other infringing files, as explained in paragraph 17 below.

16. Based on my review to date, my classifications are as follows: 1,578 files in the sample are either confirmed or highly likely infringing; 84 files are classified as non-infringing; 79 files are classified as unknowable, and 9 files are classified as illegal. A total of 17 files are excluded on the basis of being child or other illegal pornography, and 29 are excluded on the basis of being corrupt. I understand that in drawing the sample, Dr. Waterman selected 250 files from each of seven days in the sampled month. Therefore, in order to provide my results to Dr. Waterman, I broke down my infringement classifications by the sample day from which I understand each sample file was selected. That breakdown is attached hereto as Exhibit C. In short, my analysis showed that the overwhelming majority of sample files were infringing.

17. My analysis, in conjunction with Dr. Foster's data, also shows that an overwhelming number of users who uploaded files selected into the sample have used Hotfile to infringe – that is, the evidence indicates that, either as to the sample file or a separate file, they have used Hotfile to distribute files that are highly likely infringing. In addition to the 1,578 files in the sample that are either confirmed or highly likely infringing, at the request of the plaintiffs, I also examined the other uploaded files of users identified on Exhibit B who had uploaded sample files that I classified as non-infringing or unknowable in my analysis. I identified those works based on lists of the user's uploads derived from Hotfile's data by Dr. Foster. A list of those uploaders and their other infringing uploaded files is attached hereto as Exhibit D. As noted above, a summary of my results by uploader is included in the "Other Infringing Upload" column on Exhibit C. Overall, in considering the sample files, the users' other infringing files, notices or "strikes" for the user, and whether the user was terminated for copyright infringement,

10

I found that, for ▬ of these users, the evidence indicates that they have used Hotfile to distribute highly likely infringing files.

### Further Explanation of Specific Works.

18. As I noted above, the vast majority of the 1,750 files that I reviewed were infringing, and a very significant portion were straightforward to classify. Nevertheless, I understand that Prof. Boyle has challenged my classification of a handful of files. According to his deposition testimony, he has actually reviewed and investigated very few files that I classified as infringing, and as he acknowledges, he has made no systematic attempt to review my conclusions. Instead he reviewed only a relatively small subset of files, many at the guidance of defendants' counsel.

19. As to the handful of files that Prof. Boyle specifically addresses, I do not believe his criticisms are warranted.

    a. <u>Orbit Downloader.</u> Prof. Boyle claims that distribution of the download assistant "Orbit Downloader" through Hotfile is not highly likely infringing, because the developers of Orbit Downloader classify it as "freeware." The colloquial classification of something as so-called "freeware" does not, however, end the inquiry, as Prof. Boyle seems to presume. The term "freeware" means that the software is offered at no cost, but it is not synonymous with unrestricted distribution to others. Orbit Downloader is available for download on a page on the developer's website that includes a copyright notice and the phrase "All Rights Reserved." That page also includes a link for users to voluntarily donate money to the developer, which further informs the user that "*you* can use it [the software] for free as long as *you* like."[1] The inclusion of that copyright notice

11

indicates that the free and unrestricted distribution of Orbit Developer is not permitted. The fact that the developer is seeking to monetize the distribution of the content through the developer's website also undermines the notion that free and unrestricted distribution is permitted. There is no contrary indication that the developer has authorized unrestricted distribution. While Orbit Downloader is made available without the requirement that the user pay for the download (hence the expression "freeware"), under basic copyright law, that does not dictate that the developer authorized the downloading user to further distribute that content file. One important reason a copyright owner might offer something "free" from *its own* website is to attract users to the website to promote its company, products and brand, including, as in this case, to monetize downloads to support its work, all of which are undermined by unrestricted Hotfile distribution through Hotfile, because no users need go to the copyright owner's website at all.

b. <u>Skoki 2006.</u> Prof. Boyle suggests that a sample file containing the copyrighted video game Skoki 2006 should not be classified as infringing. In his report, Prof. Boyle focused on the question of whether the DirectX software, also included in the sample file, is infringing. That is a somewhat complicated question that involves interpretation of DirectX's End User License Agreement, which I analyzed in my initial assessment. However, it is beside the point, because I have also concluded that distribution of the Skoki 2006 game itself through Hotfile is highly likely infringing – it is copyrighted and is commercially available and exploited, and there is no indication that it is authorized for free and unrestricted

        distribution through Hotfile to an unlimited number of individuals. Therefore the sample file itself is infringing.

   c.   <u>Photography 101 podcast.</u> Prof. Boyle claims that distribution of a "Photography 101" podcast is not highly likely infringing to distribute through Hotfile. That podcast is made available by the author for download through iTunes. The iTunes terms and conditions, which I have consulted, do not permit the free and unrestricted distribution of files that are downloaded (even for free) from iTunes. Defendants' counsel has apparently procured an unsworn affidavit from the author, Mr. Scott Wittenburg, that Prof. Boyle believes to suggest that the podcast is authorized for posting on Hotfile, notwithstanding its distribution is subject to the iTunes terms and conditions. This declaration raises more questions than it answers, and without knowing more does not affect my infringement analysis. For instance, I do not know what representations defendants' counsel made to Mr. Wittenburg – and nor does Prof. Boyle. I understand that plaintiffs' counsel has requested those communications but has not yet received them. Also, Mr. Wittenburg's affidavit clearly does *not* state that the tutorial is authorized for free and unrestricted distribution through Hotfile. It says that "[s]o long as a person is not charging money for my podcast, I do not have any problems with" individuals "repost[ing]" them. However, where Hotfile and the uploading user make money from distributing the podcast through Hotfile – the podcast is not simply "reposted." Mr. Wittenburg may not be aware of how Hotfile's business model works and may not approve of distribution of the podcast by another user through Hotfile. In fact, Mr. Wittenburg's affidavit *does not even mention* Hotfile.

Further, it is unclear whether the statements in his affidavit are meant to reflect what was authorized at the time of the distribution of the file through Hotfile.

d. <u>Farming Simulator.</u> Prof. Boyle claims that distribution of a number of "mod" files for a game called "Farming Simulator" are not highly likely infringing. As background, "mod" files can often be infringing because they contain portions of copyrighted software code. In this case, my review uncovered considerable evidence that these files are infringing: (a) several of the files themselves contain a copyright notice or a statement of authorship attributed to the owner, Giants Software; (b) the End User License Agreement for the Farming Simulator software specifically prohibits further distribution of portions of the software code; and (c) I have reviewed other takedown notices sent to Hotfile on files related to Farming Simulator by Giants Software, confirming that Giants Software does not approve of the free and unrestricted distribution of its copyrighted code in the Farming Simulator game. The declaration procured by defendants' counsel (under circumstances of which Prof. Boyle has no knowledge) again raises many more questions than it answers. It is executed by an individual named Marc Schwegler, but he does not identify his position at Giants Software, which strikes me as highly unusual for such a document. Mr. Schwegler does not say that he represents the company; he just says that he is an employee. In fact, the company website lists four individuals as authorized company representatives, and he is not one of them. Mr. Schwegler is also not the individual at Giants Software who sent takedown notices to Hotfile on Farming Simulator games. Notably, his declaration does not state that the files contain no copyrighted code. Instead, in

14

the declaration, Mr. Schwegler opines that they are "non-infringing," without representing that he is an attorney or even familiar with U.S. copyright law. Thus, the declaration does not cause me to change my classification of the file.

  e. <u>Russian embroidery book.</u> Prof. Boyle also criticizes my classification of a book of Russian embroidery as highly likely infringing, based on his assumption that the book was published in 1871, and thus is in the public domain. When I reviewed the file, I did not believe it to be a copy of a book published in 1871. Rather, I believed it to be copied from a newer book covering subject matter from the nineteenth century. I classified it as highly likely infringing because, while the book may contain images of designs that were originally created in the nineteenth century, the selection and arrangement of those designs in a newer book receives copyright protection, and thus the distribution would be an infringement. At bottom, I consider this a disagreement as to identifying the work and its publication date. As this factual dispute appears to be a unique scenario within the 1,579 files I classified as infringing, in order to prevent any doubt, I have re-classified this file as "unknowable" for at least the time being.

  20. Prof. Boyle has specifically criticized my infringement determinations only on about a dozen files of the 1,750 that I reviewed. Even if one were to credit each of Prof. Boyle's criticisms – which plainly, as described above, I do not – the effect would not be material to the overall results of my analysis. The fact remains that the overwhelming majority of files I reviewed were infringing to distribute through Hotfile. I have provided this information in support of Dr. Waterman's more general conclusion regarding the level of infringing activity on Hotfile.

15

I declare under penalty of perjury that the foregoing is true and correct.

Executed on February 16, 2012, at Washington, DC.

_____
Scott A. Zebrak

16