UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 11-20427-WILLIAMS/TURNOFF

DISNEY ENTERPRISES, INC.,
TWENTIETH CENTURY FOX FILM CORPORATION,
UNIVERSAL CITY STUDIOS PRODUCTIONS LLLP,
COLUMBIA PICTURES INDUSTRIES, INC., and
WARNER BROS.  ENTERTAINMENT INC.,

*Plaintiffs*,

v.

HOTFILE CORP., ANTON TITOV, and
DOES 1-10.

 *Defendants*.

_____/

HOTFILE CORP.,

*Counterclaimant*,

v.

WARNER BROS. ENTERTAINMENT INC.,

*Counterdefendant*.

_____/

## DECLARATION OF DR.  IAN FOSTER IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

### PUBLIC REDACTED VERSION

I, Ian Foster, hereby declare as follows:

1.	My name is Ian Foster and I currently hold the position of Director of the Computation Institute at Argonne National Laboratory and the University of Chicago.  I also hold the positions of Arthur Holly Compton Distinguished Service Professor of Computer

Science at the University of Chicago, and of Argonne Distinguished Fellow at the Argonne National Laboratory.  My professional and academic background include extensive experience in designing, operating, maintaining, and studying large, distributed computer systems, including the management of large databases required for such systems to operate.  I have also, as part of both my professional and academic careers, created, coded, and supervised the creation of multiple websites, including what I believe was the first online textbook ("Designing and Building Parallel Programs"), the Globus Software Project, the Computation Institute at the University of Chicago and the Argonne National Laboratory, the Open Grid Forum, Grid Physics Network ("GriPhyN"), and various conferences and workshops, including the IEEE Symposium on High-Performance Distributed Computing, and dozens more.  A copy of my *curriculum vitae*, is attached hereto as Exhibit A.  Other than in this case, I have not testified at trial or by deposition within the past four years.

2.      I have been asked by the plaintiffs in this case to evaluate the functioning and operation of the website www.hotfile.com ("Hotfile"), as well as to provide certain analyses of various technical data about the Hotfile system produced by Hotfile in this litigation.  The observations and conclusions set forth below are based on my own observation and use of the live Hotfile site, and my own analyses of the technical data provided by Hotfile, as informed by my specialized knowledge, education, and expertise as applied to the facts and circumstances in this case.

3.      I am being compensated for my study and testimony in this case at a rate of $500 per hour.  If called as a witness at trial, I would testify as to the opinions and conclusions in this declaration.

I.      **Materials Considered**

4.      In addition to my qualifications and experience described above and the use of the Hotfile website, I have also for purposes of this declaration consulted and reviewed various data sets and documents produced by the parties in this case, deposition testimony, academic and engineering literature, publicly available news reports, source code produced by Hotfile in this action, and other technical data.  A list of the materials reviewed and relied upon is attached as Exhibit B hereto.

## II.   General Background About Hotfile Website

5.      Hotfile is a website that allows its users both to "upload" electronic files and to "download" files uploaded by others.  The site is operated from servers located in Dallas, Texas, and, according to Hotfile, utilizes over 700 servers.  Hotfile's claims about the number and location of its servers are consistent with my observations in analyzing the site and the origins of its traffic.

6.      Uploading a file to Hotfile is simple.  When a visitor to the website clicks a "Choose File" button on Hotfile's home page, a window opens up allowing the user to select a file on their computer to upload.  A click on a second "Upload" button then uploads the file. Hotfile provides any user who uploads a file with a "link" (an alphanumeric string that operates as a uniform resource locator or "url").  The uploaded file can then be downloaded by any Internet user who has access to the link, which leads to a "download page."  A typical Hotfile link includes the name of the file, a unique number that Hotfile sequentially assigns to each file (the "uploadid"), and a random-appearing alphanumeric character sequence that Hotfile uses to obscure the link.  A typical Hotfile URL link (to use an example of one of the files claimed as infringing by the Plaintiffs in this case) is in the following form:

**http://hotfile.com/dl/**80275915/**b1255e7**/Modern.Family .S02E07.HDTV.XviD-LOL.rar.**html.
(url of website)** / (uploadid) / **(random characters)** / (filename) / **(web page extension).**

7.      Users who download from Hotfile can find "links" to the download pages for files hosted on Hotfile in a variety of ways on the Internet (such as on other websites that host collections of such links, or via email or an online forum).  They can then follow the link to a Hotfile "download page" where they are given a choice to subscribe as a premium Hotfile user, or to download the file for free.  If the user opts for a free download, the process is more cumbersome: they may further have to complete a "captcha" (a test used to verify that a human, rather than a software program, is accessing a website), Hotfile slows the download, and Hotfile prevents users from downloading more than one file in each 30-minute interval.  Hotfile prompts such users to instead purchase a "premium" membership, which allows the user to download the file without the delays imposed on "free" downloads.[1]  At that point the user receives a link that initiates a download of the file.  When a file is downloaded, a copy is sent from Hotfile's servers

---

[1] A screenshot of the pricing terms for Hotfile's Premium subscription plans are attached hereto as Exhibit C.

in Dallas to the downloading user's computer. Once the user has obtained a copy of the file from Hotfile, they can make further copies (or send it along to others) outside the confines of the Hotfile system, just like any other digital file.

8.     Entertainment content, such as music, motion pictures, television shows, and so forth, can be represented as a digital computer file, and can easily be communicated over the Internet in digital form. Thus, it is easy for users to upload and download entertainment content (such as motion pictures and television shows) to and from Hotfile, as described above. For purposes of this declaration, I will use the term "Content File" to refer to files that Hotfile hosts and makes available for download. Larger pieces of entertainment content, such as a high-quality recording of a motion picture or television program, can be represented as a single digital computer file, but can also be divided into several, smaller computer files in order to facilitate transmission and copying (software can then easily be used to combine such files back together again once transmitted and/or copied). A high-quality copy of a full-length motion picture or television program, represented as a digital file, generally requires several hundred megabytes and are frequently broken up into several constituent pieces.

9.     Hotfile does not offer a public-facing search feature by which a visitor to the site can locate files hosted and made available for download on the site. From a technical perspective, there is no reason such a feature could not be easily offered – as discussed in greater detail below, Hotfile maintains data regarding the name of each file hosted on its system, and indexing those files and making them searchable to users of the site would not be technically challenging. (Many sites that offer user-uploaded content, such as YouTube, permit users to select whether or not their content will be searchable through the site's search feature, so providing a search function would not interfere with the ability of users who wish to keep their files non-searchable from doing so). Users' access to download files from Hotfile, therefore, depends on gaining access to the link in some other way, such as the sources mentioned in paragraph 7.

10.     Hotfile allows users who create accounts with the website to view information about the files that they have uploaded. For instance, users are displayed a "My Files" page showing basic facts about their uploaded Content Files, such as the names and sizes of each file. The "My Files" page provides the user with the ability to retrieve and select a list of download URLs for any file or chosen group of files, which the user can then easily "paste" to another

4

online location, such as a third-party website, an email, or an online forum.  The "My Files" page also provides the user with the option of creating multiple additional URLs that point to the same Content File (these will then appear as different files with different unique upload ids, even though technically they are just different links to the same copy of the file on Hotfile's servers).  Hotfile also displays to users a "File Manager" page that allows users to organize their files into folders and create links to those folders, and a "My Statistics" page that shows the user information about the downloading of the user's Content Files by others.

11.     Another feature offered by Hotfile is a "Link Checker" (at http://hotfile.com/checkfiles.html).  The Link Checker provides a web interface through which a user can quickly verify whether the Content Files hosted at multiple URLs are available for download.  For instance, prior to attempting to download a series of files from Hotfile, a user who has obtained the URLs to those files from some other online source (e.g. a forum post or a third-party website) can first "check" to confirm that the files have not been removed from Hotfile, and can check multiple links at once (e.g., multi-part files, which as explained above are often required in order to upload high-quality copies of movies or television programs to Hotfile).

12.     In order to be able to display such information to its users – as well as to be able to administer the stated criteria for paying users under its Affiliate program – Hotfile must maintain a variety of different types of data about its users, the Content Files on Hotfile's system, and uploading and downloading activity.  In Part IV of my report below, I describe in greater detail the data sets produced by Hotfile in this litigation that track some of this information.

**III.     Available Measures to Control Infringement**

13.     I have been asked by the plaintiffs in this case to describe, and opine on the feasibility of, methods that Hotfile could use to keep undesired content off the site, in particular content that is not authorized by copyright owners to be distributed through Hotfile.  In particular, plaintiffs have asked me to opine upon possible uses of content identification software and technical steps Hotfile could take to identify users of its service that infringe copyrighted content on multiple occasions.

**A.     Content Identification Software.**

14.     I have concluded that one method available to Hotfile – and commonly used on Internet websites to which users supply entertainment content such as videos – is to use software

to identify files that are not authorized by the copyright owner.  Software capable of identifying or assisting the identification of entertainment content within digital files has been available, in various forms, for over a decade; indeed Hotfile has recently implemented software of this sort provided by a company by the name of Vobile.

15.     One method, for instance, is to use a file's "metadata" (i.e. data about the characteristics of the digital file itself), such as the name of the file, the size of the file, and the filename extension, which can often supply useful information.  For instance, if a file is called "Harry Potter and the Half-Blood Prince," that is an indication that the file is more likely to contain the motion picture "Harry Potter and the Half-Blood Prince" than a file bearing some other name.  And, in turn, a file called "Harry Potter and the Half-Blood Prince" that is several hundreds of megabytes large and in a file format commonly associated with audiovisual content (such as ".avi" or ".mp4") is more likely to contain the motion picture "Harry Potter and the Half-Blood Prince" than a file that is a few megabytes large and in a format commonly used for audio content (such as .mp3), which might suggest a song from the movie's soundtrack – just as a file called "Harry Potter and the Half-Blood Prince" that is a few hundred kilobytes large and bears a file extension commonly associated with electronic books (such as ".azw") is more suggestive of the e-book of the same title.  While these are simple examples, more sophisticated software built around the principle of metadata analysis can be built to identify and/or assist in the identification of unauthorized copyrighted content.  For instance, file metadata can be used to facilitate human review or the use of fingerprinting software, described below.

16.     Another method that has gained widespread implementation on websites featuring entertainment content uploaded by users is fingerprinting software.  Many persons are familiar with this sort of software through popular consumer applications such as Shazam (software used to identify songs for the user upon receiving a short portion of the audio track through a mobile phone's microphone).  Fingerprinting software analyzes properties of the content represented within the file.  So-called "audio fingerprinting" software analyzes the acoustical properties of the file's contents and so-called "video fingerprinting" software analyzes visual properties of the file's contents.  In either case, the software generates a small "fingerprint" of the acoustical or visual characteristics of the contents of the file, and then compares that fingerprint against a database of fingerprints of known, identified audio or audiovisual works maintained by the company that operates the software.  Both audio-based and video-based techniques can be used

in combination with one another, as well as in combination with metadata-based methods as described above.

17.     Fingerprinting-based content identification technologies – both audio and video – have been implemented by many websites and online services in the past five years.  Video streaming sites such as YouTube, Veoh, MySpace, DailyMotion, and Soapbox were all using such software to identify audiovisual content as early as 2007.  Peer-to-peer file-trading services such as iMesh had implemented it to identify audio content before that.  The sophistication and accuracy of such software has grown over time, and there are a number of vendors that offer such technologies.  Testing of the leading providers of video fingerprinting software has shown that the accuracy of such software in correctly identifying content is extremely high.

18.     I understand that Hotfile is now using commercially available fingerprinting software provided by a company known as Vobile in order to identify files uploaded to the Hotfile service.  Although Hotfile does not appear to have implemented this technology until ███ ███████ there is no technical reason why the same or similar implementation of fingerprinting software (whether through Vobile, or any of the other companies that offer fingerprinting software on a commercial basis) could not have been accomplished by Hotfile in 2009 when Hotfile began operations.

**B.      Terminating Repeat Infringers.**

19.     Filtering as described above seeks to reduce infringement by identifying files.  Another measure available to Hotfile would be to terminate the accounts of users who have used the service to infringe.  From a technical perspective, it is a relatively trivial task for Hotfile to associate notifications of infringing Content Files on Hotfile with the identities of users who uploaded the files.  Indeed, I understand that Hotfile claims to be making this association in some form today; it has produced a data set called "strikes.csv" that purports to associate the unique identification number that Hotfile assigns to each user (the "userid") with "strikes" on the user's account.

20.     Generating this association is, from a technical perspective, a simple task.  Hotfile generally receives notifications of infringing files in the form of URLs reporting specific files on its system as infringing.  Hotfile's naming convention for URLs is to include within the URL of each file on its system a unique identification number that Hotfile assigns to that file (the "uploadid").  Hotfile also maintains a database that associates the uploadid of each Content File

7

on Hotfile with a unique identifier of the uploading user ("userid").  A data set called "uploads.csv" associating userid values with uploadids was produced in this action.[2]  Indeed, Hotfile needs to be able to make this association in order to pay its "affiliates" based on downloads of their files.  Therefore, associating notifications of infringing content with the uploading user is a simple matter of extracting the uploadid from the URL provided in a takedown notice, using the Hotfile database to determine the userid of the uploading user, and then associating the notification with that userid.  Once that association is made, Hotfile would know which of its users is uploading Content Files that have been reported as infringing.

21.     It would also be relatively straightforward for Hotfile to make the same association between Content Files reported as infringing and users who download those files. Hotfile receives in its regular course, and has produced in this action, logs of downloading activity that reflect, among other things, the uploadid of the file being downloaded and the userid of the user making the download.  Hotfile could relatively easily record information from such logs in a database in order to identify users who repeatedly download files identified as infringing.

22.     The same is true with respect to websites that host links to infringing content on Hotfile and thereby refer infringing users to Hotfile.  Whether or not Hotfile currently stores this information in the regular course of its business, it receives "HTTP referrer" information from the web browsing software of users who come to the Hotfile website by way of a link on a different website.  Hotfile could easily store this information and associate it with the downloads of Content Files – and then associate referring websites to downloads of files identified as infringing.  Hotfile could then use this information to prevent users from accessing Hotfile by links on websites identified as generating referrals to infringing traffic on Hotfile.  To the extent the website is registered by a Hotfile user as his or her own through Hotfile's affiliate program, the information could also be easily associated with the user through Hotfile's ███████████

██████████████████████████████████████████████████████████████

████████████████████████

---

[2] This data set, as have many of Hotfile's data sets, has been produced in several iterations, *e.g*, "Uploads4.csv," "Uploads5.csv," etc.  In referring to Hotfile's data sets generally, I am using their names to refer to the produced data inclusive of its various iterations and modifications.

IV.     **Data Produced by Hotfile.**

23.     I have been asked to analyze the data regarding the use and operations of Hotfile's system that I understand Hotfile has produced in this litigation, in order to determine what this data shows about the use of the Hotfile site by its users, as well as Hotfile's own actions and decisions in managing the site.  I describe the produced data below; in Parts V-XIII of this declaration below I address various different conclusions that can be drawn from this data.

     A.     **Data Regarding Takedown Notices.**

24.     Hotfile produced three data sets in this litigation that store information concerning takedown notices that Hotfile has received.  First, Hotfile provided a data set "dmcanotices.csv" (as well as subsequent supplements) containing entries corresponding to takedown notices that Hotfile has received by email.  Second, Hotfile produced another data set – "users_cowner_upload.csv" – containing records of takedown notices sent by means of Hotfile's web-based interface or special rightsholder account ("SRA").  In theory, these two sources ought to be sufficient to capture takedown notices received by Hotfile.  In analyzing the dmcanotices.csv data set, however, I observed that the data set only contains takedown notices from July 2, 2009 through September 15, 2009, and then again from September 19, 2010 through the present.  In other words, a year of data (running from September 2009 through September 2010) is missing from the dmcanotices.csv data set entirely.  I understand that Hotfile has stated that this data was lost and cannot be recovered.

25.     Although this data is missing from the dmcanotices.csv data set, it can be substantially reconstructed from the actual email takedown notices that Hotfile received and produced, many of which were provided in text form.  Using a script (i.e., a small computer program), I extracted from this third data set the "uploadid" (i.e., the unique numerical identifier that Hotfile assigns to each file uploaded to its service) of each file named in the accessible takedown notices for the period for which Hotfile's dmcanotices.csv data set was missing entries entirely, then summed those and added them to the total count from the other two sources.[3]  Cumulatively, Hotfile has received takedown notices referencing approximately 10 million files.

---

[3] I note here that my methodology was conservative in that it was limited to takedown notices accessible in text form.  Hotfile produced a much smaller number of notices in other formats that I did not consider due to the additional difficulty and higher potential for introducing inadvertent errors into the count.  Therefore, the actual number of takedown notices received by Hotfile is likely somewhat higher.

Because some takedown notices reference the same files as others, approximately 8 million of those notices refer to unique files.

26.     Hotfile's takedown notices contained in these three sources can then be associated relatively easily with the uploading user using the method I described in paragraph 20 above (i.e. matching the uploadid value with the userid value in the uploads data set). This data set also supplies other relevant information about each file, such as the date of upload ("uploaddate").

**B.     Data Regarding Users and Site Usage.**

27.     Hotfile also has produced, across several data sets, information regarding its users and uses of the site, which I used in connection with my analyses:

   a.   A "userdat.csv" data set, which contains data reflecting the current status of each of Hotfile's users. The userdat.csv data set associates the userid with information about whether the user is "suspended," among other things.

   b.   A "strikes.csv" data set, which contains data reflecting the number of copyright "strikes" Hotfile assigned to the user after it began associating takedown notices with users in late February 2011.

   c.   Another data set, "actiondat.csv," which contains records of actions Hotfile took regarding users. The actiondat.csv data set associates the userid with the "type" of action (which includes "suspenduser"), the date of the action ("dtaction") and other information about the suspension, including the reason for the suspension ("params").

      i.   I note that the actiondat data set is incomplete in that there are some suspended users (as indicated by the "userdat.csv" data set) for which no reason for the suspension is reflected in actiondat.

      ii.   Nonetheless, it is possible, for at least some suspended users not logged in actiondat, to identify those that were likely terminated by Hotfile due to copyright infringement, by comparing the list of suspended users against the strikes data set. Because Hotfile did not begin recording strikes until late February 2011, it is reasonable to conclude that suspended users with three or more strikes for whom no suspension is logged in actiondat were suspended for copyright infringement.

10



**C.** **Data Regarding Files Uploaded to and Downloaded From the Site.**

28. Hotfile's data sets also include information regarding the files that have been uploaded to the site over time. These principally include:

   a. An "uploads.csv" data set, which contains data reflecting information about each file uploaded to Hotfile, such as when it was uploaded, its size, its name, the unique identifier assigned to it by Hotfile, and its "status" (i.e. whether at the time of the data set's production the file was active or removed for one of various reasons).



---

[4] "Hashing" algorithms identify only identical copies of files, not copies of the contents contained therein. For instance, if a user made a copy of a sound recording file on their computer, the file would have the same "hash" as the original, but a copy of the same song downloaded from iTunes might have a different hash as a copy ripped from a CD.

11



29.     My analysis of these various data is described below.  In reviewing the data contained in Hotfile's many data sets, I am relying upon Titov's deposition testimony (and relevant exhibits) describing the various data sets and fields and their respective functions, as well as my twenty-five years of experience in designing, building, and researching large-scale distributed and data-intensive computer systems.  I am also relying upon my study of the produced data sets and the relationships among them, relationships that may be inferred from patterns and recurrences of common data values across the different data sets.

## V.     Data For Dr. Waterman's Statistical Analysis.

### A.     Selection of Sample.

30.     In support of statistical analyses that I understand are being conducted by Dr. Richard Waterman, I extracted (in accordance with instructions designed by Dr. Waterman) certain data from data sets produced by Defendants in this litigation.

31.     Specifically, I extracted certain "uploadid" values from the dailydownload.csv data set, for seven specific dates in January 2011[5] that were specified to me by Plaintiffs' counsel. (I understand that the seven days in question were selected according to Dr. Waterman's protocol.)  I extrapolated from the data set the number of times each file was downloaded on each day by summing the "free" and "premium" fields, which I understand represent downloads by non-premium users and by premium users, respectively:

---

[5] Overall, the "dailydownload.csv" data set from which the data were extracted shows 145,691,820 downloads of files from Hotfile in the month of January 2011.

| Date | Download Count |
|------|----------------|
| 2011-Jan-01 | 4180329 |
| 2011-Jan-05 | 4677811 |
| 2011-Jan-11 | 4568087 |
| 2011-Jan-20 | 4496274 |
| 2011-Jan-21 | 4631944 |
| 2011-Jan-24 | 4738937 |
| 2011-Jan-30 | 5125537 |

32.     On each day, I assigned each of those downloads a consecutive number, such that each unique file (uploadid) was assigned as many numbers as the sum of the "free" and "premium" fields for that uploadid.  I was provided with seven sets of numbers by Plaintiffs' counsel, one for each of the seven days, which I understand were randomly generated.  I extracted the uploadid values corresponding to those numbers and provided them to Plaintiffs' counsel.

**B.      Further Data Related to Dr. Waterman's Statistical Analysis.**

33.     In addition to the data described above, I also extracted additional aggregate information regarding the Hotfile system related to Dr. Waterman's analysis:

    a.   Data regarding Hotfile's subscription revenues, the number of uploaded files to Hotfile, the number of downloads from Hotfile, and the number of files deleted from Hotfile, by month.

    b.   Data showing the number of files with a non-null file size in each cohort of one million files, ordered consecutively by Hotfile uploadid, during the period of time during which Hotfile maintained a litigation hold.  Hotfile generally assigns uploaded sequentially by upload, and the presence of a non-null file size value indicates that Hotfile was still in possession of the content file during the time of the litigation hold.

    c.   For each file in Dr. Waterman's statistical analysis, data showing the cumulative number of free and premium downloads ("downloads" and "paiddownloads")

13

from the "uploaddownload" table, and data showing the cumulative number of free and premium downloads ("free" and "premium") from the "dailydownload" table.

## VI.   Data Related to Scott Zebrak's Classifications of Files From Dr. Waterman's Analysis.

### A.   Characteristics of Files Analyzed of Dr. Waterman and Mr. Zebrak.

34.   Following Dr. Waterman's analysis, as well as the classification of the files in Dr. Waterman's sample by Plaintiffs' expert Scott Zebrak, I was asked to retrieve data showing the relationship between the size of the files in Dr. Waterman's statistical sample and the copyright classification of those files by Mr. Zebrak.  Specifically, I used the file size ranges used by Hotfile's affiliate program (0-5 Megabytes, 5-50 Megabytes, 50-100 Megabytes, and 100-2000 Megabytes), and sorted the 1750 files from the study based on the file size and Mr. Zebrak's classification.  The file sizes are recorded in the uploads data set.  The results are as follows:

| Size (MB) | Confirmed Infringing (Studio) | Highly Likely Infringing | Illegal | Noninfringing | Unknowable |
|---|---|---|---|---|---|
| | | | | | |

### B.   Data Regarding Users and Files in Statistical Sample.

35.    For purposes of Scott Zebrak's analysis of the files in the statistical sample that is the subject of Dr. Waterman's testimony, I also extracted certain data from Hotfile's data sets that relates both to the files and the users who uploaded them.  In particular, for each file in the statistical sample, I extracted and provided the following data for inclusion in a chart I understand he is preparing regarding those files:

    a.  Hotfile's unique userid for the uploading user;

    b.  the username of the uploading user;

    c.  the number of "strikes" Hotfile assigned to the uploading user;

    d.  the number of days on which Hotfile had received a takedown notice for any file uploaded by the uploading user;

    e.  whether or not the uploading user had been suspended for copyright infringement (also indicating as "Reason Unknown" ("RU") where Hotfile's data shows that the user was suspended but does not contain a reason, and "Other" where Hotfile's data shows that the user was suspended for a reason other than copyright infringement);

    f.  The date the uploading user was first suspended, if any;

    g.  Search term results reflecting copyright owners with potentially similar names that sent takedown notices to Hotfile.

    h.  Data showing whether or not the url was either the subject of a takedown notice sent to Hotfile and/or removed for copyright reasons.  I describe these concepts (and the methods for extracting them from Hotfile's data sets) in Part VIII.B below;

    i.  Data showing whether or not a file with a hash identical to the file in question was either the subject of a takedown notice sent to Hotfile and/or removed for copyright reasons;

    36.    Items a, b, and c in Paragraph 35 above are straight associations of data from the uploads, userdat, and strikes data sets, respectively.  Item d is a simple matter of sorting the takedown notices referencing each user's files by date and then using standard database commands to identify the number of unique dates.  Items e and f are contained in the userdat and actiondat data sets as described in Part IV above, with userdat showing whether the user is suspended, and actiondat showing the suspension events.  Item g can be retrieved by means of a text search that compares search terms for the files' copyright owners (provided by counsel) against Hotfile's records of its takedown notices (dmcanotices.csv), Hotfile's records of the names and email addresses of users who sent SRA notices (contained in users_cowner_upload.csv and userdat.csv), and the takedown notices that Hotfile produced in text form.

37.     Items h and i in Paragraph 35 above are text searches.  I searched for keywords (provided by counsel) selected to correspond to the names of the works in Dr. Waterman's statistical sample, as determined by Scott Zebrak.  I ran the searches against defined subsets of the filenames in the uploads data set.  I defined the relevant subsets of the uploads data set as follows:

a.   Files "subject to a takedown notice" are those referenced in a takedown notice as described in Part IV.A above.

b.   Files "removed due to copyright" are those for which Hotfile's data shows that the file was removed, but not due to non-copyright reasons.  I describe the narrowing conditions in detail in Part V.B below.

c.   For purposes of item h, I searched for the specific uploadid of the file in these two subsets.

d.   For purposes of item i, I searched for any file that had the same "hash" as the file (as represented by the md5 or sha1 value in the "file" data set) in these two subsets.

38.     In addition to the data listed above, I also provided for Mr. Zebrak's review lists of other files uploaded by the users that uploaded the files in the statistics study.

**VII.   Number of Premium Users.**

39.     Hotfile's userdat data set includes a designation of whether users are, or ever have been, "premium" users of the service.  ████████ users (out of ██████ registered users) have been premium at some point or another, however, as of Hotfile's most recent data production, ██████ users (or ████ of all registered Hotfile users over time) are premium.

**VIII.   Users Who Uploaded Files Reported As Infringing.**

40.     I have also been asked by plaintiffs' counsel to analyze what Hotfile's data shows regarding Hotfile's response to Hotfile users whose uploaded files have been the subject of takedown notices.  I have analyzed Hotfile's records regarding the files uploaded by users, records of the files that have been the subject of takedown notices, and records of user suspensions.  My analysis is described below.

**A.      Users Responsible For Uploading Files Reported As Infringing On Several Occasions Prior To This Lawsuit.**

41.      At the request of plaintiffs' counsel, I calculated the number of users for whose files Hotfile had received takedown notices on three or more days before this lawsuit was filed (February 8, 2011).  There were ███ such users reflected in Hotfile's data.  The following chart lists aggregate information regarding those ███ users, including their subsequent activity on the Hotfile website:

| Category | Total |
|---|---|
| Users with Three or More "Notice Days" as of 2/7/11[6] | ██ |
| Affiliate Payments to Those Users | ███ |
| Files Uploaded by Each Such User After the User's Third Notice Day | |
| Files Uploaded After Third Notice Day that Were Subject to a Takedown Notice and/or Removed for Infringement | ██ |
| Total "Files in Suit" Uploaded After Third Notice Day[7] | ██ |
| Total "Files in Suit" Uploaded After Third Notice Day that Were Subject to a Takedown Notice and/or Removed for Infringement | |
| Downloads of Files Uploaded After Third Notice Day | ███ |
| Downloads of Files in Suit Uploaded After Third Notice Day | |
| Downloads of Files in Suit Uploaded After Third Notice Day that Were Subject to a Takedown Notice and/or Removed for Infringement | ██ |

42.      The chart attached as Exhibit D shows the backup / detail for these numbers.  Due to the large size of the file (it contains over twenty thousand entries), it is being provided to the Court in electronic form.  It contains the following data regarding each of the ███ users for whose files Hotfile had received notices on at least three separate days before this lawsuit was filed:

a.   The username ("User Name");

b.   The userid ("User ID");

---

[6] Since any given takedown notice could reference multiple files uploaded by the same user, I captured distinct reports of claimed infringement by counting the separate days on which Hotfile received takedown notices related to the users' files ("Notice Days").

[7] "Files in Suit" refers to those specifically claimed as infringing in this case, discussed in Part XIII below.

c.  The total number of Content Files uploaded by the user ("Total Uploads");

d.  The total number of Content Files uploaded by the user for which Hotfile received a takedown notice ("Total Takedowns");

e.  The number of separate days on which Hotfile received a takedown notice for a Content File uploaded by the user ("Notice Days");

f.  The first day on which Hotfile received a takedown notice for any Content File uploaded by the user ("First Notice Day");

g.  The third day on which Hotfile received a takedown notice for any Content File uploaded by the user ("Third Notice Day");

h.  The number of "strikes" Hotfile itself assigned to the user ("Strikes");



i.  Whether or not Hotfile suspended the user ("Suspended");

j.  If Hotfile suspended the user, the date on which Hotfile suspended the user ("First Suspension");[8]

k.  If Hotfile suspended the user, the stated reason Hotfile suspended the user ("Reason").  Here, to distinguish copyright-related suspensions from other kinds of suspensions, I have categorized the possibilities as follows:

  i.  An explicit copyright suspension ("Copyright");

  ii.  A suspension for another, known reason ("Other");

  iii.  A suspension for a reason unknown ("Unknown"); and

  iv.  A suspension for which no reason is reflected in Hotfile's data, but the fact that the user has three or more copyright strikes suggests the suspension was copyright related ("3+ Strikes.").

---

[8] Some users were suspended repeatedly.  In those cases, for purposes of simplicity, I have provided the first date on which Hotfile suspended the user for a copyright-related reason.

l.   Whether or not the user was a Hotfile Affiliate ("Affiliate");

m.   How much money Hotfile had paid to the user under Hotfile's Affiliate program ("Payments");

n.   The number of files that the user uploaded after the third day on which Hotfile received a takedown notice for any file uploaded by the user ("Uploads After Third Notice Day");

o.   The number of files that the user uploaded after the third day on which Hotfile received a takedown notice for any file uploaded by the user that were then themselves subject to a takedown notice or removed for copyright reasons ("Uploads After Third Notice Day (Taken Down / Removed)");

p.   The number of files that the user uploaded, after the third day on which Hotfile received a takedown notice for any file uploaded by the user, that the Plaintiffs in this case have claimed as infringing ("Uploads After Third Notice Day (Files in Suit)");

q.   The number of files that the user uploaded, after the third day on which Hotfile received a takedown notice for any file uploaded by the user, that the Plaintiffs in this case have claimed as infringing, that were then themselves subject to a takedown notice or removed for copyright reasons  ("Uploads After Third Notice Day (Files in Suit Taken Down / Removed)");

r.   The total number of downloads of the files that the user had uploaded after the third day on which Hotfile received a takedown notice for the user's files ("Downloads of Uploads After Third Notice Day");

s.   Total Downloads of the user's Files in Suit Uploaded After the Third Notice Day ("Downloads of Uploads After Third Notice Day (Files in Suit)"); and

t.   Total Downloads of the subset of the user's Files in Suit Uploaded After Third Notice Day for which Hotfile either received a takedown notice or removed for copyright reasons ("Downloads of Uploads After Third Notice Day (Files in Suit Taken Down / Removed)").

**B.    Files Taken Down And/Or Removed For Copyright Reasons.**

43.    For purposes of Exhibit D, I have treated a file as having been taken down if Hotfile received a takedown notice calling out the specific URL for the file.

44.    Takedown notices that reference specific URLs are not the only copyright-related causes of files being removed from Hotfile, however.  First, Hotfile at some point began removing and blocking so-called "hash-identical" files in response to takedown notices, so those files are removed even though the specific URL is not called out in a takedown notice.  Second, some takedown notices reference file folders on Hotfile (which contain several files), and therefore do not call out the specific URLs of the files themselves, yet still result in the suspension and eventual removal of the files.  In addition, given the large gap in Hotfile's dmcanotices data set, there is the possibility that Hotfile's records of the takedown notices it received may also be incomplete in other ways.

45.    A limitation of Hotfile's data is that it does not maintain simple and accurate data showing whether or not a file was removed for copyright reasons.  Therefore, identifying such files from the data that Hotfile does maintain requires several steps.

46.    ███████████████████████████████████████

███████████████████████████████████

██████████████████████████████████████

███████████████████████████████████

███████████████████████████████████████

████████████████████████████████████████

███████████████████████████████████

████████████████████████████████████

████████████████████████████████████

█████████████████████████████████████

███████████████████████████████████████

█████████████████████

███████████████████████████████████████

████████████████████████████████████

███████████

_____

██████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████.

47.     The first criterion relies on Hotfile's own determination of whether the file should be permitted on its system in the future (and assumes that files that are affirmatively permitted to be uploaded again had not been individually removed for copyright reasons).  This criterion conservatively excludes files which were removed based on takedowns of entire file folders, rather than specific URLs, because Hotfile did not block those files (I discuss this issue in greater detail in Paragraph 62 below).

48.     The second criterion is necessitated by the fact that Hotfile appears to have, for a certain period of time, ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████

49.     Therefore, both of these criteria are conservative. The first assumes that Hotfile always effectively blocks files reported as infringing, and the second assumes that in the absence of a specific takedown notice calling out its URL, every removed file associated with a suspended user was removed because of the user's suspension, rather than because the file was itself reported as infringing.  Therefore, these conservative assumptions likely undercount the files removed from Hotfile as infringing.[10]

**C.     Copyright Reports as Function of Users' Upload Volume.**

50.     I have also been asked to show the relationship between the number of files a user has uploaded and the likelihood that the user has been suspended for alleged copyright infringement, the likelihood that the user has been assigned copyright "strikes" by Hotfile (i.e., one or more), and the likelihood that Hotfile has received takedown notices for files uploaded by the user.  I note users who have uploaded to Hotfile at all (1 or more upload) have uploaded an average of ████ files each.  The following chart shows, based on the number of files uploaded by the user, the percentage of Hotfile users in each category:

---

[10] I cannot rule out the possibility that this method may also count some files that Hotfile removed for reasons other than copyright infringement, such as child pornography or software that performs unlawful or malicious functions. ████████████████████████████████████ ████████████████████████ However, I have seen nothing to suggest that such removed files, if any, are sufficiently common to change the numbers in any meaningful way.

| Number of Uploads By User | Users with Strikes | Users With Takedown Notices | Users With Copyright Suspension |
|---|---|---|---|
| 10+ | | | |
| 20+ | | | |
| 50+ | | | |
| 100+ | | | |
| 200+ | | | |
| 500+ | | | |
| 1000+ | | | |
| 2000+ | | | |
| 5000+ | | | |

**D. Contributions of Users Suspended For Copyright Reasons.**

51. Users who were eventually suspended by Hotfile for copyright reasons contributed a substantial portion of the total files uploaded to Hotfile, and files uploaded by those users also represented a substantial portion of the total downloads of files from Hotfile.

52. For purposes of the chart below, I have defined a user as "suspended for copyright reasons" if the user is suspended in userdat.csv (i.e., the user is currently suspended), and one of either two conditions are met:

    a. The actiondat data set reflects a suspension for a copyright-related reason; or

    b. The actiondat data set does not reflect any reason for the suspension, but the user has been assigned three or more copyright "strikes" by Hotfile.

Based on this definition, I have calculated the contributions of both users, and of "Top 500 Affiliates" (discussed in Paragraph 62 below) suspended for copyright reasons, to Hotfile's overall uploads and downloads:

22



|  | Uploads (Total) | Uploads (Percent) | Downloads of Users' Uploads (Total) | Downloads of Users' Uploads (Percent) |
|---|---|---|---|---|
| **Total (All Users)** | ■■■ | 100% | ■■■ | 100% |
| **Users Suspended For Copyright** | ■■■ | ■■■ | ■■■ | ■■■ |
| **Top 500 Affiliates Suspended for Copyright** | ■■■ | ■■■ | ■■■ | ■■■ |

## IX.   Websites Registered By Users Reported As Infringing.

53.   Many of the users for whose files Hotfile had received multiple takedown notices had registered websites to be part of Hotfile's affiliate program.  At plaintiffs' request, I extracted data regarding some of these websites from Hotfile's produced data.

54.   First, I have also been asked to specifically extract Hotfile data related to a website, ■■■ that is one of Hotfile's affiliates.  The user associated with the ■■■ website, ■■■ (userid number ■■■), is reflected in row 13 of Exhibit D, and is one of the Hotfile users with the highest number of Notice Days.  This user had uploaded ■■■ iles to Hotfile, ■■■ of which were the subject of takedown notices, with Hotfile receiving takedown notices for the user's files on ■■ separate days.  Hotfile paid this user ■■■ in affiliate fees.

55.   ■■■■■■■■■■■■■■■■■■  As of October 25, 2010, Hotfile had received notices for the user's files on ■■ separate days.  In the week before and week after October 25, 2010 (from October 19, 2010 through November 2, 2010), Hotfile received notices for user ■■■ files on ■ days (i.e., ■■■), referencing a total of ■■ files.  I have also attached as Exhibit E a list of the files uploaded by user ■■■ during those two weeks.

56.   Another website, ■■■, is also listed as a Hotfile affiliate.  The user associated with the ■■■ website has the userid number ■■■  Hotfile's records show that Hotfile most recently paid this affiliate during the period spanning ■■■

███████████████████████████████████████ suggesting that Hotfile is continuing to make payments to this website today.

57.     I have also confirmed that each of the websites listed in Exhibit F, attached, is a Hotfile affiliate.  The list includes, among others, the following sites:

| Domain | User ID |
|--------|---------|
| ██████████████ | ████ |
| ███████ | ██ |
| ██████ | ████ |
| ██████ | ████ |
| ███████ | ████ |
| █████ | ███ |
| █████████ | ██ |
| ███████████ | ██ |
| ███████ | ████ |
| ████ | ████ |
| █████ | ████ |
| ███████ | ████ |

## X.     Hotfile's Suspension of Users For Copyright Reasons.

58.     Hotfile produced information in its ██████████ data set concerning, among other things, user "suspensions" for the users suspended in ██████████ and the reasons for those actions.  Only ██ of those suspensions prior to this litigation began on February 8, 2011 are reflected by Hotfile's data as having been for copyright reasons.[11]  I have prepared a chart, from that data set, showing all ██ users that Hotfile's records show to have been suspended before this litigation began (on February 8, 2011) for reasons related to copyright infringement, as well as Hotfile's recorded reasons for doing so:

---

██ ████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████



| User ID | Date Suspended | Reason for Suspension |
|---------|----------------|------------------------|

59.     Hotfile's data begin showing suspensions for copyright-related reasons in much greater numbers beginning on February 18, 2011, eventually suspending ██████ users by January 23, 2012 (the end date is dictated by the data that was available to me for purposes of preparing this declaration).  To illustrate graphically,[12] I have plotted Hotfile's cumulative suspensions of users for copyright-related reasons:



60.     Hotfile's data also show, as described previously, when Hotfile received takedown notices referencing files uploaded by its users.  On February 7, 2011 (the day before this case was filed), Hotfile had received notices on three or more days for files uploaded by ██████ of its users.[13]  The following table indicates the number of users with varying numbers of notice days:

| As of February 7, 2011 | |
| --- | --- |
| Notice Days | Users |
| 300+ | ██ |
| 100+ | ███ |
| 25+ | ███ |

---

[12] A spreadsheet providing the underlying numbers has been provided as Exhibit G to this declaration.

[13] Due to the limitations of the data produced by Hotfile, these figures are almost certainly undercounts.  When it recently supplemented its data in this case, records for many files were missing from Hotfile's data sets, thus causing this count to appear somewhat lower than in previous iterations of Hotfile's produced data.

| | | |
|---|---|---|
| 10+ | ███ | |
| 5+ | ███ | |
| 3+ | ███ | |
| 1+ | ███ | |

61.     I have also created a graph showing, over time, the number of Hotfile users for whom Hotfile had received takedown notices on at least three different days:[14]



## XI.    Hotfile's Removal of Files For Copyright Reasons.

62.     In total, Hotfile's data reflect ███████ files uploaded to Hotfile (the number of entries in the most recent iteration of the uploads table).  Of those, a substantial percentage have been removed for copyright reasons.  Hotfile's data reflect three principal copyright-related reasons for the removal of such files:

    a.   Files removed due to claimed infringement with respect to the specific file (i.e., subject to a takedown notice or otherwise removed for copyright reasons as described in Paragraphs 24-26 above)

        i.   The method for identifying these files is described in Part VIII.B above.

---

[14] Again, the underlying numbers are being provided in Exhibit H to this declaration.

b.   Files removed because the user was suspended for copyright reasons.  The method for identifying these files is as follows:



c.   Files removed in response to a notice that did not target the specific file, but rather targeted a folder in which the file was located.



63.   I have graphed Hotfile's reasons for removal for various different download counts, including the "average" download count of files on Hotfile (which is ███) and of files that have been downloaded at least once (which is ███).  In addition, for files that remain "active" on

28

Hotfile's system █████████████████████████  I have graphed whether the uploading user has either copyright "strikes" or whether Hotfile has received takedown notices for files the user has uploaded.  The data is reflected (as percentages for various download counts) in the table below:[16]

█████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████

## XII.    Hotfile's Data Concerning Its Top 500 Affiliates.

64.    Many of the Affiliates that Hotfile identified as its "Top 500" affiliates (based on the amount of the aggregate affiliate payments made to those users) are among the users for whom Hotfile had received takedown notices on three or more days, and are thus referenced in my Exhibit D.  However, in order to make the data easier to read, I have also prepared a chart showing the same data as reflected in Exhibit D for Hotfile's Top 500 Hotfile Affiliates.  This chart is attached as Exhibit J.  (I am providing it electronically due to the volume and format of the data).  Hotfile suspended ██ of its Top 500 Affiliates for copyright reasons, suspended ██ for other reasons, and did not suspend ██.  (The ███ counts ██ whom Hotfile originally suspended for other reasons, reinstated, and then suspended for copyright reasons later).  Of the ██ Top Affiliates Hotfile did not suspend, ███ had not uploaded any files after February 18, 2011.  The following table provides summary information about the Top 500 Affiliates:

---

█
████████████████████████████████████████████████████████████
██████████████████████████

[16] Again, the numbers for this table are reflected in the attached Exhibit I.

| Top 500 Affiliates | |
|---|---|
| Terminated For Copyright Reasons (including after reinstatement) | ███ |
| Total Affiliate Payments | █████████ |
| Uploads of Files In Suit After Third Notice Day | ██████ |
| Downloads of Files In Suit After Third Notice Day | ██████ |

**XIII.   Hotfile's Data Concerning of Files Claimed By Plaintiffs As Infringing**

65.      I understand that Plaintiffs have identified 945,611 files in this case that they claim infringe their copyrights.  (I will call these the "Files in Suit.").  Each File in Suit is associated on the list with a unique URL, which contains the uploadid for the file.  I also understand that Plaintiffs have further been able to obtain and verify copies of a subset of the files in suit for purposes of this motion (which I will call the "Verified Files in Suit.").  Plaintiffs have asked me to investigate the uploads and downloads of the Files in Suit, both in general and in the United States.

**A.      Total Downloads of Files in Suit**

66.      Determining the number of times the Files in Suit have been downloaded is a simple query against Hotfile's ████████ data set.  In the aggregate, those files have been downloaded ████████ imes.

**B.      United States Uploads and Downloads of Files in Suit.**

67.      Since Hotfile's servers are in Dallas, all Files in Suit were uploaded to and downloaded from the United States.  Determining which Files in Suit were uploaded from and downloaded to the United States is also relatively simple, at least for the limited data available.

68.      ████████████████████████████████
████████████████████████████████
████████████████████████████████
████████████████████████████████
████████████████████████████████
████████████████████████████████
████████████████████████████████
████████████████████████████████

30

██████████████████████████████████████████████████████████████

██████████████████████████████████

69.     Using publicly available lookup services, one can associate IP addresses with geographical locations.[17]  Hotfile has not produced the entire IP addresses for most users (it has obfuscated the final octet), but if one wishes to do no more than identify the country in which an IP address is located, the final octet is not needed.  Using the lookup service Maxmind (http://www.maxmind.com/app/geoip_country), I have narrowed the extracted data to the specific IP addresses showing Files in Suit either uploaded in the United States or, if such data was unavailable, uploaded by users who registered their accounts in the United States.  This analysis shows that ██████ of the Files in Suit were uploaded from the United States.  A chart showing each such upload is attached hereto in electronic form as Exhibit K.

70.     With respect to downloads, Hotfile's data is far more limited.  Hotfile produced logging files reflecting downloading activity.  However, I understand that this data was only available beginning in March 2011, and that ████████████████████████████████████ ████████████████████████████████████████████████████████████████ Therefore, it is not possible to use Hotfile's data to specifically identify United States downloads prior to March 2011, although it is possible to search those logs for U.S. downloads taking place afterwards.  Specifically, Hotfile has produced logging data showing downloads of Content Files from its system, but only for a limited period of time spanning from March 2011 through September 2011.

71.     Subject to those limitations, confirming the downloads of the Files in Suit by U.S. users is a relatively straightforward proposition.  Each entry in Hotfile's logs provides the uploadid of the file downloaded (which can be associated with the Files in Suit as described in the previous section of my declaration) as well as the IP address to which the file was downloaded (which, again, as described above, can be associated with a geographical location).  I have previously, in connection with my expert report in this case, disclosed a list of all U.S. downloads of the Files in Suit, along with the IP address to which the download occurred.[18]

---

[17] At the country level, this association is highly accurate and reliable, and has been confirmed to be so by a number of studies, including those referenced in Exhibit B.

[18] This summary represents a massive, multi-part spreadsheet that has already been supplied to Defendants, and I am not including one with this declaration in order to minimize the

**C.      Verified Files in Suit.**

72.      Because the Verified Files in Suit are simply a subset of the Files in Suit, United States uploads and downloads of those files are contained within the lists of United States uploads and downloads for all Files in Suit previously disclosed to the Defendants in this case in connection with my expert report.  Plaintiffs are submitting an exhibit in connection with the Verified Works in Suit that simply subsets this United States upload/download data for those specific files; with respect to downloads, it also counts for each file the number of distinct IP addresses reflected in the download logs in order to represent the number of unique downloads. The values for US uploads and downloads in that exhibit are derived from Exhibit K and the download data described in Paragraph 71 above.

Executed in Los Angeles, CA this 17th day of February, 2012

_____

Ian Foster, PhD

---

inconvenience to the parties and the Court.  I can make the summary available to the Court upon request.