# FILED UNDER SEAL

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.: 11-CIV-20427-WILLIAMS/TURNOFF

FILED by _KAL_ D.C.

MAR 0 7 2012

STEVEN M. LARIMORE
CLERK U. S. DIST. CT.
S. D. of FLA. – MIAMI

DISNEY ENTERPRISES, INC.,
TWENTIETH CENTURY FOX FILM CORPORATION,
UNIVERSAL CITY STUDIOS PRODUCTIONS LLLP,
COLUMBIA PICTURES INDUSTRIES, INC., and
WARNER BROS. ENTERTAINMENT INC.,

*Plaintiffs*,

v.

HOTFILE CORP., ANTON TITOV, and
DOES 1-10.

 *Defendants.*
_____/

HOTFILE CORP.,

          *Counterclaimant,*

v.

WARNER BROS. ENTERTAINMENT INC.,

_____*Counter-Defendant.*_____/

## MEMORANDUM OF LAW OF DEFENDANTS HOTFILE CORPORATION AND ANTON TITOV IN OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

FILED UNDER SEAL                    CASE NO.: 11-CIV-20427-WILLIAMS/TURNOFF

## **TABLE OF CONTENTS**

**Page**

PREFACE .................................................................................................................viii

CITATION LEGEND ...............................................................................................viii

I.      INTRODUCTION ...........................................................................................1

II.     FACTUAL BACKGROUND............................................................................2

      A.     Hotfile Provides A State-Of-The Art Flexible Hosting Platform...........2

      B.     Hotfile Earns Revenue From Premium Users Who Pay For Storage And
           Speed ....................................................................................................2

      C.     Like Other Internet Businesses, Hotfile Employs An Affiliate Marketing
           Program ...............................................................................................3

      D.     The Predominant Use Of Hotfile Is For Storage ...................................4

      E.     Hotfile Proactively Cooperates With Content Owners To Combat
           Copyright Infringement ........................................................................4

      F.     Files Stored At Hotfile Are Overwhelmingly Non-Infringing ...............6

      G.     Plaintiffs' Motion Relies On Hyperbole And Distortions Of The Record.............8

III.    HOTFILE IS ENTITLED TO DMCA SAFE HARBOR PROTECTION .......................10

      A.     The Trier of Fact Can Find That Hotfile Reasonably Implemented A
           Repeat Infringer Policy.........................................................................10

      B.     Hotfile Has At All Times Complied With The Designated Agent Provision .......14

      C.     Hotfile Did Not Have Knowledge Of The Files-In-Suit, And When It
           Received Notice Of Them, It Expeditiously Took Them Down...........................15

           1.     Hotfile Did Not Have "Actual Knowledge" Of The Files-In-Suit ...........15

           2.     Hotfile Did Not Have "Red-Flag" Knowledge of The Files-In-Suit.........16

           3.     Hotfile Was Not "Willfully Blind" To Specific Instances of
                Copyright Infringement ......................................................................18

           4.     Whenever Hotfile Received Notice of The Claimed Infringements
                It Expeditiously Took Down Those Links .............................................19

      D.     Inducement of Infringement Is Not An Unwritten Exception To The
           DMCA Safe Harbor.............................................................................20

26501\2979124.3

FILED UNDER SEAL                    CASE NO.: 11-CIV-20427-WILLIAMS/TURNOFF

IV.     THE STUDIOS SHOULD BE ESTOPPED FROM ASSERTING THAT
        HOTFILE'S DMCA COUNTERMEASURES WERE INADEQUATE. ........................21

V.      TRIABLE ISSUES OF FACT EXIST AS TO THE STUDIOS' SECONDARY
        INFRINGEMENT CLAIM ..................................................................................................22

        A.      The Studios Are Unable To Carry Their Burden To Prove Direct
                Infringement By Hotfile Users ...................................................................22

        B.      A Triable Issue Of Fact Exists On The Studios' Claim For Inducement .............23

                1.      The Studios' Inducement Claim Is Based On The Demonstrably
                        False Assumption That "Popular" Equals "Infringing" ...........................23

                2.      There Is No Evidence Of Intent As Required By *Grokster* ......................24

                3.      The Studios Rely On Inapposite Peer-to-Peer Case Law ..........................25

                4.      Hotfile Did Not Communicate An Inducing Message To Users...............26

                5.      The Studios' Assertion That The Affiliate Program Induces
                        Infringement Is Not Supported By The Evidence .....................................27

                6.      The Studios Cannot Otherwise Prove Inducement....................................27

        C.      Hotfile Has Substantial Noninfringing Uses .........................................................28

        D.      There Are Many Triable Issues Of Material Fact Raised By The Studios'
                Claim For Contributory Infringement .....................................................................30

        E.      There Are Triable Issues Of Material Fact As To The Studios' Claim For
                Vicarious Infringement.............................................................................................32

VI.     THE EVIDENCE DOES NOT SUPPORT PERSONAL LIABILITY AGAINST
        MR. TITOV .......................................................................................................................34

        A.      Mr. Titov Is Neither The "Guiding Spirit" Of Hotfile Nor Its "Dominant"
                And "Controlling" Influence ....................................................................................34

        B.      The Studios' Cannot Establish Personal Liability Based On Mr. Titov's
                Work For Non-Party Entities....................................................................................37

        C.      The Studios' Arguments About Mr. Titov's "Personal Participation" Are
                Similarly Misguided .................................................................................................38

VII.    CONCLUSION ..................................................................................................................40

FILED UNDER SEAL                    CASE NO.: 11-CIV-20427-WILLIAMS/TURNOFF

## TABLE OF AUTHORITIES

### FEDERAL CASES

*A&M Records v. Napster,*
   239 F.3d 1004 (9th Cir. 2001) ...............................................................passim

*ALS Scan v. RemarQ Communities,*
   239 F. 3d 619 (4th Cir. 2001) .........................................................................12

*Arista Records v. Lime Grp.,*
   784 F. Supp. 2d 398 (S.D.N.Y. 2011) ........................................................25, 26

*Arista Records v. Usenet.com,*
   633 F. Supp. 2d 124 (S.D.N.Y. 2009) .......................................................passim

*Arista Records, Inc. v. Flea World, Inc.,*
   2006 WL 842883 (D.N.J. Mar. 31, 2006) ......................................................30

*Arista v. Myxer,*
   2011 U.S. Dist. Lexis 109668 (C.D. Cal. Apr. 1, 2011)...........................passim

*Bellsouth Advertising & Publ'g. Corp, v. American Bus. Lists, Inc.,*
   1992 WL 338392 (N.D. Ga. Sept. 8, 1992)......................................................22

*Blendingwell Music, Inc. v. Moor-Law, Inc.,*
   612 F. Supp. 474 (D. Del. 1985) .....................................................................36

*BUC International Corp. v. International Yacht Council Ltd.,*
   489 F.3d 1129 (11th Cir. 2007)........................................................................32

*Capitol Records v. MP3tunes,*
   2011 WL 5104616 (S.D.N.Y.  Oct. 25, 2011).........................................15, 17, 18

*Carson v. Dynegy, Inc.,*
   344 F. 3d 446 (5th Cir. 2003) ..........................................................................21

*Chanel, Inc. v. Italian Activewear of Florida, Inc.,*
   931 F.2d 1474 (11th Cir. 1991) ...........................................................15, 23, 34

*Columbia Pictures v. Fung,*
   2009 WL 6355911 (C.D. Cal. Dec. 21, 2009)...........................................20, 25

*Corbis Corp., v. Amazon.com, Inc.,*
   351 F. Supp. 2d 1090 (W.D. Wash. 2004) .............................................10, 11, 17

*Dawes-Ordonez v. Realtor Ass'n of Greater Fort Lauderdale, Inc.,*
   2010 WL 1791754 (S.D. Fla. May 5, 2010).................................................31, 32

FILED UNDER SEAL                    CASE NO.: 11-CIV-20427-WILLIAMS/TURNOFF

*Ellison v. Robertson,*
    357 F.3d 1072 (9th Cir. 2004) ........................................................................33

*Fame Publ'g Co. v. Ala. Custom Tape, Inc.,*
    507 F.2d 667 (5th Cir. 1975) ........................................................................10

*Field v. Google Inc.,*
    412 F. Supp. 2d 1106 (D. Nev. 2006)............................................................21

*Flava Works, Inc. v. Gunter,*
    2011 WL 3205399 (N.D. Ill. July 27, 2011) ................................................12

*Gershwin Publ'g. Corp. v. Columbia Artists Management, Inc.,*
    443 F. 2d 1159 (2d Cir. 1971) ................................................................20, 23

*Hendrickson v. eBay, Inc.,*
    165 F. Supp. 2d 1082 (C.D. Cal. 2001) ........................................................14

*HGI Associates v. Wetmore Printing Co.,*
    427 F.3d 867 (11th Cir. 2005) ......................................................................22

*Home Design Servs., Inc. v. Park Square Eng'rs., Inc.,*
    2005 WL 1027370 (M.D. Fla. May 2, 2005) ................................................37

*In re Aimster Copyright Litigation,*
    334 F.3d 643 (7th Cir. 2003) ..................................................................13, 30

*Io Group, Inc. v. Veoh Networks, Inc.,*
    586 F. Supp. 2d. 1132 (N.D. Cal. 2008)........................................11, 12, 13, 19

*J2 Global Communications, Inc. v. Blue Jay, Inc.,*
    2009 WL 29905 (N.D. Cal. Jan. 5, 2009)......................................................35

*Lorentz v. Sunshine Health Prods., Inc.,*
    2010 WL 3733986 (S.D. Fl. Aug. 27, 2010) ................................................22

*Mattel, Inc. v. Robarb's, Inc.,*
    2001 WL 913894 (S.D.N.Y. Aug. 14, 2001)................................................36

*Mattel, Inc. v. Robarb's, Inc.,*
    139 F. Supp. 2d 487 (S.D.N.Y. 2001) ..........................................................36

*Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.,*
    545 U.S. 913 (2005) ..............................................................................passim

*MGM Studios v. Grokster*
    454 F. Supp. 2d 966, 989-990 (C.D. Cal. 2006)............................................25

FILED UNDER SEAL                     CASE NO.: 11-CIV-20427-WILLIAMS/TURNOFF

*Morley Music Co v. Continental, Inc.,*
    777 F. Supp. 1579 (S.D. Fla. 1991) ................................................................34, 35

*Mozingo v. Correct Manufacturing Corp.,*
    752 F.2d 168 (5th Cir. 1985) ...........................................................................35, 39

*Netbula, LLC v. Chordiant Software, Inc.,*
    2009 WL 750201 (N.D. Cal. March 20, 2009) ...............................................39, 40

*Nick-O-Val Music. Co., Inc. v. P.O.S. Radio, Inc.,*
    656 F. Supp. 826 (M.D. Fla. 1987) ........................................................................35

*Parker v. Google,*
    422 F. Supp. 2d 492 (E.D. Pa. 2006) ..............................................................39, 40

*Perfect 10, Inc. v. Amazon.com,*
    508 F.3d 1146 (9th Cir. 2007) ...........................................................22, 23, 31, 32

*Perfect 10, Inc. v. Amazon.com, Inc. et al.,*
    2009 WL 1334364 (C.D. Cal. May 12, 2009) .......................................................14

*Perfect 10, Inc. v. CCBill, LLC.,*
    488 F.3d 1102 (2007) .....................................................................10, 12, 16, 18

*Perfect 10, Inc. v. Cybernet Ventures, Inc.,*
    213 F. Supp. 2d 1146 (C.D. Cal. 2002) ................................................................13

*Perfect 10, Inc. v. Visa International Service Ass'n,*
    494 F.3d 788 (9th Cir. 2007) .................................................................................26

*Playboy Enters., Inc., v. Starware Publ'g Corp.,*
    900 F. Supp. 438 (S.D. Fla. 1995) ........................................................................36

*Realnetworks, Inc. v. DVD Copy Control Assn., Inc.,*
    641 F. Supp. 2d 913 (N. D. Cal. 2009) .................................................................29

*Recording Industry Assn. of America v. Diamond Multimedia Systems Inc.,*
    180 F.3d 1072 (9th  Cir. 1999) ..............................................................................28

*Religious Technology Ctr. v. Netcom On-Line Commc'n Servs., Inc.,*
    907 F. Supp. 1361 (N.D. Cal. 1995) .........................................................31, 33, 34

*Songmaker v. Forward of Kansas, Inc.,*
    1993 WL 106833 (D. Kan. Mar. 5, 1993) .............................................................36

*Sony BMG Music Entertainment v. Tenenbaum,*
    672 F. Supp. 2d 217 (D. Mass. 2009) ..............................................................29, 30

FILED UNDER SEAL                    CASE NO.: 11-CIV-20427-WILLIAMS/TURNOFF

*The Cartoon Network LP, LLLP v. CSC Holdings, Inc.,*
    536 F.3d 121 (2d Cir. 2008) ............................................................................30

*Tiffany (NJ) Inc. v. eBay Inc.,*
    600 F.3d 93 (2d Cir. 2010) .............................................................................17

*UMG Recordings Inc. v. Shelter Capital Partners, LLC,*
    667 F. 3d 1022 (9th Cir. 2011) ...................................................................15, 40

*UMG Recordings, Inc. v. Veoh Networks, Inc.,*
    665 F. Supp. 2d 1099 (C.D. Cal. 2009) ........................................................9, 11

*United States v. Texas,*
    507 U.S. 521 (1993) .......................................................................................10

*Viacom, Intern, Inc. v. YouTube, Inc.,*
    718 F. Supp. 2d 514 (S.D.N.Y. 2010) .................................................14, 17, 20

*Wolk v. Kodak Imaging Network, Inc.,*
    2012 WL 11270 (S.D.N.Y.  Jan. 3,  2012) ................................................passim

*Zimnicki v. Gen. Foam Plastics Corp.,*
    2010 WL 3941869 (N.D. Ill. Oct. 4, 2010) ..................................................15, 23

## FEDERAL STATUTES

37 C.F.R. §201.38(c) ........................................................................................14

17 U.S.C. §504(c) .......................................................................................20, 21

17 U.S.C. 512(b)(2)(E) ....................................................................................11

17 U.S.C. §512(c) .............................................................................10, 11, 18, 19

17 U.S.C. §512(c)(1)(A)(i) ...............................................................................15

17 U.S.C. §512(c)(1)(A)(ii) ..............................................................................16

17 U.S.C. §512(c)(1)(A)(iii) .............................................................................16

17 U.S.C. §512(c)(1)(C) ...................................................................................19

17 U.S.C. §512(c)(3) ...................................................................................15, 19

17 U.S.C. §512(c)(3)(A) ...................................................................................14

17 U.S.C. 512(c)(3)(A)(i) .................................................................................11

17 U.S.C. §512(f) .............................................................................................14

FILED UNDER SEAL                    CASE NO.: 11-CIV-20427-WILLIAMS/TURNOFF

17 U.S.C. §512(h) .................................................................................................. 12

17 U.S.C. §512(i) ...............................................................................10, 11, 18, 20

17 U.S.C. §512(m) ............................................................................................... 17

## OTHER AUTHORITIES

Nimmer on Copyright ................................................................................10, 11, 31

United States Senate Report, *The Digital Millennium Copyright Act of 1998* (May 11, 1998) ..................................................................................................passim

## PREFACE

Plaintiffs assert in their prefatory section, "Table Of Citation Form," that "section headings" and "subsidiary paragraphs" are *not* claimed to be "[u]ncontroverted material facts," but rather that only consecutively numbered paragraphs (using numerals 1, 2, 3, etc.) are asserted "[u]ncontroverted material facts." Therefore, Hotfile provides evidence only to controvert Plaintiffs' substantive assertions – including Plaintiffs' "subsidiary paragraphs." To be clear, Hotfile disputes the assertions set forth in Plaintiffs' section headings (introduced by capital Roman numerals and capital letters as well as unsupported numerical headings), which simply state argument without any factual support or citations to the record whatsoever. Hotfile disputes each of Plaintiffs' characterizations set forth in these headings (including the assertion that "subsidiary paragraphs" do not provide "material" facts).

Regarding the format of Defendants' instant Responses To Plaintiffs' Statement Of Uncontroverted Facts ("DRSF"), Defendants note that they have previously moved to strike rebuttal testimony from Dr. Richard Waterman, Dkt. 217, and are contemporaneously moving to strike "evidence" submitted by Plaintiffs' outside counsel, Jennifer Yeh. Where Plaintiffs' "[u]ncontroverted material facts" refer to this purported evidence, Defendants have noted their objection and motion to strike using the following legend:

A.     an asterisk (*) indicates reliance on testimony in or exhibits to the Yeh Declaration which are subject to a separate motion to strike;

B.     a cross (†) indicates reliance on statements, testimony, and other materials which rely on the inadmissible report and faulty analysis of Dr. Waterman, which is also subject to a separate motion to strike.

## CITATION LEGEND

1.     "PSUF" shall refer to specific paragraph numbers of Plaintiffs' Statement of Uncontroverted Facts.

2.     "DSUF" shall refer to specific paragraph numbers of Statement of Undisputed Material Facts In Support of Motion of Defendants Hotfile Corporation for Partial Summary Judgment Based on the Digital Millennium Copyright Act Safe Harbor.

3.     "TSUF" shall refer to specific paragraph numbers of Statement of Undisputed Material Facts In Support of Motion of Anton Titov's Motion for Summary Judgment.

FILED UNDER SEAL                    CASE NO.: 11-CIV-20427-WILLIAMS/TURNOFF

    4.      "DRSF" shall refer to specific paragraph numbers of the Statement of Facts of Defendants Hotfile Corporation and Anton Titov In Opposition to Plaintiffs' Statement of Uncontroverted Facts and Defendants' Statement of Additional Material Facts.

    5.      "Foster Decl." shall refer to the declaration of Dr. Ian Foster in support of Plaintiffs' Motion for Summary Judgment Against Defendants Hotfile Corp. and Anton Titov, dated February 17, 2012.

    6.      "Yeh Decl." shall refer to the declaration of Jennifer V. Yeh in support of Plaintiffs' Motion for Summary Judgment Against Defendants Hotfile Corp. and Anton Titov, dated February 17, 2012.

    7.      "Titov Decl." shall refer to the declaration of Anton Titov in support of Defendants' Motion for Summary Judgment.

    8.      "Titov Opp. Decl." shall refer to the declaration of Anton Titov in support of Defendants' Opposition to Plaintiffs' Motion for Summary Judgment.

    9.      "Leibnitz Decl." shall refer to the declaration of Andrew Leibnitz in support of Defendants' Opposition to Plaintiffs' Motion for Summary Judgment.

    10.      "Gupta Decl." shall refer to the declaration of Deepak Gupta in support of Defendants' Motion for Summary Judgment.

    11.      "Schoenberg Decl." shall refer to the declaration of Anthony Schoenberg in support of Anton Titov's Motion for Summary Judgment.

    12.      "Levy Decl." shall refer to the declaration of Dr. Daniel S. Levy in support of Defendant's Opposition to Plaintiffs' Motion for Summary Judgment.

    13.      "Cromarty Decl." shall refer to the declaration of Dr. Andrew Cromarty in support of Defendant's Opposition to Plaintiffs' Motion for Summary Judgment.

    14.      "Boyle Decl." shall refer to the declaration of Dr. James Boyle in support of Defendant's Opposition to Plaintiffs' Motion for Summary Judgment.

    15.      "Leibnitz Ex. __," shall refer to exhibits attached to the Leibnitz Declaration.

    16.      "Yeh Ex. __," shall refer to exhibits attached to the Yeh Declaration.

    17.      "Gupta Ex. __," shall refer to exhibits attached to the Gupta Declaration.

    18.      "Schoenberg Ex. __," shall refer to exhibits attached to the Schoenberg Declaration.

    19.      "Boyle Ex. __," shall refer to exhibits attached to the Boyle Declaration.

FILED UNDER SEAL                    CASE NO.: 11-CIV-20427-WILLIAMS/TURNOFF

## I. **INTRODUCTION**

In the end, Plaintiffs' (the "Studios") case has returned to where it started—with only allegations and innuendo—not evidence.  Before receiving any discovery, Plaintiffs' counsel represented to the Court that the facts "will show the overwhelming use of [Hotfile's] service is to engage in infringement."  He confidently predicted that, just as "[i]n past cases similar" statistical analysis will show that "85, 90, 95 percent of the uses of site are for copyright infringement."  Leibnitz Ex. 9 at 5:19-6:3.  Discovery is now complete.  The facts have disproved Plaintiffs' theory.

- Hotfile.com is used principally for storage; of all files ever uploaded to Hotfile.com, more than 56% have never—not once—been downloaded.

- The most "popular" links on Hotfile are non-infringing open source software authorized by their creators for free distribution as a part of Hotfile's Affiliate Program.

- None—not one—of the 100 most downloaded files contain any materials for which the Studios claim they own copyright protection.

- Users are more likely to purchase Premium subscriptions (Hotfile's sole revenue) following downloads of noninfringing works than of works that allegedly infringe copyrights.

- Hotfile has taken powerful countermeasures against infringement since day one, which the Studios consistently commended prior to their filing of this Complaint.

Ignoring these facts, Plaintiffs rely on biased opinions and misleading statistics.  They hired the same partisan experts they used in previous cases and, through a series of convoluted statistical manipulations, produced the predicted number—90% of files supposedly infringe on someone's copyright.  To arrive at this preordained figure, they had to limit their purported analysis to less than one month of data, ignored more than half of the files on Hotfile, and engaged in other cynical manipulations and statistical improprieties that render their numbers meaningless.  As we show below, the facts cannot support these opinions.

The facts – the unmanipulated data in Hotfile's database – does not help Plaintiffs.  It shows that the overwhelming use of Hotfile is not for infringement, and, consistent with the DMCA, Hotfile has acted diligently to deter infringement.  Plaintiffs ask the Court to find copyright infringement as a matter of law based on statistical trickery, not undisputed material facts.

FILED UNDER SEAL                          CASE NO.: 11-CIV-20427-WILLIAMS/TURNOFF

Similarly, the Studios have come up entirely empty in their effort to find any proof for their claim against Mr. Titov personally. Indeed, the allegations upon which they based that claim have all proven to be false. Consequently, the Studios have conjured up a new theory that Mr. Titov's work for two non-party entities creates personal liability for the alleged conduct of Hotfile. There is no basis in the facts or law for this misguided concept.

Plaintiffs motion should be denied.

## II.  FACTUAL BACKGROUND

**A.     Hotfile Provides A State-Of-The Art Flexible Hosting Platform.**

Hotfile hosts files on the internet. Titov Decl. ¶ 2. Users may employ Hotfile's web technology to store electronic data of any kind, including documents, spreadsheets, presentations, photographs, home movies, sound recordings, software, or any other kind of electronic file. *Id.*

Entrepreneur Rumen Stoyanov of Sofia, Bulgaria conceived of Hotfile in 2008. Leibnitz Ex. 1 (Stoyanov Dep.) at 18:23-19:5. He sought to create a business whereby users could store files online ("in the cloud") without purchasing additional computer components, and where friends and colleagues could share large files without resorting to surface mail or multipart e-mails. *Id.* at 19:6-18. Pooling capital with his business partner, Atanas Vangelov, the pair sought out a former employee named Anton Titov to write the computer code underlying Hotfile's storage and delivery technology. Leibnitz Ex. 2 (Titov Dep.) at 100:7-101:4; Leibnitz Ex. 3 (Vangelov Dep.) at 27:23-28:14, 41:1-22, 122:24-123:22. Founding Hotfile as a venture owned in two equal 40% parts by Messrs. Stoyanov and Vangelov, and 20% by Mr. Titov, Hotfile began operations on February 19, 2009. Leibnitz Ex. 3 (Vangelov Dep.) at 163:25-164:16; Leibnitz Ex. 2 (Titov Dep.) at 16:16-18.[1]

**B.     Hotfile Earns Revenue From Premium Users Who Pay For Storage And Speed.**

Hotfile has a "freemium" business model. Titov Decl. ¶ 7. It earns revenue solely by selling premium memberships. Titov Opp. Decl. ¶ 6. While any user may store files at Hotfile for ninety days at no charge, premium users store their files indefinitely. *Id.*; Yeh. Ex. 59 ("Your files will be stored forever as long as you are a premium member."). Premium users also enjoy faster download speeds and shorter waiting periods before downloads. Titov Opp. Decl. ¶ 6.

Over half of the files uploaded to Hotfile are never downloaded. Titov Opp. Decl. ¶ 4.

---

[1] On the recommendation of their tax advisors, they incorporated Hotfile in Panama.

FILED UNDER SEAL                        CASE NO.: 11-CIV-20427-WILLIAMS/TURNOFF

Information stored on Hotfile remains private unless shared by the uploading user.  Titov Decl ¶ 3.  Even Hotfile personnel do not access users' uploaded files out of respect for user privacy. DRSF 26.  However, users may also share the web link or "URL" to an uploaded file with friends, family, or online communities.  Titov Decl. ¶ 4.

The most popular files shared on Hotfile are "open source" software programs created to be freely copied, improved, and distributed on the internet.  DRSF 28.  Because it is open to all, Hotfile provides a platform to populations not previously heard in the mainstream outlets run by Plaintiffs: for example, on January 11, 2011, protesters participating in the Arab Spring uploaded a video to Hotfile of police abuses in Kasserine, Tunisia, exemplifying the role of cyberlockers in society's reform.  Boyle Ex. 2 (Boyle Rebuttal Report) at ¶ 7.

## C.      Like Other Internet Businesses, Hotfile Employs An Affiliate Marketing Program.

To attract traffic in its first years of operation, Hotfile paid for referrals to its website in the same manner as many (if not most) successful internet businesses, including Amazon, eBay, Yahoo, Walmart, Netflix, Shutterfly, and thousands of others.  Cromarty Rep. ¶ 143; Cromarty Decl. ¶¶ 69-73.  Employing this "refer-a-friend" model commonly known as "affiliate marketing," Hotfile paid its registered users between $0.002 and $0.015 (*i.e.*, $^1/_5$ - $^3/_2$ ¢) for each download referred, depending on the size of the downloaded file, the server resources consumed, and the number of downloaders who subsequently purchase premium memberships.  Yeh Ex. 57. Today, Hotfile pays a referral fee only when a new user purchases a premium membership. Titov Opp. Decl. ¶ 7.

As explained by Professor James Boyle of Duke Law School, affiliate programs such as that used by Hotfile reward and incentivize the previously-unrecognized creators of popular and useful works, allowing authors of copyrighted works to upload their content and be paid for its distribution on the Internet.  Boyle Decl. ¶ 8.iv.  Such programs "are important to the future of distributed creativity" – and thus important to the future of productivity itself.  Boyle Ex. 1 (Boyle Expert Report) ¶¶ 16, 20, 21, 37).

Prior to 2012, Hotfile also paid website owners a 5% commission on sales of premium memberships to users referred by those websites.  Yeh Ex. 1 (Titov Dep.) at 665:15-24.  Paying commissions for referrals is not a new or nefarious concept designed by Hotfile to promote infringement.  The sites referring the most users to Hotfile include Google, Facebook, and YouTube – hardly "pirate link sites" as decried by Plaintiffs.  DRSF 29.

FILED UNDER SEAL                    CASE NO.: 11-CIV-20427-WILLIAMS/TURNOFF

**D.    The Predominant Use Of Hotfile Is For Storage**

Storage is the predominant use of Hotfile.  DRSF 24.  While Plaintiffs assert that Hotfile's marketing of its premium service focuses exclusively on the benefits of enhanced downloading, Mot. at 8, Hotfile's website repeatedly emphasizes the storage benefits of the premium membership.  *E.g.*, Yeh Ex. 59 ("Your files will be stored forever as long as you are a premium member."); (touting Hotfile's "[b]ackup for all uploads so files are never lost.").  While Hotfile deletes files after 90 days absent purchase of a premium membership, Plaintiffs cannot realistically suggest that Hotfile should give away an endless supply of the commodity – storage – that it is seeking to sell.  Titov Decl. ¶ 3.[2]

**E.    Hotfile Proactively Cooperates With Content Owners To Combat Copyright Infringement**

Hotfile has every reason to fight infringement.  Its business model relies on the DMCA to avoid the risk of ruinous litigation costs imposed by litigious content owners.  Files identified by Plaintiffs' expert as non-infringing drove sales to Hotfile at a rate more than five times the rate of sales resulting from Plaintiffs' works-in-suit – making it counterproductive for Hotfile to support infringement.  Boyle Ex. 2 (Boyle Rebuttal Report) at ¶ 53.

Hotfile Forbids Infringement.  Hotfile expressly forbids the uploading or downloading of copyrighted works without authorization.  Titov Decl. ¶ 3.  Each new user must explicitly agree not to upload, store, or share content to which the user does not have permission.  *Id.*

Hotfile Expeditiously Removes Any Allegedly-Infringing Content.  From its launch, Hotfile has invited content owners to report alleged copyright infringement to Hotfile for immediate action.  DSUF 4, 6.  Hotfile diligently processes takedown notices from copyright holders within 48 hours.  DSUF 17.  It began receiving and processing takedown notices from Plaintiffs in May 2009, within a few months of its launch.  Titov Decl. ¶ 14.  Of the 123 million files uploaded to Hotfile since it began operations in February 2009, Hotfile has taken down 5.4 million files – 4% of total files – in response to takedown notices.  Titov Opp. Decl. ¶ 26.

SRAs.  ***Hotfile provides content owners such as each of the Plaintiffs with the free and***

---

[2] Plaintiffs highlight Hotfile's statement on an early iteration of its website, "Upload files only if you inten[d] to promote them."  Mot. at 8; *see also* id. (encouraging "good promoters").  Plaintiffs ignore the topic being addressed:  tips for affiliates to increase their earnings.  Yeh Ex. 59.  Statements by Hotfile to its advertising partners who comprise approximately one-half of one percent (0.53%) of Hotfile's user base in no way changes the fact that the remainder of users primarily employ Hotfile for storage.  Titov Opp. Decl. ¶ 24.

FILED UNDER SEAL                    CASE NO.: 11-CIV-20427-WILLIAMS/TURNOFF

*unlimited ability to directly "take down" or disable access to any file on Hotfile without any*
*oversight whatsoever.* Titov Decl. ¶¶ 20-21. Content owners with "Special Rightsholder
Accounts" or "SRAs" have an unfettered ability to takedown files from Hotfile.com. They attest
to their rights to files, and the files are automatically deleted. *Id.* Since Hotfile began in
February 2009, slightly less than 3 million files – just under 3% of total files – have been taken
down by SRAs. Titov Opp. Decl. at ¶ 26.

        Since Hotfile began offering SRAs in the summer of 2009, Plaintiffs and their agents
consistently praised Hotfile's efforts to combat copyright infringement. Warner hailed the SRA
concept as "ideal." Titov Decl. ¶ 22. Plaintiffs repeatedly lauded Hotfile's responsiveness,
cooperativeness, and steadfastness. DSUF 11 ("we appreciate your fast response"; "we will
inform our clients of Hotfile.com's commitment to copyright compliance at the first
opportunity"; "thank you as always for your fast cooperation"). Plaintiffs even upheld Hotfile's
practices as exemplary in discussions with another hosting site. DSUF 12. Nonetheless, without
first expressing any concern, on February 8, 2011, Plaintiffs sued Hotfile, revealing that they had
actually been preparing their Complaint for "well over a year." Compl. ¶ 37.

        Through Hash-Blocking, Hotfile Blocks Uploads Of Previously-Noticed Files. Hotfile
does not store multiple copies of identical files (*i.e.*, files with identical "hashes") on its servers.
Leibnitz Ex. 2 (Titov Dep.) at 337:4-21, 338:22-339:11. If two users upload the same file and
receive two URLs, only one "master" file is kept, thus conserving storage resources. *Id.*
Originally, when Hotfile received a takedown notice, it disabled that URL. *Id.* at 339:20 -
340:13. This permitted one user to undertake non-infringing uses of her copyrighted files stored
on Hotfile while preventing others from infringing the same master file. *Id.*; Leibnitz Ex. 5
(Cromarty Dep.) at 237:15-243:7. Nonetheless, in an abundance of caution in August 2009,
Hotfile unilaterally took the additional step of disabling any master file subject to a takedown
(so-called "hash blocking"), thereby preventing any future uploading or downloading of a
disabled file. Titov Decl. ¶ 27.[3]

        Hotfile Terminates Repeat Infringers. Hotfile terminates the account of any registered
user accused on more than twice by content owners of uploading copyrighted works without

---

[3] Plaintiffs seek to condemn Hotfile for not implementing hash-blocking from the outset. Mot. at
13-14. However, the DMCA nowhere requires hash-blocking. In any event, Hotfile
implemented hash blocking within six months and before over 98.6% of its takedown notices
issued. Titov Opp. Decl. ¶ 48.

FILED UNDER SEAL                    CASE NO.: 11-CIV-20427-WILLIAMS/TURNOFF

permission (*i.e.*, Hotfile's "three strikes" policy). Titov Decl. ¶¶ 32-33. Plaintiffs assert that Hotfile should have terminated 34,741 users for receiving repeated allegations of infringement, Foster Decl. ¶ 61 & Ex. H, and Hotfile in fact terminated 22,447 of its users – meaning that, *using Plaintiffs' own numbers, Hotfile has terminated two-thirds of the repeat infringers that even the most zealous advocates could conjure.* Foster Ex. G at 26. The total number of users which Hotfile supposedly should have terminated amount to less than two-thirds of one percent (0.66%) of Hotfile's users, as opposed to the 0.42% actually suspended. Titov Opp. Decl. ¶ 33.[4]

Hotfile Employs State-Of-The-Art Digital Fingerprinting Technology. Within months of the filing of this litigation – at which point without any warning Plaintiffs reversed years of praise for Hotfile's counter-infringement efforts – Hotfile implemented state-of-the-art digital fingerprinting technology from Vobile, Inc. ("Vobile"). DRSF 40. Hotfile thus became one of only a handful of cyberlockers to implement digital fingerprinting. Leibnitz Ex. 18 (Wang Dep.) at 68:25-69:5.

Plaintiffs themselves both use and publicly recommend Vobile technology, contributing $250,000 to Vobile's revenues each month. *Id.* at 105:23-107:22. Indeed, just months before Hotfile upgraded from Vobile's "MediaWise" technology to Vobile's "vCloud9" technology – a solution specifically designed for cyberlockers that did not even exist until six months ago – Plaintiffs offered the following praise: "vCloud9 offers an important new tool for website operators offering *legitimate Cloud-based storage services* to be able to discover unauthorized content online and *ensure copyright compliance.*" *Id.* at 50:1-25; Gupta Ex. 19; Gupta Ex. 20 (Suh Dep.) at 236:1-19. Before vCloud9, effective fingerprinting technology was not available to cyberlockers such as Hotfile. Leibnitz Ex. 18 (Wang Dep.) at 56:16-25; Cromarty Decl. ¶¶ 91-96.

**F.    Files Stored At Hotfile Are Overwhelmingly Non-Infringing.**

Plaintiffs have no basis to claim that "popular" works presumptively infringe. Mot. at 5. Fifteen of the twenty-five most downloaded files on Hotfile are open source software programs, which even Plaintiffs' expert regarded as non-infringing until recognizing the damage done to Plaintiffs' case. Boyle Ex. 1 (Boyle Expert Report) ¶¶ 9i; 17-23; 34; Boyle Decl. n. 3; Gupta

---

[4] Plaintiffs complain that they cannot identify repeat infringers themselves, despite their vast resources. Mot. at 10, n.5. However, Plaintiffs elsewhere purport to identify dozens of "facially pirate" link sites supposedly trafficking in hundreds of copyrighted studio works. Mot. at 7; Yeh Ex. 43. Plaintiffs could have identified the operator of any of the "pirate" websites.

FILED UNDER SEAL                    CASE NO.: 11-CIV-20427-WILLIAMS/TURNOFF

Ex. 5 (Zebrak Dep.) at 62:5-24, 98:20-99:7 (iReb and Jdownloader noninfringing); Leibnitz Ex.
6; *See* Partial SJ Mot. at 3-5. Six open source programs alone accounted for more than 1.7
million of Hotfile's downloads. Boyle Decl. ¶ 8i. State-of-the-art digital fingerprinting
technology (vCloud9) identifies no matches for possible infringement among Hotfile's 100 most
frequently downloads. Titov Opp. Decl. ¶ 17. None of those top 100 files are Plaintiffs' works.
Leibnitz Exs. 7, 8.

Since inception, Hotfile has received notices of alleged infringement either through
DMCA notices or SRA accounts for 8,330,465 of its 123,344,533 files – or 6.8% of its files.
Titov Opp. Decl. ¶ 26. Since last June, Vobile's digital fingerprinting technology has indicated
that 134,785 of 1,825,993 uploads matched unauthorized content, returning an alleged
infringement rate of 3.4%. DRSF 40.

Nonetheless, Plaintiffs assert that "over 90% of the download activity from the Hotfile
website is copyright infringing," citing a purported statistical analysis by their expert, Dr.
Richard Waterman. Mot. at 9. This is false. Dr. Waterman has conceded that his figure applied
only to January 2011, and that the infringement rate at Hotfile "could be zero" for the remaining
thirty-five months of Hotfile's thirty-six month existence. Leibnitz Ex. 37 (Waterman Dep.) at
83:8-85:10, 85:12-18, 86:18-21, 87:7-20, 88:17-90:3. Dr. Waterman excluded from his study
over 56% of Hotfile's files – *i.e.*, files never downloaded – even though Plaintiffs' counsel
promised this Court at the outset of the case that over 90% of Hotfile's "uses" (*not* "downloads")
would infringe. Levy Decl. ¶¶ 36-38; Leibnitz Ex. 9 at 5:19-6:3. Dr. Waterman also bizarrely
omitted from his study whole populations of downloads that strip his study of any claim to
representativeness of downloads in general. *See* Levy Decl. at ¶ 33 (discussing Dr. Waterman's
omission of: downloads of files uploaded by anonymous users; downloads using Hotfile's
"hotlink" technology; downloads by premium users completed within fifteen minutes of each
other; downloads by free users numbering more than ten in a day; and downloads by free users in
134 of the world's 188 nations, while contradictorily including downloads by Hotfile's premium
users worldwide). In short, Dr. Waterman's opinion lacks any scientific validity at all. *Id.* At
most, it raises myriad triable issues of fact.

Plaintiffs then build on the statistical manipulation by relying upon Dr. Waterman's
statistical sample to assert that "nearly all Hotfile *uploaders* are copyright infringers." Yeh Ex.
112 ("98.7% of uploaders are copyright infringers") (emph. added). While flawed for all of the

FILED UNDER SEAL                    CASE NO.: 11-CIV-20427-WILLIAMS/TURNOFF

reasons just mentioned regarding Dr. Waterman's analysis, Plaintiffs' assertion regarding "all Hotfile uploaders" reflects singular temerity in that *Dr. Waterman's study excluded uploaders of over half of the files stored on Hotfile*. Levy Decl. ¶ 37.

 Plaintiffs also argue that Hotfile has taken down "almost 50% of all files ever uploaded" and "almost 70% of all files ever downloaded" solely "for reasons related to infringement." Mot. at 9 (citing Foster Rep. ¶ 63). The more relevant statistics are, thanks to Hotfile's ambitious measures to combat infringement such as hash-blocking and SRAs, that Hotfile has disabled 20.7% of files uploaded and 29.6% of files downloaded. Foster Decl. ¶ 63. This is exactly what cyberlockers are supposed to do under the DMCA. Plaintiffs more than double the numbers attributable to "infringement" by including *all* files (not just the handful accused of infringing) in a user's account who was terminated for repeat infringement. Foster Decl. ¶ 62. No evidence exists that even one of those millions of other files infringed any copyright.

**G. Plaintiffs' Motion Relies On Hyperbole And Distortions Of The Record.**

 <u>Hotfile Personnel Did Not Download Infringing Content</u>. *See* Mot. at 15; DRSF 10.b. Plaintiffs failed to ascertain whether these files were actually ever downloaded. Titov Opp. Decl. ¶ 52; Yeh Decl. ¶ 30.

 <u>Hotfile Did Not Receive Notice That One Of Its Users Had Seen Her Files Blocked From Transfer To RapidShare Due To Infringement</u>. *See* Mot. at 16; DRSF 10.g. The user's files were blocked because they were *empty* – a reason having nothing to do with copyright infringement. *Id*.

 <u>Hotfile Was Not Forced To Terminate "Almost All" Of Its Top Affiliates And Tens Of Thousands Of Its Uploaders</u>. Mot. at 12. Hotfile only terminated 4% of its known uploaders, and 22,447 (or 0.42%) of its users. DRSF 5.b; Titov Opp. Decl. ¶ 37.

 <u>Hotfile Personnel Did Not Use Web Postings To Invite Uploading Of Infringing Content</u>. Mot at 12. Even if unauthenticated web postings are admissible – which they are not – Mr. Ianakov's alleged postings sought content, not infringing content. DRSF 10.a.vii, 10.b.ii; Yeh Ex. 60; *see* Titov Opp. Decl. ¶¶ 42-43 (setting forth Plaintiffs' additional mischaracterizations).

 <u>Defendants Never Helped Users Infringe</u>. Of Hotfile's 701,116 emails, Plaintiffs attach eighty-one emails from users (0.01%) to demonstrate notice of infringement. Mot. at 13; Yeh Exs. 28, 30; DRSF 9.c Sixty-six of those received no apparent response from Hotfile. Titov Opp. Decl. ¶ 45. Of the three cited e-mails that did not receive a form response, no reason

FILED UNDER SEAL                    CASE NO.: 11-CIV-20427-WILLIAMS/TURNOFF

existed for Hotfile's Bulgarian contractor to perceive any infringement from URLs such as http://hotfile.com/dl/15607024/ 74dafec/SolidWorks_2010r.part03.rar. *Id.*

    <u>Defendants Never Viewed Hotfile As "The Flagship Of Unlicensed Content."</u>  In July 2010, Hotfile's founder Rumen Stoyanov reacted to a competitor's (RapidShare's) scaled-back operations with "***concern***" that litigious content owners like the Plaintiffs would view Hotfile as "the flagship of non-licensed content" – even though Hotfile "always believed" in the propriety of its enterprise. DRSF 10.h.; Leibnitz Ex. 1 (Stoyanov Dep.) at 81:8-83:11.

    <u>Hotfile Did Not Restore The Affiliate Status Of A Website Operator Despite "Blatant Piracy" On His Home Page</u>. Mot at 7; DRSF 10.d.i.  As evidenced in the cited email, Hotfile did ***not*** navigate to the operator's homepage in confirming ownership of the site.  Titov Opp. Decl. ¶ 21.  Unlike Plaintiffs – who could have alerted Hotfile to what they now term "blatant piracy" – Hotfile lacks resources to investigate every one of its users' backgrounds.

    <u>Hotfile's Referring Websites Were Not "Facially Pirate" Sites</u>.  DRSF 10.d.iii.  Plaintiffs make this assessment based on screenshots and "their names alone," and in any event, point to just 0.003% of Hotfile's referring websites. Mot. at 7.  This is the very definition of prejudgment.  In any event, no reason exists why Plaintiffs could not have used their indefatigable resources and unrestricted ability through SRAs to take down every single infringing link or request that Hotfile terminate these users. *See* Titov Opp. Decl. ¶ 20-23 (cataloguing other errors in Plaintiffs' attacks on Hotfile's referring websites).

    <u>Defendants Did Not Use Copyrighted Content To Illustrate How To Use Hotfile</u>.  Mot. at 15.  The URL identified by Plaintiffs as infringing –  http://hotfile.com/dl/182987/c2d67b8/ PCD.DollDomination.2009.rar.html (Yeh Ex. 44) – is not, and never has been, a "download link for the Pussycat Dolls' popular album 'Doll Domination.'" Titov Opp. Decl. ¶ 50.  Even if it were, the Pussycat Dolls are known to authorize their work for online distribution. *UMG Recordings, Inc. v. Veoh Networks, Inc.*, 665 F. Supp. 2d 1099, 1110 n.13 (C.D. Cal. 2009); *see* Titov Opp. Decl. ¶ 51-52 (setting forth other errors in Plaintiffs' assertions regarding use of "copyrighted" content).

    <u>Technical Features Of Hotfile Are Appropriate</u>.  Hotfile permits uploaders to obtain several URLs for every upload so that the uploader can track downloads by different population segments (*e.g.*, how many times downloaders accessed one's photo album from Facebook as opposed to Twitter).  DRSF 9.a.iv.; Titov Opp. Decl. ¶ 49.  No evidence exists that it propagated

infringement. *Id.* Moreover, Hotfile does not permit searching of files stored on its servers because such functionality is antithetical to Hotfile's purpose of providing private storage. DRSF 11.b.i. Plaintiffs have no support for their assertion that Hotfile "subcontracted" search to "link sites" by citing websites which have not even appeared amongst the top 500 sites providing traffic to Hotfile in the past year. Hotfile decided a search function was not consistent with its users' privacy. DRSF 11.b.i.

### III.   HOTFILE IS ENTITLED TO DMCA SAFE HARBOR PROTECTION

The Studios' request for summary judgment that the DMCA safe harbor does not apply should be denied. The DMCA, 17 U.S.C. § 512(c), offers a safe harbor from copyright damages arising "by reason of storage at the direction of users of material" on a system or network so long as the service provider satisfies the statutory prerequisites.[5] As set forth below, Hotfile is entitled to a trial on its DMCA safe harbor affirmative defense.[6]

### A.    The Trier of Fact Can Find That Hotfile Reasonably Implemented A Repeat Infringer Policy.

The DMCA requires that a service provider "adopt[] and reasonably implement[]…a policy that provides for the termination in appropriate circumstances of subscribers and account holders of the service provider's system or network who are repeat infringers." 17 U.S.C. § 512(i). "The statute permits service providers to implement a variety of procedures" for a repeat infringer policy *Perfect 10, Inc. v. CCBill, LLC.,* 488 F.3d 1102, 1109 (2007). "Given the complexities inherent in identifying and defining online copyright infringement, § 512(i) does not require a service provider to decide, *ex ante,* the specific types of conduct that will merit restricting access to its services." *Corbis Corp., v. Amazon.com, Inc.* 351 F. Supp. 2d 1090, 1101-2 (W.D. Wash. 2004); Nimmer § 12B.10[A][1] (provision "amorphous").

---

[5] The Studios rightly concede a triable issue on whether Hotfile received a direct financial benefit from infringement that they had the "right and ability to control," perhaps because of irrefutable data that Hotfile obtained proportionately more premium conversions from content that the Studios concede is non-infringing than content they have confirmed is theirs. DRSF 32.

[6] The Studios' invitation to read the DMCA safe harbor "narrowly" is inapposite. *United States v. Texas,* 507 U.S. 521, 529 (1993), a Federal debt collection case, accepts that where a statute "speaks directly" to extant law (which Congress in the DMCA did) the law must cede. *Fame Publ'g Co. v. Ala. Custom Tape, Inc.,* 507 F.2d 667 (5th Cir. 1975), did not broadly proclaim that all exceptions to liability must be construed narrowly. *Id.* at 669-70. Moreover, that case involved an exception to statute while the "safe harbor" here provides protection from judge made doctrines of secondary liability.

FILED UNDER SEAL                       CASE NO.: 11-CIV-20427-WILLIAMS/TURNOFF

Hotfile's policy has at all times been reasonable and appropriate in light of, (a) the inherent flexibility of the repeat infringer requirement under the DMCA, (b) the fact that the statute does not mandate strike-counting and, indeed, counsels against it, (c) the efficacy of Hotfile's policy and powerful countermeasures, and (d) that the Studios themselves defined and continually approved of these countermeasures.

Hotfile's repeat infringer policy from February 2009 to February 2011 was to terminate users who Hotfile learned were blatant repeat infringers, such as when they were identified to Hotfile by copyright owners in a manner that reasonably confirmed infringement. Under that policy, Hotfile documented over 40 such terminations, and more terminations were made but undocumented in its early days. Consistent with its efforts to improve its DMCA policies, after the Complaint was filed, Hotfile implemented a "strikes-based" termination policy. Titov Decl. ¶¶ 32-33.

Hotfile's delay in implementing a strikes-based policy was reasonable. It is well-settled that "section 512(i) does not require service providers to track users in a particular way." *Io Group, Inc. v. Veoh Networks, Inc.*, 586 F. Supp. 2d. 1132, 1145 (N.D. Cal. 2008). The statute itself suggests that because strikes are mere allegations, blindly counting them would be a mistake. The leading commentator explains:

> When Congress wished to refer to individuals who were proven infringers, it knew how to do so. It routinely prefaced references to others as '*alleged* infringers' or '*claimed* infringers.' *See e.g.*, 17 U.S.C. 512(b)(2)(E), 512(c)(3)(A)(i). In the current context [of § 512(i)], by contrast, Congress used the term 'repeat *infringers'* without any such qualification. The meaning unmistakably denoted is those against whom infringement has been *established*, not against whom it is merely *alleged*.

Nimmer on Copyright at 12B-109 (emph. added). *See Corbis*, 351 F. Supp. 2d at 1105; *UMG*, 665 F. Supp. 2d at 1117 ("actual knowledge of blatant, repeat infringement cannot be imputed merely from the receipt of notices of infringement.")[7] Mere notices of *claimed* infringement under 17 U.S.C. § 512(c) do not impart knowledge of a repeat *infringer*. A strikes-based policy is not – as a matter of law – required to satisfy 17 U.S.C. § 512(i). Counter-defendant Warner's

---

[7] The Studios' statistics as to the harm from Hotfile not having a strikes-based policy are greatly exaggerated. All five Plaintiff studios can confirm only 9% infringement of their works according to their own (flawed) study. *Arista v. Myxer*, No. CV 08-03935 GAF (JCx), 2011 U.S. Dist. Lexis 109668, (C.D. Cal. Apr. 1, 2011) distinguished cases like *Grokster* and *Fung*, because "[a] much smaller percentage of files on Myxer's Website, less than 25%, is arguably owned by Plaintiff." *Myxer*, at n. 23. Leibnitz Ex. 15.

FILED UNDER SEAL                     CASE NO.: 11-CIV-20427-WILLIAMS/TURNOFF

systematic campaign (discussed in Hotfile's counterclaim) of sending incorrect takedown notices
provides an unfortunate but apt illustration of the danger of over-reliance on takedown notices.
A large proportion of the notices received by Hotfile did not have the statement of penalty under
perjury or statement of "good faith" required by the DMCA. Titov Opp. Decl. ¶ 29. False
takedown notices are an Internet-wide problem. Cromarty Decl. ¶ 106; *See CCBill* at 1113. The
Studios contend that a "failure to keep records of identified infringers, without more, *calls into
question* [a] service provider's implementation of a repeat infringer policy." (Mot. at 20 (emph.
added).) *CCBill* confirms that not counting strikes can, at most, create *a genuine issue of
material fact*. *CCBill* 488 F.3d 1102, 1110 (emph. added).[8]

Hotfile's pre-Complaint policy was reasonable because content owners bear the burden
of investigation, and the repeat infringer provision is not intended to "undermine the knowledge
standard [] by suggesting that a provider must investigate possible infringements, monitor its
service, or make difficult judgments as to whether conduct is or is not infringing." *See* S. Rep. at
52; *CCBill*, 488 F.3d at 1111-1113. Indeed, the DMCA gives *content owners* a special subpoena
power to "identify repeat infringers." 17 U.S.C. § 512(h). The next step would be to seek a
user's termination under §512(i).[9] Hotfile's policy accorded with the not uncommon industry
practice of content owners identifying repeat infringers and requesting their termination.[10] *See,*

---

[8] The Studios' email evidence also confirms the existence of a fact question. One such email
was purely internal (thus, not "maintained publicly") and, in any event, shows that Hotfile was
proactively working to combat infringement. DRSF 4.b; Yeh Exs. 10, 12. The other email
merely shows a Hotfile contractor referencing the three-strikes policy not long before Hotfile
adopted it. DRSF 4.b.; Yeh Ex. 11.

[9] Plaintiffs assert that "repeat infringers" accounted for over half of all files ever uploaded to
Hotfile and more than 75% of all downloads – blindly assuming that all must have been
infringing. When Hotfile terminated these users, it took down not just the 67,341 files subject to
takedown notices, but the millions of other files these individuals had posted that had never been
identified as allegedly infringing. Titov Opp. Decl. ¶ 38. Despite Plaintiffs' protestation that
"repeat infringers" uploaded more than half of Hotfile's files, there is no evidence that 99.9%
(67,341 / 61,066,769) of these uploads infringed any copyright. Foster Decl. ¶ 52, Ex. G at 26.

[10] *ALS Scan v. RemarQ Communities*, 239 F. 3d 619 (4th Cir. 2001) (which the Studios cite
fondly for its use of the word "innocent") involved a content owner who "identified two sites
created for the sole purpose of publishing [the content owners'] copyrighted works, [and]
asserted that virtually all the images at the two sites were its copyrighted material." *Id.* at 625.
*See also Flava Works, Inc. v. Gunter*, No. 10 C 6517, 2011 WL 3205399 at *3 (N.D. Ill. July 27,
2011) (DMCA notices "specified . . .users . . . identified as 'repeat infringers'," but site " did not
disable any of those users' accounts"); *Veoh*, 586 F. Supp. 2d at 1153 (termination on "notice of

*e.g.,* Yeh Exs. 18, 19, 21 (copyright owners requesting user termination).[11]

The reasonableness of the policy is not judged in isolation. In combination with the repeat infringer policy, Hotfile used its limited resources to offer a host of additional countermeasures, including rapid notice and takedown, SRAs, and MD5 fingerprinting. *See Io v. Veoh* at 1143-1145 (termination upon "notice that a user has uploaded infringing content after a first warning" accompanied by notice and takedown and hash based "digital fingerprinting" complies with 512(i).) *See also Wolk v. Kodak Imaging Network, Inc.*, 10 Civ. 4135, 2012 WL 11270 (S.D.N.Y. Jan. 3, 2012) (takedown based on notices identifying URLs "as well as those that did not" satisfied repeat infringer policy). Tellingly, before filing suit, the Studios did not once complain about Hotfile's repeat infringer policy but, rather, voiced approval of Hotfile's countermeasures.[12] *See* Section IV, *infra*.

When the Complaint in this action suggested a strikes-based policy was necessary, Hotfile promptly implemented one. This reveals Hotfile's policy – to continually and proactively strengthen its policies in response to content owner requests, evolving technology and market shifts. Under the totality of circumstances, this was reasonable.[13] "[B]ecause a repeat infringer policy needs to be reasonable, not perfect…[Hotfile] has [at least] raised a genuine issue of material fact as to whether it has reasonably implemented its repeat infringer policy…." *Myxer,* at *71 (triable issue as to repeat infringer policy for site with notice and

---

a user" complied with 512(i)). Though the Studios were gathering links from the "link sites" whom they now allege were run by repeat infringers and sending takedown notices to Hotfile from those sites, they did not identify those sites to Hotfile and did not request their termination.

[11] While the Studios suggested Hotfile waited until a content owner initiated litigation before terminating users, this is not true. DRSF at 4.c.ii.

[12] Indeed, Studio testimony confirmed that SRAs combined with hashing "prevent additional identical files from *ever* being uploaded by *any* user." *Io*, 586 F. Supp. 2d. at 1143; Leibnitz Ex. 17 (Suh Dep.) at 59:13-62:4. The Studios concede that a hash is "almost like a fingerprint." Leibnitz Ex. 13 (Zebrak Dep.) at 89:16-90:2. Neither *Aimster* nor *Cybernet* offered countermeasures comparable to Hotfile. In fact, Aimster employed special encryption that eviscerated any hope of content protection (*In re: Aimster Copyright Litig.* 252 F. Supp. 2d 634, 659 (N.D. Ill. 2002)), while Cybernet was in "complicity" with infringers (*Perfect 10, Inc. v. Cybernet Ventures, Inc.*, 213 F. Supp. 2d 1146, 1777 (C.D. Cal. 2002).

[13] Notably, more than two-thirds of the "repeat infringers" identified by Plaintiffs did not upload a single work-in-suit after their supposed third "strike" – meaning that the terminations would not have helped Plaintiffs in any way (and disproving Plaintiffs' assertion of "enormous harm"). Foster Ex. D; Mot. at 11.

FILED UNDER SEAL                          CASE NO.: 11-CIV-20427-WILLIAMS/TURNOFF

takedown, fingerprinting, prevention of repeat downloads, and special takedown tool).

**B.      Hotfile Has At All Times Complied With The Designated Agent Provision.**

    The Studios have stipulated that "Warner's notifications by means of Hotfile's SRA are
(and have the effect of) notifications of claimed infringement *to Hotfile's designated agent*
*under 17 U.S.C. § 512(c)(3)(A)*, and are therefore subject to 17 U.S.C. § 512(f)." Joint Motion
and Stipulation, Dkt. 155 (emph. added). The same is equally true for the other Plaintiffs. As
Hotfile has offered SRAs since mid-2009, the Studios are precluded from disputing the existence
of a DMCA-complaint designated agent since that point in time.

    The Studios' hyper-technical line of argument on this issue ignores the legislative intent.
The policy behind the designated agent requirement is "that the parties will comply with the
*functional requirements* of the notification provisions—such as providing sufficient information
so that a designated agent or the complaining party submitting a notification may be contacted
efficiently...." Gupta Decl. Ex. 1 (S. Rep. 105-190), p. 47 (emph. added). Indeed, technical
deficiencies "are insubstantial...[where] they would not prevent a copyright owner from
efficiently communicating with the designated agent and vice versa." *Perfect 10, Inc. v.*
*Amazon.com, Inc. et al.*, No. CV 05-4753 AHM (SHx), 2009 WL 1334364, at *8 (C.D. Cal. May
12, 2009).[14] It is undisputed that Hotfile's abuse department could  and was always available to
be contacted at abuse@hotfile.com and by SRA. Content owners – the Studios included – never
had any difficulty contacting Hotfile, so the "functional requirement" was met.[15]

    In *Viacom, Intern, Inc. v. YouTube, Inc.*, the court was presented with precisely this
argument—that YouTube should be disqualified from the safe harbor for the period prior to its
registration with the Copyright Office. Leibnitz Ex. 10, n.24. The *YouTube* court gave no
credence to the argument and applied the safe harbor for the entire period. 718 F. Supp. 2d 514,
529 (S.D.N.Y. 2010). The same result should apply here.

---

[14] When Hotfile posted the personal name of its designated on its website is irrelevant. *See*
*Hendrickson v. eBay, Inc.*, 165 F. Supp. 2d 1082, 1092, fn.13 (C.D. Cal. 2001) ("[n]othing in the
DMCA mandates that service providers must designate the name of a person as opposed to a
specialized department to receive notifications of claimed infringement.")

[15] The Studios' assertion that Hotfile allegedly identifies a "P.O. Box" is a red herring. P.O.
boxes are acceptable. *See Wolk v. Kodak Imaging Network, Inc.*, 10 Civ. 4135, 2012 WL 11270,
at *22 (S.D.N.Y. Jan. 3, 2012) (finding "P.O. Box" for designated agent address is acceptable).
Furthermore, 37 C.F.R. § 201.38(c), is being amended to expressly allow for P.O. Boxes. Leibnitz
Ex. 36.

FILED UNDER SEAL                    CASE NO.: 11-CIV-20427-WILLIAMS/TURNOFF

**C.    Hotfile Did Not Have Knowledge Of The Files-In-Suit, And When It Received Notice Of Them, It Expeditiously Took Them Down.**

A service provider is eligible for safe harbor "for infringement of copyright by reason of the storage at the direction of a user of material," so long as the service provider does not have "actual knowledge that the material or an activity using the material on the system or network is infringing" and "in the absence of such actual knowledge, is not aware of facts or circumstances from which infringing activity is apparent," or "upon obtaining such knowledge or awareness, acts expeditiously to remove, or disable access to, the material." 17 U.S.C. § 512(c)(3).[16]  "As a general rule, a party's state of mind (such as knowledge or intent) is  a question of fact for the factfinder, to be determined after trial." *Chanel, Inc. v. Italian Activewear of Florida, Inc.*, 931 F.2d 1474, 1476 (11th Cir. 1991). *See also Zimnicki v. Gen. Foam Plastics Corp.*,  09 X 2132, 2010 WL 3941869 at *4-5  (N.D. Ill. Oct. 4, 2010) (knowledge and intent in contributory copyright infringement context is question for jury).

The categories of facts cited by the Studios fail to establish disqualifying knowledge.

**1.    Hotfile Did Not Have "Actual Knowledge" Of The Files-In-Suit.**

The Studios concede that Hotfile has always expeditiously disabled access to URLs of which it had actual knowledge based on a DMCA-compliant notice.[17]  *See* p.19, *infra*. Nevertheless, the Studios argue that Hotfile's policy of taking down only the noticed URLs and not all hash duplicates (during the limited time period from February to August 2009) did not satisfy the expeditious takedown requirement.[18]  This is wrong.  Hotfile's policy was compliant

---

[16] The Studios assert Hotfile had knowledge of "specific copyrighted works" by knowing the names "identified by their download links."  (Mot. at 24.)  The DMCA knowledge disqualifier applies to ***materials*** (in this case, ***specific digital files***) not ***works***.  *See* 17 U.S.C. § 512(c)(1)(A)(i)(no knowledge of infringing "material"); *compare* 512(c)(3)(A)(ii) & (iii) (requiring notice of ***work*** and an identification of the ***material*** claimed to be infringing).  And as the Counterclaim demonstrates, the names in links are not a reliable indicator of content.

[17] Actual knowledge typically depends on notice from the copyright owner; a "user's allegations would not give [a service provider] actual knowledge under § 512(c)(1)(A)(i), because [the service provider] would have no assurance that a third party who does not hold the copyright in question could know whether the material was infringing." *UMG Recordings Inc. v. Shelter Capital Partners, LLC* 667 F. 3d 1022, n. 14 (9th Cir. 2011).

[18] Such "de-duplication" technology is standard. *See Capitol Records v. MP3tunes*, No., 07 Civ 9931 (WHP), 2011 WL 5104616 (S.D.N.Y. Oct. 25, 2011) at *2 (where "different users upload the same song containing identical blocks of data to MP3tunes' servers, those blocks will be

because the separate uploads each had their own "URL."[19]  Even if the use of a given URL was subject to a takedown notice, a different use of the same file by another user at a different URL may not have been infringing.  The other user may have stored it, space-shifted it, or, even owned the copyright (as when the Studios themselves posted *The Vampire Diaries* to Hotfile).[20]  Hotfile's policy accordingly "remove[d], or disable[d] access to, the [*infringing*] material" (17 U.S.C. § 512(c)(1)(A)(iii)  and complied with the letter and spirit of the DMCA.

The Studios' second argument relies on customer support emails, each of which automatically generated a "last download link" (LastDL).  "Actual knowledge" means actual knowledge of *infringement* – knowledge of a name in a URL suggesting a copyrighted file is not enough.[21]  The URLs in these emails do not impart any reliable knowledge of their content.  DRSF 35.  Even if they did, that does not imply *infringement* is occurring at those URLs.  DRSF 9.c, 35.  These examples are, in fact, illustrative of the danger of inferring knowledge based on URLs.  *See UMG*, 667 F. 3d. at 1035-1041 (explaining that knowledge of particular *infringement*, not just knowledge of possible unauthorized use is required).[22]

**2.    Hotfile Did Not Have "Red-Flag" Knowledge of The Files-In-Suit.**

As an alternative to actual knowledge, "a service provider may lose immunity if it fails to take action with regard to infringing material when it is 'aware of facts or circumstances from which infringing activity is apparent.'"  *CCBill*, 488 F.3d at 1114 (*quoting* 17 U.S.C.

---

assigned the same hash tag and typically saved only once.")  Leibnitz Ex. 14.  Hotfile always maintained separate "uploadids" for each upload of these files.

[19] The Studios themselves have treated each Hotfile URL as a separate file for purposes of their Motion.  DRSF 1.  Accordingly, even based on the Studios' expert's approach to this case, this argument is a red herring.

[20] The Studios have not provided any actual examples of how this feature failed to result in expeditious takedown.  They similarly have failed to show specific instances where Hotfile's allowing a user to have multiple links to the same file – a useful feature – failed to result in expeditious takedown.  DRSF 9.a.iii-iv.

[21] *See Myxer,* at * 81 (existence of licensed content precluded actual knowledge of infringement because "any awareness of copyrighted material may have related to licensed material, only.)

[22] This is precisely why "[t]he DMCA notification procedures place the burden of policing copyright infringement – identifying the potentially infringing material and adequately documenting infringement – squarely on the owners of the copyright ... [and the Ninth Circuit] declined to shift [this] substantial burden from the copyright owner to the provider."  *CCBill, LLC*, 488 F.3d 1102, 1113 (9th Cir. 2007).

§ 512(c)(1)(A)(ii).)  The "red flag" standard does not change the fact that "[A] service provider need not monitor its service or affirmatively seek facts indicating infringing activity ..."  17 U.S.C. § 512(m).  For there to be a red flag, the service provider must have a "subjective awareness [of] facts or circumstances," that make "infringing activity . . . apparent to a reasonable person, [i.e.] an objective standard...".  It must make infringement "obvious" and it must point to *particular* infringing material, not merely provide a general awareness of infringing activity.  S. Rep. 44, 45 (subjective awareness to be measured by objective standard; red flag must be "obvious").[23]  Knowledge of *specific* instances of infringement is required to disqualify, because allowing otherwise would make service providers accountable for infringements they could do absolutely nothing to prevent.

Here, Hotfile did not have "red flag" knowledge that any particular files-in-suit were infringing.  Hotfile rarely comes to possess *any* knowledge regarding the 100 million+ files its users have uploaded.  It could not practicably review these files, has no need to in order to operate its infrastructure, and respects user privacy.  Even if occasionally it became aware of filenames or files, it did not know whether those files were *infringing*.  The Studios' "statistics" can at most provide general knowledge and are quintessentially *not* disqualifying "red flags."  *See Viacom*, 718 F. Supp. 2d at 524 ("[A]wareness of pervasive copyright-infringing...furnishes at most a statistical estimate of the chance any particular posting is infringing—and that is not a "red flag"...")  Furthermore, there is no evidence that Hotfile had a "subjective awareness" of these statistics, and they are grossly distorted.  DRSF at 10.a, a.i-vii; Levy Decl. ¶¶ 53-55.

The Studios' other evidence is equally lacking.  First, the Studios' assertion that Hotfile personnel downloaded infringing files is wrong.  DRFS at 10.b.  Further, the Studios' alleged

---

[23] *See UMG*, 667 F. 3d. at 1038  (under red flag test "burden remains with the copyright holder"; despite signs that "infringing activity was afoot" from suspicious domain names, DMCA "impose[s] no such investigative duties"; "general knowledge" does not establish red flag). *See Viacom,* 718 F. Supp. 2d at 519, 525 (emph. added) ("red flag" must point to "*specific instances* of infringement"; general knowledge imposes no duty to "monitor" or "search for infringements"); *MP3tunes* at *13 (notice of "representative works" does not give knowledge of specific instances); *Myxer* at *85 (hosting popular content does not equate to red flag knowledge); *Wolk*, at *20 (a single notice does not impart knowledge of all instances; this might block licensed instances of the material); *Corbis* 351 F. Supp. 2d  at 1108 ("general awareness" not enough) *See also Tiffany (NJ) Inc. v. eBay Inc.*, 600 F.3d 93, 106-07 (2d Cir. 2010) (eBay's "generalized" knowledge of counterfeit goods being sold on its website was insufficient for contributory trademark infringement liability where Ebay disabled listings when provided specific listing numbers).

FILED UNDER SEAL                    CASE NO.: 11-CIV-20427-WILLIAMS/TURNOFF

"constant stream of communications" does not establish red flag knowledge. These emails do not make assertions regarding copyright authorization status and do not rule out the possibility that the files are open source, public domain, freely shared or fair use, or are simply being stored in the cloud, or space-shifted. *See MP3tunes* at *22 ("emails from MP3tunes users indicating possible or even likely infringement did not put MP3tunes on notice or disqualify it from the safe harbor protection"); *UMG* at 1038-1041 (no red flag knowledge from emails that warned of infringement where not accompanied by a showing of failure to remove infringing content). In fact, these emails create more questions than they answer, and in no way do they make infringement "obvious." DRSF 10.c. The emails advanced by the Studios constitute a handful of the hundreds of thousands of emails and other records in Hotfile's systems and it is not clear whether Hotfile was even "subjectively aware" of these. DRSF at 9.b., 9.c.

    In another variation of the "knowledge suggested merely by names" theme, the Studios reference "domain names" and "home pages" whose "names alone" allegedly suggest their "infringing nature."[24] Mot. at 26. In *CCBill*, the Ninth Circuit rejected this very argument in regard to sites with far more provocative sounding names (*e.g.*, "illegal.net"). *CCBill* at 1114. *See also MP3tunes* at *21 (finding that site names do not trigger "reg flags"). Thus, this argument fails as a matter of law, and it is also factually untenable. DRSF 10.d.iii-iv. [25]

### 3.    Hotfile Was Not "Willfully Blind" To Specific Instances of Copyright Infringement.

    Disqualifying knowledge under the DMCA must point to specific infringements. The Studios' willful blindness argument improperly aspires to disqualify based on *general knowledge*. In support of their argument, the Studios cite to just *one* email, in which a Hotfile

---

[24] While the Studios argue that these users were affiliates and had "strikes," Hotfile was not subjectively aware of this information; moreover, these numbers would at most show general awareness that a user may have been an infringer. This would not impart red flag knowledge of particular infringing material under 17 U.S.C. § 512(c). Regardless, the issue of repeat infringers is separately addressed under 17 U.S.C. § 512(i). *See* Part III.A., above.

[25] The Studios otherwise base their position on gross mischaracterizations that, in any event, do not give rise to red flag knowledge. For example, the emails concerning Rapidshare do not refer to any particular infringing material (and do not even show "general knowledge," which is of course irrelevant anyway). *See MP3tunes* *13 (no red flag knowledge based on employee's downloading of "popular" artists from sites like rapidshare.com, which is "simply [a] popular file sharing site[]"); *see* Leibnitz Ex. 12. The other emails are similarly deficient. DRSF 10.f.i-iii; 10.g.

FILED UNDER SEAL                    CASE NO.: 11-CIV-20427-WILLIAMS/TURNOFF

engineer expresses concerns about ascertaining ownership and infringement status of hosted files pursuant to Warner's proposed business partnership. ***The email does not relate to a particular file.***[26] The Studios then cite Hotfile's decision not to include a search function which, as explained elsewhere, is a spurious argument without evidentiary or legal support. DRSF 11.b.i; *See UMG* at 1039 (no obligation to "use search and indexing tools to locate and remove from its website any other content by the artists identified in the notices").[27]

### 4. Whenever Hotfile Received Notice of The Claimed Infringements It Expeditiously Took Down Those Links.

The Studios' "knowledge" argument fails for a more basic reason. The Studios do not draw a connection between the material of which Hotfile supposedly had knowledge and any failure on Hotfile's part to expeditiously take down any of the verified-files-in-suit. *See* 17 U.S.C. § 512(c)(3) (upon obtaining such knowledge or awareness, acts expeditiously to remove, or disable access to, the ***material*** for which safe harbor is sought); *see also UMG* at 1038. (safe harbor applies if defendant expeditiously removes infringing material); *Io*, 586 F. Supp. 2d at 1150 (same); *Myxer* at *44 (same). Hotfile's expeditious takedown is essentially unquestioned. *See* DRSF 33. This is fatal.

The evidence shows that Hotfile removes virtually all files identified in an email or online DMCA notice within 48 hours. The SRA tool, available starting in August 2009, enables ***instantaneous takedown of multiple files with a single click.***[28] Several of the Studios' cited examples of purported "knowledge" refer to files that Hotfile had already taken down. Yeh Ex. 30 (Titov 68 (Avatar removed); Titov 70 (error messages); Titov 111).

---

[26] Moreover, when the entire email is read in context, it's simply an expression (from a Hotfile contractor) of the reality that hosts such as Hotfile do not know the content of files they host and cannot know, absent notice from a copyright holder, whether they infringe.

[27] *Aimster* is distinguishable and inapposite with respect to this issue. It found a failure to reasonably implement a repeat infringer policy because the creators of Aimster deliberately encrypted traffic in order to make it impossible to identify users who were transferring infringing content. 334 F.3d at 655. There is no similar evidence here. *Aimster's* discussion of "willful blindness" was not related to the knowledge prong of the DMCA. *Id* at 650.

[28] Because Hotfile has no effective and reliable way to know when files it hosts are suspected of infringement other than through notices from content owners, Hotfile's duty to "expeditiously" remove or block access to those files was triggered only when it received valid notifications of claimed infringement from the Studios or their agents. 17 U.S.C. § 512(c)(1)(C). There can be no dispute that Hotfile has fulfilled that duty.

FILED UNDER SEAL                    CASE NO.: 11-CIV-20427-WILLIAMS/TURNOFF

**D.     Inducement of Infringement Is Not An Unwritten Exception To The DMCA Safe Harbor.**

The DMCA safe harbor applies even where the theory of liability is based on *Grokster*. *Grokster* held that "[o]ne infringes ***contributorily*** by intentionally inducing or encouraging direct infringement". *Grokster* at 930 (emph. added). (citing *Gershwin Publ'g. Corp. v. Columbia Artists Mgmt., Inc.*, 443 F. 2d 1159, 1162 (2d Cir. 1971)). The DMCA safe harbor "limitations in subsections (a) through (d) protect qualifying service providers from liability for all monetary relief for direct, vicarious and ***contributory*** infringement." S. Rep. 55 (emph. added). As *Grokster* advanced a form of "contributory" liability, and the DMCA provides safe harbor from "contributory" liability, the DMCA applies to *Grokster* liability.[29]

The legislative purpose behind the DMCA confirms there is no exception for *Grokster*. The safe harbors "provide certainty for copyright owners and Internet service providers with respect to copyright infringement liability." S. Rep. 2. "[T]he Committee decided to leave current law in its evolving state and, instead, to create a series of 'safe harbors,' for certain common activities of service providers." S. Rep. 19. Congress did not intend the DMCA inquiry to involve a free-ranging inquiry into the "innocence" of service providers. Unmooring the safe harbor inquiry from the clear and straightforward requirements of the statute would directly contravene the aim of "certainty." [30]

---

[29] The Studios' attempt to graft a *Grokster*-exception onto the broad causal language of the preamble of 512(c) is akin to their other failed attempts to narrowly read "by reason of storage." *See UMG* at 1038-1041 ("proximate cause" reading of "by reason of storage" rejected); *Viacom*, 718 F. Supp. 2d at 526-27.

[30] The court in *Columbia Pictures v. Fung*, CV 06-5578SCW (JCX) 2009 WL 6355911 (C.D. Cal. Dec. 21 2009) simply got it wrong when it found that the DMCA and inducement are "contradictory." *Id.* at *18. To reach this incorrect conclusion, the *Fung* court extrapolated from language addressing Aimster's § 512(i) compliance, not the DMCA generally. If Congress wished to carve out "intentional" acts from the DMCA it would not have safe harbored service providers from "all monetary relief," which plainly includes ***willfulness*** damages. 17 U.S.C. § 504(c).

FILED UNDER SEAL                                  CASE NO.: 11-CIV-20427-WILLIAMS/TURNOFF

## IV.  THE STUDIOS SHOULD BE ESTOPPED FROM ASSERTING THAT HOTFILE'S DMCA COUNTERMEASURES WERE INADEQUATE.[31]

A plaintiff is estopped from asserting a copyright claim "if he has aided the defendant in infringing or otherwise induced it to infringe or has committed covert acts such as holding out ... by silence or inaction." *Field v. Google Inc.*, 412 F. Supp. 2d 1106, 1116 (D. Nev. 2006) (internal citations). *See* 4 Nimmer on Copyright § 13.07.  The elements of equitable estoppel are:  "(1) the plaintiff must know the facts of the defendant's infringing conduct; (2) the plaintiff must intend that his conduct shall be acted on or must so act that the party asserting the estoppel has a right to believe that it is so intended; (3) the defendant must be ignorant of the true facts; and (4) the defendant must rely on the plaintiff's conduct to his injury." *Carson v. Dynegy, Inc.*, 344 F. 3d 446 (5th Cir. 2003).

Here the Studios specifically requested SRAs, said they were "ideal," and said they would "solv[e] the [content protection] problem."  Once Hotfile created SRAs, Plaintiffs utilized them extensively and continually commended them over a period of years.[32]  The Studios' outwardly lauded Hotfile's "commitment to copyright compliance," professed their intent to "cooperat[e]," and thanked Hotfile repeatedly.  DSUF 11.  Plaintiffs' counsel, however, revealed that the Studios secretly wanted Hotfile's countermeasures strengthened "for years."  Leibnitz Ex. 9 at 7:10-12. The Complaint presents a wish list of measures the Studios now claim Hotfile should have been taking, including counting strikes and using Vobile fingerprinting, that were never mentioned to Hotfile before the lawsuit.  In reliance on the Studios' failure to even once request any of these additional countermeasures, Hotfile maintained its policies of providing expeditious notice and takedown, and SRAs which it supplemented with MD5 hashing, and relied on the Studios' professed satisfaction with its DMCA compliance.  Had the Studios

---

[31] In addition to estoppel and the DMCA safe harbor, Hotfile's other affirmative defenses raise genuine issues of material fact.  *See, generally* Second Amended Answer, Affirmative Defenses and Counterclaim of Defendant Hotfile Corporation To Plaintiffs' Complaint (Dkt. 161), filed 10/27/2011, ¶¶ 71-82.  In particular, even though Plaintiffs fail to mention them in the Motion, Hotfile asserts and does not waive its defenses of laches, waiver and unclean hands. *Id.* at ¶¶ 75, 77 and 78.  Those defenses are based on many of the same facts supporting the estoppel defense. Since Plaintiffs have not contested the allegations supporting those defenses as plead,  they present substantial and material issues for trial.  (It would be improper for Plaintiffs to attempt to raise new arguments as to these defenses for the first time in their Reply.)

[32] Warner even went so far as to propose a business venture with Hotfile. Titov Decl. ¶ 28, Ex. 34.

FILED UNDER SEAL                    CASE NO.: 11-CIV-20427-WILLIAMS/TURNOFF

notified Hotfile before filing suit without warning alleging "massive infringement," Hotfile would have had the opportunity to make the adjustments.

Under these facts (which a reasonable trier of fact could certainly conclude are well supported by admissible evidence), the elements of estoppel are met and the Studios should not be allowed to challenge the reasonableness of Hotfile's policies, including its repeat infringer policy. *See HGI Associates v. Wetmore Printing Co.*, 427 F.3d 867 (11th Cir. 2005) (Microsoft distributor reseller estopped from claiming copyright infringement where it misled a reseller to believe it was within its rights to resell Microsoft software, but had never granted reseller the necessary copyright license); *Lab. Corp. of Am. v. Schumann*, 3:06-CV-01566 (VLB) 2009 WL 275859, at *5, 6 (D. Conn. Feb. 4, 2009) (estoppel where copyright owners "participated in the creation" of the allegedly infringing work).

At its core, equitable estoppel seeks to avoid injustice. The injustice here would be plain, as the Studios seek ruinous damages of tens (if not hundreds) of thousands of dollars *per work* for alleged infringement that they now allege could have been prevented had they acted more forthrightly. No other cyber-copyright case has presented a remotely analogous fact pattern. Estoppel applies. *See Bellsouth Adver. & Publ'g. Corp, v. Am. Bus. Lists, Inc.*, CIV. No. 1:90-CV-149-JEC, 1992 WL 338392, (N.D. Ga. Sept. 8, 1992) (triable issue of fact on estoppel); *Lorentz v. Sunshine Health Prods., Inc.*, No. 09-61529-CIV 2010 WL 3733986 (S.D. Fl. Aug. 27, 2010) (same).

## V. TRIABLE ISSUES OF FACT EXIST AS TO THE STUDIOS' SECONDARY INFRINGEMENT CLAIM

### A.   The Studios Are Unable To Carry Their Burden To Prove Direct Infringement By Hotfile Users

In order to establish secondary liability for infringement, the Studios must first prove that Hotfile's users engaged in direct infringement of the Studios' copyrights. *See Perfect 10, Inc. v. Amazon.com*, 508 F.3d 1146, 1169 (9th Cir. 2007); *Myxer*, at *135. In order to make this showing the Studios must prove copyright ownership and violation of its exclusive rights in the owned works. *Id.*

The Studios have failed to submit sufficient evidence to prove direct infringement of their copyrights. Instead, they rely on obviously inadmissible and improper attorney testimony to establish the infringement component of their claim. *See* Accompanying Motion to Strike. For this reason alone, the Studios' motion should be denied.

FILED UNDER SEAL                          CASE NO.: 11-CIV-20427-WILLIAMS/TURNOFF

**B.      A Triable Issue Of Fact Exists On The Studios' Claim For Inducement**

The Studios cannot prove inducement liability under the strict *Grokster* rule.  It is a longstanding principle that "one who, with knowledge of the infringing activity, induces, causes or materially contributes to the infringing conduct of another, may be held liable as a 'contributory' infringer." *Gershwin*, 443 F.2d 1159, 1162 (1971).  However, in *Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.,* 545 U.S. 913, 936-937 (2005) ("*Grokster*"), the Supreme Court clarified that "inducement" is a strict, specific intent claim: "We hold that one who distributes a device with the object of promoting its use to infringe copyright, as shown by *clear expression* or other *affirmative steps*,… is liable for the resulting acts of infringement by third parties." (emph. added). *Id.* at 919.  *See also Perfect 10, Inc.,* 508 F.3d at 1107 ("Grokster tells us that contribution to infringement must be intentional for liability to arise.").  This is, indeed, a high standard:  "[U]nder *Grokster*, an actor may be contributorily liable for intentionally encouraging direct infringement if the actor knowingly takes steps that are *substantially certain* to result in such direct infringement." *Id* at 1169 (emph. added).  "Mere knowledge of infringing potential or of actual infringing uses" does not create inducement liability.  *Grokster*, 545 U.S. at 937.

Moreover, because inducement is an intentional tort, it is inherently not appropriate for resolution on summary judgment.  *See Chanel, Inc.*, 931 F.2d at 1476; *Zimnicki,* at *4-5.

The Studios have not presented sufficient evidence to take the question of Hotfile's intent away from the jury in this case.  They have cobbled together an inducement claim based on exaggerated and non-existent evidence and dubious math.  At best, there is a triable issue of fact as to whether the *Grokster* specific intent standard can be met here.

**1.      The Studios' Inducement Claim Is Based On The Demonstrably False Assumption That "Popular" Equals "Infringing"**

The Studios' claim that Hotfile is liable for inducement relies on the assertion that when Hotfile offered to pay "users to upload and promote *'popular'* and *'interesting'* content," the content was "predictably infringing" so as to attract downloaders. Mot. at 30.  The evidence, however, shows just the opposite.  Indeed, ***the most "popular" files are demonstrably not infringing, and the majority of files on Hotfile are never downloaded***. DRSF 28, 24; Boyle Ex. 1 (Boyle Expert Report) at ¶ 17; Boyle Decl. ¶ 8i, 19; Leibnitz Ex. 4; *See* Partial SJ Mot. at 3-5. Similarly, noninfringing files are more likely to cause users to purchase Premium accounts than allegedly infringing files.  Boyle Ex. 2 (Boyle Rebuttal Report) at ¶ 53.  The very digital

FILED UNDER SEAL                          CASE NO.: 11-CIV-20427-WILLIAMS/TURNOFF

fingerprinting technology championed by the Studios shows only 3.4% of uploaded files to be infringing. Titov Opp. Decl. ¶ 56. Some 93% of Hotfile uploaders have never received a takedown notice, and only 8.8% of files on Hotfile have ever been accused of infringement. Titov Opp. Decl. ¶ 31; DRSF 1. And the Studios' works – which do not account for any of the most popular files on Hotfile – amount to just 1.1% of the total downloads from Hotfile. Titov Opp. Decl. ¶ 32. Not one of the top 100 downloads from Hotfile is a Studio work. Leibnitz Ex. 8 (Plaintiffs' Responses and Objections to Hotfile's Fourth Set of Interrogatories at 5, dated Jan. 3. 2012). In addition, the Studios' supposed "statistical" analysis has proven to be hopelessly flawed. Levy Decl. ¶¶ 53-55. These facts are directly contrary to the Studios' theory of this case. The numbers alone are enough to create a genuine issue of fact.

   **2.    There Is No Evidence Of Intent As Required By *Grokster.***

   In *Grokster*, the Court found "affirmative expression" of wrongful intent in three ways: (a) the defendants had expressly sought to "satisfy a known source of demand for copyright infringement, the market comprising former Napster users"; (b) the defendants failed to "develop filtering tools or other mechanisms to diminish the infringing activity using their software"; and (3) the "commercial sense" of the company depended entirely on infringement. *Grokster*, 545 U.S. at 939. The evidence here is the opposite of *Grokster*.

   First, Hotfile did not seek to satisfy a "known source of demand for copyright infringement." Rather, Hotfile sought to provide hosting, which is an integral part of the Internet and has been for decades. Cromarty Decl. at ¶¶ 26-49. The evidence shows that Mr. Stoyanov's purpose was to fill this demand, not to cater to a known infringing market. Leibnitz Ex. 1 (Stoyanov Dep.) at 18:23-19:18. Indeed, the company's primary model was RapidShare, a business that – unlike Napster – has never been adjudicated to be an infringer and is still in operation. *See* Leibnitz Ex. 12. And, as discussed in more detail below, Hotfile has numerous noninfringing uses. *See infra* at pp. 28-29; DRSF 30.

   Second, Hotfile's aggressive anti-infringement measures are the antithesis of *Grokster*. Hotfile has taken numerous affirmative steps to combat copyright abuse, including strict anti-infringement policies, vigorous notice-and-takedown procedures, providing SRAs to content owners, using hash technology to filter out future uploads of files taken down for infringement, using digital fingerprinting technology to prevent uploads of infringing works, terminating repeat infringers (and strengthening repeat infringer policies), and continuing to adopt new and better

FILED UNDER SEAL                              CASE NO.: 11-CIV-20427-WILLIAMS/TURNOFF

measures to combat infringement including creation of the "Hotfile Copyright Education"
program. DRSF 36. These are exactly the things that Grokster did *not* do. *See* Grokster, 545
U.S. at 939. There has never been a finding of inducement where an online service took any
meaningful action to deter copyright infringement—let alone where the service did all
that Hotfile has done. *See* cases discussed below.

Third, the "commercial sense" of Hotfile does not depend on infringement. Hotfile earns
money solely on selling Premium subscriptions. The Studios' own evidence shows that more
people purchase Premium subscriptions when downloading noninfringing works than when
downloading allegedly infringing works. Boyle Ex. 2 (Boyle Rebuttal Report) at ¶ 53. As noted,
the most popular files on Hotfile are open source and free software, which are noninfringing.
The developers of these programs use the Affiliate program to earn money. DRSF 28. Hotfile
also earns money from the unlimited storage available to Premium subscribers, which constitutes
more than half of the uses of Hotfile and is a core part of what Hotfile sells with Premium
subscriptions. DRSF 24; Titov Opp. Decl. ¶ 4.

   **3.    The Studios Rely On Inapposite Peer-to-Peer Case Law**

From the outset, Plaintiffs' case has rested on the false premise that "Hotfile is no
different from [five] previous adjudicated infringers." Mot. at 9 (citing *A&M Records v.
Napster*, 239 F.3d 1004, 1013 (9th Cir. 2001); *Grokster*, 545 U.S. at 922- 933, *Columbia
Pictures v. Fung*, 2009 WL 6355911 at *4 & 8 (C.D. Cal. Dec. 21, 2009); *Arista Records v.
Usenet.com*, 633 F. Supp. 2d 124, 131-32 (S.D.N.Y. 2009); *Arista Records v. Lime Grp.*, 784 F.
Supp. 2d 398, 412 (S.D.N.Y. 2011)). The evidence has disproved this assumption. Those cases
bear not even a passing resemblance to Hotfile. The "previous adjudicated infringers" in those
cases – including *Grokster* – were peer-to-peer ("P2P") networks that were designed for the
express purpose of enabling Internet users to share copyrighted files, typically popular music.
They have nothing to do with Hotfile and, indeed, are diametrically opposed to Hotfile from both
a business and technological perspective. DRSF 25; Cromarty Decl. ¶ 112. The contrast
between Hotfile and the P2P cases could not be more clear:

- No P2P defendant implemented hash filtering, digital fingerprinting or any other
  meaningful technological means to combat infringement.[33] In contrast, Hotfile has done

---

[33] *See MGM Studios v. Grokster ("Grokster II")*, 454 F. Supp. 2d 966, 982, 989-990 (C.D. Cal.
2006); *Fung* at *14; *Arista Records v. Usenet.com*, 633 F. Supp. 2d at 153; *Arista Records v.
Lime Group*, 784 F. Supp. 2d at 429.

all of those things and more.  Titov Decl. ¶¶ 27, 34-35.

- P2P networks existed solely to facilitate the trading of music (or, in some cases, movie) files. *See, e.g., Napster,* 239 F.3d at 1011 (describing peer-to-peer file sharing)  In contrast, more than half of the use of Hotfile is for storage.  DRSF 24.

- In each P2P case, there was statistical evidence showing high levels of infringement among *all files available for download on the system.*[34]  Contrast that with the instant case, in which Dr. Waterman – the Studios serial statistical expert –performed his analysis on only 45% of the files (*i.e.,* downloaded files) on Hotfile and produced such a manifestly flawed study that he effectively took into account less than 1.3% of the files on Hotfile.  Levy Decl. ¶¶ 13-17.

- In each P2P case, the sites were searchable for copyrighted content.  *See Grokster,* 545 U.S. at 922; *Fung* at *3; *Arista Records v. Usenet.com,* 633 F. Supp. 2d at 130; *Arista Records v. Lime Grp.,* 784 F. Supp. 2d at 428; *Napster,* 239 F.3d at 1012.  Hotfile is not searchable.  Though the Studios have attempted to portray the lack of a search box as something sinister, the Studios theory is simply not supported by the evidence. DRSF 11.b.i.

- In the P2P cases, there was clear "guilty knowledge" evidence.  *See Grokster,* 545 U.S. at 922 (targeted Napster audience); *Fung* at *14 (incriminating statements by defendant such as "they accuse us for [sic] thieves, and they r [sic] right."); *Arista Records v. Usenet.com,* 633 F. Supp. 2d at 153 (statements such as "Usenet is full of Music and Movies so get your pirate on!"); *Arista Records v. Lime Grp,* 784 F. Supp. 2d at 429 (marketed to Napster audience and admitted that purpose of service was sharing of music files).  There is no such evidence here, just the Studios' hyperbole.  DRSF 10.f.i-iii, 10.h, 16.a.i-v, 16.a.vii.

### 4.     Hotfile Did Not Communicate An Inducing Message To Users

To "establish inducement liability, it is *crucial* to establish that the distributors

'communicated an inducing message to their ... users.'" *Perfect 10, Inc. v. Visa Int'l Serv. Ass'n,*

494 F.3d 788, 801 (9th Cir. 2007); *cf. Grokster,* 545 U.S. at 937 (emph. added) ("The classic

---

[34] *See Grokster,* 545 U.S. at 922 ("nearly 90% of the *files available* for download . . . were copyrighted works"), *Fung* at *4 ("In a study of the Isohunt website, Waterman found that approximately 90% of *files available* . . . from the site are copyrighted or highly likely copyrighted"); *Arista Records v. Usenet.com,* 633 F. Supp. 2d at 131-32 ("Plaintiffs' expert has testified that, based on a statistical analysis, over 94% of all content *files offered* in music-related binary newsgroups previously carried by Defendant UCI were found to be infringing or highly likely to be infringing"); *Arista Records v. Lime Grp.,* 784 F. Supp. 2d at 412 ("Dr. Waterman analyzed a random sample of 1800 *files available* through LimeWire.  He determined that 93% of files in the sample (1644 files) were protected or highly likely to be protected by copyright"); *Napster,* 239 F.3d at 1013 (87% of files available on system copyrighted).

FILED UNDER SEAL                         CASE NO.: 11-CIV-20427-WILLIAMS/TURNOFF

instance of inducement is by advertisement or solicitation that broadcasts a message designed to stimulate others to commit violations."). The Studios cannot point to a single communication in which Hotfile encouraged its users to infringe copyright. Rather, the only "messaging" that the Studios cite consists of a few posts on Internet forums (that are inadmissible in any event, see Motion to Strike) dating back to 2009, allegedly written anonymously by a Blue Ant employee, none of which were authorized by Hotfile, and none of which refer to any specific works or copyrighted content – much less infringing content. DRSF 16.a.vii, 16.b.iii. At bottom, the Studios rely on mischaracterizations of the factual record to try to portray Hotfile as another *Grokster*, *Fung* or *Usenet*, which it is not. DRSF 25; Cromarty Decl. ¶ 112.

> ### 5.   The Studios' Assertion That The Affiliate Program Induces Infringement Is Not Supported By The Evidence.

The Studios claim that Hotfile's "unlawful objective is unmistakable from Hotfile's Affiliate program alone," which they claim encourages users to "upload and "promote" "popular" and "interesting" content. Mot. at 30. As already demonstrated, just because content is "popular" does not make it infringing. DRSF 28. Moreover, Hotfile's Affiliate program – as well as its website commission program – is a commonplace form of website marketing that is designed to further legitimate business objectives. Yeh Ex. 3 (Stoyanov Dep.) at 21:3-22:22; Cromarty Decl. ¶¶ 16, 67, 69-73; Boyle Ex. 1 (Boyle Expert Report) at ¶ 9. Only one-half of one percent of Hotfile's registered users even participate in the Affiliate program. Titov Opp. Decl. ¶ 24. The Studio's conclusions that it encourages infringement are based on unfounded and incorrect interpretations of the evidence.[35]

> ### 6.   The Studios Cannot Otherwise Prove Inducement.

The Studios' remaining assertions regarding inducement are not supported by the evidence. For example, the Studios claim that Hotfile "helped users infringe" and "infringed themselves" – these assertions are both demonstrably false. DRSF 10.b.; Titov Opp. Decl. ¶ 24. Similarly, Hotfile's use of hash blocking – which the Studios remarkably try to claim is evidence

---

[35] Plaintiffs assert that Hotfile voluntarily terminated 444 (or 89%) of its 500 most highly-paid affiliates in the months following adoption of its "three strikes" repeat infringer policy on February 18, 2011. Mot. at 9. This shows good faith, not bad. Having received praise for its copyright enforcement efforts prior to February, Hotfile acted immediately to address the allegations in Plaintiffs' Complaint. In any event, these users amounted to 1.2% of Hotfile's affiliates and 0.008% of Hotfile's users. Titov Opp. Decl. ¶ 30. Thousands of affiliates were not terminated. *Id.*

FILED UNDER SEAL                          CASE NO.: 11-CIV-20427-WILLIAMS/TURNOFF

of inducement – actually proves – as does Hotfile' adoption of digital fingerprinting technology – that Hotfile is *not* an inducer.  Similarly, Hotfile's terminations of repeat infringers – and a close examination of the numbers surrounding such terminations – actually demonstrates that Hotfile has done an effective job at dealing with repeat infringers.[36]

## C.    Hotfile Has Substantial Noninfringing Uses

Absent evidence of intentional inducement, the Studios can only prove their secondary liability claim if Hotfile is not "capable of substantial noninfringing uses." *Perfect 10*, 508 F.2d at 799.  In the seminal *Sony* case, the Supreme Court held that theories of secondary copyright liability are foreclosed against a defendant who makes a product that is "capable of substantial noninfringing use" even where the defendant knows that some people use their product to infringe.  The *Grokster* court confirmed this rule.  *Grokster*, 545 U.S. at 932.

Hotfile is unquestionably capable of – and is used for – substantial noninfringing uses. *See* Cromarty Decl. at ¶ 120.  The evidence on this point is undeniable.  Those noninfringing uses include the following:

- Distribution of free and open source software, which account for many of the most heavily downloaded files on Hotfile, including the top two.  DRSF 28.  There have been well over a million downloads (and probably many more) of open source programs. Boyle Ex. 1 (Boyle Expert Report) at ¶ 9. The developers of these programs participate in Hotfile's Affiliate program. Titov Decl. ¶ 9.

- Storage and space-shifting.[37]  Indeed, ***well over half of the files on Hotfile have never been downloaded***, and ***another 5.76% have only been downloaded once***, suggesting that the uploaders of such files are either using Hotfile for personal storage and/or back-up "in the cloud" or using Hotfile for space-shifting.  Boyle Ex. 2 (Boyle Rebuttal Report) at ¶¶ 20-21, 24-25, 37-39.)  These are undoubtedly fair uses.[38]

---

[36] Plaintiffs assert that "Hotfile uploaders overwhelmingly have been identified as copyright infringers."  Mot. at 9.  That is not even remotely true.  Using the data of Plaintiffs' own expert, less than 0.42% of Hotfile's users were terminated for infringement.  Foster Ex. G at 26. Nonetheless, Plaintiffs emphasize that Hotfile terminated 40% of its users with 171 uploads or more.  Mot. at 9.  While 171 may be the average number of uploads by uploaders at Hotfile, outliers so skew this number that less than 8% of Hotfile's uploaders have ever uploaded 171 files or more.  Levy Decl. ¶ 40.  Most uploaders have uploaded two or less files.  *Id.* ¶ 39.  Fully 93% of Hotfile's uploaders have never received even a single takedown notice. DRSF 10.a.ii.

[37] "Space shifting" refers to uploading content to the Internet so that it can be viewed at a different computer or device at a later time.  Boyle Ex. 2 (Boyle Rebuttal Report) at ¶ 14.

[38] *See Recording Industry Assn. of America v. Diamond Multimedia Systems Inc.*, 180 F.3d 1072, 1079 (9th Cir. 1999) (defendant's product "merely makes copies in order to render portable, or 'space shift,' those files that already reside on a user's hard drive . . . .  Such copying is

-28-

FILED UNDER SEAL                    CASE NO.: 11-CIV-20427-WILLIAMS/TURNOFF

- Sharing Creative Commons-licensed "open source" films.  Boyle Ex. 1 (Boyle Expert Report) at ¶¶ 13-15.

- Distribution of public domain material, including classic works of literature such as A Tale of Two Cities, Huckleberry Finn and Shakespearean dramas.  *Id.* at ¶ 16.

Notably, the *Sony* rule absolves a defendant of liability not only where, as here, its product has *current* noninfringing uses – it also absolves a defendant of liability if the product is **capable** of substantial noninfringing uses.  *Sony*, 464 U.S. at 442; *A&M Records, Inc. v. Napster, Inc.*, 239 F.3d 1004, 1021 (9th Cir. 2001). This forward-looking aspect to the rule is important to "leave breathing room for innovation and vigorous commerce." *Grokster*, 545 U.S. at 932. Because Hotfile is a new business in the nascent "cloud computing" industry, its online web-hosting platform is certainly *capable* of additional noninfringing uses beyond those discussed above.  Both the current *and* potential noninfringing uses of Hotfile absolve Hotfile of liability.

Furthermore, the Studios only purport to own approximately 9% of the files on Hotfile. DRSF 1.  Under the recent *Myxer* case, this is fatal to their claim.  In *Myxer*, the court denied the plaintiffs' motion for summary judgment against an online ringtone download site based on the *Sony* rule, in part, because the plaintiffs (which included, at one time, Warner and Sony) owned only 25% of the files uploaded to the defendant's site. *Myxer*, at \*137.  *Id.*  As noted in the *Sony* case, "in an action for contributory infringement . . ., the copyright holder may not prevail unless the relief he seeks affects only his programs, or unless he speaks for virtually all copyright holders with an interest in the outcome." *Sony*, 464 U.S. at 446.  Here, the Studios' claimed 9% is far smaller than the 25% that the court in *Myxer* found wanting.

The Studios relegate the central issue of substantial noninfringing use to a footnote,

---

paradigmatic noncommercial personal use entirely consistent with the [Audio Home Recording] Act."); *Myxer*, at \*119-122 (recognizing space-shifting as a fair use); *Realnetworks, Inc. v. DVD Copy Control Assn., Inc.*, 641 F. Supp. 2d 913, 942 (N. D. Cal. 2009) (". . . it may well be fair use for an individual consumer to store a backup copy of a personally-owned DVD on that individual's computer . . . ."); *Sony BMG Music Entertainment v. Tenenbaum*, 672 F. Supp. 2d 217, 220-221 (D. Mass. 2009) ("[F]ile sharing for the purposes of . . . space-shifting to store purchased music more efficiently might offer a compelling case for fair use."). *See also Sony*, 464 U.S. at 455 (time-shifting is fair use).  In *Napster*, in holding that space-shifting on a peer-to-peer network is not a fair use because it necessarily distributes the file to the general public, the court implicitly acknowledged that space-shifting *is* a fair use if it, as is the case with Hotfile, it "exposed the material only to the original user." *Napster*, 239 F.3d at 1019.

FILED UNDER SEAL                    CASE NO.: 11-CIV-20427-WILLIAMS/TURNOFF

claiming that they can distinguish this entire body of case law based on Hotfile's alleged "ongoing relationship" with its users. Mot. at 34 n. 13. This is wrong on the facts and the law. The "ongoing relationship" dicta in *Sony* was merely part of the Court's reasoning for the rule it ultimately adopted, not a prerequisite for its application. *See Sony*, 464 U.S. at 437. The only circuit court to address this issue rejected the Studios' position. *See In re Aimster Copyright Litig.*, 334 F.3d 643, 648-649 (7th Cir. 2003) (rejecting recording industry's argument that "*Sony* is inapplicable" to services such as P2P networks). The other cases on which the Studios rely simply regard an "ongoing relationship" as a factor in the *Sony* analysis, not a prohibition. *See The Cartoon Network LP, LLLP v. CSC Holdings, Inc.*, 536 F.3d 121, 132-133 (2d Cir. 2008); *Arista Records LLC v. Usenet.com*, 633 F. Supp. 2d 124, 156 (S.D.N.Y. 2009); *Arista Records, Inc. v. Flea World, Inc.*, No. 03-2670 (JBS), 2006 WL 842883, at * 16 (D.N.J. Mar. 31, 2006). Such a prohibition would make no sense in the current world of Internet businesses, many of which provide services to customers that involve more than simply putting a product into the stream of commerce.

In any event, as a factual matter, Hotfile does not maintain the kind of "ongoing relationship" contemplated in those cases. First, approximately 90% of Hotfile's users are "free" users who do not have Premium accounts and pay nothing to Hotfile. DRSF 31. In contrast, the users in *Usenet* all paid a monthly fee to the defendant for "unlimited downloads" (*Usenet*, 633 F. Supp. 2d at 130), while the defendant in *Flea World* charged all flea market vendors a daily "per space" fee in exchange for the provision of "a number of services including booth space, tables, parking utilities, on-site food and drink concessions, and customers" (*Flea World, Inc.*, 2006 WL 842883 at *2-3). Moreover, more than 99% of Hotfile's users do not participate in the Affiliate program. DRSF 31. Finally, some users of Hotfile do not register an account with Hotfile at all.[39] *Id.*

**D.     There Are Many Triable Issues Of Material Fact Raised By The Studios' Claim For Contributory Infringement.**

Even if Hotfile did not have substantial non-infringing uses, there are still clear triable

---

[39] Importantly, the Supreme Court in *Grokster* refused the urging of the plaintiffs (which included the Studios) to inject a quantitative element into what constitutes a "substantial noninfringing use." *Grokster*, 545 U.S. at 934 (". . . we do not revisit *Sony* further, as MGM requests, to add a more quantified description of the [Sony rule]"). Though, in this case, the Studios' quantitative analysis is fundamentally flawed and does not help them in any event. Levy Decl. ¶¶ 53-55.

FILED UNDER SEAL                        CASE NO.: 11-CIV-20427-WILLIAMS/TURNOFF

issues of fact as to the Studios' contributory infringement claim. Courts will impose contributory liability only where a web host has "*actual knowledge* that *specific* infringing material is available using its system and can take simple measures to prevent further damage to copyrighted works, yet continues to provide access to infringing works." *Perfect 10, Inc,.* 508 F. 3d at 1172 (internal quotes and citations omitted). *See also Napster*, 239 F.3d at 1021 (finding knowledge where "a computer system operator learns of specific infringing material and fails to purge such materials from the system"). *See Religious Tech. Ctr. v. Netcom On-Line Commc'n Servs., Inc.*, 907 F. Supp. 1361, 1366-67 (N.D. Cal. 1995) (host of online bulletin board would be liable for infringement if it retained posts containing infringing material after it knew of their infringing content). *See also Wolk v. Kodak Imaging Network, Inc.*, 10 Civ-4135m, 2012 11270 at *24 (S.D.N.Y. Jan. 3, 2012) (rejecting claim for contributory infringement against operator of online photo sharing site because "merely providing the means to accomplish an infringing activity is insufficient to establish a claim for contributory infringement."); *Dawes-Ordonez v. Realtor Ass'n of Greater Fort Lauderdale, Inc.,* No. 90-345, 2010 WL 1791754 (S.D. Fla. May 5, 2010) (defendant not liable for contributory infringement where it removed photos from its website after notification of copyright infringement).

The Studios have failed to present evidence that Hotfile is contributorily liable. Indeed, the record is devoid of evidence that Hotfile had *actual knowledge* of any *specific* files that infringed the Studios' copyrights and still continued to provide access to such files. DRSF 9. The Studios pointedly misstate the applicable law on contributory infringement by claiming that "actual knowledge is not required. Mot. at 33. To the contrary, "actual knowledge" is *precisely* what is required. *See Perfect 10*, 508 F.3d at 1172. And the very case to which the Studios cite for their backwards recitation of the law, *Napster*, is the seminal cases *establishing* the "actual knowledge" standard. In *Napster*, the court examined the then-developing case law surrounding this issue and determined that it "suggests that in an online context, evidence of *actual knowledge of specific acts of infringement* is required to hold a computer system operator liable for contributory infringement." *Napster*, 239 F.3d at 1021 (emph. added) (discussing *Netcom*). The court went on:

> We agree that if a computer system operator learns of specific infringing material available on his system and fails to purge such material from the system, the operator knows of and contributes to direct infringement. Conversely, absent any specific information which identifies infringing activity, a computer system operator cannot be

FILED UNDER SEAL                    CASE NO.: 11-CIV-20427-WILLIAMS/TURNOFF

> liable for contributory infringement merely because the structure of the system allows for
> the exchange of copyrighted material.

*Id.*

Tellingly, the Studios studiously avoid citing to *any* Internet cases (other than their
brazen distortion of *Napster*) to support their fallacious recitation of the legal standard for
contributory infringement.  That is likely because the most recent and on-point decisions in the
online context do not favor the Studios' position.  *See Wolk,* at *24; *Myxer*, at *137.

### E.   There Are Triable Issues Of Material Fact As To The Studios' Claim For Vicarious Infringement

To prove their claim for vicarious infringement, the evidence must establish that Hotfile:
(1) has the right and ability to stop copyright infringement but failed to do so; and (2) directly
profits from third party copyright infringement.[40] *Grokster*, 545 U.S. at 930; *BUC Int'l Corp. v.
Int'l Yacht Council Ltd.*, 489 F.3d 1129, 1139 n.19 (11th Cir. 2007) (quoting *Grokster*).  The
"right and ability to control" element requires  "both a legal right to stop or limit the directly
infringing conduct, as well as the practical ability to do so."  *Perfect 10*, 508 F.3d at 1173.
Where a web host cannot practicably determine what on their systems is infringing, the
"practical ability" element is lacking.  *Id*

In *Perfect 10*, in concluding that Google was not liable for vicarious infringement for its
image search feature, the court found that Google's "supervisory power [was] limited" because it
could not "analyze every image on the [I]nternet, compare each image to all the other
copyrighted images that exist in the world … and determine whether a certain image on the web
infringes someone's copyright." *Id.* at 1174.  Similarly, Hotfile—which has hosted more than a
hundred million files in just three years – cannot analyze every file on its systems, compare them
to all files in the world, and make a determination of infringement.

The Studios argue that because Hotfile "can block access to the Hotfile servers and block
access to files on the Hotfile system" it therefore the first element is satisfied.  This is not the
law.  In *Napster*, on which the Studios purport to rely, the court's decision to impose vicarious
liability turned on the fact that Napster's system architecture had a searchable index that allowed

---

[40] Notably, the Studios concede that there is a genuine issue of fact as to whether, for purposes of
the DMCA, Hotfile receives a "direct financial benefit directly attributable to the infringing
activity, in a case in which [they also have] the right and ability to control such activity." (Mot.
at 19.)

Napster to easily locate infringing work on its system, and users had to give files names that corresponded to the music in the files. *Napster*, 239 F.3d at 1024.  In contrast, Hotfile has no searchable index, Hotfile users have no similar incentive to give files names that indicate content, and the "system architecture" of Hotfile is not set up to provide Hotfile with the ability to supervise infringing conduct.  DRSF 11.b.i., 35.  Based on this factual record, it cannot be said that Hotfile has the practical ability to stop infringing conduct.[41]  *See Wolk*, *25 (dismissing vicarious infringement claim because online photo sharing site has no "right and ability to supervise" infringing activity).

In one of the most recent decisions to address vicarious infringement in the online context, the use of digital fingerprinting technology was found sufficient to warrant denial of summary judgment to the plaintiff.  *See Myxer*, at *141.  There, the court stated: "To the extent that Myxer uses Audible Magic filtering technology (as well as other means to stop or limit the alleged copyright infringement) there remain genuine issues of material fact as to whether Myxer sufficiently exercises a right to stop or limit the alleged copyright infringement."  In the instant case, where Hotfile uses not only digital fingerprinting but numerous other means to limit infringement, there can be no question that summary judgment must be denied.

Nor can the Studios prove that Hotfile "profits from direct infringement."  As the Studios note, this element requires that they prove a "causal relationship between the infringing activity and any financial benefit a defendant reaps." *Ellison v. Robertson*, 357 F.3d 1072, 1079 (9th Cir. 2004).   This requires a showing of a "direct financial benefit from infringement." *Netcom*, 907 F. Supp. at 1376.  In *Netcom*, the court dismissed a claim for vicarious liability against an Internet service provider on which infringing material had been posted because the defendant charged "a fixed fee" that did not depend on the nature (e.g., infringing or non-infringing) of the activity of the customer.  *Id.*  The court rejected the argument – similar to arguments made by the Studios here – that the defendant did not take adequate enforcement action against infringement and that its "easy, regulation-free . . . policy attracts copyright infringers to its system." *Id.* at 1377.  The court was "not convinced that such an argument, if true, would constitute a direct financial benefit" to the defendant. *Id.*

---

[41] The other cases on which the Studios rely also involve P2P networks.  As already explained, those cases are inapposite. *See supra* at pp. 25-26. *See also Netcom*, 907 F. Supp. at 1376 (question of fact as to whether internet service provider had ability to control infringement).

FILED UNDER SEAL                    CASE NO.: 11-CIV-20427-WILLIAMS/TURNOFF

Like the defendant in *Netcom*, Hotfile charges a "fixed fee" to Premium subscribers, regardless of the content that they upload or download.  DSUF 19.  In fact, the "conversion rate" favors non-infringing works over infringing – meaning that users downloading a non-infringing work wore likely to purchase a Premium subscription than a user downloading an infringing work.  DRSF 32.  More than half of the files on Hotfile were never downloaded, meaning that users predominantly use Hotfile to store (or space-shift) rather than to access infringing material.  DRSF 24.  Hotfile's Premium account model facilitates storage, as it provides for unlimited storage for people who buy Premium accounts.  Titov Decl. ¶¶ 3, 7; Leibnitz Ex. 2 (Titov Dep.) at 711:16-21.  Accordingly, at a minimum, there is a triable issue of fact as to whether Hotfile receives a "direct financial benefit from infringement."

## VI.  THE EVIDENCE DOES NOT SUPPORT PERSONAL LIABILITY AGAINST MR. TITOV[42]

### A.  Mr. Titov Is Neither The "Guiding Spirit" Of Hotfile Nor Its "Dominant" And "Controlling" Influence.

As discussed in Mr. Titov's summary judgment motion, the Studios sued Mr. Titov individually based on a series of assumptions about his involvement in Hotfile's operations that have turned out to be false.  *See* Dkt. (Titov Mot.) 316.  Abandoning their prior theories, the Studios now argue that Mr. Titov is individually liable based on his involvement with two non-party entities – Hotfile Ltd. and Lemuria – that provide ancillary services to Hotfile.  This brand-new theory fails on both the facts and the law.

To hold an individual liable for alleged copyright infringement under a "guiding spirit" theory requires proof that the individual was the "moving, active, conscious force who caused the infringement." *Chanel, Inc.,* 931 F.2d at fn.8.  This means that a plaintiff must prove that the individual " actively participated as a moving force in the *decision* to engage in the infringing acts, or otherwise caused the infringement as a whole to occur." *Id.* at 1478, n. 8.  Alternatively, an individual can be held personally liable based on proof that the s/he "has the ability to supervise infringing activity and has a financial interest in that activity." *So. Bell Tel. & Tel. Co.,* 756 F.2d at 811.  This vicarious liability standard is reserved for claims against individuals "who have a dominant influence in a corporation and who have the capacity to control the acts of that corporation...." *Morley Music Co v. Continental, Inc.,* 777 F. Supp. 1579, 1580, 1580 (S.D.

---

[42] As discussed in Mr. Titov's motion for summary judgment, he is not subject to personal jurisdiction in this Court and should be dismissed on that basis alone.  Titov Mot. at IV.C.

Fla. 1991).  *See Nick-O-Val Music. Co., Inc. v. P.O.S. Radio, Inc.,* 656 F. Supp. 826, 828 (M.D. Fla. 1987).

The Studios' motion ignores key evidence that forecloses the imposition of personal liability against Mr. Titov under these high standards.  The following undisputed facts – which the Studios' motion studiously avoids – forecloses any conclusion that Mr. Titov is the "moving, active, conscious force" behind the alleged infringement or the "dominant influence" with the "capacity to control" Hotfile:  Mr. Titov is not only a minority shareholder but the smallest shareholder of Hotfile; the idea for Hotfile and its business model – including the Affiliate program (and the specific payment criteria of the Affiliate program) – were not Mr. Titov's but, rather, were his co-founder's ideas based on pre-existing business models that were apparent in the marketplace; Mr. Titov is not responsible for the day-to-day operations of Hotfile; Mr. Titov does not have authority to establish general policy or make decisions about substantial aspects of the operations of Hotfile without the approval of the other shareholders; Mr. Titov is not responsible for matters of business, finance, or DMCA and legal compliance at Hotfile – his responsibilities are limited to technological issues; and the personnel who perform work for Hotfile are employees of Blue Ant and do not report to Mr. Titov.  TSUF 4, 5, 6, 7, 8, 11.

Furthermore, there is no evidence that Mr. Titov participated in the predicate acts upon which the Studios base their inducement claim against Hotfile.  Mr. Titov did not conceive of or design the Affiliate program.  TSUF 7, 8; DRSF 22.a.iii.  There is no evidence that Mr. Titov was the "moving, active, conscious force" behind Hotfile's business model or its policies with respect to repeat infringers.  TSUF 4, 10; DRSF 22.e..  There is no evidence that Mr. Titov helped any users to infringe.  DRSF 22.f.i-iii.  There is no evidence that he was the "moving, active, conscious force" behind how Hotfile blocked access to files prior to implementing hash-blocking in August 2009.  DRSF 22.e., 22.f.i.  On this factual record, no reasonable jury could find that Mr. Titov is the "moving, active, conscious force" behind the alleged infringement or that he is the "dominant influence" and has the "capacity to control" Hotfile.[43]  *See Mozingo v.*

---

[43] In stark contrast to Mr. Titov, courts typically reserve personal liability for individuals who exert singular and dominant control over a corporation and its accused conduct.  *See Morley Music Co v. Continental, Inc.*, 777 F. Supp. 1579, 1580, 1582 (S.D. Fla. 1991) (individual defendant personally liable for copyright infringement where he was the "president and sole shareholder" of corporation and the "manager and operator of day to day affairs"); *j2 Global Communications, Inc. v. Blue Jay, Inc.*, No. C 08-4254 PJH, 2009 WL 29905, at *9 (N.D. Cal.

FILED UNDER SEAL                    CASE NO.: 11-CIV-20427-WILLIAMS/TURNOFF

*Correct Mfg. Corp.*, 752 F.2d 168, 174 (5th Cir. 1985) (finding no "guiding spirit" liability against company's president, general manager and controlling shareholder who had personally authorized the prototype of defective product and expressed reservations about its safety because evidence did not show he was "central figure" behind wrongful conduct).

    The case law that the Studios rely on does not support their claim against Mr. Titov. Those cases involved companies that are dominated by one individual who has substantial (and, often singular) control over the company and its accused activities. *See Arista Records LLC v. Lime Group LLC*, 784 F. Supp. 2d at 438 (defendant was the CEO and sole director of the defendant company, "ran" the company, was the "ultimate decisionmaker" of the company, had to approve "any major strategic and design decision," had "veto" power and "conceived of" the business); *Arista Records LLC v. Usenet.com, Inc.*, 633 F. Supp. 2d at 158 (defendant was sole shareholder and director of business, stated that "the company's me," had a "ubiquitous role" in the company's activities, was responsible for the "overall strategic vision" of the company, and ultimately had no employees; *Fung*, at *2 (defendant ran websites essentially by himself). *Mattel, Inc. v. Robarb's, Inc.*, No. 00 Civ. 4866 (RWS), 2001 WL 913894, at *8-9 (S.D.N.Y. Aug. 14, 2001) (two of three individual defendants found *not* liable, the third found liable where he was the President and owner[44] of company and conceived of and designed the infringing product).[45]

---

Jan. 5, 2009) (refusing to dismiss individual claim against defendant who was "president and sole officer" of corporation, "set company policies and oversaw day-to-day operations" of the corporation, and was "personally and solely responsible" for the accused conduct); *Playboy Enters., Inc., v. Starware Publ'g Corp.,* 900 F. Supp. 438, 441-442 (S.D. Fla. 1995)(defendant held personally liable for copyright infringement where he was President and shareholder of corporation and had personally authorized the sale, advertisement and production of the infringing material).

[44] *See Mattel, Inc. v. Robarb's, Inc.,* 139 F. Supp. 2d 487, 489 (S.D.N.Y. 2001) (defendant President was also owner of the company).

[45] See also *Blendingwell Music, Inc. v. Moor-Law, Inc.,* 612 F. Supp. 474, 482 (D. Del. 1985) (defendant was sole officer and shareholder and exercised control such that he was "in a position to police" infringing activity); *U.S. Media Corp. Edde Entertainment, Inc.,* No. 94 Civ. 4849 (MBM)(MHMD), 1996 WL 520901, at *5-6 (S.D.N.Y. Sept. 12, 1996) (one defendant was sole owner and employee of corporation and personally arranged unauthorized sale, other defendants were 50-50 owners and officers who personally participated in purchase of infringing works); *Songmaker v. Forward of Kansas, Inc.,* No. 90-4156-SAC, 1993 WL 106833, at *6 (D. Kan. Mar. 5, 1993) (defendant was President and COO of radio station, "controlled management," "exercised daily control over the station's business," and was "plainly situated to

FILED UNDER SEAL                    CASE NO.: 11-CIV-20427-WILLIAMS/TURNOFF

**B.     The Studios' Cannot Establish Personal Liability Based On Mr. Titov's Work For Non-Party Entities.**

Because discovery uncovered zero evidence to support their allegations of personal liability against Mr. Titov, the Studios concoct a novel theory of liability against Mr. Titov's based on his roles in Hotfile Ltd. and Lemuria. They resort to hyperbole, innuendo and invective to try to paint an unsavory – and wholly misleading – picture of a "web of companies" in which Lemuria is a "front" for Hotfile. Mot. at III.A. This tale is not to be believed and is not supported by admissible evidence, as the Studios have never sought to pierce the corporate veil nor have they ever sought to add Lemuria or Hotfile Ltd. as parties to this litigation notwithstanding that they have been expressly aware of these companies since day one. (Compl. ¶ 11; Dkt. 14 at 8.)

The Studios allege that the "operations of the Hotfile website are directed by two other entities [Hotfile Ltd. and Lemuria] that Titov exclusively controls." Mot. at 36. The evidence does not remotely support this allegation. Hotfile Ltd. is a company that has only one purpose, which is essentially mechanical:  it operates the PayPal account that makes payments to Hotfile affiliates and takes payments from Premium subscribers. TSUF 12. It was formed at the inception of Hotfile when the founders learned that PayPal had a policy that restricted the ability of Panamanian corporations – such as Hotfile – to use PayPal. TSUF 12. Mr. Titov became the manager of Hotfile Ltd. simply because, at the time, he was the person operating the PayPal account that was used for these transactions. TSUF 12. By the terms of its contract, Hotfile Ltd. must follow the instructions of Hotfile Corp. DRSF 21.b.i. There is no evidence to suggest that Mr. Titov is a "guiding spirit" or dominates or controls Hotfile simply because he operates a PayPal account for an entity that reports to Hotfile. TSUF 11.

The Studios' hyperbole about Lemuria is even more far-fetched, stating that Lemuria "coordinate[s] the great majority of Hotfile's operations" and acts as a "front" for Hotfile in "almost all commercial dealings." Mot. at 36. This sensationalistic rhetoric is simply not to be believed. Lemuria is a company that provides web-hosting services to Hotfile. Like the Studios

---

exercise a great deal of control over the financial interests involved and to enjoy, personally and vicariously, the financial benefits of the business"). While the Studios cite the *Home Design* case in their brief, that case actually found *against* liability where, like Mr. Titov, the defendant was not responsible for the company's day-to-day operations. *Home Design Servs., Inc. v. Park Square Eng'rs., Inc.*, No. 6:02-CV-637-ORL28JGGM 2005 WL 1027370, at *4 (M.D. Fla. May 2, 2005) (finding no personal liability).

-37-

state, Lemuria contracts with third parties for collocation facilities, bandwidth and servers –
***exactly the services that any web-host (e.g., Amazon) would provide.*** Titov Opp. Decl. ¶ 58.
Lemuria was initially formed because the company that Hotfile first contracted with to provide
Internet connectivity was providing poor performance.[46] TSUF 13.

　　　The Studios' invective suggesting that these companies did not interact at "arms-length"
or did not have "meaningful regard for corporate formalities" is unsupported by any actual
evidence.  It goes without saying that a corporation may contract with third parties to perform
tasks when this promotes operational and financial efficiency. Hotfile's arrangement with
Lemuria for the performance of certain services is one such example.[47] Because of Hotfile's
jurisdiction of incorporation, Hotfile was unable to efficiently make payments and perform
certain other activities. For this reason, it contracted with Lemuria – the most trusted US-based
third party it could find (since it was owned by one of the founders). Given that Lemuria and
Hotfile adhered to all corporate formalities (and there is no evidence to the contrary), it is
improper to ignore the corporate veil and attribute Lemuria's actions to Mr. Titov.  Payments
that Lemuria made were not made by Mr. Titov personally.  None of the authorities concerning
"guiding spirit" or "dominant influence" liability hold or even suggest that a defendant can be
held personally liable simply because he is the officer of a non-party company that provides
services to a defendant entity.[48]

**C.    The Studios' Arguments About Mr. Titov's "Personal Participation" Are Similarly
　　　Misguided**

　　　The Studios argue that Mr. Titov "personally participated" in the alleged infringing
activity by exaggerating (at times bordering on fabricating) the state of the factual record and
relying on evidence that is simply unhelpful to the Studios.  Indeed, the Studios lead argument

---

[46] The Studios' assertion that Hotfile created Lemuria "after Hotfile's then-Internet service
provider complained about the volume of copyright complaints it had been receiving about
Hotfile" is patently false, is contrary to the uncontroverted evidence on this point, and is even
contrary to the Studios' prior (and also false) assertion about why Lemuria was formed. DRSF
21.c.iii..

[47] This verbal agreement has recently been formalized in a written contract.  DRSF 21.c.ii.

[48] Though the Studios now claim that Mr. Titov should be held personally liable based on his
role with Lemuria, at Mr. Titov's deposition, the Studios' lead counsel previously pointed the
finger at Mr. Stoyanov, not Mr. Titov, in regard to Lemuria, stating on the record that "Lemuria
clearly is a piggy bank of Mr. Stoyanovich – what's his name – Stoyanov."  Leibnitz Ex. 2
(Titov Dep.) at 624:17-18.  The Studios apparently can't decide at whom they should throw mud.

here is that Anton's "personal participation" consisted of making payments to Affiliates.  That is a routine task that does not establish personal liability, and Hotfile Ltd. – not Mr. Titov personally – makes the payments.  Titov Opp Decl. ¶ 40.  As already noted, the Affiliate program was neither created nor designed by Mr. Titov.  TSUF 7-8.

      The Studios next argue that Mr. Titov was the "lead developer" of the Hotfile website and that he "personally participated" in alleged infringing activity because he "personally arranges for the provision of servers, bandwidth and other technical infrastructure to allow the Hotfile website to function."  Mot. at 38.  The Studios also claim that Mr. Titov was "involved in the design of the website" and "manages" Hotfile's DMCA agent.  If these allegations were accurate (which they are not), they would not come close to making him a "guiding spirit" or "dominant influence."  *See Mozingo v. Correct Mfg. Corp.* at 174.  But, in fact, the Studios exaggerate the record on each of these points. DRSF 22.a.i.-iii.; Leibnitz Ex. 2 (Titov Dep.) at 386:23-387:4, 28:19-30:8, 32:12-35:5.

      The Studios continue the barrage of misinformation by arguing that Mr. Titov "is involved in all decisions concerning Hotfile's policies and operations, and has broad decision-making authority over Hotfile's business."  As already demonstrated by uncontroverted evidence, this is simply not the case. DRSF 22.e; TSUF 7, 8, 10, 11.  And the Studios' assertion that Mr. Titov was "exposed" to copyright owner complaints" is based on exactly one email forwarded to Mr. Titov by a Blue Ant employee, in which Mr. Titov directs the Blue Ant employee to terminate a repeat infringer – precisely the right response. DRSF 22.f.ii; Yeh Ex. 21.

      Finally, the Studios argue that Mr. Titov has a "powerful direct financial interest in Hotfile's infringement."  This argument fails as a matter of law.  To hold an individual personally liable under a vicarious liability theory, the individual must have an "obvious and direct financial interest in the exploitation of copyrighted materials."  *Parker v. Google,* 422 F. Supp. 2d 492, 500 (E.D. Pa. 2006).  "The mere fact that a defendant is an officer and shareholder of an infringing corporation is too attenuated to show a direct financial interest in the exploitation of copyrighted materials."  *Netbula, LLC v. Chordiant Software, Inc.,* No. C 08-00019 JW, 2009 WL 750201, at *2-3 (N.D. Cal. March 20, 2009).

      The only facts that the Studios point to in support of this assertion are that Mr. Titov is a Hotfile shareholder (and, thus, received shareholder distributions) and that he has received salaries from the two non-parties, Lemuria and Hotfile Ltd.  (Mot. at 40.)  The Studios, thus, try

FILED UNDER SEAL                          CASE NO.: 11-CIV-20427-WILLIAMS/TURNOFF

to do exactly what the law does not allow – to establish personal liability based on the "mere fact" that Mr. Titov is a shareholder of Hotfile.[49]  As a matter of law, that is *not* enough to establish an "obvious and direct financial interest in the exploitations of copyrighted materials." *Parker,* 422 F. Supp. 2d at 500; *Netbula, LLC,* at *2-3.[50]

## VII. CONCLUSION

Congress enacted the DMCA "to foster *cooperation* among copyright holders and service providers in dealing with infringement on the Internet." *UMG Recordings,* 667 F. 3d at 1037 (citing S. Rep. No. 105-190, at 20).  Hotfile went to extraordinary lengths to proactively cooperate with the Plaintiff Studios, including granting their request for unprecedented direct access to delete files suspected of copyright infringement on its site.  With their SRAs, the Studios could and did delete files from Hotfile.com, as many and as often as they saw fit.  But these Plaintiffs did not reciprocate.  While feigning cooperation and complimenting Hotfile for its effective copyright/DMCA compliance, they were all along secretly plotting this lawsuit.  Duplicity is not cooperation and should not be rewarded.  Hotfile and Mr. Titov respectfully submit that cynical data manipulation and name-calling cannot suffice to deprive Hotfile of its right to have a jury decide whether these important issues that go to the core of the careful balance Congress struck between promoting internet freedom and technical advancement against protecting the important rights of content owners.  The Studios' motion for summary judgment should be denied.

DATED: March 7, 2012                          Respectfully submitted,

---

[49] In fact, Mr. Titov does not personally own Hotfile shares; rather, a company he owns is the owner of a 26% interest in Hotfile.  Yeh Ex. 1 (Titov Dep.) at 84:17-22.  That company, not Mr. Titov personally, has received Hotfile distributions.  Yeh Ex. 71.

[50] The DMCA makes this even more clear.  *See* Titov Mot. at IV.B.

-40-

FILED UNDER SEAL                    CASE NO.: 11-CIV-20427-WILLIAMS/TURNOFF

*Janet T. Munn*

Janet T. Munn, Esq. Fla. Bar No. 501281
Email: jmunn@rascoklock.com
RASCO KLOCK
283 Catalonia Avenue, Suite 200
Coral Gables, Fl 33134
Telephone: 305.476.7101
Telecopy: 305.476.7102

And

*Roderick M. Thompson by J Munn*

Roderick M. Thompson, Esq. (admitted *pro hac vice*)
Email: rthompson@fbm.com
Andrew Leibnitz, Esq. (admitted *pro hac vice*)
Email: aleibnitz@fbm.com
Anthony P. Schoenberg, Esq. (admitted *pro hac vice*)
Email: tschoenberg@fbm.com
Deepak Gupta, Esq. (admitted *pro hac vice*)
Email: dgupta@fbm.com
Janel Thamkul, Esq. (admitted *pro hac vice*)
Email: jthamkul@fbm.com
FARELLA BRAUN + MARTEL LLP
235 Montgomery St.
San Francisco, CA 94104
Telephone: 415.954.4400
Telecopy: 415.954.4480

And

*Valentin Gurvits by J Munn*

Valentin Gurvits, Esq. (admitted *pro hac vice*)
Email: vgurvits@bostonlawgroup.com
BOSTON LAW GROUP
825 Beacon Street, Suite 20
Newton Center, MA 02459
Telephone: 617.928.1800
Telecopy: 617.928.1802

*Counsel for Defendants Hotfile Corporation
  and Anton Titov*

-41-

FILED UNDER SEAL                         CASE NO.: 11-CIV-20427-WILLIAMS/TURNOFF

## CERTIFICATE OF SERVICE

I hereby certify that on March 7, 2012, a true and correct copy of the foregoing

document, was filed conventionally and served on all counsel of record identified below via e-

mail and by Federal Express.

Karen L. Stetson, Esq.
GRAY-ROBINSON, P.A.
Email: Karen.Stetson@gray-robinson.com
1221 Brickell Avenue
Suite 1600
Miami, FL  33131
Telephone: 305.416.6880
Telecopy: 305.416.6887

Karen R. Thorland, Esq. (admitted *pro hac vice*)
Senior Content Protection Counsel
Email: Karen_Thorland@mpaa.org
Motion Picture Association of America, Inc.
15301 Ventura Boulevard, Building E
Sherman Oaks, CA  91403-5885
Telephone: 818.935.5812

Steven B. Fabrizio, Esq. (admitted *pro hac vice*)
Email: sfabrizio@jenner.com
Duane C. Pozza, Esq. (admitted *pro hac vice*)
Email: dpozza@jenner.com
Luke C. Platzer, Esq. (admitted *pro hac vice*)
Email: lplatzer@jenner.com
JENNER AND BLOCK, LLP
1099 New York Avenue, N.W.
Suite 900
Washington, DC  20001
Telephone: 202.639.6000
Telecopy: 202.639.6066

By: _Janet J. Munn_____
Janet T. Munn