FILED UNDER SEAL

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.: 11-CIV-20427-WILLIAMS/TURNOFF

FILED by ___ D.C.

**MAR 0 7 2012**

STEVEN M. LARIMORE
CLERK U.S. DIST. CT.
S. D. of FLA. – MIAMI

DISNEY ENTERPRISES, INC.,
TWENTIETH CENTURY FOX FILM
CORPORATION, UNIVERSAL CITY
STUDIOS PRODUCTIONS LLP,
COLUMBIA PICTURES INDUSTRIES,
INC., and WARNER BROS.
ENTERTAINMENT INC.,

       *Plaintiffs,*

v.

HOTFILE CORP., ANTON TITOV, and
DOES 1-10,

       *Defendants.*           /
_____

HOTFILE CORP.,

       *Counterclaimant,*

v.

WARNER BROS. ENTERTAINMENT INC.,

       *Counter-Defendant.*       /
_____

**STATEMENT OF FACTS OF DEFENDANTS
HOTFILE CORPORATION AND ANTON
TITOV IN OPPOSITION TO PLAINTIFFS'
STATEMENT OF UNCONTROVERTED
FACTS; DEFENDANTS' STATEMENT OF
ADDITIONAL MATERIAL FACTS**

**[CONFIDENTIAL]**

## PREFACE

Plaintiffs assert in their prefatory section, "Table Of Citation Form," that "section headings" and "subsidiary paragraphs" are **not** claimed to be "[u]ncontroverted material facts," but rather that only consecutively numbered paragraphs (using numerals 1, 2, 3, etc.) are asserted "[u]ncontroverted material facts."  Therefore, Hotfile provides evidence only to controvert Plaintiffs' substantive assertions – including Plaintiffs' "subsidiary paragraphs."  To be clear, Hotfile disputes the assertions set forth in Plaintiffs' section headings (introduced by capital Roman numerals and capital letters as well as unsupported numerical headings), which simply state argument without any factual support or citations to the record whatsoever.  Hotfile disputes each of Plaintiffs' characterizations set forth in these headings (including the assertion that "subsidiary paragraphs" do not provide "material" facts).

Regarding the format of Defendants' instant Responses To Plaintiffs' Statement Of Uncontroverted Facts ("DRSF"), Defendants note that they have previously moved to strike rebuttal testimony from Dr. Richard Waterman, Dkt No. 217, and are contemporaneously moving to strike "evidence" submitted by Plaintiffs' outside counsel, Jennifer Yeh.  Where Plaintiffs' "[u]ncontroverted material facts" refer to this purported evidence, Defendants have noted their objection and motion to strike using the following legend:

A.      an asterisk (*) indicates reliance on testimony in or exhibits to the Yeh Declaration which are subject to a separate motion to strike;

B.      a cross (†) indicates reliance on statements, testimony, and other materials which rely on the inadmissible report and faulty analysis of Dr. Waterman, which is also subject to a separate motion to strike.

## CITATION LEGEND

1.      "PSUF" shall refer to specific paragraph numbers of Plaintiffs' Statement of Uncontroverted Facts.

2.      "DSUF" shall refer to specific paragraph numbers of Statement of Undisputed Material Facts In Support of Motion of Defendants Hotfile Corporation and Anton Titov for Partial Summary Judgment Based on the Digital Millennium Copyright Act Safe Harbor.

3.      "TSUF" shall refer to specific paragraph numbers of Statement of Undisputed Material Facts In Support of Motion of Anton Titov's Motion for Summary Judgment.

FILED UNDER SEAL                          CASE NO. 11-CIV-20427-WILLIAMS/TURNOFF

4.      "DRSF" shall refer to specific paragraph numbers of the Statement of Facts of Defendants Hotfile Corporation and Anton Titov In Opposition to Plaintiffs' Statement of Uncontroverted Facts and Defendants' Statement of Additional Material Facts.

5.      "Foster Decl." shall refer to the declaration of Dr. Ian Foster in support of Plaintiffs' Motion for Summary Judgment Against Defendants Hotfile Corp. and Anton Titov, dated February 17, 2012.

6.      "Yeh Decl." shall refer to the declaration of Jennifer V. Yeh in support of Plaintiffs' Motion for Summary Judgment Against Defendants Hotfile Corp. and Anton Titov, dated February 17, 2012.

7.      "Titov Decl." shall refer to the declaration of Anton Titov in support of Defendants' Motion for Summary Judgment.

8.      "Titov Opp. Decl." shall refer to the declaration of Anton Titov in support of Defendants' Opposition to Plaintiffs' Motion for Summary Judgment.

9.      "Leibnitz Decl." shall refer to the declaration of Andrew Leibnitz in support of Defendants' Opposition to Plaintiffs' Motion for Summary Judgment.

10.     "Gupta Decl." shall refer to the declaration of Deepak Gupta in support of Defendants' Motion for Summary Judgment.

11.     "Schoenberg Decl." shall refer to the declaration of Anthony Schoenberg in support of Anton Titov's Motion for Summary Judgment.

12.     "Levy Decl." shall refer to the declaration of Dr. Daniel S. Levy in support of Defendant's Opposition to Plaintiffs' Motion for Summary Judgment.

13.     "Cromarty Decl." shall refer to the declaration of Dr. Andrew Cromarty in support of Defendant's Opposition to Plaintiffs' Motion for Summary Judgment.

14.     "Boyle Decl." shall refer to the declaration of Dr. James Boyle in support of Defendant's Opposition to Plaintiffs' Motion for Summary Judgment.

15.     "Leibnitz Ex. __," shall refer to exhibits attached to the Leibnitz Declaration.

16.     "Yeh Ex. __," shall refer to exhibits attached to the Yeh Declaration.

17.     "Gupta Ex. __," shall refer to exhibits attached to the Gupta Declaration.

18.     "Schoenberg Ex. __," shall refer to exhibits attached to the Schoenberg Declaration.

19.     "Boyle Ex. __," shall refer to exhibits attached to the Boyle Declaration.

FILED UNDER SEAL

## DEFENDANTS' RESPONSES TO PLAINTIFFS' "UNCONTROVERTED" FACTS

**Fact 1.** Disputed. Defendants received notice of alleged infringement regarding approximately 8 million unique *links*, not files. Titov Opp. Decl. ¶ 26. Plaintiffs' expert concedes that 113,406,857 files have been uploaded to Hotfile, meaning that only 8.8% of files uploaded to Hotfile have been accused of infringement. Foster Decl. ¶ 62; *see infra* DRSF 37.

**Fact 2.** Disputed. Defendants could not have associated takedown notices with anonymous uploaders. Titov ESI Dep. 41:4-11. While Hotfile was capable of extracting *upload IDs* from notices, Yeh Ex. 2 (Titov ESI Dep.) at 51:23-52:4, Defendants had no reason to do so given Plaintiffs' praise of Hotfile's copyright enforcement efforts and Hotfile's reliance upon Plaintiffs' superior resources to police their own works. *See infra* DRSF 34, 36.

**Fact 3.** Disputed. Hotfile complied with the DMCA's safe harbor provisions by terminating accounts of repeat copyright infringers and processing takedown notices from copyright holders within 48 hours. *See* DUSF ¶ 18. Hotfile used its discretion in investigating reported uploaders of allegedly infringing files and terminating users who were the subject of multiple notices on receipt of complaints from copyright owners. *See* Titov Decl. ¶¶ 31, 33.

**Fact 4 & 4.a.** Disputed. *See supra* DRSF 3.

**Fact 4.b.** Disputed. Yeh Exs. 10 & 12 are draft emails circulated only within Hotfile and were never "maintained publicly." Yeh Ex. 1 (Titov Dep.) at 284:20-286:18. Yeh Ex. 11 is also an internal email suggesting that Hotfile was contemplating a manual review process to terminate repeat infringers in 2009. The description of Hotfile's policy in Yeh Ex. 11 was "not accurate *in the fact that he's suggesting that something automatic is happening*," not that Hotfile never suspended user accounts after 3 DMCA reports. Leibnitz Ex. 2 (Titov Dep.) at 289:1-4. That Hotfile moved forward with SRAs (at Plaintiffs' request), MD5 hashing and a termination-on-specific-request policy instead of a strikes-based policy does not counter this email or show that Hotfile was unreasonable. In any event, Hotfile did perform manual reviews of, terminate, and stop payments to accounts of users with numerous complaints at content owners' requests.

**Fact 4.c.\*†** Disputed. In its early days, Hotfile did not have the functionality to suspend users, only to delete them, which eliminated information of those users from its database, so an unknown number of users were terminated but not recorded. Leibnitz Ex. 2 (Titov Dep.) at 290:7-12.

**Fact 4.c.i.\*** Disputed. Defendants dispute Plaintiffs' assumption that 33 terminations

FILED UNDER SEAL                          CASE NO. 11-CIV-20427-WILLIAMS/TURNOFF

were in response to a TRO by Liberty Media.  Leibnitz Ex. 2 (Titov Dep.) at 299:22-24, 300:23-24.  Further, Yeh Ex. 1 at 302:11-304:10 refers to a subpoena served by Corbin Fisher, not a TRO.

**Fact 4.c.ii.\*** Disputed.  Other pre-complaint terminations were not in response to threats or complaints from copyright owners.  Leibnitz Ex. 2 (Titov Dep.) at 304:11-322:21.  There is no suggestion, for example, that DSH Productions provided anything more than a takedown notice before Hotfile initiated terminations at their behest.  While Hotfile received millions of notices, it also had many millions of registered users and innumerable anonymous users.  Titov Opp. Decl. ¶ 35.  It was thus not unreasonable for Hotfile to rely on Plaintiffs' praise of Hotfile's efforts to combat infringement.  *See infra* DRSF 34, 36.

**Fact 4.d.** Disputed.  Defendants' cautiousness due to pending litigation is immaterial.

**Fact 4.e.\*** Disputed.  Plaintiffs cannot authenticate this comment from an unknown Internet user unless they wrote it themselves; there is no evidence Defendants saw the posting.

**Fact 5.a.\*†** Disputed.  Hotfile did not track strikes before February 18, 2011 and has learned of wide abuse by Warner and Plaintiffs' agents who used the SRA tool to wrongfully takedown files with no authorization to do so.  Such wrongful takedowns should not be strikes, yet Plaintiffs included them in their expert's figure.  Records show that LeakID and others continuously sent takedowns for files that were already deleted, dozens of times.  Three strikes is not mandated in the law, and Hotfile managed 2,884,928,361 downloads, 123,344,533 uploads, and 5,287,163 registered users while utilizing the services of approximately six people – i.e., less than one-third the number of people employed in Warner's anti-piracy unit alone.  Titov Opp. Decl. ¶ 36; Leibnitz Ex. 11 (Kaplan Dep.) at 11:4-12:3.  There is no evidence that Hotfile knew that 0.1% of its users received dozens of takedown notices, or that 61 users received hundreds of notices.

**Fact 5.a.i.\*†** Disputed.  Immaterial; the files uploaded at any particular time cited by Plaintiffs is not meaningful; there is no evidence these were infringing.  *See supra* DRSF 5.a.

**Fact 5.a.ii.†** Disputed.  Plaintiffs' statistic is meaningless for the reasons described above; there is no evidence these were infringing.  *See supra* DRSF 5.a.

**Fact 5.a.iii.\*†** Disputed.  Plaintiffs' statistic extrapolates from the prior meaningless statistic in PSUF 5.a.ii.  That Plaintiffs' experts, through flawed analysis, denoted 25,000 of Hotfile's 5,287,163 registered users as "bad" has no correlation to copyright infringement.  The

FILED UNDER SEAL                    CASE NO. 11-CIV-20427-WILLIAMS/TURNOFF

1.5 billion downloads number is also irrelevant; there is no evidence these were infringing.

**Fact 5.a.iv.**  Disputed.  Plaintiffs' conclusion that such users were "repeat infringers" is unfounded and unsubstantiated by the evidence.  *See supra* DRSF 5.a.

**Fact 5.a.v.**  Disputed; immaterial.  Such users made up a small fraction of the total number of registered users of Hotfile.  *See supra* DRSF 5.a.

**Fact 5.b.\*†**  Disputed.  Immaterial; Hotfile only terminated 4% of its known uploaders, and 22,447 (0.42%) of its users; over 15,000 Affiliates were *not* terminated.  Titov Opp. Decl. ¶ 37.  Plaintiffs fails to specify a period when such users earned "strikes." *See supra* DRSF 5.a.1-v.

**Fact 6.**  Disputed.  Immaterial; Hotfile "designated an agent to receive notifications of claimed infringement" on its website since its launch in February 2009.  Initially, content owners could use a report abuse form "available [] on [the Hotfile] website in a location accessible to the public" to reach its abuse department at this email box. DSUF ¶ 6.  By April 2009, Hotfile.com advised: "To exercise your DMCA rights, your Proper DMCA Notice must be sent to Designated Agent of hotfile.com to email: abuse@hotfile.com."  *Id.* ¶ 7.  Yeh Exs. 25 and 6 (Luchian Dep. at 17:17-18:7) have nothing to do with registration at the Copyright Office.  Plaintiffs never had difficulty contacting Hotfile with takedown notices.  *See* Titov Decl. ¶ 13, Exs. 15, 19; *see also* Gupta Decl., Ex. 14, Defs.' Suppl. Am. Resp. to Pls.' Interrog. No. 2.

**Fact 7.**  Disputed.  Immaterial; Hotfile made the abuse@hotfile.com address available on its site since the outset.  DSUF 4.

**Fact 8.\***  Disputed.  Immaterial; the physical address listed for Hotfile's DMCA agent is that used by the agent, Incorporate Now, for all its clients.  Leibnitz Ex. 22 (Luchian Dep.) at 129:6-130:14.

**Fact 9.a.i.**  Disputed.  When users upload the same file with identical hash numbers, one entry is stored in the file table, but multiple copies of the file may exist.  Leibnitz Ex. 2 (Titov Dep.) at 337:9-15.

**Fact 9.a.ii.**  Undisputed.

**Fact 9.a.iii.**  Disputed.  Hotfile disabled URLs subject to takedown notices, allowing users to make non-infringing uses of copyrighted files (like "time-shifting" when consumers record copyrighted TV programs for later viewing) even if another user is accused of infringing the same master file.  Since August of 2009 to present, Hotfile unilaterally blocked downloading

3

of a particular hash for a file identified in a takedown notice.  Leibnitz Ex. 2 (Titov Dep.) at 339:12-19.

**Fact 9.a.iv.**  Disputed.  Immaterial; Hotfile permits uploaders to obtain several URLs for every upload so the uploader can track downloads by different population segments (e.g., how many times downloaders accessed one's photo album from Facebook versus Twitter).  Titov Opp. Decl. ¶ 49.  Plaintiffs have no evidence that before hash-blocking, users exploited duplicate URLs to propagate infringement, so that the takedown of one infringing URL would not impact the operation of another URL relating to the same content.  Before August 2009, only 48,094 (or 1.7%) of the 2,852,406 files stored at Hotfile had duplicate URLs, and only 117,931 (4.1%) of Hotfile's files were subject to takedown notices.  *Id.*

**Fact 9.a.v.**  Undisputed for August 2009 period.  Otherwise, disputed.  *Supra* DRSF 38.

**Fact 9.b.***  Disputed.  Immaterial; URL does not indicate file content or infringement.  *See infra* DRSF 35.

**Fact 9.c.***  Disputed.  Hotfile has exchanged 701,116 e-mails with users.  Titov Opp. Decl. ¶ 44.  Each e-mail to Hotfile automatically identifies the link to the last file downloaded by the user.  *Id.*  Hotfile does not respond to emails itself, but assigns the task to an independent contractor, Andrew Ianokov, who receives an average of 640 emails daily.  Titov Opp. Decl. ¶ 45; Leibnitz Ex. 2 (Titov Dep.) at 314:1-5.  Given the volume, Mr. Ianokov could not respond to every email.  For the majority of inquiries where Hotfile could not assist ("my computer crashed" [Titov Ex. 131] or "my download stopped" [Titov Ex. 89]), Mr. Ianakov made no response.  Titov Opp. Decl. ¶ 45.  Here, 66 of Plaintiffs' proffered e-mails received no evident attention or response.  Yeh. Exs. 28, 30.  Others received generic responses, *e.g., id.* (Titov Exs. 56, 96, 99), or offers of refunds, *e.g., id.* (Titov Ex. 113, 123, 130) – in both cases there was no reason to consider the user's last download.  Titov Opp. Decl. ¶ 45.  Of the 3 emails Plaintiffs identified out of thousands of user emails to which Mr. Ianakov provided a response, Yeh Ex. 28 (Titov Exs. 51, 52, 58), there is no evidence that Mr. Ianakov ever considered the "last download" URLs; even if he had, the URLs would not have indicated whether the files were copyrighted.  *See infra* DRSF 35.  Indeed, one of the few user e-mails submitted states that the titles on Hotfile do not actually provide content infringing Plaintiffs' copyrights .  Yeh Ex. 30 (Titov Ex. 86).  Plaintiffs never confirmed the contents corresponding to any of the links in Yeh Ex. 119.  Instead, unnamed individuals under the supervision of Plaintiffs' junior outside counsel

FILED UNDER SEAL                    CASE NO. 11-CIV-20427-WILLIAMS/TURNOFF

reviewed the "filename, size, and other metadata" associated with the links.  Yeh Decl. ¶ 120.
*See* Motion to Strike.

 Even if Mr. Ianakov scrutinized the "last downloads" emphasized by Plaintiffs, it is not
self-evident that the listed URL links to design software unauthorized for distribution on Hotfile.
A search on the Internet for this package shows that it is being given away for free by its author.
Titov Opp. Decl. Ex. A.  There is no way to know whether the use was authorized.  It is also not
evident that the URL in Yeh Ex. 28 (Titov 51) corresponds to an episode of The Howard Stern
Show (which is not copyrighted by Plaintiffs).  For the one user who stated that he could not
obtain the file associated with URL listed in Yeh Ex. 28 (Titov 52), Mr. Ianakov reminded the
user to log in to Hotfile to download files.  Yeh Ex. 28 (Titov Ex. 52).  Plaintiffs also cite an mp3
"remix."  Yeh Ex. 28 (Titov 53).  "Remixes" pose challenging fair use questions.  Boyle Decl.,
¶ 22, Ex. 1.  None of Plaintiffs' examples show actual knowledge of infringement.

 **Fact 10.a.\*†**  Disputed.  The magnitude of alleged infringement was low.  *See infra*
DRSF 10.a.iv (8% of files subject to notices).  Hotfile was never aware of Plaintiffs' misleading
alleged statistics.  Plaintiffs' study is flawed.  *See* Levy Decl. ¶ 36; Boyle Decl. ¶¶ 10-23.e; *supra*
DRSF 10.a.i.

 **Fact 10.a.i.\*†**  Disputed.  Plaintiffs' skewed download numbers do not count each
download equally.  Plaintiffs' expert failed to consider all "files available" on Hotfile and instead
limited himself to files *downloaded* on Hotfile (i.e., 45% of the files available).  In that 45%, he
concedes that infringement rates may be zero for 35 months of Hotfile's 36 month existence.
Leibnitz Ex. 37 (Waterman Dep.) at 83:8-85:10, 85:12-18, 86:18-21, 87:7-20, 88:17-90:3.  In the
one month of downloads that he did examine (i.e., January 2011), which was 1.3% of Hotfile's
activity, he only sampled a nonrepresentative fragment of the 1.3% of downloads, excluding
billions of internet users and broad categories of downloads available from Hotfile.  Levy Decl.
¶¶ 28-35.  Plaintiffs' statistical errors were compounded by systematic legal errors by its biased
copyright law "expert."  *See* Boyle Decl. ¶¶ 10-23.e.  Vobile data shows that only 3.4% of
attempted uploads have been blocked as unauthorized by the copyright holder.  *See infra* DRSF
40.  Indeed, a majority of Hotfile's uses involve storage and space-shifting.  Boyle Decl., ¶¶ 11-
12; 19-20; Ex. 2 ¶¶ 11-27.  Legal downloads drive Hotfile's business, including the top
downloaded files on Hotfile, numerous authorized videos (including Plaintiffs' trailers), and
open source and freeware software.  Boyle Ex. 1 (Boyle Rpt.) ¶ 9(i).  Files identified by

Plaintiffs' expert as non-infringing drove sales to Hotfile five times more than Plaintiffs' works-in-suit; it would be counterproductive for Hotfile to support infringement, even setting aside the risk of ruinous litigation costs imposed by Plaintiffs.   Titov Opp. Decl. ¶ 15; Boyle Ex. 2, ¶ 53.

**Fact 10.a.ii.\*†**  Disputed.  As 93% of Hotfile's uploaders **never received a takedown notice**, Plaintiffs' 98% figure is unreliable.  Titov Opp. Decl. ¶ 31.  Their statistician and copyright "experts" excluded storage, the largest use of Hotfile, and failed to account for fair use, space-shifting and authorized uses.  Levy Decl ¶ 33-36; Boyle Decl. ¶¶ 10-23.3; *see supra* DRSF 10.a.i.

**Fact 10.a.iii.\*†**  Disputed; immaterial. *See supra* DRSF 10.a.i.  Even taking Plaintiffs' statement as true, deletions can occur for reasons unrelated to copyright infringement, which is acknowledged to be about 20%. Foster Decl. ¶ 63.  Plaintiffs' allegation that such deletions were "related" to copyright infringement is grossly overbroad; their approach counts *all* files uploaded by any terminated user regardless of whether each file itself infringed.

**Fact 10.a.iv.\*†**  Disputed.  Only 8% of Hotfile's uploaders have uploaded over 171 files, so this statistic excludes 92% of Hotfile uploaders.  Levy Decl. ¶40.  Less than 14.2% of known uploaders were suspended, even after Hotfile terminated based on strikes (which includes access termination based on false notices).  Foster Decl. ¶ 50.  Of Hotfile's uploaders, 93% percent never received a single takedown notice.  Titov Opp. Decl. ¶ 31.  *See supra* DRSF 10.a.i-ii.

**Fact 10.a.v.\*†**  Disputed.  Immaterial; Plaintiffs' statistics are flawed.  DRSF 10.a.i, iv.  Prior to the filing of the complaint, 46,562 users (1.1% of Hotfile users at that time) received at least one takedown notice. Titov Opp. Decl. ¶ 28.

**Fact 10.a.vi.\*†**  Disputed.  Immaterial; terminated Affiliates accounted for only 8.4% of uploaded files.  Foster Decl., Ex. J.  Only 10.9% of files uploaded by Affiliates ever received a copyright notice.  Titov Opp. Decl. ¶ 39.  Those notices included over two million DMCA non-compliant and false takedown notices.  Titov Opp. Decl. ¶ 29.  Over 15,000 affiliates were *not* terminated.

**Fact 10.a.vii.**  Disputed.  Under Hotfile's repeat infringer policy, it terminated users when they received three *allegations* of copyright infringement, even where based on false notices and SRA requests.  When Hotfile suspended these users, it took down not just the 67,341 files (3 strikes for each 22,447 suspended user) subject to takedown notices, but millions of other files these users had posted that no one in over two years of Hotfile's operation had ever

identified as infringing.  Titov Opp. Decl. ¶¶ 37-38.  No evidence exists that fully 99.9% (67,341 / 61,066,769) of these uploads infringed any copyright.  Foster Decl. ¶ 52, Ex. G (last page).

**Fact 10.b.\*** Disputed.  Immaterial; such downloads were pursuant to Defendants' investigation of claims in this litigation and/or takedown notices.  Over half of the files (25) in Yeh Ex. 29 were never downloaded.  Titov Opp. Decl. ¶ 52  Fifteen were downloaded *after* the public link was disabled in order to investigate Warner's improper takedowns.  *Id.*  Four were downloaded in investigating claims of illegal pornography.  *Id.*  Three were downloaded in conjunction with Vobile testing.  *Id.*  And one was downloaded in conjunction with a non-compliant DMCA takedown request that was ultimately processed.  *Id.*  On February 26, 2012, all 49 files were processed by vCloud 9.  None were rejected as impossible to process, and none were identified as matching any copyrighted content.  Titov Opp. Decl. ¶ 53.

**Fact 10.c.\*** Disputed.  "Copyrighted content" does not equate to "infringing content."  Plaintiffs' assumption fails to consider authorized uses, storage and space-shifting.  For example, Plaintiffs use Yeh Ex. 30 (Titov 126) alleging a user downloaded "Alice in Wonderland," but the Lewis Carroll book "Alice in Wonderland" is in the public domain.  Similarly, Plaintiffs point to a user who tried to download a file entitled "Vampire Diaries," Yeh Ex. 30 (Titov 117).  Warner voluntarily uploaded "The Vampire Diaries" to Hotfile twenty times.  Gupta Ex. 6.  Furthermore, filenames are not reliable indicators of content.  Plaintiffs point to a URL containing the word "salt" as a purported "red flag" of the Hollywood movie of that name.  Yeh Ex. 30 (Titov 124).  In discovery, Plaintiff Columbia asserted infringement against a similar URL simply because it contained the word "salt."  The video was not their movie; it contained a computer simulation of a salt water aquarium bearing no copyright notices, a likely non-infringing video.  Leibnitz Decl. ¶ 17, Ex. 16; *see also infra* DRSF 35.  Furthermore, Plaintiffs fail to show that any of the URLs in Yeh Ex. 30 correlate to Plaintiffs' copyrighted content files.  *See supra* DRSF 9.c.  None of this evidence qualifies as a "red flag."

**Fact 10.d.i.\*** Disputed.  Immaterial; the sites referring the most users to Hotfile include Google, Facebook, and YouTube.  *See infra* DRSF 29.  Defendants reinstated the account of the Affiliate associated with allyoulike.com after the user's account had been hacked.  The reinstatement had nothing to do with copyright infringement, and emails show that Hotfile never navigated to the operator's site; the URL http://www.allyoulike.com/8a9e04195a2f70 shows no evidence of infringement.  Yeh Ex. 99-101.  Absent complaint from content owners, Hotfile had

no reason to investigate further. Titov Opp. Decl. ¶ 21. Payments from Hotfile to this user
related to non-copyrighted works; the lastdl links in Yeh Exs. 99-101 are for files called
"beer.rar.html" and "0117HJ.rar.html," which Plaintiffs do not contend indicate Studio content.

**Fact 10.d.ii.** Disputed. Plaintiffs mischaracterize this email. It states Hotfile did ***not***
want to advertise with PlanetSuzy because of its questionable content. Yeh Ex. 104. Relations
between Hotfile and this site were so strained that PlanetSuzy had "banned" Hotfile and was not
a member of its affiliate program as of early 2010. Titov Opp. Decl. ¶ 22.

**Fact 10.d.iii.\*** Disputed. The names of third-party websites outside of Hotfile's control
do not indicate the copyright status of the files on the sites and are consistent with sites that host
reviews, trailers and licensed content. Hotfile did not know the status of these sites or the of any
files they may have hosted at Hotfile. Plaintiffs cite 186 pages of "screenshots of various ['link
sites'],'' which do not reflect the pre-Complaint time period at all. Yeh Decl. ¶ 44 & Ex. 43.
Only 8 pages of Yeh Ex. 43 mention Hotfile, and none provided operative links to Hotfile. Titov
Opp. Decl. ¶ 12. The assertion of wrongdoing by 62 of Hotfile's 24,753 referring websites of
which there was no evidence Hotfile was aware in no way suggests that Hotfile condoned
infringement; none of the sites provided enough traffic to appear in Hotfile's top 500 sources of
traffic in the past year. *Id.* Although Plaintiffs also assert that 11 of these websites were shut
down by the federal authorities or found liable in civil actions, they do not indicate which (if
any) of those websites had any affiliation with Hotfile. Titov Opp. Decl. ¶ 20.

**Fact 10.d.iv.** Disputed. The sites in Yeh Ex. 95 do not correlate with those in PSUF
10.d.iii, and the testimony does not confirm that Yeh Ex. 95 represents payments to affiliates.
Yeh Ex. 1 (Titov Dep.) at 550:6-16. Plaintiffs fail to allege that any of these sites uploaded a
material portion – or indeed ***any*** – of the verified files-in-suit.

**Fact 10.e.i.** Disputed. Immaterial; the cited testimony fails to show any knowledge that
this URL was infringing. URLs do not indicate infringement. *See supra* DRSF 10.c. The URL
in Yeh Ex. 44 is not a download link for the Pussycat Dolls' album. Titov Opp. Decl. ¶ 50. That
band is documented to  authorize free internet distribution. *See UMG Recordings, Inc. v. Veoh
Networks, Inc.*, 665 F. Supp. 2d 1099, n. 13 (C.D. Cal. 2009).

**Fact 10.e.ii.** Disputed. Immaterial; there is no evidence that the URL in Yeh Ex. 45 is
Plaintiffs' copyrighted content. Even if it was not authorized for use in a computer test,
Plaintiffs cannot bypass infringement and fair use analyses. *See supra* DRSF 10.c.

**Fact 10.e.iii.** Disputed. Defendants did not know the contents of the tweeted link. Titov Opp. Decl. ¶ 51. Plaintiffs have no evidence that they have ever obtained the content file, compared it to any allegedly-copyrighted work, verified the copyright of that work, or inquired about the file's authorization status from its owner. *See supra* DRSF 9.c, 10.c.

**Fact 10.f.i.** Disputed. *See infra* DRSF 16.b.v.

**Fact 10.f.ii.** Disputed. Immaterial; on February 24, 2010, after Hotfile obtained dismissal of a copyright suit, Warner's agent first contacted Hotfile to propose a deal for Warner to provide links to its content on ecommerce sites for Hotfile to include on its website. Titov Decl. ¶ 28, Ex. 4; Yeh Exs. 50-51. Having just encountered the legal system, Hotfile viewed Warner's approach as further confirmation that content owners recognized the propriety and advantages of Hotfile's technology. *Id.*; Leibnitz Ex. 3 (Vangelov Dep.) at 42:5-12; Leibnitz Ex. 1 (Stoyanov Dep.) at 83:3-11.

**Fact 10.f.iii.** Disputed. The author of Yeh Ex. 46, specifically noted to Hotfile that the file had nothing to do with the TV show *Fringe* and this email does not discuss infringement. This demonstrates the impropriety of assuming infringement based on titles. *See infra* DRSF 35. Immaterial; Yeh Ex. 46 & Yeh Ex. 1 (Titov Dep.) at 628:16-630:10 do not show that Defendants had knowledge of the content file associated with the URL identified in the exhibits.

**Fact 10.g.** Disputed. The email from the user referenced in Yeh Ex. 52 does not state that Rapidshare blocked the user's files as "copyright infringing"; instead the excerpt from Rapidshare states that all of the user's files had "the same MD5 value" and were "marked as illegal," which could encompass non-infringing content. Yeh Ex. 52. In fact, the blocking did not occur because of infringement, but rather because all of the user's files were empty – and RapidShare, like Hotfile, blocks uploading of empty files. Titov Opp. Decl. ¶ 54.

**Fact 10.h.** Disputed. Plaintiffs omit Mr. Stoyanov's complete testimony. Yeh Ex. 3 at 80. Mr. Stoyanov was concerned that as a result of changes at Rapidshare, Hotfile would become "the largest file hosting and file sharing website, which [would] immediately make [it] the prime candidate for attacks" from content owners who were "discontent with the development of new technologies" and thus would want to put Hotfile out of business. Leibnitz Ex. 1 (Stoyanov Dep.) at 81:16-82:16. While Hotfile forbade the posting of illegal content and implemented infringement countermeasures, Mr. Stoyanov nonetheless fretted that hidebound plaintiffs would perceive Hotfile as the "flagship of unlicensed content" – which it undeniably

FILED UNDER SEAL                    CASE NO. 11-CIV-20427-WILLIAMS/TURNOFF

was not. *Id.*

**Fact 11.a.**  Disputed.  Immaterial; Plaintiffs mischaracterize Yeh Ex. 54, which is by a Hotfile engineer explaining the challenge of trying to ascertain ownership of various hosted files as part of the Warner business partnership proposal.  In the notice/counter-notice process Hotfile does not learn the actual ownership of a file.  Leibnitz Ex. 3 (Vangelov Dep.) at 153:14-154:7; 156:13-157:24.

**Fact 11.b.i.**  Disputed.  Hotfile prohibits searching files on its servers as it is antithetical to Hotfile's purpose of providing private storage.  Levy Decl. ¶¶ 9, 37; Leibnitz Ex. 2 (Titov Dep.) at 445:23-446:5; Cromarty Decl. ¶¶ 121-126.

**Fact 11.b.ii.\***  Disputed.  Immaterial. Hotfile never knew of much less relied on Plaintiffs' cited EFF advisory document.  Yeh Ex. 55; Titov Opp. Decl. ¶ 13.  Further, the publication is directed at peer-to-peer networks, which Hotfile is not.  Cromarty Decl. ¶ 112.

**Fact 11.c.**  Disputed.  Immaterial; Hotfile has not reviewed what its users were downloading outside of this litigation because such review is not required and investigation of 100 million+ files is impossible and futile.  Titov Decl. ¶ 6.  Hotfile did not purposefully avoid exploring what its users were downloading.  Leibnitz Ex. 2 (Titov Dep.) at 706:5-8.

**Fact 11.d.**  Disputed.  *See infra* DRSF 3, 4(a) & (b).

**Fact 12.\***  Disputed.  *See infra* DRSF 16.

**Fact 13.**  Undisputed for purposes of this motion.

**Fact 14.**  Disputed.  Plaintiffs authorized distribution of their content for marketing purposes.  Leibnitz Ex. 20 (Solmon Dep.) at 190:7-195:7; Leibnitz Ex. 19 (Perkins Dep.) at 159:3-166:3.

**Fact 15.**  Disputed.\*  Plaintiffs rely on inadmissible and improper attorney testimony to establish the infringement component of their claim.  *See supra* DRSF 9.c. *See* Motion to Strike.

**Fact 16.a.**  Disputed.  *See infra* DRSF 16.a.i-xiii.

**Fact 16.a.i.**  Undisputed for purposes of this motion.

**Fact 16.a.ii.**  Disputed.  Affiliates are paid to upload files that attract users to become Premium members.  Yeh Ex. 58 at 1.  While providing access to content may be one thing that attracts users to Hotfile, providing access to infringing content is not.  Leibnitz Ex. 21 (Lynde Dep.) at 262:7-14.

**Fact 16.a.iii.**  Disputed.  The number of times a file is downloaded is just one factor in

FILED UNDER SEAL                          CASE NO. 11-CIV-20427-WILLIAMS/TURNOFF

how Hotfile calculates payments to Affiliates.  Leibnitz Ex. 2 (Titov Dep.) at 651:4-655:17.  The

current Affiliate program does not compensate for downloads.  Titov Opp. Decl. ¶ 7.

**Fact 16.a.iv.**  Disputed.  Seeking maximum referrals from minimum expenditures of

server resources, upload resources, bandwidth, and diskspace evidences business sense.  Yeh Ex.

61 at 13.  Hotfile is predominantly used for storage. *See infra* DRSF 24.

**Fact 16.a.v.**  Disputed.  Plaintiffs ignore the topic addressed on Hotfile's site: tips for

affiliates to increase their earnings.  Yeh Ex. 59.  Hotfile's statement to advertising partners (less

than 1% of Hotfile's user base (0.53%)) in no way changes the fact that the remainder of users

primarily employ Hotfile for storage.  Titov Opp. Decl. ¶ 4. *See infra* DRSF 24.

**Fact 16.a.vi.**  Disputed.  Storage is the predominant use of Hotfile, and Premium

members get permanent storage. *See infra* DRSF 24.

**Fact 16.a.vii.*†**  Disputed.  Fifteen of the 25 most downloaded files on Hotfile are open

source software programs. Boyle Decl; n. 3; Leibnitz Ex. 7 (Ex. A).  Six open source software

programs alone accounted for more than 1.7 million of Hotfile's downloads.  Boyle Ex. 19i.

None of Plaintiffs' works are among the top 100 downloads, and state-of-the-art fingerprinting

technology identifies no infringement among Hotfile's top 100 downloads. *See supra* DRSF

10.a.i-vii. *See also* DRSF 10(a).

**Fact 16.a.viii.**  Disputed.  Immaterial; providing access to copyright infringing content is

not part of Hotfile's business model for attracting users to Hotfile.  Leibnitz Ex. 21 (Lynde Dep.)

at 262:7-14.  "Popular" is not infringing. *See supra* DRSF 16.a.vii.

**Fact 16.a.ix.**  Disputed.  Since smaller files can be aggregated as easily as bigger files

can be divided into smaller parcels, Defendants had no reason to believe that larger files more

likely infringe.  Titov Opp. Decl. ¶ 7.  Plaintiffs' correlation of file size with infringement lacks

scientific validity, given that it excludes:  (1) 56% of the files on Hotfile (i.e., those never

downloaded); (2) 97% of the months of Hotfile's operation (i.e., any month but January 2011);

and (3) an unknown percentage of Hotfile's downloaded files (e.g., files downloaded by

Hotfile's free users in three-quarters of the world's nations, files downloaded using Hotfile's

"hotlink" capability, and files uploaded by anonymous users).  Levy Decl. ¶¶ 28-31.

**Fact 16.a.x.**  Disputed.  As Plaintiffs' expert states, "[l]arger pieces of entertainment

content…can also be divided into several, smaller computer files [] to facilitate transmission and

copying," so large files are not necessarily copyrighted content.  Foster Decl. ¶ 8.

FILED UNDER SEAL                              CASE NO. 11-CIV-20427-WILLIAMS/TURNOFF

**Fact 16.a.xi.\*†** Disputed. *See supra* DRSF 16.a.ix-x.

**Fact 16.a.xii.\*** Disputed. The largest single source of traffic to Hotfile (by a factor of more than six to one over traffic from any single referring website) is users manually entering Hotfile's web address on their browser. Titov Opp. Decl. ¶ 14. Plaintiffs cannot presume that the anonymous poster on Yeh Ex. 86 at 6, which they failed to produce in discovery, is Mr. Titov.

**Fact 16.a.xiii.** Disputed. Immaterial; Defendants eliminated the website operator payment program in early 2012. Titov Opp. Decl. ¶ 23. *See infra* DRSF 29.

**Fact 16.b.i-ii.** Disputed. Hotfile's business model seeks to attract customers through uploaders who direct traffic to Hotfile. When Hotfile started, outside contractor Andrew Ianakov took it upon himself (without authority from Hotfile [Leibnitz Ex. 1 (Stoyanov Dep.) at 86:14-16]) to seek uploaders. Those who uploaded the most–"good uploaders"–were more likely to generate subscriptions to Hotfile. Mr. Ianokov never sought infringing content, and indeed Hotfile's "terms and conditions" forbade infringing content. *See* DRSF 16.a.iii-v.

**Fact 16.b.iii.\*** Disputed. Plaintiffs' characterization of the files as "infringing" is unfounded and unsubstantiated; the user's statement does not indicate what the specific content is or whether the user owns the rights to such content. Yeh Ex. 64 at 5. Further, the post allegedly by Mr. Ianakov does not even respond to the aforementioned user's comment; Mr. Ianakov responds to a posting by a promoter of the competing cyberlocker RapidShare by touting Hotfile's reliability and absence of ads. Yeh Ex. 64 at 5. Mr. Ianakov never mentions TV shows, infringement, ForumDesire, or any of ForumDesire's other three postings in the preceding day, and responds instead to a previous posting by an entirely different user.

**Fact 16.b.iv.** Disputed. Immaterial; Hotfile's Affiliate program was modeled after other affiliate or referral programs in the industry at the time of Hotfile's inception. Mr. Stoyanov specifically recalled Rapidshare having such a program, but could not recall which other cites did at that time. Yeh Ex. 3 (Stoyanov Dep.) at 21:3-22:22. Affiliate programs are common marketing tools for Internet companies. Cromarty Decl. ¶¶ 69-73. Megaupload was indicted very recently and has not been convicted of anything. Hotfile's terms of service expressly prohibited the uploading of unauthorized content at all times. DSUF 2; *See* DRSF 10.e.iii.

**Fact 16.b.v.** Disputed. Yeh Ex. 49 is a July 2, 2010 email, originally written in Bulgarian and mistranslated by Plaintiffs, in which Hotfile founder Rumen Stoyanov noted an aberrant increase in revenue. Yeh Exs. 49, 70 at 6-7. He brainstormed possible causes: internet

fraud; a bug in the payment system; delayed sales from Hotfile's Christmas promotion; the closure of websites for illegal movies; and the lack of World Cup soccer games to distract users. He noted with "concern" the possibility that "people would try and use our website to upload such movies." Yeh Ex. 3 at 59:8-6025. This never suggests that Hotfile tolerated infringement. Further, an increase in traffic to Hotfile after Rapidshare's termination of its Rewards program does not show that Defendants targeted Rapidshare users, but is a natural business phenomenon between competing companies in the same industry.   Leibnitz Ex. 2 (Titov Dep.) at 637:15-20. Hotfile employees expressly rejected the idea of targeting Rapidshare's users for any reason. Yeh Ex. 65.

      **Fact 16.b.vi.\*** Disputed. *See infra* DRSF 16.f.

      **Fact 16.c.\*†** Disputed. *See supra* DRSF 1-5.

      **Fact 16.d.\*†** Disputed. *See supra* DRSF 5, 10.a. The majority of downloads on Hotfile were not copyright infringing; out of the 2.9 billion downloads on Hotfile's website, only 13.6% were downloads of files that received a takedown notice. Titov Opp. Decl. ¶ 27.

      **Fact 16.e.** Disputed. Defendants' marketing and business model emphasizes the use of Hotfile for storage. *See infra* DRSF 16.e.i-iii, 24. Hotfile's revenues are entirely from premium access fees paid by users to obtain faster access. The fee is content-neutral and is not based on what or how much users consume—they could be using Hotfile for personal cloud storage, file transfer, space-shifting, downloading open source software, or streaming video. Titov Decl. ¶ 7.

      **Fact 16.e.i.** Undisputed for purposes of this motion.

      **Fact 16.e.ii.\*†** Disputed. Plaintiffs mischaracterize evidence. Yeh Exs. 96, 97 merely show that users can purchase Premium memberships, which offer benefits, such as unlimited storage and higher redundancy of file storage. Leibnitz Ex. 2 (Titov Dep.) at 443:11-22. The possibility that users could switch to other service providers does not mean that "Hotfile must offer copyrighted content. The top 100 most downloaded files on Hotfile are not Plaintiffs' copyrighted content. *See supra* DRSF 10.a.i-vii. The most popular files are non-infringing. *See infra* DRSF 30, 32. While Plaintiffs emphasize Dr. Lynde's testimony (Leibnitz Ex. 21 (Lynde Dep.) at 184:16-19) they ignore Dr. Lynde's previous sentence regarding about storage being an advantages. Leibnitz Ex. 21 (Lynde Dep.) at 184:9-11. *See also* DRSF 16.a.

      **Fact 16.e.iii.\*†** Disputed; immaterial. Storage is Hotfile's predominant use and part of what Premium users pay for. *See infra* DRSF 24. Even if certain users sought unauthorized

FILED UNDER SEAL                    CASE NO. 11-CIV-20427-WILLIAMS/TURNOFF

content, Hotfile's expressly prohibits such activity and deletes files found to be infringing. Leibnitz Ex. 2 (Titov Dep.) at 276:7-278:16, Yeh Ex. 66 at 1. Plaintiffs point to only 9 subscribers (out of Hotfile's 5,287,163 users); one sought to download an uncopyrighted Dickens novel, another sought to download a document that has never received a takedown request, and the other 7 emails, even if referencing a copyrighted work, do not show reliance by Hotfile on copyrighted material – particularly given that any user dissatisfied with Hotfile (before or after the strengthened repeat infringer policy) could get a refund. Yeh Ex. 68; Leibnitz Ex. 2 (Titov Dep.) at 448:2-15. No evidence exists that the strengthened repeat infringer policy caused a drop in revenue any more than user reaction to Plaintiffs' suit, threatening Hotfile's sustainability as a long-term repository of files (regardless of the lack of merit to the suit), and promising invasion of user privacy during the discovery process. Leibnitz Ex. 2 (Titov Dep.) at 181:6-182:18.

**Fact 16.f.i.** Disputed. Immaterial; Hotfile did not "look[] at MegaUpload as an example of functionality or anything else"; Hotfile principally looked to RapidShare as a model. Leibnitz Ex. 2 (Titov Dep.) at 27:13-28:1. Hotfile was founded to compete with services provided by many file hosting services available at the time, which included Google® Docs, Windows® Live SkyDrive, RapidShare®, DepositFiles®, and MediaFire®, in addition to MegaUpload®. Yeh Ex. 9 ¶ 8. Megaupload was indicted very recently and has not been convicted of anything.

**Fact 16.f.ii.** Disputed. Hotfile's Affiliate program was mainly modeled off of a program offered by RapidShare. He did not know whether Megaupload had such an affiliate system. Leibnitz Ex. 1 (Stoyanov Dep.) at 21:3-22:22. Hotfile's policy of deleting files for inactivity was based generally on other websites, such as Rapidshare, not just Megaupload. Leibnitz Ex. 2 (Titov Dep.) at 710:24-711:15.

**Fact 16.f.iii.**\*† Disputed; immaterial. *See supra* DRSF 9.a, 11.b, 16.a, 16.a.vi., 16.a.xii, 16.e, 16.f.i. Yeh Ex. 98 is prejudicial, hearsay, and unfounded; an indictment is not proof of actual facts. Megaupload's business model does not parallel Hotfile's: among other things, Megaupload advertised on its site, Yeh Ex. 98 ¶ 4, it had an internal database in which it could search directly for infringing content, *id.* ¶ 14, it did not implement hash blocking of copyrighted content, *id.* ¶ 24, its employees copied content from sites like YouTube.com to populate Megaupload's sites, *id.* ¶ 69(h), its employees downloaded copyrighted content for their own personal use, *id.* ¶¶ 69(bb, dd, ee), and its employees referred users to link cites to find movies, *id.* ¶ 69(ppp). Hotfile does none of those things. For example, Hotfile does not offer

advertising, *see supra* DRSF16.b.iii, Hotfile has no searchable index of content, *id.* 19.b., its employees never downloaded copyrighted content for personal use, *id.* 10.b, and never referred users to link sites or copyrighted content, *id.* 10.d.i-iv.

    **Fact 16.g.\*** Disputed. *See supra* DRSF 9.c.

    **Fact 16.h.\*** Disputed. *See supra* DRSF 10.b.

    **Fact 16.i.\*†** Disputed. *See supra* DRSF 9.a.iv-v.

    **Facts 16.j.i** Disputed. Vobile's vCloud 9 fingerprinting technology was only available in September of 2011. Hotfile implemented vCloud 9 shortly after. *See infra* DRSF 40. Hotfile is one of only a handful of file hosting companies to use Vobile's technology. Leibnitz Ex. 18 (Wang Depo.) at 68:25-69:5.

    **Facts 16.j.ii.** Disputed. Digital fingerprinting technology is not guaranteed to be completely accurate. Leibnitz Ex. 5 (Cromarty Dep.) at 187:23-189:11; Leibnitz Ex. 23 (Zedek Dep.) at 67:16-68:7. Fingerprinting technology is constantly developing, such that its effectiveness varies widely over time. Leibnitz Ex. 23 (Zedek Dep.) at 67:16-68:7, 168:15-20; Leibnitz Ex. 24 (Kang Dep.) at 208:19-209:2.

    **Facts 16.j.iii.** Disputed; immaterial. Hotfile had already implemented many other countermeasures, including hash filtering. *See infra* DRSF 16.j.iv. MD5 hashes are "almost like a fingerprint" for each file. Titov Decl. ¶ 27; Gupta Decl., Ex. 5, Leibnitz Ex. 13 (Zebrak Dep.) at 89:18-20. Defendants believed that their copyright enforcement efforts were sufficient per Plaintiffs' praise of Hotfile's antipiracy work. *See infra* DRSF 34. Plaintiffs never suggested that Hotfile implement fingerprinting prior to litigation. Leibnitz Ex. 11 (Kaplan Dep.) at 61:11-62:13; Leibnitz Ex. 25 (Bentkover Dep.) at 31:8-19, 44:12-22; Leibnitz Ex. 19 (Perkins Dep. 138:2-10; Leibnitz Ex. 23 (Zedek Dep.) at 46:14-23; Leibnitz Ex. 26 (Griffin Dep.) at 104:25-6, 164:17-23. Immediately after Plaintiffs finally communicated that fingerprinting was an important copyright enforcement tool to Hotfile, Hotfile began implementing that very technology. Leibnitz Ex. 2 (Titov Dep.) at 509:25-510:23.

    **Facts 16.j.iv.** Disputed. There is a lengthy delay during which fingerprint signatures are compared to those precomputed by Vobile, making it difficult for Hotfile to process takedown notices and disrupting Hotfile's business operations. Leibnitz Ex. 5 (Cromarty Dep.) at 200:21-201:16. Hotfile implemented MD5 hashes, so that once subject to a takedown notice, identical copies of the same file could not be downloaded in the future.

**Fact 17.\*†**  Disputed.  *See supra* DRSF 9, 10, 11.

**Fact 18.**  Disputed; legal conclusion and mischaracterizes evidence.  Plaintiffs fail to identify the specific infringing content allegedly on Hotfile's servers.  *See supra* DRSF 9.c.

**Fact 19.a.**  Disputed.  Immaterial; Hotfile can suspend usernames but cannot prevent users from uploading or downloading files.  Leibnitz Ex. 27 (Titov ESI Dep.) at 18:5-17, 20:25-21:15.

**Fact 19.b.**  Disputed.  Immaterial. Hotfile blocks files with the same MD5 hash as removed files cannot prevent the upload of files with the same "content" as previously removed files with different hash values.  Yeh Ex. 2 at 335:20-336:3. One cannot accurately block content files based on other matching criteria such as file name.  *See infra* DRSF 35. Hotfile has no searchable index that would allow it to locate files based on the unreliable information they do have regarding file content.  Leibnitz Ex. 2 (Titov Dep.) at 440:4-15; 445:9-12.

**Fact 20.a.\*†**  Disputed.  *See supra* DRSF 10(a)(i), 10(a)(iii), 16(a), 16(e).

**Fact 20.b.**  Disputed; immaterial.  That Defendants earn money from user subscriptions does not mean that Defendants profit from infringement.  Hotfile charges a "flat fee" to Premium subscribers.  *See infra* DRSF 32.

**Fact 21.a.i.**  Disputed.  Mr. Titov has limited areas of responsibility and is not authorized to make decisions on behalf of Hotfile without the consent of at least one other shareholder. TSUF 10, 11. All of Hotfile's shareholders have power of attorney for Hotfile Corp. *Id.* at 80:17-21. Mr. Titov is a minority shareholder. *Id.* at 84:17-85:5. He acts as a manager of Hotfile only "when these acts are authorized by the other shareholders." *Id.* at 82:10-12. Mr. Titov did not recall giving specific input regarding Hotfile's functionality. *Id.* at 24:10-13.

**Fact 21.a.ii.**  Disputed; immaterial. Lemuria owns Hotfile's servers, except those that Hotfile bought before Lemuria was formed. Yeh Ex. 1 (Titov Dep. at 38:7-17).

**Fact 21.b.i.**  Disputed.  Mr. Titov does not exercise control over Hotfile Ltd.  He acts as a manager of Hotfile only "when these acts are authorized by the other shareholders." *Id.* at 82:10-12. Per the Management Agreement, Mr. Titov was obligated to "follow the instructions of the sole owner [Hotfile Corp.]…seek his approval and report to him." Yeh Ex. 73 at ¶ 1.4.

**Fact 21.b.ii.**  Disputed.  Hotfile Ltd. collects money paid to Hotfile through PayPal and maintains a bank account under Hotfile Corp.'s control. Yeh Ex. 1 (Titov Dep.) at 113:5-6; 113:7-10. Immaterial; Mr. Titov was obligated to "follow the instructions" of Hotfile Corp. *See*

FILED UNDER SEAL                           CASE NO. 11-CIV-20427-WILLIAMS/TURNOFF

*supra* DRSF 31.b.i. Hotfile Ltd.'s only role with respect to Hotfile Corp. is to operate the PayPal account that pays Hotfile affiliates and receives payments from Premium subscribers. TSUF 12.

   **Fact 21.c.i.** Undisputed.

   **Fact 21.c.ii.** Disputed. Lemuria has a written contract to provide web-hosting services to Hotfile Corp. Titov Opp. ¶ 37; Ex. C. Previously, the contract was verbal. Leibnitz Ex. 2 (Titov Dep.) at 92:12-93:23; Yeh Ex. 77 at ¶5.

   **Fact 21.c.iii.** Disputed. Mr. Titov formed Lemuria after September 29, 2009. Yeh Ex. 79. Mr. Titov did not form Lemuria due to complaints from Limelight Networks. Titov Decl. ¶ 41. Hotfile continued to do business with Limelight until September 4, 2010, when Hotfile terminated the agreement. Yeh Ex. 1 (Titov Dep.) at 120:2-11; *see also* Titov Opp. Decl. Ex. D.

   **Fact 21.c.iv.** Disputed. Lemuria provides web-hosting and related technical services to Hotfile, contracting with ISPs for internet connection and with a collocation facility. Yeh Ex. 1 (Titov Dep.) at 47:12-22. Lemuria pays Hotfile's legal bills because it is easier for a US company (Lemuria) to pay US lawyers directly. Titov Opp. Decl. ¶ 57.

   **Fact 21.c.v.** Undisputed for purposes of this motion.

   **Fact 21.c.vi.** Disputed; immaterial. *See supra* DRSF 21.c.iv.

   **Fact 22.a.i.** Disputed characterization. Mr. Titov generally did not participate in the design of the Hotfile website. Leibnitz Ex. 2 (Titov Dep.) at 28:19-30:8. Mr. Titov provided advice on the technical feasibility of ideas invented by others. Yeh Decl. Ex. 1 (Titov Dep.) at 23:6-24:24. Mr. Vangelov had primary responsibility for inventing Hotfile's functionality, which was based on Rapidshare, along with Messrs. Chuburov and Stoyanov. *Id.* at 22:19-22; 23:16-24, 24:20-24; 26:17-27:1. Mr. Titov wrote only 50–70% of Hotfile's code, which included code he developed before Hotfile's conception, so the actual percentage is smaller. *Id.* at 497:3-17.

   **Fact 22.a.ii.** Disputed characterization; immaterial. Blue Ant has a contract with Lemuria to provide software services for Hotfile. Blue Ant employees who provide services for Hotfile are not managed or supervised by and do not report to Mr. Titov or Lemuria. TSUF 6. Mr. Kolev has been in charge of server maintenance for Hotfile since he began working for Hotfile Corp. Leibnitz Ex. 2 (Titov Dep.) at 35:20-36:12.

   **Fact 22.a.iii.** Disputed. *See supra* DRSF 22.a.i. Mr. Stoyanov, not Mr. Titov, decided to implement the Affiliate program, based on programs of others in the industry, and designed its

17

payment criteria. TSUF 7-8. Mr. Titov's input was limited to how to store information in Hotfile's database rather than the business terms of the program. Schoenberg Ex. A (Titov Dep.) 596:18-597:2.

**Fact. 22.b.&b.i-ii.** Disputed; immaterial. *See* Titov Decl. ¶ 40.

**Fact 22.c.** Disputed. Mr. Titov was not responsible for all technical operations at Hotfile. Lemuria merely paid vendors for certain technical services. Mr. Kolev took over responsibility for server maintenance and providing new servers to Hotfile. Leibnitz Ex. 2 (Titov Dep.) at 35:20-36:12.

**Fact 22.d.i.\*** Disputed. *See* Titov Decl. ¶ 37-38. Mr. Titov merely provided guidance, as needed, on technical matters to Blue Ant employees. TSUF 6. Mr. Ianokov was responsible for user communications regarding DMCA takedown notices and their implementation and was supervised by Mr. Stoyanov. Leibnitz Ex. 2 (Titov Dep.) at 32:12-34:19, 34:25-35:5; Leibnitz Ex. 3 (Vangelov Dep.) at 37:12-24.

**Fact 22.d.ii.** Disputed. Mr. Titov hired Hotfile's DMCA agent after authorization from Hotfile's shareholders. Yeh Ex. 1 (Titov Dep.) at 69:5-69:9. Mr. Titov does not manage Hotfile's DMCA agent. Mr. Ianokov, under Messrs. Stoyanov and Vangelov, handled takedown notices and occasionally consulted Mr. Titov on technical matters. *Supra* DRSF 22.d.i.

**Fact. 22.e.** Disputed. Mr. Titov does not have authority to make unilateral decisions on important aspects of Hotfile's business or operations. Titov Decl. ¶ 39; TSUF 10. Mr. Titov did not devise or manage Hotfile's Affiliate program. TSUF 7. Mr. Titov does not handle daily operations of Hotfile. TSUF 11. Before this complaint, it was not a part of Mr. Titov's job to give input on Hotfile's repeat infringer policy. Yeh Ex. 1 (Titov Dep.) at 605:23-606:3.

**Fact 22.f.i.** Disputed; immaterial. Hotfile's activities are not infringing. *See supra* DRSF 9.a.iv. Hotfile implemented hash blocking in August 2009 when Hotfile blocked all copies of files accused copyright owners. Yeh Ex. 1 (Titov Dep.) at 339:12-340:13. To the extent that Hotfile did not implement hash blocking prior to August 2009, it was not because of any a policy decision. *Id.* at 602:22-603:1.

**Fact 22.f.ii.** Disputed; immaterial. *See supra* DRSF 22.d.i-ii. The evidence does not show that Mr. Titov addressed more than a single copyright owner complaint of infringement.

**Fact 22f.iii.** Disputed; immaterial. Yeh Exs. 53 and 46 were sent by Mr. Stoyanov and Hotfile's general email box, not Mr. Titov. Plaintiffs show no evidence that Mr. Titov responded

FILED UNDER SEAL                    CASE NO. 11-CIV-20427-WILLIAMS/TURNOFF

to either email or even read them.  Neither email refers to specific infringing content.  Yeh Ex. 53 shows only that Hotfile did not want infringing material on its site.  *See supra* DSRF 10(h).

     **Fact 23.a.\***  Disputed.  *See supra* DRSF 21, 22(c), &22(e) *supra.*

     **Fact. 23.b.i.**  Disputed; immaterial.  He does not personally own 26% of Hotfile Corp; he owns a company that owns the 26% share.  Leibnitz Ex. 2 (Titov Dep.) at 84:19-22.

     **Fact 23.b.ii-iii.**  Disputed; immaterial.  *See* Brief at VI.B.

### DEFENDANTS' STATEMENT OF ADDITIONAL MATERIAL FACTS

     **Fact 24.**  Hotfile is predominantly used for storage.  See Titov Opp. Decl. ¶ 4.  Hotfile's website repeatedly emphasizes the storage benefits of the premium membership.  *See, e.g.,* (Yeh Ex. 59) ("Your files will be stored forever as long as you are a premium member.").

     **Fact 25.**  Hotfile is not a peer-to-peer network.  See Cromarty Dec. at ¶ 112.

     **Fact 26.**  Hotfile does not access users' uploaded files out of respect for user privacy.  Titov Opp. Decl. ¶ 2.

     **Fact 27.**  Hotfile forbids the uploading, downloading, sharing, or storing of copyrighted works without authorization under its Terms of Service and an Intellectual Property Policy.  Each new user must explicitly agree to the Terms of Service.  Titov Decl. ¶ 3.

     **Fact 28.**  The most popular files shared on Hotfile are "open source" software programs created to be freely copied, improved, and distributed over the Internet. Leibnitz Ex. 4; Boyle Ex. 1 at ¶ 17.

     **Fact 29.**  The sites referring the most users to Hotfile include Google, Facebook, and YouTube.  Titov Opp. Decl. ¶ 19.

     **Fact 30.**  Hotfile has many noninfringing uses.  Boyle Decl., Ex. 1, ¶¶ 9i.-iv.; Ex. 2 ¶¶ 20, 21, 24, 25, 29-33, 37-39.

     **Fact 31.**  Approximately 90% of Hotfile's users are "free" users who do not have Premium accounts and pay nothing to Hotfile. Titov Opp. Decl. ¶ 11. 99% of Hotfile's users do not participate in the Affiliate program.  Titov Opp. Decl. ¶ 24.  Some users do not register an account with Hotfile at all.  Leibnitz Ex. 2 (Titov Dep.) at 17:21-25.

     **Fact 32.**  Hotfile charges a "fixed fee" to Premium subscribers, regardless of the content they upload or download.  Titov Decl. ¶ 7; DSUF 20-21.  Users downloading a non-infringing work were more likely to purchase a Premium subscription than one downloading an infringing work.  Boyle Ex. 2 (Boyle Rebuttal Rpt.) at ¶ 53.

FILED UNDER SEAL                          CASE NO. 11-CIV-20427-WILLIAMS/TURNOFF

**Fact 33.**  Hotfile's expeditious takedown is unquestioned.  *See* Compl. ¶ 38 (no allegation of failure to expeditiously takedown in response to DMCA notices); Gupta Ex. 17 [Studios' Response to Interrogatory No. 20]).

**Fact 34.**  Plaintiffs and their agents praised Hotfile's efforts to combat copyright infringement.  DSUF 11; Leibnitz Exs. 28, 29, 30, 31, 32, 33, 34, 35.

**Fact 35.**  Plaintiffs concede that file titles are insufficient to determine contents and proffer no evidence of file sizes or other metadata.  Leibnitz Ex. 11 (Kaplan Dep.) at 249:25-250:9; Cromarty Decl. Ex. R ¶¶ 73-74.  Plaintiffs' counsel is not competent to establish infringement of 10,390 works.  Yeh Decl. 119.

 **Fact 36.**  Hotfile relied not only on the Studios' failure to request any additional countermeasures, but also on their consistent praise of Hotfile's copyright enforcement efforts.  *See supra*, DRSF 34.  Hotfile maintained its policy of providing expeditious notice and takedown, and SRA which it supplemented with MD5 hashing.  Titov Opp. Decl. ¶¶ 9, 47.  Hotfile strengthened its repeat infringer policies and adopts new measures to combat infringement, including the "Hotfile Copyright Education" program.  Titov Decl. ¶ 36.

**Fact 37.**  Since inception, Hotfile received notices of alleged infringement either through DMCA notices or SRA accounts for 8,330,465 of its 123,344,533 files (6.8% of its files).  Titov Opp. Decl. ¶ 26.

**Fact 38.**  In August 2009, Hotfile began to disable any master file subject to a takedown notice via "hash-blocking."  Prior to that, Hotfile only received takedowns for 117,937 URLs, thus Hotfile began hash-blocking before over 98.6% of notices issued.  Titov Opp. Decl. ¶ 48.

**Fact 39.**  Hotfile began offering its Special Rightsholder Account takedown tool as early as August 2009, providing content owners with the ability to instantaneously takedown multiple files with a single click.  Titov Opp. Decl. ¶ 9.

**Fact 40.**  Within months of this suit, Hotfile implemented Vobile's state-of-the-art digital fingerprinting technology  and implemented Vobile's vCloud 9 in July of 2011.  *See* Titov Decl. ¶¶ 34-35.  After more than 6 months of implementation, Vobile determined that only 3.4% of uploaded video files match copyrighted works.  Titov Opp. Decl. ¶ 56.

FILED UNDER SEAL                    CASE NO. 11-CIV-20427-WILLIAMS/TURNOFF

DATED: March 7, 2012          Respectfully submitted,

*Janet T. Munn*

Janet T. Munn, Esq. Fla. Bar No. 501281
Email: jmunn@rascoklock.com
RASCO KLOCK
283 Catalonia Avenue, Suite 200
Coral Gables, Fl 33134
Telephone:  305.476.7101
Telecopy: 305.476.7102

And

*Roderick M. Thompson by Janet T. Munn*

Roderick M. Thompson, Esq. (admitted *pro hac vice*)
Email:  rthompson@fbm.com
Andrew Leibnitz, Esq. (admitted *pro hac vice*)
Email:  aleibnitz@fbm.com
Anthony P. Schoenberg, Esq. (admitted *pro hac vice*)
Email:  tschoenberg@fbm.com
Deepak Gupta, Esq. (admitted *pro hac vice*)
Email:  dgupta@fbm.com
Janel Thamkul, Esq. (admitted *pro hac vice*)
Email:  jthamkul@fbm.com
FARELLA BRAUN + MARTEL LLP
235 Montgomery St.
San Francisco, CA  94104
Telephone:  415.954.4400
Telecopy: 415.954.4480

And

*Valentin Gurvits by Janet T. Munn*

Valentin Gurvits, Esq. (admitted *pro hac vice*)
Email: vgurvits@bostonlawgroup.com
BOSTON LAW GROUP
825 Beacon Street, Suite 20
Newton Center, MA 02459
Telephone:  617.928.1800
Telecopy:  617.928.1802

*Counsel for Defendants Hotfile Corporation
  and Anton Titov*

21

FILED UNDER SEAL                    CASE NO. 11-CIV-20427-WILLIAMS/TURNOFF

## CERTIFICATE OF SERVICE

I hereby certify that on March 7th, 2012, a true and correct copy of the foregoing document, was filed conventionally and served on all counsel of record identified below via e-mail and by Federal Express.

Karen L. Stetson, Esq.
GRAY-ROBINSON, P.A.
Email: Karen.Stetson@gray-robinson.com
1221 Brickell Avenue
Suite 1600
Miami, FL 33131
Telephone: 305.416.6880
Telecopy: 305.416.6887

Steven B. Fabrizio, Esq. (admitted *pro hac vice*)
Email: sfabrizio@jenner.com
Duane C. Pozza, Esq. (admitted *pro hac vice*)
Email: dpozza@jenner.com
Luke C. Platzer, Esq. (admitted *pro hac vice*)
Email: lplatzer@jenner.com
JENNER AND BLOCK, LLP
1099 New York Avenue, N.W.
Suite 900
Washington, DC 20001
Telephone: 202.639.6000
Telecopy: 202.639.6066

Karen R. Thorland, Esq. (admitted *pro hac vice*)
Senior Content Protection Counsel
Email: Karen_Thorland@mpaa.org
Motion Picture Association of America, Inc.
15301 Ventura Boulevard, Building E
Sherman Oaks, CA 91403-5885
Telephone: 818.935.5812

By: _Janet T. Munn_
Janet T. Munn

22