**FILED UNDER SEAL**  Sealed

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.: 11-CIV-20427-WILLIAMS/TURNOFF

DISNEY ENTERPRISES, INC.,
TWENTIETH CENTURY FOX FILM
CORPORATION, UNIVERSAL CITY
STUDIOS PRODUCTIONS LLLP,
COLUMBIA PICTURES INDUSTRIES,
INC., and WARNER BROS.
ENTERTAINMENT INC.,

    *Plaintiffs*,

v.

HOTFILE CORP., ANTON TITOV, and
DOES 1-10,

    *Defendants*.

_____/

HOTFILE CORP.,

    *Counterclaimant*,

v.

WARNER BROS. ENTERTAINMENT INC.,

    *Counter-Defendant*.

_____/

### DECLARATION OF ANTON TITOV IN SUPPORT OF DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND EXHIBITS THERETO

I, Anton Titov, declare as follows:

1. I am a founder, minority shareholder, and technologist for defendant Hotfile Corporation and a defendant in this action. This declaration is based on personal knowledge unless indicated otherwise and all statements contained in this declaration are true and correct to

1

**FILED UNDER SEAL**                                    CASE NO.: 11-CIV-20427-WILLIAMS/TURNOFF

the best of my knowledge. If called as a witness, I could and would testify to the facts set forth in this declaration.

2. Hotfile hosts files on the internet. Users may employ Hotfile's web technology to store electronic data of any kind, including documents, spreadsheets, presentations, photographs, home movies, sound recordings, software, or any other kind of electronic file. Information stored on Hotfile remains private unless shared by the uploading user. Hotfile personnel do not access users' uploaded files out of respect for user privacy.

3. Hotfile's business is not "selling access to more than one hundred million files." Mot. at 3. While Hotfile has hosted over 123,344,533 files during its three-year history, only a small fraction of those files were ever downloadable at one time – and even fewer were accessible by any one user, given that files hosted on Hotfile are private.

4. Users primarily employ Hotfile for storage. 55.96% of files uploaded to Hotfile have never been downloaded. This calculation does not count as a "zero download" file any file with duplicate URLs on Hotfile's system where some or all of the duplicate URLs did not have any associated downloads. This calculation also does not count as a "zero download" file any file that was never downloaded by virtue of being blocked by Vobile or hash-blocking or SRA or any other takedown procedure.

5. Users may share the web link or "URL" to a file uploaded to Hotfile with friends, family, or online communities.

6. Hotfile earns revenue solely by selling premium memberships. While any user may store files at Hotfile for ninety days at no charge, premium users store their files indefinitely. Premium users also enjoy faster download speeds and shorter waiting periods before downloads.

7. To attract traffic in its first years of operation, Hotfile paid its registered users between $0.002 and $0.015 (*i.e.*, $1/5$ - $3/2$ ¢) for each download referred, depending on the size of the downloaded file, the server resources consumed, and the number of downloaders who subsequently purchase premium memberships. Since smaller files can be aggregated into bigger ones as easily as bigger files can be divided into smaller parcels, Hotfile had no reason to believe that larger files more likely infringe. Today, Hotfile only pays a referral fee when a new user purchases a premium membership.

**FILED UNDER SEAL**                    CASE NO.: 11-CIV-20427-WILLIAMS/TURNOFF

8. Hotfile forbids the uploading or downloading of copyrighted works without authorization. Each user must explicitly agree not to upload, store, or share content to which the user does not have permission.

9. To protect copyrighted works, Hotfile provides content owners such as each of the Plaintiffs here with the free and unlimited ability to directly "take down" or disable access to any file on Hotfile without any oversight whatsoever. Content owners possessing this access – known as holders of "Special Rightsholder Accounts" or "SRAs" – need merely assert that they possess rights to the files taken down to effectuate their requests. For every file removed, whether by SRA or as a result of takedown requests to Hotfile, Hotfile takes the additional step of ensuring that no other copy may ever again be uploaded or downloaded through Hotfile using a technology known as "hash-blocking." In addition, Hotfile terminates the account of any registered user accused on more than two occasions of uploading copyrighted works without permission (*i.e.*, Hotfile's "three strikes" policy). On top of all of this, Hotfile employs digital fingerprinting technology from Vobile, Inc. to block unauthorized uploads. Since implementation of Vobile's technology by Hotfile last July, only 3.4% of attempted uploads have been blocked as unauthorized by the copyright holder.

10. From the first day, Hotfile terminated the accounts of repeat copyright infringers. It also processed takedown notices from copyright holders within 48 hours. Indeed, it began receiving and processing takedown notices from Plaintiffs themselves in May 2009.

11. The number of Hotfile users that have signed up for Premium accounts has varied over time though it has generally not reached levels significantly higher than 10% of Hotfile's total registered users.

## Hotfile Does Not Subcontract Out Its "Search" Functionality

12. Hotfile does not permit searching of files stored on Hotfile because such functionality is antithetical to Hotfile's purpose of providing private storage. Nonetheless, Plaintiffs assert that Hotfile "subcontracted" this search function to so-called "link sites," citing 186 pages of "screenshots of various ['link sites'] printed . . . on February 13, 2012." Mot. at 3-4; Yeh Decl. ¶ 44 & Ex. 43. However, only eight pages of the exhibit even mention Hotfile, and none of those provide operative links to Hotfile. Moreover, when I query the online database used by Hotfile to track sources of its traffic, none of Plaintiffs' enumerated sites appear among the top 500 sites providing traffic to Hotfile in the past year.

3

13. In asserting that Hotfile "disaggregated" search functionality from its website, Plaintiffs cite an article or web posting by the Electronic Frontier Foundation from 2006. Prior to Plaintiffs' motion, I had never seen that document, which apparently predated Hotfile by three years. That document appears nowhere in Hotfile's records or documents produced in this case.

**Hotfile's Business Model**

14. Plaintiffs assert that "Hotfile's entire business model hinges on being able to offer ... content that users want to download." Mot. at 5. However, when I query the online database used by Hotfile to track sources of its traffic, the largest single source of traffic to Hotfile (by a factor of more than six to one over traffic from any single referring website) is users manually entering Hotfile's web address on their browser.

15. Files identified by Plaintiffs' expert as non-infringing drove sales to Hotfile five times more than Plaintiffs' works-in-suit; it would be counterproductive for Hotfile to support infringement, even setting aside the risk of ruinous litigation costs imposed by Plaintiffs.

**Hotfile's User Affiliate Program**

16. Hotfile previously paid its users for referring additional traffic to the site to increase name recognition, marketplace adoption, and sales.[1] I understood this to be the nature of advertising.

17. Although Plaintiffs claim that "popular" works presumptively infringe, Mot. at 5, Vobile's patented digital fingerprinting technology identifies no infringement at all among Hotfile's top 100 downloads. These files were run through Vobile's technology on February 27, 2012, returning zero "matches" of unauthorized content.

18. Plaintiffs contend that Hotfile's affiliate program discouraged users from uploading files that were not downloaded frequently. Mot. at 6. While true that Hotfile gave less encouragement to these uploads (payment of any kind can hardly qualify as "discouragement"), infrequently-downloaded files use greater server resources, upload resources, bandwidth, and diskspace – and by definition generate fewer referrals. Yeh Ex. 61 at 13.

**Hotfile's Website Affiliate Program**

19. Prior to 2012, Hotfile paid website owners a 5% commission on sales of premium

---

[1] Hotfile's current Affiliate program does not compensate uploaders for downloads.

**FILED UNDER SEAL** CASE NO.: 11-CIV-20427-WILLIAMS/TURNOFF

memberships to users referred by those websites. The sites referring the most users to Hotfile include Google, Facebook, and Youtube (although these sites never signed up to receive commissions). One top participant in Hotfile's program received $350 per week for referring users to Hotfile seeking to download open source software ("freeware"). If websites which merely aggregate links foster illegality, as Plaintiffs suggest (Mot. at 7), they might investigate the 24th and 79th most popular websites in the United States: the Huffington Post and Drudge Report. *See* www.Alexa.com, one of Plaintiffs' past sources of information in this case).

20. Having had two years to investigate the matter (*see* Complaint ¶ 37 (filed 2/8/11 and identifying an investigation of Hotfile for "well over a year"), Plaintiffs argue that twelve "Hotfile-affiliated" websites identified in their brief and fifty such websites identified in an exhibit flout copyright law based on screenshots and "their names alone." Mot. at 7. This amounts to 62 of Hotfile's 24,753 referring websites. Plaintiffs also assert that eleven other websites were shut down by federal authorities or found liable in civil actions, yet they do not indicate which (if any) of those websites had any affiliation with Hotfile. In any event, none of the websites identified in this paragraph provided enough traffic to even appear among Hotfile's top 500 sources of traffic in the past year.

21. Plaintiffs contend that Hotfile once restored the affiliation of a website operator whose affiliate status had been disrupted, even though the operator's homepage "blatantly promote[d] movie and television piracy." Mot. at 7. However, in checking ownership of a webpage, no reason exists to navigate to the operator's homepage. Indeed, the e-mails cited by Plaintiffs (Yeh Exs. 99-101) simply reference the page http://www.allyoulike.com/b8a9e04195a2f70.html – which could not possibly be said to suggest infringement under anyone's definition. Absent complaint from content owners, Hotfile would have no reason to investigate further.

22. Relations between Hotfile and the site PlanetSuzy were so strained that PlanetSuzy had "banned" Hotfile and was not a member of Hotfile's affiliate program as of early 2010.

23. Hotfile eliminated the website operator payment program in early 2012.

**The Primacy Of Storage At Hotfile**

24. In contending that "users buy [premium subscriptions] for a better downloading experience," Mot. at 8, Plaintiffs highlight Hotfile's prior statement on its website: "[u]pload

5

**FILED UNDER SEAL**                                    CASE NO.: 11-CIV-20427-WILLIAMS/TURNOFF

files only if you inten[d] to promote them." *Id.*; *see also id.* (encouraging "good promoters"). Plaintiffs ignore the topic being addressed: tips for affiliates to increase their earnings. Yeh Ex. 59. Hotfile's advertising partners comprise approximately one-half of one percent (0.53%) of Hotfile's user base. Statements to these affiliates in no way changes the fact that the remainder of users primarily employ Hotfile for storage. *See supra* ¶ 4 (56% of uploads to Hotfile are never downloaded).

25. As purported evidence of Hotfile's "file distribution" business, Plaintiffs point out that Hotfile rewarded affiliates for downloads but declined to pay for uploads. Mot. at 8. Hotfile paid advertisers for traffic. It could hardly pay users to consume the storage that Hotfile was offering for sale.

**Takedowns At Hotfile**

26. Since inception, Hotfile has received notices of allegedly infringing links either through DMCA notices or SRA accounts for 8,330,465 of its 123,344,533 files – or 6.8% of its files. Hotfile has taken down 5.4 million files – 4% of total files – in response to DMCA notices, and slightly less than 3 million files – 2% of total files – have been taken down by SRAs.

27. Out of the 2,884,928,361 downloads on Hotfile's website, only 13.6% were downloads of files that received any type of takedown notice.

28. Prior to the filing of the complaint, 46,562 users – only 1.1% of registered Hotfile users at that time – received at least one takedown notice.

29. I performed a computerized review of the takedown notices that Hotfile has received and found that millions of URLS are found in takedown notices that were missing either a statement under penalty of perjury or a statement of good faith belief (or both) – which I understand to be required by the DMCA.

30. Plaintiffs argue that Hotfile voluntarily terminated 444 (or 89%) of its 500 most highly-paid affiliates in the months following adoption of its "three strikes" repeat infringer policy on February 18, 2011. Mot. at 9. These users amounted to only 1.2% of Hotfile's affiliates and 0.008% of Hotfile's users. Thousands of affiliates were not terminated.

31. Plaintiffs assert that "Hotfile uploaders overwhelmingly have been identified as copyright infringers." Mot. at 9. In fact, 93% of Hotfile's uploaders have never received even a single takedown notice, as set forth in the chart below.

**FILED UNDER SEAL** CASE NO.: 11-CIV-20427-WILLIAMS/TURNOFF



Users with Uploads by Strikes

32. Plaintiffs then argue that Hotfile users downloaded 10,390 of Plaintiffs' works over 30 million times using 945,611 links. Mot. at 10. That amounts to 1.1% of Hotfile's downloads.

**Hotfile's Termination Of Repeat Infringers**

33. According to Plaintiffs, Hotfile has terminated 22,447 of its users for receiving repeated allegations of infringement, where Hotfile supposedly should have terminated 34,741 users. Foster Ex. G at 26 (last page); Foster Decl. ¶ 61 & Ex. H. These numbers amount to 0.42% and 0.66% of Hotfile's users, respectively.

34. Plaintiffs argue that defendants falsely "claimed" to have a strikes-based repeat infringer policy prior to the Complaint. Mot. at 10-11; Yeh Exs. 10, 12. However, Exhibits 10 and 12 are purely internal e-mails entitled "Draft" between Atanas Vangelov and me and never circulated outside of Hotfile. Hotfile never "claimed" anything in these internal e-mails. In any event, Hotfile did review accounts of users with numerous complaints at the request of content owners, did perform manual reviews of those accounts, did terminate those accounts, and did stop payments. In the third document cited (Yeh Ex. 11), Hotfile's independent contractor

**FILED UNDER SEAL**  CASE NO.: 11-CIV-20427-WILLIAMS/TURNOFF

apprised a pornography representative in the final weeks before implementation of Hotfile's three-strikes policy that "3 DMCA reports *will* lead to mark[ing] account as repeat offender" – an accurate statement – and in the meantime invited the representative to apprise Hotfile of any known repeat infringers. Yeh Ex. 11.

35. Plaintiffs describe Hotfile's repeat infringer policy prior to the Complaint as "disingenuous," stating that Hotfile only terminated forty-three users despite millions of takedown notices. Mot. at 11. While Hotfile indeed received millions of notices, it also had many millions of registered users and untold numbers of anonymous users. Accordingly, we understood Plaintiffs to be truthful when repeating their praise for Hotfile's efforts to combat infringement. While Hotfile terminated dozens of users following issuance of a short-lived *ex parte* temporary restraining order obtained by pornographer Liberty Media, we sought to react immediately when first confronted with a complaint. In any event, we reacted to Liberty Media by more strictly reviewing alleged infringers of other companies as well – a response which Plaintiffs dismiss as "creating a litigation record." Mot. at 11; Yeh Ex. 21. Although Plaintiffs suggest that Hotfile acted from compulsion, no order or ruling of which I am aware required Hotfile's voluntary scrutiny of accounts highlighted for its review.

36. Plaintiffs then argue that Hotfile should have terminated 24,790 of its users before this litigation under a "three strikes" repeat infringer policy. Mot. at 11. Hotfile has managed 2,884,928,361 downloads, 123,344,533 uploads, and 5,287,163 registered users while utilizing the services of approximately six people. Prior to the strengthening of its repeat infringer policy in February 2011, Hotfile did not know that a fraction of its users (0.1%) had accumulated dozens of takedown notices, or that sixty-one individual users had accumulated hundreds of notices. However, had Hotfile followed Plaintiffs' asserted policy, Hotfile would have terminated its top uploaders years ago – whom I understand have committed no infringement, even according to Plaintiffs. *See* Foster Ex. D (asserting that open source software developer "jdownloader" received its third strike on January 5, 2010); 2 Foster Dep., Ex. 23 (asserting that open source developer "ih8sn0w" received third strike on May 28, 2011). Additionally, more than two-thirds of the "repeat infringers" identified by Plaintiffs did not upload a single work-in-suit after their supposed third strike – meaning that the terminations would not have helped Plaintiffs in any way. Foster Ex. D; Mot. at 11.

37. Plaintiffs then contend that Hotfile was forced to terminate almost all of its top

8

**FILED UNDER SEAL** CASE NO.: 11-CIV-20427-WILLIAMS/TURNOFF

Affiliates and tens of thousands of its uploaders. Mot. at 12. In fact, Hotfile only terminated 22,447 (or 0.42%) of its users, equivalent to 4% of its known uploaders. Hotfile did so within months of Plaintiffs' Complaint – a document which reversed praise Hotfile had received for years.

38. Plaintiffs then assert that "repeat infringers" accounted for over half of all files ever uploaded to Hotfile and more than 75% of all downloads. Mot. at 12. However, when Hotfile suspended these users, it took down not just the thousands of files subject to takedown notices, but the millions of other files these individuals had posted that no party anywhere had ever identified as infringing. Despite Plaintiffs' statement that "repeat infringers" uploaded more than half of Hotfile's files, fully 87% (8,330,465 / 61,066,769) of these uploads were never accused of infringing any copyright, even assuming that *all* of Hotfile's takedown notices related to files uploaded by alleged "repeat infringers." Foster Decl. ¶ 52, Ex. G at 26.

39. Among files uploaded to Hotfile by affiliates, 89% were never subject to any notice of alleged infringement, as set forth in the chart below and Exhibit B.

**Uploads By Affiliates**



40. Asserting that subscribers then complained "in email after email" that copyrighted works were no longer available on Hotfile, Plaintiffs cite e-mails from nine of Hotfile's 5,287,163 users. Mot. at 12 (citing Yeh Exs. 66-68). One of the users sought to download a novel by Charles Dickens. Yeh Ex. 66 (Titov Ex. 134). Another sought to download a

**FILED UNDER SEAL**               CASE NO.: 11-CIV-20427-WILLIAMS/TURNOFF

government document in Argentina that – to this day – has not been subject to a takedown request. *Id.* (Titov Ex. 135). The remaining seven emails, even if believed to reference copyrighted work, hardly demonstrate reliance by Hotfile on copyrighted material – particularly given that any user dissatisfied with Hotfile (either before or after the strengthened repeat infringer policy) could obtain their money back.

41. Plaintiffs point out that Hotfile's revenues dropped after February 2011, which they attribute to Hotfile's strengthened repeat infringer policy. Mot. at 12. However, Plaintiffs sued Hotfile in February 2011, threatening the sustainability of Hotfile's business as a long-term repository of files (regardless of any lack of merit to the suit), and raising the prospect of invasion of user privacy during the discovery process.

### Hotfile Sought Customers, Not Infringers

42. When Hotfile started, according to Yeh Ex. 60, outside contractor Andrew Ianakov took it upon himself to generate traffic to Hotfile by seeking uploads of "mp3 [audio files], videos, applications [and] games." However, he nowhere sought infringing content, Yeh Ex. 60, and indeed the explicit "terms and conditions" of the Hotfile website forbade infringing content. Plaintiffs even assert that Mr. Ianakov "specifically solicited users to upload movies" – even though the cited exhibit states no such thing. Mot. at 12.

43. Plaintiffs then suggest that, on March 29, 2009, Mr. Ianakov "encouraged the user [writing under the moniker "ForumDesire"] to upload infringing [television] files to Hotfile." Mot. at 12 (citing Yeh Decl. Ex. 64). This is not true. In fact, Exhibit 64 shows at most Mr. Ianakov responding to a posting by a promoter of the competing cyberlocker RapidShare (writing under the moniker "rudeturk") by touting Hotfile's reliability and freedom from advertisements. Mr. Ianakov makes no mention of television shows, infringement, ForumDesire, or any of ForumDesire's other three postings in the preceding day, and responds instead to a *previous* posting by an entirely different user. Yeh Ex. 64. At the deposition where I represented Hotfile, Plaintiffs never asked any questions about the content of this proffered exhibit.

### Defendants Did Not Help Users Infringe

44. In response to Plaintiffs' discovery demands in this case, Hotfile gathered for production approximately 701,116 e-mails with users. E-mails to Hotfile automatically identify

10

**FILED UNDER SEAL** CASE NO.: 11-CIV-20427-WILLIAMS/TURNOFF

the link to the file last downloaded by the user. Asserting as a fact that "Defendants helped users engage in specific acts of infringement," Plaintiffs attach eighty-one of these e-mails to their motion, or 0.01% of the e-mails received by Hotfile. Yeh Exs. 28, 30.

45. Hotfile assigned the task of responding to e-mails to an independent contractor, Andrew Ianakov. With an average of 640 e-mails passing through Hotfile every day, Hotfile understood that Mr. Ianakov could not study every e-mail. Indeed, for the vast majority of inquiries where Hotfile could not possibly hope to assist ("my computer crashed" [Titov Ex. 131] or "my download stopped" [Titov Ex. 89]), Mr. Ianakov spent no time with the e-mail and made no response. Yeh Ex. 30. Here, sixty-six of Plaintiffs' proffered e-mails received no evident attention or response. Yeh. Exs. 28, 30. Others received generic responses, *e.g.*, *id.* (Titov Exs. 56, 96, 99), or simply received offers of refunds, *e.g.*, *id.* (Titov Ex. 113, 123, 130) – in either of which cases no reason existed to consider the user's last download.

46. Ultimately, Plaintiffs identify three e-mails out of Hotfile's hundreds of thousands of user e-mails where its independent contractor provided an individuated response. Mot. at 13; Yeh Ex. 28 (Titov Exs. 51, 52, 58).[2] As a threshold matter, nothing submitted by Plaintiffs suggests that Mr. Ianakov gave any of the "last download" URLs any consideration. Even if Mr. Ianakov had gone out of his way to scrutinize the "last downloads" emphasized by Plaintiffs, it is not obvious to me that that http://hotfile.com/dl/15607024/74dafec/SolidWorks_2010r.part03.rar links to design software unauthorized for distribution on Hotfile, or that that http://hotfile.com/dl/117478834/c400c6/The.Wrap-Up.Show.5-11-2011.CF64KSternGeek.mp3.html corresponds to an episode of a copyrighted program unauthorized for distribution on Hotfile. Regarding the one user who stated that he could not obtain the file associated with http://hotfile.com/dl/86517108/cad2aa3/Despicable.Me.2010.720p.BRRip.XviD.AC3-FLAWL3SS.part6.rar.html, Mr. Ianakov generically reminded the user to log in to Hotfile in order to download files. Yeh Ex. 28 (Titov Ex. 52).

**Hotfile's Implementation Of Hash Blocking**

47. Hotfile does not store multiple copies of identical files on its servers. If two users

---

[2] Without providing the e-mails, Plaintiffs purport to summarize "over 700" other user e-mails in which supposedly identify works-in-suit as a user's last download. Yeh Ex. 27. Nothing submitted by Plaintiffs suggests that Mr. Ianakov responded to any of these e-mails, much less studied the "last download" listed.

**FILED UNDER SEAL**                     CASE NO.: 11-CIV-20427-WILLIAMS/TURNOFF

upload the same file and receive two URLs, only one master file is kept, thus conserving storage resources. Accordingly, when Hotfile originally received a takedown notice, it disabled that URL. This permitted one user to undertake non-infringing uses of her copyrighted files stored on Hotfile while preventing others from infringing the same master file.

48. In August 2009, Hotfile unilaterally took the additional step of disabling any master file subject to a takedown notice (so-called "hash blocking"). Prior to hash blocking, Hotfile had received takedown notices for 117,931 URLs, meaning that Hotfile implemented hash blocking before over 98.6% of its takedown notices issued.

### Multiple URLs For A Single File Permit Download Tracking By Segment – Not Circumvention Of Copyright Protection

49. Hotfile permits uploaders to obtain several URLs for every upload so that the uploader can track downloads by different population segments (*e.g.*, how many times downloaders accessed one's photo album from Facebook as opposed to Twitter). Plaintiffs suggest that, before hash-blocking, users exploited these duplicate URLs to propagate infringement, so that the takedown of one infringing URL would not impact the operation of another URL relating to the same content. Mot. at 14. However, before August 2009, only 48,094 (or 1.7%) of the 2,852,406 files stored at Hotfile had duplicate URLs, and only 117,931 (4.1%) of Hotfile's files were subject to takedown notices.

### Defendants Did Not Use Copyrighted Content To Illustrate How To Use Hotfile

50. Plaintiffs assert that Hotfile once gave the following example of a URL which could be submitted to Hotfile to check the link's operability: http://hotfile.com//dl/182987/ c2d67b8/PCD.DollDomination.2009.rar.html. Yeh Ex. 44. Despite Plaintiffs' assertion, this URL is not – and never has been – a "download link for the Pussycat Dolls' popular album 'Doll Domination,'" as it possesses incorrect syntax for a Hotfile link. Mot. at 15.

51. Plaintiffs next assert that "Defendants tweeted instructions for using its remote upload tool illustrated with an infringing adult content title." Mot. at 15. However, Defendants did not know the contents of the tweeted link.

### Hotfile Personnel Did Not Improperly Download Infringing Content

52. Plaintiffs assert that Hotfile contractors downloaded forty-nine infringing files.

12

**FILED UNDER SEAL**  CASE NO.: 11-CIV-20427-WILLIAMS/TURNOFF

Mot. at 15. However, as reflected in the table attached hereto as Exhibit A, over half of these files (twenty-five) were never downloaded. Fifteen of them were downloaded *after* the public link was disabled on Hotfile in order to investigate Warner's improper takedowns in support of Hotfile's counterclaim here. Six were downloaded in investigating claims of illegal pornography. Two were downloaded in conjunction with takedown investigations (*e.g.*, examination of a non-compliant DMCA takedown notice that was ultimately processed), and one was downloaded in conjunction with Vobile testing.

53. On February 26, 2012, all of these 49 files were submitted to Vobile for processing by vCloud9. None of the files were identified as matching any copyrighted content.

### Hotfile Did Not Receive Notice Of Infringement From RapidShare

54. Based on the fact that a user once informed Hotfile that her files were blocked from transfer to RapidShare because they all possessed the same hash value, Plaintiffs allege "rampant copyright infringement" on Hotfile. Mot. at 16; Yeh. Ex. 52. Given that the odds of even two files sharing the same hash value are 1 in $34 \times 10^{38}$, RapidShare's finding of multiple files with the same hash indicates that all of the files were empty. As far as I know, empty files infringe no copyrights.

### Defendants Implemented Vobile's Digital Fingerprinting Technology

55. Within months of the filing of this litigation – at which point Plaintiffs reversed years of praise for Hotfile's counter-infringement efforts from the Plaintiffs without any warning – Hotfile implemented digital fingerprinting technology from Vobile, Inc. ("Vobile").

56. In more than six months of Vobile's operation on Hotfile's website, Vobile has determined that only 3.4% of uploaded video files match copyrighted works (*i.e*, 63,744 matches out of 1,838,287 files).

57. Lemuria has a written contract to provide web-hosting services to Hotfile Corporation. A true and correct copy of that agreement is attached hereto as Exhibit C (bearing Bates numbers HF02868393-97). Lemuria pays Hotfile's legal bills because it is easier for a U.S. company such as Lemuria to pay U.S. lawyers in U.S. currency, rather than sending payments from Panama or Bulgaria.

58. Lemuria contracts with third parties for collocation facilities, bandwidth and servers, which are exactly the types of services that any web-host (e.g., Amazon) would provide.

13

**FILED UNDER SEAL**  
WILLIAMS/TURNOFF

CASE NO.: 11-CIV-20427-

59. Attached hereto as Exhibit D is a true and correct copy of an email from Dan Heydenfeldt to me bearing Bates number HF02865286-89.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on this 7th day of March 2012, at Sofia, Bulgaria.

_____  
Anton Titov