FILED UNDER SEAL Sealed

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.: 11-CIV-20427-WILLIAMS/TURNOFF

DISNEY ENTERPRISES, INC.,
TWENTIETH CENTURY FOX FILM
CORPORATION, UNIVERSAL CITY
STUDIOS PRODUCTIONS LLLP,
COLUMBIA PICTURES INDUSTRIES,
INC., and WARNER BROS.
ENTERTAINMENT INC.,

*Plaintiffs*,

v.

HOTFILE CORP., ANTON TITOV, and
DOES 1-10.

*Defendants*.
_____/

HOTFILE CORP.,

    *Counterclaimant*,

v.
WARNER BROS. ENTERTAINMENT INC.,

    *Counter-Defendant.*
_____/

## DECLARATION OF PROFESSOR JAMES BOYLE
## IN SUPPORT OF
## DEFENDANTS' OPPOSITION
## TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT
## AND EXHIBITS THERETO

**FILED UNDER SEAL**                    CASE NO.: 11-CIV-20427-WILLIAMS/TURNOFF

I, JAMES BOYLE, declare as follows:

1. I am currently the William Neal Reynolds Professor of Law at Duke University, and have been retained by Farella, Braun + Martel LLP on behalf of the Defendants in this action as an expert witness.

2. I received an LL.B. (Hons) from Glasgow University (1980), and an LL.M. (1981) and S.J.D. (1986) from Harvard Law School. I have been a law professor since 1982, teaching at American University, and at the Universities of Pennsylvania, Harvard and Yale as a Visiting Professor. In 2000 I joined the law faculty at Duke.

3. My academic research is mainly in the areas of intellectual property and communication policy, with a focus on the Internet. I have written and edited numerous articles and books on these subjects. In general, my research and scholarship has focused on:

   i) *Copyright law, particularly in the digital arena.* I have published extensively on copyright in law journals, monographs, and edited collections of essays; a full list is available in the attached curriculum vitae. In 2011 I was selected by the British government as one of five expert advisors to the Hargreaves Review of Intellectual Property which was tasked with adjusting copyright law to the digital age. Also in 2011, I was chosen to give the annual Melville Nimmer Lecture on Copyright.

   ii) *Technology and technology policy.* In 2003 I received the World Technology Network Award for law. My most recent book, *The Public Domain* (Yale University Press 2009), was the American Society for Information Science and Technology "Book of the Year" and the winner of the Donald McGannon Award for Communications Policy. My earlier book *Shamans, Software and Spleens: Law and the Construction of the Information Society* (Harvard University Press 1996) also deals with these issues. Beyond my monographs and edited collections of essays, my publications have been in such journals as COMMUNICATIONS OF THE ASSOCIATION OF COMPUTING MACHINERY, one of the leading computer science journals in the world, the HARVARD JOURNAL OF LAW AND TECHNOLOGY, and the DUKE LAW AND TECHNOLOGY REVIEW. Until January 1st 2012, I served as a Board Member of the Public Library of Science.

**FILED UNDER SEAL**  CASE NO.: 11-CIV-20427-WILLIAMS/TURNOFF

iii) *The economics and business methods of online commerce.* Because an understanding of economics, particularly information economics, is fundamental to intellectual property, I have been writing and teaching about information economics and about the various methods of monetizing content, since 1992. Chapters on information economics can be found in both my monographs and in such articles as *Cruel, Mean or Lavish?: Economic Analysis, Price Discrimination and Digital Intellectual Property*, 536 VANDERBILT LAW REVIEW 2007 (2000).

4. Beyond these general focal points, I have specific expertise in three areas of relevance to my reports and testimony in this case:

i. Free or "open source" software, such as Linux or Firefox, which is distributed under licenses that allow users freely to copy and make derivative works of the copyrighted code. I have extensively researched the structure of incentives innovation models in open source software and written about its features, and its various licenses in my articles and books.

ii. Cultural material that is made available under open licenses such as the Creative Commons set of licenses. There are millions of digital files covered by such licenses, ranging from photographs to scientific articles. The license is a way for the copyright owner to give permission in advance for various kinds of uses. I was one of the founding Board Members of Creative Commons and served on its board from 2002 until 2009, the last year as Chairman. While serving on the Creative Commons board I conducted extensive studies of the ways in which open licenses could be incorporated into for-profit business models.

iii. Public domain material. I am one of the founders of the Center for the Study of the Public Domain at Duke Law School and the subject of my most recent book was the role of the public domain in innovation and culture.

**FILED UNDER SEAL**                  CASE NO.: 11-CIV-20427-WILLIAMS/TURNOFF

5. The statements made in this declaration are based on my personal knowledge and on my knowledge of information provided to me by individuals working under my direction, together with my specialized experience and expertise as applied to the facts of this matter. If called to testify, I would be able to testify based on the best of my knowledge, information, and belief, as follows:

## I. FIRST EXPERT REPORT: LEGAL AND PRODUCTIVE USES OF HOTFILE AND OF THE AFFILIATE PROGRAM

6. Attached hereto as Exhibit 1, is a true and correct copy of my November 18, 2011 expert report in this matter along with materials I considered in forming the opinions therein (Ex. A to Ex. 1). I hereby affirm, under penalty of perjury, that my statements in that report are true and correct. My primary task in my first expert report was to explore some examples of the non-infringing uses of the Hotfile system. Defendants' counsel asked me to study the use of the Hotfile service to store and to distribute or download the types of material described above, that is to say, material which can be legally copied and distributed. I did not research the many other types of content that could be legally stored or transferred on Hotfile, including U.S. government works, uncopyrightable material such as databases made up entirely of unoriginal compilations of facts, users' privately created content and so on.

7. Defendant's counsel also asked me to examine Hotfile's Affiliate program, and specifically to look at how it can be used to compensate creators of content for distribution of their work on the Internet. I was asked to determine whether, for example, Hotfile's Affiliate program compensates open source software developers for the software they write and freely distribute.

8. After examining the Hotfile system, and directing the expert computer consulting company Elysium Digital to perform a number of searches and hash-matched analyses of the Hotfile databases, I came to four conclusions that I believe may provide useful information for the court's analysis of both "substantial non-infringing uses" and of *Grokster*-style inducement liability. They also shed light on Dr. Waterman's statistical study of Hotfile and on the 1750 legal opinions offered by Mr. Zebrak, expert witness for the plaintiffs.

4

**FILED UNDER SEAL**                  CASE NO.: 11-CIV-20427-WILLIAMS/TURNOFF

      i. First, there was a high volume of usage of the Hotfile system for activities that were either clearly non-infringing or highly likely to be non-infringing. Most notably, I determined that there is a high volume of usage of the Hotfile system for distribution of free and open source software. My non-comprehensive study found more than 1.7 million downloads of the six open source programs examined.[1] Using the Hotfile system to share non-infringing software files was also a popular usage of the system in relative and absolute terms: the top two most downloaded files on Hotfile were open source programs. Open source and free software programs are a substantial (and growing) component of the software market today, so Hotfile's proven suitability and compatibility with such licensing models is of significance.

      ii. Second, Hotfile's architecture is compatible with and is actually being used for a wide range of activities, beyond the open source software context. Examples of non-infringing uses that I identified ranged from distributing a public domain version of Huckleberry Finn to sharing Creative Commons-licensed "open source" animated movies. My methodology did not attempt to exhaustively identify such uses.

      iii. Third, for reasons explained in the report, services such as Hotfile fill a gap in the Internet's architecture by providing a convenient and generic method of storage, backup or distribution for files that are too large to be saved or sent by e-mail. This is particularly important for small developers of open source software or non-profit distributors and collaborators in cultural projects under open licenses, like the "Blender Project" of open animation discussed in the report. This functionality is useful to anyone

---

[1] During my first deposition, plaintiff's counsel revealed to me that one of the versions of those open source programs, Open Office, though "hash identified" as such, had been given a file name that suggested (wrongly) that it was in fact a film. I had known that there was an apparently misnamed file, but had not realized how many downloads it had received (more than 19,000.) All of those downloads were perfectly legal, since the file was an open source program which may be freely copied. Nevertheless, if one subtracts those downloads from the totals on the theory that the downloaders may not have been searching for open source software, my non exhaustive study still revealed more than 1,750,000 downloads of open source files – all of which were legal to share – including about 9,500 downloads of Open Office correctly so named.

5

**FILED UNDER SEAL**                                        CASE NO.: 11-CIV-20427-WILLIAMS/TURNOFF

who wishes to store and transfer large files of their own creation for use in their daily professional and personal activities.

iv. Fourth, at least two of the open source developers featured in this study were active participants in Hotfile's "Affiliate" program, thus being indirectly compensated for the programs they were freely providing to the public. This suggests that the Hotfile Affiliate program is capable of fulfilling the valuable function of compensating authors and distributors in proportion to the frequency with which their works are downloaded.

9. Further details of my findings are given in the attached report.

## II.  REBUTTAL REPORT: SYSTEMATIC ERRORS IN THE WATERMAN/ ZEBRAK STATISTICAL AND LEGAL STUDY

10. Attached hereto as Exhibit 2, is a true and correct copy of my expert rebuttal report in this matter along with materials I considered in forming the opinions therein (Exs. A-I to Ex. 2). I hereby affirm, under penalty of perjury, that my statements in that report are true and correct. I was asked by counsel for defendants to review expert reports submitted on behalf of the plaintiffs by Dr. Waterman and Mr. Zebrak. Dr. Waterman's report consisted of a statistical analysis of some of the uses of Hotfile, based on a sample of 1750 files that he claimed was representative. Mr. Zebrak's report consisted of 1750 legal opinions about the copyright status of those files; in particular, whether those files were or were not infringing copyright. Dr. Waterman then used Mr. Zebrak's legal opinions and classifications as the basis for his statistical assertions about Hotfile. I understand that those statistical assertions, in turn, form a central part of the plaintiff's case in this action.

11. I found a number of aspects of Dr. Waterman's and Mr. Zebrak's reports to be flawed and misleading. The principal problems were that the Waterman and Zebrak reports:

i. By focusing only on downloads, omitted the majority of files on the Hotfile system and one of the most important likely fair uses or non-infringing uses – namely, for zero download storage and backup. As the name suggests, a cyber-*locker* is used for

**FILED UNDER SEAL**                  CASE NO.: 11-CIV-20427-WILLIAMS/TURNOFF

storage as well as sharing. Dr. Waterman's and Mr. Zebrak's study intentionally ignored the 57,923,301 files – 54% of the total files on Hotfile – that were uploaded but that had zero registered downloads.

ii. Failed to consider adequately the fair use claims that could be made on behalf of those files downloaded once – a further 6,182,360, or 5.76%, of the files on Hotfile.[2] Single downloads are consistent with space-shifting, or with personal storage. As with home taping of TV shows, both uses are highly likely to be a fair use, even if the work is a commercial, copyrighted work, and the copy is made without authorization. Mr. Zebrak did not give weight to this possibility.

12. These two classificatory errors meant that the Waterman and Zebrak studies completely excluded 54% of the files on Hotfile from their study – the very files most likely to be legally uploaded – and then failed adequately to consider an additional 5.76% of the potential *uses* of files on Hotfile. *The combined effect was to exclude or inadequately characterize nearly 60% of the files most likely to have been legally uploaded.* In my opinion, these are very serious methodological flaws.

13. Beyond those two major classificatory errors, I had pointed in my rebuttal report to another general characteristic of the Waterman and Zebrak reports that, in my opinion, meant that the statistical study was flawed, namely its treatment of apparently pornographic files.

14. A substantial proportion (perhaps higher than 20%) of the files that were included in the Waterman and Zebrak studies consisted of files that appeared from their titles to be pornographic. For reasons detailed in my rebuttal report, the copyright status of pornographic work is unusually hard to classify. The producers typically have to avoid mainstream distribution channels, rendering many of the normal sources of information about a work unavailable. There is a reported plethora of distribution and business models – some of which

---

[2] I do not know what actual percentage of the 1750 files in the Zebrak/Waterman study were one download files. Dr. Waterman's procedure was to multiply the number of instances in a file in his sample by the number of times it was downloaded. This would presumably further attenuate the use represented by the one download files.

**FILED UNDER SEAL** CASE NO.: 11-CIV-20427-WILLIAMS/TURNOFF

rely on free distribution of the content. Some producers are shady, fly-by-night enterprises, so that copyright status is particularly hard to determine. In addition, the multiplication of "amateur" content, and of user-generated "remixes" of content, some of which might be fair use, complicate the picture still further. Because of all these difficulties, I suggested that the Waterman and Zebrak report should have either:

    a. Excluded pornographic content altogether – as was done in some other prior expert studies in copyright infringement actions; or

    b. Only classified the work as infringing if confirmation could be obtained from the copyright owner.

15. Given the substantial percentage of apparently pornographic work in the statistical sample (a percentage considerably higher than that of confirmed infringing commercial copyrighted works owned by the plaintiffs) I argued in my rebuttal report that failure to adopt either of these methods cast further doubt on the conclusions offered by the Waterman and Zebrak reports.

16. Finally, I examined a particular set of files that, in my opinion, Mr. Zebrak had classified incorrectly in ways that seemed to indicate two further methodological problems with his report. I discuss those files, and Mr. Zebrak's discussion of them in his declaration in support of the plaintiff's summary judgment motion, in the next section.[3]

---

[3] The Rebuttal Expert Report of Mr. Zebrak included a listing of the "Top 100" files downloaded in the history of Hotfile. A substantial portion of the Top 100 appear to be non-infringing software files. For example, 15 of the Top 25 and 32 of the Top 100 were uploaded by affiliates Jdownloader and ih8snow, who as I previously explained in my initial report, use Hotfile's Affiliate program to be compensated for distributing non-infringing software of their own creation. In fact, hash-matched copies of iReb, sn0breeze and JDownloader, three of the non infringing open source programs I described in my initial report, are prominently featured in the list. From their file names and the identity of the uploader/developer it appears – though I cannot be certain – that the remaining uploads among those 32 files are simply different versions of iReb, sn0breeze and JDownloader. If true, this would mean nearly one third of the 100 most downloaded files are uploaded by these two developers alone and are open source software programs that it is entirely legal to share and copy. It would also mean that, focusing only on these two developers, we could say that in the history of Hotfile, one third of the 100 most downloaded files are uploaded by developers and copyright owners who use the Affiliate program to receive indirect compensation for their own creative efforts.

**FILED UNDER SEAL**  CASE NO.: 11-CIV-20427-WILLIAMS/TURNOFF

### III. SUMMARY OF ERRORS IN THE WATERMAN / ZEBRAK STUDY AS PRESENTED IN THEIR EXPERT DECLARATIONS IN SUPPORT OF SUMMARY JUDGMENT

17. I have reviewed the declarations submitted on behalf of the plaintiffs by Dr. Waterman and Mr. Zebrak. These submissions recreate the same errors that are present in their expert reports, which I identified in my expert rebuttal report and have summarized above.

18. Mr. Zebrak seems to misunderstand my rebuttal report. He states that I "made no systematic attempt to review [his] conclusions" and characterizes my report as disagreeing on the classification of "a handful of files." (Zebrak Decl. ¶ 18.) In fact, as detailed above, I made three systematic criticisms of the Waterman-Zebrak study, criticisms that Dr. Waterman and Mr. Zebrak have not even made an attempt to rebut. (*See* paragraphs 11-16, *supra*.)

---

Mr. Zebrak does not offer an analysis of the prevalence of infringing activity in the Top 100. I will note however that he incorrectly alleges that one of the other uploaders of several Top 100 gaming-related files with the username "synnersynx" had, at another point, uploaded five "illegal" files to Hotfile. In Mr. Zebrak's terminology, "illegal" files are those designed to circumvent technical protection measures on copyrighted programs. In fact, according to an analysis performed at my direction, four of the five allegedly "illegal" files are actually software patches created and freely distributed by gaming developer Blizzard Entertainment for Blizzard's own games. The files were hash identical with those that Blizzard distributed. [Exhibit 6.] Mr. Zebrak incorrectly classifies them as "Mapcraft Hacks" (they are not) and incorrectly identifies them as "illegal." They also do not appear to be infringing since Blizzard explicitly allows patches to be reposted for download on other sites around the web. http://us.blizzard.com/en-us/company/about/legal-faq.html (last visited March 6th, 2012) (though one could argue about the definition of "non commercial mirroring"). The fifth supposedly "illegal" file was not available on Hotfile to be reviewed – at best I might label it as "possibly illegal depending on the content of the actual file" (which could not be retrieved). Mr. Zebrak's incorrect assertions of "illegality" – which again seem predicated on the idea that copyright owners would never voluntarily share their work – further call into question the reliability of his conclusions.

9

**FILED UNDER SEAL**                    CASE NO.: 11-CIV-20427-WILLIAMS/TURNOFF

19. **Ignoring Zero Download Storage.** As I pointed out earlier, by defining their study to focus only on downloads, Dr. Waterman and Mr. Zebrak omitted the majority of files on the Hotfile system and categorically excluded one of the most important likely non-infringing uses – namely, the use of Hotfile for zero download storage and backup. As the name suggests, a cyber-*locker* is used for storage as well as sharing. Dr. Waterman's and Mr. Zebrak's study ignored the 57,923,301 files – 54% of the total files on Hotfile – that were uploaded but never downloaded. As a *systematic* matter, therefore, their reports do not and cannot provide a fair reflection of the overall uses of the system. I noted in my rebuttal report that Dr. Waterman, in previous studies, has looked at total files available, which, of course, would have included files with zero downloads. Dr. Waterman does not defend the decision to exclude storage as a matter of statistical science. Rather, he says he was "tasked" by the Studios to only look at "distribution" and he thereby excluded storage and space-shifting. Waterman Depo. 212:10-13 [Ex. 3]. I concluded, "[i]n this case, the focus on downloads alone actually excludes a majority of the files on the system from Mr. Zebrak's review and ignores a type of use that would clearly qualify as an actual current, and potential future, substantial non-infringing use." *See* Rebuttal Report paragraph 27. I describe this aspect of the design of the study as a serious error that undermines the study's reliability. In his Declaration in support of the motion for summary judgment, Mr. Zebrak offers no response to the extensive criticism I offered in my rebuttal report of the decision to exclude zero download storage and backup. It would appear, therefore, that my opinion in this regard stands unrebutted.

20. **Ignoring One Download Storage/Space-Shifted Files.** As I pointed out in my rebuttal report, the Waterman-Zebrak study failed to consider adequately the fair use claims that could be made for files downloaded only once. These one download files reflect a further 6,182,360, or 5.76%, of the files on Hotfile. Single downloads are consistent with space-shifting, or with personal storage.[4] Indeed, this was the very kind of use at issue in the *Sony* case. I argued in my rebuttal report that this error precludes relying on Mr. Zebrak's assessment of the copyright status of files within the sample. In his Declaration in support of the motion for

---

[4] Mr. Zebrak *assumed* that the uploader and downloader of each file were *different*. Zebrak Depo. Day 1, 106:24-107:12 [Ex. 4]. With storage and space-shifting, they are, of course, the same. Thus, his study systematically excluded this possibility and therefore found downloads that were likely fair uses to be "highly likely infringing."

**FILED UNDER SEAL** CASE NO.: 11-CIV-20427-WILLIAMS/TURNOFF

summary judgment, Mr. Zebrak does not respond to this critique. Again, it would appear that my opinion, in this regard, is unrebutted.

21. **Failure to Adopt Appropriate Measures to Classify Adult Content.** Again, for reasons detailed in my rebuttal report, the copyright status of pornographic work is unusually hard to classify. I noted in that report that pornography had been altogether excluded from the *Grokster* study, yet in the Waterman-Zebrak study pornography (apart from illegal pornography or child pornography) was included. Because of all these difficulties, I suggested that the Waterman and Zebrak report should either have either:

    a. Excluded pornographic content altogether – as was done in some other prior expert studies in copyright infringement actions; or

    b. Only classified the work as infringing if confirmation could be obtained from the copyright owner.

In his declaration, Mr. Zebrak has failed to address this criticism of his system of analysis.

22. New facts in the record have further corroborated my analysis in this regard. In Mr. Zebrak's second day of deposition, which occurred after I submitted my rebuttal report, he was confronted with an example of "remixed" adult video that in his survey he had categorized as "highly likely infringing." (In my rebuttal report I had listed the possibility of remixed adult video, potentially a fair use, as one of the reasons it was so hard to classify pornography.) In deposition he conceded that he did not "recall the full consideration of [the fair use doctrine] here" and eventually stated that this is "one of the closer calls within my analysis." (Ex. 5, Zebrak Day 2, 224:16-238:10.) He was also confronted with a video that bore a watermark from an amateur adult website, for which the website's terms of use for uploaders required an assignment "for promoting and redistributing…through any media channels." (*Id.*, 252:20 – 254:15.) The use of this file appears consistent with "viral marketing," which based on my review of the literature in connection with my rebuttal report is quite common in the adult industry. Mr. Zebrak testified that "even if there were a rare instance like the one you're describing [viral redistribution], that would very much be an outlier." (*Id.*, 255:21-24.) Both in the area of adult content and elsewhere, I disagree with Mr. Zebrak's assumption that such authorized sharing, which he describes as an "outlier," is "rare" on the Internet. Making this

11

**FILED UNDER SEAL**         CASE NO.: 11-CIV-20427-WILLIAMS/TURNOFF

assumption permits him to conclude that each of these adult files is "highly likely infringing." Because this assumption is, in my opinion, faulty – particularly with regard to adult content – his analysis is unreliable. Again, Mr. Zebrak did not address these criticisms in his declaration.

23. **Failure to Correctly Assess Authorization or Public Domain Status For Software And Other Works.** Mr. Zebrak appears to misunderstand the reason for inclusion of the specific files I discussed in my report. First, contrary to his suggestion, these were far from being my only criticisms of his report. As pointed out in paragraphs 11-16 of this declaration, I had three major systemic criticisms of his methodology and that of Dr. Waterman. I have been able to find no rebuttal of those criticisms. Second, the files I specifically discussed were included as *examples* of two more general kinds of error to which Mr. Zebrak's study appears to have been prone, namely:

  i. Failure to classify accurately material that might well have been shared with permission, due to an assumption – repeated in his discussion of adult content, (*see* paragraph 14, *supra*) – that authorized viral distribution online was extremely unusual. As described in my rebuttal report, Mr. Zebrak repeatedly made this assertion in deposition. Both my knowledge of internet content in general and the specific examples that follow indicate that this assumption is not warranted.

  ii. Establishment of what appears to be a default assumption that content is infringing, leading in the most obvious example – the inclusion of a Russian book from 1871 – to ludicrous results.

  **a. Orbit Downloader**: Mr. Zebrak classified Orbit Downloader as highly likely infringing. In my rebuttal report, I pointed out that he had inadequate basis for this classification. Mr. Zebrak argues in his declaration that listing a program as "freeware" does not *definitively* mean it is offered for use without limits on reproduction and argues that it is possible that the authors of Orbit Downloader intended it for distribution only from their site. But I make both of these points in my rebuttal report.

  Of course, a company might distribute at zero cost through certain sites and prefer not to distribute through others. Copyright gives them the legal right to make that choice. Yet if

12

**FILED UNDER SEAL**                        CASE NO.: 11-CIV-20427-WILLIAMS/TURNOFF

they formally classify their product as "freeware" and fail to include any End User License Agreement to the contrary, I think the argument for either express or implied license to reproduce is a solid one. At the very least, from this evidence one could not responsibly classify such a program as "*Highly Likely* Infringing." Ex. 2, paragraph 41. My point was that, at best, we are in a situation of *uncertainty* here and the fact that Mr. Zebrak does not reflect that uncertainty in his classification is troubling. Orbit Downloader is a program that the developers carefully label, using semantic web technology, as "freeware" – showing considerable sophistication in specifying the terms under which the program is made available. Yet they choose not to include any End User License Agreement, or restriction on distribution. Mr. Zebrak argues that the inclusion of a boilerplate "all rights reserved" copyright statement at the bottom of the page and the addition of a donation button are sufficient to make the case clear. Neither argument seems persuasive to me. It is not even clear whether the first statement applies to the webpage or the program. In any event, it is contradicted by the large, free "download" button elsewhere on the page. Clearly *all* rights (in this case, the right to forbid reproduction) are not being reserved. Again in his declaration, Mr. Zebrak seems to think that asserting a work is copyrighted (as all are, automatically) inevitably implies a restrictive distribution model. But this is not true – most obviously in the case of open source software and Creative Commons licensed cultural material. The copyright over the files is clear and is vital to the distribution agreement. Its assertion does not imply an intention to restrict redistribution, however. As for the donation button, if the developers wished to include a term in their semantic web license restricting distribution to their own website, they clearly had the legal and technical savvy to do so. I am not asserting that Orbit Downloader is clearly noninfringing. That would be making the same kind of error of over-confidence as Mr. Zebrak, but in the other direction. I would have classified Orbit Downloader's status as "Unknown." My point was that his failure to admit ambiguity or the prevalence of content that is authorized for free download in *this* example, reflects a larger tendency which I this is reasonable to believe skewed the rest of his assessments.

    **b. Skoki 2006:** This program provides another example of exactly the same point. Mr. Zebrak stated in his initial classification that the reason for classifying this as Highly Likely Infringing was the inclusion of Microsoft's DirectX. But, as I point out at length in my rebuttal report, the Microsoft DirectX redistributable included in the game is one that Microsoft *wants* to be distributed free and, as the name suggests, "redistributable." Skoki 2006 appears to be in

**FILED UNDER SEAL**  CASE NO.: 11-CIV-20427-WILLIAMS/TURNOFF

scrupulous conformance with Microsoft's EULA. The point here is that, once again, Mr. Zebrak's default assumption that high quality copyrighted content is not made freely available online leads him to misclassify DirectX – a program that Microsoft wishes developers to redistribute freely, making the point that free redistribution is a part of the strategy of even the most mainstream of proprietary software producers. In his declaration, Mr. Zebrak switches ground and argues that the game may be illegal for other reasons, so that his classification remains the same even though the reasons for asserting it are now different. Yet this fails to address the point made; that his assumptions lead him to misclassify an entire class of works and to state a level of certainty that his shift of position reveals to be illusory.

   c. **Photography 101 Podcast:** This podcast is an example, again, of the same theme. As I pointed out in my rebuttal report, the podcast is in fact offered for free download online and its author confirms that he does not object to its redistribution. Mr. Zebrak – somewhat puzzlingly – introduces the iTunes terms of service into the picture, apparently imagining that iTunes has the ability to affect the copyright status of a work in which it holds no copyright. It does not. Mr. Wittenburg holds the copyright in his podcasts. He allows people to download them freely and to repost them and says so explicitly in his affidavit. There is no evidence that the version of the podcast posted on Hotfile even came from iTunes. Mr. Wittenburg refers to the podcasts being available in multiple locations online. Even if it did, the iTunes terms of service are a red herring. I may give a lecture which I record and post online, posting it also on iTunes. I hold the copyright and I may choose to allow posting and reposting as I wish. Copyright law gives iTunes no rights over the program and no rights to circumscribe what I allow with my own podcast – they have no copyright to infringe – and thus the claim that the file is "highly likely *infringing*" cannot be supported on this basis. Mr. Zebrak also mentions the fact, which I discussed in the rebuttal report, that Mr. Wittenburg had said he objected to those who reposted charging money for the files. As I pointed out, "[i]ndividuals clearly could download Mr. Wittenburg's podcast from Hotfile without being charged money. This appears to be a legal reposting of Mr. Wittenburg's podcast. It certainly cannot be classified, as Mr. Zebrak does, as 'highly likely infringing.'" Ex. 2, Paragraph 42.

   d. **Farming Simulator:** Mr. Zebrak's response to my criticisms of his classification of multiple, user-generated "mod files" intended to be used with the video game Farming Simulator is, perhaps, the most revealing of all of his answers. In my rebuttal report, I pointed out that

14

**FILED UNDER SEAL**                    CASE NO.: 11-CIV-20427-WILLIAMS/TURNOFF

Giant Software explicitly ran competitions for "mods" – that is to say additional modules – that they included an editor in the game program itself to allow users to create "mods," and that they encouraged users to repost these "mods." This is a frequent practice in the gaming world, as I explained, and one which, again, Mr. Zebrak's strong assumption against free distribution causes him to misclassify. Mr. Zebrak is silent about all this evidence. Then faced with an e-mail from Mr. Schwegler, an employee of Giant Software, explicitly saying that he has reviewed the modules, that they do not infringe Giant's copyrights, or contain any "cracks," and that they are legal to distribute, Mr. Zebrak first doubts that the employee has authority to make such decisions. He provides no explanation why it is reasonable to assume that a person who works at Giant Software would, out of some inexplicable motive, provide a detailed assessment of "mod files" that contradicts the company's wishes – a scenario that is remarkably implausible in its own right even if it were not for all the evidence I provided that Giant Software has repeatedly encouraged such "mods." For his assessment to be correct, it has to be more likely that an attorney sitting in Washington D.C. can know that a distribution of user generated content is infringing, than for an actual *employee* of the company that owns the copyright of the game (and encourages distribution of such content) to be able to declare it *non*-infringing. This defies belief. He goes on to say "Mr. Schwegler opines that they are "non-infringing," without representing that he is an attorney or even familiar with U.S. copyright law. Thus, the declaration does not cause me to change my classification of the file." Zebrak, Declaration ¶ 19. This provides the clearest example of just how hard it is to get out of Mr. Zebrak's category of "highly likely infringing." In this context we had overt permissive statements from the company, inclusion of a "mod" editor inside the game program to encourage user generated content, official competitions encouraging users to make such "mods," a frequent practice in the gaming industry allowing the free distribution of "mods" and a detailed declaration from an employee of the company specifically asserting that the "mods" were not infringing. Even after seeing all this, Mr. Zebrak maintains his classification that it is "highly likely infringing"! True to his assumption that sharing is a bizarre aberration, he also apparently believes that a company needs to have U.S. copyright experts on its staff in order to exercise its right to *share* its content but not to *exclude* others from it. This of course, is no more true than that you need to be an expert in real estate law to invite someone onto your porch. If, faced with all this evidence, Mr. Zebrak sticks to such a classification, I think it is reasonable to doubt his judgment elsewhere.

15

**FILED UNDER SEAL**          CASE NO.: 11-CIV-20427-WILLIAMS/TURNOFF

    **e. 1871 Russian Embroidery book** Mr. Zebrak's classification here was inexplicable to me in my rebuttal report and remains so now. He argues that there could be copyrightable selection and arrangement in the illustrations of this work, even though both the original work and the illustrations are clearly in the public domain. I dealt with and dismissed this possibility in my rebuttal report – indeed the site to which he cites in his original argument for infringing status explicitly identifies this exact book, in unchanged order and arrangement, as being published in 1871 in St. Petersburg. This book is at the most conservative possible classification, "highly likely in the public domain." Mr. Zebrak will not concede even this, though he does at least change his classification to "Unknowable." Again, I think the refusal to admit even overwhelming evidence like this indicates a predisposition to find infringement that is worryingly strong – and that predisposition appears to be a general one, which therefore has significance far beyond the files I was able to examine in the time available to me.

    I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

    Executed on this 6th day of March 2012, at Durham, North Carolina.

*[signature]*

James Boyle