# EXHIBIT 5

IN THE UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF FLORIDA


DISNEY ENTERPRISES, INC., TWENTIETH

CENTURY FOX FILM CORPORATION,

UNIVERSAL CITY STUDIOS PRODUCTIONS,

LLP, COLUMBIA PICTURES INDUSTRIES,

INC., and WARNER BROTHERS

ENTERTAINMENT, INC.,


        Plaintiffs,


    vs.                 Case No.


HOTFILE CORPORATION, ANTON TITOV      11-cv-20427-AJ

and DOES 1-20,


        Defendants.

_____

        Videotaped Deposition of SCOTT A. ZEBRAK,
a witness herein, called for examination by counsel
for Defendants in the above-entitled matter, Washington,
D.C. pursuant to subpoena, the witness being duly sworn
by SUSAN L. CIMINELLI, CRR, RPR, a Notary Public in and
for the District of Columbia, taken at the offices of
Jenner & Block, LLP, 1099 New York Avenue, N.W.,

Washington, D.C., at 10:49 a.m. on Friday, January 20,

2012.


Sarnoff, A VERITEXT COMPANY
877-955-3855

1  APPEARANCES:

2

3      On behalf of the Plaintiffs & Counterdefendants:

4          DUANE POZZA, ESQ.

5          STEVEN B. FABRIZIO, ESQ.

6          Jenner & Block, LLP

7          901 New York Avenue, N.W.

8          Washington, D.C.  20001

9          (202) 639-6000

10         dpozza@jenner.com

11

12     On behalf of the Defendants:

13         DEEPAK GUPTA, ESQ.

14         Farella Braun + Martel, LLP

15         235 Montgomery Street

16         San Francisco, CA  94104

17         (415) 954-4400

18         dgupta@fbm.com

19

20     ALSO PRESENT:

21         CONWAY BARKER, Videographer

22

23

24

25

Page 224

1    Q.   Okay.  And I want the record to reflect

2    that I'm submitting this chart to Mr. Zebrak without

3    waiver of Defendant's rights and concerns regarding

4    late supplementation and that sort of thing, but

5    because I do believe it will facilitate questioning,

6    I've provided it to Mr. Zebrak.

7    A.   Okay.

8    Q.   And I'd also like to direct your

9    attention, Mr. Zebrak, to line seven on the first

10   page where you made a determination that a file you

11   identified as having the title of Californication was

12   highly likely infringing.  Do you see what I'm

13   talking about?

14   A.   Yes, I do.

15   Q.   Okay.  And what I tried to do is get

16   printouts of the -- of the pages that are noted in

17   the notes column to discuss with you.  And so I'd

18   like to mark this as the next consecutively numbered

19   exhibit.  I believe we're up to 126.

20          (Zebrak Exhibit 126 was

21          marked for identification.)

22       THE WITNESS:  Okay.

23       BY MR. GUPTA:

24   Q.   So, Mr. Zebrak, this is the first link

25   that you cited, which is IMDB, and can you please

1  tell me what this is?

2      A.   Internetmoviedatabase.com is a site that,

3  among other things, has information about movies and

4  television shows.

5      Q.   Okay.  And in what sense does this support

6  your conclusion that the identified file is -- is

7  infringing?

8          MR. POZZA:  Objection.  It lacks

9  foundation generally, and in particular I just want

10  to note that there's no URL on the printout to

11  indicate what it is.

12          THE WITNESS:  First of all, this -- just

13  as a preface to my answer, you're now asking me about

14  one of 1750 works that were -- I reviewed months ago,

15  and it would, of course, assist me if you would show

16  me the actual content file that's here.

17          BY MR. GUPTA:

18      Q.   I'll do my best.

19      A.   Well, but I mean, you know, just I'd like

20  to give a complete answer if I could.  You know,

21  we've talked at length in my earlier deposition

22  somewhat today about my methodology.  It, you know,

23  would involve review of the file, along with lots of

24  other information, and this notes section, you know,

25  was a place where we kept information that was useful

1   to us in our analysis.  Presenting me with one

2   printout of a page in the abstract when I can't see

3   the file is -- it's hard for me to answer it in such

4   an isolated way.

5           You know, of course, as I look at this,

6   Californication is of course a show by Showtime.  I'm

7   familiar with that and which is probably why Showtime

8   Networks is in the company page.  Now, at the same

9   time, the analysis that I underwent here, I -- it's

10  possible that this -- you know, that my ultimate

11  conclusion is not necessarily footnoted by a link you

12  see in the notes section.  That was not the goal of

13  this notes section.  You have access to the same

14  files I do, and the idea in the notes section was for

15  us to keep notes along the way, not to pinpoint this

16  is how I identified the work, this is its author, you

17  know, how it's being commercialized.

18          Sometimes we would record links like that;

19  sometimes not.  Sometimes, you know, you would

20  identify the file and how it was commercialized by

21  review of the file, which I don't have here.  And so

22  what was most important to me was my ultimate

23  classification status on the work.  What was of

24  lesser significance was this working notes section

25  and other data about -- about the work here.

1    Q.   Let me ask you a question.  Did counsel

2   ever explain to you that you need to provide the

3   basis of your opinions in your expert report?

4         MR. POZZA:  Objection.  Argumentative and

5   ambiguous.

6         BY MR. GUPTA:

7    Q.   It's not intended to be argumentative.

8   It's just a genuine question.

9    A.   It is not -- if -- look, if what you're

10  asking is -- with regard to 1750 works, is it

11  possible for me to say when I reviewed the work on,

12  you know, minute 19, there is the notice indicating

13  who it is, and from there I went to this site, and it

14  helped me to identify this as the owner and, you

15  know, -- I mean these -- these works in the process I

16  applied are ready -- readily reproducible by anyone

17  else, and if there are certain works that you believe

18  I'm mistaken on ultimately about its infringement

19  assessment, I'm more than happy to examine those

20  works and, if I'm wrong, want to be the first one to

21  correct my classification status, but, you know,

22  showing me one printed page from the notes section is

23  going to be a hard way to review these files.  In

24  certain instances.

25        In other instances, it may trigger it, but

1    -- I'm sorry.  I just -- it's sort of a long

2    background, but I wanted to kind of get through that

3    before we do too many of these examples.  But --

4        Q.   Okay.

5        A.   -- go right ahead.

6        Q.   So is it fair to say that the notes column

7    does not provide the entire factual basis for -- for

8    your opinions in this case?

9        MR. POZZA:  Object as ambiguous and asked

10   and answered to the extent that this topic was

11   covered the previous deposition.

12       THE WITNESS:  Well, the notes section

13   clearly did not include information that I would have

14   found important as I reviewed the file, for example.

15   And, of course, we produced the file.  Other

16   information might be reflected in some of the other

17   fields I have here.  But when you say the factual

18   basis, you know, it's not possible for me to record

19   every page I click on as I arrive at certain links.

20       And I mean, it -- so it's sort of a vague

21   question, but, you know, these -- you know, many, if

22   not most, of these links are very useful in helping

23   to identify what the file is.  Information about how

24   it's being commercialized, along with information

25   showing that the file is actually being distributed,

1   but not always.  Sometimes there may be a link in

2   there that's not especially useful.  So sort of

3   erasing that link may not have been incredibly

4   helpful.

5        BY MR. GUPTA:

6     Q.   Okay.  Well, taking your concern about

7   wanting to see as much of the evidence as you can --

8     A.   Sure.  Yeah.  That's great.

9     Q.   Can you please -- what I'll do is append

10  two additional documents to the existing Zebrak

11  Exhibit 126.  And this is the website, the porn

12  website, that is identified in the notes column and

13  the particular page --

14    A.   Yes.

15    Q.   -- that's referenced.  And then there is a

16  screen shot of the video using our screen shot --

17    A.   Yes.

18    Q.   -- software.

19    A.   That's -- yes.

20    Q.   Okay.  So based on this --

21       MR. POZZA:  Do you have a copy for me too?

22       MR. GUPTA:  Yes.

23       THE WITNESS:  So --

24       MR. POZZA:  Just a second.  I need a copy.

25       BY MR. GUPTA:

Page 230

1    Q.   All right.  So based on this information,

2  can you explain to me the basis of your

3  classification of the file as --

4    A.   Sure.

5    Q.   -- highly infringing?

6    A.   Sure.  What pops to mind right now is that

7  this is professionally produced video involving

8  nudity.  I'm not sure necessarily where it crosses

9  the line -- it's your definition of pornography --

10  under the name of Californication.  And I actually

11  recall this and was thinking about this as we were

12  discussing the file a moment ago.

13        The -- Showtime is not the creator of

14  this, of this particular work.  This would have been

15  designated as highly likely infringing on the basis

16  that it was a professionally created video, not --

17  not sort of an amateur work uploaded by an

18  individual, in which case I would have presumed it to

19  be authorized.  This would have been a professional

20  work and -- consistent, of course, with the fact that

21  the title of the work has the person's name on it and

22  a year.  Yeah, so --

23    Q.   Okay.  Did you consider the length of the

24  clip?

25    A.   I don't recall this one in particular.

Page 231

1   When we talked about length of clips a moment ago, I

2   was speaking generally about the length of clips.

3   There may be some exceptions.  It seems here

4   you've -- you've isolated an exception that is not

5   the norm of the types of works that I examined here.

6   This is -- at least judging by the length here, I

7   don't know if that's a minute and 48 or an hour and

8   48 based on this.

9      Q.   I'll represent to you it's a minute and

10  48.

11     A.   It's probably a minute and 48.  This might

12  be an example of something that's been taken as being

13  distributed from a -- from another -- from a

14  commercial work.  I don't know what comes before or

15  after the screen shot, but --

16     Q.   Did you consider the fair use doctrine in

17  connection with this clip?

18     A.   Again, I would have considered that

19  wherever I deemed it to be relevant.  In my analysis,

20  that was certainly a consideration that I would have

21  looked at.  As I look at this one now, you know, I

22  would like to see, for example, the other instances

23  in which this link was being distributed.  That would

24  be something I would have looked at as well.  But I

25  don't recall the specifics of it here.

Page 232

1    Q.   So -- and just to further confirm for you

2  the length of the clip, when you look at the link

3  site that you --

4    A.   Yes.

5    Q.   -- you referenced in the notes column, it

6  does say one minute 48 seconds.  And so I wanted to

7  ask you to walk me through the fair use factors.  I

8  realize you don't remember if you applied them or

9  not.

10    A.   No.  I didn't say that.  I said I don't

11  recall the full consideration of it here.  I applied

12  it wherever it would be implicated.  It's something I

13  did in each and every instance was say is there a

14  fair use or licensing issue here, and I would reason

15  it through.

16    Q.   Right.  And so, if you reason it through

17  here, you know, what is the analysis that you walked

18  through?

19    A.   Well, I'd also like to see other instances

20  of -- of this.  I mean, I, of course, know the fair

21  use factors.  You know, in this instance if this was

22  a work of -- or a clip of two minutes or less,

23  assuming that's not a full length of the commercial

24  work, it would be using less than the whole portion

25  of the work.  The nature of the work would be one

1   deserving of copyright protection.  The nature of the

2   use in this instance is on a thread of the most

3   sensual scenes for movies and TV.

4          I'm just looking now for -- so, you know,

5   I don't know in what other instances this work we

6   found to be -- being distributed.  In this instance

7   here, the user apparently seems to be saying that

8   these are the most sensual scenes in movies from TV

9   in this posting.  I'm not sure the length of the

10  other works, but this one -- according to what you've

11  shown me, it's two minutes or less.

12  Q.   Right.  And so, I mean, I don't see any

13  advertising here.  Do you?  In this link?

14  A.   I don't -- I don't necessarily know from

15  this web page whether this person and the thread this

16  person is running is being done to derive this person

17  of consideration in any way.  I do know that, in

18  terms of the amount used, this person could clearly

19  have done lots of other things other than putting up

20  a two-minute clip from -- from this work.

21  Q.   I'm sorry.  What do you mean by they could

22  have done --

23  A.   Well, I mean --

24  Q.   -- a lot of other things?

25  A.   -- if this person wanted to convey

1   information about movies that this person found to be

2   among the most sensual scenes from movies, this

3   person could have listed them, could have put a

4   screen shot up.  Didn't have to put a two-minute

5   video up.  So in terms of, you know, the amount used,

6   you know, it would appear to me this person probably

7   used more than was necessary, and it's a work

8   deserving of copyright protection; you know, could

9   this -- could be commercial depending on what's

10  happening here.  I don't know just by looking at this

11  page and in what other instances this link is being

12  distributed.  And --

13      Q.   For the fourth factor, for the effect of

14  the use upon the potential market, do you think that

15  there is really any meaningful negative impact on the

16  market for Californication from this?

17          MR. POZZA:  Object to the extent it calls

18  for speculation.

19          BY MR. GUPTA:

20      Q.   And as a follow-on question, a subpoint is

21  couldn't it possibly even help the TV show if -- to

22  the extent that they're saying, you know, this is

23  from Californication, somebody might go out and buy

24  the iTunes video?

25      A.   You're misunderstanding.

Page 235

1        THE VIDEOGRAPHER:  This is the end of tape

2   three.  Off the record at 6:40.

3        (Discussion off the record.)

4        THE VIDEOGRAPHER:  This is the beginning

5   of tape four in the -- in the deposition of

6   Mr. Zebrak.  On the record at 6:46.

7        MR. POZZA:  I just want to make a standing

8   objection to this line of questioning to the extent

9   that it could have been asked in the first deposition

10  and thus is a way of exceeding the seven hours

11  allotted to the first deposition, which was about the

12  documents studied in the first place.

13        MR. GUPTA:  And I'll note this is being

14  linked to Professor Boyle's rebuttal report.  I'll

15  note that this is questioning that is pursuant to

16  Professor Boyle's rebuttal report where he made an

17  analysis of the use of adult content in -- in

18  Dr. Waterman's study.

19        BY MR. GUPTA:

20    Q.   So I was asking about factor four of the

21  fair use analysis, which is the harm to the market

22  for the copyright owner, and I wanted to get your

23  perspective on, you know, really and genuinely, you

24  know, if you believe that this is appreciably going

25  to harm the market.

1        MR. POZZA:  Object as ambiguous and to the

2   extent it calls for speculation.

3        THE WITNESS:  Well, I actually do think in

4   this instance -- and first of all, again, this is --

5   you know, this type of example is more of an outlier.

6   In most cases, the files that I was reviewing were

7   full-length copies of the entire episode, not what in

8   this case is apparently a two-minute portion but

9   apparently a portion that a segment of the population

10  finds very, very much of interest being in this case

11  a strip-tease scene from the Californication episode.

12  And, you know, the notion that someone would instead

13  of purchasing a copy of that Showtime episode to, you

14  know, watch what they really cared about for that

15  segment of the population being the strip-tease

16  scene, which apparently is of interest to this

17  blogger and those people that he thinks are reading

18  -- or she thinks are reading the blog, you know, this

19  could -- could certainly displace sales.

20       BY MR. GUPTA:

21  Q.   Isn't -- isn't that form of reasoning

22  essentially going to eviscerate the fourth prong of

23  the fair use analysis, because basically what you're

24  say something that as long as a work has -- is

25  generating some -- is generating some interest that

1   there is a potential market for it, and so there's

2   inherently a deprivation of the copyright owner

3   insofar as they are being deprived of the ability to

4   access that market?

5       MR. POZZA:  Object as ambiguous, and to

6   the extent it's talking about abstract legal ideas,

7   it's outside the scope of the testimony.

8       THE WITNESS:  Again, you know, I

9   understand the fair use doctrine.  I routinely need

10  to look at and apply the fair use doctrine, and do

11  not believe that my analysis here eviscerates the

12  fair use doctrine.  Your question was sort of a vague

13  abstract one.  You know, the notion that a whole

14  group of people interested in -- in seeing a

15  beautiful woman dance and do a strip-tease might be

16  happy to view this two-minute clip rather than seeing

17  the whole episode if this is the only thing that

18  person cares about -- that certainly could -- could

19  have harm to the market as opposed to going to

20  purchase the episode.  You know, this is very

21  different than, you know, the more classic type of

22  instances of fair use.  And certainly had this person

23  merely done a screen shot or included a list of

24  the -- in this person's view, the best most sensual

25  scenes from movie and TV series, I think that would

Page 238

1    be more closely in line with the fair use doctrine.

2         But, you know, again, we're now focusing

3    on what, you know, I really think is, you know,

4    probably one of a handful of outliers that are closer

5    calls in my analysis than what are really the much

6    more prevalent and easier calls, which are

7    full-length distribution of these works that are

8    being commercialized such as full-length copy of this

9    episode. But I grant you this is one of the more --

10   you know, one of the closer calls within my analysis.

11        BY MR. GUPTA:

12        Q.   Okay. And so would you consider

13   redesignating this as unknowable?

14        A.   What I -- look, with regard to any of the

15   closer calls that you raise with me today, whether

16   it's just this one or if this is one of X number, I

17   would be happy to go back and look more closely at

18   these. I actually, you know, take great pride in the

19   fact that I think that if you were to review the 1750

20   files and focus on the ones that I deemed to be

21   infringing, I think you'll find that you won't

22   dispute the overwhelming -- overwhelming majority of

23   them and that while you may be able to isolate and

24   present to me a few that are closer calls, that I had

25   sound reasoning both for the ones where I opted to

1    Q.   So this is for SeeMyBucks.com.

2    A.   I understand.

3    Q.   How does SeeMyBucks relate to Wife Bucket?

4    A.   Well, again, first of all, I'm going to

5  preface my answer that this is, again, one among now

6  thousands of files I now reviewed over the course of

7  months.  But, even as to this one, I think my memory

8  is actually pretty clear.  I think it's not unusual

9  for the terms of use you have to agree to while

10  agreeing to a site and that you see to maybe bear

11  different legend.  In this instance, SeeMyBucks could

12  be the owner of that site or these could just be the

13  terms that you have to agree to while signing up for

14  the site, but, you know, if you walk through the

15  credit card process, I'm sure you can re-create this.

16    Q.   Yeah, well, I'm actually looking at this,

17  and it says that "However, by submitting the user

18  submissions to the website" -- sorry -- so let me

19  strike that.

20        So it says, for clarity, "You retain all

21  of your ownership rights in your user submissions.

22  However, by submitting the user submissions to the

23  website.  You hereby grant SeeMyBucks a worldwide

24  nonexclusive royalty-free sub-licensable and

25  transferrable license to use, reproduce, distribute,

Page 253

1   display and perform the user submissions in

2   connection with the website and SeeMyBucks and its

3   successors in business, including without limitation

4   for promoting and redistributing part or all of the

5   website in any media formats and through any media

6   channels." So it seems like it actually contemplates

7   that they're going to be redistributing media that

8   people upload.

9       A.   Is that a question?

10      Q.   I mean, do you agree?

11      A.   Well, first of all --

12           MR. POZZA:  Objection.  Ambiguous.

13           THE WITNESS:  First of all, as you may or

14   may not be familiar with terms of use for sites that

15   receive content uploaded by others, but it's very

16   common for them to want to acquire very broad

17   licenses that give them the rights to do the things

18   they feel they need and want to do with the content

19   being uploaded by the users.

20           BY MR. GUPTA:

21      Q.   No.  I agree with that, and, you know --

22   but what I'm saying is is that they -- there are

23   certain key features of the terms of service that I'm

24   pointing out that are certainly consistent with the

25   practice as set forth in the articles cited by

1   Professor Boyle of a website using the Internet for

2   promotion. And certainly the video, with its

3   watermark and so on, is consistent with that as well.

4   So, given that, based on the information you had, how

5   can you rule out the possibility that this is a --

6   viral marketing by an adult site?

7           MR. POZZA: Object that lacks foundation,

8   assumes facts not in evidence, and is also talking

9   about articles in the Boyle report that -- but not

10  been introduced as an exhibit.

11          THE WITNESS: Yeah. So there's a number

12  of things to say in response to that. First of all,

13  the notion that a company can use the Internet or

14  that a copyright owner can choose to distribute its

15  works as it sees fit is not a novel concept.

16  According to my review of Dr. Boyle's -- Professor

17  Boyle's report, he does not have much familiarity

18  with the industry at all. He seems to premise his

19  conclusions on his being a legal scholar and having

20  read a couple of articles.

21          My understanding of the industry is

22  dramatically different than that as a result of the

23  work that I've done and the people I've spoken with

24  in the course of my research, as well as the sites

25  and the terms that I've reviewed, including this site

Page 255

1  and these terms, which actually prohibit the

2  distribution of the content from this site.  And the

3  standard you mentioned of how can I rule out the

4  possibility -- these are "isn't it possible"

5  hypothetical questions that are totally inconsistent

6  with the terms of use for the site and the site

7  owner's motivations and my understanding of

8  promotional practices for that industry.

9          BY MR. GUPTA:

10     Q.   What do you think is the percentage chance

11  that the SeeMyBucks/Wife Bucket enterprise used the

12  video that we're talking about for advertising and

13  that that represents some iteration of virally

14  redistributed video?

15     A.   You're asking me to be --

16          MR. POZZA:  Objection.  Ambiguous and

17  calls for speculation.

18          THE WITNESS:  What are the chances?  You

19  know, you brought up how can I rule out, you know, my

20  assessment on these works as highly likely

21  infringing?  So first of all, even if there were a

22  rare instance like the one you're describing, that

23  would very much be an outlier and would affect a very

24  small number of my conclusions here, but given that

25  this appears -- if this is a UGC site to be

Sarnoff, A VERITEXT COMPANY
877-955-3855

Page 296

1   UNITED STATES OF AMERICA)

2              SS:

3   DISTRICT OF COLUMBIA   )

4

5       I, SUSAN L. CIMINELLI, the officer before whom

6   the foregoing deposition was taken, do hereby

7   certify that the witness whose testimony appears in

8   the foregoing deposition was duly sworn by me; that

9   the testimony of said witness was taken by me to the

10  best of my ability and thereafter reduced to

11  typewriting under my direction; that I am neither

12  counsel for, related to, nor employed by any of the

13  parties to the action in which this deposition was

14  taken, and further that I am not a relative or

15  employee of any attorney or counsel employed by the

16  parties thereto, nor financially or otherwise

17  interested in the outcome of the action.

18

19      _____

20           SUSAN L. CIMINELLI

21

22  My commission expires:  11/30/2016

23

24

25