# FILED UNDER SEAL

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA



CASE NO.: 11-CIV-20427-WILLIAMS/TURNOFF

DISNEY ENTERPRISES, INC.,
TWENTIETH CENTURY FOX FILM
CORPORATION, UNIVERSAL CITY
STUDIOS PRODUCTIONS LLLP,
COLUMBIA PICTURES INDUSTRIES,
INC., and WARNER BROS.
ENTERTAINMENT INC.,

> *Plaintiffs,*

v.

HOTFILE CORP., ANTON TITOV, and
DOES 1-10.

> *Defendants.*

_____/

HOTFILE CORP.,

> *Counterclaimant,*

v.

WARNER BROS. ENTERTAINMENT INC.,

> *Counterdefendant.*

_____/

## DECLARATION OF DR. ANDREW CROMARTY IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

### [CONFIDENTIAL]
### [FILED UNDER SEAL PURSUANT TO PROTECTIVE ORDER]

HIGHLY CONFIDENTIAL                    Declaration of Andrew S. Cromarty, Ph.D.

I, Andrew Cromarty, hereby declare as follows:

## A. Introduction and Background

1.     I have been retained by Defendants Hotfile Corp.   ("Hotfile") and Anton Titov (collectively, "Defendants") as an expert, opining on technical and business questions bearing on alleged secondary infringement of Plaintiffs' copyrights by Hotfile Corp. and Anton Titov as asserted by Plaintiffs in their Complaint. My expertise extends to these areas of the alleged copyright infringement by virtue of, at minimum, my extensive training in computer science and commercial experience as set forth below. I will not offer opinions of law, as I am not an attorney.

2.     I have been engaged by Defendants through Distributed Systems Technology LLC, a company of which I am an owner, through Berg Software Designs. Berg Software Designs bills $600 per hour for my time working on this matter plus reasonable expenses, of which I receive a lesser indeterminate amount computed after business operations expenses of Berg Software Designs and Distributed Systems Technology LLC.  My compensation is in no way related to the outcome of this litigation.

3.     A list of the materials I considered is attached as Appendix A. My curriculum vitae and a full list of publications is attached as Appendix B. Attached hereto in Appendix C as Exhibit R is a true and correct copy of my November 18, 2011 expert report ("Cromarty Expert Report") including the exhibits to that expert report that, I understand by mutual agreement among counsel, were produced to Plaintiffs' counsel on November 20, 2011. I hereby affirm, under penalty of perjury, that the statements in that report were true and correct. Other documents or information cited or relied upon appear in Appendix D as Exhibit X.

- 2 -

HIGHLY CONFIDENTIAL                    Declaration of Andrew S. Cromarty, Ph.D.

4.      In formulating my opinion, I have relied on the Court's orders of which I am aware, and other applicable information pertaining to this matter. A summary of that understanding as of the time of issuance of my Expert Report appears in Exhibit R.

5.      I have not testified at trial in the previous ten years. I have testified as an expert witness in depositions on four dates in 2011.

6.      If called as a witness at trial, I would testify as to the statements and opinions contained in this declaration.

7.      I provide in this declaration a description of the Defendants' system and methods. I understand that Hotfile operates the website www.hotfile.com. Basic operations of Internet and the World Wide Web and the systems and methods used by Hotfile and/or visitors to www.hotfile.com are described *infra* with extensive additional tutorial detail in Appendix H of Exhibit R. Major sections of this declaration are as follows: Introduction and Background; Qualifications; Overview of Opinions; History: A Half-Century of File Sharing; Summary of www.Hotfile.com Operations, Pricing and Consumer Use; Expert Analyses, Findings and Opinions.

HIGHLY CONFIDENTIAL                    Declaration of Andrew S. Cromarty, Ph.D.

## B. Qualifications

8.      I have received academic honors, awards, appointments, and recognition and held senior technical and executive positions as noted in the accompanying CV and Expert Report. *Cromarty Expert Report at 4ff. and Exhibit B.* During my professional career I have held senior technical positions at several corporations, including the highest management-awarded corporate scientist hiring rank positions at Advanced Decision Systems, Digital Equipment Corporation, and Compaq Computer Corporation, for a combined total of approximately a decade. My relevant technical experience also includes mathematical analysis, software development, technique development, scientific investigation, and publication in technical areas that arise the present matter.

9.      I have held numerous senior corporate executive and technical management positions during my career, including Chief Technology Officer (CTO) and Chief Information Officer (CIO) of Union Square Advisors, a San Francisco technology mergers & acquisition investment bank; CIO and CTO of DAX Solutions, Inc., a primary provider of Internet-based digital asset services to the Hollywood TV and movie industry, with international operations; CTO of SoftNet Systems, Inc., a billion-dollar NASDAQ-traded Internet services and telecommunications company; Chairman of the Board of Freewire Networks, Inc., a wireless broadband service, content, and e-commerce business; CTO of ISP Channel, then the third-largest cable Internet provider in the United States; CTO of Aerzone Corp., a $100 million wireless broadband service joint venture; and Board of Directors member of additional firms including Intelligent Communications Inc., an international satellite service provider, and SoftNet Ventures, a

corporate venture investment fund. Presently I am a Partner at Minerva Consulting, and the President and CEO of Distributed Systems Technology LLC.

10.      I earned a Ph.D. in Computer and Information Science from the University of Massachusetts at Amherst, awarded in 1988, writing my doctoral dissertation on "Programming Constructs for Real-Time Distributed Knowledge-Based Systems." While there I also wrote a second doctoral dissertation on mathematical modeling and computer simulation of brain structure and function. I earned a Master of Science in Computer and Information Science from the University of Massachusetts at Amherst in 1980.  I earned a Bachelor of Arts double degree in Biology and Psychology, and simultaneously a Bachelor of Arts degree in Music, from Wesleyan University in 1978.

11.      Since obtaining my Ph.D., I have worked in numerous technical management positions and overseen dozens of successful projects developing software, hardware, and services. I also have worked as a computing professional by developing software and teaching programming in over 30 languages and have personally authored on the order of one million lines of software code.

12.      I am credited with a number of worldwide historic multimedia,  Internet and technology firsts, including first to stream 1,000,000 live videos on the Internet for an event, world's first demonstration of Java-based distributed Internet games, world's first live wireless webcasts, world's first streaming video live from an international film festival, and the first high-definition "set-top box" networked screening product and system for the movie industry.

13.      My specific relevant experience with networking, internetworking, and multimedia content sharing or delivery over the Internet is described in the accompanying Exhibits. *Cromarty Expert Report at 10ff.* It includes decades of research, development and executive

Declaration of Andrew S. Cromarty, Ph.D.

corporate oversight over Internet multimedia content delivery, business model development and analysis, venture investment, due diligence investigation of a wide range of Internet and entertainment businesses, and the development, curatorship, and monetization of intellectual property. My business experience includes extensive development and evaluation of new, alternative, and competitive business models. I have evaluated well in excess of sixty investment and merger & acquisition opportunities, including their business operations and business models.

14.     During 2005-2007, I was CTO/CIO of DAX Solutions Inc., the film and TV industry's primary provider of Digital Asset Exchange asset management and workflow services over the Internet (some details of which may be subject to commercial nondisclosure obligations). In that capacity I oversaw technical development and line-managed the firm's operations and field service teams, providing digital dailies and workflow services to many of the largest entertainment firms in Hollywood and throughout much of the world. My specific responsibilities included managing the development, deployment, and operation of DAX's state-of-the-art proprietary digital asset watermarking/fingerprinting technology and intellectual property and associated digital rights management systems and software. At DAX we operated the largest known Internet-based system in the world for securely managing film and TV industry digital assets, with over 3,000 industry accountholders. My responsibilities also included oversight and management of security for these copyrighted entertainment assets, and required working with, educating, and advising many of the largest entertainment firms in the world as to security technology and policy for their own copyrighted multimedia film and TV digital asset content, much of which they entrusted me to hold and manage for them on my servers in Los Angeles, in their own facilities, and throughout the world.

### C. Overview of Opinions

15.     Non-factual and erroneous opinion on technical and business matters has been presented as if fact in the Plaintiffs' Motion for Summary Judgment ("Plaintiffs' MSJ"), in my expert opinion. I am materially in disagreement with methods, analyses, representations, conclusions, and putative "facts" of Plaintiffs' declarants in this matter. I believe methodological errors and bias in their analyses cause them to reach incorrect conclusions. I find in my analysis that their opinions and asserted "facts" are in error.

16.     Defendants use a common business model employed by many of the most respected retailers and service providers on and off the Internet—including the Plaintiffs' own business partners and licensed Internet distributor channels. Salient components of this business model include "affiliate marketing" relationships and tiered/"freemium" pricing. This business model is conventional, and not designed to induce any form of improper customer behavior. Rather, it simply serves to encourage development of a business partnering ecosystem that better reaches a diverse international audience and provides customer "upsell" incentives (increased purchasing).

17.     It is my expert opinion that Hotfile's "premium" service is structured to allow customers to obtain better service performance. I find nothing in Defendants' service offering that provides any incentive to make illicit (*vs.* licit) use of the service.

18.     Proprietary trade-secret so-called "digital fingerprinting" (DFP) technology and systems, such as Vobile's or Audible Magic's products, which are marketed and sold to the entertainment industry and Internet service companies, purport to "identify infringement" but in fact simply

compare two files and compute a number, relying on secretive proprietary unpublished opinions or ideas of the company's product engineers. Commercial acceptance (i.e. vendor sales revenue) for commercial "fingerprinting" products is irrelevant as to the products' technical effectiveness or scientific reliability. These vendors' use of trade secret to obscure the basis in their products and services for computing alleged "infringements" thwarts proper scientific confirmation—for example by impeding both scientific disprovability and proper fulsome scientific third-party independent peer review of their methodology—and is counter to established requirements of scientific reliability. Claims as to the effectiveness of these "fingerprinting" or "infringement"-determining products do not meet the standards for either science or fact.

19.     Further, infringement is not a technical computation. These commercial products necessarily lack sufficient information to make a legal determination of infringement, leaving unresolved and unsettled substantive technical, business, and legal questions as to identity of works, rightsholder identity, license assignment, licensee rights, non-infringement due to user rights established in statute or case law, and more. Such techniques fail to incorporate or consider the full range of information essential to proper infringement analysis, and necessarily lack any technical means to do so. They cannot and do not "identify infringement."

20.     It should be regarded as entirely unsurprising if Defendants did not make an early purchase of enormously expensive, unreliable, untestable, business-irrelevant "digital fingerprinting" software marketed towards helping Hollywood corporations with their movies when Defendants were starting a company offering the very different service of consumer Internet file storage and sharing. Incurring such an expense would not have been rational behavior for technical and business reasons, and if erroneously considered during Hotfile's startup period, likely would have been properly forbidden by Hotfile's investors.

HIGHLY CONFIDENTIAL                    Declaration of Andrew S. Cromarty, Ph.D.

21.    Filenames and other file metadata are a technically inappropriate and non-fact-based means of establishing infringement. Their use for this purpose is technically erroneous and does not produce reliable facts as to infringement.

22.    Peer-to-peer ("P2P") technology, systems and services differ profoundly and materially in essential business and technical aspects from technology, systems and services of Defendants. In my expert opinion, P2P systems and any matters, actions, or conclusions concerning them are not relevant to the present case.

23.    Multiple takedown notices per "user" (website account) or per file are not inherently determinative or indicative of infringement. Proper common lawful uses of a file sharing service by innocent users may trigger issuance of repeated erroneous takedown notices. The staggeringly high percentage of false takedown notices reported for Internet file sharing sites like Hotfile—as many as half of total notices—may be explained in part by rightsholders erroneously relying on non-scientific and technically faulty "identification" systems and filename metadata criteria, as well as issuer negligence or misbehavior.

24.    Counting file downloads is a technically specious and biased means of assessing potential infringements. There is not a one-to-one relationship between computer files and copyrighted works, and such a metric creates a substanial and material bias that falsely increases the apparent frequency of infringements, in the case of movie content overstating the infringement rate by perhaps a factor of ten. Assertions regarding infringement occurences based on this metric are non-scientific, technically improper, and lead to false "facts."

25.    In my opinion, the Defendants' systems offer a specific substantial non-infringing use and benefit to normal law-abiding Internet users, one occupying an important market niche neglected by most of Defendants' business competitors. There is a substantial legitimate business

HIGHLY CONFIDENTIAL                    Declaration of Andrew S. Cromarty, Ph.D.

case for the existence and market success of a business such as that of the Defendants. *Cromarty Expert Report, Exhibit R at 154-173.* Also, it would be inappropriate to Hotfile's product mix and detrimental to their business model and to their users if Hotfile were to implement a search capability over links or filenames, as this would violate the privacy of those links and drive away proper lawful customers and business.

HIGHLY CONFIDENTIAL                    Declaration of Andrew S. Cromarty, Ph.D.


## D. History: A Half-Century of file Sharing


26.    File sharing over computer networks, including the Internet and its precursor networks, already was common and well-specified more than forty years ago. File transfer protocols, notably including today's File Transfer Protocol, were developed just for this purpose. For example, in 1971 the Internet specification publication RFC114, "A File Transfer Protocol," detailed many of the benefits of remote content sharing using an "extended file transfer protocol":


> Indirect usage ... does not require that you explicitly log into a remote system or even know how to "use" the remote system.   An intermediate process makes most of the differences in commands and conventions invisible to you.  For example, you need only know a standard set of network file transfer commands for your local system in order to utilize remote file system.  This assumes the existence of a network file transfer process at each host cooperating via a common protocol. Indirect use is not limited to file transfers.  It may include execution of programs in remote hosts and the transfer of core images.  The extended file transfer protocol would facilitate the exchange of programs and data between computers, the use of storage and file handling capabilities of other computers (possibly including the trillion-bit store data computer), and have programs in remote hosts operate on your input and return an output.   *RFC114 at 1.*

27.     Subsequently, the modern Internet File Transfer Protocol was further specified in 1980, published as RFC959 "File Transfer Protocol" in 1985, and has continued in use through the present day.

28.     Importantly, these file transfer methods were developed without the contemporaneous ability, or objective, of transferring modern copyrighted entertainment or other multimedia files. At the time these file sharing techniques were conceived and developed, substantially all such content was in non-digital form.

29.     For example, the now-common "MP3" digital music format did not emerge until the late 1990's. And at the time the File Transfer Protocol was specified, high-definition digital formats, CDs, and DVDs had not yet been invented and brought to market.

30.     As networking developed, from its earliest days, free file-sharing services arose to provide the many legitimate and needed benefits of file sharing to the networked community.

31.     For example, over a third of a century ago, the SIMTEL Archive file sharing system was created and made publicly available to all users on the ARPANET (i.e., the Internet), first at the Massachusetts Institute of Technology and then moved to and maintained at the White Sands Missile Base, a U.S. Government facility, throughout most of the 1980's. The primary use of the Archive was file sharing of free software among Internet users, under the U.S. Government's *de facto* financial and administrative sponsorship.

32.     Another very widely used file sharing system, "gatekeeper.dec.com," was established in the late 1980's as an Internet-wide file sharing site established by Digital Equipment Corporation, the first computer company in the world to create a corporate Internet gateway:

HIGHLY CONFIDENTIAL                    Declaration of Andrew S. Cromarty, Ph.D.

History

The FTP archive on gatekeeper.dec.com, later to become gatekeeper.research.compaq.com, first went on-line in the late 1980's. … In its heyday, gatekeeper was a prominent Internet FTP site. Just about any public domain software package you wanted or needed could be found on gatekeeper. One of gatekeepers' primary functions was to give Digital software developers, living on the DECNET based internal corporate network, access to public domain software available from the Internet. (The Digital internal DECNET host, DECPA::, mounted the gatekeeper FTP archive via NFS.) Gatekeeper was also used by Digital product groups to provide software updates and patches to Internet customers.   *What happened to gatekeeper.dec.com?" at 1.*

33.     There were many other such file sharing sites across the Internet throughout the past forty or more years. File sharing sites are a historical commonplace, and a long-standing necessity for routine use of computer networks.

34.     Today there is a vibrant marketplace of firms offering a range of file sharing services under a variety of different terms or business models.

35.     An important characteristic of modern file sharing and file storage services is provision of a fungible, apparently infinite, ubiquitous store for one's own digital data. These services serve as a geographic and virtual extension of the native file capacity available in the user's personal computing environment.

36.     For example, Amazon.com rents file space to anyone with a credit card at inexpensive rates in essentially unlimited capacity through its Simple Storage Service ("S3"). Amazon S3 implements a "freemium" pricing model, that is, some file storage services are offered free, with

- 7 -

HIGHLY CONFIDENTIAL                    Declaration of Andrew S. Cromarty, Ph.D.

more services and improved performance available if the customer pays for them  (called an "upsell").

37.    Dropbox, a firm that offers Internet file storage from one's personal computer or PDA cell phone under a "freemium" model, is backed by first-tier venture capital investors including Sequoia Capital, Greylock, Accel Partners, and Goldman Sachs. *SecondMarket's Q3 2011 Private Company Report*  Dropbox was recently reported by BusinessInsider as one of SecondMarket's Top Ten Most-Watched venture-backed firms. Market analysis firms SecondMarket and Crunchbase describe Dropbox as using file sharing to solve existing problems in Internet email, device interoperability, and mobile access to personal data: "Dropbox was founded in 2007 by Drew Houston and Arash Ferdowsi. Frustrated by working from multiple computers, Drew was inspired to create a service that would let people bring all their files anywhere, with no need to email around attachments. ... Guiding their decisions was a relentless focus on crafting a simple and reliable experience across every computer and phone." *SecondMarket Overview of Dropbox; Crunchbase Overview of Dropbox.*

38.    Commercial file sharing sites have become the single most important medium through which open source software is distributed today. For example, the well-known open source repository Sourceforge presently contains "software in over 260,000 projects" serving "2.7 million developers" and "46 million consumers." This file sharing service specializing in source code sharing is owned and operated by a NASDAQ-traded public corporation with a market capitalization well in excess of $100,000,000. *About Sourceforge.* Other well-known open source file sharing services include Launchpad and Github. The use of such file sharing services for distribution of open source software is well understood in the IT profession and by expert practitioners as central to the operations and essential to the viability of the open source software

- 8 -

HIGHLY CONFIDENTIAL                Declaration of Andrew S. Cromarty, Ph.D.

industry.

39.     File sharing services offer increasing value to legitimate users as multimedia technology advances. For example, it is now common for cell phones such as a Blackberry or iPhone to take high-resolution photographs and shoot high-definition movies. The resulting collection of digital assets quickly becomes very large, and for technical reasons email is a very poor choice for sharing them. File sharing services are a far better solution to sharing such assets. Indeed, Apple recently released its iCloud service to address this need for its own customers. Users of other brands of devices, however, continue to need a third-party commercial file sharing service to obtain these communications benefits.

40.     Firms such as Picasa (a Google subsidiary) and Flickr (a Yahoo subsidiary) provide file sharing services to the consumer visual multimedia file sharing market, employing a freemium pricing model with upsells. *About Picasa; Flickr FAQ; Flickr Upgrades.*

41.     Defendants' system and service, Hotfile, is a *de facto* market competitor of these established modern firms. For example, customers of these other services can choose to use Hotfile as an alternative service provider, or *vice versa.*

42.     Some file sharing services focus on particular markets, business opportunities, or "use cases" (styles of customer use). Such market specialization may present both benefits and limitations to the customer.

43.     Overall, however, with respect to the kind of content that may be stored or accessed and the degree of service provider *vs.* customer control that is possible, these services are generally indistinguishable both technically and in the market. All provide file storage as a service; all promote their storage services as part of their business model; all permit users to store files without the service provider's knowledge of or regard for the internal contents of the files, which

HIGHLY CONFIDENTIAL                    Declaration of Andrew S. Cromarty, Ph.D.

may in fact be opaque to the service provider for technical or privacy reasons; all require their users to accept responsibility for obtaining, and representing they do have, any rights required to upload content as a condition of use; and all continue the nearly half-century-old technical and business practice of providing remote storage for files of arbitrary type and content for remote use and access.

44.     Thus the technology for sharing files among distant networked users is not a new invention designed for sharing copyrighted digital works owned by others or as a specific mechanism for infringing copyright.

45.     Quite to the contrary, file sharing has been in perpetual use, starting decades before it became technically feasible to move commercial entertainment media over computer networks. Network file sharing predates substantially all modern digital entertainment content, and it has a decades-long history of substantial non-infringing use.

46.     Existing Internet file sharing services are a direct technical and business continuation of this nearly half-century-old unbroken practice of sharing content over computer networks, among university, business, personal, and government file sharing sites.

47.     Common uses of commercial file sharing services today include:

- allowing an individual to gain access to personal data across many devices, such as between a PC and a PDA/cell phone, or between work and home computers;

- sharing data securely with business colleagues, such as between attorneys and their client or experts;

- sharing computer source code and related data, such as through Sourceforge;

- sharing self-authored multimedia works such as pictures, music performances, and movies among members of a group, such as within a family, a Boy Scout

HIGHLY CONFIDENTIAL                    Declaration of Andrew S. Cromarty, Ph.D.

troop, a music band, or a commercial entertainment production company; or

- moving files from one location to another, such as a student writing an essay written on a shared computer in a school computer lab, then depositing it at a file sharing site for later pickup from a home personal computer.

48.     Sharing content and services between computers and between computer users is what networked computers are meant to do, and why computer networks exist.

49.     Consequently, as file sharing is a long-lived technology, in widespread use for a large and varied number of individual purposes, the mere presence, availability, investment in, commercial promotion of, or use of file sharing technology or services offers no technical foundation upon which to ascribe any specific intent to either individual users or service providers—other than to store and retrieve some data.

HIGHLY CONFIDENTIAL                    Declaration of Andrew S. Cromarty, Ph.D.


### E. Summary of www.hotfile.com operations, pricing, and consumer use


50.    Hotfile operates a collection of Internet-connected web servers in a data center facility in Texas. Such web servers typically comprise a computer, large amounts of data storage space, and software to support the file storage and retrieval operations described herein as well as basic computer management functions to support housekeeping functions and permit remote administration (startup, shutdown, software upgrades, etc). The data storage space often is organized as one large pool of storage shared by the server computers.

51.    When individuals anywhere in the world wish to store a file on the Internet for later retrieval and use, one choice they have is to store it on a www.hotfile.com server.

52.    An individual may choose to do this for many reasons. He may wish to offload his storage onto a willing third party, for example because his computer is low on space. He may wish to put his data in a public server location from which he later can retrieve a copy using another Internet-connected device or from a different location, e.g. while traveling with his phone or PDA or when using a laptop computer in a cafe. He may wish to share the resource with others, such as a group of business colleagues, friends, customers, or family members.

53.    The reasons a file is stored on a server—the motives of the storer—are inherently unknowable by the server owner-administrator. Internet technology generally does not provide any means for the client or its user to represent or provide this information, and any such information that could be captured or inferred by the server or its administrator is inherently unreliable.

HIGHLY CONFIDENTIAL                    Declaration of Andrew S. Cromarty, Ph.D.

54.     Like many or most websites, www.hotfile.com provides services to users whether or not they have a paid account. However, all users uploading to www.hotfile.com, whether registered paying users or not, must take specific action to agree to abide by Hotfile's policies. Before uploading a file to Hotfile servers, they must actively signify that they "have read the HotFile Terms of Service, Intellectual Property Policy, and Privacy Policy, and … agree to be bound by them." *Hotfile website.*

55.     I understand Hotfile imposes a size limit of 400 megabytes (400 MB) on uploaded files. Splitting a large file into smaller pieces to upload is permissible. An important effect of this upload policy is a reduction in the security and business risk to Hotfile due to intentional or accidental "denial of service" events, in which Hotfile's Internet communications and server resources are persistently tied up in long-lasting transfers that fail before they complete. The probability of a file transfer failing due to exogenous factors such as an Internet communications failure increases with file size, making file size limitations a rational business policy. Limiting file size also enhances the utility and effectiveness of other throttling measures available to Hotfile to balance load among users and provide fair service to all Hotfile's customers. Fairness of service delivery is a core technical concern in distributed computing and an important business concern on the Internet.

56.     When a user has accepted Hotfile's policy, he may choose and upload a file from his client (personal) computer with a few mouse clicks. The transfer of a copy of the file from his client computer to a Hotfile server then proceeds automatically. When the transfer is complete, the user is presented with a "link" or URL ("Uniform Resource Locator," a text string comprising a Web address) pointing to the uploaded file's location on the Hotfile servers. For example, uploading a file named "pictureofmydog.gif" may result in a URL being created and

HIGHLY CONFIDENTIAL                    Declaration of Andrew S. Cromarty, Ph.D.

displayed    such    as    "http://hotfile.com/dl/135394112/220ead1/pictureofmydog.gif.html".
Importantly, the filename component of the URL (e.g., "pictureofmydog") is chosen by the
uploading user, not the server or its owner-administrator. This feature permits users to give
meaningful—or arbitary—names to the digital assets they wish to share with colleagues, friends,
customers, or family on the Internet.

57.    The resulting URL may be kept private, for private use. If it is not revealed to others, its
long name and numeric components make it unlikely anyone will guess the name, affording a
degree of privacy or security.

58.    Alternatively, the URL may be shared with others. Anyone who enters the URL into their
Web browser, or who clicks on it when displayed as a link in a bookmark list or index web page,
will have access to the uploaded resource. This is how sharing is accomplished on the Internet.

59.    A non-registered Hotfile user who attempts to "visit" (use) the URL is presented with a
Hotfile web page offering a business choice pursuant to Hotfile's "freemium" business model
(cf. *supra*). The downloading/viewing user may choose a free "Regular Download" at no cost,
which provides limited download speeds, one download at a time, and a limit of two downloaded
files per hour, with a brief delay before downloads start after they are requested. Alternatively,
the downloading user may choose a premium (paid) High Speed Download, which offers
unrestricted download speed, no initial service delay, and an unrestricted number of file
downloads per hour, subject to available computing and communications resources to service
received requests. Further user performance incentives to upgrade to a premium paid account
include "Fast download even when servers are busy," support for download accelerators, and
support for resuming downloads that fail midstream due to Internet communications errors (cf.

HIGHLY CONFIDENTIAL                        Declaration of Andrew S. Cromarty, Ph.D.

*supra*), and "Hot/Direct Linking," which offers accountholders the ability to share the performance benefits they have purchased for files they upload.

60.     For example, if a parent with a premium account uploads family photographs and videos taken using a PDA or cell phone camera at her child's sporting event and then shares the resulting URL by email or SMS text message, other family members anywhere on the Internet immediately can view those photos and videos. In this case, the premium accountholder parent's paid-account performance benefits are shared by the entire family when obtaining and viewing these family digital assets.

61.     Payment by Hotfile premium accountholders in the United States is accomplished through PayPal, an eBay subsidiary, and is charged on a recurring monthly basis. Presently offered premium service "tiers" are based on the amount of file transfer volume an accountholder wishes to rent, and for how long. For example, $9/month rents 100 gigabytes (100 GB) of Hotlink file transfer traffic.

62.     This is typical pricing for Internet file storage and access. As one example, Amazon.com rents storage to anyone on the Internet through its "S3" Internet-based ("cloud"-based) storage service at prices in the range of $10 to $14 monthly per 100 GB. *Amazon S3 Pricing at 1.* Similarly, Amazon's Elastic Compute Cloud ("EC2"), "a web service that provides resizable compute capacity in the cloud" with the business goal to "to make web-scale computing easier for developers," similarly operates under a freemium model with free uploads and a marginal price for premium download service of approximately $12 per GB of file transfer traffic monthly. *Amazon EC2 at 2. Amazon EC2 Pricing at 3.* Amazon's services are very widely used

HIGHLY CONFIDENTIAL                    Declaration of Andrew S. Cromarty, Ph.D.

by companies across the Internet; as one example, the publicly-traded multi-billion-dollar entertainment movie streaming firm Netflix is a customer of Amazon's cloud services.

63.     Pre-payment discounts are offered by Hotfile as part of their pricing mix. This is common in the Internet and Web hosting industry; for example, well-known major web hosting firms such as Bluehost and 1and1 offer pre-payment discounts for web hosting services.

64.     Hotfile service pricing compares favorably and predictably with alternative commercial storage and data transfer costs. For example, raw storage purchased as hard disk equipment presently costs approximately $5 per 100 GB single-quantity capital cost, but any operating expense must be borne by the buyer and a raw hard disk is not inherently Internet-accessible or structured as a reliable ubiquitous service. Major phone carriers in the United States such as ATT presently offer data transfer (with no storage) in the general range of $10 per GB. Hotfile's pricing tiers are intermediate, falling between the cost of raw storage and the cost of mobile data transfers by carriers, as is to be expected: Hotfile's business operations can employ cheaper terrestrial communications, they offer (and must pass through costs for) added management and reliability services, and they can achieve economies of scale in their large storage arrays.

65.     Hotfile also has a reseller program,. Under this program, in essence Hotfile is a wholesale provider of storage accounts, and its resellers are individual retailers around the Internet who market and resell its underlying services. Presently Hotfile lists over a dozen resellers who resell its services in the United States, approximately thirty payment systems (such as PayPal) worldwide that are accepted and used for payments, and over one hundred countries for which there are resellers. The wholesale discount on accounts through indirect channels is nominally

20% of the retail price for direct single-quantity sales by Hotfile.

66.     Hotfile's published policy is that they "do not restrict any country - free downloads for everyone are guaranteed." For example, Hotfile downloads are permitted as a means for individuals to communicate in countries where totalitarian regimes may otherwise wish to control information flow to citizens, or where speech or information sharing may be restricted or repressed.

67.     Hotfile has an "affiliate" marketing program. Under this program an affiliate may be paid for usage generated by the affiliate. As discussed *supra,* an affiliate marketing program allows a business to reach markets or cultures outside its own, particularly on the Internet, which is international in scope. Affiliates earn commissions according to a published Earnings Table. One business incentive metric for awarding affiliates is achieving a high download-to-upload ratio. Incentivizing increased user activity is a rational business decision because, under the freemium business model, increased traffic driven to a site will result in conversions at some fixed rate to premium (paying) users. In addition, Hotfile further directly incentivizes these conversion by employing a second published metric computed based on conversions to premium user accounts attributable to an affiliate. A third incentive rewards premium accounts sold through advertising on the affiliate's web site. Amazon.com offers a similar sell-through incentive for sales by its affiliates. Finally, affiliates receive a permanent commission on referred sales for uploaders who become registered Hotfile customers, in that a first Hotfile customer earns 20% of the net sales of a second uploader who registers under the first customer's referral link. Hotfile's marketing program is substantially similar to refer-a-friend and affiliate marketing programs employed by large successful Internet sales, web hosting and telecommunications service provider companies

HIGHLY CONFIDENTIAL                    Declaration of Andrew S. Cromarty, Ph.D.

such as Amazon.com, eBay, 1and1 and Ooma. *Amazon.com Associates Program Advertising Schedule. Ooma referral offer at 1. 1and1 referral offer. 1and1 Affiliate Marketing Overview. eBay Partner Network Overview.*

## F. Expert analyses, findings, and opinions

68.     Non-factual and erroneous opinion on technical and business matters has been presented as if fact in the Plaintiffs' Motion for Summary Judgment ("Plaintiffs' MSJ"), in my expert opinion. I am materially in disagreement with methods, analyses, representations, conclusions, and putative "facts" of Plaintiffs' declarants in this matter. I believe methodological errors and bias in their analyses cause them to reach incorrect conclusions. I find in my analysis that their opinions and asserted "facts" are in error.

69.     I conclude from my analysis that Defendants use a common business model employed by many of the most respected retailers and service providers on and off the Internet—companies such as eBay, Wal-Mart, Amazon.com, Google, major web-hosting companies including Bluehost and 1and1, telecommunications firms including Sonic.net and Ooma, and Yahoo.

70.     Salient components of this business model include "affiliate marketing" relationships and tiered/"freemium"[1] pricing. The use of affiliate marketing is so common on the Internet today that a robust secondary market or brokerage ecosystem has developed, with large-scale respected corporate players including Google Affiliate Network and ValueClick's Commission Junction.

71.     This business model is conventional, and not designed to induce any form of improper customer behavior. Rather, it simply serves to encourage development of a business partnering

---

[1] "Freemium" is a portmanteau of "free" and "premium," the latter implying better or faster service for a fee. The business objective of "freemium" pricing is to introduce new customers to a service, with the hope of "converting" them to "premium" customers who pay for extra features and faster service.

HIGHLY CONFIDENTIAL                    Declaration of Andrew S. Cromarty, Ph.D.

ecosystem that better reaches a diverse international audience and provides customer "upsell" incentives (increased purchasing).

72.     Even the Plaintiffs' own business partners and licensed distributor channels employ this business model—to distribute Plaintiffs' content under license. For example, Roku is a *de facto* retail sales channel for Plaintiffs and makes available Plaintiff content licensed to Hulu.com, Amazon.com and other TV and movie distributors via set-top boxes Roku manufactures and sells to the retail market. Roku's product and service distributes both free and paid movie and TV content (thus "freemium"), and Roku provides two different methods for individuals or businesses to sign up as Roku affiliates, through Google or Commission Junction. *Roku Affiliate Program Description, Exh. X.* Roku customers also may automatically participate and obtain certain affiliate benefits simply by "referring a friend": Roku sends to its customers unsolicited refer-a-friend affiliate advertisement emails reading,

> "For every player purchased, you get an Amazon Instant Video rental—on us. The more you share, the more you get. In fact, we think some of you may never pay for another movie rental again!"   *Roku Refer-a-Friend Program Description, Exh. X.*

73.     The objective and effect of the "affililiate" business model aspect is to expand the business's reach to and through additional geographic and categorical markets and develop an indirect sales channel cost-effectively. "Geographic" expansion includes growing in international markets where cultures and languages, consumer tastes and needs, and local monetization are difficult for the home company to predict or understand.  "Categorical" expansion includes finding new ways of presenting the company's product or service offering that the home

Declaration of Andrew S. Cromarty, Ph.D.

company could not have anticipated, but affiliates will. "Indirect channel" selling refers to using other individuals or businesses to market and/or sell your company's product or service, rather than directly selling it to customers yourself. Indirect sales is similar to the distinction between "wholesale" and "retail" product sales common in the United States, and offers the additional advantage of eliminating the home company's cost of maintaining an employee sales force in return for paying a commission on actual sales produced. Affiliate marketing is a widespread, common, accepted, respected business model approach.

74.    The objective of the common "freemium" business model aspect employed by Defendants is to expand the business's customer base and increase conventional sales, by providing entry-level products or services free and additional products or services for a fee. It is a tiered pricing structure with a zero-cost entry level offering, similar to the "try before you buy" sales approach (or even free taste samples in supermarkets) common throughout the United States.

75.    Freemium pricing is common and widespread, especially for Internet service and software sales. Much, if not most, commercial open source software sales employs freemium pricing, giving a base-level product away free and hoping to "upsell" the customer (that is, to sell them additional features, performance, or services for a fee). For example Red Hat Software, a ten billion dollar New York Stock Exchange-traded open source software vendor, employs a freemium pricing structure for substantially all its sales. Yahoo offers freemium tiered email services, with a base-level account offered at no dollar cost to the consumer and a more featureful email account with restrictions removed upon payment of a periodic service fee. Most Internet Service Providers (ISPs) in the United States, including for example AT&T and Comcast, offer a tiered pricing structure where higher performance (e.g. faster transfer speed, or

special services such as static IP address assignments or throttling elimination) cost more than base-level service. Defendants apply precisely this ISP tiered-pricing structure to provide faster performance and other special services (such as throttling elimination), combining it with the "freemium" entry-level pricing. Tiered and freemium pricing are a widespread, common, accepted, respected business model approach.

76.    It is my expert opinion that Hotfile's "premium" service is structured to allow customers to obtain better service performance. I find nothing in Defendants' service offering that provides any incentive to make illicit (*vs.* licit) use of the service.

77.    Proprietary trade-secret so-called "digital fingerprinting" (DFP) technology and products such as Vobile's or Audible Magic's products, which are marketed and sold to the entertainment industry and Internet service companies, purport to "identify infringement" but in fact simply compare two files and compute a number purporting to describe computer file similarity, relying on secretive proprietary unpublished opinions or ideas of the company's product engineers.

78.    "Fingerprinting" itself is a misnomer, and a marketing appellation, as a file has no natural "fingerprint." Instead, an engineer thinks up a method, generally in secret, for generating a number that he likes—that in his otherwise unvetted opinion signifies similarity. Different engineers at different companies differ widely in their opinion of what makes up a good computation and even which factors are important or useful in comparing files with underlying assets, and they keep their comparison techniques and product details trade secret.

79.    Use of trade secret to obscure the basis for computing alleged "infringements" is counter to the requirements of science. If there were a substantive, mature, reliable scientific basis for such techniques, the science would by definition be public in all aspects, the utility of alternative techniques would be known and accepted by all participants in all affected industries, the vendor

- 22 -

companies could not compete based on differing file-comparison techniques, and the product vendors would not advertise a proprietary advantage based on trade-secret techniques.

80.     Further, infringement is not a technical computation. These commercial products necessarily lack sufficient information to make a legal determination of infringement, leaving unresolved and unsettled substantive technical, business, and legal questions as to identity of works, rightsholder identity, licensee assignment, licensee rights, and infringement.

81.     Such techniques fail to incorporate or consider the full range of information essential to proper infringement analysis, and necessarily lack any technical means to do so. They cannot and do not "identify infringement."

82.     In a typical infringement involving entertainment assets, the infringer does not copy a digital asset precisely but rather creates his own unique file, which thus will not be identical to the rightsholder's original digital asset file. They differ. This means a straightforward exact file comparison cannot suffice to evaluate candidate infringements, and similarity of underlying *human-perceived phenomena or ideas* instead must be estimated by a computer.

83.     Further, the vendors' products do not pretend to perform a complete comparison—instead they apply secret rules of thumb for comparing snippets of files, with the attendant unreliability such partial heuristic computations introduce.

84.     No matter what their "secret sauce," at best all file comparison programs can do is, they compare files. Under the typical conditions described *supra,* computer file comparisons are inadequate for establishing infringement. Human review and comparison of content is necessary to infer possible infringement.  As I have noted in my earlier deposition testimony, in documents produced during discovery the Plaintiffs' cognizant management appear to have agreed in their own internal communications—contrary to their asserted forensics—that even for the narrow

HIGHLY CONFIDENTIAL                    Declaration of Andrew S. Cromarty, Ph.D.

purpose of responsibly issuing takedown notices (TDNs) pursuant to the DMCA, human review and comparison of content is necessary to infer possible infringement.

85.    Vendors' use of trade secret to obscure the basis in their products and services for computing alleged "infringements" thwarts proper scientific confirmation—for example by impeding both scientific disprovability and proper fulsome scientific third-party independent peer review of their methodology—and is counter to established requirements of scientific reliability.

86.    It is in fact a tenet, and mathematical proof, of both computer science and mathematical system theory that without full knowledge of the details of these "fingerprinting" products, it cannot reliably be determined what the products are doing or whether they work as advertised or will produce a given result.

87.    It also is my expert opinion that commercial acceptance  (i.e. vendor sales revenue) for commercial "fingerprinting" products is irrelevant as to the products' technical effectiveness or scientific reliability. Such commercial sales signify market forces, not product competence at infringement determination or any other technical or legal task.

88.    Just as sales data are not a shortcut to replace science as to reliability, neither is blurring the line between science and other disciplines. Engineering, for example—which consists in building things (such as proprietary products)—is not science. This established distinction remains true even if engineers use processes or mathematics to choose their product's features, or publish descriptions in engineering journals of what they built and how big/fast/pleasing they found it afterward. Neither is "technology" science; nor is mathematics.  Core distinguishing principles of science include independent third-party peer review—*of methods as well as the results, and by other scientists;* scientific testability and "falsifiability"; an established error rate

HIGHLY CONFIDENTIAL                    Declaration of Andrew S. Cromarty, Ph.D.

that can be *independently* assessed, even by skeptics of a hypothesis; and methods that are accepted by the entire scientific community—including especially, accepted by those skeptical of hypothesized or predicted outcomes, and including the entire community, not only the hypothesis' supporters. By analogy: countless companies make consumer products and publish claims about them, even in engineering or trade journals; but it is the independent bodies such as Consumer's Union and *Consumer Reports* that provide independent, skeptical scientific testing. Conventional science sets an even higher bar. These principles are what makes science work, and without them, we are left only with product descriptions and advertising—and no scientific reliability, or fact.

89.     "Digital fingerprinting" products today fail these tests, and the performance claims as to the effectiveness of these "fingerprinting" or "infringement"-determining products do not meet the standards for either science or fact. Such claims are technically opaque and come from inherently untrustworthy non-independent sources, such as Plaintiffs' own industry association or their commercial vendors, who secretly create the products, financially benefit from sales of such products and services, and do not reveal their structure, function, or testing methodology. Indeed, it is essential to the business model of those vendors to ensure that the technical workings of their systems *cannot* be properly scientifically studied and verified, because revealing such details would defeat their competitive advantage in the market.

90.     Their performance analyses and claims thus will not be taken by a competent independent expert as reliable scientific fact. Rather, such performance claims are indistinguishable from engineers' and marketers' self-congratulation or industry cheerleading. Scientific discipline requires that efficacy claims for such products be fully studied by independent third parties or adversaries, and until that time, such claims must be regarded simply

HIGHLY CONFIDENTIAL                    Declaration of Andrew S. Cromarty, Ph.D.

as product advertising and as indistinguishable from unreliable "junk science."

91.    Because "digital fingerprinting" products are non-scientific, proprietary, and expensive[2] sold products, it is difficult or impossible for an Internet service company such as a file-sharing or file-storage service to evaluate them for purchase.

92.    Further, because of these limitations and because such products do not solve any organic technical or business problem of the service provider, it is not in the rational economic interest of an Internet service company such as Hotfile, or a reasonable business practice, to rush to purchase one, especially during the company's startup phase. Doing so would be as irrational as rushing to purchase an early 1900's patent medicine when one is not even sick.

93.    Such a purchase also would be an unnatural business decision for a startup. It comprises allowing another industry's native costs of doing business to be laid off onto the startup. A rational economic actor would only make such a purchase under duress.

94.    It thus should be regarded as entirely unsurprising if Defendants did not make an early purchase of enormously expensive, unreliable, untestable, business-irrelevant "digital fingerprinting" software marketed towards helping Hollywood corporations with their movies when Defendants were starting a company offering the very different service of consumer Internet file storage and sharing. This is exactly the kind of expense that professional investors instruct startups to avoid wasting their time and money on, in an effort to focus them on the

---

[2] Having negotiated and/or managed scores of software and service contracts, it is my confident expectation that business executives with whom I have worked in these industries would describe Vobile's service pricing as "gouging," "unsupportable," and even "outrageous." For example, Vobile's *monthly* fee for simply inspecting the data that will fit on a USB memory stick or server SSD disk device is greater than the cost of buying the physical memory device itself. That is, the annual cost of Vobile's service offering to Defendants—*simply to compute a number on a file*—is over *ten times* the cost of the most expensive computer file-storage hardware to hold that content. *VCloud9 Publisher License Agreement between Hotfile and Vobile at Exhibit B.*

HIGHLY CONFIDENTIAL                                    Declaration of Andrew S. Cromarty, Ph.D.

proper and legitimate activities of the business.

95.      It appears early adoption of Vobile's DFP product would have offered Hotfile limited, and questionable, material infringement "control" capability, due to the Vobile product's technical immaturity and Plaintiffs' own non-production of technically-required computer files. First, Vobile's September 2011 press release for their new VCloud9  product admits that for DFP products prior to that date, "Copyrighted content contained within cloud-based cyberlockers [sic] is very difficult to find" and that "file compression "hides" the true content, which - until now - has made it impossible to identify." *Yangbin Wang Deposition Exhibit 2.*  Second, Sony apparently had not yet created movie "fingerprint" data required by the Vobile software for many Columbia Pictures works, and had not released its available "fingerprint" data for use by Hotfile's servers, as of the end of July 2011. *Solmon deposition 244:12-248:6; Solmon Exhibit 12.* Third, Universal apparently was not responsive to inquiry as to what percentage of its library of works have been "fingerprinted" and made available to Vobile users such as Hotfile. *Perkins deposition 218:8-9.* I am unaware of any information indicating that a materially large or useful percentage of Universal's library has been "fingerprinted" and can be used by Defendants to seek possibly-infringing files.

96.      It is important to understand that if rightsholders do not create and produce these "fingerprint" files for a particular work, then the "fingerprinting" software cannot function as to that work, and the rightsholder effectively will have prevented file sharing services from applying technical means to attempt to comply with DMCA safe harbor provisions or other obligations that may apply.

97.      I additionally observe that www.hotfile.com requires every Hotfile uploader to explicitly agree to detailed contractual terms forbidding misuse of Hotfile's services, including copyright-

HIGHLY CONFIDENTIAL                    Declaration of Andrew S. Cromarty, Ph.D.

infringing acts. The technical mechanism for enforcing this agreement includes requiring every such Hotfile user to take specific, conscious, personal, physical action to accept these Terms of Service before he or she can begin to use the Hotfile service. That is, it is not possible to become a Hotfile uploader without first acknowledging copyright law, accepting full personal responsibility as to copyright of all assets the user stores on Hotfile servers, and contractually promising to Hotfile that there will be no attempt to infringe copyright using Hotfile's services. In my technical investigation I have seen no way that agreement can be circumvented.

98.     Filenames and other such metadata are an unsuitable and unreliable means of determining infringement. ("Metadata" are "data about data"; file metadata are information a computer may contain about its files.) File metadata such as filenames, apparent file sizes, and filename "types" do not in any way determine or establish file content. For example, filename metadata cannot even reliably establish whether a file is a feature-length film *vs.* a poem. These factual limitations of filenames are well-known and accepted in computer science and the IT industry. File sizes similarly are easily manipulated—increased or decreased—using common tools. Filenames and similar metadata are simply a casual uncontrolled annotation, entirely malleable, under the control of and at the whim of any individual computer user or software program with access to the file. These metadata do not carry reliable inherent meaning as to actual file content, type, or provenance.

99.     Moreover, computer filenames and similar metadata have no technical contribution to make as to actual infringement determination, because they cannot—and do not attempt to— provide reliable means of encoding essential information about rightsholders, licensees, contractual agreements, applicable law, fair use, computer backup and time-shifting rights, and countless other determinative factors.

HIGHLY CONFIDENTIAL                    Declaration of Andrew S. Cromarty, Ph.D.

100.    Indeed, as was noted in my deposition testimony, there are specific economic reasons to expect that unscrupulous individuals on the Internet can profit best from a public filesharing service by maliciously choosing and publishing filenames that gratuitously suggest an infringement when there is none.

101.    It can be concluded on purely technical and business grounds that filenames and file metadata are not trustworthy and can offer no reliable "facts" to establish infringement.

102.    Uploading a file to Hotfile servers by Hotfile customers produces a "link" or URL ("Uniform Resource Locator", also sometimes called a "Web link") pointing to the uploaded file, which can be used later to retrieve it. More such links pointing to that same uploaded file may come to exist, for various technical or policy reasons. The uploaded file may be retrieved using any of these links.

103.    When a takedown notice is received by a service provider under the DMCA, for technical and business reasons it is an error to disable or delete the underlying file rather than the accused link pointing to it. It similarly is an error to disable or delete all the file's links when only one link is accused. This is particularly true when storage-management techniques such as hash-based "de-duplication" of files are used on the server. The reason for this is simple, intuitive, and obvious. It is possible that different people may know a single file through different links, and one person may properly have access rights to the underlying asset while another does not. For example, one link might be licit and another illicit, or an individual's approval status may change as a matter of a licensing, permission, or other policy change. Under such circumstances, when a takedown notice is received accusing one link as improper or unauthorized, destroying or disabling the underlying file or other links pointing to it will also prevent legitimate authorized users from accessing the file using their own link to it, and may even result in inadvertent

HIGHLY CONFIDENTIAL                    Declaration of Andrew S. Cromarty, Ph.D.

destruction of a rightsholder's asset. This is not merely a theoretical concern. As noted in my deposition testimony, implementing this link-deletion policy correctly was a basis for file management efficiencies and permission control in the system through which my company provided commercial file sharing and production workflow management services to thousands of Hollywood-industry users, including Plaintiffs and/or their business partners.

104.    Receiving multiple takedown notices per "user" (website account) or per file is not inherently determinative or indicative of infringement behavior, and without further confirmation does not provide a proper business basis for account termination. This is particularly true if the false takedown notice rate is high, or if faulty data such as file metadata are relied on to create TDNs without proper human review of the content (and, probably, discussion with the account holder).

105.    Consider the example of the parent who makes a home movie of her child who is wearing a Harry Potter costume and trick-or-treating door-to-door on Halloween. She may name the family-produced video file on her computer "Harry Potter and the Chamber of Horrors." Next she will wish to share the home video with other family members. As is well-known, a large video file cannot be emailed under the technical constraints of most email accounts, but sharing the file using Hotfile's file-sharing website is feasible, affordable, and sensible. To do so, she uploads the file to Hotfile and emails the resulting "link" to distant grandparents to share her video. Now the takedown nightmare begins: the next day, the file has disappeared. Confused, she uploads her video again. It disappears again. She uploads it a third day. It disappears again. Unbeknownst to her, takedown notices were issued against her upload because of the filename she chose. She now has three "strikes" against her, and perhaps her Hotfile account is terminated, merely for choosing to name her video file according to the licensed retail costume her child

HIGHLY CONFIDENTIAL                    Declaration of Andrew S. Cromarty, Ph.D.

wore on Halloween. In the worst, case if she removed the file from her own computer thinking it was safely stored on Hotfile, the false takedown notice may have destroyed the only copy of her irreplaceable family video.

106.   Reported false takedown notice rates are surprisingly high, and this realistic licit usage scenario, plus Plaintiffs' erroneous insistence that filename metadata "indicate infringement," may explain why.  For example, Google states:

> A recent study undertaken in the United States reported on findings from takedown notices issued to Google under the Digital Millennium Copyright Act 1998 (US), concluding that over half (57%) of notices sent to Google for removal of material were sent by business targeting competitors and over one third (37%) of notices were not valid copyright claims. See J Urban & L Quilter, 'Efficient Process or "Chilling Effects"? Takedown Notices Under Section 512 of the Digital Millennium Copyright Act', http://mylaw.usc.edu/documents/512Rep-ExecSum_out.pdf.   *Google Internet Service Provider Copyright Code of Practice – TCF Consultation Draft, March 6, 2009, at Footnote 3.*

107.   Counting file downloads is a technically specious and biased means of assessing potential infringements.  There is not a one-to-one relationshp between computer files and copyrighted works, and this erroneous files-downloaded metric creates a substanial and material bias that falsely inflates the apparent frequency of infringements.

108.   High-quality (e.g. high-definition) television and movie content occupies very large digital files.  For expository purposes, a helpful approximation is that one second of moderately

- 31 -

HIGHLY CONFIDENTIAL                    Declaration of Andrew S. Cromarty, Ph.D.

high quality video content may require a megabyte of file storage. Thus a feature film or hour-long television show would comprise many gigabytes (thousands of megabytes) of data. Correspondingly, a standard single-density DVD nominally holds approximately 5 gigabytes of data. This large file size obtains whether the video content is commercial entertainment content such as feature film or private "user-generated content" (UGC) such as a high-definition video shot with a Blackberry, iPhone, or typical family camera.

109.    To the extent that Hotfile does not permit multigigabyte files to be uploaded, or users wish not to upload such files for technical reasons, large files may be uploaded by first splitting them into parts. Each such "part" is an independent file to be uploaded—and later, downloaded—that contains just a few minutes of the single underlying video work. That is, one work now corresponds to ten or twenty downloaded files.

110.    In the case of movie content, this means that files downloaded as a percentage of total downloads does not accurately represent the percentage of works uploaded or downloaded. In general most computer files, and most digital works, are much smaller than a movie. Thus generously supposing every single accused asset corresponds to an infringed work, Plaintiffs' computations overstate the infringement rate by perhaps a factor of ten, possibly even twenty. And Plaintiffs' experts have provided no analysis of their significant overestimation of the rate of accused infringement due to this significant bias in their forensic technique.

111.    As a result, assertions regarding infringement occurences based on the files-downloaded metric are non-scientific, technically improper, and lead to false "facts."

112.    It is important to appreciate that Defendants do not run a "peer-to-peer" (P2P) service, and technical and business aspects specific to P2P services generally do not apply in the present matter, which involves designated file transfers between a corporation's servers and individual

HIGHLY CONFIDENTIAL                    Declaration of Andrew S. Cromarty, Ph.D.

account holders' personal computers, with DMCA-based takedown systems, Terms of Service and a contractual agreement between the parties as noted *supra*. Moreover, unlike in P2P services wherein millions of unidentified anonymous personal computers make up the distribution infrastructure, it apparently is undisputed that Defendants formed a visible corporate entity and located their file storage servers expressly in Texas—that is, in plain sight in Plaintiffs' "back yard" and territory, an unlikely place for any business to choose to position its assets if it plans to use them to systematically induce unlawful behavior among its international customers. A more detailed explanation of Defendants' systems and service appear *infra* and in Exhibit R.

113.   It must be acknowledged that many of the works accused as being infringed in this matter are wasting assets having low or negligible residual or monetizable value.

114.   Many of these works have been broadcast on television and already are subject to permissible consumer recording, time-shifting, unlimited subsequent viewing, and even commercial-skipping using VCRs, TiVo, and similar devices, all of which reduce their economic value. Example such works include Warner's *Harry Potter* movies and Disney's 2010 *Alice In Wonderland* film released for broadcast on TV and subject to such treatment.

115.   Many more Plaintiff works, including feature films and TV shows, are already available for unlimited commercial-free "all-you-can-drink" Internet streaming, either free or by paying a few dollars a month to Plaintiffs' own licensed distributors such as Hulu, Amazon, and Netflix. For example, TV episodes of popular shows such as Fox's *Bones* and *Better Off Ted,* CBS's *How I Met Your Mother,* and Universal's *BattleStar Galactica* and *The Rockford Files* are available for unlimited viewing at no per-view cost, using a $7.99/month flat-rate Netflix account. Similarly, Columbia Pictures' *The Girl With The Dragon Tattoo* is available, free, for unlimited

- 33 -

HIGHLY CONFIDENTIAL                     Declaration of Andrew S. Cromarty, Ph.D.

streaming viewing by Amazon Prime members.[3]

116.    This would properly value such assets in the pennies-per-use range or at a fraction of a cent or even less—even lower if practical barriers make the rightsholder's work more difficult to obtain through a file-sharing site than from the distributor, and as authorized third-party streaming services inexpensively providing licensed entertainment content such as Netflix are becoming available internationally.

117.    Plaintiffs also likely benefit economically from Internet redistribution of their works by consumers, which benefit could be enhanced through business cooperation with centralized file sharing service sites such as Defendants', and Plaintiffs have the technical ability and business opportunity to optimize this benefit but they apparently have not evaluated that benefit or diligently explored this opportunity. *Cromarty Expert Report at 163-173.*

118.    It is my opinion that, both for business reasons and due to "laws of physics," Defendants materially lack the ability to control infringement by Internet users. As noted *supra* and detailed in Exhibit R, DFP and related technology is broadly technically inadequate or deficient to provide such control, and no competent science exists yet to support technical or marketing claims of any such technology or product when applied to this problem domain.

119.    It is my opinion that despite these material technical limitations, Defendants are demonstrating substantial effort in applying the admittedly inadequate tools that do exist to detect and respond to instances of possible copyright violation. Based on my technical and business expertise and the facts presented in this matter, in my opinion Defendants' efforts to

---

[3] Strikingly, many of these same "free" works were listed among Plaintiff-accused files. E.g. *Plaintiffs MSJ / Sehested Declaration Exhibit A.* Note, however, declarant did not opine that any file found on Defendants' server was confirmed as an infringing work—only, apparently, that files had suggestive names. See discussion *supra* concerning filename metadata.

HIGHLY CONFIDENTIAL                    Declaration of Andrew S. Cromarty, Ph.D.

apply available technologies meet or exceed the standard of reasonable business practice applied in the Internet service industry in attempting to meet their obligation with respect to copyrighted content.

120.    In my opinion, the Defendants' systems offer a specific substantial non-infringing use and benefit to normal law-abiding Internet users, one occupying an important market niche neglected by most of Defendants' business competitors. Indeed, during the course my investigations my family and I have fruitfully benefited from lawful use of the Hotfile service. There is a substantial legitimate business case for the existence and market success of a business such as that of the Defendants. *Cromarty Expert Report at 154-173.*

121.    Hotfile lacks a public search capability for files stored on the Hotfile server or links to them. Users may know of their own files, but not anyone else's unless granted access by being told the link to that file. Plaintiffs suggest this is part of a strategy to induce infringement—that Defendants cleverly induce infringement by building a system that *lacks* business and technical mechanisms to induce infringement. *Plaintiff MSJ at p.4.* This suggestion is technically erroneous, non-factual, and obtuse business reasoning.

122.    Hotfile offers customers an extension of a personal computer user's private storage, either to their own devices (e.g. between their PC and phone/PDA) or among private groups (among family members, business colleagues, a company's customer base, etc.), as described *supra.* A website-wide search capability would destroy the privacy Hotfile customers enjoy as to their files. It would take away from them their decision and control as to who sees their content and who does not.

123.    A parent may wish to share a video of her child with grandparents, but not with unknown child abductors anonymously trolling the Internet. A business may wish to share opportunities

HIGHLY CONFIDENTIAL                                    Declaration of Andrew S. Cromarty, Ph.D.

only with its loyal repeat customer base. An amateur videographer may wish to share his work with a select audience, but not publish the video to the public. A political dissident may wish to share cell-phone videos of political brutality with her cohort or a New York Times reporter but not with her nation's secret police.

124.   Further, although filename metadata are not reliable as to content, a suggestive filename made public by a service provider can have a disastrous effect. If, as an investment banker, I had placed a file named Disney_plan_to_acquire_Columbia_Pictures_in_Aug_2012.pdf on a private file-sharing service for later remote access and reference on my Blackberry or laptop computer, and then the service provider made it publicly discoverable through a search interface, the existence of the suggestive name alone—and especially if associated with me as an identifiable user, and no matter what the file's content—could spur illegal insider trading and FINRA or SEC violations, and my investment bank could go out of business overnight due to the improper disclosure.

125.   Other services that provide file storage and sharing for individual registered paying customers, e.g. Amazon S3, do not provide public search or indexing of all their clients' private content.

126.   The fact that Hotfile does not provide a public site-wide search feature directly supports their legitimate product mix, business model, and customers' highest use cases and needs.


Executed in Palo Alto, CA this 5th day of March, 2012


Andrew S. Cromarty, Ph.D.

HIGHLY CONFIDENTIAL                    Declaration of Andrew S. Cromarty, Ph.D.

# APPENDICES AND EXHIBITS

HIGHLY CONFIDENTIAL                    Declaration of Andrew S. Cromarty, Ph.D.

## A. Materials Relied Upon

All materials listed in Appendix A of *Expert Report of Andrew S. Cromarty, Ph.D.,* attached here as Exhibit R.

*Plaintiff's Motion and Memorandum of Law in Support of  Summary Judgment Against Defendants Hotfile Corp. and Anton Titov* with attached exhibits.

All materials attached herein as Exhibit X, including:

> *The Girl with the Dragon Tattoo* free unlimited viewing offer (Amazon.com web screenshot).
>
> Google *Internet Service Provider Copyright Code of Practice – TCF Consultation Draft,* dated 6 March 2009.
>
> *Harry Potter and the Order of the Phoenix* TV broadcast announcement (examiner.com web screenshot).
>
> *National Research Council Reference Manual on Scientific Evidence - Third Edition.* (cover page provided)
>
> Roku Affiliate Program description webpage.
>
> Roku Refer-a-friend Affiliate Offer webpage.
>
> *VCloud9 Publisher License Agreement between Hotfile and Vobile - Exhibit B*
>
> Wal-Mart Affiliate Program description webpage.

HIGHLY CONFIDENTIAL                    Declaration of Andrew S. Cromarty, Ph.D.

**B. Curriculum Vitae of Dr. Andrew Cromarty**

Curriculum Vitae

# Andrew Cromarty, Ph.D.

## Expertise

- Distributed computing
- Internet, broadband, networking
- Corporate IT, security, datacenter
- Web commerce, business models
- High-tech management & finance
- Software & product development
- Multimedia, entertainment tech
- Computer & Information Science

## Professional Summary

Energetic, focused leader with over 20 years business experience in large and small companies, including as CTO of a billion-dollar publicly-traded consumer broadband corporation; CTO of a $100M consumer wireless hotspot services joint venture; Chairman of a Lucent wireless content-distribution/e-commerce spinout; manager or co-founder of several high-technology startups; CTO/CIO of an entertainment software/services company; CTO/CIO of an investment bank; member of Board of Directors for satellite, broadband wireless, and venture investment corporations; and research roles in the highest management-awarded corporate scientist positions at Digital, ADS, and Compaq.

Proven track record in management & operations, software development and service delivery, new technology creation, intellectual property evaluation, business model refinement, and team building and leadership. Experience includes product/service design, definition, development, and delivery; R&D and IT management; and project, line, corporate management, corporate strategic partnering, staff management, public relations, technology transfer, and intellectual property management. Managed development of a wide range of systems, from research prototypes through commercial products and services. Leading technical expertise in system architecture, networking, distributed computing and communications, and broadband, including pioneering work in multimedia content distribution and delivery that yielded many worldwide Internet firsts.

Strong general management approach based on a customer-focused hands-on leadership style. International service delivery experience, including as CTO of corporations with wholesale and retail terrestrial landline/wireless and satellite service operations in North America, Caribbean, Europe, and Asia. Experienced, press-trained, capable writer and public speaker.

# Curriculum Vitae

## Employment History

| | | |
|---|---|---|
| From: | 2010 | **Distributed Systems Technology LLC** |
| To: | Present | Palo Alto, CA |
| | Position: | *President and CEO* |
| | | (Business & IP advisory) |

| | | |
|---|---|---|
| From: | 2009 | **Minerva Consulting** |
| To: | Present | Palo Alto, CA |
| | Position: | *Partner* |
| | | (Business & IP advisory) |

| | | |
|---|---|---|
| From: | 2007 | **Union Square Advisors** |
| To: | 2008 | San Francisco, CA |
| | Position: | *CIO  & CTO* |

Founding CIO/CTO of investment bank specializing in mergers and acquisition (M&A) and late-stage private placement investment. Reported to President/founder. Conducted M&A and investment due diligence, provided detailed intellectual property analyses internally and to clients, negotiated and managed 45 vendor and supplier contracts & licenses, and built and oversaw the bank's internal operations, security, and regulatory compliance infrastructure. Architected/implemented complete corporate mail, CRM, security, datacenter, virtualization, document management, mobile/BES, website, backup/DR/BCP, conferencing, web/videoconferencing, and VOIP/telecommunications systems. Perfect corporate security record maintained (no breaches or leaks) during the entire several-year tenure. New business development included bringing the bank its largest private placement client. Served as the investment bank's internal diligence expert on tech industry clients and opportunities across semiconductor & communications, enterprise software, clean/green tech, and Internet verticals. Worked directly and extensively with clients' management teams, including IP advisory.

| | | |
|---|---|---|
| From: | 2005 | **DAX Solutions, Inc.** |
| To: | 2007 | Los Angeles, CA |
| | Position: | *CIO & CTO* |

CIO/CTO at the entertainment industry's largest Web-based/SaaS global media asset & enterprise workflow management service supplier for film/TV industry, supporting thousands of customer users across hundreds of productions on five continents. Presided over operations during firm's growth to 55% market share over 2 years, at 80% year-over-year revenue & customer growth. Reported to CEO.

## Curriculum Vitae

Managed internal operations, field ops, product development, IT & engineering (software development, operations, global distributed server/content distribution network, outsourcing/offshoring, technical customer relations, service delivery, architecture, and security). Designed, architected, and built a new industry-redefining enterprise-level service business, the industry's first high-definition digital dailies screening and distribution system for film/TV executives, and integrated it securely into customer infrastructure at Disney and other major studios/networks. Defeated entrenched incumbents in a six-way competitive race, winning an exclusive quarter-million-dollar contract with Walt Disney Pictures; line-managed Disney contract and customer relationship. Grew product/service to serve new clients (Showtime, Lifetime, Walden Media, Fox, FX, LionsGate, ABC Touchstone).

Managed major product updates and product/service enhancements. Rearchitected CDN and datacenter operations, including servers, networking, and multi-terabyte asset storage management systems. Managed major software product updates, including Oracle/DB2/Websphere to open source/MySQL/JBOSS migration, user feature enhancements, storage access enhancements. Oversaw new trouble ticket, CRM, and project planning system implementations. Negotiated new datacenter contract, upgraded critical Internet service to a diversified tier 1 provider base, instituted new management & operations processes, and selectively outsourced operations, to reduce operations costs 40% and improve customer-facing service level from 2 nines to 4 nines. Managed and developed leasing, outsourcing/ offshoring, manufacturing and vendor relationships. Defined and instituted professional staff management practices including formal review and bonus incentive programs, to align manager performance with company goals and facilitate corporate growth. Frequently marketed/sold to and directly supported the firm's highly demanding customers.

From: 2001    **City Lights Network**
To:    2005    Palo Alto, CA
     Position:    *President & Principal*

Provided advisory services to firms in startup, restart, or growth phase, often accepting an interim Chief Officer role. Engagements included Starfish Health (as CTO and VP Operations), Fifth Day Therapeutics (as CTO and CIO), and RFG, a highly-regarded boutique analyst firm (as Strategic Consulting Partner). As professional due-diligence advisor for VCs and private investors, evaluated hardware & software investment candidates. Engaged by Global 500 computing and financial industry firms to advise on architecture, compliance, and operations. As a "hired gun" CXO, designed and developed service offerings, managed outsourced development, developed business models, supported investment activities, developed intellectual property portfolio, business

## Curriculum Vitae

relationships, growth plans, financial models, and software technology for several startups. Designed and developed software for a startup's consumer web-based service offering, managed outsourced web development, developed business models, supported investment activities. Developed intellectual property portfolio, business relationships, growth plans, financial models, and software technology for a biotech drug discovery startup, applying mathematical modeling and computer simulation techniques to developmental genomic regulatory networks to produce new drug candidates. Evaluated investment candidates in enterprise security, high-volume collaborative consumer multimedia, and distributed/grid enterprise software for professional investors.

| | | |
|---|---|---|
| From: | 1999 | **SoftNet Systems, Inc.** |
| To: | 2001 | San Francisco, CA |
| | Position: | *Chief Technical Officer* |

Member of the five-person executive team governing a billion-dollar publicly-traded broadband services corporation, growing it from 350 to 700 technical staff, 20,000 to 30,000 subscribers, 30,000 to 60,000 email users, and operations from 70 to over 100 cities internationally. Chief officer for parent corporation and all operating subsidiaries, actively participating in their operations. Operating units included the nation's third-largest cable Internet provider, the first two-way VSAT satellite broadband provider, and a $100 million broadband wireless service provider joint venture. Reported to CEO/Chairman.

Line-managed the firm's corporate IT, pre-spinout business incubator, and corporate technology staff.  Responsibilities included technical operations & service delivery, new product and business development, new technology development, corporate strategy, intellectual property, press and investor/analyst presentations, corporate venture investment, staff development, market realignment/restructuring/M&A and discontinuation/creation of subsidiaries, and cost reduction and quality improvement.  Served on Board of Directors of SoftNet Ventures, the corporation's venture capital investment arm, and led or conducted due diligence and investment activities.

Led software and hardware architecture teams as CTO of $100MM broadband wireless subsidiary/JV. Designed proprietary on-site multi-level caching server systems, with networked wireless delivery, remote management, semi-formal security policy, and industry-defining performance. Developed the broadband wireless industry's first consumer equipment certification program and first semi-formal security policy for wireless services.

Supervised a $5M P&L pre-spinout multimedia content hosting subsidiary with operations in 90 cities, including financials, product technology, strategy, staffing, sales & marketing, partnering, and external investment

# Curriculum Vitae

negotiation. Oversaw competitive, performance, and vendor/supplier relationships for content management, cable & satellite broadband businesses, internal enterprise IT applications, and external web hosting business.

Led efforts that improved profitability and operating efficiency. Refined product mix, reduced failure rate, improved service reliability by nearly two nines to 99.7% in key markets; implemented technology upgrades to reduce expense and improve performance of service delivery by 40%. Rearchitected cable network and standardized fielded hardware and software to cut operating expenses in managing $20 million of deployed capital assets.

As corporate strategy officer, tracked 7 global geographies, kept contact with 188 companies or institutions, and maintained trend data on 90 competitors and partners. Led a successful defense against a competitor's patent attack. Frequently worked directly with strategic partners and individual consumer customers.

| | | |
|---|---|---|
| From: | 2000 | **Freewire Networks, Inc.** |
| To: | 2001 | Murray Hill, NJ |
| | Position: | *Chairman* |

Lucent spinoff: Wireless consumer broadband service/content/e-commerce provider.

Initiated successful Series A investment ($8M post valuation). Led Board through successful hiring of new CEO. Mentored management team on business model and operations, including strategy, business approach and service architecture for delivering live wireless commerce & multimedia content to consumers in-venue.

| | | |
|---|---|---|
| From: | 1996 | **Digital Equipment Corp. & COMPAQ Computer Corp.** |
| To: | 1999 | Palo Alto, CA |
| | Position: | *Principal Scientist, Corporate Strategy & Technology (CTO's) Division; Manager, Networked Entertainment Technology* |

Member of the renowned Western Research Laboratory and Network Systems Laboratory, developing novel Internet system architectures and the business models to exploit them.

Designed and developed new networked hardware-software architectures for high-performance internetworked multimedia. Developed a portfolio of strategic partners; achieved many worldwide historic Internet transaction, service performance, & scalability firsts, including first to stream 1,000,000 live videos for an event, world's first Java-based distributed Internet games demo, and world's first live wireless webcasts. Served as press-trained designated corporate spokesperson for broadband