HIGHLY CONFIDENTIAL                    Expert Report of Andrew S. Cromarty, Ph.D.

and DSL Internet service provider Sonic.net.

## VIII.  OPINIONS AND ANALYSIS

144.    I present in this section my analysis of, and conclusions as to, the Principal Questions set forth *supra* in relation to the accusations in the Plaintiffs' Complaint.

### A.  Hotfile follows industry-standard practices to effect control over digital assets to the extent technically practicable.

145.    SHA/MD5 hash matching is a best-effort and reasonable business practice  that addresses an important class of potential infringements by unknown third-party actors on the Internet. Once a specific file has been properly identified as an infringing instance, the same actor or other actors in possession of that file may attempt to upload it again to Defendants' systems in violation of Hotfile policy. By remembering hashes of such offending files and computing hashes on new files, a service provider can—at some expense—identify when an offending file has been uploaded again, and take appropriate action, such as quarantining or deleting the file and  notifying, suspending, or cancelling the user and user's account consistent with any applicable policy of the service provider.

146.    I understand from Mr. Titov that Hotfile uses hashing in this manner and for this purpose, and has for some time.

147.    According to information learned in discussion with Mr. Titov, Defendants timely

HIGHLY CONFIDENTIAL                    Expert Report of Andrew S. Cromarty, Ph.D.

adopted and currently employ techniques for digital fingerprinting including those generally advanced or approved by the Plaintiffs' industry association, including the products and services of Vobile. Currently all files received via upload to Defendants' website are both hashed using SHA/MD5 techniques and processed using Vobile's services and products. Indeed, Defendants have deployed a new fleet of computer servers, entirely at Defendants' own expense, to handle the additional computational load imposed by use of these technologies.

148.   It is to be expected that Plaintiffs are generally familiar with many technologies they can use themselves, such as those described *supra*, for effecting control of their own digital assets, techniques that are alternatives to methods like digital fingerprinting that impose Plaintiffs' business risk and costs on service providers. For example, DRM technology is employed when Plaintiffs' vendors or business partners and/or their downstream distributors produce and sell DVDs or stream movies over the Internet. Similarly, watermarking is well-known in the industry, and watermarking at the granularity of individual performances of copyrighted works is a technology that has been productized by and available from their suppliers and business partners for at least a half-decade.

149.   However, I have seen nothing, in the Complaint or elsewhere, to indicate the Plaintiffs are  making good business decisions to research, evaluate, employ, or even contemplate use of these or comparable techniques, as an alternative to Plaintiffs externalizing their own business risk and costs by laying off that burden on Defendants and other independent service providers.

150.   I also have seen nothing, in the Complaint or elsewhere, to indicate that Plaintiffs are offering or have offered to Defendants and other service providers to absorb the legal risks or business costs associated with protecting Plaintiffs' copyrighted works.

151.   For example, I am aware of no offer ever made by Plaintiffs to pay for the additional

HIGHLY CONFIDENTIAL                    Expert Report of Andrew S. Cromarty, Ph.D.

capital expense or operations expense to Defendants or any other service provider when those service providers purchase and deploy technology for controlling or attempting to control infringement of Plaintiffs' digital assets, even if the technology is preferred, recommended, or demanded by Plaintiffs or their industry association, is costly, and/or provides no tangible business benefit whatsoever to the service provider.

152.    I further understand from Mr. Titov that Hotfile provides Special Rightsholder Accounts ("SRAs") that give rightsholder special business privileges and conveniences as to providing takedown notices and obtaining a rapid response to them. Among other features, in essence the SRA account gives the rightsholder a near-instantaneous takedown capability.

153.    Thus Defendants do follow industry-standard and business-reasonable practices, to the extent such techniques are practicable. Without limitation, Defendants' reasonable best efforts include use of SHA/MD5 fingerprinting for all files, creating SRA accounts and honoring requests from them, publishing their takedown notification mechanism and honoring requests pursuant to it, and adoption and use of Vobile's products and services solely at Defendants' expense.

### B. Customer incentive programs are common Internet business practice.

154.    I have reviewed the Defendants' service including their pricing/promotional information on their website. (Details of Defendants' service and their technical and business operations are described in Appendix H to this report.) Comparing Defendants' service offering and marketing to industry norms for promotion of Internet services generally, I observe that the Defendants' offering is promoted in the manner common to a very wide range of legitimate and respected

HIGHLY CONFIDENTIAL                    Expert Report of Andrew S. Cromarty, Ph.D.

Internet service firms. This variously includes Amazon.com, eBay, Yahoo, and others.

155.    There is a legitimate multi-party-sharing market niche ignored by Defendants' direct market competitors. Dropbox, for example, has a convenient user interface for saving and restoring files but for consumer (non-enterprise) accounts using Dropbox's service apparently requires anyone viewing a file to hold the same account credentials as the account holder who performed the upload. This requires that Dropbox users share their confidential account credentials—their login and password information—in order to share files among a group.

156.    For example, if a band of musicians wish to share recordings of their music among the band's members using Dropbox, first one musician must set up a Dropbox account, and then she must share her password with the other musicians, losing personal control over the account. This limitation occurs in many file storage service sites, and appears to result from limited or unthorough study of potential customer use cases.

157.    Other file service providers, such as Picasa and Flickr, do provide some ability for others to share file assets without needing the originator's uploading password. However, they generally have specialized in narrow markets, such as only photography or only video and photography.

158.    This creates an unfilled market niche. There is a market need for passwordless general-purpose file sharing, that is, sharing of content not limited to specialized filetypes or narrow use cases foreseen by the service provider's management or engineering teams.

159.    Examples of this market niche are the musician who wishes to share a recording or composition with other band members without sharing her account password, or the need to efficiently share a file with a business colleague without creating a Web site or FTP site.

160.    This market need is so common and well-understood that it is the subject of a widely-

HIGHLY CONFIDENTIAL                    Expert Report of Andrew S. Cromarty, Ph.D.

published Internet cartoon authored by one of the Internet's most popular cartoonists. The cartoon depicts someone advising a friend on all the available but unsatisfactory options for sharing a file with a third friend, even listing Dropbox as an unsatisfactory alternative. In the end, file sharing is accomplished by physically carrying a copy of the file down the street on a memory device. *XKCD Cartoon*. The cartoon is funny precisely because this is such a well-understood need that remains unanswered. In fact, the term "Sneakernet" was coined over a decade ago to refer to this physical "solution" to this Internet problem.

161.    Hotfile's business model and service model make filling this market niche possible. Hotfile combines the general-purpose file handling features of Dropbox with the passwordless access of the photo sharing services. Hotfile's service is in fact the solution to the common problem identified by the XKCD cartoon.

162.    Defendants' service thus fills an important legitimate business niche for file sharing on the Internet.

163.    I am aware of nothing in the present matter demonstrating that the cost to Plaintiffs from any alleged infringement exceeds actual business benefit from such alleged infringement. That is, it is entirely possible—and apparently unexplored by Plaintiffs—that  contrary to their Complaint, any alleged infringement through file sharing activities of Defendants' customers or business partners actually increases interest in, demand for, and sales of Plaintiffs' product, and is of net economic benefit to Plaintiffs.

164.    This is of particular interest because today there is a widespread and growing business belief that some amount of "free" content distribution actually increases sales. It is a means of using the Internet to cost-effectively expose to a new or wider audience works that were not well monetized under existing industry sales regimes or were viewed as overpriced in the market.

HIGHLY CONFIDENTIAL                    Expert Report of Andrew S. Cromarty, Ph.D.

Indeed, this is the economic basis of the "freemium" pricing model.

165.   Also widespread is the belief that those in the Plaintiffs' industry consistently are slow to, or fail to, adopt modern marketing and distribution methods suitable for new distribution media such as the Internet.

166.   For example, I am aware of no attempt by Plaintiffs to harness the business opportunity afforded by Internet file sharing technology to exploit "superdistribution" or "long tail" marketing opportunities, under which Plaintiffs themselves profitably incentivize Internet redistribution of their content by rewarding redistributors who return some revenue to the content rightsholder or who find ways to redistribute Plaintiffs' content that otherwise would sit on the shelf unsold.

167.   I similarly am aware of no information presented by Plaintiffs in the present matter indicating they are repricing their product as a rational business response to the market signals they receive when their works are alleged to be illicitly redistributed.

168.   Under conventional microeconomic pricing theory, such  product repricing would be a rational business response by Plaintiffs to optimize their profits on those copyrighted works.

169.   Moreover, repricing offers an opportunity for Plaintiffs and their industry peers to maintain or improve their control of their product distribution and copyrighted works, to surprise and delight their customer base, and to their own increase profits.

170.   No such rationalized product pricing to regain copyright control and increase profitability is reported or contemplated by the Complaint or any other Plaintiff pleading or documentation of which I am aware in the current matter.

171.   These failures by Plaintiffs and their industry generally poignantly suggest Plaintiffs are seeking to repeat the "Napster error." When industry rightsholders became concerned a decade

HIGHLY CONFIDENTIAL                    Expert Report of Andrew S. Cromarty, Ph.D.

ago that Napster was abetting illicit redistribution, they arguably attempted to destroy that company. This was an exceptionally unwise business action by rightsholders, because Napster was the rightsholders' only prospective business partner, and damaging Napster predictably[4] forced the consumer demand underground into a wide range of P2P services, an error from which the music industry itself says it has never financially recovered. Their business error was to destroy a prospective partner—the one corporation with whom they had an opportunity to employ their exceptional deal-making skills to forge business agreements that would allow them to retain control over and monetize their copyrighted works using new emergent distribution media.

172.    Centralized file sharing services offer an additional business partnering advantage to rightsholders over a P2P prospective partner: takedowns. Notwithstanding the technical difficulties in properly identifying infringing instances noted *supra*, file sharing services such as Hotfile, with its centralized architecture can—and Hotfile does—implement takedown procedures. For technical reasons, such takedowns are effectively impossible to fully implement in P2P systems such as Gnutella. This further enhances the potential of centralized file sharing services such as the Defendants as cooperative business partners of Plaintiffs, and provides additional rational business impetus for them to pursue such constructive relationships.

173.    Rather than view alleged consumer  redistribution via file sharing as a copyright violation, Plaintiffs have the opportunity to understand it as unmet market demand for their product. Rather than view a file sharing service as an alleged contributory infringer, Plaintiffs have the opportunity to view them as a valued prospective business partner.

---

[4] In fact, predicted. I accurately forecast precisely this outcome for the music industry, in a public speech in 2000. *Cromarty UC/Red Herring DIGIVATIONS panel, 2000.*

HIGHLY CONFIDENTIAL                    Expert Report of Andrew S. Cromarty, Ph.D.

### C.  Hotfile customers pay for better service, not for ability to infringe copyright.

174.    It is common for service providers on the Internet to offer "tiers" of service, with different service tiers providing better performance (larger volume, better speed, etc.) for a higher fee. For example, this typifies Internet Service Provider (ISP) connection fees for cable Internet and telephone company DSL services. Details and examples appear in Appendix H to this report.

175.    Also common both on the Internet and in the software market is a zero-cost introductory pricing level, with customers paying the provider only if they purchase premium service tiers above the free service level. This is known as a "freemium" pricing model, cf. *supra*.

176.    Hotfile offer service tiers according to a freemium pricing model.

177.    Freemium pricing models encourage business and revenue growth and facilitate customer acquisition by building interest in a service by eliminating customer objections to sale based on pricing or uncertain value-for-money.

178.    Freemium models are particularly useful or appropriate where customers may be hesitant to accept a service offered by an unknown or untested vendor, where a market has commoditized into a price war and "free" beats all other competitors prices, where the vendor's marginal cost of serving an additional customer at a useful introductory level of service is very low, and/or where a structural difference such as a proprietary advantage exists to motivate upsell purchase behavior by customers.

179.    Freemium products are not seen in the market where one product or service is substituted

HIGHLY CONFIDENTIAL                      Expert Report of Andrew S. Cromarty, Ph.D.

for another. That is, customers adopt a freemium model's upsells precisely because they feel they are getting an advantage such as a performance improvement or elimination of a distraction or impediment for their money.

180.   For example, Yahoo is understood to be the largest email service provider on the Internet. Yahoo offers its basic level of email service free of fees to customers, but "free" customers must visit Yahoo's website to read their email, and when they do they are confronted with advertisements. Yahoo's email service employs a freemium model under which, for an upsell fee of about two dollars per month, customers may download their email into their personal computer's mail program without viewing advertisements. All the prior Yahoo mail services are still offered to premium Yahoo customers, but additional conveniences are provided for the premium fee.

181.   Hotfile's business approach is similar, and common. Free users receive an introductory level of service with "rate throttling." Premium-tier Hotfile accounts have the same services available to free users, but as paying customers they receive more and faster service and, like Yahoo's advertisements and email-download feature, Hotfile premium users are not rate-throttled.

### D.  Hotfile materially lacks the "ability to control" infringement even using state-of-the-art technology.

182.   The state of the digital fingerprinting market today precludes satisfaction of the fourth technical requirement *supra* for evaluating a potential or alleged infringing digital duplication of a copyrighted work, namely, that a competent comparison of the two instances must be made, sufficient to confirm or disconfirm the infringement.

HIGHLY CONFIDENTIAL                    Expert Report of Andrew S. Cromarty, Ph.D.

183.   Because there is no science of digital asset matching, it is not possible to perform a neutral competent evaluation of either the products or the claims of vendors of digital fingerprinting and other products and services purported to offer an "ability to control." There is no accepted standard against which to make such a comparison.

184.   There also presently is no basis in either science or business practice to merit accepting the claims of these anti-infringement product vendors. There products may or may not work, but without an accepted methodology for reviewing and assessing them, no confidence in such tools for "ability to control" is justified.

185.   In essence, features-based techniques for analyzing a digital asset reduce the asset to a small set of numbers. It is obvious that information is lost in this reduction. Less obvious is that the information lost necessarily is essential to recognizing the underlying work, from a mathematical or information theoretic viewpoint. The greater the reduction, the more information is lost.  The greater the reduction, the greater the chances that legitimate works will be falsely accused.

186.   According to Motion Picture Laboratories, Inc. ("MovieLabs") documents describing Vobile's products, the Vobile methods in particular reduce an entire one- to two-hour movie to a single number.

187.   I am aware that MovieLabs has performed internal tests of competing products in the market for digital fingerprinting. MovieLabs is a joint venture of companies such as Plaintiffs and others in their industry, and has been described as the research and development arm of the Motion Picture Association of America ("MPAA") by the Los Angeles Times. *Los Angeles Times article.* MovieLabs thus is not an independent scientific evaluator. MovieLabs's digital fingerprinting analysis does not report, and apparently does not consider, essential test cases such

- 40 -

HIGHLY CONFIDENTIAL                    Expert Report of Andrew S. Cromarty, Ph.D.

as encoding/encryption. MovieLabs reports also opine that some false positives may be acceptable, suggesting a bias against service providers such as Defendants and a possible willingness to lay off the entertainment industry's inherent risks and economic costs onto others. MovieLabs further acknowledges that scalability (i.e., economic or "laws of physics" viability) was unaddressed in many of their reports and analyses.

188.    Overall, however diligently MovieLabs pursued their business goals, reports published by MovieLabs must be understood to be movie studios speaking, not an independent third party, and those reports support an opinion that there is "no science yet" as to digital asset comparison or technology-based copyright infringement determination.[5]

189.    As to the research performed by MovieLabs discussed *supra*, I am aware of no documents produced to date in this matter that identify MovieLabs's experimental design and analysis methodology, such as which feature methods or transcodes are considered. These details also do not appear in MovieLabs's publications as produced, notably including Craig Siedel's article, aptly titled "Content Fingerprinting from an Industry Perspective." *Seidel.* Full public details on scientific methodology are essential to gaining confidence in the merits of resulting analyses.

190.    Nothing in the MovieLabs documents and reports produced to date in this matter change my opinion that the state of digital asset matching and fingerprinting cannot be called a mature or reliable science and it provides an inadequate foundation upon which to define legal obligations.

191.    Even market acceptance and similar business measures provide no confidence that an

---

[5] Additional difficulty in assessing reports by MovieLabs arose during this analysis due to an improper production of those reports. Specifically, data in the MovieLabs reports heavily employ color graphics to summarize quantitative findings, but only black-and-white PDFs were produced. This has a technical effect as to these documents similar to redacting document metadata before production.

HIGHLY CONFIDENTIAL                    Expert Report of Andrew S. Cromarty, Ph.D.

"ability to control" is offered by putative infringement detection and identification tools, since under the weight of current law and market conditions, both service providers and rightsholders are essentially forced to buy whatever product is available, whether or not there is reason to have confidence in it.

192.    Demonstrations of the effectiveness of such digital fingerprinting and related products also are unreliable as a measure of their utility, correctness, or reliability. This is because the proper test of such a product is not merely whether it can be shown to work, but also and more importantly, whether it can be shown not to fail; and if it does fail, to understand and carefully characterize when and why. Presently, however, the field is insufficiently mature to provide reliable high-quality unbiased answers to these questions.

193.    As noted *supra,* feature extraction, subsetting, and related techniques trade off quality for speed or computational tractability. Again because there is no science to govern this tradeoff and the decisions are made by individual engineers and kept proprietary, the tradeoffs being made between quality and economic factors are unknown.

194.    The information science and computer science that applies is known, however, and is not favorable to these products. An unlimited number of possible morphisms or transformations can be applied to a given digital asset, and it is in the nature of mathematical modeling that no feature extraction system can adequately model them all; this is inherent in the nature of mathematical modeling and of feature selection.

195.    As one example, it appears that either simple encryption or simple methods of introducing extra "noise" time segment slices into a digital video asset are likely to defeat Vobile's systems. The latter would greatly increase its false negative failure rate, and the former would completely disable it.

- 42 -

HIGHLY CONFIDENTIAL                    Expert Report of Andrew S. Cromarty, Ph.D.

196.    These are well-known techniques employing tools already available for any personal computer. Their availability and easy use would enable simple tools to be built and freely distributed that can permanently disable these, and likely all other, digital fingerprinting methods.

197.    Those countermeasures would not, however, defeat technologies such as watermarking and DRM that rightsholders can employ entirely on their own, without added burden to service providers.

198.    Notwithstanding observations *supra,* I am aware that staff at one plaintiff, Warner Bros. Entertainment ("WB"), have experimented with using Hotfile to distribute "Fake File" samples of their movie and television products, notably including the Vampire Diaries. Indeed, WB then apparently issued unintended automatic takedowns of their own uploaded content and repeatedly had to coordinate internally to manage this confusion, demonstrating the difficulty in determining whether an uploaded file represents a permitted use. This illustrates a central difficulty in takedowns and infringement inference: It is not copyright files that may not be uploaded, but rather copyrighted files for which the copyright is held by another party and permission for redistribution has not been granted. This ownership and permission is a non-technical matter, and as noted in Appendix H, in any case data to support a technical decision are not part of the Internet handling of files generally and file transfers to file sharing services in particular.

199.    In short, even if one can find that two files appear similar, one cannot tell—and in particular, a non-rightsholder service provider certainly cannot tell—solely by visual inspection who has rights over them and whether those rights have been observed.

200.    It further appears that WB staff recognize that uploading to a service provider is

HIGHLY CONFIDENTIAL   Expert Report of Andrew S. Cromarty, Ph.D.

insufficient to induce infringing acts. According to internal WB email messages, WB expressed enthusiasm that the independent third-party PirateBay index web site would find and independently promote the availability of the "Fake Files." And further, the WB staff apparently did not consider it adequate to induce downloads when they used Hotfile as a distribution point by merely uploading files there. Their procedure next involved separately posting the files' availability at the "top 5" cyberlocker link indexing sites, i.e., to independent Napster-like indexing sites that point to file storage/sharing sites such as Hotfile. This suggests Plaintiffs understand, admit and agree that mere uploading does not induce the downloading behavior, and to elicit downloads they must take specific additional actions to induce or seed it at other third-party sites not under the ownership or control of any Defendant. *WARNER027832.pdf*

201.   In summary, although Plaintiffs themselves potentially could better control infringement, and notwithstanding Defendants' business reasonable best efforts to be of assistance to another industry, Defendants materially lack the "ability to control" infringement. This is so because the technology to do so is technically inadequate/deficient, uneconomic, unvalidated, and unreliable. It is so because the economic and, especially, computational expense to control infringement requires the service provider to "defy the laws of physics," for example, in some circumstances by promptly performing millions of years of computation in a day. And it is so because of the nature of the copyright problem itself, wherein multiple business players who may not even know of each others' existence or asset holdings are nonetheless be required to "know what they don't or can't know" to control infringement.

HIGHLY CONFIDENTIAL                    Expert Report of Andrew S. Cromarty, Ph.D.

## IX.   TRIAL EXHIBITS

202.    I may rely on visual aids and demonstrative exhibits that demonstrate the bases of my opinions.  Examples of these visual aids and demonstrative exhibits may include, for example, charts, drawings, excerpts from patent specifications or other public sources, patent file histories, interrogatory responses, deposition testimony and deposition exhibits, as well as optical components, charts, diagrams, videos and animated or computer-generated video.

203.    Other than as referred to in this report, I have not yet prepared any exhibits for use at trial as a summary or support for the opinions expressed in this report, but I expect to do so in accordance with the Court's scheduling orders.

## X.  SUPPLEMENTATION OF OPINIONS

204.    I expect to testify regarding the matters set forth in this expert report, if asked about these matters by the Court or the parties' attorneys.

205.    I understand that discovery is ongoing in this case.  I therefore reserve the right to adjust or supplement my opinions after I have had the opportunity to review deposition testimony or in light of additional documents or arguments that may be brought to my attention, including any additional orders from the Courts.  I also reserve the right to adjust or supplement my analysis in light of any new data or alternative opinions advanced by or on behalf of Plaintiffs.

HIGHLY CONFIDENTIAL                    Expert Report of Andrew S. Cromarty, Ph.D.

# APPENDICES

HIGHLY CONFIDENTIAL                    Expert Report of Andrew S. Cromarty, Ph.D.

**Report Errata**

The following typographical errors are noted in the main body of this report as produced on November 18, 2011.

Title page: Case name has changed to Civil Action No. 11-20427-CIV-WILLIAMS/TURNOFF.

p.14 para. 73: "may be name" should read "may be named".

p.14 para. 77: "not that it" should read "not knowing that it".

p.34 para. 157: "only or video" should read "only video".

p.35 para. 164: "Exposing to a new or wider works" should read "expose to a new or wider audience works".

HIGHLY CONFIDENTIAL                    Expert Report of Andrew S. Cromarty, Ph.D.

## A. Materials Relied Upon

### i.    Non-BATES-numbered documents

1and1 Affiliate Marketing pages. From http://www.1and1affiliate.com/

Amazon S3 storage pricing. http://aws.amazon.com/s3/pricing/

Retrieved 20111104.


Amazon Affiliate pricing table. https://affiliate-

program.amazon.com/gp/associates/help/operating/advertisingfees

Retrieved 20111107


Amazon EC2 Overview. http://aws.amazon.com/ec2/

Retrieved 20111121.


Amazon EC2 Pricing. http://aws.amazon.com/ec2/pricing

Retrieved 20111121.


Gannes, Liz, "Auditude Fingerprints Everyone and Everything."

GigaOM (pub.), October 17, 2008. Published and available at:

http://gigaom.com/video/auditude-fingerprints-everyone-and-everything/

HIGHLY CONFIDENTIAL                    Expert Report of Andrew S. Cromarty, Ph.D.

"Adobe Acquires Auditude to Capitalize on Exploding Video Advertising Opportunity". Press

release, Adobe Systems Incorporated (pub.), November 1, 2011. Published and available at:

http://www.adobe.com/aboutadobe/pressroom/pressreleases/201111/110111AdobeAcquiresAudi

tude.html and

http://www.adobe.com/aboutadobe/pressroom/pressreleases/pdfs/201111/110111AdobeAcquires

Auditude.pdf

Gannes, Liz, "Auditude to Power Comcast Online Video Ads". GigaOM (pub.), Feb. 22, 2010.

Published and available at: http://gigaom.com/video/auditude-to-power-comcast-online-video-

ads/

Malik, Om, "Adobe buys Auditude reportedly for over $100 million." GigaOM (pub.), Oct. 31,

2011. Published and available at: http://gigaom.com/video/adobe-buys-auditude-reportedly-for-

about-100-million/

Kopytoff, V., "Apple iCloud May Not Be a Threat to Online-Storage Services."

New York Times, June 7, 2011.  Published at

http://bits.blogs.nytimes.com/2011/06/07/icloud-may-not-be-a-threat-to-file-sharing-services/

DropBox description from crunchbase.

http://www.crunchbase.com/company/dropbox

Retrieved 20111106

- 49 -

Expert Report of Andrew S. Cromarty, Ph.D.

DropBox overview from secondmarket.  https://www.secondmarket.com/company/dropbox

Retrieved 20111106

DropBox as a top-ten, in SecondMarket's Q3 2011 Top Ten Watched list.

https://www.secondmarket.com/discover/reports/q3-2011-private-company-report

Sourceforge "About" description. http://sourceforge.net/about

Retrieved 20111106

About Picasa. http://picasa.google.com/features.html

Retrieved 20111106

Picasa+gmail freemium pricing.

http://picasa.google.com/support/bin/answer.py?answer=39567&topic=10766

Retrieved 20111106

"Flickr FAQ (incl. "Will Flickr always be free?" / upsell summary)".

http://www.flickr.com/help/general/#3

Retrieved 20111106

"Flickr upsell pricing." http://www.flickr.com/upgrade/

HIGHLY CONFIDENTIAL                    Expert Report of Andrew S. Cromarty, Ph.D.

Retrieved 20111106


"eBay affiliate marketing - How it works."

https://publisher.ebaypartnernetwork.com/files/hub/en-US/howitWorks.html

Retrieved 2012121108


"What Happened to Gatekeeper?". Hewlett-Packard.

Available at and retrieved from http://gatekeeper.dec.com/what-happened-to-gatekeeper/


Gannes, Liz, "Fingerprint Technology Waits for a Grand Entrance." GigaOM (pub.), OCtober 9,

2007. Published and available at: http://gigaom.com/video/fingerprint-tech-waits-for-a-grand-

entrance/


"Kapow Software - Web Intelligence Solution: Antipiracy". Web page, printed 20111117.

Available at: http://kapowsoftware.com/solutions/web-intelligence/antipiracy.php


Healey, Jon, "The Content-Recognition Bakeoff".

Los Angeles Times (pub.), September 21, 2007. Published at:

http://opinion.latimes.com/bitplayer/2007/09/the-content-rec.html


Healey, Jon, "Content Recognition, part 2". Los Angeles Times (pub.), September 24, 2007.

Published at: http://opinion.latimes.com/bitplayer/2007/09/content-recogni.html

HIGHLY CONFIDENTIAL                    Expert Report of Andrew S. Cromarty, Ph.D.

"Refer-a-Friend Returns!" Ooma Inc. (pub.). Unsolicited marketing email received by author October 20, 2011.

"Network.http.sendRefererHeader". MozillaZine Knowledge Base (pub.), June 10, 2007. Published and available at: http://kb.mozillazine.org/Network.http.sendRefererHeader

Fielding, R., et al., "Hypertext Transfer Protocol -- HTTP/1.1" Also known as "RFC2616". Internet Engineering Task Force (pub.), June 1999.

Granoff, M., "FARNET Stories Project: 51 Reasons to Invest in the National Information Infrastructure." 1993.  Retrieved from and availabel at http://old.cni.org/docs/farnet/story149.NM.html

Munroe, R., "File Transfer." Cartoon published September 9, 2011. Retrieved from and available at http://xkcd.com/949/

Lu, J. et al., "Method and System for Fingerprinting Digital Video Object Based on Multiresolution, Multirate Spatial and Temporal Signatures." US Patent No. 8,009,861. August 30, 2011.

Complaint regarding Bell Canada's Internet traffic management practices.  November 16, 2010.

HIGHLY CONFIDENTIAL                    Expert Report of Andrew S. Cromarty, Ph.D.

### ii.    BATES-numbered documents

DISNEY005811.pdf

DISNEY005871.pdf

DISNEY005888.pdf

DISNEY005895.pdf

MPAA000014.pdf

MPAA000033.pdf

MPAA000071.pdf

MPAA000097.pdf

MPAA000142.pdf

Thumbs.db

WARNER027504.pdf

WARNER027548.pdf

WARNER027550.pdf

WARNER027576.pdf

WARNER027583.pdf

WARNER027781.pdf

WARNER027787.pdf

WARNER027806.pdf

WARNER027810.pdf

WARNER027814.pdf

HIGHLY CONFIDENTIAL                    Expert Report of Andrew S. Cromarty, Ph.D.

WARNER027815.pdf

WARNER027816.pdf

WARNER027832.pdf

WARNER027834.pdf

WARNER072163.pdf

WARNER072176.pdf

WARNER072203.pdf

WARNER072215.pdf

WARNER072300.pdf

WARNER027815.xls

HIGHLY CONFIDENTIAL                    Expert Report of Andrew S. Cromarty, Ph.D.

### H.    Internet operations and Hotfile services

1.  This Appendix provides a brief overview of Internet and Web operations, and then provides details about the systems and methods used by Hotfile and/or visitors to www.hotfile.com.

#### a.    Brief overview of Internet and World Wide Web operations

2.  For purposes of this exposition, the Internet is a worldwide network of interconnected computers, or of interconnected networks of such computers. These server computers are sometimes also called "Internet hosts". The World Wide Web (or "Web") is an abstract service overlaid on the Internet that uses some of its computers. The Web comprises server software executing on server computers and the files or other "resources" that they can provide upon request.

3.  "Links" (text strings of a particular format) in some files "point to" or identify other resources on the Web. The author of an individual file or "web page" determines what links it contains and where they point. Most often—although not exclusively—access to these stored resources distributed around the Internet is achieved using a "browser" software program that an individual chooses to execute on his computer, such as a work or home computer located anywhere in the world.

4.  The user's computer, sometimes called a "client" of the "server," makes "requests" of the server, and assuming it chooses to do so, the server responds to the request, most often by returning a requested resource such as a file. A wide variety of non-file resource types also

- 55 -

HIGHLY CONFIDENTIAL               Expert Report of Andrew S. Cromarty, Ph.D.

exist for delivery on the Internet, such as live-streamed audio or video.

5. The server does not control the client computer, and in fact, generally is prohibited from inspecting the contents of the client computer. This is a requirement of the relevant Internet protocol specifications. Indeed, the server generally does not even know of the existence or nature of client computers on the Internet, and further, when the server comes to know any information about a client, under typical operations the server is designed to "forget" the existence of each client as soon as it has responded to a client's request. This characteristic permits servers to efficiently serve large numbers of clients and thus achieve "scalability."

6. Each server on the Internet has one or more numeric addresses, and the Internet offers a directory service called the Domain Name System that allows one or more names for a server to be used, translating them to one of the server's numeric addresses. Private name and directory services also exist, not under any centralized control.

7. As noted *supra,* a server typically cannot reliably determine where a request comes from in the Internet. Internet protocols only require that the server is provided enough return-address information to respond to that request. Such return address information may be ephemeral, obscured, translated en route to different addresses, rerouted to other locations, or even falsely identified on the Internet. If so, this is unknowable by the server.

8. The web server similarly cannot know what web sites previously were visited by the client or its user. This includes, the server does not reliably know what name or address the client or its user used to reach the server, nor how it was obtained. For example, if a private domain name server is in use by the client, or if a second web server contains a link pointing to the receiving server and the client computer's user follows that link (e.g. by clicking on it when it is displayed to him), the receiving server typically will have no knowledge of this.

HIGHLY CONFIDENTIAL            Expert Report of Andrew S. Cromarty, Ph.D.

9.  Although a web browser may optionally send a server hints as to a referring link, provision and accuracy of such data are entirely under the control of the browser and its user, and may be further modified en route. Numerous freely-available privacy enhancement browser "add-ons" exist to give this control to the user. Further, many corporate, national, or personal proxy or firewall systems remove or forge such identifying source data en route for privacy reasons. Certainly any user who wishes to can obscure where he comes from when visiting a web site such as Hotfile. *MozillaZine network.http.sendRefererHeader at 1.*

10. It is common on the Internet for users to assemble links into a public or private index of sites or Internet locations. Browsers support this through "bookmarks"; users may trader links, e.g. by email, and have done so since the early 1990's; and anyone may create their own web server and use it to publish links that point to any server and any resource they wish. This is inherent in the intended design of the Web.

11. It also is common for users to provide substitute link names for an original link, and there are services that offer this service freely on the Internet. This often is done to simplify links or make them easier to type. Well-known services such as bit.ly, amzn.to, and tinyurl.com offer this convenience to all Internet users, typically on a free and anonymous basis. These shortened aliases are increasingly common and valuable as Internet use moves to mobile platforms such as PDAs and cell phones, where there is a premium placed on short names that minimize onerous typing requirements. They also are of value when a link must be short enough to be remembered (for example, when read on a billboard while driving on a highway), and they see significant commercial use in such applications.

12. As with use of link indexes and links generally, the server and its owner-administrator will not know that such a substitute link was used by users in requests ultimately directed towards

HIGHLY CONFIDENTIAL                    Expert Report of Andrew S. Cromarty, Ph.D.

the server. In this regard, link index servers used by a client computer's user to locate files on a file sharing service are analogous to a telephone directory book in the possession of a caller. The called party does not know that the caller used a telephone directory to find and call them.

13. To the extent the Internet's HTTP protocol specification defines a means of identifying such a referring "index" server used by distant client computer users, it also gives such index web sites the ability to obscure their own use as referring sites. The HTTP Internet protocol specifically directs that "Referer" [sic] information is not to be provided when such a forwarding web site employs standard web security: "Clients SHOULD NOT include a Referer header field in a (non-secure) HTTP request if the referring page was transferred with a secure protocol.". *RFC2616 at 151, emphasis in original.* The decision to use standard web security is increasingly common today for even routine Web connections, and is taken at the sole discretion of the referring (index) site. Thus notwithstanding observations *supra* as to server limitations, simply by implementing standard inexpensive web security practices on their own  index server, owners or administrators of an index or forwarding web site may gain a *de facto* ability to eliminate referring data in clients' browser requests to a file sharing server—that is, to hide from the file sharing service the existence, identity, and use of the index site.

### b.    Summary of www.hotfile.com operations, pricing, and consumer use

14. Hotfile operates a collection of Internet-connected web servers in a data center facility in Texas. Such web servers typically comprise a computer, large amounts of data storage space,

HIGHLY CONFIDENTIAL                    Expert Report of Andrew S. Cromarty, Ph.D.

and software to support the file storage and retrieval operations described herein as well as basic computer management functions to support housekeeping functions and permit remote administration (startup, shutdown, software upgrades, etc). The data storage space often is organized as one large pool of storage shared by the server computers.

15. When individuals anywhere in the world wish to store a file on the Internet for later retrieval and use, one choice they have is to store it on a www.hotfile.com server.

16. An individual may choose to do this for many reasons. He may wish to offload his storage onto a willing third party, for example because his computer is low on space. He may wish to put his data in a public server location from which he later can retrieve a copy using another Internet-connected device or from a different location, e.g. while traveling with his phone or PDA or when using a laptop computer in a cafe. He may wish to share the resource with others, such as a group of business colleagues, friends, customers, or family members.

17. The reasons a file is stored on a server—the motives of the storer—are inherently unknowable by the server owner-administrator. Internet technology generally does not provide any means for the client or its user to represent or provide this information, and any such information that could be captured or inferred by the server or its administrator is inherently unreliable.

18.    Like many or most websites, www.hotfile.com provides services to users whether or not they have a registered account. However, all users uploading to www.hotfile.com, whether registered or not, must take specific action to agree to abide by Hotfile's policies. Before uploading a file to Hotfile servers, they must actively signify that they "have read the HotFile Terms of Service, Intellectual Property Policy, and Privacy Policy, and … agree to be bound by them." *Hotfile website.*

Expert Report of Andrew S. Cromarty, Ph.D.

19.     Hotfile imposes a size limit of 400 megabytes (400 MB) on uploaded files. Splitting a large file into smaller pieces to upload is permissible. An important effect of this upload policy is a reduction in the security and business risk to Hotfile due to intentional or accidental "denial of service" events, in which Hotfile's Internet communications and server resources are persistently tied up in long-lasting transfers that fail before they complete. The probability of a file transfer failing due to exogenous factors such as an Internet communications failure increases with file size, making file size limitations a rational business policy. Limiting file size also enhances the utility and effectiveness of other throttling measures available to Hotfile to balance load among users and provide fair service to all Hotfile's customers. Fairness of service delivery is a core technical concern in distributed computing and an important business concern on the Internet.

20.     When a user has accepted Hotfile's policy, he may choose and upload a file from his client computer with a few mouse clicks. The transfer of a copy of the file from his client computer to a Hotfile server then proceeds automatically. When the transfer is complete, the user is presented with a URL ("Uniform Resource Locator," a text string comprising Web address) pointing to the uploaded file's location on the Hotfile servers. For example, uploading a file named "pictureofmydog.gif" may result in a URL being created and displayed such as "http://hotfile.com/dl/135394112/220ead1/pictureofmydog.gif.html". Importantly, the filename component of the URL (e.g., "pictureofmydog") is chosen by the uploading user, not the server or its owner-administrator. This feature permits users to give meaningful names to the digital assets they wish to share with colleagues, friends, customers, or family on the Internet.

21.     The resulting URL may be kept private, for private use. If it is not revealed to others, its long name and numeric components make it unlikely anyone will guess the name, affording a degree of privacy or security.

HIGHLY CONFIDENTIAL                    Expert Report of Andrew S. Cromarty, Ph.D.

22.      Alternatively, the URL may be shared with others. Anyone who enters the URL into their

Web browser, or who clicks on it when displayed as a link in a bookmark list or index web page,

will have access to the uploaded resource. This is how sharing is accomplished on the Internet.

23.      A non-registered Hotfile user who attempts to "visit" (use) the URL is presented with a

Hotfile web page offering a business choice pursuant to Hotfile's "freemium" business model

(cf. *supra*). The downloading/viewing user may choose a free "Regular Download" at no cost,

which provides limited download speeds, one download at a time, and a limit of two downloaded

files per hour, with a brief delay before downloads start after they are requested. Alternatively,

the downloading user may choose a premium (paid) High Speed Download, which offers

unrestricted download speed, no initial service delay, and an unrestricted number of file

downloads per hour, subject to available computing and communications resources to service

received requests. Further user performance incentives to upgrade to a premium paid account

include "Fast download even when servers are busy," support for download accelerators, and

support for resuming downloads that fail midstream due to Internet communications errors (cf.

*supra*), and "Hot/Direct Linking," which offers accountholders the ability to share the

performance benefits they have purchased for files they upload.

24.      For example, if a parent with a premium account uploads family photographs and videos

taken using a PDA or cell phone camera at her child's sporting event and then shares the

resulting URL by email or SMS text message, other family members anywhere on the Internet

immediately can view those photos and videos. In this case, the premium accountholder parent's

paid-account performance benefits are shared by the entire family when obtaining and viewing

these family digital assets.

- 61 -

HIGHLY CONFIDENTIAL                    Expert Report of Andrew S. Cromarty, Ph.D.

25.    Payment by Hotfile premium accountholders in the United States is accomplished through PayPal, an eBay subsidiary, and is charged on a recurring monthly basis. Presently offered premium service "tiers" are based on the amount of file transfer volume an accountholder wishes to rent, and for how long. For example, $9/month rents 100 gigabytes (100 GB) of Hotlink file transfer traffic.

26.    This is typical pricing for Internet file storage and access. As one example, Amazon.com rents storage to anyone on the Internet through its "S3" Internet-based ("cloud"-based) storage service at prices in the range of $10 to $14 monthly per 100 GB. *Amazon S3 Pricing at 1.* Similarly, Amazon's Elastic Compute Cloud ("EC2"), "a web service that provides resizable compute capacity in the cloud" with the business goal to "to make web-scale computing easier for developers," similarly operates under a freemium model with free uploads and a marginal price for premium download service of approximately $12 per GB of file transfer traffic monthly. *Amazon EC2 at 2. Amazon EC2 Pricing at 3.* Amazon's services are very widely used by companies across the Internet; as one example, the publicly-traded multi-billion-dollar entertainment movie streaming firm Netflix is a customer of Amazon's cloud services.

27.    Pre-payment discounts are offered by Hotfile as part of their pricing mix. This is common in the Internet and Web hosting industry; for example, well-known major web hosting firms such as Bluehost and 1and1 offer pre-payment discounts for web hosting services.

28.    Hotfile service pricing compares favorably and predictably with alternative commercial storage and data transfer costs. For example, raw storage purchased as hard disk equipment presently costs approximately $5 per 100 GB single-quantity capital cost, but any operating

HIGHLY CONFIDENTIAL                    Expert Report of Andrew S. Cromarty, Ph.D.

expense must be borne by the buyer and a raw hard disk is not inherently Internet-accessible or structured as a reliable ubiquitous service. Major phone carriers in the United States such as ATT presently offer data transfer (with no storage) in the general range of $10 per GB. Hotfile's pricing tiers are intermediate, falling between the cost of raw storage and the cost of mobile data transfers by carriers, as is to be expected: Hotfile's business operations can employ cheaper terrestrial communications, they offer (and must pass through costs for) added management and reliability services, and they can achieve economies of scale in their large storage arrays.

29.    Hotfile also has a reseller program,. Under this program, in essence Hotfile is a wholesale provider of storage accounts, and its resellers are individual retailers around the Internet who market and resell its underlying services. Presently Hotfile lists over a dozen resellers who resell its services in the United States, approximately thirty payment systems (such as PayPal) worldwide that are accepted and used for payments, and over one hundred countries for which there are resellers. The wholesale discount on accounts through indirect channels is nominally 20% of the retail price for direct single-quantity sales by Hotfile.

30.    Hotfile's published policy is that they "do not restrict any country - free downloads for everyone are guaranteed." For example, Hotfile downloads are permitted as a means for individuals to communicate in countries where totalitarian regimes may otherwise wish to control information flow to citizens, or where speech or information sharing may be restricted or repressed.

31.    Hotfile has an "affiliate" marketing program. Under this program an affiliate may be paid for usage generated by the affiliate. As discussed *supra,* an affiliate marketing program allows a

HIGHLY CONFIDENTIAL                    Expert Report of Andrew S. Cromarty, Ph.D.

business to reach markets or cultures outside its own, particularly on the Internet, which is international in scope. Affiliates earn commissions according to a published Earnings Table. One business incentive metric for awarding affiliates is achieving a high download-to-upload ratio. Incentivizing increased user activity is a rational business decision because, under the freemium business model, increased traffic driven to a site will result in conversions at some fixed rate to premium (paying) users. In addition, Hotfile further directly incentivizes these conversion by employing a second published metric computed based on conversions to premium user accounts attributable to an affiliate. A third incentive rewards premium accounts sold through advertising on the affiliate's web site. Amazon.com offers a similar sell-through incentive for sales by its affiliates. Finally, affiliates receive a permanent commission on referred sales for uploaders who become registered Hotfile customers, in that a first Hotfile customer earns 20% of the net sales of a second uploader who registers under the first customer's referral link. Hotfile's marketing program is substantially similar to refer-a-friend and affiliate marketing programs employed by large successful Internet sales, web hosting and telecommunications service provider companies such as Amazon.com, eBay, 1and1 and Ooma. *Amazon.com Associates Program Advertising Schedule. Ooma referral offer at 1. 1and1 referral offer. 1and1 Affiliate Marketing Overview. eBay Partner Network Overview.*

HIGHLY CONFIDENTIAL                    Expert Report of Andrew S. Cromarty, Ph.D.

**B. Curriculum Vitae of Dr. Andrew Cromarty**