# EXHIBIT 29

# Computer & Internet Lawyer (January 2004 to present), A DMCA Thrown Off Balance: *UMG v. Veoh* and Beyond, (May 1, 2010)

By Scott A. Zebrak

**Scott A. Zebrak** *is an attorney in Washington, DC. The views expressed herein represent his own and not necessarily those of any past, present, or future employer or client. In his capacity as a litigator at the Recording Industry Association of America, Mr. Zebrak has represented Universal Music Group and other record companies, although he did not participate in the UMG v. Veoh litigation.*

Click to open document in a browser

## Copyright

Content owners already reeling from online copyright infringement find themselves in an even more precarious spot as a result of a pair of rulings in *UMG Recordings, Inc. v. Veoh Networks, Inc.*[1] In that case, a judge in the US District Court for the Central District of California held that Veoh was entitled to protection under the Digital Millennium Copyright Act (DMCA) safe harbor from liability for sites that store material uploaded at the direction of users.[2] Movie studios, publishers, photographers, songwriters, record labels, artists, and other copyright owners survive through the exclusive rights that they have under the Copyright Act to control certain uses of their works. Unfortunately, the *Veoh* decision marginalizes those rights in the name of "technological progress," "false positives," and other vague concepts that enable an online service provider to avoid taking responsibility for its own actions.

This article examines five key elements of the *Veoh* decision, along with why these issues matter. As discussed in this article, at almost every turn, in order to sanitize the behavior of Veoh, the court thrust Herculean obligations upon content owners, while reducing the obligations of service providers seeking DMCA safe harbor protection. In so doing, the *Veoh* decision departs from the statutory scheme set forth in §512 of the DMCA. The court's opinion upends Congress's careful balancing of the complicated, nuanced, and sometimes symbiotic interests of content owners and technology companies.

## The DMCA

Copyright law has existed since the founding of our country, balancing incentives for creativity against public demand for access to and use of original works of authorship. As we entered the digital age, when copyrighted works can be reproduced and distributed on a staggering scale, the law needed updating. Congress attempted to do this and maintain balance by passage of the DMCA in 1998.

During development of the DMCA, Internet service providers (ISPs) lobbied for a limitation of liability from Internet-based copyright infringement, claiming that they should not be held responsible for the activity of their users. Ultimately, the resulting legislation included four limited safe harbors from claims of copyright infringement against "service providers" whose infringement liability is "by reason of" an act specifically identified in subsections (a) through (d) of the statute. One of those provisions, 17 U.S.C. §512(c), gave online service providers a safe harbor from liability for materials uploaded to their systems by third parties. This "free pass" from monetary liability exists only if and to the extent that the service provider adheres to certain carefully delineated procedures.[3]

Congress intended for the DMCA to strike a balance between the operations of online service providers and the need to enforce copyright protection. Immunity under the DMCA is not presumptive, but rather is an affirmative defense granted only to "innocent service providers" that meet certain statutory pre-conditions. For example, in addition to the requirements mentioned above, a service provider seeking protection under the §512(c) safe harbor must not have actual knowledge that the material or an activity using the material on the relevant system is infringing and, in the absence of such actual knowledge, must not be aware of facts or circumstances from which infringing activity is apparent.[4] If the service provider obtains such knowledge or awareness, it must act expeditiously to remove or disable access to the infringing material.[5]

©2011 Wolters Kluwer. All rights reserved.

Further, the service provider must not receive a direct financial benefit from infringing activity, in a case in which it has the right and ability to control such activity, [6] and it must expeditiously remove or disable access to material if notified that the material is infringing or is the subject of infringing activity. [7] The service provider must also adopt and reasonably implement a policy that provides for the termination of subscribers and account holders who are repeat infringers. [8] In sum, Congress gave courts a scalpel with which to carve out immunity from infringement claims for certain specifically qualified online service providers.

## Background on Case

Veoh is a Web site that contains user-uploaded online videos, somewhat like the more famous YouTube site now owned by Google. The service is publicly accessible and free. It costs nothing for the user to post videos, and there is no fee for accessing videos from the Veoh service. Anyone connected to the Internet can type *www.veoh.com* into their browser and use Veoh's search interface to find a specific video. Users of the Veoh service can receive streams of videos that their Web browsers can begin displaying almost immediately. Users of the Veoh service can also download complete copies of video files. Rather than charge users of its service, Veoh generates revenue from advertising displayed along with or next to the uploaded videos.

Users of the Veoh service were able to receive performances (a/k/a streams) and downloads of numerous videos containing songs for which Universal Music Group (UMG) owned the copyright. The problem, as it were, was that Veoh lacked UMG's authorization to display, perform, transmit, distribute, copy, or reproduce those songs. At some point in its existence, Veoh signed deals with several major copyright holders and also engaged in certain efforts, including filtering, to reduce the infringing materials commercialized on its system. UMG and Veoh did not reach any deals, however.

Ultimately, UMG sued Veoh for copyright infringement in 2007. In turn, Veoh sought shelter under 17 U.S.C. §512(c). As mentioned earlier, §512(c) is one of four DMCA safe harbors that, if applicable, preclude imposing monetary liability on service providers for copyright infringement. Section 512(c) is the safe harbor often raised as a potential defense by sites that store content uploaded by users. This is the same safe harbor that YouTube hopes will immunize it from liability in the high-profile suit brought against it by Viacom.

The §512(c) safe harbor protection is available only if the service provider satisfies a number of statutory requirements, several of which are discussed below. On December 29, 2008, the *Veoh* court rejected a summary judgment motion by UMG, which claimed that Veoh's functions and activities at issue did not fit within the §512(c) threshold requirement that the infringement be "by reason of the storage at the direction of the user." On September 11, 2009, the *Veoh* court determined that Veoh had satisfied the remaining prerequisites to qualify for the §512(c) affirmative defense. Accordingly, having found that Veoh qualified for the safe harbor, the court granted summary judgment in its favor. UMG has indicated that it will pursue an appeal.

### *Veoh* on "Storage at the Direction of a User"

The first of the two *Veoh* rulings examined in this article concerns whether the §512(c) safe harbor is limited to storage of materials uploaded by the user, or whether it also extends to subsequent acts that facilitate access to the user-stored material.

As you will recall, §512(c) of the DMCA limits "liability for infringement by reason of the storage at the direction of a user of material that resides on a system or network controlled or operated by or for the service provider." UMG, in challenging Veoh's claim to this affirmative defense, focused on Veoh's activity *after* the site user uploads a file; namely, that Veoh reproduces, distributes, and publicly performs works, including UMG's, in the course of:

1. Creating "Flash-formatted" copies of the video files uploaded by the site user;
2. Creating copies of uploaded video files that are made up of smaller "chunks" of the original file;
3. Enabling users to access uploaded videos by "streaming" the work to their computer; and
4. Allowing users to obtain permanent copies of the uploaded videos by downloading full video files to their computers.

*©2011 Wolters Kluwer. All rights reserved.*

UMG claimed that these activities by Veoh, which it does at its own behest and for its own commercial benefit rather than at the uploader's request or instruction, do not constitute "storage" nor are they undertaken "at the direction of a user."

Veoh, in response, argued that the "by reason of the storage" language is broad causal language that is meant to cover more than mere electronic storage lockers. According to Veoh, as long as the infringing conduct occurs as a result of the storage, the safe harbor shields its activities, regardless of whether they go beyond mere storage. Veoh argued that §512(c) "presupposes" that the service provider will provide access to the material uploaded by the user.

The parties and the court engaged in an examination of the statute and its legislative history that is far too detailed to cover in full in this article. Nevertheless, UMG presented portions of its argument in redline format that is useful to illustrate the issue. UMG argued that Veoh's interpretation effectively eliminates the statutory language, making the safe harbor available only for particular conduct, and re-writes the provision to delete language as follows:

> A service provider shall not be liable for monetary relief, or; except as provided in subsection (j), for injunctive or other equitable relief, for infringement of copyright ~~by reason of the storage at the direction of a user of material that resides on a system or network controlled or operated by or for the service provider~~, if the service provider-…

UMG further argued that Veoh interprets storage of material to presuppose a purported right to display and distribute the uploaded content to others, thereby re-writing the statute to add language as follows:

> A service provider shall not be liable for monetary relief, or; except as provided in subsection (j), for injunctive or other equitable relief, for infringement of copyright by reason of the storage at the direction of a user, <u>or reproduction, or public performance, or distribution</u> of material that resides on a system or network controlled or operated by or for the service provider, if the service provider-…

Notwithstanding these arguments, the court sided with Veoh and gave it what is essentially a license to commercialize the user-uploaded material. It concluded that "by reason of" means "as a result of" or "something that can be attributed to." It then found that the safe harbor protects not just the storage of the uploaded material but also subsequent infringing conduct "narrowly directed toward providing access to material stored at the direction of users." The court couched its ruling in terms of the text, structure, and legislative history of the statute. The driving force, however, seemed to be the court's concern about not deterring what it viewed as the "vital and salutary" role of service providers in "providing access to information and material to the public." Of course, it is the commercial motives of building a business based upon content created by others, rather than any acts undertaken "as a result of" storage or "at the direction of the user," that propels a site like Veoh to (1) make multiple reproductions of the videos, (2) publicly perform the videos through streaming, and (3) provide copies to anyone who presses a download button. Nevertheless, this is the first of a number of instances in which the *Veoh* court chose to interpret the statutory language in a way to expand the limitation of liability provision and upset the balance that Congress intended to exist within the DMCA.

## *Veoh* on Red Flags of Infringement

The second of the two *Veoh* rulings examined in this article addresses the remaining elements of the §512(c) safe harbor. To begin, §512(c)(1)(A) requires that a service provider seeking to qualify for the §512(c) safe harbor must expeditiously remove or disable access to infringing items after acquiring knowledge or awareness of infringement, actual or red flag. According to the *Veoh* decision, Veoh complied with §512(c)(3) takedown notices, often a largely fact-based question. Much more controversial is the narrow scope that the *Veoh* court gave to the red-flag language of the DMCA statute; "facts or circumstances from which infringing activity is apparent."

Notwithstanding the court's favorable view of Veoh (for taking certain steps to avoid infringements), it extended, seemingly beyond reach, the bar for what constitutes obvious red flags of infringing activity. Veoh did not lose its status as an "innocent service provider" even though it (1) operated a site with copyrighted music videos and lacked licenses from at least the largest music company (UMG), (2) purchased search

*©2011 Wolters Kluwer. All rights reserved.*

engine ads tied to titles of UMG-copyrighted music videos, and (3) knew (at least for purposes of the decision) that "widespread infringement was occurring on the Veoh system." Instead, the *Veoh* court indicated, "the burden is on the copyright holder to provide notice of allegedly infringing material," and it "takes willful ignorance of readily apparent infringement" to find a red flag. As a result, under *Veoh*, absent "smoking gun" documents or testimony, an aggrieved copyright owner may find it nearly impossible to show the presence of a red flag of infringement.

The *Veoh* court's concern was that the safe harbor would not serve its purpose if the "common knowledge that most Web sites that allow users to contribute material contain infringing items" was enough to displace application of §512(c). This concern is unfounded, however. The presence of a red flag does not automatically strip a service provider of eligibility for the safe harbor. Rather, it merely triggers the service provider's obligation to expeditiously remove or disable access to infringing items, from which the service provider typically derives or hopes to derive significant commercial benefits. Therefore, as a matter of policy, it is unclear why a court would be so reluctant to recognize the obvious presence of a red flag of infringing activity. Where it is present, the service provider loses its innocence and must remove access to infringing items. This is the precise balancing/burden-shifting mandated by the DMCA.

Undoubtedly, the *Veoh* court felt constrained by the Ninth Circuit's decision in *Perfect 10 v. CCBill*.[9] According to the *Veoh* court, *CCBill* teaches that, if investigation of "facts and circumstances" is required to identify material as infringing, then those facts and circumstances are not red flags. Nevertheless, apart from whether that statement is actually the correct standard, its application in *CCBill* and *Veoh* is simply untenable if the red-flag test is to have any meaning at all.

In *CCBill*, the Ninth Circuit determined that Web sites such as *illegal.net* and *stolencelebritypictures.com* did not constitute a red flag, nor did sites that provide passwords enabling users to illegally access Web sites with copyrighted content. That conclusion, of course, seems counterintuitive to many people who would certainly regard those titles as facts or circumstances from which infringing activity is apparent. We do not excuse this sort of activity in the physical world ( *e.g.*, buying televisions and cameras from the back of a van that says "hot stolen electronics"), and there is no reason to do so in the digital world. If it looks like a duck, walks like a duck, and even quacks like a duck, we should presume it to be a duck. The hypothetical notion that a chicken may be masquerading as a duck does not remove the presence of what should be an obvious red flag of infringing activity. Dissection is not required.

Indeed, in *Columbia v. Fung*,[10] a different judge in the Central District of California more recently made what may be the first finding of the presence of red flags of infringement. The existence of "overwhelming evidence" led the *Fung* court to conclude that defendants had induced copyright infringement and were not eligible for the DMCA safe harbors. The defendants operated a file-sharing service with torrent sites that enabled users to download from the computers of other users infringing copies of copyrighted content free of charge, including popular movies, television shows, sound recordings, software, and video games. Defendant Fung knew that infringing material was available via defendants' sites, and plaintiffs showed that more than 90 percent of the material available through defendants' Web sites was likely to be copyright infringing. The evidence also indicated that defendants had designed their sites to include lists such as "Top Searches,""Top 20 Movies,""Top 20 TV Shows," and "Box Office Movies" and that these lists, which automatically updated to reflect user activities, included numerous copyrighted works. Accordingly, the court found that the only way that defendants could have avoided knowing about their users' infringement is through willful blindness ( *i.e.*, acting like an ostrich with its head in the sand and not looking at its own Web pages), conduct obviously inconsistent with the DMCA safe harbors.

## *Veoh* on "Right and Ability to Control"

A second precondition, §512(c)(1)(B), requires that a service provider seeking to qualify for the §512(c) safe harbor must not "receive a financial benefit directly attributable to the infringing activity, in a case in which the service provider has the right and ability to control such activity." If that terminology rings a bell, it is because the language closely resembles the elements of a traditional common law claim for vicarious copyright infringement (right and ability to supervise the infringing activity and a direct financial interest in such activity), a parallel undoubtedly not lost on Congress when it enacted the DMCA. Nevertheless, according to the decision, Veoh's operation of its Web site, which is the focal point of the infringement,

©2011 Wolters Kluwer. All rights reserved.

along with its ability to take down content were alone not enough to constitute "right and ability to control" for purposes of the DMCA.

To reach this result, the court held that the words "right and ability to control" have a narrower meaning for §512(c) of the DMCA than they do for a common law vicarious liability claim. That determination directly conflicts with the Ninth Circuit's prior holding in *CCBill* that the words "[direct] financial benefit" should be interpreted the same way for the DMCA and an affirmative vicarious liability claim. The *Veoh* court's reading of "right and ability to control" is also inconsistent with that of the Ninth Circuit's *Napster* decision, [11] which held that "[t]he ability to block infringers' access to a particular environment for any reason whatsoever is evidence of the right and ability to supervise." Yet in order to avoid disqualifying Veoh from the safe harbor, the court held that as to the phrase "[direct] financial benefit," the DMCA follows the common law standard, but as to the phrase "right and ability to control," it requires a departure ( *i.e.*, something more).

It is not apparent that Congress intended the words "right and ability to control" to mean anything different for the DMCA, and it is well-established that terms in a statute have their established meaning unless the statute otherwise dictates. The *Veoh* court's approach stems from a concern, supported by citation to §512(m), not to require a service provider to monitor its service. [12] Yet that provision is entitled "Protection of Privacy" and does not control. When a service provider has the right and ability to control its system and derives a direct financial benefit from the infringing activity but does not police its system to its fullest extent of its architecture, the service provider is a vicarious infringer and §512(c) of the DMCA should not shield it from liability. Section 512(c) of the DMCA protects only "innocent" service providers, a category that does not include those that fall within the plain text of §512(c)(1)(B). [13]

Even if for purposes of this article we assume that the DMCA requires more control and financial benefit than that for common law vicarious infringement, §512(c) of the DMCA should still be inapplicable to many user-uploaded sites like Veoh. It is beyond dispute that popular copyrighted material lures users and reaps financial benefits. There may be other draws as well, but high-quality content definitely attracts more eyeballs. Moreover, for their own business purposes (such as enhancing the performance and attractiveness of the site), online service providers that host user-uploaded content often routinely and voluntarily filter or edit their systems to block or remove spam and other commercially undesirable material. These sorts of facts must be enough to suffice for financial benefit and right and ability to control; if not, §512(c)(1)(B) is rendered a superfluous provision.

## *Veoh* on "Repeat Infringer Policy

A third element, §512(i), requires that a service provider attempting to qualify for the §512(c) safe harbor must adopt and reasonably implement a policy to terminate repeat infringers. The term "repeat infringer" is not defined in the DMCA, but the construction given by the *Veoh* court virtually strips the term of meaning.

After Veoh had been operating for some time, it eventually put into place a filtering technology (Audible Magic) to identify unauthorized copies of music videos. Under the decision, Veoh was not required to terminate the access of users who uploaded videos that the filtering technology identified as infringements. Rather, the *Veoh* court discounted the significance of the filter identifying infringing material on the ground that it does not meet the "standard of reliability and verifiability" required by the Ninth Circuit to justify terminating a user's account.

As to "verifiability," the court predicated its determination on *CCBill*, in which the Ninth Circuit held that a §512(c)(3) takedown notice that lacks a sworn declaration from the sender (and is therefore invalid) is not a sufficient basis for terminating a user as a repeat infringer. The comparison between a positive identification from a filtering technology and an invalid takedown notice is inapposite, however. The requirements of a valid §512(c)(3) takedown notice are not elements of what constitutes a repeat infringer under §512(i). Section 512(c) of the DMCA protects only innocent service providers. It is unclear why a service provider faced with undisputed evidence that someone is an infringer should be able to overlook such infringement when applying its repeat infringer policy.

As to "reliability," the court held that because Veoh had no ability to test the accuracy of the Audible Magic database or the information collected from copyright owners contained therein, the identifications of infringing material triggered only Veoh's takedown obligations—not its duty to terminate repeat infringers. It is certainly

*©2011 Wolters Kluwer. All rights reserved.*

puzzling that the filtering database could be reliable enough for takedowns but not reliable enough for application of the repeat infringers provision. The reasoning also seems circular: Veoh's inability to test the "reliability" of the filtering database justifies not terminating access; yet Veoh has no obligation to verify the accuracy in the first place; and therefore, the repeat infringer provision never comes into play and all the site has to do is comply with takedown notices. Under *Veoh*, the copyright owner is left with the massive burden of continuously policing the site (and every other user-uploaded site) for infringement, only to engage in an ineffectual repetitive takedown exercise of "whack-a-mole."

Additionally, under the *Veoh* decision, a "two strikes rule"—pursuant to which Veoh does not terminate a user who uploads multiple files covered under the same §512(c)(3) takedown notice—is reasonable for purposes of having a valid termination policy. Taken to its logical end, that policy allows a user to upload 1,000 copyrighted music videos but not be considered a repeat infringer if the copyright owner lists the videos within the same §512(c) takedown notice. Nor would it even matter if the user uploaded the 1,000 videos on different days ( *e.g.*, 10 per day for 100 days). It is hard to believe that Congress could have intended to exclude such a person from being classified as a "repeat infringer." That is especially true when a service like Veoh already "warned" its user base and put it "on advance notice" by conditioning use of the site on acceptance of online terms of use that bar the uploading of infringing material.

Judicial endorsement of a "two-strikes" rule means that content owners need to consider sending separate DMCA notices for each infringing work. Otherwise, certain online service providers may look to *Veoh* to justify not deeming users associated with multiple instances of infringement as repeat infringers. Just think about the oppressive and wasteful monitoring and notice obligations that sending separate DMCA notices imposes on content providers, however, along with the form over substance involved. Quoting *CCBill*, the *Veoh* court mentioned that allegations of infringement have "drastic consequences" because content could be removed or the user's access could be terminated. Noticeably absent from the *Veoh* court's analysis is *any* concern for the drastic consequences to the copyright community (in losses of jobs, revenues, and more) resulting from for-profit online service providers hosting, streaming, copying, and distributing their copyrighted works on an unprecedented scale and an entirely unlicensed basis.

## *Veoh* on the "Representative List"

Finally, if there is one possible silver lining for content owners in the otherwise dark cloud of this decision, it is the treatment given to the DMCA's "representative list" provision. Namely, while the court found that Veoh was not required to act on the particular list of artists provided on behalf of UMG, it seemed to recognize that a more precise list could be enough to trigger a service provider's obligation to locate and take down those works under §512(c)(3)(A)(ii). Specifically, the *Veoh* court determined that an "artist-only" list fell short in this particular case. The rationale was that postings for at least one or more of the artists apparently were authorized and therefore searching for a name would not necessarily unearth only unauthorized material; that is, it would produce "false positives." At the same time, the court indicated that a different result might apply if the notice identified the titles of the infringing videos or advised Veoh that all videos by a certain artist were infringing.

The DMCA, at §512(m)(1), expressly provides that a service provider's eligibility for safe harbor is not conditioned upon the service provider's "monitoring its service or affirmatively seeking facts indicating infringing activity." Yet Congress also recognized that infringement on some sites is so widespread that to require a notification to identify each work and its location would be impracticable. As a result, the DMCA expressly allows a copyright owner to provide a "representative list" of infringing works at an online site. Section 512(c)(3)(A)(ii) provides that the DMCA notice can include an "[i]dentification of the copyrighted work claimed to have been infringed, or, if multiple copyrighted works at a single online site are covered by a single notification, a representative list of such works at that site." Once the copyright owner provides the representative list, the burden to remove the specifically identified representative works and other infringing works of the same copyright owner shifts to the service provider.

In other words, as to a site with multiple copyrighted works, a takedown notice can identify the exact location of the works (for example, by URL), a representative list can identify works on the site that the service provider can locate on its own using the site's innate search functions, and the service provider seeking liability protection under the DMCA §512(c) safe harbor should remove and disable access to all the works

©2011 Wolters Kluwer. All rights reserved.

on the representative list rather than just the specific files referenced in a takedown notice. Interpreting the DMCA in that manner is necessary if the "representative list" language is to have any meaning. It is also fully consistent with §512(c)(3)(A)(iii), which requires that the service provider receive "information reasonably sufficient to permit the service provider to locate that reference or link."

Relevant case law is sparse but supportive. The Fourth Circuit, in *ALS Scan, Inc. v. RemarQ Communities, Inc.*,[14] held that "the requirements of a notification [under §512(c)(3)] does not seek to burden copyright holders with the responsibility of identifying every infringing work—or even most of them—when multiple copyrights are involved." Rather, as the Fourth Circuit explained, "the requirements are written so as to reduce the burden of holders of multiple copyrights who face extensive infringements of their works … [t]hus, when a letter provides notice equivalent to a list of representative works that can be easily identified by the service provider, the notice substantially complies with the notification requirements."

Additionally, in *Hendrickson v. Ebay*,[15] the court noted that a copyright owner could inform a service provider that all listings pertaining to a particular copyrighted work are unlawful, and the service provider could comply with §512(c)(3)(A) by searching its site for the offending title. In *Hendrickson v. Amazon*,[16] the court added that a notice that all copies of a particular work or set of works are infringing would be sufficient to trigger the service provider's obligation to remove or disable access to the works that exist on the site at the time that the notice is received but does not create a perpetual obligation for the service provider to continuously police its site. Finally, in *Perfect 10 v. Cybernet Ventures*,[17] the court found that the defendant did not structure a notice system that complies with §512 because, rather than allow such a representative list, it requests only the specific Web page at which a given work is located. The court further explained, "[t]hese apparently small differences might seem innocent enough, but in the framework of this litigation it appears to be an intent to upset the Congressionally apportioned burden between copyright holder and service provider by placing the entire burden on the copyright owner."

## Why This Matters

As discussed earlier, to the detriment of copyright owners, four aspects of the §512(c) safe harbor have little or no meaning at all in the eyes of the *Veoh* court. Such determination places too heavy a burden on copyright holders to continuously police Web sites and allows online service providers seeking DMCA protection to avoid shouldering their responsibilities. The *Veoh* court's rulings in this regard are contrary to the text and legislative history of the DMCA and should not be followed. That is true regardless whether the defendant is a so-called legitimate company engaged in questionable acts or a more brazen pirate site.

The *Veoh* decision upends the careful balancing and burden-shifting contemplated by Congress in the DMCA. This evisceration of the statute should be of significant concern not only to those who rely upon adequate copyright protection for their livelihoods but also to anyone who wants to see the creation of more quality content. Online service providers already enjoy significant insulation from liability under current law. If the *Veoh* decision withstands scrutiny on appeal and garners support from other courts,[18] online service providers will have even less incentive to take steps to respect copyrights.

When this happens, there is a domino effect. Corporate copyright owners suffer with fewer opportunities to receive fair compensation for the socially beneficial creative activities they underwrite. Online infringement also harms thousands of hardworking and creative individuals, such as studio technicians, artists, writers, and others, who lose their careers and means of supporting their families when copyrighted works are uploaded and downloaded without authorization. Furthermore, because corporate copyright owners have lesser funds and incentives to invest, the amount of quality new art and creative works decreases dramatically.

These are harsh factual realities, not dramatized exaggerations. It costs money, time, and effort to create a beautiful song, a moving photograph, a hilarious film, or a brilliant novel. These works are an important part of our culture and economy. It is not realistic or right to expect a copyright owner to earn a living while competing against free copies of its own material.

*©2011 Wolters Kluwer. All rights reserved.*

**Footnotes**

| | |
|---|---|
| 1 | UMG Recordings, Inc. v. Veoh Networks, Inc., CV 07-5744, 2009 U.S. Dist. LEXIS 86932 (C.D. Cal. Sept. 11, 2009), and 2008 WL 5423841 C.D. Cal. (Dec. 29. 2008). |
| 2 | 17 U.S.C. §512(c). |
| 3 | *See* 17 U.S.C. §512(c). |
| 4 | *See* 17 U.S.C. §512(c)(1)(A). |
| 5 | *Id.* |
| 6 | *See* 17 U.S.C. §512(c)(1)(B). |
| 7 | *See* 17 U.S.C. §512(c)(1)(C). |
| 8 | *See* 17 U.S.C. §512(i). |
| 9 | Perfect 10 v. CCBill, 488 F.3d 1102 (9th Cir. 2007). |
| 10 | Columbia v. Fung, 2:06-cv-05578. |
| 11 | A&M Records, Inc. v. Napster, Inc., 239 F.3d 1004 (9th Cir. 2001). |
| 12 | Section 512(m) says that the §512(a)-(d) safe harbors are not conditioned on a service provider "monitoring its service or affirmatively seeking facts indicating infringing activity."17 U.S.C. §512(m). |
| 13 | One court appears to have already disagreed with the *Veoh* court's handling of the "right and ability to control" issue. In *Columbia v. Fung* (discussed above), the court determined the defendants could not avail themselves of the DMCA safe harbors because of the §512(d)(2) "financial benefit" requirement. In so doing, the court used the Napster test to ascertain whether defendants have the "right and ability to control" the infringing activity (that is, an ability to block infringers' access to a particular environment), and it chose not to address the more recent and stringent *Veoh* determination that "right and ability to control" requires something more for purposes of the DMCA. |
| 14 | ALS Scan, Inc. v. RemarQ Communities, Inc., 239 F.3d 619 (4th Cir. 2001). |
| 15 | Hendrickson v. Ebay, 165 F. Supp. 2d 1082, 1090 (C.D. Cal. 2001). |
| 16 | Hendrickson v. Amazon, 298 F. Supp. 2d 914, 916-917 (C.D. Cal. 2003). |
| 17 | Perfect 10 v. Cybernet Ventures, 213 F. Supp. 2d 1146, 1180 (C.D. Cal. 2002). |
| 18 | The *CCBill* case upon which the *Veoh* decision so heavily relies has come under criticism. For instance, the Southern District of New York held that the Ninth Circuit's holding in *CCBill*, determining that the Communications Decency Act (CDA) preempts state law copyright claims, was contrary to the plain language of the CDA. Atlantic Recording Corp. v. Project Playlist, Inc., 603 F. Supp. 2d 690 (S.D.N.Y. 2009). |

*©2011 Wolters Kluwer. All rights reserved.*