**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**

**Case No. 11-20427-Civ (WILLIAMS/TURNOFF)**

DISNEY ENTERPRISES, INC., TWENTIETH
CENTURY FOX FILM CORPORATION,
UNIVERSAL CITY STUDIOS PRODUCTIONS
LLLP, COLUMBIA PICTURES INDUSTRIES,
INC., and WARNER BROS. ENTERTAINMENT
INC.,

       Plaintiffs,

vs.

HOTFILE CORP., ANTON TITOV, and
DOES 1-10,

       Defendants.

_____/

HOTFILE CORP.,

       Counterplaintiff,

vs.

WARNER BROS. ENTERTAINMENT INC.,

       Counterdefendant.

_____/

**BRIEF OF *AMICUS CURIAE* GOOGLE INC.**

# **TABLE OF CONTENTS**

**Page**

INTEREST OF AMICUS CURIAE ............................................................................ 1

ARGUMENT ........................................................................................................... 2

I.     CONGRESS ENACTED THE DMCA TO PROVIDE CLEAR PROTECTIONS
TO ONLINE SERVICES AND THEREBY TO FOSTER FREE EXPRESSION
AND INNOVATION ON THE INTERNET ................................................... 2

II.    THE DMCA REQUIRES PLAINTIFFS TO SHOW THAT THE SERVICE
PROVIDER FAILED TO ACT ON KNOWLEDGE OF SPECIFIC
INFRINGING MATERIAL AND PUTS RESPONSIBILITY FOR POLICING
ONLINE INFRINGEMENT PRIMARY ON COPYRIGHT OWNERS .......... 5

III.   THE DMCA PROTECTS QUALIFYING SERVICE PROVIDERS AGAINST
*ALL* CLAIMS OF INFRINGEMENT, INCLUDING INDUCEMENT .......... 15

CONCLUSION ...................................................................................................... 17

## TABLE OF AUTHORITIES

**Page**

### CASES

*A&M Records, Inc. v. Napster, Inc.*, 239 F.3d 1004 (9th Cir. 2001)..........................................9, 16

*ALS Scan, Inc. v. RemarQ Communities, Inc.*, 239 F.3d 619 (4th Cir. 2001) ................................7

*Arista Records LLC v. Usenet.com, Inc.*, 633 F. Supp. 2d 124 (S.D.N.Y. 2009)........................16

*Cable/Home Commc'n Corp. v. Network Productions, Inc.*,
    902 F.2d 829 (11th Cir. 1990) ........................................................15

*Capitol Records, Inc. v. MP3tunes, LLC,*
    __ F. Supp. 2d __, 2011 WL 5104616 (S.D.N.Y. Oct. 25, 2011)................5, 7, 10, 11, 12

*Columbia Pictures Indus., Inc. v. Fung,*
    2009 WL 6355911 (C.D. Cal. Dec. 21, 2009) ................................16

*Corbis Corp. v. Amazon.com, Inc.*, 351 F. Supp. 2d 1090 (W.D. Wash. 2004)...........2, 4, 6, 8, 11

*CoStar Group, Inc. v. LoopNet, Inc.*, 373 F.3d 544 (4th Cir. 2004)................................6

*Ellison v. Robertson*, 357 F.3d 1072 (9th Cir. 2004)...................................................2

*Fame Publishing Co. v. Ala. Custom Tape, Inc.*, 507 F.2d 667 (5th Cir. 1975)........................5, 6

*Hendrickson v. eBay Inc.*, 165 F. Supp. 2d 1082 (C.D.Cal. 2001)............................4, 8

*Io Group, Inc. v. Veoh Networks, Inc.*, 586 F. Supp. 2d 1132 (N.D. Cal. 2008).................6, 8, 16

*Isbrandtsen Co. v. Johnson*, 343 U. S. 779 (1952) ........................................6

*MGM Studios, Inc. v. Grokster, Ltd.*, 545 U.S. 913 (2005).............................15, 16, 17

*Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146 (9th Cir. 2007) ......................4, 9, 15

*Perfect 10, Inc. v. Amazon*, CV-05-4753 (C.D. Cal. Nov. 4, 2008) ........................6

*Perfect 10, Inc. v. VISA Int'l Service, Ass'n*, 494 F.3d 788 (9th Cir. 2007) ........................9

*Perfect10, Inc. v. CCBill, LLC*, 488 F.3d 1102 (9th Cir. 2007)..........................10, 12, 13

*Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417 (1984) ........................9

*UMG Recordings, Inc. v. Shelter Capital Partners LLC,*
    667 F.3d 1022 (9th Cir. 2011) ................................................. *passim*

*UMG Recordings, Inc. v. Veoh Networks Inc.*,
    665 F. Supp. 2d 1099 (C.D. Cal. 2009) ................................................................. *passim*

*United States v. Texas*,
    507 U.S. 529 (1993) ........................................................................................................5

*Viacom Int'l Inc. v. YouTube, Inc.*
    718 F. Supp. 2d 514 (S.D.N.Y. 2010) ...................................................................... *passim*

*Wolk v. Kodak Imaging Network, Inc.*,
    2011 WL 940056 (S.D.N.Y. March 17, 2011) ..........................................7, 10, 13, 14, 15

*Wolk v. Kodak Imaging Network, Inc.*,
    __ F. Supp. 2d __, 2012 WL 11270 (S.D.N.Y. Jan. 3, 2012) ............................4, 5, 14, 15

## STATUTES

17 U.S.C. § 512 ..............................................................................................1, 2, 15

17 U.S.C. § 512(c)(1)(A) ..............................................................................8, 11, 12

17 U.S.C. § 512(c)(1)(B) ........................................................................................4

17 U.S.C. § 512(c)(1)(C) ..................................................................................2, 4, 8

17 U.S.C. § 512(c)(2) ............................................................................................3

17 U.S.C. § 512(c)(3) ..................................................................................3, 4, 8, 13, 14

17 U.S.C. § 512(h) ................................................................................................2

17 U.S.C. § 512(i) ................................................................................................3

17 U.S.C. § 512(j) ................................................................................................4

17 U.S.C. § 512(l) ..............................................................................................17

17 U.S.C. § 512(m) ..................................................................................1, 10, 12, 13

## MISCELLANEOUS

H.R. Conf. Rep. No. 105-796 (1998) ....................................................................4, 15

H.R. Rep. 105-551 (II) (1998) ..........................................................4, 11, 14, 15

S. Rep. 105-190 (1998) ..........................................................2, 4, 6, 9, 15

3 M. NIMMER & D. NIMMER, NIMMER ON COPYRIGHT ........................................6, 11

Google Inc. ("Google") respectfully submits this brief as *amicus curiae*.

## INTEREST OF AMICUS CURIAE

Google is one of the world's largest and best known online service providers.  Google is a leading Internet search engine and provides a wide range of other products and services— including email through its Gmail service, online video through YouTube.com, blogging tools through Blogger, social-networking through Google+, and Internet browsing through its Chrome browser—that empower people around the world to create, find, organize, and share information. Google relies on the "safe-harbor" provisions of the Digital Millennium Copyright Act ("DMCA"), 17 U.S.C. § 512, in many different aspects of its business.  Google is also a defendant in a case now pending in the Second Circuit in which the district court correctly held on summary judgment that YouTube is protected by the DMCA safe harbor, including against a claim of copyright inducement liability.  *Viacom Int'l Inc. v. YouTube, Inc.*, 718 F. Supp. 2d 514 (S.D.N.Y. 2010).

Both on its own behalf, therefore, and on behalf of its millions of users, Google has an overriding interest in the proper application of the DMCA, including the particular safe harbor at issue here, which applies to "Information Residing on Systems or Networks At Direction of Users." 17 U.S.C. § 512(c).  While Google does not have access to the full summary-judgment record in this case, and thus takes no final position on how the Court should resolve the parties' respective motions, it offers this *amicus curiae* brief to a more complete perspective on the legal issues raised in those motions.  Google is particularly concerned by some of the arguments offered by the plaintiffs, which distort the meaning of the statute and, if accepted, would unduly narrow the important protections those provisions give online service providers.

No one other than Google and its counsel—including the parties to this case—authored this brief in whole or in part or contributed money to aid its preparation or submission.

## ARGUMENT

I.    **Congress Enacted The DMCA To Provide Clear Protections To Online Services And Thereby To Foster Free Expression And Innovation On The Internet**

Congress laid the legal foundation for the modern Internet when it enacted the DMCA in 1998.  The statute was premised on the recognition that "in the ordinary course of their operations service providers must engage in all kinds of acts that expose them to potential copyright infringement liability."  S. Rep. 105-190, at 8 (1998).  Congress was concerned that online communications and commerce would be chilled if service providers faced potentially expansive liability based on material that their users posted, stored, transmitted, or made available for viewing.  *Id*. ("Without clarification of their liability, service providers may hesitate to make the necessary investment in the expansion of the speed and capacity of the Internet.").  To address that concern, Congress created a series of "safe harbors" that relieve service providers from damages liability for any copyright infringement claim arising out of four different types of common online functions.  17 U.S.C. § 512(a)-(d).

These safe harbors were the product of extensive negotiations between the major copyright holders and Internet service providers.  S. Rep. 105-190, at 9.  "The DMCA intended to balance the interests of these parties by creating a mechanism for rights holders to inform ISPs of potentially infringing conduct while, at the same time, providing 'greater certainty to service providers concerning their legal exposure for infringements that may occur in the course of their activities.'"  *Corbis Corp. v. Amazon.com, Inc*., 351 F. Supp. 2d 1090, 1098 (W.D. Wash. 2004) (quoting *Ellison v. Robertson*, 357 F.3d 1072, 1076 (9th Cir. 2004)).  The statute provides benefits to both sides.  It offers service providers broad protection against infringement claims, along with express assurance that they need not monitor their services or affirmatively seek facts indicating infringing activity (§ 512(m)(1)).  In turn, the DMCA gave copyright owners new remedies against online infringement, including an expedited "notice-and-takedown" procedure (§ 512(c)(1)(C)), as well as the power to issue subpoenas directly to service providers requiring them to identify infringing users (§ 512(h)).

The safe harbor at issue here (§ 512(c)) applies to service providers that store information on their own systems at the direction of users.  That provision applies to any online service that hosts user-submitted material.  *UMG Recordings, Inc. v. Shelter Capital Partners LLC*, 667 F.3d 1022, 1030 (9th Cir. 2011) (service that stored user-uploaded videos and made those videos available for viewing or downloading by others protected by 512(c)).  There is no dispute between the parties that Hotfile is the kind of service that is at least potentially eligible for the 512(c) safe harbor.  To ensure protection, a service provider must meet certain threshold "conditions for eligibility," including the adoption and implementation of a "repeat-infringer policy" (§ 512(i)), and must designate an agent to receive "notifications of claimed infringement" from copyright owners (§ 512(c)(2)).

The agent's role is to facilitate the notice-and-takedown regime at the heart of the safe harbor.  Using the procedures described in the statute, copyright holders may avoid a costly and time-consuming judicial process by notifying service providers that certain material stored on their systems is not authorized to be there.  To be effective under the statute, a DMCA takedown notice must, among other things: identify the copyrighted work(s) that the copyright holder owns and believes to be infringed; identify "the material that is claimed to be infringing"; provide "information reasonably sufficient to permit the service provider to locate the material;" and include a certification under penalty of perjury of the information contained in the notice.  § 512(c)(3).  Service providers must respond to DMCA-compliant notices by "expeditiously" removing or disabling access to "the material that is claimed to be infringing."  § 512(c)(1)(C).

There are only two circumstances in which a service provider who meets these threshold qualifications may lose the protection of the safe harbor.  Each involves a bad-faith refusal to stop some specific instance of infringing activity.  *First*, the safe harbor does not apply if the provider acquires "actual knowledge" that particular material stored on its system is infringing— or becomes aware of "facts or circumstances from which infringing activity is apparent"—but then fails "to act[] expeditiously to remove, or disable access to, the material" in question.  § 512(c)(1)(A).  The statute expressly provides, moreover, that a notification from a copyright

owner "that fails to comply substantially with" section 512(c)(3)'s requirements for a DMCA takedown notice "shall not be considered . . . in determining whether a service provider has actual knowledge or is aware of facts or circumstances from which infringing activity is apparent." § 512(c)(3)(B)(i).  *Second*, while this provision is not at issue in the plaintiffs' summary judgment motion, the safe harbor does not apply where the service provider "receive[s] a financial benefit directly attributable to the infringing activity" in a circumstance where it "has the right and ability to control such activity." § 512(c)(1)(B); *see generally Shelter Capital*, 667 F.3d at 1043 (holding that "the 'right and ability to control' under § 512(c) requires control over specific infringing activity the provider knows about").

The protection afforded by the DMCA is broad.  "A service provider that qualifies for such protection is not liable for monetary relief and may be subject only to the narrow injunctive relief set forth in section 512(j)."  *Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146, 1158 (9th Cir. 2007).  That immunity shields "qualifying service providers from liability for *all* monetary relief for direct, vicarious and contributory infringement."  S. Rep. 105-190, at 40; H.R. Rep. 105-551 (II), at 50 (1998); H.R. Conf. Rep. No. 105–796, at 73 (1998) (emphasis added).  As Congress explained, "by limiting the liability of service providers, the DMCA ensures that the efficiency of the Internet will continue to improve and that the variety and quality of services on the Internet will continue to expand."  S. Rep. 105-190, at 8.

The DMCA has been incredibly successful in that regard.  The safe harbors have helped facilitate the development of the Internet as a robust and revolutionary platform for free expression, creativity, and economic opportunity.  A wide variety of online services—including Amazon.com,[1] eBay,[2] and YouTube,[3] along with less well known but similarly innovative services like Veoh[4] (a video-sharing and download service), Photobucket[5] (a photo-sharing site),

---

[1] *Corbis*, 351 F. Supp. 2d 1090.

[2] *Hendrickson v. eBay Inc.*, 165 F. Supp. 2d 1082 (C.D. Cal. 2001).

[3] *Viacom*, 718 F. Supp. 2d 514.

[4] *Shelter Capital*, 667 F.3d at 1026.

and MP3tunes[6] (a digital music locker)—have all been held protected by the DMCA against potentially crippling infringement claims. Other mainstays of the modern Internet, such as Facebook, Twitter, and Wikipedia, likewise rely on the DMCA safe harbors in their everyday operations. These services have become vital to democratic participation in this country and around the world. They have transformed the way people access information, buy goods and services, forge social relationships, and discuss matters of public and private concern. Without the protections afforded by the safe harbors, those services might have been forced to fundamentally alter their operations or might never have launched in the first place. As the Ninth Circuit recently observed, "[a]lthough Congress was aware that the services provided by companies like Veoh are capable of being misused to facilitate copyright infringement, it was loath to permit the specter of liability to chill innovation that could also serve substantial socially beneficial functions." *Shelter Capital*, 667 F.3d at 1030. This Court should similarly reject any effort by plaintiffs to undermine one of the fundamental legal pillars of today's Internet.

## II. The DMCA Requires Plaintiffs To Show That The Service Provider Failed To Act On Knowledge Of Specific Infringing Material And Puts Responsibility For Policing Online Infringement Primarily On Copyright Owners

While neither this Court nor the Eleventh Circuit has had occasion to interpret the DMCA safe harbors, a broad consensus about how to apply the statute has developed among the courts that have done so. Plaintiffs do not mention this extensive body of case law, which is not surprising given that it decisively rejects the crabbed approach to the statute that they offer in their brief.[7] Drawing on the DMCA's text and legislative history, these cases establish several

---

(...continued from previous page)

[5] *Wolk v. Kodak Imaging Network, Inc.*, __ F. Supp. 2d __, 2012 WL 11270 (S.D.N.Y. Jan. 3, 2012) ("*Wolk II*").

[6] *Capitol Records, Inc. v. MP3tunes, LLC*, __ F. Supp. 2d __, 2011 WL 5104616 (S.D.N.Y. Oct. 25, 2011).

[7] Citing two non-DMCA cases, plaintiffs argue that the safe harbors must be "construed narrowly." Pls.' MSJ at 18 (citing *United States v. Texas*, 507 U.S. 529 (1993) (applying the Debt Collection Act of 1982); *Fame Publ'g Co. v. Ala. Custom Tape, Inc.*, 507 F.2d 667 (5th Cir. 1975) (applying the Copyright Act's compulsory license provision)). But neither case says anything remotely like that. *Texas* is not even a copyright case, and it does not suggest that immunity-creating statutes should be interpreted narrowly. Instead, it addresses the principle that "statutes which invade the common law . . . are to be read with a presumption favoring the

(continued...)

important holdings about the statute's knowledge and awareness provisions. However it resolves the parties' summary judgment motions, this Court should follow the path established in those cases regarding at least the following propositions.

**Plaintiffs bear the burden of proving disqualifying knowledge.** Courts have consistently held that to disqualify an otherwise eligible service provider under the DMCA's knowledge or awareness provisions, the plaintiff must come forward with evidence that the provider had knowledge or awareness of particular infringing material but did not expeditiously remove it. *See Perfect 10, Inc. v. Amazon*, CV-05-4753, slip op. at 8 (C.D. Cal. Nov. 4, 2008) ("Although A9 has the ultimate burden of proving its affirmative defense, it is Perfect 10's burden to show that A9 had actual knowledge of infringement within the meaning of section 512(c)."); 3 M. NIMMER & D. NIMMER, NIMMER ON COPYRIGHT § 12B.04(B)(4)(c) ("[T]he copyright owner bears the burden of demonstrating knowledge independently of the failed notification."). If the plaintiff fails to carry its burden of showing the requisite knowledge, the service provider is entitled to summary judgment on that element of the safe-harbor defense. *See, e.g.*, *UMG Recordings, Inc. v. Veoh Networks Inc.*, 665 F. Supp. 2d 1099, 1110 (C.D. Cal. 2009) (granting summary judgment to service provider where plaintiff "has not provided evidence establishing that [defendant] failed to act expeditiously whenever it had actual notice of infringement"), *aff'd sub nom. Shelter Capital*, 667 F.3d at 1026; *Io Grp., Inc. v. Veoh Networks, Inc.*, 586 F. Supp. 2d 1132, 1148-49 (N.D. Cal. 2008) (same); *Corbis*, 351 F. Supp. 2d at 1107-09 (granting summary judgment to service provider where copyright holder provided "no evidence from which such

---

(...continued from previous page)

retention of long-established and familiar principles, except when a statutory purpose to the contrary is evident." *Id.* at 534 (quoting *Isbrandtsen Co. v. Johnson*, 343 U.S. 779, 783 (1952)). That has nothing to do with the DMCA, which does not invade or abrogate the common law, but merely creates an additional protection for service providers that are "found to be liable under existing principles of law." S. Rep. 105-190, at 19; *see also Shelter Capital*, 667 F.3d at 1044 (explaining that the DMCA does not alter the common law); *CoStar Group, Inc. v. LoopNet, Inc.*, 373 F.3d 544, 555 (4th Cir. 2004) ("the DMCA is irrelevant to determining what constitutes a prima facie case of copyright infringement."). Indeed, no DMCA case has adopted some artificial interpretative rule to give the safe harbors a narrower sweep than their text and legislative history suggest is warranted.

actual knowledge could be gleaned" and "no evidence from which to infer that Amazon was aware of, but chose to ignore, red flags").  Plaintiffs' effort here to reverse that burden (Pls.' MSJ at 19) ignores this authority and should be rejected.[8]

   ***The DMCA requires knowledge or awareness of specific infringing material.***  Every decision to have addressed the issue has held that the DMCA's knowledge provisions require that a service provider have failed to act after gaining knowledge of *particular* infringing material, before that service provider will be deemed to lost safe-harbor protection.  The case law uniformly rejects efforts to deprive service providers of the safe harbor based on generalized awareness that unspecified (or even "rampant") infringement is occurring on their services.

   In *Viacom v. YouTube*, for example, the court held that "the phrases 'actual knowledge that the material or an activity' is infringing, and 'facts or circumstances' indicating infringing activity, describe knowledge of specific and identifiable infringements of particular individual items.  Mere knowledge of prevalence of such activity in general is not enough." *Viacom*, 718 F. Supp. 2d at 523; *see also MP3tunes, LLC*, 2011 WL 5104616, at *12 ("General awareness of rampant infringement is not enough to disqualify a service provider of protection."); *id.* at *14 ("there is no genuine dispute that MP3tunes did not have specific 'red flag' knowledge with respect to any particular link on Sideload.com"); *Wolk v. Kodak Imaging Network, Inc.*, 2011 WL 940056, at *6 (S.D.N.Y. Mar. 17, 2011) ("*Wolk I*") (plaintiff "failed to point to other factors sufficient to establish that Photobucket knew or should have known of the specific infringing activity.").  The Ninth Circuit recently followed suit, holding that "general knowledge that [a service provider] hosted copyrightable material and that its services could be used for infringement is insufficient to constitute a red flag." *Shelter Capital*, 667 F.3d at 1038; *see also id.* at 1041 ("it is not enough for a service provider to know as a general matter that users are capable of posting unauthorized content; more specific knowledge is required").

---

[8] *ALS Scan, Inc. v. RemarQ Communities, Inc.*, 239 F.3d 619 (4th Cir. 2001), does not address the DMCA's actual knowledge or awareness provision, and the case neither holds nor suggests that the service provider bears the burden of proving its lack of knowledge or awareness of infringing material.

These rulings followed an unbroken line of decisions similarly holding that a service provider loses the safe harbor in a given case only where it failed to properly act upon knowledge or awareness that *the plaintiff's specific copyrighted material* was being infringed. *See, e.g.*, *UMG*, 665 F. Supp. 2d at 1111 (rejecting plaintiffs' argument that "a provider's general awareness of infringement, without more, is enough to preclude application of section 512(c)"); *Io Grp.*, 586 F. Supp. 2d at 1149 (granting summary judgment in favor of service provider where there was no genuine issue as to whether it "had the requisite level of knowledge or awareness that plaintiff's copyrights were being violated"); *Corbis*, 351 F. Supp. 2d at 1108 ("The issue is not whether Amazon had a general awareness that a particular type of item may be easily infringed.  The issue is whether Amazon actually knew that specific zShops vendors were selling items that infringed Corbis' copyrights."); *eBay Inc.*, 165 F. Supp. 2d at 1093 ("eBay's evidence shows that prior to this lawsuit, it did not have actual or constructive knowledge that particular listings were being used by particular sellers to sell pirated copies of 'Manson.'").

It is no surprise that the case law is so consistent.  The statute's text is clear.  The DMCA imposes a specific mandate on a service provider that gains "actual knowledge of infringement" or becomes "aware of facts or circumstances from which infringing activity is apparent":  the provider remains protected so long as it "acts expeditiously to remove, or disable access to, the material."  §512(c)(1)(A).  This mandate necessarily contemplates knowledge of particular infringing material.  By using the definite article in referring to "the material" that the service provider must remove, the statute indicates that the triggering knowledge or awareness is of specific items.  That is reinforced by the requirement of *expeditious* removal, which is possible only if the provider knows with sufficient particularity what items are infringing and thus what it must promptly take down.  That understanding of the statute's knowledge-and-takedown provisions harmonizes them with the parallel notice-and-takedown provisions, which similarly require the identification and expeditious removal of *specific* infringing material (§ 512(c)(1)(C), (c)(3)(A)(iii)).  *See Shelter Capital*, 667 F.3d at 1037.

A generalized-knowledge approach is also at odds with the statute's background and purpose.  Even outside the DMCA, a computer-system operator faces contributory copyright liability only '"if it has actual knowledge that specific infringing material is available using its system."'  *Perfect 10, Inc. v. Amazon.com*, 508 F.3d at 1172 (citation omitted); *cf. Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417, 439-42 (1984).[9]  Given that there is no liability in the first place in the absence of specific knowledge of infringement, it would make no sense to conclude that the DMCA safe harbor, which was enacted to give service providers *additional* protection against secondary liability, is lost merely upon generalized awareness of infringement. Indeed, as Congress was aware when it enacted the DMCA (S. Rep. 105-190, at 8), it is "common knowledge that most websites that allow users to contribute material contain infringing items."  *UMG*, 665 F. Supp. 2d at 1111.  If the safe harbors protect only service providers that lack even general knowledge of infringing activity, therefore, they protect virtually no one, and the DMCA could not fulfill its goal of ensuring "that the variety and quality of services on the Internet will continue to expand."  S. Rep. 105-190, at 8.

In short, allowing "knowledge of a generalized practice of infringement in the industry, or of a proclivity of users to post infringing materials, impose responsibility on service providers to discover which of their users' postings infringe a copyright would contravene the structure and operation of the DMCA."  *Viacom*, 718 F. Supp. 2d at 523; *see also Shelter Capital*, 667 F.3d at 1037 ("Requiring specific knowledge of particular infringing activity makes good sense in the context of the DMCA, which Congress enacted to foster cooperation among copyright holders and service providers in dealing with infringement on the Internet.").  This Court should likewise reject any effort by plaintiffs to deprive Hotfile of the section 512(c) safe harbor based merely on its purported knowledge or awareness of unspecified infringing activity on its service.

---

[9] Plaintiffs ignore this established rule in their discussion of contributory infringement (Pls.' MSJ at 33-34).  *See also, e.g.*, *Perfect 10, Inc., v. VISA Int'l Serv. Ass'n*, 494 F.3d 788, 801 (9th Cir. 2007); *A&M Records, Inc. v. Napster, Inc.*, 239 F.3d 1004, 1022 (9th Cir. 2001) (both holding that specific knowledge is required for contributory infringement).

***The DMCA does not require service providers to affirmatively monitor their services for possible infringement.*** Conspicuously absent from plaintiffs' brief is any reference to one of the DMCA's most significant provisions. Section 512(m) expressly provides that safe-harbor eligibility shall not be conditioned on "a service provider monitoring its service or affirmatively seeking facts indicating infringing activity." 17 U.S.C. § 512(m)(1). This provision "cuts against holding that [a service provider's] general knowledge that infringing material could be uploaded to its site triggered an obligation to 'police' its services to the 'fullest extent' possible." *Shelter Capital*, 667 F.3d at 1042. And it guards against any claim that a service provider loses the safe harbor by failing to "adopt specific filtering technology" or any other technique suggested by copyright owners for affirmatively seeking out possible infringement occurring on its service. *UMG*, 665 F. Supp. 2d at 1113; *see also, e.g.*, *Wolk I*, 2011 WL 940056, at *5 ("§ 512(m)(1) rejects any attempt to force ISPs to police their sites for copyright infringement"); *Viacom*, 718 F. Supp. 2d at 525 ("General knowledge that infringement is 'ubiquitous' does not impose a duty on the service provider to monitor or search its service for infringements.").

Section 512(m) also underscores the fundamental policy reflected in the DMCA: that the primary responsibility for investigating and policing online copyright infringement falls on copyright owners, not service providers. "Congress made a considered policy determination that the 'DMCA notification procedures [would] place the burden of policing copyright infringement—identifying the potentially infringing material and adequately documenting infringement—squarely on the owners of the copyright.'" *Shelter Capital*, 667 F.3d at 1038 (quoting *Perfect10, Inc. v. CCBill, LLC*, 488 F.3d 1102, 1113 (9th Cir. 2007)); *see also MP3tunes*, 2011 WL 5104616, at *13 ("the DMCA does not place the burden of investigation on the internet service provider"). Congress's decision was not arbitrary; it

> makes sense, as the infringing works in suit may be a small fraction of millions of
> works posted by others on the service's platform, whose provider cannot by
> inspection determine whether the use has been licensed by the owner, or whether
> its posting is a 'fair use' of the material, or even whether its copyright owner or
> licensee objects to its posting.

*Viacom*, 718 F. Supp. 2d at 524; *see also Shelter Capital*, 667 F.3d at 1037 ("Copyright holders know precisely what materials they own, and are thus better able to efficiently identify infringing copies than service providers like Veoh, who cannot readily ascertain what material is copyrighted and what is not.").  The plaintiffs' silence about section 512(m) and the policy it reflects is telling, but the Court should not be misled.  It should resist any effort to shift the investigatory burden that Congress deliberately allocated to copyright owners or to impose on Hotfile policing obligations of which it is specifically relieved by the DMCA.

    ***The DMCA imposes a strict standard for "red-flag" knowledge.***  These principles also bear directly on the DMCA's so-called awareness provision.  That provision requires service providers to expeditiously remove infringing material in response to becoming "aware of facts or circumstances from which infringing activity is apparent." § 512(c)(1)(A)(ii).  While plaintiffs here rely on that provision (Pls.' MSJ at 25-26), they largely ignore the legislative history and case law making clear how strict the standard is for so-called "red-flag" awareness.

    The DMCA deliberately crafted a "high bar for finding 'red flag' knowledge." *UMG*, 665 F. Supp. 2d at 1111.  Under that provision, "the question is whether the service provider deliberately proceeded in the face of blatant factors of which it was aware.  As articulated by Congress, apparent knowledge requires evidence that a service provider 'turned a blind eye to 'red flags' of obvious infringement.'" *Corbis*, 351 F. Supp. 2d at 1108 (quoting H.R. Rep. 105–551 (II), at 57 (internal quotation marks omitted); *see also* 3 Nimmer § 12B.04[A][1] ("[T]he 'flag' must be brightly red indeed – and be waving blatantly in the provider's face – to serve the statutory goal of making 'infringing activity . . . apparent.'").  The "common-sense result of this 'red flag' test is that [service providers] are not required to make discriminating judgments about potential copyright infringement." H.R Rep. 105-551 (II), at 58.  Instead, the infringing nature of the material must be "apparent from even a 'brief and casual viewing.'" *Corbis*, 351 F. Supp. 2d at 1108 (quoting H.R. Rep. 105-551 (II), at 57).  If any "investigation is required to determine whether material is infringing, then those facts and circumstances are not 'red flags.'" *MP3tunes*, 2011 WL 5104616, at *13; *see also UMG*, 665 F. Supp. 2d at 1108.

Courts applying this test have recognized that even a description of material as "illegal" or "stolen" may not be a red flag. *CCBill*, 488 F.3d at 1113-14. As the Ninth Circuit explained:

> The plaintiffs in *CCBill* argued that there were a number of red flags that made it apparent infringing activity was afoot, noting that the defendant hosted sites with names such as "illegal.net" and "stolencelebritypics.com," as well as password hacking websites, which obviously infringe. We disagreed that these were sufficient red flags because "[w]e do not place the burden of determining whether [materials] are actually illegal on a service provider," and "[w]e impose no such investigative duties on service providers."

*Shelter Capital*, 667 F.3d at 1038 (internal citations omitted). Another recent decision likewise rejected plaintiffs' suggestion that it should construe "the terms 'free,' 'mp3,' or 'file-sharing' as tantamount to 'red flag' knowledge of infringement," explaining that "those terms are ubiquitous among legitimate sites offering legitimate services." *MP3tunes*, 2011 WL 5104616, at *13. At least some of plaintiffs' supposed evidence of red-flag knowledge (Pls.' MSJ at 26) appears to suffer from the same defects identified in these cases.[10]

*The specific statutory knowledge provisions of the DMCA cannot be displaced by common law principles, including by willful blindness.* Plaintiffs attempt to overturn the express statutory scheme set forth in the DMCA by replacing the "actual knowledge" provided in section 512(c)(1)(A)(i) with the judge-made jurisprudence of "willful blindness." With this sleight-of-hand, Plaintiffs seek to impose an affirmative duty to investigate on Hotfile, something that, as explained above, section 512(m) and case law forbid. Pls.' MSJ at 27 ("Defendant Titov acknowledged that Hotfile readily *could* review what its users were downloading but, outside of working with litigation counsel in this case, has never done so.") (emphasis added).

With section 512(c)(1)(A)'s knowledge provision, Congress created an express statutory regime, including the "red flag" knowledge standard discussed above, that serves a similar purpose to—but is distinct from—common-law willful blindness. As discussed above, that

---

[10] As for plaintiffs' suggestion that Hotfile's knowledge of infringement is demonstrated by communications it received from its users (Pls.' MSJ at 25-26), the court in *MP3tunes* rejected a very similar claim. *MP3tunes*, 2001 WL 5104646, at *13 ("e-mails from MP3tunes users indicating possible or even likely infringement did not put MP3tunes on notice or disqualify it from safe harbor protection").

provision prevents service providers from ignoring particular instances of "readily apparent infringement." *UMG*, 665 F. Supp. 2d at 1108.  But it requires expeditious removal of particular infringing material, not open-ended investigation into potential infringement across an entire service.  The provision thus addresses the concern that service providers might willfully disregard obvious infringing activity, while ensuring that "the burden of policing copyright infringement" remains "squarely on the owners of the copyright."  *CCBill*, 488 F.3d at 1113. Where Congress has established by statute an express and nuanced set of knowledge standards, it is not for plaintiffs to substitute a common-law alternative, particularly one inconsistent with the statute itself.  *See* § 512(m).

> ***DMCA notices that do not identify the specific location of infringing material do not create disqualifying knowledge or awareness of that material.***  Plaintiffs make much of the fact that Hotfile, at least for a time, apparently removed only the specific download link identified as infringing in a given DMCA takedown notice, and did not take the additional step of blocking other files on its system (not called out in the notice) that might have also have contained the copyrighted work at issue.  Pls.' MSJ at 24.  But, in this respect, Hotfile did exactly what the DMCA demands, and plaintiffs' takedown notices cannot be used to charge the service with knowledge of allegedly infringing material that those notices did not specifically identify.

The DMCA requires that a valid takedown notice include an "[i]dentification of the material that is claimed to be infringing or to be the subject of infringing activity and that is to be removed or access to which is to be disabled, and information reasonably sufficient to permit the service provider to locate the material."  § 512(c)(3)(A)(iii).  Courts have consistently held that a copyright owner must "provide the specific location of the allegedly infringing works in each instance for notice to be effective."  *Wolk I*, 2011 WL 940056, at *5 (DMCA-compliant notices must "identify and locate specific acts of infringement"); *see also, e.g.*, *Shelter Capital*, 667 F.3d at 1037 (describing the notice and takedown protocol as "encouraging copyright holders to identify *specific* infringing material to service providers") (emphasis added); *Viacom*, 718 F. Supp. 2d at 528-29 (explaining that the "required specificity of notice" would be "eviscerate[d]"

if it allowed a copyright owner to provide a "merely generic description . . . without also giving the works' locations at the site"). "An example of such sufficient information would be a copy or description of the allegedly infringing material and the so-called 'uniform resource locator' (URL) (i.e. web site address) which allegedly contains the infringing material." *Viacom*, 718 F. Supp. 2d at 518, 521.

This requirement is critical because the DMCA expressly provides that a communication from a copyright owner that fails to "comply substantially" with the requirements for a valid takedown notice cannot be used to show that a service provider had actual knowledge or red-flag awareness. § 512(c)(3)(B)(i); *see also* H.R. Rep. 105-551 (II), at 54-55; *Shelter Capital*, 667 F.3d at 1037, 1040 (explaining and applying this "exclusionary rule"). As a matter of law, therefore, "[n]otices that do not identify the specific location of the alleged infringement are not sufficient to confer 'actual knowledge' on the service provider." *Wolk II*, 2012 WL 11270, at *20 (citation omitted).

Courts applying the DMCA have repeatedly held that a takedown notice identifying certain allegedly infringing material does not create disqualifying knowledge of *other* material whose existence and location are not similarly identified. In *Wolk*, for example, the court rejected the plaintiff's argument that her takedown notices, in response to which the service provider removed the specific photographs identified as infringing, "also serve as DMCA-compliant notice of other present and future alleged infringements of the same copyrighted works posted at different times and at different locations." *Wolk I*, 2011 WL 940056, at *4. "Without receiving notices identifying and locating *each instance of infringement*, Photobucket did not have 'actual knowledge' of the complained of infringements or 'aware[ness] of facts or circumstances from which infringing activity is apparent.'" *Id*. at *6[11] (citation omitted). So too

---

[11] *See also, e.g., Wolk II*, 2011 WL 11270, at *22 (service provider not "required to police its website for infringing copies of [plaintiff's] work wherever they may appear once she has provided a DMCA-compliant notice"); *Shelter Capital*, 667 F.3d at 1039 (rejecting claim that service "should have taken the initiative to use search and indexing tools to locate and remove from its website any other content by the artists identified in the notices").

here, this Court should decline plaintiffs' invitation to use the takedown notices that Hotfile actually complied with to saddle the service with disqualifying knowledge of items that those notices did not specifically identify and locate.

### III.    The DMCA Protects Qualifying Service Providers Against *All* Claims Of Infringement, Including Inducement

As described above, a service provider that qualifies for the DMCA safe harbor is protected against damages liability for all forms of copyright infringement.  The legislative history could hardly be clearer on that point.  Congress explained in three separate places that the statute bars "liability for *all* monetary relief for direct, vicarious and contributory infringement." H.R. Rep. 105-551 (II), at 50; S. Rep. 105-190, at 20; H.R. Conf. Rep. No. 105-796, at 73 (emphasis added); *accord Perfect 10 v. Amazon.com*, 508 F.3d at 1175 ("the limitations on liability contained in 17 U.S.C. § 512 protect secondary infringers as well as direct infringers.").

Plaintiffs nevertheless argue that the DMCA "as a matter of law" does not protect service providers against the claim of copyright "inducement" described in *MGM Studios, Inc. v. Grokster, Ltd.*, 545 U.S. 913, 930 (2005).  Pls.' MSJ at 27-28.  But inducement is unquestionably a form of contributory infringement (*Grokster*, 545 U.S. at 930; *Cable/Home Commc'n Corp. v. Network Prods., Inc.*, 902 F.2d 829, 845 (11th Cir. 1990)), and it would be contrary to the basic immunity conferred by the safe harbor to categorically exclude such claims from safe-harbor protection.  The Ninth Circuit rejected a similar argument that the DMCA effectively excludes all vicarious liability claims from the safe harbor.  *Shelter Capital*, 667 F.3d at 1044.  There is no basis for a treating a claim of contributory liability premised on an inducement theory any differently.  As the *Viacom* court explained:

> The *Grokster* model does not comport with that of a service provider who furnishes a platform on which its users post and access all sorts of materials as they wish, while the provider is unaware of its content, but identifies an agent to receive complaints of infringement, and removes identified material when he learns it infringes.  *To such a provider, the DMCA gives a safe harbor, even if otherwise he would be held as a contributory infringer under the general law*.

*Viacom*, 718 F. Supp. 2d at 526 (emphasis added).  Indeed, no court has ever found an otherwise DMCA-eligible service provider unprotected against a claim of inducement.[12]

       Undeterred, plaintiffs assert that section 512(c) does not protect against inducement claims because such claims do not arise "by reason of" storage, but instead by reason of the service provider's culpable state of mind.  Pls.' MSJ at 28-29.  This novel argument misunderstands the DMCA's storage provision.  As courts have consistently held, that provision is not limited to claims where the alleged infringing conduct *is* storage, but instead "encompasses the access-facilitating processes that automatically occur when a user uploads" material to a service on which it is stored.  *Shelter Capital*, 667 F.3d at 1031; *see also Viacom*, 718 F. Supp. 2d at 526-27; *Io Grp.*, 586 F. Supp. 2d at 1148.  In other words, the storage provision covers all copyright infringement claims arising out of a service provider's automated process for allowing replication, transmittal, and display of user-submitted materials covered by the storage provision. All of plaintiffs' claims here (including their inducement claim) unquestionably arise out of such processes.  That is not changed by the fact that an inducement claim has a strong scienter requirement, under which plaintiffs must show "intent to bring about infringement" (*Grokster*, 545 U.S. at 940).[13]  Indeed, plaintiffs' argument would equally suggest that vicarious liability claims are outside the 512(c) safe harbor because they could be said to premise liability not on storage but on deriving a financial benefit from infringement that service providers had the right and ability to supervise.  *Id*. at 930 n. 9 (describing elements of various liability).  But, of course, that is not the law.  *Shelter Capital*, 667 F.3d at 1043-45.

---

[12] In both of the cases that plaintiffs cite, the service provider was independently held not to qualify for DMCA protection and only then held liable for inducement.  *See Columbia Pictures Indus., Inc. v. Fung*, 2009 WL 6355911, at *16-17 (C.D. Cal. Dec. 21, 2009) (rejecting DMCA defense because service provider had knowledge of infringement); *Arista Records LLC v. Usenet.com, Inc*., 633 F. Supp. 2d 124, 142 (S.D.N.Y. 2009) (defendant deprived of DMCA defense as a discovery sanction).

[13] An inducement claim, like all claims of secondary copyright liability, is premised on acts of direct infringement.  Grokster, 545 U.S. at 940 ("the inducement theory of course requires evidence of actual infringement by recipients of the device"); *Napster*, 239 F.3d at 1013 n.2 ("Secondary liability for copyright infringement does not exist in the absence of direct infringement by a third party.").  The direct infringement alleged in this case arises out of conduct (the uploading, transmission, and downloading at a particular online location) that falls squarely within section 512(c).

In sum, rather than adopt plaintiffs' overbroad and ill-conceived approach, the Court should hold simply that whether a service provider is eligible for DMCA safe-harbor protection is distinct from whether it is liable for inducement under *Grokster*.  Determining DMCA eligibility requires applying the various statutory prerequisites discussed above, which intentionally depart from the elements of judge-made secondary infringement claims.  Indeed, Congress went out of its way to ensure that the statutory analysis and the common-law analysis would be kept separate.  *Shelter Capital*, 667 F.3d at 1044 ("Congress made clear that it intended to provide safe harbor protection *not* by altering the common law vicarious liability standards, but rather by carving out permanent safe harbors to that liability for Internet service providers even while the common law standards continue to evolve."); *cf.* § 512(l) (service provider's failure to qualify for safe-harbor protection "shall not bear adversely upon the consideration of a defense by the service provider that the service provider's conduct is not infringing").  It may well be that certain facts bearing on whether a defendant is liable for inducement are also relevant to the DMCA inquiry.  Conversely, as in *Viacom*, the same facts that demonstrate a defendant's entitlement to the safe harbors may help establish that it is not an inducer.  But it would be a significant mistake to hold, as plaintiffs urge, that a finding of secondary liability in and of itself disqualifies a service provider from the safe harbor.

## CONCLUSION

For these reasons, however the Court resolves the parties' motions for summary judgment, it should adopt the understanding of the DMCA described in this *amicus* brief and reject plaintiffs' efforts to undermine the protections provided by the statute's safe harbors.

Dated:  March 12, 2012                                Respectfully submitted,


                                            _____*/s/ Jane W. Moscowitz*_____
                                            JANE W. MOSCOWITZ
                                            Fla. Bar No. 586498
                                            jmoscowitz@moscowitz.com
                                            MOSCOWITZ & MOSCOWITZ, P.A.
                                            1111 Brickell Ave. # 2050

Brief of *Amicus Curiae*

Miami, FL 33131
Telephone:  (305) 379-8300
Facsimile:  (305) 333-7099

Counsel for *Amicus Curiae* Google Inc.

**Of Counsel:**

David H. Kramer
dkramer@wsgr.com
Maura L. Rees
mrees@wsgr.com
WILSON SONSINI GOODRICH & ROSATI, P.C.
650 Page Mill Road
Palo Alto, CA 94304-1050
Telephone:  (650) 493-9300
Facsimile :  (650) 565-5100

Brian M. Willen
bwillen@wsgr.com
WILSON SONSINI GOODRICH & ROSATI, P.C.
1301 Avenue of the Americas, 40th Floor
New York, NY 10019
Telephone:  (212) 999-5800
Facsimile:  (212) 999-5899