UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 11-CIV-20427-WILLIAMS/TURNOFF

DISNEY ENTERPRISES, INC.,
TWENTIETH CENTURY FOX FILM CORPORATION,
UNIVERSAL CITY STUDIOS PRODUCTIONS LLLP,
COLUMBIA PICTURES INDUSTRIES, INC., and
WARNER BROS. ENTERTAINMENT INC.,

   *Plaintiffs*,

v.

HOTFILE CORP., ANTON TITOV, and
DOES 1-10.

   *Defendants.*
_____/

HOTFILE CORP.,

   *Counterclaimant*,

v.

WARNER BROS. ENTERTAINMENT INC.,

   *Counterdefendant.*
_____/

FILED by _AJS_ D.C.

MAR 19 2012

STEVEN M. LARIMORE
CLERK U. S. DIST. CT.
S. D. of FLA – MIAMI

**REPLY MEMORANDUM OF LAW IN SUPPORT OF
PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

**[CONFIDENTIAL]**

**[FILED UNDER SEAL PURSUANT TO PROTECTIVE ORDER]**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................ ii

CITATION LEGEND .......................................................................................... v

I.   THE MATERIAL FACTS ARE NOT IN DISPUTE. ...................................... 1

    A.   "Personal Storage" Was Not a Material Part of Hotfile's Business. ...................... 1

    B.   Hotfile Was Used Overwhelmingly for Infringement. ............................................ 3

    C.   The Most Popular Content on Hotfile is Illicit. ....................................................... 5

    D.   Defendants' Premium Conversion "Rate" Statistic Does Not Prove Anything. ..................................................................................................................... 6

    E.   Defendants Do Not Controvert Plaintiffs' Evidence. ............................................. 7

II.  HOTFILE IS INELIGIBLE FOR DMCA SAFE HARBOR. ........................... 9

    A.   The Facts Demonstrating Hotfile's Failure To "Reasonably Implement" a "Repeat Infringer" Policy Are Uncontroverted. ................................................... 9

    B.   The Facts Demonstrating Hotfile's Failure To Comply With the DMCA's "Designated Agent" Provisions Are Admitted. ................................................... 10

    C.   The Facts Demonstrating Hotfile's Disqualifying Knowledge of Infringement Are Uncontroverted ........................................................................ 11

    D.   Defendants Made Themselves Willfully Blind to Rampant Infringement. ........... 13

    E.   As a Matter of Law, *Grokster* Inducers Of Infringement Are Not Entitled to the DMCA Safe Harbor. ................................................................................... 13

    F.   Defendants' Estoppel Argument Lacks Any Support. ........................................... 13

III. DEFENDANTS ARE LIABLE FOR SECONDARY INFRINGEMENT. ........ 14

    A.   Plaintiffs Have Shown Direct Infringement. ......................................................... 14

    B.   The Evidence Showing Inducement Liability is Overwhelming. .......................... 14

    C.   There Are No Triable Issues as to Hotfile's Contributory Infringement. .............. 17

    D.   There Are No Triable Issues as to Hotfile's Vicarious Liability. .......................... 19

IV.  TITOV IS PERSONALLY LIABLE. ............................................................... 20

CONCLUSION ................................................................................................... 20

## TABLE OF AUTHORITIES

CASES

*A&M Records, Inc. v. Napster, Inc.,* 2000 U.S. Dist. LEXIS 20668 (N.D. Cal. Aug. 10, 2000), *aff'd in part rev'd in part,* 239 F.3d 1004 (9th Cir. 2001)................................................3

*A&M Records, Inc. v. Napster, Inc.,* 239 F.3d 1004 (9th Cir. 2001)................................12, 18, 19

*In re Aimster Copyright Litigation,* 334 F.3d 643 (7th Cir. 2003) ...........................................9, 13

*Arista Records Inc. v. Flea World, Inc.,* No. Civ. A. 03-2670 (JBS), 2006 WL 842883 (D.N.J. Mar. 31, 2006)........................................................................................................20

*Arista Records LLC v. Lime Group LLC,* 784 F. Supp. 2d 398 (S.D.N.Y. 2011) .........4, 16, 17, 19

*Arista Records, LLC v. Myxer Inc.,* No. CV 08-3935 GAF, 2011 U.S. Dist. Lexis 109668 (C.D. Cal. Apr. 1, 2011).....................................................................................................10, 19

*Arista Records LLC v. Usenet.com, Inc.,* 633 F. Supp. 2d 124 (S.D.N.Y. 2009)......4, 9, 17, 19, 20

*Bertam Music Co. v. P & C Entertainments, Inc.,* 2011 U.S. Dist. LEXIS 71967 (C.D. Ill. July 5, 2011)...........................................................................................................................20

*Cable/Home Communication Corp. v. Network Productions, Inc.,* 902 F.2d 829 (11th Cir. 1990) ..................................................................................................................................17

*Cartoon Network LP, LLLP v. CSC Holdings, Inc.,* 536 F.3d 121 (2d Cir. 2008) ................. 18-19

*Chanel, Inc. v. Italian Activewear of Florida, Inc..,* 931 F. 2d 1472 (11th Cir. 1991).................17

*Columbia Pictures Industries, Inc. v. Fung,* No. CV 06-5578 SVW(JCX), 2009 WL 6355911 (C.D. Cal. Dec. 21, 2009) ...........................................................4, 5, 13, 15, 16, 17

*Dawes-Ordonez v. Realtor Ass'n of Greater Fort Lauderdale, Inc.,* No. 90-345, 2010 WL 1791754 (S.D. Fla. May 5, 2010) .......................................................................................17

*Ellison v. Robertson,* 357 F.3d 1072 (9th Cir. 2004)...................................................................20

*Fonovisa, Inc. v. Cherry Auction, Inc.,* 76 F.3d 259 (9th Cir. 1996)............................................20

*Global-Tech Appliances, Inc. v. SEB S.A.,* 131 S. Ct. 2060 (2011)..............................................13

*Harrell v. Eller Maritime Co.,* Case No. 8109-CV-1400-T-27 AEP, 2010 U.S. Dist. LEXIS 104826 (M.D. Fla. Sept. 30, 2010)........................................................................2

*Indianapolis Colts, Inc. v. Metropolitan Baltimore Football Club Ltd. Partnership,* 34 F.3d 410 (7th Cir. 1994) .....................................................................................................3

*Interplan Architects, Inc. v. C.L. Thomas, Inc.*, 2010 U.S. Dist. LEXIS 114306 (S.D. Tex. Oct. 27, 2010) ......................................................................................................................14

*Johnson v. Board of Regents of the University of Georgia*, 263 F.3d 1234 (11th Cir. 2001) ..................................................................................................................................14

*Marseilles Capital, LLC v. Geneva Financial Group, Ltd.*, 784 F. Supp. 2d 1349 (S.D. Fla. 2011) ............................................................................................................................7

*Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*, 545 U.S. 913 (2005) ..........4, 15, 16, 17, 19

*Metro-Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd.*, 454 F. Supp. 2d 966 (C.D. Cal. 2006) ...................................................................................................................4, 6, 16, 17

*Morris v. Haren*, 52 F.3d 947 (11th Cir. 1995) ..........................................................................11

*Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146 (9th Cir. 2007) ....................................15, 19

*Perfect 10, Inc. v. Amazon.com, Inc.*, No. CV 05-4753 AHM, 2009 WL 1334364 (C.D. Cal. May 12, 2009) ......................................................................................................11

*Perfect 10, Inc. v. CCBill LLC*, 488 F.3d 1102 (9th Cir. 2007)...............................................10

*Perfect 10, Inc. v. Cybernet Ventures, Inc.*, 213 F. Supp. 2d 1146 (C.D. Cal. 2002)...............9, 10

*Piamba Cortes v. American Airlines, Inc.*, 177 F.3d 1272 (11th Cir. 1999) ................................17

*Qantum Communications Corp. v. Star Broadcasting, Inc.*, 473 F. Supp. 2d 1249 (S.D. Fla. 2007), *subsequent determination*, 491 F. Supp. 2d 1123 (S.D. Fla. 2007), *aff'd*, 290 F. App'x 324 (11th Cir. 2008)..........................................................................................8

*Range Road Music, Inc. v. East Coast Foods, Inc.*, 2012 U.S. App. LEXIS 3173 (9th Cir. Feb. 16, 2012) ...................................................................................................................14

*Religious Technology Center v. Netcom On-Line Communication Services, Inc.*, 907 F. Supp. 1361 (N.D. Cal. 1995) ..........................................................................................17, 20

*Sony Corp. of America v. Universal City Studios, Inc.*, 464 U.S. 417 (1984) ........................18, 19

*UMG Recordings, Inc. v. Shelter Capital Partners LLC*, 667 F.3d 1022 (9th Cir. 2011)……........................................................................................................... 11, 13, 15-16

*United States v. Koreh*, 59 F.3d 431 (3d Cir. 1995) ...................................................................8

*Viacom International Inc. v. YouTube, Inc.*, 718 F. Supp. 2d 514 (S.D.N.Y. 2010) ....................11

*Warner Brothers-Seven Arts, Inc. v. Kalantzakis*, 326 F. Supp. 80 (S.D. Tex. 1971)..................20

*Wolk v. Kodak Imaging Network, Inc.*, 10 Civ. 4135, -- F. Supp. 2d --, 2012 WL 11270
    (S.D.N.Y. Jan. 3, 2012) ...................................................................................................11, 17

**STATUTES**

17 U.S.C. § 512(i)(1)(A) .............................................................................................................9

17 U.S.C. § 512(c)(1)(A) ...........................................................................................................11

17 U.S.C. § 512(i)(1)(C) ............................................................................................................11

17 U.S.C. § 1201(a)(2) ................................................................................................................5

**LEGISLATIVE MATERIALS**

H.R. Rep. No. 105-551(I) (1998) ..............................................................................................18

S. Rep. No. 105-190 (1998) .......................................................................................................12

# CITATION LEGEND

1.      "Boyle Decl." shall refer to the declaration of Professor James Boyle in Support of Defendants' Opposition to Plaintiffs' Motion for Summary Judgment, dated March 6, 2012, and filed under seal on March 7, 2012.

2.      "Cromarty Decl." shall refer to the declaration of Dr. Andrew Cromarty in Support of Defendants' Motion for Summary Judgment, dated March 5, 2012 and filed under seal on March 7, 2012.

3.      "Defs. Opp. to Warner MSJ" shall refer to Memorandum of Law of Defendants/Counterclaimant Hotfile Corporation in Opposition to the Motion for Summary Judgment on Hotfile's Counterclaim Filed by Plaintiff/Counter-defendant Warner Bros. Entertainment Inc., dated February 27, 2012, available publicly at Docket No. 350-1.

4.      "DRSF" shall refer to specific paragraph numbers of Statement of Facts of Defendants Hotfile Corporation and Anton Titov in Opposition to Plaintiffs' Statement of Uncontroverted facts, dated and filed under seal on March 7, 2012.

5.      "Foster Decl." shall refer to the declaration of Dr. Ian Foster, dated and filed February 17, 2012, in support of Plaintiffs' Motion for Summary Judgment Against Defendants Hotfile Corp. and Anton Titov, available publicly at Docket No. 325-17.

6.      "Foster Reply Decl." shall refer to the Reply Declaration of Dr. Ian Foster, dated March 19, 2012, filed herewith.

7.      "Levy Decl." shall refer to the Declaration of Dr. Daniel S. Levy in Opposition to Plaintiffs' Motion for Summary Judgment, dated March 6, 2012, ad filed under seal on March 7, 2012.

8.      "Opp." shall refer to the Memorandum of Law of Defendants Hotfile Corporation and Anton Titov in Opposition to Plaintiffs' Motion for Summary Judgment, dated and filed under seal on March 7, 2012.

9.      "Opp. SUF" shall refer to specific paragraph numbers of uncontroverted facts in Plaintiffs' Counterstatement of Material Facts in Opposition to Hotfile's Motion for Partial Summary Judgment Based on the Digital Millennium Copyright Act Safe Harbor.

10.      "Pls. Mot." shall refer to Plaintiffs' Motion for Summary Judgment Against Defendants Hotfile Corp. and Anton Titov, dated February 17, 2012, available publicly at Docket No. 322.

11.     "Pls. Mot. to Strike" shall refer to Plaintiffs' Motion and Memorandum of Law to Strike Portions of Declarations of Professor James Boyle, Dr. Andrew Cromarty, and Anton Titov in Support of Defendants' Opposition to Plaintiffs' Motion for Summary Judgment, dated and filed under seal on March 19, 2012.

12.     "Pls. Opp." shall refer to Plaintiffs' Memorandum of Law in Opposition to Defendant Hotfile Corporation's Motion for Partial Summary Judgment Based on the Digital Millennium Copyright Act Safe Harbor, dated and filed under seal on March 7, 2012.

13.     "Pls. Opp. to Titov MSJ" shall refer to Plaintiffs' Memorandum of Law in Opposition to Defendant Anton Titov's Motion for Summary Judgment, dated and filed under seal on March 7, 2012.

14.     "Pls. Opp. SUF" " shall refer to specific paragraph numbers of uncontroverted facts in Plaintiffs' Counterstatement of Material Facts in Opposition to Hotfile's Motion for Partial Summary Judgment Based on the Digital Millennium Copyright Act Safe Harbor, dated and filed under seal on March 7, 2012.

15.     "PSUF" shall refer to specific paragraph numbers of uncontroverted facts in Plaintiffs' Statement of Uncontroverted Facts submitted in support of Plaintiffs' Motion for Summary Judgment Against Defendants Hotfile Corp. and Anton Titov, dated February 17, 2012, available publicly at Docket No. 323.

16.     "Titov Opp. Decl." shall refer to the Declaration of Anton Titov in Support of Defendants' Opposition to Plaintiffs' Motion for Summary Judgment, dated and filed under seal on March 7, 2012.

17.     "Waterman Decl." shall refer to the declaration of Dr. Richard Waterman in support of Plaintiffs' Motion for Summary Judgment Against Defendants Hotfile Corp. and Anton Titov, dated February 16, 2012, available publicly at Docket No. 325-6.

18.     "Waterman Reply Decl." shall refer to the Reply Declaration of Dr. Richard Waterman, dated March 19, 2012, filed herewith.

19.     "Yeh Ex. __," shall refer to exhibits attached to the Declaration of Jennifer V. Yeh in Support of Plaintiffs' Motion for Summary Judgment Against Defendants Hotfile Corp. and Anton Titov, dated February 16, 2012, available publicly at Docket No. 324-1, the Declaration of Jennifer V. Yeh in Support of Plaintiffs' Opposition to Defendant Anton Titov's Motion for Summary Judgment and Defendant Hotfile Corp.'s Motion for Summary Judgment,

dated and filed under seal on March 7, 2012, as well as the Reply Declaration of Jennifer V. Yeh in Support of Plaintiffs' Motion for Summary Judgment, filed herewith. For the convenience of the Court, the exhibits attached to the Yeh Declarations have been consecutively numbered, with Exhibits attached to the Yeh Declaration filed today continuing from the numbering in the previous set of exhibits. Where appropriate, citations to such exhibits may also include pinpoint citations to the page number(s), and paragraph or line numbers, internal to the cited document. In some instances where individual Yeh Declaration exhibits were not paginated, page numbers have been added manually for ease of the Court's reference. The parentheticals indicate the nature of the item cited – *e.g.*, deposition transcripts ("dep.") – or documents produced in discovery by various parties. Thus, by way of illustration, "Yeh Ex. 1 (Titov dep.) at 200:1-10" would refer to the deposition of defendant Anton Titov, which could be found in Exhibit 1 to the Yeh Declaration, at page 200 of the transcript pages, at lines 1 through 10. And, "Yeh Ex. 110 at 2" would refer to Exhibit 110 to the Yeh Declaration, and specifically the page of that Exhibit found at page 2 of the numbered Exhibit pages.

Defendants can neither controvert nor explain away the key facts: (i) Hotfile paid so-called "Affiliates" to upload "popular" content and to promote links to those files all over the Internet; (ii) knowing that those Affiliates were critical to Hotfile's business, defendants did not terminate even the most blatant repeat infringers; (iii) predictably, as a result, the files downloaded from Hotfile were overwhelmingly infringing; (iv) Hotfile's entire business model was driven by selling "premium" accounts so users could download infringing content faster and easier; and (v) because of that, defendants refused even to consider using available copyright filters to mitigate infringement on Hotfile. From these facts – corroborated by other irrefutable evidence – Hotfile's object to foster and profit from infringement is unmistakable.

Instead of addressing these facts, defendants seek to paint a picture that is divorced from reality and ignores the evidence. Defendants argue that Hotfile is really in the storage business, not the distribution business (contrary to undisputed evidence); they attack expert analysis that 90% of downloads from Hotfile were infringing (without offering any contrary data of their own); they assert that the most popular files on Hotfile were legal (which is both immaterial and wrong); and they argue that they had no incentive to promote infringing content in order to sell premium subscriptions (based on a single statistic that shows just the opposite). Defendants' story cannot withstand scrutiny. Ultimately, defendants' opposition rests on mischaracterizations of evidence and assertions not supported by the evidence defendants cite.

The material facts are not controverted. Thus, at the outset, plaintiffs directly address why defendants' key contentions do not create a triable issue of fact.

## I.     THE MATERIAL FACTS ARE NOT IN DISPUTE.

### A.     "Personal Storage" Was Not a Material Part of Hotfile's Business.

Much of defendants' opposition rests on the assertion that "Hotfile.com is used principally for storage." Opp. at 1; *see also id.* at 4 n.2 ("users primarily employ Hotfile for storage"), 7-8, 28. But defendants' sole evidence – that 56% of files uploaded to Hotfile have not been downloaded, DRSF 16.a.ix, 24 – does not support Hotfile's contention.

First, a full 88% of all registered Hotfile users have *never* uploaded a single file – they use Hotfile *only to download files*. Foster Reply Decl. ¶ 9. Further, Hotfile affirmatively deletes files of non-premium users if they are not downloaded with sufficient frequency, *i.e.*, if they are simply stored. Pls. Mot. at 8. Thus, as Hotfile acknowledges, the only users who can use Hotfile for "storage" are premium subscribers. Opp. at 2, 4. But, only 3% of Hotfile users are premium

subscribers, and less than 10% of premium subscribers have ever uploaded even a single file to Hotfile; the rest use Hotfile *only to download*. Foster Decl. ¶ 39; Foster Reply Decl. ¶ 9; *see also* DRSF 31. Based on Hotfile's own numbers, less than 0.3% of Hotfile's users (10% of the 3% premium users) *even potentially* use Hotfile for storage. Thus, Hotfile is used almost exclusively for downloading files – the overwhelming percentage of which are infringing. *See infra* 3-5.

Second, that a file has not been downloaded (a "zero-download file") does *not* mean it was uploaded for "storage." *See* Reply Br. App. A (illustrating point). Hotfile deleted over 60% of its zero-download files for "inactivity," because they were not downloaded. Foster Reply Decl. ¶ 11. That is the antithesis of using Hotfile for storage. Another 34% were deleted because the files were identified as infringing or the uploader was terminated as a repeat infringer. *Id.* Less than 5% of zero-download files are actually still active on Hotfile, *i.e.*, are even *potentially* in personal storage. *Id.*[1] Defendants' assertion that Hotfile is used principally for storage is refuted by this undisputed evidence.

Defendants present no other evidence on the subject. Titov merely *assumes* (without evidence) that zero-download files were uploaded for personal storage. *See* Titov Opp. Decl. ¶ 4; *Harrell v. Eller Mar. Co.*, Case No. 8109-CV-1400-T-27 AEP, 2010 U.S. Dist. LEXIS 104826, at *13-14 (M.D. Fla. Sept. 30, 2010) (conclusory "characterization" of undisputed fact does not raise a triable issue). And defendants' experts specifically testified that they had not studied or formed conclusions as to potential uses of Hotfile for "storage." Yeh Ex. 151 (Boyle dep.) 278:2-15, 279:8-11 ("I would certainly repeat and stress that no, I do not know what number of these 57 million uploads with no registered downloads are actually examples of storage"); Yeh Ex. 152 (Levy dep.) at 177:19-78:1, 179:24-81:14 (similar). Even in their summary judgment testimony, these experts only offered speculation. Levy Decl. ¶ 37 ( "it *seems* that the storage function *could be* a significant aspect of how Hotfile is used") (emphasis added).

Hotfile's contemporaneous statements – encouraging users to broadly *distribute* files and *discouraging* them from using Hotfile for just "storage" – corroborate that downloading was

---

[1] The active zero-download files, which constitute only 2.8% of all Hotfile files, likewise do not appear to have been uploaded for storage. More than 11% were uploaded by non-premium users (who cannot use Hotfile for storage), and over two-thirds were uploaded by users whose files were subject to copyright infringement notices, meaning links to those files were publicly posted *for download*. Foster Reply Decl. ¶ 12; Cromarty Decl. ¶¶ 102-03.

2

Hotfile's actual and intended use. *See* Pls. Mot. at 8.  Defendants told users to "[p]ut more effort into bringing more visitors to download your files" and to "[u]pload files only if you inten[d] to promote them." PSUF 16(a)(iii), (v).  Hotfile's Affiliate program was designed "to encourage good *promoters* by increasing their earnings and to *reduce* the earnings for uploaders that mainly use the free hotfile resources for personal storage." Yeh Ex. 155 at 1 (emphasis added); *see* PSUF 16(a)(v); Pls. Mot. at 8.  Even Hotfile's "welcome" email to new premium users says nothing about storage – it tells them "you can now download data easily and without waiting." Yeh Ex. 97; *see also* PSUF 16(e)(ii).

**B.  Hotfile Was Used Overwhelmingly for Infringement.**

The *only* evidence in the record that quantifies the full extent of infringement through Hotfile is the statistical analysis of Dr. Richard Waterman.  His unrebutted analysis shows that over 90% of the downloads from Hotfile were infringing.  PSUF 10(a).

None of defendants' experts provide any contrary evidence whatsoever to dispute Dr. Waterman's analysis, though defendants had access to the very same data.  Yeh Ex. 152 (Levy dep.) at 24:14-15 ("I don't have an opinion as to the percent of files that were infringing"); *id.* at 26:14-25 (cannot say that infringement level was higher or lower than 90%); *id.* at 22:24-23:4; 24:9-25:8; 121:25-23:13; 167:22-68:6 (same); Yeh Ex. 151 (Boyle dep.) at 43:1-9.[2]

With no answer to Dr. Waterman's study, defendants instead raise theoretical challenges to his methodology:  First, defendants argue that because Dr. Waterman sampled from January 2011 (the month before the complaint was filed), the results somehow have no bearing on the level of infringement in earlier periods.  Opp. at 7.  Dr. Waterman conducted his study using January 2011 because Hotfile preserved far fewer of the actual content files for earlier time periods.  Waterman Decl. ¶ 11.  Defendants cannot contend, and present *no* evidence, that January 2011 was aberrational.  Further, Dr. Waterman subsequently analyzed extensive data from Hotfile's inception to January 2011, and concluded that, if anything, the January 2011 data *underestimated* infringement on Hotfile.  Waterman Decl. ¶¶ 26, 27, 32.

---

2 Defendants also do not controvert plaintiffs' many *other* data analyses showing overwhelming infringement on Hotfile.  Defendants complain that one statistic (that Hotfile has been forced to delete over 70% of all files ever downloaded) includes *all* files of terminated "repeat infringers," not just files for which Hotfile received infringement notices.  Opp. at 8.  But the point of the analysis was to show that Hotfile's business was driven by infringement *and* infringers.  The figure is undisputed, and plainly incompatible with any notion of a legitimate enterprise.

Most comparable statistical analyses that have been accepted by federal courts (including the Supreme Court) measured infringement from a point in time. None of those studies were able to review infringement data over the lifetime of a service. *See, e.g., Metro-Goldwyn-Mayer Studios, Inc. v. Grokster Ltd.*, 454 F. Supp. 2d 966, 985 (C.D. Cal. 2006); *Arista Records LLC v. Lime Group LLC*, 784 F. Supp. 2d 398, 412 (S.D.N.Y. 2011) ("*Limewire*"); *Arista Records LLC v. Usenet.com, Inc.*, 633 F. Supp. 2d 124, 143-45 (S.D.N.Y. 2009); *Columbia Pictures Indus., Inc. v. Fung*, No. Civ. 06-5578 SVW (JCx), 2009 WL 6355911, at *4, 8 (C.D. Cal. Dec. 21, 2009); *see also* Waterman Decl. ¶ 29 (making same point).

Second, defendants complain that Dr. Waterman focused on downloaded files rather than all files available on Hotfile. Opp. at 7. But plaintiffs' claims are based on the mass distribution of infringing content from Hotfile. *Usenet.com*, 633 F. Supp. 2d at 144-145 (statistical analysis limited to music newsgroups appropriate because plaintiffs' claims about music). Moreover, as the Supreme Court observed in *Grokster*, evidence about actual downloads (not file availability) is the best evidence of a site's uses. *Metro-Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd.*, 545 U.S. 913, 923 (2005); *see also supra* 2 (zero-download files not in "personal storage").

Third, defendants criticize Dr. Waterman for using the download counts recorded in the database Hotfile uses to count downloads for its Affiliate payments. Opp. at 7. As Dr. Waterman explained, however, this table allowed him to analyze the very downloads that Hotfile *directly incentivized* by its Affiliate program. Waterman Decl. ¶ 10. Moreover, defendants do not argue that using a different data set would suggest a different level of infringement – and it would not. Waterman Decl. ¶¶ 31-32.[3]

Defendants' unsupported criticism of Dr. Waterman's results does not create a question of material fact.[4] Courts have rejected parties' similar attempts to criticize such analyses without actually presenting controverting evidence. *See, e.g., Indianapolis Colts, Inc. v. Metro*.

---

[3] Titov in fact testified that the relatively few downloads not counted in Dr. Waterman's sample (some downloads from non-Affiliate countries) were unlikely to have different infringement levels than those counted in Dr. Waterman's study. Yeh Ex. 152 (Titov dep.) at 664:23-65:4; Waterman Decl. ¶ 31. Dr. Waterman confirmed that fact statistically. *Id.* ¶ 32.

[4] Contrary to defendants' assertions, Dr. Waterman did not testify that the level of infringement in the pre-January 2011 period "could be zero." *See* Opp. at 7. In the testimony defendants cite, Dr. Waterman disclaimed knowledge of infringement levels *after* February 2011 because Hotfile had changed its practices. Leibnitz Ex. 37 (Waterman dep.) at 85:12-87:11.

*Baltimore Football Club Ltd. P'ship*, 34 F.3d 410, 415-16 (7th Cir. 1994); *A&M Records, Inc. v. Napster, Inc.*, 2000 U.S. Dist. LEXIS 20668, at *11-12, *aff'd in part rev'd in part*, 239 F.3d 1004 (9th Cir. 2001).[5]

Ultimately, the fact that is material – that Hotfile was used overwhelmingly for infringement – is irrefutable. As one court explained, "the precise percentage of infringement is irrelevant: the evidence clearly shows that Defendants' users infringed on a significant scale. It simply does not matter whether 75% (to pick a number) of available materials were copyrighted or 95% of available materials were copyrighted." *Fung*, 2009 WL 6355911, at *4.

C.      **The Most Popular Content on Hotfile is Illicit.**

Defendants claim that the most downloaded files on Hotfile are two open source software files, iREB and sn0wbreeze. DRSF 28; Boyle Ex. 1 ¶¶ 17-18. While perhaps not infringing, iREB and sn0wbreeze are *illegal to distribute*. Both allow users to hack iPhones in order to install unauthorized software. Boyle Ex. 1 ¶ 21. Distribution of such programs is illegal under the DMCA's anti-circumvention provisions, which prohibit "traffic[king] in any technology ... primarily designed or produced for the purpose of circumventing a technological measure that effectively controls access to a work protected under this title." 17 U.S.C. § 1201(a)(2).[6]

It is also unremarkable that the most downloaded *files* over the lifetime of Hotfile are not major copyrighted works, as major copyright owners engage in a never-ending cycle of identifying infringing files and taking them down, only to see the same *titles* (a particular movie or TV show) uploaded again in the form of new files. Files containing an infringing copy of a movie can be uploaded and taken down repeatedly in a matter of days. A file that is not subject

---

[5] Defendants' claim that Vobile is today identifying only 3.4% of video files as infringing, *e.g.*, Opp. at 7, is not relevant to the level of infringement on Hotfile. First, Hotfile's *untested* implementation of Vobile *postdates* the changes defendants made after the complaint. *See* Pls. Opp. at 5. Second, Vobile recognizes only video content for which copyright owners have registered a fingerprint with Vobile, which many have not done. Vobile is *not* a tool for quantifying infringement levels and none of defendants' experts suggest otherwise.

[6] Defendants argue that iREB and sn0wbreeze are legal because a Librarian of Congress rulemaking exempted so-called "jailbreaking." Boyle Ex. 1 ¶ 21; *see also* Opp. at 6-7. Defendants misread the law. The ruling exempted only an individual's *act* of "jailbreaking," it made clear that *trafficking* in (or distributing) "jailbreaking" software is not exempt; it is illegal. 73 Fed. Reg. 58,073, 58,074 (2008); 76 Fed. Reg. 60,398, 60,399 (2011). Indeed, the "Librarian of Congress has no authority to limit either of the anti-trafficking provisions contained in subsections 1201(a)(2) or 1201(b)." 73 Fed. Reg. at 58,074.

to constant takedown notices (*e.g.*, iREB and sn0wbreeze) may remain on Hotfile's service for years, constantly accumulating downloads. There is thus a "longevity bias" in favor of files not subject to constant takedown. Correcting for the longevity bias, by looking at *titles* rather than individual files, shows that plaintiffs' titles constitute a majority of Hotfile's "top 100" downloads. Foster Reply Decl. ¶¶ 13-14 & Ex. A (*e.g.*, over 1.8 million downloads of files containing *Avatar*, over a million for *2012*, over 725,000 for *Inception*, over 2 million for *Lost* episodes). Those are the download figures *despite* plaintiffs' enforcement efforts – and they do not consider other types of copyrighted content, such as music, video games and software.

Defendants' "popularity" argument cannot rebut plaintiffs' statistical analyses. Dr. Waterman examined the percentage of *all* daily downloads that were infringing (iREB and sn0wbreeze were included in the sample and accounted for in the calculations). Yet Dr. Waterman found that *overall* 90% of the daily downloads were infringing. Cherry-picking two files does not change that conclusion. *See Grokster*, 454 F. Supp. 2d at 985 (evidence of some public domain content does not controvert statistical analysis on overall infringing uses of site).

**D.  Defendants' Premium Conversion "Rate" Statistic Does Not Prove Anything.**

In the face of overwhelming evidence that defendants overtly solicited uploads of infringing content, Pls. Mot. at 5-8, defendants argue that it would have been "counterproductive for Hotfile to support infringement." Opp. at 4. They rely on a single statistic: that users allegedly buy premium subscriptions at higher rates when downloading noninfringing files than when downloading infringing files. *Id.*; Boyle Ex. 2 ¶ 53. In fact, defendants' conclusion does not follow from their statistic, and their statistic is miscalculated in any event.

First, when 90% of downloads are infringing, looking at the "rate" of conversions from noninfringing files is meaningless. Because the number of downloads of infringing files dwarfs the number of downloads of noninfringing files, the *actual number* of premium accounts sold in connection with infringing downloads dwarfs the number sold in connection with noninfringing downloads. *See* Boyle Ex. 2 ¶ 53; Waterman Reply Decl. ¶¶ 9. Indeed, sales of premium accounts in connection with infringing downloads made up a massive part of Hotfile's business. Hotfile had a powerful economic incentive to promote copyright infringement.

Second, the purported "conversion rate" statistic is flawed and *does not* predict the conversion rate of individual files on Hotfile. Waterman Reply Decl. ¶¶ 4-8. Notably, the "conversion rate" analysis was conducted not by defendants' statistician, but by Prof. Boyle, a

6

law professor who repeatedly disclaimed any statistical training or experience and who is not qualified to draw statistical conclusions. Yeh Ex. 151 (Boyle dep.) at 13:5-21. Here, Prof. Boyle did not appreciate the importance of determining the "margin of error" on his calculated conversion rates. For noninfringing files, that margin of error is over *50%* (in contrast, the margin of error for Dr. Waterman's analysis was 1.3%). Waterman Reply Decl. ¶ 8. As a result, defendants' "conversion rate" has no statistical significance. *Id.* ¶¶ 6, 8.

### E.   Defendants Do Not Controvert Plaintiffs' Evidence.

Defendants do not dispute that their Affiliate program incentivized the upload of "popular" files, PSUF 16(a)(i)-(viii); that they failed to terminate repeat infringers who had tens and even hundreds of infringement "strikes," PSUF 5(a); that users' communications with them routinely identified specific infringing files, PSUF 9(b)-(c); that they internally discussed the copyright infringement all around them as if it was business as usual, PSUF 10(f); and that they did not even consider available filtering tools to mitigate infringement, PSUF 16(j). Defendants' discussion of other evidence does nothing to controvert that evidence:[7]

- Unable to refute that they were forced to terminate almost all (89%) of their top 500 Affiliates, and tens of thousands of uploaders, once Hotfile belatedly implemented a three-strike termination policy, defendants claim that this was a small percentage of all *uploaders*. Opp. at 8. But the users terminated for copyright infringement were responsible for uploading almost half the files ever uploaded to Hotfile (and more than 70% of those downloaded) . PSUF 10(vi)-(vii); Foster Decl. ¶ 52.

- Defendants now claim that half of their contractor-employee's infringing files, produced pursuant to a request for their downloads, were "never downloaded." Titov Opp. Decl. ¶ 52. However, the cited log data confirms that most of the content files had completed or nearly completed downloading. Titov Opp. Decl. Ex. A. In any event, what matters is that Hotfile personnel *knew* the files were infringing and did not remove them. Foster Reply Decl. ¶ 15 & Ex. B.

- Defendants assert that they "never helped users infringe," Opp. at 8-9, but the claim is

---

[7] In their response to plaintiffs' SUF, defendants repeatedly state that facts are "disputed" without actually controverting them, instead arguing their relevance. *See, e.g.*, DRSF 6, 7, 9(b),11(c), 20(b). That does not create a factual dispute. *See, e.g., Marseilles Capital, LLC v. Geneva Fin. Group, Ltd.*, 784 F. Supp. 2d 1349, 1352-53 (S.D. Fla. 2011) (fact undisputed where non-moving party's affidavit and testimony failed to specifically rebut evidence).

disproved by unrebutted contemporaneous emails showing Hotfile doing exactly that. Yeh Ex. 28. All such emails are, on their face, individually tailored responses to users asking for help downloading obviously copyrighted works such as *Chuck* and *Despicable Me*. *Id.*

- Defendants claim that "concern" motivated their admission that Hotfile would be viewed as a "flagship" of pirated content. Opp. at 9. Yet, at the time, they spoke of Rapidshare's termination of its rewards program as a "gift." Yeh Ex. 53. Regardless, the document shows that defendants *knew* that Hotfile was a hotbed of infringement, and still did nothing.

- In response to evidence that they did nothing when a Hotfile user told them that Rapidshare had blocked her Hotfile files as illegal, defendants offer implausible speculation. Titov hypothesizes that the files must have been empty because the chances of two files having the same hash are low. *See* Opp. at 8; Titov Opp. Decl. ¶ 54; Pls. Mot. to Strike at 10. That is nonsensical. When two files have the same hash they are *digitally identical*. Foster Decl. ¶ 28(b)(i) & n.4. Thus, when defendants learned that Rapidshare had rejected the files because they matched hashes of infringing files, defendants knew conclusively that their user's files were infringing. Pls. Mot. at 16.

- Defendants assert that a link they used in their tutorial "is not, and never has been" a link to the Pussycat Dolls' copyrighted album *Doll Domination*. Opp. at 9. That "denial" is apparently based on a typo – the link in the tutorial has an *extra slash*. *Compare* Yeh Ex. 44 *with* Yeh Ex. 154. Defendants' response also misses the point: using an obviously infringing work in a public tutorial, in addition to revealing defendants' knowledge, sends a clear message to would-be infringers that infringement is welcome at Hotfile. *See Grokster*, 545 U.S. at 926 ("promotional materials developed showing copyrighted songs" designed "to attract users of a mind to infringe"); *Usenet.com*, 633 F. Supp. 2d at 153.

These kinds of *post hoc* assertions, which are just spin or mischaracterizations of the evidence, do not create factual disputes. *See United States v. Koreh*, 59 F.3d 431, 433 n.1 (3d Cir. 1995) ("a defendant's attempt to characterize undisputed facts or to put another spin on them does not constitute a genuine issue of material fact"); *Qantum Commc'ns Corp. v. Star Broad., Inc.*, 473 F. Supp. 2d 1249, 1260-61 (S.D. Fla. 2007) (no genuine issue of material fact where defendants merely "attempt to re-characterize the undisputed facts"), *aff'd*, 290 F. App'x 324 (11th Cir. 2008); *Usenet.com*, 633 F. Supp. 2d at 154 (testimony denying wrongful intent does not controvert undisputed facts showing intent).

II.    **HOTFILE IS INELIGIBLE FOR DMCA SAFE HARBOR.**

A.    **The Facts Demonstrating Hotfile's Failure To "Reasonably Implement" a "Repeat Infringer" Policy Are Uncontroverted.**

Defendants do not and cannot dispute (i) that they made no effort to track identified infringing users prior to this lawsuit, Pls. Mot. at 19-22; Opp. at 11; (ii) that they terminated specific users only when they were sued or threatened with litigation (33 of 43 total pre-complaint terminations were a direct result of a TRO obtained by Liberty Media), Pls. Mot. at 11; Titov Opp. Decl. ¶ 35; or (iii) that they allowed at least 24,790 Hotfile users to continue to infringe long after they had three "strikes" (some had more than 300 "strikes"), Pls. Mot. at 20-21; Titov Opp. Decl. ¶ 36.[8] Thus, there is no factual issue for a trier of fact to resolve – only the legal issue of whether Hotfile "reasonably implemented" a repeat infringer policy prior to suit.

No court has ever found that a service provider "reasonably implemented" a repeat infringer policy when, like Hotfile, it failed to track infringements by users. 17 U.S.C. § 512(i)(1)(A). Courts have found the opposite – a provider that could but did not track infringement by users is disqualified from safe harbor. Pls. Mot. at 20. This is for good reason. While a service provider can determine which users are repeatedly infringing, a copyright owner is almost never able to track a user's activities – a fact that defendants admit here. PSUF 3. Service providers are thus in a unique position to "prevent their services from becoming safe havens or conduits for known repeat copyright infringers." *Perfect 10, Inc. v. Cybernet Ventures, Inc.*, 213 F. Supp. 2d 1146, 1178 (C.D. Cal. 2002); *see also In re Aimster Copyright Litig.*, 334 F.3d 643, 655 (7th Cir. 2003) (service provider "must do what it can reasonably be asked to do to prevent use of its service by 'repeat infringers'").[9]

Defendants' argument that they can ignore DMCA-compliant notices when implementing a repeat infringer policy, Opp. at 11-12, misstates the law. The only Circuit court to address defendants' argument rejected it and squarely held that service providers must account for DMCA notices for any repeat infringer policy to be reasonably implemented. *Perfect 10, Inc. v.*

_____

[8] Defendants' attempt to bolster the record by speculating that "more terminations were made but undocumented in its early days" is not supported by the evidence. Opp. at 11. Hotfile's data show that, at most, only one "undocumented" pre-complaint user termination was related to copyright infringement. Foster Reply Decl. ¶ 5.

[9] Defendants' suggestion that copyright holders should use subpoenas to try to learn the identities of the uploaders of millions of files one-by-one, Opp. at 12, is facially infeasible.

*CCBill LLC*, 488 F.3d 1102, 1113 (9th Cir. 2007); *see also Cybernet*, 213 F. Supp. 2d at 1176-78. Congress "import[ed] the knowledge standards of § 512(c) [including DMCA notices] to the analysis of whether a service provider reasonably implemented its § 512(i) repeat infringer policy." *CCBill*, 488 F.3d at 1113-14. Thus, all courts upholding policies as reasonable have, in fact, found that infringers were identified, warned, and ultimately terminated based on takedown notices. Pls. Mot. at 21; *see also Arista Records, LLC v. Myxer Inc.*, No. CV 08-3935 GAF (JCx), 2011 U.S. Dist. Lexis 109668, at *69-71 (C.D. Cal. Apr. 1, 2011) (provider not precluded from safe harbor where it "terminate[d] users in response to compliant DMCA notices").[10]

Section 512(i) is a fundamental DMCA protection for copyright owners. It requires a service provider to do more than remove files one-by-one; a service provider must also take action against the repeat infringers who are the "sources" of infringements. *Cybernet*, 213 F. Supp. 2d at 1177-78. Hotfile amply illustrates the need for compliance with § 512(i). Repeat infringers – Hotfile's Affiliates – were the lifeblood of defendants' business. Pls. Mot. at 12. Infringement on Hotfile simply could not have escalated the way it did if defendants had complied with § 512(i). A holding that Hotfile can simply ignore DMCA notices would render § 512(i) effectively useless.

**B.    The Facts Demonstrating Hotfile's Failure To Comply With the DMCA's "Designated Agent" Provisions Are Admitted.**

Defendants admit the facts establishing failure to comply with the DMCA's designated agent provisions. Pls. Mot. at 22-23. They nonetheless argue that the statute should be interpreted to permit "functional" compliance. Opp. at 14. Doing so, however, would disregard the unequivocal statutory text of § 512(c)(2). Pls. Mot. at 23. Not merely a technical requirement, the agent designation provisions ensure that service providers wishing to claim safe harbor under federal law do not operate anonymously and from undisclosed locations (as Hotfile did). The authorities cited by Hotfile do not suggest otherwise – they reference "technical errors" such as "misspelling a name" or "supplying an outdated area code" as failures that would not result in disqualification. Opp. at 14; S. Rep. No. 105-190, at 47 (1998); *Perfect 10, Inc. v. Amazon.com, Inc.*, No. CV 05-4753 AHM (SHx), 2009 WL 1334364, at *8 (C.D. Cal. May 12,

---

[10] Defendants claim that some DMCA notices are inaccurate. Opp. at 11-12. However, the statutory recourse for an inaccurate notice is a counter-notification. A service provider is not free to disregard notices if it wants to claim DMCA protection. *CCBill*, 488 F.3d at 1113-14.

2009). Defendants' "authorities" do not purport to rewrite the explicit statutory requirements. Pls. Mot. at 22-23.[11]

### C.   The Facts Demonstrating Hotfile's Disqualifying Knowledge of Infringement Are Uncontroverted.

There is no factual dispute about defendants' knowledge of infringement on Hotfile. Defendants' rebuttal begins and ends with the untenable legal argument that Hotfile cannot "know when files it hosts are suspected of infringement *other than through notices from content owners*," and therefore its "duty to 'expeditiously' remove or block access to [its] files was triggered *only* when it received valid notifications of claimed infringement from the Studios or their agents." Opp. at 17, 19 n.28 (emphasis added). That is not the law. Section 512(c)(1) requires service providers to remove infringing material in *three* distinct circumstances: (1) when they have "actual knowledge that the material or an activity using the material on the system or network is infringing," 17 U.S.C. § 512(c)(1)(A)(i); (2) when they become "aware of facts or circumstances from which infringing activity is apparent," 17 U.S.C. § 512(c)(1)(A)(ii); *or* (3) when they receive "a notification of claimed infringement," 17 U.S.C. § 512(c)(1)(C). Defendants' argument that they need *only* comply with takedown notices under § 512(c)(1)(C) ignores the other two requirements.

No case remotely supports defendants' position. To do so would read the other two requirements for claiming DMCA immunity out of the statute entirely. *See UMG Recordings, Inc. v. Shelter Capital Partners LLC*, 667 F.3d 1022, 1035-36 (9th Cir. 2011) ("*Veoh*") (analyzing each of the knowledge prongs separately); *see also Morris v. Haren*, 52 F.3d 947, 948-49 (11th Cir. 1995) (rejecting construction that would effectively "read out" language from statute). Though plaintiffs disagree with the Ninth Circuit's decision in *Veoh*, even that case makes clear that a service provider may receive actual or "red flag" knowledge from sources other than takedown notices, including for example "evidence of emails sent to [defendant's] executives and investors by … users identifying infringing content," 667 F.3d at 1040, like the

---

[11] Defendants cannot draw support from *Wolk v. Kodak Imaging Network, Inc.*, 10 Civ. 4135, -- F. Supp. 2d -- , 2012 WL 11270, at *22 (S.D.N.Y. Jan. 3, 2012) or *Viacom International Inc. v. YouTube, Inc.*, 718 F. Supp. 2d 514, 529 (S.D.N.Y. 2010). The agent requirement was *not litigated or decided in either case*. Equally baseless is defendants' argument that plaintiffs stipulated that Hotfile had a compliant DMCA agent. Opp. at 14. One plaintiff, Warner, stipulated that notices through Hotfile's SRA would count as DMCA notices; the stipulation says nothing about Hotfile's compliance with the registered agent provision. *See* Yeh Ex. 139 at 2.

ones present here. *E.g.*, Yeh Exs. 26-28, 30. The clear statutory text is corroborated by legislative history: "Section 512 *does not require* use of the notice and take-down procedure," as a service provider "must 'take down' or disable access to infringing material residing on its system or network of which it has actual knowledge or that meets the 'red flag' test, *even if the copyright owner or its agent does not notify it of a claimed infringement.*" S. Rep. 105-190, at 45 (emphasis added).

Plaintiffs have demonstrated that Hotfile had actual knowledge of infringement beyond files listed in takedown notices. Pls. Mot. at 24-25. For instance, if one link to a "master copy" of a file was infringing, all links to that file were infringing, and defendants should have taken them all down. Yet they did not – a practice they defend by arguing that the other links might belong to users who might not publicly distribute them. Opp. at 15-16. But that does not help defendants, because they made no attempt to restrict downloading only to the uploading user. Pls. Mot. at 14. Defendants likewise cannot controvert that, when they received user emails showing that the "last downloaded link" accessed by a user was for an obviously infringing file, defendants acquired reliable knowledge of infringement. Opp. at 16. There is simply no credible argument that a download link such as "http://hotfile.com/dl/57213642/ 696a3d5/**Harry_Potter_and_the_Deathly_Hallows_Part_I_(2010)_DVDRip**.part1.rar.html" does not impart actual, or at least red flag, knowledge. Yeh Ex. 27 at 5 (emphasis added); *see A&M Records, Inc. v. Napster, Inc.*, 239 F.3d 1004, 1024 (9th Cir. 2001).

Defendants likewise do not dispute that other "facts and circumstances" made them subjectively aware of infringing activity (and of specific infringing files) that defendants nevertheless failed to remove. Pls. Mot. at 25-26; *e.g.*, PSUF 10(c) (user communications identifying infringing content downloaded by user); 10(e) (infringing files used to demonstrate site features); 10(f)(iii) (email acknowledging copyrighted television shows). Indeed, defendants cannot deny that Hotfile's paid Affiliate websites bore the very same indicia of infringement that Congress used to illustrate quintessential red flag knowledge. Pls. Mot. at 26; PSUF 10(d)(iii). Thus, Hotfile's Affiliate websites were "obviously infringing because they typically use[d] words such as 'pirate,' 'bootleg,' or slang terms in their uniform resource locator (URL) and header information." S. Rep. 105-190, at 48; *see also* PSUF 10(d)(iii); Pls. Mot. at 7-8. This is not the "general knowledge" that concerned the *Veoh* court, 667 F.3d at 1038; even under *Veoh*, this evidence against defendants demonstrates disqualifying knowledge.

12

**D.    Defendants Made Themselves Willfully Blind to Rampant Infringement.**

Plaintiffs presented undisputed evidence that defendants were willfully blind to infringement under *Global-Tech Appliances, Inc. v. SEB S.A.*, 131 S. Ct. 2060, 2070 (2011). Pls. Mot. at 26-27; PSUF 11. Defendants' response – that willful blindness must "relate to a particular file," Opp. at 19 – defies law and logic. One cannot be willfully blind to a "particular file" without having *actual* knowledge of it. Defendants distort the point: if they did not know of specific instances of infringement, it is precisely because they were willfully blind to them. *Global-Tech*, 131 S. Ct. at 2069-70 ("persons who know enough to blind themselves to direct proof of critical facts in effect have actual knowledge of those facts"); *Fung*, 2009 WL 6355911, at *18. Defendants are disqualified from safe harbor by willful blindness.

**E.    As a Matter of Law, *Grokster* Inducers Of Infringement Are Not Entitled to the DMCA Safe Harbor.**

Defendants fail to refute plaintiffs' argument that the DMCA, by its express terms, does not shield intentional inducers of infringement. The Supreme Court in *Grokster* made clear that inducement liability is not imposed "by reason of" distribution of a device or provision of a service, but by "a patently illegal objective." 545 U.S. at 941; Pls. Mot. at 27-29. Defendants do not address that point. Defendants' argument that "the DMCA provides safe harbor from 'contributory' liability," Opp. at 20, is a non sequitur. The DMCA "does not abolish contributory liability" for service providers. *Aimster*, 334 F.3d at 655. The DMCA provides safe harbor for *some* contributory infringers, and does so by replacing the common law "constructive" knowledge standard with a "red flag" knowledge standard for liability. *See* H.R. Rep. No. 105-551 (I) at 25 (1998) ("This ["red flag"] standard differs from existing [common] law, under which a defendant may be liable for contributory infringement if it knows *or should have known* that material was infringing") (emphasis in original). The DMCA does not immunize those who contribute to infringement with actual or red flag knowledge. *A fortiori* those who contribute with the *intent* to foster infringement cannot be eligible for safe harbor. As the *Fung* court correctly held, "[i]nducement and the [DMCA] safe harbors are inherently contradictory." *Fung*, 2009 WL 6355911, at *18.

**F.    Defendants' Estoppel Argument Lacks Any Support.**

Defendants' argument that the plaintiffs' "professed satisfaction with its DMCA compliance" estops them challenging Hotfile's eligibility for safe harbor is frivolous. Opp. at 21. Defendants cite no evidence (because there is none) in which a single plaintiff suggested that

Hotfile complied with any (much less all) of the DMCA's requirements, as opposed to being polite about the takedown of specific content. Pls. Opp. SUF 11.[12] Further, plaintiffs could not know what Hotfile knew or what its repeat infringer policy was. Indeed, one of the emails that defendants cite reflects yet another pre-complaint instance of Hotfile deliberately *misrepresenting* to a vendor that it had a repeat infringer policy when admittedly it did not: "If user's files were reported two times as copyright abuse we delete user account." Leibnitz Ex. 29 at 4. That the vendor expressed appreciation for a fictional "repeat infringer" policy is no basis for estoppel.[13]

## III.   DEFENDANTS ARE LIABLE FOR SECONDARY INFRINGEMENT.

### A.   Plaintiffs Have Shown Direct Infringement.

Defendants object to lay witness identification of plaintiffs' works in suit. Those works, which consist of immediately recognizable content owned by plaintiffs (*e.g.*, a copy of the movie *Avatar*), were properly identified by counsel and those under her supervision, who reviewed the actual files to see what they contained. Identifying plaintiffs' own works requires no specialized knowledge. *See Range Road Music, Inc. v. East Coast Foods, Inc.*, No. 10-55691, 2012 U.S. App. LEXIS 3173, at *8 (9th Cir. Feb. 16, 2012) (court may rely on lay testimony identifying infringing songs which "does not require 'scientific, technical, or other specialized knowledge'") (quoting Fed. R. Evid. 701); *Interplan Architects, Inc. v. C.L. Thomas, Inc.*, No. 4:08-cv-03181, 2010 U.S. Dist. LEXIS 114306, at *49 (S.D. Tex. Oct. 27, 2010).

### B.   The Evidence Showing Inducement Liability is Overwhelming.

The only material distinction between defendants and the operators of the infringing services in *Grokster*, *Limewire*, *Fung*, and *Usenet.com* is that, in addition to targeting an infringing user-base, defendants in this case actually paid those infringers to upload "popular"

---

[12] Defendants cite eight emails, four of which are from third-party vendors not claiming to act on behalf of plaintiffs, and four of which are from *one* plaintiff in which a representative was simply being polite. Pl. Opp. SUF 11; DRSF 34. None discuss "DMCA compliance." *See also* Titov Ex. 10 at 2 (informing Hotfile that "any further unauthorized use of Warner Bros.' copyrighted materials may compel Warner Bros. to pursue more formal channels to protect its rights").

[13] As to defendants' other affirmative defenses, Opp. at 21 n.31, defendants bear the burden of proof on their affirmative defenses and were therefore required to provide evidence creating a factual dispute to defeat summary judgment – and they have not done so. *See Johnson v. Bd. Of Regents of Univ. of Ga.*, 263 F.3d 1234, 1264 (11th Cir. 2001) (burden on defendant to adduce evidence supporting affirmative defense, not party moving for summary judgment to negate it).

content. Otherwise, the inducement evidence in this case parallels that in other cases finding system operators liable on summary judgment. Pls. Mot. at 29-33. Defendants acknowledge that "an actor may be contributorily liable for intentionally encouraging direct infringement if the actor knowingly takes steps that are *substantially certain* to result in such direct infringement." Opp. at 23 (quoting *Perfect 10, Inc. v. Amazon.com*, 508 F.3d 1146, 1169 (9th Cir. 2007) (emphasis in Opp.)). Defendants unquestionably did so.

Defendants try to gloss over the obviously inducing design and effect of Hotfile's Affiliate program by comparing it to "referral" programs of legitimate businesses, that provide rewards for referring customers to them. Opp. at 3. But no legitimate business pays customers to *upload* content to its website only if that content is massively downloaded by other users. That directly induces infringement, as even defendants' expert agrees. Pls. Mot. at 7. If advertising the availability of infringing content is a "classic instance of inducement," *Grokster*, 545 U.S. at 937, then paying others to upload and promote content, knowing full well that most of that content will be infringing, must be dispositive on the issue. Pls. Mot. at 30.

Hotfile's website-Affiliate program is not any better. Defendants' payments to blatantly infringing websites – like "topdvdmovie.net" – for referrals is not comparable to legitimate referral programs. Hotfile's website-Affiliates "refer" users to Hotfile when users click on links to download specific infringing files from Hotfile. Hotfile's website-Affiliate program encourages those sites to host and index Hotfile "download links," so that Hotfile can avoid providing an index of its own. Pls. Mot. at 7. Titov admitted that the purpose of the website-Affiliate program was to encourage "search/catalogue sites." PSUF 16(a)(xii).

Defendants also argue that the "popular" and "interesting" works they admittedly solicited are not *necessarily* infringing. Opp. at 23, 27. But, as courts have observed, defendants "cannot seriously argue that [they] did not know that the popular music and movies traded on [their] network were copyrighted." *Grokster*, 454 F. Supp. 2d at 992. "[I]t is common knowledge that most popular music and movies are copyrighted." *Id.*; *see also Fung*, 2009 WL 6355911, at *11 n. 20 (same). This case is very different from a case like *Veoh* where the service provider had licensing deals with major copyright owners to distribute their content, such that the presence of major entertainment content was arguably not conclusive of infringement. 667 F.3d at 1036. Defendants cannot credibly deny that they were at least "substantially certain" that Hotfile's Affiliate program would result in significant infringement. Pls. Mot. at 5-7, 9-10.

Defendants' conduct demonstrates each of the indicia of inducement identified in *Grokster*. *First*, their Affiliate program targeted, solicited and *paid* "good uploaders" to upload television shows, videos, music and other content that would attract users. Pls. Mot. at 30; *Grokster*, 454 F. Supp. 2d at 983-84 (soliciting user-base of likely infringers shows inducement). *Second*, like the *Grokster* defendants, defendants took no steps to "implement[] a system to filter out copyrighted content," such as digital fingerprinting. 454 F. Supp. 2d at 989. Defendants cite to their alleged adoption of Vobile filtering technology, Opp. at 24-25, but they did that only *after* being sued. Hotfile started operating more than three years after the Supreme Court held that failure to "attempt[] to develop filtering tools or other mechanisms to diminish the infringing activity" supported an inducement finding. *Grokster*, 545 U.S. at 939. Yet defendants admit they did not even consider commercially available filtering technologies.[14] *Third*, as with past infringers, the "commercial sense" of defendants' business is, by admission, "predicated on the availability of popular" content, Defs. Opp. to Warner MSJ at 19, which is overwhelmingly infringing. Pls. Mot. at 5; *see also* Yeh Ex. 7 (Lynde dep.) at 262:3-6 (defendants' economist agrees that "providing access to content attract[s] users to Hotfile's site"); *Limewire*, 784 F. Supp. 2d at 429 (defendant's "sources of revenues depend on LimeWire attracting the massive user population generated by its infringement-enabling features"); *Grokster*, 454 F. Supp. 2d at 988; *Fung*, 2009 WL 6355911, at *15. *See also supra* 7-8 & Pls. Mot. at 29-32 (defendants fail to controvert other inducement evidence).

Finally, defendants cannot distinguish past inducement cases by citing immaterial distinctions about the particular technology used. Inducement is predicated on conduct, not any particular form of technology. *See Fung*, 2009 WL 6355911, at *19 (defendants' claimed different technology "is nothing more than old wine in a new bottle"). If anything, that defendants physically store the infringing content on their own servers affords defendants even greater control over infringement than a P2P service. Courts routinely grant summary judgment where, as here, the evidence of defendants' "unlawful objective is unmistakable." *Grokster*, 545 U.S. at 940; *see also Limewire*, 784 F. Supp. 2d at 431 (granting summary judgment to plaintiffs

---

[14] There is no factual dispute that digital fingerprinting technology was commercially available and utilized on similar sites in early 2009. PSUF 16(j). Defendants' *post hoc* rationalization that it would not have worked on Hotfile is immaterial, as defendants never even considered it. *See Grokster*, 454 F. Supp. 2d at 989-90.

on inducement liability); *Fung*, 2009 WL 6355911, at *15 (same); *Grokster*, 454 F. Supp. 2d at 992 (same); *Usenet.com*, 633 F. Supp. 2d at 153-54 (same).[15]

**C.     There Are No Triable Issues as to Hotfile's Contributory Infringement.**

Hotfile does not dispute the facts that establish that it materially contributed to infringement. *See* Pls. Mot. at 33-34. Instead, Hotfile argues that it lacked "actual knowledge of any specific [infringing] files" and that it is immunized by *Sony*. Opp. at 28, 30-31. On both counts, Hotfile is simply wrong on the law.[16]

Constructive knowledge of infringement – not actual knowledge – is the standard in the Eleventh Circuit, as well as elsewhere. *See Cable/Home Commc'n Corp. v. Network Prods., Inc.*, 902 F.2d 829, 846 (11th Cir. 1990) (standard is whether defendant "had reason to know" of the infringing activity); Pls. Mot. at 33. Contrary to Hotfile's claim that plaintiffs do not cite "any Internet cases," Opp. at 32, the Eleventh Circuit's holding is consistent with those of numerous courts in the Internet piracy context. *See, e.g., Usenet.com*, 633 F. Supp. 2d at 154 ("knowledge of specific infringements is not required to support a finding of contributory infringement"); *Limewire*, 784 F. Supp. 2d at 432 ("actual or constructive knowledge of the infringing activity" is all that is required for contributory infringement).[17]

Defendants argue that *Napster* supports their position, but it does not, and cannot. First, expressly following the Eleventh Circuit's *Cable/Home* decision, *Napster* held that "[c]ontributory liability requires that the secondary infringer 'know *or have reason to know*' of

---

[15] The Supreme Court itself made clear that inducement is appropriate for decision on summary judgment. 545 U.S. at 940. The *Chanel* case cited by defendants is not to the contrary, acknowledging that evidence may "warrant finding intent as a matter of law" such as if "a reasonable jury could certainly not reach a contrary conclusions." *Chanel, Inc. v. Italian Activewear of Fla., Inc.*, 931 F.2d 1472, 1476 & n.6 (11th Cir. 1991); *see also Piamba Cortes v. Am. Airlines, Inc.*, 177 F.3d 1272, 1292 n.14 (11th Cir. 1999) ("there are many instances in the law where the evidence of state of mind is so unequivocal that summary judgment is proper and, indeed, expressly mandated by Rule 56" (quotations and marks omitted)).

[16] It is also wrong on the facts: Plaintiffs *have* shown actual knowledge. *See* Pls. Mot. at 24.

[17] The Internet cases relied upon by Hotfile are in accord. *Wolk*, 2012 WL 11270 at *24 ("knowledge means actual or constructive knowledge") (internal quotation marks omitted); *Dawes-Ordonez v. Realtor Ass'n of Greater Fort Lauderdale, Inc.*, No. 90-345, 2010 WL 1791754 at *3 (S.D. Fla. May 2, 2010) ("knew or had reason to know"). *Religious Tech. Ctr. v. Netcom On-Line Commc'n Servs., Inc.*, 907 F. Supp. 1361, 1366-67 (N.D. Cal. 1995) ("*Netcom*"), stands only for the proposition that a notice from a copyright owner *can* supply knowledge – it does not reject the well-established constructive knowledge standard.

direct infringement." *A&M Records, Inc. v. Napster, Inc.*, 239 F.3d 1004, 1020 (9th Cir. 2001) (quoting *Cable/Home* 902 F.2d at 845 & 846 n. 29) (emphasis added). *Napster* discussed actual specific knowledge as part of an analysis of *Sony* that the Supreme Court subsequently rejected in *Grokster*. 545 U.S. at 933-34. Moreover, in adopting the DMCA, Congress recognized that a defendant who "knows *or should have known* that material was infringing" would be liable for contributory infringement under the common law. H.R. Rep. 105-551 (I) at 25 (emphasis in original). That is why the DMCA incorporates the "red flag" knowledge test, to provide safe harbor for service providers whose only knowledge of infringement is general constructive knowledge. *Id.* If the *common law* standard for contributory infringement required "actual, specific" knowledge, then the DMCA safe harbor would be superfluous because all contributory infringers would have disqualifying knowledge and be automatically ineligible for DMCA safe harbor.

Defendants also misapprehend the *Sony* "staple article of commerce" defense, which is inapplicable regardless of any noninfringing uses of Hotfile. *See* Opp. at 30-32; *Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417, 442 (1984).[18] In *Sony*, the Supreme Court had to either enjoin or allow the product entirely because, as the Court made clear, Sony had no further relationship with the users or the subsequent infringement. *Id.* at 438 ("The only contact between Sony and the users of the Betamax that is disclosed by this record occurred at the moment of sale"). After *Grokster*, in which the Supreme Court clarified *Sony*'s meaning, 545 U.S. at 933-34, courts have declined to apply *Sony* when, as here, the service provider maintains a continuous ongoing relationship with the infringing user during the course of the infringement. Those courts have recognized that the lack of an "ongoing relationship" between Sony and Betamax users was the key driver of the *Sony* decision. Mot. at 34 n.13; *Cartoon Networks LP, LLLP v. CSC Holdings, Inc.*, 536 F.3d 121, 132-33 (2d Cir. 2008); *see also Sony*, 464 U.S. at 437 (observing that contributory infringement "has been applied in a number of lower court copyright cases involving an *ongoing relationship* between the direct infringer and the contributory infringer at the time the infringing conduct occurred") (emphasis added).

---

[18] As a threshold matter, *Sony* is a defense to contributory liability only; the "'staple article of commerce' analysis has no application to . . . liability for vicarious infringement." *Napster*, 239 F.3d at 1022; *see also* 3 Melville B. Nimmer & David Nimmer, *Nimmer on Copyright*, §§ 12.04[A][2] & [A][3][b] (2000) (same).

**D.     There Are No Triable Issues as to Hotfile's Vicarious Liability.**

Hotfile applies the wrong legal standard to both the "financial benefit" and "control" elements of plaintiffs' vicarious liability claim.  There are no material factual disputes.

It is well-established that "[t]he ability to block infringers' access to a particular environment for any reason whatsoever is evidence of the right and ability to supervise." *Napster*, 239 F.3d at 1023.  Hotfile had – and failed to exercise – its ability to suspend infringing users, with predictably disastrous results.  Pls. Mot. at 19-22, 30-31.

Hotfile's control is further established by its ability to "block access to [files] stored on [its] own servers that contain infringing content."  *Usenet.com*, 633 F. Supp. 2d at 157.[19]  Hotfile cannot distinguish itself from *Napster* by arguing that it lacks an index of filenames, Opp. at 33, because Hotfile, unlike Napster, actually stores, maintains and controls the infringing files.  That situates Hotfile identically to the defendant in *Usenet.com*.[20]  Nor can Hotfile meaningfully dispute that it could have but chose not to filter, Pls. Mot. at 16, 32; it merely quibbles that the technology "is not guaranteed to be completely accurate."  DRSF 16.j.i & j.ii; *see also Limewire*, 784 Supp. 2d at 435 (ability to "implementing filtering" is control).  But the law does not require perfection, only that the "reserved right to police . . . be exercised to its fullest extent."  *Napster*, 239 F.3d at 1023; *see also Grokster*, 545 U.S. at 930 ("stop *or limit*" infringement) (emphasis added).  Defendants cite *Myxer*, Opp. at 33, but there the court found a fact question as to Myxer's ability to supervise only because Myxer, unlike Hotfile, *did* use fingerprinting software to limit infringement.  *Myxer*, 2011 U.S. Dist. Lexis 109668, at *141.

Likewise, there can be no real dispute that Hotfile derived a direct financial benefit from infringement.  This element is established where the availability of infringing content acts as a draw attracting users, as it does here.  *See* Pls. Mot. at 34-35; *Fonovisa Inc. v. Cherry Auction, Inc.*, 76 F.3d 259, 263-64 (9th Cir. 1996); *Usenet.com*, 633 F. Supp. 2d at 156-57; *Arista Records Inc. v. Flea World, Inc.*, No. Civ. A. 03-2670 (JBS), 2006 WL 842883 at *12 (D.N.J. Mar. 31, 2006).  Hotfile's claim that its users "predominantly" use the website for storage, *see*

---

[19] *Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146 (9th Cir. 2007), Opp. at 32, is inapposite. *Perfect 10* concerned Google's right and ability "to stop or limit the direct infringement of *third party* websites" – not on its own servers.  508 F.3d at 1173 (emphasis added).

[20] Hotfile's claim is also baseless:  Hotfile lacks a public-facing index, but Hotfile has access to extensive indices and databases identifying files, just like Napster did.  *See* Foster Decl. ¶ 9.

19

Opp. at 34, is beside the point; "[t]here is no requirement that the draw be 'substantial.'" *Ellison v. Robertson*, 357 F.3d 1072, 1078-79 (9th Cir. 2004) (rejecting "quantification requirement"). It is also immaterial that Hotfile – just like the defendant in *Usenet.com, see* 633 F. Supp. 2d at 131 – charges fixed subscription fees. Opp. a 33-34. In *Netcom*, on which Hotfile relies for this point, there was "no evidence" that infringing content attracted users. *Religious Tech. Ctr. v. Netcom On-Line Commc'ns Servs., Inc.*, 907 F. Supp. 1361, 1377 (N.D. Cal. 1995).[21]

## IV.   TITOV IS PERSONALLY LIABLE.

Titov's arguments regarding his personal liability mirror those in his motion for summary judgment. To avoid repetition, Plaintiffs refer the Court to their Opposition to that motion.

Titov's only new argument is that his participation in Hotfile's infringing conduct through two related companies he controls, Lemuria and Hotfile Ltd., is irrelevant because plaintiffs have not "sought to pierce the corporate veil." Opp. at 37-38. That is wrong as a matter of law. Titov cites no legal authority to support his apparent belief that his use of two corporations he admittedly and single-handedly controlled *solely* to advance Hotfile's infringement must be excluded from consideration. To the contrary, personal "liability may be imposed for copyright infringement even if the evidence is not sufficient to pierce the corporate veil." *Bertam Music Co. v. P & C Enters., Inc.*, Case No. 09-CV-2253, 2011 U.S. Dist. LEXIS 71967, at *24 (C.D. Ill. July 5, 2011); *see also Warner Brothers-Seven Arts, Inc. v. Kalantzakis*, 326 F. Supp. 80, 82 (S.D. Tex. 1971) (holding individual defendant liable based on control of related company where "the business operations of these two corporations were totally intermingled" and the individual "took no corrective action" to stop known infringement).

In any event, Titov's participation in and management of Hotfile Corp. suffice for personal liability on their own. Titov not only shared in Hotfile's infringing profits, but personally participated in setting Hotfile's infringement-enabling policies and implementing its pertinent technical features, including as lead developer for the website. *See generally* Pls. Opp. to Titov MSJ at 3-17.

CONCLUSION

Plaintiffs' motion for summary judgment should be granted.

---

[21] *Fonovisa*, not the earlier district court decision in *Netcom*, states the correct rule: *Netcom* had based its vicarious standard on the *Fonovisa* district court, which the Ninth Circuit reversed on this exact point. *See* 907 F. Supp. at 1376-77; 76 F.3d at 263-64.

Dated: March 19, 2012

Respectfully submitted,

By: _Karen L. Stetson_

Karen L. Stetson
GRAY-ROBINSON, P.A.
1221 Brickell Avenue
16th Floor
Miami, Fl 33131
Telephone: (305) 416-6880
Facsimile: (305) 416-6887

MOTION PICTURE ASSOCIATION
  OF AMERICA, INC.
Karen R. Thorland (*Pro Hac Vice*)
15301 Ventura Blvd.
Building E
Sherman Oaks, CA 91403
Phone: (818) 995-6600
Fax: (818) 285-4403

JENNER & BLOCK LLP
Steven B. Fabrizio (*Pro Hac Vice*)
Duane C. Pozza (*Pro Hac Vice*)
Luke C. Platzer (*Pro Hac Vice*)
1099 New York Ave., N.W.
Suite 900
Washington, DC 20001
Facsimile: (202) 639-6066

*Attorneys for Plaintiffs*

21

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 19th Day of March, 2012, I served the following documents on all counsel of record on the attached service list via their email address(es) pursuant to the parties' service agreement:

**Reply Memorandum of Law in Support of Plaintiffs' Motion for Summary Judgment**

By: _Ka L Het_

Karen L. Stetson

**SERVICE LIST**
**Disney Enterprises, Inc., et al. v. Hotfile Corp. et al.**
**CASE NO. 11-CIV-20427-JORDAN**

FARELLA BRAUN + MARTEL LLP
Anthony P. Schoenberg
tschoenberg@fbm.com
Roderick M. Thompson
rthompson@fbm.com
N. Andrew Leibnitz
aleibnitz@fbm.com
Deepak Gupta
dgupta@fbm.com
Janel Thamkul
jthamkul@fbm.com
235 Montgomery Street
San Francisco, CA  94104
Phone:  415-954-4400

*Attorneys for Defendants Hotfile Corp. and
Anton Titov*

BOSTON LAW GROUP, PC
Valentin Gurvits
vgurvits@bostonlawgroup.com
825 Beacon Street, Suite 20
Newton Centre, MA  02459
Phone: 617-928-1804

*Attorneys for Defendants Hotfile Corp. and
Anton Titov*

RASCO KLOCK
Janet T. Munn
jmunn@rascoklock.com
283 Catalonia Ave., Suite 200
Coral Gables, FL  33134
Phone:  305-476-7101
Fax:  305-476-7102

*Attorney for Defendants Hotfile Corp. and
Anton Titov*

# Hotfile Is Not Used For "Personal Storage"



**89%** of registered users use Hotfile only for downloading

**11%** of registered users have ever uploaded anything

## Zero-Download Files



Any suggestion that Zero-Download files represent personal storage is factually baseless:

**94.6%** deleted by Hotfile for "inactivity" or related to copyright infringement



**1.05%** of **Zero-Download files** even potentially reflect personal storage

**.58%** of **all files** even potentially reflect personal storage

*Reply App. A; Yeh Ex.156*