# EXHIBIT 5

1                UNITED STATES DISTRICT COURT

2                SOUTHERN DISTRICT OF FLORIDA

3           CASE NO. 11-20427-WILLIAMS/TURNOFF

4

5    DISNEY ENTERPRISES, INC.,
     TWENTIETH CENTURY FOX FILM
6    CORPORATION; UNIVERSAL CITY
     STUDIOS PRODUCTIONS LLP;
7    COLUMBIA PICTURES INDUSTRIES,
     INC., and WARNER BROS.
8    ENTERTAINMENT, INC.,

9                         Plaintiff,

10   vs.

11   HOTFILE CORP., ANTON TITOV,
     and DOES 1 - 10

12

                         Defendants.
13   _____/

14   AND RELATED CROSS-ACTIONS.
     _____/

15

16

17     VIDEOTAPED DEPOSITION OF ANDREW S. CROMARTY, Ph.D.

18              SAN FRANCISCO, CALIFORNIA

19              FRIDAY, DECEMBER 16, 2011

20

21

22

23   BY:  ANDREA M. IGNACIO HOWARD, CSR, RPR, CCRR, CLR

24   CSR LICENSE NO. 9830

25   JOB NO. 44314

1           FRIDAY, DECEMBER 16, 2011

2                   10:09 a.m.

3

4

5

6    VIDEOTAPED DEPOSITION OF ANDREW S. CROMARTY,

7    Ph.D., taken at Farella Braun + Martel LLP

8    235 Montgomery Street, San Francisco,

9    Pursuant to Notice, before me,

10   ANDREA M. IGNACIO HOWARD, CLR, CCRR, RPR,

11   CSR License No. 9830.

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    A P P E A R A N C E S:

2

3         FOR THE PLAINTIFFS:

4         JENNER & BLOCK

5         By:  LUKE C. PLATZER, Esq.

6         1099 New York Avenue, NW

7         Washington, D.C. 20001

8

9

10

11

12        FOR THE DEFENDANTS:

13        FARELLA BRAUN + MARTEL

14        By:  TONY SCHOENBERG, Esq.

15        235 Montgomery Street

16        San Francisco, California 94104

17

18

19

20        ALSO PRESENT:  Sean McGrath, Videographer

21

22                    ---oOo---

23

24

25

1          (Recess taken.)

2          THE VIDEOGRAPHER:  The time is 4:31 p.m., and

3    we are on the record.

4          MR. PLATZER:  Q.  I'd like to shift gears a

5    little and talk about fingerprinting technology.

6       A    Sure.

7       Q    And having read through your report a couple

8    of times, I want to make sure I understand exactly

9    what your expert opinion here is.

10         You're not actually offering an expert

11   opinion that fingerprinting technology results in

12   frequent false positives; are you?

13         MR. SCHOENBERG:  Objection; vague and

14   ambiguous.

15         MR. PLATZER:  Q.  Do you understand the --

16   the term "false positive" the way I used it?

17      A    I have a very deep understanding of the term

18   false positive, and I assume we're using it the same

19   way.

20      Q    Okay.

21      A    Well, respectfully, the question is not well

22   posed.

23         But if we appeal to the common understanding

24   of false positives and these sorts of matching

25   techniques, there is often a tradeoff between false

1    negatives and false positives.

2         So the question is not in a vacuum, does a

3    technique have a false positive rate, although that

4    may be a characteristic of an individual technique, as

5    is noted in the MovieLabs analyses, but what is the

6    rate of false positives and false negatives jointly

7    for some setting?

8         And then, I believe, as they themselves note,

9    that is, MovieLabs, there can be differences in the

10   combined false negative and positive rate across

11   techniques, and that there are business reasons why

12   one might choose a false positive rate.

13        So now, your question is about whether I'm

14   opining that they inherently have a high false

15   positive rate.

16        So the first part of my answer is that a

17   reason the question inherently is not well posed is

18   that it is one of many interacting characteristics of

19   the technique in application, and second, that there

20   are business decisions that go into a selected false

21   positive rate.

22        So the -- in that regard, the answer is no, I

23   am not offering the opinion that you stated -- as you

24   stated it.  I'm offering more complex opinions that

25   reflect the actual nature of false positives and the

1  other business factors and other technical factors.

2      Q   Well, since it's a vendor that you opine

3  about in your report, let's talk about Vobile

4  specifically.

5      A   Okay.

6      Q   Are you offering an opinion about the

7  frequency with which Vobile identifies a false

8  positive?

9      A   Not precisely.  Would you like me to explain?

10     Q   Well, let me -- let me pose it this way.  I

11  know you've -- you've opined that false positives are

12  a theoretical possibility with video fingerprinting

13  systems because information is lost when complex

14  assets are reduced down to small numbers.

15         Is that a fair paraphrasing or summary of

16  one -- one of the opinions that you offer in your

17  report?

18     A   That's somewhat similar to one of the

19  opinions that I offer in my report.

20     Q   How would you characterize it, briefly?

21     A   Well, I have a -- a collection of opinions

22  on -- on the topic.

23     Q   And I'm referring --

24     A   So --

25     Q   -- to that specific opinion about the





1   MD5 hashing, have you?

2       A    That's correct.  In this instance, I'm

3   answering your question.

4       Q    Okay.  So the answer that you just gave is

5   just hypothetical; it's not an answer about what

6   Hotfile actually did?

7       A    No.  That was an A, B, and neither of those

8   is correct.  It's not A or B.  It's not hypothetical,

9   and it's not what I know what they did.  It's

10  practical, and it's a deep understanding, and it has

11  significant business consequences.  But it is not

12  based on my conversation with Mr. Titov in which he --

13  he could have identified these -- these specific

14  details to me.

15      Q    Is using hashing to implement takedown

16  notices a standard business practice among Internet

17  service providers, in your opinion?

18      A    Well, first, I haven't been asked to opine on

19  the frequency of the use of this technique by other

20  providers as a part of my report, per se.

21          I think the question that you asked there is

22  slightly different from -- from -- from -- as I

23  understand your question, and maybe I don't understand

24  it.

25      Q    Well, you do opine here that this is an

Page 238

¹ industry standard practice, don't you, in the heading

² to section -- Roman numeral VIII, heading A of your

³ report?

⁴     A   Oh, yes.  You asked what -- maybe -- maybe we

⁵ should have you re-ask your question so I'm sure that

⁶ I hear it correctly.

⁷     Q   Well, is implementing takedown notices based

⁸ on hashing an industry standard practice?

⁹         MR. SCHOENBERG:  Objection; vague and

¹⁰ ambiguous.

¹¹         THE WITNESS:  There are several parts to that

¹² question.  I think that might be what I was responding

¹³ to.

¹⁴         So the use of hash matching is not the same

¹⁵ as takedowns.  So a takedown is not an algorithm.

¹⁶ It's a -- it's a business or even social process.  And

¹⁷ my opinion here in the first instance is about hash

¹⁸ matching.  I say:

¹⁹         "SHA/MD5 hash matching is a best effort and

²⁰ reasonable business practice that addresses an

²¹ importance class of potential infringements by unknown

²² third-party actors on the Internet."

²³         And so, in fact, when I review this

²⁴ paragraph -- and I'm reading 145, to which you

²⁵ effectively directed me a moment ago -- in my first

1   reading, I don't see the phrase "takedown" anywhere in

2   that paragraph, and yet I was able to say a good 30 or

3   40 words about the use of SHA and MD5 hash matching in

4   the industry.

5          So I'm just trying to -- to make clear

6   that -- that you've combined several things in your

7   question and implied a different result than perhaps I

8   had opined on.

9          MR. PLATZER:  Well, sir, I'm not asking you

10  what your report says.

11    Q    I'm asking you a question here today:  Is

12  implementing a takedown notice based on hashing to

13  identify identical files to the one that's the subject

14  of the takedown notice, is that an industry standard

15  practice?

16         MR. SCHOENBERG:  Objection; vague and

17  ambiguous; asked and answered.

18         THE WITNESS:  Based on my industry

19  experience, I will say I do have the impression that

20  to the extent that takedowns are implemented with

21  respect to DMCA takedown specifically or not, but

22  requests that -- that it may be the case that hash

23  matching is a technique that is widely employed, yes.

24  And I'm relying there on my industry experience.

25         MR. PLATZER:  So I want you to assume that a

¹ file sharing service that employs hash matching for

² de-duplication purposes, upon receipt of a takedown

³ notice, does not delete or disable the file that

⁴ resides at the URL in the takedown notice, but simply

⁵ disables the particular URL that is mentioned in the

⁶ notice that -- that leads to that file, while allowing

⁷ other URLs that direct to that file to remain active.

⁸     Q    Do you understand the hypothetical as I've

⁹ posed it?

¹⁰     A    I think so.  I think what you're saying is

¹¹ there's file de-duplication in place, that there's a

¹² single underlying physical -- well, in the sense that

¹³ we think of files as physical, an asset -- file

¹⁴ asset -- that there are multiple pointers to this

¹⁵ file, and through one that has web links or what have

¹⁶ you, names for it, and that there is a takedown notice

¹⁷ pursuant to one, for example, published web link, and

¹⁸ then in your hypothetical, that that link is made

¹⁹ dysfunctional or inactive, but that other links may

²⁰ still point to the file; is that the question?

²¹     Q    You have comprehended my hypothetical

²² precisely.

²³     A    Okay.  I understand the -- the backdrop,

²⁴ then, yes.  Okay.

²⁵     Q    In that hypothetical, is the file sharing

1   service's response of disabling one particular URL,

2   but not the underlying file itself, would you consider

3   that a standard business practice?

4         MR. SCHOENBERG:  Objective; incomplete --

5   objection; incomplete hypothetical; lack of

6   foundation; vague and ambiguous.

7         THE WITNESS:  Well, actually, that's an

8   excellent example of the flaws in the core model that

9   I understand plaintiffs to have advanced through their

10  complaint that I illustrate in my four-part

11  methodology that I identify in my report and opine on

12  extensively.

13        As one example -- and we see this from --

14  from the fact that we have plaintiffs who themselves

15  uploaded files into Hotfile -- there can be multiple

16  paths to a single file.  Some of them may be

17  warranted.

18        And so we can easily imagine a case in

19  which -- I'll give -- I'll give you an example.  When

20  I was the CTO and CIO of the principal industry file

21  sharing site that was used by many of the plaintiffs,

22  that a given asset was used and shared and made

23  available by multiple companies at once.

24        Now, if someone had somehow created an extra

25  link to that -- we never had any security violations

1  in the years that I was in that role, but that would

2  have been regarded as a security violation if it had

3  been made available to them through that additional

4  company's interface.

5      And if that link were taken down, you

6  certainly would not want to destroy the underlying

7  asset.  You would want it to remain available to the

8  legitimate rights holders who had a right to share it.

9      So this shows exactly the kind of difficulty

10 that I've identified where you can have an asset

11 that -- that does correctly belong on a file sharing

12 service, but the link to it that is a separate entity

13 does not belong in the possession of some -- some

14 unauthorized user.

15     MR. PLATZER:  Q.  Are you aware of any file

16 sharing or user-generated content website that follows

17 the practice that I just described in my hypothetical?

18     MR. SCHOENBERG:  Same objections.

19     THE WITNESS:  Well, I -- as I understand the

20 question you're immediately asking exactly, the Dax

21 site used exactly that model.  That is, one underlying

22 asset, multiple individual pointers to it, the

23 pointers are represented as web links, they're

24 available to different users, and it's theoretically

25 possible that some user could obtain a web link that

Page 243

1   was an inappropriate use for them because they did not

2   have rights to the file.

3           And in that instance the right response would

4   be to remove the link, but not to remove the other

5   links or the underlying digital asset that was owned

6   by companies such as your own clients, the plaintiffs.

7   So that's exactly an example of that, yes.

8           MR. PLATZER:  You also opine in paragraph 147

9   that defendants -- and I'm quoting here:

10          "Timely adopted and currently employ

11  techniques for digital fingerprinting, including those

12  generally advanced or approved by the plaintiff's

13  industry association, including the products and

14  services of Vobile."

15      Q   Sitting here today, do you know when Hotfile

16  implemented Vobile's technology?

17      A   It's my recollection that I discussed the

18  implementation of and adoption -- implementation is

19  probably misuse of the term, but let's call it

20  adoption -- of Vobile's technology with Mr. Titov.

21  And to the best of my ability to recall, I discussed

22  some of the details of the dates.  I no longer have

23  those in mind as I sit here today.

24          But I would point out that I must say that

25  in -- in the world of the Internet in which we live,

Page 289

1                    J U R A T

2

3

4      I, ANDREW S. CROMARTY, Ph.D., do hereby

5      certify under penalty of perjury that I have

6      read the foregoing transcript of my

7      deposition taken on December 16, 2011; that I

8      have made such corrections as appear noted

9      herein in ink, ~~initialed by me~~; that my  / on attached

10     testimony as contained herein, as corrected,  ERRATA SHEET
                                                      Exhibit

11     is true and correct.

12

13

14     DATED this __20__ day of __JANUARY__, ~~2011~~, 2012,

15     at __Palo Alto__, California.

16

17

18

19     _____

20              SIGNATURE OF WITNESS

21

22

23

24

25

Page 290

CERTIFICATE OF REPORTER

1

2

3

4     I, ANDREA M. IGNACIO HOWARD, hereby certify

5  that the witness in the foregoing deposition was by me

6  duly sworn to tell the truth, the whole truth, and

7  nothing but the truth in the within-entitled cause;

8

9     That said deposition was taken in shorthand

10  by me, a Certified Shorthand Reporter of the State of

11  California, and was thereafter transcribed into

12  typewriting, and that the foregoing transcript

13  constitutes a full, true and correct report of said

14  deposition and of the proceedings which took place;

15

16     That I am a disinterested person to the said

17  action.

18

19     IN WITNESS WHEREOF, I have hereunto set my

20  hand this 21st day of December 2011.

21

22     _____

23  ANDREA M. IGNACIO HOWARD, RPR, CCRR, CLR, CSR No. 9830

24

25

Page 292

1                E R R A T A    S H E E T

2

3        I, ANDREW S. CROMARTY, Ph.D., make the

4   following changes to my deposition taken in the matter

5   of Disney Enterprises, Inc., et al., vs. Hotfile,

6   Corp., et al., taken on December 16, 2011:

7

8   DATE:_____        _____

9                                Signature of Witness

10  Page            Line         Change

11  _____           _____        *See attached Exhibit,*

12  _____           _____        *"Transcript Errata— Cromarty*

13  _____           _____        *Hotfile Deposition Dec 16, 2011*

14  _____           _____        *Errata Sheet."* (ASC)

15  _____           _____        _____

16  _____           _____        _____

17  _____           _____        _____

18  _____           _____        _____

19  _____           _____        _____

20  _____           _____        _____

21  _____           _____        _____

22  _____           _____        _____

23  _____           _____        _____

24  _____           _____        _____

25  _____           _____        _____

**Transcript Errata - Cromarty Hotfile Deposition Dec 16, 2011**

ERRATA SHEET

I, ANDREW S. CROMARTY, Ph.D., make the following changes to my deposition taken in the matter of Disney Enterprises, Inc., et al., vs. Hotfile, Corp., et al., taken on December 16, 2011:

DATE: ___20-Jan-2012___

Signature of Witness

Page  Line:  Change    ("a -> b" signifies "replace a with b")

p.7 L.19: "JCPenny et al." -> "J. C. Penney, et al."
p.8 L.8: "the Patent-in-Suit, and that" -> "the Patent-in-Suit that"
p.11 L.24: "this" -> "is"
p.12 L.7: "to my" -> "of my"
p.15 L.23: "legally phrased" -> "legally freighted"
p.21 L.6: "which" -> "in which"
p.26 L.8: Strike "but"
p.26 L.19: "For -- for example," -> "For, for example,"
p.27 L.5: In Mr. Platzer's text, "your" should be "their" (changes meaning of my answer)
p.27 L.19: "helpful" -> "helpfully"
p.28 L.7: "experience" -> "experience is,"
p.28 L.8: "sort of the" -> "the sort of"
p.30 L.10: strike comma
p.30 L.11: "e-mails called Kapow" -> "emails, called Kapow,"
p.31 L.23-24: "principals, and" -> "principals. And"
p.33 L.4: "publication. It's" -> "publication--it's"
p.33 L.5: "referee publication, for example, by one"  -> "refereed publication, for example--by one"
p.35 L.5: Delete paragraph indentation (changes meaning).
p.34 L.7: "Google" -> "Google is"
p.36 L.18: "report", -> "report"
p.36 L.22-23: "domain name. [par] Some" -> domain name, some"
p.37 L.5 "mathematical" -> "mathematically"
p.37 L.11: "my upload" -> "upload"
p.38 L.17,22.: Mr Platzer's text refers to "Nutella", should be "Gnutella". [I am answering his questions about Gnutella, hence affects meaning of my answers.]
p.38 L.25: "true. Generally for the 2P" -> "true generally for the P2P,"
p.39 L.15 & throughout: "Use Net" -> "Usenet"
p. 39 L.17-19: "has not been use of it. It was a use of" - "has not been. Usenet was a use of"
p.40 L.2: "much" -> "machine"
p.40 L.3-4: "files. Almost inversely" -> "files, almost universally"
p.40 L.9: "server hosted sites." -> "server hosting sites, or what have you."

p.41 L.16: "implicit of" -> "implicit about"
p.42 L.7: "testing. If" -> "testing, if"
p.42 L.8: "unaware and" -> "unaware, and"
p.46 L.6: "risky" -> "risk a"
p.46 L.23: "going to be" -> "in a"
p.49 L.8: "which" -> "which a"
p.49 L.11: "resilient" -> "Brazilian"
p.49 L.13: "describe that or refer to the tool." -> "describe or refer to that tool."
p.49 L.16: "tool" -> "tool,"
p.49 L.21: "for" -> "from the"
p.50 L.1-2: "of that site, including Hotfile." -> "at sites including Hotfile."
p.50 L.3: "is, with" -> "is with"
p.50 L.4: "I" -> "I've"
p.50 L.22: "draw on" -> "draw"
p.52 L.15: "Kapow" -> "that Kapow"
p.52 L.17: "used" -> "used,"
p.52 L.22: "want to have" -> "want"
p.54 L.5: "of documents plus" -> "plus"
p.55 L.3: "information theoretically" -> "for information theoretic reasons"
p.55 L.11: "I've" -> "I have"
p.55 L.19: "cited." -> "cited it."
p.56 L.1: "now." -> "now, yes."
p.56 L.16: "general" -> "general,"
p.56 L.22-23: "copyright itself may need another party.  Permission for" -> "copyright is held by another party and permission for"
p.56 L.24-25: "granted. [par] 'The ownership information is" -> "granted. This ownership and permission is"
p.57 L.1: "matter and is noted in Appendix H. In any case," -> "matter, and as noted in Appendix I in any case"
p.57 L.2: "support the" -> "support a"
p.57 L.4: "transfers and file sharing services." -> "transfers to file sharing services in particular.'"
p.57 L.5: "In particular, that's" -> "That's"
p.58 L.2: "material" -> "materials"
p.58 L.2: "written about Kapow" -> "right in sentences about Kapow"
p.58 L.10: "list" -> "a list"
p.63 L.19: "reliable" -> "a reliable"
p.63 L.23: "there're" -> "there are"
p.64 L.2: "and impossible, probably impossible," -> "or impossible, and probably impossible,"
p.65 L.15: "burn convention" -> "Berne Convention"
p.66 L.23: "have" -> "have to have"
p.67 L.17: "would" -> "will"
p.68 L.4: "service" -> "Internet service"
p.68 L.15: "consumer-generated" -> "consumer user-generated"
p.68 L.24-25: "two documents, that the two contractual documents that the user" -> "two documents that the--two contractual documents, that the user"
p.69 L.1: "the Hotfile" -> "Hotfile's"
p.70 L.14: "service" -> "of service"

Witness intials:

p.71 L.7: "question where I'm not sure you're asking" -> "question--I'm not sure where you're also asking"

p.71 L.8: "about" -> "as to"

p.72 L.9: "information, theoretic" -> "information-theoretic"

p.72 L.19: "their" -> "their -- or an"

p.74 L.22: "explicitly" -> "illicitly"

p.75 L.1: "that a" -> "the"

p.75 L.7: "if" -> "though"

p.75 L.9: "that they're" -> "they're"

p.75 L.10: "for," -> "for it,"

p.75 L.17: "that" -> "of that"

p.77 L.13: "allowing" -> "allowing you to ask"

p.78 L.3: "'reliability,' with" -> "'reliability' is with"

p.78 L.10: "I'm assuming" -> "I assume"

p.78 L15: "of a" -> "for"

p.78 L.15-16: "correct. [par] What we" -> "correct, what we"

p.79 L.21: "is yes, but; that is," -> "is 'yes but'. That is,"

p.79 L.24: "than I would weigh" -> "that outweigh"

p.80 L.1: "if those other factors may" -> "those other factors might"

p.80 L.7 "as to, and so on." -> "as to."

p.82 L.12: misnomer" -> "misnomer,"

p.85 L.2: "as -- and" -> "as, and"

p.85 L.3: "as" -> "as,"

p.90 L.9: "as the one" -> "as one"

p.90 L.10: "answered" -> "answer"

p.90 L.22: "that" -> "as"

p.90 L.22: "report" -> "report,"

p.90 L.23: "there" -> "they're"

p.91 L.7.: "dispassionately." -> "and dispassionately."

p.91 L.11" "report" -> "report,"

p.94 L.2: "is for" -> "is: For"

p.94 L.3: "of those" -> "of"

p.94 L.4: "file sharing services server, this is 69, may" -> "file sharing service's server' -- this is 69 -- 'may"

p.94 L.7: "compliant computers connecting to it." -> "client computers connecting to it.' "

p.94 L.24: "server, at" -> "server at"

p.94 L.25: "instance" -> "instant"

p.95 L.15: "things.  There" -> "things -- there"

p.96 L.18: "IPV for" -> "IPv4"

p.97 L.14: "Certain, MapQuest" -> "certain -- MapQuest"

p.97 L.15: "company, is" -> "company -- is"

p.97 L.16: "from" -> "in"

p.97 L.19: "technical" -> "technically"

p.98 L.1: "can trivially" -> "trivially can"

p.98 L.4: "outline" -> "outlined"

p.99 L.12: "intent.  An induced intent" -> "intent, an induced intent, "

p.99 L.15: "elicit" -> "illicit"

p.125 L.8-9: "available. [par] One hopes," -> "available -- one hopes,"
p.125 L.22: "information theoretic" -> "information-theoretic"
p.130 L.22: "understanding. Similarly," -> "understanding, similarly,"
p.131 L.22: "is yes, when that's possible." -> "is, 'Yes when that's possible.' "
p.132 L.3: "information theoretic" -> "information-theoretic"
p. 133 L.18-19: "information, theoretic" -> "information-theoretic"
p.139 L.21: "information theoretic" -> "information-theoretic"
p.143 L.17: "small and feeling that it's a" -> "small 'n', treating it as a"
p.159 L.8: "protection" -> "protections"
p.161 L.2: "instance" -> "instant"
p.166 L.11: "the reason" -> "reasoned"
p.186 L.1: "justified?" -> "justified."
p.191 L.4: "the fingerprint" -> "the -- 'fingerprint' "
p.192 L.16: "plaintiff's" -> "plaintiffs"
p.194 L.14" "efficacy, these" -> "efficacy of these"
p.194 L.20-21: "information theoretic" -> "information-theoretic"
p.200 L.25: "files, that" -> "files. That"
p.201 L.5: "that we're true" -> "it were true"
p.201 L.9-10: "servers, that" -> "servers. That"
p.209 L.22-23: "effect. [par] First," -> "effect -- first,"
p.210 L.22: "effect of" -> "effective"
p.212. L.2: "at, then" -> "at -- then"
p.215 L.15: "argument, if" "argument -- if"
p.215 L.16: "assets, and we know that just" -> "assets and we know that, just"
p.219 L.22: "one's" -> "ones"
p.220 L.13: "fact" -> "facts"
p.220 L.14 "that is produced during discovery that" -> " -- that is, produced during discovery -- that"
p.232 L.18: "network detached storage" -> "network-attached storage"
p.232 L.19: "de-duplications." -> "de-duplication."
p.233 L.7: "necessary" -> "necessarily"
p.233 L.10: strike "and"
p.235 L.25: "techniques first." -> "techniques, first."
p.236 L.18: "optimization -- for business optimization" -> "optimization, for business optimization, "
p.236 L.21: "satisfy -- let's call it the" -> "satisfy, let's call it, the"
p.238 L.4: "Oh, yes." -> "Yes."
p.239 L.20: "implemented with" -> "implemented -- with"
p.239 L.22: "requests that" -> "requests -- that"
p.240 L.11: "place, that" -> "place; that"
p.240 L.13: "physical, an asset -- file" -> "physical -- an asset, a file"
p.240 L.14: "asset -- that" -> "asset; that"
p.240 L.15: "file, and through one that has web" -> "file; and through one -- that is, web"
p.240 L.16: "you, names for it, and" -> "you -> names for it; and"
p.240 L.17: "link, and" -> "link; and"
p.240 L.20: "file; is" -> "file. Is"
p.242 L.20: "asking exactly, the Dax" -> "asking, exactly, the DAX"

Witness intials:

p.252 L.8: "is -- and" -> "is, and"
p.252 L.9: "is an" -> "is, an"
p.253 L.17: "about, so I" -> "about -- so, I"
p.254 L.13: "say and" -> "say, and"
p.255 L.7: "enforced.  It's" -> "enforced; it's"
p.255 L.8: "providers that -- it" -> "providers; that it"
p.256 L.8: "of technical or" -> "of 'technical' or"
p.256 L.9" "performance or technical operations involves" -> " 'performance' or 'technical operations' involves"
p.256 L.18: "burden we've" -> "burden. We've"
p.278 L.25: "as we're all in this together, and" -> "as, 'We're all in this together', and"
p.282 L.2: "is the number" -> "is it's a number"
p.282 L.20: "inde" -> "indie"
p.283 L.1: "damages that" -> "damages, that"
p.285 L.20: "industries and have been for at least a decade" -> "industries, and have been for at least a decade, "

–        END OF ERRATA        –

Witness intials: _AC_