# EXHIBIT A

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.: 11-CIV-20427-WILLIAMS/TURNOFF

DISNEY ENTERPRISES, INC.,
TWENTIETH CENTURY FOX FILM
CORPORATION, UNIVERSAL CITY
STUDIOS PRODUCTIONS LLLP,
COLUMBIA PICTURES INDUSTRIES,
INC., and WARNER BROS.
ENTERTAINMENT INC.,

*Plaintiffs*,

v.

HOTFILE CORP., ANTON TITOV, and
DOES 1-10.

 *Defendants*.

_____/

HOTFILE CORP.,

        *Counterclaimant*,

v.

WARNER BROS. ENTERTAINMENT INC.,

_____*Counter-Defendant.*_____/


**[REDACTED] DECLARATION OF PROFESSOR JAMES BOYLE
IN SUPPORT OF
DEFENDANTS' OPPOSITION
TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT
AND EXHIBITS THERETO**

I, JAMES BOYLE, declare as follows:

1.        I am currently the William Neal Reynolds Professor of Law at Duke University, and have been retained by Farella, Braun + Martel LLP on behalf of the Defendants in this action as an expert witness.

2.        I received an LL.B. (Hons) from Glasgow University (1980), and an LL.M. (1981) and S.J.D. (1986) from Harvard Law School.  I have been a law professor since 1982, teaching at American University, and at the Universities of Pennsylvania, Harvard and Yale as a Visiting Professor.  In 2000 I joined the law faculty at Duke.

3.        My academic research is mainly in the areas of intellectual property and communication policy, with a focus on the Internet.  I have written and edited numerous articles and books on these subjects. In general, my research and scholarship has focused on:

    i)    *Copyright law, particularly in the digital arena.*  I have published extensively on copyright in law journals, monographs, and edited collections of essays; a full list is available in the attached curriculum vitae.   In 2011 I was selected by the British government as one of five expert advisors to the Hargreaves Review of Intellectual Property which was tasked with adjusting copyright law to the digital age. Also in 2011, I was chosen to give the annual Melville Nimmer Lecture on Copyright.

    ii)    *Technology and technology policy.*  In 2003 I received the World Technology Network Award for law.  My most recent book, *The Public Domain* (Yale University Press 2009), was the American Society for Information Science and Technology "Book of the Year" and the winner of the Donald McGannon Award for Communications Policy.  My earlier book *Shamans, Software and Spleens: Law and the Construction of the Information Society* (Harvard University Press 1996) also deals with these issues.  Beyond my monographs and edited collections of essays, my publications have been in such journals as COMMUNICATIONS OF THE ASSOCIATION OF COMPUTING MACHINERY, one of the leading computer science journals in the world, the HARVARD JOURNAL OF LAW AND TECHNOLOGY, and the DUKE LAW AND TECHNOLOGY REVIEW.  Until January 1st 2012, I served as a Board Member of the Public Library of Science.

iii) *The economics and business methods of online commerce.*   Because an understanding of economics, particularly information economics, is fundamental to intellectual property, I have been writing and teaching about information economics and about the various methods of monetizing content, since 1992.   Chapters on information economics can be found in both my monographs and in such articles as *Cruel, Mean or Lavish?: Economic Analysis, Price Discrimination and Digital Intellectual Property*, 536 VANDERBILT LAW REVIEW 2007 (2000).

4.  Beyond these general focal points, I have specific expertise in three areas of relevance to my reports and testimony in this case:

    i.   Free or "open source" software, such as Linux or Firefox, which is distributed under licenses that allow users freely to copy and make derivative works of the copyrighted code.  I have extensively researched the structure of incentives innovation models in open source software and written about its features, and its various licenses in my articles and books.

    ii.  Cultural material that is made available under open licenses such as the Creative Commons set of licenses.  There are millions of digital files covered by such licenses, ranging from photographs to scientific articles.  The license is a way for the copyright owner to give permission in advance for various kinds of uses.  I was one of the founding Board Members of Creative Commons and served on its board from 2002 until 2009, the last year as Chairman.  While serving on the Creative Commons board I conducted extensive studies of the ways in which open licenses could be incorporated into for-profit business models.

    iii. Public domain material.  I am one of the founders of the Center for the Study of the Public Domain at Duke Law School and the subject of my most recent book was the role of the public domain in innovation and culture.

5. The statements made in this declaration are based on my personal knowledge and on my knowledge of information provided to me by individuals working under my direction, together with my specialized experience and expertise as applied to the facts of this matter. If called to testify, I would be able to testify based on the best of my knowledge, information, and belief, as follows:

## I.      FIRST EXPERT REPORT:  LEGAL AND PRODUCTIVE USES OF HOTFILE AND OF THE AFFILIATE PROGRAM

6.  Attached hereto as Exhibit 1,  is a true and correct copy of my November 18, 2011 expert report in this matter along with materials I considered in forming the opinions therein (Ex. A to Ex. 1).  I hereby affirm, under penalty of perjury, that my statements in that report are true and correct.   My primary task in my first expert report was to explore some examples of the non-infringing uses of the Hotfile system.  Defendants' counsel asked me to study the use of the Hotfile service to store and to distribute or download the types of material described above, that is to say, material which can be legally copied and distributed.  I did not research the many other types of content that could be legally stored or transferred on Hotfile, including U.S. government works, uncopyrightable material such as databases made up entirely of unoriginal compilations of facts, users' privately created content and so on.

7.  Defendant's counsel also asked me to examine Hotfile's Affiliate program, and specifically to look at how it can be used to compensate creators of content for distribution of their work on the Internet.  I was asked to determine whether, for example, Hotfile's Affiliate program compensates open source software developers for the software they write and freely distribute.

8. After examining the Hotfile system, and directing the expert computer consulting company Elysium Digital to perform a number of searches and hash-matched analyses of the Hotfile databases,  I came to four conclusions that I believe may provide useful information for the court's analysis of both "substantial non-infringing uses" and of *Grokster*-style inducement liability.  They also shed light on Dr. Waterman's statistical study of Hotfile and on the 1750 legal opinions offered by Mr. Zebrak, expert witness for the plaintiffs.

i.  First, there was a high volume of usage of the Hotfile system for activities that were either clearly non-infringing or highly likely to be non-infringing.  Most notably, I determined that there is a high volume of usage of the Hotfile system for distribution of free and open source software.  My non-comprehensive study found more than 1.7 million downloads of the six open source programs examined.[1]  Using the Hotfile system to share non-infringing software files was also a popular usage of the system in relative and absolute terms: the top two most downloaded files on Hotfile were open source programs.  Open source and free software programs are a substantial (and growing) component of the software market today, so Hotfile's proven suitability and compatibility with such licensing models is of significance.

ii.  Second, Hotfile's architecture is compatible with and is actually being used for a wide range of activities, beyond the open source software context.  Examples of non-infringing uses that I identified ranged from distributing a public domain version of Huckleberry Finn to sharing Creative Commons-licensed "open source" animated movies.  My methodology did not attempt to exhaustively identify such uses.

iii.  Third, for reasons explained in the report, services such as Hotfile fill a gap in the Internet's architecture by providing a convenient and generic method of storage, backup or distribution for files that are too large to be saved or sent by e-mail.  This is particularly important for small developers of open source software or non-profit distributors and collaborators in cultural projects under open licenses, like the "Blender Project" of open animation discussed in the report.  This functionality is useful to anyone

---

[1] During my first deposition, plaintiff's counsel revealed to me that one of the versions of those open source programs, Open Office, though "hash identified" as such, had been given a file name that suggested (wrongly) that it was in fact a film.   I had known that there was an apparently misnamed file, but had not realized how many downloads it had received (more than 19,000.)  All of those downloads were perfectly legal, since the file was an open source program which may be freely copied.  Nevertheless, if one subtracts those downloads from the totals on the theory that the downloaders may not have been searching for open source software, my non exhaustive study still revealed more than 1,750,000 downloads of open source files – all of which were legal to share – including about 9,500 downloads of Open Office correctly so named.

who wishes to store and transfer large files of their own creation for use in their daily professional and personal activities.

iv.  Fourth, at least two of the open source developers featured in this study were active participants in Hotfile's "Affiliate" program, thus being indirectly compensated for the programs they were freely providing to the public. This suggests that the Hotfile Affiliate program is capable of fulfilling the valuable function of compensating authors and distributors in proportion to the frequency with which their works are downloaded.

9.  Further details of my findings are given in the attached report.

## II.     REBUTTAL REPORT: SYSTEMATIC ERRORS IN THE WATERMAN/ ZEBRAK STATISTICAL AND LEGAL STUDY

10 .  Attached hereto as Exhibit 2,  is a true and correct copy of my expert rebuttal report in this matter along with materials I considered in forming the opinions therein (Exs. A-I to Ex. 2).  I hereby affirm, under penalty of perjury, that my statements in that report are true and correct.  I was asked by counsel for defendants to review expert reports submitted on behalf of the plaintiffs by Dr. Waterman and Mr. Zebrak.  Dr. Waterman's report consisted of a statistical analysis of some of the uses of Hotfile, based on a sample of 1750 files that he claimed was representative.  Mr. Zebrak's report consisted of 1750 legal opinions about the copyright status of those files; in particular, whether those files were or were not infringing copyright.  Dr. Waterman then used Mr. Zebrak's legal opinions and classifications as the basis for his statistical assertions about Hotfile.  I understand that those statistical assertions, in turn, form a central part of the plaintiff's case in this action.

11.  I found a number of aspects of Dr. Waterman's and Mr. Zebrak's reports to be flawed and misleading.  The principal problems were that the Waterman and Zebrak reports:

i.  By focusing only on downloads, omitted the majority of files on the Hotfile system and one of the most important likely fair uses or non-infringing uses – namely, for zero download storage and backup.  As the name suggests, a cyber-*locker* is used for

storage as well as sharing. Dr. Waterman's and Mr. Zebrak's study intentionally ignored the 57,923,301 files – 54% of the total files on Hotfile – that were uploaded but that had zero registered downloads.

ii. Failed to consider adequately the fair use claims that could be made on behalf of those files downloaded once – a further 6,182,360, or 5.76%, of the files on Hotfile.[2] Single downloads are consistent with space-shifting, or with personal storage. As with home taping of TV shows, both uses are highly likely to be a fair use, even if the work is a commercial, copyrighted work, and the copy is made without authorization. Mr. Zebrak did not give weight to this possibility.

12. These two classificatory errors meant that the Waterman and Zebrak studies completely excluded 54% of the files on Hotfile from their study – the very files most likely to be legally uploaded – and then failed adequately to consider an additional 5.76% of the potential *uses* of files on Hotfile. *The combined effect was to exclude or inadequately characterize nearly 60% of the files most likely to have been legally uploaded.* In my opinion, these are very serious methodological flaws.

13. Beyond those two major classificatory errors, I had pointed in my rebuttal report to another general characteristic of the Waterman and Zebrak reports that, in my opinion, meant that the statistical study was flawed, namely its treatment of apparently pornographic files.

14. A substantial proportion (perhaps higher than 20%) of the files that were included in the Waterman and Zebrak studies consisted of files that appeared from their titles to be pornographic. For reasons detailed in my rebuttal report, the copyright status of pornographic work is unusually hard to classify. The producers typically have to avoid mainstream distribution channels, rendering many of the normal sources of information about a work unavailable. There is a reported plethora of distribution and business models – some of which

---

[2] I do not know what actual percentage of the 1750 files in the Zebrak/Waterman study were one download files. Dr. Waterman's procedure was to multiply the number of instances in a file in his sample by the number of times it was downloaded. This would presumably further attenuate the use represented by the one download files.

rely on free distribution of the content. Some producers are shady, fly-by-night enterprises, so that copyright status is particularly hard to determine. In addition, the multiplication of "amateur" content, and of user-generated "remixes" of content, some of which might be fair use, complicate the picture still further. Because of all these difficulties, I suggested that the Waterman and Zebrak report should have either:

a. Excluded pornographic content altogether – as was done in some other prior expert studies in copyright infringement actions; or

b. Only classified the work as infringing if confirmation could be obtained from the copyright owner.

15. Given the substantial percentage of apparently pornographic work in the statistical sample (a percentage considerably higher than that of confirmed infringing commercial copyrighted works owned by the plaintiffs) I argued in my rebuttal report that failure to adopt either of these methods cast further doubt on the conclusions offered by the Waterman and Zebrak reports.

16. Finally, I examined a particular set of files that, in my opinion, Mr. Zebrak had classified incorrectly in ways that seemed to indicate two further methodological problems with his report. I discuss those files, and Mr. Zebrak's discussion of them in his declaration in support of the plaintiff's summary judgment motion, in the next section.[3]

---

[3] The Rebuttal Expert Report of Mr. Zebrak included a listing of the "Top 100" files downloaded in the history of Hotfile. A substantial portion of the Top 100 appear to be non-infringing software files. For example, 15 of the Top 25 and 32 of the Top 100 were uploaded by affiliates Jdownloader and ih8snow, who as I previously explained in my initial report, use Hotfile's Affiliate program to be compensated for distributing non-infringing software of their own creation. In fact, hash-matched copies of iReb, sn0breeze and JDownloader, three of the non infringing open source programs I described in my initial report, are prominently featured in the list. From their file names and the identity of the uploader/developer it appears – though I cannot be certain – that the remaining uploads among those 32 files are simply different versions of iReb, sn0breeze and JDownloader. If true, this would mean nearly one third of the 100 most downloaded files are uploaded by these two developers alone and are open source software programs that it is entirely legal to share and copy. It would also mean that, focusing only on these two developers, we could say that in the history of Hotfile, one third of the 100 most downloaded files are uploaded by developers and copyright owners who use the Affiliate program to receive indirect compensation for their own creative efforts.

### III.     SUMMARY OF ERRORS IN THE WATERMAN / ZEBRAK STUDY AS PRESENTED IN THEIR EXPERT DECLARATIONS IN SUPPORT OF SUMMARY JUDGMENT

17.    I have reviewed the declarations submitted on behalf of the plaintiffs by Dr. Waterman and Mr. Zebrak.  These submissions recreate the same errors that are present in their expert reports, which I identified in my expert rebuttal report and have summarized above.

18.  Mr. Zebrak seems to misunderstand my rebuttal report.  He states that I "made no systematic attempt to review [his] conclusions" and characterizes my report as disagreeing on the classification of "a handful of files." (Zebrak Decl. ¶ 18.)  In fact, as detailed above, I made three systematic criticisms of the Waterman-Zebrak study, criticisms that Dr. Waterman and Mr. Zebrak have not even made an attempt to rebut.  (*See* paragraphs 11-16, *supra*.)

---

Mr. Zebrak does not offer an analysis of the prevalence of infringing activity in the Top 100.  I will note however that he incorrectly alleges that one of the other uploaders of several Top 100 gaming-related files with the username "synnersynx" had, at another point, uploaded five "illegal" files to Hotfile.  In Mr. Zebrak's terminology, "illegal" files are those designed to circumvent technical protection measures on copyrighted programs.  In fact, according to an analysis performed at my direction, four of the five allegedly "illegal" files are actually software patches created and freely distributed by gaming developer Blizzard Entertainment for Blizzard's own games.  The files were hash identical with those that Blizzard distributed.  [Exhibit 6.]  Mr. Zebrak incorrectly classifies them as "Mapcraft Hacks" (they are not) and incorrectly identifies them as "illegal."  They also do not appear to be infringing since Blizzard explicitly allows patches to be reposted for download on other sites around the web. http://us.blizzard.com/en-us/company/about/legal-faq.html (last visited March 6th, 2012) (though one could argue about the definition of "non commercial mirroring").   The fifth supposedly "illegal" file was not available on Hotfile to be reviewed – at best I might label it as "possibly illegal depending on the content of the actual file" (which could not be retrieved).  Mr. Zebrak's incorrect assertions of "illegality" – which again seem predicated on the idea that copyright owners would never voluntarily share their work – further call into question the reliability of his conclusions.

19. **Ignoring Zero Download Storage.**  As I pointed out earlier, by defining their study to focus only on downloads, Dr. Waterman and Mr. Zebrak omitted the majority of files on the Hotfile system and categorically excluded one of the most important likely non-infringing uses – namely, the use of Hotfile for zero download storage and backup.  As the name suggests, a cyber-*locker* is used for storage as well as sharing.  Dr. Waterman's and Mr. Zebrak's study ignored the 57,923,301 files – 54% of the total files on Hotfile – that were uploaded but never downloaded.  As a *systematic* matter, therefore, their reports do not and cannot provide a fair reflection of the overall uses of the system.  I noted in my rebuttal report that Dr. Waterman, in previous studies, has looked at total files available, which, of course, would have included files with zero downloads. Dr. Waterman does not defend the decision to exclude storage as a matter of statistical science.  Rather, he says he was "tasked" by the Studios to only look at "distribution" and he thereby excluded storage and space-shifting.  Waterman Depo. 212:10-13 [Ex. 3].   I concluded, "[i]n this case, the focus on downloads alone actually excludes a majority of the files on the system from Mr. Zebrak's review and ignores a type of use that would clearly qualify as an actual current, and potential future, substantial non-infringing use." *See* Rebuttal Report paragraph 27.  I describe this aspect of the design of the study as a serious error that undermines the study's reliability.  In his Declaration in support of the motion for summary judgment, Mr. Zebrak offers no response to the extensive criticism I offered in my rebuttal report of the decision to exclude zero download storage and backup.   It would appear, therefore, that my opinion in this regard stands unrebutted.

20. **Ignoring One Download Storage/Space-Shifted Files.**  As I pointed out in my rebuttal report, the Waterman-Zebrak study failed to consider adequately the fair use claims that could be made for files downloaded only once.  These one download files reflect a further 6,182,360, or 5.76%, of the files on Hotfile. Single downloads are consistent with space-shifting, or with personal storage.[4]  Indeed, this was the very kind of use at issue in the *Sony* case. I argued in my rebuttal report that this error precludes relying on Mr. Zebrak's assessment of the copyright status of files within the sample.  In his Declaration in support of the motion for

---

[4] ██████████████████████████████████████████████
█████████████████████████████████████████
███████████████████████████████  With storage and space-shifting, they are, of course, the same.  Thus, his study systematically excluded this possibility and therefore found downloads that were likely fair uses to be "highly likely infringing."

summary judgment, Mr. Zebrak does not respond to this critique. Again, it would appear that my opinion, in this regard, is unrebutted.

21. **Failure to Adopt Appropriate Measures to Classify Adult Content.** Again, for reasons detailed in my rebuttal report, the copyright status of pornographic work is unusually hard to classify. I noted in that report that pornography had been altogether excluded from the *Grokster* study, yet in the Waterman-Zebrak study pornography (apart from illegal pornography or child pornography) was included. Because of all these difficulties, I suggested that the Waterman and Zebrak report should either have either:

> a. Excluded pornographic content altogether – as was done in some other prior expert studies in copyright infringement actions; or

> b. Only classified the work as infringing if confirmation could be obtained from the copyright owner.

In his declaration, Mr. Zebrak has failed to address this criticism of his system of analysis.

22. New facts in the record have further corroborated my analysis in this regard. In Mr. Zebrak's second day of deposition, which occurred after I submitted my rebuttal report, he was confronted with an example of "remixed" adult video that in his survey he had categorized as "highly likely infringing." (In my rebuttal report I had listed the possibility of remixed adult video, potentially a fair use, as one of the reasons it was so hard to classify pornography.) In deposition he conceded that he did not "recall the full consideration of [the fair use doctrine] here" and eventually stated that this is "one of the closer calls within my analysis." (Ex. 5, Zebrak Day 2, 224:16-238:10.) He was also confronted with a video that bore a watermark from an amateur adult website, for which the website's terms of use for uploaders required an assignment "for promoting and redistributing…through any media channels." (*Id.*, 252:20 – 254:15.) The use of this file appears consistent with "viral marketing," which based on my review of the literature in connection with my rebuttal report is quite common in the adult industry. Mr. Zebrak testified that "even if there were a rare instance like the one you're describing [viral redistribution], that would very much be an outlier." (*Id.*, 255:21-24.) Both in the area of adult content and elsewhere, I disagree with Mr. Zebrak's assumption that such authorized sharing, which he describes as an "outlier," is "rare" on the Internet. Making this

assumption permits him to conclude that each of these adult files is "highly likely infringing." Because this assumption is, in my opinion, faulty – particularly with regard to adult content – his analysis is unreliable.  Again, Mr. Zebrak did not address these criticisms in his declaration.

23.    **Failure to Correctly Assess Authorization or Public Domain Status For Software And Other Works.**   Mr. Zebrak appears to misunderstand the reason for inclusion of the specific files I discussed in my report.  First, contrary to his suggestion, these were far from being my only criticisms of his report.  As pointed out in paragraphs 11-16 of this declaration, I had three major systemic criticisms of his methodology and that of Dr. Waterman.  I have been able to find no rebuttal of those criticisms. Second, the files I specifically discussed were included as *examples* of two more general kinds of error to which Mr. Zebrak's study appears to have been prone, namely:

    i.  Failure to classify accurately material that might well have been shared with permission, due to an assumption – repeated in his discussion of adult content, (*see* paragraph 14, *supra*) – that authorized viral distribution online was extremely unusual. As described in my rebuttal report, Mr. Zebrak repeatedly made this assertion in deposition.  Both my knowledge of internet content in general and the specific examples that follow indicate that this assumption is not warranted.

    ii.  Establishment of what appears to be a default assumption that content is infringing, leading in the most obvious example – the inclusion of  a Russian book from 1871 – to ludicrous results.

 **a.  Orbit Downloader**:  Mr. Zebrak classified Orbit Downloader as highly likely infringing.  In my rebuttal report, I pointed out that he had inadequate basis for this classification.  Mr. Zebrak argues in his declaration that listing a program as "freeware" does not *definitively* mean it is offered for use without limits on reproduction and argues that it is possible that the authors of Orbit Downloader intended it for distribution only from their site.  But I make both of these points in my rebuttal report.

    Of course, a company might distribute at zero cost through certain sites and prefer not to distribute through others.  Copyright gives them the legal right to make that choice. Yet if

they formally classify their product as "freeware" and fail to include any End User
License Agreement to the contrary, I think the argument for either express or implied
license to reproduce is a solid one.  At the very least, from this evidence one could not
responsibly classify such a program as "*Highly Likely* Infringing."  Ex. 2, paragraph 41.
My point was that, at best, we are in a situation of *uncertainty* here and the fact that Mr. Zebrak
does not reflect that uncertainty in his classification is troubling. Orbit Downloader is a program
that the developers carefully label, using semantic web technology, as "freeware" – showing
considerable sophistication in specifying the terms under which the program is made available.
Yet they choose not to include any End User License Agreement, or restriction on distribution.
Mr. Zebrak argues that the inclusion of a boilerplate "all rights reserved" copyright statement at
the bottom of the page and the addition of a donation button are sufficient to make the case clear.
Neither argument seems persuasive to me.  It is not even clear whether the first statement applies
to the webpage or the program.  In any event, it is contradicted by the large, free "download"
button elsewhere on the page.  Clearly *all* rights (in this case, the right to forbid reproduction) are
not being reserved.  Again in his declaration, Mr. Zebrak seems to think that asserting a work is
copyrighted (as all are, automatically) inevitably implies a restrictive distribution model.  But
this is not true – most obviously in the case of open source software and Creative Commons
licensed cultural material.  The copyright over the files is clear and is vital to the distribution
agreement.  Its assertion does not imply an intention to restrict redistribution, however.  As for
the donation button, if the developers wished to include a term in their semantic web license
restricting distribution to their own website, they clearly had the legal and technical savvy to do
so.  I am not asserting that Orbit Downloader is clearly noninfringing.  That would be making the
same kind of error of over-confidence as Mr. Zebrak, but in the other direction.  I would have
classified Orbit Downloader's status as "Unknown."  My point was that his failure to admit
ambiguity or the prevalence of content that is authorized for free download in *this* example,
reflects a larger tendency which I this is reasonable to believe skewed the rest of his assessments.

**b. Skoki 2006:**  This program provides another example of exactly the same point. Mr.
Zebrak stated in his initial classification that the reason for classifying this as Highly Likely
Infringing was the inclusion of Microsoft's DirectX.  But, as I point out at length in my rebuttal
report, the Microsoft DirectX redistributable included in the game is one that Microsoft *wants* to
be distributed free and, as the name suggests, "redistributable."  Skoki 2006 appears to be in

scrupulous conformance with Microsoft's EULA. The point here is that, once again, Mr. Zebrak's default assumption that high quality copyrighted content is not made freely available online leads him to misclassify DirectX – a program that Microsoft wishes developers to redistribute freely, making the point that free redistribution is a part of the strategy of even the most mainstream of proprietary software producers. In his declaration, Mr. Zebrak switches ground and argues that the game may be illegal for other reasons, so that his classification remains the same even though the reasons for asserting it are now different. Yet this fails to address the point made; that his assumptions lead him to misclassify an entire class of works and to state a level of certainty that his shift of position reveals to be illusory.

   **c. Photography 101 Podcast:** This podcast is an example, again, of the same theme. As I pointed out in my rebuttal report, the podcast is in fact offered for free download online and its author confirms that he does not object to its redistribution. Mr. Zebrak – somewhat puzzlingly – introduces the iTunes terms of service into the picture, apparently imagining that iTunes has the ability to affect the copyright status of a work in which it holds no copyright. It does not. Mr. Wittenburg holds the copyright in his podcasts. He allows people to download them freely and to repost them and says so explicitly in his affidavit. There is no evidence that the version of the podcast posted on Hotfile even came from iTunes. Mr. Wittenburg refers to the podcasts being available in multiple locations online. Even if it did, the iTunes terms of service are a red herring. I may give a lecture which I record and post online, posting it also on iTunes. I hold the copyright and I may choose to allow posting and reposting as I wish. Copyright law gives iTunes no rights over the program and no rights to circumscribe what I allow with my own podcast – they have no copyright to infringe – and thus the claim that the file is "highly likely *infringing*" cannot be supported on this basis. Mr. Zebrak also mentions the fact, which I discussed in the rebuttal report, that Mr. Wittenburg had said he objected to those who reposted charging money for the files. As I pointed out, "[i]ndividuals clearly could download Mr. Wittenburg's podcast from Hotfile without being charged money. This appears to be a legal reposting of Mr. Wittenburg's podcast. It certainly cannot be classified, as Mr. Zebrak does, as 'highly likely infringing.'" Ex. 2, Paragraph 42.

   **d. Farming Simulator:** Mr. Zebrak's response to my criticisms of his classification of multiple, user-generated "mod files" intended to be used with the video game Farming Simulator is, perhaps, the most revealing of all of his answers. In my rebuttal report, I pointed out that

Giant Software explicitly ran competitions for "mods" – that is to say additional modules – that they included an editor in the game program itself to allow users to create "mods," and that they encouraged users to repost these "mods."   This is a frequent practice in the gaming world, as I explained, and one which, again, Mr. Zebrak's strong assumption against free distribution causes him to misclassify.  Mr. Zebrak is silent about all this evidence.  Then faced with an e-mail from Mr. Schwegler, an employee of  Giant Software, explicitly saying that he has reviewed the modules, that they do not infringe Giant's copyrights, or contain any "cracks," and that they are legal to distribute, Mr. Zebrak first doubts that the employee has authority to make such decisions. He provides no explanation why it is reasonable to assume that a person who works at Giant Software would, out of some inexplicable motive, provide a detailed assessment of "mod files" that contradicts the company's wishes – a scenario that is remarkably implausible in its own right even if it were not for all the evidence I provided that Giant Software has repeatedly encouraged such "mods."  For his assessment to be correct, it has to be more likely that an attorney sitting in Washington D.C. can know that a distribution of user generated content is infringing, than for an actual *employee* of the company that owns the copyright of the game (and encourages distribution of such content) to be able to declare it *non*-infringing.  This defies belief.  He goes on to say "Mr. Schwegler opines that they are "non-infringing," without representing that he is an attorney or even familiar with U.S. copyright law. Thus, the declaration does not cause me to change my classification of the file." Zebrak, Declaration ¶ 19. This provides the clearest example of just how hard it is to get out of Mr. Zebrak's category of "highly likely infringing."  In this context we had overt permissive statements from the company, inclusion of a "mod" editor inside the game program to encourage user generated content, official competitions encouraging users to make such "mods," a frequent practice in the gaming industry allowing the free distribution of "mods" and a detailed declaration from an employee of the company specifically asserting that the "mods" were not infringing.  Even after seeing all this, Mr. Zebrak maintains his classification that it is "highly likely infringing"! True to his assumption that sharing is a bizarre aberration, he also apparently believes that a company needs to have U.S. copyright experts on its staff in order to exercise its right to *share* its content but not to *exclude* others from it.  This of course, is no more true than that you need to be an expert in real estate law to invite someone onto your porch.  If, faced with all this evidence, Mr. Zebrak sticks to such a classification, I think it is reasonable to doubt his judgment elsewhere.

**e. 1871 Russian Embroidery book**  Mr. Zebrak's classification here was inexplicable to me in my rebuttal report and remains so now.  He argues that there could be copyrightable selection and arrangement in the illustrations of this work, even though both the original work and the illustrations are clearly in the public domain.  I dealt with and dismissed this possibility in my rebuttal report – indeed the site to which he cites in his original argument for infringing status explicitly identifies this exact book, in unchanged order and arrangement, as being published in 1871 in St. Petersburg.  This book is at the most conservative possible classification, "highly likely in the public domain."  Mr. Zebrak will not concede even this, though he does at least change his classification to "Unknowable."  Again, I think the refusal to admit even overwhelming evidence like this indicates a predisposition to find infringement that is worryingly strong – and that predisposition appears to be a general one, which therefore has significance far beyond the files I was able to examine in the time available to me.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on this 6th day of March 2012, at Durham, North Carolina.

_____
James Boyle

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on March \_\_\_, 2012, a true and correct copy of the foregoing document, was filed conventionally and served on all counsel of record identified below via e-mail and by Federal Express.

Karen L. Stetson, Esq.
GRAY-ROBINSON, P.A.
Email: Karen.Stetson@gray-robinson.com
1221 Brickell Avenue
Suite 1600
Miami, FL 33131
Telephone: 305.416.6880
Telecopy: 305.416.6887

Steven B. Fabrizio, Esq. (admitted *pro hac vice*)
Email: sfabrizio@jenner.com
Duane C. Pozza, Esq. (admitted *pro hac vice*)
Email: dpozza@jenner.com
Luke C. Platzer, Esq. (admitted *pro hac vice*)
Email: lplatzer@jenner.com
JENNER AND BLOCK, LLP
1099 New York Avenue, N.W.
Suite 900
Washington, DC 20001
Telephone: 202.639.6000
Telecopy: 202.639.6066

Karen R. Thorland, Esq. (admitted *pro hac vice*)
Senior Content Protection Counsel
Email: Karen_Thorland@mpaa.org
Motion Picture Association of America, Inc.
15301 Ventura Boulevard, Building E
Sherman Oaks, CA 91403-5885
Telephone: 818.935.5812

By:_____
          Janet T. Munn

# EXHIBIT 1

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

## Expert Report of Professor James Boyle

1.  I am currently the William Neal Reynolds Professor of Law at Duke University, and have been retained by Farella, Braun + Martel LLP on behalf of the Defendants in this action as an expert witness.  I have personal knowledge of the following facts and, if called and sworn as a witness, could competently testify thereto.

### Background and Qualifications

2.  I received an LL.B. (Hons) from Glasgow University (1980), and an LL.M. (1981) and S.J.D. (1986) from Harvard Law School.  I have been a law professor since 1982, teaching at American University, and at the Universities of Pennsylvania, Harvard and Yale as a Visiting Professor.  In 2000 I joined the law faculty at Duke.

3.   My academic research is mainly in the areas of intellectual property and communication policy, with a particular focus on the Internet.  I have written and edited numerous articles and books on these subjects; a full list is available in the attached *curriculum vitae*.  In 2003 I received the World Technology Network Award for law.  My most recent book, *The Public Domain* (Yale University Press 2009), was the American Society for Information Science and Technology Book of the Year and the winner of the Donald McGannon Award for communications policy.

4.   My scholarly work has dealt with three areas relevant to this testimony:  a) "open source" software, such as Linux or Firefox, which is distributed under licenses that allow users freely to copy and make derivative works of the copyrighted code.  I have extensively researched the structure of incentives and innovation in open source software and written about its features and its various licenses in my articles and books.  b) cultural material that is made available under open licenses such as the Creative Commons set of licenses.  There are millions of digital files covered by such licenses, ranging from photographs to scientific articles.  The license is a way for the copyright owner to give permission in advance for various kinds of uses.  I was one of the founding Board Members of Creative Commons and served on its board from 2002 until 2009, the last year as Chairman.  c.) Public Domain material. I am one of the founders of the Center for the Study of the Public Domain at Duke Law School and the subject of my most recent book was the role of the public domain in innovation and culture.

### Scope of Expert Assignment

5.  My primary task was to explore some examples of the non-infringing uses of the Hotfile system.  Defendants' counsel asked me to study the use of the Hotfile service to store and to distribute or download the types of material described above, that is to say, material which can be licitly copied and distributed.  I did not research the many other types of content that could be licitly stored or transferred on Hotfile, including US government works, uncopyrightable material such as databases made up entirely of unoriginal compilations of facts, users' privately created content and so on.

6.  Defendant's counsel also asked me to examine Hotfile's Affiliate program, and specifically to look at how it can be used to compensate creators of content for distribution of their work on the Internet.  I was asked to determine whether, for example, Hotfile's Affiliate program compensates open source software developers for the software they write and freely distribute.

7.  My examination of Hotfile was not an exhaustive review of the files on Hotfile, nor does it purport to be a representative statistical sample of the uses of Hotfile as a whole.

8.  I am being compensated for my testimony at the rate of $750 an hour.

**Summary of Opinions**

9. After examining the Hotfile system, I came to four conclusions that I believe may be helpful to the court's analysis of both "substantial non-infringing uses" and of *Grokster*-style inducement liability.

i.  First, there was a high volume of usage of the Hotfile system for activities that were either clearly non-infringing or highly likely to be non-infringing.  Most notably, I determined that there is a high volume of usage of the Hotfile system for distribution of free and open source software. My non-comprehensive study found more than 1.7 million downloads of the six open source programs examined.  Using the Hotfile system to share non-infringing software files was also a *popular* usage of the system in relative and absolute terms: the top two most downloaded files on Hotfile were open source programs.  Open source and free software programs are a substantial (and growing) component of the software market today, so Hotfile's proven suitability and compatibility with such licensing models is of significance.

ii.  Second, Hotfile's architecture is compatible with and is actually being used for a wide *range* of activities, beyond the open source software context.  Examples of non-infringing uses that I identified ranged from distributing a public domain version of *Huckleberry Finn* to sharing Creative Commons-licensed "open source" animated movies.  My methodology did not attempt to exhaustively identify such uses.

iii.  Third, for reasons explained in the report, services such as Hotfile fill a gap in the Internet's architecture by providing a convenient and generic method of distributing or storing files that are too large for e-mail.  This is particularly important for small developers of open source software or non-profit distributors and collaborators in cultural projects under open licenses, like the "Blender Project" of open animation discussed in the report.  This functionality is useful to anyone who wishes to store and transfer large files of their own creation for use in their daily professional and personal activities.

iv.  Fourth, at least two of the open source developers featured in this study were

2

active participants in Hotfile's "Affiliate" program, thus being indirectly compensated for the programs they were freely providing to the public. This suggests that the Hotfile Affiliate program is capable of fulfilling the valuable function of compensating authors and distributors in proportion to the frequency with which their works are downloaded.

**Study Methodology**

10. In order to conduct my examination of the material stored on the Hotfile system, I worked with Elysium Digital, LL.C., a computer science consulting company retained by defendant's counsel. Under my direction, Elysium searched the Hotfile database for examples of the three types of files I mentioned earlier:

I. Open source software
II. Creative Commons licensed content
III. Public Domain material

Each of these types of material is more specifically described below.

11. The search method was a multi-step process that proceeded as follows.

First, Elysium searched by keywords likely to be associated with each type of content. For example, in searching for open source software, Elysium would use the official filenames of open source programs – such as Firefox or Ubuntu -- and would search for these terms both in Hotfile's database and on Google.

Second, they engaged in a human review of the contents of a small sample of the files retrieved by that search in order to discover what material was actually in the files since those terms alone could not identify the content precisely. For example, Ubuntu might refer to an African humanist philosophy of the same name, and there is a copyrighted film called "Firefox" which cannot be licitly shared. They verified, for example, that example files labeled "JDownloader" were actually the JDownloader software and that the movies that turned up from these searches were actually the Creative Commons licensed movies as indicated on Google. Based on the attached spreadsheet, this analysis should be reproducible. I assessed the copyright status of the human-verified materials they discovered. and instructed them to discard material that was not clearly in the relevant licitly sharable category.

Third, when they identified an example of a particular file type – for example a file that contained a verified distribution of Firefox – they produced a "hash" or digital signature that uniquely identified the file. I asked Elysium to use two different mathematical methods of producing hashes – MD5 and SHA1 – on each file in order to preclude false positives. Additionally, developers of open source software often list the hashes of the files on their web site so that users can verify that there were no errors during the download of the software. When possible,

Elysium compared the hashes of a file from Hotfile with the hashes listed on the developer's web site to further confirm that the file is identical to what can be downloaded from the developer's web site.

Fourth, Elysium searched the Hotfile database for those unique hashes – thus identifying other examples of exactly the same file which might or might not have been stored under the same name. This allowed me to have confidence that if we identified one copy of a file and confirmed that it was indeed within the specific category (open source, public domain, etc.) I could establish that all of the other "hits" with the identical hash in the Hotfile database were perfect duplicates, and thus were also within the specific licitly shared category. This method was deliberately conservative. For example, an open source program that had become garbled in uploading, or an earlier release of a freeware program – version 1.0 rather than 1.1– would produce a different hash and thus would not be counted in the analysis, though it would still be legal to up- and download. In addition, different compression software, or simply a decision to "break" the various portion of a Creative Commons film at a different point in a .rar file, would also result in a different hash signature.

12. This process was extremely labor-intensive and, in the time allowed, we could not classify, verify and conclusively assess a majority of the files identified by the preliminary keyword search. Thus, for example, there were 36 sets of files that used the name of an open source program which may be legally copied that we did not have time to assess at all: Apache, Chrome, ChromeOS, Debian, Django, Drupal, Emacs, FreeBSD, FreeSpire, Gimp, GNU programs, KDE, Knoppix, LibreOffice, Linspire, Mediawiki, MongoDB, Moodle, Mozilla, MySQL, Mythbuntu, OpenSolaris, PHP, Python, RenovatioCMS, Solaris, Squiz, StarOffice, SugarCRM, Suse, Symbian, Thunderbird, Wiki, Wordpress, Xandros, and Xebian. Due to the constraints, none of these were included in the final assessment. Thus, the listing in this report is best viewed as exemplary of particular non-infringing uses, not exhaustive. In addition, any material that we could not identify with a high degree of certainty as non-infringing—for example due to insufficient licensing information--was omitted from this report. For example, we omitted pre-1923 movie files that might or might not have had new copyrighted material added to them, and Creative Commons licensed material that might or might not have been distributed in accordance with the terms of the license.

**I**
**Free and Open Source software**

13. "Free and open source software" is the term used to describe software that is produced under a number of public licenses that grant to users the rights freely to copy the software and to make derivative works – new versions of the program, customized for some particular purpose. Commonly known examples of such software include the Firefox and Chrome web browsers, the Linux operating system, the Apache web server software and the Android operating system for mobile devices.

14. The most common free and open source licenses include the General Public License (GPL) produced by the Free Software Foundation and the BSD, or Berkeley Software Distribution license. These licenses differ in their particular terms. For example the GPL requires that, if a user receives software governed by the GPL, modifies it and then publicly redistributes the resulting derivative work, he must place the modified code under the same license that granted him the freedom to modify it in the first place. The BSD license, by contrast, imposes no such requirement on makers of derivative works. All of the licenses classified as free or open source, however, allow users freely to copy and distribute the software placed under the license. They also place no limits on commercial exploitation of the code by users and developers. Thus, uploading this type of software to or downloading it from a site such as Hotfile is entirely legal, as is receiving compensation from the "Affiliates" program for the volume of such downloads.

15. Unlike proprietary software developed by a single company, open source software relies on a decentralized network of developers, commercial and non-commercial, large and small. Both developers and users of open source software must use a variety of file storage and transfer methods to distribute or get access to the code produced under the license. Open source software is now a significant piece of the global software market.

16. The networks that produce open source are diverse. A single software project such as Mozilla/Firefox or a particular distribution of Linux might include paid programmers working for a large company such as IBM, Google or Red Hat and individuals who are donating their time to the project and who work in loosely organized collaborative arrays.[1] They are also heterogeneous in size, ranging from huge projects such as the two just mentioned, to small groups or individuals working on a single program. These features of open source projects have been of considerable interest to scholars studying the structure of innovation in this apparently anomalous economic system.[2] Two salient characteristics emerge from

---

[1] Yochai Benkler, Coase's Penguin, or, Linux and the Nature of the Firm, 112 Yale Law Journal 369 (2002.);

[2] Steven Weber, THE SUCCESS OF OPEN SOURCE (2004); PERSPECTIVES ON FREE AND OPEN SOURCE SOFTWARE (Feller, Fitzgerald et al. eds 2005); Josh Lerner and Jean

that scholarship: a.) these networks rely on the ease of communication and file transfer and storage facilitated by the Internet; the reduction of the transaction costs of collaboration is the single most important precipitating factor for forms of creativity such as open source. b.) participants who are not working for commercial entities are nevertheless able to profit from their contributions to open source projects, whether by demonstrating their skills to future employers or by being paid indirectly, for example through "tip jars" or per download fees from file storage systems such as Hotfile. These methods of indirect compensation are thus important to the future of distributed creativity.

17. Elysium Digital's search focused on six open source programs: Firefox, iREB and sn0wbreeze, JDownloader, OpenOffice.org and Ubuntu. As mentioned in paragraph 12, 36 other possible open source programs were identified by keyword searches, but it was impossible in the time available to explore and verify them all, and they are not included in this count. Under my direction, Elysium human-verified a source file and then used two different methods of generating "hashes" or digital fingerprints of the file so that they could identify perfect copies of that file elsewhere on the system, even if they were named differently. A complete table of all the results, with download counts of the individual source file and comprehensive download counts that include both the source file and hash-verified identical instances of the file is provided at the end of the open source software section of this report. The "Verified ID" column provides the ID or locator of the source file on the Hotfile system. The "Hash Match ID" column gives the ID's of all of the files that were an exact hash match with that original source file.

18. Focusing only on the six programs in the current study, we found a significant level of downloading. There were more than 1.7 million downloads of these files from Hotfile. Elysium Digital reported to me that two of the programs, iREB and sn0wbreeze, were the top 2 most downloaded files from Hotfile. That is to say, out of all the content on Hotfile, these files were the most often downloaded. The examples of open source software were as follows:

19. **Firefox:** Firefox is an open source web browser distributed by Mozilla, a non-profit organization[3] It is distributed under the Mozilla Public License[4] which

---

Tirole, *The Simple Economics of Open Source* NBER Research Paper 7600 (2000).

[3]     http://www.mozilla.org/about/ (last visited Nov 12, 2011.)

[4]     *Firefox: About* tab, "Mozilla Firefox is free and open source software, built by a community of thousands from all over the world. There are a few things you should know:

        Firefox is made available to you under the terms of the Mozilla Public License. This means you may use, copy and distribute Firefox to others. You are also welcome to modify the source code of Firefox as you want to meet your needs. The Mozilla Public License also gives you the right to distribute your modified versions." The Mozilla Public License can be found here http://www.mozilla.org/MPL/ (Last visited Nov 12, 2011.)

specifically gives users the freedom to copy, distribute and modify its code.[5]

Legal Status:  Clearly Non-infringing

Downloads:  There were 460 verified downloads of the human-verified instance of Firefox that we identified.

20.  **JDownloader:**  JDownloader is an open source download assistant that simplifies the process of downloading.  JDownloader's developers describe it as completely open source,[6] and licensed[7] under the General Public License.[8] The developers allow free copying and redistribution.  JDownloader advertises itself as useful on one-click hosting sites, and can also be used on sites such as Google Books or social networking sites such as Taringa.[9]  Like a web browser, JDownloader makes no distinction between infringing or non-infringing content and thus could be used for both licit and illicit downloading.  The potential for illicit use, however, is not sufficient to enjoin a product.  JDownloader would seem easily to pass the standard laid down in *Sony v Universal*[10]:  a product's distribution may not be enjoined on the grounds that it could be used to violate copyright if the product has or is capable of substantial non-infringing uses.

Legal Status:  Very likely non-infringing.

Downloads:  There were 203,389 downloads of the identified JDownloader files and 228,814 total downloads, including hash-match copies of the human-verified instances of JDownloader.  Under my direction, Elysium Digital determined that JDownloader's developers appear to be members of the Hotfile Affiliates program

---

[5]  "2.1. The Initial Developer Grant.  The Initial Developer hereby grants You a world-wide, royalty-free, non-exclusive license, subject to third party intellectual property claims:  under intellectual property rights (other than patent or trademark) Licensable by Initial Developer to use, reproduce, modify, display, perform, sublicense and distribute the Original Code (or portions thereof) with or without Modifications, and/or as part of a Larger Work."  Mozilla Public License 1.1 http://www.mozilla.org/MPL/MPL-1.1.html (last visited Nov 12, 2011.)

[6]  "JDownloader is open source, platform independent, and written completely in Java." http://jdownloader.org/ (last visited Nov 12, 2011.)

[7]  http://jdownloader.org/home/features (last visited Nov 12, 2011.)

[8]  My preliminary investigations indicate the source code for some portions of the program may not be publicly available (a requirement of the license.)  While this may be legally significant for those who wish to *modify* the code, and are unable to find all of it, it has no effect on whether it is legal simply to copy or redistribute the program as is, and thus has no apparent bearing on this case.

[9]  "JDownloader Review" Software Explorer http://www.softwareexplorer.com/jdownloader-96540.html (last visited Nov 12, 2011.)

[10]  *Sony Corp. v. Universal City Studios, Inc.*, 464 U.S. 417 (1984).

and thus are being indirectly compensated for their popular free software in proportion to the number of downloads.[11] The number of downloads was substantial and, in all probability, considerably higher than the figures given here. Elysium Digital examined the Hotfile database and discovered that authors of JDownloader had 17 of the top 100 most downloaded files. Since the software distributed by the authors of JDownloader is open source, these files would presumably be entirely licit to copy and share. However, most of those files were no longer available on Hotfile, so this count is limited to a subset of those versions of the JDownloader software that we able to conclusively verify.

21. **iREB & sn0wbreeze**: iREB and sn0wbreeze are open source programs developed (predominantly) by a programmer whose screen name is iH8sn0w.[12] They are used to "jailbreak" iPhones. In the words of the Librarian of Congress, "jailbreaking" is the colloquial term for "circumvention of the technological measures contained on certain wireless phone handsets (known as 'smartphones') that prevent third–party software applications from being installed and run on such phones."[13] To put it differently, to "jailbreak" a phone is to allow the phone's operating system to run applications of the user's choice. On July 27th, 2010, in a Digital Millennium Copyright Act (DMCA) triennial rulemaking, the Librarian of Congress determined that jailbreaking a smartphone such as an iPhone was legal under the DMCA. That is, it does not constitute a violation of DMCA section 1201's prohibition against circumventing a technological protection measure that controls access to a copyrighted work (the software in the smartphone). More specifically, one of the six exempt classes of works that the rulemaking announced was:

> Computer programs that enable wireless communication handsets to execute software applications, where circumvention is accomplished for the sole purpose of enabling interoperability of such applications, when they have been lawfully obtained, with computer programs on the telephone handset.[14]

iREB and sn0wbreeze are used to do exactly this. Without access to such programs consumers (at least those consumers who are not software engineers) would be unable to make the use identified in the Librarian's rulemaking. Both programs are licensed under the General Public License[15] and are thus legal to copy and to

---

[11] The Affiliate account has an associated e-mail address which uses the JDownloader domain and has the user-name JDownloader. The software uploaded by that account is software produced by the JDownloader developers.
[12] *See* http://ih8sn0w.com/ (last visited Nov 12, 2011.)
[13] http://www.copyright.gov/fedreg/2010/75fr43825.pdf
[14] Exemption to Prohibition on Circumvention of Copyright Protection Systems for Access Control Technologies, Final Rule, 75 Fed. Reg. 43,825 (July 27, 2010) (codified at 37 C.F.R. §201.40).
[15] *See* https://github.com/iH8sn0w/iREB-2.0/blob/master/LICENSE and https://github.com/iH8sn0w/sn0wbreeze/blob/master/LICENSE (last visited Nov 12, 2011.)

redistribute, commercially and non-commercially.   The developer of these programs, iH8sn0w, uses Hotfile to distribute them to the public.  If one goes to his homepage, one will find download links directly to Hotfile.[16]  For example, the most recent version of iREB can be found at http://hotfile.com/dl/125818297/0d55168/iREB-r4.zip.html and of sn0wbreeze can be found at http://hotfile.com/dl/134691967/4171147/sn0wbreeze-v2.8b11.zip.html

Under my direction, Elysium Digital determined that iH8sn0w is a member of the Hotfile Affiliates program and is thus being indirectly compensated for his popular free software in proportion to the number of downloads.

Legal Status:  Very likely non-infringing

Downloads:  For iREB, there were 691,625 downloads of the source file identified by Elysium and a total of 885,583 downloads including hash-match verified copies of that file.   For sn0wbreeze, there were 108,985 downloads of the source file identified by Elysium and 629,783 total downloads including hash-match verified of copies of that file.  As mentioned before, Elysium Digital reported to me that iREB and sn0wbreeze were the two most frequently downloaded files on Hotfile.

22. **OpenOffice.org:**  OpenOffice.org is an open source suite of office productivity tools similar to Microsoft Office in its functions.  The software is distributed under the Lesser General Public License.[17]  Copying is expressly permitted.

Legal Status:  Clearly non-infringing.

Downloads:   There were 9581 downloads of the identified OpenOffice.org source files and 30,265 total downloads including identical hash-verified instances of those OpenOffice.org files.

23. **Ubuntu:**  Ubuntu is an open source desktop software system built on the Linux platform. The Ubuntu distribution is designed to supply open source versions of all the software a user will require – from operating system to browser to word processing – either included in the bundle or downloadable from within the operating system.  While various add on components of Ubuntu may have differing licenses, the standard distribution of the "Main" and "Restricted" sections of Ubuntu is licensed under open source terms and all parts of the standard distribution are

---

[16]     *See* http://ih8sn0w.com/ (last visited Nov 12, 2011.)

[17]     "OpenOffice.org uses a single open-source license for the source code and a separate documentation license for most documents published on the website without the intention of being included in the product.  The source-code license is the GNU Lesser General Public License. Effective OpenOffice.org 3.0 Beta, OpenOffice.org uses the LGPL v3.  The document license is the Public Document License (PDL)." http://www.openoffice.org/license.html (last visited Nov 11, 2011.)

under licenses that guarantee the right freely to copy the software.[18]

Legal Status:  Clearly non-infringing.

Downloads:  There were 113 downloads of Ubuntu, source and hash-verified.

**TABLE ONE – EXAMPLES OF FREE AND OPEN SOURCE SOFTWARE ON HOTFILE**

| Name | Keywords/Query | Verified IDs | Hash Match IDs | Verified Downloads | Verified & Hash Downloads |
|------|----------------|--------------|----------------|--------------------|--------------------------|
| Firefox | Searched on "firefox" from file_names on hotfile database. | 111035126 | | 460 | 460 |
| JDownloader | JDownloader | 4051026, 14052520, 81315168, 23418241, 27342313 | 45471394, 14090647, 29015390, 13934079, 106024395, 124158886, 106346182, 98911239, 124395721, 85729258, 105581035, 106344622, 92329459, 105548820, 102599094, 114067993, 106462457, 97900827, 81607389, 94567934, 24440741, 127148368, 99280977, 125775956, 93040444, 18894080, 25576195, 106438662, 73552519, 117806124, 113552377, 126354675, 109171920, 116443534, 22398479, 18270992, 82381329, 103151762, 94548371, 91699126, 110450072, 23823513, 113545910, 101418523, 117047836, 27326109, 29522078, 106593311, 121139744, 119304336, 112377525, 102973863, 20506410, 110701227, 21782444, 109229943, 99494703, 95191217, 109932082, 35106867, | 203389 | 228814 |

---

[18]     "All application software in both main and restricted must meet the following requirements:
　　　　Must allow redistribution.  Your right to sell or give away the software alone, or as part of an aggregate software distribution, is important because:
　　　　You, the user, must be able to pass on any software you have received from Ubuntu in either source code or compiled form.
　　　　While Ubuntu will not charge licence fees for this distribution, you might want to charge to print Ubuntu CDs, or create your own customised versions of Ubuntu which you sell, and should have the freedom to do so."
　 http://www.ubuntu.com/project/about-ubuntu/licensing

| Name | Keywords/Query | Verified IDs | Hash Match IDs | Verified Downloads | Verified & Hash Downloads |
|------|----------------|--------------|----------------|--------------------|--------------------------|
| | | | 106450996, 78606238, 19013686, 63918903, 18709817, 116444730, 65760059, 51676988, 129274557, 19771966, 19142975, 120815723, 61837635, 31650884, 69522757, 96581338, 104790647, 106458189, 100567888, 86529234, 106450005, 128863574, 22128215, 102844760, 61812186, 119437199, 60841308, 109804729, 96118201, 80631266, 106448483, 73963108, 119445733, 105134182, 109748074, 116444651, 64639357, 123847152, 119434994, 109813103, 106451700, 20000631, 57853816, 21419769, 97386618, 19608315, 63227946, 18574719 | | |
| OpenOffice | OpenOffice%; OOo% | 61682386, 63993443, 106906538 | 101748046, 98264344, 97312315, 106374379, 100448967, 108379358, 85581586, 103002761, 107602983, 93365244, 53570616, 128924696, 95551033, 116362996, 100190542, 114295685, 112135971, 106128722, 101747896, 108983774, 112144612 | 9581 | 30265 |
| Ubuntu | Google: "Ubuntu on hotfile" | 81087050, 81087051 | | 113 | 113 |
| iREB | iREB | 108923557 | 118055012, 108969652, 125969054, 124080917, 116963265, 111015314, 108944058, 113950902, 127338293, 111134233, 111102945, 109432291, 117509749, 118236145, 113493651, 111044524, 113300326, 111225402, 129285191, 123426938, 121844508, 129137393, 123549421, 117009434, 128306751, 113216075, 108928623, 128926633, 117509141, 115224338, 128513796, 113062967, 120433044, 121484483, 127268020, 125818297, 122450789, 124740681, 110330855, 110910580, 122605094, 118434968, 123529015, 122692366, 117258783, 109050411, 126842839, 124958429, 121793717, 120075176, 128188567, 118654221, 119874964, 116596749, 119193810, 124958467, 119380105, 129237270, 126667967, 118062795, | 691625 | 885583 |

| Name | Keywords/Query | Verified IDs | Hash Match IDs | Verified Downloads | Verified & Hash Downloads |
|---|---|---|---|---|---|
| | | | 110387124, 111657566, 116941345, 124958585, 128653559, 127267996, 116829785, 118624030, 128111985, 125027246, 115932793, 111866952, 112285263, 114633459, 124661491, 116309824, 113299943, 116047221, 122776323, 126562919, 109043298, 123686433 | | |
| sn0wbreeze | sn0wbreeze% | 125818066 | 128419283, 117674441, 118702210, 122423360, 121460959, 121201922, 118222269, 128814851, 127449487, 118533619, 128733652, 128421432, 128652641, 119299826, 118937654, 121473429, 124771672, 118043851, 117674872, 124476756, 120737623, 124138569, 124476894, 118263379, 117726226, 124561020, 128457680, 125123833, 128202577, 126383120, 123897164, 118576938, 125214726, 119067724, 125396398, 118942400, 117722117, 126110757, 117635913, 122806897, 124329140, 125454952, 119483092, 120027357, 125145002, 117662024, 118048976, 125088395 | 108985 | 629783 |

**II**
**Creative Commons Licensed Content**

24.   Creative Commons licenses are standardized licenses that allow copyright holders to share their content under a variety of possible terms they choose.[19] Users select from a list of options, for example to allow commercial uses or not, to allow derivative works or not.  The resulting license has three layers; a simplified 'human readable' page that summarizes the terms of the license,[20] the actual license itself,[21] known as the 'lawyer-readable' portion, and a machine-readable set of metatags that identify the terms of the license to search engines, so that those seeking open material can search by the license terms as well as the content.  (For example, physics textbooks that are available for non-commercial reproduction and distribution.)   Creative Commons licenses have been used by a wide array of copyright holders, ranging from successful commercial artists such as Trent Reznor and David Bowie, to scholarly publications such as the Public Library of Science journals, to universities such as MIT that wish to make their course materials available on the web for reproduction and distribution.

25.   Searching for Creative Commons materials on Hotfile was challenging because the compression of files necessary to save space means the license information, too, is compressed and hidden. This means that one cannot simply search for the license terms as one can when the files are not compressed.  Instead, I directed Elysium Digital to search for the names of three popular animated films, Big Buck Bunny, Elephants Dream, and Sintel on Google and in Hotfile's data.   These films were chosen because they were all produced by the Blender Project and released under the least restrictive Creative Commons license, CC BY, which requires only attribution.   Other Creative Commons content that we discovered, including MIT Open Courseware, or author Cory Doctorow's novels and stories, were not included in this count because that material is released under a Creative Commons license that precludes commercial use and we could not be certain the uploader was receiving no revenue as a result of sharing the material.  This survey also does not

---

[19]     *About Creative Commons*, "Our tools give everyone from individual creators to large companies and institutions a simple, standardized way to keep their copyright while allowing certain uses of their work – a "some rights reserved" approach to copyright – which makes their creative, educational, and scientific content instantly more compatible with the full potential of the Internet.  The combination of our tools and our users is a vast and growing digital commons, a pool of content that can be copied, distributed, edited, remixed, and built upon, all within the boundaries of copyright law." http://creativecommons.org/about (last visited Nov 12, 2011.)

[20]     Here, for example, is the human readable summary of the CC 3.0 Attribution license.  http://creativecommons.org/licenses/by/3.0/us/

[21]     Here for example is the full text of the CC 3.0 Attribution License http://creativecommons.org/licenses/by/3.0/us/legalcode

include counts of the material discovered during the search that appears to be freely shared by the author and copyright holder but which is not under a formal Creative Commons license. For example, this Chinese PowerPoint on "Hepatitis C Treatment: Current and Future Trends"[22] seems unlikely to be infringing, but it is not formally licensed under a Creative Commons license.

26. **Big Buck Bunny:** Despite its rather alarming name, Big Buck Bunny is an animated film[23] about the eponymous rabbit of the title, created by the Blender Project. The Blender Project is an organization that was formed to explore the use of the open source program Blender to produce films which are also freely licensed.[24] The film is licensed[25] under the Creative Commons Attribution 3.0 license[26] which permits commercial and non-commercial reproduction and distribution and the creation of derivative works. Because it is a movie, the file is very large (885 megabytes in its .avi format) and cannot be easily shared without some kind of file-transfer service. It is stored on Hotfile in the highly compressed, multi-part, .rar format. A trailer for the movie can be found here. http://www.youtube.com/watch?v=YE7VzlLtp-4

Legal Status: Clearly non-infringing

Downloads: The instances of Big Buck Bunny that we found and human verified had 103 downloads.

27. **Elephants Dream**: Elephants Dream was the first movie produced by the Blender Project. It was part of a demonstration of the possibilities of open source film-making in which source files and graphics files are made available to the audience as well as the film itself. "Elephants Dream is the world's first open movie, made entirely with open source graphics software such as Blender, and with all production files freely available to use however you please, under a Creative Commons license."[27] It, too, is produced under the Creative Commons Attribution 3.0 License and as such may be copied and redistributed freely.

Legal Status: Clearly non-infringing

---

[22]     "Hepatitis C Treatment: Current and Future Trends"
http://hotfile.com/dl/126573095/0852787/1000616.ppt.html
[23]     http://www.bigbuckbunny.org/index.php/about/ (last visited Nov 13, 2011.)
[24]     http://www.blender.org/features-gallery/blender-open-projects/ (last visited Nov 13, 2011.)
[25]     "The results of the Peach open movie project has been licensed under the Creative Commons Attribution 3.0 license."
http://www.bigbuckbunny.org/index.php/about/ (last visited Nov 13, 2011.)
[26]     http://creativecommons.org/licenses/by/3.0/ (last visited Nov 13, 2011.)
[27]     http://orange.blender.org/ (last visited Nov 13, 2011.)

Downloads:  The instance of Elephants Dream we identified had 18 hash-verified downloads.

28.  **Sintel:**  Sintel is the third film in the Blender Project Series.  "Sintel is an independently produced short film, initiated by the Blender Foundation as a means to further improve and validate the free/open source 3D creation suite Blender. With initial funding provided by 1000s of donations via the Internet community, it has again proven to be a viable development model for both open 3D technology as for independent animation film."[28]  It, too, is released under the Creative Commons Attribution 3.0 license.

Legal Status: Clearly non-infringing

Downloads:  Though this file was stored on Hotfile, we did not find any downloads of Sintel.

### TABLE TWO – EXAMPLES OF CREATIVE COMMONS CONTENT ON HOTFILE

| Name | Keywords/Query | Verified IDs | Hash Match IDs | Verified Downloads | Verified & Hash Downloads |
|---|---|---|---|---|---|
| Big_Buck_Bunny | Google:"Big Buck Bunny on hotfile"; searched bunny and buck on hotfile database | 108538977, 108549505, 108557338 | | 103 | 103 |
| Elephants_Dream | google "Elephants Dream on hotfile" | 25133372 | | 18 | 18 |
| Sintel | Google: "Sintel on hotfile"; searched "Sintel" on hotfile database | 97697238, 97697035, 97697403 | | 0 | 0 |

---

[28]    http://www.sintel.org/about/  (last visited November 13, 2011.)

### III
### Public Domain Material

29.  Material may be in the public domain in the United States for many reasons.  For example, its public domain status may be because it is uncopyrightable, such as an unoriginal compilation of fact, or that it is a work of the Federal Government and thus is put into the public domain by section 105 of the Copyright Act.  In my assessment of Hotfile, I asked Elysium to search for examples of works that are in the public domain either because the work had never been under copyright to begin with, such as Shakespeare's plays, or because the copyright had expired, such as *Huckleberry Finn*. (Works published before 1923 can be presumed to be in the public domain in the United States.[29])

I applied very conservative standards even to works such as these, however.  A Google Books scan of Hamlet, while clearly in the public domain, was omitted from this analysis because the Google books cover page, listing the terms of use, was included in the download. We also found a number of pre-1923 films, including *Birth of A Nation*, and the Charlie Chaplin films *The Adventurer, On Easy Street* and *The Fireman*.  However, in the time available I could not examine the films fully enough to be sure that copyrighted material had not been added to the version stored on Hotfile.  They are not included in these counts.

30.  **Huckleberry Finn:**  Mark Twain's classic tale is available on Hotfile in the form of an attractive illustrated 1885 edition, which appears to be the very first book ever published by the Charles L. Webster publishing company.[30]

Legal Status:  Clearly non-infringing.  Works published before 1923 are in the public domain in the United States.  This book was published 38 years before that cut-off. The book has an imprint on the title page declaring "Prepared and Published by E-Books Directory" but neither mechanically scanning a book, nor adding the name of your firm to it, suffices to confer a new copyright in it.  For that to happen there would need to be additional original expressive material.  I examined the book and it is otherwise unchanged.

Downloads:  There were 17 instances of the human-verified file of Huckleberry Finn and 45 hash-verified downloads.

---

[29]     17 U.S.C. § 304

[30]     I am grateful to the Cornell University Library's exhibition "The Business of Being Mark Twain" for this fact. Both the cover and the dates match exactly. http://rmc.library.cornell.edu/twain/exhibition/webster/index.html (last visited Nov 16, 2011.)

31. **Othello:** Dating from approximately 1603, a time that preceded the coming into effect of the first true copyright act by 107 years, Shakespeare's Othello is clearly in the public domain.

Legal Status: Clearly non-infringing

Downloads: Othello was uploaded to the Hotfile system but, as yet, the Moor of Venice has found no admirers among Hotfile users. We found zero downloads.

32. **Macbeth:** Shakespeare's Macbeth was written in the early 1600's and is therefore in the public domain in the United States. The particular version on Hotfile is an unchanged pdf of the text of the play.

Legal Status: Clearly non-infringing

Downloads: Macbeth was uploaded to the Hotfile system but we found no downloads.

33. **A Tale of Two Cities:** Charles Dickens' A Tale of Two Cities was published in 1859 and is in the public domain in the United States. The version uploaded to Hotfile bore markings of an organization called "Planet PDF" but no original expression had been added to the book and thus its copyright status is unchanged.

Legal Status: Clearly non-infringing

Downloads: A Tale of Two Cities had been downloaded 4 times.

**TABLE THREE – EXAMPLES OF PUBLIC DOMAIN CONTENT ON HOTFILE**

| Name | Keywords/Query | Verified IDs | Hash Match IDs | Verified Downloads | Verified & Hash Downloads |
|---|---|---|---|---|---|
| A_Tale_of_Two_Cities | google: "A Tale of Two Cities on hotfile" | 94112268 | | 4 | 4 |
| Huckleberry_Finn | google: "Huckleberry Finn on hotfile"; search Huckleberry and Finn on hotfile database | 65463776 | 76947371, 59344815, 120866286, 95907818 | 17 | 45 |
| Macbeth | Searched on Macbeth.pdf from Hotfile database, Googled "Macbeth.pdf on hotfile" | 99000556, 118496987 | | 0 | 0 |
| Othello | Googled: "Othello.pdf on hotfile" | 118398280 | | 0 | 0 |

## IV
## Conclusion

33.  The court will make its own assessment of whether Hotfile has substantial non-infringing uses and whether Hotfile "induces" infringement.  This expert report focused only on specific instances of three types of non-infringing content, and did not survey all, or even a majority of the examples of that content.  Nevertheless, in my opinion, it reveals four facts that are relevant to the court's decision.

34.  First, non-infringing content is frequently uploaded and downloaded on Hotfile and those uses are substantial both in terms of raw numbers, and in terms of the most common uses of the Hotfile system. This report does not attempt to present a statistically representative sample of the usage of Hotfile and I have no personal knowledge about what percentage of Hotfile's uploaded content, or of user downloads, is non-infringing. Nevertheless, even within the limits suggested by the previous sentence, my investigation of the system provided some striking facts about the usage of Hotfile.  There were more than 1.7 million downloads of the six open source programs described here.  OpenOffice.org alone was downloaded more than 30,000 times. From the records we have, it appears likely, though not certain, that JDownloader supplied 17 of the top 100 most shared files on Hotfile. Elysium Digital informs me that sn0wbreeze and iREB are the two most downloaded programs on Hotfile, iREB being the #1 most downloaded and sn0wbreeze being the #2.  The fact that it is highly likely that the two most commonly downloaded files on Hotfile are open source programs that seem to be licitly shared appears relevant to any assessment the court might make about the *current* usage of the system.  In terms of the *potential* uses of the system, it is worth noting that open source software is an important, and growing, component of the software market today. Hotfile appears suited for, compatible with, and widely used for independent open source distribution.  In my opinion, therefore, this shows both current, and potential future, substantial non-infringing uses.

35.  Second, Hotfile is also being used for a wide *range* of non-infringing activity, even when the number of downloads in the category is relatively lower than for open source software.  In this study, other uses ranged from sharing Shakespearean plays to open source movies.  The courts have made clear that it is not merely current non-infringing use, but capability for future non-infringing use, that is relevant to any legal assessment of a service such as Hotfile.[31]

---

[31] "Accordingly, the sale of copying equipment, like the sale of other articles of commerce, does not constitute contributory infringement if the product is widely used for legitimate, unobjectionable purposes. Indeed, it need merely be *capable* of substantial noninfringing uses." *Sony Corp. v. Universal City Studios, Inc.*, 464 U.S. 417, at 442 (emphasis added); "We depart from the reasoning of the district court that Napster failed to demonstrate that its system is capable of commercially significant noninfringing uses. *The district court improperly confined the use analysis*

36.    Third, Hotfile provides a type of service that is very important in the architecture of the Internet.  Transferring large files over the Internet is difficult. Gmail's maximum file attachment size is 25MB, for example, and most e-mail systems set lower limits.[32]  For an 885 MB movie such as *Elephants Dream,* or an entire distribution of Ubuntu or OpenOffice.org, some kind of file hosting or transfer service is required.    Independent open source developers or filmmakers collaborating on an open source film do not necessarily have their own servers from which material can be shared.  The growth of distributed creative activity on the Internet suggests that the already important role for services such as Hotfile is likely to grow in the future.

37.  Fourth, some of those producing and sharing content licitly and freely on Hotfile are using the Affiliate Program as a way of being indirectly compensated for their efforts.    This is true of the open source developers of iREB, sn0wbreeze, and JDownloader, for example. Since we know that iREB and sn0wbreeze are the two most commonly downloaded files on the system and since Elysium Digital found that the developers of JDownloader appear to have provided 17 of the top 100 most downloaded files,[33] the Affiliate Program may offer each of them a source of revenue. Methods of indirect compensation such as this are important to the future of the types of distributed creativity described in the open source and Creative Commons sections of this report. Any assessment of the Affiliate Program, particularly one that indirectly casts doubt on the legal acceptability of such programs elsewhere on the Internet, should take this into account.

---

*to current uses, ignoring the system's capabilities.* Consequently, the district court placed undue weight on the proportion of current infringing use as compared to current and future noninfringing use." *A&M Records, Inc. v. Napster, Inc.*, 239 F.3d 1004,1021 (9th Cir. 2001) (emphasis added.); "Importantly, Sony also used the word "capable," asking whether the product is "capable of " substantial noninfringing uses... its language also indicates the appropriateness of looking to potential future uses of the product to determine its "capability." *Metro-Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd.*, 545 U.S. 913, 953-954 (2005) (Breyer, J., concurring).

[32]      http://mail.google.com/support/bin/answer.py?answer=8770 (last visited Nov 13, 2011.)

[33]      *See* infra at paragraph 20.

**SUPPLEMENTATION OF OPINIONS**

38.  I expect to testify regarding the matters set forth in this expert report, if asked about these matters by the court or the parties' attorneys. I understand that discovery is ongoing in this case.  I therefore reserve the right to adjust or supplement my opinions after I have had the opportunity to review deposition testimony or in light of additional documents or arguments that may be brought to my attention, including any additional orders from the court.

Signed,

James Boyle

Curriculum Vitae of
# JAMES D.A. BOYLE

**Office:**
Duke Law School
Box 90360 / 210 Science Drive
Durham, North Carolina 27708-0360
919 613-7287
e-mail: boyle@law.duke.edu

———————————

## EMPLOYMENT

| | |
|---|---|
| 2002–present | **William Neal Reynolds Professor of Law**, Duke Law School. Founder and Faculty Co-Director, Duke Center for the Study of the Public Domain. |
| 2000–2002 | **Professor**, Duke Law School |
| 1998–99 | **Visiting Professor**, Yale Law School |
| 1993–94 | **Visiting Professor**, Duke Law School |
| Spring 1992 | **Visiting Professor**, Harvard Law School |
| Fall 1991 | **Visiting Professor**, Boston University Law School |
| Spring 1986 | **Visiting Associate Professor**, University of Pennsylvania Law School |
| 1986–2000 | **Professor**, Washington College of Law, American University |
| 1985–1986 | **Associate Professor**, Washington College of Law, American University |
| 1982–1984 | **Assistant Professor**, Washington College of Law, American University |
| 1981–1982 & 1980–1981 | **Teaching Fellow**, Harvard University Harvard-Danforth Certificate for Excellence in Teaching |
| 1981–1982 | **Research Assistant**, Harvard Law School |

## EDUCATION

| | |
|---|---|
| 1986 | Harvard Law School **S.J.D.** |

| 1981–82 | Harvard Law School |
| | Coursework for S.J.D.: Frank Knox Fellow |

| 1980–1981 | Harvard Law School |
| | **LL.M.**: Frank Knox Fellow |

| 1975-1980 | Glasgow University |
| | **LL.B. (Hons.)**: Double First in International Law and Politics. Viscount Stair Prize for best graduate in international law. |

## PUBLICATIONS

**Books & Collections**

The Public Domain: Enclosing the Commons of the Mind (Yale University Press 2009)

Cultural Environmentalism @ 10, 70 Law & Contemporary Problems 1–210 (2007) (Larry Lessig and James Boyle eds.)

Papers on the Public Domain (edited with an introduction by James Boyle, Law & Contemporary Problems 2003)

Shamans, Software, and Spleens: Law and the construction of the Information Society (Harvard University Press 1996)

Critical Legal Studies: Selected Readings (edited with an introduction by James Boyle, Dartmouth/N.Y.U. Press 1994), part of the International Library on Law & Legal Theory Series

**Educational Comic Book**

Tales from the Public Domain: Bound By Law? (with Keith Aoki and Jennifer Jenkins 2006) (expanded edition, Duke University Press 2008) (also translated into French, Portuguese, and Italian)

**Articles & Chapters**

*Endowed by Their Creator?: The Future of Constitutional Personhood*, in Brookings Institution, The Future of the Constitution Series, No. 10 (2011)

*What Intellectual Property Law Should Learn from Software*, Communications of the ACM, Vol. 52 no. 9, p. 71 (2009)

*Intellectual Property: The Key Challenges*, in G8 Summit 2008: Challenges of Globalization, at 162 (Maurice Fraser ed., Agora Press 2008)

*Cultural Environmentalism and Beyond*, 70 Law & Contemporary Problems 5 (2007)

*Synthetic Biology: Caught Between Property Rights, the Public Domain and the Commons*, 6 PLOS BIOLOGY 389 (2007) (with Arti Rai)

*Mertonianism Unbound?: Imagining Free, Decentralized Access to Most Cultural and Scientific Material*, *in* UNDERSTANDING KNOWLEDGE AS A COMMONS: FROM THEORY TO PRACTICE, at 123 (Elinor Ostrom & Charlotte Hess eds., MIT Press 2007)

*Towards a Global Learning Commons*, EDUCATIONAL TECHNOLOGY, Nov/Dec 2007, at 5 (with Ahrash Bissel)

*Promoting Innovation, Protecting Intellectual Property: Towards Evidence-based Policy*, in G8 SUMMIT 2007: GROWTH AND RESPONSIBILITY, at 34 (Maurice Fraser ed., Agora Press 2007)

*A Manifesto on WIPO and the Future of Intellectual Property*, 2004 DUKE LAW & TECHNOLOGY REVIEW 0009

*What the Squabbles over Genetic Patents Could Teach Us*, ADVANCES IN GENETICS 2003

*The Opposite of Property*, 66 LAW & CONTEMPORARY PROBLEMS 1 (2003)

*The Second Enclosure Movement & the Construction of the Public Domain*, 66 LAW & CONTEMPORARY PROBLEMS 33 (2003)

*Fencing Off Ideas*, DAEDALUS (Intellectual Property Issue) (Spring 2002), at 13

*Cruel, Mean or Lavish?: Economic Analysis, Price Discrimination and Digital Intellectual Property*, 536 VANDERBILT LAW REVIEW 2007 (2000)

*The First Amendment and Cyberspace: The Clinton Years*, 63 LAW & CONTEMPORARY PROBLEMS 337 (2000)

*A Non-Delegation Doctrine for the Digital Age*, 50 DUKE LAW JOURNAL 5 (2000)

*Conservatives and Intellectual Property: Address to the Federalist Society*, 1 ENGAGE 83 (2000)

*Anachronism of the Moral Sentiments? Integrity, Post-Modernism and Justice*, 51 STANFORD LAW REVIEW 493 (1999)

*A Politics of Intellectual Property: Environmentalism for the Net?* 47 DUKE LAW JOURNAL 87 (1997)

*Foucault in Cyberspace: Surveillance, Sovereignty and Hard-Wired Censors*, 66 UNIVERSITY OF CINCINNATI LAW REVIEW 177 (1997)

*Intellectual Property Policy On-Line: A Young Person's Guide*, 10 HARVARD JOURNAL OF LAW AND TECHNOLOGY 47 (1996)

*The P.C. Harangue*, 45 STANFORD LAW REVIEW 1493 (1993)

*Legal Realism and the Social Contract: Fuller's Public Jurisprudence of Form, Private Jurisprudence of Substance*, 78 CORNELL LAW REVIEW 371 (1993)

*A Theory of Law and Information: Copyright, Spleens, Blackmail and Insider Trading*, 80 CALIFORNIA LAW REVIEW 1413 (1992)

*A Process of Denial: Bork and Post-Modern Conservatism*, 3 YALE JOURNAL OF LAW AND THE HUMANITIES 263 (1991)

*Is Subjectivity Possible? The Post-Modern Subject in Legal Theory*, 62 UNIVERSITY OF COLORADO LAW REVIEW 489 (1991)

*A Progressive View of Tort Law*, THE WORLD AND I 541 (Feb. 1989)

*In Re 'William Shakespeare,'* 37 AMERICAN UNIVERSITY LAW REVIEW 725–797, 809–817 (1988)

*Search for the Author: Shakespeare and the Framers*, 37 American University Law Review 625 (1988)

*Thomas Hobbes and the Invented Tradition of Positivism*, 135 UNIVERSITY OF PENNSYLVANIA LAW REVIEW 383 (1987)

*The Politics of Reason*, 133 UNIVERSITY OF PENNSYLVANIA LAW REVIEW 685 (1985)

*Ideals and Things: International Legal Scholarship and the Prison House of Language*, 26 HARVARD INTERNATIONAL LAW JOURNAL 327 (1985)

*Anatomy of a Torts Class*, 34 AMERICAN UNIVERSITY LAW REVIEW l003 (l985)

*Symposium on Critical Legal Studies: Introduction*, 34 AMERICAN UNIVERSITY LAW REVIEW 929-938 (l985)

**Review Essays**

*Legal Fiction:* Law's Empire *by Ronald Dworkin*, 38 HASTINGS LAW JOURNAL 401 (1987)

*Imagining Free, Decentralized Access to Most Cultural and Scientific and Scientific Material*, 98 HARVARD LAW REVIEW 1066 (1985)

**Reprinted & Translated Essays**

*O Segundo Movimento de Emparcelamento e a Construcao do Dominio Publico* (Portuguese translation of *The Second Enclosure Movement and the Construction of the Public Domain*), *in* A ECONOMIA DA PROPRIEDADE INTELECTUAL E OS NOVOS MEDIA: ENTRE A INOVACAO E A PROTECCAO, at 20 (Guerra & Paz Press 2007)

*Las Ideas Cercadas: El Confinamiento Y La Desaparición Del Dominio Público* (Spanish translation of *Fencing off Ideas*), in ¿UN MUNDO PATENTADO? LA PRIVATIZACIÓN DE LA VIDA Y DEL CONOCIMIENTO, at 39 (Jorge Villarreal, Silke Helfrich & Alejandro Calvillo eds., Heinrich Boell Press 2007)

*Fencing Off Ideas: Enclosure and the Disappearance of the Public Domain*, *reprinted in* A PATENTED WORLD?: PRIVATISATION OF LIFE AND KNOWLEDGE, at 19 (Ana Agostino & Glenn Ashton eds., Jacana Press 2007)

*Foucault in Cyberspace: Surveillance, Sovereignty, and Hardwired Censors*, *reprinted in* LAW AND SOCIETY APPROACHES TO CYBERSPACE (International Library of Essays in Law and Society), at 235 (Paul Berman ed., Ashgate Press 2007)

*A Manifesto on WIPO and the Future of Intellectual Property*, *reprinted in* COPYRIGHT LAW AND POLICY IN A NETWORKED WORLD, at 135 (Georgia Harper ed., NACUA Press 2007)

*Intellectual Property: The Analogy to Environmentalism*, in LAND ART: A CULTURAL ECOLOGY HANDBOOK, at 127 (RSA Press: Royal Society for the Encouragement of Arts, Manufacture and Commerce 2007)

*Fencing off Ideas: Enclosure and the Disappearance of the Public Domain*, *reprinted in* CODE: COLLABORATION AND OWNERSHIP IN THE DIGITAL ECONOMY, at 235 (Rishab Aiyer Ghosh ed., MIT Press 2005)

*A Politics of Intellectual Property: Environmentalism for the Net*, *reprinted in* READINGS IN CYBERETHICS, at 231 (Richard Spinello & Herman Tavani eds., Jones & Bartlett Press 2001)

*Copyright and the Invention of Authorship* (chapter from SHAMANS, SOFTWARE AND SPLEENS), *in* GROWING PAINS: ADAPTING COPYRIGHT FOR LIBRARIES, EDUCATION AND SOCIETY (Laura N. Gasaway ed., F.B. Rothman Press 1997)

*Modernist Social Thought: Roberto Unger's Passion*, *reprinted in* CLS: ESSAYS ON CRITICAL LEGAL STUDIES FROM THE PAGES OF THE HARVARD LAW REVIEW (Harvard Law Review l986)

*Ideals and Things: International Legal Scholarship and the Prison House of Language*, *reprinted in* THE INTERNATIONAL LIBRARY OF ESSAYS IN LAW AND LEGAL THEORY: INTERNATIONAL LAW (Martti Koskenniemi ed., Aldershot/ Dartmouth Press 1992)

**POSITIONS & HONORS:**

Expert Advisor to the Hargreaves Review of Intellectual Property Law for the Government of the United Kingdom (2010/2011)

Melville B. Nimmer Memorial Lecturer, UCLA School of Law (2011)

Arcadia Lecturer, University of Cambridge (2009)

Duke Law School Distinguished Teaching Award (2006)

Columnist, *Financial Times* "New Economy Policy Forum"

Winner, World Technology Award for Law, 2003

Co-Founder, Science Commons, ccLearn

Founder and Faculty Co-Director, Duke Center for the Study of the Public Domain (www.law.duke.edu/cspd)

Board Member, Creative Commons (www.creativecommons.org)

Academic Advisory Board, EPIC (Electronic Privacy and Information Center www.epic.org)

Academic Advisory Board, Public Knowledge (www.publicknowledge.org)

Advisory Board, Connexions Open Source Learning Tools

American University Faculty Award for Outstanding Scholarship 1996

# EXHIBIT A

# Big Buck Bunny

These files were identified by a) searching Google for "Big Buck Bunny on hotfile" and b) searching for Big AND Buck AND Bunny in the hotfile database

**Verified Files**

| uploadid | filename | size | url | md5 | sha1 |
|---|---|---|---|---|---|
| 108538977 | Big Buck Bunny.part1.rar | 350,000,000 | http://hotfile.com /dl/108538977 /a3c2359/big-buck-bunny.part1.rar.html | 33863a3917c89b9a1b00cba013f41417 | c4a1addb1ce89596dad3eb04dc64db8004de1886 |
| 108549505 | Big Buck Bunny.part2.rar | 350,000,000 | http://hotfile.com /dl/108549505 /f56f05b/big-buck-bunny.part2.rar.html | ae2c596fd5e616f46261df6c4020819c | 63350882fd8ec069bac473d70eab0454711c8fcf |
| 108557338 | Big Buck Bunny.part3.rar | 259,179,129 | http://hotfile.com /dl/108557338 /50d0365/big-buck-bunny.part3.rar.html | 30dd9917c9d92462d9f61ca10f2bb19d | fc657d08ee9fb6b4fa9f761eccc674f3be8c7f85 |

**License Information**

http://www.bigbuckbunny.org/index.php/about/ The results of the Peach open movie project has been licensed under the Creative Commons Attribution license 3.0. http://creativecommons.org/licenses/by/3.0/

**Content Validation**

The extracted avi file was the Big Buck Bunny animation, and the entire credits roll was included.

# Elephants Dream

These files were identified by
a) searching Google for "Elephants Dream on hotfile" and
b) searching for Elephants AND Dream in the hotfile database

**Verified Files**

| uploadid | filename | size | url | md5 | sha1 |
|---|---|---|---|---|---|
| 25133372 | Elephants_Dream_1024-h264-st-aac.mov | 326,632,467 | http://hotfile.com /dl/25133372/0d484f6 /elephants_dream_1024-h264-st-aac.mov.html | 5d735529ec2fde3f4e108d2dbf4b98c0 | 12b8fb9ff178cfc3c80f59cb3c7c1bb1c7c9dca0 |

**License Information**

http://orange.blender.org/
http://orange.blender.org/blog/creative-commons-license-2/
The movie "Elephants Dream" and all data on the DVDs and almost all of the contents on this website is licensed under the Creative Commons Attribution license.
http://creativecommons.org/licenses/by/2.5/

**Content Validation**

The .mov file was the Elephants Dream animation, and the entire credits roll was included.

# Firefox

These files were identified by searching the list of uploaded files for '%firefox%'

**Verified Files**

| uploadid | filename | size | url | md5 | sha1 |
|---|---|---|---|---|---|
| 111035126 | MyEgY.CoM.Mozilla Firefox 3.6.16.By.vibration.rar | 8,638,690 | 🔵 http://hotfile.com /dl/111035126/10f8009 /MyEgY.CoM.Mozilla Firefox 3.6.16.By.vibration.rar.html | 2a234cbd39e1abcc47d8c77844ccbe9f | d8c8146db1ce6e3d25087f4a771a367c840d332b |

Note that these are hashes of the .rar file, and not the .exe inside; The .exe itself for Firefox 3.6.16 can be downloaded from 📋 ftp://ftp.mozilla.org/pub/firefox/releases/3.6.16/.

**License Information**

"All of the source code to this product is available under licenses which are both free and open source. Most is available under any one of the following: the Mozilla Public License (MPL), the GNU General Public License (GPL) and the GNU Lesser General Public License (LGPL). That is, you may copy and distribute such software according to the terms of any one of those three licenses." - about:license page in Firefox

🔵 http://www.mozilla.org/foundation/licensing.html

**Hash Information**

📋 ftp://ftp.mozilla.org/pub/firefox/releases/3.6.16/MD5SUMS
📋 ftp://ftp.mozilla.org/pub/firefox/releases/3.6.16/SHA1SUMS



This is a digital copy of a book that was preserved for generations on library shelves before it was carefully scanned by Google as part of a project to make the world's books discoverable online.

It has survived long enough for the copyright to expire and the book to enter the public domain. A public domain book is one that was never subject to copyright or whose legal copyright term has expired. Whether a book is in the public domain may vary country to country. Public domain books are our gateways to the past, representing a wealth of history, culture and knowledge that's often difficult to discover.

Marks, notations and other marginalia present in the original volume will appear in this file - a reminder of this book's long journey from the publisher to a library and finally to you.

## Usage guidelines

Google is proud to partner with libraries to digitize public domain materials and make them widely accessible. Public domain books belong to the public and we are merely their custodians. Nevertheless, this work is expensive, so in order to keep providing this resource, we have taken steps to prevent abuse by commercial parties, including placing technical restrictions on automated querying.

We also ask that you:

+ *Make non-commercial use of the files* We designed Google Book Search for use by individuals, and we request that you use these files for personal, non-commercial purposes.

+ *Refrain from automated querying* Do not send automated queries of any sort to Google's system: If you are conducting research on machine translation, optical character recognition or other areas where access to a large amount of text is helpful, please contact us. We encourage the use of public domain materials for these purposes and may be able to help.

+ *Maintain attribution* The Google "watermark" you see on each file is essential for informing people about this project and helping them find additional materials through Google Book Search. Please do not remove it.

+ *Keep it legal* Whatever your use, remember that you are responsible for ensuring that what you are doing is legal. Do not assume that just because we believe a book is in the public domain for users in the United States, that the work is also in the public domain for users in other countries. Whether a book is still in copyright varies from country to country, and we can't offer guidance on whether any specific use of any specific book is allowed. Please do not assume that a book's appearance in Google Book Search means it can be used in any manner anywhere in the world. Copyright infringement liability can be quite severe.

## About Google Book Search

Google's mission is to organize the world's information and to make it universally accessible and useful. Google Book Search helps readers discover the world's books while helping authors and publishers reach new audiences. You can search through the full text of this book on the web at `http://books.google.com/`

H 70, 2 [Harr]

Oxford University

**ENGLISH FACULTY LIBRARY**
St. Cross Road
Oxford

*This book should be returned on or before the latest date below:*

**NOV 8 1965**



**—7 MAY 1969**

27 FEB 1973

17 JUN 1975

1978

2 4 OCT 1990

0 CANCELLED 2007

*Readers are asked to protect Library books from rain, etc. Any volumes which are lost, defaced with notes, or otherwise damaged, may have to be replaced by the Reader responsible.*



300017387T

# THE

## *DEVONSHIRE "HAMLETS."*

# HAMLET

By William Shake-ſpeare,

## 1603;

# HAMLET

By William Shakeſpeare,

## 1604:

*Being exact Reprints of the Firſt and Second Editions of Shakeſpeare's*
*great Drama, from the very rare Originals in the poſſeſſion of his*
*Grace the Duke of Devonſhire; with the two texts printed on oppoſite*
*pages, and ſo arranged that the parallel paſſages face each other.*
*And a Bibliographical Preface by* SAMUEL TIMMINS.

" Looke heere ʋpon this Picture, and on this."

## LONDON:

SAMPSON LOW, SON, AND CO., 47, LUDGATE HILL.

M,DCCC,LX.

# iREB & sn0wbreeze

**About iH8tesn0w Programs**

| | |
|---|---|
| **iREB** | Software that communicates through the computer to the iPhone to put the iOS device (i.e. iPhone, iPod Touch, iPad) into DFU mode so that iTunes will ask to recover the device from a backup when it is next attached to the system. This subsequent recovery allows a user to install a custom firmware version on the iOS device, thereby allowing the device to operate outside of Apple's sandboxed environment. |
| **sn0wbreeze** | An end-to-end program for jailbreaking. This program builds the custom firmware for use on the iOS device being jailbroken. It also *includes* iREB to place the phone in DFU mode and allow for the "restoration" of the custom firmware. |

**Verified Files**

| uploadid | filename | filesize | url | md5 | sha1 |
|---|---|---|---|---|---|
| 108923557 | iREB-r4.zip | 6,370,972 | http://hotfile.com /dl/108923557 /18f7493/iREB- r4.zip.html | a2bb504996b97b43293259393353dd95 | d44a0afe8637cd456f61fbab2651681255040b63 |
| 125818066 | sn0wbreeze- v2.7.3.zip | 22,216,833 | http://hotfile.com /dl/125818066 /1eeeede /sn0wbreeze- v2.7.3.zip.html | 9b72efe1a19f88748efeebfb88182c26 | 60a90e0ec1e1c4483b3aeb2968df1e4086e87420 |

**Ordinal Information**

| iREB-r4.zip | The iREB-r4.zip file verified above is the #1 most downloaded file on the Hotfile service. |
|---|---|
| sn0wbreeze | A hash-matched copy of the sn0wbreeze-v2.7.3.zip file verified above is the #2 most downloaded file on the Hotfile service. |

**License Information**

Prior versions of iREB and sn0wbreeze have been release with a GPL license.

| sn0wbreeze (2.6.1) | Main Page: https://github.com/iH8sn0w/sn0wbreeze<br>License: https://github.com/iH8sn0w/sn0wbreeze/blob/master/LICENSE |
| iREB | https://github.com/iH8sn0w/iREB-2.0<br>License: https://github.com/iH8sn0w/iREB-2.0/blob/master/LICENSE |
| iREB sn0wbreeze version (shows integration) | https://github.com/iH8sn0w/iREB----sn0wbreeze-version<br>License: https://github.com/iH8sn0w/iREB----sn0wbreeze-version/blob/master/LICENSE |

**User Information**

The sn0wbreeze-v2.7.3.zip (uploadid 125818066) file was uploaded from affiliate account with the email address "✉ ih8sn0w@ih8sn0w.com." and iREB-r4.zip (uploadid 108923557) file was uploaded from affiliate account with the email address "✉ ih8sn0wydaz@gmail.com."

The website http://ih8sn0w.com/ appears to be the main source for the sn0wbreeze and iREB products and contains links to YouTube and Twitter accounts named "iH8sn0w" and containing material related to iOS software.

**Hash Information**

Because *iH8tesn0w* shares his files directly on Hotfile, Elysium downloaded the files linked to from the developer's website and hash matched files and verified that the downloaded hashes matched those provided to Elysium by Hotfile.

# JDownloader

These files were identified by searching the list of uploaded files for 'JDownloader%'

**Verified Files**

| uploadid | filename | size | url | md5 | sha1 |
|---|---|---|---|---|---|
| 81315168 | JDownloader.zip | 18,226,758 | 🔵 http://hotfile.com/dl/81315168/653ce37/JDownloader.zip.html | fad6d9220df1a63957a78d173563b642 | 1c3b71930e6a35bd0a9d16a4664f39d408ee1d58 |
| 4051026 | JDownloader - NEW.rar | 19,335,166 | 🔵 http://hotfile.com/dl/4051026/d31c3df/JDownloader - NEW.rar.html | 9b073c194e8e8f7607e98890f3a33aaa | cb71c9c78a80e83768df46913584b6f7f93e0e97 |
| 14052520 | JDownloader 0.8.821.zip | 13,557,610 | 🔵 http://hotfile.com/dl/14052520/7a3c8f8/JDownloader 0.8.821.zip.html | aafed635fa6c4c8c03f02f69a110f4b1 | 8907f8a27282d436b8141f5807a85b8a9005fc98 |
| 23418241 | JDownloaderSetup0.9.579.rar | 27,739,996 | 🔵 http://hotfile.com/dl/23418241/ebfc069/JDownloaderSetup0.9.579.rar.html | 79f15540b5cf8b6a7b00b28546659ea3 | 684e03c7bdc339292d20935ba66d98f046ba0f9d |
| 27342313 | JDownloaderSetup.exe | 28,253,422 | 🔵 http://hotfile.com/dl/27342313/0f4c75f/JDownloaderSetup.exe.html | 19e5c65c61765b8f12b55e0d9d4952d5 | 653cae71da59e6648134e7dd44d5b03b5babe0e5 |

**User Information**

A user account with the username "jdownloader" uploaded the file with upload id 81315168, the file noted above that was downloaded 187,595 times (plus an additional 3,765 premium downloads, for a total of 191,360). That file was the 28th most downloaded file on Hotfile for the range of data we received from Hotfile.

The email address for the "jdownloader" account is "✉ ads@jdownloader.com," suggesting that the account is officially tied to the JDownloader distribution. User "jdownloader" has been an active member of the Hotfile affiliate program.

Of the top 100 most downloaded files on Hotfile, 17 were uploaded by user "jdownloader" and have file names similar to that verified file (81315168), suggesting that those files are likely various versions of JDownloader.

**License Information**

The .zip/.rar files have a license.txt file with the GPL 3.

**Hash Information**

Files were downloaded from hotfile and verified against the hashes provided by Hotfile.

JDownloader.zip (uploadid 81315168) was also downloaded from 🔵 http://download.chip.eu/en/jDownloader-for-Linux_4623247.html and 🔵 http://repository.slacky.eu/slackware-13.1/CHECKSUMS.md5. These sites were found by searching Google for the MD5 hash. Another site that came up in the Google search is 🔵 http://www.virustotal.com/file-scan/report.html?id=1f8c734f866cddef5d179fef4581dc7ad115a6eb3f1368172ac7fdc3b1aedd43-1304168441.

JDownloaderSetup0.9.579.rar (upload id 23418241): contains a single .exe file, which matches the .exe below.

JDownloaderSetup.exe (uploadid 27342313, version 0.9.579): ⬤ http://sourceforge.net/projects/chiasephanmem/files/JDownloaderSetup0.9.579.exe/download

# OpenOffice

OpenOffice files were identified by searching the list of uploaded files for 'OpenOffice%' and 'OOo%'

**Verified Files**

| uploadid | filename | size | url | md5 | sha1 |
|---|---|---|---|---|---|
| 61682386 | OOo-Dev_3.3.0beta1_Win_x86_install-en-US.exe | 157,760,107 | 🔵 http://hotfile.com/dl/61682386/4fc1efc/OOo-Dev_3.3.0beta1_Win_x86_install-en-US.exe.html | a6a1fef5ba3cccaa04dfcad7e4bf774e | b06e9599c9ac9f8eebeca3fabd5f576882d1efe0 |
| 63993443 | OOo_3.2.0_Win_x86_install-wJRE_tr.exe | 150,166,480 | 🔵 http://hotfile.com/dl/63993443/6a817e1/OOo_3.2.0_Win_x86_install-wJRE_tr.exe.html | e532393e7dcacc7ade876b5b8342017e | 826743d953c90fcdce03b17383182c697182b32b |
| 106906538 | OOo_3.3.0_Win_x86_install_en-US.exe | 143,432,120 | 🔵 http://hotfile.com/dl/106906538/9ec575c/OOo_3.3.0_Win_x86_install-en-US.exe.html | b397b639ba60dc983e58590ab055f3fb | 68e5b63dbbaa2ea925a96d6eb6f24ce8ca522b44 |

**License Information**

🔵 http://www.openoffice.org/license.html

**Hash Information**

🔵 Lists of md5 hashes for different versions of OpenOffice

# Sintel

These files were identified by a) searching Google for "Sintel on hotfile" and b) searching for Sintel in the hotfile database

**Verified Files**

| uploadid | filename | size | url | md5 | sha1 |
|---|---|---|---|---|---|
| 97697238 | St2010.part1.rar | 117,440,512 | http://new.hotfile.com /dl/97697238 /dabb39b /st2010.part1.rar.html | fc269b5f22a19f1fa8261423efbbca1b | d9cfc937e41957a3368b6dd88006f8a3f3c67d74 |
| 97697035 | St2010.part2.rar | 117,440,512 | http://new.hotfile.com /dl/97697035/13e9e3a /st2010.part2.rar.html | c381f30310c20574f40bbf087f1fc6ad | 0341e4c20f09349251d6c53b3bee990f08cd6e2c |
| 97697403 | St2010.part3.rar | 113,676,592 | http://new.hotfile.com /dl/97697403 /60062e2 /st2010.part3.rar.html | d9f89f92bfc7954bb4c6a710dce931eb | 406a3031c96d01c3c32a0591fc0ad4421e10525d |

**License Information**

http://www.sintel.org/sharing The results of the Durian Open Movie project are being licensed under the Creative Commons Attribution license 3.0. http://creativecommons.org/licenses/by/3.0/

**Content Validation**

The extracted avi file was the Sintel animation, and the entire credits roll was included.

# Ubuntu

These files were identified by searching Google for "Ubuntu on hotfile"

**Verified Files**

| uploadid | filename | size | url | md5 | sha1 |
|---|---|---|---|---|---|
| 81087050 | ubuntu-10.10-desktop-i386.iso.part1.rar | 367,001,600 | http://hotfile.com /dl/81087050 /81aa517/ubuntu-10.10-desktop-i386.iso.part1.rar.html | 029eb00314dbd47976a4699b168b7700 | d8c8146db1ce6e3d25087f4a771a367c840d332b |
| 81087051 | ubuntu-10.10-desktop-i386.iso.part2.rar | 359,825,610 | http://hotfile.com /dl/81087051/f11c1f6 /ubuntu-10.10-desktop-i386.iso.part2.rar.html | 1b4a7acc2f2a9b007e94eb925ae422eb | 8d2394dfc9f567a56d4c9ddfed6f72018e34fdca |

**License Information**

http://www.ubuntu.com/project/about-ubuntu/licensing

**Hash Information**

# EXHIBIT 2

**Disney Enterprises, Inc. et al v. Hotfile Corp. et al,**
**1:11-cv-20427-KMW (S.D. Fl.)**
**Rebuttal Report of Professor James Boyle**

1.  I am currently the William Neal Reynolds Professor of Law at Duke University, and have been retained by Farella, Braun + Martel LLP on behalf of the Defendants in this action as an expert witness.

**Background and Qualifications**

2.  I received an LL.B. (Hons) from Glasgow University (1980), and an LL.M. (1981) and S.J.D. (1986) from Harvard Law School.  I have been a law professor since 1982, teaching at American University, and at the Universities of Pennsylvania, Harvard and Yale as a Visiting Professor.  In 2000 I joined the law faculty at Duke.  My other qualifications, awards and publications were listed in my initial expert report.

3. I have not previously testified as an expert.  I am being remunerated for my work as an expert in these proceedings at the rate of $750 per hour.

4.  The Documents that were used in support of my opinions are listed below under the heading "Documents reviewed".

**Scope of Expert Assignment**

5. I have been asked by Farella, Braun + Martel LLP on behalf of the Defendants to provide an expert rebuttal report to a statistical report prepared by Dr. Richard Waterman, [1] (The Waterman Report) on the uses of Hotfile.com.  The Waterman report also includes a section (Exhibit C) by Mr. Scott Zebrak.  In that section Mr. Zebrak details the methods by which he assessed the copyright status of the 1750 files in Dr. Waterman's sample.  He also lists those files, together with his assessment of their legal status.  I have studied both Dr. Waterman's and Mr. Zebrak's methods and am prepared to testify on my conclusions about them.

**Documents reviewed**

6. In forming my opinions, I reviewed:

a)      The Rule 26(a)(2)(B) Report of Dr. Richard Waterman and all Exhibits

b)      The Rule 26(a)(2)(B) Report of Scott Zebrak (Exhibit C to the Waterman Report), all Exhibits and database materials produced by Mr. Zebrak in a timely manner

c)      The November 29, 2011 Transcript of the Deposition of Richard Waterman

---

[1] RULE 26(a)(2)(B) REPORT OF DR. RICHARD WATERMAN.

d)      The December 20th, 2011 Transcript of the Deposition of Scott Zebrak

e)      Prior testimony and reports of Dr. Waterman in other copyright matters attached as Exhibit A

f)      Elysium Digital's technical analyses of aspects of the Hotfile database, software questions, Internet issues, and the hard drive and databases provided by Mr. Zebrak.  See Elysium's analysis summaries attached as Exhibit B, hereto.

g)      Sample counter-notices received by Hotfile attached as Exhibit C, hereto.

h)      Declaration of Charles J. Hausmann in Support of Plaintiff's Motion for Summary Judgment (*Grokster*), attached as Exhibit D, hereto.

i)      Case law, offline and online articles and websites, as identified below.

j)      Affidavit of Scott Wittenburg and Elysium Analysis of a Photography Podcast, attached as Exhibit E, hereto

k)      Email from Legal Counsel of Opera Software, attached as Exhibit F, hereto.

l)      Email and affidavit from Marc Schwegler from Farm Simulator / Giants Software and End User License Agreement, attached as Exhibit G, hereto.

m)      DirectX End User Licenses and printouts re: DirectX attached as Exhibit H

n)      Russian Book regarding weaving and embroidery from 1871 attached as Exhibit I

7.   For the remainder of this report, I will focus on the quantitative picture that Dr. Waterman's report paints of Hotfile.  I by no means agree, however, that the quantitative picture is the only relevant one, and I reserve my right, if called to testify, to comment on *qualitatively* important non-infringing uses of the Hotfile system.  As an example, of what I mean by a qualitatively important non-infringing use I would point to the following incident. MIT's *Technology Review* recently published an article dealing with the role of digital services in the democratic uprisings collectively referred to as the Arab Spring.[2]  The article recounts that one of the very important catalysts for the democratic demonstrations was a gory video of a hospital emergency room in Kasserine, Tunisia, dealing with individuals who had been beaten by the police.  Denied access to other online services, one of the protest movements (Takriz) "smuggled a CD of the video over the Algerian border and streamed it via MegaUpload."[3] Al Jazeera picked up the video because of its exposure on MegaUpload and the excerpts showed on television catalyzed a wave of pro-democracy protests. Upon investigating this, I found that MegaUpload – like Hotfile – is a cyberlocker

---

[2] John Pollock, *Streetbook:  How Egyptian and Tunisian Youth Hacked the Arab Spring* TECHNOLOGY REVIEW (Sept-Oct 2011) http://www.technologyreview.com/web/38379/
[3] *Id.*

site.  (Interestingly, two hash-identical versions of the same video can be found on Hotfile, uploaded on Jan 11th 2011. Those versions were downloaded 21 times in January of 2011.)[4]

8.   The importance of the site design here is that there was no approval required for posting, nor any editorial screening for what – in this case – was extremely disturbing, but nevertheless important material. In any quantitative study of a service like Hotfile, the video would count as a single non-infringing file.  In terms of the *qualitatively* important non-infringing uses, a story like the Arab Spring one reveals the importance of open communication networks to free speech and First Amendment values in a way that transcends a single entry in an Excel spreadsheet quantifying infringement. In a final assessment, I presume that a court would want also to look at those qualitatively important non-infringing uses. In my remaining comments, however, I shall focus only on Dr. Waterman's quantitative study and the flaws I found within it.

9. Dr. Waterman's statistical review of Hotfile paints the following picture:

> Based upon my review of the most recent data provided by Mr. Zebrak, approximately 90.3% of all daily downloads of files on Hotfile were downloads of infringing or highly likely infringing content; approximately 5.4% of the downloads of files per day on Hotfile were downloads of non-infringing or highly likely non-infringing files; and the remaining approximately 4.3% of the downloads of files per day on Hotfile were downloads of files whose copyright status could not be reliably determined in the time allowed.[5]

10.   Dr. Waterman obtained this statistical snapshot by a procedure that includes several steps that deserve the court's critical attention.   I am not a statistician and cannot opine as to whether Dr. Waterman's random number generator was properly calibrated.  However, a key part of Dr. Waterman's method is the choice of what files to exclude from the study, and how to weight those that remain. That choice – at least if the study is to be legally relevant to this trial – is one that is profoundly shaped by the law.  With Dr. Waterman's and Mr. Zebrak's testimony, the plaintiffs are presumably attempting to provide the court with factual information relevant to the legal determination of

a.)       whether Hotfile is a service with "substantial non-infringing uses" under *Sony*

 and

b.)       whether Hotfile is guilty of *Grokster*-style inducement liability.

11.   In my opinion as a legal scholar, the method they have chosen to use has several fundamental flaws that cause it to present a misleading answer to both of those questions. In particular, by focusing purely on downloads, Dr. Waterman's method entirely excludes one important use of the Hotfile system, a use that appears to be clearly non-infringing

---

[4] *See* Exhibit B, Massacre at Kasserine.
[5] RULE 26(a)(2)(B) REPORT OF DR. RICHARD WATERMAN, paragraph 5.

under *Sony* and which is obviously relevant to any analysis of inducement: namely, temporary personal storage and archival backup. A statistical analysis of the use of VCR's in the *Sony* case that, because of its design, implicitly excluded the time-shifting of TV programs from its analysis of VCR uses would paint a legally misleading picture. A court could not rely on such a study in making an assessment of contributory or vicarious liability, or in assessing whether there were substantial non-infringing uses. The same would appear to be true here. In reviewing District Court findings on substantial non-infringing uses, Courts of Appeal have made the rigorous requirements of such an inquiry very clear.[6] This study does not appear to satisfy those requirements.

12. My objections are grouped into three parts. The first is to Dr. Waterman's method as a general matter. The second is to the specific application of that method or protocol to the material found on Hotfile. The third goes to decisions that Mr. Zebrak made in assessing the copyright status of the files on Hotfile. I will deal with each of them in turn.

## I
## GENERAL FLAWS IN DR. WATERMAN'S METHODOLOGY AS APPLIED TO ANY FILE-STORAGE AND TRANSFER OR "CYBERLOCKER" SITE

13. To make clear the problems with Dr. Waterman's methodology it may be instructive first to imagine it being applied to an entirely hypothetical cyberlocker and file transfer site called Example.com. Example.com has 10,000 users. 9,900 of them use the site for storage and back up. Such users upload documents on which they are working, such as the PowerPoint files they use for work purposes. Since the users do not choose to share the URL's with others, and since Example.com does not provide a file listing search feature or allow other search engines to index content that is not linked to on the open web, those files are relatively inaccessible to anyone but the uploader. An average of 10 files is uploaded by each user. So long as no disaster occurs – the document does not get corrupted, or the folder does not get mistakenly deleted – they will never need to download those files and thus, the file will register zero downloads. Example.com's business model is to encourage these users to purchase the premium subscription by removing any content that has not been downloaded for 3 months. The premium subscription to Example.com

---

[6] As I pointed out in my initial Report, the Courts of Appeal have disapproved of District Court assessments of substantial non-infringing use on the basis of far more subtle mistakes, such as a focus only on current use rather than potential uses. "We depart from the reasoning of the district court that Napster failed to demonstrate that its system is capable of commercially significant noninfringing uses. *The district court improperly confined the use analysis to current uses, ignoring the system's capabilities.* Consequently, the district court placed undue weight on the proportion of current infringing use as compared to current and future noninfringing use." *A&M Records, Inc. v. Napster, Inc.*, 239 F.3d 1004,1021 (9th Cir. 2001) (emphasis added.) To omit from one's statistical sample the method of usage most characteristic of a cyberlocker site – namely zero download storage – which is a direct analog to the substantial non-infringing uses that carried the day in *Sony v. Universal* - is an error of an altogether more obvious and fundamental type.

removes this limitation and allows storage for an unlimited period of time.

14. The remaining 100 users of Example.com use the system for file transfer. 10 use it for "space shifting" commercial content they have purchased so that they can watch it at another location when they are away from their home computers. (So long as they are space shifting their own content to themselves, this is a practice that is very probably a fair use.) Less salubriously, 70 use it for "sharing" their favorite pornography. Of those 70, 35 create edited excerpts featuring their favorite performers or scenes (raising a complex issue of legal analysis about whether there is a fair use, one that would depend on the substantiality of the portion used, the degree of transformation and the market for short form edited versions of pornography.) 35 simply copy the entire pornographic video file. (This would be infringing *unless* the pornographer gives express or implied license to distribute the pornographic video files to the web, perhaps to drive content towards a particular site whose watermark appears on the film.) 10 users utilize Example.com to share full length, commercial, (non-pornographic) copyrighted major studio films with the world. This use is infringing and provides 10% of the total downloads on the site. The total number of downloads combining the space shifters, the remixing and sharing pornography fans and the users illicitly copying commercial feature films is 90,000.

15. Finally, the last 10 users use the system to share open source software that they themselves have written and in which they hold the copyright. This is a popular use of Example.com and in fact includes the two most downloaded files on the system. (This is clearly a non-infringing use and many scholars, including me, would claim that this, by itself and without regard to any of the other clearly licit uses of the site, satisfies the *Sony* standard of a substantial non-infringing use.) There are a total of 10,000 downloads of the open source software.

16. As I understand Dr. Waterman and Mr. Zebrak's methodology, they would classify the uses of Example.com as "90% infringing." First Dr. Waterman's methodology by focusing only on *downloads*, implicitly excludes the 9,900 users who utilize the site for storage and back up. Their 99,000 uploads have no downloads. This leaves him with a universe of 100,000 downloads. Based upon my review of Mr. Zebrak's report and deposition transcript, it appears likely that he would classify all but the open source software downloads as infringing. If true, their conclusion would be that 90% of the uses of Example.com are infringing though the reality is very different. In fact, more than 99% of the *users* of Example.com are *not* infringing. More than half of the *uses* of the system – both uploads and downloads – are clearly non-infringing. And a significant percentage of the *downloads* on the system are either debatably a fair use, authorized by implied license or clearly non-infringing.

17. i.) Percentage of users, ii.) of uses and iii.) of uploads *and* downloads; these are all pieces of evidence that courts would presumably need in the process of determining whether services have a substantial non-infringing use – and given that *Sony* instructs courts not to look at *predominant* use, but rather current and potential substantial non-infringing uses, that evidence presumably needs to be comprehensive. Those same factors are also relevant to the multi-factor assessment of inducement liability that the Supreme

Court laid out in *Grokster*.

18.    In short, there are crucial omissions in the universe of uses and users that Dr. Waterman's method captures.  As a result in my opinion, his method – if used as *the* statistical snapshot on which a contributory, vicarious, or inducement liability assessment were to be carried out – would yield a legally misleading conclusion when applied to a cyberlocker and file transfer site.

19. I wish to stress that my claim is not that Example.com is Hotfile, though there are some obvious similarities. My claim is that the Example.com hypothetical shows why Dr. Waterman's method – as a general matter, not just in the case of Hotfile – will present a legally misleading picture of the facts about *any* cyberlocker/file-transfer site.  I will now turn to his analysis of Hotfile in order to show in more detail the problems caused by the methodological choices he has made.

## II
### SPECIFIC FLAWS IN DR. WATERMAN'S METHODOLOGY AS APPLIED TO HOTFILE

### i.)  Files – And Types of Use –Excluded from Study

20.  First, and vitally, by focusing only on downloads, Dr. Waterman excludes all files that have zero downloads from Mr. Zebrak's analysis of infringement.  Working under my direction, the computer consulting company Elysium Digital examined the Hotfile database in order to discover how many files had zero downloads.  They reported that, out of a total of 107,271,438 total files stored on the Hotfile system 57,923,301, or 54%, had no registered downloads.  Thus in the case of Hotfile, Dr. Waterman's study actually excludes a *majority* of the files on the system.

21.  Were many of those 57,923,301 files in fact being uploaded to Hotfile.com for file storage?  That is something that neither Dr. Waterman, nor Mr. Zebrak nor I actually know because – by design – those files have been excluded from their statistical assessment of the uses of the system.  Hotfile clearly can be and surely is used for file storage. Both Hotfile's architecture and its business model are consistent with it, particularly Hotfile's policy of capping (free) zero download storage at 3 months (14 days for anonymous users), while allowing unlimited storage time for Premium users.   Offering a free "teaser" service that attracts users to a more feature-rich fee-paying premium service is such a standard business method on the Internet that it has attracted its own neologism: "freemium."[7] Further, given that Hotfile itself has no index to the files and the choice whether to share

---

[7] Nicolas Pujol, *Freemium: Attributes of an Emerging Business Model*
http://papers.ssrn.com/sol3/papers.cfm?abstract_id=1718663
 "Freemium is a business model that works by offering a product or service free of charge (typically digital offerings such as software, content, games, web services or other) while charging a premium for advanced features, functionality, or related products and services. The word 'freemium' is a portmanteau combining the two aspects of the business model: 'free' and 'premium'." http://en.wikipedia.org/wiki/Freemium  [Last visited Dec 18, 2011]

the direct URL is the user's, the system appears well-suited to storage of a wide range of material[8] – such as a large PowerPoint file, for example.[9]

22.   A user could store such a file on Hotfile, intending only to retrieve it personally if necessary, but would have the option of giving out the URL if subsequently she decided to share it with colleagues, who would then be able to access it without being given a personal password.   As no one but the user has the URL to the file, and it is not indexed by search engines, the file is effectively private – yet the user can at any time share the file with colleagues or co-workers simply by giving them the URL. The Google search referred to in note 9 found more than 45,000 *publicly* listed PowerPoint files on Hotfile – that is, PowerPoint files that users have chosen to link to on the open web.   Those files are presumably being shared – after a conference say.   But a user can also use the system for storage or space shifting.   Acting at my direction Elysium Digital found that there were more than 40,000 PowerPoint files on Hotfile, that have been downloaded either zero or one times. And of course, PowerPoint files are only one example of this kind of storage.   A counter notice issued in response to an apparently faulty 'notice and takedown' request, for example, reveals that an architecture company was apparently using Hotfile to store drawings of the designs it created for clients.[10]   One can imagine many other such examples.

23.   One reason the plaintiffs have suggested that Hotfile is not used for storage is the absence of password protection on the files.   The implication is that no one would store on a cyberlocker unless the file was protected by a password.   However, once one understands the architecture of Hotfile, this particular objection is completely unconvincing, in my opinion.   Files stored on Hotfile, if the user does not reveal or post the URL, are actually considerably *more* secure than files stored on common types of password-protected online storage.   Consider files that are stored on a user's email or iTunes account.   An outsider who wished to get access to that account and see the material would need to provide a username and password to do so.   In both these cases, however, the username is the person's email address.   Anyone who has had an e-mail from me or who has seen my e-mail posted on my website already has the username.   Now the password alone protects the

---

[8] Hotfile URLs include the ID of the content and a randomly generated number. And the result is sufficiently long and complex as to be highly, highly unlikely for any other person to stumble upon by accident – actually more unlikely, as I will explain in a moment, than guessing a password on many typical forms of email or online storage.   Hotfile does not index files.   The large search engines such as Google only index a file on Hotfile if a user has chosen to publicly post the URL somewhere on the open web.   If the user chooses not to do that, the file effectively cannot be accessed without the user's consent – the filename could not be discovered in any way.

[9] A search on Google on December 29th 2011 for ".ppt OR .pptx site:hotfile.com" (i.e.  files with the PowerPoint file extensions .ppt or .pptx on the Hotfile site) returned  45,800 hits.   These are the PowerPoint files on Hotfile that *have* had their URL's posted publicly.   There are presumably more that have not had their URL's posted publicly and which could not be found without the storing user's consent.

[10]   *See* Exhibit C.

content. Password rules vary. Assume here that the password can be composed of any number and any lowercase letter. If the password is a 7 character alphanumeric, longer than most passwords, the chances of "brute forcing" that password – that is of obtaining the password by random computerized guessing is 1 in 78 billion. Assuming 10 efforts a second, it would take a "brute force" attack (i.e. one that simply tries every different combination of letters and numbers) 248 years to gain the password and get access to the stored material. That certainly provides security. But how does it compare to a file posted to Hotfile where the user keeps the URL and never shares it with anyone? (Search engines do not index Hotfile files unless the user posts the link elsewhere on the open web.) An outsider who knows I have stored a file on Hotfile, but does not know the URL will need to guess the URL in order to get access to the content. He knows that the URL begins http://www.hotfile.com of course, but nothing else. A Hotfile URL is composed of two parts, a numerical upload ID and a second 7 character identifier. Together, they make up the URL. For example, http://hotfile.com/dl/97361133/4bc1eqz/. In order to guess the 7 character identifier, which is also composed of any number and any lowercase letter, the outsider would face the same odds as the person guessing my password – 1 in 78 billion. But *in addition* he would also need to guess the upload ID. In other words it is actually harder to get access to the URL of a particular Hotfile file than to get access to a typical kind of online password protected storage.

24.   The fact that 57,923,301, or 54%, of the files on Hotfile have no downloads suggests that users are employing the system for something other than file transfer. Users who rely on Hotfile for temporary storage will most likely have zero downloads. Certainly many of them will. By excluding this central, and very probably legal, use, Dr. Waterman's method, in my opinion, presents a legally misleading picture of Hotfile. I would note that Dr. Waterman's testimony[11] in prior cases of alleged contributory and vicarious copyright infringement included a different statistical method as well as a download study – a study of files that were "made available," that is, that were uploaded to the system. That was in the context of a peer-to-peer system where the possibility of storage effectively did not exist. Yet there, Dr. Waterman's study effectively had two parts; one focused on the act of uploading and the other that of downloading. Had some variant of that technique been included here, in addition to the study of downloads, Dr. Waterman's statistical picture could have included the storage function of Hotfile and Mr. Zebrak would have had to assess the legality of such storage. Dr. Waterman's statistical analysis would thus not have neglected the possibility that Hotfile.com, the cyberlocker and file transfer site, was indeed being used as a cyberlocker. The method he uses here does neglect that possibility. In fact, he states in his deposition that, in this case, he was instructed by plaintiffs' counsel to look only at downloads.[12] In my opinion, this is clearly an error.

25.   At my direction, Elysium Digital examined the Hotfile database and found that an additional 6,182,360, or 5.76%, of the files on Hotfile have only one registered download, a number of downloads consistent with both storage and space-shifting – potentially licit uses. The 'one download' files do appear in Dr. Waterman's sample, but they are given a

_____

[11] *See for example* Exhibit A; Usenet Declaration paragraph 5.
[12] Waterman Depo. p. 212.

reduced weight relative to those that are downloaded more frequently.

> Within each selected day, the sample frame was obtained by taking the dailydownload data and expanding the record of each file to capture the total number of recorded downloads of that file on that day. For example, if a file was downloaded 5 times in a day, the record would be expanded to reflect five separate downloads of that file.[13]

26.  This method has a striking result.  Imagine that there were to be only 10 files on the Hotfile system – eight an example of legal (no download) storage, one an example of legal (one download) space shifting of licitly purchased commercial content and one a commercial film that was illicitly uploaded and was then downloaded nine times. The eight files that were not downloaded would be ignored by the study, the file that was downloaded once would appear a single time, and the file that was illicitly downloaded would appear nine times. As a result, Dr. Waterman would classify the system as having at least 90% illicit uses.  In addition, if Mr. Zebrak assessed the legal status of the file without considering the number of times that it was downloaded, as I believe he did, he would classify the single download space-shifting file as also being illicit, despite the fact there is a very strong argument this is a fair use under section 107.[14]  In that case, the Waterman protocol would describe the system as 100% infringing.

27.  A file downloaded nine times appears nine times in the total listing, in order to identify the relative percentage of illicit *downloads*.  But if this is extrapolated into an assessment that 90% of the *uses* of the system are illicit, the conclusion becomes unsupportable. *Sony* directs courts to look at *types of uses* in assessing a system or product. It also rejects the conclusion that a system be classified as legal or illegal based on its predominant use. Thus, any study that merely includes statistical assessment of downloads, if not accompanied by other statistical surveys that include the zero download files, will fail to provide an assessment on which a court applying *Sony*'s standard can rely. In this case, the focus on downloads alone actually excludes a majority of the files on the system from Mr.

---

[13] RULE 26(a)(2)(B) REPORT OF DR. RICHARD WATERMAN, paragraph 12

[14]  *See* for example the explicit endorsement of such a position in the *Diamond* case.  "The Rio merely makes copies *in order to render portable, or "space-shift," those files that already reside on a user's hard drive.* Cf. *Sony Corp. of America v. Universal City Studio*s, 464 U.S. 417, 455 (1984) (holding that "time-shifting" of copyrighted television shows with VCR's constitutes fair use under the Copyright Act, and thus is not an infringement). Such copying is paradigmatic noncommercial personal use entirely consistent with the purposes of the Act." *Recording Indus. Ass'n of Am. v. Diamond Multimedia Sys., Inc.*, 180 F.3d 1072, 1079 (9th Cir. 1999).  [Emphasis added.]  Subsequent cases in the peer-to-peer context have cast doubt on whether this finding would hold true in a situation where a user sought to i.) claim fair use privileged access  on a peer-to-peer network to *someone else's* copy of a copyrighted work that the user himself had purchased, ii.)  if that copy was being shared with the entire world.  But in the context of a zero or one download storage or space shifting on a cyberlocker neither of those other factors obtains and *Diamond's* premise would therefore strongly suggest fair use.

Zebrak's review and ignores a type of use that would clearly qualify as an actual current, and potential future, substantial non-infringing use.

**ii.) Questionable Decision to Include Pornographic Files**

28. Dr. Waterman made the decision to include pornographic files though, as specified in his protocol, content that the Jenner and Block team classified as illegal or child pornography was removed from the database. Not all prior empirical studies in cases of alleged contributory, vicarious or inducement liability included pornographic files in the empirical assessments of copyright infringement. In the *Grokster* case, for example, all pornographic content appears to have been deliberately omitted.[15] But both Mr. Zebrak's description of his protocol,[16] and the plethora of content with tasteful titles such as "Wreck My Asian Virgin A\*\*" or "Big Wet T\*\*s # 10" in the Waterman study show that the opposite decision was made in this case. No explanation was given for that different methodology. Mr. Zebrak then proceeded to find the vast majority of that pornographic content "highly likely infringing." It is remarkable how many of the files listed in Dr. Waterman's study have salacious or disgusting file names, particularly in contrast to the relatively smaller percentage of the sample that actually contains verified studio content, that is to say, content in which the plaintiffs might actually have any copyright interest.

29. The impact of the decision to include pornographic works is significant. For example,

---

[15] The excluded "pornography" category in the *Grokster* study covered all pornography, not merely illegal (and particularly) child pornography, meaning that a much wider category of files was excluded from the infringement study. Dr. Hausman's report describes the classification as "'Porn,' *meaning that the file was plainly pornographic, including files that, from their metadata, appeared clearly to constitute illegal pornography* (e.g., child porn, etc.)" Declaration of Charles J. Hausman in Support of Plaintiffs' Motions for Summary Judgment at paragraph 22[Emphasis added.] Dr. Hausman's report is also clear that these files were then excluded from the study. "Once works were assigned to a particular category, spoofs, porn, junk/damaged/unintelligible, virus/malicious, KPL, and illegal files were removed from the sample per the protocol established by Professor Olkin, and the first 1,800 files obtained through Kazaa and through Morpheus (3,600 total) that fit one of the confirmed infringing/noninfringing; highly likely infringing/ noninfringing; or unknowable categories were analyzed for copyright infringement." *Id.* at paragraph 23. Thus Dr. Hausman excluded *all* pornography, illegal or not.

[16] Mr. Zebrak and Dr. Waterman, by contrast to Dr. Hausman, only excluded illegal pornography. "I understand that Dr. Waterman's protocol calls for exclusion of any file that, by its metadata, appears to contain child pornography or other illegal pornography, before the files are requested from Hotfile. Consistent with that approach, and in consultation with Dr. Waterman, I excluded any sample file from the study that, upon further review, I believed might likely contain child or other illegal pornography. All of these files were replaced in the sample set of 1750 files that I reviewed with another randomly selected file per Dr. Waterman's pre-established protocol." RULE 26(a)(2)(B) REPORT OF MR SCOTT ZEBRAK, paragraph 7. I could find no explanation for the variance in method from the Hausman study.

of the first 100 files in the Zebrak study, 25 seemed by their titles[17] likely to have pornographic content. Of those, Mr. Zebrak counted 22 as "Highly Likely Infringing" 2 as "Non-infringing" and one as "Child Pornography." (The latter one being the only file which would be removed from the study.) In other words, 22 of the files tagged by Mr. Zebrak as "Highly Likely Infringing" in that 100 file stretch appear likely to be pornography – approximately 25% of the files identified as infringing in that set of files. Under the protocol used by Dr. Hausman in the *Grokster* case, all of those files would have been removed from the study. By contrast, in that same 100 file sample, only nine files are listed as "Confirmed Infringing (Studio)," that is, as being content in which the plaintiffs might actually have a copyright interest. The relatively small percentage of studio content is striking.

30. Pornographers certainly can have enforceable intellectual property rights and it is doubtless commendable to see the plaintiffs looking out for their interests so assiduously here. Nevertheless, there are reasons other than tastefulness why prior studies may have chosen to omit pornographic content, and why the court here might choose to put less weight on this fraction of Dr. Waterman's statistics and Mr. Zebrak's determinations.

31. One reason that pornographic content may sometimes be omitted from surveys of potentially infringing works is that it is very difficult, as compared to mainstream commercial content, to assess its copyright status. Consider the task that Mr. Zebrak and his team faced, forced to spend the holiday season going through what sounds like gigabytes of porn. Thankfully, I was spared this chore, but, as a legal scholar I am at a loss to think of how I could reliably determine the copyright status of so much pornographic content in such a short time-frame. Some producers of adult films clearly do *not* intend them to be spread freely and indeed litigate their claims of copyright infringement assiduously. This is an important point, one which presumably Mr. Zebrak and Dr. Waterman considered, and it should not be overlooked. On the other hand, the scholarly literature on the economics of pornography stresses that some of it is distributed free,[18] using indirect methods such as advertising, or the lure of longer versions or higher quality versions on a pay site to generate revenue. Indeed articles stress that some pornographers energetically push content at viewers, even when those viewers are unwilling,[19] and newspaper coverage has stressed the multiple business methods that the adult film industry has been using to generate revenue.

> Michael Herman, director of business development at Adult Entertainment Broadcast Network — owner of PornoTube.com, a YouTube-like site with user-generated content — says exposure on the Internet is ideal for a company's branding. PornoTube, started nearly a year ago, generates 10 million to 15 million hits a day — making it one of the 200 most-popular sites on the Web, according to

---

[17] I note for clarity's sake that neither filename nor file title is a sure indicator of the contents of a file.

[18] Simon Bowmaker, *Economics of Pornography* in ECONOMICS UNCUT 174-175 (2000).

[19] Jerry Ropelato, *Tricks Pornographers Play* Internet Filter Software Review
http://internet-filter-review.toptenreviews.com/tricks-pornographers-play.html

Alexa, which tracks Internet traffic. Most of PornoTube's user-generated videos are free, but clips are limited to a few minutes. Consumers who want more must pay. PornoTube partners with others to sell subscriptions to paid websites, dating services and video-on-demand.  "It's become an invaluable tool for us to promote business partnerships" with adult studios, Herman says.  And it's a valuable outlet for adult performers. "I can do short clips just for the Internet," says Sunny Lane, an actress in Southern California who owns Sunnylanelive.com. "It's a way to make more money and gain more exposure."[20]

32. Distribution of many of the types of pornographic content I have just mentioned on Hotfile would not be illicit, at least if it were expressly or impliedly licensed as it apparently sometimes is.  Then, what of non-commercially produced videos by amateur exhibitionists – who now have access to high quality digital photographic equipment?  Mr. Zebrak apparently did classify as non-infringing or unknowable some works tagged as amateur content, but how can one tell where the line is?  And what of the user-generated remix containing excerpts from multiple films featuring favorite performers or positions? That would present a challenging fair use analysis though not one I would choose to put in a final exam.  Finally, what of adult films where the copyright owner is not known or cannot be found? The term of art "orphan works" seems particularly inappropriate when dealing with such content, but it does not seem unreasonable to believe that many pornographic production companies are – literally – fly-by-night operations, where after several years the copyright owner may not exist as a corporate entity, or may have no interest in policing the rights to its work.

33.   Given the difficulties in making any, let alone all, of these assessments in an objectively reliable manner, were I designing the legal protocols for the Waterman/Zebrak study, I would have omitted pornographic content from the analysis. I wish to stress however, that Dr. Waterman's choice to include pornography, unlike the decision implicitly to exclude zero download files from review, is not necessarily by itself an error. Reasonable minds could differ about whether it should be done or not – given the nature of the content.  But once that decision has been made in the affirmative, a question is raised for the court about the reliability of that particular portion of the evidence if no *confirmation* of the copyright holder's objection to the sharing of the file is obtained. My own opinion is that little weight can be put on that portion of the files in the survey, at least without certification from the pornographers in question, similar to that that Mr. Zebrak received from the studios for their commercial content, that the file is indeed "confirmed infringing."  Thus, I believe that the Waterman/Zebrak study should either have omitted pornography altogether, or included it but only classified it as infringing if there was confirmation from the copyright holder.   This is both because of the difficulty of identifying with certainty the copyright status of this particular content, and because of the reality that some purveyors of pornography may not object to having their work shared, particularly if it drives traffic to a

[20] Jon Swartz, *Purveyors of Porn Scramble to Keep Up With Internet* USA Today (Updated 6/12/2007) available at
http://www.usatoday.com/tech/techinvestor/industry/2007-06-05-internet-porn_N.htm (last visited Dec 30, 2011)

particular site, or increases demand for a longer commercial version. That possible diversity of viewpoint about the desirability of sites that allow for viral distribution of copyrighted content raises an additional issue in this litigation given the disparity between the high levels of pornography found on Hotfile and the relatively low levels of confirmed studio content. In the words of the *Sony* Court,

> In an action for contributory infringement against the seller of copying equipment, the copyright holder may not prevail *unless the relief that he seeks affects only his programs, or unless he speaks for virtually all copyright holders with an interest in the outcome.*[21]

Because of the choice made by Dr. Waterman to include pornography and a number of other types of content when some copyright holders in those types of content have a different business model of digital distribution than that of the major studios, I question whether that last requirement has been satisfied.

### III
### FLAWS IN MR. ZEBRAK'S ASSESSMENT OF COPYRIGHT STATUS

34. Beyond the general methodological problems with the Waterman study, I have questions about specific decisions that Mr. Zebrak made in his review of the content to determine its copyright status. In my opinion, there are flaws in his methods.

35. First, because he is applying Dr. Waterman's protocol, he does not examine any zero download files in order to assess their copyright status. This excludes 54% of the files on the system – and one of the most important potential uses of the system – from consideration. I have pointed out the flaws this introduces to the study in Parts I and II of this Rebuttal Report and will not repeat those points here.

36. Second, it appears that, in those files that he *did* examine, Mr. Zebrak makes a clear methodological error. Effectively, his method seems to have focused intensively on the copyright status of the file itself, omitting full consideration of two key factors that one would need to examine in order to be able to classify a file as "highly likely infringing."

- The type of use involved, including whether the conduct would constitute a fair use under section 107.
- The full range of possible forms of implied or express license by the copyright owner that would make the distribution legal.

**i.) Failure to Assess *Type* of Use: Fair Use**

37. I pointed out earlier that 5.76% of the files on Hotfile have only a single registered download. As with zero-download storage and backup, there is a very strong argument that

---

[21] *Sony Corp. v. Universal City Studios, Inc.*, 464 U.S. 417, 447 (1984). [emphasis added]

a user who purchases commercial, copyrighted content and "space shifts" a single copy of that content to a different computer, using Hotfile as the storage and download method, is making a fair use and is thus not violating the exclusive rights of the copyright holder. It was precisely a version of this argument that won the day in *Sony*. The content was copyrighted, commercially produced and was copied without permission – nevertheless the court, having considered all the aspects of the use, declared that it was a fair use. Space shifting was explicitly endorsed as a fair use in *RIAA. v. Diamond Multimedia Sys., Inc.*[22] As I pointed out earlier, cases in the peer-to-peer context have cast doubt on whether this finding would hold true in a situation where a user sought to i.) claim fair use privileged access on a peer-to-peer network to *someone else's* copy of a copyrighted work that the user himself had purchased, ii.) if that copy was being shared with the entire world. But in the context of zero or one download storage or space shifting on a cyberlocker neither of those other factors obtains. *Sony* and *Diamond* would therefore strongly suggest fair use. Mr. Zebrak's deposition suggests that he took it to be black letter law that any file that is even theoretically available to others cannot thereby constitute space shifting or storage fair use.[23] In the context of a peer-to-peer network where numbers on downloads are unavailable this position might be credible. In a situation where we know the number of downloads to be zero or one, or in a situation where the link is not available on the open web, *Diamond's* reasoning returns full force. At the very least, we cannot assume by the design of the study itself that such uses are not fair. The one download files return us squarely to the central category of uses in *Sony* and *Diamond*.

38. So far as I can tell, Mr. Zebrak's analysis of downloads on Hotfile does not attempt to assess whether the use is of this type. Rather, from his description of his method, it would appear that his approach is one-dimensional. He looks at the legal status of the file in question and, if it is commercially produced and under copyright, with no evidence of formal open licensing, assumes that all copying is infringement. An analyst applying a similar method in the *Sony* case would have looked at the nature of the content in question – the movie *Shane*, say. The analyst would have discovered that *Shane* was commercially produced, was under copyright and was shared without permission. He then would have concluded, without looking at any other circumstances, including the number of copies made or by whom, that this was "highly likely infringing." But an analysis with these assumptions would have found that almost *all* the uses of the VCR were "highly likely infringing." In other words, it would have omitted the key variable on which *Sony* turned.

---

[22] *Recording Indus. Ass'n of Am. v. Diamond Multimedia Sys., Inc.*, 180 F.3d 1072, 1079 (9th Cir. 1999).

[23] "[W]e're dealing with viral distribution of full-length commercial works, you know, without the authority of the copyright owner. That's -- that's what I concluded, and, you know, fair use is not applicable in that scenario. That's well established." DEPOSITION OF SCOTT ZEBRAK at 296. But in a situation where the file is only downloaded once, or the link to the file is not made available on the open web we cannot assume "viral distribution" of copyrighted works. We may well be dealing with exactly the kind of single copy, private storage dealt with in *Sony* and *Diamond*. Those uses – uses where there are zero or one copies made – do not somehow become unfair because the storage is "in the cloud" rather than in an iPod or on a dusty shelf behind the television.

39.  There are a number of ways in which Mr. Zebrak's analysis could have been more accurate.  The simplest would be to acknowledge that, in the case of 'one download' files, the fair use calculation made it impossible to say that the file was "highly likely infringing" and thus meant it must be included in the "unknowable" category. Other more complex methods that capture more of the factors relevant to fair use are also possible, such as classifying all single download files *that are not linked to on the open web* as "noninfringing" and those that are linked as "possibly infringing."  A simple Google search would have enabled such a procedure, one that clearly distinguished between those files that were available publicly, and those that were effectively inaccessible to all but the uploader – itself further evidence of fair use. A failure even to consider the possibility of these forms of fair use renders the legal conclusions of the analysis particularly problematic in any study that purports to give the court relevant facts about the application of the test in *Sony,* a case that explicitly required attention to exactly such contextual issues.  This appears to be a clear flaw in Mr. Zebrak's study.  A study of a peer-to-peer network such as in the cases of *Napster* or *Grokster* would not need to pay as much attention to these factors, precisely because on a peer-to-peer network archival storage and backup is effectively impossible and space shifting less likely.  A study of a cyberlocker site, however, has to pay attention to such issues.  It is important to remember that Dr. Waterman's protocol excludes 54% of the files – the files with zero registered downloads – which could represent legal usage.  When one adds to this the fact that Mr. Zebrak fails to consider fair use in looking at the 5.76% of files that were downloaded once, it seems that a total of nearly 60% of the files on Hotfile most likely to represent legal uses were either excluded from the study or classified using an incorrect procedure.

**ii.)  Errors in Classifying Content that Is Shared With Permission or Otherwise Legal to Distribute**

40.  First, let me be clear that I am respectful of the daunting task that Mr. Zebrak faced in attempting to survey the copyright status of such a large number of files in a short period of time.  Yet I have concerns about whether his method was accurate when applied to copyrighted content that was shared under an express or implied license.  To his credit, Mr. Zebrak correctly identifies as non-infringing (and not illegal) those open source programs mentioned in my initial report that are found within his sample.  That includes iReb and sn0breeze, the two most distributed files on the Hotfile system, and JDownloader, which is also very highly ranked.  Yet beyond the world of software that is formally under an open source license, his method appears to have been tilted in the direction of finding content infringing even if there is strong evidence that it is shared with permission.  Here are some examples:

41.  **Orbit Downloader**[24]  Orbit Downloader is a download assistant that is available for free download from http://orbitdownloader.com.  The opening line in the site's "metatags" – the description of the site's content by the webdevelopers – is <meta name="description" content="Orbit Downloader is a free social music, video and file downloader..">  Elsewhere

---

[24] Orbit Downloader is listed as file number 1510 in Mr. Zebrak's spreadsheet.

on the Orbitdownloader site, one can find the XML or Extensible Markup Language, data for the Portable Application Description.

> <MASTER_PAD_INFO>Portable Application Description, or PAD for short, is a data set that is used by shareware authors to disseminate information to anyone interested in their software products. To find out more go to **Error! Hyperlink reference not valid.**>[25]

The XML data provided by the developers of OrbitDownloader formally defines its qualities as follows. On each line a formal characteristic of the program is given between brackets that look like this <>….</>.

> <Program_Name>Orbit Downloader</Program_Name>
> <Program_Version>4.1.0.2</Program_Version>
> <Program_Release_Month>06</Program_Release_Month>
> <Program_Release_Day>28</Program_Release_Day>
> <Program_Release_Year>2011</Program_Release_Year>
> <Program_Cost_Dollars>0</Program_Cost_Dollars>….
> **<Program_Type>Freeware</Program_Type>[26]**

That is, the developers of the software are explicitly identifying it as not merely zero cost but as "freeware." If one goes to other popular and relatively authoritative download sites, such as CNet,[27] one will see the program listed as "freeware," and available for free download. Finally, if one simply Google searches for "Orbit Downloader License," Google, which has a "license search feature" will return the following:



Faced with this evidence, Mr. Zebrak classified Orbit Downloader as "Highly Likely Infringing." The sources he gave to back up that conclusion included the Orbitdownloader .com site from which I have quoted, a site that clearly lists the program as both free and

---

[25] http://dl.orbitdownloader.com/dl/pad_file.xml (visited Dec 30, 2011)

[26] http://dl.orbitdownloader.com/dl/pad_file.xml (visited Dec 30, 2011) [emphasis added]

[27] http://download.cnet.com/Orbit-Downloader/3000-2071_4-10600926.html [last visited January 2nd 2012]

freeware. When asked about Orbit Downloader in his deposition, his reasoning appeared to be that – absent evidence that a company *specifically* authorized a particular distribution channel such as Hotfile – content is to be classified as "highly likely infringing," even where the copyright owners themselves classify it as freeware.[28]  Of course, a company might distribute at zero cost through certain sites and prefer not to distribute through others. Copyright gives them the legal right to make that choice. Yet if they formally classify their product as "freeware" and fail to include any End User License Agreement to the contrary, I think the argument for either express or implied license to reproduce is a solid one.  At the very least, from this evidence one could not responsibly classify such a program as "*Highly Likely* Infringing."

42. **Photography 101: Professional Photography Tips Tutorial[29]**  Mr. Zebrak lists Photography 101 as Highly Likely Infringing.  Photography 101 is in fact a popular set of podcasts by Scott Wittenburg, a photography teacher who distributes his podcasts freely online.[30] Mr. Wittenburg's own site includes links to free versions of these podcasts (though, like many purveyors of free content, he also has a paid "app" that allows you to view the content more easily on your smartphone.  This viral distribution of free content as an advertisement for other services is a common business method online and one that Mr. Zebrak's working assumptions might lead him to misclassify.)  Defendant's counsel gave me an affidavit from Mr. Wittenburg.  In that affidavit, which is attached, Mr. Wittenburg states "I know that by making my podcasts available for free on the internet, that people are able to download them and also repost them.  So long as a person is not charging money for my podcast, I do not have any problems with this."[31] Individuals clearly could download Mr. Wittenburg's podcast from Hotfile without being charged money.  This appears to be a legal reposting of Mr. Wittenburg's podcast. It certainly cannot be classified, as Mr. Zebrak does, as "highly likely infringing."

43. **DirectX[32]**  DirectX is Microsoft's collection of multimedia and gaming API's (Application Programming Interfaces) that allow games and multimedia programs to play on, and thoroughly use, the capabilities of Windows platforms.  Thus, developers of games frequently need to distribute the DirectX libraries together with their games. Microsoft freely distributes the DirectX libraries under an End User License Agreement (EULA)[33] that explicitly permits game developers to distribute the DirectX libraries with their games.

---

[28] "So, you know, the fact that it was doing that on its own web site doesn't -- doesn't make it less likely to me -- I'm saying that awkwardly.  The fact that it's doing that on its own web site, if it's doing that, doesn't -- doesn't change my opinion that the distribution of it through Hotfile was unauthorized."  Deposition of Scott Zebrak  at 307.

[29] Photography 101 is listed as file number 132 in Mr. Zebrak's spreadsheet.  It contains 7 of Mr. Wittenburg's podcasts.

[30] http://scottwittenburg.com/ [last visited Jan 3rd 2012]

[31] Affidavit of Scott Wittenburg 19th December, 2011.  EXHIBIT E.

[32] DirectX is part of a set of files listed as file number 30 in Mr. Zebrak's spreadsheet.  *See* EXHIBIT H (Direct X Exhibits).

[33] END-USER LICENSE AGREEMENT FOR MICROSOFT SOFTWARE DirectX 9.0 Software Development Kit Update (October 2004)  (Attached.)

That is, Microsoft not only makes the program available freely, it does so under a license that allows a game developer to *redistribute* the Direct X library in or with their game.  Mr. Zebrak classifies what is apparently a ski jumping game – Skoki 2006 – as highly likely infringing and states that this is because the game folder includes DirectX.  At my direction, the computer consulting company Elysium Digital examined the files that Mr. Zebrak classified as infringing.  So far as I can tell, they are the files covered by Microsoft's EULA. One of the files has a slightly different hash, but I think that it may simply be an earlier version of the program. In fact, if one installs DirectX from the game distribution, Elysium Digital confirmed that, during the installation, one is required to assent to a EULA binding the user to the terms of the DirectX EULA, thus complying with the requirements that Microsoft had set up for the "redistributable" portion of DirectX.  Based on these facts, I do not think Mr. Zebrak can classify the software as "highly likely infringing" for its inclusion of the DirectX files. In fact it appears to be distributed in exactly the way Microsoft envisioned in writing the "redistributable" portion of the EULA.  I would also note that in practice the software is widely available around the World Wide Web on reputable and highly visible sites where drivers or API libraries can be found – such as "Major Geeks." Elysium Digital identified multiple examples of the DirectX software being made freely available by itself, suggesting, but not proving, that Microsoft tolerates distribution even more widely than the license suggests.  That implication is not necessary for my analysis, however.  Based on all of these facts, I would say the copyright status of the DirectX library, the software Mr. Zebrak focused on, is either "likely non-infringing" or, at the most conservative, "unknown."  It cannot in my view be classified as "highly likely infringing."

44.  **Farming Simulator "Mods"**    This litigation has been an enlightening experience in many ways, but none perhaps more delightful than the discovery that there is a great interest in a game called "Farming Simulator."[34]    Farming Simulator, published by Giants Software is a simulator game akin to "Sim City."  The player makes certain choices and based on that, her farm thrives or fails to thrive.  Farming Simulator, like many games, allows users to create new aspects to the game.  Indeed it provides an editor program that assists the user to do so. In some other games, these new aspects consist of new levels or landscapes in which the game is played.  In the case of Farming Simulator, users can create new features called "Mods" that generally consist of new types of farm equipment that the game will feature.  Interestingly, and contrary to the assumption that commercial providers of copyrighted works would never relinquish any aspect of control over their works, makers of copyrighted games frequently allow and even encourage this practice.  This practice has sufficiently fascinated scholars, that it has attracted its own academic literature, including articles such as *The Labour of User Co-Creators: Emergent Social Network Markets?*[35] The practice, and the academic literature, are directly relevant to this litigation in that they demonstrate another reason that one cannot assume that high quality, commercially produced online content is only shared illicitly.  Sharing that content

---

[34] http://www.farming-simulator.com/  [last visited January 6th 2012]
[35] John Banks & Sal Humphries, The Labour of User Co-Creators : Emergent Social Network Markets? 14 *Convergence: The International Journal of Research into New Media Technologies* vol.  401-418 (November 2008).  The canonical book on the more general practice is Eric von Hippel, DEMOCRATIZING INNOVATION (MIT Press 2005).

licitly is in fact a central part of many business models.

45. Giants Software is one of the companies that encourages this practice, that is, it encourages its users to produce and to share "Mods." As mentioned before, Giants Software actually includes an editor program in the game to make it easier for users to create Mods. They have even held competitions as an incentive to the practice, a fact noted on the website Mr. Zebrak cites in his reasons for claiming the Mods are infringing.[36] In the sample of 1750 files examined by Mr. Zebrak there are multiple examples of Farming Simulator Mods – that is, multiple file directories containing Mod files, each one of which Mr. Zebrak assessed and classified separately. Co-counsel in this case sent eight of those files to Giants Software, the copyright holders in and developers of Farming Simulator, to confirm that the company had no objection to the sharing of these Mods. Of the eight, Mr. Zebrak had found seven "highly likely infringing" and one non-infringing. Mr. Schwegler of Giant Software provided an Affidavit confirming that all of the files were not infringing. He also provided an email stating "I got the files. and checked them all. They are all free mods created by fans of our game and are legal to share anywhere on the web including Hotfile. The items do not infringe on our copyrights and do not contain cracks, serial keys or similar illegal software which would compromise our products." It is hard to think of a more definitive answer.[37] In my opinion Mr. Zebrak's classification of "Highly Likely Infringing" for seven of the Mods is clearly incorrect. Elysium Digital discovered two additional Mods, AA01 and BiginParadies, both listed as "highly likely infringing." (All Mods are listed in the attached analysis.)[38] Given these facts, I would classify these files, too, as highly likely non-infringing, but I was not able to confirm this with Mr. Schwegler before this report was to be filed.

**46. Opera Portable Browser** Opera Portable Browser is a version of the Opera web browser that can be run from a USB stick. Mr. Zebrak classified it as highly likely infringing. There are both free and paid versions of the browser. An e-mail inquiry to Opera elicited a response[39] that seems to indicate they do not object to cloud storage of the free version. At the time this report was filed, I was still attempting to discover whether the version of software shared on Hotfile was the free version.

47. These examples are indicative of a larger point. Many, many copyright holders allow

---

[36] http://www.farming-simulator.com/modContest2011.php [last visited January 6th 2012]

[37] One could postulate the Mod creators objecting to the copying of their Mods but I think this far fetched since the only way for them to get online is for the user to post them himself. Further, the fact that users *like* sharing their Mods and showing their competence at creating them is well established in the scholarly literature cited earlier. Users do sometimes ask for attribution – one such request was included in the Mods mentioned here. The file posted on Hotfile included the requested attribution. Another Mod contained a claim for rights to an "Excerpt" of code. This too seems consistent with permission from the author of the Mod.

[38] *See* Elysium Farming Simulator analysis, EXHIBIT G.

[39] *See* EXHIBIT F.

redistribution of their work online, some of them as part of a profit making strategy, others because they have simply chosen to share the work. Mr. Zebrak stated several times in his deposition that his assumption is that if content was being generated as part of a profit making enterprise, then the copyright holder would object to it being shared and therefore he could classify it as "highly likely infringing."[40] But on the world of the Internet, that assumption is a problematic one. Microsoft is a profit-making company but they want developers of games to embed Microsoft's software platform, DirectX, inside their games and thus they give permission to distribute versions of games that include those files. Mr. Wittenburg makes high quality podcasts giving lessons in photography, but distributes those podcasts freely. Farming Simulator players create and freely share Mods – a practice encouraged by the copyright holder in the game. Mr. Zebrak's assumption causes him to incorrectly classify all of these examples. To use an example that does not occur in Mr. Zebrak's study, Nine Inch Nails distribute their album Ghosts I-IV under a Creative Commons license. It is legal to copy and redistribute non-commercially online. Yet at the same time, they sell CD's and digital copies of their music and in fact that album was the best selling MP3 download album on Amazon.com in 2008.[41] Note the way in which this situation does not fit Mr. Zebrak's background assumptions. Similarly, I note that there is music from little-known artists from Bulgaria and Turkey in Mr. Zebrak's study.[42] Do the musicians, particularly those in countries with less well-developed music distribution systems than the United States, object to viral distribution of their songs or do they welcome it as a way of building recognition and increasing demand for concert performances? I would want more facts before I assumed that all this content was "highly likely infringing." Finding this pattern of errors in the files I did examine makes me question whether the pattern continues in the ones I did not.

48. In the case of Hotfile, these concerns are not academic ones. I have attached to this study a collection of Counter Notices to Takedown requests received by Hotfile.[43] Those protesting include a musician who shares the musician's own work online using Hotfile, a company that writes and freely distributes firmware updates for Samsung products and an architecture company that uses Hotfile for storage of drawings made for clients. All are complaining that their work has been wrongly removed when they intended to share it with permission, wanted to use the Hotfile service as one of their distribution channels, and had every right to do so. Classification of the copyright status of works shared online is extremely difficult and time-consuming – for content owners and online services alike. It is highly factually specific and easily distorted if one assumes that all of those distributing content online have the same business model or motivation. The Counter Notices, as well as the points made in my initial report, raise an additional point – one that was of particular interest to the *Sony* Court. There are clearly individuals and companies who

---

[40] Zebrak at p. 218-219; p. 257-258 ("professional artist" wouldn't allow distribution through Hotfile); p. 276-278 ("antithesis").

[41] Nate Anderson, *Free Nine Inch Nails Albums Top 2008 Amazon MP3 Sales Charts* http://arstechnica.com/media/news/2009/01/free-nine-inch-nails-albums-top-2008-amazon-mp3-sales-charts.ars

[42] See Zebrak Depo. pp. 209 and 280-84 (Turkish Rap) and 266-70 (Bulgarian Pop).

[43] *See* EXHIBIT C.

wish to use the Hotfile service to pursue entirely legitimate goals ranging from personal back up and storage to creating and distributing open source software and being compensated for it through the Affiliate Program to storing architectural drawings. These users wish to use this service to do things that are entirely in accord not only with the Copyright Act, but with the larger goals in Article 1 section 8 clause 8 of the Constitution. This lawsuit, and the plaintiffs' curiously narrow design of Dr. Waterman's study, implicate – and in the case of storage and space shifting, improperly ignore – those unquestionably legitimate uses. Discussing the analogy between contributory copyright infringement and contributory patent infringement, the Supreme Court had this to say;

> When a charge of contributory infringement is predicated entirely on the sale of an article of commerce that is used by the purchaser to infringe a patent, the public interest in access to that article of commerce is necessarily implicated. A finding of contributory infringement does not, of course, remove the article from the market altogether; it does, however, give the patentee effective control over the sale of that item. Indeed, a finding of contributory infringement is normally the functional equivalent of holding that the disputed article is within the monopoly granted to the patentee.[44]

Because it believed that intellectual property holders should not be able to veto technological developments or services merely because those developments *could* be used to violate their intellectual property rights, the Court found that possibility unacceptable in the copyright as well as the patent context so long as the article had "substantial non-infringing uses." I mention this legal background only to make the point that it is unfortunate that so few of those uses are reflected in Dr. Waterman and Mr. Zebrak's study.

49. Finally, I have more general concern about the accuracy of Mr. Zebrak's classification. It seems at times that his default assumption is that content is "highly likely infringing" and that considerable evidence is required to shift the needle on that point. He includes, for example, an 1871 Russian book[45] on the subject of weaving and embroidery techniques as "highly likely infringing." The illustrations in the book are quite beautiful, but the idea that a book which carries the date "1871" on its cover is "highly likely infringing" in the United States is truly a strange one. (Published works from before 1923 are in the public domain in the United States.[46]) Mr. Zebrak links to a 1976 Dover Books edition on Amazon.com,[47] but this is not the version found on Hotfile. Dover Books is a publishing company that predominantly reissues works that have fallen into the public domain. The cover of the 1976 Dover Books edition is significantly different and the title is in English, making it easy to distinguish between the two at first sight. Dover's copyright would, in any event, only extend to any original material that they added, such as a new cover, not to the underlying

---

[44] *Sony Corp. v. Universal City Studios, Inc.,* 464 U.S. 417 440-441 (1984).

[45] A literal translation of the Russian title would be RUSSIAN ORNAMENT: SEWING, FABRIC, LACE (St. Petersburg: 1871)

[46] 17 U.S.C. § 304

[47] http://www.amazon.com/Russian-Peasant-Needleworkers-Craftsmen-Pictorial/dp/0486232352/ref=sr_1_1?ie=UTF8&qid=1320680095&sr=8-1

book or images, which remain in the public domain. Mr. Zebrak also links to another site that does contain the same file found on Hotfile and that correctly identifies the book's date of publication as 1871 and its place of publication as St. Petersburg,[48] so he must have been aware of its publication date. Given these facts, this book is clearly in the public domain and I am surprised to see Mr. Zebrak assert otherwise. Errors such as these in that fraction of his sample I did examine make me wary of the accuracy of Mr. Zebrak's assessments in the remainder of his sample.

<div align="center">

**IV**

**RELEVANCE OF THE FLAWS IN THE STUDY TO ANY INDUCEMENT LIABILITY CLAIM**

</div>

50. Many of my comments have been directed to the way that the flaws in the Waterman/Zebrak study are problematic for any court investigating "substantial non-infringing uses" under *Sony*. Before concluding, I would like to highlight several key connections of those flaws to the factual analysis a court would perform in assessing any claim of *Grokster* style inducement liability.

51. First, and most obviously, the *Grokster* test is a multi-part one, with no single portion being sufficient. In applying such a test, a finder of fact will be guided by a sense of the overall *bona fides* of the service in question. By omitting key legal uses of Hotfile from the study, the Waterman report, in my opinion, provides a misleading starting place for such an assessment.

52. Second, the specific omissions from the Waterman study are relevant to particular components of the *Grokster* test. *Grokster* asks a court to engage in a complex study of whether a service is aiming to profit principally from infringement. If one omits storage or space shifting from one's picture of Hotfile, as the Waterman report does, then features of Hotfile's system – such as its removal of files that have not been downloaded after three months, for example, can be cast in a negative light. If one includes storage and space shifting, however, and the fact that Premium users are allowed to store their material permanently regardless of whether it is downloaded, then the business model looks rather different and altogether more benign.

---

[48] http://translate.google.com/translate?hl=en&sl=ru&u=http://valhalla.ulver.com/f49/t1 1428.html&ei=_y20TqTMM5KRgQefm9iwBA&sa=X&oi=translate&ct=result&resnum=1&s qi=2&ved=0CCQQ7gEwAA&prev=/search%3Fq%3D%25D0%25A0%25D1%2583%25D1 %2581%25D1%2581%25D0%25BA%25D0%25B8%25D0%25B9%2B%25D0%25BE%2 5D1%2580%25D0%25BD%25D0%25B0%25D0%25BC%25D0%25B5%25D0%25BD%25 D1%2582.%2B%25D0%25A8%25D0%25B8%25D1%2582%25D1%258C%25D1%2591, %2B%25D1%2582%25D0%25BA%25D0%25BD%25D0%25B8,%2B%25D 0%25BA%25D1%2580%25D1%2583%25D0%25B6%25D0%25B5%25D0%25B2%25D0 %25B0.rar.html%26hl%3Den%26biw%3D685%26bih%3D300%26prmd%3Dimvns Collection patterns of Russian folk ornamentation (embroidery, fabrics, laces).
Title: Russian ornament. Sewing, fabric, lace Year: 1871 Publisher: St. Petersburg  Series / Issue: A series or Issue:  Pages: 42 Quality: good Size: 9.81 MB  Format: DjVu Language: Russian

53.  Third, I have argued here that Mr. Zebrak's study is, in a number of ways, prone to make errors that predispose him to classify files as "highly likely infringing."  In other words, I have argued there is reason to believe that his statistics on infringement are too high and his identification of non-infringing content too low.  Suppose for a moment, however that we accept Mr. Zebrak's classifications as entirely accurate.  One key feature of Hotfile's business plan is to convert users to Premium status.  Premium allows longer storage times, but it also allows faster downloads.  Hotfile keeps a log heading (called "paidfor") of what particular file prompted users to "convert," that is, what file the user was so drawn to that he chose to subscribe to the paid Premium service.  Using Mr. Zebrak's own figures and classifications as the basis, Elysium Digital prepared a chart of the relative conversion rates for each of the types of content he identified.  (That is, those users who converted to the Premium service on that type of file as a percentage of the total number of downloads of that category.)

| Zebrak Category | Sum of *paidfor* | Dailydownload Total | Conversion Rate |
|---|---|---|---|
| Confirmed Infringing | 44 | 215302 | 0.0204% |
| Highly Likely Infringing | 1245 | 2123933 | 0.0586% |
| Noninfringing | 699 | 650727 | 0.1074% |
| Unknowable | 116 | 316235 | 0.0367% |

Using Mr. Zebrak's own classifications, which I have argued substantially underestimate the amount of Non-infringing work, we find that the Non-infringing category is nearly twice as good (1.82) at converting users to Premium as the Highly Likely Infringing.  More notably still Non-infringing material is more than 5 times (5.264) as likely to cause users to convert to Premium as the Confirmed Infringing category – the major studio content that is the subject of this litigation.   A rational Hotfile executive, knowing these numbers, would prefer Non-infringing content to Infringing content and, of all the content on the list, would be least interested in getting uploads of Confirmed Infringing content, that is of the copyrighted content owned by the plaintiffs in this case.

## V
## CONCLUSION

54.  In my opinion, the study performed by Dr. Waterman and Mr. Zebrak has a number of flaws.  These flaws are individually serious, and their effects are cumulatively more misleading.

- By focusing only on downloads, and thus ignoring files with zero registered downloads, the study omits one of the central potential uses of a cyberlocker site: personal storage.  Zero download personal storage is likely to be legal, either

because the content was generated by the user, or because it is merely an archival or backup copy of licitly purchased content, not made available to others, and thus probably a fair use. The fact there are zero downloads is consistent with either of these scenarios. The result of the decision to focus only on downloads is to ignore the majority, 54%, of the files of the system and also to ignore one of the most important potential substantial non-infringing uses of the system. I would note that the possibility of personal storage is one of the qualities that distinguishes a service such as Hotfile from a peer-to-peer system such as Grokster. My claim here is not that I know what percentage of the zero download files on Hotfile are examples of personal storage. It is that it is a serious error in Dr. Waterman's study design to omit that possibility from consideration in the statistical picture he paints of the service.

- Turning now to the files he does study, Dr. Waterman chooses to include legal pornographic content in his file samples, excluding only illegal content such as child pornography. Other studies, such as that performed in the *Grokster* case, apparently excluded all pornographic content. This has large consequences for Dr. Waterman's study. 25 of the first 100 files in his sample are apparently pornographic as compared to nine files that are confirmed infringing examples of major studio content. Given the difficulties in assessing the copyright status, business methods and possible fair use claims of pornographic content, in my opinion this decision was erroneous and pornographic content should either have been omitted or only included when it was classified as "confirmed infringing." This means that, of the 46% of the files on Hotfile that were potentially a subject of Dr. Waterman's study, that is, those that were downloaded at least once, a substantial proportion and perhaps as many as a quarter are of a kind that might lead the court to doubt the accuracy of any assessment of their infringing status.

- Mr. Zebrak's legal classification of the files is erroneously incomplete in that it fails to consider information that would bear on fair use. His method appears to have been to examine the file to see if it was commercial copyrighted content and if so, and there was no immediate evidence that the copyright holder gave permission for copying, to classify it as "highly likely infringing." The 5.76% of the files on Hotfile that were downloaded once – a number consistent with both "space shifting" and backup or archival storage – are particularly germane here. Since the potential universe of files that Dr. Waterman looked at consisted of only 46% of the total files on Hotfile (that is, those with one or more downloads) the one download files constitute 12.5% of the total potential file universe from which Dr. Waterman's sample could draw. (I have no information on the *actual* percentage of one download files in Dr. Waterman's sample.) Mr. Zebrak could easily have made a separate classification for one download files found in Dr. Waterman's sample, perhaps by including them in his "unknowable" category. His failure to consider information bearing on potential fair uses here means that his classifications as "highly likely infringing" cannot, without more, be relied upon. Ironically, Mr. Zebrak's technique, had it been applied in the *Sony* case, would have excluded the

very non-infringing use on which the case turned – namely home taping, without permission, of single copies of commercially produced copyrighted content. This is a serious error in the study. In my opinion, this error alone precludes relying on Mr. Zebrak's assessment of copyright status.

- Mr. Zebrak also appears to have operated on an assumption that producers of high quality copyrighted content would not have a business model that involved allowing the "viral" sharing of that content online. He does note, to his credit, that iReb and Sn0breeze – the two most widely shared files on Hotfile – are non-infringing and legal to distribute. Yet in his other assessments there were apparently a number of errors in legal classification, ranging from Mr. Wittenburg's podcasts to the Orbit Downloader. Those errors, and the inclusion of such works as the 1871 Russian embroidery manual as "highly likely infringing," concern me about the accuracy of his classification methods.

55. I am concerned about the effect of these flaws on the accuracy of the statistical picture that Dr. Waterman and Mr. Zebrak paint for the court. In particular I note that their methodology excludes a majority of the files on the system and ignores two of the central potential non-infringing uses, namely zero or one download storage, and one download "space shifting." I wish to stress this point. Dr. Waterman's protocol excludes 54% of the files on Hotfile – the zero download files – when they clearly could represent legal usage. When one adds to this the fact that Mr. Zebrak fails to consider fair use in looking at the 5.76% of files that were downloaded once, it seems that *a total of nearly 60% of the files on Hotfile most likely to represent legal uses were either excluded from the study or classified using an incorrect procedure.* I note also that the files that remain include a high percentage of pornographic content – omitted in some prior studies – and that there are a number of errors in classifying as infringing material that was actually shared with permission, was a fair use or was in the public domain. In my opinion, the cumulative effect of these flaws is to present a distorted and inaccurate statistical picture of the Hotfile service.

Signed,

James Boyle

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 11-20427-WILLIAMS-TURNOFF


DISNEY ENTERPRISES, INC.,
TWENTIETH CENTURY FOX FILM
CORPORATION, UNIVERSAL CITY
STUDIOS PRODUCTIONS LLLP,
COLUMBIA PICTURES INDUSTRIES,
INC., and WARNER BROS.
ENTERTAINMENT INC.,

       *Plaintiffs*,

v.

HOTFILE CORP., ANTON TITOV, and
DOES 1-10.

       *Defendants*.

_____/

## <u>CERTIFICATE OF SERVICE</u>

       I am a citizen of the United States and employed in San Francisco County, California.  I am over the age of eighteen years and not a party to the within-entitled action.  My business address is 235 Montgomery Street, 17th Floor, San Francisco, California  94104; my email address is dgracia@fbm.com.

       I HEREBY CERTIFY that on January 6, 2012 I electronically served the following document(s) on all counsel of record on the attached Service List via their email address(es) as set forth on the Court's CM/ECF filing system, or in some other authorized manner for those counsel or parties who are not set forth on the Court's CM/ECF filing system.  The documentserved on this date is:

       **THE REBUTTAL EXPERT REPORT OF JAMES BOYLE**

       I declare under penalty of perjury that the foregoing is true and correct.  Executed on January 6,  2012, at San Francisco, California.


                              /s/
                              Deepak Gupta

## SERVICE LIST: CASE NO. 11-CIV-20427-WILLIAMS-TURNOFF

Daniel M. Mandil, Esq.
Karen R. Thorland, Esq.
Motion Picture Association of America, Inc.
15301 Ventura Blvd., Building E
Sherman Oaks, CA 91403
Telephone:     (818) 935-5812
Fax:              (818) 285-4407
Email: Daniel_Mandil@mpaa.org;
       Karen_Thorland@mpaa.org


*Attorneys for Plaintiffs*
*Party Name:   Disney Enterprises, Inc.,*
*Twentieth Century Fox Film Corporation,*
*Universal City Studios Productions LLP,*
*Columbia Pictures Industries, Inc., Warner*
*Bros. Entertainment Inc.*

**Served via electronic mail by agreement**

Karen Linda Stetson, Esq.
Gray-Robinson P.A.
1221 Brickell Avenue, Suite 1650
Miami, FL 33131
Telephone:     (305) 416-6880
Fax:              (305) 416-6887
Email: kstetson@gray-robinson.com


*Attorneys for Plaintiffs*
*Party Name:   Disney Enterprises, Inc.,*
*Twentieth Century Fox Film Corporation,*
*Universal City Studios Productions LLP,*
*Columbia Pictures Industries, Inc., Warner*
*Bros. Entertainment Inc.*

**Served via electronic mail by agreement**

Duane C. Pozza, Esq.
Luke C. Platzer, Esq.
Steven B. Fabrizio, Esq.
Jenner & Block
1099 New York Avenue, N.W.,  Ste. 900
Washington, DC 20001-4412
Telephone:     (202) 639-6094
Fax:              (202) 639-6068
Email: dpozza@jenner.com;
       lplatzer@jenner.com;  sfabrizio@jenner.com


*Attorneys for Plaintiffs*
*Party Name:   Disney Enterprises, Inc.,*
*Twentieth Century Fox Film Corporation,*
*Universal City Studios Productions LLP,*
*Columbia Pictures Industries, Inc., Warner*
*Bros. Entertainment Inc.*

**Served via electronic mail by agreement**

BOSTON LAW GROUP
Valentin Gurvits
825 Beacon Street, Suite 20
Newton Center, MA 02459
Telephone:     (617) 928-1800
Fax:              (617) 928-1802
Email:  vgurvits@bostonlawgroup.com


*Attorneys for Defendants*
*Hotfile Corp and Anton Titov*
**Served via electronic mail by agreement**

Janet T. Munn, Esq.
Rasco Klock
283 Catalonia Avenue, Suite 200
Coral Gables, FL 33134
Telephone:     (305) 476-7101
Fax:              (305) 476-7102
Email: jmunn@rascoklock.com

*Local Attorney for:     Defendants*
*Party Name:   Hotfile Corp. and Anton Titov*

**Served via electronic mail by agreement**

# EXHIBIT A



1 JENNER & BLOCK LLP
2 STEVEN B. FABRIZIO (*pro hac vice*)
   sfabrizio@jenner.com
3 601 Thirteenth Street, N.W.
4 Suite 1200 South
   Washington, D.C. 20005
5 Telephone: (202) 639-6000
6 Facsimile: (202) 661-4823

7 GIANNI P. SERVODIDIO (*pro hac vice*)
   gps@jenner.com
8 SAMI J. VALKONEN (*pro hac vice*)
9 svalkonen@jenner.com
10 919 Third Avenue, 37th Floor
   New York, NY 10022
11 Telephone: (212) 891-1600
12 Facsimile: (212) 891-1699

13 *Attorneys for Plaintiffs*

14               UNITED STATES DISTRICT COURT
15               CENTRAL DISTRICT OF CALIFORNIA
16

| 17 COLUMBIA PICTURES INDUSTRIES, INC., *et. al.* | Case No. CV-06-05578 SVW (JCx) |
|---|---|
| 18 | |
| 19 | The Hon. Stephen V. Wilson |
| 20 Plaintiffs, | |
| 21 v. | **DECLARATION OF RICHARD WATERMAN IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT** |
| 22 GARY FUNG, *et. al.* | |
| 23 | |
| 24 Defendants. | Date:       November 19, 2007 |
| 25 | Time:       1:30 p.m. |
| 26 | Ctrm:       6 |

27
28

1

I, Richard Waterman, the undersigned, declare:

1.    I am an Adjunct Associate Professor of Statistics at The Wharton School at the University of Pennsylvania, and the President and Co-Founder of Analytic Business Services, Inc., a consultancy focused on providing expert advice and opinions in the field of statistical analysis. I received my Ph.D. in Statistics from the Pennsylvania State University in 1993. I have substantial experience designing and reviewing sampling protocols for various large organizations, such as the United States Postal Service, for whom I designed and analyzed a national multi-stage sample for the estimation of operational characteristics. I also have substantial experience in designing sampling protocols in the private sector, and have developed market research studies for numerous large corporate clients, which typically involve issues relating to sampling. Further details of my professional history including a list of publications I have authored can be found on the résumé attached hereto as Exhibit A.

## Scope Of Work

2.    I have been asked by the plaintiffs to create a protocol for drawing a statistically reliable sample for studies analyzing the percentage of dot-torrent files corresponding to infringing content available and/or downloaded via two of the websites operated by the defendants, namely www.isohunt.com ("Isohunt") and www.torrentbox.com ("Torrentbox"). These studies are comprised of analyses of (i) the percentage of dot-torrent files available on Isohunt that correspond to infringing content files (the "Isohunt Availability Study"), (ii) the percentage of dot-torrent file download activity on Isohunt that correspond to infringing content files (the "Isohunt Activity Study"), and (iii) the percentage of dot-torrent files actually downloaded from Torrentbox that correspond to infringing content files (the "Torrentbox Download Study").

3. I devised methodologies, described in more detail below, to allow for a scientifically reliable and unbiased sample of files from the respective population for each of the studies. After the samples had been drawn and the content downloaded, an analysis was conducted by a team of copyright analysts, headed and supervised by Mr. Lee Friedman whose declaration describing this process is attached hereto as Exhibit B. For the determination of the copyright infringement status of each file in the samples, I relied on the work and conclusions of Mr. Friedman and his team.

4. Based on the analysis of the content files in the samples, I performed additional statistical analyses to derive the results for each of the Isohunt Availability Study, Isohunt Activity Study, and Torrentbox Download Study. Those results are presented below, beginning with a summary of my conclusions and followed by a detailed description of each study, the sampling protocol and analyses.

## Summary Of Conclusions

5. *Isohunt Availability Study*: 90.9% of all dot-torrent files *available* on Isohunt correspond to infringing or highly likely infringing content; 6.1% of the available dot-torrent files corresponded to non-infringing or highly likely non-infringing files (the remaining 3.0% of the dot-torrent files correspond to files whose copyright status could not be reliably determined in the time allowed).

6. *Isohunt Activity Study*: 94.3% of all dot-torrent file *download activity* on Isohunt (based on activity statistics published on the Isohunt site) correspond to infringing or highly likely infringing content; 1.4% of the dot-torrent files downloaded corresponded to non-infringing or highly likely non-infringing files (the remaining 4.3% of the dot-torrent files correspond to files whose copyright status could not be reliably determined in the time allowed).

1       7.    *Torrentbox Download Study*: 95.6% of all dot-torrent files that users

2 **actually downloaded** from Torrentbox (based on the actual downloads of dot-torrent

3 files per server logs produced by defendants) correspond to infringing or highly

4 likely infringing content; 3.2% of the dot-torrent files downloaded corresponded to

5 non-infringing or highly likely non-infringing files (the remaining 1.2% of the dot-

6 torrent files correspond to files whose copyright status could not be reliably

7 determined in the time allowed).

8                     **General Principles For Developing Sampling Protocols**

9       8.     The following describes the processes I used to design the sampling

10 protocol and select the sample for each of the studies:[1]

11 Isohunt Sampling Protocol

12       9.     The first step in devising a sampling protocol is to define the relevant

13 population of interest from which the sample will be extracted, and to ensure the

14 population is accurately represented in the sampling frame. Since the objective of

15 the Isohunt studies was to analyze the percentage of dot-torrent files corresponding

16 to infringing files available on Isohunt and/or downloaded by its users, the

17 population of interest consists of all dot-torrent files indexed on the site.

18       10.    The download activity level of dot-torrent files on the Isohunt site

19 varies considerably from file to file. Accordingly, in order to provide reliable

20 results for both the availability and activity studies, I employed a standard and

21 universally accepted statistical approach known as a stratified sample. That is, I

22 segmented the population into four strata based on the sum of the "seeder" and

23 "leecher" statistics ("S/L Sum") associated with each dot-torrent file.

24

25 [1] The sampling protocols, estimation techniques, and variance estimation formulae

26 used in my work can all be found in the canonical reference by William G. Cochran,

27 Sampling Techniques (3rd ed., 1977).

28

11.     Seeder and leecher statistics are published on the Isohunt site for each dot-torrent file indexed. A "seeder" is an online user who is a source for and is offering the *entire* content file represented by that dot-torrent file; a "leecher" is a user who is downloading the content file, and thus is a source for only pieces of the content file. Generally speaking, the S/L Sum is a fair indicator of the download activity for a particular content file represented by a dot-torrent file. A file with an S/L Sum of 500 represents more downloading activity than a file with an S/L Sum of 5. (While I have a basic understanding of the BitTorrent technology and the importance of the seeder/leecher numbers, to confirm my understanding I consulted with plaintiffs' technical expert, Professor Ellis Horowitz, on this issue.)

12.     My analysis of S/L Sums for dot-torrent files indexed on Isohunt showed a relatively small number of dot-torrent files with extremely high S/L Sums. I consulted with Prof. Horowitz, who explained that dot-torrent files with S/L Sums in this outlier category (2,000 or above) are highly likely either the result of a malfunctioning tracker or a deliberate falsification of the information by "spammers." Accordingly, in order to maintain the integrity of the study, I did not include dot-torrent files with S/L Sums of 2,000 or greater in the sample frame.

13.     Based on the foregoing, the sample frame consisted of 391,873 dot-torrent files from which the sample would be drawn. For any given confidence level, the size of the sample determines the margin of error when generalizing from the sample to the entire population, and the larger the sample size the smaller the margin of error. A confidence level of 95% with a margin of error of 5% provides sufficient information for a reliable conclusion for these studies. What this means is that if the sample shows 92% infringement level, statistically speaking, we would have a 95% confidence level that the true percentage of infringement in the entire population is between 87% and 97% (or 92% +/- 5%). This allows for a high level of confidence that the results of the study reflect the percentage of infringing files in

DECLARATION OF
RICHARD WATERMAN, Ph.D.

the entire population, together with a high level of precision. To target this level of precision, I concluded that the Isohunt sample size should be 400.

14.    The precise margin of error achieved can only be determined after the sample data is analyzed, because it is influenced by the observed proportion of infringing files. With the same sample size, data that shows a 50% infringement level would yield a larger margin of error than if the data showed either a 90% or 10% infringement level. The closer the proportion is to one of the extremes, the lower the margin of error will be, and the more the precise the results of the study. In the context of this study this means that the achieved margin of error would be less than 5% if the proportion of infringing files would be close to one of the extremes. These are well known and universally accepted statistical principles.

15.    I used "simple random sampling" to draw the sample within each stratum. "Simple random sampling" is a universally accepted statistical methodology in which each item has the same opportunity to be chosen as any other item. Simple random sampling can easily be accomplished by generating uniform random numbers from a pool of sequential numbers corresponding to the size of the population in each stratum, and drawing the items associated with the randomly generated numbers. In other words, each dot-torrent file in each stratum was assigned a sequential number. I then used a standard random number generator to generate a list of numbers to select the dot-torrent files that constitute the sample. This too is a standard and universally accepted means to generate a simple random sample.

16.    I am attaching herewith as <u>Exhibit C</u> the download instructions that implement the sampling protocol I have described in the foregoing for the Isohunt study.

1    Torrentbox Sampling Protocol

2         17.    The available data for Torrentbox study corresponded precisely to the

3    population of interest -- the dot-torrent files users actually download from the

4    Torrentbox website.  This is because the server log data produced by defendants

5    recorded each actual download, and, thus, the population for the Torrentbox study

6    was simply the total population of downloaded dot-torrent files as reflected in the

7    defendants' server log productions.

8         18.    At the time when I devised the Torrentbox sampling protocol I already

9    had the benefit of some preliminary results from the Isohunt study, which indicated

10   that over 90% of the dot-torrent files in the sample corresponded to infringing

11   content.  This information provided me a basis to conclude that a smaller sample

12   size would be sufficient to achieve at least the same 95% confidence level with a

13   margin of error of less than 5%.  Accordingly, I concluded that a sample size of 250

14   would be more than sufficient.

15        19.    Since the server log database contained an entry for each actual

16   download of a dot-torrent file, *i.e.*, the specific objective that this study was to

17   measure, there was no benefit to be had through stratification or weighting of the

18   results.  Consequently, for this study, my protocol directed a simple random

19   sampling of the server log database produced by defendants.

20        20.    The server logs defendants had produced at the time of the study

21   consisted of 2,784,597 downloads of dot-torrent files.  I used the same process for

22   generating random numbers as described above, which was used to select a simple

23   random sample of 250 dot-torrent files.

24        21.    I am attaching herewith as Exhibit D the download instructions that

25   implement the sampling protocol I have described in the foregoing for the

26   Torrentbox study.

27

28

7

## Results Of The Isohunt Availability Study

22. The first of the three studies related to the percentage of dot-torrent files *available* for download through the Isohunt website that correspond to infringing content.

23. Mr. Friedman reported that his analysis showed that of the 400 sample files analyzed, 379 were determined to be either confirmed or highly likely copyright infringing, with the number consisting of 90 files (out of 100) in Stratum I, 96 (out of 100) in Stratum II, 98 (out of 100) in Stratum III, and 95 (out of 100) in Stratum IV. To calculate the percentage of infringing dot-torrent files I needed to weight the per stratum results by the number of dot-torrent files in each stratum and divide the result by the total number of dot-torrent files in the entire population. The number of dot-torrent files in each stratum and the corresponding S/L Sum numbers are itemized in the attached Exhibit E.

24. By doing the calculations described above, I am able to conclude that the percentage of dot-torrent files available on Isohunt that correspond to infringing content is 90.9%. By doing the same calculation on the eight non-infringing files identified by Mr. Friedman in the sample, I conclude that 6.1% of dot-torrent files available on Isohunt correspond to non-infringing content. The remaining 3.0% correspond to files Mr. Friedman classified as "unknowable."

25. Using standard and universally accepted statistical methods to calculate a margin of error at a 95% confidence level yields a margin of error for this study of 5.0%. This indicates a high level of reliability.

## Results Of The Isohunt Activity Study

26. The second study involved taking the same copyright classification results described above and weighting them based on the S/L Sum statistics as the proxy for the frequency of user downloads of each dot-torrent file. I understand

from plaintiffs' counsel that at the time this Isohunt study was conducted, the Court had not yet ordered defendants to produce server log data showing actual dot-torrent download activity. Thus, the seeder/leecher statistics (and the S/L Sum) were used to provide a reasonably valid and reliable proxy for download activity. The objective of this analysis is to arrive at the percentage of dot-torrent files actually downloaded (as opposed to simply being available) that correspond to infringing content.

27.    The methodology I used to estimate the proportion of infringing activity utilized the "ratio-estimator for stratified simple random samples," which is a standard and universally accepted approach. Using this estimator, a dot-torrent file with a S/L Sum of 10 would have two times the weight of a dot-torrent file with a S/L Sum of 5 in calculating the proportions of infringing activity within the stratum.

28.    Applying the weighting calculations to the numbers provided by Mr. Friedman, I am able to conclude that 94.3% of the dot-torrent files downloaded by users from Isohunt correspond to infringing content, and that 1.4% of dot-torrent files downloaded correspond to non-infringing content. The remaining 4.3% correspond to files Mr. Friedman classified as "unknowable."

29.    Using standard and universally accepted statistical methods to calculate a margin of error at a 95% confidence level yields a margin of error for this study of 3.2%. This indicates a high level of reliability.

## Results Of The Torrentbox Download Study

30.    The Torrentbox study, using actual dot-torrent download data, directly measures the downloading of dot-torrent files on the Torrentbox website. Therefore, the server log files describe the specific characteristic the study is designed to estimate.

9

1    31.    Mr. Friedman reported that his analysis showed that of the 250 sample
2    files analyzed, 239 were determined to be either confirmed or highly likely
3    copyright infringing.  I am, therefore, able to conclude that the estimated percentage
4    of dot-torrent files actually downloaded by Torrentbox users that correspond to
5    infringing content is 95.6%.  Mr. Friedman reported that eight files were determined
6    to be non-infringing, thus allowing me to conclude that 3.2% of dot-torrent files
7    actually downloaded correspond to non-infringing content.  The remaining 1.2%
8    corresponds to files Mr. Friedman classified as "unknowable."
9    32.    Using standard and universally accepted statistical methods to calculate
10   a margin of error at a 95% confidence level yields a margin of error for this study of
11   2.5%.  This indicates a high level of reliability.
12
13                    **Meta-Analysis Of The Studies**
14   33.    Because the Isohunt Activity Study and Torrentbox Download Study
15   studies were conducted independently, but intended to answer the same basic
16   question[2] I am able to do further analyses by combining the results of the two
17   studies.  As such, there are standard and universally accepted statistical
18   methodologies to analyze the *combined* results of the two studies to provide an even
19   smaller margin of error.  The process of combining the results across separate
20   studies is referred to as a "meta-analysis."  A meta-analysis does not change the
21   results of the individual studies, but to the extent the objectives of the studies are the
22   same we can achieve more reliable results and a smaller margin of error than in the
23   individual studies.
24
25
26   [2] Both studies are designed to estimate what percentage of dot-torrent files
27   downloaded from the defendants' websites corresponds to infringing content files.
28

1   34.    That is the case here. The simple fact that the two studies resulted in

2   such similar infringement proportions (94.3% for Isohunt and 95.6% for

3   Torrentbox) lends credence to the meta-analysis. The results of the meta-analysis

4   show the proportion of infringing files downloaded from defendants' websites to be

5   95.1% with, at a 95% confidence level, a margin of error of 2.0%. These results

6   provide for a highly definitive conclusion.

7                                    <u>Conclusion</u>

8      35.    In my professional opinion, the sampling procedures used in the

9   Isohunt and Torrentbox studies are based on standard and universally accepted

10  statistical methods, and provide random samples from which we can reliably

11  estimate the incidents of copyright infringement through the Isohunt and Torrentbox

12  websites.

13         I declare under penalty of perjury that the foregoing is true
        and correct. Executed on September 4, 2007.
14

15

16                    _____
                      Richard Waterman, Ph.D.
17

18

19

20

21

22

23

24

25

26

27

28

                                11

Exhibit 9

DEPOSITION EXHIBIT

SiRee 14

2 /21/11

BILL VISCONTI

# EXPERT REPORT OF DR. RICHARD WATERMAN

## I.  INTRODUCTION

### A.  Professional Background

1.      I am an Adjunct Associate Professor of Statistics at The Wharton School at the University of Pennsylvania, and the President and Co-Founder of Analytic Business Services, Inc., a consultancy focused on providing expert advice and opinions in the field of statistical analysis. I received my Ph.D. in Statistics from the Pennsylvania State University in 1993. I have substantial experience designing and reviewing sampling protocols for various large organizations, such as the United States Postal Service, for whom I designed and analyzed a national multi-stage sample for the estimation of operational characteristics. I have also designed sampling protocols involving other filesharing technologies, specifically BitTorrent. I also have substantial experience in designing sampling protocols in the private sector, and have developed market research studies for numerous large corporate clients, which typically involve issues relating to sampling. Further details of my professional history, including a list of publications I have authored during the last ten years, can be found on the resume attached hereto as Exhibit A. I have served as an expert witness in Columbia Pictures Industries, Inc., et al. v. Gary Fung, 06-CV-05578. I am presently serving as an expert witness in Arista Records LLC, et al. v. Usenet.com, Inc., 07-CV-08822.

### B.  Assignment

1.      I have been retained by plaintiffs, through Cravath, Swaine &

1

Moore LLP, to provide expert analysis and opinions in the matter of <u>Arista Records LLC,</u> <u>et al. v. Lime Wire LLC,</u> 06 Civ. 05936.[1]

      2.      I have been asked to develop a protocol to determine the authorization status of files being offered for download to LimeWire users and the frequency of download requests for those files.

      3.      The documents that I have specifically reviewed or considered in forming the opinions expressed herein are listed in Exhibit B.  I may supplement my analyses and opinions if new information becomes available in conjunction with my ongoing research on the issues involved in this case.  I may also develop charts or other visual aids to illustrate my testimony.

      4.      I am being compensated for my work in connection with this engagement at my standard rates of $450 per hour of testimony and $350 per hour for all other activities.  My support analysts are being compensated at a rate of $150 per hour.

## II.    CONCLUSIONS

      1.      I estimate that 92.7% of the files available for download through the LimeWire client are not authorized for free distribution on peer-to-peer networks. (43.6% of the available files are owned by one of the four major record companies (EMI Music North America, Sony BMG Music Entertainment, Universal Music Group or Warner Music Group Corp., collectively, the "Record Companies") and are not authorized for free distribution on peer-to-peer networks, and 49.0% of the available files

---

[1] The sampling protocols, estimation techniques, and margin of error calculation used in my work can all be found in the canonical reference by William G. Cochran, <u>Sampling Techniques</u> (3rd ed., 1977).

2

are highly likely to be owned by another entity that has not authorized them for free distribution on peer-to-peer networks.) In addition, 3.2% of the available files are authorized (or highly likely to be authorized) for free distribution on peer-to-peer networks. The identity or authorization status of 4.2% of the available files is unknowable.

2.    I also estimate that 98.8% of the download requests for authorized or unauthorized files to LimeWire clients are for unauthorized files. 1.2% of the download requests for unauthorized or authorized files to LimeWire clients are for authorized files.

## III.    DESCRIPTION OF PROTOCOL

1.    I designed a three-phase study to determine the authorization status of (a) the files being offered for download to LimeWire users and (b) the download requests for those files. First, a Master Hash Library of file hashes (the "Master Library") was created. Second, using this Master Library, files were randomly selected for download and subsequent analysis. Third, the files downloaded and analyzed were made available for searching, and user requests for these files were logged.

### A.    Creation of the Master Hash Library

1.    The Master Library was created using the LimeWire Basic Client version 4.12.11 (the "Client"). During Client installation, the team implementing the protocol selected "English" as the language and declined the Client's request to scan the hard drive for files. The Client was configured to display all possible columns of information in the search-result lists, not to share files during and after download, and to

3

proceed with the downloading of files without regard to any dialogue boxes about licenses. The Client's default settings with respect to the number of simultaneous downloads (eight) was not changed. The searches were conducted with the Client's default filters in place. If a client became inoperative for any reason during the execution of the protocol, the Client was restarted and the protocol continued.

2.     The protocol was implemented in Los Angeles, CA; Detroit, MI; Little Rock, AR; Columbus, OH and New York, NY.

3.     The Client was directed to initiate a search request using the "What's New" function with the default settings enabled. The "What's New" search was allowed to run for 90 seconds.

4.     One file was randomly selected from the files returned by the "What's New" search, with each result weighted by its source count. A "browse host" command was issued on the selected result. The "browse host" command was allowed to run for 90 seconds before another file was selected.

5.     If the host responded to the "browse host" request, an inventory of all data received in response to the "browse host" request, including hashes, was collected from the host. A hash was recorded by selecting a file, right clicking on it and selecting the "copy magnet link to clipboard" option. This process was repeated until hashes were collected for each of the files returned in response to the "browse host" request. Data from the clipboard was then stored to create the Master Library. If the "copy magnet link to clipboard" option was not available for any reason, then the "Lookup File with Bitzi" option was used to obtain the hash value for the file. No actual

4

files were downloaded at this point in the study. The tab displaying the results of the "browse host" request was then closed.

6.     The file selection and hash collection process was repeated nine more times on each "What's New" results list, such that ten "browse host" requests were issued for each "What's New" search.

7.     After each "What's New" query, the Client was disconnected from its UltraPeers and then reconnected to a different set of UltraPeers. Software controls prevented any of the Clients from connecting to the same UltraPeer more than once.

8.     After reconnecting to a different set of UltraPeers, the Client was directed to initiate a new "What's New" search request. The process described in Paragraphs 4 and 5 was then repeated. In all, the process was repeated continuously for one week, creating a Master Library of 7,691,324 file hashes.

9.     Duplicate file hashes that were captured from the same IP address were then removed from the inventory, leaving 6,908,689 file hashes.

**B.     Selection and Acquisition of the Sample for Analysis**

1.     Each hash in the Master Library was assigned an integer.

2.     I generated a list of 10,000 uniform random numbers, with a value ranging anywhere from 1 to 6,908,689. Those random numbers were used to select hashes from the Master Library with the corresponding assigned integer value. This selection method ensured that each entry in the Master Library was equally likely to be chosen.

3.   Using multiple instances of the Client, the randomly-selected hashes (as magnet links) were used to download the associated files from the network.  If a download request timed out and could not be downloaded in ten attempts, the file was deemed undownloadable and replaced with the next hash from the randomly-generated list from the Master Library.  Each instance of the Client attempted to download eight files at any one time.

4.   The downloaded files were scanned for viruses using AVG Anti-Virus Professional Edition.  Files containing viruses were removed.  Files that appeared to contain child pornography were also removed from the set.

5.   The first 1,800 files appearing in this set were analyzed by Eric German and his team to determine their identity and authorization status.

C.   The User Request Study

1.   Using the Client, the team implementing the protocol made the files analyzed in Phase III of the study available for download for a period of one week.

2.   User requests to download the files were logged.  No files were transferred to users.  Multiple requests for the same file from the same IP address were excluded from the results.

3.   User requests were then analyzed to determine the percentage of requests for unauthorized files.

6

## IV.   RESULTS AND CONCLUSIONS

1.      I relied upon the classifications of Mr. German and his team.
Mr. German's declaration is attached as Exhibit C.  Mr. German and his team's analysis
showed that of the 1,800 files analyzed, 774 were confirmed to be infringing by their
Record Company owner; 870 were determined to be highly likely infringing; 38 were
determined to be highly likely noninfringing; 18 were determined to be part of the
LimeWire client itself; 17 were determined to be spam or spoofs; and 9 were determined
to be pornographic.  Mr. German and his team also reported that the status of 74 files
could not be determined either because the file could not be identified or its authorization
status could not be determined.

2.      Leaving aside the 26 files determined to be spam/spoof or
pornography, 43.6% (774 files) of the available files were confirmed to be infringing by
their Record Company owners.  49.0% (870 files) of the available files were determined
to be highly likely infringing.  3.2% (56 files) of the available files were determined to be
highly likely noninfringing (including files containing parts of the LimeWire client).  The
identity or authorization status of 4.2% (74 files) of the available files could not be
determined.

3.      Thus, based on the number of files in the sample confirmed by
their Record Company owners as unauthorized and the number of files determined to be
highly likely infringing, and not considering the files determined to be spam/spoof or
pornography, I estimate that 92.7% of the files made available for download to LimeWire
clients are either not authorized or highly likely not to be authorized for free distribution

7

on peer-to-peer networks.   In addition, I estimate that 3.2% of the available files are authorized or highly likely to be authorized for free-distribution on peer-to-peer networks.  The identity or authorization status of 4.2% of the available files is unknowable.  The margin of error for this estimate is +/- 1.2% at 95% confidence.  This represents a very high level of precision.

        4.     The above reported percentages are concordant with similar studies I have designed to analyze file sharing activity on a peer-to-peer network.  This high level of concordance, in my opinion, lends additional credence to the validity of this study and its results.

        5.     Of the 1,625 download requests, 1,606 were for confirmed or highly likely infringing files, and 19 were for highly likely noninfringing files (including files containing parts of the LimeWire client).  Therefore, I further estimate that 98.8% of the download requests for authorized or unauthorized files to LimeWire clients were for unauthorized files.  1.2% of the download requests for authorized or unauthorized files to LimeWire clients were for authorized files.  The margin of error for this estimate is +/- 0.5% at 95% confidence, which also represents a very high level of precision.

6.      The protocol described above and adhered to, in my opinion, yielded files that are representative of both the files available to LimeWire clients as well as the frequency of requests for such files. Therefore, I am able to conclude that the vast majority of file transfers executed by the LimeWire client are for infringing files.

April 17, 2008

_Dr. Richard Waterman_

Dr. Richard Waterman

**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| ARISTA RECORDS LLC; ATLANTIC RECORDING CORPORATION; BMG MUSIC; CAPITOL RECORDS, LLC; CAROLINE RECORDS, INC.; ELEKTRA ENTERTAINMENT GROUP, INC.; INTERSCOPE RECORDS; LAFACE RECORDS LLC; MAVERICK RECORDING COMPANY; SONY BMG MUSIC ENTERTAINMENT; UMG RECORDINGS, INC.; VIRGIN RECORDS AMERICA, INC.; WARNER BROS. RECORDS INC.; and ZOMBA RECORDING LLC, <br><br> Plaintiffs, <br><br> v. <br><br> USENET.COM, INC.; SIERRA CORPORATE DESIGN, INC.; and GERALD REYNOLDS, <br><br> Defendants. | No. 07-CIV-8822 (HB) <br><br> ECF Case |

**DECLARATION OF DR. RICHARD WATERMAN**

## I.    INTRODUCTION.

1.       I am an Adjunct Associate Professor of Statistics at The Wharton School at the

University of Pennsylvania, and the President and Co-Founder of Analytic Business Services,

Inc., a consultancy focused on providing expert advice and opinions in the field of statistical

analysis.  I received my Ph.D. in Statistics from the Pennsylvania State University in 1993.  I

have substantial experience designing and reviewing sampling protocols for various large

organizations, such as the United States Postal Service, for whom I designed and analyzed a

national multi-stage sample for the estimation of operational characteristics.  I have designed

sampling protocols involving other filesharing technologies, specifically BitTorrent and

Gnutella.  I also have substantial experience in designing sampling protocols in the private

sector, and have developed market research studies for numerous large corporate clients, which

typically involve issues related to sampling.  Further details of my professional history, including

a list of publications I have authored during the last ten years, can be found on the resume

attached hereto as Exhibit 1.  Within the last four years, I have served as an expert witness in

*Columbia Pictures Industries, Inc. et al. v. Gary Fung*, No. 06-CV-5578, pending in the United

States District Court for the Central District of California, and in *Arista Records LLC et al. v.*

*Lime Group LLC et al.*, No. 06 CV 5936, pending in the United States District Court for the

Southern District of New York.  I have personal knowledge of the following facts and, if called

and sworn as a witness, could competently testify thereto.

      2.      I have been retained by the Plaintiffs, through Jenner & Block LLP, to provide

expert analysis and opinions in the matter of <u>Arista Records LLC et al. v. Usenet.com, Inc. et al</u>,

No. 07-CIV-8822, pending in the United States District Court for the Southern District of New

York.  I am being compensated for my work in connection with this engagement at the rate of

$450 per hour of testimony and $350 per hour for all other activities.

      3.      I have been asked to develop a protocol for drawing a statistically reliable sample

for a study to determine the authorization status of content files being offered for download on

certain identified music newsgroups that were available on Usenet.com (hereafter, the "Music

Newsgroups").  The sampling protocols, estimation techniques, and margin of error calculation

used in my work can all be found in the standard reference by William G. Cochran, <u>Sampling</u>

Techniques (3rd ed. 1977).  The instructions for the protocol I developed are attached hereto as
Exhibit 2, and the list of Music Newsgroups is attached as Exhibit A thereto.

       4.      The documents that I have specifically reviewed or considered in forming the
opinions expressed herein are listed in Exhibit 3.  In general, in reaching my opinions and
conclusions, I relied upon my specialized knowledge, education, and experience as applied to the
facts and data discussed below, as well as my review of publicly available information listed on
Exhibit 3, my review of the Giganews service using a publicly available Usenet client, and the
work and conclusions of Mr. Brad Newberg and his team (as discussed below).  I may
supplement my analysis and opinions if new information becomes available in conjunction with
my ongoing research on the issues involved in this case.  I may develop charts or other visual
aids to illustrate my testimony.

## II.      SUMMARY OF CONCLUSIONS.

       5.      I estimate that 94.17% of the content files available for download from the
identified Music Newsgroups on Usenet.com are not authorized for free distribution on
Usenet.com.  The identity or authorization status of 3.94% of the available files is unknowable.

## III.      DESCRIPTION OF PROTOCOL.

       6.      I designed a study to create a scientifically reliable and unbiased sample of files
from the population of interest, in order to determine the authorization status of content files
being offered for download on the Usenet.com Music Newsgroups.

       7.      The database for sample selection was created as follows.  As it was my
understanding that the music newsgroups of interest had been disabled on Usenet.com, the
Giganews service was used as an alternative for purposes of this protocol.  All available message
headers in the Music Newsgroups were downloaded from Giganews.com to create a "Message

47392

Database."[1]  A second database (the "Searched Database") was then created using common identifying header information to identify sets of associated messages that comprise a larger file: for each set of associated messages identified as part of a larger file, the common header information was included in the Searched Database, and for each message not identified as part of a larger file, the individual header information was included in the Searched Database.  I refer to the files and messages represented in the Searched Database as "Searched Files."

8.      The random selection was done as follows.  Each Searched File was assigned a unique number between 1 and the total number of Searched Files in the Searched Database. The total number of Searched Files was 5,024,680.  I then generated a list of a random permutation of numbers between 1 and 5,024,680.  Those numbers were used in a sequential manner to select Searched Files from the Searched Database with the corresponding assigned numerical value. This selection method ensured that each Searched File in the Searched Database was equally likely to be chosen.

9.      Searched Files were downloaded from the Searched Database in the order given by the random permutation.  In downloading the Searched Files, my protocol here distinguishes between "Data Files" and "Text Files."  A Data File is defined as any file or message that contains binary encoded content.  A Text File is any file or message that does not contain binary encoded content.  The sample for review consisted of the first 1,800 Data Files selected and successfully downloaded.  (A file was given six hours to complete downloading before the download was terminated.  Also, the protocol includes a provision for identification and exclusion of suspected child pornography, but no such child pornography was identified.)  If a

---

[1] My conclusions are based on the understanding that the Music Newsgroups that were analyzed in this study were also available on Usenet.com, and that the same binary encoded content available in the Music Newsgroups on Giganews would be available in those Music Newsgroups on Usenet.com.

47392

file was unable to be opened or played after reasonable efforts, or contained no sound or recognizable output when opened or played, it was classified as "Junk / Damaged Unintelligible," and replaced in the sample by the next Data File selected using the random permutation until 1,800 Data Files were selected.

10.     The instructions for this protocol are attached as Exhibit 2.  In my professional opinion, the procedures used in this study are based on standard and universally accepted statistical methods, and provide a random sample from which we can reliably estimate the incidence of copyright infringement of content files available for download from the identified Music Newsgroups on Usenet.com.

## IV.     RESULTS AND CONCLUSIONS.

11.     I relied upon the classifications of Mr. Brad Newberg and his team, including the classification of "Junk / Damaged Unintelligible" files discussed above.  Mr. Newberg's declaration is attached hereto as Exhibit 4.  Mr. Newberg and his team's analysis showed that of the 1,800 content files analyzed, 603 were confirmed to be infringing by their Record Company owner;[2] 1092 were determined to be highly likely infringing; and 34 were determined to be highly likely or confirmed noninfringing.  Mr. Newberg and his team also reported that the status of 71 content files could not be determined either because the file could not be identified or its authorization status could not be determined.

12.     Overall, 33.5% (603 files) of the available content files were confirmed to be infringing by the Record Company owners, and 60.67%% (1092 files) of the available content files were determined to be highly likely infringing, for a total of 94.17% (1,695 files) that were confirmed or highly likely infringing.  1.89% (34 files) of the available content files were

_____

[2] The "Record Companies" are EMI Music North America, Sony BMG Music Entertainment, Universal Music Group, and Warner Music Group Corp.

determined to be highly likely or confirmed noninfringing. The identity or authorization status of 3.94% (71 files) of the available content files could not be determined.

13.   Based on the number of files in the sample confirmed by their Record Company owners as infringing and the number of files determined to highly likely infringing, I estimate that 94.17% of the content files made available on the specified Music Newsgroups on Usenet.com are either not authorized or highly likely not authorized for free distribution on Usenet.com. In addition, I estimate that 1.72% of the available content files are authorized or highly likely to be authorized for free distribution on Usenet.com. The identity or authorization status of 3.94% of the available files is unknowable. The margin of error for the infringement estimate is +/- 1.1% at 95% confidence. This represents a very high level of reliability and precision. As a further corroboration of the reliability of this study, I note that this study's estimate of infringing content is remarkably similar to that obtained in comparable studies in which I have been involved in the design and analysis.

I declare under penalty of perjury that the foregoing is true and correct.

February 19th, 2009

Dr. Richard Waterman

47392.1

# EXHIBIT B

| | | |
|---|---|---|
| Total number of files in the uploaddownloads table | 107,271,438 | |
| Number of files with 0 downloads (both free and paid) | 57,923,301 | 54% |
| Number of files with 1 download | 6,182,360 | 5.76% |
| Number of files with 2-30 downloads | 28,604,972 | 26.67% |
| Number of files with 31 or more downloads | 14,560,805 | 13.57% |

| | | |
|---|---|---|
| Total number of files in the uploaddownloads table with 1 or more downloads | 49,348,137 | |
| Number of files with 1 download | 6,182,360 | 12.53% |
| Number of files with 2-30 downloads | 28,604,972 | 57.97% |
| Number of files with 31 or more downloads | 14,560,805 | 29.51% |

## Massacre at Kasserine

This is a video taken at a hospital in Kasserine, Tunisia, after the deaths of numerous protesters, as described in the article, "Streetbook, How Egyptian and Tunisian youth hacked the Arab Spring" ( http://www.technologyreview.com/web/38379/?mod=ArabSpring_feature). According to the article, the video was smuggled out of Tunisia and then uploaded to MegaUpload. In a Google search for "megaupload Kasserine hospital video", the fourth result is  http://tweetmeme.com/story/3695652402/megaupload-the-leading-online-storage-and-file-delivery-service. The second link in that page is  http://goo.gl/6YsGo, which redirects to  http://www.megaupload.com/?d=83K07BDP. The content of this video matches the description given in the Technology Review article.

Two files on Hotfile, uploadids 95955101 and 96107137, have similar file names. Both of these files were uploaded on January 11, 2011, and have the same SHA1 hash. They are the same video as the one available on MegaUpload. They were downloaded from Hotfile a total of 25 times, with 21 of those downloads confirmed to be in January, 2011.

# Need for Speed save game file

This file contains 3 screenshots (5 copies of each), some settings in two text files, `Need for Speed(TM) Hot Pursuit/config.NFS11Save` and `Need for Speed(TM) Hot Pursuit/Save/Default/controls.NFS11Save`, and a binary file, `Need for Speed(TM) Hot Pursuit/Save/Default /MUD.7.NFS11Save`. This binary file is not the game executable itself, but contains player information, as described at, for example, http://forum.ea.com/eaforum/posts /list/4726754.page and http://forum.ea.com/eaforum/posts/list/4691528.page.

## Zebrak's Notes

http://www.muchfile.com/file/2uc049/need-for-speed-hot-pursuit-save-game

http://hotpursuit.needforspeed.com/store

http://xbox360.ign.com/objects/001/001321.html

# Orbit Downloader

Free download from  http://www.orbitdownloader.com/download.htm

## Zebrak's Notes

http://www.orbitdownloader.com/

http://en.wikipedia.org/wiki/Orbit_Downloader

http://orbit-downloader.en.softonic.com/

The total number of files uploaded to Hotfile that have a `.ppt` or `.pptx` extension and are listed with 0 or exactly 1 download in the uploadsdownloads table is 40489.

This chart shows the number of premium conversions (the *paidfor* field of the *dailydownload* table) for the files in each category of Zebrak's list.

| Zebrak Category | Sum of *paidfor* | Dailydownload Total | Conversion Rate |
|---|---|---|---|
| Confirmed Infringing | 44 | 215302 | 0.0204% |
| Highly Likely Infringing | 1245 | 2123933 | 0.0586% |
| Noninfringing | 699 | 650727 | 0.1074% |
| Unknowable | 116 | 316235 | 0.0367% |

Two of the parts of a URL to a file on Hotfile are the uploadid and a second 7-character identifier. For example, in the URL 🌐 http://hotfile.com/dl/12345678/abc1234/, the uploadid is 12345678 and the identifier is the string "abc1234". A file can only be downloaded if both the uploadid and identifier are correct in the URL. The set of uploadids in the Hotfile system are sequential, so most integers up to the total number of files ever uploaded to Hotfile will be connected to some file. The 7-character identifier, however, would need to be guessed by the user. Since the identifier is 7 characters from the set of lowercase letters and digits, the probability of guessing correctly would be 36 to the power of 7, which is approximately 1 in 78 billion. If a user could try 10 URL's per second, it would take over 248 years to try every possible identifier.

# EXHIBIT C



**HotFile Corp <hotfile.mailbox@gmail.com>**

# Counter notification for deleted files

4 messages

---

**HotFile Corp** ▮▮▮▮▮▮▮▮▮▮▮▮▮▮                              **Tue, Jun 14, 2011 at 3:10 PM**
To: ▮▮▮▮▮▮▮▮▮▮

Hello,
We received counter notification for deleted by you file:
http://hotfile.com/dl/120313261/aeb6a12/I9000XXJVP.rar.html

Please respond according DMCA regulations within appropriate term.

Regards,


> ---------- Forwarded message ----------
> From: Samsung-Firmware Samsung-Firmware
> Date: Mon, Jun 13, 2011 at 2:16 PM
> Subject: Hotfile remove my files because of no reason.
> To: abuse@hotfile.com
>
>
> Hello
> I', Danny Dorresteijn from www.SamFirmware.com
>
> We use hotfile for i think 6 months now.
> Its a great host for all my files.
> We have almost 300.000 site members.
> We send hotfile.com already a email about that, we are most of the time
> always the first one with our files.!
> If someone send you guys a abuse about us, this could be FAKE.
>
> SamFirmware is the only website who is using hotfile.com
> If someone email you about us.
> This is for 100% FAKE.
>
> We are not happy that you guys show fakers real answers!
> You should aks us first.
>
> We are a big website all over the world.
>
> Today we got a email from hotfile.com
>
> *This mail is to notify you that the access to the following links was
> disabled
> as a result of received complaint of copyright holders of the files. If you
> belleve
> that access to this files were disabled by mistake, please follow the
> instructions
> in our Intelectual Property Policy
> (**http://hotfile.com/ippolicy.html*
> *) for submitting
> counter-notification.
>
> **http://hotfile.com/dl/120313261/aeb6a12/I9000XXJVP.rar.html* (samfirmware)
> *
> --

Confidential

HF02835682

> Hotfile.com abuse team
>
>
> *We Reupload the file already!
> We are using Hotfile.com for over 6 months now someone emailed you about us
> and talk bad and hotfile.com removed our file.
> This is not the normal way because it is never happening before.
> Please ask us to!
>
> We do nothing wrong.
> We have contacts with Samsung!
> Samsugn told us everything is alright what we are doiing!
> So the boss "Samsung" tell us its safe and now some hater is sayin its
> wrong...
> We are a Samsung website with a contact person of Samsung Benelux.
>
> Please don't remove any other files please ask us first if something is
> wrong.
>
> This is the work of people who don't like us!
>
> Thanks. █████████████
> www.SamFirmware.com

---

**Jimmy Lee <jle@dtecnet.com>**               **Tue, Jun 14, 2011 at 8:45 PM**
To: HotFile Corp ██████████████████

Dear Hotfile,

We would like to retract the request for takedown of the link mentioned below.

Best,
Jimmy

---

**From:** HotFile Corp █████████████████
**Date:** Tue, 14 Jun 2011 07:10:15 -0500
**To:** █████████████████
**Subject:** Counter notification for deleted files

Hello,
We received counter notification for deleted by you file:
http://hotfile.com/dl/120313261/aeb6a12/I9000XXJVP.rar.html

Please respond according DMCA regulations within appropriate term.

Regards,


> ---------- Forwarded message ----------
> From: Samsung-Firmware Samsung-Firmware
> Date: Mon, Jun 13, 2011 at 2:16 pm
> Subject: Hotfile remove my files because of no reason.
> To: abuse@hotfile.com
>
>
> Hello
> I', █████████████ from www.SamFirmware.com
>
> We use hotfile for i think 6 months now.

Confidential               HF02835683

> Its a great host for all my files.
> We have almost 300.000 site members.
> We send hotfile.com already a email about that, we are most of the time
> always the first one with our files.!
> If someone send you guys a abuse about us, this could be FAKE.
>
> SamFirmware is the only website who is using hotfile.com
> If someone email you about us.
> This is for 100% FAKE.
>
> We are not happy that you guys show fakers real answers!
> You should aks us first.
>
> We are a big website all over the world.
>
> Today we got a email from hotfile.com
>
> *This mail is to notify you that the access to the following links was
> disabled
> as a result of received complaint of copyright holders of the files. If you
> believe
> that access to this files were disabled by mistake, please follow the
> instructions
> in our Intelectual Property Policy
> (**http://hotfile.com/ippolicy.html*
> *) for submitting
> counter-notification.
>
> **http://hotfile.com/dl/120313261/aeb6a12/I9000XXJVP.rar.html* (samfirmware)
> *
> --
> Hotfile.com abuse team
>
>
> *We Reupload the file already!
> We are using Hotfile.com for over 6 months now someone emailed you about us
> and talk bad and hotfile.com removed our file.
> This is not the normal way because it is never happening before.
> Please ask us to!
>
> We do nothing wrong.
> We have contacts with Samsung!
> Samsugn told us everything is alright what we are doing!
> So the boss "Samsung" tell us its safe and now some hater is sayin its
> wrong...
> We are a Samsung website with a contact person of Samsung Benelux.
>
> Please don't remove any other files please ask us first if something is
> wrong.
>
> This is the work of people who don't like us!
>
> Thanks. ███████████
> www.SamFirmware.com

**HotFile Corp** ███████████████              Tue, Jun 14, 2011 at 10:48 PM
To: Vasil Kolev ███████████████

Vazstanovi file-a i user accounta ako e suspednat...
http://hotfile.com/dl/120313261/aeb6a12/I9000XXJVP.rar.html
--------- Forwarded message ----------
From: ▮▮▮▮▮▮▮▮▮▮▮▮▮▮
Date: Tue, Jun 14, 2011 at 8:45 PM
Subject: Re: Counter notification for deleted files
To: HotFile Corp ▮▮▮▮▮▮▮▮▮▮▮▮

Dear Hotfile,

We would like to retract the request for takedown of the link mentioned below.

Best,
Jimmy

---------------------------------------------------------------------------------

**From:** HotFile Corp ▮▮▮▮▮▮▮▮▮▮▮▮
**Date:** Tue, 14 Jun 2011 07:10:15 -0500
**To:** ▮▮▮▮▮▮▮▮▮▮▮▮▮▮
**Subject:** Counter notification for deleted files

Hello,
We received counter notification for deleted by you file:
http://hotfile.com/dl/120313261/aeb6a12/I9000XXJVP.rar.html

Please respond according DMCA regulations within appropriate term.

Regards,


> ---------- Forwarded message ----------
> From: Samsung-Firmware Samsung-Firmware
> Date: Mon, Jun 13, 2011 at 2:16 PM
> Subject: Hotfile remove my files because of no reason.
> To: abuse@hotfile.com
>
>
> Hello
> I', ▮▮▮▮▮▮▮▮▮ rom www.SamFirmware.com
>
> We use hotfile for i think 6 months now.
> Its a great host for all my files.
> We have almost 300.000 site members.
> We send hotfile.com    already a email about that, we are most of the time
> always the first one with our files.l
> If someone send you guys a abuse about us, this could be FAKE.
>
> SamFirmware is the only website who is using hotfile.com
> If someone email you about us.
> This is for 100% FAKE.
>
> We are not happy that you guys show fakers real answers!
> You should aks us first.
>
> We are a big website all over the world.
>
> Today we got a email from hotfile.com
>

Confidential

HF02835685

> *This mail is to notify you that the access to the following links was
> disabled
> as a result of received complaint of copyright holders of the files. If you
> believe
> that access to this files were disabled by mistake, please follow the
> instructions
> in our Intelectual Property Policy
> (**http://hotfile.com/ippolicy.html*
> *) for submitting
> counter-notification.
>
> **http://hotfile.com/dl/120313261/aeb6a12/I9000XXJVP.rar.html*    (samfirmware)
> *
> --
> Hotfile.com abuse team
>
>
> *We Reupload the file already!
> We are using Hotfile.com for over 6 months now someone emailed you about us
> and talk bad and hotfile.com    removed our file.
> This is not the normal way because it is never happening before.
> Please ask us to!
>
> We do nothing wrong.
> We have contacts with Samsung!
> Samsugn told us everything is alright what we are doiing!
> So the boss "Samsung" tell us its safe and now some hater is sayin its
> wrong...
> We are a Samsung website with a contact person of Samsung Benelux.
>
> Please don't remove any other files please ask us first if something is
> wrong.
>
> This is the work of people who don't like us!
>
> Thanks. ██████████████
> www.SamFirmware.com

---

**Vasil Kolev** ██████████████████████         **Tue, Jun 14, 2011 at 11:52 PM**
To: HotFile Corp < ███████████████████ >

Готово.

В 22:48 +0300 на 14.06.2011 (вт), HotFile Corp написа:
> Vazstanovi file-a i user accounta ako e suspednat...
> http://hotfile.com/dl/120313261/aeb6a12/I9000XXJVP.rar.html
> ---------- Forwarded message ----------
> From: Jimmy Lee <jle@dtecnet.com>
> Date: Tue, Jun 14, 2011 at 8:45 PM
> Subject: Re: Counter notification for deleted files
> To: HotFile Corp <andrew@hotfile.com>
>
>
> Dear Hotfile,
>
> We would like to retract the request for takedown of the link mentioned
> below.

\>
\> Best,
\>  ▮▮▮▮▮▮▮▮▮▮▮
\> ▮
\> From: HotFile Corp ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
\> Date: Tue, 14 Jun 2011 07:10:15 -0500
\> To: ▮▮▮▮▮▮▮▮▮▮
\> Subject: Counter notification for deleted files
\>
\> Hello,
\> We received counter notification for deleted by you file:
\> http://hotfile.com/dl/120313261/aeb6a12/I9000XXJVP.rar.html
\>
\> Please respond according DMCA regulations within appropriate term.
\>
\> Regards,
\>
\>
\> > ---------- Forwarded message ----------
\> > From: Samsung-Firmware Samsung-Firmware
\> > Date: Mon, Jun 13, 2011 at 2:16 PM
\> > Subject: Hotfile remove my files because of no reason.
\> > To: abuse@hotfile.com
\> >
\> >
\> > Hello
\> > I', ▮▮▮▮▮▮▮▮ from www.SamFirmware.com
\> >
\> > We use hotfile for i think 6 months now.
\> > Its a great host for all my files.
\> > We have almost 300.000 site members.
\> > We send hotfile.com already a email about that, we are most of the time
\> > always the first one with our files.!
\> > If someone send you guys a abuse about us, this could be FAKE.
\> >
\> > SamFirmware is the only website who is using hotfile.com
\> > If someone email you about us.
\> > This is for 100% FAKE.
\> >
\> > We are not happy that you guys show fakers real answers!
\> > You should aks us first.
\> >
\> > We are a big website all over the world.
\> >
\> > Today we got a email from hotfile.com
\> >
\> > *This mail is to notify you that the access to the following links was
\> > disabled
\> > as a result of received complaint of copyright holders of the files. If
\> you
\> > believe
\> > that access to this files were disabled by mistake, please follow the
\> > instructions
\> > in our Intelectual Property Policy
\> > (**http://hotfile.com/ippolicy.html*
\> > *) for submitting
\> > counter-notification.
\> >
\> > **http://hotfile.com/dl/120313261/aeb6a12/I9000XXJVP.rar.html*(samfirmware)
\> > *
\> > --
\> > Hotfile.com abuse team

Confidential                                        HF02835687

> >
> >
> > *We Reupload the file already!
> > We are using Hotfile.com for over 6 months now someone emailed you about
> us
> > and talk bad and hotfile.com removed our file.
> > This is not the normal way because it is never happening before.
> > Please ask us to!
> >
> > We do nothing wrong.
> > We have contacts with Samsung!
> > Samsugn told us everything is alright what we are doiing!
> > So the boss "Samsung" tell us its safe and now some hater is sayin its
> > wrong...
> > We are a Samsung website with a contact person of Samsung Benelux.
> >
> > Please don't remove any other files please ask us first if something is
> > wrong.
> >
> > This is the work of people who don't like us!
> >
> > Thanks ██████████████
> > www.SamFirmware.com


--
Regards,

██████████

----------------------------------------------------------------------

**signature.asc**
1K

===========================================================================

Confidential

HF02835688



**HotFile Corp <hotfile.mailbox@gmail.com>**

---

# Fwd: Counter-Notification Disputing Removal or Blocking of Content

4 messages

---

**Hotfile Abuse <abuse@hotfile.com>**                                    **Fri, Jun 3, 2011 at 12:08 PM**
To: ██████████████████

--------- Forwarded message ----------
From: ████████████████████████████
Date: Thu, Jun 2, 2011 at 6:59 PM
Subject: Counter-Notification Disputing Removal or Blocking of Content
To: abuse@hotfile.com

To Whom it May Concern:

The content that has been removed mistakenly is the following:
http://hotfile.com/dl/95741768/0643dcf/21_ARCHITECTURAL_GRAPHICS.rar.html

This is a zipped folder containing architectural graphics for one of my clients, Greenplan. We are utilizing these
graphics in order to maintain the section of his website which can be found here:

http://greenplan.ca/architecturalgraphics.htm

In good faith I believe the material was removed or disabled as a result of mistake, or as a result of
misidentification of the material to be removed or disabled.



I consent to the jurisdiction of the Federal District Court in the judicial district in Northern District of
California, and I will accept service of process from the person who provided notification of the alleged
infringement or from an agent of such person.

Regards,

██████████████████

--------- Forwarded message ----------
From: **Hotfile.com Abuse** <abuse@hotfile.com>
Date: 2 June 2011 08:14
Subject: Deleted files on hotfile.com
To: ████████████████████

This mail is to notify you that the access to the following links was disabled
as a result of received complaint of copyright holders of the files. If you believe
that access to this files were disabled by mistake, please follow the instructions

---

Confidential                                                              HF02835689

in our Intelectual Property Policy (http://hotfile.com/ippolicy.html) for submitting counter-notification.

http://hotfile.com/dl/95741768/0643dcf/21_ARCHITECTURAL_GRAPHICS.rar.html

--
Hotfile.com abuse team


--
███████████████

**HotFile Corp** ███████████████                          Sat, Jun 4, 2011 at 10:03 AM
To: r███████████████

Hello,
User started counter-notice and you should respond ASAP.

Regards,
[Quoted text hidden]

**HotFile Corp** ███████████████                          Sun, Jun 12, 2011 at 10:19 AM
To: ███████████████

Vazstanovi file/user, niama otgovor na counter notice-a....

---------- Forwarded message ----------
From: **Hotfile Abuse** <abuse@hotfile.com>
Date: Fri, Jun 3, 2011 at 12:08 PM
[Quoted text hidden]

**Vasil Kolev <vasil@ludost.net>**                        Sun, Jun 12, 2011 at 1:49 PM
To: HotFile Corp ███████████████

Възстанових.

В 10:19 +0300 на 12.06.2011 (нд), HotFile Corp написа:
> Vazstanovi file/user, niama otgovor na counter notice-a....
>
> ---------- Forwarded message ----------
> From: Hotfile Abuse <abuse@hotfile.com>
> Date: Fri, Jun 3, 2011 at 12:08 PM
> Subject: Fwd: Counter-Notification Disputing Removal or Blocking of Content
> To: andrew@hotfile.com
>
>
>
>
> ---------- Forwarded message ----------
> From: Crystal Sawyer <shangriladreams@gmail.com>
> Date: Thu, Jun 2, 2011 at 8:39 PM
> Subject: Counter-Notification Disputing Removal or Blocking of Content
> To: abuse@hotfile.com
>
>
> To Whom it May Concern:

>
> The content that has been removed mistakenly is the following:
> http://hotfile.com/dl/95741768/0643dcf/21_ARCHITECTURAL_GRAPHICS.rar.<http://hotfile.com/dl/95741768/0643dcf/21_ARCHITECTURAL_GRAPHICS.rar.html>
> html<http://hotfile.com/dl/95741768/0643dcf/21_ARCHITECTURAL_GRAPHICS.rar.html>

[Quoted text hidden]

Regards,



signature.asc
1K



**HotFile Corp <hotfile.mailbox@gmail.com>**

# Counter notice for wrong deleted file

4 messages

---

**HotFile Corp <support@hotfile.com>**          **Sat, Jun 25, 2011 at 2:18 PM**
To: █████████████████

Please respond ASAP!
You deleted file mentioned below for which we received counter notice:

> Hello,
>
> our account cryptloadUpload has been terminated but we have the copyright
> for the abused files because we are the developer of the software (
> http://cryptload.info).
>
> The mentioned file
> http://hotfile.com/dl/117253666/d0f1170/cryptload118.rar.html (cryptloadUpload) is our
> software wich we offer users through your service.
>
> Please reactivate my account and dont abuse our software on your system.
>



--
------------------------------------------
Hotfile.com

Support:http://hotfile.com/contacts.html
Help/FAQ:http://hotfile.com/help.html

---

**herve lemaire** ████████████████████████      **Sat, Jun 25, 2011 at 2:32 PM**
To: HotFile Corp <support@hotfile.com>

Yes its a mistake

De : hotfile.mailbox@gmail.com [mailto:hotfile.mailbox@gmail.com] De la part de HotFile Corp
Envoyé : samedi 25 juin 2011 13:18
À : ██████████████████████
Objet : Counter notice for wrong deleted file

---

Confidential

[Quoted text hidden]

---

**HotFile Corp <support@hotfile.com>**          **Sun, Jun 26, 2011 at 7:55 AM**
To: ███████████████████

Restore file/user

[Quoted text hidden]

---

**HotFile Corp <support@hotfile.com>**          **Sun, Jun 26, 2011 at 7:56 AM**
To: ███████████████████

OK, but we suspended user who is our customer since one year and he now quit using our service because of this?
How exactly you decided to delete this file?

[Quoted text hidden]

---

Confidential

HF02835693



Redacted

-------- Original Message --------
**Subject:** Fwd: Counter-Notification
   **Date:** Tue, 23 Aug 2011 09:14:59 +0300
  **From:** Hotfile Abuse <abuse@hotfile.com>
      **To:** ███████████████e@leakid.com>
    **CC:** anton@titov.net

Hello,
Please respond ASAP, we deleted user's file/account due your report....

---------- Forwarded message ----------
From: ████████████████████████████>
Date: Tue, Aug 23, 2011 at 1:35 AM
Subject: Counter-Notification
To: "abuse@hotfile.com" <abuse@hotfile.com>

This file is the album of MY band, and it's not abuse since My album is free and I can distribute it however I want!

http://hotfile.com/dl/113643491/7c7ae9a/Tiarah_-_Extinction_Ceremony_-_FREE_2011_MP3_320kbps_SKiN.rar.html

My name is ████████████ I am the vocalist and owner of all the rights of the recorded material and the writer, producer and tehnician of this material.
If someone reported this link I would like to know who.

This album is free, and not signed to any label!!!
You can check it!



--
http://hotfile.com/reportabuse.html
http://hotfile.com/ippolicy.html

HF02868355


Redacted

-------- Original Message --------
**Subject:** Fwd: Account Suspended Counter Claim
**Date:** Thu, 10 Nov 2011 09:13:14 +0200
**From:** Hotfile Abuse <abuse@hotfile.com>
**To:** anton@titov.net

---------- Forwarded message ----------
From: ▮▮▮ ▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮@▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮>
Date: Wed, Nov 9, 2011 at 1:13 PM
Subject: Account Suspended Counter Claim
To: abuse@hotfile.com

Hello it has come to my attention that account ahfm ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮n) has been suspended.

I would like to say that we run a online radio station thats well respected on the www. We have over 200 artists that upload their special works to us on daily basis, we have permission by them to share their works online.

Our full legal regulatory is: www.ah.fm/legal.html
**DJ's/Composers/Producers/Agencies**
Afterhours.FM uses your mixed shows to be aired on the radio also for download as a promotional pack using 3rd party hosting websites. Afterhours.FM does not sell these mixed shows, and are for promotional use only. You acknowledge that you have the rights to and consent to (by uploading your scheduled show) share the works by being broadcasted by Afterhours.FM. You also acknowledge that Afterhours.FM does not assume nor will be held accountable for any legal infringements you may cause due to not having the permission of composers to upload their works, and that you can be responsible for damages that may occur due to infringement. Any complaints due to infringements mailed to admins of Afterhours.FM will be taken seriously, upon proof of infringement that particular show will be canceled & removed from the station, contact information will be shared upon discretion of the parties involved.

So any 3rd party wanting us NOT to upload artists works online they need to contact us and we will be happy to remove those artists from being shared online...

Please ublock our account as many artists depend on hotfile links as for promotion, if not we will try to look for alternative place to host our permission given works.

Best Regards

HF02868356



**Web:** http://www.ah.fm
**Facebook:** http://www.facebook.com/Afterhoursfm
**Twitter:** http://twitter.com/Afterhoursfm
**Mobile:** http://www.ah.fm/apps

--
http://hotfile.com/reportabuse.html
http://hotfile.com/ippolicy.html

HF02868357



Redacted

---------- Forwarded message ----------
From: **Notices** <Notices@ifpi.org>
Date: Thu, Nov 10, 2011 at 1:57 PM
Subject: RE: Counter Claim
To: Hotfile Abuse Department <abuse@hotfile.com>


Dear Sir/Madam

We are writing regarding the claim we asserted against the following file:

http://hotfile.com/dl/115379401/78283d5/Orkidea_-_Radio_Unity_028_on_AH.FM_20-04-2011.mp3.zip.html

Despite our earlier good faith belief, we have become aware that this file was removed in error and they are not in fact infringing our member or represented company's rights:

We would therefore like to withdraw our claim in relation to these files.

Yours faithfully
IFPI


-----Original Message-----
From: Hotfile Abuse Department [mailto:abuse@hotfile.com]
Sent: None
To: Notices
Subject: Counter Claim

Message-Id: <20111109183541.6E412622F4@a1.hotfile.com>
Date: Wed, 9 Nov 2011 12:35:41 -0600 (CST)
Return-Path: lighttpd@a1.hotfile.com
X-OriginalArrivalTime: 09 Nov 2011 18:35:47.0499 (UTC) FILETIME=[65E867B0:01CC9F0E]



HF02868358

November 09, 2011

RE: Mistaken Removal

Dear Constantin Luchain;

   Please find attached to this letter a list of material removed by you pursuant to 17 U.S.C. Section 512.  I have a good faith belief that this material was removed or disabled in error as a result of mistake or misidentification of the material.  I declare that this is true and accurate under penalty of perjury under the laws of the United States of America.

   For the purposes of this matter, I consent to the jurisdiction of the Federal District Court for the judicial district in which the service provider may be found. I also consent to service of process by the person providing notification under  Section 512(c)(1)(C) or that personâ€™s agent. However, by this letter, I do not waive any other rights, including the ability to pursue an action for the removal or disabling of access to this material, if wrongful.

   Having complied with the requirements of Section 512(g)(3), I remind you that you must now replace the blocked or removed material and cease disabling access to it within fourteen business days of your receipt of this notice.  Please notify me when this has been done.

   I appreciate your prompt attention to this matter.  If you have any questions about this notice, please do not hesitate to contact me.
Sincerely,

_____
dan k (AH.FM)
mscice@gmail.com
48510652789
toronto, ontario

Enclosure

File List:
http://hotfile.com/dl/115379401/78283d5/Orkidea_-_Radio_Unity_028_on_AH.FM_20-04-2011.mp3.zip.html


--
http://hotfile.com/reportabuse.html
http://hotfile.com/ippolicy.html


--
http://hotfile.com/reportabuse.html
http://hotfile.com/ippolicy.html

HF02868359

# EXHIBIT D



For Opinion See 518 F.Supp.2d 1197 , 454 F.Supp.2d 966 , 269 F.Supp.2d 1213 , 259 F.Supp.2d 1029 , 243 F.Supp.2d 1073

United States District Court, C.D. California.
METRO-GOLDWYN-MAYER STUDIOS INC., et al., Plaintiffs,
v.
GROKSTER, LTD., et al., Defendants;
Jerry Leiber, et al., Plaintiffs,
v.
Consumer Empowerment BV a/k/a Fasttrack, et al., Defendants,
And Related Counterclaims.
No. CV 01-08541 SVW (FMOx).
February 14, 2006.

Consolidated with: CV 01-09923 SVW (FMOx)

Declaration of Charles J. Hausman in Support of Plaintiffs' Motions for Summary Judgment

Donald B. Verrilli, Jr. (pro hac vice), Steven B. Fabrizio (pro hac vice), Jenner & Block LLP, 601 Thirteenth Street, NW, Washington, D.C. 20005-3823, Telephone: (202) 639-6000, Facsimile: (202) 639-6066, dverrilli @jenner.com, sfabrizio@jenner.com, Attorneys for Record Company Plaintiffs.

George M. Borkowski (SBN 133416), Mitchell Silberg & Knupp LLP, 11377 West Olympic Boulevard, Los Angeles, CA 90064-1683, Telephone: (310) 312-2000, Facsimile: (310) 312-3100, GMB@msk.com, Attorneys for Record Company Plaintiffs.

David E. Kendall (pro hac vice), Williams & Connolly LLP, 725 Twelfth Street, N.W., Washington, D.C. 20005, Telephone: (202) 434-5000, Facsimile: (202) 434-5029, dkendall@wc.com, Attorneys for the Motion Picture Studio Plaintiffs.

Carey R. Ramos (pro hac vice), Paul Weiss Rifkind, Wharton & Garrison LLP, 1285 Avenue of the Americas, New York, NY 10019-6064, Telephone: (212) 373-3000, Facsimile: (212) 757-3990, cramos@paulweiss.com, Attorneys for Music Publisher Plaintiffs.

Date: May 1, 2006

Time: 1:30 p.m.

Ctrm: The Hon. Stephen V. Wilson

I, Charles J. Hausman, the undersigned, declare:

1. I am the Deputy Director of Anti-Piracy for the Motion Picture Association of America ("MPAA"). I make this declaration in support of plaintiffs' motions for summary judgment. I have personal knowledge of the following facts

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

and, if called and sworn as a witness, could competently testify thereto.

2. My regular duties at MPAA include formulating and implementing strategies regarding movie theft in the United States, including investigations into the online infringement and theft of movies and trademark infringement of all kinds.

3. I have over a decade of experience assessing works for copyright infringement and identification of copyright ownership. Having also worked for many years at the Recording Industry Association of America ("RIAA"), I am familiar with the organization and operation of both the MPAA and the RIAA, their member companies, their policies regarding copyright ownership, and both criminal and civil piracy. Between 1995 and 2004, I served in various capacities relating to anti-piracy for the RIAA, including several years as the RIAA's Anti-Piracy Counsel.

4. I am familiar with all aspects of the prosecution of sound recording and motion picture copyright infringement, including Internet violations. I regularly gather forensic evidence relating to such prosecution, and have organized, led and managed teams engaged in infringement analyses. In addition, as part of the normal course of my job responsibilities, I often am called upon to review the corporate records of member companies to ascertain copyright ownership. I also regularly research and prepare affidavits in criminal matters affirming that the defendants' acts violate an MPAA member company's copyrights and are not licensed.

5. I use a variety of source material to determine copyright ownership in the ordinary course of performing my duties. This includes both print publications and reliable Internet databases that report corporate affiliations, exclusive distribution rights, and copyright ownership. I also consult additional commonly used Internet sources to gain supplemental information relating to new releases and ownership thereof.

*General Overview*

6. I conducted and supervised an investigation and analysis, on behalf of the plaintiffs in this case, regarding the amount of infringing material being traded through the services offered by StreamCast (through the Morpheus system) and Sharman (through the Kazaa system). That investigation and analysis took the form of four separate statistical studies.

7. The purpose of the first study was to determine the proportion of files made available through Kazaa and Morpheus that infringe the copyrights of copyright owners (the "Making Available" Study). This study was undertaken separately with each client application (*i.e.,* separately through Morpheus and through Kazaa) in order to provide a system-specific percentage of infringing-to-noninfringing works.

8. The second statistical study determined the proportion of infringing audio files that Kazaa users are actually requesting for download, using a sample set of data provided by iMesh (the "iMesh Data" Study).

9. The final two projects determined what users are actually requesting for download on each of the Kazaa and Morpheus systems by monitoring the files requested from controlled file-sharing folders created on Morpheus and Kazaa clients (the "Actual Download" Studies). The Actual Download Studies were divided into two versions. Version I used as its sample set of files the same random files that resulted from the Making Available Study for each client application. Thus, it used approximately 1,800 representative files from each system as determined by the sampling protocol designed by Dr. Ingram Olkin, Professor of Statistics and Education at Stanford University. Actual Download Version II used as its sample set of files 100 copyrighted works owned by plaintiffs that were not authorized for distribution and 100 works that were either authorized for distribution by the owners or otherwise public domain works, including many of the so-called "noninfringing" works that had been cited by the defendants in this case in earlier court filings.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

10. The results of these studies reveal that at least 89.28% of the files made available on Kazaa are copyrighted and not authorized for distribution, while only 3.11% of the files available on Kazaa are not infringing. Similarly, 87.33% of the files made available on Morpheus are not authorized for distribution, while only 2.17% of the files are noninfringing.

11. In the iMesh Data study, moreover, over 95.05% of audio files actually requested by Kazaa users for downloading are copyrighted works not authorized for distribution.

12. The Actual Download studies yielded similar results. Looking at the Kazaa data from the Making Available study, the works determined to be infringing were requested for downloading with great frequency; the works determined to be noninfringing or otherwise unknowable were hardly requested at all. Specifically, 95.94% of the requests by Kazaa users were for infringing works, while only 1.36% of the requests were for noninfringing works. The results were the same when looking at the Morpheus Making Available data. 96.61% of the requests by Morpheus users were for infringing works, while only 1.72% were for noninfringing works. Thus, while the Making Available studies reveal that some Kazaa and Morpheus users may have some trivial amount of noninfringing works in their Kazaa and Morpheus "share" folders, almost no one is actually requesting to download those works.

13. These results were confirmed in Version II of the Actual Download study. The 100 popular copyrighted works were requested for downloading persistently and with great frequency. The 100 noninfringing works -- even the works that have been touted by defendants -- were hardly requested at all. Specifically, 96.67% of the requests from Kazaa users were for infringing works, while only 3.33% were for noninfringing works. On Morpheus, 96.70% of the requests were for infringing works, while only 3.30% were for noninfringing works.

*The Making Available and iMesh Data Studies*

14. The Making Available and iMesh Data Studies are the results of data collection protocols designed by Professor Olkin, which are described in Professor Olkin's declaration, also submitted in support of plaintiffs' motions for summary judgment.

15. The Making Available studies are comprised of 1,800 random files downloaded from Morpheus and 1,800 random files downloaded from Kazaa per Professor Olkin's protocol. That protocol employed random word searches and was implemented in five cities distributed throughout the major geographic regions in the United States. The first 1,800 files from each application to fit within the categories of confirmed or highly likely infringing, confirmed or highly likely noninfringing, or "unknowable" (discussed in detail below), populated the Making Available sample for each client application. The list of 1,800 files contained in the Morpheus Making Available sample are attached hereto as Exhibit 1. The list of 1,800 files contained in the Kazaa Making Available sample are attached hereto as Exhibit 2.

16. The iMesh Data Study consists of a sample set of 2,645 randomly selected audio files actually requested by Kazaa users for download from iMesh between September 12, 2005 and October 9, 2005. As noted above, these files were also chosen by implementing a protocol designed by Professor Olkin and described in his declaration. The list of files contained in the iMesh Data study are attached hereto as Exhibit 3.

17. I oversaw the data collection for both studies, and have assured myself that each was conducted in accordance with the relevant protocols.

18. In connection with determining copyright ownership and authorization, I led a team of investigators, lawyers, and technologists experienced in entertainment and anti-piracy matters. Bringing to the project my prior experience conducting piracy analyses on both RIAA and MPAA matters, I selected individuals who had proven themselves reliable and with whom I had previously worked. Under my close supervision, these investigators reviewed the works and/or data, and checked, and rechecked, the copyright and authorization status for each work.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

19. As an initial matter, each file was run, under my supervision, through an Audible Magic tool that checked the file against a database of audio fingerprints for copyrighted sound recordings not authorized for distribution. I, together with my team, spot-checked the results of the Audible Magic identification tool manually on an ongoing basis to confirm accuracy. Works that were not identified by the Audible Magic tool were further analyzed manually to determine the identity of the work, its copyright status, and the copyright owner, using a variety of online and print sources.

20. Once copyright holders were identified, I supervised my team in verifying that works identified as being owned or exclusively controlled by plaintiffs or their affiliates were so owned or controlled. To verify such ownership or control, we used sources generally accepted in the anti-piracy community that I have also personally found to be accurate and effective in determining issues of copyright ownership. I, together with my team, determined that the record company plaintiffs the music publisher plaintiffs, and/or the motion picture studio plaintiffs (or their respective affiliates) own or control the rights to the files attributed to them in the confirmed infringing category.

21. In addition, my team and I sought, in the time available, to contact as many third-party copyright owners -- *i.e.,* owners who are not plaintiffs -- as possible to ascertain whether they had authorized the distribution of their particular work(s) through the peer-to-peer system on which they were found. In many instances, third party rightsholders who confirmed to us that they did not authorize the particular works to be distributed on Morpheus or Kazaa provided sworn statements to that effect. This effort continues.

22. After thorough investigation and analysis involving multiple levels of review, each of the files downloaded as a result of the Making Available and iMesh Data studies was assigned to a "copyright status" category. These categories consisted of:
• "Confirmed infringing," meaning that the work was confirmed to be owned by a plaintiff or third party and not authorized for distribution on the relevant peer-to-peer system;
• "Highly likely infringing," meaning that based on the nature of the work and/or its owner, it was highly likely that the work was copyrighted and not authorized for distribution on the relevant peer-to-peer system;
• "Highly likely noninfringing," meaning that based on the nature of the work and/or its owner, it was highly likely that the work was either not copyrighted, in the public domain, or copyrighted but authorized for peer-to-peer distribution;
• "Confirmed noninfringing," meaning that the work was either confirmed to be copyrighted but authorized for peer-to-peer distribution or based on the nature of the work and/or its owner, it was almost certain to be not copyrighted, in the public domain, or authorized;
• "Unknowable," meaning that the copyright status of the file could not fairly be determined, generally because the file could not be identified;
• "Spoofs," meaning that the file was deliberately labeled so as to mislead the user to believe it contained particular content, when it did not in fact contain that content but served another commercial purpose, for example, a file labeled as a popular copyrighted work that did not in fact contain that work and turned out to be unusable (often distributed by record companies to protect their copyrighted works);
• "Porn," meaning that the file was plainly pornographic, including files that, from their metadata, appeared clearly to constitute illegal pornography (e.g., child porn, etc.);
• "Junk/damaged/unintelligible," meaning that the file could not be analyzed in any way for infringement purposes because it was so badly distorted, damaged or junk that it was essentially unintelligible;
• "Virus/malicious," meaning that the file was a virus or otherwise malicious;
• "KPL," meaning that the file was not a content file at all but a list of files organized as a playlist which could be separately downloaded; and
• "Illegal," meaning that the file constitutes or reflects illegal activity, for example, a file containing acknowledged stolen personal financial data.

23. Once works were assigned to a particular category, spoofs, porn, junk/damaged/unintelligible, virus/malicious, KPL, and illegal files were removed from the sample per the protocol established by Professor Olkin, and the first

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

1,800 files obtained through Kazaa and through Morpheus (3,600 total) that fit one of the confirmed infringing/noninfringing; highly likely infringing/noninfringing; or unknowable categories were analyzed for copyright infringement. The data regarding actual Kazaa user requests for downloading from iMesh was categorized in the same way.

24. As a result of the above analysis, we were able to determine that, for the Making Available sample of files obtained through Kazaa, at least 1,607 (or 89.28%) of the files were infringing. Within that group, 1,077 files were confirmed infringing by either plaintiffs or third party owners. An additional 530 files were highly likely infringing, but could not be confirmed and/or documented, in the allotted time, as conclusively infringing.

25. Only 56 (3.11%) of the 1,800 files obtained through Kazaa appear to consist of public domain material or material being made available without objection from a rightsholder. This makes up the confirmed noninfringing and highly likely noninfringing files.

26. As for the remaining 137 files available through Kazaa, there simply was no way to determine the copyright status of the particular works. These unknowable files constitute 7.61% of the Kazaa Making Available database.

27. The Morpheus Making Available sample revealed similar findings. We were able to conclude that at least 1,572 (or 87.33%) of the files obtained through Morpheus were infringing. This group includes 1,095 files that are confirmed infringing by either plaintiffs or third party owners. An additional 477 files are highly likely infringing, but could not be confirmed and/or documented, in the available time, as conclusively infringing.

28. Only 39 (2.17%) appear to consist of public domain material or material being made available without objection from a rightsholder. This makes up the confirmed noninfringing and highly likely noninfringing files.

29. The remaining 189 files available through Morpheus are unknowable; these constitute 10.50% of the Morpheus Making Available sample.

30. Upon their completion, both the Morpheus and Kazaa Making Available results were transmitted to Professor Olkin.

31. With respect to the iMesh Data Study, we were able to conclude that at least 2,514 (or 95.05%) of the files were infringing. Within that group, 1,970 files (or 74.48% of the total files) were confirmed infringing. An additional 544 files (or 20.57% of the total files) were highly likely infringing.

32. Only 10 (or 0.38%) of the files populating the iMesh Data database consist of confirmed noninfringing or highly likely noninfringing files. The unknowable files requested for download by Kazaa users constitute 4.57% of the database. The results of the iMesh Data Study were also transmitted to Professor Olkin.

*Actual Download Studies*

33. As explained above, the Actual Download studies took two forms. In Actual Download Version I, approximately 1,800 files that were randomly obtained for the Making Available study from each of the Kazaa and Morpheus systems were uploaded and offered for distribution using the same client application (*i.e.,* Morpheus or Kazaa) from which they were obtained. The files were offered for distribution through Kazaa and Morpheus clients in each of the same five cities used for the Making Available studies. The purpose of this study was to determine which of these randomly selected files would actually be requested for download by Kazaa and Morpheus users. The computers were configured to log every request for downloading, but to prevent the actual downloading of the files. Duplicate or repeated requests for a file from the same IP address were eliminated such that the results avoid overcounting and reflect requests for downloading by unique users.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

34. Data was collected for the Actual Download study over a two-week period, 24 hours a day, seven days a week.

35. Using the same category demarcations determined in the Making Available Study, the Actual Download Version I database reveals that 95.94% of the download requests by Kazaa users were for infringing works (i.e., works that were determined to be confirmed or highly likely infringing). Only 1.36% of the download requests by Kazaa users were for noninfringing works (i.e., works found to be confirmed or highly likely noninfringing), and only 2.70% were for works in the unknowable category. Similarly, 96.61% of Morpheus users' requests were for works categorized as confirmed or highly likely infringing, whereas only 1.72% of the requests were for confirmed or highly likely non-infringing files, and only 1.67% were for works in the unknowable category.

36. In the second version of the Actual Download study, I supervised the selection of 100 copyrighted works that were not authorized for distribution ("Copyrighted Works") and 100 public domain or authorized-for-distribution works ("Noninfringing Works"). Included in the 100 Noninfringing Works were materials and sources previously referenced by defendants. For example, the Noninfringing Works include a number of e-books (including the Bible, Romeo and Juliet, and the Communist Manifesto) available from the Gutenberg Project; the "top ten" movie picks from the Pre-linger Archives; presidential speeches; NASA images of 9/11; and authorized for distribution audio works. Each of these works and/or types of works have been previously identified by defendants. On the infringing side, the Copy-righted Works included popular songs, movies, and TV shows. A list of the 100 Noninfringing and 100 Copyrighted Works used in Actual Download Version II are attached hereto as Exhibit 4. As in Actual Download Version I, each of these files was shared through Morpheus and Kazaa clients in each of the five cities selected for the Making Available study. Data was collected for the same two-week period, and the download requests were processed in the same way as in Version I of the Actual Download study.

37. Actual Download Version II reveals that 96.67% of the download requests by Kazaa users were for the Copy-righted Works, whereas only 3.33% of the download requests were for Noninfringing Works. Similarly, 96.70% of Morpheus users' requests were for Copyrighted Works, whereas only 3.30% of the requests were for Noninfringing Works.

I declare under penalty of perjury that the foregoing is true and correct and that this Declaration was executed on Feb 7, 2006, at Los Angeles California.

<<signature>>

Charles J. Hausman

END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

# EXHIBIT E

# Photography 101

"Photography 101" is a podcast by Scott Wittenburg. The file Pro.Photo.101.part4.rar ( 🌐 http://hotfile.com/dl/62287463/23e8c78/Pro.Photo.101.part4.rar.html) contains the following files:

| Name | Size | Packed | Date | Time | CRC |
|---|---|---|---|---|---|
| Lesson 2_ Setting Exposure Using the Mode Dial.mp4 | 52,967,771 | 36,973,613 | 23-06-10 | 18:24 | 0314B440 |
| Lesson 3_ Depth-of-Field and the Preview Button.mp4 | 18,801,157 | 18,801,157 | 23-06-10 | 18:24 | 2BD9CB2D |
| Lesson 4_ Selection Tips in Photoshop.mp4 | 14,520,934 | 14,520,934 | 23-06-10 | 18:24 | 2AB2E0F1 |
| Lesson 5_ Night Photography Tips.mp4 | 8,143,194 | 8,143,194 | 23-06-10 | 18:24 | F56BC0C3 |
| Lesson 6_ Creative Color Exercise in Photoshop.mp4 | 16,139,893 | 16,139,893 | 23-06-10 | 18:24 | 320F9CAF |
| Lesson 7_ Composition, Cropping and Depth of Field.mp4 | 8,292,721 | 8,292,721 | 23-06-10 | 18:24 | D5F55CB7 |
| Lesson 8_ Resolution, Resizing and Printing in Photoshop.mp4 | 11,646,732 | 11,646,732 | 23-06-10 | 18:24 | A96FC6A5 |
| Lesson 9_ Texture _Magic_ in Photoshop.mp4 | 4,317,950 | 4,317,950 | 23-06-10 | 18:24 | 89E375C5 |

These files match the files listed in Scott Wittenburg's affidavit dated December 19, 2011.

## Zebrak's Notes

🌐 http://www.scottwittenburg.com/

🌐 http://www.downprog.net/tutorial/e-book/196069-photography-101-professional-ph.html;
🌐 http://www.psdjungle.com/e-books/151814-photography-101-professional-ph.html

🌐 http://www.dl4all.com/video-tutorials/print:page,1,400388-photography-101-professional-

photography-tips-tutorial-dvdrip.html

## Affidavit of Scott Wittenburg

Scott Wittenburg, does depose and state as follows:

1.      My name is Scott Wittenburg.  Unless otherwise stated, I make this affidavit of

my own personal knowledge.

2.      I am a photography teacher at Upper Arlington High School in Ohio.  I am also

the creator of a podcast, called Photography 101.

3.      My Photography 101 podcast is available for free at Apple's iTunes as well as

other locations on the internet.  With more than 12,000 subscribers, my podcast is one of the

most popular photography podcasts on iTunes.

4.      Judging only by their titles, each of the files listed below would appear to be one

of my podcasts:

| | | | | | |
|---|---|---|---|---|---|
| Lesson 2_ Setting Exposure Using the Mode Dial.mp4 <-- | 52,967,771 | 26,973,613 | MPEG-4 Movie | 6/23/2010 6:24 ... | 0314B440 |
| Lesson 3_ Depth-of-Field and the Preview Button.mp4 | 18,801,157 | 18,801,157 | MPEG-4 Movie | 6/23/2010 6:24 ... | 2BD9CB2D |
| Lesson 4_ Selection Tips in Photoshop.mp4 | 14,520,934 | 14,520,934 | MPEG-4 Movie | 6/23/2010 6:24 ... | 2AB2E0F1 |
| Lesson 5_ Night Photography Tips.mp4 | 8,143,194 | 8,143,194 | MPEG-4 Movie | 6/23/2010 6:24 ... | F56BC0C3 |
| Lesson 6_ Creative Color Exercise in Photoshop.mp4 | 16,130,893 | 16,130,893 | MPEG-4 Movie | 6/23/2010 6:24 ... | 320F9CAF |
| Lesson 7_ Composition, Cropping and Depth of Field.mp4 | 8,292,721 | 8,292,721 | MPEG-4 Movie | 6/23/2010 6:24 ... | D5F55CB7 |
| Lesson 8_ Resolution, Resizing and Printing in Photoshop.mp4 | 11,646,732 | 11,646,732 | MPEG-4 Movie | 6/23/2010 6:24 ... | A96FC6A5 |
| Lesson 9_ Texture _Magic_ in Photoshop.mp4 | 4,317,950 | 4,317,950 | MPEG-4 Movie | 6/23/2010 6:24 ... | 89E375C5 |

5.      I know that by making my podcasts available for free on the internet, that people

are able to download them and also repost them.  So long as a person is not charging money for

my podcast, I do not have any problems with this.

Signed under the pains and penalties of perjury this $\underline{9}$ day of December, 2011.

Scott Wittenburg

# EXHIBIT F

| **From:** | Aaron Michael McParlan |
|---|---|
| **To:** | evan@cfwlegal.com |
| **Subject:** | Inquiry regarding Opera Portable v.11.01.1 |
| **Date:** | Thursday, January 05, 2012 9:59:50 AM |

Mr. Fray-Witzer,

I am in receipt of your inquiry regarding a file described as "Opera Portable v.11.01.1" which is in cyberlocker storage at hotfile.com. You inquired if Opera would consider the placement of this file in cloud storage at hotfile.com as infringing on Opera's rights. I am not in receipt of the "Opera Portable v.11.01.1" file itself. However, there exists a version of the free-to-end-users Opera 11 desktop browser which is for use on external storage devices and is often referred to as "Opera Portable". Assuming the file you mentioned is an Opera Portable version of the Opera 11 desktop browser, Opera has no information indicating that placement of this file in cyberlocker storage by an end-user would infringe Opera's rights. If Opera were to determine that material on hotfile.com was infringing on Opera's rights, Opera would request that it be removed.

Best regards,

--
Aaron M. McParlan
Legal Counsel

Opera Software ASA
P.O. Box 2648, St. Hanshaugen
Waldemar Thranes gate 98
0175 Oslo
Norway

www.opera.com

Office: +47 23 69 24 00
Direct: +47 23 69 27 40
Fax: +47 23 69 24 01

------------------------ CONFIDENTIALITY NOTICE -----------------------
The information in this email and any attachments is OPERA CONFIDENTIAL INFORMATION and is solely for the attention of the addressee. If you are not the intended recipient, you are hereby notified that you have received this message in error and that reading it, copying it, or in any way disclosing its content to any other person, is strictly unauthorized. If you have received this message in error, please inform the sender by reply e-mail and then immediately delete this e-mail (including any attachments).

Please telephone +47 23 69 24 00 immediately if you have any questions.
-------------------------------------------------------------------------

## Opera Portable

Free download from ⊕ http://portableapps.com/apps/internet/opera_portable

This file was downloaded a total of 6 times. 6 downloads is consistent with personal use and storage given that the purpose of this program is to allow space-shifting of the Opera browser executable.

### Zebrak's Notes

⊕ http://www.opera.com/

⊕ http://portableappz.blogspot.com/2011/10/opera-12001116-alpha-11521100-final.html

# EXHIBIT G

<u>Affidavit of Marc Schwegler</u>

Marc Schwegler, does depose and state as follows:

1.      My name is Marc Schwegler.  Unless otherwise stated, I make this affidavit of my own personal knowledge.

2.      I am employed by Giants Software, GmbH, a software company which is the creator of simulator games such as Farming Simulator 2011 (as well as earlier versions of Farming Simulator).

3.      Our Farming Simulator games allow players to simulate running a farm and raising cattle, by completing a variety of tasks including operating farming machinery, plowing fields, sowing seeds, storing grain in silos, feeding cattle, and so on.

4.      Farming Simulator is a popular and award-winning game, which has a large following of fans across the globe.

5.      As part of the Farming Simulator game, our players create their own modifications, or "mods," which they can then add to the simulation.  For example, a user might develop a "tractor mod," which would be a new tractor which could be added to the game. Indeed, our software includes a program called the "GIANTS Engine Modding SDK," which is specifically designed to allow our users to create new mods to be used as part of the Farming Simulator game.

6.      A large community has developed around the creation and free distribution of such mods, something which Giants Software not only allows, but encourages, because these mods enhance our players' experiences.  Indeed, each year we run a contest for our users in which users submit their mods, players vote, and the best mods are awarded prizes.  Information about the most recent contest can be found on our website at:  [http://www.farming-simulator.com/modContest2011.php](http://www.farming-simulator.com/modContest2011.php).

7.      Giants Software considers mods to be "User Generated Content."   The creation and distribution of such content does not infringe upon Giants Software's intellectual property, nor does it violate the terms of Farming Simulator's end user license.

8.      I have specifically reviewed the following files and found them to be non-infringing of Giants Software's intellectual property

- The files contained in the compressed folder "Zonda_Pagani_R.zip," which includes the Pagani Zonda Farming Simulator Mod.

- The files contained in the compressed folder "NHCR9090_2011_v11.zip," which includes the New Holland CR9090 Mod for Farming Simulator 2011

- The files contained in the compressed folder "sampleModMap.zip," which

includes a wide variety of files (including mods and maps);

- The files contained in the compressed folder "VW_18_310.zip," which includes the VW Tracatto 6x4 mod;

- The files contained in the compressed folder "John_Deere_1550_Pack.zip," which includes the John Deere 1550 Pack (Farming Simulator 2011) mod;

- The files contained in the compressed folder "Lexion_460_Pack_open_me_mods.zip," which includes the Lexion 460 Pack (Farming Simulator Mods);

- The files contained in the compressed folder "Tatra Ternno 6x6+Trailer.rar," which includes the Farming Simulator Mod (6x6 Trailer); and

- The files contained in the compressed folder "Kaszuby_v2_open_me_mods.rar," which includes the Kaszuby v2 (Farming Simulator Mods).

9.    Each of the above files contain non-infringing User Generated Content.  I know of no reason why these files could not be shared freely on the internet on sites including Hotfile.com.

Signed under the pains and penalties of perjury this 6th day of January, 2012.

_____
Marc Schwegler,
Giants Software, GmbH

Each of these files contains one or more game add-ons. The file modDesc.xml in each add-on provides basic information about what it adds to the game.

None of these files include a game executable, which means that the add-ons can only be used if the game is already installed by the user.

All but one of the mod files has no copyright notice save for a GIANTS Software GmbH notice which appears to be vestigial of a template provided to encourage add-on creation. Only one other file has a copyright notice, and it appears to be a generic notice to "Scripter" for "excerpts" of add-on code. See AA01/mers500g/LADA.lua.

## AA01

This add-on provides a single new vehicle to the game.

### Zebrak's Notes

🌐 http://www.farming-simulator.com/

🌐 http://www.amazon.com/Farming-Simulator-2011-Pc/dp/B004D2OFO8

🌐 http://translate.google.com/translate?hl=en&sl=cs&u=http://ofpmafia.blog.cz/1101/balicek-vozidel-mapy&ei=9lu8TuuaAqHL0QG058HkBA&sa=X&oi=translate&ct=result&resnum=4&ved=0CDIQ7gEwAw&prev=/search%3Fq%3Dhttp://hotfile.com/dl/95486696/eb78394/AA01.zip.html%26hl%3Den%26prmd%3Dimvns

## BiginParadies

This add-on provides an additional map, including graphics and sound information.

### Zebrak's Notes

🌐 http://www.ls4.pl/topics215/big-in-pradies-vt9708.htm 🌐 http://www.ls-uk.info/d/5/12454 From LUA

## John_Deere_1550_Pack

This file contains four separate add-ons:

- JD_1550 is an add-on that provides four additional vehicles.
- JD612_MG is an add-on that provides one additional vehicle.
- JD625H is an add-on that provides one additional vehicle.
- JOHN_DEERE_TRAILER1 is an add-on that provides four additional vehicles.

🌐 http://www.farming-simulator.com/

🌐 http://www.amazon.com/Farming-Simulator-2011-Pc/dp/B004D2OFO8

## Kaszuby_v2_open_me_mods

This file contains five separate add-ons:

- Kaszuby_v2_by_lechu19 is an add-on that provides an additional map
- oat is an add-on that provides an additional kind of crop
- potato is an add-on that provides an additional kind of crop
- Sugarbeet is an add-on that provides an additional kind of crop
- sunflower is an add-on that provides an additional kind of crop

**Zebrak's Notes**

🌐 http://www.farming-simulator.com/

🌐 http://www.amazon.com/Farming-Simulator-2011-Pc/dp/B004D2OFO8

🌐 http://fs2011mods.com/maps/236-kaszuby-map-v2.html

🌐 http://hotfile.com/dl/90599124/79dbfb8/Kaszuby_v2_open_me_mods.rar.html

## Lexion_460_Pack_open_me_mods

This file contains four separate add-ons:

- CLAAS_C660 is an add-on that provides one additional vehicle.
- CLAAS_Cornspeed_8 is an add-on that provides one additional vehicle.
- CLAAS_Lexion_460 is an add-on that provides one additional vehicle.
- CLAAS_Trailer is an add-on that provides one additional vehicle.

Zebrak's link to www.claas.com points to the website of the actual machine manufacturer

**Zebrak's Notes**

🌐 http://www.farming-simulator.com/

🌐 http://www.amazon.com/Farming-Simulator-2011-Pc/dp/B004D2OFO8

🌐 http://www.claas.com/cl-gr/en/main/start.html

## NHCR9090_2011_v11

This add-on provides five additional vehicles to the game.

The modDesc.xml file lists the author as wohlstandskind. The Readme.txt file includes credits for wohlstandskind, yekk1, GIANTS Software GmbH, Elli, Bigfarmer145, and MxY.rlp.

**Zebrak's Notes**

🌐 http://farmingsimulatorteam.xooit.fr/t231-New-Holland-CR9090-Elevation-v1-1.htm

## sampleModMap

This add-on provides an additional map, including graphics and sound information.

**Zebrak's Notes**

🌐 http://www.giants-software.com/ls11Detail.php

🌐 http://www.filestube.com/source.html?token=3d784f2a0083b9b303e9

## Tatra Ternno 6x6+Trailer

This file contains two separate add-ons:

- TatraTernno6x6LS11b is an add-on that provides one additional vehicle.
- TTG_27T is an add-on that provides one additional vehicle.

**Zebrak's Notes**

🌐 http://www.ls2011-mods.com/?s=Tatra

🌐 http://www.hotfilesearch.com/download/50417988-Tatra-Ternno-6x6+Trailer.rar.html

## VW_18_310

This add-on provides a single new vehicle to the game.

**Zebrak's Notes**

🌐 http://www.farming-simulator.com/

🌐 http://www.farmingsimulator.com/Trucks-Cars/--Other/--Unspecified-341.html

🌐 http://www.amazon.com/gp/product/B004D2OFO8
/ref=pd_lpo_k2_dp_sr_1?pf_rd_p=486539851&pf_rd_s=lpo-top-stripe-1&pf_rd_t=201&
pf_rd_i=B002T9ZVZO&pf_rd_m=ATVPDKIKX0DER&
pf_rd_r=1H1KWFSBY9ZF6KZ8M7WE

# Zonda_Pagani_R

This add-on provides a single new vehicle to the game.

The zip file includes a Readme.txt file. Google translates the Russian text as:

file was downloaded from the site
Www.TruckGame.ru
Do not modify this mod and post it on other sites without indicating the original link!
Author STALKER
email: ✉ shooter362@mail.ru

## Zebrak's Notes

🌐 http://www.filestube.com/search.html?q=http://hotfile.com/dl/70604126/7c0c416 /zonda_pagani_r.zip.html 🌐 http://simulatormods.info/tag/pagani-zonda-r/

End User License Agreement "EULA"

The software product associated with this license is the property of GIANTS Software GmbH and is protected by copyright and other international treaties on intellectual property. By installing, copying or using the software in any form you agree to be bound by the terms of this EULA.

License Grant
You are entitled
- to install the software on a single computer and use it.
- to create one copy of the software product for personal backup purposes.
You may not
- give away, rent or sublicense the whole or parts of the software.
- reverse engineer, decompile or disassemble the whole or parts of the software.
- develop the software further in any form.

Limited Warranty
GIANTS Software ensures that the software will work for a period of ninety (90) days after the acquisition date in accordance with the documentation, assumed that the software was used according to the instructions. GIANTS Software does not guarantee that the use of the software will be uninterrupted or the operation of the Software will be free of errors or secure or that the software can be used for any particular purpose. For a period of ninety (90) days GIANTS Software ensures that the disk which contains the software is free from material or workmanship defects.

Customer claims
The entire liability of GIANTS Software and your exclusive remedy is at the sole discretion of the GIANTS software either (i) return of the price paid or (ii) repair or replacement of the Software. This limited warranty does not apply if failure of the software has resulted from accident, abuse, or improper use is due. For the replacement GIANTS Software only grants a guarantee for the remainder of the original warranty period. A further guarantee is expressly excluded.

Limitation of liability
Neither GIANTS Software or its suppliers will be liable for any damages (included are damages for lost profits, business interruption, loss of business information or data or other pecuniary loss) and will not be liable for damages resulting from the use of the software product or its unavailability, even if GIANTS software has been informed about the possibility of such damage. In any case, the liability of GIANTS Software is limited to the amount you have paid for the software product. This exclusion does not apply to damages caused by intent or gross negligence of GIANTS Software. Claims that are based on inalienable legal rules for the product liability remain untouched.

License for User Generated Content
If you create any User Generated Content for this application, you will still own the User Generated Content (assuming you have rights to own it) but you are giving GIANTS Software the right to use your User Generated Content.
If you create, transfer, share, send, submit, post or upload any application related User Generated Content, you grant us certain rights to use it (described below) without getting your further permission or without any form of compensation. In legal terms, by transferring, sharing, sending, submitting, posting, uploading or making available User Generated Content on the Internet, you grant GIANTS Software a worldwide, royalty-free, perpetual, irrevocable, non-exclusive right and fully sub-licensable license to use, copy, reproduce, distribute, publish, publicly perform, publicly display, modify, adapt, translate, archive, store, and create derivative works from your User Generated Content, in any form, format or medium of any kind now known or later developed, and in other forms or media off the Internet. You waive any moral rights you might have with respect to any User Generated Content you provide to us.
In addition, by transferring, sharing, sending, submitting, posting, uploading or making available User Generated Content on the internet, you acknowledge that other users may use your User Generated Content. GIANTS Software is not responsible for enforcing any rights you may have with respect to your User Generated Content against other users. If you have a dispute with another user, you are responsible for contacting other users directly, do not contact GIANTS Software.

Final clause
Invalid agreements in this license agreement do not affect valid agreements.

---

Copyright © 1994-2008 Lua.org, PUC-Rio.

Permission is hereby granted, free of charge, to any person obtaining a copy of this software and associated documentation files (the "Software"), to deal in the Software without restriction, including without limitation the rights to use, copy, modify, merge, publish, distribute, sublicense, and/or sell copies of the Software, and to permit persons to whom the Software is furnished to do so, subject to the following conditions:

The above copyright notice and this permission notice shall be included in all copies or substantial portions of the Software.

THE SOFTWARE IS PROVIDED "AS IS", WITHOUT WARRANTY OF ANY KIND, EXPRESS OR IMPLIED, INCLUDING BUT NOT LIMITED TO THE WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE AND NONINFRINGEMENT. IN NO EVENT SHALL THE AUTHORS OR COPYRIGHT HOLDERS BE LIABLE FOR ANY CLAIM, DAMAGES OR OTHER LIABILITY, WHETHER IN AN ACTION OF CONTRACT, TORT OR OTHERWISE, ARISING FROM, OUT OF OR IN CONNECTION WITH THE SOFTWARE OR THE USE OR OTHER DEALINGS IN THE SOFTWARE.

---

libjpeg

Copyright © 1991 - 1998 Thomas G. Lane

This software is based in part on the work of the Independent JPEG Group.
Permission for use of this software is granted only if the user accepts full responsibility for any undesirable consequences; the authors accept NO LIABILITY for damages of any kind.

---

NVIDIA Cg

Note that this license covers only some portions of the software, and does
*NOT* apply to any other components you may have obtained at the same
time.  Please see above for more details.
Copyright (c) 2002-2008, NVIDIA Corporation.
NVIDIA Corporation("NVIDIA") supplies this software to you in consideration of
your agreement to the following terms, and your use, installation,
modification or redistribution of this NVIDIA software constitutes acceptance
of these terms.If you do not agree with these terms, please do not use,
install, modify or redistribute this NVIDIA software.

In consideration of your agreement to abide by the following terms, and
subject to these terms, NVIDIA grants you a personal, non-exclusive license,
under NVIDIA's copyrights in this original NVIDIA software (the "NVIDIA
Software"), to use, reproduce, modify and redistribute the NVIDIA Software,
with or without modifications, in source and/or binary forms; provided that if
you redistribute the NVIDIA Software, you must retain the copyright notice of
NVIDIA, this notice and the following text and disclaimers in all such

redistributions of the NVIDIA Software. Neither the name, trademarks, service marks nor logos of NVIDIA Corporation may be used to endorse or promote products derived from the NVIDIA Software without specific prior written permission from NVIDIA.Except as expressly stated in this notice, no other rights or licenses express or implied, are granted by NVIDIA herein, including but not limited to any patent rights that may be infringed by your derivative works or by other works in which the NVIDIA Software may be incorporated. No hardware is licensed hereunder.

THE NVIDIA SOFTWARE IS BEING PROVIDED ON AN "AS IS" BASIS, WITHOUT WARRANTIES OR CONDITIONS OF ANY KIND, EITHER EXPRESS OR IMPLIED, INCLUDING WITHOUT LIMITATION, WARRANTIES OR CONDITIONS OF TITLE, NON-INFRINGEMENT, MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, OR ITS USE AND OPERATION EITHER ALONE OR IN COMBINATION WITH OTHER PRODUCTS.

IN NO EVENT SHALL NVIDIA BE LIABLE FOR ANY SPECIAL, INDIRECT, INCIDENTAL, EXEMPLARY, CONSEQUENTIAL DAMAGES (INCLUDING, BUT NOT LIMITED TO, LOST PROFITS; PROCUREMENT OF SUBSTITUTE GOODS OR SERVICES; LOSS OF USE, DATA, OR PROFITS; OR BUSINESS INTERRUPTION) OR ARISING IN ANY WAY OUT OF THE USE, REPRODUCTION, MODIFICATION AND/OR DISTRIBUTION OF THE NVIDIA SOFTWARE, HOWEVER CAUSED AND WHETHER UNDER THEORY OF CONTRACT, TORT (INCLUDING NEGLIGENCE), STRICT LIABILITY OR OTHERWISE, EVEN IF NVIDIA HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGE.

---

NVIDIA PhysX

This End User License Agreement (the "Agreement") is a legal agreement between you (either individually or an entity) ("You" or "Your") and NVIDIA Corporation ("NVIDIA") regarding the use of the NVIDIA® PhysX™ Driver and any accompanying documentation (collectively, the "Software").

YOU MUST READ AND AGREE TO THE TERMS OF THIS AGREEMENT BEFORE ANY SOFTWARE CAN BE DOWNLOADED OR INSTALLED OR USED. BY CLICKING ON THE "AGREE" BUTTON OF THIS AGREEMENT, OR INSTALLING SOFTWARE, OR USING SOFTWARE, YOU ARE AGREEING TO BE BOUND BY THE TERMS AND CONDITIONS OF THIS AGREEMENT. IF YOU DO NOT AGREE WITH THE TERMS AND CONDITIONS OF THIS AGREEMENT, THEN YOU SHOULD EXIT THIS PAGE, NOT INSTALL OR USE ANY SOFTWARE, AND DESTROY ALL COPIES OF THE SOFTWARE THAT YOU HAVE DOWNLOADED. BY DOING SO YOU FOREGO ANY IMPLIED OR STATED RIGHTS TO DOWNLOAD OR INSTALL OR USE SOFTWARE.

NVIDIA MAY MODIFY THE TERMS OF THIS AGREEMENT FROM TIME TO TIME.  ANY USE OF THE PHYSX SDK WILL BE SUBJECT TO SUCH UPDATED TERMS.  A CURRENT VERSION OF THIS AGREEMENT IS POSTED ON NVIDIA'S DEVELOPER WEBSITE: www.developer.nvidia.com/object/physx_eula.html

This license is only granted to and only may be used by You.  NVIDIA grants You a limited, non-exclusive, non-transferable license to use the provided Software for evaluation, testing and production purposes according to the terms set forth below:

1. Use of the Software.
a.  You may use, display and reproduce the NVIDIA PhysX Driver on Licensed Platforms only.  For purposes of this Agreement, "Licensed Platforms" shall include the following:

- Any PC or Apple Mac computer with a NVIDIA CUDA-enabled processor executing NVIDIA PhysX;
- Any PC or Apple Mac computer running NVIDIA PhysX software executing on the primary central processing unit of the PC only;
- Any PC utilizing an AGEIA PhysX processor executing NVIDIA PhysX code;
- Microsoft XBOX 360™;
- Nintendo® Wii™; and/or
- Sony Playstation®3

b.  You may not and shall not permit others to:
(i)  modify, translate, reverse engineer, decompile, decrypt, disassemble or otherwise attempt to defeat, avoid, bypass, remove, deactivate or otherwise circumvent any software protection mechanisms in the Software, including without limitation any such mechanism used to restrict or control the functionality of the Software, or to derive the source code or the underlying ideas, algorithms, structure or organization from the Software;
(ii)  alter, adapt, modify or translate the Software in any way for any purpose, including without limitation error correction;
(iii)  rent, loan, lease, transfer or grant  any rights in the Software or modifications thereof in any form to any person without the prior written consent of NVIDIA.

c.  Distribution Rights. This license grants the right to distribute the Software as part of a Physics Application (For purposes of this Agreement, Physics Application shall mean a software application designed for use and fully compatible with the PhysX SDK and or NVIDIA Graphics processor products, including but not limited to, a video game, visual simulation, movie, or other product).and is subject to an end user license agreement including language that (a) prohibits the end user from modifying, reproducing, de-compiling, reverse engineering or translating the Software; (b) prohibits the end user from distributing or transferring the Software other than as part of the Physics Application; (c) disclaims any and all warranties on behalf of NVIDIA and its affiliated companies and licensors; (d) disclaims, to the maximum extent permitted by law, NVIDIA's, its affiliated companies and its licensors' liability for all damages, direct or indirect, incidental or consequential, that may arise from any use of the Software and/or Physics Application; (e) requires the end user to agree not to export the Software and/or Physics Application,  directly or indirectly, in violation of any U.S. laws; and (f) licenses the Software or  any portions thereof for use only in conjunction with the Licensed Platforms.

2. Ownership. This license is not a sale. Title, copyrights and all other rights to the Software and any copy made by You remain with NVIDIA and its suppliers and licensors. Unauthorized copying of the Software, or failure to comply with the license restrictions set forth in Section 1(b) above, will result in automatic termination of this license and will make available to NVIDIA other legal remedies.

3. Termination. This license is effective once You click the "AGREE" button of this Agreement, or install or use the Software, and will continue until terminated. Unauthorized copying of the Software, Your failure to comply with the above restrictions or Your failure to comply with any terms of this Agreement will result in automatic termination of this Agreement and will make available to NVIDIA other legal remedies. Upon termination of this license for any reason You will destroy all copies of the Software. Any use of the Software after termination is unlawful. Upon termination of this Agreement, all rights granted to You in this Agreement shall immediately terminate. NVIDIA's rights and Your obligations under this Agreement shall survive any termination of this Agreement.

4. Trademarks. Certain of the product names used in this Agreement and the Software constitute trademarks, trade names, trade dress, or service  marks ("Trademarks") of NVIDIA or other third

parties. You are not authorized to use any such Trademarks for any purpose.

5. No Warranty. THE SOFTWARE IS BEING DELIVERED TO YOU "AS IS" AND NVIDIA MAKES NO WARRANTIES WHATSOEVER WITH RESPECT TO THE SOFTWARE. NVIDIA AND ITS SUPPLIERS AND LICENSORS MAKE AND YOU RECEIVE NO OTHER WARRANTIES OR CONDITIONS, EXPRESS, IMPLIED, STATUTORY OR OTHERWISE OR IN ANY COMMUNICATION WITH YOU, AND NVIDIA ANDITS SUPPLIERS AND LICENSORS SPECIFICALLY DISCLAIM ANY IMPLIED WARRANTY OF MERCHANTABILITY, SATISFACTORY QUALITY, FITNESS FOR A PARTICULAR PURPOSE OR NONINFRINGEMENT AND THEIR EQUIVALENTS. NVIDIA does not warrant that the operation of the Software will be uninterrupted or error free or that the Software will meet Your specific requirements.

SOME STATES OR OTHER JURISDICTIONS DO NOT ALLOW THE EXCLUSION OF IMPLIED WARRANTIES, SO THE ABOVE EXCLUSIONS MAY NOT APPLY TO YOU. YOU MAY ALSO HAVE OTHER RIGHTS THAT VARY FROM STATE TO STATE AND JURISDICTION TO JURISDICTION.

6. Limitation of Liability. IN NO EVENT WILL NVIDIA, ITS SUPPLIERS OR ITS LICENSORS BE LIABLE FOR LOSS OF OR CORRUPTION TO DATA, LOST PROFITS OR LOSS OF CONTRACTS, COST OF PROCUREMENT OF SUBSTITUTE PRODUCTS OR OTHER SPECIAL, INCIDENTAL, PUNITIVE, CONSEQUENTIAL OR INDIRECT DAMAGES, LOSSES, COSTS OR EXPENSES OF ANY KIND ARISING FROM THE SUPPLY OR USE OF THE SOFTWARE, HOWEVER CAUSED AND ON ANY THEORY OF LIABILITY (INCLUDING WITHOUT LIMITATION NEGLIGENCE). THIS LIMITATION WILL APPLY EVEN IF NVIDIA OR AN AUTHORIZED DISTRIBUTOR HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES AND NOTWITHSTANDING THE FAILURE OF ESSENTIAL PURPOSE OF ANY LIMITED REMEDY EXCEPT TO THE EXTENT THAT LIABILITY MAY NOT BY LAW BE LIMITED OR EXCLUDED. YOU ACKNOWLEDGE THAT THE LACK OF A REQUIRED PAYMENT BY YOU FOR THE SOFTWARE REFLECT THIS ALLOCATION OF RISK.

SOME STATES OR OTHER JURISDICTIONS DO NOT ALLOW THE EXCLUSION OR LIMITATION OF LIABILITY FOR INCIDENTAL OR CONSEQUENTIAL DAMAGES, SO THE ABOVE LIMITATIONS AND EXCLUSIONS MAY NOT APPLY TO YOU.

7. Indemnity. You agree to indemnify and hold NVIDIA, its successors, assigns, subsidiaries, affiliates, officers, directors, agents, and employees harmless from any claim or demand, including reasonable attorneys' fees, made by any third party due to or arising out of Your failure to comply with this Agreement or Your violation of any law or the rights of any third party.

8. Legal Compliance. You agree that You shall fully comply with all applicable laws, statutes, ordinances and regulations regarding Your use of the Software.

9. Governing Law and General Provisions. This Agreement shall not be governed by the 1980 U.N. Convention on Contracts for the International Sale of Goods; rather, this Agreement and the performance of the parties hereunder shall be construed in accordance with and governed by the laws of the State of California, U.S.A., except for its conflict of law rules. The exclusive jurisdiction and venue of any action arising out of or related to this Agreement will be either the state or federal courts in Santa Clara County, California, U.S.A., and the parties agree and submit to the personal and exclusive jurisdiction and venue of these courts. This Agreement is the entire agreement between You and NVIDIA and supersedes any other communications, representations or advertising with respect to the Software. If any provision of this Agreement is held invalid or unenforceable, such provision shall be revised to the extent necessary to cure the invalidity or unenforceability, and the remainder of the Agreement shall continue in full force and effect. Failure to prosecute a party's rights with respect to a

default hereunder will not constitute a waiver of the right to enforce rights with respect to the same or any other breach. If You are acquiring the Software on behalf of any part of the U.S. Government, the following provisions apply. The Software programs and documentation are deemed to be "Commercial computer software" and "Commercial computer software documentation" respectively, pursuant to DFAR Section 227.7202 and FAR 12.212(b), as applicable. Any use, modification, reproduction, release, performance, display or  disclosure of the Software programs and/or documentation by the U.S. Government or any of its agencies shall be governed solely by the terms of this Agreement and shall be prohibited except to the extent expressly permitted by the terms of this Agreement. Any technical data provided that is not covered by the above provisions is deemed to be "Technical data-commercial items" pursuant to DFAR Section 227.7015(a). Any use, modification, reproduction, release, performance, display or disclosure of such technical data shall be governed by the terms of DFAR Section 227.7015(b).

10. Questions. Should You have any questions relating to this Agreement, or if You desire to contact NVIDIA for any reason, please contact physxlicensing@NVIDIA.com.

NVIDIA PhysX, Copyright © 2008 NVIDIA Corporation. All rights reserved.  AGEIA PhysX, Copyright © 2002-2008 AGEIA Technologies, Inc.  All rights reserved.  NovodeX Physics SDK, Copyright © 2001-2006 NovodeX.  All rights reserved.
http://www.NVIDIA.com

---

Copyright (c) 2005-2009, Thomas BERNARD
All rights reserved.

Redistribution and use in source and binary forms, with or without
modification, are permitted provided that the following conditions are met:

   * Redistributions of source code must retain the above copyright notice,
     this list of conditions and the following disclaimer.
   * Redistributions in binary form must reproduce the above copyright notice,
     this list of conditions and the following disclaimer in the documentation
     and/or other materials provided with the distribution.
   * The name of the author may not be used to endorse or promote products
       derived from this software without specific prior written permission.

THIS SOFTWARE IS PROVIDED BY THE COPYRIGHT HOLDERS AND CONTRIBUTORS "AS IS" AND ANY EXPRESS OR IMPLIED WARRANTIES, INCLUDING, BUT NOT LIMITED TO, THE IMPLIED WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE ARE DISCLAIMED. IN NO EVENT SHALL THE COPYRIGHT OWNER OR CONTRIBUTORS BE LIABLE FOR ANY DIRECT, INDIRECT, INCIDENTAL, SPECIAL, EXEMPLARY, OR CONSEQUENTIAL DAMAGES (INCLUDING, BUT NOT LIMITED TO, PROCUREMENT OF SUBSTITUTE GOODS OR SERVICES; LOSS OF USE, DATA, OR PROFITS; OR BUSINESS INTERRUPTION) HOWEVER CAUSED AND ON ANY THEORY OF LIABILITY, WHETHER IN CONTRACT, STRICT LIABILITY, OR TORT (INCLUDING NEGLIGENCE OR OTHERWISE) ARISING IN ANY WAY OUT OF THE USE OF THIS SOFTWARE, EVEN IF ADVISED OF THE POSSIBILITY OF SUCH DAMAGE.

---

MICROSOFT SOFTWARE LICENSE TERMS
MICROSOFT DIRECTX END USER RUNTIME
These license terms are an agreement between Microsoft Corporation (or based on where you live, one of its affiliates)

and you. Please read them. They apply to the software named above, which includes the media on which you received it, if any. The terms also apply to any Microsoft
* updates,
* supplements,
* Internet-based services, and
* support services
for this software, unless other terms accompany those items. If so, those terms apply.
BY USING THE SOFTWARE, YOU ACCEPT THESE TERMS. IF YOU DO NOT ACCEPT THEM, DO NOT USE THE SOFTWARE.
If you comply with these license terms, you have the rights below.
1. INSTALLATION AND USE RIGHTS. You may install and use any number of copies of the software on your devices.
2. SCOPE OF LICENSE. The software is licensed, not sold. This agreement only gives you some rights to use the software. Microsoft reserves all other rights. Unless applicable law gives you more rights despite this limitation, you may use the software only as expressly permitted in this agreement. In doing so, you must comply with any technical limitations in the software that only allow you to use it in certain ways. You may not
* work around any technical limitations in the software;
* reverse engineer, decompile or disassemble the software, except and only to the extent that applicable law expressly permits, despite this limitation;
* make more copies of the software than specified in this agreement or allowed by applicable law, despite this limitation;
* publish the software for others to copy;
* rent, lease or lend the software;
* transfer the software or this agreement to any third party; or
* use the software for commercial software hosting services.
3. BACKUP COPY. You may make one backup copy of the software. You may use it only to reinstall the software.
4. DOCUMENTATION. Any person that has valid access to your computer or internal network may copy and use the documentation for your internal, reference purposes.
5. EXPORT RESTRICTIONS. The software is subject to United States export laws and regulations. You must comply with all domestic and international export laws and regulations that apply to the software. These laws include restrictions on destinations, end users and end use. For additional information, see www.microsoft.com/exporting.
6. SUPPORT SERVICES. Because this software is "as is," we may not provide support services for it.
7. ENTIRE AGREEMENT. This agreement, and the terms for supplements, updates, Internet-based services and support services that you use, are the entire agreement for the software and support services.
8. APPLICABLE LAW.
a. United States. If you acquired the software in the United States, Washington state law governs the interpretation of this agreement and applies to claims for breach of it, regardless of conflict of laws principles. The laws of the state where you live govern all other claims, including claims under state consumer protection laws, unfair competition laws, and in tort.
b. Outside the United States. If you acquired the software in any other country, the laws of that country apply.
9. LEGAL EFFECT. This agreement describes certain legal rights. You may have other rights under the laws of your country. You may also have rights with respect to the party from whom you acquired the software. This agreement does not change your rights under the laws of your country if the laws of your country do not permit it to do so.
10. DISCLAIMER OF WARRANTY. THE SOFTWARE IS LICENSED "AS-IS." YOU BEAR THE RISK OF USING IT. MICROSOFT GIVES NO EXPRESS WARRANTIES, GUARANTEES OR CONDITIONS. YOU MAY HAVE ADDITIONAL CONSUMER RIGHTS UNDER YOUR LOCAL LAWS WHICH THIS AGREEMENT CANNOT CHANGE. TO THE EXTENT PERMITTED UNDER YOUR LOCAL LAWS, MICROSOFT EXCLUDES THE IMPLIED WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE AND NON-INFRINGEMENT.
11. LIMITATION ON AND EXCLUSION OF REMEDIES AND DAMAGES. YOU CAN RECOVER FROM MICROSOFT AND ITS SUPPLIERS ONLY DIRECT DAMAGES UP TO U.S. $5.00. YOU CANNOT RECOVER ANY OTHER DAMAGES, INCLUDING CONSEQUENTIAL, LOST PROFITS, SPECIAL, INDIRECT OR INCIDENTAL DAMAGES.
This limitation applies to

\* anything related to the software, services, content (including code) on third party Internet sites, or third party programs; and

\* claims for breach of contract, breach of warranty, guarantee or condition, strict liability, negligence, or other tort to the extent permitted by applicable law.

It also applies even if Microsoft knew or should have known about the possibility of the damages. The above limitation or exclusion may not apply to you because your country may not allow the exclusion or limitation of incidental, consequential or other damages.

From: Marc Schwegler [mailto:mschwegler@giants-software.com]
Sent: Thursday, January 05, 2012 12:38 PM
To: Evan@CFWLegal.com
Subject: Re: I Have Added You to a Folder on ShareFile

Hallo again Evan

Thank you I got the files as well and checked them all.

They are all free mods created by fans of our game and are legal to share anywhere
on the web including Hotfile.

The items do not infringe on our copyrights and do not contain cracks, serial keys
or similar illegal software which would compromise our products.

May I ask why you became aware of those exact mods, did another user complain about
them being hosted there?

Thank you for your commitment to keep hotfile free of illegal activities and

best regards

Marc

# EXHIBIT H

END-USER LICENSE AGREEMENT FOR MICROSOFT SOFTWARE
DirectX 9.0 Software Development Kit Update (October 2004)

IMPORTANT-READ CAREFULLY:  This End-User License Agreement ("EULA") is a legal agreement between you (either an individual or a single entity) and Microsoft Corporation ("Microsoft") for the Microsoft software that accompanies this EULA, which includes computer software and may include associated media, printed materials, "online" or electronic documentation, and Internet-based services ("Software").  An amendment or addendum to this EULA may accompany the Software.  YOU AGREE TO BE BOUND BY THE TERMS OF THIS EULA BY INSTALLING, COPYING, OR OTHERWISE USING THE SOFTWARE.  IF YOU DO NOT AGREE, DO NOT INSTALL, COPY, OR USE THE SOFTWARE; YOU MAY RETURN IT TO YOUR PLACE OF PURCHASE (IF APPLICABLE) FOR A FULL REFUND.

1.      GRANTS OF LICENSE.  Microsoft grants you the following rights provided that you comply with all terms and conditions of this EULA:
        1.1     General License Grant.  Microsoft grants to you as an individual, a personal, nonexclusive license to make and use copies of the Software for the purposes of designing, developing, and testing your software product(s), provided that you are the only individual using the Software.
                If you are an entity, Microsoft grants to you a personal, nonexclusive license to make and use copies of the Software, provided that for each individual using the Software within your organization, you have acquired a separate and valid license for each such individual.
        1.2     Documentation.  You may make and use an unlimited number of copies of any documentation, provided that such copies shall be used only for personal purposes and are not to be republished or distributed (either in hard copy or electronic form) beyond your premises.
        1.3     Storage/Network Use.  You may also store or install a copy of the Software on a storage device, such as a network server, used only to install or run the Software on computers used by a licensed end user in accordance with Section 1.1.  A single license for the Software may not be shared or used concurrently by multiple end users.
2.      ADDITIONAL LICENSE RIGHTS - REDISTTIBUTABLE CODE.
In addition to the rights granted in Section 1, certain portions of the Software, as described in this Section 2, are provided to you with additional license rights.  These additional license rights are conditioned upon your compliance with the distribution requirements and license restrictions described in Section 3.
        2.1     Sample Code.
         (a)  Microsoft grants you the right to: (i) use and modify the source code version of those portions of the Software identified as "Samples" in the Software ("Sample Code") for the sole purposes of designing, developing, and testing your software product(s), and (ii) a limited, nonexclusive, royalty-free right to reproduce and distribute the Sample Code, along with any modifications thereof, in object and/or source code form.  For applicable redistribution requirements for Sample Code, see Section 3 below.
                (b)  Software Sample Code is identified as all of the files in the following directories and subdirectories of the Software Download:
        <Installed SDK Location>\DXSdk\Samples\C++
        <Installed SDK Location>\DXSdk\Samples\Managed
        <Installed SDK Location>\DXSdk\Samples\Media
        <Installed SDK Location>\DXSdk\Utilities\MView
        <Installed SDK Location>\DXSdk\Utilities\Content Creation Tool Plug-Ins
        <SDK CD ROOT>\Extras\Direct3D\Plug-Ins
        <SDK CD ROOT>\Extras\DirectShow
        2.2     Redistributable Code.  Microsoft grants you a nonexclusive, royalty-free right to reproduce and distribute the object code form of any portion of the Software listed in <Installed SDK Location>\DXSDK\Documentation\License Agreements\DirectX Redist.TXT ("Redistributable Code").  For general redistribution requirements for Redistributable Code, see Section 3 below.
3.      DISTRIBUTION REQUIREMENTS AND OTHER LICENSE LIMITATIONS.
If you choose to exercise your rights under Section 2, any redistribution by you is subject to your compliance with Section 3.
        3.1     General Distribution Requirements.

(a) If you choose to redistribute Sample Code, or Redistributable Code (collectively, the "Redistributables") as described in Section 2, you agree: (i) except as otherwise noted in Section 2.1 (Sample Code), to distribute the Redistributables only in object code form and in conjunction with and as a part of a software application product developed by you that adds significant and primary functionality to the Redistributables ("Licensee Software"); (ii) that the Redistributables only operate in conjunction with Microsoft Windows platforms; (iii) that if the Licensee Software is distributed beyond Licensee's premises or externally from Licensee's organization, to distribute the Licensee Software containing the Redistributables pursuant to an end user license agreement (which may be "break-the-seal", "click-wrap" or signed), with terms no less protective than those contained in this EULA; (iv) not to use Microsoft's name, logo, or trademarks to market the Licensee Software; (v) to display your own valid copyright notice which shall be sufficient to protect Microsoft's copyright in the Software; (vi) not to remove or obscure any copyright, trademark or patent notices that appear on the Software as delivered to you; (vii) to indemnify, hold harmless, and defend Microsoft from and against any claims or lawsuits, including attorney's fees, that arise or result from the use or distribution of the Licensee Software; (viii) to otherwise comply with the terms of this EULA; and (ix) that Microsoft reserves all rights not expressly granted.

You also agree not to permit further distribution of the Redistributables by your end users except you may permit further redistribution of the Redistributables by your distributors to your end-user customers if your distributors only distribute the Redistributables in conjunction with, and as part of, the Licensee Software, you comply with all other terms of this EULA, and your distributors comply with all restrictions of this EULA that are applicable to you.

(b) If you use the Redistributables, then in addition to your compliance with the applicable distribution requirements described for the Redistributables, the following also applies. Your license rights to the Redistributables are conditioned upon your not (i) creating derivative works of the Redistributables in any manner that would cause the Redistributables in whole or in part to become subject to any of the terms of an Excluded License; or (ii) distributing the Redistributables (or derivative works thereof) in any manner that would cause the Redistributables to become subject to any of the terms of an Excluded License. "Excluded License" means any license that requires as a condition of use, modification and/or distribution of software subject to the Excluded License, that such software or other software combined and/or distributed with such software be (x) disclosed or distributed in source code form; (y) licensed for the purpose of making derivative works; or (z) redistributable at no charge.

3.2   Use of PIX tool. You may use the PIX tool solely for internal debugging, development, and performance data collection with respect to Licensee Software developed by you using the Software. You shall not use any performance information or other diagnostic data collected through the use of the PIX tool to market Licensee Software.

4.   RESERVATION OF RIGHTS AND OWNERSHIP. Microsoft reserves all rights not expressly granted to you in this EULA. The Software is protected by copyright and other intellectual property laws and treaties. Microsoft or its suppliers own the title, copyright, and other intellectual property rights in the Software. The Software is licensed, not sold.

5.   LIMITATIONS ON REVERSE ENGINEERING, DECOMPILATION, AND DISASSEMBLY. You may not reverse engineer, decompile, or disassemble the Software, except and only to the extent that such activity is expressly permitted by applicable law notwithstanding this limitation.

6.   NO RENTAL/COMMERCIAL HOSTING. You may not rent, lease, lend or provide commercial hosting services with the Software.

7.   CONSENT TO USE OF DATA. You agree that Microsoft and its affiliates may collect and use technical information gathered as part of the product support services provided to you, if any, related to the Software. Microsoft may use this information solely to improve our products or to provide customized services or technologies to you and will not disclose this information in a form that personally identifies you.

8.   ADDITIONAL SOFTWARE/SERVICES. This EULA applies to updates, supplements, add-on components, or Internet-based services components, of the Software that Microsoft may provide to you or make available to you after the date you obtain your initial copy of the Software, unless we provide other terms along with the update, supplement, add-on component, or Internet-based services component. Microsoft reserves the right to discontinue any Internet-based services provided to you or made available to you through the use of the Software.

9.   UPGRADES/DOWNGRADES.

Upgrades. To use Software identified as an upgrade, you must first be licensed for the software identified by Microsoft as eligible for the upgrade. After upgrading, you may no longer use the software that formed the basis for your upgrade eligibility.

Downgrades. Instead of installing and using the Software, you may install and use one copy of an earlier version

of the Software, provided that you completely remove such earlier version and install the original Software within a reasonable time. Your use of such earlier version shall be governed by this EULA, and your rights to use such earlier version shall terminate when you install the Software.

10. NOT FOR RESALE SOFTWARE. Software identified as "Not For Resale" or "NFR," may not be sold or otherwise transferred for value, or used for any purpose other than demonstration, test or evaluation.

11. ACADEMIC EDITION SOFTWARE. To use Software identified as "Academic Edition" or "AE," you must be a "Qualified Educational User." For qualification-related questions, please contact the Microsoft Sales Information Center/One Microsoft Way/Redmond, WA 98052-6399 or the Microsoft subsidiary serving your country.

12. EXPORT RESTRICTIONS. You acknowledge that the Software is subject to U.S. export jurisdiction. You agree to comply with all applicable international and national laws that apply to the Software, including the U.S. Export Administration Regulations, as well as end-user, end-use, and destination restrictions issued by U.S. and other governments. For additional information see <http://www.microsoft.com/exporting/>.

13. SOFTWARE TRANSFER. The initial user of the Software may make a one-time permanent transfer of this EULA and Software to another end user, provided the initial user retains no copies of the Software. This transfer must include all of the Software (including all component parts, the media and printed materials, any upgrades, this EULA, and, if applicable, the Certificate of Authenticity). The transfer may not be an indirect transfer, such as a consignment. Prior to the transfer, the end user receiving the Software must agree to all the EULA terms.

14. TERMINATION. Without prejudice to any other rights, Microsoft may terminate this EULA if you fail to comply with the terms and conditions of this EULA. In such event, you must destroy all copies of the Software and all of its component parts.

15. DISCLAIMER OF WARRANTIES. TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, MICROSOFT AND ITS SUPPLIERS PROVIDE THE SOFTWARE AND SUPPORT SERVICES (IF ANY) AS IS AND WITH ALL FAULTS, AND HEREBY DISCLAIM ALL OTHER WARRANTIES AND CONDITIONS, WHETHER EXPRESS, IMPLIED OR STATUTORY, INCLUDING, BUT NOT LIMITED TO, ANY (IF ANY) IMPLIED WARRANTIES, DUTIES OR CONDITIONS OF MERCHANTABILITY, OF FITNESS FOR A PARTICULAR PURPOSE, OF RELIABILITY OR AVAILABILITY, OF ACCURACY OR COMPLETENESS OF RESPONSES, OF RESULTS, OF WORKMANLIKE EFFORT, OF LACK OF VIRUSES, AND OF LACK OF NEGLIGENCE, ALL WITH REGARD TO THE SOFTWARE, AND THE PROVISION OF OR FAILURE TO PROVIDE SUPPORT OR OTHER SERVICES, INFORMATION, SOFTWARE, AND RELATED CONTENT THROUGH THE SOFTWARE OR OTHERWISE ARISING OUT OF THE USE OF THE SOFTWARE. ALSO, THERE IS NO WARRANTY OR CONDITION OF TITLE, QUIET ENJOYMENT, QUIET POSSESSION, CORRESPONDENCE TO DESCRIPTION OR NON-INFRINGEMENT WITH REGARD TO THE SOFTWARE.

16. EXCLUSION OF INCIDENTAL, CONSEQUENTIAL AND CERTAIN OTHER DAMAGES. TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, IN NO EVENT SHALL MICROSOFT OR ITS SUPPLIERS BE LIABLE FOR ANY SPECIAL, INCIDENTAL, PUNITIVE, INDIRECT, OR CONSEQUENTIAL DAMAGES WHATSOEVER (INCLUDING, BUT NOT LIMITED TO, DAMAGES FOR LOSS OF PROFITS OR CONFIDENTIAL OR OTHER INFORMATION, FOR BUSINESS INTERRUPTION, FOR PERSONAL INJURY, FOR LOSS OF PRIVACY, FOR FAILURE TO MEET ANY DUTY INCLUDING OF GOOD FAITH OR OF REASONABLE CARE, FOR NEGLIGENCE, AND FOR ANY OTHER PECUNIARY OR OTHER LOSS WHATSOEVER) ARISING OUT OF OR IN ANY WAY RELATED TO THE USE OF OR INABILITY TO USE THE SOFTWARE, THE PROVISION OF OR FAILURE TO PROVIDE SUPPORT OR OTHER SERVICES, INFORMATION, SOFTWARE, AND RELATED CONTENT THROUGH THE SOFTWARE OR OTHERWISE ARISING OUT OF THE USE OF THE SOFTWARE, OR OTHERWISE UNDER OR IN CONNECTION WITH ANY PROVISION OF THIS EULA, EVEN IN THE EVENT OF THE FAULT, TORT (INCLUDING NEGLIGENCE), MISREPRESENTATION, STRICT LIABILITY, BREACH OF CONTRACT OR BREACH OF WARRANTY OF MICROSOFT OR ANY SUPPLIER, AND EVEN IF MICROSOFT OR ANY SUPPLIER HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES.

17. LIMITATION OF LIABILITY AND REMEDIES. NOTWITHSTANDING ANY DAMAGES THAT YOU MIGHT INCUR FOR ANY REASON WHATSOEVER (INCLUDING, WITHOUT LIMITATION, ALL DAMAGES REFERENCED HEREIN AND ALL DIRECT OR GENERAL DAMAGES IN CONTRACT OR ANYTHING ELSE), THE ENTIRE LIABILITY OF MICROSOFT AND ANY OF ITS SUPPLIERS UNDER ANY PROVISION OF THIS EULA AND YOUR EXCLUSIVE REMEDY HEREUNDER SHALL BE LIMITED TO THE GREATER OF THE ACTUAL DAMAGES YOU INCUR IN REASONABLE RELIANCE ON THE SOFTWARE UP TO THE AMOUNT ACTUALLY PAID BY YOU FOR THE SOFTWARE OR US$5.00. THE FOREGOING

LIMITATIONS, EXCLUSIONS AND DISCLAIMERS SHALL APPLY TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, EVEN IF ANY REMEDY FAILS ITS ESSENTIAL PURPOSE.

18.    U.S. GOVERNMENT LICENSE RIGHTS.  All Software provided to the U.S. Government pursuant to solicitations issued on or after December 1, 1995 is provided with the commercial license rights and restrictions described elsewhere herein.  All Software provided to the U.S. Government pursuant to solicitations issued prior to December 1, 1995 is provided with "Restricted Rights" as provided for in FAR, 48 CFR 52.227-14 (JUNE 1987) or DFAR, 48 CFR 252.227-7013 (OCT 1988), as applicable.

19.    APPLICABLE LAW.  If you acquired this Software in the United States, this EULA is governed by the laws of the State of Washington.  If you acquired this Software in Canada, unless expressly prohibited by local law, this EULA is governed by the laws in force in the Province of Ontario, Canada; and, in respect of any dispute which may arise hereunder, you consent to the jurisdiction of the federal and provincial courts sitting in Toronto, Ontario. If you acquired this Software in the European Union, Iceland, Norway, or Switzerland, then local law applies.  If you acquired this Software in any other country, then local law may apply.

20.    ENTIRE AGREEMENT; SEVERABILITY.  This EULA (including any addendum or amendment to this EULA which is included with the Software) is the entire agreement between you and Microsoft relating to the Software and the support services (if any) and it supersedes all prior or contemporaneous oral or written communications, proposals and representations with respect to the Software or any other subject matter covered by this EULA.  To the extent the terms of any Microsoft policies or programs for support services conflict with the terms of this EULA, the terms of this EULA shall control.  If any provision of this EULA is held to be void, invalid, unenforceable or illegal, the other provisions shall continue in full force and effect.


Si vous avez acquis votre produit Microsoft au CANADA, la garantie limitee suivante s'applique :

DENI DE GARANTIES.  DANS LA MESURE MAXIMALE PERMISE PAR LES LOIS APPLICABLES, LE LOGICIEL ET LES SERVICES DE SOUTIEN TECHNIQUE (LE CAS ECHEANT) SONT FOURNIS TELS QUELS ET AVEC TOUS LES DEFAUTS PAR MICROSOFT ET SES FOURNISSEURS, LESQUELS PAR LES PRESENTES DENIENT TOUTES AUTRES GARANTIES ET CONDITIONS EXPRESSES, IMPLICITES OU EN VERTU DE LA LOI, NOTAMMENT, MAIS SANS LIMITATION, (LE CAS ECHEANT) LES GARANTIES, DEVOIRS OU CONDITIONS IMPLICITES DE QUALITE MARCHANDE, D'ADAPTATION A UNE FIN PARTICULIERE,  DE FIABILITE OU DE DISPONIBILITE, D'EXACTITUDE OU D'EXHAUSTIVITE DES REPONSES, DES RESULTATS, DES EFFORTS DEPLOYES SELON LES REGLES DE L'ART, D'ABSENCE DE VIRUS ET D'ABSENCE DE NEGLIGENCE, LE TOUT A L'EGARD DU LOGICIEL ET DE LA PRESTATION OU DE L'OMISSION DE LA  PRESTATION DES SERVICES DE SOUTIEN TECHNIQUE OU A L'EGARD DE LA FOURNITURE OU DE L'OMISSION DE LA FOURNITURE DE TOUS AUTRES SERVICES, RENSEIGNEMENTS, LOGICIELS, ET CONTENU QUI S'Y RAPPORTE  GRACE AU LOGICIEL OU PROVENANT AUTREMENT DE L'UTILISATION DU LOGICIEL . PAR AILLEURS, IL N'Y A AUCUNE GARANTIE OU CONDITION QUANT AU TITRE DE PROPRIETE, A LA JOUISSANCE OU LA POSSESSION PAISIBLE, A LA CONCORDANCE A UNE DESCRIPTION NI QUANT A UNE ABSENCE DE CONTREFACON CONCERNANT LE LOGICIEL.

EXCLUSION DES DOMMAGES ACCESSOIRES, INDIRECTS ET DE CERTAINS AUTRES DOMMAGES. DANS LA MESURE MAXIMALE PERMISE PAR LES LOIS APPLICABLES, EN AUCUN CAS MICROSOFT OU SES FOURNISSEURS NE SERONT RESPONSABLES DES DOMMAGES SPECIAUX, CONSECUTIFS, ACCESSOIRES OU INDIRECTS DE QUELQUE NATURE QUE CE SOIT (NOTAMMENT, LES DOMMAGES A L'EGARD DU MANQUE A GAGNER OU DE LA DIVULGATION DE RENSEIGNEMENTS CONFIDENTIELS OU AUTRES, DE LA PERTE D'EXPLOITATION, DE BLESSURES CORPORELLES, DE LA VIOLATION DE LA VIE PRIVEE, DE L'OMISSION DE REMPLIR TOUT DEVOIR, Y COMPRIS D'AGIR DE BONNE FOI OU D'EXERCER UN SOIN RAISONNABLE, DE LA NEGLIGENCE ET DE TOUTE AUTRE PERTE PECUNIAIRE OU AUTRE PERTE DE QUELQUE NATURE QUE CE SOIT) SE RAPPORTANT DE QUELQUE MANIERE QUE CE SOIT A L'UTILISATION DU LOGICIEL OU A L'INCAPACITE DE S'EN SERVIR, A LA PRESTATION OU A L'OMISSION DE LA PRESTATION DE SERVICES DE SOUTIEN TECHNIQUE OU A LA FOURNITURE OU A L'OMISSION DE LA FOURNITURE DE TOUS AUTRES SERVICES, RENSEIGNEMENTS, LOGICIELS, ET CONTENU QUI S'Y RAPPORTE  GRACE AU LOGICIEL OU PROVENANT AUTREMENT DE L'UTILISATION DU LOGICIEL OU AUTREMENT AUX TERMES DE TOUTE DISPOSITION DE LA PRESENTE CONVENTION OU RELATIVEMENT A UNE TELLE DISPOSITION, MEME EN CAS DE FAUTE, DE DELIT CIVIL (Y COMPRIS LA NEGLIGENCE), DE RESPONSABILITE STRICTE, DE VIOLATION DE CONTRAT OU DE

VIOLATION DE GARANTIE DE MICROSOFT OU DE TOUT FOURNISSEUR ET MEME SI MICROSOFT OU TOUT FOURNISSEUR A ETE AVISE DE LA POSSIBILITE DE TELS DOMMAGES.

LIMITATION DE RESPONSABILITE ET RECOURS. MALGRE LES DOMMAGES QUE VOUS PUISSIEZ SUBIR POUR QUELQUE MOTIF QUE CE SOIT (NOTAMMENT, MAIS SANS LIMITATION, TOUS LES DOMMAGES SUSMENTIONNES ET TOUS LES DOMMAGES DIRECTS OU GENERAUX OU AUTRES), LA SEULE RESPONSABILITE DE MICROSOFT ET DE L'UN OU L'AUTRE DE SES FOURNISSEURS AUX TERMES DE TOUTE DISPOSITION DE LA PRESENTE CONVENTION ET VOTRE RECOURS EXCLUSIF A L'EGARD DE TOUT CE QUI PRECEDE SE LIMITE AU PLUS ELEVE ENTRE LES MONTANTS SUIVANTS : LE MONTANT QUE VOUS AVEZ REELLEMENT PAYE POUR LE LOGICIEL OU 5,00 $US. LES LIMITES, EXCLUSIONS ET DENIS QUI PRECEDENT (Y COMPRIS LES CLAUSES CI-DESSUS), S'APPLIQUENT DANS LA MESURE MAXIMALE PERMISE PAR LES LOIS APPLICABLES, MEME SI TOUT RECOURS N'ATTEINT PAS SON BUT ESSENTIEL.

A moins que cela ne soit prohibe par le droit local applicable, la presente Convention est regie par les lois de la province d'Ontario, Canada. Vous consentez a la competence des tribunaux federaux et provinciaux siegeant a Toronto, dans  la province d'Ontario.

Au cas ou vous auriez des questions concernant cette licence ou que vous desiriez vous mettre en rapport avec Microsoft pour quelque raison que ce soit, veuillez utiliser l'information contenue dans le Logiciel pour contacter la filiale de Microsoft desservant votre pays, ou visitez Microsoft sur le World Wide Web a http://www.microsoft.com.

MICROSOFT DirectX 9.0c

SUPPLEMENTAL END USER LICENSE AGREEMENT FOR MICROSOFT SOFTWARE ("Supplemental EULA")

IMPORTANT: READ CAREFULLY - These Microsoft Corporation ("Microsoft") operating system components, including any "online" or electronic documentation ("OS
Components") are subject to the terms and conditions of the agreement under which you have licensed the applicable Microsoft operating system product described below (each an "End User License Agreement" or "EULA") and the terms and conditions of this Supplemental EULA. BY INSTALLING, COPYING OR OTHERWISE USING THE OS COMPONENTS, YOU AGREE TO BE BOUND BY THE TERMS AND CONDITIONS OF THE APPLICABLE OPERATING SYSTEM PRODUCT EULA AND THIS SUPPLEMENTAL EULA. IF YOU DO NOT AGREE TO THESE TERMS AND CONDITIONS, DO NOT INSTALL, COPY OR USE THE OS COMPONENTS.

NOTE: IF YOU DO NOT HAVE A VALIDLY LICENSED COPY OF ANY VERSION OR EDITION OF MICROSOFT WINDOWS XP MEDIA CENTER EDITION, MICROSOFT WINDOWS 95, WINDOWS 98, WINDOWS NT 4.0 WINDOWS 2000 OPERATING SYSTEM OR ANY MICROSOFT OPERATING SYSTEM THAT IS A SUCCESSOR TO ANY OF THOSE OPERATING SYSTEMS (each an "OS Product"),
YOU ARE NOT AUTHORIZED TO INSTALL, COPY OR OTHERWISE USE THE OS COMPONENTS AND YOU HAVE NO RIGHTS UNDER THIS SUPPLEMENTAL EULA.

Capitalized terms used in this Supplemental EULA and not otherwise defined
herein shall have the meanings assigned to them in the applicable OS Product
EULA.

General. Each of the OS Components available from this site is identified as being applicable to one or more of the OS Products. The applicable OS Components are provided to you by Microsoft to update, supplement, or replace existing functionality of the applicable OS Product. Microsoft grants you a license to use the applicable OS Components under the terms and conditions of the EULA for the applicable OS Product (which are hereby incorporated by reference except as set forth below), the terms and conditions set forth in this Supplemental EULA, and the terms and conditions of any additional end user license agreement that may accompany the individual OS Components (each an "Individual EULA"), provided that you comply with all such terms and conditions. To the extent that there is a conflict among any of these terms and conditions applicable to the OS Components, the following hierarchy shall apply: 1) the terms and conditions of the Individual EULA; 2) the terms and conditions in this Supplemental EULA; and 3) the terms and conditions of the applicable OS Product EULA.

Additional Rights and Limitations.

* If you have multiple validly licensed copies of any OS Product, you may reproduce, install and use one copy of the applicable OS Components as part of the applicable OS product on all of your computers running validly licensed copies of the applicable OS Product, provided that you use such additional copies of such OS Components in accordance with the terms and conditions above. For each validly licensed copy of the applicable OS Product, you also may reproduce one additional copy of the applicable OS Components solely for archival purposes or reinstallation of the OS Components on the same computer as the OS Components were previously installed. Microsoft retains all right, title and interest in and to the OS Components. All rights not expressly granted are
reserved by Microsoft.

* If you are installing the OS Components on behalf of an organization other than your own, prior to installing any of the OS Components, you must confirm
that the end-user (whether an individual or a single entity) has received, read and accepted these terms and conditions.

* The OS Components may contain technology that enables applications to be shared between two or more computers, even if an application is installed on only one of the computers. You may use this technology with all Microsoft application products for multi-party conferences. For non-Microsoft applications, you should consult the

accompanying license agreement or contact the licensor to determine whether application sharing is permitted by the licensor.

* You may not disclose the results of any benchmark test of the .NET Framework component of the OS Components to any third party without Microsoft's prior written approval.

SOLELY WITH RESPECT TO THE MICROSOFT VIRTUAL MACHINE FOR JAVA, YOU ARE ONLY LICENSED TO INSTALL THIS OS COMPONENT ON A MACHINE THAT ALREADY CONTAINS A VERSION OF THE MICROSOFT VIRTUAL MACHINE FOR JAVA.

IF THE APPLICABLE OS PRODUCT WAS LICENSED TO YOU BY MICROSOFT OR ANY OF ITS WHOLLY OWNED SUBSIDIARIES, THE LIMITED WARRANTY (IF ANY) INCLUDED IN THE APPLICABLE OS PRODUCT EULA APPLIES TO THE APPLICABLE OS COMPONENTS PROVIDED THE APPLICABLE OS COMPONENTS HAVE BEEN LICENSED BY YOU WITHIN THE TERM OF THE LIMITED WARRANTY IN THE APPLICABLE OS PRODUCT EULA. HOWEVER, THIS SUPPLEMENTAL EULA DOES NOT EXTEND THE TIME PERIOD FOR WHICH THE LIMITED WARRANTY IS PROVIDED.

IF THE APPLICABLE OS PRODUCT WAS LICENSED TO YOU BY AN ENTITY OTHER THAN MICROSOFT OR ANY OF ITS WHOLLY OWNED SUBSIDIARIES, MICROSOFT DISCLAIMS ALL WARRANTIES WITH RESPECT TO THE APPLICABLE OS COMPONENTS AS FOLLOWS:

DISCLAIMER OF WARRANTIES. TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, MICROSOFT AND ITS SUPPLIERS PROVIDE TO YOU THE OS COMPONENTS, AND ANY (IF ANY) SUPPORT SERVICES RELATED TO THE OS COMPONENTS ("SUPPORT SERVICES") AS IS AND WITH ALL FAULTS; AND MICROSOFT AND ITS SUPPLIERS HEREBY DISCLAIM WITH RESPECT TO THE OS COMPONENTS AND SUPPORT SERVICES ALL WARRANTIES AND CONDITIONS, WHETHER EXPRESS, IMPLIED OR STATUTORY, INCLUDING, BUT NOT LIMITED TO, ANY (IF ANY) WARRANTIES, DUTIES OR CONDITIONS OF OR RELATED TO: MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, LACK OF VIRUSES, ACCURACY OR COMPLETENESS OF RESPONSES, RESULTS, WORKMANLIKE EFFORT AND LACK OF NEGLIGENCE. ALSO THERE IS NO WARRANTY, DUTY OR CONDITION OF TITLE, QUIET ENJOYMENT, QUIET POSSESSION, CORRESPONDENCE TO DESCRIPTION OR NON-INFRINGEMENT. THE ENTIRE RISK ARISING OUT OF USE OR PERFORMANCE OF THE OS COMPONENTS AND ANY SUPPORT SERVICES REMAINS WITH YOU.

EXCLUSION OF INCIDENTAL,CONSEQUENTIAL AND CERTAIN OTHER DAMAGES. TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, IN NO EVENT SHALL MICROSOFT OR ITS SUPPLIERS BE LIABLE FOR ANY SPECIAL, INCIDENTAL, INDIRECT, PUNITIVE OR CONSEQUENTIAL DAMAGES WHATSOEVER (INCLUDING, BUT NOT LIMITED TO, DAMAGES FOR: LOSS OF PROFITS, LOSS OF CONFIDENTIAL OR OTHER INFORMATION, BUSINESS INTERRUPTION, PERSONAL INJURY, LOSS OF PRIVACY, FAILURE TO MEET ANY DUTY (INCLUDING OF GOOD FAITH OR OF REASONABLE CARE), NEGLIGENCE, AND ANY OTHER PECUNIARY OR OTHER LOSS WHATSOEVER) ARISING OUT OF OR IN ANY WAY RELATED TO THE USE OF OR INABILITY TO USE THE OS COMPONENTS OR THE SUPPORT SERVICES, OR THE PROVISION OF OR FAILURE TO PROVIDE SUPPORT SERVICES, OR OTHERWISE UNDER OR IN CONNECTION WITH ANY PROVISION OF THIS SUPPLEMENTAL EULA, EVEN IF MICROSOFT OR ANY SUPPLIER HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES.

LIMITATION OF LIABILITY AND REMEDIES. NOTWITHSTANDING ANY DAMAGES THAT YOU MIGHT INCUR FOR ANY REASON WHATSOEVER (INCLUDING, WITHOUT LIMITATION, ALL DAMAGES REFERENCED ABOVE AND ALL DIRECT OR GENERAL DAMAGES), THE ENTIRE LIABILITY OF MICROSOFT AND ANY OF ITS SUPPLIERS UNDER ANY PROVISION OF THIS SUPPLEMENTAL EULA AND YOUR EXCLUSIVE REMEDY FOR ALL OF THE FOREGOING SHALL BE LIMITED TO ACTUAL DAMAGES INCURRED BY YOU BASED ON REASONABLE RELIANCE UP TO THE GREATER OF THE AMOUNT ACTUALLY PAID BY YOU FOR THE OS COMPONENTS OR U.S.$5.00. THE FOREGOING

LIMITATIONS, EXCLUSIONS AND DISCLAIMERS SHALL APPLY TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, EVEN IF ANY REMEDY FAILS ITS ESSENTIAL PURPOSE.

Download DirectX 9 Redistributable 9.0c June 2010



New here? **Create an account** | Sign in or f **Connect with Facebook**

| Home | | Mac | Mobile | Blog |



🏠 › Windows › Games › Tools & Editors › DirectX 9 Redistributable

## DirectX 9 Redistributable 9.0c June 2010

**PROGRAM INFO**

SCREENSHOTS (1)
PUBLISHER'S
USER REVIEWS (0)
SUBMIT REVIEW

Related links:

› Developer website
› Report abuse
› Report an issue
› Visit this product forums
› Program RSS feed

Microsoft **DirectX** End-User Runtime provides updates to 9.0c and previous versions of DirectX — the core **Windows** technology that drives high-speed multimedia and games on the PC.

| Last update | 23 Nov. 2011 |
| Licence | Free |
| OS Support | Windows XP, Windows Server 2003, Windows Vista, Windows 7, Windows Server 2008 |
| Downloads | Total: 377,404 | Last week: 43 |
| Ranking | #5 in Tools & Editors |
| Publisher | Microsoft | more software |
| Users rating: | (2 ratings) |

+1 0  f Like  Confirm  Share   Subscribe to this program ›

⚠️ **Before downloading:** Run a free scan to check for hidden Windows errors

## Screenshots of DirectX 9 Redistributable



View more screenshots ›

## DirectX 9 Redistributable Publisher's Description

Microsoft DirectX is a group of technologies designed to make Windows-based **computers** an ideal platform for running and displaying applications rich in multimedia elements such as full-color graphics, video, 3D animation, and rich audio.



**BETA AND OLD VERSIONS**

DirectX 9 Redistributable 9.0c August 2006

› All versions



**POPULAR DOWNLOADS**

**Soft32 Updater** 1.0.2.0
Stay up-to-date with your software.

**Counter Strike** 1.6
A MOD for Half-Life.

**Cheat Engine** 6.1
Cheat Engine is an open source tool

http://directx-redistributable.soft32.com/[12/19/2011 2:21:32 PM]

DirectX 9.0 includes security and performance updates, along with many new features across all technologies, which can be accessed by applications using the DirectX 9.0 APIs.

DirectX 9.0 End-User Runtime setup minimizes the download size but requires an internet connection during setup.

The DirectX 9.0 Redist is available for download for those users that do not have an internet connection available during installation or Setup has trouble connecting to the Microsoft server.

This download provides the DirectX 9.0c end-user multi-languaged redistributable that developers can include with their product.

The redistributable license agreement covers the terms under which developers may use the Redistributable. For full details please review the DirectX SDK EULA.txt and DirectX Redist.txt files located in the license directory.



infolinks Related Tags

Search        Publishing Companies        Publisher        Movie Phone

## DirectX 9 Redistributable User Reviews

**ALL VERSIONS** (0)        CURRENT VERSION (0)        FACEBOOK ( 0 )

There are no reviews for this program.

Be the first to write a review!

## Submit Your Review

You need to be signed in to review this program.

Create an account | Sign in or  Connect with Facebook

**Rate this product** *

**Review title** *

Maximum 80 characters (10 characters minimum)

**Your review of DirectX 9 Redistributable** *

You have 0 of 5000 characters (50 characters minimum)

See example | How to write a review

* Your review will be published with a slight delay, due to our approval process.

It is forbidden to share any crack, patches, serial numbers or keygen for DirectX 9 Redistributable, or link to pages that contain them. If you do, your user account will be deleted, your IP address logged and legal action will be taken. It is forbidden to post advertisements, profanity, or personal attacks. Click here to view our terms of use.



Partition Magic  8.0
Partition Magic 8

avast! Antivirus Free  6.0.1367.0
Free antivirus for non-commercial home use

› All popular downloads        1 of 4



Advanced SystemCare 5

Quick Care    Deep Care    Toolbox    Turbo Boost

Speedup your PC in just one click

Free Download

## Look for Similar Items by Category

Games > Tools & Editors

This product is also listed in: System Tools

## Feedback

- If you need help or have a question, visit our forum or contact us
- Would you like to update this product info?
- Is there any feedback you would like to provide? Click here



**Is Your PC Slow?** by Systweak Inc

+ Start Now

2 minutes can save you months of frustration and crashes.

**Home**    **Submit Software**    **Support**    **Contact Us**    **Advertise with Us**    **All Software**    **Sitemap**    **Blog**



© 2003 - 2011 ITNT. All rights reserved.

Terms of use    Copyright    Privacy policy








PROTECT 3 COMPUTERS
FOR THE PRICE OF 1
SOFTPEDIA® & LAVASOFT
EXCLUSIVE OFFER
AD-AWARE PRO
INTERNET SECURITY
Download Now

# DirectX Redistributable June 2010 9.29.1974

5/5 SOFTPEDIA pick

DOWNLOAD

OR ADD TO DOWNLOAD BASKET

no screenshots available

**Downloads:** 3,415,576 | View global page | Tell us about an update

**User Rating:** Very Good (4.3/5)
**Rated by:** 6054 user(s)
Like Confirm 3

| | |
|---|---|
| **Developer:** | Microsoft \| More programs |
| **License / Price:** | Ad-supported / $0 |
| **Size / OS:** | 95.6 MB / Windows 2K / XP / 2003 / Vista / XP X64 / 7 |
| **Last Updated:** | December 1st, 2010, 12:02 UTC |
| **Category:** | C: \ System \ OS Enhancements |

Read user reviews ( 7) | Send to friend | Follow (72 users)

EDITOR'S RATING

CLICK HERE TO ADD YOUR COMMENT/REVIEW

## Softpedia Editor's Review for DirectX Redistributable June 2010

Ads by Google | Virtual PC OS | Applications | DirectX 3D | Sky DirectX

### A very useful application for running and displaying applications rich in multimedia elements

*Written by **Olivian Puha** on December 15th, 2011*

Ads by Google

**Likewise Software**
Identity Security &
Storage Secure Access
to Unstructured Data
www.likewise.com

**Best Call Center Software**
Trusted by Multiple
Fortune 500's. Increase
Revenues. Free eBook!
InContact.com/Free

**Norton™ Antivirus - Free**
#1-Ranked Online
Protection Suite.
Download Latest Version
for Free.
www.Norton.com

**Management Software**
Powerful & Affordable
Software Save Time &
Money. Free Trial.
BlueRidgeSoftware.bz

**GlobalWorx-Mobility**
Workforce Management
Software Save up to
50% on your IT cost
www.synergies4u.com

**WEEK'S BEST**

- AIDA64 Extreme Edi...
- Sticky Password Pr...
- Online Armor Premi...
- Emsisoft Anti-Malw...
- All My Movies [DIS...
- Ad-Aware Internet ...
- Atlantis Word Proc...
- Process Lasso [DIS...
- McAfee Total Prote...
- Ashampoo Burning S...

A lot of computer programs require specific runtimes in order to work properly; in other words some software sometimes requires the presence another software that is especially designed to support its execution. One of the most common and encountered by the majority of users when dealing with multimedia elements is Microsoft's DirectX.

In the absence of the latest version of this component games may not function the right way or at all, while video or audio playback could be also affected. DirectX impacts on 3D animation rendering and full color graphics as well. Bundled with Windows operating system, this runtime needs only to be updated and no other user intervention is required.

Checking the current version installed on your system is an easy task, all you have to do is run the 'DirectX Diagnostic Tool'. The simplest way to bring it up is to type 'dxdiag' in the 'Run' field of the 'Start Menu' and then press 'Enter'. Since DirectX consists of several components, you can view and diagnose them from the above mentioned application.

The technologies included in this package also feature performance and security updates, therefore it's recommended to update it each time a new release is available. Fortunately, DirectX cannot be uninstalled by accident, thus there is virtually no danger of losing it.

Some dedicated software may downgrade or rollback a more recent version of the runtime, but it is not recommended to remove the components as they are key in the functioning of the operating system. Not having DirectX onto your PC means that you are no longer able to play the latest games or use many rich multimedia programs, so it's best to simply leave this Windows component do its job.

## DirectX Redistributable June 2010 description

**+ SHOW PRODUCT DESCRIPTION**

**Users are advised to pay attention while installing this ad-suported application:**

· Offers to download or install software or components (such as browser toolbars) that the program does not require to fully function: Bing Toolbar

| Ads by Google | OS Android | OS Havaianos | DirectX Driver | Embedded OS |
|---|---|---|---|---|

**TAGS:** display application | multimedia element | running application | DirectX | graphic | video

SHARE THIS
TWEET THIS

HTML code for linking to this page:

Go to top

 PC TOOLS SPYWARE Doctor 2010

Recommended Download

Award-winning Anti-virus Software
Free Virus, Spyware, Adware, Trojan, & Rootkit Scan
Rated 5 Stars by Industry Experts

DOWNLOAD
FOR FREE SCAN

Download DirectX Redistributable June 2010 9.29.1974 Free - A very useful application for running and displaying applications rich in multimedia elements - Softpedia

WINDOWS    GAMES    DRIVERS    MAC    LINUX    SCRIPTS    MOBILE    HANDHELD    NEWS

SUBMIT PROGRAM    |    ADVERTISE    |    GET HELP    |    SEND US FEEDBACK    |    RSS FEEDS    |    UPDATE YOUR SOFTWARE    |    ROMANIAN FORUM

© 2001 - 2011 Softpedia. All rights reserved.
Softpedia® and the Softpedia® logo are
registered trademarks of SoftNews NET SRL.

Copyright Information | Privacy Policy | Terms of Use



**Microsoft**



PRODUCTS    STORE    DOWNLOADS    SUPPORT

United States (English)

Sign in

# Download Center

Windows    Office    Product downloads    Download categories    Security    Resources

# DirectX End-User Runtimes (June 2010)

Subscribe

## Quick links

↓ Overview
↓ System requirements
↓ Instructions
↓ Additional information



This download provides the DirectX end-user redistributable that developers can include with their product.



### Quick details

| | | | |
|---|---|---|---|
| **Version:** | 9.29.1974 | **Date Published:** | 4/18/2011 |
| **Language:** | English | | |

| File Name | Size | |
|---|---|---|
| directx_Jun2010_redist.exe | 95.6 MB | **DOWNLOAD** |

## Overview

This download provides the DirectX end-user multi-languaged redistributable that developers can include with their product. The redistributable license agreement covers the terms under which developers may use the Redistributable. For full details please review the DirectX SDK EULA.txt and DirectX Redist.txt files located in the license directory.

This package is localized into Chinese (Simplified), Chinese (Traditional), Czech, Dutch, French, German, Italian, Japanese, Korean, Polish, Portuguese (Brazil), Russian, Swedish, and English.

↑ Top of page

## System requirements

**Supported Operating Systems:** Windows 7, Windows Server 2003 Service Pack 1, Windows Server 2003 Service Pack 2, Windows Server 2008, Windows Vista, Windows XP Service Pack 2, Windows XP Service Pack 3

↑ Top of page

## Instructions

1. Click the **Download** button on this page to start the download, or select a different language from the **Change language** drop-down list and click **Go**.

2. Do one of the following:

   - To start the installation immediately, click **Run**.

   - To save the download to your computer for installation at a later time, click **Save**.

   - To cancel the installation, click **Cancel**.

↑ Top of page

# Additional information

- The DirectX redist installation includes all the latest and previous released DirectX runtime. This includes D3DX, XInput, and Managed DirectX components.

- The DirectX runtime cannot be uninstalled.

- This update is recommended for users that do not have internet connection during installation.

- If you would like the websetup version of the runtime package, please click here.

- Starting with the December 2006 SDK release, the redist no longer supports Win9x.

- Starting with the June 2010 SDK release, the redist no longer supports Windows 2000.

↑ Top of page

## Related resources

Developer Resources For DirectX  ›

DirectX Websetup  ›

DirectX SDK  ›

## What others are downloading

DirectX End-User Runtime Web Installer  ›

DirectX Software Development Kit  ›

DirectX 11 Technology Update  ›

Microsoft .NET Framework 4 (Web Installer)  ›

Microsoft Visual C++ 2010 Redistributable Package (x86)  ›

DirectX End-User Runtimes (February 2010)  ›



### Automated fixes

Diagnose and repair your PC with free, automated solutions and personalized support.

Learn more  ›

Manage your profile | Worldwide downloads | Free newsletter | Share downloads | Careers

Contact us | Privacy statement | Terms of use | Trademarks

***Microsoft***

© 2011 Microsoft



< **HOME** | **MAC** | **GEEK - WEAR** | **MAIL LIST** | **SUPPORT FORUM** | **TOP DOWNLOADS** >



Custom Search

advertisement



**Before You Download**
**Run a Free Scan for Hidden Windows Errors**
Destroy **Malware**, Remove **Spyware** &
Repair windows **Registry**

**⊙ SCAN NOW! ⊙**

"MajorGeeks.com - It's all Geek to me."

## FILES

- Admin Tools
- All In One Tools
- Anti-Spyware
- Anti-Virus
- Appearance
- Back Up
- Benchmarking
- BIOS
- Browsers
- CD/DVD/Blu-Ray
- Covert Ops
- Data Recovery
- Diagnostics
- Drive Cleaners
- Drive Utilities
- Drivers
- Driver Tools
- Ergonomics
- Firewalls
- Games
- Game Tweaks
- Graphics
- Input Devices
- Internet Tools
- Macintosh
- Mail Utilities
- Memory
- Messaging
- Microsoft
- Monitoring
- Multimedia
- Networking
- Office Tools
- Process Management
- Processor
- Registry
- Security
- System Info
- Toys
- Video
- Miscellaneous
- News Archive
  - Off Base
  - Way Off Base

🔍 SEARCH

## FEEDS

- XML News Feeds
- Twitter
- FaceBook
- YouTube

**Microsoft** | **Microsoft DirectX (November 2010)** | Recommend Confi|

**Author:** Microsoft
**Date:** 2010-12-01
**Size:** 281 KB
**License:** Freeware
**Requires:** Win XP/2003/Vista/Windows7
**Downloaded:** 324967 Times

 **DOWNLOAD LOCATIONS**

- Download@Author's Site
- Download@MajorGeeks
- Download@MajorGeeks
- Internode - |Australia|

**Rating:** 4.65 (442 votes)
5. Geek-o-licious

⚠ Report A Bad Link

**Recommended Fix:** Click here to fix Windows errors and optimize PC performance

The Microsoft DirectX® End-User Runtime provides updates to 9.0c and previous versions of DirectX — the core Windows® technology that drives high-speed multimedia and games on the PC.

Microsoft DirectX is a group of technologies designed to make Windows-based computers an ideal platform for running and displaying applications rich in multimedia elements such as full-color graphics, video, 3D animation, and rich audio. DirectX includes security and performance updates, along with many new features across all technologies, which can be accessed by applications using the DirectX APIs.

**Additional Information:**

- The DirectX end-user installation includes the D3DX, HLSL Compiler, XInput, XAudio, and Managed DirectX 1.1 components.
- Note that the DirectX Runtime (Direct3D, DirectInput, DirectSound) is not part of this package as it is included as part of the Windows operating system, and therefore cannot be installed or uninstalled. Updating the DirectX Runtime is achieved by installing the latest Service Pack or obtaining a newer version of Windows.
- For information on obtaining DirectX 11 for Windows Vista or Windows Server 2008, see Microsoft Knowledge Base article 971644.
- The DirectX End-User Runtimes installer contains all of the components installed by the Web Installer in a single package and is recommended for those users that do not have an Internet connection during installation.

**Limitations:** This is the web installer. Word is nothing has changed since the last release except the Bing toolbar. We can not confirm this.

☆ **TIP:** Click here to Update all your PC's Drivers.

  

**BEFORE YOU DOWNLOAD**

Free Scan    Repair    Boost

**Run a free scan for hidden Windows errors**

Scan your Windows system with the new Reimage product

⊙ **DOWNLOAD NOW**

## INFO

- New? Start Here
- Live Tech Support
- Top Freeware Picks
- Support Forum
- CompatDB
- Reviews
- Geek-Wear
- Free Magazines
- Geek Shopping
- Geektionary
- About
- Links
- Folding@Home Team
- FAQ
- Spyware Removal

advertisement

**Advanced SystemCare 5**


Quick Care


Deep Care


Toolbox


Turbo Boost

**Speedup your PC in just one click**

Ads by Google
**IT Helpdesk Software** - >> Easy to install & Use, Web based, with Asset mgmt, Self Service. Try! www.ManageEngine.com/IT_Help_Desk





Google
Yahoo!
MSN
Sidebar

This Weeks
Top Downloads

1. Malwarebytes Anti-Malware
2. IObit Malware Fighter
3. Win7codecs
4. SpywareBlaster
5. x64 Components
6. PC De-Crapifier
7. HostsXpert
8. Combofix
9. Windows Installer CleanUp Utility
10. IrfanView

More>>




**Top 10 Most Downloaded Wallpapers Ever**




**Whole Web Is Obsessed With Those Sensational...**



**Windows 8 Has Surprised Everyone!**



**Muscle Girls**



**Some Windows Tricks Only Pros Know**

Free Download

FREE TECH
WHITE PAPERS


How Will Your Energy Company Respond to the CIP Challenge?: Learn how your energy company can become CIP compliant and less vulnerable to security...


Forrester White Paper: IT Operations Managers Must Rethink Their Approach to Priv...: Discover best practices for improving virtualization in...

Hundreds more titles ...

**CompatDB.org Project: >> Microsoft DirectX Control Panel - Check Results**



Copyright ©2000-2011
MajorGeeks.Com
Powered by Esselbach Storyteller
CMS System Version 1.8
NTCompatible.

## Skoki 2006

Hotfile has a CD image, skoki2006.iso. Zebrak states that the infringing material is the installer for the DirectX runtime libraries. Of the 9 files in the `_sterowniki/DirectX9c/` directory on the CD image, 8 of them have the same SHA1 hash as the corresponding files in the package that can be downloaded for free from Microsoft's website at ⊕ http://www.microsoft.com/download/en/details.aspx?id=2823. The only file that doesn't have the same SHA1 hash is ManagedDX.CAB, for which the Hotfile version is slightly smaller and has an older timestamp, suggesting it is a slightly earlier version of the file. The download from Microsoft also includes the license for developers to redistribute the installer.

If a user runs the dxsetup.exe installer from the disc, the End User License Agreement for DirectX is displayed as part of the installation procedure. If the user accepts the agreement, DirectX is installed.

### Zebrak's Notes

Among the many files in this folder is the Microsoft DirectX Software.

- ⊕ http://www.microsoft.com/download/en/details.aspx?id=35

- ⊕ http://www.microsoft.com/download/en/details.aspx?id=21416

# EXHIBIT I



# Русскій народный орнаментъ

### отдѣлъ первый

# Шитьё, ткани, кружева.

### 1871 годъ.

ИЗДАНІЕ ОБЩЕСТВА ПООЩРЕНІЯ ХУДОЖНИКОВЪ.

Цѣна 10 рублей.

# EXHIBIT 3

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF PENNSYLVANIA

DISNEY ENTERPRISES, INC.,     :   CIVIL ACTION
ET AL.,          Plaintiffs,  :
          vs.                 :
HOTFILE CORP., ANTON TITOV,   :
ET AL.,                       :
          Defendants.  :   NO. 11-20427

- - -

Tuesday, November 29, 2011

- - -

Videotaped deposition of RICHARD WATERMAN,

Ph.D., taken at the Law Offices of STRADLEY, RONON,

STEVENS & YOUNG, LLP, 2005 Market Street, Suite

2600, Philadelphia, Pennsylvania, on the above date,

beginning at 9:33 a.m., before Theresa Kepler, CCR,

RPR-Notary Public, there being present.

- - -

LOVE COURT REPORTING, INC.
1500 Market Street
12th Floor, East Tower

Philadelphia, Pennsylvania  19102

(215) 568-5599

1   A P P E A R A N C E S:

2

3   JENNER & BLOCK, LLP
    BY:  DUANE POZZA, ESQUIRE
4   1099 New York Avenue, NW
    Suite 900
5   Washington, D.C. 20001
    Phone: (202) 639-6000
6   Counsel for Plaintiffs and Richard Waterman, Ph.D.

7

    FARELLA, BRAUN & MARTEL, LLP
8   BY:  ANDREW LEIBNITZ, ESQUIRE
    235 Montgomery Street
9   San Francisco, California 94104
    Phone: (415) 954-4400
10  Counsel for Defendants

11

12  Also Present:  Daniel Levy

13  Videographer:  Scott Rowland

14

15
                        - - -
16

17

18

19

20

21

22

23

24

1    systems.

2         Q.      If the information was available you

3    could have done the studies but you didn't because

4    in fairness you weren't asked to, right?

5         A.      I believe that those questions could

6    probably be addressed through a statistical study,

7    the ones that you have raised.

8         Q.      But you didn't do it here because you

9    weren't asked to; is that correct?

10        A.      I was tasked with looking at the

11   activity from the distribution side of the site and

12   that's what my findings refer to, the distribution

13   activity.

14        Q.      And you weren't asked to look at

15   infringing days per user or proportion of users who

16   don't infringe?

17        A.      That was not something that, again, I

18   was -- you know, I was focusing on the activity of

19   the site, and sort of users who do nothing in terms

20   of downloading would, therefore, not be a part of

21   the population so...

22        Q.      Sorry.  You're -- you kind of trailed

23   off halfway there.  You personally didn't undertake

24   a study of the infringing days per user or

1                    C E R T I F I C A T E

2

3          I hereby certify that the proceedings

4    and evidence noted are contained fully and

5    accurately in the notes taken by me on the

6    deposition of the above matter, and that this is a

7    correct transcript of the same.

8

9

10          _____

11          Theresa Kepler, CCR, RPR

12

13

14

15

16          (The foregoing certification of this

17    transcript does not apply to any reproduction of the

18    same by any means, unless under the direct control

19    and/or supervision of the certifying reporter.)

20

21

22

23

24

**Waterman deposition errata**

Page 30. Line 23. "point of" → "pointer to".

Page 103. Line 23. "not of" → "not".

Page 121. Line 24. "Not aware" → " I am not aware".

Page 142. Line 13. "refers to" → "refers".

Page 146. Line 8. "that the" → "the".

Page 158. Line 13. "only" → "own".

Page 205. Line 24. "cold" → "coal".

Page 206. Line 5. "knowledge" ➜ "acknowledge".

Page 209. Line 6. "or" → "as".


Page 248. Line 21. "state" → "stated".

Page 254. Line 16. "down" → "does".

```
1              CERTIFICATE OF DEPONENT
2
3                 I do hereby certify that I
4    have read the foregoing pages, and that the same is
5    a correct transcription of the answers given by me
6    to the questions therein propounded, except for the
7    corrections or changes in form or substance, if any,
8    noted in the attached Errata Sheet.
9    _____
     RICHARD WATERMAN, Ph.D.
10   1/17/2012.
     _____
11   DATE
12
13   Subscribed and sworn to before me this
14   17th day of January , 2011. 2012
15   Gwen E. Lentine
16   My commission expires: 08/11/2012
17   Notary Public
18
19        COMMONWEALTH OF PENNSYLVANIA
           NOTARIAL SEAL
20   GWEN E. LENTINE, Notary Public
     Rockledge Boro., Montgomery County
21   My Commission Expires August 11, 2012
22
23
24
```

# EXHIBIT 4

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF FLORIDA

------------------------------------x

DISNEY ENTERPRISES, INC., et al.,   )

        Plaintiffs,   ) Case No.

   v.              ) 11-20427-

HOTFILE CORP., et al.,     ) WILLIAMS/

       Defendants.   ) TURNOFF

------------------------------------x

HOTFILE CORP.,         )

     Counterclaimant,   )

   v.           )

WARNER BROS. ENTERTAINMENT, INC.,  )

     Counterdefendant.   )

------------------------------------x

VIDEOTAPED DEPOSITION OF SCOTT A. ZEBRAK, ESQUIRE

     Washington, D.C.

    Tuesday, December 20, 2011

      9:43 a.m.

Job No.:  439702

Pages 1 - 370

Reported By:  Joan V. Cain

1       Videotaped Deposition of SCOTT A. ZEBRAK,

2   ESQUIRE, held at the law offices of:

3

4           STRADLEY RONON STEVENS & YOUNG, LLP

5           Suite 500

6           1250 Connecticut Avenue, Northwest

7           Washington, D.C. 20036

8           (202) 822-9611

9

10      Pursuant to Notice, before Joan V. Cain, Court

11  Reporter and Notary Public in and for the District of

12  Columbia.

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1        A P P E A R A N C E S

 2

 3    ON BEHALF OF PLAINTIFFS:

 4        STEVEN B. FABRIZIO, ESQUIRE

 5        JENNER & BLOCK, LLP

 6        Suite 900

 7        1099 New York Avenue, Northwest

 8        Washington, D.C. 20001

 9        Telephone:  (202) 639-6000

10        E-mail:  sfabrizio@jenner.com

11

12    ON BEHALF OF DEFENDANTS AND COUNTERCLAIMANT:

13        ANDREW LEIBNITZ, ESQUIRE

14        FARELLA BRAUN & MARTEL, LLP

15        Russ Building

16        235 Montgomery Street

17        San Francisco, California 94104

18        Telephone:  (415) 954-4400

19        E-mail:  aleibnitz@fbm.com

20

21    ALSO PRESENT:

22        Terry Michael King, Videographer

23

24

25
```

1   sample files you reviewed where the uploader differed

2   from the downloader?

3        MR. FABRIZIO:  Objection, vague and

4   ambiguous.  Asked and answered.

5        THE WITNESS:  The short answer is yes.

6   BY MR. LEIBNITZ:

7   Q   Please point to it in Exhibit 101.

8        MR. FABRIZIO:  Would it help you to have the

9   document that we brought today, Mr. Zebrak?

10       THE WITNESS:  Well, Counsel --

11       MR. LEIBNITZ:  Please mark this point.  That

12  kind of coaching objection is absolutely impermissible

13  in any jurisdiction, Steve.  You can't do that.

14       MR. FABRIZIO:  Really?

15       MR. LEIBNITZ:  Suggest a document for the

16  witness to look at, that is utterly irresponsible.

17  You can't do that.

18       MR. FABRIZIO:  Utterly irresponsible?  So

19  not just irresponsible, but utterly irresponsible?

20  BY MR. LEIBNITZ:

21  Q   Do you recall the question, Mr. Zebrak?

22  A   I do.

23  Q   Please answer the question.

24  A   As I did my work, all of these files are

25  files in which the uploader and downloader differed

1   from each other.

2      Q   How do you know that?

3      A   Well, first of all, as we talked about

4   before a few times, that -- that was an assumption in

5   my report.  So for every one of these files, I didn't

6   do a separate analysis to document whether the

7   uploader and downloader differed.  It was -- it was a

8   beginning assumption in my report that I applied

9   throughout my report, and as we talked about before, I

10  felt it was a reasonable and accurate assumption for a

11  variety of reasons.  I've listed them before.  I could

12  do so again if you'd like me to.

13     Q   You're telling me you made the assumption.

14  What I'm asking for, Mr. Zebrak, is do you have

15  documentary proof or any evidence -- let's start with

16  line Item 1.  You see upload ID 93154962, right?

17     A   The upload ID, yes, I do.

18     Q   How many times was this file downloaded?

19     A   I -- I'm sorry.

20        MR. FABRIZIO:  No, go ahead.

21        THE WITNESS:  I don't have in front of me

22  here or necessarily in another location the exact

23  number of times a given file was downloaded.

24  BY MR. LEIBNITZ:

25     Q   You were never given that information, were

1    CERTIFICATE OF SHORTHAND REPORTER-NOTARY PUBLIC

2      I, Joan V. Cain, Court Reporter, the officer

3   before whom the foregoing deposition was taken, do

4   hereby certify that the foregoing transcript is a true

5   and correct record of the testimony given; that said

6   testimony was taken by me stenographically and

7   thereafter reduced to typewriting under my direction

8   and that I am neither counsel for, related to, nor

9   employed by any of the parties to this case and have

10  no interest, financial or otherwise, in its outcome.

11     IN WITNESS WHEREOF, I have hereunto set my

12  hand and affixed my notarial seal this 29th day of

13  December 2011.

14

15  My commission expires:

16  June 14, 2014

17  _____

18  NOTARY PUBLIC IN AND FOR THE

19  DISTRICT OF COLUMBIA

20

21

22

23

24

25

# EXHIBIT 5

IN THE UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF FLORIDA


DISNEY ENTERPRISES, INC., TWENTIETH

CENTURY FOX FILM CORPORATION,

UNIVERSAL CITY STUDIOS PRODUCTIONS,

LLP, COLUMBIA PICTURES INDUSTRIES,

INC., and WARNER BROTHERS

ENTERTAINMENT, INC.,


       Plaintiffs,


  vs.             Case No.


HOTFILE CORPORATION, ANTON TITOV     11-cv-20427-AJ

and DOES 1-20,


       Defendants.

_____

       Videotaped Deposition of SCOTT A. ZEBRAK,
a witness herein, called for examination by counsel
for Defendants in the above-entitled matter, Washington,
D.C. pursuant to subpoena, the witness being duly sworn
by SUSAN L. CIMINELLI, CRR, RPR, a Notary Public in and
for the District of Columbia, taken at the offices of
Jenner & Block, LLP, 1099 New York Avenue, N.W.,

Washington, D.C., at 10:49 a.m. on Friday, January 20,

2012.

1    APPEARANCES:

2

3       On behalf of the Plaintiffs & Counterdefendants:

4          DUANE POZZA, ESQ.

5          STEVEN B. FABRIZIO, ESQ.

6          Jenner & Block, LLP

7          901 New York Avenue, N.W.

8          Washington, D.C.  20001

9          (202) 639-6000

10         dpozza@jenner.com

11

12      On behalf of the Defendants:

13         DEEPAK GUPTA, ESQ.

14         Farella Braun + Martel, LLP

15         235 Montgomery Street

16         San Francisco, CA  94104

17         (415) 954-4400

18         dgupta@fbm.com

19

20      ALSO PRESENT:

21         CONWAY BARKER, Videographer

22

23

24

25



15   Q.   Okay.  And what I tried to do is get

16   printouts of the -- of the pages that are noted in

17   the notes column to discuss with you.  And so I'd

18   like to mark this as the next consecutively numbered

19   exhibit.  I believe we're up to 126.

20           (Zebrak Exhibit 126 was

21             marked for identification.)

22         THE WITNESS:  Okay.

23         BY MR. GUPTA:

24   Q.   So, Mr. Zebrak, this is the first link

25   that you cited, which is IMDB, and can you please

1  tell me what this is?

2      A.   Internetmoviedatabase.com is a site that,

3  among other things, has information about movies and

4  television shows.

5      Q.   Okay.  And in what sense does this support

6  your conclusion that the identified file is -- is

7  infringing?

8          MR. POZZA:  Objection.  It lacks

9  foundation generally, and in particular I just want

10 to note that there's no URL on the printout to

11 indicate what it is.

12         THE WITNESS:  First of all, this -- just

13 as a preface to my answer, you're now asking me about

14 one of 1750 works that were -- I reviewed months ago,

15 and it would, of course, assist me if you would show

16 me the actual content file that's here.

17         BY MR. GUPTA:

18     Q.   I'll do my best.

19     A.   Well, but I mean, you know, just I'd like

20 to give a complete answer if I could.  You know,

21 we've talked at length in my earlier deposition

22 somewhat today about my methodology.  It, you know,

23 would involve review of the file, along with lots of

24 other information, and this notes section, you know,

25 was a place where we kept information that was useful

1  to us in our analysis.  Presenting me with one

2  printout of a page in the abstract when I can't see

3  the file is -- it's hard for me to answer it in such

4  an isolated way.

5          You know, of course, as I look at this,

6  Californication is of course a show by Showtime.  I'm

7  familiar with that and which is probably why Showtime

8  Networks is in the company page.  Now, at the same

9  time, the analysis that I underwent here, I -- it's

10  possible that this -- you know, that my ultimate

11  conclusion is not necessarily footnoted by a link you

12  see in the notes section.  That was not the goal of

13  this notes section.  You have access to the same

14  files I do, and the idea in the notes section was for

15  us to keep notes along the way, not to pinpoint this

16  is how I identified the work, this is its author, you

17  know, how it's being commercialized.

18          Sometimes we would record links like that;

19  sometimes not.  Sometimes, you know, you would

20  identify the file and how it was commercialized by

21  review of the file, which I don't have here.  And so

22  what was most important to me was my ultimate

23  classification status on the work.  What was of

24  lesser significance was this working notes section

25  and other data about -- about the work here.

1    Q.   Let me ask you a question.  Did counsel

2  ever explain to you that you need to provide the

3  basis of your opinions in your expert report?

4        MR. POZZA:  Objection.  Argumentative and

5  ambiguous.

6        BY MR. GUPTA:

7    Q.   It's not intended to be argumentative.

8  It's just a genuine question.

9    A.   It is not -- if -- look, if what you're

10  asking is -- with regard to 1750 works, is it

11  possible for me to say when I reviewed the work on,

12  you know, minute 19, there is the notice indicating

13  who it is, and from there I went to this site, and it

14  helped me to identify this as the owner and, you

15  know, -- I mean these -- these works in the process I

16  applied are ready -- readily reproducible by anyone

17  else, and if there are certain works that you believe

18  I'm mistaken on ultimately about its infringement

19  assessment, I'm more than happy to examine those

20  works and, if I'm wrong, want to be the first one to

21  correct my classification status, but, you know,

22  showing me one printed page from the notes section is

23  going to be a hard way to review these files.  In

24  certain instances.

25        In other instances, it may trigger it, but

1    -- I'm sorry.  I just -- it's sort of a long

2    background, but I wanted to kind of get through that

3    before we do too many of these examples.  But --

4       Q.   Okay.

5       A.   -- go right ahead.

6       Q.   So is it fair to say that the notes column

7    does not provide the entire factual basis for -- for

8    your opinions in this case?

9          MR. POZZA:  Object as ambiguous and asked

10   and answered to the extent that this topic was

11   covered the previous deposition.

12         THE WITNESS:  Well, the notes section

13   clearly did not include information that I would have

14   found important as I reviewed the file, for example.

15   And, of course, we produced the file.  Other

16   information might be reflected in some of the other

17   fields I have here.  But when you say the factual

18   basis, you know, it's not possible for me to record

19   every page I click on as I arrive at certain links.

20         And I mean, it -- so it's sort of a vague

21   question, but, you know, these -- you know, many, if

22   not most, of these links are very useful in helping

23   to identify what the file is.  Information about how

24   it's being commercialized, along with information

25   showing that the file is actually being distributed,

1   but not always.  Sometimes there may be a link in

2   there that's not especially useful.  So sort of

3   erasing that link may not have been incredibly

4   helpful.

5        BY MR. GUPTA:

6        Q.   Okay.  Well, taking your concern about

7   wanting to see as much of the evidence as you can --

8        A.   Sure.  Yeah.  That's great.

9        Q.   Can you please -- what I'll do is append

10  two additional documents to the existing Zebrak

11  Exhibit 126.  And this is the website, the porn

12  website, that is identified in the notes column and

13  the particular page --

14       A.   Yes.

15       Q.   -- that's referenced.  And then there is a

16  screen shot of the video using our screen shot --

17       A.   Yes.

18       Q.   -- software.

19       A.   That's -- yes.

20       Q.   Okay.  So based on this --

21       MR. POZZA:  Do you have a copy for me too?

22       MR. GUPTA:  Yes.

23       THE WITNESS:  So --

24       MR. POZZA:  Just a second.  I need a copy.

25       BY MR. GUPTA:

1    Q.   All right.  So based on this information,

2  can you explain to me the basis of your

3  classification of the file as --

4    A.   Sure.

5    Q.   -- highly infringing?

6    A.   Sure.  What pops to mind right now is that

7  this is professionally produced video involving

8  nudity.  I'm not sure necessarily where it crosses

9  the line -- it's your definition of pornography --

10 under the name of Californication.  And I actually

11 recall this and was thinking about this as we were

12 discussing the file a moment ago.

13       The -- Showtime is not the creator of

14 this, of this particular work.  This would have been

15 designated as highly likely infringing on the basis

16 that it was a professionally created video, not --

17 not sort of an amateur work uploaded by an

18 individual, in which case I would have presumed it to

19 be authorized.  This would have been a professional

20 work and -- consistent, of course, with the fact that

21 the title of the work has the person's name on it and

22 a year.  Yeah, so --

23   Q.   Okay.  Did you consider the length of the

24 clip?

25   A.   I don't recall this one in particular.

1    When we talked about length of clips a moment ago, I

2    was speaking generally about the length of clips.

3    There may be some exceptions.  It seems here

4    you've -- you've isolated an exception that is not

5    the norm of the types of works that I examined here.

6    This is -- at least judging by the length here, I

7    don't know if that's a minute and 48 or an hour and

8    48 based on this.

9        Q.   I'll represent to you it's a minute and

10   48.

11       A.   It's probably a minute and 48.  This might

12   be an example of something that's been taken as being

13   distributed from a -- from another -- from a

14   commercial work.  I don't know what comes before or

15   after the screen shot, but --

16       Q.   Did you consider the fair use doctrine in

17   connection with this clip?

18       A.   Again, I would have considered that

19   wherever I deemed it to be relevant.  In my analysis,

20   that was certainly a consideration that I would have

21   looked at.  As I look at this one now, you know, I

22   would like to see, for example, the other instances

23   in which this link was being distributed.  That would

24   be something I would have looked at as well.  But I

25   don't recall the specifics of it here.

1       Q.   So -- and just to further confirm for you

2    the length of the clip, when you look at the link

3    site that you --

4       A.   Yes.

5       Q.   -- you referenced in the notes column, it

6    does say one minute 48 seconds.  And so I wanted to

7    ask you to walk me through the fair use factors.  I

8    realize you don't remember if you applied them or

9    not.

10      A.   No.  I didn't say that.  I said I don't

11   recall the full consideration of it here.  I applied

12   it wherever it would be implicated.  It's something I

13   did in each and every instance was say is there a

14   fair use or licensing issue here, and I would reason

15   it through.

16      Q.   Right.  And so, if you reason it through

17   here, you know, what is the analysis that you walked

18   through?

19      A.   Well, I'd also like to see other instances

20   of -- of this.  I mean, I, of course, know the fair

21   use factors.  You know, in this instance if this was

22   a work of -- or a clip of two minutes or less,

23   assuming that's not a full length of the commercial

24   work, it would be using less than the whole portion

25   of the work.  The nature of the work would be one

1  deserving of copyright protection.  The nature of the

2  use in this instance is on a thread of the most

3  sensual scenes for movies and TV.

4         I'm just looking now for -- so, you know,

5  I don't know in what other instances this work we

6  found to be -- being distributed.  In this instance

7  here, the user apparently seems to be saying that

8  these are the most sensual scenes in movies from TV

9  in this posting.  I'm not sure the length of the

10 other works, but this one -- according to what you've

11 shown me, it's two minutes or less.

12    Q.   Right.  And so, I mean, I don't see any

13 advertising here.  Do you?  In this link?

14    A.   I don't -- I don't necessarily know from

15 this web page whether this person and the thread this

16 person is running is being done to derive this person

17 of consideration in any way.  I do know that, in

18 terms of the amount used, this person could clearly

19 have done lots of other things other than putting up

20 a two-minute clip from -- from this work.

21    Q.   I'm sorry.  What do you mean by they could

22 have done --

23    A.   Well, I mean --

24    Q.   -- a lot of other things?

25    A.   -- if this person wanted to convey

1 information about movies that this person found to be

2 among the most sensual scenes from movies, this

3 person could have listed them, could have put a

4 screen shot up.  Didn't have to put a two-minute

5 video up.  So in terms of, you know, the amount used,

6 you know, it would appear to me this person probably

7 used more than was necessary, and it's a work

8 deserving of copyright protection; you know, could

9 this -- could be commercial depending on what's

10 happening here.  I don't know just by looking at this

11 page and in what other instances this link is being

12 distributed.  And --

13     Q.   For the fourth factor, for the effect of

14 the use upon the potential market, do you think that

15 there is really any meaningful negative impact on the

16 market for Californication from this?

17       MR. POZZA:  Object to the extent it calls

18 for speculation.

19       BY MR. GUPTA:

20     Q.   And as a follow-on question, a subpoint is

21 couldn't it possibly even help the TV show if -- to

22 the extent that they're saying, you know, this is

23 from Californication, somebody might go out and buy

24 the iTunes video?

25     A.   You're misunderstanding.

1          THE VIDEOGRAPHER:  This is the end of tape

2    three.  Off the record at 6:40.

3          (Discussion off the record.)

4          THE VIDEOGRAPHER:  This is the beginning

5    of tape four in the -- in the deposition of

6    Mr. Zebrak.  On the record at 6:46.

7          MR. POZZA:  I just want to make a standing

8    objection to this line of questioning to the extent

9    that it could have been asked in the first deposition

10   and thus is a way of exceeding the seven hours

11   allotted to the first deposition, which was about the

12   documents studied in the first place.

13         MR. GUPTA:  And I'll note this is being

14   linked to Professor Boyle's rebuttal report.  I'll

15   note that this is questioning that is pursuant to

16   Professor Boyle's rebuttal report where he made an

17   analysis of the use of adult content in -- in

18   Dr. Waterman's study.

19         BY MR. GUPTA:

20   Q.   So I was asking about factor four of the

21   fair use analysis, which is the harm to the market

22   for the copyright owner, and I wanted to get your

23   perspective on, you know, really and genuinely, you

24   know, if you believe that this is appreciably going

25   to harm the market.

1      MR. POZZA:  Object as ambiguous and to the

2   extent it calls for speculation.

3      THE WITNESS:  Well, I actually do think in

4   this instance -- and first of all, again, this is --

5   you know, this type of example is more of an outlier.

6   In most cases, the files that I was reviewing were

7   full-length copies of the entire episode, not what in

8   this case is apparently a two-minute portion but

9   apparently a portion that a segment of the population

10   finds very, very much of interest being in this case

11   a strip-tease scene from the Californication episode.

12   And, you know, the notion that someone would instead

13   of purchasing a copy of that Showtime episode to, you

14   know, watch what they really cared about for that

15   segment of the population being the strip-tease

16   scene, which apparently is of interest to this

17   blogger and those people that he thinks are reading

18   -- or she thinks are reading the blog, you know, this

19   could -- could certainly displace sales.

20      BY MR. GUPTA:

21      Q.   Isn't -- isn't that form of reasoning

22   essentially going to eviscerate the fourth prong of

23   the fair use analysis, because basically what you're

24   say something that as long as a work has -- is

25   generating some -- is generating some interest that

1  there is a potential market for it, and so there's

2  inherently a deprivation of the copyright owner

3  insofar as they are being deprived of the ability to

4  access that market?

5      MR. POZZA:  Object as ambiguous, and to

6  the extent it's talking about abstract legal ideas,

7  it's outside the scope of the testimony.

8      THE WITNESS:  Again, you know, I

9  understand the fair use doctrine.  I routinely need

10  to look at and apply the fair use doctrine, and do

11  not believe that my analysis here eviscerates the

12  fair use doctrine.  Your question was sort of a vague

13  abstract one.  You know, the notion that a whole

14  group of people interested in -- in seeing a

15  beautiful woman dance and do a strip-tease might be

16  happy to view this two-minute clip rather than seeing

17  the whole episode if this is the only thing that

18  person cares about -- that certainly could -- could

19  have harm to the market as opposed to going to

20  purchase the episode.  You know, this is very

21  different than, you know, the more classic type of

22  instances of fair use.  And certainly had this person

23  merely done a screen shot or included a list of

24  the -- in this person's view, the best most sensual

25  scenes from movie and TV series, I think that would

1  be more closely in line with the fair use doctrine.

2       But, you know, again, we're now focusing

3  on what, you know, I really think is, you know,

4  probably one of a handful of outliers that are closer

5  calls in my analysis than what are really the much

6  more prevalent and easier calls, which are

7  full-length distribution of these works that are

8  being commercialized such as full-length copy of this

9  episode.  But I grant you this is one of the more --

10  you know, one of the closer calls within my analysis.

11       BY MR. GUPTA:

12       Q.   Okay.  And so would you consider

13  redesignating this as unknowable?

14       A.   What I -- look, with regard to any of the

15  closer calls that you raise with me today, whether

16  it's just this one or if this is one of X number, I

17  would be happy to go back and look more closely at

18  these.  I actually, you know, take great pride in the

19  fact that I think that if you were to review the 1750

20  files and focus on the ones that I deemed to be

21  infringing, I think you'll find that you won't

22  dispute the overwhelming -- overwhelming majority of

23  them and that while you may be able to isolate and

24  present to me a few that are closer calls, that I had

25  sound reasoning both for the ones where I opted to

1    Q.   So this is for SeeMyBucks.com.

2    A.   I understand.

3    Q.   How does SeeMyBucks relate to Wife Bucket?

4    A.   Well, again, first of all, I'm going to

5  preface my answer that this is, again, one among now

6  thousands of files I now reviewed over the course of

7  months.  But, even as to this one, I think my memory

8  is actually pretty clear.  I think it's not unusual

9  for the terms of use you have to agree to while

10  agreeing to a site and that you see to maybe bear

11  different legend.  In this instance, SeeMyBucks could

12  be the owner of that site or these could just be the

13  terms that you have to agree to while signing up for

14  the site, but, you know, if you walk through the

15  credit card process, I'm sure you can re-create this.

16    Q.   Yeah, well, I'm actually looking at this,

17  and it says that "However, by submitting the user

18  submissions to the website" -- sorry -- so let me

19  strike that.

20       So it says, for clarity, "You retain all

21  of your ownership rights in your user submissions.

22  However, by submitting the user submissions to the

23  website.  You hereby grant SeeMyBucks a worldwide

24  nonexclusive royalty-free sub-licensable and

25  transferrable license to use, reproduce, distribute,

1   display and perform the user submissions in

2   connection with the website and SeeMyBucks and its

3   successors in business, including without limitation

4   for promoting and redistributing part or all of the

5   website in any media formats and through any media

6   channels." So it seems like it actually contemplates

7   that they're going to be redistributing media that

8   people upload.

9       A.   Is that a question?

10      Q.   I mean, do you agree?

11      A.   Well, first of all --

12          MR. POZZA:  Objection.  Ambiguous.

13          THE WITNESS:  First of all, as you may or

14   may not be familiar with terms of use for sites that

15   receive content uploaded by others, but it's very

16   common for them to want to acquire very broad

17   licenses that give them the rights to do the things

18   they feel they need and want to do with the content

19   being uploaded by the users.

20          BY MR. GUPTA:

21      Q.   No.  I agree with that, and, you know --

22   but what I'm saying is is that they -- there are

23   certain key features of the terms of service that I'm

24   pointing out that are certainly consistent with the

25   practice as set forth in the articles cited by

1  Professor Boyle of a website using the Internet for

2  promotion.  And certainly the video, with its

3  watermark and so on, is consistent with that as well.

4  So, given that, based on the information you had, how

5  can you rule out the possibility that this is a --

6  viral marketing by an adult site?

7       MR. POZZA:  Object that lacks foundation,

8  assumes facts not in evidence, and is also talking

9  about articles in the Boyle report that -- but not

10  been introduced as an exhibit.

11       THE WITNESS:  Yeah.  So there's a number

12  of things to say in response to that.  First of all,

13  the notion that a company can use the Internet or

14  that a copyright owner can choose to distribute its

15  works as it sees fit is not a novel concept.

16  According to my review of Dr. Boyle's -- Professor

17  Boyle's report, he does not have much familiarity

18  with the industry at all.  He seems to premise his

19  conclusions on his being a legal scholar and having

20  read a couple of articles.

21       My understanding of the industry is

22  dramatically different than that as a result of the

23  work that I've done and the people I've spoken with

24  in the course of my research, as well as the sites

25  and the terms that I've reviewed, including this site

1   and these terms, which actually prohibit the

2   distribution of the content from this site.  And the

3   standard you mentioned of how can I rule out the

4   possibility -- these are "isn't it possible"

5   hypothetical questions that are totally inconsistent

6   with the terms of use for the site and the site

7   owner's motivations and my understanding of

8   promotional practices for that industry.

9          BY MR. GUPTA:

10     Q.   What do you think is the percentage chance

11  that the SeeMyBucks/Wife Bucket enterprise used the

12  video that we're talking about for advertising and

13  that that represents some iteration of virally

14  redistributed video?

15     A.   You're asking me to be --

16          MR. POZZA:  Objection.  Ambiguous and

17  calls for speculation.

18          THE WITNESS:  What are the chances?  You

19  know, you brought up how can I rule out, you know, my

20  assessment on these works as highly likely

21  infringing?  So first of all, even if there were a

22  rare instance like the one you're describing, that

23  would very much be an outlier and would affect a very

24  small number of my conclusions here, but given that

25  this appears -- if this is a UGC site to be

1   UNITED STATES OF AMERICA)

2                SS:

3   DISTRICT OF COLUMBIA   )

4

5       I, SUSAN L. CIMINELLI, the officer before whom

6   the foregoing deposition was taken, do hereby

7   certify that the witness whose testimony appears in

8   the foregoing deposition was duly sworn by me; that

9   the testimony of said witness was taken by me to the

10  best of my ability and thereafter reduced to

11  typewriting under my direction; that I am neither

12  counsel for, related to, nor employed by any of the

13  parties to the action in which this deposition was

14  taken, and further that I am not a relative or

15  employee of any attorney or counsel employed by the

16  parties thereto, nor financially or otherwise

17  interested in the outcome of the action.

18

19          _____

20             SUSAN L. CIMINELLI

21

22  My commission expires:  11/30/2016

23

24

25

# EXHIBIT 6

# Blizzard Files Marked as Illegal by Zebrak

Zebrak identified five files related to Warcraft III as being "Warcraft hacks" and thus illegal files:

- http://hotfile.com/dl/25188688/fe395ae/War3TFT_124d_English.exe.html
- http://hotfile.com/dl/25242802/7682c05/War3TFT_124c_124d_English.exe.html
- http://hotfile.com/dl/25598010/1532974/Warcraft 1.24d Maphack.rar.html
- http://hotfile.com/dl/112932854/087fb55/War3TFT_126a_English.exe.html
- http://hotfile.com/dl/112930614/186b6ba/War3TFT_125b_126a_English.exe.html

Four of these files are not illegal:

- War3TFT_124d_English.exe,
- War3TFT_124c_124d_English.exe,
- War3TFT_126a_English.exe, and
- War3TFT_125b_126a_English.exe.

These four files are also available from Blizzard Entertainment's file server at
http://ftp.blizzard.com/pub/war3x/patches/pc/.

The SHA1 sums for these files are:

| | |
|---|---|
| 93c003481987e9aa18e7137d0f56ec6efd740440 | War3TFT_124c_124d_English.exe |
| f06cabb98cced19e52891fea61778020ee15ff55 | War3TFT_124d_English.exe |
| 41b592026419bd1859fba458f819b57b7a95979e | War3TFT_125b_126a_English.exe |
| 070965bea2e61850ce409564b9f8ae6f55ebf7ba | War3TFT_126a_English.exe |

The SHA1 sums are the same for both the files downloaded from Blizzard's file server and the files that were available from Hotfile

The status of the file "Warcraft 1.24d Maphack.rar" could not be determined because the file is no longer available on Hotfile.