# EXHIBIT A

# PUBLIC VERSION

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.: 11-CIV-20427-WILLIAMS/TURNOFF

DISNEY ENTERPRISES, INC.,
TWENTIETH CENTURY FOX FILM CORPORATION,
UNIVERSAL CITY STUDIOS PRODUCTIONS LLLP,
COLUMBIA PICTURES INDUSTRIES, INC., and
WARNER BROS. ENTERTAINMENT INC.,

*Plaintiffs*,

v.

HOTFILE CORP., ANTON TITOV, and
DOES 1-10.

  *Defendants*.

_____ /

HOTFILE CORP.,

        *Counterclaimant*,

v.

WARNER BROS. ENTERTAINMENT INC.,

        *Counter-Defendant*.             /

## DECLARATION OF DR. DANIEL S. LEVY IN OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

**FILED UNDER SEAL**                    CASE NO.: 11-CIV-20427-WILLIAMS/TURNOFF

<u>**TABLE OF CONTENTS**</u>

## Contents

RESEARCH QUESTION ........................................................................................ 1

QUALIFICATIONS ............................................................................................... 1

INFORMATION CONSIDERED ........................................................................... 1

INTRODUCTION .................................................................................................. 2

DR. WATERMAN'S SAMPLE ............................................................................. 3

    a)    Dr. Waterman's Analysis Excludes 95 Percent Of The Time Hotfile Was In Operation. ...................................................................................... 3

    b)    Dr. Waterman's Sample And Analysis Excludes "Free-User" Downloads From 47.9 Percent Of Internet Users .................................................... 4

        i       *Dr, Waterman Provides No Scientific Evidence That His Limited Sampled Population Reflects The Population Of Downloads Through the Hotfile Website.* ................................................................... 7

        ii      *The Hotfile User Environment was Evolving Rapidly* .............................. 9

    c)    Dr. Waterman Mischaracterizes The Statistical and Sampling Process Applied To The Real World Process Of Drug Trials Required By The FDA........................................................................................................ 10

    d)    Dr. Waterman's Analysis Based On The Dailydownload File Does Not Even Reflect The Population Of Downloads From January 2011 ...................... 12

        i       *Dr. Waterman's Analysis Excludes Repeat Downloads By Premium-users* ...................................................................................... 12

        ii      *Dr. Waterman's Analysis Excludes All "Hotlink" Downloads* .............. 13

        iii     *Dr. Waterman's Analysis Excludes Downloads by Free-Users Numbering More Than 10 In A 24 Hour Period*...................................... 13

        iv     *Dr. Waterman's Analysis Excludes All Downloads That Were Anonymously Uploaded.* ....................................................................... 14

    e)    Conclusion: Dr. Waterman's Sample Is Not A Valid Scientific Sample of Downloads Through The Hotfile Website .......................................... 14

DR. WATERMAN'S ANALYSIS IGNORES MAJOR USES OF HOTFILE........................... 15

i

**FILED UNDER SEAL**                    CASE NO.: 11-CIV-20427-WILLIAMS/TURNOFF

DR. WATERMAN COUNTS MEDIA STORED IN MULTIPART FILES AS
SEPARATE DOWNLOADS .................................................................................................... 20

NO MEASURE OF HOW "HIGHLY LIKELY" TO INFRINGE ............................................ 21

MR. ZEBRAK PROVIDES NO MEASUREMENT OF THE RELIABILITY OF HIS
DETERMINATION OF INFRINGEMENT ............................................................................ 22

CONCLUSION ......................................................................................................................... 23

APPENDIX 1 ............................................................................................................................ 24

APPENDIX 2 ............................................................................................................................ 31

APPENDIX 3 ............................................................................................................................ 32

**FILED UNDER SEAL**               CASE NO.: 11-CIV-20427-WILLIAMS/TURNOFF

I, Daniel S. Levy, declare as follows:

1.       I am National Managing Director for Advanced Analytical Consulting Group. This declaration is based on personal knowledge unless indicated otherwise and all statements contained in this declaration are true and correct to the best of my knowledge.  If called as a witness, I could and would testify to the facts set forth in this declaration.

## RESEARCH QUESTION

2.       I have been retained by Farella, Braun + Martel LLP on behalf of Hotfile Corp. and Anton Titov (collectively, "Hotfile") to review the report of Dr. Richard Waterman dated November 18, 2011, and to assess his conclusions about the incidence of alleged infringement from March 2009 through January 2011 through the Hotfile website related to the various ways that Hotfile is employed by users, as well as assess various statistical issues.

## QUALIFICATIONS

3.       I am the National Managing Director and a founder of Advanced Analytical Consulting Group, Inc. ("AACG").  I have a Ph.D. in Economics from The University of Chicago.  I have designed and implemented statistical sampling protocols for business analysis and litigations over the course of more than 25 years.  I have provided testimony involving surveys, sampling, statistics, econometrics, economics and business, among other topics, before state and Federal courts.  I have served as an expert for the US Department of Justice, the US Securities and Exchange Commission, the New York State Attorney General and served as an Expert Arbitrator for the Internal Revenue Service.  I have testified in a range of matters over a number of years.  A true and correct copy of my curriculum vitae is attached in Appendix 1.

4.       My billing rate for this case is $650 per hour.  The rates of my staff assigned to this project range from $195 to $550 per hour.  Compensation for AACG is not contingent on the outcome of the proceedings.

## INFORMATION CONSIDERED

5.       My opinions are based upon the review of documents produced in this matter, interviews, investigative testimony and testimony from various depositions.

1

**FILED UNDER SEAL**                    CASE NO.: 11-CIV-20427-WILLIAMS/TURNOFF

6.      The information I considered has been noted in the footnotes throughout this report.  In addition, I considered other documents.  A true and correct list of these additional documents can be found in Appendix 2.

7.      In addition, my opinions are based on my skills, knowledge, experience, education, and training, as well as information gathered by me and provided to me as of the date of this report.  It is usual and customary for experts to consider and/or rely upon sources of information such as those identified in Appendix 2 in forming expert opinions.

8.      My conclusions are based on information I have access to at the time of this report.  They are subject to change based on new information and depositions conducted after the report date.

**<u>INTRODUCTION</u>**

9.      Hotfile provides users a location to store, retrieve, and share computer files through the internet.  By "uploading" computer files through the internet to Hotfile computer servers, Hotfile users can remotely store their computer files from any location and then retrieve the same files from any other internet-enabled location.  Hotfile users can also provide other internet users access to uploaded files so that other Hotfile users can "download" files.  Users' uploaded files may be removed from access by Hotfile after three months unless the file is downloaded by other users during that time.[1]  A file that is repeatedly downloaded by another Hotfile user may remain on Hotfile's servers indefinitely.  A file that is never downloaded may also remain accessible on Hotfile's servers over an extended period time if the user pays Hotfile a monthly fee to become a Premium-user.  Any Hotfile user may store files and download files to various internet connected devices at work, home or while traveling.

10.     Hotfile charges customers a fee to become Premium-users.  In addition to the ability to store files indefinitely, Hotfile's Premium-users are provided enhanced download abilities, including greater download speeds, avoidance of any waiting period prior to downloads, and avoidance of hourly limits on downloads.

11.     Hotfile pays Affiliates for certain downloads of files that they have uploaded and stored on Hotfile.  The amount of payment received depends on the Affiliate's status (Copper, Bronze, Silver, Gold or Platinum), the number of downloads and the amount of data

---

[1] http://hotfile.com/faq.html.

**FILED UNDER SEAL**                    CASE NO.: 11-CIV-20427-WILLIAMS/TURNOFF

downloaded.[2]  The Affiliates' status depends on the ratio of the users who downloaded an

affiliate's files and the users who become Premium-users based on the affiliate's uploaded files.

It also is influenced by the ratio of uploaded files to number of downloads.  All Hotfile users are

eligible to become Affiliates.[3]

      12.      Hotfile files can be accessed wherever a user can use the internet to access

Hotfile's servers.  However, Affiliate users can only earn payments for having their files

downloaded by users in the following countries:

**Table 1: List of Countries Eligible in which Downloads are Counted as of January 2011[4]**

| Americas: | Europe: | | | | Asia and Rest: | | |
|---|---|---|---|---|---|---|---|
| *North:* | Austria | Belgium | Bulgaria | Croatia | Bahrain | China | Hong Kong |
| Canada | Cyprus | Czech Republic | Denmark | Estonia | Israel | Japan | Kuwait |
| Mexico | Finland | France | Germany | Gibraltar | Malaysia | Oman | Qatar |
| United States | Greece | Hungary | Ireland | Italy | Saudi Arabia | Singapore | South Africa |
| | Latvia | Liechtenstein | Lithuania | Luxembourg | Turkey | UAE | |
| *South:* | Malta | Netherlands | Norway | Poland | **Oceania:** | | |
| Argentina | Portugal | Romania | Russia | Slovakia | Australia | New Zealand | |
| Brazil | Slovenia | Spain | Sweden | Switzerland | | | |
| | United Kingdom | | | | | | |
| Total:  5 | Total:  33 | | | | Total:  16 | | |

## DR. WATERMAN'S SAMPLE

      a)      **Dr. Waterman's Analysis Excludes 95 Percent Of The Time Hotfile Was In Operation.**

      13.      In his report, Dr. Waterman used a set of files listed in dailydownload.csv

(Dailydownload).  Dr. Waterman uses the Dailydownload file with the goal of creating "a

statistically reliable sample for a study analyzing the percentage of files downloaded daily that

were identified as infringing from the website operated by the defendants, www.hotfile.com."[5]

Further in his report and at his deposition, Dr. Waterman makes it clear that he recognizes that

his analysis provides no scientific evidence about Hotfile download or allegedly infringing

---

[2] http://hotfile.com/terms-of-service.html#affiliate.

[3] http://hotfile.com/affiliate.html.

[4] http://hotfile.com/affiliate.html as of January 2011.

[5] Rule 26(a)(2)(B) Report of Dr. Richard Waterman, November 18, 2011, P. 2, Para 2.

**FILED UNDER SEAL**                    CASE NO.: 11-CIV-20427-WILLIAMS/TURNOFF

behavior for any month other than January 2011.[6]  This is because, although Dr. Waterman had access to the Dailydownload file for the preceding twenty-two months of operation[7] and download logs from January 2011 through September 2011, Dr. Waterman chose to analyze only the downloads from one month: January, 2011.  As is clearly stated in statistical texts, including those which Dr. Waterman considers "canonical,"[8] "[t]he population to be sampled (the sampled population) should coincide with the population about which the information is wanted (the target population)."[9]  Therefore, the analysis in Dr. Waterman's report cannot, and does not, provide scientifically valid evidence based on sampling about behavior in any period outside the one from which he drew his sample: January 2011.  Indeed Dr. Waterman points out in his deposition that his goal was to analyze the downloads from only January 2011.[10]  Furthermore, for reasons discussed below, Dr. Waterman's analysis does not provide any reliable, scientific estimates of the incidence of alleged infringement even for January 2011.

      **b)**      **Dr. Waterman's Sample And Analysis Excludes "Free-User" Downloads From 47.9 Percent Of Internet Users**

      14.      Dr. Waterman understands that the data analyzed is missing download information for many countries.  Therefore, Dr. Waterman also agreed at his deposition that his calculated infringement rate cannot be applied to the downloads from geographic areas that were not included in the Dailydownload file.[11]  This is important because the Dailydownload file does not include data for a set of downloads in the countries listed in Table 2.[12]  These countries combined had 956,341,890 internet users as of 2010 as estimated by the World Bank.[13]

---

[6] Rule 26(a)(2)(B) Report of Dr. Richard Waterman, ¶ 9 and Deposition of Dr. Richard Waterman, November 29, 2011, P. 83, line 12-15.

[7] The Dailydownload file date range is 2/24/2009 to 9/6/2011.

[8] Arista Records LLC, et al. v. Lime Wire LLC, 06 Civ. 05936, Expert Report of Dr. Richard Waterman, P. 2, Footnote 1.

[9] William G. Cochran, *Sampling Techniques*, third edition, John Wiley & Sons, New York, 1977, P. 5. The quotation continues with the following: "Sometimes, for reason of practicability or convenience, the sampled population is more restricted than the target population. If so, it should be remembered that the conclusions drawn from the sample apply to the sampled population."

[10] Deposition of Dr. Richard Waterman, November 29, 2011, P.37, lines 7-16; P. 87, lines 16-20.

[11] Deposition of Dr. Richard Waterman, November 29, 2011, P. 140, lines 1-13.

[12] Deposition of Anton Titov, December 17, 2011, P. 62, lines 19-20.

[13] World Bank (2010).  World Development Indicators Online (WDI) Database. "Infrastructure: Internet Users."  Retrieved from:  databank.worldbank.org.

**FILED UNDER SEAL**                    CASE NO.: 11-CIV-20427-WILLIAMS/TURNOFF

**Table 2:  Countries not Included in Dailydownload in January 2011**

| | | | |
|---|---|---|---|
| Afghanistan | Congo, Rep. | Jamaica | Paraguay |
| Albania | Costa Rica | Jordan | Peru |
| Algeria | Cote d'Ivoire | Kazakhstan | Puerto Rico |
| Andorra | Cuba | Kenya | Rwanda |
| Angola | Djibouti | Kiribati | Samoa |
| Antigua and Barbuda | Dominica | Korea, Rep. | Sao Tome and Principe |
| Armenia | Dominican Republic | Lao PDR | Senegal |
| Aruba | Ecuador | Lebanon | Serbia |
| Azerbaijan | Egypt, Arab Rep. | Lesotho | Solomon Islands |
| Bahamas, The | El Salvador | Liberia | Sri Lanka |
| Bangladesh | Equatorial Guinea | Libya | Suriname |
| Barbados | Eritrea | Macao SAR, China | Swaziland |
| Belarus | Ethiopia | Macedonia, FYR | Syrian Arab Republic |
| Belize | Faeroe Islands | Madagascar | Tajikistan |
| Benin | Fiji | Malawi | Tanzania |
| Bermuda | French Polynesia | Maldives | Thailand |
| Bhutan | Gabon | Mali | Timor-Leste |
| Bolivia | Gambia, The | Mauritania | Togo |
| Bosnia and Herzegovina | Georgia | Mauritius | Tonga |
| Botswana | Ghana | Micronesia, Fed. Sts. | Trinidad and Tobago |
| Brunei Darussalam | Greenland | Moldova | Tunisia |
| Burkina Faso | Grenada | Mongolia | Turkmenistan |
| Burundi | Guatemala | Montenegro | Tuvalu |
| Cambodia | Guinea | Morocco | Uganda |
| Cameroon | Guinea-Bissau | Mozambique | Ukraine |
| Cape Verde | Guyana | Namibia | Uruguay |
| Cayman Islands | Haiti | Nepal | Uzbekistan |
| Central African Republic | Honduras | Nicaragua | Vanuatu |
| Chad | Iceland | Niger | Venezuela, RB |
| Chile | India | Nigeria | Vietnam |
| China | Indonesia | Pakistan | West Bank and Gaza |
| Colombia | Iran, Islamic Rep. | Panama | Yemen, Rep. |
| Comoros | Iraq | Papua New Guinea | Zambia |
| Congo, Dem. Rep. | | | Zimbabwe |

Sources:  World Bank (2010).  World Development Indicators Online (WDI) Database.
"Infrastructure:  Internet Users."  Retrieved from:  databank.worldbank.org.
http://hotfile.com/affiliate.html

15.      In contrast to the Free-user downloads from countries listed in Table 2, a set of Free-user downloads from the countries listed in Table 3 were recorded in the Dailydownload file.  The World Bank estimates that there are 1,041,116,133 internet users in these countries.[14] A "Free-user" download would be any download where an account of a Premium-user was not identified in the download.  This could be a download by a non-Premium-user of Hotfile or a

----

[14] Includes population of Gibraltar in 2010 from WDI 29,244.

**FILED UNDER SEAL**                          CASE NO.: 11-CIV-20427-WILLIAMS/TURNOFF

download by a Premium-user who was not identified as such during the Hotfile download process.

**Table 3: Countries with Downloads Included in Dailydownload in January 2011[15]**

| | | | |
|---|---|---|---|
| Argentina | France | Lithuania | Russia |
| Australia | Germany | Luxembourg | Saudi Arabia |
| Austria | Gibraltar | Malaysia | Singapore |
| Bahrain | Greece | Malta | Slovakia |
| Belgium | Hong Kong | Mexico | Slovenia |
| Brazil | Hungary | Netherlands | South Africa |
| Bulgaria | Ireland | New Zealand | Spain |
| Canada | Israel | Norway | Sweden |
| Croatia | Italy | Oman | Switzerland |
| Cyprus | Japan | Poland | Turkey |
| Czech Republic | Kuwait | Portugal | UAE |
| Denmark | Latvia | Qatar | United Kingdom |
| Estonia | Liechtenstein | Romania | United States |
| Finland | | | |
| Source:  http://hotfile.com/affiliate.html, http://hotfile.com/news.html | | | |

16.     This means that any Free-user downloads from 47.9 percent of the internet users from these countries around the world were not recorded in the Dailydownload file.  Therefore, Dr. Waterman has no scientific statistical evidence about the behavior associated with Free-users from this 47.9 percent of the internet population in these countries.  From his analysis, he cannot even determine how many of these Free-user downloads there were, even in January 2011 – the only month Dr. Waterman sampled.

17.     Based on this critical omission alone, Dr. Waterman has not provided scientific statistical evidence "from which we can reliably estimate the incidents (sic) of copyright infringement through the Hotfile website."[16]  He has no evidence of the overall incidence of alleged infringement at any given period of time, including January 2011, because he has omitted the Free-user download behavior of 47.9 percent of the internet users in the world; the Dailydownload file simply does not count their downloads.  And Dr. Waterman does not even sample downloads through the Hotfile website except for a single month out of the 23 months through January 2011.  That is only 4.3 percent of the time Hotfile had been in service through January 2011.

---

[15] http://hotfile.com/affiliate.html, as of January 2011 China was not included by Hotfile among the countries listed in Table 3.
[16] Rule 26(a)(2)(B) Report of Dr. Richard Waterman, November 18, 2011, P. 8, Para 18.

**FILED UNDER SEAL**                              CASE NO.: 11-CIV-20427-WILLIAMS/TURNOFF

*i*        ***Dr, Waterman Provides No Scientific Evidence That His Limited Sampled Population Reflects The Population Of Downloads Through the Hotfile Website.***

18.     As discussed, Dr. Waterman has excluded from his population of interest all but 4.3 percent of the time period for which Hotfile was in operation and further has excluded Free-user downloads from 956,341,890 internet users.  These excluded populations had zero percent chance of being selected in his sample and therefore no scientifically valid statement about their allegedly-infringing behavior can be made based on the field of sampling science.  It is important to note that there are many files that were not selected for analysis in the limited target population Dr. Waterman analyzed; Dr. Waterman selected only 1,750 downloads for review out of the 145,691,820 that were in the Dailydownload file in January 2011.  This selection of some files for the sample and the exclusion of other files based on a probabilistic random sample is not a source of the problems with Dr. Waterman's sample.  A significant source of problems in Dr. Waterman's sample, however, is caused by the fact that the files outside of January 2011 were excluded from his analysis and, in a statistical sense, had no chance of being selected into Dr. Waterman's sample.  This exclusion of downloads outside of January 2011 makes it impossible for Dr. Waterman to make any reliable statement about the level of alleged infringement in that excluded population based on statistical sampling, because this population of downloads had no statistical chance of being selected into the sample.  As we will discuss further below, there are also segments of the population of downloads within January 2011 which had no possibility of being selected into Dr. Waterman's sample.  As we will discuss, these omissions render Dr. Waterman's estimates of alleged infringement as unreliable and unscientific even within January 2011.

19.     Any attempt to apply the results from Dr. Waterman's sample to downloads from the excluded months and users from excluded geographies would have to be based on some additional evidence, which Dr. Waterman does not provide.  To establish that the other months and populations exhibited the same downloading behavior as found in the population Dr. Waterman sampled, Dr. Waterman would need some evidence that these excluded time periods and geographies had the same copyright infringement behavior as the limited population he sampled.  At times, evidence that the behavior of the excluded population is similar to the sampled population can be found (although this was not done here).  In some cases, extensive

**FILED UNDER SEAL**                        CASE NO.: 11-CIV-20427-WILLIAMS/TURNOFF

research can be conducted to determine whether there are other factors that correlate with the behavior of interest.  With this knowledge of the strength of these correlating factors, and their values in the populations that were excluded from the statistical sampling, it may be possible to make estimates of the incidence of the behavior of interest in the population that had zero chance of being selected into the sample.[17]  Dr. Waterman does not attempt to gather any of this supplementary information that would help inform the nature of the difference between the population that was sampled (downloads from the January 2011 Dailydownload) and the target population (downloads through the Hotfile website) which includes additional downloads from more than 95 percent of the time period Hotfile was in operation and by Free-users drawn from 956,341,890 additional internet users.[18]

20.    Dr. Waterman's report does not investigate whether there are any correlates that would be associated with the incidence of alleged copyright infringement.  Hence he cannot determine whether there is a change over time in these correlates which may help determine whether the incidence of alleged infringement through the Hotfile website have changed over time.  Similarly, for internet users who were omitted from his analysis because they were located in countries for which Hotfile did not retain data, Dr. Waterman has no information based on sampling or statistical science to provide any scientifically valid estimates of the incidence of infringing behavior through Hotfile's website.  He has excluded most of the downloads from Hotfile from his population of interest, has excluded them from the possibility of being included in his sample, and has not studied any correlates of infringing behavior that may assist in extrapolating from his limited target population, January 2011, to any other broader population.  For these reasons, Dr. Waterman has no scientific evidence about the incidence of infringement through the Hotfile website during the excluded periods and geographies.  And as we will

---

[17] Even if Dr. Waterman had performed such an analysis, it would not fix the omissions of downloads from his sample for January 2011.  It would therefore leave his estimates for January 2011 unreliable and the extrapolations to other time periods based on the January 2011 sample would similarly remain unreliable and unscientific.

[18] The number of users in each country is based on data from the World Bank in 2010.  The number of users did change over time. Figures for internet users over time can be found in Appendix 3.  In addition, the countries for which Hotfile maintained download data has changed over time. This is a factor that Dr. Waterman would need to consider if he attempted to study the infringement behavior in earlier periods and other geographies.

**FILED UNDER SEAL**                    CASE NO.: 11-CIV-20427-WILLIAMS/TURNOFF

discuss below, his omissions from the population of downloads from January 2011 render his estimates from that period unreliable and unscientific as well.

> ii      ***The Hotfile User Environment was Evolving Rapidly***

21.      There was rapid change over time in internet behavior through Hotfile.  The volume of users was changing rapidly over time and from month to month.  The Hotfile environment is not one where even this basic feature of the Hotfile environment is similar across months.  An appeal to the stability of use patterns over time at Hotfile would not be supported by the basic data about the pattern of downloads, uploads and number of users over time.  If anything, the Hotfile environment appears to be rapidly evolving, undermining any assertion that use behaviors were stable over time.  This can be seen in Figure 1, which shows the daily average of downloads by month for Hotfile.

**Figure 1**



22.      The Average Downloads per Day was changing rapidly across months.  Between January 2010 and January 2011 the Average Downloads per Day increased by more than 100%.

**FILED UNDER SEAL**                      CASE NO.: 11-CIV-20427-WILLIAMS/TURNOFF

23.     In addition, the daily average of uploads per month on Hotfile similarly changed greatly over time.  This can be seen in Figure 2.

**Figure 2**



24.     When comparing January 2011 to prior months, Dr. Waterman states that he has "no reason to believe that the world changed (in) some dramatic fashion."[19]  However, the number of uploads more than doubled from January 2010 to January 2011.  From June 2010 to January 2011 the number of uploads increased by approximately one third.  Many companies would consider this level of growth to be a dramatic change in the behavior of their user base.

    **c)**    **Dr. Waterman Mischaracterizes The Statistical and Sampling Process Applied To The Real World Process Of Drug Trials Required By The FDA**

25.     During his deposition, Dr. Waterman references "drug trials" in what appears to be an assertion that drug trials simply rely on samples from one population to determine the effect of a drug on another population.[20]  If Dr. Waterman is referring to clinical drug trials of the

---

[19] Deposition of Dr. Richard Waterman, November 29, 2011, P. 85,  line 1-3.
[20] Deposition of Dr. Richard Waterman, November 29, 2001, P. 106, line 18 - P. 107, line 21.

type required by the FDA, he has grossly oversimplified the testing and statistical analysis required by the FDA in its clinical drug trials in many ways. But perhaps two critical distinctions between what the FDA requires and what Dr. Waterman appears to be asserting would be useful. First, the FDA clinical trials require tests to be performed on a range of subjects that have characteristics or covariates that have been determined through years of clinical trials to be associated with the performance of the pharmaceuticals in the general population. Thus, through extensive experience and use of relevant covariates, the medical professionals and physicians at the FDA and the pharmaceutical manufacturer have extensive information that will allow them to use the covariates they have built into their study to determine how the pharmaceuticals are likely to function in the broader population. Dr. Waterman has performed no analysis of the covariates of alleged infringement at all.

26.    Second, the FDA, in its Phase 4 clinical trials may require extensive monitoring and testing in the actual population in which the pharmaceutical is being used in the field. Furthermore, "a crucial element in this [FDA] process is that physicians report any untoward complications ... The manufacturer must report adverse drug reactions at quarterly intervals for the first 3 years after approval, including a special report for any serious and unexpected adverse reaction."[21] This is clearly a direct analysis of the population of interest. It is not an assumption on the part of the FDA that the pharmaceutical will function in the broader population as it did in the sampled population.

27.    If anything, the FDA process demonstrates that in clinical drug trials the FDA is not comfortable relying on a sample from one population to project to another population without extensive use of correlates and then confirmation of the experience of the population of interest through direct observation. Dr. Waterman does neither of these. His appeal to clinical drug tests does not support his apparent claim that the FDA uses the type of extrapolation from one population to another that Dr. Waterman is discussing at that point in his deposition. Consideration of the actual process required by the FDA in drug testing further demonstrates that extrapolation from the experience of downloads in the January 2011 downloads files to other months, geographies or user populations not found in that file is not supported by the science of

---

[21] Martin S. Lipsky, MD and Lisa K. Sharp, PhD, *From Idea to Market: The Drug Approval Process*, JABFP, September-October 2001, Vol. 14, No. 5, PP. 362-367.

FILED UNDER SEAL                    CASE NO.: 11-CIV-20427-WILLIAMS/TURNOFF

statistical sampling or used in the practical application of clinical drug trials required by the FDA.

### d)   Dr. Waterman's Analysis Based On The Dailydownload File Does Not Even Reflect The Population Of Downloads From January 2011

28.     Dr. Waterman used the Dailydownload file as the source of his population of downloads.[22]  As I discussed above, this file does not include Free-user downloads by 956,341,890 internet users.  But more importantly the Dailydownload file does not even include all of the downloads by users in the countries where Hotfile did retain information about some of the downloads.  As I discuss next, this attribute of the Dailydownload file leaves Dr. Waterman's analysis useless for estimating the incidence of allegedly infringing behavior because he does not actually have the information to determine how many downloads there were even in his restricted sample of downloads from January 2011 and the limited set of countries for which Hotfile retained download information in the Dailydownload file.  This critical flaw in Dr. Waterman's analysis results from the fact that the Dailydownload file:  (1) does not contain all the downloads by Premium-users; (2) does not include the count of downloads for files downloaded by "Hotlinks"; (3) does not include downloads by Free-users numbering more than 10 downloads in a 24 hour period; and (4) does not include any downloads of files that were anonymously uploaded to Hotfile.  Dr. Waterman does not know how many downloads he is missing from his analysis.  He does not know the size of the target population from which he is trying to sample.  Because Dr. Waterman does not know the number of downloads excluded from his analysis or the total size of the actual population of downloads, he cannot know the percent of alleged infringement in the actual downloaded files through the Hotfile system.  Therefore he cannot provide any scientific evidence whatsoever of the percent of alleged infringement based on downloads through the Hotfile website.

### i   Dr. Waterman's Analysis Excludes Repeat Downloads By Premium-users

29.     The Dailydownload file does not include counts of the Premium-user downloads completed within 15 minutes of each other.[23]  A segment of downloads from January 2011 in the

---

[22] Rule 26(a)(2)(B) Report of Dr. Richard Waterman, November 18, 2011, P. 8, Para. 4.
[23] Based on conference with Anton Titov.

FILED UNDER SEAL                        CASE NO.: 11-CIV-20427-WILLIAMS/TURNOFF

"Affiliate" countries are therefore not included in the Dailydownload file.[24]  Dr. Waterman's analysis is missing these downloads.  He does not know whether these downloads tend to infringe copyrights or not.  He does not even know how many of these downloads there are. Without knowledge of how many of these downloads have occurred each month, Dr. Waterman cannot provide any scientific statistical evidence about the percentage of allegedly-infringing daily downloads through the Hotfile website, even during January 2011.

<strong>ii        <em>Dr. Waterman's Analysis Excludes All "Hotlink" Downloads</em></strong>

30.     Premium-users can provide a "Hotlink" to other individuals which allows the other individuals to download the Hotlinked file with improved access features compared to those available to standard Free-users.  These downloads via a Hotlink are not counted in the Dailydownload file.  As I understand it, they are not counted for payments by Hotfile to Affiliates (the purpose for which the Dailydownload file was created).[25]  Again, Dr. Waterman, does not address how many of these files downloaded by Hotlinks are missing from the Dailydownload file and therefore from his sample and analysis.  Further, since he does not have the Hotlink downloads in his sample, he cannot determine whether these files tend to be infringing or not.  Again, due to this omission, Dr. Waterman cannot provide any scientific statistical evidence about the percentage of alleged copyright infringement through the Hotfile website even during January 2011.

<strong>iii       <em>Dr. Waterman's Analysis Excludes Downloads by Free-Users<br>Numbering More Than 10 In A 24 Hour Period</em></strong>

31.     The Dailydownload file does not count downloads by Free-users once they have reached 10 downloads in a 24-hour period.  So once a Free-user has downloaded 10 files in a 24-hour period all subsequent downloads are omitted from the Dailydownload file.[26]  Again, Dr. Waterman does not address how many of these files downloaded by Free-users are missing from the Dailydownload file and therefore from his sample and analysis.  Further, since he does not have these downloads in his sample, he cannot determine whether these files tend to be infringing or not.  Again, due to this omission, Dr. Waterman cannot provide any scientific

---

[24]  In conversations with Anton Titov, I have confirmed that an entire segment of repeat downloads by the same Premium ID are not counted in the Dailydownload file.
[25] Communication with Anton Titov.
[26] Communication with Anton Titov.

**FILED UNDER SEAL**                    CASE NO.: 11-CIV-20427-WILLIAMS/TURNOFF

statistical evidence about the percentage of alleged copyright infringement through the Hotfile website even during January 2011.

> ### iv        Dr. Waterman's Analysis Excludes All Downloads That Were Anonymously Uploaded.

32.    Hotfile users can upload files without providing any individual information. These files are "anonymously" uploaded by anyone who is not identified by Hotfile or logged into Hotfile.  These anonymously-uploaded files are not eligible for Affiliate payments.[27]  Again, this means that Dr. Waterman could not have selected these files for review.  Further, Dr. Waterman does not have any count of the number of files that were downloaded from anonymous uploads.  Dr. Waterman does not know how large the target population of downloads actually is, for this reason.  In addition, Dr. Waterman does not know whether these files tend to infringe or not.  For this reason, in addition to the missing downloads discussed above, Dr. Waterman cannot determine the percentage of downloads through the Hotfile website that allegedly infringe copyrights.

**e)    Conclusion: Dr. Waterman's Sample Is Not A Valid Scientific Sample of Downloads Through The Hotfile Website**

33.    In total, Dr. Waterman's sample is not a valid scientific sample of the "incidents (sic) of copyright infringement through the Hotfile website,"[28] which was the concluding goal of Dr. Waterman's report.  It is not a valid sample of downloads through the Hotfile website because (1) it excludes Free-user downloads from 47.9 percent of the world's internet users due to their geography, (2) it excludes more than 95 percent of the time period for which Hotfile was in service, (3) it excludes the repeated downloads by Premium-users downloaded within 15 minutes, (4) it excludes Hotlink downloads, (5) it excludes downloads numbering more than 10 in a 24-hour period for Free-users and (6) it excludes the downloads of files uploaded anonymously.

34.    These are not minor omissions.  The omissions of download in category 1 above make Dr. Waterman's estimates inapplicable to the downloads by 956,341,890 internet users Dr. Waterman's choice to exclude all months but January 2011 eliminate 1,882,459,335 downloads from affiliate countries from his analysis, the vast majority.

---

[27] Communication with Anton Titov.
[28] Rule 26(a)(2)(B) Report of Dr. Richard Waterman, November 18, 2011, P. 8, Para 18.

**FILED UNDER SEAL**                    CASE NO.: 11-CIV-20427-WILLIAMS/TURNOFF

35.     Due to the omissions of downloads in categories 3, 4, 5 and 6, Dr. Waterman cannot even tell us how many downloads there were during January 2011, let alone the percentage of them that allegedly infringed.  These sampling errors, in categories 3 through 6, make Dr. Waterman's estimates inapplicable to the question of the percentage or incidence of allegedly-infringing behavior through the Hotfile website even during the limited period of January 2011 and the limited geography of Affiliated countries.[29]

## DR. WATERMAN'S ANALYSIS IGNORES MAJOR USES OF HOTFILE.

36.     Dr. Waterman's analysis, which focuses on downloads, ignores any other uses of Hotfile.  He does not investigate the storage function of Hotfile.  He does not investigate the backup and security functions of Hotfile.  He does not investigate the file transfer activity on Hotfile between devices owned by one individual.  Even if Dr. Waterman's sample of downloads provided a valid sample of downloads to inform this case, which it does not, his study does not reflect the range of user behavior on the Hotfile website because it focuses on only one of the uses and benefits Hotfile provides to users.

37.     Hotfile data list no downloads for 54 percent of all files in the Uploaddownload file which contains a record for files uploaded to Hotfile since February 19, 2009.  Although there are omissions in the downloads counted by Hotfile, as discussed in detail above, there is the potential that a large percentage, or a majority, of files uploaded to Hotfile were never downloaded.[30]  However, given that as much as 54 percent of the files ever uploaded to Hotfile are used in this way, it seems that the storage function could be a significant aspect of how Hotfile is used.

38.     Given the magnitude of this one activity alone, it is clear that in order to assess the incidence of allegedly-infringing usage of Hotfile, these other functions would have to be

---

[29] Dr. Waterman could have employed more comprehensive data provided by Hotfile to perform his sampling analysis.  The Dailydownload file contains information starting with a partial month of data in February 2009.  The Uploaddownload file contains information about uploads and additional downloads starting with a partial month of data in February 2009.  The Download logs contain essentially comprehensive information regarding downloads after March 2011.

[30] Information comes from uploaddownloads.csv, which as I understand it, contains a unique record for uploaded files.  To find total downloads, I summed the fields "downloads" and "paid downloads".  My understanding is that "downloads" gives a count of downloads from free-users and "paid downloads" gives a count of downloads from premium-users that were counted by Hotfile with the exception that some of the omissions discussed above are also omitted from the Uploaddownload file.

**FILED UNDER SEAL**                    CASE NO.: 11-CIV-20427-WILLIAMS/TURNOFF

investigated in addition to performing a scientific and relevant sample of downloads in place of the sampling performed by Dr. Waterman.

39.     Plaintiffs' Motion for Summary Judgment states on Page 9 that "For instance, the average Hotfile uploader has uploaded 171 files;…" The Plaintiffs are referring to the average number of uploads per Hotfile Uploader.[31]  Figure 3 presents the number of Hotfile users that have uploaded each specific number of files, starting with one file and continuing only up to those that uploaded 200 files.[32] Of all Hotfile Uploaders, 93.32% made 200 or less uploads. Later, Figure 4 displays the full range of the same data. Since Figure 3 reflects the experience of 93.32% of the Uploaders, it shows the uploading behavior of the vast majority of Hotfile Uploaders. For example, the tall bar to the far left of the Figure 3 reflects that 37.83% of all Uploaders uploaded only once. The second bar from the left shows that 12.90% of all Hotfile Uploaders uploaded twice. In fact, 50.73% of Hotfile Uploaders have uploaded only two files or less.   Therefore, the most typical uploading experience of Hotfile Uploaders is to literally upload at most one or two files. Moreover, over 75% of Hotfile Uploaders have uploaded only a dozen times or less.

40.     Actually very few Hotfile Uploaders have uploaded 171 times or more. Only 7.24% of all Hotfile Uploaders have uploaded 171 times or more, making those who uploaded 171 or more files fairly atypical, rather than average or typical. Clearly, the experience of 7.24% of the Hotfiles Uploading users does not reflect the experience of the most typical Hotfile Uploader.

---

[31]  Our calculation of average number of uploads per Hotfile Uploader with non-missing userid based on upload.csv.bz2 data set is slightly higher at 175.4.
[32]  A Hotfile member may upload the same file more than once.  The data analyzed here is based on the number of uploads as indicated by the language of the Plaintiffs Statement of Uncontroverted Material Facts and Yeh Declaration Exhibit 114 in support of Plaintiffs' Motion for Summary Judgment.

**FILED UNDER SEAL**                              CASE NO.: 11-CIV-20427-WILLIAMS/TURNOFF

**Figure 3**



41.    As can be seen from Figure 3, the vast majority of users uploaded a small number

of files. At greater numbers of uploads, further to the right in the Figure, there are comparatively

**FILED UNDER SEAL**                    CASE NO.: 11-CIV-20427-WILLIAMS/TURNOFF

few Hotfile users. For example, the last observation on the far right of Figure 3 reflects that there were 90 Uploaders that uploaded exactly 200 files. That exact number is difficult to read from Figure 3 because it is such a small number compared to the number of Uploaders that uploaded just one or two files.

42.     The distribution presented in Figure 3, as well as the one in Figure 4 below, have most of the Uploaders in the area on the far left, making it what is often called an "asymmetric distribution," simply reflecting that the distribution is not balanced around the mean or average. The average number of downloads per user is 171, but because the experience of the Hotfile Uploaders is so asymmetric this average is not at all reflective of the experience of the most typical Hotfile Uploader.  The red vertical line in Figure 3, references the location of the 171 uploads discussed in the Plaintiffs' Motion for Summary Judgment. There were 133 Uploaders who uploaded 171 times, and only 7.24% of all Uploaders uploaded 171 files or more files.

43.     Figure 4 shows the same information but also includes Hotfile Uploaders who uploaded more than 200 files. The extent of the asymmetry in the data is even more apparent.  So few Hotfile Uploaders, let alone Hotfile users in total, uploaded more than 200 files that although their experience is reflected on this chart, their experience is dwarfed by the experience of those users who uploaded only one or two files. To try to make the experience of Hotfile users who Uploaded 200 or more file a bit more visible in Figure 4, I focused on the portion of the vertical axis that is below 1,000.  This means that while the first 39 columns of data reflect that there were more than 1,000 users who uploaded up to 39 files, Figure 4, vertical axis will run only up to 1,000. Again, this is simply to make it possible to see the shape of the distribution of data further to the right.  It is still obvious that the distribution of the data is highly asymmetric and that the value Plaintiffs use to reflect the experience of the "average Hotfile uploader" certainly does not reflect that experience of the most typical Hotfile Uploader, who uploaded at most two files.

**FILED UNDER SEAL**   CASE NO.: 11-CIV-20427-WILLIAMS/TURNOFF

Figure 4



* Source: *upload.csv.bz2*

** Number of Hotfile users with count of uploads ranging from 1 to 39 varies from 218,980 users with a single upload to 1,040 users with 39 uploads. The distribution of uploads is even more asymmetric than appears in Figure 4 since Numbers of Uploads that had no Users are not included.  Including the Number of Uploads with no Users on the horizontal axis of Figure 4 would simply expand the far right portion of the horizontal axis further.

FILED UNDER SEAL                    CASE NO.: 11-CIV-20427-WILLIAMS/TURNOFF

## DR. WATERMAN COUNTS MEDIA STORED IN MULTIPART FILES AS SEPARATE DOWNLOADS

44.    Some users cut a single piece of media into multiple parts for storage and downloading on Hotfile.  In some cases a single piece of media is cut into six or more parts.  Some of these files, for example many with the RAR extension, are cut into pieces in such a way that it is difficult to view or read the file unless all of the Parts of the *.RAR file have been downloaded for a specific piece of media.  Therefore, for example, a movie that has been stored in a six part RAR would require six downloads from Hotfile to be functional for most or all users.  Alternatively, a movie of similar file size could be stored in a single file.  In Dr. Waterman's sampling protocol, a single piece of media stored in multiple parts has a greater chance of being sampled than that same piece of media stored in a single file.[33]

45.    Take for example two pieces of media, one infringing and one not, where both are downloaded once.  If the infringing file is stored in a ten part RAR file the download of the entire piece of media would be counted as 10 downloads.  If the non-infringing file is stored in a single file, the download of the entire file will result in one download.  Therefore, under the counting system devised by Dr. Waterman, the download of this one infringing film and this one non-infringing film would result in a count of 10 infringing downloads and one non-infringing download, for a 91 percent incidence of infringing downloads.  But this resulted from the download of one infringing film and one non-infringing film, in this example.

46.    Clearly the method of counting downloads of multipart files can have an important impact on the measured incidence of infringing downloads.  To investigate the impact of downloads of multipart files, I selected the most common file types used with multipart files, the .part##.RAR extension and files for which the final part of the file extension is made up of three numbers, for example ".avi.001".  Based on Dr. Waterman's sampling and the files he received, I was able to determine how many parts each of the multipart files had in the Dailydownload file that Dr. Waterman used.[34]  Based on the number of parts each of the files

---

[33] For this discussion, I consider the media to be downloaded the same number of time whether it is stored in a single file or in a multipart file.

[34] For example, Waterman's sample included a file called A.Christmas.Carol.2009.DvDrip-aXXo.part2.rar (uploadid: 90857607).  The file studio_requested_fileinfo.csv shows that Waterman and his team requested both A.Christmas.Carol.2009.DvDrip-aXXo.part1.rar (uploadid:  90855097) and  A.Christmas.Carol.2009.DvDrip-aXXo.part2.rar  (uploadid:

**FILED UNDER SEAL**                    CASE NO.: 11-CIV-20427-WILLIAMS/TURNOFF

had, I reversed the weighting that Dr. Waterman had applied to the media found in the multipart files, by dividing the observation Dr. Waterman had selected by the number of parts the file had been divided into.  This provides an estimate of the incidence of alleged infringement if each of these multipart files had been stored and downloaded as a single file; a download of one movie is counted as one download regardless of how many parts used to store it.  Even leaving all the other omissions and errors in Dr. Waterman's analysis intact, this single change in the method of counting downloads for multipart files, such as RAR and AVI extension files, reduces the estimated level of alleged infringement.  This reduction in the percentage of alleged infringement occurs because these multipart files tended to be found by Plaintiffs' witness, Mr. Zebrak, to infringe copyright more than single part files.

47.     There are likely other multipart files in addition to the ones I have identified using the method outlined above.  Without more analysis of these multipart files, it is not possible to determine the extent to which the counting process devised by Dr. Waterman influences the incidence of alleged infringement.

## NO MEASURE OF HOW "HIGHLY LIKELY" TO INFRINGE

48.     For the vast majority of files that Mr. Zebrak reviewed - 82.6 percent[35] according to Dr. Waterman[36] - Mr. Zebrak could not determine whether the downloaded file infringed or did not infringe.  Mr. Zebrak was only able to give it a relative status of Highly Likely to infringe.  However, neither Dr. Waterman nor Mr. Zebrak provided a quantitative assessment of how likely a Highly Likely download was to infringe.  We are provided no information whether highly likely means 66 percent, often known as a super majority, or 99 percent likely to infringe, or any other percentage.  Furthermore, we are not provided any information to suggest that such a quantification was even performed or can be provided by Mr. Zebrak.  If "Highly Likely" means 66 percent then 66 percent of the 82.6 percent Highly Likely infringing downloads are actually estimated to be infringing.  That would be 54.5 percent of the total files would be

---

90857607) from Hotfile to review.   In this case, I classify the sampled file, A.Christmas.Carol.2009.DvDrip-aXXo.part2.rar (uploadid: 90857607), as having two parts.

[35] The upper and lower 95 percent confidence intervals are 84.4 percent and 80.8 percent.

[36] Rule 26(a)(2)(B) Report of Scott Zebrak Appendix C.  I calculated proportions separately for "confirmed infringing" and "highly likely infringing" files, using methods that produce the same result as those produced by Dr. Waterman for the proportion of files either "confirmed" or "highly likely infringing": (10*(proportion of weekend files that infringe)+21*(proportion of weekday files that infringe))/31— William G. Cochran, *Sampling Techniques*, third edition, John Wiley & Sons, New York, 1977, page 107; Eq. 5.52.

**FILED UNDER SEAL**                          CASE NO.: 11-CIV-20427-WILLIAMS/TURNOFF

infringing (54.5%=66% x 82.6%) based on the Highly Likely pool.  Adding in the 7.7 percent based on the confirmed infringing status, a total of 62.2 percent of the downloads would be infringing.  If 85 percent of the Highly Likely files are actually infringing then 77.9 percent of the downloads sampled by Dr. Waterman would be infringing.[37]

49.     It is clear that some evidence about the percent of Highly Likely files that actually infringe is needed to provide the basis for a scientific sampling and extrapolation of the incidence of infringement through the Hotfile website.  Neither Dr. Waterman nor Mr. Zebrak provide this required information.

## MR. ZEBRAK PROVIDES NO MEASUREMENT OF THE RELIABILITY OF HIS DETERMINATION OF INFRINGEMENT

50.     Not only has Mr. Zebrak not quantified how likely the Highly Likely Infringing files are to infringe, but he has also provided no information about the reliability of his assessments and coding of alleged infringement.  The measurement of coding reliability is common in situations where individuals review some record and make some assessment about the record based on the review.  It is common practice in scientific research to determine how reliably the coders have assessed the records.[38]  Clearly individuals make mistakes or differ in their interpretations about the status of a given piece of media.  To the extent that they disagree about the final determination of a piece of media their determinations are considered to be not Reliable.

51.     Coding Reliability is often tested and measured by having some portion of the records that are being reviewed coded by a second coder to determine the percentage of times where there is agreement between coders.  If we know the percent of times that there was not agreement we could factor that into our assessment of the overall infringement levels.  But neither Mr. Zebrak nor Dr. Waterman has provided this type of measure.  Again this is not a

---

[37] 70.2% = 85% x 82.6% from the Highly Likely observations plus 7.7% from the Confirmed observations for a total 77.9%.

[38] See for example Jackson, Sherri L.  (2012).  Research Methods and Statistics:  A Critical Thinking Approach, 4th Edition.  Wadsworth, Cengage Learning. Webb, Noreen M. et. al. (2007). "Reliability Coefficients and Generalizability Theory."  In Rao, C.R. and Sinharay (eds.) The Handbook of Statistics vol. 26: Psychometrics.  Elsevier. Stemler , Steven and Jessica Tsai. (2008).  "Best Practices in Interrater Reliability:  Three Common Approaches."  In Jason Osborne (ed. Best Practices in Quantitative Methods.  Sage Publications..

minor omission. Some researchers consider coded data of the type provided here unusable if some measure of the Reliability of the coding is not provided.[39]

52.     So in addition to some measure of how likely a file categorized as Highly Likely is to infringe, we also need some measure of how Reliable Mr. Zebrak's coding process was.

## CONCLUSION

53.     For the reasons stated above Dr. Waterman has not provided a scientifically reliable estimate of the incidence of allegedly-infringing behavior through the Hotfile website. As he stated in his deposition, Dr. Waterman did not intend to provide a scientific estimate of the incidence of alleged infringement in downloads from the Hotfile website outside the time period of January 2011, and he did not. In addition, as stated in his deposition, he did not provide a scientific estimate of the allegedly-infringing behavior from the non-Affiliate geographies. Further, due to various omissions in downloads from the file Dr. Waterman used to construct his sample, Dr. Waterman has also failed to provide a scientifically reliable estimate of the incidence of infringement in the downloads from the Hotfile website during January 2011. Dr. Waterman has provided no reliable scientific evidence about the overall population of downloads from the Hotfile website during any time period.

54.     In addition, Dr. Waterman has investigated only one aspect of how users employ Hotfile. He has not investigated the storage, file security and backup or single users' file transfer across locations or devices for self use. Dr. Waterman has not investigated the alleged infringement behavior across the uses of Hotfile.

55.     Finally, neither Dr. Waterman nor Mr. Zebrak have provided any estimate or analysis of how likely files designated as "Highly Likely" are to infringe. Without this information it is not possible to calculate the proportion of allegedly-infringing behavior through the Hotfile website.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on this __6 th__ day of March 2012, at Boston, Massachusetts.

Daniel Levy, PhD

---

[39] Neuendorf, Kimberly A. (2002). The Content Analysis Guidebook. Sage Publications. p.142.

**FILED UNDER SEAL**                    CASE NO.: 11-CIV-20427-WILLIAMS/TURNOFF

APPENDIX 1

**DANIEL S. LEVY, PhD**

National Managing Director
Advanced Analytical Consulting Group, Inc.
Phone: 617 901 6344
Email: DanLevy@AACG.com

EDUCATION

Ph.D., Economics, The University of Chicago
A.B., Economics, The University of Chicago (With Special Honors in Economics)

Daniel S. Levy specializes in applications of economics and statistics. He has testified about sampling and statistical issues in Federal Court, presented statistical issues to Government Agencies and served as an Expert Arbitrator.

Dr. Levy has developed and implemented advanced analytical methods for quality control tests for major corporations. For more than a decade, Dr. Levy led a team of economists and statisticians in monthly testing of quality of service for multiple telecommunications companies. His analyses of sampling and statistical issues include testimony for the Securities and Exchange Commission and the Department of Justice and have been presented in Federal Court. He also has performed economic and statistical work in telecommunications, transportation, manufacturing, financial services, mining, oil and gas, consumer durables, healthcare, pharmaceuticals and medical devices industries. He has extensive experience in developing statistical methods for practical business applications. As part of his antitrust and market demand research, Dr. Levy has developed and used large GIS software databases.

Prior to Advanced Analytical Consulting Group, Inc., Dr. Levy was the national leader of the Economic and Statistical Consulting Group at Deloitte Financial Advisory Services and Global Leader of Economic Consulting at Arthur Andersen's Business Consulting Group. He also held research and consulting positions at Charles River Associates, The RAND Corporation, Needham-Hamer Worldwide Advertising, SPSS Inc. and The University of Chicago Computation Center.

EXPERT TESTIMONY/AFFIDAVITS

- Stephen Markson v. MBNA Canada Bank, Ontario Superior Court of Justice, Court File 03-CV254970CP, 2012, Expert Report.

24

**FILED UNDER SEAL**                          CASE NO.: 11-CIV-20427-WILLIAMS/TURNOFF

- Disney Enterprises, Inc. et al. v Hotfile Corp et al, U.S. District Court, Southern District of Florida, Case no. 11-20427-Williams-Turnoff, 2012, Expert Report and Deposition.

- United States of America, *ex rel.* Thomas F. Jamison v McKesson Corporation et al, Civil Action No. 2:08CV 214-SA-DAS, 2011, Expert Report.

- Gerald Leveille v Avantage Link Inc. et al, Superior Court, Province of Quebec, District of Montreal, No. 500-06-000118-006, 2011, Expert Report and Deposition.

- Brian Driscoll et al. v Granite Rock Company, Santa Clara County Superior Court**,** no. 108-CV-103426 Class Action, 2011, Expert Deposition.

- United States of America, *ex rel.* Thomas F. Jamison v McKesson Corporation et al, U.S. District Court Northern District of Mississippi (Delta Division), Civil Action No. 2:08CV 214-SA-DAS, 2011, Expert Report, Reply Report and Deposition.

- Oracle USA, Inc., et al v. SAP AG, et al, United States District Court, Northern District of California, San Francisco Division 2009, Case No. 07-CV-01658 PJH (EDL), 2010, Reply Exert Report Regarding Daubert of Defendants Damages Expert.

- Oracle USA, Inc., et al v. SAP AG, et al, United States District Court, Northern District of California, San Francisco Division 2009, Case No. 07-CV-01658 PJH (EDL), 2010, Exert Report Regarding Daubert of Defendants Damages Expert.

- Oracle USA, Inc., et al v. SAP AG, et al, United States District Court, Northern District of California, San Francisco Division, 2009, Case No. 07-CV-01658 PJH (EDL), 2010, Exert Report Regarding Daubert of Defendants Damages Expert.

- Oracle USA, Inc., et al v. SAP AG, et al, United States District court, Northern District of California San Francisco Division, 2009, Case No. 07-CV-01658 PJH (EDL), 2010, Deposition.

- Oracle USA, Inc., et al v. SAP AG, et al, United States District Court, Northern District of California San Francisco Division, 2009, Case No. 07-CV-01658 PJH (EDL), November 2009, Expert Report.

- Glenn Burton, Jr. v. American Cyanamid Co., *et al*, United States District Court Eastern District of Wisconsin, Case No. 07-C-0303, March, 2010, Expert Report.

- Yasmine Clark v. American Cyanamid Co, *et al.* State of Wisconsin Circuit Court : Milwaukee County, Case No. 2006 CV 12653, Case Code 30107, June 1, 2010, Expert Report.

- Securities and Exchange Commission v. Brantley Capital Management, LLC, Robert Pinkas, and Tab Kiplinger, United States District Court, Northern District of Ohio, Eastern Division, Case 1:09-cv-01906-JG, Expert Report and Deposition, 2010

**FILED UNDER SEAL**                                CASE NO.: 11-CIV-20427-WILLIAMS/TURNOFF

- Stephen Markson v. MBNA Canada Bank Court File 03-CV254970CP, January 2009, July 2009

- Mary Lewis et al. v. NL Industries et al, 2009, Circuit Court of Cook County, Illinois County Department, Chancery Division, Case No. 00 CH 9800.

- Drs Newco III, Inc v. Night Vision Equipment Company Holding, Inc, 2008, Expert Report, Testimony, *Damages in High Technology Market.*

- Invesco Institutional (N.A.) Inc v. Deutsche Investment Management Americas, Inc, 2008, Expert Report, *Damages in Financial Services Industry.*

- Securities and Exchange Commission v. Kenneth D. Pasternak and John P. Leighton, 2007, 2008. Expert Report and Testimony. *Damage Analysis.*

- Cytologix v. Ventana, Expert Report and Testimony, 2002, 2007. *Antitrust*

- Rubin Squared Inc. v. Cambrex Corporation, 2006 Case No. 03-CIV. 10138(PAC) Expert Report.

- Polaris Industries Inc. v. Commission of Revenue, 2005, Expert Report, Minnesota Tax Court, Docket No. 7694-R

- Before the New Mexico Department of Insurance, 2004, Expert Report, *Health Insurance Merger.*

- Carolyn Fears v. Wilhelmina et. al. 2004, Expert Report and Deposition, *Antitrust.*

- Shoshone and Arapaho Indian Tribes v. the United States of America, 2003, Expert Report, *Statistical Sampling.*

- Pechiney Plastic Packaging Inc. v. Continental PET Technologies Inc. 2002, Expert Report and Deposition, 2002, *Statistical Sampling/Patent Infringement.*

- Cytologix v. Ventana, 2002, Expert Report, *Antitrust.*

- Before the Illinois Commerce Commission, 2001, Expert Report and Testimony, *Statistical Methods and Telecommunications Performance.*

- IRS Expert Arbitrator, 2000, James Schilling Inc., v. Internal Revenue Service, *Expert Arbitrator Report and Decision.*

- Expert Witness, 1999, before the New Mexico Insurance Commissioner, *Hospital Merger.*

- Before the Michigan Public Service Commission, 1998, Expert Affidavit, *Statistical Analysis.*

- Statistical Methods for Parity Tests of Telecommunications Resale and Retail Markets, Before the Indiana Public Service Commission, 1998, Expert Affidavit, *Statistical Analysis.*

**FILED UNDER SEAL**                    CASE NO.: 11-CIV-20427-WILLIAMS/TURNOFF

- Before the FCC, CC Docket No. 98-56, RM-9101, 1998, Expert Affidavit, *Statistical Analysis*.

- Graber, A. et al. v. Giuliani, United States District Court Southern District of New York, 1998, Expert Affidavit and Deposition, *Statistical Sampling and Survey Research*.

- Marisol, A. et al. v. Giuliani, United States District Court Southern District of New York, 1998, Expert Affidavit and Deposition, *Statistical Sampling and Survey Research*.

- DFW v. Continental Air Lines, Texas, 1998, Expert Deposition and Testimony.

- Randall's Food Markets, Inc., v. Fleming Companies, Inc., The American Arbitration Association Dallas, Texas, June, 1998, Expert Affidavit, *Statistical Sampling*.

- Randall's Food Markets, Inc., v. Fleming Companies, Inc., The American Arbitration Association Dallas, Texas, February 1998, Expert Report, *Statistical Sampling*.

- Donald E. Haney v. Timesavers Inc., et al. United States District Court, District of Oregon, January 1998, Expert Testimony, *Patent Infringement*.

- Merck-Medco Managed Care Inc. v. Rite Aid Corporation et al. Northern District of Maryland, May 1997, Expert Deposition, *Antitrust*.

- Donald E. Haney v. Timesavers Inc., et al. United States District Court, District of Oregon, July 1997, Expert Report, *Patent Infringement*.

- Kenneth Heubert Williams v. Honri Vashon Hunt et al., State of Michigan in the Circuit Court for the County of Oakland, May 1997, Expert Deposition, *Value of Life*.

- Merck-Medco Managed Care Inc. v. Rite Aid Corporation et al. Northern District of Maryland, April 1997, Expert Report, *Antitrust*.

- Robinson Rubber et al. v. Hennepin County, Minnesota, United States District Court, District of Minnesota, Fourth Division, April 1997, Expert Deposition, *Antitrust*.

- Robinson Rubber et al v. Hennepin County, Minnesota, United States District Court, District of Minnesota, Fourth Division, April 1997, Expert Report, *Antitrust*.

- Massachusetts Wholesalers of Malt Beverages, Inc., v. Commonwealth of Massachusetts et al, Suffolk Superior Court, 1996, Expert Testimony, *Financial Damages*.

- Luke Brothers v. S. P. Krusell, US District Court, District of Massachusetts, July 1996, Expert Affidavit, *Antitrust*.

- Luke Brothers v. S. P. Krusell, US District Court, District of Massachusetts, August 1996, Expert Affidavit, *Antitrust*.

- Daras v. Texaco Inc, 1993, Affidavit.

- Environmental Protection Agency: Navajo Generating Station, 1991, Public Comment, *Valuation of Environmental Damages*.

27

**FILED UNDER SEAL**                            CASE NO.: 11-CIV-20427-WILLIAMS/TURNOFF

PROFESSIONAL EXPERIENCE

| | |
|---|---|
| 2009 – Present | National Managing Director, Advance Analytical Consulting Group, Inc. |
| 2002 - 2009 | National Leader of Economic and Statistical Consulting, Deloitte FAS LLP |
| 2001 - 2002 | Global Director of Economic and Statistical Consulting, Arthur Andersen: Value Solutions |
| 1998 - 2001 | National Director of Economic and Statistical Consulting, Arthur Andersen: Business Consulting |
| 1996 - 1998 | Regional Director of Economics, Arthur Andersen: CRCO |
| 1995 - 1996 | Economist, Arthur Andersen |
| 1991 - 1995 | Senior Associate, Charles River Associates |
| 1988 - 1991 | Associate Economist, The RAND Corporation |
| 1985 - 1988 | Computer Advisor, The University of Chicago Computation Center |
| 1982 - 1985 | Research and Teaching Consultant, SPSS Inc. |
| 1981 - 1982 | Research Consultant, Needham, Harper Worldwide Advertising |

PROFESSIONAL HONORS AND ACTIVITIES

- Earhart Fellowship for graduate research in economics, 1981 - 1982
- Hewlett Grant for research in developing countries, 1985 - 1986; renewed, 1986 - 1987
- CBS Bicentennial Scholarship for research on events leading to the American Revolution, 1986 - 1987
- Homer and Alice Jones Fellowship, University of Chicago, 1987 - 1988
- American Economics Association, 1988- Present
- Population Association of America,  1988-1991

PAPERS, PRESENTATIONS, AND PUBLICATIONS

- Daniel S. Levy and Timothy J. Tardiff "Pricing and Maximizing Profits within Corporations: Applications of Lester Taylor's Insights," Presented at Telecommunications Demand and Investment: The Road Ahead, Conference in Honor of Emeritus Professor Lester D. Taylor, Jackson Hole, Wyoming, October 10, 2011.

Daniel S. Levy "Foundations of Pricing," Presented at the Professional Pricing Society Meetings, Oct 2010.

Daniel S. Levy. "New Econometric Techniques for Transfer Pricing." Presented at the American Bar Association Annual Meetings, August, 1997.

Daniel S. Levy et al.  "Economics and the New Transfer Pricing Regulations: Achieving Arm's Length Through the Invisible Hand." Special Report to *Transfer Pricing Reporter*, Vol. 4, No. 2, May 24, 1995.

**FILED UNDER SEAL**                    CASE NO.: 11-CIV-20427-WILLIAMS/TURNOFF

Daniel S. Levy and Deloris R. Wright. "In the OECD and the United States, It's the Arm's-Length Principle that Matters: Comparison of New Transfer Pricing Regulations." *International Transfer Pricing Journal* 1, No. 2, January 1995.

Robert Fagan, Manjusha Gokhale, Daniel S. Levy, Peter Spinney, and G.C. Watkins. "Estimating DSM Program Impacts for Large Commercial and Industrial Electricity Users." Presented at 1995 International Energy Program Evaluation Conference, Chicago, IL, August 1995.

Talk on the EPA's decision to require the Navajo Generating Station to reduce emissions to protect visibility in the Grand Canyon.  Panel on "Valuation of Environmental Resource Damages," CRA conference on *Economists' Perspectives on Legal Issues Today:  Estimating Damages*, Boston, MA, April 23, 1992.

Daniel S. Levy et al. "Conceptual and Statistical Issues in Contingent Valuation: Estimating the Value of Altered Visibility in the Grand Canyon." (MR-344-RC). Santa Monica, CA: RAND Corporation, 1995. Draft submitted to the Environmental Protection Agency, March 1991.

Daniel S. Levy and D. Friedman. "The Revenge of the Redwoods?: Reconsidering Property Rights and Economic Allocation." *The University of Chicago Law Review* (April 1, 1994). Reprinted in *Land Use and Environment Law Review* 26 (September 1995).

Lois Davis, Susan Hosek,  Daniel S. Levy and Janet Hanley, "Health Benefits for Military Personnel: An Overview of Their Value and Comparability to Civilian Benefits" (WD-5875-FMP). Santa Monica, CA: RAND Corporation, February 1992.

D. Buddin, J. Hanley, Daniel S. Levy, and D. Waldman. *Promotion Tempo and Enlisted Retention* (R-4135-FMP). Santa Monica, CA: RAND Corporation, August 1991.

Daniel S. Levy et al. "Comments On Contingent Valuation of Altered Visibility in the Grand Canyon Due to Emissions from the Navajo Generating Station." Presented to the Environmental Protection Agency, April 18, 1991.

Daniel S. Levy. "The Economic Demography of the Colonial South." Ph.D. Thesis, Department of Economics, University of Chicago, 1991.

**FILED UNDER SEAL**                    CASE NO.: 11-CIV-20427-WILLIAMS/TURNOFF

J. DaVanzo and Daniel S. Levy. "Influences on Breastfeeding Decisions in Peninsular Malaysia." Presented at *The Yale Conference on the Family, Gender Differences, and Development*, September 1989.

Daniel S. Levy. "Long-Run Geographic and Temporal Changes in Mortality in the Colonial South." Presented at the annual meeting of the Population Association of America, Baltimore, 1989. Submitted 1995 to *Social Science History*.

Daniel S. Levy. "The Economic Determinants of Family Sizes in Colonial Maryland: Evidence from Colonial Legislators of Maryland." Presented at the Social Science History Association, Chicago, 1989.

Daniel S. Levy. "The Epidemiological Causes of Changing Political Life Expectancies." Manuscript, 1989.

Daniel S. Levy. "The Life Expectancies of Colonial Maryland Legislators." *Historical Methods* 20, No. 1 (Winter 1987): 17−27.

David W. Galenson and Daniel S. Levy. "A Note on Biases in the Measurement of Geographic Persistence Rates." *Historical Methods* 19, No. 4 (Fall 1986): 171−179.

<u>APPENDIX 2</u>

dailydownload.csv

dailydownload.csv.headers

estimation_11172011.txt

studio_requested_fileinfo.csv

uploaddownloads.csv.headers

uploaddownloads.csv

Waterman Ex C.pdf

Waterman Ex D.pdf

Waterman Ex E.pdf

Waterman Report.pdf

Waterman FULL Transcript.pdf


http://hotfile.com/affiliate.html

http://hotfile.com/news.html

http://hotfile.com/tenns-of-service.html#affiliate


William G. Cochran, Sampling Techniques, third edition, John Wiley & Sons, New York, 1977


World Bank (2010). World Development Indicators Online (WDI) Database. "Infrastructure: Internet Users."

**FILED UNDER SEAL**                    CASE NO.: 11-CIV-20427-WILLIAMS/TURNOFF

APPENDIX 3



**FILED UNDER SEAL**                    CASE NO.: 11-CIV-20427-WILLIAMS/TURNOFF

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on March 7, 2012, a true and correct copy of the foregoing document, was filed conventionally under seal and served on all counsel of record identified below via e-mail and via FedEx.

Karen L. Stetson, Esq., Fla. Bar No.: 742937
GRAY-ROBINSON, P.A.
Email: Karen.Stetson@gray-robinson.com
1221 Brickell Avenue
Suite 1600
Miami, FL  33131
Telephone: 305.416.6880
Telecopy: 305.416.6887

Steven B. Fabrizio, Esq. (admitted *pro hac vice*)
Email: sfabrizio@jenner.com
Duane C. Pozza, Esq. (admitted *pro hac vice*)
Email: dpozza@jenner.com
Luke C. Platzer, Esq. (admitted *pro hac vice*)
Email: lplatzer@jenner.com
JENNER AND BLOCK, LLP
1099 New York Avenue, N.W.
Suite 900
Washington, DC  20001
Telephone: 202.639.6000
Telecopy: 202.639.6066

Karen R. Thorland, Esq. (admitted *pro hac vice*)
Senior Content Protection Counsel
Email: Karen_Thorland@mpaa.org
Motion Picture Association of America, Inc.
15301 Ventura Boulevard, Building E
Sherman Oaks, CA  91403-5885
Telephone: 818.935.5812

By:_____
    Janet T. Munn