```
 1              UNITED STATES DISTRICT COURT

 2              SOUTHERN DISTRICT OF FLORIDA

 3              CASE NO. 11-20427-WILLIAMS

 4

 5   DISNEY ENTERPRISES, INC.,    )
     TWENTIETH CENTURY FOX FILM   )
 6   CORPORATION, UNIVERSAL CITY  )
     STUDIOS PRODUCTIONS LLLP,    )
 7   COLUMBIA PICTURES            )
     INDUSTRIES, INC., and        )
 8   WARNER BROS. ENTERTAINMENT   )
     INC.,                        )
 9                                )
                                  )
10   Plaintiffs,                  )
                                  )
11                                )
     v.                           )
12                                )
     HOTFILE CORP., ANTON TITOV   )
13   and DOES 1-10,               )
                                  )
14   Defendants.                  )

15

16

17              Deposition of JAMES BOYLE

18              (Taken by the Plaintiffs)

19              Raleigh, North Carolina

20              December 21, 2011

21

22

23   Reported by:   Marisa Munoz-Vourakis -
                     RMR, CRR and Notary Public
24   TSg Job # 44315

25
```

```
 1    APPEARANCE OF COUNSEL:

 2    For the Plaintiffs:

 3            DUANE POZZA, ESQ.

 4            Jenner & Block

 5            1099 New York Avenue, NW, Suite 900

 6            Washington, DC 20001

 7

 8

 9

10    For the Defendants:

11            DEEPAK GUPTA, ESQ.

12            Farella Braun & Martel

13            Russ Building

14            235 Montgomery Street

15            San Francisco, CA 94104

16

17

18

19            Deposition of JAMES BOYLE, taken by the

20    Plaintiffs, at Office Suites Plus, 3737 Glenwood

21    Avenue, Suite 100, Raleigh, North Carolina, on the 21st

22    day of December, 2011 at 11:04 a.m., before Marisa

23    Munoz-Vourakis, Registered Merit Reporter, Certified

24    Realtime Reporter and Notary Public.

25
```

Page 13

███████████████████████████████████████

███████████████████████████████████

████████████████████████████████

████████████

5       Q.      In the course of your research, do you have

6    any experience designing statistical studies?

7               MR. GUPTA:  Objection, vague and

8        ambiguous.

9       A.      No, I do not.

10      Q.      Are you trained in statistics?

11      A.      No, I am not.

12      Q.      In the course of your research, do you have

13   any experience analyzing large data sets?

14              MR. GUPTA:  Objection, vague and

15        ambiguous.

16      A.      No, I would say that I do not have the

17   experience as a statistician analyzing large data sets.

18   As an academic, I have to consider large amounts of

19   data all of the time and try and draw conclusions from

20   it, so it depends exactly what you mean by large data

21   sets.

██      ██        ████████████████████████

██      ███████████████████████████████

██          ███████████      █████████████████

██          ████████████

[redacted]

In addition, I am not a statistician, as I made clear on paragraph seven. This does not purport to be a representative statistical sample.

[redacted]

Page 77



19      Q.      Just going back again to the last sentence

20  of 9 sub-i, you say:  Hotfile's proven suitability and

21  capability with such licensing models is of

22  significance.

23              Do you see that?

24      A.      Yes, I do see it.

25      Q.      What kind of significance?

1            MR. GUPTA:   Objection, it's vague.

2       A.      In Sony and the cases that followed Sony,

3    the courts have been very clear that it's not just the

4    current usage of a system but its potential for future

5    use that is important.

6            So, for example, in the Napster case the

7    court of appeals held that the district court had erred

8    in not considering the potential uses for Napster,

9    focusing only on its current uses.  You asked what the

10   meaning is of the word significance.  It's significant

11   first in that here we have a method that can be used

12   indirectly to compensate developers and distributors of

13   open source software, in this case these small

14   distributors, not the large scale commercial

15   distributors, but the independent programmer working

16   alone or in teams, who is being indirectly compensated

17   for his or her labor by distributing this copyrighted

18   work in accordance with the goals of the copyright act.

19           The significance there is first, that that

20   is an example of noninfringing use; and second, that

21   the potential that the system could be used even more

22   for this and other kinds of licitly, that is to say,

23   legally licensed distribution is something that shows

24   that under the Sony test, as reiterated in Napster, it

25   has potential future uses.

1          So it's the growth and potential for this

2   kind of software in term of methods of distribution.

3   Hotfile would be one such method of distribution.

4   That's what I meant by significance.

5          Q.     It has legal significance?

6          A.     I think it has legal significance.  I think

7   it has cultural significance.  I think it has economic

8   significance.  But in this case, I was talking about

9   significance to an assessment under the Sony standard

10   and the Grokster standard.

```
 1        A.       I said that one of the uses of Hotfile,
 2   which was significant in terms of applying the test in
 3   Sony and in Grokster, was the fact that there was a
 4   significant licit use to encourage the distribution of
 5   legal copyrighted material.  It's, in my opinion, if
 6   one reads Sony and Grokster, and if one reads Article I
 7   Section 8, Clause 8 of the Constitution, it seems clear
 8   that one of the main goals in interpreting all of the
 9   tests here, the tests in Sony and the tests in Grokster
10   is the promote the progress goal of copyright law.
11             In looking at licit uses, therefore, I
12   think it's particularly likely that a court would lay
13   weight on licit uses of distributing copyrighted
14   content, which actually managed A, to spread that
15   content to users or consumers, which is one of the
16   goals of the copyright system; and B, to compensate the
17   creator and thus incentivize future creativity, which
18   is a second goal.
19             So for that reason, I think this use of the
20   Hotfile system is significant in order to figure out
21   whether or not it has substantial noninfringing uses.
```

■ ████████████████████████

■    ███      ████

■    ███   ████████████████████████

■ ███████████████████████████████████████

■ █████████████████████

■          ████████  ██████████████

```
7        A.     Certainly not as high as the 1.7 million

8   download figure for the open source programs.  I

9   included this because, as I understand the test in

10  Sony, the court in Sony and subsequent courts are

11  interested both in magnitude, that is to say, the

12  number of uses, but also in types of uses, and this is

13  illustrative of a type of use.

14           When we think about the uses of a system in

15  order to spread cultural material, we, at least I, in

16  interpreting the Sony and Napster test, are not looking

17  only at the number, although that is clearly something

18  that we do look at, but also at what this represents.

19  In some cases, it may represent intensity of

20  preference.  People who really like Hamlet or Othello

21  rather than many people who like JDownloader.
```

■          ████████████████████████

■ ███████████████████████████████████

■ ██████████████████████████

■          ████████████████████████



21        Q.        I want to go to paragraph 34 of your

22    report.  The first sentence there says:  First,

23    noninfringing content is frequently uploaded and

24    downloaded on Hotfile, and those uses are substantial

25    both in terms of raw numbers and in terms of the most

1    common uses of the Hotfile system.

2              Do you see that?

3         A.    I do.

4         Q.    I think we talked about the raw numbers.

5    In terms of the most common uses of the Hotfile system,

6    what do you mean there?

7         A.    I mean the information about the fact that

8    files such as iREB and sn0wbreeze and to a less extent

9    JDownloader, were among the most commonly shared files

10   on Hotfile, that their number of downloads was high in

11   proportion to, excuse me, was high in rank if you

12   looked at the most downloaded.

13        Q.    So are you making a statement about

14   different kinds of uses of the Hotfile system in

15   general?

16             MR. GUPTA:  Objection, it's vague.

17        A.    So I'm trying to give the court information

18   relevant to whether or not there are substantial,

19   noninfringing uses of Hotfile and also relevant to

20   whether or not Hotfile would be guilty of a Grokster

21   style inducement liability.  To me, as a legal scholar,

22   it appears that if you find that the one and two most

23   downloaded files on the system are actually licitly

24   shared, that seems important, that seems significant.

25             The fact that those files are examples of

open source development, a kind of creativity, and the fact that the developers of that open source software are actively choosing to use Hotfile licitly to spread it and appear to be gaining some compensation, I believe that a court would see that as significant in the determination of substantial noninfringing uses.

[redacted]

```
 1                    C E R T I F I C A T E

 2        I, Marisa Munoz-Vourakis, RMR, CRR and Notary Public,

 3   the officer before whom the foregoing proceeding was

 4   conducted, do hereby certify that the witness(es) whose

 5   testimony appears in the foregoing proceeding were duly

 6   sworn by me; that the testimony of said witness(es) were

 7   taken by me to the best of my ability and thereafter

 8   transcribed under my supervision; and that the foregoing

 9   pages, inclusive, constitute a true and accurate

10   transcription of the testimony of the witness(es).

11        I do further certify that I am neither counsel for,

12   related to, nor employed by any of the parties to this

13   action in which this proceeding was conducted, and

14   further, that I am not a relative or employee of any

15   attorney or counsel employed by the parties thereof, nor

16   financially or otherwise interested in the outcome of the

17   action.

18   IN WITNESS WHEREOF, I have hereunto subscribed my name

19   this 27th of December, 2011.

                              _____
20                            MARISA MUNOZ-VOURAKIS

21   Notary #20032900127

22

23

24

25
```

Page 204

1                    UNITED STATES DISTRICT COURT

2                    SOUTHERN DISTRICT OF FLORIDA

3                      CASE NO. 11-20427-WILLIAMS

4

5    DISNEY ENTERPRISES, INC.,    )
     TWENTIETH CENTURY FOX FILM   )
6    CORPORATION, UNIVERSAL CITY  )
     STUDIOS PRODUCTIONS LLLP,    )
7    COLUMBIA PICTURES            )
     INDUSTRIES, INC., and        )
8    WARNER BROS. ENTERTAINMENT   )
     INC.,                        )
9                                 )
                                  )
10   Plaintiffs,                  )
                                  )
11                                )
     v.                           )
12                                )
     HOTFILE CORP., ANTON TITOV   )
13   and DOES 1-10,               )
                                  )
14   Defendants.                  )

15

16

17           Continued Deposition of JAMES BOYLE

18                        Volume II

19               (Taken by the Plaintiffs)

20               Raleigh, North Carolina

21                   January 19, 2012

22

23

24   Reported by:    Marisa Munoz-Vourakis -
                      RMR, CRR and Notary Public
25   TSG Job # 45588

Page 205

1    APPEARANCE OF COUNSEL:

2    For the Plaintiffs:

3              DUANE POZZA, ESQ.

4              Jenner & Block

5              1099 New York Avenue, NW, Suite 900

6              Washington, DC 20001

7

8

9

10   For the Defendants:

11             DEEPAK GUPTA, ESQ.

12             Farella Braun & Martel

13             Russ Building

14             235 Montgomery Street, 17th Floor

15             San Francisco, CA 94104

16

17

18                        o0o

19

20             Continued Deposition of JAMES BOYLE,

21   taken by the Plaintiffs, at Office Suites Plus, 3737

22   Glenwood Avenue, Suite 100, Raleigh, North Carolina, on

23   the 19th day of January, 2012 at 9:38 a.m., before

24   Marisa Munoz-Vourakis, Registered Merit Reporter,

25   Certified Realtime Reporter and Notary Public.



[redacted]

Q. Have you ever taken a course in statistics?

A. No, I have not.

Q. Do you believe that you're qualified as a statistician?

A. No, I do not. In fact, I believe I said in my first expert report that I was not a statistician and did not purport to be a statistician.

[redacted]

[redacted]

I am not a statistician, as I've said many times in this report, and do not have the ability to go and perform that study. What I was suggesting was that

[redacted]

Page 292



13          So I don't think that anything in Sony or

14   the subsequent case law requires one to focus on

15   predominant use, as you have defined it, that is to

16   say, in terms of the number of infringing downloads as

17   a percentage of usages of the system.  I certainly know

18   of no law to that effect, and in fact, I believe the

19   Supreme Court to have indicated strongly that the

20   opposite is the case.

Page 300



22      Q.    Of the 1,750 files in Dr. Waterman's

23  statistical sample, do you know how many of those files

24  were only downloaded once?

25      A.    No, I don't.  I think I say so in the

report, but I don't know that.

Q. Did you ask Elysium Digital to give you a report as to whether any of the 6,182,360 files with only one registered downloads made it into the statistical sample?

A. No, I didn't.

[redacted]

[redacted]

Q. And you're not aware of how many one download files actually ended up in the sample?

MR. GUPTA: Objection, that's asked and answered.

A. No, I'm not.

[redacted]

12      Q.      Have you examined the notes field in the

13  database that Mr. Zebrak produced?

14      A.      If the notes field is the field at the end

15  where he lists, generally without comment, some URLs,

16  which I presume were the places that he went for

17  research, yes, in a few of the cases that I talk about

18  here, I have looked at them.

19      Q.      Have you looked at all of them?

20      A.      No, I have not.

21      Q.      Approximately -- for approximately what

22  percentage of the 1750 files have you looked at the

23  URLs that were listed in the notes field?

24          MR. GUPTA:   Objection, it's vague and

25      it calls for speculation.

1      A.      I'm genuinely unsure.  I would say I looked

2  through to try and get a sense of his methods, and so

3  if we're merely talking, looking through to get a sense

4  of his methods, the kinds of things that are in there,

5  then in that case, I looked at a fairly large number of

6  them, 150, 200, simply looking at what URLs were there,

7  not going to the URL and checking it out.

8      Q.      That was my next question.

9      A.      In terms of the ones where I actually went

10 and looked at the specific URL, certainly for the ones,

11 all of the examples that I mentioned here, and for a

12 number of others, I would say perhaps there are also

13 some of the files that were looked at in my first

14 study, so JDownloader, iREB, sn0wbreeze.  If one adds

15 all of those together, I would guess perhaps somewhere

16 between 25 and 40, but I couldn't be sure.  Not all of

17 them being specifically referred to in both reports

18 that is.

19     Q.      Those are ones where you clicked on a

20 specific URL?

21     A.      Where I clicked on a URL or attempted to

22 look at what the URL was.  I might have clicked on the

23 URL and also attempted to look for that material as

24 well.



22        Q.      And I believe you testified earlier that,

23   correct me if I'm wrong, that you looked at the -- you

24   had actually clicked on the links in the note section

25   for approximately 30 to 40 of the files in the sample?

A. I had clicked on some of the links in, I think I said I thought it was 20 to 40. The ones that I focused on most intensively are ones that have been mentioned in the reports that we've talked about here.

[redacted]

Page 334



16        Q.    Did you take a sample, a subsample of the

17    1750 sample files that was random and look at those to

18    see if you had any opinion as to whether or not

19    Mr. Zebrak's opinions as to the infringement status was

20    correct?

21        A.    No, I did not.

5      Q.    But sitting here today, you would not add

6    any -- if I'm understanding you correctly, you would

7    not add any files to the list of those that you believe

8    Mr. Zebrak classified erroneously in terms of its

9    infringement status, other than the ones that are

10    listed in your rebuttal report?

11      A.    As I sit here today, I don't have knowledge

12    of other files where I am satisfied enough, specific

13    files where I'm satisfied enough with my analysis to

14    come to a definite conclusion on that.  There are some

15    classes of files where I have concerns, but because of

16    the limitations of time and because, you know, I was

17    largely working on this, you know, under those

18    limitations of time, I simply wasn't able to

19    investigate all of them, and so I don't have specific

20    examples sitting here today, no.



18        Q.        Have you reviewed any of these files that

19   appear to be pornographic?

20        A.        No.

21        Q.        Have you reviewed any of the links for

22   these files that Mr. Zebrak provided for any of the

23   files that appear to be pornographic?

24        A.        When you say reviewed the links?

25        Q.        Have you clicked on the links?

1        A.      No, I have not.

2        Q.      Are any of these files short promotional

3    clips?

4        A.      I do not know.

5        Q.      You don't know.

6                So you've hypothesized that some could be

7    short promotional clips, right?

8        A.      Yes.

9        Q.      But you don't know if any of them are?

10       A.      I've hypothesized -- I think what I said in

11   general is for the reasons stated in the report, it's

12   very hard to classify the content with great certainty.

7       Q.      Do you have any knowledge of what -- how

8   many of the files that were actually in the study you

9   would classify as being teasers?

10      A.      No.  As I said, I didn't examine any of the

11  files in the study.

12      Q.      And do you have any knowledge of any files

13  that appear to be -- to you to be orphan works of any

14  sort?

15      A.      As I said, I didn't examine any of the

16  files in the study.  What I tried to do was to point

10        Q.      Do you have any reason to believe that

11   Mr. Zebrak did not look closely at files to make an

12   assessment of whether he thought the pornographic files

13   distribution of the pornographic tiles would be a fair

14   use?

15        A.      I don't know whether he did or not.  I note

16   that in other portions of this study, I was concerned

17   that he had not carried out a full fair use analysis.

18   So to the extent that concern carries over, it would be

19   replicated here.

20        Q.      There's nothing specific about the

21   pornographic files for which you think Mr. Zebrak did

22   not engage in a full, fair use analysis?

23        A.      I simply don't know.  My point was that in

24   this class, it was going to be harder to classify, and,

25   thus, the confidence interval will have highly likely

Page 439

1    infringing was going to be harder to reach.



2      Q.      Are you purporting to claim that this

3   allowed you to draw any opinions or conclusions about

4   Hotfile?

5      A.      I would say that these numbers indicate

6   that the category that Mr. Zebrak identified as

7   noninfringing had a much higher conversion rate, that

8   is to say, a rate of converting people to premium than

9   the confirmed infringing.

10            I'd say in addition, that Mr. Zebrak's

11   confirmed infringing category was the lowest of all of

12   the types of content, lower even than unknowable, and

13   so I think I can from that draw the conclusion that

14   Hotfile was gaining economic success from noninfringing

15   material, number one, I can conclude that; and number

16   two, that they were actually gaining more economic

17   success proportionately from noninfringing material

18   than from confirmed infringing or highly likely

19   infringing material.

20      Q.      Can you extrapolate these results from the

21   1750 files to the broader population of files on

22   Hotfile?

23      A.      I believe it is the assertion of

24   Dr. Waterman and Mr. Zebrak that the study can be

25   extrapolated.  I, for the reasons in this report, I

1   have problems with extrapolating the study, but this,

2   for the purposes of argument, I took their

3   classifications and accepted them.

4        Q.    Well, no, these numbers themselves you're

5   taking a different variable, the paid for variable,

6   right?  They didn't analyze that?

7        A.    That is correct.

8        Q.    And you're saying that you can take that

9   variable, calculate this conversion rate, which is

10  based on this other variable daily download total that

11  they did not consider?

12       A.    I believe they did consider.

13       Q.    Daily download total?

14       A.    Well, they looked at daily downloads,

15  excuse me.

16            MR. GUPTA:  Objection, this line of

17         questioning is obviously somewhat confusing

18         and complicated.

19            BY MR. POZZA:

20       Q.    I'm trying to figure out if these

21  conversion rates that you claim for different

22  categories of infringing and noninfringing content, are

23  you claiming that those conversion rates would

24  extrapolate to the entire population of files or

25  downloads on Hotfile?

1          MR. GUPTA:   Objection, to the extent

2      it seeks a statistical analysis.

3      A.     What I'm claiming is that if Dr. Waterman

4   and Mr. Zebrak were correct about, first of all, the

5   statistical representativeness of their study, about

6   which I raise questions, and also the accuracy of it,

7   about which I raise questions, but if we assume that

8   for the sake of argument they are claiming that it

9   provides a generalizable representative picture of

10  Hotfile, if they take their assumption, the assumption

11  they make in their report, then I would expect that the

12  paid for could be extrapolated to the rest of Hotfile.

13     Q.     Would it be extrapolated in the way that

14  you have done here?

15     A.     I think a court might extrapolate it in any

16  number of ways.  I think if their argument is correct,

17  and they are presenting estoppel from which conclusions

18  can be extrapolated, then their sample and their

19  classifications with this one extra piece of

20  information, namely, the sample paid for is a

21  percentage of daily download totals.

22     Q.     Is that based on your understanding of the

23  statistical methods that Dr. Waterman employed?

24     A.     It's based on my understanding that

25  Dr. Waterman claims that his study is a statistically

Page 449

1    representative picture of Hotfile.  As I said, I'm

2    assuming that for the sake of argument.  I don't

3    actually accept that it's a statistically

4    representative picture, but assuming it for the sake of

5    argument, then one would be able to extrapolate.

6         Q.    But to be clear, Dr. Waterman does not

7    analyze this paid for variable, right?

8         A.    That is correct.

9         Q.    Or this conversion rate variable?

10        A.    That is correct.

Page 462

1                    SIGNATURE PAGE

2          you.

3               (Whereupon the deposition was

4          concluded at 5:43 p.m.)

5               (Signature reserved.)

6                                    Digitally signed by James Boyle
                                     DN: cn=James Boyle, o, ou,
7          _____ email=boyle@law.duke.edu, c=US
                                     Date: 2012.01.31 15:55:27 -05'00'

8          JAMES BOYLE

9

10

11   SUBSCRIBED AND SWORN to before me this _____

12   day of_____, 2012

13

14

15          _____

16               NOTARY PUBLIC

17

18   My Commission expires:_____

19

20

21

22

23

24

25

 1                C E R T I F I C A T E

 2         I, Marisa Munoz-Vourakis, RMR, CRR and Notary Public,

 3    the officer before whom the foregoing proceeding was

 4    conducted, do hereby certify that the witness(es) whose

 5    testimony appears in the foregoing proceeding were duly

 6    sworn by me; that the testimony of said witness(es) were

 7    taken by me to the best of my ability and thereafter

 8    transcribed under my supervision; and that the foregoing

 9    pages, inclusive, constitute a true and accurate

10    transcription of the testimony of the witness(es).

11         I do further certify that I am neither counsel for,

12    related to, nor employed by any of the parties to this

13    action in which this proceeding was conducted, and

14    further, that I am not a relative or employee of any

15    attorney or counsel employed by the parties thereof, nor

16    financially or otherwise interested in the outcome of the

17    action.

18    IN WITNESS WHEREOF, I have hereunto subscribed my name

19    this 23rd of January, 2012.

20

21

22                    _____
                          MARISA MUNOZ-VOURAKIS

23                         Notary #20032900127

24

25