Sealed

# FILED UNDER SEAL

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.: 11-CIV-20427-WILLIAMS/TURNOFF



DISNEY ENTERPRISES, INC.,
TWENTIETH CENTURY FOX FILM CORPORATION,
UNIVERSAL CITY STUDIOS PRODUCTIONS LLLP,
COLUMBIA PICTURES INDUSTRIES, INC., and
WARNER BROS. ENTERTAINMENT INC.,

       *Plaintiffs,*

v.

HOTFILE CORP., ANTON TITOV, and
DOES 1-10.

       *Defendants.*

_____/

HOTFILE CORP.,

       *Counterclaimant,*

v.

WARNER BROS. ENTERTAINMENT INC.,

       *Counter-Defendant.*_____/

## MEMORANDUM OF LAW OF DEFENDANTS HOTFILE CORPORATION AND ANTON TITOV IN OPPOSITION TO PLAINTIFFS' MOTION TO STRIKE PORTIONS OF BOYLE, CROMARTY, AND TITOV DECLARATIONS

**FILED UNDER SEAL**                    CASE NO.: 11-CIV-20427-WILLIAMS/TURNOFF

## CITATION LEGEND

1.      "PSUF" shall refer to specific paragraph numbers of Plaintiffs' Statement of Uncontroverted Facts.

2.      "DSUF" shall refer to specific paragraph numbers of Statement of Undisputed Material Facts In Support of Motion of Defendants Hotfile Corporation for Partial Summary Judgment Based on the Digital Millennium Copyright Act Safe Harbor.

3.      "TSUF" shall refer to specific paragraph numbers of Statement of Undisputed Material Facts In Support of Motion of Anton Titov's Motion for Summary Judgment.

4.      "DRSF" shall refer to specific paragraph numbers of the Statement of Facts of Defendants Hotfile Corporation and Anton Titov In Opposition to Plaintiffs' Statement of Uncontroverted Facts and Defendants' Statement of Additional Material Facts.

5.      "Foster Decl." shall refer to the declaration of Dr. Ian Foster in support of Plaintiffs' Motion for Summary Judgment Against Defendants Hotfile Corp. and Anton Titov, dated February 17, 2012.

6.      "Zebrak Decl." shall refere to the declaration of Scott Zebrak Foster in support of Plaintiffs' Motion for Summary Judgment Against Defendants Hotfile Corp. and Anton Titov, dated February 17, 2012.

7.      "Yeh Decl." shall refer to the declaration of Jennifer V. Yeh in support of Plaintiffs' Motion for Summary Judgment Against Defendants Hotfile Corp. and Anton Titov, dated February 17, 2012.

8.      "Titov Decl." shall refer to the declaration of Anton Titov in support of Defendants' Motion for Summary Judgment.

9.      "Titov Opp. Decl." shall refer to the declaration of Anton Titov in support of Defendants' Opposition to Plaintiffs' Motion for Summary Judgment.

10.      "Leibnitz Decl." shall refer to the declaration of Andrew Leibnitz in support of Defendants' Opposition to Plaintiffs' Motion to Strike Portions of Boyle, Cromarty, and Titov Declarations.

11.      "Gupta Decl." shall refer to the declaration of Deepak Gupta in support of Defendants' Motion for Summary Judgment.

13.      "Levy Decl." shall refer to the declaration of Dr. Daniel S. Levy in support of Defendant's Opposition to Plaintiffs' Motion for Summary Judgment.

-i-

**FILED UNDER SEAL**          CASE NO.: 11-CIV-20427-WILLIAMS/TURNOFF

    14.    "Cromarty Decl." shall refer to the declaration of Dr. Andrew Cromarty in support of Defendant's Opposition to Plaintiffs' Motion for Summary Judgment.

    15.    "Boyle Decl." shall refer to the declaration of Dr. James Boyle in support of Defendant's Opposition to Plaintiffs' Motion for Summary Judgment.

    16.    "Leibnitz Ex. __," shall refer to exhibits attached to the Leibnitz Declaration.

    17.    "Yeh Ex. __," shall refer to exhibits attached to the Yeh Declaration.

    18.    "Gupta Ex. __," shall refer to exhibits attached to the Gupta Declaration.

    19.    "Schoenberg Ex. __," shall refer to exhibits attached to the Schoenberg Declaration.

    20.    "Boyle Ex. __," shall refer to exhibits attached to the Boyle Declaration.

    21.    "Thamkul Decl." shall refer to the declaration of Janel Thamkul in support of Defendants' Opposition to Plaintiffs' Motion for Summary Judgment.

    22.    "Thamkul Ex. __," shall refer to exhibits attached to the Thamkul Declaration.

    23.    "Titov Reply Decl." shall refer to the declaration of Anton Titov in support of Defendants' Reply in support of their Motion for Partial Summary Judgment.

    27.    "PMSJ" shall refer to Plaintiffs' Motion for Summary Judgment Against Defendants Hotfile Corp. and Anton Titov.

    28.    "Yeh Strike Decl." shall refer to the Declaration Of Jennifer V. Yeh In Support Of Plaintiffs' Motion To Strike Portions Of Declarations Of Professor James Boyle, Dr. Andrew Cromarty, & Anton Titov In Support Of Defendants' Opposition To Plaintiffs' Motion For Summary Judgment.

    29.    "Levy Evid. Decl." shall refer to the declaration of Dr. Daniel S. Levy in support of this brief (Defendants' Opposition To Plaintiffs' Motion To Strike Portions Of Boyle, Cromarty, And Titov Declarations).

**FILED UNDER SEAL**                    CASE NO.: 11-CIV-20427-WILLIAMS/TURNOFF

II.      INTRODUCTION ................................................................................1

III.     LEGAL ARGUMENT .........................................................................1

   A.    Professor Boyle Properly Offers Admissible Testimony .........................1

       1.   Professor Boyle's Background And His Expert Reports...........................1

       2.   Professor Boyle Remains Well-Qualified To Testify That The
            Waterman/Zebrak Study Failed To Consider The "Fair Uses" Of
            Storage And Space-Shifting ...............................................................2

       3.   Professor Boyle Properly Critiques Mr. Zebrak's Methodology ..............4

       4.   Professor Boyle Is Qualified To Perform Elementary Mathematical
            Division So As To Comment On "Conversion Rates" Of The
            Downloads Sampled By Plaintiffs.........................................................7

       5.   Given That Plaintiffs Rely Upon A Copyright Lawyer To Opine
            On The Ultimate Legal Status Of Files On 1,750 Occasions,
            Plaintiffs Cannot Credibly Seek To Strike Professor Boyle's
            Testimony Simply Because It Takes Into Account The Operative
            Case Law ........................................................................................8

   B.    Plaintiffs' Argument For Striking Dr. Cromarty's Declaration Is Baseless.........10

       1.   Dr. Cromarty Is Well Qualified To Opine On Matters Related To
            Erroneous Takedowns .......................................................................10

       2.   Dr. Cromarty Properly Relied On An Academic Report..........................13

       3.   Dr. Cromarty Covered This Topic In His Report And At His
            Deposition........................................................................................13

   C.    Anton Titov's Testimony Is Admissible ...............................................14

       1.   Mr. Titov's Testimony About Hotfile's Implementation Of Hash-
            Blocking In August 2009 In No Way Conflicts With His
            Deposition........................................................................................14

       2.   Mr. Titov's Testimony About Andrew Ianakov In No Way
            Conflicts With His Deposition Testimony ..............................................15

       3.   Mr. Titov Bases His Testimony About Ms. Justin's Attempted File
            Transfers From Hotfile To RapidShare On Personal Knowledge............16

       4.   Hotfile Had No Duty to Produce Google Analytics Information,
            And Plaintiffs Cannot Blame Hotfile For Their Own Failure To
            Pursue It..........................................................................................17

IV.      CONCLUSION ..................................................................................20

26501\3005566.5

FILED UNDER SEAL                              CASE NO.: 11-CIV-20427-WILLIAMS/TURNOFF

## I.    **INTRODUCTION**

Plaintiffs blind themselves to inconvenient testimony, and by this Motion ask the Court to do the same.  However, Professor James Boyle – a professor of copyright law at Duke University Law School – is well-qualified to explain why Plaintiffs' statistical study of alleged copyright infringement is flawed by failing to include over half of the files stored at Hotfile.  Likewise, Dr. Andrew Cromarty's three decades of experience in designing, organizing, and operating internet businesses amply qualifies him to testify regarding erroneous takedowns.  Nor can Plaintiffs properly exclude testimony from Anton Titov regarding sources of traffic to Hotfile simply because they failed to ask him the questions in deposition.  Plaintiffs' Motion should be denied.

## II.    **LEGAL ARGUMENT**

### A.    **Professor Boyle Properly Offers Admissible Testimony**

#### 1.    **Professor Boyle's Background And His Expert Reports**

Professor Boyle holds the William Neal Reynolds Distinguished Chair at Duke Law school, where he teaches intellectual property law.  Boyle Decl. ¶ 1.  Through twenty years of experience in the discipline, he has become one of the nation's leading experts on the interrelationship between copyright law, the public domain, open source software, fair use, free licensing, incentives for innovation, and the Internet.  Boyle Decl. ¶¶ 1-5; Ex. 1, ¶¶ 1-4.  His works include the American Society for Information Science and Technology "Book of the Year" in 2009 and winner of the Donald McGannon Award for Communications Policy.  Professor Boyle's qualifications and accolades are summarized further in his declaration.  *Id.*

Professor Boyle's opening expert report demonstrated that (i) the most popular files on Hotfile are open source software programs that by definition do ***not*** infringe any copyrights; (ii) the authors  of those files explicitly authorize their distribution on Hotfile; and (iii) these developers use Hotfile's affiliate program as a perfectly legitimate and socially-beneficial means of compensation.  His testimony showed that Hotfile democratizes content distribution by providing means for any internet users to popularize their work, thus giving voice to populations never served by mainstream outlets such as those operated by Plaintiffs.  In his rebuttal expert report, Professor Boyle caught error after error in one of the centerpieces of Plaintiffs' case:  a purported statistical study designed to show "overwhelming infringement" on Hotfile.  This study was "weighted" to entirely exclude large amounts of fair use storage and space-shifting, and was premised on 1,750 biased legal judgments by one of the content industry's own lawyers.

FILED UNDER SEAL                          CASE NO.: 11-CIV-20427-WILLIAMS/TURNOFF

    **2.**      **Professor Boyle Remains Well-Qualified To Testify That The Waterman/Zebrak Study Failed To Consider The "Fair Uses" Of Storage And Space-Shifting**

Plaintiffs seek to block Professor Boyle from testifying that the sizeable populations of zero-download and one-download files that were deliberately excluded from the Waterman-Zebrak study are likely fair uses.   Boyle Decl. ¶¶ 11-12, 19-20; Ex. 2, ¶¶ 10-27, 37-29.  It is well-settled that a statistical study which excludes relevant populations of data is subject to critique and exclusion.  *See, e.g., Gencom, Inc. v. F.C.C.*, 832 F.2d 171, 186 (D.C. Cir. 1987) ("exclusion of residential demand from [cell phone demand study focused solely on businesses] was inadequately substantiated" and "nothing more than a restatement of the assumption itself"); *Brokerage Concepts, Inc. v. U.S. Healthcare, Inc.*, 140 F.3d 494, n.14 (3d Cir. 1998) ("[a] proper universe must be examined"; market share survey was improper where data was gathered from 20 pharmacies but data from only14 pharmacies who identified "hard bargaining" civil RICO defendant as their "largest customer" was tabulated and used).

Only a copyright expert – not a statistician – can explain fully the ramifications of the Waterman/Zebrak study's deliberate exclusion of over *50 million* zero-download files and one of the most important uses of a cyberlocker, namely, storage.  Professor Boyle is uniquely qualified to opine on this flaw in the study design, just as it would be appropriate for a cardiologist who was not a statistician to opine that a statistical study of heart conditions that included only men would not be representative of the human population as a whole.  *See Cambridge University Press v. Becker*, 2010 WL 6067575, 2 (N.D. Ga. 2010) (motion to exclude expert report of attorney with decades of expertise on fair use denied; "the fact that he does not have a degree in statistics . . . does not render his expert report unreliable"); *Peckham v. Continental Cas. Ins. Co.*, 895 F.2d 830, 837 (1st Cir. 1990) ("plaintiffs started this particular ball rolling by presenting [similar] expert testimony in their case in chief…")

Plaintiffs' attempt to preclude Professor Boyle from rebutting the subject matter of the Waterman-Zebrak study contradicts their earlier arguments to this Court that "rebuttal experts need not use the same methodology to discuss a subject matter as the experts they rebut."  *See* Opp. To Mot. To Strike Waterman [Docket No. 232] at 5.  Plaintiffs' criticism of Professor Boyle is particularly ironic because, even though Dr. Waterman is a statistician, Plaintiffs did not rely on his expertise to design the sample of Hotfile files presented in this case.  Rather, Dr. Waterman was "tasked" by Plaintiffs' counsel with studying only files that had been downloaded

FILED UNDER SEAL                    CASE NO.: 11-CIV-20427-WILLIAMS/TURNOFF

– *i.e.*, *the decision to exclude storage and space-shifting was dictated by Plaintiffs' counsel*. Waterman Decl., Ex. 3.  In short, Plaintiffs try to use an expert study to camouflage the fact that they are assuming their conclusion – that storage is not a relevant part of the use of a cyberlocker site – yet they object when the Defendants' experts point this out.

    Plaintiffs' threshold assumption that statistics are somehow necessary to understand the non-infringing and fair uses of a system under *Sony* and *Grokster* is incorrect.  Mot. at 3.  *Sony* held that "in order to resolve this case we *need not give precise content to the question of how much use is commercially significant*…"  All that was necessary to defeat any claim of infringement liability was "one potential use of the Betamax[:]… private, noncommercial time-shifting in the home."  *Sony Corp. v. Universal City Studios, Inc.*, 464 U.S. 417, 442 (1984). While the *Grokster* Court noted the statistical incidence of infringement, it *held*, we "do not revisit *Sony* further, as MGM requests, to add a more quantified description of the point of balance between protection and commerce when liability rests solely on distribution with knowledge that unlawful use will occur."  *Id.* at 934.  Moreover, *Grokster* held that "the commercial sense of their enterprise turns on high-volume use, which the record shows is infringing," so this *Grokster* factor looks to the "use" of the system as a whole, not "downloads" in particular.  *Id.* at 940.  These cases guide us to look at the uses of accused systems under copyright principles and expressly disclaim any definitive role for statistics in doing so.  Thus, excluding Professor Boyle based on lack of statistical training defies justifiability.

    Moreover, *Sony* and *Grokster* both require the Court to look at the uses of the technology *overall*.  *Sony*, 464 U.S. at 442 ("whether the Betamax is capable of commercially significant noninfringing uses"); *MGM*, 545 U.S. at 922-3, 936-37 (non-infringing uses considered; decision required "clear expression or other affirmative steps" of intent to infringe).   The notion that Plaintiffs could design a study of what they themselves have called a cyber*locker* (*i.e.*, cyberspace *storage facility*) that omits zero download storage and one download space-shifting flies in the face of those precedents.  Plaintiffs' justification of this decision – *i.e.*, that "[d]istribution of files is the stated purpose and overwhelming use of Hotfile" – *assumes* what the statistics are supposedly intended to demonstrate regarding uses of Hotfile.  Because the study deliberately excludes key non-distribution "uses," Plaintiffs' study fails to show that distribution is the overwhelming or even primary use.  This renders the study circular and

misleading – facts which Plaintiffs cannot justifiably prevent Professor Boyle from presenting to the finder of fact.

Professor Boyle's credentials cannot seriously be questioned, nor can his testimony regarding the fair uses that were excluded because of the design of the Waterman-Zebrak study. Such testimony is necessary to provide a complete view of the use of Hotfile, something which is required under *Sony* and *Grokster*. Allowing the Waterman-Zebrak "weighted sample" which gives storage and space-shifting "zero weight" to be presented to a fact-finder without permitting rebuttal from Professor Boyle would present an unfair and distorted view of Hotfile. His testimony should be allowed.[1]

### 3.    Professor Boyle Properly Critiques Mr. Zebrak's Methodology

It is completely appropriate for a rebuttal expert to opine on the methodological errors of an opponent. *See, e.g., Dorn v. Burlington Northern Santa Fe Railroad Co.*, 397 F.3d 1183, 1195-1196 (9th Cir. 2005) (district court committed error in excluding defense expert called to discredit opinions of plaintiff's damages expert). Moreover, the basis for Plaintiffs' challenge to Professor Boyle's criticisms of Mr. Zebrak – that his testimony "lacks any connection to the actual facts and is speculative" (Mot. at 5) – is fatuous. The sole basis for this argument is that Professor Boyle did not look at every one of the 1,750 files that were part of the Waterman / Zebrak study. This is unfounded. Professor Boyle in fact spent many days and hours carefully studying a substantial number of individual files that reside on Hotfile's servers – both metadata and content – including files in the Waterman / Zebrak study, and he oversaw the scrutiny of many additional files by the team working under his direction. *See* Boyle Decl., Ex. 1 (Boyle Opening Report) at 3, 6-17; Ex. 2 (Boyle Rebuttal Report) at 15-22. He also analyzed hundreds of pages of licenses and webpages bearing upon the licensing status of the files discussed in the Waterman-Zebrak study. Boyle Decl., Ex. 2 at 15-22.

Furthermore, as Plaintiffs' themselves assert, Professor Boyle's criticisms are in substantial part directed not at Mr. Zebrak's assessment of individual files but, rather, at the

---

[1] Citing an erroneous figure, Plaintiffs argue that one-download space-shifting is "immaterial" because it represents ".002% [sic] of all downloads from Hotfile." Mot. at 3-4 & n.3. Ignoring their bad math, ***one-download files represent 5.76% of the files stored at Hotfile***. Boyle Decl. ¶ 12. This is hardly immaterial. Plaintiffs attempt to diminish the appearance of lawful space-shifting by calculating space-shifting as a fraction of downloads rather than files. By definition, files downloaded only once will represent a small fraction of total downloads. However, what matters are the ***uses*** of Hotfile – not merely the ***downloads***. *Sony*, 464 U.S. at 417.

FILED UNDER SEAL                     CASE NO.: 11-CIV-20427-WILLIAMS/TURNOFF

*design of the study* and on his *methodology*.  Neither law nor logic supports Plaintiffs'
suggestion that reviewing every one of the 1,750 files is compulsory in order to render such
opinions.  Indeed, Professor Boyle identified a number of errors that undermine any confidence
in Mr. Zebrak's study, as follows:

> • One Download Storage/Space-Shifting. Mr. Zebrak did not consider the
possibility that files with one download (or a few downloads) might be storage or space-shifting.
Even though Hotfile is a "cyber*locker,*" he *assumed* that the uploader and downloader for each
file were different.  ***It does not require actually looking at the content of each and every file in
the sample to realize this is a fundamental methodological and design error that ignores fair
use.***  (Boyle Decl. ¶ 20)  In any event, "as a general rule, questions relating to the bases and
sources of an expert's opinion affect the *weight* to be assigned that opinion rather than its
*admissibility* and should be left for the jury's consideration."  *Primrose Operating Co. v. Nat'l
American Ins. Co.,* 382 F.3d 546, 562 (5th Cir. 2004).  *See  Allapattah Services, Inc. v. Exxon
Corp.*, 61 F. Supp. 2d 1335, 1350 (S.D. Fla. 1999) (denying challenge to expert's "selection of
data" because it goes "more to weight rather than to reliability"); *Microfinancial, Inc. v. Premier
Holidays Int'l, Inc.*, 385 F.3d 72, 80-81 (1st Cir. 2004) ("objection regarding scope of [expert's]
investigation . . . goes to weight, not admissibility"); *Miles v. General Motors Corp.*, 262 F.3d
720, 724 (8th Cir. 2001) (rejecting challenge to experts based on the data they reviewed because
it "goes to weight that the jury accords the testimony rather than its admissibility"). [2]

> • Adult Content. Mr. Zebrak made indefensible judgments regarding adult content
files – which comprise approximately 20% of Dr. Waterman's sample.  Adult content is difficult

---

[2] The cases Plaintiffs cite are distinguishable as each involved expert testimony that was
irrelevant and/or otherwise totally disconnected from the facts of the case. *See Williams v.
Michelin North America, Inc.*, 381 F. Supp. 2d 1351, 1358, 1362 (M.D. Fla. 2005) (expert – "a
professional advocate, dressed in scientific garb" – rendered opinion that "does not fit the facts
of the case" because he opined that 10-year old tire was defective for lacking an expiration date
but did not say what date would have been appropriate, rendering the opinion irrelevant); *Bauer
v. J.B. Hunt Transport, Inc.*, 150 F.3d 759, 765 (7th Cir. 1998) (expert's opinion had no
connection to the facts of the case and, instead, merely discussed factors that, in the abstract,
could cause a certain type of accident); *Shepherd v. Michelin Tire Corp.,* 6 F. Supp. 2d 1307,
1312 (N.D. Ala. 1997) (expert in failure to warn case could not testify that there was any
probability that his proposed warning would have averted the accident).  Curiously, Plaintiffs
incorrectly state that the expert in *Bauer* was a "law professor" – the opinion clearly states that
he was a "professor of law *enforcement*," which is quite different.  *Bauer*, 150 F.3d at 765.

to classify and, as Professor Boyle pointed out, these same Plaintiffs and attorneys have excluded pornography from their samples in other indirect copyright infringement cases. This content resists easy classification in part because it is often given away on the internet for free as a means for generating demand. This is well-established in the literature, and, notably, though Plaintiffs have taken the liberty of providing reply declarations with previously undisclosed expert testimony on a variety of issues, they have conspicuously not provided any rebuttal to this basic premise of Professor Boyle's testimony. Indeed, Mr. Zebrak *confirmed,* when challenged in deposition, that adult files that he had categorized as "highly likely infringing," actually were "closer calls" in terms of fair use and authorization. Boyle Decl. ¶¶ 20-22. This is a categorical criticism of Mr. Zebrak's *method* of analyzing adult content – which Plaintiffs' do not dispute made up a significant part of the Waterman / Zebrak sample – and *does not require viewing every individual file* (which even Mr. Zebrak himself did not do). Zebrak Decl. ¶ 5.

- Software and Public Domain Material. Mr. Zebrak repeatedly made errors with software and public domain material. Mr. Zebrak assumed that if a work is being sold somewhere on the Internet, then its distribution on Hotfile must be infringing. This basic assumption led to untold numbers of errors. *Professor Boyle did review these individual files – appropriately – in order to ascertain these blatant errors in Mr. Zebrak's work.* Mr. Zebrak mistakenly asserted that an 1871 book was still under copyright, because an obviously different version of the book was being sold on Amazon.com. Further, as Professor Boyle points out in the passages Plaintiffs wish to strike, Mr. Zebrak had considerable problems with material that is distributed with permission. He mischaracterized software from Microsoft and Sun Microsystems – that is plainly redistributable by the express terms of the relevant licenses – as infringing, apparently because other software by these companies is sold for profit on other internet sites. He incorrectly assumed that because a game called "farming simulator" is commercially distributed, "gaming mods" for that game must be infringing, despite the fact that the company involved actually encouraged users to create such mods and gave them tools to do so. This error alone affected nine separate judgments. He did not realize that people might create high quality training videos on photography and software programming and give these away for free to promote themselves or for altruistic aims. Mr. Zebrak assumed that such authorized redistribution is "rare" "outlier" behavior, which is why he inferred just by looking at files and seeing professionally produced high quality content that these files were highly "likely"

FILED UNDER SEAL                          CASE NO.: 11-CIV-20427-WILLIAMS/TURNOFF

infringing.  When confronted with the redistributable licenses for these software files and affidavits from content owners whom Hotfile was able to contact saying they did not object to distribution on Hotfile, Mr. Zebrak repeatedly conceded that his classifications of files as "highly likely infringing" actually may have presented "closer calls" and required more investigation. Boyle Decl. ¶ 23 (a)-(e).

Far from having "no basis" for his criticisms or being "speculative" as Plaintiffs' proclaim, Professor Boyle's critique of Mr. Zebrak's methodology was based on each of the above enumerated hard facts (and more).  Given the profound problems with Mr. Zebrak's study, Professor Boyle's broad based methodological critique should be heard in order to rebut Mr. Zebrak's incorrect assessment.[3]  *See Walker v. Soo Line Railroad Co.*, 208 F.3d 581, 586-590 (7th Cir. 2000) (district court abused its discretion in limiting and excluding experts; court rejected argument that their testimony was based on inadequate facts and too speculative).

> **4.   Professor Boyle Is Qualified To Perform Elementary Mathematical Division So As To Comment On "Conversion Rates" Of The Downloads Sampled By Plaintiffs**

Plaintiffs rely on Dr. Waterman's reported infringement rate of 90.3% in January 2011 to assert that Hotfile depends upon massive copyright infringement.  PMSJ at 1.  Responding to this, Professor Boyle noted that non-infringing downloads in Dr. Waterman's study resulted in five times as many premium subscriptions (so-called "conversions") as "confirmed infringing" downloads, and twice as many subscriptions as "highly likely infringing" downloads.  Boyle Decl., Ex. 2 ¶ 53.  Thus, *using the very downloads examined by Plaintiffs to supposedly prove Hotfile's dependence on infringement*, Professor Boyle demonstrated that Hotfile generated comparatively more sales from non-infringing works than allegedly-infringing works – draining any logic from Plaintiffs' argument that Hotfile depends on infringement.  *Id.*; PMSJ at 1.

---

[3] The fact that Mr. Zebrak used nomenclature (*e.g.*, "highly likely infringing") that has been used in other cases (Mot. at 4-5) does not mean his methodology and conclusions are reliable here.  In each of the four "numerous cases" cited by the Plaintiffs as purportedly accepting this nomenclature as "reliable," the statistical sample *was not limited to downloaded files*.  *See Grokster*, 545 U.S. at 933 (analysis of "works available"); *Arista Records LLC v. Lime Group LLC*, 784 F. Supp. 2d 398, 438 (S.D.N.Y. 2011) (study of "files available"); *Arista Records LLC v. Usenet.com, Inc.*, 633 F. Supp. 2d 124, 158 (S.D.N.Y. 2009) (study of "all content files offered"); *Columbia Pictures Indus., Inc. v. Fung*, No. CV 06-5578 SVW (JCX), 2009 WL 6355911, at *8 (C.D. Cal. Dec. 21, 2009) (study of "files available").  As discussed above, the Waterman / Zebrak study excluded more than half of the files uploaded to Hotfile.

FILED UNDER SEAL                    CASE NO.: 11-CIV-20427-WILLIAMS/TURNOFF

Plaintiffs seek to strike Professor Boyle's testimony on grounds that he did not perform statistical computations regarding weighting of the sample, the margin of error, and statistical significance. Mot. at 7; Waterman Reply Decl. ¶¶ 4-8. However, as explained by Hotfile's statistician Dr. Daniel Levy, *such computations only apply when attempting to apply conclusions from a sampled population to a broader population*. Levy Evid. Decl. ¶¶ 3-9. Here, Professor Boyle simply remarks upon the conversion rates of the 1,750 downloads under consideration by Plaintiffs themselves without attempting to opine about Hotfile's downloads generally, which neither he nor Dr. Waterman sampled. Boyle Decl., Ex. 2 ¶ 53; Docket No. 217 at 3 & n.3.[4] There is no statistical variance to calculate, nor confidence interval, nor margin of error, because Professor Boyle did not sample anything. Boyle Decl., Ex. 2 ¶ 53. He knows with 100% certainty that the conversion rate for the downloads sampled by Dr. Waterman was 0.1074% for non-infringing files because the number of conversions for noninfringing files (699) divided by the downloads of non-infringing files (650,727) equals 0.1074% without any doubt. *Id.* Likewise, he knows with absolute mathematical certainty that the conversion rate for the sampled "confirmed infringing" downloads was 44 divided by 215,302, or 0.0204%. *Id.* Accordingly, as a matter of elementary mathematics, the conversion rate for non-infringing downloads exceeded that of "confirmed infringing" downloads by a factor of more than five to one. *Id.* One does not need training in statistics to perform math. *See Cambridge University Press v. Becker*, 2010 WL 6067575, 2 (N.D. Ga. 2010) ("the fact that [attorney] does not have a degree in statistics, economics, or computer science does not render his expert report unreliable"); *S. Cement Co. v. Sproul*, 378 F.2d 48, 49 (5th Cir. 1967) ("[A] person may become qualified as an expert by practical experience . . . Professional education is not a prerequisite.").

> **5.    Given That Plaintiffs Rely Upon A Copyright Lawyer To Opine On The Ultimate Legal Status Of Files On 1,750 Occasions, Plaintiffs Cannot Credibly Seek To Strike Professor Boyle's Testimony Simply Because It Takes Into Account The Operative Case Law**

---

[4] At deposition, Professor Boyle testified that extrapolation of conversion rates from Dr. Waterman's sample to a broader population of downloads or files "*could*" be performed using statistical principles, Boyle Dep. at 447:20-448:12 (emphasis added) (Leibnitz Decl., Ex. 14), but that – for the purposes of this litigation – he rebutted Dr. Waterman and Mr. Zebrak by simply using their own sample against them. *See id.* at 447:2-3 ("[F]or the purposes of [this] argument, I took their classifications and accepted them."). In any event, Dr. Waterman's criticism of Professor Boyle's "conversion rates" analysis as statistically unsound when applied to a broader population is itself indefensible. *See* Levy Evid. Decl. ¶¶ 10-19.

FILED UNDER SEAL                    CASE NO.: 11-CIV-20427-WILLIAMS/TURNOFF

The Federal Rules of Evidence permit an expert to give opinions on matters of specialized knowledge so long as the testimony "will assist the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702. In the context of legal experts, "courts and commentators have consistently concluded that expert testimony that ordinarily might be excluded on the ground that it gives legal conclusions may nonetheless be admitted in cases that involve highly technical legal issues." *U.S. v. Offill*, 666 F.3d 168, 175 (4th Cir. 2011); *citing United States v. Bilzerian*, 926 F.2d 1285, 1294 (2d Cir.1991) ("Particularly in complex cases . . . expert testimony may help a jury understand unfamiliar terms and concepts"); *Peckham v. Cont'l Cas. Ins. Co.*, 895 F.2d 830, 837 (1st Cir.1990) (expert testimony on proximate causation in insurance law was properly admitted because experts "could reasonably be expected to shed some light in a shadowy domain"). Courts in the Eleventh Circuit have endorsed the principle that "[e]xpert testimony on issues of law may be admitted in certain complex cases." *Dubiel v. Columbia Hosp. (Palm Beaches) Ltd. Partnership*, 2005 WL 5955691, at *5 (S.D. Fla. Jan. 11, 2005); *see United States v. Barnette*, 800 F.2d 1558, 1568 (11th Cir.1986) (affirming admission of expert testimony of tax law in prosecution for tax fraud). It is well-established that "copyright is a particularly intricate area of the law," especially regarding questions of non-infringement and fair use. *Palmer v. Braun*, 2005 WL 3093409 at *3 (M.D. Fla. Jan. 11, 2005); *Spectrum Creations, L.P. v. Carolyn Kinder Intern., LLC*, 2007 WL 1217917 at *16 (W.D. Tex. April 17, 2007); *see Maxtone-Graham v. Burtchaell*, 803 F.2d 1253, 1259 (2nd Cir. 1986) ("fair use determination often requires a complex and subtle evaluation of numerous mixed issues of fact and law.")

Professor Boyle teaches copyright law as his profession. Boyle Decl. ¶¶ 1-5 & Ex. 1 ¶¶ 1-4. Distillation of the complex Supreme Court precedent in *Sony* regarding a difficult area of law is precisely the type of expert legal testimony admissible under Rule 702. *See supra*.

In contrast to Plaintiffs' legal expert, Scott Zebrak, Professor Boyle avoids making ultimate conclusions of law. *See Montgomery v. Aetna Cas. & Sur. Co.*, 898 F.2d 1537, 1541 (11th Cir.1990) (noting that an expert witness cannot testify regarding ultimate legal conclusions nor on the legal implications of conduct). Professor Boyle relies on *Sony* to show: (i) the need to consider not just current but potential uses of accused technologies, Boyle Decl., Ex. 1, ¶ 35 & n. 31; (ii) the propriety of space-shifting as fair use, *id.*, Ex. 2, ¶¶ 11, 27 & n.14; and (iii) the policy and Constitutional underpinnings of this Supreme Court precedent. *Id.* ¶ 48. He carefully

avoids intrusion on the province of the Court. *See* Boyle Decl., Ex. 1 ¶ 33 ("The court will make its own assessment of whether Hotfile has substantial non-infringing uses and whether Hotfile 'induces' infringement."). In contrast, Scott Zebrak decides for the jury that Hotfile users committed copyright infringement in relation to 1,579 of the 1,750 files sampled in January 2011. Zebrak Decl. ¶ 19(e). He leaves no room for application of the law to the facts, but does that himself, defying jurors to exercise their own judgment instead of blindly acquiescing in his 1,750 rulings garbed in the mantle of "expert" testimony. Where Professor Boyle's assistance to the jury in reaching their own conclusion is proper, Mr. Zebrak's usurpation of the jury's role is not. *See Lozano v. City of Hazleton*, 241 F.R.D. 252, 256 (M.D. Pa. 2007) (admitting testimony from leading expert on immigration law – "a large and complex body of [law]" – to "help us to reach our own decision about the constitutionality of the ordinances" while noting that legal conclusions on ultimate question of legality "would be inappropriate").

Additionally, Professor Boyle's testimony should not be excluded simply for mentioning the very case law that Mr. Zebrak applies. An expert is required to provide a "complete statement" of his or her opinions and the basis for such opinions. Fed. R. Civ. P. 26(a)(2)(B)(i). Mr. Zebrak's failure to disclose the case law which he interprets only serves to demonstrate the insufficiency of his opinion – and should not disqualify any part of Professor Boyle's testimony.

In short, Plaintiffs cannot justify excluding Professor Boyle's testimony whenever it mentions *Sony*.[5] However, if this Court concludes that legal experts are not sufficiently helpful to the Court to be admitted under Rule 702, then the entirety of Mr. Zebrak's report lacks admissibility. Compared to any "legal conclusion" offered in Professor Boyle's report, Mr. Zebrak's testimony is 1,750 times worse.

### B.    Plaintiffs' Argument For Striking Dr. Cromarty's Declaration Is Baseless

#### 1.    Dr. Cromarty Is Well Qualified To Opine On Matters Related To Erroneous Takedowns

Plaintiffs move to strike four paragraphs of Dr. Cromarty's declaration as beyond his qualifications because "nothing in his testimony suggests that he has expertise in dealing with takedown notices online or in analyzing the methodology or reliability of the studies he appears

---

[5] Plaintiffs attempt to strike paragraph 34 of Professor Boyle's opening report (Boyle Decl., Ex. 1), and paragraphs 26 and 31 even though they do not mention *Sony* or other cases. As Plaintiffs' puzzling *Sony*-must-be stricken argument provides no basis to strike this paragraph under any stretch, the request to strike these paragraphs should be denied.

to simply accept as fact." (Mot. at 8.)  Plaintiffs' motion should be denied.  The Eleventh Circuit applies a "liberal" standard for qualifying experts under Federal Rule of Evidence 702.  *See Collins v. Seaboard Coast Line Railroad Co.*, 675 F.2d 1185, 1194 (11th Cir. 1982) (explaining "liberal construction of Rule 702"); *Thomas v. Evenflo Co., Inc.*, No. CV-02-HS-2001-S, 2005 U.S. Dist. LEXIS 46512, *16 (N.D. Ala. Aug. 11, 2005) ("[T]he standard for qualifying expert witnesses is liberal.").  There can be no real question that Dr. Cromarty satisfies this standard.

During his thirty-plus year career as a computer scientist, senior corporate technology officer, entrepreneur and academic, Dr. Cromarty has been involved in an immense range of internet-related businesses and endeavors.  Among other things, he has "operated the largest known Internet-based system in the world for securely managing film and industry digital assets," even advising the staff and management of these Plaintiffs and/or their industry peers and partners as to this technology.  Cromarty Decl. ¶ 14.  Dr. Cromarty has been active on the internet in its various historical manifestations since 1975, and substantial aspects of his doctoral work in computer science, as well as much of his professional life, has been devoted to internet-related work.  Cromarty Decl. ¶¶ 12-22.  His professional experience includes evaluation of the technology and business models of *over sixty businesses*, "including business models for multimedia and entertainment content delivery and use on the Internet."  Cromarty Decl. ¶ 13 and App C., Ex. R at 22.  He founded and ran an e-commerce startup firm that provided services to commercial customers (including various internet retailers).  *Id.* at ¶ 16.  He has been credited with a number of internet "firsts," including the first to stream 1,000,000 live videos on the internet for an event, the world's first demonstration of Java-based distributed internet games, the world's first live wireless webcasts, the world's first streaming video live from an international film festival, and the first high-definition "set-top box" networked screening product and system for the movie industry.  *Id.* at ¶ 10.  And those are just the highlights.  *See* Cromarty Decl. ¶ 1-7.

Plaintiffs try to overcome Dr. Cromarty's vast qualifications by suggesting that he is required to have specific "expertise in dealing with takedown notices online."  Mot. at 8. However, Rule 702 does not require such narrow experiential precision.  In fact, "it is an abuse of discretion for a trial court to exclude expert testimony solely on the ground that the witness is not qualified to render an opinion because the witness lacks expertise in specialized areas that are directly pertinent to the issues in question, if the witness has educational and experiential

FILED UNDER SEAL                          CASE NO.: 11-CIV-20427-WILLIAMS/TURNOFF

qualifications in a general field related to the subject matter of the issue in question." *Evenflo Co., Inc.*, 2005 U.S. Dist. LEXIS 46512, at *17; *see Maiz v. Virani*, 253 F.3d 641, 665 (11th Cir. 2001) (economics expert need not have specific experience with real estate development); *United States v. Majors*, 196 F.3d 1206, 1215 (11th Cir. 1999) (allowing financial expert's testimony even though he was not a CPA and lacked specialized expertise).

There can be no serious question that Dr. Cromarty has deep educational and experiential qualifications in the general field of internet technology and business. Thus, it is of no moment that Dr. Cromarty has not been personally responsible for addressing takedown notices. As the above authorities recognize, if such a narrow standard were applied, almost no expert would ever qualify. Indeed, "Rule 702 is not so wooden as to demand an intimate level of familiarity with every component of a transaction or device as a prerequisite to offering expert testimony." *Microfinancial, Inc. Premier Holidays International, Inc.*, 385 F.3d 72, 80 (1st Cir. 2004); *see Hangarter v. Provident Life and Accident Ins. Co.*, 373 F.3d 998, 1015-1016 (9th Cir. 2004) (Rule 702 is "intended to embrace more than a narrow definition of qualified expert"); *Wechsler v. Hunt Health Systems, Ltd.*, 381 F. Supp. 2d 135, 142-143 (S.D.N.Y. 2003 (rejecting argument that plaintiffs' expert not qualified because he had not performed forensic accounting services that involved the health care industry); *Wolkowitz v. Lerner*, Case No. SA CV 07-777-CAS, 2008 WL 1885770, *3 (C.D. Cal. Apr. 21, 2008) ( "lack of specialty will go to the weight to be afforded to [expert's] testimony" not admissibility).[6]

In any event, the relevance of Dr. Cromarty's experience to takedown notices could not be more clear. Takedown notices are requests to a business to implement a particular access policy with respect to multimedia files on a pool of internet-connected servers. Dr. Cromarty has over 15 years of business experience designing, managing, and implementing such access policies. Cromarty Decl., App. C, Ex. R at 137-143 (CV at 2-6). He served as the senior

---

[6] Plaintiffs' cite to two cases which only undermine their position. The first, *City of Tuscaloosa v. Harcros Chemicals, Inc.*, 158 F.3d 548, 563-567 (11th Cir. 1999), supports Defendants' position, as the court reversed – with one limited exception – the district court's conclusion that two experts were unqualified. *Id.* The one clearly distinguishable limited exception related to a statistician's purported conclusions about collusive behavior (which usurped the jury's function) and his opinions regarding legal standards. *Id.* at 656. The other case, *United States v. Brown*, 402 F.3d 1257 (11th Cir. 2005), is also easily distinguishable. There, the court held that the district court did not abuse its discretion in precluding a plant pathologist from opining about chemistry, *i.e.*, an entirely different discipline. *Id.* at 1269. That bears no similarity to the instant matter. (Plaintiffs purport to quote language from *Brown* that appears nowhere in the opinion.)

FILED UNDER SEAL                          CASE NO.: 11-CIV-20427-WILLIAMS/TURNOFF

manager for the world's largest internet file-sharing service used by the Hollywood film and TV industry to manage its multimedia assets, overseeing the design, management, and implementation of exactly such access policies. Cromarty Decl., App. C, Ex. R at 137-138 (CV at 2-3).

### 2.    Dr. Cromarty Properly Relied On An Academic Report

Plaintiffs' curiously criticize Dr. Cromarty for relying on an academic article that is "not admitted into evidence."[7] Mot. at 8-9. It is axiomatic that an expert can rely on such articles. *See* Fed. R. Evid. 703 ("If experts in the particular field would reasonably rely on those kinds of facts or data . . . they need not be admissible . . . ."); *Proctor v. Flour Enterprises, Inc.*, 494 F.3d 1337, 1349 (11th Cir. 2007) (expert testimony properly based on review of depositions, shift report, photographs and articles); *United States v. Garcia*, 447 F.3d 1327, 1336 (11th Cir. 2006) (law enforcement expert properly relied on hearsay statement of drug trafficker); *Ramirez v. Debs-Elias*, 407 F.3d 444, 449 (1st Cir. 2005) (admitting expert testimony of doctor who relied on published works of another doctor).

### 3.    Dr. Cromarty Covered This Topic In His Report And At His Deposition

Plaintiffs' contend that Dr. Cromarty "did not opine on these issues in his initial report." Mot. at 8. That is not correct. In his initial report, Dr. Cromarty talked at length about the difficulties of identifying infringing content on a service such as Hotfile, a topic directly related to erroneous takedowns. Cromarty Decl., App. C, Ex. R ¶¶ 93-136. Furthermore, he opined on the unreliability of metadata such as file names as an indicator of content, which is at the crux of the discussion about false takedowns. *Id.* ¶¶ 73-74 (discussing the unreliability of "metadata such as the filename"); Cromarty Decl. ¶ 23 (discussing "faulty . . . filename metadata"), ¶ 104

---

[7] Plaintiffs inexplicably characterize the article as "based on reports from an interested third party." Mot. at 8. This assertion is false. The article is an academic piece written by researchers at U.S.C. and U.C. Berkeley reporting the results of a research study. *See* Urban and Quilter, *Efficient Process or "Chilling Effects"? Takedown Notices Under Section 512 of the Digital Millennium Copyright Act,* http://static.chillingeffects.org/Urban-Quilter-512-summary.pdf. The study was based on takedown notices submitted by a variety of different recipients, one of which was Google. *Id.* Assuming that Google is the supposed "interested party," it is unclear on what Plaintiffs base this assertion, since Google is not a party to the present litigation. In any event, there is nothing improper about an expert relying on materials from an "interested" party. *See, e.g.*, *Ward v. Dixie National Life Ins. Co.*, 595 F.3d 164, 181-182 (4th Cir. 2010) (district court properly admitted plaintiffs' damage expert's testimony that relied on hearsay spreadsheets created by plaintiffs' counsel and by defendants).

FILED UNDER SEAL                    CASE NO.: 11-CIV-20427-WILLIAMS/TURNOFF

("... faulty data such as file metadata . . ."), ¶ 105 (discussing example of false takedown based on filename). In addition, he was questioned at length at his deposition about takedown systems used by Plaintiffs that have resulted in erroneous takedowns. Cromarty Rep. at ¶ 93-106; Cromarty Dep. at 48:113-64:13, 73:8-79:4 (Leibnitz Decl., Ex. 15). This is not new material.

C.    **Anton Titov's Testimony Is Admissible**

1.    **Mr. Titov's Testimony About Hotfile's Implementation Of Hash-Blocking In August 2009 In No Way Conflicts With His Deposition**

Plaintiffs seek to strike the following sentence from Mr. Titov's declaration on grounds that it supposedly conflicts with his deposition testimony: "In August 2009, Hotfile unilaterally took the additional step of disabling any master file subject to a takedown notice (so-called 'hash blocking')." Mot. at 9-10; Titov Opp. Decl. ¶ 48. As evidence of Mr. Titov's alleged conflict, Plaintiffs cite passages from his deposition in which Mr. Titov stated that, to the best of his recollection, Hotfile implemented hash-blocking in August 2009. *See* Mot. at 9-10 (citing Titov Dep. at 339:20-340:13 ("I'm not sure about the time, but maybe August 2009"), 475:19-476:1 (following investigation, finding that no better answer existed than August 2009).

These passages are completely consistent with Mr. Titov's declaration. In each instance, Mr. Titov attests that Hotfile began hash-blocking in August 2009. Indeed, Mr. Titov explicitly affirmed this fact on the second day of his deposition, Titov Dep. at 473:2-8, and the parties assumed the accuracy of the August 2009 date throughout Mr. Titov's four-day deposition. *See* Titov Dep. at 473:19-474:2; 474:7-16; 474:24-475:6; 475:10-17; 340:20-341:2; 367:6-18 (Leibnitz Decl., Ex. 1).

Mr. Titov's testimony is not a "sham affidavit" which "merely contradicts, without explanation, previously given clear testimony" under *Reese v. Herbert*, 527 F.3d 1253, 1270 n.28 (11th Cir. 2008). Here, despite Plaintiffs' best efforts, there is no contradiction. Mr. Titov's best recollection is that Hotfile implemented hash-blocking in August 2009.[8] "[S]uch preciseness is all that is needed to render the testimony admissible." *U.S. v. McKenzie*, 414 F.2d 808, 810 (3rd Cir. 1969) (admitting evidence of witness' "best recollection"). While Plaintiffs might not wish to admit that Hotfile implemented hash-blocking in August 2009 – *i.e.*, before Hotfile received

---

[8] At considerable expense to both sides, Plaintiffs obtained Court-Ordered access to Hotfile's source code in an attempt to find something to contradict Mr. Titov on this point. Docket No. 227. They came up empty; the source code is entirely consistent with Mr. Titov's recollection.

more than 98.6% of its takedown notices – Plaintiffs cannot credibly deny this undisputed evidence.

### 2.   Mr. Titov's Testimony About Andrew Ianakov In No Way Conflicts With His Deposition Testimony

Plaintiffs object to Mr. Titov's testimony that Hotfile contractor Andrew Ianakov "took it upon himself" to generate traffic to Hotfile in 2009 through internet postings.  Mot. at 10; Titov Opp. Decl. ¶ 42.[9]  Plaintiffs allege that Mr. Titov cannot deny authorizing Mr. Ianakov to promote Hotfile on the internet.  *Id.*  Plaintiffs were informed, however, that Hotfile progenitor Rumen Stoyanov – *not* Anton Titov – had responsibility for overseeing any promotional activities by Mr. Ianakov.  Mr. Ianakov worked for Mr. Stoyanov's company, Blue Ant, Ltd. ("Blue Ant").  Titov Dep. at 33:18-20 (Leibnitz Decl., Ex. 1); Vangelov Dep. at 39:22-24 (Leibnitz Decl., Ex. 2).  While Mr. Titov provided *technological* oversight when Mr. Ianakov required it to respond to user inquiries, Titov Dep. at 33:8-10, 34:25-35:5 (Leibnitz Decl., Ex. 1), Mr. Stoyanov acted as Mr. Ianakov's supervisor in the day-to-day *business* operations of Hotfile. Titov Dep. at 30:12-31:2, 34:25-35:5, 130:9-131:17 (Leibnitz Decl., Ex. 1).  Accordingly, Hotfile advised Plaintiffs' counsel that Rumen Stoyanov would have more knowledge than Mr. Titov about the Rule 30(b)(6) Topic 41 of Plaintiffs' deposition notice: "[a]ll actions taken by [Hotfile contractors], on behalf of or at the direction of Defendants, Hotfile, or any Hotfile Entity, including the scope of responsibilities or work of such individuals or entities . . . ." Plaintiffs' Rule 30(b)(6) Notice Of Deposition Of Hotfile Corporation (Leibnitz Decl., Ex. 3); E-mail from R. Thompson to S. Fabrizio of 12/3/11 (Leibnitz Decl., Ex. 4) (Specifically noting that while Mr. Titov was designated on all Plaintiffs' 30(b)(6) topics, Mr. Stoyanov "ha[d] better knowledge than Mr. Titov" regarding information falling within Topic 41. *Id.*

Mr. Stoyanov testified unequivocally that Hotfile did *not* authorize Mr. Ianakov to promote the website through internet postings.  Stoyanov Dep. at 85:15-86:16 ("**Q.** Did Mr. Ianakov's job responsibilities include promoting Hotfile?  **A.** No.") (Leibnitz Decl., Ex. 5); *id.* at 87:5-8 ("**Q.** Was someone else at Hotfile responsible for promoting or raising awareness about Hotfile at the time of its founding?  **A.** No.  It was word of mouth.").  Thus Plaintiffs knew well

---

[9] Although Plaintiffs seek to strike the whole paragraph of Mr. Titov's declaration, they pose no objection other than to the four words quoted above.  Mot. at 10.

FILED UNDER SEAL                    CASE NO.: 11-CIV-20427-WILLIAMS/TURNOFF

before Mr. Titov's declaration here that Hotfile did **not** direct Mr. Ianakov to promote Hotfile online.

Nonetheless, Plaintiffs characterize as "inconsistent" Mr. Titov's declaration that Mr. Ianakov "took it upon himself" to promote Hotfile. Mot. at 10. Plaintiffs rely on Mr. Titov's testimony at deposition that, although he "[did **not**] know about all [Mr. Ianakov's] activities," he had some awareness that Mr. Ianakov promoted Hotfile online and he did not stop it. *Id.* (citing Titov Dep. at 493:21-494:14, 574:18-20). Plaintiffs ignore Mr. Titov's testimony that – although he understood Mr. Ianakov's job responsibilities to be limited to responding to user inquiries and handling DMCA takedown requests – he did not oversee Mr. Ianakov on non-technical matters and thus had no reason to halt any promotional activities by Mr. Ianakov. Titov Dep. at 33:8-35:5 (Leibnitz Decl., Ex. 1). Again, rather than representing a "sham affidavit," *Reese v. Herbert*, 527 F.3d 1253, 1270 n.28 (11th Cir. 2008), Mr. Titov's testimony comports both with his prior testimony and with the testimony of Hotfile's most knowledgeable witness designated pursuant to Rule 30(b)(6), Rumen Stoyanov. Accordingly, the Court should not strike the words "took it upon himself" from Paragraph 42 of Mr. Titov's deposition.

3.     **Mr. Titov Bases His Testimony About Ms. Justin's Attempted File Transfers From Hotfile To RapidShare On Personal Knowledge**

On May 9, 2010, user Isler Justin asked for assistance from Hotfile in copying files from her Hotfile account to her account with another cyberlocker, RapidShare. Yeh Ex. 52. She relayed the message from RapidShare that "all [her] files" were blocked as having "the same MD5 [hash] value" – and that the "value [was] marked as illegal in [RapidShare's] system." *Id.* Based upon this, Plaintiffs assert in their summary judgment papers that Hotfile knew that Ms. Justin sought to transfer "*copyright infringing*" works from Hotfile to RapidShare. PMSJ at 16.

The parties agree that the odds of even two files sharing the same MD5 hash value are vanishingly low: 1 in $34 \times 10^{38}$. Titov Opp. Decl. ¶ 54; 2 Zebrak Dep. at 89:16-90:2 (comparing hash value to human fingerprint as used for identification purposes) (Leibnitz Decl., Ex. 16). The chances of "all" of a user's many different content files having the same hash value are thus effectively zero. However, *when those files are all empty, they have the same hash value* – an experience Mr. Titov knows first-hand from implementing hash-blocking at Hotfile. Titov Opp. Decl. ¶¶ 1, 54; Titov Dep. at 476:3-12; 30:12-31:2 ) (Leibnitz Decl., Ex. 1). There is no other way that Ms. Isler could have generated an identical hash value for "all" of her files unless those files were all empty when analyzed. While Hotfile blocks files having an empty file hash – *i.e.*,

FILED UNDER SEAL                    CASE NO.: 11-CIV-20427-WILLIAMS/TURNOFF

Hotfile generates "a value marked as illegal in [its] system" for empty files – this has nothing to do with copyright infringement.

Plaintiffs motion to strike Mr. Titov's testimony is thus based on a false premise that "illegal in our system" meant the files were "copyright infringing" as opposed to being "empty." Mr. Titov based his testimony correcting this false assumption about MD5 hashing based on his personal experience, and his testimony remains properly admissible.

### 4. Hotfile Had No Duty to Produce Google Analytics Information, And Plaintiffs Cannot Blame Hotfile For Their Own Failure To Pursue It

#### a. Plaintiffs Failed Timely To Pursue Documents From Google Or Testimony From Hotfile Regarding Google Analytics

As Plaintiffs have known since the first days of the case, Hotfile uses a tool called "Google Analytics" to track information about Hotfile.com.  Docket No. 16-5 at 4 (reflecting Plaintiffs' demand for Google Analytics data eight days after filing the Complaint).  By embedding code into Hotfile's web pages, Hotfile enables Google to compile information about the demographics of Hotfile's audience, user behavior on the site, the browser, internet service providers and mobile devices used, social networking employed, recommended keyword advertising, sources of traffic, load speeds, and much more.  Google maintains all of this information for every day of Hotfile's three-year existence – making for an immense storehouse of information.  All this information is in the possession, custody, and control of Google.

Plaintiffs indiscriminately demanded all Google Analytics data from Hotfile on April 1, 2011.  *See* Yeh Strike Decl., Ex. 4 at 27 (Request For Production No. 19) (demanding "[a]ll documents pertaining to tracking or monitoring the utilization of or traffic to the Hotfile Website, including any reports or data generated from Google Analytics").  Three days later, Plaintiffs subpoenaed Google, demanding Google Analytics data for Hotfile's website "or any other website."  *See* Subpoena to Google of 4/4/11 (Leibnitz Decl., Ex. 6) (demanding "[a]ll reports and data you have collected, prepared, displayed, or otherwise made available through the Google Analytics service to any Hotfile Party, whether regarding the Hotfile Website or any other website").

On May 5, 2011, Hotfile objected to Plaintiffs' demand, stating in relevant part:

> Hotfile further objects to this request as overbroad . . . Google Analytics is a website data analysis tool that allows the user to generate a nearly infinite number of reports based on an enormous

FILED UNDER SEAL                    CASE NO.: 11-CIV-20427-WILLIAMS/TURNOFF

> set of data.  To the extent that this request seeks all possible
> "reports" or all the data generated by Google Analytics, such a
> request is unduly burdensome.  Hotfile further objects to this
> request to the extent it seeks documents not in the possession,
> custody, or control of Hotfile and insofar as it would require
> Hotfile to create documents that do not presently exist.

Yeh Decl. ISO Mot. Strike, Ex. 4 at 27–28.  Google likewise objected to the subpoena.

In meeting and conferring about this request in May 2011, Hotfile offered to produce any Google Analytics information ever printed or saved electronically by Hotfile in full satisfaction of Request No. 19.  Leibnitz Decl. ¶ 2.  Plaintiffs declined, demanding that Hotfile *create* documents from Google's database that did not already exist – in clear contravention of the Federal Rules of Civil Procedure.  Fed. R. Civ. Proc. 34(a)(1); *Alexander v. F.B.I.*, 194 F.R.D. 305, 310 (D.D.C. 2000); *see Tate v. U.S. Postal Service*, No. 04-61509-CIV, 2007 WL 521848 at *6 (S.D. Fla., Feb. 14, 2007) ("there is no requirement under Rule 34 that a party create documents for litigation purposes").  Rather than include Request 19 in any of Plaintiffs' seven motions to compel, they instead chose to deride Hotfile's reliance on the Rules in e-mail after e-mail.  *E.g.*, Leibnitz Decl., Exs. 7-10 (continuing to demand creation of Google Analytics documents from Hotfile in e-mails dated June 23, July 6, October 20, and November 4, 2011).

Eventually, on November 15, 2011, Plaintiffs demanded that Hotfile produce a corporate representative to testify about Hotfile's reliance upon Google Analytics.  *See* Pls.' Rule 30(b)(6) Notice Dep. Of Def. Hotfile at 9 (Leibnitz Decl., Ex. 3) (demanding in Topic No. 19 that Hotfile testify about "information about the characteristics of Hotfile uses or users gained from sources such as Google Analytics").  Hotfile prepared its witness, Mr. Titov, who testified for a full four days on this and other topics.  At no point in the four days did Plaintiffs ask about the sources of traffic to Hotfile as revealed by Google Analytics; instead, Plaintiffs simply confirmed that Hotfile indeed relied on this information in Google's database.  Titov Dep. 543:24–548:16 (Leibnitz Decl., Ex. 1).

Plaintiffs served a second subpoena on Google on December 6, 2011 seeking the same information.  Subpoena to Google of 12/6/11 (Leibnitz Decl., Ex. 11) (demanding "reports for all available dates, showing the sources of all traffic to the Hotfile Website that you have collected, prepared, displayed, or otherwise made available through the Google Analytics service regarding the Hotfile Website").  Google objected again.  Discovery closed on December 23, 2011.

FILED UNDER SEAL                    CASE NO.: 11-CIV-20427-WILLIAMS/TURNOFF

Six weeks *after* the close of discovery, Plaintiffs then demanded that Hotfile direct Google to produce Google Analytics data.  E-mail from D. Pozza to T. Schoenberg of 2/2/12 (Leibnitz Decl., Ex. 12).  Hotfile declined, pointing out that both the Court's Scheduling Order and Local Rule 26.1(h) forbade Plaintiffs from harassing anyone – much less third parties – for documents six weeks after the close of discovery.  Plaintiffs responded with derision, *see* E-mail from S. Fabrizio to A. Leibnitz of Feb. 2, 2012 ("Andy, seriously, if you have this much time on your hands you can just work on one of your other cases") (Leibnitz Decl., Ex. 13), and moved on an expedited basis for an order compelling this discovery.  Docket No. 242.  Magistrate Judge Turnoff rejected Plaintiffs' motion the following day.  Docket No. 246.

Plaintiffs moved for summary judgment on February 17, 2012, identifying for the first time sixty-three websites which supposedly referred infringers to Hotfile.  *See* PMSJ at 7; Yeh Exs. 31–43, 102–103.  Having never had any previous reason to query Google Analytics regarding these sixty-three websites, Mr. Titov did so on or about March 7, 2012.  Titov Opp. Decl. ¶¶ 12, 20.  He confirmed that none of these websites provided enough traffic to even appear among Hotfile's top 500 sources of traffic.  *Id.*  In doing so, he also confirmed that the sites referring the most users to Hotfile included Google, Facebook, and Youtube.  *Id.* ¶ 19.  He also confirmed that the largest single source of traffic to Hotfile (by a factor of more than six to one) is users typing Hotfile's web address directly into their browser.  *Id.* ¶ 14.

In summary, Plaintiffs failed to (1) move to compel analytics data from Google in June 2011, despite knowing of this information since the first days of the litigation; (2) enforce a second, nearly-identical subpoena against Google in December 2011; (3) timely file a motion to compel against Hotfile on this subject; (4) serve an interrogatory on Hotfile on this subject; and (5) ask Hotfile's corporate designee at deposition about Hotfile's sources of traffic in deposition.  On the other hand, Hotfile properly declined under Rule 34 to *create* documents for production, prepared its witness to answer questions regarding Google Analytics in deposition which Plaintiffs never asked, and then justly accessed this storehouse after Plaintiffs revealed their top sixty-three affiliates for the first time only weeks ago.

        b.     Plaintiffs Provide No Basis to Exclude Mr. Titov's Statements

The Court should deny the motion to strike paragraphs 12, 14, 19, and 20 of Mr. Titov's opposition declaration because there is no support for doing so under Rule 37(c).  A party that "fails to provide information … as required by Rule 26(a) or (e) … is not allowed to use that

FILED UNDER SEAL                    CASE NO.: 11-CIV-20427-WILLIAMS/TURNOFF

information … to supply evidence on a motion, [or] at a hearing … unless the failure was substantially justified or is harmless." Fed. R. Civ. Proc. 37(c)(1). Here, Defendants used the Google Analytics data solely for impeachment or rebuttal; they did not fail to provide information required by Rule 26(a) or (e). Defendants had no reason to anticipate using such data to support its claims or defenses, and thus never incurred any duty to unilaterally disclose data accessible from Google's database. Fed. R. Civ. Proc. 26(a)(1)(A). In addition, Defendants can produce Google Analytics data only by creating new reports about it, which Rule 26(a) does not require. *See S.E.C. v. Canadian Javelin Ltd.*, 64 F.R.D. 648, 651 (S.D.N.Y. 1974) (non-existent documents need not be produced); *Soetaert v. Kan. City Coca Cola Bottling Co.*, 16 F.R.D. 1, 2 (W.D. Mo. 1954) (same); *Toorchen v. Olin Indus.*, 6 F.R.D. 20, 20 (E.D.N.Y. 1946) (same). In any event, the Rules do not oblige defendants to disclose documents used solely for impeachment. Fed. R. Civ. P. 26(a)(1)(A)(ii). Hotfile proffers Mr. Titov's testimony solely for purposes of impeaching Plaintiffs' putative evidence that Hotfile knew of or precipitated infringement through affiliation with websites such as the sixty-three identified in Plaintiffs' summary judgment papers. *Rasmussen v. Central Florida Council Boy Scouts of America, Inc.*, No. 10-12238, 2011 WL 311680 at *4 (11th Cir. Feb. 2, 2011); *Campbell v. Moon Palace, Inc.*, No. 11-60274-CIV, 2012 WL 399218 at *2 (S.D. Fla. Feb. 7, 2012). Plaintiffs' motion should be denied.[10]

## III.   CONCLUSION

Plaintiffs ask the Court to strike selected portions of testimony that undermines their summary judgment arguments. But they provide no legal basis to exclude the plainly relevant and admissible testimony  Their motion should be denied.

DATED: April 2, 2012                    Respectfully submitted,

---

[10] *Cary Oil Co. v. MG Refining & Marketing, Inc.*, 257 F. Supp. 2d 751, 761 (S.D.N.Y. 2003), which is not controlling authority, is inapposite because it merely excluded testimony and other evidence at trial if that same testimony or evidence had been withheld during discovery based on attorney-client privilege. 257 F. Supp. 2d at 761. Here, the parties are not at trial, no Google Analytics information was withheld on the basis of privilege, and the information regarding the sixty-three accused affiliates did not even exist in Hotfile's possession until Plaintiffs first made accusations about these websites weeks ago – at which point Mr. Titov disclosed it.

-20-

FILED UNDER SEAL                    CASE NO.: 11-CIV-20427-WILLIAMS/TURNOFF

*[signature]*

Janet T. Munn, Esq. Fla. Bar No. 501281
Email: jmunn@rascoklock.com
RASCO KLOCK
283 Catalonia Avenue, Suite 200
Coral Gables, Fl 33134
Telephone:  305.476.7101
Telecopy: 305.476.7102

And

*[signature]*

Roderick M. Thompson, Esq. (admitted *pro hac vice*)
Email:  rthompson@fbm.com
Andrew Leibnitz, Esq. (admitted *pro hac vice*)
Email:  aleibnitz@fbm.com
Anthony P. Schoenberg, Esq. (admitted *pro hac vice*)
Email:  tschoenberg@fbm.com
Deepak Gupta, Esq. (admitted *pro hac vice*)
Email:  dgupta@fbm.com
Janel Thamkul, Esq. (admitted *pro hac vice*)
Email:  jthamkul@fbm.com
FARELLA BRAUN + MARTEL LLP
235 Montgomery St.
San Francisco, CA  94104
Telephone:  415.954.4400
Telecopy: 415.954.4480

And

*[signature]*

Valentin Gurvits, Esq. (admitted *pro hac vice*)
Email: vgurvits@bostonlawgroup.com
BOSTON LAW GROUP
825 Beacon Street, Suite 20
Newton Center, MA 02459
Telephone:  617.928.1800
Telecopy:  617.928.1802

*Counsel for Defendants Hotfile Corporation
 and Anton Titov*

-21-

FILED UNDER SEAL                    CASE NO.: 11-CIV-20427-WILLIAMS/TURNOFF

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on April 2, 2012, a true and correct copy of the foregoing document, was filed conventionally and served on all counsel of record identified below via e-mail and by Federal Express.

Karen L. Stetson, Esq.
GRAY-ROBINSON, P.A.
Email: Karen.Stetson@gray-robinson.com
1221 Brickell Avenue
Suite 1600
Miami, FL 33131
Telephone: 305.416.6880
Telecopy: 305.416.6887

Karen R. Thorland, Esq. (admitted *pro hac vice*)
Senior Content Protection Counsel
Email: Karen_Thorland@mpaa.org
Motion Picture Association of America, Inc.
15301 Ventura Boulevard, Building E
Sherman Oaks, CA 91403-5885
Telephone: 818.935.5812

Steven B. Fabrizio, Esq. (admitted *pro hac vice*)
Email: sfabrizio@jenner.com
Duane C. Pozza, Esq. (admitted *pro hac vice*)
Email: dpozza@jenner.com
Luke C. Platzer, Esq. (admitted *pro hac vice*)
Email: lplatzer@jenner.com
JENNER AND BLOCK, LLP
1099 New York Avenue, N.W.
Suite 900
Washington, DC 20001
Telephone: 202.639.6000
Telecopy: 202.639.6066

By: *Janet T. Munn*
Janet T. Munn