**Exhibit 15**

Page 1

1            UNITED STATES DISTRICT COURT

2            SOUTHERN DISTRICT OF FLORIDA

3        CASE NO. 11-20427-WILLIAMS/TURNOFF

4

5  DISNEY ENTERPRISES, INC.,
   TWENTIETH CENTURY FOX FILM
6  CORPORATION; UNIVERSAL CITY
   STUDIOS PRODUCTIONS LLP;
7  COLUMBIA PICTURES INDUSTRIES,
   INC., and WARNER BROS.
8  ENTERTAINMENT, INC.,

9                    Plaintiff,

10  vs.

11  HOTFILE CORP., ANTON TITOV,
    and DOES 1 - 10

12

                    Defendants.
13  _____/

14  AND RELATED CROSS-ACTIONS.

    _____/
15

16

17     VIDEOTAPED DEPOSITION OF ANDREW S. CROMARTY, Ph.D.

18            SAN FRANCISCO, CALIFORNIA

19            FRIDAY, DECEMBER 16, 2011

20

21

22

23  BY:  ANDREA M. IGNACIO HOWARD, CSR, RPR, CCRR, CLR

24  CSR LICENSE NO. 9830

25  JOB NO. 44314

Page 2

1        FRIDAY, DECEMBER 16, 2011

2            10:09 a.m.

3

4

5

6   VIDEOTAPED DEPOSITION OF ANDREW S. CROMARTY,

7   Ph.D., taken at Farella Braun + Martel LLP

8   235 Montgomery Street, San Francisco,

9   Pursuant to Notice, before me,

10  ANDREA M. IGNACIO HOWARD, CLR, CCRR, RPR,

11  CSR License No. 9830.

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1    A P P E A R A N C E S:

 2

 3         FOR THE PLAINTIFFS:

 4         JENNER & BLOCK

 5         By:  LUKE C. PLATZER, Esq.

 6         1099 New York Avenue, NW

 7         Washington, D.C. 20001

 8

 9

10

11

12         FOR THE DEFENDANTS:

13         FARELLA BRAUN + MARTEL

14         By:  TONY SCHOENBERG, Esq.

15         235 Montgomery Street

16         San Francisco, California 94104

17

18

19

20         ALSO PRESENT:  Sean McGrath, Videographer

21

22                  ---oOo---

23

24

25
```

1    11:14 a.m., and we're off the record.

2         (Recess taken.)

3         THE VIDEOGRAPHER:   The time is 11:29 a.m.,

4    and we're on the record.

5         MR. PLATZER:   Q.   Welcome back.

6    A    Thank you.

7    Q    We were talking earlier about the appendices

8    to your report and the different materials you

9    reviewed.

10        You mentioned that you included some material

11   in that appendix about a software called Kapow.

12   A    Yes.

13   Q    Have you formulated any expert opinions about

14   the Kapow software?

15   A    I'll do my best to answer that question.   It

16   might be a little complicated.   There is a little

17   ambiguity in the question.

18        To the best of my ability to recall, as I sit

19   here today, Kapow is a service and tool that is

20   employed at least by plaintiff Warner Brothers for

21   takedowns, and I have observed that it was employed by

22   Warner to take down what they alleged was infringing

23   content, and that it also engaged in unwanted behavior

24   of taking down material that was not intended to have

25   been alleged as infringing, and that the Warner staff

Page 49

1   had considerable difficulty controlling its behavior

2   and had numerous e-mail conversations internally in

3   the Bates numbered documents I cited where they

4   struggled, both in English and in German, over the

5   difficulty of managing a collection of assets, some of

6   which they wanted taken down and some not, and Kapow

7   figured in this.

8        I've also observed a discussion in which

9   plaintiff in this case, Warner, discussed what

10  appeared to be replacing or augmenting Kapow possibly

11  with other tools.  A resilient tool was implied but

12  never explicitly named, or the word Brazil appeared to

13  describe that or refer to the tool.

14       There was some discussion about whether Kapow

15  was adequate and whether it was technically feasible

16  to employ Kapow or, in general, a takedown tool to

17  reliably identify infringing content or whether there

18  needed to be human analysis of proposed candidates for

19  takedown.

20       And it's my recollection in those materials,

21  those Bates numbered e-mail conversations for

22  plaintiff, that the executive director for anti-piracy

23  himself provided the opinion that, in essence, it was

24  insufficient to use a technical tool and that human

25  intervention and analysis was necessary in order to

1    determine infringement of uploaded materials of that

2    site, including Hotfile.

3         So your question is, with respect to opinions

4    I formed, and with this background about Kapow and the

5    materials that I've read, I already have provided in

6    my report the opinion that, in essence, it is not

7    sufficient because of the state of the art and a lack

8    of science to employ a technical tool.

9         I provided a four-part test in my report for

10   what necessarily must occur, or a four-part method or

11   procedure for identifying infringing materials or

12   candidate or accused infringing materials.

13        And with respect to Kapow, the plaintiff's

14   own documentation supports my finding and my opinion,

15   in my view.  So now there's a fine point about whether

16   I have a separate opinion about Kapow there directly

17   to your question or whether I simply believe that it

18   supports my -- my finding and my own opinion.

19        At a minimum, it's the latter.  Perhaps it

20   rises to the level of the former, and that may get

21   into a fine legal distinction that's difficult for me,

22   as a nonattorney, to draw on as to what constitutes an

23   opinion versus data that supports an opinion.

24        MR. SCHOENBERG:  Can -- I didn't realize I

25   left my pen in my office.  Do you mind if I grab a

Page 51

1    pen?

2         MR. PLATZER:  Not at all.

3         Let's go off the record.

4         MR. SCHOENBERG:  Yeah, we can go off the

5    record.  I'm sorry about that.

6         THE VIDEOGRAPHER:  The time is 11:34, and

7    we're off the record.

8         (Recess taken.)

9         THE VIDEOGRAPHER:  The time is 11:35 a.m.,

10   and we are on the record.

11        MR. PLATZER:  Okay.

12   Q    Dr. Cromarty, that's a long answer.  I

13   believe in the first part of your answer you discussed

14   things that you read in Warner's internal e-mails;

15   correct?

16   A    That certainly was included in my answer,

17   yes.

18   Q    Okay.  And the summary that you gave there,

19   that wasn't -- that wasn't your expert opinion about

20   the e-mails.  That was just you observing what you

21   understood the e-mails to mean; right?

22   A    I'm not certain that's an accurate

23   characterization, for several reasons.

24        The first is the one I answered with, which

25   is there may be fine, legal distinctions between what

Page 52

1   is and is not an expert opinion that I don't

2   appreciate as a nonattorney.

3         Whether I have the opinion that Kapow isn't

4   capable of identifying infringing content as a

5   technical tool, or whether I'm citing the executive

6   director of anti-piracy for the plaintiff on that

7   matter is kind of a technical fine point of -- of law

8   that I don't claim to be expert on.

9         If I were speaking colloquially, not with

10   respect to expert obligations and rights and

11   responsibilities, and not with respect to that legal

12   question, at a minimum, I would say that the data

13   provided by plaintiffs support my own opinion, and it

14   may also rise to an opinion -- the level of an opinion

15   Kapow has been, at a minimum, described by its own

16   users as incapable of being used, or more generally

17   that such tools are incapable of being used to

18   identify infringement.

19     Q   Your expert report in this case does not

20   include an opinion as to the adequacy or accuracy of

21   Kapow; does it?

22     A   To answer that, I would want to have a copy

23   of my report to review, and that hasn't been provided

24   to me yet today.

25     Q   Why don't we mark that as an exhibit.

Page 53

1        Mark this as Cromarty 1.

2        (Document marked Cromarty Exhibit 1

3         for identification.)

4        THE WITNESS:  Thank you.

5        And just for the record, I understand your

6    question to be pending; is that correct?

7        MR. PLATZER:  That's correct.

8    Q    And, for the record, the -- what's been

9    marked as Cromarty Exhibit 1 is a document, not Bates

10   numbered, but bears the -- the cover sheet saying

11   "Expert Report of Andrew S. Cromarty, Ph.D.," and is

12   dated November 18th.

13   A    Right, and I would note also for the record

14   that this is not my complete report.

15       So what we have here, at most, is what I

16   refer to as the body of my report.  It does not

17   include all of the attachments and appendices and

18   other material, and it does not include the referenced

19   materials, including the documents, the Bates numbered

20   documents that I just referred to.

21       So in that regard, at a minimum, it's

22   incomplete.  But with your representation, I will

23   accept, for purposes of the deposition today, that it

24   is otherwise a true and accurate copy of the main body

25   of my report.

1    Q   That's true.

2        Carrying three copies of the entire thing,

3    with appendices, on the plane to San Francisco would

4    have been rather heavy.

5    A   I understand.  363 pages of documents plus

6    the Bates numbered documents, yes.

7    Q   Why don't I withdraw the pending question --

8    A   Okay.

9    Q   -- and just ask a foundational one here.

10       Is -- is -- Cromarty Exhibit 1, is this a --

11   the body -- excluding appendices, is the body of the

12   report that you prepared?

13   A   I'm accepting your representation that it is.

14   It appears to be, and I have no reason at present to

15   doubt that.

16   Q   Okay.  In this report, do you express an

17   expert opinion as to the accuracy of the Kapow

18   software?

19       MR. SCHOENBERG:  Objection; vague and

20   ambiguous.

21       THE WITNESS:  I think the best answer is yes.

22       MR. PLATZER:  Okay.

23   Q   Can you tell me where in the report that

24   opinion is located?

25   A   Well, first let me tell you the nature of it,

Page 55

1    and then I'll be happy to look for it.

2          The nature of it is that I have opined that

3    it is for structural and information theoretically not

4    possible, and also given the current state of the art,

5    for any such tool to reliably answer the question of

6    infringement.  That a technical tool alone is not

7    capable of doing that, and I understand Kapow to be

8    such a tool.

9          So, in this regard, I believe the answer is

10   yes, I've provided that opinion merely by virtue of

11   Kapow falling in the category that I've identified as

12   not capable of providing those answers.

13         Now, I have a recollection that I did cite

14   Kapow in here, and I'd like to take a look at it and

15   see if I need to augment my answer in any way.

16       Q   Go ahead.

17       A   If you -- if you believe you know the

18   reference, just for efficiency, I'm happy to have you

19   tell me where I cited.  Otherwise, I'd have to look

20   through.

21         It's my recollection it's towards the end.

22       Q   That is my recollection as well.  And to the

23   extent it helps shorten your review of Cromarty

24   Exhibit 1, I believe you have discussion of Warner

25   beginning around paragraph 198.

1      A    That's where I'm looking now.

2           Now, we have, at this moment, the limitation

3      during deposition that I have not been provided the --

4      as we've already mentioned -- the complete report,

5      including all of the Bates numbered documents.

6           But at the paragraph that you mentioned, 198

7      and forward, I have a discussion of plaintiff Warner

8      Brothers.  And, in particular, what I referred to as

9      their apparently unintended automatic takedowns of

10     their own uploaded content, and this is a reference to

11     the Bates numbered documents that include the

12     reference to Kapow.

13          Kapow was the mechanism through which they

14     experienced precisely the failures that demonstrated

15     the inefficacy of that tool in particular, and these

16     tools in general supporting my broader opinion that I

17     mentioned a moment ago which I believe covers Kapow.

18          I -- I go on to say:

19          "This illustrates a central difficulty in

20     takedowns and infringement inference.  It is not

21     copyright files that may not be uploaded but rather

22     copyrighted files for which the copyright itself may

23     need another party.  Permission for redistribution has

24     not been granted.

25          "The ownership information is a nontechnical

Page 57

1    matter and is noted in Appendix H.  In any case, data

2    to support the technical decision are not part of the

3    Internet handling of files generally and file

4    transfers and file sharing services."

5         In particular, that's the last part of

6    paragraph 198.  And so there and throughout I've

7    expressed the specific expert opinion that -- that

8    these tools, including the class of tools of which

9    Kapow is a member, are not capable of answering the

10   question of infringement, and the Bates numbered

11   documents also, in my view, directly support that

12   finding.

13        Just so that we're absolutely clear and to

14   avoid a possible objection, therefore my answer is

15   yes, it is my view that I have included Kapow in this.

16        Q    Have you used the Kapow software yourself?

17        A    I have not used the Kapow software, and in my

18   professional and expert judgment, it's not necessary

19   for me to use it in order to reach my opinion.

20        Q    Can you tell me how it works?

21        A    Probably not in considerable detail, because

22   the available data about all these systems is very

23   carefully kept secret for a variety of reasons by the

24   -- the sellers, the marketers of these systems, and

25   also by their users.

Page 58

1        For example, you'll notice that even in the

2   produced material, information written about Kapow

3   itself was redacted by the plaintiffs before

4   production.  So it's highly secret, probably for trade

5   secret and a variety of other reasons.

6        So it's generally not going to be possible,

7   without a review of their source code software, to

8   understand all the details of their system, but

9   generally it's my understanding from the

10  correspondence of plaintiff that list of files is

11  provided to or through Kapow, and that as some

12  combination of service and tool, it's employed to

13  identify potentially infringing content and take it

14  down or request takedowns of that material.

15       And in one detailed Bates numbered e-mail

16  discussion between employees of plaintiff, there is a

17  specific roughly 12-point itemization of various

18  features of the analysis that Kapow performs and that

19  other tools might perform, and a specific evaluation

20  of which of those might or might not be useful in

21  Kapow versus a competing tool; and that list provides

22  some insight into what Kapow may be doing based on the

23  beliefs of plaintiff.

24       Again, I would emphasize no one can really

25  know, outside of Kapow, what the tool does, and this

Page 59

1    is a considerable difficulty in the industry as I've

2    already opined in my report.

3         Q    And is it fair to say that the documents that

4    are listed in your appendix to your report constitute

5    the entire universe of documents that you reviewed

6    regarding Kapow in order to form your opinion

7    expressed in your report?

8         A    With the proviso that it's always possible

9    that there is an additional document that was produced

10   to me that, for purely incidental or accidental

11   reasons that I neglected or through some editing

12   error, was not provided in my report.

13             And, of course, at any time we determine

14   that's the case, I would be delighted to provide any

15   additional information about any sources that I relied

16   on or referred to.  But as I sit here today, to the

17   best of my ability to recall, my appendix list is

18   complete with respect to the Kapow documents that I

19   referred to or reviewed.

20        Q    And other the -- other than the list of

21   appendix documents regarding Kapow, is there anything

22   that you requested further regarding Kapow in order to

23   conduct your analysis and form your expert opinions

24   for this report?

25        A    Generally, the answer is no, and this is, I

Page 60

1    think, really the question you asked and I answered

2    earlier this morning with respect to having requested

3    additional documents.  But I would also note, as I did

4    a moment ago, that in my judgment, there is more than

5    enough information already provided here to reach the

6    opinions that I have and that I have put into my

7    report.

8         Of course, in addition, I have my own

9    expertise, and as I've said before, I rely on that as

10   well.

11       Q   I'd like to direct your attention to

12   paragraph 198 --

13       A   Yes.

14       Q   -- of your report here, and you note toward

15   the end of that paragraph that ownership and

16   permission is a nontechnical manner.

17       A   Yes.

18       Q   You'd agree that, leaving aside how the tools

19   work, it's not really a technical issue whether or not

20   a particular piece of content is authorized.  That's

21   something that can be communicated through means other

22   than through technology?

23       MR. SCHOENBERG:  Objection; incomplete

24   hypothetical; calls for a legal conclusion.

25       THE WITNESS:  So one difficulty I have with

Page 61

1  that question is that it is my perception, as a

2  practitioner in the field, that there are unresolved

3  questions of law alone as to this matter, so it may

4  not be a fact question whether or not authorization

5  has been granted.  There may be, in addition, legal

6  questions that are currently unresolved with respect

7  to case law as to whether authorization has been

8  granted or is necessary or not required when one is in

9  possession of a digital asset.

10         So I think it's much broader than your

11  question implies.

12         MR. PLATZER:  Q.  Well, I'm going to give you

13  a hypothetical.  I want you to assume that a copyright

14  owner is intentionally uploading a piece of their

15  content to Hotfile.

16     A    Okay.

17     Q    Wouldn't it be true, in that hypothetical,

18  that Hotfile could acquire awareness of the authorized

19  nature of the content through nontechnical means, such

20  as through cooperation with the copyright owner?

21         MR. SCHOENBERG:  Objection; incomplete

22  hypothetical; lack of foundation; calls for

23  speculation.

24         THE WITNESS:  I understand your question to

25  be, is it possible that -- to concretize this -- that,

Page 62

1   for the sake of an example, Warner and Hotfile could

2   have a conversation in which Warner uploads data to

3   Hotfile servers and then Warner communicates their

4   opinion as to the authorization of that content.

5        Is it possible for a conversation to occur?

6   Yes, it's possible for a conversation to occur.

7        Is it -- is it determinative that that

8   provides authorization?  I believe the answer is

9   almost certainly no, and the reason is that it is not

10  possible for Hotfile to independently vet the

11  allegation or assertion as to either infringement or

12  ownership and authorship of any particular asset.

13       Now, that is a -- a legal matter that depends

14  on a very complex web of interactions and ownership

15  and rights management that is well beyond the purview

16  of Hotfile to vet, and upon which the representation

17  of any one individual cannot be reliable.

18       And I will give you a specific example of

19  this, which is, when I was working as the CTO of the

20  principal file sharing company that was engaged by

21  substantially all the plaintiffs to share their own

22  content among themselves and between these companies,

23  that I came to learn that there's an extremely complex

24  rights management culture within the -- the

25  entertainment industry, specifically in the film

Page 63

1    industry and probably also extending to TV and other

2    parts of the entertainment, the commercial

3    entertainment industry, an individual asset may have

4    as many as 20 to 30 individual rights into which it is

5    divided.

6         As a -- as a -- as an example, there might be

7    a right to show the film on Tuesdays in Hungary, and

8    the rights is -- is a -- an area where it is so

9    balkanized that there are companies in this industry

10   that specifically exist to manage just the rights or

11   to produce rights management systems and software.

12        And in that context, my answer is no, it is

13   not possible for a Hotfile to reliably vet and receive

14   and process information based simply on a claim from a

15   plaintiff in this suit or any other possible source of

16   information.

17        So on the one hand, yes, they can have a

18   conversation.  On the other hand, it's not -- it's not

19   reliable source of information, even if it's a large

20   company of whom we have heard.

21        And I'll finally close this answer by saying,

22   again, I think on top of this there are additional

23   legal, open questions where there're, apparent to me,

24   unsettled matters of case law as to what constitutes

25   authorization.  And as long as those are open, even if

Page 64

1    all other questions could be answered, it's difficult

2    and impossible, probably impossible, for a company in

3    Hotfile's position to receive information and reliably

4    act on it.

5         Now, this is not to say that they don't

6    receive that information.  It's not to say they don't

7    act on it, and I have given the opinion in my report

8    that they make what I judge, as a professional in this

9    field, are commercially reasonable best efforts to do

10   so.

11        But with this context, the answer to your

12   question, I think, is a resounding no as to a

13   hypothetical.

14        Q   You're familiar with the YouTube website;

15   right?

16        A   Generally, yes.

17        Q   And you're aware that on YouTube there are

18   companies that posts content through their own

19   official company accounts; right?

20        A   I'm aware that there has been reported in the

21   press an increasing set of relationships between

22   Google, the owner of YouTube, and entertainment

23   companies.  Some of those appear to me to have been

24   with respect to establishing contractual

25   relationships, and others appear to have been lawsuits

1   them.

2       Q    Do you know what account Warner used to

3   upload the Vampire Diaries files that you discuss in

4   paragraph 198 of your declaration?

5       A    As I sit here today, I don't recall whether

6   that information was provided in the produced

7   documents that are cited in my appendices.

8       Q    I want you to assume that Warner used the

9   official Warner Brothers account that Hotfile provided

10  to Warner in order to upload those files.

11          With that assumption in mind, does the fact

12  that Warner used an official Hotfile provided Warner

13  Brothers account, provide information that Hotfile

14  could have used to discern that the files were

15  authorized by Warner to be on Hotfile?

16          MR. SCHOENBERG:   Objection; incomplete

17  hypothetical.

18          THE WITNESS:   I think --

19          MR. SCHOENBERG:   Lack of foundation.

20          THE WITNESS:   I'm sorry.

21          I think you described a world that CIOs

22  wished they lived in.   There's a document that I have

23  seen of which I don't recall the name, but I believe

24  it was possibly produced by plaintiff Warner Brothers

25  as some form of legal pleading where my reading of it,

1    my colloquial nonattorney reading of it is they

2    effectively attempt to -- attempt to minimize and

3    disavow in some measure the uploads performed by their

4    own staff, and -- and it has been my experience that

5    it sometimes is difficult for large corporations to

6    control behavior of their employees, so there's at

7    least an open question as to whether -- whether

8    employees always do what -- what one wants and

9    therefore whether an outside provider can know for

10   certain that an account has been used for a proper

11   purpose.

12          So because of these regulatory problems

13   within companies, it's -- it's not completely reliable

14   in the case of your hypothetical for Hotfile to make

15   that assumption.  There also are situations where it's

16   demonstrably unreliable, such as when credentials have

17   been obtained by someone who did not have authority to

18   use them, and uses that account, and that sort of

19   thing happens all the time.

20          As one simple example, there is a major spam

21   attack in the last quarter of a year on AOL where

22   people are explicitly obtaining and using the

23   credentials of AOL account holders to send e-mail,

24   spam e-mail, on their behalf from their accounts, and

25   it's happening to a few other service providers as

Page 75

1    well, and this illustrates that a general problem that

2    a company in Hotfile's position would have.

3           So on the one hand we can -- we can say that

4    Warner is responsible for whatever happens under their

5    account, if it is actually their account and you've

6    provided in your hypothetical that it is.

7           But on the other hand, even if Warner is

8    responsible for it and is accountable for it, and

9    including under the terms of service that they're

10   accountable for, that it may still not be entirely

11   reliable by -- by Hotfile.

12          And, finally, I'll comment that there's

13   specific evidence, which I believe that I have made

14   reference to in my report, of takedowns that have

15   occurred that -- that -- that has been communicated to

16   me possibly by Mr. Titov, but I -- I can't tell you as

17   I sit here today with certainty that -- of takedowns

18   that were inappropriate.

19          And I believe, if I'm not mistaken, that he

20   may have communicated to me that some of those were

21   specifically from Warner Brothers where they issued

22   takedowns from their own account over content to which

23   they did not have rights and that there may be a

24   separate matter in suit and a counterclaim involving

25   exactly that behavior.

Page 76

1        So this goes to your question as well.  So

2   even in the case of your hypothetical, I think, to

3   summarize, on the one hand we have that Warner is

4   responsible for the account and they've made

5   agreements with respect to it.  But on the other hand,

6   it's not entirely reliable to a company in Hotfile's

7   position.  And they have to, in the face of that

8   unreliability and uncertainty, to simply do the best

9   they can, and that includes under the DMCA Safe

10  Harbors, and also as a -- as an operating business.

11     Q    Okay.  Dr. Cromarty, you're using the term

12  re- -- terms "reliable" and "reliability" a lot in

13  your answers.

14        Can you explain to me what you mean when you

15  use those words?

16     A    Well, there are probably several uses of

17  that, depending on the question one is faced with in

18  business.  So I have used it with respect to some

19  scientific questions, and I've used it with respect to

20  some business practice questions.

21        I could try to give you several answers, or

22  perhaps you have a more specific question.

23     Q    Well, it's precisely because the term has

24  some variety of meanings.  I'm trying to understand

25  which meaning you intend in each answer that you give.

Page 77

1       So let's first talk about the answer that you

2   just gave to my question about whether or not, in my

3   hypothetical, Hotfile could use the fact that the

4   Vampire Diaries files were uploaded from the official

5   Warner account as an indication that the files were

6   uploaded were -- were authorized to be there.

7       And I believe, and you can correct me if this

8   is an unfair characterization of your testimony, you

9   said that it would not be reliable for Hotfile to rely

10  upon the fact that an official account was used for

11  the uploads; is that a fair characterization?

12  A   Well, I won't disagree with it for the

13  purpose of you allowing your question certainly.

14  Q   In what sense did -- did you intend the

15  meaning of the word "reliable" in that answer?

16  A   Well, it's, I think, an implication of your

17  having posed the hypothetical that you're inquiring

18  about possible business behavior that Hotfile might

19  engage in, and so Hotfile has to make decisions about

20  the business behavior that they will engage in based

21  on the information that's available to them, and there

22  becomes a question when they are working in this

23  complex domain where there are financial and legal

24  implications of any action they take and any choice

25  they make, what their sources of data are in their

1    decision-making process.

2          And so one form of the use of the word

3    "reliability," with respect to making decisions that

4    are fraught with legal and financial implications, and

5    certainly we see in the existence of this suit the --

6    the criticality of -- of those decisions and therefore

7    of the data sources.

8          And, in fact, to the extent that the

9    defendant's countersuit has merit, and I'm not making

10   a judgment on that, I'm assuming that's for a trier of

11   fact to do, but to the extent that it has merit and

12   even to the extent that the underlying data that have

13   been presented by the defendants as to -- again, I

14   believe it's plaintiff Warner -- to Warner's takedown

15   issuances of a content they did not own is correct.

16         What we have is that -- that the plaintiff,

17   this plaintiff, has, over time, taught Hotfile that

18   they are not a reliable partner with respect to what I

19   believe is their SRA account.

20         So one thing we learn from this is that when

21   one is in business and making decisions, that the

22   interactions one has with a partner teach whether or

23   not that partner is a good source of information, is a

24   good partner, is providing honest and true information

25   and so forth.

Page 79

1           And -- and this is, in a sense, a business

2    colloquial use of the word "reliable," and it's one

3    form of the -- the word "reliable" that I've been

4    using in -- in this particular part of my analysis.

5        Q     Would the fact that, in that hypothetical,

6    that an official account was used to upload the files,

7    provide any useful information to Hotfile?

8           MR. SCHOENBERG:   Same objection.

9           THE WITNESS:   I think it could be a factor

10   that could be taken into account by Hotfile, but it

11   does nothing to address many of the other

12   countervailing factors that I've also identified in

13   this specific case, which include first the

14   possibility that account credentials are being

15   misused; and, second, the fact that there have been

16   representations, as I understand it, by the defendants

17   that this plaintiff has arguably abused their

18   privileges with respect to that account.

19          So as I sit here today and as I try to

20   remember the -- the information that's been given to

21   me, the answer is yes, but; that is, it's a factor one

22   might take into account.   But if there are

23   countervailing business factors that would move your

24   decision in a different direction than I would weigh

25   it, then ultimately it would not be decisive.

Page 289

```
1              J U R A T

2

3

4    I, ANDREW S. CROMARTY, Ph.D., do hereby

5    certify under penalty of perjury that I have

6    read the foregoing transcript of my

7    deposition taken on December 16, 2011; that I

8    have made such corrections as appear noted

9    herein in ink, ~~initialed by me~~, that my / on attached

10   testimony as contained herein, as corrected,   ERRATA SHEET
                                                      Exhibit
11   is true and correct.

12

13
                                                       2012
14   DATED this 20 day of JANUARY        , 2011,

15   at Palo Alto                  , California.

16

17

18

19   _____

20        SIGNATURE OF WITNESS

21

22

23

24

25
```

Page 292

1        E R R A T A    S H E E T

2

3        I, ANDREW S. CROMARTY, Ph.D., make the

4    following changes to my deposition taken in the matter

5    of Disney Enterprises, Inc., et al., vs. Hotfile,

6    Corp., et al., taken on December 16, 2011:

7

8    DATE:_____        _____

9                                 Signature of Witness

10   Page            Line         Change

11   ____            ____         SEE ATTACHED EXHIBIT,

12   ____            ____         "Transcript Errata- Cromarty

13   ____            ____         Hotfile Deposition Dec 16, 2011

14   ____            ____         ERRATA SHEET." (ASC)

15   ____            ____         _____

16   ____            ____         _____

17   ____            ____         _____

18   ____            ____         _____

19   ____            ____         _____

20   ____            ____         _____

21   ____            ____         _____

22   ____            ____         _____

23   ____            ____         _____

24   ____            ____         _____

25   ____            ____         _____

**Transcript Errata - Cromarty Hotfile Deposition Dec 16, 2011**

ERRATA SHEET

I, ANDREW S. CROMARTY, Ph.D., make the
following changes to my deposition taken in the matter
of Disney Enterprises, Inc., et al., vs. Hotfile,
Corp., et al., taken on December 16, 2011:

DATE:   20-Jan-2012

Signature of Witness

Page Line: Change     ("a -> b" signifies "replace a with b")

p.7 L.19: "JCPenny et al." -> "J. C. Penney, et al."
p.8 L.8: "the Patent-in-Suit, and that" -> "the Patent-in-Suit that"
p.11 L.24: "this" -> "is"
p.12 L.7: "to my" -> "of my"
p.15 L.23: "legally phrased" -> "legally freighted"
p.21 L.6: "which" -> "in which"
p.26 L.8: Strike "but"
p.26 L.19: "For -- for example," -> "For, for example,"
p.27 L.5: In Mr. Platzer's text, "your" should be "their" (changes meaning of my answer)
p.27 L.19: "helpful" -> "helpfully"
p.28 L.7: "experience" -> "experience is,"
p.28 L.8: "sort of the" -> "the sort of"
p.30 L.10: strike comma
p.30 L.11: "e-mails called Kapow" -> "emails, called Kapow,"
p.31 L.23-24: "principals, and" -> "principals. And"
p.33 L.4: "publication. It's" -> "publication--it's"
p.33 L.5: "referee publication, for example, by one"  -> "refereed publication, for example--by one"
p.35 L.5: Delete paragraph indentation (changes meaning).
p.34 L.7: "Google" -> "Google is"
p.36 L.18: "report," -> "report"
p.36 L.22-23: "domain name. [par] Some" -> domain name, some"
p.37 L.5 "mathematical" -> "mathematically"
p.37 L.11: "my upload" -> "upload"
p.38 L.17,22.: Mr Platzer's text refers to "Nutella", should be "Gnutella". [I am answering his questions about Gnutella, hence affects meaning of my answers.]
p.38 L.25: "true. Generally for the 2P," -> "true generally for the P2P,"
p.39 L.15 & throughout: "Use Net" -> "Usenet"
p. 39 L.17-19: "has not been use of it. It was a use of" - "has not been. Usenet was a use of"
p.40 L.2: "much" -> "machine"
p.40 L.3-4: "files. Almost inversely" -> "files, almost universally"
p.40 L.9: "server hosted sites." -> "server hosting sites, or what have you."

Errata Page 1 of 5                                       Witness intials 

p.41 L.16: "implicit of" -> "implicit about"
p.42 L.7: "testing. If" -> "testing, if"
p.42 L.8: "unaware and" -> "unaware, and"
p.46 L.6: "risky" -> "risk a"
p.46 L.23: "going to be" -> "in a"
p.49 L.8: "which" -> "which a"
p.49 L.11: "resilient" -> "Brazilian"
p.49 L.13: "describe that or refer to the tool." -> "describe or refer to that tool."
p.49 L.16: "tool" -> "tool,"
p.49 L.21: "for" -> "from the"
p.50 L.1-2: "of that site, including Hotfile." -> "at sites including Hotfile."
p.50 L.3: "is, with" -> "is with"
p.50 L.4: "I" -> "I've"
p.50 L.22: "draw on" -> "draw"
p.52 L.15: "Kapow" -> "that Kapow"
p.52 L.17: "used" -> "used,"
p.52 L.22: "want to have" -> "want"
p.54 L.5: "of documents plus" -> "plus"
p.55 L.3: "information theoretically" -> "for information theoretic reasons"
p.55 L.11: "I've" -> "I have"
p.55 L.19: "cited." -> "cited it."
p.56 L.1: "now." -> "now, yes."
p.56 L.16: "general" -> "general,"
p.56 L.22-23: "copyright itself may need another party.  Permission for" -> "copyright is held by another party and permission for"
p.56 L.24-25: "granted. [par] The ownership information is" -> "granted. This ownership and permission is"
p.57 L.1: "matter and is noted in Appendix H. In any case," -> "matter, and as noted in Appendix I in any case"
p.57 L.2: "support the" -> "support a"
p.57 L.4: "transfers and file sharing services." -> "transfers to file sharing services in particular.'"
p.57 L.5: "In particular, that's" -> "That's"
p.58 L.2: "material" -> "materials"
p.58 L.2: "written about Kapow" -> "right in sentences about Kapow"
p.58 L.10: "list" -> "a list"
p.63 L.19: "reliable" -> "a reliable"
p.63 L.23: "there're" -> "there are"
p.64 L.2: "and impossible, probably impossible," -> "or impossible, and probably impossible,"
p.65 L.15: "burn convention" -> "Berne Convention"
p.66 L.23: "have" -> "have to have"
p.67 L.17: "would" -> "will"
p.68 L.4: "service" -> "Internet service"
p.68 L.15: "consumer-generated" -> "consumer user-generated"
p.68 L.24-25: "two documents, that the two contractual documents that the user" -> "two documents that the--two contractual documents, that the user"
p.69 L.1: "the Hotfile" -> "Hotfile's"
p.70 L.14: "service" -> "of service"

Witness intials: (initials)

p.71 L.7: "question where I'm not sure you're asking" -> "question--I'm not sure where you're also asking"
p.71 L.8: "about" -> "as to"
p.72 L.9: "information, theoretic" -> "information-theoretic"
p.72 L.19: "their" -> "their -- or an"
p.74 L.22: "explicitly" -> "illicitly"
p.75 L.1: "that a" -> "the"
p.75 L.7: "if" -> "though"
p.75 L.9: "that they're" -> "they're"
p.75 L.10: "for," -> "for it,"
p.75 L.17: "that" -> "of that"
p.77 L.13: "allowing" -> "allowing you to ask"
p.78 L.3: "'reliability,' with" -> "'reliability' is with"
p.78 L.10: "I'm assuming" -> "I assume"
p.78 L15: "of a" -> "for"
p.78 L.15-16: "correct. [par] What we" -> "correct, what we"
p.79 L.21: "is yes, but; that is," -> "is 'yes but'. That is,"
p.79 L.24: "than I would weigh" -> "that outweigh"
p.80 L.1: "if those other factors may" -> "those other factors might"
p.80 L.7 "as to, and so on." -> "as to."
p.82 L.12: misnomer" -> "misnomer,"
p.85 L.2: "as -- and" -> "as, and"
p.85 L.3: "as" -> "as,"
p.90 L.9: "as the one" -> "as one"
p.90 L.10: "answered" -> "answer"
p.90 L.22: "that" -> "as"
p.90 L.22: "report" -> "report,"
p.90 L.23: "there" -> "they're"
p.91 L.7.: "dispassionately." -> "and dispassionately."
p.91 L.11" "report" -> "report,"
p.94 L.2: "is for" -> "is: For"
p.94 L.3: "of those" -> "of"
p.94 L.4: "file sharing services server, this is 69, may" -> "file sharing service's server' -- this is 69 -- 'may"
p.94 L.7: "compliant computers connecting to it." -> "client computers connecting to it.' "
p.94 L.24: "server, at" -> "server at"
p.94 L.25: "instance" -> "instant"
p.95 L.15: "things. There" -> "things -- there"
p.96 L.18: "IPV for" -> "IPv4"
p.97 L.14: "Certain, MapQuest" -> "certain -- MapQuest"
p.97 L.15: "company, is" -> "company -- is"
p.97 L.16: "from" -> "in"
p.97 L.19: "technical" -> "technically"
p.98 L.1: "can trivially" -> "trivially can"
p.98 L.4: "outline" -> "outlined"
p.99 L.12: "intent. An induced intent" -> "intent, an induced intent, "
p.99 L.15: "elicit" -> "illicit"

p.125 L.8-9: "available. [par] One hopes," -> "available -- one hopes,"
p.125 L.22: "information theoretic" -> "information-theoretic"
p.130 L.22: "understanding. Similarly," -> "understanding, similarly,"
p.131 L.22: "is yes, when that's possible." -> "is, 'Yes when that's possible.' "
p.132 L.3: "information theoretic" -> "information-theoretic"
p. 133 L.18-19: "information, theoretic" -> "information-theoretic"
p.139 L.21: "information theoretic" -> "information-theoretic"
p.143 L.17: "small and feeling that it's a" -> "small 'n', treating it as a"
p.159 L.8: "protection" -> "protections"
p.161 L.2: "instance" -> "instant"
p.166 L.11: "the reason" -> "reasoned"
p.186 L.1: "justified?" -> "justified."
p.191 L.4: "the fingerprint" -> "the -- 'fingerprint' "
p.192 L.16: "plaintiff's" -> "plaintiffs"
p.194 L.14" efficacy, these" -> "efficacy of these"
p.194 L.20-21: "information theoretic" -> "information-theoretic"
p.200 L.25: "files, that" -> "files. That"
p.201 L.5: "that we're true" -> "it were true"
p.201 L.9-10: "servers, that" -> "servers. That"
p.209 L.22-23: "effect. [par] First," -> "effect -- first,"
p.210 L.22: "effect of" -> "effective"
p.212. L.2: "at, then" -> "at -- then"
p.215 L.15: "argument, if" "argument -- if"
p.215 L.16: "assets, and we know that just" -> "assets and we know that, just"
p.219 L.22: "one's" -> "ones"
p.220 L.13: "fact" -> "facts"
p.220 L.14 "that is produced during discovery that" -> " -- that is, produced during discovery -- that"
p.232 L.18: "network detached storage" -> "network-attached storage"
p.232 L.19: "de-duplications." -> "de-duplication."
p.233 L.7: "necessary" -> "necessarily"
p.233 L.10: strike "and"
p.235 L.25: "techniques first." -> "techniques, first."
p.236 L.18: "optimization -- for business optimization" -> "optimization, for business optimization, "
p.236 L.21: "satisfy -- let's call it the" -> "satisfy, let's call it, the"
p.238 L.4: "Oh, yes." -> "Yes."
p.239 L.20: "implemented with" -> "implemented -- with"
p.239 L.22: "requests that" -> "requests -- that"
p.240 L.11: "place, that" -> "place; that"
p.240 L.13: "physical, an asset -- file" -> "physical -- an asset, a file"
p.240 L.14: "asset -- that" -> "asset; that"
p.240 L.15: "file, and through one that has web" -> "file; and through one -- that is, web"
p.240 L.16: "you, names for it, and" -> "you -> names for it; and"
p.240 L.17: "link, and" -> "link; and"
p.240 L.20: "file; is" -> "file. Is"
p.242 L.20: "asking exactly, the Dax" -> "asking, exactly, the DAX"

Errata Page 4 of 5

Witness initials

p.252 L.8: "is -- and" -> "is, and"
p.252 L.9: "is an" -> "is, an"
p.253 L.17: "about, so I" -> "about -- so, I"
p.254 L.13: "say and" -> "say, and"
p.255 L.7: "enforced.  It's" -> "enforced; it's"
p.255 L.8: "providers that -- it" -> "providers; that it"
p.256 L.8: "of technical or" -> "of 'technical' or"
p.256 L.9" "performance or technical operations involves" -> " 'performance' or 'technical operations' involves"
p.256 L.18: "burden we've" -> "burden. We've"
p.278 L.25: "as we're all in this together, and" -> "as, 'We're all in this together', and"
p.282 L.2: "is the number" -> "is it's a number"
p.282 L.20: "inde" -> "indie"
p.283 L.1: "damages that" -> "damages, that"
p.285 L.20: "industries and have been for at least a decade" -> "industries, and have been for at least a decade, "

–       END OF ERRATA       –

Witness intials:

Page 290

1                    CERTIFICATE OF REPORTER

2

3

4          I, ANDREA M. IGNACIO HOWARD, hereby certify

5    that the witness in the foregoing deposition was by me

6    duly sworn to tell the truth, the whole truth, and

7    nothing but the truth in the within-entitled cause;

8

9          That said deposition was taken in shorthand

10   by me, a Certified Shorthand Reporter of the State of

11   California, and was thereafter transcribed into

12   typewriting, and that the foregoing transcript

13   constitutes a full, true and correct report of said

14   deposition and of the proceedings which took place;

15

16         That I am a disinterested person to the said

17   action.

18

19         IN WITNESS WHEREOF, I have hereunto set my

20   hand this 21st day of December 2011.

21

22   _____

23   ANDREA M. IGNACIO HOWARD, RPR, CCRR, CLR, CSR No. 9830

24

25