# EXHIBIT 2

10-3270, 10-3342
*Viacom Int'l, Inc., Football Ass'n Premier League Ltd. v. YouTube, Inc.*

## UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

August Term, 2011

(Argued: October 18, 2011)                    Decided: April 5, 2012)

Docket No. 10-3270-cv

VIACOM INTERNATIONAL, INC., COMEDY PARTNERS, COUNTRY MUSIC TELEVISION, INC., PARAMOUNT PICTURES CORPORATION, BLACK ENTERTAINMENT TELEVISION, LLC,

> *Plaintiffs-Appellants,*

> v.

YOUTUBE, INC., YOUTUBE, LLC, GOOGLE, INC.,

> *Defendants-Appellees.*

Docket No. 10-3342-cv

THE FOOTBALL ASSOCIATION PREMIER LEAGUE LIMITED, on behalf of themselves and all others similarly situated, BOURNE CO., CAL IV ENTERTAINMENT, LLC, CHERRY LANE MUSIC PUBLISHING COMPANY, INC., X-RAY DOG MUSIC, INC., FÉDÉRATION FRANÇAISE DE TENNIS, MURBO MUSIC PUBLISHING, INC., STAGE THREE MUSIC (US), INC.,

> *Plaintiffs-Appellants,*

Robert Tur, d/b/a Los Angeles News Service, The Scottish Premier League Limited, The Music Force Media Group LLC, The Music Force, LLC, Sin-Drome Records, Ltd., on behalf of themselves and all others similarly situated, National Music Publishers' Association, The Rodgers & Hammerstein Organization, Edward B. Marks Music Company, Freddy Bienstock Music Company, d/b/a Bienstock Publishing Company, Alley Music Corporation,

> *Plaintiffs,*

> v.

YOUTUBE, INC., YOUTUBE, LLC, GOOGLE, INC.,

> *Defendants-Appellees.*

1

Before: CABRANES and LIVINGSTON, *Circuit Judges.*[*]

Appeal from the judgment of the United States District Court for the Southern District of New York (Louis L. Stanton, *Judge*), granting summary judgment to the defendants-appellees on all claims of direct and secondary copyright infringement based on a finding that the defendants-appellees were entitled to safe harbor protection under the Digital Millennium Copyright Act ("DMCA"), 17 U.S.C. § 512.  Although the District Court correctly held that the § 512(c) safe harbor requires knowledge or awareness of specific infringing activity, we vacate the order granting summary judgment because a reasonable jury could find that YouTube had actual knowledge or awareness of specific infringing activity on its website.  We further hold that the District Court erred by interpreting the "right and ability to control" infringing activity to require "item-specific" knowledge.  Finally, we affirm the District Court's holding that three of the challenged YouTube software functions fall within the safe harbor for infringement that occurs "by reason of" storage at the direction of the user, and remand for further fact-finding with respect to a fourth software function.

Affirmed in part, vacated in part, and remanded.

> PAUL M. SMITH, Jenner & Block LLP, Washington, DC (William M. Hohengarten, Scott B. Wilkens, Matthew S. Hellman, and Susan J. Kohlmann, Jenner & Block LLP, New York, NY, and Washington, DC; Theodore B. Olson and Matthew D. McGill, Gibson, Dunn & Crutcher LLP, Washington, DC; Stuart J. Baskin, Shearman & Sterling LLP, New York, NY, *on the brief*), *for Plaintiffs-Appellants Viacom International, Inc., et al.*

> CHARLES S. SIMS, Proskauer Rose LLP, New York, NY (William M. Hart, Noah Siskind Gitterman, and Elizabeth A. Figueira, Proskauer Rose LLP, New

---

[*] The Honorable Roger J. Miner, who was originally assigned to the panel, died prior to the resolution of this case.  The remaining two members of the panel, who are in agreement, have determined the matter.  *See* 28 U.S.C. § 46(d); 2d Cir. IOP E(b); *United States v. Desimone*, 140 F.3d 457, 458–59 (2d Cir. 1998).

2

York, NY, *on the brief*), *for Plaintiffs-Appellants Football Association Premier League Ltd., et al.*; Max W. Berger and John C. Browne, Bernstein Litowitz Berger & Grossmann LLP, New York, NY, *on the brief, for Plaintiffs-Appellants Football Association Premier League Ltd., Bourne Co., Murbo Music Publishing, Inc., Cherry Lane Music Publishing Co., Inc., X-Ray Dog Music, Inc., and Fédération Française de Tennis*; Louis M. Solomon and Hal S. Shaftel, Cadwalader, Wickersham & Taft, LLP, New York, NY, *on the brief, for Plaintiff-Appellant Football Association Premier League Ltd.*; Jacqueline C. Charlesworth and Cindy P. Abramson, Morrison & Foerster, New York, NY, and David S. Stellings and Annika K. Martin, Lieff Cabraser Heimann & Bernstein, LLP, New York, NY, *on the brief, for Plaintiff-Appellant Stage Three Music (US), Inc., and Plaintiffs-Appellants National Music Publishers' Association, Rodgers & Hammerstein Organization, Edward B. Marks Music Co., Freddy Bienstock Music Co. d/b/a Bienstock Publishing Co., and Alley Music Corporation*; Daniel Girard and Christina Connolly Sharp, Girard Gibbs LLP, San Francisco, CA, David Garrison, Barrett Johnston & Parsley, Nashville, TN, and Kevin Doherty, Burr & Forman LLP, Nashville, TN, *on the brief, for Plaintiff-Appellant Cal IV Entertainment LLC*; Christopher Lovell and Christopher M. McGrath, Lovell Stewart Halebian LLP, New York, NY, Jeffrey L. Graubart, Pasadena, CA, and Steve D'Onofrio, Washington, DC, *for Plaintiffs The Music Force Media Group LLC, The Music Force, LLC, and Sin-Drome Records, Ltd.*

ANDREW H. SCHAPIRO, Mayer Brown LLP, New York, NY (A. John P. Mancini and Brian M. Willen, Mayer Brown LLP, New York, NY; David H. Kramer, Michael H. Rubin, and Bart E. Volkmer, Wilson Sonsini Goodrich & Rosati, Palo Alto, CA, *on the brief*), *for Defendants-Appellees*.

Clifford M. Sloan (Christopher G. Clark and Mary E. Rasenberger, *on the brief*), Skadden, Arps, Slate, Meagher & Flom LLP, New York, NY, and Washington, DC, *for amici curiae* Advance Publications, Inc., Association of American Publishers, Association of American University Presses, The Associated Press, The Center for the Rule of Law, Gannett Co., Inc., ICBC Broadcast Holdings, Inc., Institute for Policy Innovation, The

3

Ladies Professional Golf Association, The McClatchy Co., The Media Institute, Minority Media & Telecommunications Council, Inc., National Association of Black Owned Broadcasters, The National Football League, Newspaper Association of America, Picture Archive Council of America, Professional Photographers of America, Radio Television Digital News Association, Rosetta Stone Ltd., The E.W. Scripps Co., Sports Rights Owners Coalition, The Washington Post, and Zuffa LLC, *in support of Plaintiffs-Appellants.*

Peter D. DeChiara, Cohen, Weiss & Simon LLP, New York, NY, *for amici curiae* American Federation of Musicians, American Federation of Television & Radio Artists, Directors Guild of America, Inc., International Alliance of Theatrical Stage Employees, Screen Actors Guild, Inc., and Studio Transportation Drivers, Local 399, International Brotherhood of Teamsters, *in support of Plaintiffs-Appellants.*

Russell J. Frackman, Mitchell Silberberg & Knupp LLP, Los Angeles, CA, *for amici curiae* Broadcast Music, Inc., American Society of Composers, Authors and Publishers, SESAC, Inc., The Society of Composers and Lyricists, The Association of Independent Music Publishers, Songwriters Guild of America, The Recording Academy, The Nashville Songwriters Association International, American Association of Independent Music, Music Publishers' Association of the United States, Lisa Thomas Music Services, LLC, Garth Brooks, Bruce Hornsby, Boz Scaggs, Sting, Roger Waters, Glenn Frey, Don Henley, Timothy B. Schmit, and Joe Walsh (The Eagles), *in support of Plaintiffs-Appellants.*

Carey R. Ramos (Lynn B. Bayard and Darren W. Johnson, *on the brief*), Paul, Weiss, Rifkind, Wharton & Garrison LLP, New York, NY, *for amici curiae* Stuart N. Brotman, Ronald A. Cass, and Raymond T. Nimmer, *in support of Plaintiffs-Appellants.*

Jonathan L. Marcus (Martin F. Hansen, Matthew Berns, Brian D. Ginsberg & Evan R. Cox, *on the brief*), Covington & Burling LLP, New York, NY, San Francisco, CA, and

4

Washington, DC, *for amicus curiae* Business Software
Alliance, *in support of Plaintiffs-Appellants.*

Robert Penchina, Levine Sullivan Koch & Schulz, L.L.P.,
New York, NY, *for amicus curiae* CBS Corp., *in support of
Plaintiffs-Appellants.*

Hon. Bruce A. Lehman (Jason D. Koch and Cameron
Coffey, *on the brief*), Washington, DC, *for amicus curiae*
International Intellectual Property Institute, *in support of
Plaintiffs-Appellants.*

Bruce E. Boyden, Marquette University Law School,
Milwaukee, WI, *for amici curiae* Intellectual Property
Law Professors, *in support of Plaintiffs-Appellants.*

Gregory G. Garre, Latham & Watkins LLP, Washington, DC
(Lori Alvino McGill, Latham & Watkins LLP,
Washington, DC, Thomas W. Burt, Microsoft Corp.,
Redmond, WA, and Jacob Schatz, Electronic Arts Inc.,
Redwood City, CA, *on the brief*), *for amicus curiae*
Microsoft Corp. & Electronic Arts Inc., *in support of
Plaintiffs-Appellants.*

Kelly M. Klaus, Munger, Tolles & Olson LLP, Los Angeles,
CA (Susan Cleary, Independent Film & Television
Alliance, *on the brief*) *for amicus curiae* Motion Picture
Association of America, Independent Film &
Television Alliance, *in support of Plaintiffs-Appellants.*

Richard B. Kendall (Laura W. Brill and Joshua Y. Karp, *on the
brief*), Kendall Brill & Klieger LLP, Los Angeles, CA, *for
amici curiae* Matthew L. Spitzer, John R. Allison, Robert G.
Bone, Hugh C. Hansen, Michael S. Knoll, Reinier H.
Kraakman, Alan Schwartz, and Robert E. Scott, *in support
of Plaintiffs-Appellants.*

Andrew M. Riddles, Crowell & Moring LLP, New York, NY
(Michael J. Songer, Crowell & Moring LLP, Washington,
DC, and Daniel J. Popeo and Cory L. Andrews,
Washington Legal Foundation, Washington, DC, *on the
brief*), *for amicus curiae* Washington Legal Foundation, *in
support of Plaintiffs-Appellants.*

5

Ron Lazebnik, Lincoln Square Legal Services, Inc., New York, NY, *for amici curiae* Anaheim Ballet, Michael Moore, Khan Academy Inc., Adam Bahner, Michael Bassik, Dane Boedigheimer, Matthew Brown, Michael Buckley, Shay Butler, Charles Como, Iman Crosson, Philip De Vellis, Rawn Erickson, Hank Green, John Green, Kassem Gharaibeh, William Louis Hyde, Kevin Nalty, Allison Speed, Charles Todd, Charles Trippy, and Barnett Zitron, *in support of Defendants-Appellees.*

Seth D. Greenstein, Constantine Cannon LLP, Washington, DC, *for amicus curiae* Professor Michael Carrier, *in support of Defendants-Appellees.*

Jonathan Band, Washington, DC (Markham C. Erickson, Holch & Erickson LLP, Washington, DC, and Matthew Schruers, Computer & Communications Industry Association, Washington, DC, *on the brief*), *for amici curiae* Computer & Communications Industry Association, and Netcoalition, *in support of Defendants-Appellees.*

Michael Barclay, Menlo Park, CA; Deborah R. Gerhardt, UNC School of Law, Chapel Hill, NC, *for amicus curiae* Consumer Electronics Association, *in support of Defendants-Appellees.*

Andrew P. Bridges, Winston & Strawn LLP, San Francisco, CA, *for amici curiae* eBay Inc., Facebook, Inc., IAC/Interactivecorp., and Yahoo! Inc., *in support of Defendants-Appellees.*

Corynne M. McSherry (Abigail Phillips, *on the brief*), Electronic Frontier Foundation, San Francisco, CA, *for amici curiae* Electronic Frontier Foundation, Center for Democracy & Technology, International Federation of Library Associations & Institutions, American Library Association, Association of College & Research Libraries, and Association of Research Libraries, *in support of Defendants-Appellees.*

David T. Goldberg (Sean H. Donahue, *on the brief*), Donahue & Goldberg, LLP, New York, NY, and Washington, DC, *for amici curiae* Human Rights Watch, Freedom House, Reporters Without Borders, and Access, *in support of Defendants-Appellees.*

6

Rebecca S. Engrav, Perkins Coie LLP, Seattle, WA, *for amici curiae* Intellectual Property and Internet Law Professors, *in support of Defendants-Appellees.*

Gregory P. Gulia (Vanessa C. Hew and R. Terry Parker, *on the brief*), Duane Morris LLP, New York, NY, *for amicus curiae* MP3Tunes, Inc., *in support of Defendants-Appellees.*

Jennifer M. Urban, Samuelson Law, Technology & Public Policy Clinic, University of California, Berkeley School of Law, Berkeley, CA, *for amici curiae* National Alliance for Media Art and Culture and The Alliance for Community Media, *in support of Defendants-Appellees.*

Anthony P. Schoenberg (Stephanie P. Skaff, Deepak Gupta, and David K. Ismay, *on the brief*), Farella Braun & Martel LLP, San Francisco, CA, *for amici curiae* National Consumers League, Consumers Union of United States, Inc., Consumer Action, and United States Student Association, *in support of Defendants-Appellees.*

Joseph C. Gratz (Michael H. Page and Ragesh K. Tangri, *on the brief*), Durie Tangri LLP, San Francisco, CA, *for amici curiae* National Venture Capital Association, *in support of Defendants-Appellees.*

Benjamin J. Kallos, New York, NY (Sherwin Siy and Michael Weinberg, Public Knowledge, Washington, DC, *on the brief*), *for amicus curiae* Public Knowledge, *in support of Defendants-Appellees.*

Patrick J. Coyne, Finnegan Henderson Farabow Garrett & Dunner, LLP, Washington, DC (David W. Hill, American Intellectual Property Law Association, Arlington, VA, *on the brief*), *for amicus curiae* American Intellectual Property Law Association, *in support of neither party.*

Jeremy H. Stern, Stern Digital Strategies, Manhattan Beach, CA (Partha P. Chattoraj, Markowitz & Chattoraj LLP, New York, NY, *on the brief*), *for amicus curiae* Audible Magic Corp., *in support of neither party.*

Stephen M. Wurzburg, Pillsbury Winthrop Shaw Pittman LLP, Palo Alto, CA, *for amicus curiae* Vobile, Inc., *in support of neither party.*

7

JOSÉ A. CABRANES, *Circuit Judge*:

This appeal requires us to clarify the contours of the "safe harbor" provision of the Digital Millennium Copyright Act (DMCA) that limits the liability of online service providers for copyright infringement that occurs "by reason of the storage at the direction of a user of material that resides on a system or network controlled or operated by or for the service provider." 17 U.S.C. § 512(c).[1]

The plaintiffs-appellants in these related actions—Viacom International, Inc. ("Viacom"), The Football Association Premier League Ltd. ("Premier League"), and various film studios, television networks, music publishers, and sports leagues (jointly, the "plaintiffs")[2]—appeal from an August 10, 2010 judgment of the United States District Court for the Southern District of New York (Louis L. Stanton, *Judge*), which granted summary judgment to defendants-appellees YouTube, Inc., YouTube, LLC, and Google Inc. (jointly, "YouTube" or the "defendants"). The plaintiffs alleged direct and secondary copyright infringement based on the public performance, display, and reproduction of approximately 79,000 audiovisual "clips" that appeared on the YouTube website between 2005 and 2008. They demanded, *inter alia*, statutory damages pursuant to 17 U.S.C. § 504(c) or, in the alternative, actual damages from the alleged infringement, as well as declaratory and injunctive relief.[3]

In a June 23, 2010 Opinion and Order (the "June 23 Opinion"), the District Court held that the defendants were entitled to DMCA safe harbor protection primarily because they had insufficient notice of the particular infringements in suit. *Viacom Int'l, Inc. v. YouTube, Inc.*, 718 F. Supp. 2d 514, 529 (S.D.N.Y. 2010). In construing the statutory safe harbor, the District Court concluded that the "actual

---

[1] The relevant provisions of 17 U.S.C. § 512(c) appear in Appendix A.

[2] The plaintiffs-appellants in *Viacom Int'l, Inc. v. YouTube, Inc.*, No. 10-3270-cv, are Viacom, Comedy Partners, Country Music Television, Inc., Paramount Pictures Corporation, and Black Entertainment Television, LLC (jointly, the "Viacom plaintiffs"). The plaintiffs-appellants in *Football Ass'n Premier League Ltd. v. YouTube, Inc.*, No. 10-3342-cv, are Premier League, Bourne Co., Cal IV Entertainment, LLC, Cherry Lane Music Publishing Company, Inc., X-Ray Dog Music, Inc., Fédération Française de Tennis, Murbo Music Publishing, Inc., and Stage Three Music (US), Inc. (jointly, the "class plaintiffs").

[3] The class plaintiffs also sought class certification pursuant to Rule 23 of the Federal Rules of Civil Procedure.

8

knowledge" or "aware[ness] of facts or circumstances" that would disqualify an online service provider from safe harbor protection under § 512(c)(1)(A) refer to "knowledge of specific and identifiable infringements." *Id.* at 523.  The District Court further held that item-specific knowledge of infringing activity is required for a service provider to have the "right and ability to control" infringing activity under § 512(c)(1)(B).  *Id.* at 527.  Finally, the District Court held that the replication, transmittal, and display of videos on YouTube constituted activity "by reason of the storage at the direction of a user" within the meaning of § 512(c)(1).  *Id.* at 526–27.

These related cases present a series of significant questions of statutory construction.  We conclude that the District Court correctly held that the § 512(c) safe harbor requires knowledge or awareness of specific infringing activity, but we vacate the order granting summary judgment because a reasonable jury could find that YouTube had actual knowledge or awareness of specific infringing activity on its website.  We further hold that the District Court erred by interpreting the "right and ability to control" provision to require "item-specific" knowledge.  Finally, we affirm the District Court's holding that three of the challenged YouTube software functions fall within the safe harbor for infringement that occurs "by reason of" user storage; we remand for further fact-finding with respect to a fourth software function.

## BACKGROUND

### A.  The DMCA Safe Harbors

"The DMCA was enacted in 1998 to implement the World Intellectual Property Organization Copyright Treaty," *Universal City Studios, Inc. v. Corley*, 273 F.3d 429, 440 (2d Cir. 2001), and to update domestic copyright law for the digital age, *see Ellison v. Robertson*, 357 F.3d 1072, 1076 (9th Cir. 2004). Title II of the DMCA, separately titled the "Online Copyright Infringement Liability Limitation Act" (OCILLA), was designed to "clarif[y] the liability faced by service providers who transmit potentially

9

infringing material over their networks." S. Rep. No. 105-190 at 2 (1998). But "[r]ather than embarking upon a wholesale clarification" of various copyright doctrines, Congress elected "to leave current law in its evolving state and, instead, to create a series of 'safe harbors[ ]' for certain common activities of service providers." *Id.* at 19. To that end, OCILLA established a series of four "safe harbors" that allow qualifying service providers to limit their liability for claims of copyright infringement based on (a) "transitory digital network communications," (b) "system caching," (c) "information residing on systems or networks at [the] direction of users," and (d) "information location tools." 17 U.S.C. §§ 512(a)–(d).

To qualify for protection under any of the safe harbors, a party must meet a set of threshold criteria. First, the party must in fact be a "service provider," defined, in pertinent part, as "a provider of online services or network access, or the operator of facilities therefor." 17 U.S.C. § 512(k)(1)(B). A party that qualifies as a service provider must also satisfy certain "conditions of eligibility," including the adoption and reasonable implementation of a "repeat infringer" policy that "provides for the termination in appropriate circumstances of subscribers and account holders of the service provider's system or network." *Id.* § 512(i)(1)(A). In addition, a qualifying service provider must accommodate "standard technical measures" that are "used by copyright owners to identify or protect copyrighted works." *Id.* §§ 512(i)(1)(B), (i)(2).

Beyond the threshold criteria, a service provider must satisfy the requirements of a particular safe harbor. In this case, the safe harbor at issue is § 512(c), which covers infringement claims that arise "by reason of the storage at the direction of a user of material that resides on a system or network controlled or operated by or for the service provider." *Id.* § 512(c)(1). The § 512(c) safe harbor will apply only if the service provider:

(A)  (i)  does not have actual knowledge that the material or an activity using the material on the system or network is infringing;

(ii)  in the absence of such actual knowledge, is not aware of facts or circumstances from which infringing activity is apparent; or

(iii)  upon obtaining such knowledge or awareness, acts expeditiously to remove, or disable access to, the material;

(B)  does not receive a financial benefit directly attributable to the infringing activity, in a case in which the service provider has the right and ability to control such activity; and

(C)  upon notification of claimed infringement as described in paragraph (3), responds expeditiously to remove, or disable access to, the material that is claimed to be infringing or to be the subject of infringing activity.

*Id.* §§ 512(c)(1)(A)–(C).  Section 512(c) also sets forth a detailed notification scheme that requires service providers to "designate[ ] an agent to receive notifications of claimed infringement," *id.* § 512(c)(2), and specifies the components of a proper notification, commonly known as a "takedown notice," to that agent, *see id.* § 512(c)(3).  Thus, actual knowledge of infringing material, awareness of facts or circumstances that make infringing activity apparent, or receipt of a takedown notice will each trigger an obligation to expeditiously remove the infringing material.

With the statutory context in mind, we now turn to the facts of this case.

### B.  Factual Background

YouTube was founded in February 2005 by Chad Hurley ("Hurley"), Steve Chen ("Chen"), and Jawed Karim ("Karim"), three former employees of the internet company Paypal.  When YouTube announced the "official launch" of the website in December 2005, a press release described YouTube as a "consumer media company" that "allows people to watch, upload, and share personal video clips at www.YouTube.com."  Under the slogan "Broadcast yourself," YouTube achieved rapid prominence and profitability, eclipsing competitors such as Google Video and Yahoo Video by wide margins.  In

11

November 2006, Google acquired YouTube in a stock-for-stock transaction valued at $1.65 billion.  By March 2010, at the time of summary judgment briefing in this litigation, site traffic on YouTube had soared to more than 1 billion daily video views, with more than 24 hours of new video uploaded to the site every minute.

The basic function of the YouTube website permits users to "upload" and view video clips free of charge.  Before uploading a video to YouTube, a user must register and create an account with the website.  The registration process requires the user to accept YouTube's Terms of Use agreement, which provides, *inter alia*, that the user "will not submit material that is copyrighted . . . unless [he is] the owner of such rights or ha[s] permission from their rightful owner to post the material and to grant YouTube all of the license rights granted herein."  When the registration process is complete, the user can sign in to his account, select a video to upload from the user's personal computer, mobile phone, or other device, and instruct the YouTube system to upload the video by clicking on a virtual upload "button."

Uploading a video to the YouTube website triggers a series of automated software functions.  During the upload process, YouTube makes one or more exact copies of the video in its original file format.  YouTube also makes one or more additional copies of the video in "Flash" format,[4] a process known as "transcoding."  The transcoding process ensures that YouTube videos are available for viewing by most users at their request.  The YouTube system allows users to gain access to video content by "streaming" the video to the user's computer in response to a playback request.  YouTube uses a computer algorithm to identify clips that are "related" to a video the user watches and display links to the "related" clips.

---

[4] The "Flash" format "is a highly compressed streaming format that begins to play instantly.  Unlike other delivery methods, it does not require the viewer to download the entire video file before viewing."  Joint App'x IV:73.

### C.  Procedural History

Plaintiff Viacom, an American media conglomerate, and various Viacom affiliates filed suit against YouTube on March 13, 2007, alleging direct and secondary copyright infringement[5] based on the public performance, display, and reproduction of their audiovisual works on the YouTube website. Plaintiff Premier League, an English soccer league, and Plaintiff Bourne Co. filed a putative class action against YouTube on May 4, 2007, alleging direct and secondary copyright infringement on behalf of all copyright owners whose material was copied, stored, displayed, or performed on YouTube without authorization.  Specifically at issue were some 63,497 video clips identified by Viacom, as well as 13,500 additional clips (jointly, the "clips-in-suit") identified by the putative class plaintiffs.

The plaintiffs in both actions principally demanded statutory damages pursuant to 17 U.S.C. § 504(c) or, in the alternative, actual damages plus the defendants' profits from the alleged infringement, as well as declaratory and injunctive relief.[6]  Judge Stanton, to whom the *Viacom* action was assigned, accepted the *Premier League* class action as related.  At the close of discovery, the parties in both actions cross-moved for partial summary judgment with respect to the applicability of the DMCA safe harbor defense.[7]

In the dual-captioned June 23 Opinion, the District Court denied the plaintiffs' motions and granted summary judgment to the defendants, finding that YouTube qualified for DMCA safe harbor protection with respect to all claims of direct and secondary copyright infringement.  *Viacom Int'l*, 718 F. Supp. 2d at 529.  The District Court prefaced its analysis of the DMCA safe harbor by holding that, based on the plaintiffs' summary judgment submissions, "a jury could find that the defendants not only

---

[5] Doctrines of secondary copyright infringement include contributory, vicarious, and inducement liability.  *See Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*, 545 U.S. 913, 930–31, 936–37 (2005).

[6] National Music Publishers' Association, one of the named plaintiffs in the putative class action, seeks only equitable relief.

[7] It is undisputed that all clips-in-suit had been removed from the YouTube website by the time of summary judgment, mostly in response to DMCA takedown notices.  *Viacom Int'l*, 718 F. Supp. 2d at 519.

13

were generally aware of, but welcomed, copyright-infringing material being placed on their website." *Id.* at 518. However, the District Court also noted that the defendants had properly designated an agent pursuant to § 512(c)(2), and "when they received specific notice that a particular item infringed a copyright, they swiftly removed it." *Id.* at 519. Accordingly, the District Court identified the crux of the inquiry with respect to YouTube's copyright liability as follows:

> [T]he critical question is whether the statutory phrases "actual knowledge that the material or an activity using the material on the system or network is infringing," and "facts or circumstances from which infringing activity is apparent" in § 512(c)(1)(A)(i) and (ii) mean a general awareness that there are infringements (here, claimed to be widespread and common), or rather mean actual or constructive knowledge of specific and identifiable infringements of individual items.

*Id.* After quoting at length from the legislative history of the DMCA, the District Court held that "the phrases 'actual knowledge that the material or an activity' is infringing, and 'facts or circumstances' indicating infringing activity, describe knowledge of specific and identifiable infringements of particular individual items." *Id.* at 523. "Mere knowledge of [the] prevalence of such activity in general," the District Court concluded, "is not enough." *Id.*

In a final section labeled "Other Points," the District Court rejected two additional claims. First, it rejected the plaintiffs' argument that the replication, transmittal and display of YouTube videos are functions that fall outside the protection § 512(c)(1) affords for "infringement of copyright by reason of . . . storage at the direction of the user." *Id.* at 526–27. Second, it rejected the plaintiffs' argument that YouTube was ineligible for safe harbor protection under the control provision, holding that the "right and ability to control" infringing activity under § 512(c)(1)(B) requires "item-specific" knowledge thereof, because "the provider must know of the particular case before he can control it." *Id.* at 527.

Following the June 23 Opinion, final judgment in favor of YouTube was entered on August 10, 2010. These appeals followed.

14

## DISCUSSION

We review an order granting summary judgment *de novo*, drawing all factual inferences in favor of the non-moving party. *See, e.g., Paneccasio v. Unisource Worldwide, Inc.*, 532 F.3d 101, 107 (2d Cir. 2008). "Summary judgment is proper only when, construing the evidence in the light most favorable to the non-movant, 'there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Doninger v. Niehoff*, 642 F.3d 334, 344 (2d Cir. 2011) (quoting Fed. R. Civ. P. 56(a)).

### A.  Actual and "Red Flag" Knowledge: § 512(c)(1)(A)

The first and most important question on appeal is whether the DMCA safe harbor at issue requires "actual knowledge" or "aware[ness]" of facts or circumstances indicating "specific and identifiable infringements," *Viacom*, 718 F. Supp. 2d at 523.  We consider first the scope of the statutory provision and then its application to the record in this case.

### 1.  The Specificity Requirement

"As in all statutory construction cases, we begin with the language of the statute," *Barnhart v. Sigmon Coal Co.*, 534 U.S. 438, 450 (2002).  Under § 512(c)(1)(A), safe harbor protection is available only if the service provider:

> (i)   does not have actual knowledge that the material or an activity using the material on the system or network is infringing;
>
> (ii)  in the absence of such actual knowledge, is not aware of facts or circumstances from which infringing activity is apparent; or
>
> (iii) upon obtaining such knowledge or awareness, acts expeditiously to remove, or disable access to, the material . . . .

17 U.S.C. § 512(c)(1)(A).  As previously noted, the District Court held that the statutory phrases "actual knowledge that the material . . . is infringing" and "facts or circumstances from which infringing activity is apparent" refer to "knowledge of specific and identifiable infringements." *Viacom*, 718 F. Supp. 2d at 523.  For the reasons that follow, we substantially affirm that holding.

15

Although the parties marshal a battery of other arguments on appeal, it is the text of the statute that compels our conclusion. In particular, we are persuaded that the basic operation of § 512(c) requires knowledge or awareness of specific infringing activity. Under § 512(c)(1)(A), knowledge or awareness alone does not disqualify the service provider; rather, the provider that gains knowledge or awareness of infringing activity retains safe-harbor protection if it "acts expeditiously to remove, or disable access to, the material." 17 U.S.C. § 512(c)(1)(A)(iii). Thus, the nature of the removal obligation itself contemplates knowledge or awareness of specific infringing material, because expeditious removal is possible only if the service provider knows with particularity which items to remove. Indeed, to require expeditious removal in the absence of specific knowledge or awareness would be to mandate an amorphous obligation to "take commercially reasonable steps" in response to a generalized awareness of infringement. Viacom Br. 33. Such a view cannot be reconciled with the language of the statute, which requires "expeditious[ ]" action to remove or disable *the material* at issue. 17 U.S.C. § 512(c)(1)(A)(iii) (emphasis added).

On appeal, the plaintiffs dispute this conclusion by drawing our attention to § 512(c)(1)(A)(ii), the so-called "red flag" knowledge provision. *See id.* § 512(c)(1)(A)(ii) (limiting liability where, "in the absence of such actual knowledge, [the service provider] is not aware of facts or circumstances from which infringing activity is apparent"). In their view, the use of the phrase "facts or circumstances" demonstrates that Congress did not intend to limit the red flag provision to a particular type of knowledge. The plaintiffs contend that requiring awareness of specific infringements in order to establish "aware[ness] of facts or circumstances from which infringing activity is apparent," 17 U.S.C. § 512(c)(1)(A)(ii), renders the red flag provision superfluous, because that provision would be satisfied only when the "actual knowledge" provision is also satisfied. For that reason, the plaintiffs urge the

16

Court to hold that the red flag provision "requires less specificity" than the actual knowledge provision. Pls.' Supp. Br. 1.

This argument misconstrues the relationship between "actual" knowledge and "red flag" knowledge. It is true that "we are required to 'disfavor interpretations of statutes that render language superfluous.'" *Conn. ex rel. Blumenthal v. U.S. Dep't of the Interior*, 228 F.3d 82, 88 (2d Cir. 2000) (quoting *Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 253 (1992)). But contrary to the plaintiffs' assertions, construing § 512(c)(1)(A) to require actual knowledge or awareness of specific instances of infringement does not render the red flag provision superfluous. The phrase "actual knowledge," which appears in § 512(c)(1)(A)(i), is frequently used to denote subjective belief. *See, e.g., United States v. Quinones*, 635 F.3d 590, 602 (2d Cir. 2011) ("[T]he belief held by the defendant need not be reasonable in order for it to defeat . . . actual knowledge."). By contrast, courts often invoke the language of "facts or circumstances," which appears in § 512(c)(1)(A)(ii), in discussing an objective reasonableness standard. *See, e.g., Maxwell v. City of New York*, 380 F.3d 106, 108 (2d Cir. 2004) ("Police officers' application of force is excessive . . . if it is objectively unreasonable in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." (internal quotation marks omitted)).

The difference between actual and red flag knowledge is thus not between specific and generalized knowledge, but instead between a subjective and an objective standard. In other words, the actual knowledge provision turns on whether the provider actually or "subjectively" knew of specific infringement, while the red flag provision turns on whether the provider was subjectively aware of facts that would have made the specific infringement "objectively" obvious to a reasonable person. The red flag provision, because it incorporates an objective standard, is not swallowed up by the actual

17

knowledge provision under our construction of the § 512(c) safe harbor.  Both provisions do independent work, and both apply only to specific instances of infringement.

The limited body of case law interpreting the knowledge provisions of the § 512(c) safe harbor comports with our view of the specificity requirement.  Most recently, a panel of the Ninth Circuit addressed the scope of § 512(c) in *UMG Recordings, Inc. v. Shelter Capital Partners LLC*, 667 F.3d 1022 (9th Cir. 2011), a copyright infringement case against Veoh Networks, a video-hosting service similar to YouTube.[8]  As in this case, various music publishers brought suit against the service provider, claiming direct and secondary copyright infringement based on the presence of unauthorized content on the website, and the website operator sought refuge in the § 512(c) safe harbor.  The Court of Appeals affirmed the district court's determination on summary judgment that the website operator was entitled to safe harbor protection.  With respect to the actual knowledge provision, the panel declined to "adopt[ ] a broad conception of the knowledge requirement," *id.* at 1038, holding instead that the safe harbor "[r]equir[es] specific knowledge of particular infringing activity," *id.* at 1037.  The Court of Appeals "reach[ed] the same conclusion" with respect to the red flag provision, noting that "[w]e do not place the burden of determining whether [materials] are actually illegal on a service provider." *Id.* at 1038 (alterations in original) (quoting *Perfect 10, Inc. v. CCBill LLC*, 488 F.3d 1102, 1114 (9th Cir. 2007)).

Although *Shelter Capital* contains the most explicit discussion of the § 512(c) knowledge provisions, other cases are generally in accord.  *See, e.g., Capitol Records, Inc. v. MP3tunes, LLC*, __ F. Supp. 2d __, 2011 WL 5104616, at *14 (S.D.N.Y. Oct. 25, 2011) ("Undoubtedly, MP3tunes is aware that some level of infringement occurs.  But, there is no genuine dispute that MP3tunes did not have specific 'red flag' knowledge with respect to any particular link . . . ."); *UMG Recordings, Inc. v. Veoh Networks, Inc.*, 665 F. Supp. 2d 1099, 1108 (C.D. Cal. 2009) ("*UMG II*") ("[I]f investigation of 'facts and

---

[8] Veoh Networks operates a website that "allows people to share video content over the Internet." *Shelter Capital*, 667 F.3d at 1026.

circumstances' is required to identify material as infringing, then those facts and circumstances are not 'red flags.'"). While we decline to adopt the reasoning of those decisions *in toto*, we note that no court has embraced the contrary proposition—urged by the plaintiffs—that the red flag provision "requires less specificity" than the actual knowledge provision.

Based on the text of § 512(c)(1)(A), as well as the limited case law on point, we affirm the District Court's holding that actual knowledge or awareness of facts or circumstances that indicate specific and identifiable instances of infringement will disqualify a service provider from the safe harbor.

### 2.   The Grant of Summary Judgment

The corollary question on appeal is whether, under the foregoing construction of § 512(c)(1)(A), the District Court erred in granting summary judgment to YouTube on the record presented. For the reasons that follow, we hold that although the District Court correctly interpreted § 512(c)(1)(A), summary judgment for the defendants was premature.

### i.   Specific Knowledge or Awareness

The plaintiffs argue that, even under the District Court's construction of the safe harbor, the record raises material issues of fact regarding YouTube's actual knowledge or "red flag" awareness of specific instances of infringement. To that end, the plaintiffs draw our attention to various estimates regarding the percentage of infringing content on the YouTube website. For example, Viacom cites evidence that YouTube employees conducted website surveys and estimated that 75–80% of all YouTube streams contained copyrighted material. The class plaintiffs similarly claim that Credit Suisse, acting as financial advisor to Google, estimated that more than 60% of YouTube's content was "premium" copyrighted content—and that only 10% of the premium content was authorized. These approximations suggest that the defendants were conscious that significant quantities of material on the

19

YouTube website were infringing. *See Viacom Int'l*, 718 F. Supp. 2d at 518 ("[A] jury could find that the defendants not only were generally aware of, but welcomed, copyright-infringing material being placed on their website."). But such estimates are insufficient, standing alone, to create a triable issue of fact as to whether YouTube actually knew, or was aware of facts or circumstances that would indicate, the existence of particular instances of infringement.

Beyond the survey results, the plaintiffs rely upon internal YouTube communications that do refer to particular clips or groups of clips. The class plaintiffs argue that YouTube was aware of specific infringing material because, *inter alia*, YouTube attempted to search for specific Premier League videos on the site in order to gauge their "value based on video usage." In particular, the class plaintiffs cite a February 7, 2007 e-mail from Patrick Walker, director of video partnerships for Google and YouTube, requesting that his colleagues calculate the number of daily searches for the terms "soccer," "football," and "Premier League" in preparation for a bid on the global rights to Premier League content. On another occasion, Walker requested that any "clearly infringing, official broadcast footage" from a list of top Premier League clubs—including Liverpool Football Club, Chelsea Football Club, Manchester United Football Club, and Arsenal Football Club—be taken down in advance of a meeting with the heads of "several major sports teams and leagues." YouTube ultimately decided not to make a bid for the Premier League rights—but the infringing content allegedly remained on the website.

The record in the *Viacom* action includes additional examples. For instance, YouTube founder Jawed Karim prepared a report in March 2006 which stated that, "[a]s of today[,] episodes and clips of the following well-known shows can still be found [on YouTube]: Family Guy, South Park, MTV Cribs, Daily Show, Reno 911, [and] Dave Chapelle [sic]." Karim further opined that, "although YouTube is not legally required to monitor content . . . and complies with DMCA takedown requests,

we would benefit from *preemptively* removing content that is blatantly illegal and likely to attract criticism." He also noted that "a more thorough analysis" of the issue would be required. At least some of the TV shows to which Karim referred are owned by Viacom. A reasonable juror could conclude from the March 2006 report that Karim knew of the presence of Viacom-owned material on YouTube, since he presumably located specific clips of the shows in question before he could announce that YouTube hosted the content "[a]s of today." A reasonable juror could also conclude that Karim believed the clips he located to be infringing (since he refers to them as "blatantly illegal"), and that YouTube did not remove the content from the website until conducting "a more thorough analysis," thus exposing the company to liability in the interim.

Furthermore, in a July 4, 2005 e-mail exchange, YouTube founder Chad Hurley sent an e-mail to his co-founders with the subject line "budlight commercials," and stated, "we need to reject these too." Steve Chen responded, "can we please leave these in a bit longer? another week or two can't hurt." Karim also replied, indicating that he "added back in all 28 bud videos." Similarly, in an August 9, 2005 e-mail exchange, Hurley urged his colleagues "to start being diligent about rejecting copyrighted / inappropriate content," noting that "there is a cnn clip of the shuttle clip on the site today, if the boys from Turner would come to the site, they might be pissed?" Again, Chen resisted:

> but we should just keep that stuff on the site. i really don't see what will happen. what? someone from cnn sees it? he happens to be someone with power? he happens to want to take it down right away. he gets in touch with cnn legal. 2 weeks later, we get a cease & desist letter. we take the video down.

And again, Karim agreed, indicating that "the CNN space shuttle clip, I like. we can remove it once we're bigger and better known, but for now that clip is fine."

Upon a review of the record, we are persuaded that the plaintiffs may have raised a material issue of fact regarding YouTube's knowledge or awareness of specific instances of infringement. The foregoing Premier League e-mails request the identification and removal of "clearly infringing, official

broadcast footage." The March 2006 report indicates Karim's awareness of specific clips that he perceived to be "blatantly illegal." Similarly, the Bud Light and space shuttle e-mails refer to particular clips in the context of correspondence about whether to remove infringing material from the website. On these facts, a reasonable juror could conclude that YouTube had actual knowledge of specific infringing activity, or was at least aware of facts or circumstances from which specific infringing activity was apparent. *See* § 512(c)(1)(A)(i)–(ii). Accordingly, we hold that summary judgment to YouTube on all clips-in-suit, especially in the absence of any detailed examination of the extensive record on summary judgment, was premature.[9]

We hasten to note, however, that although the foregoing e-mails were annexed as exhibits to the summary judgment papers, it is unclear whether the clips referenced therein are among the current clips-in-suit. By definition, only the current clips-in-suit are at issue in this litigation. Accordingly, we vacate the order granting summary judgment and instruct the District Court to determine on remand whether any specific infringements of which YouTube had knowledge or awareness correspond to the clips-in-suit in these actions.

### ii.   "Willful Blindness"

The plaintiffs further argue that the District Court erred in granting summary judgment to the defendants despite evidence that YouTube was "willfully blind" to specific infringing activity. On this issue of first impression, we consider the application of the common law willful blindness doctrine in the DMCA context.

---

[9] We express no opinion as to whether the evidence discussed above will prove sufficient to withstand a renewed motion for summary judgment by YouTube on remand. In particular, we note that there is at least some evidence that the search requested by Walker in his February 7, 2007 e-mail was never carried out. *See* Joint App'x III:256. We also note that the class plaintiffs have failed to identify evidence indicating that any infringing content discovered as a result of Walker's request in fact remained on the YouTube website. The class plaintiffs, drawing on the voluminous record in this case, may be able to remedy these deficiencies in their briefing to the District Court on remand.

22

"The principle that willful blindness is tantamount to knowledge is hardly novel." *Tiffany (NJ) Inc. v. eBay, Inc.*, 600 F.3d 93, 110 n.16 (2d Cir. 2010) (collecting cases); *see In re Aimster Copyright Litig.*, 334 F.3d 643, 650 (7th Cir. 2003) ("Willful blindness is knowledge, in copyright law . . . as it is in the law generally."). A person is "willfully blind" or engages in "conscious avoidance" amounting to knowledge where the person "'was aware of a high probability of the fact in dispute and consciously avoided confirming that fact.'" *United States v. Aina-Marshall*, 336 F.3d 167, 170 (2d Cir. 2003) (quoting *United States v. Rodriguez*, 983 F.2d 455, 458 (2d Cir. 1993)); *cf. Global-Tech Appliances, Inc. v. SEB S.A.*, ___ U.S. ___, 131 S. Ct. 2060, 2070–71 (2011) (applying the willful blindness doctrine in a patent infringement case). Writing in the trademark infringement context, we have held that "[a] service provider is not . . . permitted willful blindness. When it has reason to suspect that users of its service are infringing a protected mark, it may not shield itself from learning of the particular infringing transactions by looking the other way." *Tiffany*, 600 F.3d at 109.

The DMCA does not mention willful blindness. As a general matter, we interpret a statute to abrogate a common law principle only if the statute "speak[s] directly to the question addressed by the common law." *Matar v. Dichter*, 563 F.3d 9, 14 (2d Cir. 2009) (internal quotation marks omitted). The relevant question, therefore, is whether the DMCA "speak[s] directly" to the principle of willful blindness. *Id.* (internal quotation marks omitted). The DMCA provision most relevant to the abrogation inquiry is § 512(m), which provides that safe harbor protection shall not be conditioned on "a service provider monitoring its service or affirmatively seeking facts indicating infringing activity, except to the extent consistent with a standard technical measure complying with the provisions of subsection (i)." 17 U.S.C. § 512(m)(1). Section 512(m) is explicit: DMCA safe harbor protection cannot be conditioned on affirmative monitoring by a service provider. For that reason, § 512(m) is incompatible with a broad common law duty to monitor or otherwise seek out infringing activity based

23

on general awareness that infringement may be occurring. That fact does not, however, dispose of the abrogation inquiry; as previously noted, willful blindness cannot be defined as an affirmative duty to monitor. *See Aina-Marshall*, 336 F.3d at 170 (holding that a person is "willfully blind" where he "was aware of a high probability of the fact in dispute and consciously avoided confirming that fact"). Because the statute does not "speak[ ] directly" to the willful blindness doctrine, § 512(m) limits—but does not abrogate—the doctrine. Accordingly, we hold that the willful blindness doctrine may be applied, in appropriate circumstances, to demonstrate knowledge or awareness of specific instances of infringement under the DMCA.

The District Court cited § 512(m) for the proposition that safe harbor protection does not require affirmative monitoring, *Viacom*, 718 F. Supp. 2d at 524, but did not expressly address the principle of willful blindness or its relationship to the DMCA safe harbors. As a result, whether the defendants made a "deliberate effort to avoid guilty knowledge," *In re Aimster*, 334 F.3d at 650, remains a fact question for the District Court to consider in the first instance on remand.[10]

## B.  Control and Benefit: § 512(c)(1)(B)

Apart from the foregoing knowledge provisions, the § 512(c) safe harbor provides that an eligible service provider must "not receive a financial benefit directly attributable to the infringing activity, in a case in which the service provider has the right and ability to control such activity." 17 U.S.C. § 512(c)(1)(B). The District Court addressed this issue in a single paragraph, quoting from § 512(c)(1)(B), the so-called "control and benefit" provision, and concluding that "[t]he 'right and ability to control' the activity requires knowledge of it, which must be item-specific." *Viacom*, 718 F.

---

[10] Our recent decision in *Tiffany (NJ) Inc. v. eBay Inc.*, 600 F.3d 93 (2d Cir. 2010), lends support to this result. In *Tiffany*, we rejected a willful blindness challenge, holding that although eBay "knew as a general matter that counterfeit Tiffany products were listed and sold through its website," such knowledge "is insufficient to trigger liability." *Id.* at 110. In so holding, however, we rested on the extensive findings of the district court with respect to willful blindness. *Id.* (citing *Tiffany (NJ) Inc. v. eBay, Inc.*, 576 F. Supp. 2d 463, 513 (S.D.N.Y. 2008)). Thus, the *Tiffany* holding counsels in favor of explicit fact-finding on the issue of willful blindness.

24

Supp. 2d at 527. For the reasons that follow, we hold that the District Court erred by importing a specific knowledge requirement into the control and benefit provision, and we therefore remand for further fact-finding on the issue of control.

### 1. "Right and Ability to Control" Infringing Activity

On appeal, the parties advocate two competing constructions of the "right and ability to control" infringing activity. 17 U.S.C. § 512(c)(1)(B). Because each is fatally flawed, we reject both proposed constructions in favor of a fact-based inquiry to be conducted in the first instance by the District Court.

The first construction, pressed by the defendants, is the one adopted by the District Court, which held that "the provider must know of the particular case before he can control it." *Viacom*, 718 F. Supp. 2d at 527. The Ninth Circuit recently agreed, holding that "until [the service provider] becomes aware of specific unauthorized material, it cannot exercise its 'power or authority' over the specific infringing item. In practical terms, it does not have the kind of ability to control infringing activity the statute contemplates." *UMG Recordings, Inc. v. Shelter Capital Partners LLC*, 667 F.3d 1022, 1041 (9th Cir. 2011). The trouble with this construction is that importing a specific knowledge requirement into § 512(c)(1)(B) renders the control provision duplicative of § 512(c)(1)(A). Any service provider that has item-specific knowledge of infringing activity and thereby obtains financial benefit would already be excluded from the safe harbor under § 512(c)(1)(A) for having specific knowledge of infringing material and failing to effect expeditious removal. No additional service provider would be excluded by § 512(c)(1)(B) that was not already excluded by § 512(c)(1)(A). Because statutory interpretations that render language superfluous are disfavored, *Conn. ex rel. Blumenthal*, 228 F.3d at 88, we reject the District Court's interpretation of the control provision.

The second construction, urged by the plaintiffs, is that the control provision codifies the common law doctrine of vicarious copyright liability. The common law imposes liability for vicarious copyright infringement "[w]hen the right and ability to supervise coalesce with an obvious and direct financial interest in the exploitation of copyrighted materials—even in the absence of actual knowledge that the copyright mono[poly] is being impaired." *Shapiro, Bernstein & Co. v. H.L. Green Co.*, 316 F.2d 304, 407 (2d Cir. 1963); *cf. Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*, 545 U.S. 913, 930 n.9 (2005). To support their codification argument, the plaintiffs rely on a House Report relating to a preliminary version of the DMCA: "The 'right and ability to control' language . . . codifies the second element of vicarious liability. . . . Subparagraph (B) is intended to preserve existing case law that examines all relevant aspects of the relationship between the primary and secondary infringer." H.R. Rep. No. 105-551 (I), at 26 (1998). In response, YouTube notes that the codification reference was omitted from the committee reports describing the final legislation, and that Congress ultimately abandoned any attempt to "embark[ ] upon a wholesale clarification" of vicarious liability, electing instead "to create a series of 'safe harbors' for certain common activities of service providers." S. Rep. No. 105-190, at 19.

Happily, the future of digital copyright law does not turn on the confused legislative history of the control provision. The general rule with respect to common law codification is that when "Congress uses terms that have accumulated settled meaning under the common law, a court must infer, unless the statute otherwise dictates, that Congress means to incorporate the established meaning of those terms." *Neder v. United States*, 527 U.S. 1, 21 (1999) (ellipsis and internal quotation marks omitted). Under the common law vicarious liability standard, "'[t]he ability to block infringers' access to a particular environment for any reason whatsoever is evidence of the right and ability to supervise.'" *Arista Records LLC v. Usenet.com, Inc.*, 633 F. Supp. 2d 124, 157 (S.D.N.Y. 2009) (alteration in original) (quoting *A&M Records, Inc. v. Napster, Inc.*, 239 F.3d 1004, 1023 (9th Cir. 2001)). To adopt that

26

principle in the DMCA context, however, would render the statute internally inconsistent.  Section 512(c) actually presumes that service providers have the ability to "block . . . access" to infringing material.  *Id.* at 157; *see Shelter Capital*, 667 F.3d at 1042–43.  Indeed, a service provider who has knowledge or awareness of infringing material or who receives a takedown notice from a copyright holder is *required* to "remove, or disable access to, the material" in order to claim the benefit of the safe harbor.  17 U.S.C. §§ 512(c)(1)(A)(iii) & (C).  But in taking such action, the service provider would—in the plaintiffs' analysis—be admitting the "right and ability to control" the infringing material.  Thus, the prerequisite to safe harbor protection under §§ 512(c)(1)(A)(iii) & (C) would at the same time be a disqualifier under § 512(c)(1)(B).

Moreover, if Congress had intended § 512(c)(1)(B) to be coextensive with vicarious liability, "the statute could have accomplished that result in a more direct manner." *Shelter Capital*, 667 F.3d at 1045.

> It is conceivable that Congress . . . intended that [service providers] which receive a financial benefit directly attributable to the infringing activity would not, under any circumstances, be able to qualify for the subsection (c) safe harbor.  But if that was indeed their intention, it would have been far simpler and much more straightforward to simply say as much.

*Id.* (alteration in original) (quoting *Ellison v. Robertson,* 189 F. Supp. 2d 1051, 1061 (C.D. Cal. 2002), *aff'd in part and rev'd in part on different grounds,* 357 F.3d 1072 (9th Cir. 2004)).

In any event, the foregoing tension—elsewhere described as a "predicament"[11] and a "catch-22"[12]—is sufficient to establish that the control provision "dictates" a departure from the common law vicarious liability standard, *Neder*, 527 U.S. at 21.  Accordingly, we conclude that the "right and ability to control" infringing activity under § 512(c)(1)(B) "requires something more than the ability to remove or block access to materials posted on a service provider's website."  *MP3tunes, LLC*, 2011 WL

---

[11] *Ellison*, 189 F. Supp. 2d at 1061.

5104616, at *14; *accord Wolk v. Kodak Imaging Network, Inc.*, __ F. Supp. 2d __, 2012 WL 11270, at *21 (S.D.N.Y. Jan. 3, 2012); *UMG II*, 665 F. Supp. 2d at 1114–15; *Io Grp., Inc. v. Veoh Networks, Inc.*, 586 F. Supp. 2d 1132, 1151 (N.D. Cal. 2008); *Corbis Corp. v. Amazon.com, Inc.*, 351 F. Supp. 2d 1090, 1110 (W.D. Wash. 2004), *overruled on other grounds by Cosmetic Ideas, Inc. v. IAC/Interactivecorp.*, 606 F.3d 612 (9th Cir. 2010). The remaining—and more difficult—question is how to define the "something more" that is required.

To date, only one court has found that a service provider had the right and ability to control infringing activity under § 512(c)(1)(B).[13] In *Perfect 10, Inc. v. Cybernet Ventures, Inc.*, 213 F. Supp. 2d 1146 (C.D. Cal. 2002), the court found control where the service provider instituted a monitoring program by which user websites received "detailed instructions regard[ing] issues of layout, appearance, and content." *Id.* at 1173. The service provider also forbade certain types of content and refused access to users who failed to comply with its instructions. *Id.* Similarly, inducement of copyright infringement under *Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*, 545 U.S. 913 (2005), which "premises liability on purposeful, culpable expression and conduct," *id.* at 937, might also rise to the level of control under § 512(c)(1)(B). Both of these examples involve a service provider exerting substantial influence on the activities of users, without necessarily—or even frequently—acquiring knowledge of specific infringing activity.

In light of our holding that § 512(c)(1)(B) does not include a specific knowledge requirement, we think it prudent to remand to the District Court to consider in the first instance whether the plaintiffs have adduced sufficient evidence to allow a reasonable jury to conclude that YouTube had the

---

[12] *UMG II*, 665 F. Supp. 2d at 1112.

[13] Other courts have suggested that control may exist where the service provider is "actively involved in the listing, bidding, sale and delivery" of items offered for sale, *Hendrickson v. eBay, Inc.*, 165 F. Supp. 2d 1082, 1094 (C.D. Cal. 2001), or otherwise controls vendor sales by previewing products prior to their listing, editing product descriptions, or suggesting prices, *Corbis Corp.*, 351 F. Supp. 2d at 1110. Because these cases held that control did *not* exist, however, it is not clear that the practices cited therein are individually sufficient to support a finding of control.

right and ability to control the infringing activity and received a financial benefit directly attributable to that activity.

### C.  "By Reason of" Storage: § 512(c)(1)

The § 512(c) safe harbor is only available when the infringement occurs "by reason of the storage at the direction of a user of material that resides on a system or network controlled or operated by or for the service provider."  17 U.S.C. § 512(c)(1).  In this case, the District Court held that YouTube's software functions fell within the safe harbor for infringements that occur "by reason of" user storage, noting that a contrary holding would "confine[ ] the word 'storage' too narrowly to meet the statute's purpose." *Viacom*, 718 F. Supp. 2d at 526.  For the reasons that follow, we affirm that holding with respect to three of the challenged software functions—the conversion (or "transcoding") of videos into a standard display format, the playback of videos on "watch" pages, and the "related videos" function.  We remand for further fact-finding with respect to a fourth software function, involving the third-party syndication of videos uploaded to YouTube.

As a preliminary matter, we note that "the structure and language of OCILLA indicate that service providers seeking safe harbor under [§] 512(c) are not limited to merely storing material." *Io Grp.*, 586 F. Supp. 2d at 1147.  The structure of the statute distinguishes between so-called "conduit only" functions under § 512(a) and the functions addressed by § 512(c) and the other subsections. *See* 17 U.S.C. § 512(n) ("Subsections (a), (b), (c), and (d) describe separate and distinct functions for purposes of applying this section.").  Most notably, OCILLA contains two definitions of "service provider."  17 U.S.C. § 512(k)(1)(A)–(B).  The narrower definition, which applies only to service providers falling under § 512(a), is limited to entities that "offer[ ] the transmission, routing or providing of connections for digital online communications, between or among points specified by a user, of material of the user's choosing, *without modification to the content of the material* as sent or received."

*Id.* § 512(k)(1)(A) (emphasis added). No such limitation appears in the broader definition, which applies to service providers—including YouTube—falling under § 512(c). Under the broader definition, "the term 'service provider' means a provider of online services or network access, or the operator of facilities therefor, and includes an entity described in subparagraph (A)." *Id.* § 512(k)(1)(B). In the absence of a parallel limitation on the ability of a service provider to modify user-submitted material, we conclude that § 512(c) "is clearly meant to cover more than mere electronic storage lockers." *UMG Recordings, Inc. v. Veoh Networks, Inc.*, 620 F. Supp. 2d 1081, 1088 (C.D. Cal. 2008) ("*UMG I*").

The relevant case law makes clear that the § 512(c) safe harbor extends to software functions performed "for the purpose of facilitating access to user-stored material." *Id.*; *see Shelter Capital*, 667 F.3d at 1031–35. Two of the software functions challenged here—transcoding and playback—were expressly considered by our sister Circuit in *Shelter Capital*, which held that liability arising from these functions occurred "by reason of the storage at the direction of a user." 17 U.S.C. § 512(c); *see Shelter Capital*, 667 F.3d at 1027–28, 1031; *see also UMG I*, 620 F. Supp. 2d at 1089–91; *Io Group*, 586 F. Supp. 2d at 1146–48. Transcoding involves "[m]aking copies of a video in a different encoding scheme" in order to render the video "viewable over the Internet to most users." Supp. Joint App'x I:236. The playback process involves "deliver[ing] copies of YouTube videos to a user's browser cache" in response to a user request. *Id.* at 239. The District Court correctly found that to exclude these automated functions from the safe harbor would eviscerate the protection afforded to service providers by § 512(c). *Viacom*, 718 F. Supp. 2d at 526–27.

A similar analysis applies to the "related videos" function, by which a YouTube computer algorithm identifies and displays "thumbnails" of clips that are "related" to the video selected by the user. The plaintiffs claim that this practice constitutes content promotion, not "access" to stored

30

content, and therefore falls beyond the scope of the safe harbor.  Citing similar language in the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961–68, and the Clayton Act, 15 U.S.C. §§ 12 *et seq.*, the plaintiffs argue that the statutory phrase "by reason of" requires a finding of proximate causation between the act of storage and the infringing activity.  *See, e.g., Holmes v. Sec. Investor Prot. Corp.*, 503 U.S. 258, 267–68 (1992) (holding that the "by reason of" language in the RICO statute requires proximate causation).  But even if the plaintiffs are correct that § 512(c) incorporates a principle of proximate causation—a question we need not resolve here—the indexing and display of related videos retain a sufficient causal link to the prior storage of those videos.  The record makes clear that the related videos algorithm "is fully automated and operates solely in response to user input without the active involvement of YouTube employees."  Supp. Joint App'x I:237. Furthermore, the related videos function serves to help YouTube users locate and gain access to material stored at the direction of other users.  Because the algorithm "is closely related to, and follows from, the storage itself," and is "narrowly directed toward providing access to material stored at the direction of users," *UMG I*, 620 F. Supp. 2d at 1092, we conclude that the related videos function is also protected by the § 512(c) safe harbor.

The final software function at issue here—third-party syndication—is the closest case.  In or around March 2007, YouTube transcoded a select number of videos into a format compatible with mobile devices and "syndicated" or licensed the videos to Verizon Wireless and other companies.  The plaintiffs argue—with some force—that business transactions do not occur at the "direction of a user" within the meaning of § 512(c)(1) when they involve the manual selection of copyrighted material for licensing to a third party.  The parties do not dispute, however, that none of the clips-in-suit were among the approximately 2,000 videos provided to Verizon Wireless.  In order to avoid rendering an

advisory opinion on the outer boundaries of the storage provision, we remand for fact-finding on the question of whether any of the clips-in-suit were in fact syndicated to any other third party.

## D.  Other Arguments

### 1.  Repeat Infringer Policy

The class plaintiffs briefly argue that YouTube failed to comply with the requirements of § 512(i), which conditions safe harbor eligibility on the service provider having "adopted and reasonably implemented . . . a policy that provides for the termination in appropriate circumstances of subscribers and account holders of the service provider's system or network who are repeat infringers." 17 U.S.C. § 512(i)(1)(A).  Specifically, the class plaintiffs allege that YouTube "deliberately set up its identification tools to try to avoid identifying infringements of class plaintiffs' works."  This allegation rests primarily on the assertion that YouTube permitted only designated "partners" to gain access to content identification tools by which YouTube would conduct network searches and identify infringing material.[14]

Because the class plaintiffs challenge YouTube's deployment of search technology, we must consider their § 512(i) argument in conjunction with § 512(m).  As previously noted, § 512(m) provides that safe harbor protection cannot be conditioned on "a service provider monitoring its service or affirmatively seeking facts indicating infringing activity, *except to the extent consistent with a standard technical measure complying with the provisions of subsection (i).*"  17 U.S.C. § 512(m)(1) (emphasis added).  In other words, the safe harbor expressly disclaims any affirmative monitoring requirement—except to the extent that such monitoring comprises a "standard technical measure" within the meaning of § 512(i).  Refusing to accommodate or implement a "standard technical measure" exposes a service provider to

---

[14] The class plaintiffs also assert, in a single sentence, that YouTube failed to implement any repeat infringer policy prior to March 2006, and that the defendants are therefore excluded from the safe harbor for any infringing activity before that date.  This one-sentence argument is insufficient to raise the issue for review before this Court.  Accordingly, we deem the issue waived on appeal. *See, e.g., Norton v. Sam's Club*, 145 F.3d 114, 117 (2d Cir. 1998) ("Issues not sufficiently argued in the briefs are considered waived and normally will not be addressed on appeal.").

32

liability; refusing to provide access to mechanisms by which a service provider affirmatively monitors its own network has no such result. In this case, the class plaintiffs make no argument that the content identification tools implemented by YouTube constitute "standard technical measures," such that YouTube would be exposed to liability under § 512(i). For that reason, YouTube cannot be excluded from the safe harbor by dint of a decision to restrict access to its proprietary search mechanisms.

### 2. Affirmative Claims

Finally, the plaintiffs argue that the District Court erred in denying summary judgment to the plaintiffs on their claims for direct infringement, vicarious liability, and contributory liability under *Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*, 545 U.S. 913 (2005). In granting summary judgment to the defendants, the District Court held that YouTube "qualif[ied] for the protection of . . . § 512(c)," and therefore denied the plaintiffs' cross-motion for summary judgment without comment. *Viacom*, 718 F. Supp. 2d at 529.

The District Court correctly determined that a finding of safe harbor application necessarily protects a defendant from all affirmative claims for monetary relief. 17 U.S.C. § 512(c)(1); *see* H.R. Rep. No. 105-551(II), at 50; S. Rep. No. 105-190, at 20; *cf.* 17 U.S.C. § 512(j) (setting forth the scope of injunctive relief available under § 512). For the reasons previously stated, further fact-finding is required to determine whether YouTube is ultimately entitled to safe harbor protection in this case. Accordingly, we vacate the order denying summary judgment to the plaintiffs and remand the cause without expressing a view on the merits of the plaintiffs' affirmative claims.

## CONCLUSION

To summarize, we hold that:

(1)     The District Court correctly held that 17 U.S.C. § 512(c)(1)(A) requires knowledge or awareness of facts or circumstances that indicate specific and identifiable instances of infringement;

(2)     However, the June 23, 2010 order granting summary judgment to YouTube is **VACATED** because a reasonable jury could conclude that YouTube had knowledge or awareness under § 512(c)(1)(A) at least with respect to a handful of specific clips; the cause is **REMANDED** for the District Court to determine whether YouTube had knowledge or awareness of any specific instances of infringement corresponding to the clips-in-suit;

(3)     The willful blindness doctrine may be applied, in appropriate circumstances, to demonstrate knowledge or awareness of specific instances of infringement under § 512(c)(1)(A); the cause is **REMANDED** for the District Court to consider the application of the willful blindness doctrine in the first instance;

(4)     The District Court erred by requiring "item-specific" knowledge of infringement in its interpretation of the "right and ability to control" infringing activity under 17 U.S.C. § 512(c)(1)(B), and the judgment is **REVERSED** insofar as it rests on that erroneous construction of the statute; the cause is **REMANDED** for further fact-finding by the District Court on the issues of control and financial benefit;

(5)     The District Court correctly held that three of the challenged YouTube software functions—replication, playback, and the related videos feature—occur "by reason of the storage at the direction of a user" within the meaning of 17 U.S.C. § 512(c)(1), and

34

the judgment is **AFFIRMED** insofar as it so held; the cause is **REMANDED** for further fact-finding regarding a fourth software function, involving the syndication of YouTube videos to third parties.

On remand, the District Court shall allow the parties to brief the following issues, with a view to permitting renewed motions for summary judgment as soon as practicable:

(A)    Whether, on the current record, YouTube had knowledge or awareness of any specific infringements (including any clips-in-suit not expressly noted in this opinion);

(B)    Whether, on the current record, YouTube willfully blinded itself to specific infringements;

(C)    Whether YouTube had the "right and ability to control" infringing activity within the meaning of § 512(c)(1)(B); and

(D)    Whether any clips-in-suit were syndicated to a third party and, if so, whether such syndication occurred "by reason of the storage at the direction of the user" within the meaning of § 512(c)(1), so that YouTube may claim the protection of the § 512(c) safe harbor.

We leave to the sound discretion of the District Court the question of whether some additional, guided discovery is appropriate in order to resolve "(C)" ("[w]hether YouTube had 'the right and ability to control' infringing activity"), and "(D)" ("[w]hether any clips-in-suit were syndicated to a third party"). As noted above, for purposes of this case, the record with respect to "(A)" ("[w]hether . . . YouTube had knowledge or awareness of any specific infringements") and "(B)" ("[w]hether . . . YouTube willfully blinded itself to specific infringements") is now complete.

Each party shall bear its own costs.

# APPENDIX A

## RELEVANT PROVISIONS OF THE DIGITAL MILLENNIUM COPYRIGHT ACT

### 17 U.S.C. § 512

**(c) Information residing on systems or networks at direction of users.—**

(1) In general.—A service provider shall not be liable for monetary relief, or, except as provided in subsection (j), for injunctive or other equitable relief, for infringement of copyright by reason of the storage at the direction of a user of material that resides on a system or network controlled or operated by or for the service provider, if the service provider—

(A)(i) does not have actual knowledge that the material or an activity using the material on the system or network is infringing;

(ii) in the absence of such actual knowledge, is not aware of facts or circumstances from which infringing activity is apparent; or

(iii) upon obtaining such knowledge or awareness, acts expeditiously to remove, or disable access to, the material;

(B) does not receive a financial benefit directly attributable to the infringing activity, in a case in which the service provider has the right and ability to control such activity; and

(C) upon notification of claimed infringement as described in paragraph (3), responds expeditiously to remove, or disable access to, the material that is claimed to be infringing or to be the subject of infringing activity.

(2) Designated agent.—The limitations on liability established in this subsection apply to a service provider only if the service provider has designated an agent to receive notifications of claimed infringement described in paragraph (3), by making available through its service, including on its website in a location accessible to the public, and by providing to the Copyright Office, substantially the following information:

(A) the name, address, phone number, and electronic mail address of the agent.

(B) other contact information which the Register of Copyrights may deem appropriate.

The Register of Copyrights shall maintain a current directory of agents available to the public for inspection, including through the Internet, and may require payment of a fee by service providers to cover the costs of maintaining the directory.

36

(3) Elements of notification.—

    (A) To be effective under this subsection, a notification of claimed infringement must be a written communication provided to the designated agent of a service provider that includes substantially the following:

        (i) A physical or electronic signature of a person authorized to act on behalf of the owner of an exclusive right that is allegedly infringed.

        (ii) Identification of the copyrighted work claimed to have been infringed, or, if multiple copyrighted works at a single online site are covered by a single notification, a representative list of such works at that site.

        (iii) Identification of the material that is claimed to be infringing or to be the subject of infringing activity and that is to be removed or access to which is to be disabled, and information reasonably sufficient to permit the service provider to locate the material.

        (iv) Information reasonably sufficient to permit the service provider to contact the complaining party, such as an address, telephone number, and, if available, an electronic mail address at which the complaining party may be contacted.

        (v) A statement that the complaining party has a good faith belief that use of the material in the manner complained of is not authorized by the copyright owner, its agent, or the law.

        (vi) A statement that the information in the notification is accurate, and under penalty of perjury, that the complaining party is authorized to act on behalf of the owner of an exclusive right that is allegedly infringed.

  (B)(i) Subject to clause (ii), a notification from a copyright owner or from a person authorized to act on behalf of the copyright owner that fails to comply substantially with the provisions of subparagraph (A) shall not be considered under paragraph (1)(A) in determining whether a service provider has actual knowledge or is aware of facts or circumstances from which infringing activity is apparent.

  (ii) In a case in which the notification that is provided to the service provider's designated agent fails to comply substantially with all the provisions of subparagraph (A) but substantially complies with clauses (ii), (iii), and (iv) of subparagraph (A), clause (i) of this subparagraph applies only if the service provider promptly attempts to contact the person making the notification or takes other reasonable steps to assist in the receipt of notification that substantially complies with all the provisions of subparagraph (A).

**(i) Conditions for Eligibility.—**

    (1) Accommodation of technology.— The limitations on liability established by this section shall apply to a service provider only if the service provider—

        (A) has adopted and reasonably implemented, and informs subscribers and account holders of the service provider's system or network of, a policy that provides for the termination in appropriate circumstances of subscribers and account holders of the service provider's system or network who are repeat infringers; and

        (B) accommodates and does not interfere with standard technical measures.

    (2) Definition.— As used in this subsection, the term "standard technical measures" means technical measures that are used by copyright owners to identify or protect copyrighted works and—

        (A) have been developed pursuant to a broad consensus of copyright owners and service providers in an open, fair, voluntary, multi-industry standards process;

        (B) are available to any person on reasonable and nondiscriminatory terms; and

        (C) do not impose substantial costs on service providers or substantial burdens on their systems or networks.

**(k) Definitions.—**

    (1) Service provider.—

        (A) As used in subsection (a), the term "service provider" means an entity offering the transmission, routing, or providing of connections for digital online communications, between or among points specified by a user, of material of the user's choosing, without modification to the content of the material as sent or received.

        (B) As used in this section, other than subsection (a), the term "service provider" means a provider of online services or network access, or the operator of facilities therefor, and includes an entity described in subparagraph (A).

    (2) Monetary relief.— As used in this section, the term "monetary relief" means damages, costs, attorneys' fees, and any other form of monetary payment.

**(m) Protection of privacy.**—Nothing in this section shall be construed to condition the applicability of subsections (a) through (d) on—

    (1) a service provider monitoring its service or affirmatively seeking facts indicating infringing activity, except to the extent consistent with a standard technical measure complying with the provisions of subsection (i); or

(2) a service provider gaining access to, removing, or disabling access to material in cases in which such conduct is prohibited by law.

**(n) Construction.—**

Subsections (a), (b), (c), and (d) describe separate and distinct functions for purposes of applying this section. Whether a service provider qualifies for the limitation on liability in any one of those subsections shall be based solely on the criteria in that subsection, and shall not affect a determination of whether that service provider qualifies for the limitations on liability under any other such subsection.

**United States Court of Appeals for the Second Circuit**
**Thurgood Marshall U.S. Courthouse**
**40 Foley Square**
**New York, NY 10007**

**DENNIS JACOBS**
CHIEF JUDGE

**CATHERINE O'HAGAN WOLFE**
CLERK OF COURT

Date: April 05, 2012
Docket #: 10-3270cv
Short Title: Viacom International, Inc. v. Youtube, Inc.

DC Docket #: 07-cv-2103
DC Court: SDNY (NEW YORK CITY)
DC Judge: Stanton

## BILL OF COSTS INSTRUCTIONS

The requirements for filing a bill of costs are set forth in FRAP 39. A form for filing a bill of costs is on the Court's website.

The bill of costs must:
* be filed within 14 days after the entry of judgment;
* be verified;
* be served on all adversaries;
* not include charges for postage, delivery, service, overtime and the filers edits;
* identify the number of copies which comprise the printer's unit;
* include the printer's bills, which must state the minimum charge per printer's unit for a page, a cover, foot lines by the line, and an index and table of cases by the page;
* state only the number of necessary copies inserted in enclosed form;
* state actual costs at rates not higher than those generally charged for printing services in New York, New York; excessive charges are subject to reduction;
* be filed via CM/ECF or if counsel is exempted with the original and two copies.

**United States Court of Appeals for the Second Circuit**
**Thurgood Marshall U.S. Courthouse**
**40 Foley Square**
**New York, NY 10007**

**DENNIS JACOBS**
CHIEF JUDGE

**CATHERINE O'HAGAN WOLFE**
CLERK OF COURT

Date: April 05, 2012
Docket #: 10-3270cv
Short Title: Viacom International, Inc. v. Youtube,
Inc.

DC Docket #: 07-cv-2103
DC Court: SDNY (NEW YORK CITY)
DC Judge: Stanton

### VERIFIED ITEMIZED BILL OF COSTS

Counsel for

_____

respectfully submits, pursuant to FRAP 39 (c) the within bill of costs and requests the Clerk to
prepare an itemized statement of costs taxed against the

_____

and in favor of

_____

for insertion in the mandate.

Docketing Fee        _____

Costs of printing appendix (necessary copies _____ )  _____

Costs of printing brief (necessary copies _____ _____ )  _____

Costs of printing reply brief (necessary copies _____ )  _____

**(VERIFICATION HERE)**

_____
Signature