**Exhibit 16**

IN THE UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF FLORIDA


DISNEY ENTERPRISES, INC., TWENTIETH

CENTURY FOX FILM CORPORATION,

UNIVERSAL CITY STUDIOS PRODUCTIONS,

LLP, COLUMBIA PICTURES INDUSTRIES,

INC., and WARNER BROTHERS

ENTERTAINMENT, INC.,


      Plaintiffs,


  vs.           Case No.


HOTFILE CORPORATION, ANTON TITOV     11-cv-20427-AJ

and DOES 1-20,


      Defendants.

_____

      Videotaped Deposition of SCOTT A. ZEBRAK,
a witness herein, called for examination by counsel
for Defendants in the above-entitled matter, Washington,
D.C. pursuant to subpoena, the witness being duly sworn
by SUSAN L. CIMINELLI, CRR, RPR, a Notary Public in and
for the District of Columbia, taken at the offices of
Jenner & Block, LLP, 1099 New York Avenue, N.W.,

Washington, D.C., at 10:49 a.m. on Friday, January 20,

2012.

1  APPEARANCES:

2

3      On behalf of the Plaintiffs & Counterdefendants:

4          DUANE POZZA, ESQ.

5          STEVEN B. FABRIZIO, ESQ.

6          Jenner & Block, LLP

7          901 New York Avenue, N.W.

8          Washington, D.C.  20001

9          (202) 639-6000

10         dpozza@jenner.com

11

12     On behalf of the Defendants:

13         DEEPAK GUPTA, ESQ.

14         Farella Braun + Martel, LLP

15         235 Montgomery Street

16         San Francisco, CA  94104

17         (415) 954-4400

18         dgupta@fbm.com

19

20     ALSO PRESENT:

21         CONWAY BARKER, Videographer

22

23

24

25



Page 90



1  Court would rule.  I do not believe a Court has, you

2  know, ruled on -- or that a case is pending with

3  respect to features such as these in the context of

4  tools such as these.

5       BY MR. GUPTA:

6       Q.   So until such time as a Court does rule on

7  these types of software tools, do you believe it

8  would be appropriate for you to actually offer an

9  opinion that these tools are illegal?

10      MR. POZZA:  Object as ambiguous.  And

11  calling for a legal conclusion.

12      THE WITNESS:  If I am reasonably certain

13  as to how I think the issue should come out, I think

14  it would be entirely appropriate for me to, you know,

15  offer my opinion on that.

16      BY MR. GUPTA:

17      Q.   But at this time, is it fair to say that

18  your view of the law is that it doesn't provide a

19  clear answer on this question?

20      MR. POZZA:  Objection.  It's ambiguous.

21      THE WITNESS:  I would say it a little

22  differently than that.  I would say that these

23  provisions are what they are, and there are some

24  limited exemptions to them.  Where I'm finalizing my

25  analysis is fleshing out the application of these

1  provisions to these two tools, but I think there is a

2  very substantial argument that even if the use of

3  these tools by a user doesn't violate or constitute a

4  circumvention any longer if it's used for the

5  purposes of the Librarian of Congress's exemption

6  concerning adding a non-Apple approved app, for

7  example, you know, the question is whether these

8  tools are doing what those exemptions don't allow.

9  And that's why I mentioned the features of sn0wbreeze

10  that, for example, do not appear to be concerned with

11  software interoperability which is what this reverse

12  engineering and copyright office exemption concerned.

13        As well as the fact that iREB as stand

14  alone from sn0wbreeze sort of puts the phone, I

15  believe, in a jail breakable state, so to speak.  I

16  think I just made up that word, in the sense that

17  it's not necessarily paired with adding a particular

18  application or not.  But so, you know, these are

19  the -- these are sort of a factual --

20        BY MR. GUPTA:

21     Q.  Yes.

22     A.  Development relative to -- relative to

23  these exemptions.

24     Q.  If you look at 1201, and I don't want to

25  spend too much time on this, but look at

1  1201(A)(2)(a) and it talks about the distribution

2  aspect that you've mentioned.  But a predicate is

3  that the software be primarily designed for the

4  purpose of circumventing a technological measure that

5  effectively controls access to a work.

6          So in what sense would the functionalities

7  of sn0wbreeze that allow network unlocking and that

8  allow changing the images on your system constitute

9  technological measures that control access to a work,

10  if you so contend?

11          MR. POZZA:  Same objections.  Ambiguous.

12          THE WITNESS:  First of all, it's clear

13  what these tools are marketed for.  And with respect

14  to the work, I mean, you know, the -- you know, the

15  operating system, for example, that, you know, needs

16  to be put into a different state so you can upload

17  these applications, you know, I think that, you know,

18  these are the -- you know, that could be the work

19  that, you know, would be at play.

20          BY MR. GUPTA:

21      Q.   Sorry.  So you believe access to the

22  operating system is the access that's -- that's

23  potentially at issue here?

24          MR. POZZA:  Objection.  Ambiguous.

25  Misstates testimony.

1   has I think the wrong sort of presumption based in

2   it.  You know, my analysis was whether distribution

3   of the work through Hotfile was an infringement.  My

4   analysis did not extend to whether that copyright

5   owner could walk into Court the next day and bring a

6   lawsuit, prevail on the lawsuit and, you know, seek

7   remedy provided for in the Copyright Act and

8   whether -- if it wanted to do that, what -- an

9   equitable doctrine might otherwise stand in the

10  copyright owner's way.  May -- that was not -- that

11  was not part of my analysis nor did it need to be.

12      BY MR. GUPTA:

13      Q.   So you didn't consider, for example, the

14  equitable doctrine of waiver whereby a Defendant in a

15  copyright suit might be able to argue that the

16  copyright owner had waived their rights?

17      MR. POZZA:  Object as ambiguous.

18      THE WITNESS:  I think subsumed within the

19  authorization and fair use analyses would be some of

20  the arguments that somebody attempting to plead it

21  under lots of different umbrella terms might label it

22  as.  And I, of course, have no reason to think that

23  waiver would apply to the sorts of infringements that

24  I was seeing in the instances where I declared a, you

25  know, work to be, you know, highly likely infringing

1   in terms of its distribution through Hotfile.

2       BY MR. GUPTA:

3       Q.   Do, you know, what the legal standard is

4   for waiver?

5       MR. POZZA:  Objection.  Ambiguous.

6       THE WITNESS:  I'm familiar with lots of

7   different legal and equitable doctrines.  If you're

8   viewing an abandonment of rights or -- you know,

9   whether it's under, like, a promissory estoppel

10  theory or formal abandonment, loss of rights or

11  laches because you're moving to slow or, you know,

12  anything else you want to label these as, you know,

13  these are -- factually you're asking sort of

14  theoretical questions that were not presented by the

15  facts of the infringements that I was presented with.

16      BY MR. GUPTA:

17      Q.   So my understanding of waiver is it is

18  similar to abandonment, and it's the intentional

19  relinquishment of a known right with knowledge of its

20  existence and the intent to relinquish it.

21      A.   Uh-huh.

22      Q.   Is that consistent with your understanding

23  of the doctrine?

24      MR. POZZA:  I'm going to object as

25  ambiguous and to the extent it calls for legal

1   testimony on issues in the abstract that would be

2   outside the scope of the report.

3          THE WITNESS:  You're talking about, yes,

4   waiver and abandonment issues, and, you know, often

5   when people raise arguments like these, they raise

6   them under lots of different names and titles as they

7   plead them, but, yes, I'm familiar with these

8   doctrines.

9          BY MR. GUPTA:

10     Q.   Okay.  And I understand that it's your

11  position that they're -- they're not relevant, but

12  assume for the sake of argument that -- that they are

13  relevant, that one should consider whether the

14  copyright owner waived their copyright before making

15  a conclusion that the file is highly likely

16  infringing because the, you know, usage would be

17  shielded under copyright, under waiver doctrine.  So

18  in that case, do you agree that one needs to inquire

19  into the intent of the copyright owner to ascertain

20  the applicability of the defense?

21         MR. POZZA:  Same objections and misstates

22  witness testimony and is ambiguous.

23         THE WITNESS:  This is one of these

24  theoretical, isn't it possible questions of the type

25  that you were asking me earlier today where, you

1    know, I did my research and analysis and applied my

2    methodology according to the facts in my

3    investigation as I did it.  I mean I wasn't doing

4    this in the abstract.  I was, you know, reviewing

5    what these files were, identifying the copyright

6    owners, seeing how they were commercializing these

7    products which were entirely inconsistent in the

8    instances where I deemed it to be highly likely

9    infringing with notions of waiver.  And therefore it

10   would be inapplicable.

11         BY MR. GUPTA:

12      Q.   I understand.  Did you consider the

13   doctrine of implied license?

14      A.   Yes.

15      Q.   And how did that play into your analysis

16   and methodology?

17      A.   Sure.  Well, I considered -- as I talked

18   about in my first deposition and perhaps mentioned

19   today, I considered whether copyright owners have in

20   a given instance -- if the activity was authorized by

21   the copyright owner.  Of course, if the copyright

22   owner authorized it, it would be a noninfringing

23   distribution through Hotfile.  And there are

24   different ways to authorize it.  You can have of

25   course express authorizations, for example, in the

1   case of certain free kind of almost demo versions of

2   certain software products, it was freely

3   redistributable as long as the recipient agreed to

4   the installation terms of use, as opposed to the full

5   commercial version, which in that instance I'm

6   thinking of was not freely distributable.  So in that

7   instance, though, the installation terms of use

8   explained that it was freely distributable, that

9   being an example of express authorization.

10          In an implied case, it would be sort of,

11   you know, by its conduct, you know, someone would

12   make that argument.  But -- so perhaps, for example,

13   of the download through the site where there

14   wasn't -- you know where you click download here and

15   you don't have to agree to licensing terms, but, you

16   know, by its -- well, that's actually not the best

17   example.

18          The -- you know, to the extent there would

19   be an implied issue, the -- to the extent I thought

20   it was -- if I was not comfortable if there was a

21   lack of authorization, it would be in the

22   noninfringing category.  So where I saw indicia that

23   there was not this authorization, and there was no

24   reason to view implied license, it would not be put

25   into the noninfringing category.

1   Q.   Okay.  So if I'm getting you right, you

2   did attempt to look at the question of implied

3   authorization, implied license, whatever you want to

4   call it?

5        MR. POZZA:  Objection.  Ambiguous.

6        THE WITNESS:  I looked at authorization

7   issues.  Implied license -- as I'm sure, you know,

8   it's a narrowly construed doctrine and factually was

9   inapposite to those instances that I deemed something

10  to be highly likely infringing and, you know,

11  therefore it was not -- not a reason for me to hold

12  back from reaching that conclusion.  If -- and I'm

13  not saying there was an instance, but if there was

14  some instance where I viewed it to be arguably within

15  that call, it likely would have been put in the --

16  wouldn't have put it in the infringing category, but

17  it was -- it was -- this is sort of -- again, it's a

18  theoretical question rather than one driven by the

19  facts.

20       BY MR. GUPTA:

21  Q.   Right.  But I do believe you said

22  something to the effect that you would look -- try to

23  look at the conduct of the copyright owner in order

24  to make a -- a judgment as to whether there was some

25  implied authorization or implied license, is that

1  right?

2       MR. POZZA:  Objection.  Misstates

3  testimony.  Ambiguous.

4       THE WITNESS:  There's -- potentially

5  that's something you could look at.  Yes.

6       BY MR. GUPTA:

7  Q.   Okay.

8  A.   But this -- I'm sorry.  Go ahead.

9  Q.   Yes.  And so my question to you is, isn't

10  it true that by virtue of the fact that you don't

11  have access to -- of the -- you don't have access to

12  the engines of discovery that are available in the

13  Court system, and by the fact that you were pressed

14  for time and the fact that large amounts of

15  information that would bear upon the question of

16  implied license were inaccessible to you and

17  inscrutable simply by the fact that it could involve

18  parties who reside far away, dealings between parties

19  whom you don't know, and ultimately the intent of the

20  parties and the intent of the copyright owner, that

21  you were essentially operating with a limited amount

22  of evidence as to whether or not there was any kind

23  of license or authorization.

24       MR. POZZA:  Objection.  Ambiguous.

25  Compound.  Lacks foundation.

1          THE WITNESS:  Your question had a lot of

2     what I think you're describing as facts and

3     circumstances of my review.  I don't agree with some

4     of them.  I'm not going to go through each one right

5     now unless you want me to, but the answer to your

6     question is absolutely not.  In doing our review we

7     were very thorough.  The question you pose is a very

8     abstract one.  In my review, implied license was not

9     triggered, for example, when I would see the terms

10    under which the party was commercializing its work,

11    whether -- whether expressly when you read the

12    governing terms or you see how it's being

13    commercialized.  The notion that a party who's

14    commercializing its work would -- in selling it,

15    would want to permit at the same time free and

16    unrestricted viral distribution of its product

17    through Hotfile and let anyone distribute it on an

18    unlimited basis, that was inconsistent with how I saw

19    parties commercializing their work, as well as how

20    their express terms read, and so, therefore, I was

21    comfortable making the determinations I made.

22       Q.   Okay.  Let's talk a little bit more on the

23    specific because I appreciate that you feel it's

24    getting too abstract.  I do think the abstract

25    question is very important, but in order to move it

1          THE VIDEOGRAPHER:  This is the end of tape

2  three.  Off the record at 6:40.

3          (Discussion off the record.)

4          THE VIDEOGRAPHER:  This is the beginning

5  of tape four in the -- in the deposition of

6  Mr. Zebrak.  On the record at 6:46.

7          MR. POZZA:  I just want to make a standing

8  objection to this line of questioning to the extent

9  that it could have been asked in the first deposition

10  and thus is a way of exceeding the seven hours

11  allotted to the first deposition, which was about the

12  documents studied in the first place.

13          MR. GUPTA:  And I'll note this is being

14  linked to Professor Boyle's rebuttal report.  I'll

15  note that this is questioning that is pursuant to

16  Professor Boyle's rebuttal report where he made an

17  analysis of the use of adult content in -- in

18  Dr. Waterman's study.

19          BY MR. GUPTA:

20     Q.   So I was asking about factor four of the

21  fair use analysis, which is the harm to the market

22  for the copyright owner, and I wanted to get your

23  perspective on, you know, really and genuinely, you

24  know, if you believe that this is appreciably going

25  to harm the market.

1     MR. POZZA:  Object as ambiguous and to the

2   extent it calls for speculation.

3     THE WITNESS:  Well, I actually do think in

4   this instance -- and first of all, again, this is --

5   you know, this type of example is more of an outlier.

6   In most cases, the files that I was reviewing were

7   full-length copies of the entire episode, not what in

8   this case is apparently a two-minute portion but

9   apparently a portion that a segment of the population

10   finds very, very much of interest being in this case

11   a strip-tease scene from the Californication episode.

12   And, you know, the notion that someone would instead

13   of purchasing a copy of that Showtime episode to, you

14   know, watch what they really cared about for that

15   segment of the population being the strip-tease

16   scene, which apparently is of interest to this

17   blogger and those people that he thinks are reading

18   -- or she thinks are reading the blog, you know, this

19   could -- could certainly displace sales.

20     BY MR. GUPTA:

21   Q.   Isn't -- isn't that form of reasoning

22   essentially going to eviscerate the fourth prong of

23   the fair use analysis, because basically what you're

24   say something that as long as a work has -- is

25   generating some -- is generating some interest that

1   there is a potential market for it, and so there's

2   inherently a deprivation of the copyright owner

3   insofar as they are being deprived of the ability to

4   access that market?

5        MR. POZZA:  Object as ambiguous, and to

6   the extent it's talking about abstract legal ideas,

7   it's outside the scope of the testimony.

8        THE WITNESS:  Again, you know, I

9   understand the fair use doctrine.  I routinely need

10  to look at and apply the fair use doctrine, and do

11  not believe that my analysis here eviscerates the

12  fair use doctrine.  Your question was sort of a vague

13  abstract one.  You know, the notion that a whole

14  group of people interested in -- in seeing a

15  beautiful woman dance and do a strip-tease might be

16  happy to view this two-minute clip rather than seeing

17  the whole episode if this is the only thing that

18  person cares about -- that certainly could -- could

19  have harm to the market as opposed to going to

20  purchase the episode.  You know, this is very

21  different than, you know, the more classic type of

22  instances of fair use.  And certainly had this person

23  merely done a screen shot or included a list of

24  the -- in this person's view, the best most sensual

25  scenes from movie and TV series, I think that would

1  be more closely in line with the fair use doctrine.

2       But, you know, again, we're now focusing

3  on what, you know, I really think is, you know,

4  probably one of a handful of outliers that are closer

5  calls in my analysis than what are really the much

6  more prevalent and easier calls, which are

7  full-length distribution of these works that are

8  being commercialized such as full-length copy of this

9  episode.  But I grant you this is one of the more --

10  you know, one of the closer calls within my analysis.

11       BY MR. GUPTA:

12  Q.   Okay.  And so would you consider

13  redesignating this as unknowable?

14  A.   What I -- look, with regard to any of the

15  closer calls that you raise with me today, whether

16  it's just this one or if this is one of X number, I

17  would be happy to go back and look more closely at

18  these.  I actually, you know, take great pride in the

19  fact that I think that if you were to review the 1750

20  files and focus on the ones that I deemed to be

21  infringing, I think you'll find that you won't

22  dispute the overwhelming -- overwhelming majority of

23  them and that while you may be able to isolate and

24  present to me a few that are closer calls, that I had

25  sound reasoning both for the ones where I opted to

1

2

3

4    I have read the foregoing transcript of my deposition

5

6    and find it to be true and accurate to the best of my

7

8    knowledge and belief.

9

10

11

12

13                    SCOTT A. ZEBRAK

14

15

16

17

18

19

20

21

22

23

24

25

Page 293

Deposition of Scott Zebrak – Day 2 (rebuttal)
January 20, 2012
Errata

| Location | Correction |
|---|---|
| 163:2 | change "highly unlikely infringing category" to "highly likely infringing category" |

Page 296

1   UNITED STATES OF AMERICA)

2                    SS:

3   DISTRICT OF COLUMBIA    )

4

5       I, SUSAN L. CIMINELLI, the officer before whom

6   the foregoing deposition was taken, do hereby

7   certify that the witness whose testimony appears in

8   the foregoing deposition was duly sworn by me; that

9   the testimony of said witness was taken by me to the

10   best of my ability and thereafter reduced to

11   typewriting under my direction; that I am neither

12   counsel for, related to, nor employed by any of the

13   parties to the action in which this deposition was

14   taken, and further that I am not a relative or

15   employee of any attorney or counsel employed by the

16   parties thereto, nor financially or otherwise

17   interested in the outcome of the action.

18

19       _____

20            SUSAN L. CIMINELLI

21

22   My commission expires:  11/30/2016

23

24

25