# EXHIBIT 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 11-20427-WILLIAMS/TURNOFF

DISNEY ENTERPRISES, INC.,
TWENTIETH CENTURY FOX FILM CORPORATION,
UNIVERSAL CITY STUDIOS PRODUCTIONS LLLP,
COLUMBIA PICTURES INDUSTRIES, INC., and
WARNER BROS. ENTERTAINMENT INC.,

*Plaintiffs,*

v.

HOTFILE CORP., ANTON TITOV, and
DOES 1-10.

   *Defendants.*
_____/

HOTFILE CORP.,

*Counterclaimant,*

v.

WARNER BROS. ENTERTAINMENT INC.,

*Counterdefendant.*
_____/

## RULE 26(a)(2)(B) REPORT OF DR. IAN FOSTER

I, Ian Foster, hereby declare as follows:

　　　　1.　　　　My name is Ian Foster and I currently hold the position of Director of the

Computation Institute at Argonne National Laboratory and the University of Chicago. I also

hold the positions of Arthur Holly Compton Distinguished Service Professor of Computer

Science at the University of Chicago, and of Argonne Distinguished Fellow at the Argonne

**Highly Confidential**

National Laboratory.  A copy of my *curriculum vitae*, including lists of my previous publications and cases in which I have given testimony, is attached hereto as Exhibit A.

2.      I have been asked by the plaintiffs in this case to evaluate the functioning and operation of the website www.hotfile.com ("Hotfile"), as well as to provide certain analyses of various technical data about the Hotfile system produced by Hotfile in this litigation.  The observations and conclusions set forth below are based on my own observation and use of the live Hotfile site, as informed by my specialized knowledge, education, and expertise as applied to the facts and circumstances in this case.  In addition, I have consulted and reviewed:

   a.  Various data sets and technical data produced by Hotfile in this litigation that I have reviewed, including the following data sets:
      i.  Actiondat.csv
      ii.  Uploadip.csv
      iii.  Affpay.csv
      iv.  Refsites.csv
      v.  Uploads.csv
      vi.  Uploads4.csv
      vii.  Userdat.csv
      viii.  Top500_2.dat
      ix.  Dmcanotices.csv
      x.  Uploadsdownloads.csv
      xi.  Strikes.csv
      xii.  HF0285583.
   b.  Takedown notices sent to Hotfile produced by Hotfile in this litigation;
   c.  Logging data produced by Hotfile in this litigation;
   d.  Plaintiffs' Response to Hotfile's Interrogatory No. 1, including Exhibits;
   e.  Hotfile's Response to Plaintiffs' Interrogatory No. 9;
   f.  Technical analyses produced in this litigation by Plaintiffs regarding several providers of fingerprinting technology, including:
      i.  WARNER027504
      ii.  WARNER027550

2

**Highly Confidential**

   iii.  WARNER027583

   iv.  MPAA000014

   v.  MPAA000033

   vi.  MPAA000071

   vii.  MPAA000097

   viii.  DISNEY005811

   ix.  DISNEY005871

   x.  DISNEY005895.

g.  Patents and academic literature regarding fingerprinting technology, including:

   i.  E. Wold, T. Blum, D. Keislar, and J. Wheaten, Method and Apparatus for Creating a Unique Audio Signature, European Patent EP 1 354 276 B1. Filed 10/26/2001; Published 12/12/2007.

   ii.  E. Wold, T. Blum, D. Keislar, and J. Wheaten, Content-based classification, search, and retrieval of audio, IEEE Multimedia, 3(3):27-36, Fall 1996.

   iii.  J. Oostveen, T. Kalker, J. Haitsma, Feature Extraction and a Database Strategy for Video Fingerprinting. In: Recent Advances in Visual Information Systems, Lecture Notes in Computer Science 2314, pp 67-81, Springer, 2002.

   iv.  J. Haitsma and T. Kalker, A Highly Robust Audio Fingerprinting System, Proceedings of the Annual Conference of The International Society for Music Information Retrieval, 2002.

   v.  J. Liu and Y. Wang, Method and System for Fingerprinting Digital Video Object Based on Multiresolution, Multirate Spatial and Temporal Signatures, US Patent 8,009,861 B2, Filed on March 2, 2007.

   vi.  Vobile's Product Sheet for its vCloud9[TM] service.

h.  Publicly available news accounts regarding fingerprinting technology, including:

   i.  Dailymotion Selects Audible Magic's Fingerprinting Solution for Detecting Copyrighted Video, Audible Magic Inc. Press Release, May 10, 2007. http://audiblemagic.com/pr-2007-05-10.php

   ii.  Bebo Protects the Rights of Artists and Bands with Audible Magic, Audible Magic Inc. Press Release, June 14, 2007, http://audiblemagic.com/pr-2007-06-15.php

   iii.  Vobile Announces Commercial Deployment With Leading Video Sharing Website 56.com. Press Release, Vobile Inc., March 23, 2009. http://www.reuters.com/article/2009/03/23/idUS95209+23-Mar-2009+PRN20090323

**Highly Confidential**

     i.    Information regarding the November 17, 2011 deposition of Hotfile regarding its data sets supplied to me by Plaintiffs' counsel (a transcript of the deposition was not yet available at the time of this Report).

3.    I am being compensated for my study and testimony in this case at a rate of $500 per hour.

4.    My general conclusions and bases therefore are as follows:

## I.   General Background About Hotfile Website

5.    Hotfile is a website that allows its users both to "upload" electronic files and to "download" files uploaded by others. Hotfile provides any user who uploads a file with a "link" (an alphanumeric string that operates as a uniform resource locator or "url"). The uploaded file can then be downloaded by any Internet user who has access to the link. Users who download from Hotfile can find "links" to files hosted on Hotfile in a variety of ways on the Internet (such as on other websites that host collections of such links, or via email or an online forum). They can then follow the link to a Hotfile "download page" where they are given a choice to subscribe as a premium Hotfile user, or to download the file for free, but more slowly. If the user opts for a free download, they may further have to complete a "captcha" (a test used to verify that a human, rather than a software program, is accessing a website). At that point the user receives a link that initiates a download of the file.

6.    Entertainment content, such as music, motion pictures, television shows, and so forth, can be represented as a digital computer file, and can easily be communicated over the Internet in digital form. Thus, it is easy for users to upload and download entertainment content (such as motion pictures and television shows) to and from Hotfile, as described above. For purposes of this declaration, I will use the term "Content File" to refer to files that Hotfile hosts and makes available for download. Larger pieces of entertainment content, such as a high-quality recording of a motion picture or television program, can be represented as a single digital

**Highly Confidential**

computer file, but can also be divided into several, smaller computer files in order to facilitate transmission and copying (software can then easily be used to combine such files back together again once transmitted and/or copied).

7.      Hotfile allows users who create accounts with the website to view extensive information about the files that they have uploaded.  For instance, users are displayed a "My Files" page showing basic facts about their uploaded Content Files, such as the names and sizes of each file.  The "My Files" page provides the user with the ability to retrieve and select a list of download URLs for any file or chosen group of files, which the user can then easily "paste" to another online location, such as a third-party website, an email, or an online forum.  The "My Files" page also provides the user with the option of creating multiple additional copies, at different URLs, of the same Content File.  Hotfile also displays to users a "File Manager" page that allows users to organize their files into folders and create links to those folders, and a "My Statistics" page that shows the user information about the downloading of the user's Content Files by others.

8.      Another feature offered by Hotfile is a "Link Checker" (at http://hotfile.com/checkfiles.html).  The Link Checker provides a web interface through which a user can quickly verify whether the Content Files hosted at particular URLs are available for download.  For instance, prior to attempting to download a series of files from Hotfile, a user who has obtained the URLs to those files from some other online source (e.g. a forum post or a third-party website) can first "check" to confirm that the files have not been removed from Hotfile.

9.      In order to be able to display such information to its users – as well as to be able to administer the stated criteria for paying users under its Affiliate program (the payment criteria

5

**Highly Confidential**

for which I have discussed in my previous declarations in this case) – Hotfile must maintain a variety of different types of data about its users, the Content Files on Hotfile's system, and uploading and downloading activity.  In Part III of my report below, I describe in greater detail the data sets produced by Hotfile in this litigation that track some of this information.

10.    I expect in my testimony to the Court to describe the above and other salient features and functions of the Hotfile website, some of which are discussed further below.

## II.    Available Measures to Control Infringement

11.    I have been asked by the plaintiffs in this case to describe, and opine on the feasibility of, methods that Hotfile could use to keep undesired content off the site, in particular content that is not authorized by copyright owners to be distributed through Hotfile.  In particular, plaintiffs have asked me to opine upon possible uses of content identification software and technical steps Hotfile could take to identify users of its service that infringe copyrighted content on multiple occasions.

## A.    Content Identification Software.

12.    I have concluded that one method available to Hotfile – and commonly used on Internet websites to which users supply entertainment content such as videos – is to use software to identify files that are not authorized by the copyright owner.  Software capable of identifying or assisting the identification of entertainment content within digital files has been available, in various forms, for over a decade; indeed Hotfile claims to have recently implemented software of this sort provided by a company by the name of Vobile.

13.    One method, for instance, is to use a file's "metadata" (i.e. data about the characteristics of the digital file itself), such as the name of the file, the size of the file, and the filename extension, which can often supply useful information.  For instance, if a file is called "Harry Potter and the Half-Blood Prince," that is an indication that the file is more likely to

**Highly Confidential**

contain the motion picture "Harry Potter and the Half-Blood Prince" than a bearing some other name. And, in turn, a file called "Harry Potter and the Half-Blood Prince" that is several hundreds of megabytes large and in a file format commonly associated with audiovisual content (such as ".avi" or ".mp4") is more likely to contain the motion picture "Harry Potter and the Half-Blood Prince" than a file that is a few megabytes large and in a format commonly used for audio content (such as .mp3), which might suggest a song from the movie's soundtrack – just as a file called "Harry Potter and the Half-Blood Prince" that is a few hundred kilobytes large and bears a file extension commonly associated with electronic books (such as ".azw") is more suggestive of the e-book of the same title. While these are simple examples, more sophisticated software built around the principle of metadata analysis can be built to identify and/or assist in the identification of unauthorized copyrighted content.

14. Another method that has gained widespread implementation on websites featuring entertainment content uploaded by users is fingerprinting software. Many persons are familiar with this sort of software through popular consumer applications such as Shazam (software used to identify songs for the user upon receiving a short portion of the audio track through a mobile phone's microphone). Fingerprinting software analyzes properties of the content represented within the file. So-called "audio fingerprinting" software analyzes the acoustical properties of the file's contents and so-called "video fingerprinting" software analyzes visual properties of the file's contents. In either case, the software generates a small "fingerprint" of the acoustical or visual characteristics of the contents of the file, and then compares that fingerprint against a database of fingerprints of known, identified audio or audiovisual works maintained by the company that operates the software. Both audio-based and video-based techniques can be used

**Highly Confidential**

in combination with one another, as well as in combination with metadata-based methods as described above.

15.     Fingerprinting-based content identification technologies – both audio and video – have been implemented by many websites and online services in the past five years.  Video streaming sites such as YouTube, Veoh, MySpace, DailyMotion, and Soapbox were all using such software to identify audiovisual content as early as 2007.  Peer-to-peer file-trading services such as iMesh had implemented it to identify audio content before that.  The sophistication and accuracy of such software has grown over time, and there are a number of vendors that offer such technologies.  Testing of the leading providers of video fingerprinting software has shown that the accuracy of such software in correctly identifying content is extremely high.

16.     I understand that Hotfile is now using commercially available fingerprinting software provided by a company known as Vobile in order to identify files uploaded to the Hotfile service.[1]  Although Hotfile does not appear to have implemented this technology until the middle of 2011, there is no technical reason the same or similar implementation of fingerprinting software (whether through Vobile, or any of the other companies that offer fingerprinting software on a commercial basis) could not have been accomplished by Hotfile in 2009 when Hotfile began operations.

## B.     Terminating Repeat Infringers.

17.     Filtering as described above seeks to reduce infringement by identifying files.  Another measure available to Hotfile would be to terminate the accounts of users who have used the service to infringe.  From a technical perspective, it is a relatively trivial task for Hotfile to associate notifications of infringing Content Files on Hotfile with the identities of users who

---

[1] I expect to receive additional information concerning Hotfile's implementation of Vobile's technology as discovery in this litigation progresses, and may offer further opinions on the specifics of the implementation once I have received such additional information.

**Highly Confidential**

uploaded the files.  Indeed, I understand that Hotfile claims to be making this association in some form today; it has produced a data set called "strikes.csv" that purports to associate the unique identification number that Hotfile assigns to each user (the "userid") with "strikes" on the user's account.

18.    Generating this association is, from a technical perspective, a very simple task. Hotfile generally receives notifications of infringing files in the form of URLs reporting specific files on its system as infringing.  Hotfile's naming convention for URLs is to include within the URL of each file on its system a unique identification number that Hotfile assigns to that file (the "uploadid").  Hotfile also maintains a database that associates the uploadid of each Content File on Hotfile with a unique identifier of the uploading user ("userid").  A data set called "uploads4.csv" associating userid values with uploadids was produced in this action.  Therefore, associating notifications of infringing content with the uploading user is a simple matter of extracting the uploadid from the URL provided in a takedown notice, and then associating it with the userid of the uploading user.  Once that association is made, Hotfile would know which of its users is uploading Content Files that have been reported as infringing.

19.    It would also be relatively straightforward for Hotfile to make the same association between Content Files reported as infringing and users who download those files. Hotfile receives in its regular course, and has produced in this action, logs of downloading activity that reflect, among other things, the uploadid of the file being downloaded and the userid of the user making the download.  Hotfile could relatively easily record information from such logs in a database in order to identify users who repeatedly download files identified as infringing.

9

**Highly Confidential**

20.     The same is true with respect to websites that host links to infringing content on Hotfile and thereby refer infringing users to Hotfile.  Whether or not Hotfile currently stores this information in the regular course of its business, it receives "HTTP referrer" information from the web browsing software of users who come to the Hotfile website by way of a link on a different website.  Hotfile could easily store this information and associate it with the downloads of Content Files – and then associate referring websites to downloads of files identified as infringing.  Hotfile could then use this information to prevent users from accessing Hotfile by links on websites identified as generating referrals to infringing traffic on Hotfile.  To the extent the website is registered by a Hotfile user as his or her own through Hotfile's affiliate program, the information could also be easily associated with the user through Hotfile's "refsites.csv" data set, which associates the userid with any "domain" (i.e. website) the user has registered through the affiliate program.

**C.      Other Methods.**

21.     I am also still awaiting evidence, particularly in the form of testimony from depositions of Hotfile's personnel, regarding any other steps or measures that Hotfile took in order to police other forms of undesired activity or content on the site.  Once I receive such further information, I may have additional opinions to offer as to further technical means Hotfile could have utilized to reduce infringing content on the website.

22.     I continue to analyze the Hotfile system, and may receive further data or information in the form of documents or data.  My continued analysis may result in further opinions or conclusions regarding Hotfile's options for limiting infringement on the site and may cause me to supplement this report.

**Highly Confidential**

### III.    Analysis of Data Produced by Hotfile.

23.    I have been provided by Plaintiffs' counsel with a variety of data regarding the use and operations of Hotfile's system that I understand Hotfile has produced to Plaintiffs in this litigation.  I have been asked to analyze this data to determine what it can tell us about user activity on Hotfile.

24.    My preliminary analysis of the data is described below.  In reviewing the data contained in Hotfile's many data sets, I am relying upon my twenty-five years of experience in designing, building, and researching large-scale distributed and data-intensive computer systems. I am also relying upon my study of the produced data sets and the relationships among them, relationships that may be inferred from patterns and recurrences of common data values across the different data sets.  These conclusions are based on the data that has been provided to me; as discovery in this case progresses (and I conduct both further analysis of the data and acquire any new information, such as testimony from Hotfile representatives responsible for the different databases) I may supplement these conclusions.

### A.  Data For Statistical Analysis.

25.    In support of statistical analyses that I understand are being conducted by Dr. Richard Waterman, I extracted (in accordance with instructions designed by Dr. Waterman) certain data from data sets produced by Defendants in this litigation.

26.    Specifically, I extracted certain "uploadid" values from the dailydownload.csv data set, for seven specific dates in January 2011[2] that were specified to me by Plaintiffs' counsel. (I understand that the seven days in question were selected according to Dr. Waterman's protocol.)  I extrapolated from the data set the number of times each file was downloaded on

---

[2] Overall, the "dailydownload.csv" data set shows 145,691,820 downloads of files from Hotfile in the month of January 2011.

**Highly Confidential**

each day by summing the "free" and "premium" fields, which I understand represent downloads by non-premium users and by premium users, respectively:

| Date | Download Count |
|------|----------------|
| 2011-Jan-01 | 4180329 |
| 2011-Jan-05 | 4677811 |
| 2011-Jan-11 | 4568087 |
| 2011-Jan-20 | 4496274 |
| 2011-Jan-21 | 4631944 |
| 2011-Jan-24 | 4738937 |
| 2011-Jan-30 | 5125537 |

27.     On each day, I assigned each of those downloads a consecutive number, such that each unique file (uploadid) was assigned as many numbers as the sum of the "free" and "premium" fields for that uploadid.  I was provided with seven sets of numbers by Plaintiffs' counsel, one for each of the seven days, which I understand were randomly generated.  I extracted the uploadid values corresponding to those numbers and provided them to plaintiffs' counsel.

**B.  Hotfile's Data Concerning Uploaders of Files Reported As Infringing.**

28.     I have also been asked by plaintiffs' counsel to analyze what Hotfile's data shows regarding Hotfile's response to Hotfile users whose uploaded files have been the subject of takedown notices.  I have analyzed Hotfile's records regarding the files uploaded by users, records of the files that have been the subject of takedown notices, and records of user suspensions.  My preliminary analysis is described below.

12

**Highly Confidential**

29.     I have been provided by Plaintiffs' counsel with two data sets that I understand were produced by Hotfile in this litigation and which purport to store information concerning takedown notices that Hotfile has received.  The first data set, titled "dmcanotices.csv" purports to contain information concerning takedown notices sent to Hotfile via email, including the name of the sender of each notice, the date on which each notice was sent, and the body of the email, typically containing the URLs of each file to which the takedown notice applies.  The second data set, "users_cowner_upload.csv" purports to contain similar information for takedown notices that Hotfile has received via its web interface rather than via email.

30.     Each record in the "dmcanotices.csv" data set indicates the date on which the notice was received ("receivetime").  In analyzing the data, I observed that the table only contains takedown notices from July 2, 2009 through September 15, 2009, and then again from September 19, 2010 through the present.  In other words, a year of data (running from September 2009 through September 2010) appears to be missing from the dmcanotices.csv data set entirely.

31.     Because Hotfile's records do not include the takedown notices it received for a one-year period, my preliminary analysis described below is underinclusive and does not capture all takedown notices received by Hotfile, only those for which Hotfile has produced database records.  It may ultimately be possible to recreate the missing data from the actual takedown notices themselves.  However, due to the sheer volume of the emails produced by Hotfile from which this data would need to be extracted, this process would require a substantial investment of time and computing resources and I have not yet been able to complete such a data extraction.  As Hotfile did not produce the dmcanotices data set until two weeks ago, and I consequently did not discover that the data set was missing an entire year's worth of data until this week, it has not yet been possible for me to re-create this year of missing data as part of my analysis.  However,

**Highly Confidential**

to the extent I am able to do so, I may supplement my report with data concerning these additional takedown notices.

32.     Hotfile's takedown notices (or, for present purposes, the ones of which it has produced database records) can then be associated relatively easily with the uploading user using the method I described in paragraph 20 above (i.e. matching the uploadid value with the userid value in the uploads4.csv data set).  This data set also supplies other relevant information about the file, such as the date of upload ("uploaddate").

33.     Hotfile also has produced, across several data sets, information regarding its users, which I used in connection with my analyses:

    a.  A "strikes.csv" data set.

    b.  Another data set, "actiondat.csv," which contains records of actions Hotfile took regarding users.  The actiondat.csv data set associates the userid with the "type" of action (which includes "suspenduser"), the date of the action ("dtaction") and other information about the suspension, including the reason for the suspension ("params").

    c.  Data showing which websites were registered by each user in Hotfile's affiliate program; this data is reflected in the refsites.csv data set, which associates each userid with any "domain[s]" they have registered.

    d.  Data regarding whether or not a user is a Hotfile affiliate.  This data is reflected in the "isaffiliate" value of the "userdat.csv" data set.

    e.  Records of Hotfile's payments to affiliates in the affpay.csv data set.

34.     A chart, attached as Exhibit B, contains the following information about each user whose uploaded files have been subject to takedown notices:

    a.  The userid;

    b.  The total number of Content Files uploaded by the user;

    c.  The total number of Content Files uploaded by the user for which Hotfile received a takedown notice;

    d.  The number of separate days on which Hotfile received a takedown notice for a Content File uploaded by the user;

    e.  The first day on which Hotfile received a takedown notice for any Content File uploaded by the user;

14

**Highly Confidential**

f.   The third day on which Hotfile received a takedown notice for any Content File uploaded by the user;

g.   The number of "strikes" Hotfile itself assigned to the user;

h.   Whether or not Hotfile suspended the user;

i.   If Hotfile suspended the user, the date on which Hotfile suspended the user;

j.   If Hotfile suspended the user, the stated reason Hotfile suspended the user;

k.   Whether or not the user was a Hotfile Affiliate;

l.   Which websites, if any, the user had registered under Hotfile's Affiliate program;

m.  How much money Hotfile had paid to the user under Hotfile's Affiliate program;

n.   The number of files that the user uploaded after the third day on which Hotfile received a takedown notice for any file uploaded by the user;

o.   The number of files that the user uploaded, after the third day on which Hotfile received a takedown notice for any file uploaded by the user, that the Plaintiffs in this case have claimed as infringing (see my discussion in Paragraph 42, below, regarding the "Files in Suit");

p.   For the Files In Suit uploaded by the user after the third day on which a takedown notice was received against one of the user's files, the total number of downloads.[3]

q.   It is likely also possible, using Hotfile's dailydownload data set, to determine the Files in Suit uploaded by the user, and then calculate the number of times those files were downloaded after the third day on which Hotfile received a notice against one of the user's files.  I may supplement my report with such a calculation if Hotfile's data production is sufficiently complete and I am able to extract the data.

In addition, as stated previously, because Hotfile's production is missing a year's worth of data, the actual number of takedown notices issued against each user's files would in many cases be higher, and the actual date of the user's third notice would be earlier (correspondingly, in such cases, the actual number of files uploaded after the third notice and the actual number of downloads of those files might also be higher).

---

[3] This data is contained in the "uploaddownloads.csv" data set, which contains cumulative download counts for each uploadid.  My understanding is that Hotfile's representative testified at his November 17, 2011 deposition that the "downloads" value in the uploadsdownloads data set represents downloads by non-premium users, and the "paiddownloads" value represents downloads by premium users.  Thus the cumulative download total can be generated by summing the two values.

**Highly Confidential**

**C. Hotfile's Data Concerning Users Terminated Prior to this Litigation.**

35.     Hotfile produced information in its actiondat.csv data set concerning, among other things, user "suspensions" and the reasons for those actions.  I have prepared a chart, from that data set, showing all users that Hotfile's records show to have been suspended before this litigation began (on February 8, 2011) for reasons related to copyright infringement.  In so doing, I have used the chart produced by Hotfile (HF0285583) identifying which suspensions were copyright-related.  My chart showing each userid, the date of suspension ("dtaction") and the reason for the suspension ("params") is attached as Exhibit C.

**D. Hotfile's Data Concerning Hotfile Affiliates.**

**1. Affiliate Websites.**

36.     I have also been asked by plaintiffs' counsel to identify the websites registered in Hotfile's "Affiliate" program by the Affiliates identified by Hotfile as the "Top 500" affiliates to whom the largest amount of affiliate payments were made.  This data is contained within a data set produced by Hotfile called "refsites.csv," which associates the unique userid of each affiliate with particular websites (or, more accurately, with particular domains).  I prepared Exhibit D by extracting, from the refsites.csv data set, a list of the websites registered by each of the Top 500 affiliates identified by Hotfile.  Hotfile also produced an interrogatory response showing the cumulative payments to each of the Top 500 affiliates; this information has been added to the spreadsheet as well.  (Hotfile also has produced a data set called "affpay.csv" containing records of payments to affiliates, so similar information could also be derived from that data set, but I have used Hotfile's own interrogatory response for purposes of simplicity).

37.     In addition, I have added to Exhibit D values from the actiondat.csv data set showing whether the Affiliate was "suspended" by Hotfile, and, if so, when and for what reason.

**Highly Confidential**

### 2. Terminations of Affiliates.

38.     In order to make the data easier to read, I have also prepared a subset of the table attached as Exhibit B that lists only the entries associated with the Top 500 Hotfile Affiliates. This chart is attached as Exhibit E.

### E. Hotfile's Data Concerning Uploading of Files Claimed By Plaintiffs As Infringing By Users In The United States.

39.     Plaintiffs' counsel has also asked me to confirm, from Hotfile's user and upload data, which of the files claimed as infringing by the Plaintiffs in this action were uploaded to Hotfile by users in the United States.

40.     I have been provided by Plaintiffs' counsel with the list of the files they are claiming as infringing in this action, which I understand was provided as an attachment to their response to Hotfile's Interrogatory Number 1.  (I will call these the "Files in Suit.")  Each File in Suit is associated on the list with a unique URL, which contains the uploadid for the file.

41.     Another Hotfile data set, "uploadip.csv," contains an entry for the Internet Protocol address ("IP address") associated with each uploadid (the "ip" value).  Where such an IP address was available in the data set, I extracted it.  However, not every uploadid is associated with an ip address in the uploadip.csv data set (some entries are blank).  Where an entry is blank, however, it is still possible to obtain the IP address of the user who uploaded the file because the userdat.csv data set associates each user with the IP address from which the user registered the account ("registerip").  Therefore, where the uploadip.csv table is blank, one can associate the uploadid of the file with the userid, and in turn with the user's IP address.  For each File in Suit, I extracted the uploadip, or, if none was available in Hotfile's records, the registerip of the uploading user.

17

**Highly Confidential**

42.     Using publicly available lookup services, one can associate IP addresses with geographical locations.  Hotfile has not produced the entire IP addresses for most users (it has obfuscated the final octet), but if one wishes to do no more than identify the country in which an IP address is located, the final octet is not needed.  Using the lookup service Maxmind (http://www.maxmind.com/app/geoip_country), I have narrowed the extracted data to the specific IP addresses showing Files in Suit either uploaded in the United States or, if such data was unavailable, uploaded by users who registered their accounts in the United States.  The chart is attached hereto as Exhibit F.

**F. Data Concerning Downloading of Files Claimed By Plaintiffs As Infringing By Users In The United States.**

43.     Plaintiffs' counsel has also asked me to confirm, from logging data produced by Hotfile, which of the Files in Suit were downloaded from Hotfile by users in the United States. Hotfile has produced logging data showing downloads of Content Files from its system, but only for a limited period of time spanning from March 2011 through September 2011.  Therefore, this question can be answered only for this narrow period.

44.     Confirming the downloads of the Files in Suit by U.S. users is a relatively straightforward proposition.  Each entry in Hotfile's logs provides the uploadid of the file downloaded (which can be associated with the Files in Suit as described in the previous section of my declaration) as well as the IP address to which the file was downloaded (which, again, as described above, can be associated with a geographical location).  I have confirmed that Hotfile's download logs reflect downloads of each of the files listed in Exhibit G, attached hereto, at the dates and to the IP addresses indicated in the chart.  In addition, in order to make the chart more comprehensible, I have added the values associating those log entries with the particular URLs and Titles reflected in Plaintiffs' identification of the Files in Suit.

**Highly Confidential**

**G.  Data Concerning Sources of Hotfile's Traffic.**

45.      It is my understanding that Hotfile has claimed that it does not store information regarding the sources of its web traffic (i.e. the websites from which traffic is referred to Hotfile), even though users' web browsers supply such information to websites in the regular course.  Therefore, I have not yet been able to analyze such data for purposes of this report.  However, it is likely that this information exists.  I can see, by examining the structure of the Hotfile webpages, that Hotfile is using a service called "Google Analytics."  Google Analytics is a service that allows the owner of a website to maintain records of their website traffic at Google, and to analyze various properties of that traffic.  Part of the operation of this service involves the transmission of information to Google and the storage of that information on Google's computers for analysis by the website owner.  A description can be found at http://www.google.com/analytics/.  In the event that this or similar information is provided to me in the future, I may supplement this report with an analysis of the origins and breakdown of Hotfile's web traffic.

**H.  Further Exhibits.**

46.      The data sets produced by Hotfile in this action are voluminous, and the data can be assorted and presented in many different ways.  My testimony to the Court will use the techniques used to generate the particular exhibits to this report, but may organize or present Hotfile's data in other ways or formats.

November 18, 2011

_____
Ian Foster

**Highly Confidential**

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

CASE NO. 11-20427-WILLIAMS-TURNOFF

DISNEY ENTERPRISES, INC.,
TWENTIETH CENTURY FOX FILM CORPORATION,
UNIVERSAL CITY STUDIOS PRODUCTIONS LLLP,
COLUMBIA PICTURES INDUSTRIES, INC., and
WARNER BROS. ENTERTAINMENT INC.,

*Plaintiffs,*

v.

HOTFILE CORP., ANTON TITOV, and
DOES 1-10.

  *Defendants.*
_____/

HOTFILE CORP.,

*Counterclaimant,*

v.

WARNER BROS. ENTERTAINMENT INC.,

*Counterdefendant.*
_____/

**CERTIFICATE OF SERVICE**

    I HEREBY CERTIFY that on this 18th Day of November, 2011, I served the following

documents on all counsel of record by means of the email addresses listed through the Court's

ECF System:

**RULE 26(a)(2)(B) REPORT OF DR. IAN FOSTER**

               By: /s/ Luke C. Platzer_____
                    Luke C. Platzer

# SERVICE LIST

**Disney Enterprises, Inc., et al. v. Hotfile Corp. et al.**
**CASE NO. 11-CIV-20427-JORDAN**

FARELLA BRAUN + MARTEL LLP
Anthony P. Schoenberg
tschoenberg@fbm.com
Roderick M. Thompson
rthompson@fbm.com
N. Andrew Leibnitz
aleibnitz@fbm.com
Deepak Gupta
dgupta@fbm.com
Janel Thamkul
jthamkul@fbm.com
235 Montgomery Street
San Francisco, CA  94104
Phone:  415-954-4400

*Attorneys for Defendants Hotfile Corp. and
Anton Titov*

RASCO KLOCK
Janet T. Munn
jmunn@rascoklock.com
283 Catalonia Ave., Suite 200
Coral Gables, FL  33134
Phone:  305-476-7101
Fax:  305-476-7102

*Attorney for Defendants Hotfile Corp. and
Anton Titov*

BOSTON LAW GROUP, PC
Valentin Gurvits
vgurvits@bostonlawgroup.com
825 Beacon Street, Suite 20
Newton Centre, MA  02459
Phone:  617-928-1804

*Attorneys for Defendants Hotfile Corp. and
Anton Titov*