# EXHIBIT 2

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 11-20427-WILLIAMS/TURNOFF

DISNEY ENTERPRISES, INC.,
TWENTIETH CENTURY FOX FILM CORPORATION,
UNIVERSAL CITY STUDIOS PRODUCTIONS LLLP,
COLUMBIA PICTURES INDUSTRIES, INC., and
WARNER BROS. ENTERTAINMENT INC.,

*Plaintiffs,*

v.

HOTFILE CORP., ANTON TITOV, and
DOES 1-10.

  *Defendants.*
_____/

HOTFILE CORP.,

*Counterclaimant,*

v.

WARNER BROS. ENTERTAINMENT INC.,

*Counterdefendant.*
_____/

### RULE 26(a)(2)(B) REBUTTAL REPORT OF DR. IAN FOSTER

1. I have been asked by the Plaintiffs to review the November 18, 2011 report and deposition of Dr. Andrew Cromarty and to respond to specific technical opinions Dr. Cromarty expresses therein. I have also been asked to prepare analyses of certain Hotfile datasets, which I understand relate to the November 18, 2011 reports and depositions of Dr. Boyle and Dr. Lynde, and which support the rebuttal report of Scott Zebrak. My qualifications and bases for my expert

**Highly Confidential**

opinions are set forth in my November 18, 2011 report as well as discussed at my December 14, 2011 deposition in this matter.

2. In addition to my experience and materials previously cited, I have further reviewed and relied upon additional materials in preparing this rebuttal report:

    a. Ingmar Poese, Steve Uhlig, Mohamed Ali Kaafar, Benoit Donnet and Bamba Gueye. IP Geolocation Databases: Unreliable?, ACM SIGCOMM Computer Communication Review, 41(2), April 2011.

    b. S. Siwpersad, B. Gueye, and S. Uhlig, "Assessing the geographic resolution of exhaustive tabulation for geolocating Internet hosts," in Proc. Passive and Active Network Measurement Workshop, April 2008.

    c. M. Freedman, M. Vutukurum, N. Feamster, and H. Balakrishnan, "Geographic locality of IP prefixes," in Proc. ACM SIGCOMM Conference on Internet Measurement, October 2005.

    d. Yuval Shavitt and Noa Zilberman. "A Study of Geolocation Databases", IEEE Journal on Selected Areas in Communications, 29(9), December 2011.

    e. James A. Muir, Paul C. Van Oorschot, Internet Geolocation: Evasion and Counter evasion, *ACM Computing Surveys* 42:1 (2009).

    f. PADMANABHAN, V. AND SUBRAMANIAN, L. 2001. An investigation of geographic mapping techniques for Internet hosts. In *Proceedings of SIGCOMM* (Aug.). 173–185.

    g. PAREKH, S., FRIEDMAN, R., TIBREWALA, N., AND LUTCH, B. 2004. Systems and methods for determining collecting and using geographic locations of Internet users. United States Patent 6,757,740. Assigned to Digital Envoy, Inc. Filed March 31, 2000. Issued June 29, 2004.

    h. HUFFMAN, S. AND REIFER, M. 2005. Method for geolocating logical network addresses. United States Patent 6,947,978. Assigned to the United States of America as represented by the Director, National Security Agency. Filed December 29, 2000. Issued September 20, 2005.

    i. ANDERSON, M., BANSAL, A., DOCTOR, B., HADJIYIANNIS, G., HERRINGSHAW, C., KARPLUS, E., AND MUNIZ, D. 2004. Method and apparatus for estimating a geographic location of a networked entity. United States Patent 6,684,250. Assigned to Quova, Inc. Filed April 3, 2001. Issued January 27, 2004.

2

**Highly Confidential**

   j. MovieLabs, Content Recognition Study: Methodology, June 1, 2007.

   k. Deposition testimony given by Anton Titov during his two depositions in this case.

 3. If called as a witness at trial, I would testify as to the opinions expressed in this rebuttal report.

## Rebuttal Opinions Regarding IP Address Geolocation

 4. In my initial report, I opined that it is possible, from reviewing Hotfile's stored data and server logs, to discern (for such uploads, uploading users, and downloads as Hotfile has available) the IP address of the uploading and/or downloading user, which in turn can be used to identify which of those uploads and/or downloads were conducted from the United States. Nothing in Dr. Cromarty's report, which opines that the IP address of a computer is an unreliable indicator of the computer's geographic location, changes my opinion.

 5. Using a computer's IP address to discern the country in which it is located is a common and pervasive practice in the industry and is commonly used for business purposes. (I observe that Hotfile appears to use this method itself in order to discern the countries from which files are being downloaded for purposes of computing payments under its affiliate program, and that Mr. Titov has supplied testimony to the Court to this effect.) The method that is commonly used by commercial IP geolocation services is straightforward. Internet Service Providers ("ISPs") are assigned "blocks" of IP addresses that they in turn assign to their users. Commercial IP address geolocation services maintain databases of those block assignments, which in turn are mapped to the ISPs' service areas.

 6. It is possible for this method to result in some inaccuracies at the city level. (The frequency of such inaccuracies depends on the quality of the service's records and the regularity of the ISPs' assignment of IP addresses to their users within their service areas.) At the country

**Highly Confidential**

level, however, this method becomes much more reliable because of the relative infrequency with which ISPs serve customers across national boundaries and the likelihood that, when they do, they regularly assign IP addresses in a manner that tracks the national distinctions. In addition, since the Internet Assigned Numbers Authority (IANA) assigns IP addresses to regional Internet registries (who in turn assign them to ISPs), the IP addresses assigned to ISPs begin with geographic constraints. Thus, contrary to Dr. Cromarty's expressed belief at his deposition, inaccuracies in IP geolocation at the city level have a straightforward explanation (ISPs that serve large geographic areas might irregularly assign IP addresses within those service areas) that is much less likely to recur at the country level. Thus, it would not be surprising if an IP address in Palo Alto were incorrectly reported as being located in Santa Rosa; but it would be highly unusual for that same Palo Alto address to be reported as being in France—or for an address in France to be misreported as being in the United States.

7. It is therefore my opinion that Dr. Cromarty substantially overstates the uncertainty of IP address geolocation software when applied to discerning the country in which a computer is located. Contrary to his claim that the accuracy of this method is "unknowable," computers have actual, physical locations and it is therefore possible using various methods (including empirical observation) to study whether the physical locations predicted by geolocation databases are in fact accurate. Such studies – presented at respected electrical engineering and computer science conferences and in peer-reviewed publications – have been conducted and have shown that, while this method is not always accurate to the city level, it produces results with a high degree of accuracy at the country level.

8. Dr. Cromarty also identifies a second source of uncertainty – the potential for users to obfuscate their IP address. While I do not disagree with him that such obfuscation is

4

**Highly Confidential**

possible, the mere possibility of such obfuscation also does not change my opinion that Hotfile's data can be used to identify likely uploads and downloads in the United States. In order to believe that IP addresses in Hotfile's data reflecting geographic locations in the United States were the result of obfuscation by users in other countries, one would need to believe not merely that some Hotfile users had obfuscated their IP addresses, but also to make a second assumption that Hotfile users outside the United States had reason to not only obfuscate their IP addresses, but to do so in a manner that would cause them to appear as being located in the United States. I have seen nothing to cause me to believe that such an assumption is justified or that such a practice, if engaged in, would be common.

**Rebuttal Opinions Regarding Content Identification Software**

9. I have reviewed the portions of Dr. Cromarty's report and deposition testimony in which he opines as to the effectiveness of digital fingerprinting technology. Nothing in Dr. Cromarty's report or testimony changes the opinion expressed in my original report that such technologies are widely available, implemented, and effective at identifying digital assets for which fingerprinting vendors maintain fingerprints, and could have readily been implemented by Hotfile much earlier.

10. I note that Dr. Cromarty opines in his report on techniques that can defeat fingerprinting technologies, including encryption, file compression, archiving, and distortions of the underlying content. I believe that Dr. Cromarty overstates the usefulness of these techniques for circumventing a well-designed and effectively implemented fingerprinting system.

11. As I stated at my deposition, file decompression and archiving techniques can be readily reversed by a file-hosting site prior to applying digital fingerprinting software to the audiovisual file. Dr. Cromarty's apparent assumption that a site would apply fingerprinting

5

software to the compressed or archived file itself (as opposed to the decompressed or unarchived video file contained therein) assumes an illogical implementation of the technology.

12. Furthermore, although encryption of a file would prevent effective application of present fingerprinting software as Dr. Cromarty states, such encryption would also limit the potential audience of a file. A similar statement holds true for techniques that distort the image or audio content of a digital asset. Fingerprinting technologies are increasingly designed to be robust to common distortions. Thus, to effectively defeat a well-built fingerprinting system, such distortions would be likely to diminish the similarity of the distorted file to the copyrighted work embodied therein. Such distortions may diminish the ability of the distorted copy to function as a desirable substitute to the original. And in any event, Dr. Cromarty's opinion seems to assume that the mere possibility of circumventing a security measure (such as fingerprinting software) undermines its effectiveness. It is well-accepted among those skilled in the art of designing computer systems that systems need not be impervious to every single attack in order to be useful, and that security measures that impede and increase the cost and effort level needed to access or use the system in an unauthorized manner can play an important role.

13. I also disagree with Dr. Cromarty's claim that it is "unknowable" whether digital fingerprinting technology successfully identifies the audiovisual works embodied in digital files. Whether or not a digital file embodies a certain audiovisual asset is a fact susceptible to empirical verification, and the accuracy of fingerprinting software that identifies particular digital files as embodying a particular audiovisual work is therefore susceptible to empirical verification as well. The extensive commercial use of fingerprinting technologies indicates that real-world experience has reflected favorably upon the effectiveness and accuracy of the technology.

**Highly Confidential**

14. I likewise disagree with Dr. Cromarty's suggestion that automated processes such as fingerprinting software cannot determine the authorization status of a copyrighted work. Automated processes can readily consult other sources of information that reflect whether or not a file is authorized – for instance, information that copyright owners supply to fingerprinting vendors regarding the works identified, or other sources such as past indications by a copyright owner that they authorize or do not authorize the online distribution of a particular work (such as takedown notices). Indeed, due to their ability to query large databases of such information more quickly, I would expect automated processes to be better at this task than human review.

15. I also disagree with Dr. Cromarty's suggestion that testing of various fingerprinting vendors conducted by MovieLabs is unreliable simply because MovieLabs receives funding from the movie industry. It is common for industry groups with an interest in the development of particular technologies to fund independent laboratories to conduct research and testing that advances the relevant technological fields. For instance, the Electric Power Research Institute, Sematech, and various consortia run by the Southwest Research Institute. (Indeed, my father ran two such organizations in New Zealand: the Pottery and Ceramics Research Association, and the Building Research Association of New Zealand.) There is no reason to believe that commercial entities funding such labs have an interest in inaccurate information. To the contrary, their interest is to obtain accurate information for business intelligence purposes. And as I stated at my deposition, industry-funded labs of this sort have a business interest in retaining their credibility to third parties, such as vendors for the relevant technologies. In addition, from my own review of the MovieLabs reports produced in this action, as well as the methodology used by MovieLabs to conduct those tests, the tests appear professional and well-designed.

7

**Highly Confidential**

16. Relatedly, as I stated at my deposition, it is my opinion that software can often be designed to respond to the same inputs and cues relied upon by humans. Therefore, with respect to Hotfile's counterclaim against Warner, it is my opinion that there is nothing inherently unreasonable or unreliable about Warner's use of an automated process, as opposed to a human process, to gather and process metadata regarding files that may contain Warner's content.

**Rebuttal Opinions Regarding File Metadata**

17. I have reviewed the portions of Dr. Cromarty's report in which he opines that a file's metadata is an unreliable indicator of a file's content. Nothing in Dr. Cromarty's report causes me to change my opinion that metadata can supply useful information that can aid the identification of particular files.

18. In my experience, computer users frequently use meaningful names for files. One reason is that people are not good at remembering where they put things. For example, if a person gives a file containing the movie "Harry Potter and the Goblet of Fire" the meaningless name "M123," it is quite likely that they will not be able to recall at a later date what that file contains. The person can maintain a database of file names and file contents, but that introduces overhead. On the other hand, simply naming the file "Harry Potter and the Goblet of Fire.wmv" provides a strong reminder of both the file type (movie) and contents (the Harry Potter movie). If the same user then uploads this movie file to Hotfile, they can certainly rename the uploaded file from the long, meaningful name to something more opaque (e.g., M123). However, such a renaming operation requires time and thought, and furthermore reduces the accessibility of the file to others—two reasons that may often disincentivize renaming. And, again, Dr. Cromarty's criticism appears to conflate the question of whether a method is infallible with the question of whether the method is useful. File metadata may not on its own establish conclusively the

8

**Highly Confidential**

contents of a file, but it can supply useful information that can be used in combination with other sources of information (including human review or fingerprinting software or other metadata).

**Data Analyses Related to Scott Zebrak's Rebuttal Report**

19. I am supplying and organizing certain data from Hotfile's data sets requested by counsel, which I understand are being used by Scott Zebrak as part of his rebuttal analysis in this case. In particular:

20. With respect to Mr. Zebrak's analysis of a sample of files downloaded from Hotfile:

   a. Hotfile's unique userid for the uploading user;

   b. the username of the uploading user;

   c. the number of "strikes" Hotfile assigned to the uploading user;

   d. the number of days on which Hotfile had received a takedown notice for any file uploaded by the uploading user;

   e. whether or not the uploading user had been suspended for copyright infringement (also indicating as "Reason Unknown" ("RU") where Hotfile's data shows that the user was suspended but does not contain a reason, and "Other" where Hotfile's data shows that the user was suspended for a reason other than copyright infringement);

   f. The date the uploading user was first suspended, if any;

   g. Data showing whether or not the URL was the subject of a takedown notice sent to Hotfile;

   h. Data showing whether or not a file with a hash identical to the file in question was the subject of a takedown notice sent to Hotfile;

   i. Search term results reflecting files with potentially similar filenames that were the subject of a takedown notice sent to Hotfile;

   j. Search term results reflecting copyright owners with potentially similar names that sent takedown notices to Hotfile.

The methodology for retrieving items a-f was described in my previous report and deposition. Item g can be retrieved from Hotfile's records of its takedown notices

9

**Highly Confidential**

(dmcanotices.csv), Hotfile's records of SRA notices (users_cowner_upload.csv), and the "status" of files in Hotfile's uploads data set (per Anton Titov's testimony, with statuses '5' and '2' representing files removed per a takedown notice, but excluding files uploaded by users terminated before Hotfile began terminating users following the initiation of this lawsuit). Item h can be retrieved from the md5 and sha1 hash values in Hotfile's uploads data set. Item i can be retrieved by running keyword searches against the filenames in Hotfile's uploads data set, and item j can be retrieved (for SRA notices) by running keyword searches against the usernames and email addresses in the userdat data set that match uploadids in the users_cowner_upload data set, and (for email DMCA notices) by running similar searches in the dmcanotices data set.

21. With respect to Mr. Zebrak's analysis of a sample of files downloaded from Hotfile:

    a. the size of each file from the uploads data set;

    b. which payment range the file size falls under in Hotfile's affiliate program as reflected at http://hotfile.com/affiliate.html;

    c. The relationship between the payment range for the file's filesize and Mr. Zebrak's classification of the file's copyright status.

22. With respect to Mr. Zebrak's analysis of files involved in Hotfile's Counterclaim against Warner, for each file/URL that Hotfile claims that Warner removed in error:

    a. Hotfile's unique userid for the uploading user;

    b. the username of the uploading user;

    c. the number of "strikes" Hotfile assigned to the uploading user;

    d. the number of days on which Hotfile had received a takedown notice for any file uploaded by the uploading user;

    e. whether or not the uploading user had been suspended for copyright infringement (also indicating as "Reason Unknown" ("RU") where Hotfile's data shows that the user was suspended but does not contain a reason;

    f. Whether or not the uploading user was a "premium" user;

10

Highly Confidential

g. If the uploading user was a "premium" user, the date on which the user ceased being "premium,"

h. The total amount of payments, if any, Hotfile made to the uploading user under Hotfile's affiliate program;

i. The date the uploading user was first suspended, if any;

j. The time elapsed between the date on which Hotfile claims Warner sent the notice and the date the uploading user was suspended;

k. Search term results reflecting files with potentially similar filenames that were the subject of a takedown notice sent to Hotfile other than an SRA notice sent by Warner;

l. Search term results reflecting copyright owners with potentially similar names that sent takedown notices to Hotfile;

m. The number of discrete days after February 18, 2011 on which the takedown notices over which Hotfile is suing in its counterclaim were sent against a file uploaded by the user;

n. Whether or not Hotfile has a copy of the file that is the subject of the Counterclaim.

The methodology for retrieving the information in items a-m is described in my previous report and in paragraph 20 above; cases in which Hotfile lacks a file (n) can be identified by determining whether or not Hotfile maintains filesize information for the file in the uploads data set.

23. With respect to Mr. Zebrak's analysis of users who had uploaded files claimed as noninfringing in the expert report of Dr. Boyle:

a. The total number of times the file had been downloaded;

b. Hotfile's unique userid for the uploading user;

c. the username of the uploading user;

d. the number of "strikes" Hotfile assigned to the uploading user;

e. the number of days on which Hotfile had received a takedown notice for any file uploaded by the uploading user;

11

Highly Confidential

    f. whether or not the uploading user had been suspended for copyright infringement (also indicating as "Reason Unknown" ("RU") where Hotfile's data shows that the user was suspended but does not contain a reason.

The methodology for retrieving this information is described in my previous report and in paragraph 20 above.

24. With respect to Mr. Zebrak's analysis of files referenced in Hotfile's Interrogatory No. 22 to Plaintiffs:

    a. the number of "strikes" Hotfile assigned to the uploading user;

    b. the number of days on which Hotfile had received a takedown notice for any file uploaded by the uploading user;

    c. whether or not the uploading user had been suspended for copyright infringement (also indicating as "Reason Unknown" ("RU") where Hotfile's data shows that the user was suspended but does not contain a reason.

The methodology for retrieving this information is described in my previous report and in paragraph 20 above.

**Data Regarding Hotfile Usage**

25. I have been asked to ascertain the percentage of Hotfile's registered users who have utilized the site to upload (as opposed to download) files. This can be shown by comparing the number of unique userids in Hotfile's uploads data set with the total number of assigned userids in Hotfile's userdat data set. Based on this calculation, 89% of Hotfile's registered users have never used their accounts to upload a file.

26. I also expect to present Hotfile's data regarding the characteristics of all files hosted on its system and how those characteristics, on average, vary based on the number of times the file has been downloaded. In particular:

    a. the average number of downloads for all files on Hotfile (calculated from the uploads data set);

12

Highly Confidential

b. the average number of downloads for all files downloaded at least once (similarly calculated from the uploads data set);

c. the likelihood of a file having been removed based on claimed copyright infringement as a function of the number of times the file had been downloaded (e.g. the percentage of files so removed that had never been downloaded, that had been downloaded at once, twice, two hundred times, etc.) (calculated from the download and status information in the uploads data set).

27. I also expect to present the average daily downloads of files on Hotfile, as measured by the total downloads reflected in the uploadsdownloads data set, divided by the total time the file was available on the site.

a. For files that were not deleted, the methodology for counting the total time the file was available on the site is to count the time from the upload date reflected in the uploads data set through the last date on which Hotfile produced download data.

b. For files that were deleted, the methodology for counting the total time the file was available on the site is to count the time from the upload date through the deletedate in the uploads data set.

c. Hotfile's data contains some inconsistencies and anomalies that prevent the reliable calculation of this download rate for certain files (files whose status in the uploads data set indicates that the file is deleted, but which lack delete dates; files whose status in the uploads data set indicates that the file is live, but which have deletedates; files with very short lifespans; files anomalously removed by the uploading user very shortly after upload, as reflected in the status in the uploads data set, etc.).

28. I also expect to present Hotfile's data regarding the characteristics of users of its system and how those characteristics, on average, vary based on the number of files the user has uploaded. In particular, the relationship between the number of files users have uploaded and the likelihood that the user has received a strike from Hotfile, that a takedown has been issued against the user's files, and that the user has been suspended for copyright infringement.

Highly Confidential

**Further Data Analyses Regarding Repeat Infringers**

29. With respect to my analysis of repeat infringers in my original report, I am associating a few additional types of information with the data previously assembled and/or deriving more specific information from the information already provided:

   a. The average length of time between the third day on which Hotfile received a notice of infringement regarding a file uploaded by a user and the day Hotfile suspended the user's account, if any;

   b. For each user with three or more Hotfile "strikes," the average number of strikes;

   c. For each user with three or more days on which Hotfile received a takedown notice for a file uploaded by the user, the average number of such days;

   d. A subset of my previous Exhibit B limited to users with 3 or more strikes only;

   e. An update to the "Files in Suit" columns in my previous Exhibit B reflecting the removal of a handful of files from Plaintiffs' claims of infringement in this case;

   f. An update to the "Total Takedowns" column to reflect, in addition to files for which a takedown notice is reflected in the dmcanotices and users_cowner_upload data sets, files with a status of 5 or 2 (excluding files uploaded by users terminated before Hotfile's terminations of users after the initiation of this litigation).

   g. An update to the "Days Noticed" category in my previous Exhibits B and E, as well as in dependent fields and across the analyses described in this report, to capture notices received by Hotfile during time periods for which Hotfile lacks records in its dmcanotices data set, but which can be reconstructed in part from email records as described in my previous report;

   h. The total number of files that were themselves the subject of a takedown notice uploaded after the third date on which Hotfile received a takedown notice for a user's file(s);

   i. The total number of downloads of files uploaded after the third date on which Hotfile received a takedown notice for a user's file(s);

   j. The total number of Files in Suit that were themselves the subject of a takedown notice uploaded after the third date on which Hotfile received a takedown notice for a user's file(s);

   k. The time that elapses between Hotfile's receiving a third takedown notice for a user's uploaded files and the suspension of the user (derived from the userdat data set and the takedown data described in my initial report).

14

**Highly Confidential**

The methodology for retrieving this information is described in my previous report.

30.   In addition, for each category identified above, as well as for the exhibits attached to my initial report, I am still considering the form and cosmetics of how such information will ultimately be presented at trial or summary judgment (e.g. whether and how the data will be presented in graphs or pie charts, or whether and how it may be simplified).

January 6, 2012

_____
Ian Foster

**Highly Confidential**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 11-20427-WILLIAMS-TURNOFF

DISNEY ENTERPRISES, INC.,
TWENTIETH CENTURY FOX FILM CORPORATION,
UNIVERSAL CITY STUDIOS PRODUCTIONS LLLP,
COLUMBIA PICTURES INDUSTRIES, INC., and
WARNER BROS. ENTERTAINMENT INC.,

*Plaintiffs*,

v.

HOTFILE CORP., ANTON TITOV, and
DOES 1-10.

  *Defendants*.
_____/

HOTFILE CORP.,

*Counterclaimant*,

v.

WARNER BROS. ENTERTAINMENT INC.,

*Counterdefendant*.
_____/

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 6th Day of January, 2012, I served the following documents on all counsel of record by means of the email addresses listed through the Court's ECF System:

**RULE 26(a)(2)(B) REBUTTAL REPORT OF DR. IAN FOSTER**

By: /s/ Luke C. Platzer
Luke C. Platzer

## SERVICE LIST

**Disney Enterprises, Inc., et al. v. Hotfile Corp. et al.
CASE NO. 11-CIV-20427-JORDAN**

FARELLA BRAUN + MARTEL LLP
Anthony P. Schoenberg
tschoenberg@fbm.com
Roderick M. Thompson
rthompson@fbm.com
N. Andrew Leibnitz
aleibnitz@fbm.com
Deepak Gupta
dgupta@fbm.com
Janel Thamkul
jthamkul@fbm.com
235 Montgomery Street
San Francisco, CA  94104
Phone:  415-954-4400

*Attorneys for Defendants Hotfile Corp. and Anton Titov*

RASCO KLOCK
Janet T. Munn
jmunn@rascoklock.com
283 Catalonia Ave., Suite 200
Coral Gables, FL  33134
Phone:  305-476-7101
Fax:  305-476-7102

*Attorney for Defendants Hotfile Corp. and Anton Titov*

BOSTON LAW GROUP, PC
Valentin Gurvits
vgurvits@bostonlawgroup.com
825 Beacon Street, Suite 20
Newton Centre, MA  02459
Phone:  617-928-1804

*Attorneys for Defendants Hotfile Corp. and Anton Titov*