```
              UNITED STATES DISTRICT COURT
             SOUTHERN DISTRICT OF FLORIDA
                   MIAMI DIVISION
              Case No. 11-20427-CV-WILLIAMS
```

DISNEY ENTERPRISES, INC., ET AL        MIAMI, FLORIDA
                 Plaintiffs
                                       August 17, 2012
        Versus                         VOLUME I

                                       PAGE 1 TO 232
HOTFILE CORPORATION, ET AL.
                    Defendants


```
                    ORAL ARGUMENT
         BEFORE THE HON. KATHLEEN M. WILLIAMS, J.
              UNITED STATES DISTRICT JUDGE
```


APPEARANCES:

FOR THE PLAINTIFFS:

                    STEVEN B. FABRIZIO, ESQ.
                    JENNIFER V. YEAH, ESQ.
                    LUKE C. PLATZER, ESQ.
                    Jenner & Block
                    1099 New York Avenue, NW
                    Suite 900
                    Washington, DC

                    KAREN L. STETSON, ESQ.
                    Gray Robinson P.A.
                    1221 Brickell Avenue - Suite 1650
                    Miami, FL  33131

                    KAREN R. THORLAND, ESQ.
                    15301 Ventura Boulevard - Building E
                    Sherman Oaks, CA


REPORTED BY:        DAVID S. EHRLICH, RPR
                    Official Court Reporter
                    Wilkie D. Ferguson, Jr.
                    U. S. Courthouse
                    400 N. Miami, Room 11-4
                    Miami, Florida 33128-1810
                    (305) 523-5537

```
APPEARANCES:   (Continued)

FOR THE DEFENDANTS:

                         RODERICK M. THOMPSON, ESQ.
                         ANDREW LEIBNITZ, ESQ.
                         ANTHONY P. SCHOENBERG, ESQ.
                         DEEPAK GUPTA, ESQ.
                         Farella Braun & Martel, LLP
                         235 Montgomery Street - 17th Floor
                         San Francisco, CA  94104

                         JANET T. MUNN, ESQ.
                         Rasco Klock Reininger Perez Esquenazi
                         283 Catalonia Avenue
                         Coral Gables, FL  33134

                         VALENTIN GURVITZ, ESQ.
                         Boston Law Group, PC
                         825 Beacon Street - Suite 20
                         Newton Centre, MA  02459
```

(Court convened at 10:03 a.m.)

THE COURT:  Please be seated, everyone.

COURTROOM DEPUTY:  This Court calls Case
Number 11-20427-civil-Williams, Disney Enterprise, Inc., et al. Vs.
Hotfile Corporation, et al.

Counsel, would you please state your appearance.

MR. FABRIZIO:  Good morning, Your Honor.  Steven Fabrizio
for plaintiffs.

THE COURT:  Good morning, Mr. Fabrizio.

MR. PLATZER:  Good morning, Your Honor.  Luke Platzer, also
for the plaintiffs.

THE COURT:  Good morning, Mr. Platzer.

MS. THORLAND:  Karen Thorland for the plaintiffs.

THE COURT:  Good morning.

MS. STETSON:  Karen Stetson on behalf of the plaintiffs.

THE COURT:  Good morning.

MS. YEH:  Jennifer Yeh on behalf of the plaintiffs.

THE COURT:  Good morning.

MS. LUNDY:  Kershaw Lundy (ph) on behalf of the plaintiffs.

THE COURT:  Really, you're way over there in the corner.
Well, okay.  I know you're there.

MS. MUNN:  Good morning, Your Honor.  Janet Munn on behalf
of the defendants.  And with us today is Mr. Anton Titov, who is a
defendant in the case.  He came from Sofia, Bulgaria.

THE COURT:  Good morning, Mr. Titov.

MS. MUNN:  And also, Professor James Boyle, of Duke University, who's one of our experts in the case.

THE COURT:  Good morning.

MS. MUNN:  And with us from Farella Braun and Martel, we have Roderick Thompson, Andrew Leibnitz, Anthony Schoenberg, and Deepak Gupta, and also Valentin Gurvits, from the Boston Law Group.

THE COURT:  Good morning.

Just out of curiosity, is everybody going to have something to say today, all of you arrayed at the tables?  I'm just flashing on Judge Koh, and I was wondering out of curiosity did we have a situation?

MR. FABRIZIO:  No, Your Honor.  For plaintiffs, it will be largely Mr. Platzer and myself.

THE COURT:  All right.  Not that I wouldn't love to hear from all of you.

MR. THOMPSON:  For the defendants, I'll be the principal spokesperson, but we do have four -- actually, three people ready to speak, depending on what motions you wanted to address.

THE COURT:  All right.

MR. THOMPSON:  We've divided up the labor, so we're ready for anything, Your Honor.

THE COURT:  All right.  Well, it's always good to hear.

All right.  Well, we're here today on the various pending motions regarding summary judgment.  I do have some idea about how we would proceed, but I would first ask the lawyers, if they have

spoken to each other, if there is an agenda or a direction they
would like to urge the Court to follow, as opposed to what I may
have come up with in my own mind.

          MR. FABRIZIO:  Your Honor, Mr. Thompson and I haven't
spoken, but if the Court has something in mind, I think we're both
prepared to do whatever the Court would like.

          THE COURT:  All right.  Well, what I had anticipated was
that we would take up the plaintiffs' motion for summary judgment,
the defense response, the Titov motion.  I don't think we're going
to get to the counterclaim today -- I have that last -- but hope
springs eternal.

          I assumed the parties -- and I could have assumed
wrongly -- would like an opportunity to present some manner of
opening to give an overview of the myriad motions and declarations
and affidavits.  And then I would like to start with DMCA, go then
to contributory infringement, Grokster inducement, material
contribution, commercial product, then vicarious infringement, and
then Mr. Titov's motion.  And if we had any time after that, the
counterclaim.

          Within those subjects, I have questions, and I may try to
nudge you in certain directions in terms of what you address first.
For example, DMCA, I think we start with repeat infringers.  But
that is a broad brush, and I would leave it to all of you to fill in
any of the blanks with that.

          MR. THOMPSON:  Your Honor, for Hotfile, there is an

affirmative motion for summary -- partial summary judgment.

        THE COURT:  Right.

        MR. THOMPSON:  We can address that -- I believe it would

fit with the DMCA discussions.

        THE COURT:  Right.  That's how I saw that.

        MR. THOMPSON:  Thank you, Your Honor.

        THE COURT:  I didn't say that -- That is what I meant by

the motions, plaintiffs' motion, Hotfile's motion, and then

Mr. Titov, and then the counterclaim with Warner.  I just don't know

if we'll have time.

        Everybody mentioned in their permission to receive

electronics "August 17th and days thereafter."  That kind of caught

me up short, that "days thereafter."  But it may come to pass.  We

need to reconvene for, at the very least, the counterclaim.  I just

don't know.

        So, does that seem to comport with what you all had

anticipated we would be doing?

        MR. FABRIZIO:  Yes, Your Honor.  That makes sense.

        THE COURT:  All right.

        Well, let's start with plaintiffs, then.

        MR. FABRIZIO:  Good morning, Your Honor.

        THE COURT:  Good morning.

        MR. FABRIZIO:  May it please the Court.

        There is, we submit, no fair ground to dispute that Hotfile

knowingly, intentionally fostered and profited from massive

copyright infringement.

This case has always been about whether the DMCA somehow immunizes Hotfile's conduct.  Thus, we believe, just as Your Honor just indicated, that we should spend the bulk of our time in oral argument discussing the DMCA.

Hotfile is not and has never been a legitimate business. It operates in the shadows, using fictitious addresses and P.O. boxes to conceal where it is and who's running it.  It is indistinguishable from the notorious infringers that came before it. In each of those cases, the pirate service was held liable on a motion for summary judgment.

Hotfile is, in fact, far worse than any of its predecessors ever were.  Hotfile actually pays its users to upload content that is inevitably infringing.  No previous infringer has had the temerity to do anything like that.  That single fact should, Your Honor, be dispositive.

In analyzing Grokster's liability, the Supreme Court identified three factors that made Grokster's intent to foster infringement unmistakable.  Those same three factors likewise make Hotfile's intent unmistakable.

First, the Supreme Court noted that Grokster targeted a user base of likely infringers.  So did Hotfile.  It actively solicited users to upload infringing works.

Your Honor, RapidShare is another comparable download hub, and it had a similar affiliate program or rewards program.  When

RapidShare was sued, it immediately terminated its affiliate's program.

Hotfile knew that RapidShare's uploaders would abandon RapidShare. So, one Hotfile principal wrote to Mr. Titov, quote: "What an unexpected gift we have from RapidShare. The bad thing is that they clean up their image while we become the flagship of non-licensed content."

So, Hotfile understood fully that the uploaders --

THE COURT: Is that Mr. Stoyanov's e-mail?

MR. FABRIZIO: This is Mr. Stoyanov's e-mail, yes.

Hotfile understood fully that the uploaders who would be abandoning RapidShare would be prominently uploading unlicensed content. Yet Hotfile then devised a plan to go solicit those disaffected RapidShare infringing users.

In another piece of evidence, Your Honor, in a posting, Hotfile's personnel, Mr. Ianokov, he solicited uploaders on public forums. And following one user's post that he had a massive amount of television shows to upload, Mr. Ianokov jumped into the discussion and said, "Well, let me introduce you to Hotfile," encouraging that user, obviously, to upload those files to Hotfile.

In this sense, Your Honor, evidence of Hotfile's targeting of infringing users is far greater and more direct than was present in Grokster.

Second, the Supreme Court noted that Grokster had not attempted to implement advanced copyright filters. Your Honor, that

was ten years ago.  Back then, there were heated disputes about

whether the technology worked.  But the Supreme Court concluded back

then that the fact that Grokster didn't even investigate filtering

was powerful evidence of its culpable intent.

Here, we are ten years later.  Advanced copyright filters

are standard; they are in place in dozens of major websites and

other commercial services.  Yet like Grokster, Hotfile did not even

explore using copyright filters.

Mr. Titov admitted in his deposition that he knew full well

that sites like YouTube were filtering for copyrighted content.  But

Hotfile did not even investigate filtering until after plaintiffs

brought this lawsuit.

Finally, Your Honor, the Supreme Court noted that the

economic sense of Grokster's business model was dependent upon

copyright infringement.  Grokster's business depended on attracting

as many users as possible, and users were attracted to Grokster to

download copyrighted content.  The exact same is true of Hotfile.

This point is proven beyond question by looking at what happened

when Hotfile finally, after getting sued, began terminating its

repeat infringers.

In the months that followed, Hotfile's user traffic

decreased 71 percent, and its revenues decreased 94 percent.  That

fact is not in dispute.  The revenue numbers come from Hotfile's own

economist, Dr. Lynde.  The only thing that changed in this time

period was that Hotfile was forced, finally, to start terminating

blatant repeat copyright infringers.  So, the conclusion that copyright infringement drove Hotfile's economics is unmistakable. Hotfile's revenues fell by 94 percent just because Hotfile started terminating blatant infringers.

Not surprisingly, the result of Hotfile's conduct was unthinkable levels of copyright infringement.  Try as Hotfile might to pick holes in Dr. Waterman's analysis, Dr. Waterman's study is the only analysis that has been proffered in this case that looks at all downloads from Hotfile.  All of Hotfile's alleged non-infringing use evidence is anecdotal.  And it was all subsumed in Dr. Waterman's analysis, which included all of those anecdotal non-infringing uses.  They still got 90 percent of downloads were infringing.  This is using the same statistical methods that have been accepted by federal courts around the country in numerous comparable cases.

The conclusion that Dr. Waterman came to simply confirmed what everybody already knew.  Hotfile was used overwhelmingly for copyright infringement.  More than 90 percent of downloads were infringing.

Hotfile actively solicited and paid users to upload infringing content, because infringing content was the lifeblood of Hotfile's business.  Even Hotfile's economist testified that popular content was necessary to attract users to Hotfile so that Hotfile could try and convert those users to paying customers.  That, Your Honor, explains why Hotfile didn't terminate repeat infringers.

Hotfile needed a steady supply of popular entertainment content to keep attracting users.  Remember, Your Honor, their revenues went down 94 percent the minute they started terminating those infringers.  So, complying with the DMCA in a way that might cut off this supply of content was antithetical to Hotfile's business model.

Hotfile knew it needed repeat infringer policy.  There is no dispute about that.  Hotfile repeatedly represented publicly that it terminated users who were the subject of two or three copyright owner infringement notices.  The problem is that that was a lie. It's admitted that Hotfile didn't have any such policy.

There can, we believe, be no fair debate that Hotfile users have engaged in copyright infringement on a massive scale, or that Hotfile is responsible for that infringement under principles of secondary copyright liability.

As I will discuss in a moment, we also believe that the DMCA does not begin to immunize defendant's conduct.  Now, our papers detail multiple different bases, independent bases, that make Hotfile ineligible for DMCA's safe harbor.  But for the sake of time, here I propose to talk about three that operate as complete bars to DMCA's safe harbor.

First and foremost, as Your Honor mentioned, Hotfile did not reasonably implement a repeat infringer policy.  In no prior case that has been presented to any Court have we seen a set of facts this egregious.

Second, Hotfile failed to register a DMCA agent in

compliance with the statute.  That is a prerequisite to any, any
DMCA safe harbor.  It's not a technicality.  It ensures that
companies seeking safe harbor don't operate in the shadows.  And
that's exactly what Hotfile did, and still does.  It hides behind
fictitious addresses and P.O. boxes.  Even today, Your Honor, no one
would know how to get ahold of Hotfile physically or who runs it.
They still keep that information concealed, in violation of the DMCA
agent registration requirements.

        Third, Hotfile is ineligible for DMCA's safe harbor because
it induces infringement under the standards set forth in Grokster.
As one Court put it, inducement liability is simply incompatible
with DMCA's safe harbor.  DMCA's safe harbor is an immunity from
federal liability.  Thus, like all immunities, it is to be narrowly
construed.

        THE COURT:  Well, Judge Posner doesn't think so.  I think
he said it should be capaciously construed.  So, at least you've got
one person who's not agreeing with you these days.

        MR. FABRIZIO:  Yes, Judge Posner's recent decision is a
little unusual.  But the Supreme Court has said that immunities from
federal statute should be narrowly construed, and they still trump
Judge Posner.

        THE COURT:  He wouldn't agree, but....

        MR. FABRIZIO:  That's probably right, Your Honor.

        Safe harbor is also not presumptive.  Hotfile has the
burden of proving its eligibility under each element of the safe

harbor.  And, most critically, the DMCA's safe harbor is only available to innocent service providers.  The statutory factors can all be seen as going towards that same simple question:  Is the defendant seeking safe harbor innocent of the infringement happening on their system?

          The material facts here are not in dispute.  The parties bicker about characterizations and spin, but the core facts that are material to disposition of these motions are not in dispute.  They demonstrate as a matter of law that Hotfile is not eligible for DMCA's safe harbor.

          Now, Your Honor, if I may turn to the repeat infringer.

          THE COURT:  Well, do you want to -- Should we just do the overview, and then get to -- let Hotfile and Mr. Titov -- Are Hotfile and Mr. Titov both going to give opening statements or would it be just one?

          MR. THOMPSON:  There will be just one for Hotfile and Mr. Titov.

          THE COURT:  All right.

          Mr. Fabrizio, are you just going to go over generally what you have on repeated infringer or are we going to get into it now?

          MR. FABRIZIO:  No, I'm just ready to dig right into it, Your Honor.  So, if you want openings first, then this would be the right time.

          THE COURT:  Okay.  Then let's hear from Hotfile, and then we'll go right into your -- and I'll have questions.

          MR. THOMPSON:  Thank you, Your Honor.

     Good morning again, Your Honor.

     THE COURT:  Good morning.

     MR. THOMPSON:  Roderick Thompson for Hotfile and Mr. Titov.

     Your Honor, I'd like to stress at the outset how important this case is.  It's important not just to Mr. Titov, who came from Bulgaria to be here today; it's important to the future of the DMCA and the jurisprudence it's developing.

     The movie studios have approached this case, as you just heard Mr. Fabrizio elucidate, as just another pirate.  They assume that Hotfile will be the same as some of their other experiences.  They assume the facts.  They assume -- They just told you that Mr. Titov is hiding in the shadows.  He's sitting in the second row of this Court.

     They assume there's rampant infringement, when the statistics -- And I want to make a point here, Your Honor.  You'll see this this morning, I'm sure, in detail.  There's a difference between statistics and statistical manipulations.  Look at the statistics, the undisputed facts, and you'll see there is not rampant infringement.  You only get to those -- overwhelming infringement when you consider the manipulations by Dr. Waterman, who is experienced, he's testified on the same side of this issue again and again, and Mr. Zebrak, who is a former industry lawyer.  He's never had any objectivity.  As a matter of fact, if you look at Mr. Zebrak's resume, he's written two articles in the last ten

years.   They both criticize fundamental DMCA cases.   He thinks the

YouTube case is wrongly decided; he thinks the Veoh case is wrongly

decided.   Yet he's their expert, who is giving opinions to the Court

about what is copyright infringement and what it is not.   Your

Honor, it is manipulation of statistics.

          We did prepare a little bit of an opening, and I think it's

important for the Court to really see what Hotfile is about.   And

with Your Honor's indulgence, we have a few slides that I'd like to

show.   I'll stop at the place where we shift to DMCA, as

Mr. Fabrizio did.

          THE COURT:  Mr. Fabrizio, I take it you don't have any

problem with this presentation?

          MR. FABRIZIO:  No, Your Honor.  We haven't seen it, but

it's argument.  It's not evidence.

          THE COURT:  Okay.  I'm just making sure my record is clear.

          MR. FABRIZIO:  Thank you, Your Honor.

          THE COURT:  Yes, Mr. Thompson, please proceed.

          MR. THOMPSON:  Thank you.

          Your Honor, Hotfile is Cloud storage and hosting.  What

does that mean?

          Let's go to the next slide.

          So, Hotfile is different than the Groksters and the

Napsters and some of these other what are called notorious

infringers, because Hotfile accepts any type of content.  Literally,

any type of digital file can be uploaded to Hotfile -- not just

music, not just video.  But in the upper right-hand corner here,
open source software.  Open source software meaning software that is
open, and people can get that software downloaded and make changes
and improvements to the open source software.  As a matter of fact,
Your Honor, the statistics are that the majority -- is that the
single most frequently downloaded files on Hotfile are these open
source software.

THE COURT:  The top 100?

MR. THOMPSON:  Most of the top 100.  And what's important,
Your Honor, is none of the top 100 are the files in the suit.  None
of them belong to these studios.

Your Honor, other examples we put up here on the screen are
Huckleberry Fin, Russian embroidery.  Obviously that's public domain
works.  That's fine to distribute.  And, of course, many, many
pictures.

There's also music.  These are actual albums that are
distributed by artists who choose to do it on Hotfile.  And on the
left bottom corner, we refer to AH Online, which is After Hours
Online.  It's an online radio station.  They tell all their artists,
"If you want us to play your music, you first have to upload it to
Hotfile so it can be distributed on the Internet."

And on the bottom right -- As I said, there are videos and
there are -- Actually, that Vampire Diaries picture there is a real
excerpt from a television show that was uploaded to Hotfile by none
other than Warner Brothers, the plaintiff here, who decided to use

Hotfile to promote their television show.  Unfortunately, they
didn't tell Hotfile about that, but they used Hotfile for that
purpose.

So, how does Hotfile work, Your Honor?  It's really very
simple.  Any one of us can go on your computer and save a file and
upload it to Hotfile.  You just go on the website of Hotfile and you
save it.  The file gets saved in one of these 700 servers in Dallas.
You're given a unique URL, or link.  You'll hear about that a lot
today.  Links and URLs are the same.  And this one happens to be an
example of JDownloader.  That's one of those open source software
that we've mentioned.  But you can use any name you want.  You don't
have to be descriptive.  Some people are, some people aren't.  But
from the link itself, you really can't tell what is the content of
that link.

It's really like a private storage.  It's referred to by
the studios and others as a cyber locker.  And, actually, that
terminology is pretty apt.  If you think of the brick and mortar
private storage, it's very much the same thing.  You want to get a
storage locker, you get a key, you can put in there anything you
want.  In the cyber world, you put in any kind of digital file you
want.  A difference is, in the cyber world, the DMCA sets the rules.

Now, Mr. Fabrizio has already mentioned the affiliate
program.  I think his words were something like Hotfile pays
affiliates who are inevitably copyright infringers.  That's simply
not the case, Your Honor.  We have a slide here that illustrates the

affiliate program with an open source software program.  This is a
different one.  This happens to be the single most downloaded file
on Hotfile.  It's called Snowbreeze, you can see here.  Snowbreeze
is open source.  It's used on iPhones.  The designer of that
software decided to distribute in Hotfile.  So, he uploads the open
source software onto these servers, and then he makes available the
links to anyone who wants to download his software and use it on
their iPhone.  There are many folks who want to do that.

          This functionality is essentially making your iPhone
inoperable.  It's allowing someone who's paid for that phone to open
it up and use it with other software.  It turns out that the
software Snowbreeze was quite popular, and Hotfile pays one-fifth of
one cent, up to three halves of a cent.  And this is what happened
in the past, by the way.  They've changed this.  This is no longer
their policy, but this is what happened that Mr. Fabrizio is talking
about.

          The idea for Hotfile is, Hotfile's revenue model is a
freemium product.  Much like the New York Times website.  Any of us
can go on New York Times, and you can look at the stories they make
available for free.  Most users may be satisfied with that, but some
users may be curious about let's get David Brooks, let's see what
his opinion is.  For that, you may have to pay a subscription, $9 a
month or so.

          In Hotfile's case, the premium subscription gives you the
benefits of faster downloads.  Meaning, if you want to download that

Snowbreeze software instead of waiting for it a long time, you can get it downloaded much, much faster.  And the second thing it gives you is unlimited storage.  For a free user of Hotfile, if you or I just loaded up a file in Hotfile of our pictures, after 120 days those pictures would automatically be deleted, unless we pay for the premium subscription.  Then you can have unlimited storage for unlimited amount of time.

So, Hotfile is a freemium model, where most use is free, but they live off of the premium subscriptions.

Why is that relevant here?  Because that's why Snowbreeze is remunerated for every copy of its software that's downloaded. Because every time someone downloads, there's another chance for a customer, there's another chance for someone to upgrade the premium. It happened in the example of the designer of Snowbreeze.  He earned up to $350 a week for choosing to distribute his software in this manner.

Professor Boyle, who is also in the audience, looked at all of this, and he is of the opinion that this type of freemium distribution provides socially beneficial compensation, a model for open source software.  It allow that software to be distributed free of charge, yet it gives the designer some remuneration.  In Professor Boyle's words, "Important to the future of distributed creativity."  And that's exactly what the DMCA is all about, promoting the future of the Internet and distributed creativity.

THE COURT:  I don't mean to interrupt, but we have -- This

file is so dense, I'm afraid if I don't ask a question now, I won't remember to ask it later.

So, at a future time, though -- So, Snowbreeze says, I'm an affiliate, and Hotfile says, I'm going to pay you whatever it is they pay you.  How does that arrangement -- My understanding is that users can be affiliates, or at some juncture, anybody -- I could have been an affiliate.

MR. THOMPSON:  That's correct, Your Honor.

THE COURT:  It just depended on how much content I was going to bring to the mix.  But Hotfile didn't know me from Adam's house cat.  I could have been Kathy, et al.  All Hotfile knew was that a lot of content was coming into its storage locker.

MR. THOMPSON:  It didn't even necessarily know that, Your Honor.  The servers knew that.

THE COURT:  Well, they knew enough to delete unpopular inactive files after awhile.  So, wasn't there a corollary identification with the affiliate program?  You don't have to answer this now, but this is -- the Snowbreeze -- I understand Professor Boyle's comment with regard to Snowbreeze, but my understanding as I sit here, and I'm asking you to educate me, is that the affiliate program was not as transparent as this example, and that's what might have made it vulnerable to DMCA.

MR. THOMPSON:  Maybe "transparent" is not the correct terminology.

THE COURT:  Okay.

         MR. THOMPSON:  So, you're absolutely right, Your Honor.
You could register as an affiliate now; you could have done it
earlier.  And at the time of this example, when Snowbreeze was doing
that, absolutely Hotfile had to keep track of Snowbreeze.  They
register -- It's really an e-mail or domain address.  And they keep
track of -- This domain address has loaded up files, and those files
are being downloaded.  Every time they're downloaded, it generates
some fraction of a penny of income for that particular uploader.
That's all kept track of by the database and the algorithms on
Hotfile.  And Snowbreeze then gets a credit.  It can be done by
PayPal, but some electronic way to get that $350.  It's actually
paid, I think, every week to the affiliates.

         THE COURT:  But Hotfile isn't going to reach out to
Kathy, et al.  Whoever the affiliate is, Hotfile wants affiliates
with large content.  So, if I come to them with a disk, really they
don't want to pay me for that, do they?

         MR. THOMPSON:  It's entirely up to you, Your Honor.  Anyone
can register to be an affiliate.  If you only have one download, you
may get -- pay one-fifth of one cent.  That's what you've earned.
They don't go out soliciting people.  Whoever signs up as an
affiliate earns what they earn.  As I mentioned, that particular
aspect of the program no longer exists.

         THE COURT:  Okay.

         MR. THOMPSON:  What does exist today, and it did exist back
at the time, is the next part of the affiliate program, which is a

more standard commission-based program.  Five percent of revenue

that is generated from a user that's referred to Hotfile is paid

back to the referring person.  That could be a website, or there's

also a refer-a-friend program.  We have this slide just to show,

Your Honor, what I'm sure you're aware of, is that type of

commission-based remuneration is ubiquitous on the Internet.  It is

all over the place.  It's standard.  And that is now what Hotfile

has for its commission for its affiliate program, is they pay when

someone converts, and they share the revenue from that conversion

with the person who is responsible for bringing the customer to

them.

            THE COURT:  Okay.

            MR. THOMPSON:  Now, I've talked about statistics.  This is

one -- the first, I'm sure, of many you'll see today.  But I wanted

to put this up early as part of the introduction just to disabuse

the Court from any notion that affiliates are all somehow pirates

and bad people and responsible for massive infringement and some of

the other things you've heard already from Mr. Fabrizio.

            Here is a fact.  The fact is that over nine-tenths of the

files uploaded by all affiliates have never even received a takedown

notice.  Less than ten percent are subject to takedown notices.

That's a fact.  Now we're going to see manipulations of the

statistics that I mentioned.  You'll see a lot of different probably

colorful posters in a moment.  But that's a fact.

            THE COURT:  You're both going to have to -- 90 percent of

the files or 90 percent of the links?

          MR. THOMPSON:  Links and files are synonymous here.  So, it
is 90 percent of the links which correspond to a unique file.

          THE COURT:  Right.  But my understanding is, once that
unique file goes up -- I, Kathy, send the file up, I get a link.
Bob, he sends the same file, he gets a link, but it's all merged
into one file in the system.  So, it's not -- So, if you at some
point eliminate my link, Bob's link is still up and maybe the file
is still up.

          MR. THOMPSON:  I can see you've been reading this.  Yes,
Your Honor, that's correct.  And this is probably inaccurate.  We
should have nine-tenths of the links uploaded, because that's how
Hotfile keeps track of things.

          Just continuing with the introduction, Your Honor, I want
to talk a little bit about the Digital Millennium Copyright Act,
which I know we'll get into the details, but it's important to
remember why it came about.  Congress laid the legal foundation for
the modern Internet when it enacted DMCA.  I'm reading here from the
brief of the amicus Google that was filed with this Court.

          MR. FABRIZIO:  Excuse me, your Honor, I don't mean to
interrupt Mr. Thompson.  You can argue whatever you'd like, but the
Court has not allowed this brief to be entered in this case.

          THE COURT:  Is this the amicus for this case or was this
something that went to the passage of the Digital Millennium Act?

          MR. THOMPSON:  This is a brief filed in this case, which is

quoting from the Senate report that was -- led to the passage.  I
believe Mr. Fabrizio is right, Your Honor hasn't ruled yet as to
whether or not the Google brief would be admitted.  Regardless, this
is a helpful, I think, summary of the DMCA.  And I think it's
important to realize -- Let's think about it.  Why did Google come
down here to Florida and ask for permission to file an amicus brief?
It's because of the importance of this case and how important it is
to the jurisprudence of the DMCA.

          Now, Your Honor, I won't bother to read the slide.  You
can, of course, do that.  You can read the legislative history.  But
the fundamental principle of the DMCA is a balance.  It's a
trade-off between two interests that the government wanted to
promote.  Certainly the government wants to promote the creativity
of the movie studios and the movies they make, and the copyright and
protect their copyrights, and encourage all that creativity.  At the
same time, it's very important to the Internet community, to the
growth and development of our Internet, to protect folks like Google
and Hotfile from ruinous copyright infringement liability that's
based on the nature of the Internet.

          Now, if you think about Google, Google every day indexes
the entire Internet.  They index by making copies of links and
sometimes images.  That could be considered copyright infringement.
Now, they rely under various safe harbors for protection.

          THE COURT:  Perfect 10 isn't very happy with Google.  They
seem to be suing them rather regularly, and with some measure of

success.

      MR. THOMPSON:  I would say very limited success.  It's one of the more unsuccessful litigants I think you'll see.

      THE COURT:  But they're tenacious.

      MR. THOMPSON:  Yes.  And YouTube, of course, is owned by Google as well.  And that case has just recently been decided in the Second Circuit.  And I'm sure we'll talk about that more a little bit later.

      But the point I'm trying to make here, Your Honor, is that the DMCA is a careful balance struck by Congress.  And the content owners were actively involved in lobbying for that and in lobbying for the contours of that balance.  And that's why it's important here to think of cooperation.

      This is from the Veoh case in the Ninth Circuit just last year, that -- And this is all over the other case law as well.  DMCA was designed to foster cooperation between these two communities, between the copyright holders and the service providers.  It was recognized by Congress it's not going to work unless there's cooperation.  They can't be warring, they can't be less than honest with each other, or this program is not going to work.

      Indeed, Colombia Pictures -- This is a -- Down at the bottom of this page is a takedown notice that's standard and set out by Colombia Pictures, one of the plaintiffs here, and they note that these matters are best resolved cooperatively.  They know that.  That's part of their attempt too.

I mention that as background because the other part of the DMCA is that because the content owners have far superior knowledge and far superior resources to police, the DMCA places the burden of policing squarely on the copyright owners.  That doesn't mean the service providers can ignore or try to impede that, but it's the content owners who have that responsibility.

Your Honor, I'm going to shift now back to Hotfile.  And I apologize, because this slide is a little busy, but we'll be seeing this a lot, and I'm just going to touch on it lightly now.

The point I'm bringing it up now for is, from the beginning, February, 2009, Hotfile embraced the DMCA.  It recognized that as a service provider, it had to operate within the law and meet the requirements of the DMCA to be assured that it would be insulated from copyright liability.  From the very beginning, its terms of use said no copyright infringement.  From the very beginning, there was a repeat infringer policy.

Now, Mr. Fabrizio will point out it was crude and rudimentary.  Remember, these are three start-ups -- individuals from Bulgaria, who are trying to comply with the U.S. law.  But there was a very clear statement that they reserved the right to terminate any user who didn't comply with their rules.  One of their rules was comply with the copyright law.

And, most importantly, Your Honor, they recognized the fundamental principle of the DMCA, the notice and takedown provisions.  There was, from the beginning, an e-mail box,

Abuse@Hotfile.com, available to all the content providers, including

all these movie studios, and it was used from the beginning.  When

there was a suspected infringing file, notice was give and Hotfile

always expeditiously took those down.  They embraced that from the

beginning.

        THE COURT:  I'm going to want -- When we get into the

details, I think I'm going to need you to tell me why this isn't

like the policy in Aimster, because -- which the Court called --

What is it?  It is a policy, an absolute mirage, but it is a policy

nonetheless.  Because I think really once we start getting into

it -- Well, I don't want to get ahead of myself, but I think we're

talking mostly about post-2011.

        MR. THOMPSON:  I'll get into more specifics later.

        THE COURT:  Okay.

        MR. THOMPSON:  I appreciate Your Honor's point, and

actually it's a good segue into the rest of this slide.

        So, Hotfile did have the notice and takedown procedure from

the beginning.  And then Hotfile began to receive information from

the movie studios about what was working and what was not working.

So, within six months, in August of 2009, at the request of one of

the plaintiffs here, Warner Brothers, Hotfile instituted a powerful

takedown tool called a special rightsholder account, or an SRA.  And

they also adopted MD5 hash blocking at that time.  And I'll explain

in a moment a little bit more about those.

        But it's important to realize, when you look at the repeat

infringer policy, you can't just look at that in a vacuum.  We have to look at the overall effort to cooperate with the content owners, to give them these extraordinary takedown tools, and, frankly, to rely on them to alert Hotfile when there was a repeat blatant infringer.  That was what the policy was.  And there were 40-some terminations before this lawsuit was filed.

THE COURT:  But the DMCA doesn't talk about the evolution of policy, and it doesn't have an exception for start-ups.  The DMCA says, you will do X, Y, and Z to be eligible for the safe harbor.

I think the point where you and counsel are going to have to forge the road for me is the idea that once ineligible for safe harbor, always ineligible for safe harbor, which doesn't seem to me to be what the intent was, and it's what I hear the plaintiff saying, is that your remedial and evolutionary step into the DMCA world cannot be recognized because of all the havoc that was wrecked, in their mind's eye, before that.

But I've read your arguments, and that's -- I don't -- and I see this progression.  But I think the problem is, as of the time you started until the lawsuit, was -- were the steps you took good enough, I guess.

MR. THOMPSON:  And, Your Honor, there's a couple points.  I think you've really honed in on a key issue here.

The DMCA does not specify any particular repeat infringer policy.  It just says you have to adopt a reasonable, reasonable repeat infringer policy.  Reasonableness, Your Honor, is a classic

jury issue.  We would like to present to a jury all the steps
Hotfile took, outlined in this slide and others, and let a jury
judge whether those measures were reasonable under all the
circumstances.  And, Your Honor, the case law does support the idea
that when you get more information -- For example, if you get hit
with a lawsuit, and there are a bunch of links that are supposedly
infringing, you have an obligation to investigate and take those
down.

          THE COURT:  Right.

          MR. THOMPSON:  And companies are credited with that.

          THE COURT:  But I think Mr. Fabrizio made a good point in
another context about, say, Sony, how it's a decade ago.  Your
client was, in the scheme of the development of the law, a little
late to the party.  But at least late enough to know about Napster,
Grokster, LimeWire.  I know you -- Oh, no, that's not us.  I know
you have a little bit of a reaction to LimeWire.

          Now, with your amicus reference, I'm going to have
Mr. Fabrizio -- He can take his own shot with the mega upload
reference, but you certainly had enough in that pantheon of cases to
understand what would be expected.  So, I think, in some respects,
it is not, at this juncture, necessarily a jury question maybe from
2009 to 2011.  Maybe after that, you could argue it.  But these are
the things that I'm thinking about while you're arguing and when I'm
looking at your paperwork.

          MR. THOMPSON:  And, Your Honor, I think we need to separate

the law.  Certainly the law has been evolving, and it's been more
certainty since some of those early cases.  Remember, Grokster and
Napster were not DMCA safe harbor cases.  Those issues didn't even
come up in those cases.  So, it's a little apples and oranges.

What the jury should hear are the facts and the disputed
facts.  And where I fundamentally disagree with Mr. Fabrizio, there
are lots of disputed facts here and issues of credibility that are
classic jury issues.

THE COURT:  There are a lot of -- There are a lot, a lot, a
lot of disputed facts.  I'm not certain on several issues that there
are disputed material facts.

MR. THOMPSON:  Hopefully I can show you why there are.

THE COURT:  Okay.

MR. THOMPSON:  Your Honor, you touched earlier on
Mr. Fabrizio's statement about not adopting state-of-the-art
technology.  First, remember, I think you do and a jury would
consider that you have a start-up of three people with limited
funds.  You don't have the resources of Warner Brothers.

But, secondly, Your Honor --

THE COURT:  That's not going to be your best argument,
because that is not a good excuse to "I'm going to allow people to
infringe," especially when the technology, as I've said -- You do
not agree with the applicability of those decisions and their models
to this.  But -- And I'm just -- I will mangle this mightily as the
day goes on, but the hash was known.

MR. THOMPSON:  Yes.

THE COURT:  It was all known in 2009.

MR. THOMPSON:  And, Your Honor, in 2009 not only was the special rightsholder account adopted, which I'll come back to in a moment, but Hotfile adopted hash blocking in August of 2009.  It was known.  Hotfile found out about it and adopted it within six months of its start-up.  It's been implemented ever since.  And that goes to exactly what -- Your Honor I think understands the concept well as you explained it.  Once there is a file identified by a DMCA notice as infringing, a hash identical copy of that will not be allowed to be uploaded.  That was implemented in August of 2009.

Now, Mr. Fabrizio questions Mr. Titov's testimony about that.  I think they're quarreling with the date.  We have some corroboration, we can show that.  But for this purpose, there's strong testimony saying it was adopted by 2009.  That's the state-of-the-art technology.

THE COURT:  Okay.

MR. THOMPSON:  Now, Your Honor, just going back for a second, the special rightsholder account, if you go back to the brick and mortar analogy for a second, these studios were literally given a skeleton key to every storage locker on Hotfile.  The difference between a special rightsholder account and a DMCA notice is that the special rightsholder account is automatic.  Warner Brothers, all the rest of these plaintiffs, Disney, could simply list a bunch of links, attest that they believe they're infringing,

and they would be automatically taken down.  There's no action on

the part of anyone from Hotfile.

        That's extraordinary access.  It's called back-door access,

and it's given only to responsible content owners.  All five of

these plaintiffs we certainly believe are responsible.  About a

hundred companies in all had that privilege.  And they've had that

privilege from August of 2009.  It's one of the things that must be

looked at in conjunction with this timeline as to what is

reasonable.

        THE COURT:  Again, and this will come later, but can you be

thought to have reasonably implemented policy by transferring your

obligations under the statute to someone else?

        MR. THOMPSON:  Your Honor, the obligation to police is

squarely on the content owners.  We just gave them better tools to

do that.

        THE COURT:  But the obligation to comply with DMCA is

squarely on your clients.  So, if that is one tool, then -- and if

that is the primary tool you're pointing to, then, in essence, you'd

say, by giving them the key, which I don't think Disney and Fox ever

had a key, but by giving them the key, we are absolved.

        MR. THOMPSON:  We're not absolved.  We're cooperating to

insure compliance with the takedowns, a procedure dictated by the

Digital Millennium Copyright Act.

        THE COURT:  So, you see it as a collaborative process.

        MR. THOMPSON:  Yes.  And we just had these slides that

that's how the courts have looked at it too.  This is from Veoh
again.  The whole purpose behind the DMCA is to foster cooperation.
It's not going to work without cooperation.

        And that's why -- to jump ahead a moment -- we feel so
deceived and betrayed now to have learned after this lawsuit was
filed that despite all the good things they were saying about what
Hotfile was doing, the studios had been plotting this.  They wanted
to make a test case out of a cyber locker, frankly, Your Honor.
That's what's clear now.  And they selected Hotfile more than a year
before this lawsuit was filed.  And that's why we have all these
assumptions about badness that have just not been corroborated by
the evidence.

        But let me return to one more -- I think you had concern
about the technology again.

        So, if we look at where Hotfile ended up with its
technology, its improvements, after the lawsuit was filed, when the
studios complained about digital fingerprinting technology, Hotfile
adopted Vobile by June.  Now, what's important here, Your Honor,
is -- I don't think there's any dispute about this -- Vobile is
state of the art.  And Vobile itself has said that until actually
September of last year, that is this date here of September 26,
2011, its vCloud9 fingerprinting technology was not available.
That's important because Vobile itself says its fingerprinting
technology wasn't well suited to cyber lockers.  It only recently
has had that available, and when it was available, Hotfile promptly

adopted it.

So, we adopted hash blocking almost right away, shortly after start-up.  When the state-of-the-art fingerprinting was available, it was also adopted.

I realize I'm still in the introduction, so I'm going to go a little faster, Your Honor.

We've talked about hash blocking.  Here are just some of the compliments.  These are in the papers.  One thing I'd like to focus on, though, is with Warner Brothers, Warner Brothers sent this e-mail in 2010 inviting Hotfile to do a business with Warner Brothers.  And look what Warner Brothers offer -- affiliate commissions.  Warner Brothers pays affiliate commissions.  Actually, triple it says there.  So, again, affiliates are -- and commissions are ubiquitous on the Internet.  Indeed, these same plaintiffs use that technology to drive business to their websites.

Now, let's look at the comparison of the case law.  Mr. Fabrizio has talked about these here on the left -- the Grokster case, the isoHunt case, or the phone case as he calls it, Usenet, LimeWire.  None of those countermeasures were adopted in those cases.  Where companies try to be responsible, like Hotfile, and try to follow the DMCA, generally they've been found to be in a safe harbor.  They found the protection.  Even where -- In the case of Photobucket, for example, a smaller company, they didn't adopt all the countermeasures that Hotfile has, but they were still found to be safe harbor protected.

           Your Honor, magnitude of scale here, these, again, are
facts.  These really can't be manipulated.  In Hotfile's life, there
have been 2.8 billion downloads, 123 million uploads, some
eight million takedown notices.  And it goes on.  But there's only
36,000 affiliates.  You can see that's a small percentage of the
more than 5.5 million registered users.

           A couple more statistics to give us perspective.  And,
again, these are just raw data.  No manipulation of these.  Let's
look at uploaders.  Those are people who have ever uploaded on
Hotfile.  92 percent of those uploaders that is an individual e-mail
address have never received even one takedown notice.  You'll see
only -- less than four percent were actually receiving three
takedown notices.  And in the studios' minds should have been
terminated.

           THE COURT:  What does 3.7 represent in real numbers?  How
many people?

           MR. THOMPSON:  I'll have to do it in my head now, but we
know the uploaders, 123 million.  I'll have to get back to you on
that.  I don't have the number offhand, but I can get that.

           THE COURT:  So, it's in the hundreds of thousands, 3.7.

           MR. LEIBNITZ:  No, the uploaded, Your Honor, are 562,000.
Not five million, 562,000.

           THE COURT:  562,000.

           MR. THOMPSON:  Oh, there they are -- I'm sorry -- in that
line.

Mr. Leibnitz, by the way, is ready to talk about statistics and the evidentiary issues, and he can either address it in one module or answer Your Honor's questions.

So, it's three percent of this number of 500,000.

THE COURT:  So, again, getting to the policy -- and, Mr. Leibnitz, you can talk to me about this -- of those 500-some-odd thousand, from 2009 to 2011, within your stated DMCA policy, only 40 users were terminated.  Is that right?  Are we all agreed on that?

MR. THOMPSON:  They were terminated, only 43, I believe, for copyright infringement.  Others were terminated for other reasons as well.

THE COURT:  Okay.  But the copyright issue was 43.

MR. THOMPSON:  With one footnote, Your Honor.  And I don't want to overemphasize this, but very early on, before Hotfile's system was mature, they didn't keep track of terminated infringers. So, when someone was terminated, there's no more record of them. So, it's possible there were more before Mr. Titov testified.  It's likely there were a few, but I'm not going to tell you it's a significant number.  We documented 40.  And that's up until the lawsuit was filed.

Now, these uploaders, the total number here is through a time after the lawsuit was filed, I believe when we produced the database.  So that includes some uploaders who were uploading after the lawsuit was filed.

The other statistic is the flip side on this.  We've looked

at the number of individuals.  92 percent have never received a

takedown notice.  Now let's look at the --

            THE COURT:  I like the baby picture, by the way.

            MR. THOMPSON:  It's public domain, I think.  It's from

about 1200.

            The flip side of it, how many files?  And, actually, Your

Honor is correct.  How many links is more precise.  Links uploaded

to Hotfile have never been taken down.  That's an even higher

number.  93 percent have never been taken down.  So, that's just

looking at the number of links as opposed to the number of users.

            THE COURT:  But isn't that -- And this -- You really have

to help me.  Isn't that argument on your side compromised by the

design Mr. Titov implemented, that being the merging of -- If I

upload Sleepless in Seattle, and Bob uploads Sleepless in Seattle,

and you send a notice to me, my link is gone, but Bob's link stays

up.  Is that how it works or no?

            MR. THOMPSON:  No, it doesn't.  When he instituted hash

blocking in August of 2009, from that moment forward, whenever there

is a hash identical file -- so, it could be ten links to the same

file -- one takedown notice for one of those links, all the links

come down.

            THE COURT:  All the links come down.  Okay.

            MR. THOMPSON:  And, importantly, no other links identical

to that are allowed to be uploaded in the future.

            THE COURT:  Okay.

MR. THOMPSON:  And, again, Mr. Titov's testimony is that
happened in 2009, in August.  And Mr. Fabrizio is contesting that
data, I think, but there's no dispute that, in fact, it was adopted
by Hotfile.  But there may be a dispute about when.

THE COURT:  So, that -- What you've just related to me is
based on Mr. Titov's testimony.  Was there any analysis -- I don't
know that you can look back on that -- of that phenomenon?  Was
there any run done, was there any algorithm looked at that would
corroborate that --

MR. THOMPSON:  Yes.  Could you pull up --

MR. LEIBNITZ:  Your Honor, maybe I could speak to that,
very briefly.

MR. THOMPSON:  Could I put that up, please?

Can you get Exhibit 10 to the Yeh declaration?

THE COURT:  And I knew this would happen, Mr. Fabrizio.
You got the fuzzy end of the lollipop, because you just started.  I
know we're now getting into some of the more substantive areas.

MR. FABRIZIO:  That's all right, Your Honor.

MR. THOMPSON:  Your Honor, I want to -- and I'll let
Mr. Leibnitz speak -- and correct me in a moment, I think -- but
this is an important -- This is one of the two or three favorite
e-mails for the studios, the ones they claim prove their case.

Mr. Fabrizio said that --

MR. FABRIZIO:  What kind of e-mails?

MR. THOMPSON:  Sorry.  Their favorite e-mails.

MR. FABRIZIO:  Favored?

MR. THOMPSON:  Favorite.

MR. FABRIZIO:  Favorite.  Thank you very much.

MR. THOMPSON:  Certainly.  I'm sorry.  I'm talking a little fast.

So, I wanted to bring this up and put that in context. They claim that this shows there was a public dissemination about the repeat infringer policy, and it was not accurate, back in July of 2009.  Well, you can see this was a draft.  It didn't go out to the public.  This was a communication from Mr. Vangelov, who is known as Nasco (ph), and it went to Mr. Titov.

But the reason I pulled this up, because you just asked, Your Honor, in the context of this e-mail, which is a draft, they talk about being concerned about the e-mail, which raises this issue about multiple copies.  And then look what it says down here in the third paragraph:  "The information that once a file is deleted, it is being quickly uploaded again is very disturbing.  We are working on a system that check the check sums of the files that are reported as illegally uploaded.  After a takedown notice is received, the system will ban the check sums of the infringement material, and the uploader won't be able to upload the same file again.  This system will be implemented in the next days."

So, Your Honor asked for any corroboration to date.  The date of this draft is July of 2009.  The testimony by Mr. Titov was that, in fact, was adopted in August of 2009.

Now, Mr. Leibnitz.

MR. LEIBNITZ:  Your Honor, you asked about whether there had been any study done, I think was your question.  And hash blocking was implemented -- I'm the statistics guy on our side.  Hash blocking was implemented before 98 or 99 percent of all takedown notices were ever received by Hotfile.  So, we implemented hash blocking very early.

Last comment:  Sleepless in Seattle can be legitimately uploaded to Hotfile.  Just because it's uploaded doesn't mean it's illegal.  If it's your copy, it's legal.

THE COURT:  Right.

MR. THOMPSON:  So, Your Honor, the last slide I wanted to say on statistics shows after that Vobile fingerprinting was implemented.  Now, this is after the complaint was filed, but it's important, because it shows now the state-of-the-art fingerprinting.  And what is the percentage of files uploaded that are actually stopped because there's a fingerprint that's identical?  It's 3.4 percent.  You can see that number is pretty constant from when it was first implemented in June, all the way to today, including after February of this year when the vCloud9, the real state-of-the-art stuff, was implemented.  It stays very steady.  It's right around 3.4 percent.

And I shouldn't overstate this.  The fingerprinting works by having a database.  And the movie studios participate.  They provide fingerprints of their works.  It goes in the database.

Every file that's uploaded then is checked against that

fingerprinting database.  And if there's a match, the file is

blocked.  That's 3.4 percent.  It's certainly possible that someone

didn't choose to put something in a database and it gets uploaded.

But it is an important state-of-the-art improvement.

        With that, Your Honor, I think I've finished the

introduction.  I appreciate your patience.  What we plan to do

today, just to help provide -- We really want to provide you all the

information we can and answer all your questions.  As you've heard,

Mr. Leibnitz is prepared to talk about statistics, as well as any

issues about evidentiary objections, and there are several of those.

        My colleague, Mr. Schoenberg, will talk to the Titov

motion, both the offense and defense.

        And to the extent you want to hear it, Miss Munn is

prepared to talk about the Titov Exhibit 27 series of motions that

went through Magistrate Judge Turnoff and are also ripe for

decision.  I'm not sure you want to hear that today or not.

        THE COURT:  I think today -- Although I'm certain in

discussing matters, you will alert me that this is the subject of a

motion to strike, I think today we should probably operate in the

spirit of amnesty and just marshal everything you have with the

caveat that I might have to ignore it or find it unavailing.  But I

don't think -- I think we'd stagger along piecemeal if we have to

step out from an argument and take up the evidentiary portion of our

program.

            I'm not trying to diminish how critical some of these
arguments are to the parties, but I just think the Waterman,
Boyle -- I think we need not drill down on that today.

            MR. THOMPSON:  Very well, Your Honor.  We can proceed that
way.

            I have a photocopy of the slides I just showed.  Would it
be helpful for me to hand it up?

            THE COURT:  Yes.  And I'd like that marked as Defendant's A
for today's proceeding.

            MR. FABRIZIO:  Do you have an extra copy for me?

            MR. THOMPSON:  I'll hand a copy to Mr. Fabrizio as well.

            THE COURT:  All right.

            MR. THOMPSON:  And, Your Honor, the last part about our
division of labor, it's not obvious.  I will address the studios'
affirmative summary judgment motion, as well as the Warner summary
judgment motion on the counterclaim, and Hotfile's affirmative
summary judgment motion on the DMCA.

            THE COURT:  Okay.

            MR. THOMPSON:  Thank you.

            THE COURT:  Mr. Fabrizio, let's talk about DMCA.

            MR. FABRIZIO:  I am tempted, Your Honor, to respond, but I
realize that we have a lot to cover, and the DMCA issues are most
important, and that is where we should spend our time.  But suffice
to say that there's a lot to say in response to some of those
purported facts Mr. Thompson stated for you.

I'm going to start with the repeat infringer provision. I'll then talk about the failure to designate a DMCA agent.  And then I will talk about the inducement disqualifying defendants from DMCA safe harbor.

The repeat infringer provision, Section 512(i) of the DMCA, provides that a service provider seeking safe harbor must reasonably implement a policy for the termination of repeat infringers.  Now, Hotfile didn't have a policy, much less one that it reasonably implemented.

And just to address something Mr. Thompson just said, it is incorrect to say that with all the facts laid out on the table undisputed, this is a question for the jury to determine reasonableness.  The law in the Eleventh Circuit is that reasonableness -- once the facts are resolved, reasonableness, a determination of whether something was reasonable, is an issue for the Court as a matter of law, not the jury as a matter of fact.

Repeat infringer policy is a threshold for all safe harbors.  It is perhaps the most important safe harbor for copyright owners.  This case amply illustrates why.

Sometimes it's just impossible to meaningfully address infringement on a file-by-file basis.  The repeat infringer provision is designed to target the source of the infringement, and that's the one-by-one files.

THE COURT:  So, your position is it targets the users.  The users have to be terminated as opposed to the files being deleted,

or both.

MR. FABRIZIO:  The repeat infringer provision targets the users.  It is a repeat infringer provision.  It targets the source of infringement.  It is very distinct from the other provisions of the DMCA that address the takedown of individual files.  And that's a very critical distinction to keep in mind, Your Honor.  In cases such a Cybernet Ventures and I believe CC, they'll make it very clear that you cannot just take down files one by one, regardless of how well you do it, without addressing the source of the infringement.  Or else you leave a copyright owner in the position, as Hotfile did, and we believe very deliberately, of trying to empty the ocean with a teaspoon.  Will they fill it with a fire hose?  You just can't keep up.  That's why you must address the source of the infringement.

THE COURT:  Well, is there any -- How good does a policy have to be to pass muster?  Case law talks about the different scenarios with peer to peer and with others, but I mean does it have to be a three strikes?  What does it have to be?

You can come up, Mr. Thompson.

MR. THOMPSON:  Thank you, Judge.

THE COURT:  If you wanted to, you could prop them on the jury seats.

MR. FABRIZIO:  Your Honor, the short answer to your question is, this case doesn't require you to decide where the outer boundaries of how perfect a repeat infringer policy has to be,

because Hotfile didn't have any.

          The cases are very clear that a service provider seeking immunity from copyright infringement needs to take the notices of infringement it is given, identify the infringers, and keep track of when they're repeat infringers.  Hotfile admits it didn't do that.  And because it didn't do that, 25,000 users accumulated more than three strikes and were never terminated.

          Let me just quickly get to one important fact here.  Hotfile talks about only a small percentage of its users got terminated, 3.7 percent of its users.  Hotfile is not a system where everybody uploads in proportion.  Hotfile depends on a core group of dedicated commercial infringers in order to supply the content that Hotfile then monetizes.  Those 3.7 percent of their uploaders are responsible for uploading more than half of the files that have ever been uploaded to Hotfile.  So, those repeat infringers that they didn't terminate weren't just some trivial number or responsible for a trivial amount of infringement.

          THE COURT:  Responsible for half of all of Hotfile's files or half of all the infringing files?

          MR. FABRIZIO:  Half of all files ever uploaded to Hotfile, infringing or not.  Just an astonishing amount of uploading for a small group.  And, Your Honor, that just evidences the fact that their business depends on that really diehard group of people who are paid.  They're commercial recidivist infringers.

          It is critical for the protections intended by Congress

that courts enforce the repeat infringer provision.  Your Honor, as one Court put it -- and we think this simply describes what's happening here -- making the entrance to safe harbor too wide would allow service providers, acting in complicity with infringers, to approach copyright infringement on a file-by-file basis without ever targeting the source of these files.  And that's the Cybernet case that we cite.  That is exactly what these defendants did.  They built a business that depends on Hotfile users uploading files for others to download, they pay them to do it, but yet having incented massive infringement.

          THE COURT:  But you would agree -- Well, a couple of things.  The hash, that only identifies files, right?  So, unless you terminate the user, that is not a tool that avails you of safe harbor --

          MR. FABRIZIO:  Not under the repeat infringer provision, exactly right, Your Honor.  A hash identifies a particular file, but it only identifies that file after it's been infringed.  There's a big difference between a hash and filtering.  Defendants try and conflate the two.  Filtering stops infringement before it's happening.  That's what major websites all have in place.  Defendants talk about this hash, which is simply something that happens after a file has already been infringed.  There's a big difference.

          THE COURT:  All right.  Now, this case presents a -- You've said in your opening it's the worst case and the most notorious.

But isn't it a little different inasmuch as the evidence adduced in those other cases, while there's an e-mail or two here, X -- Well, maybe I'm getting ahead of myself to inducement, but -- I am getting ahead of myself to inducement.

All right.  What happens, though, when a company wakes up and says, "This is not working for us.  We need to implement more stringent policies," and we do that?  Are you saying that they are forever cast on the seas of piracy that they can never dock in safe harbor?

MR. FABRIZIO:  No, Your Honor, of course not.

THE COURT:  Okay.  You're just saying that this particular boat hasn't earned the right to dock yet.

MR. FABRIZIO:  Well, that is true, Your Honor.  But what we are principally saying -- and this gets to Hotfile's motion -- is that those changes that Hotfile talks about -- All Hotfile talks about, all these good things it did, it did only after it was sued. Some of them well after it was sued.

Our point, Your Honor, is that our complaint defines the issues in this case, and our complaint sued the service that existed at the time we filed our complaint.  The service Hotfile is asking this Court to give it an advisory opinion as to is not the service that existed at the time we filed our complaint.  It is not subject to the pleadings in this case, and it wasn't litigated in this case. So, it's just not appropriate to reach those issues.  But if the Court wants to, we're perfectly prepared to explain to you why the

current iteration of Hotfile still doesn't pass muster.

THE COURT:  Well, no, I obviously am looking for ways to impose some order to the breadth and depth of this matter.  So, I am trying to fit in the parties' arguments about post-February, 2011 activity.  So, the plaintiffs are not seeking to recover damages post-February, 2011, only before February, 2011.

MR. FABRIZIO:  Plaintiffs are only seeking to recover damages based on defendants' inducement and conduct prior to the day we filed the complaint, which is, I believe, February 8, 2011.

THE COURT:  Okay.

MR. FABRIZIO:  Some of that conduct may carry over, as we would talk about.  As courts have said, you don't -- If you can -- Inducing infringement all for years and creating a niche -- matching your niche in the marketplace for infringement, becoming the destination for infringement for all of your inducing activities doesn't end the day you decide to stop your overt inducing.  It continues.  And I think that's only sensible.

THE COURT:  Well, I don't know if it's sensible.  I mean to me that sounds like having it both ways, because if indeed -- I mean -- and despite the fact that that pleading has not been admitted as an amicus, it's pretty clear Congress is trying to balance the interests of commerce and art and innovation.  And if someone comes into compliance, then they've come into compliance.  And to state that they started out as inducing or materially contributing, and the ripple effect goes on forever, just ignores

their --

MR. FABRIZIO:  That's a very fair point, Your Honor.  And we're not saying that.

THE COURT:  Okay.

MR. FABRIZIO:  We're just simply saying that what it takes to come into compliance, once you have been massively inducing for such a long period of time, might require more affirmative action to stop the infringement.

THE COURT:  So, you're saying it might be DMCA-plus.

MR. FABRIZIO:  It might need to be DMCA-plus.  That's what the Fung court said, that's what the StreamCast court said, is that once you've been an inducer at such extraordinary levels, like these defendants, you can't just say, "I'm going to stop inducing."  In order to stop the consequences of your inducement, you may have to do something like filter.

THE COURT:  Okay.  I think I understand now.

MR. FABRIZIO:  The facts as to defendant's disqualification from DMCA safe harbor, the facts that they didn't have a repeat infringer policy are not in dispute.  Hotfile did not attempt to identify infringing uploaders from notices sent by copyright owners.  Defendant Titov testified that it would have been trivial for them to do that, but they didn't do it.

They also, by the way, Your Honor, they do keep track of their uploaders in the files that are downloaded from those uploaders.  They keep track to pay the users.  So, they were keeping

track to pay users, but not to terminate them as repeat infringers.

        THE COURT:  Now, this may be a stupid question, but --

        MR. FABRIZIO:  I assure you it won't be.

        THE COURT:  Oh, no, you have no idea.

        I took some of Hotfile's argument to be steeped in the anonymity of its storage users, i.e., we pay affiliates, but they're not just -- they can be business people, they can be users.  We don't -- like I would imagine it's taking out of the ambit of Grokster, Napster, all those -- we don't know who these folk are. We only know that they wish to bring large content to our facility.

        So, how then could they be put on notice other than by the sheer amount of materials being uploaded?  They don't know it's -- They don't know that it's Napster trying to find its way back into the game, or -- You did mention RapidShare in that one e-mail.  Is there anything else?  Because I thought that that was kind of the center point of the argument, the we don't know who these folk are, we don't even know what they're putting in the storage locker.  We just know that they're paying to do so.

        MR. FABRIZIO:  Your Honor, they're not paying to do so. They are being paid to do so.

        THE COURT:  Well, there are two -- This is kind of like antitrust.  There are two component parts of the business here. There are the users who are paying the monthly fee to be able to use the locker, and there are -- which makes this unique, I would imagine -- there are the folks being paid to upload vast amounts of

materials, which kind of puts the idea of it's simply a storage
locker on its head a little bit.

          MR. FABRIZIO:  Quite a bit, Your Honor.

          Yes, it is unique in that defendants like to talk about
affiliate programs being popular on the Internet.  No one, other
than other pirate cyber lockers, no one pays people to supply the
content, and then does it without any regulation about who's doing
it or what's being uploaded.

          THE COURT:  Do you agree that there's nothing that tells
them who or what necessarily, other than popular content, which in
some ways you're equating with infringing content?

          MR. FABRIZIO:  Well, Your Honor, no.  I do believe they
actually knew.  But I also believe that when you pay people, when
you incent them, and you pay them only to upload content that is
downloaded many, many times by other people, that everybody knows,
everybody in this courtroom knows, everybody on the Internet knows,
that what is going to be uploaded is going to be popular copyrighted
entertainment content.  We're talking about content being downloaded
tens of millions of times.  There's no fair room for debate.

          But you also have out of defendant's own mouth that they
understood RapidShare, you know, the disaffected RapidShare
uploaders were going to be looking for a new home, and they tried to
solicit them, knowing that they were going to be uploading
non-licensed content.  They were out publicly, as I talked about
before.  When somebody said, "I've got all these television shows I

want to upload," they were out there publicly saying, "Hey, let me introduce you to Hotfile.  There's a nice place to upload it."  They were out there publicly soliciting people to upload video games, MP3s, videos.  They weren't out there saying this is -- we want your open source code.  They were out there arguing for popular entertainment content.

Other courts -- These defendants are not the only people, they're not the only defendants that have said, "Well, we don't know that all this popular content is actually copyright infringement."  On summary judgment, other courts have looked at that argument and said it's implausible, that everybody knows that popular movies and music are copyrighted.  Everybody knows.

THE COURT:  That was the Aimster Court.  But there was a little more than just -- And I fear we've strayed from repeat infringer.  I think there was a little more than just it was popular.

But getting back to the repeat infringer, is there anything else in that regard that you had?  This is the 512(i) conditions of eligibility, reasonably implemented policy, informing subscribers, that would be the DMCA agent, which I don't know if the parties can agree, but it doesn't seem to me that all came together until 2010.

MR. FABRIZIO:  The appointing of a DMCA agent in compliance --

THE COURT:  Right.

MR. FABRIZIO:  Well, Your Honor, clearly everybody agrees

that it didn't come together until 2010, or at least the facts

agree.  There's a question about whether it's together even today,

which I will explain.

THE COURT:  Okay.

MR. FABRIZIO:  But staying on repeat infringer, on 512(i),

Your Honor, these were not close calls, as you can see in the other

graphic.  More than 18,000 of these users had five strikes, more

than 12,000 had ten strikes.  Your Honor, there were more than a

thousand that had a hundred notices.  These were not close calls.

This is not a question of should they have had a two-strike policy

or three-strike policy.  We're talking about a hundred strikes and

still being allowed to upload infringing content.  And these

infringers, massive repeat infringers, uploaded extraordinary

volumes of content after they should have been terminated, including

thousands of the files in suit.  There's a direct correlation

between their failure to implement a repeat infringer policy and the

harm to plaintiffs.

THE COURT:  I digress.  Are these charts within the

materials I have or will you supplement with copies?

MR. FABRIZIO:  We'll give you a copy of everything that we

use today, but --

THE COURT:  I understand it's demonstrative, but I just

want to know where I can reference it if I --

MR. FABRIZIO:  Sure.  I appreciate it.

The three that are right now before the Court are all in

the record.  But we'll give you a copy of everything that we use

today just so you have it more conveniently.

             MR. THOMPSON:  Could you identify them by number so we can

see them?

             MR. FABRIZIO:  Of course.

             There is Appendix I, Appendix H, and Appendix G.

             MR. THOMPSON:  Thank you.

             MR. LEIBNITZ:  And, of course, all these are subject to a

motion to strike, Your Honor.

             THE COURT:  I would have assumed that even if I didn't know

it.

             MR. FABRIZIO:  Anything incriminating is subject to a

motion to strike, Your Honor.

             THE COURT:  Yes.

             MR. FABRIZIO:  Your Honor, on the issue of what type of

repeat infringer policy, defendants like to say, "Well, you don't --

the law doesn't require any specific type of policy."  Well, the law

requires that you terminate repeat infringers.  So, there has got to

be some way of tallying the infringers.  The cases very clearly say

you've got to use notices to do that.

             But these defendants knew full well exactly what type of

repeat infringer policy they needed, because from the outset, they

were telling people publicly that they tracked DMCA notices and

terminated those who had multiple notices.

             I wonder if I could have you put Yeh Exhibit 10 back on the

screen?

      MR. THOMPSON:  Sure.

      MR. FABRIZIO:  Defendants --

      MR. THOMPSON:  Your Honor, may I approach?

      THE COURT:  Yes.  You may come up here.

      (Off-the-record discussion.)

      MR. FABRIZIO:  So, defendants look at Yeh Exhibit 10 and say, this is -- and they say, "This was never disseminated publicly. As you can see, it was just a draft."  They also, oddly, used this document as corroboration of the date that they instituted hashing.

      Just as an aside, Your Honor, they've admitted that what was said in this e-mail was a lie.  It's very odd that they're using an admitted lie as corroboration, as their only corroboration --

      THE COURT:  Where do they admit that?

      MR. FABRIZIO:  Defendant Titov in deposition admitted that the policy that was being described in this e-mail was not true and was not the policy that they had at the time.

      Their rebuttal to this is that, "Well, this was not a public policy.  We never maintained this policy publicly."  Well, that, Your Honor, is just simply not true.  If you look at Leibnitz Exhibit 29, which is the one right here, this is a --

      THE COURT:  Well, I can see it says "gmail."  I just don't have the eyes I used to.

      MR. FABRIZIO:  We have the handout.  That may help you.

      THE COURT:  Okay.

          MR. FABRIZIO:  Leibnitz Exhibit 29 is an e-mail that was

sent out publicly in September of 2009.  It was sent out publicly to

Bay TSP, which is a major anti-piracy organization.  They work for

many different copyright owners, including some of the plaintiffs in

this case.  And Bay TSP asked Hotfile in September of 2009,

effectively, what's your DMCA policy for repeat infringers, and

Hotfile lied.  They said, "We have a two-strike policy."  They said,

"When we get a notice, we send it to the user as a warning, and on

the second notice, we terminate them."  This was a public document.

This went out to a third party.  It is just simply not true that Yeh

Exhibit 10 was just an internal draft they were playing with

internally.

          And, Your Honor, if you look at Yeh Exhibit 12 at some

point, Mr. Titov himself approved the falsehood in Yeh Exhibit 10.

He responded -- When he was asked for his approval of it, he said,

"It's great."

          Anyway, Your Honor, they did it again in December of 2010.

Another anti-piracy organization questioned them about their repeat

infringer policy.  And this was, I think, Porn Guardian.  And they

responded to Porn Guardian -- and I believe this is Yeh

Exhibit 11 -- they responded to Porn Guardian by saying, "Oh, yes,

we have a robust repeat infringer policy.  We have a three-strike

policy.  Any user that's notified in DMCA notices a third time gets

terminated."

          Throughout this whole period, Your Honor, they had no DMCA

policy.  They were not keeping track of DMCA notices at all.  But
yet they were representing it the entire period.  They knew exactly
what type of DMCA policy they needed and how they had to implement
it.  They just chose not to.

          And, Your Honor, if I may, as kind of an aside, defendants
like to talk about how the -- some in the copyright community were
praising them or saying nice things about them, which really amounts
to a couple of people saying thank you and otherwise being polite.
But Leibnitz Exhibit 29 is one of the e-mails that they point to for
Bay TSP responding saying, "Oh, thank you.  I'm going to tell my
clients that you have a good policy."  Well, of course Bay TSP said
that.  They lied to Bay TSP.  They told Bay TSP that they had a
two-strike policy, that they warned users after the first notice,
and that when they blocked users, they blocked by IP address.
Absolutely none of that was true at the time, and most of it is not
even true today.

          So, you have to be very careful when defendants talk about
things like being lulled into a false sense of security by people
saying nice things to them.  People said nice things to them because
they lied.

          THE COURT:  Let's assume that I concur with your analysis
of the eligibility of safe harbor, because we're not getting into
the 512(c) argument yet, because that would involve specific notice
of specific infringing materials, Viacom.  We're still just on
512(i).

MR. FABRIZIO:  Well, if Your Honor concurs with 512(i), we never get to any other issue with the DMCA.

THE COURT:  Correct.

So, the most compelling, I would suppose, evidence you have is that in all that time, only 43 people were bounced.

MR. FABRIZIO:  And 33 of them, Your Honor, were after a copyright owner sued them and got a temporary restraining order. Hard to call that part of a repeat infringer policy.

THE COURT:  So, what remains then?  Is there a -- Again, we're not pursuing post-2011 conduct, so there's no question for the jury about when they may have become compliant post-2011?

MR. FABRIZIO:  No.  No, Your Honor.

If Your Honor concurs, as we believe and hope you will, that this cannot be called a compliant DMCA policy that gets you federal immunity from copyright infringement, then the only question left is the underlying copyright infringement.  And we submit that that's not much of a question.  It never has been in this case.

If Your Honor concurs that 512(i) was not complied with by these defendants, Your Honor doesn't even have to reach inducement. Your Honor can just look at vicarious infringement, which very clearly under the common law is met here.  There's no credible argument that it's not.  You can look at knowledge and contribution. Under the common law, not the DMCA, under the common law, there's no real question that that standard has been met here.  And, obviously, inducement as well.  It is pretty clear, given the comparison from

Grokster to Hotfile, we think that's also a matter that doesn't go to the jury, it's so obvious.

        But if Your Honor agrees with 512(i), that's the heart of the case.

        THE COURT:  And it is your position that because of the evidence you have adduced, it is not a matter for a jury to decide, but it is a matter of law for the Court to decide whether or not the program was compliant.

        MR. FABRIZIO:  Yes.

        THE COURT:  Or had fit the eligibility criteria.

        MR. FABRIZIO:  Exactly, Your Honor.  The reasonableness, which here doesn't -- Let's put it this way, Your Honor.  If the question was could a reasonable jury determine that this was a reasonable repeat infringer policy, the answer is of course no reasonable jury could find that.  But that's not the question. Reasonableness is a question of law.  Once the facts are set, the reasonableness of the policy is something the Court decides as a matter of law.

        And I have two Eleventh Circuit cases I can identify for Your Honor that talk about, in this circuit, reasonableness is a pure question of law.  The first is Penley, P-E-N-L-E-Y v. Eslinger, E-S-L-I-N-G-E-R, and that is at 605 F.3d 843, and the pin cite is 849.  That's the Eleventh Circuit, 2010.

        If I can give a quote from there:  "Once we've determined the relevant set of facts and drawn all inferences in favor of the

non-moving party to the extent supportable by the record, the

reasonableness of" -- in that case, it was the officers -- "the

officers' actions is a pure question of law."

          A second case for the same proposition, Your Honor, is

H&R Block Eastern Enterprises vs. Morris, and that is at

606 F.3d 1285, pin cite 1290, and that's also the Eleventh Circuit,

2010.

          And, again, as the reasonableness of a restraint in trade

in an employment contract, the reasonableness is a question of law.

          THE COURT:  I don't mean to be glib, but isn't that what

all of -- isn't that what all these other courts have been doing in

terms of gatekeeping on DMCA?  Isn't that the question, whether or

not it's available, and either they say in a summary judgment

context it isn't or it is?

          MR. FABRIZIO:  So far, Your Honor, yes.  So far every court

that has -- As far as I'm aware of, every court that has looked at a

DMCA issue has been able to decide the question on summary judgment

as a matter of law.  And every court that has looked at a repeat

infringer policy, the courts that have affirmed those policies, it

was all circumstances where the defendants had a two- or

three-strike policy, where they warned their users, and then they

terminated them based on DMCA notices.

          All of the cases say that you have to look at notices.

Defendants cite a single case for the notion that they don't have to

pay attention to these notices.  The Corbis case, that case is no

longer good law.  After Corbis, the Ninth Circuit decided CCBill,

which said for the repeat infringer provision of 512(i), you have

the same knowledge component that you have under 512(c).  Notices

count as knowledge, and you have to act on that knowledge.

So, the only case defendants were able to muster that

suggested anything otherwise is just simply not law anymore.

THE COURT:  All right.

MR. FABRIZIO:  I'd like to move on to, very briefly, other

DMCA issues, or would you like to trade off?

THE COURT:  Why don't we trade off, then I'll have whatever

questions I have fresh.

MR. FABRIZIO:  Good.

THE COURT:  Sorry to interrupt you.

MR. FABRIZIO:  No, I think that makes sense, Your Honor.  I

just wanted to check with you first.

THE COURT:  Okay.

MR. THOMPSON:  Your Honor, let me start from one of the

last points Mr. Fabrizio made.  He said that there's never been a

triable issue found on the DMCA.  We have the Arista vs. Myxer case.

It's cited in both parties' briefs.  That was, in fact, found to

have a triable issue on DMCA.

THE COURT:  What was the issue that the jury had?

MR. THOMPSON:  I'm going to have to take a moment and get

back to you in a moment on the details of that case.

THE COURT:  All right.  I have it somewhere in my outline.

If I find it first, I'll will let you know.

MR. THOMPSON:  Okay.

Can we put back Exhibit 11, please, the Yeh?

Mr. Fabrizio has two e-mails from one of the Abuse@Hotfile.com people who responded to hundreds and hundreds and hundreds of e-mails.  They literally had 700,000 e-mails have been produced in this case (sic).  He's found two that he says are deceptive.  But I want to look at one.

Could we blow it up a little bit, please?

So, this is the e-mail that Mr. Fabrizio was pointing to a moment ago.  He didn't look at the second sentence, which says:  "If you noticed some repeat offender which is not suspended by us, please let us know.  Just inform us at Abuse@Hotfile.com with the subject line 'repeat offender.'"  That's from -- The date on this is December 5, 2010.

Could we have Exhibit 21, please?

This same individual who was writing Hotfile followed up on December 21 to Hotfile.  This is the Porn Guardian fellow, Mr. Phinney.  He says, "It has come to our attention that one of your members is a repeat offender who continually posts links to illegal copyrighted material."  He goes on to say, "We have notified you of these files in the past.  You have always been very cooperative having them removed from your servers.  We thank you for that cooperation."  And he goes on.

And can we go to the top of the e-mail, please?

So, here, Your Honor, is the same e-mail chain where
Hotfile invited this fellow from Porn Guardian, "If you have any
concerns about a repeat offender, let us know."  He followed up a
few weeks later, and their response was, "Okay.  We'll stop him."
He was terminated by Hotfile, because that particular -- Porn
Guardian is a --

THE COURT:  They sued, though, didn't they?  I mean my
understanding --

MR. THOMPSON:  No, Your Honor.  They didn't sue.
Mr. Fabrizio is exaggerating on that.

THE COURT:  Okay.

MR. THOMPSON:  This particular -- I just showed how they
complimented Hotfile for all of their SRA tools --

THE COURT:  Liberty Media sued.

MR. THOMPSON:  Liberty Media sued, yes, Your Honor.

THE COURT:  And after Liberty Media sued is when the 40 or
43 came tumbling out.

MR. THOMPSON:  Some of them, Your Honor.

THE COURT:  Okay.

MR. THOMPSON:  But what I'm trying to establish here is
there was a repeat infringer policy.  We just saw it.  It was
Hotfile saying to the copyright content owners, "If you suspect
there's a repeat infringer, let us know, we'll take care of it."
Porn Guardian did exactly that.

Now, Your Honor, maybe that's not ideal.  It's not a three

strikes policy, but that should be a judgment for the jury.

            If we can skip to the PowerPoint --

        THE COURT:  Let me offer editorial comment in that I think this is a tough road for you to hoe, because Hotfile essentially starts up and says to it users, "Don't break the law."  Okay.  And then it offers this SRA -- Disney and Fox don't avail themselves, maybe Warner did -- essentially saying, "You all go in and fix it." And of all the notices, of which there were how many between 2009 and 2011, were in the millions of notices, 40 users are terminated. Under anybody's assessment, how can that be viewed as a reasonable policy?  Even Mr. Titov says, "I looked at these individually, and I had the discretion."  How do you argue, in light of the case law, that you have somehow comported with the statute and can use safe harbor?  I just don't think the facts -- Any reasonable either jury or Court viewing this could find compliance here.

        MR. THOMPSON:  Let me try, Your Honor.

        THE COURT:  All right.

        MR. THOMPSON:  And, first, just as -- by way of introduction, to make us all -- remind all of us, it's not just the DMCA safe harbor.  We also have an estoppel defense, which I think is very strong and raises triable issues, as well as the secondary liability we've talked about.

        Let's focus on DMCA for a second.  I'm going to skip over the other two requirements, which apparently Mr. Fabrizio isn't focusing on.  Well, I should mention that in one second.  The

YouTube holding, I think, resolves any doubt that it has to be the specific files in suit to establish actual knowledge or red flag knowledge, so we'll --

THE COURT:  But that's in the 512(c) context.

MR. THOMPSON:  Yes.

THE COURT:  So, we're not importing that to the eligibility.

MR. THOMPSON:  Yes.

Let me go to repeat infringer, because that's been the focus.

THE COURT:  Okay.

MR. THOMPSON:  So, this is from the CCBill case.  The statute permits service providers to implement a variety of procedures.  That's from 2007.  That's been the law since then.  There is no magic formula.  There is no requirement of strikes, no matter what you may hear.  Now, we've adopted strikes, but there was no requirement of that.

Given the complexities inherent in identifying and defining online copyright infringement.  Remember, Your Honor, we have 123 million links to a small start-up company.  They have six individuals; three of them were part-time.  There's no way you can read those or police those.

And remember that the DMCA in its balance places the burden of policing on the copyright owner.  Your Honor, we believe it's very reasonable in light of that, in light of the staggering amount

of files that are uploaded, to ask the content owners for help.  "If you think there's a repeat infringer, let us know."  And we just showed you that with Porn Guardian, that worked just fine.

And the Corbis case was not overruled.  It was decided before CCBill, but here they're both cases right one on top of the other.

THE COURT:  Well, doesn't CCBill go on to say, though, that a service provider must take account of takedown notices in determining whether users are repeat infringers implementing a reasonable policy?  So, doesn't the sheer number of notices undermine you almost fatally, or no?

MR. THOMPSON:  No, because there's a lot of notices, but it doesn't necessarily mean that any one individual is accumulating all those notices.  Mr. Fabrizio, with lots of help and computers, has now come back and shown some accumulated lots of notices.  But it doesn't say you have to review eight million notices.  You can't do that.  Given the complexities inherent in identifying and defining copyright infringement, 512(i) does not require a service provider to decide in advance the specific types of conduct that will merit restricting access.  So, what we have here is proactive policy.

Your Honor, to correct one misunderstanding you made about the SRAs, Warner didn't just adopt it; Warner asked for it.  Warner wrote to Hotfile and said, "Dear Hotfile, please give us this special tool.  It will help us in our efforts."  Warner adopted it.  Several of the other plaintiffs also adopted it, and their agents

adopted it.  That's a hundred special rightsholder accounts.  So, it is clearly an exceptional tool and was adopted.  And I think it has to be looked at as part of the overall copyright compliance.  What is reasonable is -- in this context, depends on the overall circumstances.

THE COURT:  And this -- You're saying these accounts were opened in --

MR. THOMPSON:  August of 2009.

THE COURT:  For a hundred persons?

MR. THOMPSON:  Well, they were made available to anyone who wanted one in August of 2009, and Warner signed up quickly.  Other of the anti-piracy agents representing the studios signed up shortly thereafter.  And all of them praised Hotfile for making that available.  As a matter of fact, they held Hotfile out as an example to other cyber locker sites.  "Why don't you do this SRA back-door access?  It works so well."

THE COURT:  But I'm still going back to -- I understand it is a factor, and for you I would argue it as a critical factor, but can it ever actually relieve a service provider from its obligations under DMCA?  And you have portrayed the statutory scheme as a collaborative effort, and I don't know that I necessarily see it that way.  It seems to me that it's placing certain obligations on the provider to invoke a safe harbor, and to say, "We gave them the SR accounts.  It was up to them to let us know.  And if we get eight million notices, we don't have the time, because we're small, to

wade through it.   I think that's a problematic approach.

          MR. THOMPSON:  Well, Your Honor, it has to be look at in
context about the relative practicability to police.  And the
cooperation is not something that I'm asking you to adopt.  That's a
core principle from the DMCA.

          But, Your Honor, remember that it's a repeat infringer
policy.  It's not a repeat accused infringer policy.  The SRAs don't
mean someone actually is necessarily an infringer.  It means that
these studios or the content owners say they were.  We've shown, in
the counterclaim with Warner, thousands -- actually, there's
hundreds that are in the counterclaim, but we have evidence of
thousands of wrongful takedowns, because they sent a robot out in
the Internet to look for links and took down things that didn't
belong to them.

          THE COURT:  But you're setting up a burden in terms of
costs in business that Congress never would have anticipated.
You're saying, we get the notice, and then we have to have our own
like mini scrub to determine is this person really an infringer or
are they just sending up files using movie titles, but they're
really their home movies, because that would take all of the heat
out of this.  I mean I think if you get three notices on something,
in some cases it says, that's a pretty good indication.  You don't
need to find out who it is or what it is.  You take it down, deal
with them later, give them back their money, but do not keep this
content on your website.

MR. THOMPSON:  Your Honor, I was just looking -- Perhaps you misunderstood my point on that.  I wasn't suggesting that Hotfile should look at every notice or that any service provider could ever do that.  That doesn't work that way.  What I was suggesting is, the statute talks about a policy for terminating repeat infringers.  Professor Nimmer has pointed out that it doesn't say "accused infringers."  So just because someone sends a takedown notice, and Professor Boyle has written on this, in some instances, 50 percent of the takedown notices can be just wrong.  They can be sent out by competitors.  Now, I'm not that saying these particular plaintiffs are abusing it to that extent, but it is a real problem.  And the distinction is between who is a real infringe and who is an accused infringer.

THE COURT:  Okay.  But even with that, eight million, 40, that -- The question is, is that reasonable.  And I'm no statistician, but eight million notices -- Am I right about that?

MR. LEIBNITZ:  No, Your Honor.  I'm sorry.  That's why I rose.  Eight million is not right.  Remember, it's three percent of 500,000.  So, it's --

THE COURT:  No, I'm talking about notices, receiving notices of possible infringement.

MR. FABRIZIO:  Your Honor, the record evidence is that there were more than eight million notices sent during the pre-complaint period.

THE COURT:  Right.  So, I'm saying there's 500,000 users or

uploaders of the 3.7 percent, eight million notices are given to

Hotfile saying somebody is infringing.  And in a two-year period,

only 40 somebodies are taken off.  That seems to me to be

problematic, because it doesn't seem reasonable that eight million

notices would go out -- and all of the case law says notice is a

critical component of the analysis -- and only 40 were terminated.

It suggests that the policy is not being reasonably implemented, if,

indeed, there is a policy.  And Aimster says, "Even if you write it

out, we don't violate the law, we don't want you to violate the

law."  That can be illusory, depending on how it is effectuated.

        MR. THOMPSON:  Your Honor, Aimster, let me distinguish

that.  And that goes back to, you know, there were some renegades

out there, and what the Seventh Circuit said on that was that far

from doing anything to discourage repeat infringers, that plaintiffs

actually encouraged it.  Aimster showed them by teaching users how

to encrypt their unlawful distribution of copyrighted materials.

There's nothing like that in this case, Your Honor.

        THE COURT:  Right.  And I think you -- And I think, quite

frankly, you have a fairly good argument in a Grokster inducement

analysis.  I'm not so sure about material contribution.  But I'm

just talking about the 512(i), getting -- You want this safe harbor.

And, again, it's just a reasonable policy termination of repeat

infringers and just the numbers.

        Tell me -- Show me -- Look, there's Haley's Comet.  Direct

me to something other than the eight million and 40 to get me back

on track with your argument as to why it should be available to you.
Because I'm in your corner as to -- although I don't know precisely
when post-suit, but at some point, I think you did all you could
possibly do to become compliant.  I don't know exactly when from
this record, but before the complaint, I have questions.

          MR. THOMPSON:  Your Honor, what we can show is a couple of
things.  First of all, for the Haley's comment, 123 million files
were uploaded.  The fact that eight million were subject to takedown
accusations doesn't jump out as anyone shock you conscious (sic).
That's a relatively small percentage.  You know that there will be
some infringement when you have a cyber locker.

          THE COURT:  Sure.

          MR. THOMPSON:  And we went far, Hotfile went above and
beyond the normal notice and takedown.  And maybe the way to think
about this is, let's assume the repeat infringer policy was not very
strong, not as well as it could have done.  On the takedown side,
with the SRAs, they went fabulously.  They went above and beyond,
and as a matter of reasonableness, you have to weigh them both
together.

          MR. LEIBNITZ:  Your Honor, on that eight million number, if
I may, remember there's eight million takedowns according to the
other side.  There's five million users divided among them.  It's
not necessarily that any one user would have gotten all these
numbers, just based on the numbers alone.

          THE COURT:  All right.  Thank you.

MR. THOMPSON:  And, by the way, Your Honor, with respect to the post-complaint period, the evidence is undisputed.  Ten days after the complaint was filed, February 18, the three strikes policy was implemented.  And I can show Your Honor -- and we can go through this if you'd like -- this was an issue from the beginning.  The complaint alleges continuing copyright infringement, asks for injunctive relief.  They took extensive discovery from Mr. Titov and others about his current policies.  This was litigated.  The studios may not like the answer they found, they may want to drop the claim now, but we're entitled to summary judgment as a matter of law.  I think they more or less conceded that the post-complaint repeat infringer policy does, in fact, qualify under 512(i).

THE COURT:  Well, I'm fairly swayed by post-complaint, but we've still got that two-year period.  And maybe even I can get off repeat infringer for a moment, and let's get to notification.

I'm not clear entirely.  There was an e-mail address.  There was no name.  I mean when you talked originally in your opening statement, you talked about the cooperation of DMCA, which I've referred to, and you suggest a certain obligation or a certain attitude on the part of the entertainment industry in terms of making it happen and making it real.  Well, a name.  The statute is really clear.  You need to designate a guy or a gal, and you need to make that name known to the public, Bob at -- I keep going back to Bob -- Bob at whatever dot com, and that didn't happen until 2010.

So, I don't even -- In this context, I don't think there's

a substantial compliance argument at all.  You either did or you
didn't, and you didn't.

So, if you're talking about cooperation, how is it your
client could have missed such a definitive requisite of this --

MR. THOMPSON:  Your Honor, first of all, the client had no
legal advice.  It was a start-up company in Bulgaria.  They did
their best to comply with an American statute, and I think they did
very well.  But let's look what it says.

THE COURT:  That's not a good argument.

MR. THOMPSON:  But, Your Honor, it's the fact --

THE COURT:  If your client wishes to do business in the
United States, wishes to do business in a sophisticated and
innovative technological field, which is part and parcel of the
defense you're giving to me, it behooves him or her to check it out.

MR. THOMPSON:  Well, Your Honor, let's look at the law for
a second in this slide.  You mentioned substantial compliance.  I
think this is a classic example of substantial compliance.

First of all, the statute itself, you see the word there,
"substantially the following information, name, address," et cetera.

THE COURT:  Name.  In any language, "name" is a fairly easy
concept.

MR. THOMPSON:  Well, then, Your Honor, Perfect 10 vs.
Amazon, "Technical deficiencies are insubstantial where they would
not prevent a copyright owner from officially communicating with the
designated agent and vice versa."  There is no evidence -- And, as a

matter of fact, you've talked about the takedown notices.  There was
no evidence that anyone ever had any difficulty reaching Hotfile to
provide that takedown notice.

THE COURT:  Well, what evidence is it that -- Who did it go
to when it was just -- Where did they go?

MR. THOMPSON:  It's right on the website --
Abuse@Hotfile.com.

THE COURT:  Right.

MR. THOMPSON:  And it was used extensively.  And then when
Warner and others communicated with that Abuse mailbox, they set up
the SRA.

THE COURT:  No.  Who at Hotfile got Abuse@Hotfile.com?

MR. THOMPSON:  Excuse me, Your Honor?

THE COURT:  Who, what person, the name of the person who
got the Abuse@Hotfile communications?

MR. THOMPSON:  Well, at the time, I believe his name was
Andre Ianokov.  Later on, there was a designated agent in the U.S.
Constantin Luchian was the name that was eventually listed.

THE COURT:  All right.  So, somebody in Bulgaria was
getting the takedown notices.

MR. THOMPSON:  Yes, Your Honor.

THE COURT:  The same somebodies who were unclear on U.S.
law; therefore, they hadn't given their -- I mean this could feed on
itself for a long time.

MR. THOMPSON:  Well, Your Honor, they were not clear on the

concept of takedowns.  They knew exactly that was important, and

they acted on it.  There's been no allegation that there's been

anything less than expeditious compliance with takedown notices.

And there's certainly no allegation that these studios had any

difficulty reaching Hotfile, which is really what the Perfect 10

case is about.  There was nothing to prevent the copyright owner

from communicating, and they did so.

        So, I think, Your Honor, if you look at the success of the

takedown process, including the back and forth and the interaction

with the SRAs, that worked well.

        THE COURT:  Wasn't the technical -- When you say that it --

Weren't the examples given in the case law and the committee notes

where there was an outdated name accompanied by an address?  So, the

committee said, "We intend substantial compliance standard be

applied to the technical error," the misspelling of a name, B-O-O-B

or B-O-B-B, "supplying an outdated area code if the phone number is

accompanied by an accurate address."  Here there was no phone

number, was there?  Was there a phone number?

        MR. THOMPSON:  I don't believe there was originally, Your

Honor.

        THE COURT:  Okay.  "Supplying an outdated name if

accompanied by an e-mail address that remains valid."

        So, there are all these permutations that the committee

says would say that you substantially complied but for technical

difficulties.  Here, there is no name, there is no address, there is

no phone number, there is no registry until 2010.  There is

Abuse@Hotfile.com initially to some gentleman in Bulgaria who is

unfamiliar with law on takedown.  I don't see how that argument is

availing for you.

        MR. THOMPSON:  If I could go back to the last point, he was

quite effective at taking down files.  There's no question that he

performed his job exactly as it was intended.

        THE COURT:  But he didn't terminate users.

        MR. THOMPSON:  He did terminate users.

        THE COURT:  40.

        MR. THOMPSON:  Yes, Your Honor.  And you have to look at

the totality of the factors.  Now, Hotfile did very well on the

takedowns.

        But focusing on the designated agent, I believe this is a

classic technical of non-compliance with the statute in the sense

of (sic), as the Perfect 10 case says, no copyright owner was

prevented from effectively communicating.

        And, Your Honor, as recently as the YouTube case, that very

well celebrated case, in the trial court, the defendants raised the

issue, "Oh, you didn't register with the copyright in time -- the

copyright office, you didn't make your registration.  There's

another technical violation."  The trial judge didn't even address

the issue before granting summary judgment.

        In the Wolk case, W-O-L-K, which is a recent Southern

District of New York case, 2012 WL 11270, again, it doesn't even

merit a discussion, but they list there, at page 16, exactly who the designated agent was.  It was called Copyrightagent@Photobucket.com. No individual.  The name "copyright agent."  They won summary judgment, Your Honor.

          THE COURT:  Well, tell me -- I'm interested.  Is this in the Viacom decision?

          MR. THOMPSON:  No, Your Honor.  The best we can say is that in the -- I believe a footnote in a district court decision, there was a reference -- there was an argument made by the defendants that there was non-compliance, and the district court judge didn't reach that issue.

          THE COURT:  All right.  But --

          MR. THOMPSON:  Like Hotfile, YouTube was a start-up once, and when it was in the start-up mode, it didn't punch all the right buttons and comply with all the technical requirements of the DMCA. But that didn't stop the district court from granting summary judgment there.

          THE COURT:  Yeah.  You don't think there might be a little bit of a difference between YouTube and your client in terms of business structure and policies and --

          MR. THOMPSON:  Well, now there certainly is because YouTube is owned by one of the largest companies around.  But when YouTube started, it was very similar in it being a fledgling start-up that didn't have time to scrupulously comply with all the technical requirements of the DMCA.

THE COURT:  Okay.

I'm trying to look at the time frame for when --

MR. THOMPSON:  Your Honor, we looked hard on this, because I wanted to find law on it, and the best I can say is it was raised, but it just wasn't addressed.  It wasn't seen as an important issue.

THE COURT:  All right.

And then the other part of "I" is that the -- policies communicated to the public.

MR. THOMPSON:  Yes, Your Honor.  And, again, there's substantial compliance in the sense of I showed you the e-mail that went to the Porn Guardian fellow, and it was saying, "If you have a concern about a repeat offender, give us an e-mail.  Put 'repeat offender' in the subject line."

That was how it was communicated.  I'm not going to argue that that was a full compliance.  But I think it's enough for substantial compliance, enough for the jury to consider the overall reasonableness of Hotfile's compliance.

THE COURT:  Just so I'm clear, because -- and I misspoke -- reasonably informed subscribers and account holders, other than your recitation that you advise your subscribers and account holders not to violate copyright law, was there any other articulated policy of the consequence to them should they do so?  And if there was, when was that policy made known?

I would imagine it would have to be contained in your subscription information.

            MR. THOMPSON:  It was contained on the website from day

one, Your Honor.  This is in the Titov opposition declaration, where

Hotfile reserved the right to terminate subscribers who didn't

comply with its policies.

            There's no case law that suggests that you have to lay out

all the details of your repeat infringer policy, but you did, and

Hotfile did notify its users by its website that it reserved that

right to terminate.

            THE COURT:  All right.  But it did not use -- And you've

cited me the cases that there's no uniform policy proscription.  But

it did not talk specifically to repeat infringers in its website.

Because it reserves the right to terminate you if you violate its

policies, not that it will terminate you.  It reserves the right.

            MR. THOMPSON:  I believe that's the way the language was,

and it is in the record.

            Your Honor, from the Corbis vs. Amazon case, it's probably

important to read this quote:  "Section 512(i), however, is not so

exacting.  Amazon need only inform users that in appropriate

circumstances, it may terminate the user's accounts for repeat

copyright infringement."  This is at 351 F.Supp.2d, and the jump

cite is 1102.  And it goes on to cite the CCBill case.

            THE COURT:  Thank you.

            MR. THOMPSON:  Your Honor, if I can proceed?  I realize we

don't have unlimited time.  Unless you have more questions on 512?

            THE COURT:  No, I don't.  And I did want to ask you,

though -- We're not going to finish in the next 50 minutes or so, what would with the parties like in terms of a break, lunch?

MR. LEIBNITZ:  Your Honor, if I could just pitch in one last thing before we break.

THE COURT:  Yes.

MR. LEIBNITZ:  The Arista/Myxer question that you'd asked earlier, we have the quote from that.  This is from the Central District of California last year, 2011.  And the quote is: "Accordingly, because a repeat infringer policy needs to be reasonable, not perfect, and because Myxer has presented evidence of an arguably adequate policy, the Court concludes that Myxer has raised a genuine issue of material fact."  So that's 2011 U.S.Dist. Lexis 109668, jump cite star 7.

MR. FABRIZIO:  Your Honor, while we're helping the Court with Myxer, Myxer had a repeat infringer policy, and they terminated users in response to DMCA notice as well as in response to informal notices.  The reason the case was sent to trial was, first of all, because the defendant didn't move -- or Myxer didn't move for summary judgment, but the issue that was reserved for trial was whether the policy was adequate, because Myxer didn't terminate downloaders who were repeat infringers, and it didn't block IP addresses when it terminated a user, which allowed users to create a brand new account and log back on.

So, no question that Myxer terminated repeat infringers based on notices, DMCA notices and informal notices.  The question

for trial had nothing to do with it.

          And the quote that Mr. Leibnitz just read to you, Your Honor, related to how Myxer blocked users that had been terminated. There was a debate as to whether simply blocking their account was good enough, or whether they had to block IP addresses, and the Court, in the context that Mr. Leibnitz was just reading to you, was saying, I'm not going to get into whether -- it doesn't need to be perfect in the sense that IP address or account.  The issue here for the jury to decide as to whether it's enough.  This is not a case that helps defendants.

          MR. THOMPSON:  Mr. Thompson, you're out of this for awhile.

          MR. LEIBNITZ:  This is a joy to hear, Your Honor, because he's just told you to look at all the circumstances, which is exactly our point, Your Honor.

          THE COURT:  Okay.

          You're back on, Mr. Thompson.

          MR. THOMPSON:  Your Honor, as far as the schedule, we certainly on Hotfile's side are at your convenience, whatever works for you.  We can keep going, we could take a break, whatever you'd like.

          THE COURT:  I think we really do need to take a break for lunch.  So, I would suggest we reconvene at 1:30.

          We'll resume at 1:30.

          MR. FABRIZIO:  Before we break, so we can complete the issue of repeat infringer, could I just respond quickly on

something?

        THE COURT:  Yes.

        Were you finished, Mr. Thompson?  Because we can --

        MR. THOMPSON:  Yes, Your Honor.

        THE COURT:  All right.

        MR. FABRIZIO:  I want a very brief -- understanding that this is not a core question anymore.  But defendants say that their policy was to wait for copyright owners to identify the repeat infringers to them.  But the evidence in this case, the undisputed evidence in this case, because it comes from Mr. Titov himself, is that copyright owners didn't have the means to identify the uploaders to Hotfile.  Copyright owners just go out and find the links.  They have no idea who's uploading the links.

        In this case, only Hotfile has the means to identify the users, except in extraordinarily rare circumstances, such as when the upload of a link identifies themself in some way.

        THE COURT:  So, even under this SRA, only the links are identified?

        MR. FABRIZIO:  It's simply the way Hotfile works.  These links are posted on hundreds of websites around the Internet, and that's what the copyright owners have to go find.  So, when they find the link, that link doesn't tell them that Bob is the uploader of that link.  So, when they find another link that happened to have been uploaded by Bob, they have no idea.

        So, waiting for copyright owners to identify Bob makes no

sense.  It's obviously not a policy at all.  You're saying, "I'm going to wait for you to tell me, but I know you don't have the information to ever tell me."

Mr. Thompson also made some factually unsupported comment that it would be impossible to look at all these notices.  Again, Your Honor, the record evidence there is undisputed.  When asked how difficult it would be to associate these DMCA notices with the infringing uploaders, Mr. Titov testified it would be, quote, trivial, close quote.

THE COURT:  But that doesn't describe the ease.  That just describes his view on how important it was, I suppose.  Or --

MR. FABRIZIO:  No.  He was describing how difficult technically it would be to get a notice and determine who the uploader was and keep track of it.

THE COURT:  Okay.

MR. FABRIZIO:  Finally, Your Honor, all the cases must say that you need to take account of these notices.  You don't have to, but if you don't, you don't get any safe harbor.  The question here is not what defendants were obligated to do, not affirmative mandatory obligations.  The question is, what conditions that they had to meet if they want to come to court and say, "Give me an immunity for all of this copyright infringement."

And the answer to mistaken notices, which, by the way, Your Honor, there is no record evidence that there's a problem with notices, notwithstanding Professor Boyle's writings.  The DMCA

provides a counter notice process.  The DMCA contemplates that when
you get a notice, you'll send it to the user, warn them not to do it
again, and if there's a mistake, there's a counter notice procedure.
They just send a counter notice.  And if a user sends a counter
notice, the copyright -- the ISP is absolved (sic).  They have to
put the information back up, unless the copyright owner sues that
user.

So, there's no evidence here that there was any issue with
the -- that there was any counter notices sent, or any notices sent
at all.  So, Hotfile itself prevented the counter notice process.

Anyway -- I'll leave it at that.

MR. THOMPSON:  Your Honor, just a couple -- Could you put
up 365, please?

Mr. Fabrizio has argued that his clients were not able to
track repeat infringers, yet they blocked all discovery into the
anti-piracy investigative techniques used by his clients.  These are
the most sophisticated anti-piracy companies in the world.  They
identify people all the time.

And, Your Honor, one step back.  The reason I put this
slide up, it shows that the cases -- This is just two quotes out of
cases showing that the content owner identified two sites created
for the sole purpose of publishing.  That's the ALS Scan case.  In
the Flava Works case, which is the recent Judge Posner decision, the
DMCA notices sent there specified the users identified as repeated
infringers.  The DMCA notices themselves said, "Here are the repeat

infringers.  Please take them down."

The content owners do this.  The studios have the capability of doing it.  They're hiding behind an investigative privilege.  We don't have any discovery on the capability, although I do know it's formidable.  They have huge anti-piracy departments and great capabilities far, far superior to anything Hotfile could ever hope to do.

And, lastly, Your Honor -- and I appreciate your patience -- the DMCA, remember it was a grand bargain.  What -- The service providers get a safe harbor; that's what we're talking about.  On the other hand, the content owners got a lot.  They got the notice and takedown proceeding.  They don't have to go through an adjudication.  They can just say, "Take it down."

They also got subpoena power.  If they want to know who is behind that address that has the infringing material, they have the right to ask Hotfile, or any other service provider, to provide that information by summary subpoena power.  It was a balance.  Part of that balance gives a safe harbor to someone like Hotfile when they're trying to comply with their end of the bargain, just like the studios should be complying with theirs.

Thank you, Your Honor.

THE COURT:  All right.  We'll resume at 1:30.  And I anticipate we won't have to go all afternoon, but, you know, I'm wrong a lot.  But we'll start up at 1:30.

(Court recessed at 12:20 p.m.)

              (Court reconvened at 1:40 p.m.)

         THE COURT:  All right.  What I'd like to do now is spend a

brief -- Well, first, I have a question for defense counsel,

Mr. Thompson.  The DMCA agent currently for Hotfile is who?

         MR. THOMPSON:  He's actually in the courtroom.  It's

Constantin Luchian.

         THE COURT:  Hello there.

         And is there an e-mail -- If you go on Hotfile's website,

is there an e-mail address for him, reach him at abuse --

Reportabuse.com, or is there only a post office box?

         MR. THOMPSON:  Well, I believe there's both on the

Internet, and there's the registration with the U.S. Copyright

Office.

         THE COURT:  Right.  No, I was just wondering if there

was -- I know the name, the address is a post office box.  I just

wanted to make certain that that e-mail address was in some way

linked to him and was still up and running.

         MR. THOMPSON:  Yes, it is, Your Honor.

         THE COURT:  Okay.

         All right.  I think what I'd like to do now is spend a

brief amount of time on actual knowledge -- Viacom actual knowledge

under 512(c).  I realize that if we -- if there's a resolution on

(i), we don't get to (c).  But let's, since everyone is here, have a

conversation about that.  And it could be as simple as kind of a

"Letterman, give me your top 5" actual knowledge pieces of evidence

and a little -- I'm sure you'd like a little more discussion on
that.

          MR. FABRIZIO:  Your Honor was absolutely right.  Obviously,
we don't get to the issues of actual knowledge or red flag knowledge
if the Court rules on 512(i).

          Initially defendants have taken the position in this case
that the only way they can acquire knowledge is through notice from
copyright owners, and that's simply not true.  That would write out
of the DMCA the two other provisions dealing directly with
knowledge -- one providing for actual knowledge, and one providing
for what is commonly referred to as red flag knowledge.

          In terms of top 5, Your Honor, first, Hotfile actually
assisted users.  There are communications back and forth between
Hotfile and users, where users are identifying individual items that
they are engaged in infringing and seeking technical help from
Hotfile, where Hotfile engaged them on that process.  That would be
one.

          Number two, Hotfile designed its user communication system
such that whenever a user sends a message, it provides Hotfile with
certain information about that user.  Hotfile obviously did that for
business reasons, so that they could understand more about their
users.

          One of the things that those user communications provide to
Hotfile every time is something called the last DL field, which is
the last download page on Hotfile that user had visited.  Those last

DL field indicate, very frequently, that the user is coming from a page that is obviously infringing, just simply by the name.  And obviously we believe that is actual or, at a minimum, red flag knowledge.

THE COURT:  But is this -- I mean I think this evidence is important for the secondary contributory -- however you now categorize Grokster and other liability theories.  But is this Viacom?

MR. FABRIZIO:  Yes, Your Honor, we believe, actually, in some ways, it's a lot more than Viacom.  Here we have somebody sending Hotfile a message.  Viacom, the Court noted that there were several e-mails that potentially satisfied red flag.  But here we have multiple e-mails that are identifying individual links, individual URLs.  So, at a minimum, we believe that is -- that from those URLs, a reasonable person would understand that there's copyright infringement.

Three, Your Honor, goes back to -- By the way, Your Honor, there are in many of the works in suits that are covered by those two elements of knowledge.

Three, Your Honor, goes back to something you discussed with Mr. Thompson, and that is a period of time prior to the time Hotfile instituted hash blocking.  Again, we still don't know when Hotfile instituted hash blocking.  Mr. Titov says in summary judgment that it was in August, but at his deposition, he said he didn't know.

MR. THOMPSON:  No.

MR. FABRIZIO:  And this is also -- But let me put that aside for one second, Your Honor.

Prior to the time they implemented hash blocking, when a user uploaded a file, that user could get six different URL links to that file.  So, one upload, and you get six different links pointing to the same exact file.  This is the same user gets those six links.

If copyright owners found one of those links out in the Internet wild at some point and gave Hotfile specific notice of that one link, Hotfile would only take down the link and would leave the content available to that user through the other five links. Clearly, in that case, Hotfile had actual knowledge.

Four -- I'm getting close to my top 5 -- four is related to that.  It wasn't just the same user that got multiple links. Hotfile would only keep one master copy, no matter how many users uploaded the identical -- hash identical copy of that file.  So, if a thousand users had uploaded the same movie, and they all had links to them, and Hotfile had been given specific instructions by a copyright owner that that was an infringing work, Hotfile still wouldn't remove the work from its system.  It would simply disable that single link, leaving the work vulnerable to be infringed through all of the other, in hypothought posited (sic), hundreds of thousands of links.

Five and six, I'll do them together.

THE COURT:  Okay.

MR. FABRIZIO:  Hotfile personnel themselves downloaded some works that are infringing.  And in tutorials and things of that nature, in sort of teaching people how to use various aspects of their service, they illustrated them in certain instances with works that were copyright infringing works, which not only obviously indicate their knowledge of those works, but as we get to inducement, as other courts have found, it sends an unmistakable message to the world that when they're illustrating tutorials with copyrighted works, that Hotfile condones that type of copyright infringement.

So, that would be my top 5 or 6 in terms of actual or specific knowledge.

THE COURT:  I'm aware of the other courts' discussion of use of -- what was it -- nothing compares to you and Aimster something is a pedagogical tool.  Which copyrighted work was used in Hotfile's tutorial?  I know there's Dave Matthews, but I think he allows you to record his concerts.  So, I don't know -- I saw that mentioned, but I wondered if that was a copyrighted matter.

MR. FABRIZIO:  Your Honor, let me check on which specific works were in the tutorials.  I believe one of them was Vicious Rumors, I believe one of them was Pussycat Dolls --

THE COURT:  Don't they allow everybody to use their films and videos?

MR. FABRIZIO:  Your Honor, not that I'm aware of.  And, frankly, they wouldn't have authority to do them.  The copyright

owner of those works would be the record company that owns them.

THE COURT:  Okay.  But my point is if -- I have not viewed it, but if Mr. Matthews is performing in concert, and it's videoed and it's uploaded that concert, and he allows that to be filmed, that isn't necessarily a copyrighted work.

MR. FABRIZIO:  It would still be a copyrighted work, Your Honor.  It might very well be allowed, with the copyright owner's authority.  I'm not trying to make a simple question more complex, but it's not clear that any band would allow further distributions of their work.  Even bands that allow people to tape their concerts and take them home restrict the ability of people to further distribute them.  And record companies tend to own rights to things once they are actually recorded, not the actual artist.

So, it's not clear at all that that would be an allowable use.

THE COURT:  Okay.

MR. FABRIZIO:  But it's hard to know without more specifics.

THE COURT:  And perhaps the reason I'm being overly persistent in the DMCA context of knowledge and Viacom, I think specific infringing moments you have to be more focused than, say, talking about knowledge in another context of liability, is --

MR. FABRIZIO:  But given -- If you're following the YouTube decision, that's absolutely correct, Your Honor.  There is more specificity required.  But that doesn't necessarily mean that the

red flag itself has to be the infringing work.  Or else, if you
had -- If your red flag had to be the infringing work itself, then
that would become actual knowledge.

So, you can have -- Red flag can be you can be aware of
facts and circumstances that would let a reasonable, ordinary person
believe that a particular type of work was infringing.

THE COURT:  And that brings me -- And I don't know -- You
can tell me if I'm not fixed on the issue in its appropriate
context.  Is this a damages question or is it one of statutory
construction?

So, I've asked for the top 5, and you've told me there are
multiple others, many multiple others.  But how -- Is there a
measure of how prevalent or how extensive the infringement has to be
before one announces an actual knowledge finding, or is if -- even
if there were five instances, the inability to avail yourself of
safe harbor would still be --

MR. FABRIZIO:  I think I understand what Your Honor is
asking.  I believe the answer is, it doesn't generally matter.  If
you have actual knowledge or red flag knowledge -- Let's call it
disqualifying knowledge.  If you have disqualifying knowledge, Your
Honor, that is enough, even if it is only of a few works.

Now, one could get into a debate as to whether -- And you
would be disqualified as to those works.

THE COURT:  Right.

MR. FABRIZIO:  One could get into a debate as to whether

your knowledge of specific infringements has reached such an epidemic level that you would be disqualified from safe harbor generally.  And clearly we believe that is what Congress intended, not that copyright owners had to prove infringement on a one work-by-one work basis, like other areas of the DMCA that disqualify you from safe harbor wholesale.  We don't believe that the knowledge requirement intended to be completely different.

So, I think -- Does that answer your question?

THE COURT:  It does.

I did wonder did Viacom alter that analysis or dynamic?

MR. FABRIZIO:  I believe it's fair to say, Your Honor, that the Second Circuit decision in Viacom probably erred much more on the side of your liability would be limited to the specific works. But I think there is still much about that decision that is left to be worked out.

THE COURT:  Okay.

MR. FABRIZIO:  Both in the district court in Viacom and in the courts around the country.  I don't think we can look at one case and say that defines this area of law.

THE COURT:  All right.  Thank you.

All right.  Mr. Thompson, now you get to give me your top 5 list, and you can have a 5A and B.

MR. THOMPSON:  Your Honor, it makes more sense for me to say YouTube is the top one through five, and then just respond to Mr. Fabrizio's top 5 list.  But I want to remind the Court that both

parties have provided a summary of that YouTube decision, or the

Viacom decision, and Hotfile's was document 444 in the Court's

docket.  At page 2, we describe the holding.  It couldn't be clearer

on this point.  "Both apply to specific instances of infringement."

That is both red flag knowledge and actual knowledge apply to

specific instances of infringement.

        And then with respect to the questions you were asking

Mr. Fabrizio about the damages impact, the remand is very clear.

"By definition, only the current clips in suit are at issue in this

litigation.  Accordingly, we instruct the district court to

determine on remand whether any specific infringements of which

YouTube had knowledge or awareness correspond to the clips in suit

in this action."  You have to have the clips in suit, they have to

be the plaintiff's clips.

        I was listening to Mr. Fabrizio go through his top 5 or 6

list, and he never identified any work, any link that belongs

allegedly to these plaintiffs.  He did say in passing many of these

were works in suit.  I think if he actually had evidence of a work

in suit, and actual knowledge of it, we would have seen it cited.

        What he's referring to were the e-mails that were received

by Hotfile in the Hotfile abuse mailbox.  700,000 e-mails have been

produced in this case.  That's the e-mails that Mr. Fabrizio

explained automatically generate certain fields, like the last

download link.  If he had evidence of actual knowledge, we would

have heard about it, because none of that relates to specific links

in suit.

          With respect to the specifics of that, he mentioned that
the last download link would reveal the content of the file that it
was corresponding to.  As we've seen from what I put up this
morning, Your Honor, the link doesn't necessarily have any
information about what the content of the file is, and there's
700,000 files there.  So, even putting aside that they're not the
links in suit, that doesn't give Hotfile notice necessarily of
anything.  700,000 files are not going to be reviewed individually
by anyone at Hotfile.  They can try to respond.  They have certain
templates for responding to this fix or that technical fix.  But
that's just surely too many links to respond to.

          It also doesn't tell you, even if the link appears, by the
way, to say contain Dave Matthews.  Is that infringing?  Does that
give you notice that there's infringement?  Well, it really depends,
as Mr. Fabrizio alluded to, of what Mr. Matthews authorized.  You
can't tell that from the link, of course.

          And Pussycat Dolls, by the way, you correctly remembered
the details that are in the briefing.  That's from the UMG trial
court decision, 665 F.Supp.2d at 1099, and it's note 13, where it
makes very clear that that particular entity authorizes that type of
use.

          Now, I think Mr. Titov was -- sorry -- Mr. Fabrizio was
mistaken when referred to Mr. Titov's testimony.  He said
Mr. Titov's deposition testimony didn't identify August of 2009 as

the time when hash blocking was adopted.  In fact, he did.  As a matter of fact, after we came back from Bulgaria, the studios pursued discovery seeking software source code to try to determine whether Mr. Titov's memory was accurate.  We had a motion practice (sic) before Judge Turnoff on that issue.  And there's nothing in the record that would contradict Mr. Titov's memory, which is that the hash blocking was adopted about the same time as the special rightsholder account.  And the special rightsholder account is established as August of 2009.  And as I showed you this morning, there's a contemporaneous e-mail suggesting they're working on the hash blocking at about that same time.

        Mr. Fabrizio also mentioned in his top 10 list downloaded links by Hotfile personnel.  Well, first of all, we object to that evidence, because it's not proper.  Those links weren't entirely downloaded.  What they were were partial downloads by Hotfile personnel checking its system.  There's no evidence that a full download was ever completed that would allow someone to actually view the content of the download.

        But more importantly, Your Honor, none of that were links in suit.  And I'm told that in the record, we've established that all of those links had, in fact, been submitted to the vCloud9 filter, and none of them were found to be blocked by the filter.

        So, Your Honor, on this point, I think the evidence is very strong.  You would have to disregard the Second Circuit's decision in Viacom, you'd have to disregard the Ninth Circuit's decision in

Veoh to agree with Mr. Fabrizio that the specific links in suit are
not required to provide the actual or red flag knowledge.

          THE COURT:  Well, is it your -- And this is where I'm --
So, Viacom did clearly impose some more stricture and stringency as
far as the specificity of the infringing material being known either
through actual or red flag knowledge.  But did Viacom also say once
you've identified ten files, you are limited -- you can get safe
harbor for only those ten -- No, I'm saying this backwards.

          MR. THOMPSON:  I think I understand the question.  And I
think Viacom on that remand direction is pretty clear.  There were a
handful of clips that were identified as allegedly infringing that
belonged to the plaintiff, Viacom, or one of the other plaintiffs in
that case.  And the Second Circuit on remand said, "You're
restricted, district court, to those specific clips," they're
called.

          THE COURT:  So that only those clips would allow the
plaintiff's suit to go forward.  Safe harbor was available
everywhere outside those specific clips.  So, the Second Circuit is
saying, you cannot infer, you cannot circumstantially find more
knowledge as to other content being infringing; you are limited to
those five files.

          MR. THOMPSON:  That's certainly how we read the remand
instruction.  And just to repeat the words used again, "We instruct
the district court to determine on remand whether any specific
infringements of which YouTube had knowledge or awareness correspond

to the clips in this action."  Clips in suit in this action.

So, the district court is to determine, did they have knowledge or awareness of any of the specific clips that were asserted and owned by the plaintiffs in this action.

THE COURT:  Okay.

MR. THOMPSON:  Thank you, Your Honor.

THE COURT:  All right.

MR. THOMPSON:  If the Court please, I have a very short segment on estoppel, if it's time for that.  Or we obviously can move on.

THE COURT:  Sure.

I am not fond of the estoppel argument, but -- So it's short, that would be better.  Not to say that I'm not going to be persuaded otherwise because of both the brevity and the focus of what it is you're going to show me.

MR. THOMPSON:  I will strive for that, Your Honor.

THE COURT:  You want to respond?

MR. FABRIZIO:  I don't want to take away from Mr. Thompson's estoppel argument, but can I just briefly respond?

THE COURT:  Yes, you may.

And so we're all on the same page, we'll have the estoppel, and then we'll go into the discussion of secondary or contributory infringement and how it is, characterize it.

MR. FABRIZIO:  Thank you, Your Honor.

First, I just want to make sure the Court understands the

difference between the works that are in suit and the works that are
in summary judgment.

We identified, in response to an interrogatory to identify
all the works in suits, almost one million URLs.  We only moved on
some smaller number, because we felt that that number met the
summary judgment standard, whereas the others, there might have been
more disputes, and it might have been a trial issue.  So, it's not
simply the URLs that are attached to our summary judgment paper that
are the works in suit.

Second, as I said, Your Honor, there is no denying that the
Viacom decision said what it said about knowledge being tied to the
works in suit.  That decision doesn't bind this Court.  And we don't
necessarily agree with the decision.

If you look at almost every other aspect of the DMCA,
whether it's designated agent, repeat infringer, financial benefit
and ability to control, when you lose your safe harbor, you lose
your safe harbor.  You don't do it on a work-by-work basis.  In the
ALS Scan case in the Fourth Circuit, speaking about the knowledge
requirement, said that your safe harbor ends when your innocence
ends.  And when you get knowledge that someone else is using your
system to infringe, that's when your innocence ends.  So, that is
another circuit level case that we would suggest your court more
fairly captures what Congress intended.

Just picking up on a couple of small points.  Mr. Thompson
said that, you saw from the earlier URL he showed, that you can't

tell what these are.  Well, that URL very clearly said JDownloader. And some of them are even more clear than that with a full title. There may be some that aren't.  But where a reasonable person would have been put on notice, that's the standard.  And the suggestion that there were so many e-mails that they didn't look at them or couldn't look at them, well, Your Honor, it's their burden, not ours.  It is their burden to prove that they do not have disqualifying knowledge.  It was their burden to put in evidence of a lack of actual knowledge of all of those 700,000 e-mails.  They did not do that.  They did not put in testimony from Mr. Ianokov. And they reason they didn't put in testimony from him is because when we tried to depose him, and filed a motion to get his deposition, he apparently quit the next day to avoid having to give testimony in this case.

So, defendants cannot complain about the fact that there is no evidence in this record on that.  It was their burden to put it in there, not ours.

On the links partially downloaded, as we've pointed out in our papers, the point is not whether the link was fully downloaded and whether they, in fact, infringed or pirated a work.  Whether a link is fully downloaded or partially downloaded, or they just see it, it's at least a red flag.

THE COURT:  Its notice.

MR. FABRIZIO:  Yes, it's notice.

And down to the minutia, Pussycat Dolls, while it may very

well be that the Pussycat Dolls authorized their works to be up on a video viewing site, that does not mean that they authorize full, unfettered distribution across the Internet.

And, again, Your Honor, here it's not just notice. Here it's when you put those things in your tutorials, you're sending an unmistakable message to the world at large that this is a place that condones copyright infringement.

Thank you.

THE COURT: All right, Mr. Thompson, estoppel.

MR. THOMPSON: Thank you, Your Honor.

The issue on estoppel is very simple: Whether the studios should be estopped from now arguing that Hotfile's repeat infringer policy, which we heard a lot about this morning, was unreasonable. And here's the basis for why we believe there's a factual issue for the trier of fact. Here's the timeline we saw this morning. I'm not going to go through all the counter measures. We've talked about them some as well already.

The point is, Your Honor, during this period of time, from the start-up of 2009 until the lawsuit was filed, it's about two years, Hotfile was hearing nothing but positive interaction with these studios. And they did interact.

Remember that Warner Brothers, in the upper left-hand corner, you can see here, asked for the SRA tool and said having such a tool would be ideal in order to curb piracy. So, the cooperation on the surface for Hotfile appeared to be working. The

studios are telling us what they want to help them, we'll help them. We'll give them the information they want.  We'll follow their suggestions.  And as Mr. Fabrizio alluded to, there were lots of compliments.  The interaction was always very positive, "Thank you for your copyright compliance."  That's on the surface.  That's what Hotfile knew.

But what the studios were not telling Hotfile was, during that two-year period, they had targeted Hotfile to bring this case to make -- I assume they want to make a precedent involving cyber lockers.  They targeted Hotfile.  They were planning on bringing this, we know, for well over a year.  They were investigating Hotfile.  They knew very well Hotfile's policies, including the repeater infringer policy.  Instead of telling Hotfile, "We think your repeat infringer policy is inadequate, fix it," as they did with respect to the SRA account, they said nothing.  They kept silent.

Your Honor, they should be estopped now from asserting that the repeat infringer policy, as used before the lawsuit, was inadequate or unreasonable.  And here we just have to look at one case from Field vs. Google, where Mr. Field was silent to Google. He didn't tell Google that he didn't want cached links.  That's essentially the way Google records it.  He didn't like that.  He didn't want that copied.  But he stood silent, just as the movie studios have here.  And the Court found there that Google detrimentally relied on that silence.

And here's the important part.  Where's the damage, where's the prejudice to Hotfile?  Well, the prejudice to Hotfile is this lawsuit, just as Google experienced.  "Had Field communicated their preferences to Google, the parties would have avoided this whole lawsuit."  The same is true here.  Had the studios told Hotfile a year before filing suit, "We'd like you to do a three strikes policy," we know from the record Hotfile would have responded positively.  They were cooperating.

So, the studios now should be estopped from coming back and saying, "Well, you relied on our silence, but now we're going to hit you with this lawsuit and seek the ruinous damages they're after in this case.

THE COURT:  I didn't mean to look -- I was furiously flipping through my huge outline here, but -- And I can't find it, of course.  But it seems to me that for an estoppel argument, you need to demonstrate that the plaintiffs actively contributed to the infringement of their own product.  I mean it has to be -- I think it has to be more than shenanigans or strategy or gamesmanship or one up.  I mean it has to be they assisted -- There has to be some -- one, that there was infringement, and, two, that they helped to have a recognizable estoppel defense.

MR. THOMPSON:  Your Honor, anticipating -- What's a little different here, of course, is this is an affirmative defense.  This is not, as was the case with Google, an alleged infringement.  So, it admittedly is distinguishable in that way.

However, look at the conduct by Mr. Field.  Silence.  He
knew Google's practices; he knew how Google operated.  He chose not
to tell them of his preference.  Yet he came around and later
complained and said, "You're infringing."

Here, these studios knew of Hotfile.  They were
investigating them.  Of course, we don't have the discovery record
as to what they were doing when, because that's their work product.
But we knew they were investigating.  There's no dispute about that.
They're very sophisticated.  They knew Hotfile's policies.  Yet they
choose not to tell Hotfile that they objected to the repeat
infringer policy.  They did tell Hotfile a lot of other things, as
we've seen.

They chose to endorse the SRA.  They chose to compliment
Hotfile over and over again.  All of that could reasonably have
led -- and this is a triable issue -- Hotfile to detrimentally rely
on their silence on the repeat infringer policy.  They knew about
it, they said nothing.

THE COURT:  Are the two necessarily mutually exclusive?
So, you're being lauded for practice, but these businesses are
engaged in an ongoing investigation of precisely how these practices
are playing out.

I think for an estoppel, at least in the Eleventh Circuit,
what you would have to prove is that the intent of the studios was
to that you rely on these representations and continue the
infringement.  No?

        MR. THOMPSON:  Well, and continue to not change your repeat

infringer policy in reliance on those statements.

        And, Your Honor, again, it's a reasonableness issue, and

the question is whether the Hotfile personnel who were receiving

these communications from the movie studios reasonably didn't change

their repeat infringer policy, because they had assumed that if the

sophisticated studios, the content owners, had an objection, they

would have told them, just as they had told them, "Please get us

this special takedown tool."

        Now, Your Honor, I understand it's our burden.  I

understand it's a question of intent.  But we also have to face the

reality that all discovery is foreclosed about their investigation.

They're not going to tell us what they knew when.  So, all we have

are the facts and the timing, which I believe could lead to an

inference that they deliberately chose not to say anything about

their repeat infringer policy, apparently preferring to do just what

they did here, to complain about it and to bring the lawsuit.  And

Google suggests --

        THE COURT:  I guess that what I'm -- And maybe I'm doing

the backwards or circuitous way to it.  I certainly see this as an

argument -- I mean if this ever goes to trial -- Which, by the way,

might I remind everybody we were talking about winnowing everything

down so that there wasn't a trial, not, of course, that everyone is

bound to that, but I just thought I'd bring that up a quarter after

two.  It's just a good point to bring up at some point.

But if there was a trial, I can see the argument being
advanced to a jury, how can these folks be heard to say that this
was an inadequate policy when -- and screen 1, screen 2, screen --
But I don't know under an estoppel argument if it is sufficient for
a Court to say, "I would not consider the DMCA challenge. I cannot
consider that because of these e-mails or letters or whatever."

        MR. THOMPSON: And, Your Honor, all we're asking for is the
ability to make those arguments to a jury or to the trier of fact as
this is estoppel. It may well be an equitable issue. Present that
as part of the entire milieu of facts regarding the DMCA.

        Remember, by the way, the SRA was like giving the keys to
the kingdom to the movie studios. Hotfile trusted them. We didn't
have to give them this automatic access.

        And let me just -- I probably wasn't clear this morning in
trying to explain this to you, but the SRA gave Warner Brothers, who
used it extensively, the right to automatically take down all the
links it saw fit to take down. It didn't have to go through the
DMCA notice process, where a notice would be given to Hotfile, and
then Hotfile would look at the notice and, if necessary, provide
notice to the uploader. The SRA is an extraordinary remedy, in
short, and because --

        THE COURT: But it didn't -- Because they didn't know whose
link it was, they couldn't terminate that person's account.

        MR. THOMPSON: They couldn't terminate because they didn't
ask for it. But they do have subpoena power, and they do have the

most sophisticated anti-piracy technology that's trade secret, we don't know about, but they are very good at it.

But, Your Honor, it's just that if you look at it from estoppel, is it reasonable for Hotfile to say, "We're not just going to comply with the law here, we're going to give you this extraordinary get tool, Warner Brothers, you asked for it, you asked for this special access, we gave it to you, you say it's ideal" -- Isn't it reasonable, or at least a triable issue as to whether it's reasonable for Hotfile to assume that if Warner thought there was something else wrong, they would have said something?

THE COURT:  Let me ask you, since you brought up the SRA. I had a question.  I did pull the Myxer case, and I apologize for not knowing, but in the terms of use that Hotfile posted, did it have the "artist must also agree that I understand that uploading material that violates Myxer's term of use will result in a canceling of my account"?  Was that language in the Hotfile?

MR. THOMPSON:  I'll look to see the exact language, but it's very close to that.

THE COURT:  Okay.

MR. THOMPSON:  Thank you, Your Honor.

THE COURT:  Thank you.

All right.  Now, onward.

MR. FABRIZIO:  I'll be very brief, Your Honor.

Your Honor spoke of Exhibit 1, Exhibit 2, Exhibit 3, Exhibit 4 in front of the jury.  Well, what those e-mails would be

is a junior Warner person saying, thank you, literally, thank you. When Warner asked for their SRA account daily limit to be increased periodically, Hotfile would do it.  And the Warner person who made the request said thank you.  That's it.  That's the sum total of the evidence from any plaintiff in this case.  Nothing from any of the other studios, just those four e-mails saying thank you from Warner Brothers.

This would be Exhibit 5, Your Honor.  Because none of those comments, none of the thank you's had anything to do with the repeat infringer program.  They all had to do with the SRA account.  To my knowledge, this is the only thank you that had to do with anything related to the repeat infringer policy.

This is a thank you by Bay TSP, who is not one of the plaintiffs in this suit, and we don't even know whether Bay TSP was acting on behalf of a plaintiff.  They act on behalf of hundreds of copyright owners.

But, Your Honor, this is the e-mail I showed you earlier where Hotfile had just misrepresented its repeat infringer program. This is the place where they said, "We have a two-strike policy.  We warn our users, and we block by IP address."  And in response to being told that about the repeat infringer policy, somebody at Bay TSP said, "Thanks, that sounds great," or words to that effect. That can hardly give rise to estoppel, Your Honor.

THE COURT:  And who -- I had written it down earlier, but in October of 2009, who was the author at Hotfile abuse?  The

responding person.

          MR. FABRIZIO:  From the Hotfile side, Your Honor, or -- I
believe it was -- I think it was Ianokov.

          THE COURT:  You told me earlier, Mr. Thompson.  I just
don't have it available in my notes.

          MR. THOMPSON:  I believe it was Andrei Ianokov for most of
those.  It's impossible to know exactly, but that was his
responsibility at the time.

          THE COURT:  All right.  Thank you.

          MR. FABRIZIO:  The SRA, Your Honor, not to trivialize it,
but the reality is, is that the SRA is nothing more than an
automated DMCA notice.  And it only automates the process from
Hotfile's side.  Copyright owners still have to go to hundreds,
maybe thousands, of link sites around the Internet to find these
links.  It gives them a quicker way to give Hotfile notice of them.

          Hotfile has stipulated in this case that the SRA notices
are DMCA notices.  So, to give them some special status is not
warranted, Your Honor.

          Thank you.

          THE COURT:  All right.  We're going to turn now to the
whole Grokster material contribution.

          MR. FABRIZIO:  Yes, Your Honor.

          THE COURT:  Now, I understand that depending on your
interpretation of Fung and -- this all gets a little tangled up.
But the way I'd like to -- that will help me understand it better is

to just start with Grokster inducement, material contribution, distribution of a commercial product, vicarious infringement. And for each of them identify for me whether you think Betamax is applicable as a defense.

         MR. FABRIZIO:  Okay.  I can answer that question as a threshold matter.

         THE COURT:  Okay.

         MR. FABRIZIO:  The staple article of commerce or a substantial non-infringing uses defense is not applicable to a Grokster-induced claim.  That's clear.  It is also not applicable to a vicarious infringement claim.  Every Court that has looked at that has said the same.  It is potentially applicable to a -- what we call a traditional contributory infringement claim, where it's a knowledge plus material contribution.

         THE COURT:  Because of the LimeWire decision?

         MR. FABRIZIO:  No, Your Honor.  It's potentially applicable in the sense that it applies to contributory infringement.  However, it does not apply in this context, because unlike in the case of Sony Betamax, where there was a distribution of a product into a stream of commerce, or as was the case in Grokster itself, where there was a distribution of a software product into commerce, these defendants, Hotfile, it operates a site that maintains an ongoing relationship with the infringers throughout the period of the infringement.  And every Court since Grokster that has looked at this has acknowledged that that ongoing relationship is critical and

means that the staple article of commerce or substantial

non-infringing uses defense does not apply.  And that backs up, Your

Honor -- If I can explain it further, that backs up to actually the

Sony case.

          THE COURT:  Right.  Sony said that it was -- Go ahead.  You

tell me what Sony said.

          MR. FABRIZIO:  Sony said that the last time Sony had any

interaction with the user of the product was at the point of sale,

and that there was no ongoing relationship.  In Sony, the Supreme

Court also acknowledged that there are many instances where the law

allows for contributory liability without regard to the staple

article of commerce doctrine where there is an ongoing relationship.

          Since Sony, the Second Circuit in the Cablevision decision,

otherwise known as -- also known as the Cartoon Network's decision,

looked at the role of ongoing relationship and identified it as

something that was critical to the decision in Sony.  And since

then, you've had two district courts, I believe, two district

courts, one being Flea World in the District of New Jersey, and one

being Usenet in the Southern District of New York -- both cited in

our briefs, Your Honor -- in which courts have given a very rational

explanation for why the Sony Betamax doctrine does not apply to a

service that maintains an ongoing relationship with the infringers

during the course of the infringement.

          The Supreme Court, facing what they called a Hobson's

choice -- it was an all or nothing, either I let the product out

into the stream of commerce or I hold it back altogether.  But it
has been long since recognized that when there's an ongoing
relationship, you can allow the non-infringing uses to continue
while stopping the infringing uses.  And the concerns that animated
Sony simply don't apply.

        Now, I will -- As Your Honor would like, I'll start with
inducement and work my way back.  I had thought that it actually
would be easiest, Your Honor, if I started with vicarious.  And to
explain.  If Your Honor were to rule that the defendants are not
entitled to safe harbor because of 512(i), then the easiest
disposition of the remaining liability issues in this case is with
vicarious infringement.  There is no question -- There can be no
real question that defendants are liable under the common law
standard of vicarious infringement.  And then that would essentially
dispose of the underlying liability case.

        THE COURT:  Well, you may start with that.  I'm interested
why you think that.

        MR. FABRIZIO:  Why I think --

        THE COURT:  Vicarious --

        MR. FABRIZIO:  Is the easiest?

        THE COURT:  Yes.

        MR. FABRIZIO:  Well, it's the easiest on summary judgment
for Your Honor because there are no fact issues that are or could be
in dispute.

        The disagreements that the parties have seem to be over the

legal issue.  In order to be liable for copyright infringement under the common law of vicarious infringement, Hotfile needs to have the ability to supervise the infringement and receive a financial benefit attributable to that infringement.

Now, on the ability to supervise or control the infringement, it is firmly established by every court, I believe that has considered this in the common law context, that the ability to block access to files or the ability to block users is evidence of the ability to control.  Nothing more is needed.

The debate in the courts, and some of the cases defendants had pointed to, the debate in the courts was whether the DMCA had a higher standard or whether it was the same as the common law.  But when you're looking at the common law, case after case says ability to block files, ability to block users, that's enough.  As a matter of fact, that's exactly why the courts looked at the DMCA and said, "Does it have a higher standard," because they said most service providers, like a Hotfile, clearly have the ability to block users, clearly have the ability to block files.  So, they questioned whether something more was necessary in the DMCA context.  But in the common law context, that's all that's necessary, and that's all the Court has to consider if you rule on 512(i).

On financial benefit, there really also can't be any fair basis for dispute.  You don't need to -- The law has recognized that a defendant receives the financial benefit if infringement acts as a draw to bring users to their site.  On this record, Your Honor,

there can be no reasonable question that copyright infringement acted as a draw.  Notably, Your Honor, it does not have to be the sole draw.  It does not even have to be a predominant draw.  It just has to be a draw.  As the courts have said, any causal connection between infringement and revenues satisfies the financial benefit test.

          Here, with the level of infringement that we saw on Hotfile, that's sort of beyond question.  But if you want to look at it further, when Hotfile started terminating its repeat infringers, its revenues went down 94 percent and its traffic went down, I believe, 71 percent.  So, there can really be no serious debate that Hotfile meets the financial benefit test of vicarious infringement.

          That's why, Your Honor, I wanted to start there, because I don't see any fair ground for dispute.  If they don't have a DMCA defense, they are liable under vicarious without any question.

          Should I continue to work back at contributory?

          THE COURT:  Sure.

          MR. FABRIZIO:  Here, again, I believe --

          THE COURT:  I'll stop you, because -- But isn't -- And your reading of the record is perhaps much more comprehensive than mine, but isn't that a triable issue, the direct financial benefit?  If nothing else isn't --

          MR. FABRIZIO:  How could it be, Your Honor?

          THE COURT:  Well, because the models that I show -- that

I've seen say that Hotfile generates its revenues from 9.99 a month, all its users.  Indirectly, I suppose the users come to Hotfile's storage locker because of the infringers.  I guess that's your argument.  But how is -- Is that something -- On a summary judgment, how is that not something that a jury would have to suss out with -- Well, I guess stop, question mark.

        MR. FABRIZIO:  Well, Your Honor, because I don't believe the underlying facts are controverted.  It's no different than any of the other cases where the revenues of the business were tied to attracting users.  It's no different from Grokster, even though they had an advertising model.  The subscription model and a advertising model doesn't make the difference here.

        THE COURT:  Right, but in those cases -- I mean maybe I'm taking issue with something you told me at ten o'clock about this being the most egregious of all cases.

        The thing that's problematic in Hotfile's presentation is the fact that -- and it's one of the e-mails -- we're protected because we don't know, and nobody else knows either, and nobody knows the names of the people and who's doing the uploading and the downloading.  But it's that quality of this case that I think takes it away from Napster, Grokster, where the Court said the only reason, the only reason these people were in business was to infringe.  There just wasn't anything else happening.

        So, even if we don't mix in the Sony Betamax analysis, there was still that idea that their sole purpose in being was to

assist others, induce others to infringe.  And I don't -- And in

that regard, you've got a direct financial benefit from the

infringement.

I don't know that it's as linear here.  It kind of goes to

the right, then it goes up, and then it goes to the right again.

So, I don't know that that's something on summary judgment that is

knowable.

MR. FABRIZIO:  Your Honor, maybe I'm being dense, but I

actually fail to see the difference.  In each of those cases, the

defendants said exactly the same thing as these defendants about

multiple other non-infringing uses.  Mr. Thompson said all those

other systems were just for movies and music.  That's not true.

After Napster, which was just music, all of the systems

allowed all types of content, exactly like Hotfile.  And the

evidence of the level of infringement on those sites is comparable

to exactly what we're seeing in terms of Hotfile -- high 80s, low

90 percent of use of the downloads from infringement.  So, I don't

see that they're different at all.

But, again, Your Honor, even if you want to credit all of

Hotfile's suggestion that there are lots of other uses here, it

can't be denied that users are attracted to their service for

infringing content.  Again, if you want to give them every benefit

of every doubt, you could say it may not be the predominant reason

that they're attracted, which obviously isn't true factually, but

you could say that.  But the standard is it just has to be any draw,

a draw, any causal connection, and it's enough.

          And I don't see -- Your Honor, I believe when you look at what happened when Hotfile terminated its repeat infringers, the only thing that changed from February 11 to I guess six months later, when their economist looked at their revenue again, the only thing that had changed in that time period is that Hotfile terminated repeat infringers.  Immediately upon getting rid of its blatant repeat infringers, its whole business tanked.  Its revenues went through the floor, 94 percent drop-off.  It lost users at a rate of 71 percent.

          Again, if the standard is any causal connection between infringement and revenues, it's as direct as it gets, Your Honor.

          THE COURT:  Okay.

          Mr. Thompson, would you rather do this one by one or would you want to wait until Mr. Fabrizio --

          MR. THOMPSON:  I'd welcome the opportunity to talk to this point, Your Honor.

          THE COURT:  All right.

          MR. FABRIZIO:  Your choice, Your Honor.

          THE COURT:  All right.

          I leave it to you.  It's getting late in the day, and if you'd rather sit at your tables -- I never understood why they designed those microphones that way, because they're only any good if you sit down.  And I know, especially if you're old school, you like to stand.  I count myself as old school.  But if you'd

rather -- Instead of popping back and forth, if you'd rather sit at your table, that would be fine.

          MR. FABRIZIO:  I would actually prefer to take the podium, if Your Honor wouldn't mind.

          THE COURT:  Okay.  All right.  I wanted to give you the option.

          MR. THOMPSON:  I will too, Your Honor.

          THE COURT:  Fine, fine, fine.

          MR. FABRIZIO:  We're old at heart.

          MR. THOMPSON:  Your Honor, a couple of points, maybe I'll start with the last one.

          Mr. Fabrizio has said several times that nothing changed except for their repeat infringer policy between February of 2011 -- and he -- and that must explain the big drop-off in revenue.  Well, the elephant in the room, Your Honor, is this lawsuit.  This lawsuit that was being plot for a year, it was designed to put Hotfile out of business.

          Now, it did have an impact on the revenues.  There's no question that people didn't want to use the site that the MPAA releases a press release that says is a pirate.  That's the impact, Your Honor.

          Now, as far as substantial non-infringing uses and what the site is used for, here -- I alluded to this earlier, but I thought it was important to actually look at the data.  These are -- This whole exhibit goes to the top 100 most frequently downloaded files.

This is the top half of that.  And you'll see iReb is that open

source software.  Next two are Snowbreeze.  And it goes down, you

see JDownloader and a bunch of others below that.  All of these are

non-infringing.  Not only are they substantial non-infringing uses,

these are the predominant, the most frequently used downloads in

Hotfile.  That cannot be disputed.

        Now, again, this is the data.  Mr. Fabrizio talks about

manipulations of the data to reach high numbers of infringement.

But these are the most frequently downloaded files.  That cannot be

disputed.

        Mr. Fabrizio also -- Sorry to jump around, but I don't want

to lose the thought.  The Sony case said nothing about being

confined to contributory infringement and not applying to vicarious

liability.  The Sony case is a Supreme Court case, of course, and we

believe it can be equally applied to both.  We agree with him that

the inducement liability is Grokster, not Sony.  But the Aimster

case we've been talking about considered this very argument and

considered the vicarious liability defense of the defendants there

as well as contributory infringement under Sony.

        Now, there are other cases.  Mr. Fabrizio has alluded to

it.  The law is simply not clear whether the Sony defense is

available on vicarious liability.  But we would argue logically it

certainly should be.

        THE COURT:  I think Perfect 10 kind of --

        MR. THOMPSON:  In the Ninth Circuit?

THE COURT:  Yes.

MR. THOMPSON:  Yes.

Could you put up 375, please?

Because, Your Honor, I think you focused exactly on the right issue with respect to the direct financial benefit issue, and that is, Hotfile is a subscription service.  It is paid exactly the same no matter who you are, no matter what you're doing.  If you want a premium service, you pay Hotfile for it.

And what's interesting on this is, we looked at the manipulated data from their experts and put together this file.  This is from Professor Boyle's declaration.  And the Zebrak is reference to Mr. Zebrak, who is the copyright lawyer I mentioned this morning, and he put the various files that he looked at in various categories there.  You can see confirmed infringement, or highly likely, et cetera.

Over on the right, we looked at the amount of daily downloads, how many times those were downloaded, and then the conversion ratio.  The conversion ration is tracked by Hotfile to determine who owns commissions, to figure out when they were downloading those files, who bought a premium account.

Very significantly, from that data, it appears that -- You see the non-infringing, the third line down?  That percentage is 0.10, et cetera., roughly five times higher, higher than those who were downloading the confirmed infringing file.

So, let's absorb that for a second.  How is it a lure to

have copyright infringement when their own data show it's five times more likely to have a conversion from someone downloading a non-infringing file?

Now, they gave us Waterman -- Their expert gave us a reply declaration, down at the bottom, trying to rebut this.  The best he can come up -- and this is very significant, Your Honor -- he says -- this is their expert -- "properly calculated, the margin of error shows there is no statistically significant difference between the conversion rate of infringing and non-infringing files."

Your Honor, at the very least that raises a substantial issue as to whether there's any draw, when their own expert says there's no difference between those files they claim are infringing and those that are not.

THE COURT:  Are you challenging that declaration?

MR. THOMPSON:  The reply declaration?

THE COURT:  Yes.

MR. THOMPSON:  I believe we are in other respects.

THE COURT:  Okay.  But not this part, I bet.

MR. THOMPSON:  Not that ultimate conclusion.  That I think we can certainly argue in the alternative.  It's full of flaws for other reasons.

THE COURT:  Okay.

MR. THOMPSON:  Let's go -- Skip ahead a few slides.

And, Your Honor, I wanted to mention this conversion ratio point, because it really comes up in several ways in the secondary

liability arguments.  I know we haven't gotten to inducement yet, but it's very important, because one of the Grokster factors is, is there a commercial sense that this business lives off infringement?  Well, this conversion ratio is very importantly a rebuttal to that argument.

Actually, Your Honor, I think now I've responded to the direct financial benefit piece.  I don't want to get ahead, and I think Mr. Fabrizio may have some other things to say on inducement.  I have some things to say as well.

THE COURT:  Okay.  So, let's talk about Grokster.

MR. FABRIZIO:  Your Honor, the simple answer to why draw is established as a matter of law can be seen right on this chart.  In order to be a draw, there just has to be a draw, any causal connection, and their own chart shows that infringing works convert to premium users.  Any draw is enough.

But, Your Honor, let me talk about this chart.  We actually, by the way, have a motion to strike this one, because it was -- Well, it's a statistical chart that was prepared by their law professor, not their statistician, Your Honor.  And he got it wrong.  We tried to be a little more reasonable about what we objected to.

But the reason you see the works that they identify at the top of their top 100 list is not because they are the most popular works on Hotfile.  It's because they've accumulated the most downloads.  Well, how do works accumulate downloads?  The longer they're up, the more downloads they accumulate.

So, works like iReb and Snowbreeze, which are not copyright infringing, don't get taken down by their copyright owners.  They stay up for months and even years at a time collecting downloads.  Whereas when you're talking about the most popular entertainment content owned by the plaintiffs and other copyright owners like them, these copyright owners engage in a never-ending battle to identify links, send notices, have the works taken down.  They get taken down, they get uploaded again at the same time, or one gets taken down, two get uploaded, two get taken down, four get uploaded.  But every new file begins its download count again.

So, they don't keep track of downloads by title, for instance, Harry Potter and the Sorcerer's Stone.  They don't look at how many times Harry Potter and the Sorcerer's Stone has been downloaded.  They look at how many times a file has been downloaded.

THE COURT:  So, this is the longevity bias --

MR. FABRIZIO:  This is the longevity bias point, Your Honor.

THE COURT:  -- that Dr. Foster was about.  Is that --

MR. FABRIZIO:  Yes, Your Honor.

THE COURT:  Okay.  Because I actually had pulled that.  I was confused.  It seems counter intuitive.

So, one more time, it's that infringing files -- you wrote: "Infringing files rarely have an opportunity to accumulate large download counts because of copyright owners' never-ending quest to get them down."

DAVID S. EHRLICH - OFFICIAL COURT REPORTER

MR. FABRIZIO:  They may only be up on Hotfile -- A
particular file may only be up on Hotfile for a couple of days if
work gets taken down.  The problem for copyright owners is that
they're immediately uploaded again, but as a different file.

THE COURT:  So, does this undermine your argument about
continuing -- Because I had asked you before, if you are only
confining yourself to damages after the suit, 2011, and you kind of
answered me, but you talked about this problem of once you've been
identified as an infringer, then everyone is going to come back, I
would assume, in this fashion.  But if an entity has taken
reasonable steps and made a safe harbor, then you're not asking for
damages after 2011.

MR. FABRIZIO:  That's right, Your Honor.  Our claim for
damage is based exclusively on pre-complaint conduct, stop -- full
stop.

THE COURT:  Okay.  And now I think I understand.

MR. FABRIZIO:  But, in any event, the longevity bias -- and
it's very significant.  We're not saying that iReb and Snowbreeze
are heavily downloaded items.  But that's irrelevant.  Dr. Waterman
looked at all downloads.  This is anecdotal.  You can't look at
anecdotal, whether it's the top hundred or top 500.  Dr. Waterman
measured downloads of all files.

THE COURT:  But that's a daily -- You have to go slowly
with me and use little words.  That's at the daily download rate.
So, that's a snapshot, as it were, of what's happening on a day.

Wouldn't you assume if -- In a direct financial benefit context, wouldn't you assume that the infringing materials are sweeping down at a much greater clip than everybody's --

          MR. FABRIZIO:  The iRebs of the world?  Of course, your Honor.  That's because the infringing works are so much more popular.  That's why looking at daily download rate gives you a sense of what's popular on the site.

          THE COURT:  Okay.  I see.

          MR. FABRIZIO:  But to be clear, iReb and Snowbreeze and JDownloader were in Dr. Waterman's study.  Their impact on the uses of the site and how it's used was accounted for in his study.  If he excluded them, the infringing rate might have been much higher than 90 percent.  So, you cannot controvert a statistical analysis that looks at all uses of a site with anecdotal evidence.  And the Grokster district court said that directly, when presented with this exact sort of situation.

          And, Your Honor, it is worth noting -- I don't think anybody wants to get into a collateral debate about it, but while iReb and Snowbreeze are not copyright infringing, meaning that their authors may allow them to be on Hotfile, they are nonetheless illegal.  And they are illegal in the sense that they violate the Copyright Act.  They violate the anti-circumvention provisions of the Digital Millennium Copyright Act, which prohibits trafficking in tools that circumvent protection measures.  There's no question that they are illegal.

Defendant's law professor, who is not qualified to give legal opinions in a court of law like this, but defendant's law professor confuses a copyright office directive on individual users jail breaking -- What they do is they jailbreak an iPhone.  Let me back it up a second, Your Honor.  These pieces of software are used to hack into an iPhone so that you can put apps on your iPhone that you couldn't otherwise put on, and so that you could make your iPhone interop (sic) with phone networks that it's not scheduled to operate with.

THE COURT:  Well, your circumvention assessment, if not outright charge, other than your sharing that with me today, is that anywhere in the record?  And if it's not in the record, has anyone either charged or sued Snowbreeze?

MR. FABRIZIO:  I don't know the answer to that, but this is -- We make this argument in our briefs.  We point it out in our briefs and cited to the relevant statutory provisions.

The confusion with defendant's law professor is that the copyright office had a rule making where it exempted individuals from engaging in -- I'll call it iPhone jail breaking.  It only excused the individuals doing it.  That was one section of the statute.

Another different section of the statute, which the copyright office expressly doesn't have authority to change, and it's acknowledged that, affirmatively prohibits trafficking in jail breaking tools.  And iReb and Snowbreeze are jail breaking tools.

They're anti-circumvention tools.

So, yes, if it makes Hotfile happy to point out that its two top downloaded files are not copyright infringement, so be it. They are still illegal.

THE COURT:  All right.  Grokster.

And we have about an hour and-a-half left.  I'm going to take a break in a few minutes.

But let me tell you, Grokster inducement appears to me to be fairly specific and fairly dramatic.  And, again, I don't know that on this record, I see the scope and breadth and brazenness of the Napster, Grokster, LimeWire folk.  And I know that defense counsel has made -- I know when I said LimeWire before, it was like I had taken a cattle prod.  So, I understand the different technology.  But in reading those cases, they really were quite unscrupulous and very open and notorious about it.  I don't see that level here.

So, tell me about Grokster inducement.

MR. FABRIZIO:  Your Honor, the reality is that defendants get smarter, and they get better at concealing their activities. But in none of those cases, none, did a defendant pay users to upload popular works which are going to be inevitably infringing in great numbers.  That's the difference.

THE COURT:  That's going to be -- Don't you think that's a problem, popular equals infringing?  Unless there's more, unless there's more, I just think that equation could make many people

nervous.

MR. FABRIZIO:  Your Honor, I realize we're on summary

judgment, but the summary judgment standard doesn't require this

Court to suspend reality or to ignore common sense.

When defendants pay users to upload popular works or

interesting works, everybody knows what that means, everybody in

this room knows what the result of that's going to be, everybody on

the Internet knows what the result of that is going to be.  And,

again, Your Honor, the point is proven by looking at what happened

when they finally terminated their repeat infringers.  Their whole

business fell apart.

And, again, Hotfile itself tells us.  Now, you may -- Your

Honor may say there are just a few e-mails.  But people don't take

their illegal intent and write it on billboards.  They try and

conceal it as best they can.  So, you have to infer it from the

objective evidence, and the Supreme Court says that you can do that.

So, when Hotfile --

THE COURT:  But isn't it -- That's why I'm between Grokster

and material contribution.  Isn't Grokster basically a but for?  I

mean the only reason for being.

MR. FABRIZIO:  No.  No, absolutely not, Your Honor.  And,

in fact, if that's the confusion, let me set the record straight on

that.

Grokster says that if you act with the object that your

service be used for infringement --

THE COURT:  Right, your intention to build this technological paradigm is to infringe, or help others infringe.

MR. FABRIZIO:  But not exclusively infringe.  That's the whole point of Grokster.  Grokster gets away from substantial non-infringing uses.  Grokster says your system can have enormous non-infringing uses.  That's irrelevant if you act with the object that it be used also for the infringing uses.  You can be held liable for the infringement.  Even if there was 20 percent infringement and 80 percent non-infringement, if the evidence was that they were incenting users to upload the files that were downloaded for that 20 percent infringement, they would be liable for that.  That's the essence of Grokster.

Remember, Grokster came about because Sony had said, "If you have a substantial non-infringing use, then you can't be held liable for contributory infringement in a product context."

So, the Supreme Court had to look at a product, which it -- at least -- the judges all split on whether StreamCast had a non-infringing use, but at least some justices thought clearly StreamCast had a -- or Grokster had a non-infringing use.

So, Your Honor, the Grokster Court was looking -- It was born in an environment where it assumed that there were going to be substantial non-infringing uses of the defendant's service.  So, it doesn't matter that there may be some of these non-infringing uses.  It doesn't matter that some popular works are not going to be infringing.

THE COURT:  Okay.

MR. FABRIZIO:  What matters is that it is substantially certain that when you pay people to upload works based on how often they're downloaded, that many of the works that are uploaded are going to be infringing.

THE COURT:  Plus messaging, very strong, clear messaging.

MR. FABRIZIO:  No, Your Honor.  Again, if I respectfully may disagree.  The Supreme Court actually said the messaging was irrelevant.  It's the culpable intent that creates your liability.

In Grokster, the Court looked at several messages that were exclusively internal and said the point of the message in an inducement analysis is not to say that you actually solicited or advertised the infringement, but that it goes to your state of mind, your object to operate your system to foster the infringement.  It identified soliciting, advertising of infringement, as the classic instance of inducement, but it was very clear that it's not necessary.  There don't have to be any outward messages for an inducement claim.  It is the provision of the product or service with wrongful intent.  That's what the Supreme Court tells us in Grokster.

THE COURT:  And is it -- Does it make a difference if we treat it, as Fung did, as a separate cause of action or --

MR. FABRIZIO:  No.

THE COURT:  -- a subcategory?  No?

MR. FABRIZIO:  No, it makes no difference.  Some courts

have said it's a variant of contributory; some courts have defined

it as another branch of secondary liability.  The standard is the

standard.  It doesn't preempt any other standard.  They live side by

side.

THE COURT:  Okay.

MR. FABRIZIO:  On the popular equals infringing, because I

know this is an important point -- and clearly Your Honor has

expressed some question on it -- remember that from their own

mouths, they went out into forums and said, "We're looking for good

uploaders, people that are going to upload MP3 files, videos,

games."  And they are the ones that defined that they were looking

for infringers.  Remember when they sent their staff out to these

forums and somebody said, "I've got all these television shows."

So, Your Honor, there are no non-infringing television shows.  And

he says, "Welcome to Hotfile," or "Let me introduce you to Hotfile."

And the whole RapidShare evidence -- You know, what the

Supreme Court found so compelling is that the Grokster people went

after Napster users.  Clearly, not every Napster user was an

infringer.  But that showed their intent, that if they wanted a user

body of people that were going to be infringing, going after Napster

users is clearly evidence of intent.

But when they look at RapidShare, and they internally

acknowledge that those RapidShare users are going to be leaving and

that they are going to create a flagship of non-licensed content,

and then go out and devise a strategy to lure them into be Hotfile

users, how much more is necessary for them to themselves reveal their intent?

Again, Your Honor, these defendants are not the first to make this argument that popular doesn't mean infringing.  But the courts have looked past that, again, because summary judgment doesn't require you to ignore the fact that water is wet.

The Fung court and the StreamCast court both said, in effect, that that argument is just simply implausible even on summary judgment, that everybody knows that these popular works are infringing.

Now, defendants point to Veoh.  But there's a very, very big difference.  Veoh had commercial contracts with several major content owners, such that the mere presence of popular works on their system might not act as an obvious sign in the same way.  That circumstance isn't here.  This is just like Fung and just like StreamCast and Grokster, except they pay based on how often a work is downloaded.

We actually have a chart.  It might be useful to -- This is just from Hotfile's data, a list of their top 20 affiliates.  How much they were paid, and what that translates into, how many times their files were downloaded.  It's astonishing, Your Honor.

MR. THOMPSON:  Hold on.  We've never seen this before.  What is this?

MR. FABRIZIO:  It is a graphical presentation of your interrogatory response identifying the top affiliates and how much

they were paid, and our estimation based on what you said -- based on what Hotfile has represented users get paid per download.

In any event, Your Honor, you're talking about 647 million downloads, 328 million downloads.  These are extraordinary numbers.  These are not people downloading public domain works.  No one could possibly think it was.

And, again, Your Honor, Hotfile's argument that popular doesn't equal infringing also misses the point.  What Hotfile says is popular does not necessarily mean infringing.  Let's just take that as a given for purposes of this discussion.  It doesn't matter.  Some, and we would submit virtually all, but at least had some substantial portion of what they are inducing users to upload by paying them to do it is going to be infringing.

Now, the standard of inducement, the standard that Hotfile cites, is when you take an action that's substantially certain to lead to infringement, you're inducing the infringement, and you're liable for it.  How can one say that when you pay people based on how much a file is downloaded, that you are not inducing action that is going to result in substantial infringement?  Not when you have coming out of their own mouths that they were chasing RapidShare users, or that they invited people to upload television shows, or that they were looking for MP3s and games and videos.

Again, even if half of what the affiliates were uploading was non-infringing, even if it was half, they'd still be liable for inducing infringement that was the other half.  They can't

absolve --

THE COURT:  But as a business model, how do they make money?  I mean how do they get more business?  How do they -- The idea that the affiliate program is a legitimate tool --

MR. FABRIZIO:  It's not a legitimate tool.  There's nobody else but them and their ilk do it.

THE COURT:  Okay.

MR. FABRIZIO:  And when you're talking about paying users to upload content, and paying them to upload content, without any regard to what they're uploading or who they are, I don't believe there's anybody else that does that.  And there's nothing in this regard about anyone else doing that.  That is a far cry from an e-bay program or one of the -- a legitimate referral program.  They're paying for content.  No one else does that.

THE COURT:  All right.  I'm going to take a five-minute break.

MR. FABRIZIO:  I'll see if there's more to say, or if you have any more questions, I can continue, but I don't want to take up all Mr. Thompson's time either.

THE COURT:  Okay.  We're going to take a ten-minute break.

 (Court recessed at 3:08 p.m.)

 (Court reconvened at 3:22 p.m.)

MR. FABRIZIO:  I just wanted to clarify one response to a question.  Your Honor asked how Hotfile makes money.  They make money by selling premium subscriptions, and they sell premium

subscriptions largely by users who click links to come to Hotfile. When you click a link from one of these other websites to go to Hotfile, you go to what's called a download page.  On that download page, you can download the file for free, but you are presented with multiple options to convert to a premium user and pay money.  And the big selling point for converting to a premium user is to get faster downloads.

Now, they put up a statistic that showed that non-infringing files had a conversion rate of five times that of infringing files.  Again, Your Honor, we've taken issue with this, because this is done by their lawyer and not their statistician. And Mr. Thompson rightfully pointed out that our statistician, Dr. Waterman, said that the margin of error for that analysis was 50 percent.  Compare that to the margin of error for his stat study, which was 1.3 percent.  So, there's no statistical significance to that number.

But the real reason, which they sort of glossed over, the real reason that number doesn't matter is looking at rate of conversion is crazy when 90 percent of the files that are being downloaded are infringing.  People are downloading infringing files ten to one.  Looking at the rate of conversion doesn't matter.  The absolute numbers of conversions are going to -- from infringing files are going to dwarf the number of conversions from non-infringing files.  Of course defendants have a powerful economic incentive to encourage the -- to continue encouraging the

downloading of infringing files.

            Additionally, Your Honor, they don't just pay people based on how many times a file is downloaded.  They pay people based on how big the file is.  Now, they may have their reasons for that, but the simple reality is that when you pay people more for uploading big files, that really does target our clients' movie and television properties, because they tend to be very big files.  And the typical files that somebody might upload just for their own benefit, a couple of images or things of that nature, documents, they don't even pay for those.  They're not big enough.  They don't pay them for that.

            So, with that, I will let Mr. Thompson take the podium.

            MR. THOMPSON:  Thank you, Your Honor.

            I'm going to take your invitation to sit down for a moment, because I need to read from my computer.

            THE COURT:  All right.

            MR. THOMPSON:  And that's because Mr. Fabrizio talked about the so-called jailbreak software of iReb.  First of all, all jail breaking means is that it allows a user who's bought an iPhone and paid for a license to open up their iPhone and to make it interoperable with other programs.  Jailbreak sounds sinister. There's nothing illegal about it.

            THE COURT:  They should get another name, mother's little helper or something.

            MR. THOMPSON:  That might be more apt.

You asked Mr. Fabrizio where in the record is that?  Well, it's not in the record.  What is in the record is the following: From Mr. Boyle, Professor Boyle's declaration, he attached as Exhibit 2 his rebuttal expert report.  And at paragraph 54 of that report, which is the very end, it's at page 24, Mr. Boyle is criticizing Mr. Zebrak, who's one of the plaintiff experts, and he says in part:  "He does not to his credit -- He does note, to his credit, that iReb and Snowbreeze, the most widely shared files on Hotfile, are non-infringing and legal to distribute."  That's the statement attributed to plaintiffs' expert, and that's what the record is, Your Honor.  Not what Mr. Fabrizio's oral argument is today.  In fact, iReb is legal.

Now, I know it's getting late, and that may be the reason why we've run into a few problems, but we have a lot of argument and not evidence that was largely Mr. Fabrizio's presentation.  He talks about unidentified blogs as showing Hotfile's bad intent.  None of that was shown to Your Honor.  It's objected to, first of all, and it's anonymous blog posts that they believe can be attributed to Hotfile.  That's what it comes down to.  And not ascribing any bad intent on Mr. Fabrizio's part, I think it's fair to say he tended to exaggerate in his descriptions.

So, I would just encourage Your Honor, and with your staff, if those become important, to look to the actual evidence and not to rely on the summary here.

I'm going to skip through what I had prepared on Grokster,

because I think Your Honor understands very clearly the issues.  And Hotfile is a different site than Grokster ever was.  But let me return to the one piece of evidence that they point to, one e-mail out of that entire record of millions.

And if you can please call up Yeh 53.

This is the e-mail that you were shown earlier.  And this is Exhibit A to the studios' case, really.  The best thing they have.  And they've taken some liberties in describing it, because they didn't include this little smiley face thing, which shows, I think, a lighter touch at 12:47 a.m.  But look at the next sentence. It says:  "The bad thing is that they clean up their image while we become the flagship of non-licensed content."  That's a bad thing to Hotfile.  Hotfile did not want to become the flagship of unlicensed content.

And, Your Honor, what's another significant point here is, we're talking about RapidShare, and Mr. Fabrizio is correct, this coincided with RapidShare's change in policy, and Hotfile was regretting that it would become more popular with clientele it may not have wanted.  I think that's the right way to read this, at least expresses concern at the very least.

The other thing to remember is RapidShare to this day is an entirely lawful site.  It's not Napster.  Napster had been adjudicated to be infringing and unlawful, and yet the Grokster guys went out after that clientele.  They wanted an adjudicated infringer's clientele.

            THE COURT:  Did RapidShare have an affiliate-like dimension

to it that it shut down?  Or am I thinking of someone else entirely?

            MR. THOMPSON:  You're exactly right.  And that's what this

e-mail is referring to.

            RapidShare is a larger entity, and when Hotfile first came

into being, the testimony was that they looked to RapidShare as a

model to use.  And RapidShare had many of the same attributes as

Hotfile.  And they decided in -- I guess this is July of 2010, that

is RapidShare announced that they would be discontinuing their

affiliate program.  And Mr. Fabrizio is right, that's the context of

the e-mail here.

            THE COURT:  Okay.

            MR. THOMPSON:  But that doesn't make the affiliate program

illegal, adjudicated illegal, or anything of the kind.

            Now, Your Honor, with respect to the limited time

available, I really want to make sure that Hotfile has the

opportunity to do two things.  One is Mr. Leibnitz, who I've told

you has all the statistics in his mind, can I think address some of

the exaggerations made, let's put it that way, in Mr. Fabrizio's

latest presentation.  And then, perhaps most importantly, we have

Mr. Titov, who is here in the courtroom, as you know, his individual

motion, and I want to make sure that Mr. Schoenberg has an

opportunity to present argument to Your Honor on that before we have

to adjourn.

            So, I think it's time for me to sit down and to hand off,

first, to Mr. Leibnitz.

       THE COURT:  Okay.

       MR. LEIBNITZ:  Good afternoon, Your Honor.

       THE COURT:  Good afternoon.

       And, again, this presentation will somehow be appended to
the record, either by disk or by copies of the charts or some --
There it is.  Okay.

       MR. THOMPSON:  We have all the charts here.  We can hand
those to you.

       THE COURT:  I want to make sure the record is complete
about what's being seen and -- I beg your pardon for interrupting
your intro.

       MR. LEIBNITZ:  Thanks, Your Honor.

       I rise solely for a very limited point.  It's about the
90 percent infringement rate that you've heard time and time again.

       THE COURT:  Yes.

       MR. LEIBNITZ:  They cannot stand in this courtroom and
assert that Hotfile has a 90 percent infringement rate.  Cannot do
that.

       This is the exhibit that they appended to their summary
judgment papers.  This is false.

       Mr. Fabrizio stood up before -- well, figuratively, he was
on the phone -- before Judge McAliley at the outset of this case and
said, "I will prove 90 percent use of Hotfile is infringing."  That
didn't turn out to be true, because what Mr. Fabrizio did is he went

to Dr. Waterman, his expert, and said, "Dr. Waterman, blind yourself to half the world, blind yourself to the predominant use of Hotfile. Do not look at files that are stored and never downloaded."  They cannot stand here in this court and say that 90 percent of the usage of Hotfile is infringing when they blind themselves.  It's like a study of heart disease that ignores women.  It's like a study of infringement in Sony that ignores time-shifting or space-shifting. It presumes the conclusion they want to reach.  That's the first reason of many why this 90 percent figure cannot stand.

        The second, of course, is that they have evidence of one month.  One month.  Dr. Waterman's report said, "I will tell you about January, 2011, and in that month, there's a 90.2 percent infringement rate."  That's his report.

        They come to this Court and say 90 percent, as if it expands across the three-year existence of Hotfile.  Not true.  In fact, what they're trying to rely upon is a rebuttal report of Dr. Waterman that was given after every single deposition in this case.  We took Dr. Waterman's deposition first at the outset of this case, because it was arguably the most important, and we relied upon it for the rest of the case.

        In rebuttal, they said, "Oh, yeah that 90 percent figure really does apply to every month of Hotfile's existence."  But I was there.  I was the only person in this court who took and was in the room when Dr. Waterman testified over a dozen times in affirmance of the explicit words of his original report, "My opinion only applies

to January, 2011."

Now, the rule is automatic and self-executing that any evidence that is garbed as rebuttal that's not really rebuttal, it's new testimony, is excluded.

Mr. Fabrizio says, "You're taking the dozen admissions out of context." Your Honor, we submitted 27 pages of uninterrupted deposition testimony from Dr. Waterman. There's no out of context.

They say his testimony is not new on rebuttal.

MR. FABRIZIO: Excuse me, Your Honor, I don't mean to interrupt, but I thought Your Honor said we are not going to have argument on the evidentiary issues. I thought Mr. Leibnitz was going to address the substantive issues, not the evidentiary issues.

MR. LEIBNITZ: This is the second of many. But, again, the amnesty that you said applies to exhibits -- and I'll just be brief. We'll finish up this argument.

THE COURT: Okay.

MR. LEIBNITZ: For that reason alone, though, the second bullet point on this chart, Dr. Waterman's chart, and it's the second exclamation point on this chart.

THE COURT: Second to the right or second down?

MR. LEIBNITZ: Second down.

So, Dr. Waterman's report, when properly considered, only considers one month of Hotfile's three-year existence. Because everything else is new.

If Your Honor can read his 27-page excerpt and think

anything other than his testimony, excluding the 90 percent figure,

is anything but new, then I'll eat my hat, figuratively speaking.

          THE COURT:  Right.  You don't have a hat.

          MR. LEIBNITZ:  Sure.

          Nine more points on -- but I'll be brief -- why

Dr. Waterman cannot stand.

          Their whole argument about infringement is that it pays to

be a pirate.  They seem to think that piracy pays.  Well, look at

what Dr. Waterman excludes from his report.  He excludes anonymous

uploads.

          THE COURT:  Well, part of the reason why I declared kind of

an amnesty was that, to be frank to both parties, I find myself in a

situation where I'm not comparing apples to apples.  And so, I'm

trying to find the bases on which to make a ruling, but there's

Dr. Waterman, who says what he says.  There's also that kind of

caveat at the end of both his declaration and I think his deposition

saying, "I leave myself open to further comment as the evidence

comes in."

          But then there's Professor Boyle, who is an alum of my alma

mater, who is law professor, not a statistician.  So, I don't have,

on behalf of Hotfile, a statistician telling me, "Well, look at

this."  I have Professor Boyle, who is not -- or

Professor Cromarty -- did I get that right?

          MR. LEIBNITZ:  It is Boyle.

          THE COURT:  Okay.  And talking about, again, not only

apples and oranges, but a different timeline of the apples and
oranges in existence.

And I realize, as I said initially, this is critical, at
least both sides think their motions addressed to the evidence is
critical to their case, but in terms of getting today's argument,
that's why -- just so -- that's why I declared the amnesty, because
I'm really not certain how I reconcile both of these gentlemen's
role in the case, other than possibly to say, "Well, it kind of goes
to the weight of the evidence as opposed to its admission."  That's
clearly a way out many of my colleagues have used, at least in my
career.

But, again, for today's purposes, I thought -- and I
understand why -- 90 percent is something that's a rather critical
focal point.  And I understand defense saying that how can you come
to 90 percent when you didn't even examine 50 percent.  I at least
get that much of the --

MR. LEIBNITZ:  And your Honor may be not completely
remembering, we have a statistician, Dr. Daniel Levy.  He submitted
a report that says, "You're right, Dr. Waterman.  Your sample, it is
a fundamental tenant of statistical science that you cannot opine
about populations you do not sample from."  So, they both agree, the
entirety of the statistical evidence before you says there's only
one month at stake, January, 2011, and every other month, day,
minute could have a zero percent infringement rate.  And that's what
Dr. Waterman says himself.

THE COURT:  If I'm wrong please correct me, but the reason why Dr. Waterman -- He provided the rebuttal declaration in response to something Professor Boyle said about Dr. Waterman.  So, that's why it wasn't Dr. Levy, Dr. Waterman.  That's why it was this law professor versus statistician mix.

MR. LEIBNITZ:  Sure.  And I encourage you to read those two side by side, because if you read Professor Boyle's original opinion, it would be great if we had a rebuttal to him.  We don't.  The only mention of Professor Boyle in Professor Waterman's rebuttal report is to agree with him and say, in paragraph 2, "Yeah, I agree with Dr. Waterman.  He's not a statistician, and we're going to go -- we're parting ways."  And for the next nine paragraphs of Dr. Waterman's report, he departs upon a frolic and detour nowhere mentioned in Dr. Boyle's report.  Because he had no occasion to.  He explicitly denies any reference to statistics in his report.

But before we leave the issue, the plaintiffs say Dr. Waterman did not testify -- and I love this, in their reply brief, "He did not testify that the level of infringement pre-January could be zero."  The record begs to differ.  As I said, my study does not pertain to that period, pre-2011, and it may have been a hundred percent, it may have been 50 percent, it may have been zero.  That's the evidence properly before the Court.

Now, one last comment on Dr. Waterman.  Even if he's not stricken -- He absolutely should be stricken, make no mistake, from our perspective.  But even if he is not stricken -- Your Honor had

previously mentioned today daily downloads.  Please do not

misapprehend, "daily downloads" is a term of art at Hotfile that has

nothing to do with downloads each day.  That population is what

Waterman sampled, and here are the bizarre exculpations from that

sample set.  He ignores files uploaded anonymously, which, by the

way, are -- that -- Anonymous uploaders are those who would have no

incentive to infringe, because they get paid nothing by Hotfile,

even under their theory of the case.  So, he ignores this population

of unknown extent that would be helpful to Hotfile.

        THE COURT:  Well, could we rewind a little?  "Daily

downloads" are a term of art at Hotfile.  What do they mean if not

daily downloads?

        MR. LEIBNITZ:  Exactly.  And I'd love to explain that.

It's this slide, Your Honor.

        THE COURT:  Okay.

        MR. LEIBNITZ:  Look at the -- every other bullet point,

except for the first three down the left.  So, every other bullet

point, except the first three exclamation points down the left,

explains -- Well, I guess even the third bullet point down the left

explains what the population is of daily downloads.

        Daily downloads is this -- it's a sample set at Hotfile

that excludes anonymously uploaded files, which, for the purposes of

this analysis, could only help Hotfile under plaintiffs' theory.  It

excludes -- And this is why Waterman cannot, and these plaintiffs

cannot come before the Court and say that 90 percent of all files on

Hotfile are all downloads infringe, because it excludes these

bizarre, inexplicable, unknown X factors, like downloads completed

by premium users within 15 minutes of each other.  There's no way to

know one way or the other how that impacts Dr. Waterman's study, and

he certainly didn't try.

It ignores an unknown number, an unknown X factor of hot

link downloads.

It ignores -- and this is just bizarre -- it ignores

downloads by free users numbering more than ten in a 24-hour period.

And, moreover, it ignores three-quarters of the world's

population, or at least three-quarters of the nations in the world

and half the planet's Internet users.  That's a billion people.

These are all pockets that Waterman bizarrely ignores.

Now, the plaintiffs are going to say, "Hey, look, that's

fine.  We were just looking at Hotfile's daily downloads

population," because those are what Hotfile incented.  Those are

the -- This is the file that Hotfile used to pay affiliates.  So,

they say, "It's all good.  We can rely on this."

That would be fine if Mr. Fabrizio was standing here

saying, "Your Honor, 90 percent of downloads infringe.  If I ignore

half of all files ever uploaded to Hotfile, if I ignore downloads

completed within 15 minutes of each other, if I ignore a billion

people in the world, if I ignore anonymous uploads, if I ignore an

unknown number" -- if he was to say that, less of a problem.  But

that's not with they say.

Dr. Waterman apparently is being construed by Mr. Fabrizio saying 90 percent of everything on Hotfile infringes, can't do it, can't possibly do it without defying Daubert in the worst possible way.  And that's what I have on Dr. Waterman.

Before I leave, one comment on Dr. Foster.  As far as I know, they've made up this term "longevity bias."  The point of Daubert is to apply to those who garb themselves in expert qualification, it's to require them to apply a uniform methodology. Dr. Foster calculates his top 100 list by aggregating download counts for plaintiffs' files differently than Hotfile's files.  He aggregates 23 years of Simpsons episodes into one entry on his chart.  That's 508 episodes.  And he does that while refusing to aggregate download counts for JDownloader if even a comma is different, if even the file extension is different.  You can't do that without flouting Daubert.  It requires at least a modicum of consistency not in pursuit of a contrived outcome.

Thank you very much for hearing me, Your Honor.

THE COURT:  All right.

Well, as to that last point, while I'm sure Daubert is concerned with some consistency in that persons are being regarded as experts in a field that has been written on and treatises developed, the courts are not in a position to substitute their idea of expertise with that of the parties and the experts themselves.  I think, again, going back to Judge Koh in her current situation in the battle of the experts there, it's -- A lot of it comes down to

the jury and whether or not jurors would understand what it is these experts are saying.  And I think in this scenario, we might have the same situation.  We have people who are well recognized in their discipline giving wildly different ideas of what the world looks like.  I don't know that I'm in a position to say they are not qualified to give that view.  I think the jury is in a position to say, "We think you're all crazy, and we either agree or disagree with what it is you've presented to us."  But I don't think consistency, uniformity is the predominant goal of Daubert.

MR. LEIBNITZ:  Your Honor, if I may be heard with one last comment?

THE COURT:  Sure.

MR. LEIBNITZ:  There is case law in this very district that says an apples-to-oranges comparison of different systematic methodologies is excludable.  I would have no problem if Dr. Foster just was fair to both sides and applied the same methodology to both sides, because their reason behind aggregating download counts for their files and not ours, as you heard Mr. Fabrizio say, was that their files keep getting taken down by the content owners.

Your Honor, you may be interested to know just how many times JDownloader has been taken down by plaintiffs and content owners -- nine times.  You cannot purport to be an expert applying a systematic methodology and blind yourself to longevity bias, as they've made it up, on one hand and not apply it on the other.  That's all we have.

THE COURT:  Thank you.

MR. FABRIZIO:  Dr. Foster was simply trying to illustrate the concept of longevity bias.  That's all he was doing.  And his analysis simply demonstrates the common sense point that I described to Your Honor, and when copyright owners send millions of notices taking down works, and they get uploaded the next day, that their download count for any particular file is going to be small, relatively speaking, to works that don't get taken down all the time.  I don't think there's a lot more to it than that, and I don't think Dr. Foster is purported to say a whole lot more than that.

Dr. Waterman.  Dr. Waterman is a Wharton School statistician, who applied the same statistical methodologies here that he applied in many other cases and where he was accepted as an expert in comparable cases.

Let's just put this one month business to bed.  Is anyone really seriously contending that the use of Hotfile in January, 2011 was different from December, 2010?  That's what they're asking you to believe.  They're asking you to suspend reality, to pretend that water isn't wet.

The reality is that Dr. Waterman said in his first deposition -- He was hounded in his deposition, Your Honor.  And he said several times that his data was based on a particular month, and that's where his conclusions -- that's where he feels most comfortable with his conclusions, but if he didn't have any reason to believe that the activity of Hotfile was dramatically different

in the prior months, he'd be comfortable with that.

Well, he then went back, after his deposition, he went back and analyzed whether there were differences that could have been material.  And as his reply declaration, I think it is, indicates, there's nothing that would suggest Hotfile had a different user pattern in the months prior to January, 2011.

But let me just turn defendants' words on them just for a second.  They continually strove to improve their system so that they were reducing copyright infringement every day, right?  Well, then one would imagine that January, 2011 is the lowest infringement rate that there exists.  We didn't do any analysis in the post-complaint work, because the world changed.  And Dr. Waterman said, "I can't opine as to what happens after February (sic) of 2011, because the world changed.  Big differences.  They terminate repeat infringers.  That's a different business.

But as for the period before, come on!  No one can seriously think that Hotfile was any different.  And, again, it's belied by Hotfile's own words that they tried to improve their anti-piracy measures, not make them weaker.  The reason he used January, 2011 is because that's where the best data was, that's where he could actually get the most files.  Hotfile didn't keep all their files going back.  So, if you went back further, the complaint would be that he didn't have the files to confirm things.

In every -- I believe in every -- I don't want to -- maybe not be as absolute on that, but in almost all statistical studies

that have been accepted by the courts, short periods of time were used.  In Fung, it was a couple of weeks.  In LimeWire and Grokster, and StreamCast, it was snapshots in time.  In Usenet, it was a snapshot in time of a particular relevant field of data.  Those are the limits of data gathering.  There's no reason -- That's not improper, and it's not improper to use that sample to draw conclusions about the whole.  Not when there's no other reason -- no reason to believe that there's a difference.

        And Hotfile has control of all of its data.  If there was a reason to believe it was different, don't you think we would have heard it?

        One thing their statistician did was pick a lot.  One thing he didn't do was any analysis to determine whether any of those picks amount to a hill of beans.

        Courts have said, "I will not entertain picking unless you tell me that it matters."  And they haven't told you that it matters.  But Dr. Waterman went back and looked.  He went back and looked at all their criticisms, he examined data, and his declaration addresses these issues one by one and explains that even if they're right, they just don't matter.

        I mean this notion about using daily downloads, it is a particular file in Hotfile.  It is a term of art.  It also happens to be what he measured.  He measured the daily download, in a lay term, but he measured it using a file called "daily downloads."  The reason he used daily downloads is because, as I understand it, there

was an issue with certain data logs having been accidentally destroyed.  But there are no reason to believe that the two data sets are meaningfully different.

Anton Titov, who's supposed to have a pretty good sense of Hotfile, right?  I asked him at his deposition:  "Do you have any reason to believe that the pool of people in this data set," which is the full data set, "download any differently than the people in this data set?"  And the answer was no.

So, I do stand here, comfortably, telling you that when you look at downloads from Hotfile, 90 percent of the downloads are infringing.  I don't think there's any question about that.

THE COURT:  Well, bringing it all back away from the evidentiary contest to the liability discussion we've been having, we had talked about Grokster and the level of nefariousness in those.  Honestly, my focus for the past however long has been material contribution.  I'm just surprised that everybody else has taken the other ends of the spectrum, and I'm here by myself thinking, "I thought that was the focal point."

MR. FABRIZIO:  Well, Your Honor --

THE COURT:  Because that takes us to the question I had asked earlier in some other context.  90 percent, 50 percent, is there something that tells me there is a certain quantum, a level of infringement that can be tolerated, or is, again, Dr. Waterman's analysis subject to vigorous cross-examination?  But the fact remains, we have evidence of infringement, and the question remains,

did Hotfile know and fail to do anything about it constituting

material contribution to that infringement?  That was my, as I sat

down today, question.

So, I would like to get to the argument on Mr. Titov,

because he has come this long way, and they're prepared.  But just

because it was my question, I'd like to spend at least the next ten

or 15 minutes hearing from both sides as to what they think of how

that theory of liability plays out on this record.

MR. FABRIZIO:  Sure, Your Honor.

First, let me say that in terms of common law contributory

liability, the statistical evidence doesn't really have a role in

there.  I mean it's color commentary.  It's backdrop.  But it

doesn't have a place.

THE COURT:  Okay.

MR. FABRIZIO:  In inducement, it doesn't have a strict

place.  But what courts have said is when the overwhelmingness --

you know, when there's so much infringement, it signals that

defendants condoned it and that they knew about it.

Your Honor, this, again, is not the first time stat studies

have been vehemently challenged.  I mean what Judge Wilson said in,

I believe, StreamCast -- it may have been Fung, but I believe it was

StreamCast -- was, look, the parties vigorously dispute things about

the statistical study, but that misses the point.  The point is that

whether the number is 90, 80, 70, or whatever, it's a big number.

It's a very big number.  And that's what matters.  So, it doesn't

have to be undisputed that the number is 90 percent, but it can't be disputed that it's a very big number.

Briefly, Your Honor, and then I will turn right back to your question, this whole notion of files so-called in storage, the ones that were ignored because they weren't download, there's a long answer to that and there's a short answer. And given the hour, I'll give you the short answer. Those files -- When you want to understand the use of Hotfile, you have to start with one basic statistic. 89 percent of Hotfile users never upload a single file. 89 percent of Hotfile users use Hotfile exclusively to download. Our case is about the downloading. Our case is about their inducing and facilitating users in distributing these works.

Hotfile doesn't permit people to use their facility for storage. If you're not a premium user, if you're not premium, if you haven't paid them, they will delete your files if they haven't been downloaded frequently enough. That's the opposite --

THE COURT: If they're inactive, they'll delete you.

MR. FABRIZIO: That's right. If they're not downloaded frequently enough.

THE COURT: Right.

MR. FABRIZIO: They will delete your files. That is not storage. That's the opposite of storage.

So, premium users become the only pool of users that are even eligible to use Hotfile for storage. What percentage of Hotfile's user base is premium? Three percent. And of the premium

users, 90 percent have never uploaded a single file.  So, it becomes a rather small sliver of Hotfile's world that can actually use Hotfile for personal storage.

         The fact that there are files that haven't been downloaded yet just means they're files that haven't been downloaded yet.  Most of them were deleted because Hotfile didn't think they were being downloaded enough.  More than 60 percent of them were deleted because they just -- for inactivity.  Another 35 were deleted for reasons of infringement.  So, 95 percent of this big number of files, these zero download files, they demonstrably had nothing to do with personal storage.

         Again, these are not disputes of facts, Your Honor.  The facts are what the data tell you.  They just draw different conclusions from them.  And they're entitled to reasonable conclusions, but when 90 percent of users use Hotfile to only to download, and only premium users are even permitted by Hotfile to use the service for meaningful storage, and 90 percent of them only use Hotfile to download, they're not entitled to irrational conclusions.

         So, now, Your Honor wanted to talk more about contributory liability.  The standard of knowledge in contributory liability under the common law is whether the defendant knew or should have known that the system was being used for infringement -- constructive knowledge.  Doesn't have to be specific infringements, just constructive knowledge.

One of the reasons we have the DMCA is because the standard under contributory under common law is a very broad one.  It's constructive knowledge, and Congress wanted to raise the bar for the DMCA.

But if we move past the DMCA on the basis of 512(i), then we're left talking about the common law standard for copyright infringement under the contributory standard -- actual or constructive knowledge.  And, clearly, Hotfile has constructive knowledge.

The notices provide them with constructive knowledge.  I mean the items that we talked about, my top 5 list, or six, lists that we talked about in terms of red flag knowledge, provide them with knowledge.  And the fact that it's common knowledge that they know their system is being used for infringement is the constructive knowledge.  I mean they clearly have constructive knowledge.

So, the question becomes -- I don't think the parties disagree on that, by the way, as a factual matter.  Defendants argue for a different standard.  They effectively argue for the DMCA standard to be applied to the common law.  But that -- there's no basis for that.  The law in this circuit, the Cable/Home case that we cited and the others, is explicit.  For a contributory infringement claim, knowledge means -- includes constructive knowledge.  And they make some argument that that doesn't apply to the online context.  That's just some offline old world analysis.  But that's not true.

THE COURT:  Swap shop.

MR. FABRIZIO:  Yeah.  It's not true.  That's the standard that was applied in Usenet, an online case.  It was the standard that was applied in LimeWire, an online case.  It was the standard that was applied in Napster, which was obviously an online case.  And it's actually the Eleventh Circuit standard has been applied in this district in an online case.  And that is the Dawes-Ordonez case, which is at 210 (sic) Westlaw 1791754 at star 3.  That was an online case.  It was a real estate -- online real estate listing case, and it involved infringement of photographs.

So, there's no basis to argue that the common law standard should be the same as the DMCA standard.  Then you wouldn't need the DMCA.

And as for material contribution -- Again, I don't even know that this is disputed, but maybe Mr. Thompson will prove me wrong -- but when you provide the site and facilities for the infringement, that's material contribution.  It always has been.  These files are stored on servers that Hotfile provides.  There really can't be any debate about that.

So, Your Honor is right in the sense that contributory and vicarious both are sort of very easy questions once you're not considering the DMCA.

THE COURT:  All right.  Thank you, Mr. Fabrizio.

MR. THOMPSON:  It probably won't surprise Your Honor to know that I -- we do strongly disagree with Mr. Fabrizio.  There are

disputed issues.

THE COURT:  I'm holding on to the bench so I don't fall off
my chair.

(Laughter.)

MR. FABRIZIO:  I really thought I was going to get away
with that one.

MR. THOMPSON:  On the contribution -- contributory
infringement issue, let me make two points.  First, as far as legal
standard, I think we can look at the Aimster case, which you've
referred to several times, and let me read a couple small passages
from it:  "If a service facilitates both infringing and
non-infringing uses, as in the case of AOL's instant messaging
service, and the detection and prevention of the infringing uses
would be highly burdensome, the rule for which the recording
industry is contending could result in shutting down of the service
or its annexation by the copyright owners, contrary to the clear
import of the Sony decision."

And in the same page, a little further on:  "We, therefore,
agree with Professor Goldstein that the Ninth Circuit erred in
Napster in suggesting that actual knowledge of specific infringing
uses is a sufficient condition for deeming a facilitator a
copyright (sic) infringer."  And this is at 334 F.3d 643, and the
jump site is 649.

Your Honor, with respect to non-infringing uses -- Let's
put up 046, please.

And this, Your Honor will remember, is an example of some
of the very prevalent non-infringing uses in Hotfile.  This really
can't be disputed.

Mr. Fabrizio makes an interesting argument.  He says,
"Well, there are 56 percent of the uses of Hotfile are for storage,"
clearly non-infringing.  But then he says, "Well, that's short-term
storage most of the time.  Only premium users can keep it more than
120 days."

Well, one of the things that Hotfile has noticed is that
it's popular for use with video surveillance cameras, nanny cams and
the like.  A lot of uses out there require storage of huge digital
video files for short periods of time.  If you're monitoring the
local liquor store, you want to be able to go back through the
surveillance tape for a few weeks, or maybe a few months at most.
After that, you don't care.  So, if it gets deleted at 120 days, you
don't care.  Similarly with your nanny cam, if you're going to be
uploading that and storing that to see what happens at home.  And
I'm sure you can think of may other uses where temporary storage --
well, working on a brief together across the country, looking at
movies together, your softball team.  We've given lots of examples.
Temporary storage is a significant and plentiful non-infringing use.

Again, it's 56 percent of all Hotfile files are never, ever
downloaded.  They're stored and that's it.  That's the use, is
storage.

THE COURT:  So, you're arguing that Sony applies to the

theory of material contribution, that it's -- despite some language

in other cases, that it is a defense.

      MR. THOMPSON:  Absolutely, Your Honor.  I didn't understand

Mr. Fabrizio to suggest Sony wasn't applicable.  I think he was

arguing a different point.  He was saying there's not substantial

non-infringing uses according to his view of Sony.

      MR. FABRIZIO:  Well, quite the opposite.  Your Honor had it

right.  We are arguing that Sony does not apply in this context,

regardless of the non-infringing uses.

      THE COURT:  Right.

      MR. FABRIZIO:  The one thing we haven't done in this case

is try to prove that there are no non-infringing uses.

      MR. THOMPSON:  Well, that brings me to the next slide then.

Maybe that's one place we can agree.  There are non-infringing uses.

      And if you could put up the slide 382.

      We have admissions from at least three witnesses from the

studio side.  First, from Mr. Zebrak, their expert, who ran across

instances of software.  David Kaplan, who confesses to having

actually used it himself, having Warner Brothers use Hotfile.  And

then you can see that the representative for -- I believe that's

Columbia said they don't usually take down trailers.  They allow

that use to happen.

      So, this is significant that we have an admission that

there's significant non-infringing uses.  I think the law is clear.

Sony still is controlling.  There's nothing -- no hint that Sony

shouldn't be applying in an online context. I haven't seen the last

cite he gave you, of course.

THE COURT: Well, I didn't necessarily agree with

Mr. Fabrizio earlier. I think Sony was more -- I think Sony

particularly carved out other secondary liability or contributory

liability other than the one it was examining, which was commercial

product. And I think -- The question I have is, I don't know that

anybody said it expressly, but whether or not -- I think they have

vicarious liability, but in this context whether Sony is applicable.

And I'm not sure it is. I don't know that the cases -- I think what

Mr. Fabrizio was saying earlier, and what I was going to ask you

about, was the idea of this ongoing relationship, whether or not

that dynamic takes it outside of the Betamax rationale.

MR. THOMPSON: I don't believe it does. As Your Honor

alluded to earlier, one of the features of Hotfile is privacy. And

there is not a significant ongoing relationship in the sense of any

communication with the users, aside from perhaps some technical

issues here and there. Hotfile doesn't know who its users are,

doesn't know what's stored there. It just makes the service

available, much like Sony made its Betamax product available to

customers.

Your Honor, if you'd like further briefing on this, I'm

sure we could oblige you. Mr. Fabrizio, I'm sure, would agree to do

that, if this is an important issue.

THE COURT: They're the worst two words in --

MR. FABRIZIO:  Your Honor, it's already briefed.

THE COURT:  I've asked this question, you want to make sure it's answered.  So, I will ponder whether or not -- Look at Mr. Jacobs giving me the evil eye -- whether or not further briefing is -- My final question to you -- and then I do want to hear argument with regard to Mr. Titov -- is being an aficionado of old school, I don't know that you're really a storage unit.  Aren't you a swap shop?  Aren't the responsibilities more akin to -- and I'm going to butcher the name again -- Fonavia (ph).

MR. THOMPSON:  Fonovisa, Your Honor.

THE COURT:  That one -- in that you provide the lights, you provide -- Because the argument made in that case, although not in a technological context, is analogous in that they're saying, "Look, we just have a venue here.  These people come in, they set up, they pay their fee, but we don't know that they're selling knock-off Chanel or what they're doing."  And the Ninth said, "No, under copyright, we're not going to let you avoid liability."

How -- Especially since you have -- If you were just -- If you didn't have the affiliate program, but with the affiliate program where you are paying people to come in and store with you, how do you avoid the analogy to the swap shop?

MR. THOMPSON:  First of all, there are 123 million files.  There's no way -- Like the swap shop is aware of what people are doing?

THE COURT:  Right.

MR. THOMPSON:  Hotfile is not transparent, to use a word you used earlier.  The swap shop, by definition, is transparent. You can walk down the corridors and see what's being sold.  In Hotfile, there's privacy.  Those lockers are private.  Hotfile doesn't go in -- It couldn't look at 120 million files, to begin with.

Secondly, Your Honor, it is different.  It's online, it's cyberspace.  And the idea of imposing a burden on someone who provides storage online to be aware of the content would impose --

THE COURT:  Isn't that analysis a little more -- I mean I'm certainly no whiz, but I mean when you're speaking of cyberspace, are you not speaking of technicians and engineers and people designing programs and analogs that know they can't go into the file and see that it is a pirated movie?  But, again, the fingerprint, the hash -- There are ways to ferret out what is inappropriately stored and what isn't.  And the argument of anonymity can only take you so far, don't you think?

MR. THOMPSON:  Oh, absolutely, Your Honor, and that's why we showed the countermeasures that Hotfile has adopted from day one. It's been constantly evolving and improving.  In Fonovisa, there was no indication that they were changing anything or trying to adapt once they had some notice.  Here, Hotfile has, as we've explained in detail, been updating and changing its countermeasures, which now include the fingerprinting, earlier included the hash blocking, the SRA, et cetera.

Can you please put up 225?

Your Honor, it's well recognized by the courts that it is a different world when you go online, when you get out of the brick and mortar.  This just happens to be a quote from Perfect 10, that Perfect 10, or in this case Google, cannot analyze every image on the Internet to compare each image to all the other copyrighted images that exist in the world and determine whether a certain image on the web infringes someone's copyright.  That's what Hotfile would have to do with 123 million storage files, and that's just not a practical burden.  There's no practical ability to control.

THE COURT:  All right.

MR. THOMPSON:  Your Honor, in closing, I'm going to turn over to Mr. Titov.  I would like to make one last point.  I couldn't help but thinking of it.  You mentioned earlier the credibility determinations in the Daubert context.  And I just couldn't help thinking that's what juries are for, as you said.  If we're going to make decisions based on expert testimony, especially hotly disputed expert testimony, and Your Honor believes it should be considered by a jury, then that's not a summary judgment case.

Remember, we looked at that one e-mail, the one e-mail that talks about the flagship of unlicensed conduct.  At most, that raises issues of motive, intent, classic jury issues, things that should not be decided on summary judgment, especially based on one e-mail out of thousands.

But I'll turn over -- unless Your Honor has any questions?

THE COURT:  No.  But Mr. Fabrizio is right behind you.  He
doesn't agree with you again.

MR. FABRIZIO:  I agree with almost everything Rod said.  I
just have a few clarifications.

MR. THOMPSON:  I would like to make sure we have time.

Thank you, Your Honor.

THE COURT:  Yes, yes.

MR. FABRIZIO:  Your Honor, inducement -- Well, first of
all, for vicarious and contributory, as we've talked about, those
are not analyses that require any of the expert testimony.  Those
can be decided.  The facts are not fairly in dispute.

Even on inducement, it is a totality of the circumstances
test.  Your Honor is permitted to grant summary judgment even if
there are disputes as to individual factors.  As long as when you
look at the totality of the circumstances, you are left with an
unmistakable conclusion that Hotfile acted with the object to foster
infringement.  That's what the Supreme Court said.  It effectively
directed that the case be remanded to be considered for summary
judgment.  And that is why every inducement case since has been
decided on summary judgment, because when you look at the totality,
you're allowed to determine whether you get an unmistakable
impression that they were fostering copyright infringement.

Just briefly, on the Perfect 10, the Google case, you have
to just understand the context of the case.  Google wasn't accused
of infringing contact that was -- content that was happening on its

site.  Google was accused of infringement for conduct occurring on third-party websites all over the Internet.  It was in that context that the practicality came into being.

Hotfile is being accused of infringement of what's happening on its own servers, just like Napster, just like Fung, just like Usenet.  Their ability to control is established by those cases, and convincingly so.

And they could filter.  The suggestion that they couldn't do anything is belied by the fact that they now claim to be filtering.  They just decided to do it two years too late.

Lastly, the notion of personal storage again.  Defendants encouraged, promoted, and paid for files for distribution.  They chastised their users not to upload things unless you're going to promote them.  They only paid for massive distribution.  But it doesn't matter.  If 80 percent of Hotfile was used for non-infringing storage, and 20 percent was used for infringing distribution, but yet Hotfile, through all of the considerations that we've talked about today, induced the uploads that led to those 20 percent infringing downloads, there's no question that they would be liable.  The non-infringing uses don't matter.  They're liable for what they did, not for what they didn't do.

So, I will leave it at that, since I know we wanted to turn to Mr. Titov.

THE COURT:  All right.  Thank you.

MR. THOMPSON:  Mr. Schoenberg will present this argument,

Your Honor.

       THE COURT:  All right.

       MR. FABRIZIO:  Oh, that's right.

       Well, how are we going to handle Mr. Titov?  We have a motion for summary judgment that he's liable.  They have a motion that he's not liable.

       THE COURT:  Right.

       MR. THOMPSON:  Respectfully, Your Honor, we have a separate motion that's entirely devoted to this issue.  We've heard the studios' motion all day.

       MR. FABRIZIO:  Well, we are plaintiffs.  It is our burden.

       THE COURT:  Well, I did think to have Mr. Titov's lawyer tee this off.

       MR. FABRIZIO:  On that case, I agree.

       THE COURT:  All right.

       MR. SCHOENBERG:  Good afternoon, Your Honor.  Tony Schoenberg.  I'm going to argue the motion of Mr. Titov.

       THE COURT:  Good afternoon, Mr. Schoenberg.

       MR. SCHOENBERG:  Your Honor, the claim against Mr. Titov in this case was initially based on a series of factual allegations in the complaint, which were then repeated in opposing Mr. Titov's motion to dismiss, and Judge Jordan relied on those allegations, including allegations such as that Lemuria was formed because of a subpoena served on a company called Webazilla.  None of which turned out to be true.  And they got past the 12(b) stage by relying on

those allegations.

When those allegations were proven false in discovery, they shifted their stories, and we've had a series of shifting stories in this case as to Mr. Titov.

In their summary judgment motion, the defendants argue that Mr. Titov should be personally liable because of his involvement with two other entities not parties before this Court.  One of which I just mentioned, Lemuria; the other which is called Hotfile Limited.  Then in their opposition brief, the story changed again. It evolved into, "Well, all three owners of the company are actually guiding spirits."

And then in their reply brief, this is what they've said. They've said:  Titov's participation in and management of Hotfile Corp. Suffice for personal liability on their own."  And I'd like to focus on that last statement, Your Honor, because it's not a correct statement of the law.

In the Eleventh Circuit, individual liability, it's not a participation standard.  It's a higher standard than that, a significantly higher standard.  It requires proof of actual participation as a moving force in the decision to engage in the infringing acts, or that the individual otherwise caused the infringement as a whole to occur, or in the vicarious liability context, that's reserved for individuals who have a dominant influence in a corporation and have the capacity to control its acts.

Your Honor, we submit that the undisputed factual record as to Mr. Titov does not support liability under these standards. And I think a useful way to look at this is to analyze and look at what courts have done when they've actually analyzed individual defendants under these standards. And I want to talk about three cases, three cases the plaintiffs have relied on, three cases that they call comparable to the instant case, because when you compare the facts of those cases to the facts related to Mr. Titov, they are simply incomparable. They're not remotely similar.

The first case, Your Honor, is LimeWire, which we've heard about a lot today. What we have here on the screen, Your Honor, is a chart that shows each of the facts that the Court relied on in the LimeWire case in finding the individual defendant liable. None of these facts are remotely similar, Your Honor, to Mr. Titov. He's not the CEO, nor is he the director of Hotfile. He's Hotfile's smallest shareholder. He doesn't run the company. In fact, the day-to-day operations of the company are run by one the larger shareholders of the company, a gentleman named Mr. Rumen Stoyanov. Mr. Titov's responsibilities are that of a technologist. That's why he was asked to join the company. He's a technology specialist.

THE COURT: He designed the code, correct?

MR. SCHOENBERG: He wrote the code, and, Your Honor, there's not a single case that the plaintiffs can cite to in which writing computer code is sufficient to hold an individual liable as the guiding spirit of a company.

THE COURT:  But you have a trinity, yes?  LimeWire is just the one guy.  If you have a triumvirate, do you therefore take yourself outside of any type of legal analysis that might -- I mean is it that Mr. Titov is a lesser involved individual, or is it that because we have to divide it three ways, we can't hold him liable?

MR. SCHOENBERG:  Actually, Your Honor, as an initial matter, our position is that in the normal case, individuals aren't liable for the acts of a corporation.  I mean we all learned that in law school.  That's why you incorporate.  That's part of the reason why you would incorporate.

THE COURT:  Part of the reason why they kept changing their theory.  I think they were going through the various corporate identities going back to find out where Mr. Titov placed in the scheme.

MR. SCHOENBERG:  Well, Your Honor, as I said, our initial position is that liability does not attach in the normal case to an individual for the acts of the corporation.  There are these limited exceptional circumstances, none of which we believe exist here, under which sometimes individuals are held personally liability for the acts of an entity.  And if I may continue with some of the facts that I was discussing.

THE COURT:  Yes.

MR. SCHOENBERG:  Mr. Titov is not responsible for matters of business and finance at Hotfile.  One of the larger shareholders, again Mr. Stoyanov, has that responsibility.

He's also --

THE COURT:  I thought Hotfile was -- Hotfile Limited managed the business of Hotfile, or am I in error on that?

MR. SCHOENBERG:  No, Your Honor, I'm going to get to that. I can just tell you, Hotfile Limited is an entity that has one purpose and one purpose only, and that is to operate a PayPal account on behalf of Hotfile Corporation.  And the reason for that is because when Hotfile first incorporated, and when it first began its business, PayPal at that time had restrictions on what a Panamanian corporation could do via PayPal.  Specifically, they weren't allowed to receive funds.  And if you go on the PayPal website, you'll see there are restrictions that apply to different countries.

So, they came up with a simple solution to that, which is they incorporated Hotfile Limited, which is a Bulgarian corporation, not a Panamanian corporation.  Mr. Titov is its managing director. And it has just one function, which is to operate a PayPal account. And that's it.

And Mr. Titov has a written contract with Hotfile Limited, which is in the record, and we've put it in the record.  And that written contract specifically says that Mr. Titov, in his role as managing director of Hotfile Limited, must take instruction from Hotfile Corp.

So, that was a long way of saying the answer is no, Hotfile Limited does not run Hotfile Corporation.  Hotfile Corporation runs

Hotfile Corporation.

THE COURT:  No.  I didn't think it did.  I just thought
Hotfile Limited had -- when you said he didn't operate the
day-to-day, that Hotfile Limited had more of a business presence
use.

MR. SCHOENBERG:  Your Honor, if I may continue.  The point
I was about to make is that when you look at how the
responsibilities are split, and this is important in this case,
Mr. Titov doesn't have responsibility for DMCA-related issues, and
that the testimony in the record is that that was a responsibility
that fell to one of the larger shareholders, Mr. Atanas Vangelov,
not Mr. Titov.  He's not the ultimate decision-maker in the company.
And, in fact, the evidence in the record is that he doesn't have the
power to set policy or to make significant decisions without the
approval of the larger shareholders.

And unlike the defendant in the LimeWire case, he didn't
have veto power, and he didn't conceive of the business.  The
evidence in the record is that the idea for the business came from
Mr. Stoyanov, again, one of the larger shareholders; the idea for
the affiliate program came from Mr. Stoyanov; and, in fact,
Mr. Stoyanov designed the affiliate program.  So, this is not
remotely like the situation in the LimeWire case.

So, I want to go on to the next case now, which also,
according to the plaintiffs, is comparable.  And it's clear when you
look at the facts, it's actually the opposite of that.  This is the

Usenet case.  And I'm sorry for the density of this slide, but these
are all of the facts that the Court relied on in Usenet in finding
the individual defendant liable.  And, again, this is nothing like
Mr. Titov.  He's not the sole shareholder; he's not the director.  I
won't go through all of them, Your Honor, but you get the picture.
He doesn't have the ubiquitous role.  His responsibilities aren't to
this extent.  It is simply not a comparable case.

        The third comparable case, according to the plaintiffs, is
Fung.  These are the facts of Fung.  The Court didn't discuss the
facts related to Mr. Fung in the level of detail they did in the
other two cases, but nonetheless it was clear he was running a
website by himself, he created it, he was posting links to motion
pictures personally himself, he made a number of what I would call
statements against interest, you could say.  There's nothing
remotely like Fung in the instant case.

        A point I want to make, Your Honor, is the e-mails that the
defendants have tried to make an issue out of in this case that they
claim support their sort of theories of liability as to Hotfile,
those are e-mails written not by Mr. Titov, but written by
Mr. Stoyanov, Mr. Vangelov, and Mr. Ianokov, who is an employee of
Blue Ant.

        And I may have -- I'm not sure that I covered this one fact
in my statements a few moments ago.  The employees or the personnel
who work for Hotfile, they are employees of an entity called
BlueAnt.  BlueAnt is a company that is owned 50/50 by Mr. Stoyanov

and Mr. Vangelov.  It's been in existence since 2003, five years

before Hotfile.  It provides the personnel who do the work for

Hotfile.  Those personnel report to and are supervised by

Mr. Stoyanov and Mr. Vangelov, not by Mr. Titov.  And, in fact, all

of the employees of BlueAnt don't work for Hotfile.  There are

employees of BlueAnt who don't.

          And as I said, Mr. Ianokov is an employee of BlueAnt, who's

not supervised by Mr. Titov.  He no longer works for the company,

but he wasn't supervised by Mr. Titov, nor did he report to

Mr. Titov.

          THE COURT:  Could I go back to something you said earlier,

because I think the plaintiffs have brought it up, and I'd just like

you to point me to the record.  Did Mr. Titov have any role in

addressing the copyright notices?  He was -- So, I think we've

answered, he was not at the other end of report abuse, and he was

never involved in --

          MR. SCHOENBERG:  Right.

          THE COURT:  -- responding to that or handling those

notifications.

          MR. SCHOENBERG:  That is correct, Your Honor.  The

individuals who were responsible for handling those notifications

were BlueAnt employees, for most of the time a gentleman named

Mr. Ianokov.  There was an independent contractor named

Mr. Manov (ph), who for a very brief time was doing that role.  He

didn't work for BlueAnt.  He was an independent contractor.  The

evidence in the record on that is that he also was supervised by

Mr. Stoyanov and/or Mr. Vangelov, not by Mr. Titov.  So, now,

Mr. Titov was not responsible for, nor was he the supervisor of, the

people who were doing that.

THE COURT:  Okay.  Thank you.

MR. SCHOENBERG:  So, I'm just reiterating the facts, Your

Honor, which are not genuinely in dispute as to Mr. Titov, not

responsible for day-to-day operations, doesn't supervise the

personnel who do the work for Hotfile.  They all work for BlueAnt,

which is owned by the larger shareholders.  His responsibilities are

limited to technology, not responsible for matters of business,

finance, DMCA, or legal compliance.  It wasn't his idea to found the

company, wasn't his idea to adopt the affiliate program, didn't

design its payment criteria.  His input into the program was limited

to data storage, and there's testimony about that, not the business

terms.  He doesn't have policy-making authority; he can't make

significant decisions without the approval of the larger

shareholders.  And, again, he's the smallest shareholder in the

company, Your Honor.

THE COURT:  But does that last "does not have the

authority" -- is that in contra -- does that contradict Mr. Titov's

testimony that the business is run by consensus?

MR. SCHOENBERG:  Well, Your Honor, there is testimony that

there are decisions made by consensus, and they do discuss things

together, no question about it.  That's not enough to establish

liability under these standards.

And I would also point out, Your Honor, with respect -- The only testimony in the record is general testimony about sometimes there are discussions and consensus-based decisions.  And, Your Honor, I submit it's their burden in this case to establish liability, and they can't prove it just based on generalized testimony about sometimes decisions are made based on consensus.

THE COURT:  Right.  But, again, we've got this continuum that the parties have set up for me that there are these cases that talk about -- where it's clear Mr. Fung, not the brightest bulb, an individual who solely controls the activities and the design and implementation.  Okay.

Then on the other end, you have some huge corporation, board of directors, limited liability -- the whole, as you say, what we learned in law school.  Somewhere here is the Hotfile model, where you have three individuals who comprise the business, as it were.  Do you have any case that tells me that when I have more than one individual like this, I am precluded from looking to an individual as the guiding or controlling spirit or moving force, that just by virtue of multiple individuals somehow liability can't be imposed?

MR. SCHOENBERG:  Well, Your Honor, I would point you to the Mozingo case as an example of a case -- it's from the Fifth Circuit -- where an individual who had a much more significant role than Mr. Titov was found not liable under these standards.

In terms of your specific question about numbers of people, I'm not aware of a case that gets into that particular question.  I will say, though, this is not a case of what I would call Three Musketeers or something of that nature.  We have two individuals who were previously the owners of a company, BlueAnt, who decided to form this business together, and they brought Mr. Titov on solely to be the technologist.  And that's what he does.  It's a limited role, Your Honor, just technology.  And so --

THE COURT:  I mean that -- I wrote this down somewhere.  It would be one thing if you were to say -- I don't know, it's the end of the day.  So, Karl Lagerfeld is the designer for Chanel, and you bring in somebody, and they're just getting you price points and inventory; he's just technology.  Or you have JPMorgan and their financial instruments and sale; this guy is just technology.  This doesn't exist.  That is what this is, technology.  Without Mr. Titov, the other two gentlemen would indeed have a swap shop somewhere on a corner.  It is technology.  Does that not make a distinction?

MR. SCHOENBERG:  Well, Your Honor, I mean Google is technology, Apple is technology.

THE COURT:  Right.

MR. SCHOENBERG:  They all employ hundreds, if not thousands, of engineers and people who write code.  That's not -- That doesn't make someone the guiding spirit or vicariously liable for those companies' acts.  It doesn't.  And there's not a single

case the plaintiffs have cited where a technologist has been held personally liable, nor have they cited to a single case -- and I don't believe there's any -- where someone has been held personally liable for writing code.  There is no such case, Your Honor.

THE COURT:  There is no such case in the copyright world because why?  Because most all of these cases involved individuals, and when you have corporate behemoths like Google and Viacom, assessing individual liability is a futility?  I mean you have a Bill Gates, you have a board of directors -- well, I'm talking about Microsoft -- but you have a board of directors, you have a vast array of people who were hired.  That's why I'm saying, in the continuum, we don't have a vast array here.  We have three.  Doesn't that make it different somehow?

MR. SCHOENBERG:  Your Honor, you're correct, there are three here.  And as I mentioned, Mr. Titov's role is a limited role of those three.  He's not the one with DMCA compliance responsibility, he doesn't supervise the personnel, he didn't design the affiliate program.  It wasn't his idea.  The company wasn't his idea.

THE COURT:  Is there anything in the record about how the companies either -- who owns what portion of the business?  Is there anything --

MR. SCHOENBERG:  Absolutely.  Mr. Titov owns 26 percent, Your Honor.  The other two shareholders own 37 percent.  And that is in the record.  Initially, Mr. Titov owned 20 percent.  He was a

very good technologist, and so his share was increased to 26 percent

at some point in the past, and that's where it's been ever since.

And so, he has the smallest share of the three.

THE COURT:  Okay.

MR. SCHOENBERG:  And if I may just go -- I have just a few

small points I want to make, Your Honor, in addition to what I've

made already.

Lemuria I mentioned earlier, and the plaintiffs have had

shifting stories regarding Lemuria in particular.  And I don't want

to get into the particulars of the allegations that they've made,

because they really are just based on innuendo and conjecture.  I

want to talk about what the evidence actually shows about Lemuria,

just so there's a clear record and no question about it.

Lemuria, Your Honor, is a Florida corporation.  Mr. Titov

is the owner of the corporation.  It has two functions.  One

function is it provides web hosting services to Hotfile, and the

other function is it pays certain expenses on behalf of Hotfile, and

it simply does that because it's convenient and expeditious for an

American corporation to pay expenses -- I should say it's easier and

more expeditious than it is for a Panamanian corporation to pay

expenses.

They had an oral contract for a period time.  It is now a

formalized written agreement.  We've submitted it to the Court.

It's Exhibit C to Mr. Titov's declaration.  It explains exactly how

this relationship between the entities works.  And that's the whole

story to Lemuria.  Everything else is just conjecture and innuendo
on the part of the plaintiffs.

          In thinking about that, Your Honor, I want to just read
from a Supreme Court case, Matsushita, which is a summary judgment
case.  And that case says:  In order to oppose summary judgment, the
opposing party, quote, "must do more than simply show that there is
some metaphysical doubt as to the material facts."  And, Your Honor,
I would submit that they have done nothing more than that with
respect to Mr. Titov.

          And my last slide here, Your Honor, is just related to
Hotfile Limited, which we've already discussed.  There was some
allegation at the very beginning of the case that Mr. Titov had paid
uploading users.  The reality is explained in this slide here.  I
don't want to bog you down in the detail of it.  But as I said
before, Hotfile Limited is an entity that was formed and exists for
one purpose, which is to operate a PayPal account.  Mr. Titov is not
a guiding spirit of Hotfile Corporation, nor is he vicariously
liable based on two non-party entities that have contractual
arrangements with Hotfile.  And there's no authority that would
support that liability.  It's far too remote and far too attenuated.

          And so, let me just finish, Your Honor, by saying this is a
very serious motion for Mr. Titov.  Mr. Titov is the smallest
shareholder of the company, he's just the company's technologist, he
is not a CEO, he's not a CFO, and yet he's been sued in a very
significant and serious lawsuit.  And I can only say that it's an

understatement to say that he's concerned about this.  And that's
why he traveled here from Bulgaria today, Your Honor.

           And so, we urge you to reach the decision that is compelled
by the law and the undisputed facts and grant summary judgment for
Mr. Titov.

           Thank you, Your Honor.

           THE COURT:  Thank you.

           MR. FABRIZIO:  I know it's late, and I will try and be as
quick as I can.

           MR. SCHOENBERG:  Your Honor, may I approach and look at the
chart, please?

           THE COURT:  Of course.  Yes.

           You probably can see as much as I can with my eyesight,
but, yes, come up.

           MR. FABRIZIO:  I've always been curious as to why
defendants are so concerned about our allegations and how they have
changed since the complaint was filed.  Allegations are supposed to
conform to the facts.  We got discovery.  I think a lot of what was
in the complaint was proven, but a whole lot more showed up.

           What Mr. Titov just described were cases where there was
only one principal.  Of course that principal was the dominant
force.  But we have yet to see a case where in a company where there
are three principals, where any Court has suggested that one of them
couldn't have personal participation liability, guiding force
liability, or even sort of controlling benefit liability just

because there are two others.  I mean, that would be a very
convenient way to insulate yourself from liability.  And make no
mistake, in cases like this, it's very important to actually hold
the wrongdoers liable, because they can just simply shut down the
business and move on to the next one.  If you don't hold the
principals liable, then you can end up with illusory relief.

Now, I do agree with Mr. Schoenberg that the cases -- that
the facts are not really in dispute.  But, shockingly, I have a
different take on what they mean legally.

But let's first make clear.  There are a lot of labels
being thrown around, he didn't have responsibility for this, he
didn't have responsibility for that.  That's fine.  I don't consider
those the facts.  I consider the facts what he did.  I think what he
did speaks to whether he has liability.  Whether he was formally in
charge of the DMCA issues in the case isn't as important as his
actual involvement in the DMCA issues.  Whether he was formally in
charge of finance is not as important as the fact that he was in
charge of the company that operated their finances.  This is not
just a PayPal account.  As far as we can see, it's substantially
where all their money comes into and where it all goes out from.

So, there are a lot of facts, Your Honor, that while not in
dispute, you actually just have to look at the fact, not the labels
that are being put on them.

A corporate representative is individually liable if he
personally participated in the infringing actions.  Granted, Your

Honor, it's not just passing participation.  You have to in some way

be a moving force or a guiding spirit.  I don't think that there's

really serious dispute over the standard.  But the Southern District

case, the Babbitt Electronics case, says, and I quote:  "A corporate

officer who directs, controls, ratifies, participates in, or is the

moving force behind the infringing activity is personally liable for

such infringement without regard to piercing of the corporate veil."

        THE COURT:  Right.  We're not having a flashback to law

school.  We are not engaged in the piercing the corporation veil,

are we?

        MR. FABRIZIO:  We don't need to, Your Honor.  We clearly

could, but we don't need to.

        The real dispute here is I don't believe one of fact, but

about two related legal issues.  One is, as we've just discussed,

whether the fact there are two other shareholders absolves Mr. Titov

of liability on a per se basis.  Clearly, it does not.  There are

innumerable cases where more than one person is held liable.

        In another Southern of District of Florida case, the

Foreign Imported Products and Pub -- I don't really know what the

"pub" means -- it's 2008 Westlaw 4724495 at star 14.  It said:  "The

Eleventh Circuit's Southern Bell case" -- and it's obviously the

standard -- "the Eleventh Circuit's Southern Bell case does not

require ultimate authority, nor does it require only one person to

have authority."

        At page 4 of I believe our reply brief, we identify a

series of cases.  The Pickwick Music Corp. Case, at 292 F.Supp 39;
the Microsoft case, at 203 Lexis 13735; the Slip and Slide Records
case, at 207 Lexis 9014; the Johnson and Johnson consumer case, at
540 F.Supp.2d 374, and the list actually does go on.  All of these
cases found more than one person liable.

So, on that issue, we don't think there's any basis to try
and absolve Mr. Titov of liability because he had two other
shareholders.

The other issue is that Mr. Titov's participation cannot be
judged based on actions he took through two related companies,
Hotfile Limited and Lemuria.  Your Honor, these companies are
intertwined with Hotfile, and we cited a case for saying when
companies are intertwined like this, of course it's logical to
consider them.

Importantly, Your Honor, what we're not doing, we're not
asking the Court to attribute to Mr. Titov actions of those
companies performed by some staff member of those companies.  We're
not asking you to attribute to him corporate actions.  We're asking
you to attribute to him actions that he himself personally did and
does.  His involvement, of course, has to be measured like that, or
else, again, you invite companies like Hotfile to set up different
companies to perform different function.  And, of course, nobody can
be liable in that case.

Hotfile Limited, as we've talked about, handles all of the
payments -- or a substantial number of the payments into and out of

Hotfile.  Not an insignificant responsibility.  Mr. Titov is the
sole manager of Hotfile Limited.

Lemuria, formed by Titov, and Mr. Titov is the only owner
and the only manager, was formed for the specific purpose of
providing services to Hotfile.  Your Honor, we haven't abandoned our
belief that Lemuria was formed to interpose a layer between Hotfile
and other ISPs that would shut it down because of its infringing
ways.  But we don't need to get into an area that may be fraught
with fact issues.  The reality is that there are no disputes as to
what Lemuria does.  It's not your typical ISP.  It acts as a front
for Hotfile in virtually all its commerce dealings.

Now, that's fine -- Mr. Titov says it's just convenient to
do it that way.  But companies don't operate like that.  If one
company needs somebody to pay its lawyers, I just don't call up my
ISP and say, "Can you pay for my lawyers?"  But that's what they do
with Lemuria.

In relation to the infringing conduct of the case,
Mr. Titov is the one, through Lemuria, that actually commissions all
of the staff that run Hotfile.  They talked about it being BlueAnt,
a company that's owned by Messrs. Stoyanov and Vangelov.  But
Mr. Titov -- The Hotfile Corporation does not contract for its own
staff.  It doesn't have the employees, but it doesn't even contract
for its own staff.  Hotfile Limited doesn't contract for its own
staff, no.  Lemuria contracts for the people that run Hotfile.  So,
those people, in fact, do report to Mr. Titov.  He hires them.

We talked about how Mr. Titov is the lead developer on the source code.  And a word about that.  No one is suggesting that simply by virtue of writing code, you have liability.  But this is a case largely about the technology.  He was a central figure, a guiding spirit, a moving force in the technological development.  But he's so much more.  You get to consider his role as the lead developer in the context of him being one of three principals, in the context of him handling affiliate payments, in the context of all he does through Lemuria, and as Your Honor pointed out, the testimony, in the context where he said "all decisions of consequence."  Now, it was kind of downplayed a little bit.  But what Mr. Titov said is almost all decisions of consequence are made by consensus.

He also said he never disagreed with any of the decisions that his other co-principals made, and that they never disagreed with any of the decisions he made.  And he specifically said that in connection with the repeat infringer policy and in connection with their affiliate program.

So, whether he was the idea spark is not the question.  He was directly involved in those decisions, and if he didn't make them, because no one shareholder can make decisions, because no one shareholder has majority, he certainly participated in them and ratified them.  And those are the activities that go to the heart of this case.

Mr. Titov not only developed the initial code, or

substantial parts of it, through Lemuria, he continues to be in charge of all upgrades and further developments of that code.

He participated in the decisions regarding the design and functionality of the Hotfile website.  Again, because he makes the payments to all affiliates, he effectively manages the affiliate program.  He participated in the decisions regarding the structure of the affiliate program.  He personally went out with -- maybe with others, maybe not, but he admits to personally going out and researching their competitors.  And here, Your Honor, I'll get my Mega upload.  He researched Mega upload to determine what their business model should look like, and went back then with his colleagues and built that business.  The fact that it may not have been his idea is not really as important when he is a founder.

THE COURT:  Well, he's a founder.  Other than that, a technologist.  But does he have any -- Are there titles affiliated with Hotfile?  Do Mr. --

MR. FABRIZIO:  They do not have formal titles.

THE COURT:  Is that because of Bulgarian law?  Did I read that correctly?  No?  That was something else?

MR. FABRIZIO:  I don't know whether it's a matter of Bulgarian law.  I was only thinking of something sarcastic that I probably shouldn't say.

THE COURT:  Okay.  But the fact that he's not the CFO doesn't mean someone else is.

MR. FABRIZIO:  No one is, according to them.  But I will

tell you this, there was a point in time when somebody needed to be designated a corporate officer for some document, and Mr. Titov proposed himself as the CEO.  He is one of the three managers of Hotfile.  He acknowledges that he's manager of Hotfile.  He has signed every interrogatory response in this case as manager of Hotfile.

        He went in online forums himself and promoted and advertised the Hotfile affiliate program.  That's at the heart of what this case is about.

        THE COURT:  Although he did not design it, according to the record.

        MR. FABRIZIO:  He participated in the decisions to design it -- with the design of it, he acknowledges, and he did not disagree with the design or structure of it.

        THE COURT:  He did design the idea of the one file once you link it into the --

        MR. FABRIZIO:  I believe so, Your Honor, although honestly I think the testimony was a little muddied on that.

        THE COURT:  Okay.

        MR. FABRIZIO:  I think he acknowledges that he probably did it, but he doesn't remember.

        THE COURT:  I'm going to have to -- because we are -- I actually do have another appointment, but I'm going to have to ask you to wrap it up, because I know counsel is going to want to get up and reply to your remarks.

MR. FABRIZIO:  Okay.  I'll end with this.  Talking about
what's right at the heart of this case, remember that draft e-mail
that the defendants put up about the falsely stated repeat infringer
policy?  That was sent to Mr. Titov for his approval.  He said,
"It's great."  When they finally got around to hiring a DMCA agent,
it was Mr. Titov who worked with the outside company, Incorporate
Now, who did it.

These are not facts that are in dispute.  Again, the labels
that people put on these things, where they're their formal titles
or they're formal divisions of responsibility, can't create disputes
when you actually look at what Mr. Titov did and didn't do.  And
based on what he did and didn't do, it's hard to see how he couldn't
have liability in this case.

Thank you, Your Honor.

THE COURT:  Thank you.

MR. SCHOENBERG:  Your Honor, I'll try to make this as brief
as possible.  I know we're at the finish line here.

Your Honor, with all due respect, counsel does not know the
record as to Mr. Titov.  Okay?  He simply doesn't know it.

Let me start with one of his last statements when you asked
about who designed the one file issue.  The testimony in the record
on that, Mr. Fabrizio asked:  "Did you make the decision on the
technology side that Hotfile would disable only the specifically
noticed URL?"

The response:  "I don't believe so."

So that's in the record.  I believe it's page 604 of his deposition.

The assertion about Mega upload, wrong.  He was asked that question and he said, "No, I did not look at Mega upload."

The affiliate program.  The testimony is that Mr. Stoyanov was responsible for the affiliate program, not Mr. Titov.  Mr. Titov does take responsibility for making payments, which is a mechanical process, and that is in the record that it is a purely mechanical, ministerial function.  But responsibility for monitoring and the business aspects of the program are not within his domain.

THE COURT:  The money -- It's not Mr. Vangelov or Mr. Stoyanov who have control or direct the corporation that controls the account.  It's Mr. --

MR. SCHOENBERG:  Mr. Titov is the managing director of Hotfile Limited.

THE COURT:  Right.

MR. SCHOENBERG:  And that's why the payments are made by Mr. Titov.  As I said, that's an entity that has only one function -- to operate a PayPal account.  That's it.

THE COURT:  For Hotfile.

MR. SCHOENBERG:  For Hotfile Corporation's benefit, absolutely.

Counsel mentioned decisions regarding the functionality and design of the website.  So, again, he doesn't know the record, Your Honor.  Mr. Titov wasn't the person who did the web design.  They

hired an outside contractor to do that.  That's in the record.  And, moreover, with regard to functionality, if you read the testimony in its entirety, Mr. Titov's testimony is that with regard to functionality, his main role was to say if things were technically feasible.  That was his role.

I want to talk a little bit about the law.  Counsel mentioned a number of cases, including Foreign Imported Products, Microsoft, Slip and Slide.  Your Honor, those cases are all inapposite.  Those cases are cases in which individuals were the actual direct infringers.  That is not this case, Your Honor.

They were also cases -- several of them involving counterfeit goods.  The Microsoft case, it was several gentlemen who were out selling counterfeit Microsoft software.  I think he mentioned Johnson & Johnson.  That's a case where individuals were selling counterfeit cosmetics.  These are simply cases that have nothing to do with the instant case.

And I just want to reiterate a few points about Lemuria, Your Honor.  Lemuria and Hotfile are corporate entities that have an arm's length relationship; they have a formal contractual relationship.  As I mentioned, in addition to web hosting services, Hotfile pays expenses -- excuse me -- Lemuria pays some expenses on behalf of Hotfile.  One of those is to BlueAnt for the services of the personnel who do the work.  That's part of that contractual arrangement.

I also would make an additional point.  In their papers --

and Mr. Fabrizio echoed this a little bit in his comments -- they
seem to misunderstand what web hosting companies do.  And we've
submitted evidence about this, Your Honor.  And a number -- And the
services that Lemuria provides are very typical of web hosts.  And I
don't want to bog you down in technical detail, but there is
evidence about this.  It's in one of Mr. Titov's declarations, I
believe the declaration in opposition to summary judgment.  And I'll
just say that they misunderstand what web hosting means, Your Honor.

        So, let me just end by saying, the undisputed facts, Your
Honor, facts of which there is no genuine dispute, can lead to only
one conclusion with respect to Mr. Titov, and that is that summary
judgment should be granted in his favor, Your Honor.

        Thank you very much.

        THE COURT:  Thank you.

        All right.  Gentlemen and ladies, I think that is all we're
going to be able to do today.  I don't know where we go from here in
terms of reconvening for argument on the counterclaim or whether or
not we should leave that to the papers.

        MR. FABRIZIO:  May I?

        THE COURT:  Well, yes.

        MR. FABRIZIO:  I asked.

        On the counterclaim, we would be content with having Your
Honor review the papers, and then getting back to us as to whether
the Court feels that oral argument would assist the Court.  And if
the Court is prepared or feels that it can fully decide the matter

without argument, that would be fine with us.

          MR. THOMPSON:  I can't disagree that we'll do whatever the Court finds helpful.  We are prepared argue that.

          THE COURT:  Okay.

          With regard to today, if the parties wish to simultaneously file within seven days no more than -- Help me out.

          MR. THOMPSON:  Ten pages?

          THE COURT:  All right.  Ten pages in response to what you perceived I asked of you and you wish to expand upon.  So, a week from today, end of business, or is that too imposing of a schedule considering all you've done to prepare for today?

          MR. FABRIZIO:  It would not otherwise be an imposing schedule at all, but I technically started a week-long vacation today.

          THE COURT:  Wow, aren't you the funster.

          MR. FABRIZIO:  Could we have two weeks to submit that?

          THE COURT:  Two weeks.

          MR. FABRIZIO:  Thank you, Your Honor.

          MR. THOMPSON:  Your Honor, would we have the transcript available before the brief is due?  That might be helpful for the writing.

          THE COURT:  Well, that depends.

          COURT REPORTER:  I don't know.

          THE COURT:  There we go.  If the stars align.

          MR. THOMPSON:  Okay.  We understand.

MR. FABRIZIO:  Your Honor, can I just -- Is it that the Court would like the parties to address a particular issue?

THE COURT:  No.  No, no.

MR. FABRIZIO:  If that's the case, Your Honor, this case has been briefed to death.  I'm not sure that unless the Court wants additional briefing, that there's cause to have additional briefing.

THE COURT:  I think that "to death" is in extreme, but it certainly has received quite a bit of briefing.  I just thought that there were some areas where I heard both counsel say, "Let me -- I'd like to look back at."  And inasmuch as we've spent all day here and not had the opportunity to really look back, I just thought I'd make this available.  That's all.

MR. THOMPSON:  We would appreciate the opportunity, Your Honor.

THE COURT:  Okay.  You can be silent like the grave, as it were.

MR. FABRIZIO:  Unlikely, Your Honor.

THE COURT:  Well, hope springs eternal.

All right.  So, we have the counterclaim and the evidentiary matters, but you've all given me quite a bit to think of today.  And I want to thank you for not only superlative briefing, but superlative oral argument.  I know everybody is probably very weary, but I have to say it was not only enlightening, but a pleasure to hear from all of you.  So, thank you very much.

And starting your vacation, you've rendered me speechless

on that.

      MR. FABRIZIO:  Thank you, Your Honor.

      MR. THOMPSON:  Thank you, Your Honor.

      (Court adjourned at 5:10 p.m.)

### CERTIFICATION


I CERTIFY THAT THE FOREGOING IS A CORRECT TRANSCRIPT FROM THE RECORD

OF PROCEEDINGS IN THE ABOVE-ENTITLED MATTER.

August 24, 2012          S/DAVID S. EHRLICH
                          Official Court Reporter

## $

**$350** [1] - 19:15, 21:11

## '

**'repeat** [2] - 62:14, 78:12

## 0

**0.10** [1] - 120:23
**02459** [1] - 2:11
**046** [1] - 159:25

## 1

**1** [3] - 1:6, 106:3, 107:24
**1.3** [1] - 135:15
**10** [14] - 24:24, 38:14, 54:25, 55:7, 56:11, 56:14, 73:22, 75:5, 76:16, 96:12, 119:24, 165:4, 165:5, 166:23
**100** [6] - 16:8, 16:9, 16:10, 118:25, 122:22, 148:9
**109668** [1] - 80:13
**1099** [2] - 1:15, 95:20
**10:03** [1] - 3:1
**11** [3] - 56:21, 62:3, 117:4
**11-20427-civil-Williams** [1] - 3:4
**11-20427-CV-WILLIAMS** [1] - 1:2
**11-4** [1] - 1:24
**1102** [1] - 79:21
**11270** [1] - 76:25
**12** [1] - 56:13
**12(b** [1] - 168:25
**12,000** [1] - 53:8
**120** [4] - 19:4, 160:8, 160:15, 164:5
**1200** [1] - 37:5
**1221** [1] - 1:18
**123** [6] - 35:3, 35:18, 65:20, 71:7, 163:22, 165:9
**1285** [1] - 60:6
**1290** [1] - 60:6
**12:20** [1] - 85:25
**12:47** [1] - 138:10
**13** [1] - 95:20

**13735** [1] - 185:2
**14** [1] - 184:20
**15** [3] - 147:3, 147:22, 154:7
**15301** [1] - 1:20
**16** [1] - 77:1
**1650** [1] - 1:18
**17** [1] - 1:4
**1791754** [1] - 158:8
**17th** [2] - 2:5, 6:12
**18** [1] - 72:3
**18,000** [1] - 53:7
**1:30** [1] - 81:22, 81:23, 85:22, 85:24
**1:40** [1] - 86:1

## 2

**2** [5] - 94:3, 106:3, 107:24, 137:4, 145:10
**2.8** [1] - 35:3
**20** [7] - 2:10, 129:8, 129:11, 132:19, 167:16, 167:19, 179:25
**2003** [1] - 175:1
**2007** [1] - 65:14
**2008** [1] - 184:20
**2009** [24] - 26:11, 27:20, 29:22, 31:2, 31:3, 31:5, 31:11, 31:15, 32:7, 36:7, 37:18, 38:2, 39:9, 39:24, 39:25, 56:2, 56:5, 64:8, 67:8, 67:11, 95:25, 96:9, 101:19, 108:25
**2010** [11] - 34:10, 52:21, 53:1, 56:17, 59:23, 60:7, 62:15, 72:24, 76:1, 139:8, 150:17
**2011** [2] - 29:22, 33:22, 36:7, 48:4, 48:6, 48:9, 64:9, 80:8, 80:12, 118:13, 124:7, 124:12, 141:12, 142:1, 144:23, 150:16, 151:6, 151:10, 151:14, 151:20
**2012** [3] - 1:4, 76:25, 196:9
**203** [1] - 185:2
**207** [1] - 185:3
**21** [2] - 62:16, 62:18
**210** [1] - 158:8
**225** [1] - 165:1
**23** [1] - 148:11

**235** [1] - 2:5
**24** [2] - 137:5, 196:9
**24-hour** [1] - 147:9
**25,000** [1] - 45:6
**26** [3] - 33:21, 179:23, 180:1
**27** [2] - 41:15, 142:6
**27-page** [1] - 142:25
**283** [1] - 2:8
**29** [3] - 55:21, 56:1, 57:9
**292** [1] - 185:1

## 3

**3** [2] - 107:24, 158:8
**3.4** [3] - 40:18, 40:22, 41:3
**3.7** [5] - 35:15, 35:20, 45:10, 45:13, 70:1
**305** [1] - 1:25
**328** [1] - 133:4
**33** [1] - 58:6
**33128-1810** [1] - 1:25
**33131** [1] - 1:18
**33134** [1] - 2:8
**334** [1] - 159:22
**35** [1] - 156:8
**351** [1] - 79:20
**36,000** [1] - 35:5
**365** [1] - 84:13
**37** [1] - 179:24
**374** [1] - 185:4
**375** [1] - 120:3
**382** [1] - 161:15
**39** [1] - 185:1
**3:08** [1] - 134:21
**3:22** [1] - 134:22

## 4

**4** [2] - 107:25, 184:25
**40** [9] - 36:7, 36:19, 63:16, 64:9, 69:14, 70:3, 70:6, 70:25, 76:10
**40-some** [1] - 28:5
**400** [1] - 1:24
**43** [4] - 36:9, 36:12, 58:5, 63:17
**444** [1] - 94:2
**4724495** [1] - 184:20

## 5

**5** [11] - 62:15, 86:25, 87:12, 89:13, 90:11, 92:11, 93:21, 93:25,

94:15, 108:8, 157:11
**5.5** [1] - 35:6
**50** [6] - 69:9, 80:1, 135:14, 144:15, 145:21, 153:21
**50/50** [1] - 174:25
**500** [1] - 124:21
**500,000** [3] - 36:4, 69:19, 69:25
**500-some-odd** [1] - 36:6
**508** [1] - 148:12
**512** [1] - 79:24
**512(c** [2] - 57:23, 65:4
**512(c)** [2] - 61:3, 86:22
**512(i** [12] - 43:5, 52:18, 53:5, 58:1, 58:18, 59:3, 61:2, 66:18, 70:21, 79:17, 112:10, 157:5
**512(i)** [4] - 57:25, 72:12, 87:5, 113:21
**523-5537** [1] - 1:25
**53** [1] - 138:5
**54** [1] - 137:4
**540** [1] - 185:4
**56** [2] - 160:5, 160:22
**562,000** [3] - 35:21, 35:22, 35:23
**5:10** [1] - 196:4
**5A** [1] - 93:22

## 6

**6** [2] - 90:11, 94:15
**60** [1] - 156:7
**604** [1] - 191:1
**605** [1] - 59:22
**606** [1] - 60:6
**643** [1] - 159:22
**647** [1] - 133:3
**649** [1] - 159:23
**665** [1] - 95:20

## 7

**7** [1] - 80:13
**70** [1] - 154:24
**700** [1] - 17:7
**700,000** [5] - 62:6, 94:21, 95:7, 95:9, 100:9
**71** [3] - 9:22, 114:11, 117:10

## 8

**8** [1] - 48:9
**80** [3] - 129:9, 154:24, 167:15
**80s** [1] - 116:16
**825** [1] - 2:10
**843** [1] - 59:22
**849** [1] - 59:23
**89** [2] - 155:9, 155:10

## 9

**9** [1] - 18:22
**9.99** [1] - 115:1
**90** [28] - 10:12, 10:18, 22:25, 23:1, 23:3, 116:17, 125:13, 135:19, 140:15, 140:18, 140:24, 141:4, 141:9, 141:14, 141:21, 143:1, 144:13, 144:15, 146:25, 147:20, 148:2, 153:10, 153:21, 154:24, 155:1, 156:1, 156:15, 156:17
**90.2** [1] - 141:12
**900** [1] - 1:15
**9014** [1] - 185:3
**92** [2] - 35:10, 37:1
**93** [1] - 37:9
**94** [5] - 9:22, 10:3, 11:3, 114:10, 117:9
**94104** [1] - 2:6
**95** [1] - 156:9
**98** [1] - 40:5
**99** [1] - 40:5

## A

**a.m** [2] - 3:1, 138:10
**abandon** [1] - 8:3
**abandoned** [1] - 186:5
**abandoning** [1] - 8:12
**ability** [14] - 91:11, 99:16, 106:8, 113:3, 113:5, 113:7, 113:8, 113:9, 113:13, 113:14, 113:17, 113:18, 165:10, 167:6
**able** [7] - 39:21, 50:23, 60:17, 61:5, 84:14, 160:13, 193:16
**ABOVE** [1] - 196:8

**ABOVE-ENTITLED**
[1] - 196:8
**absolute** [3] - 27:9,
135:22, 151:25
**absolutely** [8] - 21:1,
21:4, 87:3, 91:24,
128:21, 145:24,
164:18, 191:22
**Absolutely** [3] -
57:15, 161:3, 179:23
**absolve** [2] - 134:1,
185:7
**absolved** [3] - 32:20,
32:21, 84:5
**absolves** [1] -
184:15
**absorb** [1] - 120:25
**Abuse** [1] - 74:10
**abuse** [4] - 86:9,
94:21, 108:25, 175:15
**Abuse@Hotfile** [1] -
74:15
**Abuse@Hotfile.**
**com** [6] - 27:1, 62:5,
62:13, 74:7, 74:12,
76:2
**abusing** [1] - 69:11
**accepted** [3] - 10:14,
150:13, 152:1
**accepts** [1] - 15:24
**access** [7] - 32:3,
66:20, 67:16, 106:13,
107:7, 113:8
**accidentally** [1] -
153:1
**accompanied** [3] -
75:13, 75:17, 75:22
**according** [6] -
71:21, 161:6, 173:24,
174:8, 188:25, 189:10
**Accordingly** [2] -
80:9, 94:10
**account** [26] - 27:22,
31:4, 31:19, 31:22,
31:23, 66:8, 78:19,
78:20, 80:23, 81:4,
81:8, 83:17, 96:8,
96:9, 102:15, 106:23,
107:16, 108:2,
108:10, 120:20,
172:7, 172:17,
181:16, 183:19,
191:13, 191:19
**accounted** [1] -
125:11
**accounts** [4] - 67:1,
67:6, 67:24, 79:19
**accumulate** [3] -
122:24, 122:25,
123:23

**accumulated** [3] -
45:6, 66:15, 122:23
**accumulating** [1] -
66:13
**accurate** [3] - 39:8,
75:17, 96:4
**accusations** [1] -
71:9
**accused** [6] - 68:7,
69:7, 69:13, 166:24,
167:1, 167:4
**acknowledge** [1] -
131:23
**acknowledged** [3] -
110:25, 111:10,
126:24
**acknowledges** [3] -
189:4, 189:13, 189:20
**acquire** [1] - 87:7
**Act** [5] - 23:15,
23:24, 32:23, 125:22,
125:23
**act** [5] - 61:4, 108:15,
128:24, 129:6, 132:14
**acted** [3] - 75:2,
114:2, 166:16
**acting** [2] - 46:4,
108:15
**action** [9] - 32:1,
49:7, 94:13, 98:1,
98:4, 130:22, 133:15,
133:18
**actions** [6] - 60:3,
183:25, 185:10,
185:16, 185:18,
185:19
**actively** [4] - 7:22,
10:20, 25:11, 103:16
**activities** [4] - 48:15,
127:19, 177:11,
187:23
**activity** [3] - 48:5,
150:25, 184:6
**acts** [8] - 113:24,
169:21, 169:25,
171:8, 171:17,
171:20, 178:25,
186:10
**actual** [26] - 16:16,
65:2, 86:21, 86:25,
87:4, 87:10, 88:3,
89:12, 90:11, 91:13,
92:3, 92:14, 92:19,
94:5, 94:19, 94:24,
97:2, 97:6, 100:9,
137:23, 157:7,
159:20, 169:19,
183:16, 192:10
**Adam's** [1] - 20:10
**adapt** [1] - 164:21

**addition** [2] - 180:6,
192:20
**additional** [3] -
192:25, 195:6
**Additionally** [1] -
136:2
**address** [29] - 4:18,
5:21, 6:3, 21:5, 21:6,
35:11, 36:2, 42:14,
43:10, 43:20, 44:5,
44:13, 57:14, 72:16,
73:19, 75:13, 75:17,
75:22, 75:25, 76:22,
81:8, 85:15, 86:9,
86:15, 86:16, 108:20,
139:18, 142:12, 195:2
**addressed** [2] - 78:5,
144:4
**addresses** [5] - 7:7,
12:5, 80:22, 81:5,
152:19
**addressing** [2] -
44:9, 175:14
**adduced** [2] - 47:1,
59:6
**adequate** [2] - 80:11,
80:20
**adjourn** [1] - 139:24
**adjourned** [1] -
196:4
**adjudicated** [3] -
138:23, 138:24,
139:14
**adjudication** [1] -
85:13
**admission** [2] -
144:9, 161:23
**admissions** [2] -
142:5, 161:16
**admit** [1] - 55:14
**admits** [2] - 45:5,
188:8
**admitted** [7] - 9:9,
11:10, 24:3, 48:21,
55:11, 55:13, 55:15
**admittedly** [1] -
103:25
**adopt** [5] - 28:24,
34:23, 66:22, 68:4,
176:13
**adopted** [20] - 27:23,
31:4, 31:5, 31:6,
31:15, 33:18, 34:1,
34:2, 34:4, 34:19,
38:3, 39:25, 65:16,
66:24, 66:25, 67:1,
67:2, 96:1, 96:7,
164:19
**adopting** [1] - 30:15
**advance** [1] - 66:19

**advanced** [2] - 8:25,
106:2
**Advanced** [1] - 9:5
**advertised** [2] -
130:13, 189:8
**advertising** [3] -
115:11, 130:15
**advice** [1] - 73:6
**advise** [1] - 78:20
**advisory** [1] - 47:21
**affidavits** [1] - 5:15
**affiliate** [33] - 7:25,
17:22, 18:1, 20:4,
20:7, 20:17, 20:21,
21:2, 21:14, 21:18,
21:21, 21:25, 22:8,
34:11, 34:12, 51:5,
134:4, 139:1, 139:10,
139:13, 163:19,
173:20, 173:21,
176:13, 179:18,
187:8, 187:18, 188:5,
188:7, 189:8, 191:5,
191:6
**affiliate's** [1] - 8:1
**affiliate-like** [1] -
139:1
**affiliated** [1] - 188:15
**affiliates** [14] - 17:24,
20:6, 21:12, 21:14,
22:16, 22:20, 34:13,
35:5, 50:6, 132:19,
132:25, 133:23,
147:17, 188:5
**affirmance** [1] -
141:24
**affirmatively** [1] -
126:24
**affirmed** [1] - 60:19
**aficionado** [1] -
163:6
**afraid** [1] - 20:1
**afternoon** [5] -
85:23, 140:3, 140:4,
168:16, 168:18
**agenda** [1] - 5:1
**agent** [13] - 11:25,
12:8, 43:2, 52:20,
52:22, 73:25, 74:17,
76:14, 77:2, 77:3,
86:4, 99:15, 190:5
**agents** [2] - 66:25,
67:12
**aggregate** [1] -
148:13
**aggregates** [1] -
148:11
**aggregating** [2] -
148:9, 149:17
**ago** [4] - 9:1, 29:12,

62:11, 174:23
**agree** [22] - 12:22,
30:23, 46:11, 51:9,
52:21, 53:2, 97:1,
99:13, 107:14,
119:15, 144:21,
145:10, 149:7,
159:19, 161:14,
162:3, 162:23, 166:2,
166:3, 168:14, 183:7
**agreed** [1] - 36:8
**agreeing** [1] - 12:17
**agreement** [1] -
180:23
**agrees** [2] - 52:25,
59:3
**AH** [1] - 16:18
**ahead** [7] - 27:11,
33:4, 47:3, 47:4,
111:5, 121:23, 122:7
**ahold** [1] - 12:6
**Aimster** [8] - 27:8,
52:13, 70:8, 70:11,
70:15, 90:14, 119:16,
159:9
**akin** [1] - 163:8
**AL** [2] - 1:3, 1:6
**al** [4] - 3:4, 3:5,
20:11, 21:14
**albums** [1] - 16:16
**alert** [2] - 28:4, 41:19
**algorithm** [1] - 38:8
**algorithms** [1] - 21:9
**align** [1] - 194:24
**allegation** [3] - 75:2,
75:4, 181:12
**Allegations** [1] -
182:17
**allegations** [7] -
168:20, 168:22,
168:23, 169:1, 169:2,
180:10, 182:16
**alleged** [2] - 10:9,
103:24
**allegedly** [2] - 94:17,
97:11
**alleges** [1] - 72:6
**allow** [11] - 19:20,
30:21, 46:4, 90:22,
91:9, 91:10, 96:17,
97:16, 112:3, 125:20,
161:21
**allowable** [1] - 91:14
**allowed** [9] - 23:22,
31:11, 37:24, 53:12,
80:22, 91:7, 116:14,
166:21, 172:11
**allowing** [1] - 18:10
**allows** [4] - 90:17,
91:4, 111:11, 136:19

**alluded** [5] - 95:16, 102:3, 118:23, 119:20, 162:15
**alma** [1] - 143:19
**almost** [7] - 34:2, 66:11, 99:4, 99:14, 151:25, 166:3, 187:12
**alone** [2] - 71:24, 142:17
**ALS** [2] - 84:22, 99:18
**alter** [1] - 93:10
**alternative** [1] - 121:20
**altogether** [1] - 112:1
**alum** [1] - 143:19
**Amazon** [3] - 73:23, 79:16, 79:18
**ambit** [1] - 50:8
**American** [2] - 73:7, 180:19
**amicus** [5] - 23:19, 23:23, 24:6, 29:17, 48:21
**amnesty** [4] - 41:21, 142:14, 143:12, 144:6
**amount** [9] - 8:17, 19:7, 45:17, 45:21, 50:12, 65:25, 86:21, 120:16, 152:14
**amounts** [2] - 50:25, 57:7
**amply** [1] - 43:19
**analogous** [1] - 163:13
**analogs** [1] - 164:13
**analogy** [2] - 31:20, 163:21
**analyses** [1] - 166:10
**analysis** [20] - 10:7, 10:8, 10:11, 38:6, 57:21, 70:6, 70:20, 93:10, 115:24, 125:13, 130:12, 135:13, 146:23, 150:4, 151:11, 152:13, 153:24, 157:24, 164:10, 171:3
**analyze** [2] - 165:5, 170:3
**analyzed** [2] - 151:3, 170:4
**analyzing** [1] - 7:17
**and-a-half** [1] - 127:6
**Andre** [1] - 74:17
**Andrei** [1] - 109:6
**ANDREW** [1] - 2:3
**Andrew** [1] - 4:5
**anecdotal** [5] -

10:10, 10:11, 124:20, 124:21, 125:14
**animated** [1] - 112:4
**annexation** [1] - 159:16
**announced** [1] - 139:9
**announces** [1] - 92:14
**anonymity** [2] - 50:6, 164:16
**anonymous** [3] - 137:18, 143:9, 147:23
**Anonymous** [1] - 146:6
**anonymously** [2] - 146:5, 146:22
**answer** [17] - 20:17, 36:3, 41:9, 44:23, 59:14, 72:9, 83:23, 92:18, 93:8, 110:5, 122:11, 126:14, 153:8, 155:6, 155:7, 172:24
**answered** [3] - 124:8, 163:3, 175:15
**Ant** [1] - 174:21
**ANTHONY** [1] - 2:4
**Anthony** [1] - 4:5
**anti** [10] - 56:3, 56:18, 67:12, 84:16, 84:17, 85:5, 107:1, 125:22, 127:1, 151:19
**anti-circumvention** [2] - 125:22, 127:1
**anti-piracy** [8] - 56:3, 56:18, 67:12, 84:16, 84:17, 85:5, 107:1, 151:19
**anticipate** [1] - 85:23
**anticipated** [3] - 5:7, 6:17, 68:16
**anticipating** [1] - 103:22
**antithetical** [1] - 11:5
**antitrust** [1] - 50:22
**Anton** [2] - 3:23, 153:4
**Anyway** [2] - 56:17, 84:11
**AOL's** [1] - 159:12
**apart** [1] - 128:11
**apologize** [2] - 26:8, 107:12
**appearance** [1] - 3:6
**APPEARANCES** [2] - 1:11, 2:1
**appeared** [1] - 101:25
**appended** [2] -

140:5, 140:20
**Appendix** [3] - 54:6
**Apple** [1] - 178:20
**apples** [6] - 30:4, 143:13, 144:1, 149:14
**apples-to-oranges** [1] - 149:14
**applicability** [1] - 30:23
**applicable** [7] - 110:4, 110:9, 110:10, 110:12, 110:16, 161:4, 162:9
**applied** [10] - 75:15, 119:15, 149:16, 150:12, 150:13, 157:19, 158:3, 158:4, 158:5, 158:6
**applies** [4] - 110:17, 141:25, 142:14, 160:25
**apply** [13] - 94:4, 94:5, 110:18, 111:2, 111:21, 112:5, 141:22, 148:7, 148:8, 149:24, 157:23, 161:8, 172:12
**applying** [3] - 119:13, 149:22, 162:1
**appointing** [1] - 52:22
**appointment** [1] - 189:23
**appreciate** [5] - 27:15, 41:7, 53:24, 85:8, 195:13
**approach** [4] - 46:5, 55:4, 68:1, 182:10
**approached** [1] - 14:9
**appropriate** [3] - 47:24, 79:18, 92:8
**approval** [4] - 56:15, 173:15, 176:17, 190:4
**approved** [1] - 56:14
**apps** [1] - 126:6
**apt** [2] - 17:17, 136:25
**area** [3] - 75:16, 93:19, 186:8
**areas** [3] - 38:17, 93:5, 195:9
**arguably** [2] - 80:11, 141:19
**argue** [13] - 23:21, 29:22, 64:12, 67:18, 78:14, 119:22, 121:20, 157:17, 157:18, 158:11, 168:17, 169:5, 194:3

**argued** [1] - 84:14
**arguing** [6] - 29:23, 52:5, 101:12, 160:25, 161:5, 161:8
**ARGUMENT** [1] - 1:8
**argument** [48] - 7:5, 15:14, 30:20, 37:12, 41:24, 50:5, 50:16, 52:10, 57:23, 58:22, 70:19, 71:1, 73:1, 73:9, 76:3, 77:9, 98:12, 98:19, 103:15, 105:21, 106:1, 106:4, 115:4, 119:17, 122:5, 124:5, 126:15, 132:4, 132:8, 133:7, 137:11, 137:14, 139:23, 142:11, 142:15, 143:7, 144:5, 154:4, 157:23, 160:4, 163:6, 163:12, 164:16, 167:25, 193:17, 193:24, 194:1, 195:22
**arguments** [5] - 28:17, 42:2, 48:4, 106:8, 122:1
**Arista** [1] - 61:19
**Arista/Myxer** [1] - 80:6
**arm's** [1] - 192:19
**arrangement** [2] - 20:5, 192:24
**arrangements** [1] - 181:19
**array** [2] - 179:11, 179:12
**arrayed** [1] - 4:9
**art** [11] - 30:15, 31:16, 33:20, 34:3, 40:15, 40:21, 41:5, 48:22, 146:2, 146:11, 152:22
**article** [3] - 110:8, 111:1, 111:12
**articles** [1] - 14:25
**articulated** [1] - 78:21
**artist** [2] - 91:13, 107:14
**artists** [2] - 16:17, 16:19
**ascribing** [1] - 137:19
**aside** [5] - 55:11, 57:5, 89:3, 95:7, 162:17
**aspect** [2] - 21:22, 99:14
**aspects** [2] - 90:3, 191:10

**assert** [1] - 140:18
**asserted** [1] - 98:4
**asserting** [1] - 102:17
**assertion** [1] - 191:3
**assessing** [1] - 179:8
**assessment** [2] - 64:10, 126:10
**assist** [2] - 116:1, 193:24
**assisted** [2] - 87:13, 103:19
**associate** [1] - 83:7
**assume** [11] - 14:10, 14:12, 14:15, 57:21, 71:15, 102:9, 107:9, 124:10, 125:1, 125:2
**assumed** [5] - 5:12, 54:10, 105:6, 129:21
**assumptions** [1] - 33:11
**assure** [1] - 50:3
**assured** [1] - 26:13
**astonishing** [2] - 45:21, 132:21
**Atanas** [1] - 173:11
**attach** [1] - 171:16
**attached** [2] - 99:8, 137:3
**attempt** [2] - 25:25, 49:19
**attempted** [1] - 8:25
**attention** [2] - 60:25, 62:19
**attenuated** [1] - 181:20
**attest** [1] - 31:25
**attitude** [1] - 72:20
**attract** [1] - 10:23
**attracted** [3] - 9:16, 116:21, 116:24
**attracting** [3] - 9:15, 11:2, 115:10
**attributable** [1] - 113:4
**attribute** [3] - 185:16, 185:18, 185:19
**attributed** [2] - 137:10, 137:18
**attributes** [1] - 139:7
**audience** [1] - 19:17
**August** [15] - 1:4, 6:12, 27:20, 31:5, 31:11, 32:7, 37:18, 38:2, 39:25, 67:8, 67:11, 88:24, 95:25, 96:9, 196:9
**author** [1] - 108:25

authority [8] - 90:25,
91:8, 126:23, 176:16,
176:21, 181:19,
184:23, 184:24
authorize [1] - 101:2
authorized [2] -
95:16, 101:1
authorizes [1] -
95:21
authors [1] - 125:20
automated [1] -
109:12
automates [1] -
109:12
automatic [3] -
31:23, 106:13, 142:2
automatically [4] -
19:5, 32:1, 94:23,
106:16
avail [2] - 64:6, 92:15
available [21] - 13:2,
18:6, 18:20, 27:1,
33:22, 33:25, 34:4,
60:13, 67:10, 67:14,
71:1, 89:11, 97:17,
109:5, 119:22,
139:16, 162:20,
194:20, 195:12
availing [1] - 76:4
avails [1] - 46:13
Avenue [3] - 1:15,
1:18, 2:8
avoid [3] - 100:13,
163:17, 163:21
avoided [1] - 103:4
aware [8] - 22:5,
60:16, 90:13, 90:24,
92:4, 163:23, 164:9,
178:2
awareness [3] -
94:12, 97:25, 98:3
awhile [2] - 20:16,
81:11

B

Babbitt [1] - 184:4
baby [1] - 37:3
back-door [2] - 32:3,
67:15
backdrop [1] -
154:12
background [1] -
26:1
backs [2] - 111:2,
111:3
backwards [2] -
97:8, 105:20
bad [6] - 8:5, 22:17,

137:16, 137:19,
138:11, 138:12
badness [1] - 33:11
balance [7] - 24:11,
25:10, 25:12, 48:22,
65:23, 85:17, 85:18
ban [1] - 39:20
band [1] - 91:9
bands [1] - 91:10
bar [1] - 157:3
bargain [2] - 85:9,
85:19
bars [1] - 11:20
base [2] - 7:22,
155:25
based [27] - 22:1,
22:6, 24:19, 38:6,
48:8, 60:22, 71:24,
80:25, 124:14, 130:3,
132:16, 133:1,
133:17, 136:2, 136:3,
150:22, 165:17,
165:23, 168:20,
177:4, 177:6, 177:7,
180:11, 181:18,
185:10, 190:12
bases [3] - 11:17,
143:14
basic [1] - 155:8
basis [11] - 43:21,
46:5, 93:5, 99:17,
101:14, 113:23,
157:5, 157:20,
158:11, 184:16, 185:6
battle [2] - 123:6,
148:25
Bay [1] - 56:3, 56:5,
57:10, 57:11, 57:12,
108:13, 108:14,
108:22
bay [1] - 134:13
Beacon [1] - 2:10
beans [1] - 152:14
become [9] - 8:6,
58:11, 71:4, 92:3,
137:23, 138:12,
138:13, 138:18,
155:23
becomes [2] - 156:1,
157:16
becoming [1] - 48:14
bed [1] - 150:15
BEFORE [1] - 1:19
beg [1] - 140:11
began [3] - 9:19,
27:18, 172:8
begin [2] - 11:16,
164:5
beginning [9] -
26:11, 26:14, 26:16,

26:25, 27:2, 27:5,
27:18, 72:5, 181:12
begins [1] - 123:10
begs [1] - 145:19
behalf [10] - 3:15,
3:17, 3:19, 3:22,
108:15, 143:21,
172:7, 180:17, 192:22
behemoths [1] -
179:7
behind [7] - 12:4,
33:2, 85:3, 85:15,
149:17, 166:1, 184:6
behooves [1] - 73:14
belied [2] - 151:18,
167:9
belief [1] - 186:6
believes [1] - 165:18
Bell [2] - 184:21,
184:22
belong [2] - 16:11,
68:14
belonged [1] - 97:12
belongs [1] - 94:16
below [1] - 119:3
bench [1] - 159:2
beneficial [1] - 19:19
benefit [15] - 99:15,
113:4, 113:22,
113:24, 114:5,
114:12, 114:22,
116:2, 116:22, 120:5,
122:7, 125:1, 136:8,
182:25, 191:21
benefits [1] - 18:25
best [9] - 25:24,
30:20, 73:7, 77:7,
78:4, 121:5, 128:15,
138:7, 151:20
bet [1] - 121:18
Betamax [6] - 110:3,
110:19, 111:21,
115:24, 162:13,
162:20
betrayed [1] - 33:5
better [4] - 32:14,
98:13, 109:25, 127:19
between [20] - 14:18,
24:12, 25:16, 25:17,
31:22, 46:18, 53:16,
64:8, 69:12, 77:19,
87:13, 99:1, 114:5,
114:13, 118:13,
121:8, 121:12,
128:18, 180:25, 186:6
beyond [4] - 9:18,
71:14, 71:17, 114:8
bias [6] - 123:15,
123:16, 124:17,
148:6, 149:23, 150:3

bicker [1] - 13:7
Big [1] - 151:14
big [13] - 46:18,
46:22, 118:14,
132:12, 135:6, 136:4,
136:6, 136:7, 136:10,
154:24, 154:25,
155:2, 156:9
Bill [1] - 179:9
billboards [1] -
128:14
billion [3] - 35:3,
147:12, 147:22
bind [1] - 99:12
bit [14] - 15:6, 23:15,
25:8, 27:24, 29:16,
51:2, 51:3, 62:9,
77:19, 187:11, 192:6,
193:1, 195:8, 195:20
bizarre [3] - 146:4,
147:2, 147:8
bizarrely [1] - 147:13
blanks [1] - 5:24
blatant [2] - 10:1,
10:4, 28:4, 117:8
blind [4] - 141:1,
141:2, 141:5, 149:23
Block [2] - 1:14, 60:5
block [9] - 80:21,
81:5, 108:20, 113:8,
113:14, 113:17,
113:18
blocked [6] - 41:3,
57:14, 81:3, 84:15,
96:22
blocking [16] -
27:23, 31:5, 34:2,
34:7, 37:18, 40:4,
40:5, 40:7, 81:4,
88:22, 88:23, 89:4,
96:1, 96:7, 96:11,
164:24
blog [1] - 137:18
blogs [1] - 137:16
blow [1] - 62:9
Blue [1] - 174:21
BlueAnt [11] -
174:25, 175:5, 175:6,
175:7, 175:22,
175:25, 176:9, 178:5,
186:19, 192:22
board [3] - 177:14,
179:9, 179:10
boat [1] - 47:12
Bob [8] - 23:6, 37:14,
72:23, 72:24, 82:22,
82:24, 82:25
Bob's [2] - 23:8,
37:15
BOBB [1] - 75:16

body [1] - 131:20
bog [2] - 181:14,
193:5
BOOB [1] - 75:15
born [1] - 129:21
Boston [2] - 2:10,
4:6
bother [1] - 24:9
bottom [4] - 16:18,
16:22, 25:22, 121:5
bought [2] - 120:20,
136:19
Boulevard [1] - 1:20
bounced [1] - 58:5
bound [1] - 105:24
boundaries [1] -
44:25
box [3] - 26:25,
86:10, 86:15
boxes [2] - 7:8, 12:5
Boyle [4] - 4:1,
19:17, 42:3, 69:8,
137:3, 137:5, 143:19,
143:22, 143:24,
145:3, 145:9
Boyle's [7] - 19:22,
20:19, 83:25, 120:11,
137:3, 145:7, 145:14
branch [1] - 131:2
brand [1] - 80:23
Braun [2] - 2:5, 4:4
brazenness [1] -
127:10
breadth [2] - 48:3,
127:10
break [9] - 64:5,
80:2, 80:4, 81:19,
81:21, 81:24, 127:7,
134:16, 134:20
breaking [5] - 126:4,
126:19, 126:25,
136:19
brevity [1] - 98:14
brick [3] - 17:17,
31:20, 165:3
Brickell [1] - 1:18
brief [19] - 23:19,
23:22, 23:25, 24:3,
24:6, 82:6, 86:3,
86:21, 107:23,
142:14, 143:5,
145:18, 160:19,
169:9, 169:12,
175:24, 184:25,
190:16, 194:20
briefed [2] - 163:1,
195:5
briefing [7] - 95:19,
162:22, 163:4, 195:3,
195:8, 195:21

201

**Briefly** [1] - 155:3
**briefly** [4] - 38:12, 61:8, 98:19, 166:23
**briefs** [4] - 61:20, 111:20, 126:15, 126:16
**brightest** [1] - 177:10
**bring** [9] - 20:10, 39:6, 50:10, 102:8, 105:17, 105:24, 105:25, 113:25, 178:12
**bringing** [4] - 22:10, 26:10, 102:10, 153:12
**brings** [2] - 92:7, 161:13
**broad** [2] - 5:23, 157:2
**Brooks** [1] - 18:21
**Brothers** [14] - 16:25, 27:21, 30:18, 31:24, 34:9, 34:11, 34:12, 101:22, 106:15, 107:6, 108:7, 161:19
**brought** [4] - 9:12, 107:11, 175:12, 178:6
**brush** [1] - 5:23
**build** [1] - 129:1
**Building** [1] - 1:20
**built** [2] - 46:8, 188:12
**bulb** [1] - 177:10
**Bulgaria** [8] - 3:24, 14:7, 26:19, 73:6, 74:19, 76:2, 96:2, 182:2
**Bulgarian** [3] - 172:15, 188:18, 188:21
**bulk** [1] - 7:4
**bullet** [4] - 142:18, 146:16, 146:17, 146:19
**bunch** [3] - 29:6, 31:25, 119:3
**burden** [13] - 12:25, 26:3, 65:23, 68:15, 100:6, 100:7, 100:8, 100:16, 105:10, 164:8, 165:10, 168:11, 177:5
**burdensome** [1] - 159:14
**business** [43] - 7:6, 9:14, 9:15, 10:22, 11:5, 34:10, 34:15, 45:23, 46:8, 50:7, 50:22, 68:16, 73:11,

73:12, 77:20, 87:21, 115:9, 115:22, 117:8, 118:17, 122:3, 128:11, 134:2, 134:3, 150:15, 151:15, 171:24, 172:3, 172:9, 173:4, 173:17, 173:18, 176:11, 176:15, 176:22, 177:16, 178:6, 179:21, 183:5, 188:11, 188:12, 191:10, 194:10
**businesses** [1] - 104:19
**busy** [1] - 26:8
**butcher** [1] - 163:9
**buttons** [1] - 77:15
**BY** [1] - 1:22

## C

**c)** [1] - 86:23
**CA** [2] - 1:20, 2:6
**Cable/Home** [1] - 157:20
**Cablevision** [1] - 111:13
**cached** [1] - 102:21
**calculated** [1] - 121:7
**calculates** [1] - 148:9
**California** [1] - 80:8
**cam** [1] - 160:16
**cameras** [1] - 160:10
**cams** [1] - 160:10
**canceling** [1] - 107:16
**Cannot** [1] - 140:18
**cannot** [20] - 28:15, 44:8, 58:14, 97:19, 100:15, 106:5, 119:6, 119:9, 125:13, 140:17, 141:4, 141:9, 143:6, 144:20, 146:24, 146:25, 149:22, 165:5, 185:9
**capabilities** [1] - 85:6
**capability** [2] - 85:3, 85:4
**capaciously** [1] - 12:16
**capacity** [1] - 169:24
**captures** [1] - 99:23
**care** [3] - 63:23, 160:15, 160:16

**career** [1] - 144:11
**careful** [2] - 25:10, 57:17
**carry** [1] - 48:11
**Cartoon** [1] - 111:14
**carved** [1] - 162:5
**Case** [3] - 1:2, 3:3, 44:16
**case** [182] - 3:24, 4:2, 7:2, 10:8, 11:23, 14:6, 14:9, 15:2, 17:25, 18:24, 23:22, 23:23, 23:25, 24:7, 25:6, 25:14, 25:15, 29:4, 33:8, 34:16, 34:18, 34:22, 38:22, 43:19, 44:24, 46:6, 46:24, 46:25, 47:19, 47:23, 56:5, 58:17, 59:4, 60:2, 60:4, 60:24, 60:25, 61:5, 61:19, 61:24, 62:7, 64:12, 65:12, 66:4, 70:5, 70:17, 75:6, 75:12, 76:16, 76:18, 76:19, 76:24, 76:25, 79:5, 79:16, 79:21, 80:17, 81:9, 82:9, 82:10, 82:14, 84:22, 84:23, 87:6, 89:12, 93:19, 94:22, 97:13, 99:18, 99:22, 100:14, 102:8, 102:20, 103:12, 103:24, 107:12, 108:5, 109:16, 110:18, 110:20, 111:4, 112:11, 112:15, 113:13, 115:20, 119:12, 119:14, 119:17, 138:7, 140:23, 141:18, 141:19, 141:20, 144:5, 144:8, 146:8, 149:13, 155:11, 157:20, 158:3, 158:4, 158:5, 158:7, 158:8, 158:9, 158:10, 159:9, 159:12, 161:11, 163:12, 165:5, 165:19, 166:18, 166:19, 166:23, 166:24, 168:14, 168:20, 169:4, 170:7, 170:10, 170:13, 170:23, 171:7, 171:16, 173:8, 173:16, 173:22, 173:23, 174:1, 174:7, 174:8, 174:15,

174:17, 177:5, 177:17, 177:23, 178:2, 178:3, 179:1, 179:2, 179:4, 179:5, 181:4, 181:5, 181:12, 182:22, 183:15, 184:4, 184:18, 184:21, 184:22, 185:1, 185:2, 185:3, 185:12, 185:23, 186:17, 187:4, 187:24, 189:5, 189:9, 190:2, 190:13, 192:10, 192:12, 192:14, 192:16, 195:4
**cases** [52] - 7:10, 10:15, 15:1, 29:19, 30:2, 30:3, 30:4, 34:20, 44:6, 45:2, 47:2, 54:19, 59:19, 60:23, 66:5, 68:22, 79:10, 83:16, 84:20, 84:21, 113:10, 115:9, 115:13, 115:15, 116:9, 119:20, 127:14, 127:20, 150:13, 150:14, 161:2, 162:10, 167:7, 170:6, 170:8, 174:11, 177:9, 179:6, 182:20, 183:3, 183:7, 184:17, 185:1, 185:5, 192:7, 192:8, 192:9, 192:11, 192:15
**cast** [1] - 47:8
**cat** [1] - 20:11
**Catalonia** [1] - 2:8
**categories** [1] - 120:14
**categorize** [1] - 88:7
**cattle** [1] - 127:13
**caught** [1] - 6:12
**causal** [4] - 144:4, 117:1, 117:11, 122:13
**caused** [1] - 169:21
**caveat** [2] - 41:22, 143:16
**CC** [1] - 44:7
**CCBill** [5] - 61:1, 65:12, 66:5, 66:7, 79:21
**celebrated** [1] - 76:19
**cent** [3] - 18:13, 21:19
**center** [1] - 50:16
**Central** [1] - 80:7
**central** [1] - 187:4
**Centre** [1] - 2:11
**CEO** [3] - 170:15,

181:24, 189:3
**certain** [18] - 5:21, 30:10, 41:18, 67:22, 72:19, 86:16, 87:20, 90:4, 94:23, 95:10, 130:3, 133:15, 144:7, 153:1, 153:22, 165:7, 180:17
**certainly** [14] - 29:19, 32:5, 41:3, 75:4, 77:21, 81:18, 97:22, 105:20, 119:23, 121:20, 147:5, 164:11, 187:22, 195:8
**Certainly** [3] - 24:13, 30:1, 39:4
**certainty** [1] - 30:2
**CERTIFICATION** [1] - 196:5
**CERTIFY** [1] - 196:7
**cetera** [4] - 73:19, 120:15, 120:23, 164:25
**CFO** [2] - 181:24, 188:23
**chain** [1] - 63:1
**chair** [1] - 159:3
**challenge** [1] - 106:5
**challenged** [1] - 154:20
**challenging** [1] - 121:14
**chance** [2] - 19:12, 19:13
**Chanel** [2] - 163:16, 178:11
**change** [4] - 105:1, 105:5, 126:23, 138:17
**changed** [9] - 9:24, 38:14, 117:4, 117:6, 118:12, 151:12, 151:14, 169:9, 182:17
**changes** [2] - 16:3, 47:15
**changing** [3] - 164:21, 164:23, 171:11
**characterizations** [1] - 13:7
**characterize** [1] - 98:23
**charge** [6] - 19:21, 126:11, 183:15, 183:17, 183:18, 188:2
**charged** [1] - 126:13
**chart** [11] - 122:12, 122:14, 122:16, 122:18, 132:18, 142:18, 142:19, 148:12, 170:12,

182:11
**charts** [3] - 53:18, 140:6, 140:8
**chasing** [1] - 133:20
**chastised** [1] - 167:13
**check** [6] - 39:18, 39:20, 61:15, 73:14, 90:19
**checked** [1] - 41:1
**checking** [1] - 96:16
**choice** [2] - 111:25, 117:19
**choose** [3] - 16:17, 41:4, 104:10
**choosing** [1] - 19:15
**chose** [5] - 57:4, 104:2, 104:13, 105:15
**Circuit** [19] - 25:7, 25:14, 43:13, 59:19, 59:23, 60:6, 61:1, 70:13, 93:12, 97:13, 97:18, 99:18, 104:22, 111:13, 119:25, 158:6, 159:19, 169:17, 177:24
**circuit** [3] - 59:20, 99:22, 157:20
**Circuit's** [4] - 96:24, 96:25, 184:21, 184:22
**circuitous** [1] - 105:20
**circumstance** [1] - 132:15
**circumstances** [10] - 29:4, 60:20, 67:5, 79:19, 81:13, 82:15, 92:5, 166:12, 166:15, 171:18
**circumstantially** [1] - 97:19
**circumvent** [1] - 125:24
**circumvention** [3] - 125:22, 126:10, 127:1
**cite** [9] - 46:7, 59:22, 60:6, 60:24, 79:21, 80:13, 162:2, 170:23
**cited** [6] - 61:20, 79:10, 94:19, 111:19, 126:16, 157:21, 179:1, 179:2, 185:12
**cites** [1] - 133:15
**ck** [1] - 115:5
**claim** [13] - 38:22, 39:7, 72:9, 110:10, 110:11, 110:13, 121:12, 124:13, 130:18, 157:22, 167:9, 168:19, 174:18

**clarifications** [1] - 166:4
**clarify** [1] - 134:23
**classic** [6] - 28:25, 30:8, 73:17, 76:15, 130:15, 165:22
**clean** [2] - 8:6, 138:11
**clear** [30] - 15:15, 26:20, 33:9, 44:8, 45:2, 48:21, 58:25, 72:16, 72:22, 74:25, 81:9, 91:9, 91:14, 94:8, 95:21, 97:10, 100:2, 106:14, 110:10, 119:21, 125:9, 130:6, 130:16, 159:16, 161:24, 173:24, 174:11, 177:10, 180:13, 183:10
**clearer** [1] - 94:3
**Clearly** [3] - 89:12, 131:18, 184:16
**clearly** [18] - 52:25, 54:19, 58:21, 67:2, 93:3, 97:4, 100:1, 113:17, 113:18, 129:18, 131:7, 131:21, 138:1, 144:10, 157:8, 157:15, 160:6, 184:11
**click** [2] - 135:1, 135:2
**client** [5] - 29:13, 73:4, 73:5, 73:11, 77:19
**clientele** [3] - 138:18, 138:24, 138:25
**clients** [4] - 32:17, 57:11, 84:14, 84:16
**clients'** [1] - 136:6
**clip** [1] - 125:3
**Clips** [1] - 98:1
**clips** [10] - 94:9, 94:12, 94:13, 94:14, 97:11, 97:14, 97:16, 97:18, 98:1, 98:3
**close** [5] - 53:6, 53:9, 83:9, 89:13, 107:18
**closing** [1] - 165:12
**Cloud** [1] - 15:19
**co** [1] - 187:15
**co-principals** [1] - 187:15
**code** [12] - 52:5, 75:16, 96:3, 170:21, 170:22, 170:24, 178:23, 179:4, 187:2, commonly [1] -

187:3, 187:25, 188:2
**coincided** [1] - 138:17
**collaborative** [2] - 32:24, 67:21
**collateral** [1] - 125:18
**colleague** [1] - 41:12
**colleagues** [2] - 144:10, 188:12
**collecting** [1] - 123:3
**Colombia** [2] - 25:21, 25:23
**color** [1] - 154:12
**colorful** [1] - 22:24
**Columbia** [1] - 161:21
**com** [1] - 72:24
**Comet** [1] - 70:24
**comfortable** [2] - 150:24, 151:1
**comfortably** [1] - 153:9
**coming** [4] - 20:12, 88:1, 103:9, 133:20
**comma** [1] - 148:13
**comment** [9] - 20:19, 40:8, 64:3, 71:7, 83:4, 143:17, 145:23, 148:5, 149:11
**commentary** [1] - 154:12
**comments** [2] - 108:9, 193:1
**commerce** [8] - 48:22, 110:8, 110:20, 110:21, 111:1, 111:12, 112:1, 186:11
**commercial** [8] - 5:17, 9:7, 45:12, 45:24, 110:2, 122:3, 132:12, 162:6
**commission** [2] - 22:1, 22:6, 22:8
**commission-based** [2] - 22:1, 22:6
**commissions** [5] - 34:12, 34:13, 120:19, 186:18
**committee** [3] - 75:12, 75:14, 75:23
**common** [18] - 58:21, 58:23, 112:13, 113:2, 113:7, 113:12, 113:13, 113:20, 128:4, 150:4, 154:10, 156:22, 157:2, 157:6, 157:13, 157:19, 158:11
**commonly** [1] -

87:11
**communicated** [4] - 74:10, 78:8, 78:14, 103:3
**communicating** [3] - 73:24, 75:7, 76:17
**communication** [3] - 39:10, 87:18, 162:17
**communications** [4] - 74:15, 87:13, 87:23, 105:5
**communities** [1] - 25:16
**community** [2] - 24:16, 57:6
**companies** [17] - 12:3, 29:10, 32:6, 34:20, 77:22, 84:17, 91:12, 179:21, 185:10, 185:11, 185:13, 185:17, 185:21, 185:22, 186:13, 193:2
**companies'** [1] - 178:25
**company** [25] - 34:23, 47:5, 65:20, 73:6, 91:1, 168:24, 169:10, 170:16, 170:17, 170:18, 170:20, 170:25, 173:12, 174:25, 175:8, 176:13, 176:19, 178:5, 179:18, 181:23, 182:22, 183:18, 186:14, 186:20, 190:6
**company's** [1] - 181:23
**comparable** [8] - 7:24, 10:15, 116:15, 150:14, 170:7, 173:24, 174:7, 174:8
**compare** [2] - 165:6, 170:7
**Compare** [1] - 135:14
**compares** [1] - 90:14
**comparing** [1] - 143:13
**comparison** [3] - 34:16, 58:25, 149:14
**compelled** [1] - 182:3
**compelling** [2] - 58:4, 131:17
**compensation** [1] - 19:19
**competitors** [2] - 69:10, 188:9

**complain** [2] - 100:15, 105:17
**complained** [2] - 33:17, 104:4
**complaint** [19] - 40:14, 47:18, 47:19, 47:20, 47:22, 48:9, 69:24, 71:5, 72:2, 72:3, 72:6, 72:11, 72:13, 124:14, 151:12, 151:22, 168:21, 182:17, 182:19
**complete** [3] - 11:19, 81:24, 140:10
**completed** [3] - 96:17, 147:2, 147:22
**completely** [2] - 93:7, 144:17
**complex** [1] - 91:8
**complexities** [2] - 65:18, 66:17
**compliance** [22] - 12:1, 32:22, 48:23, 49:6, 52:23, 64:15, 67:3, 73:1, 73:16, 73:17, 75:3, 75:14, 76:15, 77:10, 78:10, 78:15, 78:16, 78:17, 102:5, 176:12, 179:16
**compliant** [4] - 58:11, 58:14, 59:8, 71:4
**complicity** [1] - 46:4
**complied** [2] - 58:18, 75:24
**compliment** [1] - 104:13
**complimented** [1] - 63:13
**compliments** [2] - 34:8, 102:4
**comply** [10] - 26:19, 26:21, 26:22, 32:16, 73:7, 77:15, 77:24, 79:4, 85:19, 107:5
**complying** [2] - 11:4, 85:20
**component** [3] - 50:22, 61:3, 70:6
**comport** [1] - 6:16
**comported** [1] - 64:13
**comprehensive** [1] - 114:21
**comprise** [1] - 177:16
**compromised** [1] - 37:12
**computer** [3] - 17:5,

136:15, 170:24
**computers** [1] - 66:14
**conceal** [2] - 7:8, 128:15
**concealed** [1] - 12:7
**concealing** [1] - 127:19
**conceded** [1] - 72:11
**conceive** [1] - 173:17
**concept** [4] - 31:8, 73:21, 75:1, 150:3
**concern** [3] - 33:13, 78:12, 138:20
**concerned** [4] - 39:14, 148:20, 182:1, 182:16
**concerns** [2] - 63:3, 112:4
**concert** [2] - 91:3, 91:4
**concerts** [2] - 90:17, 91:10
**concluded** [1] - 9:2
**concludes** [1] - 80:11
**conclusion** [6] - 10:1, 10:16, 121:19, 141:8, 166:16, 193:11
**conclusions** [6] - 150:23, 150:24, 152:7, 156:14, 156:15, 156:19
**concur** [1] - 57:21
**concurs** [3] - 58:1, 58:13, 58:18
**condition** [1] - 159:21
**conditions** [2] - 52:18, 83:20
**condoned** [1] - 154:18
**condones** [2] - 90:9, 101:7
**conduct** [12] - 7:3, 10:5, 11:16, 48:8, 48:11, 58:10, 66:19, 104:1, 124:14, 165:21, 167:1, 186:17
**confesses** [1] - 161:18
**confined** [1] - 119:13
**confining** [1] - 124:7
**confirm** [1] - 151:23
**confirmed** [3] - 10:16, 120:14, 120:24
**conflate** [1] - 46:19
**conform** [1] - 182:18
**confused** [1] -

123:21
**confuses** [1] - 126:3
**confusion** [2] - 126:17, 128:22
**Congress** [9] - 23:17, 25:10, 25:18, 45:25, 48:21, 68:16, 93:3, 99:23, 157:3
**conjecture** [2] - 180:11, 181:1
**conjunction** [1] - 32:8
**connection** [6] - 114:4, 117:1, 117:11, 122:14, 187:17
**conscious** [1] - 71:9
**consensus** [5] - 176:22, 176:24, 177:4, 177:7, 187:13
**consensus-based** [1] - 177:4
**consequence** [3] - 78:22, 187:11, 187:12
**consequences** [1] - 49:14
**consider** [10] - 14:21, 30:17, 78:16, 106:5, 106:6, 113:21, 183:12, 183:13, 185:14, 187:6
**considerations** [1] - 167:17
**considered** [7] - 24:22, 113:7, 119:17, 119:18, 142:22, 165:18, 166:18
**considering** [2] - 158:22, 194:11
**considers** [1] - 142:23
**consistency** [3] - 148:16, 148:20, 149:9
**constant** [1] - 40:18
**Constantin** [2] - 74:18, 86:6
**constantly** [1] - 164:20
**constituting** [1] - 154:1
**construction** [1] - 92:10
**constructive** [9] - 156:24, 156:25, 157:3, 157:8, 157:10, 157:14, 157:15, 157:22
**construed** [4] - 12:14, 12:16, 12:20, 148:1
**consumer** [1] - 185:3

**contact** [1] - 166:25
**contain** [1] - 95:14
**contained** [2] - 78:24, 79:1
**contemplates** [1] - 84:1
**contemporaneous** [1] - 96:10
**contending** [2] - 150:16, 159:15
**content** [63] - 7:13, 8:7, 8:13, 9:10, 9:17, 10:21, 10:23, 11:1, 11:5, 15:24, 17:13, 20:9, 20:12, 21:15, 25:10, 26:2, 26:6, 27:1, 28:2, 32:4, 32:14, 45:12, 50:10, 51:7, 51:10, 51:11, 51:14, 51:18, 51:24, 52:6, 52:9, 53:12, 53:14, 63:22, 66:1, 68:9, 68:25, 84:21, 85:2, 85:11, 89:11, 95:3, 95:6, 96:18, 97:20, 105:7, 116:14, 116:22, 123:5, 131:24, 132:13, 134:9, 134:14, 138:12, 138:14, 149:19, 149:21, 164:9, 166:25, 193:22
**contest** [1] - 153:13
**contesting** [1] - 38:2
**context** [35] - 29:12, 39:6, 39:13, 60:14, 65:4, 67:4, 68:3, 72:25, 81:6, 91:20, 91:22, 92:9, 110:18, 113:7, 113:19, 113:20, 125:1, 129:15, 139:10, 142:6, 142:7, 153:21, 157:24, 161:8, 162:1, 162:9, 163:13, 165:15, 166:24, 167:2, 169:23, 187:7, 187:8, 187:10
**continually** [2] - 62:20, 151:8
**continue** [8] - 104:24, 105:1, 112:3, 114:17, 134:18, 135:25, 171:20, 173:6
**Continued** [2] - 2:1
**continues** [2] - 48:17, 188:1
**continuing** [3] - 23:14, 72:6, 124:6
**continuum** [2] -

177:8, 179:12
**contours** [1] - 25:12
**contra** [1] - 176:21
**contract** [7] - 60:9, 172:19, 172:21, 180:22, 186:21, 186:22, 186:23
**contractor** [3] - 175:23, 175:25, 192:1
**contracts** [2] - 132:12, 186:24
**contractual** [3] - 181:18, 192:19, 192:23
**contradict** [2] - 96:6, 176:21
**contrary** [1] - 159:16
**contributed** [1] - 103:16
**contributing** [1] - 48:25
**contribution** [13] - 5:17, 58:22, 70:20, 109:21, 110:1, 110:14, 128:19, 153:16, 154:2, 158:14, 158:17, 159:7, 161:1
**contributory** [21] - 5:16, 88:6, 98:22, 110:13, 110:17, 111:11, 114:17, 119:13, 119:19, 129:15, 131:1, 154:10, 156:20, 156:21, 157:2, 157:7, 157:21, 158:20, 159:7, 162:5, 166:9
**contrived** [1] - 148:16
**control** [8] - 99:16, 113:5, 113:9, 152:9, 165:10, 167:6, 169:24, 191:12
**controlling** [3] - 161:25, 177:19, 182:25
**controls** [3] - 177:11, 184:5, 191:13
**controvert** [1] - 125:13
**controverted** [1] - 115:8
**convened** [1] - 3:1
**convenience** [1] - 81:18
**convenient** [3] - 180:18, 183:2, 186:12
**conveniently** [1] - 54:2

**conversation** [1] - 86:24
**conversion** [10] - 22:9, 120:18, 121:2, 121:9, 121:24, 122:4, 135:9, 135:19, 135:21
**conversions** [2] - 135:22, 135:23
**convert** [3] - 10:24, 122:14, 135:5
**converting** [1] - 135:6
**converts** [1] - 22:9
**convincingly** [1] - 167:7
**cooperate** [1] - 28:2
**cooperating** [2] - 32:21, 103:8
**cooperation** [10] - 25:13, 25:16, 25:19, 33:2, 33:3, 62:24, 68:4, 72:18, 73:3, 101:25
**cooperative** [1] - 62:23
**cooperatively** [1] - 25:24
**copied** [1] - 102:23
**copies** [4] - 24:21, 39:15, 53:19, 140:6
**copy** [9] - 19:11, 31:10, 40:10, 42:10, 42:11, 53:20, 54:1, 89:15, 89:16
**copyright** [93] - 7:1, 8:25, 9:5, 9:8, 9:15, 10:1, 10:2, 10:6, 10:18, 11:8, 11:12, 11:14, 15:4, 17:24, 24:14, 24:18, 24:22, 25:17, 26:4, 26:14, 26:15, 26:22, 36:10, 36:12, 43:18, 44:10, 45:3, 46:5, 49:20, 52:9, 56:4, 57:6, 58:7, 58:15, 58:16, 63:22, 65:19, 65:24, 66:18, 67:3, 72:6, 73:24, 75:6, 76:16, 76:20, 76:21, 77:3, 78:21, 79:20, 82:8, 82:11, 82:21, 82:25, 83:22, 84:5, 84:6, 87:8, 88:16, 89:8, 89:19, 90:5, 90:9, 90:25, 91:7, 93:4, 101:7, 102:5, 108:16, 113:1, 114:1, 120:12, 121:1, 123:1, 123:2, 123:5, 123:6, 123:24, 124:3,

125:19, 126:3, 126:18, 126:23, 127:3, 150:5, 151:9, 157:6, 159:16, 159:22, 163:17, 165:8, 166:22, 175:14, 179:5

**Copyright** [7] - 23:15, 32:23, 82:12, 86:12, 109:13, 125:22, 125:23

**Copyrightagent@ Photobucket.com** [1] - 77:2

**copyrighted** [12] - 9:10, 9:17, 51:17, 52:12, 62:21, 70:16, 90:9, 90:15, 90:18, 91:5, 91:6, 165:6

**copyrights** [1] - 24:15

**Coral** [1] - 2:8

**Corbis** [4] - 60:25, 61:1, 66:4, 79:16

**core** [4] - 13:7, 45:11, 68:5, 82:7

**corner** [6] - 3:20, 16:1, 16:18, 71:2, 101:23, 178:17

**corollary** [1] - 20:16

**Corp** [3] - 169:14, 172:23, 185:1

**corporate** [8] - 171:12, 179:7, 183:24, 184:4, 184:7, 185:18, 189:2, 192:18

**CORPORATION** [1] - 1:6

**Corporation** [7] - 3:5, 172:7, 172:25, 173:1, 181:17, 186:21

**corporation** [13] - 169:24, 171:8, 171:17, 172:10, 172:15, 172:16, 177:13, 180:14, 180:15, 180:19, 180:20, 184:9, 191:12

**Corporation's** [1] - 191:21

**Correct** [1] - 58:3

**correct** [13] - 20:8, 20:23, 23:11, 37:7, 38:20, 66:21, 91:24, 138:16, 145:1, 169:15, 170:21, 175:20, 179:14

**CORRECT** [1] - 196:7

**correctly** [2] - 95:18,

188:19

**correlation** [1] - 53:15

**correspond** [3] - 23:3, 94:12, 97:25

**corresponding** [1] - 95:4

**corridors** [1] - 164:3

**corroborate** [1] - 38:9

**corroborated** [1] - 33:11

**corroboration** [5] - 31:14, 39:23, 55:10, 55:13

**cosmetics** [1] - 192:15

**costs** [1] - 68:16

**counsel** [6] - 28:10, 86:3, 127:12, 189:24, 190:18, 195:9

**Counsel** [3] - 3:6, 191:23, 192:6

**count** [4] - 61:4, 117:25, 123:10, 150:7

**counter** [8] - 84:1, 84:3, 84:4, 84:9, 84:10, 101:16, 123:21

**counterclaim** [10] - 5:10, 5:19, 6:9, 6:14, 42:16, 68:10, 68:11, 193:17, 193:22, 195:19

**counterfeit** [3] - 192:12, 192:13, 192:15

**countermeasures** [4] - 34:19, 34:24, 164:19, 164:23

**countries** [1] - 172:13

**country** [3] - 10:14, 93:18, 160:19

**counts** [4] - 123:24, 148:10, 148:13, 149:17

**couple** [12] - 28:21, 35:7, 46:11, 57:8, 71:6, 84:12, 99:24, 110:10, 124:2, 136:9, 152:2, 159:10

**course** [24] - 16:14, 24:10, 25:5, 47:10, 54:5, 54:8, 57:11, 59:14, 95:17, 103:15, 103:23, 104:6, 105:23, 111:23, 119:14, 125:4, 135:24, 141:10, 162:2, 182:12,

182:21, 185:13, 185:20, 185:22

**court** [24] - 49:11, 60:15, 60:16, 60:18, 76:19, 77:8, 77:10, 77:16, 83:21, 93:17, 94:10, 95:20, 97:14, 97:24, 98:2, 99:22, 113:6, 125:15, 126:2, 132:7, 141:4, 141:23

**Court** [81] - 1:23, 3:1, 3:3, 5:2, 5:5, 5:6, 6:23, 7:17, 7:21, 8:24, 9:2, 9:13, 11:23, 12:11, 12:19, 14:14, 15:3, 15:7, 22:16, 23:19, 23:22, 27:8, 43:16, 46:2, 47:21, 47:25, 52:13, 53:25, 59:7, 59:17, 64:15, 80:11, 80:14, 81:6, 85:25, 86:1, 87:5, 88:11, 93:25, 98:8, 98:25, 99:12, 102:24, 106:5, 110:11, 110:24, 111:10, 111:24, 113:21, 115:21, 119:14, 128:4, 128:16, 129:16, 129:20, 130:8, 130:10, 130:19, 131:17, 134:21, 134:22, 141:14, 145:22, 146:25, 166:17, 169:7, 170:12, 174:2, 174:9, 180:23, 181:4, 182:23, 185:16, 193:24, 193:25, 194:3, 195:2, 195:5, 196:4, 196:9

**COURT** [333] - 1:1, 3:2, 3:9, 3:12, 3:14, 3:16, 3:18, 3:20, 3:25, 4:3, 4:7, 4:14, 4:19, 4:22, 5:7, 6:2, 6:5, 6:7, 6:19, 6:22, 8:9, 12:15, 12:22, 13:12, 13:18, 13:24, 14:3, 15:11, 15:15, 15:17, 16:8, 19:25, 20:9, 20:15, 20:25, 21:13, 21:23, 22:12, 22:25, 23:4, 23:23, 24:24, 25:4, 27:6, 27:14, 28:7, 29:9, 29:11, 30:9, 30:13, 30:20, 31:2, 31:17, 32:10, 32:16, 32:24, 35:15, 35:20, 35:23, 36:5, 36:12, 37:3, 37:11,

37:22, 37:25, 38:5, 38:15, 40:11, 41:18, 42:8, 42:12, 42:18, 42:20, 43:24, 44:15, 44:21, 45:18, 46:11, 46:24, 47:11, 48:2, 48:10, 48:18, 49:4, 49:9, 49:16, 50:2, 50:4, 50:21, 51:9, 52:13, 52:24, 53:4, 53:18, 53:22, 54:10, 54:14, 55:5, 55:14, 55:22, 55:25, 57:21, 58:3, 58:9, 59:5, 59:10, 60:10, 61:7, 61:10, 61:13, 61:16, 61:22, 61:25, 63:7, 63:11, 63:14, 63:16, 63:19, 64:3, 64:17, 65:4, 65:6, 65:11, 66:7, 67:6, 67:9, 67:17, 68:15, 69:14, 69:20, 69:25, 70:18, 71:12, 71:25, 72:13, 73:9, 73:11, 73:20, 74:4, 74:8, 74:12, 74:14, 74:19, 74:22, 75:11, 75:21, 76:8, 76:10, 77:5, 77:12, 77:18, 78:1, 78:6, 78:18, 79:9, 79:22, 79:25, 80:5, 81:15, 81:21, 82:2, 82:5, 82:17, 83:10, 83:15, 85:22, 86:2, 86:7, 86:14, 86:19, 88:5, 89:25, 90:13, 90:22, 91:2, 91:16, 91:19, 92:7, 92:24, 93:9, 93:16, 93:20, 97:3, 97:16, 98:5, 98:7, 98:11, 98:17, 98:20, 100:23, 101:9, 103:13, 104:18, 105:19, 106:22, 107:11, 107:19, 107:21, 108:24, 109:4, 109:9, 109:20, 109:23, 110:7, 110:15, 111:5, 112:16, 112:19, 112:21, 114:18, 114:20, 114:25, 115:13, 117:13, 117:18, 117:20, 118:5, 118:8, 119:24, 120:1, 121:14, 121:16, 121:18, 121:22, 122:10, 123:15, 123:18, 123:20, 124:5,

124:16, 124:23, 125:8, 126:10, 127:5, 127:23, 128:18, 129:1, 130:1, 130:6, 130:21, 130:24, 131:5, 134:2, 134:7, 134:15, 134:20, 136:16, 136:23, 139:1, 139:12, 140:2, 140:4, 140:10, 140:16, 142:16, 142:20, 143:3, 143:11, 143:25, 145:1, 146:10, 146:15, 148:18, 149:12, 150:1, 153:12, 153:20, 154:14, 155:17, 155:20, 158:1, 158:23, 159:2, 160:25, 161:10, 162:3, 162:25, 163:2, 163:11, 163:25, 164:10, 165:11, 166:1, 166:7, 167:24, 168:2, 168:7, 168:12, 168:15, 168:18, 170:21, 171:1, 171:11, 171:22, 172:2, 173:2, 175:11, 175:18, 176:5, 176:20, 177:8, 178:9, 178:21, 179:5, 179:20, 180:4, 182:7, 182:12, 184:8, 188:14, 188:18, 188:23, 189:10, 189:15, 189:19, 189:22, 190:15, 191:11, 191:16, 191:20, 193:14, 193:20, 194:4, 194:8, 194:15, 194:17, 194:22, 194:23, 194:24, 195:3, 195:7, 195:15, 195:18

**Court's** [1] - 94:2

**courthouse** [1] - 1:24

**courtroom** [4] - 51:16, 86:5, 139:21, 140:17

**COURTROOM** [1] - 3:3

**courts** [25] - 10:14, 33:1, 46:1, 48:12, 52:7, 52:10, 60:11, 60:19, 90:7, 93:18, 111:17, 111:18, 111:20, 113:10,

113:11, 113:15,
114:4, 130:25, 131:1,
132:5, 148:22, 152:1,
154:16, 165:2, 170:4
**Courts** [1] - 152:15
**courts'** [1] - 90:13
**cover** [1] - 42:22
**covered** [2] - 88:18,
174:22
**crazy** [2] - 135:19,
149:7
**create** [3] - 80:22,
131:24, 190:10
**created** [2] - 84:21,
174:12
**creates** [1] - 130:9
**creating** [1] - 48:13
**creativity** [4] - 19:23,
19:24, 24:13, 24:15
**credibility** [2] - 30:7,
165:14
**credible** [1] - 58:21
**credit** [4] - 21:10,
116:19, 137:7, 137:8
**credited** [1] - 29:10
**criteria** [2] - 59:10,
176:14
**critical** [10] - 42:1,
44:6, 45:25, 67:18,
70:6, 110:25, 111:16,
144:3, 144:5, 144:13
**critically** [1] - 13:1
**criticisms** [1] -
152:18
**criticize** [1] - 15:1
**criticizing** [1] - 137:6
**Cromarty** [1] -
143:23
**cross** [1] - 153:24
**cross-examination**
[1] - 153:24
**crude** [1] - 26:17
**cry** [1] - 134:12
**culpable** [2] - 9:4,
130:9
**curb** [1] - 101:24
**curiosity** [2] - 4:8,
4:10
**curious** [2] - 18:21,
182:15
**current** [4] - 48:1,
72:8, 94:9, 148:24
**customer** [2] - 19:13,
22:10
**customers** [2] -
10:24, 162:21
**cut** [1] - 11:4
**cyber** [9] - 17:16,
17:20, 17:21, 33:8,
33:24, 51:6, 67:15,

71:11, 102:9
**Cybernet** [2] - 44:7,
46:6
**cyberspace** [2] -
164:8, 164:11

# D

**daily** [14] - 108:2,
120:16, 124:23,
124:24, 125:6, 146:1,
146:2, 146:12,
146:20, 147:15,
152:21, 152:23,
152:24, 152:25
**Daily** [2] - 146:10,
146:21
**Dallas** [1] - 17:7
**damage** [2] - 103:1,
124:14
**damages** [7] - 48:5,
48:8, 92:9, 94:8,
103:11, 124:7, 124:12
**Daniel** [1] - 144:18
**data** [22] - 35:8, 38:3,
118:24, 119:7, 119:8,
120:10, 120:21,
121:1, 132:19,
150:22, 151:20,
152:4, 152:5, 152:9,
152:18, 153:1, 153:2,
153:6, 153:7, 153:8,
156:13, 176:15
**database** [6] - 21:9,
36:23, 40:24, 40:25,
41:2, 41:4
**date** [6] - 31:13,
33:21, 39:23, 39:24,
55:10, 62:14
**Daubert** [6] - 148:3,
148:7, 148:15,
148:19, 149:9, 165:15
**Dave** [2] - 90:16,
95:14
**DAVID** [1] - 1:22
**David** [2] - 18:21,
161:18
**Dawes** [1] - 158:7
**Dawes-Ordonez** [1] -
158:7
**day-to-day** [3] -
170:17, 173:4, 176:8
**days** [10] - 6:12,
6:13, 12:17, 19:4,
39:22, 72:2, 124:2,
160:8, 160:15, 194:6
**DC** [1] - 1:16
**deal** [1] - 68:23
**dealing** [1] - 87:9

**dealings** [1] - 186:11
**Dear** [1] - 66:23
**death** [2] - 195:5,
195:7
**debate** [10] - 11:11,
51:19, 81:4, 92:22,
92:25, 113:10,
113:11, 114:11,
125:18, 158:19
**decade** [1] - 29:12
**deceived** [1] - 33:5
**December** [4] -
56:17, 62:15, 62:18,
150:17
**deceptive** [1] - 62:8
**decide** [8] - 44:24,
48:16, 59:6, 59:7,
60:17, 66:19, 81:9,
193:25
**decided** [13] - 15:2,
15:3, 16:25, 18:5,
25:6, 61:1, 66:4,
139:8, 165:23,
166:11, 166:20,
167:10, 178:5
**decides** [1] - 59:17
**decision** [25] - 12:18,
41:17, 77:6, 77:8,
84:23, 91:24, 93:12,
93:14, 94:1, 94:2,
95:20, 96:24, 96:25,
99:11, 99:12, 99:13,
110:15, 111:13,
111:14, 111:16,
159:17, 169:20,
173:12, 182:3, 190:22
**decision-maker** [1] -
173:12
**decisions** [17] -
30:23, 165:17,
173:14, 176:17,
176:24, 177:4, 177:7,
187:10, 187:12,
187:14, 187:16,
187:20, 187:21,
188:3, 188:6, 189:12,
191:23
**declaration** [13] -
38:14, 79:2, 120:11,
121:5, 121:14,
121:15, 137:3,
143:16, 145:2, 151:4,
152:19, 180:24, 193:7
**declarations** [2] -
5:14, 193:6
**declared** [2] -
143:11, 144:6
**decreased** [2] - 9:22
**dedicated** [1] - 45:12
**deeming** [1] - 159:21

**DEEPAK** [1] - 2:4
**Deepak** [1] - 4:6
**Defendant** [2] -
49:21, 55:15
**defendant** [9] - 3:24,
13:4, 80:18, 113:24,
127:20, 156:22,
170:13, 173:16, 174:3
**Defendant's** [2] -
42:8, 126:1
**defendant's** [6] -
11:16, 49:17, 51:20,
126:2, 126:17, 129:22
**DEFENDANTS** [1] -
2:2
**defendants** [41] -
3:23, 4:16, 43:3, 46:7,
49:13, 51:4, 52:7,
52:8, 54:16, 54:21,
55:7, 57:5, 57:17,
58:19, 60:20, 61:5,
76:19, 77:9, 81:10,
82:7, 83:19, 87:6,
100:15, 110:22,
112:9, 112:13,
113:10, 116:10,
119:18, 127:18,
128:5, 132:3, 132:11,
135:24, 154:18,
169:5, 170:5, 174:17,
182:16, 190:3
**Defendants** [7] - 1:7,
46:18, 46:21, 55:3,
60:24, 157:17, 167:11
**defendants'** [2] -
48:8, 151:7
**defense** [16] - 5:9,
41:13, 64:20, 73:14,
86:3, 103:21, 103:23,
110:4, 110:9, 111:2,
114:16, 119:18,
119:21, 127:11,
144:14, 161:2
**deficiencies** [1] -
73:23
**defined** [2] - 131:1,
131:11
**defines** [2] - 47:18,
93:19
**defining** [2] - 65:18,
66:17
**definition** [2] - 94:9,
164:2
**definitive** [1] - 73:4
**defying** [1] - 148:3
**delete** [4] - 20:15,
155:15, 155:17,
155:21
**deleted** [2] - 19:5,
39:16, 43:25, 156:6,

156:7, 156:8, 160:15
**deliberately** [2] -
44:11, 105:15
**demonstrably** [1] -
156:10
**demonstrate** [2] -
13:9, 103:16
**demonstrates** [1] -
150:4
**demonstrative** [1] -
53:22
**denied** [1] - 116:21
**denies** [1] - 145:15
**dense** [2] - 20:1,
116:8
**density** [1] - 174:1
**denying** [1] - 99:10
**departments** [1] -
85:5
**departs** [1] - 145:13
**depended** [2] - 9:15,
20:9
**dependent** [1] - 9:14
**depose** [1] - 100:12
**deposition** [14] - 9:9,
55:15, 88:24, 95:25,
100:13, 141:17,
141:18, 142:7,
143:16, 150:21,
151:2, 153:5, 191:2
**depth** [1] - 48:3
**DEPUTY** [1] - 3:3
**describe** [2] - 83:10,
94:3
**described** [3] -
55:16, 150:4, 182:20
**describes** [2] - 46:2,
83:11
**describing** [2] -
83:12, 138:8
**descriptions** [1] -
137:21
**descriptive** [1] -
17:12
**design** [12] - 37:13,
176:14, 177:11,
179:17, 188:3,
189:10, 189:12,
189:13, 189:14,
189:15, 191:24,
191:25
**designate** [2] - 43:2,
72:22
**designated** [6] -
73:25, 74:17, 76:14,
77:2, 99:15, 189:2
**designed** [8] - 25:16,
43:22, 87:18, 117:23,
118:16, 170:21,
173:21, 190:21

designer [4] - 18:4, 19:14, 19:21, 178:11
designing [1] - 164:13
despite [3] - 33:6, 48:20, 161:1
destination [1] - 48:15
destroyed [1] - 153:2
detail [6] - 11:17, 14:17, 164:23, 174:10, 181:14, 193:5
details [5] - 23:16, 27:7, 61:24, 79:6, 95:19
detection [1] - 159:13
determination [1] - 43:15
determinations [1] - 165:15
determine [13] - 43:12, 59:13, 68:18, 83:13, 94:11, 96:3, 97:24, 98:2, 120:19, 152:13, 165:7, 166:21, 188:10
determined [1] - 59:24
determining [1] - 66:9
detour [1] - 145:13
detrimentally [2] - 102:25, 104:15
developed [2] - 148:22, 187:25
developer [2] - 187:1, 187:7
developing [1] - 14:8
development [3] - 24:17, 29:13, 187:5
developments [1] - 188:2
devise [1] - 131:25
devised [1] - 8:13
devoted [1] - 168:9
Diaries [1] - 16:23
dictated [1] - 32:22
diehard [1] - 45:23
differ [1] - 145:19
difference [16] - 14:17, 17:21, 31:22, 46:18, 46:23, 77:19, 99:1, 115:12, 116:9, 121:8, 121:12, 127:22, 130:21, 130:25, 132:12, 152:8
differences [2] - 151:3, 151:14
different [40] - 11:17,

15:22, 18:2, 22:23, 44:16, 47:1, 56:4, 89:5, 89:6, 93:7, 103:23, 115:8, 115:10, 116:18, 124:4, 126:22, 127:13, 138:2, 144:1, 148:14, 149:4, 149:14, 150:17, 150:25, 151:5, 151:11, 151:17, 152:10, 153:3, 156:13, 157:18, 161:5, 164:7, 165:3, 172:12, 179:13, 183:9, 185:21, 185:22
differently [2] - 148:10, 153:7
difficult [2] - 83:7, 83:12
difficulties [1] - 75:25
difficulty [2] - 74:2, 75:5
dig [1] - 13:21
Digital [4] - 23:15, 23:24, 32:23, 125:23
digital [4] - 15:25, 17:20, 33:17, 160:11
digress [1] - 53:18
dimension [1] - 139:1
diminish [1] - 42:1
Direct [1] - 70:24
direct [10] - 8:22, 53:15, 114:22, 116:2, 117:12, 120:5, 122:7, 125:1, 191:12, 192:10
directed [1] - 166:18
direction [2] - 5:1, 97:10
directions [1] - 5:21
directive [1] - 126:3
directly [3] - 87:9, 125:15, 187:20
director [5] - 170:15, 172:16, 172:22, 174:4, 191:14
directors [3] - 177:14, 179:9, 179:10
directs [1] - 184:5
disable [2] - 89:20, 190:23
disabuse [1] - 22:15
disaffected [2] - 8:14, 51:21
disagree [7] - 30:6, 130:8, 149:7, 157:17, 158:25, 189:14, 194:2
disagreed [2] -

187:14, 187:15
disagreements [1] - 112:25
discipline [1] - 149:4
discontinuing [1] - 139:9
discourage [1] - 70:14
discovery [8] - 72:7, 84:15, 85:4, 96:3, 104:6, 105:12, 169:2, 182:18
discretion [1] - 64:12
discuss [3] - 11:15, 174:9, 176:24
discussed [3] - 88:20, 181:11, 184:14
discussing [3] - 7:5, 41:19, 171:21
discussion [8] - 8:19, 55:6, 77:1, 87:1, 90:13, 98:22, 133:10, 153:13
discussions [2] - 6:4, 177:4
disease [1] - 141:6
disk [2] - 21:15, 140:6
dismiss [1] - 168:22
Disney [4] - 3:4, 31:24, 32:19, 64:6
DISNEY [1] - 1:3
dispose [1] - 112:15
disposition [2] - 13:8, 112:11
dispositive [1] - 7:16
dispute [22] - 6:24, 9:23, 11:7, 13:6, 13:8, 33:19, 38:3, 38:4, 49:19, 104:8, 112:24, 113:23, 114:15, 154:22, 166:11, 176:7, 183:8, 183:22, 184:3, 184:13, 190:8, 193:10
disputed [11] - 30:5, 30:7, 30:10, 30:11, 119:6, 119:10, 155:2, 158:15, 159:1, 160:3, 165:17
disputes [6] - 9:1, 99:7, 156:12, 166:14, 186:9, 190:10
disqualification [1] - 49:17
disqualified [2] - 92:23, 93:2
disqualify [1] - 93:5
disqualifying [4] - 43:3, 92:20, 100:8

disregard [2] - 96:24, 96:25
disseminated [1] - 55:8
dissemination [1] - 39:7
distinct [1] - 44:4
distinction [3] - 44:6, 69:12, 178:18
distinguish [1] - 70:11
distinguishable [1] - 103:25
distribute [5] - 16:14, 18:5, 19:15, 91:12, 137:9
distributed [5] - 16:17, 16:21, 19:20, 19:22, 19:24
distributing [1] - 155:12
distribution [9] - 19:19, 70:16, 101:3, 110:2, 110:19, 110:21, 167:12, 167:14, 167:17
distributions [1] - 91:9
District [1] - 76:25, 80:8, 111:18, 111:19, 184:3, 184:18
DISTRICT [3] - 1:1, 1:1, 1:9
district [13] - 77:8, 77:10, 77:16, 93:17, 94:10, 97:14, 97:24, 98:2, 111:17, 125:15, 149:13, 158:7
disturbing [1] - 39:17
divide [1] - 171:5
divided [2] - 4:20, 71:22
division [1] - 42:14
DIVISION [1] - 1:2
divisions [1] - 190:10
DL [2] - 87:24, 88:1
DMCA [108] - 5:15, 5:22, 6:4, 7:2, 7:5, 11:4, 11:16, 11:25, 12:2, 12:7, 14:7, 15:1, 15:9, 17:21, 19:23, 20:22, 23:18, 24:4, 24:8, 24:11, 25:10, 25:15, 26:2, 26:3, 26:11, 26:13, 26:24, 28:7, 28:8, 28:14, 28:23, 30:3, 31:9, 31:22, 32:16, 33:2,

34:21, 36:7, 42:17, 42:20, 42:22, 43:2, 43:4, 43:5, 44:5, 49:9, 49:10, 49:18, 52:20, 52:22, 54:23, 56:6, 56:23, 56:25, 57:1, 57:3, 58:2, 58:14, 58:23, 60:12, 60:17, 60:22, 61:9, 61:19, 61:21, 64:20, 64:23, 65:23, 67:20, 68:5, 72:18, 77:15, 77:25, 80:16, 80:25, 83:7, 83:25, 84:1, 84:24, 84:25, 85:9, 86:4, 87:9, 91:20, 93:5, 99:14, 106:5, 106:10, 106:18, 109:12, 109:17, 113:11, 113:15, 113:19, 114:15, 157:1, 157:4, 157:5, 157:18, 158:12, 158:13, 158:22, 173:9, 176:12, 179:16, 183:15, 183:16, 190:5
DMCA's [7] - 11:18, 11:20, 12:9, 12:12, 13:1, 13:10
DMCA-plus [2] - 49:9, 49:10
DMCA-related [1] - 173:9
dock [2] - 47:8, 47:12
docket [1] - 94:3
doctrine [2] - 111:12, 111:21
document [4] - 55:10, 56:9, 94:2, 189:2
documented [1] - 36:19
documents [1] - 136:9
Dolls [4] - 90:21, 95:18, 100:25, 101:1
domain [6] - 16:13, 21:5, 21:6, 37:4, 133:5, 191:10
dominant [2] - 169:23, 182:21
done [1] - 21:2, 21:10, 38:8, 40:3, 71:16, 135:11, 161:11, 170:4, 181:8, 194:11
door [2] - 32:3, 67:15
dot [1] - 72:24
doubt [3] - 65:1,

116:23, 181:7
**down** [60] - 11:3, 24:6, 27:4, 29:8, 32:1, 37:8, 37:9, 37:21, 37:22, 39:15, 42:3, 44:8, 68:13, 68:23, 76:6, 85:1, 85:13, 89:10, 100:25, 105:23, 106:16, 106:17, 108:24, 114:10, 117:24, 119:2, 120:22, 121:5, 123:2, 123:7, 123:8, 123:9, 123:25, 124:3, 125:2, 136:14, 137:19, 139:2, 139:25, 142:20, 142:21, 146:17, 146:18, 146:19, 148:25, 149:19, 149:21, 150:6, 150:8, 154:3, 159:15, 161:21, 164:3, 179:8, 181:14, 183:4, 186:7, 193:5
**Down** [1] - 25:21
**download** [30] - 7:24, 9:17, 18:7, 18:25, 21:18, 46:9, 87:25, 94:24, 95:3, 96:17, 96:18, 123:10, 123:24, 124:24, 125:6, 133:2, 135:3, 135:4, 148:9, 148:13, 149:17, 150:7, 152:23, 153:7, 155:5, 155:10, 156:10, 156:16, 156:18
**downloaded** [38] - 16:3, 16:6, 18:2, 19:2, 19:11, 21:7, 49:24, 51:15, 51:18, 90:1, 96:12, 96:15, 100:18, 100:19, 100:21, 118:25, 119:9, 120:17, 123:14, 124:19, 127:3, 129:11, 130:4, 132:17, 132:21, 133:18, 135:20, 136:3, 141:3, 155:16, 155:18, 156:4, 156:5, 156:7, 160:23
**downloaders** [1] - 80:21
**downloading** [8] - 115:20, 120:20, 120:24, 121:2, 133:5, 135:20, 136:1, 155:11
**downloads** [40] -

10:9, 10:12, 10:18, 18:25, 19:12, 35:3, 96:15, 116:17, 119:5, 120:17, 122:24, 122:25, 123:3, 123:11, 124:20, 124:22, 133:4, 135:7, 146:1, 146:2, 146:3, 146:11, 146:12, 146:20, 146:21, 147:1, 147:2, 147:7, 147:9, 147:15, 147:20, 147:21, 152:21, 152:24, 152:25, 153:10, 167:19
**downplayed** [1] - 187:11
**dozen** [2] - 141:24, 142:5
**dozens** [1] - 9:6
**Dr** [49] - 9:24, 10:7, 10:11, 10:16, 14:21, 123:18, 124:19, 124:21, 125:10, 135:13, 141:1, 141:11, 141:17, 141:18, 141:24, 142:7, 142:18, 142:22, 143:6, 143:9, 143:15, 144:18, 144:19, 144:25, 145:2, 145:3, 145:4, 145:11, 145:13, 145:14, 145:17, 145:23, 147:4, 148:1, 148:4, 148:5, 148:9, 149:15, 150:2, 150:10, 150:11, 150:20, 151:12, 152:17, 153:23
**draft** [6] - 39:9, 39:13, 39:24, 55:9, 56:11, 190:2
**dramatic** [1] - 127:9
**dramatically** [1] - 150:25
**draw** [14] - 113:25, 114:2, 114:3, 114:4, 116:25, 117:1, 121:11, 122:11, 122:13, 122:15, 152:6, 156:13
**drawn** [1] - 59:25
**drill** [1] - 42:3
**drive** [1] - 34:15
**drop** [3] - 72:9, 117:9, 118:14
**drop-off** [2] - 117:9, 118:14

**drove** [1] - 10:2
**due** [2] - 190:18, 194:20
**Duke** [1] - 4:1
**during** [4] - 69:23, 101:18, 102:7, 111:23
**dwarf** [1] - 135:23
**dynamic** [2] - 93:10, 162:13

# E

**e-bay** [1] - 134:13
**e-mail** [33] - 8:9, 8:10, 21:5, 26:25, 34:10, 35:10, 39:13, 39:14, 47:2, 50:14, 55:12, 55:16, 56:1, 62:10, 62:25, 63:1, 72:16, 75:22, 78:10, 78:12, 86:8, 86:9, 86:16, 96:10, 108:17, 138:3, 138:6, 139:4, 139:11, 165:20, 165:24, 190:2
**e-mails** [21] - 38:22, 38:24, 38:25, 57:9, 62:4, 62:6, 88:12, 88:13, 94:20, 94:21, 94:22, 100:5, 100:9, 106:6, 107:25, 108:6, 115:17, 128:13, 174:16, 174:19
**early** [4] - 22:15, 30:2, 36:14, 40:7
**earn** [1] - 21:21
**earned** [3] - 19:14, 21:19, 47:12
**earns** [1] - 21:21
**ease** [1] - 83:10
**easier** [1] - 180:19
**easiest** [1] - 112:8, 112:10, 112:20, 112:22
**Eastern** [1] - 60:5
**easy** [2] - 73:20, 158:21
**eat** [1] - 143:2
**echoed** [1] - 193:1
**economic** [2] - 9:14, 135:24
**economics** [1] - 10:2
**economist** [3] - 9:24, 10:22, 117:5
**editorial** [1] - 64:3
**educate** [1] - 20:20
**effect** [3] - 48:25, 108:22, 132:8
**effective** [1] - 76:6

**effectively** [5] - 56:6, 76:17, 157:18, 166:17, 188:5
**effectuated** [1] - 70:10
**effort** [2] - 28:2, 67:21
**efforts** [1] - 66:24
**egregious** [2] - 11:24, 115:15
**EHRLICH** [2] - 1:22, 196:9
**eight** [12] - 35:4, 66:16, 67:24, 69:14, 69:16, 69:23, 70:1, 70:4, 70:25, 71:8, 71:20, 71:21
**Eight** [1] - 69:18
**either** [12] - 36:2, 60:13, 64:14, 73:1, 97:5, 111:25, 115:18, 126:13, 134:19, 140:6, 149:7, 179:21
**electronic** [1] - 21:11
**electronics** [1] - 6:12
**Electronics** [1] - 184:4
**element** [1] - 12:25
**elements** [1] - 88:19
**elephant** [1] - 118:15
**Eleventh** [9] - 43:13, 59:19, 59:23, 60:6, 104:22, 158:6, 169:17, 184:21, 184:22
**eligibility** [5] - 12:25, 52:19, 57:22, 59:10, 65:7
**eligible** [3] - 13:9, 28:9, 155:24
**eliminate** [1] - 23:8
**elucidate** [1] - 14:10
**embraced** [2] - 26:11, 27:4
**embroidery** [1] - 16:13
**employ** [1] - 178:22
**employee** [2] - 174:20, 175:7
**employees** [6] - 174:23, 174:24, 175:5, 175:6, 175:22, 186:22
**employment** [1] - 60:9
**empty** [1] - 44:11
**enacted** [1] - 23:18
**encourage** [4] - 24:15, 135:25, 137:22, 145:6

**encouraged** [2] - 70:15, 167:12
**encouraging** [2] - 8:20, 135:25
**encrypt** [1] - 70:16
**end** [12] - 38:16, 48:16, 85:19, 137:5, 143:16, 175:15, 177:13, 178:10, 183:6, 190:1, 193:9, 194:10
**ended** [1] - 33:15
**ending** [2] - 123:6, 123:24
**endorse** [1] - 104:13
**ends** [4] - 99:19, 99:20, 99:21, 153:17
**enforce** [1] - 46:1
**engage** [2] - 123:6, 169:20
**engaged** [5] - 11:12, 87:15, 87:16, 104:20, 184:9
**engaging** [1] - 126:19
**engineers** [2] - 164:12, 178:23
**enlightening** [1] - 195:23
**enormous** [1] - 129:5
**ensures** [1] - 12:2
**entered** [1] - 23:22
**Enterprise** [1] - 3:4
**Enterprises** [1] - 60:5
**ENTERPRISES** [1] - 1:3
**entertain** [1] - 152:15
**entertainment** [5] - 11:1, 51:18, 52:6, 72:20, 123:4
**entire** [4] - 24:21, 57:2, 106:10, 138:4
**entirely** [6] - 21:17, 72:16, 96:14, 138:22, 139:2, 168:9
**entirety** [2] - 144:22, 192:3
**entities** [4] - 169:7, 180:25, 181:18, 192:18
**entitled** [4] - 72:10, 112:10, 156:14, 156:18
**ENTITLED** [1] - 196:8
**entity** [8] - 95:21, 124:10, 139:5, 171:20, 172:5,

174:24, 181:15, 191:18
**entrance** [1] - 46:3
**entry** [1] - 148:11
**environment** [1] - 129:21
**epidemic** [1] - 93:2
**episodes** [2] - 148:11, 148:12
**equal** [1] - 133:8
**equally** [1] - 119:15
**equals** [2] - 127:24, 131:6
**equating** [1] - 51:11
**equation** [1] - 127:25
**equitable** [1] - 106:9
**erred** [2] - 93:12, 159:19
**error** [5] - 75:15, 121:8, 135:13, 135:14, 172:3
**Eslinger** [1] - 59:21
**ESLINGER** [1] - 59:22
**Especially** [1] - 163:18
**especially** [4] - 30:22, 117:24, 165:17, 165:23
**ESQ** [11] - 1:13, 1:13, 1:14, 1:17, 1:19, 2:3, 2:3, 2:4, 2:4, 2:7, 2:9
**Esquenazi** [1] - 2:7
**essence** [2] - 32:18, 129:12
**essentially** [5] - 18:9, 64:4, 64:7, 102:22, 112:14
**establish** [4] - 63:20, 65:2, 176:25, 177:5
**established** [5] - 96:9, 96:20, 113:6, 122:12, 167:6
**estate** [2] - 158:9
**estimation** [1] - 133:1
**estopped** [3] - 101:12, 102:17, 103:9
**estoppel** [14] - 64:20, 98:9, 98:12, 98:19, 98:21, 101:9, 101:11, 103:15, 103:21, 104:22, 106:4, 106:9, 107:4, 108:23
**ET** [2] - 1:3, 1:6
**et** [8] - 3:4, 3:5, 20:11, 21:14, 73:19, 120:15, 120:23, 164:25

**eternal** [2] - 5:11, 195:18
**event** [2] - 124:17, 133:3
**eventually** [1] - 74:18
**everywhere** [1] - 97:18
**evidence** [56] - 8:15, 8:21, 9:4, 10:10, 15:14, 33:12, 47:1, 58:4, 59:6, 68:11, 69:22, 72:2, 73:25, 74:2, 74:4, 80:10, 82:9, 82:10, 83:6, 83:24, 84:8, 86:25, 88:5, 94:18, 94:24, 96:14, 96:16, 96:23, 100:8, 100:16, 108:5, 113:8, 116:15, 124:14, 128:16, 129:9, 131:16, 131:21, 137:15, 137:23, 138:3, 141:10, 142:3, 143:17, 144:4, 144:9, 144:22, 145:22, 153:25, 154:11, 173:13, 173:18, 176:1, 180:12, 193:3, 193:6
**evidences** [1] - 45:22
**evidentiary** [7] - 36:2, 41:11, 41:24, 142:11, 142:12, 153:13, 195:20
**evil** [1] - 163:4
**evolution** [1] - 28:7
**evolutionary** [1] - 28:14
**evolved** [1] - 169:10
**evolving** [2] - 30:1, 164:20
**exact** [4] - 9:17, 89:7, 107:17, 125:16
**exacting** [1] - 79:18
**exactly** [22] - 12:4, 19:23, 31:8, 46:7, 46:16, 54:21, 57:2, 63:24, 71:4, 75:1, 76:7, 77:1, 81:14, 109:7, 113:15, 116:10, 116:14, 116:16, 120:4, 120:6, 139:3, 180:24
**Exactly** [2] - 59:11, 146:13
**exaggerate** [1] - 137:21

**exaggerating** [1] - 63:10
**exaggerations** [1] - 139:19
**examination** [1] - 153:24
**examine** [1] - 144:15
**examined** [1] - 152:18
**examining** [1] - 162:6
**example** [11] - 5:22, 17:10, 19:14, 20:21, 21:3, 29:5, 34:23, 67:14, 73:17, 160:1, 177:23
**examples** [3] - 16:12, 75:12, 160:20
**except** [5] - 82:15, 118:13, 132:16, 146:17, 146:18
**exception** [1] - 28:8
**exceptional** [2] - 67:2, 171:18
**excerpt** [2] - 16:24, 142:25
**exclamation** [2] - 142:19, 146:18
**excludable** [1] - 149:15
**excluded** [2] - 125:12, 142:4
**excludes** [5] - 143:9, 146:22, 146:24, 147:1
**excluding** [1] - 143:1
**exclusive** [1] - 104:18
**exclusively** [4] - 124:14, 129:3, 130:11, 155:10
**exculpations** [1] - 146:4
**Excuse** [3] - 23:20, 74:13, 142:9
**excuse** [2] - 30:21, 192:21
**excused** [1] - 126:20
**executing** [1] - 142:2
**exempted** [1] - 126:18
**exhibit** [2] - 118:25, 140:20
**Exhibit** [21] - 38:14, 41:15, 54:25, 55:7, 55:21, 56:1, 56:11, 56:13, 56:14, 56:21, 57:9, 62:3, 62:16, 107:24, 107:25, 108:8, 137:4, 138:7, 180:24

**exhibits** [1] - 142:14
**exist** [5] - 21:24, 165:7, 171:18, 178:15
**existed** [2] - 47:19, 47:22
**existence** [5] - 141:15, 141:22, 142:23, 144:2, 175:1
**exists** [3] - 21:22, 151:11, 181:15
**expand** [1] - 194:9
**expands** [1] - 141:15
**expected** [1] - 29:20
**expeditious** [3] - 75:3, 180:18, 180:20
**expeditiously** [1] - 27:4
**expenses** [5] - 180:17, 180:19, 180:21, 192:21
**experienced** [2] - 14:22, 103:3
**experiences** [1] - 14:11
**expert** [14] - 15:3, 121:4, 121:7, 121:11, 137:4, 137:10, 141:1, 148:7, 149:22, 150:14, 161:17, 165:17, 165:18, 166:10
**expertise** [1] - 148:23
**experts** [7] - 4:2, 22:10, 137:6, 148:21, 148:23, 148:25, 149:2
**explain** [8] - 27:23, 47:25, 53:3, 106:15, 111:3, 112:9, 118:14, 146:13
**explained** [4] - 31:9, 94:23, 164:22, 181:13
**explains** [5] - 10:25, 146:19, 146:20, 152:19, 180:24
**explanation** [1] - 111:21
**explicit** [2] - 141:25, 157:21
**explicitly** [1] - 145:15
**explore** [1] - 9:8
**expressed** [1] - 131:8
**expresses** [1] - 138:20
**expressly** [2] - 126:23, 162:8
**extension** [1] -

148:14
**extensive** [2] - 72:7, 92:13
**extensively** [2] - 74:9, 106:16
**extent** [5] - 41:14, 60:1, 69:11, 146:9, 174:7
**extra** [1] - 42:10
**extraordinarily** [1] - 82:10
**extraordinary** [7] - 28:3, 32:3, 49:12, 53:13, 106:20, 107:6, 133:4
**extreme** [1] - 195:7
**eye** [2] - 28:16, 163:4
**eyes** [1] - 55:23
**eyesight** [1] - 182:13

**F**

**F.3d** [3] - 59:22, 60:6, 159:22
**F.Supp** [1] - 185:1
**F.Supp.2d** [3] - 79:20, 95:20, 185:4
**Fabrizio** [62] - 3:7, 3:9, 13:19, 14:10, 15:10, 15:11, 17:22, 18:15, 22:18, 24:2, 26:17, 29:11, 29:18, 30:6, 31:12, 34:17, 38:2, 38:15, 38:23, 42:11, 42:20, 61:18, 62:4, 62:10, 63:10, 64:24, 66:14, 84:14, 94:8, 94:15, 94:22, 95:16, 95:23, 96:12, 97:1, 102:3, 117:15, 118:12, 119:7, 119:11, 119:20, 122:8, 136:17, 137:1, 138:16, 139:10, 140:22, 140:25, 142:5, 147:19, 148:1, 149:18, 158:23, 158:25, 160:4, 161:4, 162:4, 162:11, 162:23, 166:1, 190:22, 193:1
**FABRIZIO** [158] - 1:13, 3:7, 4:12, 5:4, 6:18, 6:21, 6:23, 8:10, 12:18, 12:23, 13:21, 15:13, 15:16, 23:20, 38:18, 38:24, 39:1, 39:3, 42:10, 42:21, 44:2, 44:23, 45:20, 46:15, 47:10, 47:13,

48:7, 48:11, 49:2, 49:5, 49:10, 49:17, 50:3, 50:19, 51:3, 51:12, 52:22, 52:25, 53:5, 53:20, 53:24, 54:5, 54:12, 54:15, 55:3, 55:7, 55:15, 55:24, 56:1, 58:1, 58:6, 58:12, 59:9, 59:11, 60:15, 61:8, 61:12, 61:14, 69:22, 80:14, 81:24, 82:6, 82:19, 83:12, 83:16, 87:3, 88:9, 89:2, 90:1, 90:19, 90:24, 91:6, 91:17, 91:23, 92:17, 92:25, 93:11, 93:17, 98:18, 98:24, 100:24, 107:23, 109:2, 109:10, 109:22, 110:5, 110:8, 110:16, 111:7, 112:18, 112:20, 112:22, 114:19, 114:24, 115:7, 116:8, 117:19, 118:3, 118:9, 122:11, 123:16, 123:19, 124:1, 124:13, 124:17, 125:4, 125:9, 126:14, 127:18, 128:2, 128:21, 129:3, 130:2, 130:7, 130:23, 130:25, 131:6, 132:24, 134:5, 134:8, 134:17, 134:23, 142:9, 150:2, 153:19, 154:9, 154:15, 155:18, 155:21, 158:2, 159:5, 161:7, 161:11, 163:1, 166:3, 166:8, 168:3, 168:11, 168:14, 182:8, 182:15, 184:11, 188:17, 188:20, 188:25, 189:12, 189:17, 189:20, 190:1, 193:19, 193:21, 194:12, 194:16, 194:18, 195:1, 195:4, 195:17, 196:2

**Fabrizio's** [6] - 30:15, 93:25, 137:11, 137:15, 137:20, 139:19

**fabulously** [1] - 71:17

**face** [2] - 105:11, 138:9

**facilitates** [1] - 159:11

**facilitating** [1] - 155:12

**facilitator** [1] - 159:21

**facilities** [1] - 158:16

**facility** [2] - 50:10, 155:13

**facing** [1] - 111:24

**fact** [54] - 7:12, 7:15, 9:3, 9:23, 14:24, 16:4, 22:19, 22:22, 22:24, 38:3, 39:25, 43:16, 45:8, 45:22, 48:20, 61:20, 67:14, 71:8, 72:12, 73:10, 74:1, 80:12, 96:1, 96:2, 96:21, 100:15, 100:20, 101:15, 106:8, 112:23, 113:15, 115:17, 128:22, 132:6, 137:12, 141:16, 153:24, 156:4, 157:13, 167:9, 170:16, 173:13, 173:20, 174:22, 175:4, 183:17, 183:22, 184:13, 184:15, 186:9, 186:25, 188:12, 188:23

**factor** [3] - 67:18, 147:6

**factors** [7] - 7:18, 7:19, 13:2, 76:12, 122:2, 147:2, 166:14

**facts** [47] - 11:24, 13:6, 13:7, 14:12, 14:19, 30:5, 30:6, 30:7, 30:10, 30:11, 35:2, 42:25, 43:11, 43:14, 49:17, 49:18, 53:1, 59:16, 59:25, 64:14, 92:5, 105:14, 106:10, 115:8, 156:12, 156:13, 166:11, 170:8, 170:12, 170:14, 171:20, 173:25, 174:2, 174:9, 174:10, 176:6, 181:7, 182:4, 182:18, 183:8, 183:13, 183:21, 190:8, 193:9, 193:10

**factual** [4] - 101:14, 157:17, 168:20, 170:1

**factually** [2] - 83:4, 116:24

**fail** [2] - 116:9, 154:1

**failed** [1] - 11:25

**failure** [2] - 43:2, 53:16

**fair** [9] - 6:24, 11:11, 49:2, 51:19, 93:11, 113:22, 114:15, 137:20, 149:16

**fairly** [7] - 70:19, 72:13, 73:20, 99:23, 127:9, 166:11

**fall** [1] - 159:2

**false** [3] - 57:18, 140:21, 169:2

**falsehood** [1] - 56:14

**falsely** [1] - 190:3

**far** [21] - 7:12, 8:22, 26:2, 26:3, 60:15, 60:16, 70:13, 71:13, 81:17, 85:6, 97:5, 118:22, 134:12, 148:5, 159:8, 164:17, 181:20, 183:19

**Farella** [2] - 2:5, 4:4

**fashion** [1] - 124:10

**fast** [1] - 39:5

**faster** [4] - 18:25, 19:2, 34:6, 135:7

**fatally** [1] - 66:11

**favor** [2] - 59:25, 193:12

**Favored** [1] - 39:1

**favorite** [2] - 38:21, 38:25

**Favorite** [2] - 39:2, 39:3

**fear** [1] - 52:14

**feasible** [1] - 192:5

**features** [1] - 162:15

**February** [10] - 26:11, 40:20, 48:4, 48:6, 48:9, 72:3, 117:4, 118:13, 151:13

**federal** [4] - 10:14, 12:13, 12:20, 58:15

**fee** [2] - 50:23, 163:15

**feed** [1] - 74:23

**fell** [3] - 10:3, 128:11, 173:11

**fellow** [3] - 62:18, 63:2, 78:11

**felt** [1] - 99:5

**Ferguson** [1] - 1:23

**ferret** [1] - 164:15

**few** [14] - 15:8, 36:18, 63:4, 92:21, 121:23, 127:7, 128:13, 137:14, 160:14, 166:4, 174:23, 180:5, 192:17

**fictitious** [2] - 7:7,

12:5

**Field** [4] - 102:20, 103:3, 104:1

**field** [5] - 73:13, 87:24, 88:1, 148:21, 152:4

**fields** [1] - 94:23

**Fifth** [1] - 177:23

**fifth** [2] - 18:12, 21:19

**figuratively** [2] - 140:22, 143:2

**figure** [5] - 120:19, 141:9, 141:21, 143:1, 187:4

**file** [57] - 15:25, 17:5, 17:7, 17:20, 18:2, 19:4, 20:1, 23:3, 23:5, 23:6, 23:7, 23:8, 24:6, 27:3, 31:9, 37:19, 37:20, 39:16, 39:21, 41:1, 41:2, 43:21, 46:5, 46:16, 46:17, 46:22, 89:5, 89:6, 89:7, 89:16, 95:3, 95:6, 120:10, 120:24, 121:3, 123:10, 123:14, 124:2, 124:4, 133:18, 135:4, 136:3, 136:4, 147:17, 148:14, 150:7, 152:22, 152:24, 155:9, 156:1, 164:13, 189:15, 190:21, 194:6

**file-by-file** [2] - 43:21, 46:5

**filed** [17] - 23:19, 23:25, 28:6, 33:6, 33:10, 33:16, 36:20, 36:22, 36:24, 40:14, 47:20, 47:22, 48:9, 72:3, 100:12, 101:19, 182:17

**files** [89] - 8:20, 16:6, 16:10, 20:16, 21:6, 22:20, 23:1, 23:2, 37:6, 39:18, 40:16, 43:23, 43:25, 44:5, 44:8, 45:14, 45:18, 45:19, 45:20, 46:6, 46:8, 46:12, 49:24, 53:15, 62:22, 65:2, 66:1, 68:19, 71:7, 76:6, 95:7, 95:9, 97:7, 97:21, 113:8, 113:14, 113:18, 118:25, 119:9, 120:13, 120:20, 121:9, 121:12, 123:22, 123:23, 124:22,

127:3, 129:10, 131:10, 132:21, 135:9, 135:10, 135:19, 135:20, 135:23, 135:24, 136:1, 136:6, 136:7, 136:8, 137:8, 141:3, 146:5, 146:22, 146:25, 147:21, 148:10, 149:18, 149:19, 151:21, 151:22, 151:23, 155:4, 155:7, 155:15, 155:21, 156:4, 156:5, 156:10, 158:18, 160:12, 160:22, 163:22, 164:5, 165:9, 167:12

**filing** [1] - 103:6

**fill** [2] - 5:23, 44:12

**filmed** [1] - 91:4

**films** [1] - 90:22

**filter** [4] - 49:15, 96:22, 167:8

**Filtering** [1] - 46:19

**filtering** [5] - 9:3, 9:10, 9:11, 46:18, 167:10

**filters** [3] - 8:25, 9:5, 9:8

**Fin** [1] - 16:13

**final** [1] - 163:5

**Finally** [2] - 9:13, 83:16

**finally** [4] - 9:19, 9:25, 128:10, 190:5

**finance** [3] - 171:24, 176:12, 183:17

**finances** [1] - 183:18

**financial** [12] - 99:15, 113:3, 113:22, 113:24, 114:5, 114:12, 114:22, 116:2, 120:5, 122:7, 125:1, 178:14

**fine** [10] - 16:14, 66:3, 118:2, 118:8, 147:15, 147:19, 183:12, 186:12, 194:1

**Fine** [1] - 118:8

**fingerprint** [2] - 40:17, 164:14

**fingerprinting** [9] - 33:17, 33:22, 33:23, 34:3, 40:13, 40:15, 40:23, 41:2, 164:24

**fingerprints** [1] - 40:25

**finish** [4] - 80:1, 142:15, 181:21,

190:17
**finished** [2] - 41:6, 82:3
**fire** [1] - 44:12
**firmly** [1] - 113:6
**First** [11] - 7:21, 11:21, 30:16, 71:7, 73:18, 98:25, 136:18, 154:10, 159:8, 161:17, 163:22
**first** [31] - 4:25, 5:21, 13:22, 16:20, 22:14, 40:19, 57:13, 59:21, 61:15, 62:1, 64:18, 73:5, 80:17, 86:3, 87:12, 96:13, 132:3, 137:17, 139:5, 140:1, 141:8, 141:18, 146:17, 146:18, 150:20, 154:19, 166:8, 170:10, 172:8, 183:10
**fit** [4] - 6:4, 48:4, 59:10, 106:17
**five** [13] - 32:4, 35:22, 53:7, 71:22, 89:11, 92:15, 93:24, 97:21, 120:23, 121:1, 134:15, 135:9, 175:1
**Five** [2] - 22:1, 89:24
**five-minute** [1] - 134:15
**fix** [4] - 64:7, 95:11, 102:14
**fixed** [1] - 92:8
**FL** [2] - 1:18, 2:8
**flag** [14] - 65:2, 87:4, 87:11, 88:3, 88:12, 92:1, 92:2, 92:4, 92:19, 94:5, 97:2, 97:6, 100:22, 157:12
**flagship** [5] - 8:6, 131:24, 138:12, 138:13, 165:21
**flashback** [1] - 184:8
**flashing** [1] - 4:9
**Flava** [1] - 84:23
**flaws** [1] - 121:20
**Flea** [1] - 111:18
**fledgling** [1] - 77:23
**flip** [2] - 36:25, 37:6
**flipping** [1] - 103:14
**floor** [1] - 117:9
**Floor** [1] - 2:5
**FLORIDA** [2] - 1:1, 1:3
**Florida** [4] - 1:25, 24:6, 180:14, 184:18
**flouting** [1] - 148:15
**focal** [2] - 144:14,

153:18
**focus** [6] - 34:9, 64:23, 65:10, 98:14, 153:15, 169:15
**focused** [2] - 91:21, 120:4
**focusing** [2] - 64:25, 76:14
**folk** [3] - 50:9, 50:16, 127:11
**folks** [4] - 18:8, 24:17, 50:25, 106:2
**follow** [3] - 5:2, 34:21, 102:2
**followed** [3] - 9:21, 62:17, 63:3
**following** [4] - 8:17, 73:19, 91:23, 137:2
**Fonavia** [1] - 163:9
**fond** [1] - 98:12
**Fonovisa** [2] - 163:10, 164:20
**footnote** [2] - 36:13, 77:8
**FOR** [2] - 1:12, 2:2
**force** [7] - 169:20, 177:19, 182:22, 182:24, 184:2, 184:6, 187:5
**forced** [1] - 9:25
**foreclosed** [1] - 105:12
**FOREGOING** [1] - 196:7
**Foreign** [2] - 184:19, 192:7
**foremost** [1] - 11:21
**forever** [2] - 47:8, 48:25
**forge** [1] - 28:11
**form** [1] - 178:6
**formal** [4] - 188:17, 190:9, 190:10, 192:19
**formalized** [1] - 180:23
**formally** [2] - 183:14, 183:16
**formed** [5] - 168:23, 181:15, 186:3, 186:4, 186:6
**former** [1] - 14:23
**formidable** [1] - 85:5
**formula** [1] - 65:15
**forth** [4] - 12:10, 75:9, 87:13, 118:1
**forums** [4] - 8:17, 131:9, 131:13, 189:7
**forward** [2] - 37:18, 97:17
**Foster** [6] - 123:18,

148:5, 148:9, 149:15, 150:2, 150:10
**foster** [5] - 7:18, 25:16, 33:2, 130:14, 166:16
**fostered** [1] - 6:25
**fostering** [1] - 166:22
**foundation** [1] - 23:17
**founder** [2] - 188:13, 188:14
**four** [5] - 4:17, 35:12, 89:13, 108:6, 123:9
**Four** [1] - 89:13
**Fourth** [1] - 99:18
**Fox** [2] - 32:19, 64:6
**fraction** [1] - 21:8
**frame** [1] - 78:2
**Francisco** [1] - 2:6
**frank** [1] - 143:12
**frankly** [4] - 28:3, 33:8, 70:19, 90:25
**fraught** [1] - 186:8
**free** [6] - 18:20, 19:3, 19:8, 19:20, 135:4, 147:9
**freemium** [3] - 18:18, 19:8, 19:18
**frequently** [7] - 16:6, 88:1, 118:25, 119:5, 119:9, 155:16, 155:19
**fresh** [1] - 61:11
**friend** [1] - 22:4
**frolic** [1] - 145:13
**FROM** [2] - 1:12, 186:10
**front** [2] - 107:25, 186:10
**full** [9] - 9:9, 54:21, 78:15, 96:16, 100:2, 101:2, 121:20, 124:14, 153:7
**fully** [5] - 8:8, 8:11, 100:19, 100:21, 193:25
**function** [6] - 172:17, 180:16, 180:17, 185:22, 191:9, 191:19
**functionality** [5] - 18:9, 188:4, 191:23, 192:2, 192:4
**functions** [1] - 180:15
**fundamental** [4] - 15:1, 24:11, 26:24, 144:20
**fundamentally** [1] - 30:6
**funds** [2] - 30:18, 172:11

Fung [13] - 49:11, 109:24, 130:22, 132:7, 132:15, 152:2, 154:21, 167:5, 174:9, 174:10, 174:15, 177:10
**funster** [1] - 194:15
**furiously** [1] - 103:13
**futility** [1] - 179:8
**future** [5] - 14:7, 19:22, 19:24, 20:3, 37:24
**fuzzy** [1] - 38:16

# G

**Gables** [1] - 2:8
**gal** [1] - 72:22
**game** [1] - 50:14
**games** [3] - 52:3, 131:11, 133:22
**gamesmanship** [1] - 103:18
**garb** [1] - 148:7
**garbed** [1] - 142:3
**gatekeeping** [1] - 60:12
**Gates** [1] - 179:9
**gathering** [1] - 152:5
**general** [1] - 177:3
**generalized** [1] - 177:6
**generally** [4] - 13:19, 34:21, 92:18, 93:3
**generate** [1] - 94:23
**generated** [1] - 22:2
**generates** [2] - 21:7, 115:1
**gentleman** [3] - 76:2, 170:18, 175:22
**Gentlemen** [1] - 193:15
**gentlemen** [2] - 178:16, 192:12
**gentlemen's** [1] - 144:7
**genuine** [2] - 80:12, 193:10
**genuinely** [1] - 176:7
**gift** [1] - 8:5
**Given** [2] - 65:18, 66:17
**given** [17] - 17:8, 31:21, 32:4, 45:4, 58:25, 70:1, 74:23, 75:12, 89:18, 91:23, 106:18, 111:20, 133:10, 141:17, 155:6, 160:20, 195:20

**glib** [1] - 60:10
**glossed** [1] - 135:17
**gmail** [1] - 55:22
**goal** [1] - 149:9
**Goldstein** [1] - 159:19
**goods** [1] - 192:12
**Google** [24] - 23:19, 24:3, 24:5, 24:17, 24:20, 24:24, 25:6, 102:20, 102:21, 102:22, 102:24, 103:3, 103:4, 103:24, 104:2, 105:18, 165:5, 166:23, 166:24, 167:1, 178:19, 179:7
**Google's** [1] - 104:2
**government** [2] - 24:12, 24:13
**grand** [1] - 85:9
**grant** [2] - 166:13, 182:4
**granted** [1] - 193:12
**Granted** [1] - 183:25
**granting** [2] - 76:23, 77:16
**graphic** [1] - 53:7
**graphical** [1] - 132:24
**grave** [1] - 195:15
**Gray** [1] - 1:17
**great** [6] - 56:16, 85:6, 108:22, 127:22, 145:8, 190:5
**greater** [2] - 8:22, 125:3
**Grokster** [49] - 5:16, 7:21, 8:23, 8:24, 9:3, 9:7, 9:16, 12:10, 29:15, 30:2, 34:17, 50:9, 59:1, 70:19, 88:7, 109:21, 110:1, 110:10, 110:20, 110:24, 115:10, 115:21, 119:16, 122:2, 122:10, 125:15, 127:5, 127:8, 127:11, 127:17, 128:18, 128:19, 128:24, 129:4, 129:5, 129:12, 129:13, 129:19, 129:20, 130:10, 130:20, 131:17, 132:16, 137:25, 138:2, 138:23, 152:2, 153:14
**Grokster's** [4] - 7:17, 7:18, 9:14, 9:15
**Grokster-induced** [1] - 110:10

**Groksters** [1] - 15:22
**ground** [2] - 6:24, 114:15
**Group** [2] - 2:10, 4:6
**group** [3] - 45:11, 45:22, 45:23
**growth** [1] - 24:17
**Guardian** [9] - 56:19, 56:20, 56:21, 62:18, 63:2, 63:6, 63:24, 66:3, 78:11
**guess** [7] - 28:20, 105:19, 115:3, 115:6, 117:4, 139:8, 146:19
**guiding** [8] - 169:11, 170:25, 177:19, 178:24, 181:17, 182:24, 184:2, 187:5
**GUPTA** [1] - 2:4
**Gupta** [1] - 4:6
**Gurvits** [1] - 4:6
**GURVITZ** [1] - 2:9
**guy** [4] - 40:4, 72:22, 171:2, 178:14
**guys** [1] - 138:23

# H

**H&R** [1] - 60:5
**hack** [1] - 126:6
**Haley's** [2] - 70:24, 71:7
**half** [11] - 45:14, 45:18, 45:19, 119:1, 127:6, 133:23, 133:24, 133:25, 141:2, 147:12, 147:21
**Half** [1] - 45:20
**halves** [1] - 18:13
**hand** [6] - 16:1, 42:7, 42:11, 85:11, 101:22, 139:25, 140:8, 149:24
**handful** [1] - 97:11
**handle** [1] - 168:4
**handles** [1] - 185:24
**handling** [3] - 175:18, 175:21, 187:8
**handout** [1] - 55:24
**happy** [2] - 24:24, 127:2
**harbor** [43] - 11:18, 11:20, 12:2, 12:3, 12:9, 12:12, 12:24, 13:1, 13:4, 13:10, 28:9, 28:12, 30:3, 34:22, 34:25, 43:4, 43:6, 43:18, 46:3, 46:14, 47:9, 49:18, 57:22, 64:14, 64:20,

67:23, 70:21, 83:18, 85:10, 85:18, 92:16, 93:2, 93:6, 97:8, 97:17, 99:16, 99:17, 99:19, 112:10, 124:11
**harbors** [2] - 24:23, 43:18
**hard** [3] - 78:3, 91:17, 190:12
**Hard** [1] - 58:8
**hardly** [1] - 108:23
**harm** [1] - 53:17
**Harry** [2] - 123:12, 123:13
**hash** [23] - 27:23, 30:25, 31:5, 31:10, 34:2, 34:7, 37:17, 37:19, 40:3, 40:7, 46:12, 46:16, 46:18, 46:21, 88:22, 88:23, 89:4, 89:16, 96:1, 96:7, 96:11, 164:15, 164:24
**Hash** [1] - 40:5
**hashing** [1] - 55:10
**hat** [2] - 143:2, 143:3
**havoc** [1] - 28:15
**head** [2] - 35:17, 51:2
**hear** [4] - 4:14, 4:22, 13:24, 17:8, 28:13, 30:5, 41:14, 41:17, 65:16, 81:12, 163:5, 195:24
**heard** [13] - 14:10, 22:18, 41:9, 94:25, 101:13, 106:2, 140:15, 149:10, 149:18, 152:11, 168:9, 170:10, 195:9
**hearing** [3] - 101:20, 148:17, 154:7
**heart** [6] - 59:3, 118:9, 141:6, 187:23, 189:8, 190:2
**heat** [1] - 68:20
**heated** [1] - 9:1
**heavily** [1] - 124:19
**held** [8] - 7:10, 67:14, 129:7, 129:14, 171:19, 179:1, 179:3, 184:17
**Hello** [1] - 86:7
**help** [14] - 37:12, 41:8, 55:24, 66:1, 66:14, 66:24, 87:15, 102:1, 109:25, 129:2, 146:23, 165:14, 165:15
**Help** [1] - 194:6

**helped** [1] - 103:20
**helper** [1] - 136:24
**helpful** [5] - 24:4, 42:7, 146:9, 194:3, 194:20
**helping** [1] - 80:14
**helps** [1] - 81:10
**hides** [1] - 12:4
**hiding** [2] - 14:13, 85:3
**high** [2] - 116:16, 119:8
**higher** [8] - 37:8, 113:12, 113:16, 120:23, 125:12, 169:18, 169:19
**highly** [2] - 120:15, 159:14
**hill** [1] - 152:14
**himself** [9] - 56:14, 82:10, 144:25, 161:19, 174:12, 174:13, 185:19, 189:3, 189:7
**hint** [1] - 161:25
**hired** [2] - 179:11, 192:1
**hires** [1] - 186:25
**hiring** [1] - 190:5
**history** [1] - 24:10
**hit** [2] - 29:5, 103:10
**Hobson's** [1] - 111:24
**hoe** [1] - 64:4
**hold** [5] - 112:1, 170:24, 171:5, 183:3, 183:5
**Hold** [1] - 132:22
**holders** [3] - 25:17, 78:19, 78:20
**holding** [3] - 65:1, 94:3, 159:2
**holes** [1] - 117:25
**home** [4] - 51:22, 68:20, 91:11, 160:17
**HON** [1] - 1:9
**honed** [1] - 28:22
**honest** [1] - 25:19
**Honestly** [1] - 153:15
**honestly** [1] - 189:17
**Honor** [381] - 3:7, 3:10, 3:22, 4:12, 4:21, 5:4, 5:25, 6:6, 6:18, 6:21, 7:3, 7:16, 7:24, 8:15, 8:21, 8:25, 9:13, 10:25, 11:2, 11:21, 12:5, 12:23, 13:11, 13:22, 14:1, 14:2, 14:5, 14:16, 15:5, 15:13, 15:16, 15:19,

16:5, 16:10, 16:12, 17:4, 17:25, 20:8, 20:14, 21:1, 21:17, 22:5, 23:11, 23:14, 23:20, 24:2, 24:9, 25:9, 26:7, 26:23, 28:21, 28:25, 29:4, 29:25, 30:14, 30:19, 31:3, 31:8, 31:18, 32:13, 33:8, 33:18, 34:6, 35:1, 35:21, 36:13, 37:7, 38:11, 38:18, 38:19, 39:13, 39:23, 40:2, 40:12, 41:6, 42:4, 42:13, 42:21, 44:6, 44:23, 45:22, 46:1, 46:16, 47:10, 47:13, 47:18, 49:2, 49:23, 50:19, 51:3, 51:12, 52:25, 53:6, 53:8, 54:9, 54:13, 54:15, 55:4, 55:11, 55:20, 56:13, 56:17, 56:25, 57:5, 58:1, 58:6, 58:12, 58:13, 58:18, 58:19, 58:20, 59:3, 59:11, 59:12, 59:20, 60:4, 60:15, 61:14, 61:17, 63:1, 63:9, 63:15, 63:18, 63:25, 64:16, 65:19, 65:24, 66:21, 68:2, 68:6, 69:1, 69:17, 69:22, 70:11, 70:17, 71:6, 71:20, 72:1, 72:4, 73:5, 73:10, 73:15, 73:22, 74:13, 74:21, 74:25, 75:8, 75:20, 76:11, 76:18, 77:4, 77:7, 78:3, 78:9, 79:2, 79:16, 79:23, 80:3, 80:14, 81:3, 81:12, 81:14, 81:17, 82:4, 83:6, 83:16, 83:24, 84:12, 84:19, 85:8, 85:21, 86:18, 87:3, 87:12, 88:9, 88:17, 88:20, 89:3, 90:19, 90:24, 91:7, 91:24, 92:17, 92:21, 93:11, 93:23, 95:5, 96:19, 96:23, 98:6, 98:16, 98:24, 99:10, 100:6, 101:4, 101:10, 101:18, 102:17, 103:22, 105:3, 105:10, 106:7, 107:3, 107:20, 107:23, 107:24, 108:8, 108:17, 108:23,

109:2, 109:10, 109:18, 109:22, 110:16, 111:3, 111:20, 112:6, 112:8, 112:9, 112:23, 113:25, 114:2, 114:14, 114:24, 115:7, 116:8, 116:19, 117:2, 117:12, 117:17, 117:19, 118:4, 118:7, 118:10, 118:15, 118:21, 120:4, 121:6, 121:10, 121:24, 122:6, 122:11, 122:16, 122:19, 123:17, 123:19, 124:13, 125:5, 125:17, 126:5, 127:18, 128:2, 128:9, 128:13, 128:21, 129:20, 130:7, 131:7, 131:14, 132:3, 132:21, 133:3, 133:7, 134:24, 135:10, 136:2, 136:13, 137:11, 137:17, 137:22, 138:1, 138:15, 139:15, 139:23, 140:3, 140:13, 142:6, 142:9, 142:10, 142:25, 144:17, 145:25, 146:14, 147:20, 148:17, 149:10, 149:20, 150:5, 150:21, 153:19, 154:9, 154:19, 155:3, 156:12, 156:20, 158:20, 158:24, 159:24, 160:1, 161:3, 161:7, 162:14, 162:22, 163:1, 163:10, 164:7, 164:18, 165:2, 165:12, 165:18, 165:25, 166:6, 166:8, 166:13, 168:1, 168:8, 168:16, 168:19, 169:15, 170:1, 170:10, 170:11, 170:14, 170:22, 171:6, 171:15, 172:4, 173:6, 174:5, 174:16, 175:20, 176:7, 176:19, 176:23, 177:2, 177:5, 177:22, 178:8, 178:19, 179:4, 179:14, 179:24, 180:6, 180:14, 181:3, 181:7, 181:10, 181:21, 182:2, 182:6,

182:10, 183:21,
184:1, 184:11,
185:11, 185:15,
186:5, 187:9, 188:9,
189:17, 190:14,
190:16, 190:18,
191:25, 192:8,
192:10, 192:18,
193:3, 193:8, 193:10,
193:12, 193:23,
194:18, 194:19,
195:1, 195:4, 195:14,
195:17, 196:2, 196:3
**Honor's** [3] - 15:8,
27:15, 36:3
**hope** [4] - 5:10,
58:13, 85:7, 195:18
**Hopefully** [1] - 30:12
**hose** [1] - 44:12
**hosting** [5] - 15:19,
180:16, 192:20,
193:2, 193:8
**hosts** [1] - 193:4
**hot** [1] - 147:6
**HOTFILE** [1] - 1:6
**Hotfile** [369] - 3:5,
5:25, 6:24, 7:6, 7:12,
7:13, 7:22, 8:3, 8:4,
8:8, 8:11, 8:13, 8:19,
8:20, 9:7, 9:11, 9:17,
9:19, 9:25, 10:3, 10:6,
10:9, 10:17, 10:20,
10:23, 10:25, 11:1,
11:6, 11:7, 11:10,
11:11, 11:13, 11:18,
11:21, 11:25, 12:4,
12:6, 12:9, 12:24,
13:9, 13:13, 13:14,
13:16, 13:24, 14:4,
14:11, 15:7, 15:19,
15:22, 15:24, 15:25,
16:6, 16:17, 16:21,
16:24, 17:1, 17:2,
17:4, 17:6, 17:23,
18:3, 18:5, 18:12,
18:17, 19:3, 19:4,
19:8, 20:4, 20:10,
20:11, 21:4, 21:10,
21:13, 21:14, 22:2,
22:7, 23:13, 24:18,
26:7, 26:11, 27:3,
27:17, 27:18, 27:21,
28:4, 29:2, 31:5, 31:6,
31:21, 32:2, 33:7,
33:9, 33:15, 33:17,
33:25, 34:10, 34:20,
34:24, 35:10, 37:8,
38:4, 40:6, 40:9, 43:8,
44:11, 45:1, 45:5,
45:9, 45:10, 45:11,

45:13, 45:15, 45:20,
46:8, 47:15, 47:20,
48:1, 49:19, 52:2,
56:5, 56:7, 59:1,
62:17, 62:18, 63:2,
63:5, 63:13, 63:22,
64:4, 66:23, 67:13,
67:14, 69:3, 70:2,
71:13, 74:2, 74:12,
75:5, 76:12, 77:13,
79:3, 79:7, 82:12,
82:14, 82:19, 84:10,
85:6, 85:16, 85:18,
86:4, 87:12, 87:14,
87:16, 87:18, 87:19,
87:20, 87:24, 87:25,
88:11, 88:22, 88:23,
88:9, 89:10, 89:12,
89:15, 89:18, 89:19,
90:1, 90:9, 94:21,
95:8, 95:10, 96:13,
96:15, 101:20,
101:25, 102:6, 102:7,
102:8, 102:10,
102:12, 102:13,
103:2, 103:5, 103:7,
104:5, 104:10,
104:11, 104:14,
104:15, 105:4,
106:12, 106:18,
106:19, 107:4, 107:9,
107:13, 107:16,
108:3, 108:18,
108:25, 109:2,
109:15, 109:16,
110:22, 113:2,
113:17, 114:8, 114:9,
114:12, 115:1,
116:14, 116:16,
117:3, 117:6, 118:16,
119:6, 120:6, 120:8,
120:18, 122:23,
124:1, 124:2, 125:20,
127:2, 128:12,
128:17, 131:15,
131:25, 133:2, 133:8,
133:14, 134:24,
135:1, 135:3, 137:9,
137:19, 138:2,
138:13, 138:17,
139:5, 139:8, 139:16,
140:18, 140:24,
141:2, 141:5, 141:15,
143:21, 146:2, 146:7,
146:9, 146:11,
146:21, 146:23,
147:1, 147:16,
147:17, 147:21,
148:2, 150:16,
150:25, 151:5,
151:17, 151:21,

152:9, 152:22, 153:5,
153:10, 154:1, 155:8,
155:9, 155:10,
155:13, 155:24,
156:3, 156:6, 156:15,
156:16, 156:18,
157:8, 158:18, 160:2,
160:5, 160:9, 160:22,
161:19, 162:15,
162:18, 164:1, 164:4,
164:19, 164:22,
165:8, 166:16, 167:4,
167:15, 167:17,
169:8, 169:13,
170:15, 171:24,
172:2, 172:3, 172:5,
172:7, 172:8, 172:15,
172:19, 172:22,
172:23, 172:24,
172:25, 173:1, 173:3,
173:4, 174:18,
174:24, 175:2, 175:3,
175:5, 176:9, 177:15,
180:16, 180:17,
181:11, 181:15,
181:17, 181:19,
185:11, 185:12,
185:21, 185:24,
186:1, 186:2, 186:5,
186:6, 186:11,
186:19, 186:21,
186:23, 186:24,
188:4, 188:16, 189:4,
189:6, 189:8, 190:23,
191:15, 191:20,
191:21, 192:18,
192:21, 192:22
**Hotfile's** [45] - 6:8,
7:3, 7:20, 8:16, 8:21,
9:21, 9:23, 10:2, 10:3,
10:5, 10:9, 10:22,
11:5, 18:17, 18:24,
35:2, 36:14, 42:16,
45:18, 47:14, 50:5,
78:17, 81:18, 86:8,
90:16, 94:2, 101:12,
102:12, 104:9,
109:13, 115:2,
115:16, 116:20,
132:19, 133:7,
137:16, 141:22,
142:23, 147:15,
148:10, 151:18,
155:25, 156:2, 170:15
**hotly** [1] - 165:17
**hounded** [1] - 150:21
**hour** [2] - 127:6,
155:6
**Hours** [1] - 16:18
**house** [1] - 20:11

**hub** [1] - 7:24
**Huckleberry** [1] -
16:13
**huge** [4] - 85:5,
103:14, 160:11,
177:13
**hundred** [7] - 32:6,
53:9, 53:11, 67:1,
67:9, 124:21, 145:21
**hundreds** [10] -
35:20, 62:5, 62:6,
68:11, 82:20, 89:22,
108:15, 109:13,
178:22
**hypothought** [1] -
89:22

**I**

**i.e** [1] - 50:6
**Ianokov** [9] - 8:16,
8:18, 74:17, 100:10,
109:3, 109:6, 174:20,
175:7, 175:23
**idea** [22] - 4:24,
18:17, 28:11, 29:4,
50:4, 51:1, 82:13,
82:24, 115:25, 134:4,
148:22, 162:12,
164:8, 173:18,
173:19, 176:12,
176:13, 179:18,
179:19, 187:19,
188:13, 189:15
**ideal** [3] - 63:25,
101:24, 107:7
**ideas** [1] - 149:4
**identical** [6] - 31:10,
37:19, 37:23, 40:17,
89:16
**identification** [1] -
20:17
**identified** [12] - 7:18,
31:9, 82:18, 84:21,
84:24, 94:16, 97:7,
97:11, 99:3, 111:15,
124:9, 130:15
**identifies** [4] - 46:12,
46:16, 46:17, 82:16
**identify** [15] - 45:4,
49:20, 54:3, 59:19,
82:8, 82:11, 82:14,
82:25, 84:18, 95:25,
99:3, 110:3, 122:21,
123:7, 184:25
**identifying** [5] -
65:18, 66:17, 87:14,
88:13, 132:25
**identities** [1] -

171:13
**ignore** [9] - 26:5,
41:22, 128:4, 132:6,
147:20, 147:21,
147:22, 147:23
**ignored** [1] - 155:5
**ignores** [10] - 48:25,
141:6, 141:7, 146:5,
146:8, 147:6, 147:8,
147:10, 147:13
**ilk** [1] - 134:6
**illegal** [10] - 40:10,
62:21, 125:21,
125:25, 127:4,
128:14, 136:22,
139:14
**illegally** [1] - 39:19
**illusory** [2] - 70:10,
183:6
**illustrate** [1] - 150:2
**illustrated** [1] - 90:4
**illustrates** [2] -
17:25, 43:19
**illustrating** [1] - 90:8
**image** [5] - 8:6,
138:11, 165:5, 165:6,
165:7
**images** [3] - 24:22,
136:9, 165:7
**imagine** [4] - 50:8,
50:25, 78:24, 151:10
**Immediately** [1] -
117:7
**immediately** [2] -
8:1, 124:4
**immunities** [2] -
12:13, 12:19
**immunity** [4] - 12:12,
45:3, 58:15, 83:22
**immunize** [1] - 11:16
**immunizes** [1] - 7:3
**impact** [4] - 94:8,
118:18, 118:20,
125:10
**impacts** [1] - 147:4
**impede** [1] - 26:5
**implausible** [2] -
52:11, 132:8
**implement** [7] - 8:25,
11:22, 43:7, 47:6,
53:16, 57:3, 65:13
**implementation** [1] -
177:12
**implemented** [16] -
31:7, 31:11, 32:11,
37:13, 39:22, 40:4,
40:5, 40:6, 40:14,
40:19, 40:21, 43:9,
52:19, 70:7, 72:4,
89:4

implementing [1] - 66:9
import [1] - 159:17
importance [1] - 24:7
Important [1] - 19:22
important [36] - 14:5, 14:6, 14:7, 15:7, 16:9, 23:16, 24:5, 24:7, 24:16, 25:12, 27:25, 33:18, 33:23, 38:21, 40:15, 41:5, 42:23, 43:18, 45:8, 75:1, 78:5, 79:17, 83:11, 88:6, 103:1, 118:24, 122:2, 131:7, 137:23, 141:19, 162:24, 173:8, 183:3, 183:15, 183:17, 188:13
importantly [5] - 26:23, 37:23, 96:19, 122:4, 139:20
Importantly [1] - 185:15
Imported [2] - 184:19, 192:7
importing [1] - 65:6
impose [3] - 48:3, 97:4, 164:9
imposed [1] - 177:21
imposing [3] - 164:8, 194:10, 194:12
impossible [3] - 43:20, 83:5, 109:7
impression [1] - 166:22
improper [2] - 152:6
improve [2] - 151:8, 151:18
improvement [1] - 41:5
improvements [2] - 16:4, 33:16
improving [1] - 164:20
IN [1] - 196:8
inability [1] - 92:15
inaccurate [1] - 23:11
inactive [2] - 20:16, 155:17
inactivity [1] - 156:8
inadequate [3] - 102:14, 102:19, 106:3
inapposite [1] - 192:9
inappropriately [1] - 164:15
inasmuch [1] - 47:1, 195:10

INC [1] - 1:3
Inc [1] - 3:4
incent [1] - 51:14
incented [2] - 46:9, 147:16
incenting [1] - 129:10
incentive [2] - 135:25, 146:7
include [2] - 138:9, 164:24
included [2] - 10:11, 164:24
includes [1] - 36:23, 157:22
including [8] - 27:1, 40:19, 53:14, 56:4, 75:9, 102:12, 168:23, 192:7
income [1] - 21:8
incomparable [1] - 170:9
incompatible [1] - 12:11
Incorporate [1] - 190:6
incorporate [2] - 171:9, 171:10
incorporated [2] - 172:8, 172:15
incorrect [1] - 43:11
increased [2] - 108:2, 180:1
incriminating [1] - 54:12
Indeed [2] - 25:21, 34:14
indeed [3] - 48:19, 70:8, 178:16
independent [3] - 11:17, 175:23, 175:25
index [1] - 24:21
indexes [1] - 24:20
indicate [2] - 88:1, 90:6
indicated [1] - 7:4
indicates [1] - 151:4
indication [2] - 68:22, 164:21
Indirectly [1] - 115:2
indistinguishable [1] - 7:9
individual [24] - 35:10, 44:5, 62:17, 66:13, 77:3, 87:14, 88:13, 88:14, 126:3, 139:21, 166:14, 169:17, 169:21, 170:4, 170:13, 170:24, 171:4,

171:17, 174:3, 177:11, 177:18, 177:19, 177:24, 179:8
individually [3] - 64:11, 95:9, 183:24
individuals [15] - 26:18, 37:1, 65:21, 126:18, 126:20, 169:23, 171:7, 171:19, 175:21, 177:16, 177:20, 178:4, 179:6, 192:9, 192:14
induce [1] - 116:1
induced [2] - 110:10, 167:18
inducement [26] - 5:16, 12:11, 43:3, 47:3, 47:4, 48:8, 49:14, 58:19, 58:25, 70:19, 90:7, 110:1, 112:7, 119:16, 122:1, 122:8, 127:8, 127:17, 130:12, 130:16, 130:18, 133:14, 154:15, 166:8, 166:12, 166:19
inducer [1] - 49:12
induces [1] - 12:10
Inducing [1] - 48:13
inducing [10] - 48:15, 48:16, 48:24, 49:6, 49:13, 133:12, 133:16, 133:18, 133:25, 155:11
indulgence [1] - 15:8
industry [3] - 14:23, 72:20, 159:15
ineligible [4] - 11:18, 12:9, 28:11, 28:12
inevitably [3] - 7:14, 17:24, 127:21
inexplicable [1] - 147:2
infer [2] - 97:19, 128:15
inference [1] - 105:15
inferences [1] - 59:25
influence [1] - 169:24
inform [2] - 62:13, 79:18
informal [2] - 80:16, 80:25
information [13] - 12:7, 27:18, 29:5, 39:16, 41:9, 73:19, 78:25, 83:3, 84:6,

85:17, 87:20, 95:6, 102:2
informed [1] - 78:19
informing [1] - 52:19
infringe [11] - 30:22, 69:12, 99:21, 115:23, 116:1, 129:2, 129:3, 146:7, 147:1, 147:20
infringed [4] - 46:17, 46:22, 89:21, 100:20
infringement [131] - 5:16, 5:17, 7:1, 7:19, 9:15, 10:2, 10:6, 10:18, 11:9, 11:12, 11:13, 12:10, 13:4, 14:15, 14:20, 14:21, 15:4, 22:17, 24:18, 24:22, 26:15, 36:10, 39:20, 43:21, 43:22, 44:4, 44:10, 44:14, 45:3, 45:4, 45:17, 46:5, 46:10, 46:19, 48:13, 48:14, 48:15, 49:8, 52:9, 58:15, 58:16, 58:20, 65:19, 66:18, 69:21, 71:11, 72:6, 79:20, 83:22, 88:16, 90:10, 92:13, 93:4, 94:4, 94:6, 95:15, 98:23, 101:7, 103:17, 103:20, 103:24, 104:25, 110:2, 110:11, 110:13, 110:17, 110:24, 111:23, 112:12, 112:14, 113:1, 113:2, 113:3, 113:4, 113:6, 113:24, 114:1, 114:5, 114:7, 114:13, 116:3, 116:15, 116:17, 117:12, 119:8, 119:13, 119:19, 120:14, 121:1, 122:3, 127:3, 128:25, 129:8, 129:9, 129:11, 129:15, 130:13, 130:14, 130:15, 133:16, 133:19, 133:25, 140:15, 140:18, 141:7, 141:13, 143:7, 144:24, 145:18, 151:9, 151:10, 153:23, 153:25, 154:2, 154:17, 156:9, 156:23, 157:7, 157:14, 157:22, 158:10, 158:17, 159:8, 166:17,

166:22, 167:1, 167:4, 169:22, 184:7
infringements [4] - 93:1, 94:11, 97:25, 156:24
infringer [69] - 7:14, 11:6, 11:22, 13:11, 13:20, 26:16, 28:1, 28:5, 28:23, 28:25, 39:8, 43:1, 43:5, 43:17, 43:21, 44:2, 44:3, 44:25, 46:1, 46:15, 49:19, 52:15, 52:17, 53:5, 53:16, 54:16, 54:22, 56:19, 56:22, 58:8, 59:14, 60:19, 61:2, 63:21, 63:23, 65:9, 66:2, 68:6, 68:7, 68:8, 68:18, 69:13, 71:15, 72:12, 72:15, 79:6, 80:9, 80:15, 81:25, 99:15, 101:12, 102:13, 102:14, 102:18, 104:11, 104:16, 105:2, 105:6, 105:16, 108:10, 108:12, 108:18, 108:21, 118:13, 124:9, 131:19, 159:22, 187:17, 190:3
infringer's [1] - 138:25
infringers [47] - 5:22, 7:9, 7:22, 9:20, 10:1, 10:4, 10:25, 11:4, 15:24, 17:24, 36:15, 43:7, 45:4, 45:5, 45:12, 45:15, 45:24, 46:4, 50:1, 53:13, 54:18, 54:19, 56:6, 66:9, 69:6, 69:7, 70:14, 70:23, 79:11, 80:21, 80:24, 82:9, 84:15, 84:25, 85:1, 110:23, 111:22, 114:9, 115:3, 117:3, 117:7, 117:8, 128:10, 131:12, 151:15, 192:10
infringes [2] - 148:2, 165:8
Infringing [1] - 123:23
infringing [115] - 7:14, 7:23, 8:14, 8:22, 10:9, 10:12, 10:13, 10:19, 10:21, 27:3, 29:7, 31:10, 31:25, 45:19, 45:21, 49:20,

51:11, 53:12, 57:24, 70:2, 83:8, 85:15, 87:15, 88:2, 89:19, 90:2, 90:5, 91:21, 92:1, 92:2, 92:6, 95:14, 97:5, 97:11, 97:20, 104:4, 110:9, 111:2, 112:3, 112:4, 116:11, 116:22, 118:22, 119:4, 120:22, 120:24, 121:3, 121:9, 121:12, 122:14, 123:2, 123:22, 125:2, 125:5, 125:12, 125:19, 127:21, 127:24, 129:5, 129:6, 129:7, 129:14, 129:18, 129:19, 129:22, 129:23, 129:25, 130:5, 131:6, 131:14, 131:20, 132:4, 132:10, 133:8, 133:9, 133:13, 133:24, 135:9, 135:10, 135:20, 135:22, 135:24, 136:1, 137:9, 138:23, 140:24, 141:5, 153:11, 159:11, 159:12, 159:13, 159:20, 159:24, 160:2, 160:6, 160:21, 161:6, 161:9, 161:12, 161:14, 161:24, 166:25, 167:16, 167:19, 167:20, 169:21, 183:25, 184:6, 186:7, 186:17

**inherent** [2] - 65:18, 66:17

**initial** [3] - 171:6, 171:15, 187:25

**injunctive** [1] - 72:7

**innocence** [2] - 99:19, 99:21

**innocent** [2] - 13:2, 13:4

**innovation** [1] - 48:22

**innovative** [1] - 73:13

**innuendo** [2] - 180:11, 181:1

**innumerable** [1] - 184:17

**inoperable** [1] - 18:10

**input** [1] - 176:14

**insignificant** [1] -

186:1

**instance** [2] - 123:12, 130:16

**instances** [7] - 69:8, 90:4, 92:15, 94:4, 94:6, 111:10, 161:18

**instant** [4] - 159:12, 170:7, 174:15, 192:16

**Instead** [2] - 102:13, 118:1

**instead** [1] - 19:1

**instituted** [5] - 27:21, 37:17, 55:10, 88:22, 88:23

**instruct** [2] - 94:10, 97:23

**instruction** [2] - 97:23, 172:22

**instructions** [1] - 89:18

**instruments** [1] - 178:14

**insubstantial** [1] - 73:23

**insulate** [1] - 183:2

**insulated** [1] - 26:14

**insure** [1] - 32:22

**intend** [1] - 75:14

**intended** [5] - 45:25, 76:7, 93:3, 93:7, 99:23

**intent** [15] - 7:18, 7:20, 9:4, 28:13, 104:23, 105:11, 128:14, 130:9, 130:19, 131:19, 131:21, 132:2, 137:16, 137:20, 165:22

**intention** [1] - 129:1

**intentionally** [1] - 6:25

**interact** [1] - 101:21

**interaction** [4] - 75:9, 101:20, 102:4, 111:8

**interest** [1] - 174:14

**interested** [2] - 77:5, 112:16, 149:20

**interesting** [3] - 120:9, 128:6, 160:4

**interests** [2] - 24:12, 48:22

**internal** [2] - 56:11, 130:11

**internally** [2] - 56:12, 131:22

**Internet** [21] - 16:21, 19:24, 22:6, 23:18, 24:16, 24:17, 24:19,

24:21, 34:14, 51:5, 51:16, 68:13, 82:20, 86:12, 89:9, 101:3, 109:14, 128:8, 147:12, 165:6, 167:2

**interop** [1] - 126:8

**interoperable** [1] - 136:21

**interpose** [1] - 186:6

**interpretation** [1] - 109:24

**interrogatory** [3] - 99:3, 132:25, 189:5

**interrupt** [4] - 19:25, 23:21, 61:13, 142:10

**interrupting** [1] - 140:11

**intertwined** [2] - 185:12, 185:13

**intro** [1] - 140:12

**introduce** [3] - 8:19, 52:2, 131:15

**introduction** [5] - 22:15, 23:14, 34:5, 41:7, 64:19

**intuitive** [1] - 123:21

**inventory** [1] - 178:13

**investigate** [3] - 9:3, 9:11, 29:7

**investigating** [3] - 102:11, 104:6, 104:8

**investigation** [2] - 104:20, 105:12

**investigative** [2] - 84:16, 85:3

**invitation** [1] - 136:14

**invite** [1] - 185:21

**invited** [2] - 63:2, 133:21

**inviting** [1] - 34:10

**invoke** [1] - 67:23

**involve** [1] - 57:23

**involved** [6] - 25:11, 158:10, 171:4, 175:16, 179:6, 187:20

**involvement** [3] - 169:6, 183:16, 185:20

**involving** [1] - 102:9, 192:11

**IP** [5] - 57:14, 80:21, 81:5, 81:8, 108:20

**iPhone** [9] - 18:8, 18:9, 126:4, 126:6, 126:8, 126:19, 136:19, 136:20

**iPhones** [1] - 18:4

**iReb** [9] - 119:1, 123:1, 124:18, 125:9,

125:19, 126:25, 136:18, 137:8, 137:12

**iRebs** [1] - 125:4

**irrational** [1] - 156:18

**irrelevant** [3] - 124:19, 129:6, 130:9

**IS** [1] - 196:7

**isoHunt** [1] - 34:18

**ISP** [3] - 84:5, 186:10, 186:15

**ISPs** [1] - 186:7

**issue** [49] - 14:22, 28:22, 29:1, 36:12, 39:14, 43:15, 54:15, 58:2, 60:17, 61:19, 61:21, 61:22, 72:5, 76:20, 76:23, 77:11, 78:5, 80:12, 80:19, 81:8, 81:25, 84:8, 92:8, 94:9, 96:5, 99:7, 101:11, 101:14, 104:15, 105:3, 106:9, 107:8, 113:1, 114:22, 115:14, 120:5, 121:11, 135:10, 145:16, 153:1, 159:8, 162:24, 168:9, 174:17, 185:6, 185:9, 190:21, 195:2

**issues** [28] - 30:3, 30:7, 30:8, 30:10, 36:2, 41:11, 42:22, 47:19, 47:24, 61:9, 64:21, 87:4, 112:11, 112:23, 138:1, 142:11, 142:12, 152:19, 159:1, 162:18, 165:22, 173:9, 183:15, 183:16, 184:14, 186:9

**items** [3] - 87:14, 124:19, 157:11

**iteration** [1] - 48:1

**itself** [10] - 17:13, 33:20, 33:23, 73:18, 74:24, 84:10, 92:1, 92:2, 110:20, 128:12

**J**

**Jacobs** [1] - 163:4

**jail** [5] - 126:4, 126:19, 126:24, 126:25, 136:18

**Jailbreak** [1] - 136:21

**jailbreak** [2] - 126:4, 136:18

**James** [1] - 4:1

**Janet** [1] - 3:22

**JANET** [1] - 2:7

**January** [8] - 141:12, 142:1, 144:23, 145:19, 150:16, 151:6, 151:10, 151:20

**JDownloader** [6] - 17:10, 100:1, 119:3, 125:10, 148:13, 149:21

**Jenner** [1] - 1:14

**Jennifer** [1] - 3:17

**JENNIFER** [1] - 1:13

**Jersey** [1] - 111:18

**job** [1] - 76:7

**Johnson** [4] - 185:3, 192:14

**join** [1] - 170:20

**Jordan** [1] - 168:22

**joy** [1] - 81:12

**JPMorgan** [1] - 178:13

**Jr** [1] - 1:23

**Judge** [12] - 4:10, 12:15, 12:18, 12:21, 41:16, 44:20, 84:23, 96:5, 140:23, 148:24, 154:20, 168:22

**judge** [3] - 29:3, 76:22, 77:10

**JUDGE** [1] - 1:9

**judged** [1] - 185:10

**judges** [1] - 129:17

**judgment** [40] - 4:24, 5:8, 6:1, 7:11, 42:15, 42:16, 42:17, 52:10, 60:13, 60:17, 64:1, 72:10, 76:23, 77:4, 77:17, 80:19, 88:24, 99:2, 99:6, 99:8, 112:22, 115:4, 116:6, 128:3, 132:5, 132:9, 140:21, 165:19, 165:23, 166:13, 166:19, 166:20, 168:5, 169:5, 181:4, 181:5, 182:4, 193:7, 193:12

**July** [3] - 39:8, 39:24, 139:8

**jump** [6] - 33:4, 71:9, 79:20, 80:13, 119:11, 159:23

**jumped** [1] - 8:18

**juncture** [2] - 20:6, 29:21

**June** [2] - 33:18, 40:19

**junior** [1] - 108:1

juries [1] - 165:16
jurisprudence [2] - 14:8, 24:8
jurors [1] - 149:1
jury [28] - 29:1, 29:2, 29:21, 30:5, 30:8, 30:16, 43:12, 43:16, 44:22, 58:11, 59:2, 59:6, 59:13, 59:15, 61:22, 64:1, 64:14, 78:16, 81:9, 106:2, 106:8, 107:25, 115:5, 149:1, 149:6, 165:19, 165:22
justices [1] - 129:18

## K

Kaplan [1] - 161:18
KAREN [2] - 1:17, 1:19
Karen [2] - 3:13, 3:15
Karl [1] - 178:11
KATHLEEN [1] - 1:9
Kathy [3] - 20:11, 21:14, 23:5
keep [19] - 11:2, 12:7, 21:4, 21:5, 36:15, 44:6, 44:13, 45:4, 49:23, 49:25, 68:24, 72:23, 81:19, 83:14, 89:15, 123:11, 149:19, 151:21, 160:7
keeping [2] - 49:25, 57:1
keeps [1] - 23:13
kept [3] - 21:9, 102:15, 171:11
Kershaw [1] - 3:19
key [6] - 17:19, 28:22, 31:21, 32:19, 32:20
keys [1] - 106:11
kind [6] - 6:12, 17:20, 38:24, 50:15, 50:21, 51:1, 57:5, 86:24, 116:4, 119:24, 124:7, 139:14, 143:11, 143:15, 144:8, 187:11
kingdom [1] - 106:12
Klock [1] - 2:7
knock [1] - 163:15
knock-off [1] - 163:15
knowable [1] - 116:7
knowing [2] - 51:23, 107:13
knowingly [1] - 6:25

knowledge [63] - 26:2, 58:22, 61:3, 61:4, 65:2, 65:3, 86:21, 86:25, 87:4, 87:7, 87:10, 87:11, 88:4, 88:19, 89:12, 90:6, 90:12, 91:20, 91:22, 92:3, 92:14, 92:19, 92:20, 93:1, 93:6, 94:5, 94:12, 94:19, 94:24, 97:2, 97:6, 97:20, 97:25, 98:3, 99:11, 99:20, 100:8, 100:9, 108:11, 110:14, 156:21, 156:24, 156:25, 157:3, 157:8, 157:9, 157:10, 157:12, 157:13, 157:15, 157:22, 157:23, 159:20
known [10] - 30:25, 31:2, 31:6, 39:11, 72:23, 78:23, 97:5, 111:14, 156:23
knows [11] - 51:15, 51:16, 52:11, 52:12, 115:18, 115:19, 128:6, 128:7, 128:8, 132:9
Koh [2] - 4:10, 148:24

## L

labels [3] - 183:10, 183:22, 190:8
labor [2] - 4:20, 42:14
lack [1] - 100:9
ladies [1] - 193:15
Lagerfeld [1] - 178:11
laid [2] - 23:17, 43:11
language [5] - 73:20, 79:14, 107:16, 107:17, 161:1
large [4] - 21:15, 50:10, 101:6, 123:23
largely [4] - 4:13, 135:1, 137:15, 187:4
larger [8] - 139:5, 170:17, 171:24, 173:11, 173:15, 173:19, 176:10, 176:17
largest [1] - 77:22
last [26] - 5:10, 14:25, 25:14, 33:21, 40:12, 42:13, 61:18,

76:5, 80:4, 80:8, 87:24, 87:25, 94:23, 95:3, 111:7, 118:11, 145:23, 148:19, 149:10, 162:1, 165:13, 169:15, 176:20, 181:10, 190:20
Last [1] - 40:8
Lastly [1] - 167:11
lastly [1] - 85:8
late [6] - 29:14, 117:21, 137:13, 167:10, 182:8
latest [1] - 139:20
lauded [1] - 104:19
Laughter [1] - 159:4
law [77] - 13:9, 25:15, 26:12, 26:19, 26:22, 29:4, 29:13, 30:1, 34:16, 43:13, 43:16, 44:16, 54:17, 58:21, 58:23, 59:7, 59:16, 59:18, 59:21, 60:3, 60:9, 60:18, 61:1, 61:6, 64:5, 64:12, 65:14, 70:5, 70:9, 70:10, 72:10, 73:15, 74:23, 75:12, 76:3, 78:4, 78:21, 79:5, 93:19, 107:5, 111:10, 112:13, 113:2, 113:7, 113:12, 113:13, 113:20, 113:23, 119:21, 122:12, 122:18, 126:1, 126:2, 126:17, 143:20, 145:4, 149:13, 154:10, 156:22, 157:2, 157:6, 157:19, 157:20, 158:11, 161:24, 169:16, 171:9, 177:15, 182:4, 184:8, 188:18, 188:21, 192:6
Law [2] - 2:10, 4:6
lawful [1] - 138:22
lawsuit [19] - 9:12, 28:6, 28:19, 29:6, 33:5, 33:10, 33:16, 36:20, 36:22, 36:24, 101:19, 102:18, 103:3, 103:5, 103:11, 105:17, 118:15, 181:25
lawyer [4] - 14:23, 120:12, 135:11, 168:12
lawyers [3] - 4:25, 186:14, 186:15

lay [2] - 79:5, 152:23
layer [1] - 186:6
lead [5] - 105:14, 133:16, 187:1, 187:6, 193:10
learned [3] - 33:5, 171:8, 177:15
least [20] - 6:14, 12:16, 29:14, 53:1, 100:22, 104:22, 107:8, 121:10, 129:17, 129:18, 133:11, 138:20, 144:4, 144:10, 144:15, 147:11, 148:15, 154:6, 161:16
leave [10] - 5:23, 44:10, 84:11, 89:10, 117:21, 143:17, 145:16, 148:5, 167:22, 193:18
leaving [1] - 89:21, 131:23
led [3] - 24:1, 104:15, 167:18
left [11] - 16:18, 34:17, 58:16, 93:14, 101:22, 127:6, 146:17, 146:18, 146:19, 157:6, 166:15
left-hand [1] - 101:22
legal [11] - 23:17, 40:10, 73:6, 113:1, 126:2, 137:9, 137:12, 159:8, 171:3, 176:12, 184:14
legally [1] - 183:9
legislative [1] - 24:10
legitimate [4] - 7:6, 134:4, 134:5, 134:13
legitimately [1] - 40:8
LEIBNITZ [24] - 2:3, 35:21, 38:11, 40:2, 54:8, 69:17, 71:20, 80:3, 80:6, 81:12, 140:3, 140:13, 140:17, 142:13, 142:17, 142:21, 143:4, 143:24, 144:17, 145:6, 146:13, 146:16, 149:10, 149:13
Leibnitz [14] - 4:5, 36:1, 36:6, 38:20, 40:1, 41:10, 55:20, 56:1, 57:9, 81:2, 81:6, 139:17, 140:1, 142:11
Lemuria [20] -

168:23, 169:8, 180:8, 180:9, 180:12, 180:14, 181:1, 185:11, 186:3, 186:6, 186:10, 186:16, 186:18, 186:24, 187:9, 188:1, 192:17, 192:18, 192:21, 193:4
length [1] - 192:19
less [6] - 25:19, 35:12, 43:8, 72:11, 75:3, 147:24
Less [1] - 22:21
lesser [1] - 171:4
Letterman [1] - 86:25
letters [1] - 106:6
level [9] - 93:2, 99:22, 114:7, 116:15, 127:16, 145:18, 153:14, 153:22, 174:10
levels [2] - 10:6, 49:12
Levy [2] - 144:18, 145:4
Lexis [5] - 80:13, 185:2, 185:3
liability [51] - 7:17, 11:14, 12:11, 12:13, 24:18, 26:14, 64:22, 88:7, 91:22, 93:13, 111:11, 112:11, 112:15, 119:14, 119:16, 119:18, 119:22, 122:1, 130:9, 131:2, 153:13, 154:8, 154:11, 156:21, 162:5, 162:6, 162:9, 163:17, 169:14, 169:17, 169:22, 170:2, 171:16, 171:19, 174:18, 177:1, 177:6, 177:14, 177:20, 179:8, 181:20, 182:24, 182:25, 183:2, 183:14, 184:16, 185:7, 187:3, 190:13
liable [31] - 7:10, 112:13, 113:1, 114:16, 129:8, 129:11, 129:15, 133:17, 133:24, 167:20, 168:5, 168:6, 169:6, 170:13, 170:24, 171:5, 171:8, 174:3, 177:25, 178:24, 179:2, 179:4, 181:18, 183:4, 183:6,

183:24, 184:6,
184:17, 185:5, 185:23
**liberties** [1] - 138:8
**Liberty** [3] - 63:14,
63:15, 63:16
**license** [1] - 136:20
**licensed** [4] - 8:7,
51:24, 131:24, 138:12
**lie** [3] - 11:9, 55:12,
55:13
**lied** [3] - 56:7, 57:12,
57:20
**life** [1] - 35:2
**lifeblood** [1] - 10:21
**light** [3] - 64:12,
65:25
**lighter** [1] - 138:10
**lightly** [1] - 26:9
**lights** [1] - 163:11
**likely** [4] - 7:22,
36:18, 120:15, 121:2
**likewise** [1] - 7:19
**LimeWire** [13] -
29:15, 29:16, 34:19,
110:15, 127:11,
127:12, 152:2, 158:4,
170:10, 170:13,
171:1, 173:16, 173:22
**limit** [1] - 108:2
**limited** [13] - 25:2,
30:17, 93:13, 97:7,
97:20, 139:15,
140:14, 171:17,
176:11, 176:14,
177:14, 178:7, 179:15
**Limited** [16] - 169:9,
172:2, 172:5, 172:15,
172:19, 172:22,
172:25, 173:3, 173:4,
181:11, 181:15,
185:11, 185:24,
186:2, 186:23, 191:15
**limits** [1] - 152:5
**line** [5] - 35:25,
62:14, 78:13, 120:22,
190:17
**linear** [1] - 116:4
**link** [30] - 17:8,
17:13, 17:14, 23:5,
23:6, 23:8, 37:15,
82:16, 82:22, 82:23,
89:10, 89:21, 94:16,
94:24, 95:3, 95:5,
95:13, 95:17, 100:19,
100:21, 106:23,
109:14, 135:2, 147:7,
189:16
**linked** [1] - 86:17
**Links** [3] - 17:9,
23:2, 37:7

**links** [45] - 18:7,
23:1, 23:3, 23:12,
24:21, 29:6, 31:25,
37:7, 37:10, 37:19,
37:20, 37:22, 37:23,
62:20, 65:20, 68:13,
82:13, 82:17, 82:20,
88:13, 89:5, 89:6,
89:7, 89:8, 89:11,
89:14, 89:17, 89:23,
94:25, 95:8, 95:12,
96:13, 96:14, 96:19,
96:21, 97:1, 100:18,
102:21, 106:17,
109:15, 123:7, 135:1,
174:12
**liquor** [1] - 160:13
**list** [11] - 31:25, 77:1,
93:22, 93:25, 94:16,
96:12, 122:22,
132:19, 148:9,
157:11, 185:4
**listed** [1] - 74:18
**listening** [1] - 94:15
**listing** [1] - 158:9
**lists** [1] - 157:11
**Literally** [1] - 15:24
**literally** [3] - 31:20,
62:6, 108:1
**litigants** [1] - 25:3
**litigated** [2] - 47:23,
72:8
**litigation** [1] - 94:10
**live** [2] - 19:9, 131:3
**lives** [1] - 122:3
**LLP** [1] - 2:5
**loaded** [2] - 19:4,
21:6
**lobbying** [2] - 25:11
**local** [1] - 160:13
**locker** [11] - 17:16,
17:19, 20:12, 31:21,
33:8, 50:17, 50:24,
51:2, 67:15, 71:11,
115:3
**lockers** [4] - 33:24,
51:6, 102:10, 164:4
**log** [1] - 80:23
**logical** [1] - 185:13
**logically** [1] - 119:22
**logs** [1] - 153:1
**lollipop** [1] - 38:16
**longevity** [6] -
123:15, 123:16,
124:17, 148:6,
149:23, 150:3
**Look** [5] - 14:18,
70:24, 146:16, 163:3,
163:13
**look** [71] - 14:24,

18:19, 27:25, 28:1,
28:2, 33:15, 34:11,
34:16, 35:9, 37:2,
38:7, 39:15, 55:7,
55:20, 56:13, 58:20,
58:22, 60:23, 62:8,
62:11, 68:2, 68:13,
69:3, 73:8, 73:15,
75:8, 76:11, 78:2,
81:13, 83:5, 93:18,
99:14, 100:5, 100:6,
102:19, 103:13,
104:1, 106:19, 107:3,
107:17, 114:8, 117:2,
118:24, 123:12,
123:14, 124:20,
129:16, 131:22,
137:23, 138:10,
141:3, 143:8, 143:21,
147:14, 153:10,
154:22, 159:9, 164:5,
166:15, 166:20,
170:3, 173:7, 173:25,
182:10, 183:22,
188:11, 190:11,
191:4, 195:10, 195:11
**looked** [26] - 19:17,
32:8, 33:1, 36:25,
38:8, 52:10, 60:16,
60:18, 64:11, 67:3,
78:3, 110:11, 110:24,
111:15, 113:15,
117:5, 120:9, 120:13,
120:16, 124:20,
130:10, 132:5, 139:6,
152:17, 152:18,
165:20
**Looking** [1] - 135:21
**looking** [17] - 9:18,
29:24, 37:10, 48:2,
51:22, 69:1, 113:13,
125:6, 128:9, 129:20,
131:9, 131:11,
133:22, 135:18,
147:15, 160:19,
177:18
**looks** [3] - 10:8,
125:14, 149:4
**lose** [3] - 99:16,
119:12
**lost** [1] - 117:9
**love** [3] - 4:14,
145:17, 146:13
**low** [1] - 116:16
**lowest** [1] - 151:10
**Luchian** [2] - 74:18,
86:6
**LUKE** [1] - 1:14
**Luke** [1] - 3:10
**lulled** [1] - 57:18

**lunch** [2] - 80:2,
81:22
**LUNDY** [1] - 3:19
**Lundy** [1] - 3:19
**lure** [2] - 120:25,
131:25
**Lynde** [1] - 9:24

## M

**MA** [1] - 2:11
**magic** [1] - 65:15
**Magistrate** [1] -
41:16
**magnitude** [1] - 35:1
**mail** [33] - 8:9, 8:10,
21:5, 26:25, 34:10,
35:10, 39:13, 39:14,
47:2, 50:14, 55:12,
55:16, 56:1, 62:10,
62:25, 63:1, 72:16,
75:22, 78:10, 78:12,
86:8, 86:9, 86:16,
96:10, 108:17, 138:3,
138:6, 139:4, 139:11,
165:20, 165:24, 190:2
**mailbox** [2] - 74:10,
94:21
**mails** [21] - 38:22,
38:24, 38:25, 57:9,
62:4, 62:6, 88:12,
88:13, 94:20, 94:21,
94:22, 100:5, 100:9,
106:6, 107:25, 108:6,
115:17, 128:13,
174:16, 174:19
**main** [1] - 192:4
**maintained** [1] -
55:19
**maintains** [2] -
110:22, 111:22
**major** [4] - 9:6,
46:20, 56:3, 132:12
**majority** [2] - 16:5,
187:22
**maker** [1] - 173:12
**managed** [1] - 172:3
**management** [1] -
169:13
**manager** [4] - 186:2,
186:4, 189:4, 189:5
**managers** [1] - 189:3
**manages** [1] - 188:5
**managing** [3] -
172:16, 172:22,
191:14
**mandatory** [1] -
83:20
**mangle** [1] - 30:24

**manipulated** [2] -
35:2, 120:10
**manipulation** [2] -
15:5, 35:8
**manipulations** [4] -
14:18, 14:21, 22:22,
119:8
**manner** [2] - 5:13,
19:16
**Manov** [1] - 175:24
**margin** [2] - 121:7,
135:13, 135:14
**mark** [1] - 115:6
**marked** [1] - 42:8
**marketplace** [1] -
48:14
**marshal** [1] - 41:21
**Martel** [2] - 2:5, 4:4
**massive** [7] - 6:25,
8:17, 11:12, 22:17,
46:10, 53:13, 167:14
**massively** [1] - 49:6
**master** [1] - 89:15
**match** [1] - 41:2
**matching** [1] - 48:13
**mater** [1] - 143:20
**material** [22] - 5:16,
13:6, 13:8, 30:11,
39:20, 62:21, 70:20,
80:12, 85:15, 97:5,
107:15, 109:21,
110:1, 110:14,
128:19, 151:4,
153:16, 154:2,
158:14, 158:17,
161:1, 181:7
**materially** [1] - 48:24
**materials** [6] - 50:12,
51:1, 53:19, 57:24,
70:16, 125:2
**Matsushita** [1] -
181:4
**MATTER** [1] - 196:8
**matter** [37] - 13:9,
14:24, 16:4, 43:16,
48:3, 59:1, 59:6, 59:7,
59:18, 60:18, 65:16,
67:14, 71:18, 72:10,
74:1, 89:15, 90:18,
92:18, 96:2, 110:6,
113:14, 120:7,
122:12, 129:23,
129:24, 133:10,
135:18, 135:21,
152:20, 157:17,
167:15, 167:20,
171:7, 188:20, 193:25
**matters** [9] - 25:24,
41:19, 130:2, 152:16,
152:17, 154:25,

171:23, 176:11,
195:20
**Matthews** [4] -
90:16, 91:3, 95:14,
95:16
**mature** [1] - 36:15
**McAliley** [1] - 140:23
**MD5** [1] - 27:23
**mean** [44] - 15:20,
19:25, 23:20, 26:4,
40:9, 44:17, 48:18,
48:20, 60:10, 63:7,
66:13, 68:8, 68:21,
72:17, 74:23, 88:5,
91:25, 101:2, 103:13,
103:17, 103:19,
105:21, 115:13,
128:20, 132:4, 133:9,
134:3, 142:9, 146:11,
152:21, 154:12,
154:20, 157:11,
157:15, 164:10,
164:11, 171:3, 171:8,
178:9, 178:19, 179:8,
183:1, 183:9, 188:24
**meaning** [2] - 16:2,
125:19
**Meaning** [1] - 18:25
**meaningful** [1] -
156:17
**meaningfully** [1] -
43:20, 153:3
**means** [10] - 68:8,
82:11, 82:14, 111:1,
128:6, 136:19, 156:5,
157:22, 184:20, 193:8
**meant** [1] - 6:7
**measure** [2] - 24:25,
92:13
**measured** [5] -
124:22, 152:23,
152:24, 185:20
**measures** [4] - 29:3,
101:16, 125:24,
151:19
**mechanical** [2] -
191:7, 191:8
**Media** [3] - 63:14,
63:15, 63:16
**meet** [2] - 26:13,
83:21
**meets** [1] - 114:12
**mega** [1] - 29:18
**Mega** [4] - 188:10,
191:3, 191:4
**member** [1] - 185:17
**members** [1] - 62:20
**memory** [2] - 96:4,
96:6
**mention** [5] - 26:1,

50:14, 64:25, 121:24,
145:9
**mentioned** [21] -
6:11, 11:21, 17:11,
17:22, 21:21, 22:23,
73:16, 90:18, 95:2,
96:12, 120:12,
145:14, 146:1,
165:14, 169:8,
179:15, 180:8,
191:23, 192:7,
192:14, 192:20
**mere** [1] - 132:13
**merged** [1] - 23:6
**merging** [1] - 37:13
**merit** [2] - 66:19,
77:1
**message** [5] - 87:19,
88:11, 90:8, 101:6,
130:11
**messages** [2] -
130:10, 130:17
**messaging** [4] -
130:6, 130:8, 159:12
**Messrs** [1] - 186:20
**met** [3] - 58:21,
58:24, 99:5
**metaphysical** [1] -
181:7
**methodologies** [2] -
149:15, 150:12
**methodology** [3] -
148:8, 149:16, 149:23
**methods** [1] - 10:13
**MIAMI** [2] - 1:2, 1:3
**Miami** [3] - 1:18,
1:24, 1:25
**microphones** [1] -
117:23
**Microsoft** [5] -
179:10, 185:2, 192:8,
192:12, 192:13
**might** [20] - 10:6,
11:4, 20:22, 41:22,
49:7, 49:9, 49:10,
77:18, 91:7, 99:6,
99:7, 105:22, 125:12,
132:14, 132:18,
136:8, 136:25, 149:2,
171:3, 194:20
**mightily** [1] - 30:24
**milieu** [1] - 106:10
**Millennium** [4] -
23:15, 23:24, 32:23,
125:23
**million** [26] - 35:3,
35:4, 35:6, 35:18,
35:22, 65:20, 66:16,
67:25, 69:14, 69:16,
69:18, 69:23, 70:1,

70:4, 70:25, 71:7,
71:8, 71:20, 71:21,
71:22, 99:4, 133:3,
133:4, 163:22, 164:5,
165:9
**millions** [4] - 51:19,
64:9, 138:4, 150:5
**mind** [6] - 5:3, 5:5,
44:6, 118:4, 130:13,
139:18
**mind's** [1] - 28:16
**minds** [1] - 35:13
**mine** [1] - 114:21
**mini** [1] - 68:18
**minimum** [2] - 88:3,
88:14
**ministerial** [1] -
191:9
**minute** [4] - 11:3,
134:15, 134:20,
144:24
**minutes** [5] - 80:1,
127:7, 147:3, 147:22,
154:7
**minutia** [1] - 100:25
**mirage** [1] - 27:9
**misapprehend** [1] -
146:2
**misrepresented** [1] -
108:18
**Miss** [1] - 41:14
**missed** [1] - 73:4
**misses** [2] - 133:8,
154:23
**misspelling** [1] -
75:15
**misspoke** [1] - 78:18
**mistake** [3] - 84:3,
145:24, 183:3
**mistaken** [2] - 83:23,
95:24
**misunderstand** [2] -
193:2, 193:8
**misunderstanding**
[1] - 66:21
**misunderstood** [1] -
69:2
**mix** [3] - 20:10,
115:24, 145:5
**mode** [1] - 77:14
**model** [12] - 9:14,
11:5, 18:17, 19:8,
19:19, 115:11,
115:12, 134:2, 139:7,
177:15, 188:11
**models** [2] - 30:23,
114:25
**modern** [1] - 23:18
**modicum** [1] -
148:15

**module** [1] - 36:3
**moment** [12] - 11:15,
22:24, 27:24, 31:5,
33:4, 37:18, 38:20,
61:23, 61:24, 62:11,
72:15, 136:14
**moments** [2] - 91:21,
174:23
**monetizes** [1] -
45:13
**money** [7] - 68:24,
134:3, 134:24,
134:25, 135:5,
183:20, 191:11
**monitoring** [2] -
160:12, 191:9
**Montgomery** [1] -
2:5
**month** [11] - 18:23,
115:1, 141:11,
141:12, 141:22,
142:23, 144:23,
150:15, 150:22
**monthly** [1] - 50:23
**months** [8] - 9:21,
27:20, 31:6, 117:4,
123:3, 151:1, 151:6,
160:14
**moreover** [2] -
147:10, 192:2
**morning** [22] - 3:7,
3:9, 3:10, 3:12, 3:14,
3:16, 3:18, 3:22, 3:25,
4:3, 4:7, 6:21, 6:22,
14:2, 14:3, 14:17,
95:5, 96:10, 101:13,
101:15, 106:14,
120:13
**Morris** [1] - 60:5
**mortar** [3] - 17:17,
31:20, 165:4
**most** [31] - 13:1,
16:6, 18:2, 19:8,
26:23, 42:22, 43:18,
46:25, 57:15, 58:4,
84:17, 107:1, 109:6,
113:16, 115:15,
118:25, 119:5, 119:9,
122:22, 122:23,
123:4, 137:8, 139:20,
141:19, 150:23,
151:21, 160:7,
160:14, 165:21,
175:22, 179:6
**Most** [3] - 16:9,
18:20, 156:5
**mostly** [1] - 27:12
**mother's** [1] - 136:23
**motion** [28] - 5:8,
5:9, 5:18, 6:1, 6:8,

7:11, 41:13, 41:20,
42:15, 42:16, 42:17,
47:14, 54:9, 54:13,
96:4, 100:12, 122:17,
139:22, 168:5, 168:9,
168:10, 168:17,
168:22, 169:5,
174:12, 181:22
**motions** [7] - 4:18,
4:24, 5:14, 6:8, 13:8,
41:15, 144:4
**motive** [1] - 165:22
**mouth** [1] - 51:20
**mouths** [2] - 131:9,
133:20
**move** [6] - 61:8,
80:18, 98:10, 157:5,
183:5
**moved** [1] - 99:4
**movie** [12] - 14:9,
24:14, 27:2, 27:19,
40:24, 68:19, 89:17,
102:23, 105:5,
106:12, 136:6, 164:14
**movies** [5] - 24:14,
52:11, 68:20, 116:12,
160:20
**moving** [6] - 60:1,
169:20, 177:19,
184:2, 184:6, 187:5
**Mozingo** [1] - 177:23
**MP3** [1] - 131:10
**MP3s** [2] - 52:4,
133:22
**MPAA** [1] - 118:19
**MR** [364] - 3:7, 3:10,
4:12, 4:16, 4:20, 5:4,
5:25, 6:3, 6:6, 6:18,
6:21, 6:23, 8:10,
12:18, 12:23, 13:16,
13:21, 14:1, 14:4,
15:13, 15:16, 15:18,
16:9, 20:8, 20:13,
20:23, 21:1, 21:17,
21:24, 22:13, 23:2,
23:10, 23:20, 23:25,
25:2, 25:5, 27:13,
27:15, 28:21, 29:10,
29:25, 30:12, 30:14,
31:1, 31:3, 31:18,
32:13, 32:21, 32:25,
35:17, 35:21, 35:24,
36:9, 36:13, 37:4,
37:17, 37:23, 38:1,
38:10, 38:11, 38:13,
38:18, 38:19, 38:24,
38:25, 39:1, 39:2,
39:3, 39:4, 40:2,
40:12, 42:4, 42:10,
42:11, 42:13, 42:19,

218

42:21, 44:2, 44:20,
44:23, 45:20, 46:15,
47:10, 47:13, 48:7,
48:11, 49:2, 49:5,
49:10, 49:17, 50:3,
50:19, 51:3, 51:12,
52:22, 52:25, 53:5,
53:20, 53:24, 54:3,
54:5, 54:7, 54:8,
54:12, 54:15, 55:2,
55:3, 55:4, 55:7,
55:15, 55:24, 56:1,
58:1, 58:6, 58:12,
59:9, 59:11, 60:15,
61:8, 61:12, 61:14,
61:17, 61:23, 62:2,
63:9, 63:12, 63:15,
63:18, 63:20, 64:16,
64:18, 65:5, 65:8,
65:12, 66:12, 67:8,
67:10, 68:2, 69:1,
69:17, 69:22, 70:11,
71:6, 71:13, 71:20,
72:1, 73:5, 73:10,
73:15, 73:22, 74:6,
74:9, 74:13, 74:16,
74:21, 74:25, 75:19,
76:5, 76:9, 76:11,
77:7, 77:13, 77:21,
78:3, 78:9, 79:1,
79:14, 79:23, 80:3,
80:6, 80:14, 81:11,
81:12, 81:17, 81:24,
82:4, 82:6, 82:19,
83:12, 83:16, 84:12,
86:5, 86:11, 86:18,
87:3, 88:9, 89:1, 89:2,
90:1, 90:19, 90:24,
91:6, 91:17, 91:23,
92:17, 92:25, 93:11,
93:17, 93:23, 97:9,
97:22, 98:6, 98:8,
98:16, 98:18, 98:24,
100:24, 101:10,
103:22, 105:1, 106:7,
106:24, 107:17,
107:20, 107:23,
109:2, 109:6, 109:10,
109:22, 110:5, 110:8,
110:16, 111:7,
112:18, 112:20,
112:22, 114:19,
114:24, 115:7, 116:8,
117:16, 117:19,
118:3, 118:7, 118:9,
118:10, 119:25,
120:2, 121:15,
121:17, 121:19,
121:23, 122:11,
123:16, 123:19,
124:1, 124:13,

124:17, 125:4, 125:9,
126:14, 127:18,
128:2, 128:21, 129:3,
130:2, 130:7, 130:23,
130:25, 131:6,
132:22, 132:24,
134:5, 134:8, 134:17,
134:23, 136:13,
136:17, 136:25,
139:3, 139:13, 140:3,
140:8, 140:13,
140:17, 142:9,
142:13, 142:17,
142:21, 143:4,
143:24, 144:17,
145:6, 146:13,
146:16, 149:10,
149:13, 150:2,
153:19, 154:9,
154:15, 155:18,
155:21, 158:2,
158:24, 159:5, 159:7,
161:3, 161:7, 161:11,
161:13, 162:14,
163:1, 163:10,
163:22, 164:1,
164:18, 165:12,
166:3, 166:5, 166:8,
167:25, 168:3, 168:8,
168:11, 168:14,
168:16, 168:19,
170:22, 171:6,
171:15, 171:23,
172:4, 173:6, 175:17,
175:20, 176:6,
176:23, 177:22,
178:19, 178:22,
179:14, 179:23,
180:5, 182:8, 182:10,
182:15, 184:11,
188:17, 188:20,
188:25, 189:12,
189:17, 189:20,
190:1, 190:16,
191:14, 191:17,
191:21, 193:19,
193:21, 194:2, 194:7,
194:12, 194:16,
194:18, 194:19,
194:25, 195:1, 195:4,
195:13, 195:17,
196:2, 196:3
 **MS** [7] - 3:13, 3:15,
3:17, 3:19, 3:22, 4:1,
4:4
 **muddied** [1] - 189:18
 **multiple** [10] - 11:17,
39:15, 54:24, 88:13,
89:14, 92:12, 116:11,
135:5, 177:20
 **MUNN** [4] - 2:7, 3:22,

4:1, 4:4
 **Munn** [2] - 3:22,
41:14
 **Music** [1] - 185:1
 **music** [6] - 16:1,
16:16, 16:20, 52:12,
116:12, 116:13
 **Musketeers** [1] -
178:4
 **must** [9] - 32:7, 43:6,
44:13, 66:8, 83:16,
107:14, 118:14,
172:22, 181:6
 **muster** [3] - 44:16,
48:1, 61:5
 **mutually** [1] - 104:18
 **myriad** [1] - 5:14
 **Myxer** [10] - 61:19,
80:10, 80:11, 80:15,
80:18, 80:20, 80:24,
81:3, 107:12
 **Myxer's** [1] - 107:15

# N

 **Name** [1] - 73:20
 **name** [18] - 17:11,
72:17, 72:21, 72:23,
73:19, 73:20, 74:14,
74:16, 74:18, 75:13,
75:15, 75:21, 75:25,
77:3, 86:15, 88:2,
136:23, 163:9
 **named** [3] - 170:18,
175:22, 175:23
 **names** [1] - 115:19
 **nanny** [2] - 160:10,
160:16
 **Napster** [15] - 29:14,
30:3, 50:9, 50:13,
115:21, 116:13,
127:11, 131:18,
131:20, 138:22,
158:5, 159:20, 167:5
 **Napsters** [1] - 15:23
 **narrowly** [2] - 12:13,
12:20
 **Nasco** [1] - 39:11
 **nations** [1] - 147:11
 **nature** [4] - 24:19,
90:3, 136:9, 178:4
 **necessarily** [15] -
20:13, 29:21, 51:10,
66:13, 67:21, 68:8,
71:23, 91:5, 91:25,
95:5, 95:8, 99:13,
104:18, 133:9, 162:3
 **necessary** [6] -
10:23, 106:19,

113:19, 113:20,
130:17, 132:1
 **need** [20] - 6:14,
27:7, 29:25, 42:3,
47:6, 49:10, 68:23,
72:22, 79:18, 81:7,
81:21, 83:17, 103:16,
113:23, 136:15,
158:12, 184:11,
184:12, 186:8
 **needed** [6] - 11:1,
11:6, 54:22, 57:3,
113:9, 189:1
 **needs** [4] - 45:3,
80:9, 113:2, 186:14
 **nefariousness** [1] -
153:14
 **nervous** [1] - 128:1
 **Network's** [1] -
111:14
 **networks** [1] - 126:8
 **never** [27] - 7:6,
14:24, 22:20, 35:11,
37:1, 37:8, 37:9, 45:7,
47:8, 55:8, 55:19,
58:2, 58:17, 61:18,
68:16, 94:16, 117:22,
123:6, 123:24,
132:22, 141:3, 155:9,
156:1, 160:22,
175:16, 187:14,
187:15
 **never-ending** [2] -
123:6, 123:24
 **new** [7] - 51:22,
80:23, 123:10, 142:4,
142:8, 142:24, 143:2
 **New** [6] - 1:15,
18:18, 18:19, 76:25,
111:18, 111:19
 **Newton** [1] - 2:11
 **next** [12] - 15:21,
21:25, 39:22, 80:1,
100:13, 138:10,
145:12, 150:6, 154:6,
161:13, 173:23, 183:5
 **Next** [1] - 119:2
 **nice** [4] - 52:2, 57:7,
57:19
 **niche** [2] - 48:13,
48:14
 **Nimmer** [1] - 69:6
 **nine** [4] - 22:19,
23:12, 145:12, 149:22
 **Nine** [1] - 143:5
 **nine-tenths** [2] -
22:19, 23:12
 **Ninth** [6] - 25:14,
61:1, 96:25, 119:25,
159:19, 163:16

 **nobody** [4] - 115:18,
134:5, 185:22
 **non** [45] - 4:7, 10:9,
10:12, 51:24, 60:1,
76:15, 77:10, 110:9,
111:2, 112:3, 116:11,
118:22, 119:4,
120:22, 121:3, 121:9,
129:5, 129:6, 129:9,
129:14, 129:18,
129:19, 129:22,
129:23, 131:14,
131:24, 133:24,
135:9, 135:24, 137:9,
138:12, 159:12,
159:24, 160:2, 160:6,
160:21, 161:6, 161:9,
161:12, 161:14,
161:24, 167:16,
167:20, 181:18
 **non-compliance** [2]
- 76:15, 77:10
 **non-infringement**
[1] - 129:9
 **non-infringing** [36] -
10:9, 10:12, 110:9,
111:2, 112:3, 116:11,
118:22, 119:4,
120:22, 121:3, 121:9,
129:5, 129:6, 129:14,
129:18, 129:19,
129:22, 129:23,
131:14, 133:24,
135:9, 135:24, 137:9,
159:12, 159:24,
160:2, 160:6, 160:21,
161:6, 161:9, 161:12,
161:14, 161:24,
167:16, 167:20
 **non-licensed** [4] -
8:7, 51:24, 131:24,
138:12
 **non-moving** [1] -
60:1
 **non-party** [1] -
181:18
 **none** [11] - 16:10,
16:24, 57:15, 94:25,
96:19, 96:22, 108:8,
108:9, 127:20, 171:18
 **None** [5] - 16:10,
34:19, 137:16,
168:24, 170:13
 **nonetheless** [3] -
27:10, 125:20, 174:11
 **normal** [3] - 71:14,
171:7, 171:16
 **Notably** [1] - 114:2
 **note** [3] - 25:23,
95:20, 137:7

**noted** [4] - 7:21, 8:24, 9:13, 88:11
**notes** [2] - 75:12, 109:5
**Nothing** [2] - 108:5, 113:9
**nothing** [25] - 51:9, 70:17, 75:6, 81:1, 90:14, 96:6, 101:20, 102:15, 104:17, 109:11, 111:25, 114:23, 118:12, 119:12, 134:11, 136:22, 146:3, 146:7, 151:5, 156:10, 161:25, 174:3, 174:14, 181:8, 192:16
**notice** [47] - 22:21, 25:22, 26:24, 27:3, 27:17, 31:10, 31:22, 35:11, 37:2, 37:15, 37:20, 39:19, 50:11, 56:8, 56:9, 57:13, 57:23, 68:17, 69:3, 69:8, 70:5, 71:14, 74:3, 80:16, 83:13, 84:1, 84:2, 84:3, 84:4, 84:5, 84:10, 85:12, 87:7, 89:9, 95:8, 95:15, 100:4, 100:23, 100:24, 101:4, 106:18, 106:19, 106:20, 109:12, 109:15, 164:22
**noticed** [3] - 62:12, 160:9, 190:24
**notices** [55] - 11:9, 22:21, 35:4, 35:13, 40:6, 45:3, 49:20, 53:9, 54:20, 54:23, 54:24, 56:23, 57:1, 60:22, 60:23, 60:25, 64:8, 64:9, 66:8, 66:10, 66:12, 66:14, 66:15, 66:16, 67:25, 68:21, 69:9, 69:16, 69:20, 69:21, 69:23, 70:1, 70:5, 74:1, 74:20, 75:3, 80:17, 80:25, 83:5, 83:7, 83:17, 83:23, 83:25, 84:9, 84:24, 84:25, 109:16, 109:17, 123:7, 150:5, 157:10, 175:14
**Notices** [1] - 61:3
**notification** [1] - 72:15
**notifications** [2] - 175:19, 175:21

**notified** [2] - 56:23, 62:21
**notify** [1] - 79:7
**noting** [1] - 125:17
**notion** [5] - 22:16, 60:24, 152:21, 154:4, 167:11
**notorious** [4] - 7:9, 15:23, 46:25, 127:15
**notwithstanding** [1] - 83:25
**nowhere** [1] - 145:13
**nudge** [1] - 5:21
**number** [34] - 35:19, 36:4, 36:19, 36:21, 37:1, 37:9, 37:10, 40:18, 45:16, 54:3, 66:10, 71:20, 75:16, 75:18, 76:1, 99:5, 135:16, 135:18, 135:23, 147:6, 147:24, 154:24, 154:25, 155:1, 155:2, 156:9, 174:13, 185:25, 192:7, 193:3
**Number** [2] - 3:4, 87:18
**numbering** [1] - 147:9
**numbers** [10] - 9:23, 35:15, 70:23, 71:24, 119:8, 127:22, 133:4, 135:22, 178:1
**numerous** [1] - 10:14
**NW** [1] - 1:15

## O

**o'clock** [1] - 115:14
**Oaks** [1] - 1:20
**object** [5] - 96:13, 128:24, 129:6, 130:14, 166:16
**objected** [3] - 104:10, 122:20, 137:17
**objection** [1] - 105:7
**objections** [1] - 41:11
**objective** [1] - 128:16
**objectivity** [1] - 14:24
**obligated** [1] - 83:19
**obligation** [4] - 29:7, 32:13, 32:16, 72:19
**obligations** [4] - 32:12, 67:19, 67:22,

83:20
**oblige** [1] - 162:23
**obvious** [3] - 42:14, 59:2, 132:14
**obviously** [12] - 8:20, 48:2, 58:24, 83:1, 87:20, 88:2, 88:3, 90:5, 98:9, 116:24, 158:5, 184:21
**Obviously** [2] - 16:13, 87:3
**occasion** [1] - 145:14
**occur** [1] - 169:22
**occurring** [1] - 167:1
**ocean** [1] - 44:12
**October** [1] - 108:25
**odd** [1] - 55:12
**oddly** [1] - 55:9
**OF** [2] - 1:1, 196:8
**Off-the-record** [1] - 55:6
**offender** [2] - 62:12, 62:14, 62:20, 63:3, 78:12
**offender'** [1] - 78:13
**offense** [1] - 41:13
**offer** [2] - 34:11, 64:3
**offers** [1] - 64:6
**offhand** [1] - 35:19
**office** [6] - 76:21, 86:10, 86:15, 126:3, 126:18, 126:23
**Office** [1] - 86:13
**officer** [2] - 184:5, 189:2
**officers** [1] - 60:2
**officers'** [1] - 60:3
**Official** [2] - 1:23, 196:9
**officially** [1] - 73:24
**offline** [1] - 157:24
**often** [2] - 130:3, 132:16
**old** [5] - 117:24, 117:25, 118:9, 157:24, 163:6
**once** [14] - 23:4, 27:10, 28:11, 39:16, 43:14, 49:6, 49:12, 77:13, 91:13, 97:6, 124:8, 158:21, 164:22, 189:15
**Once** [3] - 31:9, 59:16, 59:24
**one** [163] - 4:2, 8:4, 8:17, 12:5, 12:11, 12:17, 13:15, 13:16, 17:5, 17:7, 17:9, 17:10, 18:2, 18:12,

18:13, 21:18, 21:19, 22:14, 23:7, 25:2, 25:23, 27:20, 32:7, 32:17, 33:13, 35:11, 36:2, 36:13, 37:20, 38:21, 43:8, 43:23, 44:8, 45:8, 46:2, 50:14, 51:5, 51:6, 55:21, 57:9, 61:17, 62:4, 62:8, 62:19, 64:25, 66:5, 66:13, 66:21, 67:11, 71:23, 77:22, 79:2, 80:3, 84:19, 87:10, 87:17, 89:3, 89:6, 89:8, 89:10, 89:15, 90:20, 90:21, 92:9, 92:14, 92:22, 93:4, 93:5, 93:18, 93:24, 97:12, 99:4, 102:19, 103:19, 103:20, 108:13, 111:18, 115:17, 117:14, 118:11, 122:2, 122:17, 123:8, 123:22, 126:20, 133:5, 133:17, 134:13, 134:14, 134:23, 135:2, 135:21, 137:6, 138:3, 141:10, 142:23, 144:23, 145:23, 147:4, 148:5, 148:11, 149:10, 149:24, 150:15, 151:10, 151:16, 152:19, 155:8, 157:2, 159:6, 160:9, 161:11, 161:14, 162:6, 162:15, 163:11, 164:19, 165:13, 165:20, 165:23, 170:17, 171:2, 172:5, 172:6, 172:17, 173:11, 173:19, 174:22, 177:18, 178:10, 179:16, 181:16, 182:21, 182:23, 183:5, 184:13, 184:17, 184:23, 185:5, 186:13, 186:18, 187:2, 187:7, 187:21, 188:25, 189:3, 189:15, 190:20, 190:21, 191:18, 193:6, 193:11
**One** [14] - 26:21, 34:8, 87:23, 92:25, 139:17, 141:11, 152:12, 157:1, 169:7, 171:24, 180:15,

184:14, 192:22
**one-by-one** [1] - 43:23
**one-fifth** [2] - 18:12, 21:19
**ones** [3] - 38:22, 131:11, 155:5
**ongoing** [10] - 104:20, 110:22, 110:25, 111:9, 111:12, 111:15, 111:22, 112:2, 162:12, 162:16
**Online** [2] - 16:18, 16:19
**online** [14] - 16:19, 65:19, 157:24, 158:3, 158:4, 158:5, 158:7, 158:9, 162:1, 164:7, 164:9, 165:3, 189:7
**onward** [1] - 107:22
**open** [15] - 16:2, 16:3, 16:4, 16:6, 17:10, 18:1, 18:4, 18:5, 18:10, 19:20, 52:5, 119:1, 127:15, 136:20, 143:17
**Open** [1] - 16:2
**opened** [1] - 67:7
**opening** [5] - 5:14, 13:14, 15:6, 46:25, 72:18
**openings** [1] - 13:22
**operate** [12] - 11:19, 12:3, 26:12, 41:20, 126:9, 130:14, 172:6, 172:17, 173:3, 181:16, 186:13, 191:19
**operated** [2] - 104:2, 183:18
**operates** [2] - 7:7, 110:22
**operations** [2] - 170:17, 176:8
**opine** [1] - 144:20, 151:13
**opinion** [5] - 18:22, 19:18, 47:21, 141:25, 145:8
**opinions** [2] - 15:3, 126:2
**opportunity** [7] - 5:13, 117:16, 123:23, 139:17, 139:23, 195:11, 195:13
**oppose** [1] - 181:5
**opposed** [4] - 5:2, 37:10, 43:25, 144:9
**opposing** [2] -

168:21, 181:6
**opposite** [4] - 155:16, 155:22, 161:7, 173:25
**opposition** [3] - 79:2, 169:9, 193:7
**option** [1] - 118:6
**options** [1] - 135:5
**ORAL** [1] - 1:8
**oral** [5] - 7:4, 137:11, 180:22, 193:24, 195:22
**oranges** [4] - 30:4, 144:1, 144:2, 149:14
**order** [8] - 45:12, 48:3, 49:14, 58:7, 101:24, 113:1, 122:13, 181:5
**ordinary** [1] - 92:5
**Ordonez** [1] - 158:7
**organization** [2] - 56:3, 56:18
**original** [2] - 141:25, 145:7
**originally** [2] - 72:17, 75:19
**otherwise** [7] - 57:8, 61:6, 98:14, 111:14, 126:7, 169:21, 194:12
**outcome** [1] - 148:16
**outdated** [3] - 75:13, 75:16, 75:21
**outer** [1] - 44:24
**outline** [2] - 61:25, 103:14
**outlined** [1] - 29:2
**outright** [1] - 126:11
**outset** [4] - 14:5, 54:22, 140:23, 141:18
**outside** [5] - 97:18, 162:13, 171:3, 190:6, 192:1
**outward** [1] - 130:17
**overall** [4] - 28:2, 67:3, 67:4, 78:16
**overemphasize** [1] - 36:14
**overly** [1] - 91:19
**overruled** [1] - 66:4
**overstate** [1] - 40:23
**overt** [1] - 48:16
**overview** [2] - 5:14, 13:13
**overwhelming** [1] - 14:20
**overwhelmingly** [1] - 10:17
**overwhelmingness** [1] - 154:16
**own** [20] - 5:3, 9:23,

29:18, 51:20, 68:17, 91:12, 103:17, 121:1, 121:11, 122:14, 131:8, 133:20, 136:8, 151:18, 167:5, 169:14, 179:24, 186:21, 186:23
**owned** [8] - 25:5, 77:22, 98:4, 123:5, 174:25, 176:10, 179:25, 186:20
**owner** [13] - 11:9, 44:10, 58:7, 65:24, 73:24, 75:6, 76:16, 84:6, 84:21, 89:19, 91:1, 180:15, 186:3
**owner's** [1] - 91:7
**owners** [37] - 25:11, 26:2, 26:4, 26:6, 28:2, 32:4, 32:14, 43:19, 49:20, 56:4, 63:22, 66:1, 68:9, 82:8, 82:11, 82:12, 82:21, 82:25, 85:2, 85:11, 87:8, 89:8, 93:4, 105:7, 108:16, 109:13, 123:2, 123:5, 123:6, 124:3, 132:13, 149:19, 149:22, 150:5, 159:16, 169:10, 178:5
**owners'** [1] - 123:24
**owns** [4] - 91:1, 120:19, 179:21, 179:23

## P

**P.A** [1] - 1:17
**p.m** [5] - 85:25, 86:1, 134:21, 134:22, 196:4
**P.O** [2] - 7:7, 12:5
**page** [12] - 25:22, 77:1, 87:25, 88:2, 94:3, 98:21, 135:3, 135:4, 137:5, 159:18, 184:25, 191:1
**PAGE** [1] - 1:6
**pages** [3] - 142:6, 194:7, 194:8
**paid** [17] - 10:20, 18:10, 21:12, 22:2, 45:24, 50:20, 50:25, 120:6, 132:20, 133:1, 133:2, 136:20, 146:7, 155:15, 167:12, 167:14, 181:12
**Panamanian** [3] - 172:10, 172:16, 180:20

**pantheon** [1] - 29:19
**paper** [1] - 99:8
**papers** [7] - 11:17, 34:8, 100:19, 140:21, 192:25, 193:18, 193:23
**paperwork** [1] - 29:24
**paradigm** [1] - 129:2
**paragraph** [3] - 39:16, 137:4, 145:10
**paragraphs** [1] - 145:12
**parcel** [1] - 73:13
**pardon** [1] - 140:11
**Part** [2] - 85:17, 171:11
**part** [21] - 21:25, 22:15, 25:25, 26:1, 32:2, 42:13, 58:8, 65:21, 67:3, 72:20, 73:13, 78:7, 103:1, 106:10, 121:18, 137:7, 137:20, 143:11, 171:9, 181:2, 192:23
**part-time** [1] - 65:21
**partial** [2] - 6:1, 96:15
**partially** [2] - 100:18, 100:21
**participate** [1] - 40:24
**participated** [5] - 183:25, 187:22, 188:3, 188:6, 189:12
**participates** [1] - 184:5
**participation** [6] - 169:13, 169:18, 169:20, 182:24, 184:1, 185:9
**particular** [18] - 21:8, 21:21, 28:23, 46:16, 47:11, 63:5, 63:12, 69:10, 92:6, 95:21, 124:2, 150:7, 150:22, 152:4, 152:22, 178:2, 180:9, 195:2
**particularly** [1] - 162:5
**particulars** [1] - 180:10
**parties** [16] - 5:12, 13:6, 42:2, 52:20, 80:2, 94:1, 103:4, 112:25, 143:12, 148:23, 154:22, 157:16, 169:7, 177:9, 194:5, 195:2

**parties'** [2] - 48:4, 61:20
**parting** [1] - 145:12
**parts** [2] - 50:22, 188:1
**party** [6] - 29:14, 56:10, 60:1, 167:2, 181:6, 181:18
**pass** [3] - 6:13, 44:16, 48:1
**passage** [2] - 23:24, 24:1
**passages** [1] - 159:10
**passing** [2] - 94:17, 184:1
**past** [7] - 18:14, 62:22, 132:5, 153:15, 157:5, 168:25, 180:2
**patience** [2] - 41:7, 85:9
**pattern** [1] - 151:6
**pay** [32] - 18:22, 19:5, 20:4, 20:5, 21:16, 21:19, 22:8, 46:9, 49:25, 50:1, 50:6, 51:13, 51:14, 60:25, 120:8, 127:20, 128:5, 130:3, 132:16, 133:17, 135:5, 136:2, 136:3, 136:5, 136:10, 147:17, 163:15, 180:19, 180:20, 186:14, 186:15
**paying** [9] - 10:24, 50:18, 50:19, 50:23, 133:13, 134:8, 134:9, 134:14, 163:20
**payment** [1] - 176:14
**payments** [6] - 185:25, 187:8, 188:5, 191:7, 191:17
**PayPal** [9] - 21:11, 172:6, 172:9, 172:10, 172:11, 172:17, 181:16, 183:19, 191:19
**pays** [10] - 7:13, 17:23, 18:12, 34:12, 51:6, 143:7, 143:8, 180:17, 192:21
**PC** [1] - 2:10
**pedagogical** [1] - 90:15
**peer** [2] - 44:17
**pending** [1] - 4:23
**Penley** [1] - 59:21
**PENLEY** [1] - 59:21
**penny** [1] - 21:8
**People** [2] - 57:19,

135:20
**people** [58] - 4:17, 16:3, 17:12, 21:20, 22:17, 30:17, 30:21, 35:9, 35:16, 45:23, 50:7, 51:6, 51:13, 51:15, 52:3, 52:7, 54:23, 57:8, 57:18, 58:5, 62:5, 84:18, 90:3, 91:10, 91:11, 115:19, 115:22, 118:19, 127:25, 128:13, 130:3, 131:10, 131:17, 131:20, 133:5, 133:17, 133:21, 136:2, 136:3, 136:5, 147:12, 147:23, 149:3, 153:6, 153:7, 155:13, 163:14, 163:20, 163:23, 164:12, 176:4, 178:1, 178:23, 179:11, 186:24, 186:25, 190:9
**per** [2] - 133:2, 184:16
**perceived** [1] - 194:9
**percent** [76] - 9:22, 10:3, 10:12, 10:18, 11:3, 22:1, 22:21, 22:25, 23:1, 23:3, 35:10, 35:12, 36:4, 37:1, 37:9, 40:5, 40:18, 40:22, 41:3, 45:10, 45:13, 69:9, 69:18, 70:1, 114:10, 114:11, 116:17, 117:9, 117:10, 125:13, 129:8, 129:9, 129:11, 135:14, 135:15, 135:19, 140:15, 140:18, 140:24, 141:4, 141:9, 141:12, 141:14, 141:21, 143:1, 144:13, 144:15, 144:24, 145:21, 146:25, 147:20, 148:2, 153:10, 153:21, 155:1, 155:9, 155:10, 155:25, 156:1, 156:7, 156:9, 156:15, 156:17, 160:5, 160:22, 167:15, 167:16, 167:19, 179:23, 179:24, 179:25, 180:1
**percentage** [6] - 35:5, 40:16, 45:9, 71:10, 120:22, 155:24

**Perez** [1] - 2:7
**perfect** [3] - 44:25, 80:10, 81:8
**Perfect** [8] - 24:24, 73:22, 75:5, 76:16, 119:24, 165:4, 165:5, 166:23
**perfectly** [1] - 47:25
**perform** [1] - 185:22
**performed** [2] - 76:7, 185:17
**performing** [1] - 91:3
**perhaps** [5] - 43:18, 91:19, 114:21, 139:20, 162:17
**Perhaps** [1] - 69:1
**period** [17] - 9:25, 49:7, 56:25, 57:2, 69:24, 70:2, 72:2, 72:14, 88:21, 101:18, 102:8, 110:23, 117:6, 145:20, 147:9, 151:16, 180:22
**periodically** [1] - 108:3
**periods** [2] - 152:1, 160:12
**permission** [2] - 6:11, 24:6
**permit** [1] - 155:13
**permits** [1] - 65:13
**permitted** [2] - 156:16, 166:13
**permutations** [1] - 75:23
**persistent** [1] - 91:20
**person** [17] - 12:17, 22:3, 22:10, 68:18, 74:14, 88:15, 92:5, 100:3, 108:1, 108:3, 109:1, 141:23, 184:17, 184:23, 185:5, 191:25
**person's** [1] - 106:23
**personal** [5] - 156:3, 156:11, 167:11, 169:14, 182:24
**personally** [10] - 169:6, 171:19, 174:13, 179:2, 179:3, 183:25, 184:6, 185:19, 188:7, 188:8
**personnel** [11] - 8:16, 90:1, 96:13, 96:16, 105:4, 174:23, 175:2, 175:3, 176:9, 179:17, 192:23
**persons** [2] - 67:9, 148:20
**perspective** [2] -

35:7, 145:25
**persuaded** [1] - 98:14
**pertain** [1] - 145:20
**ph** [3] - 3:19, 39:11, 175:24
**ph)** [1] - 163:9
**phenomenon** [1] - 38:7
**Phinney** [1] - 62:19
**phone** [8] - 18:10, 34:18, 75:16, 75:17, 75:18, 76:1, 126:8, 140:23
**Photobucket** [1] - 34:23
**photocopy** [1] - 42:6
**photographs** [1] - 158:10
**physically** [1] - 12:6
**pick** [2] - 10:7, 152:12
**picking** [2] - 99:24, 152:15
**picks** [1] - 152:14
**Pickwick** [1] - 185:1
**picture** [3] - 16:23, 37:3, 174:5
**Pictures** [1] - 25:21, 25:23
**pictures** [4] - 16:15, 19:4, 19:5, 174:13
**piece** [3] - 8:15, 122:7, 138:3
**piecemeal** [1] - 41:23
**pieces** [2] - 86:25, 126:5
**piercing** [2] - 184:7, 184:9
**pin** [2] - 59:22, 60:6
**piracy** [11] - 47:8, 56:3, 56:18, 67:12, 84:16, 84:17, 85:5, 101:24, 107:1, 143:8, 151:19
**pirate** [5] - 7:10, 14:10, 51:6, 118:20, 143:8
**pirated** [2] - 100:20, 164:14
**pirates** [1] - 22:16
**pitch** [1] - 80:3
**place** [10] - 9:6, 15:9, 22:7, 46:20, 52:2, 101:6, 108:19, 154:13, 154:16, 161:14
**placed** [1] - 171:13
**places** [2] - 26:3,

65:23
**placing** [1] - 67:22
**plaintiff** [6] - 16:25, 28:13, 97:12, 108:5, 108:15, 137:6
**plaintiff's** [2] - 94:14, 97:17
**plaintiffs** [40] - 1:4, 3:8, 3:11, 3:13, 3:15, 3:17, 3:19, 4:12, 6:20, 9:11, 25:23, 27:21, 31:24, 32:5, 34:14, 48:5, 53:17, 56:4, 66:25, 69:11, 70:14, 94:17, 97:12, 98:4, 103:16, 108:14, 123:5, 145:16, 146:24, 147:14, 149:21, 168:11, 170:6, 170:23, 173:24, 174:8, 175:12, 179:1, 180:8, 181:2
**Plaintiffs** [1] - 48:7
**PLAINTIFFS** [1] - 1:12
**plaintiffs'** [5] - 5:8, 6:8, 137:10, 146:23, 148:10
**plan** [2] - 8:13, 41:7
**planet's** [1] - 147:12
**planning** [1] - 102:10
**Platzer** [3] - 3:10, 3:12, 4:13
**PLATZER** [2] - 1:14, 3:10
**play** [1] - 16:20
**playing** [2] - 56:11, 104:21
**plays** [1] - 154:8
**pleading** [1] - 48:20
**pleadings** [1] - 47:23
**pleasure** [1] - 195:24
**plentiful** [1] - 160:21
**plot** [1] - 118:16
**plotting** [1] - 33:7
**Plus** [1] - 130:6
**plus** [3] - 49:9, 49:10, 110:14
**pockets** [1] - 147:13
**podium** [1] - 118:3, 136:12
**point** [64] - 9:18, 14:16, 23:8, 25:9, 26:10, 26:17, 27:15, 28:10, 29:11, 47:18, 49:2, 50:16, 56:14, 57:9, 69:2, 71:3, 76:5, 81:14, 89:9, 91:2, 94:4, 96:23, 100:19,

101:18, 105:25, 111:8, 117:17, 121:25, 123:16, 126:15, 127:2, 128:9, 129:4, 130:11, 131:7, 132:11, 133:8, 135:6, 138:3, 138:15, 140:14, 142:18, 142:19, 144:14, 146:16, 146:18, 146:19, 148:6, 148:19, 150:4, 153:18, 154:23, 161:5, 165:13, 173:6, 174:16, 175:13, 177:2, 177:22, 180:2, 189:1, 192:25
**pointed** [5] - 69:6, 100:18, 113:11, 135:12, 187:9
**pointing** [3] - 32:18, 62:10, 89:6
**points** [10] - 28:21, 61:18, 99:24, 118:10, 143:5, 146:18, 159:8, 178:12, 180:6, 192:17
**police** [4] - 26:3, 32:13, 65:22, 68:3
**policies** [9] - 47:7, 60:19, 72:8, 77:20, 78:7, 79:4, 79:13, 102:12, 104:9
**policing** [2] - 26:4, 65:24
**policy** [93] - 11:6, 11:10, 11:22, 18:15, 26:16, 27:8, 27:9, 28:1, 28:5, 28:8, 28:24, 28:25, 32:11, 36:5, 36:7, 39:8, 43:7, 43:8, 43:17, 44:15, 44:25, 49:19, 52:19, 53:10, 53:11, 53:16, 54:16, 54:17, 54:22, 55:16, 55:17, 55:19, 56:6, 56:7, 56:19, 56:22, 56:23, 57:1, 57:3, 57:11, 57:13, 58:8, 58:14, 59:14, 59:17, 60:19, 60:21, 63:21, 64:1, 64:11, 66:10, 66:20, 68:7, 69:5, 70:7, 70:8, 70:22, 71:15, 72:3, 72:12, 78:21, 78:23, 79:6, 79:10, 80:9, 80:11, 80:15, 80:20, 82:8, 83:1, 101:13, 102:13, 102:14, 102:18, 103:7,

104:11, 104:16, 105:2, 105:6, 105:16, 106:3, 108:12, 108:19, 108:21, 118:13, 138:17, 173:14, 176:16, 187:17, 190:4
**policy-making** [1] - 176:16
**polite** [1] - 57:8
**ponder** [1] - 163:3
**pool** [2] - 153:6, 155:23
**popping** [1] - 118:1
**popular** [26] - 10:22, 11:1, 18:12, 51:5, 51:10, 51:17, 52:5, 52:9, 52:11, 52:16, 122:22, 123:4, 125:6, 125:7, 127:21, 127:24, 128:5, 129:24, 131:6, 132:4, 132:9, 132:13, 133:7, 133:9, 138:18, 160:10
**population** [5] - 146:3, 146:8, 146:20, 147:11, 147:16
**populations** [1] - 144:21
**Porn** [9] - 56:19, 56:20, 56:21, 62:18, 63:2, 63:5, 63:24, 66:3, 78:11
**portion** [3] - 41:24, 133:12, 179:21
**portrayed** [1] - 67:20
**posited** [1] - 89:22
**position** [9] - 43:24, 44:10, 59:5, 87:6, 148:22, 149:5, 149:6, 171:7, 171:16
**positive** [2] - 101:20, 102:4
**positively** [1] - 103:8
**Posner** [3] - 12:15, 12:21, 84:23
**Posner's** [1] - 12:18
**possible** [6] - 9:16, 36:17, 41:3, 69:21, 148:3, 190:17
**possibly** [4] - 71:4, 133:6, 144:8, 148:3
**post** [10] - 8:17, 48:4, 48:6, 71:3, 72:2, 72:11, 72:13, 86:10, 86:15, 151:12
**post-2011** [3] - 27:12, 58:10, 58:11
**post-complaint** [4] - 72:2, 72:11, 72:13,

151:12
**post-February** [2] - 48:4, 48:6
**post-suit** [1] - 71:3
**posted** [2] - 82:20, 107:13
**posters** [1] - 22:24
**posting** [2] - 8:15, 174:12
**posts** [2] - 62:20, 137:18
**potentially** [3] - 88:12, 110:12, 110:16
**Potter** [2] - 123:12, 123:13
**power** [5] - 85:14, 85:17, 106:25, 173:14, 173:17
**powerful** [3] - 9:4, 27:21, 135:24
**PowerPoint** [1] - 64:2
**practicability** [1] - 68:3
**practical** [2] - 165:10
**practicality** [1] - 167:3
**practice** [2] - 96:5, 104:19
**practices** [2] - 104:2, 104:20
**praised** [1] - 67:13
**praising** [1] - 57:7
**pre** [3] - 69:24, 124:14, 145:19
**pre-2011** [1] - 145:20
**pre-complaint** [2] - 69:24, 124:14
**pre-January** [1] - 145:19
**precedent** [1] - 102:9
**precise** [1] - 37:7
**precisely** [2] - 71:2, 104:20
**precluded** [1] - 177:18
**predecessors** [1] - 7:12
**predominant** [5] - 114:3, 116:23, 119:5, 141:2, 149:9
**preempt** [1] - 131:3
**prefer** [1] - 118:3
**preference** [1] - 104:3
**preferences** [1] - 103:4
**preferring** [1] - 105:16
**prejudice** [2] - 103:2

**premium** [19] - 18:24, 19:6, 19:9, 19:13, 120:8, 120:20, 122:15, 134:25, 135:5, 135:6, 147:3, 155:14, 155:23, 155:25, 156:16, 160:7
**prepare** [2] - 15:6, 194:11
**prepared** [9] - 5:6, 41:10, 41:15, 47:25, 122:18, 137:25, 154:5, 193:25, 194:3
**prerequisite** [1] - 12:1
**presence** [2] - 132:13, 173:4
**Present** [1] - 106:9
**present** [5] - 5:13, 8:22, 29:1, 139:23, 167:25
**presentation** [6] - 15:12, 115:16, 132:24, 137:15, 139:20, 140:5
**presented** [5] - 11:23, 80:10, 125:15, 135:4, 149:8
**presents** [1] - 46:24
**press** [1] - 118:20
**presumes** [1] - 141:8
**presumptive** [1] - 12:24
**pretend** [1] - 150:18
**pretty** [7] - 17:17, 40:18, 48:21, 58:25, 68:22, 97:10, 153:4
**prevalent** [2] - 92:13, 160:2
**prevent** [2] - 73:24, 75:6
**prevented** [2] - 76:17, 84:10
**prevention** [1] - 159:13
**previous** [1] - 7:14
**previously** [2] - 146:1, 178:5
**price** [1] - 178:12
**primary** [1] - 32:18
**principal** [4] - 4:16, 8:4, 182:21
**principally** [1] - 47:14
**principals** [4] - 182:23, 183:6, 187:7, 187:15
**principle** [3] - 24:11, 26:24, 68:5
**principles** [1] - 11:13

**privacy** [1] - 162:15, 164:4
**private** [3] - 17:15, 17:18, 164:4
**privilege** [3] - 32:6, 32:7, 85:4
**proactive** [1] - 66:20
**problem** [10] - 11:9, 15:12, 28:18, 69:11, 83:24, 124:3, 124:8, 127:24, 147:24, 149:15
**problematic** [3] - 68:1, 70:4, 115:16
**problems** [1] - 137:14
**procedure** [3] - 27:17, 32:22, 84:3
**procedures** [1] - 65:14
**proceed** [4] - 4:25, 15:17, 42:4, 79:23
**proceeding** [2] - 42:9, 85:12
**PROCEEDINGS** [1] - 196:8
**process** [8] - 32:24, 75:9, 84:1, 84:10, 87:16, 106:18, 109:12, 191:8
**prod** [1] - 127:13
**produced** [3] - 36:22, 62:7, 94:22
**product** [14] - 5:17, 18:18, 103:17, 104:7, 110:2, 110:19, 110:21, 111:8, 111:25, 129:15, 129:16, 130:18, 162:7, 162:20
**Products** [2] - 184:19, 192:7
**Professor** [17] - 4:1, 19:17, 19:22, 20:19, 69:6, 69:8, 83:25, 120:11, 137:3, 143:19, 143:22, 143:23, 145:3, 145:7, 145:9, 159:19
**professor** [6] - 122:19, 126:1, 126:3, 126:17, 143:20, 145:5
**proffered** [1] - 10:8
**profited** [1] - 6:25
**program** [17] - 7:25, 8:2, 17:23, 18:1, 20:17, 20:21, 21:22, 21:25, 22:1, 22:4, 22:8, 25:20, 41:25, 59:8, 108:10, 108:18,

134:4, 134:13, 139:10, 139:13, 163:19, 163:20, 173:20, 173:21, 176:13, 176:14, 179:18, 187:18, 188:6, 188:7, 189:8, 191:5, 191:6, 191:10
**programs** [3] - 51:5, 136:21, 164:13
**progression** [1] - 28:18
**prohibits** [2] - 125:23, 126:24
**prominently** [1] - 8:12
**promote** [4] - 17:1, 24:13, 167:14
**promoted** [2] - 167:12, 189:7
**promoting** [1] - 19:24
**promptly** [1] - 33:25
**proof** [1] - 169:19
**prop** [1] - 44:21
**proper** [1] - 96:14
**properly** [3] - 121:7, 142:22, 145:22
**properties** [1] - 136:7
**proportion** [1] - 45:11
**propose** [1] - 11:19
**proposed** [1] - 189:3
**proposition** [1] - 60:4
**proscription** [1] - 79:10
**protect** [2] - 24:15, 24:17
**protected** [2] - 34:25, 115:17
**protection** [3] - 24:23, 34:22, 125:24
**protections** [1] - 45:25
**prove** [8] - 38:22, 93:4, 100:7, 104:23, 140:24, 158:15, 161:12, 177:6
**proven** [4] - 9:18, 128:9, 169:2, 182:19
**provide** [13] - 40:25, 41:8, 74:3, 85:16, 87:23, 97:2, 106:19, 157:10, 157:12, 158:16, 163:11, 163:12
**provided** [2] - 94:1, 145:2

**provider** [9] - 26:12, 43:6, 45:2, 66:8, 66:18, 67:19, 67:23, 69:3, 85:16
**providers** [8] - 13:2, 25:17, 26:5, 27:1, 46:4, 65:13, 85:10, 113:17
**provides** [9] - 19:19, 43:6, 84:1, 87:19, 158:18, 164:9, 175:2, 180:16, 193:4
**providing** [3] - 87:10, 186:5
**proving** [1] - 12:25
**provision** [9] - 43:1, 43:5, 43:22, 44:2, 44:3, 46:1, 46:15, 61:2, 130:18
**provisions** [5] - 26:25, 44:4, 87:9, 125:22, 126:16
**Pub** [1] - 184:19
**pub** [1] - 184:20
**public** [10] - 8:16, 16:13, 37:4, 39:7, 39:10, 55:19, 56:9, 72:23, 78:8, 133:5
**publicly** [9] - 11:7, 51:24, 52:1, 52:3, 54:23, 55:8, 55:19, 56:2
**publishing** [1] - 84:22
**pull** [2] - 38:10, 107:12
**pulled** [2] - 39:12, 123:20
**punch** [1] - 77:14
**pure** [2] - 59:21, 60:3
**purely** [1] - 191:8
**purport** [1] - 149:22
**purported** [2] - 42:25, 150:10
**purpose** [9] - 17:3, 31:14, 33:2, 84:22, 115:25, 172:6, 181:16, 186:4
**purposes** [3] - 133:10, 144:12, 146:22
**pursued** [1] - 96:3
**pursuing** [1] - 58:10
**pursuit** [1] - 148:16
**Pussycat** [4] - 90:21, 95:18, 100:25, 101:1
**put** [40] - 12:11, 16:12, 17:19, 17:20, 22:15, 38:13, 39:6, 41:4, 46:2, 50:11,

54:25, 59:12, 62:3,
84:6, 84:12, 84:19,
89:2, 95:4, 100:4,
100:8, 100:10,
100:11, 100:16,
101:5, 118:16, 120:3,
120:10, 120:13,
126:6, 126:7, 135:8,
139:19, 150:15,
159:25, 161:15,
165:1, 172:20,
183:23, 190:3, 190:9
**Put** [1] - 78:12
**puts** [1] - 51:1
**putting** [2] - 50:17,
95:7

## Q

**qualification** [1] -
148:8
**qualified** [2] - 126:1,
149:6
**qualify** [1] - 72:12
**quality** [1] - 115:20
**quantum** [1] - 153:22
**quarreling** [1] -
31:13
**quarter** [1] - 105:24
**quarters** [2] -
147:10, 147:11
**quest** [1] - 123:24
**questioned** [2] -
56:18, 113:18
**questions** [12] -
5:20, 13:25, 31:12,
36:3, 41:9, 61:11,
71:5, 79:24, 94:7,
134:18, 158:21,
165:25
**quick** [1] - 182:9
**quicker** [1] - 109:15
**quickly** [4] - 39:17,
45:8, 67:11, 81:25
**quit** [1] - 100:13
**Quite** [1] - 51:3
**quite** [7] - 18:12,
70:18, 76:6, 127:14,
161:7, 195:8, 195:20
**quote** [11] - 8:4,
59:24, 79:17, 80:7,
80:8, 81:2, 83:8, 83:9,
165:4, 181:6, 184:4
**quotes** [1] - 84:20
**quoting** [1] - 24:1

## R

**radio** [1] - 16:19

**raise** [1] - 157:3
**raised** [3] - 76:19,
78:4, 80:12
**raises** [4] - 39:14,
64:21, 121:10, 165:22
**rampant** [2] - 14:15,
14:20
**ran** [1] - 161:17
**RapidShare** [20] -
7:24, 8:1, 8:4, 8:5,
8:12, 8:14, 50:14,
51:21, 131:16,
131:22, 131:23,
133:20, 138:16,
138:21, 139:1, 139:5,
139:6, 139:7, 139:9
**RapidShare's** [2] -
8:3, 138:17
**rare** [1] - 82:15
**rarely** [1] - 123:23
**Rasco** [1] - 2:7
**rate** [13] - 117:10,
121:9, 124:24, 125:6,
125:12, 135:9,
135:18, 135:21,
140:15, 140:18,
141:13, 144:24,
151:11
**rather** [7] - 24:25,
117:14, 117:22,
118:1, 144:13, 156:2
**ratified** [1] - 187:23
**ratifies** [1] - 184:5
**ratio** [3] - 120:18,
121:24, 122:4
**ration** [1] - 120:18
**rational** [1] - 111:20
**rationale** [1] - 162:13
**raw** [1] - 35:8
**reach** [8] - 21:13,
47:24, 58:19, 77:10,
86:9, 119:8, 141:8,
182:3
**reached** [1] - 93:1
**reaching** [2] - 74:2,
75:5
**reaction** [1] - 29:16
**read** [16] - 24:9,
24:10, 28:17, 65:22,
79:17, 81:2, 97:22,
136:15, 138:19,
142:25, 145:6, 145:7,
159:10, 181:3,
188:18, 192:2
**reading** [5] - 23:10,
23:18, 81:6, 114:21,
127:14
**ready** [4] - 4:17,
4:20, 13:21, 36:1
**real** [13] - 16:23,

35:15, 40:20, 58:24,
69:11, 69:12, 72:21,
112:13, 135:17,
135:18, 158:9, 184:13
**reality** [9] - 105:12,
109:11, 127:18,
128:4, 136:5, 150:18,
150:20, 181:13, 186:9
**realize** [8] - 24:5,
27:25, 34:5, 42:22,
79:23, 86:22, 128:2,
144:3
**really** [41] - 15:7,
17:4, 17:13, 17:15,
21:5, 21:15, 27:10,
28:22, 35:2, 37:11,
41:8, 45:23, 57:7,
68:18, 68:20, 72:22,
75:5, 81:21, 95:15,
113:22, 114:11,
121:25, 127:14,
136:6, 138:7, 139:16,
141:22, 142:3, 144:7,
150:16, 154:11,
158:19, 159:5, 160:2,
163:7, 180:11, 183:8,
184:3, 184:19,
188:13, 195:11
**Really** [1] - 3:20
**reason** [30] - 39:12,
80:17, 84:19, 91:19,
100:11, 115:22,
116:23, 122:21,
128:20, 135:17,
135:18, 137:13,
141:9, 142:17,
143:11, 145:1,
145:24, 150:14,
151:19, 152:5, 152:7,
152:8, 152:10,
152:25, 153:2, 153:6,
171:9, 171:11, 172:7
**reasonable** [27] -
28:24, 29:3, 32:9,
43:15, 59:13, 59:14,
59:15, 64:10, 64:14,
65:25, 66:10, 67:4,
69:15, 70:4, 70:22,
80:10, 88:15, 92:5,
100:3, 107:4, 107:8,
107:9, 114:1, 122:20,
124:11, 156:14
**reasonableness** [12]
- 43:13, 43:14, 59:11,
59:17, 59:20, 60:2,
60:8, 60:9, 71:18,
78:17, 105:3
**Reasonableness** [2]
- 28:25, 59:16
**reasonably** [9] -

11:22, 32:11, 43:6,
43:8, 52:19, 70:7,
78:19, 104:14, 105:5
**reasons** [6] - 36:11,
87:21, 121:21, 136:4,
156:9, 157:1
**rebut** [1] - 121:5
**rebuttal** [11] - 55:18,
122:4, 137:4, 141:16,
141:21, 142:3, 142:8,
145:2, 145:8, 145:9
**receive** [4] - 6:11,
27:18, 113:3, 152:7
**received** [7] - 22:20,
35:11, 37:1, 39:19,
40:6, 94:20, 195:8
**receives** [1] - 113:24
**receiving** [3] - 35:12,
69:20, 105:4
**recent** [3] - 12:18,
76:24, 84:23
**recently** [3] - 25:6,
33:24, 76:18
**recessed** [2] - 85:25,
134:21
**recidivist** [1] - 45:24
**recitation** [1] - 78:20
**recognizable** [1] -
103:21
**recognized** [8] -
25:18, 26:11, 26:23,
28:15, 112:2, 113:23,
149:3, 165:2
**reconcile** [1] - 144:7
**reconvene** [2] - 6:14,
81:22
**reconvened** [2] -
86:1, 134:22
**reconvening** [1] -
193:17
**RECORD** [1] - 196:7
**record** [52] - 15:15,
36:16, 54:1, 55:6,
60:1, 69:22, 71:5,
79:15, 83:6, 83:24,
90:17, 91:1, 91:12,
96:6, 96:20, 100:16,
103:7, 104:6, 113:25,
114:21, 126:12,
127:10, 128:22,
137:1, 137:2, 137:11,
138:4, 140:6, 140:10,
145:19, 154:8, 170:1,
172:20, 173:10,
173:13, 173:18,
175:13, 176:1, 177:3,
179:20, 179:25,
180:13, 189:11,
190:19, 190:21,
191:1, 191:8, 191:24,

192:1
**recorded** [1] - 91:13
**recording** [1] -
159:14
**records** [1] - 102:22
**Records** [1] - 185:2
**recover** [2] - 48:5,
48:7
**red** [13] - 65:2, 87:4,
87:11, 88:3, 88:12,
92:1, 92:2, 92:19,
94:5, 97:2, 97:6,
100:22, 157:12
**Red** [1] - 92:4
**reducing** [1] - 151:9
**refer** [2] - 16:18, 22:4
**refer-a-friend** [1] -
22:4
**reference** [6] - 29:17,
29:19, 53:23, 77:9,
120:12, 145:15
**referral** [1] - 134:13
**referred** [6] - 17:15,
22:2, 72:19, 87:11,
95:24, 159:10
**referring** [3] - 22:3,
94:20, 139:4
**refusing** [1] - 148:12
**regard** [11] - 20:19,
52:18, 111:11, 116:2,
134:10, 134:12,
163:6, 184:7, 192:2,
192:3, 194:5
**regarded** [1] -
148:20
**regarding** [6] - 4:24,
106:10, 180:9, 188:3,
188:6, 191:23
**regardless** [2] - 44:8,
161:9
**Regardless** [1] -
24:3
**register** [5] - 11:25,
21:2, 21:5, 21:18,
76:20
**registered** [1] - 35:6
**registration** [3] -
12:8, 76:21, 86:12
**registry** [1] - 76:1
**regretting** [1] -
138:18
**regularly** [1] - 24:25
**regulation** [1] - 51:7
**Reininger** [1] - 2:7
**reiterate** [1] - 192:17
**reiterating** [1] -
176:6
**related** [10] - 38:5,
81:3, 89:13, 108:12,
170:8, 173:9, 174:10,

181:10, 184:14,
185:10

**relates** [1] - 94:25
**relation** [1] - 186:17
**relationship** [12] -
110:23, 110:25,
111:9, 111:12,
111:15, 111:22,
112:3, 162:12,
162:16, 180:25,
192:19, 192:20
**relative** [1] - 68:3
**relatively** [2] - 71:10,
150:8
**release** [1] - 118:20
**releases** [1] - 118:20
**relevant** [4] - 19:10,
59:25, 126:16, 152:4
**reliance** [1] - 105:2
**relied** [7] - 102:25,
103:10, 141:19,
168:22, 170:6,
170:12, 174:2
**relief** [2] - 72:7,
183:6
**relieve** [1] - 67:19
**rely** [7] - 24:23, 28:4,
104:15, 104:24,
137:24, 141:16,
147:18
**relying** [1] - 168:25
**remaining** [1] -
112:11
**remains** [4] - 58:9,
75:22, 153:25
**remand** [6] - 94:8,
94:11, 97:10, 97:13,
97:22, 97:24
**remanded** [1] -
166:18
**remarks** [1] - 189:25
**remedial** [1] - 28:14
**remedy** [1] - 106:20
**Remember** [10] -
11:2, 26:18, 30:2,
65:19, 69:18, 101:22,
106:11, 129:13,
131:12, 165:20
**remember** [12] -
20:2, 23:17, 30:16,
65:23, 68:6, 71:21,
85:9, 131:8, 138:21,
160:1, 189:21, 190:2
**remembered** [1] -
95:18
**remembering** [1] -
144:18
**remind** [3] - 64:19,
93:25, 105:22
**remote** [1] - 181:20

**remotely** [4] - 170:9,
170:14, 173:22,
174:15
**remove** [1] - 89:20
**removed** [1] - 62:23
**remunerated** [1] -
19:11
**remuneration** [2] -
19:21, 22:6
**rendered** [1] -
195:25
**renegades** [1] -
70:12
**Repeat** [1] - 43:17
**repeat** [92] - 5:22,
9:20, 10:1, 10:25,
11:6, 11:22, 13:11,
26:16, 27:25, 28:4,
28:23, 28:25, 39:8,
43:1, 43:5, 43:7,
43:21, 44:2, 44:3,
44:25, 45:5, 45:15,
46:1, 46:15, 49:18,
50:1, 52:14, 52:17,
53:5, 53:13, 53:16,
54:16, 54:18, 54:22,
56:6, 56:18, 56:22,
58:8, 59:14, 60:18,
61:2, 62:12, 62:20,
63:3, 63:21, 63:23,
65:9, 66:2, 66:9, 68:6,
68:7, 69:6, 70:14,
70:22, 71:15, 72:11,
72:15, 78:12, 79:6,
79:11, 79:19, 80:9,
80:15, 80:21, 80:24,
81:25, 82:8, 84:15,
84:25, 97:23, 99:15,
101:12, 102:14,
102:18, 104:10,
104:16, 105:1, 105:6,
105:16, 108:9,
108:12, 108:18,
108:21, 114:9, 117:3,
117:7, 117:8, 118:13,
128:10, 151:15,
187:17, 190:3
**repeated** [3] - 13:20,
84:24, 168:21
**repeatedly** [1] - 11:7
**repeater** [1] - 102:13
**reply** [7] - 121:4,
121:15, 145:17,
151:4, 169:12,
184:25, 189:25
**report** [18] - 24:1,
137:4, 137:5, 141:11,
141:13, 141:16,
141:25, 142:22,
143:9, 144:19,

145:10, 145:13,
145:14, 145:15,
175:3, 175:9, 175:15,
186:25
**Reportabuse.com**
[1] - 86:10
**reported** [1] - 39:18
**REPORTED** [1] -
1:22
**REPORTER** [1] -
194:23
**Reporter** [2] - 1:23,
196:9
**represent** [1] - 35:15
**representations** [1] -
104:24
**representative** [2] -
161:20, 183:24
**represented** [2] -
11:7, 133:2
**representing** [1] -
57:2, 67:12
**request** [2] - 27:20,
108:4
**require** [11] - 44:24,
49:7, 54:17, 66:18,
128:3, 132:6, 148:8,
160:11, 166:10,
184:23
**required** [2] - 91:25,
97:2
**requirement** [4] -
65:15, 65:17, 93:7,
99:19
**requirements** [5] -
12:8, 26:13, 64:24,
77:15, 77:25
**requires** [3] - 54:18,
148:15, 169:19
**requisite** [1] - 73:4
**researched** [1] -
188:10
**researching** [1] -
188:9
**reserved** [5] - 26:20,
79:3, 79:7, 80:19,
169:23
**reserves** [2] - 79:12,
79:13
**resolution** [1] -
86:22
**resolved** [2] - 25:24,
43:14
**resolves** [1] - 65:1
**resources** [2] - 26:3,
30:18
**respect** [11] - 72:1,
94:7, 95:2, 102:15,
120:5, 139:15,
159:24, 177:2, 181:9,

190:18, 193:11
**respectfully** [1] -
130:7
**Respectfully** [1] -
168:8
**respects** [2] - 29:20,
121:17
**respond** [7] - 42:21,
81:25, 93:24, 95:10,
95:12, 98:17, 98:19
**responded** [6] -
56:15, 56:20, 56:21,
62:5, 103:7, 122:6
**responding** [4] -
57:10, 95:11, 109:1,
175:18
**response** [13] - 5:9,
42:24, 63:4, 80:16,
99:3, 108:20, 132:25,
134:23, 145:2, 189:5,
190:25, 194:8
**responsibilities** [5] -
163:8, 170:19, 173:8,
174:6, 176:10
**responsibility** [12] -
26:6, 109:8, 171:25,
173:9, 173:10,
179:17, 183:11,
183:12, 186:1,
190:10, 191:7, 191:9
**Responsible** [1] -
45:18
**responsible** [14] -
11:13, 22:10, 22:17,
32:4, 32:5, 34:20,
45:14, 45:16, 171:23,
175:21, 176:3, 176:8,
176:11, 191:6
**rest** [3] - 27:16,
31:24, 141:20
**restraining** [1] - 58:7
**restraint** [1] - 60:8
**restrict** [1] - 91:11
**restricted** [1] - 97:14
**restricting** [1] -
66:20
**restrictions** [2] -
172:9, 172:12
**result** [6] - 10:5,
107:15, 128:7, 128:8,
133:19, 159:15
**resume** [3] - 14:25,
81:23, 85:22
**return** [2] - 33:13,
138:3
**reveal** [2] - 95:3,
132:1
**revenue** [6] - 9:23,
18:17, 22:1, 22:9,
117:5, 118:14

**revenues** [10] - 9:22,
10:3, 11:2, 114:5,
114:10, 115:1, 115:9,
117:8, 117:12, 118:18
**review** [2] - 66:16,
193:23
**reviewed** [1] - 95:9
**rewards** [1] - 7:25
**rewind** [1] - 146:10
**rid** [1] - 117:7
**right-hand** [1] - 16:1
**rightfully** [1] -
135:12
**rights** [1] - 91:12
**rightsholder** [8] -
27:22, 31:4, 31:19,
31:22, 31:23, 67:1,
96:8
**ripe** [1] - 41:16
**ripple** [1] - 48:25
**rise** [2] - 108:23,
140:14
**road** [2] - 28:11, 64:4
**Robinson** [1] - 1:17
**robot** [1] - 68:12
**robust** [1] - 56:22
**Rod** [1] - 166:3
**RODERICK** [1] - 2:3
**Roderick** [2] - 4:5,
14:4
**role** [14] - 111:15,
144:8, 154:11,
172:21, 174:6,
175:13, 175:24,
177:24, 178:7,
179:15, 187:6, 192:4,
192:5
**Room** [1] - 1:24
**room** [4] - 51:19,
118:15, 128:7, 141:24
**rose** [1] - 69:18
**roughly** [1] - 120:23
**row** [1] - 14:13
**RPR** [1] - 1:22
**rudimentary** [1] -
26:18
**ruinous** [2] - 24:18,
103:11
**rule** [5] - 112:9,
113:21, 126:18,
142:2, 159:14
**ruled** [1] - 24:2
**rules** [4] - 17:21,
26:21, 26:22, 87:5
**ruling** [1] - 143:14
**Rumen** [1] - 170:18
**Rumors** [1] - 90:21
**run** [6] - 38:8,
137:14, 170:16,
170:17, 172:25,

176:22, 186:19, 186:24
**running** [3] - 7:8, 86:17, 174:11
**runs** [2] - 12:6, 172:25
**Russian** [1] - 16:13

## S

**S/DAVID** [1] - 196:9
**Safe** [2] - 12:24, 97:17
**safe** [43] - 11:18, 11:20, 12:2, 12:3, 12:9, 12:12, 12:25, 13:1, 13:4, 13:10, 24:23, 28:9, 28:11, 28:12, 30:3, 34:21, 34:25, 43:4, 43:6, 43:17, 43:18, 46:3, 46:13, 47:8, 49:18, 57:22, 64:13, 64:20, 67:23, 70:21, 83:18, 85:10, 85:18, 92:16, 93:2, 93:6, 97:7, 99:16, 99:17, 99:19, 112:10, 124:11
**sake** [1] - 11:18
**sale** [2] - 111:8, 178:14
**sample** [5] - 144:19, 144:21, 146:5, 146:21, 152:6
**sampled** [1] - 146:4
**San** [1] - 2:6
**sarcastic** [1] - 188:21
**sat** [1] - 154:2
**satisfied** [2] - 18:20, 88:12
**satisfies** [1] - 114:5
**save** [2] - 17:5, 17:7
**saved** [1] - 17:7
**saw** [7] - 6:5, 63:21, 90:17, 99:25, 101:15, 106:17, 114:7
**scale** [2] - 11:12, 35:1
**Scan** [2] - 84:22, 99:18
**scenario** [1] - 149:2
**scenarios** [1] - 44:17
**schedule** [3] - 81:17, 194:10, 194:13
**scheduled** [1] - 126:8
**scheme** [3] - 29:13, 67:20, 171:14

**Schoenberg** [7] - 4:5, 41:12, 139:22, 167:25, 168:17, 168:18, 183:7
**SCHOENBERG** [24] - 2:4, 168:16, 168:19, 170:22, 171:6, 171:15, 171:23, 172:4, 173:6, 175:17, 175:20, 176:6, 176:23, 177:22, 178:19, 178:22, 179:14, 179:23, 180:5, 182:10, 190:16, 191:14, 191:17, 191:21
**School** [1] - 150:11
**school** [6] - 117:24, 117:25, 163:7, 171:9, 177:15, 184:9
**science** [1] - 144:20
**scope** [1] - 127:10
**screen** [6] - 16:12, 55:1, 106:3, 170:11
**scrub** [1] - 68:18
**scrupulously** [1] - 77:24
**se** [1] - 184:16
**seas** [1] - 47:8
**seated** [1] - 3:2
**seats** [1] - 44:22
**Seattle** [3] - 37:14, 40:8
**Second** [11] - 8:24, 11:25, 25:7, 93:12, 96:24, 97:13, 97:18, 99:10, 111:13, 142:20, 142:21
**second** [9] - 14:13, 19:2, 31:19, 31:20, 56:9, 60:4, 62:11, 64:23, 64:25, 73:16, 89:3, 120:25, 126:5, 141:10, 142:13, 142:17, 142:19, 142:20, 151:8
**secondary** [7] - 11:14, 64:21, 88:6, 98:22, 121:25, 131:2, 162:5
**Secondly** [1] - 164:7
**secondly** [1] - 30:19
**secret** [1] - 107:1
**section** [2] - 126:20, 126:22
**Section** [2] - 43:5, 79:17
**security** [1] - 57:18
**see** [50] - 14:17, 14:19, 15:7, 18:3,

18:21, 22:14, 22:22, 22:23, 23:10, 25:3, 28:18, 32:24, 35:5, 35:11, 39:9, 40:18, 53:6, 54:4, 55:9, 55:22, 67:21, 73:18, 76:3, 100:21, 101:23, 105:20, 106:1, 107:17, 114:15, 116:9, 116:18, 117:2, 119:1, 119:3, 120:14, 120:22, 122:21, 125:8, 127:10, 127:15, 134:17, 160:17, 161:20, 164:3, 164:14, 172:12, 182:13, 182:22, 183:19, 190:12
**seeing** [2] - 26:8, 116:16
**seek** [1] - 103:11
**seeking** [8] - 12:3, 13:4, 43:6, 45:2, 48:5, 48:7, 87:15, 96:3
**seem** [6] - 6:16, 24:25, 28:12, 52:21, 70:4, 112:25, 143:8, 193:2
**segment** [1] - 98:9
**segue** [1] - 27:16
**selected** [1] - 33:9
**self** [1] - 142:2
**self-executing** [1] - 142:2
**sell** [1] - 134:25
**selling** [5] - 134:25, 135:6, 163:15, 192:13, 192:15
**Senate** [1] - 24:1
**send** [7] - 23:5, 37:15, 56:8, 84:2, 84:4, 123:7, 150:5
**sending** [3] - 68:19, 88:11, 101:5
**sends** [5] - 23:6, 69:7, 84:4, 87:19, 90:7
**sense** [19] - 6:18, 8:21, 9:14, 57:18, 61:14, 76:15, 78:10, 81:8, 83:1, 93:23, 110:17, 122:3, 125:7, 125:21, 128:4, 150:4, 153:4, 158:20, 162:16
**sensible** [2] - 48:17, 48:18
**sent** [13] - 34:9, 49:20, 56:2, 68:12, 69:10, 69:23, 80:17,

84:9, 84:24, 131:12, 190:4
**sentence** [2] - 62:11, 138:10
**separate** [3] - 29:25, 130:22, 168:8
**September** [4] - 33:21, 56:2, 56:5
**series** [4] - 41:15, 168:20, 169:3, 185:1
**serious** [4] - 114:11, 181:22, 181:25, 184:3
**seriously** [2] - 150:16, 151:17
**served** [1] - 168:24
**servers** [6] - 17:7, 18:6, 20:14, 62:23, 158:18, 167:5
**service** [32] - 7:10, 13:2, 25:17, 26:5, 26:12, 43:6, 45:2, 46:4, 47:19, 47:20, 47:21, 65:13, 66:8, 66:18, 67:19, 69:3, 85:10, 85:16, 90:4, 111:22, 113:16, 116:21, 120:6, 120:8, 128:25, 129:22, 130:18, 156:17, 159:11, 159:13, 159:15, 162:19
**services** [6] - 9:7, 180:16, 186:5, 192:20, 192:22, 193:4
**set** [16] - 11:23, 12:10, 25:22, 59:16, 59:25, 74:10, 128:22, 146:5, 146:21, 153:6, 153:7, 153:8, 163:14, 173:14, 177:9, 185:21
**sets** [1] - 17:21, 153:3
**setting** [1] - 68:15
**seven** [1] - 194:6
**Seventh** [1] - 70:13
**several** [11] - 30:10, 41:11, 88:12, 118:12, 121:25, 130:10, 132:12, 150:22, 159:10, 192:11, 192:12
**Several** [1] - 66:25
**shadows** [2] - 7:7, 12:3, 14:13
**share** [3] - 22:9, 180:1, 180:3
**shared** [1] - 137:8
**shareholder** [6] - 170:16, 174:4, 176:18, 181:23,

187:21, 187:22
**shareholders** [10] - 170:18, 171:24, 173:11, 173:15, 173:19, 176:10, 176:18, 179:24, 184:15, 185:8
**sharing** [1] - 126:11
**sheer** [2] - 50:12, 66:10
**shenanigans** [1] - 103:18
**Sherman** [1] - 1:20
**shift** [2] - 15:9, 26:7
**shifted** [1] - 169:3
**shifting** [4] - 141:7, 169:3, 180:9
**shock** [1] - 71:9
**shockingly** [1] - 183:8
**shop** [6] - 158:1, 163:8, 163:21, 163:23, 164:2, 178:16
**short** [10] - 6:13, 44:23, 98:8, 98:13, 106:21, 152:1, 155:6, 155:7, 160:6, 160:12
**short-term** [1] - 160:6
**shortly** [2] - 34:2, 67:12
**shot** [1] - 29:18
**show** [12] - 15:9, 16:24, 17:1, 22:4, 30:12, 31:14, 71:6, 72:4, 98:15, 114:25, 121:1, 181:6
**Show** [1] - 70:24
**showed** [2] - 42:6, 63:12, 66:3, 70:15, 78:10, 96:9, 99:25, 108:17, 131:19, 135:8, 164:19, 182:19
**showing** [2] - 84:21, 137:16
**shown** [4] - 66:15, 68:9, 137:17, 138:6
**shows** [14] - 8:18, 39:7, 40:13, 40:15, 51:25, 84:20, 121:8, 122:14, 131:13, 131:14, 133:21, 139:9, 170:12, 180:12
**shut** [3] - 139:2, 183:4, 186:7
**shutting** [1] - 159:15
**sic** [7] - 76:16, 89:22, 96:5, 126:8, 151:13, 158:8, 159:22
**sic)** [3] - 62:7, 71:9,

84:5
**side** [17] - 14:22, 36:25, 37:6, 37:12, 40:4, 71:16, 71:22, 81:18, 93:13, 109:2, 109:13, 131:3, 131:4, 145:7, 161:17, 190:23
**sides** [4] - 144:4, 149:16, 149:17, 154:7
**sign** [1] - 132:14
**signals** [1] - 154:17
**signed** [3] - 67:11, 67:12, 189:5
**significance** [1] - 135:15
**significant** [13] - 36:19, 121:6, 121:8, 124:18, 138:15, 160:21, 161:23, 161:24, 162:16, 173:14, 176:17, 177:24, 181:25
**significantly** [2] - 120:21, 169:19
**signs** [1] - 21:20
**silence** [3] - 102:25, 103:10, 104:16
**Silence** [1] - 104:1
**silent** [4] - 102:16, 102:20, 102:23, 195:15
**similar** [4] - 7:25, 77:23, 170:9, 170:14
**Similarly** [1] - 160:16
**simple** [8] - 13:3, 17:5, 86:24, 91:8, 101:11, 122:11, 136:5, 172:14
**simply** [30] - 10:16, 12:11, 17:24, 31:24, 46:2, 46:21, 49:5, 51:1, 55:20, 56:10, 61:6, 81:4, 82:19, 87:8, 88:2, 89:20, 99:8, 112:5, 119:21, 132:8, 150:2, 150:4, 170:9, 174:7, 180:18, 181:6, 183:4, 187:3, 190:19, 192:15
**Simpsons** [1] - 148:11
**simultaneously** [1] - 194:5
**single** [11] - 7:15, 16:6, 18:2, 60:24, 89:21, 141:17, 155:9, 156:1, 170:23, 178:25, 179:2
**sinister** [1] - 136:21
**sit** [6] - 20:20,

117:22, 117:24, 118:1, 136:14, 139:25
**site** [13] - 101:2, 110:22, 113:25, 118:19, 118:23, 125:7, 125:11, 125:14, 138:2, 138:22, 158:16, 159:23, 167:1
**sites** [5] - 9:10, 67:15, 84:21, 109:14, 116:15
**sitting** [1] - 14:13
**situation** [6] - 4:11, 125:16, 143:13, 148:24, 149:3, 173:22
**six** [9] - 27:20, 31:6, 65:20, 89:5, 89:6, 89:7, 89:24, 117:4, 157:11
**skeleton** [1] - 31:21
**Skip** [1] - 121:23
**skip** [3] - 64:2, 64:23, 137:25
**Sleepless** [3] - 37:14, 40:8
**Slide** [2] - 185:2, 192:8
**slide** [16] - 15:21, 17:25, 22:4, 24:9, 26:8, 27:16, 29:2, 40:12, 73:16, 84:20, 144:14, 161:13, 161:15, 174:1, 181:10, 181:13
**slides** [4] - 15:8, 32:25, 42:6, 121:23
**Slip** [2] - 185:2, 192:8
**sliver** [1] - 156:2
**slowly** [1] - 124:23
**small** [11] - 35:5, 45:9, 45:22, 65:20, 67:25, 71:10, 99:24, 150:7, 156:2, 159:10, 180:6
**smaller** [2] - 34:23, 99:5
**smallest** [4] - 170:16, 176:18, 180:3, 181:22
**smarter** [1] - 127:19
**smiley** [1] - 138:9
**snapshot** [2] - 124:25, 152:4
**snapshots** [1] - 152:3
**Snowbreeze** [20] - 18:3, 18:12, 19:1, 19:10, 19:14, 20:3,

20:18, 20:19, 21:3, 21:4, 21:10, 119:2, 123:1, 124:18, 125:9, 125:19, 126:13, 126:25, 137:8
**so-called** [2] - 136:18, 155:4
**socially** [1] - 19:19
**Sofia** [1] - 3:24
**softball** [1] - 160:20
**software** [25] - 16:2, 16:3, 16:4, 16:7, 17:10, 18:1, 18:5, 18:6, 18:7, 18:11, 18:12, 19:1, 19:11, 19:15, 19:20, 96:3, 110:21, 119:2, 126:5, 136:18, 161:18, 192:13
**sold** [1] - 164:3
**sole** [5] - 84:22, 114:3, 115:25, 174:4, 186:2
**solely** [3] - 140:14, 177:11, 178:6
**solicit** [2] - 8:13, 51:23
**solicited** [4] - 7:23, 8:16, 10:20, 130:12
**soliciting** [3] - 21:20, 52:3, 130:15
**solution** [1] - 172:14
**somebodies** [2] - 70:3, 74:22
**someone** [19] - 18:10, 19:12, 19:13, 22:9, 32:12, 36:16, 41:3, 48:23, 68:8, 69:7, 85:18, 96:17, 99:20, 121:2, 139:2, 164:8, 178:24, 179:3, 188:24
**Sometimes** [1] - 43:20
**sometimes** [4] - 24:22, 171:19, 177:3, 177:7
**somewhere** [3] - 61:25, 178:9, 178:17
**Somewhere** [1] - 177:15
**Sony** [31] - 29:12, 110:19, 111:4, 111:5, 111:6, 111:7, 111:9, 111:13, 111:16, 111:21, 112:5, 115:24, 119:12, 119:14, 119:16, 119:19, 119:21, 129:13, 141:7,

159:17, 160:25, 161:4, 161:6, 161:8, 161:25, 162:4, 162:9, 162:20
**sophisticated** [5] - 73:12, 84:17, 104:9, 105:7, 107:1
**Sorcerer's** [2] - 123:12, 123:13
**sorry** [5] - 35:24, 39:4, 69:17, 95:23, 174:1
**Sorry** [3] - 38:25, 61:13, 119:11
**sort** [7] - 90:3, 114:8, 125:16, 135:17, 158:21, 174:18, 182:25
**sounds** [3] - 48:19, 108:22, 136:21
**source** [18] - 16:2, 16:4, 16:7, 17:10, 18:1, 18:4, 18:6, 19:20, 43:22, 44:3, 44:9, 44:13, 46:6, 52:5, 96:3, 119:2, 187:2
**Southern** [6] - 76:24, 111:19, 184:3, 184:18, 184:21, 184:22
**SOUTHERN** [1] - 1:1
**space** [1] - 141:7
**space-shifting** [1] - 141:7
**spark** [1] - 187:19
**speaking** [5] - 99:18, 143:2, 150:8, 164:11, 164:12
**speaks** [1] - 183:14
**special** [12] - 27:22, 31:4, 31:19, 31:22, 31:23, 66:24, 67:1, 96:8, 105:9, 107:7, 109:17
**specialist** [1] - 170:20
**specific** [26] - 54:17, 57:23, 57:24, 65:2, 66:19, 89:9, 89:18, 90:12, 90:19, 91:21, 93:1, 93:13, 94:4, 94:6, 94:11, 94:25, 97:1, 97:14, 97:18, 97:24, 98:3, 127:9, 156:24, 159:20, 178:1, 186:4
**specifically** [4] - 79:11, 172:21, 187:16, 190:23

**Specifically** [1] - 172:10
**specificity** [2] - 91:25, 97:5
**specifics** [3] - 27:13, 91:18, 95:2
**specified** [1] - 84:24
**specify** [1] - 28:23
**spectrum** [1] - 153:17
**speechless** [1] - 195:25
**spend** [5] - 7:4, 42:23, 86:2, 86:20, 154:6
**spent** [1] - 195:10
**spin** [1] - 13:7
**spirit** [7] - 41:21, 170:25, 177:19, 178:24, 181:17, 184:2, 187:5
**spirits** [1] - 169:11
**split** [2] - 129:17, 173:8
**spoken** [2] - 5:1, 5:5
**spokesperson** [1] - 4:17
**springs** [2] - 5:11, 195:18
**squarely** [3] - 26:4, 32:14, 32:17
**SR** [1] - 67:24
**SRA** [20] - 27:22, 63:13, 64:6, 67:15, 74:11, 82:17, 101:23, 102:15, 104:13, 106:11, 106:15, 106:20, 107:11, 108:2, 108:10, 109:10, 109:11, 109:16, 164:25
**SRAs** [4] - 66:22, 68:7, 71:17, 75:10
**staff** [7] - 131:12, 137:22, 185:17, 186:19, 186:22, 186:23, 186:24
**stage** [1] - 168:25
**stagger** [1] - 41:23
**staggering** [1] - 65:25
**stake** [1] - 144:23
**stand** [6] - 117:25, 140:17, 141:4, 141:9, 143:6, 153:9
**standard** [37] - 9:6, 22:1, 22:7, 25:22, 58:24, 75:14, 99:6, 100:4, 112:14, 113:12, 113:16,

116:25, 117:11, 128:3, 131:2, 131:3, 133:14, 156:21, 157:1, 157:6, 157:7, 157:18, 157:19, 158:2, 158:3, 158:4, 158:6, 158:11, 158:12, 159:9, 169:18, 169:19, 184:3, 184:22

**standards** [5] - 12:10, 170:2, 170:5, 177:1, 177:25

**standing** [1] - 147:19

**staple** [3] - 110:8, 111:1, 111:11

**star** [3] - 80:13, 158:8, 184:20

**stars** [1] - 194:24

**start** [26] - 5:15, 5:22, 6:20, 9:25, 26:18, 27:10, 28:8, 30:17, 31:7, 34:3, 43:1, 61:17, 65:20, 73:6, 77:13, 77:14, 77:23, 85:24, 101:19, 110:1, 112:6, 112:16, 114:14, 118:11, 155:8, 190:20

**start-up** [9] - 30:17, 31:7, 34:3, 65:20, 73:6, 77:13, 77:14, 77:23, 101:19

**start-ups** [2] - 26:18, 28:8

**started** [9] - 10:3, 11:3, 28:19, 38:16, 48:24, 77:23, 112:8, 114:9, 194:13

**starting** [1] - 195:25

**starts** [1] - 64:5

**stat** [2] - 135:14, 154:19

**state** [10] - 3:6, 30:15, 31:16, 33:20, 34:3, 40:15, 40:21, 41:5, 48:24, 130:13

**state-of-the-art** [6] - 30:15, 31:16, 34:3, 40:15, 40:21, 41:5

**statement** [6] - 26:20, 30:15, 72:18, 137:10, 169:15, 169:16

**statements** [5] - 13:14, 105:2, 174:14, 174:23, 190:20

**STATES** [2] - 1:1, 1:9

**States** [1] - 73:12

**station** [1] - 16:19

**statistic** [3] - 36:25, 135:8, 155:9

**statistical** [1] - 10:13, 14:18, 122:18, 125:13, 135:15, 144:20, 144:22, 150:12, 151:25, 154:11, 154:23

**statistically** [1] - 121:8

**statistician** [11] - 69:16, 122:19, 135:11, 135:12, 143:20, 143:21, 144:18, 145:5, 145:11, 150:12, 152:12

**statistics** [14] - 14:16, 14:18, 14:19, 15:5, 16:5, 22:13, 22:23, 35:7, 36:1, 40:4, 40:13, 41:10, 139:18, 145:15

**status** [1] - 109:17

**statute** [12] - 12:1, 12:20, 32:12, 64:13, 65:13, 69:5, 72:21, 73:7, 73:18, 76:15, 126:21, 126:22

**statutory** [4] - 13:2, 67:20, 92:9, 126:16

**stay** [1] - 123:3

**staying** [1] - 53:5

**stays** [2] - 37:15, 40:21

**steady** [2] - 11:1, 40:21

**steeped** [1] - 50:5

**step** [3] - 28:14, 41:24, 84:19

**steps** [3] - 28:19, 29:1, 124:11

**Stetson** [1] - 3:15

**STETSON** [2] - 1:17, 3:15

**Steven** [1] - 3:7

**STEVEN** [1] - 1:13

**still** [24] - 10:12, 12:4, 12:7, 12:20, 23:8, 23:9, 34:5, 34:24, 48:1, 53:12, 57:24, 67:17, 72:14, 86:17, 88:22, 89:19, 91:6, 92:16, 93:14, 109:13, 115:25, 127:4, 133:24, 161:25

**stipulated** [1] - 109:16

**Stone** [1] - 123:12, 123:13

**stood** [2] - 102:23, 140:22

**stop** [11] - 15:9, 48:16, 49:8, 49:13, 49:14, 63:4, 77:16, 114:20, 115:6, 124:14, 124:15

**stopped** [1] - 40:17

**stopping** [1] - 112:4

**stops** [1] - 46:19

**storage** [32] - 15:19, 17:15, 17:18, 17:19, 19:3, 19:6, 20:12, 31:21, 50:6, 50:17, 51:1, 115:3, 155:4, 155:14, 155:22, 155:24, 156:3, 156:11, 156:17, 160:5, 160:7, 160:11, 160:18, 160:21, 160:24, 163:7, 164:9, 165:9, 167:11, 167:16, 176:15

**store** [2] - 160:13, 163:20

**stored** [5] - 141:3, 158:18, 160:23, 162:19, 164:16

**stories** [4] - 18:19, 169:3, 180:9

**storing** [1] - 160:17

**story** [2] - 169:9, 181:1

**Stoyanov** [12] - 170:18, 171:25, 173:19, 173:20, 173:21, 174:20, 174:25, 175:4, 176:2, 186:20, 191:5, 191:12

**Stoyanov's** [2] - 8:9, 8:10

**straight** [1] - 128:22

**strategy** [3] - 103:18, 131:25

**strayed** [1] - 52:14

**stream** [2] - 110:20, 112:1

**StreamCast** [8] - 49:11, 129:17, 129:19, 132:7, 132:16, 152:3, 154:21, 154:22

**Street** [2] - 2:5, 2:10

**stress** [1] - 14:5

**stricken** [3] - 145:24, 145:25

**strict** [1] - 154:15

**stricture** [1] - 97:4

**strike** [11] - 41:20, 53:10, 53:11, 54:9,

54:13, 56:7, 56:22, 57:13, 60:21, 108:19, 122:17

**strikes** [10] - 44:18, 45:7, 53:7, 53:8, 53:11, 64:1, 65:15, 65:16, 72:3, 103:6

**stringency** [1] - 97:4

**stringent** [1] - 47:7

**strive** [1] - 98:16

**strong** [5] - 31:15, 64:21, 71:16, 96:24, 130:6

**strongly** [1] - 158:25

**strove** [1] - 151:8

**struck** [1] - 25:10

**structure** [3] - 77:20, 188:6, 189:14

**studies** [2] - 151:25, 154:19

**studio** [1] - 161:17

**studios** [31] - 14:9, 16:11, 17:16, 24:14, 27:2, 27:19, 31:20, 33:7, 33:17, 38:22, 40:24, 67:12, 68:9, 72:8, 75:4, 85:2, 85:20, 96:2, 101:11, 101:21, 102:1, 102:7, 102:24, 103:5, 103:9, 104:5, 104:23, 105:5, 105:7, 106:12, 108:6

**studios'** [4] - 35:13, 42:14, 138:7, 168:10

**study** [10] - 10:7, 40:3, 125:10, 125:11, 135:14, 141:6, 145:20, 147:4, 154:23

**stuff** [1] - 40:21

**stupid** [1] - 50:2

**subcategory** [1] - 130:24

**subject** [10] - 11:8, 22:21, 41:19, 47:22, 54:8, 54:12, 62:14, 71:8, 78:13, 153:24

**subjects** [1] - 5:20

**submit** [7] - 6:24, 58:16, 133:11, 170:1, 177:5, 181:8, 194:16

**submitted** [5] - 96:21, 142:6, 144:18, 180:23, 193:3

**subpoena** [4] - 85:14, 85:17, 106:25, 168:24

**subscribers** [4] - 52:19, 78:19, 78:20, 79:3

**subscription** [6] -

18:22, 18:24, 19:6, 78:25, 115:11, 120:6

**subscriptions** [3] - 19:9, 134:25, 135:1

**substantial** [19] - 73:1, 73:16, 73:17, 75:14, 78:10, 78:16, 110:9, 111:1, 118:22, 119:4, 121:10, 129:4, 129:14, 129:22, 133:12, 133:19, 161:5, 185:25, 188:1

**substantially** [5] - 73:19, 75:24, 130:2, 133:15, 183:19

**substantive** [2] - 38:17, 142:12

**substitute** [1] - 148:22

**subsumed** [1] - 10:10

**success** [3] - 25:1, 25:2, 75:8

**sue** [1] - 63:9

**sued** [12] - 8:1, 9:19, 47:16, 47:17, 47:19, 58:7, 63:7, 63:14, 63:15, 63:16, 126:13, 181:24

**sues** [1] - 84:6

**suffice** [2] - 42:23, 169:14

**sufficient** [3] - 106:4, 159:21, 170:24

**suggest** [5] - 72:19, 81:22, 99:22, 151:5, 161:4

**suggested** [2] - 61:6, 182:23

**suggesting** [5] - 69:2, 69:5, 96:10, 159:20, 187:2

**suggestion** [3] - 100:4, 116:20, 167:8

**suggestions** [1] - 102:3

**suggests** [3] - 70:7, 79:5, 105:18

**suing** [1] - 24:25

**suit** [21] - 16:10, 53:15, 65:2, 71:3, 94:9, 94:12, 94:13, 94:18, 94:19, 95:1, 95:8, 96:20, 97:1, 97:17, 98:1, 99:1, 99:9, 99:12, 103:6, 108:14, 124:7

**Suite** [3] - 1:15, 1:18, 2:10

**suited** [1] - 33:24

**suits** [2] - 88:18, 99:4
**sum** [1] - 108:4
**summary** [44] - 4:24, 5:8, 6:1, 7:11, 24:4, 42:15, 42:17, 52:10, 60:13, 60:17, 72:10, 76:23, 77:3, 77:16, 80:19, 85:17, 88:23, 94:1, 99:2, 99:6, 99:8, 112:22, 115:4, 116:6, 128:2, 128:3, 132:5, 132:9, 137:24, 140:20, 165:19, 165:23, 166:13, 166:18, 166:20, 168:5, 169:5, 181:4, 181:5, 182:4, 193:7, 193:11
**sums** [2] - 39:18, 39:20
**superior** [3] - 26:2, 26:3, 85:6
**superlative** [2] - 195:21, 195:22
**supervise** [4] - 113:3, 113:5, 176:8, 179:17
**supervised** [4] - 175:3, 175:8, 175:9, 176:1
**supervisor** [1] - 176:3
**supplement** [1] - 53:19
**supply** [4] - 11:1, 11:5, 45:12, 51:6
**supplying** [1] - 75:16
**Supplying** [1] - 75:21
**support** [4] - 29:4, 170:2, 174:18, 181:20
**supportable** [1] - 60:1
**suppose** [3] - 58:4, 83:11, 115:2
**supposed** [2] - 153:4, 182:17
**supposedly** [1] - 29:6
**Supreme** [16] - 7:17, 7:21, 8:24, 9:2, 9:13, 12:19, 111:9, 111:24, 119:14, 128:16, 129:16, 130:8, 130:19, 131:17, 166:17, 181:4
**surely** [1] - 95:12
**surface** [2] - 101:25, 102:5

**surprise** [1] - 158:24
**surprised** [1] - 153:16
**surprisingly** [1] - 10:5
**surveillance** [2] - 160:10, 160:14
**suspect** [1] - 63:22
**suspected** [1] - 27:3
**suspend** [2] - 128:4, 150:18
**suspended** [1] - 62:12
**suss** [1] - 115:5
**Swap** [1] - 158:1
**swap** [5] - 163:8, 163:21, 163:23, 164:2, 178:16
**swayed** [1] - 72:13
**sweeping** [1] - 125:2
**synonymous** [1] - 23:2
**system** [17] - 13:5, 23:7, 36:15, 39:18, 39:20, 39:21, 45:10, 87:18, 89:20, 96:16, 99:21, 129:5, 130:14, 132:14, 151:8, 156:23, 157:14
**systematic** [2] - 149:14, 149:23
**systems** [2] - 116:12, 116:13

**T**

**table** [2] - 43:11, 118:2
**tables** [2] - 4:9, 117:22
**takedown** [29] - 22:20, 22:21, 25:22, 26:24, 27:17, 27:22, 28:3, 35:4, 35:11, 35:13, 37:2, 37:20, 39:19, 40:6, 44:5, 66:8, 69:7, 69:9, 71:8, 71:14, 71:16, 74:1, 74:3, 74:20, 75:3, 75:9, 76:3, 85:12, 105:9
**takedowns** [5] - 32:22, 68:12, 71:21, 75:1, 76:13
**talks** [8] - 44:16, 45:9, 47:15, 69:5, 119:7, 137:15, 165:21
**tallying** [1] - 54:19
**tangled** [1] - 109:24

**tanked** [1] - 117:8
**tape** [2] - 91:10, 160:14
**target** [2] - 43:22, 136:6
**targeted** [3] - 7:21, 102:8, 102:10
**targeting** [2] - 8:21, 46:6
**targets** [3] - 43:24, 44:2, 44:3
**teaching** [2] - 70:15, 90:3
**team** [1] - 160:20
**teaspoon** [1] - 44:12
**Technical** [1] - 73:23
**technical** [11] - 75:11, 75:15, 75:24, 76:15, 76:22, 77:15, 77:24, 87:15, 95:11, 162:17, 193:5
**technicality** [1] - 12:2
**technically** [3] - 83:13, 192:4, 194:13
**technicians** [1] - 164:12
**techniques** [1] - 84:16
**technological** [4] - 73:13, 129:2, 163:13, 187:5
**technologist** [6] - 170:19, 178:7, 179:1, 180:1, 181:23, 188:15
**technology** [23] - 9:2, 30:16, 30:22, 31:16, 33:14, 33:16, 33:17, 33:22, 33:24, 34:15, 107:1, 127:14, 170:20, 176:11, 178:8, 178:13, 178:14, 178:15, 178:17, 178:20, 187:4, 190:23
**tee** [1] - 168:13
**television** [8] - 8:18, 16:24, 17:1, 51:25, 131:13, 131:14, 133:21, 136:6
**temerity** [1] - 7:15
**templates** [1] - 95:11
**temporary** [2] - 58:7, 160:18
**Temporary** [1] - 160:21
**tempted** [1] - 42:21
**ten** [13] - 9:1, 9:5, 14:25, 22:21, 37:19, 53:8, 97:7, 97:8,

115:14, 134:20, 135:21, 147:9, 154:6
**Ten** [3] - 72:2, 194:7, 194:8
**ten-minute** [1] - 134:20
**tenacious** [1] - 25:4
**tenant** [1] - 144:20
**tend** [2] - 91:12, 136:7
**tended** [1] - 137:20
**tens** [1] - 51:19
**tenths** [2] - 22:19, 23:12
**term** [7] - 107:15, 146:2, 146:11, 148:6, 152:22, 152:24, 160:6
**terminate** [18] - 10:25, 26:21, 45:16, 46:13, 50:1, 54:18, 56:9, 76:8, 76:9, 79:3, 79:8, 79:12, 79:13, 79:19, 80:20, 106:23, 106:24, 151:14
**terminated** [25] - 8:1, 11:8, 35:14, 36:8, 36:9, 36:10, 36:15, 36:16, 43:25, 45:7, 45:10, 53:14, 54:24, 56:24, 60:22, 63:5, 64:9, 70:6, 80:15, 80:22, 80:24, 81:3, 117:3, 117:7, 128:10
**terminating** [6] - 9:19, 9:25, 10:4, 11:3, 69:5, 114:9
**termination** [2] - 43:7, 70:22
**terminations** [1] - 28:6
**terminology** [2] - 17:17, 20:24
**terms** [17] - 5:21, 26:15, 60:12, 68:15, 72:20, 77:19, 80:2, 87:12, 90:11, 107:13, 116:16, 144:5, 154:10, 157:12, 176:16, 178:1, 193:17
**test** [4] - 33:8, 114:6, 114:12, 166:13
**testified** [6] - 10:22, 14:22, 36:17, 49:21, 83:8, 141:24
**testify** [2] - 145:17, 145:18
**testimony** [31] - 31:12, 31:15, 38:1, 38:6, 39:24, 95:24, 95:25, 100:10,

100:11, 100:14, 139:6, 142:4, 142:7, 142:8, 143:1, 165:17, 165:18, 166:10, 173:10, 176:15, 176:22, 176:23, 177:3, 177:7, 187:10, 189:18, 190:21, 191:5, 192:2, 192:3
**THAT** [1] - 196:7
**THE** [337] - 1:9, 1:12, 2:2, 3:2, 3:9, 3:12, 3:14, 3:16, 3:18, 3:20, 3:25, 4:3, 4:7, 4:14, 4:19, 4:22, 5:7, 6:2, 6:5, 6:7, 6:19, 6:22, 8:9, 12:15, 12:22, 13:12, 13:18, 13:24, 14:3, 15:11, 15:15, 15:17, 16:8, 19:25, 20:9, 20:15, 20:25, 21:13, 21:23, 22:12, 22:25, 23:4, 23:23, 24:24, 25:4, 27:6, 27:14, 28:7, 29:9, 29:11, 30:9, 30:13, 30:20, 31:2, 31:17, 32:10, 32:16, 32:24, 35:15, 35:20, 35:23, 36:5, 36:12, 37:3, 37:11, 37:22, 37:25, 38:5, 38:15, 40:11, 41:18, 42:8, 42:12, 42:18, 42:20, 43:24, 44:15, 44:21, 45:18, 46:11, 46:24, 47:11, 48:2, 48:10, 48:18, 49:4, 49:9, 49:16, 50:2, 50:4, 50:21, 51:9, 52:13, 52:24, 53:4, 53:18, 53:22, 54:10, 54:14, 55:5, 55:14, 55:22, 55:25, 57:21, 58:3, 58:9, 59:5, 59:10, 60:10, 61:7, 61:10, 61:13, 61:16, 61:22, 61:25, 63:7, 63:11, 63:14, 63:16, 63:19, 64:3, 64:17, 65:4, 65:6, 65:11, 66:7, 67:6, 67:9, 67:17, 68:15, 69:14, 69:20, 69:25, 70:18, 71:12, 71:25, 72:13, 73:9, 73:11, 73:20, 74:4, 74:8, 74:12, 74:14, 74:19, 74:22, 75:11, 75:21, 76:8, 76:10, 77:5, 77:12, 77:18, 78:1, 78:6, 78:18, 79:9,

79:22, 79:25, 80:5,
81:15, 81:21, 82:2,
82:5, 82:17, 83:10,
83:15, 85:22, 86:2,
86:7, 86:14, 86:19,
88:5, 89:25, 90:13,
90:22, 91:2, 91:16,
91:19, 92:7, 92:24,
93:9, 93:16, 93:20,
97:3, 97:16, 98:5,
98:7, 98:11, 98:17,
98:20, 100:23, 101:9,
103:13, 104:18,
105:19, 106:22,
107:11, 107:19,
107:21, 108:24,
109:4, 109:9, 109:20,
109:23, 110:7,
110:15, 111:5,
112:16, 112:19,
112:21, 114:18,
114:20, 114:25,
115:13, 117:13,
117:18, 117:20,
118:5, 118:8, 119:24,
120:1, 121:14,
121:16, 121:18,
121:22, 122:10,
123:15, 123:18,
123:20, 124:5,
124:16, 124:23,
125:8, 126:10, 127:5,
127:23, 128:18,
129:1, 130:1, 130:6,
130:21, 130:24,
131:5, 134:2, 134:7,
134:15, 134:20,
136:16, 136:23,
139:1, 139:12, 140:2,
140:4, 140:10,
140:16, 142:16,
142:20, 143:3,
143:11, 143:25,
145:1, 146:10,
146:15, 148:18,
149:12, 150:1,
153:12, 153:20,
154:14, 155:17,
155:20, 158:1,
158:23, 159:2,
160:25, 161:10,
162:3, 162:25, 163:2,
163:11, 163:25,
164:10, 165:11,
166:1, 166:7, 167:24,
168:2, 168:7, 168:12,
168:15, 168:18,
170:21, 171:1,
171:11, 171:22,
172:2, 173:2, 175:11,
175:18, 176:5,

176:20, 177:8, 178:9,
178:21, 179:5,
179:20, 180:4, 182:7,
182:12, 184:8,
188:14, 188:18,
188:23, 189:10,
189:15, 189:19,
189:22, 190:15,
191:11, 191:16,
191:20, 193:14,
194:5, 194:4, 194:8,
194:15, 194:17,
194:22, 194:24,
195:3, 195:7, 195:15,
195:18, 196:7, 196:8
  **theirs** [1] - 85:20
  **themself** [1] - 82:16
  **themselves** [7] -
64:6, 84:25, 90:1,
132:1, 141:5, 148:7,
148:23
  **theories** [2] - 88:7,
174:18
  **theory** [5] - 146:8,
146:23, 154:8, 161:1,
171:12
  **thereafter** [3] - 6:12,
6:13, 67:13
  **therefore** [3] - 74:23,
159:18, 171:2
  **They've** [2] - 18:14,
169:13
  **they've** [11] - 32:6,
34:21, 48:23, 55:11,
122:23, 138:8, 146:6,
149:24, 169:12,
170:4, 180:10
  **thinking** [7] - 29:23,
139:2, 153:18,
165:14, 165:16,
181:3, 188:21
  **thinks** [2] - 15:1,
15:2
  **third** [7] - 39:16,
56:10, 56:23, 120:22,
146:19, 167:2, 174:8
  **Third** [1] - 12:9
  **third-party** [1] -
167:2
  **Thompson** [23] - 4:5,
5:4, 14:4, 15:17,
23:21, 42:25, 43:10,
44:19, 81:11, 81:16,
82:3, 83:4, 86:4,
88:21, 93:21, 99:24,
101:9, 109:4, 116:11,
117:14, 135:12,
136:12, 158:15
  **THOMPSON** [161] -
2:3, 4:16, 4:20, 5:25,

6:3, 6:6, 13:16, 14:1,
14:4, 15:18, 16:9,
20:8, 20:13, 20:23,
21:1, 21:17, 21:24,
22:13, 23:2, 23:10,
23:25, 25:2, 25:5,
27:13, 27:15, 28:21,
29:10, 29:25, 30:12,
30:14, 31:1, 31:3,
31:18, 32:13, 32:21,
32:25, 35:17, 35:24,
36:9, 36:13, 37:4,
37:17, 37:23, 38:1,
38:10, 38:13, 38:19,
38:25, 39:2, 39:4,
40:12, 42:4, 42:11,
42:13, 42:19, 44:20,
54:3, 54:7, 55:2, 55:4,
61:17, 61:23, 62:2,
63:9, 63:12, 63:15,
63:18, 63:20, 64:16,
64:18, 65:5, 65:8,
65:12, 66:12, 67:8,
67:10, 68:2, 69:1,
70:11, 71:6, 71:13,
72:1, 73:5, 73:10,
73:15, 73:22, 74:6,
74:9, 74:13, 74:16,
74:21, 74:25, 75:19,
76:5, 76:9, 76:11,
77:7, 77:13, 77:21,
78:3, 78:9, 79:1,
79:14, 79:23, 81:11,
81:17, 82:4, 84:12,
86:5, 86:11, 86:18,
89:1, 93:23, 97:9,
97:22, 98:6, 98:8,
98:16, 101:10,
103:22, 105:1, 106:7,
106:24, 107:17,
107:20, 109:6,
117:16, 118:7,
118:10, 119:25,
120:2, 121:15,
121:17, 121:19,
121:23, 132:22,
136:13, 136:17,
136:25, 139:3,
139:13, 140:8,
158:24, 159:7, 161:3,
161:13, 162:14,
163:10, 163:22,
164:1, 164:18,
165:12, 166:5,
167:25, 168:8, 194:2,
194:7, 194:19,
194:25, 195:13, 196:3
  **Thompson's** [2] -
98:19, 134:19
  **Thorland** [1] - 3:13
  **THORLAND** [2] -

1:19, 3:13
  **thousand** [3] - 36:7,
53:9, 89:17
  **thousands** [8] -
35:20, 53:15, 68:10,
68:12, 89:23, 109:14,
165:24, 178:23
  **Three** [4] - 88:17,
88:20, 155:25, 178:3
  **three** [43] - 4:17,
7:18, 7:19, 11:8,
11:19, 18:13, 26:18,
30:17, 35:12, 36:4,
38:21, 44:18, 45:7,
53:11, 53:25, 56:22,
60:21, 63:25, 65:21,
68:21, 69:18, 72:3,
103:6, 141:15,
142:23, 146:17,
146:18, 147:10,
147:11, 161:16,
169:10, 170:5, 170:6,
171:5, 177:16,
179:12, 179:15,
179:16, 180:3,
182:23, 187:7, 189:3
  **three-quarters** [2] -
147:10, 147:11
  **three-strike** [3] -
53:11, 56:22, 60:21
  **three-year** [2] -
141:15, 142:23
  **threshold** [2] -
43:17, 110:6
  **throughout** [1] -
110:23
  **Throughout** [1] -
56:25
  **thrown** [1] - 183:11
  **tied** [2] - 99:11,
115:9
  **time-shifting** [1] -
141:7
  **timeline** [3] - 32:8,
101:15, 144:1
  **timing** [1] - 105:14
  **title** [2] - 100:2,
123:11
  **titles** [4] - 68:19,
188:15, 188:17, 190:9
  **Titov** [97] - 3:23,
3:25, 5:9, 6:9, 8:4,
9:9, 13:13, 13:14,
13:17, 14:4, 14:6,
14:13, 36:17, 37:13,
39:11, 39:24, 41:12,
41:15, 49:21, 55:15,
56:14, 64:11, 72:7,
79:2, 82:10, 83:8,
88:23, 95:23, 139:21,

153:4, 154:4, 163:6,
165:13, 167:23,
168:4, 168:17,
168:19, 169:4, 169:6,
170:2, 170:8, 170:14,
171:4, 171:13,
171:23, 172:16,
172:19, 172:21,
173:9, 173:12, 174:4,
174:19, 175:4, 175:8,
175:9, 175:10,
175:13, 176:2, 176:3,
176:7, 177:25, 178:6,
178:16, 179:23,
179:25, 180:14,
181:9, 181:12,
181:16, 181:22,
182:5, 182:20,
184:15, 185:7,
185:16, 186:1, 186:3,
186:12, 186:18,
186:21, 186:25,
187:1, 187:12,
187:25, 189:2, 190:4,
190:6, 190:11,
190:19, 191:6,
191:14, 191:18,
191:25, 193:11
  **Titov's** [18] - 5:18,
31:12, 38:1, 38:6,
95:24, 95:25, 96:4,
96:6, 168:12, 168:21,
169:13, 170:19,
176:21, 179:15,
180:24, 185:9, 192:3,
193:6
  **TO** [1] - 1:6
  **today** [32] - 3:23, 4:9,
4:23, 5:10, 12:5, 14:7,
17:9, 21:24, 22:14,
40:19, 41:8, 41:17,
41:18, 41:20, 42:3,
53:2, 53:21, 54:2,
57:16, 126:11,
137:12, 146:1, 154:3,
167:18, 170:11,
182:2, 193:16, 194:5,
194:10, 194:11,
194:14, 195:21
  **today's** [3] - 42:9,
144:5, 144:12
  **together** [10] - 52:21,
53:1, 53:2, 71:19,
89:24, 120:10,
160:19, 160:20,
176:25, 178:6
  **tolerated** [1] - 153:23
  **Tony** [1] - 168:16
  **took** [9] - 27:4,
28:19, 29:2, 50:5,

68:13, 72:7, 141:18,
141:23, 185:10
**tool** [13] - 27:22,
32:17, 32:18, 46:13,
66:24, 67:2, 90:15,
101:23, 101:24,
105:9, 107:6, 134:4,
134:5
**tools** [7] - 28:3,
32:14, 63:13, 125:24,
126:25, 127:1
**top** [26] - 16:8, 16:9,
16:10, 62:25, 66:5,
86:25, 87:12, 89:13,
90:11, 92:11, 93:21,
93:24, 93:25, 94:15,
96:12, 118:25, 119:1,
122:22, 124:21,
127:3, 132:19,
132:25, 148:9, 157:11
**total** [2] - 36:21,
108:4
**totality** [4] - 76:12,
166:12, 166:15,
166:20
**touch** [2] - 26:9,
138:10
**touched** [1] - 30:14
**tough** [1] - 64:4
**towards** [1] - 13:3
**track** [14] - 21:4,
21:6, 21:9, 23:13,
36:15, 45:4, 49:23,
49:25, 50:1, 57:1,
71:1, 83:14, 84:15,
123:11
**tracked** [2] - 54:23,
120:18
**trade** [5] - 24:12,
60:8, 61:9, 61:10,
107:1
**trade-off** [1] - 24:12
**traditional** [1] -
110:13
**traffic** [2] - 9:21,
114:10
**trafficking** [2] -
125:23, 126:24
**trailers** [1] - 161:21
**transcript** [1] -
194:19
**TRANSCRIPT** [1] -
196:7
**transferring** [1] -
32:11
**translates** [1] -
132:20
**transparent** [4] -
20:21, 20:23, 164:1,
164:2

**traveled** [1] - 182:2
**treat** [1] - 130:22
**treatises** [1] - 148:21
**triable** [6] - 61:19,
61:21, 64:21, 104:15,
107:8, 114:22
**trial** [10] - 76:19,
76:22, 80:17, 80:19,
81:1, 95:19, 99:7,
105:21, 105:23, 106:1
**tried** [5] - 51:22,
100:12, 122:20,
151:18, 174:17
**trier** [2] - 101:15,
106:8
**trinity** [1] - 171:1
**triple** [1] - 34:13
**triumvirate** [1] -
171:2
**trivial** [4] - 45:16,
45:17, 49:21, 83:9
**trivialize** [1] - 109:10
**true** [9] - 9:17,
47:13, 55:16, 55:20,
56:10, 57:15, 57:16,
87:8, 103:5, 116:12,
116:24, 140:25,
141:15, 157:25,
158:2, 168:25
**trump** [1] - 12:20
**trusted** [1] - 106:12
**try** [15] - 5:20, 10:24,
26:5, 34:20, 46:18,
64:16, 95:10, 96:3,
128:14, 147:5,
161:12, 182:8, 185:6,
190:16
**Try** [1] - 10:6
**trying** [17] - 25:9,
26:19, 42:1, 44:11,
48:4, 48:21, 50:13,
63:20, 78:2, 85:19,
91:8, 106:15, 121:5,
141:16, 143:14,
150:2, 164:21
**TSP** [9] - 56:3, 56:5,
57:10, 57:11, 57:12,
108:13, 108:14,
108:22
**tumbling** [1] - 63:17
**turn** [8] - 13:11,
109:20, 140:25,
151:7, 155:3, 165:12,
165:25, 167:22
**turned** [1] - 168:24
**Turnoff** [2] - 41:16,
96:5
**turns** [1] - 18:11
**tutorial** [1] - 90:16
**tutorials** [4] - 90:2,

90:8, 90:20, 101:5
**two** [55] - 11:8,
14:25, 24:12, 25:16,
38:21, 46:19, 47:2,
50:21, 50:22, 53:10,
56:7, 57:13, 59:19,
60:20, 62:4, 62:7,
64:24, 70:2, 72:14,
84:20, 84:21, 87:9,
87:18, 88:19, 101:19,
102:8, 103:20,
104:18, 105:25,
108:19, 111:17,
119:2, 123:9, 127:3,
139:17, 145:6, 153:2,
159:8, 162:25,
167:10, 169:7,
174:11, 178:4,
178:16, 179:24,
180:15, 181:18,
183:1, 184:14,
184:15, 185:7,
185:10, 194:16
**Two** [1] - 194:17
**two-strike** [4] -
53:10, 56:7, 57:13,
108:19
**two-year** [3] - 70:2,
72:14, 102:8
**type** [12] - 15:24,
15:25, 19:18, 22:5,
54:15, 54:17, 54:21,
57:3, 90:9, 92:6,
95:21, 171:3
**types** [2] - 66:19,
116:14
**typical** [3] - 136:7,
186:10, 193:4

## U

**U.S** [4] - 26:19,
74:17, 74:22, 86:12
**U.S.Dist** [1] - 80:12
**ubiquitous** [3] -
22:6, 34:14, 174:6
**ultimate** [3] - 121:19,
173:12, 184:23
**UMG** [1] - 95:19
**unavailing** [1] -
41:22
**unclear** [1] - 74:22
**Under** [2] - 58:23,
64:10
**under** [31] - 11:13,
12:10, 12:25, 24:23,
29:3, 32:12, 46:15,
58:21, 58:23, 61:3,
67:20, 72:12, 82:17,
86:22, 106:4, 112:13,

113:1, 114:16,
119:19, 146:8,
146:23, 156:22,
157:2, 157:7, 163:16,
170:2, 170:5, 171:19,
177:1, 177:25
**underlying** [3] -
58:16, 112:15, 115:8
**undermine** [2] -
66:11, 124:5
**understatement** [1] -
182:1
**understood** [4] - 8:8,
8:11, 51:21, 117:22
**undisputed** [9] -
14:19, 43:12, 72:2,
82:9, 83:6, 155:1,
170:1, 182:4, 193:9
**unexpected** [1] - 8:5
**unfamiliar** [1] - 76:3
**unfettered** [1] -
101:3
**Unfortunately** [1] -
17:1
**unidentified** [1] -
137:16
**uniform** [2] - 79:10,
148:8
**uniformity** [1] -
149:9
**uninterrupted** [1] -
142:6
**unique** [5] - 17:8,
23:3, 23:5, 50:24,
51:4
**unit** [1] - 163:7
**United** [1] - 73:12
**UNITED** [2] - 1:1, 1:9
**University** [1] - 4:2
**unknown** [5] - 146:9,
147:2, 147:6, 147:24
**unlawful** [2] - 70:16,
138:23
**Unless** [2] - 79:24,
127:24
**unless** [9] - 19:5,
25:18, 46:12, 84:6,
127:24, 152:15,
165:25, 167:13, 195:5
**unlicensed** [3] -
8:12, 138:13, 165:21
**unlike** [2] - 110:18,
173:16
**Unlikely** [1] - 195:17
**unlimited** [4] - 19:3,
19:6, 19:7, 79:24
**unmistakable** [7] -
7:19, 7:20, 10:2, 90:7,
101:6, 166:16, 166:21
**unpopular** [1] -

20:15
**unreasonable** [2] -
101:13, 102:19
**unscrupulous** [1] -
127:15
**unsuccessful** [1] -
25:3
**unsupported** [1] -
83:4
**unthinkable** [1] -
10:6
**unusual** [1] - 12:19
**up** [100] - 4:20, 5:3,
5:8, 6:13, 8:6, 16:12,
18:11, 18:13, 19:4,
19:15, 21:6, 21:17,
21:20, 22:15, 23:5,
23:8, 23:9, 26:10,
30:4, 30:17, 31:7,
33:15, 34:3, 36:19,
37:16, 38:10, 38:13,
39:6, 39:12, 41:24,
42:7, 44:13, 44:19,
47:5, 55:5, 62:9,
62:17, 63:3, 64:5,
65:20, 67:11, 67:12,
67:24, 68:15, 68:19,
73:6, 74:10, 77:13,
77:14, 77:23, 84:6,
84:13, 84:20, 85:24,
86:17, 95:4, 99:24,
101:1, 101:19,
103:19, 105:24,
105:25, 107:11,
109:24, 111:2, 111:3,
116:5, 120:3, 121:6,
121:25, 122:25,
123:3, 124:1, 124:2,
126:5, 134:18, 135:8,
136:20, 138:5,
138:11, 140:22,
142:15, 148:6,
149:24, 159:25,
161:15, 163:14,
165:1, 172:14,
175:12, 177:9,
182:14, 182:19,
183:6, 185:21,
186:14, 189:24, 190:3
**updating** [1] - 164:23
**upgrade** [1] - 19:13
**upgrades** [1] - 188:2
**upload** [34] - 7:13,
7:23, 8:18, 8:20,
10:20, 16:20, 17:6,
29:18, 37:14, 39:21,
50:25, 51:14, 52:1,
52:2, 52:3, 53:12,
82:16, 89:6, 127:21,
128:5, 129:10, 130:3,

131:10, 133:12, 133:21, 134:9, 136:8, 155:9, 167:13, 188:10, 191:3, 191:4

**uploaded** [39] - 15:25, 16:24, 22:20, 23:12, 31:11, 35:9, 35:21, 37:7, 37:24, 39:17, 39:19, 40:9, 40:16, 41:1, 41:4, 45:15, 45:20, 50:12, 51:8, 51:17, 53:13, 66:1, 71:8, 82:24, 89:5, 89:16, 89:17, 91:4, 123:8, 123:9, 124:4, 130:4, 146:5, 146:22, 147:21, 150:6, 156:1

**uploader** [5] - 21:8, 39:21, 82:22, 83:14, 106:20

**uploaders** [19] - 8:3, 8:8, 8:11, 8:16, 35:9, 35:10, 35:18, 36:21, 36:23, 45:13, 49:20, 49:24, 49:25, 51:22, 70:1, 82:12, 83:8, 131:10, 146:6

**uploading** [14] - 8:12, 36:23, 45:14, 45:21, 46:8, 51:23, 82:13, 107:14, 115:19, 133:23, 134:10, 136:5, 160:17, 181:13

**uploads** [7] - 18:5, 35:3, 37:14, 45:11, 143:10, 147:23, 167:18

**upper** [2] - 16:1, 101:22

**ups** [2] - 26:18, 28:8

**urge** [2] - 5:2, 182:3

**URL** [5] - 17:8, 89:5, 99:25, 100:1, 190:24

**URLs** [5] - 17:9, 88:14, 88:15, 99:4, 99:8

**usage** [1] - 141:4

**useful** [2] - 132:18, 170:3

**Usenet** [7] - 34:18, 111:19, 152:3, 158:3, 167:6, 174:1, 174:2

**user** [34] - 7:22, 8:20, 9:21, 19:3, 22:2, 26:21, 46:13, 56:8, 56:23, 71:23, 80:22, 84:2, 84:4, 84:7, 87:18, 87:19, 87:20,

87:23, 87:25, 88:1, 89:5, 89:7, 89:11, 89:14, 111:8, 131:18, 131:19, 135:5, 135:6, 136:19, 151:5, 155:14, 155:25

**user's** [2] - 8:17, 79:19

**users** [95] - 7:13, 7:23, 8:14, 8:22, 9:16, 10:20, 10:23, 10:24, 11:2, 11:8, 11:11, 18:20, 18:21, 20:6, 35:6, 36:8, 37:10, 43:24, 43:25, 44:3, 45:6, 45:9, 45:10, 46:8, 49:25, 50:1, 50:6, 50:7, 50:23, 53:7, 57:13, 57:14, 60:21, 64:5, 64:9, 66:9, 69:25, 70:15, 71:22, 76:8, 76:9, 79:7, 79:18, 80:16, 80:22, 81:3, 82:15, 84:24, 87:13, 87:14, 87:22, 89:15, 89:17, 108:20, 113:8, 113:14, 113:17, 113:25, 115:2, 115:10, 116:21, 117:9, 122:15, 126:3, 127:20, 128:5, 129:10, 131:18, 131:21, 131:23, 132:1, 133:2, 133:12, 133:21, 134:8, 135:1, 147:3, 147:9, 147:12, 155:9, 155:10, 155:12, 155:23, 156:1, 156:15, 156:16, 160:7, 162:17, 162:18, 167:13, 181:13

**uses** [30] - 10:12, 110:9, 111:2, 112:3, 112:4, 116:11, 116:20, 118:22, 119:4, 125:10, 125:14, 129:5, 129:6, 129:7, 129:22, 129:23, 159:12, 159:13, 159:21, 159:24, 160:2, 160:5, 160:11, 160:18, 161:6, 161:9, 161:12, 161:14, 161:24, 167:20

---

# V

**vacation** [2] - 194:13, 195:25

**vacuum** [1] - 28:1

**Valentin** [1] - 4:6

**VALENTIN** [1] - 2:9

**valid** [1] - 75:22

**Vampire** [1] - 16:23

**Vangelov** [8] - 39:10, 173:11, 174:20, 175:1, 175:4, 176:2, 186:20, 191:11

**variant** [1] - 131:1

**variety** [1] - 65:13

**various** [6] - 4:23, 24:23, 90:3, 120:13, 120:14, 171:12

**vast** [3] - 50:25, 179:10, 179:12

**vCloud9** [3] - 33:22, 40:20, 96:21

**vehemently** [1] - 154:20

**veil** [2] - 184:7, 184:9

**Ventura** [1] - 1:20

**Ventures** [1] - 44:7

**venue** [1] - 163:14

**Veoh** [6] - 15:2, 25:14, 33:1, 97:1, 132:11, 132:12

**versa** [1] - 73:25

**versus** [1] - 145:5

**Versus** [1] - 1:5

**veto** [1] - 173:17

**via** [1] - 172:10

**Viacom** [18] - 57:24, 77:6, 86:21, 88:8, 88:10, 88:11, 91:20, 93:10, 93:12, 93:17, 94:2, 96:25, 97:4, 97:6, 97:10, 97:12, 99:11, 179:7

**vicarious** [17] - 5:17, 58:20, 110:2, 110:11, 112:8, 112:12, 112:14, 114:3, 114:12, 114:16, 119:13, 119:18, 119:22, 158:21, 162:9, 166:9, 169:22

**Vicarious** [1] - 112:19

**vicariously** [2] - 178:24, 181:17

**vice** [1] - 73:25

**Vicious** [1] - 90:20

**video** [5] - 16:1, 52:3, 101:2, 160:10,

160:12

**videoed** [1] - 91:3

**videos** [5] - 16:22, 52:4, 90:23, 131:10, 133:22

**view** [4] - 83:11, 96:18, 149:6, 161:6

**viewed** [2] - 64:10, 91:2

**viewing** [2] - 64:15, 101:2

**vigorous** [1] - 153:24

**vigorously** [1] - 154:22

**violate** [6] - 70:9, 78:21, 79:12, 125:21, 125:22

**violates** [1] - 107:15

**violation** [2] - 12:7, 76:22

**virtually** [2] - 133:11, 186:11

**virtue** [1] - 177:20, 187:3

**visited** [1] - 87:25

**Vobile** [5] - 33:18, 33:19, 33:20, 33:23, 40:13

**VOLUME** [1] - 1:5

**volumes** [1] - 53:14

**vs** [6] - 3:4, 60:5, 61:19, 73:22, 79:16, 102:20

**vulnerable** [2] - 20:22, 89:21

---

# W

**wade** [1] - 68:1

**wait** [3] - 82:8, 83:2, 117:15

**waiting** [2] - 19:1, 82:25

**wakes** [1] - 47:5

**walk** [1] - 164:3

**wants** [6] - 18:7, 21:14, 24:13, 47:25, 125:18, 195:5

**warn** [2] - 84:2, 108:20

**warned** [2] - 57:13, 60:21

**Warner** [28] - 6:9, 16:25, 27:21, 30:18, 31:23, 34:9, 34:10, 34:11, 34:12, 42:15, 64:7, 66:22, 66:24, 67:11, 68:10, 74:10, 101:22, 106:15,

107:6, 107:9, 108:1, 108:2, 108:3, 108:6, 161:19

**warning** [1] - 56:8

**warranted** [1] - 109:18

**warring** [1] - 25:19

**Washington** [1] - 1:16

**water** [2] - 132:6, 150:11

**Waterman** [33] - 10:16, 14:21, 42:2, 121:4, 124:19, 124:21, 135:13, 141:1, 141:17, 141:24, 142:7, 143:6, 143:9, 143:15, 144:19, 144:25, 145:2, 145:3, 145:4, 145:11, 145:17, 145:23, 146:4, 146:24, 147:13, 148:1, 148:4, 150:11, 150:20, 151:12, 152:17

**Waterman's** [12] - 10:7, 10:11, 125:10, 141:11, 141:18, 142:18, 142:22, 145:9, 145:13, 147:4, 153:23

**ways** [9] - 48:2, 48:19, 51:11, 88:10, 121:25, 145:12, 164:15, 171:5, 186:8

**weaker** [1] - 151:19

**weary** [1] - 195:23

**web** [7] - 165:8, 180:16, 191:25, 192:20, 193:2, 193:4, 193:8

**Webazilla** [1] - 168:24

**website** [13] - 17:6, 18:18, 22:3, 68:25, 74:6, 79:1, 79:7, 79:11, 86:8, 172:12, 174:12, 188:4, 191:24

**websites** [8] - 9:6, 34:15, 46:20, 82:20, 135:2, 167:2

**week** [4] - 19:15, 21:12, 194:9, 194:13

**week-long** [1] - 194:13

**weeks** [5] - 63:4, 152:2, 160:14, 194:16, 194:17

**weigh** [1] - 71:18

**weight** [1] - 144:9
**Welcome** [1] - 131:15
**welcome** [1] - 117:16
**Westlaw** [2] - 158:8, 184:20
**wet** [2] - 132:6, 150:19
**Wharton** [1] - 150:11
**whereas** [1] - 99:6
**Whereas** [1] - 123:4
**whiz** [1] - 164:11
**whole** [17] - 33:2, 56:25, 103:4, 109:21, 117:8, 118:25, 128:10, 129:4, 131:16, 143:7, 150:10, 152:7, 155:4, 169:22, 177:14, 180:25, 182:19
**wholesale** [1] - 93:6
**wide** [1] - 46:3
**widely** [1] - 137:8
**wild** [1] - 89:9
**wildly** [1] - 149:4
**Wilkie** [1] - 1:23
**WILLIAMS** [1] - 1:9
**Wilson** [1] - 154:20
**winnowing** [1] - 105:22
**wish** [3] - 50:10, 194:5, 194:9
**wishes** [2] - 73:11, 73:12
**witnesses** [1] - 161:16
**WL** [1] - 76:25
**Wolk** [1] - 76:24
**WOLK** [1] - 76:24
**women** [1] - 141:6
**won** [1] - 77:3
**wonder** [2] - 54:25, 93:10
**wondered** [1] - 90:18
**wondering** [2] - 4:10, 86:14
**word** [3] - 73:18, 164:1, 187:2
**words** [9] - 17:23, 19:22, 97:23, 108:22, 124:24, 141:25, 151:7, 151:18, 162:25
**work-by-one** [1] - 93:5
**work-by-work** [1] - 99:17
**works** [47] - 7:23, 16:14, 37:16, 40:23, 40:25, 67:16, 81:18, 82:19, 88:18, 90:2,

90:4, 90:5, 90:6, 90:9, 90:20, 91:1, 92:21, 92:23, 93:13, 94:18, 99:1, 99:4, 99:9, 99:12, 101:1, 122:14, 122:21, 122:23, 122:24, 123:1, 123:7, 125:5, 127:21, 128:5, 128:6, 129:24, 130:3, 130:4, 132:9, 132:13, 133:5, 150:6, 150:8, 155:12, 175:8, 180:25
**Works** [1] - 84:23
**world** [18] - 17:20, 17:21, 28:15, 84:17, 90:8, 101:6, 125:4, 141:2, 147:11, 147:23, 149:4, 151:12, 151:14, 156:2, 157:24, 165:3, 165:7, 179:5
**World** [1] - 111:18
**world's** [1] - 147:10
**worse** [1] - 7:12
**worst** [3] - 46:25, 148:3, 162:25
**worth** [1] - 125:17
**Wow** [1] - 194:15
**wrap** [1] - 189:24
**wrecked** [1] - 28:16
**write** [4] - 70:8, 87:8, 128:14, 178:23
**writing** [5] - 62:17, 170:24, 179:4, 187:3, 194:21
**writings** [1] - 83:25
**written** [9] - 14:25, 69:8, 108:24, 148:21, 172:19, 172:21, 174:19, 180:23
**wrongdoers** [1] - 183:4
**wrongful** [2] - 68:12, 130:19
**wrongly** [3] - 5:13, 15:2
**wrote** [5] - 8:4, 66:23, 123:22, 170:22, 178:9

# Y 

**YEAH** [1] - 1:13
**year** [13] - 25:15, 33:9, 33:21, 40:20, 70:2, 72:14, 80:8, 102:8, 102:11, 103:6, 118:16, 141:15, 142:23

**years** [9] - 9:1, 9:5, 15:1, 48:13, 101:20, 123:3, 148:11, 167:10, 175:1
**YEH** [1] - 3:17
**Yeh** [10] - 3:17, 38:14, 54:25, 55:7, 56:10, 56:13, 56:14, 56:20, 62:3, 138:5
**York** [5] - 1:15, 18:18, 18:19, 76:25, 111:19
**you's** [1] - 108:9
**yourself** [7] - 92:15, 124:7, 141:1, 141:2, 149:23, 171:3, 183:2
**YouTube** [14] - 9:10, 15:2, 25:5, 65:1, 76:18, 77:13, 77:19, 77:21, 77:22, 91:23, 92:24, 94:1, 94:12, 97:25

# Z

**Zebrak** [5] - 14:23, 120:11, 120:12, 137:6, 161:17
**Zebrak's** [1] - 14:25
**zero** [4] - 144:24, 145:19, 145:22, 156:10