**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA**

**MIAMI DIVISION**

**CASE NO. 1:11-cv-20427 WILLIAMS/TURNOFF**

DISNEY ENTERPRISES, INC.,
TWENTIETH CENTURY FOX FILM CORPORATION,
UNIVERSAL CITY STUDIOS PRODUCTIONS LLLP,
COLUMBIA PICTURES INDUSTRIES, INC., and
WARNER BROS. ENTERTAINMENT INC.,

*Plaintiffs,*

v.

HOTFILE CORP., ANTON TITOV, and
DOES 1-10,

*Defendants.*
_____/

HOTFILE CORP.,

*Counterclaimant,*

v.

WARNER BROS. ENTERTAINMENT INC.,

*Counterdefendant.*
_____/


**BRIEF OF AMICUS CURIAE ELECTRONIC FRONTIER FOUNDATION IN
SUPPORT OF HOTFILE'S OPPOSITION TO SUMMARY JUDGMENT ON ITS
COUNTERCLAIM**

## TABLE OF CONTENTS

INTRODUCTION ...................................................................................................................1

ARGUMENT..........................................................................................................................1

    I.     Interest of Amicus ...........................................................................................1

    II.    Section 512(f) Cannot Be Reconciled With Automated Takedowns......................2

        A.     Section 512(f) Is An Essential Part of the DMCA's Statutory Scheme ......2

        B.     DMCA Takedown Abuse Is a Serious Problem for Online Free Speech..........................................................................................................4

        C.     An Automated System Cannot Provide A Sufficient Basis for a Good Faith Belief That Material Is Infringing .....................................................5

        D.     Section 512(f) Liability Does Not Require a Deliberate Lie.......................9

    III.   The Counter-notice Procedure of Section 512(g) Does Not Obviate the Need for Section 512(f) Deterrence........................................................................10

CONCLUSION ....................................................................................................................12

## TABLE OF AUTHORITIES

### Federal Cases

*Am. Can Co. v. Mansukhani,*
   742 F.2d 314 (7th Cir.1984) ................................................................................4

*Batzel v. Smith,*
   333 F.3d 1018 (9th Cir. 2003) .............................................................................3

*Campbell v. Acuff-Rose Music, Inc.,*
   510 U.S. 569 (1994) ..........................................................................................11

*Design Furnishings, Inc. v. Zen Path, LLC,*
   No. CIV. 2:10-CV-2765-WB, 2010 WL 5418893 (E.D. Cal. Dec. 23, 2010) .................11

*Dudnikov v. MGA Entm't, Inc.,*
   410 F. Supp. 2d 1010 (D. Colo. 2005) ...............................................................6, 7

*Epic Games, Inc. v. Altmeyer,*
   08-CV-0764-MJR, 2008 WL 4853634 (S.D. Ill. Nov. 5, 2008) .........................3, 4

*Harte-Hanks Commc'ns, Inc. v. Connaughton,*
   491 U.S. 657 (1989) ............................................................................................9

*Hunt v. Liberty Lobby,*
   720 F.2d 631 (11th Cir 1983) ............................................................................10

*In re Aimster Copyright Litig.,*
   334 F.3d 643 (7th Cir. 2003) ...............................................................................9

*In re Barboza,*
   545 F.3d 702 (9th Cir. 2008) ...............................................................................9

*Lenz v. Universal Music Corp.,*
   572 F. Supp. 2d 1150 (N.D. Cal. 2008) ...........................................................7, 11

*New York Times Co. v. Sullivan,*
   376 U.S. 254 (1964) ............................................................................................9

*Peer Int'l v. Pausa Records,*
   909 F.2d 1332 (9th Cir. 1990) .............................................................................9

*Perfect 10 v. CCBill,*
   488 F.3d 1102 (9th Cir. 2007) .........................................................................3, 7

*Rossi v. Motion Picture Ass'n of Am. Inc.*,
    391 F.3d 1000 (9th Cir. 2004) .................................................................5, 6, 7

*Shropshire v. Canning*,
    809 F. Supp. 2d 1139 (N.D. Cal. 2011)...........................................................7

*Smith v. Summit Entm't LLC*,
    2011 WL 2200599 (N.D. Ohio June 6, 2011) ..................................................8

*St. Amant v. Thompson*,
    390 U.S. 727 (1968) .........................................................................................9

*U.S. v. Real Prop. at 2659 Roundhill Dr., Alamo, Cal.*,
    194 F.3d 1020 (9th Cir. 1999) .........................................................................9

## Federal Statute

17 U.S.C. § 512 ..................................................................................................*passim*

## Federal Rule

Federal Rule of Civil Procedure 65 ......................................................................3

## Legislative Material

Sen. Rep. No. 105-190...........................................................................................3

## Other Authorities

3 Melville B. Nimmer & David Nimmer, *Nimmer on Copyright* (1989)......................................9

*Black's Law Dictionary* (7th ed.1999) ..........................................................................6

Jennifer Urban & Laura Quilter, *Efficient Process or "Chilling Effects"? Takedown Notices under Section 512 of the Digital Millennium Copyright Act*,
    22 Santa Clara Computer & High Tech. L.J. 621, 651 (2006) ....................................5

Wendy Seltzer, *Free Speech Unmoored in Copyright's Safe Harbor: Chilling Effects of the DMCA on the First Amendment*, 24 Harv. J.L. & Tech. 171 (2010) ..........................................4

## INTRODUCTION

Amicus curiae Electronic Frontier Foundation (EFF) files this brief because Hotfile's counterclaim raises an issues of crucial importance to Internet users: whether the Digital Millennium Copyright Act authorizes copyright owners to send takedown notices based on the conclusions of a computer program.

Much of the record in this case is under seal. Nonetheless, the crucial facts do not seem to be in dispute. Warner sent notices pursuant to Section 512(c), which requires both a "statement that the complaining party has a good faith belief that use of the material in the manner complained of is not authorized by the copyright owner, its agent, or the law," and a "statement that the information in the notification is accurate." 17 U.S.C. § 512(c)(3)(A)(v & vi). In many instances, these statements were incorrect. Warner knew its system would result in false positives, but sent the notices anyway.

Warner claims that these were simple "mistakes," and that it cannot be held accountable for its misrepresentations because, in essence, its system design does not allow for a deliberate lie. Warner gets it exactly backwards: the problem is that it does not appear that its system could have provided a sufficient basis for Warner to form the requisite good faith belief.

Warner's theories run contrary to well-established judicial authority, clear congressional intent, and the public interest. If accepted, they could render Section 512(f) a virtual dead letter and encourage the abuse of the "notice and takedown" process that already interferes with the legitimate uses of Internet sites that store user-uploaded materials.

EFF urges the Court to firmly reject Warner's strained analyses and hold it accountable for its improper takedowns.

## ARGUMENT

### I.    Interest of Amicus

The Electronic Frontier Foundation (EFF) is a nonprofit civil liberties organization that has worked for more than 20 years to protect consumer interests, innovation, and free expression in the digital world. EFF and its members have a strong interest in assisting the courts and

policymakers to help ensure that copyright law balances the interests of creators, innovators and the general public.

EFF represents the interests of Internet users, who are not directly represented in disputes such as this one between Internet-based businesses and copyright owners. EFF has particular interest in the rule of law at issue in Hotfile's counterclaim, Section 512(f) of the Digital Millennium Copyright Act of 1998, 17 U.S.C. § 512(f). EFF has represented numerous plaintiffs in Section 512(f) cases. *See e.g., Sapient v. Uri Geller and Explorologist Ltd.,* 3:07-cv-02478 VRW (N.D. Cal.); *Showing Animals Respect and Kindness v. Professional Rodeo Cowboys Ass'n,* 1:08-cv-03314 (N.D. Ill). In particular, it represents Stephanie Lenz in *Lenz v. Universal Music Corp.,* 5:07-cv-03783 JF (N.D. Cal.). A central issue in that case, as in this one, is whether the defendant formed the requisite good faith belief that material on a website was not authorized by law before sending a takedown notice under the Digital Millennium Copyright Act.

## II.    Section 512(f) Cannot Be Reconciled With Automated Takedowns

Warner's defense appears to be based on two fundamentally flawed premises: (1) that Section 512(f) countenances automated takedowns because while the operator of the system knows there will be errors, by design it can never know, in advance, *which* notices will be erroneous; and (2) that Section 512(f) liability cannot attach absent a showing of deliberate, intentional falsehood. As explained below, Warner could not be more wrong. In fact, Warner's approach would render Section 512(f) a virtual nullity, contrary to clear judicial authority and legislative intent.

### A.    <u>Section 512(f) Is An Essential Part of the DMCA's Statutory Scheme</u>

When Congress took up the issue of online copyright infringement in the mid-1990s, it sought to resolve a difficult challenge:  How to allow copyright owners to quickly and efficiently police online infringement without impairing lawful uses of copyrighted works.  Its answer was Section 512's expedited "notice and takedown" provisions, which gave copyright owners new tools to cause service providers to expeditiously take down infringing content without advance judicial review.

To ensure that expedited process was not abused, Congress also included an important and powerful deterrent, Section 512(f), that allows lawful users of copyrighted works to hold copyright owners accountable if they send a takedown notice in bad faith.  As the Senate Report on Section 512(f) explained,

> The Committee was acutely concerned that it provide all end-users . . . with appropriate procedural protections to ensure that material is not disabled without proper justification.  The provisions in the bill balance the need for rapid response to potential infringement with the end-users legitimate interests in not having material re-moved without recourse.

Sen. Rep. No. 105-190 at 21 (1998).

Numerous courts have recognized the harm to free speech that could be caused by indiscriminate takedowns under Section 512, and the importance of mitigating that harm by requiring copyright owners to take the notice requirements seriously.  Admonishing one copyright owners for its failure to send compliant notice, for example, the Ninth Circuit Court of Appeals noted:

> The DMCA requires a complainant to declare, under penalty of perjury, that he is authorized to represent the copyright holder, and that he has a good-faith belief that the use is infringing. This requirement is not superfluous. Accusations of alleged infringement have drastic consequences: A user could have content removed, or may have his access terminated entirely. If the content infringes, justice has been done. But if it does not, speech protected under the First Amendment could be removed. We therefore do not require a service provider to start potentially invasive proceedings if the complainant is unwilling to state under penalty of perjury that he is an authorized representative of the copyright owner, and that he has a good-faith belief that the material is unlicensed.

*Perfect 10 v. CCBill*, 488 F.3d 1102, 1112 (9th Cir. 2007). Thus, Section 512(f) was crucial to accomplishing the DMCA's goal of  "carefully balanc[ing] the First Amendment rights of users with the rights of a potentially injured copyright holder."  *Batzel v. Smith,* 333 F.3d 1018, 1031 n.19 (9th Cir. 2003) (dictum).

By way of comparison, consider the procedure copyright owners might have used before the DMCA was enacted: a temporary restraining order under Federal Rule of Civil Procedure 65(b).  *Epic Games, Inc. v. Altmeyer*, 08-CV-0764-MJR, 2008 WL 4853634, at *3 (S.D. Ill. Nov. 5, 2008).  A TRO granted before the opposing party has an opportunity to be heard is

subject to "stringent restrictions," acknowledging that "our entire jurisprudence runs counter to the notion of court action taken before reasonable notice and an opportunity to be heard has been granted both sides of a dispute.  *Id.* at *5 (quoting *Am. Can Co. v. Mansukhani,* 742 F.2d 314, 321 (7th Cir.1984)).

Like a TRO, takedowns under Section 512(c) can result in expressive material being taken down from the Internet sites through which they are communicated, without prior notice to the person who posted the material or a prior opportunity to contest the removal.  Unlike a TRO, removal can occur, and is indeed expected to occur, without any prior judicial scrutiny.  In the statutory scheme of the DMCA, the availability of actions for knowing misrepresentation under Section 512(f) help compensate for the lack of prior judicial approval to protect the "end-users legitimate interests" recognized by Congress.

### B.   DMCA Takedown Abuse Is a Serious Problem for Online Free Speech

Since 1998, it has become abundantly clear that Congress's concerns were not misplaced. Attacks on free speech through Section 512 misuse are well-documented.[1]  To offer just one of many examples, in 2003 the Recording Industry Association of America sent a takedown notice to Penn State University because it decided that an mp3 file of an astrophysicist named Peter Usher singing to a satellite might infringe copyrighted works by R&B star Usher.[2]  Indeed, an academic study of the Chilling Effects database of takedown notices found numerous abuses,

---

[1] *See e.g., Landmark Education*, at http://www.eff.org/cases/landmark-and-internet-archive (last visited March 3, 2012) (controversial education foundation sent DMCA takedown against critical six-hour documentary that showed two pages of its manual for a few seconds); *Sapient v. Geller, supra*; *Malkin v. Universal* at https://www.eff.org/deeplinks/2007/05/malkin-fights-back-against-copyright-law-misuse-universal-music-group (last visited March 3, 2012) (Universal sent DMCA notice for criticism of Akon using short clips of videos for purposes of criticism); *Diehl v. Crook* at https://www.eff.org/cases/diehl-v-crook (Last visited March 3, 2012) (interviewee sent DMCA takedown notice claiming copyright in Fox News' broadcast of interview).  *See generally* Wendy Seltzer, *Free Speech Unmoored in Copyright's Safe Harbor: Chilling Effects of the DMCA on the First Amendment*, 24 Harv. J.L. & Tech. 171 (2010) (documenting use of DMCA takedown process to chill protected speech).
[2] *See* Declan McCullach, *RIAA Apologizes for threatening letter,* CNET, May 12, 2003, available at http://news.cnet.com/2100-1025_3-1001095.html.

including that over half of the takedowns sent to Google were by apparent competitors. *See* Jennifer Urban & Laura Quilter, *Efficient Process or "Chilling Effects"? Takedown Notices under Section 512 of the Digital Millennium Copyright Act*, 22 Santa Clara Computer & High Tech. L.J. 621, 651 (2006). Google has stated that over 37% of the DMCA takedown notices it receives are invalid.[3]

All too often, the source of the problem is an automated (or semi-automated) takedown process. For example, two bloggers recently discovered that posts they had written (ironically, regarding copyright issues) had been removed from Google search results as a result of improper DMCA notices generated by an automated program.[4] A ruling that automated takedown systems are immune from Section 512(f) would open the door for further abuse.

Improper takedown notices are already a serious problem for online speech. Without the restraints Congress mandated in Section 512(f), this problem will only get worse.

### C.   An Automated System Cannot Provide A Sufficient Basis for a Good Faith Belief That Material Is Infringing

Warner concedes that it knew that it was issuing takedown requests for files that did *not* contain any infringing copies of Warner's works. Warner Br. at 10. Nevertheless, it asks the court to excuse the improper takedowns as simple "errors" and "mistakes," relying particularly on *Rossi v. Motion Picture Ass'n of Am. Inc.*, 391 F.3d 1000 (9th Cir. 2004).

Warner's reliance is misplaced: *Rossi* specifically *distinguished* automated systems. *Id.*

---

[3] T. Gibbons, *Google Submission Hammer Section 92A*, PC World, Mar. 16 2009, available at http://pcworld.co.nz/pcworld/pcw.nsf/feature/93FEDCEF6636CF90CC25757A0072B4B7. As it happens, Warner itself has a sorry track record when it comes to overbroad takedowns. In 2009, it was widely criticized for using YouTube's "Content I.D." system to block thousands of videos at once, including clear fair uses. *See* Fred von Lohmann, *YouTube's January Fair Use Massacre*,  (Feb. 3, 2009), available at https://www.eff.org/deeplinks/2009/01/youtubes-january-fair-use-massacre.

[4] *See* Drew Wilson, TorrentFreak, TechDirt Reinstated, Armovore Apologizes, Zeropaid, Feb 28, 2012, available at http://www.zeropaid.com/news/99310/torrentfreak-techdirt-reinstated-armovore-apologizes/.

at 1005 n.7. In fact, the MPAA's review process, while imperfect, was significantly more rigorous than Warner's appears to be. In that case, the plaintiff's website contained statements such as "Full Length Downloadable Movies" and "Join to download full length movies online." *Id*. at 1002. An employee of the Motion Picture Association of America reviewed the site, and erroneously concluded that "motion pictures owned by MPAA members were available for immediate downloading," and issued a takedown notice to the plaintiff's ISP.[5] *Id*. at 1005.

The court held that Section 512(c) and (f), read together, created a subjective good faith test that adopted the "subjective standard traditionally associated with a good faith requirement." *Id*. at 1004. The court defined good faith as "'[a] state of mind consisting [of] ... honesty in belief or purpose.' *Black's Law Dictionary*, 701 (7th ed.1999)." *Id*. at 1004 n.5. The Court concluded that while the MPAA had made a mistake, it had still done enough to form a good faith belief in infringement because the text pervading the site "not only suggests that conclusion, but virtually compels it." *Id*. On that basis, the Court ruled that the MPAA did not make a knowing misrepresentation. *Id*. at 1005-06.

Under *Rossi*, an automated conclusion that a given file might possibly infringe a given owner's content, without more, would still fall well short of what was needed to form a good faith belief that the targeted material infringed the sender's copyrights. *Id*. Indeed, the Ninth Circuit's conclusion was based, in part, on an examination of "the information residing on Rossi's website, and MPAA's actions in response to the discovery of that information." *Id*. at 1005. If Warner were right, there would have been no need for the Court to review that evidence.

Likewise, in *Dudnikov v. MGA Entm't, Inc.*, 410 F. Supp. 2d 1010 (D. Colo. 2005), the court found that "MGA was required to show that it had a sufficient basis to form the required good faith belief that the Plaintiffs' auction infringed on its rights, and that its actions therefore

---

[5] In *Rossi*, the MPAA used the "Ranger" automated computer "program to initially identify potentially infringing websites [however,] the MPAA employs three to four employees who actually review the identified sites. It is these employees, rather than 'Ranger,' who ultimately decide whether a website contains infringing material." *Rossi*, 391 F.3d at 1005 n.7.

complied with the notice and takedown requirements under the DMCA." *Id*. at 1013.

Thus, *Rossi* (and every other Section 512(f) decision of which EFF is aware) is clear that while mistaken conclusions won't always lead to Section 512(f) liability, a party must still do what is necessary to form the requisite good faith belief that material is infringing. *Id. See also, e.g., Perfect 10*, 488 F.3d at 1112. An automated process, particularly one known to result in errors, cannot suffice.

Relevant persuasive authority can also be found in one of the leading Section 512(f) decisions interpreting *Rossi*, *Lenz v. Universal Music Corp.,* 572 F. Supp. 2d 1150 (N.D. Cal. 2008). In that case, Judge Jeremy Fogel firmly rejected the defendants' claim that they were not required to even consider whether a given video was authorized by the fair use doctrine. Noting that the DMCA "requires copyright owners to make an initial review of the potentially infringing material prior to sending a takedown notice . . . ." *id.* at 1155, Judge Fogel concluded that part of that review must be a consideration of whether the material in question is sheltered by the fair use doctrine:

> An allegation that a copyright owner acted in bad faith by issuing a takedown notice without proper consideration of the fair use doctrine thus is sufficient to state a misrepresentation claim pursuant to Section 512(f) of the DMCA.

*Id*.; *accord Shropshire v. Canning*, 809 F. Supp. 2d 1139, 1148 n.3 (N.D. Cal. 2011) ("in order . . . to proceed under the DMCA . . . , the [copyright] owner must evaluate whether the material makes fair use of the copyright." (quoting *Lenz*, 809 F. Supp. 2d at 1154)).

On the public facts, Warner could not have considered fair use—or license, or any other legal protections—because it based its takedowns on the results of a computer algorithm. Indeed, it appears that this algorithm only considered the title of the work—necessarily meaning that no good faith belief could have been formed about the lawfulness of the work's content. Moreover, while a human may well be able to recognize a fair use quickly and easily, we are aware of no computer program that can adequately provide that service.[6] Accordingly, if Warner

---

[6] This is not to say that computers have no role to play. Certainly an automated computer

is following a common industry practice, Br. at 10, that practice flatly contradicts existing precedent.

That precedent includes *Smith v. Summit Entm't LLC*, in which the defendant movie studio sent takedown notices based on nothing more than the words of a title, just as Warner admits to doing in this case. 2011 WL 2200599, at *1 (N.D. Ohio June 6, 2011). The plaintiff, a recording artist, distributed his music on Youtube.com and other websites with cover art that included the words "inspired by the twilight saga," referencing a book series that was made into films distributed by the defendant. The court found, on the allegations of the complaint, that the studio's claim of copyright infringement was made in bad faith, where it was based only on the use of the words "twilight saga," with no evidence or suggestion of any copying of copyrighted material. *Id.* at *3.

Indeed, if Warner were correct, which it is not, Section 512(f) would become largely superfluous. Any company could sidestep accountability for improper takedowns by simply outsourcing the process to a computer. What is worse, copyright owners would have a perverse incentive to dumb-down the process, removing human review so as to avoid the possibility of any form of subjective belief. The tragic consequences for lawful uses are obvious: untold numbers of legal videos would be taken down, whether or not the uses were fair or even licensed.

Imagine the potential for mischief: Let's say that Warner does not like competition from Universal. It could set a computer to search through Universal's online presence, with the loosest possible settings, and issue takedown after takedown to Universal's ISP for spurious claims. Nor is this scenario far-fetched: as noted above, *supra* at 4-5, anticompetitive uses of the DMCA takedown process are commonplace.

---

review could provide Warner with a list of files that contained possible matches, providing trained human reviewers with a more efficient and cost effective process to establish the requisite good faith belief.

**D.      Section 512(f) Liability Does Not Require a Deliberate Lie**

After sending takedown notices without acquiring a good faith belief, Warner seeks

escape liability by asking this Court to heighten the standard for Section 512(f) liability to an

intentional, "deliberate falsehood."  Br. at 9.  In effect, Warner argues that it can arrange to be

willfully blind to its improper takedowns, without consequence.

Again, Warner is wrong.  Under the DMCA, as with any other body of law,[7] proof of

willful blindness and reckless disregard suffice to establish knowledge.  "Willful blindness is

knowledge, in copyright law . . . as it is in the law generally."  *In re Aimster Copyright Litig.*,

334 F.3d 643, 650 (7th Cir. 2003).  For example, to prove willful infringement, a plaintiff must

show that the infringer acted "with knowledge that [its] conduct constitutes copyright

infringement."  *See Peer Int'l v. Pausa Records*, 909 F.2d 1332, 1335 n.3 (9th Cir. 1990)

(quoting 3 Melville B. Nimmer & David Nimmer, *Nimmer on Copyright* § 1404[B], at 14-40.2-

.3 (1989)).  Willfulness can be based "on either 'intentional' behavior, or merely 'reckless'

behavior."  *In re Barboza*, 545 F.3d 702, 707-08 (9th Cir. 2008) (collecting cases from multiple

circuits).

Even under what may well be the most rigorous knowledge standard in U.S. law, the

"actual malice" standard applicable to defamation claims against public figures, *New York Times

Co. v. Sullivan*, 376 U.S. 254, 280 (1964), knowledge may be inferred from circumstance.  *See

St. Amant v. Thompson*, 390 U.S. 727, 732 (1968) ("recklessness may be found where there are

obvious reasons to doubt the veracity of the informant or the accuracy of his reports"). Thus, for

example, "the purposeful avoidance of the truth" can establish actual malice.  *See Harte-Hanks

Commc'ns, Inc. v. Connaughton*, 491 U.S. 657, 692 (1989) (jury finding that "it is likely that the

newspaper's inaction was a product of a deliberate decision not to acquire knowledge of facts

that might confirm the probable falsity" of facts in its story supports a finding of actual malice).

---

[7] *See, e.g.*, *U.S. v. Real Prop. at 2659 Roundhill Dr., Alamo, Cal.,* 194 F.3d 1020, 1028 (9th Cir. 1999) ("An owner cannot deliberately avoid actual knowledge through 'willful blindness'").

In a similar vein, the Eleventh Circuit Court of Appeals has held that malice may be shown by evidence of a grossly inadequate investigation. *Hunt v. Liberty Lobby,* 720 F.2d 631, 643-44 (11th Cir 1983) ("evidence which shows that the statement was inherently implausible or that there were obvious reasons to doubt the veracity of the informant is relevant to establishing actual malice." (citing cases)).

These lines of authority recognize the injustice of absolving malfeasors who took steps to avoid gaining actual knowledge of their improper acts, as Warner did in implementing a system it admits "is bound to produce some errors." Warner Br. at 10. Such injustice would be particularly improper here, given that a central purpose of Section 512, including Section 512(f), was to facilitate the growth of the Internet as a platform for free speech. If a defendant can establish subjective good faith through willful blindness to law or fact, this would eviscerate the protections Congress created in Section 512(f).

Warner apparently chose to be deliberately indifferent to whether its DMCA takedown notices would include misrepresentations. The Court should not permit it to avoid the consequences of that choice.

**III.     The Counter-notice Procedure of Section 512(g) Does Not Obviate the Need for Section 512(f) Deterrence.**

Section 512 contains another provision that protects those who post material: the "notice and put-back" procedure of Section 512(g). Under that provision, a user whose content has been removed pursuant to a takedown notice can declare under penalty of perjury that the material is non-infringing, and consent to the jurisdiction of an appropriate court, whereupon the online service provider must restore the content to preserve its immunity from liability from a suit by that user. However, the availability of the put-back procedure does not diminish the purpose and importance of Section 512(f) as an effective deterrent to overbroad takedowns, for at least three reasons.

First, users who post non-infringing materials that are taken down may not be aware of their ability to send a counter-notice, and/or may be afraid to exercise that right. Individuals may

not understand their rights under copyright law, such as the right to use copyrighted works for purposes of parody, *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569 (1994), or for personal back-up.  Moreover, no matter how confident the user is that her material is lawful, if she *does* know something about copyright law she may be afraid to counter-notice give the significant downside risk of statutory damages if a court disagrees. Further, some users may be concerned about giving identifying information to the sender of the takedown notice.

Second, user-posted material can be time-critical, such as videos that comment on political debates or other current events,[8] or sales listings for which removal means lost sales. *See, e.g., Design Furnishings, Inc. v. Zen Path, LLC,* No. CIV. 2:10-CV-2765-WB, 2010 WL 5418893, at *7 (E.D. Cal. Dec. 23, 2010); *see also Lenz*, 572 F. Supp. 2d at 1156 ("the unnecessary removal of non-infringing material causes significant injury to the public where time-sensitive or controversial subjects are involved and the counter-notification remedy does not sufficiently address these harms.")*.*  Even if the user counter-notices, lawful non-infringing materials may not be restored for many days, diminishing their relevance, purpose, and/or commercial value.  *See* 17 U.S.C. § 512(g) (restoration need not occur until ten days after a counter-notice is received).

Finally, because Section 512 requires service providers to have a repeat infringer policy that provides for terminating accounts of repeat infringers in appropriate circumstances, repeated takedowns can also lead to termination of a user's account*. See e.g., Design Furnishings,* 2010 WL 5418893, at *7 (granting injunction barring further DMCA takedown notices and finding likelihood of success as to Section 512(f) claim). In 2008, for example, a non-profit organization that videotapes and photographs rodeos in order to expose animal abuse, had its YouTube account terminated as a result of multiple takedown notices sent by the Professional Rodeo

---

[8] *See e.g. NPR Forces Takedown of Political Ad Weeks Before Critical Vote*, https://www.eff.org/takedowns/npr-forces-takedown-political-ad-weeks-critical-vote; *see also* Corynne McSherry, *Olympic Committee Takedown Shows Risks of Ill-timed Takedowns,* https://www.eff.org/deeplinks/2008/08/olympic-committee-takedown-shows-risks-ill-timed-t.

Cowboys Association (PRCA). Those notices were utterly baseless, as the PRCA cannot claim copyright in live rodeo events filmed by other.[9]

Thus, the counter-notice procedure alone is not enough to protect lawful online speech. Congress intended Section 512(f) to impose a meaningful deterrent, ensuring that copyright holders have the requisite good faith basis *before* initiating an extra-judicial process that would potentially take protected expression offline.

## CONCLUSION

Warner's automated dragnet technique, done with admitted knowledge that it would inevitably cause a substantial amount of lawful content to disappear from Hotfile, resulted in numerous takedowns that were not based on a good faith belief that the identified files infringed its copyrights. Warner should not be permitted to escape Section 512(f) liability through willful blindness. EFF urges the Court to deny Warner's motion.

Dated: March 5, 2012                    ELECTRONIC FRONTIER FOUNDATION

                                        /s/ Dineen Pashoukos Wasylik
                                        DINEEN PASHOUKOS WASYLIK
                                        Florida State Bar No. 191620
                                        CONWELL KIRKPATRICK, PA
                                        2701 N. Rocky Point Drive
                                        Suite 1030
                                        Tampa, Florida 33607
                                        Telephone: 813-282-8000
                                        Facsimile: 813-282-8800
                                        *dwasylik@ckbusinesslaw.com*

                                        MITCHELL L. STOLTZ (*pro hac vice pending*)
                                        *mitch@eff.org*
                                        KURT OPSAHL
                                        *kurt@eff.org*
                                        CORYNNE MCSHERRY
                                        *corynne@eff.org*
                                        ELECTRONIC FRONTIER FOUNDATION
                                        454 Shotwell Street

---

[9] *See SHARK v. PRCA,* https://www.eff.org/cases/shark-v-prca.

San Francisco, CA 94110
Telephone: (415) 436-9333
Facsimile: (415) 436-9993

Attorneys for Amicus Curiae

# CERTIFICATE OF SERVICE

### *Disney Enterprises, Inc., et al. v. Hotfile Corp. et al.*
### Case No.: 1:11-cv-20427-KMW (Williams/Turnoff)

I HEREBY CERTIFY that a true and correct copy of the foregoing BRIEF OF AMICUS CURIAE ELECTRONIC FRONTIER FOUNDATION IN SUPPORT OF HOTFILE'S OPPOSITION TO SUMMARY JUDGMENT ON ITS COUNTERCLAIM was served by the Court's ECF system on March 5, 2012, on all counsel or parties of record on the service list.

Dated: March 5, 2012

/s/ Dineen Pashoukos Wasylik
DINEEN PASHOUKOS WASYLIK

*Disney Enterprises, Inc., et al. v. Hotfile Corp. et al.*
**Case No.: 1:11-cv-20427-KMW (Williams/Turnoff)**

## SERVICE LIST

Steven B. Fabrizio
Duane C. Pozza
Jennifer V. Yeh
Luke C. Platzer
JENNER & BLOCK
1099 New York Avenue, N.W., Suite 900
Washington, DC  10022
202-639-6094
Email: sfabrizio@jenner.com
Email: dpozza@jenner.com
Email: jyeh@jenner.com
Email: lplatzer@jenner.com

Karen R. Thorland
Senior Content Protection Counsel
MOTION PICTURE ASSOCIATION OF
AMERICA, INC.
15301 Ventura Boulevard, Building E
Sherman Oaks, CA  91403
818-935-5812
Email: Karen_Thorland@mpaa.org

Karen Linda Stetson
GRAYROBINSON P.A.
1221 Brickell Avenue, Suite 1650
Miami, FL 33131
305-416-6880
Fax: 305-416-6887
Email: karen.stetson@gray-robinson.com

Attorneys for Plaintiffs/Counter-Defendants
Disney Enterprises, Inc.,
20th Century Fox Film Corporation,
Universal City Studios Productions,
Columbia Pictures Industries, Inc., and
Warner Brothers Entertainment, Inc.

Anthony P. Schoenberg
Deepak Gupta
Janel Thamkul
N. Andrew Leibnitz
Roderick M. Thompson
FARELLA BRAUN & MARTEL, LLP
235 Montgomery Street, 17th Floor
San Francisco, CA 94104
415-954-4400
Email: tschoenberg@fbm.com
Email: dgupta@fbm.com
Email: jthamkul@fbm.com
Email: aleibnitz@fbm.com
Email: rthompson@fbm.com

Janet T. Munn
RASCO KLOCK REININGER PEREZ
ESQUENAZI VIGIL & NIETO
283 Catalonia Avenue, Suite 200
Coral Gables, FL 33134
305-476-7101
Fax: 305-476-7102
Email: jmunn@rascoklock.com

Valentin Gurvits
BOSTON LAW GROUP, PC
825 Beacon Street, Suite 20
Newton Centre, MA 02459
617-928-1804
Email: vgurvits@bostonlawgroup.com

Attorneys for Defendants/Counter-
Claimants
Hotfile Corp., Anton Titov, Does 1-10, and
Lemuria Communications, Inc.