UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 11-20427-WILLIAMS/TURNOFF

DISNEY ENTERPRISES, INC.,
TWENTIETH CENTURY FOX FILM CORPORATION,
UNIVERSAL CITY STUDIOS PRODUCTIONS LLLP,
COLUMBIA PICTURES INDUSTRIES, INC., and
WARNER BROS. ENTERTAINMENT INC.,

*Plaintiffs*,

v.

HOTFILE CORP., ANTON TITOV, and
DOES 1-10.

  *Defendants*.
_____/

HOTFILE CORP.,

*Counterclaimant*,

v.

WARNER BROS. ENTERTAINMENT INC.,

*Counterdefendant*.
_____/

**RESPONSE OF WARNER BROS. ENTERTAINMENT INC. TO THE
*AMICUS CURIAE* BRIEF OF ELECTRONIC FRONTIER FOUNDATION**

**CITATION LEGEND**

For the purposes of Warner Bros. Entertainment Inc.'s Response to the *Amicus Curiae* Brief of Electronic Frontier Foundation, the following abbreviations shall be used:

1. "Kaplan Decl." shall refer to the declaration of David Kaplan, the Senior Vice President, Intellectual Property Counsel, Worldwide Antipiracy Operations of Plaintiff and Counterdefendant Warner Bros. Entertainment Inc. ("Warner"), dated February 8, 2012, filed on February 10, 2012 in support of Warner's Motion for Summary Judgment (available publicly at Dkt. #308).

2. "WB Br." shall refer to Warner's Motion for Summary Judgment and Memorandum of Law in Support of Motion for Summary Judgment, filed on February 10, 2012 (available publicly at Dkt. #301).

3. "WB Reply Br." shall refer to the Reply Memorandum of Law in Support of Warner's Motion for Summary Judgment, filed on March 12, 2012 (available publicly at Dkt. #409).

4. "WB SUF" shall refer to specific paragraph numbers of uncontroverted facts in Warner's Statement of Uncontroverted Facts in Support of Motion for Summary Judgment, filed on February 10, 2012 in support of Warner's Motion for Summary Judgment (available publicly at Dkt. #302).

5. "Yeh Ex. __," shall refer to exhibits attached to the Declaration of Jennifer V. Yeh in Support of Warner's Motion for Summary Judgment, dated February 9, 2012, filed on February 10, 2012 in support of Warner's Motion for Summary Judgment (available publicly at Dkt. #301-9), and, if appropriate, pinpoint citations to the page number(s), and paragraph or line numbers, internal to the cited document.

## **TABLE OF CONTENTS**

CITATION LEGEND ..................................................................................................................... i

TABLE OF AUTHORITIES ........................................................................................................ iii

ARGUMENT .................................................................................................................................. 1

I. EFF SEEKS TO CIRCUMVENT THE PLAIN LANGUAGE OF § 512(f) AS CONSISTENTLY INTERPRETED BY COURTS. ............................................................ 1

    A. Section 512(f) Is Inconsistent With a Prohibition on Automated Antipiracy Systems. ........................................................................................ 2

    B. EFF Argues for a Different Standard and Burden of Proof. ..................................... 5

    C. Interpreting § 512(f) as Written Does Not Have the Policy Consequences EFF Fears. ............................................................................................ 5

II. HUMAN REVIEW IS NOT NECESSARILY MORE ACCURATE THAN AUTOMATED ANTIPIRACY SYSTEMS. ......................................................................... 6

III. WILLFUL BLINDNESS DOES NOT APPLY. ................................................................... 8

CONCLUSION ............................................................................................................................... 9

## TABLE OF AUTHORITIES

**CASES**

*Cabell v. Zimmerman*, 09 civ. 10134 (CM), 2010 WL 996007 (S.D.N.Y. Mar. 12, 2010)..............1

*Dudnikov v. MGA Entertainment, Inc.*, 410 F. Supp. 2d 1010 (D. Colo. 2005)..............................1

*Floyd v. McNeil*, Case No. 4:10cv289-RH/WCS, 2011 WL 6955839 (N.D. Fla. Dec. 5, 2011), *report and recommendation adopted*, 2012 WL 28262 (N.D. Fla. Jan. 5, 2012) ..........8

*Global Aerospace Inc. v. Landow Aviation, L.P.*, No. CL 61040 (Va. Cir. Ct. April 23, 2012) .......................................................................................................................................7

*Lenz v. Universal Music Corp.*, 572 F. Supp. 2d 1150 (N.D. Cal. 2008) .......................................3

*Lenz v. Universal Music Corp.*, No. C07-3783JFRS, 2008 WL 4790669 (N.D. Cal. Oct. 28, 2008) ..................................................................................................................................3

*Moore v. Publicis Groupe & MSL Group*, No. 11 Civ. 1279(ALC)(AJP), --F.R.D.--, 2012 WL 607412 (S.D.N.Y. Feb. 24, 2012), *adopted by*, 2012 WL 1446534 (S.D.N.Y. April 26, 2012)......................................................................................................................7

*Ouellette v. Viacom Int'l, Inc.*, No. CV 10-133-M-DWM-JCL, 2012 WL 850921 (D. Mont. Mar. 13, 2012), *report and recommendation adopted*, 2012 WL 1435703 (D. Mont. Apr. 25, 2012). .....................................................................................................................4

*Ouellette v. Viacom International, Inc.*, No. CV 10-133-M-DWM-JCL, 2012 WL 1435703 (D. Mont. Apr. 25, 2012) .................................................................................4, 5

*Rossi v. Motion Picture Ass'n of America, Inc.*, 391 F.3d 1000 (9th Cir. 2004) ....................1, 2, 3

*Safeco Insurance Co. of America v. Burr*, 551 U.S. 47 (2007) .......................................................9

*Smith v. Summit Entertainment LLC*, Case No. 3:11CV348, 2011 WL 2200599 (N.D. Ohio June 6, 2011).............................................................................................................3, 4

*Third Educ. Grp., Inc. v. Phelps*, 675 F. Supp. 2d 916 (E.D. Wis. 2009) ......................................1

*UMG Recordings, Inc. v. Augusto*, 558 F. Supp. 2d 1055 (C.D. Cal. 2008), *aff'd*, 628 F.3d 1175 (9th Cir. 2011) ...................................................................................................1

*Williams v. Obstfeld*, 314 F.3d 1270 (11th Cir. 2002).................................................................9

**STATUTES**

17 U.S.C. § 512(f)................................................................................................................ *passim*

**OTHER AUTHORITIES**

ESI Symposium, *The Sedona Conference® Best Practices Commentary on the Use of Search and Information Retrieval Methods in E-Discovery*, 8 Sedona Conf. J. 189 (2007) ................................................................................................................................. 7

Maura R. Grossman & Gordon V. Cormack, *Technology-Assisted Review in E-Discovery Can Be More Effective And More Efficient Than Exhaustive Manual Review*, 17 RICH. J.L. & TECH. 11 (2011) ............................................................................................... 7

The principal contention of the Electronic Frontier Foundation ("EFF"), in a nutshell, is that the use of automated antipiracy systems should be *per se* unlawful under § 512(f). This contention is repudiated by clear and controlling statutory language, well-settled case law and the factual record in this case. In fact, DMCA section 512(f) imposes liability only on copyright owners who submit takedown notices with actual, subjective knowledge that they are misrepresenting that a work is infringing. There is no room in this statutory scheme for the *per se* rule EFF proposes. EFF's arguments are further undercut by the factual record in this case. EFF acknowledges that it lacks access to the most salient facts in this case. EFF Br. at 1. Undeterred, EFF assumes facts about Warner's system and the record in this case that are simply not accurate. *See, e.g.*, EFF Br. at 5, 7. The undisputed record in this case shows that Warner designed and operated its antipiracy system with the utmost good faith, and had no knowledge of any errors at the time it sent the counterclaim takedown notices to Hotfile. EFF's factual inaccuracies and misapplication of settled law are pervasive, and fatally undermine its analysis and conclusions.

## ARGUMENT

**I.      EFF SEEKS TO CIRCUMVENT THE PLAIN LANGUAGE OF § 512(f) AS CONSISTENTLY INTERPRETED BY COURTS.**

Section 512(f) of the DMCA limits liability to those who, in a DMCA takedown notice, "knowingly materially misrepresent[] . . . that material or activity is infringing." 17 U.S.C. § 512(f). Based on the plain language of the statute, courts have consistently held that liability attaches under § 512(f) only upon a showing of *actual, subjective knowledge* of a material misrepresentation. "[T]here must be a demonstration of some actual knowledge of misrepresentation on the part of the copyright owner." *Rossi v. Motion Picture Ass'n of America, Inc.*, 391 F.3d 1000, 1005 (9th Cir. 2004); *see also, e.g., Cabell v. Zimmerman*, 09 civ. 10134 (CM), 2010 WL 996007, at *4 (S.D.N.Y. Mar. 12, 2010) ("a defendant must have actual knowledge that it is making a misrepresentation of fact"); *Third Educ. Grp., Inc. v. Phelps*, 675 F. Supp. 2d 916, 927 (E.D. Wis. 2009) (§ 512(f) requires "a demonstration that the actor had some actual knowledge of the misrepresentation"); *UMG Recordings, Inc. v. Augusto*, 558 F. Supp. 2d 1055, 1065 (C.D. Cal. 2008) (similar), aff'd, 628 F.3d 1175 (11th Cir. 2011); *Dudnikov v. MGA Entm't, Inc.*, 410 F. Supp. 2d 1010, 1012 (D. Colo. 2005) (similar); *see also* WB Br. at

1

8-9; WB Reply Br. at 2-3.  Federal courts apply the exact same standard in other contexts that require proof of a willful or knowing misrepresentation.  WB Br. at 9.

Proceeding as if the Court were faced with a blank slate, the EFF *amicus* brief argues for a rule that is not in the statute and is, in fact, antithetical to it.  Specifically, EFF contends that use of an automated antipiracy system constitutes a *per se* violation of § 512(f).  EFF Br. 5-9.  This *per se* standard must be rejected.  First, the unambiguous statutory language is incompatible with EFF's proposed *per se* rule.  Second, EFF's proposal rewrites the standard and reverses the burden of proof:  a § 512(f) *defendant* is not required to affirmatively prove that it had a "sufficient basis" to form a good faith belief, as EFF erroneously argues; rather, a § 512(f) *plaintiff* must prove that the defendant acted with actual subjective knowledge of the misrepresentation.  Third, EFF's policy argument – that the use of automated antipiracy systems would enable copyright owners to elude § 512(f) entirely – is unfounded.  Warner does not argue that a copyright owner using an automated system can *never* violate § 512(f).  Rather, Warner rightfully argues that no such violation can be shown on the undisputed record in this case.

### A.     Section 512(f) Is Inconsistent With a Prohibition on Automated Antipiracy Systems.

EFF argues that the use of automated antipiracy systems runs afoul of congressional intent and judicial authority interpreting § 512(f).  EFF Br. at 1.  That argument, however, is contradicted by the plain language of the statute, and finds no support in the precedent on which EFF relies.

First, EFF can point to no language in the text of the Digital Millennium Copyright Act, or its legislative history, even suggesting that Congress intended to prohibit the use of automated antipiracy systems.  Automated systems were commonplace when Congress enacted § 512(f); if Congress had intended to ban the use of automated notice systems altogether, it would have said so.  As the Ninth Circuit explained in *Rossi*, "Congress could have easily incorporated an objective standard of reasonableness," but did not do so.  391 F.3d at 1004.  Instead, Congress expressly limited a copyright owner's liability for erroneous takedown notices to "knowing[] material[] misrepresent[ations]," a standard associated with a well-developed body of law requiring actual subjective knowledge of falsity.  *See id.* at 1005.

Second, EFF's contention that *Rossi* and *Lenz* support a *per se* rule against automated antipiracy systems is flatly wrong.  *Rossi* involved an allegedly erroneous takedown notice sent by the MPAA following an employee's *manual review* of purportedly infringing files.  *Id*. at

2

1005.  Although EFF contends that *Rossi* "specifically *distinguished*" automated systems from human review, EFF Br. at 5, the passage EFF cites merely restates the facts of the case.  391 F.3d at 1005 n.7.  The court did not reach or imply any conclusion regarding the use of automated systems.  It merely held that the manual review process used by the MPAA in *Rossi* was sufficient in that case as a matter of law, and that the alleged error by the MPAA's reviewer did not expose the defendant to liability.  EFF's argument that "[u]nder *Rossi*, an automated [system] . . . would still fall well short" of statutory compliance, EFF Br. at 6, is not remotely supported by the analysis or holding of the case.

EFF's reliance on *Lenz v. Universal Music Corp.*, 572 F. Supp. 2d 1150 (N.D. Cal. 2008), EFF Br. at 7, is similarly misplaced.  EFF argues that, because *Lenz* allegedly concluded that a copyright owner "must" consider the fair use doctrine prior to sending a takedown notice, automated antipiracy systems could never pass muster under § 512(f).  EFF forgets, however, that the *Lenz* court clarified its opinion on this very point, rejecting the stringent fair use investigation suggested by EFF.  In denying interlocutory appeal, the *Lenz* court confirmed that:

> The Court did not hold that every takedown notice must be preceded by a full fair use investigation.  *Id*. at 7 (citing *Rossi*, 391 F.3d at 1003-04).  Rather, it recognized, as it has previously, that in a given case fair use may be so obvious that a copyright owner could not reasonably believe that actionable infringement was taking place.  *See Online Policy Group v. Diebold, Inc.*, 337 F. Supp. 2d 1195, 1204 (N.D. Cal. 2004).  In such a case, **which is likely to be extremely rare**, the policy objectives of the DMCA are served by requiring copyright owners at least to form a subjective good faith belief that the "particular use is not a fair use" before sending the takedown notice.

*Lenz v. Universal Music Corp.*, No. C07-3783JFRS, 2008 WL 4790669, at *2 (N.D. Cal. Oct. 28, 2008) (emphasis added).  The *Lenz* case represented that "extremely rare" case, according to the court, in part because it believed some fair uses on YouTube were "obvious."  *Id*.[1]  EFF has no basis to argue that *Lenz* supports a *per se* ban on automated antipiracy systems.

*Smith v. Summit Entm't LLC*, Case No. 3:11CV348, 2011 WL 2200599 (N.D. Ohio June 6, 2011), EFF Br. at 8, is also inapposite.  EFF asserts that the *Smith* court found that a takedown notice was sent in bad faith where the notice was based only on the title of an allegedly

---

[1]  It is undisputed that fair use is not an issue in any of the notices that make up Hotfile's counterclaim against Warner.  *See* WB Reply Br. at 4.  Nor are any of the other abusive practices cited by EFF.  EFF Br. at 4-5 & n.1.

3

infringing song. EFF Br. at 8. However, EFF misstates the holding of the case. In *Smith*, the complaint stated a potential violation of § 512(f) because the defendant admitted to sending a takedown notice for *copyright infringement* when in fact the defendant believed the plaintiff to be violating the defendant's *trademark*. 2011 WL 2200599, at *1. The court held that, on those facts, the complaint stated a claim that the defendant knew at the time it sent the takedown notice that the song at issue did not infringe any of defendant's copyrights. That case has no bearing on the issues here.

Automated scanning systems are an essential antipiracy tool, given the massive volume of infringement on websites such as Hotfile. Automated scanning systems are, and have been for some time, an industry standard across a wide range of copyright industries. Kaplan Decl. ¶ 5. Recognizing this necessity, one federal court recently rejected the argument that the use of automated scanning software to issue takedown notices violated § 512(f). In *Ouellette v. Viacom Int'l, Inc.*, the plaintiff had sued Viacom under § 512(f), alleging that Viacom's "use of 'scanning software' violates the DMCA's good-faith requirement" because Viacom "fails to use human oversight to prevent that software 'from mis-identifying Fair Use videos.'" *Ouellette v. Viacom Int'l, Inc.*, No. CV 10-133-M-DWM-JCL, 2012 WL 850921 at *4 (D. Mont. Mar. 13, 2012), *report and recommendation adopted*, 2012 WL 1435703 (D. Mont. Apr. 25, 2012).

The court granted Viacom's motion for judgment on the pleadings – thus rejecting the *per se* rule that EFF argues for here. The *Ouellette* court held that under the "subjective" standard in *Rossi*, "defendants … are liable only if they *know* that the subject material is not infringing on its copyright *when they issue their takedown notices*." 2012 WL 1435703, at *3 (emphasis added). This "high standard," according to the court, "reflects the reality that copyright owners face an uphill battle to protect their copyrights on the [I]nternet"; given the sheer number of infringing works, "[w]ithout the subjective standard, copyright owners … could face limitless lawsuits just by policing [their] copyrighted material." *Id*.

Accordingly, the Court held that a § 512(f) plaintiff is "required to plead facts that [defendant] *knew* that its 'scanning software' was flagging [plaintiff's] non-infringing videos and that [defendant] issued a takedown notice nonetheless." *Id*. at *4 (emphasis added). Leaving no doubt that § 512(f) requires proof of actual subjective knowledge as to the notice in question, the court further held that knowledge *cannot* be shown "by alleging that [defendant] has acted improperly in the past to others"; it requires proof that defendant "acted improperly in *his*

4

[plaintiff's] case." *Id*. (emphasis in original).

Under *Ouellette*, automated antipiracy systems are subject to the same § 512(f) standard as any other method of identifying potentially infringing material. Liability under § 512(f) arises only where there is actual subjective knowledge of a misrepresentation. EFF's preferred *per se* prohibition on automated antipiracy systems is incompatible with § 512(f).

### B. EFF Argues for a Different Standard and Burden of Proof.

The statute provides liability only for "knowing[] material[] misrepresentat[ions]." 17 U.S.C. § 512(f). Under bedrock law, it is the plaintiff asserting a § 512(f) claim that has the burden of proving a knowing misrepresentation. EFF, however, would change the standard and reverse the burden.

Because the *per se* rule EFF wants cannot be reconciled with the statute as written, EFF is forced to argue for a completely different standard. EFF argues that the copyright owner must demonstrate that it had a "sufficient basis for a good faith belief that material is infringing." *See, e.g.*, EFF Br. at 5-6 (emphasis omitted). That is not the law. That is in fact the opposite of what the statute provides: Under § 512(f), the burden is on the *plaintiff* to prove a defendant's actual subjective knowledge of falsity. That EFF has to misstate both the legal standard and the burden of proof further illustrates the absence of any support for a *per se* rule against automated systems.

Again, Congress readily could have written § 512(f) so as to provide a cause of action against copyright owners who did not have a "sufficient basis" to form a good faith belief – but it did not. EFF's *ipse dixit* cannot make it so.

### C. Interpreting § 512(f) as Written Does Not Have the Policy Consequences EFF Fears.

EFF's policy argument is also unavailing. It is not the case, as EFF hypothesizes – *see* EFF Br. at 8 – that the § 512(f) standard, if interpreted as written, means that no copyright owner using an automated system could ever be liable under § 512(f).

Section 512(f) imposes a subjective good faith standard. The operator of an automated system has to comply with that standard in the design and operation of its system. If there is evidence that a copyright claimant designed or operated its system in bad faith, then that might give rise to § 512(f) liability.

This dispenses with all the hypotheticals raised in EFF's brief. *See* EFF Br. at 8. If a defendant designed its automated system with "the loosest possible settings" purposefully to

5

issue false takedowns of a competitor's content, *id.*, that defendant would not be operating its system in good faith. The defendant's subjective bad faith under § 512(f) might amount to actual knowledge of the misrepresented notices.

A court may one day be called upon to decide precisely where to draw that line – but this is not that case. The undisputed record demonstrates that Warner exercised the utmost good faith in every aspect of the design and operation of its system. Kaplan Decl. ¶¶ 6-16. In fact, Warner purposefully operated its system so as to minimize mistaken identifications, even at the expense of failing to identify substantial numbers of infringing files. Kaplan Decl. ¶ 13. And, Warner engaged in a near constant process of improving its system. *See* Kaplan Decl. ¶¶ 15-16. There is not a shred of evidence that could support an inference of bad faith on the part of Warner, much less a knowing misrepresentation.

## II.  HUMAN REVIEW IS NOT NECESSARILY MORE ACCURATE THAN AUTOMATED ANTIPIRACY SYSTEMS.

EFF insists that the use of automated antipiracy systems are detrimental to the public interest because such systems have a higher error rate than manual (*i.e.*, human) review. EFF Br. at 5. But EFF offers no evidence to support its conjecture.[2] In fact, the actual evidence is to the contrary.

As a threshold matter, EFF grossly oversimplifies and mischaracterizes Warner's system. Warner operates a system that integrates manual research and analysis, human judgment, and automated features. That system is described in detail in the Declaration of David Kaplan, Docket # 308, which was filed under seal for obvious reasons. *See* Kaplan Decl. ¶¶ 2-13; WB Br. at 4-7; WB Reply Br. at 3. Warner's system is as sophisticated a system as exists anywhere in the world. Indeed, in the time period at issue in Hotfile's counterclaim, of the nearly one million notices Warner sent Hotfile, Hotfile has identified less than 890 notices that contain errors – for an error rate of less than 1/10th of 1% (and almost all of those so-called "mistakes" were still blatantly infringing files). WB SUF ¶ 8.

---

[2] On pages 4-5 of its brief, EFF cites anecdotes and untested studies from anti-copyright academics and Google as to errors and abuses in DMCA notices. Notably, however, most of the errors and abuses EFF cites appear to have nothing to do with automated systems – on their face, most appear to be deliberate abuses carried out by humans, not machines. *E.g.*, EFF Br. at 5 (takedowns by competitors); *id.* at 4 n.1 (takedowns of critics' content). More importantly, EFF does not even purport to demonstrate that more human review would yield lower error rates.

A reality, however, is that *every* system, no matter how good, whether automated or manual, is "bound to produce some errors." EFF Br. at 10. Hotfile has conceded as much. Yeh Ex. B (Titov dep.) at 157:22-158:6 ("mistakes happen"). Fully automated systems, fully manual systems and hybrid systems, moreover, each have knowable error rates. If, as EFF advocates, knowledge that a system is "bound to produce some errors" could turn every honest mistake into an actionable misrepresentation under § 512(f), then the "knowing[] material[] misrepresent[ation]" standard would become a strict liability standard, contrary to the plain language of the statute.

In fact, contrary to EFF's supposition, when it comes to high-volume, repetitive tasks, research suggests that automated computer systems yield fewer errors than human review. For example, one recent study of technology-assisted document review systems found that "by all measures, the average efficiency and effectiveness of … technology-assisted reviews surpass that of the manual reviews…." *See* Maura R. Grossman & Gordon V. Cormack, *Technology-Assisted Review in E-Discovery Can Be More Effective And More Efficient Than Exhaustive Manual Review*, 17 RICH. J.L. & TECH. 11, 43, 49, 52 (2011). Overall, technology-assisted reviews had an 80% effectiveness rate versus 36% for manual review. *Id*. at 45-46. Courts too have endorsed automated reviews in electronic discovery, noting that "while some lawyers still consider manual review to be the 'gold standard,' that is a myth, as statistics clearly show that computerized searches are at least as accurate, if not more so, then manual review." *Moore v. Publicis Groupe & MSL Group*, No. 11 Civ. 1279(ALC)(AJP), --F.R.D.--, 2012 WL 607412, at *9 (S.D.N.Y. Feb. 24, 2012), *adopted*, 2012 WL 1446534 (S.D.N.Y. April 26, 2012); *see also Global Aerospace Inc. v. Landow Aviation, L.P.*, No. CL 61040 (Va. Cir. Ct. April 23, 2012) (approving use of predictive coding for discovery); ESI Symposium, *The Sedona Conference® Best Practices Commentary on the Use of Search and Information Retrieval Methods in E-Discovery*, 8 Sedona Conf. J. 189, 199 (2007) (noting "myth that manual review by humans … constitutes the gold standard by which all searches should be measured," and citing study that automated processes are substantially more accurate and complete due to incidence of human error).

These findings are borne out in this very case. With teams of lawyers manually reviewing a relatively small number files, Hotfile still made a number of errors in presenting the counterclaim files. WB SUF ¶ 6 (over 40 files Hotfile claims were wrongly taken down are in

7

fact Warner works). Likewise, many of the counterclaim files (the LeakID files) were in fact subject to a human review process – and yet there were errors as a result of "human … mistakes." Kaplan Decl. ¶ 20. The fact that there were mistakes just proves that human review is susceptible to errors: humans make mistakes of judgment, or make mundane errors such as skipping over lines of URLs, inadvertently scrolling too far on a computer screen, or checking the wrong boxes on forms. Boredom, fatigue, inattention, neglect, and just plain human frailty all lead to errors, none of which remotely rise to the level of a "knowing[] material[] misrepresent[ation]."[3]

As explained above, there is no legal basis for EFF's proposed *per se* prohibition of automated systems. Further, since both human and automated systems result in occasional error – and the research indicates that automated systems may in fact be more accurate – there is no factual or policy justification for the categorical rule EFF advances.

### III. WILLFUL BLINDNESS DOES NOT APPLY.

Finally, EFF throws in a claim that even Hotfile did not make: that a "knowing[] material[] misrepresent[ation]" under § 512(f) can be demonstrated through proof of willful blindness. EFF Br. 9-10. This is surprising for two reasons. First, the claim – "willful blindness" – is predicated on facts that EFF admits it cannot know. Second, willful blindness is not presented in this case. It was Hotfile's burden to "come forward with evidentiary material demonstrating a genuine issue of material fact for trial." *Floyd v. McNeil*, Case No. 4:10cv289-RH/WCS, 2011 WL 6955839, at *1 (N.D. Fla. Dec. 5, 2011), *report and recommendation adopted*, 2012 WL 28262 (N.D. Fla. Jan. 5, 2012). That Hotfile did not even assert willful blindness, much less adduce evidence of it, is dispositive of the issue. The Court need not and should not decide whether – in a different case – the doctrine of willful blindness might be applicable.

---

[3] In its zeal to disparage Warner, EFF too made mistakes. In footnote 3 of its brief, EFF accuses Warner of having a "sorry track record" on takedown notices, citing an incident with YouTube's Content ID system. EFF Br. at 5 n.3. However, the Warner involved in the YouTube incident is not Counterdefendant Warner Bros. Entertainment Inc. at all; it is a record company that has no corporate relationship with Warner Bros. Entertainment Inc., and has not for years. Just because the two companies share the word "Warner" in their names, EFF – presumably through a manual and not automated review – made a mistake, a human error.

8

In any event, EFF misstates the legal standard applicable to a claim of willful blindness. In an effort to convert § 512(f) into an *objective* standard, EFF conflates willful blindness with recklessness. EFF Br. at 9. Recklessness, however, is inapplicable to a § 512(f) claim. Unlike the *subjective* actual knowledge standard of § 512(f), "the common law has generally understood [recklessness] in the sphere of civil liability as conduct violating an objective standard." *Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 57, 68 (2007) (noting the distinction between "knowing violations" and "reckless ones"). EFF's additional argument, that willful blindness may be established through a "grossly inadequate investigation," EFF Br. at 9-10, also improperly seeks to upend the statutory standard in § 512(f).

The proper willful blindness standard is well-established in this Circuit: A party is willfully blind only when it "was aware of a high probability of the existence of the fact in question and purposely contrived to avoid learning all of the facts in order to have a defense in the event of a subsequent prosecution." *Williams v. Obstfeld*, 314 F.3d 1270, 1278 (11th Cir. 2002) (quoting *United States v. Perez-Tosta*, 36 F.3d 1552, 1564 (11th Cir. 1994)). Here, the undisputed record demonstrates that Warner believed its antipiracy system was "highly accurate and reliable." Kaplan Decl. ¶ 14. Moreover, far from "contriv[ing] to avoid learning all of the facts," Warner actively sought to identify mistakes and consistently used any evidence of a mistake both to resolve the mistake and to improve the system overall. *See* Kaplan Decl. ¶¶ 7-13 (describing the care Warner has taken in developing and operating its system); *id*. ¶¶ 15-16 (describing the steps Warner takes to identify and correct errors).

Thus, even if the doctrine of willful blindness could be invoked in support of a claim of liability under § 512(f)'s "knowing[] material[] misrepresent[ation]" standard – an issue which is not before the Court in this case – the uncontroverted facts make clear that there is no basis here for a claim that Warner willfully blinded itself. That may explain why Hotfile – which, unlike EFF, had access to actual evidence and facts – did not even assert willful blindness.

## CONCLUSION

For the foregoing reasons, the Court should decline to adopt the *per se* rule against automated antipiracy systems advocated by *amicus curiae* EFF.

9

Dated:  September 18, 2012				Respectfully submitted,

							By: /s/ Karen L. Stetson

							Karen L. Stetson
							GRAY-ROBINSON, P.A.
							1221 Brickell Avenue
							16th Floor
							Miami, Fl 33131
							Telephone: (305) 416-6880
							Facsimile:  (305) 416-6887


MOTION PICTURE ASSOCIATION			JENNER & BLOCK LLP
  OF AMERICA, INC.				Steven B. Fabrizio (*Pro Hac Vice*)
Karen R. Thorland (*Pro Hac Vice*)		Luke C. Platzer (*Pro Hac Vice*)
15301 Ventura Blvd.				1099 New York Ave., N.W.
Building E					Suite 900
Sherman Oaks, CA 91403				Washington, DC 20001
Phone:  (818) 995-6600				Facsimile:  (202) 639-6066
Fax:  (818) 285-4403

						*Attorneys for Plaintiff-Counterdefendant*
						*Warner Bros. Entertainment Inc.*

10

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 18th Day of September, 2012, I served the following documents on all counsel of record on the attached service list via the Court's ECF System:

**Response of Warner Bros. Entertainment Inc. to the *Amicus Curiae* Brief of Electronic Frontier Foundation**

By: /s/ Karen L. Stetson
Karen L. Stetson

## SERVICE LIST
### Disney Enterprises, Inc., et al. v. Hotfile Corp. et al.
### CASE NO. 11-CIV-20427-WILLIAMS/TURNOFF

FARELLA BRAUN + MARTEL LLP
Anthony P. Schoenberg
tschoenberg@fbm.com
Roderick M. Thompson
rthompson@fbm.com
N. Andrew Leibnitz
aleibnitz@fbm.com
Deepak Gupta
dgupta@fbm.com
Janel Thamkul
jthamkul@fbm.com
235 Montgomery Street
San Francisco, CA  94104
Phone:  415-954-4400

*Attorneys for Defendants Hotfile Corp. and Anton Titov*

BOSTON LAW GROUP, PC
Valentin Gurvits
vgurvits@bostonlawgroup.com
825 Beacon Street, Suite 20
Newton Centre, MA  02459
Phone:  617-928-1804

*Attorneys for Defendants Hotfile Corp. and Anton Titov*

RASCO KLOCK
Janet T. Munn
jmunn@rascoklock.com
283 Catalonia Ave., Suite 200
Coral Gables, FL  33134
Phone:  305-476-7101
Fax:  305-476-7102

*Attorney for Defendants Hotfile Corp. and Anton Titov*