# EXHIBIT A

Slip Copy, 2013 WL 1899851 (N.D.Cal.)
**(Cite as: 2013 WL 1899851 (N.D.Cal.))**

H

Only the Westlaw citation is currently available.

United States District Court,
N.D. California.
PERFECT 10, INC., Plaintiff,
v.
YANDEX N.V., et al., Defendants.

No. C 12–01521 WHA.
May 7, 2013.

Eric Jon Benink, Krause Kalfayan Benink & Slavens, LLP, San Diego, CA, Natalie Hrysoula Locke, Los Angeles, CA, for Plaintiff.

Daniel C. Posner, Rory S. Miller, Daniel C. Posner, Quinn Emanuel Trial Lawyers, Los Angeles, CA, Diane M. Doolittle, Rachel M. Kassabian, Quinn Emanuel Urquhart & Sullivan, LLP, Redwood Shores, CA, Douglas Stephen Tilley, Quinn Emanuel Urquhart & Sullivan LLP, San Francisco, CA, for Defendants.

**ORDER ON MOTION FOR PARTIAL SUM-MARY JUDGMENT**
WILLIAM ALSUP, District Judge.
**INTRODUCTION**
**\*1** In this copyright-infringement action, plaintiff moves for partial summary judgment. To the extent stated below, the motion is **GRANTED IN PART.**

**STATEMENT**
Plaintiff Perfect 10, Inc., a California company, creates copyrighted adult entertainment products, including photographs. Perfect 10 owns the copyrights for all of the photos at issue in this action. Defendant Yandex N.V., a Dutch holding company headquartered in the Netherlands, owns a family of companies under the "Yandex" brand. The Yandex companies offer a broad range of search functions over the internet. Subsidiary Yandex Inc. is based in Palo Alto and hosts yandex.com. Subsidiary

Yandex LLC is a Russian company which operates yandex.ru and provides the search results required to operate yandex.com. Perfect 10 alleges that the Yandex websites violated (and continue to violate) its copyrights by copying its images and displaying them to internet users, and by linking to, storing, and placing ads around such images without permission.

Prior to bringing suit, Perfect 10 sent hundreds of Digital Millennium Copyright Act ("DMCA") takedown notices to Yandex requesting that it remove or take down links to thousands of allegedly-infringing images. Perfect 10 now moves for partial summary judgment on three discrete issues relating to these notices: (i) that the three "sample" DMCA notices appended to its motion are substantially compliant with the notice requirements of 17 U.S.C. 512(c)(3)(A) and (d)(3); (ii) that the Yandex defendants are ineligible for any DMCA safe harbor defense pursuant to 17 U.S.C. 512 during the period when they had no DMCA agent registered with the United States Copyright Office; and (iii) that the three sample DMCA notices conferred actual knowledge to Yandex LLC and Yandex Inc. regarding the allegedly infringing images/links which were identified by those sample notices for the purpose of Perfect 10's contributory copyright infringement claim.

Perfect 10 alleges that defendants are directly liable for copyright infringement based on their own use of the allegedly infringing images. Perfect 10 also alleges that defendants are contributorily liable because they link to third parties who are making directly-infringing copies available on the internet. Because Yandex uses smaller, "thumbnail" versions of the Perfect 10 images on its search result pages, there are substantial fair use questions lurking in this action in light of *Perfect 10, Inc. v. Amazon.com, Inc.,* 487 F.3d 701, 719–25 (9th Cir.2007). Defendants have all pleaded fair use as an affirmative defense but have not yet properly teed up the issue for resolution.

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2013 WL 1899851 (N.D.Cal.)
**(Cite as: 2013 WL 1899851 (N.D.Cal.))**

The question of whether the sample notices are representative is also a point of contention between the parties, but Perfect 10 does not seek partial summary judgment on that issue at this time, and this order does not rule thereon. This order follows full briefing and oral argument.

## ANALYSIS

**\*2** Summary judgment is proper when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FRCP 56(a). Where the party moving for summary judgment would bear the burden of proof at trial, that party bears the initial burden of producing evidence that would entitle it to a directed verdict if uncontroverted at trial. *See C.A.R. Transp. Broker-age Co. v. Darden Rests., Inc.,* 213 F.3d 474, 480 (9th Cir.2000). Where the party moving for summary judgment would not bear the burden of proof at trial, that party bears the initial burden of either producing evidence that negates an essential element of the non-moving party's claims, or showing that the non-moving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial. If the moving party satisfies its initial burden of production, then the non-moving party must produce admissible evidence to show there exists a genuine issue of material fact. If the moving party does not satisfy its initial burden, then the non-moving party has no obligation to produce anything and summary judgment must be denied. *See Nissan Fire & Marine Ins. Co. v. Fritz Cos.,* 210 F.3d 1099, 1102–03 (9th Cir.2000).

\* \* \*

Preliminarily, Yandex contends Perfect 10's motion should be denied or held in abeyance because subject-matter jurisdiction is lacking. Yandex argues that "the record reflects that at least 94% of the alleged underlying third-party direct infringements at issue in Perfect 10's three sample DMCA notices occurred abroad" (Opp. 8 (emphasis removed)). Therefore, under our court of appeals' "server test," these foreign-hosted infringements

are not actionable. *See Perfect 10,* 508 F.3d at 1162.

At oral argument, Yandex conceded that the record contained affirmative evidence of domestic direct infringement of an image in Sample Notice 1. Thus, in large part Yandex's argument is a *non-sequitur.* Even assuming that Yandex is correct and only one image or six percent of the links involve domestic infringements (a point disputed by Perfect 10), Yandex does not explain how this circumstance would deprive the Court of subject-matter jurisdiction. Nor does Yandex explain why it would be appropriate to delay partial summary judgment given that six percent of the links in the DMCA notice correspond to domestic infringements. Perfect 10 has not moved for partial summary judgment on the subject of liability. It seeks a determination of whether its notices satisfied DMCA notification requirements and whether they confer actual knowledge of infringement (Br.2).

As for Sample Notice 2, during oral argument counsel for Perfect 10 were unable to identify affirmative evidence in the record that any of the allegedly contributorily-infringing links in that notice led to domestic infringements. Perfect 10's Zada reply declaration claims that Yandex's web pages linked to domestic infringements hosted by other domestic search providers (Dkt. No. 130–1 at ¶ 23). Yet, the appended exhibits only show that Yandex linked to other search providers' websites—not domestically-hosted infringing copies. Perfect 10's claims that U.S.-based individuals downloaded the infringing images linked in Sample Notice 2 are unsubstantiated. In the absence of affirmative evidence that the Sample Notice 2 implicates underlying direct infringements, any further ruling on the sufficiency of the notice would be advisory. Summary judgment on this notice is accordingly **DENIED.**

**\*3** As for Sample Notice 3, Yandex conceded at oral argument that thumbnails of the allegedly-infringed images were hosted at some point on Yandex servers in the United States. Yandex argued

that subject-matter jurisdiction is lacking, however, because storage of such thumbnails amounts to fair use. Perfect 10 countered that decisions applying the fair use doctrine to thumbnail images are distinguishable on the facts. This order concludes that Yandex's fair use defense should be properly teed up for resolution in a motion for summary judgment by Yandex. This order declines to rule on the issue at this time; for now, subject-matter jurisdiction on Sample Notice 3 appears to be proper.

**1. SAMPLE NOTICE 1.**

Turning towards whether Sample Notice 1 complied with the notice requirements of the DMCA, Section 512(c)(3) provides:

> (A) To be effective under this subsection, a notification of claimed infringement must be a written communication provided to the designated agent of a service provider that includes substantially the following:
>
> > (i) A physical or electronic signature of a person authorized to act on behalf of the owner of an exclusive right that is allegedly infringed.
> >
> > (ii) Identification of the copyrighted work claimed to have been infringed, or, if multiple copyrighted works at a single online site are covered by a single notification, a representative list of such works at that site.
> >
> > (iii) Identification of the material that is claimed to be infringing or to be the subject of infringing activity and that is to be removed or access to which is to be disabled, and information reasonably sufficient to permit the service provider to locate the material.
> >
> > (iv) Information reasonably sufficient to permit the service provider to contact the complaining party, such as an address, telephone number, and, if available, an electronic mail address at which the complaining party may be contacted.
> >
> > (v) A statement that the complaining party has a good faith belief that use of the material in the manner complained of is not authorized by the copyright owner, its agent, or the law.
> >
> > (vi) A statement that the information in the notification is accurate, and under penalty of perjury, that the complaining party is authorized to act on behalf of the owner of an exclusive right that is allegedly infringed.

Section 512(d)(3) applies specifically to providers of "information location tools" such as internet search engines. Section 512(d)(3) has the DMCA notification requirements of Section 512(c)(3) except that "the information described in subsection (c)(3)(A)(iii) shall be identification of the reference or link, to material or activity claimed to be infringing, that is to be removed or access to which is to be disabled, and information reasonably sufficient to permit the service provider to locate that reference or link."

Substantial compliance with Section 512(c)(3) means substantial compliance with all of its clauses, not just some of them. Moreover, the DMCA notification procedures place the burden of policing copyright infringement—identifying the potentially infringing material and adequately documenting infringement—squarely on the owners of the copyright. A DMCA notice may not be adequate if it requires that a service provider take substantial time to piece together the relevant information for each instance of claimed infringement. *Perfect 10, Inc. v. CCBill LLC,* 488 F.3d 1102, 1112–13 (9th Cir.2007).

***4** A brief description of Sample Notice 1 is in order. Sample Notice 1 began with a cover email attaching the DMCA notice. Next, there was an attached PDF file. The PDF file began with a short DMCA notice letter that described the contents of the DMCA notice itself and requested that the images be taken down. The notice letter was followed by several pages of screen shots from Yandex's own image search web sites. The screen shots showed the allegedly-copyrighted images in Yandex's search results along with corresponding links

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2013 WL 1899851 (N.D.Cal.)
**(Cite as: 2013 WL 1899851 (N.D.Cal.))**

to the party directly hosting the content. In many instances the links to the third-party sites were truncated, but it was possible to copy the whole link by right-clicking on the image in the file. At the end of each sample notice was a single screen shot from Perfect 10's own website that included the allegedly copyrighted images in a four-by-four grid of images.

Yandex first makes a general objection that none of the sample notices can be considered in isolation, but must instead be aggregated into a single notice based on contemporaneous transmissions. Yandex complains that the sample DMCA notices were not notices at all, but "fragments" of larger, massive notices. For example, Yandex complains that Perfect 10 sent Sample Notice 1 during the same ten-minute period it sent 12 other notices. Although Sample Notice 1 was only 11 pages long, all of the notices sent in that ten-minute period totaled nearly 225 pages of screen shots.

Yandex's argument misses the point of Perfect 10's motion. Perfect 10 has not moved for summary judgment on whether, in the aggregate, its notices complied with the DMCA, and this order does not rule on that issue. Perfect 10 seeks summary judgment on whether, for example, Sample Notice 1 standing alone was compliant with the statute.

As to the merits of Yandex's objection, Yandex does not provide any authority supporting its suggestion that DMCA notices that are sent contemporaneously should be aggregated and considered together to determine whether they provide sufficient notice, rather than as separate transmissions addressing separate alleged infringements. In making this argument, Yandex fails to address the obvious problem that the allegations in the amended complaint implicate at least thousands of instances of alleged infringement. There must be a way for a party to efficiently comply with Section 512(c)(3) in such circumstances, and a party whose conduct runs afoul of the statute should not be allowed a safe harbor merely because its voluminous misconduct would require voluminous takedown notices.

In another version of this same argument, Yandex argues that the burden it faced from processing Perfect 10's DMCA notices demonstrates that they do not comply with Section 512(c)(3). This contention fails because it rests on a presupposition that the three DMCA notices at issue here cannot stand alone. As explained above, Yandex has not established for the purposes of this motion that the two sample DMCA notices should be aggregated and evaluated with other DMCA notices. Yandex's vague contention that it had to extract URL's from "thousands of pages of PDF screenshots" is irrelevant and misleading; its contention that identifying 177 links derived from the sample notices was "extremely burdensome and time consuming" cannot be taken seriously.

**\*5** Yandex's real complaint is that processing the aggregate DMCA notices from Yandex required substantial effort, and it would have preferred receiving the DMCA notices in a different format: a "simple list of URLs" (Opp.1). Yandex does not appear to have communicated this preference to Perfect 10. Section 512(c)(3) does not require any particular format for DMCA notices. The decisions interpreting Section 512(c)(3) do not prescribe a particular form of notice—they only *proscribe* forms of notice that have proved problematic. And, as noted above, Yandex has not moved for summary judgment on any issue relating to this objection. Moreover, to the extent that Yandex's burden is a result of "review[ing] the cover letter[s]," "determin[ing] precisely which Yandex services were complained of," and "manually review[ing] the suppressed pages," these steps are a necessary part of the takedown process (*see* Opp. 15). The burden from these steps is a result of Yandex's statutory obligations, not some fault in the DMCA notices.

Next, Yandex argues that the sample notices were deficient because they failed to adequately identify the copyrighted work. Because the final screen shot in each notice showed 16 images in a grid, Yandex contends that it was "force [d] ... to

Slip Copy, 2013 WL 1899851 (N.D.Cal.)
**(Cite as: 2013 WL 1899851 (N.D.Cal.))**

wade through numerous thumbnails in one section of [the] PDFs and compare them to dozens or hundreds of pages of sceenshots of alleged infringements to try to match them up" (Opp.13). As a preliminary matter, Sample Notice 1 was only 11 pages (including the cover email). Yandex's complaint that it had to wade through "dozens or hundreds of pages" of screen shots is disingenuous. The Court has "waded through" the screen shots for Sample Notice 1. Matching the allegedly copyrighted work to the alleged infringements in the PDF required only a few seconds of effort. Aggregated across thousands of alleged infringements, this manual process would require substantial time—as would any manual process for reviewing alleged infringements on a large scale.

Yandex contends that Sample Notice 1 confusingly identified a single image as both an authorized work and infringing material. This order disagrees. The sample notice made clear that the authorized versions appeared at the end of the notice and that the challenged versions were displayed on the included screen shots of Yandex web pages.

Yandex also argues that Sample Notice 1 was deficient because it failed to sufficiently identify the location of the allegedly-infringing materials. The links displayed in the screen shots were, in some instances, truncated. This argument is rejected. The truncated links were generated as part of Yandex's own search results. The sample notice used the screen shots to prove that the images were linked from Yandex's site, not to identify the location of the allegedly-infringing content. As the notice itself explained, the exact links to each allegedlyinfringing copy were available by clicking or right-clicking on the images listed in the search results. There is no evidence that any of these links were truncated.

**\*6** Because this order concludes that, standing alone, Sample Notice 1 complied with Section 512(c)(3), this order does not address the question of whether Yandex's decision to process the notice, notwithstanding any deficiencies, rendered it *a for-*

*tiori* compliant with the statute.

**2. SAMPLE NOTICE 2.**

As stated, Sample Notice 2 has not been shown to implicate domestic infringement and will not be considered further in this order.

**3. SAMPLE NOTICE 3.**

Yandex raises all of the same objections to Sample Notice 3 as it does for the first one. For the reasons explained above, these objections are rejected. One new objection is made, however. It appears that the allegedly authorized copy and the alleged infringements are not the identical work. Upon inspection of the final screen shot of authorized works, the same model depicted is against the same backdrop as in the challenged works, but posed in a slightly different position. Although similar, the allegedly-infringing work and the allegedly-infringed work are different images.

There is no express requirement in Section 512(c)(3) that a DMCA notice include an exact, authorized copy of an allegedly-infringing work, or even any authorized copy of the allegedly-infringing work. Indeed, Yandex itself has complained that these images are unhelpful and that it would prefer a list format. Nevertheless, the voluntarily inclusion of an incorrect version of the original work raises questions as to how the notice would have been understood by the recipient. These are properly questions for the jury, and summary judgment on Sample Notice 3 is **DENIED.**

This order does not address the question of whether Yandex's decision to process Sample Notice 3, notwithstanding any deficiencies, rendered it *a fortiori* compliant with the statute. Given that the comprehensibility *vel non* of Sample Notice 3 is an issue, ruling on the effect of Yandex processing it would be premature.

**4. ACTUAL KNOWLEDGE OF THE ALLEGED INFRINGEMENT?**

As explained above, Sample Notice 1 (standing alone) was DMCA-compliant. Perfect 10 contends

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2013 WL 1899851 (N.D.Cal.)
**(Cite as: 2013 WL 1899851 (N.D.Cal.))**

that its compliant sample notices *necessarily* conferred actual knowledge of infringement for the purposes of its contributory liability claim. This is incorrect. Our court of appeals has recently clarified that a DMCA-compliant notice "provides only a *claim* of infringement, and is not necessarily sufficient by itself to establish actual or 'red flag' knowledge." *UMG Recordings, Inc. v. Shelter Capital Partners, LLC,* —— F.3d ——, 2013 WL 1092793, at *10 n. 12 (9th Cir. Mar.14, 2013) (emphasis in original). Thus, whether a DMCA-compliant notice confers actual knowledge of alleged infringement depends on the evidentiary record.

Yandex responds that it has proffered evidence that it did not have actual knowledge of the alleged infringement in the form of a declaration by Maria Grigorieva, Yandex LLC's "Head of Support for Search Services." In a subsection of the declaration titled "Yandex Has No Actual Knowledge of Infringement," Ms. Grigorieva states that although Yandex LLC processed the notices,

**\*7** Yandex does not know who the copyright holder is for a given image, nor whether a particular display of an image on a website is licensed, a fair use, or otherwise authorized by the copyright holder or by the law. While Yandex has processed Perfect 10's notices to the fullest extent possible in the circumstances, it could be that Perfect 10's claims of infringement are incorrect in one or more instances. We simply have taken Perfect 10's word for it and blocked any and all URLs that Perfect 10 seemed to be complaining of.

(Dkt. No. 118 ¶ 26).

Sample Notice 1 did not call out any theory of liability, *i.e.* whether Perfect 10 was accusing Yandex of direct infringement of the images, contributory infringement of the images, or something else. This fact, taken in combination with the Grigorieva declaration, leaves a genuine issue of material fact regarding whether Yandex had actual knowledge of contributory infringement. Perfect 10's motion for

summary judgment on this issue is accordingly **DENIED.**

Because this order is based on a finding that Sample Notice 1 was DMCA-compliant, and the compliance of Sample Notice 3 remains to be determined, it is not necessary to reach the parties' alternative arguments that assume the sample notices are not compliant.

## 5. THE REGISTERED DMCA AGENT REQUIREMENT.

Perfect 10 moves for summary judgment that each Yandex entity is ineligible for the DMCA safe harbor under Section 512(c) during the period when they had no registered DMCA agent. Yandex's responses to this contention are meritless and frivolous. Summary judgment in favor of Perfect 10 on this issue is **GRANTED.**

Section 512(c)(2) requires that a service provider designate an agent to receive DMCA notices (emphasis added):

Designated agent.—The limitations on liability established in this subsection apply to a service provider *only if* the service provider *has designated* an agent to receive notifications of claimed infringement described in paragraph (3), by making available through its service, including on its website in a location accessible to the public, *and by providing to the Copyright Office,* substantially the following information:

(A) the name, address, phone number, and electronic mail address of the agent.

(B) other contact information which the Register of Copyrights may deem appropriate.

The Register of Copyrights shall maintain a current directory of agents available to the public for inspection, including through the Internet, and may require payment of a fee by service providers to cover the costs of maintaining the directory.

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2013 WL 1899851 (N.D.Cal.)
**(Cite as: 2013 WL 1899851 (N.D.Cal.))**

Perfect 10 alleges that Yandex, Inc. filed its DMCA agent registration with the United States Copyright Office on or about August 24, 2012, that Yandex LLC filed its DMCA agent registration on or about October 15, 2012, and that Yandex, N.V. has not yet registered an agent with the United States Copyright Office (Br.21).

Yandex does not dispute these facts. Instead, Yandex argues that Section 512(c)(2) does not require that its agent be registered with the United States Copyright Office. Yandex argues that Congress only intended for the courts to enforce substantial compliance with the DMCA safe harbor requirements. Yandex's parsing of the statute is inaccurate. The phrase "substantially the following information" modifies the ensuing subparagraphs that list types of contact information. Thus, substantial compliance with the statute implicates the information provided to the Copyright Office—it cannot excuse a failure to provide the Copyright Office with any information at all.

**\*8** Yandex's substantial compliance argument also treats a significant portion of the language in Section 512(c)(2) as a nullity. The statute plainly specifies that a registered agent is a predicate, express condition—the safe harbor will apply "only if" such agent has been designated and identified to the Copyright Office for inclusion in the directory of agents.

Giving effect to the clauses referring to registration with the Copyright Office is not a "hyper-technical" reading of the statute as Yandex contends, it is a plain reading. The statute does not make any provision for application of the safe harbor in the absence of an agent registered with the United States Copyright Office. Nor is there any basis to expand the concept of substantial compliance so as to eliminate entire clauses from the statute, as Yandex requests.

Yandex's objection that it received and processed the DMCA notices without having an agent registered with the United States Copyright Office

is irrelevant to whether it complied with Section 512(c). Yandex's objections that Perfect 10 at times sent DMCA notices to the wrong email address, and that it substantially complied with the DMCA takedown requirements in response to the notices are likewise irrelevant.

**6. OBJECTIONS TO REPLY EVIDENCE.**
Yandex objects to a declaration and exhibits appended to Perfect 10's reply brief and requests a sur-reply (Dkt. No. 133). Because this order did not rely on any of the contested evidence in order to reach the conclusions herein, the objections are **OVERRULED** and the request for a sur-reply is **DENIED.**

**CONCLUSION**
To the foregoing extent only, Perfect 10's motion for partial summary judgment is **GRANTED IN PART.**

**IT IS SO ORDERED.**

N.D.Cal.,2013.
Perfect 10, Inc. v. Yandex N.V.
Slip Copy, 2013 WL 1899851 (N.D.Cal.)

END OF DOCUMENT

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.