CASE NO. 11-CIV-20427-WILLIAMS/TURNOFF

*DISNEY ENTERPRISES, INC., TWENTIETH CENTURY FOX*
*FILM CORPORATION, UNIVERSAL CITY STUDIOS PRODUCTIONS*
*LLLP, COLUMBIA PICTURES INDUSTRIES, INC., and*
*WARNER BROS. ENTERTAINMENT INC.*
*v. HOTFILE CORP., ANTON TITOV AND DOES 1-10*

# EXHIBIT A

# HIGHLIGHTED PROPOSED AGREED REDACTIONS TO THE AUGUST 28, 2013 SEALED ORDER ON SUMMARY JUDGMENT FILED IN SUPPORT OF THE JOINT MOTION OF THE PARTIES FOR LEAVE TO FILE UNDER SEAL THE PROPOSED AGREED REDACTIONS TO THE AUGUST 28, 2013 <u>SEALED ORDER ON SUMMARY JUDGMENT</u>

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 11-20427-CIV-WILLIAMS

DISNEY ENTERPRISES, INC., *et al.*,

     Plaintiffs,

vs.

HOTFILE CORP., *et al.*,

     Defendants.

                      /

ISSUED UNDER SEAL

## ORDER

**THIS MATTER** is before the Court on several pending motions for summary judgment, which were filed under seal and in a public, but redacted form (DE 255, DE 275, DE 276, DE 280, DE 301, DE 316, DE 318, DE 322). In connection with this briefing, the parties filed numerous related motions to strike (DE 217, DE 241, DE 339, DE 452, DE 371, DE 387), supplemental briefing permitted by the Court (DE 474, DE 475), and additional, robust pleadings on supplemental authority without leave of Court (DE 443, DE 444, DE 500, DE 501, DE 502, DE 503, DE 504, DE 505, DE 507, DE 509, DE 510, DE 513, DE 514, DE 515, DE 516, DE 517, DE 523).[1] Finally, the Court permitted the Electronic Frontier Foundation to file a brief as *amicus curiae* (DE 480). The Court addresses all related filings in this Order. To the extent that this Order discusses information considered by the parties to be business secrets, it will be redacted in a public version of this decision.

---

[1] As evinced by the volume of the briefing and the proceeding discussion, the parties do not agree on much, there are many facts asserted to be relevant, and the Court has been asked to weigh in on numerous unsettled legal issues.

## I.   BACKGROUND

This case concerns the actions of an off-shore technology company that provides online file storage services, Defendant Hotfile Corp., and one of its founders, Defendant Anton Titov (collectively, "Hotfile" or "Defendants").   Plaintiffs are five major media studios and entertainment companies (collectively, the "Studios") that hold copyrights on various artistic works:   Disney Enterprises, Inc., Twentieth Century Fox Film Corporation, Universal City Studios Productions LLLP, Columbia Pictures Industries, Inc., and Warner Bros. Entertainment Inc. ("Warner").   The gravamen of the Studios' claim is that Hotfile's users have abused its system by sharing licensed materials belonging to the Studios and that Hotfile and Titov are liable as a result.

The pending motions for summary judgment seek an adjudication that Hotfile's activities are not (or are) entitled to a statutory safe harbor protection created by Congress fifteen years ago in the Digital Millennium Copyright Act ("DMCA"), 17 U.S.C. § 1201, *et seq.*; that Hotfile is (or is not) liable for secondary copyright infringement at common law; that Titov is (or is not) personally liable for Hotfile's activities as one of its corporate officers and founders; and that Warner is not liable for itself abusing a system that enabled it to remove works from Hotfile's system.   After considering the extensive factual record and applying the relevant law, the Court concludes that Defendants have failed to meet criteria necessary for safe harbor protection; that Defendants are vicariously liable for the actions of Hotfile's users, but that questions of fact preclude a determination of other forms of secondary liability; that Titov is individually liable for the actions of his company, such that he will have to share in whatever judgment Hotfile is deemed to owe; and that Hotfile may proceed on a counterclaim it filed against Warner

relating to notices of infringement.  This action will proceed to trial on all unresolved issues of liability as well as for a determination of the measure of damages.

### A.    Hotfile's System

Hotfile, which began its operations on February 19, 2009, is what is known as an online "storage locker."   The company operates an Internet website that allows registered users to take electronic files of any type that are stored on their computers or other accessible locations and transfer them to Hotfile's electronic storage system through an uploading process.  As a result, a copy of that file then exists on Hotfile's servers.  The website provides a simple interface between Hotfile users (and their data) and Hotfile's storage network, connecting them with just a few computer mouse clicks. Once a file is uploaded, the uploading user automatically receives one or more unique URL links containing the file name and an extension.  So, for example, if a user uploads a piece of software called "JDownloader" – which is a real program whose authors voluntarily uploaded it through Hotfile's website – Hotfile would issue the user a link location such as "http://hotfile.com/dl/14052520/7a3c8f8/JDownloader%200.8.821. zip.html." As can be seen, the link generally gives some indication of the file name, and thus, its possible content.  By entering that link into the address bar of any Internet web browser on any computer, the user may retrieve and download his file.  Hotfile keeps track of the date, time of use, and certain user information associated with the file.[2]

---

[2]    This case revolves around emerging technologies, which requires the Court to give an overview of the relevant concepts.  The parties have provided more comprehensive information and more sophisticated analyses, which are on file with the Court. (*See, e.g.,* Foster Decl. (DE 325-17).)

While an individual's act of uploading a file is ostensibly innocuous – and indeed, other networks provide similar sorts of services – several of Hotfile's attributes facilitate users' infringement of copyrights.  First, while the uploading process places just one copy of the file on Hotfile's servers, that file can be downloaded an *unlimited* number of times.  Moreover, there are no limitations as to how someone can further use or replicate the file.

Second, because the file is not secure, it is accessible to anyone with an Internet connection.  It is important to note that Hotfile provides no index or search feature, which means that anyone trying to access a file must know its exact location or URL – the file is essentially hidden in plain sight.  Nevertheless, ways exist for other users to learn about and gain access to files.  For instance, Hotfile encourages users to share file links (and thus files) through an affiliate program, which pays individuals to navigate prospective downloaders to file locations.  The incentives increase with the size of the file and the frequency of its download but without regard to other characteristics the file might possess (e.g., if it is entertainment media versus utility computer software or if it is created by the user or created by someone else).[3]  In practice, Hotfile's affiliates have created their own websites that catalogue files found on Hotfile, promote their files, or allow the public to search for files.  In addition, uploading users can themselves broadcast the download links, such as by e-mailing them to people they know or by

---

[3]   The amounts paid per file – no more than $0.015 – are small, but in aggregate have resulted in the payment of millions of dollars to affiliates.  Prior to 2012, Hotfile also paid website owners a five percent commission based on the number of users who purchased premium subscriptions to Hotfile and had been referred by such websites.

advertising them through various channels. This has turned Hotfile into not only a storage site, but also a file distribution network.

Finally, because Hotfile protects users' privacy, it has effectively refrained from interfering in any way with how its members use the service. In the normal course of its business, for example, Hotfile does not review what its users are uploading, downloading or promoting. Indeed, as discussed below, one of Hotfile's main defenses in this action is that it is unaware of the nature of the content available and has no affirmative duty to monitor user activities.

Hotfile has sought to increase the use of its system and expand the rate of file sharing because the corporation derives revenue through subscriber fees that users pay to it. Indeed, this is Hotfile's sole source of revenue. While Hotfile is accessible to the public and anyone can upload or download for free, paying nine dollars per month for "premium" status permits uploaders to store their files for a longer period; otherwise, files are automatically deleted every three months. Moreover, premium users who seek to download files benefit from easier access, faster download speeds, and the ability to download files frequently; they would otherwise be restricted to one download every thirty minutes. Hotfile calculates that user activity drives premium subscriptions while rewarding users for giving away access to files they possess. For instance, it is undisputed that Hotfile's affiliate program promotes the use of Hotfile and leads users to convert to premium status.

By any measure, Hotfile's model has been effective at encouraging user participation and driving growth among downloading users, uploading users and affiliate members. For instance, according to Hotfile's figures, 123 million files available on

Hotfile's system have been downloaded 2.9 billion times – 145 million times alone in the month preceding this lawsuit – and have resulted in the registration of 5.3 million users. (Titov Decl. ¶ 36 (DE 396-1).) This has worked a significant financial benefit to Hotfile and its founders. Although claiming to be just a small startup, it has earned over 60 million dollars from its inception through August 2011. (Yeh Decl. Ex. 70 (DE 288-82 (filed under seal); DE 324-13).) Titov claims to have received as much as 50 thousand dollars per month from Hotfile and might receive additional income as an employee of related entities under contracts to perform services. (Id.)

### B.    Legal Claims at Issue

As alluded to above, these features – the ease of replication and dissemination of any type of file, the lack of oversight regarding content, and the scale of Hotfile's activity – raise questions of liability for users' illegal activities.[4] In their Complaint filed on February 8, 2011 (DE 1), the Studios allege that while Hotfile proclaims to be an online personal storage site, it is actually designed to provide a mechanism for uploading and downloading users to engage in digital piracy, complete with a system of

---

[4]    Systems with similar capabilities have faced careful scrutiny. For instance, in the late 1990s and early 2000s, copyright owners brought numerous successful challenges to peer-to-peer file networks, which coordinated the transmission of media stored on users' computers directly to other users, imposing liability on the network operators for the conduct of their users. *See, e.g., Metro-Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd.*, 545 U.S. 913 (2005); *A&M Records, Inc. v. Napster, Inc.*, 239 F.3d 1004 (9th Cir. 2001); *Arista Records LLC v. Lime Group LLC*, 784 F. Supp. 2d 398 (S.D.N.Y. 2011) ("*Lime Group*"). The system challenged most recently, Megaupload Limited, shuttered its service in early 2012 and is facing potential criminal and civil liability in the United States. *See* Ben Sisario, *7 Charged as F.B.I. Closes a Top File-Sharing Site*, N.Y. Times, Jan. 19, 2012, at B1. While the parties have found it convenient to compare Hotfile to these systems, the Court predicates its decision on the facts and law presented by this record.

financial incentives that fosters infringement.  They assert that it is Hotfile's infringing uses, not legitimate user activity, that drives the company's business.  The Studios bring a claim for secondary infringement (Count II); their claim for direct infringement (Count I) was dismissed by prior order of the Court (DE 94).  To frame the legal issues and put into context the evidence discussed throughout this decision, the Court provides the following summary of the parties' positions and their key evidence.

Although largely irrelevant to issues of liability, the cornerstone of the Studios' case is a statistical analysis conducted by Dr. Richard Waterman based on classifications provided by their proffered copyright expert, Mr. Scott A. Zebrak.[5]  The report concludes that 90.2% of the daily downloads on Hotfile are downloads of "infringing" or "highly infringing" content and that only 5.3% of downloads are noninfringing, with a 1.3% margin of error.  (Waterman Decl. ¶¶ 22-23 (DE 325-6).)  The Studios also provide circumstantial and anecdotal evidence that Hotfile does not serve a

---

[5]  As explained in more detail below, courts have squarely rejected the Studios' position that generalized evidence of infringement, such as Dr. Waterman's study, forecloses the statutory safe harbor protection afforded by the DMCA and necessitates a finding of liability.  Although the Studios cite to dicta supporting the proposition that the goals of the DMCA are inconsistent with rewarding those who knowingly contribute to infringement (but mean to protect innocent actors who are engaged in beneficial applications of technology), a litigant must point to evidence of known infringement particular to works that they own.  For instance, in *Viacom Int'l, Inc. v. YouTube, Inc.*, 676 F.3d 19 (2d Cir. 2012), the Second Circuit found that a defendant could not be said to have awareness of infringement where an internal survey revealed that 75 to 80 percent of all content on the system was infringing.  *Id.* at 32-34.  As another case recently summarized, "knowledge of the prevalence of infringing activity, and welcoming it, does not itself forfeit the safe harbor.  To forfeit that, the provider must influence or participate in the infringement." *Viacom Int'l, Inc. v. YouTube, Inc.*, No. 07 Civ. 2103 (LLS), 2013 WL 1689071, at *5 (S.D.N.Y. Apr. 18, 2013).  Outside the scope of the DMCA, general knowledge of infringement is a factor supporting secondary liability for infringement but cannot establish such liability on its own.

primarily lawful purpose, as discussed below.  Further, they contend that Hotfile knows about rampant infringement of works owned by the Studios and others, that Hotfile failed to remove infringing material or disable the accounts of users who uploaded such material despite having received eight million infringement notices from copyright holders, and that Hotfile and its uploading users have profited from the infringing activity.  As a result, the Studios contend that Hotfile is liable under various theories of secondary copyright infringement and that it cannot avail itself of a safe harbor created in favor of service providers by Congress through Section 512 of the DMCA.

For its part, Hotfile portrays itself as anything but a pirate network.  Hotfile and its founders claim that the corporation's business model is not unusual for the industry. And they contend that the system is used predominantly for storage and other legitimate uses, such as distributing non-licensed software; "space shifting" (i.e., enabling individual users to access their media through another device they own); and the sharing of media that is either created by users (such as videos to promote political change), freely licensed (or altogether not copyrighted), or too large to send by other methods.  For example, Hotfile points to the fact that Plaintiff Warner acknowledged using Hotfile once in a "test" to disseminate twenty short video clips of one of its television programs, *The Vampire Diaries*.  (Gupta Decl. Ex. 6 (Warner Interrog. Resps.) at 24-25 (DE 275-4) (filed under seal).)[6]

Further, through its experts, Hotfile attempts to undermine the Studios' infringement analyses, contending that the Waterman study examined only a one-month period of data from January 2011 (leaving the possibility but hugely improbable

---

[6]    No other Plaintiffs appear to have done so.

likelihood that there was a zero percent infringement rate in other months prior to this lawsuit) and improperly excluded entire categories of files, such as those with adult content, which is often given away with the copyright holders' permission, and public domain material, including works whose copyrights have expired. Hotfile does concede that, at least to some degree, infringement has occurred through its system and the availability of infringing files drives conversions to paid premium accounts. Nonetheless, to the extent that infringement did transpire on its system, Hotfile claims to have been unaware of it.

Hotfile also asserts that to the extent this litigation has highlighted ways it could better police the activity of its users, it has done so (even if it was not required to). This appears to be true. For example, when alerted by the Studios' lawsuit to the presence of infringing content, Hotfile implemented "powerful countermeasures" against Internet piracy, such as adopting filtering technologies and terminating large numbers of repeat infringers, that go beyond the most rudimentary foils to such activities. In this way, Hotfile advances the claim that it is a small, foreign company that has done everything possible to investigate its users' backgrounds, implement countermeasures to defeat piracy, and comply with United States copyright law (with which it says it was not always familiar). Finally, Hotfile asserts that the Studios have an improper motive in bringing this lawsuit, claiming that they stood witness to, and were complicit in, the alleged violations in order to drive damages and recover *post hoc*.

### C.   Evidence of Hotfile's Intent

The parties have diametrically different views of Hotfile's aims and have devoted much space to debating whether Hotfile set out to serve a legitimate purpose. Hotfile

acknowledges that at its inception, it modeled itself after RapidShare, another online storage locker website. Notably, copyright holders eventually claimed that RapidShare was used for infringement and brought suit against it in June 2010 to shut the network down. Hotfile was aware of RapidShare's problems. After the RapidShare lawsuit was filed, one of Hotfile's co-founders, Rumen Stoyanov, sent an e-mail to Titov noting an increase in traffic on Hotfile's system and remarking, "[w]hat an unexpected gift we have from Rapidshare :) The bad thing is that they clean up their image while we become the flagship of non-licensed content." (Yeh Decl. Ex. 53 (DE 288-58 (filed under seal; DE 324-11).) One month later, Stoyanov speculated that one reason that "our profits increased so rapidly" was that "Hollywood has closed 3-4 large websites for illegal movies and that could have redirected users to us." (Yeh Decl. Ex. 49 (DE 288-54 (filed under seal); DE 324-11).) Titov responded to that e-mail by specifically naming RapidShare.

Apart from the generalized statistics highlighted earlier, the Studios have provided a pastiche of evidence related to Hotfile's business model, design and use that they contend makes a circumstantial case that Hotfile understood it was making illegal content available for distribution and tacitly fostering such activity. For instance, the fact that Hotfile encouraged downloading activity – by deleting files that are not frequently downloaded and by paying members only for downloading activity – means that Hotfile was intended to be a distribution network and not merely a storage facility. As a corollary, the Studios contend that Hotfile's affiliate compensation structure rewarded the sharing of *larger* and *popular* content, which drove premium conversions and earned revenue for the network.

On the other hand, Hotfile presents evidence that it conducts its affairs without regard to the nature of the content available on its system (i.e., protected by copyright or otherwise) or user activity (e.g., storage, sharing, streaming, etc.). Hotfile's expert, Dr. Boyle, challenges the Studio's claims about the conversion rate. Even the Studios' expert, Dr. Ian Foster, acknowledges that entertainment media, which may or may not be protected and which Hotfile users may or may not have had permission to share, can be a single large file, or "divided into several, smaller computer files in order to facilitate transmission or copying." (Foster Decl. ¶ 8 (DE 325-17).)

The Studios also point to specific documents to refute Hotfile's claims that it did not understand what was occurring on its system. For instance, in an e-mail between Hotfile engineers discussing the company's intellectual property policy, one of them stated that "what is protecting us legally is the fact that we don't know what is up there on our site. If we know, then we are susceptible to lawsuits. And now according to the IP policy, 10 days after a report, we pretend we don't know." (Yeh Decl. Ex. 54 (DE 288-59 (filed under seal); DE 324-11).) The Studios argue that Hotfile turned a blind eye to infringement. Moreover, as previously cited, Hotfile acknowledged (or at least expressed the concern) in the Summer of 2010 that it was becoming "the flagship of non-licensed content" and capturing infringing traffic from competing systems. And as discussed in the DMCA context below, Hotfile received millions of notices from copyright holders claiming that their rights to particular works were being infringed yet failed to target the associated users, failed to remove other identical copies of the works from the system (and only removed offending links and not the offending files), and did not implement robust counter-piracy tools until after this lawsuit was filed.

With regard to Hotfile's affiliate program, the Studios contend that because of "facially pirate" affiliate sites like "copymovie.net" – a website that, from screenshots, apparently displayed popular movies' promotional materials and may have been embedded with Hotfile download links – Hotfile should have understood the availability of copyrighted content. (Yeh Decl. Ex. 35 (DE 324-3).) In fact, Hotfile had several run-ins with affiliates regarding piracy. In one internal discussion, for example, an employee named "Andrei" reached out to Titov about an affiliate site called "PlanetSuzy" that was "converting well" but had somehow strained its relationship with Hotfile. Titov responded that "it must not appear in any way that we pay for advertising on a pornography site, where piracy activity prospers." (Yeh. Decl. Ex. 104 (DE 288-116 (filed under seal); DE 324-17).) While Hotfile suggests that the document shows its unwillingness to deal with infringers, the Studios provide evidence that "Hotfile most recently paid this affiliate during the period spanning January 16, 2012 through January 22, 2012 . . . suggesting that Hotfile is continuing to make payments to this website today." (Foster Decl. ¶ 56 (DE 286 (filed under seal); DE 325-17).)

The Studios also point to other Hotfile communications with affiliates. Instructions on Hotfile's system addressed to its affiliates stated that third-party site owners can get a commission equal to five percent of all premium accounts they sell, so those third-parties should "[p]ost *interesting* download links" in order to "earn big money." (Yeh Decl. Ex. 57 (DE 324-11) (emphasis added).) Other instructions to affiliates suggest uploading "files only if you inten[d] to promote them." (Yeh Decl. Ex. 59 (DE 324-11).) And, around the time of Hotfile's founding, someone affiliated with Hotfile, Andrew Ianakov, solicited affiliates by posting on a website that "[o]ur goal is to

reach people who are interested in this kind of business, and to find good uploaders . . . uploading some stuff – mp3, videos, applications, games on our file host and spread these links over . . . forums where download links are posted (to games, applications and so on)." (Yeh Decl. Ex. 60 (DE 324-12).)

Apart from affiliates, evidence of similar communications exists between Hotfile and its uploading and downloading users. One user seeking technical assistance, for instance, stated that "im a premium user n im trying to download from the below link but after clicking download button, page not found appears http://hotfile.com/dl/8651708/ cad2aa3/Despicable.Me.2010.720p.BRRip.XViD.AC3-FLAWL3SS.part6rar.html." (Yeh Decl. Ex. 54 (DE 288-31 (filed under seal); DE 324-11).) Someone at Hotfile apparently responded with download instructions. The Studios contend that the file name identified above should have alerted Hotfile to the fact that a user was attempting to illegally download a portion of the popular movie *Despicable Me*. Beyond this example, the evidence shows that whenever Hotfile was contacted by users, the title of the file last accessed by that user was revealed.

In another document, a Hotfile user complained that he was unable to export files that had been uploaded from Hotfile to other services because those services "wrote me that all my files are BLACKLISTED." (Yeh. Decl. Ex. 1 (Titov Dep.) at 719:2-21. (DE 288-3 (filed under seal); DE 324-2).) Someone at Hotfile responded that "[s]ince the specific value is identical to a value marked *illegal* in our system, uploads are denied. We suggest to contact your hoster in this matter. Unfortunately, due to security and legal matters, the blockage of the value cannot be lifted." (*Id.* (emphasis added).) And Titov commented in an internal e-mail that "we generally do not support transferring files

from our system out and that is not a problem that we need to give much consideration."
(*Id.* at 721:4-10.)   In this regard, Hotfile argues that the files were non-transferrable for reasons independent of copyright; they were essentially blank files.   But the Studios rejoin that the inference to be drawn is that Hotfile had notice that the user's files were infringing because they had been blocked by the other service.

Similarly, one portion of Hotfile's website allowed users to test whether a Hotfile link was operational.   According to a screen shot, Hotfile provided the instructional example of "http://hotfile.com//dl/182987/c2d67b8/PCD.DollDomination.2009.rar.html." (Yeh Decl. Ex. 44 (DE 324-11).)   The Studios contend that the link used as an illustration contained an album by "The Pussycat Dolls" called "Doll Domination" and that other copyrighted works were used in other tutorials illustrating Hotfile's functions. Hotfile argues that even if the file contained what the Studios assert it contained, this particular band authorizes certain works for online distribution, as one court has recognized. *See UMG Recordings, Inc. v. Veoh Networks, Inc.*, 620 F. Supp. 2d 1081 (C.D. Cal. 2008) (concluding that the defendant network did not have actual knowledge of infringing material where it knew that works by particular artists were available for download since they were uploaded by artists themselves, such as The Pussycat Dolls).

### D.   Additional Facts Relevant to Hotfile's DMCA Defense

As explained more fully below, Section 512 of the DMCA confers immunity "from all monetary relief" on Internet service providers that meet certain criteria with regard to storing infringing material and making it accessible.   Principally, with respect to the network at issue here, a requirement for eligibility contained in Section 512(i) along with several other requisites contained in Section 512(c) mandate:   that the defendant has a

policy, reasonably implemented, for terminating repeat infringers; that it is a qualified service provider; that it has properly registered a DMCA agent; that it does not have actual or "red flag" knowledge of the infringing nature of files stored on its system; that it takes down files that are the subject of an infringement notice; that it does not receive a direct financial benefit from the alleged infringing activity; that it does not have the practical ability to control the alleged infringements; and that it accommodates and does not interfere with standard technical measures used to protect content.  Notably, the statute does not focus on the general characteristics of the network, does not require affirmative action to police content, and does not preclude a grant of immunity even if the operator knew or should have known of infringement generally.   The parties' motions in this case concern in part whether Hotfile has met those requirements and, as a result, whether Hotfile became eligible for safe harbor protection at any point.

        1.      **Infringement Notices and
Hotfile's Repeat Infringer Policy**

     Under the DMCA, Internet service providers must reasonably implement a policy designed to terminate users identified as repeat infringers.  To that end, since May 2010, Hotfile has provided its users with notice of a repeat infringement policy through the terms of service provided on its website.  (Yeh. Decl. Ex. 1 (Titov Dep.) at 279:1-4 (DE 324-2).)   That policy states that Hotfile "discontinue[s] service to users who repeatedly make such content available or otherwise violate HotFile's Terms of Service. Please do not abuse the HotFile service by using it to distribute materials to which you do not have the rights."  (Titov Decl. ¶¶ 17-19 (DE 321-1).)   Prior to that time, Hotfile had warned users that "[s]ervices of Hotfile can be used in legitimate objectives. Transmission, distribution, or storage of any materials that violate laws is forbidden.

This includes without restriction patented materials, copyright laws, trademarks, commercial secrets and other intellectual property rights." (*Id.* ¶ 12.) It had also posted an e-mail address on its website – abuse@hotfile.com – that the public could use to alert Hotfile of infringement. Although the policies essentially ask users not to engage in misconduct and warn that they may be excluded from using Hotfile, they are notably silent as to what criteria Hotfile would consider in terminating repeat infringers and what efforts it would undertake in doing so. It is undisputed that Hotfile terminated only approximately 43 users up to the filing of the Complaint.

It is clear from the record that Hotfile's repeat infringer policy was not tied to notices of infringement it received from copyright owners under the DMCA.[7] By the time this Complaint was filed, for instance, ten million such notices had been sent to the company with respect to links to files available on its system. (Foster Decl. ¶ 25 (DE 325-17) (discussing data produced by Hotfile).) Both sides agree that those notices correspond to approximately eight million unique files. (*Id.*; Titov Decl. ¶ 26 (DE 396-1).)

Hotfile acknowledges that it made no connection between infringement notices and acts of infringement. Hotfile explains that it did not track the notices and did not base its policy on how many notices were associated with certain users (such as by "flagging" them). (Yeh. Decl. Ex. 1 (Titov Dep.) at 283:24-285:15 (DE 324-2).) Titov

---

[7]   The DMCA sets out a notice protocol under which copyright holders can notify an agent responsible for the service of claimed infringement. *See* 17 U.S.C. § 512(c)(3); *Hendrickson v. eBay, Inc.*, 165 F. Supp. 2d 1082, 1089 (C.D. Cal. 2001). The statute also allows service providers to challenge infringement designations through a counter-notification process.

said as much at his deposition, acknowledging that when Hotfile received a DMCA

notice of infringement, it did not record which user it corresponded to:

> Q.    Prior to the filing of this Complaint, when Hotfile received a DMCA notice from a copyright owner, did Hotfile attempt to identify the user who had uploaded the offending file?

> MR. THOMPSON:  Objection, overbroad.

> A.    I don't believe that would be the case most of the time.  But again, on discretion, employees could investigate further.

> * * *

> Q.    . . . . Absent a request, a specific request by a copyright owner, prior to the filing of this action, did Hotfile have a practice of identifying the user who had uploaded files identified as infringing on DMCA notices?

> MR. THOMPSON:  Objection.  Overbroad, asked and answered.

> A.    I won't say "specific request," but if a copyright holder would raise some kind of concern that I – I think can be – can be summarized, again, a discretion, identification could be made.

> BY MR. FABRIZIO:

> Q.    Okay.  My question, though, is without a request from a copyright owner, when Hotfile received a DMCA notice, did Hotfile, as a matter of practice, identify the user who had uploaded the offending file?

> MR. THOMPSON:  Objection.  Asked and answered.

> A.    I don't believe so.

(Yeh. Decl. Ex. 1 (Titov Dep.) at 281:10-282:15 (DE 324-2).)  While Hotfile did not track

such notices, Titov, as the designated corporate Rule 30(b)(6) representative regarding

Hotfile's electronically stored information, testified that Hotfile knows the user identity for

every upload and that it would have been a "trivial task" to extract user identities from

infringement notices.  (Yeh Decl. Ex. 2 (Titov ESI Dep.) at 51:23-52:4 (DE 288-4 (filed

under seal); DE 324-2).)  In sum, prior to this action, whether a user was the subject of one notice or 300 notices, Hotfile acted no differently in terms of investigating possible infringement.

Instead, in its briefs, Hotfile credits a system of "manual review" and "discretion" for the termination of 43 users.  However, the Studios' evidence demonstrates that Hotfile was motivated not by policy, but by the threat of litigation.  Of those 43 terminations, 33 were due to a court's temporary restraining order issued in connection with litigation initiated by a pornography producer called "Liberty Media."  (Yeh. Decl. Ex. 1 (Titov Dep.) at 299:1-24 (DE 288-2 (filed under seal); DE 324-2).)  Others were apparently terminated when Hotfile or its affiliated entities received litigation threats from copyright holders.  (See, e.g., id. at 306:12-307:10 (acknowledging that Hotfile terminated a user after a copyright owner complained of Hotfile's failure to respond to DMCA notices and threatening to hold Hotfile liable for "a huge loss to my company").)  Thus, while Hotfile claims to have acted to "terminate, and stop payments to accounts of users with numerous complaints at content owners' request," it has failed to cite evidence to support the proposition, explain the conditions that led it to target or terminate users, or rebut the Studios' account of user termination only by litigation. (See Titov Decl. ¶ 34 (stating only that "Hotfile did review accounts of users with numerous complaints at the request of content owners, did perform manual reviews of those accounts, did terminate those accounts, and did stop payments") (DE 342-2 (filed under seal); DE 396-1).)

Similarly, Hotfile's public claims about its repeat infringer policy appear to be unfounded.  For example, it purported to have a policy of automatically removing users

that had accumulated two "strikes," based on DMCA notices; the policy was discussed in internal e-mails. (*See* Liebnitz Ex. 29 (DE 346-31) at HF02835779 ("If user's files were reported two times as copyright abuse we delete user account.").) Hotfile also reported to copyright holders that it acted upon the notices of infringement that it received, but vetted them manually to ensure that the users it deleted had in fact infringed. (*Id.*) Likewise, internal documents suggest that Hotfile had a "system in place that flags the users [with] numerous infringing [Complaints]" and that the corporation "manually review[ed] those accounts," deleted them, and seized funds they have received from their affiliate program. (Yeh. Decl. Ex. 1 (Titov Dep.) at 286:6-18 (DE 288-2 (filed under seal); DE 324-2).)

In his deposition, Titov acknowledged that those representations were untrue. (*See, e.g.,* Yeh. Decl. Ex. 1 (Titov Dep.) at 286:6-289:4 (DE 324-2).) Indeed, had Hotfile paid attention to the DMCA notices, it would have known that by the time of the Complaint, 24,790 users had accumulated more than three notices; half of those had more than ten notices; half again had 25 notices; 1,217 had 100 notices; and 61 had more than 300 notices. (Foster Decl. ¶¶ 42-52 & Ex. D. (DE 286 (filed under seal); DE 325-17).) Moreover, documents produced in the litigation support the conclusion that, prior to the filing of the Complaint, Hotfile lacked any meaningful policy to combat infringement. Although it is the subject of a motion to strike on the grounds of hearsay and authenticity, one document purports to show a conversation thread in which a Hotfile user observes in an online forum that "[i]f any of you[r] files are reported by a real representative (see http://hotfile.com/reportabuse.html), then the file will be deleted, but your account will not be removed, and you will not be suspended from hotfile.com."

(Yeh. Decl. Ex. 22 (DE 288-25 (filed under seal); DE 324-2).)  Similarly, another user who operated a site with Hotfile links, which the Studios suggest was "blatantly" infringing, was suspended but allegedly had his account restored after contacting Hotfile. (Yeh. Decl. Ex. 100 (DE 288-112 (filed under seal); DE 324-16).)  The Studios' expert calculated that this particular user had uploaded nearly 30 thousand files to Hotfile and received over 40 thousand dollars in affiliate commissions, but had also accumulated 9,254 takedown notices. (Foster Decl. ¶ 54 (DE 286 (filed under seal); DE 325-17).)  To the extent that they may be admissible at trial, these documents give substance to the Studios' assertions.

Like that user, the evidence produced shows that the subjects of the notices formed a discreet group of problematic users.  While those who were the subject of more than three infringement notices made up less than one percent of all of Hotfile's users,[8] they were responsible for posting 50 million files (15.6 million of which were subsequently the subject of a takedown notice or removed for infringement), representing 44 percent of all files ever uploaded to Hotfile.  (Foster Decl. ¶ 41 (DE 286 (filed under seal); DE 325-17).)  Those same files were downloaded nearly 1.5 billion

---

[8]   The fact that these users were few in number but had a large aggregate impact (particularly with respect to downloaded files) accounts for the discrepancies between the parties' proffered statistics, as does the fact that the Studios focus only on total downloading activity.  For instance, Hotfile argues that only four percent of files ever uploaded have been the subject of a DMCA notice; that three percent have been removed by copyright holders under Hotfile's Special Rightsholder Account program; that the most popular downloads are not copyrighted; and that 56 percent of the files uploaded have never been downloaded.  Further, because Hotfile made significant changes to its system after this lawsuit was filed, including implementing a three-strikes policy and various fingerprinting technologies to seek out infringing content, additional discrepancies are attributable to the time period analyzed.  Supported by post-Complaint data, Hotfile asserts it has been more proactive in identifying and removing infringing files and users.

Case 1:11-cv-20427-KMW   Document 524 *SEALED*   Entered on FLSD Docket 08/28/2013
Page 21 of 52

times, representing roughly half of all downloads ever from Hotfile.  (*Id.*)  Moreover, that group was paid 10.8 million dollars through Hotfile's affiliate program (out of 13.1 million dollars paid to all affiliates).  (*Id.*)   In turn, the conversion rate evidence shows that Hotfile earned large sums from new premium users.  Significantly, a snapshot taken by the Studios showed that their files accounted for one percent of the files on Hotfile, or 945,611 files.  With regard to downloads, however, ten percent of files downloaded from Hotfile (according to the Studios' download study) were owned or controlled by the Studios.

While Hotfile's efforts to control infringers' activity appears to have been ineffective (whatever its policy might have been), Hotfile adopted a "revamped repeat infringer policy" immediately after this litigation began.   The new policy focuses on "three strikes" – terminating and banning users who receive three DMCA notices of claimed infringement or Special Rightsholder Account requests (discussed below). (Titov Decl. ¶ 33 (DE 321-1).)  Hotfile now tracks how many times it receives notices of infringement, each of which count as a "strike."  (*Id.*)  This revamped policy led directly to the termination of 444 of its 500 highest-paid affiliates, although thousands of smaller affiliates were not terminated.   (Titov Decl. ¶ 30 (DE 396-1).)   Ultimately, Hotfile terminated 22,447 users within months of the filing of the Complaint. (Titov Decl. ¶¶ 34, 37 (DE 342-1 (filed under seal); DE 396-1).)  Hotfile cites this evidence in support of its argument that it is now DMCA compliant, while the Studios use the evidence to show how rampant and unchecked user activity had been.  And Hotfile points out that the number of users removed is, in relative terms, a small number.

### 2.    DMCA Agent Registration

Another requirement of DMCA protection is that a registered agent be designated to receive infringement notices.   At least as far back as April 24, 2009, Hotfile maintained an e-mail address posted on its website for the public to report illegitimate or illegal user activity.  At that time, the website explained to users that "[t]o exercise your DMCA rights, your Proper DMCA Notice must be sent to Designated Agent of hotfile.com to email:  abuse@hotfile.com . . . When a Proper DMCA notification is received by Designated Agent, or when hotfile.com becomes aware that copyrights are infringed, it will remove or disable access to infringing materials as soon as possible."  (Titov Decl. ¶ 15 (DE 321-1).)   Hotfile formally registered a DMCA agent with the Copyright Office in December 2009, a fact that is undisputed.  (Titov Decl. ¶ 16 (DE 321-1).)  Thereafter, in May 2010, it posted a policy expressly incorporating the DMCA, informing users of its repeat infringer policy and the contact information for its designated agent.  (Gupta Decl. Ex. 6 (Warner Interrog. Resps.) (DE 275-4 (filed under seal); DE 320-7).)  It is further undisputed that the agent address provided by Hotfile was a post office box, which the Studios contend fails to comply with the statute.

### 3.    Other Infringement Countermeasures

In addition to targeting repeat infringers' accounts, Hotfile makes much of other countermeasures it has put into place, largely after this litigation began.  For instance, Titov stated that Hotfile's current practice is to remove individual files within 48 hours of receiving a notice, which he believes Hotfile does 95% of the time.  (Titov Decl. ¶ 19 (DE 321-1).)  The Studios do not dispute that since February 2011, Hotfile has adhered

22

to this practice, although the Studios have submitted documents suggesting that in some instances, Hotfile might not have always done so.

In August 2009, Hotfile implemented a Special Rightsholder Account ("SRA") program after receiving a request for a "takedown tool" from Plaintiff Warner. (Titov Decl. ¶ 20 (DE 321-1).). The program, which gives rise to Hotfile's counterclaim against Warner, allows trusted content owners who attest that they own rights to protected works to have access to Hotfile's system. This is a much quicker alternative than the user termination prompted by a DMCA-compliant infringement notice. Indeed, the parties have stipulated that notifications by the Studios through the SRA program have the effect of notices of infringement for purposes of the DMCA. (DE 151, at 2 ("Warner's notifications by means of Hotfile's SRA are (and have the effect of) notifications of claimed infringement to Hotfile's designated agent under 17 U.S.C. § 512(c)(3)(A), and are therefore subject to 17 U.S.C. § 512(f).").) Through an interface provided by Hotfile, owners are permitted to identify and automatically remove offending links without any action by Hotfile. According to record evidence, at least one of the Studios, Warner, has participated in this program.

Finally, Hotfile now actively polices files on its network, principally through advanced filtering technology. Video fingerprinting implemented in September 2011 is capable of identifying copyrighted content, which Hotfile claims to then block. (Titov Decl. ¶ 35 (DE 321-1).) Hotfile has also used so-called "hashing technology" (possibly since August 2009[9]) to remove identical copies of files once one is found to be infringing. This is a revision of the "master file policy" – something sharply criticized by

---

[9]   While Titov stated in his declaration that the technology was implemented in August 2009, his deposition testimony is not consistent with that assertion.

the Studios – in which Hotfile saved server space by maintaining only one copy of identical files uploaded by different users. Formerly, when Hotfile received a claim of infringement, it disabled any offending links but did not actually remove the file from the server, thus leaving it accessible for download with a different link. And finally, Hotfile is employing other video and audio filtering technology that identifies files with characteristics matching content registered by copyright owners, which Hotfile then blocks. It is unclear what impact these technologies have had in blocking access to infringing files that were already available at the time the Complaint was filed. But, according to Hotfile, they have two significant, remedial outcomes: (1) Hotfile now removes all infringing files to the extent that its sophisticated technology can identify them; and (2) the low percentage of files currently identified and blocked (in the range of two to four percent in February 2012) demonstrates that Hotfile is no longer used to share infringing files. (*See* Gupta Decl. Ex. 38 (DE 321-39).)

### E.   Corporate History and Titov's Involvement

The Studios' last claim is against Titov individually because of his participation in, and ability to benefit from, the infringing activity present on Hotfile's network. In particular, paragraph 45 of the Complaint states that Titov adopted an infringement-reliant business model; designed the aforementioned affiliate program that promotes infringement and paid infringing users; planned technological features that both frustrated copyright enforcement and failed to prevent infringement by users; managed Hotfile's operations; and operated related businesses to evade liability. While Hotfile makes much of the fact that the Studios have been unable to prove up all of these

allegations, it is more significant that several of them are actually supported by the evidence produced in discovery.

As background, Hotfile is the successor to a business venture Stoyanov and co-founder Atanas Vangelov started in 2003 called "Blue Ant," which developed certain websites. Although it is unclear how Titov first became involved with Blue Ant or what exactly the company was formed to do, it is undisputed that Titov performed software programing, search engine optimization and server administration for the company. At some point, Stoyanov devised the idea for an online file hosting company based on a competitor in the market, Rapidshare. Thus, Stoyanov and Vangelov provided the necessary start-up capital for Hotfile Corp. Titov was approached because of his technical expertise and prior web-hosting experience; he joined them in founding Hotfile in Fall 2008. Hotfile acknowledges that the three "researched the competition in this space to learn about the functionalities of other services" and agreed on Hotfile's business model. They then staffed the company almost entirely with Blue Ant employees, who continue to work for Hotfile. (Yeh. Decl. Ex. 1 (Titov Dep.) at 105:5-7 (DE 288-1 (filed under seal); DE 324-2).)

The evidence shows that Titov's primary role at Hotfile is as a technical engineer, responsible for implementing business ideas and functions. For instance, the parties agree that Titov wrote the source code that runs Hotfile's website. (Yeh. Decl. Ex. 1 (Titov Dep.) at 497:3-7 (DE 288-2 (filed under seal); DE 324-2) (acknowledging writing between 50 and 70 percent of the source code); Yeh Decl. Ex. 88 (Titov Decl.) at ¶ 6 (DE 288-95 (filed under seal); DE 324-15) ("I wrote the source code for Hotfile's website with the assistance of one other person. We designed the source code from scratch.

My conservative estimate is that more than 1,000 hours have been spent developing the source code.").)  Titov also provides "guidance" to Blue Ant employees and oversees aspects of their work for Hotfile.  (*Id.* at 132:8-20 ("I'm not sure that I do in fact supervise them but . . . to the extent they need some guidance and understanding of the technical parts of . . . our system, yes we do communicate, and – yes, I would say that I have certain authority over them.").)

The evidence demonstrates that Titov actively participates in the management of Hotfile and in decision-making. As one of three owners of Hotfile, Titov has acquired a "beneficial interest" in 26 percent of the company, which he placed in the name of a holding company called "Battele Holdings SA." (Stoyanov and Vangelov each own 37 percent of Hotfile's shares.)  Titov testified that Hotfile's three shareholders manage Hotfile jointly and, while the governance procedures have not always been formal, they agree on major decisions such as the implementation of Hotfile's affiliate program. (Yeh. Decl. Ex. 1 (Titov Dep.) at 597:11-598:22 (DE 324) (stating that "major issues" were put to a vote but were not opposed).)  Additionally, Titov acknowledged that he received power of attorney to act on behalf of the corporation "as a manager of the company when [such] acts are authorized by other shareholders."  (Yeh. Decl. Ex. 1 (Titov Dep.) at 79:23-80:1; 82:5-12 (DE 288-1 (filed under seal); DE 324-2).)

Nonetheless, it is undisputed that Titov does not have the authority to make unilateral decisions regarding important aspects of Hotfile's business or operations. Titov asserts that he was not the originator of certain concepts; for instance, he credits Stoyanov with making the decision to implement the affiliate program.  And Titov denies

involvement in other aspects crucial to Hotfile's business, such as soliciting new investors, selecting contractors or devising advertising strategies.

The evidence also shows that, in October 2009, Titov formed a company called Lemuria Communications Inc., a Florida corporation that Hotfile uses to perform web hosting, software maintenance and development. Titov, according to the Defendants, is "the sole owner, manager, and director" of Lemuria.[10] Lemuria, in turn, contracts with Blue Ant to perform some of those services and pays for many of Hotfile's expenses. (Yeh. Decl. Ex. 1 (Titov Dep.) at 38:7-40:10, 106:2-107:14 (DE 288-1 (filed under seal); DE 324-2).)

Beyond examining Titov's overall responsibilities at Hotfile, the Studios point to several specific ways that Titov is linked to the infringement at issue. With respect to the affiliate program, which the Studios believe promotes infringement, it is undisputed that Titov provided input on technological feasibility. Moreover, Hotfile has failed to rebut the Studios' assertions that Titov paid affiliates from an account he opened and transferred to Hotfile Ltd., a company that handles most of Hotfile's finances and that he manages. (Titov Reply Decl. ¶ 4 (DE 378-1 (filed under seal); Yeh. Decl. Ex. 1 (Titov Dep.) at 602:9-14 (DE 324-2) ("Yes, there were instances where users were paid by an account opened [in] my name.").) Titov also stated that he was aware of the master file policy, acknowledging that it permitted users to continue to access suspected files even

---

[10]     Lemuria was formed one month after Hotfile's previous Internet service provider informed the company that it had received a large number of infringement complaints from copyright holders and two months after a copyright holder served a subpoena on that Internet service provider. (Yeh. Decl. Ex. 1 (Titov Dep.) at 119:13-121(DE 288-2 (filed under seal); DE 324-2).) The Studios contend that Lemuria was formed to prevent the consequences of a third-party Internet service provider cutting off Hotfile's service and that Lemuria acts as a front for Hotfile's commercial activity. Hotfile denies these allegations.

while individual links were disabled.  (Yeh. Decl. Ex. 1 (Titov Dep.) at 602:16-604:13 (DE 324-2).)  Similarly, given that Hotfile was governed jointly, Titov did not recall opposing Hotfile's key policies, such as how it treated repeat infringers or how it endeavored to remove infringing files.

Finally, while evidence of Titov's personal involvement in Hotfile's treatment of copyright infringement claims is not extensive, he acknowledged instructing Hotfile employees to ban a user and to "[b]e more strict in stopping these days," after Hotfile was sued by a company called Perfect 10.  (Yeh. Decl. Ex. 1 (Titov Dep.) at 317:15-321:10 (DE 288-2 (filed under seal); DE 324-2).)  Titov was also responsible for hiring Hotfile's DMCA agent, but he claims that others are responsible for responding to DMCA notices and handling that aspect of Hotfile's operation.

### F.   Facts Relevant to Hotfile's Counterclaim

Separately, Warner moves for summary judgment on a 17-page counterclaim filed by Hotfile relating to 890 DMCA takedown notices that Warner submitted to Hotfile. (DE 161-4.)  In these notices, Warner typically stated "under penalty of perjury" that it was "the owner or authorized legal representative of the owner of copyrights" and that it had "a good faith belief that use of this material is not authorized by the copyright owner, the copyright owner's agent, or the law."  Since April 2009, Warner has participated in Hotfile's SRA program, in which the parties agree that deletions have the same legal effect as takedown notices.

The counterclaim asserts that the works at issue were mistakenly identified as infringing and that Warner violated 17 U.S.C. § 512(f) by making such knowing and material misrepresentations and causing injury to Hotfile.  Warner contends that, while

28

mistakes were made, they were not made knowingly and are not the type of egregious violations contemplated by the statute; that there were few resulting damages to Hotfile; and that Hotfile's motive in pursuing the claim is to demonstrate how difficult it can be for anyone to identify and prevent infringement, which helps Hotfile illustrate its defense to the main infringement claims.

### 1.    Warner's Review Process

Many of Hotfile's contentions concern the sufficiency of the review process Warner implemented to identify and notice particular files.  As explained by Warner's head of anti-piracy operations, David Kaplan, Warner devotes the efforts of seven employees to online anti-piracy enforcement, hires third-party vendors, and, notably, uses the "common practice" of having "automated systems [ ] scan link sites and [ ] issue notifications of infringement to [storage] locker sites when infringing content is detected."  (Kaplan Decl. ¶¶ 4-5 (DE 258 (filed under seal); DE 301-6).)  This last practice is apparently the method by which the counterclaim files were selected for deletion and requires some explanation.

In the automated review process, Warner's employees first determine that a site is used for Internet piracy.  (Kaplan Decl. ¶ 6 (DE 301-6).)  They then manually create programmable instructions and matching criteria for "robots" – software programs that use keywords to search for content based on attributes such as the file's title, genre, and year of release.  (Kaplan Decl. ¶¶ 7-9 (DE 258 (filed under seal); DE 301-6).)  The robots then, on their own, use search algorithms to spot URL links to infringing content.  The search instructions are refined based on how often they improperly detect non-Warner content that appears in the robots' search results. (*Id.* ¶ 8.)

To the extent necessary, Warner's programmers add "exclude" words to the search criteria that distinguish and exclude non-Warner content. (Kaplan Decl. ¶ 8 (DE 258 (filed under seal); DE 301-6).) Warner also maintains a global database of exclude terms to filter out the most common false indicators that turn up in searches. (*Id.* ¶ 12.) If infringing content is found, the robots either identify all surrounding links for deletion or – "[f]or some linking sites" – conduct a tailored search of each link to determine if they contain parts of the same work or other protected works. (*Id.* ¶¶ 10-11.) For each link determined to contain infringing content, Warner sends infringement notices.

### 2.    Prevalence and Knowledge of Errors

Overall, while the evidence shows that Warner's system has many commendable characteristics, it also reveals some areas for improvement.  On one hand, Warner applies the system only to sites it believes to be devoted to infringing content, takes care in creating a robot particular to each site, uses employees to tailor search terms, maintains exclusion procedures and a global database of exclude terms, reviews its practices on a continuous basis, conducts spot checks, and disables robots at the moment they are found to be malfunctioning.  (Kaplan Decl. ¶¶ 15-16 (DE 301-6).) Warner contends that it "has designed its system to err on the side of conservatism, even if that results in fewer infringing files being identified, in order to avoid errors," and professes great confidence in the reliability of its enforcement. (*Id.* ¶ 6.)  It also repeatedly asserts that its methodology and system features are common in its industry.

On the other hand, Warner readily admits that mistakes do occur, and Hotfile has identified characteristics that may be responsible for engendering those mistakes.  For example, Warner's staff did not download or review any Hotfile content before marking it

for removal. (Thompson Decl. Ex. 4 (Kaplan Dep.) at 43:12-44:14 (DE 354-5).)[11] Indeed, its search process relied on computer automation to execute programs and did not involve human review of the file titles, page names or other overt characteristics before issuing a takedown notice. And because the files were not reviewed, neither Warner's robots nor its employees made a determination whether there were legal uses for the files.

The parties have proffered limited statistical and anecdotal evidence about how this translates to the effectiveness of Warner's system. For its part, Warner avers that it sent 400,000 takedown notices to Hotfile prior to this lawsuit without receiving any counternotices from Hotfile or its users, suggesting that the mistakes were not apparent or significant enough to contest. (See Kaplan Decl. ¶ 14 (DE 301-6).) Moreover, according to Warner, the fact that only 890 erroneous files have been identified by Hotfile after it undertook the most scrupulous review of those takedown notices suggests a low error rate, well under one percent, by a simple calculation.

Warner goes further, suggesting that the actual number of mistaken notices sent to Hotfile numbers around 600, not 890. Showing the difficulty attendant to identifying infringing content, the evidence shows that 19 of the files challenged by Hotfile in the counterclaim are in fact owned by Warner. Another 271 of the files undisputedly belong to an entity, Electronic Arts, Inc., that gave Warner permission – albeit, apparently after-the-fact – to request removal of the files. (See Hopkins Decl. ¶ 9 (DE 301-7) (Electronic

---

[11]   Warner contends that it would not have been "practicable for Warner to download files prior to issuing a notification of infringement" because of the computing resources required. (Kaplan Decl. ¶ 17 (DE 301-6).) Additionally, some of the files in the counterclaim were reviewed by a Warner vendor called LeakID, which does use a human screening process. (Id. ¶ 20.)

Arts, Inc. executive stating that the company "retroactively authorizes Warner having sent takedown notices" on its behalf).)  And it is also undisputed that of the 890 files listed, 24 are duplicative.  This further supports the view that Warner's actual error rate, in general and with respect to its search of Hotfile's website in particular, is small.

In response, Hotfile points to other evidence that Warner's error rate may actually be higher, the most important being an internal discussion between Warner employees in August 2011.  One employee stated that, in an un-described sample, the prevalence of "false positives" was "almost 10%," which he considered "way too high."  (Thompson Decl. Ex. 8 (DE 304-1 (filed under seal); DE 354).)  In response, another employee explained that the error rate "is not that high" and that the aberration was due to a shut-down of 75 percent of the system, an ongoing audit process, and atypical sampling. (*Id.*)  He cited to another sample that yielded a 1.5 percent error rate and would have translated to "75,000 false positives out of 5 million links."  (*Id.*)  Thus, drawing inferences in favor of Hotfile, Warner employees might have known of an error rate as high as ten percent during the time that it was identifying the files identified in the counterclaim.

Hotfile also points to instances of anecdotal errors to show how unsound Warner's search practices might have been.  For example, the robots identified and removed clips of a Warner-produced television show that Warner *itself* uploaded to Hotfile and thus, had authorized for distribution.  (Thompson Decl. Ex. 4 (Kaplan Dep.) at 16:10-17:4 (DE 354-5).)  Warner also apparently used overbroad search terms like "lope," which in one instance caused Warner's robots to cull out a non-Warner file called the "Encyclopedia of History of World."  (Thompson Decl. Ex. 5 (DE 304-1 (filed under

Case 1:11-cv-20427-KMW  Document 524 *SEALED*  Entered on FLSD Docket 08/28/2013
Page 33 of 52

seal); DE 354-6).)  A search for the word "shorts" caused Warner to remove all manner of salacious video files that it would not want to claim owning.  (Thompson Decl. Ex. 16 (DE 304-6 (filed under seal); DE 354-17).)  And in e-mails from November 2009 bearing the subject "False Positives," Warner employees acknowledged that the search term "V" – which had been added to search protocols because it had turned up in links observed to be infringing – resulted in "surprising" yields and was "definitely too vague!" (Thompson Decl. Ex. 18 (DE 304-6 (filed under seal); DE 354-19).)

Moreover, Warner admits that on linking sites, it sought to delete entire pages rather than scrutinize each individual link.  (Thompson Decl. Ex. 4 (Kaplan Dep.) at 232:23-233:7 (DE 304-1 (filed under seal); DE 354-5).)  Thus, it deleted one of the counterclaim files because it was "included on the same post page" as a title called "Sherlock Holmes."  (*Id.*)  Hotfile claims that *en masse* deletion was Warner's typical practice and extends beyond this example.

In addition, Hotfile has also proffered evidence of an illicit motive on Warner's part.  For example, Warner liberally removed what is by all indications a popular and innocuous free software program mentioned at the outset of this decision, JDownloader, which was created by a company called "Appwork GmbH" and which Warner does not own or have rights to.  In one instance, Warner targeted the program because it appeared on a link site and was posted near a Warner-owned piece called "Little Red Riding Hood."  (Thompson Decl. Ex. 4 (Kaplan Dep.) at 225:13-226:12 (DE 304-1 (filed under seal); DE 354-5).)  Kaplan explained that Warner sought to remove the program not because its distribution infringed on Warner's rights, but because that software's function is to assist with downloads of all kinds; in the case of Little Red Riding Hood, its

proximity would "help people download the pirated version more rapidly." (*Id.* at 225:13-21.) Kaplan acknowledged that this resulted in Warner deleting something it did not have rights to, but later denied the removal was intended. (*Id.* at 226:4-12, 236:9-18.)

Warner's efforts to police were at times overzealous and overreaching. In the case of JDownloader, its anti-piracy executive stated that despite not owning the program he could not "say that [Warner] would have no legal right to take down JDownloader in some circumstances at least" under Section 512(c). (Thompson Decl. Ex. 4 (Kaplan Dep.) at 236:9-18 (DE 304-1 (filed under seal); DE 354-5).) As discussed above, Warner took liberties in removing content owned by other copyright holders, such as Electronic Arts, only obtaining permission to do so later in an "antipiracy partnership." In the main summary judgment briefing, the Studios show that the most popular content on Hotfile is actually software that is illegal to distribute but that does not include the Studios' works. And, in its motion, Warner points out that Hotfile is unable to recover for the vast majority of the files Warner wrongfully removed. These facts demonstrate that Warner's goals may have been broader than preventing infringement of its own works in the manner prescribed by Section 512(c).

### 3.    Evidence of Damages

Assuming Warner's actions were unauthorized, Warner contends that Hotfile is unable to show a cognizable injury from the takedown notices identified in the counterclaim. First, Warner has established that many of the files did not cause Hotfile to wrongfully terminate any paying users. At least 28 of the files were noticed before Hotfile implemented a repeat infringer policy based on strikes, meaning that Hotfile took no action when it received those notices. Similarly, nine files wrongfully noticed after

Hotfile implemented its three-strikes policy in February 2011 did not result in user termination, since those users never accumulated more than three strikes. Additionally, 53 files were posted by users who would have accumulated three or more strikes without counting the files from the counterclaim, although Hotfile questions whether some of those notifications were DMCA-compliant. And finally, nine remaining files correspond to six users, none of whom was a subscribing member. These facts are not otherwise subject to dispute.

Warner has also retained an expert, Dr. Zebrak, who concluded that 477 of the files – if they did not belong to Warner – "highly likely" infringed others' copyrights and had no business being on Hotfile's system. This portion of Dr. Zebrak's testimony is challenged by Hotfile, which points out that the expert acknowledged he did not contact those owners to find out whether distribution on Hotfile was truly unauthorized. (Zebrak Decl. ¶ 16 (DE 201-1); Thompson Decl. Ex. 32 (Zebrak Dep.) at 319:3-22 (DE 354-33).) It is well-established that a lack of authorization is required to prove a claim of copyright infringement. *See Morley Music Co. v. Cafe Cont'l, Inc.*, 777 F. Supp. 1579, 1582 (S.D. Fla. 1991) (citations omitted). There is no compelling evidence one way or the other establishing these files' copyright status.

But Hotfile's main assertion is that Warner's focus wrongly assumes that Hotfile's lost revenue could only have come from terminated users' subscription fees. Instead, Hotfile points out that its business model is driven by the availability of content, which Warner's actions have interfered with. Hotfile has provided evidence that the files in the counterclaim, even excluding the files identified as infringing by Dr. Zebrak, were downloaded 278,319 times and earned Hotfile $1,154 in premium subscriptions from 51

new user accounts.  (Titov Decl. ¶¶ 7-8 (DE 304-10 (filed under seal); DE 352-1).)  The

JDownloader program in particular was deleted eight times by Warner, but had been

downloaded a total of 150,028 times and resulted in 42 premium subscriptions, earning

$1,053 for Hotfile.  (Titov Decl. ¶¶ 7-8 (DE 304-10 (filed under seal); DE 352-1).)  And,

Warner's own expert acknowledged that the false notices caused one JDownloader

distributor to be briefly suspended, apparently preventing downloads of his files for two

days.  It is unclear whether the files deleted were ever replaced.  (Foster Reply Decl. ¶ 3

(DE 360-1 (filed under seal); DE 409-9).)

Hotfile's expert, Dr. Matthew R. Lynde, estimates that Hotfile's total damages

range from $9,100 to $80,670.  (Thompson Decl. Ex. 34 (Lynde Decl.) at ¶ 9 (DE 304-7

(filed under seal); DE 354-35); Yeh. Decl. Ex. 1 (Lynde Dep.) at 282:5-25 (DE 301-10).)

He opines on a variety of ways in which Hotfile could have been harmed, including

diminishing payments to affiliates, decreasing incentive for users to pay for premium

access, and harm to Hotfile's business reputation and goodwill.  His opinion associates

an observed decrease in revenue with increased use of takedowns by Warner.

## II.   DISCUSSION

The parties have moved for summary judgment on various aspects of the claims

and defenses raised in this litigation.  Under Federal Rule of Civil Procedure 56,

summary judgment is appropriate if, after discovery, "the pleadings, depositions,

answers to interrogatories, affidavits and admissions on file, together with the affidavits,

show that there is no genuine issue as to any material fact and that the moving party is

entitled to a judgment as a matter of law."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322

(1986) (quoting Fed. R. Civ. P. 56(c)).  "An issue of fact is 'material' if, under the

applicable substantive law, it might affect the outcome of the case." *Hickson Corp. v. N. Crossarm Co., Inc.*, 357 F.3d 1256, 1259-60 (11th Cir. 2004) (citations omitted). "An issue of fact is 'genuine' if the record taken as a whole could lead a rational trier of fact to find for the nonmoving party." *Id.* at 1260 (citations omitted). "The moving party bears the initial burden of establishing the nonexistence of a triable fact issue." *Cont'l Cas. Co. v. Wendt*, 205 F.3d 1258, 1261 (11th Cir. 2000) (citing *Celotex Corp.*, 477 U.S. at 317). In ruling on summary judgment, the evidence and reasonable inferences are construed in the light most favorable to the non-movant. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970); *Jackson v. BellSouth Telecomms.*, 372 F.3d 1250, 1280 (11th Cir. 2004).

If the movant establishes the absence of a genuine issue of material fact, the nonmoving party must "go beyond the pleadings and by her own affidavits or by the 'depositions, answers to interrogatories, and admissions on file' designate 'specific facts showing that there is a genuine issue for trial." *Celotex*, 477 U.S. at 324 (quoting Fed. R. Civ. P. 56(c)). Thus, "[i]f the non-movant . . . fails to adduce evidence which would be sufficient . . . to support a jury finding for the non-movant, summary judgment may be granted." *Brooks v. Blue Cross & Blue Shield of Fla., Inc.*, 116 F.3d 1364, 1370 (11th Cir. 1997) (citation omitted). However, "if factual issues are present, the Court must deny the motion and proceed to trial." *Warrior Tombigbee Transp. Co. v. M/V Nan Fung*, 695 F.2d 1294, 1296 (11th Cir. 1983) (citations omitted).

### A.    DMCA Defense

The parties agree that the proper starting point for the Court's analysis is whether Hotfile is entitled to DMCA protection, given its ability to absolve Hotfile of liability for

secondary copyright infringement. *See* 17 U.S.C. § 512(c)(1) (stating that if the safe harbor requirements are met, "[a] service provider shall not be liable for monetary relief, or, except as provided in subsection (j), for injunctive or other equitable relief, for infringement of copyright by reason of the storage at the direction of a user of material that resides on a system or network controlled or operated by or for the service provider."); S. Rep. No. 105-190 (1998) at 64, reprinted in 1998 U.S.C.C.A.N. at 639 (stating that the safe harbor "protect[s] qualifying service providers from liability for all monetary relief for direct, vicarious and contributory infringement" as well as injunctive relief). As recounted in detail in *Viacom*, Congress enacted the DMCA in 1998 to provide liability safe harbors for service providers that operate or control networks through which users store copyrighted digital works if those providers meet certain specified criteria. 676 F.3d at 26-27 (citing 17 U.S.C. § 512(a)-(d) and legislative history). The Studios contend that Hotfile is not entitled to safe harbor protection as a matter of law, while Hotfile asks for a determination that it is not liable for acts of infringement that took place after the filing of the Complaint on February 18, 2011.

Generally, the advances of the Internet and digital technology make possible replication and dissemination of creative works on an astonishing scale. S. Rep. No. 105-190 (1998) at 8 (noting "the ease with which digital works can be copied and distributed worldwide virtually instantaneously"). In that regard, the DMCA was meant to foster the growth of the Internet while protecting the rights of copyright holders and encouraging Internet entities' efforts to offer valuable on-line services, which on occasion might be infringing under copyright law. *Id.*; *Realnetworks, Inc. v. DVD Copy Control Ass'n*, 641 F. Supp. 2d 913, 943 (N.D. Cal. 2003) ("The DMCA represents

38

Congress' attempt at a balance to preserve ownership rights protection for companies and artists in the face of the modern reality of a digital world with an increasingly technologically-savvy population."). As Hotfile recognized at oral argument, without the immunity conferred by the DMCA safe harbor provisions, Internet businesses could otherwise be subject to ruinous liability under common law principles of secondary infringement.

A party asserting DMCA's safe harbor as an affirmative defense to a claim of copyright infringement has the burden of demonstrating entitlement to its protections. *See ALS Scan, Inc. v. RemarQ Communities., Inc.*, 239 F.3d 619, 625 (4th Cir. 2001) (stating that entitlement to immunity under the DMCA is not "presumptive" but applies to service providers that prove they meet certain criteria); *see also Blue Cross & Blue Shield of Ala. v. Weitz*, 913 F.2d 1544, 1552 (11th Cir. 1990) (discussing burden of proof as to a statute of limitations defense). Nonetheless, in many instances, the DMCA serves to relieve service providers of burdens they might otherwise shoulder, even transferring them to the copyright owner. *See, e.g., UMG Records, Inc. v. Shelter Capital Partners LLC*, 718 F.3d 1006 (9th Cir. 2013) ("Congress made a considered policy determination that the 'DMCA notification procedures [would] place the burden of policing copyright infringement — identifying the potentially infringing material and adequately documenting infringement — squarely on the owners of the copyright.'" (quoting *Perfect 10, Inc. v. CCBill LLC*, 488 F.3d 1102, 1113 (9th Cir. 2007))). In this regard, courts have counseled that the advantages of the DMCA should be viewed capaciously. *See Flava Works v. Gunter*, 689 F.3d 754, 758 (7th Cir. 2012). Although

39

an affirmative defense, the DMCA has often been construed in favor of service providers, requiring relatively little effort by their operations to maintain immunity.

Hotfile asserts that it qualifies for DMCA protection as an Internet service provider that allows information to reside on its system at the direction of its users, which is one of four specified categories recognized by the Act. *See* 17 U.S.C. § 512(c)(1). The parties do not dispute that Hotfile qualifies as a service provider. *See id.* § 512(k)(1)(A) (defining a "service provider" as "an entity offering the transmission, routing, or providing of connections for digital online communications, between or among points specified by a user, of material of the user's choosing, without modification to the content of the material as sent or received."). The term "storage" has also been broadly interpreted to include displaying or disseminating content that is uploaded to the system's servers at the direction of users, which covers Hotfile's operations. *See UMG Recordings, Inc.*, 620 F. Supp. 2d at 1089-91 (construing statutory language and concluding that Congress intended a broad application by including the phrase "by reason of," such that the protected infringing conduct need not be limited to an act of storage).

Section 512 provides that a preliminary condition for eligibility is that the service provider maintain a policy to terminate "repeat infringers." 17 U.S.C. § 512(i)(1)(A). The particular category of service provider that applies to Hotfile imposes four additional requirements: (1) the service provider designates an agent to the United States Copyright Office and to the public through its service; (2) the service provider acts expeditiously to "remove, or disable access to" infringing material it actually knows of or of which it should be aware from "facts or circumstances" showing that "infringing

activity is apparent;" (3) the provider has no actual or red flag knowledge of infringing activity; and (4) the provider receives no financial benefit from infringing activity.  *Id.* § 512(c)(1).  While case law has developed in other parts of the country, construing these provisions is an issue of first impression in this Circuit.

### 1.     Repeat Infringer Policy

The repeat infringer requirement of Section 512(i) calls for a policy, reasonably implemented, that provides for the termination of a service provider's users in "appropriate circumstances":

> The limitations on liability established by this section shall apply to a service provider only if the service provider  .  .  .  has adopted and reasonably implemented, and informs subscribers and account holders of the service provider's system or network of, a policy that provides for the termination in appropriate circumstances of subscribers and account holders of the service provider's system or network who are repeat infringers.

17 U.S.C. § 512(i)(1)(A).  Congress, in enacting the DMCA, failed to elaborate upon what it means for a policy to be reasonably implemented.  *See Perfect 10, Inc. v. CCBill, LLC*, 488 F.3d 1102, 1109 (9th Cir. 2007).  Thus, in the absence of express statutory language, the Ninth Circuit has prescribed that "an implementation is reasonable if, under 'appropriate circumstances,' the service provider terminates users who repeatedly or blatantly infringe copyright" – a standard that this Court applies.  *CCBill, LLC*, 488 F.3d at 1109 (quoting legislative history).

Such a policy may take a variety of forms.  *Id.*  Notably, "§ 512(i) does not require a service provider to decide, *ex ante*, the specific types of conduct that will merit restricting access to its services."  *Corbis Corp. v. Amazon.com, Inc.*, 351 F. Supp. 2d 1090, 1101-02 (W.D. Wash. 2004), *rev'd in part on other grounds, Cosmetic Ideas, Inc.*

41

*v. IAC/Interativecorp.*, 606 F.3d 612 (9th Cir. 2010).   For storage lockers like Hotfile, the focus of the analysis is on uploading users:  "users who know they lack authorization and nevertheless upload content to the Internet for the world to experience or copy . . . are blatant infringers that Internet service providers are obligated to ban from their websites."  *Capitol Records, Inc. v. MP3tunes, LLC*, 821 F. Supp. 2d 627, 637 (S.D.N.Y. 2011).

In assessing the reasonableness of a defendant's efforts, additional guidance on what constitutes an appropriate policy can be ascertained in the Act's legislative history. For instance, policies should be considered in light of Congress's intention that "those who repeatedly or flagrantly abuse their access to the Internet through disrespect for the intellectual property rights of others should know that there is a realistic threat of losing that access."  *UMG Recordings, Inc. v. Veoh Networks, Inc.*, 665 F. Supp. 2d 1099, 1118 (C.D. Cal. 2009) (quoting legislative history).  Service providers granting access to those users should also be given "strong incentives . . . to prevent their services from becoming safe havens or conduits for known repeat copyright infringers."  *Perfect 10, Inc. v. Cybernet Ventures, Inc.*, 213 F. Supp. 2d 1146, 1178 (C.D. Cal. 2002).   Yet consonant with other provisions of the DMCA, courts should not construe policies so as to impose affirmative action on the part of the service provider to monitor for infringement.  *See* 17 U.S.C. § 512(m); *Cybernet Ventures, Inc.*, 213 F. Supp. 2d at 1176 (interpreting legislative history). As Congress stated:

> The Committee recognizes that there are different degrees of on-line copyright infringement, from the inadvertent and noncommercial, to the willful and commercial. In addition, the Committee does not intend this provision to undermine the principles of new subsection ([m]) or the knowledge standard of new subsection (c) by *suggesting that a provider must investigate possible infringements, monitor its service, or make*

42

> *difficult judgments as to whether conduct is or is not infringing.* However, those who repeatedly or flagrantly abuse their access to the Internet through disrespect for the intellectual property rights of others should know that there is a realistic threat of losing that access.

H.R. Rep. No. 105-551(II) at 61 (1998) (emphasis added).

The Studios in this action do not contend that Hotfile failed to dictate or publish any policy, but rather that Hotfile failed to reasonably implement it by actually terminating users. Several considerations, taken together, lead the Court to agree. Initially, a reasonable policy must be capable of tracking infringers. Reviewing the holdings of *Ellison v. Robertson*, 357 F.3d 1072 (9th Cir. 2004) and *In re Aimster Copyright Litigation*, 334 F.3d 643 (7th Cir. 2003), *cert. denied*, 540 U.S. 1107 (2004), the court in *CCBill* announced a standard for Section 512(i) in which a service provider must maintain a vehicle to receive notices of potential infringement, design its system so as to be able to ascertain the identity of the users responsible for those files, and make some effort to record infringing users. 488 F.3d at 1110.[12] Without those threshold functions, service providers are unable to carry out any sort of reasonable policy. For instance, in *In re Aimster Copyright Litigation*, 252 F. Supp. 2d 634 (N.D. Ill. 2002), the district court concluded that whatever policy the defendants might have ostensibly had could not be reasonably implemented because the system's encryption

---

[12] This is different from a situation where a plaintiff claims that a service provider must look for repeat infringers who open accounts under new pseudonyms. *Cf. Io Grp., Inc. v. Veoh Networks, Inc.*, 586 F. Supp. 2d 1132, 1144-45 (distinguishing *A&M Records, Inc. v. Napster, Inc.*, No. C99-05183 MHP, 2000 WL 573136 (N.D. Cal. May 12, 2000), which found that failure to block users' Internet Protocol addresses created a question whether the policy was reasonable). In *CCBill*, there was no dispute that the defendant implemented a policy by which it kept a DMCA log indicating the name and e-mail address of the webmaster for each site to which it provided service.

of user information made it "impossible to ascertain which users are transferring which files." *Id.* at 659. The court ruled that the precondition to safe harbor was not met even though the plaintiffs had failed to identify "a single repeat infringer whose access should be terminated." *Id.*

In this case, while the statute does not require Hotfile to maintain a perfect policy (or even anything as stringent as the three-strikes policy it eventually implemented), it is apparent that Hotfile effectively did nothing to tie notices to repeat infringers. Titov admitted, and Hotfile does not seriously dispute, that the corporation had no way to keep track of infringing users based on infringement notices. Hotfile's sole method for terminating its users was its "discretion," which it evidently failed to exercise; it had no technology to record notices and no procedure for dealing with notification. Consequently, it is not too harsh an assessment to conclude that when Hotfile received such notices, it was Hotfile's practice to ignore them rather than act to terminate the users they were associated with. This deliberate disregard is significant.

The data discussed above – both the number of users who received multiple notices of infringement and the number of users who were terminated after Hotfile implemented a stronger policy – show that Hotfile failed to act when confronted with infringing conduct.[13] Thus, despite receiving over eight million notices for five million users, Hotfile only terminated 43 users before the commencement of this action, for reasons that had no apparent relation to the notices Hotfile received. Most glaringly, there were 61 users who had accumulated more than 300 notices each. As recounted

---

[13]   Hotfile claims that it "had no knowledge that the file[s]-in-suit were infringing *apart from* notifications Hotfile [might] have received from the Studios regarding these alleged infringements." (Titov Decl. ¶ 6. (DE 321-1) (emphasis added).)

above, those users were particularly prolific, driving traffic to Hotfile's website, receiving money through Hotfile's affiliate program, and generating significant revenue for Hotfile by encouraging users to convert to premium subscriptions.

In response, Hotfile contends that the DMCA does not mandate action based on infringement notices. On this point, there is some disagreement as to whether such notices equate to knowledge of a user's actual infringement.[14] *See, generally,* 4-12B M; Nimmer & Nimmer, Copyright § 12B.10[B] (Matthew Bender Rev. Ed. 2013). The court in *Corbis Corp.*, for instance, found that DMCA notices alone are not enough to confer knowledge on a service provider: "Although there may be instances in which two or more DMCA compliant notices make a service provider aware of a user's blatant, repeat infringement, the notices alone do not make the user's activity blatant, or even conclusively determine that the user is an infringer." 351 F. Supp. 2d at 1105 & n.9; *see also MP3tunes, LLC*, 821 F. Supp. 2d at 637.

Yet a subsequent circuit court decision in *CCBill* suggests a different approach on this issue. That court held that statutorily *deficient* notices of infringement – in particular, those lacking a declaration from the copyright holder detailing ownership and the material's infringing nature – were an insufficient basis for terminating a user. *CCBill*, 488 F.3d at 1113. At the same time, however, it held that the district court erred in failing to consider whether defendants' continued services for websites that were the subject of non-party notifications (which might have conformed with the statute)

---

[14]   Courts agree that Section 512(i) requires terminating *known* repeat infringers. *See CC Bill*, 488 F.3d at 1113 ("A policy is unreasonable only if the service provider failed to respond when it had knowledge of the infringement."); *Ellison*, 357 F.3d at 1080.

constituted an unreasonable policy. *Id.* Thus, the decision suggests that *proper* notifications, which require "[a] statement that the complaining party has a good faith belief that use of the material in the manner complained of is not authorized by the copyright owner, its agent, or the law," 17 U.S.C. § 512(c)(3)(A)(v), can provide requisite knowledge to defendants.   Other decisions support this reasoning.   *See UMG Recordings, Inc.*, 665 F. Supp. 2d at 1116-18 (holding that filtering technology used by the defendant to identify infringing material did not constitute knowledge because, "however beneficial the [filtering] technology is in helping to identify infringing material, it does not meet the standard of reliability and verifiability required by [*CC Bill*] in order to justify terminating a user's account"); *Flava Works, Inc. v. Gunter*, No. 10C6517, 2011 WL 3205399, at *10 (N.D. Ill. July 27, 2011), *rev'd on other grounds*, 689 F.3d 754 (7th Cir. 2012) ("It is true that service providers are not required to police their sites for infringement, but they are required to investigate and respond to notices of infringement — with respect to content *and* repeat infringers."). As one court observed, *CC Bill* borrowed the knowledge standard from Section 512(c)(1)(A), which requires removal of material upon notification of *claimed* infringement. *UMG Recordings*, 665 F. Supp. 2d at 1117; *see also Corbis Corp.*, 351 F. Supp. 2d at 1107 ("[T]he most powerful evidence of a service provider's knowledge [is an] actual notice of infringement from the copyright holder."); *cf. UMG Recordings, Inc.*, 2013 WL 1092793, at *10 (stating that the plaintiff's "decision to forgo the DMCA notice protocol stripped it of the most powerful evidence of a service provider's knowledge – actual notice of infringement" (quotation omitted)).

Aside from infringement notices, however, Hotfile had no alternative method for preventing repeat infringement by its users.   Courts often consider the degree of

46

infringement at issue and the defendant's efforts to stop repeat infringers in determining
the reasonableness of the policy's implementation.  In *Corbis Corp.*, for instance, the
defendant had cancelled millions of offending merchant listings, warned such vendors
that "repeated violations of the rules may result in 'permanent suspension,'" and
ultimately terminated hundreds of vendors. 351 F. Supp. 2d at 1103-05 & n.7.  This
evidence was sufficient to show that the defendant had meaningfully responded to
allegations of copyright infringement and thus, "properly implemented a procedure for
addressing copyright complaints and enforcing violations of its policies." *Id.* at 1103.
Moreover, the plaintiff was unable to show that the defendant "could have used another,
more effective and reasonable" method for preventing terminated users from re-
accessing the service.  *Id.* at 1103-04.   Finally, addressing the "appropriate
circumstances" language of the statute, the court concluded that there was insufficient
evidence that the defendant had knowledge of blatant infringement – such as user
statements about the pirated nature of a product, chat room discussions regarding use
of the service for infringing purposes, or characteristics of listings that would give away
their infringing nature – that would have required it to terminate user access. *Id.* at
1104-05. Thus, the defendant was entitled to safe harbor protection.

      By contrast, the district court in *In re Aimster* confronted a policy similar to the
one at issue here that warned users not to post infringing content and promised to
terminate users who repeatedly violated copyright law.  The court discounted the policy
as an "absolute mirage" after evidence showed that the defendants obstructed ways of
determining which users were transferring infringing files and, in practice, failed to
terminate a single user. *In re Aimster*, 252 F. Supp. 2d at 658-59 & n.18 (declining safe

harbor protection on motion for preliminary injunction).  Affirming the district court on appeal, the Seventh Circuit instructed that a "service provider must do what it can reasonably be asked to do to prevent the use of its services by 'repeat infringers.'"  *Id.* at 655 (citation omitted).  In a similar vein, other courts have held that "where a service provider is given sufficient evidence to create actual knowledge of blatant, repeat infringement by particular users, particularly infringement of a willful and commercial nature," it is compelled to act.  *Cybernet Ventures, Inc.*, 213 F. Supp. 2d at 1176 (citing legislative history).  Still others have held that there are circumstances in which operators must go beyond merely posting a policy in a site's terms of use, as Hotfile did.  *See Arista Records LLC v. Usenet.com, Inc.*, 633 F. Supp. 2d 124, 131 (S.D.N.Y. 2009).[15]

Here, the scale of activity – the notices of infringement and complaints from copyright holders – indicated to Hotfile that a substantial number of blatant repeat infringers made the system a conduit for infringing activity.  Yet Hotfile did not act on receipt of DMCA notices and failed to devise any actual policy of dealing with those offenders, even if it publicly asserted otherwise.  It has presented no evidence to show

---

[15]  The Court also notes that most of the "robust" steps Hotfile claims to have taken to prevent repeat infringement relate to its handling of particular files and not their users.  Hotfile's SRA program is legally insufficient because, by its plain language, Section 512(i) requires user termination, thereby targeting future infringement from an individual who is deemed likely to recidivate.  *See Cybernet Ventures, Inc.*, 213 F. Supp. 2d at 1176 ("[S]ection 512(i) is focused on infringing users, whereas 512(c) is focused primarily on the infringing material itself.").  More particularly, while Section 512(c) requires service providers to remove infringing material, Section 512(i) targets the source of that infringement.  *See id.* ("Making the entrance into the safe harbor too wide would allow service providers acting in complicity with infringers to approach copyright infringement on an image by image basis without ever targeting the source of these images." (citation omitted)).

48

that the small number of removals that did occur were for any reason other than threatened litigation or by court order. Indeed, it has been unable to point to a single specific user who was terminated pursuant to its policy of manual review and exercise of "discretion." Documents and statistics indicate that there was never any realistic threat of termination to Hotfile's users, whose activities were protected by the company's indifference to infringement notices. In sum, regardless of official policies forbidding infringement, Hotfile did not significantly address the problem of repeat infringers. This renders Hotfile's policy legally insufficient under Section 512(i).

Before leaving the issue, the Court briefly addresses two other points made by Hotfile. First, Hotfile contends that the Studios should be equitably estopped from asserting a DMCA challenge because of the parties' previous cooperation on infringement issues. In particular, they assert that Warner's participation in Hotfile's SRA program precludes the Studios' DMCA argument (although it should be noted that not every Studio Plaintiff participated in the SRA program.) Hotfile has provided correspondence in which a member of Warner's legal department communicated directly with Hotfile to complain about the perception of Hotfile's ineffectiveness in responding to DMCA takedown notices submitted on behalf of one of Warner's media subsidiaries, to request a direct takedown removal tool, and to praise Hotfile's "fast cooperation and removal of Warner's property." (Titov Decl. Ex. 31 (DE 275-10 (filed under seal); DE 321-31; DE 321-32; DE 321-33).) That individual later testified, however, that he was merely "being polite" and did not condone Hotfile's actions.

Principles of estoppel apply to copyright actions in the same manner as they apply to other actions at law. Although the parties have not cited authority discussing a