DMCA defense in particular, a copyright claim can be waived if "(1) the plaintiff [knows] the facts of the defendant's infringing conduct; (2) the plaintiff [intends] that its conduct shall be acted on or must so act that the defendant has a right to believe that it is so intended; (3) the defendant [is] ignorant of the true facts; and (4) the defendant [relies] on the plaintiff's conduct to its injury." *Carson v. Dynegy, Inc.*, 344 F.3d 446, 453 (5th Cir. 2003) (collecting authority).   Here, although Hotfile has pointed to an isolated discussion that may be useful in a cross-examination at trial, there are no facts to sustain a conclusion that the Studios have acquiesced to Hotfile's conduct.  The Studios appear to have protected the rights to their content, and there is no suggestion that they knew and approved of the extent of Hotfile's actions (or inaction).

Second, Hotfile has moved for partial summary judgment on the applicability of the DMCA to conduct that occurred after this litigation was initiated.  As support, Hotfile provides evidence of a continuum of increased compliance, such as applying new fingerprinting and hashing technology, giving copyright owners access to Hotfile's SRA program, and implementing other "powerful countermeasures," spanning from the summer of 2009 through Hotfile's retooling of its affiliate program in February 2012, a year after this litigation began.   Some of this evidence shows that Hotfile took meaningful, recent steps to combat infringement.  For example, it is undisputed that Hotfile adopted and began to implement a three-strikes policy, resulting in the termination of over 20,000 of its users after the start of this litigation. Although the Court is mindful that the DMCA does not specify the characteristics of a reasonably implemented policy, it is unaware of any situation in which a three-strikes policy has been found to be ineffective. *See, e.g., Viacom Int'l Inc. v. YouTube, Inc.*, 718 F. Supp.

50

2d 514, 528-29 (S.D.N.Y. 2010) *rev'd in part on other grounds*, 676 F.3d 19 (2d Cir. 2012) (discussing strike-based policies).

This request to limit liability raises questions of whether a party can ever regain the protections of the DMCA and whether the Court should trust Hotfile not to revert to their offending conduct; whether the Court can determine the exact point at which Hotfile implemented a DMCA-compliant policy and, if so, whether the Court should use the date of technical compliance as the point of entry to safe harbor or whether the proper measure should be when Hotfile ceased to be a hotbed for infringement (since many DMCA requirements have a prospective purpose); and whether the parties have conducted a sufficient amount of discovery for the Court to make these determinations at this stage. However, in their briefing and at a day-long oral argument, the Studios made clear that they have brought suit based on Hotfile's system and business model "as they existed pre-Complaint" and that post-Complaint damages are not a part of this dispute. Accordingly, relying on these express representations and because the Studios have not yet made any claim concerning post-Complaint damage, the Court need not decide these issues and refrains from issuing an advisory opinion on Hotfile's current practices.

### 2.    Other Disqualifying Factors

Having concluded that a necessary precondition to DMCA safe harbor eligibility – a reasonably implemented repeat infringer policy – is lacking as a matter of law, the Court concludes that Hotfile's DMCA defense fails. Nevertheless, the Court offers observations and conclusions about two of the remaining DMCA requirements.

### a.    DMCA Agent

Section 512(c)(2) requires that a service provider "designate[ ] an agent to receive notifications of claimed infringement . . . by making available through its service, including on its website in a location accessible to the public, and by providing to the Copyright Office, substantially the following information:  (A) the name, address, phone number, and electronic mail address of the agent."  17 U.S.C. § 512(c)(2).  Per the express terms of the statute, "[o]nly substantial compliance with the enumerated requirements is required by subsection 512(c)(2), as is also the case with subsection (c)(3)."  *Perfect 10, Inc. v. Amazon.com, Inc.*, No. CV 05-4753 AHM (SHx), 2009 WL 1334364, at *8 (C.D. Cal. May 12, 2009) (citing H.R. Rep. No. 105-551(II) (1998)).  The legislative history for the provision includes the following committee statement, which explains that decision:

> The Committee intends that the substantial compliance standard in subsections (c)(2) and (c)(3) be applied so that technical errors (such as misspelling a name, supplying an outdated area code if the phone number is accompanied by an accurate address, or supplying an outdated name if accompanied by an e-mail address that remains valid for the successor of the prior designated agent or agent of a copyright owner) do not disqualify service providers and copyright owners from the protections afforded under subsection (c). The Committee expects that the *parties will comply with the functional requirements of the notification provisions–such as providing sufficient information so that a designated agent or the complaining party submitting a notification may be contacted efficiently–*in order to ensure that the notification and take down procedures set forth in this subsection operate smoothly.

S. Rep. No. 105-190 (1998) (emphasis added).  "To prevail at trial, the service provider has the burden of proving that it properly designated a copyright agent and that it responded to notifications as required."  *Perfect 10, Inc.*, 2009 WL 1334364, at *8.

Here, the record shows that Hotfile had a "report abuse" form on its website and provided an e-mail address where users could report infringing content.  It did not register a DMCA agent with the Copyright Office until December 2009; did not identify an agent on its website until May 2010; and, to date, has not provided a proper mailing address for its registered agent insofar as it lists only a post office box.  *See* 37 C.F.R. § 201.38(c) (noting that the submission of an agent designation must bear the caption "Interim Designation of Agent to Receive Notification of Claimed Infringement" and include, among other things, a "full address" and not a "post office box or similar designation . . . except where it is the only address that can be used in that geographic location").   While the statute focuses on whether someone with an infringement complaint would be able to contact the company, courts have held that substantial compliance in the DMCA context "means substantial compliance with all its clauses, not just some of them."  *Perfect 10, Inc. v. Yandex N.V.*, No. C 12-01521 WHA, 2013 WL 1899851, at *3 (N.D. Cal. May 7, 2013) (discussing 17 U.S.C. § 512(c)(3)).  Thus, even were Hotfile otherwise able to avail itself of the DMCA safe harbor, the Court concludes that it would be ineligible under Section 512(c)(2) at least through May 2010, the date on which it published its agent's contact information.  *See Yandex*, 2013 WL 1899851, at *7 ("The phrase 'substantially all the following information' modifies the ensuing the subparagraphs that list types of contact information . . . it cannot excuse a failure to provide the Copyright Office with any information at all.").

### b.    Actual or Red Flag Knowledge of Infringement

Finally, much of the Studios' briefing addresses Section 512(c)(1)(A)(i), which requires that a defendant not have "actual knowledge that the material or an activity

53

using the material on the system or network is infringing" without removing it.  17 U.S.C. § 512(c)(1)(A)(i).  The safe harbor also requires that the defendant not have knowledge "of facts or circumstances from which the infringing activity is apparent."  17 U.S.C. § 512(c)(1)(A)(ii).  As one court interpreting the statute explained, "[t]he DMCA's protection of an innocent service provider disappears at the moment the service provider loses its innocence, *i.e.,* at the moment it becomes aware that a third party is using its system to infringe."  *ALS Scan, Inc.,* 239 F.3d at 625.  These provisions of the DMCA are designed to "deny safe harbor protection to Internet service providers operating or linking to pirate sites whose illegal purpose is obvious to a reasonable person."  *MP3tunes, LLC,* 821 F. Supp. 2d at 643-44 (citing S. Rep. No. 105-190 (1998)).

Nevertheless, there are two important limitations on disqualification.  First, Section 512(m) specifies that a service provider has no duty to monitor activity occurring on its service or to "affirmatively seek facts indicating infringing activity," which informs the knowledge analysis.  17 U.S.C. § 512(m).  Second, because the statute elsewhere imposes the requirement that providers remove every piece of material identified as infringing, "[g]eneral awareness of rampant infringement is not enough to disqualify a service provider of protection."  *MP3tunes, LLC,* 821 F. Supp. 2d at 644.  Instead, the section "requires knowledge or awareness of specific infringing activity."  *Viacom Int'l, Inc.,* 676 F.3d at 30-32 (collecting authority) ("[T]he nature of the removal obligation itself contemplates knowledge or awareness of specific infringing material, because expeditious removal is possible only if the service provider knows with particularity which items to remove."); *accord UMG Records, Inc.,* 2013 WL 1092793, at *11

(declining to adopt "a broad conception of the knowledge requirement" and holding that the safe harbor requires "specific knowledge of particular infringing activity").

Alternatively, "the red flag provision turns on whether the provider was *subjectively* aware of facts that would have made the specific infringement 'objectively' obvious to a reasonable person." *Viacom Int'l, Inc.*, 676 F.3d at 31 (emphasis added). Courts have recognized that while willful blindness under the common law – i.e., an intentional effort to avoid guilty knowledge – can equate to actual knowledge, a DMCA analysis should not lose sight of the focus on specificity. *Id.* at 35 ("[W]illfull blindness [ ] may be applied, in appropriate circumstances, to demonstrate knowledge or awareness of specific instances of infringement under the DMCA."); *Tiffany (NJ) Inc. v. eBay Inc.*, 600 F.3d 93, 107, 109-10 (2d Cir. 2010).  In a recent decision analyzing the competing considerations of the statute, one court concluded that a lack-of-knowledge defense was a triable issue because several documents in the record could have been viewed "as imposing a duty to make further inquiries into 'specific and identifiable' instances of possible infringement."  *Capitol Records, Inc. v. MP3tunes, LLC*, No. 07 Civ. 9931 (WHP), 2013 WL 1987225, at *3 (S.D.N.Y. May 14, 2013) (citation omitted).

With regard to Hotfile's actual knowledge, the Studios' proof consists primarily of circumstantial evidence of infringement.  The Studios assert that Hotfile does not serve a primarily lawful purpose, citing the facts that Hotfile pays users based on downloads rather than uploads (suggesting that it is a file sharing, rather than storage, service) and that a high percentage of downloaded files are infringing (suggesting infringing files are the most popular and drive user activity).   The Studios thus contend that Hotfile resembles other peer-to-peer file sharing networks that have been shut down,

highlighted by the fact that Hotfile's business increased as some of those systems became inactive.  As further support, the Studios cite documents containing purported admissions that Hotfile is "the flagship of non-licensed content."

In response, Hotfile states that it provides a vehicle for the distribution of files with the authorization of the content owner and that the primary purposes of its system are personal storage, "space shifting" and distribution of non-protected materials. Indeed, Hotfile has shown that one of the Studios used Hotfile to distribute its own content.  And Hotfile points to statistics showing that its network is actually used for those purposes, observing that most files have never been downloaded (i.e., most uploaded files have not been retrieved by another user); that the most popular links currently available are for noninfringing content (such as open-source software) that is meant to be freely copied and shared; that there is no search feature that allows users to locate files; and that only a small percentage of files have been the subject of a DMCA notice or SRA action or have been the subject of infringement.  According to Hotfile, it is a small business trying to eke out a reasonable profit in a prohibitively litigious world.

Considering all of the evidence, the Court cannot say – and does not need to determine – which Hotfile is before it.  The testimony, documents and evidence of particular system characteristics create an issue of fact for a jury as to whether Hotfile knew or blinded itself to actual infringement of particular works, on a small or large scale.  The master copy policy as it existed prior to this litigation, for instance, could mean that Hotfile was attuned to the infringing nature of files, but merely disabled the offending link rather than removing the file itself.  Because a significant number of the

56

DMCA notices concerned the Studios' works, a jury could conclude that Hotfile understood that it was continuing to make particular infringing content available to the public or that, at the very least, it should have investigated those files. Similarly, to the extent that communications with users should have alerted Hotfile to the infringing nature of files on its system that were owned by the Studios (such as users seeking technical assistance who indicated that their difficulties were owing to the illegal nature of their activity), Hotfile might be deemed to have possessed red flag knowledge. *See UMG Recordings, Inc.*, 2013 WL 1092793, at *14 (stating that had e-mails identifying infringing content come from a system's users, rather than the copyright owner, "it might meet the red flag test because it specified particular infringing material"). Indeed, based on the evidence put on by the parties, a jury might even determine that Hotfile should have understood that particular material was infringing (or at least should have looked into whether infringement was occurring) when it became aware of the link name.

But "[a]s a general rule, a party's state of mind (such as knowledge or intent) is a question of fact for the factfinder, to be determined after trial." *Chanel, Inc. v. Italian Activewear of Fla., Inc.*, 931 F.2d 1474, 1476 (11th Cir. 1991). Thus, as to actual or red flag knowledge of infringement, the Court concludes that a genuine issue of material fact exists, and this issue would have to be resolved by a jury at trial.

### B.   Liability for Infringement

Without the benefit of the DMCA safe harbor, the Court must still determine whether Hotfile is liable for the copyright violations committed by its users. The DMCA does not supplant common law principles of liability, and a finding that such a protection is unavailable does not necessarily mean that liability for infringement on the system is

proper. *See Columbia Pictures Indus., Inc. v. Fung*, 710 F.3d 1020, 1039-40 (9th Cir.

2013) ("[W]e are not clairvoyant enough to be sure that there are no instances in which

a defendant otherwise liable for contributory copyright infringement could meet the

prerequisites for one or more of the DMCA safe harbors. We therefore think it best to

conduct the two inquiries independently – although, as will appear, aspects of the

inducing behavior that give rise to liability are relevant to the operation of some of the

DMCA safe harbors and can, in some circumstances, preclude their application."); 

*Perfect 10, Inc. v. Cybernet Ventures, Inc.*, 213 F. Supp. 2d 1146, 1174 (C.D. Cal.

2002) ("These 'safe harbors' do not affect the question of ultimate liability under the

various doctrines of direct, vicarious, and contributory liability . . . Rather they limit the

relief available against service providers that fall within these safe harbors."); *cf. Flava

Works, Inc.*, 689 F.3d at 758 ("[A] noninfringer doesn't need a safe harbor.").

Courts have struggled with defining the liability of Internet-based companies that

provide the technological mechanism to foster, or at least enable, others to infringe.

This confusion and uncertainty prompted in part the enactment of the DMCA. *See, e.g.*,

*Sony Corp. of Am. v. Universal City Studios*, 464 U.S. 417, 434 n.17 (1984)

("*Sony/Betamax*") (noting that "the lines between direct infringement, contributory

infringement, and vicarious liability are not clearly drawn" (quoting district court

decision)); *Flava Works, Inc.*, 689 F.3d at 760 ("The only distinctions relevant to this

case are between direct infringement . . . and contributory infringement, and between

contributory infringement and noninfringement.").

Even so, courts have recognized the value and remaining viability of a claim of

secondary liability: "When a widely shared service or product is used to commit

58

infringement, it may be impossible to enforce rights in the protected work effectively against all direct infringers, the only practical alternative being to go against the distributor of the copying device for secondary liability on a theory of contributory or vicarious infringement." *Metro-Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd.*, 545 U.S. 913, 929-30 (2005) (citation omitted); *Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146, 1171 n.11 (9th Cir. 2007) ("[C]opyright holders cannot protect their rights in a meaningful way unless they can hold providers of such services or products accountable for their actions.")   These theories of secondary liability – contributory infringement, inducement liability and vicarious liability – are court-created and do not rely on the Copyright Act or another statute.   *See Viacom Int'l Inc.*, 676 F.3d at 28 n.5 (citing *Grokster*, 545 U.S. at 930-31); *Perfect 10, Inc. v. Visa Int'l Serv. Ass'n*, 494 F.3d 788, 795 (9th Cir. 2007) ("Contributory copyright infringement is a form of secondary liability with roots in the tort-law concepts of enterprise liability and imputed intent.").

### 1.    Inducement and Contributory Infringement

The Supreme Court's seminal 2005 decision in *Grokster* observed that "[o]ne infringes contributorily by intentionally inducing or encouraging direct infringement." 545 U.S. at 929.   "[C]ontributory liability is based on the defendant's failure to stop its own actions which facilitate third-party infringement." *Amazon.com, Inc.*, 508 F.3d at 1175. The theory has two requirements:   (1) the defendant knows of direct infringement, and (2) the defendant "induces, causes, or materially contributes to [that] infringing conduct." *Napster, Inc.*, 239 F.3d at 1020 (internal quotation and citations omitted).   To "establish inducement liability, it is crucial to establish that the distributors communicated an

Case 1:11-cv-20427-KMW   Document 524-1 *SEALED*   Entered on FLSD Docket 08/28/2013   Page 8 of 47

inducing message to their . . . users.'" *Visa Int'l Serv. Ass'n*, 494 F.3d at 801 (internal quotation omitted).

Thus, to establish this derivative liability, a plaintiff must first make a prima facie case of direct infringement by a third party, which is done by proving ownership of a particular work and evidence of unauthorized copying. *Napster, Inc.*, 239 F.3d at 1013 n.2; *Situation Mgmt. Sys., Inc. v. ASP Consulting LLC*, 560 F.3d 53, 58 (1st Cir. 2009) (quoting *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361 (1991)). In this case, the parties do not dispute that the Studios own 3,800 works at issue and that they have properly registered them under Section 411 of the Copyright Act. Moreover, while Hotfile takes issue with the Studios' method for proving infringement, it does not dispute that at least some of the Studios' works have been illegally copied or downloaded using the Hotfile system. This has caused the Studios to lose money they would have earned from licensing the content to users and because of the threat of further downstream "viral" distributions. The Waterman study and the facts of the counterclaim provide competent proof in that regard; any other questions merely go to the level of damages. *Cf. Fung*, 710 F.3d at 1034.

The more vexing question here concerns the hallmark of this type of liability – whether intent can be expressly shown or inferred from Hotfile's actions. The Studios allege that infringement is a natural consequence of Hotfile's business model; that the company "actively fosters" massive copyright infringement to increase its revenue; and that despite storing all infringing content on its servers, it failed to mitigate infringement.

### a.   *Grokster*-type Intent

In this regard, courts have held that even though an entity merely distributes a device that causes infringement, it may nonetheless be liable for inducement if the defendant has "the object of promoting its use to infringe copyright, as shown by clear expression or other affirmative steps taken to foster infringement." *Grokster*, 545 U.S. at 919. Liability may be imposed "if the actor knowingly takes steps that are substantially certain to result in [ ] direct infringement." *Amazon.com, Inc.*, 508 F.3d at 1170. Or, a defendant can encourage or induce infringement through certain acts, "such as advertising an infringing use or instructing how to engage in an infringing use." *Grokster*, 545 U.S. at 936 (citations and internal quotations omitted). In addition to these methods of directly proving intent, an actor may be liable under older common law theories based on imputing intent, such as by knowing of specific acts of infringement and failing to act or by providing "material support" to those who commit infringement. As discussed below, there is disagreement as to the parameters of these doctrines, whether they continue to apply, and what defenses may be applicable to counter the deleterious effect they may have on innovation and the benefits of technology.

The decision in *Grokster* illustrates what unquestionably suffices to show actual intent. There, a group of copyright holders consisting of recording companies, songwriters and music publishers sued companies that distributed software products enabling peer-to-peer file sharing among users. 545 U.S. at 919. The defendants did not maintain copies of files on their servers, did not know which files their users were transmitting, and did not effectively control user-behavior. *Id.* at 920 & n.1, 922. But evidence showed that "the probable scope of copyright infringement is staggering" and

61

that the defendants were aware of the nature of the infringement. *Id.* at 923. Similar to the facts of this case, an expert commissioned by one of the plaintiffs concluded that 90 percent of the files on one of the systems were infringing, although the defendants raised methodological challenges, suggested that the software had significant noninfringing uses, and provided other "anecdotal and statistical evidence" to show that files might not have been copyright protected. *Id.* at 922-23. Finally, e-mails from users "with questions about playing copyrighted movies they had downloaded" and notifications from one of the plaintiffs about the infringing nature of certain files demonstrated the defendants' knowledge of the fact of infringement. *Id.* at 923.

The Court went beyond knowledge of infringement, however, to address actual evidence of intent. It concluded that the defendants "clearly voiced the objective that recipients use it to download copyrighted works, and each took active steps to encourage infringement." *Id.* at 923-24. In particular, one of the defendants designed and advertised software to compete with a system that was ruled to have been infringing (Napster), thereby "aiming to satisfy a known source of demand for copyright infringement." *Id.* at 924, 939. Their business models were centered on advertising revenue driven by the popularity of content, which the court equated with infringing content and which confirmed "that [defendants'] principal object was use of their software to download copyrighted works." *Id.* at 926 ("Users seeking Top 40 songs, for example, or the latest release by Modest Mouse, are certain to be far more numerous than those seeking a free Decameron, and Grokster and StreamCast translated that

demand into dollars.")[16] Finally, the Court found that companies failed to develop tools "to diminish the infringing activity [of] using their software," thereby underscoring their "intentional facilitation of their users' infringement." *Id.* at 939.

After discussing the plaintiffs' prima facie case of liability for inducement and vicarious liability, which fall under the umbrella of secondary liability, the *Grokster* Court considered defenses. In particular, it discussed its holding in *Sony/Betamax*, which the court of appeals had applied in affirming the district court's grant of summary judgment.[17] That decision applied the "staple article of commerce doctrine" and concluded that an actor distributing a commercial product (such as a video recording device) is not liable for acts of infringement, even if it knows of actual or likely infringement, unless the product is incapable of substantial noninfringing uses. *Grokster*, 545 U.S. at 932-333 (discussing the holding of *Sony/Betamax*). The Court sought to balance the harms that infringement has on copyright owners with the effect liability might have in stifling commerce and innovation. Thus, it suggested that the doctrine applies only to circumstances where no intent to promote infringing uses can be imputed from the design of a distributed product and where the defendant has not "expressed an object" of bringing about infringement, such as by advertising uses that

---

[16]    This was contrary to the district court's conclusion that the defendants were entitled to summary judgment and its reasoning that distributing the software "did not provide the distributors with actual knowledge of specific acts of infringement." *Id.* at 927 (citing district court decision).

[17]    Similar to the appellate court's holding, prior precedent in the Eleventh Circuit concluded that *Sony/Betamax* applies to all forms of contributory liability. *Cable/Home Comm'n Corp. v. Network Prods., Inc.*, 902 F.2d 829, 845 (11th Cir. 1990) ("Contributory infringement will not be found if the product in question is capable of 'substantial noninfringing uses,' the determinative issue in *Sony,* and clarified in that case as wide use 'for legitimate, unobjectionable purposes.'" (quoting *Sony/Betamax*, 464 U.S. at 442)).

are necessarily infringing.  *Id.* at 933.  In other words, the *Sony/Betamax* rule does not bar liability where a plaintiff pleads an inducement theory of secondary liability premised on actual evidence of intent.  *Id.* at 933 ("*Sony* barred secondary liability based on presuming or imputing intent to cause infringement solely from the design or distribution of a product capable of substantial lawful use, which the distributor knows is in fact used for infringement. . . . Because *Sony* did not displace other theories of secondary liability, and because we find below that it was error to grant summary judgment to the companies on MGM's inducement claim, we do not revisit *Sony* further.").

The *Grokster* Court concluded that "one who distributes a device with the object of promoting its use to infringe copyright, as shown by clear expression or other affirmative steps taken to foster infringement, is liable for the resulting acts of infringement by third parties," and, in that instance, the staple article of commerce doctrine does not act as an affirmative defense.  *Id.* at 936-37.  A showing of intent requires evidence of active steps taken to entice or persuade another to infringe and cannot be established from "mere knowledge of infringing potential," "actual infringing uses," "a failure to take affirmative steps to prevent infringement," or "ordinary acts incident to product distribution, such as offering customers technical support or product updates."  *Id.* at 935-37, 939 n.12, 940 (stating that the fact that a business model benefits from infringement could not alone "justify an inference of unlawful intent, but viewed in the context of the entire record its import is clear").  Instead, liability must be premised on "purposeful, culpable expression and conduct."  *Id.* at 937.

Based on the evidence presented, the Court in *Grokster* found an "unlawful objective" that was "unmistakeable":  the system was used predominately to infringe.

The Court predicated its conclusion on the facts that the defendants learned of the infringing nature of use when providing technical assistance; the business competed with another system whose users were known to have infringed; the business model was driven by the availability of unlicensed content; and the defendants took no meaningful steps to prevent infringement.[18]  *Id.* at 941.

### b.  Material Contribution Liability

Developing guidance for some of *Grokster*'s unanswered questions, a more recent case from the Southern District of New York reviewed the file sharing service LimeWire and addressed how the legal theories of inducement of infringement, contributory infringement, common law infringement and unfair competition fit together. *Lime Group*, 784 F. Supp. 2d at 409.  The service at issue employed peer-to-peer technology through which software created by the defendants took an inventory of files on users' computers and allowed others to search for and download them directly. *Id.* at 410-411.  The same expert engaged by the Studios in this case, Dr. Waterman, concluded that 98.8 percent of the files downloaded through LimeWire were not authorized for free distribution and that 43.6 percent of those files were owned by the plaintiffs in the action.  *Id.* at 412.  The court determined that there was sufficient evidence of direct infringement by LimeWire users and that the Waterman report provided competent proof of the scope of that infringement. *Id.* at 422-24.

On the issue of *Grokster*-type inducement, the court found that summary judgment in favor of the plaintiffs was warranted. *Id.* at 426.  Evidence cited by the

---

[18]   Ultimately, on remand, the district court entered summary judgment in favor of the plaintiffs on the issue of liability.  *Metro-Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd.*, 454 F. Supp. 2d 966, 999 (C.D. Cal. 2006).

court to establish the defendants' awareness of infringement included:  (1) the scope of the infringement, which revealed that "most actual downloads involve unauthorized content;" (2) internal communications that not only noted that users were sharing digital recordings, but also acknowledged that they were copyrighted (including a document in which the defendants considered legitimizing and monetizing user activity); (3) the fact that the infringing nature of the activity was communicated to defendants through user e-mails and the company maintained articles about infringement in a file labeled "Knowledge of Infringement;" and (4) the fact that the defendants provided technological assistance with files that "plainly relate[d] to unauthorized sharing of digital recordings." *Id.* at 426-28.

Moreover, like the network in *Grokster*, the defendants developed business strategies to target users of shuttered networks; their advertisements intimated illegal uses; and their revenue relied on the popularity of content that was indirectly tied to infringement.  *Id.* at 427-29.  Other attributes of the LimeWire software suggested that it was designed with infringement in mind.  The program not only enabled searches, but also suggested popular and copyrighted recordings to users; the defendants even tested its functionality using protected titles.  *Id.* at 428.  Moreover, the defendants failed to implement any sort of technical barrier or design choice to diminish infringement; instead, while existing technology could have been applied to infringing works, that filtering technology was disabled by default (and had to be enabled by users).  *Id.* at 429-430.  Finally, the defendants had considered alternative business models, including opening a store to guide users to licensed content.  *Id.*  This evidence was sufficient to show the same kind of unmistakable intent as existed in *Grokster*.

Case 1:11-cv-20427-KMW   Document 524-1 *SEALED*   Entered on FLSD Docket 08/28/2013
Page 15 of 47

But in addressing other common law principles of secondary infringement, Judge Wood concluded that summary judgment was inappropriate. The decision made a distinction between inducement liability, which requires *Grokster*-type evidence of intent, and contributory infringement liability, which does not so long as a defendant's contribution to infringing activities is "material." [19] *Id.* at 432. Under the contributory infringement theory of liability, the court found that the evidence was sufficient to show the defendants' knowledge of and material contribution to substantial infringing activity. *Id.* at 434. However, applying the *Sony/Betamax* rule, the court found there was insufficient evidence that the LimeWire service was incapable of substantial noninfringing uses. *Id.* The court observed that, while the LimeWire service was used "overwhelmingly for infringement" at the time of the decision, the defendants demonstrated substantial noninfringing uses that existed or were likely to develop,

---

[19] The decision reasoned that *Grokster* answered the question of inducement liability but failed to determine "whether the Ninth Circuit had been correct in granting summary judgment on the contributory infringement claim." *Id.* at 433. The concurring opinions in *Grokster* debated whether the noninfringing uses identified by the defendants were sufficient to merit summary judgment, but agreed that the *Sony/Betamax* rule continues to act as a defense to contributory infringement. *Id.* at 433 (citing concurring opinions); *see also* Alfred C. Yen, *Torts and the Construction of Inducement and Contributory Liability in Amazon and Visa*, 32 Colum J.L. & Arts 513, 513 (2009) ("In [*Grokster*], the Supreme Court adopted intentional inducement as a cause of action for third party copyright liability. Before *Grokster*, such liability existed in two forms, contributory liability and vicarious liability . . . Now, after *Grokster*, a defendant also faces liability if she acts with the object of promoting infringement by others." (footnote omitted)). Other decisions have suggested that two categories of contributory infringement liability exist – "actively encouraging (or inducing infringement through specific acts . . . or [ ] distributing a product distributees use to infringe copyrights, if the product is not capable of 'substantial' or 'commercially significant' noninfringing uses" – and that *Sony/Betamax* serves as a defense where the latter is asserted. *Amazon.com, Inc.*, 508 F.3d at 1170 (quoting *Grokster*, 545 U.S. at 942 (Ginsburg, J., concurring)).

including distribution of non-protected works. *Id.* Thus, under the *Lime Group* analysis, the *Sony/Betamax* rule may still be raised as a theory of defense where the intent to infringe or induce infringement is not explicit, but rather is imputed from a defendant's material contribution to infringement.

Several other courts have considered the material contribution theory of liability but have not always addressed the applicability of the *Sony/Betamax* defense under that theory. In *Fonovisa, Inc. v. Cherry Auction, Inc.*, 76 F.3d 259 (9th Cir. 1996), operators of a swap meet where counterfeit goods were sold were deemed to have provided the "support services" for infringement, including "the provision of space, utilities, parking, advertising, plumbing, and customers," such that the swap meet operators could be held liable. *Id.* at 263. Extending that theory of liability to the Internet context, the district court in *Napster* found the search and directory features of the music sharing program to be "an Internet swap meet." *A&M Records, Inc. v. Napster, Inc.*, 114 F. Supp. 2d 896, 919-20 (N.D. Cal. 2000) (quoting briefing), *aff'd in part & rev'd in part*, 239 F.3d 1004, 1022 (9th Cir. 2001). On appeal, albeit in a pre-*Grokster* decision, the Ninth Circuit found that the *Sony/Betamax* defense was applicable to instances in which intent to promote infringement was imputed from the structure of the system, but inapplicable to instances where the defendant has identified specific information regarding infringing activity. *Napster*, 239 F.3d at 1020-22. While the court concluded that the defendants were also liable under a *Fonovisa* material contribution theory, it did not address whether the *Sony/Betamax* defense applies under that theory. *Id.* at 1022.

In *In re Aimster*, "[i]nstead of parking spaces, advertisements, and plumbing," the defendants "provided the software and the support services necessary for individual Aimster users to connect with each other . . . manag[ing[ to do everything but actually steal the music off the store shelf and hand it to Aimster users." 252 F. Supp. 2d at 659. The court disallowed the *Sony/Betamax* defense, reasoning that the online network had an ongoing relationship with the direct infringer, as opposed to merely providing the means to commit infringement in a single point-of-sale transaction, like selling a VCR – an argument aggressively pursued by the Studios in this case.[20] Moreover, the Aimster technology permitted mass distribution of infringing content rather than "private, home use copying." *Id.* at 653. Rather than focusing solely on the features of the staple article of commerce doctrine, the decision made a distinction that would be echoed three years later in *Grokster* : there was both a lack of evidence that the technology had legitimate purposes and significant evidence that the defendant intended to foster infringement. *Id.* at 652-64.

For the most part, as in *Lime Group*, recent decisions have suggested that the *Sony/Betamax* rule applies wherever material contribution is at issue. *See, e.g., Capitol Records, LLC v. ReDigi Inc.*, No. 12 Civ. 95 (RJS), 2013 WL 1286134, at *13 (S.D.N.Y. Mar. 30, 2013) ("However, even where a defendant's contribution is material, it may evade liability if its product is 'capable of substantial noninfringing uses.'" (quoting *Sony/Betamax*, 464 U.S. at 442)).

---

[20]    While other courts have used this distinction to decline to apply the *Sony/Betamax* rule, this Court includes the analysis of an ongoing relationship in the vicarious liability context. As explained below, that theory of liability examines a defendant's relationship with, and control over, direct infringers to hold the defendant liable, just as a principal may be liable for the actions of his agent.

### c.    Knowledge of Infringing Content and Failure to Remove

Finally, the Ninth Circuit's decision in *Perfect 10, Inc. v. Amazon.com, Inc.* shows that the *Grokster* decision does not foreclose other common law principles of imputing intent.  In particular, a provider may face liability where it knows of particular instances of infringement – rather than simply that the system is capable of infringement or generally permits some level of infringement – and fails to act to remove it.  There, a copyright owner sued two companies, one of which (Google) operated a search engine that permitted users to search the Internet for images and facilitated downloads of those images from third-party websites by linking to them.  508 F.3d at 1155-56.  On the issue of secondary infringement, it was undisputed that the third parties did not have permission to display plaintiff's images on their websites and that some direct infringement had occurred.  *Id.* at 1169.

The parties disagreed, however, as to whether Google fostered infringement through specific acts under *Grokster.*  Although there was no suggestion that Google actually induced copyright infringement, the Ninth Circuit applied common law tort principles of fault-based liability to reason that "an actor may be contributorily liable for intentionally encouraging direct infringement if the actor knowingly takes steps that are substantially certain to result in direct infringement." *Id.* at 1170-71 & n.11.  It also relied on its pre-*Grokster* decision in *Napster*, which held that "if a computer system operator learns of specific infringing material on his system and fails to purge such material from the system, the operator knows of and contributes to direct infringement" under a material contribution theory.  *Id.* at 1171.  The court was persuaded by the reasoning that secondary infringement should be available to provide a practical mechanism for

70

preventing direct infringement. *Id.* at 1172. Because the district court had applied a different standard and there was evidence that "Google substantially assist[ed] websites to distribute [users'] infringing copies to a worldwide market and assist[ed] a worldwide audience of users to access infringing materials," Google could have been liable if it failed to take simple measures to prevent damage to the plaintiff. *Id.*[21]

### d. Application of Precedent

Against this body of jurisprudence, the Court sets out the standard for inducement and contributory infringement liability it applies here. First, while it may be unclear whether *Grokster* introduced a new category of liability based on inducement or whether it spoke to pre-existing notions of contributory liability, it is evident that a defendant will be liable for actually expressing an intention to foster infringement. If that intent is express or can otherwise be said to be "unmistakeable," the *Sony/Betamax* defense will not apply and the defendant will be liable for all acts of direct infringement committed using its system, as was the case in *Grokster*. Similarly, as explained in *Amazon.com*, where traditional principles permit a court to impute intent – for instance, where the defendant knows of specific infringing content available on its system yet fails to remove it – that defendant may be liable, by operation of law, just as if he had actually intended to infringe under *Grokster*. Finally, contributory infringement may be

---

[21]   On remand, the district court rejected the plaintiff's request for a preliminary injunction because the plaintiff failed to show that individual notices of infringement that had elicited no response were adequate to confer knowledge of infringement on Google. *Perfect 10, Inc. v. Google, Inc.*, No. CV 04-9484 AHM (SHx), 2010 WL 9479060, at *6-7 (C.D. Cal. July 30, 2010). Plaintiff also failed to show that practical and simple measures to prevent infringement were available to Google as a viable remedy. *Id.* at *7. Nor could the plaintiff meet the other requirements for a preliminary injunction. *Id.* at *14. The decision was affirmed, 653 F.3d 976 (9th Cir. 2011), and certiorari was denied by the Supreme Court, 132 S.Ct. 1713 (Mar. 5, 2012).

Case 1:11-cv-20427-KMW   Document 524-1 *SEALED*   Entered on FLSD Docket 08/28/2013
Page 20 of 47

found based on a material contribution theory in instances where a defendant did not express an intention to foster infringement but provided the means for infringement or distributed a commercial product that was subsequently used to infringe. Under that theory, the *Sony/Betamax* rule provides a backstop to liability, immunizing a defendant who demonstrates that noninfringing uses of the system are substantial. The Studios have raised claims and presented facts related to each of these theories of liability.

As a preliminary matter, it should be understood that although Hotfile has many unique characteristics, it is also true that it shares many of the attributes that have doomed other networks.[22] Most notably, the Court concludes that the extent of infringement by Hotfile's users was staggering, as was the case in *Grokster*. On this point, Hotfile questions the Waterman study and its finding of a respective 90.2% and 5.3% rate of infringement and noninfringement based on an examination of files that had been downloaded. The Court agrees that the study assumed an infringing purpose and that an examination of *uploaded* files – including those that were never shared or downloaded – would likely have shown a lower infringement rate and alternative uses for Hotfile's system apart from infringement (as Hotfile's expert, Dr. James Boyle, points out). It may also be true, as Hotfile argues, that the Waterman study examined too short of a time period (i.e., one month of data) and improperly excluded entire categories of files that would have resulted in an even lower rate.

Despite Hotfile's quarrel with the Waterman rate and suggestion that it is somewhat high, it cannot dispute that an enormous amount of infringement has actually

---

[22]   The Studios contend that Hotfile is similar to other infringing networks, such as Grokster, Fung, Streamcast, Usenet.com, and LimeWire.

occurred on Hotfile's system.  For example, the record reflects a large number of DMCA notices received by Hotfile – eight million in total.  As is explained in the Court's discussion of the counterclaim, only a relatively small number of the notices pertaining to Warner have been claimed to be incorrect and noninfringing, suggesting the same may be true of the other sets of notices Hotfile received from the Studios.  Moreover, while the Court cannot deduce that every file posted by a repeat infringer is actually infringing, the uploads of those subject to three or more notices constituted 44 percent of all files on Hotfile (and half of all downloaded files) in February 2011.  At the very least, this shows that a high number of Hotfile users likely engaged in infringement – the vast majority of Hotfile's top affiliates, and well over 20,000 of its users – and were likely responsible for a substantial amount of infringement.   Indeed, the Studios have identified over 900,000 files containing their own works that were available for the taking.  These numbers are consistent with the demonstrated outcome of Hotfile's post-Complaint policy changes, which Hotfile asserts were effective in combatting infringement and resulted in the termination of affiliates and users, deletion of files, and a substantial drop in revenue.

The Court can also conclude that Hotfile became aware of the general fact of infringement – although possibly not its scale – at least when it received DMCA notices through its agent and when it was sued or threatened with suit by copyright holders.  Documents produced in discovery suggest that Hotfile was aware it was becoming "the flagship of non-licensed content;" that if it had examined the files on its system, it would have known of the infringing activity; and that it was doing business with those it suspected were infringers like the affiliate PlanetSuzy.  Hotfile provided the means of

infringement; it created and currently maintains the Hotfile website, which Hotfile's members actually use to infringe. Users even store the infringing content on Hotfile's own servers, in contrast to decentralized peer-to-peer networks, in which the information resides on users' computers.

Finally, there is some evidence suggestive of a deliberate design to facilitate infringement. Hotfile is deliberately modeled after networks that were subsequently subject to challenges of infringement; its incentive structure rewards large and frequent file downloads; it pays members through an affiliate program; and it relies on the popularity of content to drive growth, even imploring users to post "interesting" links and media files. The fact that it actually pays infringers for this activity is, as the Studios argue in briefing, "simply unprecedented." Hotfile also provides technical assistance to those who infringe, both by answering specific questions from users about downloading media and by providing tutorials that reference copyrighted works. And, despite having the means to implement counter-piracy technologies and to target infringement (as demonstrated by Hotfile's actions immediately after the Complaint was filed), Hotfile did not take any meaningful action to curtail infringement. Moreover, it did not have an effective policy to terminate blatant, repeat infringement, which constituted a substantial amount of the total infringement, until February 2011. Based on the totality of the evidence, the Court concludes that Hotfile was successful in large part because it did not control infringement activity on its system.

Nonetheless, the Court draws distinctions between this case and the case law recited above in which courts determined that judgment on the question of secondary liability was proper. For instance, despite an increase in user traffic, the Studios have

shown neither that Hotfile's inspiration, RapidShare, actually was a pirate network nor that Hotfile targeted RapidShare's users to satisfy a known source of demand for copyright infringement, as was the situation in cases finding liability for networks attempting to become the next Napster.  Indeed, as shown by the Stoyanov e-mail, Hotfile apparently viewed the migration of RapidShare users as a "bad thing."  (Yeh Decl. Ex. 53 (DE 288-58 (filed under seal); DE 324-11).)  Moreover, Hotfile did not promote any of its files or enable a file search function, but instead relied on third-party affiliates that were responsible for promoting (and essentially making available) infringing content.  All infringing activity thus took place between uploading users, downloading users and affiliates (and not Hotfile).  Additionally, the system has noninfringing uses ignored in the Studios' focus on downloading activity, such as the distribution of unlicensed materials.  And Hotfile eventually developed a notice and takedown system and, over time, implemented technology to combat infringing users.

Hotfile's general knowledge of infringement, even if rampant, is insufficient by itself to support liability.  The Studios have not proffered an express statement by Hotfile indicating its intention to foster copyright infringement, that is, clearly voicing an objective of encouraging infringement.  Not one document shows a business plan contemplating infringing uses or an understanding that Hotfile was actually assisting users (individually or as a whole) to commit infringement.  Hotfile had no direct involvement in the acts of infringement (as would be the case if its employees had posted the Studios' copyrighted content).  Unlike *Lime Group*, there were no considerations (and rejections) of counter-piracy software, internal communications acknowledging the illegal nature of specific network activity, or proposals to legitimize

user activity.  Unlike *Grokster*, the intent to infringe is not "unmistakeable" such that it can be said to be central to the business model and ingrained in the platform's design. Indeed, Hotfile has, at least, a plausible alternative design model in the form of personal data storage.[23]

Although some evidence shows that Hotfile might have been on notice that specific acts of infringement were afoot, the evidence does not demonstrate that Hotfile knew for certain that the uses were illegal or that Hotfile induced the infringing use.  For example, the Studios assert that users put Hotfile on notice that they were purchasing premium accounts "specifically to download copyrighted works."  But the document supporting this assertion is an e-mail from a prospective user to a Hotfile e-mail address stating that he "wish[ed] to sign up to Hotfile to down load" eight "Ebooks" of older novels including Dickens's *A Christmas Carol.*  (Yeh Decl. Ex. 66 (DE 324-12).)  It is plausible that a service provider, foreign or domestic, might believe that a work from a 19th century English writer is no longer subject to copyright protection.  The document shows no response from Hotfile endorsing an illegal use, and nothing about the request suggests that the user's downloads would be blatantly infringing.

The Studios also allege that Hotfile "repeatedly provided technical assistance to users they knew were seeking to download [infringing] content," such as by answering user questions when the link's URL was apparent to Hotfile.  (Hotfile could see the URL path of the last file downloaded in every communication.)  But Hotfile points out that it had no way of knowing whether the user lacked permission to share the file, whether

---

[23]   Based on data, Dr. Boyle concluded that there were substantial noninfringing uses in the form of open source software and movie sharing, fair use downloads, storage, and monetizing works owned by creators through the affiliate program.

the file contained what the title indicated, or whether the work was actually protected by copyright. Indeed, the evidence shows that when users indicated to Hotfile that they were accessing particular content, they did nothing to conclusively inform Hotfile of the fact of infringement. While the Studios contend that by rewarding distribution of large and popular downloads (in contrast to promoting storage), Hotfile knew that it was encouraging the sharing of protected music and movies, no documents show that Hotfile equated popular content with protected content.

Thus, with respect to each example raised by the Studios, a number of questions remain regarding Hotfile's intent (actual or imputed) to foster infringement and the capacity for and scope of noninfringing uses of Hotfile's system. For example: When Hotfile supported user activity or communicated with affiliates, did it know that the files actually contained copyrighted material as the link names or discussion indicated? Did Hotfile know that the works are currently protected by copyright? Did Hotfile know when users lacked permission to download certain works (which would not have been the case if the works were user-owned and "space-shifted," or if the files were freely-licensed, as the most popular downloads on Hotfile currently are)? Was Hotfile designed, and is it primarily used, for storage or for distribution? If the latter, did Hotfile intend to promote the infringement of copyrighted work, or did it merely provide a service that was ultimately used to infringe? Did Hotfile encourage the sharing of protected content, thereby crossing the threshold from knowledge of infringement to fostering infringement? In sum, unlike other cases where the evidence of intent is more compelling, the record here does not provide an unequivocal picture. The fact that these questions remain makes summary judgment inappropriate on the theories of

inducement and contributory infringement liability. And while Hotfile may have a difficult time explaining its "innocence" to a jury,[24] the genuine issues of material fact must be resolved by a jury at trial.

## 2.    Vicarious liability

The Studios next assert that Hotfile is vicariously liable for the actions of its users. In contrast to contributory liability, which focuses on the defendant's actions in enabling infringement, "vicarious liability is based on the defendant's failure to cause a third party to stop its directly infringing activities." *Amazon.com, Inc.*, 508 F.3d at 1175 (citations omitted). Vicarious copyright liability has been described as a variation of the doctrine *of respondeat superior* – a form of strict liability premised on agency. *See Fonovisa, Inc.*, 76 F.3d at 262. Thus, the doctrine does not require knowledge of the infringement and may be applied even where the defendant has acted in good faith to prevent it. *Id.*[25] Vicarious infringement has two elements, occurring "when one profits from direct infringement while declining to exercise a right to stop or limit it." *Luvdarts, LLC v. AT&T Mobility, LLC*, 710 F.3d 1068, 1071 (9th Cir. 2013) (citing *Grokster*, 545

---

[24]    For instance, as indicated in the DMCA context, Hotfile's master file policy (which removed offending links but not the actual file) may mean that Hotfile knew of particular infringing files and failed to bar further access. Hotfile will also have to explain how, in each of these instances, it was unaware of the offending nature of the activity, did not intend to contribute to it, and could not utilize existing technology to prevent infringement. Finally, to the extent that the Studios premise liability on the fact that Hotfile provided the mechanism for infringement, Hotfile has suggested *Sony/Betamax*-type noninfringing uses for the system, and there is a question of whether those uses are "substantial."

[25]    Although a defendant's lack of knowledge may not affect liability in this context, it does have implications for the measure of damages available under the Copyright Act. *See* 17 U.S.C. § 504(c)(2) (providing that statutory damages may range from $750 to $30,000 per violation, but capping willful violations at $150,000 per violation); *see also EMI April Music, Inc. v. White*, 618 F. Supp. 2d 497, 507 (E.D. Va. 2009) (citing *Nelson-Salabes, Inc. v. Morningside Dev., LLC*, 284 F.3d 505, 517 (4th Cir. 2002)).

Case 1:11-cv-20427-KMW Document 524-1 *SEALED* Entered on FLSD Docket 08/28/2013 Page 27 of 47

U.S. at 930); *A&M Records, Inc.*, 239 F.3d at 1022. The determination of whether a defendant has the capacity to halt infringement is determined by examining the system's "current architecture." *Napster*, 239 F.3d at 1024.

Hotfile contends that the Studios cannot show a "direct financial benefit" from infringement because Hotfile charges a fixed rate to users through subscriptions and does not profit incrementally from infringement. Hotfile's argument rests on an early Internet case, *Religious Technology Center v. Netcom On-Line Communication Services, Inc.*, 907 F. Supp. 1361 (N.D. Cal. 1995), in which a member of a religious organization posted the plaintiffs' copyrighted works to a computer bulletin board service. *Id.* at 1365-66. Those works were automatically copied to the defendant's computer by the service and thereby made available to users who paid the defendant a fixed subscription fee. *Id.* at 1365-68. The court concluded that the plaintiffs were unlikely to prevail on their vicarious liability claim because the link between infringement and revenue was not sufficiently established. *Id.* at 1376-77.

Notably, however, the *Netcom* court did not rule that a fixed fee could never provide a direct benefit basis for vicarious liability. Instead, the court observed that the plaintiffs failed to show that the policy at issue enhanced "the value of [defendant's] services to subscribers or attract[ed] new subscribers," in light of the fact that the defendant was merely an entity providing Internet access to users. *Id.* at 1377. Indeed, the only evidence of such a link consisted of a declaration from plaintiffs' counsel stating that the defendant was concerned it would lose business if an injunction were to be granted on the infringement claims. *Id.* The court found such evidence insufficient to show the type of financial tie required. *Id.*

79

Case 1:11-cv-20427-KMW   Document 524-1 *SEALED*   Entered on FLSD Docket 08/28/2013   Page 28 of 47

By contrast, other courts have permitted liability where the financial benefit was even more attenuated than here. In *Arista Records LLC v. Usenet.com, Inc.*, 633 F. Supp. 2d 124 (S.D.N.Y. 2009), the court rejected an argument that causation was not established "because [the defendants] are paid on a per-volume, not per-download, basis and because infringing music accounts for less than 1% of the newsgroups available on their service." *Id.* at 157. Likewise, in the Ninth Circuit's *Napster* decision, an increase in user base – i.e., more user registrations – due to the increasing quality and quantity of available music meant that the defendants financially benefitted from infringement such that they were liable. 239 F.3d at 1023 (quoting lower court decision).

The *Napster* case posits that only a *causal* relationship between infringement and profit must be established "regardless of how substantial the benefit is in proportion to a defendant's overall profits." *Ellison v. Robertson*, 357 F.3d 1072, 1079 (9th Cir. 2004). In other words, "the law is clear that to constitute a direct financial benefit, the 'draw' of infringement need not be the primary, or even significant, draw – rather, it only need be 'a' draw." *Usenet.com, Inc.*, 633 F. Supp. 2d at 157. As one observer noted after a review of many of these cases, "[a]t present, the dominant view is that any for profit enterprise could be found vicariously liable for copyright infringement however remote, unquantifiable, and unidentifiable the benefit it receives from copyright infringement may be." Craig A. Grossman, *From Sony to Grokster, the Failure of the Copyright Doctrines of Contributory Infringement and Vicarious Liability to Resolve the War between Content and Destructive Technologies*, 53 Buff. L. Rev. 141, 230-31 (2005).

The Court has already concluded that questions remain regarding whether the financial benefit Hotfile received and the design of its business model are sufficient to impute intent to induce copyright infringement at this stage. But the vicarious liability standard requires neither that a defendant have knowledge of the acts of infringement nor that the defendant receive *substantial* financial benefit from infringement. Hotfile concedes that infringement did occur on its system and, while it argues that its support for infringement would not have made business sense, it acknowledges that infringing files drove some amount of sales to Hotfile, as shown by the Zebrak classifications and Waterman calculations. The infringement-sales connection is also indicated by the dramatic drop in Hotfile's income after the Complaint was filed and after Hotfile implemented its three-strikes policy and technologies to ferret out infringers. (*See, e.g.,* Yeh Decl. Ex. 70 (DE 288-82 (filed under seal); DE 324-13).) Hotfile may contend that infringement was not central to its success, but it is undeniable that it financially benefitted from it by attracting some users. This is sufficient to subject Hotfile to vicarious liability under the first prong of the analysis.

As for the second prong – the right to control user conduct and failure to do so – Hotfile contends that there is a triable issue because Hotfile's content-neutral approach meant that Hotfile could not determine which files were infringing, thereby depriving it of the ability to control the infringement. However, a reading of the common law standard suggests that courts have viewed this element expansively, finding that service providers have the capacity to control the activities of their users simply by virtue of providing the means to commit direct infringement. *See, e.g., Gershwin Publ'g Corp. v. Columbia Artists Mgmt., Inc.,* 443 F.2d 1159, 1173 (2d Cir. 1971); *Polygram Int'l Publ'g*

*Inc. v. Nevada/TIG, Inc.*, 855 F. Supp. 1314, 1328 (D. Mass. 1994) (reviewing case law, quoting the legislative history of the Copyright Act, and concluding that a defendant has "control" if they "either actively operate or supervise the operation of the place wherein the performances occur, *or* control the content of the infringing program").[26]

For example, in *Usenet.com*, the defendants maintained online bulletin boards from which users (with a subscription) could download copyrighted sound recordings. 633 F. Supp. 2d at 130-131. As sufficient evidence of the right to control, the court noted that the defendants had a policy that prohibited the sharing of copyrighted content; maintained computer servers that stored and transmitted user-originated content; possessed the ability to filter or block content, including infringing content; and "at times, exercised their right and ability to restrict, suspend, or terminate subscribers," such as by suspending accounts of spammers, limiting the activity of those who used a disproportionate amount of resources, and restricting downloads of pornographic material. *Id.* at 131, 157. And in the swap meet case, albeit a non-Internet context, the site operator could be held vicariously liable because it "patrolled the premises,"

---

[26]    It is important to note that Section 512(c)(1)(B) of the DMCA excludes from safe harbor those who "receive a financial benefit directly attributable to the infringing activity, in a case in which the service provider has the right and ability to control such activity."  17 U.S.C. § 512(c)(1)(B).  Although phrased in a similar way to the common law vicarious liability standard, courts have read it in the context of other portions of the DMCA to not foreclose protection for service providers that would be vicariously liable for users' infringing activity (without "something more than the ability to remove or block access to materials posted on a service provider's website"). *Viacom*, 676 F.3d at 38 (quotation omitted); *UMG Recordings, Inc. v. Shelter Capital Partners LLC*, 718 F.3d 1006 (9th Cir. 2013). This not only demonstrates the breadth of each prong of the common law doctrine, but also indicates that the DMCA precedent Hotfile relies on in its brief is inapplicable to the discussion here.  *See Capitol Records, Inc. v. MP3tunes, LLC*, No. 07 Civ. 9931 (WHP), 2013 WL 1987225, at *10 (S.D.N.Y. May 14, 2013).

"controlled the access of customers to the swap meet area," and "had the right to terminate vendors for any reason whatsoever and through that had the ability to control the activities of vendors on the premises." *Fonovisa*, 76 F.3d at 262.

Beyond the right to exclude, the ability to control must be real and practical. In *Perfect 10 v. Amazon.com, Inc.*, for instance, Google allowed users to search for images (including infringing images) on others' websites, but could not prevent those websites from posting infringing content and did not possess image-recognition technology that could precisely block its users' access to those images. 508 F.3d at 1174. The court stated that the alleged offender must have "both a legal right to stop or limit the directly infringing conduct, as well as the practical ability to do so." *Id.* at 1175. Thus, Google was not vicariously liable because it could not control the activities of the direct infringers (although it could have been contributorily liable to the extent it materially assisted them). *Id.* at 1174-75. And in *Luvdarts, LLC*, the Ninth Circuit ruled that mobile wireless carriers could not be held vicariously liable for the acts of their subscribers who allegedly shared access to plaintiffs' protected works. 710 F.3d at 1071-72. Even though the infringement occurred over the service networks that the defendants ran, the defendants had no way of supervising user activity or implementing a system to prevent infringement.

The analysis here, based on precedent, is straightforward. Hotfile controls the means of infringement by among other things mandating user registration and hosting the infringing materials on its own servers. *Cf. Amazon.com, Inc.*, 508 F.3d at 1174 (distinguishing *Napster*, 239 F.3d at 1023-24). Moreover, Hotfile has a stated policy that permits it to control user activity (and, as in *Fonovisa*, to exclude users) and

maintains that it has exercised that control in policing content.  Hotfile has also adopted

technology that it claims is effective in filtering and targeting infringing works.   These

actions, which benefit Hotfile in an assessment of direct liability, belie Hotfile's argument

that it lacks control because it has no search function and no way to identify or remove

infringing files.   It is also clear that prior to the filing of the Complaint, Hotfile failed to

properly exercise its control in light of the number of users who were blatantly infringing

and the estimates of the Studios' experts regarding the prevalence of protected content

available for download.   Accordingly, on this record, the Studios have made a case for

vicarious liability, and summary judgment is entered in their favor.

### C.   Anton Titov's Individual Liability

In addition to the corporate entity, Hotfile Corp., the Studios have sued Titov in

his individual capacity, seeking to extend any damages that may be awarded against

Hotfile.   Titov has filed a separate motion for summary judgment on the issue of his

liability.  In this Circuit, "a corporate officer who directs, controls, ratifies, participates in,

or is the moving force behind the infringing activity, is personally liable for such

infringement."  *Babbit Elecs., Inc. v. Dynascan Corp.*, 38 F.3d 1161, 1184 (11th Cir.

1994) (citation omitted); *Southern Bell Tel. & Tel. Co. v. Assoc. Tel. Directory

Publishers*, 756 F.2d 801, 811 (11th Cir. 1985).   While much of this precedent concerns

corporations that directly violate others' copyrights, it is equally applicable to entities

liable for secondary infringement.  *See Usenet.com*, 633 F. Supp. 2d at 158-59 (holding

that director and sole shareholder of companies operating online bulletin boards where

infringement occurred was liable under theories of direct and secondary liability for

copyright infringement).   The secondary infringement theory focuses on the effect the

individual had on the decision to commit infringement and looks beyond the corporate form and principles of limited liability. *See Babbit Elecs., Inc.*, 38 F.3d at 1184 (citation omitted).

Alternatively, a person may be liable under a vicarious liability theory if he is responsible for supervising the infringing activity and benefits from it, even if he is "ignorant of the infringement." *Southern Bell*, 756 F.2d at 811 (citations omitted); *see also Gershwin Pub'g Co.*, 443 F.2d at 1162 ("For example, a person who has promoted or induced the infringing acts of the performer has been held jointly and severally liable as a 'vicarious' infringer, even though he has no actual knowledge that copyright monopoly is being impaired.") As courts have recognized,

> A corporate officer may be held vicariously liable under the Copyright Act when: (1) the officer personally participated in the actual infringement; or (2) the officer derived financial benefit from the infringing activities as either a major shareholder in the corporation, or through some other means such as receiving a percentage of the revenues from the activity giving rise to the infringement; or (3) the officer used the corporation as an instrument to carry out a deliberate infringement of copyright; or (4) the officer was the dominant influence in the corporation, and determined the policies which resulted in the infringement; or (5) on the basis of some combination of the above criteria.

*Marvin Music Co. v. BHC Ltd. P'ship*, 830 F. Supp. 651, 654-55 (D. Mass. 1993) (summarizing case law) (quotation omitted).

Defendants attempt to minimize Titov's role, arguing that he is an "engineer," "technologist," "employee," or "accountant," rather than a key officer, involved only in "routine" administrative matters; that he did not provide the start-up capital or conceive of the idea for Hotfile; that he holds no sway over Hotfile either at the top-level or with respect to its day-to-day operations; and that he is a minority shareholder reporting to Stoyanov and Vangelov. Defendants' argument rests both on an assertion that Titov

Case 1:11-cv-20427-KMW  Document 524-1 *SEALED*  Entered on FLSD Docket 08/28/2013  Page 34 of 47

did not have personal involvement in the decisions giving rise to liability and that the group dynamic and the presence of more culpable figures (i.e., Stoyanov and Vangelov[27]) mean that Titov could not have had the requisite degree of control over the company's decisions to warrant liability.

Defendants illustrate their argument by citing *Mozingo v. Correct Manufacturing Corporation*, 752 F.2d 168 (5th Cir. 1985), which involved a products liability claim against a work platform manufacturer and its president. There, the plaintiff established that the product was defective at trial, but the district court directed a verdict on the issue of the president's personal liability, applying a Mississippi doctrine that requires that an officer "directly participates in or authorizes the commission of a tort." *Id.* at 171-73. The evidence showed that the president organized and owned predecessor companies that manufactured the defective product. *Id.* at 172-73. Moreover, the president expressed "some reservations concerning the unit's safety" during its development – possibly touching on the nature of the defect – and "authorized the production of a single prototype unit." *Id.* at 173. Nevertheless, the district court characterized his involvement in the development and manufacturing processes as "peripheral" and cited his lack of awareness that the product was put into production. *Id.* at 174. In affirming, the Fifth Circuit reasoned that "[i]f [the president] can be held personally liable in this case, any corporate officer who fails to maintain an almost total ignorance of the products the corporation produces may be personally liable in the event a defective product is produced." *Id.*

---

[27]  The Studios explain that they have not brought suit against these shareholders because Hotfile proffered Titov as its public face and the Studios only recently discovered these shareholders' identities.

Case 1:11-cv-20427-KMW   Document 524-1 *SEALED*   Entered on FLSD Docket 08/28/2013
Page 35 of 47

However, authority involving copyright infringement is not as stringent in holding relevant corporate principals liable.  For example, in *Quartet Music v. Kissimmee Broadcasting, Inc.*, 795 F. Supp. 1100 (M.D. Fla. 1992), a group of music publishers brought suit against a radio station and its president for broadcasting music in a manner inconsistent with a licensing agreement.  *Id.* at 1101.  Issuing a decision after a bench trial, the court juxtaposed the Eleventh Circuit's decision in *Southern Bell* and two district court cases, *Warner Brothers Inc. v. Lobster Pot Inc.*, 582 F. Supp. 478 (N.D. Ohio 1984), which imposed liability against a president who oversaw a restaurant where unauthorized performances of music were held, and *Broadcast Music, Inc. v. Behulak*, 651 F. Supp. 57, 61 (M.D. Fla. 1986), which, by contrast, immunized a corporate officer who was merely a "silent partner" in the lounge where infringement occurred.  *Quartet Music*, 795 F. Supp. at 1103-04.  The court concluded that the president was liable for copyright infringement notwithstanding his corporate role because of his participation in the activities of the business and the conduct at issue; he had been involved in litigation concerning similar claims, his company had been given notice of the alleged infringement, he ran the radio station's operations, and he had the right to supervise the infringing activity.  *Id.* at 1104.

While *Quartet Music* involved a single owner with exclusive control over the infringing activities, one judge in this district has observed that "*Southern Bell* does not require ultimate authority, nor does it require only one person to have authority." *Foreign Imported Prods. & Publ'g, Inc. v. Grupo Indus. Hotelero, S.A.*, No. 07-22066 CIV, 2008 WL 4724495, at *14 (S.D. Fla. Oct. 24, 2008).  Numerous other courts support that proposition.  *See, e.g., Columbia Pictures Indus., Inc. v. Redd Home, Inc.*,

Case 1:11-cv-20427-KMW   Document 524-1 *SEALED*   Entered on FLSD Docket 08/28/2013 Page 36 of 47

749 F.2d 154, 160 (3d Cir. 1984) (affirming order imposing liability against both the president and sole shareholder of a defendant entity, as well as his brother, who was not a stockholder or officer but gave the impression that he was a principal in the business venture); *Pickwick Music Corp. v. Record Prods., Inc.*, 292 F. Supp. 39, 41 (S.D.N.Y. 1968) (finding liability for three defendants who formed and ran a corporation, although they had different responsibilities for recording, editing, and selling an infringing record, but not two others who had "performed merely ministerial office functions"). "Corporate officers have been held liable for the copyright infringement committed by their corporate entity in a variety of situations." *Blendingwell Music, Inc. v. Moor-Law, Inc.*, 612 F. Supp. 474, 482 (D. Del. 1985) (parenthetically citing examples). By contrast, Defendants point to no precedent suggesting that a multitude of culpable actors – and thus, the lack of a single "central figure" – is determinative of liability.

Moreover, Defendants' contention that the particular facts of this case make it incomparable to any other is unpersuasive, since the hallmarks of participation, control, and benefit are undeniably present here. First, Titov is a high-ranking, central figure at Hotfile. He owns a stake in the company nearly as large as its other two shareholders and runs it in equal part; all three are minority shareholders and govern Hotfile by consensus. In his role, Titov has advanced, rejected, agreed upon or failed to block every decision that has shaped the company, including the efforts Hotfile took to identify and remove infringing content, implementing and eventually eliminating the master file policy, and deciding how to reward Hotfile's affiliates. Moreover, Titov (along with Stoyanov and Vangelov) was indispensable in the company's formation, crucial to the development of its business model, and continues to be involved in its business

strategy.  Titov acknowledges possessing power of attorney for the company and acting as its manager when authorized.

In addition, Titov has personally had a hand in every aspect of the conduct underpinning the Studios' theories of liability in this case.  For example, at the outset, Titov wrote the programming code that runs the Hotfile interface and enables direct infringers to upload and download protected works.  More recently, he undertook a management role in which he oversees contractors working for Hotfile and participates in maintaining Hotfile's storage and delivery technology.  Titov also has a significant impact in his work for Hotfile's related entities.  He is the sole owner, manager and director of Lemuria, which owns and maintains the servers on which the infringing files at issue are stored, and he is the managing director of Hotfile Ltd., which collects subscription fees from users and pays affiliates.  Together, these companies provide mechanisms necessary for Hotfile to collect its revenue, for its users to access its services, and for the entire system to sustain business and grow.

The Studios have also pointed to specific evidence showing Titov's actual awareness of infringement on Hotfile's network.  For example, he understood from his conversations with Stoyanov that Hotfile acquired users migrating from Rapidshare when that network was sued for infringement.  He also expressed the concern that Hotfile would become the "flagship" for non-licensed content and was a party to communications claiming that certain files were infringing.  Significantly, Titov appears on nearly every document that the Court considered in determining liability.  Titov also put in place Hotfile's DMCA agent, who received millions of infringement notices.  Thus, while the Court acknowledges that Titov may not have gone so far as to personally

engage in acts of direct infringement, and that any one of his functions might not give rise to liability on its own, the totality of the circumstances supports liability. In contrast to other cases, his role is not peripheral, his function is not that of merely a silent shareholder or ordinary employee, and his duties are not just ministerial.

The Studios have shown sufficient financial benefit and control for the Court to conclude that Titov is liable under a vicarious liability theory. With regard to the first requirement – financial benefit – the evidence shows that as the company earned money from new subscriptions (some portion of which was attributable to the availability of infringing materials), so did Titov. Titov also instructed employees to ban one user, demonstrating his ability to block or exclude Hotfile's clientele. And, as noted previously, the record shows Titov's impact in determining Hotfile's policies and his dominant influence on the corporation. To the extent that Hotfile can be found liable on any of the theories discussed above, the Court finds that Titov was a critical actor in the underlying operations. Thus, there are no disputed facts that preclude a finding that Titov is vicariously liable for the acts of infringement occurring on Hotfile's network.

In a final effort to avoid liability, Defendants contend that Titov – a Russian citizen who resides in Bulgaria – is not subject to personal jurisdiction in Florida. Titov has advanced this assertion at least twice in this case: as a defense in his Answer and by asking the Studios not to serve him while he attended mediation in this jurisdiction. However, Titov failed to address the issue in the motion to dismiss he filed on March 31, 2011 (DE 50), which challenged only whether the Complaint stated a claim for relief under Federal Rule of Civil Procedure 12(b)(6). Federal Rule of Civil Procedure 12(h) provides that a party waives certain defenses that could have been raised under Rule

12(b) – such as lack of personal jurisdiction – by failing to interpose them in the first pleading. Rule 12(h) is explicit, requires compliance, and means that Titov has procedurally waived the personal jurisdiction issue. *See, e.g., Boston Telecomms. Grp., Inc. v. Deloitte Touche Tohmatsu*, 249 F. App'x 534, 537 (9th Cir. 2007) (reversing district court's finding of non-waiver of personal jurisdiction where counsel had not seen a copy of the complaint, moved to dismiss for insufficiency of process, and stated that he reserved the right to file a supplemental motion to dismiss).

Moreover, a long litany of cases establishes the common law principle that a party waives such a defense by appearing generally and litigating the merits of a claim, as Titov has done here. *See, e.g., Ins. Corp. of Ireland, Ltd. v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 706 (1982) (noting that where personal jurisdiction is lacking, the defendant has the choice of ignoring the proceedings and raising a collateral challenge in enforcement proceedings or appearing specifically to challenge personal jurisdiction).[28] After stumbling upon a personal jurisdiction challenge buried deep in the summary judgment briefing, the Court finds no indication that Titov is

---

[28]   In *Gerber v. Riordan*, 649 F.3d 514 (6th Cir. 2011), for example, a *pro se* defendant filed a motion to dismiss for lack of personal jurisdiction, which was denied for procedural reasons. The defendant then obtained an attorney who entered an appearance, moved to stay pending arbitration, sought to vacate a default judgment that had been entered, opposed a request for mediation, participated in a case management and pretrial conference, sought to enforce a settlement agreement, and engaged in discovery. *Id.* at 518-19. After noting the lack of precedent in the area, the court considered whether filings and appearances that are distinct from jurisdictional challenges – such as anything that would "cause the court to go to some effort that would be wasted if personal jurisdiction is later found lacking" – waive a personal jurisdiction defense. *Id.* at 519 (citations and quotation omitted). While some of those actions might have indicated that the party did not submit to the court's jurisdiction or that the defendant sought merely to postpone the case, the filing of a general appearance "constituted a voluntary acceptance of the district court's jurisdiction."

avoiding a defense of the suit on the merits. To the contrary, in asserting defenses, filing motions related to the record, and personally attending oral argument, Titov has submitted to – has invoked – the jurisdiction of this Court. The Court finds Titov's contentions that this was the "first available opportunity" to raise the issue and that the Studios "have waived any waiver argument" disingenuous. If any issue could be deemed waived, this is and he has.

### D.   Hotfile's Counterclaim

And finally, the Court turns to Hotfile's counterclaim against Plaintiff Warner. Notices of infringement are a prominent feature of the DMCA. The statute spells out six elements for a notice to be effective, specifies requirements the service provider must meet so that it may properly receive notice, requires service providers to act on receipt of notices such as by removing infringing users' content, and provides a procedure for challenging copyright owners' designations. Providing the legal basis for Hotfile's counterclaim, Section 512(f) sets out a private cause of action for anyone who is injured by a material representation that content or activity is infringing when it is not:

> Any person who knowingly materially misrepresents under this section . . . that material or activity is infringing . . . shall be liable for any damages, including costs and attorneys' fees, incurred by the alleged infringer, by any copyright owner or copyright owner's authorized licensee, or by a service provider, who is injured by such misrepresentation, as the result of the service provider relying upon such misrepresentation in removing or disabling access to the material or activity claimed to be infringing, or in replacing the removed material or ceasing to disable access to it.

17 U.S.C. § 512(f).

Section 512(c), dealing with the creation of notices, requires that notices be accompanied by "[a] statement that the complaining party has a good faith belief that use of the material in the manner complained of is not authorized by the copyright

owner, its agent, or the law." 17 U.S.C. § 512(c)(3)(A)(v). Nonetheless, Section 512(f) does not impose liability for issuing a defective notice *per se*, only for making false claims of infringement. According to the statute's legislative history, the subsection "establishes a right of action against any person who knowingly misrepresents that material or activity is infringing" and "is intended to deter knowingly false allegations to service providers in recognition that such misrepresentations are detrimental to rights holders, service, providers, and Internet users." S. Rep. No. 105-190 (1998) at 50. In this regard, Hotfile claims that Warner had actual knowledge that the identified notices were false and asserts that it was damaged as a result. Warner, conversely, has moved for summary judgment on the ground that Hotfile cannot make a sufficient showing to establish its claim.

Preliminarily, the parties, like the Court, have grappled with several issues surrounding enforcement of Section 512(f), which is not well understood. *See Ground Zero Museum Workshop v. Wilson*, 813 F. Supp. 2d 678, 704 (D. Md. 2011) ("There is not a great deal of case law interpreting [Section 512(f)]."); *UMG Recordings, Inc. v. Augusto*, 558 F. Supp. 2d 1055, 1065 (C.D. Cal. 2008), *aff'd on other grounds*, 628 F.3d 1175 (9th Cir. 2011) (noting "uncertainty" in the area of law). For instance, both sides recognize that the statute requires actual, subjective knowledge of the fact of noninfringement at the time that a takedown notice is made, based upon the theory that one cannot knowingly misrepresent what one does not understand to be false. *See Rossi v. Motion Picture Ass'n of Am., Inc.*, 391 F.3d 1000, 1004-05 (9th Cir. 2004) (holding that the statute "encompasses a subjective, rather than objective

Case 1:11-cv-20427-KMW   Document 524-1 *SEALED*   Entered on FLSD Docket 08/28/2013
Page 42 of 47

[reasonableness] standard").[29]  Indeed, mistakes, even "unreasonable" mistakes, do not necessarily call for liability, so long as they are honestly believed. *Id.* (citing 17 U.S.C. § 512(f)).

But Hotfile asks whether certain "egregious" attributes of Warner's system that might have prevented it from *acquiring* subjective knowledge (such as not relying on human review, failing to download mistaken files, and failing to examine file titles) unjustly insulate Warner from liability for unreasonable mistakes. *Compare, e.g., Online Policy Grp. v. Diebold, Inc.*, 337 F. Supp. 2d 1195, 1204 (N.D. Cal. 2004) ("'Knowingly' means that a party actually knew, should have known if it acted with reasonable care or diligence, or would have had no substantial doubt had it been acting in good faith, that it was making misrepresentations."), *with Cabell*, 2010 WL 996007, at *4 ("[N]egligence is not the standard for liability under section 512(f)." (citation omitted)), *and Augusto*, 558 F. Supp. 2d at 1065 (holding that allegations that the counterclaim-defendant "should have known better do not create a genuine issue of material fact").  Hotfile also asks

---

[29]   In *Rossi*, which is the case cited most often in this area, the owner of a website directory sued a movie studio trade association that followed the DMCA's notice and takedown procedures, contending that any reasonable investigation of his website would have revealed that it did not link to infringing content. *Id.* at 1003. Considering Section 512(f)'s express language and interpretive case law dealing with a wide variety of similarly-worded statutes, the Ninth Circuit held that the statute employs an objective standard and ruled against the plaintiff. *Id.* at 1004-05 (stating that the statute protects "potential violators from subjectively improper actions by copyright owners").  Instead of subjective knowledge of noninfringement, one of the association's members notified it of possible infringements on the subject website and the website itself suggested to users that protected movies could be downloaded by joining. *Id.*  The clear lesson of *Rossi* is that "as a prerequisite to liability under section 512(f), a defendant must have actual knowledge that it is making a misrepresentation of fact." *Cabell v. Zimmerman*, No. 09 Civ. 10134 (CM), 2010 WL 996007, at *4  (S.D.N.Y. Mar. 12, 2010) (citations omitted).

whether Warner's actual knowledge of its rate of false positives – attributable to search terms it knew were, at times, overbroad as well as its practice of deleting surrounding files – can raise an inference that Warner is liable for possessing guilty knowledge or support liability under a willful blindness theory.

Some courts have cited Section 512(c) to suggest liability where a party did not develop a "good faith" or "sufficient" basis to believe infringement before submitting a notice. *See Dudnikov v. MGA Entm't, Inc.*, 410 F. Supp. 2d 1010, 1013 (D. Colo. 2005) (holding, in the context of a Section 512(f) claim, that the defendant "was required to show that it had a sufficient basis to form the required good faith belief that the plaintiffs' auction infringed on its rights, and that its actions therefore complied with the notice and takedown requirements under the DMCA); *but see Augusto*, 558 F. Supp. 2d at 1065 ("Congress included an expressly limited cause of action for improper infringement notifications, imposing liability only if a copyright owner's notification is a knowing misrepresentation." (quotation and citations omitted)).[30]  One court, in a series of four decisions, went so far as to hold that prior to submitting a takedown notice, the copyright holder must consider not only whether the material actually belongs to it, but whether the use of the material lacks an obviously lawful purpose like fair use. *See Lenz v. Universal Music Corp.*, 572 F. Supp. 2d 1150 (N.D. Cal. 2008) ("*Lenz I*") (denying motion to dismiss); *Lenz v. Universal Music Corp.*, No. C07-3783 JF(RS), 2008 WL 4790669 (N.D. Cal. Oct. 28, 2008) ("*Lenz II*") (denying motion for interlocutory appeal); *Lenz v. Universal Music Corp.*, No. C07-3783 JF, 2010 WL 702466 (N.D. Cal.

---

[30]    *Rossi* itself noted the fact that the defendant in that case had not actually downloaded the files, but went on to describe other compelling facts that led the defendant to believe that infringement of its works was occurring.

Feb. 25, 2010) ("*Lenz III*") (granting plaintiff's motion for partial summary judgment on affirmative defenses); *Lenz v. Universal Music Corp.*, No. 5:07-cv-03783-JF, 2013 WL 271673 (N.D. Cal. Jan. 24, 2013) ("*Lenz IV*") (denying motions for summary judgment).[31]

Thus, if Warner had some similar type of duty, it might find itself vulnerable to suit because its pre-notice review was minimal and swift, consisting of mechanically reviewing the titles and superficial attributes of files. Moreover, even if its methodology were reliable, Warner was concerned with determining whether it *owned* the works rather than whether the use of the works *infringed* on its copyrights to support a proper 512(c) claim. *See Sony/Betamax*, 464 U.S. at 433 ("[A]nyone . . . who makes a fair use of the work is not an infringer of the copyright with respect to such use."); *Amaretto*

---

[31]   In that case, Stephanie Lenz, a user of the Internet video hosting site YouTube, uploaded a video of her family dancing to a song performed by the music artist Prince, which turned out to be wildly popular among viewers. *Lenz I*, 572 F. Supp. 2d at 1152. The owner of the song, Universal Music Corporation, sent a takedown notice to the service provider, which notified Ms. Lenz that her video had been removed because of a claim of copyright infringement. *Id.* Discovery revealed that Universal had an employee who was tasked with using YouTube's system to search for titles owned or administered by Universal. *Lenz IV*, 2013 WL 271673, at *1. He stated that he issued a takedown notice whenever he could recognize a one second or longer portion of a Prince song in any video, as occurred in the video at issue. *Id.* at *5. His boss stated that Universal seeks to remove songs "when a writer is upset or requests that particular videos be removed from YouTube," prompting Universal to conduct a review. *Id.*

The court concluded that summary judgment in favor of either party was improper. Ms. Lenz could show that Universal's procedures might have willfully blinded it to knowledge of her fair use, but not that Universal subjectively believed that there was a high probability that the video was lawful or that the nature of fair use was self-evident. *Id.* at *6-7 (citing *Viacom*, 676 F.3d at 34). Likewise, Universal could not demonstrate the absence of subjective intent. *Id.* at *8.

*Ranch Breedables, LLC v. Ozimals, Inc.*, 790 F. Supp. 2d 1024, 1029 (N.D. Cal. 2011) (noting that a Section 512(f) plaintiff can contest the validity of a takedown notification even where a valid copyright exists). And, Warner's reliance on technology to accomplish the task might prevent it from forming any belief at all, as the *amicus curiae* argues here and a similar group asserted in *Rossi*: "computers conducting automated searches cannot form a belief consistent with the language of the DMCA, because they cannot distinguish between infringing content and content that merely contains words that suggest infringement." *Rossi*, 391 F.3d at 1005 n.7. The Court, however, is unaware of any decision to date that actually addressed the need for human review, and the statute does not specify how belief of infringement may be formed or what knowledge may be chargeable to the notifying entity.

Ultimately, while these are engaging questions surrounding Warner's knowledge; its responsibility to investigate; whether it had a good faith belief in infringement in each instance; and whose burden it is to show or refute what – all issues of first impression in this Circuit – there is sufficient evidence in the record to suggest that Warner intentionally targeted files it knew it had no right to remove. This precludes summary judgment in its favor. Specifically, Hotfile has provided the example of JDownloader, which Warner did not manage and acknowledged removing for reasons unrelated to copyright infringement. It has also shown Warner's interest in an application of its takedown rights beyond works that it owns. And Warner has not otherwise argued that it had the right to remove those files, only that its mistakes should be excused. The Court finds this motive and other evidence sufficient to sustain an inference that Warner violated Section 512(f), such that these issues should be presented to the jury.

The only issue remaining is whether Hotfile is able to show any injury for the deletions, which is an element of a Section 512(f) claim and which Warner questions. "A fair reading of the statute, the legislative history, and similar statutory language indicates that § 512(f) plaintiff's damages must be proximately caused by the *misrepresentation to the service provider and the service provider's reliance on the misrepresentation.*" *Lenz III*, 2010 WL 702466, at *10 (emphasis in original). In this regard, the Court observes that the quantity of economic damages to Hotfile's system is necessarily difficult to measure with precision and has led to much disagreement between the parties and their experts. Notwithstanding this difficulty, the fact of injury has been shown, and Hotfile's expert can provide the jury with a non-speculative basis to assess damages. Additionally, *Lenz III* concluded that the subsection provides for damages beyond actual damages, even if they are not substantial. *Id.* at *7-10. On this basis, the Court concludes that Warner is unable to establish the absence of a genuine dispute on the issue of damages and cannot prevail at this juncture.

### III.   CONCLUSION

In accordance with the foregoing, it is hereby **ORDERED AND ADJUDGED** as follows:

   (1)   Hotfile's motion for partial summary judgment for post-Complaint DMCA protection (DE 275, DE 318), Defendant Anton Titov's motion for summary judgment on personal liability (DE 276, DE 316), and Warner's motion for summary judgment as to Hotfile's counterclaim (DE 255, DE 301) are **DENIED**.

(2)     Plaintiffs' motion for summary judgment (DE 280, DE 322) is **GRANTED** as to the issues of Defendants' DMCA defense, vicarious liability, and Mr. Titov's liability.  It is **DENIED** in all other respects.

(3)     Except to the extent addressed herein, Defendants' motions to strike Dr. Waterman's rebuttal report (DE 217); to strike Dr. Foster's reply declaration (DE 452, DE 460) and certain exhibits (DE 339) in connection with Plaintiffs' summary judgment briefing; and to strike certain exhibits in connection with Plaintiffs' opposition to Mr. Titov's summary judgment motion (DE 371), are **DENIED AS MOOT**.  Similarly, Plaintiffs' motion to strike portions of the declarations of Dr. Andrew Cromarty, Dr. Boyle, and Mr. Titov (DE 387, DE 423) is **DENIED AS MOOT**.

(4)     Warner's motion to use an exhibit from Mr. Titov's deposition at trial (DE 241, DE 297) is **GRANTED**, and Plaintiffs' Objections to Judge Turnoff's Report and Recommendation (DE 327, DE 370) are **OVERRULED**. Judge Turnoff's Report and Recommendation (DE 306) is **ADOPTED AND AFFIRMED**.

(5)     The parties shall confer and provide to the Court proposed redactions to this Order within **fourteen (14) days** of the date of this Order, so that the Court can issue a public version of this decision.

**DONE AND ORDERED** in chambers in Miami, Florida, this 28 day of August, 2013.

KATHLEEN M. WILLIAMS
UNITED STATES DISTRICT JUDGE