HIGHLY CONFIDENTIAL                          Expert Report of Andrew S. Cromarty, Ph.D.

**Table of Contents**

I.      INTRODUCTION AND BACKGROUND ..................................................................1
II.     QUALIFICATIONS.......................................................................................................1
III.    PRINCIPAL QUESTIONS ADDRESSED IN THIS REPORT......................................1
IV.     SUMMARY OF OPINIONS .........................................................................................1
V.      SYSTEMS AND METHODS OF DEFENDANT SYSTEMS........................................3
VI.     COMPLAINT, AND APPLICABLE LEGAL FINDINGS TO DATE ...........................3
VII.    TECHNICAL AND HISTORICAL BACKGROUND...................................................5
    A.      A half-century of file sharing ............................................................................5
    B.      A brief technical explanation of file sharing.........................................................11
    C.      Technical and business challenges in identifying or confirming infringement ..........18
    D.      File sharing and Internet business models ............................................................29
VIII.   OPINIONS AND ANALYSIS........................................................................................31
    A.      Hotfile follows industry-standard practices to effect control over digital assets to
    the extent technically practicable. ............................................................................31
    B.      Customer incentive programs are common Internet business practice.................33
    C.      Hotfile customers pay for better service, not for ability to infringe copyright......38
    D.      Hotfile materially lacks the "ability to control" infringement even using state-of-
    the-art technology.....................................................................................................39
IX.     TRIAL EXHIBITS ......................................................................................................45
X.      SUPPLEMENTATION OF OPINIONS ......................................................................45
APPENDICES .........................................................................................................................46
    A.      Materials Relied Upon ......................................................................................48
        i.      Non-BATES-numbered documents ................................................................48
        ii.     BATES-numbered documents.........................................................................53
    H.      Internet operations and Hotfile services................................................................55
        a.      Brief overview of Internet and World Wide Web operations ...............................55
        b.      Summary of www.hotfile.com operations, pricing, and consumer use ................58
    B.      Curriculum Vitae of Dr. Andrew Cromarty..........................................................65

HIGHLY CONFIDENTIAL                    Expert Report of Andrew S. Cromarty, Ph.D.


# I.  INTRODUCTION AND BACKGROUND

1.      I have been retained by Defendants Hotfile Corp.   ("Hotfile") and Anton Titov (collectively, "Defendants") as an expert.  In my capacity as an expert, I was asked to offer my opinion on specific technical and business questions bearing on alleged secondary infringement of Plaintiffs' copyrights by Hotfile Corp. and Anton Titov as asserted by Plaintiffs in their Complaint.  If additional claims as to infringement are asserted, I reserve the right to opine on those claims as well.   My expertise extends to the technical areas of the alleged copyright infringement, by virtue of, at minimum, my extensive training in computer science and commercial experience as set forth below. I will not offer opinions of law, as I am not an attorney.

2.      I have been engaged through Distributed Systems Technology LLC, a company of which I am an owner, through Berg Software Designs. Berg Software Designs bills $600 per hour for my time working on this matter plus reasonable expenses, of which I receive a lesser indeterminate amount computed after business operations expenses of Berg Software Designs and Distributed Systems Technology LLC.   My compensation is in no way related to the outcome of this litigation.

3.      A list of the materials I considered is attached as Exhibit A.

# II. QUALIFICATIONS

4.      I have received the following academic honors, awards, appointments, and recognition: Visiting Scholar, Stanford University (1990); National Science Foundation Assistantship, to design a new programming language (1983); Departmental Teaching Assistantship, University of Massachusetts at Amherst (1982); National Institutes of Health/NINCDS Research

HIGHLY CONFIDENTIAL                    Expert Report of Andrew S. Cromarty, Ph.D.

Assistantship, for computer science and mathematical modeling of biological systems (1981-1982); Deutscher Akademischer Austausch Dienst (DAAD) Doctoral Fellowship, to direct neurophysiology and computer modeling research in Europe (1980); National Institutes of Health/NINCDS Research Assistantship, for computer science and mathematical modeling of biological systems (1979-1980); National Science Foundation Summer Research Fellowship, for neurophysiology research (1977); Bausch and Lomb Honorary Science Award (1974); Cum Laude Society, Newark Academy (1974); National Merit Scholarship Finalist (1974).

5.      During my professional career I have held senior technical positions at several corporations, including Principal Scientist at both Digital Equipment Corporation and Compaq Computer Corporation, the highest management-awarded corporate scientist hiring rank at those corporations, and Division Research Director and then Corporate Principal Scientist at ADS, the highest management-awarded corporate scientist rank at that corporation, for a combined total of approximately a decade.

6.      I have held numerous senior corporate executive and technical management positions during my career, including Chief Technology Officer (CTO) and Chief Information Officer (CIO) of Union Square Advisors, a San Francisco technology mergers & acquisition investment bank; CIO and CTO of DAX Solutions, Inc., a primary provider of Internet-based digital asset services to the Hollywood TV and movie industry, with international operations; CTO of SoftNet Systems, Inc., a billion-dollar NASDAQ-traded Internet services and telecommunications company; Chairman of the Board of Freewire Networks, Inc., a wireless broadband service, content, and e-commerce business; CTO of ISP Channel, then the third-largest cable Internet provider in the United States; CTO of Aerzone Corp., a $100 million wireless broadband service joint venture; and Board of Directors member of additional firms including Intelligent

HIGHLY CONFIDENTIAL                    Expert Report of Andrew S. Cromarty, Ph.D.

Communications Inc., an international satellite service provider, and SoftNet Ventures, a corporate venture investment fund. Presently I am a Partner at Minerva Consulting, and the President and CEO of Distributed Systems Technology LLC.

7.      I earned a Ph.D. in Computer and Information Science from the University of Massachusetts at Amherst, awarded in 1988, writing my doctoral dissertation on "Programming Constructs for Real-Time Distributed Knowledge-Based Systems." While there I also wrote a second doctoral dissertation on mathematical modeling and computer simulation of brain structure and function. I earned a Master of Science in Computer and Information Science the University of Massachusetts at Amherst in 1980.  I earned a Bachelor of Arts double degree in Biology and Psychology, and simultaneously a Bachelor of Arts degree in Music, from Wesleyan University in 1978.

8.      Since obtaining my Ph.D., I have worked in numerous technical management positions and overseen dozens of successful projects developing software, hardware, and services.  My experience includes overseeing technical staff from groups very small in size to hundreds of employees. My experience in these projects has been consistently direct and hands-on, and has delivered working products and services to paying customers.  I also have worked as a computing professional by developing software and teaching programming in over 30 languages.

9.      I have personally authored on the order of one million lines of software code.

10.     I am credited with a number of worldwide historic multimedia,  Internet and technology firsts, including first to stream 1,000,000 live videos on the Internet for an event, world's first demonstration of Java-based distributed Internet games, world's first live wireless webcasts, world's first streaming video live from an international film festival, and the first high-definition "set-top box" networked screening product and system for the movie industry.

- 3 -

HIGHLY CONFIDENTIAL                    Expert Report of Andrew S. Cromarty, Ph.D.

11.    My specific relevant experience with networking, internetworking, and multimedia content sharing or delivery over the Internet includes:

12.    Active on the Internet in its successive historical manifestations since approximately 1975.

13.    Developed and published novel networking and distributed computing techniques for my doctoral research 1983-1988.

14.    Active networking and electronic communications researcher and experimentalist since 1978, involved in defining and implementing novel communications protocols, experiments, and techniques including: packet radio techniques, propagation research, TCP/IP extensions, administrative management of a subset of the public Internet allocated for packet radio use, design and implementation of American Red Cross emergency/disaster communications systems, and design and creation of networked satellite communications systems and packet gateways to the Internet.

15.    Created and directed a Computer Systems group that grew into a corporate division and developed novel networking and distributed computing techniques including internetworked multimedia delivery and distribution methods,1983-1990.

16.    Founder and President of a startup firm in 1990 that provided distributed computing and networking consulting analyses, software, and services to U.S. Government/military and commercial clients 1990-1993; and subsequently in 1994-1996, provided to commercial customers e-commerce, Web catalog, and Internet services, entailing early market study, in-house development, and adoption of open-source software tools implementing networking and shopping technology and development of an early form of affiliate marketing business website, on the World Wide Web starting in 1994. Among my firm's catalog Web sites were the first

- 4 -

HIGHLY CONFIDENTIAL                    Expert Report of Andrew S. Cromarty, Ph.D.

known hockey retailer and the first known soccer retailer on the Web, software for which was executing on a Web server on a public host computer delivering multimedia content at least as early as 1994.

17.    Principal Scientist at the Network Systems Laboratory of Digital Equipment Corporation, 1996-1999.   While at Digital Equipment Corporation, I developed a number of networking methods and systems, which may be subject to contractual nondisclosure agreements. In 1996 I developed the networking method of filtering active content from HTTP traffic at a network firewall. I also developed in 1997 the methods and systems of internetworked peripheral devices and services including methods and systems related to wirelessly internetworking printers, keyboards, remote displays and monitoring systems, and in 1998, additional architectures, methods and systems for high-performance internetworked multimedia client-server systems that were used for applications including education and entertainment.

18.    While at Digital Equipment Corporation, I also held the title of Manager of Networked Entertainment. I actively managed a collection of entertainment-related server equipment and Internet services, at Digital's corporate Internet gateway and distributed in locations throughout the world throughout the late 1990's, primarily for the purpose of delivering audio, video, and other complex multimedia content worldwide. Digital was a multi-billion-dollar company and creator of the first and largest Internet corporate gateway in the world, and my responsibilities included researching, evaluating, and developing both technologies and Internet-related business models for Internet multimedia delivery on behalf of that corporation. Among other activities, I developed the business model, including cash-flow break-even model and Internet pricing structure, for a joint venture of Digital Equipment Corporation and Reuters named SportsWeb, which later was successfully spun out and acquired by CBS Sportsline. I also met with and

HIGHLY CONFIDENTIAL                    Expert Report of Andrew S. Cromarty, Ph.D.

lectured to senior executives from major corporate Digital business partners as to industry trends, including Internet business models and technology related to multimedia and entertainment, on approximately 50 occasions. Similarly, after Digital's acquisition by Compaq Computer Corporation, I was the invited Keynote Speaker at the EnterTech Entertainment and Technology conference created to introduce the Silicon Valley and Hollywood industries, where I lectured to Hollywood industry executives on business models and technologies for entertainment and other multimedia content.

19.    From 1999 and thereafter, I have served as a senior executive of several broadband and Internet-related firms ranging up to a billion dollars in size and spanning all forms of network connectivity with global operations.  As Chief Technical Officer of NASDAQ-traded broadband corporation SoftNet Systems Inc., I served on the senior executive team of chief officers managing the corporation and oversaw technical and field operations for the parent corporation and its operating unit subsidiaries, comprising a technical staff of approximately 700 employees as we grew this company to a market capitalization of approximately two billion dollars. This included serving as CTO of ISP Channel, then the third-largest cable Internet service provider in the United States with tens of thousands of customers, and line-managing the pre-spinout corporate incubator. I also served as CTO of Intellicom, the first two-way VSAT satellite Internet service provider, with international operations. In my roles at ISP Channel and Intellicom I led specific large-scale efforts to develop new business models appropriate to the firms' intellectual capital and market opportunities. As founding CTO and member of the Board of Directors of the hundred million dollar wireless broadband firm Aerzone Corp., I led technical development and business strategy development for the premier hotspot wireless broadband service provider, with international operations. As a member of the Board of Directors of

- 6 -

HIGHLY CONFIDENTIAL                    Expert Report of Andrew S. Cromarty, Ph.D.

corporate venture capital fund SoftNet Ventures, I directed and performed technical and business model due diligence on scores of investment or merger/acquisition matters. As Chairman of the Board of Directors of Freewire Networks, an e-commerce startup corporation to provide multimedia broadband services in sports arenas and other entertainment venues, I led a successful Series A funding effort, culminating in spinout from Lucent Technologies Inc. and an eight million dollar post valuation, and I oversaw the hiring of a new CEO. As CTO and CIO of technology investment banking firm Union Square Advisors, my duties included performing due diligence on merger and acquisition candidates as to technology and business factors, assisting clients in developing their intellectual property portfolios, bringing in new customers, working closely with the other chief officers especially as to operations and banking compliance matters, and overseeing all technical operations for the firm.

20.     During 2005-2007, I was CTO/CIO of DAX Solutions Inc., the film and TV industry's primary provider of Digital Asset Exchange asset management and workflow services over the Internet (some details of which may be subject to commercial nondisclosure obligations). In that capacity I oversaw technical development and line-managed the firm's operations and field service teams, providing digital dailies and workflow services to many of the largest entertainment firms in Hollywood and throughout much of the world. My specific responsibilities included managing the development, deployment, and operation of DAX's state-of-the-art proprietary digital asset watermarking/fingerprinting technology and intellectual property and associated digital rights management systems and software. At DAX we operated the largest known Internet-based system in the world for securely managing film and TV industry digital assets, with over 3,000 industry accountholders. My responsibilities also included oversight and management of security for these copyrighted entertainment assets, and

HIGHLY CONFIDENTIAL                          Expert Report of Andrew S. Cromarty, Ph.D.

required working with, educating, and advising many of the largest entertainment firms in the world as to security technology and policy for their own copyrighted multimedia film and TV digital asset content, much of which they entrusted me to hold and manage for them on my servers in Los Angeles, in their own facilities, and throughout the world.

21.     My technical experience includes mathematical analysis, software development, technique development, and publication in technical areas that additionally arise the present matter, including work on pattern recognition, pattern matching, multidimensional and visual signal and image analysis, probability and other mathematical confidence models as applied to pattern recognition systems, and computational complexity of real-time computations. My Masters thesis developed descriptive and mathematical models of visual signal processing. My first doctoral dissertation developed mathematical techniques for feature-based pattern analysis and visual pattern matching, and I also performed research on biological and computer visual recognition systems. My later research, lecturing, and publications addressed topics including methods for space object identification, systems for feature-based matching and analysis of imagery data, strengths and weaknesses of mathematical techniques for probabilistic decision-making, heuristic as well as algorithmic techniques, and analyses of combinatoric complexity of algorithms for real-time signal analysis and computational reasoning applications.

22.     My business experience includes extensive development and evaluation of new, alternative, and competitive business models. I developed competitive business models early in the development of the Web for my own and other startup companies. I advised and consulted on business models as a Strategic Consulting Partner at boutique analyst firm RFG. At Digital Equipment Corporation my responsibilities included developing and evaluating business models, expressly including business models for multimedia and entertainment content delivery and use

HIGHLY CONFIDENTIAL                    Expert Report of Andrew S. Cromarty, Ph.D.

on the Internet. As a member of the Board of Directors of corporate venture capital fund SoftNet

Ventures, as CTO of billion-dollar broadband corporation SoftNet, and later as CTO of

investment bank Union Square Advisors, I evaluated well in excess of sixty investment and

merger & acquisition opportunities, including their business operations and business models.

23.     I have not testified at trial in the previous ten years. I have testified as an expert witness

in depositions on three dates in 2011.

24.     A full list of my publications is included in my curriculum vitae, attached hereto as

Exhibit B.

25.     If called as a witness at trial, I would testify as to the statements and opinions contained

in this report.

HIGHLY CONFIDENTIAL                    Expert Report of Andrew S. Cromarty, Ph.D.

## III.   PRINCIPAL QUESTIONS ADDRESSED IN THIS REPORT

26.     In the course of this report, I review and offer expert opinions as to at least the following

four primary questions raised in this matter:

1.  Did and do Defendants follow industry-standard practices to effect control over digital

assets to the extent technically practicable?

2.  Is Hotfile's affiliate program consistent with widely-respected customer incentive

programs that are common among Internet businesses?

3.  Is Hotfile's revenue model consistent with widely-respected Internet revenue models

under which customers pay for better service performance?

4.  From a technical perspective, does Hotfile materially have the ability to control copyright

infringement by its users?

## IV.   SUMMARY OF OPINIONS

27.     For reasons discussed in detail below, it is my expert opinion that the Defendants employ

standard, widespread, long-standing, respected business models, systems, and technical methods

that were developed long ago for a wide range of respected and accepted business purposes.

28.     It is my opinion that the Defendants' customer incentive programs are common Internet

business practice, and they are widely used by many of the most respected and successful

corporations offering services on the Internet. Further, Plaintiffs likely benefit economically

from Internet redistribution of their works by consumers, which benefit could be enhanced

through business cooperation with centralized file sharing service sites such as Defendants', and

HIGHLY CONFIDENTIAL                    Expert Report of Andrew S. Cromarty, Ph.D.

Plaintiffs have the technical ability and business opportunity to optimize this benefit but they apparently have not evaluated that benefit or diligently explored this opportunity.

29.     It is my opinion that Hotfile's "premium" service is structured to allow customers to obtain better service performance. I further find nothing in Defendants' service offering that provides any incentive to make illicit (*vs.* licit) use of the service.

30.     It is my opinion that, both for business reasons and due to "laws of physics," Defendants materially lack the ability to control infringement by Internet users. The technology is broadly technically inadequate or deficient to provide such control, and no competent science exists yet to support technical or marketing claims of any proposed such technology or product when applied to this problem domain. Even any future tools not yet in existence but hypothesized capable of providing such control would be either computationally infeasible to employ or unable to justify confidence as to their reliability and efficacy, due to the mathematics of pattern analysis as applied to complex digital copyrighted works and the insufficiency of needed information about such copyrighted works.

31.     It further is my opinion that despite these material technical limitations, Defendants are demonstrating substantial effort in applying the admittedly inadequate tools that do exist to detect and respond to instances of possible copyright violation. Based on both my technical and business expertise, I conclude that Defendants' efforts to apply available technologies meet or exceed the standard of reasonable business practice applied in the Internet service industry in attempting to meet their obligation with respect to copyrighted content.

32.     In my opinion, the Defendants' systems offer a specific substantial non-infringing benefit to normal law-abiding Internet users, one occupying an important market niche neglected by most of Defendants' business competitors. There is a substantial legitimate business case for the

HIGHLY CONFIDENTIAL                              Expert Report of Andrew S. Cromarty, Ph.D.

existence and market success of a business such as that of the Defendants.

## V. SYSTEMS AND METHODS OF DEFENDANT SYSTEMS

33.      I provide in this report a description of the Defendants' system and methods. I understand

that Hotfile operates the website www.hotfile.com. Details about operations of Internet and the

World Wide Web and the systems and methods used by Hotfile and/or visitors to

www.hotfile.com are described in Appendix H.

## VI.    COMPLAINT, AND APPLICABLE LEGAL FINDINGS TO DATE

34.      In formulating my opinion, I have relied on the Court's orders of which I am aware,

including its Order on Motion to Dismiss. *Order on Motion to Dismiss, July 8, 2011.* I expressly

reserve the right to supplement or modify my opinions and this report if the Court modifies or

provides additional orders or opinions.

35.      I understand a  copyright is found to be directly infringed only if  a plaintiff shows that he

owns a valid copyright and that the other party copied some of the protected elements of that

work of his copyright.

36.      I understand that in the present matter, the Court already has found that the Plaintiffs

have failed to state a cause of action for direct infringement by Defendants, and the Court

therefore has dismissed Plaintiff's Complaint Count as to direct infringement in this matter by

Defendants.  *Order on Motion to Dismiss, July 8, 2011.*

HIGHLY CONFIDENTIAL                    Expert Report of Andrew S. Cromarty, Ph.D.

37.     I understand the Court has directed that a defendant may be liable for inducing copyright infringement if he "distributes a device with the object of promoting its use to infringe copyright, as shown by clear expression or other affirmative steps taken to foster infringement" and that someone commits contributory infringement when he, with knowledge of the infringing acts, nonetheless "induces, causes, or materially contributes to the infringing conduct of another." *id. at 7*.  And further, I understand that the Complaint alleges that hotfile.com is a website that Hotfile uses to promote copyright infringement and alleges that Hotfile took affirmative steps to foster this infringement by creating a structured business model that encourages users to commit copyright infringement. *id.* I understand that to allege a claim for vicarious infringement, a plaintiff must allege that the defendant "infringes vicariously by profiting from direct infringement while declining to exercise a right to stop or limit it." *id at 8.*

38.     I understand that Defendants have asserted a defense based on the Safe Harbor provision under the Digital Millenium Copyright Act ("DMCA"). I understand one of the mandates of the Safe Harbor is that the service provider "does not receive a financial benefit directly attributable to the infringing activity, in a case in which the service provider has the right and ability to control such activity." *17 USC §512((d)(2)).*

39.     I understand that in response to Defendants' interrogatories, Plaintiffs have proposed certain example effective "supervisory measures," i.e., proposed effective technical means or effective business practices, which Plaintiffs contend Defendants have the practical ability to implement but did not. Question No. 3 of the First Set of Interrogatories and Plaintiffs' response thereto is hereby included by reference. *Plaintiffs' Responses and Objections to Defendant Hotfile Corp.'s First Set of Interrogatories, at 8.*

HIGHLY CONFIDENTIAL                                  Expert Report of Andrew S. Cromarty, Ph.D.

## VII.  TECHNICAL AND HISTORICAL BACKGROUND

40.     I provide in this section an overview of relevant technical background. This establishes a technical vocabulary and historical context for my opinions later in this report.

### A. A half-century of file sharing

41.     File sharing over computer networks, including the Internet and its precursor networks, already was common and well-specified more than forty years ago. File transfer protocols, notably including today's File Transfer Protocol, were developed just for this purpose. For example, in 1971 the Internet specification publication RFC114, "A File Transfer Protocol," detailed many of the benefits of remote content sharing using an "extended file transfer protocol":

> Indirect usage … does not require that you explicitly log into a remote system or even know how to "use" the remote system.  An intermediate process makes most of the differences in commands and conventions invisible to you.  For example, you need only know a standard set of network file transfer commands for your local system in order to utilize remote file system.  This assumes the existence of a network file transfer process at each host cooperating via a common protocol.  Indirect use is not limited to file transfers.  It may include execution of programs in remote hosts and the transfer of core

HIGHLY CONFIDENTIAL                    Expert Report of Andrew S. Cromarty, Ph.D.

images. The extended file transfer protocol would facilitate the exchange of programs and data between computers, the use of storage and file handling capabilities of other computers (possibly including the trillion-bit store data computer), and have programs in remote hosts operate on your input and return an output.      *RFC114 at 1.*

42.    Subsequently, the modern Internet File Transfer Protocol was further specified in 1980, published as RFC959 "File Transfer Protocol" in 1985, and has continued in use through the present day.

43.    Importantly, these file transfer methods were developed without the contemporaneous ability, or objective, of transferring modern copyrighted entertainment or other multimedia files. At the time these file sharing techniques were conceived and developed, substantially all such content was in non-digital form.

44.    For example, the now-common "MP3" digital music format did not emerge until the late 1990's. And at the time the File Transfer Protocol was specified, high-definition digital formats, CDs, and DVDs had not yet been invented and brought to market.

45.    As networking developed, from its earliest days, free file-sharing services arose to provide the many legitimate and needed benefits of file sharing to the networked community.

46.    For example, over a third of a century ago, the SIMTEL Archive file sharing system was created and made publicly available to all users on the ARPANET (i.e., the Internet), first at the Massachusetts Institute of Technology and then moved to and maintained at the White Sands Missile Base, a U.S. Government facility, throughout most of the 1980's. The primary use of the Archive was file sharing of free software among Internet users, under the U.S. Government's *de facto* financial and administrative sponsorship.

- 6 -

HIGHLY CONFIDENTIAL                    Expert Report of Andrew S. Cromarty, Ph.D.

47.     Another very widely used file sharing system, "gatekeeper.dec.com," was established in the late 1980's as an Internet-wide file sharing site established by Digital Equipment Corporation, the first computer company in the world to create a corporate Internet gateway:

> History
>
> The    FTP    archive    on    gatekeeper.dec.com,    later    to    become gatekeeper.research.compaq.com, first went on-line in the late 1980's. … In its heyday, gatekeeper was a prominent Internet FTP site. Just about any public domain software package you wanted or needed could be found on gatekeeper. One of gatekeepers' primary functions was to give Digital software developers, living on the DECNET based internal corporate network, access to public domain software available from the Internet. (The Digital internal DECNET host, DECPA::, mounted the gatekeeper FTP archive via NFS.) Gatekeeper was also used by Digital product groups to provide software updates and patches to Internet customers.    *"What happened to gatekeeper.dec.com?" at 1.*

48.     There were many other such file sharing sites across the Internet throughout the past forty or more years. File sharing sites are a historical commonplace, and a long-standing necessity for routine use of computer networks.

49.     Today there is a vibrant marketplace of firms offering a range of file sharing services under a variety of different terms or business models.

50.     An important characteristic of modern file sharing and file storage services is provision of a fungible, apparently infinite, ubiquitous store for one's own digital data. These services serve as a geographic and virtual extension of the native file capacity available in the user's

personal computing environment.

51.     For example, Amazon.com rents file space to anyone with a credit card at inexpensive rates in essentially unlimited capacity through its Simple Storage Service ("S3"). Amazon S3 implements a "freemium" pricing model, that is, some file storage services are offered free, with more services and improved performance available if the customer pays for them  (called an "upsell").

52.     Dropbox, a firm that offers Internet file storage from one's personal computer or PDA cell phone under a "freemium" model, is backed by first-tier venture capital investors including Sequoia Capital, Greylock, Accel Partners, and Goldman Sachs. *SecondMarket's Q3 2011 Private Company Report*  Dropbox was recently reported by BusinessInsider as one of SecondMarket's Top Ten Most-Watched venture-backed firms. Market analysis firms SecondMarket and Crunchbase describe Dropbox as using file sharing to solve existing problems in Internet email, device interoperability, and mobile access to personal data: "Dropbox was founded in 2007 by Drew Houston and Arash Ferdowsi. Frustrated by working from multiple computers, Drew was inspired to create a service that would let people bring all their files anywhere, with no need to email around attachments. … Guiding their decisions was a relentless focus on crafting a simple and reliable experience across every computer and phone." *SecondMarket Overview of Dropbox; Crunchbase Overview of Dropbox.*

53.     Commercial file sharing sites have become the single most important medium through which open source software is distributed today. For example, the well-known open source repository Sourceforge presently contains "software in over 260,000 projects" serving "2.7 million developers" and "46 million consumers."  This file sharing service specializing in source code sharing is owned and operated by a NASDAQ-traded public corporation with a market

HIGHLY CONFIDENTIAL                    Expert Report of Andrew S. Cromarty, Ph.D.

capitalization well in excess of $100,000,000. *About Sourceforge.* Other well-known open source file sharing services include Launchpad and Github. The use of such file sharing services for distribution of open source software is well understood in the IT profession and by expert practitioners as central to the operations and essential to the viability of the open source software industry.

54.     File sharing services offer increasing value to legitimate users as multimedia technology advances. For example, it is now common for cell phones such as a Blackberry or iPhone to take high-resolution photographs and shoot high-definition movies. The resulting collection of digital assets quickly becomes very large, and for technical reasons email is a very poor choice for sharing them. File sharing services are a far better solution to sharing such assets. Indeed, Apple recently released its iCloud service to address this need for its own customers. Users of other brands of devices, however, continue to need a third-party commercial file sharing service to obtain these communications benefits.

55.     Firms such as Picasa (a Google subsidiary) and Flickr (a Yahoo subsidiary) provide file sharing services to the consumer visual multimedia file sharing market, employing a freemium pricing model with upsells. *About Picasa; Flickr FAQ; Flickr Upgrades.*

56.     Defendants' system and service, Hotfile, is a *de facto* market competitor of these established modern firms. For example, customers of these other services can choose to use Hotfile as an alternative service provider, or *vice versa.*

57.     Some file sharing services focus on particular markets, business opportunities, or "use cases" (styles of customer use). Such market specialization may present both benefits and limitations to the customer.

58.     Overall, however, with respect to the kind of content that may be stored or accessed and

HIGHLY CONFIDENTIAL                    Expert Report of Andrew S. Cromarty, Ph.D.

the degree of service provider *vs.* customer control that is possible, these services are generally indistinguishable both technically and in the market. All provide file storage as a service; all promote their storage services as part of their business model; all permit users to store files without the service provider's knowledge of or regard for the internal contents of the files, which may in fact be opaque to the service provider for technical or privacy reasons; all require their users to accept responsibility for obtaining, and representing they do have, any rights required to upload content as a condition of use; and all continue the nearly half-century-old technical and business practice of providing remote storage for files of arbitrary type and content for remote use and access.

59.    Thus the technology for sharing files among distant networked users is not a new invention designed for sharing copyrighted digital works owned by others or as a specific mechanism for infringing copyright.

60.    Quite to the contrary, file sharing has been in perpetual use, starting decades before it became technically feasible to move commercial entertainment media over computer networks. Network file sharing predates substantially all modern digital entertainment content, and it has a decades-long history of substantial non-infringing use.

61.    Existing Internet file sharing services are a direct technical and business continuation of this nearly half-century-old unbroken practice of sharing content over computer networks, among university, business, personal, and government file sharing sites.

62.    Common uses of commercial file sharing services today include:

- allowing an individual to gain access to personal data across many devices, such as between a PC and a PDA/cell phone, or between work and home computers;

- sharing data securely with business colleagues, such as between attorneys and

HIGHLY CONFIDENTIAL                          Expert Report of Andrew S. Cromarty, Ph.D.

their client or experts;

- sharing computer source code and related data, such as through Sourceforge;

- sharing self-authored multimedia works such as pictures, music performances, and movies among members of a group, such as within a family, a Boy Scout troop, a music band, or a commercial entertainment production company; or

- moving files from one location to another, such as a student writing an essay written on a shared computer in a school computer lab, then depositing it at a file sharing site for later pickup from a home personal computer.

63.    Sharing content and services between computers and between computer users is what networked computers are meant to do, and why computer networks exist.

64.    Consequently, as file sharing is a long-lived technology, in widespread use for a large and varied number of individual purposes, the mere presence, availability, investment in, commercial promotion of, or use of file sharing technology or services offers no technical foundation upon which to ascribe any specific intent to either individual users or service providers—other than to store and retrieve some data.


## B. A brief technical explanation of file sharing


65.    Although the presentation to the human user (if there is one) may differ across competing file sharing services, the underlying technology is substantially identical. The local computer connects to a remote computer over a network such as the Internet. The two computers conduct a stylized conversation, using a strict set of phrases (a network "protocol") they agree on. And the contents of the file is retrieved from storage on one computer, transferred between the computers

HIGHLY CONFIDENTIAL                     Expert Report of Andrew S. Cromarty, Ph.D.

over the network, and stored at the second computer.

66.     In such file transfers there typically are exactly two computers involved—the local (sometimes "client") computer, such as a personal computer at home, and the remote ("server") computer, such as a server computer at a file sharing site. (Intermediate computers that may sit between them on the network do not play a material role in this description.)

67.     The local computer has a way to indentify the remote computer, such as an Internet domain name or, more rarely, a numeric Internet Protocol ("IP") address, which the local computer uses to initiate a temporary connection between them.

68.     A remote computer, such as the file sharing service's server computer, may receive no information as to how it was named or addressed by the clients connecting to it. For example, the server may have no information as to the name used by the client computer to identify the server computer. Similarly, if the digital asset was named on a third computer, such as using a link (a "URL") residing on a separate web server under the control of an independent third party, the file sharing service's server may receive no information from which it could be aware of or determine this. Only the client computer and its user, not the server or its administrator, will be aware that such a third-party web server or its link exists and was employed to locate the file at the file sharing service. This is inherent  in the design of the World Wide Web and Internet protocols.

69.     For a variety of technical reasons, a remote computer such as a file sharing service's server may not have accurate or reliable information as to the location, identity, or even the true IP address of the client computers connecting to it. As one example, at some corporations all connections from every employee are routed through a single address before reaching the Internet, and this single address is what the remote file share service will see for all such users.

HIGHLY CONFIDENTIAL                    Expert Report of Andrew S. Cromarty, Ph.D.

As another example, in some countries where Internet service is limited or access is tightly controlled by government, an entire region or nation may be routed through and appear to originate at a single IP address or a small block of addresses.

70.     Further, technology is commonly available and in widespread use that obscures the local computer's IP address, identity, and location, so that a connection from one location appears to originate at another location. Network Address Translation ("NAT") and "onion routing" are two common such techniques. This technology sees a wide variety of uses in practice, ranging from enforcing corporate networking policies on traveling employees, to achieving free speech while avoiding political scrutiny of a local user's government monitors, to moving contraband content such as pornography or stolen information untraceably, to achieving anonymity for personal privacy reasons.

71.     Use of such obscuring technology is entirely under the control of the local computer and its user, and a remote service provider generally cannot detect, determine, or confirm that such obscuring technology has been employed. As may be expected, the information on how to use such technology is public and readily available to those motivated to find and employ it.

72.     This ability for an individual to forge their location or network identity when connecting to a remote server is an inherent design characteristic of the Internet and its communications protocols.

73.     Also unknown, and generally unknowable, by the server computer administrator is the content or nature of the contents of the files placed there by client computers or their users. For example, the client computer and its user, not the server, establish the file's name and its implied file "type." On some computers, metadata such as the filename of a well-named file may provide a suggestive clue to the content, but this information is inherently unreliable. In fact, the client

- 13 -

HIGHLY CONFIDENTIAL                    Expert Report of Andrew S. Cromarty, Ph.D.

computer or its user generally has complete liberty to choose any filename they wish, consistent with certain minimal syntactic limitations. For example, a picture file may be named as if it is an audio file, or an email message may be name and stored as if a software program. Any desired degree of obscuring of a filename is permissible. This is an inherent characteristic of filenames, and results from the design intent of filesystem developers to provide as flexible as possible a set of data management tools to computer users, for them to use in their sole discretion.

74.     Thus filenames are a completely unreliable source of information as to the contents of the file they contain. The name of a file may or may not be of any value at all in helping to identify the file or its contents. The only requirement for a filename is, it must be unique.[1]

75.     File content can be further obscured, intentionally or unintentionally, through certain common operations on files. For example, for space efficiency and other conveniences, sometimes one or more files are bundled together in a single file using an "archive" format, such as the common ZIP format. Compression techniques applied to such files reduce their size, at a significantly increased computational cost of recovering the original files for inspection or use. Such archives further can be encrypted for privacy, requiring a password or much stronger decryption means to recover the archive file's inner contents for inspection or use.

76.     Files also may be encoded using a technique that is not encryption per se but has a similar effect, such as through conversion to a format more suitable for certain kinds of network transmission or cross-platform storage and use.

77.     Such encoded or encrypted file objects become effectively opaque to the file sharing service—that is, they cannot be inspected, easily or at all. Problems recovering the information in such a file include not knowing that it has been encoded or encrypted, not knowing the format

---

[1] Including file path/URL as appropriate.

HIGHLY CONFIDENTIAL                    Expert Report of Andrew S. Cromarty, Ph.D.

of encoding or encryption, not knowing the decryption data such as password or key required to recover the content, or not knowing the algorithm for recovery. Technology is now ubiquitous to permit such encoding and encryption. Today, decrypting a routinely encrypted individual file using the required decryption key is possible in a short time, while recovering the file's contents without the needed decryption key is believed by mathematicians to be essentially impossible— for example, to take much longer than a human lifetime just to decrypt and inspect a single file.

78.    Encoding or encryption technology is commonplace and has a very wide range of legitimate uses.

79.    Particularly on file sharing services, encryption is a choice that a user or customer may make in their sole discretion at their own client computer to enhance the privacy of data they deposit with the file sharing service.

80.    Digital asset encryption is considered a properly protective "best practice" within the Information Technology ("IT") profession whenever private information of any kind is placed outside one's own direct control, including on file sharing servers administered by a third party like an Internet file sharing service firm.

81.    In the event that the server is compromised by "crackers,"[2] the user's encrypted data remain safe, because such files are impossible for the cracker to recover and inspect. However, encrypted files also are typically impossible for the file sharing service to inspect.

82.    Consequently, as encoding and encryption technology are in routine and widespread use and have many legitimate uses, no single conclusion about intent of either individual users or service providers can reliably be drawn from the mere presence, availability, promotion, or use of file encoding or encryption technology, including in files on file sharing services.

---

[2] Sometimes, less properly, called "hackers."

- 15 -

HIGHLY CONFIDENTIAL                              Expert Report of Andrew S. Cromarty, Ph.D.

83.     During the late 1990's a second, alternative model of file or content sharing gained currency, called "peer-to-peer" ("P2P") networking. In P2P networking, computers already connected by a communications network such as the Internet join an informal coalition of computers that agree to pool and share their spare computing resources, such as their file space, network capacity, and/or processing power.

84.     P2P networks are inherently decentralized—there is no central administration of a P2P network of computers. There also is no server *per se* in P2P networks—rather, every computer can serve as both a client of and a server to other computers, even simultaneously and for the same file.

85.     Peer-to-peer file sharing quickly became a common means of sharing content, alternative to using centralized public or commercial file sharing services. P2P networks offer the advantage of harnessing spare unused capacity, small individually but large in the aggregate, of a very large number of confederated computers working in a cooperative manner.

86.     In P2P file sharing, an individual file is splintered into small fragments, and individual fragments of a single file may be delivered to a single client simultaneously by many other computers in the P2P network.

87.     Although companies have emerged to extract financial gain from (i.e. to "monetize") such networks, in practice it appears most P2P activity is non-commercial.

88.     For technical reasons largely stemming from P2P's decentralized nature and design aspects of the Internet, P2P activity cannot be regulated or controlled, reliably monitored, or accurately measured.

89.     Some P2P networks additionally were explicitly designed to offer enhanced anonymity to all users, for example for privacy or to allow their use in totalitarian countries.

- 16 -

HIGHLY CONFIDENTIAL                          Expert Report of Andrew S. Cromarty, Ph.D.

90.     Anonymity in P2P networks also benefits from client's ability to obscure source locations and addresses that is inherent in the Internet, described *supra*. This affords individuals sharing files via P2P networks an unusually high degree of anonymity, which can be employed for licit purposes or exploited for illicit ones. It is well understood by those skilled in the art that the majority of Internet traffic throughout the decade 2000-2010 was a combination of "spam" email and P2P file traffic. This occurred notwithstanding persistent, public attempts by commercial copyright holders or their agents to identify users who they allege employ P2P networks to infringe copyright on commercial entertainment content.

91.     By comparison, commercial file sharing services such as that of the Defendants provide a relatively poor opportunity, and a markedly higher degree of danger or risk, for those seeking to infringe copyright through illicit distribution of digital assets.

92.     Commercial file sharing services operating in the United States typically have centralized servers, a formal Acceptable Use Policy to which users must agree that forbids infringing acts, a notification procedure in accordance with the DMCA, an account structure for at least their more frequent users, a corporate legal structure, business risk to manage, and a stated policy of compliance with the DMCA. The business model, financial and legal requirements, and technical operations practices of commercial file sharing services make them very poorly suited to, and an unwise choice for, individuals who seek knowingly to infringe copyright through illicit distribution of digital assets.

HIGHLY CONFIDENTIAL                          Expert Report of Andrew S. Cromarty, Ph.D.

## C. Technical and business challenges in identifying or confirming infringement

93.     Several technical conditions or limitations must be met to evaluate a potential or alleged infringing digital duplication of a copyrighted work.. At a minimum, first, a copyrighted original work must exist with a still-valid current copyright. Second, the copyright holder must identify that original work as one over which they assert copyright. Third, a second digital object must exist and must be identified as a potentially infringing instance. Fourth, a competent comparison of the two instances must be made, sufficient to confirm or disconfirm the alleged infringement.

94.     Many of these conditions or limitations result from infringement instance identification, evaluation, and response being a multi-step, multi-party process. Technology can assist this process, and relevant technology has evolved and continues to evolve. But technology alone is not a complete remedy for addressing infringement. Instead, a cooperative process among all parties is essential. This fact results from the information theoretic nature of the comparison task.

95.     The first limitation exposes a difficult challenge for both content owners and the owners of a file sharing service. For many works, such as those created before 1923 or released into the public domain, there is no currently valid copyright. Computer instances of these works bear no distinguishing mark to separate them from copyrighted works. As a business matter it cannot reasonably be assumed that a work has a particular copyright status; that is what markings are for, and technical users rely on them to answer such questions.

96.     The second limitation is rarely met. Most computer files do not bear a copyright notice. All that is available on a server is the bytes of data in the file, not identifying legal metadata. It is

HIGHLY CONFIDENTIAL                    Expert Report of Andrew S. Cromarty, Ph.D.

apparent from inspection and experience that the vast majority of digital data (email messages, personal blogs, calendars, notes, student essays, databases, etc.) bear no explicit copyright markings. Additionally, there is an enormous volume of publicly placed copyrighted content made available by rightsholders and intended for distribution. Examples include content published under Creative Commons licensing, such as is commonly used on Wikipedia, and open source software bearing licenses that permit and encourage redistribution and sharing such as the GNU Public License or Berkeley Software Distribution license.

97.     The storage and duplication of this vast majority of data is non-infringing simply because—perhaps apart from email messages—these data typically remain under the control of the author *qua* copyright holder. As noted *supra,* modern file sharing services provide a fungible, apparently infinite, ubiquitous store for one's *own* digital data, and from the file owner-user's perspective, such a service is an extension of his own computer: Files stored there for individual or shared use remain materially under his own control.

98.     For the vast majority of computer digital assets, the most common case is that the second technical limitation is virtually never practiced, because individual users experience no need to assert their rights over their own files, whether stored locally or by their service providers.

99.     The third limitation is challenging because a third-party entity (such as a file sharing service) holding a file  may have no reliable or practicable technical means for associating it with a copyrighted work, while a copyright holder may have no knowledge of the existence or content of the second digital object.  This is exacerbated by the plethora of permission models (Creative Commons, GPL, unstated, etc.) commonly employed for legitimate distribution and redistribution of content on the Internet and the fact that content can be posted or shared from anywhere in the world. The obvious implication of the latter concern is the volume, variety, and

HIGHLY CONFIDENTIAL                    Expert Report of Andrew S. Cromarty, Ph.D.

untraceability of such postings. A more subtle corollary is that authors and rightsholders are distributed worldwide. The problem of determining the identity of a rightsholder is not limited to comparing works to a few thousand assets of a few companies located near Burbank, California, for example.

100.    At a minimum, this means that a business collaboration, such as occurs under a proper balance of business interests, is required to meet the third limitation. In essence, this only can function as a business partnership. It is well understood among those experienced in business partnering that that such a collaboration only can succeed and persist if it occurs under business terms reasonable to both parties. For example, one party cannot be expected to absorb all the other party's costs, and no party can be expected to allowed to lay off[3] all its costs or risks onto the other party.

101.    There also may be additional parties to the business arrangement. For example vendors or suppliers may be engaged to provide tools or services for or facilitate the business collaboration between the primary partners. (As one example, Vobile is such a vendor in the present matter.) An important factor to resolve in building such a successful lasting business relationship is to properly, fairly, and rationally assign the costs associated with such vendors or suppliers.

102.    Further, as part of such a reasonable balance of interests, it must be understood by all parties that no party can be expected to perform tasks that are impossible for it to perform. As one example, decrypting an encrypted file without benefit of the decryption keys, as noted *supra,* may not be technically feasible, and other such operations may be exceptionally expensive,

---

[3] In business parlance, to "lay off one's costs onto one's partners or competitors" is to find a clever business arrangement through which your firm obtains disproportionate economic benefit from a deal, contract, or *de facto* business arrangement by getting, or tricking, other firms into unduly absorbing and paying your business costs for you.

HIGHLY CONFIDENTIAL                    Expert Report of Andrew S. Cromarty, Ph.D.

beyond the reasonable ability of a single party to bear. In such circumstances, business experience shows that a reasonable business accommodation by the other party is the only successful means of maximizing the parties joint ability to succeed and meet common goals.

103.    The fourth limitation *supra* requires that competent comparison of the two instances must be made, sufficient to confirm or disconfirm the infringement. There are two challenges presented by this requirement. First, either individually or in the aggregate, the comparison may not be technically feasible, whether due to reasonable business requirements imposed by the third limitation or due to strictly technical factors. Second, the comparison must be competent.

104.    Unless a digital copy of the original work exists and is available, there is no base case against which either a copyright holder or a service provider can compute a comparison for the purpose of identifying a possible infringement. In practice, an assertion of copyright over a second digital asset to be evaluated, there must have been a asset itself in digital form such that a comparison computation can proceed.

105.    Where the two files do exist in digital format, computational comparison as to equivalence of their underlying digital assets is fraught with difficulty. Except in the case where the works are identical and simple file system comparisons of total file identity suffice, there is no established accepted reliable technical standard from either computer science or information science for comparing two creative works to determine whether one is an instance or derivative work of the other.

106.    Techniques for identifying and comparing two candidate files, particularly such as two multimedia files, can be classified relevantly for purposes of this report according to the following dimensions: exact vs. inexact; algorithmic vs. heuristic; and total vs. partial.

107.    Exact techniques are those that lack or eliminate uncertainty, while inexact techniques

HIGHLY CONFIDENTIAL                              Expert Report of Andrew S. Cromarty, Ph.D.

carry some uncertainty or inexpressibility. As a simple example, a file's size may be reported as "11,223,445 bytes" or as "11 MB"; the former is exact, while the latter is inexact, that is, an approximation.

108.   Algorithmic techniques are expected to produce exactly the same result each time applied, and typify cases where the input data is well understood or well behaved. Heuristic techniques employ a simplifying "rule of thumb" and are designed for problems that may be poorly understood, computationally intractable when handled algorithmically, or relatively unstructured. It is common that heuristic techniques are employed to provide a best-effort answer that is not entirely reliable, but often achieved at a lower cost than an exact algorithmic technique.

109.   Total identification or matching techniques are a class of techniques that apply to all of a digital asset. Partial techniques do not apply to the entire asset. One example of a partial technique is subset-matching approaches that attempt to identify or match two works based on finding only a subsets of each—say, the first five minutes of two video files—that are identical. Subset-matching techniques as described are exact, partial, and heuristic (because they assume that a small segment matching implies the entire assets match). Another class of partial techniques is "feature extraction" approaches that attempt to find some simple characteristic or feature of assets—say, the amount of green, or the number of key frames, or the average pixel value of successive frame blocks—and only match those features rather than the entire two assets. Feature extraction techniques as described are inexact, partial, and heuristic.

110.   "Digital fingerprinting" is a term of art used to describe a collection of techniques for developing a simplified representation of a digital asset that is less reliable but more convenient to use than complete byte-by-byte exact algorithmic total matching of the files.

HIGHLY CONFIDENTIAL                    Expert Report of Andrew S. Cromarty, Ph.D.

111.    Importantly, the term is a misnomer. Unlike humans, files have no natural fingerprint. Rather, exercising human discretion, a person selects and applies a technique for mathematical simplification of files.

112.    Since there is no limit to such mathematical techniques, there is no limit to the number of such digital "fingerprints" a file may have. The analogy to  human fingerprints lies in the assumption, or assertion, that "collisions" are infrequent. A "collision" occurs whenever two files have the same digital fingerprint. A part of the human discretion applied involves selecting a mathematical technique that supports the hope for infrequent collisions. The science of information theory governs and predicts the rate at which collisions are likely to occur. Of course, as with a human population, in a sufficiently large population of files it is expected that collisions will occur.

113.    One method of digital fingerprinting is file hashing. File hashing is a technique of computing a single long number corresponding to the contents of a file. Hashing is exact and algorithmic, in that applying the hash algorithm later to the same file or any true copy of it will produce exactly the same hash value. Its use is heuristic in that collisions may occur, though rarely for a suitably chosen hash technique. Two common well-known mathematical techniques for computing hashes are "MD5" and "SHA1".

114.    Once a file hash value has been computed, it can be stored efficiently as a numeric value and used later with the same hashing algorithm applied to a different file. If the second file "hashes to" (yields) the same numeric value (and if the technique was suitably chosen), it is highly likely that the two files have precisely the same content. This is not certain, due to the possibility of collisions; confirmation requires that the two files are exhaustively compared using an exact algorithmic total comparison technique.

HIGHLY CONFIDENTIAL                    Expert Report of Andrew S. Cromarty, Ph.D.

115.   Hash techniques are moderately efficient. As one example, on a 1.8 billion instruction per second processor attached by gigabit Ethernet to a NAS filestore, computing a SHA1 checksum on a sample high-definition video asset (30fps, 720p, H.264, 48KHz stereo audio) proceeded at a rate of approximately 120 megabytes/second and 7 seconds of elapsed time (dominated by network transfer time) per second of processing time.

116.   A primary disadvantage of hash techniques is their lack of robustness in the presence of file changes. The smallest possible change in the underlying file—for example, trimming a single video frame from a video file—will result in entirely different hash values. The hash comparison then will say that the two files differ, although they may be from substantially equivalent underlying digital assets.

117.   As applied to indentifying possible instances of copyright infringement, hashes are effective at detecting a second instance of a known infringing file being uploaded. They are not effective at detecting an attempt to upload a slightly different version of the same underlying digital asset, however.

118.   Feature-based pattern matching techniques have different, and widely varying, disadvantages. The disadvantages depend on the specifics of the feature-matching technique employed. In general, a disadvantage of feature-based techniques is that by design they ignore most data, under a personal theory that the extracted features chosen by the engineer who developed the technique either adequately represent or adequately identify the underlying digital asset.

119.   Feature-based techniques also have the difficulty that there often is no inherently correct judgment or assessment criterion that provides a "yes"/"no" answer as to two files' similarity. Instead, typically, an engineer or developer simply picks some intuitively appealing metric and

HIGHLY CONFIDENTIAL                    Expert Report of Andrew S. Cromarty, Ph.D.

threshold, and applies them as if they are correct and true. Among other risks, this technique often is not amendable to a sensitivity analysis that determines how often and under what circumstances the method will experience one of its "failure modes," that is, ways it is certain to fail due to its own flaws.

120.    One manufacturer of digital fingerprinting and infringement detection software and services is Vobile, Inc. ("Vobile"). Based in part on the business experience of Hotfile as related by Mr. Titov, it is my technical inference that the techniques employed by Vobile employ partial subset-matching feature-based heuristic methods of identifying and matching files, for example by matching features extracted from small partial samples of a file to a stored database of pre-computed feature samples.

121.    Although there is a large well-developed mathematical discipline of feature-based pattern matching and signal analysis, there is presently no science of digital asset matching.

122.    For example, there is no set of standards, either developed by unaffected third parties or jointly developed and broadly accepted by all parties in all affected industries, as to testing methods, agreed proper scientific design, standard test input data sets, experimental apparatus or measurement techniques, standards for assessing experimental outcomes, metric for assessing cost/benefit tradeoffs of competing techniques, publications venue for reporting results, or product or service quality and reliability.

123.    The digital fingerprinting product market presently is dominated by engineering-before-science. It resembles the patent medicine market of a century ago, as opposed to the regulated drug manufacturing market of today. Patents are filed and issued, and proprietary digital fingerprinting solutions are promoted and sold. But the products' inner workings typically are opaque to all buyers and users, unvetted by any broadly trusted independent third party,

- 25 -

HIGHLY CONFIDENTIAL                    Expert Report of Andrew S. Cromarty, Ph.D.

uncharacterized as to specific performance or failure modes, and not commensurable to other products in the market.

124.     Neither issued patents nor commercial success, such as purchases by rightsholders or service providers, provide a basis for concluding that digital fingerprinting tools work. Customers on both sides of the balance of business interests are compelled to buy such tools, whether they work or not, as a defensive measure, and both parties lack the technical ability and inside information to determine accurately and reliably whether the product they purchased actually works.

125.     A correctly-functioning efficacious digital fingerprinting tool must combine features and capabilities that are quite difficult or impossible to achieve in a single product. For example, the product must achieve high match rate, low false positive rate, ability to discriminate copies from non-copies, affordability, and insensitivity to substantial common variations in content such as varying encoding parameters and many sophisticated forms of obfuscation by intentional infringers.

126.     Digital fingerprinting techniques require a tradeoff decision to be made between poor quality and expensive performance. Feature extraction algorithms can be simple or complex, and relatively effective or highly ineffective. However, the scale cost cannot easily be avoided. The distribution of file sizes on Defendants' system is unknown to me, and may not be practical to compute. But if, for example, there are 93,000,000 files and each is comparable to the one-minute video cited *supra* in the hash example, then computing a one-second-per-file hash computation for those files would take three years, if they all could be cached on a single server.

127.     Tens of millions of video files of any appreciable or typical size cannot all be cached in primary memory on a single server. If the more realistic architectural assumption is made that the

Expert Report of Andrew S. Cromarty, Ph.D.

files are on a NAS connected by a gigabit Ethernet, simply computing the hash value for all these files would require approximately twenty server-years, that is twenty elapsed years when executed on one server working full-time with no other tasks to occupy it.

128.    The cost of feature extraction on a large file can be expected to be much higher. As one example, according to information learned in discussion with Mr. Titov, the Defendants' system using the Vobile digital fingerprinting system can take from one minute to one day of elapsed time to identify a proposed match for a single submitted file. Importantly, this is not the time for analyzing the entire file. Rather, and worse, the one-minute to one-day delay is the time empirically required for Vobile to process a fingerprint computed from a one- or two-minute video data sample extracted from a video file.

129.    This means a technique reportedly advocated as state of the art by Plaintiffs' trade organization—one that demonstrably is a non-total heuristic technique, with attendant flaws and weaknesses—takes approximately one hundred times longer to deliver a result than the example SHA1 computation. And that result is considerably less certain, that is, lower quality for identification purposes, than a SHA1 comparison.

130.    All such digital fingerprinting techniques are essentially useless as soon as an unknown encoding or recoding or encryption is applied at the client computer before a file is uploaded to the file sharing system. In particular, even the simplest rapid encryption techniques will scramble the data sufficiently to eliminate all the features a digital fingerprinting technique could extract for inferring possible infringement. If this were not true, residual information would be extractable from the encrypted asset and thus the encryption technique would have failed. Cryptologists therefore design encryption techniques precisely so that mathematical feature extraction, signal analysis, and comparable techniques are certain to fail, and will be entirely

HIGHLY CONFIDENTIAL                    Expert Report of Andrew S. Cromarty, Ph.D.

ineffective.

131.    When even simple rapid inexpensive encryption techniques are employed, the length of time required to produce data suitable for inferring infringement is lengthened by months to years. Thus for example, processing 93,000,000 existing files would take millions of years. And as noted *supra,* the file sharing service provider has no reliable information from which to determine whether a particular file is encrypted. In some instances, one file is intentionally hidden inside another, using techniques such as steganography, such that even upon careful inspection it is not possible to confirm the type or contents of a file or determine what digital asset it contains. Such techniques can be used trivially and at will by uploaders to convert positives to false negatives, or negatives to false positives. Meanwhile, more assets are being loaded onto file sharing servers each day, compounding the scale of the infringement inference challenge.

132.    From the point of view of a purchasing decision-maker such as a service provider, there is no way for a well-intentioned technology buyer to differentiate between the many digital fingerprinting and comparable product options available. And absent a science and a standard for testing and evaluating such products, agreed upon in advance by rightsholders—and since rightsholder notably are all authors of  copyrighted works, not merely large entertainment corporations—it is impossible for a service provider to know what product would be satisfactory to rightsholders before the fact.

133.    There are technical alternatives to digital fingerprinting that may be more effective in limiting copyright infringement. Such techniques have the advantages of superior traceability of infringers and decreased burden on service providers, in that they are put into effect by the rightsholders during each performance rather than imposed on service providers.

HIGHLY CONFIDENTIAL                    Expert Report of Andrew S. Cromarty, Ph.D.

134.    One example alternative is watermarking. In watermarking, a unique visible or invisible marking is introduced into the copyrighted work, ideally uniquely at each performance. For a wide range of use cases and distribution or performance venues, watermarking is now technically and financially feasible.

135.    Use of this technique by rightsholders would allow them to focus their enforcement efforts on infringers rather than service providers, and would free service providers from the burden of sharing another industry's business risk.

136.    Other alternatives, such as Digital Rights Management technology, also exist. When properly used, Digital Rights Management (DRM) has proven very effective in limiting illicit redistribution of copyrighted digital works.

## D. File sharing and Internet business models

137.    Firms doing business on the Internet routinely combine older pre-Internet "bricks and mortar" business models and some new business models well-suited to the economics and technical features of the Internet.

138.    The different economics of the Internet has resulted in widespread growth and adoption of certain new business models. For example, unlike the physical world, the Internet reduces the cost of doing certain kinds of business on an international scale nearly to zero. Commercial sale and delivery of digital goods can happen nearly instantaneously, including clearing a financial transaction and final delivery of the product to the customer, nearly anywhere on the planet.

139.    Selling to an international clientele also implies selling across all cultures globally, and

HIGHLY CONFIDENTIAL                Expert Report of Andrew S. Cromarty, Ph.D.

into all markets simultaneously. It can be difficult or impossible to predict, from the vantage point of a business started in one country or culture, how best to identify and sell to a market in a different culture, country, or language.

140.    One response to this different economics of product and services sales on the Internet is a much higher use of indirect sales, including particularly through resellers who are internationally dispersed and whom the product or server provider has never met. These resellers serve as an "indirect sales channel" in conventional sales parlance, but they differ from indirect sales agents common in bricks and mortar businesses by virtue of a different relationship. They typically are more "arms-length," less well known, and under less influence by the product or service provider. However, this is traded off against the business advantage of globally expanded reach.

141.    One form of reselling common on the Internet is an "affiliate marketing" relationship. An affiliate is a firm or person that is provided incentives, such as a "revenue split" (a share of sales revenue), for bringing new customers to the product or service provider.

142.    An affiliate marketing program is especially useful if one has developed a product or service and does not know with confidence what the best markets for it are around the world. The question can be "outsourced" to affiliates, in return for a share of the revenue they bring in when they successfully sell the vendor's product or service into to new markets.

143.    Examples of well-known firms that employ affiliate marketing, customer-incentive, or similar programs under which one customer is paid to refer others include: Amazon.com, the roughly $100 billion-valuation publicly traded Internet sales firm; 1and1, the German web hosting firm historically reported as the largest web hosting firm in the world; eBay, the world's largest Internet auction business (affiliate marketing slogan: "Earn money when you deliver quality traffic"); Ooma, the Internet Voice over IP (VOIP) service firm; and regional telephone

HIGHLY CONFIDENTIAL                    Expert Report of Andrew S. Cromarty, Ph.D.

and DSL Internet service provider Sonic.net.

## VIII.  OPINIONS AND ANALYSIS

144.    I present in this section my analysis of, and conclusions as to, the Principal Questions set forth *supra* in relation to the accusations in the Plaintiffs' Complaint.

### A.  Hotfile follows industry-standard practices to effect control over digital assets to the extent technically practicable.

145.    SHA/MD5 hash matching is a best-effort and reasonable business practice that addresses an important class of potential infringements by unknown third-party actors on the Internet. Once a specific file has been properly identified as an infringing instance, the same actor or other actors in possession of that file may attempt to upload it again to Defendants' systems in violation of Hotfile policy. By remembering hashes of such offending files and computing hashes on new files, a service provider can—at some expense—identify when an offending file has been uploaded again, and take appropriate action, such as quarantining or deleting the file and  notifying, suspending, or cancelling the user and user's account consistent with any applicable policy of the service provider.

146.    I understand from Mr. Titov that Hotfile uses hashing in this manner and for this purpose, and has for some time.

147.    According to information learned in discussion with Mr. Titov, Defendants timely

HIGHLY CONFIDENTIAL                          Expert Report of Andrew S. Cromarty, Ph.D.

adopted and currently employ techniques for digital fingerprinting including those generally advanced or approved by the Plaintiffs' industry association, including the products and services of Vobile. Currently all files received via upload to Defendants' website are both hashed using SHA/MD5 techniques and processed using Vobile's services and products. Indeed, Defendants have deployed a new fleet of computer servers, entirely at Defendants' own expense, to handle the additional computational load imposed by use of these technologies.

148.    It is to be expected that Plaintiffs are generally familiar with many technologies they can use themselves, such as those described *supra,* for effecting control of their own digital assets, techniques that are alternatives to methods like digital fingerprinting that impose Plaintiffs' business risk and costs on service providers. For example, DRM technology is employed when Plaintiffs' vendors or business partners and/or their downstream distributors produce and sell DVDs or stream movies over the Internet. Similarly, watermarking is well-known in the industry, and watermarking at the granularity of individual performances of copyrighted works is a technology that has been productized by and available from their suppliers and business partners for at least a half-decade.

149.    However, I have seen nothing, in the Complaint or elsewhere, to indicate the Plaintiffs are  making good business decisions to research, evaluate, employ, or even contemplate use of these or comparable techniques, as an alternative to Plaintiffs externalizing their own business risk and costs by laying off that burden on Defendants and other independent service providers.

150.    I also have seen nothing, in the Complaint or elsewhere, to indicate that Plaintiffs are offering or have offered to Defendants and other service providers to absorb the legal risks or business costs associated with protecting Plaintiffs' copyrighted works.

151.    For example, I am aware of no offer ever made by Plaintiffs to pay for the additional

- 32 -

HIGHLY CONFIDENTIAL                    Expert Report of Andrew S. Cromarty, Ph.D.

capital expense or operations expense to Defendants or any other service provider when those service providers purchase and deploy technology for controlling or attempting to control infringement of Plaintiffs' digital assets, even if the technology is preferred, recommended, or demanded by Plaintiffs or their industry association, is costly, and/or provides no tangible business benefit whatsoever to the service provider.

152.    I further understand from Mr. Titov that Hotfile provides Special Rightsholder Accounts ("SRAs") that give rightsholder special business privileges and conveniences as to providing takedown notices and obtaining a rapid response to them. Among other features, in essence the SRA account gives the rightsholder a near-instantaneous takedown capability.

153.    Thus Defendants do follow industry-standard and business-reasonable practices, to the extent such techniques are practicable. Without limitation, Defendants' reasonable best efforts include use of SHA/MD5 fingerprinting for all files, creating SRA accounts and honoring requests from them, publishing their takedown notification mechanism and honoring requests pursuant to it, and adoption and use of Vobile's products and services solely at Defendants' expense.


### B. Customer incentive programs are common Internet business practice.


154.    I have reviewed the Defendants' service including their pricing/promotional information on their website. (Details of Defendants' service and their technical and business operations are described in Appendix H to this report.) Comparing Defendants' service offering and marketing to industry norms for promotion of Internet services generally, I observe that the Defendants' offering is promoted in the manner common to a very wide range of legitimate and respected

- 33 -

HIGHLY CONFIDENTIAL                    Expert Report of Andrew S. Cromarty, Ph.D.

Internet service firms. This variously includes Amazon.com, eBay, Yahoo, and others.

155.    There is a legitimate multi-party-sharing market niche ignored by Defendants' direct market competitors. Dropbox, for example, has a convenient user interface for saving and restoring files but for consumer (non-enterprise) accounts using Dropbox's service apparently requires anyone viewing a file to hold the same account credentials as the account holder who performed the upload. This requires that Dropbox users share their confidential account credentials—their login and password information—in order to share files among a group.

156.    For example, if a band of musicians wish to share recordings of their music among the band's members using Dropbox, first one musician must set up a Dropbox account, and then she must share her password with the other musicians, losing personal control over the account. This limitation occurs in many file storage service sites, and appears to result from limited or unthorough study of potential customer use cases.

157.    Other file service providers, such as Picasa and Flickr, do provide some ability for others to share file assets without needing the originator's uploading password. However, they generally have specialized in narrow markets, such as only photography or only video and photography.

158.    This creates an unfilled market niche. There is a market need for passwordless general-purpose file sharing, that is, sharing of content not limited to specialized filetypes or narrow use cases foreseen by the service provider's management or engineering teams.

159.    Examples of this market niche are the musician who wishes to share a recording or composition with other band members without sharing her account password, or the need to efficiently share a file with a business colleague without creating a Web site or FTP site.

160.    This market need is so common and well-understood that it is the subject of a widely-

HIGHLY CONFIDENTIAL                    Expert Report of Andrew S. Cromarty, Ph.D.

published Internet cartoon authored by one of the Internet's most popular cartoonists. The cartoon depicts someone advising a friend on all the available but unsatisfactory options for sharing a file with a third friend, even listing Dropbox as an unsatisfactory alternative. In the end, file sharing is accomplished by physically carrying a copy of the file down the street on a memory device. *XKCD Cartoon.* The cartoon is funny precisely because this is such a well-understood need that remains unanswered. In fact, the term "Sneakernet" was coined over a decade ago to refer to this physical "solution" to this Internet problem.

161.   Hotfile's business model and service model make filling this market niche possible. Hotfile combines the general-purpose file handling features of Dropbox with the passwordless access of the photo sharing services. Hotfile's service is in fact the solution to the common problem identified by the XKCD cartoon.

162.   Defendants' service thus fills an important legitimate business niche for file sharing on the Internet.

163.   I am aware of nothing in the present matter demonstrating that the cost to Plaintiffs from any alleged infringement exceeds actual business benefit from such alleged infringement. That is, it is entirely possible—and apparently unexplored by Plaintiffs—that  contrary to their Complaint, any alleged infringement through file sharing activities of Defendants' customers or business partners actually increases interest in, demand for, and sales of Plaintiffs' product, and is of net economic benefit to Plaintiffs.

164.   This is of particular interest because today there is a widespread and growing business belief that some amount of "free" content distribution actually increases sales. It is a means of using the Internet to cost-effectively expose to a new or wider audience works that were not well monetized under existing industry sales regimes or were viewed as overpriced in the market.

HIGHLY CONFIDENTIAL                    Expert Report of Andrew S. Cromarty, Ph.D.

Indeed, this is the economic basis of the "freemium" pricing model.

165.    Also widespread is the belief that those in the Plaintiffs' industry consistently are slow to, or fail to, adopt modern marketing and distribution methods suitable for new distribution media such as the Internet.

166.    For example, I am aware of no attempt by Plaintiffs to harness the business opportunity afforded by Internet file sharing technology to exploit "superdistribution" or "long tail" marketing opportunities, under which Plaintiffs themselves profitably incentivize Internet redistribution of their content by rewarding redistributors who return some revenue to the content rightsholder or who find ways to redistribute Plaintiffs' content that otherwise would sit on the shelf unsold.

167.    I similarly am aware of no information presented by Plaintiffs in the present matter indicating they are repricing their product as a rational business response to the market signals they receive when their works are alleged to be illicitly redistributed.

168.    Under conventional microeconomic pricing theory, such  product repricing would be a rational business response by Plaintiffs to optimize their profits on those copyrighted works.

169.    Moreover, repricing offers an opportunity for Plaintiffs and their industry peers to maintain or improve their control of their product distribution and copyrighted works, to surprise and delight their customer base, and to their own increase profits.

170.    No such rationalized product pricing to regain copyright control and increase profitability is reported or contemplated by the Complaint or any other Plaintiff pleading or documentation of which I am aware in the current matter.

171.    These failures by Plaintiffs and their industry generally poignantly suggest Plaintiffs are seeking to repeat the "Napster error."  When industry rightsholders became concerned a decade

- 36 -

HIGHLY CONFIDENTIAL                    Expert Report of Andrew S. Cromarty, Ph.D.

ago that Napster was abetting illicit redistribution, they arguably attempted to destroy that company. This was an exceptionally unwise business action by rightsholders, because Napster was the rightsholders' only prospective business partner, and damaging Napster predictably[4] forced the consumer demand underground into a wide range of P2P services, an error from which the music industry itself says it has never financially recovered. Their business error was to destroy a prospective partner—the one corporation with whom they had an opportunity to employ their exceptional deal-making skills to forge business agreements that would allow them to retain control over and monetize their copyrighted works using new emergent distribution media.

172.    Centralized file sharing services offer an additional business partnering advantage to rightsholders over a P2P prospective partner: takedowns. Notwithstanding the technical difficulties in properly identifying infringing instances noted *supra,* file sharing services such as Hotfile, with its centralized architecture can—and Hotfile does—implement takedown procedures. For technical reasons, such takedowns are effectively impossible to fully implement in P2P systems such as Gnutella. This further enhances the potential of centralized file sharing services such as the Defendants as cooperative business partners of Plaintiffs, and provides additional rational business impetus for them to pursue such constructive relationships.

173.    Rather than view alleged consumer  redistribution via file sharing as a copyright violation, Plaintiffs have the opportunity to understand it as unmet market demand for their product. Rather than view a file sharing service as an alleged contributory infringer, Plaintiffs have the opportunity to view them as a valued prospective business partner.

---

[4] In fact, predicted. I accurately forecast precisely this outcome for the music industry, in a public speech in 2000. *Cromarty UC/Red Herring DIGIVATIONS panel, 2000.*

HIGHLY CONFIDENTIAL                     Expert Report of Andrew S. Cromarty, Ph.D.

## C. Hotfile customers pay for better service, not for ability to infringe copyright.

174.    It is common for service providers on the Internet to offer "tiers" of service, with different service tiers providing better performance (larger volume, better speed, etc.) for a higher fee. For example, this typifies Internet Service Provider (ISP) connection fees for cable Internet and telephone company DSL services. Details and examples appear in Appendix H to this report.

175.    Also common both on the Internet and in the software market is a zero-cost introductory pricing level, with customers paying the provider only if they purchase premium service tiers above the free service level. This is known as a "freemium" pricing model, cf. *supra*.

176.    Hotfile offer service tiers according to a freemium pricing model.

177.    Freemium pricing models encourage business and revenue growth and facilitate customer acquisition by building interest in a service by eliminating customer objections to sale based on pricing or uncertain value-for-money.

178.    Freemium models are particularly useful or appropriate where customers may be hesitant to accept a service offered by an unknown or untested vendor, where a market has commoditized into a price war and "free" beats all other competitors prices, where the vendor's marginal cost of serving an additional customer at a useful introductory level of service is very low, and/or where a structural difference such as a proprietary advantage exists to motivate upsell purchase behavior by customers.

179.    Freemium products are not seen in the market where one product or service is substituted

- 38 -

HIGHLY CONFIDENTIAL                    Expert Report of Andrew S. Cromarty, Ph.D.

for another. That is, customers adopt a freemium model's upsells precisely because they feel they are getting an advantage such as a performance improvement or elimination of a distraction or impediment for their money.

180.   For example, Yahoo is understood to be the largest email service provider on the Internet. Yahoo offers its basic level of email service free of fees to customers, but "free" customers must visit Yahoo's website to read their email, and when they do they are confronted with advertisements. Yahoo's email service employs a freemium model under which, for an upsell fee of about two dollars per month, customers may download their email into their personal computer's mail program without viewing advertisements. All the prior Yahoo mail services are still offered to premium Yahoo customers, but additional conveniences are provided for the premium fee.

181.   Hotfile's business approach is similar, and common. Free users receive an introductory level of service with "rate throttling." Premium-tier Hotfile accounts have the same services available to free users, but as paying customers they receive more and faster service and, like Yahoo's advertisements and email-download feature, Hotfile premium users are not rate-throttled.


### D.  Hotfile materially lacks the "ability to control" infringement even using state-of-the-art technology.

182.   The state of the digital fingerprinting market today precludes satisfaction of the fourth technical requirement *supra* for evaluating a potential or alleged infringing digital duplication of a copyrighted work, namely, that a competent comparison of the two instances must be made, sufficient to confirm or disconfirm the infringement.

HIGHLY CONFIDENTIAL                    Expert Report of Andrew S. Cromarty, Ph.D.

183.   Because there is no science of digital asset matching, it is not possible to perform a neutral competent evaluation of either the products or the claims of vendors of digital fingerprinting and other products and services purported to offer an "ability to control." There is no accepted standard against which to make such a comparison.

184.   There also presently is no basis in either science or business practice to merit accepting the claims of these anti-infringement product vendors. There products may or may not work, but without an accepted methodology for reviewing and assessing them, no confidence in such tools for "ability to control" is justified.

185.   In essence, features-based techniques for analyzing a digital asset reduce the asset to a small set of numbers. It is obvious that information is lost in this reduction. Less obvious is that the information lost necessarily is essential to recognizing the underlying work, from a mathematical or information theoretic viewpoint. The greater the reduction, the more information is lost.  The greater the reduction, the greater the chances that legitimate works will be falsely accused.

186.   According to Motion Picture Laboratories, Inc. ("MovieLabs") documents describing Vobile's products, the Vobile methods in particular reduce an entire one- to two-hour movie to a single number.

187.   I am aware that MovieLabs has performed internal tests of competing products in the market for digital fingerprinting. MovieLabs is a joint venture of companies such as Plaintiffs and others in their industry, and has been described as the research and development arm of the Motion Picture Association of America ("MPAA") by the Los Angeles Times. *Los Angeles Times article.* MovieLabs thus is not an independent scientific evaluator. MovieLabs's digital fingerprinting analysis does not report, and apparently does not consider, essential test cases such

- 40 -

HIGHLY CONFIDENTIAL                    Expert Report of Andrew S. Cromarty, Ph.D.

as encoding/encryption. MovieLabs reports also opine that some false positives may be acceptable, suggesting a bias against service providers such as Defendants and a possible willingness to lay off the entertainment industry's inherent risks and economic costs onto others. MovieLabs further acknowledges that scalability (i.e., economic or "laws of physics" viability) was unaddressed in many of their reports and analyses.

188.    Overall, however diligently MovieLabs pursued their business goals, reports published by MovieLabs must be understood to be movie studios speaking, not an independent third party, and those reports support an opinion that there is "no science yet" as to digital asset comparison or technology-based copyright infringement determination.[5]

189.    As to the research performed by MovieLabs discussed *supra,* I am aware of no documents produced to date in this matter that identify MovieLabs's experimental design and analysis methodology, such as which feature methods or transcodes are considered. These details also do not appear in MovieLabs's publications as produced, notably including Craig Siedel's article, aptly titled "Content Fingerprinting from an Industry Perspective." *Seidel.* Full public details on scientific methodology are essential to gaining confidence in the merits of resulting analyses.

190.    Nothing in the MovieLabs documents and reports produced to date in this matter change my opinion that the state of digital asset matching and fingerprinting cannot be called a mature or reliable science and it provides an inadequate foundation upon which to define legal obligations.

191.    Even market acceptance and similar business measures provide no confidence that an

---

[5] Additional difficulty in assessing reports by MovieLabs arose during this analysis due to an improper production of those reports. Specifically, data in the MovieLabs reports heavily employ color graphics to summarize quantitative findings, but only black-and-white PDFs were produced. This has a technical effect as to these documents similar to redacting document metadata before production.

HIGHLY CONFIDENTIAL                    Expert Report of Andrew S. Cromarty, Ph.D.

"ability to control" is offered by putative infringement detection and identification tools, since under the weight of current law and market conditions, both service providers and rightsholders are essentially forced to buy whatever product is available, whether or not there is reason to have confidence in it.

192.    Demonstrations of the effectiveness of such digital fingerprinting and related products also are unreliable as a measure of their utility, correctness, or reliability. This is because the proper test of such a product is not merely whether it can be shown to work, but also and more importantly, whether it can be shown not to fail; and if it does fail, to understand and carefully characterize when and why. Presently, however, the field is insufficiently mature to provide reliable high-quality unbiased answers to these questions.

193.    As noted *supra,* feature extraction, subsetting, and related techniques trade off quality for speed or computational tractability. Again because there is no science to govern this tradeoff and the decisions are made by individual engineers and kept proprietary, the tradeoffs being made between quality and economic factors are unknown.

194.    The information science and computer science that applies is known, however, and is not favorable to these products. An unlimited number of possible morphisms or transformations can be applied to a given digital asset, and it is in the nature of mathematical modeling that no feature extraction system can adequately model them all; this is inherent in the nature of mathematical modeling and of feature selection.

195.    As one example, it appears that either simple encryption or simple methods of introducing extra "noise" time segment slices into a digital video asset are likely to defeat Vobile's systems. The latter would greatly increase its false negative failure rate, and the former would completely disable it.

- 42 -

HIGHLY CONFIDENTIAL                    Expert Report of Andrew S. Cromarty, Ph.D.

196.    These are well-known techniques employing tools already available for any personal computer. Their availability and easy use would enable simple tools to be built and freely distributed that can permanently disable these, and likely all other, digital fingerprinting methods.

197.    Those countermeasures would not, however, defeat technologies such as watermarking and DRM that rightsholders can employ entirely on their own, without added burden to service providers.

198.    Notwithstanding observations *supra,* I am aware that staff at one plaintiff, Warner Bros. Entertainment ("WB"), have experimented with using Hotfile to distribute "Fake File" samples of their movie and television products, notably including the Vampire Diaries. Indeed, WB then apparently issued unintended automatic takedowns of their own uploaded content and repeatedly had to coordinate internally to manage this confusion, demonstrating the difficulty in determining whether an uploaded file represents a permitted use. This illustrates a central difficulty in takedowns and infringement inference: It is not copyright files that may not be uploaded, but rather copyrighted files for which the copyright is held by another party and permission for redistribution has not been granted. This ownership and permission is a non-technical matter, and as noted in Appendix H, in any case data to support a technical decision are not part of the Internet handling of files generally and file transfers to file sharing services in particular.

199.    In short, even if one can find that two files appear similar, one cannot tell—and in particular, a non-rightsholder service provider certainly cannot tell—solely by visual inspection who has rights over them and whether those rights have been observed.

200.    It further appears that WB staff recognize that uploading to a service provider is

HIGHLY CONFIDENTIAL                    Expert Report of Andrew S. Cromarty, Ph.D.

insufficient to induce infringing acts. According to internal WB email messages, WB expressed enthusiasm that the independent third-party PirateBay index web site would find and independently promote the availability of the "Fake Files." And further, the WB staff apparently did not consider it adequate to induce downloads when they used Hotfile as a distribution point by merely uploading files there. Their procedure next involved separately posting the files' availability at the "top 5" cyberlocker link indexing sites, i.e., to independent Napster-like indexing sites that point to file storage/sharing sites such as Hotfile. This suggests Plaintiffs understand, admit and agree that mere uploading does not induce the downloading behavior, and to elicit downloads they must take specific additional actions to induce or seed it at other third-party sites not under the ownership or control of any Defendant. *WARNER027832.pdf*

201.   In summary, although Plaintiffs themselves potentially could better control infringement, and notwithstanding Defendants' business reasonable best efforts to be of assistance to another industry, Defendants materially lack the "ability to control" infringement. This is so because the technology to do so is technically inadequate/deficient, uneconomic, unvalidated, and unreliable. It is so because the economic and, especially, computational expense to control infringement requires the service provider to "defy the laws of physics," for example, in some circumstances by promptly performing millions of years of computation in a day. And it is so because of the nature of the copyright problem itself, wherein multiple business players who may not even know of each others' existence or asset holdings are nonetheless be required to "know what they don't or can't know" to control infringement.

HIGHLY CONFIDENTIAL                    Expert Report of Andrew S. Cromarty, Ph.D.

## IX.   TRIAL EXHIBITS

202.    I may rely on visual aids and demonstrative exhibits that demonstrate the bases of my opinions.  Examples of these visual aids and demonstrative exhibits may include, for example, charts, drawings, excerpts from patent specifications or other public sources, patent file histories, interrogatory responses, deposition testimony and deposition exhibits, as well as optical components, charts, diagrams, videos and animated or computer-generated video.

203.    Other than as referred to in this report, I have not yet prepared any exhibits for use at trial as a summary or support for the opinions expressed in this report, but I expect to do so in accordance with the Court's scheduling orders.

## X.  SUPPLEMENTATION OF OPINIONS

204.    I expect to testify regarding the matters set forth in this expert report, if asked about these matters by the Court or the parties' attorneys.

205.    I understand that discovery is ongoing in this case.  I therefore reserve the right to adjust or supplement my opinions after I have had the opportunity to review deposition testimony or in light of additional documents or arguments that may be brought to my attention, including any additional orders from the Courts.  I also reserve the right to adjust or supplement my analysis in light of any new data or alternative opinions advanced by or on behalf of Plaintiffs.

HIGHLY CONFIDENTIAL                              Expert Report of Andrew S. Cromarty, Ph.D.

# APPENDICES

HIGHLY CONFIDENTIAL                    Expert Report of Andrew S. Cromarty, Ph.D.


**<u>Report Errata</u>**


The following typographical errors are noted in the main body of this report as produced on

November 18, 2011.


Title page: Case name has changed to Civil Action No. 11-20427-CIV-WILLIAMS/TURNOFF.

p.14 para. 73: "may be name" should read "may be named".

p.14 para. 77: "not that it" should read "not knowing that it".

p.34 para. 157: "only or video" should read "only video".

p.35 para. 164: "Exposing to a new or wider works" should read "expose to a new or wider

audience works".

HIGHLY CONFIDENTIAL                    Expert Report of Andrew S. Cromarty, Ph.D.


## A. Materials Relied Upon

### i.   Non-BATES-numbered documents


1and1 Affiliate Marketing pages. From http://www.1and1affiliate.com/

Amazon S3 storage pricing. http://aws.amazon.com/s3/pricing/

Retrieved 20111104.


Amazon Affiliate pricing table. https://affiliate-

program.amazon.com/gp/associates/help/operating/advertisingfees

Retrieved 20111107


Amazon EC2 Overview. http://aws.amazon.com/ec2/

Retrieved 20111121.


Amazon EC2 Pricing. http://aws.amazon.com/ec2/pricing

Retrieved 20111121.


Gannes, Liz, "Auditude Fingerprints Everyone and Everything."

GigaOM (pub.), October 17, 2008. Published and available at:

http://gigaom.com/video/auditude-fingerprints-everyone-and-everything/

HIGHLY CONFIDENTIAL                     Expert Report of Andrew S. Cromarty, Ph.D.

"Adobe Acquires Auditude to Capitalize on Exploding Video Advertising Opportunity". Press release, Adobe Systems Incorporated (pub.), November 1, 2011. Published and available at: http://www.adobe.com/aboutadobe/pressroom/pressreleases/201111/110111AdobeAcquiresAuditude.html and

http://www.adobe.com/aboutadobe/pressroom/pressreleases/pdfs/201111/110111AdobeAcquiresAuditude.pdf


Gannes, Liz, "Auditude to Power Comcast Online Video Ads". GigaOM (pub.), Feb. 22, 2010. Published and available at: http://gigaom.com/video/auditude-to-power-comcast-online-video-ads/


Malik, Om, "Adobe buys Auditude reportedly for over $100 million." GigaOM (pub.), Oct. 31, 2011. Published and available at: http://gigaom.com/video/adobe-buys-auditude-reportedly-for-about-100-million/


Kopytoff, V., "Apple iCloud May Not Be a Threat to Online-Storage Services."
New York Times, June 7, 2011.  Published at
http://bits.blogs.nytimes.com/2011/06/07/icloud-may-not-be-a-threat-to-file-sharing-services/


DropBox description from crunchbase.
http://www.crunchbase.com/company/dropbox
Retrieved 20111106

HIGHLY CONFIDENTIAL                    Expert Report of Andrew S. Cromarty, Ph.D.

DropBox overview from secondmarket.  https://www.secondmarket.com/company/dropbox

Retrieved 20111106

DropBox as a top-ten, in SecondMarket's Q3 2011 Top Ten Watched list.

https://www.secondmarket.com/discover/reports/q3-2011-private-company-report

Sourceforge "About" description. http://sourceforge.net/about

Retrieved 20111106

About Picasa. http://picasa.google.com/features.html

Retrieved 20111106

Picasa+gmail freemium pricing.

http://picasa.google.com/support/bin/answer.py?answer=39567&topic=10766

Retrieved 20111106

"Flickr FAQ (incl. "Will Flickr always be free?" / upsell summary)".

http://www.flickr.com/help/general/#3

Retrieved 20111106

"Flickr upsell pricing." http://www.flickr.com/upgrade/

HIGHLY CONFIDENTIAL                        Expert Report of Andrew S. Cromarty, Ph.D.

Retrieved 20111106

"eBay affiliate marketing - How it works."

https://publisher.ebaypartnernetwork.com/files/hub/en-US/howitWorks.html

Retrieved 2012121108

"What Happened to Gatekeeper?". Hewlett-Packard.

Available at and retrieved from http://gatekeeper.dec.com/what-happened-to-gatekeeper/

Gannes, Liz, "Fingerprint Technology Waits for a Grand Entrance." GigaOM (pub.), OCtober 9,

2007. Published and available at: http://gigaom.com/video/fingerprint-tech-waits-for-a-grand-

entrance/

"Kapow Software - Web Intelligence Solution: Antipiracy". Web page, printed 20111117.

Available at: http://kapowsoftware.com/solutions/web-intelligence/antipiracy.php

Healey, Jon, "The Content-Recognition Bakeoff".

Los Angeles Times (pub.), September 21, 2007. Published at:

http://opinion.latimes.com/bitplayer/2007/09/the-content-rec.html

Healey, Jon, "Content Recognition, part 2". Los Angeles Times (pub.), September 24, 2007.

Published at: http://opinion.latimes.com/bitplayer/2007/09/content-recogni.html