# EXHIBIT 11

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 11-20427-WILLIAMS/TURNOFF

DISNEY ENTERPRISES, INC.,
TWENTIETH CENTURY FOX FILM CORPORATION,
UNIVERSAL CITY STUDIOS PRODUCTIONS LLLP,
COLUMBIA PICTURES INDUSTRIES, INC., and
WARNER BROS.  ENTERTAINMENT INC.,

*Plaintiffs,*

v.

HOTFILE CORP., ANTON TITOV, and
DOES 1-10.

   *Defendants.*
_____/

HOTFILE CORP.,

*Counterclaimant,*

v.

WARNER BROS. ENTERTAINMENT INC.,

*Counterdefendant.*
_____/

## <u>RULE 26(a)(2)(B) REBUTTAL REPORT OF DR.  ERLING WOLD</u>

1.     My name is Erling Wold and I currently hold the position of Chief Scientist at

Audible Magic, Inc.  I have a Bachelor's degree in Electrical Engineering 1978 from the

California Institute of Technology, and a Master's and PhD in Electrical Engineering and

Computer Science from the University of California at Berkeley 1987, where my primary area of

study was the development of computer algorithms and architectures for the analysis of audio

and music.  My thesis was on the nonlinear parameter estimation of acoustic models, but during my time as a graduate student I also published papers in computer graphics ("Antialiasing Through Stochastic Sampling" SIGGRAPH 1985), applied mathematics ("Fast Fourier Transform Processors Using Gaussian Residue Arithmetic," J. Parallel and Distributed Computing 1985) and VLSI design ("Pipeline and Parallel-Pipeline FFT Processors for VLSI Implementations" IEEE Transactions on Computers 1984).

2.      I was a Chief Engineer and member of the research staff at Yamaha Music Technologies from 1988 to 1992 where I primarily developed algorithms for the analysis and synthesis of music (e.g. "Method and apparatus for analyzing and synthesizing a sound by extracting and controlling a sound parameter" US 5536902) but also wrote patents with my colleagues on sensor technology ("Position-based controller for electronic musical instrument" US 5541358), software architecture ("Apparatus and method for linking software modules" US 5386568) and nanotechnology ("Musical tone generating apparatus employing microresonator array" US 5569871).  After Yamaha, I was a partner in Muscle Fish LLC for eight years, a consulting group that specialized in the areas of computer music and audio, audio analysis, and signal processing but also general software programming and architecture.  While there, my colleagues and I did some of the earliest work on automatic audio classification, similarity and retrieval.  Our initial paper in this area ("Content-Based Classification, Search and Retrieval of Audio" IEEE Multimedia 1996) has been widely cited.  At the time I also coauthored a number of other papers in audio classification and similarity matching and contributed to several books.  For the last fifteen years, I have focused almost entirely on the problem of automatically identifying audio and video.

3.      For the last decade, I have been an employee of Audible Magic, a company that

2

offers media file identification services to a broad array of clients in a variety of application areas including advertising, royalty distribution, direct consumer-facing identification on phones and televisions, and copyright compliance. I am a named inventor on a number of granted patents assigned to Audible Magic in its service and product areas ("System for identifying content of digital data" US 8006314; "Method and apparatus for identifying new media content" US 7877438; "Method and apparatus for cache promotion" EP 1485815B1; "Method and apparatus for creating a unique audio signature" US 7562012; "Method and apparatus for identifying an unknown work" US 7529659 and US 6968337; "Method and article of manufacture for content-based analysis, storage, retrieval and segmentation of audio information" US 5918223). At both Muscle Fish and Audible Magic I was the main developer and designer of their audio and video fingerprinting algorithms. I was also directly involved in the evaluation of a number of other audio and video fingerprinting technologies that were offered to us for licensing. A copy of my CV, including a list of my publications, is attached as Exhibit A.

4.      I have been asked by the Plaintiffs in this litigation to review, analyze, and respond to certain views and opinions expressed in the November 18 expert report of Dr. Andrew Cromarty regarding content identification technologies. I have reviewed the relevant sections of Dr. Cromarty's report in which he discusses the use of digital fingerprinting of media files for the purposes of identification, excluding a handful of paragraphs in the report that I understand have been designated as Confidential under the protective order in this case. My opinions and bases therefore are expressed below.

5.      In preparing this report, I have reviewed one review paper by a pair of researchers in the area ("A review of algorithms for audio fingerprinting" Multimedia Signal Processing 2002) as well as the papers listed in paragraph 56. I have relied upon my experience in the

3

industry, including more than a decade's work at Audible Magic and Muscle Fish leading to the patents and papers detailed above, my personal knowledge and testing of the public work of our competitors, and my focused reading of their publications over the years.

6.     I am being compensated by Plaintiffs for my study and testimony in this case at a rate of $250 per hour.  If called as an expert at trial, I would testify to the opinions and conclusions expressed in this report.

**Fingerprinting of Media Files**
**1. Definition**
**1.1. General**

7.     A "fingerprint" of a media file is a set of features extracted from the file that serve to represent the file for the purposes of identification.  The term is derived from the use of human fingerprints in identification.   A "fingerprinting technique" is a combination of a fingerprint and an algorithm that can compare two fingerprints to determine if they match or if they do not.  A "fingerprinting system" describes the entire business operation surrounding the technique that makes it viable in the marketplace.

8.     A media asset – for example a movie or an audio recording – may have many different digital representations.   For example, the original master of *Citizen Kane*, originally on film, may be digitized and then released on a DVD or a Blu-ray disc in digital form, and these discs may be ripped by a computer user to any one of many available digital file formats and encoded using any one of many available audio and video encoders.  It may also be broadcast over a TV channel that is imperfect, resulting in added errors and noise, and may be altered intentionally, letterboxed or cropped, sped up or slowed down, and this version might be rerecorded by a viewer.  Alternately, a theatrical presentation of the film might be surreptitiously recorded by a theatergoer using a camcorder and then uploaded to her or his computer.  All of

4

the resulting digital files will be different in size and content, but an individual viewing them all, for example by using a movie player on a computer, would immediately agree that they were all representations of *Citizen Kane*.

9.     For a fingerprinting technique to function, it must, like the human viewer, be able to reasonably identify the digital representations above as representations of the movie *Citizen Kane*. At the same time, it must be able to distinguish this collection of representations from a collection of representations of any other different media asset, e.g. *Gone with the Wind*. These two capabilities are reasonably necessary for a fingerprinting technique to function correctly.

10.     A practical fingerprinting technique will also be constrained by cost considerations. The fingerprints must be relatively small, typically a small fraction of the size of any of the digital representations discussed above, so that it is cheap to store and transmit. The cost of extracting the features and computing a match / no-match decision must be low, as many millions or billions of comparisons between an unknown file and a database of fingerprints may need to be done immediately, say while a user is waiting for a response.

11.     Also, a practical system may be constrained by other user requirements. For example, the holder of the copyright of the media asset may require that the fingerprint does not contain enough information to recreate a version of the asset that is commercially viable.

12.     The use of digital fingerprints for identification of media files is a special case of the broader discipline of classification and recognition of audio and video, and as such relies on many decades of work that have come before it. Media file fingerprinting technologies use many of the same techniques, algorithms, scientific knowledge and mathematical methods that have been developed for the broader subject. Fingerprinting is narrower in scope than other problems in this area that have also seen mature, robust and widely commercialized applications: e.g.

5

speech recognition, now on mobile phones and answering machines; and computer vision, used in detection of handwritten postal codes in letter sorters to space exploration.

13.     Identification through digital fingerprinting is a special case of the broader field of pattern recognition, a general mathematical and technological framework for classifying and clustering data of all types, including text, DNA sequences, radar and sonar detection, credit scoring, and medical diagnosis.  Again, the same techniques, algorithms and mathematics used in these applications are commonly used in fingerprinting.  In many of these applications, the same issues arise, namely extracting a small and tractable set of pertinent features from the data, reducing the dimensions of that data, ignoring features in the original data that are unimportant, and deriving efficient and reliable algorithms for classification.

14.     In some of the following I will talk specifically about audio or video fingerprinting.  For an audio-only media file, clearly audio alone is enough.  For a video file that contains audio and video, either technique or both together can be used for identification.

## 1.2.  Features

15.     Given a digital representation of a media asset, a fingerprinting technique reduces this file to a set of features, typically a set of numerical values.  As with human fingerprints, which are reduced to minutiae as well as other features, the media file features chosen must capture those aspects of the media file that identify it as what it is, regardless of the actual bits contained in the media file.  Some identification techniques use features that are derived from knowledge of human hearing and vision, both in terms of the physical sensors in the ear and eye and the way the brain emphasizes some aspects of the sound or image or motion over others.  Some identification techniques model the mathematical transformations that occur when the original media asset is converted into a particular representation and optimize their features to be those that are present throughout this process and that change the least when subjected to such

6

transformations.

16.     However they are derived, all possible feature sets must capture the aspects of the
original media asset that are common to all representations.  As an example, a black-and-white
version of a color movie still has the same shapes in the same relative positions on the screen,
and the scene changes occur in the same time locations.  Thus a feature set that captured those
particular qualities would be robust in the presence of alterations of color.

17.     Many of the features used in fingerprinting systems have been used in computer
speech, audio and vision systems for many years, in some cases many decades.  During that
period, their efficacy in pattern recognition and classification systems has been tested and peer-
reviewed.

## 1.3.  Matching

18.     To discover if an unknown media file is a representation of a particular media
asset, fingerprinting systems first convert both the unknown file and the original master media
asset to fingerprints using the feature extraction methods above.  Once the two fingerprints are
available, the system compares them to each other to see whether they match.  This can be
accomplished through a variety of techniques, but in practice, the exact method used is not that
critical.  If the two fingerprints are close enough to each other, a match is declared.  If they are
dissimilar, the system returns no match.

## 1.4.  Reference fingerprint database

19.     For a fingerprinting system to be commercially viable for applications that require
the identification of unknown files, the vendor of the fingerprinting system must also maintain a
large database of reference fingerprints.  If the fingerprint of a particular master media asset is
not in the database, the fingerprinting system will fail to identify any digital representations of
that original asset.  Audible Magic, for instance, has agreements with many copyright holders to

7

generate fingerprints for all their media assets as part of their production or maintenance processes. Other vendors have simply purchased CDs and DVDs and have computed fingerprints directly from those, or fingerprinted off live broadcast feeds. Current vendors in the marketplace have millions or tens of millions of fingerprints in their databases. As well as containing the fingerprints, these databases have other information about the original media asset, including title, copyright holder, industry identifications like International Standard Recording Code ("ISRC") numbers, and so on.

### 1.5. Example process

20. The following is a description of the process followed by a media file fingerprint identification system. Say a user of a fingerprinting system had an unknown media file and wanted to know what it is. One would first run the feature extraction software supplied by the identification service on this file to produce a fingerprint. This small package of information would then be transmitted, say over the Internet, to a computer maintained by the identification service. The computer would contain the reference database above and the software that implements the matching algorithm. The computer would compare the incoming fingerprint to all the fingerprints in the database. The system would then report back to us whether there was a match and, if there was, what was matched.

### 1.6. Errors

21. There are two types of errors that can occur in a fingerprint identification system, one or the other of which may matter more in a particular application. False negatives occur when the system fails to identify an unknown that should match something in the database. False positives occur when the system reports a match for something that actually should not have been matched.

22. Note that is possible for such errors to occur due to human error, for example, an

8

incorrect title attached to the fingerprint.  What is more important is the fundamental error rate of the low-level algorithms themselves.  In modern fingerprinting solutions, both the false negative and false positive rates are extremely low.  Based on my experience using fingerprinting algorithms to identify media files, one can achieve false negative rates that are much less than one in a hundred thousand files and false positive rates that are much less than one in a million files.  One can trade off these two error rates against each other and against other performance requirements such as the cost of identification.

**2. History**

23.     Automated media recognition systems have a history extending back at least to the early 1980s, when Broadcast Data Systems patented a solution for audio broadcast monitoring using filter banks.  Given the state of technology at the time, only audio detection was possible, and the technique was simple and probably error-prone.  However, even this early technique was based on a simple model of the cochlea as a bank of frequency-sensitive filters.

24.     Over the years, such systems have improved in many ways, not in the least due to the rapid increase in hardware performance, which has allowed standard pattern recognition algorithms to be applied to audio and video in real time.  Automated broadcast monitoring has continued to be an application area worldwide, now used for both radio and television for royalty distribution and verification of ad placement.

25.     When Napster, KaZaa, BitTorrent and other file sharing systems started to become popular for music sharing in 1999 and beyond, there was a great deal of research and interest in both the academy and industry to develop audio identification systems which could be used for copyright compliance.  A number of systems were developed which worked very well and, due to this, quickly found other application niches.  One of the most famous of these is the Shazam music identification service, which allows cell phone users to identify a piece of music

being played even in a noisy environment like a club or bar, and to purchase it if desired.

26.     Web 2.0 companies such as YouTube, Facebook, MySpace and others, which allowed users to upload and share video and audio content, initially agreed to use fingerprint identification systems to block or notify users when copyrighted material was uploaded. Fingerprinting systems were commercially available to file-sharing sites well before 2009, when I understand that Hotfile commenced operations. For instance, by 2008, Audible Magic had a combined video and audio fingerprinting system that was utilized by all three of the companies named above, and other companies were offering fingerprinting systems as well. However, what is most interesting is that the companies listed above, realizing how well the systems worked, quickly began to use fingerprint-based identifications for their own business purposes, beyond copyright filtering, including ad placement and to sell media assets directly to their users.

27.     More recently, the growth of the tablet market and the connected television market has spawned another burst of development in the area. A number of television producers have applications on tablets and phones that listen to what is playing on the television, identify it using fingerprinting techniques, and allow users to interact with the show and other fans. Television sets themselves are beginning to incorporate identification systems in the televisions themselves, allowing similar applications, plus commercial detection, coupon promotions, and more. All of this speaks to the maturity and reliability of fingerprint-based media identification technology.

## 3. Scientific background
### 3.1. Basis for choices of features

28.     As discussed in section 1.2, in audio fingerprinting, many approaches use features that are based on psychoacoustic models. The cochlea is to first approximation a filter bank, i.e. a spectrum analyzer. Most features used in fingerprinting are features derived from the spectrum

10

of the signal, including spectral peaks (which are very robust in the presence of noise), quantities known as "mel-filtered cepstral coefficients" (which come from speech research and model the overall shape of the spectrum), and "filter bank coefficients" that quantify the amount of signal in each spectral range. As these parameters have psychoacoustic analogs, and as they are derived from nature, they are the natural fingerprint of a sound. In addition, many of the aspects of the sound that are ignored by such features are those that are known from audio and speech research to also be ignored by the ear-brain system, e.g. those that are psychoacoustically masked.

29.     Similarly, one can look to eye-brain models to find meaningful features for use in image and video identification. For example, the eye does not see all possible frequencies of light and has limitations on its ability to detect spatial and temporal changes. These considerations allow developers of a fingerprinting system to ignore much of the data in a video stream and to concentrate on those features that are most important.

30.     However, it is not necessary for features to follow psychophysical parameters. Some methods simply use prominent features of the signal, features that have been experimentally or mathematically determined to remain more or less constant even in the presence of the modifications listed in section 1.1. This is again analogous to a human fingerprint, where identification relies on such features as dots and bifurcations and line terminations, prominent attributes that will survive the transfer of oils to a surface.

**3.2. Basis for matching algorithms**

31.     As discussed previously, the exact matching algorithm is typically not critical if one has a well-designed set of robust features. All that is important in determining whether two fingerprints match is to determine the similarity of the two sets of features. There are standard and statistically well-understood techniques from the field of pattern matching that can be

11

applied.  For example, if a fingerprint is a set of numbers, one can measure the distance between the two sets using a standard Euclidean distance, just like a normal distance on a map or in space, but generalized to the case of many more dimensions.  With such a distance measure, a match is declared if the distance is closer than a particular threshold and no match is returned if the distance is greater.

### 4. Fingerprinting in practice and in the marketplace

32.     In practice, digital fingerprinting systems work very well.  There has been a great flowering of applications in response to their efficacy.  Identification systems have many motivations, not just adversarial copyright compliance, but also by the desire for device manufacturers and device users to know what is playing or being stored on their systems.  Audible Magic conducts roughly a billion identifications every year, and Shazam last year reported having one hundred million users of its cell-phone identification systems.

33.     In practice, the techniques are straightforward.  Digital fingerprinting systems have become the stuff of student projects.  Digital fingerprinting identification has become a commodity service, with many competing vendors, and even open source projects given away for free and maintained by volunteers.  The vendor companies are now competing primarily in application features, in cost, and in ease-of-use.  The areas of continuing research are in pushing the limits of the algorithms, for example, how well they function in extremely noisy or visually distracting environments, or at identifying extremely short portions of the original, or at providing the service on very small and less powerful embedded devices.

34.     It is important to note that the development of digital fingerprinting was not initially motivated primarily by copyright compliance.  Media file fingerprinting systems are relied on to pay royalties, to identify what someone is watching or listening to for statistical tracking purposes, or to present metadata and other information that a user desires to know.

12

There has been broad uptake of fingerprint-based identification solutions across the media application landscape.

### 5. Specific comments and points of rebuttal

35.      In paragraph 93 of his report, Dr. Cromarty is correct in stating that a copyright holder must identify works over which they assert copyright.  However, a digital fingerprinting system is a method by which this can be accomplished.  Vendors of digital fingerprinting services maintain databases of reference fingerprints and associated information, including the copyright holder, as well as title, artists, casts, players, cover art and so on.  As this identifying information is what they sell, they are financially motivated to keep this information accurate, up to date, and to build as large a database as possible.  Copyright holders are also motivated to keep this information accurate for copyright compliance applications but also for other users, such as correct royalty reporting in broadcast.  Audible Magic works with many copyright holders to register all their works and to supply fingerprints to the reference database.

36.      In paragraphs 95 through 99 of his report, Dr. Cromarty lays out the difficulties of knowing the copyright status of all possible media assets.  This is true, but in my expert opinion, it is misleading.  It is not necessary to know the copyright status of all possible media assets for a system to function well.  If a significant number of copyright owners assert ownership over a significant number of their assets and work to have those fingerprints available and labeled correctly, and if they clearly define allowed uses of those assets, this is enough to make an identification process useful.

37.      If a copyright holder of a media asset wants to control the distribution of that asset, for example because it is commercially, aesthetically, morally or historically valuable, the copyright holder can register the work with whomever is maintaining the reference database.  In the case of Audible Magic, rightsholders register their works for free, and the business model is

13

to sell identification services to those who are interested. The more complete the catalog, the more valuable the service. Customers of that service may be motivated by any of a number of desires, including but not limited to: enforcing copyright compliance, as a way to generate leads to sales of DVDs or CDs or licensed digital downloads, and to sell related advertising based on the demographics of the groups interested in those assets.

38. In paragraph 102 of Dr. Cromarty's report, he opines that easy availability of encryption makes an accurate fingerprint-based identification system expensive or impossible. He also returns to this point in paragraphs 130, 131 and 195. It is true that encryption adds a layer of difficulty to the identification problem, and it is technically infeasible at this point in time to decrypt a file that has been encrypted with a modern and correctly implemented encryption technique. However, in my expert opinion, encryption is a barrier to sharing as well. For a file sharing transaction that uses encryption to succeed, there must be a point of rendezvous between sharers where the encryption key is passed between them. If the point of rendezvous is made public to encourage sharing, then an identification process could have access to the key as well. If this point of rendezvous is to be kept secret, then the number of sharers involved must be kept small. Note that this alone limits distribution, and thus an identification system that drives sharers to utilize encryption may in fact partially satisfy a copyright holder who wishes to control or at least reduce distribution of a media asset.

39. In paragraph 104 of his report, Dr. Cromarty states correctly that media assets must already exist in digital form so that the comparison computation can proceed. It is my expert opinion that such a situation already exists. An enormous and ever-growing collection of the world's media assets are already in digital form, either as CDs or DVDs, or digital masters held by the original producers, or as computer files ready for digital download or distribution

14

through any of a variety of authorized online digital retailers or streaming services. A copyright holder who wishes to assert copyright in the digital world needs simply to digitize their media assets. This is currently a very low barrier.

40.     In paragraph 105 of his report, Dr. Cromarty opines that there is no established accepted reliable technical standard to compare two creative works and to determine if one is an instance or derivative of the other. First, consider the case of determining if one is an instance of the other. It is my expert opinion that there are currently in practice several competing techniques that meet his strict requirements, i.e., which are in fact established, accepted and reliable. However, his use of the term "standard" is misleading, implying as it does that the lack of a standard somehow diminishes the technology. This requires some discussion.

41.     There are actual named standards determined by trade groups (MPEG, JPEG) or governmental (NIST) or international organizations (ISO), some of which are accepted by industry or engineering practice, and many of which are not. Standards of this sort are most useful when industries need to agree upon structures or interfaces, e.g. a particular kind of cable connection or a file format that they can use to interoperate.

42.     There are also *de facto* standards, techniques or methods or interfaces which become popular simply because they work well or they are successful in economic terms. An example of this is the Windows operating system.

43.     However, in the area of media file identification, there is no need for a standard method. It is primarily enough to ask whether a particular vendor's fingerprinting technique succeeds or fails in terms of the two requirements named in section 1.1, secondarily if it has attained the market acceptance to accumulate a large enough reference database, and finally if it has achieved a cost / performance ratio that is acceptable for the applications in question. Many

15

fingerprinting techniques have been proposed and implemented by companies and university researchers over the last few decades, a number of which have been tested and selected by the marketplace, and a number of which have been in constant service for years or decades. The market is growing for these techniques, the use cases have multiplied, and the number of users of these services has continued to increase, and increase that has been accelerating in the last few years.

44.     In the opinion of the marketplace at least, these techniques are established, accepted and reliable for determining whether a media file is an instance of an underlying media asset.

45.     Next, consider the case of determining if one creative work is a derivative of the other. In my expert opinion, it is misleading that he conflates this with the previous case. It is true that there is no solution currently in the marketplace for determining if a media file is a derivative work of a media asset, except in the case where the derivative work is simply a combination of other works, and therefore reduces to a set of questions about whether portions of the work are instances of other works. However, the inability of a digital fingerprinting technique to detect all possible derivative works is no different than its lack of ability to detect all possible works to begin with. With a large enough reference database, a digital fingerprinting system is quite useful.

46.     In paragraphs 106 and 107 of Dr. Cromarty's report, he makes the distinction between exact and inexact techniques. In my expert opinion, his discussion is misleading, as it implies that an exact technique is better than an inexact technique, since the latter includes error. In fact, exact techniques are not valuable and not interesting. It is exceedingly rare that a digital master of a media asset would match bit-for-bit a version that is uploaded to a file sharing site.

16

An exact technique would therefore fail to achieve the first goal of an identification technique, that of determining that all representations of a media asset are identified as the same.

47.     In paragraph 109 of the report, Dr. Cromarty discusses the distinction between full and partial identification techniques. In my expert opinion, his initial distinction between partial and full matching is not a valuable one. First, a partial matching technique can also be used as a full matching technique. Any two files that match in all pieces also match in their entirety. Second, two files that don't match partially won't match in entirety, so it is common practice to test for a partial match first, and, if a match is detected, to follow that up with a test for a full match. This strategy is a cost-saving optimization that does not affect the result. On the other hand, a copyright holder may very well be interested in detecting both full and partial copies of the original media asset, and thus a technique that can, for example, detect that a particular 10 minute interval in an unknown file is a match for a particular 10 minute interval of a media asset can be more useful than a technique that simply returns a yes / no decision as to whether the entire file is a match.

48.     But in my expert opinion, the second half of paragraph 109 of Dr. Cromarty's report is even more misleading. He reuses the term "partial" to mean something else, no longer a section of the original, but instead to mean some aspect of the original. The very nature of a successful fingerprinting technique is to extract those features from the original that are robust, that are approximately the same in all representations of the original media asset, and that distinguish it from all other media assets. A successful fingerprinting technique deliberately throws away those aspects of the original that vary between different representations. This wheat-from-chaff aspect is what gives a successful fingerprinting technique its power. Note that Dr. Cromarty returns to this criticism in paragraph 185 of his report.

17

49.     In paragraph 109, he also applies the term "heuristic" to feature-based techniques, implying a lack of rigor.  In my expert opinion this is not true.  A fingerprinting technique can be as rigorously developed and tested as any other scientific or mathematical or engineering method.  Those fingerprinting techniques that have survived in the marketplace have been tested extensively, both by the vendors themselves and by their customers.  Audible Magic, for example, has developed very large test beds over the years, involving tens of millions of reference fingerprints and the testing of billions of identifications.  Other vendors have developed and published methods to model the distortions and variations of different digital representations of media assets.  Fingerprinting techniques are tested in standard scientific ways, generating hypotheses, making predictions, running experiments, revising the model and iterating.  Again, this is a mature industry with a proven record.

50.     In paragraph 110 of his report, Dr. Cromarty opines that digital fingerprinting is less reliable but more convenient than a complete byte-by-byte comparison.  (So-called "hashing" techniques, such as MD5 or SHA, are methods for approximating a byte-by-byte comparison).  In my expert opinion, this is quite misleading.  As described in section 1.1, if the goal of an identification technique is to identify a file as a representation of an underlying media asset, then feature-based digital fingerprinting techniques are in fact more reliable than a complete byte-by-byte matching of the files (including hashing), a technique which is practically useless for identifying multiple representations of the same asset, as it identifies only absolutely identical representations of the same asset.

51.     In paragraph 111 of his report, Dr. Cromarty makes a distinction between natural fingerprints, like those of humans, and the fingerprints used in media file identification.  This is not a critical point, but in my expert opinion it is worth some discussion.  Even a human

18

fingerprint has no natural representation.  Fingerprints are catalogued by human or automatic algorithms that find robust features of the fingerprint, including the minutiae, and it is these features are compared, not the fingerprints themselves.  The scientific process by which a feature set is determined is similar for all identification techniques: looking at examples, generating hypotheses as to what features might be useful based on those examples and one's area knowledge, testing those hypotheses on a large universe of test cases, and using the results of those experiments to improve the features and matching techniques.

52.    In paragraph 112 of his report, Dr.  Cromarty discusses the likelihood of collisions, i.e.  false positives.  In my expert opinion, his presentation is misleading.  The likelihood of collisions for some fingerprinting techniques can be estimated theoretically but even more easily measured experimentally.  Unlike a human fingerprint, the identification of which may use a few tens of independent features, a media asset like a movie may have a digital fingerprint that consists of millions of independent features.  The likelihood of a collision between two such fingerprints is exceedingly low.  For example, as I have already discussed, the historical false positive rate of Audible Magic's fingerprinting technique is extremely low, and this for a reference fingerprint population in the millions.

53.    In paragraph 118 of Dr. Cromarty's report, he opines that a disadvantage of feature-based techniques is that by design they ignore most data, under a personal theory that the extracted features chosen by the engineer adequately represent or identify the underlying asset. Again, it is my expert opinion that the fact that most data is ignored is not a disadvantage at all, but exactly what is necessary for any identification system to function according to the requirements of section 1.1, not only a feature-based identification system.

54.    In addition, all theories, no matter how personal, are subjected to experiment.

Only theories that actually function well will survive in the marketplace, especially a marketplace as crowded and competitive as the digital fingerprinting market. Scientific progress is based on personal theories that are tested and either survive those tests or are modified to correct deficiencies shown by those tests and tested again. An engineer skilled in the art and familiar with the application area will already know of features that are likely to work. The features that I made use of in my own fingerprinting work were features that had been developed during decades of research in speech and auditory signal processing. However, these features still had to be tested for use in identification applications, both by me and by Audible Magic's customers.

55.     In paragraph 119, Dr. Cromarty opines that there is no inherently correct judgment or assessment criterion to judge the identification made by a feature-based technique, and that the techniques are not amenable to a sensitivity analysis. In my expert opinion, the first part of this statement is simply wrong. A very natural assessment criterion can be stated as follows: Does the identification system's result match the identification that would be made by a human? If by his second point, he means a mathematical sensitivity analysis, at least some feature-based techniques are amenable to that as well, but what is more misleading is that it seems to discount the value of well-designed experimental tests of sensitivity. In my opinion, the massive real-world testing of feature-based techniques that have succeeded in the marketplace is still the best measure of their efficacy.

56.     In paragraph 121 of his report, Dr. Cromarty opines that there is presently no science of digital asset matching. In my expert opinion this is not true, and the field has developed in a similar fashion to other scientific or technological fields, with multiple tests of predictions made by hypotheses and theories arrived at through mathematical modeling and

experiment.  Researchers in the study of digital fingerprint-based identification have published many papers in a wide variety of peer-reviewed journals.  Many experiments have been duplicated by cooperating and competing groups, testing other approaches and comparing them to their own.  Repeatability of experimental results is considered standard practice in the sciences.  To bolster this argument, the following is an annotated collection of a few papers that have been published in the area.

- "Distortion Discriminant Analysis for Audio Fingerprinting," published in the 2003 IEEE Transactions on Speech and Audio Processing, a respected, peer-reviewed journal.  This paper shows the development of a set of audio fingerprint features using mathematical models for the expected audio distortions in the application area.  It demonstrates experimental methods for evaluating the efficacy of the system, and develops a mathematical model for the probability of identification error.

- "Extracting Noise-Robust Features from Audio Data," published in the 2002 Proceedings of the IEEE Conference on Acoustics, Speech and Signal Processing, a major research conference.  Similar to the previous paper, it shows experimental methods applied to estimate error rates.

- "Robust Video Fingerprinting for Content-Based Video Identification," published in the 2008 IEEE Transactions on Circuits and Systems for Video Technology, another peer-reviewed journal.  This paper develops a mathematical model of the fingerprint features, describes an experimental setup to measure feature robustness and reports the results of these experiments.  The authors experimentally compare their chosen feature set to a variety of other published video features.  It also shows how false-positive and false-negative rates can be traded off against each other in a typical system.

- "A Highly Robust Audio Fingerprinting System," published in the 2002 Proceedings of the International Society for Music Information Retrieval, an international group that has for more than 10 years specialized in problems in music and audio identification, retrieval and analysis.  The paper describes experiments and results for testing the robustness of the features in the presence of different distortions.

- "A robust image fingerprinting system using the Radon transform," published in Signal Processing: Image Communication 2004.  It shows a mathematical model used to derive a set of features for image identification, a basic building block of video identification.  The paper demonstrates the robustness of the features experimentally.

- "Perceptual Audio Hashing Function," published in EURASIP Journal on Applied Signal Processing 2005, another peer-reviewed journal.   The paper shows experimental results for both false negative and false positive error rates.

21

- "Automatic Song Identification in Noisy Broadcast Audio," published in Signal and Image Processing 2002, another peer-reviewed journal. The paper shows experimental measurement of error rates of their set of audio identification features.

- "Modulation-Scale Analysis for Content Identification," published in IEEE Transactions on Signal Processing 2004, a peer-reviewed journal. This paper shows experimental measurements of error rates and compares behavior of their feature set to other popular feature sets in audio fingerprint-based identification.

57.     This is by no means a complete bibliography. Note that many of the papers reference many other papers that have come before. This reflects the systematic way in which Science proceeds, building and organizing and accumulating knowledge.

58.     In paragraph 122, Dr. Cromarty claims broadly that there are no standards developed by third parties, or agreed upon scientific designs or standard test input data sets, and no publications venue for reporting results. In my expert opinion this is incorrect. Many papers have been published, including descriptions of experimental methods and experimental results, in respected peer-reviewed journals. Part of the peer-review process is to judge the quality of those results and the design of the experiments. Peer-reviewers are by design not party to the research described in the papers, instead they are independent agents who do not directly benefit from the paper's publication. As shown above, there are many peer-reviewed journals that review and publish papers in this area.

59.     The number of industries using digital fingerprinting is large, from those built around applications of cell phones and televisions and tablets to computer media playback devices and social networking sites. It is unlikely that all corporations across all these industries will formally decide on published standards or metrics or test beds. However, this is not necessary to determine the truth of whether the systems work. It is a mature industry, used by many companies to process billions of identifications per year, and the marketplace has already weeded out those vendors that do not provide working solutions. Digital fingerprinting has also

22

been developed by companies who use it internally to improve their systems and to increase revenue. The cost / benefit tradeoffs of digital fingerprinting have been in the hands of the marketplace for many years, and the marketplace has chosen the viable techniques over others.

60.     In paragraph 123 of his report, Dr. Cromarty compares the digital fingerprinting industry to the patent medicine market of a century ago. In my expert opinion, this is extremely unfair. The patent medicine market was motivated by fraud, selling useless products to unsuspecting people. The digital fingerprinting marketplace is a mature industry, used in many applications where such a fraud would be exposed. The performance characteristics, including identification rates, are vetted by consumers every day and have been peer-reviewed in publications. As an example, there are at least three different iPhone applications which identify music that the user is listening to in a club or other environment (Shazam, SoundHound, Gracenote) which have at times charged the user for such identification services. In this competitive environment, sensitivity to error is high. Television manufacturers are using identification services to detect shows and advertisements in the broadcast stream. Web 2.0 companies use identification services to advertise against videos that are uploaded. Vendors have supplied solutions that work well for these industries, and some of these customers – some very large customers – have vetted all the different vendors in terms of cost and benefit and error rate.

61.     In paragraph 124 of his report, Dr. Cromarty opines that customers of digital fingerprinting services are compelled to pay for these services as defensive measures, whether the said services work or not. While it is true that in an adversarial business environment, such an argument might have some weight, it is my expert opinion based on years in the industry that such environments are only a small portion of the digital fingerprinting market. This argument

23

breaks down completely for many of the application areas I have discussed previously. In many application areas, there are no adversarial business interests being balanced, there are simply identification service vendors that do a job well and are used with success by customers that require them to do that job well.

62.     In paragraph 125, Dr. Cromarty states that it is difficult or impossible to provide a digital fingerprinting tool that achieves everything required of it. In my expert opinion, the fact that these tools and services do exist, are very high performance, very low cost, and do deliver high match rates with extremely low false positive rates, shows the emptiness of his statement. Later in the paragraph, he opines that digital fingerprinting will fail when faced with sophisticated forms of obfuscation. This argument has already been addressed, in that obfuscation is analogous to encryption. An identification system that drives sharers to encryption or obfuscation succeeds in limiting sharing. Note that only an identification system that worked well – that successfully identified the majority of files – would actually drive sharers to the use of these techniques.

63.     In paragraph 126, Dr. Cromarty discusses the difficulty of scaling his hash-based method to a very large file base. In my expert opinion, this is a misleading argument. The hash approach, since it can only succeed in detecting files that are the same bit-for-bit, is not useful as an identification technique by the requirements of section 1.1.

64.     A digital fingerprinting solution can be quite fast. For example, as mentioned previously, one can perform an initial identification on a portion of the file, say 30 seconds, and then, if a match is found, one can perform a more detailed identification of the rest of the file. In my experience, computing a 30 second fingerprint from an audio or video recording requires only a small fraction of a second.

65.     In reality, this would not be done all at once at a file sharing site, but only as each file is uploaded.   The process of uploading is much slower than that required for feature extraction.

66.     In the second half of paragraph 131, Dr. Cromarty discusses the use of steganography to hide one file inside of another file, and points out that this technique could be used by a stealthy uploader to convert positives to false negatives and negatives to false positives.  While it is true that such techniques exist, they are in my expert opinion highly impractical.  Steganography is typically used to hide small amounts of data inside a much larger digital object, e.g a text message inside a photographic image.  To steganographically hide a high-quality movie file inside another movie file to "convert positives to false negatives or negatives to false positives" would result in a massively larger file to upload than the original movie file.  And, again, this is similar in effect to the use of encryption, as it would place an extra burden on sharers that would necessarily limit the distribution of the shared file.

67.     In paragraph 134, Dr. Cromarty suggests watermarking as an alternative.  In my expert opinion, watermarking is a reasonable approach, but it does have some disadvantages.  As it requires that the content be watermarked before it is ever released in any form, it is capable of identifying only newly produced material.  Legacy content, that is content that is already released into the world, cannot be identified through watermarking.  Watermarking is also subject to countermeasures, and since a watermark is intended to be invisible and/or inaudible, the removal of a watermark may leave no visible or audio trace.

68.     In paragraph 186, Dr. Cromarty relates that the methods used by Vobile reduce an entire one- to two-hour movie to a single number.  This statement seems to disparage Vobile's feature-based techniques.  I do not know the technical details of Vobile's technology, but in my

expert opinion the statement itself is not a meaningful criticism. For it to be meaningful, one would have to state the range of that single number. The entire original movie file itself is a single number, just one with many bits – or digits, if you prefer.

69.     In paragraph 194, Dr. Cromarty opines that, since there are an unlimited number of possible morphisms of the original digital asset, it is not possible for a single set of features to adequately model them all. It is true that no set of features will be able to identify all possible morphisms of the original media asset. However, in my expert opinion, an identification system need identify only those morphisms that preserve the character of the file, such that it is still perceived by a human as a representation of the original media asset. It is my expert opinion that a set of features can in fact adequately model those, and that this has been proven by the rapid acceptance of digital fingerprinting techniques. Note that any morphism of the original media file that is so altered that it is audibly or visibly distorted or damaged will rarely be shared. In this way, the goals of the sharer and the goals of the fingerprinting technique are in harmony. The sharer wants the quality of the file to be as high as possible given whatever constraints are placed on him or her: bandwidth, storage space, etc. This makes it more likely that the qualities on which the fingerprinting technique depends will be present in the shared file.

January 6, 2012

Erling H. Wold, PhD

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

CASE NO. 11-20427-WILLIAMS-TURNOFF

DISNEY ENTERPRISES, INC.,
TWENTIETH CENTURY FOX FILM CORPORATION,
UNIVERSAL CITY STUDIOS PRODUCTIONS LLLP,
COLUMBIA PICTURES INDUSTRIES, INC., and
WARNER BROS.  ENTERTAINMENT INC.,

*Plaintiffs,*

v.

HOTFILE CORP., ANTON TITOV, and
DOES 1-10.

  *Defendants.*

_____/

HOTFILE CORP.,

*Counterclaimant,*

v.

WARNER BROS. ENTERTAINMENT INC.,

*Counterdefendant.*

_____/

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 6th Day of January, 2012, I served the

following documents on all counsel of record by means of the email addresses listed

through the Court's ECF System:

**RULE 26(a)(2)(B) REBUTTAL REPORT OF DR. ERLING WOLD**

By: /s/ Luke C.  Platzer
         Luke C.  Platzer

**SERVICE LIST**

**Disney Enterprises, Inc., et al. v. Hotfile Corp. et al.**
**CASE NO. 11-CIV-20427-JORDAN**

FARELLA BRAUN + MARTEL LLP
Anthony P. Schoenberg
tschoenberg@fbm.com
Roderick M. Thompson
rthompson@fbm.com
N. Andrew Leibnitz
aleibnitz@fbm.com
Deepak Gupta
dgupta@fbm.com
Janel Thamkul
jthamkul@fbm.com
235 Montgomery Street
San Francisco, CA  94104
Phone:  415-954-4400

*Attorneys for Defendants Hotfile Corp. and
Anton Titov*

RASCO KLOCK
Janet T. Munn
jmunn@rascoklock.com
283 Catalonia Ave., Suite 200
Coral Gables, FL  33134
Phone:  305-476-7101
Fax:  305-476-7102

*Attorney for Defendants Hotfile Corp. and
Anton Titov*

BOSTON LAW GROUP, PC
Valentin Gurvits
vgurvits@bostonlawgroup.com
825 Beacon Street, Suite 20
Newton Centre, MA  02459
Phone:  617-928-1804

*Attorneys for Defendants Hotfile Corp. and
Anton Titov*