# EXHIBIT 21

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 11-20427-WILLIAMS/TURNOFF

DISNEY ENTERPRISES, INC.,
TWENTIETH CENTURY FOX FILM CORPORATION,
UNIVERSAL CITY STUDIOS PRODUCTIONS LLLP,
COLUMBIA PICTURES INDUSTRIES, INC., and
WARNER BROS. ENTERTAINMENT INC.,

*Plaintiffs*,

v.

HOTFILE CORP., ANTON TITOV, and
DOES 1-10.

*Defendants*.
_____/

HOTFILE CORP.,

*Counterclaimant*,

v.

WARNER BROS. ENTERTAINMENT INC.,

*Counterdefendant*.
_____/

**DECLARATION OF DAVID KAPLAN IN SUPPORT OF WARNER BROS. ENTERTAINMENT'S MOTION FOR SUMMARY JUDGMENT**

**[FILED UNDER SEAL PURSUANT TO PROTECTIVE ORDER]**

I, DAVID KAPLAN, declare as follows:

1. I hold the position of Senior Vice President, Intellectual Property Counsel, Worldwide Antipiracy Operations at Warner Bros. Entertainment Inc. ("Warner"). In that capacity, I oversee Warner's antipiracy efforts worldwide, including with respect to so-called "locker" and "linking" sites, including Hotfile. I make this declaration in support of Warner's Motion for Summary Judgment. Unless otherwise indicated, I have personal knowledge of all of the procedures and events described herein.

**Warner's Locker Site Enforcement System**

2. One of the many tasks performed by Warner's Worldwide Antipiracy Operations Group to protect Warner's content online is to identify and respond to infringement on so-called "locker sites" (sites that host and provide access to infringing content). Hotfile is an example of a locker site, as is MegaUpload.

3. Many locker sites, including Hotfile, provide no mechanism for a copyright owner to search the site directly to detect unauthorized copies of files hosted on the system. Warner therefore must search other sites in order to locate "links" to copies of infringing Warner content hosted on locker sites, and to then issue notifications of infringement to the locker sites on which the infringing files are hosted. Specifically, there are a large number of so-called "linking sites" whose purpose is to organize information and links regarding infringing files hosted on locker sites. Warner searches link sites using a highly sophisticated system in which it has invested substantial time and resources over the years, and which I describe below.

4. The scale of infringement of Warner's works on the Internet generally – and on locker sites, including Hotfile – is vast. New infringing copies of Warner's motion pictures and television programs are continuously being uploaded to Hotfile and other sites like it. Warner,

on its own and through vendors, detects and sends out takedown notices to Hotfile and sites like it on millions of infringing files every year, and has sent something on the order of a million notices to Hotfile alone since early 2009. To keep up with this massive volume of infringement, Warner employs seven employees who are substantially or entirely devoted to addressing online infringement of Warner's works, including but not limited to operating the antipiracy system I describe below. In addition, as noted above, Warner also augments its in-house capabilities by working with third-party vendors to assist with locating infringing copies of Warner's content online and issuing takedown notices.

5.  Due to the volume of infringement on link and locker sites, it is common for many copyright owners and antipiracy vendors to use automated systems to scan link sites and to issue notifications of infringement to locker sites when infringing content is detected. That is the case not only in the motion picture industry, but in other copyright industries (such as the video game and music industries) as well. Warner follows this common practice.

6.  Warner does not scan all linking sites (of which there are thousands) that host links to content on locker sites. Rather, to ensure the reliability and accuracy of its search results, Warner only searches specific link sites that Warner personnel have hand-selected based on a determination that the linking site is either devoted to infringing content or has discrete sections of the site (such as a dedicated "Movies" section) devoted to infringing content. Even though there are many sites that might link to Warner files hosted on locker sites, Warner limits its searching to the most notorious linking sites (currently, approximately 200). To augment its antipiracy enforcement efforts beyond those approximately two hundred sites, as discussed above, Warner retains vendors with expertise in searching for infringing content, including content linked to from other linking sites.

7. These hand-selected linking sites are then searched using sophisticated, dedicated software, which conducts keyword-based searching (mimicking the way that a human might search based on search terms while disregarding search results containing nonresponsive terms). Warner internally refers to these software programs as "robots." Warner uses multiple robots for each site, each with a dedicated set of programmable instructions and matching criteria.

8. Warner's personnel manually set searching and matching criteria for Warner's robots based on the sites being searched and the copyrighted works being searched for. For each title, Warner personnel manually determine which combinations of words should be part of the search algorithm. Warner personnel then research each title using multiple public sources, to refine the search algorithm and to identify potential non-Warner content that may share keywords with a Warner title. (For instance, Warner might conduct online searches for a film's title to discern whether those searches also result in hits for other types of content). Based on this research, Warner may associate other data with the Warner title, such as year of release, so that the file will only be selected if it contains both the selected keywords and the year of release of the Warner title; Warner also identifies "exclude" words, *i.e.*, words that, if they appear, will cause the robot to exclude a result even if it otherwise matches the title of the Warner work.

9. Many link sites enable searching by genre of content (such as movies, music, games, software, etc.). Warner's system also takes advantage of this additional information whenever available. For instance, when Warner searches for a television program on a site with a "TV" section, Warner configures the relevant robots to search for the title only in the TV section. Thus, if an infringing copy of a Warner television program is incorrectly posted in another section, the Warner robot would ignore it. While this is a conservative measure – and results in Warner's "missing" infringing files that would otherwise be detected by a keyword

match – the approach is designed to err on the side of conservatism and to avoid erroneous identification.

10. Once preliminary searches on a particular link site have produced a set of candidate results, Warner's robot examines the specific "post page" for each result. Link sites are typically organized by "post pages" that contain specific links and describe the content being offered. A post page for a movie, for instance, typically contains the title of the movie and links to download the movie. Warner's robots apply the search algorithm for a given title to the contents of the post page; to the extent there is a match, the robot will collect all of the links on the post page. There are often several links on a postpage, both because movies and television programs are often broken up into several files when hosted on locker sites, and because linking sites will often link to copies of a movie or television program on more than one locker site.

11. For some linking sites, Warner's robots will not only apply the search algorithm to the post page, but will also apply it to each individual "link" and will not declare a match unless each of the search criteria are satisfied by the link itself. Because the text of links may not contain comprehensive information about the contents of the file, this process excludes many files that are in fact infringing copies of Warner content. Again, however, Warner has designed its system to err on the side of conservatism, even if that results in fewer infringing files being identified, in order to avoid errors.

12. Once Warner has identified and collected links to infringing files using the process described above, Warner sends notices on those files, either through emails or (for some sites) web-based takedown tools offered by many locker sites, including Hotfile. (Hotfile, in its Counterclaim, calls its interface its "Special Rightsholder Account" or "SRA"). Historically, the software Warner uses to issue takedown notices has again checked the post pages for the links to

ensure that they do not contain hand-selected exclude terms and to confirm that the links are "live" (i.e., resolve to a file that is present and available for download). Over time, Warner has built a library of "global exclude" terms that apply to all searches regardless of the title being searched; global exclude terms similarly cause the file to be excluded regardless whether there is a title match. For example, "pdf" (a common image file format) is a global exclude term, to help prevent notices from being sent for images that happen to have names similar to Warner's motion picture and television titles.[1]

13. The net result of this process is a complex search algorithm for each title and each linking site that is designed to minimize the risk that unintended files will be identified. As described, Warner takes care to ensure, as much as possible, that its system only identifies and sends notices on infringing Warner content. At several places in the process, Warner makes decisions that result in its robots excluding (not sending notices on) potentially infringing Warner content so as to avoid sending notices on misidentified content. The cumulative effect of these decisions is a system that, by design, favors excluding files rather than potentially misidentifying files.

### Accuracy of Warner's Enforcement System

14. Warner believes its system for locating links to infringing content on linking sites (and then issuing notifications of infringement to locker sites hosting the content) to be highly accurate and reliable, and Warner has great confidence in the system. Prior to bringing its lawsuit against Hotfile, for instance, Warner had issued something on the order of four hundred thousand takedown notices to Hotfile using the system described above, but had not received any

---

[1] The precise stage in the process where Warner checks for these global exclude terms (i.e., at the notice-sending stage or the link-collecting stage) has evolved over time, but the practice of globally excluding files meeting certain manually-selected criteria has been a constant feature of Warner's system since 2010.

counternotices from Hotfile users notifying Warner that the takedown had been sent in error; Warner has received only a handful of such notices subsequent to filing this case.

15. Warner's system is not perfect; Warner has become aware at points in the past of instances in which Warner has sent out notices in error. As a matter of regular practice, when Warner has learned of an error, it has investigated it and has taken corrective action, such as refining search criteria or adding additional exclude words to prevent recurrence of the error. If an error was of the sort that cannot be readily corrected by Warner – for instance, if a linking site's search feature was malfunctioning and is returning incorrect results that did not correspond to Warner's search terms – Warner's practice has been to suspend its searching of the site entirely until the issue can be resolved.

16. Warner's personnel also regularly review reports of past takedowns to identify errors, learn from them, and prevent their recurrence. Over time, Warner has refined and improved those processes. In fact, when Warner learned of Hotfile's counterclaim, it took its entire system offline and double-checked every robot and title; it brought the system back online one robot at a time, and only after satisfying itself that the system was reliably identifying Warner content.

17. I understand that Hotfile is suggesting in this case that Warner should have downloaded every file before issuing a takedown notice. Given the scale of the online infringement of Warner's content on locker sites, as well as the sizes of the files typically used to commit such infringement on locker sites, it would not be practicable for Warner to download files prior to issuing a notification of infringement. (Remember that Hotfile is only one of many locker sites that host infringing Warner content and to which Warner sends notices in the manner described). The computing resources and Internet bandwidth that would be required to do so

would be immense. Because of these facts, it is extremely unusual for copyright owners or their vendors who send notices to locker sites in large quantities to download files prior to sending a notice. As described above, however, Warner's system can reliably and accurately identify content without downloading the file itself.

### Notices in Hotfile's Counterclaim

18. Hotfile's counterclaim identifies a number of takedown notices that Warner appears to have sent in error. As described in the following section, many of these were in fact works for which Warner was searching on behalf of Electronic Arts, Inc., but had not intended to send notices on, and several other files identified by Hotfile are, in fact, works owned by Warner notwithstanding their inclusion in Hotfile's counterclaim.

19. Nonetheless, the balance of the counterclaim appears to reflect cases in which Warner misidentified the file and sent a mistaken takedown notice. Warner promptly investigated the mistakes identified by Hotfile and has taken corrective action, including shutting down its system entirely when it became aware of Hotfile's counterclaim and reviewing each set of search criteria, exclude terms, and robots to improve the accuracy of the system and prevent the recurrence of the errors identified by Hotfile's counterclaim. The mistakes identified by Hotfile are just that – unintended mistakes. In none of the cases identified by Hotfile did Warner know or believe, at the time it sent the notice in question, that the notice was not accurate.

20. I understand that Hotfile is also suggesting in this case that Warner's process was deficient because Warner did not use human review to pre-screen all of its takedown notices. I note that many of the files in Hotfile's Counterclaim were actually not generated by Warner's robots described above, but rather were located by one of Warner's vendors, a French company called LeakID, whose process differs from Warner's and in fact involves human screening of

links. As with takedowns generated entirely by Warner's internal process, Warner has confidence in the accuracy of Warner's system for issuing takedown notices based on infringing links found by LeakID. Nonetheless, human processes can also make mistakes, as occurred in the case of the LeakID links complained of by Hotfile. Again, these errors were entirely unintentional and were unknown to Warner until Hotfile notified Warner of the errors through its counterclaim. And again, Warner promptly investigated the cause of the error with LeakID and reassured itself that steps were in place to prevent the same mistake from recurring.

### Warner's Antipiracy Work with Electronic Arts

21. Warner is not solely an owner of motion picture and television programming rights; it also has a substantial business in video games. This includes a business arrangement with Electronic Arts, Inc. ("EA"), whereby Warner holds the rights to distribute EA works in Brazil. As part of this business relationship, the two companies also coordinate some of their online antipiracy activity. In early 2011, Warner and EA were working together on a plan to leverage Warner's antipiracy system to locate infringing copies of EA files on locker sites, which Warner would then supply to EA so that EA could issue takedown notices on those files. Unknown to Warner, at the beginning of this process, when Warner first began scanning for EA works using the robots described above, Warner inadvertently sent takedown notices on those EA titles to Hotfile. The issue was resolved quickly (within approximately a week) when the revisions to Warner's system to search for EA titles were completed. Indeed, Warner did not even know that it had sent notices on EA works back in February 2011 until Hotfile complained about it months later as part of this litigation.

### Warner Works in Counterclaim

22. I understand that Hotfile's Counterclaim includes the allegation that Warner wrongfully took down nineteen files that represent a video game, F.E.A.R. 2 Project Origin. Rights in F.E.A.R. 2 Project Origin are in fact owned Warner and distributed by a Warner affiliate, Warner Bros. Interactive Entertainment, and are not authorized to be distributed through Hotfile.

I declare under penalty of perjury that the foregoing is true and correct.

Executed in the State of California this 8th day of February, 2012.

_____
David Kaplan