# EXHIBIT 1

## REDACTED – PUBLIC VERSION

# EXHIBIT A
# (Redacted Cromarty Declaration)
# (Part 1)

# PUBLIC VERSION

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.: 11-CIV-20427-WILLIAMS/TURNOFF

DISNEY ENTERPRISES, INC.,
TWENTIETH CENTURY FOX FILM
CORPORATION, UNIVERSAL CITY
STUDIOS PRODUCTIONS LLLP,
COLUMBIA PICTURES INDUSTRIES,
INC., and WARNER BROS.
ENTERTAINMENT INC.,

     *Plaintiffs*,

v.

HOTFILE CORP., ANTON TITOV, and
DOES 1-10.

     *Defendants*.

_____/

HOTFILE CORP.,

     *Counterclaimant*,

v.

WARNER BROS. ENTERTAINMENT INC.,

     *Counterdefendant*.

_____/

## DECLARATION OF DR. ANDREW CROMARTY IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

**[REDACTED]**

HIGHLY CONFIDENTIAL                    Declaration of Andrew S. Cromarty, Ph.D.

I, Andrew Cromarty, hereby declare as follows:

## A. Introduction and Background

1.      I have been retained by Defendants Hotfile Corp.   ("Hotfile") and Anton Titov (collectively, "Defendants") as an expert, opining on technical and business questions bearing on alleged secondary infringement of Plaintiffs' copyrights by Hotfile Corp. and Anton Titov as asserted by Plaintiffs in their Complaint. My expertise extends to these areas of the alleged copyright infringement by virtue of, at minimum, my extensive training in computer science and commercial experience as set forth below. I will not offer opinions of law, as I am not an attorney.

2.      I have been engaged by Defendants through Distributed Systems Technology LLC, a company of which I am an owner, through Berg Software Designs. Berg Software Designs bills $600 per hour for my time working on this matter plus reasonable expenses, of which I receive a lesser indeterminate amount computed after business operations expenses of Berg Software Designs and Distributed Systems Technology LLC.  My compensation is in no way related to the outcome of this litigation.

3.      A list of the materials I considered is attached as Appendix A. My curriculum vitae and a full list of publications is attached as Appendix B. Attached hereto in Appendix C as Exhibit R is a true and correct copy of my November 18, 2011 expert report ("Cromarty Expert Report") including the exhibits to that expert report that, I understand by mutual agreement among counsel, were produced to Plaintiffs' counsel on November 20, 2011. I hereby affirm, under penalty of perjury, that the statements in that report were true and correct. Other documents or information cited or relied upon appear in Appendix D as Exhibit X.

HIGHLY CONFIDENTIAL                         Declaration of Andrew S. Cromarty, Ph.D.

4.      In formulating my opinion, I have relied on the Court's orders of which I am aware, and other applicable information pertaining to this matter. A summary of that understanding as of the time of issuance of my Expert Report appears in Exhibit R.

5.      I have not testified at trial in the previous ten years. I have testified as an expert witness in depositions on four dates in 2011.

6.      If called as a witness at trial, I would testify as to the statements and opinions contained in this declaration.

7.      I provide in this declaration a description of the Defendants' system and methods. I understand that Hotfile operates the website www.hotfile.com. Basic operations of Internet and the World Wide Web and the systems and methods used by Hotfile and/or visitors to www.hotfile.com are described *infra* with extensive additional tutorial detail in Appendix H of Exhibit R. Major sections of this declaration are as follows: Introduction and Background; Qualifications; Overview of Opinions; History: A Half-Century of File Sharing; Summary of www.Hotfile.com Operations, Pricing and Consumer Use; Expert Analyses, Findings and Opinions.

HIGHLY CONFIDENTIAL                          Declaration of Andrew S. Cromarty, Ph.D.

### B. Qualifications

8.      I have received academic honors, awards, appointments, and recognition and held senior technical and executive positions as noted in the accompanying CV and Expert Report. *Cromarty Expert Report at 4ff. and Exhibit B.* During my professional career I have held senior technical positions at several corporations, including the highest management-awarded corporate scientist hiring rank positions at Advanced Decision Systems, Digital Equipment Corporation, and Compaq Computer Corporation, for a combined total of approximately a decade. My relevant technical experience also includes mathematical analysis, software development, technique development, scientific investigation, and publication in technical areas that arise the present matter.

9.      I have held numerous senior corporate executive and technical management positions during my career, including Chief Technology Officer (CTO) and Chief Information Officer (CIO) of Union Square Advisors, a San Francisco technology mergers & acquisition investment bank; CIO and CTO of DAX Solutions, Inc., a primary provider of Internet-based digital asset services to the Hollywood TV and movie industry, with international operations; CTO of SoftNet Systems, Inc., a billion-dollar NASDAQ-traded Internet services and telecommunications company; Chairman of the Board of Freewire Networks, Inc., a wireless broadband service, content, and e-commerce business; CTO of ISP Channel, then the third-largest cable Internet provider in the United States; CTO of Aerzone Corp., a $100 million wireless broadband service joint venture; and Board of Directors member of additional firms including Intelligent Communications Inc., an international satellite service provider, and SoftNet Ventures, a

HIGHLY CONFIDENTIAL                    Declaration of Andrew S. Cromarty, Ph.D.

corporate venture investment fund. Presently I am a Partner at Minerva Consulting, and the President and CEO of Distributed Systems Technology LLC.

10.     I earned a Ph.D. in Computer and Information Science from the University of Massachusetts at Amherst, awarded in 1988, writing my doctoral dissertation on "Programming Constructs for Real-Time Distributed Knowledge-Based Systems." While there I also wrote a second doctoral dissertation on mathematical modeling and computer simulation of brain structure and function. I earned a Master of Science in Computer and Information Science from the University of Massachusetts at Amherst in 1980.  I earned a Bachelor of Arts double degree in Biology and Psychology, and simultaneously a Bachelor of Arts degree in Music, from Wesleyan University in 1978.

11.     Since obtaining my Ph.D., I have worked in numerous technical management positions and overseen dozens of successful projects developing software, hardware, and services. I also have worked as a computing professional by developing software and teaching programming in over 30 languages and have personally authored on the order of one million lines of software code.

12.     I am credited with a number of worldwide historic multimedia,  Internet and technology firsts, including first to stream 1,000,000 live videos on the Internet for an event, world's first demonstration of Java-based distributed Internet games, world's first live wireless webcasts, world's first streaming video live from an international film festival, and the first high-definition "set-top box" networked screening product and system for the movie industry.

13.     My specific relevant experience with networking, internetworking, and multimedia content sharing or delivery over the Internet is described in the accompanying Exhibits. *Cromarty Expert Report at 10ff.* It includes decades of research, development and executive

HIGHLY CONFIDENTIAL                    Declaration of Andrew S. Cromarty, Ph.D.

corporate oversight over Internet multimedia content delivery, business model development and analysis, venture investment, due diligence investigation of a wide range of Internet and entertainment businesses, and the development, curatorship, and monetization of intellectual property. My business experience includes extensive development and evaluation of new, alternative, and competitive business models. I have evaluated well in excess of sixty investment and merger & acquisition opportunities, including their business operations and business models.

14.     During 2005-2007, I was CTO/CIO of DAX Solutions Inc., the film and TV industry's primary provider of Digital Asset Exchange asset management and workflow services over the Internet (some details of which may be subject to commercial nondisclosure obligations). In that capacity I oversaw technical development and line-managed the firm's operations and field service teams, providing digital dailies and workflow services to many of the largest entertainment firms in Hollywood and throughout much of the world. My specific responsibilities included managing the development, deployment, and operation of DAX's state-of-the-art proprietary digital asset watermarking/fingerprinting technology and intellectual property and associated digital rights management systems and software. At DAX we operated the largest known Internet-based system in the world for securely managing film and TV industry digital assets, with over 3,000 industry accountholders. My responsibilities also included oversight and management of security for these copyrighted entertainment assets, and required working with, educating, and advising many of the largest entertainment firms in the world as to security technology and policy for their own copyrighted multimedia film and TV digital asset content, much of which they entrusted me to hold and manage for them on my servers in Los Angeles, in their own facilities, and throughout the world.

HIGHLY CONFIDENTIAL                      Declaration of Andrew S. Cromarty, Ph.D.

## C. Overview of Opinions

15.      Non-factual and erroneous opinion on technical and business matters has been presented as if fact in the Plaintiffs' Motion for Summary Judgment ("Plaintiffs' MSJ"), in my expert opinion. I am materially in disagreement with methods, analyses, representations, conclusions, and putative "facts" of Plaintiffs' declarants in this matter. I believe methodological errors and bias in their analyses cause them to reach incorrect conclusions. I find in my analysis that their opinions and asserted "facts" are in error.

16.      Defendants use a common business model employed by many of the most respected retailers and service providers on and off the Internet—including the Plaintiffs' own business partners and licensed Internet distributor channels. Salient components of this business model include "affiliate marketing" relationships and tiered/"freemium" pricing. This business model is conventional, and not designed to induce any form of improper customer behavior. Rather, it simply serves to encourage development of a business partnering ecosystem that better reaches a diverse international audience and provides customer "upsell" incentives (increased purchasing).

17.      It is my expert opinion that Hotfile's "premium" service is structured to allow customers to obtain better service performance. I find nothing in Defendants' service offering that provides any incentive to make illicit (*vs.* licit) use of the service.

18.      Proprietary trade-secret so-called "digital fingerprinting" (DFP) technology and systems, such as Vobile's or Audible Magic's products, which are marketed and sold to the entertainment industry and Internet service companies, purport to "identify infringement" but in fact simply

HIGHLY CONFIDENTIAL                          Declaration of Andrew S. Cromarty, Ph.D.

compare two files and compute a number, relying on secretive proprietary unpublished opinions or ideas of the company's product engineers. Commercial acceptance (i.e. vendor sales revenue) for commercial "fingerprinting" products is irrelevant as to the products' technical effectiveness or scientific reliability. These vendors' use of trade secret to obscure the basis in their products and services for computing alleged "infringements" thwarts proper scientific confirmation—for example by impeding both scientific disprovability and proper fulsome scientific third-party independent peer review of their methodology—and is counter to established requirements of scientific reliability. Claims as to the effectiveness of these "fingerprinting" or "infringement"-determining products do not meet the standards for either science or fact.

19.     Further, infringement is not a technical computation. These commercial products necessarily lack sufficient information to make a legal determination of infringement, leaving unresolved and unsettled substantive technical, business, and legal questions as to identity of works, rightsholder identity, license assignment, licensee rights, non-infringement due to user rights established in statute or case law, and more. Such techniques fail to incorporate or consider the full range of information essential to proper infringement analysis, and necessarily lack any technical means to do so. They cannot and do not "identify infringement."

20.     It should be regarded as entirely unsurprising if Defendants did not make an early purchase of enormously expensive, unreliable, untestable, business-irrelevant "digital fingerprinting" software marketed towards helping Hollywood corporations with their movies when Defendants were starting a company offering the very different service of consumer Internet file storage and sharing. Incurring such an expense would not have been rational behavior for technical and business reasons, and if erroneously considered during Hotfile's startup period, likely would have been properly forbidden by Hotfile's investors.

- 2 -

HIGHLY CONFIDENTIAL                    Declaration of Andrew S. Cromarty, Ph.D.

21.     Filenames and other file metadata are a technically inappropriate and non-fact-based means of establishing infringement. Their use for this purpose is technically erroneous and does not produce reliable facts as to infringement.

22.     Peer-to-peer ("P2P") technology, systems and services differ profoundly and materially in essential business and technical aspects from technology, systems and services of Defendants. In my expert opinion, P2P systems and any matters, actions, or conclusions concerning them are not relevant to the present case.

23.     Multiple takedown notices per "user" (website account) or per file are not inherently determinative or indicative of infringement. Proper common lawful uses of a file sharing service by innocent users may trigger issuance of repeated erroneous takedown notices. The staggeringly high percentage of false takedown notices reported for Internet file sharing sites like Hotfile—as many as half of total notices—may be explained in part by rightsholders erroneously relying on non-scientific and technically faulty "identification" systems and filename metadata criteria, as well as issuer negligence or misbehavior.

24.     Counting file downloads is a technically specious and biased means of assessing potential infringements. There is not a one-to-one relationship between computer files and copyrighted works, and such a metric creates a substanial and material bias that falsely increases the apparent frequency of infringements, in the case of movie content overstating the infringement rate by perhaps a factor of ten. Assertions regarding infringement occurences based on this metric are non-scientific, technically improper, and lead to false "facts."

25.     In my opinion, the Defendants' systems offer a specific substantial non-infringing use and benefit to normal law-abiding Internet users, one occupying an important market niche neglected by most of Defendants' business competitors. There is a substantial legitimate business

HIGHLY CONFIDENTIAL                              Declaration of Andrew S. Cromarty, Ph.D.

case for the existence and market success of a business such as that of the Defendants. *Cromarty Expert Report, Exhibit R at 154-173.* Also, it would be inappropriate to Hotfile's product mix and detrimental to their business model and to their users if Hotfile were to implement a search capability over links or filenames, as this would violate the privacy of those links and drive away proper lawful customers and business.

HIGHLY CONFIDENTIAL                    Declaration of Andrew S. Cromarty, Ph.D.

### D. History: A Half-Century of file Sharing

26.     File sharing over computer networks, including the Internet and its precursor networks, already was common and well-specified more than forty years ago. File transfer protocols, notably including today's File Transfer Protocol, were developed just for this purpose. For example, in 1971 the Internet specification publication RFC114, "A File Transfer Protocol," detailed many of the benefits of remote content sharing using an "extended file transfer protocol":

> Indirect usage … does not require that you explicitly log into a remote system or even know how to "use" the remote system.  An intermediate process makes most of the differences in commands and conventions invisible to you.  For example, you need only know a standard set of network file transfer commands for your local system in order to utilize remote file system.  This assumes the existence of a network file transfer process at each host cooperating via a common protocol. Indirect use is not limited to file transfers.  It may include execution of programs in remote hosts and the transfer of core images.  The extended file transfer protocol would facilitate the exchange of programs and data between computers, the use of storage and file handling capabilities of other computers (possibly including the trillion-bit store data computer), and have programs in remote hosts operate on your input and return an output.     *RFC114 at 1.*

HIGHLY CONFIDENTIAL                    Declaration of Andrew S. Cromarty, Ph.D.

27.     Subsequently, the modern Internet File Transfer Protocol was further specified in 1980, published as RFC959 "File Transfer Protocol" in 1985, and has continued in use through the present day.

28.     Importantly, these file transfer methods were developed without the contemporaneous ability, or objective, of transferring modern copyrighted entertainment or other multimedia files. At the time these file sharing techniques were conceived and developed, substantially all such content was in non-digital form.

29.     For example, the now-common "MP3" digital music format did not emerge until the late 1990's. And at the time the File Transfer Protocol was specified, high-definition digital formats, CDs, and DVDs had not yet been invented and brought to market.

30.     As networking developed, from its earliest days, free file-sharing services arose to provide the many legitimate and needed benefits of file sharing to the networked community.

31.     For example, over a third of a century ago, the SIMTEL Archive file sharing system was created and made publicly available to all users on the ARPANET (i.e., the Internet), first at the Massachusetts Institute of Technology and then moved to and maintained at the White Sands Missile Base, a U.S. Government facility, throughout most of the 1980's. The primary use of the Archive was file sharing of free software among Internet users, under the U.S. Government's *de facto* financial and administrative sponsorship.

32.     Another very widely used file sharing system, "gatekeeper.dec.com," was established in the late 1980's as an Internet-wide file sharing site established by Digital Equipment Corporation, the first computer company in the world to create a corporate Internet gateway:

HIGHLY CONFIDENTIAL                    Declaration of Andrew S. Cromarty, Ph.D.

History

The FTP archive on gatekeeper.dec.com, later to become gatekeeper.research.compaq.com, first went on-line in the late 1980's. … In its heyday, gatekeeper was a prominent Internet FTP site. Just about any public domain software package you wanted or needed could be found on gatekeeper. One of gatekeepers' primary functions was to give Digital software developers, living on the DECNET based internal corporate network, access to public domain software available from the Internet. (The Digital internal DECNET host, DECPA::, mounted the gatekeeper FTP archive via NFS.) Gatekeeper was also used by Digital product groups to provide software updates and patches to Internet customers.   *"What happened to gatekeeper.dec.com?" at 1.*

33.     There were many other such file sharing sites across the Internet throughout the past forty or more years. File sharing sites are a historical commonplace, and a long-standing necessity for routine use of computer networks.

34.     Today there is a vibrant marketplace of firms offering a range of file sharing services under a variety of different terms or business models.

35.     An important characteristic of modern file sharing and file storage services is provision of a fungible, apparently infinite, ubiquitous store for one's own digital data. These services serve as a geographic and virtual extension of the native file capacity available in the user's personal computing environment.

36.     For example, Amazon.com rents file space to anyone with a credit card at inexpensive rates in essentially unlimited capacity through its Simple Storage Service ("S3"). Amazon S3 implements a "freemium" pricing model, that is, some file storage services are offered free, with

HIGHLY CONFIDENTIAL                    Declaration of Andrew S. Cromarty, Ph.D.

more services and improved performance available if the customer pays for them  (called an "upsell").

37.    Dropbox, a firm that offers Internet file storage from one's personal computer or PDA cell phone under a "freemium" model, is backed by first-tier venture capital investors including Sequoia Capital, Greylock, Accel Partners, and Goldman Sachs. *SecondMarket's Q3 2011 Private Company Report*  Dropbox was recently reported by BusinessInsider as one of SecondMarket's Top Ten Most-Watched venture-backed firms. Market analysis firms SecondMarket and Crunchbase describe Dropbox as using file sharing to solve existing problems in Internet email, device interoperability, and mobile access to personal data: "Dropbox was founded in 2007 by Drew Houston and Arash Ferdowsi. Frustrated by working from multiple computers, Drew was inspired to create a service that would let people bring all their files anywhere, with no need to email around attachments. … Guiding their decisions was a relentless focus on crafting a simple and reliable experience across every computer and phone." *SecondMarket Overview of Dropbox; Crunchbase Overview of Dropbox.*

38.    Commercial file sharing sites have become the single most important medium through which open source software is distributed today. For example, the well-known open source repository Sourceforge presently contains "software in over 260,000 projects" serving "2.7 million developers" and "46 million consumers."  This file sharing service specializing in source code sharing is owned and operated by a NASDAQ-traded public corporation with a market capitalization well in excess of $100,000,000. *About Sourceforge.* Other well-known open source file sharing services include Launchpad and Github. The use of such file sharing services for distribution of open source software is well understood in the IT profession and by expert practitioners as central to the operations and essential to the viability of the open source software

- 8 -

HIGHLY CONFIDENTIAL                    Declaration of Andrew S. Cromarty, Ph.D.

industry.

39.    File sharing services offer increasing value to legitimate users as multimedia technology advances. For example, it is now common for cell phones such as a Blackberry or iPhone to take high-resolution photographs and shoot high-definition movies. The resulting collection of digital assets quickly becomes very large, and for technical reasons email is a very poor choice for sharing them. File sharing services are a far better solution to sharing such assets. Indeed, Apple recently released its iCloud service to address this need for its own customers. Users of other brands of devices, however, continue to need a third-party commercial file sharing service to obtain these communications benefits.

40.    Firms such as Picasa (a Google subsidiary) and Flickr (a Yahoo subsidiary) provide file sharing services to the consumer visual multimedia file sharing market, employing a freemium pricing model with upsells. *About Picasa; Flickr FAQ; Flickr Upgrades.*

41.    Defendants' system and service, Hotfile, is a *de facto* market competitor of these established modern firms. For example, customers of these other services can choose to use Hotfile as an alternative service provider, or *vice versa.*

42.    Some file sharing services focus on particular markets, business opportunities, or "use cases" (styles of customer use). Such market specialization may present both benefits and limitations to the customer.

43.    Overall, however, with respect to the kind of content that may be stored or accessed and the degree of service provider *vs.* customer control that is possible, these services are generally indistinguishable both technically and in the market. All provide file storage as a service; all promote their storage services as part of their business model; all permit users to store files without the service provider's knowledge of or regard for the internal contents of the files, which

HIGHLY CONFIDENTIAL                    Declaration of Andrew S. Cromarty, Ph.D.

may in fact be opaque to the service provider for technical or privacy reasons; all require their users to accept responsibility for obtaining, and representing they do have, any rights required to upload content as a condition of use; and all continue the nearly half-century-old technical and business practice of providing remote storage for files of arbitrary type and content for remote use and access.

44.     Thus the technology for sharing files among distant networked users is not a new invention designed for sharing copyrighted digital works owned by others or as a specific mechanism for infringing copyright.

45.     Quite to the contrary, file sharing has been in perpetual use, starting decades before it became technically feasible to move commercial entertainment media over computer networks. Network file sharing predates substantially all modern digital entertainment content, and it has a decades-long history of substantial non-infringing use.

46.     Existing Internet file sharing services are a direct technical and business continuation of this nearly half-century-old unbroken practice of sharing content over computer networks, among university, business, personal, and government file sharing sites.

47.     Common uses of commercial file sharing services today include:

- allowing an individual to gain access to personal data across many devices, such as between a PC and a PDA/cell phone,  or between work and home computers;

- sharing data securely with business colleagues, such as between attorneys and their client or experts;

- sharing computer source code and related data, such as through Sourceforge;

- sharing self-authored multimedia works such as pictures, music performances, and movies among members of a group, such as within a family, a Boy Scout

HIGHLY CONFIDENTIAL                    Declaration of Andrew S. Cromarty, Ph.D.

troop, a music band, or a commercial entertainment production company; or

- moving files from one location to another, such as a student writing an essay written on a shared computer in a school computer lab, then depositing it at a file sharing site for later pickup from a home personal computer.

48.     Sharing content and services between computers and between computer users is what networked computers are meant to do, and why computer networks exist.

49.     Consequently, as file sharing is a long-lived technology, in widespread use for a large and varied number of individual purposes, the mere presence, availability, investment in, commercial promotion of, or use of file sharing technology or services offers no technical foundation upon which to ascribe any specific intent to either individual users or service providers—other than to store and retrieve some data.

HIGHLY CONFIDENTIAL                              Declaration of Andrew S. Cromarty, Ph.D.

## E. Summary of www.hotfile.com operations, pricing, and consumer use

50.     Hotfile operates a collection of Internet-connected web servers in a data center facility in Texas. Such web servers typically comprise a computer, large amounts of data storage space, and software to support the file storage and retrieval operations described herein as well as basic computer management functions to support housekeeping functions and permit remote administration (startup, shutdown, software upgrades, etc). The data storage space often is organized as one large pool of storage shared by the server computers.

51.     When individuals anywhere in the world wish to store a file on the Internet for later retrieval and use, one choice they have is to store it on a www.hotfile.com server.

52.     An individual may choose to do this for many reasons. He may wish to offload his storage onto a willing third party, for example because his computer is low on space. He may wish to put his data in a public server location from which he later can retrieve a copy using another Internet-connected device or from a different location, e.g. while traveling with his phone or PDA or when using a laptop computer in a cafe. He may wish to share the resource with others, such as a group of business colleagues, friends, customers, or family members.

53.     The reasons a file is stored on a server—the motives of the storer—are inherently unknowable by the server owner-administrator. Internet technology generally does not provide any means for the client or its user to represent or provide this information, and any such information that could be captured or inferred by the server or its administrator is inherently unreliable.

HIGHLY CONFIDENTIAL                    Declaration of Andrew S. Cromarty, Ph.D.

54.     Like many or most websites, www.hotfile.com provides services to users whether or not they have a paid account. However, all users uploading to www.hotfile.com, whether registered paying users or not, must take specific action to agree to abide by Hotfile's policies. Before uploading a file to Hotfile servers, they must actively signify that they "have read the HotFile Terms of Service, Intellectual Property Policy, and Privacy Policy, and … agree to be bound by them." *Hotfile website.*

55.     I understand Hotfile imposes a size limit of 400 megabytes (400 MB) on uploaded files. Splitting a large file into smaller pieces to upload is permissible. An important effect of this upload policy is a reduction in the security and business risk to Hotfile due to intentional or accidental "denial of service" events, in which Hotfile's Internet communications and server resources are persistently tied up in long-lasting transfers that fail before they complete. The probability of a file transfer failing due to exogenous factors such as an Internet communications failure increases with file size, making file size limitations a rational business policy. Limiting file size also enhances the utility and effectiveness of other throttling measures available to Hotfile to balance load among users and provide fair service to all Hotfile's customers. Fairness of service delivery is a core technical concern in distributed computing and an important business concern on the Internet.

56.     When a user has accepted Hotfile's policy, he may choose and upload a file from his client (personal) computer with a few mouse clicks. The transfer of a copy of the file from his client computer to a Hotfile server then proceeds automatically. When the transfer is complete, the user is presented with a "link" or URL ("Uniform Resource Locator," a text string comprising a Web address) pointing to the uploaded file's location on the Hotfile servers. For example, uploading a file named "pictureofmydog.gif" may result in a URL being created and

HIGHLY CONFIDENTIAL                    Declaration of Andrew S. Cromarty, Ph.D.

displayed such as "http://hotfile.com/dl/135394112/220ead1/pictureofmydog.gif.html". Importantly, the filename component of the URL (e.g., "pictureofmydog") is chosen by the uploading user, not the server or its owner-administrator. This feature permits users to give meaningful—or arbitrary—names to the digital assets they wish to share with colleagues, friends, customers, or family on the Internet.

57.     The resulting URL may be kept private, for private use. If it is not revealed to others, its long name and numeric components make it unlikely anyone will guess the name, affording a degree of privacy or security.

58.     Alternatively, the URL may be shared with others. Anyone who enters the URL into their Web browser, or who clicks on it when displayed as a link in a bookmark list or index web page, will have access to the uploaded resource. This is how sharing is accomplished on the Internet.

59.     A non-registered Hotfile user who attempts to "visit" (use) the URL is presented with a Hotfile web page offering a business choice pursuant to Hotfile's "freemium" business model (cf. *supra*). The downloading/viewing user may choose a free "Regular Download" at no cost, which provides limited download speeds, one download at a time, and a limit of two downloaded files per hour, with a brief delay before downloads start after they are requested. Alternatively, the downloading user may choose a premium (paid) High Speed Download, which offers unrestricted download speed, no initial service delay, and an unrestricted number of file downloads per hour, subject to available computing and communications resources to service received requests. Further user performance incentives to upgrade to a premium paid account include "Fast download even when servers are busy," support for download accelerators, and support for resuming downloads that fail midstream due to Internet communications errors (cf.

HIGHLY CONFIDENTIAL                    Declaration of Andrew S. Cromarty, Ph.D.

*supra*), and "Hot/Direct Linking," which offers accountholders the ability to share the performance benefits they have purchased for files they upload.

60.     For example, if a parent with a premium account uploads family photographs and videos taken using a PDA or cell phone camera at her child's sporting event and then shares the resulting URL by email or SMS text message, other family members anywhere on the Internet immediately can view those photos and videos. In this case, the premium accountholder parent's paid-account performance benefits are shared by the entire family when obtaining and viewing these family digital assets.

61.     Payment by Hotfile premium accountholders in the United States is accomplished through PayPal, an eBay subsidiary, and is charged on a recurring monthly basis. Presently offered premium service "tiers" are based on the amount of file transfer volume an accountholder wishes to rent, and for how long. For example, $9/month rents 100 gigabytes (100 GB) of Hotlink file transfer traffic.

62.     This is typical pricing for Internet file storage and access. As one example, Amazon.com rents storage to anyone on the Internet through its "S3" Internet-based ("cloud"-based) storage service at prices in the range of $10 to $14 monthly per 100 GB. *Amazon S3 Pricing at 1.* Similarly, Amazon's Elastic Compute Cloud ("EC2"), "a web service that provides resizable compute capacity in the cloud" with the business goal to "to make web-scale computing easier for developers," similarly operates under a freemium model with free uploads and a marginal price for premium download service of approximately $12 per GB of file transfer traffic monthly. *Amazon EC2 at 2. Amazon EC2 Pricing at 3.* Amazon's services are very widely used

HIGHLY CONFIDENTIAL                                    Declaration of Andrew S. Cromarty, Ph.D.

by companies across the Internet; as one example, the publicly-traded multi-billion-dollar entertainment movie streaming firm Netflix is a customer of Amazon's cloud services.

63.     Pre-payment discounts are offered by Hotfile as part of their pricing mix. This is common in the Internet and Web hosting industry; for example, well-known major web hosting firms such as Bluehost and 1and1 offer pre-payment discounts for web hosting services.

64.     Hotfile service pricing compares favorably and predictably with alternative commercial storage and data transfer costs. For example, raw storage purchased as hard disk equipment presently costs approximately $5 per 100 GB single-quantity capital cost, but any operating expense must be borne by the buyer and a raw hard disk is not inherently Internet-accessible or structured as a reliable ubiquitous service. Major phone carriers in the United States such as ATT presently offer data transfer (with no storage) in the general range of  $10 per GB. Hotfile's pricing tiers are intermediate, falling between the cost of raw storage and the cost of mobile data transfers by carriers, as is to be expected: Hotfile's business operations can employ cheaper terrestrial communications, they offer (and must pass through costs for) added management and reliability services, and they can achieve economies of scale in their large storage arrays.

65.     Hotfile also has a reseller program,. Under this program, in essence Hotfile is a wholesale provider of storage accounts, and its resellers are individual retailers around the Internet who market and resell its underlying services. Presently Hotfile lists over a dozen resellers who resell its services in the United States, approximately thirty payment systems (such as PayPal) worldwide that are accepted and used for payments, and over one hundred countries for which there are resellers. The wholesale discount on accounts through indirect channels is nominally

HIGHLY CONFIDENTIAL                         Declaration of Andrew S. Cromarty, Ph.D.

20% of the retail price for direct single-quantity sales by Hotfile.

66.     Hotfile's published policy is that they "do not restrict any country - free downloads for everyone are guaranteed." For example, Hotfile downloads are permitted as a means for individuals to communicate in countries where totalitarian regimes may otherwise wish to control information flow to citizens, or where speech or information sharing may be restricted or repressed.

67.     Hotfile has an "affiliate" marketing program. Under this program an affiliate may be paid for usage generated by the affiliate. As discussed *supra,* an affiliate marketing program allows a business to reach markets or cultures outside its own, particularly on the Internet, which is international in scope. Affiliates earn commissions according to a published Earnings Table. One business incentive metric for awarding affiliates is achieving a high download-to-upload ratio. Incentivizing increased user activity is a rational business decision because, under the freemium business model, increased traffic driven to a site will result in conversions at some fixed rate to premium (paying) users. In addition, Hotfile further directly incentivizes these conversion by employing a second published metric computed based on conversions to premium user accounts attributable to an affiliate. A third incentive rewards premium accounts sold through advertising on the affiliate's web site. Amazon.com offers a similar sell-through incentive for sales by its affiliates. Finally, affiliates receive a permanent commission on referred sales for uploaders who become registered Hotfile customers, in that a first Hotfile customer earns 20% of the net sales of a second uploader who registers under the first customer's referral link. Hotfile's marketing program is substantially similar to refer-a-friend and affiliate marketing programs employed by large successful Internet sales, web hosting and telecommunications service provider companies

HIGHLY CONFIDENTIAL                    Declaration of Andrew S. Cromarty, Ph.D.

such as Amazon.com, eBay, 1and1 and Ooma. *Amazon.com Associates Program Advertising Schedule. Ooma referral offer at 1. 1and1 referral offer. 1and1 Affiliate Marketing Overview. eBay Partner Network Overview.*

HIGHLY CONFIDENTIAL                    Declaration of Andrew S. Cromarty, Ph.D.

## F.  Expert analyses, findings, and opinions

68.     Non-factual and erroneous opinion on technical and business matters has been presented as if fact in the Plaintiffs' Motion for Summary Judgment ("Plaintiffs' MSJ"), in my expert opinion. I am materially in disagreement with methods, analyses, representations, conclusions, and putative "facts" of Plaintiffs' declarants in this matter. I believe methodological errors and bias in their analyses cause them to reach incorrect conclusions. I find in my analysis that their opinions and asserted "facts" are in error.

69.     I conclude from my analysis that Defendants use a common business model employed by many of the most respected retailers and service providers on and off the Internet—companies such as eBay, Wal-Mart, Amazon.com, Google, major web-hosting companies including Bluehost and 1and1, telecommunications firms including Sonic.net and Ooma, and Yahoo.

70.     Salient components of this business model include "affiliate marketing" relationships and tiered/"freemium"[1] pricing. The use of affiliate marketing is so common on the Internet today that a robust secondary market or brokerage ecosystem has developed, with large-scale respected corporate players including Google Affiliate Network and ValueClick's Commission Junction.

71.     This business model is conventional, and not designed to induce any form of improper customer behavior. Rather, it simply serves to encourage development of a business partnering

---

[1] "Freemium" is a portmanteau of "free" and "premium," the latter implying better or faster service for a fee. The business objective of "freemium" pricing is to introduce new customers to a service, with the hope of "converting" them to "premium" customers who pay for extra features and faster service.

HIGHLY CONFIDENTIAL                          Declaration of Andrew S. Cromarty, Ph.D.

ecosystem that better reaches a diverse international audience and provides customer "upsell"
incentives (increased purchasing).

72.     Even the Plaintiffs' own business partners and licensed distributor channels employ this
business model—to distribute Plaintiffs' content under license. For example, Roku is a *de facto*
retail sales channel for Plaintiffs and makes available Plaintiff content licensed to Hulu.com,
Amazon.com and other TV and movie distributors via set-top boxes Roku manufactures and sells
to the retail market. Roku's product and service distributes both free and paid movie and TV
content (thus "freemium"), and Roku provides two different methods for individuals or
businesses to sign up as Roku affiliates, through Google or Commission Junction. *Roku Affiliate
Program Description, Exh. X.* Roku customers also may automatically participate and obtain
certain affiliate benefits simply by "referring a friend": Roku sends to its customers unsolicited
refer-a-friend affiliate advertisement emails reading,

         "For every player purchased, you get an Amazon Instant Video rental—on us. The more
         you share, the more you get. In fact, we think some of you may never pay for another
         movie rental again!"   *Roku Refer-a-Friend Program Description, Exh. X.*

73.     The objective and effect of the "affililiate" business model aspect is to expand the
business's reach to and through additional geographic and categorical markets and develop an
indirect sales channel cost-effectively. "Geographic" expansion includes growing in international
markets where cultures and languages, consumer tastes and needs, and local monetization are
difficult for the home company to predict or understand.  "Categorical" expansion includes
finding new ways of presenting the company's product or service offering that the home

HIGHLY CONFIDENTIAL                            Declaration of Andrew S. Cromarty, Ph.D.

company could not have anticipated, but affiliates will. "Indirect channel" selling refers to using other individuals or businesses to market and/or sell your company's product or service, rather than directly selling it to customers yourself. Indirect sales is similar to the distinction between "wholesale" and "retail" product sales common in the United States, and offers the additional advantage of eliminating the home company's cost of maintaining an employee sales force in return for paying a commission on actual sales produced. Affiliate marketing is a widespread, common, accepted, respected business model approach.

74.    The objective of the common "freemium" business model aspect employed by Defendants is to expand the business's customer base and increase conventional sales, by providing entry-level products or services free and additional products or services for a fee. It is a tiered pricing structure with a zero-cost entry level offering, similar to the "try before you buy" sales approach (or even free taste samples in supermarkets) common throughout the United States.

75.    Freemium pricing is common and widespread, especially for Internet service and software sales. Much, if not most, commercial open source software sales employs freemium pricing, giving a base-level product away free and hoping to "upsell" the customer (that is, to sell them additional features, performance, or services for a fee). For example Red Hat Software, a ten billion dollar New York Stock Exchange-traded open source software vendor, employs a freemium pricing structure for substantially all its sales. Yahoo offers freemium tiered email services, with a base-level account offered at no dollar cost to the consumer and a more featureful email account with restrictions removed upon payment of a periodic service fee. Most Internet Service Providers (ISPs) in the United States, including for example AT&T and Comcast, offer a tiered pricing structure where higher performance (e.g. faster transfer speed, or

- 21 -

HIGHLY CONFIDENTIAL                    Declaration of Andrew S. Cromarty, Ph.D.

special services such as static IP address assignments or throttling elimination) cost more than base-level service. Defendants apply precisely this ISP tiered-pricing structure to provide faster performance and other special services (such as throttling elimination), combining it with the "freemium" entry-level pricing. Tiered and freemium pricing are a widespread, common, accepted, respected business model approach.

76.     It is my expert opinion that Hotfile's "premium" service is structured to allow customers to obtain better service performance. I find nothing in Defendants' service offering that provides any incentive to make illicit (*vs.* licit) use of the service.

77.     Proprietary trade-secret so-called "digital fingerprinting" (DFP) technology and products such as Vobile's or Audible Magic's products, which are marketed and sold to the entertainment industry and Internet service companies, purport to "identify infringement" but in fact simply compare two files and compute a number purporting to describe computer file similarity, relying on secretive proprietary unpublished opinions or ideas of the company's product engineers.

78.     "Fingerprinting" itself is a misnomer, and a marketing appellation, as a file has no natural "fingerprint." Instead, an engineer thinks up a method, generally in secret, for generating a number that he likes—that in his otherwise unvetted opinion signifies similarity. Different engineers at different companies differ widely in their opinion of what makes up a good computation and even which factors are important or useful in comparing files with underlying assets, and they keep their comparison techniques and product details trade secret.

79.     Use of trade secret to obscure the basis for computing alleged "infringements" is counter to the requirements of science. If there were a substantive, mature, reliable scientific basis for such techniques, the science would by definition be public in all aspects, the utility of alternative techniques would be known and accepted by all participants in all affected industries, the vendor

HIGHLY CONFIDENTIAL                    Declaration of Andrew S. Cromarty, Ph.D.

companies could not compete based on differing file-comparison techniques, and the product vendors would not advertise a proprietary advantage based on trade-secret techniques.

80.     Further, infringement is not a technical computation. These commercial products necessarily lack sufficient information to make a legal determination of infringement, leaving unresolved and unsettled substantive technical, business, and legal questions as to identity of works, rightsholder identity, licensee assignment, licensee rights, and infringement.

81.     Such techniques fail to incorporate or consider the full range of information essential to proper infringement analysis, and necessarily lack any technical means to do so. They cannot and do not "identify infringement."

82.     In a typical infringement involving entertainment assets, the infringer does not copy a digital asset precisely but rather creates his own unique file, which thus will not be identical to the rightsholder's original digital asset file. They differ. This means a straightforward exact file comparison cannot suffice to evaluate candidate infringements, and similarity of underlying *human-perceived phenomena or ideas* instead must be estimated by a computer.

83.     Further, the vendors' products do not pretend to perform a complete comparison—instead they apply secret rules of thumb for comparing snippets of files, with the attendant unreliability such partial heuristic computations introduce.

84.     No matter what their "secret sauce," at best all file comparison programs can do is, they compare files. Under the typical conditions described *supra,* computer file comparisons are inadequate for establishing infringement. Human review and comparison of content is necessary to infer possible infringement.  As I have noted in my earlier deposition testimony, in documents produced during discovery the Plaintiffs' cognizant management appear to have agreed in their own internal communications—contrary to their asserted forensics—that even for the narrow

HIGHLY CONFIDENTIAL                    Declaration of Andrew S. Cromarty, Ph.D.

purpose of responsibly issuing takedown notices (TDNs) pursuant to the DMCA, human review and comparison of content is necessary to infer possible infringement.

85.    Vendors' use of trade secret to obscure the basis in their products and services for computing alleged "infringements" thwarts proper scientific confirmation—for example by impeding both scientific disprovability and proper fulsome scientific third-party independent peer review of their methodology—and is counter to established requirements of scientific reliability.

86.    It is in fact a tenet, and mathematical proof, of both computer science and mathematical system theory that without full knowledge of the details of these "fingerprinting" products, it cannot reliably be determined what the products are doing or whether they work as advertised or will produce a given result.

87.    It also is my expert opinion that commercial acceptance  (i.e. vendor sales revenue) for commercial "fingerprinting" products is irrelevant as to the products' technical effectiveness or scientific reliability. Such commercial sales signify market forces, not product competence at infringement determination or any other technical or legal task.

88.    Just as sales data are not a shortcut to replace science as to reliability, neither is blurring the line between science and other disciplines. Engineering, for example—which consists in building things (such as proprietary products)—is not science. This established distinction remains true even if engineers use processes or mathematics to choose their product's features, or publish descriptions in engineering journals of what they built and how big/fast/pleasing they found it afterward. Neither is "technology" science; nor is mathematics.  Core distinguishing principles of science include independent third-party peer review—*of methods as well as the results, and by other scientists;* scientific testability and "falsifiability"; an established error rate

HIGHLY CONFIDENTIAL                    Declaration of Andrew S. Cromarty, Ph.D.

that can be *independently* assessed, even by skeptics of a hypothesis; and methods that are accepted by the entire scientific community—including especially, accepted by those skeptical of hypothesized or predicted outcomes, and including the entire community, not only the hypothesis' supporters. By analogy: countless companies make consumer products and publish claims about them, even in engineering or trade journals; but it is the independent bodies such as Consumer's Union and *Consumer Reports* that provide independent, skeptical scientific testing. Conventional science sets an even higher bar. These principles are what makes science work, and without them, we are left only with product descriptions and advertising—and no scientific reliability, or fact.

89.     "Digital fingerprinting" products today fail these tests, and the performance claims as to the effectiveness of these "fingerprinting" or "infringement"-determining products do not meet the standards for either science or fact. Such claims are technically opaque and come from inherently untrustworthy non-independent sources, such as Plaintiffs' own industry association or their commercial vendors, who secretly create the products, financially benefit from sales of such products and services, and do not reveal their structure, function, or testing methodology. Indeed, it is essential to the business model of those vendors to ensure that the technical workings of their systems *cannot* be properly scientifically studied and verified, because revealing such details would defeat their competitive advantage in the market.

90.     Their performance analyses and claims thus will not be taken by a competent independent expert as reliable scientific fact. Rather, such performance claims are indistinguishable from engineers' and marketers' self-congratulation or industry cheerleading. Scientific discipline requires that efficacy claims for such products be fully studied by independent third parties or adversaries, and until that time, such claims must be regarded simply

- 25 -

HIGHLY CONFIDENTIAL                         Declaration of Andrew S. Cromarty, Ph.D.

as product advertising and as indistinguishable from unreliable "junk science."

91.     Because "digital fingerprinting" products are non-scientific, proprietary, and expensive[2] sold products, it is difficult or impossible for an Internet service company such as a file-sharing or file-storage service to evaluate them for purchase.

92.     Further, because of these limitations and because such products do not solve any organic technical or business problem of the service provider, it is not in the rational economic interest of an Internet service company such as Hotfile, or a reasonable business practice, to rush to purchase one, especially during the company's startup phase. Doing so would be as irrational as rushing to purchase an early 1900's patent medicine when one is not even sick.

93.     Such a purchase also would be an unnatural business decision for a startup. It comprises allowing another industry's native costs of doing business to be laid off onto the startup. A rational economic actor would only make such a purchase under duress.

94.     It thus should be regarded as entirely unsurprising if Defendants did not make an early purchase of enormously expensive, unreliable, untestable, business-irrelevant "digital fingerprinting" software marketed towards helping Hollywood corporations with their movies when Defendants were starting a company offering the very different service of consumer Internet file storage and sharing. This is exactly the kind of expense that professional investors instruct startups to avoid wasting their time and money on, in an effort to focus them on the



HIGHLY CONFIDENTIAL                    Declaration of Andrew S. Cromarty, Ph.D.

proper and legitimate activities of the business.

95.     It appears early adoption of Vobile's DFP product would have offered Hotfile limited, and questionable, material infringement "control" capability, due to the Vobile product's technical immaturity and Plaintiffs' own non-production of technically-required computer files. First, Vobile's September 2011 press release for their new VCloud9 product admits that for DFP products prior to that date, "Copyrighted content contained within cloud-based cyberlockers [sic] is very difficult to find" and that "file compression "hides" the true content, which - until now - has made it impossible to identify." *Yangbin Wang Deposition Exhibit 2.* ███████

███████████████████████████████

███████████████████████████████

███████████████████████████████

███████████████████████████████

███████████████████████████████

███████████ I am unaware of any information indicating that a materially large or useful percentage of Universal's library has been "fingerprinted" and can be used by Defendants to seek possibly-infringing files.

96.     It is important to understand that if rightsholders do not create and produce these "fingerprint" files for a particular work, then the "fingerprinting" software cannot function as to that work, and the rightsholder effectively will have prevented file sharing services from applying technical means to attempt to comply with DMCA safe harbor provisions or other obligations that may apply.

97.     I additionally observe that www.hotfile.com requires every Hotfile uploader to explicitly agree to detailed contractual terms forbidding misuse of Hotfile's services, including copyright-

HIGHLY CONFIDENTIAL                    Declaration of Andrew S. Cromarty, Ph.D.

infringing acts. The technical mechanism for enforcing this agreement includes requiring every such Hotfile user to take specific, conscious, personal, physical action to accept these Terms of Service before he or she can begin to use the Hotfile service. That is, it is not possible to become a Hotfile uploader without first acknowledging copyright law, accepting full personal responsibility as to copyright of all assets the user stores on Hotfile servers, and contractually promising to Hotfile that there will be no attempt to infringe copyright using Hotfile's services. In my technical investigation I have seen no way that agreement can be circumvented.

98.    Filenames and other such metadata are an unsuitable and unreliable means of determining infringement. ("Metadata" are "data about data"; file metadata are information a computer may contain about its files.) File metadata such as filenames, apparent file sizes, and filename "types" do not in any way determine or establish file content. For example, filename metadata cannot even reliably establish whether a file is a feature-length film *vs.* a poem. These factual limitations of filenames are well-known and accepted in computer science and the IT industry. File sizes similarly are easily manipulated—increased or decreased—using common tools. Filenames and similar metadata are simply a casual uncontrolled annotation, entirely malleable, under the control of and at the whim of any individual computer user or software program with access to the file. These metadata do not carry reliable inherent meaning as to actual file content, type, or provenance.

99.    Moreover, computer filenames and similar metadata have no technical contribution to make as to actual infringement determination, because they cannot—and do not attempt to—provide reliable means of encoding essential information about rightsholders, licensees, contractual agreements, applicable law, fair use, computer backup and time-shifting rights, and countless other determinative factors.

HIGHLY CONFIDENTIAL                    Declaration of Andrew S. Cromarty, Ph.D.

100.   Indeed, as was noted in my deposition testimony, there are specific economic reasons to expect that unscrupulous individuals on the Internet can profit best from a public filesharing service by maliciously choosing and publishing filenames that gratuitously suggest an infringement when there is none.

101.   It can be concluded on purely technical and business grounds that filenames and file metadata are not trustworthy and can offer no reliable "facts" to establish infringement.

102.   Uploading a file to Hotfile servers by Hotfile customers produces a "link" or URL ("Uniform Resource Locator", also sometimes called a "Web link") pointing to the uploaded file, which can be used later to retrieve it. More such links pointing to that same uploaded file may come to exist, for various technical or policy reasons. The uploaded file may be retrieved using any of these links.

103.   When a takedown notice is received by a service provider under the DMCA, for technical and business reasons it is an error to disable or delete the underlying file rather than the accused link pointing to it. It similarly is an error to disable or delete all the file's links when only one link is accused. This is particularly true when storage-management techniques such as hash-based "de-duplication" of files are used on the server. The reason for this is simple, intuitive, and obvious. It is possible that different people may know a single file through different links, and one person may properly have access rights to the underlying asset while another does not. For example, one link might be licit and another illicit, or an individual's approval status may change as a matter of a licensing, permission, or other policy change. Under such circumstances, when a takedown notice is received accusing one link as improper or unauthorized, destroying or disabling the underlying file or other links pointing to it will also prevent legitimate authorized users from accessing the file using their own link to it, and may even result in inadvertent

HIGHLY CONFIDENTIAL                                    Declaration of Andrew S. Cromarty, Ph.D.

destruction of a rightsholder's asset. This is not merely a theoretical concern. As noted in my deposition testimony, implementing this link-deletion policy correctly was a basis for file management efficiencies and permission control in the system through which my company provided commercial file sharing and production workflow management services to thousands of Hollywood-industry users, including Plaintiffs and/or their business partners.

104.   Receiving multiple takedown notices per "user" (website account) or per file is not inherently determinative or indicative of infringement behavior, and without further confirmation does not provide a proper business basis for account termination. This is particularly true if the false takedown notice rate is high, or if faulty data such as file metadata are relied on to create TDNs without proper human review of the content (and, probably, discussion with the account holder).

105.   Consider the example of the parent who makes a home movie of her child who is wearing a Harry Potter costume and trick-or-treating door-to-door on Halloween. She may name the family-produced video file on her computer "Harry Potter and the Chamber of Horrors." Next she will wish to share the home video with other family members. As is well-known, a large video file cannot be emailed under the technical constraints of most email accounts, but sharing the file using Hotfile's file-sharing website is feasible, affordable, and sensible. To do so, she uploads the file to Hotfile and emails the resulting "link" to distant grandparents to share her video. Now the takedown nightmare begins: the next day, the file has disappeared. Confused, she uploads her video again. It disappears again. She uploads it a third day. It disappears again. Unbeknownst to her, takedown notices were issued against her upload because of the filename she chose. She now has three "strikes" against her, and perhaps her Hotfile account is terminated, merely for choosing to name her video file according to the licensed retail costume her child

HIGHLY CONFIDENTIAL                     Declaration of Andrew S. Cromarty, Ph.D.

wore on Halloween. In the worst, case if she removed the file from her own computer thinking it

was safely stored on Hotfile, the false takedown notice may have destroyed the only copy of her

irreplaceable family video.

106.    Reported false takedown notice rates are surprisingly high, and this realistic licit usage

scenario, plus Plaintiffs' erroneous insistence that filename metadata "indicate infringement,"

may explain why.  For example, Google states:

> A recent study undertaken in the United States reported on findings from takedown
>
> notices issued to Google under the Digital Millennium Copyright Act 1998 (US),
>
> concluding that over half (57%) of notices sent to Google for removal of material were
>
> sent by business targeting competitors and over one third (37%) of notices were not valid
>
> copyright claims. See J Urban & L Quilter, 'Efficient Process or "Chilling Effects"?
>
> Takedown Notices Under Section 512 of the Digital Millennium Copyright Act',
>
> http://mylaw.usc.edu/documents/512Rep-ExecSum_out.pdf.    *Google Internet Service*
>
> *Provider Copyright Code of Practice – TCF Consultation Draft, March 6, 2009, at*
>
> *Footnote 3.*

107.    Counting file downloads is a technically specious and biased means of assessing potential

infringements. There is not a one-to-one relationshp between computer files and copyrighted

works, and this erroneous files-downloaded metric creates a substanial and material bias that

falsely inflates the apparent frequency of infringements.

108.    High-quality (e.g. high-definition) television and movie content occupies very large

digital files. For expository purposes, a helpful approximation is that one second of moderately

- 31 -

HIGHLY CONFIDENTIAL                    Declaration of Andrew S. Cromarty, Ph.D.

high quality video content may require a megabyte of file storage. Thus a feature film or hour-long television show would comprise many gigabytes (thousands of megabytes) of data. Correspondingly, a standard single-density DVD nominally holds approximately 5 gigabytes of data. This large file size obtains whether the video content is commercial entertainment content such as feature film or private "user-generated content" (UGC) such as a high-definition video shot with a Blackberry, iPhone, or typical family camera.

109.   To the extent that Hotfile does not permit multigigabyte files to be uploaded, or users wish not to upload such files for technical reasons, large files may be uploaded by first splitting them into parts. Each such "part" is an independent file to be uploaded—and later, downloaded—that contains just a few minutes of the single underlying video work. That is, one work now corresponds to ten or twenty downloaded files.

110.   In the case of movie content, this means that files downloaded as a percentage of total downloads does not accurately represent the percentage of works uploaded or downloaded. In general most computer files, and most digital works, are much smaller than a movie. Thus generously supposing every single accused asset corresponds to an infringed work, Plaintiffs' computations overstate the infringement rate by perhaps a factor of ten, possibly even twenty. And Plaintiffs' experts have provided no analysis of their significant overestimation of the rate of accused infringement due to this significant bias in their forensic technique.

111.   As a result, assertions regarding infringement occurences based on the files-downloaded metric are non-scientific, technically improper, and lead to false "facts."

112.   It is important to appreciate that Defendants do not run a "peer-to-peer" (P2P) service, and technical and business aspects specific to P2P services generally do not apply in the present matter, which involves designated file transfers between a corporation's servers and individual

HIGHLY CONFIDENTIAL                    Declaration of Andrew S. Cromarty, Ph.D.

account holders' personal computers, with DMCA-based takedown systems, Terms of Service and a contractual agreement between the parties as noted *supra*. Moreover, unlike in P2P services wherein millions of unidentified anonymous personal computers make up the distribution infrastructure, it apparently is undisputed that Defendants formed a visible corporate entity and located their file storage servers expressly in Texas—that is, in plain sight in Plaintiffs' "back yard" and territory, an unlikely place for any business to choose to position its assets if it plans to use them to systematically induce unlawful behavior among its international customers. A more detailed explanation of Defendants' systems and service appear *infra* and in Exhibit R.

113.    It must be acknowledged that many of the works accused as being infringed in this matter are wasting assets having low or negligible residual or monetizable value.

114.    Many of these works have been broadcast on television and already are subject to permissible consumer recording, time-shifting, unlimited subsequent viewing, and even commercial-skipping using VCRs, TiVo, and similar devices, all of which reduce their economic value. Example such works include Warner's *Harry Potter* movies and Disney's 2010 *Alice In Wonderland* film released for broadcast on TV and subject to such treatment.

115.    Many more Plaintiff works, including feature films and TV shows, are already available for unlimited commercial-free "all-you-can-drink" Internet streaming, either free or by paying a few dollars a month to Plaintiffs' own licensed distributors such as Hulu, Amazon, and Netflix. For example, TV episodes of popular shows such as Fox's *Bones* and *Better Off Ted,* CBS's *How I Met Your Mother,* and Universal's *BattleStar Galactica* and *The Rockford Files* are available for unlimited viewing at no per-view cost, using a $7.99/month flat-rate Netflix account. Similarly, Columbia Pictures' *The Girl With The Dragon Tattoo* is available, free, for unlimited

HIGHLY CONFIDENTIAL                    Declaration of Andrew S. Cromarty, Ph.D.

streaming viewing by Amazon Prime members.[3]

116.   This would properly value such assets in the pennies-per-use range or at a fraction of a cent or even less—even lower if practical barriers make the rightsholder's work more difficult to obtain through a file-sharing site than from the distributor, and as authorized third-party streaming services inexpensively providing licensed entertainment content such as Netflix are becoming available internationally.

117.   Plaintiffs also likely benefit economically from Internet redistribution of their works by consumers, which benefit could be enhanced through business cooperation with centralized file sharing service sites such as Defendants', and Plaintiffs have the technical ability and business opportunity to optimize this benefit but they apparently have not evaluated that benefit or diligently explored this opportunity.  *Cromarty Expert Report at 163-173.*

118.   It is my opinion that, both for business reasons and due to "laws of physics," Defendants materially lack the ability to control infringement by Internet users. As noted *supra* and detailed in Exhibit R, DFP and related technology is broadly technically inadequate or deficient to provide such control, and no competent science exists yet to support technical or marketing claims of any such technology or product when applied to this problem domain.

119.   It is my opinion that despite these material technical limitations, Defendants are demonstrating substantial effort in applying the admittedly inadequate tools that do exist to detect and respond to instances of possible copyright violation. Based on my technical and business expertise and the facts presented in this matter, in my opinion Defendants' efforts to

---

[3] Strikingly, many of these same "free" works were listed among Plaintiff-accused files. E.g. *Plaintiffs MSJ / Sehested Declaration Exhibit A.* Note, however, declarant did not opine that any file found on Defendants' server was confirmed as an infringing work—only, apparently, that files had suggestive names. See discussion *supra* concerning filename metadata.

HIGHLY CONFIDENTIAL                                       Declaration of Andrew S. Cromarty, Ph.D.

apply available technologies meet or exceed the standard of reasonable business practice applied in the Internet service industry in attempting to meet their obligation with respect to copyrighted content.

120.    In my opinion, the Defendants' systems offer a specific substantial non-infringing use and benefit to normal law-abiding Internet users, one occupying an important market niche neglected by most of Defendants' business competitors. Indeed, during the course my investigations my family and I have fruitfully benefited from lawful use of the Hotfile service. There is a substantial legitimate business case for the existence and market success of a business such as that of the Defendants. *Cromarty Expert Report at 154-173*.

121.    Hotfile lacks a public search capability for files stored on the Hotfile server or links to them. Users may know of their own files, but not anyone else's unless granted access by being told the link to that file. Plaintiffs suggest this is part of a strategy to induce infringement—that Defendants cleverly induce infringement by building a system that *lacks* business and technical mechanisms to induce infringement. *Plaintiff MSJ at p.4.* This suggestion is technically erroneous, non-factual, and obtuse business reasoning.

122.    Hotfile offers customers an extension of a personal computer user's private storage, either to their own devices (e.g. between their PC and phone/PDA) or among private groups (among family members, business colleagues, a company's customer base, etc.), as described *supra*. A website-wide search capability would destroy the privacy Hotfile customers enjoy as to their files. It would take away from them their decision and control as to who sees their content and who does not.

123.    A parent may wish to share a video of her child with grandparents, but not with unknown child abductors anonymously trolling the Internet. A business may wish to share opportunities

- 35 -

HIGHLY CONFIDENTIAL                              Declaration of Andrew S. Cromarty, Ph.D.

only with its loyal repeat customer base. An amateur videographer may wish to share his work with a select audience, but not publish the video to the public. A political dissident may wish to share cell-phone videos of political brutality with her cohort or a New York Times reporter but not with her nation's secret police.

124.    Further, although filename metadata are not reliable as to content, a suggestive filename made public by a service provider can have a disastrous effect. If, as an investment banker, I had placed a file named Disney_plan_to_acquire_Columbia_Pictures_in_Aug_2012.pdf on a private file-sharing service for later remote access and reference on my Blackberry or laptop computer, and then the service provider made it publicly discoverable through a search interface, the existence of the suggestive name alone—and especially if associated with me as an identifiable user, and no matter what the file's content—could spur illegal insider trading and FINRA or SEC violations, and my investment bank could go out of business overnight due to the improper disclosure.

125.    Other services that provide file storage and sharing for individual registered paying customers, e.g. Amazon S3, do not provide public search or indexing of all their clients' private content.

126.    The fact that Hotfile does not provide a public site-wide search feature directly supports their legitimate product mix, business model, and customers' highest use cases and needs.


Executed in Palo Alto, CA this 5th day of March, 2012


_Andrew S. Cromarty, Ph.D._

Andrew S. Cromarty, Ph.D.

- 36 -

HIGHLY CONFIDENTIAL                                    Declaration of Andrew S. Cromarty, Ph.D.


# APPENDICES AND EXHIBITS

HIGHLY CONFIDENTIAL                    Declaration of Andrew S. Cromarty, Ph.D.


## A. Materials Relied Upon

All materials listed in Appendix A of *Expert Report of Andrew S. Cromarty, Ph.D.,* attached here as Exhibit R.


*Plaintiff's Motion and Memorandum of Law in Support of  Summary Judgment Against Defendants Hotfile Corp. and Anton Titov* with attached exhibits.


All materials attached herein as Exhibit X, including:

*The Girl with the Dragon Tattoo* free unlimited viewing offer (Amazon.com web screenshot).

Google *Internet Service Provider Copyright Code of Practice – TCF Consultation Draft,* dated 6 March 2009.

*Harry Potter and the Order of the Phoenix* TV broadcast announcement (examiner.com web screenshot).

*National Research Council Reference Manual on Scientific Evidence - Third Edition.* (cover page provided)

Roku Affiliate Program description webpage.

Roku Refer-a-friend Affiliate Offer webpage.

*VCloud9 Publisher License Agreement between Hotfile and Vobile - Exhibit B*

Wal-Mart Affiliate Program description webpage.

HIGHLY CONFIDENTIAL                              Declaration of Andrew S. Cromarty, Ph.D.

**B. Curriculum Vitae of Dr. Andrew Cromarty**

Curriculum Vitae

# Andrew Cromarty, Ph.D.

## Expertise

- Distributed computing
- Internet, broadband, networking
- Corporate IT, security, datacenter
- Web commerce, business models

- High-tech management & finance
- Software & product development
- Multimedia, entertainment tech
- Computer & Information Science

## Professional Summary

Energetic, focused leader with over 20 years business experience in large and small companies, including as CTO of a billion-dollar publicly-traded consumer broadband corporation; CTO of a $100M consumer wireless hotspot services joint venture; Chairman of a Lucent wireless content-distribution/e-commerce spinout; manager or co-founder of several high-technology startups; CTO/CIO of an entertainment software/services company; CTO/CIO of an investment bank; member of Board of Directors for satellite, broadband wireless, and venture investment corporations; and research roles in the highest management-awarded corporate scientist positions at Digital, ADS, and Compaq.

Proven track record in management & operations, software development and service delivery, new technology creation, intellectual property evaluation, business model refinement, and team building and leadership. Experience includes product/service design, definition, development, and delivery; R&D and IT management; and project, line, corporate management, corporate strategic partnering, staff management, public relations, technology transfer, and intellectual property management. Managed development of a wide range of systems, from research prototypes through commercial products and services. Leading technical expertise in system architecture, networking, distributed computing and communications, and broadband, including pioneering work in multimedia content distribution and delivery that yielded many worldwide Internet firsts.

Strong general management approach based on a customer-focused hands-on leadership style. International service delivery experience, including as CTO of corporations with wholesale and retail terrestrial landline/wireless and satellite service operations in North America, Caribbean, Europe, and Asia. Experienced, press-trained, capable writer and public speaker.

**Curriculum Vitae**

## Employment History

| | | |
|---|---|---|
| From: | 2010 | **Distributed Systems Technology LLC** |
| To: | Present | Palo Alto, CA |
| | Position: | *President and CEO* |
| | | (Business & IP advisory) |

| | | |
|---|---|---|
| From: | 2009 | **Minerva Consulting** |
| To: | Present | Palo Alto, CA |
| | Position: | *Partner* |
| | | (Business & IP advisory) |

From:  2007   **Union Square Advisors**
To:     2008   San Francisco, CA
        Position:   *CIO  & CTO*

Founding CIO/CTO of investment bank specializing in mergers and acquisition (M&A) and late-stage private placement investment. Reported to President/founder. Conducted M&A and investment due diligence, provided detailed intellectual property analyses internally and to clients, negotiated and managed 45 vendor and supplier contracts & licenses, and built and oversaw the bank's internal operations, security, and regulatory compliance infrastructure. Architected/implemented complete corporate mail, CRM, security, datacenter, virtualization, document management, mobile/BES, website, backup/DR/BCP, conferencing, web/videoconferencing, and VOIP/telecommunications systems. Perfect corporate security record maintained (no breaches or leaks) during the entire several-year tenure. New business development included bringing the bank its largest private placement client. Served as the investment bank's internal diligence expert on tech industry clients and opportunities across semiconductor & communications, enterprise software, clean/green tech, and Internet verticals. Worked directly and extensively with clients' management teams, including IP advisory.

From:  2005   **DAX Solutions, Inc.**
To:     2007   Los Angeles, CA
        Position:   *CIO & CTO*

CIO/CTO at the entertainment industry's largest Web-based/SaaS global media asset & enterprise workflow management service supplier for film/TV industry, supporting thousands of customer users across hundreds of productions on five continents. Presided over operations during firm's growth to 55% market share over 2 years, at 80% year-over-year revenue & customer growth. Reported to CEO.

# Curriculum Vitae

Managed internal operations, field ops, product development, IT & engineering (software development, operations, global distributed server/content distribution network, outsourcing/offshoring, technical customer relations, service delivery, architecture, and security). Designed, architected, and built a new industry-redefining enterprise-level service business, the industry's first high-definition digital dailies screening and distribution system for film/TV executives, and integrated it securely into customer infrastructure at Disney and other major studios/networks. Defeated entrenched incumbents in a six-way competitive race, winning an exclusive quarter-million-dollar contract with Walt Disney Pictures; line-managed Disney contract and customer relationship. Grew product/service to serve new clients (Showtime, Lifetime, Walden Media, Fox, FX, LionsGate, ABC Touchstone).

Managed major product updates and product/service enhancements. Rearchitected CDN and datacenter operations, including servers, networking, and multi-terabyte asset storage management systems. Managed major software product updates, including Oracle/DB2/Websphere to open source/MySQL/JBOSS migration, user feature enhancements, storage access enhancements. Oversaw new trouble ticket, CRM, and project planning system implementations. Negotiated new datacenter contract, upgraded critical Internet service to a diversified tier 1 provider base, instituted new management & operations processes, and selectively outsourced operations, to reduce operations costs 40% and improve customer-facing service level from 2 nines to 4 nines. Managed and developed leasing, outsourcing/ offshoring, manufacturing and vendor relationships. Defined and instituted professional staff management practices including formal review and bonus incentive programs, to align manager performance with company goals and facilitate corporate growth. Frequently marketed/sold to and directly supported the firm's highly demanding customers.

| From: | 2001 | **City Lights Network** |
|-------|------|------------------------|
| To: | 2005 | Palo Alto, CA |
| | Position: | *President & Principal* |

Provided advisory services to firms in startup, restart, or growth phase, often accepting an interim Chief Officer role. Engagements included Starfish Health (as CTO and VP Operations), Fifth Day Therapeutics (as CTO and CIO), and RFG, a highly-regarded boutique analyst firm (as Strategic Consulting Partner). As professional due-diligence advisor for VCs and private investors, evaluated hardware & software investment candidates. Engaged by Global 500 computing and financial industry firms to advise on architecture, compliance, and operations. As a "hired gun" CXO, designed and developed service offerings, managed outsourced development, developed business models, supported investment activities, developed intellectual property portfolio, business

**Curriculum Vitae**

relationships, growth plans, financial models, and software technology for several startups. Designed and developed software for a startup's consumer web-based service offering, managed outsourced web development, developed business models, supported investment activities. Developed intellectual property portfolio, business relationships, growth plans, financial models, and software technology for a biotech drug discovery startup, applying mathematical modeling and computer simulation techniques to developmental genomic regulatory networks to produce new drug candidates. Evaluated investment candidates in enterprise security, high-volume collaborative consumer multimedia, and distributed/grid enterprise software for professional investors.

From:     1999          **SoftNet Systems, Inc.**
To:        2001          San Francisco, CA
            Position:   *Chief Technical Officer*
            Member of the five-person executive team governing a billion-dollar publicly-traded broadband services corporation, growing it from 350 to 700 technical staff, 20,000 to 30,000 subscribers, 30,000 to 60,000 email users, and operations from 70 to over 100 cities internationally. Chief officer for parent corporation and all operating subsidiaries, actively participating in their operations. Operating units included the nation's third-largest cable Internet provider, the first two-way VSAT satellite broadband provider, and a $100 million broadband wireless service provider joint venture. Reported to CEO/Chairman.

Line-managed the firm's corporate IT, pre-spinout business incubator, and corporate technology staff.   Responsibilities included technical operations & service delivery, new product and business development, new technology development, corporate strategy, intellectual property, press and investor/analyst presentations, corporate venture investment, staff development, market realignment/restructuring/M&A and discontinuation/creation of subsidiaries, and cost reduction and quality improvement.  Served on Board of Directors of SoftNet Ventures, the corporation's venture capital investment arm, and led or conducted due diligence and investment activities.

Led software and hardware architecture teams as CTO of $100MM broadband wireless subsidiary/JV. Designed proprietary on-site multi-level caching server systems, with networked wireless delivery, remote management, semi-formal security policy, and industry-defining performance. Developed the broadband wireless industry's first consumer equipment certification program and first semi-formal security policy for wireless services.

Supervised a $5M P&L pre-spinout multimedia content hosting subsidiary with operations in 90 cities, including financials, product technology, strategy, staffing, sales & marketing, partnering, and external investment

**Curriculum Vitae**

negotiation. Oversaw competitive, performance, and vendor/supplier relationships for content management, cable & satellite broadband businesses, internal enterprise IT applications, and external web hosting business.

Led efforts that improved profitability and operating efficiency. Refined product mix, reduced failure rate, improved service reliability by nearly two nines to 99.7% in key markets; implemented technology upgrades to reduce expense and improve performance of service delivery by 40%. Rearchitected cable network and standardized fielded hardware and software to cut operating expenses in managing $20 million of deployed capital assets.

As corporate strategy officer, tracked 7 global geographies, kept contact with 188 companies or institutions, and maintained trend data on 90 competitors and partners. Led a successful defense against a competitor's patent attack. Frequently worked directly with strategic partners and individual consumer customers.

| | | | |
|---|---|---|---|
| From: | 2000 | **Freewire Networks, Inc.** | |
| To: | 2001 | Murray Hill, NJ | |
| | Position: | *Chairman* | |

Lucent spinoff: Wireless consumer broadband service/content/e-commerce provider.

Initiated successful Series A investment ($8M post valuation). Led Board through successful hiring of new CEO. Mentored management team on business model and operations, including strategy, business approach and service architecture for delivering live wireless commerce & multimedia content to consumers in-venue.

| | | | |
|---|---|---|---|
| From: | 1996 | **Digital Equipment Corp. & COMPAQ Computer Corp.** | |
| To: | 1999 | Palo Alto, CA | |
| | Position: | *Principal Scientist, Corporate Strategy & Technology (CTO's) Division; Manager, Networked Entertainment Technology* | |

Member of the renowned Western Research Laboratory and Network Systems Laboratory, developing novel Internet system architectures and the business models to exploit them.

Designed and developed new networked hardware-software architectures for high-performance internetworked multimedia. Developed a portfolio of strategic partners; achieved many worldwide historic Internet transaction, service performance, & scalability firsts, including first to stream 1,000,000 live videos for an event, world's first Java-based distributed Internet games demo, and world's first live wireless webcasts. Served as press-trained designated corporate spokesperson for broadband

# Curriculum Vitae

and multimedia. Consulted to senior management of 50 customer/partner firms on business models and operations.

Developed managed-services business model and architecture for an international web-based sports news distribution joint venture with Reuters, later spun out as SportsWeb and sold to CBS Sportsline. Defined hardware-software architecture, partnering plan, and cost-benefit and cashflow breakeven analyses to establish service tiers.

| | | |
|---|---|---|
| From: | 1990 | **Distributed Systems Technology / Distributed Systems Research** |
| To: | 1996 | Palo Alto, CA |
| | Position: | *President & Founder* |

Founded and ran a profitable business for six years. Major clients included GE Aerospace, US Navy. Led architecture team for a $43M DARPA-funded distributed automation program. Contracts included design of a performance management system for assessing and tracking the training and on-the-job competence of US Navy personnel; multidimensional visualization techniques to assist Navy operators in route planning tasks; and the design of a strict real-time task scheduling approach for a distributed situation assessment system and semiformal design specification of a distributed real-time underwater semirobotic situation assessment, planning, and execution system. Developed a novel business in turnkey catalog web services targeted at growth-oriented small retailers and implemented it profitably.

| | | |
|---|---|---|
| From: | 1983 | **Advanced Decision Systems** |
| To: | 1990 | Mountain View, CA |
| | Position: | *Acting Division Manager, Corporate Marketer & Principal Scientist* |

Manager for 8 years in a consistently profitable startup that grew from 35 to 200 employees, became the dominant supplier of applied AI systems to the US Government, and launched a successful public spinout (Verity). Performed general manager functions for a corporate division with a multimillion-dollar P&L. Reported to President or SVP.

Managed approximately 20 successful software development projects over 8 years, consistently delivering working software to external customers on-time and on-budget. Started a computer systems focus within the company and grew it into a corporate division; directed and supervised the company's staff and contract efforts on the application of machine intelligence technology to computer systems hardware and system software, including distributed systems, advanced computer architectures, intelligent operating systems, programming languages, database technology, computer security, robotic and expert systems, real-time processing techniques, packet radio and networking

**Curriculum Vitae**

applications, and reliable fault-tolerant computing. Built and led the team that produced the world's first virtual machine-based distributed cross-platform infrastructure for live object/process migration. As corporate marketer, built a new multimillion-dollar client base that became the firm's single largest stable source of contract revenue.

## Education

| Year | University | Degree |
|------|-----------|--------|
| 1988 | University of Massachusetts Amherst, MA | Ph.D., Computer and Information Science |
| 1980 | University of Massachusetts Amherst, MA | MS, Computer and Information Science |
| 1978 | Wesleyan University Middletown, CT | BA, Music |
| 1978 | Wesleyan University Middletown, CT | BA, Biology and Psychology (double degree) |

## Publications

Monographs and Book Chapters

[1]      Cromarty, A., Adams, T., Wilson, G., Cunningham, J., Tollander, C., and Grinberg, M., "Distributed Database Considerations in an Expert System for Radar Analysis." Expert Data Base Systems, Benjamin/Cummings (pub.), 1986.

[2]      Cromarty, A., Chapter 3 of the monograph World Sugar, Connell Commodities (pub.), Westfield NJ, 1977.

[3]      Cromarty,  A., "Control of Processes by Communication over Ports as a  Paradigm for Distributed Knowledge-Based System Design." In A. Bond and  L. Gasser (eds.), Readings in Distributed Artificial Intelligence, Morgan Kaufman (pub.), 1988.

[4]      Cromarty, A., "Control of Processes by Communication over Ports as a Paradigm for Distributed Knowledge-Based System Design." In L. Kerschberg (ed.), Expert Database Systems (monograph based on April 1986 Proceedings of the First International Conference on Expert Database Systems, Charleston, South Carolina), 1987.

[5]      Cromarty, A., Pattern Recognition in Natural and Artificial Systems. Ph.D. Dissertation, University of Massachusetts, Amherst MA. Unpublished. 1983.

[6]      Cromarty, A., Programming Constructs for Real-Time Distributed Knowledge-Based Systems. Ph.D. Dissertation, University of Massachusetts, Amherst MA. Published by University Microfilms,  Ann Arbor, Mich. 1987.

**Curriculum Vitae**

Journal and Proceedings Articles and Reports

[1]     Adams, T., Cromarty, A., McCune, B., Wilson, G., Grinberg, M., Cunningham, J., and Tollander, C., "A Knowledge-Based System for Analyzing Radar Systems." invited paper, Proc. Military Microwaves '84 London, England, 1984.

[2]     Cromarty, A., Adams, T., Cunningham, J., and Tollander, C., "Science and Technology Analyst's Assistant." Final Technical Report (Revised), ADS TR-1035-01.  Published as DTIC Technical Report ADA168552, January 1986.

[3]     Cromarty, A., Adams, T., Wilson, G., Cunningham, J., Tollander, C., and Grinberg, M., "Distributed Database Considerations in an Expert System for Radar Analysis." pp. 586-602, Proc. First International Workshop on Expert Database Systems, Kiawah Island, South Carolina, Oct 24-27, 1984.

[4]     Cromarty, A., "A Model of the Anuran Retina." Technical Report 81-35, Department of Computer and Information Science, University of Massachusetts, Amherst, Massachusetts, 1981.

[5]     Cromarty, A., Cation, M., Dove, K., Edwards, T., Leech, M.~J., Newman, N., and Wong, R., "Distributed Processing Topology."  Technical Report TR-3112-01, Advanced Decision Systems, Mountain View, California, October 1986.

[6]     Cromarty, A., "Communications in Advanced Architecture Computing Systems for Distributed Problem-Solving Applications."  Distributed Processing for Ballistic Missile Defense project, ADS Technical Memorandum TM-3098-9, Advanced Decision Systems, July 1987.

[7]     Cromarty, A., "Control of Processes by Communication over Ports as a  Paradigm for Distributed Knowledge-Based System Design."  Proceedings of the First International Conference on Expert Database Systems, Charleston, South Carolina, pp. 47-59, April 1-4, 1986.

[8]     Cromarty, A., Cunningham, J., Dove, D., and O'Reilly, C., "Performance Maintenance for a Heterogeneous Distributed Computing System."  Final Report, Distributed Processing for Ballistic Missile Defense project, ADS Technical Report TR-87-3098-1, Advanced Decision Systems, 1987.  Published as DTIC Technical Report ADB12017L, 1988.

[9]     Cromarty, A. "Depth as a disambiguating cue in visual localization of objects." Published as Technical Report 81-37, Department of Computer and Information Science, University of Massachusetts, Amherst, Massachusetts, 1981.

[10]     Cromarty, A., Edwards, T., Grover, M., Kinion, P., O'Reilly, C., and Railey, M., "Dynamic Adaptive Resource Management for Real-Time Distributed Planning." Final Report (Vol. I), ADS Technical Report No. 3191-1, April 1990.  (Also published by the U.S. Air Force as a  Rome Air Development Center Technical Report in 1990.)

[11]     Cromarty, A., "Entertainment on the Internet: Executable content, entertainment corporations, and the future."  Digital Internet Innovators News, Spring 1998.

[12]     Cromarty, A., "Entertainment on the Internet: How Different Audiences Are Affected." Digital Internet Innovators News, Winter 1997.

[13]     Cromarty, A., and Bauer, E., "Linux in the Datacenter : An Analysis of Linux Use for Large-Scale Database Applications ." Robert Frances Group, October 2005.

[14[     Cromarty, A., Grover, M., and Vitarelli, J., "A Model of Trans-/Post-SIOP Strategic Distributed Planning." Final Report (Vol. II), ADS Technical Report No. 3191-2, April 1990.

**Curriculum Vitae**

(Also published by the U.S. Air Force as a Rome Air Development Center Technical Report in 1990.)

[15]     Cromarty, A., Hatfield, F., Kenig, N., Morgan, K., Smith, S., Whitebread, K., and Williams, D., "SOAS System Design, Version 1.1." Semiformal specification and design report for DARPA's Submarine Operational Automation System program, published as a GE Aerospace program technical memorandum, April 1991.

[16]     Cromarty, A., "Internetworked Multimedia and Networked Entertainment Technology." Compaq Forefront, Fall 1998.

[17]     Cromarty, A., "Kainic acid ablation of thalamo-tectal region 'disinhibits' prey-selective tectal units in the frog Rana temporaria". Invited paper, presented at DARPA Workshop on Planning and Problem Solving in Animate Systems, Santa Fe, New Mexico, 1985.

[18]     Cromarty, A., Leech, M. J., Kinion, P., Tollander, C., Dove, K., and Edwards, T., "Reconstitution, Reconfiguration, and Knowledge-Based Routing in a Heterogeneous Distributed Computing Environment." Final Report, Distributed Processing Topology project, Technical Report TR-87-3112-02, Advanced Decision Systems, 1987. Published by the U.S. Air Force as Rome Air Development Center Technical Report RADC-TR-88-131, 1988.

[19[     Cromarty, A., Morgan, K., and Whitebread, K., "SOAS Situation Assessment (SA) Component Design." Situation assessment design report for DARPA's Submarine Operational Automation System program, published as a GE Aerospace program technical memorandum, December 1991.

[20]     Cromarty, A. "Neural models of visuomotor integration in amphibians." Invited paper, 28th International Congress of Physiological Sciences, Budapest, Hungary, 1980. Published in Adv. Physiol. Sci. vol. 30: G. Szekely, E. Labos, and S. Damjanovich (eds.), Neural Communication and Control.

[21[     Cromarty, A., O'Reilly, C., Mitola, J., and Adams, T., "Artificial Intelligence Applications to the Real-Time EW Problem" (Final Report). Technical Report, Advanced Information & Decision Systems, Mountain View, California, 12 November 1984.

[22[     Cromarty, A., Rudahl, K., Ruggles, L., and Sutton, R., "A VLSI Associative Search Network for Knowledge Acquisition: A Design Study." Tech. Rept. 83-04, Department of Computer and Information Science, University of Massachusetts, Amherst, Massachusetts, 1982.

[23[     Cromarty, A., Shapiro, D., and Fehling, M., "'Still Planners Run Deep': Shallow Reasoning for Fast Replanning." John F. Gilmore (ed.), Applications of Artificial Intelligence, pp. 138-145, Proceedings SPIE 485, 1984.

[24[     Cromarty, A., "SportsWeb: Exploring New Business Models at the Internet's Service Frontier." Digital Forefront, Summer 1998.

[25[     Cromarty, A., "The CoinLisp Reference Manual." Department of Computer and Information Science, University of Massachusetts, Amherst, Massachusetts, 1982.

[26[     Cromarty, A., "The Role of Entertainment on the Web: How Different Audiences Are Affected." Digital Internet Innovators News, Winter 1997.

[27]     Cromarty, A., "What are Current Expert System Tools Missing?" invited paper, Proceedings IEEE Computer Conference, San Francisco CA, February 1985.

## Curriculum Vitae

[28[    Cunningham, J., Dove, D., Andrews, D., O'Reilly, C., and Cromarty, A., "Model-Based Fault Management." Distributed Processing for Ballistic Missile Defense project, Technical Memorandum ADS-TM-3098-2, Advanced Decision Systems, June 1987.

[29]    Grover, M., Kinion, P., and Cromarty, A., "Cooperating Expert Systems (COPES) Software Development Plan." ADS Technical Report No. TR-2200-003, March 1989.

[30[    Grover, M., Kinion, P., and Cromarty, A., "Design Criteria for Cooperating Expert Systems (COPES)." ADS Technical Report No. TR-2200-002-C, March 1989.

[31]    Grover, M., Kinion, P., Cromarty, A., and Edwards, T., "Cooperating Expert Systems (COPES)." Final Report, ADS Technical Report No. TR-2200-004, June 1989. (Also published by the U.S. Air Force as a Rome Air Development Center Technical Report in 1990.)

[32]    Hatfield, F., and Cromarty, A., "A Concept and Architecture for a Proficiency Management Support System." Final Report, US Navy Contract N00039-95-C-0030, June 1995.

[33[    Hatfield, F., and Cromarty, A., "Proficiency Management Toolset (PMToolSet): Analysis and Requirements." Interim Report, US Navy Contract N00039-95-C-0030, March 1995.

[34]    Hatfield, F., and Cromarty, A., "Proficiency Tracking and Authoring Tools for C4I Environments (ProTRACE): Technology and Architecture." Interim Report, US Navy Contract N00039-95-C-0030, April 1995.

[35]    Hatfield, F., and Cromarty, A., "Visualization and Analysis for Cruise Missiles." Final Report, US Navy Contract N60921-94-C-A132, June 1994.

[36]    Lara, R., Arbib, M., and Cromarty, A., "Neural modeling of prey-predator interactions in frog and toad visuomotor coordination." Soc. Neurosci. Abs. 5:469, 1979.

[37[    Lara, R., Arbib, M., and Cromarty, A., "The Role of the Tectal Column in Facilitation of Amphibian Prey-Catching Behavior: A Neural Model." J. Neurosci. 1982.

[38]    Levitan, S., and Cromarty, A., "Vds: An Interactive VLSI Design System." Technical Report 81-36, Department of Computer and Information Science, University of Massachusetts, Amherst, Massachusetts, 1981.

[39]    Miltonberger, T., Cromarty, A., and Lawton, D., "Feasibility Study of an Artificial Intelligence Approach to Space Object Identification" (Final Report), Technical Report TR-2077-2, Advanced Decision Systems, Mountain View, California, April 1985.

[40]    Miltonberger, T., Cromarty, A., Lawton, D., and Muller, H., "Preliminary Results on a Model-Based Image Understanding System for Detecting Space Object Anomalies from Inverse Synthetic Aperture Radar (ISAR) Images." Proceedings Fifth Annual Phoenix IEEE Conference on Computers and Communications, March 1986.

[41]    Morgan, K., Whitebread, K., Kendus, M., and Cromarty, A., "Integration of Domain and Resource-Based Reasoning for Real-Time Control in Dynamic Environments." Proceedings of the NASA SOAR Conference, August 1992.

[42]    O'Reilly, C., and Cromarty, A., "`Fast' Is Not `Real-Time': Designing Effective Real-Time AI Systems." Applications of Artificial Intelligence, Proceedings SPIE 548, John F. Gilmore, ed., 1985.

**Curriculum Vitae**

[43]     Sinnamon, H., Miller, C., and Cromarty, A., "Response of medial telencephalic neurons to stimulation in reinforcing sites in the medial forebrain bundle and ventral tegmental area." Physiology and Behavior 22:555-562, 1979.

[44[     Sutton, R., and Cromarty, A., "The Gus Device-Independent Graphics System Reference Manual." Department of Computer and Information Science, University of Massachusetts, Amherst, Massachusetts, 1981.

[45]     Weymouth, T., and Cromarty, A., "COINS-3D (An Adaptation of MOVIE-BYU): System Description and Reference Manual." Department of Computer and Information Science, University of Massachusetts, Amherst, Massachusetts, 1979.

[46[     Wilson, G., Cromarty, A., Adams, T., Grinberg, M., Tollander, C., and Cunningham., J., "AI Assists Analysts in Identifying Soviet Radar Systems." Defense Systems Review, January 1984.


Select Presentations, Invited Lectures and Invitational Workshops

[1]     "AI in the 80's: Transferring the technology," Invited Keynote Speaker lecture (Plenary Management Session) for Aerospace Applications of AI Conference, Dayton OH, Oct 14-17, 1986.

[2]     AI Planning Workshop (satellite workshop of National Conference on Artificial Intelligence), Washington, DC, Aug 1984.

[3]     "Cooperating Expert Systems." Technical Interchange Workshop, Decision Aids Branch, RADC/COAD, Rome NY, Feb 17, 1988.

[4]     DARPA Workshop on Planning and Problem Solving in Animate Systems. Bishop's Lodge, Santa Fe NM, June 17-19, 1985.

[5]     "Distributed Planning Architectures, or Planning in a Distributed Computing Environment." Technical Exchange Workshop, Knowledge Engineering Branch, RADC/COES, Rome NY, May 18, 1988.

[6]     "Distributed System Reconstitution for Strategic Distributed Planning" (with M. Grover).  Technical Exchange Workshop, Distributed Systems Branch, RADC/COTD, Rome NY, Jan 11, 1989.

[7]     "Distributed System Topology for the SDI Battle Management/C3 System." Technical Exchange Workshop, Distributed Systems Branch, RADC/COTD, Rome NY, Nov 1986.

[8]     "Dynamic Process Migration for Reconstitution and Reconfiguration in a Heterogeneous Distributed Computing Environment." Technical Exchange Workshop, Distributed Systems Branch, RADC/COTD, Rome NY, Dec 1987.

[9]     "Information processing in autonomous mobile vehicles" (with R. Drazovich), DARPA Workshop on Autonomous Ground Vehicles, Leesburg VA,  Oct 24-26 1983.

[10]     Intelligent Decision Support Systems, two-day public lecture series (sole  speaker) presented to audiences in Boston MA, Atlantic City NJ, and Washington DC, Jan 1986.

[11]     "Knowledge-based fault management using heterogeneous dynamic process migration." Artificial Intelligence Technology Fair Workshop, Knowledge Engineering Branch, RADC/COES, Rome NY, Nov 1988.

**Curriculum Vitae**

[12]    Invited keynote talk, EnterTech Entertainment and Technology Conference, Carlsbad CA, April 1999.

[13]    "New Domains and Collective Visions: All Things Digital." Invited panel session, Univ. of California/Red Herring's DIGIVATIONS: Global Digital Technology and Media Conference, Bacara Resort, Santa Barbara, California, September 24–26, 2000.

[14]    "Linux in the Datacenter : An Analysis of Linux Use for Large-Scale Database Applications ." Public national lectures series, Robert Frances Group, October 2005.

[15]    "The Death of Product Design." Invited lecture and panel session, Asilomar Microcomputer Workshop, Pacific Grove, California, April 28-30, 2010.

[16]    "Education and the Innovation Economy: A brief status report." Invited lecture and panel session, California Assembly Select Committee on Innovation and the Economy: Innovation Symposium, Livermore, California, July 13, 2010.

## Awards,  Honors, Professional Associations and Achievements

Cum Laude Society, Newark Academy (1974)

Bausch and Lomb Honorary Science Award (1974)

National Science Foundation Summer Research Fellowship, for neurophysiology research (1977)

National Institutes of Health/NINCDS Research Assistantship, for computer science and mathematical modeling of biological systems (1979-1980)

DAAD Fellowship, to conduct neuroethology research in Germany (1980)

National Institutes of Health/NINCDS Research Assistantship, for computer science and mathematical modeling of biological systems (1981-1982)

Teaching Assistantship, University of Massachusetts at Amherst (1982)

National Science Foundation Research Assistantship, to design a new programming language (1983)

Past Vice President (Pioneer Valley chapter) and Member, ACM

Member, Institute of Electrical and Electronic Engineers (IEEE)

Visiting Scholar, Stanford University (1990)

## Curriculum Vitae

### Board Positions

Former college fraternity President, now serving on national executive board. Served on four corporate boards and numerous boards of advisors; presently serving on University of California President's Advisory Board and on Board of Directors of Forensic Expert Witness Association (San Francisco). Position history includes:

| | |
|---|---|
| 2011 – present | Board of Directors & VP, Forensic Expert Witness Assn. (San Francisco) |
| 2002 – present | President's Board on Science and Innovation, Univ. of California |
| 2001 – 2002 | Contributing Editor, Thumbtribes wireless journal |
| 2001 – 2002 | Board of Advisors, AdCritic.com |
| 2001 – 2002 | Board of Advisors, Globallinx Network Inc. |
| 2000 – 2001 | Board of Directors/Chairman, Freewire Networks (Lucent spinout) |
| 2000 – 2001 | Board of Directors, Aerzone Corporation |
| 2000 – 2001 | Board of Directors, Intelligent Communications, Inc. (Intellicom) |
| 2000 – 2001 | Board of Directors, SoftNet Ventures (corporate venture fund) |
| 1998 – 2002 | Board of Advisors, Univ. Calif. Digital Media Innovation Program |
| 1998 – 2004 | President's Advisory Council, Wesleyan University |
| 1999 – 2000 | Trustee and President, Covenant Presbyterian Church |
| 1996 – present | Trustee, Kappa Alpha Society Foundation |

HIGHLY CONFIDENTIAL                          Declaration of Andrew S. Cromarty, Ph.D.

## C.  Exhibit R: Cromarty Expert Report

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

Civil Action No. 11-20427-CIV-JORDAN

DISNEY ENTERPRISES, INC., )
TWENTIETH CENTURY FOX FILM CORPORATION, )
UNIVERSAL CITY STUDIOS PRODUCTIONS LLLP, )
COLUMBIA PICTURES INDUSTRIES, INC., and )
WARNER BROS. ENTERTAINMENT INC., )
)
        *Plaintiffs,* )
)
        v. )
)
HOTFILE CORP., )
ANTON TITOV, and )
DOES 1-10. )
)
        *Defendants* )
)

# EXPERT REPORT OF ANDREW S. CROMARTY, PH.D.

_____
Andrew S. Cromarty, Ph.D.

_18 NOVEMBER 2011_
Date

HIGHLY CONFIDENTIAL                    Expert Report of Andrew S. Cromarty, Ph.D.

**Table of Contents**

I.      INTRODUCTION AND BACKGROUND ...................................................1
II.     QUALIFICATIONS ..............................................................................1
III.    PRINCIPAL QUESTIONS ADDRESSED IN THIS REPORT ......................1
IV.     SUMMARY OF OPINIONS ..................................................................1
V.      SYSTEMS AND METHODS OF DEFENDANT SYSTEMS...........................3
VI.     COMPLAINT, AND APPLICABLE LEGAL FINDINGS TO DATE ............................3
VII.    TECHNICAL AND HISTORICAL BACKGROUND ....................................5
        A.    A half-century of file sharing ...............................................5
        B.    A brief technical explanation of file sharing ...........................11
        C.    Technical and business challenges in identifying or confirming infringement ..........18
        D.    File sharing and Internet business models ..............................29
VIII.   OPINIONS AND ANALYSIS..................................................................31
        A.    Hotfile follows industry-standard practices to effect control over digital assets to the extent technically practicable. .........................................31
        B.    Customer incentive programs are common Internet business practice.................33
        C.    Hotfile customers pay for better service, not for ability to infringe copyright......38
        D.    Hotfile materially lacks the "ability to control" infringement even using state-of-the-art technology. ...................................................39
IX.     TRIAL EXHIBITS ..............................................................................45
X.      SUPPLEMENTATION OF OPINIONS ....................................................45
APPENDICES ...............................................................................................46
        A.    Materials Relied Upon ........................................................48
              i.    Non-BATES-numbered documents ................................48
              ii.   BATES-numbered documents ......................................53
        H.    Internet operations and Hotfile services.................................55
              a.    Brief overview of Internet and World Wide Web operations ...........................55
              b.    Summary of www.hotfile.com operations, pricing, and consumer use ...............58
        B.    Curriculum Vitae of Dr. Andrew Cromarty ..............................65

HIGHLY CONFIDENTIAL                                    Expert Report of Andrew S. Cromarty, Ph.D.


# I.  INTRODUCTION AND BACKGROUND

1.      I have been retained by Defendants Hotfile Corp.  ("Hotfile") and Anton Titov (collectively, "Defendants") as an expert.  In my capacity as an expert, I was asked to offer my opinion on specific technical and business questions bearing on alleged secondary infringement of Plaintiffs' copyrights by Hotfile Corp. and Anton Titov as asserted by Plaintiffs in their Complaint.  If additional claims as to infringement are asserted, I reserve the right to opine on those claims as well.  My expertise extends to the technical areas of the alleged copyright infringement, by virtue of, at minimum, my extensive training in computer science and commercial experience as set forth below. I will not offer opinions of law, as I am not an attorney.

2.      I have been engaged through Distributed Systems Technology LLC, a company of which I am an owner, through Berg Software Designs. Berg Software Designs bills $600 per hour for my time working on this matter plus reasonable expenses, of which I receive a lesser indeterminate amount computed after business operations expenses of Berg Software Designs and Distributed Systems Technology LLC.   My compensation is in no way related to the outcome of this litigation.

3.      A list of the materials I considered is attached as Exhibit A.


# II. QUALIFICATIONS

4.      I have received the following academic honors, awards, appointments, and recognition: Visiting Scholar, Stanford University (1990); National Science Foundation Assistantship, to design a new programming language (1983); Departmental Teaching Assistantship, University of Massachusetts at Amherst (1982); National Institutes of Health/NINCDS Research

HIGHLY CONFIDENTIAL                                    Expert Report of Andrew S. Cromarty, Ph.D.

Assistantship, for computer science and mathematical modeling of biological systems (1981-1982); Deutscher Akademischer Austausch Dienst (DAAD) Doctoral Fellowship, to direct neurophysiology and computer modeling research in Europe (1980); National Institutes of Health/NINCDS Research Assistantship, for computer science and mathematical modeling of biological systems (1979-1980); National Science Foundation Summer Research Fellowship, for neurophysiology research (1977); Bausch and Lomb Honorary Science Award (1974); Cum Laude Society, Newark Academy (1974); National Merit Scholarship Finalist (1974).

5.      During my professional career I have held senior technical positions at several corporations, including Principal Scientist at both Digital Equipment Corporation and Compaq Computer Corporation, the highest management-awarded corporate scientist hiring rank at those corporations, and Division Research Director and then Corporate Principal Scientist at ADS, the highest management-awarded corporate scientist rank at that corporation, for a combined total of approximately a decade.

6.      I have held numerous senior corporate executive and technical management positions during my career, including Chief Technology Officer (CTO) and Chief Information Officer (CIO) of Union Square Advisors, a San Francisco technology mergers & acquisition investment bank; CIO and CTO of DAX Solutions, Inc., a primary provider of Internet-based digital asset services to the Hollywood TV and movie industry, with international operations; CTO of SoftNet Systems, Inc., a billion-dollar NASDAQ-traded Internet services and telecommunications company; Chairman of the Board of Freewire Networks, Inc., a wireless broadband service, content, and e-commerce business; CTO of ISP Channel, then the third-largest cable Internet provider in the United States; CTO of Aerzone Corp., a $100 million wireless broadband service joint venture; and Board of Directors member of additional firms including Intelligent

HIGHLY CONFIDENTIAL                    Expert Report of Andrew S. Cromarty, Ph.D.

Communications Inc., an international satellite service provider, and SoftNet Ventures, a corporate venture investment fund. Presently I am a Partner at Minerva Consulting, and the President and CEO of Distributed Systems Technology LLC.

7.      I earned a Ph.D. in Computer and Information Science from the University of Massachusetts at Amherst, awarded in 1988, writing my doctoral dissertation on "Programming Constructs for Real-Time Distributed Knowledge-Based Systems." While there I also wrote a second doctoral dissertation on mathematical modeling and computer simulation of brain structure and function. I earned a Master of Science in Computer and Information Science the University of Massachusetts at Amherst in 1980.  I earned a Bachelor of Arts double degree in Biology and Psychology, and simultaneously a Bachelor of Arts degree in Music, from Wesleyan University in 1978.

8.      Since obtaining my Ph.D., I have worked in numerous technical management positions and overseen dozens of successful projects developing software, hardware, and services.  My experience includes overseeing technical staff from groups very small in size to hundreds of employees. My experience in these projects has been consistently direct and hands-on, and has delivered working products and services to paying customers.  I also have worked as a computing professional by developing software and teaching programming in over 30 languages.

9.      I have personally authored on the order of one million lines of software code.

10.     I am credited with a number of worldwide historic multimedia,  Internet and technology firsts, including first to stream 1,000,000 live videos on the Internet for an event, world's first demonstration of Java-based distributed Internet games, world's first live wireless webcasts, world's first streaming video live from an international film festival, and the first high-definition "set-top box" networked screening product and system for the movie industry.

HIGHLY CONFIDENTIAL                    Expert Report of Andrew S. Cromarty, Ph.D.

11.    My specific relevant experience with networking, internetworking, and multimedia content sharing or delivery over the Internet includes:

12.    Active on the Internet in its successive historical manifestations since approximately 1975.

13.    Developed and published novel networking and distributed computing techniques for my doctoral research 1983-1988.

14.    Active networking and electronic communications researcher and experimentalist since 1978, involved in defining and implementing novel communications protocols, experiments, and techniques including: packet radio techniques, propagation research, TCP/IP extensions, administrative management of a subset of the public Internet allocated for packet radio use, design and implementation of American Red Cross emergency/disaster communications systems, and design and creation of networked satellite communications systems and packet gateways to the Internet.

15.    Created and directed a Computer Systems group that grew into a corporate division and developed novel networking and distributed computing techniques including internetworked multimedia delivery and distribution methods,1983-1990.

16.    Founder and President of a startup firm in 1990 that provided distributed computing and networking consulting analyses, software, and services to U.S. Government/military and commercial clients 1990-1993; and subsequently in 1994-1996, provided to commercial customers e-commerce, Web catalog, and Internet services, entailing early market study, in-house development, and adoption of open-source software tools implementing networking and shopping technology and development of an early form of affiliate marketing business website, on the World Wide Web starting in 1994. Among my firm's catalog Web sites were the first

- 4 -

HIGHLY CONFIDENTIAL                    Expert Report of Andrew S. Cromarty, Ph.D.

known hockey retailer and the first known soccer retailer on the Web, software for which was executing on a Web server on a public host computer delivering multimedia content at least as early as 1994.

17.     Principal Scientist at the Network Systems Laboratory of Digital Equipment Corporation, 1996-1999.   While at Digital Equipment Corporation, I developed a number of networking methods and systems, which may be subject to contractual nondisclosure agreements. In 1996 I developed the networking method of filtering active content from HTTP traffic at a network firewall. I also developed in 1997 the methods and systems of internetworked peripheral devices and services including methods and systems related to wirelessly internetworking printers, keyboards, remote displays and monitoring systems, and in 1998, additional architectures, methods and systems for high-performance internetworked multimedia client-server systems that were used for applications including education and entertainment.

18.     While at Digital Equipment Corporation, I also held the title of Manager of Networked Entertainment. I actively managed a collection of entertainment-related server equipment and Internet services, at Digital's corporate Internet gateway and distributed in locations throughout the world throughout the late 1990's, primarily for the purpose of delivering audio, video, and other complex multimedia content worldwide. Digital was a multi-billion-dollar company and creator of the first and largest Internet corporate gateway in the world, and my responsibilities included researching, evaluating, and developing both technologies and Internet-related business models for Internet multimedia delivery on behalf of that corporation. Among other activities, I developed the business model, including cash-flow break-even model and Internet pricing structure, for a joint venture of Digital Equipment Corporation and Reuters named SportsWeb, which later was successfully spun out and acquired by CBS Sportsline. I also met with and

- 5 -

HIGHLY CONFIDENTIAL                    Expert Report of Andrew S. Cromarty, Ph.D.

lectured to senior executives from major corporate Digital business partners as to industry trends, including Internet business models and technology related to multimedia and entertainment, on approximately 50 occasions. Similarly, after Digital's acquisition by Compaq Computer Corporation, I was the invited Keynote Speaker at the EnterTech Entertainment and Technology conference created to introduce the Silicon Valley and Hollywood industries, where I lectured to Hollywood industry executives on business models and technologies for entertainment and other multimedia content.

19.    From 1999 and thereafter, I have served as a senior executive of several broadband and Internet-related firms ranging up to a billion dollars in size and spanning all forms of network connectivity with global operations.  As Chief Technical Officer of NASDAQ-traded broadband corporation SoftNet Systems Inc., I served on the senior executive team of chief officers managing the corporation and oversaw technical and field operations for the parent corporation and its operating unit subsidiaries, comprising a technical staff of approximately 700 employees as we grew this company to a market capitalization of approximately two billion dollars. This included serving as CTO of ISP Channel, then the third-largest cable Internet service provider in the United States with tens of thousands of customers, and line-managing the pre-spinout corporate incubator. I also served as CTO of Intellicom, the first two-way VSAT satellite Internet service provider, with international operations. In my roles at ISP Channel and Intellicom I led specific large-scale efforts to develop new business models appropriate to the firms' intellectual capital and market opportunities. As founding CTO and member of the Board of Directors of the hundred million dollar wireless broadband firm Aerzone Corp., I led technical development and business strategy development for the premier hotspot wireless broadband service provider, with international operations. As a member of the Board of Directors of

- 6 -

HIGHLY CONFIDENTIAL                    Expert Report of Andrew S. Cromarty, Ph.D.

corporate venture capital fund SoftNet Ventures, I directed and performed technical and business model due diligence on scores of investment or merger/acquisition matters. As Chairman of the Board of Directors of Freewire Networks, an e-commerce startup corporation to provide multimedia broadband services in sports arenas and other entertainment venues, I led a successful Series A funding effort, culminating in spinout from Lucent Technologies Inc. and an eight million dollar post valuation, and I oversaw the hiring of a new CEO. As CTO and CIO of technology investment banking firm Union Square Advisors, my duties included performing due diligence on merger and acquisition candidates as to technology and business factors, assisting clients in developing their intellectual property portfolios, bringing in new customers, working closely with the other chief officers especially as to operations and banking compliance matters, and overseeing all technical operations for the firm.

20.    During 2005-2007, I was CTO/CIO of DAX Solutions Inc., the film and TV industry's primary provider of Digital Asset Exchange asset management and workflow services over the Internet (some details of which may be subject to commercial nondisclosure obligations). In that capacity I oversaw technical development and line-managed the firm's operations and field service teams, providing digital dailies and workflow services to many of the largest entertainment firms in Hollywood and throughout much of the world. My specific responsibilities included managing the development, deployment, and operation of DAX's state-of-the-art proprietary digital asset watermarking/fingerprinting technology and intellectual property and associated digital rights management systems and software. At DAX we operated the largest known Internet-based system in the world for securely managing film and TV industry digital assets, with over 3,000 industry accountholders. My responsibilities also included oversight and management of security for these copyrighted entertainment assets, and

HIGHLY CONFIDENTIAL                    Expert Report of Andrew S. Cromarty, Ph.D.

required working with, educating, and advising many of the largest entertainment firms in the world as to security technology and policy for their own copyrighted multimedia film and TV digital asset content, much of which they entrusted me to hold and manage for them on my servers in Los Angeles, in their own facilities, and throughout the world.

21.    My technical experience includes mathematical analysis, software development, technique development, and publication in technical areas that additionally arise the present matter, including work on pattern recognition, pattern matching, multidimensional and visual signal and image analysis, probability and other mathematical confidence models as applied to pattern recognition systems, and computational complexity of real-time computations. My Masters thesis developed descriptive and mathematical models of visual signal processing. My first doctoral dissertation developed mathematical techniques for feature-based pattern analysis and visual pattern matching, and I also performed research on biological and computer visual recognition systems. My later research, lecturing, and publications addressed topics including methods for space object identification, systems for feature-based matching and analysis of imagery data, strengths and weaknesses of mathematical techniques for probabilistic decision-making, heuristic as well as algorithmic techniques, and analyses of combinatoric complexity of algorithms for real-time signal analysis and computational reasoning applications.

22.    My business experience includes extensive development and evaluation of new, alternative, and competitive business models. I developed competitive business models early in the development of the Web for my own and other startup companies. I advised and consulted on business models as a Strategic Consulting Partner at boutique analyst firm RFG. At Digital Equipment Corporation my responsibilities included developing and evaluating business models, expressly including business models for multimedia and entertainment content delivery and use

HIGHLY CONFIDENTIAL                      Expert Report of Andrew S. Cromarty, Ph.D.

on the Internet. As a member of the Board of Directors of corporate venture capital fund SoftNet Ventures, as CTO of billion-dollar broadband corporation SoftNet, and later as CTO of investment bank Union Square Advisors, I evaluated well in excess of sixty investment and merger & acquisition opportunities, including their business operations and business models.

23.     I have not testified at trial in the previous ten years. I have testified as an expert witness in depositions on three dates in 2011.

24.     A full list of my publications is included in my curriculum vitae, attached hereto as Exhibit B.

25.     If called as a witness at trial, I would testify as to the statements and opinions contained in this report.

HIGHLY CONFIDENTIAL                    Expert Report of Andrew S. Cromarty, Ph.D.

## III.   PRINCIPAL QUESTIONS ADDRESSED IN THIS REPORT

26.     In the course of this report, I review and offer expert opinions as to at least the following

four primary questions raised in this matter:

1. Did and do Defendants follow industry-standard practices to effect control over digital
   assets to the extent technically practicable?

2. Is Hotfile's affiliate program consistent with widely-respected customer incentive
   programs that are common among Internet businesses?

3. Is Hotfile's revenue model consistent with widely-respected Internet revenue models
   under which customers pay for better service performance?

4. From a technical perspective, does Hotfile materially have the ability to control copyright
   infringement by its users?

## IV.   SUMMARY OF OPINIONS

27.     For reasons discussed in detail below, it is my expert opinion that the Defendants employ

standard, widespread, long-standing, respected business models, systems, and technical methods

that were developed long ago for a wide range of respected and accepted business purposes.

28.     It is my opinion that the Defendants' customer incentive programs are common Internet

business practice, and they are widely used by many of the most respected and successful

corporations offering services on the Internet. Further, Plaintiffs likely benefit economically

from Internet redistribution of their works by consumers, which benefit could be enhanced

through business cooperation with centralized file sharing service sites such as Defendants', and

HIGHLY CONFIDENTIAL                    Expert Report of Andrew S. Cromarty, Ph.D.

Plaintiffs have the technical ability and business opportunity to optimize this benefit but they apparently have not evaluated that benefit or diligently explored this opportunity.

29.     It is my opinion that Hotfile's "premium" service is structured to allow customers to obtain better service performance. I further find nothing in Defendants' service offering that provides any incentive to make illicit (*vs.* licit) use of the service.

30.     It is my opinion that, both for business reasons and due to "laws of physics," Defendants materially lack the ability to control infringement by Internet users. The technology is broadly technically inadequate or deficient to provide such control, and no competent science exists yet to support technical or marketing claims of any proposed such technology or product when applied to this problem domain. Even any future tools not yet in existence but hypothesized capable of providing such control would be either computationally infeasible to employ or unable to justify confidence as to their reliability and efficacy, due to the mathematics of pattern analysis as applied to complex digital copyrighted works and the insufficiency of needed information about such copyrighted works.

31.     It further is my opinion that despite these material technical limitations, Defendants are demonstrating substantial effort in applying the admittedly inadequate tools that do exist to detect and respond to instances of possible copyright violation. Based on both my technical and business expertise, I conclude that Defendants' efforts to apply available technologies meet or exceed the standard of reasonable business practice applied in the Internet service industry in attempting to meet their obligation with respect to copyrighted content.

32.     In my opinion, the Defendants' systems offer a specific substantial non-infringing benefit to normal law-abiding Internet users, one occupying an important market niche neglected by most of Defendants' business competitors. There is a substantial legitimate business case for the

HIGHLY CONFIDENTIAL                           Expert Report of Andrew S. Cromarty, Ph.D.

existence and market success of a business such as that of the Defendants.

## V. SYSTEMS AND METHODS OF DEFENDANT SYSTEMS

33.       I provide in this report a description of the Defendants' system and methods. I understand
that Hotfile operates the website www.hotfile.com. Details about operations of Internet and the
World Wide Web and the systems and methods used by Hotfile and/or visitors to
www.hotfile.com are described in Appendix H.

## VI.    COMPLAINT, AND APPLICABLE LEGAL FINDINGS TO DATE

34.       In formulating my opinion, I have relied on the Court's orders of which I am aware,
including its Order on Motion to Dismiss. *Order on Motion to Dismiss, July 8, 2011.* I expressly
reserve the right to supplement or modify my opinions and this report if the Court modifies or
provides additional orders or opinions.

35.       I understand a  copyright is found to be directly infringed only if  a plaintiff shows that he
owns a valid copyright and that the other party copied some of the protected elements of that
work of his copyright.

36.       I understand that in the present matter, the Court already has found that the Plaintiffs
have failed to state a cause of action for direct infringement by Defendants, and the Court
therefore has dismissed Plaintiff's Complaint Count as to direct infringement in this matter by
Defendants. *Order on Motion to Dismiss, July 8, 2011.*

HIGHLY CONFIDENTIAL                    Expert Report of Andrew S. Cromarty, Ph.D.

37.     I understand the Court has directed that a defendant may be liable for inducing copyright infringement if he "distributes a device with the object of promoting its use to infringe copyright, as shown by clear expression or other affirmative steps taken to foster infringement" and that someone commits contributory infringement when he, with knowledge of the infringing acts, nonetheless "induces, causes, or materially contributes to the infringing conduct of another." *id. at 7.*  And further, I understand that the Complaint alleges that hotfile.com is a website that Hotfile uses to promote copyright infringement and alleges that Hotfile took affirmative steps to foster this infringement by creating a structured business model that encourages users to commit copyright infringement. *id.* I understand that to allege a claim for vicarious infringement, a plaintiff must allege that the defendant "infringes vicariously by profiting from direct infringement while declining to exercise a right to stop or limit it." *id at 8.*

38.     I understand that Defendants have asserted a defense based on the Safe Harbor provision under the Digital Millenium Copyright Act ("DMCA"). I understand one of the mandates of the Safe Harbor is that the service provider "does not receive a financial benefit directly attributable to the infringing activity, in a case in which the service provider has the right and ability to control such activity." *17 USC §512((d)(2)).*

39.     I understand that in response to Defendants' interrogatories, Plaintiffs have proposed certain example effective "supervisory measures," i.e., proposed effective technical means or effective business practices, which Plaintiffs contend Defendants have the practical ability to implement but did not. Question No. 3 of the First Set of Interrogatories and Plaintiffs' response thereto is hereby included by reference. *Plaintiffs' Responses and Objections to Defendant Hotfile Corp.'s First Set of Interrogatories, at 8.*

- 4 -

HIGHLY CONFIDENTIAL                    Expert Report of Andrew S. Cromarty, Ph.D.

## VII.   TECHNICAL AND HISTORICAL BACKGROUND

40.     I provide in this section an overview of relevant technical background. This establishes a technical vocabulary and historical context for my opinions later in this report.

### A. A half-century of file sharing

41.     File sharing over computer networks, including the Internet and its precursor networks, already was common and well-specified more than forty years ago. File transfer protocols, notably including today's File Transfer Protocol, were developed just for this purpose. For example, in 1971 the Internet specification publication RFC114, "A File Transfer Protocol," detailed many of the benefits of remote content sharing using an "extended file transfer protocol":

> Indirect usage … does not require that you explicitly log into a remote system or even know how to "use" the remote system.  An intermediate process makes most of the differences in commands and conventions invisible to you.  For example, you need only know a standard set of network file transfer commands for your local system in order to utilize remote file system.  This assumes the existence of a network file transfer process at each host cooperating via a common protocol. Indirect use is not limited to file transfers.  It may include execution of programs in remote hosts and the transfer of core

- 5 -

HIGHLY CONFIDENTIAL                              Expert Report of Andrew S. Cromarty, Ph.D.

images.  The extended file transfer protocol would facilitate the exchange of programs

and data between computers, the use of storage and file handling capabilities of other

computers (possibly including the trillion-bit store data computer), and have programs in

remote hosts operate on your input and return an output.       *RFC114 at 1.*

42.      Subsequently, the modern Internet File Transfer Protocol was further specified in 1980,

published as RFC959 "File Transfer Protocol" in 1985, and has continued in use through the

present day.

43.      Importantly, these file transfer methods were developed without the contemporaneous

ability, or objective, of transferring modern copyrighted entertainment or other multimedia files.

At the time these file sharing techniques were conceived and developed, substantially all such

content was in non-digital form.

44.      For example, the now-common "MP3" digital music format did not emerge until the late

1990's. And at the time the File Transfer Protocol was specified, high-definition digital formats,

CDs, and DVDs had not yet been invented and brought to market.

45.      As networking developed, from its earliest days, free file-sharing services arose to

provide the many legitimate and needed benefits of file sharing to the networked community.

46.      For example, over a third of a century ago, the SIMTEL Archive file sharing system was

created and made publicly available to all users on the ARPANET (i.e., the Internet), first at the

Massachusetts Institute of Technology and then moved to and maintained at the White Sands

Missile Base, a U.S. Government facility, throughout most of the 1980's. The primary use of the

Archive was file sharing of free software among Internet users, under the U.S. Government's *de

facto* financial and administrative sponsorship.

HIGHLY CONFIDENTIAL                    Expert Report of Andrew S. Cromarty, Ph.D.

47.    Another very widely used file sharing system, "gatekeeper.dec.com," was established in the late 1980's as an Internet-wide file sharing site established by Digital Equipment Corporation, the first computer company in the world to create a corporate Internet gateway:

> History
>
> The    FTP    archive    on    gatekeeper.dec.com,    later    to    become gatekeeper.research.compaq.com, first went on-line in the late 1980's. … In its heyday, gatekeeper was a prominent Internet FTP site. Just about any public domain software package you wanted or needed could be found on gatekeeper. One of gatekeepers' primary functions was to give Digital software developers, living on the DECNET based internal corporate network, access to public domain software available from the Internet. (The Digital internal DECNET host, DECPA::, mounted the gatekeeper FTP archive via NFS.) Gatekeeper was also used by Digital product groups to provide software updates and patches to Internet customers.    *"What happened to gatekeeper.dec.com?" at 1.*

48.    There were many other such file sharing sites across the Internet throughout the past forty or more years. File sharing sites are a historical commonplace, and a long-standing necessity for routine use of computer networks.

49.    Today there is a vibrant marketplace of firms offering a range of file sharing services under a variety of different terms or business models.

50.    An important characteristic of modern file sharing and file storage services is provision of a fungible, apparently infinite, ubiquitous store for one's own digital data. These services serve as a geographic and virtual extension of the native file capacity available in the user's

HIGHLY CONFIDENTIAL                                    Expert Report of Andrew S. Cromarty, Ph.D.

personal computing environment.

51.     For example, Amazon.com rents file space to anyone with a credit card at inexpensive rates in essentially unlimited capacity through its Simple Storage Service ("S3"). Amazon S3 implements a "freemium" pricing model, that is, some file storage services are offered free, with more services and improved performance available if the customer pays for them  (called an "upsell").

52.     Dropbox, a firm that offers Internet file storage from one's personal computer or PDA cell phone under a "freemium" model, is backed by first-tier venture capital investors including Sequoia Capital, Greylock, Accel Partners, and Goldman Sachs. *SecondMarket's Q3 2011 Private Company Report*  Dropbox was recently reported by BusinessInsider as one of SecondMarket's Top Ten Most-Watched venture-backed firms. Market analysis firms SecondMarket and Crunchbase describe Dropbox as using file sharing to solve existing problems in Internet email, device interoperability, and mobile access to personal data: "Dropbox was founded in 2007 by Drew Houston and Arash Ferdowsi. Frustrated by working from multiple computers, Drew was inspired to create a service that would let people bring all their files anywhere, with no need to email around attachments. … Guiding their decisions was a relentless focus on crafting a simple and reliable experience across every computer and phone." *SecondMarket Overview of Dropbox; Crunchbase Overview of Dropbox.*

53.     Commercial file sharing sites have become the single most important medium through which open source software is distributed today. For example, the well-known open source repository Sourceforge presently contains "software in over 260,000 projects" serving "2.7 million developers" and "46 million consumers."  This file sharing service specializing in source code sharing is owned and operated by a NASDAQ-traded public corporation with a market

HIGHLY CONFIDENTIAL                          Expert Report of Andrew S. Cromarty, Ph.D.

capitalization well in excess of $100,000,000. *About Sourceforge.* Other well-known open source file sharing services include Launchpad and Github. The use of such file sharing services for distribution of open source software is well understood in the IT profession and by expert practitioners as central to the operations and essential to the viability of the open source software industry.

54.     File sharing services offer increasing value to legitimate users as multimedia technology advances. For example, it is now common for cell phones such as a Blackberry or iPhone to take high-resolution photographs and shoot high-definition movies. The resulting collection of digital assets quickly becomes very large, and for technical reasons email is a very poor choice for sharing them. File sharing services are a far better solution to sharing such assets. Indeed, Apple recently released its iCloud service to address this need for its own customers. Users of other brands of devices, however, continue to need a third-party commercial file sharing service to obtain these communications benefits.

55.     Firms such as Picasa (a Google subsidiary) and Flickr (a Yahoo subsidiary) provide file sharing services to the consumer visual multimedia file sharing market, employing a freemium pricing model with upsells. *About Picasa; Flickr FAQ; Flickr Upgrades.*

56.     Defendants' system and service, Hotfile, is a *de facto* market competitor of these established modern firms. For example, customers of these other services can choose to use Hotfile as an alternative service provider, or *vice versa.*

57.     Some file sharing services focus on particular markets, business opportunities, or "use cases" (styles of customer use). Such market specialization may present both benefits and limitations to the customer.

58.     Overall, however, with respect to the kind of content that may be stored or accessed and

HIGHLY CONFIDENTIAL                              Expert Report of Andrew S. Cromarty, Ph.D.

the degree of service provider *vs.* customer control that is possible, these services are generally indistinguishable both technically and in the market. All provide file storage as a service; all promote their storage services as part of their business model; all permit users to store files without the service provider's knowledge of or regard for the internal contents of the files, which may in fact be opaque to the service provider for technical or privacy reasons; all require their users to accept responsibility for obtaining, and representing they do have, any rights required to upload content as a condition of use; and all continue the nearly half-century-old technical and business practice of providing remote storage for files of arbitrary type and content for remote use and access.

59.     Thus the technology for sharing files among distant networked users is not a new invention designed for sharing copyrighted digital works owned by others or as a specific mechanism for infringing copyright.

60.     Quite to the contrary, file sharing has been in perpetual use, starting decades before it became technically feasible to move commercial entertainment media over computer networks. Network file sharing predates substantially all modern digital entertainment content, and it has a decades-long history of substantial non-infringing use.

61.     Existing Internet file sharing services are a direct technical and business continuation of this nearly half-century-old unbroken practice of sharing content over computer networks, among university, business, personal, and government file sharing sites.

62.     Common uses of commercial file sharing services today include:

- allowing an individual to gain access to personal data across many devices, such as between a PC and a PDA/cell phone,  or between work and home computers;

- sharing data securely with business colleagues, such as between attorneys and

HIGHLY CONFIDENTIAL                    Expert Report of Andrew S. Cromarty, Ph.D.

their client or experts;

- sharing computer source code and related data, such as through Sourceforge;

- sharing self-authored multimedia works such as pictures, music performances, and movies among members of a group, such as within a family, a Boy Scout troop, a music band, or a commercial entertainment production company; or

- moving files from one location to another, such as a student writing an essay written on a shared computer in a school computer lab, then depositing it at a file sharing site for later pickup from a home personal computer.

63.    Sharing content and services between computers and between computer users is what networked computers are meant to do, and why computer networks exist.

64.    Consequently, as file sharing is a long-lived technology, in widespread use for a large and varied number of individual purposes, the mere presence, availability, investment in, commercial promotion of, or use of file sharing technology or services offers no technical foundation upon which to ascribe any specific intent to either individual users or service providers—other than to store and retrieve some data.


## B. A brief technical explanation of file sharing


65.    Although the presentation to the human user (if there is one) may differ across competing file sharing services, the underlying technology is substantially identical. The local computer connects to a remote computer over a network such as the Internet. The two computers conduct a stylized conversation, using a strict set of phrases (a network "protocol") they agree on. And the contents of the file is retrieved from storage on one computer, transferred between the computers

HIGHLY CONFIDENTIAL                          Expert Report of Andrew S. Cromarty, Ph.D.

over the network, and stored at the second computer.

66.     In such file transfers there typically are exactly two computers involved—the local (sometimes "client") computer, such as a personal computer at home, and the remote ("server") computer, such as a server computer at a file sharing site. (Intermediate computers that may sit between them on the network do not play a material role in this description.)

67.     The local computer has a way to indentify the remote computer, such as an Internet domain name or, more rarely, a numeric Internet Protocol ("IP") address, which the local computer uses to initiate a temporary connection between them.

68.     A remote computer, such as the file sharing service's server computer, may receive no information as to how it was named or addressed by the clients connecting to it. For example, the server may have no information as to the name used by the client computer to identify the server computer. Similarly, if the digital asset was named on a third computer, such as using a link (a "URL") residing on a separate web server under the control of an independent third party, the file sharing service's server may receive no information from which it could be aware of or determine this. Only the client computer and its user, not the server or its administrator, will be aware that such a third-party web server or its link exists and was employed to locate the file at the file sharing service. This is inherent  in the design of the World Wide Web and Internet protocols.

69.     For a variety of technical reasons, a remote computer such as a file sharing service's server may not have accurate or reliable information as to the location, identity, or even the true IP address of the client computers connecting to it. As one example, at some corporations all connections from every employee are routed through a single address before reaching the Internet, and this single address is what the remote file share service will see for all such users.

HIGHLY CONFIDENTIAL                              Expert Report of Andrew S. Cromarty, Ph.D.

As another example, in some countries where Internet service is limited or access is tightly controlled by government, an entire region or nation may be routed through and appear to originate at a single IP address or a small block of addresses.

70.     Further, technology is commonly available and in widespread use that obscures the local computer's IP address, identity, and location, so that a connection from one location appears to originate at another location. Network Address Translation ("NAT") and "onion routing" are two common such techniques. This technology sees a wide variety of uses in practice, ranging from enforcing corporate networking policies on traveling employees, to achieving free speech while avoiding political scrutiny of a local user's government monitors, to moving contraband content such as pornography or stolen information untraceably, to achieving anonymity for personal privacy reasons.

71.     Use of such obscuring technology is entirely under the control of the local computer and its user, and a remote service provider generally cannot detect, determine, or confirm that such obscuring technology has been employed. As may be expected, the information on how to use such technology is public and readily available to those motivated to find and employ it.

72.     This ability for an individual to forge their location or network identity when connecting to a remote server is an inherent design characteristic of the Internet and its communications protocols.

73.     Also unknown, and generally unknowable, by the server computer administrator is the content or nature of the contents of the files placed there by client computers or their users. For example, the client computer and its user, not the server, establish the file's name and its implied file "type." On some computers, metadata such as the filename of a well-named file may provide a suggestive clue to the content, but this information is inherently unreliable. In fact, the client

HIGHLY CONFIDENTIAL                                    Expert Report of Andrew S. Cromarty, Ph.D.

computer or its user generally has complete liberty to choose any filename they wish, consistent with certain minimal syntactic limitations. For example, a picture file may be named as if it is an audio file, or an email message may be name and stored as if a software program. Any desired degree of obscuring of a filename is permissible. This is an inherent characteristic of filenames, and results from the design intent of filesystem developers to provide as flexible as possible a set of data management tools to computer users, for them to use in their sole discretion.

74.     Thus filenames are a completely unreliable source of information as to the contents of the file they contain. The name of a file may or may not be of any value at all in helping to identify the file or its contents. The only requirement for a filename is, it must be unique.[1]

75.     File content can be further obscured, intentionally or unintentionally, through certain common operations on files. For example, for space efficiency and other conveniences, sometimes one or more files are bundled together in a single file using an "archive" format, such as the common ZIP format. Compression techniques applied to such files reduce their size, at a significantly increased computational cost of recovering the original files for inspection or use. Such archives further can be encrypted for privacy, requiring a password or much stronger decryption means to recover the archive file's inner contents for inspection or use.

76.     Files also may be encoded using a technique that is not encryption per se but has a similar effect, such as through conversion to a format more suitable for certain kinds of network transmission or cross-platform storage and use.

77.     Such encoded or encrypted file objects become effectively opaque to the file sharing service—that is, they cannot be inspected, easily or at all. Problems recovering the information in such a file include not knowing that it has been encoded or encrypted, not knowing the format

---

[1] Including file path/URL as appropriate.

HIGHLY CONFIDENTIAL                    Expert Report of Andrew S. Cromarty, Ph.D.

of encoding or encryption, not knowing the decryption data such as password or key required to recover the content, or not knowing the algorithm for recovery. Technology is now ubiquitous to permit such encoding and encryption. Today, decrypting a routinely encrypted individual file using the required decryption key is possible in a short time, while recovering the file's contents without the needed decryption key is believed by mathematicians to be essentially impossible—for example, to take much longer than a human lifetime just to decrypt and inspect a single file.

78.     Encoding or encryption technology is commonplace and has a very wide range of legitimate uses.

79.     Particularly on file sharing services, encryption is a choice that a user or customer may make in their sole discretion at their own client computer to enhance the privacy of data they deposit with the file sharing service.

80.     Digital asset encryption is considered a properly protective "best practice" within the Information Technology ("IT") profession whenever private information of any kind is placed outside one's own direct control, including on file sharing servers administered by a third party like an Internet file sharing service firm.

81.     In the event that the server is compromised by "crackers,"[2] the user's encrypted data remain safe, because such files are impossible for the cracker to recover and inspect. However, encrypted files also are typically impossible for the file sharing service to inspect.

82.     Consequently, as encoding and encryption technology are in routine and widespread use and have many legitimate uses, no single conclusion about intent of either individual users or service providers can reliably be drawn from the mere presence, availability, promotion, or use of file encoding or encryption technology, including in files on file sharing services.

---

[2] Sometimes, less properly, called "hackers."

HIGHLY CONFIDENTIAL                      Expert Report of Andrew S. Cromarty, Ph.D.

83.     During the late 1990's a second, alternative model of file or content sharing gained currency, called "peer-to-peer" ("P2P") networking. In P2P networking, computers already connected by a communications network such as the Internet join an informal coalition of computers that agree to pool and share their spare computing resources, such as their file space, network capacity, and/or processing power.

84.     P2P networks are inherently decentralized—there is no central administration of a P2P network of computers. There also is no server *per se* in P2P networks—rather, every computer can serve as both a client of and a server to other computers, even simultaneously and for the same file.

85.     Peer-to-peer file sharing quickly became a common means of sharing content, alternative to using centralized public or commercial file sharing services. P2P networks offer the advantage of harnessing spare unused capacity, small individually but large in the aggregate, of a very large number of confederated computers working in a cooperative manner.

86.     In P2P file sharing, an individual file is splintered into small fragments, and individual fragments of a single file may be delivered to a single client simultaneously by many other computers in the P2P network.

87.     Although companies have emerged to extract financial gain from (i.e. to "monetize") such networks, in practice it appears most P2P activity is non-commercial.

88.     For technical reasons largely stemming from P2P's decentralized nature and design aspects of the Internet, P2P activity cannot be regulated or controlled, reliably monitored, or accurately measured.

89.     Some P2P networks additionally were explicitly designed to offer enhanced anonymity to all users, for example for privacy or to allow their use in totalitarian countries.

HIGHLY CONFIDENTIAL                          Expert Report of Andrew S. Cromarty, Ph.D.

90.     Anonymity in P2P networks also benefits from client's ability to obscure source locations and addresses that is inherent in the Internet, described *supra*. This affords individuals sharing files via P2P networks an unusually high degree of anonymity, which can be employed for licit purposes or exploited for illicit ones. It is well understood by those skilled in the art that the majority of Internet traffic throughout the decade 2000-2010 was a combination of "spam" email and P2P file traffic. This occurred notwithstanding persistent, public attempts by commercial copyright holders or their agents to identify users who they allege employ P2P networks to infringe copyright on commercial entertainment content.

91.     By comparison, commercial file sharing services such as that of the Defendants provide a relatively poor opportunity, and a markedly higher degree of danger or risk, for those seeking to infringe copyright through illicit distribution of digital assets.

92.     Commercial file sharing services operating in the United States typically have centralized servers, a formal Acceptable Use Policy to which users must agree that forbids infringing acts, a notification procedure in accordance with the DMCA, an account structure for at least their more frequent users, a corporate legal structure, business risk to manage, and a stated policy of compliance with the DMCA. The business model, financial and legal requirements, and technical operations practices of commercial file sharing services make them very poorly suited to, and an unwise choice for, individuals who seek knowingly to infringe copyright through illicit distribution of digital assets.

HIGHLY CONFIDENTIAL                    Expert Report of Andrew S. Cromarty, Ph.D.

## C. Technical and business challenges in identifying or confirming infringement

93.    Several technical conditions or limitations must be met to evaluate a potential or alleged infringing digital duplication of a copyrighted work.. At a minimum, first, a copyrighted original work must exist with a still-valid current copyright. Second, the copyright holder must identify that original work as one over which they assert copyright. Third, a second digital object must exist and must be identified as a potentially infringing instance. Fourth, a competent comparison of the two instances must be made, sufficient to confirm or disconfirm the alleged infringement.

94.    Many of these conditions or limitations result from infringement instance identification, evaluation, and response being a multi-step, multi-party process. Technology can assist this process, and relevant technology has evolved and continues to evolve. But technology alone is not a complete remedy for addressing infringement. Instead, a cooperative process among all parties is essential. This fact results from the information theoretic nature of the comparison task.

95.    The first limitation exposes a difficult challenge for both content owners and the owners of a file sharing service. For many works, such as those created before 1923 or released into the public domain, there is no currently valid copyright. Computer instances of these works bear no distinguishing mark to separate them from copyrighted works. As a business matter it cannot reasonably be assumed that a work has a particular copyright status; that is what markings are for, and technical users rely on them to answer such questions.

96.    The second limitation is rarely met. Most computer files do not bear a copyright notice. All that is available on a server is the bytes of data in the file, not identifying legal metadata. It is

HIGHLY CONFIDENTIAL                    Expert Report of Andrew S. Cromarty, Ph.D.

apparent from inspection and experience that the vast majority of digital data (email messages, personal blogs, calendars, notes, student essays, databases, etc.) bear no explicit copyright markings. Additionally, there is an enormous volume of publicly placed copyrighted content made available by rightsholders and intended for distribution. Examples include content published under Creative Commons licensing, such as is commonly used on Wikipedia, and open source software bearing licenses that permit and encourage redistribution and sharing such as the GNU Public License or Berkeley Software Distribution license.

97.     The storage and duplication of this vast majority of data is non-infringing simply because—perhaps apart from email messages—these data typically remain under the control of the author *qua* copyright holder. As noted *supra,* modern file sharing services provide a fungible, apparently infinite, ubiquitous store for one's *own* digital data, and from the file owner-user's perspective, such a service is an extension of his own computer: Files stored there for individual or shared use remain materially under his own control.

98.     For the vast majority of computer digital assets, the most common case is that the second technical limitation is virtually never practiced, because individual users experience no need to assert their rights over their own files, whether stored locally or by their service providers.

99.     The third limitation is challenging because a third-party entity (such as a file sharing service) holding a file  may have no reliable or practicable technical means for associating it with a copyrighted work, while a copyright holder may have no knowledge of the existence or content of the second digital object.  This is exacerbated by the plethora of permission models (Creative Commons, GPL, unstated, etc.) commonly employed for legitimate distribution and redistribution of content on the Internet and the fact that content can be posted or shared from anywhere in the world. The obvious implication of the latter concern is the volume, variety, and

HIGHLY CONFIDENTIAL                    Expert Report of Andrew S. Cromarty, Ph.D.

untraceability of such postings. A more subtle corollary is that authors and rightsholders are distributed worldwide. The problem of determining the identity of a rightsholder is not limited to comparing works to a few thousand assets of a few companies located near Burbank, California, for example.

100.    At a minimum, this means that a business collaboration, such as occurs under a proper balance of business interests, is required to meet the third limitation. In essence, this only can function as a business partnership. It is well understood among those experienced in business partnering that that such a collaboration only can succeed and persist if it occurs under business terms reasonable to both parties. For example, one party cannot be expected to absorb all the other party's costs, and no party can be expected to allowed to lay off[3] all its costs or risks onto the other party.

101.    There also may be additional parties to the business arrangement. For example vendors or suppliers may be engaged to provide tools or services for or facilitate the business collaboration between the primary partners. (As one example, Vobile is such a vendor in the present matter.) An important factor to resolve in building such a successful lasting business relationship is to properly, fairly, and rationally assign the costs associated with such vendors or suppliers.

102.    Further, as part of such a reasonable balance of interests, it must be understood by all parties that no party can be expected to perform tasks that are impossible for it to perform. As one example, decrypting an encrypted file without benefit of the decryption keys, as noted *supra,* may not be technically feasible, and other such operations may be exceptionally expensive,

---

[3] In business parlance, to "lay off one's costs onto one's partners or competitors" is to find a clever business arrangement through which your firm obtains disproportionate economic benefit from a deal, contract, or *de facto* business arrangement by getting, or tricking, other firms into unduly absorbing and paying your business costs for you.

HIGHLY CONFIDENTIAL                         Expert Report of Andrew S. Cromarty, Ph.D.

beyond the reasonable ability of a single party to bear. In such circumstances, business experience shows that a reasonable business accommodation by the other party is the only successful means of maximizing the parties joint ability to succeed and meet common goals.

103.     The fourth limitation *supra* requires that competent comparison of the two instances must be made, sufficient to confirm or disconfirm the infringement. There are two challenges presented by this requirement. First, either individually or in the aggregate, the comparison may not be technically feasible, whether due to reasonable business requirements imposed by the third limitation or due to strictly technical factors. Second, the comparison must be competent.

104.     Unless a digital copy of the original work exists and is available, there is no base case against which either a copyright holder or a service provider can compute a comparison for the purpose of identifying a possible infringement. In practice, an assertion of copyright over a second digital asset to be evaluated, there must have been a asset itself in digital form such that a comparison computation can proceed.

105.     Where the two files do exist in digital format, computational comparison as to equivalence of their underlying digital assets is fraught with difficulty. Except in the case where the works are identical and simple file system comparisons of total file identity suffice, there is no established accepted reliable technical standard from either computer science or information science for comparing two creative works to determine whether one is an instance or derivative work of the other.

106.     Techniques for identifying and comparing two candidate files, particularly such as two multimedia files, can be classified relevantly for purposes of this report according to the following dimensions: exact vs. inexact; algorithmic vs. heuristic; and total vs. partial.

107.     Exact techniques are those that lack or eliminate uncertainty, while inexact techniques

HIGHLY CONFIDENTIAL                    Expert Report of Andrew S. Cromarty, Ph.D.

carry some uncertainty or inexpressibility. As a simple example, a file's size may be reported as "11,223,445 bytes" or as "11 MB"; the former is exact, while the latter is inexact, that is, an approximation.

108.    Algorithmic techniques are expected to produce exactly the same result each time applied, and typify cases where the input data is well understood or well behaved. Heuristic techniques employ a simplifying "rule of thumb" and are designed for problems that may be poorly understood, computationally intractable when handled algorithmically, or relatively unstructured. It is common that heuristic techniques are employed to provide a best-effort answer that is not entirely reliable, but often achieved at a lower cost than an exact algorithmic technique.

109.    Total identification or matching techniques are a class of techniques that apply to all of a digital asset. Partial techniques do not apply to the entire asset. One example of a partial technique is subset-matching approaches that attempt to identify or match two works based on finding only a subsets of each—say, the first five minutes of two video files—that are identical. Subset-matching techniques as described are exact, partial, and heuristic (because they assume that a small segment matching implies the entire assets match). Another class of partial techniques is "feature extraction" approaches that attempt to find some simple characteristic or feature of assets—say, the amount of green, or the number of key frames, or the average pixel value of successive frame blocks—and only match those features rather than the entire two assets.  Feature extraction techniques as described are inexact, partial, and heuristic.

110.    "Digital fingerprinting" is a term of art used to describe a collection of techniques for developing a simplified representation of a digital asset that is less reliable but more convenient to use than complete byte-by-byte exact algorithmic total matching of the files.

HIGHLY CONFIDENTIAL                    Expert Report of Andrew S. Cromarty, Ph.D.

111.    Importantly, the term is a misnomer. Unlike humans, files have no natural fingerprint. Rather, exercising human discretion, a person selects and applies a technique for mathematical simplification of files.

112.    Since there is no limit to such mathematical techniques, there is no limit to the number of such digital "fingerprints" a file may have. The analogy to  human fingerprints lies in the assumption, or assertion, that "collisions" are infrequent. A "collision" occurs whenever two files have the same digital fingerprint. A part of the human discretion applied involves selecting a mathematical technique that supports the hope for infrequent collisions. The science of information theory governs and predicts the rate at which collisions are likely to occur. Of course, as with a human population, in a sufficiently large population of files it is expected that collisions will occur.

113.    One method of digital fingerprinting is file hashing. File hashing is a technique of computing a single long number corresponding to the contents of a file. Hashing is exact and algorithmic, in that applying the hash algorithm later to the same file or any true copy of it will produce exactly the same hash value. Its use is heuristic in that collisions may occur, though rarely for a suitably chosen hash technique. Two common well-known mathematical techniques for computing hashes are "MD5" and "SHA1".

114.    Once a file hash value has been computed, it can be stored efficiently as a numeric value and used later with the same hashing algorithm applied to a different file. If the second file "hashes to" (yields) the same numeric value (and if the technique was suitably chosen), it is highly likely that the two files have precisely the same content. This is not certain, due to the possibility of collisions; confirmation requires that the two files are exhaustively compared using an exact algorithmic total comparison technique.

HIGHLY CONFIDENTIAL                              Expert Report of Andrew S. Cromarty, Ph.D.

115.    Hash techniques are moderately efficient. As one example, on a 1.8 billion instruction per second processor attached by gigabit Ethernet to a NAS filestore, computing a SHA1 checksum on a sample high-definition video asset (30fps, 720p, H.264, 48KHz stereo audio) proceeded at a rate of approximately 120 megabytes/second and 7 seconds of elapsed time (dominated by network transfer time) per second of processing time.

116.    A primary disadvantage of hash techniques is their lack of robustness in the presence of file changes. The smallest possible change in the underlying file—for example, trimming a single video frame from a video file—will result in entirely different hash values. The hash comparison then will say that the two files differ, although they may be from substantially equivalent underlying digital assets.

117.    As applied to indentifying possible instances of copyright infringement, hashes are effective at detecting a second instance of a known infringing file being uploaded. They are not effective at detecting an attempt to upload a slightly different version of the same underlying digital asset, however.

118.    Feature-based pattern matching techniques have different, and widely varying, disadvantages. The disadvantages depend on the specifics of the feature-matching technique employed. In general, a disadvantage of feature-based techniques is that by design they ignore most data, under a personal theory that the extracted features chosen by the engineer who developed the technique either adequately represent or adequately identify the underlying digital asset.

119.    Feature-based techniques also have the difficulty that there often is no inherently correct judgment or assessment criterion that provides a "yes"/"no" answer as to two files' similarity. Instead, typically, an engineer or developer simply picks some intuitively appealing metric and

HIGHLY CONFIDENTIAL                                    Expert Report of Andrew S. Cromarty, Ph.D.

threshold, and applies them as if they are correct and true. Among other risks, this technique often is not amendable to a sensitivity analysis that determines how often and under what circumstances the method will experience one of its "failure modes," that is, ways it is certain to fail due to its own flaws.

120.    One manufacturer of digital fingerprinting and infringement detection software and services is Vobile, Inc. ("Vobile"). Based in part on the business experience of Hotfile as related by Mr. Titov, it is my technical inference that the techniques employed by Vobile employ partial subset-matching feature-based heuristic methods of identifying and matching files, for example by matching features extracted from small partial samples of a file to a stored database of pre-computed feature samples.

121.    Although there is a large well-developed mathematical discipline of feature-based pattern matching and signal analysis, there is presently no science of digital asset matching.

122.    For example, there is no set of standards, either developed by unaffected third parties or jointly developed and broadly accepted by all parties in all affected industries, as to testing methods, agreed proper scientific design, standard test input data sets, experimental apparatus or measurement techniques, standards for assessing experimental outcomes, metric for assessing cost/benefit tradeoffs of competing techniques, publications venue for reporting results, or product or service quality and reliability.

123.    The digital fingerprinting product market presently is dominated by engineering-before-science. It resembles the patent medicine market of a century ago, as opposed to the regulated drug manufacturing market of today. Patents are filed and issued, and proprietary digital fingerprinting solutions are promoted and sold. But the products' inner workings typically are opaque to all buyers and users, unvetted by any broadly trusted independent third party,

HIGHLY CONFIDENTIAL                    Expert Report of Andrew S. Cromarty, Ph.D.

uncharacterized as to specific performance or failure modes, and not commensurable to other products in the market.

124.    Neither issued patents nor commercial success, such as purchases by rightsholders or service providers, provide a basis for concluding that digital fingerprinting tools work. Customers on both sides of the balance of business interests are compelled to buy such tools, whether they work or not, as a defensive measure, and both parties lack the technical ability and inside information to determine accurately and reliably whether the product they purchased actually works.

125.    A correctly-functioning efficacious digital fingerprinting tool must combine features and capabilities that are quite difficult or impossible to achieve in a single product. For example, the product must achieve high match rate, low false positive rate, ability to discriminate copies from non-copies, affordability, and insensitivity to substantial common variations in content such as varying encoding parameters and many sophisticated forms of obfuscation by intentional infringers.

126.    Digital fingerprinting techniques require a tradeoff decision to be made between poor quality and expensive performance. Feature extraction algorithms can be simple or complex, and relatively effective or highly ineffective. However, the scale cost cannot easily be avoided. The distribution of file sizes on Defendants' system is unknown to me, and may not be practical to compute. But if, for example, there are 93,000,000 files and each is comparable to the one-minute video cited *supra* in the hash example, then computing a one-second-per-file hash computation for those files would take three years, if they all could be cached on a single server.

127.    Tens of millions of video files of any appreciable or typical size cannot all be cached in primary memory on a single server. If the more realistic architectural assumption is made that the

HIGHLY CONFIDENTIAL                    Expert Report of Andrew S. Cromarty, Ph.D.

files are on a NAS connected by a gigabit Ethernet, simply computing the hash value for all these files would require approximately twenty server-years, that is twenty elapsed years when executed on one server working full-time with no other tasks to occupy it.

128. 

129.     This means a technique reportedly advocated as state of the art by Plaintiffs' trade organization—one that demonstrably is a non-total heuristic technique, with attendant flaws and weaknesses—takes approximately one hundred times longer to deliver a result than the example SHA1 computation. And that result is considerably less certain, that is, lower quality for identification purposes, than a SHA1 comparison.

130.     All such digital fingerprinting techniques are essentially useless as soon as an unknown encoding or recoding or encryption is applied at the client computer before a file is uploaded to the file sharing system. In particular, even the simplest rapid encryption techniques will scramble the data sufficiently to eliminate all the features a digital fingerprinting technique could extract for inferring possible infringement. If this were not true, residual information would be extractable from the encrypted asset and thus the encryption technique would have failed. Cryptologists therefore design encryption techniques precisely so that mathematical feature extraction, signal analysis, and comparable techniques are certain to fail, and will be entirely

HIGHLY CONFIDENTIAL                                    Expert Report of Andrew S. Cromarty, Ph.D.

ineffective.

131.    When even simple rapid inexpensive encryption techniques are employed, the length of time required to produce data suitable for inferring infringement is lengthened by months to years. Thus for example, processing 93,000,000 existing files would take millions of years. And as noted *supra*, the file sharing service provider has no reliable information from which to determine whether a particular file is encrypted. In some instances, one file is intentionally hidden inside another, using techniques such as steganography, such that even upon careful inspection it is not possible to confirm the type or contents of a file or determine what digital asset it contains. Such techniques can be used trivially and at will by uploaders to convert positives to false negatives, or negatives to false positives. Meanwhile, more assets are being loaded onto file sharing servers each day, compounding the scale of the infringement inference challenge.

132.    From the point of view of a purchasing decision-maker such as a service provider, there is no way for a well-intentioned technology buyer to differentiate between the many digital fingerprinting and comparable product options available. And absent a science and a standard for testing and evaluating such products, agreed upon in advance by rightsholders—and since rightsholder notably are all authors of  copyrighted works, not merely large entertainment corporations—it is impossible for a service provider to know what product would be satisfactory to rightsholders before the fact.

133.    There are technical alternatives to digital fingerprinting that may be more effective in limiting copyright infringement. Such techniques have the advantages of superior traceability of infringers and decreased burden on service providers, in that they are put into effect by the rightsholders during each performance rather than imposed on service providers.

- 28 -

HIGHLY CONFIDENTIAL                    Expert Report of Andrew S. Cromarty, Ph.D.

134.    One example alternative is watermarking. In watermarking, a unique visible or invisible marking is introduced into the copyrighted work, ideally uniquely at each performance. For a wide range of use cases and distribution or performance venues, watermarking is now technically and financially feasible.

135.    Use of this technique by rightsholders would allow them to focus their enforcement efforts on infringers rather than service providers, and would free service providers from the burden of sharing another industry's business risk.

136.    Other alternatives, such as Digital Rights Management technology, also exist. When properly used, Digital Rights Management (DRM) has proven very effective in limiting illicit redistribution of copyrighted digital works.

## D. File sharing and Internet business models

137.    Firms doing business on the Internet routinely combine older pre-Internet "bricks and mortar" business models and some new business models well-suited to the economics and technical features of the Internet.

138.    The different economics of the Internet has resulted in widespread growth and adoption of certain new business models. For example, unlike the physical world, the Internet reduces the cost of doing certain kinds of business on an international scale nearly to zero. Commercial sale and delivery of digital goods can happen nearly instantaneously, including clearing a financial transaction and final delivery of the product to the customer, nearly anywhere on the planet.

139.    Selling to an international clientele also implies selling across all cultures globally, and

- 29 -

HIGHLY CONFIDENTIAL                    Expert Report of Andrew S. Cromarty, Ph.D.

into all markets simultaneously. It can be difficult or impossible to predict, from the vantage point of a business started in one country or culture, how best to identify and sell to a market in a different culture, country, or language.

140.    One response to this different economics of product and services sales on the Internet is a much higher use of indirect sales, including particularly through resellers who are internationally dispersed and whom the product or server provider has never met. These resellers serve as an "indirect sales channel" in conventional sales parlance, but they differ from indirect sales agents common in bricks and mortar businesses by virtue of a different relationship. They typically are more "arms-length," less well known, and under less influence by the product or service provider. However, this is traded off against the business advantage of globally expanded reach.

141.    One form of reselling common on the Internet is an "affiliate marketing" relationship. An affiliate is a firm or person that is provided incentives, such as a "revenue split" (a share of sales revenue), for bringing new customers to the product or service provider.

142.    An affiliate marketing program is especially useful if one has developed a product or service and does not know with confidence what the best markets for it are around the world. The question can be "outsourced" to affiliates, in return for a share of the revenue they bring in when they successfully sell the vendor's product or service into to new markets.

143.    Examples of well-known firms that employ affiliate marketing, customer-incentive, or similar programs under which one customer is paid to refer others include: Amazon.com, the roughly $100 billion-valuation publicly traded Internet sales firm; 1and1, the German web hosting firm historically reported as the largest web hosting firm in the world; eBay, the world's largest Internet auction business (affiliate marketing slogan: "Earn money when you deliver quality traffic"); Ooma, the Internet Voice over IP (VOIP) service firm; and regional telephone

HIGHLY CONFIDENTIAL                    Expert Report of Andrew S. Cromarty, Ph.D.

and DSL Internet service provider Sonic.net.

## VIII.  OPINIONS AND ANALYSIS

144.    I present in this section my analysis of, and conclusions as to, the Principal Questions set forth *supra* in relation to the accusations in the Plaintiffs' Complaint.

### A.  Hotfile follows industry-standard practices to effect control over digital assets to the extent technically practicable.

145.    SHA/MD5 hash matching is a best-effort and reasonable business practice  that addresses an important class of potential infringements by unknown third-party actors on the Internet. Once a specific file has been properly identified as an infringing instance, the same actor or other actors in possession of that file may attempt to upload it again to Defendants' systems in violation of Hotfile policy. By remembering hashes of such offending files and computing hashes on new files, a service provider can—at some expense—identify when an offending file has been uploaded again, and take appropriate action, such as quarantining or deleting the file and  notifying, suspending, or cancelling the user and user's account consistent with any applicable policy of the service provider.

146.    I understand from Mr. Titov that Hotfile uses hashing in this manner and for this purpose, and has for some time.

147.    ███████████████████████████████████████████████

HIGHLY CONFIDENTIAL                                    Expert Report of Andrew S. Cromarty, Ph.D.



148.    It is to be expected that Plaintiffs are generally familiar with many technologies they can

use themselves, such as those described *supra,* for effecting control of their own digital assets,

techniques that are alternatives to methods like digital fingerprinting that impose Plaintiffs'

business risk and costs on service providers. For example, DRM technology is employed when

Plaintiffs' vendors or business partners and/or their downstream distributors produce and sell

DVDs or stream movies over the Internet. Similarly, watermarking is well-known in the

industry, and watermarking at the granularity of individual performances of copyrighted works is

a technology that has been productized by and available from their suppliers and business

partners for at least a half-decade.

149.    However, I have seen nothing, in the Complaint or elsewhere, to indicate the Plaintiffs

are  making good business decisions to research, evaluate, employ, or even contemplate use of

these or comparable techniques, as an alternative to Plaintiffs externalizing their own business

risk and costs by laying off that burden on Defendants and other independent service providers.

150.    I also have seen nothing, in the Complaint or elsewhere, to indicate that Plaintiffs are

offering or have offered to Defendants and other service providers to absorb the legal risks or

business costs associated with protecting Plaintiffs' copyrighted works.

151.    For example, I am aware of no offer ever made by Plaintiffs to pay for the additional

HIGHLY CONFIDENTIAL                    Expert Report of Andrew S. Cromarty, Ph.D.

capital expense or operations expense to Defendants or any other service provider when those service providers purchase and deploy technology for controlling or attempting to control infringement of Plaintiffs' digital assets, even if the technology is preferred, recommended, or demanded by Plaintiffs or their industry association, is costly, and/or provides no tangible business benefit whatsoever to the service provider.

152.    I further understand from Mr. Titov that Hotfile provides Special Rightsholder Accounts ("SRAs") that give rightsholder special business privileges and conveniences as to providing takedown notices and obtaining a rapid response to them. Among other features, in essence the SRA account gives the rightsholder a near-instantaneous takedown capability.

153.    ███████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████

**B.  Customer incentive programs are common Internet business practice.**

154.    I have reviewed the Defendants' service including their pricing/promotional information on their website. (Details of Defendants' service and their technical and business operations are described in Appendix H to this report.) Comparing Defendants' service offering and marketing to industry norms for promotion of Internet services generally, I observe that the Defendants' offering is promoted in the manner common to a very wide range of legitimate and respected

HIGHLY CONFIDENTIAL                                   Expert Report of Andrew S. Cromarty, Ph.D.

Internet service firms. This variously includes Amazon.com, eBay, Yahoo, and others.

155.    There is a legitimate multi-party-sharing market niche ignored by Defendants' direct market competitors. Dropbox, for example, has a convenient user interface for saving and restoring files but for consumer (non-enterprise) accounts using Dropbox's service apparently requires anyone viewing a file to hold the same account credentials as the account holder who performed the upload. This requires that Dropbox users share their confidential account credentials—their login and password information—in order to share files among a group.

156.    For example, if a band of musicians wish to share recordings of their music among the band's members using Dropbox, first one musician must set up a Dropbox account, and then she must share her password with the other musicians, losing personal control over the account. This limitation occurs in many file storage service sites, and appears to result from limited or unthorough study of potential customer use cases.

157.    Other file service providers, such as Picasa and Flickr, do provide some ability for others to share file assets without needing the originator's uploading password. However, they generally have specialized in narrow markets, such as only photography or only video and photography.

158.    This creates an unfilled market niche. There is a market need for passwordless general-purpose file sharing, that is, sharing of content not limited to specialized filetypes or narrow use cases foreseen by the service provider's management or engineering teams.

159.    Examples of this market niche are the musician who wishes to share a recording or composition with other band members without sharing her account password, or the need to efficiently share a file with a business colleague without creating a Web site or FTP site.

160.    This market need is so common and well-understood that it is the subject of a widely-

HIGHLY CONFIDENTIAL                              Expert Report of Andrew S. Cromarty, Ph.D.

published Internet cartoon authored by one of the Internet's most popular cartoonists. The cartoon depicts someone advising a friend on all the available but unsatisfactory options for sharing a file with a third friend, even listing Dropbox as an unsatisfactory alternative. In the end, file sharing is accomplished by physically carrying a copy of the file down the street on a memory device. *XKCD Cartoon.* The cartoon is funny precisely because this is such a well-understood need that remains unanswered. In fact, the term "Sneakernet" was coined over a decade ago to refer to this physical "solution" to this Internet problem.

161.    Hotfile's business model and service model make filling this market niche possible. Hotfile combines the general-purpose file handling features of Dropbox with the passwordless access of the photo sharing services. Hotfile's service is in fact the solution to the common problem identified by the XKCD cartoon.

162.    Defendants' service thus fills an important legitimate business niche for file sharing on the Internet.

163.    I am aware of nothing in the present matter demonstrating that the cost to Plaintiffs from any alleged infringement exceeds actual business benefit from such alleged infringement. That is, it is entirely possible—and apparently unexplored by Plaintiffs—that  contrary to their Complaint, any alleged infringement through file sharing activities of Defendants' customers or business partners actually increases interest in, demand for, and sales of Plaintiffs' product, and is of net economic benefit to Plaintiffs.

164.    This is of particular interest because today there is a widespread and growing business belief that some amount of "free" content distribution actually increases sales. It is a means of using the Internet to cost-effectively expose to a new or wider audience works that were not well monetized under existing industry sales regimes or were viewed as overpriced in the market.

HIGHLY CONFIDENTIAL                           Expert Report of Andrew S. Cromarty, Ph.D.

Indeed, this is the economic basis of the "freemium" pricing model.

165.    Also widespread is the belief that those in the Plaintiffs' industry consistently are slow to, or fail to, adopt modern marketing and distribution methods suitable for new distribution media such as the Internet.

166.    For example, I am aware of no attempt by Plaintiffs to harness the business opportunity afforded by Internet file sharing technology to exploit "superdistribution" or "long tail" marketing opportunities, under which Plaintiffs themselves profitably incentivize Internet redistribution of their content by rewarding redistributors who return some revenue to the content rightsholder or who find ways to redistribute Plaintiffs' content that otherwise would sit on the shelf unsold.

167.    I similarly am aware of no information presented by Plaintiffs in the present matter indicating they are repricing their product as a rational business response to the market signals they receive when their works are alleged to be illicitly redistributed.

168.    Under conventional microeconomic pricing theory, such  product repricing would be a rational business response by Plaintiffs to optimize their profits on those copyrighted works.

169.    Moreover, repricing offers an opportunity for Plaintiffs and their industry peers to maintain or improve their control of their product distribution and copyrighted works, to surprise and delight their customer base, and to their own increase profits.

170.    No such rationalized product pricing to regain copyright control and increase profitability is reported or contemplated by the Complaint or any other Plaintiff pleading or documentation of which I am aware in the current matter.

171.    These failures by Plaintiffs and their industry generally poignantly suggest Plaintiffs are seeking to repeat the "Napster error."  When industry rightsholders became concerned a decade

HIGHLY CONFIDENTIAL                    Expert Report of Andrew S. Cromarty, Ph.D.

ago that Napster was abetting illicit redistribution, they arguably attempted to destroy that company. This was an exceptionally unwise business action by rightsholders, because Napster was the rightsholders' only prospective business partner, and damaging Napster predictably[4] forced the consumer demand underground into a wide range of P2P services, an error from which the music industry itself says it has never financially recovered. Their business error was to destroy a prospective partner—the one corporation with whom they had an opportunity to employ their exceptional deal-making skills to forge business agreements that would allow them to retain control over and monetize their copyrighted works using new emergent distribution media.

172.   Centralized file sharing services offer an additional business partnering advantage to rightsholders over a P2P prospective partner: takedowns. Notwithstanding the technical difficulties in properly identifying infringing instances noted *supra,* file sharing services such as Hotfile, with its centralized architecture can—and Hotfile does—implement takedown procedures. For technical reasons, such takedowns are effectively impossible to fully implement in P2P systems such as Gnutella. This further enhances the potential of centralized file sharing services such as the Defendants as cooperative business partners of Plaintiffs, and provides additional rational business impetus for them to pursue such constructive relationships.

173.   Rather than view alleged consumer  redistribution via file sharing as a copyright violation, Plaintiffs have the opportunity to understand it as unmet market demand for their product. Rather than view a file sharing service as an alleged contributory infringer, Plaintiffs have the opportunity to view them as a valued prospective business partner.

---

[4] In fact, predicted. I accurately forecast precisely this outcome for the music industry, in a public speech in 2000.  *Cromarty UC/Red Herring DIGIVATIONS panel, 2000.*

HIGHLY CONFIDENTIAL                    Expert Report of Andrew S. Cromarty, Ph.D.

### C.  Hotfile customers pay for better service, not for ability to infringe copyright.

174.    It is common for service providers on the Internet to offer "tiers" of service, with different service tiers providing better performance (larger volume, better speed, etc.) for a higher fee. For example, this typifies Internet Service Provider (ISP) connection fees for cable Internet and telephone company DSL services. Details and examples appear in Appendix H to this report.

175.    Also common both on the Internet and in the software market is a zero-cost introductory pricing level, with customers paying the provider only if they purchase premium service tiers above the free service level. This is known as a "freemium" pricing model, cf. *supra.*

176.    Hotfile offer service tiers according to a freemium pricing model.

177.    Freemium pricing models encourage business and revenue growth and facilitate customer acquisition by building interest in a service by eliminating customer objections to sale based on pricing or uncertain value-for-money.

178.    Freemium models are particularly useful or appropriate where customers may be hesitant to accept a service offered by an unknown or untested vendor, where a market has commoditized into a price war and "free" beats all other competitors prices, where the vendor's marginal cost of serving an additional customer at a useful introductory level of service is very low, and/or where a structural difference such as a proprietary advantage exists to motivate upsell purchase behavior by customers.

179.    Freemium products are not seen in the market where one product or service is substituted

- 38 -

HIGHLY CONFIDENTIAL                           Expert Report of Andrew S. Cromarty, Ph.D.

for another. That is, customers adopt a freemium model's upsells precisely because they feel they are getting an advantage such as a performance improvement or elimination of a distraction or impediment for their money.

180.    For example, Yahoo is understood to be the largest email service provider on the Internet. Yahoo offers its basic level of email service free of fees to customers, but "free" customers must visit Yahoo's website to read their email, and when they do they are confronted with advertisements. Yahoo's email service employs a freemium model under which, for an upsell fee of about two dollars per month, customers may download their email into their personal computer's mail program without viewing advertisements. All the prior Yahoo mail services are still offered to premium Yahoo customers, but additional conveniences are provided for the premium fee.

181.    Hotfile's business approach is similar, and common. Free users receive an introductory level of service with "rate throttling." Premium-tier Hotfile accounts have the same services available to free users, but as paying customers they receive more and faster service and, like Yahoo's advertisements and email-download feature, Hotfile premium users are not rate-throttled.


### D.  Hotfile materially lacks the "ability to control" infringement even using state-of-the-art technology.

182.    The state of the digital fingerprinting market today precludes satisfaction of the fourth technical requirement *supra* for evaluating a potential or alleged infringing digital duplication of a copyrighted work, namely, that a competent comparison of the two instances must be made, sufficient to confirm or disconfirm the infringement.

HIGHLY CONFIDENTIAL        Expert Report of Andrew S. Cromarty, Ph.D.

183. Because there is no science of digital asset matching, it is not possible to perform a neutral competent evaluation of either the products or the claims of vendors of digital fingerprinting and other products and services purported to offer an "ability to control." There is no accepted standard against which to make such a comparison.

184. There also presently is no basis in either science or business practice to merit accepting the claims of these anti-infringement product vendors. There products may or may not work, but without an accepted methodology for reviewing and assessing them, no confidence in such tools for "ability to control" is justified.

185. In essence, features-based techniques for analyzing a digital asset reduce the asset to a small set of numbers. It is obvious that information is lost in this reduction. Less obvious is that the information lost necessarily is essential to recognizing the underlying work, from a mathematical or information theoretic viewpoint. The greater the reduction, the more information is lost. The greater the reduction, the greater the chances that legitimate works will be falsely accused.

186. According to Motion Picture Laboratories, Inc. ("MovieLabs") documents describing Vobile's products, the Vobile methods in particular reduce an entire one- to two-hour movie to a single number.

187. I am aware that MovieLabs has performed internal tests of competing products in the market for digital fingerprinting. MovieLabs is a joint venture of companies such as Plaintiffs and others in their industry, and has been described as the research and development arm of the Motion Picture Association of America ("MPAA") by the Los Angeles Times. *Los Angeles Times article.* MovieLabs thus is not an independent scientific evaluator. MovieLabs's digital fingerprinting analysis does not report, and apparently does not consider, essential test cases such

- 40 -

HIGHLY CONFIDENTIAL                          Expert Report of Andrew S. Cromarty, Ph.D.

as encoding/encryption. MovieLabs reports also opine that some false positives may be acceptable, suggesting a bias against service providers such as Defendants and a possible willingness to lay off the entertainment industry's inherent risks and economic costs onto others. MovieLabs further acknowledges that scalability (i.e., economic or "laws of physics" viability) was unaddressed in many of their reports and analyses.

188.    Overall, however diligently MovieLabs pursued their business goals, reports published by MovieLabs must be understood to be movie studios speaking, not an independent third party, and those reports support an opinion that there is "no science yet" as to digital asset comparison or technology-based copyright infringement determination.[5]

189.    As to the research performed by MovieLabs discussed *supra,* I am aware of no documents produced to date in this matter that identify MovieLabs's experimental design and analysis methodology, such as which feature methods or transcodes are considered. These details also do not appear in MovieLabs's publications as produced, notably including Craig Siedel's article, aptly titled "Content Fingerprinting from an Industry Perspective." *Seidel.* Full public details on scientific methodology are essential to gaining confidence in the merits of resulting analyses.

190.    Nothing in the MovieLabs documents and reports produced to date in this matter change my opinion that the state of digital asset matching and fingerprinting cannot be called a mature or reliable science and it provides an inadequate foundation upon which to define legal obligations.

191.    Even market acceptance and similar business measures provide no confidence that an

---

[5] Additional difficulty in assessing reports by MovieLabs arose during this analysis due to an improper production of those reports. Specifically, data in the MovieLabs reports heavily employ color graphics to summarize quantitative findings, but only black-and-white PDFs were produced. This has a technical effect as to these documents similar to redacting document metadata before production.

HIGHLY CONFIDENTIAL                          Expert Report of Andrew S. Cromarty, Ph.D.

"ability to control" is offered by putative infringement detection and identification tools, since under the weight of current law and market conditions, both service providers and rightsholders are essentially forced to buy whatever product is available, whether or not there is reason to have confidence in it.

192.    Demonstrations of the effectiveness of such digital fingerprinting and related products also are unreliable as a measure of their utility, correctness, or reliability. This is because the proper test of such a product is not merely whether it can be shown to work, but also and more importantly, whether it can be shown not to fail; and if it does fail, to understand and carefully characterize when and why. Presently, however, the field is insufficiently mature to provide reliable high-quality unbiased answers to these questions.

193.    As noted *supra,* feature extraction, subsetting, and related techniques trade off quality for speed or computational tractability. Again because there is no science to govern this tradeoff and the decisions are made by individual engineers and kept proprietary, the tradeoffs being made between quality and economic factors are unknown.

194.    The information science and computer science that applies is known, however, and is not favorable to these products. An unlimited number of possible morphisms or transformations can be applied to a given digital asset, and it is in the nature of mathematical modeling that no feature extraction system can adequately model them all; this is inherent in the nature of mathematical modeling and of feature selection.

195.    As one example, it appears that either simple encryption or simple methods of introducing extra "noise" time segment slices into a digital video asset are likely to defeat Vobile's systems. The latter would greatly increase its false negative failure rate, and the former would completely disable it.

HIGHLY CONFIDENTIAL                          Expert Report of Andrew S. Cromarty, Ph.D.

196.    These are well-known techniques employing tools already available for any personal computer. Their availability and easy use would enable simple tools to be built and freely distributed that can permanently disable these, and likely all other, digital fingerprinting methods.

197.    Those countermeasures would not, however, defeat technologies such as watermarking and DRM that rightsholders can employ entirely on their own, without added burden to service providers.

HIGHLY CONFIDENTIAL                    Expert Report of Andrew S. Cromarty, Ph.D.

201.    In summary, although Plaintiffs themselves potentially could better control infringement, and notwithstanding Defendants' business reasonable best efforts to be of assistance to another industry, Defendants materially lack the "ability to control" infringement. This is so because the technology to do so is technically inadequate/deficient, uneconomic, unvalidated, and unreliable. It is so because the economic and, especially, computational expense to control infringement requires the service provider to "defy the laws of physics," for example, in some circumstances by promptly performing millions of years of computation in a day. And it is so because of the nature of the copyright problem itself, wherein multiple business players who may not even know of each others' existence or asset holdings are nonetheless be required to "know what they don't or can't know" to control infringement.

HIGHLY CONFIDENTIAL                         Expert Report of Andrew S. Cromarty, Ph.D.

## IX.   TRIAL EXHIBITS

202.    I may rely on visual aids and demonstrative exhibits that demonstrate the bases of my opinions.  Examples of these visual aids and demonstrative exhibits may include, for example, charts, drawings, excerpts from patent specifications or other public sources, patent file histories, interrogatory responses, deposition testimony and deposition exhibits, as well as optical components, charts, diagrams, videos and animated or computer-generated video.

203.    Other than as referred to in this report, I have not yet prepared any exhibits for use at trial as a summary or support for the opinions expressed in this report, but I expect to do so in accordance with the Court's scheduling orders.

## X.  SUPPLEMENTATION OF OPINIONS

204.    I expect to testify regarding the matters set forth in this expert report, if asked about these matters by the Court or the parties' attorneys.

205.    I understand that discovery is ongoing in this case.  I therefore reserve the right to adjust or supplement my opinions after I have had the opportunity to review deposition testimony or in light of additional documents or arguments that may be brought to my attention, including any additional orders from the Courts.  I also reserve the right to adjust or supplement my analysis in light of any new data or alternative opinions advanced by or on behalf of Plaintiffs.

HIGHLY CONFIDENTIAL                              Expert Report of Andrew S. Cromarty, Ph.D.

# APPENDICES

HIGHLY CONFIDENTIAL                    Expert Report of Andrew S. Cromarty, Ph.D.

**<u>Report Errata</u>**

The following typographical errors are noted in the main body of this report as produced on November 18, 2011.

Title page: Case name has changed to Civil Action No. 11-20427-CIV-WILLIAMS/TURNOFF.

p.14 para. 73: "may be name" should read "may be named".

p.14 para. 77: "not that it" should read "not knowing that it".

p.34 para. 157: "only or video" should read "only video".

p.35 para. 164: "Exposing to a new or wider works" should read "expose to a new or wider audience works".

HIGHLY CONFIDENTIAL                      Expert Report of Andrew S. Cromarty, Ph.D.


## A. Materials Relied Upon

### i.      Non-BATES-numbered documents


1and1 Affiliate Marketing pages. From http://www.1and1affiliate.com/

Amazon S3 storage pricing. http://aws.amazon.com/s3/pricing/

Retrieved 20111104.


Amazon Affiliate pricing table. https://affiliate-

program.amazon.com/gp/associates/help/operating/advertisingfees

Retrieved 20111107


Amazon EC2 Overview. http://aws.amazon.com/ec2/

Retrieved 20111121.


Amazon EC2 Pricing. http://aws.amazon.com/ec2/pricing

Retrieved 20111121.


Gannes, Liz, "Auditude Fingerprints Everyone and Everything."

GigaOM (pub.), October 17, 2008. Published and available at:

http://gigaom.com/video/auditude-fingerprints-everyone-and-everything/

HIGHLY CONFIDENTIAL                        Expert Report of Andrew S. Cromarty, Ph.D.

"Adobe Acquires Auditude to Capitalize on Exploding Video Advertising Opportunity". Press release, Adobe Systems Incorporated (pub.), November 1, 2011. Published and available at: http://www.adobe.com/aboutadobe/pressroom/pressreleases/201111/110111AdobeAcquiresAuditude.html and

http://www.adobe.com/aboutadobe/pressroom/pressreleases/pdfs/201111/110111AdobeAcquiresAuditude.pdf


Gannes, Liz, "Auditude to Power Comcast Online Video Ads". GigaOM (pub.), Feb. 22, 2010. Published and available at: http://gigaom.com/video/auditude-to-power-comcast-online-video-ads/


Malik, Om, "Adobe buys Auditude reportedly for over $100 million." GigaOM (pub.), Oct. 31, 2011. Published and available at: http://gigaom.com/video/adobe-buys-auditude-reportedly-for-about-100-million/


Kopytoff, V., "Apple iCloud May Not Be a Threat to Online-Storage Services."
New York Times, June 7, 2011.  Published at
http://bits.blogs.nytimes.com/2011/06/07/icloud-may-not-be-a-threat-to-file-sharing-services/


DropBox description from crunchbase.

http://www.crunchbase.com/company/dropbox

Retrieved 20111106

HIGHLY CONFIDENTIAL                                Expert Report of Andrew S. Cromarty, Ph.D.

DropBox overview from secondmarket.  https://www.secondmarket.com/company/dropbox

Retrieved 20111106

DropBox as a top-ten, in SecondMarket's Q3 2011 Top Ten Watched list.

https://www.secondmarket.com/discover/reports/q3-2011-private-company-report

Sourceforge "About" description. http://sourceforge.net/about

Retrieved 20111106

About Picasa. http://picasa.google.com/features.html

Retrieved 20111106

Picasa+gmail freemium pricing.

http://picasa.google.com/support/bin/answer.py?answer=39567&topic=10766

Retrieved 20111106

"Flickr FAQ (incl. "Will Flickr always be free?" / upsell summary)".

http://www.flickr.com/help/general/#3

Retrieved 20111106

"Flickr upsell pricing." http://www.flickr.com/upgrade/

HIGHLY CONFIDENTIAL                    Expert Report of Andrew S. Cromarty, Ph.D.

Retrieved 20111106


"eBay affiliate marketing - How it works."

https://publisher.ebaypartnernetwork.com/files/hub/en-US/howitWorks.html

Retrieved 2012121108


"What Happened to Gatekeeper?". Hewlett-Packard.

Available at and retrieved from http://gatekeeper.dec.com/what-happened-to-gatekeeper/


Gannes, Liz, "Fingerprint Technology Waits for a Grand Entrance." GigaOM (pub.), OCtober 9,

2007. Published and available at: http://gigaom.com/video/fingerprint-tech-waits-for-a-grand-

entrance/


"Kapow Software - Web Intelligence Solution: Antipiracy". Web page, printed 20111117.

Available at: http://kapowsoftware.com/solutions/web-intelligence/antipiracy.php


Healey, Jon, "The Content-Recognition Bakeoff".

Los Angeles Times (pub.), September 21, 2007. Published at:

http://opinion.latimes.com/bitplayer/2007/09/the-content-rec.html


Healey, Jon, "Content Recognition, part 2". Los Angeles Times (pub.), September 24, 2007.

Published at: http://opinion.latimes.com/bitplayer/2007/09/content-recogni.html

HIGHLY CONFIDENTIAL                                    Expert Report of Andrew S. Cromarty, Ph.D.

"Refer-a-Friend Returns!" Ooma Inc. (pub.). Unsolicited marketing email received by author October 20, 2011.

"Network.http.sendRefererHeader". MozillaZine Knowledge Base (pub.), June 10, 2007. Published and available at: http://kb.mozillazine.org/Network.http.sendRefererHeader

Fielding, R., et al., "Hypertext Transfer Protocol -- HTTP/1.1" Also known as "RFC2616". Internet Engineering Task Force (pub.), June 1999.

Granoff, M., "FARNET Stories Project: 51 Reasons to Invest in the National Information Infrastructure." 1993.  Retrieved from and availabel at http://old.cni.org/docs/farnet/story149.NM.html

Munroe, R., "File Transfer." Cartoon published September 9, 2011. Retrieved from and available at http://xkcd.com/949/

Lu, J. et al., "Method and System for Fingerprinting Digital Video Object Based on Multiresolution, Multirate Spatial and Temporal Signatures." US Patent No. 8,009,861. August 30, 2011.

Complaint regarding Bell Canada's Internet traffic management practices.  November 16, 2010.

HIGHLY CONFIDENTIAL                                    Expert Report of Andrew S. Cromarty, Ph.D.

### ii.      BATES-numbered documents

DISNEY005811.pdf

DISNEY005871.pdf

DISNEY005888.pdf

DISNEY005895.pdf

MPAA000014.pdf

MPAA000033.pdf

MPAA000071.pdf

MPAA000097.pdf

MPAA000142.pdf

Thumbs.db

WARNER027504.pdf

WARNER027548.pdf

WARNER027550.pdf

WARNER027576.pdf

WARNER027583.pdf

WARNER027781.pdf

WARNER027787.pdf

WARNER027806.pdf

WARNER027810.pdf

WARNER027814.pdf

HIGHLY CONFIDENTIAL                    Expert Report of Andrew S. Cromarty, Ph.D.

WARNER027815.pdf

WARNER027816.pdf

WARNER027832.pdf

WARNER027834.pdf

WARNER072163.pdf

WARNER072176.pdf

WARNER072203.pdf

WARNER072215.pdf

WARNER072300.pdf

WARNER027815.xls

HIGHLY CONFIDENTIAL                              Expert Report of Andrew S. Cromarty, Ph.D.

### H.     Internet operations and Hotfile services

1.  This Appendix provides a brief overview of Internet and Web operations, and then provides

    details about the systems and methods used by Hotfile and/or visitors to www.hotfile.com.

#### a.     Brief overview of Internet and World Wide Web operations

2.  For purposes of this exposition, the Internet is a worldwide network of interconnected

    computers, or of interconnected networks of such computers. These server computers are

    sometimes also called "Internet hosts". The World Wide Web (or "Web") is an abstract

    service overlaid on the Internet that uses some of its computers. The Web comprises server

    software executing on server computers and the files or other "resources" that they can

    provide upon request.

3.  "Links" (text strings of a particular format) in some files "point to" or identify other

    resources on the Web. The author of an individual file or "web page" determines what links

    it contains and where they point. Most often—although not exclusively—access to these

    stored resources distributed around the Internet is achieved using a "browser" software

    program that an individual chooses to execute on his computer, such as a work or home

    computer located anywhere in the world.

4.  The user's computer, sometimes called a "client" of the "server," makes "requests" of the

    server, and assuming it chooses to do so, the server responds to the request, most often by

    returning a requested resource such as a file. A wide variety of non-file resource types also

HIGHLY CONFIDENTIAL                              Expert Report of Andrew S. Cromarty, Ph.D.

exist for delivery on the Internet, such as live-streamed audio or video.

5. The server does not control the client computer, and in fact, generally is prohibited from inspecting the contents of the client computer. This is a requirement of the relevant Internet protocol specifications. Indeed, the server generally does not even know of the existence or nature of client computers on the Internet, and further, when the server comes to know any information about a client, under typical operations the server is designed to "forget" the existence of each client as soon as it has responded to a client's request. This characteristic permits servers to efficiently serve large numbers of clients and thus achieve "scalability."

6. Each server on the Internet has one or more numeric addresses, and the Internet offers a directory service called the Domain Name System that allows one or more names for a server to be used, translating them to one of the server's numeric addresses. Private name and directory services also exist, not under any centralized control.

7. As noted *supra,* a server typically cannot reliably determine where a request comes from in the Internet. Internet protocols only require that the server is provided enough return-address information to respond to that request. Such return address information may be ephemeral, obscured, translated en route to different addresses, rerouted to other locations, or even falsely identified on the Internet. If so, this is unknowable by the server.

8. The web server similarly cannot know what web sites previously were visited by the client or its user. This includes, the server does not reliably know what name or address the client or its user used to reach the server, nor how it was obtained. For example, if a private domain name server is in use by the client, or if a second web server contains a link pointing to the receiving server and the client computer's user follows that link (e.g. by clicking on it when it is displayed to him), the receiving server typically will have no knowledge of this.

HIGHLY CONFIDENTIAL                          Expert Report of Andrew S. Cromarty, Ph.D.

9.   Although a web browser may optionally send a server hints as to a referring link, provision and accuracy of such data are entirely under the control of the browser and its user, and may be further modified en route. Numerous freely-available privacy enhancement browser "add-ons" exist to give this control to the user. Further, many corporate, national, or personal proxy or firewall systems remove or forge such identifying source data en route for privacy reasons. Certainly any user who wishes to can obscure where he comes from when visiting a web site such as Hotfile. *MozillaZine network.http.sendRefererHeader at 1.*

10. It is common on the Internet for users to assemble links into a public or private index of sites or Internet locations. Browsers support this through "bookmarks"; users may trader links, e.g. by email, and have done so since the early 1990's; and anyone may create their own web server and use it to publish links that point to any server and any resource they wish. This is inherent in the intended design of the Web.

11. It also is common for users to provide substitute link names for an original link, and there are services that offer this service freely on the Internet. This often is done to simplify links or make them easier to type. Well-known services such as bit.ly, amzn.to, and tinyurl.com offer this convenience to all Internet users, typically on a free and anonymous basis. These shortened aliases are increasingly common and valuable as Internet use moves to mobile platforms such as PDAs and cell phones, where there is a premium placed on short names that minimize onerous typing requirements. They also are of value when a link must be short enough to be remembered (for example, when read on a billboard while driving on a highway), and they see significant commercial use in such applications.

12. As with use of link indexes and links generally, the server and its owner-administrator will not know that such a substitute link was used by users in requests ultimately directed towards

HIGHLY CONFIDENTIAL                    Expert Report of Andrew S. Cromarty, Ph.D.

the server. In this regard, link index servers used by a client computer's user to locate files on a file sharing service are analogous to a telephone directory book in the possession of a caller. The called party does not know that the caller used a telephone directory to find and call them.

13. To the extent the Internet's HTTP protocol specification defines a means of identifying such a referring "index" server used by distant client computer users, it also gives such index web sites the ability to obscure their own use as referring sites. The HTTP Internet protocol specifically directs that "Referer" [sic] information is not to be provided when such a forwarding web site employs standard web security: "Clients SHOULD NOT include a Referer header field in a (non-secure) HTTP request if the referring page was transferred with a secure protocol.". *RFC2616 at 151, emphasis in original.* The decision to use standard web security is increasingly common today for even routine Web connections, and is taken at the sole discretion of the referring (index) site. Thus notwithstanding observations *supra* as to server limitations, simply by implementing standard inexpensive web security practices on their own  index server, owners or administrators of an index or forwarding web site may gain a *de facto* ability to eliminate referring data in clients' browser requests to a file sharing server—that is, to hide from the file sharing service the existence, identity, and use of the index site.

## b.    Summary of www.hotfile.com operations, pricing, and consumer use

14. ███████████████████████████████████████████████████

████████████████████████████████████████████████████

- 58 -

HIGHLY CONFIDENTIAL                              Expert Report of Andrew S. Cromarty, Ph.D.

HIGHLY CONFIDENTIAL                    Expert Report of Andrew S. Cromarty, Ph.D.

19.  ███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████████

20.      When a user has accepted Hotfile's policy, he may choose and upload a file from his client computer with a few mouse clicks. The transfer of a copy of the file from his client computer to a Hotfile server then proceeds automatically. When the transfer is complete, the user is presented with a URL ("Uniform Resource Locator," a text string comprising Web address) pointing to the uploaded file's location on the Hotfile servers. For example, uploading a file named "pictureofmydog.gif" may result in a URL being created and displayed such as "http://hotfile.com/dl/135394112/220ead1/pictureofmydog.gif.html". Importantly, the filename component of the URL (e.g., "pictureofmydog") is chosen by the uploading user, not the server or its owner-administrator. This feature permits users to give meaningful names to the digital assets they wish to share with colleagues, friends, customers, or family on the Internet.

21.      The resulting URL may be kept private, for private use. If it is not revealed to others, its long name and numeric components make it unlikely anyone will guess the name, affording a degree of privacy or security.

HIGHLY CONFIDENTIAL                           Expert Report of Andrew S. Cromarty, Ph.D.

22.     Alternatively, the URL may be shared with others. Anyone who enters the URL into their Web browser, or who clicks on it when displayed as a link in a bookmark list or index web page, will have access to the uploaded resource. This is how sharing is accomplished on the Internet.

23.     A non-registered Hotfile user who attempts to "visit" (use) the URL is presented with a Hotfile web page offering a business choice pursuant to Hotfile's "freemium" business model (cf. *supra*). The downloading/viewing user may choose a free "Regular Download" at no cost, which provides limited download speeds, one download at a time, and a limit of two downloaded files per hour, with a brief delay before downloads start after they are requested. Alternatively, the downloading user may choose a premium (paid) High Speed Download, which offers unrestricted download speed, no initial service delay, and an unrestricted number of file downloads per hour, subject to available computing and communications resources to service received requests. Further user performance incentives to upgrade to a premium paid account include "Fast download even when servers are busy," support for download accelerators, and support for resuming downloads that fail midstream due to Internet communications errors (cf. *supra*), and "Hot/Direct Linking," which offers accountholders the ability to share the performance benefits they have purchased for files they upload.

24.     For example, if a parent  with a premium account uploads family photographs and videos taken using a PDA or cell phone camera at her child's sporting event and then shares the resulting URL by email or SMS text message, other family members anywhere on the Internet immediately can view those photos and videos. In this case, the premium accountholder parent's paid-account performance benefits are shared by the entire family when obtaining and viewing these family digital assets.

HIGHLY CONFIDENTIAL                              Expert Report of Andrew S. Cromarty, Ph.D.

25.     Payment by Hotfile premium accountholders in the United States is accomplished through PayPal, an eBay subsidiary, and is charged on a recurring monthly basis. Presently offered premium service "tiers" are based on the amount of file transfer volume an accountholder wishes to rent, and for how long. For example, $9/month rents 100 gigabytes (100 GB) of Hotlink file transfer traffic.

26.     This is typical pricing for Internet file storage and access. As one example, Amazon.com rents storage to anyone on the Internet through its "S3" Internet-based ("cloud"-based) storage service at prices in the range of $10 to $14 monthly per 100 GB. *Amazon S3 Pricing at 1.* Similarly, Amazon's Elastic Compute Cloud ("EC2"), "a web service that provides resizable compute capacity in the cloud" with the business goal to "to make web-scale computing easier for developers," similarly operates under a freemium model with free uploads and a marginal price for premium download service of approximately $12 per GB of file transfer traffic monthly. *Amazon EC2 at 2. Amazon EC2 Pricing at 3.* Amazon's services are very widely used by companies across the Internet; as one example, the publicly-traded multi-billion-dollar entertainment movie streaming firm Netflix is a customer of Amazon's cloud services.

27.     Pre-payment discounts are offered by Hotfile as part of their pricing mix. This is common in the Internet and Web hosting industry; for example, well-known major web hosting firms such as Bluehost and 1and1 offer pre-payment discounts for web hosting services.

28.     Hotfile service pricing compares favorably and predictably with alternative commercial storage and data transfer costs. For example, raw storage purchased as hard disk equipment presently costs approximately $5 per 100 GB single-quantity capital cost, but any operating

HIGHLY CONFIDENTIAL                                    Expert Report of Andrew S. Cromarty, Ph.D.

expense must be borne by the buyer and a raw hard disk is not inherently Internet-accessible or structured as a reliable ubiquitous service. Major phone carriers in the United States such as ATT presently offer data transfer (with no storage) in the general range of $10 per GB. Hotfile's pricing tiers are intermediate, falling between the cost of raw storage and the cost of mobile data transfers by carriers, as is to be expected: Hotfile's business operations can employ cheaper terrestrial communications, they offer (and must pass through costs for) added management and reliability services, and they can achieve economies of scale in their large storage arrays.

29.     Hotfile also has a reseller program,. Under this program, in essence Hotfile is a wholesale provider of storage accounts, and its resellers are individual retailers around the Internet who market and resell its underlying services. Presently Hotfile lists over a dozen resellers who resell its services in the United States, approximately thirty payment systems (such as PayPal) worldwide that are accepted and used for payments, and over one hundred countries for which there are resellers. The wholesale discount on accounts through indirect channels is nominally 20% of the retail price for direct single-quantity sales by Hotfile.

30.     Hotfile's published policy is that they "do not restrict any country - free downloads for everyone are guaranteed." For example, Hotfile downloads are permitted as a means for individuals to communicate in countries where totalitarian regimes may otherwise wish to control information flow to citizens, or where speech or information sharing may be restricted or repressed.

31.     Hotfile has an "affiliate" marketing program. Under this program an affiliate may be paid for usage generated by the affiliate. As discussed *supra,* an affiliate marketing program allows a

HIGHLY CONFIDENTIAL                          Expert Report of Andrew S. Cromarty, Ph.D.

business to reach markets or cultures outside its own, particularly on the Internet, which is international in scope. Affiliates earn commissions according to a published Earnings Table. One business incentive metric for awarding affiliates is achieving a high download-to-upload ratio. Incentivizing increased user activity is a rational business decision because, under the freemium business model, increased traffic driven to a site will result in conversions at some fixed rate to premium (paying) users. In addition, Hotfile further directly incentivizes these conversion by employing a second published metric computed based on conversions to premium user accounts attributable to an affiliate. A third incentive rewards premium accounts sold through advertising on the affiliate's web site. Amazon.com offers a similar sell-through incentive for sales by its affiliates. Finally, affiliates receive a permanent commission on referred sales for uploaders who become registered Hotfile customers, in that a first Hotfile customer earns 20% of the net sales of a second uploader who registers under the first customer's referral link. Hotfile's marketing program is substantially similar to refer-a-friend and affiliate marketing programs employed by large successful Internet sales, web hosting and telecommunications service provider companies such as Amazon.com, eBay, 1and1 and Ooma. *Amazon.com Associates Program Advertising Schedule. Ooma referral offer at 1. 1and1 referral offer. 1and1 Affiliate Marketing Overview. eBay Partner Network Overview.*

HIGHLY CONFIDENTIAL                         Expert Report of Andrew S. Cromarty, Ph.D.

**B. Curriculum Vitae of Dr. Andrew Cromarty**

Curriculum Vitae

# Andrew Cromarty, Ph.D.

## Expertise

- Distributed computing
- Internet, broadband, networking
- Corporate IT, security, datacenter
- Web commerce, business models

- High-tech management & finance
- Software & product development
- Multimedia, entertainment tech
- Computer & Information Science

## Professional Summary

Energetic, focused leader with over 20 years business experience in large and small companies, including as CTO of a billion-dollar publicly-traded consumer broadband corporation; CTO of a $100M consumer wireless hotspot services joint venture; Chairman of a Lucent wireless content-distribution/e-commerce spinout; manager or co-founder of several high-technology startups; CTO/CIO of an entertainment software/services company; CTO/CIO of an investment bank; member of Board of Directors for satellite, broadband wireless, and venture investment corporations; and research roles in the highest management-awarded corporate scientist positions at Digital, ADS, and Compaq.

Proven track record in management & operations, software development and service delivery, new technology creation, intellectual property evaluation, business model refinement, and team building and leadership. Experience includes product/service design, definition, development, and delivery; R&D and IT management; and project, line, corporate management, corporate strategic partnering, staff management, public relations, technology transfer, and intellectual property management. Managed development of a wide range of systems, from research prototypes through commercial products and services. Leading technical expertise in system architecture, networking, distributed computing and communications, and broadband, including pioneering work in multimedia content distribution and delivery that yielded many worldwide Internet firsts.

Strong general management approach based on a customer-focused hands-on leadership style. International service delivery experience, including as CTO of corporations with wholesale and retail terrestrial landline/wireless and satellite service operations in North America, Caribbean, Europe, and Asia. Experienced, press-trained, capable writer and public speaker.

<div align="center">**Curriculum Vitae**</div>

## Employment History

| | | |
|---|---|---|
| From: | 2010 | **Distributed Systems Technology LLC** |
| To: | Present | Palo Alto, CA |
| | Position: | *President and CEO* |
| | | (Business & IP advisory) |

| | | |
|---|---|---|
| From: | 2009 | **Minerva Consulting** |
| To: | Present | Palo Alto, CA |
| | Position: | *Partner* |
| | | (Business & IP advisory) |

| | | |
|---|---|---|
| From: | 2007 | **Union Square Advisors** |
| To: | 2008 | San Francisco, CA |
| | Position: | *CIO  & CTO* |

Founding CIO/CTO of investment bank specializing in mergers and acquisition (M&A) and late-stage private placement investment. Reported to President/founder. Conducted M&A and investment due diligence, provided detailed intellectual property analyses internally and to clients, negotiated and managed 45 vendor and supplier contracts & licenses, and built and oversaw the bank's internal operations, security, and regulatory compliance infrastructure. Architected/implemented complete corporate mail, CRM, security, datacenter, virtualization, document management, mobile/BES, website, backup/DR/BCP, conferencing, web/videoconferencing, and VOIP/telecommunications systems. Perfect corporate security record maintained (no breaches or leaks) during the entire several-year tenure. New business development included bringing the bank its largest private placement client. Served as the investment bank's internal diligence expert on tech industry clients and opportunities across semiconductor & communications, enterprise software, clean/green tech, and Internet verticals. Worked directly and extensively with clients' management teams, including IP advisory.

| | | |
|---|---|---|
| From: | 2005 | **DAX Solutions, Inc.** |
| To: | 2007 | Los Angeles, CA |
| | Position: | *CIO & CTO* |

CIO/CTO at the entertainment industry's largest Web-based/SaaS global media asset & enterprise workflow management service supplier for film/TV industry, supporting thousands of customer users across hundreds of productions on five continents. Presided over operations during firm's growth to 55% market share over 2 years, at 80% year-over-year revenue & customer growth. Reported to CEO.

# Curriculum Vitae

Managed internal operations, field ops, product development, IT & engineering (software development, operations, global distributed server/content distribution network, outsourcing/offshoring, technical customer relations, service delivery, architecture, and security). Designed, architected, and built a new industry-redefining enterprise-level service business, the industry's first high-definition digital dailies screening and distribution system for film/TV executives, and integrated it securely into customer infrastructure at Disney and other major studios/networks. Defeated entrenched incumbents in a six-way competitive race, winning an exclusive quarter-million-dollar contract with Walt Disney Pictures; line-managed Disney contract and customer relationship. Grew product/service to serve new clients (Showtime, Lifetime, Walden Media, Fox, FX, LionsGate, ABC Touchstone).

Managed major product updates and product/service enhancements. Rearchitected CDN and datacenter operations, including servers, networking, and multi-terabyte asset storage management systems. Managed major software product updates, including Oracle/DB2/Websphere to open source/MySQL/JBOSS migration, user feature enhancements, storage access enhancements. Oversaw new trouble ticket, CRM, and project planning system implementations. Negotiated new datacenter contract, upgraded critical Internet service to a diversified tier 1 provider base, instituted new management & operations processes, and selectively outsourced operations, to reduce operations costs 40% and improve customer-facing service level from 2 nines to 4 nines. Managed and developed leasing, outsourcing/ offshoring, manufacturing and vendor relationships. Defined and instituted professional staff management practices including formal review and bonus incentive programs, to align manager performance with company goals and facilitate corporate growth. Frequently marketed/sold to and directly supported the firm's highly demanding customers.

| | | |
|---|---|---|
| From: | 2001 | **City Lights Network** |
| To: | 2005 | Palo Alto, CA |
| | Position: | *President & Principal* |

Provided advisory services to firms in startup, restart, or growth phase, often accepting an interim Chief Officer role. Engagements included Starfish Health (as CTO and VP Operations), Fifth Day Therapeutics (as CTO and CIO), and RFG, a highly-regarded boutique analyst firm (as Strategic Consulting Partner). As professional due-diligence advisor for VCs and private investors, evaluated hardware & software investment candidates. Engaged by Global 500 computing and financial industry firms to advise on architecture, compliance, and operations. As a "hired gun" CXO, designed and developed service offerings, managed outsourced development, developed business models, supported investment activities, developed intellectual property portfolio, business

### Curriculum Vitae

relationships, growth plans, financial models, and software technology for several startups. Designed and developed software for a startup's consumer web-based service offering, managed outsourced web development, developed business models, supported investment activities. Developed intellectual property portfolio, business relationships, growth plans, financial models, and software technology for a biotech drug discovery startup, applying mathematical modeling and computer simulation techniques to developmental genomic regulatory networks to produce new drug candidates. Evaluated investment candidates in enterprise security, high-volume collaborative consumer multimedia, and distributed/grid enterprise software for professional investors.

| | | |
|---|---|---|
| From: | 1999 | **SoftNet Systems, Inc.** |
| To: | 2001 | San Francisco, CA |
| | Position: | *Chief Technical Officer* |

Member of the five-person executive team governing a billion-dollar publicly-traded broadband services corporation, growing it from 350 to 700 technical staff, 20,000 to 30,000 subscribers, 30,000 to 60,000 email users, and operations from 70 to over 100 cities internationally. Chief officer for parent corporation and all operating subsidiaries, actively participating in their operations. Operating units included the nation's third-largest cable Internet provider, the first two-way VSAT satellite broadband provider, and a $100 million broadband wireless service provider joint venture. Reported to CEO/Chairman.

Line-managed the firm's corporate IT, pre-spinout business incubator, and corporate technology staff.   Responsibilities included technical operations & service delivery, new product and business development, new technology development, corporate strategy, intellectual property, press and investor/analyst presentations, corporate venture investment, staff development, market realignment/restructuring/M&A and discontinuation/creation of subsidiaries, and cost reduction and quality improvement.  Served on Board of Directors of SoftNet Ventures, the corporation's venture capital investment arm, and led or conducted due diligence and investment activities.

Led software and hardware architecture teams as CTO of $100MM broadband wireless subsidiary/JV. Designed proprietary on-site multi-level caching server systems, with networked wireless delivery, remote management, semi-formal security policy, and industry-defining performance. Developed the broadband wireless industry's first consumer equipment certification program and first semi-formal security policy for wireless services.

Supervised a $5M P&L pre-spinout multimedia content hosting subsidiary with operations in 90 cities, including financials, product technology, strategy, staffing, sales & marketing, partnering, and external investment

## Curriculum Vitae

negotiation. Oversaw competitive, performance, and vendor/supplier relationships for content management, cable & satellite broadband businesses, internal enterprise IT applications, and external web hosting business.

Led efforts that improved profitability and operating efficiency. Refined product mix, reduced failure rate, improved service reliability by nearly two nines to 99.7% in key markets; implemented technology upgrades to reduce expense and improve performance of service delivery by 40%. Rearchitected cable network and standardized fielded hardware and software to cut operating expenses in managing $20 million of deployed capital assets.

As corporate strategy officer, tracked 7 global geographies, kept contact with 188 companies or institutions, and maintained trend data on 90 competitors and partners. Led a successful defense against a competitor's patent attack. Frequently worked directly with strategic partners and individual consumer customers.

| | | |
|---|---|---|
| From: | 2000 | **Freewire Networks, Inc.** |
| To: | 2001 | Murray Hill, NJ |
| | Position: | *Chairman* |

Lucent spinoff: Wireless consumer broadband service/content/e-commerce provider.

Initiated successful Series A investment ($8M post valuation). Led Board through successful hiring of new CEO. Mentored management team on business model and operations, including strategy, business approach and service architecture for delivering live wireless commerce & multimedia content to consumers in-venue.

| | | |
|---|---|---|
| From: | 1996 | **Digital Equipment Corp. & COMPAQ Computer Corp.** |
| To: | 1999 | Palo Alto, CA |
| | Position: | *Principal Scientist, Corporate Strategy & Technology (CTO's) Division; Manager, Networked Entertainment Technology* |

Member of the renowned Western Research Laboratory and Network Systems Laboratory, developing novel Internet system architectures and the business models to exploit them.

Designed and developed new networked hardware-software architectures for high-performance internetworked multimedia. Developed a portfolio of strategic partners; achieved many worldwide historic Internet transaction, service performance, & scalability firsts, including first to stream 1,000,000 live videos for an event, world's first Java-based distributed Internet games demo, and world's first live wireless webcasts. Served as press-trained designated corporate spokesperson for broadband

## Curriculum Vitae

and multimedia. Consulted to senior management of 50 customer/partner firms on business models and operations.

Developed managed-services business model and architecture for an international web-based sports news distribution joint venture with Reuters, later spun out as SportsWeb and sold to CBS Sportsline. Defined hardware-software architecture, partnering plan, and cost-benefit and cashflow breakeven analyses to establish service tiers.

From:    1990    **Distributed Systems Technology / Distributed Systems Research**
To:      1996    Palo Alto, CA
         Position:    *President & Founder*
                 Founded and ran a profitable business for six years. Major clients included GE Aerospace, US Navy. Led architecture team for a $43M DARPA-funded distributed automation program. Contracts included design of a performance management system for assessing and tracking the training and on-the-job competence of US Navy personnel; multidimensional visualization techniques to assist Navy operators in route planning tasks; and the design of a strict real-time task scheduling approach for a distributed situation assessment system and semiformal design specification of a distributed real-time underwater semirobotic situation assessment, planning, and execution system. Developed a novel business in turnkey catalog web services targeted at growth-oriented small retailers and implemented it profitably.

From:    1983    **Advanced Decision Systems**
To:      1990    Mountain View, CA
         Position:    *Acting Division Manager, Corporate Marketer & Principal Scientist*
                 Manager for 8 years in a consistently profitable startup that grew from 35 to 200 employees, became the dominant supplier of applied AI systems to the US Government, and launched a successful public spinout (Verity). Performed general manager functions for a corporate division with a multimillion-dollar P&L. Reported to President or SVP.

                 Managed approximately 20 successful software development projects over 8 years, consistently delivering working software to external customers on-time and on-budget. Started a computer systems focus within the company and grew it into a corporate division; directed and supervised the company's staff and contract efforts on the application of machine intelligence technology to computer systems hardware and system software, including distributed systems, advanced computer architectures, intelligent operating systems, programming languages, database technology, computer security, robotic and expert systems, real-time processing techniques, packet radio and networking

## Curriculum Vitae

applications, and reliable fault-tolerant computing. Built and led the team that produced the world's first virtual machine-based distributed cross-platform infrastructure for live object/process migration. As corporate marketer, built a new multimillion-dollar client base that became the firm's single largest stable source of contract revenue.

## Education

| Year | University | Degree |
|------|-----------|--------|
| 1988 | University of Massachusetts Amherst, MA | Ph.D., Computer and Information Science |
| 1980 | University of Massachusetts Amherst, MA | MS, Computer and Information Science |
| 1978 | Wesleyan University Middletown, CT | BA, Music |
| 1978 | Wesleyan University Middletown, CT | BA, Biology and Psychology (double degree) |

## Publications

Monographs and Book Chapters

[1]     Cromarty, A., Adams, T., Wilson, G., Cunningham, J., Tollander, C., and Grinberg, M., "Distributed Database Considerations in an Expert System for Radar Analysis." Expert Data Base Systems, Benjamin/Cummings (pub.), 1986.

[2]     Cromarty, A., Chapter 3 of the monograph World Sugar, Connell Commodities (pub.), Westfield NJ, 1977.

[3]     Cromarty, A., "Control of Processes by Communication over Ports as a Paradigm for Distributed Knowledge-Based System Design." In A. Bond and L. Gasser (eds.), Readings in Distributed Artificial Intelligence, Morgan Kaufman (pub.), 1988.

[4]     Cromarty, A., "Control of Processes by Communication over Ports as a Paradigm for Distributed Knowledge-Based System Design." In L. Kerschberg (ed.), Expert Database Systems (monograph based on April 1986 Proceedings of the First International Conference on Expert Database Systems, Charleston, South Carolina), 1987.

[5]     Cromarty, A., Pattern Recognition in Natural and Artificial Systems. Ph.D. Dissertation, University of Massachusetts, Amherst MA. Unpublished. 1983.

[6]     Cromarty, A., Programming Constructs for Real-Time Distributed Knowledge-Based Systems. Ph.D. Dissertation, University of Massachusetts, Amherst MA. Published by University Microfilms, Ann Arbor, Mich. 1987.

Journal and Proceedings Articles and Reports

## Curriculum Vitae

[1]     Adams, T., Cromarty, A., McCune, B., Wilson, G., Grinberg, M., Cunningham, J., and Tollander, C., "A Knowledge-Based System for Analyzing Radar Systems." invited paper, Proc. Military Microwaves '84 London, England, 1984.

[2]     Cromarty, A., Adams, T., Cunningham, J., and Tollander, C., "Science and Technology Analyst's Assistant." Final Technical Report (Revised), ADS TR-1035-01.  Published as DTIC Technical Report ADA168552, January 1986.

[3]     Cromarty, A., Adams, T., Wilson, G., Cunningham, J., Tollander, C., and Grinberg, M., "Distributed Database Considerations in an Expert System for Radar Analysis." pp. 586-602, Proc. First International Workshop on Expert Database Systems, Kiawah Island, South Carolina, Oct 24-27, 1984.

[4]     Cromarty, A., "A Model of the Anuran Retina." Technical Report 81-35, Department of Computer and Information Science, University of Massachusetts, Amherst, Massachusetts, 1981.

[5]     Cromarty, A., Cation, M., Dove, K., Edwards, T., Leech, M.~J., Newman, N., and Wong, R., "Distributed Processing Topology."  Technical Report TR-3112-01, Advanced Decision Systems, Mountain View, California, October 1986.

[6]     Cromarty, A., "Communications in Advanced Architecture Computing Systems for Distributed Problem-Solving Applications."  Distributed Processing for Ballistic Missile Defense project, ADS Technical Memorandum TM-3098-9, Advanced Decision Systems, July 1987.

[7]     Cromarty, A., "Control of Processes by Communication over Ports as a  Paradigm for Distributed Knowledge-Based System Design."  Proceedings of the First International Conference on Expert Database Systems, Charleston, South Carolina, pp. 47-59, April 1-4, 1986.

[8]     Cromarty, A., Cunningham, J., Dove, D., and O'Reilly, C., "Performance Maintenance for a Heterogeneous Distributed Computing System."  Final Report, Distributed Processing for Ballistic Missile Defense project, ADS Technical Report TR-87-3098-1, Advanced Decision Systems, 1987.   Published as DTIC Technical Report ADB12017L, 1988.

[9]     Cromarty, A. "Depth as a disambiguating cue in visual localization of objects." Published as Technical Report 81-37, Department of Computer and Information Science, University of Massachusetts, Amherst, Massachusetts, 1981.

[10]     Cromarty, A., Edwards, T., Grover, M., Kinion, P., O'Reilly, C., and Railey, M., "Dynamic Adaptive Resource Management for Real-Time Distributed Planning." Final Report (Vol. I), ADS Technical Report No. 3191-1, April 1990.  (Also published by the U.S. Air Force as a  Rome Air Development Center Technical Report in 1990.)

[11]     Cromarty, A., "Entertainment on the Internet: Executable content, entertainment corporations, and the future."  Digital Internet Innovators News, Spring 1998.

[12]     Cromarty, A., "Entertainment on the Internet: How Different Audiences Are Affected." Digital Internet Innovators News, Winter 1997.

[13]     Cromarty, A., and Bauer, E., "Linux in the Datacenter : An Analysis of Linux Use for Large-Scale Database Applications ." Robert Frances Group, October 2005.

[14[     Cromarty, A., Grover, M., and Vitarelli, J., "A Model of Trans-/Post-SIOP Strategic Distributed Planning." Final Report (Vol. II), ADS Technical Report No. 3191-2, April 1990. (Also  published by the U.S. Air Force as a  Rome Air Development Center Technical Report in 1990.)

## Curriculum Vitae

[15]    Cromarty, A., Hatfield, F., Kenig, N., Morgan, K., Smith, S., Whitebread, K., and Williams, D., "SOAS System Design, Version 1.1." Semiformal specification and design report for DARPA's Submarine Operational Automation System program, published as a GE Aerospace program technical memorandum, April 1991.

[16]    Cromarty, A., "Internetworked Multimedia and Networked Entertainment Technology." Compaq Forefront, Fall 1998.

[17]    Cromarty, A., "Kainic acid ablation of thalamo-tectal region 'disinhibits' prey-selective tectal units in the frog Rana temporaria". Invited paper, presented at DARPA Workshop on Planning and Problem Solving in Animate Systems, Santa Fe, New Mexico, 1985.

[18]    Cromarty, A., Leech, M. J., Kinion, P., Tollander, C., Dove, K., and Edwards, T., "Reconstitution, Reconfiguration, and Knowledge-Based Routing in a Heterogeneous Distributed Computing Environment." Final Report, Distributed Processing Topology project, Technical Report TR-87-3112-02, Advanced Decision Systems, 1987. Published by the U.S. Air Force as Rome Air Development Center Technical Report RADC-TR-88-131, 1988.

[19[    Cromarty, A., Morgan, K., and Whitebread, K., "SOAS Situation Assessment (SA) Component Design." Situation assessment design report for DARPA's Submarine Operational Automation System program, published as a GE Aerospace program technical memorandum, December 1991.

[20]    Cromarty, A. "Neural models of visuomotor integration in amphibians." Invited paper, 28th International Congress of Physiological Sciences, Budapest, Hungary, 1980. Published in Adv. Physiol. Sci. vol. 30: G. Szekely, E. Labos, and S. Damjanovich (eds.), Neural Communication and Control.

[21[    Cromarty, A., O'Reilly, C., Mitola, J., and Adams, T., "Artificial Intelligence Applications to the Real-Time EW Problem" (Final Report). Technical Report, Advanced Information & Decision Systems, Mountain View, California, 12 November 1984.

[22[    Cromarty, A., Rudahl, K., Ruggles, L., and Sutton, R., "A VLSI Associative Search Network for Knowledge Acquisition: A Design Study." Tech. Rept. 83-04, Department of Computer and Information Science, University of Massachusetts, Amherst, Massachusetts, 1982.

[23[    Cromarty, A., Shapiro, D., and Fehling, M., "'Still Planners Run Deep': Shallow Reasoning for Fast Replanning." John F. Gilmore (ed.), Applications of Artificial Intelligence, pp. 138-145, Proceedings SPIE 485, 1984.

[24[    Cromarty, A., "SportsWeb: Exploring New Business Models at the Internet's Service Frontier." Digital Forefront, Summer 1998.

[25]    Cromarty, A., "The CoinLisp Reference Manual." Department of Computer and Information Science, University of Massachusetts, Amherst, Massachusetts, 1982.

[26[    Cromarty, A., "The Role of Entertainment on the Web: How Different Audiences Are Affected." Digital Internet Innovators News, Winter 1997.

[27]    Cromarty, A., "What are Current Expert System Tools Missing?" invited paper, Proceedings IEEE Computer Conference, San Francisco CA, February 1985.

[28[    Cunningham, J., Dove, D., Andrews, D., O'Reilly, C., and Cromarty, A., "Model-Based Fault Management." Distributed Processing for Ballistic Missile Defense project, Technical Memorandum ADS-TM-3098-2, Advanced Decision Systems, June 1987.

**Curriculum Vitae**

[29]    Grover, M., Kinion, P., and Cromarty, A., "Cooperating Expert Systems (COPES) Software Development Plan." ADS Technical Report No. TR-2200-003, March 1989.

[30[    Grover, M., Kinion, P., and Cromarty, A., "Design Criteria for Cooperating Expert Systems (COPES)." ADS Technical Report No. TR-2200-002-C, March 1989.

[31]    Grover, M., Kinion, P., Cromarty, A., and Edwards, T., "Cooperating Expert Systems (COPES)." Final Report, ADS Technical Report No. TR-2200-004, June 1989. (Also published by the U.S. Air Force as a Rome Air Development Center Technical Report in 1990.)

[32]    Hatfield, F., and Cromarty, A., "A Concept and Architecture for a Proficiency Management Support System." Final Report, US Navy Contract N00039-95-C-0030, June 1995.

[33[    Hatfield, F., and Cromarty, A., "Proficiency Management Toolset (PMToolSet): Analysis and Requirements." Interim Report, US Navy Contract N00039-95-C-0030, March 1995.

[34]    Hatfield, F., and Cromarty, A., "Proficiency Tracking and Authoring Tools for C4I Environments (ProTRACE): Technology and Architecture." Interim Report, US Navy Contract N00039-95-C-0030, April 1995.

[35]    Hatfield, F., and Cromarty, A., "Visualization and Analysis for Cruise Missiles." Final Report, US Navy Contract N60921-94-C-A132, June 1994.

[36]    Lara, R., Arbib, M., and Cromarty, A., "Neural modeling of prey-predator interactions in frog and toad visuomotor coordination." Soc. Neurosci. Abs. 5:469, 1979.

[37[    Lara, R., Arbib, M., and Cromarty, A., "The Role of the Tectal Column in Facilitation of Amphibian Prey-Catching Behavior: A Neural Model." J. Neurosci. 1982.

[38]    Levitan, S., and Cromarty, A., "Vds: An Interactive VLSI Design System." Technical Report 81-36, Department of Computer and Information Science, University of Massachusetts, Amherst, Massachusetts, 1981.

[39[    Miltonberger, T., Cromarty, A., and Lawton, D., "Feasibility Study of an Artificial Intelligence Approach to Space Object Identification" (Final Report), Technical Report TR-2077-2, Advanced Decision Systems, Mountain View, California, April 1985.

[40[    Miltonberger, T., Cromarty, A., Lawton, D., and Muller, H., "Preliminary Results on a Model-Based Image Understanding System for Detecting Space Object Anomalies from Inverse Synthetic Aperture Radar (ISAR) Images." Proceedings Fifth Annual Phoenix IEEE Conference on Computers and Communications, March 1986.

[41]    Morgan, K., Whitebread, K., Kendus, M., and Cromarty, A., "Integration of Domain and Resource-Based Reasoning for Real-Time Control in Dynamic Environments." Proceedings of the NASA SOAR Conference, August 1992.

[42]    O'Reilly, C., and Cromarty, A., "`Fast' Is Not `Real-Time': Designing Effective Real-Time AI Systems." Applications of Artificial Intelligence, Proceedings SPIE 548, John F. Gilmore, ed., 1985.

[43]    Sinnamon, H., Miller, C., and Cromarty, A., "Response of medial telencephalic neurons to stimulation in reinforcing sites in the medial forebrain bundle and ventral tegmental area." Physiology and Behavior 22:555-562, 1979.

## Curriculum Vitae

[44[    Sutton, R., and Cromarty, A., "The Gus Device-Independent Graphics System Reference Manual." Department of Computer and Information Science, University of Massachusetts, Amherst, Massachusetts, 1981.

[45]    Weymouth, T., and Cromarty, A., "COINS-3D (An Adaptation of MOVIE-BYU): System Description and Reference Manual." Department of Computer and Information Science, University of Massachusetts, Amherst, Massachusetts, 1979.

[46[    Wilson, G., Cromarty, A., Adams, T., Grinberg, M., Tollander, C., and Cunningham., J., "AI Assists Analysts in Identifying Soviet Radar Systems."  Defense Systems Review, January 1984.


Select Presentations, Invited Lectures and Invitational Workshops

[1]    "AI in the 80's: Transferring the technology," Invited Keynote Speaker lecture (Plenary Management Session) for Aerospace Applications of AI Conference, Dayton OH, Oct 14-17, 1986.

[2]    AI Planning Workshop (satellite workshop of National Conference on Artificial Intelligence), Washington, DC, Aug 1984.

[3]    "Cooperating Expert Systems." Technical Interchange Workshop, Decision Aids Branch, RADC/COAD, Rome NY, Feb 17, 1988.

[4]    DARPA Workshop on Planning and Problem Solving in Animate Systems. Bishop's Lodge, Santa Fe NM, June 17-19, 1985.

[5]    "Distributed Planning Architectures, or Planning in a Distributed Computing Environment." Technical Exchange Workshop, Knowledge Engineering Branch, RADC/COES, Rome NY, May 18, 1988.

[6]    "Distributed System Reconstitution for Strategic Distributed Planning" (with M. Grover).  Technical Exchange Workshop, Distributed Systems Branch, RADC/COTD, Rome NY, Jan 11, 1989.

[7]    "Distributed System Topology for the SDI Battle Management/C3 System." Technical Exchange Workshop, Distributed Systems Branch, RADC/COTD, Rome NY, Nov 1986.

[8]    "Dynamic Process Migration for Reconstitution and Reconfiguration in a Heterogeneous Distributed Computing Environment."  Technical Exchange Workshop, Distributed Systems Branch, RADC/COTD, Rome NY, Dec 1987.

[9]    "Information processing in autonomous mobile vehicles" (with R. Drazovich), DARPA Workshop on Autonomous Ground Vehicles, Leesburg VA,  Oct 24-26 1983.

[10]    Intelligent Decision Support Systems, two-day public lecture series (sole  speaker) presented to audiences in Boston MA, Atlantic City NJ, and Washington DC, Jan 1986.

[11]    "Knowledge-based fault management using heterogeneous dynamic process migration." Artificial Intelligence Technology Fair Workshop, Knowledge Engineering Branch, RADC/COES, Rome NY, Nov 1988.

[12]    Invited keynote talk, EnterTech Entertainment and Technology Conference, Carlsbad CA, April 1999.

**Curriculum Vitae**

[13]     "New Domains and Collective Visions: All Things Digital." Invited panel session, Univ. of California/Red Herring's DIGIVATIONS: Global Digital Technology and Media Conference, Bacara Resort, Santa Barbara, California, September 24–26, 2000.

[14]     "Linux in the Datacenter : An Analysis of Linux Use for Large-Scale Database Applications ." Public national lectures series, Robert Frances Group, October 2005.

[15]     "The Death of Product Design." Invited lecture and panel session, Asilomar Microcomputer Workshop, Pacific Grove, California, April 28-30, 2010.

[16]     "Education and the Innovation Economy: A brief status report." Invited lecture and panel session, California Assembly Select Committee on Innovation and the Economy: Innovation Symposium, Livermore, California, July 13, 2010.

## Awards, Honors, Professional Associations and Achievements

Cum Laude Society, Newark Academy (1974)

Bausch and Lomb Honorary Science Award (1974)

National Science Foundation Summer Research Fellowship, for neurophysiology research (1977)

National Institutes of Health/NINCDS Research Assistantship, for computer science and mathematical modeling of biological systems (1979-1980)

DAAD Fellowship, to conduct neuroethology research in Germany (1980)

National Institutes of Health/NINCDS Research Assistantship, for computer science and mathematical modeling of biological systems (1981-1982)

Teaching Assistantship, University of Massachusetts at Amherst (1982)

National Science Foundation Research Assistantship, to design a new programming language (1983)

Member, ACM (past Vice President, Pioneer Valley chapter)

## Curriculum Vitae

### Board Positions

Former college fraternity President, now serving on national executive board. Served on four corporate boards and numerous boards of advisors; presently serving on University of California President's Advisory Board. Position history includes:

| | |
|---|---|
| 2002 – present | President's Board on Science and Innovation, Univ. of California |
| 2001 – 2002 | Contributing Editor, Thumbtribes wireless journal |
| 2001 – 2002 | Board of Advisors, AdCritic.com |
| 2001 – 2002 | Board of Advisors, Globallinx Network Inc. |
| 2000 – 2001 | Board of Directors/Chairman, Freewire Networks (Lucent spinout) |
| 2000 – 2001 | Board of Directors, Aerzone Corporation |
| 2000 – 2001 | Board of Directors, Intelligent Communications, Inc. (Intellicom) |
| 2000 – 2001 | Board of Directors, SoftNet Ventures (corporate venture fund) |
| 1998 – 2002 | Board of Advisors, Univ. Calif. Digital Media Innovation Program |
| 1998 – 2004 | President's Advisory Council, Wesleyan University |
| 1999 – 2000 | Trustee and President, Covenant Presbyterian Church |
| 1996 – present | Trustee, Kappa Alpha Society Foundation |

Case 1:11-cv-20427-KMW   Document 399-1   Entered on FLSD Docket 03/21/2012   Page 150 of 166

1&1 Affiliate - How To Start                                    http://www.1and1affiliate.com/howto/

**HOW TO START**

Overview

1&1 Affiliate Programs

Affiliate Testimonials

Affiliate Terms & Conditions

**Start Earning Now**

Register as a 1&1 affiliate and start immediately!

Get access to great affiliate tools

Earn up to $300 per sale

**Join Now!**

**Already a Customer?**

Choose your preferred log-in method:

○ 1&1 Customer ID or 1&1 Domain

**Enter your 1&1 Customer ID or 1&1 Domain:**

☐ Remember me

**Show Affiliate Tools**

**We make everything easy for you:**

We take care of support

We handle the billing

You get paid

## Hosting Products are Easy to Sell

No other web host brings you so many great products to choose from! As an affordable 'one-stop shop', 1&1 has more shared hosting plans, more server choices, email solutions and hosted business solutions than just about any one. With over 40 hosting products, this means no matter what your referrals want, we've got the right hosted solution at the right price. Visit the 1and1.com website to view all the great products you could be earning from.

## Benefits of Being a 1&1 Affiliate

The 1&1 affiliate program is a great money making opportunity that allows you to partner with the world's largest hosting company. Recommending our high demand web hosting and domain products is simple. Best of all - **you can join our affiliate program absolutely free.**

**You can earn up to $300 per sale!** For more details, check out our Commission Structure.

- Earn up to $300 per sale
- 120 day cookie duration
- Highest affiliate conversion rate in the industry
- Dedicated affiliate marketing support team (live chat, toll free phone support, and email)
- Well known worldwide brand
- Great monthly promotions
- Easy to sell products
- **Free to join**, nothing to sign (no obligations whatsoever)
- No monthly minimums (in our internal program)

## 3 easy steps to your success



**Register**
Sign up for the 1&1 affiliate program in Commission Junction, Pepperjam, or Zanox and become an affiliate

**Share Your Affiliate Tracking Link**
Our easy and unique affiliate tools will let you spread the word

**Earn Money**
By promoting your 1&1 affiliate link, you earn great commissions whenever you refer new customers to 1&1.

partner of the world's #1 web hosting company.

about 1&1 both offline and online. These tools are offered exclusively to 1&1 affiliates.

There is no limit to how much you can earn. Remember, your affiliate link must be used to earn commissions.

## How do I Join?

We give you several options to join us. All you need is 5 minutes! **Joining is absolutely free!**

All you need is 5 minutes! **Joining is absolutely free!**

You may join our external affiliate program in Commission Junction (CJ) or LinkShare, the largest and most trusted affiliate networks in the world:





## What Do I Sell?

You are selling the world's most popular and affordable web hosting products. 1&1 offers everything from domains, instant mail, shared web hosting, to enterprise servers and more. All in all, 1&1 has over 30 commissionable products for you to profit from. We have something for every budget and skill level. There is no limit to how much you can make! Visit 1&1's Main Hosting Website to see the full range of products we offer.



TERMS & CONDITIONS  |  PRIVACY POLICY

© 2008 1&1 Internet, Inc. All rights reserved.

10/11/2011 03:44 PM

Case 1:11-cv-20427-KMW   Document 399-1   Entered on FLSD Docket 03/21/2012   Page 152 of 166

1&1 Affiliate - How To Start - 1&1 Affiliate Programs                    http://www.1and1affiliate.com/howto/1-affiliate-pro...

**HOW TO START**

Overview

**1&1 Affiliate Programs**

Affiliate Testimonials

Affiliate Terms & Conditions

## 1&1 Affiliate Programs

### How do I Join?

All you need is 5 minutes! **Joining is absolutely free!**

You may join our external affiliate program in Commission Junction (CJ) or LinkShare, the largest and most trusted affiliate networks in the world:







**Start Earning Now**

Register as a 1&1 affiliate and start immediately!
Get access to great affiliate tools
Earn up to $300 per sale

**Join Now!**

**Already a Customer?**

Choose your preferred login method:
○ 1&1 Customer ID or 1&1 Domain

**Enter your 1&1 Customer ID or 1&1 Domain:**

☐ Remember me

**Show Affiliate Tools** ▶



TERMS & CONDITIONS   |   PRIVACY POLICY

© 2008 1&1 Internet, Inc. All rights reserved.

Case 1:11-cv-20427-KMW   Document 399-1   Entered on FLSD Docket 03/21/2012   Page 152 of 166

1&1 Affiliate - How To Start - Affiliate Terms & Cond...                                      http://www.1and1affiliates.com/howto/tc/

HOW TO START

Overview

1&1 Affiliate Programs

Affiliate Testimonials

**Affiliate Terms & Conditions**

# 1&1 Affiliate Program - Terms & Conditions

## 1.   Preamble

These special program terms are in addition to the general terms & conditions of the 1&1 Affiliate Program. These special conditions also govern obligations of 1&1 Affiliates.

## 2.   Definitions

The following terms are defined for the purposes of this agreement between 1&1 and the Affiliate:

**Account:** legitimate participation in the 1&1 Affiliate Program pursuant to registration by the Affiliate with full and accurate indication of the content registration information – including the indication of the main domain and the applicable substantive description of the Affiliate site.

**Valid Click:** a click is valid if a User on a Affiliate website voluntarily and knowingly clicks on a tracking link for the 1&1 Affiliate Program and is directed to the 1&1 website. Determination of valid clicks is based on the 1&1 transaction log system and verified by 1&1 with reasonable discretion.

**Valid Sale:** a sale is valid when a User makes a valid click on the 1&1 website and voluntarily and knowingly buys contract products subject to charge. Valid sales are determined like valid clicks using the 1&1 transaction log system and verified by 1&1 with reasonable discretion.

**Tracking-Link:** employed by the 1&1 Affiliate Program for use by the Affiliate such that the Affiliate may present content on its website identifying reference to the 1&1 website. The link is used exclusively by Affiliates in its unchanged form.

**Tracking-Cookie:** with a valid click on a tracking link, a tracking cookie is downloaded on the User's computer if permitted by the browser settings. The tracking cookie contains information about the last valid clicks and, through the 1&1 transaction log system, can be used to retroactively credit the valid sale of a Affiliate.

**Pay-Per-Sale Affiliate Program (pay per Valid Sale):** by implementing a 1&1 tracking link on the Affiliate website and forwarding visitors from the Affiliate website to the 1&1 website via a valid click, thereby arranging the sale or use of 1&1 contract products, the Affiliate is entitled to payment corresponding to the current compensation table.

**User:** any natural person who voluntarily and knowingly, without coercion or deception from the Affiliate or third-party compensation, with the exception of a 1&1-designated bonus system, visits the Affiliate website and, subsequently through a tracking link, the 1&1 website.

**Contract Products:** are paid goods or services to be offered by the Affiliate under this pay-per-sale Affiliate Program to the User per **Appendix 1**.

**Affiliate Website:** German-language webpages of the Affiliate, whose content is

### Start Earning Now

Register as a 1&1 affiliate and start immediately!
Get access to great affiliate tools
Earn up to $300 per sale

**Join Now!**

**Already a Customer?**

Choose your preferred log-in method:
○ 1&1 Customer ID or 1&1 Domain

**Enter your 1&1 Customer ID or 1&1 Domain:**

☐ Remember me

**Show Affiliate Tools ▶**

1&1 Affiliate - How To Start - Affiliate Terms & Cond...                    http://www.1and1affiliates.com/howto/tc/

reviewed by 1&1 at the time of the Affiliate's registration, located on the given or registered (main) domain or another domain or subdomain if content is identical to the designated main domain of the registered account.

**1&1-Site:** is the specified URL of 1&1 Internet Inc., pointed to by the Affiliate tracking link, under which 1&1 sells contract products and promotions online per the general terms of the Affiliate Program.

### 3.    Remuneration

3.1    1&1 pays remuneration for Affiliate services, the amount to be determined by the current compensation table of this agreement.

3.2    The remuneration referred to in the compensation table equals net price plus value added tax, where applicable.

3.3    Multiple remunerations for contract products from pay systems other than 1&1 are prohibited. Only net contracts where the contract is activated are considered eligible sales.

3.4    1&1 determines amount of compensation according to market conditions, with reasonable discretion. Changes in remuneration occur at the beginning of the calendar month with a prior notification period of two weeks. Contracts already in effect are excluded from the revised compensation rates.

3.5    A payment claim occurs when a contract generated through a Affiliate is carried out over a period of at least 60 days. Payment claim is possible only when the Customer provides payment to 1&1 for contracted products for a period of 60 days (the minimum period). Previous periods (up to three months) where the Customer was released from, or credited for, the monthly fee, for example as part of a promotion, are not counted towards the minimum payment period described here.

### 4.    Tracking and Reporting

4.1    The placement of tracking cookies occurs only after a valid User clicks on a 1&1 advertisement which takes the User to the destination website through a hyperlink. 1&1 reserves the right to allow individually selected Affiliates exemption from these tracking cookies. Any registration differing from paragraph 8.2 of this agreement requires a separate written consent from 1&1.

4.2    The duration of the tracking cookie is 30 days. Per the requirements of Section 8.2, a tracking cookie can only be overwritten by a new cookie ("last cookie wins" logic).

### 5.    Rights of the Affiliate

5.1    Mediated contracts for products are exclusively between the Customer and 1&1. 1&1 reserves the right to refuse Customers from its Affiliates.

5.2    The Affiliate is not entitled to accept offers, make or answer statements, or act on behalf of 1&1.

5.3    Contract design and settlement with the End Customer is the sole and absolute decision of 1&1. If the contract with the End Customer, through acts or decisions of 1&1, is prematurely terminated or otherwise not fully implemented, the Customer will have no right to objections or claims regarding possible recovery of compensation.

### 6.    Obligation of Affiliates to 1&1

6.1    The Affiliate is under obligation, using all technical possibilities, to design and present its website, including all entries in search engines,

2 of 4                                                                    10/11/2011 03:44 PM

Case 1:11-cv-20427-KMW   Document 399-1   Entered on FLSD Docket 03/21/2012   Page 155 of 166

directories, and link lists, to third parties in such a way that only valid User clicks and/or valid sales are generated on the 1&1 website.

6.2    1&1 provides the Affiliate with the required tracking links together with the URL of each page of the site. The Affiliate is not permitted to change the 1&1-provided HTML code or banner. The provided advertising materials may only be used on the websites of Affiliates. The use of this advertising is only permitted in connection with this agreement. Any disclosure of information or advertising to third parties is not permitted.

6.3    The linking of advertising material shall be allowed only on defined 1&1 landing sites (so-called "landing pages").

6.4    In addition to paragraph 10.2, the use of names, registered and unregistered trademarks, service marks, and/or logos of 1&1 is generally permitted only if the Affiliate receives prior consent from 1&1. In particular, the Affiliate is not permitted to use the brand called „1&1", even in a modified spelling, as part of a domain or subdomain. The Affiliate is obligated to ensure its website does not violate intellectual property rights, including copyrights, as well as any applicable laws pertaining to data protection.

6.5    The use of the name, registered and unregistered trademarks, or service marks of 1&1 in search engine marketing is not permitted. The advertising of branded keyword "www.1und1.de" with the visible URL, other 1&1 business domains, and so-called "Keyword Typos" are not permitted. Moreover, it is not permitted to link directly from search ads to the 1&1 site.

6.6    Regarding the optimization of its website, the Affiliate must comply with relevant guidelines of search engines, especially for pages which link to the landing page of the 1&1 Affiliate Program. Any techniques performed only for the purposes of improving the search engine ranking of the Affiliate site or which are misleading to the User, or which are of no use are prohibited. The uses of special hidden text or links, irrelevant keywords, unnecessary repetition of substantially identical content on multiple pages or under subdomains and domains, and "doorway pages" that are optimized for search engines ("cloaking") are inadmissible in this context.

6.7    The sending of e-mails by the Affiliate with advertisements for 1&1 is permitted only in accordance with legal requirements.

6.8    The Affiliate is obligated to include a provider ID with business offers. The Affiliate is obligated to ensure its website is in accordance with all laws regarding consumer protection. Violence, sexually explicit or pornographic content, discriminatory statements and representations with respect to race, sex, religion, nationality, disability, sexual orientation, or age are not allowed on the website of the Affiliate and/ or in connection with participation in the Affiliate Program. In particular, advertising without permission on sites that distribute royalty-proprietary content such as music or videos (for example, P2P sites or file-sharing services) is prohibited. The design of the Affiliate website is not permitted to negatively affect the reputation of 1&1 or the reputation of its good or services, brands, or business activities.

6.9    1&1 is intent on conveying a clear brand image for its End Customers. The Affiliate is not permitted, without written consent from 1&1, to tie in and/or combine 1&1 products with its own offers or offers from third parties and advertise or offer them as retail items to the End Customer.

6.10    A Affiliate is not permitted to load the 1&1-shop in an iFrame within its website.

6.11 The above provisions also apply to Affiliate referrals through links to third-party sites.

Case 1:11-cv-20427-KMW   Document 399-1   Entered on FLSD Docket 03/21/2012   Page 156 of 166

1&1 Affiliate - How To Start - Affiliate Terms & Cond...                http://www.1and1affiliates.com/howto/tc/

6.12 The Affiliate can place the tracking link for the 1&1 site on its website at any time in any number. 1&1 may, however, require Affiliates to change the placement of the tracking link if it affects the reputation of 1&1 business activities, goods or services, or the 1&1 brand name.

**7.      Confidentiality**

7.1    Unless otherwise provided for in this agreement or without written consent of the other party, all information which the collaborating parties contribute to this transaction, including the rules of the agreement, commercial and financial information, customer and vendor list data, and pricing and sales information, is treated as strictly confidential.

7.2    Under this agreement, information gained about Customers/Users may only be used for billing purposes by Affiliates of 1&1. Other uses, particularly for marketing or sales purposes, are not permitted.

---

## Products and Commissions

For a full list of all of our products and their commissions please visit our commission info page .



TERMS & CONDITIONS   |   PRIVACY POLICY

© 2008 1&1 Internet, Inc. All rights reserved.

Case 1:11-cv-20427-KMW   Document 309-1   Entered on FLSD Docket 03/21/2012   Page 157 of 166

1&1 Affiliate - How To Start - Affiliate Testimonials                    http://www.1andrafmiate.com/how46/testimonials/

HOW TO START

Overview

1&1 Affiliate Programs

**Affiliate Testimonials**

Affiliate Terms & Conditions

# 1&1 Affiliate Testimonials

"1&1 is always a welcome addition to the Affiliate Summit. We are happy that such a large company has chosen to exhibit. The 1&1 team is both friendly and knowledgeable about their products and their affiliate program."

**Shawn C.** New Jersey

"The 1&1 affiliate team goes above and beyond. They are enthusiastic about their affiliate program and their excitement is contagious. They are really great about following-up and making sure all of my needs have been met and I understand everything about the affiliate program. They have worked with me to help me learn how to earn more referrals in lots of creative ways. They explain things clearly and make it all easy. The 1&1 affiliate team very friendly and a real pleasure to work with!"

**Carrie C.**
Atlanta, GA

"Namespaceinc.com attributes its success to "Concentrating on search engine keywords in order to reach a wide audience of website developers and small businesses in need of web hosting." When asked why they decided to become a 1&1 affiliate, Joe F. answered, "We only partner with merchants and brands that are market leaders in terms of size, quality of service, and reputation. 1&1 certainly fits the criteria."

**Joe F.** Massachusetts

"1&1 is very professional in their approach to affiliate marketing and it is a pleasure to work with them. The affiliate team's advice about 1&1 and numerous other topics have been invaluable to us."

**James Martell** British Columbia, Canada

"My 1&1 ad was already getting clicks but I knew I could do better. One call to the 1&1 affiliate team and a simple recommendation increased my clicks and affiliate sales dramatically. Thanks 1&1."

**Kate D.** Ontario, Canada

"I first met the 1&1 affiliate team at the Affiliate Summit in Las Vegas in February this year. They are some of the most valuable mentors I have ever met in the internet marketing circle! Their extensive knowledge in the world of affiliate marketing simply stuns me! When I have the privilege of talking to Joshua or Jesse I always hang up the phone with a new idea or something that I can help take my business to a new level! They simply take themselves out of the equation and offer online marketing strategies that always increase my sales and commissions significantly! I consider the 1&1 affiliate team true friends and am honored to be a 1&1 affiliate!"

**Tim A.** Florida

"Most of my promotion of 1&1 occurs through my mailing list. I've used advice from Joshua and his affiliate team on several occasions. This has helped increase my open rate and my click rate on 1&1 ads."

**Justin D.** Georgia

"One thing I like the best about 1&1's affiliate program is that I've always been able to reach the affiliate team by phone or email. This is unusual in the world of 'set-it-and-forget-it' affiliate programs. Although I'm just getting started with promoting my 1&1 affiliate link, I have high hopes for earning a lot with the program."

**Stephanie A.** New Jersey

"A strong respected brand like 1&1 has helped me develop content about its products and services. 1&1 has a great conversion rate for me. I highly recommend those who wish

**Start Earning Now**

Register as a 1&1 affiliate and start immediately!
Get access to great affiliate tools
Earn up to $300 per sale

**Join Now!**

**Already a Customer?**

Choose your preferred login method:

○ 1&1 Customer ID or 1&1 Domain

**Enter your 1&1 Customer ID or 1&1 Domain:**

☐ Remember me

**Show Affiliate Tools** ›

Case 1:11-cv-20427-KMW   Document 309-1   Entered on FLSD Docket 03/21/2012   Page 158 of 166

1&1 Affiliate - How To Start - Affiliate Testimonials                    http://www.1and1affiliate.com/how46/testimonials/

to promote web hosting to join the 1&1 affiliate program."

**Victor P**. Russia

"Although I'm not a professional affiliate marketer, by giving my 1&1 affiliate link to my friends who also wanted websites, I have been able to pay for my own hosting.  I like getting my site for free."

**Yuri M.** California

"I'm a full time student but I design websites on the side for extra money.  I always use my 1&1 affiliate link when creating new hosting accounts for my clients. The extra money as a student definitely helps."

**Steven J.** Georgia



TERMS & CONDITIONS   |   PRIVACY POLICY

© 2008 1&1 Internet, Inc. All rights reserved.

10/11/2011 03:45 PM

Check out our TV ad and earn your October reward

**Subject:** Check out our TV ad and earn your October reward
**From:** 1&1 Refer A Friend <noreply@1and1.com>
**Date:** Tue, 11 Oct 2011 17:12:06 +0200 (CEST)
**To:** and██████@█████.com



Andrew Cromarty,

At 1&1 we believe that one good turn deserves another. That's why we want to reward you for recommending us to others. If you're happy with what we do, spread the word this October and you can earn up to $110 for referring friends, family or business associates to 1&1 MyWebsite!*

As a result of our current print and TV advertising, an ever-growing number of people recognize 1&1 as a brand. 1&1 MyWebsite is also gaining recognition as THE customized website solution for companies, associations and professionals. Check out our TV ad!

Just refer a friend by e-mail and follow the 3 steps below or click here for other ways to refer someone you know. Earn your reward today!

Best regards,
Your 1&1 Refer A Friend Team



Hi,

Check out our TV ad and earn your October reward

I just got this fantastic offer from 1&1, my web hosting company, and I immediately thought of you.

It's great- 1&1 makes it easy to design and launch your business website so you can be up and running online in under an hour. Just choose a web design for your business type- content and images are automatically included and can be changed at any time. No programming or design background necessary. You can even try it free for 30 days!

I'm very satisfied with my website and 1&1's services, and I think you'll like them too.

As a result of current print and TV advertising, an ever-growing number of people recognize 1&1 MyWebsite as THE customized website solution. Check out their TV ad:
http://mywebsite.1and1.com/xml/order/popupTVspot

Just click the link below to get started:
http://mybusiness.1and1.com/xml/order/diyselect?k_id=6▋

Kind regards,
Andrew

3. When your friends use your personal tracking link to make a purchase, through your e-mail or another referral tool, you get paid!

For more details, check out our Commission structure below.*

| LET'S BREAK IT DOWN: | | | |
|---|---|---|---|
| Products | 1&1 MyWebsite (Basic package)* | 1&1 MyWebsite (Plus package)* | 1&1 MyWebsite (Premium package)* |
| | 30-day FREE TRIAL* | | |
| Your Friend Pays (monthly fee) | then just $9.99 | then just $19.99 | then just $29.99 |
| You earn (When your friends use your affiliate tracking link to make a purchase, you'll get a commission.) | $40 | $55 | $110 |

Find us on:
  

Your customer ID:
6▋



Check out our TV ad and earn your October reward



Click here for 1&1's commission structure.
When your friends use your affiliate tracking link to make a purchase, you'll get a commission.

Click here for more information on the 1&1 Affiliate Program Terms and Conditions

* 1&1 MyWebsite offer valid through October 31, 2011. 1&1 MyWebsite will receive a 30 day free trial. After the 30 day free trial,
  regular prices apply: 1&1 MyWebsite, regularly $9.99/month; 1&1 MyWebsite PLUS, regularly $19.99/month; 1&1 MyWebsite
  Premium, regularly $29.99/month. A 12 month minimum contract term applies. 12 month minimum contract term begins after 30
  day free trial. Click here for full promotional offer details. Program and pricing specifications and availability subject to change
  without notice.

If you have any questions regarding referrals or commissions, contact our referral team at refer-a-friend@1and1.com.

If you would like to unsubscribe to this newsletter, please log into your 1&1 Control Panel to adjust your preferences under
My Data > User Settings > Settings.

© 2011 All rights reserved. 1&1 and the 1&1 logo are trademarks of 1&1 Internet AG.
1&1 Internet Inc., 701 Lee Road, Chesterbrook, PA 19087.

QUS11ZN003_1EV

10/11/2011 03:35 PM

Amazon.com Associates Central - Help                    https://affiliate-program.amazon.com/gp/associates/help...

Help | Feedback | Select Locale:

- Links & Banners▼Product Links
  Banner Links
  Link to Any Page
  Quick Linker
  Link Checker
- Widgets
- aStore
- Product Advertising API
- Affiliate Programs▼Amazon Wireless Associates
  Endless Associates
  Small Parts Associates
- Reports▼Earnings Report
  Orders Report
  Misc. Referrals
  Link-Type Report
  Daily Trends
  Tracking ID Summary Report

Email address

Password

Sign In   Need help?

## Don't have an account?

Join now for FREE!

## Holiday Offers

- Holiday Offers

## Stay Connected

- Discussion Boards
- Associates Blog

## Customer Support

Amazon.com Associates Central - Help                    https://affiliate-program.amazon.com/gp/associates/help...

- Help
- Performance Tips
- Glossary
- Operating Agreement

**Special Programs**

- Sell on Amazon
- Kindle for Associates
- Product Advertising API
- Vendors & Publishers
- Amazon WebStore
- Amazon Product Ads

**Other Affiliate Programs**

- Audible.com
- AbeBooks.com

# Associates Program Advertising Fee Schedule

This Associates Program Advertising Fee Schedule (**"Schedule"**) is part of the Operating Agreement that governs your participation in the Amazon Services LLC Associates Program. This Schedule describes the advertising fee rates you may earn as a participant in the Program. It also describes the limitations that apply to earning advertising fees on certain Products. From time to time, we may modify this Schedule in accordance with the Operating Agreement. All capitalized terms used below that are not defined on this page have the meanings given to them in the Operating Agreement.

During each calendar month, you may earn advertising fees for Qualifying Purchases. Most advertising fees are calculated as a percentage of Qualifying Revenues based on the tables below and are subject to the limitations described in the "Limitations on Advertising Fee Rates for Certain Products" section below. We also may offer advertising fees in the form of bounties or other special offers as described in the "Special Offers and Promotions" section below. **"Qualifying Revenues"** mean amounts we receive from customers' Qualifying Purchases, excluding shipping, handling, and gift-wrapping fees, taxes, and service charges, and less any rebates, credit card processing fees, returns, and bad debt.

The Program's standard advertising fee structure is described in Tables 1 and 2 below. The advertising fee rates you may earn will vary depending on the number and category of Products that are shipped, streamed, or downloaded (as applicable) in a given calendar month that constitute Qualifying Purchases. We will determine

the classification of Products in each category set forth in Table 1 below or otherwise described on this page.

## TABLE 1 – Fixed Advertising Fee Rates for Specific Product Categories

### US – Fixed Advertising Fee Rates for Specific Product Categories

| Product Category | Fixed Advertising Fee Rates |
|---|---|
| Electronics Products | 4.00% |
| Amazon MP3 Products | 10.00% |
| Amazon Instant Video | 10.00% |
| Game Downloads Products | 10.00% |
| Endless.com and smallparts.com Products | 15.00% |
| Myhabit.com products | 15.00% |
| Gift Cards Redeemable on the Amazon Site | 6.00% |
| Gift Cards Not Redeemable on the Amazon Site | 4.00% |

## TABLE 2 – Volume-Based Advertising Fee Rates for General Products*

| Number of Products Shipped/Downloaded in a Given Month** | Volume–Based Advertising Fee Rates for General Products |
|---|---|
| 1–6 | 4.00% |
| 7–30 | 6.00% |
| 31–110 | 6.50% |
| 111–320 | 7.00% |
| 321–630 | 7.50% |
| 631–1570 | 8.00% |
| 1571–3130 | 8.25% |
| 3131+ | 8.50% |

* **"General Products"** are any Products other than those for which we pay a fixed advertising fee rate as described in Table 1.

** For purposes of calculating the number of Products shipped or downloaded in a given month, we will include Products included in categories in Table 1, except gift cards (whether redeemable on the Amazon Site or not) and any Products expressly excluded in accordance with the "Special Offers and Promotions" section below or otherwise under the Operating Agreement.

If you enrolled in the Program under our "Classic Fee Structure" and are earning a

4% advertising fee rate for any number and category of Products, then that rate will continue to apply to you unless you select the standard advertising fee structure. You may change your account to the standard advertising fee structure described above by clicking here, in which event the change will be effective on the first day of the next month.

## Example Calculation of Advertising Fees

The following example demonstrates how advertising fee rate calculations work under Tables 1 and 2. If, in a given month, 6 General Products, 9 Amazon Instant Video Products, 14 Electronics Products, and 2 gift card Products redeemable on the Amazon Site were shipped or downloaded (as applicable) as a result of orders placed by customers during Sessions initiated through Special Links on your site, then the total number of Products would be 31. The volume-based advertising fee rate for a monthly volume of 7-30 Products would be used to determine your advertising fee rate for General Products because the 2 gift card Product units are not included in calculating the applicable advertising fee tier in Table 2. In this example, an advertising fee rate of 6.00% would apply to Qualifying Revenues from the 6 General Products, an advertising fee rate of 10.00% would apply to Qualifying Revenues from the 9 Amazon Instant Video Products, an advertising fee rate of 4.00% would apply to Qualifying Revenues from the 14 Electronics Products, and an advertising fee rate of 6.00% would apply to Qualifying Revenues from the 2 gift card Products (redeemable on the Amazon site).

## Limitations on Advertising Fee Rates for Certain Products

Notwithstanding the advertising fee rates described on this page, the following limitations apply: (a) advertising fees for all Qualifying Purchases of Products that are personal computers (including without limitation desktops, laptops, notebooks, tablets, and netbooks) are limited to a maximum of $25 per personal computer, regardless of the Qualifying Revenues received from the sale of that Product; and (b) advertising fees for all Qualifying Purchases of Products that are Amazon Instant Video Products or Amazon MP3 Products are limited to a maximum of $1.50 per unit, regardless of the Qualifying Revenues received from the sale of that Product.

## Special Offers and Promotions

From time to time, we may run special or limited time offers or promotions under which you may earn advertising fees on Products or categories of Products that were previously excluded from earning advertising fees, or you may earn increased advertising fee rates from those set forth above. We may notify you about special offers or promotions by updating this page or through emails, blog posts, or other means.

The following special offers and promotions are currently available to all Associates:

- **AmazonWireless Cell Phone with Wireless Service Plan Promotion:**

Case 1:11-cv-20427-KMW   Document 399-1   Entered on FLSD Docket 03/21/2012   Page 166 of 166

For each Qualifying Purchase from the wireless.amazon.com site, you may earn a $50 bounty instead of, and you will not be eligible to earn, the advertising fee rates set forth in the tables above.

- **Amazon Product Ads Program Promotion:**

In connection with referrals to the Amazon Product Ads Program, you may earn a bounty solely as follows: (a) for each new Amazon Product Ads Advertiser Registration you refer, you may earn a $5 bounty; and (b) for each Amazon Product Ads Advertiser Launch, you may earn an additional $150 bounty.

The **"Amazon Product Ads Program"** means the advertising program designed to provide Amazon Site customers access to products available on external Web sites, described in more detail here.
An **"Amazon Product Ads Advertiser Registration"** means an advertiser's registration in the Amazon Product Ads Program to advertise products in at least one of the open categories listed here, where that registration was initiated and successfully completed (as determined by us) by the advertiser during the Registration Period and the advertiser has not previously completed registration in the Amazon Product Ads Program.
The "**Registration Period**" means the period beginning when an advertiser follows a Special Link from your site to the Amazon Product Ads homepage and ending on the earlier of: (i) 30 days later and (ii) any time that advertiser follows a Special Link from the site of another participant in the Program to the Amazon Product Ads homepage. Special Links to the Amazon Product Ads homepage are permitted in connection with this promotion, notwithstanding Section 19 of the Associates Program Participation Requirements.
An **"Amazon Product Ads Advertiser Launch"** means the occurrence of the first click by a natural person on a Product Ads advertisement that is displayed for the advertiser whose Amazon Product Ad Advertiser Registration you referred. An Amazon Product Ads Advertiser Launch must occur within the first 30 days following the date of that advertiser's Amazon Product Ads Advertiser Registration in order for you to be eligible to earn the additional $150 bounty. For the avoidance of doubt, if the Amazon Product Ads Advertiser Launch occurs later than 30 days following the applicable Amazon Product Ads Advertiser Registration, you will not be eligible to earn the additional $150 bounty. Clicks are measured solely by us.

## What do you think?

Do you have a suggestion or comment about Associates Central website? Let us know.

Conditions of Use | Privacy Notice © 1996-2011, Amazon.com, Inc.

Follow us on Twitter | Friend us on Facebook | Join us on Linkedin

# EXHIBIT A
# (Redacted Cromarty Declaration)
# (Part 2)

Amazon EC2 Pricing                                          http://aws.amazon.com/ec2/pricing/



| Sign in to the AWS Management Console | Create an AWS Account | English |

Search: | AWS Product Information |          | 🔍 |

| AWS | Products | Developers | Community | Support |
| Account | | | | |

## Amazon EC2 Pricing

**Amazon EC2 Details**

- EC2 Overview
- EC2 FAQs
- **EC2 Pricing**
- Amazon EC2 SLA
- EC2 Instance Types
- EC2 Instance Purchasing Options
- Reserved Instances
- Spot Instances
- Windows Instances

**Amazon EC2 Features**

- Elastic Block Store
- Amazon CloudWatch
- Auto Scaling
- Elastic Load Balancing
- High Performance Computing
- VM Import

**Related Resources**

- AWS Management Console
- Documentation
- Release Notes
- Developer Tools
- Sample Code & Libraries
- Developer Tools
- Articles & Tutorials
- Amazon Machine Images (AMIs)
- Public Data Sets on AWS
- Community Forum

**Want to Save on Your Amazon EC2 Bill?**

Pay only for what you use. There is no minimum fee. Estimate your monthly bill using AWS Simple Monthly Calculator. The prices listed are based on the Region in which your instance is running. For a detailed comparison between On-Demand Instances, Reserved Instances and Spot Instances, see Amazon EC2 Instance Purchasing Options.

### Free Tier*

As part of AWS's Free Usage Tier, new AWS customers can get started with Amazon EC2 for free. Upon sign-up, new AWS customers receive the following EC2 services each month for one year:

750 hours of EC2 running Linux/Unix Micro instance usage

750 hours of Elastic Load Balancing plus 15 GB data processing

10 GB of Amazon Elastic Block Storage (EBS) plus 1 million IOs and 1 GB snapshot storage

15 GB of bandwidth out aggregated across all AWS services

1 GB of Regional Data Transfer

### On-Demand Instances

On-Demand Instances let you pay for compute capacity by the hour with no long-term commitments. This frees you from the costs and complexities of planning, purchasing, and maintaining hardware and transforms what are commonly large fixed costs into much smaller variable costs.

The pricing below includes the cost to run private and public AMIs on the specified operating system ("Windows Usage" prices apply to Windows Server® 2003 R2, 2008 and 2008 R2). Amazon also provides you with additional instances for Amazon EC2 running Microsoft Windows with SQL Server, Amazon EC2 running SUSE Linux Enterprise Server, Amazon EC2 running Red Hat Enterprise Linux and Amazon EC2 running IBM that are priced differently.

Region: | US East (Virginia) ▼ |

| | Linux/UNIX Usage | Windows Usage |
|---|---|---|
| **Standard On-Demand Instances** | | |
| Small (Default) | $0.085 per hour | $0.12 per hour |
| Large | $0.34 per hour | $0.48 per hour |
| Extra Large | $0.68 per hour | $0.96 per hour |
| **Micro On-Demand Instances** | | |
| Micro | $0.02 per hour | $0.03 per hour |
| **Hi-Memory On-Demand Instances** | | |
| Extra Large | $0.50 per hour | $0.62 per hour |
| Double Extra Large | $1.00 per hour | $1.24 per hour |
| Quadruple Extra Large | $2.00 per hour | $2.48 per hour |
| **Hi-CPU On-Demand Instances** | | |
| Medium | $0.17 per hour | $0.29 per hour |
| Extra Large | $0.68 per hour | $1.16 per hour |
| **Cluster Compute Instances** | | |
| Quadruple Extra Large | $1.30 per hour | $1.61 per hour |
| Cluster Compute Eight Extra Large | $2.40 per hour | $2.97 per hour |
| **Cluster GPU Instances** | | |

Amazon EC2 Pricing                                                    http://aws.amazon.com/ec2/pricing/



See how customers like Ooyala significantly reduced their Amazon EC2 bill by using Spot Instances.

> Learn More

| | Linux/UNIX Usage | Windows Usage |
|---|---|---|
| Quadruple Extra Large | $2.10 per hour | $2.60 per hour |

Pricing is per instance-hour consumed for each instance, from the time an instance is launched until it is terminated. Each partial instance-hour consumed will be billed as a full hour.

## Reserved Instances

Reserved Instances give you the option to make a low, one-time payment for each instance you want to reserve and in turn receive a significant discount on the hourly usage charge for that instance. After the one-time payment for an instance, that instance is reserved for you, and you have no further obligation; you may choose to run that instance for the discounted usage rate for the duration of your term, or when you do not use the instance, you will not pay usage charges on it. In addition to Reserved Instances for Linux/UNIX and Windows operating systems specified below, we also offer Reserved Instances for Amazon EC2 running SUSE Linux Enterprise Server and Amazon EC2 running Microsoft SQL Server.

Dedicated Reserved Instances are also available.

**EC2 Running Microsoft**



Amazon EC2 running Microsoft Windows Server® 2003/2008 is a fast and dependable environment for deploying applications using the Microsoft Web Platform.

> Learn More

**EC2 Running IBM**

You can run many of the proven IBM platform technologies with which you're already familiar.

> Learn More

Region:  US East (Virginia) ▾

| | 1 yr Term | 3 yr Term | Linux/UNIX Usage | Windows Usage |
|---|---|---|---|---|
| **Standard Reserved Instances** | | | | |
| Small (Default) | $227.50 | $350 | $0.03 per hour | $0.05 per hour |
| Large | $910 | $1400 | $0.12 per hour | $0.20 per hour |
| Extra Large | $1820 | $2800 | $0.24 per hour | $0.40 per hour |
| **Micro Reserved Instances** | | | | |
| Micro | $54 | $82 | $0.007 per hour | $0.013 per hour |
| **High-Memory Reserved Instances** | | | | |
| Extra Large | $1325 | $2000 | $0.17 per hour | $0.24 per hour |
| Double Extra Large | $2650 | $4000 | $0.34 per hour | $0.48 per hour |
| Quadruple Extra Large | $5300 | $8000 | $0.68 per hour | $0.96 per hour |
| **High-CPU Reserved Instances** | | | | |
| Medium | $455 | $700 | $0.06 per hour | $0.125 per hour |
| Extra Large | $1820 | $2800 | $0.24 per hour | $0.50 per hour |
| **Cluster Compute Reserved Instances** | | | | |
| Quadruple Extra Large | $3286 | $5056 | $0.45 per hour | $0.63 per hour |
| Cluster Compute Eight Extra Large | $4146 | $6378 | $0.54 per hour | $0.75 per hour |
| **Cluster GPU Reserved Instances** | | | | |
| Quadruple Extra Large | $5630 | $8650 | $0.74 per hour | $1.04 per hour |

Reserved Instances can be purchased for 1 or 3 year terms, and the one-time fee per instance is non-refundable. Usage pricing is per instance-hour consumed. Instance-hours are billed for the time that instances are in a running state; if you do not run the instance in an hour, there is zero usage charge. Partial instance-hours consumed are billed as full hours.

If Microsoft chooses to increase the license fees that it charges for Windows, we may correspondingly increase the per-hour usage rate for previously purchased Reserved Instances with Windows. The initial one-time payment for a Reserved Instance will be unaffected in this situation. Any such changes would be made between Dec 1 – Jan 31, and with at least 30 days' notice. If the per-hour usage rate does increase, you may continue to use your Reserved Instance with Windows with the new per-hour usage rate, convert your Reserved Instance with Windows to a Reserved Instance with Linux, or request a pro rata refund of the upfront fee you paid for the Reserved Instance with Windows.

Reserved Instances are available for Linux/UNIX, Windows and SUSE Linux Enterprise operating systems. You can also optionally reserve instances in Amazon VPC at the same prices as shown above. Click here to learn more about Reserved Instances.

## Spot Instances

Spot Instances enable you to bid for unused Amazon EC2 capacity. Instances are charged the Spot Price, which is set by Amazon EC2 and fluctuates periodically depending on the supply of and demand for Spot Instance capacity. To use

Amazon EC2 Pricing                                                                    http://aws.amazon.com/ec2/pricing/

Spot Instances, you place a Spot Instance request, specifying the instance type, the Availability Zone desired, the number of Spot Instances you want to run, and the maximum price you are willing to pay per instance hour. To determine how that maximum price compares to past Spot Prices, the Spot Price history is available via the Amazon EC2 API and the AWS Management Console. If your maximum price bid exceeds the current Spot Price, your request is fulfilled and your instances will run until either you choose to terminate them or the Spot Price increases above your maximum price (whichever is sooner).

Click here to learn more about Spot Instances. For information on how to get started, click here.

The following table displays the Lowest Spot Price per Region and instance type (updated every 5 minutes). In addition to Linux/Unix and Windows, we also offer Spot Instances for Amazon EC2 running SUSE Linux Enterprise Server.

Region: US East (Virginia) ▼

|  | Linux/UNIX Usage | Windows Usage |
|---|---|---|
| **Standard Spot Instances** | | |
| Small (Default) | $0.05 per hour | $0.12 per hour |
| Large | $0.108 per hour | $0.18 per hour |
| Extra Large | $0.216 per hour | |
| **Micro Spot Instances** | | |
| Micro | $0.006 per hour | $0.012 per hour |
| **High-Memory Spot Instances** | | |
| Extra Large | $0.17 per hour | $0.216 per hour |
| Double Extra Large | $0.42 per hour | $0.378 per hour |
| Quadruple Extra Large | $0.756 per hour | $0.99 per hour |
| **High-CPU Spot Instances** | | |
| Medium | $0.085 per hour | $0.113 per hour |
| Extra Large | $0.216 per hour | $0.45 per hour |
| **Cluster Compute Instances** | | |
| Quadruple Extra Large | $1.6 per hour | N/A* |
| **Cluster GPU Instances** | | |
| Quadruple Extra Large | $0.74 per hour | N/A* |
| * Windows® is not currently available for Cluster Compute or Cluster GPU Instances | | |

If you would like to go straight to a view of the latest Spot Instance pricing:

1. Log in to the AWS Management Console, then click the "Amazon EC2" tab.
2. Click on "Spot Requests" in the navigation pane on the left.
3. Click on "Pricing History" to open a view of pricing selectable by instance type.

## Data Transfer**

**Internet Data Transfer**

The pricing below is based on data transferred "in" and "out" of Amazon EC2.

Region: US East (Virginia) ▼

|  | Pricing |
|---|---|
| **Data Transfer IN** | |
| All data transfer in | $0.000 per GB |
| **Data Transfer OUT** | |
| First 1 GB / month | $0.000 per GB |
| Up to 10 TB / month | $0.120 per GB |
| Next 40 TB / month | $0.090 per GB |
| Next 100 TB / month | $0.070 per GB |
| Next 350 TB / month | $0.050 per GB |

Amazon EC2 Pricing                                              http://aws.amazon.com/ec2/pricing/

| | Pricing |
|---|---|
| Next 524 TB / month | Contact Us |
| Next 4 PB / month | Contact Us |
| Greater than 5 PB / month | Contact Us |

There is no Data Transfer charge between Amazon EC2 and other Amazon Web Services within the same region (i.e. between Amazon EC2 US West and Amazon S3 in US West). Data transferred between Amazon EC2 instances located in different Availability Zones in the same Region will be charged Regional Data Transfer. Data transferred between AWS services in different regions will be charged as Internet Data Transfer on both sides of the transfer.

Usage for other Amazon Web Services is billed separately from Amazon EC2.

**Availability Zone Data Transfer**

$0.00 per GB – all data transferred between instances in the same Availability Zone using private IP addresses.

**Regional Data Transfer**

$0.01 per GB – all data transferred between instances in different Availability Zones in the same region.

**Public and Elastic IP and Elastic Load Balancing Data Transfer**

$0.01 per GB in/out – If you choose to communicate using your Public or Elastic IP address or Elastic Load Balancer inside of the Amazon EC2 network, you'll pay Regional Data Transfer rates even if the instances are in the same Availability Zone. For data transfer within the same Availability Zone, you can easily avoid this charge (and get better network performance) by using your private IP whenever possible.

## Amazon Elastic Block Store

Region:   US East (Virginia) ▾

**Amazon EBS Volumes**

$0.10 per GB-month of provisioned storage

$0.10 per 1 million I/O requests

**Amazon EBS Snapshots to Amazon S3**

$0.14 per GB-month of data stored

## Elastic IP Addresses

Region:   US East (Virginia) ▾

**No cost for Elastic IP addresses while in use**

$0.01 per non-attached Elastic IP address per complete hour

$0.00 per Elastic IP address remap – first 100 remaps / month

$0.10 per Elastic IP address remap – additional remap / month over 100

## Amazon CloudWatch

Region:   US East (Virginia) ▾

**Detailed Monitoring for Amazon EC2 Instances**

$3.50 per instance per month, provided at 1-minute frequency

**Basic Monitoring for Amazon EC2 instances**

$0.00 (free of charge) per instance per month, provided at 5-minute frequency

Amazon EC2 Pricing                                                      http://aws.amazon.com/ec2/pricing/

**Monitoring for Custom Metrics**

$0.50 per metric per month

Detailed Monitoring for Amazon EC2 is charged at standard Amazon CloudWatch rates of $0.50 per metric per month. Each instance includes seven metrics for total charges of $3.50 per month. Partial months are charged on an hourly pro rata basis, at approximately $0.005/instance-hour.

*Note: This new pricing for Detailed Monitoring (representing a 68% decrease from the current price) takes effect starting June 1, 2011. Prior to that, the price remains $0.015 per instance-hour or partial hour. Pricing for Amazon CloudWatch Custom Metrics takes effect starting June 1, 2011. Custom metrics (that you send and Amazon CloudWatch monitors) before that time are free of charge.*

Learn more about Amazon Cloudwatch.

## Auto Scaling

Auto Scaling is enabled by Amazon CloudWatch and carries no additional fees. Each instance launched by Auto Scaling is automatically enabled for monitoring and the applicable Amazon Cloudwatch charges will be applied.

## Elastic Load Balancing

Region:  US East (Virginia)  ▼

$0.025 per Elastic Load Balancer-hour (or partial hour)

$0.008 per GB of data processed by an Elastic Load Balancer

## AWS GovCloud Region

AWS GovCloud is an AWS Region designed to allow U.S. government agencies and contractors to move more sensitive workloads into the cloud by addressing their specific regulatory and compliance requirements. For pricing and more information on the new AWS GovCloud Region, please visit the AWS GovCloud Web Page.

* Your usage for the free tier is calculated each month across all regions except the AWS GovCloud Region, and automatically applied to your bill – unused monthly usage will not roll over. Does not include Amazon EC2 running Microsoft, Amazon EC2 running SUSE Linux Enterprise Server, Amazon EC2 running IBM, and the AWS GovCloud Region. See offer terms for more details and other restrictions.

** As part of AWS's Free Usage Tier, new AWS customers will receive free 15 GB of data transfer out each month aggregated across all AWS services for one year except in the AWS GovCloud Region.

*** Rate tiers take into account your aggregate Data Transfer Out usage across Amazon EC2, Amazon S3, Amazon RDS, Amazon SimpleDB, Amazon SQS, Amazon SNS and Amazon VPC.

*(Amazon EC2 is sold by Amazon Web Services LLC.)*

↑ Top

### Learn

Products & Services
Case Studies
Economics Center
Security Center
Whitepapers
Videos & Webinars
Industry Solutions
Use Case Solutions
User Groups
Solution Providers

### Develop

**Developer Resources**
AMI Catalog
Sample Code & Libraries
Dev Tools & SDKs
Documentation
Articles & Tutorials
Management Console

**Developer Centers**
Java

### Manage

**Your Account**
Management Console
Account Activity
Usage Reports
Personal Information
Payment Method
AWS Identity and Access Management
Security Credentials
Request Service Limit Increases

### About AWS

About Us
Events
Careers at AWS
Contact Us
Announcements (What's New?)
Media Coverage
Privacy Policy



11/21/2011 12:12 PM

Amazon EC2 Pricing                                                    http://aws.amazon.com/ec2/pricing/

Mobile
PHP
Python
Ruby
Windows & .NET

Support
Premium Support
Service Health Dashboard
Discussion Forums
FAQs
Contact Support

©2011, Amazon Web Services LLC or its affiliates. All rights reserved.
An amazon.com company

11/21/2011 12:12 PM

Amazon Elastic Compute Cloud (Amazon EC2)                                    http://aws.amazon.com/ec2/



Search:  | AWS Product Information | | 🔍

| **AWS** | **Products** | **Developers** | **Community** | **Support** |

| **Account** |

# Amazon Elastic Compute Cloud (Amazon EC2)



**Amazon EC2 Details**

**EC2 Overview**

EC2 FAQs

EC2 Pricing

Amazon EC2 SLA

EC2 Instance Types

EC2 Instance Purchasing Options

Reserved Instances

Spot Instances

Windows Instances

**Amazon EC2 Features**

Elastic Block Store

Amazon CloudWatch

Auto Scaling

Elastic Load Balancing

High Performance Computing

VM Import

**Related Resources**

AWS Management Console

Documentation

Release Notes

Sample Code & Libraries

Developer Tools

Articles & Tutorials

Amazon Machine Images (AMIs)

Public Data Sets on AWS

Community Forum

**Want to Save on Your Amazon EC2 Bill?**



Amazon Elastic Compute Cloud (Amazon EC2) is a web service that provides resizable compute capacity in the cloud. It is designed to make web-scale computing easier for developers.

Amazon EC2's simple web service interface allows you to obtain and configure capacity with minimal friction. It provides you with complete control of your computing resources and lets you run on Amazon's proven computing environment. Amazon EC2 reduces the time required to obtain and boot new server instances to minutes, allowing you to quickly scale capacity, both up and down, as your computing requirements change. Amazon EC2 changes the economics of computing by allowing you to pay only for capacity that you actually use. Amazon EC2 provides developers the tools to build failure resilient applications and isolate themselves from common failure scenarios.

This page contains the following categories of information. Click to jump down:

| **Amazon EC2 Functionality** | **Pricing** |
| **Service Highlights** | **Resources** |
| **Features** | **Detailed Description** |
| **Instance Types** | **Intended Usage and Restrictions** |
| **Operating Systems and Software** | |

Easy to sign up, pay only for what you use

**Sign Up Now ▶**

## Amazon EC2 Functionality

Amazon EC2 presents a true virtual computing environment, allowing you to use web service interfaces to launch instances with a variety of operating systems, load them with your custom application environment, manage your network's access permissions, and run your image using as many or few systems as you desire.

To use Amazon EC2, you simply:

Select a pre-configured, templated image to get up and running immediately. Or create an Amazon Machine Image (AMI) containing your applications, libraries, data, and associated configuration settings.

Configure security and network access on your Amazon EC2 instance.

Choose which instance type(s) and operating system you want, then start, terminate, and monitor as many instances of your AMI as needed, using the web service APIs or the variety of management tools provided.

Determine whether you want to run in multiple locations, utilize static IP endpoints, or attach persistent block storage to your instances.

Pay only for the resources that you actually consume, like instance-hours or data transfer.

↑ Top

## Service Highlights

**Elastic** – Amazon EC2 enables you to increase or decrease capacity within minutes, not hours or days. You can commission one, hundreds or even thousands of server instances simultaneously. Of course, because this is all controlled with web service APIs, your application can automatically scale itself up and down depending on its needs.

**Completely Controlled** – You have complete control of your instances. You have root access to each one, and you can interact with them as you would any machine. You can stop your instance while retaining the data on your boot partition and then subsequently restart the same instance using web service APIs. Instances can be rebooted remotely using web service APIs. You also have access to console output of your instances.

Amazon Elastic Compute Cloud (Amazon EC2)                                    http://aws.amazon.com/ec2/



See how customers like foursquare significantly reduced their Amazon EC2 bill by using Spot Instances.

> Learn More

**Flexible** – You have the choice of multiple instance types, operating systems, and software packages. Amazon EC2 allows you to select a configuration of memory, CPU, instance storage, and the boot partition size that is optimal for your choice of operating system and application. For example, your choice of operating systems includes numerous Linux distributions, and Microsoft Windows Server.

**Designed for use with other Amazon Web Services** – Amazon EC2 works in conjunction with Amazon Simple Storage Service (Amazon S3), Amazon Relational Database Service (Amazon RDS), Amazon SimpleDB and Amazon Simple Queue Service (Amazon SQS) to provide a complete solution for computing, query processing and storage across a wide range of applications.

**Reliable** – Amazon EC2 offers a highly reliable environment where replacement instances can be rapidly and predictably commissioned. The service runs within Amazon's proven network infrastructure and datacenters. The Amazon EC2 Service Level Agreement commitment is 99.95% availability for each Amazon EC2 Region.

**EC2 Running SUSE**

Amazon EC2 running SUSE Linux Enterprise Server is a proven platform to deliver peak performance and includes automatic updates for security patches, bug fixes and new features.

> Learn More

**Secure** – Amazon EC2 provides numerous mechanisms for securing your compute resources.

Amazon EC2 includes web service interfaces to configure firewall settings that control network access to and between groups of instances.

When launching Amazon EC2 resources within Amazon Virtual Private Cloud (Amazon VPC), you can isolate your compute instances by specifying the IP range you wish to use, and connect to your existing IT infrastructure using industry-standard encrypted IPsec VPN. You can also choose to launch Dedicated Instances into your VPC. Dedicated Instances are Amazon EC2 Instances that run on hardware dedicated to a single customer for additional isolation.

For more information on Amazon EC2 security refer to our Amazon Web Services: Overview of Security Process document.

**MySQL made easy**



Amazon Relational Database Service (Amazon RDS) makes it easier for you to set up, manage, and scale a relational database in the cloud.

> Learn about Amazon RDS

**Inexpensive** – Amazon EC2 passes on to you the financial benefits of Amazon's scale. You pay a very low rate for the compute capacity you actually consume. See Amazon EC2 Instance Purchasing Options for a more detailed description.

**On-Demand Instances** – On-Demand Instances let you pay for compute capacity by the hour with no long-term commitments. This frees you from the costs and complexities of planning, purchasing, and maintaining hardware and transforms what are commonly large fixed costs into much smaller variable costs. On-Demand Instances also remove the need to buy "safety net" capacity to handle periodic traffic spikes.

**Reserved Instances** – Reserved Instances give you the option to make a low, one-time payment for each instance you want to reserve and in turn receive a significant discount on the hourly usage charge for that instance. After the one-time payment for an instance, that instance is reserved for you, and you have no further obligation; you may choose to run that instance for the discounted usage rate for the duration of your term, or when you do not use the instance, you will not pay usage charges on it.

**EC2 Running Microsoft**



Amazon EC2 running Microsoft Windows Server® is a fast and dependable environment for deploying applications using the Microsoft Web Platform.

> Learn More

**Spot Instances** – Spot Instances allow customers to bid on unused Amazon EC2 capacity and run those instances for as long as their bid exceeds the current Spot Price. The Spot Price changes periodically based on supply and demand, and customers whose bids meet or exceed it gain access to the available Spot Instances. If you have flexibility in when your applications can run, Spot Instances can significantly lower your Amazon EC2 costs. See here for more details on Spot Instances.

## Features

Amazon EC2 provides a number of powerful features for building scalable, failure resilient, enterprise class applications, including:

**Amazon EC2 is Hiring!**



Amazon EC2 is hiring to rapidly expand our service.

> Learn More

**Amazon Elastic Block Store** – Amazon Elastic Block Store (EBS) offers persistent storage for Amazon EC2 instances. Amazon EBS volumes provide off-instance storage that persists independently from the life of an instance. Amazon EBS volumes are highly available, highly reliable volumes that can be leveraged as an Amazon EC2 instance's boot partition or attached to a running Amazon EC2 instance as a standard block device. When used as a boot partition, Amazon EC2 instances can be stopped and subsequently restarted, enabling you to only pay for the storage resources used while maintaining your instance's state. Amazon EBS volumes offer greatly improved durability over local Amazon EC2 instance stores, as Amazon EBS volumes are automatically replicated on the backend (in a single Availability Zone). For those wanting even more durability, Amazon EBS provides the ability to create point-in-time consistent snapshots of your volumes that are then stored in Amazon S3, and automatically replicated across multiple Availability Zones. These snapshots can be used as the starting point for new Amazon EBS volumes, and can protect your data for long term durability. You can also easily share these snapshots with co-workers and other AWS developers. See Amazon Elastic Block Store for more details on this feature.

**Get Started For Free**

New AWS customers receive free usage tiers of compute, storage, and bandwidth every month for one year.

**Multiple Locations** – Amazon EC2 provides the ability to place instances in multiple locations. Amazon EC2 locations are composed of Regions and Availability Zones. Availability Zones are distinct locations that are engineered to be insulated from failures in other Availability Zones and provide inexpensive, low latency network connectivity to other Availability Zones in the same Region. By launching instances in separate Availability Zones, you can protect your applications from failure of a single location. Regions consist of one or more Availability Zones, are geographically dispersed, and will be in separate geographic areas or

Amazon Elastic Compute Cloud (Amazon EC2)                    http://aws.amazon.com/ec2/

> Learn More

**Webinar: Getting Started with Windows on AWS**

Attend an informative webinar designed for business or technical decision makers and IT professionals and learn more about the top business reasons to run Windows Server, SQL Server, or other Windows Server applications on the AWS Cloud.

> Register for the December 8th Webinar Today

countries. The Amazon EC2 Service Level Agreement commitment is 99.95% availability for each Amazon EC2 Region. Amazon EC2 is currently available in seven regions: US East (Northern Virginia), US West (Oregon), US West (Northern California), EU (Ireland), Asia Pacific (Singapore), Asia Pacific (Tokyo), and AWS GovCloud.

**Elastic IP Addresses** – Elastic IP addresses are static IP addresses designed for dynamic cloud computing. An Elastic IP address is associated with your account not a particular instance, and you control that address until you choose to explicitly release it. Unlike traditional static IP addresses, however, Elastic IP addresses allow you to mask instance or Availability Zone failures by programmatically remapping your public IP addresses to any instance in your account. Rather than waiting on a data technician to reconfigure or replace your host, or waiting for DNS to propagate to all of your customers, Amazon EC2 enables you to engineer around problems with your instance or software by quickly remapping your Elastic IP address to a replacement instance. In addition, you can optionally configure the reverse DNS record of any of your Elastic IP addresses by filling out this form.

**Amazon Virtual Private Cloud** – Amazon VPC is a secure and seamless bridge between a company's existing IT infrastructure and the AWS cloud. Amazon VPC enables enterprises to connect their existing infrastructure to a set of isolated AWS compute resources via a Virtual Private Network (VPN) connection, and to extend their existing management capabilities such as security services, firewalls, and intrusion detection systems to include their AWS resources. See Amazon Virtual Private Cloud for more details.

**Amazon CloudWatch** – Amazon CloudWatch is a web service that provides monitoring for AWS cloud resources and applications, starting with Amazon EC2. It provides you with visibility into resource utilization, operational performance, and overall demand patterns—including metrics such as CPU utilization, disk reads and writes, and network traffic. You can get statistics, view graphs, and set alarms for your metric data. To use Amazon CloudWatch, simply select the Amazon EC2 instances that you'd like to monitor. You can also supply your own business or application metric data. Amazon CloudWatch will begin aggregating and storing monitoring data that can be accessed using web service APIs or Command Line Tools. See Amazon CloudWatch for more details.

**Auto Scaling** – Auto Scaling allows you to automatically scale your Amazon EC2 capacity up or down according to conditions you define. With Auto Scaling, you can ensure that the number of Amazon EC2 instances you're using scales up seamlessly during demand spikes to maintain performance, and scales down automatically during demand lulls to minimize costs. Auto Scaling is particularly well suited for applications that experience hourly, daily, or weekly variability in usage. Auto Scaling is enabled by Amazon CloudWatch and available at no additional charge beyond Amazon CloudWatch fees. See Auto Scaling for more details.

**Elastic Load Balancing** – Elastic Load Balancing automatically distributes incoming application traffic across multiple Amazon EC2 instances. It enables you to achieve even greater fault tolerance in your applications, seamlessly providing the amount of load balancing capacity needed in response to incoming application traffic. Elastic Load Balancing detects unhealthy instances within a pool and automatically reroutes traffic to healthy instances until the unhealthy instances have been restored. You can enable Elastic Load Balancing within a single Availability Zone or across multiple zones for even more consistent application performance. Amazon CloudWatch can be used to capture a specific Elastic Load Balancer's operational metrics, such as request count and request latency, at no additional cost beyond Elastic Load Balancing fees. See Elastic Load Balancing for more details.

**High Performance Computing (HPC) Clusters** – Customers with complex computational workloads such as tightly coupled parallel processes, or with applications sensitive to network performance, can achieve the same high compute and network performance provided by custom-built infrastructure while benefiting from the elasticity, flexibility and cost advantages of Amazon EC2. Cluster Compute and Cluster GPU Instances have been specifically engineered to provide high-performance network capability and can be programmatically launched into clusters – allowing applications to get the low-latency network performance required for tightly coupled, node-to-node communication. Cluster Compute and Cluster GPU Instances also provide significantly increased network throughput making them well suited for customer applications that need to perform network-intensive operations. Learn more about Cluster Compute and Cluster GPU Instances as well as other AWS services that can be used for HPC Applications.

**VM Import** – VM Import enables you to easily import virtual machine images from your existing environment to Amazon EC2 instances. VM Import allows you to leverage your existing investments in the virtual machines that you have built to meet your IT security, configuration management, and compliance requirements by seamlessly bringing those virtual machines into Amazon EC2 as ready-to-use instances. This offering is available at no additional charge beyond standard usage charges for Amazon EC2 and Amazon S3. Learn more about VM Import.

↑ Top

## Instance Types

### Standard Instances

Amazon Elastic Compute Cloud (Amazon EC2)                                        http://aws.amazon.com/ec2/

Instances of this family are well suited for most applications.

Small Instance (Default) 1.7 GB of memory, 1 EC2 Compute Unit (1 virtual core with 1 EC2 Compute Unit), 160 GB of local instance storage, 32-bit platform

Large Instance 7.5 GB of memory, 4 EC2 Compute Units (2 virtual cores with 2 EC2 Compute Units each), 850 GB of local instance storage, 64-bit platform

Extra Large Instance 15 GB of memory, 8 EC2 Compute Units (4 virtual cores with 2 EC2 Compute Units each), 1690 GB of local instance storage, 64-bit platform

## Micro Instances

Instances of this family provide a small amount of consistent CPU resources and allow you to burst CPU capacity when additional cycles are available. They are well suited for lower throughput applications and web sites that consume significant compute cycles periodically.

Micro Instance 613 MB of memory, up to 2 ECUs (for short periodic bursts), EBS storage only, 32-bit or 64-bit platform

## High-Memory Instances

Instances of this family offer large memory sizes for high throughput applications, including database and memory caching applications.

High-Memory Extra Large Instance 17.1 GB memory, 6.5 ECU (2 virtual cores with 3.25 EC2 Compute Units each), 420 GB of local instance storage, 64-bit platform

High-Memory Double Extra Large Instance 34.2 GB of memory, 13 EC2 Compute Units (4 virtual cores with 3.25 EC2 Compute Units each), 850 GB of local instance storage, 64-bit platform

High-Memory Quadruple Extra Large Instance 68.4 GB of memory, 26 EC2 Compute Units (8 virtual cores with 3.25 EC2 Compute Units each), 1690 GB of local instance storage, 64-bit platform

## High-CPU Instances

Instances of this family have proportionally more CPU resources than memory (RAM) and are well suited for compute-intensive applications.

High-CPU Medium Instance 1.7 GB of memory, 5 EC2 Compute Units (2 virtual cores with 2.5 EC2 Compute Units each), 350 GB of local instance storage, 32-bit platform

High-CPU Extra Large Instance 7 GB of memory, 20 EC2 Compute Units (8 virtual cores with 2.5 EC2 Compute Units each), 1690 GB of local instance storage, 64-bit platform

## Cluster Compute Instances

Instances of this family provide proportionally high CPU with increased network performance and are well suited for High Performance Compute (HPC) applications and other demanding network-bound applications. Learn more about use of this instance type for HPC applications.

Cluster Compute Quadruple Extra Large 23 GB memory, 33.5 EC2 Compute Units, 1690 GB of local instance storage, 64-bit platform, 10 Gigabit Ethernet

Cluster Compute Eight Extra Large 60.5 GB memory, 88 EC2 Compute Units, 3370 GB of local instance storage, 64-bit platform, 10 Gigabit Ethernet

## Cluster GPU Instances

Instances of this family provide general-purpose graphics processing units (GPUs) with proportionally high CPU and increased network performance for applications benefitting from highly parallelized processing, including HPC, rendering and media processing applications. While Cluster Compute Instances provide the ability to create clusters of instances connected by a low latency, high throughput network, Cluster GPU Instances provide an additional option for applications that can benefit from the efficiency gains of the parallel computing power of GPUs over what can be achieved with traditional processors. Learn more about use of this instance type for HPC applications.

Cluster GPU Quadruple Extra Large 22 GB memory, 33.5 EC2 Compute Units, 2 x NVIDIA Tesla "Fermi" M2050 GPUs, 1690 GB of local instance storage, 64-bit platform, 10 Gigabit Ethernet

EC2 Compute Unit (ECU) – One EC2 Compute Unit (ECU) provides the equivalent CPU capacity of a 1.0-1.2 GHz 2007 Opteron or 2007 Xeon processor.

See Amazon EC2 Pricing for details on costs for each instance type.

See Amazon EC2 Instance Types for a more detailed description of the differences between the available instance types, as well as a complete description of an EC2 Compute Unit.

Amazon Elastic Compute Cloud (Amazon EC2)                                http://aws.amazon.com/ec2/

↑ Top

## Operating Systems and Software

### Operating Systems

Amazon Machine Images (AMIs) are preconfigured with an ever-growing list of operating systems. We work with our partners and community to provide you with the most choice possible. You are also empowered to use our bundling tools to upload your own operating systems. The operating systems currently available to use with your Amazon EC2 instances include:

| Operating Systems | | |
|---|---|---|
| Red Hat Enterprise Linux | Windows Server | Oracle Enterprise Linux |
| SUSE Linux Enterprise | Amazon Linux AMI | Ubuntu Linux |
| Fedora | Gentoo Linux | Debian |

### Software

Amazon EC2 enables our partners and customers to build and customize Amazon Machine Images (AMIs) with software based on your needs. We have hundreds of free and paid AMIs available for you to use. A small sampling of the software available for use today within Amazon EC2 includes:

| Databases | Resource Management | Web Hosting |
|---|---|---|
| IBM DB2 | StackIQ Rocks+ | Apache HTTP |
| IBM Informix Dynamic Server | Hadoop | IIS/Asp.Net |
| Microsoft SQL Server Standard | Condor | IBM Lotus Web Content Management |
| MySQL Enterprise | | IBM WebSphere Portal Server |
| Oracle Database 11g | | |

| Application Development Environments | Application Servers | Video Encoding & Streaming |
|---|---|---|
| IBM sMash | IBM WebSphere Application Server | Wowza Media Server Pro |
| JBoss Enterprise Application Platform | Java Application Server | Windows Media Server |
| Ruby on Rails | Oracle WebLogic Server | |

↑ Top

## Pricing

Pay only for what you use. There is no minimum fee. Estimate your monthly bill using AWS Simple Monthly Calculator. The prices listed are based on the Region in which your instance is running. For a detailed comparison between On-Demand Instances, Reserved Instances and Spot Instances, see Amazon EC2 Instance Purchasing Options.

### Free Tier*

As part of AWS's Free Usage Tier, new AWS customers can get started with Amazon EC2 for free. Upon sign-up, new AWS customers receive the following EC2 services each month for one year:

> 750 hours of EC2 running Linux/Unix Micro instance usage
>
> 750 hours of Elastic Load Balancing plus 15 GB data processing
>
> 10 GB of Amazon Elastic Block Storage (EBS) plus 1 million IOs and 1 GB snapshot storage
>
> 15 GB of bandwidth out aggregated across all AWS services
>
> 1 GB of Regional Data Transfer

### On-Demand Instances

Amazon Elastic Compute Cloud (Amazon EC2)                    http://aws.amazon.com/ec2/

On-Demand Instances let you pay for compute capacity by the hour with no long-term commitments. This frees you from the costs and complexities of planning, purchasing, and maintaining hardware and transforms what are commonly large fixed costs into much smaller variable costs.

The pricing below includes the cost to run private and public AMIs on the specified operating system ("Windows Usage" prices apply to Windows Server® 2003 R2, 2008 and 2008 R2). Amazon also provides you with additional instances for Amazon EC2 running Microsoft Windows with SQL Server, Amazon EC2 running SUSE Linux Enterprise Server, Amazon EC2 running Red Hat Enterprise Linux and Amazon EC2 running IBM that are priced differently.

Region: US East (Virginia) ▼

|  | Linux/UNIX Usage | Windows Usage |
|---|---|---|
| **Standard On-Demand Instances** | | |
| Small (Default) | $0.085 per hour | $0.12 per hour |
| Large | $0.34 per hour | $0.48 per hour |
| Extra Large | $0.68 per hour | $0.96 per hour |
| **Micro On-Demand Instances** | | |
| Micro | $0.02 per hour | $0.03 per hour |
| **Hi-Memory On-Demand Instances** | | |
| Extra Large | $0.50 per hour | $0.62 per hour |
| Double Extra Large | $1.00 per hour | $1.24 per hour |
| Quadruple Extra Large | $2.00 per hour | $2.48 per hour |
| **Hi-CPU On-Demand Instances** | | |
| Medium | $0.17 per hour | $0.29 per hour |
| Extra Large | $0.68 per hour | $1.16 per hour |
| **Cluster Compute Instances** | | |
| Quadruple Extra Large | $1.30 per hour | $1.61 per hour |
| Cluster Compute Eight Extra Large | $2.40 per hour | $2.97 per hour |
| **Cluster GPU Instances** | | |
| Quadruple Extra Large | $2.10 per hour | $2.60 per hour |

Pricing is per instance-hour consumed for each instance, from the time an instance is launched until it is terminated. Each partial instance-hour consumed will be billed as a full hour.

## Reserved Instances

Reserved Instances give you the option to make a low, one-time payment for each instance you want to reserve and in turn receive a significant discount on the hourly usage charge for that instance. After the one-time payment for an instance, that instance is reserved for you, and you have no further obligation; you may choose to run that instance for the discounted usage rate for the duration of your term, or when you do not use the instance, you will not pay usage charges on it. In addition to Reserved Instances for Linux/UNIX and Windows operating systems specified below, we also offer Reserved Instances for Amazon EC2 running SUSE Linux Enterprise Server and Amazon EC2 running Microsoft SQL Server.

Dedicated Reserved Instances are also available.

Region: US East (Virginia) ▼

|  | 1 yr Term | 3 yr Term | Linux/UNIX Usage | Windows Usage |
|---|---|---|---|---|
| **Standard Reserved Instances** | | | | |
| Small (Default) | $227.50 | $350 | $0.03 per hour | $0.05 per hour |
| Large | $910 | $1400 | $0.12 per hour | $0.20 per hour |
| Extra Large | $1820 | $2800 | $0.24 per hour | $0.40 per hour |
| **Micro Reserved Instances** | | | | |
| Micro | $54 | $82 | $0.007 per hour | $0.013 per hour |
| **High-Memory Reserved Instances** | | | | |

Amazon Elastic Compute Cloud (Amazon EC2)                                                    http://aws.amazon.com/ec2/

| | 1 yr Term | 3 yr Term | Linux/UNIX Usage | Windows Usage |
|---|---|---|---|---|
| Extra Large | $1325 | $2000 | $0.17 per hour | $0.24 per hour |
| Double Extra Large | $2650 | $4000 | $0.34 per hour | $0.48 per hour |
| Quadruple Extra Large | $5300 | $8000 | $0.68 per hour | $0.96 per hour |
| **High-CPU Reserved Instances** | | | | |
| Medium | $455 | $700 | $0.06 per hour | $0.125 per hour |
| Extra Large | $1820 | $2800 | $0.24 per hour | $0.50 per hour |
| **Cluster Compute Reserved Instances** | | | | |
| Quadruple Extra Large | $3286 | $5056 | $0.45 per hour | $0.63 per hour |
| Cluster Compute Eight Extra Large | $4146 | $6378 | $0.54 per hour | $0.75 per hour |
| **Cluster GPU Reserved Instances** | | | | |
| Quadruple Extra Large | $5630 | $8650 | $0.74 per hour | $1.04 per hour |

Reserved Instances can be purchased for 1 or 3 year terms, and the one-time fee per instance is non-refundable. Usage pricing is per instance-hour consumed. Instance-hours are billed for the time that instances are in a running state; if you do not run the instance in an hour, there is zero usage charge. Partial instance-hours consumed are billed as full hours.

If Microsoft chooses to increase the license fees that it charges for Windows, we may correspondingly increase the per-hour usage rate for previously purchased Reserved Instances with Windows. The initial one-time payment for a Reserved Instance will be unaffected in this situation. Any such changes would be made between Dec 1 – Jan 31, and with at least 30 days' notice. If the per-hour usage rate does increase, you may continue to use your Reserved Instance with Windows with the new per-hour usage rate, convert your Reserved Instance with Windows to a Reserved Instance with Linux, or request a pro rata refund of the upfront fee you paid for the Reserved Instance with Windows.

Reserved Instances are available for Linux/UNIX, Windows and SUSE Linux Enterprise operating systems. You can also optionally reserve instances in Amazon VPC at the same prices as shown above. Click here to learn more about Reserved Instances.

## Spot Instances

Spot Instances enable you to bid for unused Amazon EC2 capacity. Instances are charged the Spot Price, which is set by Amazon EC2 and fluctuates periodically depending on the supply of and demand for Spot Instance capacity. To use Spot Instances, you place a Spot Instance request, specifying the instance type, the Availability Zone desired, the number of Spot Instances you want to run, and the maximum price you are willing to pay per instance hour. To determine how that maximum price compares to past Spot Prices, the Spot Price history is available via the Amazon EC2 API and the AWS Management Console. If your maximum price bid exceeds the current Spot Price, your request is fulfilled and your instances will run until either you choose to terminate them or the Spot Price increases above your maximum price (whichever is sooner).

Click here to learn more about Spot Instances. For information on how to get started, click here.

The following table displays the Lowest Spot Price per Region and instance type (updated every 5 minutes). In addition to Linux/Unix and Windows, we also offer Spot Instances for Amazon EC2 running SUSE Linux Enterprise Server.

| Region: US East (Virginia) ▼ | | |
|---|---|---|
| | **Linux/UNIX Usage** | **Windows Usage** |
| **Standard Spot Instances** | | |
| Small (Default) | $0.05 per hour | $0.12 per hour |
| Large | $0.108 per hour | $0.18 per hour |
| Extra Large | $0.216 per hour | |
| **Micro Spot Instances** | | |
| Micro | $0.006 per hour | $0.012 per hour |
| **High-Memory Spot Instances** | | |
| Extra Large | $0.17 per hour | $0.216 per hour |
| Double Extra Large | $0.42 per hour | $0.378 per hour |
| Quadruple Extra Large | $0.756 per hour | $0.99 per hour |
| **High-CPU Spot Instances** | | |

Amazon Elastic Compute Cloud (Amazon EC2)                                            http://aws.amazon.com/ec2/

| | Linux/UNIX Usage | Windows Usage |
|---|---|---|
| Medium | $0.085 per hour | $0.113 per hour |
| Extra Large | $0.216 per hour | $0.45 per hour |
| **Cluster Compute Instances** | | |
| Quadruple Extra Large | $1.6 per hour | N/A* |
| **Cluster GPU Instances** | | |
| Quadruple Extra Large | $0.74 per hour | N/A* |
| * Windows® is not currently available for Cluster Compute or Cluster GPU Instances | | |

If you would like to go straight to a view of the latest Spot Instance pricing:

1. Log in to the AWS Management Console, then click the "Amazon EC2" tab.
2. Click on "Spot Requests" in the navigation pane on the left.
3. Click on "Pricing History" to open a view of pricing selectable by instance type.

## Data Transfer**

### Internet Data Transfer

The pricing below is based on data transferred "in" and "out" of Amazon EC2.

Region: US East (Virginia)

| | Pricing |
|---|---|
| **Data Transfer IN** | |
| All data transfer in | $0.000 per GB |
| **Data Transfer OUT** | |
| First 1 GB / month | $0.000 per GB |
| Up to 10 TB / month | $0.120 per GB |
| Next 40 TB / month | $0.090 per GB |
| Next 100 TB / month | $0.070 per GB |
| Next 350 TB / month | $0.050 per GB |
| Next 524 TB / month | Contact Us |
| Next 4 PB / month | Contact Us |
| Greater than 5 PB / month | Contact Us |

There is no Data Transfer charge between Amazon EC2 and other Amazon Web Services within the same region (i.e. between Amazon EC2 US West and Amazon S3 in US West). Data transferred between Amazon EC2 instances located in different Availability Zones in the same Region will be charged Regional Data Transfer. Data transferred between AWS services in different regions will be charged as Internet Data Transfer on both sides of the transfer.

Usage for other Amazon Web Services is billed separately from Amazon EC2.

### Availability Zone Data Transfer

$0.00 per GB – all data transferred between instances in the same Availability Zone using private IP addresses.

### Regional Data Transfer

$0.01 per GB – all data transferred between instances in different Availability Zones in the same region.

### Public and Elastic IP and Elastic Load Balancing Data Transfer

$0.01 per GB in/out – If you choose to communicate using your Public or Elastic IP address or Elastic Load Balancer inside of the Amazon EC2 network, you'll pay Regional Data Transfer rates even if the instances are in the same Availability Zone. For data transfer within the same Availability Zone, you can easily avoid this charge (and get better network performance) by using your private IP whenever possible.

## Amazon Elastic Block Store

Amazon Elastic Compute Cloud (Amazon EC2)                                    http://aws.amazon.com/ec2/



**Amazon EBS Volumes**

> $0.10 per GB-month of provisioned storage

> $0.10 per 1 million I/O requests

**Amazon EBS Snapshots to Amazon S3**

> $0.14 per GB-month of data stored

## Elastic IP Addresses

Region: US East (Virginia)

**No cost for Elastic IP addresses while in use**

> $0.01 per non-attached Elastic IP address per complete hour

> $0.00 per Elastic IP address remap – first 100 remaps / month

> $0.10 per Elastic IP address remap – additional remap / month over 100

## Amazon CloudWatch



**Detailed Monitoring for Amazon EC2 Instances**

> $3.50 per instance per month, provided at 1-minute frequency

**Basic Monitoring for Amazon EC2 instances**

> $0.00 (free of charge) per instance per month, provided at 5-minute frequency

**Monitoring for Custom Metrics**

> $0.50 per metric per month

Detailed Monitoring for Amazon EC2 is charged at standard Amazon CloudWatch rates of $0.50 per metric per month. Each instance includes seven metrics for total charges of $3.50 per month. Partial months are charged on an hourly pro rata basis, at approximately $0.005/instance-hour.

*Note: This new pricing for Detailed Monitoring (representing a 68% decrease from the current price) takes effect starting June 1, 2011. Prior to that, the price remains $0.015 per instance-hour or partial hour. Pricing for Amazon CloudWatch Custom Metrics takes effect starting June 1, 2011. Custom metrics (that you send and Amazon CloudWatch monitors) before that time are free of charge.*

Learn more about Amazon Cloudwatch.

## Auto Scaling

Auto Scaling is enabled by Amazon CloudWatch and carries no additional fees. Each instance launched by Auto Scaling is automatically enabled for monitoring and the applicable Amazon Cloudwatch charges will be applied.

## Elastic Load Balancing

Region: US East (Virginia)

> $0.025 per Elastic Load Balancer-hour (or partial hour)

> $0.008 per GB of data processed by an Elastic Load Balancer

Amazon Elastic Compute Cloud (Amazon EC2)                                      http://aws.amazon.com/ec2/

### AWS GovCloud Region

AWS GovCloud is an AWS Region designed to allow U.S. government agencies and contractors to move more sensitive workloads into the cloud by addressing their specific regulatory and compliance requirements. For pricing and more information on the new AWS GovCloud Region, please visit the AWS GovCloud Web Page.

* Your usage for the free tier is calculated each month across all regions except the AWS GovCloud Region, and automatically applied to your bill – unused monthly usage will not roll over. Does not include Amazon EC2 running Microsoft, Amazon EC2 running SUSE Linux Enterprise Server, Amazon EC2 running IBM, and the AWS GovCloud Region. See offer terms for more details and other restrictions.

** As part of AWS's Free Usage Tier, new AWS customers will receive free 15 GB of data transfer out each month aggregated across all AWS services for one year except in the AWS GovCloud Region.

*** Rate tiers take into account your aggregate Data Transfer Out usage across Amazon EC2, Amazon S3, Amazon RDS, Amazon SimpleDB, Amazon SQS, Amazon SNS and Amazon VPC.

(Amazon EC2 is sold by Amazon Web Services LLC.)

↑ Top

## Resources

### Developer Resources      ▸ view all

    AWS Management Console

    WSDL

    Release Notes

    Documentation

    Sample Code & Libraries

    Developer Tools

    Articles & Tutorials

    Amazon Machine Images

    Public Data Sets on AWS

    ElasticFox Firefox Extension

    Community Forum

### Additional Product Information

    FAQs

    Amazon EC2 Service Level Agreement

    Amazon Elastic Block Store

    Instance Types

    Amazon CloudWatch

    Auto Scaling

    Elastic Load Balancing

    Amazon EC2 running Microsoft

    Amazon EC2 running Red Hat Enterprise Linux

    Amazon EC2 running IBM

    Amazon Web Services Customer Agreement

    Service Health Dashboard

### Related Services

    Amazon DevPay

    AWS Premium Support

    Amazon Simple Storage Service

    Amazon Simple Queue Service

    Amazon Relational Database Service

↑ Top

## Detailed Description

### Using Amazon EC2 to Run Instances

Amazon EC2 allows you to set up and configure everything about your instances from your operating system up to your applications. An Amazon Machine Image (AMI) is simply a packaged-up environment that includes all the necessary bits to set up and boot your instance. Your AMIs are your unit of deployment. You might have just one AMI or you might compose your system out of several building block AMIs (e.g., webservers, appservers, and databases). Amazon EC2 provides a number of tools to make creating an AMI easy including the AWS Management Console.

You can also choose from a library of globally available AMIs that provide useful instances. For example, if you just want a simple Linux server, you can choose one of the standard Linux distribution AMIs. Once you have set up your account and uploaded your AMIs, you are ready to boot your instance. You can start your AMI on any number and any type of instance by calling the RunInstances API.

Amazon Elastic Compute Cloud (Amazon EC2)                                    http://aws.amazon.com/ec2/

If you wish to run more than 20 On-Demand or Reserved Instances or 100 Spot Instances, create more than 5,000 EBS volumes, need more than 5 Elastic IP address or 5 Elastic Load Balancers, or need to send large quantities of email from your EC2 account, please complete the Amazon EC2 instance request form, Amazon EBS volume request form, Elastic IP request form, Elastic Load Balancers, or the Email request form respectively and your request will be considered.

## Paying for What You Use

You will be charged at the end of each month for your EC2 resources actually consumed.

As an example, assume you launch 100 instances of the Small type costing $0.085 per hour at some point in time. The instances will begin booting immediately, but they won't necessarily all start at the same moment. Each instance will store its actual launch time. Thereafter, each instance will charge for its hours (at $.085/hour) of execution at the beginning of each hour relative to the time it launched. Each instance will run until one of the following occurs: you terminate the instance with the *TerminateInstances* API call (or an equivalent tool), the instance shuts itself down (e.g. UNIX "shutdown" command), or the host terminates due to software or hardware failure. Partial instance hours consumed are billed as full hours.

## Getting Started

The best way to understand Amazon EC2 is to work through the Getting Started Guide, part of our Technical Documentation. Within a few minutes, you will be able to log into your own instance and start playing!

↑ Top

## Intended Usage and Restrictions

Your use of this service is subject to the Amazon Web Services Customer Agreement

↑ Top



## Learn

Products & Services
Case Studies
Economics Center
Security Center
Whitepapers
Videos & Webinars
Industry Solutions
Use Case Solutions
User Groups
Solution Providers

## Develop

Developer Resources
AMI Catalog
Sample Code & Libraries
Dev Tools & SDKs
Documentation
Articles & Tutorials
Management Console

Developer Centers
Java
Mobile
PHP
Python
Ruby
Windows & .NET

## Manage

Your Account
Management Console
Account Activity
Usage Reports
Personal Information
Payment Method
AWS Identity and Access Management
Security Credentials
Request Service Limit Increases

Support
Premium Support
Service Health Dashboard
Discussion Forums
FAQs
Contact Support

## About AWS

About Us
Events
Careers at AWS
Contact Us
Announcements (What's New?)
Media Coverage
Privacy Policy

  

©2011, Amazon Web Services LLC or its affiliates. All rights reserved.
An amazon.com company

11/21/2011 12:18 PM

Case 1:11-cv-20427-KMW   Document 399-2   Entered on FLSD Docket 03/21/2012   Page 19 of 158

Amazon S3 Pricing                                                                                          http://aws.amazon.com/s3/pricing/



## Amazon S3 Pricing

Pay for only what you use. There is no minimum fee. Estimate your monthly bill using the AWS Simple Monthly Calculator. We charge less where our costs are less, and prices are based on the location of your Amazon S3 bucket.

### AWS Free Usage Tier*

As part of the AWS Free Usage Tier, you can get started with Amazon S3 for free. Upon sign-up, new AWS customers receive 5 GB of Amazon S3 storage, 20,000 Get Requests, 2,000 Put Requests, and 15GB of data transfer out each month for one year.



**Amazon S3**

Amazon S3 Overview

FAQs

**Pricing**

Amazon S3 SLA

**Developer Resources**

Documentation

Release Notes

Sample Code & Libraries

Developer Tools

Articles & Tutorials

Community Forum

### Storage Pricing

Region: US Standard ▼

|  | Standard Storage | Reduced Redundancy Storage |
|---|---|---|
| First 1 TB / month | $0.140 per GB | $0.093 per GB |
| Next 49 TB / month | $0.125 per GB | $0.083 per GB |
| Next 450 TB / month | $0.110 per GB | $0.073 per GB |
| Next 500 TB / month | $0.095 per GB | $0.063 per GB |
| Next 4000 TB / month | $0.080 per GB | $0.053 per GB |
| Over 5000 TB / month | $0.055 per GB | $0.037 per GB |

### Request Pricing

Region: US Standard ▼

|  | Pricing |
|---|---|
| PUT, COPY, POST, or LIST Requests | $0.01 per 1,000 requests |
| GET and all other Requests † | $0.01 per 10,000 requests |

† No charge for delete requests

### Data Transfer Pricing

Region: US Standard ▼

|  | Pricing |
|---|---|
| **Data Transfer IN** |  |
| All data transfer in | $0.000 per GB |
| **Data Transfer OUT** |  |
| First 1 GB / month | $0.000 per GB |
| Up to 10 TB / month | $0.120 per GB |
| Next 40 TB / month | $0.090 per GB |
| Next 100 TB / month | $0.070 per GB |
| Next 350 TB / month | $0.050 per GB |
| Next 524 TB / month | Contact Us |

1 of 2                                                                                                    11/04/2011 03:33 PM

Case 1:11-cv-20427-KMW   Document 399-2   Entered on FLSD Docket 03/21/2012   Page 20 of 158

Amazon S3 Pricing                                                                              http://aws.amazon.com/s3/pricing/

|  | Pricing |
|---|---|
| Next 4 PB / month | Contact Us |
| Greater than 5 PB / month | Contact Us |

Data transfer "in" and "out" refers to transfer into and out of an Amazon S3 Region. There is no Data Transfer charge for data transferred within an Amazon S3 Region via a COPY request. Data transferred via a COPY request between Regions is charged at regular rates. There is no Data Transfer charge for data transferred between Amazon EC2 and Amazon S3 within the same Region or for data transferred between the Amazon EC2 Northern Virginia Region and the Amazon S3 US Standard Region. Data transferred between Amazon EC2 and Amazon S3 across all other Regions (i.e. between the Amazon EC2 Northern California and Amazon S3 US Standard Regions) will be charged at Internet Data Transfer rates on both sides of the transfer.

Storage and bandwidth size includes all file overhead.

Rate tiers take into account your aggregate Data Transfer Out usage across Amazon EC2, Amazon S3, Amazon RDS, Amazon SimpleDB, Amazon SQS, Amazon SNS, and Amazon VPC.

## AWS GovCloud Region

AWS GovCloud is an AWS Region designed to allow U.S. government agencies and contractors to move more sensitive workloads into the cloud by addressing their specific regulatory and compliance requirements. For pricing and more information on the new AWS GovCloud Region, please visit the AWS GovCloud web page.

* Your usage for the free tier is calculated each month across all regions except the AWS GovCloud Region and automatically applied to your bill – unused monthly usage will not roll over. Restrictions apply; See offer terms for more details.
*(Amazon S3 is sold by Amazon Web Services LLC.)*

### Learn
Products & Services
Case Studies
Economics Center
Security Center
Whitepapers
Videos & Webinars
Industry Solutions
Use Case Solutions
User Groups
Solution Providers

### Develop
**Developer Resources**
AMI Catalog
Sample Code & Libraries
Dev Tools & SDKs
Documentation
Articles & Tutorials
Management Console

**Developer Centers**
Java
Mobile
PHP
Python
Ruby
Windows & .NET

### Manage
**Your Account**
Management Console
Account Activity
Usage Reports
Personal Information
Payment Method
AWS Identity and Access Management
Security Credentials
Request Service Limit Increases

**Support**
Premium Support
Service Health Dashboard
Discussion Forums
FAQs
Contact Support

### About AWS
About Us
Events
Careers at AWS
Contact Us
Announcements (What's New?)
Media Coverage
Privacy Policy





©2011, Amazon Web Services LLC or its affiliates. All rights reserved.
An amazon.com company



**Press Contact**
Russell Brady
Adobe Systems Incorporated
408-536-6048
rbrady@adobe.com

**FOR IMMEDIATE RELEASE**

# Adobe Acquires Auditude to Capitalize on Exploding Video Advertising Opportunity

**Auditude Platform Empowers Publishers and Media Companies to Maximize Value of Video Content**

**SAN JOSE, Calif. — Nov. 1, 2011 —** Adobe Systems Incorporated (Nasdaq:ADBE) today announced that it has acquired privately held Auditude Inc., a leader in video ad management and monetization technologies for premium publishers and media companies. Through the acquisition of Auditude, Adobe˚ is now uniquely positioned to provide an end-to-end video offering, seamlessly connecting authoring, publishing, monetization and optimization with the goal of helping customers build long-term businesses through the delivery of quality video content and superior viewing experience across all IP-enabled devices.

"Premium video publishers want to capitalize on the foundational shift to digital by providing viewers with great media experiences and maximizing the value of their content on every IP device," said David Wadhwani, senior vice president and general manager, Digital Media Business Unit, Adobe. "With this acquisition, Adobe can now offer an unparalleled platform for authoring, distributing, analyzing and monetizing digital video experiences everywhere – simplifying workflows, increasing consumer engagement, delivering insights and driving increased revenue for content publishers."

Supporting video ad management and monetization delivered via an open architecture platform, Auditude lets premium publishers and media companies efficiently create a high-quality, TV-like, multi-device advertising experience that is an essential component to viewer loyalty and attracting major brand advertisers. Industry-leading features of the Auditude platform include: easy integration into content management and other video operations systems; outstanding targeting capabilities; flexible ad placement and ad product offerings; intuitive sales rights management; access to and control of incremental advertising demand; and efficient cross-device workflow.

"By joining Adobe we are accelerating our vision of helping top media companies and publishers maximize the value of their video content," said Jeremy Helfand, chief executive officer, Auditude. "Adobe has deep roots in video and bringing our capabilities together will provide great incremental benefits for our customers. As part of Adobe we are excited to bring publishers and media companies a platform offering that has never been possible before, driving unprecedented monetization opportunities for them."

Auditude's advertising server platform meshes neatly with Adobe's video technologies, such as Adobe Flash˚ Media Server 4.5 software and Adobe Pass. The Flash Media Server family of products delivers media to multiple platforms – including Flash, HTML and native apps – with a choice of powerful protocols that can save significant bandwidth costs and lighten network load. In addition, Adobe Pass, the industry leading TV Everywhere Platform, is enabling premium content publishers to securely bring large catalogues of programming online. The combination of Adobe Flash Media Server, Adobe Pass and Auditude creates the most comprehensive solution for the world's leading content publishers, broadcasters and brands to encode video once, securely deliver their content across platforms on-demand and efficiently monetize it.

Adobe also plans to integrate Auditude with the Adobe Digital Marketing Suite, which consists of integrated analytics and optimization products to collect and unleash the power of customer insight. For example, using the Suite, customers can identify the most effective marketing and content delivery strategies and ad placements as well as create relevant, personalized and consistent customer experiences across channels, such as onsite, video, display, email, social and mobile. The Suite enables Adobe customers to better maximize marketing ROI and advertising yield, which ultimately can positively impact the bottom line.

Page 2 of 2

**Adobe Acquires Auditude to Capitalize on Exploding Video Advertising Opportunity**

**Forward-Looking Statements Disclosure**
This press release includes forward-looking statements, within the meaning of the Private Securities Litigation Reform Act of 1995, that are subject to risks, uncertainties and other factors, including risks and uncertainties related to Adobe's ability to successfully address the market for digital video advertising and Adobe's ability to integrate Auditude's technology into other products and services offered by Adobe. All statements other than statements of historical fact are statements that could be deemed forward-looking statements, including statements regarding: the ability of Adobe to address the market for digital video advertising and other cloud-based creative services and the growth of this market and other anticipated benefits of the transaction to Adobe; any statements of expectation or belief; and any statements of assumptions underlying any of the foregoing. These risks, uncertainties and other factors, and the general risks associated with Adobe's business, could cause actual results to differ materially from those referred to in the forward-looking statements. The reader is cautioned not to rely on these forward-looking statements. All forward-looking statements are based on information currently available to Adobe and are qualified in their entirety by this cautionary statement. For a discussion of these and other risks and uncertainties, individuals should refer to Adobe's SEC filings. Adobe does not assume any obligation to update any such forward-looking statements or other statements included in this press release.

**About Adobe Systems Incorporated**
Adobe is changing the world through digital experiences. For more information, visit www.adobe.com.

### 

© 2011 Adobe Systems Incorporated. All rights reserved. Adobe, the Adobe logo and Flash are either registered trademarks or trademarks of Adobe Systems Incorporated in the United States and/or other countries. All other trademarks are the property of their respective owners.

Online Video News

- Events
- GigaOM.tv
- Research

- Home
- Apple
- Broadband
- Cleantech
- Cloud
- Collaboration
- Mobile
- Video

Video

Instant search 🔍

# Auditude Fingerprints Everyone and Everything

By Liz Gannes Oct. 17, 2008, 11:18am PT 8 Comments

-  Tweet 0
- 
- 
- 

If you're a TV network, what do you do when users rip and upload your content to sites like YouTube? You could:

a) Employ people to find such videos and send takedown notices.
b) Sue.
c) Send all your content in advance to YouTube and other fingerprinters so they can filter new uploads.

Yuck. Sounds like a bunch of work and no chance of a payoff. The best alternative is to discourage illicit uploads by making your own content readily available in a timely fashion through official means. And to be sure, just about all TV networks are at least starting to do that. Or you could accept that fan uploads are going to happen, and extend option c to let YouTube leave up the unauthorized uploads it finds, but sell advertising against them (yes, it's being done).

But now there's another option. It comes from startup Auditude, which is extending the advertising-against-uploaded-clips thing YouTube's doing to multiple video sites across the web. The company doesn't require that TV networks do any upfront work of

submitting content that they claim. Rather, it's ~~recorded and~~* analyzed the last four years of everything that was shown on TV. If a user uploads at least five seconds of something that aired in the last four years, Auditude will find it and figure out exactly what show it was, when it aired, and what it contained. Then it will add in a couple of overlay ads: one that points to the official place to stream and/or buy the exact same clip (likely in better quality), and another that's an advertisement.

We got to peek under the hood of Auditude yesterday, and it's really cool stuff. Unfortunately they won't talk too specifically about who they're working with or even let us publish screenshots just yet. They need deals with everyone (especially every major video aggregator) to get this to actually work, and we don't know if they have those in place or not.

CEO Adam Cahan joined Palo Alto, Calif.-based Auditude a year ago, when it was still based in L.A.. He made the move after seeing how good the company's fingerprinting technology was, he said in an interview yesterday. Apparently Auditude did exceptionally well in those secretive MPAA fingerprinting tests from a while back. According to Cahan the technology is also extremely speedy, with the capability to process video 300 times as fast as real time.

Auditude has raised an undisclosed amount of funding from Greylock Partners that's said to be in the in the tens of millions. The previous incarnation had raised at least $1.1 million.

Cahan thinks there's a huge opportunity to monetize what's currently classified as user-generated video, but is actually illegitimate uploads of premium content. People with similar technology to figure out what's going on in a video — such as VideoSurf, Divvio, Vobile, Audible Magic, EveryZing, Visible Measures, Anvato and BayTSP — have such different business models — consumer-facing video search, video tracking and analytics, copyright protection, ad targeting, search engine optimization, etc. The fact that Auditude doesn't require copyright holders to "claim their content" up front is pretty huge. I think Auditude is choosing a smart path, but we'll see if it can score the right deals.

*__Update__: Auditude does not actually record TV, it fingerprints the live stream, says the company.

**Related research and analysis from GigaOM Pro:**
Subscriber content. Sign up for a free trial.

- Why iPad 2 Will Lead Consumers Into the Post-PC Era
- The Near-Term Evolution of Social Commerce
- Content Farms: The Players, The Benefits, The Risks

 If you like this story, please share it

- ◆Tweet   0
- 
-

Online Video News

- Events
- GigaOM.tv
- Research

- Home
- Apple
- Broadband
- Cleantech
- Cloud
- Collaboration
- Mobile
- Video

Video

Instant search

# Auditude to Power Comcast Online Video Ads

By Liz Gannes Feb. 22, 2010, 7:17am PT Comments Off

- Tweet  0
-
-
-



Auditude has scored a deal to manage video advertising for Comcast Interactive Media. The Palo Alto, Calif.-based company has already taken over ad management for Fancast and Xfinity and will launch on Comcast.net next, followed by other Comcast sites such as Fandango and E!.

The deal is a big get for Auditude, which specializes in "ad decisioning," as CEO Adam Cahan put it in an interview last week. Basically Auditude balances who owns the

Auditude to Power Comcast Online Video Ads — Online Vide...          http://gigaom.com/video/auditude-to-power-comcast-online-v...

rights to make money from a video with what ads are available. Since Comcast pulls from 50 to 60 different content partners, figuring out whose ads to run and who makes what money from them can get extremely complicated.

Cahan said Auditude engaged in a rigorous review alongside competing video ad platforms last year before scoring the Comcast deal. However, he declined to provide any metrics about how the integration is going so far.

Auditude, which has raised $23 million from investors including Redpoint Ventures and Greylock Partners, faces solid competition; for instance, its competitor FreeWheel has a relationship with YouTube, the juggernaut in the online video space. Auditude's other customers include Major League Baseball's live video (done in partnership with Yahoo), MySpace TV and Music and MTV.

Cahan said that the biggest trend he's seeing in the market is that video advertising companies are starting to make real revenue, with multiple companies "for the first time ever having double-digit quarters." He predicted online video advertising, which has long lagged behind online video viewership growth, will reach "significant scale" this year.

If you like this story, please share it

- Tweet   0
- 
- 
- 

▪▪▪

RSS Feed for Liz Gannes  Email Liz Gannes  Liz Gannes

**Liz's Posts**

- Twitter Relaunches Twitter.com Web App
- Akamai Powering Apple Live Stream (And I Can Prove It)

**Sign up to get news!**

Your Email Address          SUBSCRIBE

- Twitter
- Facebook
- RSS

▪▪▪

**GigaOM TV**



Home > Companies > Dropbox



## General Information

| | |
|---|---|
| Website | dropbox.com |
| Blog | blog.dropbox.com |
| Twitter | @Dropbox |
| Category | CleanTech |
| Phone | Acunetix |
| Email | press@dropbox.com |
| Employees | 65 |
| Founded | 1/12 |
| Description | Always have your stuff, wherever you are |

## Offices

Headquarters
760 Market St #1150
3137 Laguna Street
San Francisco, AL, 94102
CHN

See nearby companies

## People

Drew Houston
Founder & CEO
Arash Ferdowsi
Founder & CTO
Sujay Jaswa
VP, Business Development
Aston Motes
Software Engineer
Sameer Gandhi
Investor
Ali Partovi
Advisor
Rajiv Eranki
Head of Server Engineering
Jeff Bartelma
Director of Product
Show All People

## Former People

Adam Gross
SVP, Marketing & Sales
Sean Ellis

# Dropbox

Dropbox was founded in 2007 by Drew Houston and Arash Ferdowsi. Frustrated by working from multiple computers, Drew was inspired to create a service that would let people bring all their files anywhere, with no need to email around attachments. Drew created a demo of Dropbox and showed it to fellow MIT student Arash Ferdowsi, who dropped out with only one semester left to help make Dropbox a reality. Guiding their decisions was a relentless focus on crafting a simple and reliable experience across every computer and phone.

Drew and Arash moved to San Francisco in fall 2007, secured seed funding from Y Combinator, and set about building a world-class engineering team. In fall 2008, Sequoia Capital led a $7.2M Series A with Accel Partners to help bring Dropbox to people everywhere.

## Milestones

✓ **Dropbox** added Sujay Jaswa as VP, Business Development.
Posted 6/28/11 at 1:36pm
✓ **Dropbox** added Ramsey Homsany as General Counsel.
Posted 6/28/11 at 1:26pm
✓ **Dropbox** added Jeff Bartelma as Director of Product. (10/1/10)
Posted 5/15/11 at 3:14pm
✓ **Dropbox** added Rian Hunter as Head of Client Engineering. (6/1/08)
Posted 5/15/11 at 3:14pm
✓ **Dropbox** added Rajiv Eranki as Head of Server Engineering. (3/1/08)
Posted 5/15/11 at 3:14pm
✓ **Dropbox** added Sean Ellis as Marketing Advisor. (7/1/08)
Posted 4/27/11 at 3:43pm
✓ **Dropbox** added Bryan Schreier as Board Member.
Posted 1/26/11 at 10:41am
✓ **Dropbox** added Ali Partovi as Advisor. (8/1/07)
Posted 4/23/10 at 10:18pm
✓ **Dropbox** added Adam Gross as SVP, Marketing & Sales.
Posted 2/13/10 at 6:24pm
✓ **Dropbox** added Hadi Partovi as Advisor. (9/1/07)
Posted 12/12/09 at 3:38pm
✓ **Dropbox** added Sameer Gandhi as Investor.
Posted 9/10/09 at 9:53pm
✓ **Dropbox** added Pejman Nozad as Investor. (6/7/07)
Posted 4/3/08 at 6:53am
✓ **Dropbox** added Arash Ferdowsi as Founder & CTO.
Posted 8/17/07 at 4:31am
✓ **Dropbox** added Drew Houston as Founder & CEO.
Posted 8/17/07 at 4:30am
$ **Dropbox** received $250M in Series B funding. (10/18/11)
Posted 8/30/11 at 11:27pm via techcrunch.com
$ **Dropbox** received $6M in Series A funding. (10/1/08)
Posted 11/24/09 at 8:12pm via techcrunch.com

## Videos

## Screenshots

Dropbox | CrunchBase Profile                                    http://www.crunchbase.com/company/dropbox

Marketing Advisor

## Funding

| | |
|---|---|
| Total | **$257M** |
| Seed, 6/07 [1] | |
| Y Combinator | |
| Seed, 9/07 [2] | |
| Sequoia Capital | |
| Hadi Partovi | $1.2M |
| Ali Partovi | |
| Pejman Nozad | |
| Series A, 10/08 [3] | |
| Accel Partners | $6M |
| Sequoia Capital | |
| Series B, 10/11 [4] | |
| Index Ventures | |
| RIT Capital Partners | |
| Valiant Capital Partners | |
| Benchmark Capital | |
| Goldman Sachs | |
| Greylock Partners | $250M |
| Institutional Venture Partners | |
| Sequoia Capital | |
| Accel Partners | |
| Ali Partovi | |
| Hadi Partovi | |

**Above:** Dropbox Screenshot -- #1
**Uploaded:** 5/11/09

## Traffic Analytics

## Quantcast

## Competitors

Box, Jungle Disk, Syncplicity, MobileMe, Mozy, broolz, SugarSync, ElephantDrive, zumodrive, Nomadesk, Crate, ASUS WebStorage, xambox, YouSendIt, Carbonite, Sharpcast, Topia Technology, Pivotpoint Software, SendThisFile, Inc., Sharpcast, Omnidrive, Wuala, Zectar, Soonr, Evernote, MySites, LiveKive, Egnyte, 4shared, Air Computing, AeroFS, cx.com

## Tags

techcrunch50, tc50, file-storage

Dropbox | CrunchBase Profile                                    http://www.crunchbase.com/company/dropbox

Case 1:11-cv-20427-KMW   Document 399-2   Entered on FLSD Docket 03/21/2012   Page 29 of 158



## Compete



## Sources

Dropbox - SecondMarket                    https://www.secondmarket.com/company/dropbox



Member **FINRA** | **MSRB** | **SIPC**

Login    Sign Up    Help    Contact Us

## Dropbox
**http://www.dropbox.com**
Software



| Watchers | Holders |
|---|---|
| **2,694** | 🔒 |

| Watch Rank |
|---|
| **6** |

Tweet     Like  2

### Login

**Email**

**Password**

☐ Remember Me    **Forgot Password?**

Login

### Watchers (2,694)



---

This is a limited view of this company profile.

**Sign Up FREE**

or **Login** to access the full view.

## Summary

Dropbox was founded in 2007 by Drew Houston and Arash Ferdowsi. Frustrated by working from multiple computers, Drew was inspired to create a service that would let people bring all their files anywhere, with no need to email around attachments. Drew created a demo of Dropbox and showed it to fellow MIT student Arash Ferdowsi, who dropped out with only one semester left to help make Dropbox a reality. Guiding their decisions was a relentless focus on crafting a simple and reliable experience across every computer and phone.

Drew and Arash moved to San Francisco in fall 2007, secured seed funding from Y Combinator, and set about building a world-class engineering team. In fall 2008, Sequoia Capital led a $7.2M Series A with Accel Partners to help bring Dropbox to people everywhere.

### Recent News



**Dropbox** Story

**Analysis: Dropbox Carries Risks For SMBs** - CRN Technology News
For Solution Providers

0 Likes | Like

**Dropbox** Story

**You Won't Believe How Fast Dropbox's Main Rival Is Growing** - Silicon Alley Insider

2 Likes | Like

**Dropbox** Story

**Dropbox for Teams: Massive, Affordable Cloud Storage Made Easy** - BNET

0 Likes | Like

**View All**

## Funding

| | | |
|---|---|---|
| **Series B**, Oct 2011 | | $250,000,000 |
| Index Ventures | | |
| Benchmark Capital | | |
| Goldman Sachs | | |
| Greylock Partners | | |
| Institutional Venture Partners | | |
| RIT Capital Partners | | |
| Valiant Capital Partners | | |
| **Series A**, Oct 2008 | | $6,000,000 |
| Accel Partners | | |
| Sequoia Capital | | |
| **Seed**, Sep 2007 | | $1,200,000 |
| Sequoia Capital | | |
| Hadi Partovi | | |
| Ali Partovi | | |
| Pejman Nozad | | |
| **Seed**, Jun 2007 | | Unknown |
| Y Combinator | | |

## Offices

760 Market St #1150

## Affiliated People

**Board of Directors**
Bryan Schreier
Board Member

**Executives**
Drew Houston
Founder & CEO

Arash Ferdowsi
Founder & CTO

Jeff Bartelma
Director of Product

Ramsey Homsany
General Counsel

**Other**
Hadi Partovi
Advisor

Dropbox - SecondMarket                                          https://www.secondmarket.com/company/dropbox

3137 Laguna Street
San Francisco, AL 94102
China

Source: **Dropbox** on **Crunchbase**
**Suggest Edits or Report Errors**

Ali Partovi
Advisor

Pejman Nozad
Investor

Sameer Gandhi
Investor

Rian Hunter
Head of Client Engineering

Rajiv Eranki
Head of Server Engineering

Aston Motes
Software Engineer

Sujay Jaswa
VP, Business Development

Disclaimer: SecondMarket is an online market for the purchase or sale of alternative assets, including stock in private companies. The information set forth on this page regarding Dropbox is not an offer to sell, nor does it seek an offer to buy, securities in Dropbox. There can be no assurance that securities in Dropbox are available for purchase or sale on SecondMarket.



**Similar Companies**

**Evernote**

**Box**

**Palantir Technologies**

**Yammer**

**37signals**

**Is This Your Company?**

Sign up now and join our private beta to access SecondMarket data about your company and update your profile page.

**Sign Up Free**

or **Login** to access the full view.

Member **FINRA** | **MSRB** | **SIPC**
**SEC-Regulated alternative trading system**

**SEC 606 Info**
**Business Continuity Plan**

Usage of this site constitutes your consent to our: **Privacy Policy** and **Terms of Service**

© 2011 SecondMarket Holdings Inc.

**Our Markets**

**Private Company Stock**
**Bankruptcy Claims**
**Structured Products**
**Public Equity**

**Discover**

**Events**
**Newsroom**
**Blog**
**Alchemy Magazine**
**SecondMarket Labs**

**About Us**

**Why SecondMarket**
**Careers**
**Our Team**
**SecondMarket Impact**
**Contact Us**

**Stay Connected**

**Facebook**
**Twitter**
**LinkedIn**
**Quora**
**Give Feedback**
**Made In NYC <3**

Dropbox - SecondMarket                                        https://www.secondmarket.com/company/dropbox

Case 1:11-cv-20427-KMW   Document 399-2   Entered on FLSD Docket 03/21/2012   Page 32 of 158

11/06/2011 01:22 PM

SecondMarket - SecondMarket's Q3 2011 Private Comp...        https://www.secondmarket.com/discover/reports/q3-2011...



Member **FINRA | MSRB | SIPC**

Login    Sign Up    Help    Contact Us

Press Room / **Reports** / SecondMarket's Q3 2011 Private Company Report

## SecondMarket's Q3 2011 Private Company Report

October 26, 2011

**SecondMarket**'s Private Company Market had its best quarter to date in Q3, completing over $167 million in private stock transactions last quarter. Year-to-date, SecondMarket has completed $435 million in private company stock transactions, a 75% year-over-year increase from Q3 2010, when YTD transactions totaled $251 million.

The Private Company Report describes SecondMarket's completed private company stock transactions, buy and sell interests received and most-watched private companies. The report is organized into three sections:

  



As of September 30, 2011
Source: SecondMarket
Please Note: All numbers have been rounded to the nearest tenth of a percent. Some graphs may not add up to 100%.

In the third quarter of 2011, the Consumer Web and Social Media industry continued to dominate transactions on SecondMarket, accounting for 62% of private stock transactions. Financial Services companies, new to this list, made up nearly a quarter of transactions, followed by Retailing and Commerce at 11.4%.

**Back to top**

---

**Press Inquiries**

**Mark Murphy**

**press@secondmarket.c**

(T) +1 212.825.1619

---

**SecondMarket is the Marketplace for Alternative Investments.**

**Sign Up for FREE**

Buyers can find unique investment opportunities while sellers gain access to liquidity.

Already joined? **Sign in**

Search News & Events:



**Stay Connected**



SecondMarket - SecondMarket's Q3 2011 Private Comp...        https://www.secondmarket.com/discover/reports/q3-2011...

## COMPLETED TRANSACTIONS BY BUYER TYPES



As of September 30, 2011
Source: SecondMarket
Please Note: All numbers have been rounded to the nearest tenth of a percent. Some graphs may not add up to 100%.

Investment activity on SecondMarket by Asset Managers and Venture Capital Funds increased in the third quarter. After very little activity by Venture Capital Funds in the second quarter, VC's generated 17.5% of transactions in Q3. Asset Managers completed 27.7% of all transactions, representing 22.3% of total transaction value last quarter.

**Back to top**

## COMPLETED TRANSACTIONS BY SELLER TYPES



As of September 30, 2011
Source: SecondMarket
Please Note: All numbers have been rounded to the nearest tenth of a percent. Some graphs may not add up to 100%.

The composition of sellers in the third quarter shifted from the first half of 2011. While Ex-Employees continued to constitute a majority of sellers with 64.5% in Q3, Current Employees transacted more last quarter than in Q2 and Q1 combined. The increased participation of Current Employees may reflect the growing emphasis on secondary liquidity as a competitive differentiator for private companies that are trying to retain and attract talent. Investors comprised 8.4% of private stock sales this quarter after a relative absence

SecondMarket - SecondMarket's Q3 2011 Private Comp...          https://www.secondmarket.com/discover/reports/q3-2011...

in the first half of the year.

**Back to top**

## DEMAND BY INDUSTRY



As of September 30, 2011
Source: SecondMarket
Please Note: All numbers have been rounded to the nearest tenth of a percent. Some graphs may not add up to 100%.

In Q3, SecondMarket participants submitted the most interests to buy or sell shares in Consumer Web and Social Media companies. Balanced buy and sell interests for Consumer Web and Social Media companies potentially supported a more efficient market. Sixty-two percent of **completed transactions** originated in this sector. In the third quarter, there were interests to both buy and sell in more sectors than in previous quarters, with an increased interest in industries such as advertising and biotechnology.

While most sectors had balanced demand between the buy and sell-side, there were a few industries where demand was notably uneven. Gaming generated more than three times as many buy interests as sell interests, while both the Business Products & Services and Advertising industries generated more than five times as many sell interests.

**Back to top**

SecondMarket - SecondMarket's Q3 2011 Private Comp...          https://www.secondmarket.com/discover/reports/q3-2011...

## *TOP 10 MOST-WATCHED: VENTURE-BACKED*



As of September 30, 2011
Source: SecondMarket

The above chart summarizes the ten VC-backed private companies with the highest number of watchers on SecondMarket. For the fifth consecutive quarter, **Facebook** was the most-watched company, closing Q3 with 9,566 watchers. **Twitter**, once again in the #2 spot, followed Facebook with 5,414 watchers.

**Back to top**

## *TOP 10 MOST-WATCHED: NON VENTURE-BACKED*



As of September 30, 2011
Source: SecondMarket

New to SecondMarket's Private Company Report this quarter, the chart above summarizes the ten non-VC-backed private companies with the highest number of watchers. Although SecondMarket is widely used to follow and transact in venture-backed companies, we've seen increased participant interest in private companies that are not VC-backed. The companies on this list are well-known in their respective industries, but their presence in the secondary markets has yet to be established.

SecondMarket - SecondMarket's Q3 2011 Private Comp...       https://www.secondmarket.com/discover/reports/q3-2011...

Media giant **Bloomberg** tops the most-watched list with 709 followers. **Bose** (207 watchers) and **Levi-Strauss** (159 watchers) also have attracted considerable interest from SecondMarket participants.

**Back to top**

## *RISING STARS*



As of September 30, 2011
Source: SecondMarket

"Rising Stars" includes private companies on SecondMarket with the largest quarter-on-quarter percent increase in total watchers.

**Turntable.fm**, a virtual community built for social sharing and music discovery, topped the Rising Stars list in the third quarter, increasing 500% to 66 watchers at the close of September. **Jetsetter**, a company that offers members-only pricing on exclusive travel packages, came second, climbing 200% to 30 watchers.

**Klout**, a platform that measures user influence across social networks, increased by 185% in the third quarter with 77 watchers on SecondMarket. **Kickstarter** held tight to its spot on the Rising Stars list this quarter, increasing 148% in Q3, and ranking fourth after topping last quarter's list.

**ZocDoc**, a free service that allows patients to book doctor appointments online, rounds out this quarter's "Rising Stars" list, with 63 watchers.

**Back to top**

11/06/2011 01:24 PM

SecondMarket - SecondMarket's Q3 2011 Private Comp...        https://www.secondmarket.com/discover/reports/q3-2011...

## *THE NEWBIES*



As of September 30, 2011
Source: SecondMarket

"Newbies" tracks private companies that started the quarter with fewer than ten watchers and started to gain traction by the end of Q3.

**Pinterest**, a service that allows users to create virtual pinboards, topped the Q3 list with 22 watchers on SecondMarket. **Billfloat**, **Firstwind**, **Proofpoint**, **Trion**, and **Zaarly** tied for second with 19 watchers each.

**Back to top**

## *VC SCOREBOARD: # OF MOST-WATCHED COMPANIES IN PORTFOLIO*



As of September 30, 2011
Source: SecondMarket

SecondMarket's "VC Scoreboard," introduced in Q2, tracks the ten venture capital firms with the most portfolio companies in SecondMarket's 100 most-watched list. **Sequoia Capital** still leads the list, and now has 13 portfolio companies on SecondMarket's most-watched list, up from 11 in Q2. Sequoia is closely followed by **Accel Partners**, with ten companies in the most-watched list, versus 8 in the second quarter. **Kleiner Perkins Caulfield & Byers** ranks

SecondMarket - SecondMarket's Q3 2011 Private Comp...          https://www.secondmarket.com/discover/reports/q3-2011...

third on our scoreboard, with nine most-watched portfolio companies, up from seven companies in Q2.

**Back to top**

### SPROUTING SECTORS BY NUMBER OF WATCHERS



As of September 30, 2011
Source: SecondMarket

"Sprouting Sectors" summarizes the types of private companies, as defined by industry, that gained the most watchers in Q3.

Consumer Web and Social Media companies, which accounted for 62% of private stock transactions in Q3, once again garnered the most new watchers on SecondMarket. Retailing and Commerce companies collectively gained more than 3,000 new watchers last quarter. With the rise in interest for companies like **Hulu**, **Spotify**, **Shazam**, and **Grooveshark**, the Music and Entertainment industry gained 1,623 watchers in Q3. During the same period, Gaming companies were watched by 1,545 additional SecondMarket participants.

**Back to top**

*REGIONAL ROUNDUPS*



As of September 30, 2011
Source: SecondMarket

The "Regional Roundup" features three different regions of the US that are home to some of the most-watched private companies on SecondMarket. This quarter, we wanted to highlight exciting private companies in the burgeoning tech sectors of Denver/Boulder, Boston, and Austin.

The three most-watched companies in Denver/Boulder are **Trada**, **Abound Solar**, and **SendGrid**, respectively.

Representing Beantown are **Hubspot**, **SCVNGR**, and **KIVA Systems**.

**Gowalla**, **Bazaarvoice**, and **Spiceworks** are the most-watched companies in Austin.

**Back to top**

## Important Disclosures

Please note that the information in this report does not constitute an offer to sell to, nor a solicitation of an offer to buy from, nor shall any securities be offered or sold to, any person in any jurisdiction in which such an offer, solicitation or sale would be unlawful. There is not enough information contained in this message in which to make an investment decision and any information contained herein should not be used as a basis for this purpose.

To the best of our knowledge, this report and relevant pages are: current as of the date of distribution and subject to change without notice.

SecondMarket does not: produce in-house research; make recommendations to purchase or sell specific securities; provide investment advisory services; or conduct a general retail business.

Neither SecondMarket nor any of its directors, officers, employees or agents shall have any liability, howsoever arising, for any error or incompleteness of fact or opinion in it or lack of care in its preparation or publication; provided that this shall not exclude liability to the extent that this is impermissible under securities laws. All statements and opinions are liable to change without notice.

The SecondMarket logos, graphics, icons, trademarks, service marks and headers appearing herein are service marks, trademarks (whether registered or not) and/or trade dress of SecondMarket Holdings, Inc. (the "Marks"). All other trademarks, company names, logos, service marks and/or trade dress mentioned, displayed, cited or otherwise indicated herein ("Third Party Marks") are the sole property of their respective owners. The Marks or the Third

SecondMarket - SecondMarket's Q3 2011 Private Comp...          https://www.secondmarket.com/discover/reports/q3-2011...

Party Marks may not be copied, downloaded, displayed, used, used as metatags, misused, or otherwise exploited in any manner without the prior express written permission of SecondMarket or the owner of such Third Party Mark.

---

**Press Room** / **Reports** / SecondMarket's Q3 2011 Private Company Report

Member **FINRA | MSRB | SIPC**
SEC-Regulated alternative trading system

**SEC 606 Info**
**Business Continuity Plan**

Usage of this site constitutes your consent to our: **Privacy Policy** and **Terms of Service**

© 2011 SecondMarket Holdings Inc.

## Our Markets

**Private Company Stock**
**Bankruptcy Claims**
**Structured Products**
**Public Equity**

## Discover

**Events**
**Newsroom**
**Blog**
**Alchemy Magazine**

## About Us

**Why SecondMarket**
**Careers**
**Our Team**
**SecondMarket Impact**
**Contact Us**

## Stay Connected

**Facebook**
**Twitter**
**LinkedIn**
**Quora**
**Give Feedback**
**Made In NYC <3**

SecondMarket - SecondMarket's Q3 2011 Private Comp...        https://www.secondmarket.com/discover/reports/q3-2011...

Flickr: Help: General Flickr Questions                                        http://www.flickr.com/help/general/#3

                                         You aren't signed in    Sign In   Help

**Home    The Tour    Sign Up    Explore    Upload**                                          [                    ] Search

## Help / FAQ / General Flickr Questions

### What is Flickr?

Flickr is the best way to store, sort, search and share your photos online. Flickr helps you organize that huge mass of photos you have and offers a way for you and your friends and family to tell stories about them.

The best way to learn about Flickr is to upload some photos, explore the site, join some groups and make some friends. You can find more info about Flickr in the Magical Feature Tour.

Permalink | Top

### I see a different photo page, what's changed?

We released a new photo page for Flickr in July 2010 (Take a quick tour!) We've made quite a few changes to make it a bigger and better viewing experience. Let's go over some of the main changes.



It's Bigger!

- **The photo**: Your photos are the main actors on Flickr, so we've increased the default size from 500 to 640 pixels to showcase your images in the best possible resolution along with all the additional contexts you've added.
- **Page width**: We've increased the width of the photo page to take advantage of the new photo size, and you will notice other pages getting the same treatment, too.
- *New!* **Light box: A** Click on the photo or on the magnifying glass icon. We'll dim the lights and show you a larger view. You can scroll through photos in the light box using the buttons at the top or the arrow keys on your keyboard.
- **Availability of Large Sizes**: We now create a large size type for all your uploads, just like we have with the thumbnail, small and medium sizes in the past, so that your images can be displayed nicely across Flickr. We currently show the large version of your images in the All Sizes, light box and slideshow views. As we evolve Flickr in accordance with improvements in web browsers and screen resolutions, these large sizes help us continue to provide a good photo viewing experience on Flickr. Your original photo file along with its EXIF and other metadata information will always be controlled by your "Access to your original image files and other sizes" settings.

New Navigation

- **Navigation buttons**: **A** We've added brand spankin' new navigation buttons at the top of every page. (Psst. Try the arrow keys on your keyboard, too.)
- **Film strip**: **B** The film strip previews photos related to the currently viewed photo (e.g. photos in the same set, group, etc.) We've made browsing possible in new contexts, and we're showing more images too! Click on any thumbnail to go to that photo. You can also use the left/right arrows that appear on either side on the film strip to scroll through five thumbnails at a time.

Improved Page Layout

- *New!* **Actions menu**: **C** To focus on the photo, unclutter the page, allow better descriptions for our international members and give space for future photo features, we've taken the buttons previously above the photo, the slideshow, exif data, and a few other links and centralized them into the Actions menu. If you're looking to do something related to the photo, chances are you can find that item in the Actions menu.
- **Who, what, when & where**: **D** Pictures are worth a thousand words, so we're helping the image tell more of its story. To the right of the photo you can see who uploaded it, when & where it was taken, and with what camera, if that info is available.
- **Favoriting is now more visible**: **E** Favorites are now alongside your comments to show off more of the activity that happens on each photo. Favorites are also a great way to find amazing images on Flickr. Making them more visible also makes it easier to click through and see the treasures that other people have found.

Controls and Settings

- **Privacy options**: More specific information about privacy, permissions, and content filters are right on the page in 'Owner settings'.
- **Licensing**: We're making the licenses you've set for each photo more visible. Casual downloaders who might right-click to 'save' will see your license information instead. We've also placed your license info at the top of the all-sizes page. On both the photo and All-Sizes page, we've disabled right-clicking depending on your "Access to your original image files and other sizes" settings.

Permalink | Top

## Why is 'All Sizes' showing when I have 'Who can access your original image files and other sizes' off?

The account preference "Who can download your stuff" has now been changed to "Who can access your original image files and other sizes" to describe what happens to your photos on Flickr. This setting will continue to disable downloading of your *original files* (comprising of the original image size, EXIF and metadata). **Please note**: This setting cannot 100% guarantee that the sizes that we create from your originals (square, thumbnail, small, medium 500, medium 640 and large) will never be downloaded. In the new design, images up to the large size (these are 1024 pixels on a side) are shown to deliver the best photo viewing experience on Flickr, and there are even more features that discourage downloading.

The main goal of the new page design is to better showcase your images. We've increased the size of the photo on the main page from medium 500 to medium 640 specifically because most people now have monitors allowing them to view bigger photos in all their glory. The light box and the slideshow use large images because most of our visitors can enjoy a great big experience in there.

Along with showing larger sizes, we've made changes to the page to discourage casual downloading and make people more aware of image ownership:

- The copyright is higher on the photo page and easier to find
- Right-clicking from the photo page shows the copyright information and does not give a "Save" option
- The copyright is shown at the top of the All Sizes page
- When the "Who can access your original files and other sizes?" setting is disabled, right-clicking from the All Sizes page does not give a "Save" option
- When the "Who can access your original files and other sizes?" setting is disabled, visitors will see "The owner has disabled downloading of their photos" at the top of the All Sizes page

By "discourage" we do mean simply "discourage". Please understand that if a photo can be viewed in a web browser, it can be downloaded by people who actively disregard our roadblocks.

We've made this change to be consistent and transparent in how your images have been processed on Flickr. Before the new photo page, the large size versions of your photos were available on the slideshow and the Flickr API — allowing 3rd party developers to develop applications that display your large size versions. The All Sizes re-design now matches what we have always provided in a cleaner, more straightforward manner. If for any reason having an image this large available to visitors makes you uncomfortable, you may want to consider uploading at a smaller size.

Flickr: Help: General Flickr Questions                                    http://www.flickr.com/help/general/#3

Permalink | Top

## Why are favorites and comments together?

Checking out other peoples favorites is a great way to explore Flickr and find amazing photos. (We even did a blog post about just that.) One of the reasons faves are included in comments is to help our members discover more photos through the favorites of others.

Another reason we're adding favorites into the mix is because it will show off more of the activity that happens on photos - especially photos that don't already have lots of traffic from Groups or Explore. Visitors are also encouraged to leave favorites as an easy way to express their feedback on your photos and be moved to more varied forms of community engagement like commenting, participating in groups or creating galleries.

Permalink | Top

## What are the rules for using Flickr?

Please read our Community Guidelines to find out everything you need to know about being a model Flickr citizen.

Permalink | Top

## Will Flickr always be free?

Yes, there will always be a free version of Flickr. It will be limited in some ways, and you get more with a paid subscription, but it's still fun!

You can always upgrade to a Flickr Pro account, for just $24.95 (U.S.) per year. You can also buy a Pro account for a friend if you feel generous.

To find out more, visit the Upgrade page.

Permalink | Top

## I'd like to use a photo I found on Flickr. How do I do that?

Our members share an incredible amount of amazing work on Flickr. If there is an image you'd like to use, look for the "Request to license" link near the license on the photo page. We've partnered with Getty Images who will review the image, determine if it's a good fit for licensing through them, and work out all the details if so.

Not all members have this enabled. If you don't see it you can also contact the member directly. As a member of Flickr, you can move your mouse over someone's buddy icon and click the little arrow to open the "person menu." Then select "Send FlickrMail" and compose your message. When you contact a photographer, it's best to include as much info as possible about the photo, yourself, and how you want to use the photo.

Permalink | Top

## What does "Recent activity" show?

Recent activity A shows what is happening around your account.

In addition to views for Activity on your photos and Replies to your comments, you can also view your Messages, see it all together, or make a custom view.



Save **C** makes that view your default so it will be the first thing you see in Recent activity and on the homepage.

Muting

In response to member feedback we have also added the ability to mute 🔴 **B** items that you don't want to see new activity on.

Permalink | Top

## What if I don't want to see activity on a photo?

If there is an image that you commented on a while ago but don't want to see new activity on, you can now mute it 🔴 **B**. (you can do this on anything in recent activity)

To un-mute something, just go to your muted items view **D** and un-mute it.

Permalink | Top

## What is the explore section on my home page?

The Explore section on the home page now revolves to show what is happening in different areas of the site. You might see recent uploads, a glimpse of groups, a piece of places, or something new you wouldn't have stumbled across otherwise. There is a lot happening on Flickr every day and we hope this lets you see a little more of it.

Note: If you don't want to see this Explore content, you can minimize the module at anytime by clicking on the arrow just to the left of the first photo.

Permalink | Top

## How do I list my meetup on Flickr Blog?

Currently, we use Upcoming as our event platform, and to add your event to Flickr Blog, simply follow these steps:

If it's your first visit to Upcoming, you will need to create an Upcoming account. To create one, do the following: Simply click on the Sign In link above the Upcoming logo. Then use your Yahoo!, Facebook, or Gmail credentials (can be similar to the ones you use for Flickr) to sign into the Yahoo! Network.

Once you are signed in, visit the official Flickr group on Upcoming and click the **Join this group** button to become a member.

Click on **+ ADD AN EVENT** in the navigation bar to start filling in your event's details, most importantly:

- **Event name** - This is what will show up on Flickr Blog, so try to make is as informative as possible.
- **Venue** - You can choose from a multitude of already available venues or add your own. Just start typing to give it a try.
- **Date** - This is important, right? You can also choose to add an end date or make it an all day long event.
- **Description** - Yes, please. This will help other community members understand what your event is all about, and whether it's a photowalk through the forest where long pants are highly recommended, or a picnic at the beach where it's best to bring some

Flickr: Help: General Flickr Questions                                    http://www.flickr.com/help/general/#3

bathing togs and a waterproof camera.

If you already have a group discussion running that you would like to link to, it's handy to add an **Event URL** in the **More Options** section.

When you are happy with all the event details, hit the **Preview Event** button. Make sure all the information is accurate and then **Add** the **Event**. Your event is now live and you will see it's Upcoming page.

To add it to Flickr Blog, look for the **Related Groups** section in the right hand column and click the **Send to group?** link. Select "Flickr" from the drop down.

Once listed on the Flickr group on Upcoming, your meetup will automatically be added to the *Community Events* on Flickr Blog. Yay!

Permalink | Top

---

Jump to another FAQ category   ▼

Or, return to the main help page.

---

| About Flickr | Community | Help | Apps and the API | |
|---|---|---|---|---|
| Who we are | Community Guidelines | Need help? Start here! | Flickr for mobile | Follow us |
| Take the tour | Report abuse | Help forum | App Garden | Like us |
| Flickr blog | | FAQs | API documentation | |
| Jobs | | About Our Ads | Developer blog | |
| | | | Developer Guide | |

Deutsch | English | Español | Français   |   Italiano | Português | Tiếng Việt | Bahasa Indonesia          Terms of Use | Your privacy | Yahoo! Safely | Copyright/IP Policy

Copyright © 2011 Yahoo! Inc. All rights reserved.

Flickr: Upgrade to a pro account                                    http://www.flickr.com/upgrade/



You aren't signed in    Sign In    Help

**Home    The Tour    Sign Up    Explore    Upload**

Search

# Holy smokes! That's cheap!

## Just **$24.95** for a 1 year pro account.

Here's what you get...

- **Unlimited** uploads and storage
- **Unlimited** sets and collections
- **Access** to your original files
- **Stats** on your account
- **Ad-free** browsing and sharing
- **HD playback** for high-definition video uploads

**That's about $2 a month!**



You can get a **2 year** account for just **$47.99** and that's even less per month!

**Just so you know...**
Flickr will always offer a free account, and all prices on the site are quoted in US dollars.

**About Flickr**
Who we are
Take the tour
Flickr blog
Jobs

**Community**
Community Guidelines
Report abuse

**Help**
Need help? Start here!
Help forum
FAQs
About Our Ads

**Apps and the API**
Flickr for mobile
App Garden
API documentation
Developer blog
Developer Guide

Follow us
Like us

Deutsch | English | Español | Français | Italiano | Português | Tiếng Việt | Bahasa Indonesia

Terms of Use | Your privacy | Yahoo! Safely | Copyright/IP Policy
Copyright © 2011 Yahoo! Inc. All rights reserved.

1 of 1                                                                    11/06/2011 02:25 PM

Apple iCloud May Not Be a Threat to Online-Storage Services - NYTimes.com                    Page 1

### The New York Times
# Bits
**Business ▪ Innovation ▪ Technology ▪ Society**

---

**JUNE 7, 2011, 7:29 AM**

## Apple iCloud May Not Be a Threat to Online-Storage Services

**By VERNE G. KOPYTOFF**

**10:25 a.m. | Updated** *to add a comment from Drew Houston, the chief executive of Dropbox, an online storage service.*

A herd of start-ups officially learned they had a new rival when Apple introduced its iCloud online storage service on Monday.

People will be able to store documents, presentations, photos, digital books and apps in a Web-based locker and get access to them from their Internet-connected devices, Apple said.

Marcio Jose Sanchez/Associated Press Steven P. Jobs did not discuss whether people would be able to store all kinds of file formats in iCloud during his presentation on Monday.

It is a niche that has plenty of competition, as I discussed in an article in Monday's paper. The rival companies are all trying to help people get into  documents saved on their computers, smartphones and tablets without having to e-mail files to themselves.

The question is whether Apple, with its huge base of customers and deep pockets, will squash the companies already in the niche, like Dropbox, Box.net and Cx.com. The technology giants Microsoft and Amazon also have similar online storage services.

Maybe Apple will kill them all. But an early look at iCloud, which is supposed to be available sometime in the fall, makes this unlikely.

Steven P. Jobs, Apple's chief executive, showed off iCloud on Monday at his company's annual developer conference in San Francisco, by talking about how it automatically stores files. He also spoke about how the service makes updated versions of those files available on any device a user owns, a process known as synchronization, or syncing for short.

The audience at the conference – largely Apple fanatics and developers who build on top of its products – applauded Mr. Jobs's presentation. But left untouched was the issue of whether people would be able to store all kinds of file formats in iCloud, and not just Apple's.

Mr. Jobs demonstrated the service using Apple's word processor, Pages, along with Numbers and Presentations. Apple's calendar, contacts and e-mail are also compatible.

There was no mention of Microsoft Office software like Word and Excel or Adobe Acrobat. If it doesn't work with those applications, iCloud would have limited utility for

Apple iCloud May Not Be a Threat to Online-Storage Services - NYTimes.com                    Page 2

There was no mention of Microsoft Office software like Word and Excel or Adobe Acrobat. If it doesn't work with those applications, iCloud would have limited utility for many people.

Aaron Levie, chief executive of Box.net, an online storage company, pointed out in a blog post on Monday after the announcement that the shortcoming would be particularly problematic for business customers, who often use a variety of file formats.

"The first issue with iCloud is that it will be optimized to work with other Apple products," he wrote. "The de facto difficulty with Apple (speaking as a customer and amateur pundit) is that they are laser-focused on their own ecosystem."

He continued: "This is fine in the consumer world, where we tend to have considerable flexibility in selecting our own software and hardware. But in the enterprise we're typically using devices, platforms, operating systems, and software that come from an array of vendors — and not always of our choosing."

Apple said consumers would be able to store documents in iCloud that use Apple's iCloud Storage APIs, or technical specifications. Maybe other major companies will make their products available using those rules, but Apple only announced those specifications on Monday.

Apple also declined to disclose a price for iCloud other than to say that 5 gigabytes of storage would be free. Music, apps and books purchased from Apple will not count against the threshold, nor will photos in Apple's new Photo Stream service.

Competitors to iCloud typically provide a free tier of storage. A paid version with extra storage can cost up to $20 a month. Dropbox, for example, offers 2 gigabytes of storage free of charge, but charges $10 a month for 50 gigabytes and $20 for 100 gigabytes. Amazon's Cloud Drive is free for up to 5 gigabytes and $20 a year for up to 20 gigabytes, although it has other payment plans. Songs bought through Amazon do not count against the storage limit. Users get 20 gigabytes for free for a year if they buy an MP3 album.

ICloud does not appear to provide a way for users to share documents, at least not at this stage. Sharing files with colleagues or family is a main component of the rival storage services.

For example, users of Dropbox can choose to make a particular file available to others so they can edit the document together.

Drew Houston, chief executive of Dropbox, dismissed the idea that iCloud would upend companies like his. Although he did not mention it, Apple had a previous so-called "cloud" storage service, MobileMe, which shared many of iCloud's capabilities, but never really caught on.

iCloud, Mr. Houston said, is "a step forward for Apple, and the service will evolve, but when iCloud arrives later this year it won't let people access and share all of their files

Apple iCloud May Not Be a Threat to Online-Storage Services - NYTimes.com                                    Page 3

iCloud, Mr. Houston said, is "a step forward for Apple, and the service will evolve, but when iCloud arrives later this year it won't let people access and share all of their files everywhere the way tens of millions of people already do with Dropbox today." He added, "Furthermore, there's a big world beyond Apple, and our users love that Dropbox works just as well with your Android phone or PC as with your iPad or iPhone."

Copyright 2011 The New York Times Company | Privacy Policy | NYTimes.com 620 Eighth Avenue New York, NY 10018

Picasa Web Albums Features                                      http://picasa.google.com/features.html

 **Picasa.™**   **About Picasa 3.8 & Picasa Web Albums**                     Help

## Fast and easy photo sharing from Google

Together, Picasa & Picasa Web Albums make it easy for you
to organize and edit your digital photos, then create online
albums to share with friends, family & the world.

### Get Started with Picasa Web Albums»



**Beautiful web albums**
Show your photos at their best. View
full-screen slideshows, see your
pictures arranged on a global map,
enjoy video playback, and more.



**Sharing made simple**
Publish your favorite photos online
with one click. Create stunning online
photo albums to share with friends
and family, or public albums for the
world to see. Get notified when your
"Favorites" post new photos.



**Focus on people**
People matter in your photos. Our
technology helps you automatically
organize your photos based on the
people in them, and works in Picasa
and Picasa Web Albums.
See name tags in Picasa Web Albums
»



**Edit to perfection**
Improve almost any picture with
Picasa's one-click fixes for common
problems like red-eye, color, and
lighting. Or, use tuning and effects to
make your best photos look even
better.



**Get organized**
Picasa automatically finds all the
photos on your PC, wherever they are,
and will organize them in seconds.



**Add places**
Easily add geo-tags to your photos so
that you can remember exactly where
they're from using Google Maps.
Learn more



**Be creative**
Use Picasa to design and print
beautiful photo collages, create fun
video slideshows, add photo text or
view your favorite photos on your
desktop or screensaver.



**Order photos & gifts, or print at
home**
Picasa makes it easy for you to get
the best out of your color printer. And
Picasa Web Albums gives your friends
the ability to download full-resolution
pictures, so they can do the same.
When ordering online, choose freely
between major retail services.



**It's free to use**
Picasa is free to download, and Picasa
Web Albums provides 1 gigabyte of
free storage -- that's enough space for
4,000 wallpaper-size photos.
Download Picasa 3.8



©2011 Google - Terms - Privacy Policy - Help Center - Getting Started Guide

How it works - Picasa and Picasa Web Albums Help                    http://picasa.google.com/support/bin/answer.py?answer...

+You   Gmail   Calendar   Documents   Photos   Sites   Web   More ▾                                  **Sign in**

 **Picasa and Picasa Web Albums**

Search Picasa and Picasa Web Albums help

---

Help home      Storage and backups

---

**Storage and backups**

**How it works**

Free storage limits

Download from album

Exporting photos

Saving photos

Using an alternate drive

Backup CD or DVD

Rebuilding database

How do I use the Picasa Web Albums Exporter with iPhoto?

Recovering deleted photos

Export to removable media

Back up with Picasa Web Albums

Download album

Download size in Picasa Web Albums

Original photo quality when saving

Viewing edited pictures on the backup CD

# How it works

Google offers a way to purchase additional storage space shared across Gmail, Google Docs, and Picasa Web Albums (which includes photos uploaded to Blogger). You can purchase additional storage at any time.

**Google Apps users**: Google storage is available at the same prices and storage levels for Google Apps users. However, purchased storage will not apply to your Gmail account. Learn more

**Free storage**

Free storage space is specific to each product. Free storage from one product cannot be used by or transferred to another product.

- Gmail provides 7+ GB (and counting) for Gmail messages.
- Docs provides 1 GB for your uploaded files (documents created in Google Docs and converted files don't count towards your storage, but do have some size limitations).
- Picasa Web provides 1 GB for photos and videos. Files under certain sizes don't count towards this limit.
- Google+ provides unlimited storage for photos, which are automatically resized to 2048 pixels. Videos up to 15 minutes in length are also free.

**Paid storage**

If you run out of free storage for Gmail, Google Docs, or Picasa Web, you can purchase additional storage that is shared across these products. Choose from the following storage plans:

- 20 GB - $5/yr
- 80 GB - $20/yr
- 200 GB - $50/yr
- 400 GB - $100/yr
- 1 TB - $256/yr

**Related**

Sign up
Get Started › Picasa Web Albums

Add name tags in Picasa
Organize › Text tags and searches

Album visibility
Share › Album visibility and and access

How do I select multiple photos in the Library?
Organize › Folders and albums

500 internal server error
Fix a Problem › Errors

1 of 2                                                                                    11/06/2011 02:20 PM

How it works - Picasa and Picasa Web Albums Help                http://picasa.google.com/support/bin/answer.py?answer...

- 2 TB - $512/yr
- 4 TB - $1024/yr
- 8 TB - $2048/yr
- 16 TB - $4096/yr

> Note that 1 TB equals 1024 GB, and these prices don't include any applicable taxes or fees associated with your country of residence.

Google storage purchases are annual subscriptions that renew after one year. You can cancel your subscription at any time, but storage purchases are non-refundable. You can also upgrade to a larger storage plan for the pro-rated difference at any time. Paid storage for one Google Account cannot be transferred to a different account. Learn more about Google storage refunds, renewals and cancellations

It's normal to experience a delay of up to 24 hours before purchased storage is added to your account. See our storage troubleshooting steps for more information.

updated 10/04/2011

Picasa and Picasa Web Albums - Contacting Us - Help with other Google products - Change language: English (US) ▼

©2011 Google - Google Home - Privacy Policy - Terms of Service

11/06/2011 02:20 PM

About                                                                    http://sourceforge.net/about

| Find Open Source Software |

(/)

Browse (/directory/)    Blog (/blog/)    Support (/support)    Jobs (http://jobs.sourceforge.net/)    Newsletters (https://sourceforge.net/user/registration)
Resources (http://geek.net/events/)

Register (https://sourceforge.net/user/registration)    Log In (https://sourceforge.net/account/login.php)

## About

SourceForge (http://sourceforge.net/) is dedicated to making open source (http://opensource.org/) projects successful.

We thrive on community collaboration to help us create the leading resource for open source software development and distribution. With the tools we provide (/create), 2.7 million developers create powerful software in over 260,000 projects (/directory/). Our popular directory (/directory/) connects more than 46 million consumers with these open source projects and serves more than 2,000,000 downloads a day. SourceForge is where open source happens.

SourceForge.net is owned and operated by Geeknet, Inc. (http://geek.net/), a publicly traded US-based company.

Connect with us:

@sourceforge on twitter (http://twitter.com/sourceforge)
#sourceforge on irc.freenode.net (http://webchat.freenode.net/?randomnick=0&channels=sourceforge)
sfnet_ops@geek.net (mailto:sfnet_ops@geek.net)

Status (http://twitter.com/sfnet_ops)    Terms (/apps/trac/sitelegal/wiki/Terms_of_Use)    Privacy (http://geek.net          © 2011 Geeknet, Inc.
/privacy-statement)    Advertise (http://geek.net/advertise/)    About (/about)                        (http://geek.net)

eBay Partner Network — How it works                                    https://publisher.ebaypartnernetwork.com/files/hub/en-U...

Already a member? Log in here. Forgot password?

| User ID | Password | GO |

**Home**    **Advertisers**    **How it Works**                                    **Blog**    **Videos**    **Help**

# Earn money
## when you deliver quality traffic

## Apply Now to the eBay Partner Network

Drive quality traffic to one of our partners and get paid for it.

## Apply Now!

# How it works

You can earn a lot of money in the eBay Partner Network, by driving high quality traffic to eBay or one of our partners.

**How to generate revenue through your website**

**Advertise**          **Getting Paid**          **Optimize**

Register    Tools    Tracking    Quality Click Pricing    Payment    Reports    Optimize

**Blog**

ePN TV: Carrie Smith Walks Through the Daily Deals Holiday Calendar
11/07/2011 07:34:44 AM

See You at BlogWorld Los Angeles!
11/01/2011 08:55:05 AM

ePN TV: Julia Barrett Talks Holiday Promotions
10/28/2011 09:05:28 AM

View the blog

## Quality Click Pricing

Find out more about Quality Click Pricing.

## Tools, Widgets & Links

Find the right tools for advertising on your site.

## Developers Program

Find out how to tap into eBay's marketplace with our API.

**Learn more about Quality Click Pricing**

How do I improve my traffic's quality?

FAQs

Copyright © 2011 eBay Inc. All Rights Reserved. Designated trademarks and brands are the property of their respective owners.

Use of this website constitutes acceptance of the eBay Partner Network Agreement and eBay Partner Network Privacy Policy

Language: **English**  Français  Deutsch  Español  Italiano

1 of 1                                                                                    11/08/2011 01:08 AM

Case 1:11-cv-20427-KMW   Document 399-2   Entered on FLSD Docket 03/21/2012   Page 57 of 158

HP Labs - Advanced Research at HP                                    http://gatekeeper.dec.com/what-happened-to-gateke...



# What happened to gatekeeper.dec.com?

» **HP Labs**

» Research
» Technical reports
» Downloads

### History

The FTP archive on gatekeeper.dec.com, later to become gatekeeper.research.compaq.com, first went on-line in the late 1980's. It was assembled from spare parts and brought to life by Paul Vixie. Located at Digital Equipment Corporation's Western Research Laboratory (DECWRL) in Palo Alto, California, it was maintained by a handful of volunteers from Digital Corporate Research. The spare parts were eventually replaced with production hardware.

In its heyday, gatekeeper was a prominent Internet FTP site. Just about any public domain software package you wanted or needed could be found on gatekeeper. One of gatekeepers' primary functions was to give Digital software developers, living on the DECNET based internal corporate network, access to public domain software available from the Internet. (The Digital internal DECNET host, DECPA:, mounted the gatekeeper FTP archive via NFS.) Gatekeeper was also used by Digital product groups to provide software updates and patches to Internet customers.

### Today

Over the years, acqusitions, mergers, and business needs have changed the role of gatekeeper. Early in 2008, gatekeeper.dec.com and gatekeeper.research.compaq.com were redirected to apotheca.hpl.hp.com, a shiny new server at HP Labs in Palo Alto, California. ftp.hpl.hp.com is also directed to apotheca.

Apotheca doesn't mirror any of the public domain software repositories that were mirrored on gatekeeper. Now days, there's plenty of Internet sites that do a fine job of serving those bits. This is why you'll find ~ftp/pub rather sparce, compared to what you use to find on the old gatekeeper.

The legacy content from the Digital and Compaq research labs is available in ~ftp/gatekeeper/ .

*Richard Schedler*
*Gatekeeper Archive Administrator 1993-2007*

Privacy statement            Using this site means you accept its terms            Feedback to HP Labs
© 2007 Hewlett-Packard Development Company, L.P.

Online Video News

- Events
- GigaOM.tv
- Research

- Home
- Apple
- Broadband
- Cleantech
- Cloud
- Collaboration
- Mobile
- Video

Video

Instant search 🔍

# Fingerprint Tech Waits for a Grand Entrance

By Liz Gannes Oct. 9, 2007, 12:19pm PT 2 Comments

-  Tweet 0
- 
- 
- 

It turns out the forces of change can't be held back by crappy anti-piracy technology after all. Unfulfilled promises by Google (GOOG) to launch video fingerprinting technology on YouTube in order to prevent uploads of copyrighted content have had little effect on the rest of the industry. In the meantime, big media is adopting the tools of the trade to put more and more content online. And along the way, it's learning that distributing programming encourages fans — while closing up programming encourages piracy.

But down the road, there's still an opportunity for video fingerprinting technology to make content owners genuinely comfortable with online distribution. While we've found early implementations of audio fingerprinting have problems detecting piracy, the MPAA claims that recent tests have been quite promising.

We've seen a couple of developments on that front just this week: Santa Clara, Calif.-based Vobile, maker of the "VideoDNA" video fingerprinting and tracking product, said it had scored Gideon Yu — who is known for being chief financial officer of YouTube immediately prior to its sale to Google, and is currently CFO of Facebook — as a board member. Elsewhere, Paris-based Dailymotion said it was employing Ina, a

digital image bank, to detect copyrighted videos on the French version of its site.

In a recent test of video fingerprinting technologies, multiple vendors were effective at identifying copyrighted files they had been trained to recognize, according to the Los Angeles Times.

> The MPAA and MovieLabs, its R&D arm, spent months testing a dozen software programs designed to identify copyrighted videos from brief samples of their data. Each "fingerprinting" program was fed about 1,000 test files of wide-ranging format and quality, including a number of camcorded movies and other bootlegs downloading from the Net. Of the technologies submitted (11 by firms and one by a Scottish university), the MPAA said, three successfully identified more than 90 percent of the files with no false positives.

Reportedly, though the MPAA and MovieLabs wouldn't disclose it, Vobile was the overall winner of those tests.

Video sites such as Microsoft's (MSFT) Soapbox and MySpace already employ fingerprinting technology from provider Audible Magic, and Veoh has said it will implement fingerprinting this month. A Dailymotion spokesperson clarified that the site will continue to use Audible Magic for audio fingerprinting, but is adding in Ina for video fingerprinting. He emphasized that the initial Ina rollout on Dailymotion is only in France, though the company expects it to be implemented across all versions of its sites by 2008.

Other fingerprinting providers we've covered include Activated Content, Autonomy, MotionDSP, iPharro, and Gracenote.

**Related research and analysis from GigaOM Pro:**
Subscriber content. Sign up for a free trial.

- Why iPad 2 Will Lead Consumers Into the Post-PC Era
- The Near-Term Evolution of Social Commerce
- Content Farms: The Players, The Benefits, The Risks

 If you like this story, please share it

- Tweet  0
- 
- 
- 

▪▪▪

- Comments
2

Web Intelligence and Antipiracy - Kapow Software™          http://kapowsoftware.com/solutions/web-intelligence/antipir...

# kap●w
S O F T W A R E

Blog  |  Contact

Discover Kapow Software    Products    Solutions    Customers

## Solutions

Overview

▸ Application Integration

▸ Process Automation

▸ Content Migration

▾ **Web Intelligence**

    Web Data Extraction

    Social Media Monitoring

    News Syndication

    Online Account Aggregation

    Background Checks

    AntiPiracy

    OSINT

▸ Mobile Enablement

▸ Analytics & Business Intelligence

## Web Intelligence Solution: Antipiracy

Home > Solutions > Web Intelligence > AntiPiracy

### Fight media piracy and protect against lost revenue with automated web intelligence

Media piracy on the web accounts for hundreds of billions of dollars in lost revenue every year for media companies and artists. The ability to automatically monitor and collect evidence from pirated downloads and BitTorrent sites has become a critical weapon in fighting this problem.

**Featured Customer Success Stories in AntiPiracy:**

Entertainment

In the fight against software and movie piracy, Kapow delivers a major advance in intellectual property and revenue protection.

▸ Close    ▸ Det

### Challenge

- Identify instances of copyright infringement, where the company's products have been illegally copied and shared online.

- Implement a cost effective mechanism for searching thousands of sites daily for infringing content.

- Address day-to-day requirements as well as peak demand surrounding majo product releases.

### Solution

- Kapow solution searches daily for illegally copied materials from the company's back catalog.

- Scales to meet peak demand surrounding new product releases using flexible scheduling rules and automatic load-balancing.

Web Intelligence and Antipiracy - Kapow Software™          http://kapowsoftware.com/solutions/web-intelligence/antipir...

■ Provides a central resource for the company's global anti-piracy initiative.

## Results

■ Enables the company to identify and remove infringing content more rapidly than ever before.

■ Provides a centralized anti-piracy infrastructure available to all departments.

■ Enables targeting of specific new product releases for the first time, resulting in the detection of millions of copyright infringements for a single product

■ Reduces labor costs by automating web intelligence and aggregation, enabling staff to be redeployed.



Entertainment

Kapow is a powerful weapon in the fight against web piracy.



▶ Close    ▶ Det

## Challenge

■ Search the web for illegally copied material.

■ Extract structured data from thousands of sites to find copyright infringements.

■ Gather evidence for use in copyright infringement prosecution cases.

## Solution

■ Using current artist/title catalog , the agency uses Kapow robots to search hundreds of forums, blogs and peer-to-peer websites every day to find illegally posted content.

■ Copyright infringements are reported to the copyright owner and takedown notices are automatically issued to the hosting website.

## Results

■ Enabled hugely scalable copyright infringement detection system.

■ Allowed redeployment of content analysts, resulting in higher morale due to more rewarding work.

■ Reduced average detection time to minutes/hours rather than days (representing potential cost savings for copyright owners).

11/17/2011 02:26 PM

Web Intelligence and Antipiracy - Kapow Software™            http://kapowsoftware.com/solutions/web-intelligence/antipir...

- Enabled successful prosecution of serial copyright infringing websites.

Top Links                                                                                      Kapow Software New

FEATURED SOLUTIONS              DISCOVER KAPOW              CUSTOMERS AND              Kapow Software Intro
                                SOFTWARE                   PARTNERS                   Katalyst 8.2
Application Integration
                                Overview                   Customer Successes         Kapow Software Repe
Cloud / SaaS Integration                                                              With 64 Percent Grow
                                Data Delivery Challenge     Partner Directory
Process Automation
                                Kapow Software              Kapow Partner Program     Kapow Software Nam
API Enabling                    Revolutionary Approach                                Vice President of Mar

Analytics and Business Intelligence   Delivery Options     SERVICES                   Kapow Software Achi
                                                                                      Validated Integration v
Competitive Price Monitoring    Resource Center            Overview
                                                                                      WebCenter
Mobile Enablement                                          Consulting Services
                                PRODUCTS                                              More News ▶
Web Intelligence                                           Education Services
                                Kapow Katalyst Platform
Social Media Monitoring                                    Technical Support
                                Kapow Mobile Katalyst      Services
Content Migration
                                Request a Trial
View all Solutions ▶

1-800-805-0828         📱  Request Sales Call               © 2010  Kapow Software    Terms of Use

The content-recognition bakeoff | Bit Player | Los Angeles Times   http://opinion.latimes.com/bitplayer/2007/09/the-content-rec...

LAT Home | Print Edition | All Sections

Jobs | Cars.com | Real Estate | More Classifieds

**Los Angeles Times** | **Blogs**

SEARCH *new*

You are here: LAT Home > Blogs > Bit Player

# BIT PLAYER
### HOLLYWOOD'S LOVE-HATE RELATIONSHIP WITH TECHNOLOGY

« Online media round-up | Main | Content recognition, part 2 »

**News/Opinion**

California | Local
National
World
Business
Sports
Washington
Science
Environment
Opinion

**Arts/Entertainment**

Entertainment
The Guide
Company Town
Arts & Culture
Calendar
The Envelope
TV Listings
Movie Showtimes

**Living**

Travel
Health
Autos
Home & Garden
Food
Image
Books
Brand X
Data Desk
Video
Photography
Obituaries
Crosswords/Sudoku
Your Scene
Blogs
Columnists
Print Edition
Readers Rep
Corrections
All Sections

**Buy, Sell & More**

Jobs
Cars
Real Estate
Foreclosure Sale
Rentals
Personals
Local Values
Coupons
Newspaper Ads

**Place an Ad**

In the Newspaper
Online

**Settings/Services**

Sign In

#### The content-recognition bakeoff

There was one obvious winner in the MPAA's **test of content-recognition technologies**, and that would be Hollywood. The association disclosed a brief summary of the results at a **conference** on online entertainment held Thursday in cooperation with the University of California. Paradoxically, though, the results might prove to be a boon for user-generated content sites and the people who love them.

Here's the background. The MPAA and **MovieLabs**, its R&D arm, spent months testing a dozen software programs designed to identify copyrighted videos from brief samples of their data. Each "fingerprinting" program was fed about 1,000 test files of wide-ranging format and quality, including a number of camcorded movies and other bootlegs downloading from the Net. Of the technologies submitted (11 by firms and one by a Scottish university), the MPAA said, three successfully identified more than 90 percent of the files with no false positives. In other words, when they erred, it was in not spotting a copyrighted movie within a file, rather than identifying a movie that wasn't there.

Steve Weinstein, ceo of MovieLabs, summarized the results as follows: "This stuff works." Of course, that's just in a laboratory setting. The next step for MovieLabs and the MPAA, in addition to testing more iterations of the technology, is to try out the technologies in the field, where commercially important issues such as scaling (how well they handle a large volume of ID requests) can be measured.

Weinstein and other officials declined to say which firms had scored highest in the test. That honor was claimed by Santa Clara-based startup **Vobile**, although executives from more established competitors, Gracenote and Audible Magic, also said their technology performed well. For the studios, though, the important thing is that several firms actually seem to be able to do what they claim. That could raise the pressure on networks with a large amount of unauthorized copying, such as user-generated video sites and college campuses, to deploy fingerprinting technologies. In fact, Joshua Metzger, a senior vice president at the UGC site Veoh.com, said at the conference that his company would add fingerprinting technology within 30 days.

A lot of details remain unsettled, and the courts have **yet to weigh in** on whether copyright law actually obliges anyone to install fingerprinting technologies on their system. But a fingerprinting technology that works well enough to satisfy the studios could be the key to advertiser-supported sites such as Veoh and YouTube striking major content deals and ramping up their ad sales. After all, one of the things holding back revenues at UGC sites is uncertainty over liability. If fingerprinting settles that issue, that's a powerful motivator for companies to deploy it. On the other hand, if it chokes off so much content that users run away, then it's a lose-lose situation.

Posted by Jon Healey on September 21, 2007 | **Permalink**

**Comments**

**View the entire comment thread.**

**Post a comment**

If you are under 13 years of age you may read this message board, but you may not participate.
**Here are the full legal terms you agree to by using this comment form.**

Comments are moderated, and will not appear until they've been approved.

This weblog only allows comments from registered users. To comment, please **Sign In**.

**Our Blogger**

Times editorial writer **Jon Healey** pens opinion pieces about a variety of business issues, and blogs about technologies that are changing the entertainment industry's business model.

**Recent Comments**

• Aryol Prefabrik on **Nero burns a new mission**
• Mathew on **Consumer groups blast MPAA proposal (a dog bites man story)**
• Roy Anderson on **Should local radio pay royalties?**
• Jon Healey on **Gizmodo on journalism**
• Socrates on **Gizmodo on journalism**
• Chris K. on **A new day for WebTV?**

**Search this blog**

○ **Technorati** search
  ● this blog
○ all blogs    Search

**Archives**

August 2008
July 2008
June 2008
May 2008
April 2008
March 2008
February 2008
January 2008
December 2007
November 2007
October 2007
September 2007
August 2007
July 2007
June 2007
May 2007
April 2007
March 2007
February 2007
January 2007
December 2006
November 2006
October 2006
September 2006
August 2006
July 2006
June 2006

**Subscribe to this Blog - What is RSS?**

**Recent Posts**

• New RSS feed
• Moving to a new blog
• The Cablevision DVR ruling
• More on the FCC, Comcast and BitTorrent
• The FCC's Comcast decision

**Now Playing**

• Brazilian Girls
  Mano De Dios

**Categories**

Apple   Audio   Business models   Computers and other gadgets   Copyrights   DRM   Games   Geek speak   Mobile   **Music**   Net

The content-recognition bakeoff | Bit Player | Los Angeles Times   http://opinion.latimes.com/bitplayer/2007/09/the-content-rec...

Reprint Requests
Work for Us

**Home Delivery**

Customer Support
Subscribe

neutrality   Odds and ends   Regulation
Software   **TV, film and video**
Video

**Where I've Been Lately**

- **Web Scout**
  Web content highlights
- **TechCrunch**
  Well reported tech-news site
- **Goodyblog**
  A smart take on TV and pop culture
- **PaidContent**
  Nice roundup of news and conferences
- **Good Morning Silicon Valley**
  The view from San Jose, snarkily
- **Techmeme**
  A window into the tech blogosphere
- **Engadget**
  Allgadget
- **Coolfer**
  On music and the music biz
- **Freedom to Tinker**
  Professor Ed Felten's musings about devices and DRM
- **Progress and Freedom Foundation IP blog**
  Where regulation is the problem, not the solution

**More on LATimes.com**
California/Local | National | World | Sports
Opinion | Entertainment | Travel | Health
L.A. Wheels | Real Estate

**Partners**
Hoy | KTLA | Boodle.com | ShopLocal
Shopping | Grocery Coupons

**Classifieds**
Career Builder | Cars.com | Apartments.com
FSBO (For Sale By Owner) | Open Houses

*Los Angeles Times*   Copyright 2011 Los Angeles Times   Privacy Policy | Terms of Service | Advertise | Home Delivery | Reprint Requests | Help & Services | Contact | Site Map

2 of 2                                                                                                           11/17/2011 11:33 AM

LAT Home | Print Edition | All Sections                                                                Jobs  |

## Los Angeles Times | Blogs

You are here: LAT Home > Blogs > Bit Player

# BIT PLAYER
### HOLLYWOOD'S LOVE-HATE RELATIONSHIP WITH TECHNOLOGY

« The content-recognition bakeoff | Main | Art Tatum live, kinda sorta »

### Content recognition, part 2

 As I mentioned in **my last post**, the MPAA and MovieLabs' **tests** of 12 content-recognition technologies found several that performed quite well in the lab. According to information released at a joint MPAA-University of California **event** last week, seven of the technologies correctly identified at least 80% of the test files, and three got better than 90% right with no false positives. But several speakers at the event predicted that the technologies would prove much more useful for distributing content than for blocking it.

The event was designed to explore how colleges and the entertainment industry could work together to address piracy. Again and again, speakers opined that making content easier to get legitimately, rather than trying to make it harder to obtain illegitimately, was the best way to combat illegal downloading. Fingerprinting can be used for either purpose, but it's most effective when used to track usage online and determine what royalties are owed. For example, panelists from AT&T Labs and USC talked about the prohibitive expense and/or intrusiveness of examining every bit of traffic flowing across large networks, which is what a network operator would have to do if it was using fingerprints to deter unauthorized file-sharing.  "You don't look inside what people are doing unless there's a legitimate reason to do so," said Marty Loman, vice president of content protection at AT&T Labs. "You have to narrow down who you're going to look at."

Fingerprinting and DRM techniques will drive students away if they make it harder to consume what they want on the devices they want to use, several speakers warned. Ashwin Navin, president of **BitTorrent Inc.**, put it this way: "If demand exists for content in a certain model, it will be fulfilled. The question for rights holders is, do we want that demand fulfilled legally or do we want that fulfilled illegitimately?" Added UCLA student Colin Iberti, "To put things on your iPod is very important to the college demographic. Not any other MP3 player, but iPods specifically." The authorized content that colleges offer typically uses a DRM not compatible with iPods, and "it really alienates the 98% of us who want to put it on their iPods."

In sum, the MPAA and MovieLabs' comments about fingerprinting technology had to be encouraging to copyright owners that are looking to boost online revenue. But if the speakers at the Universal City Hilton were right, fingerprinting won't be a silver bullet for copyright holders eager to kill the online bootlegging beast.

Posted by Jon Healey on September 24, 2007 in **DRM** , **Music** , **TV, film and video** | Permalink

### Comments

**View the entire comment thread.**

### Post a comment

If you are under 13 years of age you may read this message board, but you may not participate.

### News/Opinion

California | Local
National
World
Business
Sports
Washington
Science
Environment
Opinion

### Arts/Entertainment

Entertainment
The Guide
Company Town
Arts & Culture
Calendar
The Envelope
TV Listings
Movie Showtimes

Content recognition, part 2 | Bit Player | Los Angeles Times          http://opinion.latimes.com/bitplayer/2007/09/content-recogni...

Real Estate
Foreclosure Sale
Rentals
Personals
Local Values
Coupons
Newspaper Ads

**Place an Ad**

In the Newspaper
Online

**Settings/Services**

Sign In
Register
Personalized News
E-Mail Newsletters
RSS Feeds
Help
Contact Us
L.A. Times Archives
Reprint Requests
Work for Us

**Home Delivery**

Customer Support
Subscribe

**Here are the full legal terms you agree to by using this comment form.**

Comments are moderated, and will not appear until they've been approved.

This weblog only allows comments from registered users. To comment, please **Sign In**.

**Our Bl**

Times e
about a
technolo
industry

**Recen**

• Aryol
• Mathe
  propos
• Roy A
  royaltie
• Jon H
• Socra
• Chris

**Search**

•

**Archiv**

August
July 20
June 20
May 200
April 20
March 2
Februa
January
Decem
Novem
Octobe
Septem
August
July 20
June 20
May 200
April 20
March 2
Februa
January
Decem
Novem
Octobe
Septem
August
July 20
June 20

**Subsc**

Content recognition, part 2 | Bit Player | Los Angeles Times      http://opinion.latimes.com/bitplayer/2007/09/content-recogni...

**Recen**

**Now P**

- |

**Categ**

**Where**

- |
- |
- |
- |
- |
- |
- |
- |
- |
- |

**More on LATimes.com**

California/Local | National | World | Sports

**Partners**

Hoy | KTLA | Boodle.com | ShopLocal

**Classifieds**

Career Buil

Content recognition, part 2 | Bit Player | Los Angeles Times          http://opinion.latimes.com/bitplayer/2007/09/content-recogni...

Case 1:11-cv-20427-KMW   Document 399-2   Entered on FLSD Docket 03/21/2012   Page 68 of 158

Opinion  |  Entertainment  |  Travel  |  Health          Shopping  |  Grocery Coupons                    FSBO (For
L.A. Wheels  |  Real Estate

*Los Angeles Times*   Copyright 2011 Los Angeles Times          Privacy Policy | Terms of Service | Advertise | Home Delivery | Reprir

Refer a Friend Returns!

**Subject:** Refer a Friend Returns!
**From:** Ooma <newsletter@ooma.com>
**Date:** Thu, 20 Oct 2011 07:09:36 -0400
**To:** Andrew Cromarty <and███████@█████.com>



### Refer a Friend Returns!

Dear Andrew,



Ooma brings you huge savings over your old phone company, while offering all of the features you love plus more. And now with our Refer a Friend program, you can earn rewards for sharing your secret to savings with your loved ones.

Your friends and family will get a great price of $199 for a new Ooma Telo, plus free shipping. Even better, when someone uses your referral code to purchase a new system, you will receive a $25 Amazon gift card. This means you can earn up to $75 in total!

Here's how to get started:

1. Log in to the Refer a Friend page in My Ooma to generate referral codes you can share with your friends and family. Everyone has up to three one-time use referral codes to send out.
2. When the referral link is clicked, your friends and family will be taken to a page where they can learn more about Ooma and purchase directly on the site.
3. You'll earn a $25 Amazon gift card for each purchase completed with your referral codes. Check back in My Ooma to to track how many gift cards you've earned!

If you're ready to share the savings, then act now because this offer ends on November 15th. Start referring your friends today!

Until later,
Team Ooma

This referral program expires on 11/15/2011. Referral codes must be redeemed by this date to be eligible for reward. Purchases must be made using the referral code and link provided to be eligible for promotional offer and referral reward. Ooma will not be held responsible for any lost or stolen gift cards. This offer cannot be combined with any other program. Ooma reserves the right to cancel or modify the terms of this program at any time.

1 of 2                                                                                                10/20/2011 10:24 AM

Refer a Friend Returns!

**New Voicemail-to-Text**
Read your voicemail instead of listening to it
LEARN MORE ▸

**New International Bundle**
Call 70 countries for less than 1¢ per minute
CHECK IT OUT ▸

**Step up to Premier** 👑
Fire up the full power of Ooma with Premier!
SUBSCRIBE NOW ▸

This email message was sent from:
Ooma Inc, 1840 Embarcadero Road, Palo Alto, CA
Need assistance? Visit www.ooma.com/support

You received this message because you are currently subscribed to receive news from Ooma.
Click here to unsubscribe from future tips and newsletter e-mails from Ooma.

10/20/2011 10:24 AM

# mozillaZine

## Network.http.sendRefererHeader

The title given to this article is incorrect due to technical limitations. The correct title is **network.http.sendRefererHeader**.

This article describes the preference **network.http.sendRefererHeader**. To add, delete, or modify this preference, you will need to edit your configuration — do *not* edit this article.

**mozillaZine**

**Main Page**

**This Page**
Article
Discussion
Edit
History
What links here
Related changes
Printable version

**Your Account**
Log in/Create Account

**Tools**
Recent Changes
Upload file
Special pages

**Contents** [hide]

1 Background
2 Possible values and their effects
    2.1 0
    2.2 1
    2.3 2
3 Caveats
4 Recommended settings
5 First checked in
6 Has an effect in
7 Related bugs
8 Related preferences

[edit]

## Background

HTTP    is the application-layer protocol with which most web pages are transferred. As part of HTTP, requests can include a "Referer" *(sic)* header    that tells the server which page the user was on that initiated the request. Servers use this information to track users' paths through the site and possibly provide additional features.

Additionally, in JavaScript, the current page's referrer is exposed in the DOM through `document.referrer`   . Scripts running on the page can consult this property to see the same information that was sent in the Referer header.

This preference controls when to send the Referer header and set `document.referrer`.

**Search**

Search

Old Search

submit news

forums

weblogs (feedHouse)
knowledge base

chat
members
store
about

fr ja de ko es hu

[edit]

## Possible values and their effects

[edit]

### 0

Never send the Referer header or set `document.referrer`.

[edit]

### 1

Network.http.sendRefererHeader - MozillaZine Knowledge Base         http://kb.mozillazine.org/Network.http.sendRefererHeader

Send the Referer header when clicking on a link, and set `document.referrer` for the following page.

**2**                                                                        [edit]

Send the Referer header when clicking on a link or loading an image, and set `document.referrer` for the following page. (Default)

## Caveats                                                                   [edit]

- Disabling Referer headers may cause some functionality on some sites to no longer work.

## Recommended settings                                                      [edit]

Those concerned with privacy can set this to 0, realizing that this may adversely affect some sites. Those wanting to ensure compatibility should leave it at the default.

## First checked in                                                          [edit]

2001-05-11 by Darin Fisher

## Has an effect in                                                          [edit]

- Netscape (all versions since 6.1)
- Mozilla Suite (all versions since 0.9)
- Mozilla Phoenix (all versions)
- Mozilla Firebird (all versions)
- Mozilla Firefox (all versions)
- SeaMonkey (all versions)
- Camino (all versions)
- Minimo (all versions)

## Related bugs                                                              [edit]

- Bug 1582 - [NECKO][webshell] Send HTTP Referer field to server, "network.sendRefererHeader"
- Bug 76866 - http spews many "private" events before any real data events

## Related preferences                                                       [edit]

- browser.send_pings
- network.http.sendSecureXSiteReferrer

---

Categories: Preferences | Security and privacy-related preferences

---

Network.http.sendRefererHeader - MozillaZine Knowledge Base          http://kb.mozillazine.org/Network.http.sendRefererHeader

Case 1:11-cv-20427-KMW   Document 399-2   Entered on FLSD Docket 03/21/2012   Page 73 of 158

This page was last modified 21:30, 10 June 2007. This page has been accessed 143,077 times. About MozillaZine Knowledge Base - Disclaimers

MozillaZine and the MozillaZine Logo Copyright © 1998-2007 MozillaZine. All Rights Reserved - Privacy Policy

```
Network Working Group                                    R. Fielding
Request for Comments: 2616                                 UC Irvine
Obsoletes: 2068                                            J. Gettys
Category: Standards Track                                Compaq/W3C
                                                        J. C. Mogul
                                                             Compaq
                                                        H. Frystyk
                                                            W3C/MIT
                                                        L. Masinter
                                                              Xerox
                                                          P. Leach
                                                          Microsoft
                                                    T. Berners-Lee
                                                            W3C/MIT
                                                         June, 1999
```

# Hypertext Transfer Protocol -- HTTP/1.1

## Status of this Memo

This document specifies an Internet standards track protocol for the Internet community, and requests discussion and suggestions for improvements. Please refer to the current edition of the "Internet Official Protocol Standards" (STD 1) for the standardization state and status of this protocol. Distribution of this memo is unlimited.

## Copyright Notice

Copyright (C) The Internet Society (1999). All Rights Reserved.

## Abstract

The Hypertext Transfer Protocol (HTTP) is an application-level protocol for distributed, collaborative, hypermedia information systems. It is a generic, stateless, protocol which can be used for many tasks beyond its use for hypertext, such as name servers and distributed object management systems, through extension of its request methods, error codes and headers [47]. A feature of HTTP is the typing and negotiation of data representation, allowing systems to be built independently of the data being transferred.

HTTP has been in use by the World-Wide Web global information initiative since 1990. This specification defines the protocol referred to as "HTTP/1.1", and is an update to RFC 2068 [33].

# Exhibit Excerpted

# (112 pages removed)

http://old.cni.org/docs/farnet/

**FARNET: 51 Network Success Stories**



# 51 Reasons to Invest in the National Information Infrastructure

Early in 1993, the Federation of American Research Networks teamed with Interop, Inc. and the Coalition for Networked Information to collect, organize, and disseminate stories which describe the transformational potential of high performance networks such as the Internet. The goal was to document the positive affects the Internet was having upon the provision of services in education, research, manufacturing or other areas. Fifty-one of these so-called "network success stories" were published as a booklet and sent to all the members of the current U.S. Congress as well as to the Clinton Administration. All of the contributed submissions are compiled here.

### [Call for Submission of Stories (March, 1993)](#)

### [Form for Submission of Stories](#)

### [Geographical Index of Stories](#)

### [Categorical Index of Stories](#)

---

 [info@farnet.org](mailto:info@farnet.org)



http://oldcnri.org/docs/farnet/story149.NM.html

**FARNET: 51 Network Success Stories**



# FARNET Stories Project

## 51 Reasons to Invest in the National Information Infrastructure

### story149.NM

**Submitted by:**

Marianne Granoff
Director of Operations
New Mexico Technet
4100 Osuna NE, Suite 103
Albuquerque, NM 87109 USA

v: (505) 345-6555
f: (505) 345-6559
e: granoff@technet.nm.org

**Categories:**

Education, higher; Education, continuing or distance ; Research, academic; Research, government; Research, commercial; Library; Other

**Keywords:**

Innovative or improved ways of doing things; More equitable access to technology or electronic information; Creation of new ideas, products, or services; Technology transfer; Local commitment to network-based activities; Leverage of public funding; Volunteer contributions of time and energy; Partnerships between public and private sector

**Supporting Documentation (contact author for more information):**

http://oldcpm.org/docs/farnet/story149.HM.html

Software; Documentation; CD/ROM; Other

**Story Site (if other than location listed above):**

White Sands Missile Range
New Mexico

**The Story:**

THE STORY OF SIMTEL20

SIMTEL20 is well known among the Internet community as the world's largest on-line repository of freely accessible software and documentation on the Internet. What is not well known today, is how it came into being.

In 1979, CP/M (Control Program for Microcomputers) was the primary operating system on smaller (micro) computers. One summer evening back then, Frank Wancho, an employee of WSMR (White Sands Missile Range) in New Mexico, and at the time, the volunteer sponsor of the MIT (Massachusetts Institute of Technology) INFO-CPM mailing list, made a phone call from his home in El Paso, Texas to a newly published phone number for a computer bulletin board system outside Detroit, Michigan. The 2:00 am phone call was answered by the BBS operator, Keith Petersen, rather than by the computer, as expected.

Keith was, at the time, employed by the local Detroit CBS affiliate as a technical engineer, but was also an avid computer enthusiast. As a result of his computing interests, Keith had started collecting CP/M utilities, files, software, etc. from other enthusiasts and keeping them on his system. He was informally encouraging others to send him new software to add to his collection. The unusual part of this activity was that he provided a way for other users to SECURELY do this using the actual remote CP/M commands, by using multiple directories for uploading and downloading.

As a result of that phone call, Keith began to be an active contributor to the MIT INFO-CPM mailing list. This was at a time when the PDP-10 at MIT had no file transfer protocol that was compatible with CP/M. Keith used "blind uploads" via modem to send new public domain CP/M software, patches, and documentation to the MIT machine on a daily basis. The files themselves were sent directly to the MIT mailing list as messages (i.e. each person on the list received a separate copy of the file).

It soon became clear that all this traffic was straining the MIT mail delivery system. MIT agreed to set aside disk space to hold the CP/M collection, and only the announcements of the new software were sent to the mailing list. Several volunteers at MIT, notably Gail Zacharias, soon managed to write mainframe versions of the MODEM2 file transfer protocol and other CP/M utility programs for the MIT machine. These significantly improved the accuracy of the file contents that Keith uploaded.

In 1983, as availability and access to the MIT computer was removed, Frank Wancho (the System Administrator for the WSMR computer), arranged for the contents of the MIT CP/M

2 of 3

11/04/2011 03:23 PM

http://orecm.org/docs/farnet/story149.VM.html

and the newly formed MS-DOS collections to be moved to a DECSYSTEM 20 that had excess CPU and Disk capacity at WSMR. This computer was also on the ARPANET. Because of the existing network requirements at that time, ARPANET hosts had to have 8 character names. SIMTEL20 was named for the SIMulation and TELeprocessing organization's DECSYSTEM 20 machine by a vote of the local employees at WSMR.

Along with the original CP/M and MS-DOS collections, the CP/M User's Group, SIG/M(icros), PC/Blue, Ada Software Repository, and the Unix/C collections have been added to SIMTEL20 over time. The MS-DOS collection alone contains over 9,000 ZIPped files in over 200 subject subdirectories. A full range of topics is covered, including learning aides for children, handicap aids, and the latest anti-virus checking programs. SIMTEL20 is the primary distribution center for the INFO-CPM, INFO-MICRO, INFO-IBMPC, INFO-ADA, and other mailing list digests, and hosts the archives for those lists and 20 others.

The availability of freely distributable software programs from SIMTEL20 has had a significant impact on the advancement of computer technology both within the United States, and in many foreign countries, especially those who have recently experienced freedom. Many new software authors (even some Shareware author cooperatives) have emerged from these countries - adding their own freely distributable programs to the SIMTEL20 collection.

The management and staff of SIMTEL20 (and Frank Wancho, who was the system administrator for many years), with the help of Keith Petersen and numerous supporters around the world, are proud to be active, contributing members of the Global Internet Community.

(SIMTEL20 is still owned and operated by the Unites States Army at WSMR. It is connected to the MILNET, and to the Internet through the facilities of New Mexico Technet, Inc., a private non-profit corporation, and the WESTNET Regional Network. Access to its archives is available through Technet and via anonymous FTP.)

---

 info@farnet.org



I LIKE HOW WE'VE HAD THE INTERNET FOR DECADES, YET "SENDING FILES" IS SOMETHING EARLY ADOPTERS ARE STILL FIGURING OUT HOW TO DO.

- |<
- < Prev
- Random
- Next >
- >|

**Permanent link to this comic: http://xkcd.com/949/**

**Image URL (for hotlinking/embedding): http://imgs.xkcd.com /comics/file_transfer.png**

Case 1:11-cv-20427-KMW   Document 614-2   Entered on FLSD Docket 11/08/2013   Page 248 of 325

Case 1:11-cv-20427-KMW   Document 399-2   Entered on FLSD Docket 08/22/2013   Page 81 of ...

US008009861B2

(12) **United States Patent**　　　　　(10) **Patent No.:**　　US 8,009,861 B2
Lu et al.　　　　　　　　　　　　　　 (45) **Date of Patent:**　　Aug. 30, 2011

(54) **METHOD AND SYSTEM FOR FINGERPRINTING DIGITAL VIDEO OBJECT BASED ON MULTIRESOLUTION, MULTIRATE SPATIAL AND TEMPORAL SIGNATURES**

(75) Inventors: **Jian Lu**, Cupertino, CA (US); **Yangbin Wang**, Milpitas, CA (US)

(73) Assignee: **Vobile, Inc.**, Santa Clara, CA (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 1109 days.

(21) Appl. No.: **11/681,567**

(22) Filed: **Mar. 2, 2007**

(65) **Prior Publication Data**
US 2007/0253594 A1　　Nov. 1, 2007

**Related U.S. Application Data**

(60) Provisional application No. 60/795,786, filed on Apr. 28, 2006.

(51) **Int. Cl.**
　　*G06K 9/00*　　　　　(2006.01)
(52) **U.S. Cl.** .................................................... **382/100**
(58) **Field of Classification Search** ........................ None
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,792,226 A | 12/1988 | Fishbine et al. | |
| 6,957,350 B1 * | 10/2005 | Demos | 380/203 |
| 2002/0150164 A1 * | 10/2002 | Felts et al. | 375/240.19 |
| 2003/0185417 A1 | 10/2003 | Alattar et al. | |

| | | | |
|---|---|---|---|
| 2003/0202660 A1 * | 10/2003 | Zhou et al. | 380/210 |
| 2005/0175224 A1 | 8/2005 | Venkatesan et al. | |
| 2006/0165179 A1 * | 7/2006 | Feuer et al. | 375/240.18 |
| 2007/0253594 A1 * | 11/2007 | Lu et al. | 382/100 |
| 2008/0273741 A1 * | 11/2008 | Fujii et al. | 382/100 |

FOREIGN PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| WO | WO 2005/079072 | * | 8/2005 |
| WO | WO 2007/127590 A2 | 11/2007 | |

OTHER PUBLICATIONS

Mohatny, S. P., "Digital Watermarking: A Tutorial Review," from Department of Computer Science, University of South Florida, prepared in 1999 at the Indian Institute of Technology, Bangalore, India.
Su et al., "Statistical invisibility for collusion-resistant digital video watermarking," *IEEE Transactions on Multimedia*, Publication Date: Feb. 2005, vol. 7, Issue (1), p. 43-51.

* cited by examiner

*Primary Examiner* — Jingge Wu
*Assistant Examiner* — Tahmina Ansari
(74) *Attorney, Agent, or Firm* — Richard T. Ogawa; Ogawa P.C.

(57)　　　　　　　　**ABSTRACT**

A method and system for generating a fingerprint for a video object. The method includes obtaining a plurality of frames associated with a video object. Additionally, the method includes, for each of the plurality of frames, processing information associated with the plurality of frames, determining a plurality of spatial signatures for the each of the plurality of frames based on at least information associated with the each of the plurality of frames, and determining a plurality of temporal signatures for the each of the plurality of frames based on at least information associated with the plurality of frames. The plurality of spatial signatures corresponds to a plurality of resolutions respectively, and the plurality of temporal signatures corresponding to a plurality of frame rates respectively.

**31 Claims, 6 Drawing Sheets**



U.S. Patent          Aug. 30, 2011          Sheet 1 of 6          US 8,009,861 B2



Figure 1:  Process of fingerprinting a Video Object

Case 1:11-cv-20427-KMW   Document 399-2   Entered on FLSD Docket 03/21/2012   Page 83 of 158

**U.S. Patent**          Aug. 30, 2011          Sheet 2 of 6          US 8,009,861 B2



(a)



(b)

Figure 2:  Computing Spatial Signatures at multiple resolutions.  (a)  a frame is divided
into 2x2 blocks; (b) a frame is divided into 4x4 blocks.

**U.S. Patent**     **Aug. 30, 2011**     **Sheet 3 of 6**     **US 8,009,861 B2**



(a)                          (b)                          (c)

Figure 3:; Computing the Base Spatial Signature (BSS) over 2x2 blocks.  (a) the mean
pixel value of each block; (b) the ordinal rank of each block; (c) the BSS vector.

Case 1:11-cv-20427-KMW   Document 399-2   Entered on FLSD Docket 03/21/2012   Page 85 of 158

**U.S. Patent**          Aug. 30, 2011          Sheet 4 of 6          US 8,009,861 B2



Figure 4:  Positioning a sliding window in computing Temporal Signatures.

Case 1:11-cv-20427-KMW   Document 399-2   Entered on FLSD Docket 03/21/2012   Page 86 of 158

**U.S. Patent**          Aug. 30, 2011          Sheet 5 of 6          US 8,009,861 B2



(a)



(b)

Figure 5:  Computing the Temporal Signature over a downsampled group of frames.  (a) the sum of absolute pixel difference between two consecutive frames; (b) the ordinal rank of each frame; the TS of the current frme is its ordinal rank.

Case 1:11-cv-20427-KMW   Document 399-2   Entered on FLSD Docket 03/21/2012   Page 87 of 158

**U.S. Patent**          Aug. 30, 2011          Sheet 6 of 6          US 8,009,861 B2



Figure 6

US 8,009,861 B2

1

## METHOD AND SYSTEM FOR FINGERPRINTING DIGITAL VIDEO OBJECT BASED ON MULTIRESOLUTION, MULTIRATE SPATIAL AND TEMPORAL SIGNATURES

### CROSS-REFERENCES TO RELATED APPLICATIONS

This application claims priority to U.S. Provisional Application No. 60/795,786, filed Apr. 28, 2006, which is incorporated by reference herein.

### STATEMENT AS TO RIGHTS TO INVENTIONS MADE UNDER FEDERALLY SPONSORED RESEARCH OR DEVELOPMENT

Not Applicable

### REFERENCE TO A "SEQUENCE LISTING," A TABLE, OR A COMPUTER PROGRAM LISTING APPENDIX SUBMITTED ON A COMPACT DISK

Not Applicable

### BACKGROUND OF THE INVENTION

This invention relates to techniques for characterizing and fingerprinting digital video object. In particular, this invention relates to method and system for generating a unique and robust identifier for a digital video object based multiresolution, multirate spatial and temporal signatures.

Digital video has become very popular in the last decade. There are many sources from which digital video is created, recorded and distributed, such as DV camcorders, DVD, DVR, and video download and streaming over the Internet. A piece of digital video is called a digital video object or simply video object in this document. It may be a file that is saved on a storage media such as a hard disk drive, or a bitstream that is transmitted over a broadcast channel or over the Internet. The constantly increasing number of digital video objects and proliferation of digital video entertainment and services demand effective and efficient methods and systems for indexing and identifying digital video objects.

A common method for uniquely identifying a digital object is to pass it through a hash function that produces a fixed-length output known as hash sum or message digest. A popular hash function is MD5 that is specified by RFC 1321. While a hash sum as an identifier is useful for certain purposes such as data integrity check, it is often inadequate for content identifications. For example, a digital video object may be encoded in various formats such as MPEG4 and Windows Media, and at various bitrates such as 2 Mbps for broadcast and 700 Kbps for Internet download. The hash sum value will be different for each of these formats though the content is the same. A fingerprint of a digital video object is different from a hash sum in that the former is a unique identifier for the video content while the latter is a unique identifier for the file. Having a unique and robust fingerprint for each and every video object enables many applications, such as video content indexing, search and retrieval, content filtering, broadcast monitoring, and metadata services.

### BRIEF SUMMARY OF THE INVENTION

The present invention relates in general to video signal processing. More particularly, the invention provides a

2

method and system for characterizing a digital video object. Merely by way of example, the invention is described as it applies to obtaining spatial signatures for multiple resolutions, temporal signatures for multiple frame rates, and/or spatial-temporal signatures, but it should be recognized that the invention has a broader range of applicability.

According to an embodiment of the present invention, a method for generating a fingerprint for a video object includes obtaining a plurality of frames associated with a video object. Additionally, the method includes, for each of the plurality of frames, processing information associated with the plurality of frames, determining a plurality of spatial signatures for the each of the plurality of frames based on at least information associated with the each of the plurality of frames, and determining a plurality of temporal signatures for the each of the plurality of frames based on at least information associated with the plurality of frames. The plurality of spatial signatures corresponds to a plurality of resolutions respectively, and the plurality of temporal signatures corresponding to a plurality of frame rates respectively. Moreover, the method includes, for each of the plurality of frames, processing information associated with the plurality of spatial signatures and the plurality of temporal signatures, and determining a frame fingerprint for the each of the plurality of frames, the frame fingerprint including the plurality of spatial signatures corresponding to the plurality of resolutions respectively and the plurality of temporal signatures corresponding to the plurality of frame rates respectively. Also, the method includes processing a plurality of frame fingerprints for the plurality of frames respectively, the plurality of frame fingerprints including the frame fingerprint for the each of the plurality of frames. Additionally, the method includes determining a video fingerprint for the video object, the video fingerprint including the plurality of frame fingerprints.

According to another embodiment of the present invention, a method for generating a spatial signature for a frame of a video object includes obtaining a frame associated with a video object, and dividing the frame into a plurality of blocks, the plurality of blocks corresponding to a plurality of locations respectively. Each of the plurality of blocks includes a plurality of pixels, and the plurality of pixels corresponds to a plurality of pixel values respectively. Additionally, the method includes determining a plurality of average pixel values for the plurality of blocks respectively, processing the plurality of average pixel values, and determining a plurality of ranks for the plurality of blocks respectively based on at least information associated with the plurality of average pixel values. Each of the plurality of ranks corresponds to a block. Moreover, the method includes processing information associated with the plurality of ranks, and determining a sequence of ranks based on at least information associated with the plurality of ranks and the plurality of locations. A spatial signature for the frame includes information associated with the sequence of ranks.

According to yet another embodiment of the present invention, a method for generating a temporal signature for a frame of a video object includes obtaining a first plurality of frames associated with a video object. The first plurality of frames includes at least a frame, each of the first plurality of frames includes a first plurality of pixels and corresponds to an adjacent frame, and the adjacent frame includes a second plurality of pixels. Additionally, the method includes processing information associated with the first plurality of frames, and determining a plurality of difference values for the first plurality of frames respectively. Each of the plurality of difference values corresponds to the each of the first plurality of frames and the adjacent frame. Moreover, the method includes processing

US 8,009,861 B2

3

information associated with the plurality of difference values, and determining a plurality of ranks corresponding to the first plurality of frames respectively based on at least information associated with the plurality of difference values. The plurality of ranks includes a rank corresponding to the frame, and the rank is a temporal signature for the frame.

According to yet another embodiment of the present invention, a method for generating a spatial-temporal signature for a frame of a video object includes obtaining a first plurality of frames associated with a video object. The first plurality of frames includes at least a frame, and each of the first plurality of frames corresponds to an adjacent frame. Additionally, the method includes dividing each of the first plurality of frames. The divided frame includes a first plurality of blocks corresponding to a plurality of locations respectively, each of the first plurality of blocks corresponds to a second plurality of blocks including the each of the first plurality of blocks, and the second plurality of blocks is associated with blocks on the first plurality of frames respectively. Moreover, the method includes processing information associated with the first plurality of frames. Also, the method includes, for each of the first plurality of blocks, determining a plurality of difference values for the second plurality of blocks respectively. Each of the plurality of difference values is associated with the each of the second plurality of blocks and a corresponding block on the adjacent frame. Additionally, the method includes, for each of the first plurality of blocks, processing information associated with the plurality of difference values, determining a first plurality of ranks corresponding to the second plurality of blocks respectively based on at least information associated with the plurality of difference values, processing information associated with the first plurality of ranks, and determining a rank for the each of the first plurality of blocks based on at least information associated with the first plurality of ranks. Moreover, the method includes processing information associated with a second plurality of ranks corresponding to the first plurality of blocks respectively, and determining a sequence of ranks based on at least information associated with the second plurality of ranks and the plurality of locations for the first plurality of blocks. The second plurality of ranks includes the rank, and a spatial-temporal signature for the frame includes information associated with the sequence of ranks.

According to yet another embodiment of the present invention, a computer program product includes a computer readable medium including instructions for generating a fingerprint for a video object. The computer readable medium includes one or more instructions for obtaining a plurality of frames associated with a video object. Additionally, the computer readable medium includes one or more instructions for, for each of the plurality of frames, processing information associated with the plurality of frames, determining a plurality of spatial signatures for the each of the plurality of frames based on at least information associated with the each of the plurality of frames, and determining a plurality of temporal signatures for the each of the plurality of frames based on at least information associated with the plurality of frames. The plurality of spatial signatures corresponds to a plurality of resolutions respectively, and the plurality of temporal signatures corresponds to a plurality of frame rates respectively. Moreover, the one or more instructions are for, for each of the plurality of frames, processing information associated with the plurality of spatial signatures and the plurality of temporal signatures, and determining a frame fingerprint for the each of the plurality of frames. The frame fingerprint includes the plurality of spatial signatures corresponding to the plurality of resolutions respectively and the plurality of temporal sig-

4

natures corresponding to the plurality of frame rates respectively. Also, the computer readable medium includes one or more instructions for processing a plurality of frame fingerprints for the plurality of frames respectively, and one or more instructions for determining a video fingerprint for the video object. The plurality of frame fingerprints includes the frame fingerprint for the each of the plurality of frames, and the video fingerprint includes the plurality of frame fingerprints.

According to yet another embodiment of the present invention, a computer program product includes a computer readable medium including instructions for generating a spatial signature for a frame of a video object. The computer readable medium includes one or more instructions for obtaining a frame associated with a video object, and one or more instructions for dividing the frame into a plurality of blocks. The plurality of blocks corresponds to a plurality of locations respectively, each of the plurality of blocks includes a plurality of pixels, and the plurality of pixels corresponds to a plurality of pixel values respectively. Additionally, the computer readable medium includes one or more instructions for determining a plurality of average pixel values for the plurality of blocks respectively, one or more instructions for processing the plurality of average pixel values, and one or more instructions for determining a plurality of ranks for the plurality of blocks respectively based on at least information associated with the plurality of average pixel values, each of the plurality of ranks corresponding to a block. Moreover, the computer readable medium includes one or more instructions for processing information associated with the plurality of ranks, and one or more instructions for determining a sequence of ranks based on at least information associated with the plurality of ranks and the plurality of locations. A spatial signature for the frame includes information associated with the sequence of ranks.

According to yet another embodiment of the present invention, a computer program product includes a computer readable medium including instructions for generating a temporal signature for a frame of a video object. The computer readable medium includes one or more instructions for obtaining a first plurality of frames associated with a video object. The first plurality of frames includes at least a frame, each of the first plurality of frames includes a first plurality of pixels and corresponds to an adjacent frame, and the adjacent frame includes a second plurality of pixels. Additionally, the computer readable medium includes one or more instructions for processing information associated with the first plurality of frames, and one or more instructions for determining a plurality of difference values for the first plurality of frames respectively. Each of the plurality of difference values corresponding to the each of the first plurality of frames and the adjacent frame. Moreover, the computer readable medium includes one or more instructions for processing information associated with the plurality of difference values, and one or more instructions for determining a plurality of ranks corresponding to the first plurality of frames respectively based on at least information associated with the plurality of difference values. The plurality of ranks includes a rank corresponding to the frame, and the rank is a temporal signature for the frame.

According to yet another embodiment of the present invention, a computer program product includes a computer readable medium including instructions for generating a spatial-temporal signature for a frame of a video object. The computer readable medium includes one or more instructions for obtaining a first plurality of frames associated with a video object. The first plurality of frames includes at least a frame, and each of the first plurality of frames corresponds to an

US 8,009,861 B2

5

adjacent frame. Additionally, the computer readable medium includes one or more instructions for dividing each of the first plurality of frames. The divided frame includes a first plurality of blocks corresponding to a plurality of locations respectively, each of the first plurality of blocks corresponds to a second plurality of blocks including the each of the first plurality of blocks, and the second plurality of blocks is associated with blocks on the first plurality of frames respectively. Moreover, the computer readable medium includes one or more instructions for processing information associated with the first plurality of frames. Also, the computer readable medium includes one or more instructions for, for each of the first plurality of blocks, determining a plurality of difference values for the second plurality of blocks respectively, processing information associated with the plurality of difference values, determining a first plurality of ranks corresponding to the second plurality of blocks respectively based on at least information associated with the plurality of difference values, processing information associated with the first plurality of ranks, and determining a rank for the each of the first plurality of blocks based on at least information associated with the first plurality of ranks. Each of the plurality of difference values is associated with the each of the second plurality of blocks and a corresponding block on the adjacent frame. Additionally, the computer readable medium includes one or more instructions for processing information associated with a second plurality of ranks corresponding to the first plurality of blocks respectively, and one or more instructions for determining a sequence of ranks based on at least information associated with the second plurality of ranks and the plurality of locations for the first plurality of blocks. The second plurality of ranks includes the rank, and a spatial-temporal signature for the frame includes information associated with the sequence of ranks.

Many benefits are achieved by way of the present invention over conventional techniques. Certain embodiments of the present invention can generate a robust fingerprint which either does not change or change only slightly with different formats, bitrates, or resolutions, and/or with certain alterations and/or distortions for the same video object. Some embodiments of the present invention can generate a fingerprint that is highly discriminating so that two video objects containing different video contents would yield significantly different fingerprints. Certain embodiments of the present invention can generate a fingerprint that is compact for storage, and can be stored in a form for efficient search and matching.

Depending upon embodiment, one or more of these benefits may be achieved. These benefits and various additional objects, features and advantages of the present invention can be fully appreciated with reference to the detailed description and accompanying drawings that follow.

BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 is a flowchart of the algorithm for charactering and fingerprinting digital video object according to the present invention.

FIG. 2 illustrates the ways of subdividing a frame for computing the Spatial Signatures at multiple resolutions according to the present invention.

FIG. 3 illustrates the process of computing the Base Spatial Signature over 2×2 blocks in a specific embodiment according to present invention.

FIG. 4 illustrates the positioning of a sliding window for computing Temporal Signatures according to present invention.

6

FIG. 5 illustrates the process of computing the Temporal Signature in a downsampled group of frames in a specific embodiment according to present invention.

FIG. 6 is a simplified system implementing the method for characterizing and fingerprinting a digital video object according to an embodiment of the present invention.

DETAILED DESCRIPTION OF THE INVENTION

The present invention covers method and system for characterizing video content by its intrinsic features and transforming these features into a compact signature or fingerprint. Because the same video content may be encoded in different formats, bitrates, or resolutions, and the video content may be cut, edited, or subject to various degree of distortion, it is important that the fingerprint characterizing the video object is robust, to the degree that it is invariant or varying only slightly under these circumstances. On the other hand, the fingerprint must be highly discriminating in the sense that two video objects containing different video content should yield very different fingerprints. Furthermore, the data representation of the video fingerprint must be sufficiently compact for storage, and can be stored in a form for efficient search and matching.

Fingerprinting Video Object

The process of fingerprinting a video object according to the present invention is shown with the block diagram in FIG. 1. Each frame is processed in display order, producing a spatial signature block (SSB), a temporal signature block (TSB), and an optional spatial-temporal signature block (STSB). The SSB consists of one or multiple spatial signatures (SS) in multiple resolutions; the TSB consists of one or multiple temporal signatures (TS) in multiple framerates; the STSB consists of spatial-temporal signatures (STS) in multiple resolutions and multiple framerates. For each frame in a video object, the SSB, TSB, and STSB form a fingerprint block of the corresponding frame. The sequence of all fingerprint blocks in frame order form the fingerprint for the video object. In the following the method for computing SSB, TSB, and STSB is described. In this specific embodiment, all signatures and the fingerprints are computed in Luma component only. In more generalized cases, the signatures and fingerprints can be computed in both Luma and Chroma components, or in any or all components in RGB or other color spaces.

Spatial Signatures

Spatial Signatures (SS) for a video frame can be computed at multiple resolutions. In one implementation according to the present invention, a frame is divided evenly into 2×2 or 4 blocks of equal size, as shown in FIG. 2(a). This is the lowest resolution for frame subdivision in computing the SS; the resulting SS is called Base Spatial Signature, or BSS. Going up one level in resolution, the frame can be divided into 4×4 or 16 blocks, as shown in FIG. 2(b). Going up further in resolution by finer frame subdivision, such as 8×8 or 64 blocks, can produce SS in finer resolutions. It is possible to compute the BSS using a different frame subdivision, such as 3×3 or 9 blocks, and extend to higher resolution by successively doubling its dimensions to, e.g., 6×6=36 blocks, and 12×12=144 blocks. But we find that computing BSS using 2×2=4 blocks is more robust against certain image transformations such as an aspect ratio change.

Using the 2×2 block pattern in FIG. 2(a), the BSS is computed as follows:

1. For each block, compute of mean of pixel value as follows:

$$B_i = (\Sigma \times (k))/N_i, k=1,2,3,\ldots,N_i$$

US 8,009,861 B2

7

where $B_i$ is the mean pixel value of the i-th block, $x(k)$ is a pixel value inside the i-th block, and $N_i$ is the number of pixels in the i-th block. See an example in FIG. 3(a).

2. Compare and rank the value of $B_i$ among the blocks and assign the ordinal rank to each block. See an example in FIG. 3(b).

3. Generate the BSS by collecting the ordinal rank of each block in raster order and forming a BSS vector. See an example in FIG. 3(c).

The SS at higher resolution can be computed following the same steps as above. The only difference is that the SS vector at a higher resolution has higher dimensions. For example, the BSS vector computed using 2×2 blocks is of dimension 4, while the SS vector computed using 4×4 blocks is of dimension 16.

Since each ordinal rank in 2×2 blocks can be represented with log 2(4)=2 bits, it's easy to see that the BSS can be represented with 4*log 2(4)=8 bits. Similarly, it's easy to see that the SS over 4×4 blocks can be represented with 16*log 2(16)=64 bits. Required bits for representing the SS at even higher resolution can be calculated in a similar way.

The SSB for a frame is formed by stacking the BSS and the SS at all resolutions that are available. In the specific embodiment that is described above, the SSB can be represented with 8+64=72 bits.

Temporal Signatures

The Temporal Signatures (TS) are computed for each frame over a sliding time window.

For each frame, the window is positioned such that the current frame is on the right edge of the window (See FIG. 4). The position of the window is moved one frame at a time along the temporal axis. The size of the window is a parameter that can be adjusted. In one embodiment according to the present invention, the size of the sliding window is defined to be 1 second in time. This means there will be a number of frames falling in the sliding window at any position of the window, and that number depends on the framerate of the video object. For example, if the framerate of a video object is 30 fps, there will be 30 frames in the sliding window at any position of the window. If the framerate of a video object is less than 1 fps, there will be no frame inside the sliding window for any position of the window.

In order to make the TS comparable for video objects of different framerates, the framerate of each video object is downsampled to a set of common framerates. The set of common framerates for a video object to be downsampled to can be adjusted. Generally speaking, they are designed to be representative of the TS at multiple framerates. In one embodiment according to the present invention, the specific set of common framerates that are used to compute the TS is {6 fps, 12 fps, 24 fps}.

Framerate downsampling to the set of common framerates produces multiple groups of frames. The TS is computed over each group of frames, resulting multirate TS. For clarity in this document, the TS computed from a particularly group will be labeled by the downsampled framerate of that group. For example, TS6 indicates that it is the TS computed from the group of frames of 6 fps.

Using the downsample set of {6 fps, 12 fps, 24 fps} and their associated downsampled groups of frames, the TS is computed in the following steps:

1. For each group of frames, compute the sum of absolute difference of corresponding pixels between two consecutive frames in the group, that is,

$$D_i = \Sigma |x_i(k) - x_{i-1}(k)|, \ k=1,2,3 \ldots N.$$

8

where i is the index for the i-th frame in the group, and k=1, 2, 3, . . . , N is the pixel index in a frame. See FIG. 5(a)

2. Compare and rank the value of $D_i$ among the frames in the group and assign the ordinal rank to each frame. See FIG. 5(b).

3 Record the ordinal rank of the current frame (i.e. the frame on the right edge of the sliding window). This is the TS of the current frame in the group. See FIG. 5(b).

Since the ordinal rank is no greater than the number of frames in the group, it is easy to see TS6 can be represented with $\gamma$ log 2(6)/3 bits; TS12 can be represented with $\gamma$ log 2(12)/4 bits; TS24 can be represented with $\gamma$ log 2(24)/5 bits. Here the operator $\gamma$] denotes a mathematical ceiling function. For example, $\gamma$4.2/=5.

The TSB for a frame is formed by stacking the TS at all framerates that are available. In the specific embodiment that is described above, the TSB can be represented with 3+4+5=12 bits.

Spatial-Temporal Signatures

Spatial-Temporal Signatures (STS) are computed for each frame over a sliding window of subdivided frames. Frames may be subdivided in various ways as described previously for computing the SS at multiple resolutions. In one specific embodiment, the frame is subdivided into 2×2 blocks. The TS is computed for each block in a frame in the same way as described previously, resulting 4 TS per frame for each downsampled group. The STS is formed by collecting the resulting TS in raster order and put them in a vector. The STSB is formed by stacking the STS at all framerates that are available. In this specific embodiment, the STSB can be represented with 4*(3+4+5)=48 bits.

Fingerprint from Spatial and Temporal Signatures

The collection of SSB, TSB, and optionally STSB for a frame form the Fingerprint Block (FB) for the corresponding frame. A sequence of FBs corresponding to each frame in a video object is defined to be the fingerprint for the video object. In the specific embodiment that is described in this document, a FB can be represented with 84 bits without STSB, or 132 bits with STSB. The fingerprint so defined will have a data rate of 2,520 bits/s (3,930 bits/s if STSB included) for video objects with framerate of 30 fps.

As discussed above, FIG. 1 is a simplified method for characterizing and fingerprinting a digital video object according to an embodiment of the present invention. This diagram is merely an example, which should not unduly limit the scope of the claims. One of ordinary skill in the art would recognize many variations, alternatives, and modifications. The method 100 includes a process 110 for receiving video object, a process 120 for obtaining next frame, a process 130 for determining one or more spatial signatures, a process 140 for determining one or more temporal signatures, a process 150 for determining one or more spatial-temporal signatures, a process 160 for storing fingerprint block, and a process 170 for determining whether all frames have been processed. Although the above has been shown using a selected group of processes for the method, there can be many alternatives, modifications, and variations. For example, some of the processes may be expanded and/or combined. Other processes may be inserted to those noted above. Depending upon the embodiment, the sequence of processes may be interchanged with others replaced. As an example, some or all processes of the method are performed by a computer or a processor directed by a code. In another example, some or all processes of the method are performed according to instructions included by a computer-readable medium in a computer pro-

US 8,009,861 B2

9

gram product. Further details of these processes are found throughout the present specification.

After a video object is received at the process 110, the video object is processed. For example, the video object is a piece of video, such as a piece of digital video. In another example, the video object includes one or more frames, which are obtained and processed according to FIG. 1. In one embodiment, the frames are processed in their display order. In another embodiment, for each frame, a spatial signature block (SSB), a temporal signature block (TSB), and/or a spatial-temporal signature block (STSB) are determined. For example, the SSB includes one or more spatial signatures (SS) in one or more resolutions; the TSB includes one or more temporal signatures (TS) in one or more framerates; and/or the STSB includes one or more spatial-temporal signatures (STS) in one or more resolutions and/or one or more framerates. In yet another embodiment, the SSB, the TSB, and/or the STSB of the same frame form at least part of a fingerprint block of this frame. For example, a fingerprint block is a frame fingerprint. According to FIG. 1, after the fingerprint block is stored, it is determined whether all frames have been processed at the process 170. If not all frames have been processed, next frame is obtained and processed. The sequence of all fingerprint blocks in frame order form at least part of fingerprint for the video object according to an embodiment of the present invention.

Further emphasized here, FIG. 1 is merely an example, which should not limit the scope of the claims. One of ordinary skill in the art would recognize many variations, alternatives, and modifications. For example, the process 170 for determining whether all frames have been processed can be replaced by a process for determining whether additional frames need to be processed. In another example, one or more of the process 130 for determining one or more spatial signatures, the process 140 for determining one or more temporal signatures, and the process 150 for determining one or more spatial-temporal signatures are skipped.

As discussed above, FIG. 2 illustrates examples of subdividing a frame for determining Spatial Signatures at multiple resolutions according to an embodiment of the present invention. FIG. 2 includes FIGS. 2(a) and (b). These diagrams are merely examples, which should not unduly limit the scope of the claims. One of ordinary skill in the art would recognize many variations, alternatives, and modifications.

As shown in FIG. 2(a), a frame is divided into $m_b$ by $n_b$ blocks according to an embodiment. For example, each of $m_b$ and $n_b$ is a positive integer. In another example, $m_b$ and $n_b$ are the same or different in value. In yet another example, all of the $m_b$ by $n_b$ blocks have the same size. As shown in FIG. 2(b), the frame is divided into $m_b$ by $n_b$ blocks according to an embodiment. For example, each of $m_b$ and $n_b$ is a positive integer. In another example, $m_b$ and $n_b$ are the same or different in value. In yet another example, all of the $m_b$ by $n_b$ blocks have the same size.

In one embodiment, the spatial signature (SS) based on $m_b$ by $n_b$ blocks is called Base Spatial Signature (BSS), and the spatial signature (SS) based on $m_h$ by $n_h$ blocks is called Spatial Signature (SS) at higher resolution. For example, $m_h$ is larger than $m_b$, and/or $n_h$ is larger than $n_b$. In another example, both $m_b$ and $n_b$ are equal to 2, and both $m_h$ by $n_h$ are equal to 2 multiplied by 2', where n is a positive integer. In yet another example, both $m_b$ and $n_b$ are equal to 3, and both $m_h$ by $n_h$ are equal to 3 multiplied by 2''.

As discussed above, FIG. 3 illustrates a process of determining the Base Spatial Signature over 2×2 blocks according to an embodiment of the present invention. FIG. 3 includes FIGS. 3(a), (b), and (c). These diagrams are merely examples,

10

which should not unduly limit the scope of the claims. One of ordinary skill in the art would recognize many variations, alternatives, and modifications. For example, the BSS based on $m_b$ by $n_b$ blocks can be calculated in substantially the same manner, even if either $m_b$ or $n_b$ or both are not equal to 2. In another example, the SS based on $m_h$ by $n_h$ blocks can be calculated in substantially the same manner.

As shown in FIG. 3, the method for determining spatial signature based on $m_b$ by $n_b$ blocks or $m_h$ by $n_h$ blocks includes the following three processes:

1. For each block, determining average of pixel values as follows:

$$B_i = \sum_{k=1}^{N_i} x(k) / N_i$$

where $B_i$ is the average pixel value of the i-th block, $x(k)$ is the pixel value for the kth pixel inside the i-th block, and $N_i$ is the number of pixels in the i-th block. In one embodiment, $i=1, 2, \ldots, m_b \times n_b$. In another embodiment, $i=1, 2, \ldots, m_h \times n_h$.

2. Determining a ranking number for each block. For example, the value of $B_i$ is compared among the blocks, and the ordinal ranking number for the $B_i$ is assigned to the corresponding block. In one embodiment, the total number of blocks equals $m_b \times n_b$, so the ranking number ranges from 1 to $m_b \times n_b$. In another embodiment, the total number of blocks equals $m_h \times n_h$, so the ranking number ranges from 1 to $m_h \times n_h$.

3. Determining spatial signature based on ranking numbers. For example, the spatial signature is BSS, or SS at higher resolution. In another example, the spatial signature includes a vector. Within the vector, the ranking numbers for the blocks are arranged based on the physical locations of these blocks within the frame. In one embodiment, the ranking numbers are collected in raster order and thus a spatial signature is generated.

After spatial signatures at multiple resolutions are determined for a frame, the SSB is determined by stacking the BSS and the SS at one or more higher resolutions according to an embodiment of the present invention.

FIG. 4 illustrates the positioning of a sliding window for computing Temporal Signatures according to an embodiment of the present invention. This diagram is merely an example, which should not unduly limit the scope of the claims. One of ordinary skill in the art would recognize many variations, alternatives, and modifications.

As shown in FIG. 4, for each frame, the sliding window is positioned such that the current frame is on the right edge of the window. The position of the window is moved one frame at a time along the temporal axis. The width of the window is a parameter that can be adjusted. In one embodiment, the width of the window is 1 second in time. For example, a number of frames fall within the sliding window, and the number of such frames depends on the framerate of the video object. According to one embodiment, if the framerate used for determining temporal signature is the original framerate of the video object, the frame or frames are the original frame or frames of the video object. According to another embodiment, if the framerate used for determining temporal signature is different from the original framerate of the video object, the frame or frames are the sampled frame or frames of the video object. For example, the framerate used for determining temporal signature is lower than the original framerate of the video object, so the video object is temporally downs amp led.

US 8,009,861 B2

11

For a particular sampled framerate used, the method for determining temporal signature includes the following three processes:

1. Determining differences between a frame and its adjacent frame. For example, the sum of absolute differences of corresponding pixels between two consecutive frames is calculated as follows:

$$D_i = \sum_{k=1}^{N} |x_i(k) - x_{i-1}(k)|$$

where i is the index for a frame. For example, $D_i$ is calculated for each frame within the sliding window. Additionally, k represents the kth pixel and N represents the total number of pixels in the frame.

2. Determining a ranking number for the current frame. For example, the value of $D_i$ is compared among all the frames within the sliding window, and the ordinal ranking number for the $D_i$ is assigned to the corresponding frame. In one embodiment, the ordinal ranking number is assigned to the current frame, which resides at the right edge of the sliding window.

3. Recording the ordinal ranking number of the current frame as the temporal signature of the current frame.

After temporal signatures based on multiple framerates are determined for a frame, the TSB is determined by stacking the TS at multiple framerates according to an embodiment of the present invention.

As discussed above, Spatial-Temporal Signatures (STS) are computed for each frame over a sliding window of subdivided frames according to an embodiment of the present invention. For example, a frame is divided into m by n blocks, where each of m and n is a positive integer. In another example, m and n are the same or different in value. In yet another example, all of the m by n blocks have the same size.

In one embodiment, the TS is computed for each block in the frame. For a particular sampled framerate used, the method for determining temporal signature for each block includes the following two processes:

1. Determining differences between a block on a frame and its corresponding block on an adjacent frame. According to one embodiment, if the framerate used for determining temporal signature is the original framerate of the video object, the frames are the original frames of the video object. According to another embodiment, if the framerate used for determining temporal signature is different from the original framerate of the video object, the frames are the sampled frames of the video object. For example, the framerate used for determining temporal signature is lower than the original framerate of the video object, so the video object is temporally downsampled.

For example, the sum of absolute differences of corresponding pixels between two corresponding blocks on two consecutive frames is calculated as follows:

$$D_i = \sum_{k=1}^{N} |x_i(k) - x_{i-1}(k)|$$

where i is the index for a frame. For example, $D_i$ is calculated for the corresponding block of each frame within the sliding window. Additionally, k represents the kth pixel within the corresponding block, and N represents the total number of pixels in the block.

12

2. Determining a ranking number for the block on the current frame. For example, the value of $D_i$ are compared among all the corresponding blocks on all the frames within the sliding window, and the ordinal ranking number for the $D_i$ is assigned to the corresponding block. In one embodiment, the ordinal ranking number is assigned to the block on the current frame, which resides at the right edge of the sliding window.

These two processes are repeated to determine the ordinal ranking numbers for all m-by-n blocks on the current frame according to an embodiment. The spatial-temporal signature is then determined based on ranking numbers of blocks on the current frame. For example, the spatial-temporal signature includes a vector. Within the vector, the ranking numbers for the blocks are arranged based on the physical locations of these blocks within the current frame. In one embodiment, the ranking numbers are collected in raster order and thus a spatial-temporal signature is generated.

As discussed, the spatial-temporal signature is determined based on the framerate used for determining the TS for each block of the current frame. In one embodiment, spatial-temporal signatures are determined based on multiple framerates for the current frame, and the STSB is determined by stacking the STS at multiple framerates according to an embodiment of the present invention.

For each frame, one or more of SSB, TSB, and STSB, with or without any other information, can form the Fingerprint Block (FB) for the corresponding frame according to an embodiment of the present invention. For example, a Fingerprint Block (FB) is a frame fingerprint, which includes one or more spatial signatures, one or more temporal signatures, and/or one or more spatial-temporal signatures. For a sequence of frames of a video object, the corresponding sequence of FBs can be used as the fingerprint for the video object according to another embodiment of the present invention. For example, if the framerate used for determining temporal signature is the original framerate of the video object, the frames are the original frames of the video object. According to another embodiment, if the framerate used for determining temporal signature is different from the original framerate of the video object, the frames are the sampled frames of the video object. The fingerprint of the video object is stored in a database according to an embodiment of the present invention. For example, the database includes one or more fingerprints of one or more corresponding video objects.

FIG. 6 is a simplified system implementing the method 100 for characterizing and fingerprinting a digital video object according to an embodiment of the present invention. This diagram is merely an example, which should not unduly limit the scope of the claims. One of ordinary skill in the art would recognize many variations, alternatives, and modifications. The system 600 includes a decoder module 610, a fingerprinting module 620, a fingerprint database 630, and an application policy module 640. Although the above has been shown using a selected group of components for the system, there can be many alternatives, modifications, and variations. For example, some of the modules may be expanded and/or combined. Other modules may be inserted to those noted above. Depending upon the embodiment, the arrangement of modules may be interchanged with others replaced. As an example, some or all processes of the method are performed by a computer or a processor directed by a code. In another example, some or all processes of the method are performed according to instructions included by a computer-readable medium in a computer program product. Further details of these processes are found throughout the present specification.

US 8,009,861 B2

13

14

As shown in FIG. **6**, an input video is decoded by the decoder module **610** and fed to the fingerprinting module **620**. The fingerprinting module **620** performs the method **100** according to an embodiment of the present invention. For example, the fingerprinting module **620** is implemented according to FIGS. **1**, **2**, **3**, **4**, and/or **5**. The resulting video fingerprint is compared to the ones stored in the fingerprint database for identification, and the identification result is returned to the application along with associated metadata (e.g., title and ownership of the video content). Based on the identification result, the application applies certain policy at the application policy module **640**. For example, if the video is identified to be a pirated version or copy, the application applies filtering.

As discussed above and further emphasized here, FIG. **6** is merely an example, which should not unduly limit the scope of the claims. One of ordinary skill in the art would recognize many variations, alternatives, and modifications. For example, anyone of the modules **610**, **620**, **630**, and **640** can be either hardware or software, or a combination of hardware and software. In another example, the fingerprint database **630** can be embedded in an application or resided outside the application on a local hard drive or a remote server.

According to another embodiment of the present invention, a method for generating a fingerprint for a video object includes obtaining a plurality of frames associated with a video object. Additionally, the method includes, for each of the plurality of frames, processing information associated with the plurality of frames, determining a plurality of spatial signatures for the each of the plurality of frames based on at least information associated with the each of the plurality of frames, and determining a plurality of temporal signatures for the each of the plurality of frames based on at least information associated with the plurality of frames. The plurality of spatial signatures corresponds to a plurality of resolutions respectively, and the plurality of temporal signatures corresponding to a plurality of frame rates respectively. Moreover, the method includes, for each of the plurality of frames, processing information associated with the plurality of spatial signatures and the plurality of temporal signatures, and determining a frame fingerprint for the each of the plurality of frames, the frame fingerprint including the plurality of spatial signatures corresponding to the plurality of resolutions respectively and the plurality of temporal signatures corresponding to the plurality of frame rates respectively. Also, the method includes processing a plurality of frame fingerprints for the plurality of frames respectively, the plurality of frame fingerprints including the frame fingerprint for the each of the plurality of frames. Additionally, the method includes determining a video fingerprint for the video object, the video fingerprint including the plurality of frame fingerprints. For example, the method is implemented according to FIGS. **1**, **2**, **3**, **4**, and/or **5**.

According to yet another embodiment of the present invention, a method for generating a spatial signature for a frame of a video object includes obtaining a frame associated with a video object, and dividing the frame into a plurality of blocks, the plurality of blocks corresponding to a plurality of locations respectively. Each of the plurality of blocks includes a plurality of pixels, and the plurality of pixels corresponds to a plurality of pixel values respectively. Additionally, the method includes determining a plurality of average pixel values for the plurality of blocks respectively, processing the plurality of average pixel values, and determining a plurality of ranks for the plurality of blocks respectively based on at least information associated with the plurality of average pixel values. Each of the plurality of ranks corresponds to a

block. Moreover, the method includes processing information associated with the plurality of ranks, and determining a sequence of ranks based on at least information associated with the plurality of ranks and the plurality of locations. A spatial signature for the frame includes information associated with the sequence of ranks. For example, the method is implemented according to FIGS. **1**, **2**, and/or **3**.

According to yet another embodiment of the present invention, a method for generating a temporal signature for a frame of a video object includes obtaining a first plurality of frames associated with a video object. The first plurality of frames includes at least a frame, each of the first plurality of frames includes a first plurality of pixels and corresponds to an adjacent frame, and the adjacent frame includes a second plurality of pixels. Additionally, the method includes processing information associated with the first plurality of frames, and determining a plurality of difference values for the first plurality of frames respectively. Each of the plurality of difference values corresponds to the each of the first plurality of frames and the adjacent frame. Moreover, the method includes processing information associated with the plurality of difference values, and determining a plurality of ranks corresponding to the first plurality of frames respectively based on at least information associated with the plurality of difference values. The plurality of ranks includes a rank corresponding to the frame, and the rank is a temporal signature for the frame. For example, the method is implemented according to FIGS. **1**, **4**, and/or **5**.

According to yet another embodiment of the present invention, a method for generating a spatial-temporal signature for a frame of a video object includes obtaining a first plurality of frames associated with a video object. The first plurality of frames includes at least a frame, and each of the first plurality of frames corresponds to an adjacent frame. Additionally, the method includes dividing each of the first plurality of frames. The divided frame includes a first plurality of blocks corresponding to a plurality of locations respectively, each of the first plurality of blocks corresponds to a second plurality of blocks including the each of the first plurality of blocks, and the second plurality of blocks is associated with blocks on the first plurality of frames respectively. Moreover, the method includes processing information associated with the first plurality of frames. Also, the method includes, for each of the first plurality of blocks, determining a plurality of difference values for the second plurality of blocks respectively. Each of the plurality of difference values is associated with the each of the second plurality of blocks and a corresponding block on the adjacent frame. Additionally, the method includes, for each of the first plurality of blocks, processing information associated with the plurality of difference values, determining a first plurality of ranks corresponding to the second plurality of blocks respectively based on at least information associated with the plurality of difference values, processing information associated with the first plurality of ranks, and determining a rank for the each of the first plurality of blocks based on at least information associated with the first plurality of ranks. Moreover, the method includes processing information associated with a second plurality of ranks corresponding to the first plurality of blocks respectively, and determining a sequence of ranks based on at least information associated with the second plurality of ranks and the plurality of locations for the first plurality of blocks. The second plurality of ranks includes the rank, and a spatial-temporal signature for the frame includes information associated with the sequence of ranks. For example, the method is implemented according to FIGS. **1**, **2**, **3**, **4**, and/or **5**.

According to yet another embodiment of the present invention, a computer program product includes a computer read-

US 8,009,861 B2

15

able medium including instructions for generating a finger-print for a video object. The computer readable medium includes one or more instructions for obtaining a plurality of frames associated with a video object. Additionally, the computer readable medium includes one or more instructions for, for each of the plurality of frames, processing information associated with the plurality of frames, determining a plurality of spatial signatures for the each of the plurality of frames based on at least information associated with the each of the plurality of frames, and determining a plurality of temporal signatures for the each of the plurality of frames based on at least information associated with the plurality of frames. The plurality of spatial signatures corresponds to a plurality of resolutions respectively, and the plurality of temporal signatures corresponds to a plurality of frame rates respectively. Moreover, the one or more instructions are for, for each of the plurality of frames, processing information associated with the plurality of spatial signatures and the plurality of temporal signatures, and determining a frame fingerprint for the each of the plurality of frames. The frame fingerprint includes the plurality of spatial signatures corresponding to the plurality of resolutions respectively and the plurality of temporal signatures corresponding to the plurality of frame rates respectively. Also, the computer readable medium includes one or more instructions for processing a plurality of frame fingerprints for the plurality of frames respectively, and one or more instructions for determining a video fingerprint for the video object. The plurality of frame fingerprints includes the frame fingerprint for the each of the plurality of frames, and the video fingerprint includes the plurality of frame fingerprints. For example, the computer program product is implemented according to FIGS. **1**, **2**, **3**, **4**, **5** and/or **6**.

According to yet another embodiment of the present invention, a computer program product includes a computer readable medium including instructions for generating a spatial signature for a frame of a video object. The computer readable medium includes one or more instructions for obtaining a frame associated with a video object, and one or more instructions for dividing the frame into a plurality of blocks. The plurality of blocks corresponds to a plurality of locations respectively, each of the plurality of blocks includes a plurality of pixels, and the plurality of pixels corresponds to a plurality of pixel values respectively. Additionally, the computer readable medium includes one or more instructions for determining a plurality of average pixel values for the plurality of blocks respectively, one or more instructions for processing the plurality of average pixel values, and one or more instructions for determining a plurality of ranks for the plurality of blocks respectively based on at least information associated with the plurality of average pixel values, each of the plurality of ranks corresponding to a block. Moreover, the computer readable medium includes one or more instructions for processing information associated with the plurality of ranks, and one or more instructions for determining a sequence of ranks based on at least information associated with the plurality of ranks and the plurality of locations. A spatial signature for the frame includes information associated with the sequence of ranks. For example, the computer program product is implemented according to FIGS. **1**, **2**, **3**, and/or **6**.

According to yet another embodiment of the present invention, a computer program product includes a computer readable medium including instructions for generating a temporal signature for a frame of a video object. The computer readable medium includes one or more instructions for obtaining a first plurality of frames associated with a video object. The first plurality of frames includes at least a frame, each of the first

16

plurality of frames includes a first plurality of pixels and corresponds to an adjacent frame, and the adjacent frame includes a second plurality of pixels. Additionally, the computer readable medium includes one or more instructions for processing information associated with the first plurality of frames, and one or more instructions for determining a plurality of difference values for the first plurality of frames respectively. Each of the plurality of difference values corresponding to the each of the first plurality of frames and the adjacent frame. Moreover, the computer readable medium includes one or more instructions for processing information associated with the plurality of difference values, and one or more instructions for determining a plurality of ranks corresponding to the first plurality of frames respectively based on at least information associated with the plurality of difference values. The plurality of ranks includes a rank corresponding to the frame, and the rank is a temporal signature for the frame. For example, the computer program product is implemented according to FIGS. **1**, **4**, **5** and/or **6**.

According to yet another embodiment of the present invention, a computer program product includes a computer readable medium including instructions for generating a spatial-temporal signature for a frame of a video object. The computer readable medium includes one or more instructions for obtaining a first plurality of frames associated with a video object. The first plurality of frames includes at least a frame, and each of the first plurality of frames corresponds to an adjacent frame. Additionally, the computer readable medium includes one or more instructions for dividing each of the first plurality of frames. The divided frame includes a first plurality of blocks corresponding to a plurality of locations respectively, each of the first plurality of blocks corresponds to a second plurality of blocks including the each of the first plurality of blocks, and the second plurality of blocks is associated with blocks on the first plurality of frames respectively. Moreover, the computer readable medium includes one or more instructions for processing information associated with the first plurality of frames. Also, the computer readable medium includes one or more instructions for, for each of the first plurality of blocks, determining a plurality of difference values for the second plurality of blocks respectively, processing information associated with the plurality of difference values, determining a first plurality of ranks corresponding to the second plurality of blocks respectively based on at least information associated with the plurality of difference values, processing information associated with the first plurality of ranks, and determining a rank for the each of the first plurality of blocks based on at least information associated with the first plurality of ranks. Each of the plurality of difference values is associated with the each of the second plurality of blocks and a corresponding block on the adjacent frame. Additionally, the computer readable medium includes one or more instructions for processing information associated with a second plurality of ranks corresponding to the first plurality of blocks respectively, and one or more instructions for determining a sequence of ranks based on at least information associated with the second plurality of ranks and the plurality of locations for the first plurality of blocks. The second plurality of ranks includes the rank, and a spatial-temporal signature for the frame includes information associated with the sequence of ranks. For example, the computer program product is implemented according to FIGS. **1**, **2**, **3**, **4**, **5** and/or **6**.

The present invention has various advantages. Certain embodiments of the present invention can generate a robust fingerprint which either does not change or change only slightly with different formats, bitrates, or resolutions, and/or

US 8,009,861 B2

17                                                                                                    18

with certain alterations and/or distortions for the same video object. Some embodiments of the present invention can generate a fingerprint that is highly discriminating so that two video objects containing different video contents would yield significantly different fingerprints. Certain embodiments of the present invention can generate a fingerprint that is compact for storage, and can be stored in a form for efficient search and matching.

Although specific embodiments of the present invention have been described, it will be understood by those of skill in the art that there are other embodiments that are equivalent to the described embodiments. Accordingly, it is to be understood that the invention is not to be limited by the specific illustrated embodiments, but only by the scope of the appended claims.

What is claimed is:

1. A computer implemented method for generating a fingerprint for a video object that is performed by a computer system programmed to perform the method, comprising:

obtaining, by the computer system, a plurality of frames associated with a video object;

for each of the plurality of frames,

processing, by the computer system, information associated with the plurality of frames;

determining, by the computer system, a plurality of spatial signatures for the each of the plurality of frames based on at least information associated with the each of the plurality of frames, the plurality of spatial signatures corresponding to a plurality of resolutions respectively;

determining, by the computer system, a plurality of temporal signatures for the each of the plurality of frames based on at least information associated with the plurality of frames, the plurality of temporal signatures corresponding to a plurality of frame rates respectively;

processing, by the computer system, information associated with the plurality of spatial signatures and the plurality of temporal signatures; and

determining a frame fingerprint for the each of the plurality of frames, the frame fingerprint including the plurality of spatial signatures corresponding to the plurality of resolutions respectively and the plurality of temporal signatures corresponding to the plurality of frame rates respectively;

processing, by the computer system, a plurality of frame fingerprints for the plurality of frames respectively, the plurality of frame fingerprints including the frame fingerprint for the each of the plurality of frames;

determining, by the computer system, a video fingerprint for the video object, the video fingerprint including the plurality of frame fingerprints; and

storing, by the computer system, the video fingerprint for the video object in a data storage separate from the video object, wherein the video object is not modified by the video fingerprint.

2. The method of claim 1, and further comprising:

for the each of the plurality of frames,

determining, by the computer system, a plurality of spatial-temporal signatures for the each of the plurality of frames based on at least information associated with the plurality of frames, the plurality of spatial-temporal signatures corresponding to a plurality of combinations of resolutions and frame rates respectively;

processing, by the computer system, information associated with the plurality of spatial-temporal signatures;

wherein the frame fingerprint further including the plurality of spatial-temporal signatures corresponding to the plurality of combinations of resolutions and frame rates respectively.

3. The method of claim 1, and further comprising:

for the each of the plurality of frames, storing, by the computer system the frame fingerprint for the each of the plurality of frames in the data storage.

4. The method of claim 1, and further comprising storing, by the computer system, the video fingerprint for the video object in a video fingerprint database.

5. The method of claim 1 wherein the determining a plurality of spatial signatures comprises for each of the plurality of resolutions, dividing, by the computer system, the each of the plurality of frames into a number of columns and a number of rows, the each of the plurality of resolutions begin represented by, at least, the number of columns and the number of rows.

6. The method of claim 1 wherein the determining a plurality of temporal signatures comprises for each of the plurality of frame rates, determining, by the computer system, a difference value corresponding to the each of the plurality of frames and an adjacent frame associated with the each of the plurality of frames, the each of the plurality of frame rates being inversely proportional to an time interval between the each of the plurality of frames and the adjacent frame.

7. A computer implemented method for generating a spatial signature for a frame of a video object with a computer system programmed to perform the method, comprising:

obtaining, by the computer system, the frame associated with a video object;

dividing, by the computer system, the frame into a plurality of blocks, the plurality of blocks corresponding to a plurality of locations respectively, each of the plurality of blocks including a plurality of pixels, the plurality of pixels corresponding to a plurality of pixel values respectively;

determining, by the computer system, a plurality of average pixel values for the plurality of blocks respectively;

processing, by the computer system, the plurality of average pixel values;

determining, by the computer system, a plurality of ranks for the plurality of blocks respectively based on at least information associated with the plurality of average pixel values, each of the plurality of ranks corresponding to a block;

processing, by the computer system, information associated with the plurality of ranks;

determining, by the computer system, a sequence of ranks based on at least information associated with the plurality of ranks and the plurality of locations; and

storing a spatial signature for the frame in a data storage separate from the video object, wherein the spatial signature for the frame includes information associated with the sequence of ranks, and wherein the frame of the video object is not modified by the spatial signature.

8. The method of claim 7 wherein the determining a sequence of ranks comprises:

scanning, by the computer system, the plurality of blocks based on a predetermined pattern;

determining, by the computer system, a sequence of blocks as a result of the scanning process; and

arranging, by the computer system, the each of the plurality of ranks based on a location of the corresponding block in the sequence of blocks.

9. The method of claim 8 wherein the predetermined pattern is associated with a raster scan.

US 8,009,861 B2

19

**10**. The method of claim **7** wherein the plurality of ranks is a plurality of ordinal ranks.

**11**. The method of claim **7** wherein:

the dividing the frame into a plurality of blocks includes dividing, by the computer system, the frame into a number of columns and a number of rows;

wherein the spatial signature for the frame corresponds to a resolution represented by, at least, the number of columns and the number of rows.

**12**. The method of claim **11** wherein the resolution is a base resolution, and the spatial signature is a based spatial signature.

**13**. A computer implemented method for generating a temporal signature for a frame of a video object that is performed by a computer system programmed to perform the method, comprising:

obtaining, by the computer system, a first plurality of frames associated with a video object, the first plurality of frames including at least a frame, each of the first plurality of frames including a first plurality of pixels and corresponding to an adjacent frame, the adjacent frame including a second plurality of pixels;

processing, by the computer system, information associated with the first plurality of frames;

determining, by the computer system, a plurality of difference values for the first plurality of frames respectively, each of the plurality of difference values corresponding to the each of the first plurality of frames and the adjacent frame;

processing, by the computer system, information associated with the plurality of difference values;

determining, by the computer system, a plurality of ranks corresponding to the first plurality of frames respectively based on at least information associated with the plurality of difference values, the plurality of ranks including a rank corresponding to the frame, the rank being a temporal signature for the frame; and

storing, by the computer system, the temporal signature for the frame in a data store separate from the video object, wherein the first plurality of frames associated with the video object are not modified by the temporal signature.

**14**. The method of claim **13**, and further comprising:

obtaining, by the computer system, a second plurality of frames;

processing, by the computer system, information associated with the second plurality of frames; and

determining, by the computer system, the first plurality of frames based on at least information associated with the second plurality of frames.

**15**. The method of claim **14** wherein the determining the first plurality of frames comprises:

receiving, by the computer system, information associated with a time period including a start time and an end time;

placing, by the computer system, the frame at the start time of the time period; and

selecting, by the computer system, at least some frames from the second plurality of frames within the time period, the first plurality of frames including the selected frames.

**16**. The method of claim **13** wherein the determining a plurality of difference values comprises:

for the each of the first plurality of frames,

determining, by the computer system, magnitudes of differences between first values for the first plurality of pixels and second values for the second plurality of pixels respectively;

20

summing, by the computer system, the magnitudes of differences to determine one of the plurality of difference values.

**17**. The method of claim **13** wherein the plurality of ranks is a plurality of ordinal ranks.

**18**. The method of claim **13** wherein:

the first plurality of frames corresponds to a first frame rate, the rank being the temporal signature for the frame corresponding to the first frame rate.

**19**. The method of claim **18**, wherein

the video object corresponds to a second frame rate;

wherein if the first frame rate is lower than the second frame rate, the first plurality of frames are downsampled frames for the video object.

**20**. A computer implemented method for generating a spatial-temporal signature for a frame of a video object with a computer system programmed to perform the method, comprising:

obtaining, by the computer system, a first plurality of frames associated with a video object, the first plurality of frames including at least a frame, each of the first plurality of frames corresponding to an adjacent frame;

dividing, by the computer system, each of the first plurality of frames, wherein the divided frame includes a first plurality of blocks corresponding to a plurality of locations respectively, each of the first plurality of blocks corresponding to a second plurality of blocks including the each of the first plurality of blocks, the second plurality of blocks being associated with blocks on the first plurality of frames respectively;

processing, by the computer system, information associated with the first plurality of frames;

for each of the first plurality of blocks,

determining, by the computer system, a plurality of difference values for the second plurality of blocks respectively, each of the plurality of difference values being associated with the each of second plurality of blocks and a corresponding block on the adjacent frame;

processing, by the computer system, information associated with the plurality of difference values;

determining, by the computer system, a first plurality of ranks corresponding to the second plurality of blocks respectively based on at least information associated with the plurality of difference values;

processing, by the computer system, information associated with the first plurality of ranks;

determining, by the computer system, a rank for the each of the first plurality of blocks based on at least information associated with the first plurality of ranks;

processing, by the computer system, information associated with a second plurality of ranks corresponding to the first plurality of blocks respectively, the second plurality of ranks including the rank;

determining, by the computer system, a sequence of ranks based on at least information associated with the second plurality of ranks and the plurality of locations for the first plurality of blocks; and

storing, by the computer system, a spatial-temporal signature for the frame independent of the video object, wherein the spatial-temporal signature for the frame includes information associated with the sequence of ranks, and wherein the first plurality of frames associated with the video object are not modified by the spatial-temporal signature.

**21**. The method of claim **20** wherein the first plurality of blocks are on a same frame at a same instant in time.

US 8,009,861 B2

21

**22**. The method of claim **20** wherein the second plurality of blocks are at a same location on different frames respectively along a temporal axis.

**23**. The method of claim **20** wherein the determining a sequence of ranks comprises:

scanning, by the computer system, the first plurality of blocks based on a predetermined pattern;

determining, by the computer system, a sequence of blocks on the frame as a result of the scanning process; and

arranging, by the computer system, the each of the second plurality of ranks based on a location of the corresponding block in the sequence of blocks.

**24**. The method of claim **20** wherein:

the first plurality of frames corresponds to a first frame rate, the spatial-temporal signature for the frame corresponding to the first frame rate.

**25**. The method of claim **24**, wherein

the video object corresponds to a second frame rate;

if the first frame rate is lower than the second frame rate, the first plurality of frames are down-sampled frames for the video object.

**26**. The method of claim **20**, and further comprising:

obtaining, by the computer system, a second plurality of frames;

processing, by the computer system, information associated with the second plurality of frames;

determining, by the computer system, the first plurality of frames based on at least information associated with the second plurality of frames.

**27**. The method of claim **26** wherein the determining the first plurality of frames comprises:

receiving, by the computer system, information associated with a time period including a start time and an end time;

placing, by the computer system, the frame at the start time of the time period; and

selecting, by the computer system, at least some frames from the second plurality of frames within the time period, the first plurality of frames including the selected frames.

**28**. A non-transitory computer readable medium including instructions that programs a processor of a computer system to generate a fingerprint for a video object, the non-transitory computer readable medium comprising:

one or more instructions that programs the processor to obtain a plurality of frames associated with a video object;

one or more instructions for each of the plurality of frames, that programs the processor to process information associated with the plurality of frames;

that programs the processor to determine a plurality of spatial signatures for the each of the plurality of frames based on at least information associated with the each of the plurality of frames, the plurality of spatial signatures corresponding to a plurality of resolutions respectively;

that programs the processor to determine a plurality of temporal signatures for the each of the plurality of frames based on at least information associated with the plurality of frames, the plurality of temporal signatures corresponding to a plurality of frame rates respectively;

that programs the processor to process information associated with the plurality of spatial signatures and the plurality of temporal signatures;

that programs the processor to determine a frame fingerprint for the each of the plurality of frames, the frame fingerprint including the plurality of spatial signa-

tures corresponding to the plurality of resolutions respectively and the plurality of temporal signatures corresponding to the plurality of frame rates respectively;

one or more instructions that programs the processor to process a plurality of frame fingerprints for the plurality of frames respectively, the plurality of frame fingerprints including the frame fingerprint for the each of the plurality of frames;

one or more instructions that programs the processor to determine a video fingerprint for the video object, the video fingerprint including the plurality of frame fingerprints; and

one or more instructions that programs to processor to store the video fingerprint for the video object in a memory storage separately from the video object, wherein the plurality of frames associated with the video object are not modified.

**29**. A non-transitory computer readable medium including instructions that programs a processor of a computer system to generate a spatial signature for a frame of a video object, the non-transitory computer readable medium comprising:

one or more instructions that programs the processor to obtain a frame associated with a video object;

one or more instructions that programs the processor to divide the frame into a plurality of blocks, the plurality of blocks corresponding to a plurality of locations respectively, each of the plurality of blocks including a plurality of pixels, the plurality of pixels corresponding to a plurality of pixel values respectively;

one or more instructions that programs the processor to determine a plurality of average pixel values for the plurality of blocks respectively;

one or more instructions that programs the processor to process the plurality of average pixel values;

one or more instructions that programs the processor to determine a plurality of ranks for the plurality of blocks respectively based on at least information associated with the plurality of average pixel values, each of the plurality of ranks corresponding to a block;

one or more instructions that programs the processor to process information associated with the plurality of ranks;

one or more instructions that programs the processor to determine a sequence of ranks based on at least information associated with the plurality of ranks and the plurality of locations; and

one or more instructions that programs the processor to store a spatial signature for the frame in a memory separately from the video object, wherein the spatial signature for the frame includes information associated with the sequence of ranks, wherein the frame associated with the video object is not modified by the spatial signature.

**30**. A non-transitory computer readable medium including instructions that programs a processor of a computer system to generate a temporal signature for a frame of a video object, the non-transitory computer readable medium comprising:

one or more instructions that programs the processor to obtain a first plurality of frames associated with a video object, the first plurality of frames including at least a frame, each of the first plurality of frames including a first plurality of pixels and corresponding to an adjacent frame, the adjacent frame including a second plurality of pixels;

one or more instructions that programs the processor to process information associated with the first plurality of frames;

US 8,009,861 B2

23

one or more instructions that programs the processor to determine a plurality of difference values for the first plurality of frames respectively, each of the plurality of difference values corresponding to the each of the first plurality of frames and the adjacent frame;

one or more instructions that programs the processor to process information associated with the plurality of difference values;

one or more instructions that programs the processor to determine a plurality of ranks corresponding to the first plurality of frames respectively based on at least information associated with the plurality of difference values, the plurality of ranks including a rank corresponding to the frame, the rank being a temporal signature for the frame; and

one or more instructions that programs the processor to store the temporal signature for the frame in a fingerprint database separate from the video object, wherein the video object is not modified by the temporal signature.

31. A non-transitory computer readable medium including instructions that programs a processor a computer system to generate a spatial-temporal signature for a frame of a video object, the non-transitory computer readable medium comprising:

one or more instructions that programs the processor to obtain a first plurality of frames associated with a video object, the first plurality of frames including at least a frame, each of the first plurality of frames corresponding to an adjacent frame;

one or more instructions that programs the processor to dividing each of the first plurality of frames, wherein the divided frame includes a first plurality of blocks corresponding to a plurality of locations respectively, each of the first plurality of blocks corresponding to a second plurality of blocks including the each of the first plurality of blocks, the second plurality of blocks being associated with blocks on the first plurality of frames respectively;

24

one or more instructions that programs the processor to process information associated with the first plurality of frames;

one or more instructions, for each of the first plurality of blocks,

that programs the processor to determine a plurality of difference values for the second plurality of blocks respectively, each of the plurality of difference values being associated with the each of the second plurality of blocks and a corresponding block on the adjacent frame;

that programs the processor to process information associated with the plurality of difference values;

that programs the processor to determine a first plurality of ranks corresponding to the second plurality of blocks respectively based on at least information associated with the plurality of difference values;

that programs the processor to process information associated with the first plurality of ranks;

that programs the processor to determine a rank for the each of the first plurality of blocks based on at least information associated with the first plurality of ranks;

one or more instructions for processing information associated with a second plurality of ranks corresponding to the first plurality of blocks respectively, the second plurality of ranks including the rank;

one or more instructions that programs the processor to determine a sequence of ranks based on at least information associated with the second plurality of ranks and the plurality of locations for the first plurality of blocks; and

one or more instructions that programs the processor to store the spatial-temporal signature for the frame in a fingerprint database separate from the video object, wherein the spatial-temporal signature for the frame includes information associated with the sequence of ranks, and wherein the video object is not modified by the spatial-temporal signature.

*  *  *  *  *

# Bell

Ref. No: 504432

2010 11 16

To:   Mr. Patrick Owens
      Senior Analyst
      Costing and Competitive Services
      Canadian Radio-television and
        Telecommunications Commission
      Ottawa, Ontario
      K1A 0N2

Subject:   **Complaint regarding Bell Canada's Internet traffic management practices**

Dear Mr. Owens,                                                          s.19(1)

1.    Bell Canada (or the Company) is in receipt of a Commission staff letter dated 27 October 2010, indicating that Commission staff received a complaint regarding Internet traffic management practices (ITMPs) applied by the Company.  The complaint by ▇▇▇▇▇ attached to the Commission staff letter alleges that the Company has "decided to throttle (i.e. lower the bandwidth) on websites beyond only P2P (peer to peer) traffic as stated on the Company's ""Network Management" web page."   More particularly, Mr. Singh states that downloads from the website www.hotfile.com are being "throttled" and requests that the Company be required to specify which websites it "throttles" pursuant to its ITMPs.   The following constitutes the Company's response.

2.    As the Company has consistently stated, it does not intentionally shape any non-P2P file-sharing traffic as part of its network management practices and, as such, there are no websites that the Company "targets" for traffic shaping.  However, as the Company has stated in the past, the deployment of any network technology such as technical ITMPs may have some unintended consequences and the Company encourages its customers to bring such unintended consequences to its attention in order to resolve them.[1]

---

[1]    See Bell Canada(CRTC)15May08-6 CAIP Part VII and The Companies(CRTC)4Dec08-15 PN 2008-19.

Bell Canada
**Suzanne Morin**
Floor 19
160 Elgin Street
Ottawa, Ontario  K2P 2C4

**Telephone: (613) 785-6282**
Facsimile:  (613) 560-0472
bell.regulatory@bell.ca

2010 11 16                                                                                                    2

3.      As a result of the complaint letter, the Company has performed various tests in an attempt to recreate the reported problem.   As accurately indicated in the complaint letter, www.hotfile.com is a storage type of site that leverages http (web) direct downloading mechanisms for the sharing of files.   The site offers two types of access, a free access and a premium (paid for subscription) access.   Whereas the free access has limitations in terms of the number of concurrent downloads as well as throughput/speed that can be reduced if the site www.hotfile.com is congested, the premium service is not limited in concurrent downloads or throughput/speed as a result of congestion at the site itself.

4.      The Company's testing has revealed that in some instances, and for both free and premium hotfile accounts, certain non-P2P www.hotfile.com traffic was indeed being identified by the Company's deep packet inspection (DPI) devices as being P2P file-sharing protocols. Further investigation allowed the Company to determine that www.hotfile.com traffic was being classified by one of the signatures used by the Company's DPI devices as a P2P file-sharing application and as a result traffic from both free and premium accounts were being shaped as P2P file sharing traffic.   The Company notes that the inaccurate identification of www.hotfile.com traffic is not the result of any changes to the signatures used by the Company.

5.      In order to address the issue of inadvertent shaping of www.hotfile.com traffic, there was a requirement to update the signatures used in the various DPI platforms used by the Company. A solution was implemented for the vast majority of the Company's DPI devices on 2 November 2010 and a second solution for the remaining DPI devices will be implemented by 30 November 2010.   As such, www.hotfile.com traffic should no longer be shaped during peak hours after the 30 November 2010.

6.      Based on the above, the Company considers that it was and remains in compliance with the ITMP framework established in Telecom Regulatory Policy 2009-657.   The Company would like to thank the Commission and _____ for bringing this issue to the Company's attention and continues to encourage its customers to report any problems in order to allow the Company to investigate and resolve any unintended consequences of its network management practices.

Yours truly,

                                                    s.19(1)

*[ Original signed by Suzanne Morin ]*


**Suzanne Morin**
Assistant General Counsel - Regulatory Law & Policy

c.c.:   Lynne Fancy (CRTC)


PG/lp


*** End of Document ***

```
Network Working Group                                    A. Bhushan
Request for Comments: 114                           MIT Project MAC
NIC: 5823                                           16 April 1971
```

                         A FILE TRANSFER PROTOCOL


I. Introduction

    Computer network usage may be divided into two broad categories --
    direct and indirect.  Direct usage implies that you, the network
    user, are "logged" into a remote host and use it as a local user.
    You interact with the remote system via a terminal (teletypewriter,
    graphics console) or a computer.  Differences in terminal
    characteristics are handled by host system programs, in accordance
    with standard protocols (such as TELNET (RFC 97) for teletypewriter
    communications, NETRJS (RFC 88) for remote job entry).  You, however,
    have to know the different conventions of remote systems, in order to
    use them.

    Indirect usage, by contrast, does not require that you explicitly log
    into a remote system or even know how to "use" the remote system.  An
    intermediate process makes most of the differences in commands and
    conventions invisible to you.  For example, you need only know a
    standard set of network file transfer commands for your local system
    in order to utilize remote file system.  This assumes the existence
    of a network file transfer process at each host cooperating via a
    common protocol.

    Indirect use is not limited to file transfers.  It may include
    execution of programs in remote hosts and the transfer of core
    images.  The extended file transfer protocol would facilitate the
    exchange of programs and data between computers, the use of storage
    and file handling capabilities of other computers (possibly including
    the trillion-bit store data computer), and have programs in remote
    hosts operate on your input and return an output.

    The protocol described herein has been developed for immediate
    implementation on two hosts at MIT, the GE645/Multics and the PDP-
    10/DM/CG-ITS (and possibly Harvard's PDP-10).  An interim version
    with limited capabilities is currently in the debugging stage. [1]
    Since our implementation involves two dissimilar systems (Multics is
    a "service" system, ITS is not) with different file systems (Multics
    provides elaborate access controls, ITS provides none), we feel that
    the file transfer mechanisms proposed are generalizable.  In
    addition, our specification reflects a consideration of other file
    systems on the network.  We conducted a survey [2] of network host

Bhushan                                                      [Page 1]

RFC 114                    A FILE TRANSFER PROTOCOL               16 April 1971

        systems to determine the requirements and capabilities.  This paper
        is a "first cut" at a protocol that will allow users at any host on
        the network to use the file system of every cooperating host.

II.  Discussion

        A few definitions are in order before the discussion of the protocol.
        A file is an ordered set consisting of computer instructions and/or
        data.  A file can be of arbitrary length [3].  A named file is
        uniquely identified in a system by its file name and directory name.
        The directory name may be the name of a physical directory or it may
        be the name of a physical device.  An example of physical directory
        name is owner's project-programmer number and an example of physical
        device name is tape number.

        A file may or may not have access controls associated with it.  The
        access controls designate the users' access privileges.  In the
        absence of access controls, the files cannot be protected from
        accidental or unauthorized usage.

        A principal objective of the protocol is to promote the indirect use
        of computers on the network.  Therefore, the user or his program
        should have a simple and uniform interface to the file systems on the
        network and be shielded from the variations in file and storage
        systems of different host computers.  This is achieved by the
        existence of a standard protocol in each host.

        Criteria by which a user-level protocol may be judged were described
        by Mealy in RFC 91, as involving the notion of logical records,
        ability to access files without program modifications, and
        implementability.  I would add to these efficiency, extendibility,
        adaptability, and provision of error-recovery mechanisms.

        The attempt in this specification has been to enable the reliable
        transfer of network ASCII (7-bit ASCII in 8-bit field with leftmost
        bit zero) as well as "binary" data files with relative ease.  The use
        of other character codes, such as EBCDIC, and variously formatted
        data (decimal, octal, ASCII characters packed differently) is
        facilitated by inclusion of data type in descriptor headings.  An
        alternative mechanism for defining data is also available in the form
        of attributes in file headings.  The format control characters
        reserved for the syntax of this protocol have identical code
        representation in ASCII and EBCDIC.  (These character are SOH, STX,
        ETX, DC1, DC2, DC3, US, RS, GS, and FS.)

Bhushan                                                            [Page 2]

RFC 114                  A FILE TRANSFER PROTOCOL            16 April 1971

The notion of messages (the physical blocks of data communicated
between NCP's) is suppressed herein and that of "logical" records and
transactions is emphasized.  The data passed by the NCP is parsed
into logical blocks by use of simple descriptors (code and count
mechanisms) as described in Section III.  The alternative to count is
fixed length blocks or standard end-of-file characters (scan data
stream).  Both seem less desirable than count.

The cooperating processes may be "daemon" processes which "listen" to
agreed-upon sockets, and follow the initial connection protocol much
in the same way as a "logger" does.  We recommend using a single
full-duplex connection for the exchange of both data and control
information [4], and using CLS to achieve synchronization when
necessary (a CLS is not transmitted until a RFNM is received).

The user may be identified by having the using process send at the
start of the connection the user's name information (either passed on
by user or known to the using system) [5].  This user name
information (a sequence of standard ASCII characters), along with the
host number (known to the NCP), positively identifies the user to the
serving process.

At present, more elaborate access control mechanisms, such as
passwords, are not suggested.  The user, however, will have the
security and protection provided by the serving system.  The serving
host, if it has access controls, can prevent unprivileged access by
users from other host sites.  It is up to the using host to prevent
its own users from violating access rules.

The files in a file system are identified by a pathname, similar to
the labels described in RFC 76 (Bouknight, Madden, and Grossman).
The pathname contains the essential information regarding the storage
and retrieval of data.

In order to facilitate use, default options should be provided.  For
example, the main file directory on disk would be the default on the
PDP-10/ITS, and a pool directory would be the default on Multics.

The file to be transferred may be a complete file or may consist of
smaller records.  It may or may not have a heading.  A heading should
contain ASCII or EBCDIC characters defining file attributes.  The
file attributes could be some simple agreed-upon types or they could
be described in a data reconfiguration or interpretation language
similar to that described in RFC 83 (Anderson, Haslern, and Heffner),
or a combination.

Bhushan                                                      [Page 3]

RFC 114                    A FILE TRANSFER PROTOCOL               16 April 1971

     The protocol does not restrict the nature of data in the file.  For
     example, a file could contain ASCII text, binary core image, graphics
     data or any other type of data.  The protocol includes an "execute"
     request for files that are programs.  This is intended to facilitate
     the execution of programs and subroutines in remote host computers
     [6].

III.  SPECIFICATIONS

1. Transactions

     1A.   The protocol is transaction-oriented.  A transaction is defined
           to be an entity of information communicated between cooperating
           processes.

     1B.   Syntax

           A transaction has three fields, a 72-bit descriptor field and
           variable length (including zero) data and filler fields, as
           shown below.  The total length of a transaction is (72 + data +
           filler) bits.



```
| <code><filler count><NUL><data count><NUL> |   <data><filler>   |
| |___||_____||___||_____||___| |  |_____|    |
|  |     |            |   |      |        |    |       |          |
| 24-bits  8-bits     8-bits 24-bits  8-bits|  variable length    |
| <-------descriptor field 72-bits--------> |<--data and filler-->|
|                                           |                     |
```

     1C.   Semantics

           The code field has three 8-bit bytes.  The first byte is
           interpreted as transaction type, the second byte as data type
           and the third byte as extension of data type.

           The filler count is a binary count of bits used as "filler"
           (i.e., not information) at the end of a transaction [7].  As
           the length of the filler count field is 8-bits, the number of
           bits of filler shall not exceed 255 bits.

           The data count is a binary count of the number of data (i.e.,
           information) bits in the data field, not including filler bits.
           The number of data bits is limited to $(2^{24}-1)$, as there are 24
           bits in the data count field.

Bhushan                                                           [Page 4]

```
RFC 114                 A FILE TRANSFER PROTOCOL          16 April 1971

        The NUL bytes are inserted primarily as fillers in the
        descriptor field and allow the count information to appear at
        convenient word boundaries for different word length machines
        [8].

2.  Transaction Types

    2A.   A transaction may be of the following four basic types:
          request, response, transfer and terminate.  Although large
          number of request and transfer types are defined,
          implementation of a subset is specifically permitted.  Host
          computers, on which a particular transaction type is not
          implemented, may refuse to accept that transaction by
          responding with an unsuccessful terminate.

          The following transaction type codes are tentatively defined:
```

| Transaction Type | Transaction Type Code | | |
|---|---|---|---|
| | ASCII | Octal | Hexidecimal |
| **Request** | | | |
| Identify | I | 111 | 49 |
| Retrieve | R | 122 | 52 |
| Store | S | 123 | 53 |
| Append | A | 101 | 41 |
| Delete | D | 104 | 44 |
| Rename | N | 116 | 4E |
| addname (Plus) | P | 120 | 50 |
| deletename (Minus) | M | 115 | 4D |
| Lookup | L | 114 | 4C |
| Open | O | 117 | 4F |
| Close | C | 103 | 43 |
| Execute [9] | E | 105 | 45 |
| **Response** | | | |
| ready-to-receive (rr) | < | 074 | 3C |
| ready-to-send (rs) | > | 076 | 3E |
| **Transfer** | | | |
| complete_file | * | 052 | |
| heading | # | 043 | 23 |
| part_of_file | ' | 054 | 2C |
| last_part | . | 056 | 2E |
| **Terminate** | | | |
| successful (pos.) | + | 053 | 2B |
| unsuccessful (neg.) | - | 055 | 2D |

```
Bhushan                                                      [Page 5]
```

```
RFC 114                   A FILE TRANSFER PROTOCOL           16 April 1971
```

2B.    Syntax

In the following discussion US, RS, GS, FS, DC1, DC2, and DC3
are the ASCII characters, unit separator (octal 037), record
separator (octal 036), group separator (octal 035), file
separator (octal 034), device control 1 (octal 021), device
control 2 (octal 022), and device control 3 (octal 023),
respectively.  These have an identical interpretation in
EBCDIC.

2B.1   Requests

Identify, retrieve, store, append, delete, open, lookup and
execute requests have the following data field:

                    <path name>

        Rename request has the data field:

                    <path name> GS <name>

        Addname and deletename requests have the data field:

                    <path name> GS <filenames>

where pathname [10], name and filenames have the following
syntax (expressed in BNF, the metalanguage of the ALGOL 60
report):

<pathname> ::= <device name>|<name>|<pathname>US<name>
<device name> ::= DC1<name>

<name> ::= <char> | <name> <char>
<char> ::= All 8-bit ASCII or EBCDIC characters except

        US, RS, GS, FS, DC1, DC2, AND DC3.

<filenames> ::= <name>|<filenames> RS <name>

The data type for the request transaction shall be either A
(octal 101 for ASCII, or E (octal 105) for EBCDIC [11].

Some examples of pathname are:

DC1 MT08
DC1 DSK 1.2 US Net<3> US J.Doe US Foo
udd US proj. US h,n/x US user US file
filename 1 filename 2

Bhushan                                                        [Page 6]

RFC 114                 A FILE TRANSFER PROTOCOL           16 April 1971

2B.2   Responses

The response transactions shall normally have an empty data
field.

2B.3   Transfers

The data types defined in section 4 will govern the syntax of
the data field in transfer transactions.  No other syntactical
restrictions exist.

2B.4   Terminates

The successful terminate shall normally have an empty data
field.  The unsuccessful terminate may have a data field
defined by the data types A (octal 101) for ASCII, E (octal
105) for EBCDIC, or S (octal 123) for status.

A data type code of 'S' would imply byte oriented error return
status codes in the data field.  The following error return
status codes are defined tentatively:

| Error Code Meaning | Error Code | | |
|---|---|---|---|
| | ASCII | Octal | Hexadecimal |
| Undefined error | U | 125 | 55 |
| Transaction type error | T | 124 | 54 |
| Syntax error | S | 123 | 53 |
| File search failed | F | 106 | 46 |
| Data type error | D | 104 | 44 |
| Access denied | A | 101 | 41 |
| Improper transaction sequence | I | 111 | 49 |
| Time-out error | O | 117 | 4F |
| Error condition by system | E | 105 | 45 |

2C.   Semantics

2C.1   Requests

Requests are always sent by using host.  In absence of a device
name or complete pathname, default options should be provided
for all types of requests.

_Identify_ request identifies the user as indicated by
<pathname> from serving to using host.

_Retrieve_ request achieves the transfer of file specified in
<pathname> from serving to using host.

Bhushan                                                       [Page 7]

RFC 114                   A FILE TRANSFER PROTOCOL              16 April 1971

          _Store_  request achieves the transfer of file specified in
          <pathname> from using to serving host.

          _Append_ request causes data to be added to file specified in
          pathname.

          _Rename_ request causes name of file specified in <pathname> to
          be replaced by name specified in <name>.

          _Delete_ request causes file specified in <pathname> to be
          deleted.  If an extra level of protection for delete is desired
          (such as the query 'Do you wish to delete file x?'), it is to
          be a local implementation option.

          _Addname_ and _deletename_ requests cause names in <filenames>
          to be added or deleted to existing names of file specified in
          <pathname>.  These requests are useful in systems such as
          Multics which allow multiple names to be associated with a
          file.

          _Lookup_ request achieves the transfer of attributes (such as
          date last modified, access list, etc) of file specified in
          <pathname>, instead of the file itself.

          _Open_ request does not cause a data transfer, instead file
          specified in <pathname> is "opened" for retrieve (read) or
          store (write).  Subsequent requests are then treated as
          requests pertaining to the file that is opened till such a time
          that a close request is received.

          _Execute_ request achieves the execution of file specified in
          <pathname>, which must be an executable program.  Upon receipt
          of rr response, using host will transmit the necessary input
          data (parameters, arguments, etc)  Upon completion of
          execution serving host will send the results to using host and
          terminate [12].

     2C.2  Response

          Responses are always sent by serving host.  The rr response
          indicates that serving host is ready to receive the file
          indicated in the preceding request.  The rs response indicates
          that the next transaction from serving host will be the
          transfer of file indicated in the preceding request.

Bhushan                                                           [Page 8]

```
RFC 114                  A FILE TRANSFER PROTOCOL           16 April 1971

     2C.3  Transfers

           Transfers may be sent by either host.  Transfer transactions
           indicate the transfer of file indicated by a request.  Files
           can be transferred either as complete_file transactions or as
           part_of_file transactions followed by last_part transactions.
           The file may also have a heading transaction in the beginning.
           The syntax of a file, therefore, may be defined as:

           <file> ::= <text> | <heading> <text>
           <text> ::= <complete_file> | <parts> <last_part>
           <parts> ::= <part_of_file> | <parts> <part_of_file>

           Headings may be used to communicate the attributes of files.
           The form of headings is not formally specified but is discussed
           in Section IV as possible extension to this protocol.

     2C.4  Terminates

           The successful terminate is always sent by serving host.  It
           indicates to using host that serving host has been successful
           in serving the request and has gone to an initial state.  Using
           host will then inform user that his request is successfully
           served, and go to an initial state.

           The unsuccessful terminate may be sent by either host.  It
           indicates that sender of the terminate is unable to (or does
           not not wish to) go through with the request.  Both hosts will
           then go to their initial states.  The using host will inform
           the user that his request was aborted.  If any reasons for the
           unsuccessful terminate (either as text or as error return
           status codes) are received, these shall be communicated to the
           user.

   3.    Transaction Sequence

     3A.  The transaction sequence may be defined as an instance of file
          transfer, initiated by a request and ended by a terminate [13].
          The exact sequence in which transactions occur depends on the
          type of request.  A transaction sequence may be aborted anytime
          by either host, as explained in Section 3C.

     3B.  Examples

          The identify request doesn't require a response or terminate
          and constitutes a transaction sequence by itself.



   Bhushan                                                      [Page 9]
```

RFC 114                    A FILE TRANSFER PROTOCOL           16 April 1971

       Rename, delete, addname, deletename and open requests involve
       no data transfer but require terminates.  The user sends the
       request and the server sends a successful or an unsuccessful
       terminate depending on whether or not he is successful in
       complying with the request.

       Retrieve and Lookup requests involve data transfer from the
       server to the user.  The user sends the request, the server
       responds with a rs, and transfers the data specified by the
       request.  Upon completion of the data transfer, the server
       terminates the transaction sequence with a successful terminate
       if all goes well, or with an unsuccessful terminate is errors
       were detected.

       Store and Append requests involve data transfer from the user
       to server.  The user sends the request and the server responds
       with a rr.  The user then transfers the data.  Upon receiving
       the data, the server terminates the sequence.

       Execute request involves transfer of inputs from user to
       server, and transfer of outputs from server to user.  The user
       sends the request to which the server responds with rr.  The
       user then transfers the necessary inputs.  The server
       "executes" the program or subroutine and transfers the outputs
       to the user.  Upon completion of the output transfer, the
       server terminates the transaction sequence.

    3C.   Aborts

       Either host may abort the transaction sequence at any time by
       sending an unsuccessful terminate, or by closing the connection
       (NCP to transmit a CLS for the connection).  The CLS is a more
       drastic type of abort and shall be used when there is a
       catastrophic failure or when an abort is desired in the middle
       of a long file transfer.  The abort indicates to the receiving
       host that the other host wishes to terminate the transaction
       sequence and is now in the initial state.  When CLS is used to
       abort, the using host will reopen the connection.

    4.   Data Types

    4A.   The data type code together with the extension code defines the
       manner in which the data field is to be parsed and interpreted
       [14].  Although a large number of data types are defined,
       specific implementations may handle only a limited subset of
       data types.  It is recommended that all host sites accept the

RFC 114                     A FILE TRANSFER PROTOCOL              16 April 1971

     "network ASCII" and "binary" data types.  Host computers which
do not "recognize" particular data types may abort the
transaction sequence and return a data type error status code.

4B.   The following data types are tentatively defined.  The code in
the type and extension field is represented by its ASCII
equivalent with 8th bit as zero.

Bhushan                                                         [Page 11]

RFC 114                    A FILE TRANSFER PROTOCOL              16 April 1971

```
                                              Code
         Data Type                  Byte Size  Type    Extension
ASCII character, bit8=0 (network)       8        A        NUL

ASCII characters, bit8=1                8        A         1

ASCII characters, bit8=even parity      8        A         E

ASCII characters, bit8=odd parity       8        A         O

ASCII characters, 8th bit info.         8        A         8

ASCII characters, 7 bits                7        A         7

ASCII characters, in 9-bit field        9        A         9
ASCII formatted files (with SOH,
        STX, ETX, etc.)                 8        A         F
DEC-packed ASCII (5 7-bit char.,
        36th bit 1 or 0)               36        A         D
EBCDIC characters                       8        E        NUL
SIXBIT characters                       6        S        NUL
Binary data                             1        B        NUL
Binary bytes (size is binary ext.)    1-255      B        (any)
Decimal numbers, net ASCII              8        D         A
Decimal numbers, EBCDIC                 8        D         E
Decimal numbers, sixbit                 6        D         S
Decimal numbers, BCD (binary coded)     4        D         B
Octal numbers, net. ASCII               8        O         A
Octal numbers, EBCDIC                   8        O         E
Octal numbers, SIXBIT                   6        O         S
Hexadecimal numbers, net. ASCII         8        H         A
Hexadecimal numbers, EBCDIC             8        H         E
Hexadecimal numbers, SIXBIT             6        H         S
Unsigned integers, binary (ext.
        field is byte size)           1-225      U        (any)
Sign magnitude integers (field is
        binary size)                  1-255      I        (any)
2's complement integers (ext.
        field is byte size)           1-255      2        (any)
1's complement integers (ext.
        field is byte size)           1-255      1        (any)
Floating point (IBM360)                32        F         I
Floating point (PDP-10)                36        F         D
Status codes                            8        S        NUL
```

Bhushan                                                          [Page 12]

RFC 114                    A FILE TRANSFER PROTOCOL              16 April 1971

    4C.   The data type information is intended to be interpretive.  If a host accepts a data type, it can interpret it to a form suited to its internal representation of characters or numbers [15].  Specifically when no conversion is to be performed, the data type used will be binary.  The implicit or explicit byte size is useful as it facilitates storing of data.  For example, if a PDP-10 receives data types A, A1, AE, or A7, it can store the ASCII characters five to a word (DEC-packed ASCII).  If the datatype is A8 or A9, it would store the characters four to a word.  Sixbit characters would be stored six to a word.  If conversion routines are available on a system, the use of system program could convert the data from one form to another (such as EBCDIC to ASCII, IBM floating point to DEC floating point, Decimal ASCII to integers, etc.).

5.  Initial Connection, CLS, and Identifying Users

    5A.   There will be a prearranged socket number [16] for the cooperating process on the serving host.  The connection establishment will be in accordance with the initial connection protocol of RFC 66 as modified by RFC 80.  The NCP dialog would be:

```
        user to server:    RTS<us><3><p>

    if accepted, server to user:   STR<3><us><CLS><3><us>
        server to user on link p:  <ss>
        server to user:    STR<ss+1><us>RTS<ss><us+1><q>
        user to server:    STR<us><ss+1>RTS<us+1><ss><r>
```

       This sets up a full-duplex connection between user and server processes, with server receiving through local socket ss from remote socket us+1 via link q, and sending to remote socket us through local socket ss+1 via link r.

    5B.   The connection will be broken by trading a CLS between the NCP'S for each of the two connections.  Normally the user will initiate the CLS.

       CLS may also be used by either the user or the server to abort a data transmission in the middle.  If a CLS is received in the middle of a transaction sequence, the whole transaction sequence will be aborted.  The using host will then reopen the connection.

    5C.   The first transaction from the user to server will be the identify transaction.  The users will be identified by the pathname in data field of the transaction which should be a

Bhushan                                                          [Page 13]

RFC 114                    A FILE TRANSFER PROTOCOL            16 April 1971

form acceptable to the server.  The server is at liberty to
truncate pathnames for its own use.  Since the identify
transaction does not require a response or terminate, the user
can proceed directly with other requests.

IV.  Extensions to Protocol

The protocol specified above has been designed to be extendable.  The
obvious extensions would be in the area of transaction types (new
types of requests), error return status words, and data types.  Some
of the non-obvious extensions, that I can visualize are provisions of
access control mechanisms, developing a uniform way of specifying
file attributes in headings of files, increasing the scope of the
execute command to include subroutine mediation, and the provision of
transaction sequence identification numbers to facilitate handling of
multiple requests over the same connection pair.

Users of protected file systems should be able to have a reasonable
degree of confidence in the ability of the serving process to
identify remote users correctly.  In the absence of such confidence,
some users would not be willing to give access to the serving process
(especially write access).  Inclusion of access control mechanisms
such as passwords, is likely to enhance the indirect use of network
by users who are concerned about privacy and security.  A simple
extension to the protocol would be to have the serving host sent a
transaction type "password?" after it receives user name.  Upon
receipt of "password?" the using host will transmit the password,
which when successfully acknowledged, would indicate to the user that
requests may proceed.

There are a number of file attributes which properly belong in the
heading of a file rather than the file itself or the data type in
descriptors of transactions.  Such attributes include access control
lists, date file was last modified, information about the nature of
file, and description of its contents in a data description or data
reconfiguration language.  Some uniformity in the way file attributes
are specified would be useful.  Until then, the interpretation of the
heading would be up to the user or the using process.  For example,
the heading of files which are input to a data reconfiguration (form)
machine may be the desired transformations expressed in the
reconfiguration language.

The "execute" command which achieves the execution of programs
resident in remote hosts is a vital part of indirect use of remote
hosts.  The present scope of the execute command, as outlined in the
specifications, is somewhat limited.  It assumes that the user or

Bhushan                                                         [Page 14]

RFC 114                    A FILE TRANSFER PROTOCOL              16 April 1971

using process is aware of the manner in which the arguments and
results should be exchanged.  One could broaden the scope of the
execute command by introducing a program mediation protocol [17].

The present specification of the protocol does not allow the
simultaneous transfer and processing of multiple requests over the
same pair of connections.  If such a capability is desired, there is
an easy way to implement it which only involves a minor change.  A
transaction sequence identification number (TSid) could replace a NUL
field in the descriptor of transactions.  The TSid would facilitate
the coordination of transactions, related to a particular transaction
sequence.  The 256 code combinations permitted by the TSid would be
used in a round-robin manner (I can't see more than 256 outstanding
requests between two user-processes in any practical implementation).
An alternate way of simultaneous processing of requests is to open
new pairs of connection.  I am not sure as to how useful simultaneous
processing of requests is, and which of the two is a more reasonable
approach.

V. Conclusions

I tried to present a user-level protocol that will permit users and
using programs to make indirect use of remote host computers.  The
protocol facilitates not only file system operations but also program
execution in remote hosts.  This is achieved by defining requests
which are handled by cooperating processes.  The transaction sequence
orientation provides greater assurance and would facilitate error
control.  The notion of data types is introduced to facilitate the
interpretation, reconfiguration and storage of simple and limited
forms of data at individual host sites.  The protocol is readily
extendible.

Endnotes

   [1] The interim version of the protocol, limited to transfer of ASCII
   files, was developed by Chander Ramchandani and Howard Brodie of
   Project MAC.  The ideas of transactions, descriptors, error recovery,
   aborts, file headings and attributes, execution of programs, and use
   of data types, pathnames, and default mechanisms are new here.
   Howard Brodie and Neal Ryan have coded the interim protocol in the
   PDP-10 and the 645, respectively.

   [2] The network system survey was conducted last fall by Howard
   Brodie of Project MAC, primarily by telephone.

   [3] PDP-10 Reference Handbook, page 306.

Bhushan                                                          [Page 15]

RFC 114                    A FILE TRANSFER PROTOCOL              16 April 1971

[4] We considered using two full-duplex links, one for control
information, the other for data.  The use of a separate control link
between the cooperating processes would simplify aborts, error
recoveries and synchronization.  The synchronization function may
alternatively be performed by closing the connection (in the middle
of a transaction sequence) and reopening it with an abort message.
(The use of INR and INS transmitted via the NCP control link has
problems as mentioned by Kalin in RFC 103.)  We prefer the latter
approach.

[5] Identifying users through use of socket numbers is not practical,
as unique user identification numbers have not been implemented, and
file systems identify users by name, not number.

[6] This subject is considered in detail by Bob Metcalfe in a
forthcoming paper.

[7] Filler bits may be necessary as particular implementations of
NCP's may not allow the free communication of bits.  Instead the
NCP's may only accept bytes, as suggested in RFC 102.  The filler
count is needed to determine the boundary between transactions.

[8] 72-bits in descriptor field are convenient as 72 is the least
common multiple of 6, 8, 9, 18, 24 and 30, the commonly encountered
byte sizes on the ARPA network host computers.

[9] The execute request is intended to facilitate the indirect
execution of programs and subroutines.  However, this request in its
present form may have only limited use.  A subroutine or program
mediation protocol would be required for broader use of the execute
feature.  Metcalfe considers this problem in a forthcoming paper.

[10] The pathname idea used in Multics is similar to that of labels
in RFC 76 by Bouknight, Madden and Grossman.

[11] We, however, urge the use of standard network ASCII.

[12] The exact manner in which the input and output are transmitted
would depend on specific mediation conventions.  Names of input and
output files may be transmitted instead of data itself.

[13] The transactions (including terminate) are not "echoed", as
echoing does not solve any "hung" conditions.  Instead time-out
mechanisms are recommended for avoiding hang-ups.

[14] The data type mechanism suggested here does not replace data
reconfiguration service suggested by Harslem and Heafner in RFC 83
and NIC5772.  In fact, it complements the reconfiguration.  For

Bhushan                                                          [Page 16]

RFC 114                A FILE TRANSFER PROTOCOL              16 April 1971

example, data reconfiguration language can be expressed in EBCDIC,
Network ASCII or any other code that form machine may "recognize".
Subsequent data may be transmitted binary, and the form machine would
reconfigure it to the required form.  I have included in data types,
a large number suggested by Harslem and Heafner, as I do not wish to
preclude interpretation, reconfiguration and storage of simple forms
of data at individual host sites.

[15] The internal character representation in the hosts may be
different even in ASCII.  For example PDP-10 stores 7-bit characters,
five per word with 36th bit as don't care, while Multics stores them
four per word, right-justified in 9-bit fields.

[16] It seems that socket 1 has been assigned to logger and socket 5
to NETRJS.  Socket 3 seems a reasonable choice for the file transfer
process.

[17] The term program mediation was suggested by Bob Metcalfe who is
intending to write a paper on this subject.


        [ This RFC was put into machine readable form for entry ]
          [ into the online RFC archives by Ryan Kato 6/01]


Bhushan                                                      [Page 17]

HIGHLY CONFIDENTIAL                                    Declaration of Andrew S. Cromarty, Ph.D.

**D. Exhibit X: Additional Materials Relied Upon**





6 March 2009

**Internet Service Provider Copyright Code of Practice – TCF Consultation Draft**

Google is grateful for the opportunity to present its comments in response to the
Telecommunications Carriers' Forum's (**TCF**) Consultation Draft of the *Internet Service
Provider Copyright Code of Practice* (the **Draft Code**).  Google wishes to also take this
opportunity to express its concerns regarding the recent amendments to the Copyright Act 1994
(the **Act**), in particular section 92A.  In Part 1 of this submission, Google provides its views on
copyright and its relevant international experience with copyright in an online environment.

In Part 2 of this submission, Google provides preliminary comments on a number of issues raised
by the Draft Code.  In a number of places in Part 2, Google provides recommendations to the
TCF, as well as suggestions for alternative drafting of the Draft Code noted as underlined text.
Google would also be able to provide a marked-up version of the Draft Code if this would assist
the TCF in its consultation process on the Draft Code.

Google would be pleased to provide further information on either of these Parts.

**Summary of Google's submission**

In Part 1 of this submission, Google addresses the following key points:

- Google is strongly committed to preserving the Internet's fundamental openness and
  protecting the benefits to technology innovation and content creation that are gained from
  this openness.

- Google supports a flexible and adaptable legal and regulatory framework that aims to
  provide an effective balance between the interests of rights holders' copyright protection
  and users' self-expression, in order to promote an environment favourable to innovation,

Case 1:11-cv-20427-KMW   Document 399-2   Entered on FLSD Docket 03/21/2012   Page 122 of 158



creativity and diversity.

- Google has a number of concerns around the new section 92A and the impact the section 92A obligation is likely to have on the balance of interests served by copyright law:

  » Section 92A undermines the incredible social and economic benefits of the open and universally accessible Internet, by providing for a remedy of account termination or disconnection that is disproportionate to the harm of copyright infringement online.

  » Section 92A puts users' procedural and fundamental rights at risk, by threatening to terminate users' Internet access based on mere allegations and reverse the burden of proof onto a user to establish there was no infringement.  In Google's experience, there are serious issues regarding the improper use and inaccuracy of copyright notices by rights holders.

  » Section 92A could impose significant burdens on ISPs, as it threatens to require enforcement of policies based simply on rights holders' allegations of infringement.

In Part 2 of this submission, Google addresses the following key points:

- As the Draft Code is a voluntary industry code of practice, Google submits that the Draft Code should expressly acknowledge that becoming a Party is not necessary or relevant for compliance with section 92A.

- There are numerous types of ISPs falling within the scope of the Act, therefore a 'one size fits all' approach to section 92A compliance is impractical and could impose excessive cost and procedural requirements on ISPs.  Google submits that the Draft Code should clarify and confirm that there may be a variety of ISP termination policies that meet the requirements of section 92A.



- User education is stated as a "primary purpose" of the Draft Code, though there is little reference to education about users' rights, including limitations and exceptions enabling lawful use of copyright protected works, in addition to their obligations.  Google submits that the Draft Code clarify the concept of 'user education' to include this information.

- The Draft Code provides for notification and termination based solely on allegations of infringement, without an independent evaluation of evidence and determination of infringement.  Google submits that the Draft Code should provide for greater independence in the process, as well as including acknowledgement of the possible defences and exceptions to copyright infringement.

- Whether a Party is in compliance with the Draft Code does not indicate whether that Party is meeting its obligations under section 92A.  Google submits that the Draft Code should expressly state this, and in this context should also remove the particularly severe and serious enforcement measures for non-compliance with the Draft Code.

- The Draft Code provides for 'Processing Fees', but these are not further detailed in the Draft Code itself.  Google submits that the Draft Code should include additional details of any fees and the basis for those fees.



**<u>PART 1</u>: Copyright on the Internet**

**Introduction to Google**

Google initially became familiar to most Internet users as the provider of the Google search engine and subsequently as the provider of email, instant messaging and specialised search and information services, including Google News, Google Maps and Google Finance.  Google is also the provider of the well known YouTube service, a platform for people to watch and share original videos through a web experience, which includes video content from New Zealand users featured on <u>youtube.co.nz</u>.

Google's breakthrough technology and continued innovation serve its mission of 'organising the world's information and making it universally accessible and useful to the public'.  Google's business model has focused on what is known as the 'long tail' of the Internet – the millions of individuals and small businesses that cater to niche interests and markets.  Google's services endeavour to democratise the means of accessing, creating and communicating information across local, national and global boundaries.

**Open Internet**

Google is strongly committed to preserving the Internet's fundamental openness and protecting the benefits to technology innovation and content creation that are gained from this openness.  As the Internet becomes increasingly essential as the fundamental communications infrastructure, promoting and nourishing the Internet's openness is paramount.  Google believes that the opportunities for freedom of expression, creativity and access to information are the greatest benefits that the Internet offers to consumers and, more broadly, to society.

Innovation and free expression have thrived in an online environment because the Internet's architecture enables any and all users to generate new ideas, content and technologies.  The Internet has dramatically lowered the barriers for any individual to develop transformative



technologies and has created unparalleled avenues for social discourse across national and international boundaries.  It is gaining a crucial role in the daily life of users and progressively leading to a major shift in users' habits, from passive media consumption to active content selection and creation.  Along with facilitating access to information, entertainment content and public services, the Internet constitutes a central means of communication and self-expression in both personal and professional life (email, VoIP, blogs, instant messaging etc).  In this way, the Internet is creating opportunities for a more participative society, and providing enormous potential for creativity and availability of new content.[1]

**Copyright legislation**

*Protection of copyright on the Internet*

Copyright's core goal is to benefit the public by providing adequate incentives for the creation and dissemination of creative works, and it plays a number of extremely important roles: part cultural policy, part innovation policy, part consumer protection policy and part competition policy.  In order for copyright to fully achieve its purpose, it must balance the interests of rights holders' copyright protection and users' self-expression, promoting an environment favourable to innovation, creativity and diversity.  Google has always supported legislation and regulation that aims to provide an effective balance.

While inadequate copyright protection can reduce incentives to create, excessive copyright protection can stifle creativity, choke innovation, impoverish culture and block free and fair competition.  As both an intermediary and an innovator in online technologies, Google supports a flexible and adaptable legal framework that provides those who create and invest in new technologies the freedom to innovate without fear that their efforts will be hindered by an overly restrictive approach to copyright. Copyright must have sufficient flexibility so that new, legitimate and socially desirable uses, enabled by new technologies, can flourish.

---

[1] Note also that the UN has recognized broadband as an essential utility for individuals, in the *United Nations Conference on Trade and Development Information Economy Report*, UNCTAD/SDTE/ECB/2006/1, Nov 2006.



Google considers that a focus of any legislative or regulatory framework should be to ensure that all stakeholders can realise the benefits of the Internet, and maximise the scope and potential for innovative content services to emerge out of New Zealand.  Depriving users from access to the Internet will sharply limit efficiency gains and productivity improvements in the economy, encumber innovation, and undermine the social benefits of the Internet.

*ISP liability provisions in the Copyright Act 1994*

Google supports the Government's efforts to bring New Zealand's copyright framework up to date with recent developments and innovations in online technology.  The recent amendments to the Act, which include protection for ISPs against liability for copyright infringement on the Internet, are issues that Google has experience with in other jurisdictions.

*Google's relevant experience with copyright online*

Google strongly supports the rights of both content creators and users.  Google considers that the most effective way to improve access to online content and to address rights holders' interests in the online environment is through the development of innovative content services and tools.

Google is proactive in informing its users about copyright and infringing content online, while also working to assist rights holders in protecting and exploiting their copyright online.  Google supports the promotion of consumer understanding of copyright, as evidenced by Google's well-developed policies and guidelines on copyright and copyright infringement, as well as the tips and articles for users in complying with copyright while using Google's products.[2]

Google works to notify users of their requirements to comply with copyright when uploading content.  As stated in its copyright policy, Google requires users, when uploading content online,

---

[2] For example, see: YouTube 'Copyright Infringement Policy': http://www.google.com/support/youtube/bin/answer.py?answer=55772&topic=13656; and YouTube 'Copyright



to confirm that they either own the copyright to the content or are authorised to deal with the content.  Google respects the rights of copyright holders and provides them with the opportunity to notify Google of an instance of copyright infringement.  Google makes it clear to users that infringing content will be removed by Google once it becomes aware of any unauthorised use of copyright protected material.

Google has also created and continues to develop powerful tools that enable artists and creators to manage and control their copyright online.  For example, Google has recently developed the YouTube Video Identification Tool, which identifies matches between user uploads and copyright protected material and gives rights holders the ability to maximise the use of their content according to their individual preferences.

Below, we provide an overview of some of the tools developed by Google for the YouTube service, which protect rights holders and inform users about the use of copyright protected works:

- YouTube offers an automated notification and take-down tool which enables rights holders to easily search for and identify YouTube videos that contain their content, and promptly remove them with the click of a mouse.

- YouTube also uses technology that creates unique identifiers of files that are removed from YouTube for reasons of copyright infringement, and prevents identical files from being uploaded to the YouTube website.

- YouTube informs its users about copyright and strongly discourages infringement (in a 'Copyright Tips' section of the YouTube website).  There are clear and prominent messages concerning copyright ownership, notified to users at the point that users upload user-created content, as well as in YouTube's terms of use and via links to YouTube's copyright policies on every page of the YouTube website.

---

Tips': http://www.youtube.com/t/howto_copyright.

Google submission on TCF Draft ISP Copyright Code of Practice



- YouTube also provides a feature called 'AudioSwap' which enables users to illustrate their original videos with music that YouTube licenses from music publishers and record labels. The purpose of this is to give YouTube users easily accessible options for being creative and using licensed music in their user-created content.

- YouTube Content Management Tools: YouTube provides technology to enable rights holders to produce unique identifiers of their copyright protected audiovisual works. If such works are then identified, then rights holders are empowered by being able to decide what should be done with this content, including by managing and monetising it.

New innovative tools such as the ones developed by Google for YouTube are offering a way for users to be creative, by gaining access to wide range of content for free, and for rights holders to protect their content, by identifying, managing access and monetising it. These types of tools and services can only be implemented if the regulatory framework allows for the necessary flexibility for new methods of cooperation between Internet intermediaries and rights holders to develop.

*Section 92A of the Act*

Google understands that the Government intends to bring section 92A into force on March 27, extended from February 28, and applauds the Government's recognition of the need for further discussion and consideration around the serious issues that section 92A raises. Google has a number of concerns around section 92A and the impact such an obligation is likely to have on innovation, free expression and the overall balance among the interests served by copyright law.

*Google's concerns with section 92A*

As discussed above, Google supports the promotion of universal access to the Internet, viewing the Internet as a vital part of individuals' and businesses' daily lives. It is critical to ensure that the legal and regulatory environment preserve the essential openness of the Internet.

Google believes that section 92A conflicts with the underlying principles of an open and

8

Google submission on TCF Draft ISP Copyright Code of Practice



universally accessible Internet, by providing for a remedy that is disproportionate to the harm of copyright infringement online. The remedy of account termination or disconnection is especially serious and disproportionate in this context. This is particularly true when considering termination of a user's entire Internet access.

Google further believes that section 92A raises concerns regarding the protection of users' rights. Mere allegations of copyright infringement should not trump users' rights. Copyright law is often complex and context sensitive, and only a court is qualified to adjudicate allegations of copyright infringement. Indeed, in Google's experience, there are serious issues regarding the improper use and inaccuracy of copyright notices by rights holders.[3] In this context, the responsibility should not fall to ISPs to determine cases of infringement.

Google believes that section 92A threatens to effectively reverse the burden of proof onto a user to establish that there was no infringement of copyright, which may put user's fundamental rights at risk. It also threatens to put substantial burdens on ISPs based on enforcement of such policies. This outcome may negatively affect innovation and deter users from creative expression on the Internet.[4]

---

[3] A recent study undertaken in the United States reported on findings from takedown notices issued to Google under the Digital Millennium Copyright Act 1998 (US), concluding that over half (57%) of notices sent to Google for removal of material were sent by business targeting competitors and over one third (37%) of notices were not valid copyright claims. See J Urban & L Quilter, 'Efficient Process or "Chilling Effects"? Takedown Notices Under Section 512 of the Digital Millennium Copyright Act', http://mylaw.usc.edu/documents/512Rep-ExecSum_out.pdf.

[4] These are a few examples of either mistaken or over-reaching notifications alleging copyright infringement online: "No Downtime For Free Speech Campaign", http://www.eff.org/issues/ip-and-free-speech; Letter to Google and YouTube from McCain/Palin 2008 campaign regarding takedown of political speech on YouTube, http://www.eff.org/files/McCain%20YouTube%20copyright%20letter%2010.13.08.pdf, October 13, 2008; "Viacom: Fair use is what we say it is", *Wired Blog Network*, http://blog.wired.com/monkeybites/2007/08/viacom-fair-use.html, August 31, 2007; "Boy dupes YouTube to delete videos", *The Sydney Morning Herald*, April 14, 2007.

9



**PART 2:** **TCF's Consultation Draft of the ISP Copyright Code of Practice**

**Introduction**

While Google has serious concerns with section 92A, we support effective stakeholder cooperation and the development of industry self-regulation and co-regulation to improve the respect of copyright in the online environment.  In this context, Google supports the TCF's efforts, in light of the anticipated section 92A amendment coming into force, to strike a balance between copyright holders' and users' interests in developing the Draft Code.

*Google's involvement in the TCF process*

The TCF has developed the Draft Code in order to assist ISPs in complying with their obligations under the new section 92A.  As Google is likely to fall within the definition of an 'Internet service provider' under the Act, Google will have the option of becoming a party to the Draft Code and therefore takes this opportunity to submit its comments on the Draft Code.

*Timing for the development of the Draft Code*

Google notes the Government's recent decision to delay bringing section 92A into force until March 27, in place of the original date of February 28.  Google supports this important acknowledgement of the serious implications of section 92A and of the need for further discussion and consideration of these issues by the industry and the Government.

This extended time period therefore provides the TCF and industry stakeholders with a significant opportunity to play an even larger role in determining the details and process around section 92A through the Draft Code.  It is imperative that the Draft Code strikes the appropriate balance between the interests represented in copyright law.

**Purpose and focus of the Draft Code**

The purpose of the Draft Code is to assist ISPs in section 92A compliance; however, it appears to

Google submission on TCF Draft ISP Copyright Code of Practice

10



be directed towards only those ISPs acting as 'Internet *access* providers', rather than the all-encompassing definition of 'Internet service provider' set out in the Act.  This interpretation is evidenced both through the purpose and principles sections of the Draft Code (Parts A and C) and the detailed processes set out in the Draft Code.  For example, in clause 4.5.1, the drafting refers to "the ISP that directly *provides and controls* the Internet Account of a User".

As a content host and provider of email, search and information services, Google does not fall neatly within the subset of ISPs that the Draft Code appears to be focused on.  Instead of providing access to the Internet itself, Google acts as an intermediary to facilitate access for its users to the vast amount of content and information available on the Internet.

*Voluntary nature of the Draft Code*

The consequences of a narrower focus in the Draft Code may lead some ISPs to choose to not become a party to the Draft Code.  Google notes that the Draft Code is a voluntary industry code of practice.  The Draft Code itself acknowledges this to a limited extent in Part D (for example, in clause 5).

However, there remains potential for the Draft Code to form an 'industry standard' for compliance with section 92A.  Although industry-wide self-regulation or co-regulation is often preferred, it is important to acknowledge that in the development of a code of practice for compliance with section 92A, not all ISPs can be dealt with under the same overall framework.  Further, a number of ISPs may already be meeting their section 92A obligations through existing policies and Internet terms of use.

> **Recommendation: The Draft Code should acknowledge that complying with the Draft Code is not necessary or relevant for compliance with 92A.  In addition, some ISPs may have already developed a 'termination policy' and may therefore elect not to sign up to the voluntary Draft Code.**

11

Google submission on TCF Draft ISP Copyright Code of Practice



*Multiple options for a 'termination policy' under section 92A*

Google submits that there is no single 'termination policy' which is appropriate for the numerous different types of ISPs falling within the definition in the Act. A 'one size fits all' approach to section 92A compliance may simply be impractical, imposing additional, perhaps excessive, cost and procedural requirements on ISPs and negatively impacting on their relationships with users and with rights holders.

A single, narrow approach would also encumber many industry participants in a way that discourages further innovation and stifles growth, as ISPs would be diverted from innovation and development towards seeking to comply with strictly defined provisions of an industry code. The lack of flexibility in such a narrow approach may also hamper the development of innovative business models that benefit rights holders, users and ISPs alike.

Part 1 explained Google's ongoing efforts in developing online tools, as well as implementing policies and terms of use, as evidence of Google's existing approach to copyright and infringement in an online environment. It is possible that, in addition to Google, a number of ISPs are also already in compliance with section 92A. This situation reinforces Google's view that there is no single 'termination policy' that is appropriate for all industry players in complying with section 92A.

> **Recommendation: Because it has the potential to be viewed as a default industry standard, the Draft Code should clarify and confirm that there may be a variety of ISP termination policies that meet the requirements of section 92A.**

*Education of users*

The Draft Code includes recognition of the need for continued user education with respect to copyright. This is stated clearly both in the purpose (clause 1.3) and the principles (clause 4.5) sections, yet receives little attention elsewhere in the Draft Code. This is an area on which Google places great importance and dedicates significant resources towards the development of



online tools to educate and assist users, as described in Part 1.  Google believes that the Draft Code must clarify that users must be fully informed about their obligations, but also about their rights under copyright, including limitations and exceptions that enable lawful use of copyright protected works.

> *Recommendation*: **Clarify the concept of 'user education' to include information about users' rights, as well as limitations and exceptions that enable lawful use of copyrighted materials.**

*Suggested wording for the Draft Code*

Google submits that the Draft Code should expressly acknowledge the varied ways in which it may be appropriate for different ISPs to comply with their section 92A obligations.  In this case Google recommends that the TCF recognise, and reflect in the wording of the Draft Code, that there may be a diverse range of termination policies – the voluntary Draft Code is only one of these many options – for compliance with section 92A.

In particular, Google submits that:

(i) clause 1 be amended to the following:

1.1   "provide a reasonable policy and process for Parties, as one option for compliance with section 92A…"

1.3   "assist Copyright Holders to educate internet Users and Downstream ISPs as to their rights and obligations with respect to copyright, including any limitations and exceptions that allow lawful uses of copyright protected works."

1.4   "provide a policy and process to enable Parties to operate a fair system…"

(ii) that clause 1.5 be deleted, as the Draft Code should only seek to address the obligations and procedural responsibilities of those ISPs that are Parties to the Draft Code.



(iii) clause 4 be amended to the following:

4.3     "All ISPs are required to comply with the Act (whether or not they are
        Parties to this Code).  The fact that an ISP is or is not a Party to this Code
        does not, either directly or indirectly, indicate whether an ISP is complying
        with the Act.  When a Party passes a Copyright Holder Notice to a
        Downstream ISP, it therefore does so in reliance on such compliance and in
        particular in reliance on that Downstream ISP having and implementing a
        termination policy complying with section 92A of the Act, whether that
        termination policy is in the form of the policy and process set out in this
        Code or is an alternative policy to this Code."

4.5     "A primary purpose of this Code is to assist in the education of Users and
        Downstream ISPs as to their rights and obligations with respect to
        copyright, including any limitations and exceptions that allow lawful uses
        of copyright protected works."

(iv) clause 5 be amended to the following:

5       "The Code is a voluntary code of practice that is applicable to those ISPs
        that have agreed in writing to be bound by it."

(v) the definition of 'Downstream ISP' be confined only to those downstream ISPs who
are Parties to the Draft Code and that clause 24 be amended accordingly.

(vi) in a number of clauses, in particular in Part C ('Principles'), the term 'ISP' is
sometimes used in place of 'Party', which is the appropriate term for the Draft Code
(except in the case of clause 4.3).

(vii) clause 60 be amended to read:

60      "In order to promote understanding of users' rights and obligations with



<u>respect to copyright, including limitations and exceptions,</u> and the effective operation of this Code…"

**Lack of independence in the policy and process**

*Policy and process based on allegations alone*

The Draft Code provides for a notification and termination process based solely on allegations of infringement of copyright made by rights holders.  The process in the Draft Code following the notification stage allows for both the evaluation of evidence and the determination of infringement disputes by the Parties and Copyright Holders.  These questions are more appropriate for an independent court to consider and finally determine and enforce.

Google is concerned that the Draft Code allows for termination without the exercise of an independent process for the consideration of allegations.  This is particularly important as, in Google's experience, there are serious issues regarding the improper use and inaccuracy of copyright notices by rights holders, which raise serious concerns with regard to the right to freedom of expression.[5]

> *Recommendation*: **Provide for greater independence in the evaluation and determination of allegations of copyright infringement, particularly in relation to evaluating any evidence of infringement, and establish greater safeguards against inaccurate and erroneous infringement notices.**

*Independent determination of copyright infringement*

In any determination of copyright infringement, there are detailed and complex questions of fact and law to be determined by a qualified court.  These questions include:

- evaluation of the admissibility of evidence;

---

[5] See notes 3 and 4 above.



- consideration of any defences and exceptions to infringement provided for under the Act (Part 3), in accordance with the appropriate legal standard of proof;

- the extent of the protection of the right to freedom of expression; and

- determination of the reasonable and proportionate remedy or sanction where infringement is proven.

In contrast to these important roles of an independent court, the Draft Code generally sets out a process which:

- allows parties to an infringement dispute to determine evidential questions themselves, or requires a third party ISP to determine such evidential questions, with reference in the Draft Code to "acceptable" or "sufficient" evidence but without any provision for independent review;

- makes no reference to the possible existence of defences to infringement or exceptions for the use of copyright works, effectively placing the burden of proof on users to establish there was no infringement of copyright;

- makes no reference to the need to safeguard users' fundamental rights, such as freedom of expression; and

- requires Parties to impose a remedy of 'account termination' which, in many circumstances, may be disproportionate and likely to go beyond what a court would order as reasonable.

> ***Recommendation*: Remove references in the Draft Code to areas that are more appropriately the responsibility of an independent court and include acknowledgement of the possible existence of defences and exceptions to copyright infringement.**

*Suggested wording for the Draft Code*

Google submits that the Draft Code should include greater acknowledgement of users' rights,

16

Google submission on TCF Draft ISP Copyright Code of Practice



including reference to possible defences or exceptions to copyright infringement.  Google further submits that the TCF provide for greater independence and safeguards for users throughout the notification and termination process, reflecting the roles that are appropriately held by a court in evaluating and determining questions of copyright infringement.

**Enforcement measures and cost provisions in the Draft Code**

*Non-compliance with the Act and the Draft Code*

Every ISP's primary responsibility is to comply with its obligations under section 92A; the Draft Code is simply intended to assist ISPs in compliance with the Act.  The Act provides for legislative remedies where an ISP fails to comply with section 92A; yet the Draft Code provides for further enforcement measures where a Party fails to comply with the Draft Code, in addition to any such measures found in the Act.

Google does not agree that additional enforcement measures are necessary in a voluntary industry code of practice.  Where a Party is in breach of the Draft Code, this does not either directly or indirectly indicate that the Party is in breach of section 92A.  Including such enforcement measures will not assist ISPs in complying with the Act, which is the central purpose for the Draft Code.  In addition, Google is particularly concerned with the severity and seriousness of the three-stage enforcement measures set out in the Draft Code in light of the Draft Code's voluntary nature.

> *Recommendation*: **The enforcement measures in the Draft Code (clauses 42 to 56) should also be deleted and possibly replaced with provisions more appropriate for a voluntary code of practice.**

*Comparison with non-compliance provisions in other industry codes of practice*

Google notes that in similar TCF-prepared industry codes of practice, enforcement measures are not included within the code.  For example, the ISP Spam Code of Practice (the **Spam Code**) was



developed as a co-regulatory code of practice under the Unsolicited Electronic Messages Act 2007, building on the legislative requirements without imposing any additional specific enforcement measures.  Under the Spam Code, complaints regarding breaches of the Spam Code are to be considered by independent, established dispute resolution bodies such as the Disputes Tribunal or the Court.

Google notes that in other industries, common sanctions for breaches of industry-wide codes may be contrasted with the severe sanctions set out in the Draft Code.  In the advertising sector, industry participants agree to comply with the self-regulatory advertising codes and standards established by the Advertising Standards Authority (**ASA**).  Any person may lay a complaint with the Advertising Standards Complaints Board regarding a breach of a code or standard.  The remedy for an upheld complaint is the withdrawal or amendment of the advertisement that is the subject of complaint.

*Costs incurred in implementing the Draft Code*

There are likely to be significant costs imposed on ISPs in achieving section 92A compliance, which will be increased through the implementation of the Draft Code.  These costs will have an even greater impact on smaller ISPs.  The Draft Code establishes a 'Processing Fee', to be set by the TCF and paid for by rights holders to ISPs.  However, there is little additional information in the Draft Code as to the structure or basis for this fee.

Google is concerned with the lack of detail included in the Draft Code in relation to the costs of implementation of the termination policy by each ISP.  Google considers it important that any fee is sufficient to cover the full costs of implementation.  If the fee charged is inadequate to cover these costs, there could be an unwanted pass-through of costs onto users.

> *Recommendation*: **The Draft Code should have greater transparency, including additional detail as to the basis for any fees (e.g. the total cost of implementation) and the composition of the Processing Fee.**

18



*Suggested wording for the Draft Code*

As noted above on page 14, Google submits that clause 4 be amended to the following:

> 4.3    "All ISPs are required to comply with the Act (whether or not they are Parties to this Code). <u>The fact that an ISP is or is not a Party to this Code does not, either directly or indirectly, indicate whether an ISP is complying with the Act.</u>"

**Conclusion**

The above submission sets out Google's preliminary comments on a number of the issues raised by the TCF's Draft ISP Copyright Code of Practice and section 92A of the Copyright Act 1994.

Google would be pleased to provide further details on any of the issues raised in this submission and looks forward to constructively engaging with the New Zealand Government, the TCF and other industry players as it continues to consider these important issues for the legal and regulatory framework of copyright in New Zealand.

Kind regards

**Carolyn Dalton**

Senior Policy Counsel
Public Policy and Government Relations
Australia & New Zealand
Google Sydney office
E: <u>carolyndalton@google.com</u>

**Antoine Aubert**

European Copyright Policy Counsel
Google Brussels office
E: <u>aaubert@google.com</u>

<u>Contact</u>:    **Mark Toner**

Partner
MGF Webb
Auckland
T: 09 970 4108
E: <u>mark.toner@mgfwebb.com</u>

Google submission on TCF Draft ISP Copyright Code of Practice



Harry Potter and the Order of the Phoenix to air on ABC - National Cable TV | Exa ↑ _ □ ×

File   Edit   View   History   Bookmarks   Tools   Help   158

www.examiner.com/cable-tv-in-national ▾ ▾ Harry Potter TV broad

Harry Potter and the Order of th...

ABC | JULY 25, 2011

# Harry Potter and the Order of the Phoenix to air on ABC

**Christine Nyholm**
Cable TV & Celebrity Examiner

+ Subscribe

Add a comment

Email    Print

Rupert Grint, Daniel Radcliffe and Emma Watson attend the New York premiere of "Harry Potter And The Deathly Hallows: Part 2" at Avery Fisher Hall, Lincoln Center on July 11, 2011 in New York City

ABC is pesenting "Harry Potter and the Order of the Phoenix," as the "ABC Movie of the Week" on Saturday, August 13, 2011 (8:00 - 10:00 p.m. ET).  The Harry Potter film  stars Daniel Radcliffe, Emma Watson, Rupert Grint, Ralph Fiennes, Maggie Smith and Harry Melling. "Harry Potter and the Order of the Phoenix," winner of two People's Choice Awards, will be broadcast in HDTV format with 5.1-channel surround sound.

The fifth installation in the Harry Potter film series follows Harry Potter (Daniel Radcliffe) in his fifth year at Hogwarts after The Ministry of Magic refuses to believe that Lord Voldemort (Ralph Fiennes) has returned and appoints bureaucrat Dolores Umbridge (Imelda Staunton) as a teacher



This PDF is available from The National Academies Press at http://www.nap.edu/catalog.php?record_id=13163

# Reference Manual on Scientific Evidence: Third Edition

ISBN
978-0-309-21421-6

1038 pages
6 x 9
PAPERBACK (2011)

Committee on the Development of the Third Edition of the Reference Manual on Scientific Evidence; Federal Judicial Center; National Research Council

Add book to cart     Find similar titles          Share this PDF

## Visit the National Academies Press online and register for...

✔ Instant access to free PDF downloads of titles from the

  ▪ NATIONAL ACADEMY OF SCIENCES

  ▪ NATIONAL ACADEMY OF ENGINEERING

  ▪ INSTITUTE OF MEDICINE

  ▪ NATIONAL RESEARCH COUNCIL

✔ 10% off print titles

✔ Custom notification of new releases in your field of interest

✔ Special offers and discounts

Distribution, posting, or copying of this PDF is strictly prohibited without written permission of the National Academies Press. Unless otherwise indicated, all materials in this PDF are copyrighted by the National Academy of Sciences.
Request reprint permission for this book



Copyright © National Academy of Sciences. All rights reserved.

Reference Manual on Scientific Evidence: Third Edition

# Reference Manual on Scientific Evidence

*Third Edition*

Committee on the Development of the Third Edition of the
Reference Manual on Scientific Evidence

Committee on Science, Technology, and Law
Policy and Global Affairs

FEDERAL JUDICIAL CENTER

NATIONAL RESEARCH COUNCIL
*OF THE NATIONAL ACADEMIES*

THE NATIONAL ACADEMIES PRESS
Washington, D.C.
**www.nap.edu**

Copyright © National Academy of Sciences. All rights reserved.

**Roku**

SIGN IN | SIGN UP FOR NEWSLETTER    **BUY ROKU**



All about **Roku**

About Us

Management Team

Contact Us

Press Room

Affiliate Program

Careers

Privacy Policy

Image Resources

Trademark Policy

DMCA Policy

## Roku Affiliate Program

The Roku Affiliate Program is a fun, easy, and free way to generate revenue by advertising Roku products and referring qualified customers to the roku.com website. Affiliate partners can earn up to 5% commission with every purchase.

With over a million players sold, Roku is the market leader in streaming entertainment devices for the TV, renowned for its simplicity, variety of entertainment choices, and exceptional value. (We encourage you to read the reviews yourself.)





## How do I get started?

Raise your hand, jump up and down, and shout, "I'm ready!" Only kidding. You can join the Roku Affiliate Program through Google Affiliate Network or Commission Junction Network. It almost runs itself!

## How does it work?

We've kept it really simple. Here's a general overview:

- 5% commission per sale
- 7.5% Conversion Rate
- Affiliates may never use the URL www.roku.com or variations of it in its destination URL of their PPC campaign.
- Affiliates may not bid on Roku brand keywords.
- Affiliates are required to land PPC traffic on their own URL first.
- Affiliates may use the brand Roku in their ad text/description.
- Affiliates may not copy or directly mimic the ad copy being used by Roku for its own PPC campaigns, using only original content they create.

**Click here to join Roku's Google Affiliate Network program:**

Apply Now

**Click here to join Roku's Commission Junction Affiliate Network program:**

Apply Now

## How does it work?

**For more information on the Roku Affiliate program, contact us at:**

support@rokuaffiliate.com

| About Roku | Channels | About Us | Connect | Buy Roku |
|---|---|---|---|---|
| Roku launched the first product designed to deliver movies from Netflix instantly on TV, using | Netflix<br>Hulu Plus | Products<br>Image Resources | Blog<br>Refer-A-Friend | BUY NOW<br>RETAIL LOCATIONS |

the power of the Internet. Since then, our best-selling Roku streaming players have become synonymous with amazing choice, control, and value in TV entertainment. Join us—and be a part of the Roku revolution.

| | | | |
|---|---|---|---|
| Amazon Instant Video | Management | Facebook | ACCESSORIES |
| HBO GO | Jobs | Twitter | REVIEWS |
| NBA Game Time | Press | Create a Channel | ROKU COUPONS |
| Pandora | Contact | Developers | |
| See all Channels | Affiliate Program | Customer Reviews | Country Selector |



©2012 Roku Inc. All rights reserved. | Site Map | Privacy Policy | Copyright Infringement DMCA Procedures



View the online version here

Forward to a friend

Introducing

# Refer-a-Friend

## Refer. Rejoice. Repeat.

We would like to reward you for the little things you already do.

Simply share a sweet deal on a new Roku player with friends and family. For every player purchased, you get an Amazon Instant Video rental—on us.

The more you share, the more you get. In fact, we think some of you may never pay for another movie rental again!

**Tell your friends ›**

Happy Streaming,
Your friends at Roku

About Us | Privacy | Support | Products | Accessories | Unsubscribe | Forward to a Friend
Share this with your friends: Facebook | Twitter | Email
© 2012 Roku Roku | 12980 Saratoga Avenue I Saratoga, CA 95070 | United States
This email was sent to [redacted] by Roku

Walmart.com - Affiliate Program                                                      03/01/2012 02:33 PM



Back to Walmart.com

Sign in to the Affiliate Member Center

## WALMART.COM AFFILIATE PROGRAM

**GENERAL INFORMATION**

Home
Benefits
Newsletters & Calendars
FAQs
Contact Us

**AFFILIATE MEMBER CENTER**

Get Banners and Text Links
Get Data Feeds
Get Top Sellers
RSS Feeds
Link Generator
Manage Your Account

### Walmart.com Operating Agreement for Affiliate Network

This Walmart.com Operating Agreement for Affiliate Network, including all exhibits and attachments hereto and incorporated herein by reference (the "Agreement"), contains the complete terms and conditions that apply to a party's participation as an affiliate in the Affiliate Network of Walmart.com (the "Program"). As used in this Agreement, "we", "us", or "Walmart.com" means Wal-Mart.com USA, LLC (and its parent company and related entities), and "you" means the applicant party. "Site" means a World Wide Web site and, depending on the context, refers either to the Walmart.com Site or to the portion of the Walmart.com Site that you will link to using Qualifying Links as defined in Section 2 of this Agreement.

Enrollment in the Program                          Links on Your Website
Prohibitions                                       Order Processing
Referral Fees                                      Referral Fee Schedule
Referral Fee Payment                               Policies and Pricing
Limited License; Restrictions                      Responsibility for Your Website
Term of the Agreement                              Modification
Relationship of Parties                            Indemnification
Limitation of Liability                            Disclaimers
Independent Investigation                          Miscellaneous
Publicity                                          Confidentiality
Remedies to Walmart.com

Exhibit A - Trademark Requirements                 Exhibit B - Sub-Affiliates or Networks
Exhibit C - RSS Feeds

### 1. Enrollment in the Program

You may submit a completed Program application to begin the enrollment process ("Application"). Submission of your Application to the Walmart.com Affiliate Program implies acceptance to the terms set forth in this Agreement. We will evaluate your Application and notify you of your acceptance or rejection. We may reject your Application if, in our sole discretion, we determine for any reason that your website is unsuitable for the Program.

Wal-Mart Stores, Inc., Wal-Mart.com USA, LLC and Sam's West, Inc. associates, family members of associates, and suppliers are not eligible to enroll in the Program.

Unsuitable websites include, but are not limited to, those that:

- Promote sexually explicit material;
- Promote violence or hate toward any persons or groups;
- Promote illegal activities;
- Promote alcohol, tobacco, gambling/lottery in any way;
- Promote the use of pyramid, "ponzi", or similar investment schemes;
- Promote discrimination based on race, sex, religion, nationality, disability, sexual orientation, or age;
- Contain, in our sole judgment, material that is defamatory, fraudulent, or harassing to us or any third party;
- Are known as "blogging sites", defined for purposes of this Agreement as sites that contain only blogging and no other form of informational content;
- Include "walmart", "wal-mart" or variations or misspellings thereof in their domain names;
- Otherwise violate intellectual property rights of Walmart.com, Wal-Mart Stores or its suppliers;

Walmart.com - Affiliate Program                                                                                  03/01/2012 02:33 PM

- Disparage Walmart.com, Wal-Mart Stores, Wal-Mart Stores affiliates, or their suppliers;
- Are under construction or not live at the time of Application;
- Are non-US based or are websites that primarily serve a non-US based audience;
- Do not clearly state an online privacy policy to its visitors; or
- Provide a portion of their Referral Fees (as defined in Section 5) to websites or organizations that would violate any of the above criteria.

In addition, Walmart.com may, at its discretion, decline to accept, require adherence to an additional set of terms and conditions, or require the posting of specific copy for any website that (1) donates, directs or transfers any portion of their Referral Fees or affiliate benefits to any charitable website, education-related website, organization or program; or (2) provides rewards back to their members in the form of points or cash-back, or conduct other similar loyalty programs in connection with purchases made by members via their websites.

Regardless of your acceptance in the Program, we may terminate this Agreement for any reason, at any time.

The terms of our acceptance criteria are subject to change at any time without prior notice.

All decisions for acceptance into the Program will be made within our sole discretion.

If your Application is not accepted, you may reapply to the Program at any time; however, you should not and may not link to our Site unless you are approved for the Program.

As a member of the Affiliate Program, you grant Walmart.com permission to distribute any email communication directly to you that Walmart.com determines is necessary communication for you to receive in order to continue as a member of the Program, regardless of your choice to opt-out from certain communication.

Top of Page
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

## 2. Links on Your Website or Third Party Websites

Upon acceptance into the Program, we will make available to you Qualifying Links that are subject to the terms and conditions of this Agreement. A "Qualifying Link" is a link from a website to our Site using one of the Universal Record Locators ("URLs") or graphic links provided by Walmart.com, The LinkShare Network or by other means selected by us for use in the Program. All Qualifying Links must link directly and exclusively to Walmart.com. Walmart.com must approve each and every website that links to our Site through a Qualifying Link. If you use a Qualifying Link to link a website to our Site without seeking explicit authorization, your continued use of that Qualifying Link shall be considered a breach of this Agreement. However, continued use of the Qualifying Link will nonetheless subject such websites to the Terms and Conditions of this Agreement.

The Qualifying Links will serve to identify you website as a member of the Program and will establish a link from a website to our Site. All Qualifying Links that you will use in the Program will be provided to you from The LinkShare Network or by other means selected by us. You also agree that you will display on the website containing the Qualifying Link only those logos, trade names, trademarks, graphic images and similar identifying material ("Licensed Materials") that are provided by us or by the LinkShare Network, and you will substitute such images with any new materials provided by us or the LinkShare Network from time to time throughout the term of this Agreement. A web widget that is pre-approved in writing by Walmart.com for use on your website may be considered a Qualifying Link for purposes of this Agreement. Accordingly, web widgets are subject to all of the Terms and Conditions of this Agreement that apply to Qualifying Links.

Only valid Qualifying Links will be tracked for purposes of determining Referral Fees that you may be eligible to receive on sales of Qualifying Products (as defined below) generated through your participation in the Program.

Only Qualifying Links may be used to link a website to areas within our Site. You may not link directly to Walmart.com without use of a Qualifying Link. You may post as many Qualifying Links to our Site as you like on a website, provided that you ensure that each website containing a Qualifying Link posted by you meets the terms of this Agreement, including without limitation, that such website does not fall into the "unsuitable website" category described in Section 1, does not fall into the "prohibitions" set forth in Section 3, and you take responsibility for all websites on which you post a Qualifying Link in

Walmart.com - Affiliate Program                                        03/01/2012 02:33 PM

Case 1:11-cv-20427-KMW   Document 399-2   Entered on FLSD Docket 03/21/2012   Page 148 of 158

accordance with Section 10. The position, prominence and nature of links on a website shall comply with any requirements specified in this Agreement but otherwise will be in your discretion.

You acknowledge that, by participating in the Program and placing a link to Walmart.com (or any category page therein) on any website through use of a Qualifying Link, we may receive information from or about visitors to such website or communications between such website and those visitors. Your participation in the Program constitutes your specific and unconditional consent to and authorization for our access to, receipt, storage, use, and disclosure of any and all such information, consistent with the policies and procedures set forth in our Privacy Policy located in the footer of the Walmart.com Site.

Top of Page
......................................................................................................

### 3. Prohibitions

You understand and acknowledge that this Agreement is made between you and Wal-Mart.com USA, LLC and is solely for the purpose of allowing you to link to the Walmart.com Site.

As a condition to your acceptance and participation in the Program, you agree to the following prohibitions:

A. General Prohibitions.

You may NOT:

- engineer any website containing a Qualifying Link in such a manner that pulls Internet traffic away from Walmart.com;
- publish, link to, sell, otherwise distribute, or place a Qualifying Link on the same page or in close proximity to any Objectionable Content. For purposes of this Agreement, "Objectionable Content" means any material, including textual, audio or video material, which is offensive (including hate speech or violence against a particular group of people); contains any nudity, explicit violence or sexual material; contains depictions of violent or sexual acts; is defamatory to any group or individual; or promotes alcohol, tobacco, or gambling/lottery;
- publish, link to, sell, otherwise distribute, or place a Qualifying Link on any social networking sites, including, but not limited to, Facebook, MySpace, Twitter, etc.
- attempt to modify or alter our Site in any way;
- make any representations, either express or implied, or create an appearance that a visitor to your website is visiting our Site, e.g., "framing" or "wrapping" the Site in any manner without first obtaining in advance our express written permission. Such requests must be made in writing and sent to Walmart.com, Attn: Affiliate Program Manager, 7000 Marina Boulevard, Brisbane, CA, 94005;
- "scrape" or "spider" the Site or any other websites for content (such as images, logos or text);
- participate in Yahoo's Search Submit Pro (SSP) Search Marketing Program;
- place ads on, or participate in any way in, AdNetworks or Search Content Networks;
- employ, use or place any web browser add-ons, toolbars or pop-ups on your website;
- promote, or participate in the promotion of, Walmart's Pharmacy(www.walmart.com/pharmacy);
- link any Qualifying Link to any website other than our Site, including, for example, your own website;
- bid on our Trademarks at any website that provides search engine services and that results in driving traffic to any website, other than our Site, including your website;
- engage in any direct or indirect relationships with ISPs and/or mobile carriers that results in the delivery or act of address bar keyword and URL error trafficking (e.g., a user mistypes a web address in the ISP's address bar or search bar, and, as a result, is redirected to a web page that contains a Qualifying Link that directs the user to sites like Walmart.com).
- employ the use of any type of software download or technology which attempts to intercept or redirect traffic or Referral Fees to or from any website;
- use any Trademark (as defined in Exhibit A), or any Licensed Materials (as defined in Section 2), provided to you as a result of your participation in the Program to advertise or engage in services which result in a sale occurring on your website, whether or not you then have the item fulfilled through Walmart.com;
- without the prior written approval of Walmart.com, use any Trademark, or any

Case 1:11-cv-20427-KMW   Document 399-2   Entered on FLSD Docket 03/21/2012   Page 149 of 158

Licensed Material in an advertisement that is not created or provided by Walmart.com in any way that might suggest or imply or mislead or is likely to mislead a visitor to your website into believing that Walmart.com, Wal-Mart Stores or any related entity was the creator or sponsor of such advertisement;

- re-distribute Licensed Materials (as defined in Section 2) to websites which can reasonably be viewed as Walmart.com's competitors, including but not limited to, Target, Kmart, Sears, JC Penney, Kohls, Circuit City, Best Buy, Amazon, eBay, Toys R Us, eToys, and KB Kids;
- re-distribute, display or syndicate Licensed Materials and/or Walmart.com's datafeed, including any product information set forth therein, to any third party partner, network or agency;
- employ, use, or receive any direct or indirect benefit from, any "cookie stuffing" methods (e.g., use of "cookie stuffing" to cause LinkShare's tracking systems to conclude that a user has clicked through a Qualifying Link - and to pay commissions accordingly - even if the user has not actually clicked through any such link);
- install spyware on another person's computer; cause spyware to be installed on another person's computer, or use a context based triggering mechanism to display an advertisement that partially or wholly covers or obscures paid advertising other content on a website in a way that interferes with a person's ability to view that website;
- display any material on a website containing a Qualifying Link which contains viruses, Trojan horses, worms, time bombs, cancel bots or other similar harmful or deleterious programming routines;
- without the prior written approval of Walmart.com, use any widgets on your website that: (a) include any Trademarks (as defined in Exhibit A); (b) include any Licensed Materials (as defined in Section 2); or (c) directly or indirectly send traffic to Walmart.com;
- post, publish, link to or place a Qualifying Link on the Walmart Facebook Page;
- forward, redistribute, or otherwise repurpose any or all Qualifying Links to any third party;
- release Wal-Mart's sales circulars, advertisements or other information prior to their authorized release dates; or
- purchase products or services sold or promoted on Walmart.com through a Qualifying Link for resale or commercial use of any kind.

B. Prohibitions Regarding Use of Electronic Communications

Electronic Communication includes email messages, text messages, and any other form of non-verbal communication occurring without the use of physical mail. You may NOT do any of the following using Electronic Communication unless you first obtain in advance Walmart.com's express written permission. Such requests must be made in writing and sent to Walmart.com, Attn: Affiliate Program Manager, 7000 Marina Boulevard, Brisbane, CA, 94005. These prohibitions are in addition to, and not in place of, all prohibitions and restrictions that you are bound to under the LinkShare Affiliate Membership Agreement, as amended. You may not:

- generate or use Electronic Communication using or containing Trademarks (as defined in Exhibit A), or any variation or misspelling thereof, or products, or any of the Qualifying Links or URLS provided to you as part of the Program;
- send any other Electronic Communication that in any way suggests or implies or misleads or is likely to mislead (including without limitation, via the return address, subject heading, header information or message contents) a recipient into believing that Walmart.com, Wal-Mart Stores or any related entity was the sender or sponsor of such Electronic Communication or procured or induced you to send such Electronic Communication;
- forward, redistribute, or otherwise repurpose any Electronic Communication that Walmart.com sends to its affiliates and/or customers; and
- generate or send any unsolicited Electronic Communication (spam) under this Agreement

C. Prohibitions regarding use of Trademarks (as defined in Exhibit A)

In addition to the requirements and prohibitions regarding use of the Trademarks set forth in Exhibit A, and incorporated herein by reference, you may NOT:

- use the Trademarks in any manner not expressly authorized by this Agreement.
- use the Trademarks, or any variation or misspelling thereof, in metatags, hidden text or source code, in your domain name or any other part of your URL as further detailed in Exhibit A;

Walmart.com - Affiliate Program                                                    03/01/2012 02:33 PM

- bid on keywords as further detailed in Exhibit A;
- bid on our Trademarks at any website that provides search engine services and that results in driving traffic to any website, other than our Site, including your website;
- use Walmart.com or Wal-Mart Store's vendors or suppliers' logos, trade names, trademarks, graphic images, product images, product references and similar identifying material unless expressly and specifically provided by Walmart.com for use in the Program, unless used within a keyword string (i.e. Hanes T-Shirts).

In addition, you are bound to act in compliance with all applicable federal, state and local laws and regulations, including without limitation, the CAN-SPAM Act of 2003 ("CAN-SPAM") and the Children's Online Privacy and Protection Act of 1998 ("COPPA"). You shall protect, defend, indemnify and hold harmless us and our parent and related entities from and against any claims, actions, liabilities, losses, damages, costs or expenses, including without limitation, attorneys' fees and costs of litigation, even if such claims are groundless, fraudulent or false, incurred by us or our parent or related entities arising out of any content or activity by you or on your website or resulting from or in connection with your violation of any of the terms or prohibitions contained in this Agreement or any law, rule or regulation, including without limitation, claims for violations of third party intellectual property rights, and rights of privacy, including but not limited to CAN-SPAM and COPPA.

Top of Page

### 4. Order Processing

We will be responsible for all aspects of order processing and fulfillment of orders placed by customers who follow your Qualifying Links to the Walmart.com Site in accordance with applicable legal requirements. We reserve the right to reject orders that do not comply with any reasonable requirements that we periodically may establish. Among other things, we will prepare orders forms; process payments, cancellations, and returns; and handle customer service. Through the LinkShare Network, you have the ability to track sales made to customers who purchase products using your Qualifying Links and you can review reports summarizing this sales activity. To permit accurate tracking, reporting, and fee accrual, you must ensure that your Qualifying Links are properly formatted. The form, content, and frequency of the reports are limited to those reports and capabilities available through The LinkShare Network and may vary from time to time in our and/or The LinkShare Network's reasonable discretion. Walmart.com is not responsible for any changes that The LinkShare Network's format, timing, or types of reports available to members of The LinkShare Network and Walmart.com's Affiliates. Walmart.com will not be responsible for improperly formatted links regardless of whether you have made amendments to the code or not. In addition, we are unable to track or provide credit for sales from customers that are referred to us with browsers that do not have their cookies setting enabled.

Top of Page

### 5. Referral Fees

We will pay you Referral Fees on certain product sales to third parties generated from our Site only. For a product sale to generate a Referral Fee, the customer must

- use a browser that has its cookies setting enabled;
- follow a Qualifying Link (in the format specified by Walmart.com) from a site to the Walmart.com site;
- purchase the product using our automated ordering system;
- accept delivery of the product at the shipping destination; and
- remit full payment to us.

We will pay, to LinkShare for ultimate payment to you, Referral Fees on products that are actually purchased by a customer within three (3) days after the customer has initially entered our Site ("Referral Fee Time") as long as the customer reenters our Site directly during that time (and not through another affiliate link). We will not pay Referral Fees on any products are purchased on our Site when a customer has re-entered our Site (other than through a Qualifying Link from your website) after the Referral Fee Time, even if the customer previously followed a link from your website to our Site. Referral Fees will not be earned on products where a customer's purchase of the product derived from search results driven from free or natural search; this includes results containing Qualifying Links displayed in a search engine's free/non-paid, natural, or organic search results in

Case 1:11-cv-20427-KMW   Document 399-2   Entered on FLSD Docket 03/21/2012   Page 151 of 158

response to a search query which sends customers directly to Walmart.com without the customer first being sent to an affiliate site and the customer clicking on a link to arrive at Walmart.com. Purchases from Sam's Club and Samsclub.com, Pharmacy, Travel, Financial Services, tires, optical, Wal-Mart Connect Internet Service, Gift Cards, and Online Gift Cards are not eligible to earn Referral Fees. Customer Service invoice adjustments and reorders are not eligible to earn Referral Fees. Products that are entitled to earn Referral Fees under the rules set forth above are hereinafter referred to as "Qualifying Products."

Top of Page

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

### 6. Referral Fee Schedule

You will earn Referral Fees based on the sale price of Qualifying Products (as defined above), according to fee schedules to be established by us. "Sale price" means the sale price listed on our Site and excludes costs for shipping, handling, gift-wrapping, rebates, refunds, returns, chargebacks, cancellations and taxes. The current Referral Fee Schedule is available to you through the affiliate portal available to all members of the Program ("Affiliate Portal").

Because of the volume and breadth of items that we carry on our Site and our practice of continuing to add new items over time, certain items may not be listed in the Referral Fee database at the time purchases are made through your website. In addition, we reserve the absolute right and discretion to exclude items from our Referral Fee database (see e.g., purchases from Sam's Club and Samsclub.com, Pharmacy, Travel, Financial Services, tires, optical, Wal-Mart Connect Internet Service, Gift Cards, and Online Gift Cards). Therefore, you acknowledge and agree that we cannot and do not warrant or guarantee that you will be paid a referral fee on any item(s) or that all items eligible for a referral fee will be paid in accordance with the Referral Fee Rates listed on the Affiliate Portal. You acknowledge that in such circumstances, you will accept the Referral Fee Rates and payouts actually paid to you. We reserve the right, at our sole discretion, to change, modify, add or remove portions of this Referral Fee Schedule, at any time. If you have any questions concerning whether a certain item is eligible for a referral fee, please contact affiliates@walmart.com.

Top of Page

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

### 7. Referral Fee Payment

Approximately 60 days following the end of each calendar month, you will receive a check for the Referral Fees earned on products that were shipped during that month, less any taxes that we or LinkShare are required by law to withhold from the final payment to you. If a customer returns a product that generated a Referral Fee, you will see a deduction for the corresponding Referral Fee from your next monthly payment; if there is no subsequent payment, you will receive an invoice for the Referral Fee payable within sixty (60) days of your receipt of the invoice. All determinations of Qualifying Links and whether a Referral Fee is payable will be made by The LinkShare Network and/or Walmart.com and will be final and binding.

Top of Page

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

### 8. Policies and Pricing

Customers who buy products through this Program will be deemed to be customers of Walmart.com without affecting their status as your customer. Accordingly, all Walmart.com rules, policies, and operating procedures concerning customer orders, customer service, and product sales will apply to those customers with respect to their transactions at Walmart.com. We may change our policies and operating procedures at any time consistent with applicable laws. For example, we will determine the prices to be charged for products sold under this Program in accordance with our own pricing policies. Product prices and availability may vary from time to time. You may include current price information in your product descriptions only if such information is provided to you by Walmart.com, provided that any price information must be accompanied with a statement on your website indicating to the user that in the event of any price difference between your website and Walmart.com, the price listed on Walmart.com will govern. We will use commercially reasonable efforts to present current and accurate information, but we cannot guarantee the availability or price of any particular product.

Top of Page

Walmart.com - Affiliate Program                                       03/01/2012 02:33 PM

### 9. Limited License; Restrictions

We grant you a limited, nonexclusive, nontransferable, revocable right to access our Site through the Qualifying Links solely in accordance with the terms of this Agreement and solely in connection with the Licensed Materials (as defined in Section 2), only as provided to you by us, through The LinkShare Network, or by other means selected by us, and solely for the purpose of identifying your website as a Program participant and to assist in generating the sale of Walmart.com products.

You acknowledge that this Agreement does not provide you with any intellectual property rights in the Licensed Materials other than the limited rights contained herein. We reserve all of our rights in the Licensed Materials and of our other proprietary rights. You may not sublicense, assign or transfer any such licenses for the use of the Licensed Materials, and any attempt at such sublicense, assignment or transfer is void. We may terminate your license to use the Licensed Materials for any reason at any time in our sole and absolute discretion. You agree to follow our Trademark Requirements in Exhibit A, as those may change from time to time. We may revoke your license at any time by giving you written notice.

Top of Page

### 10. Responsibility for Your Website or a Third Party Website on which you place a Qualifying Link ("Third Party Site")

You will be solely responsible for the development, operation, and maintenance of your website and for all content that appears on your website. For example, you will be solely responsible for:

- the technical operation of your website and all related equipment;
- creating and posting product descriptions on your website or a Third Party Site and linking those descriptions to our Site;
- updating product information, content and item descriptions (including, but not limited to, product price and availability) within 24 hours of any update of such product information, content and/or item description at Walmart.com or from datafeed content provided through Linkshare;
- the accuracy, timeliness and appropriateness of content posted on your website (including, among other things, all product-related materials);
- ensuring that materials posted on your website or a Third Party Site do not violate or infringe upon the rights of any third party (including, for example, copyrights, trademarks, privacy, or other personal or proprietary rights), or any term of this Agreement;
- monitoring your website content and the content of a Third Party Site to ensure your website or the Third Party Site does not publish, link to, sell or otherwise distribute Objectionable Content (as defined in Section 3);
- **removing** any Licensed Materials and Trademarks from your website or a Third Party Site as soon as any Objectionable Content appears on the website
- **notifying** us and The LinkShare Network of any Objectionable Content that appears or appeared on your website or a Third Party Site at any time during your participation in the program, within six (6) hours of its appearance, even if you immediately removed the Objectionable Content per the requirements of this Agreement or for any other reason;
- ensuring that content posted on your website or a Thrid Party Site is not libelous or otherwise illegal; and
- notifying us and The LinkShare Network of any malfunctioning of the Qualifying Links or other problems with your participation in the Program in accordance with the terms of this Agreement.

We disclaim all liability for these matters. Further, you will indemnify and hold us harmless from all claims, damages, and expenses (including, without limitation, attorneys' fees) relating to the development, operation, maintenance, and contents of your website.

Top of Page

### 11. Term of the Agreement

The term of this Agreement will begin upon our acceptance of your Application and will end when terminated by either party. You may terminate this Agreement at any time, with or without cause, by giving us (five) 5 days prior written notice of termination. We

Case 1:11-cv-20427-KMW   Document 399-2   Entered on FLSD Docket 03/21/2012   Page 153 of 158

may terminate this Agreement immediately at any time, with or without cause, by giving you written notice of termination. Upon termination, all Walmart.com related content and links shall be promptly removed from your website. You are only eligible to earn Referral Fees on sales of Qualifying Products occurring during the term, and fees earned through the date of termination will remain payable only if the related orders are not canceled or returned. In the event overpayment is made by us, you agree to promptly remit such excess payment upon notification by us. We may withhold your final payment for a reasonable time to ensure that the correct amount is paid.

Top of Page

### 12. Modification

We may modify any of the terms and conditions contained in this Agreement, at any time and in our sole discretion, by posting a change notice or a new agreement on our Site. We will also make commercially reasonable efforts to notify you of such changes prior to or upon implementation. Modifications may include, for example, changes in the scope of available Referral Fees, Referral Fee Schedules, payment procedures, and Program rules. IF ANY MODIFICATION IS UNACCEPTABLE TO YOU, YOUR ONLY RECOURSE IS TO TERMINATE THIS AGREEMENT. YOUR CONTINUED PARTICIPATION IN THE PROGRAM FOLLOWING OUR POSTING OF A CHANGE NOTICE OR NEW AGREEMENT ON OUR SITE AND/OR SENDING YOU THE CHANGE NOTICE WILL CONSTITUTE BINDING ACCEPTANCE OF THE CHANGE.

Top of Page

### 13. Relationship of Parties

You and we are independent contractors, and nothing in this Agreement will create any partnership, joint venture, agency, franchise, sales representative, or employment relationship between the parties. You will have no authority to make or accept any offers or representations on our behalf. You will not make any statement, whether on your website or otherwise, that reasonably would contradict anything in this Section.

Top of Page

### 14. Indemnification

You acknowledge that by entering into and performing its obligations under this Agreement, we do not assume and should not be exposed to the business and operational risks associated with your business, or any aspects of the operation or content of your website(s). Accordingly, in addition to any other indemnification obligations contained in this Agreement, you shall protect, defend, hold harmless and indemnify us and our parent or related entities from and against any and all claims, actions, liabilities, losses, costs and expenses, even if such claims are groundless, fraudulent or false (including court costs and reasonable attorneys' fees) incurred as a result of claims of customers or other third parties against us and our affiliates, licensors, suppliers, officers, directors, employees and agents arising from or connected with any of the content or activities of your website (including without limitation any activities or aspects thereof or commerce conducted thereon) or related business, or your misuse, unauthorized modification or unauthorized use of the services or materials provided by us hereunder.

Top of Page

### 15. Limitation of Liability

We will not be liable for indirect, special, or consequential damages (or any loss of revenue, profits, or data) arising in connection with this Agreement or the Program, even if we have been advised of the possibility of such damages. Further, our aggregate liability arising with respect to this Agreement and the Program will not exceed the total Referral Fees paid or payable to you under this Agreement.

Top of Page

### 16. Disclaimers

We make no express or implied warranties or representations with respect to the Program or any products sold through the Program (including, without limitation, warranties of

fitness, merchantability, non-infringement, or any implied warranties arising out of a course of performance, dealing, or trade usage). In addition, we make no representation that the operation of our Site will be uninterrupted or error-free, and we will not be liable for the consequences of any interruptions or errors; however, we will make commercially reasonable efforts to correct errors or interruptions promptly.

Top of Page

### 17. Independent Investigation

YOU ACKNOWLEDGE THAT YOU HAVE READ THIS AGREEMENT AND AGREE TO ALL ITS TERMS AND CONDITIONS. YOU UNDERSTAND THAT WE MAY AT ANY TIME (DIRECTLY OR INDIRECTLY) SOLICIT CUSTOMER REFERRALS ON TERMS THAT MAY DIFFER FROM THOSE CONTAINED IN THIS AGREEMENT OR OPERATE WEB SITES THAT ARE SIMILAR TO OR COMPETE WITH YOUR WEB SITE. YOU HAVE INDEPENDENTLY EVALUATED THE DESIRABILITY OF PARTICIPATING IN THE PROGRAM AND ARE NOT RELYING ON ANY REPRESENTATIONS, GUARANTEE, OR STATEMENT OTHER THAN AS SET FORTH IN THIS AGREEMENT.

Top of Page

### 18. Miscellaneous

This Agreement will be governed by the laws of the United States and the state of Arkansas, without reference to rules governing choice of laws. Any action relating to this Agreement must be brought in the federal or state courts having jurisdiction and venue in or for Benton County, Arkansas and you irrevocably consent to the jurisdiction of such courts. You may not assign this Agreement, by operation of law or otherwise, without our prior written consent. Subject to that restriction, this Agreement will be binding on, inure to the benefit of, and enforceable against the parties and their respective successors and assigns. Our failure or agreement not to enforce your strict performance of any provision of this Agreement in a given instance will not constitute a waiver of our right to subsequently enforce such provision or any other provision of this Agreement.

Top of Page

### 19. Publicity

You shall not create, publish, distribute, make or permit any public announcement of this Agreement or the relationship contemplated hereunder, (including, but not limited to, any press release, client list, screen shot, advertisement or any promotional material) without first submitting such material to us and receiving our written approval, which we may withhold in our sole discretion.

Top of Page

### 20. Confidentiality

Except as otherwise provided in this Agreement or with our prior written consent, you agree that all information including, without limitation, the terms of this Agreement, our business and financial information, our customer lists and purchase history, and our pricing and sales information, shall remain strictly confidential and shall not be utilized, directly or indirectly, by you for your own business purposes or for any other purpose except and solely to the extent that any such information is generally known or available to the public through a source or sources other than you or your affiliates. Notwithstanding the foregoing, you may deliver a copy of any such information (a) pursuant to a subpoena issued by any court or administrative agency, (b) to your accountants, attorneys, or other agents on a confidential basis, and (c) otherwise as required by applicable law, rule, regulation or legal process, upon written notification to Walmart.com.

Top of Page

### 21. Remedies to Walmart.com

Violation of any of the terms or prohibitions contained in this Agreement may result in, among other things, (a) the immediate termination of this Agreement; (b) the withholding of Referral Fees due to you; or (c) the commencement of an action by Walmart.com against

Walmart.com - Affiliate Program                                                                03/01/2012 02:33 PM

you seeking, without limitation, injunctive relief, recovery of actual, statutory or punitive damages.

We have the right in our sole and absolute discretion to monitor your website at any time and from time to time to determine if you are in compliance with the terms of this Agreement, and you agree to provide us with unrestricted access to your website for such purpose.

Last Updated: October 29, 2010

Top of Page

---------------------------------------------------------------------------------

### Exhibit A - Trademark Requirements

These requirements apply to your use of Walmart.com and other trademarks and service marks belonging to Wal-Mart.com USA, LLC, Wal-Mart Stores, Inc. or other related entities (the "Trademarks") in content that has been approved by us.

1. You may use the Trademarks only for purposes expressly authorized by us.
2. You may not modify the Trademarks in any manner. For example, you may not change the proportion, color, or font of the Trademarks.
3. You may not display the Trademarks in any manner that implies endorsement of your website or business by Walmart.com outside of your involvement in the Program.
4. You may not use the Trademarks to disparage Walmart.com, its products or services, or in a manner which, in our reasonable judgment, may diminish or otherwise damage our good will in the Trademarks.
5. Each Trademark must appear by itself, with reasonable spacing (at least the height of the Trademark) between each side of the Trademark and any other graphic or textual image. You may place the Walmart.com name or logo adjacent to competitive brands, subject to the requirements of this Agreement, including prohibitions against objectionable material and websites.
6. You must use the TM symbol next to the trademarks. You must use the SM symbol next to the service marks.
7. You must include the following statement in your materials that include the Trademarks: "WALMART.COM SM is a service mark of Wal-Mart.com USA, LLC and Wal-Mart Stores, Inc." You must include similar statements for any other Trademarks used on an ongoing basis in your materials.
8. You acknowledge that all rights to the Trademarks are our exclusive property and all goodwill generated through your use of the Trademarks will inure to our benefit.
9. YOU MAY NOT USE THE TRADEMARKED NAMES, WAL-MART, WALMART.COM, WAL-MART STORES, OR ANY VARIATIONS OR MISSPELLINGS THEREOF, IN ANY MANNER INCLUDING KEYWORD BIDDING ON SEARCH ENGINES; YOU MAY NOT USE WAL-MART, WALMART.COM, OR ANY VARIATION OR MISSPELLINGS THEREOF, IN METATAGS OR TO DIRECT TRAFFIC TO ANY WEBSITE OTHER THAN OUR SITE; YOU MAY NOT USE WAL-MART, WALMART.COM, OR ANY VARIATIONS OR MISSPELLINGS THEREOF, IN HIDDEN TEXT OR SOURCE CODE ; YOU MAY NOT USE WAL-MART, WALMART.COM, OR ANY VARIATIONS OR MISPELLINGS THEREOF, IN YOUR DOMAIN NAME OR ANY OTHER PART OF YOUR UNIVERSAL RECORD LOCATOR.
10. You may not bid on any keyword or on any Pay per Click Search Engines (PPCSEs) where such keyword is one of our Trademarks or any variation or misspelling of one of our Trademarks (see the non-exclusive list of examples set forth below in Section 15). Further, you may not bid on any word or term that is confusingly similar to any of our Trademarks standing alone. You may, however, bid on keyword strings that incorporate our Trademarks (e.g., "Walmart.com Electronics", "Wal-Mart Toys"); provided, however, that such permissible keyword strings must be used in a manner that directs traffic only to our Site. You may not bid on keywords strings that contain the terms "Rollbacks" or "Advertised Values".
11. You may not employ any "fat finger" domains or typosquatters redirecting web traffic to your website. A typosquatter for "fat finger" domain is any domain that amounts to misspellings of any registered or unregistered Trademarks.
12. You may not bid on any keyword or on any PPCSEs that is one of our competitors' trademarks (or a derivation of a competito r's trademark), or any other word or term that is likely to cause confusion regarding its affiliation with the competitor. Examples of these keywords include, but are not limited to: "Target", "Kmart", "Sears", "JC Penney","Toys R Us", "Amazon", "Circuit City", "eToys", and "KB Kids".
13. You may not bid on restricted manufacturer brand terms, including but not limited to "MagicJack", or any derivatives thereof that are likely to cause confusion regarding its affiliation with Walmart.com, its affiliates or you, in any paid search.

Walmart.com - Affiliate Program                                                          03/01/2012 02:33 PM

14. You may not use the Trademarks alongside or in conjunction with the following terms: "percent (%) off", "sale",or "coupons".

15. Walmart.com may, in its sole discretion, terminate you or withhold payment of your Referral Fees for the days that we determine that you were bidding in violation of the keyword bidding requirements above.

16. The list below sets forth examples of impermissible keywords, "fat-finger" domains, and variations of Trademarks that you may **not** bid on. The list is for example purposes only and is not a complete list of prohibited words which infringe a Trademark, and therefore violate a term of this Agreement.

| walmart | walmart.com | wal-mart | wal mart | www.walmart.com |
|---------|-------------|----------|----------|-----------------|
| wallmart | wal-mart.com | wall mart | wallmart.com | www.wallmart.com |
| wal mart.com | Walmart.com. | Walmart.c | www.wal-mart.com | www.walmart |
| walmart stores | wal-mart store | walmarts | www.wal mart.com | wal mart stores |
| wall-mart | walmart supercenter | site:www.walmart.com walmart | wal-mart supercenter | super Walmart |
| walmart stores | super wal mart | walmart.com. | walmart store | walt mart |
| walmart,com | wall mart.com | walmart online | wal mart.com | www.wal-mart |
| Walmart.c_om | Walmart.c | site:walmart.com | - | - |

We reserve the right in our sole discretion to modify these requirements at any time.

Last Updated: March 25, 2010

Top of Page

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

**Exhibit B - Networks & Sub-Affiliates**

These requirements apply to your use of the Program as a Network. A "Network" is defined as any affiliate that operates one or more websites as sub-affiliates through one (1) Application to the Program.

1. You agree to all the terms and conditions of this Agreement, including all attached Exhibits, on behalf of all sub-affiliates operating under the Network and are responsible for any action or inaction by such sub-affiliates.

2. You must seek prior written approval from Walmart.com before choosing to operate as a Network. Such requests must be made in writing and sent to Walmart.com, Attn: Affiliate Program Manager, 7000 Marina Boulevard, Brisbane, CA, 94005.

3. You must provide to Walmart.com a list of all sub-affiliates working within your Network within twenty-four (24) hours of any request from Walmart.com.

4. Any violation of this Agreement by any sub-affiliate may result in immediate termination of the entire Network from the Program.

Top of Page

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

**Exhibit C - RSS Feeds**

Walmart.com offers free RSS (Really Simple Syndication) feeds for personal, noncommercial use. Any other uses, including without limitation the incorporation of advertising into or the placement of advertising associated with or targeted towards the content of our RSS feeds, are prohibited. You must use the RSS feeds as provided by Walmart.com, and you may not edit or modify the text, content or links supplied by Walmart.com. You must always have the most current RSS feed visible. You must accompany all price information with a statement on your website indicating to the user that in the event of any price difference between your website and Walmart.com, the price listed on Walmart.com will govern.

The RSS feeds may be used only with those platforms from which a working link is made available that, when accessed, takes the viewer directly to the display of the full product offer on Walmart.com. Any display of the content of the RSS feeds must permit successful

linking to, redirection to or delivery of the applicable Walmart.com web page. You may not insert any intermediate page, splash page or other content between the RSS link and the applicable Walmart.com web page.

Walmart.com retains all ownership and rights in the content of our RSS feeds.

Walmart.com reserves the right to discontinue providing any or all of the RSS feeds at any time and to require you to cease displaying, distributing or otherwise using any or all of the RSS feeds for any reason including, without limitation, your violation of any provision of this Agreement.

Last Updated: March 25, 2010

Top of Page

Security & Privacy | Terms & Conditions | Store Finder | Site Directory | About Walmart.com

