Sealed

FILED by _____ D.C.

JAN 3 1 2014

STEVEN M. LARIMORE
CLERK U. S. DIST. CT.
S. D. of FLA. – MIAMI

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 11-20427-WILLIAMS/TURNOFF

DISNEY ENTERPRISES, INC.,
TWENTIETH CENTURY FOX FILM CORPORATION,
UNIVERSAL CITY STUDIOS PRODUCTIONS LLLP,
COLUMBIA PICTURES INDUSTRIES, INC., and
WARNER BROS. ENTERTAINMENT INC.,

*Plaintiffs,*

v.

HOTFILE CORP., ANTON TITOV, and
DOES 1-10.

*Defendants.*
_____/

HOTFILE CORP.,

*Counterclaimant,*

v.

WARNER BROS. ENTERTAINMENT INC.,

*Counterdefendant.*
_____/

### PLAINTIFFS' RESPONSE TO THE COURT'S
### OMNIBUS ORDER OF NOVEMBER 26, 2013

**[CONFIDENTIAL]**
**[FILED UNDER SEAL PURSUANT TO PROTECTIVE ORDER]**

Pursuant to this Court's Omnibus Order of November 26, 2013, as modified by its paperless order of December 3, 2013, Plaintiffs Disney Enterprises, Inc., Twentieth Century Fox Film Corporation, Universal City Studio Productions LLLP, Columbia Pictures Industries, Inc., and Warner Bros. Entertainment Inc. ("Plaintiffs") hereby identify the information disclosed in this case that should remain confidential even if this Court were to unseal the record more generally. As explained in greater detail below, some of the filings in the record of this case contain highly sensitive information relating to the systems and criteria employed by Plaintiffs Warner Bros. Entertainment Inc. ("Warner") and Columbia Pictures Industries, Inc. ("Columbia") to detect and prevent the online infringement of their works, the efficacy of which depends critically upon shielding the underlying operation of these systems from putative infringers. In addition, the record also includes commercially sensitive pricing terms of the business deals between the Plaintiffs and a third party antipiracy vendor, Vobile Inc. ("Vobile"), that could be harmful to the business interests of both Vobile and the Plaintiffs in this case.

The sensitive information in the sealed record of this case falls generally into five categories, each of which this Court should continue to maintain as confidential. During the course of the litigation, Warner revealed (1) information regarding the methods employed by Warner to identify files online that infringe Warner's copyrights; (2) information regarding the use of "excluded" terms used by Warner to avoid mistakenly identifying noninfringing files as infringing and, in particular, the list of the specific exclude words Warner utilizes for this purpose; and (3) information regarding Warner's confidential internal investigation of its system for purposes of responding to allegations in this litigation. In addition, during the course of the litigation, Columbia revealed (4) certain criteria by which Columbia determines whether to take action against the online infringement of its copyrights. Finally, the record also contains (5) commercially sensitive information produced by a third party, Vobile, regarding its finances and business arrangements with the Plaintiffs in which there is no legitimate interest in public disclosure to outweigh the likely harm to both Plaintiffs' and Vobile's business interests that such disclosure would cause.

## LEGAL STANDARD

The Eleventh Circuit has held that the common law and First Amendment rights of access to judicial proceedings can be overcome by a showing of "good cause" to maintain matters in confidence. *See Romero v. Drummond Co.,* 480 F.3d 1234, 1246 (11th Cir. 2007); *Chicago*

1

*Tribune v. Bridgestone/Firestone, Inc.*, 263 F.3d 1304, 1310, 1313 (11th Cir. 2001). When a party seeks to seal only a portion of the record, a determination of good cause requires "balanc[ing] the asserted right of access against the other party's interest in keeping the information confidential." *Chicago Tribune*, 263 F.3d at 1309.[1] In assessing whether to keep information contained in court documents under seal, "courts consider among other factors, whether allowing access would impair court functions or harm legitimate privacy interests, the degree of and likelihood of injury if made public, the reliability of the information, whether there will be an opportunity to respond to the information, whether the information concerns public officials or public concerns, and the availability of a less onerous alternative to sealing the documents." *Romero*, 480 F.3d at 1246. In particular, a party's privacy or proprietary interest in information can overcome the public's interest in access to sealed information. *Id.* (citing *Nixon v. Warner Commc'ns, Inc.*, 435 U.S. 589, 598 (1978)).

**INFORMATION THAT SHOULD REMAIN CONFIDENTIAL**

I.  **INFORMATION REGARDING WARNER'S COPYRIGHT ENFORCEMENT SYSTEM.**

    A.  **Information Regarding the Means Warner Uses to Identify Infringing Files Online and Avoid Mistaken Identifications.**

This Court should maintain the confidentiality of information regarding the logic and construction of the system Warner uses to identify infringements of its copyrighted materials online and to prevent mistaken identifications. In particular, this Court should preserve the confidentiality of two categories of information: (1) information regarding Warner's use of "exclude words" (*i.e.*, terms that, if they appear within an online post, will cause Warner's antipiracy software not to return a "match" for the posted online file even if it otherwise matches the search criteria for a particular Warner work), including the specific exclude words that have

---

[1] The showing required to maintain confidentiality over discrete items is thus a substantially less demanding one than the standard to keep an entire case record under seal. In contrast, "the decision to seal the entire record of the case – including the pleadings, docket entries, orders, affidavits, and hearing transcripts – must be 'necessitated by a compelling governmental interest [] and [be] narrowly tailored to that interest.'" *Perez-Guerrero v. U.S. Att'y Gen.*, 717 F.3d 1224, 1235 (11th Cir. 2013) (internal quotation marks omitted; alterations in original), *cert. denied*, No. 13-323, 2014 WL 210667 (U.S. Jan 21, 2014)

2

been disclosed in this litigation,[2] and (2) information regarding the logic employed by Warner's system to locate and identify content that infringes Warner's copyrights online in the first instance.[3]

The record in this case includes information, designated either "Confidential" or "Highly Confidential" by Warner, describing the specific methods that Warner uses to search various online locations for files that infringe Warner's copyrights. *See, e.g.*, Warner Bros. Entertainment Inc.'s Motion for Summary Judgment and Memorandum of Law in Support of Motion for Summary Judgment (filed under seal) (hereinafter "Warner Motion for Summary Judgment") at 5-6 ; Declaration of David Kaplan in Support of Warner Bros. Entertainment's Motion for Summary Judgment (filed under seal) (hereinafter "Kaplan MSJ Decl."), ¶¶ 7-11. As explained in Warner's Motion for Summary Judgment, filed on February 10, 2012, Warner personnel manually set search and matching criteria for "robots" that scan selected sites (and selected sections of sites) for particular copyrighted works, including the title, year, genre, content type (such as television show or movie), and relevant keywords. Information currently under seal in this litigation includes the details of specific searches used by Warner to identify certain infringing files. *See, e.g.*, Declaration of Roderick Thompson in Support of Defendants' Opposition to Plaintiff Warner Bros.' Motion for Summary Judgment (filed under seal) (hereinafter "Thompson Opp'n MSJ Decl."), Exhibits 5, 19, 20, 21.

Making public information regarding the operations of Warner's antipiracy software would severely undercut the effectiveness of Warner's efforts to identify infringing copies of its works online – and, to the extent any other copyright owners or their antipiracy vendors utilize search methods with similar features, may even undermine the parallel efforts of other Plaintiffs. As this Court is well aware, Warner is engaged in a continuous arms race against new and ever more effective methods of online copyright infringement, and Warner's antipiracy system is essential to meeting this challenge. *See* Warner Motion for Summary Judgment at 3-7; Memorandum of Law in Support of Plaintiffs' Motion for a Protective Order Regarding Plaintiffs' Antipiracy Investigations and Enforcement Procedures (D.E. 105-1), at 7-8. Putative

---

[2] The information regarding exclude words that has previously been designated and should remain confidential or highly confidential is attached hereto as Exhibit A.

[3] The information regarding the logic and method of Warner's antipiracy system that has previously been designated and should remain confidential or highly confidential is attached hereto as Exhibit B.

infringers familiar with the methods used by Warner's system to locate and identify infringing content could readily take steps to avoid detection of their own infringing activity. *See* Declaration of David Kaplan in Support of Plaintiffs' Motion for a Protective Order Regarding Plaintiffs' Antipiracy Investigations and Enforcement Procedures (D.E. 106-14) (hereinafter "Kaplan Protective Order Decl."), ¶ 6 ("[P]ersons familiar with Warner's methods and strategies for identifying unauthorized Warner content online could infringe without fear of detection if they knew how the detection worked."). For instance, they could place their files in online locations that Warner does not or cannot search, or describe them in ways that Warner's software is not configured to detect. Moreover, to the extent other copyright owners or their antipiracy vendors may use search methods with any features similar to Warner's, methods that infringers could use to circumvent Warner's system could impede the enforcement efforts of the remaining Plaintiffs as well. Because releasing information to the public and thus to putative infringers regarding the operations of Warner's antipiracy system would stymie Warner's ongoing antipiracy efforts, as well as those of the other Plaintiffs, the information should remain confidential.

Indeed, the fact that Warner uses "exclude words" to prevent its software from mistakenly identifying noninfringing files as Warner content, as well as the specific exclude words Warner employs for that purpose, are particularly vulnerable to misuse. Information produced in this litigation explains that Warner, in order to err on the side of avoiding mistaken notifications of infringement, has configured its software not to identify a file as representing infringing Warner content if certain "exclude" words are present in the post, even if the file otherwise matches Warner's search criteria. *See, e.g.*, Warner Motion for Summary Judgment at 5; Kaplan MSJ Decl. ¶ 12 ("Over time, Warner has built a library of 'global exclude' terms that apply to all searches regardless of the title being searched; global exclude terms similarly cause the file to be excluded regardless whether there is a title match."); Order on Pending Motions for Summary Judgment (filed under seal) at 30. Hotfile attached Warner's full list of its exclude words, as well as the search terms with which the exclude words are associated, to one if its summary judgment filings in this case. *See* Opp'n MSJ Decl., Exhibit 15.

Making public Warner's list of exclude words and their associated works would provide putative infringers with a powerful tool for circumventing Warner's online copyright enforcement efforts: by including the "exclude" word within an infringing post, they would be

able to ensure that Warner's system would not return the file as a "match" to infringing Warner content. Indeed, revealing the mere fact that Warner's searching method utilizes "exclude" words at all could encourage persons engaged in online copyright infringement to seek to identify those exclude words and incorporate them into their posts to avoid detection. Given that the purpose for Warner's use of "exclude" words is to err on the side of conservatism and avoid issuing mistaken notices, it would be particularly perverse to create a situation in which persons engaged in online infringement could use that very feature of Warner's system against it.

Warner's legitimate interest in protecting information regarding the operations of its robots outweighs any interest of the public in accessing this information. First, the operation of Warner's antipiracy system, including the use and list of exclude words, is highly sensitive information that Warner has a clear and legitimate interest in keeping confidential. Courts have long recognized that a party's proprietary interest in information revealed during the course of litigation can, in and of itself, overcome the public's interest in accessing that information. *See Romero*, 480 F.3d at 1246; *Chicago Tribune*, 263 F.3d at 1313.

Moreover, courts in analogous criminal contexts have recognized that potential prejudice to an ongoing criminal investigation represents a compelling interest that justifies the closure of judicial records. *See, e.g., United States v. Valenti*, 987 F.2d 708, 713-15 (11th Cir. 1993). In *United States v. Steinger*, for example, the Southern District of Florida sealed the records of a grand jury proceeding that would have revealed the nature of an ongoing investigation because publicizing the information would alert the subjects of the investigation, compromise the investigation itself, and likely lead to the destruction of evidence. 626 F. Supp. 2d 1231, 1235 (S.D. Fla. 2009); *see also Bennett v. United States*, No. 12-61499-civ, 2013 WL 3821625, at *4 (S.D. Fla. July 23, 2013). Warner similarly investigates online pirates in order to prevent the illegal infringement of its legally protected copyright. Indeed, one of the purposes of Warner's antipiracy efforts is to identify and refer for criminal prosecution persons engaged in criminal infringement activity. *See* Kaplan Protective Order Decl., DE 106-14, ¶ 5. As in the criminal context, publicizing the details of Warner's investigation methods – including information about the logic of Warner's antipiracy software and its use of exclude words – would compromise Warner's attempts to stop violations of its copyrights: it would alert online infringers about the nature of Warner's methods and provide pirates with a means of avoiding or tricking Warner's

system. This Court should therefore recognize Warner's legitimate interest in keeping information regarding the operations of its antipiracy system confidential.

Finally, there is no genuine public interest in publicizing information about Warner's antipiracy system and strategies at this level of detail. Indeed, the only possible use of this information by anyone other than Warner or its antipiracy vendors would be to evade Warner's antipiracy systems and thereby facilitate online copyright infringement. And even if there were some marginal public interest in satisfying curiosity about the operation of Warner's antipiracy system and methods, Warner has minimized any burden on that interest by seeking, in this filing, to maintain confidentiality over only a very small subset of the information designated as confidential under the protective order in this case. *Cf. Curry v. McNeil*, No. 3:08cv539, 2009 WL 395247, at *2 (N.D. Fla. Feb. 17, 2009) (courts restrict public access to confidential information "in a way that will minimize that burden on the public's right" of access); *M.P. v. Schwartz*, 853 F. Supp. 164, 168–69 (D. Md. 1994) (redacting information in a manner "narrowly tailored" to the interest in confidentiality). The information regarding the operations and construction of Warner's antipiracy software and strategies, and its use of exclude words should therefore remain permanently sealed.

B.    **Information Regarding Warner's Internal Investigation of its Antipiracy Software in This Litigation.**

There is similarly good cause to maintain the confidentiality of information regarding Warner's audits and assessments of its antipiracy system triggered by Hotfile's allegations in this litigation.[4] Warner strives to have the most accurate antipiracy systems possible, and its internal audits and tests of those systems – including those run in response to this litigation – are part of that effort. It is crucial that these tests remain confidential, as Warner must be able to test its systems and identify errors without fear that its efforts to improve its systems will later be used against it, whether in litigation or to create public embarrassment. The willingness of parties such as Warner to engage in thorough internal investigations in response to accusations of wrongdoing depends upon the legitimate expectation that such investigations can be conducted in confidence.

---

[4] The information regarding Warner's investigation of its antipiracy system for purposes of this litigation that has previously been designated and should remain confidential or highly confidential is attached as Exhibit C.

6

As this Court is aware, Hotfile alleged in this litigation that Warner's antipiracy system at one point had a ten percent error rate, an allegation that was based on misleading interpretations of two internal Warner emails.[5] Even though Hotfile's allegation is inaccurate – indeed, precisely *because* the allegation is inaccurate – the disclosure of the allegation and the documents on which it is based would needlessly smear Warner, and could encourage further, meritless claims against Warner arising out of its antipiracy system.[6]

Keeping information about Warner's internal investigations confidential also goes hand in hand with maintaining confidentiality regarding the features of Warner's system described in Part I.a, *supra*. Information regarding Warner's investigation of its antipiracy system that has become part of the record in this litigation by necessity describes many sensitive and confidential features of the underlying software programs that Warner uses as part of its means for detecting infringing content online. For example, the summary judgment record includes testimony from Warner that details the different categories of information that Warner employees reviewed to identify "false positives" when Warner conducted an "audit" of its antipiracy system in the summer of 2011, which in turn reveal how Warner's software programs locate and identify

---

[5] Publicizing inaccurate and potentially embarrassing information regarding the alleged error rate could similarly damage Warner's business relationship with Kapow, the vendor whose software Warner utilizes as one component of its antipiracy system.

[6] As explained in Warner's reply brief in support of its motion for summary judgment, Hotfile's claim that Warner "knew" that its antipiracy system had an error rate of ten percent is not supported by either of the two documents on which Hotfile relied. Reply Memorandum of Law in Support of Warner Bros. Entertainment Inc.'s Motion for Summary Judgment (filed under seal) (hereinafter "Warner Reply Brief") at 6. One dates from a pre-beta technology trial of Warner's system before the system launched. *See* Reply Declaration of Jennifer Yeh in Support of Warner Bros. Entertainment Inc.'s Motion for Summary Judgment (hereinafter "Yeh Decl."), Exhibit R (Kaplan dep.) 93:8-96:8, 98:4-17 & Exhibit X. The email contrasts notices Warner actually sent (which were error-free) with links Warner identified but – as the email expressly states – did *not* take down. *See* Opp'n MSJ Decl., Exhibit 6. The second email is from Warner's investigation *after* it shut down its system to investigate Hotfile's counterclaim. *See* Opp'n MSJ Decl., Exhibit 8. But that email merely reflects someone's "guess" that a few of the files reviewed may have been false positives and, in any event, involves the review of only a small number of files identified on a single day. *Id.*; Yeh Decl., Exhibit R (Kaplan dep.) at 141:15-142:11. In a review of only a small number of files, even a few files could be a large percentage. Indeed, Hotfile's own expert repeatedly testified that these emails were not "the sort of document [he] would rely upon in concluding that there was in fact a ten percent false positive rate"; that they were "not . . . statistical evidence"; and that he "would not form the basis of an expert statistical opinion about a false positive rate" based on them. Yeh Decl. Exhibit S (Lynde dep.) at 203:24- 204:3; 204:17-205:5; 219:11-23; 227:20-228:8; Exhibits T, U (Lynde Exhibits 5, 6).

infringing content online in the first instance.  *See* Thompson Decl. Exhibit 4 at 87-88.  As explained *supra*, publication of this type of information risks seriously undercutting Warner's copyright enforcement efforts.

Even if there were some genuine public interest in Warner's internal review of its antipiracy efforts, the isolated and misleading internal emails on which Hotfile predicated its accusations regarding the accuracy of Warner's system would do more to mislead than to inform the public.  As Warner explained in its reply memorandum of law in support of its motion for summary judgment, the two documents on which Hotfile relied do not support its claim that Warner "knew" ten percent of files on which it had sent takedown notices belonged to a party other than Warner, much less any claim that Warner's system had a ten percent error rate:  one did not involve takedown notices at all, and the other represented an inaccurate guess based on only a handful of files taken down on a single day.  *See* Warner Reply Brief at 6; *supra* at 5 n.5. Making public the misimpression that these misleading emails would create in isolation would force Warner to release further sensitive, confidential information about its antipiracy system simply to correct the record.  It would thus present Warner with the untenable choice of either enduring unjust public embarrassment based on a misleading and partial record, or being forced to release further information that would undercut the effectiveness of its antipiracy efforts. Warner should not be forced to make that choice.

Moreover, there is nothing that weighs in favor of disclosing the results of Warner's internal investigation into Hotfile's allegations.  The documents on which Hotfile based its accusations regarding Warner's error rate are between two and four years old, and thus have limited or no relevance to the operation of Warner's system today, now that Warner has made improvements in response to knowledge it gained during this litigation; thus, while the documents create an undue and unnecessary risk of embarrassment to Warner, they provide no relevant information about the accuracy of Warner's system at any recent point in time.  Any public interest in Warner's internal deliberations regarding its system as it existed before its 2011 improvements is therefore nonexistent.  The internal operation of Warner's antipiracy system several years ago is a private concern, not a matter of public importance.  *See Romero*, 480 F.3d at 1246 (in determining whether to keep information under seal, courts should consider "whether the information concerns public officials or public concerns"); *Steinger*, 626 F. Supp. at 1234 (same).  And again, by limiting its request for continued confidentiality to only a small subset of

the materials designated as confidential in this case, Warner has restricted its request for continued confidentiality so as to minimize any burden on the public. *Cf. Romero*, 480 F.3d at 1246 (courts should consider whether there is a less onerous alternative to sealing documents). Moreover, no third party has moved to make this information public. Warner's legitimate interest in maintaining the confidentiality of its audits of its antipiracy systems, coupled with the significant risk of harm to Warner if such information is disclosed publicly, outweigh any theoretical public interest in their disclosure.

## II. INFORMATION REGARDING COLUMBIA'S COPYRIGHT ENFORCEMENT CRITERIA.

This Court should likewise maintain the confidentiality of information regarding Plaintiff Columbia's copyright enforcement criteria. In their summary judgment filings, Defendants cited two specific pieces of information regarding Columbia's enforcement policies that, if revealed to the public, could compromise Columbia's ability to protect its copyrighted works: the fact that Columbia has chosen to prioritize its takedown efforts by not seeking to remove infringing content with a running time below a specified length (and that this minimum length is longer than the length of the average movie trailer); and that Columbia generally does not attempt to remove copies of movie trailers from online sites at times following the trailer's launch.[7] Thus, while Columbia has the right to protect against the online infringement of its copyrighted works, it has made certain decisions regarding enforcement priorities that could be exploited by putative infringers were those criteria made public. Recognizing this fact, Columbia has long worked to maintain the confidentiality of this information; Columbia "closely guard[s] information about [its] antipiracy strategies" and reveals information about these strategies only to those directly involved in the protection of particular works. Declaration of Vicki R. Solmon in Support of Plaintiffs' Application for Protective Order (D.E. 106-13), ¶4 [hereinafter "Solmon Decl."].

As with the information regarding the operation of Warner's antipiracy system, information regarding Columbia's enforcement criteria and policies could be exploited by putative infringers if it were to become widely known. For example, a potential infringer armed with knowledge about Columbia's "minimum length" criterion could carry out infringement in a manner that circumvents that limit, such as by breaking up a single infringing work into multiple

---

[7] The information regarding Columbia's antipiracy policies that has previously been designated and should remain confidential or highly confidential is identified in Exhibit D.

shorter sections, each too short individually to trigger a takedown notice. Similarly, Columbia's decision generally to forgo issuing takedown notices for trailers could harm Columbia by encouraging the posting of trailers to unlicensed websites with which Columbia wishes to avoid the appearance of a commercial affiliation (such as sites with large amounts of infringing or unsavory material), as well as undermine the value of movie trailers that Columbia offers to licensed partner websites and media outlets. Thus, making this information public could both provide a "road map" for copyright infringement and encourage activity harmful to Columbia's brand and goodwill with consumers, as well as undercutting the "considerable" time spent by Columbia's lawyers and paralegals every year formulating Columbia's antipiracy efforts and supervising their implementation. Solmon Decl., ¶5.

In contrast, the public has no valid interest in obtaining this information. Much like the information regarding Warner's antipiracy system and methods, the only possible public use of information regarding Columbia's antipiracy policies would be to circumvent them. Indeed, there has not even been a third-party request for this information. For that reason alone, Columbia's antipiracy policies should be kept under seal. Further, Columbia seeks to redact only two specific pieces of information revealed in only a few locations in the record; in other words, it has minimized the burden on the public by limiting its request for continued confidentiality. *Cf. Romero*, 480 F.3d at 1246. Finally, the information Columbia seeks to keep under seal concerns only the private protection of its copyrighted works, rather than public concerns of any kind, further weighing in favor of confidentiality. *See id.*; *Steinger*, 626 F. Supp. 2d at 1234.

## III.    COMMERCIALLY SENSITIVE THIRD-PARTY PRICING INFORMATION.

Finally, there is no reason to publicly reveal information, produced by third party Vobile, Inc. ("Vobile") regarding the business and pricing arrangements between Vobile and the Plaintiffs in this case.[8] Vobile's work on behalf of Plaintiffs, by its very nature, involves sensitive, proprietary information that could compromise Plaintiffs' business if revealed: Vobile provides content-identification software that many copyright owners, including Plaintiffs, use to facilitate automated identification of infringing material online to help target copyright

---

[8] The Chief Executive Officer of Vobile, Yangbin Wang, has provided a declaration, attached hereto as Exhibit E, requesting that the Court maintain such information as confidential, which Plaintiffs are providing to the Court at Vobile's request. The information regarding Vobile's business and pricing information that Plaintiffs have previously designated and that should remain confidential or highly confidential is attached hereto as Exhibit F.

enforcement efforts, and Plaintiffs provide "digital fingerprints" of their content to Vobile to aid in these automated identifications. The record contains sensitive information regarding both the services that Vobile provides to the Plaintiffs and the price of those services.

Courts have long recognized that confidential pricing information is proprietary information that should typically be kept under seal. *See, e.g., In re Boston Herald, Inc.*, 321 F.3d 174, 190 (1st Cir. 2003) (pricing information is a protectable trade secret); *Uniroyal Chem. Co. v. Syngenta Crop Prot.*, 224 F.R.D. 53, 57 (D. Conn. 2004) ("Pricing and marketing information are widely held to be confidential business information . . . ."); *Confederated Tribes of Siletz Indians of Or. v. Weyerhaeuser Co.*, 340 F. Supp. 2d 1118, 1124 (D. Or. 2003) (unsealing contract terms, but redacting pricing information); *Star Scientific, Inc. v. Carter*, 204 F.R.D. 410, 414 (S.D. Ind. 2001) (pricing information is a protectable trade secret); *see also Graphic Packaging Int'l, Inc. v. C.W. Zumbiel Co.*, No. 3:10-cv-891-J-JBT, 2010 WL 6790538, at *2 (M.D. Fla. Oct. 29, 2010) ("Courts have found that a company's interest in the privacy of its financial records and the terms of confidential agreements, however, often outweigh the public right of access."). Publicizing the pricing terms of Plaintiffs' business arrangements with Vobile would cause unnecessary injury to Vobile's and Plaintiffs' legitimate commercial interest in keeping such information confidential. Indeed, in the case of Vobile, such information could cause injury by allowing competitors to undercut Vobile's pricing. *See* Declaration of Yangbin Wang (attached as Exhibit E); *see also, e.g., MEDAI, Inc. v. Quantros, Inc.*, No. 6:12-cv-840-Orl-375GJK, 2012 WL 2512007, at *2 (M.D. Fla. June 29, 2012) (recognizing protecting confidential information from unnecessary exposure to competitors as a basis for keeping information sealed); *United States ex rel. Westfall v. Axiom Worldwide, Inc.*, No. 8:06-cv-571-T-33TBM, 2008 WL 5341140, at *4 (M.D. Fla. Dec.19, 2008) (requiring that a customer list compiled by a company be filed under seal due in part to its value to competitors); *see also Chicago Tribune*, 263 F.3d at 1313 (whether information would be valuable to a competitor is a factor in determining whether information is a trade secret, which therefore should be kept under seal). The risk of harm to Vobile's business interests is therefore significant.

In addition to the potential commercial harm to the Plaintiffs from exposing the confidential terms of their business arrangements with a vendor, Vobile is not a party to this litigation, and its proprietary interests are therefore entitled to a higher degree of protection. "[T]he privacy interests of innocent third parties . . . should weigh heavily in a court's balancing

11

equation." *Gardner v. Newsday, Inc. (In re Application of Newsday, Inc.)*, 895 F.2d 74, 79–80 (2d Cir. 1990); *see United States v. Amodeo*, 71 F.3d 1044, 1500-01 (2d Cir. 1995); *see also United States v. Smith*, 776 F.2d 1104, 1113-15 (3d Cir. 1985).  Indeed, at least one court in this Circuit has suggested that the interest of a third party in keeping private confidential information *necessarily* outweighs the public interest in disclosure.  *See FDIC v. Brudnicki*, No. 5:12-cv-00398-RS-GRJ, 2013 WL 5814494, at *1 n.1 (N.D. Fla. Oct. 29, 2013) ("The answers to interrogatories contain personal financial information relating to third parties and therefore the interest in keeping these documents confidential outweighs the public's interest in disclosure.").

In this case, any public interest in the disclosure of this information is minimal – if it exists at all.  Vobile's commercial arrangements with the Plaintiffs and the pricing for those arrangements concerns only the parties' respective private business interests, not matters of public concern.  *See Romero*, 480 F.3d at 1246.  Moreover, there is not a less onerous alternative to redacting Vobile's pricing information:  if the information is not redacted, then it will become public – and available to Vobile's competitors – as soon as the record is unsealed. *Id.*  Vobile's proprietary interest in its pricing information, and the risk of harm if that information is revealed, therefore outweigh this minimal public interest in revealing Vobile's pricing information.

## CONCLUSION

For the foregoing reasons, this Court should keep confidential the information identified in Exhibits A, B, C, D, F, and Exhibit E, the Declaration of Yangbin Wang appended hereto.

DATED:  January 31, 2014

Respectfully submitted,

By: /s/ Karen L. Stetson
Karen L. Stetson
GRAY-ROBINSON, P.A.
1221 Brickell Avenue
16th Floor
Miami, FL 33131
Telephone: (305) 416-6880
Facsimile:  (305) 416-6887

MOTION PICTURE ASSOCIATION
  OF AMERICA, INC.
Karen R. Thorland (*Pro Hac Vice*)
15301 Ventura Blvd.
Building E
Sherman Oaks, CA 91403
Phone:  (818) 995-6600
Fax:  (818) 285-4403

JENNER & BLOCK LLP
David A. Handzo (*Pro Hac Vice*)
Kenneth L. Doroshow (*Pro Hac Vice*)
Luke C. Platzer (*Pro Hac Vice*)
1099 New York Ave., N.W.
Suite 900
Washington, DC 20001
Telephone: (202) 639-6000
Facsimile:  (202) 639-6066

*Attorneys for Plaintiffs*

13

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 31st day of January, 2014, I served the following

document on all counsel of record on the attached service list via their email address(es) pursuant

to the parties' service agreement:

**Plaintiffs' Response to the Court's Omnibus Order of November 26, 2013**

By: /s/ *Kar L Stet*
Karen L. Stetson

## SERVICE LIST

**Disney Enterprises, Inc., et al. v. Hotfile Corp. et al.**
**CASE NO. 11-CIV-20427-WILLIAMS-TURNOFF**

BOSTON LAW GROUP, PC
Valentin Gurvits
vgurvits@bostonlawgroup.com
Matthew Shayefar
matt@bostonlawgroup.com
825 Beacon Street, Suite 20
Newton Centre, MA 02459
Phone: 617-928-1804

*Attorney for Defendants Hotfile Corp. and
Anton Titov*

CIAMPA FRAY-WITZER, LLP
Evan Fray-Witzer
evan@cfwlegal.com
20 Park Plaza, Suite 804
Boston, MA 02116 Phone:617-426-0000

*Attorneys for Defendants Hotfile Corp. and
Anton Titov*

COBB EDDY MIJARES PLLC
Brady J. Cobb
bcobb@CEMLaw.net
642 Northeast Third Ave.
Fort Lauderdale, FL 33305
Phone: 954-527-4111, ext 201
*Attorney for Defendants Hotfile Corp. and
Anton Titov*