# EXHIBIT E

*Lenz v. Universal Music Corp.*, No. C07-3783JFRS, 2008 WL 4790669, at *2 (N.D. Cal. Oct. 28, 2008).  The particular "context of the facts alleged in *Lenz*'s complaint," according to the court, represented that "extremely rare" case in part because "obvious" fair uses were rife on YouTube.  *Id.*  Here, Warner only uses its robots on pirate sites offering *full-length* motion pictures and television programs for mass public distribution.  Kaplan Decl. ¶ 6.  There is no colorable argument that such uses are ever a fair use.  *See BMG Music v. Gonzalez,* 430 F. 3d 888, 889-91 (7th Cir. 2005) (downloading full-length entertainment content not fair use); *A&M Records, Inc. v. Napster*, 239 F.3d 1004, 1014-19 (9th Cir. 2001) (same).  Here, Hotfile does not even claim (much less proffer evidence) that any of the counterclaim files was a fair use.

Hotfile's standard would turn every mistaken DMCA notice into an actionable knowing misrepresentation because it is "known" in advance that any system will result in some errors. This is an argument for constructive knowledge and is incompatible with the § 512(f) statutory standard.  *E.g.*, *Rossi*, 391 F.3d at 1005 (rejecting constructive knowledge standard).

*As Rossi* recognizes, many methods can support a subjective good faith belief.  In *Rossi*, the MPAA did not download files before sending a DMCA notice.  *Rossi v. Motion Picture Ass'n of Am., Inc.*, Civ. No. 02-00239 BMK, 2003 U.S. Dist. LEXIS 12864, at *2-3 (D. Haw. Apr. 29, 2003).  Rossi argued – as Hotfile does here – that "Defendants were not justified in sending…a notice, or at the very least there is a triable issue of fact regarding justification, because Defendants failed to conduct an investigation to determine whether Plaintiff's website actually infringed on any copyrights before sending…the notice."  *Id.* at *8.  The district court rejected this argument, noting that "the Court cannot find [] any provision in the DMCA which requires a copyright holder to conduct an investigation to establish actual infringement prior to sending a notice to an ISP."  *Id.*, at 8-9.  The Ninth Circuit concurred.  391 F.3d at 1003-05.

Notably, Hotfile offers no evidence that a fully manual or "human review" system would have produced fewer errors than Warner's system.  And there is no suggestion that it would. Mot. at 2 (Hotfile acknowledges that "mistakes happen" even with fully manually systems). Hotfile's counterclaim proves the point.  Hotfile's "human review" by teams of lawyers still resulted in Hotfile including among the counterclaim files works that are owned by Warner. Mot. at 1.  That was just simple human error.  Likewise, many of the counterclaim files (the LeakID files) were in fact subject to a process calling for human review (two levels of human review) – and yet there were errors as a result of "human … mistakes."  Kaplan Decl. ¶ 20.

Hotfile, without evidence, questions the LeakID process because some apparent mistakes were seemingly obvious.  Opp. at 12-14.  But that is why it is called "human error."  Even responsible and diligent people make mistakes, particularly with high-volume repetitive tasks, such as the hundreds of thousands of notices Warner has had to send to Hotfile.  There is simply no basis for the Court to find that *any* system of locating infringing links online would produce fewer errors than Warner's system – and Hotfile certainly does not provide any evidence to that effect.[2]

## II.   NO EVIDENCE SUPPORTS HOTFILE'S CLAIM THAT WARNER HAD "KNOWLEDGE" OF SPECIFIC ERRORS.

### A.   No Evidence Supports Hotfile's Claim that Warner Knowingly Deleted JDownloader.

Hotfile repeatedly asserts that Warner "knew" all along that JDownloader links were "normally" or "typically" posed on pages containing Warner content, but "took no steps to prevent the deletion of the JDownloader links on such posts." Opp. at 5-6, 12.  The cited deposition testimony from Warner's representative, however, does not say that *at all*.  Kaplan testified that it was Hotfile's counterclaim that brought to Warner's attention that, once in a while, an infringer posting links to Warner content would also post a link to JDownloader alongside infringing Warner content, thus causing it to be removed when Warner removed infringing posts.  *See* Yeh Ex. R (Kaplan dep.) at 181:10-181:18; 225:13-21 (noting "conclusion" of research "after the fact" of the counterclaim).  Warner *first learned of this* when investigating Hotfile's counterclaim in this case.  *Id.*  It did not have that information when sending the notices at issue.  Indeed, when Warner learned, it modified its system to prevent takedowns of JDownloader.  Yeh Ex. R (Kaplan dep.) at 186:7-16.  The actual facts are not in dispute.

---

[2] To the contrary, automated processes are commonly used in the analogous context of civil discovery.  Rule 26 requires attorneys to certify in good faith that discovery responses are "complete and correct" (Fed. R. Civ. Proc. § 26(g)(1)), yet courts regularly endorse the use of automated document search and retrieval programs, effectively recognizing that such automated programs can provide the basis for a good faith belief.  *See, e.g., Zubulake v. UBS Warburg LLC*, 229 F.R.D. 422, 432 (S.D.N.Y. 2004) ("To the extent that it may not be feasible for counsel to speak with every key player" to identify relevant documents, "[i]t may be possible to run a system-wide keyword search").  Indeed, there is recognition that sophisticated automated review processes are **more** accurate than human review.  The Sedona Conference, *The Sedona Conference Best Practices Commentary on the Use of Search and Information Retrieval Methods in E-Discovery*, 8 Sedona Conf. J. 189, 199 (2007) (noting "myth that manual review by humans … constitutes the gold standard by which all searches should be measured," citing study that automated searching is substantially more accurate and complete due to incidence of human error).