# EXHIBIT F

mistakes were made, they were not made knowingly and are not the type of egregious violations contemplated by the statute; that there were few resulting damages to Hotfile; and that Hotfile's motive in pursuing the claim is to demonstrate how difficult it can be for anyone to identify and prevent infringement, which helps Hotfile illustrate its defense to the main infringement claims.

### 1. Warner's Review Process

Many of Hotfile's contentions concern the sufficiency of the review process Warner implemented to identify and notice particular files. As explained by Warner's head of anti-piracy operations, David Kaplan, Warner devotes the efforts of seven employees to online anti-piracy enforcement, hires third-party vendors, and, notably, uses the "common practice" of having "automated systems [ ] scan link sites and [ ] issue notifications of infringement to [storage] locker sites when infringing content is detected." (Kaplan Decl. ¶¶ 4-5 (DE 258 (filed under seal); DE 301-6).) This last practice is apparently the method by which the counterclaim files were selected for deletion and requires some explanation.

In the automated review process, Warner's employees first determine that a site is used for Internet piracy. (Kaplan Decl. ¶ 6 (DE 301-6).) They then manually create programmable instructions and matching criteria for "robots" – software programs that use keywords to search for content based on attributes such as the file's title, genre, and year of release. (Kaplan Decl. ¶¶ 7-9 (DE 258 (filed under seal); DE 301-6).) The robots then, on their own, use search algorithms to spot URL links to infringing content. The search instructions are refined based on how often they improperly detect non-Warner content that appears in the robots' search results. (Id. ¶ 8.)

for removal. (Thompson Decl. Ex. 4 (Kaplan Dep.) at 43:12-44:14 (DE 354-5).)[11] Indeed, its search process relied on computer automation to execute programs and did not involve human review of the file titles, page names or other overt characteristics before issuing a takedown notice. And because the files were not reviewed, neither Warner's robots nor its employees made a determination whether there were legal uses for the files.

The parties have proffered limited statistical and anecdotal evidence about how this translates to the effectiveness of Warner's system. For its part, Warner avers that it sent 400,000 takedown notices to Hotfile prior to this lawsuit without receiving any counternotices from Hotfile or its users, suggesting that the mistakes were not apparent or significant enough to contest. (*See* Kaplan Decl. ¶ 14 (DE 301-6).) Moreover, according to Warner, the fact that only 890 erroneous files have been identified by Hotfile after it undertook the most scrupulous review of those takedown notices suggests a low error rate, well under one percent, by a simple calculation.

Warner goes further, suggesting that the actual number of mistaken notices sent to Hotfile numbers around 600, not 890. Showing the difficulty attendant to identifying infringing content, the evidence shows that 19 of the files challenged by Hotfile in the counterclaim are in fact owned by Warner. Another 271 of the files undisputedly belong to an entity, Electronic Arts, Inc., that gave Warner permission – albeit, apparently after-the-fact – to request removal of the files. (*See* Hopkins Decl. ¶ 9 (DE 301-7) (Electronic

---

[11]   Warner contends that it would not have been "practicable for Warner to download files prior to issuing a notification of infringement" because of the computing resources required. (Kaplan Decl. ¶ 17 (DE 301-6).) Additionally, some of the files in the counterclaim were reviewed by a Warner vendor called LeakID, which does use a human screening process. (*Id.* ¶ 20.)

31

proximity would "help people download the pirated version more rapidly." (*Id.* at 225:13-21.) Kaplan acknowledged that this resulted in Warner deleting something it did not have rights to, but later denied the removal was intended. (*Id.* at 226:4-12, 236:9-18.)

Warner's efforts to police were at times overzealous and overreaching. In the case of JDownloader, its anti-piracy executive stated that despite not owning the program he could not "say that [Warner] would have no legal right to take down JDownloader in some circumstances at least" under Section 512(c). (Thompson Decl. Ex. 4 (Kaplan Dep.) at 236:9-18 (DE 304-1 (filed under seal); DE 354-5).) As discussed above, Warner took liberties in removing content owned by other copyright holders, such as Electronic Arts, only obtaining permission to do so later in an "antipiracy partnership." In the main summary judgment briefing, the Studios show that the most popular content on Hotfile is actually software that is illegal to distribute but that does not include the Studios' works. And, in its motion, Warner points out that Hotfile is unable to recover for the vast majority of the files Warner wrongfully removed. These facts demonstrate that Warner's goals may have been broader than preventing infringement of its own works in the manner prescribed by Section 512(c).

### 3. Evidence of Damages

Assuming Warner's actions were unauthorized, Warner contends that Hotfile is unable to show a cognizable injury from the takedown notices identified in the counterclaim. First, Warner has established that many of the files did not cause Hotfile to wrongfully terminate any paying users. At least 28 of the files were noticed before Hotfile implemented a repeat infringer policy based on strikes, meaning that Hotfile took no action when it received those notices. Similarly, nine files wrongfully noticed after

34

[reasonableness] standard").[29] Indeed, mistakes, even "unreasonable" mistakes, do not necessarily call for liability, so long as they are honestly believed. *Id.* (citing 17 U.S.C. § 512(f)).

But Hotfile asks whether certain "egregious" attributes of Warner's system that might have prevented it from *acquiring* subjective knowledge (such as not relying on human review, failing to download mistaken files, and failing to examine file titles) unjustly insulate Warner from liability for unreasonable mistakes. *Compare, e.g., Online Policy Grp. v. Diebold, Inc.*, 337 F. Supp. 2d 1195, 1204 (N.D. Cal. 2004) ("'Knowingly' means that a party actually knew, should have known if it acted with reasonable care or diligence, or would have had no substantial doubt had it been acting in good faith, that it was making misrepresentations."), *with Cabell*, 2010 WL 996007, at *4 ("[N]egligence is not the standard for liability under section 512(f)." (citation omitted)), *and Augusto*, 558 F. Supp. 2d at 1065 (holding that allegations that the counterclaim-defendant "should have known better do not create a genuine issue of material fact"). Hotfile also asks

---

[29] In *Rossi*, which is the case cited most often in this area, the owner of a website directory sued a movie studio trade association that followed the DMCA's notice and takedown procedures, contending that any reasonable investigation of his website would have revealed that it did not link to infringing content. *Id.* at 1003. Considering Section 512(f)'s express language and interpretive case law dealing with a wide variety of similarly-worded statutes, the Ninth Circuit held that the statute employs an objective standard and ruled against the plaintiff. *Id.* at 1004-05 (stating that the statute protects "potential violators from subjectively improper actions by copyright owners"). Instead of subjective knowledge of noninfringement, one of the association's members notified it of possible infringements on the subject website and the website itself suggested to users that protected movies could be downloaded by joining. *Id.* The clear lesson of *Rossi* is that "as a prerequisite to liability under section 512(f), a defendant must have actual knowledge that it is making a misrepresentation of fact." *Cabell v. Zimmerman*, No. 09 Civ. 10134 (CM), 2010 WL 996007, at *4 (S.D.N.Y. Mar. 12, 2010) (citations omitted).

94

whether Warner's actual knowledge of its rate of false positives – attributable to search terms it knew were, at times, overbroad as well as its practice of deleting surrounding files – can raise an inference that Warner is liable for possessing guilty knowledge or support liability under a willful blindness theory.

Some courts have cited Section 512(c) to suggest liability where a party did not develop a "good faith" or "sufficient" basis to believe infringement before submitting a notice. See Dudnikov v. MGA Entm't, Inc., 410 F. Supp. 2d 1010, 1013 (D. Colo. 2005) (holding, in the context of a Section 512(f) claim, that the defendant "was required to show that it had a sufficient basis to form the required good faith belief that the plaintiffs' auction infringed on its rights, and that its actions therefore complied with the notice and takedown requirements under the DMCA); but see Augusto, 558 F. Supp. 2d at 1065 ("Congress included an expressly limited cause of action for improper infringement notifications, imposing liability only if a copyright owner's notification is a knowing misrepresentation." (quotation and citations omitted)).[30] One court, in a series of four decisions, went so far as to hold that prior to submitting a takedown notice, the copyright holder must consider not only whether the material actually belongs to it, but whether the use of the material lacks an obviously lawful purpose like fair use. See Lenz v. Universal Music Corp., 572 F. Supp. 2d 1150 (N.D. Cal. 2008) ("Lenz I") (denying motion to dismiss); Lenz v. Universal Music Corp., No. C07-3783 JF(RS), 2008 WL 4790669 (N.D. Cal. Oct. 28, 2008) ("Lenz II") (denying motion for interlocutory appeal); Lenz v. Universal Music Corp., No. C07-3783 JF, 2010 WL 702466 (N.D. Cal.

---

[30] Rossi itself noted the fact that the defendant in that case had not actually downloaded the files, but went on to describe other compelling facts that led the defendant to believe that infringement of its works was occurring.

95

Feb. 25, 2010) ("*Lenz III*") (granting plaintiff's motion for partial summary judgment on affirmative defenses); *Lenz v. Universal Music Corp.*, No. 5:07-cv-03783-JF, 2013 WL 271673 (N.D. Cal. Jan. 24, 2013) ("*Lenz IV*") (denying motions for summary judgment).[31]

Thus, if Warner had some similar type of duty, it might find itself vulnerable to suit because its pre-notice review was minimal and swift, consisting of mechanically reviewing the titles and superficial attributes of files. Moreover, even if its methodology were reliable, Warner was concerned with determining whether it *owned* the works rather than whether the use of the works *infringed* on its copyrights to support a proper 512(c) claim. *See Sony/Betamax*, 464 U.S. at 433 ("[A]nyone . . . who makes a fair use of the work is not an infringer of the copyright with respect to such use."); *Amaretto*

---

[31] In that case, Stephanie Lenz, a user of the Internet video hosting site YouTube, uploaded a video of her family dancing to a song performed by the music artist Prince, which turned out to be wildly popular among viewers. *Lenz I*, 572 F. Supp. 2d at 1152. The owner of the song, Universal Music Corporation, sent a takedown notice to the service provider, which notified Ms. Lenz that her video had been removed because of a claim of copyright infringement. *Id.* Discovery revealed that Universal had an employee who was tasked with using YouTube's system to search for titles owned or administered by Universal. *Lenz IV*, 2013 WL 271673, at *1. He stated that he issued a takedown notice whenever he could recognize a one second or longer portion of a Prince song in any video, as occurred in the video at issue. *Id.* at *5. His boss stated that Universal seeks to remove songs "when a writer is upset or requests that particular videos be removed from YouTube," prompting Universal to conduct a review. *Id.*

The court concluded that summary judgment in favor of either party was improper. Ms. Lenz could show that Universal's procedures might have willfully blinded it to knowledge of her fair use, but not that Universal subjectively believed that there was a high probability that the video was lawful or that the nature of fair use was self-evident. *Id.* at *6-7 (citing *Viacom*, 676 F.3d at 34). Likewise, Universal could not demonstrate the absence of subjective intent. *Id.* at *8.

*Ranch Breedables, LLC v. Ozimals, Inc.*, 790 F. Supp. 2d 1024, 1029 (N.D. Cal. 2011) (noting that a Section 512(f) plaintiff can contest the validity of a takedown notification even where a valid copyright exists). And, Warner's reliance on technology to accomplish the task might prevent it from forming any belief at all, as the *amicus curiae* argues here and a similar group asserted in *Rossi*: "computers conducting automated searches cannot form a belief consistent with the language of the DMCA, because they cannot distinguish between infringing content and content that merely contains words that suggest infringement." *Rossi*, 391 F.3d at 1005 n.7. The Court, however, is unaware of any decision to date that actually addressed the need for human review, and the statute does not specify how belief of infringement may be formed or what knowledge may be chargeable to the notifying entity.

Ultimately, while these are engaging questions surrounding Warner's knowledge; its responsibility to investigate; whether it had a good faith belief in infringement in each instance; and whose burden it is to show or refute what – all issues of first impression in this Circuit – there is sufficient evidence in the record to suggest that Warner intentionally targeted files it knew it had no right to remove. This precludes summary judgment in its favor. Specifically, Hotfile has provided the example of JDownloader, which Warner did not manage and acknowledged removing for reasons unrelated to copyright infringement. It has also shown Warner's interest in an application of its takedown rights beyond works that it owns. And Warner has not otherwise argued that it had the right to remove those files, only that its mistakes should be excused. The Court finds this motive and other evidence sufficient to sustain an inference that Warner violated Section 512(f), such that these issues should be presented to the jury.

97